No. 24-6697

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

COURTHOUSE NEWS SERVICE,

*Plaintiff-Appellee*,

v.

SARA OMUNDSON,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the District of Idaho,

Case No. 1:21-CV-00305-DCN, the Honorable David C. Nye, Presiding

---

**EXCERPTS OF RECORD, VOL. 1**

---

Keely E. Duke
Molly E. Mitchell
Duke Evett, PLLC
1087 West River Street, Suite 300,
Boise, ID 83702
Telephone (208) 342-3310
Email: ked@dukeevett.com; mem@dukeevett.com

*Attorneys for Appellant Sara Omundson*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | Case No. 1:21-cv-00305-DCN |
| Plaintiff, | **JUDGMENT** |
| v. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

In accordance with the Court's Memorandum Decision and Order entered concurrently herewith,

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be entered in favor of Plaintiff, Courthouse News Service, and this case CLOSED.

DATED: September 30, 2024

David C. Nye
Chief U.S. District Court Judge

JUDGMENT - 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | Case No. 1:21-cv-00305-DCN |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

## I. INTRODUCTION

Before the Court are the parties' cross-motions for summary judgment. Dkts. 60, 61. Defendant Sara Omundson also filed a Motion to Seal (Dkt. 58), and, as part of the briefing on that motion, Plaintiff Courthouse News Service ("CNS") filed a Motion for Leave to File Sur-Reply (Dkt. 77).

The Court held oral argument on July 10, 2023, and took the matters under advisement. Upon review, and for the reasons outlined below, the Court GRANTS the Motion for Leave to File Sur-Reply (Dkt. 77), GRANTS in PART and DENIES in PART the Motion to Seal (Dkt. 58), DENIES Omundson's Motion for Summary Judgment (Dkt. 60) and GRANTS CNS's Motion for Summary Judgment (Dkt. 61.)

MEMORANDUM DECISION AND ORDER - 1

## II. OVERVIEW

While this is a difficult case, the issues boil down to two basic questions. First, under the First Amendment, at what point in time can CNS expect access to newly-filed civil complaints in Idaho state court? And second, does the review process Omundson currently uses inhibit CNS's right of access?

The Court has researched the issues involved in this case extensively. Notably, CNS has pursued—and is currently pursuing—claims like those at issue here throughout the United States. And generally speaking, CNS has found success in its pursuit.

Many district courts have ruled in CNS's favor. *See, e.g., Courthouse News Serv. v. Forman*,[1] 606 F. Supp. 3d 1200 (N.D. Fla. 2022), (ruling in CNS's favor because defendant's "filing system frustrates the press and public's right to monitor their local judiciary" and infringes CNS's First Amendment rights) *appeal dismissed sub nom. Courthouse News Serv. v. Broward Cnty. Clerk*, 2022 WL 9643634 (11th Cir. Sept. 6, 2022); *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *18 (D. Vt. Nov. 19, 2021) (enjoining the state of Vermont from "delaying public access to electronically filed civil complaints until the [] Courts' pre-access review process is complete"); *Courthouse News Serv. v. Jackson*, 2009 WL 2163609, at *5 (S.D. Tex. July 20, 2009) (granting CNS's motion for injunctive relief).

Some of those cases have been affirmed on appeal. *See, e.g., Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021) (affirming the district court's finding that

---

[1] Because the case names of these suits are similar—e.g., Courthouse News v. [Defendant]—and to avoid confusion, the Court will typically use the full citations even when a "short cite" would be permissible.

MEMORANDUM DECISION AND ORDER - 2

CNS's First Amendment rights had been violated when the defendants did not make newly-filed complaints available "contemporaneously"—defined loosely as the same day as filing). But others have not. *See, e.g., Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1273 (10th Cir. 2022) (holding the district court erred in granting CNS's motion for preliminary injunction and imposing a bright-line, five-business-hour rule for when complaints needed to be made public).

Some courts have ruled in CNS's favor, but on more limited grounds. *See, e.g., Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (finding some procedures unconstitutional and others constitutional).

Still other courts have decided the question is fact driven and must proceed to trial. *Courthouse News Serv. v. Cozine*, 2023 WL 6891322, at *6 (D. Or. Oct. 19, 2023) ("Because the Court finds that Defendant has shown genuine issues of fact for both parts of the *Planet III* balancing test, summary judgment in Plaintiff's favor is not appropriate. Plaintiff's First Amendment claim will proceed to trial.").[2]

Finally, some courts have stayed similar CNS cases in the hopes of settlement. *Courthouse News Serv. v. Harris*, No. CV ELH-22-0548, Dkt. 109 (D. Md. May 21, 2024) (granting joint motion to stay so parties could pursue settlement negotiations).

The varying outcomes of these cases is not surprising considering that each turns on the specific state statutes, filing rules, and court procedures at issue and whether each is constitutionally sufficient under the First Amendment. Nevertheless, the underlying

---

[2] The day before trial was set to begin on September 12, 2024, the parties settled. *Courthouse News Serv. v. Cozine*, Case No. 3:21-cv-00680-SI, Dkt. 158.

analysis in each of those decisions relates to principles at play in this case and has caused the Court great consternation. There is a difficult balance here. On the one hand, nobody disputes (not even Omundson) that CNS should have access—and quick access at that—to newly filed civil lawsuits for news reporting purposes. On the other hand, everyone agrees (even CNS) that some type of review is necessary for organizational and clerical purposes. Ultimately then, the problem is timing. When does CNS's right to this information attach? And when does Omundson get to undertake her review?

CNS has a right under the First Amendment to access the information it seeks. It candidly recognizes this right is not "immediate." But it also counters the right cannot be "delayed" either. Omundson's process includes some "delay"—at least by common parlance. Thus, the Court must resolve whether the delays stemming from Omundson's review process infringe CNS's constitutional rights. Under the circumstances, the Court finds Omundson's process does infringe CNS's rights. Accordingly, summary judgment is entered in favor of CNS and against Omundson.

### III. BACKGROUND

#### A. Factual Background

CNS is a nationwide news service founded more than thirty years ago to provide coverage of civil lawsuits. It offers a variety of publications to thousands of subscribers across the United States. The publication covering Idaho courts is *The Big Sky Report*, written by Boise-based reporter Cathy Valenti. *The Big Sky Report* includes news about civil complaints filed in Idaho, Montana, and Wyoming, with its primary focus on actions involving businesses and public entities.

MEMORANDUM DECISION AND ORDER - 4

Omundson is the Administrative Director of Idaho Courts and, in her official capacity, is responsible for the administration of Idaho's e-filing and public access system—Odyssey or "iCourts"—that is used statewide by courthouses in each of Idaho's 44 counties.

As noted, the crux of this lawsuit centers on the timeliness of CNS's access to newly filed civil complaints in Idaho state court. As it currently stands, when a civil complaint is filed in Idaho, there is a short review county clerks undertake before the case is accessible to the public. This review includes checking for the following: (1) the required case information sheet has been submitted; (2) a certification of service was completed and is included; (3) the caption contains party names; (4) filing fees are paid and paid in the correct amount; (5) the document includes required signatures; and (6) the proper Magistrate division of the District Court has been selected (if applicable). *See* Dkt. 20-14, at 3.

The parties agree the aforementioned process takes roughly five minutes. The bigger problem is the time it takes staff to get to the review process in the first place.

CNS argues Omundson and her staff take too long, and the resulting delay infringes on its First Amendment right of access. Omundson asserts any delay is minimal and does not infringe any Constitutional rights.

### B. Procedural Background

At the outset of this litigation, Omundson filed a Motion to Dismiss. Dkt. 7. Therein, Omundson argued that CNS had not stated a claim upon which relief could be granted and, alternatively, that the Court should decline to exercise jurisdiction over this case based

MEMORANDUM DECISION AND ORDER - 5

upon principles of abstention. CNS opposed Omundson's Motion to Dismiss and filed a Motion for Preliminary Injunction alleging the Court should enjoin Omundson from continuing to delay its access to newly filed civil complaints. Dkt. 14.

Ultimately, the Court denied both motions. Dkt. 40; *Courthouse News Serv. v. Omundson*, 598 F. Supp. 4d 929 (D. Idaho 2022). The Court summarized its decision as follows:

> Omundson's Motion to Dismiss is DENIED. She is incorrect in her assertion that *Planet III* forecloses this case outright. Additionally, the Court joins other district courts—in conformity with the Ninth Circuit's holding—and finds abstention is inapplicable here. For these reasons, dismissal in inappropriate.
>
> The Court cannot, however, grant CNS's Motion for a Preliminary Injunction at this time either. The outcome of *Press Enterprise II*'s critical second question—regarding the constitutionality of any delay—cannot be determined at this early stage, even preliminarily. The Court has provided some initial rulings and guidance, but discovery is necessary to bring this fully before the Court for resolution. What's more, the remaining *Winter* factors are roughly even. Ultimately, the Court finds a preliminary injunction is not warranted.

*Id.* at 946. As alluded to, a two-prong test is at issue in this case. The Court previously found that CNS had meet the first prong of the test, but that discovery was necessary to flesh out the issues relative to the second prong. Discovery has come to an end, the parties have filed cross-motions for summary judgment on the remaining issue, and the Court held oral argument on the same.[3] The matter is ripe for adjudication.

---

[3] As part of her Motion for Summary Judgment, Omundson asks the Court to revisit its ruling on the first issue arguing information obtained during discovery shows the Court's analysis is incorrect. This aside, the primary focus of the parties' discovery and briefing relates to the second prong of the test.

MEMORANDUM DECISION AND ORDER - 6

## IV. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (cleaned up). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Zetwick*, 850 F.3d at 441. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (cleaned up). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment does not generally

MEMORANDUM DECISION AND ORDER - 7

change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.*, 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## V. DISCUSSION

Before diving into the substance of the Parties' competing Motions for Summary Judgment, the Court must address some procedural issues.

### A. Motion to Seal and Motion to File Sur-Reply (Dkts. 58, 77)

On December 15, 2022, the parties filed their Motions for Summary Judgment. Dkts. 60, 61. In conjunction with her Motion for Summary Judgment, Omundson filed a Motion to Seal. Dkt. 58. Therein, she asked the Court to allow her to file certain documents in support of her Motion for Summary Judgment under seal. *Id*. Those documents include the Declaration of Terry Derrick,[4] the Declaration of Sara Omundson, the Declaration of Jennifer Dvorak, Volume I of the transcript of the deposition of Terry Derrick (Exhibit G to the Declaration of Keely Duke), and Volume II of the deposition of Terry Derrick (Exhibit F to the Declaration of Keely Duke).

In response to Omundson's Motion to Seal, CNS argued Omundson had not met her burden establishing why the documents needed to be filed under seal but averred it would work with her to resolve the issues to avoid further motion practice. Dkt. 68.

In reply to her own motion, Omundson affirmed the parties were able to reach

---

[4] Terry Derrick is Tyler Technologies' 30(b)(6) deponent. Tyler Technologies developed the Odyssey software suite Idaho utilizes for case filing.

agreement on two of the documents—the Declaration of Dvorak and the Declaration of
Omundson—and that, as a result, she would file redacted versions of those documents for
the public record. Dkt. 73. She then noted the parties remained at odds on whether the items
related to Derrick should be sealed. *Id*.

CNS then filed a Motion for Leave to File Sur-reply to clarify Omundson's
representations about the parties' negotiations. Dkt. 77. It explained that, despite the
parties' agreement, Omundson never filed redacted versions of the two documents as
promised. *Id*. It also maintained anything related to Derrick need not be filed under seal.

Omundson opposed CNS's request to file a sur-reply, contending there is no such
mechanism in federal court. Dkt. 81.[5] She further stated that the redacted documents *were*
filed under seal as Dkts. 75-12 and 75-13. *Id*. The parties later clarified at oral argument
that the documents in question are actually filed at Dkts. 78-1 and 78-2. Regardless, the
parties agree the redacted versions are now in the public record and there is no evidentiary
dispute as to the Declaration of Dvorak and the Declaration of Omundson. The sealed and
redacted copies in the record as to those documents shall stand.

The bigger issue is what to do with the documents related to Terry Derrick—third-
-party Tyler Technologies' 30(b)(6) deponent. CNS argues Omundson has not met her

---

[5] Omundson is generally correct. However, the Court has allowed sur-replies in the past. As the Court has
explained, "[w]hile the Federal Rules of Civil Procedure do not expressly permit the filing of a sur-reply,
this Court has recognized that a reply brief may justify a sur-reply in appropriate circumstances." *Ocampo
v. Corizon*, LLC, 2019 WL 1495251, at *3 (D. Idaho Apr. 4, 2019). Leave to file a sur-reply is discretionary
but should be granted "where a valid reason for such additional briefing exists," such as when the movant
raises new arguments in its reply brief. *Hill v. England*, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005).
Here, it does appear CNS was responding to arguments first raised in Omundson's reply. While those
arguments were more procedural (about the parties' communications) as opposed to substantive, the Court
will accept the sur-reply and give it the weight it deems appropriate in sorting out this matter.

MEMORANDUM DECISION AND ORDER - 9

burden of establishing exactly why these documents should be filed under seal. Omundson explains her argument is short because the argument is simple. According to Omundson, Tyler Technologies had expressed *its* understanding that Derrick's testimony and declaration were subject to the protective order in this case because both documents include confidential and proprietary information. As a result, *Tyler Technologies' counsel* asked that the documents be filed under seal as part of the summary judgment proceedings. Omundson explained at oral argument that she was simply trying to honor Tyler Technologies' concerns.

Notably, Tyler Technologies did not designate any portions of Derrick's deposition testimony as confidential. Additionally, an *unredacted* version of Derrick's testimony is already in the record. *See* Dkt. 67-1, at 62–122. Thus, while the Court appreciates that some of the information is confidential and/or related to Tyler Technologies' business practices, the fact that it did not actually designate anything specific as confidential and/or move to redact or seal the deposition already publicly available in the record renders the issue essentially moot. Accordingly, Dkts. 59-2, 59-5, and 59-6 shall be unsealed.

A final procedural matter: as part of summary judgment, and pursuant to local rule, Omundson filed a 27-page Statement of Undisputed Facts. Dkt. 60-1.[6] CNS filed a 23-page response to Omundson's Statement of Undisputed Facts. Dkt. 76. As part of its Response to Omundson's Motion for Summary Judgment, CNS also filed a 58-page "Appendix" outlining its "objections to evidence submitted by [Omundson] in support of her motion

---

[6] CNS filed a 17-page statement of undisputed facts in conjunction with its Motion for Summary Judgment. Dkt. 61-2.

MEMORANDUM DECISION AND ORDER - 10

for summary judgment." Dkt. 74-3. Omundson then filed a 7-page response to CNS's Appendix. Dkt, 79-1.

Local Rule 7.1(c)(2) outlines that ". . . the responding party must also file a separate statement, not to exceed ten (10) pages, of all material facts which the responding party contends are in dispute." Because CNS's response to Omundson's Statement of Undisputed Facts exceeds the local rule's limit by 13 pages, Omundson asked the Court to either strike the document or require CNS to refile a shorter document in conformity with local rule. If the latter, Omundson asked for leave to file a short sur-reply. Furthermore, while acknowledging that CNS can file whatever it likes (such as an appendix of objections), Omundson argues this extra document is really a ruse to get around the 10-page limit on statements of disputed facts (even though CNS already exceeded it by 13 pages) and that the appendix should be stricken as well.[7]

The Court discussed this matter with counsel at the hearing. As it indicated at that time, the Court will allow all documents to stand. It appears there was some confusion regarding a stipulation between the parties and how it applied to page lengths. There were also some procedural anomalies as to how these documents came before the Court. Regardless, the important thing is all arguments are squarely before the Court for adjudication.

Finally, CNS's appendix of objections and Omundson's request to strike the same requires more attention and analysis.

---

[7] This argument notwithstanding, as noted, Omundson also filed a formal response to CNS's appendix. Dkt. 79-1.

MEMORANDUM DECISION AND ORDER - 11

The commentary in Rule 56 of the Federal Rules of Civil Procedure makes clear that, while a party can object to "material cited to support or dispute a fact," because it "cannot be presented in a form that would be admissible,", there is "no need to make a separate motion to strike." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment. Instead, the party should file an objection and then "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id*.

Despite this direction, the Court constantly reviews motions to strike where the parties strive to do just that: strike material offered in support of, or against, summary judgment. Thus, because motions to strike are disfavored, the Court has outlined that any objections should be raised as part of briefing itself or in a separate appendix. *See* https://id.uscourts.gov/district/judges/nye/Motion_Practice.cfm. Candidly, this is the first time a party has utilized the Court's "appendix" suggestion. And the Court is not implying CNS's appendix was improperly filed; it is simply long. At 58 pages—and containing 45 separate objections—it is actually longer than most of the underlying briefs. Additionally, CNS has included arguments in its appendix. Again, there is nothing inherently wrong with doing so, as the Court would expect CNS to explain its objection(s). But the Court's point is that the purpose of the appendix—to avoid prolonging the case as often occurs when motions to strike are filed—did not really occur here because Omundson responded (as she would have if a motion to strike had been filed) and it took the court substantial time to review the materials (again as it would have with a motion to strike). So, while CNS's methodology here was procedurally proper, it did not save the Court or counsel time as

MEMORANDUM DECISION AND ORDER - 12

compared to a Motion to Strike.

That said, many of the objections boil down to a repeating single objection, but associated with different people.[8] Thus, for organizational purposes, the Court will group similar objections together while also addressing others individually.

CNS's first objection relates to Omundson's statements regarding certain functionalities of the Odyssey filing system. Dkt. 59-7, at 8–9. CNS alleges Omundson is not an expert on that system and that her opinion lacks foundation. Dkt. 74-3, at 1–3. In response, Omundson agrees she is not an expert, but contends she is not providing an expert opinion, but rather her own observations of how the system operates. The Court agrees that Omundson's personal observations and opinions are not expert opinions. To be sure, Omundson oversees Idaho's e-filing system, but just because she shares her personal knowledge and opinion on a matter does not render those opinions "expert" opinions. *See Richbourg v. Jimerson*, 2013 WL 3336167 (D. Ariz. 2013) (rejecting argument that affidavit testimony from employees was improper expert testimony under Rule 702). The Court will not strike this testimony.

CNS's second objection relates to Omundson's opinion that public confidence could "erode" if a Press Review Queue[9] is utilized. Dkt. 59-7, at 9. Multiple other individuals expressed this same sentiment—*see, e.g.,* Dkts. 60-26, at 5; 60-28, at 12; 60-

---

[8] By way of explanation, Omundson filed almost twenty declarations from Idaho state judges and court staff in support of her Motion for Summary Judgment. While the documents are not identical, they are very similar in nature and contain similar wording. Thus, the statements that CNS objected to are, more or less, uniform amongst all the declarants.

[9] A "press review queue," is a feature Tyler Technologies offers which allows the press to view submitted documents *prior* to administrative or clerical review.

30, at 5—and it serves as the basis for objections 2, 8, 9, 13, 17, 20, 32, 37, and 45 in CNS's appendix. CNS alleges this statement is speculative and lacks foundation. While it is speculative whether the public's confidence could erode if certain things happen within the Odyssey system, these individuals are just expressing their opinion that this erosion would occur. As a result, this is a question of weight, not admissibility, and is better dealt with at trial. *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) (explaining that challenges to lay witness testimony and opinion go to the weight of the evidence and are "an issue for trial, not summary judgment."). Moreover, while this testimony does not specifically go to the heart of the matters at hand, even if it did, such would still likely be allowed. *See U.S. v. Christensen*, 2016 WL 1158893, at *2 (D. Ariz. Mar. 24, 2016) (noting that "lay opinion testimony is not inadmissible solely because it addresses the ultimate issue in the case"). Regardless, the Court will not strike these statements.

CNS's third and fourth objections concern two news articles Omundson submitted in support of her Motion for Summary Judgment. Dkts. 60-11, 60-12. These news articles detail a data breach in the Odyssey system that occurred in California and resulted in the inadvertent publication of confidential material. CNS claims these documents are hearsay and lack authentication. Dkt. 74-3, at 3–6. To begin, news articles such as those at issue are self-authenticating. *See Jarritos, Inc. v. Reyes*, 345 F. App'x 215, 218 (9th Cir. 2009) (explaining that "printed materials purporting to be newspapers or periodicals" are self-authenticating and holding it was erroneous for trial court to exclude magazine article for lack of authentication and foundation). Second, these documents are not hearsay. They are not being cited for the proposition that a data breach occurred, but simply to illustrate that

MEMORANDUM DECISION AND ORDER - 14

the Odyssey system has potential flaws. The Court will not strike this testimony.

The next group of objections relates to multiple declarants' statements that "judicial action would be required to address improperly submitted documents . . . ." *See, e.g.,* Dkt. 60-26, at 3; Dkt. 60-31, at 23, Dkt. 60-34, at 2. CNS contends—in objections 5, 10, 11, 14, 15, 18, 19, 21, 22, 25, 28, 29, 30, 35, 36, 38, 40, 41, 43, and 44—that these statements are "unsupported opinions" and should not be considered. As with the Court's above observations about opinion statements, at this stage of the case, the Court will allow these opinion statements to stand. Each statement is simply the declarant's opinion based upon his or her experience with the state of Idaho's judicial system. Rule 701(a)'s personal knowledge requirement is met here because these individuals necessarily drew on his or her own understanding and experience with the state of Idaho's judicial system and how Odyssey is utilized. *See United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014). Thus, there is requisite knowledge—but not impermissible expert knowledge—and support behind these statements and the Court will allow them to stand.

The final group of objections is similar to the above and relates to statements that certain Odyssey features would "increase the workload" of judges and staff in Idaho's courthouses. *See, e.g.,* Dkt. 60-31, at 3; Dkt. 60-32, at 3; Dkt. 60-34, at 2. CNS again objects—in objections 6, 7, 12, 16, 23, 26, 27, 31, 33, 34, 39, and 42—on the basis that such opinions are speculative. To repeat, like all the opinion statements CNS to which objects, the objection is noted, but overruled because the issue is one of weight and not admissibility.

In sum, Omundson's Motion to Seal is GRANTED in PART and DENIED in

MEMORANDUM DECISION AND ORDER - 15

PART, as outlined above. The documents already under seal (with redacted versions) shall remain under seal *except* Dkts. 59-2, 59-5, and 59-6 shall be unsealed. CNS's Motion for leave to File Sur-Reply is GRANTED. The objections in CNS's appendix are OVERRULED as outlined above.

### B. Motions for Summary Judgment (Dkts. 60, 61)

As previously discussed at length in the Court's prior decision, the heart of this case takes its lead from a line of cases out of California and the Ninth Circuit referred to as the "*Planet* trilogy." *See Omundson*, 598 F. Supp. 3d at 935–38. The Court will not recount that story, and lengthy legal history, here. Nevertheless, the Ninth Circuit's decision in *Courthouse News Service v. Planet* ("*Planet III*") provides the applicable standard for evaluating whether a court's administrative procedures violate the media's "right of timely access to newly filed nonconfidential complaints." 947 F.3d 581, 585 (9th Cir. 2020).

Based on the leading Supreme Court authority on court record access, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), the Ninth Circuit in *Planet III* established a two-step framework for evaluating claims such as those brought by CNS in this case.

Under the first step, a reviewing court must determine whether "the qualified First Amendment right of access" exists as to the judicial records in question and "relatedly, at what point in time that right attaches." *Planet III,* 947 F.3d at 590. In making this determination, a court considers various factors including, "(1) whether that proceeding or record 'ha[s] historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular [governmental]

process in question.'" *Id.* (quoting *Press-Enterprise II,* 478 U.S. at 8). If both factors are evident, a qualified First Amendment right of access attaches to the implicated judicial records.

Under the second prong, the reviewing court then considers whether any restrictions on that right are "essential to preserve higher values" and "narrowly tailored to serve those interests." *Id.* at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13–14).

The Court will address each factor in turn.

*A. Judicial Records*

As noted, the Court already determined the first question from *Press-Enterprise II*. Or so it thought.

In its decision on the parties' prior motions, the Court noted that, "like the parties in *Planet III*, the parties in this case do not dispute the materials in question have historically been available to the public in Idaho and both agree that public access to these types of documents is important." *See Omundson*, 598 F. Supp. 3d at 937–38. The Court went on to note the main dispute, therefore, was "*when* this right attaches and whether any delays in 'processing' are acceptable." *Id.* at 938 (emphasis added).

Omundson now asks the Court to reconsider its prior position on this first question. Simply put, Omundson now claims the public *has not* had historic access to the documents CNS is trying to access. Or at least, it has not had access within the timeframe everyone originally thought.

This, unfortunately, throws the Court back into the murky waters of when a document is "filed" in Idaho state court.

MEMORANDUM DECISION AND ORDER - 17

From the outset of this case, Omundson has taken the position that, because there are administrative rules discussing when a civil complaint is "accepted," the First Amendment right of access does not attach in Idaho until after a county clerk "processes" and "accepts" a civil complaint for filing. For its part, CNS has followed the language of *Planet III*'s holding "the right to timely access attaches at the moment of filing, i.e., when the complaint is received by the court." 947 F.3d at 588. "[W]e conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court . . . ." *Id.* at 594.[10]

The Court previously waded into this issue and, after analyzing various state court filing rules, determined that: "'filed' is best understood to mean when the complaint is submitted to the respective e-filing system, *not* to mean once the documents are reviewed/accepted/processed by a clerk." *Omundson*, 598 F. Supp. 3d at 944.

Omundson contends that the Court's reasoning is flawed because discovery revealed that reporters *historically* did not have access to complaints the minute they were filed—as originally claimed by CNS. Rather, reporters only had access once the civil complaints had been "accepted" by the clerk, file-stamped, and entered into the computer system. Omundson claims that until this process is complete, the documents are not judicial

---

[10] The underlying facts surrounding this argument come from CNS's complaint where it states reporters previously (before e-filing) would go to courthouses in Idaho and could view newly-filed cases in a "media box, bucket, or cart" and that they could access these documents "regardless of whether the complaints had been docketed [] or processed . . . ." Dkt. 1, at 11. In discovery, however, it became clear that the documents in the "box, bucket, or cart" had been file-stamped—meaning the "basic, ministerial review had been done" even though the case hadn't been placed into the "physical file yet." Dkt. 85, at 16. Omundson claims the language from CNS's complaint is, therefore, false, and that this clarification from discovery and testimony bolsters its argument that the access CNS has now is the same as it has always had—that of complaints *after* an administrative review has taken place.

documents, and nobody has any type of First Amendment right to them.

CNS counters that Omundson's view is not only contradictory to the Court's prior ruling, but it contradicts other Court rulings as well. For example, since the Court's prior ruling in this case, the Tenth Circuit has had an opportunity to address this issue. It too found that "the First Amendment right of access attaches to complaints when the court *receives* them, regardless of the technical terms and clerical processes used by the court." *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1262 (10th Cir. 2022).

Never dissuaded, Omundson counters that county clerks in Idaho are not officially "receiving" anything until they have reviewed and processed the filings and so their processes still conform with the "receiving" language of the Tenth Circuit.

The Court sees Omundson's point. This is a difficult question. But, respectfully, Omundson has a retort for everything. Omundson initially took the position that lawsuits are not "filed" until court staff reviews and "processes" the documents. But in its prior decision, the Court found "filed" means "submitted." Omundson's response then turned slightly and focused on the idea that documents are not "submitted" until they are "accepted" by court staff. And then when faced with the Tenth Circuit's analysis that "receipt" is essentially acceptance, Omundson pivoted again, now asserting documents are not really "received" until they are "processed" or "reviewed."

The Court does not fault Omundson for seeking to relitigate this issue. First, as the Court already noted, this question turns on "unclear language," and different—sometimes incongruent—uses of the word "filed" in various Idaho court rules. *Omundson*, 598 F.

MEMORANDUM DECISION AND ORDER - 19

Supp. 3d at 944. Second, if Omundson prevails on this prong, then CNS's case crumbles. Said another way, if the Court were to agree that the First Amendment right of access does not attach until lawsuits are filed, and "filed" does not occur until after all the processing and review steps have happened (per Omundson's definition), then access is basically instantaneous when cases are filed, there is no delay, and CNS has no complaint.

The Court, however, cannot accept Omundson's position (and will not revise its prior finding) for the following reasons.

First, Omundson's argument creatively puts any delay in the process *before* filing. Said differently, if filing isn't defined until the very end of the process, then a case could be uploaded to the Odyssey system and sit for an undetermined period of time while various processes and procedures are completed before it is actually "filed," and any right of access has actually been created. This stands in contrast to the spirit of the First Amendment's right to access.

Second, and more importantly, Omundson's interpretation is contradictory to Idaho's Rules for Electronic Filing and Service ("IFERS"). As the Court previously analyzed at length, Rule 12 mandates that the current date and time when a document is *submitted* is affixed and will serve as the date and time for statute of limitations purposes *even if additional processing is necessary. See* IFERS (12)(1). Thus, it appears clear that the filing or submission occurs at the outset (i.e. the moment the sender hits send and the document lands in Odyssey). Now, as the Court also already lamented, the next section of IFERS goes on to explain that if the document is then "accepted for filing"—seeming to indicate filing is *not* complete upon submission—the prior date and time will stand. *Id*. But

MEMORANDUM DECISION AND ORDER - 20

IFERS goes on to explain that when corrections are needed, a filer has "3 business days" from the date it received notice of the error in which to correct the mistake. IFERS 13(b). And, as part of any corrective filing, that party may "request . . . that the date of *filing* of the resubmitted document relate back to the date of *submission* of the original document to meet *filing* requirements." IFERS 13(c) (emphasis added). Again, the overlapping usage of terms such as "submit," and "file" leave much to be desired.

The Court appreciates the gravity of the situation. But it does not think mental gymnastics or creative arguments about semantics are necessary. The "traditional" definition of "filed" suffices. As the Tenth Circuit noted, no Court has yet to hold that "the right of access attaches at the point of acceptance" as opposed to the point of "submission." *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1266 (10th Cir. 2022).[11]

In sum, the Court will not revisit its prior ruling. "'[F]iled' is best understood to mean when the complaint is submitted to the respective e-filing system, *not* to mean once the documents are reviewed/accepted/processed by a clerk. *Omundson*, 598 F. Supp. at 944.

That said, the Court must briefly touch on the "experience and logic" test set forth by *Press-Enterprise II* for determining whether CNS has a historical right to these types of materials in general. *See* 478 U.S. at 9.

---

[11] The Tenth Circuit also noted that an unwieldy focus on terminology could lead to court administrators "adopting administrative rules that define a document as 'filed' much later in the judicial review process . . ." in an attempt to circumventing the media's First Amendment right of access. *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1267 (10th Cir. 2022) (cleaned up).

MEMORANDUM DECISION AND ORDER - 21

Omundson argues that the "historical" question hinges on the *timing* of CNS's historical access. The Court disagrees because doing so focuses on a singular aspect of access—timing. The relevant inquiry is broader and looks to the whole "place and process" of the access and whether such materials were "historically [] open to the press and general public." *Id*. at 8. Thus, while timing plays a role in the overall question, the primary issue is whether this type of information was historically accessible to the press and public in the first place and whether that access served an important governmental function. The answers to both questions are undoubtedly yes.

There has always been a right to access newly filed civil and criminal complaints. Indeed, every circuit to consider the issue has uniformly concluded that the right applies to both civil and criminal proceedings. *See Dhiab v. Trump*, 852 F.3d 1087, 1099 (D.C. Cir. 2017) (Rogers, J., concurring in part and concurring in the judgment) (collecting cases). Nor can Omundson argue public access is unimportant. Afterall, press coverage of judicial proceedings is a "cornerstone[ ] of American democracy." Rachel Luberda, *The Fourth Branch of the Government: Evaluating the Media's Role in Overseeing the Independent Judiciary*, 22 Notre Dame J. L. Ethics & Pub. Pol'y 507, 513 (2008).

As many courts have explained, complaints "instantaneously invoke[] a court's jurisdiction," trigger legal obligations, and impact parties' "substantive legal rights and duties." *Schaefer*, 2 F.4th at 328. "The press and public thus have an important interest in reasonably contemporaneous access to civil complaints." *Id.*; *cf. Planet III*, 947 F.3d at 592 ("Public access to civil complaints before judicial action . . . buttresses the institutional integrity of the judiciary."). Because public access upon filing facilitates public scrutiny of

MEMORANDUM DECISION AND ORDER - 22

the court system, it plays a significant positive role in the function of civil court proceedings and governance.

Omundson's efforts to obscure this rather simple truth through definitional disagreements and a myopic focus on timing is ineffective. *See NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."). CNS had access to civil lawsuits in the past and that access served an important function.

Thus, in answering the question of whether CNS has had "historical" access to these documents, the Court finds that it has. Now, depending on how one views the definition of certain words, could CNS's previous access look different—from a timing standpoint—than its current access under Odyssey? Maybe. Similarly, if Omundson were to use different variations of the Odyssey software suite or another service provider (or no provider altogether) could that affect this definition? Potentially. But such esoteric questions miss the mark. The Court's finding today is that "filed" is defined as the moment a complaint is sent or uploaded to the Court's system. And for today's purposes, the Court finds that CNS has had that type of historical access sufficient to meet the first prong of the *Press-Enterprise II* test.

### B. Restrictions

Consistent with its conclusion above regarding history and the definition of "filing," the Court finds CNS has a right to access newly-filed civil complaints the moment they are uploaded to the Odyssey system. CNS does not currently have that access based on Omundson's restrictions. Thus, the Court turns to the second step of the *Press-Enterprise*

MEMORANDUM DECISION AND ORDER - 23

*II* framework: whether any restriction on CNS's right of access are "essential to preserve higher values" and "narrowly tailored to serve that interest." 478 U.S. at 13–14. The parties previously placed these arguments before the Court as part of their Motion to Dismiss / Motion for Preliminary Injunction briefs. The Court determined, however, that it could not rule on that question at that time since the inquiry is very "fact driven" and not "appropriate at the motion to dismiss stage." *Omundson*, 598 F. Supp. 3d at 938. The Court and Counsel now have the benefit of extensive discovery and can proceed with resolving this critical second question.

As part of its prior order, the Court noted that it "would like more briefing from both parties on the level of scrutiny to apply as part of its second-prong inquiry and whether Idaho's procedures constitute time, place, and manner restrictions." *Omundson*, 598 F. Supp. 3d at 939. In its briefing on summary judgment, CNS says the Court's question is "a bit of a red herring." Dkt. 61-1 at 16 n.3. It goes on to argue that *Planet III* clarified the strict scrutiny standard was not relevant because the "time, place, manner" analysis applicable to speech in public forums is not applicable in these types of press-access cases. *Id.* (citing *Planet III*, 947 F.3d at 596 n.9).

Respectfully, the Court did not pose a "red herring" issue for counsel. It was not trying to confuse or mislead anyone; it was simply asking a question to which it did not know the answer. CNS has now provided an answer—which the Court appreciates. That was the Court's point in asking. For its part, Omundson agrees that the Court in *Planet III* said it was not going to use a strict scrutiny test, but then argues it essentially did just that. While Omundson urges the Court not to follow suit, there is little reason to assess the

MEMORANDUM DECISION AND ORDER - 24

"confusing" analysis from *Planet III* (*see* Dkt. 85, at 13) further when the parties agree on the applicable standard. That standard is known—at least in the Ninth Circuit—as "rigorous scrutiny." *Planet III*, 947 F.3d at 596.

In order to prevail on the second step of *Press-Enterprise II*, Omundson "must demonstrate first that there is a 'substantial probability' that [her asserted] interest . . . would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that [] interest." *Id*. (quoting *Press-Enterprise II*, 478 U.S. at 14). Omundson bears the burden of satisfying this "fact-intensive" test, *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012), which requires more than generalized assertions or speculation. *New York Civil Liberties Union v. New York City Transit Auth*., 684 F.3d 286, 303 (2d Cir. 2012) ("[W]e do not believe speculation should form the basis for a restriction of the public's First Amendment rights.") (cleaned up); *Press-Enter. Co. v. Superior Ct*., 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*") ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.").

Omundson begins by discussing the time accompanying her ministerial review and explains that even if there is some delay from when a civil complaint is filed to when it is available to the press and public, it is minimal at best. According to the data compiled by the parties, nearly 85% of complaints[12] were available within eight business hours of filing

---

[12] The data is restricted to Complaints in the "A.A. filing fee category." Cases in this category are civil cases where the amount in controversy exceeds $10,000. These are the only cases to which CNS seeks access.

(e.g. from the point of original submission), with over 70% of those complaints ready in under four hours, and 65% in less than three hours. Dkt. 60-2, at 21. As a reminder, the actual review process only takes about five minutes. But the delays that occur—and that CNS is worried about—come from the delays of life. That is to say, what takes time is not the individual review itself, but the county clerk finding time in their busy day to get the review done: going to their computer, getting logged into the system, accessing the documents, *and then* performing their five-minute review. The hours-long timeframes mentioned above are, therefore, the time from when a person files their documents to when the clerk allows those documents formally into the system. And this is why understanding the numbers is important. While Omundson correctly claims that it only took eight, four, or three hours from the time of filing to complete the five-minute review process, those are *business* hours. In other words, if a complaint was filed at 3:00pm on a Friday and reviewed by 9:00am the following Monday, that would only count as three business hours even though two and a half calendar days had elapsed. So, while Omundson's numbers may not stand out as overly long, when days are used (as CNS illustrates) the difference appears more dire: 42% of new complaints were not released until the day after filing, with 15% delayed two calendar days or longer. Dkt. 61-4, at 14.

The Court digresses momentarily to discuss the numbers in this case. The parties spent a great deal of time in discovery gathering data. That data was, quite literally, terabytes in volume and had to be submitted to the Court on an external hard drive. The parties had various individuals review, analyze, compile, and summarize these numbers. The problem with statistics, however, is they can be arranged and discussed in ways that

MEMORANDUM DECISION AND ORDER - 26

benefit each side. The Court is not implying the parties misled the Court in any way; simply that the numbers need to be looked at very closely. For example, during the timeframe the parties reviewed, the total number of cases filed in Idaho was 2,961,279. Dkt. 60-18, at 2–4. Of those, 177,677 were rejected, which is a 6% rejection rate. *Id*. But that was ALL cases (civil and criminal). As far as civil cases go, apparently 403,246 were filed in Idaho during the applicable timeframe the parties decided to use and 44,357 were rejected. *Id*. That is an 11% rejection rate. *Id*. But even then, the cases CNS wants access to are just the A.A. category cases. Omundson claims there were 8,645 A.A. category cases filed in all of Idaho during this time. *Id*. She does not list a rejection rate. CNS claims there were actually 9,497 such cases filed and 1,624 were rejected which is about a 17% rejection rate. Dkt. 61-4, at 5. A few additional comments about the data.

The Court thoroughly appreciates the parties' efforts here. It has reviewed the data (and the testimony analyzing the data). As noted, numbers can be used, and viewed, from different vantage points. And that is fine. What concerns the Court more is two inter-related issues.

First, Omundson claims that if the Court were to allow CNS to have access to complaints right out of the gate, it would wreak havoc on the system because judges would need to get involved to remedy the errors in those 177,677 rejected cases when they could have been resolved during the clerk review. This concern appears to be premised upon an Idaho rule relating to the handling of records and files once a case is officially open. To wit, Omundson claims a clerk cannot change things in the case without a judge's permission once it has become an official court file. Dkt. 66, at 49. But Omundson readily

MEMORANDUM DECISION AND ORDER - 27

admits that the Idaho Supreme Court could amend that rule to provide the clerk with more flexibility. *Id*. at 50. It is not clear to the Court why a judge, as opposed to a clerk, would need to fix the errors simply because the case was "officially on file" instead of in the "pre-processing" phase. The task is the same either way. So, if a rule appears to be dictating *who* can edit materials based on where the file is, it might make the most sense to simply change the rule.

Second and relatedly, the 177,677 cases that were rejected appear large in scale. But again, that is ALL cases (both criminal and civil) over an almost 18-month period. When the data is broken down into just the AA civil cases, the number of rejections per day is minimal (e.g. four or five per day *in the entire state*).[13] Thus, whether it is a judge or clerk that needs to address these cases, such could hardly be called burdensome. Omundson's point seems to be that if the Court finds its procedure is unconstitutional as to the A.A. category of cases, it will have to revamp the *entire* system. Thus, it won't just be those 1,624 rejections the Court has to deal with, but the 177,677 cases with errors. The Court is not so sure. CNS has narrowed its challenge to the A.A. category of cases. Thus, if the Court finds Omundson's procedures unconstitutional as to those cases, Omundson must change its procedure to remedy that discrete issue. The Court can only adjudicate the issue before it. The Court is not ignorant of the fact that the A.A. cases are just one component within a larger system. And the Court understands it might be difficult to break those cases out with a separate filing procedure, e.g. it might be easier to change the *whole* system as

---

[13] Those four or five per day would be spread out over 44 Counties.

MEMORANDUM DECISION AND ORDER - 28

opposed to just the A.A. cases. However, as will be discussed later, such is possible.

In summary, while the data is important—after all, the Court is to undertake a "fact-intensive" inquire—the Court is more concerned with the real-world application of that data. With those thoughts, the Court returns to Omundson's arguments.

More important than her contention that the delay in review is minimal, is Omundson's claim that there are compelling justifications under *Press-Enterprise II* for the delays themselves. Some of these justifications include: 1) catching errors in submissions, 2) protecting confidential information, and 3) maintaining public trust in the judiciary if documents are filed but not opened.

CNS avers none of these justifications rise to the level sufficient to overcome the presumption of access. Under the circumstances, the Court agrees.

For example, Omundson avers clerical errors may need to be corrected and this is an important interest that is worthy of protection. CNS does not dispute that correcting errors is important but points out that Omundson has not explained why those errors have to be corrected *before* the case is publicly available. The Court agrees with CNS that it does not undermine the process if simple errors are corrected after the documents become public rather than before. Other Courts share in these feelings. *See Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *15 (D. Vt. Nov. 19, 2021). ("Defendant[] offer[s] no evidence that staff review of signatures, filing fees, and filing codes is necessary to protect the orderly administration of justice."); *Planet*, 947 F.3d at 597 (finding no evidence that immediate access resulted in "accounting issues[,]" "compromised the quality and accuracy of information logged into the [case management system,]" "created efficiency

MEMORANDUM DECISION AND ORDER - 29

problems[,]" or "resulted in loss, destruction, or mutilation of, or otherwise compromised the 'integrity' of, case files"); *Courthouse News Serv. v. Jackson*, 2009 WL 2163609, at *4 (S.D. Tex. July 20, 2009) (finding twenty-four to seventy-two hour delays to verify correct case number, proper court, accurate title, and proper filing category were not narrowly tailored).

Omundson next argues she must ensure no confidential or personal information ends up in new filings. There should not be any confidential information in these types of filings to begin with as they are, by nature, nonconfidential civil cases. Second, even if a mistake is made and some personal information is included, is not Omundson's fault. Per IRERS 15(a), it is the filer's duty to ensure protected information is redacted from publicly submitted documents.[14] And to reiterate, this is not to say the information cannot ever be corrected. It can—just after it first becomes available to the public. While it may seem counter-intuitive to correct something once it becomes publicly available, the Court sees this happen quite frequently in federal court. The entire process does not crumble because edits have to be made to documents—even documents that are publicly available.

Omundson also claims that the public's trust in the judiciary could be compromised if it were inadvertently publishing information and data that was not supposed to be publicly available. But the opposite is also true: public trust could deteriorate if cases are delayed by the Court and news becomes stale. For its part, CNS contends that public trust

---

[14] The evidence shows that, during the two-and-a-half-year period the parties reviewed, there was a *single* instance in which a party submitted a motion to seal with the complaint asking that the information be sealed from public access.

actually increases when errors are corrected because that provides assurances the system is working. Moreover, the fact that some cases get rejected could be newsworthy. *See Courthouse News Serv. v. New Mexico Admin. Off. of Cts*., 53 F.4th at 1268-69 (noting that Defendants' argument that "providing access to complaints that may be rejected or withdrawn only invites confusion as to what is happening in a state's courts . . . overlooks the fact that the withdrawal or rejection of a complaint might itself be a matter of public interest that the press deems newsworthy"). Omundson cites to an example of a filing that included "nasty things" about the other party that was "caught and [not] allowed to be filed" claiming its review "saved" that from becoming public. Dkt. 85, at 31. By all accounts that was a singular instance, but more importantly, that filing in itself, could likely have been newsworthy.

In sum, the Court finds Omundson has not "demonstrate[d] . . . a 'substantial probability' that [her] interest in the fair and orderly administration of justice would be impaired by immediate access . . . ." *Planet III*, 947 F.3d at 596. Are Omundson's concerns irrelevant or imagined? Not at all. They are important concerns. But there is no evidence that giving CNS more timely access would hinder her ability to address those concerns. It would change the timing and order of operations to some degree, but it would not materially alter what Omundson is doing or the end result.

The Court moves to the next question—are there any alternatives to "adequately protect" Omundson's interest. *See id*. Although this second step is largely irrelevant considering the Court's finding that Omundson has not shown granting CNS immediate access would impair the administration of justice, the Court will assess it briefly because

it bolsters the Court's findings above (and provides Omundson guidance for how to move forward).

Omundson has argued there are no reasonable alternatives to the system Idaho currently uses. She outlines why a press-review queue will not work and why other options are cost-prohibitive and/or have failings of their own. CNS rejects all of these arguments, noting it really isn't up to the Court to decide which option is best, but whether the current option is constitutional. The Court agrees in part. The Court's duty is to determine whether the current schema is constitutional. But as noted, that inquiry includes analyzing whether any alternatives exist.

The problem for Omundson, quite frankly, is there does appear to be alternatives to the current system. And candidly, those alternatives seem reasonable. Other states use alternative methods with good success. Most federal courts, including Idaho, although not using the Odyssey system or Tyler Technologies, have alternative systems that do not have the same review process as Idaho state court, and they use those with success as well. *See* Dkt. 64, at 15.

Omundson's two primary concerns appear to be finances and a reluctance to change because the task would be arduous. The parties put forth competing fee amounts each believes would be necessary to make some of the changes which have been discussed. Those numbers range from $12,500 to $108,000. Omundson also implies it would take substantial effort—including changing Idaho filing rules, training staff, training attorneys—to revamp its procedures. The Court is sensitive to these apprehensions. But neither can justify an unconstitutional policy. *See Courthouse News Serv. v. Tingling*, 2016

MEMORANDUM DECISION AND ORDER - 32

WL 8739010 (S.D.N.Y. Dec. 16, 2016), ("As in *Planet* and *Jackson,* this Court finds that the clerk has failed to meet its burden of demonstrating that its policy of refusing to provide the public and press access to newly filed complaints until after they are reviewed and logged is either essential to preserve higher values or is narrowly tailored to serve that interest.").

Critically, the Court is not telling Omundson *how* she has to change her system as part of today's decision. It is simply finding that the *current* method is untenable. Omundson could revamp the entire system. Or she could just carve out A.A. complaints. She could use the press-review queue offered by Tyler Technologies. Or Idaho could develop its own program.[15] Whatever option she chooses, however, must allow CNS un-delayed access. Otherwise, the policy will continue to be unconstitutional under the First Amendment, *Press-Enterprise II*, and *Planet III.*

## VI. CONCLUSION

The Ninth Circuit said in *Planet III* that a party does not have a First Amendment right to "immediate, pre-processing access to newly filed complaints." 947 F.3d at 594. Omundson claims that is basically what CNS gets, however, if the Court concludes she cannot meet her burden today. The Court agrees the balance between "CNS doesn't get immediate access" and "Omundson can't unreasonably delay access" puts the Court in a bit of a quandary. But the law is clear—a policy cannot withstand "rigorous scrutiny" unless there is a justification for the policy and there are no reasonable alternatives. *Id*. at

---

[15] In fact, is appears Omundson already began exploring whether Idaho could build its own portal or contract with another company to do so at a lower rate than Tyler was offering. Dkt. 66, at 35.

MEMORANDUM DECISION AND ORDER - 33

596. Ultimately, the Court finds Omundson has not met her burden to establish either factor.

First, CNS's right to access attaches when the complaint is filed. And filed is given its ordinary meaning: when a document is uploaded to the Court's e-filing system.[16] CNS has historically had access to newly-filed civil complaints and this access is an important public function. Thus, CNS has satisfied the first step of the *Press Enterprise II* test.

Second, while Omundson has valid reasons for undertaking a ministerial review of newly-filed complaints, there is no indication that granting CNS (and others) access prior to that review would impair or undermine her process. What's more, there are reasonable alternatives available that Omundson could utilize to make the process work for both sides. The Court will not dictate *what* Omundson must do moving forward, but under the second step of the *Press Enterprise II* test, she must do something because her current system impermissibly delays CNS's First Amendment access.

For all of these reasons, CNS's Motion for Summary Judgment is GRANTED and Omundson's Motion for Summary Judgment is DENIED.

## VII. ORDER

1. Omundson's Motion to Seal (Dkt. 58) is GRANTED in PART and DENIED in PART as outlined above. The documents already under seal shall remain as such except the Docketing Clerk is directed to unseal Dkts. 59-2, 59-5, and 59-6. Redacted versions already filed shall remain on file.

---

[16] And, as explained above, "submitted" is given its ordinary meaning as well. The bottom line is the right attaches prior to any ministerial review when the document is uploaded to the system by a filer.

MEMORANDUM DECISION AND ORDER - 34

2. CNS's Motion for Leave to File Sur-Reply (Dkt. 77) is GRANTED.

3. Omundson's Motion for Summary Judgment (Dkt. 60) is DENIED.

4. CNS's Motion for Summary Judgment (Dkt. 61) is GRANTED.

5. The Court herby enters a declaratory judgment that Omundson's policy is unconstitutional. She is preliminarily and permanently enjoined from continuing any process that denies CNS timely access to new non-confidential civil complaints. Omundson has 90 days to bring her policies and procedures into substantial compliance with the Court's ruling today.

6. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: September 30, 2024

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 35

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | Case No. 1:21-cv-00305-DCN |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

## I. INTRODUCTION

Pending before the Court is Defendant Sara Omundson's Motion to Dismiss (Dkt. 7) and Plaintiff Courthouse News Service's ("CNS") Motion for Preliminary Injunction (Dkt. 14).

The Court held oral argument on February 18, 2022, and took the matters under advisement. Upon review, and for the reasons outlined below, the Court DENIES Omundson's Motion to Dismiss and DENIES CNS's Motion for Preliminary Injunction.

## II. OVERVIEW

The First Amendment covers some of the most recognized rights under the United States Constitution. At issue in this case is whether the First Amendment confers a right to access documents filed in court, and, if so, at what point in time does that right attach.

MEMORANDUM DECISION AND ORDER - 1

Assuming such a right exists, the Court must also consider whether any procedures utilized for processing court documents are justified in scope and timing.

Plaintiff, CNS, brings the present suit in an effort to remedy what it sees as a violation of its right to speedily access materials filed in Idaho state court. It argues that the electronic case filing system used in Idaho delays its access to noteworthy materials and that these delays are unreasonable, unnecessary, and, ultimately, unconstitutional. CNS asks the Court to preliminarily enjoin the current scheme in Idaho until these matters can be resolved. Notably, CNS has brought, or is currently bringing, similar suits in numerous states throughout the country. Some have been resolved in CNS's favor, others have not. Some are still on appeal.

Defendant Sara Omundson has asked that the Court dismiss CNS's lawsuit in its entirety claiming that the redress CNS seeks is foreclosed by prior caselaw and under the legal doctrine of abstention.

### III. BACKGROUND[1]

CNS is a nationwide news service founded more than thirty years ago upon the belief that a great deal of news about civil litigation goes unreported or underreported by traditional news media outlets. It offers a variety of publications to thousands of subscribers nationwide. Sara Omundson is the Administrative Director of Idaho Courts and, in her official capacity, is responsible for the administration of the statewide e-filing and public

---

[1] The following facts are taking from CNS's complaint and presumed true for purposes of the instant motion. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

MEMORANDUM DECISION AND ORDER - 2

access systems used by state courthouses in Idaho.

The crux of this lawsuit centers on the timeliness of media access to new civil complaints filed in Idaho state court.

Historically, reporters in Idaho—such as Boise-based reporter Cathy Valenti, who writes for CNS—would travel to various courthouses near the end of the day and review any new complaints filed that day. For example, in Ada County, new complaints were typically placed in a press-review box, or cart, that enabled the press to review and report the contents of newly filed civil complaints. The complaints may, or may not, have been "processed," "screened," or "administratively reviewed" prior to being placed in the press-review box.

The advent of technology made case filing even easier. With the development of electronic filing systems, individuals can automatically upload documents to the Court system, thus eliminating the need for "runners" to hand-deliver materials. In addition, much of the physical work done at a courthouse intake counter was eliminated. At the same time, however, clerical staff still needed to (at some point) review the submissions to ensure compliance with all appropriate rules and procedures.

In 2015, Idaho courts began migrating to an e-filing system through their adoption of Tyler Technologies' Odyssey software suite, branded for Idaho Courts as "iCourt." Implementation wrapped up in 2018. Odyssey allows parties to submit electronic documents to Idaho's courts from anywhere in the world and at any time—the proverbial "24/7/365."

Tyler provides courts using the Odyssey program with several options for making

MEMORANDUM DECISION AND ORDER - 3

new e-filings available to the press and public. The *default* configuration withholds newly filed civil complaints until after a clerk manually processes and "accepts" them. Idaho employs this default method.[2] CNS argues that waiting for this "acceptance" or "processing" procedure results in delays that (1) did not previously occur with paper filings and (2) are not acceptable under the First Amendment.

CNS brought suit asking the Court to find certain policies and procedures of the Idaho state courts unconstitutional under the First and Fourteenth Amendments. CNS also asks the Court to issue a preliminary and permanent injunction against Omundson (and her agents, successors, etc.) curtailing the current procedure which "den[ies] access to complaints until after administrative processing." Dkt. 1, at 15.

Shortly after CNS filed its Complaint, Omundson filed a Motion to Dismiss (Dkt. 7) arguing that CNS had not stated a claim upon relief could be granted and, alternatively, that the Court should decline to exercise jurisdiction over this case based upon principles of abstention. CNS opposes the Motion. Dkt. 11.

For its part, CNS doubled down on its prayer for injunctive relief and filed a formal Motion for Preliminary Injunction. Dkt. 14. Omundson opposes that motion. Dkt. 20.

The Court set both matters for hearing. Dkt. 22.

Following the close of briefing on the two pending motions, but before the hearing, Omundson filed a Notice of Supplemental Authority. Dkt. 28. As the Court alluded to above, this is not the sole case related to these issues CNS has filed. In fact, there appear

---

[2] As will be explained below, an alternate method involves newly filed complaints being placed in a "press review queue," which allows the press to view the documents *prior* to administrative or clerical review.

to be roughly a dozen such cases in varying stages throughout the country. One such case, out of the District of Maine, was recently dismissed. CNS has appealed that dismissal to the First Circuit Court of Appeals. The Conference of Chief Justices—an organization comprised of state judicial officers—has apparently filed an amicus brief before the First Circuit for consideration in that case. It is that brief Omundson wishes to present to the Court via supplement. CNS contends the Court should not give the amicus brief any weight as it involves an issue that was not before the Maine District Court (abstention) and because the position the Conference of Chief Justices takes is in stark contrast to Ninth Circuit precedent. Dkt. 30. The Court notes this submission but finds it of marginal relevance to the issues before it today.

Omundson also filed a sur-reply addressing various calculations CNS used in support of its argument that there are delays in Idaho state court. Dkt. 29. CNS does not object to Omundson's sur-reply, but contends the information does not change any of the arguments presented in briefing. Dkt. 31. CNS's acquiesces aside, the Court would have preferred this submission had been filed as a motion. Omundson recognizes the standard procedure of seeking leave to file a sur-reply (Dkt. 29, at 1) but chose not to actually utilize the process. As the Court has explained before, "*[a]bsent permission by the Court*, neither the District of Idaho's local rules, nor the Federal Rules of Civil Procedure, permit sur-replies." *Stanger v. Way*, 2021 WL 4303605, at \*4 (D. Idaho Sept. 21, 2021) (emphasis added). Nevertheless, because the information contained in the sur-reply is unopposed (and appears relevant), the Court will accept, and consider, the submission.

The week of the hearing, CNS filed a Notice of Supplemental Authority bringing to

MEMORANDUM DECISION AND ORDER - 5

the Court's attention a recent decision by a magistrate judge of the District of Oregon in a case substantially similar to this one.[3] Dkt. 32. The Court notes this submission. The Oregon District Judge adopted the Magistrate Judge's decision over an objection by the Defendant, and many of the underlying issues are the same as presented here.[4] Thus the Court finds the analysis therein helpful.

Finally, after the hearing, both parties filed supplements answering questions posed by the Court during oral argument. Dkts. 33, 35. The Court appreciates the parties' diligence in responding to its inquires.

## IV. DISCUSSION

### A. Motion to Dismiss

In her Motion to Dismiss, Omundson argues CNS has failed to state a claim upon which relief can be granted because no one has a First Amendment right to immediate and instantaneous access to court filings in light of existing Ninth Circuit law. Alternatively, Omundson asks the Court to decline to exercise jurisdiction under principles of abstention, equity, comity, and federalism because of the nature of the requested relief: changes to Idaho state court proceedings.

### 1. Rule 12(b)(6) Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6)

---

[3] *Courthouse News Serv. v. Cozine*, 2022 WL 593603 (D. Or. Feb. 14, 2022).

[4] Courthouse News Serv v. Cozine, 2022 WL 1000775 (D. Or. Apr. 4, 2022). The District Judge's decision was issued after oral argument in the present case, but before this decision was rendered.

dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (cleaned up). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. In considering a Rule 12(b)(6) motion, the Court must view the complaint in the light most favorable to the claimant and "accept[ ] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Johnson*, 534 F.3d at 1122.

### 2. *Claim for Relief Analysis*

As a threshold matter, the Court must review an important line of cases out of California and the Ninth Circuit as they frame the issues today and are binding on the Court. Notably, the parties agree that these cases provide the applicable standard for evaluating whether Omundson and Idaho courts are violating CNS's access to newly filed complaints. That said, the parties strongly disagree about certain nuances in the cases and whether they apply to the situation at bar.

The Ninth Circuit's decision in *Courthouse News Service v. Planet* ("*Planet III*")

MEMORANDUM DECISION AND ORDER - 7

provides the applicable standard for evaluating whether a court's administrative procedures violate the media's "right of timely access to newly filed nonconfidential complaints." 947 F.3d 581, 585 (9th Cir. 2020). *Planet III* established a two-pronged test for this analysis. Under the first prong, a reviewing court must determine whether "the qualified First Amendment right of access" exists as to the judicial record in question. *Id*. In making this determination, the court considers various factors outlined by the United States Supreme Court, including, "(1) whether that proceeding or record 'ha[s] historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular [governmental] process in question.'" *Id.* at 590 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press Enterprise II*"). If both factors are evident, a qualified First Amendment right of access attaches to the implicated judicial records. Under the second prong, the reviewing court then considers whether a restriction on that right "is essential to preserve higher values and is narrowly tailored to serve those interests." *Id.* at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13–14).

A look back at the *Planet* trilogy of cases helps to contextualize the Ninth Circuit's ruling in *Planet III*.

The *Planet* cases involved legal challenges brought by the same plaintiff as in this case, CNS, against two case filing procedures adopted by the Ventura County Superior Court in California ("Ventura Court"). In the first procedure, the Ventura Court offered a physical bin where members of the media could access new filings *after* they had been processed. *Id.* at 586. The Ventura Court's "processing" procedure required court staff to

MEMORANDUM DECISION AND ORDER - 8

perform the following seven-steps:

> First, a [court assistant] reviews the documents to determine that the complaint is being filed in the correct court and the documents necessary to initiate the case are presented with the correct filing fee or fee waiver. Second, the [court assistant] enters all the required case information to "create" a new case in [the court's case management system]. Third, all accompanying instruments, for example checks, are entered and the receipt is generated. Fourth, any summons required are issued. Fifth, the documents are stamped as "Filed." Sixth, the labels generated from [the Court's case management system] are placed on the physical case file, along with the filing date, courtroom assignment, and case destruction stamp. Finally, the documents are placed in a physical case file.

*Courthouse News Serv. v. Planet*, 2016 WL 4157210, at *4 n.6 (C.D. Cal. May 26, 2016).

Some complaints were also subjected to a quality check process that took "one to several days to complete." *Id.* at *4. Further, complaints requiring "immediate judicial review" were immediately sent to judges, with copies of only the first pages of the complaint placed in the physical bin. *Planet III,* 947 F.3d at 586–87. The overall policy created "significant delays between the filing of a complaint and its availability" to the press. *Id.* at 587.

After the plaintiff filed suit over the seven-step policy outlined above, the Ventura Court instituted a new "scanning policy." *Id.* This procedure required court clerks to "scan all new civil complaints before reviewing or processing them." *Id.* The scanned complaints were accessible via computer terminals located in the Ventura Court's clerk's office, and reporters could view the documents during a seven-hour window on the days the court was open. *Id.* Scans of cases filed after the conclusion of each seven-hour window were made available on the terminals the next day. *Id.*

In the original *Planet* lawsuit, the district court dismissed the case under the

MEMORANDUM DECISION AND ORDER - 9

*Pullman*[5] and *O'Shea*[6] abstention doctrines. *Courthouse News Serv. v. Planet*, 2011 WL 11715054 (C.D. Cal. Nov. 30, 2011) (*Planet I*). On appeal in *Planet I*, the Ninth Circuit reversed the decision to abstain and remanded the case to the district court for further proceedings. 750 F.3d 776 (9th Cir. 2014). Upon remand, the district court "erroneously interpret[ed]" the Ninth Circuit's mandate and "ruled on a different issue entirely." *Courthouse News Serv. v. Planet,* 2014 WL 12740134 (C.D. Cal. Aug. 28, 2014) (*Planet II*). This led the Ninth Circuit to again reverse in *Planet II* and reassign the case to a different judge. 614 F. App'x 912 (9th Cir. 2015). The new judge ultimately issued a declaratory judgment and permanent injunction in plaintiff's favor, and cross-appeals at the Ninth Circuit followed, resulting in the decision now known as *Planet III. Courthouse News Serv. v. Planet*, 2016 WL 4157354 (C.D. Cal. June 14, 2016).

Having already rejected any arguments relative to abstention, the Ninth Circuit, at long last, addressed the constitutionality of the Ventura Court's policies in *Planet III.* As to the first question—whether the qualified right of access applies to newly filed civil complaints—the Ninth Circuit concluded that "the First Amendment right of access to information reaches civil judicial proceedings and records," and the parties agreed the Ventura Court had a "long-standing policy of providing timely access to court records" and that "experience and logic support a public right of access to newly filed civil complaints." *Planet III*, 947 F.3d at 590–91. In short, the parties in *Planet III* had not been at odds on

---

[5] *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).

[6] *O'Shea v. Littleton*, 414 U.S. 488 (1974).

this point.

The parties were, however, at odds as to *when* this qualified First Amendment right attached to newly filed civil complaints. Ventura Court argued the right attached "only at the moment [the pleading becomes] the subject of some type of judicial action." *Id.* at 591. The Ninth Circuit rejected this argument, finding that "[ab]sent a showing that there is a substantial interest in retaining the private nature of a judicial record, once documents have been filed in judicial proceedings, a presumption arises that the public has the right to know the information they contain." *Id.* at 592 (citing *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)). Instead, the Ninth Circuit concluded that the media's qualified First Amendment right attached to newly filed civil complaints as soon as they are "filed in judicial proceedings." *Id.* As the Court will explain in detail below, *when* a document is considered "filed" is hotly contested in the present case.

After finding that a First Amendment right of access attached to newly filed complaints, the *Planet III* court reviewed the Ventura Court's two different filing processes. The Circuit ultimately concluded that only the seven-step process unconstitutionally infringed upon the media's right of access. The second process—the "scanning" procedure—survived scrutiny and was deemed constitutional. *Id.* at 595–600. As part of its decision, the Ninth Circuit articulated the tension between a court's need to administratively process complaints, and the media's right to deliver news to the general public:

> Though we conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court, we do not view that conclusion as demanding immediate, pre-

MEMORANDUM DECISION AND ORDER - 11

> processing access to newly filed complaints. At the same time, however, we
> recognize, like the district court, that a necessary corollary of the right to
> access is a right to timely access. CNS's reporting on complaints must be
> timely to be newsworthy and to allow for ample and meaningful public
> discussion regarding the functioning of our nation's court systems.

*Id.* at 594. This language is also at the heart of one of the disputes—if not the main

dispute—in this case.

Like the parties in *Planet III*, the parties in this case do not dispute the materials in

question have historically been available to the public in Idaho and both agree that public

access to these types of documents is important. Also like the parties in *Planet III*, however,

the parties here dispute when this right attaches and whether any delays in "processing"

are acceptable.

Omundson begins her Motion to Dismiss by citing the above-quoted language from

*Planet III* that the Circuit did not view its conclusion as "demanding immediate, pre-

processing access to newly filed complaints." *Id*. at 594. Omundson then quotes a line from

*Planet III*'s introduction—that the press's qualified right to timely access "does not entitle

[them] to *immediate* access . . ." *id*. at 585 (emphasis added)—and concludes that CNS's

request in this case for immediate access to materials is already barred by binding Ninth

Circuit caselaw.

CNS begins by correcting Omundson and explaining that it did not bring this suit

claiming to have a "right to immediate access," but that it brought suit because her

procedures result in delays and she cannot justify those delays under the second prong of

the *Press-Enterprise II* test. CNS then emphasizes that nothing in *Planet III* forecloses this

lawsuit. Each state has different procedures, and those procedures must be evaluated under

the appropriate test to determine if they withstand scrutiny.

First, the Court agrees (with both parties) that *Planet III* does not mandate CNS get "immediate" access to court filings. The Court also agrees that CNS is not actually asking for immediate access; it is asking for un-delayed access. Thus, the relevant question is whether any delay is occurring in Idaho and, if so, whether that delay is justifiable. Despite fairly substantial briefing from the parties on this issue, the Court finds it cannot answer that particular question at this time.

While the Court finds that *Planet III does not* preclude this lawsuit as Plaintiff suggests—and, as will be discussed below, finds that abstention does not apply either—the Court is unwilling to move to the second step of the *Press-Enterprise II* analysis on the current record. The Court has excellent briefs before it and numerous declarations in support of both sides. That said, the Court is persuaded by Omundson's commentary during oral argument regarding when, if ever, other courts have addressed the critical second prong of the test. This question—whether any restriction on CNS's right "is essential to preserve higher values and is narrowly tailored to serve those interests," *Planet III*, 947 F.3d at 595 (cleaned up)—is very fact driven. Such would not typically be appropriate at the motion to dismiss stage.

Other Courts have reached this determination to be sure, but some Courts did so at a procedurally different posture than what is before the Court now.[7] Others have been in a

---

[7] In the District of Oregon for example, even though the case was relatively young—much like the situation here—Defendants moved for summary judgment as opposed to moving to dismiss. This provided the Court a broader record and allowed it the opportunity to review whether there were factual disputes at issue. *See Cozine*, 2022 WL 593603, at *2.

MEMORANDUM DECISION AND ORDER - 13

similar procedural posture but had different briefing[8] or different proceedings.[9] There are, no doubt, varying reasons for why each court chose to analyze the issues before it in the manner it did, but the Court here is unprepared to take a step in either direction at this stage on the limited record before it. *Could* the Court make a ruling now? Maybe. But it would rather adjudicate the pending motions first and then allow more tailored briefing on the merits of the second question under *Press-Enterprise II*.

The Court is not implying other courts took a less-than desired approach. For her part, Omundson expressed surprise at other courts' approaches and even went so far as to claim many "have not followed that second scale." Dkt. 36, at 54. In reviewing decisions from other courts, it appears most did, in fact, reach the relevant second question. The manner in which they did so, however, is what appears to startle Omundson and is, frankly, why the Court will not take that step today. And to be fair, while some courts made their determination during summary judgment proceedings, others did so at the preliminary injunction stage. Those that ruled against CNS have been appealed. And those that ruled in favor of CNS then required the state court to take action—which they did. Thus, it is not clear how, if at all, those cases proceeded following the preliminary injunction phase. Regardless, the Court finds it odd to make a preliminary ruling that would require action,

---

[8] In the District of Maine, while similarly at the Motion to Dismiss / Motion for Preliminary Injunction stage, the court there was presented with arguments that allowed it to proceed beyond the pleadings and reach a conclusion as to the constitutionality of the restrictions. *Courthouse News Serv. v. Glessner*, 549 F. Supp. 169, 193(D. Me.  2021).

[9] In *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *1 (D. Vt. Nov. 19, 2021), the Court—with the parties' permission—consolidated the hearing on the preliminary injunction with a trial on the merits. Again, this allowed that court to go further than this Court can go today.

MEMORANDUM DECISION AND ORDER - 14

when the unanswered merits-based question could render that action unnecessary.

The Circuit in *Planet III* found that one of Ventura Court's procedures was unconstitutional, but it *also found another was not*. *Planet III*, 947 F.3d at 600. Limited discovery and further briefing is necessary to understand the full picture of what is happening in Idaho state court.[10] Specifically, while mentioned in passing, the Court would like more briefing from both parties on the level of scrutiny to apply as part of its second-prong inquiry and whether Idaho's procedures constitute time, place, and manner restrictions.

The Court returns to its conclusion regarding Omundson's first argument: *Planet III* does not foreclose this lawsuit. The questions *within Planet III* will be adjudicated later.

Having concluded dismissal under Rule 12(b)(6) is not appropriate, the Court will next consider whether it should dismiss under principles of abstention.

### 3. Abstention Analysis

In the second part of her Motion to Dismiss, Omundson suggests the Court should decline to exercise jurisdiction over this case under the principle of abstention.

"Federal courts have a strict, but not absolute duty to exercise the jurisdiction that is conferred upon them by Congress." *Courthouse News Serv. v. Gilmer*, 2021 WL 2438914, at *5 (E.D. Mo. June 15, 2021) (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). "[F]ederal courts may decline to exercise their jurisdiction, in otherwise

---

[10] As will be explained below, the Court is not implying *substantial* discovery is needed in this case. However, at the motion to dismiss stage, the Court is unwilling to go outside the pleadings and make concrete findings on constitutionality based on potential factual disagreements between the parties.

'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest, for example, where abstention is warranted by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Quackenbush*, 517 U.S. at 716 (cleaned up).

Here, Omundson argues that under *Younger v. Harris*, 401 U.S. 37 (1971), and its offshoots in *O'Shea v. Littleton*, 414 U.S. 488 (1974) and *Rizzo v. Goode*, 423 U.S. 362 (1976), the Court should decline to even hear this matter because it would invade the state of Idaho's purview.

Omundson argues there is a "split in the circuits on the issue of abstention raised by similar claims to those raised in this matter." Dkt. 7-1, at 5. She cites the Seventh Circuit's conclusion that abstention is "particularly appropriate" in these types of cases as courts "continue to transition to electronic filing and, like many courts across the country, are working through the associated implementation challenges and resource limitations." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1074 (7th Cir. 2018).

While this does illustrate one side of the split, the Court notes the "split" is heavily tilted against Omundson. Not only have many more courts *not* found abstention appropriate in these types of cases, but the Ninth Circuit has already soundly *rejected* the holding in *Brown* Omundson relies on:

> We disagree . . . with the Seventh Circuit's decision to abstain from resolving the dispute about when the right attaches and when delays are so long as to be tantamount to a denial of the right. *See Brown*, 908 F. 3d at 1070–75; *see also Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976); *O'Shea*, 414 U.S. 488.

*Planet III,* 947 F.3d at 591 n.4.

MEMORANDUM DECISION AND ORDER - 16

The *Brown* court itself recognized that none of the "principal categories of abstention" constituted "a perfect fit" and that it was basing its decision, instead, on "the more general principles of federalism." *Brown*, 908 F.3d at 1071.

Even then, the Fourth Circuit has joined the Ninth Circuit by recently noting that *Brown*'s approach "is inconsistent with . . . Supreme Court guidance." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 325 (4th Cir. 2021). The Court here must agree.

In *Quackenbush*, the United States Supreme Court outlined when abstention was appropriate, and determined it was only necessarily in "exceptional circumstances where denying a federal forum would clearly serve an important countervailing interest." 517 U.S. at 716 (cleaned up). The Supreme Court went on to explain:

> Federal courts have the power to refrain from hearing cases that would interfere with a pending state criminal proceeding, or with certain types of state civil proceedings; cases in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law; cases raising issues intimately involved with [the States'] sovereign prerogative, the proper adjudication of which might be impaired by unsettled questions of state law; cases whose resolution by a federal court might unnecessarily interfere with a state system for the collection of taxes; and cases which are duplicative of a pending state proceeding.

*Id*. at 716–17 (cleaned up).

Omundson's position here (and the Seventh Circuit's position in *Brown*) flatly ignores more recent Supreme Court guidance emphasizing *Younger* abstention should not be applied "outside the[] three exceptional categories" outlined in *Quackenbush*, and that

MEMORANDUM DECISION AND ORDER - 17

"in accord[ance] with *NOPSI*,[11] [those categories] define *Younger*'s scope." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013).

And after *Sprint*, the Ninth Circuit has expressly held that abstention under *Younger* and its progeny

> is appropriate *only* when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges. If these 'threshold elements' are met, we then consider whether the federal action would have the practical effect of enjoining the state proceedings and whether an exception to Younger applies. Each element must be satisfied.

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014) (emphasis added) (cleaned up).

Here, no such circumstances exists. While the issues are *related* to state court proceedings in a somewhat colloquially sense because civil complaints are "legal proceedings," the acts of filing, accepting, and processing civil complaints are truly not "state proceedings" that trigger *Younger*.[12]

Finally, as part of her discussion regarding abstention, Omundson claims she does not have the authority to take any of the actions CNS suggests she take. She argues county

---

[11] In *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) ("*NOPSI*"), the Supreme Court identified the three "exceptional circumstances" that authorize abstention under *Younger* and its progeny: (1) a case seeking federal intrusion into ongoing state criminal prosecutions, (2) a case seeking federal intrusion into certain "civil enforcement proceedings," and (3) a case seeking federal intrusion into pending "civil proceedings involving certain orders . . . uniquely in furtherance of the state court's ability to perform their judicial functions."

[12] Omundson argues that under *Sprint* (and other cases), the issues here implicate an important state interest, which also supports abstention. Be that as it may, Omundson is forgetting the qualifying condition that those interests be a part of "ongoing" state proceedings. There are no proceedings here. "We emphasize that federal courts cannot ignore *Sprint*'s strict limitations on *Younger* abstention simply because states have an undeniable interest" at stake. *Cook v. Harding*, 879 F.3d 1035, 1040 (9th Cir. 2018).

MEMORANDUM DECISION AND ORDER - 18

clerks—who are individually elected officials with varying job duties—are really those who have the power to do what CNS requests. The Court disagrees. While Idaho's county clerks are the "boots on the ground" with these issues, Omundson is, in her official capacity, responsible for the administration of Idaho's e-filing system.[13] Even were this not the case, the Court would allow amendment (as CNS offers to do) in order to join all forty-four of Idaho's county clerks. This seems hardly necessary.

In short, abstention is not applicable here and does not warrant dismissal. The Court declines to decline jurisdiction over this matter.

### 4. Conclusion

The Court finds that Omundson has not met her burden. Her two contentions in support of her Motion to Dismiss are that *Planet III* forecloses this case and that abstention should apply.

First, the Court finds that *Planet III* does not stand for the proposition asserted by Omundson. Now, it remains to be seen whether there are "delays" in this case and whether those delays are justified, but those questions are for later down the road and in no way support early dismissal.

Second, the Court takes its lead from the United States Supreme Court and the Ninth Circuit and finds that abstention does not apply in this case.

In sum, the Motion to Dismiss is denied.

---

[13] What's more, there is no indication that individual counites in Idaho were given the opportunity to opt out of the ICourts e-filing system. Said differently, this system was implemented (and is currently utilized) state-wide under Omudson's direction and purview.

MEMORANDUM DECISION AND ORDER - 19

### B.  Motion for Preliminary Injunction

The Court turns next to CNS's Motion for Preliminary Injunction. As alluded to above, while the Court is making certain findings today, it cannot go so far as to make others. Without some degree of certainty on those critical questions, it cannot enter a preliminary injunction at this time.

#### 1.  Legal Standard

The purpose of temporary injunctive relief is to prevent irreparable injury and to maintain the status quo pending a decision on the merits. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

#### 2.  Analysis

##### a.  Likelihood of Success

As noted, the applicable test for this case comes from the United States Supreme Court in *Press Enterprise II* and asks first whether the "proceeding or record ha[s] historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular [governmental] process in

MEMORANDUM DECISION AND ORDER - 20

question." *Planet III*, 947 F.3d at 590 (cleaned up). As noted, the parties in this case do not dispute the materials in question have historically been available to the public in Idaho and both agree that public access to these types of documents is important. Thus, there is a very high likelihood of success for CNS on this point.

The second question, however, is whether any restriction on that right "is essential to preserve higher values and is narrowly tailored to serve those interests." *Id.* at 595. As previously explained, this question remains unanswered. The parties must engage in some limited discovery and return to the Court upon a more complete record. The likelihood of success on this second prong, and thus the entire case, is unclear.

While the Court will not address the question of whether there are delays and whether those delays are unconstitutional, it must preliminarily address another point of disagreement: when the right to access attaches in the first place. The Court must do this now as this determination will ultimately regulate from what point to calculate any delay.

Trying to determine when CNS's right attaches turns on the definition of certain actions. Omundson contends that a civil complaint is not "filed" until court staff examines the pleading for compliance with court regulations and formally "processes" the document. She argues this is consistent with *Planet III*. CNS disagrees by pointing to the language in *Planet III* where the Circuit noted that the "right to timely access attaches at the moment of filing, *i.e., when the complaint is received by the court.*" *Planet III*, 947 F.3d at 588 (emphasis added). In other words, according to CNS, under *Planet III*, "filing" means the moment the documents cross over the desk (physically or electronically), *not* after they have been reviewed/scanned/approved by staff.

MEMORANDUM DECISION AND ORDER - 21

For support, CNS points to the final result in the Planet litigation: the district court's amended judgment declaring (1) that the "qualified right of timely access attaches when new complaints are received by a court, rather than after they are 'processed,'" and (2) that Planet's policy "requiring that newly filed complaints and their associated exhibits be 'processed' prior to providing the press and public with access to those complaints violates CNS's qualified First Amendment right of timely access to newly filed complaints." *Courthouse News Serv. v. Planet*, 2021 WL 1605216, at *1 (C.D. Cal. Jan. 26, 2021)

Omundson, however, points the Court to the district court's decision filed contemporaneously with the amended judgment that states, "*Planet III* did not address the distinction between 'filed' and 'received' because [the clerk] did not raise the issue, and so [the clerk] abandoned any objection." *Courthouse News Serv. v. Planet*, 2021 WL 1605218, at *4 (C.D. Cal. Jan. 26, 2021). For purposes of the judgment, the District Court adopted CNS's proposed language on the right of access attaching when complaints are "received by a court" but cautioned that "this Court's final judgment should still reflect the full extent of the Ninth Circuit's ruling, including those aspects that limit CNS's relief." *Id*.

Both parties also point to Idaho Rules for Electronic Filing and Service ("IREFS") in support of their respective positions. Omundson cites generally to IREFS 12 and avers that a "submitted document" is not the same as a "filed document." CNS also cites to IREFS 12 (among others) for the opposite conclusion.

One difficulty in the IREFS is that some rules use the word "file" as part of the definition of "file." For example, Rule 11 states, "A document will be considered *filed*

MEMORANDUM DECISION AND ORDER - 22

when: (1) the document has been electronically submitted to the court's electronic filing system; and (2) the submission has been acknowledged and the document accepted for *filing*." IREFS 11 (emphasis added). Under the first portion of Rule 11, it appears a document is filed upon submission. The second portion, however, muddies the waters by adding that the submission must be "acknowledged" and "accepted for filing" to be considered "filed."

CNS also points to Rule 2, and the definition of "Electronic filing" as "the process whereby a filer electronically transmits documents to a court in an electronic form to initiate an action or to be included in the court file of an action." IREFS 2(c).

Finally, CNS points the Court back to Rule 12, which discusses timing. In relevant part, Rule 12, subsection (1) explains: "For documents electronically filed, the date and time that the filer *submits* the electronic filing will serve as the filing date and time for purposes of meeting the statute of limitations or any other filing deadlines, *even if placed into an error queue for additional processing*." IFERS 12(1) (emphasis added). Unfortunately, subsection (2) goes on to say,

> If the document is *accepted* for filing, the date and time of filing entered in the register of actions relate back to the date and time the electronic filing system *received* the document. When the document *is accepted* for filing, the electronic filing system will affix the date and time of *submission* on the document *as the date and time of filing* of the document.

IFERS 12(2) (emphasis added).

Frankly, it seems that IREFS uses the word "filed" in two separate but related ways. First, it appears clear a document is considered "filed" once the submitting party hits the "send" button on his or her end and the submission is transmitted to the Court via the

MEMORANDUM DECISION AND ORDER - 23

electronic system. This conclusion is supported by Rule 2(c)'s "transmits" language; Rule 11(1)'s "electronically submitted" language; and Rule 12(1)'s language outlining the date and time of *submission* is used "*even if placed into an error queue for additional processing*." The phrase "additional processing" also seems to suggest that the quality control aspect Omundson relies on can happen *after* a matter is electronically submitted.

This aside, Rule 11(2) uses the word "filed" only after the qualifier "acknowledge" and Rule 12(2) uses the word "filed" after the phrase "is accepted." Now, whether "acknowledge" and "accepted" are meant to denote simple receipt (without human interaction via the E-filing system) or some more concrete form of acknowledgment or acceptance (like a clerk *deeming* the paperwork acceptable) is unclear. What's more, Rule 12(2) adds that "if" a document is accepted for filing (suggesting it isn't filed until something happens) the "filing date" relates back to when it was "filed" (i.e., when the electronic filing system received the document).

IREFS's unclear language notwithstanding—and leaving aside the District Court in *Planet III* noting that the Circuit did not formally address this matter—CNS argues that decisions rendered recently by other courts confirm that the "traditional definition" of filed is when the right to access attaches. *Courthouse News Serv. v. N.M. Admin. Off. of the Cts*., 2021 WL 4710644, at *39 (D.N.M. Oct. 8, 2021), appeal filed (10th Cir. Oct. 29, 2021) (quoting *Planet III*, 947 F.3d at 594); *accord Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *13, (D. Vt. Nov. 19, 2021), appeal filed (2nd Cir. Dec. 21, 2021).

The Court is inclined to agree with CNS—and other courts—that "filed" is best understood to mean when the complaint is submitted to the respective e-filing system, *not*

MEMORANDUM DECISION AND ORDER - 24

to mean once the documents are reviewed/accepted/processed by a clerk. The moment of submission triggers the date and time to be affixed for procedural purposes. IREFS 12. And such is the case even if further processing is required. *Id*.

The Court thus finds that "filed" is equivalent to submission. However, that does not mean the Court is finding "filed" is equivalent to *immediate* access. Again, this might be viewed as a distinction without a difference, but it is not. As CNS notes—and in accordance with *Planet III*—it never sought "immediate" access to court records (in this case or any others). It simply contends that the current schema in Idaho, with its associated delays, cannot be justified. The above conclusion regarding "filed" is, therefore, important, because the Court's inquiry later in this case will be whether Omundson's procedures are "essential to preserve higher values and [are] narrowly tailored to serve those interests" or if they cannot be justified. *Press-Enterprise II*, 478 U.S. at 13–14. When the clock starts ticking is relevant in determining whether Omundson's procedures are justified.

In sum, while CNS enjoys a high likelihood of success on the first *Press Enterprise II* element—after all Omundson does not contest the materials have historically been accessible and are relevant—it is not clear CNS will prevail on the second element under *Press Enterprise II*. The Court can appreciate both sides' positions at this point. However, the Court cannot find, even preliminarily, for either party. Such uncertainty weighs against a preliminary injunction.

b.  Irreparable Harm

CNS argues that any loss of a First Amendment freedom constitutes irreparable injury and weighs in favor of an injunction. The Court does not dispute this general

statement. That said, the Court does not know if there has been a First Amendment loss here or not. It has not yet determined whether the delays caused by the Omundson's procedures are so onerous as to constitute constitutional deprivations.

Omundson agrees, even at this early stage, that there are some delays under Idaho's current system from the time a Complaint is submitted to when it becomes available to the press and public. However, in her mind, the delay is insignificant, a necessary part of the process, not irreparable and not unconstitutional.

Whether there is irreparable harm to CNS here is difficult to determine. That conclusion, again, rests on the second prong of the *Press-Enterprise II* test and the Courts conclusion on the constitutionality of any delays.

Interestingly, the Court finds harm could result *for Omundson* were the Court to grant an injunction at this time. For example, if the Court granted the injunction— effectively telling Idaho state courts they needed to change procedures immediately—*but* later determines the minor delays under the current procedures are constitutional, Idaho would have incurred substantial cost, time, and energy changing a system that did not need to be changed.[14] CNS is quick to note that the Omundson does not have to take its suggested approach of using the press review feature from Tyler and could either build a program internally to remedy the delays or figure out another workaround. While true, *in any*

---

[14] For example, Omundson claims that were it to ask Tyler Technologies to reconfigure its Odyssey program to do what CNS asks and have the "press review queue" feature, it would cost $108,000. CNS contends this quote is highly suspect because Tyler has implemented the exact same program with many of its existing customers *for free*. The resolution of this disagreement would affect the question under *Press-Enterprise II* of whether Idaho has any reasonable alternatives it can use to protect the interest it seeks to protect via its procedures.

MEMORANDUM DECISION AND ORDER - 26

*scenario*, the State could be incurring cost and time that is ultimately unnecessary.

To be sure, the question regarding injury looks to CNS, as opposed to Idaho, but this principle dovetails into the remaining *Winter* factors.[15] What's more, while assuredly not dispositive, the Court notes that CNS *did not* file its motion for preliminary injunction at the outset of this case (rather, it was four months later) nor did it request expedited briefing or an expedited hearing. Thus, it would appear that any alleged harm is at least manageable under the current circumstances.

c.   Balance of Equites and Public Interest

The Court finds it is not equitable at this stage to force Idaho to overhaul its entire legal filing system. Again, CNS's point is well taken that any delay in access is access denied—particularly in a fast-paced environment such as news reporting. However, Omundson's point is also well taken that orderly filing and administration causing minor delays is not automatically unconstitutional. Afterall, such was the holding in *Planet III* as applied to one of Ventura County's processes.

In like manner, while the public has an interest in undelayed access to newsworthy civil filings, it also has an interest in the orderly administration of justice and ensuring the proper use of tax-payer funds.

d.   Conclusion

Ultimately, the Court cannot say whether CNS has a likelihood of success on the merits of its case because the Court does not know how the pivotal question of

---

[15] As is the situation in most preliminary injunction briefing, both parties focused almost exclusively on the first question—likelihood of success—and essentially lumped the remaining considerations together.

MEMORANDUM DECISION AND ORDER - 27

constitutionality will unfold. Because of this, the Court is also unwilling to force Omundson (and Idaho) to undertake potentially lengthy and/or costly changes until it knows such are necessary. Upon review, and weighing all the *Winter* factors, the Court cannot grant a preliminary injunction at this time.

## V. CONCLUSION

Omundson's Motion to Dismiss is DENIED. She is incorrect in her assertion that *Planet III* forecloses this case outright. Additionally, the Court joins other district courts— in conformity with the Ninth Circuit's holding—and finds abstention is inapplicable here. For these reasons, dismissal in inappropriate.

The Court cannot, however, grant CNS's Motion for a Preliminary Injunction at this time either. The outcome of *Press Enterprise II*'s critical second question—regarding the constitutionality of any delay—cannot be determined at this early stage, even preliminarily. The Court has provided some initial rulings and guidance, but discovery is necessary to bring this fully before the Court for resolution. What's more, the remaining *Winter* factors are roughly even. Ultimately, the Court finds a preliminary injunction is not warranted.

## VI. ORDER

1. Omundson's Motion to Dismiss (Dkt. 17) is DENIED.

2. CNS's Motion for Preliminary Injunction (Dkt. 14) is DENIED.

3. The Court is of the opinion that this case is somewhat unique when it comes to discovery. It likely does not need the typical 9–12 months to reach a summary judgment posture. The Court will send out its standard litigation notice requiring that the parties meet and confer on a proposed schedule and encourages the parties

MEMORANDUM DECISION AND ORDER - 28

to tailor discovery to the needs of this case. The Court *recommends* a few months of discovery and then briefing on summary judgment.

DATED: April 14, 2022

_____
David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 29