No. 24-6697

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

COURTHOUSE NEWS SERVICE,

*Plaintiff-Appellee*,

v.

SARA OMUNDSON,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the District of Idaho,

Case No. 1:21-CV-00305-DCN, the Honorable David C. Nye, Presiding

---

**EXCERPTS OF RECORD, VOL. 2**

---

Keely E. Duke
Molly E. Mitchell
Duke Evett, PLLC
1087 West River Street, Suite 300,
Boise, ID 83702
Telephone (208) 342-3310
Email: ked@dukeevett.com; mem@dukeevett.com

*Attorneys for Appellant Sara Omundson*

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

COURTHOUSE NEWS SERVICE,                    Case No. 1:21-CV-305-DCN

        Plaintiff,

    vs.                                     Boise, Idaho
                                            July 10, 2023
SARA OMUNDSON, in her official              3:00 p.m.
capacity as Administrative
Director of Idaho Courts,

        Defendant.

---

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE DAVID C. NYE
CHIEF UNITED STATES DISTRICT COURT JUDGE

---

APPEARANCES:

For the Plaintiff:        MR. JONATHAN G. FETTERLY
                          MS. KATHERINE A. KEATING
                          Bryan Cave Leighton Paisner, LLP
                          3 Embarcadero Center, Seventh Floor
                          San Francisco, California  94111

                          MS. AMBER N. DINA
                          Givens Pursley LLP
                          601 W. Bannock Street
                          Boise, Idaho  83702

For the Defendant:        MS. KEELY E. DUKE
                          MS. MOLLY MITCHELL
                          Duke Evett, PLLC
                          P.O. Box 7387
                          Boise, Idaho  83707

Court Reporter:           MS. ANNE BOWLINE, RMR, CRR
                          Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography.  Transcript produced by
computer-aided transcription.*

2

I N D E X

<u>MOTIONS</u>                                                <u>PAGE</u>

Defendant's Motion to Seal
    Ms. Keating                                          4
    Mr. Fetterly                                         5
    Ms. Duke                                             6
    the Court                                            7

Plaintiff's Motion for Leave to File Sur-Reply
    Mr. Fetterly                                         8
    Ms. Duke                                             8
    the Court                                            9

Cross-Motions for Summary Judgment
    Ms. Duke                                            11
    Mr. Fetterly                                        37
    Ms. Duke                                            61
    Mr. Fetterly                                        66

3

1          (Proceedings commenced at 3:00 p.m., July 10, 2023.)

2          THE COURT:  Please be seated.

3          THE COURTROOM DEPUTY:  The Court will now hear the

4    motion hearings in case 1-21-CV-305, Courthouse News Service

5    versus Sara Omundson.

6          Counsel, would you please state your appearance for

7    the record, beginning with the plaintiff.

8          MR. FETTERLY:  Good afternoon, Your Honor.  Jonathan

9    Fetterly with Bryan Cave for the plaintiff, Courthouse News

10   Service.  With me at the counsel table is Ms. Katherine

11   Keating, also with Bryan Cave, and Mr. William Girdner.  And

12   also with us is Amber Dina with Givens Pursley.

13         THE COURT:  Thank you.  Will you be doing the

14   majority of the arguing?

15         MR. FETTERLY:  Yes, Your Honor.

16         MS. DUKE:  Good afternoon, Your Honor.  Keely Duke

17   with Duke Evett here in Boise.  I have Molly Mitchell with my

18   firm with me as well.  And our client, Sara Omundson, is here

19   as well.  And I'll be doing the arguing.

20         THE COURT:  Thank you.

21         MS. DUKE:  Thank you.

22         THE COURT:  All right.  Counsel, before we get on

23   your clocks, I want to take up a couple minutes on my clock.

24   There's a couple procedural issues that I just wanted to go

25   through with you to make sure that I understand what the

4

1    issues are and whether they're still truly an issue or not.

2          The first one is the sealing of the documents.

3    Defense wants to seal certain documents, including the

4    declaration of Derrick, the declaration of --

5          I apologize.  Omundson?

6          MS. DUKE:  Omundson.

7          THE COURT:  You'd think I would know that by now.

8          -- the declaration of Dvorak, and the declaration of

9    Duke.  We got a statement saying the parties have reached an

10   agreement as to Dvorak and Duke, and defense would file

11   redacted versions of those documents.  And then CNS said that

12   those had not been filed and they wanted to do a surreply to

13   clarify the parties' negotiations.  I believe they have now

14   been filed.  And is everybody in agreement with that?

15         MR. FETTERLY:  Yes, Your Honor.

16         THE COURT:  They're not the 75-12 and 75-13 that was

17   mentioned, but they're 78-1 and 2.  Those are the right ones.

18   So that issue has gone away.  But what about -- well, I assume

19   it's gone away.  Are you okay with redacted versions?

20         MR. FETTERLY:  Yes, Your Honor.

21         THE COURT:  All right.  What about Derrick and

22   Omundson's declarations?  What's happening there?  Has there

23   been any agreement reached?

24         MS. KEATING:  I believe the Omundson declaration was

25   one of the ones filed in a redacted version.  I believe what's

5

```
1    left are -- there's an exhibit to the Omundson -- I'm sorry --

2    to the Dvorak declaration.  There is an exhibit to the Duke

3    declaration which are excerpts from the Terry Derrick

4    deposition, and they're the Terry Derrick declaration and two

5    exhibits to that declaration.

6            THE COURT:  And no agreement's been reached on those?

7            MS. KEATING:  That's correct.

8            THE COURT:  All right.  And if I'm understanding

9    right, the reason plaintiff doesn't want to agree to the

10   sealing is because they're saying that defendant hadn't met

11   their burden of showing why they're confidential?

12           MR. FETTERLY:  That is correct, Your Honor.  And then

13   I would add to that, where we're talking about the excerpts of

14   the Derrick deposition, we have a protective order in place

15   whereby Tyler Technologies could have designated any portions

16   of the transcript as confidential, but they did not.

17           In our view, it is not a confidential transcript.

18   And plaintiff Courthouse News Service filed that transcript in

19   support of its own motion, and we did not move to seal it,

20   again, because the deponent did not move to declare any

21   portions of it as confidential.  So it's a combination of

22   both.  We do not believe the defendant has met the requisite

23   showing for sealing a court record, but in addition to that,

24   this depo transcript is already part of the court record in

25   its entirety.
```

6

1          THE COURT:  Okay.  Ms. Duke, do you want to respond

2   to that?  You agree that some of them have been resolved?

3          MS. DUKE:  Yes, Your Honor, I do.

4          THE COURT:  Okay.  But it's the ones having to do

5   with Tyler Technology that -- Dvorak, is that one still up in

6   the air?

7          MS. KEATING:  The Dvorak deposition declaration was

8   filed in a redacted version.  I think that one --

9          THE COURT:  You're okay with?

10          MS. KEATING:  -- has been resolved.

11          THE COURT:  So talk to me about Tyler Technologies.

12          MS. DUKE:  Sure, Your Honor.  With respect to Tyler

13   Technologies, for Tyler to testify, we did have to

14   negotiate -- our office, Mr. Fetterly's office, and Tyler's

15   counsel's office -- to enter into a protective order.  It was

16   my understanding that that deposition was supposed to be

17   protected.  That's a commitment I had made to them when I told

18   them that we would be bringing their witness in.

19          If they had not done their duty to redact portions of

20   that, I feel I've done my duty in moving to seal it.  If the

21   Court disagrees with that, that's, of course, a court order

22   that is entered then.

23          And if it's already been filed and in the public

24   record and Tyler hasn't taken any action, to me, that's

25   Tyler's issue.  But we did it out of an abundance of caution,

7

1 given a verbal commitment I had made to their counsel which

2 was then subsequently put into a protective order.

3    THE COURT:  And I have read that protective order,

4 but I didn't read it very much in depth.  It seems to me that

5 it says that if somebody's going to say that it's

6 confidential, they have to say so.  And what I'm hearing is

7 that Tyler Technologies never said so.

8    Okay.  I'm going to issue a decision on that as part

9 of my summary judgment decision, but I'm having a hard time

10 seeing how I seal that under those facts.  So I don't think

11 you need to spend any more time on that issue.

12    The second what I'm calling procedural issues has to

13 do with the statements of undisputed facts for summary

14 judgment.  And again, this is my own notes; it's my -- what I

15 gleaned from the record.  The defense filed their statement of

16 undisputed facts.  It's 27 pages long.  CNS filed its own

17 statement of undisputed facts for its summary judgment motion.

18 It's 17 pages long.  CNS also filed a response to the

19 defendant's statement of facts.  That one's 25 pages long.

20    And I think that's where the hang-up is here.  I did

21 see the stipulation of the parties that said there could be

22 extra pages for the briefs and for the original undisputed

23 statement of facts.  I didn't see anything one way or the

24 other about an opposition to the statement of facts.

25    And so if you want to talk about that briefly, I

8

1  would appreciate it.  Why do you think you get to file more

2  than the original 10 pages?

3         MR. FETTERLY:  Yes, Your Honor.  It was our

4  understanding in reaching that agreement that it would apply

5  not only to the opening memorandum but also the opposition or

6  response to the other side's statement of undisputed facts.

7         And I agree with the Court that the stipulation does

8  not address the responding document one way or another.  Our

9  view is that it was at least implied that we would get equal

10  time to respond to a document.  If an initial document is

11  given additional length to state additional things, it made

12  sense to us that the responding document would also be given

13  additional length to respond so those additional things.

14         So I think it's unfortunate that the stipulation does

15  not more specifically call that out, but it was certainly our

16  understanding, and that is why we filed a responsive document

17  that was roughly equal in length to the opening document to

18  which we responded.

19         THE COURT:  All right.  Ms. Duke.

20         MS. DUKE:  And we just had -- obviously it's not

21  covered by the stipulation, Your Honor.  We just had a

22  different appreciation for what we were agreeing to, given we

23  had filed cross-motions for summary judgment.  You'll note we

24  did not end up filing a, you know, line-by-line we dispute

25  that this is undisputed because we believed that that had all

9

1    been subsumed by the fact that we were doing cross-motions.

2         So I think just have two different parties viewing it

3    differently, and we raised the objection given that it's only

4    ten pages.  But by no means did I say no to it.  We just never

5    discussed it.

6         THE COURT:  And I'll be honest.  I read the

7    stipulation, and the first time I read it, I thought this

8    applied to everything.  And then I went back and read it

9    closer, and I thought, well, maybe it doesn't.  It is a little

10   vague there.

11        But I agree that with the spirit of the local rules,

12   if I'm going to get an extension of pages to the original

13   statement of facts, I think it's only fair I give an extension

14   to the others as well.  It just follows suit, I think.

15        So I'm going to deny the motion, however it was

16   worded.  I'm going to allow it to stand, both the statement of

17   facts and the response.  And we'll go from there.  So that

18   one's done.

19        The appendix is the other one issue that I have.

20   I'll say I think it's pretty creative.  I've never seen a

21   58-page appendix before.  But the local rules do say don't

22   file a motion to strike; file an appendix.

23        I kind of think this appendix is nothing but a clever

24   name for a motion to strike, but I don't know what to do with

25   it.  I'll give plaintiff an opportunity.  You're going to tell

10

1     me you were just following the rules.

2          MR. FETTERLY:  That -- that is correct, Your Honor.

3     I think in different jurisdictions or circumstances we might

4     file evidentiary objections or other --

5          THE COURT:  Or a motion to strike.

6          MR. FETTERLY:  Motion to strike, correct.  And so we

7     find ourselves here trying to comply with the rule, but, you

8     know, going to go into the heart of the matter, we thought

9     there were a number of evidentiary issues that warranted

10    address given this procedure here with cross-motions for

11    summary judgment.  And rather than, you know, raise them at

12    oral argument and occupy our limited time with such matters,

13    we reduced them to writing so the Court could consider and

14    rule on them.

15         So our view would be, you know, the Court consider

16    the objections and rule on them as it would.  But beyond that,

17    we don't think that the objection to the appendix is the

18    appropriate way to go.

19         THE COURT:  Okay.  Ms. Duke, if I understood your

20    position correctly, you are objecting to the appendix.  But at

21    the same time, you also filed a response to it.  And I will

22    commend you:  It was only seven pages long.

23         MS. DUKE:  Thank you.

24         THE COURT:  I do think there's a lot of merit to the

25    argument that many of the objections have to go to the weight

11

1   of the evidence.  They're not really appropriate for summary

2   judgment, but the objections have to get on the record

3   somehow.

4          I'm going to let the appendix stand.  I'm going to

5   let the response or the reply to it stand.  I will make

6   rulings on them.  It may take me a while to do it, but I think

7   it's pretty safe to say a lot of them will be this goes to the

8   weight, not the -- although there are some foundational ones

9   I've got to rule on.  So I'll look at them very closely, but

10  I'm going to let both documents stand.

11         So with that, let's turn to the motion -- the

12  competing motions for summary judgment.  My understanding is

13  that Bennett told you defense would go first.  Is that

14  correct?

15         MS. DUKE:  Yes, Your Honor.

16         THE COURT:  So you may go first.

17         MS. DUKE:  Your Honor, may it please the Court and

18  Counsel.  As you know, Your Honor, we're here today with

19  respect to a significant issue to both parties, and that is

20  the balance that the Idaho Supreme Court has struck when

21  considering access to complaints that have not yet been

22  reviewed by a court clerk and whether those should be provided

23  to the press, balancing that with the court's interest in

24  protecting the integrity of Idaho state courts, its court

25  files, along with litigant rights and with court access.

12

1          The Idaho Supreme Court, to strike this balance,

2    effectively has created a large manual and several rules --

3    both electronic filing rules, both rules of court, both rules

4    of civil procedure -- to address really the crux of the case,

5    and that is that the clerks in each of our 44 counties are

6    expected to do a ministerial review that takes approximately

7    five minutes before accepting or rejecting an intended filing

8    of, in this instance, complaints and transferring them into

9    the court's official record.

10          The second policy that the Idaho Supreme Court put in

11    place through this was that once that clerk review was done

12    and if the document was accepted and not rejected, it was then

13    immediately provided to the press and the public the moment it

14    went into -- or goes into the Court's case management file.

15          In this lawsuit CNS demands that this Court enjoin

16    the Idaho Supreme Court from following this very process that

17    it's put in place and that provides timely access to the

18    complaints at issue.

19          What CNS's demand effectively means is that this

20    Court will need to rule that there is no preprocessing review

21    that will be done in the state of Idaho with newly submitted

22    complaints because that is, per CNS, unconstitutional and that

23    CNS be provided immediate access to submitted complaints

24    through either a press review queue or auto accept.

25          As such, CNS is demanding preprocessing, immediate

13

1   access to complaints submitted for acceptance into the court's

2   case management file.  There is no legal support for CNS's

3   position, and their complaint should be dismissed as to

4   summary judgment and their request for permanent injunction

5   denied.

6         I didn't want to presume by you having us go first

7   that you had already made a decision related to our request

8   that you reconsider the judicial document issues, so I am

9   prepared to talk about that and I'd like --

10         THE COURT:  I think you should.

11         MS. DUKE:  I appreciate that, Your Honor.

12         From the standpoint of -- we are all here because of

13   *Planet III*, and I think we can all admit we've read those

14   cases far more many times than we ever wanted to, all three

15   versions of them.  And they are very confusing, and there were

16   some inaccuracies in the drafting that ended up in the

17   published opinion that we've highlighted for Your Honor.  And

18   we'd like to address those here for you.

19         The paper complaints in *Planet III* were judicial

20   documents because they had already crossed the clerk's

21   counter.  So in terms of Idaho taking it to the electronic

22   world, they had already gone from Tyler eFile & Serve, which

23   is a Tyler-maintained cloud-based service portal.  They had

24   already then crossed the clerk's counter, with the clerk doing

25   an initial review of them to look to make sure filing fee,

14

1   jurisdiction, and the clerk accepting them and not rejecting

2   them and handing them back to the filer.

3          With that acceptance, this is where everything is --

4   is in my view, in reading many of these cases across the

5   country where courts have simply adopted what *Planet III* did

6   and they've ignored that nuance -- and it's a very crucial

7   nuance, because what we are dealing with here are totally

8   different circumstances.

9          In *Planet III* those complaints were already accepted

10  by the clerk.  They then went through a later process where

11  they would be double-checked by a supervisor, which would

12  sometimes take a long time before they could start and open

13  the paper file.  They were ultimately then scanned in.

14         Notably, *Planet III* found the scanning policy -- or

15  practice to be okay.  But that's one of the key issues there.

16  And how did -- how did *Planet III* get there?  Well, *Planet II*

17  found that a complaint is a judicial document by citing the

18  *Lugosch* case that we provided to Your Honor.

19         The problem with *Lugosch*, however, is that the

20  portion they cited quotes, "The mere filing of a paper or

21  document with the court is insufficient to render that paper

22  or judicial document subject to the right of public access."

23  And *Lugosch* was quoting the *United States v. Amodeo* case.

24         *United States v. Amodeo* and *Lugosch* go on to state,

25  "In order to be designated a judicial document, the item filed

15

1   must be relevant to the performance of the judicial function

2   and useful in the judicial process."

3          In the case of *Planet III*, it makes sense given the

4   court clerk had accepted the filing and had then said, "Great.

5   I've got your filing.  I'm opening a case."  That is

6   completely different than our case here, where until a clerk

7   goes into the private part of the eFile & Serve, the private

8   portion of that, to review the complaint in those five

9   minutes, about, to do that ministerial review of am I filing

10  in Bonner or Bonneville?  Am I in Ada or Ada County?  Am I in

11  Boise or Ada County?  All of those nuances that we referenced

12  to Your Honor, all of that's been done by your *Planet III*

13  scenarios.

14         That's not what occurs in Idaho.  Idaho's clerks will

15  take a look and they will look to the document and say, "You

16  know what?  This should be in magistrate court.  This is not a

17  district court case.  You don't have a filing fee."  They then

18  push that complaint electronically back instead of accepting

19  it, like they did in *Planet III*.

20         And so, Your Honor, that's where we believe in

21  looking to historical access, which I'll obviously get to, is

22  a judicial document is not the document.  We are not dealing

23  with the same types of process or procedure as the *Planet III*

24  case.

25         We then turn to *Planet II*.  That did give us an

16

1    analysis of what the two-part test is to determine whether

2    there's a judicial document, and that's historical access and

3    whether public access plays a significant role in the

4    functioning of the court system.

5           So you look to this.  This is undisputed.  And first

6    it was alleged -- and this is why we were hopeful that you

7    would be open to reconsidering those few sentences in your

8    decision previously in the case.  With discovery, we now know

9    that Docket 1, paragraph 37 is not true.  It's wrong.

10          Cathy Valenti, who is the CNS reporter who was

11   working back when we were in the paper-filing days and who has

12   now been working for CNS in the electronic-filing days,

13   testified under oath that she would go to Ada County and she

14   would ask the court clerk a few times a day for a copy of the

15   docket.  And we've provided you the testimony from clerks and

16   from Ms. Valenti herself who said they were file-stamped

17   complaints that they would get, that she would receive.

18          The historical access that Ms. Valenti had was the

19   clerk accepting the complaint because the basic ministerial

20   review had been done.  It just wasn't being put into a

21   physical file yet.  That's Ms. Valenti's testimony.

22          You then have Mr. Girdner, the CEO of CNS, trying to

23   create a material issue of fact there in a few ways.  First

24   you have an affidavit by Ms. Valenti that does not contradict

25   or address the various issues that they are raising trying to

17

1 explain her testimony away in their opposition.  Mr. Girdner

2 never visited Idaho.  He never went to the clerk's counter to

3 see what would be received.  That's why we included in our

4 opposition a motion striking, effectively, for lack of

5 foundation that testimony from Mr. Girdner.

6     Ms. Valenti testified that she, prior to electronic

7 filing, would have file-stamped copies.  And that was in Ada

8 County.  That was Canyon County.  As for other counties, she

9 testified she wouldn't even go to them except for once a

10 month, and other counties not at all.

11     And so it's undisputed that the historical access

12 that we're talking about here was after clerk review and

13 acceptance by the Courts.

14     We also provided you with declarations from Judge

15 Brown, Judge Watkins, Judge Meyer, other judges that were

16 familiar with the paper filing system prior to the transition

17 to electronic who also were able to provide that testimony,

18 that file-stamped means it's been accepted, I've stamped it,

19 it's filed.

20     So we get to the second prong.  There's no historical

21 access, as CNS is arguing.  We get to the second prong, and

22 that is what significant, positive role does public access

23 play for a complaint that has not yet been viewed by a clerk.

24 That's the second prong that they have to meet with this

25 judicial document analysis.

18

1        And if you sit and ask yourself, "If I make a mistake

2   and I am supposed to file a complaint in Ada County and I make

3   a goof and I file it in Boise County -- or tried to file it in

4   Boise County," what is the significant positive role that the

5   public or press has other than, I guess, to illustrate that I

6   made a mistake, to that knowledge, that, "Hey, we're not

7   accepting that.  That's the wrong county.  You need to go

8   change your caption and resubmit and refile in the proper

9   county"?

10       This -- how can this be significant?  The clerk has

11  not touched it yet.  The case has not been started yet.  It's

12  still sitting in eFile & Serve.  With complaints, there is no

13  case file in Case Manager yet.  There is no action that a

14  judge could take any type of action on.  The judge does not

15  even have a copy of the complaint yet.  It is still in a

16  completely different system, eFile & Serve, versus the court's

17  official record, which is Case Manager.

18       THE COURT:  Doesn't your argument, though, run

19  counter to the Ninth Circuit's recent decision where they

20  said -- and these are my words -- once the sender hits send,

21  it's filed?  I mean, isn't there a big difference there

22  between that and the way the Idaho courts are doing it?  And

23  if so, is that permissible to have different states having

24  different situations?

25       MS. DUKE:  And you're referring to the *Planet III*

19

1   case with that quote or with that summation?

2          THE COURT:  It's the Tenth Circuit case.  It's not --

3          MS. DUKE:  Oh, Tenth Circuit.  I'm sorry.  The Tenth

4   Circuit case that provides that?

5          THE COURT:  It just came out not too long ago.

6          MS. DUKE:  I understand, and I -- unfortunately, I

7   think some of the arguments that have been raised across the

8   country related to this underlying premise within *Planet III*

9   that we've highlighted for you related to how *Planet III* got

10  on this judicial document tangent, what a judicial document

11  means.  I think it has not been well addressed by other

12  courts.

13          And I don't know the details of what system was being

14  used, you know, with that court.  It's not filed.  Once send

15  is hit, there's no record.  I can't go back as a litigant and

16  get the prior complaints that people filed if I haven't

17  maintained them myself.  Tyler's not maintaining anything.

18  There's no official record of what's been submitted and

19  rejected, no official record.

20          THE COURT:  So if I'm understanding, you're saying in

21  Idaho -- how do I say it?  It's not the plaintiff who

22  determines when a complaint is filed; it's the courts?

23          MS. DUKE:  The plaintiff decides they're going to

24  initiate it, but they need to go through a ministerial review

25  to make sure that they checked the right boxes.  And as long

1    as those right boxes are checked, it's up to the court.

2          And when we get to *Planet III* -- and I'll get to that

3    here real quick, because I think that's important to note real

4    fast, and I'll go out of line here a little bit. *Planet*

5    *III* -- and this is very devoid from CNS's briefing. First

6    you've got to have a substantial probability that these

7    alternatives that they're proposing are still in the interests

8    of the fair and orderly admission of justice.

9          And second -- and this is -- this is what CNS wants

10   you to just focus on, these words: no reasonable alternatives

11   exist. And they want you to stop there. They don't want you

12   to read the rest of that sentence, and that is, to, quote,

13   unquote, "adequately protect," close quote, that government

14   interest.

15         And so that goes right to your question, Your Honor,

16   of is it the Courts or is it the filer? The filer initiates

17   the submission, but they've got to go through a couple of

18   basic checkpoints to get through the border. And, yes, the

19   court clerk is the border patrol and is saying, "You've got

20   your documents. You've got everything in order. I'm going to

21   let you through," and then you go through, and it now becomes

22   a formal official court document.

23         So getting back, Your Honor, to the judicial document

24   piece, that's why we wanted to highlight for you that -- and I

25   think we do it really well in our briefing -- that this is not

21

1    a judicial document as defined by the very cases that *Planet*

2    *III* relied on, because it's a wholly different situation.

3           Any other questions on that before I move on, Your

4    Honor?

5           THE COURT:  Well, the only one I'm curious about is,

6    are you aware of any other state out there that uses this,

7    what I'm going to call Idaho's system of determining when a

8    complaint is filed?

9           MS. DUKE:  I mean, I don't know.  I'm assuming that

10   there must be various jurisdictions out there that do.  I

11   mean, certainly there's jurisdictions that do a ministerial

12   review.  Do they follow the exact process that Idaho does?

13   Quite frankly, no.  I think Idaho is actually unique in that

14   Idaho, once that clerk reviews it and does their five or so

15   minutes, it's automatic.  There are other jurisdictions it's

16   not automatic.

17          The Idaho Supreme Court made a conclusion that when

18   we say go and it's in our case management system, it's now

19   accessible to the press and the public.  And I don't know that

20   all of these other jurisdictions CNS has been involved in have

21   that immediate access.

22          And that's not at all what was happening in Ventura

23   County in *Planet III*.  It was accepted, so they got the green

24   light.  They got to go.  They crossed the border.  And then

25   they took another days to weeks to actually provide the

22

1   access.  The State of Idaho's access is instantaneous once it

2   enters our case management system.

3   THE COURT:  Thank you.

4   MS. DUKE:  So if Your Honor determines that this is a

5   judicial document and historical access and the tests that

6   were to find historical access and the substantial interest

7   that the public would have in a complaint that does not

8   ultimately get filed -- and I'll note for you, Your Honor,

9   that in CNS's briefing and our briefing, we all provided you

10  with statistics in very long spreadsheets that note some

11  pretty interesting things.

12  This process we're talking about for Idaho, if you

13  look at initial filings statewide, 403,246 filings from

14  April 4, 2021 to November 18, 2022, the average business hours

15  to review those were 4.8, which I'll talk about in a moment,

16  and --

17  THE COURT:  What was the purpose of using those

18  dates?

19  MS. DUKE:  They were dates that we all agreed to in

20  discovery to have some kind of finite window so we could have

21  data for you.

22  THE COURT:  I just want to make sure that you didn't

23  pick your own dates and they picked their own dates and it

24  gave me different stats.

25  MS. DUKE:  These are the same.  And I think we were

23

1    also trying to look at the pandemic, because obviously the

2    pandemic made a mess of everything in the nine months of 2020

3    when we were shut down and dealing with all the things we were

4    dealing with.

5         There's an 11 percent rejection rate, Your Honor.  So

6    that is 11 percent of the time that the clerk is saying no,

7    red light, you're not going in, 11 percent of the time.  And

8    what's notable with that is when we do get into some of these

9    other filings -- CNS noted this, and I should quickly mention

10   CNS has limited their complaint to just the AA complaints.

11   I'm not sure how a private company gets to say what's

12   constitutional or not.  Your decision in this case is a

13   decision as to are complaints that are sitting in eFile &

14   Serve merely -- are they all judicial documents that all need

15   to come through, green light, no clerk review, or am I going

16   to say that some judicial documents are more important than

17   others?

18        That's what CNS is asking you to do because that's to

19   their business interest.  Their business interest has nothing

20   to do with the great majority of filings in Idaho.  Their

21   business has to do with civil lawyers like myself, Givens

22   Pursley, you know, those firms that all get this nightly

23   report that tell us, hey, maybe one of our clients has been

24   sued, we should let them know.

25        So CNS in this lawsuit has limited their complaints

24

1    that they would like you to rule on with no legal basis for

2    why you should be able to limit their -- the issue of whether

3    these are judicial documents to just this select group because

4    it goes to CNS's business interests.

5            But I'll take their AAs because that's what they

6    brief.  If you look at their opposition, Docket 74, they're

7    dealing with a different data set only because they were

8    dealing with discovery answers that were missing four months

9    of data.  Our Exhibit A to the Carroll declaration actually

10   provides all of the data.

11           But you'll see that they identify for you that 1,642

12   complaints were rejected and only 1,025 were corrected for

13   filing.  That leaves you with a significant number of

14   complaints that never initiated a court action in district

15   court.

16           Now, what are the reasons for that?  It could be that

17   many of those were magistrate cases and so they weren't going

18   to initiate a AA case.  They were going to be a magistrate

19   court case.  But you have a significant number that were --

20   that never became a lawsuit.

21           And so that's where we come to the judicial document

22   and why Idaho has done what they've done.  And if states are

23   doing something different than Your Honor, I mean, they're

24   letting a number of things in that otherwise are rejected.

25   And that's where I'll get to press review queue and auto

25

1   accept as to whether they're problematic.

2          All right.  So it's clear, Your Honor, if you go past

3   the judicial document analysis, which we believe, you know,

4   wins the day for the Court, the Supreme Court, in that these

5   are not judicial documents yet based upon how Idaho's process

6   works.  It's very distinguishable from the facts in *Planet*

7   *III*.

8          But when we get into these other issues, obviously

9   the First Amendment secures a right of timely access to public

10  available civil complaints that arise before any judicial

11  action is taken upon them.  But we also know in *Nixon* that

12  every court has supervising power over its own records and

13  files.  We provided to Your Honor the Idaho constitution,

14  indicating that the courts can run themselves, but the way

15  they're funded is through the legislative branch.

16         When you look to *Planet III*, this is where it's

17  confusing as to the standing issue.  And I'm not sure if you

18  want me to spend any time on standing.  Certainly we address

19  it in our briefing.  *Planet III*, again, says they're using --

20  you know, not doing strict scrutiny, but then they apply a

21  firmer standard than that.  And Judge Smith, in his infinite

22  wisdom, noted that.  I don't know if you want me to address

23  that at all or just go with --

24         THE COURT:  I'll leave it up to you.  I do want to

25  make sure that you understand -- and I think you do -- just

26

1　because I told you 30 minutes, when I interrupt you with

2　questions, I'm not counting that against you.

3　　　　　MS. DUKE:  Thank you, Your Honor.

4　　　　　THE COURT:  So how you keep track of that, I have no

5　idea.

6　　　　　MS. DUKE:  If you could just tell me when you think

7　I'm close to time.  I just got my five-minute warning from

8　Molly.  So I won't have her --

9　　　　　THE COURT:  That's why I said that.  I figured that's

10　what it was, and I want to make sure you understand you

11　probably have a little bit more than five minutes.

12　　　　　MS. DUKE:  Well, quickly, with respect to standing, I

13　think Judge Smith was -- and I'm sorry that the majority

14　didn't agree with him, because I think he was right.  They

15　said that it was a lower standard.  We can certainly cross

16　that hurdle, no issue.  But we can also cross the hurdle, no

17　issue, with respect to what CNS wants it to be, which is this,

18　quote, unquote, rigorous scrutiny standard.

19　　　　　And so we know that the press is not entitled to

20　immediate access and that time, place, and manner regulations

21　are permitted when they're content neutral, narrowly tailored,

22　and necessary to preserve the court's important interest in

23　the fair and orderly administration of justice.

24　　　　　CNS ignores this balancing test.  The public's

25　interest in contemporaneous news filings in the court and the

27

1    state's administrative interests in the fair and orderly

2    processing of filings and maintenance of court records are

3    crucial.

4          And the Idaho Supreme Court should be able to say,

5    "We don't want a bunch of civil actions," 500 of them per

6    CNS's data, "that never initiate a district court case, that

7    never do this."  But we're going to have our entire system

8    struck down under the First Amendment of the constitution

9    because the public has an interest in people accidentally

10    filing in Boise County or magistrate county -- or magistrate

11    versus district court?  That doesn't add up.  It doesn't make

12    sense.

13          But if you look to -- if you look to the

14    constitutional delay argument that CNS is making, any delay

15    that we have is minimal, Your Honor, and it's justified when

16    weighed against the reasons for requiring clerk review and

17    acceptance prior to access.

18          We have this data for you.  Any alleged delay is not

19    significant.  Total filings, 2,961,279 filings that our clerks

20    across this great state are wading through every single year

21    with the data that we have here -- which is that January 4,

22    2021, to November 18, 2022, so not even a full year -- that

23    our clerks are going through, in 3.68 business hours with a

24    6 percent rejection rate.

25          On initial civil filings, I've already gone through

28

1    that data with you and then the AA filings, which is the

2    business interest group that CNS wants this lawsuit limited

3    to, this is remarkable.  The clerks of the court have been

4    charged by the Idaho Supreme Court with making sure that just

5    some basic things that make our court system function smoothly

6    are done, and they're doing this in remarkable time.

7          Next, Your Honor, when you look to the two-prong

8    test, so this is if you adopt this rigorous scrutiny that CNS

9    wants applied, because they sure know they can't beat Judge

10   Smith's concurrence scrutiny.  But when you look to this

11   rigorous scrutiny that they assert needs to occur -- this is

12   the slide that I got to you -- that is a substantial

13   probability that fair and orderly administration of justice is

14   impaired, and no reasonable alternative exists to adequately

15   protect the government interest.

16         So we look to press review queue, Your Honor.  And

17   again *Planet III* has a really important quote there that we've

18   provided to you, and that is it said exactly -- it defeated

19   exactly what CNS's arguments are in this case.  They are not

20   saying that *Planet III* comes to the conclusion that you get

21   immediate preprocessing access.  That is exactly what CNS is

22   asking from you here today.

23         The process review queue, we've outlined for you

24   significant costs.  108,000 apparently isn't a lot to CNS or

25   the arguments that they're making.  It's a lot in this state.

29

1    And to go to the Idaho legislature and to get an

2    appropriation, as we outlined with Sara Omundson's

3    declaration, this is not something that the Idaho Supreme

4    Court can just turn off a switch and say, oh, now we're in

5    press review queue.  This will require your order extending to

6    be the Idaho Supreme Court and the Idaho legislature to fund

7    this press review queue for Tyler.  CNS also does not factor

8    in the costs that are associated with tailoring that program

9    to Idaho, along with the training.

10          Again, the First Amendment does not require us to

11   second-guess the careful deliberations the state court

12   undertook in deciding how to manage its scarce resources.  And

13   *Planet III* said, "We decline to do so here," and upheld the

14   scanning policy.

15          You then look to the security risks.  Ms. Omundson

16   several times -- and we have this in our declarations for

17   you -- has asked Tyler for assurances that if we do press

18   review queue, if that's something that we even look to

19   consider, look to see if there's an appropriation, "Are you

20   able to assure me that nothing will happen to that original

21   filing that's been filed in eFile & Serve that now press

22   review queue, everybody has access to?"  Except the judges.  I

23   guess the judges could get their own log in to eFile & Serve,

24   but the public and press.  Tyler won't answer that question.

25   They won't assure that the original document cannot be

30

1    manipulated.

2         And I know we are in a scary day and age for many

3    reasons, but one of them that I think keeps us all terrified

4    at night is cybersecurity.  And they won't answer and give her

5    those assurances, and that's in the record for you in our

6    briefing.

7         Tyler also confirmed that web scraping could occur,

8    and that's where you send a spider into the server, and the

9    spider or bot goes in -- and CNS using these -- and it grabs

10   the data off of -- you know, basically off of the electronic

11   filing.

12        Tyler just had 300,000 documents taken that way in

13   California, and we provided that to you in our briefing.  It

14   was in a different platform but certainly a platform that

15   scares us and from the standpoint that Tyler's had this

16   incredible security breach where bots got in and took 300,000

17   state bar records from the California State Bar.  And Sara

18   Omundson wants these assurances, and Tyler can't provide them.

19        You also have the public confidence and integrity of

20   the court system.  There's no question that I believe every

21   institution seems to be under fire right now, sadly, and the

22   integrity of our courts matters.  And for CNS to argue that we

23   should erase and not permit any clerk review, to allow the

24   public and press to see documents before we've said, hey, this

25   passes some basic things, that makes no sense.  The Court has

31

1    every right to protect its documents that it accepts into its

2    case management system, and it has every right to reject those

3    that don't comply.

4            And we do provide you with an example that Judge

5    Watkins dealt with where, in a very contentious criminal

6    matter, the party wanted to publish a number of nasty things

7    about the prosecutor which the clerk caught and didn't allow

8    to be filed.

9            So, you know, Your Honor, the one other thing I want

10   to highlight on the press review queue is it's taking the

11   clerks out of this.  CNS cannot get up here and say to you

12   that clerk review won't happen before this goes into the press

13   review queue, because it's automatic.  It happens before the

14   clerk reviews it.

15           The same is true with auto accept, Your Honor.  Auto

16   accept, no clerk processing before the public.  And this goes

17   into the court's file.  This actually becomes a judicial

18   document.  Auto accept means you're not hanging in that eFile

19   & Serve queue.  You are now given the green light

20   automatically, with no clerk review, and you're allowed over

21   into the border of the case management system for the court.

22           Because of that, Your Honor, there's incredible costs

23   that we outlined for you in many judicial declarations and

24   clerk declarations, which included clerk time to address

25   errors with the parties because they don't have access in the

32

1   Case Manager to communicate with the eFile & Serve folks.  So

2   to get ahold of my secretary and to say, "Ms. Stocksdale,

3   you-all filed in the wrong court.  You've got to do this.  Or

4   you forgot your filing fee."  They need to go look up her

5   email address and email her rather than do it all through the

6   eFile & Serve system.

7          There's also incredible clerk time to -- or judge

8   time, because now it's a part of the official record.  What

9   happens if you file on the day the statute of limitations runs

10  in Boise County and you meant to file in Ada County?  Well,

11  under our Idaho rules, I, as a savvy defense lawyer, can come

12  in and I can file a motion to dismiss, and a judge is going to

13  have discretion to dismiss that.  If it's a pro se plaintiff,

14  it's very likely that pro se plaintiff doesn't file something,

15  and the case is dismissed.  The judge is going to sua sponte

16  change the venue of a case, and that pro se plaintiff is out

17  of luck.

18         The Idaho Supreme Court, in doing everything that it

19  has done with its system, has struck the balance it can find

20  by providing a reasonable time to review complaints, as we

21  indicated, 85 percent of the AA complaints that had been

22  cherry-picked by CNS, 4.82 hours of business hours for any

23  other document -- or any other initial filing, and in the 3s

24  for all filings.

25         You also look, Your Honor, to the public confidence

33

1    and integrity of the courts and abuse of the system.  Again,

2    that applies to both press review queue and auto accept.  Not

3    having some eyes for a ministerial review on a document would

4    lead to nothing more than the potential to have documents

5    filed that never should have crossed the border.

6          So, Your Honor, I'll stop there.  Obviously, we

7    request Your Honor --

8          THE COURT:  Let me just ask you two questions.

9          MS. DUKE:  Sure.

10         THE COURT:  I think they may be the same question.

11   I'm not sure.  The way I see it, what CNS wants here is what

12   the federal courts already do.  If it works here in federal

13   court, what's the harm with doing it in Idaho?  That's the

14   first question.

15         And the second question, I have no doubt that the

16   state clerks do great work, why, but why can't they do the

17   exact same work on the back end, after filing, rather than on

18   the front end?

19         Now, you may view those as the same question.  I

20   don't know.  But I would like a response to both of them.

21         MS. DUKE:  Absolutely.  Two very different questions.

22   So thank you.

23         The first, we provided this in our briefing too, and

24   this is by, of course, no means a -- the state court is far

25   busier volumewise in Idaho given the type of cases that the

34

1    state courts have.  From 1/1/2021 to 11/18/2022 -- we were

2    trying to find the same time period, and we provided this to

3    you at Docket 60-15 -- fewer than 500 civil cases were filed

4    in the U.S. District of Idaho.

5          You also don't have the magistrate court problem

6    because you're filing -- at least in the civil world, you're

7    filing your complaint.  You don't have the county problem.

8    You don't have the issue with respect to various districts,

9    because in Idaho's federal court system, it -- it's not hard

10   other than making sure you've got your right caption, you've

11   appropriately provided all the pages, and then you have your

12   filing fee.  There's not a lot to correct there.

13         THE COURT:  Okay.

14         MS. DUKE:  So that's number one.

15         Number two, to go back to what you were just

16   indicating there, we provided you with all of the clerk

17   affidavits.  Why can't the clerks just do this on the back

18   end?  And that was one of my first questions to Ms. Omundson

19   when I got this case, what, a year and a half ago.

20         And here's what the clerks tell you in those

21   declarations.  The clerks tell you a couple things.  With auto

22   accept -- so that means it's going automatically into the case

23   management system -- the clerks are no longer the keepers of

24   those records from the standpoint of it's not easy to access

25   them to review for mistakes.  Because in eFile & Serve

35

1    everything comes in a nice envelope, and that envelope has all

2    the filers' names, the opposing parties' names, and then it

3    has all of the documents that go with it.  And so a lot of

4    times, you know, with a complaint you might file a number of

5    different exhibits, those types of things.  All of those are

6    contained within the same envelope.

7          That doesn't exist in Case Manager.  So the clerks

8    would then have to go document by document.  And then rather

9    than have the ease of being able to just send us a quick

10   message -- which is what we get.  We'll get a message that

11   says "docket entry correction" from eFile & Serve and, you

12   know, "no signature."

13         They would have to go get the email from the

14   directory, email on their own personal -- or on their business

15   account to my assistant saying, "Sandy, you have an error

16   here.  You need to fix this.  We need a signature page," and

17   then Sandy's on vacation or whatever.  I mean, the

18   communication abilities, Your Honor, don't work like that.

19         Second, in the auto accept world, it would require

20   judicial action.  You can't -- clerks are not authorized or

21   permitted to just go change official court records.

22         And I should note that even the public records laws

23   allow three days to respond to public records requests.  So

24   the irony of having 4.82 hours or 85 percent of the claims

25   received within eight business hours is a bit astonishing.

36

1        But that said, clerks cannot go in and just change

2  the public record.  It's going to take judge action.  It's

3  going to take the judge's assistant as well even if they're

4  just going to change venue.

5        One other example we gave you is the filing fee

6  issue.  So if I filed in Boise County and I meant to file in

7  Ada County and I pay my filing fee, Boise County already has

8  it in their coffers.  It's automatically transferred to them.

9  So you then have to go to Boise County and say, "Listen, this

10  just got transferred over.  We now need you to go transfer

11  those funds here."

12        This is why ministerial review matters, and it's why

13  it matters on this interface side, because this interface side

14  doesn't let it into the record.

15        And on the press review queue side, you've got the

16  cost.  You then have the training.  But then you have all of

17  the same issues of not having any security, that there is

18  protection of that original document sitting in the press

19  review queue.

20        So I know I'll have a few minutes for rebuttal, but

21  unless you have any other questions --

22        THE COURT:  I don't.  Thank you.

23        Sir, if I could start you off with an assumption

24  here, and that is simply Ms. Duke said that the prefiling

25  review process takes about five minutes.  I am assuming that

37

1   your beef isn't with the five-minute process but with the

2   delays of life; that is, when clerks get around to do that

3   five-minute process.  That's where your beef is, isn't it?

4           MR. FETTERLY:  That's a correct assumption, Your

5   Honor.  It may require only five minutes, approximately, for a

6   clerk to conduct this ministerial review as to any given

7   complaint.  But what the record shows is that from the moment

8   the filer submits the document and it is received by the court

9   into the e-filing database, the EFM, it would be any period of

10  time thereafter until the court clerks are able to perform

11  that function:  Log in to their system, go to their computer,

12  access the document, review it.

13          And the record shows that if we look at, you know,

14  kind of the larger aggregate over this 19-month sample that

15  the parties came up with, January of 2021 through July of

16  2022, during this window of time, 42 percent of all new civil

17  complaints -- this is the AA category, and I'll speak to why

18  we're talking about that in a moment -- but 42 percent of them

19  were delayed until the next day, meaning that five-minute

20  process did not take place until the following day.

21          15 percent of them were delayed two days or longer.

22  Same thing:  That five-minute process did not begin until two

23  days or longer.  It's that intervening delay from the moment

24  the filer submits the document to when the court clerk gets

25  around to conducting the review.  That is the delay that we're

38

1    talking about.

2          And I wanted to be very clear in our analysis because

3    I do intend to focus my argument here today on the analytical

4    framework that we believe this Court should follow on ruling

5    on these motions.  We're not looking at the delays in a vacuum

6    here.  I think I heard the term "balance" used more than a few

7    times, but this is not a balancing test per se.  I'll get to

8    that in a moment.

9          What we are challenging is the restriction on access

10   results in the delays.  Again, this is a distinction not

11   without a difference.  We have a restriction.  The filer has

12   submitted a document, and the Court has received it.  It's in

13   the eFile manager.  And there is ample authority for the

14   proposition that this First Amendment right of access attaches

15   when the document is submitted to the court, not just *Planet*

16   but the Tenth Circuit New Mexico *AOC* case and numerous other

17   district courts that have addressed this exact issue in the

18   e-filing context and using the same e-filing system that we

19   have here.  And, yes, there are other courts that use this

20   exact same system.

21         So what we're talking about is from the moment the

22   court receives it, there's now a restriction.  The court can

23   provide access, talk about all the different ways it could do

24   so, but they're not.

25         And so at that point in time, we do have a delay.

39

1    And that is the result of the restriction, but we're

2    challenging the restriction.  And that's going to become very

3    relevant here when I talk about the second part of the *Press*

4    *Enterprise II* test.

5          Did I sufficiently address the Court on its question

6    on that point?

7          THE COURT:  You did.  Thank you.

8          MR. FETTERLY:  Thank you.  So again, the analytical

9    framework -- I want to focus on the path that the Ninth

10   Circuit has given us for evaluating this claim.  And I'll do

11   my best to address counsel's arguments along the way, but I

12   also intend to stay on this path.

13         I'll begin by addressing what this case is about

14   followed by a brief discussion of this restriction that

15   results in the delayed access, and then focus on the two-part

16   *Press Enterprise II* test that really is the heart of this case

17   and governs the Court's analysis.  And then I'll briefly

18   conclude with Courthouse News's entitlement to relief.

19         Starting with what this case is about, the Ninth

20   Circuit tells us what this case is about.  In *Planet III*

21   Justice Wardlaw begins with the following sentence:  "The

22   peculiar value of news is in the spreading of it while it is

23   fresh."  That's what this case is about, Courthouse News's

24   ability to report on new, nonconfidential civil complaints

25   while the news value is fresh.

40

1    When a filer submits a document to the court, they

2    invoke the court's power.  They invoke the power of the

3    government to resolve a private dispute.  The press and the

4    public have a right to know about that.

5    Courthouse News reports on these civil complaints

6    that are filed with the Idaho courts.  It does so by going and

7    reporting on them in a daily basis.  The public at large does

8    not do this.  The public does not go to the courthouse on a

9    daily basis to look at all civil complaints.  They rely on the

10    reporting of the press, Courthouse News and other members of

11    the media.  And as *Planet III* explains, Courthouse News is a

12    surrogate of the public.  So Courthouse News and the press are

13    standing in the public's shoes when they're performing this

14    vital function.

15    In order to report on new complaints when the news

16    value is fresh, Courthouse News must be able to see them when

17    they are received by the court on the day they are filed.

18    When news is delayed by even one day, it is overtaken by the

19    next day's news cycle, and it becomes old news.  This is why

20    delays in access matter, even short delays.  That's what this

21    case is about, and we're challenging the restriction that

22    results in the delayed access.

23    Turning briefly to that restriction, again, we don't

24    look at the delays in a vacuum.  The restriction is the policy

25    decision, the practice here of restricting access until after

41

1   ministerial review and acceptance.  We know that delays are

2   inevitable whenever this happens.  When courts are withholding

3   access for public -- for processing, ministerial review,

4   delays are an inevitable result.

5        Mr. Girdner speaks about this in his declaration at

6   paragraph 25.  This is ECF 64.  And here we have an undisputed

7   record of delays.  I know that it's -- arguments here today

8   suggest that there may be some dispute, but really what we're

9   talking about are a universe of complaints that the parties

10  stipulated to in discovery as being the basis of the data that

11  we would present to the Court.  And this wasn't just chosen

12  willy-nilly for convenience and discovery purposes.

13       But the Ninth Circuit recognizes a First Amendment

14  right of access to nonconfidential civil complaints.  And here

15  the record shows that this AA category is comprised of

16  complaints that are in fact public.  They're nonconfidential.

17  And these just happen to also be the complaints that

18  Courthouse News is asking to see.  They are the general

19  litigation civil complaints, not the magistrate filings, not

20  some other category.

21       So this category of AA lines up with the recognized

22  right of access established by *Planet III*, and it corresponds

23  with Courthouse News's reporting of new complaints, and this

24  is the universe that we have.  And within that universe we

25  have the delays that I was speaking about a few moments ago,

42

1   this 42 percent delayed to the next day and 15 percent delayed

2   two days or longer.  And this isn't a large aggregate number.

3   It doesn't tell the real story on the day to day.

4        And if you look at the declaration of Jimmy

5   Shimabukuro -- this is Docket 61-3, Exhibits 1 through 9 -- we

6   see examples of far different and greater delays, because they

7   vary from court to court and month to month.  We have one

8   example of Kootenai County in April of 2021.  57 complaints

9   were filed, 56 of which were delayed two-plus days.  So it

10  took the court clerk two-plus days to begin that five-minute

11  material review.  And there are greater examples, and I won't

12  get into them here.  They're all reflected in the record in

13  the exhibits I just referenced to the Shimabukuro declaration.

14       So then that just leaves us with this kind of

15  alternate measurement of are we going to measure them by

16  business hours?  Are we going to measure them by days?

17  There's not really a conflict.  This isn't a disputed fact.

18  The defendant just measures the delays in a way that makes

19  them look less severe.

20       But this business-hour approach, which stops the

21  clock when the court is closed, it ignores the actual passage

22  of time.  It ignores the value of fresh news, as recognized by

23  Justice Wardlaw.  And quite frankly, we don't believe it's an

24  accurate measurement in this 24-hour news cycle that we're

25  talking about in which news that is delayed becomes old news

43

1    as it's overtaken by the next day's news cycle.

2            So the business-hour method, while I appreciate it's

3    what the defendant would like because it makes the delays look

4    less severe, it doesn't reflect the realities of Courthouse

5    News's reporting and the realities of life.

6            So to recap where we are right now, we've talked

7    about *Planet III*, what this case is about, and why delays in

8    access matter.  We've discussed defendant's practice of

9    restricting access to new civil complaints until after

10   clerical processing and how that results in delays.  And we

11   have evidence of delays submitted by CNS that is not disputed.

12   Again, measuring it differently does not create a material

13   dispute.

14           So we're now at the heart of this case, which is the

15   two-part *Press Enterprise II* test.  And I'll start with the

16   first part of the test, the experience and logic test.  That

17   really was the heart of *Planet III*, and *Planet III* discusses

18   at great length and settled an issue that had not been settled

19   before.  Numerous courts have settled it since.  *Planet* agreed

20   with that and settled it in their respective circuits and

21   districts.

22           *Planet III* recognizes that there is a First Amendment

23   right of access that attaches to new civil complaints when

24   they are filed.  And as this Court previously recognized, that

25   is when they are submitted to the court.

44

1      I appreciate the Court mentioning the Tenth Circuit

2  case, because I think it goes a long way to address most, if

3  not all, of the arguments counsel made earlier.  We heard a

4  lot of argument about this idea of judicial records.  And

5  that's addressed in our papers, but I want to just be very

6  clear on this.

7      The defendant's argument boiled down is that the

8  First Amendment does not attach to a new complaint until some

9  later point in time following receipt, when court staff have

10 conducted their ministerial review and accepted it.  And I

11 suppose then and only then would the First Amendment right of

12 access attach and would there be any obligation to comply with

13 the second part of the *Press Enterprise II* test.

14     So these labels about judicial records and so forth,

15 that's really what they're saying.  They're saying, "We don't

16 start the First Amendment clock until after we've accepted the

17 document."  And this idea that somehow *Planet III* did not

18 understand this and this idea about judicial records being

19 some different, misunderstood thing I don't think is supported

20 by the record nor is it supported by the law.

21     *Planet III* was clear that in the paper-filing

22 world -- and this is true here, and I'll get to why that is in

23 a minute -- when a document is submitted to the court and

24 filed, the First Amendment right of access attaches.

25     Now, in the paper world, you had a clerk and a

45

1    counter.  I'd bring my complaint up to the counter and hand it

2    to the clerk.  This moment of quote, unquote acceptance in the

3    paper world, it was contemporaneous.  It happened there on the

4    spot.

5         And I suppose if in the e-filing world it always

6    worked that way, we wouldn't have this problem.  Now, it does

7    work that way in auto accept.  It does work that way in

8    federal courts.  But for courts that choose not to do that,

9    there is now a delay.  The filer submits the document, the

10   court receives it into their e-filing system, and there it

11   sits.

12        And here again lies the problem.  And the Tenth

13   Circuit addressed this directly in the New Mexico *AOC* case.

14   In that case the panel in its opinion drew a distinction

15   between paper and e-filing in this regard.  They recognized

16   that in the e-filing world, where courts choose to withhold

17   for review, this moment of acceptance does not happen

18   contemporaneously.  There's delay, and that's the problem.

19        And the court is clear in saying that this is a

20   relevant distinction, and the court went on to then follow the

21   Ninth Circuit and conclude, like many other courts have done,

22   that in the e-filing world, a new civil complaint, when it is

23   submitted to the court, received by the court in the EFM,

24   that's when the right of access attaches.  No different in

25   e-filing, no different than with paper.

46

1          If we were to start creating different rules for

2     different systems, we would have a scenario where the First

3     Amendment applies differently depending on what state you're

4     in, what jurisdiction you're in, what court you're in.  If

5     we're going to say the First Amendment does not begin to apply

6     until after the administrative steps are taken in Idaho, then

7     we find ourselves in a spot where the First Amendment just

8     doesn't apply the same way here as it does everywhere else.

9          That just can't be the rule, and, quite frankly, it

10    is not.  That's why courts have been very uniform in

11    concluding and holding that the right of access attaches when

12    the document is submitted to the court, and that is when

13    the -- we then turn to the second part of the *Press Enterprise*

14    *II* test.

15         And I will note the New Mexico courts do use the same

16    Tyler Technology e-filing systems as do the Vermont state

17    courts as do many other state courts.  And Mr. Girdner

18    addresses this in his declaration as well.  So the system used

19    here in Idaho, it is not unique.  The rules may vary in their

20    language, but in this state, as in other states, the rules

21    were hardly adopted around the e-filing system implemented by

22    the court.

23         And so what we now see is Tyler has offered other

24    options, other ways of providing access.  And many courts have

25    adopted the rules, amended them as necessary to address the

47

1    alternative ways of access that do not restrict for

2    processing.  And we'll get to that right now because this is

3    really the heart of the case, which is the second part of the

4    *Press Enterprise II* test.

5          And so, Your Honor, I'm showing you the second part

6    of the test, which is the rigorous scrutiny test.  Again, the

7    first part of the test is settled by the Ninth Circuit.  And

8    again, it's not just the Ninth Circuit.  Other circuits and

9    district courts agree.

10         So once we established that the right of access

11   attaches upon submission, which when it's received by the

12   court, we then apply this test.  This is not a test that

13   Courthouse News is wanting the Court to apply because we

14   believe there's any discretion in the matter.  This is the

15   test.  The Ninth Circuit was very clear that it was not

16   plying -- applying time, place, and manner, and it wasn't

17   applying strict scrutiny.  Following another line of Ninth

18   Circuit cases, they called their test rigorous scrutiny and

19   announced this test.

20         And to be clear, this isn't just the Ninth Circuit's

21   test.  This is a Supreme Court test.  This is the *Press

22   Enterprise II* test.  Numerous courts across this country have

23   applied this test faithfully and consistently.  It sometimes

24   goes by different names, sometimes strict scrutiny.  But

25   rigorous scrutiny is what we are calling this test in the

48

1    Ninth, and regardless of its name, this is the test we are

2    applying.

3            So the Ninth Circuit tells us a lot about how to

4    apply this test.  First of all, it is fact intensive.  We know

5    that from *Leigh v. Salazar*.  They use that exact phrase, fact

6    intensive.

7            We also know from other circuit cases cited in our

8    brief cannot rely on generalized assertions or speculation to

9    overcome her burden on this test.  But to be clear, it is the

10   defendant's burden.  The language could not be more clear

11   about how to survive *Press Enterprise II*'s two-prong balancing

12   test.  The defendant must demonstrate, and we walk through the

13   different pieces.  And we're not asking this Court to

14   cherry-pick any one part of it or another.  We'll walk through

15   why this test is simply, when faithfully applied, one that

16   defendant cannot satisfy, which is why she has not met her

17   burden.

18           So how do -- how do we scrutinize?  Well, first,

19   before we do that, again, what are we scrutinizing?  We're

20   scrutinizing the practice of restricting access, and that's

21   the restriction that results in delays.  So the question is,

22   does the defendant need to do this?  Is there an interest that

23   is being preserved that would be substantially impaired if

24   immediate access were provided?  Are there no alternatives

25   that adequately protect that interest?

49

1        Well, we can stop right there.  We can look at other

2   courts across the country that are doing the exact same thing

3   that we are suggesting they could do:  provide preprocessing

4   or undelayed access.  And that in and of itself is pretty

5   compelling evidence for why there are alternatives that exist

6   and could be utilized.  So we have to ask ourselves, do these

7   reasons, do these justifications that are provided by

8   defendant, do they hold water?

9        So how do we scrutinize that, and how do we do so

10  rigorously?  We kick the tires.  We don't take it at face

11  value.  So for instance, in their papers they identify

12  interest in confidentiality as being a reason why clerks must

13  first review e-filed documents before the public can see them.

14  But we know from the record that the AA category of complaints

15  are all public records.  They're not confidential.  There's no

16  evidence in the record to suggest that any of the type of

17  complaints at issue here are confidential.  And again, the

18  First Amendment right of access here from the Ninth Circuit is

19  a right to nonconfidential civil complaints.

20        So what about a complaint that could be filed with a

21  motion to seal?  It's a -- it's a public document, but someone

22  wants it sealed.  Well, what does -- what does that mean?

23  Well, again, we look at the evidence.  We look at the record,

24  and it shows us that over a two-and-a-half-year period, there

25  was one instance, a single instance, of a filer e-filing a

50

1     motion to seal.  So I would suggest that that hardly qualifies

2     as a substantial probability that an interest in

3     confidentiality would be impaired if, you know, immediate

4     access were provided to new civil complaints.

5          And again, we're not demanding immediate access.

6     We've been over this before, but defendant has a burden of

7     showing that her interests would be impaired by immediate

8     access.  She cannot make that showing.

9          What about PII, personal identifying information?

10     Again, the Idaho rules are very clear.  It's the filer's

11     responsibility.  Those rules also state that the clerk will

12     not review to ensure adequacy of redaction.  So as the Ninth

13     Circuit recognized in *Planet III*, the possibility of some PII

14     being in a public record does not -- you know, is not a reason

15     to restrict the access.  That doesn't go to the asserted

16     interest.  There's no substantial probability that that

17     interest would be impaired.

18          And we also know from our sample of rejection data --

19     there were four months sampled by Courthouse News -- this is

20     in the Adam Angione declaration --  January and July of 2021,

21     January and July of 2022.  We did an in-depth dive on that

22     rejection data.  There was not a single instance of a document

23     being rejected because of, you know, inadequate or failure to

24     redact.

25          So that's what I would ask this Court to do when

51

1  ruling on and analyzing this motion.  We have to rigorously

2  scrutinize the reasons why -- we are given for why the courts

3  claim cannot make this change.  So confidentiality is just but

4  one example.  But we look at the press review queue, we look

5  at the API alternative of it, and we look at auto accept.  And

6  we can run through the same analysis.

7         So for instance, pick review queue.  We heard counsel

8  saying that, you know, the clerk, with review queue, has those

9  security conditions.  Well, yes, they may have concerns, but

10  this is a system that's used by the nation's leading e-filing

11  provider and used by many other courts who all share the same

12  interest in preserving, you know, the fair and orderly

13  administration of justice.

14         If there had been issues with the press review queue

15  being used at these other courts, we certainly would have

16  heard about it here.  We do not.  We just have concerns, but

17  we don't have a record showing that concerns are grounded in

18  reality.  We have this argument that Tyler wouldn't provide

19  information.  Well, Tyler actually testified that it would

20  provide the information, but you've got to get into a certain

21  contractual posture first.  They don't just open up their hood

22  and show their confidential trade secret information absent

23  some binding or some kind of understood arrangement.

24         So it's not that Tyler wouldn't or couldn't, but it

25  was just the defendant wasn't prepared to take the steps it

52

1    needed to take.  So we have this chicken and egg situation.  I

2    would respectfully argue that such a chicken and egg situation

3    does not qualify as a -- establishing a substantial

4    probability that an interest would be impaired by providing

5    immediate access.

6            And we go on.  We have the cost issue.  Okay.

7    There's a -- there's a cost for the Tyler-hosted press review

8    queue.  We also know from Tyler that they give their APIs,

9    application program interfaces, to their partners so they can

10   build their own queue.  And we have in the record that Arizona

11   state courts, they built their own for approximately $12,500.

12           And I'm not suggesting that any of this is free, but

13   I think the idea that -- the idea that the defendant might

14   have to do something or incur some cost is alone reason to

15   suspend the constitution is just a faulty assumption.  If a

16   practice or policy is unconstitutional, it stands to follow

17   that, yes, there may need to be some change.

18           And what we're seeing here is that with the API

19   alternative, they could have the software they need to develop

20   their system for free.  And in the deposition testimony,

21   Ms. Omundson talked about how the court is currently

22   undertaking a large initiative to upgrade and improve all of

23   these technologies, but yet she did not inquire about whether

24   they could build their own press queue because of the policy

25   reason that a document is not available to the public until

53

1    it's been accepted.

2          So, you know, we can't change the policy because it's

3    the policy, and we're going to justify the policy because it's

4    the policy.  This is not satisfying rigorous scrutiny.  We

5    have to actually look at the facts and see what they tell us.

6          As for auto accept, you know, I can't underscore this

7    enough.  We have the Tyler Technologies representative talking

8    about how it is a free, out-of-the-box alternative.  The press

9    queue and auto accept -- or the API version of it, those are

10   accessed before, on the front end, before acceptance; auto

11   accept, access after.

12         And what Tyler tells us is that with auto accept, it

13   really is a matter of flipping the figurative switch.  It can

14   be customized and configured so that only the type of public

15   complaints, that AA category, are automatically accepted.  It

16   can also be configured to take into account payment issues.

17   And I would note that the AA category all involve the exact

18   same filing fee, so we're not talking about multiple fees and

19   confusion there.  It's the same fee for the same type of

20   complaint.

21         It can also be configured to not automatically accept

22   pro se filings, so lawyer filings.  These are all the

23   different ways in which this tool could be implemented and

24   configured to address the various concerns that the defendant

25   claims exist here with auto accept, and yet, again, they

54

1    simply choose not to do it.

2         Now, we heard about how auto accept might be more

3    cumbersome for the court because you're now correcting

4    something on the back end and you're not addressing it on the

5    front end.  Well, again, we need to scrutinize this.  What

6    does the record show?  What does the evidence show?  Does the

7    evidence show that this is a overwhelming problem, or does it

8    show that it's a concern not grounded in reality?

9         Well, again, back to that four-month sample of

10   rejection data.  We saw on average -- and this is Exhibit 8 to

11   the Angione declaration.  We see here that there are an

12   average of one to two rejections per court per month.  So

13   again, we took a four-month example:  January and July 2021,

14   January and July 2022.  We chose those because we thought that

15   was objective and fair, for obvious reasons, one and seven,

16   one and seven.

17        You look at the rejection data produced by the court,

18   and the number of reinjections is not this unwieldy and

19   overbearing volume that would suggest that correcting issues

20   on the back end would be overwhelmingly problematic.  It's

21   quite the opposite, one to two per court per month.  That's

22   the average.

23        And we also have testimony from Ms. Omundson --

24        THE COURT:  If I could interrupt here for just a

25   moment.  I guess I'm lost on the idea, why all of a sudden,

55

1    when you agree to an 18-month time frame, are you now using a

2    four-month time frame?

3          MR. FETTERLY:  Your Honor, it's quite simply a

4    function of trying to comb through the volume of the data.

5    We're trying to provide a representative sample.  We tried to

6    choose fair samples so we weren't cherry-picking.  That's why

7    January, July, January, July.  The number of complaints in the

8    data was quite a bit to comb through, and given timing and

9    practical constraints, we chose a representative sample.

10          THE COURT:  I just want to make sure you're not

11    cherry-picking the best four months for your case.

12          MR. FETTERLY:  That's why we landed on January, July,

13    January, July.  If the Court would like us to do further

14    briefing that illustrates the sample, we would be happy to do

15    so.

16          THE COURT:  No.

17          MR. FETTERLY:  I know the Court has a lot of paper

18    already.

19          THE COURT:  Yeah.  I have plenty.

20          MR. FETTERLY:  So I -- what I was going to say is

21    that we also have deposition testimony from Ms. Omundson, and

22    what she is acknowledging is that court clerks could be given

23    more power to address these issues when they arise so as to

24    not involve or require judicial action or any number of the

25    other things that were contemplated here by these

56

1   declarations.

2          So what we have from the defendant are numerous

3   declarations in which concerns are expressed, and we admit

4   there's a lot of people expressing concern.  But when you

5   apply rigorous scrutiny, we don't see that the concerns are

6   grounded in reality.  We don't see that these individuals have

7   talked to other courts that use the Tyler auto accept system

8   and have discovered that it is this unwieldy, unmanageable

9   scenario that they claim it would be.  We don't see that they

10  have reviewed the Terry Derrick deposition testimony in which

11  he talks about how this auto accept system can be configured

12  to address any number of the concerns that they raise.

13         So the issue here is, are concerns sufficient?  And

14  under rigorous scrutiny the answer is no.  It needs to be

15  grounded in something factual, a fact-intensive inquiry that

16  needs to be grounded in reality, not just unsubstantiated

17  concerns.

18         So we would ask the Court -- I'm not going to cover

19  any more examples.  There are many.  But that is the framework

20  that we would ask the Court to apply when scrutinizing the

21  reasons why defendant claims they simply cannot provide the

22  access.

23         So on to the entitlement to relief.  Having not been

24  able to meet her burden -- because, again, this test that we

25  have up here, this is defendant's burden.  She must satisfy

57

1    it, and we know that she cannot do so for the reasons I've

2    just discussed in terms of the substantial probability of harm

3    if immediate access is provided, as well as alternatives.  We

4    know the alternatives exist.  They're used by other courts in

5    using the exact same system here.

6           Courthouse News then would respectfully request that

7    the Court grant the request for declaratory relief.  At a

8    minimum, we're entitled to a declaration that this practice

9    violates the First Amendment because defendant has not met her

10   burden, and that, separately, an injunction enjoining that

11   practice.

12          Briefly on that point, and then I'll conclude.  In

13   this Court's prior ruling, Your Honor stated, you know, "The

14   Court finds it is not equitable at this stage to force Idaho

15   to overhaul its entire legal filing system."  To be clear,

16   that is not required.  It wasn't required then, and it's not

17   required now.  These tools, these alternatives that Tyler

18   provides exist within the existing and current e-filing

19   system.  They're readily available to the defendant should

20   they only wish to use them.  Had defendant been open and

21   willing to doing so, we wouldn't be here today.

22          What we have seen in our experience -- and

23   Mr. Girdner addresses this in his declaration as well --

24   numerous courts have done so, and they can do so.  Some of

25   that has been in response to a court order.

58

1           In New York the District Court of the Southern

2   District of New York granted a preliminary injunction

3   enjoining the practice, and shortly thereafter the New York

4   courts provided preprocessing access.  They were no longer

5   restricting access for processing.

6           Vermont, also an e-filing using the exact same

7   e-filing system, there the district judge granted a permanent

8   injunction.  And approximately three weeks later the Vermont

9   court implemented the auto accept feature and thereby

10  addressed the issue, combined with the injunction.

11          So what we're asking the Court to do here is simply

12  enjoin a practice that doesn't exist everywhere and has been

13  enjoined by other courts and need not exist here.  Enjoin the

14  practice of restricting access until after completion of

15  processing.  Thereafter, the defendant is free to choose which

16  alternative means of access it deems appropriate as a means of

17  complying with that injunction.  But what we know from the

18  record is that numerous courts are able to provide this very

19  access, and it's the very reason why the defendant cannot meet

20  her burden.

21          THE COURT:  I have two questions for you to close

22  this off.  The way I read *Planet III*, the Circuit said that

23  some of the -- some steps of delay were allowed.  I hear you

24  saying that no steps of delay are allowed.  How do you balance

25  those two?

59

1        MR. FETTERLY:  I -- I will agree with the Court that

2   *Planet III* may not be a model of clarity, but I think if you

3   reduce it to its core holding and the test that it provides,

4   what it is saying is that some amount of delay is allowed if

5   the defendant is able to satisfy their burden.  If that's the

6   case, if the defendant is able to meet their burden under this

7   test, then the delay is allowed.

8        That's what makes this a qualified right of access.

9   We're not talking about a per se right.  We're not saying the

10  First Amendment demands immediate access at the moment it

11  attaches.  It's a qualified right because the defendant has

12  the opportunity to justify the restriction that results in the

13  delay.  They have this two-part test that I have up on the

14  screen right now.  If they can satisfy that test, the delay's

15  allowed.  That's what makes it a qualified right versus a

16  nonqualified one.

17       Our position is and at all points has been defendant

18  cannot satisfy this burden.  And this idea that immediate

19  access is somehow off the table is -- is kind of defeated by

20  the language of the test itself.  The test that the Ninth

21  Circuit gives us here specifically contemplates immediate

22  access by saying that the defendant must demonstrate that

23  there's a substantial probability that its interests -- I'm

24  paraphrasing -- that its interests would be impaired by

25  immediate access.

60

1      So as a practical matter, once you remove the

2  restriction of withholding for clerical review, it likely

3  tends to be that there would be immediate access.  That's what

4  historically was the case.  I know there was a lot of talk

5  about historical access here, but the record shows that even

6  Chris Rich, the former Ada County Clerk, conceded that

7  historically on paper Courthouse News had access to complaints

8  on the day they were received.  And so that's -- the delay did

9  not exist historically in the way that it does now, and that's

10  what we're dealing with here.

11      THE COURT:  The only other question I have -- and if

12  you could just give me a brief, two-minute answer to it --

13  there was some talk earlier about a good argument for why only

14  AA complaints.  I didn't hear that argument.  What's the

15  reason for just going after the AA complaints?

16      MR. FETTERLY:  So it's a few things, Your Honor.

17  First, the First Amendment right of access is limited to new

18  civil unlimited complaints.  So we're -- that's what we're

19  talking about here.  That's what the right attaches to.

20      And in Idaho there is this category that corresponds

21  with the complaints that Courthouse News is going to the

22  courthouse to review on a daily basis.  It's not the

23  magistrate or lesser civil complaints.  It's those that are

24  the general civil complaints.  This is the -- kind of the

25  meaty ones, if you will.  And we've provided examples in our

61

1    papers of new complaints that fit within this category that

2    are environmental actions, actions against government

3    entities.  That's where we find the most newsworthy

4    complaints.  That's what here looking for.

5           So these are all public.  The record shows that none

6    of them are confidential.  We don't want to be getting in a

7    situation where there's confidential records.  We understand

8    that.  We're just asking for the public, nonconfidential civil

9    complaints, and those that are -- which Courthouse News

10   reports on, and that that is the AA -- the AA category.

11          THE COURT:  Okay.  Thank you.

12          Counsel, I'm going to give both of you a brief

13   rebuttal time, and I promise I won't interrupt.

14          MS. DUKE:  No.

15          THE COURT:  Given the lateness of the day, it's

16   probably going to be no more than eight minutes.

17          MS. DUKE:  Thank you, Your Honor.

18          THE COURT:  And if you take less, great.

19          MS. DUKE:  I will -- I will try.

20          First and foremost, what CNS wants is preprocessing

21   immediate access.  That's what you just heard from

22   Mr. Fetterly.  The Tenth Circuit rejected that and denied the

23   permanent injunction that CNS requested related to that.  The

24   Ninth Circuit in the *Planet III* case, as we provided to you --

25   and for some reason it's not showing up here now, but the --

62

1        THE COURT:  I think the monitors went home at 4:30 or

2    4:15.

3        MS. DUKE:  But we did have that quote for you out of

4    *Planet III* saying, "Though we conclude, as the District Court,

5    that the qualified right of access to nonconfidential civil

6    complaints arises when they are filed with the court, we do

7    not view that conclusion as demanding immediate preprocessing

8    access to newly filed complaints."  That is exactly what CNS

9    wants this Court to do, which the Tenth Circuit has rejected.

10    The Ninth Circuit has stated in this dicta that they are not

11    saying that this is what *Planet III* means.

12        I'll next note the delays.  The 24 hours versus

13    business hours matters a lot, and fortunately the Tenth

14    Circuit was clever enough to note that in its decision.  The

15    Tenth Circuit concluded that even the five hours ruled upon by

16    the district court wasn't reasonable, didn't take in

17    extraordinary events that could occur, and also would not

18    permit or require the press review queue or auto accept to be

19    required.

20        The delays that CNS wants you to look to make it

21    sound horrible.  So if my assistant files a complaint at

22    4:45 on a Friday and it's a three-day weekend and the court

23    clerk gets to that complaint on Tuesday morning after the

24    Monday holiday at 8:00 a.m., right off the bat, that's 15

25    minutes in business hours that that complaint sat there, and

63

1    CNS wants this Court to believe that that's four days.  And

2    that's why they're manipulating the data.

3        And in all fairness, they did cherry-pick data from

4    the standpoint of they picked a narrow window of time.  If you

5    look at 11 months, like we provided to Your Honor, you're

6    talking about 8,647 complaints.  They did a lower number

7    because they wanted to be able to go in and look at all the

8    reasons that complaints were rejected, because there were

9    1,482 rejections.  They didn't want to analyze 1,482

10   rejections.  They wanted to analyze 617 and come to this Court

11   and state that these reasons weren't given for rejections.

12       So I'll also note, Your Honor, that with respect to

13   the press review queue and auto accept, they -- Mr. Fetterly

14   just represented to you that these are used all over.  And

15   please, please look at our declarations; 61-2 of our

16   undisputed facts; 59-3, the Derrick declaration; and 61-2,

17   paragraph 80, because here's exactly what those tell you.

18       CNS claims that 25 state courts are using the press

19   review tool, and they're implying it's being used statewide.

20   It's not.  There are specific counties there or courts that

21   have done that.  Number two, a mere two states and 24 counties

22   across this entire country, so two states and 24 counties

23   across the entire country, have implemented a Tyler press

24   review tool for certain types of filings.

25       And as for auto accept, only one state, one state,

64

1     has auto accept configured such that certain initial filings

2     are auto accepted. And CNS has represented to this Court that

3     more than 20 state courts or jurisdictions are currently using

4     Tyler's auto accept. Mr. Derrick, who testified on behalf of

5     Tyler, told you that's not accurate. Auto accept is not being

6     universally used, as suggested by CNS.

7           Auto accept and press review queue are not the magic

8     wand that CNS wants them to be. They are getting rid of the

9     clerk review, providing preprocess access, and immediate

10    access that are not supported, is not supported by any

11    Circuit, whether it's the Ninth, whether it's the Tenth, or

12    any other.

13          The API to build our own, that was briefly touched

14    upon. To build your own computer software, Tyler provides you

15    some of the code at no cost. You then have to take that code

16    and hire a software team, which we provided to you in our

17    declarations, to then develop that and create your own press

18    review queue. That is not something, as they suggest, that is

19    a $12,500 endeavor. We provided you all the reasons in

20    Ms. Omundson's declaration and Ms. Dvorak's testimony as to

21    why you can't just say, oh, we're going to just build our own.

22    That'll be the cost-free ability or advantage.

23          So, Your Honor, we do meet our burden. We meet our

24    burden. If we don't prevail on the judicial document

25    argument, if we don't prevail on the historical access and the

65

1    substantial interest arguments as to these not being judicial

2    documents because they're sitting in a queue to be reviewed

3    and many, you know, up to 11 percent of which are rejected,

4    we've met our burden to show you that under this two-prong

5    test of *Planet III*, by having our program, that first there is

6    a substantial probability that its interest in the fair and

7    orderly administration of justice would be impaired by

8    immediate access.  We've provided you scores of testimony from

9    folks as to why that would be.

10           And second, that there is no reasonable alternative

11   existing to adequately protect the interests that our Idaho

12   Supreme Court has in protecting the integrity of the court, in

13   protecting the integrity of the judicial records here in the

14   state.

15           So we would ask Your Honor that the relief sought by

16   CNS be denied and that the case be dismissed.  If the Court

17   feels that there is a material issue of fact as to, as

18   Mr. Fetterly stated, a very fact-intensive dispute with no

19   rebuttal or testimony being provided by CNS to counter the

20   testimony of our judges, of our clerks, then certainly an

21   evidentiary hearing, much as which occurred in the Tenth

22   Circuit, would be appropriate.

23           We feel we've provided the undisputed facts to

24   support that both prongs identified in the *Press* case have

25   been met.  Thank you, Your Honor.

66

1          THE COURT:  Thank you.

2          Any further rebuttal from plaintiff?

3          MR. FETTERLY:  Yes, Your Honor.  Thank you.

4          Counsel came back to that line from *Planet III* about

5     the First Amendment not demanding immediate access.  We

6     discussed that earlier.  That's why it's a qualified right.

7     Defendant does have the opportunity to satisfy her burden.

8     That's why the First Amendment does not demand immediate

9     access once it attaches.  Rather, once it attaches, we go to

10    the second part of the test, and the defendant must carry her

11    burden.

12         The Tenth Circuit has come up a lot, and I just want

13    to be very clear about the five business hours in that case.

14    The -- that case involved an order granting a preliminary

15    injunction in which the Court came up with a bright line

16    five-hour rule.  The defendant, the New Mexico courts,

17    appealed.  They did not want that five-hour rule.  They

18    thought it was too unwieldy.  They thought it would be

19    problematic because what if there are circumstances beyond

20    their control that prevent them from being able to conduct

21    their review within five hours?

22         And this is, quite frankly, the reason why earlier I

23    was saying Courthouse News doesn't believe there should be a

24    bright line rule like that either because it assumes the need

25    to review.  If you assume the need to review, suddenly trying

67

1    to come up with an appropriate amount of time gets pretty

2    tricky.

3            And again, we're not asking this Court to come up

4    with or divine the amount of permissible delay.  As we've

5    argued, we believe that the practice should be challenged and

6    scrutinized based on the restriction itself which results in

7    the delay.  And we don't just look at delays in a vacuum and

8    try to decide whether five hours or six hours is enough.

9            However, I would note that if we're talking about

10   business hours, even a delay of three business hours on most

11   occasions is going to result in delays until at least the next

12   court day.  If we're talking about eight business hours, then

13   pretty much anything coming in on a given day could be delayed

14   until the next day, eight business hours.

15           So again, we would ask this Court to just apply the

16   test as we believe the Ninth Circuit requires, which is right

17   attaches upon submission, at which point defendant must

18   justify the restriction under the second part of the *Press*

19   *Enterprise II* test.

20           Talking about the access that is received across the

21   nation, I would refer the Court to the Girdner declaration.

22   This is ECF 86.  I believe I gave the cite earlier, but

23   paragraphs 34 through 86.  There are numerous examples of

24   different courts and different systems that are providing

25   access without restricting it until after the completion of

68

1    processing.  Many of them are Tyler systems, but they are not

2    exclusively limited to Tyler.

3         What we do know is that Tyler does provide these, and

4    the Tyler representative testified as to the approximate

5    number that are used.  And counsel's correct.  It may not be

6    statewide.  We wouldn't expect to see that.  Different types

7    of cases may present different issues.  What we're talking

8    about here is these AA category or, if you want to go more

9    broadly, just not confidential civil complaints.

10        And so whether auto accept is being used for other

11   types of filings and other types of issues here is beyond the

12   purview of these motions and really not at issue in this

13   court.  But we know that the functionality exists, we know it

14   can be done, and we don't need to look any further than the

15   federal courts and this court to see what auto accept is and

16   how it can work.  It is used across the nation, if not by all

17   the state courts, at least by all of the federal courts or at

18   least the vast majority of them.

19        Then just going back to the API piece, one of the

20   reasons why we walked through the way to rigorously scrutinize

21   the justifications is because we -- we believe the Court needs

22   to kick the tires on this.  Once again, API, yes, it may

23   require some action by the Court.  But what we aren't seeing

24   here is a development of a record that shows, "Yes, in order

25   to build our own press queue using the Tyler APIs, it's going

69

1    to require X, Y, and Z; cost us A, B, and C; and therefore it

2    is prohibited under some method."  It's more, "We're going to

3    have to do something."

4         Well, yeah.  If you fail to meet your burden, you

5    can't maintain the status quo.  But a stubborn desire to

6    maintain the status quo is not sufficient justification under

7    the second part of the rigorous scrutiny test.

8         Lastly, we were talking about the 11 months versus

9    the other months of rejection data.  I just want to be clear.

10   Courthouse News's rejection data over the four-month sample,

11   it's providing an average.  Counsel's giving us total numbers.

12   So, yes, if you have a larger sample, you will have larger and

13   higher total numbers.  But what we're not seeing is that the

14   average is any different.

15        Admittedly, I didn't have the opportunity to run that

16   math here at counsel table here today.  If the Court would

17   like us to do so, we're happy to supplement the record.  But

18   what we're seeing, though, from the record that we have

19   analyzed and the data we have provided is that the average

20   number of rejections is relatively small.

21        But yet defendant insists that that is sufficient

22   reason to restrict and withhold access to the vast majority of

23   all other complaints, for which there is no clerical issue to

24   be corrected and for which there is no basis for return and

25   rejection.

70

1    So the Ninth Circuit does not give us a balancing

2  test when it lays out that second part of the test.  But I do

3  think we do need to be thinking about balancing in terms of

4  the burden and the harm, which is part of the entitlement to

5  relief in the injunction analysis.

6    And there what we are seeing is defendant is arguing

7  that the Court should be allowed to overburden the First

8  Amendment by restricting access to everything because a very

9  small number of complaints may have a clerical or technical

10  issue that needs to be corrected and addressed and that, quite

11  frankly, is easier for them to do it on the front end rather

12  than the back end.

13    Meanwhile, we know the technology can be configured

14  to address their needs, and we have no reason to believe that

15  they are unable to simply address these issues that they deem

16  fit, because there are very few of them, while still providing

17  the undelayed access to the overwhelming majority of civil

18  complaints for which there is no issue.

19    Unless the Court has any questions --

20    THE COURT:  Thank you.  I do not.

21    MR. FETTERLY:  Thank you, Your Honor.

22    THE COURT:  I do want to say two things that really

23  having nothing to do with your case but kind of explain some

24  things.  All of us, of course, are very excited that Judge

25  Brailsford is here.  Two things that have come about because

71

1    of that:  One, my caseload dropped by one-third immediately.

2    That's great.  Number two, the corollary to that is that I

3    didn't give up any cases with pending motions.  So my backlog

4    is still my backlog.  But my frontlog, if you will, is not

5    nearly what it used to be, so that's going to help in the

6    speed in getting a decision out here.

7            And then the other thing is, because we now have, I'm

8    going to say, three active district judges -- because I

9    understand Judge Winmill has taken senior status, but when he

10   won't reduce his workload, he's still an active judge whether

11   he wants to be called that or not.  So we had to -- we had to

12   pull this courtroom out of mothballs, so to speak, and so I

13   apologize for the problems with the screens.  They're still

14   working out some technical difficulties.  We'll get them

15   resolved shortly, but I'm sorry it went off on you.  That was

16   not a reflection of the quality of what you were going to show

17   me or anything of that nature.  It just happened.

18           MS. DUKE:  No worries.

19           THE COURT:  Just one of the bugs in the system so

20   far.

21           I am going to take this under advisement.  I do not

22   believe any additional briefing is needed.  I think what's

23   been filed is more than adequate.  The arguments have been

24   very, very helpful, and I appreciate them, from both sides.

25   And we'll get you a decision as quickly as we can.

72

1        One thing I do want to have you thinking about, and
2   maybe this is a hypothetical, maybe it's not.  I don't know.
3   But in the defendant's answer, you demanded a jury trial.  I
4   don't know if this case can have a jury trial.  So that's
5   something to be thinking about.  We may have to cross that
6   bridge down the road if we get to it.  I think it's more
7   likely this will -- if this goes on, it will go to a court
8   trial, a bench trial.  But that's something we can take up
9   later after we see how this decision comes out.

10        Anything else from either party?

11        MS. DUKE:  No, Your Honor.  Thank you.  It's always a
12   pleasure being here, and thank you all for your time here
13   today.

14        MR. FETTERLY:  Thank you, Your Honor.

15        THE COURT:  Court will be in recess.

16      (Proceedings concluded at 4:43 p.m., July 10, 2023.)

17

18

19

20

21

22

23

24

25

73

1              C E R T I F I C A T E

2

3          I, ANNE BOWLINE, a Registered Merit Reporter and

4    Certified Realtime Reporter, do hereby certify that I reported

5    by machine shorthand the proceedings contained herein on the

6    aforementioned subject on the date herein set forth, and that

7    the foregoing 72 pages constitute a full, true and correct

8    transcript.

9          Dated this 16th day of July, 2023.

10

11

12

13          _____/s/ Anne Bowline_____

14              ANNE BOWLINE
            Registered Merit Reporter
15          Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | Case No: 1:21-cv-00305-DCN |
| Plaintiff, | |
| v. | **PLAINTIFF COURTHOUSE NEWS SERVICE'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................... 1

I. The First Amendment Access Right Attaches When a Court Receives a
Complaint, Not After Staff Have Completed a "Ministerial Review" ............................ 2

    A. The Notion of "Pre-Acceptance" Access Can Only Confuse the Analysis.............. 2

    B. As *Planet III* Recognized, Logic Dictates Access to Complaints Submitted
       by Filers ............................................................................................ 4

II. The "Immediate Access" Theory from Defendant's Motion to Dismiss is Still Wrong .... 6

III. The Parties Measure Delays Differently But Do Not Dispute Them ................................ 8

IV. Defendant Has Not Met Her Burden to Demonstrate Justification or a Lack of
Reasonable Alternatives ..................................................................................... 11

    A. Neither the Possibility that a Complaint Might be Returned for Correction
       Nor Concerns About Confidentiality Justify the Delays Caused by Defendant's
       Policy of Withholding for Processing ...................................................... 11

    B. Defendant's Preference to Maintain the Status Quo Does Not Render
       Alternatives Non-Existent .................................................................... 13

V. The Delays at Issue Are Caused by Defendant's Policy of Withholding Complaints
from the Public Until Court Staff Have Completed a "Ministerial Review" .................... 17

VI. Defendant's Secret Agenda Theory .................................................................... 18

VII. Courthouse News is Entitled to Relief................................................................... 19

CONCLUSION................................................................................................... 20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*ABC, Inc. v. Stewart,*
   360 F.3d 90 (2d Cir. 2004) ...................................................................... 20

*Boardman v. Inslee,*
   354 F. Supp. 3d 1232 (W.D. Wash. 2019), *aff'd*, 978 F.3d 1092 (9th Cir.
   2020) .................................................................................................. 11, 13

*Courthouse News. Serv. v. Cozine,*
   2022 WL 593603 (D. Or. Feb. 14, 2022) ............................................... 3, 5

*Courthouse News Serv. v. Gabel,*
   2021 WL 5416650 (D. Vt. Nov. 19, 2021) ........................... 8, 11, 18, 20

*Courthouse News. Serv. v. Harris,*
   2022 WL 17850125 (D. Md. Dec. 22, 2022) ........................................ 6, 13

*Courthouse News. Serv. v. New Mexico Admin. Off. Of Cts.,*
   53 F.4th 1245 (10th Cir. 2022) ............................................................ 3, 12

*Courthouse News Serv. v. Omundson,*
   598 F. Supp. 3d 929 (D. Idaho 2022) ..................................................... 1, 6

*Courthouse News Serv. v. Planet* ("*Planet III*"),
   947 F.3d 581 (9th Cir. 2020) ........................................................... *passim*

*Elrod v. Burns,*
   427 U.S. 347 (1976) ................................................................................. 20

*Hansen v. United States,*
   7 F.3d 137 (9th Cir. 1993) ........................................................................ 13

*Klein v. City of San Clemente,*
   584 F.3d 1196 (9th Cir. 2009) ................................................................. 20

*Leigh v. Salazar,*
   677 F.3d 892 (9th Cir. 2012) ..................................................... 1, 11, 18

*New York Civil Liberties Union v. New York City Transit Auth.,*
   684 F.3d 286 (2d Cir. 2012) ....................................................................... 1

*Press-Enterprise Co. v. Superior Court,*
   464 U.S. 501 (1984) .................................................................................... 1

*Press-Enterprise Co. v. Superior Court ("Press-Enterprise II"),*
478 U.S. 1 (1986) ......................................................................................................... *passim*

## INTRODUCTION

The first part of the *Press-Enterprise II* test – whether a First Amendment right of access attaches to nonconfidential civil complaints and when – is settled. *Courthouse News Serv. v. Planet*, 947 F.3d 581, 585, 590-94 (9th Cir. 2020) ("*Planet III*"). Despite this Court's directive for the parties to move on to the question of "whether there are 'delays' in this case and whether those delays are justified," *Courthouse News Serv. v. Omundson*, 598 F. Supp. 3d 929, 942 (D. Idaho 2022), Defendant wants to go backwards, raising arguments about the first part of the *Press-Enterprise II* test that are as flawed now as when she made them in her motion to dismiss.

Because the First Amendment access right attaches when the court receives a complaint, *Planet III*, 947 F.3d at 588, 594; *Omundson*, 598 F. Supp. 3d at 944, Defendant bears the burden of "demonstrat[ing]" (1) "a 'substantial probability' that" an overriding government interest "would be impaired by immediate access"; and (2) "that no reasonable alternatives exist to 'adequately protect' that government interest." *Planet III*, 947 F.3d at 596 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 14 (1986) ("*Press-Enterprise II*")).

Lacking the evidence to satisfy her burden under this "fact-intensive" test," *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012), without relying on generalized assertions or speculation, *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 303 (2d Cir. 2012); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984), Defendant engages in a campaign of misdirection. She focuses on irrelevancies like how often Courthouse News sends reporters to courthouses in Montana and Wyoming, salts her brief liberally with baseless insinuations against Courthouse News, and concocts a bizarre (and irrelevant) theory about Courthouse News' supposed "real motivations" in bringing this case. These distractions aside, the law and facts in this case are simple and straightforward, and they require summary judgment for Courthouse News.

REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S
MOTION FOR SUMMARY JUDGMENT - 1

I.     **The First Amendment Access Right Attaches When a Court Receives a Complaint, Not After Staff Have Completed a "Ministerial Review"**

In *Planet III*, the Ninth Circuit equated "filed" with "received by the court," 947 F.3d. at 588 ("The district court further held that the right to timely access attaches at the moment of filing, i.e., when the complaint is received by the court."), and "conclude[d], as [had] the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court..." 947 F.3d at 594; *see* Courthouse News' MSJ Brief (ECF 61-1) ("CNS MSJ") at 12; Courthouse News' MSJ Opp. (ECF 74) ("CNS MSJ Opp.") at 1-3. Unhappy with the holding of *Planet III*, Defendant seeks to avoid it and re-litigate the issue of when the First Amendment access right attaches. As throughout her brief, she relies on unsupported assertions that, while ultimately irrelevant, must be addressed.

A.     **The Notion of "Pre-Acceptance" Access Can Only Confuse the Analysis**

The concept of "acceptance" of a complaint was introduced in Idaho as part of its rules on electronic filing and service. *See* IREFS 2(i); IREFS 11(a). For paper filings, Idaho's rules provide simply that "[a] paper is filed by delivering it … to the clerk." Idaho Rules of Civil Procedure ("IRCP") 5(d)(2)(A). Defendant superimposes the concept of "acceptance" onto the historic paper-filing environment, labeling as "accepted" complaints that were handed to the intake clerk and not immediately handed back to the filer. Def. MSJ Opp. at 6-9; *see also* CNS MSJ Opp. at 3-4. Both parties agree that in the paper-filing era, a filer would hand a complaint to the intake clerk, who stamped it as filed, and then send it along for other clerical tasks. Thus, every single paper complaint in the court's possession had been "accepted" for filing, and providing access to a paper complaint prior to "acceptance" is a logical impossibility.

Accordingly, when Defendant refers to paper complaints that are "waiting to be accepted for filing," Def. MSJ Opp. at 1 (citing Valenti Depo. 58:25-59:3), she means complaints ***in the***

***hands of filers standing in line at the intake counter.*** *See* Duke Decl., Exh. E (Valenti Depo. 58:11-59:14) (reporter did not ask to see complaints in the hands of filers standing in line and instead wanted to see the ones that had been filed – *i.e.*, handed to the intake clerk). Defendant refers to Ms. Valenti's testimony repeatedly, Def. MSJ Opp. 1, 7-8, 10, 24, 26, without ever revealing that she was using the word "filed" in the ordinary sense, to mean "handed to the intake clerk." *See* Duke Decl., Exh. E (Valenti Depo. 58:11-59:14); Resp. to Def.'s Statement of Undisputed Facts (ECF 76) ("DSUF Resp.") ¶¶ 24-25. Her testimony does not support the assertion that "according to CNS's own Idaho reporter, CNS has no interest in reviewing submitted but not yet filed complaints because she would not want to report on a complaint that has not been filed with the court." Def. MSJ Opp. at 24 (citing Valenti Depo. 58:25-59:3).

Defendant is ultimately correct that "there is no factual dispute regarding historical access in Idaho," Def. MSJ Opp. at 7, and her discussion of the lack of so-called "pre-acceptance" access in the paper era is a confusing distraction. As the Tenth Circuit observed in rejecting the same argument, it "disingenuously focuses on the technical terms applied to various intake and docketing tasks, rather than the delay that such tasks may cause – even though these delays lie at the heart of Courthouse News' constitutional challenge." *Courthouse News. Serv. v. New Mexico Admin. Off. Of Cts.*, 53 F.4th 1245, 1266 (10th Cir. 2022); *see also Courthouse News. Serv. v. Cozine*, 2022 WL 593603 at *7-8 (D. Or. Feb. 14, 2022).[1]

Even more distracting is Defendant's assertion that declaration testimony from Mr. Girdner "ignores and contradicts his under-oath deposition testimony," and that Ms. Valenti's testimony "directly contradicts Mr. Girdner's unfounded, self-serving, and factually wrong

---

[1] Defendant incorporates by reference her similar argument that "submitted complaints are not judicial documents," Def. MSJ Opp. at 2 n.2, and Courthouse News incorporates by reference its response to those arguments. CNS MSJ Opp. at 4-8.

declaration testimony." Def. MSJ Opp. at 6-7. This serious allegation is unsupported and unsupportable. Mr. Girdner testified that paper-filing courts made complaints available "shortly after they were received by the court, allowing reporters to see new complaints by the end of the day they were filed, that they did this by "making complaints available after they crossed the intake counter, regardless of whether clerks had completed docketing or other clerical tasks," and that "[t]he Ada County District Court … [was] no exception." Decl. of William Girdner, ¶ 19 (ECF 64) (mis-cited as ¶ 20 in Def. MSJ Opp. at 6). There is no dispute that Ada County made paper-filed complaints available by the end of the day they were submitted to the court. *See* Girdner Decl., ¶ 31 & Exh. 9 (Ada County clerk letter explaining that the court provided "same day access to the paper record.").

Defendant's attack on evidence she says fails to establish "some sort of 'national standard'" of "pre-acceptance access" is yet another distraction. Courthouse News has made no "claim that, across the nation, all courts provided some form of pre-acceptance access." Def. MSJ Opp. at 8. Indeed, as discussed above, the phrase "pre-acceptance access" makes no sense in a paper-filing world. Regardless, the argument is irrelevant because the Ninth Circuit resolved the first part of the *Press-Enterprise II* test. *Planet III*, 947 F.3d at 585, 588, 590-94. Courthouse News' evidence of courts' practices – both historic and current – goes to the ***second*** part of the test by describing the ways courts avoided – and can continue to avoid – access delays. *See* Girdner Decl., ¶¶ 17-24, 34-86.

**B.    As *Planet III* Recognized, Logic Dictates Access to Complaints Submitted by Filers**

Seeking to avoid *Planet III* and the Court's prior ruling in this case, Defendant also urges the Court to re-open the first part of the *Press-Enterprise II* test and conclude that logic supports the First Amendment access right attaching only on "acceptance." Def. MSJ Opp. at 9-11. She does so based on conclusory assertions that "prior to acceptance, a lawsuit has not been initiated

and therefore the … court's jurisdiction has not been invoked." *Id*. at 10.[2]

As throughout this case, Defendant focuses on the courts' internal administrative processes and not on the reality that filers and the press and public experience. "Invoke" means to "to petition for help" or "to appeal to." *See, e.g.*, Decl. of Katherine Keating in Supp. of MSJ Opp., Exh. 1 (ECF 74-1); *see also* CNS MSJ at 16-17. Petitioning the court for help is what a litigant does when it submits a complaint to the court, ***not*** what court staff do after performing a "ministerial review" of the complaint. And once "a complaint is filed, and the authority of the people of the United States is thereby invoked, even if only as a threat to induce settlement, the American people have a right to know that the plaintiff has invoked their power to achieve his personal ends." *Planet III*, 947 F.3d at 593 (quotation omitted).

The overwhelming majority of the Complaints at Issue are not returned for correction, and most that are returned are later corrected. Decl. of Jonathan Fetterly, Exh. 2 at 11-13 (ECF 67-1) (Resp. to Interrog. Nos. 21 and 22); *see also* CNS MSJ Opp. at 10. There is no "logic" to removing all newly submitted civil complaints from the First Amendment's reach, enabling court staff to withhold access for as long as they wish, for any reason or for no reason at all. *See, e.g., Cozine*, 2022 WL 593603, at *7 ("[I]f defendant's position was correct, court administrators could potentially evade the *Planet III* holding—and abrogate the media's First Amendment right of access—by adopting administrative rules that define a document as 'filed' much later in the judicial review process. Such a proposition not only contradicts the Supreme Court's jurisprudence, which makes clear that administrative rules cannot abrogate constitutional rights,

---

[2] Defendant is wrong that "[t]here is no dispute" that complaints "become[] part of the official court record" and "initiate[]" "a civil action" only when they are "accepted by a clerk." Def. MSJ Opp. at 11; *see* DSUF Resp. ¶¶ 6, 9-10, 19-21.1; CNS MSJ at 14-17. But this dispute is immaterial, as when the First Amendment right of access attaches to new complaints is settled.

REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S
MOTION FOR SUMMARY JUDGMENT - 5

but also is antithetical to the importance of media access that *Planet III* identified.").[3]

## II.   The "Immediate Access" Theory from Defendant's Motion to Dismiss is Still Wrong

Defendant also attempts to resuscitate her argument that a remedy resulting in immediate

access is incompatible with the First Amendment right because the Ninth Circuit said the right

does not "demand[] immediate, pre-processing access to newly filed complaints."  *Planet III* at

594; Def. MSJ Opp. at 12-13.  In her motion to dismiss, Defendant argued that Courthouse News

failed to present a cognizable legal theory because its claim was based on violation of a "right to

immediate access."  Def.'s Mot. to Dismiss at 3-4 (ECF 7-1).  As Courthouse News explained,

Defendant's policy violates the First Amendment "not because there is a 'right to immediate

access,'" but because the policy causes delays that Defendant cannot justify.  Mot. to Dismiss

Opp. at 7 (ECF 11).  The Court accurately paraphrased this distinction: "Courthouse News …

explain[s] that it did not bring this suit claiming to have a 'right to immediate access,' but …

because [Defendant's] procedures result in delays and she cannot justify those delays under the

second prong of the *Press-Enterprise II* test."  *Omundson*, 598 F. Supp. 3d at 938.

Thus, when the Court said that "CNS is not actually asking for immediate access; it is

asking for un-delayed access," *id.*, this was not a "factual finding" as to Courthouse News' view

of how quickly e-filed non-confidential civil complaints should be made available, Def. MSJ

Opp. at 12, but rather a rejection of Defendant's assertion that Courthouse News' claim was

based on a right to immediate access.  That has not changed.  Whether Courthouse News

---

[3] Defendant also says, cryptically, that the First Amendment access right "attach[ed] upon acceptance for filing … under the *Planet III* facts."  Def. MSJ Opp. at 10.  She does not explain what she means, but points to an order that compared the processing in another Tyler court to the processing in *Planet III*.  *Id.* at 10-11 (citing *Courthouse News. Serv. v. Harris*, 2022 WL 17850125, at *38 (D. Md. Dec. 22, 2022)).  That order, however, did not suggest the access right in *Planet III* attached on "acceptance"; rather, it considered Ventura processing in the context of the fact-specific second part of the *Press-Enterprise II* test, after assuming for purposes of the order that the right "attaches when a complaint is electronically submitted."  *Id.* at *34, 38.

"consider[s] … delayed access" to be "[a]ccess past the time of receipt or shortly thereafter," Duke Decl. in Supp. of MSJ, Exh. D (Girdner Depo. 129:6-20) (ECF 60-7), or is "looking for immediate access to complaints," *Id*., Exh. E (Valenti Depo. 23:23-24:19) (ECF 60-8); *see* Def. MSJ Opp. at 12-13, is irrelevant.

Defendant also insinuates a lack of candor, claiming Courthouse News "admitted in depositions that it is in fact seeking immediate access – despite prior representations to the contrary." Def. MSJ Opp. at 12-13.  Though Defendant does not point to any particular "representation," she appears to mean Courthouse News' explanation that its claim is not based on a "right to immediate access." *See id*. at 12.  In reality, Mr. Girdner's testimony is squarely consistent with the applicable analysis.  Observing that many state and federal courts provide access "within a few minutes," he said that Courthouse News considers access that takes more than a few minutes after the court's receipt of the complaint to be delayed.  He also observed that the existence of a delay is only the first step of the analysis and does not necessarily mean that there has been a violation of the access right:  "It's not something I can guess at or define what the correct amount of time is.  I can say that the right of access attaches on receipt.  And after that, the court needs to justify delays." Duke Decl., Exh. D (Girdner Depo. 130:21-131:9); *see also id*. (132:8-21, 161:7-13).

Defendant correctly notes that alternatives that would solve the delays at Idaho's district courts would result in something very close to immediate access.  That is because the key to avoiding access delays in an e-filing court is to not keep complaints from the public while they await "ministerial review" by court staff.  Affidavit of Margaret Molchan (Dec. 22, 2021) (ECF 20-14) ("Molchan PI Aff.").  Immediate access is the natural result when an e-filing court does not withhold complaints pending action by clerks. *See Courthouse News Serv. v. Gabel*, 2021

**REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S
MOTION FOR SUMMARY JUDGMENT - 7**

WL 5416650, at *14 (D. Vt. Nov. 19, 2021) ("[B]ut for the pre-access review process, there would be no delay.").  Further, if "immediate access" were anathema, as Defendant suggests, the Ninth Circuit would not have used it in framing the governing test.  *Planet III*, 947 F.3d at 596 (whether interest "would be impaired by immediate access").  The Ninth Circuit thus expressly contemplated the possibility of "immediate access" if a court failed to justify the challenged restrictions under the *Press-Enterprise II* test.

### III. The Parties Measure Delays Differently But Do Not Dispute Them

There is no genuine dispute as to delays in this case, despite Defendant's confusing discussion of them.  Def. MSJ Opp. at 13-16.  Defendant does not dispute that her own data reflects that from January 2021 through July 2022, Idaho's refusal to make complaints available prior to completion of a "ministerial review" meant that the press and public was unable to access ***nearly half* (*42%*)** of all complaints filed in the relevant category ("Complaints at Issue") on the day they were filed, or that approximately 15% were unavailable for two calendar days or longer.  PSUF ¶ 43; Decl. of Adam Angione (ECF 61-4), Exh. 2; *see also id.*, Exh. 3 (delays expressed in court days).  Nor does she dispute that individual delays during that period were regularly worse, or that Kootenai County withheld every single Complaint at Issue in April 2021 until at least the following day, with 98% of them withheld for two calendar days or longer.  *See* Decl. of Jimmy Shimabukuro (ECF 61-3), Exhs. 1-9.

Defendant handles the same set of complaints a bit differently: (1) she treats complaints submitted after 5:00 p.m. as having been submitted on the following day, and (2) she stops the clock whenever the court is closed, measuring delays in "business hours."  Decl. of Emily Carroll (ECF 60-18), ¶ 6.[4]  She then presents the numbers of Complaints at Issue that were

---

[4] Defendant mistakenly says that "CNS has now provided alternative calculations based on business hours."  Def. MSJ Opp. at 15.  It has not.  The different measurements reflect the

reviewed within a certain number of "business hours" of the complaint's submission, concluding that 85% were reviewed "within eight business hours of submission." Def. MSJ Opp. at 15; Carroll Decl., ¶ 6(h). Defendant accuses Courthouse News of "dramatiz[ing]" delays and calls her own presentation "the proper analysis," Def. MSJ Opp. at 14, 15, but she does not contend that Courthouse News' numbers are inaccurate (and cannot, given that they are based on calculations of data provided by Defendant herself, Angione MSJ Decl., ¶¶ 4-18). Presumably, Defendant focuses on eight business hours to draw a parallel with Courthouse News' measurements based on days. This parallel is illusory because a business-hour measurement will not reveal whether or not a complaint was available on the day it was filed (when it is most capable of capturing the public's attention). There is no dispute that a substantial proportion of complaints reviewed "within eight business hours of submission" will be unavailable to the press and public until the next day the court is open. *See* DSUF Resp. ¶ 72.

Defendant correctly characterizes the impact of measuring in days (whether court day or calendar days) vs. business hours. A delay of two minutes in business hours might mean access delayed until the following day. Def. MSJ Opp. at 15. And if the court withholds complaints pending "ministerial review," a complaint e-filed on March 1, returned to the filer for correction that same day, resubmitted with corrections on March 4, and "accepted" by court staff that day, will have been unavailable for three days, even if relatively few "business hours" have passed. *Id*. The salient point is that the press and public were unaware of the complaint for three days.

Courthouse News is not impugning the diligence of Idaho's court clerks and is not asking them to work harder or faster. To the contrary, Courthouse News agrees that – as Defendant's

---

parties' different perspectives: Defendant focuses on internal administrative procedures, and Courthouse News focuses on the experience of the press and public, who experience the passage of time as a daily cycle and do not know or care how many "business hours" elapsed between a complaint's submission and availability. The latter is more relevant to the First Amendment.

**REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S**
**MOTION FOR SUMMARY JUDGMENT - 9**

evidence shows – delays are inevitable when access waits for the completion of clerical tasks. *See, e.g.,* Decl. of Lindsey Bratcher (ECF 75-1), ¶¶ 5-13 (staffing issues and need "to balance document review with other job duties" impact ability to review and "accept" new complaints); Decl. of Angie Cooke (ECF 75-3), ¶¶ 8-11 (same); Suppl. Decl. of Kerry Hong (ECF 75-6), ¶¶ 4, 7-8 (same); Suppl. Decl. of Roland Gammill (ECF 75-5), ¶¶ 4-6 (same).

Rather than focusing on delays, Defendant focuses on Courthouse News' "business practices," Def. MSJ Opp. at 13-14, but she gets her facts wrong. Her assertion that reporters' "typical hours match up with court hours" contradicts the record, including the very testimony she cites. Duke Decl., Exh. E (Valenti Depo. 37:13-16) (reporter leaves the courthouse when it closes at 5:00 *and then completes her reporting from home*); Decl. of Catherine Valenti (ECF 62), ¶ 4 (same); *see also* DSUF Resp. ¶ 1. Citing testimony that Ms. Valenti "most likely" wouldn't see a complaint filed in federal court at *6:00 p.m.* on a Friday until the following Monday (or Tuesday on a holiday weekend), Valenti Depo. 37:21-38:6, Defendant incorrectly states that "if a complaint is accepted for filing on a Friday *late afternoon* before a three-day holiday weekend, CNS is not reporting on it until that next Tuesday." Def. MSJ Opp. at 13-14.

Defendant also points to cases from Montana and Wyoming that Courthouse News reported long after they were filed. Def. MSJ Opp. at 14. Given the economic impossibility of sending a reporter to every courthouse in the country, Courthouse News must forgo covering some courts altogether and must cover some less often than daily, sometimes only weekly or monthly, especially in sparsely populated states with geographically remote courthouses. *See* Duke Decl., Exh. D (Girdner Depo. 90:20-91:4); *Id.*, Exh. E (Valenti Depo. 28:18-35:7).[5]

---

[5] Defendant also asserts that "CNS's reporting on Idaho state court cases appears to be almost non-existent," evidently based on her judgment that Courthouse News' Big Sky Report does not qualify as "reporting." Def. MSJ Opp. at 14.

REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S
MOTION FOR SUMMARY JUDGMENT - 10

The fact that Courthouse News will still include older complaints from Wyoming and Montana in its reports does not mean that the age of the complaints has not substantially degraded their news value.  Of course it has.  But the practical reality is that Courthouse News must sometimes choose between reporting complaints late or not reporting them at all.  In any event, delayed reporting in Wyoming and Montana is beside the point: "The issue before the court is not how fast Plaintiffs cover new filings or whether Defendants' delay is comparable to that of other courts, but whether Defendants' pre-access review process is necessary to protect a higher interest and is narrowly tailored to achieve it."  *Gabel*, 2021 WL 5416650, at *14.

## IV.     Defendant Has Not Met Her Burden to Demonstrate Justification or a Lack of Reasonable Alternatives

Defendant conflates the two parts of her burden under *Press-Enterprise II*  into one.  Def. MSJ Opp. at 16-21.  Courthouse News addresses them separately below.

## A.     Neither the Possibility that a Complaint Might be Returned for Correction Nor Concerns About Confidentiality Justify the Delays Caused by Defendant's Policy of Withholding for Processing

Defendant bears the burden of "demonstrat[ing] … a 'substantial probability' that" an overriding government interest "would be impaired by immediate access."  *Planet III*, 947 F.3d at 596; *see Leigh*, 677 F.3d at 898 (*Press-Enterprise II* requires "overriding interest").  Courthouse News' opening brief included detailed factual evidence and argument establishing that Defendant cannot meet this burden.  CNS MSJ at 14-20; *see also* CNS MSJ Opp. at 14-23.  Remarkably, Defendant has not directly addressed *any* of it.  This is fatal to her summary judgment defense.  *See Boardman v. Inslee*, 354 F. Supp. 3d 1232, 1239 (W.D. Wash. 2019) ("Conclusory, nonspecific statements in affidavits are not sufficient [to oppose summary judgment], and missing facts will not be presumed."), *aff'd*, 978 F.3d 1092 (9th Cir. 2020).

*Erosion of Trust*.  Defendant makes no serious effort to advance her theory that providing access to new complaints prior to "acceptance" would "erode public confidence in Idaho Courts," Def. MSJ Opp. at 17, and for good reason.  The implausible theory is based on Defendant's personal speculation, and lacks any basis in evidence.  Decl. of Sara Omundson (ECF 78-1), ¶ 19 ("If a complaint is reported on but ultimately rejected without a successful resubmission, the press and public will be left to speculate about the reasons for this phenomenon.").  The possibility that clerks might reject an e-filed complaint is not a reason to keep it secret.  To the contrary, "the withdrawal or rejection of a complaint might itself be a matter of public interest that the press deems newsworthy."  *New Mexico*, 53 F.4th at 1269; *see also* CNS MSJ at 14-18; CNS MSJ Opp. at 14-17.

*Confidentiality*.  Courthouse News has shown that Idaho's "ministerial review" does not actually protect against the release of confidential information.  None of the Complaints at Issue are confidential by rule or statute.  *See* CNS MSJ at 18; PSUF ¶ 46.  Motions to seal must be (and, as a practical matter, are) filed in paper, not e-filed.  IREFS 5(h); ICAR 32(i); *see* CNS MSJ at 18-19; PSUF ¶¶ 47-48.  Idaho places the burden of redacting protected personal identifiers on the filer, warning that clerks will not check for such information. IRCP 2.6(a), (f), (g); IREFS 15(a), (f), (g); *see* CNS MSJ at 19; PSUF ¶ 49-51.  If, despite this rule, Idaho clerks routinely returned complaints to filers so that protected personal identifiers could be redacted, that would be reflected in the rejection data produced by Defendant.  It is not.  Angione Decl., Exhs. 4-7; *see* CNS MSJ at 20.

Rather than contend with Courthouse News' argument and evidence about confidentiality in Idaho, Defendant borrows from comments about other court systems.  Def. MSJ Opp. at 19-20.  Citing *Harris* cannot help Defendant meet her burden.  That preliminary injunction decision

issued without the benefit of evidence of whether clerk review served confidential interests in any meaningful way. *Harris*, 2022 WL 17850125, \*42. Such evidence does exist in this case, and it contradicts Defendant's arguments. Angione Decl., Exhs. 4-7 (ECF 61-4); *see* CNS MSJ at 18-20. And while Defendant would like the Court to follow the District of Maryland in disregarding the filer's burden to redact confidential information, it must instead follow the Ninth Circuit, which concluded otherwise. *Planet III*, 947 F.3d at 597 (no-access-before-process policy did not serve "concerns about privacy and confidentiality" where rule "requires the filer – not the court – to exclude or redact private information from publicly filed judicial documents").

Equally unavailing is Defendant's citation of a letter from Senator Ron Wyden, conveying Senator Wyden's thoughts on the adequacy of rules related to personal identifier information in federal court filings. Def. MSJ Opp. at 20. Senator Wyden's letter is not evidence that his concerns have any basis in fact, and the observation that placing the redaction burden on the filer will not protect against mistakes by the filer cannot help Defendant meet her burden. What she needs – but does not have – is evidence that (a) filers make a substantial number of mistakes in complying with Idaho's redaction rule; and (b) that clerk review routinely prevents the release of information filers fail to redact. *See Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (a party "cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact"); *see also Boardman*, 354 F. Supp. 3d at 1239 ("Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed.").

**B.    Defendant's Preference to Maintain the Status Quo Does Not Render Alternatives Non-Existent**

Defendant bears the burden of "demonstrat[ing] … that no reasonable alternatives exist to 'adequately protect'" a overriding government interest that would be impaired by immediate access. *Planet III*, 947 F.3d at 596. Again, Courthouse News provided extensive argument and

evidence showing that Defendant cannot satisfy this burden. CNS MSJ at 20-27. And, again, Defendant ignores that argument and evidence entirely. *See* Def. MSJ Opp. at 16-21.[6]

Defendant continues to assert that the clerical issues in civil complaints currently handled by clerks would need to be handled by judges in an auto-accept system, Def. MSJ Opp. at 16, 18-19, but she struggled in deposition to explain why this would be true, Fetterly Decl., Exh. 5 (ECF 67-1) (Omundson Depo. 80:6-94:10), and acknowledged that Idaho could adjust its procedures to give clerks more flexibility. *Id*. (94:11-25). As to her example of a filer mistakenly choosing "Adams" instead of "Ada" County from the e-filing interface, requiring dismissal or transfer, Def. MSJ Opp. at 29, she provides no basis for concluding that this happens with the Complaints at Issue so frequently that it could impact the courts' workload in any meaningful way. *See also* CNS MSJ at 21-23; CNS MSJ Opp. at 24-27.

Indeed, Defendant completely ignores evidence of the relatively small number of the Complaints at Issue typically returned for correction in each of Idaho's district courts. Angione Decl., ¶¶ 19-22 & Exh. 8; *see* CNS MSJ at 21; CNS MSJ Opp. at 24-25. This means, for example, that even if she is correct that communicating with filers in an auto-accept system would be slightly less efficient (prior testimony estimated that the review would take "five … or more minutes" instead of the current three minutes, Molchan P.I. Aff., ¶ 10(a)), she has not shown that the overall impact would be significant for any court.

While Defendant asserts that "[i]t takes clerks at least an hour to correct a filing error once a document has been transferred into Case Manager," Def. MSJ Opp. at 29, the evidence

---

[6] Defendant mentions CNS' evidence only to accuse CNS of misrepresenting how many courts use Tyler alternatives. Def. MSJ Opp. at 20-21. CNS faithfully presented information based on testimony from Tyler's representative, who said "about 25" courts "are currently using [Tyler's] Press Review Tool," and "roughly 25 courts" "use the auto-accept review feature." Fetterly Decl., Exh. 6 (Derrick Depo. 77:17-78:17; 104:17-105:7); PSUF ¶¶ 80, 87.

REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S
MOTION FOR SUMMARY JUDGMENT - 14

she cites is far narrower.  Kerry Hong, an administrator for the Sixth Judicial District, says this only about Power County, and without explanation as to why.  Decl. of Kerry Hong, ¶ 6 (ECF 60-37).  Defendant filed declarations from more than 20 court personnel, and none offers comparable testimony for any other county (including Mr. Hong, who presumably could testify as to the other five counties in the Sixth Judicial District).  Moreover, Defendant's evidence reflects that ***not a single Complaint at Issue*** e-filed in Power County was returned for correction during the four months of rejection data Courthouse News analyzed.  Angione Decl., Exh. 8.

As for making the Complaints at Issue available through a press review queue or other portal while they await "ministerial review" by court staff, Defendant expresses concerns about the security and cost of the press review tool from her vendor Tyler.  Def. MSJ Opp. at 17.  She has not attempted to negotiate the price, relying on Tyler's representation that the price is fixed. Fetterly Decl., Exh. 7 at 20 (RFA No. 7).  Her "serious security concerns," Def. MSJ Opp. at 17, are not based on evidence of security issues but rather on a lack of information from Tyler – information she says Tyler would provide if she were to begin the contract amendment process that implementing the press review tool would evidently require.  CNS MSJ at 25-26.  The only specific issue Defendant has identified is that "it is unknown if or how the Press Review Queue is secured against manipulation of the original documents sitting in the Press Review Queue." DSUF ¶ 47 (ECF 60-1).  But Tyler has answered this question, explaining that its press review queue software merely displays documents, and that it is not possible to modify those documents from within the queue.  Fetterly Decl., Exh. 6 (Derrick Depo. 82:23-83:14, 85:17-23, 91:5-93:3).

Moreover, if, for whatever reason, Defendant prefers not to use Tyler's press review queue, she can develop her own, as other courts have done.  *See* CNS MSJ at 26.  Defendant's response is that "[i]t is not justifiable or reasonable for CNS to suggest the Idaho Supreme Court

should be required to change its vendor, breach its contract with Tyler, enter into a contract with a new e-filing vendor, and completely overhaul Idaho's e-filing system." Def. MSJ Opp. at 21.

This assertion reflects a stunning lack of engagement with the arguments and evidence in this case. The record reflects that Tyler would provide Defendant with the application programming interface (API) that would enable Idaho to build its own press review queue, either using its own IT staff or a vendor. Fetterly Decl., Exh. 6 (Derrick Depo. 191:13-196:12); *see* CNS MSJ at 26; PSUF ¶ 90; CNS MSJ Opp. at 29-30. To be clear, Idaho would not be changing its e-filing system – let along "completely overhaul[ing]" it. Def. MSJ Opp. at 30. It would simply be using software to display the Complaints at Issue submitted through the existing e-filing system based on whatever configuration Defendant chooses (*i.e.*, free or paid; remote or courthouse-only; limited to press or open to public). *See* PSUF ¶¶ 71-76. Tyler supports this approach, Derrick Depo. 191:13-193:22, which does not involve "breaching [a] contract with Tyler" or replacing Tyler as Idaho's e-filing vendor. The record also reflects that the project should not be expensive, even if Idaho chooses to outsource it to a vendor. Girdner Decl, ¶¶ 70-71 (Arizona developed press access portal software for $12,500).

In fact, the Idaho Judicial Branch is already working on "build[ing its] own" portal for providing access to court documents through a non-Tyler vendor. Fetterly Decl., Exh. 5 (Omundson Depo. 34:5-36:5); CNS MSJ at 26; CNS MSJ Opp. at 29-30; PSUF ¶ 19. That portal work does not encompass pre-processing access only because of Defendant's view that "the Idaho Supreme Court's rules tell me that a document is available to the public when it is placed in a case file." Fetterly Decl., Exh. 5 (Omundson Depo. 37:16-39:1).

Finally, if Defendant were correct that the alternatives available would lead to the bad outcomes she and other court personnel imagine – including being "misused to publish

confidential … information" or "malicious filings," Def. MSJ Opp. at 17, 19 – evidence of those

problems would be readily available from the many courts that have already implemented auto-

accept or press review queue functions (including those using the same Tyler system Idaho uses).

That Defendant offers no such evidence fatally undermines her ability to carry her burden of

demonstrating a lack of alternatives.  *See* Fetterly Decl., Exh. 9 at 6-7 (Interrog. No. 26).

**V.      The Delays at Issue Are Caused by Defendant's Policy of Withholding Complaints from the Public Until Court Staff Have Completed a "Ministerial Review"**

Unable to escape the reality of delays, Defendant asserts that they have nothing to do

with her.  Def. MSJ Opp. at 21-24.  She argues that she cannot order courts to hire more

personnel, as if faster processing were the way to avoid delays.  Def. MSJ Opp. at 24.

Defendant acknowledges that delays in the Complaints at Issue have "typically been

because of staffing issues, clerks being out sick," and what she calls "other justifiable reasons."

Def. MSJ Opp. at 22; *see* Bratcher Decl., ¶¶ 5-13; Cooke Decl., ¶¶ 8-11; Suppl. Hong Decl., ¶¶

4, 7-8; Suppl. Gammill Decl., ¶¶ 4-6; Krames Decl., ¶¶ 6-7; Prisco Decl., ¶¶ 6-12; Tilton Decl.,

¶¶ 5-7.  If by "justifiable" Defendant means that staffing issues and competing demands on

clerks' time are an unavoidable reality of court administration, Courthouse News agrees.  But

what she seems to mean is that this reality excuses her from addressing access delays.  That is

not true.  Withholding new e-filed civil complaints until after court clerks "accept" them

inevitably leads to access delays.  *See, e.g.*, Girdner Decl., ¶ 25.  Were it not for Defendant's

policy of withholding access to complaints pending clerk review, there would be no delays.

> In effect, Defendant[] purposefully withhold[s] immediate access by placing newly filed complaints in a [clerk] review queue where they may be reviewed in a matter of minutes, hours, or days with virtually no guarantee as to when they will become accessible to the public.  The delay differs significantly among and within the [state's courts], varies day by day, and occurs with no predictability. It is Defendant['s] placement of newly filed complaints in this queue which must be justified under the First Amendment.

**REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S
MOTION FOR SUMMARY JUDGMENT - 17**

*Gabel*, 2021 WL 5416650, at *9.

Nor can she save her policy by suggesting that under *Planet III*, delays caused by "staffing issues or budgetary constraints do not give rise to a violation of the qualified right of timely access." Def. MSJ Opp. at 23. The fact-intensive inquiry required by *Press-Enterprise II* does not permit such convenient generalizations. Ventura was a paper-filing court, which means the alternatives that make access on receipt so easy for e-filing courts were not available to it. Based on specific facts established by Ventura, *Planet III* concluded that "overnight delay in access to complaints filed during the last ninety minutes of the court's public hours was no greater than essential to manage necessary court operations under the circumstances existing at the time." *Id*. at 599-600.

In contrast, Defendant offers only conclusory assertions as to what court personnel imagine would happen if the press and public were able to see new civil complaints before staff completed their "ministerial review." *See* CNS MSJ at 15-17, 21-26; CNS MSJ Opp. at 11, 14-22, 23-29. Under *Press-Enterprise II*, "a court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh*, 677 F.3d at 900.

## VI.    Defendant's Secret Agenda Theory

Defendant makes the baffling assertion that "this lawsuit is not really about legitimate concerns of delayed access" and that "[t]here would be no lawsuit if that were the case." Def. MSJ Opp. at 2; *see also id*. at 17, 18. Courthouse News surmises that her theory is that Courthouse News does not actually care about delays and instead wants courts to implement online press review queues so that it can fire its reporters and rely on automated programs to pull information from those queues. *See* Duke Decl., Exh. D (Girdner Depo. 86:15-95:24). This theory is clearly contradicted by the record. The automated program Courthouse News sometimes uses "to assist the reporter in gathering routine clerical information such as the docket

**REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S**
**MOTION FOR SUMMARY JUDGMENT - 18**

entries" cannot retrieve the complaints themselves or substitute for the work Courthouse News' reporters perform.  *Id*. (87:7-11, 91:15-20, 94:11-19, 95:3-8, 95:12-97:24).  Moreover, Idaho does not need to provide remote online access in order to remedy access delays.  It could configure its system to automatically accept the Complaints at Issue or provide a press review queue that is accessible only from a terminal at the courthouse.  *See* PSUF ¶ 86.

## VII.   Courthouse News is Entitled to Relief

Finally, Defendant argues that even if the Court concludes she has failed to satisfy her burdens under *Press-Enterprise II*, it should nevertheless deny injunctive relief and allow her to maintain her policy.  Def. MSJ Opp. at 24-30.  She addresses none of Courthouse News' argument or authority on this point.  *See* CNS MSJ at 27-29.  Nor does she explain how the Court and parties would square a declaration that her policy is unconstitutional with an order allowing it to remain in place.  *See* Complaint at 15 (ECF 1) (declaratory relief).

Moreover, Defendant's assertion that "CNS has not been irreparably harmed by waiting a few hours for clerk review" ignores both fact and law.  Defendant's delay evidence does not reflect how long the press and public "wait" for access but rather how much of that time passed while the courthouse was open.  *See infra* at 9.  Defendant cannot dispute that the press and public was unable to access ***nearly half*** of all Complaints at Issue on the day they were filed, or that approximately 15% were unavailable ***for two calendar days or longer***, Angione Decl., Exh. 2, or that individual delays during that period were regularly worse.  Shimabukuro Decl., Exhs. 1-9.[7]  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir.

---

[7] Ms. Valenti's "sworn testimony" that a particular complaint was submitted on June 8 but withheld until June 25 is not "flatly contradicted" by the fact that another news outlet reported the complaint on June 10.  Def. MSJ. Opp. at 25.  Defendant's own records establish that Ms. Valenti's testimony is correct.  Suppl. Keating Decl., ¶¶ 2-5 & Exh. 3.

REPLY IN SUPPORT OF COURTHOUSE NEWS SERVICE'S
MOTION FOR SUMMARY JUDGMENT - 19

2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Moreover, "when a governmental entity contends that the 'limited denial of access' is insubstantial, it 'begs the question of whether there was a sufficient factual basis for denying access at all.'"  *Gabel*, 2021 WL 5416650, at *14 (quoting *ABC, Inc. v. Stewart*, 360 F.3d 90, 100 (2d Cir. 2004)).

Defendant also characterizes injunctive relief in this case as an order "that the Idaho Supreme Court abandon its extensive policies and procedures."  Def. MSJ Opp. at 1.  In fact, an auto-accept configuration might entail adjusting who reviews new complaints and when, but not "[o]verhauling Idaho's clerk review process."  Def. MSJ Opp. at 30; *see* CNS MSJ at 20-23; CNS MSJ Opp. at 24-27.  Providing access to the Complaints at Issue through a press review queue would require no procedural changes whatsoever.  It would simply require ending the policy of refusing to provide access to such complaints pending "ministerial review."  That is the "policy and procedure" Defendant does not want to "abandon."  *See, e.g.*, Fetterly Decl., Exh. 5 (Omundson Depo. 37:16-39:1, 46:24-47:24, 103:2-21).

## CONCLUSION

For the foregoing reasons, Courthouse News respectfully requests that the Court grant its motion for summary judgment and enter declaratory and injunction relief.

DATED this 15th day of February, 2023      BRYAN CAVE LEIGHTON PAISNER LLP

　　 */s/ Jonathan G. Fetterly*　　　　　　　　　
Jonathan G. Fetterly
*Attorneys for Courthouse News Service*

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

I.   INTRODUCTION ......................................................................................................... 1

II.  ARGUMENT .............................................................................................................. 4

A.   Omundson objects to CNS's overlength Response to Statement of Undisputed Facts and the
     Evidentiary Objections Appendix. ........................................................................... 4

B.   There is no First Amendment violation because CNS is not entitled to immediate access. ... 5

C.   The right of timely access attaches upon acceptance for filing. ................................. 7

     1.   Historically, CNS did not have access to newly submitted complaints. .......................... 8

     2.   Access to newly submitted complaints does not play a "significant positive role" in the
          functioning of the judicial system. ...................................................................... 9

D.   Even if the Court determines the right of access attaches upon submission, the time between
     submission and clerk review does not give rise to an unconstitutional delay when weighed
     against the reasons for requiring clerk review and the reasons for not implementing a Press
     Review Queue or Auto Accept. ............................................................................... 11

     1.   The time between submission and acceptance for filing does not give rise to an
          unconstitutional delay. ....................................................................................... 11

     2.   Any incidental delay between submission and filing is justified when weighed against
          the reasons for requiring clerk review prior to acceptance for filing and the reasons for not
          implementing a Press Review Queue and Auto Accept. ....................................... 13

III. CONCLUSION ............................................................................................................ 20

## I.     INTRODUCTION

The First Amendment right of timely access does not entitle Courthouse News Service ("CNS") to immediate access to newly filed civil complaints.  Nevertheless, it is undisputed that in Idaho's state courts, CNS has immediate access to newly filed complaints. So why this lawsuit? Because CNS seeks immediate or near immediate access (i.e. access within "a few minutes" of submission") to complaints that have been submitted by the filer for review and filing, but that have not yet been reviewed or accepted by the clerk. The First Amendment does not entitle CNS to such access, and therefore the First Amendment inquiry ends there regardless of whether the right of timely access attaches upon submission versus acceptance for filing. *Courthouse News Service v. Planet* (*"Planet III"*), 947 F.3d, 581, 585 (9th Cir. 2020) (right of timely access to newly filed complaints "does not entitle the press to immediate access").

If the Court decides to reach the issue of when the right of timely access attaches, the inquiry is based on the *Press-Enterprise II*, 478 U.S 1 (1986) factors. Those two factors look at the historic access provided and whether public access plays a "significant positive role" in the functioning of the judicial system. The right of access attaches upon acceptance for filing based on the following undisputed facts:

- CNS did not have pre-acceptance access to complaints in Idaho in the days of paper filings (Dkt. 60-1, ¶ 23-27);

- CNS has not presented admissible evidence establishing a national standard of pre-acceptance access to paper filings (Dkt. 75 at 9-11); and

- Access to newly submitted complaints does not play a significant positive role in the functioning of the judiciary because a submitted complaint has not initiated a lawsuit, and therefore provides no insight into the functioning of the judiciary, and creates unnecessary risks of disclosing confidential information and misleading the public (*See e.g.* Dkt. 60-26 through Dkt. 60-32 (Idaho District Court Judges identifying concerns with the Press Review Queue and Auto Accept).

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 1

Thus, both *Press-Enterprise II* factors weigh in favor of the right of access attaching upon acceptance for filing rather than submission. CNS has immediate access, even though it is not entitled to it by the First Amendment, upon acceptance for filing. Therefore, CNS cannot establish a First Amendment violation.

Even if the Court disagrees and finds that the right of access attaches upon submission, CNS still has not established a First Amendment violation. The next step in the analysis looks to "whether any restriction on CNS's right 'is essential to preserve higher values and is narrowly tailored to serve those interests.'" Dkt. 40 at 13 (citing *Planet III*, 947 F.3d at 595). As a preliminary matter, any restriction on immediate access to complaints cannot be subject to this inquiry because *there is no right to immediate access*; the Court need not evaluate restrictions on a non-existent right.

Setting aside this dispositive issue, CNS still cannot establish a First Amendment violation. The time between submission and clerk review does not give rise to an unconstitutional delay when weighed against the reasons for requiring clerk review and the reasons for not implementing a Press Review Queue or Auto Accept. The following non-exhaustive list of undisputed facts is relevant to this balancing test:

- The average statewide time between submission and review for all initial filings is 4.82 business hours (the First Amendment does not just apply to the complaints CNS arbitrarily deems relevant in this case to CNS's financial interests) (Dkt. 60-21);

- Nearly 85% of complaints filed in the A.A. filing fee category were reviewed within eight business hours of submission, with over 70% of those complaints reviewed in under four hours, and 65% reviewed in less than three hours (Dkt. 60-18, ¶ 20);

- The Tyler Press Review Queue raises serious security concerns, which have not been adequately addressed by Tyler (Dkt. 60-1, ¶ 46);

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 2**

- The Press Review Queue is not protected against web scraping software and there's an "implied assumption" that web scraping bots would have access to the Press Review Queue (Dkt. 59-5, Derrick Depo. at 64:6-65:6);

- CNS uses web scraping software (Dkt. 60-7 at 102:6-103:2, 105:1-106:1);

- The use of web scraping software inadvertently caused a massive data breach in another public-facing Tyler product (Dkt. 60-11, 60-12);

- The Press Review Queue would cost a minimum of $108,000 annually, and this price would be "significantly higher" if Tyler agreed to comply with the Idaho Supreme Court's security requirements (Dkt. 60-1, ¶¶ 47-50);

- The Press Review Queue erodes public confidence in Idaho Courts since it allows for publication of complaints that have not yet initiated a lawsuit and may never initiate a lawsuit if they are rejected for filing and not resubmitted, and could further mislead the public if a complaint is filed in the wrong county and reported on (e.g. a complaint filed in Adams County is rejected because it was supposed to be filed in Ada County, but the public is then reviewing the Adams County docket) (Dkt. 60-1, ¶¶ 51-53);

- The Press Review Queue and Auto Accept could be misused to publish confidential or inflammatory information and neither option protects against inadvertent or malicious dissemination of information (Dkt. 60-1, ¶¶ 54-55, 60, 68-69);

- Auto Accept would be detrimental to litigants because filing issues that could be addressed on the front end through clerk review may go unnoticed for a substantial period of time, and could result in the complaint being dismissed and subsequently time barred if it was filed near the statute of limitations (Dkt. 60-1, ¶ 61);

- Judicial action would be required to address filing errors that could have been caught by clerk review, which would significantly increase the already overwhelming workloads of Idaho's judges and court staff (Dkt. 60-1, ¶¶ 62-63);

- Auto Accept cannot determine whether the accurate court filing fee was provided and creates issues relating to the refunding of fees (Dkt. 60-1, ¶¶ 64-65);

- Auto Accept eliminates the clerk's ability to directly communicate with filers through eFile & Serve, which would greatly increase the amount of time it would take to address filing errors with complaints that have been automatically accepted (Dkt. 60-1, ¶¶ 66-67); and

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 3**

- Auto Accept cannot protect against malicious filings (Dkt. 60-1, ¶¶ 68-69).

CNS failed to present admissible evidence to refute these facts. Instead, CNS relies on unfounded evidentiary objections in a 58-page "appendix," relies on its own self-serving interpretation of the Idaho Rules for Electronic Filing and Service ("IREFS"), ignores this Court's rules in its significantly overlength Response to Statement of Undisputed Facts, and mischaracterizes testimony and evidence in an attempt to create issues of fact that simply are not there (e.g. by claiming the $108,000 price of the Press Review Queue is not a certainty because Omundson has not engaged in contract negotiations with Tyler, despite Tyler's 30(b)(6) representative testifying unequivocally that this price is non-negotiable). *Compare* Dkt. 59-5, at 70:23-71:16, 172:15-22, *with* Dkt. 74 at 33. None of this raises a genuine issue of fact. Based on the undisputed material facts, summary judgment should be granted in Omundson's favor.

## II. ARGUMENT

### A. Omundson objects to CNS's overlength Response to Statement of Undisputed Facts and the Evidentiary Objections Appendix.

Local Rule 7.1(c) permits a responding party to file "a separate statement, not to exceed ten (10) pages, of all material facts which the responding party contends are in dispute." While the parties stipulated to overlength opposition briefs, they did not stipulate to extending the page limitations for the separate statement of disputed facts and the Court's order does not allow for an overlength statement of disputed facts. Dkt. 56, 57. Nevertheless, **CNS filed a 23-page Response to Statement of Undisputed Facts**. Dkt. 76. Omundson respectfully requests that the Court either strike CNS's Response to Statement of Undisputed Facts or, alternatively, require CNS to file an amended Response to Statement of Undisputed Facts that meets the requirements of Local Rule 7.1. If the latter, Omundson respectfully requests she be granted leave to file a short sur-reply brief addressing the amended Response to Statement of Undisputed Facts.

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 4

Also, although CNS is permitted to file an appendix raising evidentiary objections, the lengthy appendix it filed raises few evidentiary objections but instead primarily attempts to dispute facts. *See* Dkt. 74-3. Most of the purported objections are mere attempts to discredit witness testimony by providing cites to the record with oftentimes misleading descriptions of the evidence cited, and then claiming the witness failed to account for the misleading evidence making the testimony  inadmissible. These so-called "evidentiary objections" that misrepresent the record should be ignored.  They are  also improper because they go to the weight of the evidence, not its admissibility.  *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) ("[T]he weight of the evidence is an issue for trial, not summary judgment."). Such "evidentiary objections" are also an improper attempt to circumvent the page limitations for CNS' Response to Statement of Undisputed facts, which is already overlength by 13 pages. Because CNS's "evidentiary objections appendix" is mostly a guise for attempting to raise factual disputes – which it fails to do, Omundson requests the Court strike this appendix from the record.

## B. <u>There is no First Amendment violation because CNS is not entitled to immediate access.</u>

CNS has failed to dispute two key facts. First, CNS does not dispute that complaints in Idaho are immediately available to the public upon acceptance for filing. *Compare* Dkt. 60-1, ¶ 20(g) *with* Dkt. 76 at 6-7. Because the right of timely access attaches upon acceptance for filing, as discussed below, CNS cannot establish a First Amendment violation given the uncontroverted evidence of immediate access.

Second, even if the Court determines that *Planet III* provides for a right of timely access upon submission by the filer but prior to acceptance for filing by the clerk, CNS's First Amendment claim still fails as a matter of law because CNS is not entitled to *immediate* access upon submission, yet that is undisputedly what it is seeking in this lawsuit. *Planet III*, 947 F.3d at

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 5

594 ("Though we conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court, we do not view that conclusion as demanding immediate, pre-processing access to newly filed complaints.").

Omundson cited testimony from CNS's own witnesses, Catherine Valenti and William Girdner, to support the fact that CNS is seeking immediate access to complaints. Dkt. 60-1, ¶ 34. CNS has not submitted any evidence to refute this fact, and instead attempts to dispute Mr. Girdner's testimony by claiming he did not specifically testify "that such a delay was necessarily unconstitutional." Dkt. 76 at 14. Mr. Girdner's testimony speaks for itself:

```
 6    Q. (BY MS. DUKE) What does CNS consider to
 7  be delayed access to newly E-filed civil
 8  complaints in this lawsuit?
 9    A. Access past the time of receipt or
10  shortly thereafter, as we see in so many other
11  courts, state and federal.
12    Q. How much time shortly thereafter? What's
13  too long?
14    A. Yeah, I'd say a few minutes. For
15  example, in Miami -- I'm sorry, in Florida, we
16  agreed with the e-filing authority to -- at the
17  time of receipt or within five minutes afterwards.
18  I think that's typically the amount of time that
19  it takes for these -- for the complaints to come
20  into the system.
```

Dkt. 60-7 at 129:6-20. CNS's mischaracterization of Mr. Girdner's undisputed admissions in his deposition does not raise an issue of fact as to the immediacy of access CNS is seeking in this lawsuit. *See e.g. Schreiner v. City of Gresham*, 681 F. Supp. 2d 1270, 1277 n.1 (D. Or. 2010) (issue of fact cannot be created by mischaracterizing evidence). Further, CNS did not and could not refute Ms. Valenti's admission that CNS is seeking "immediate access to complaints." Dkt. 60-1, ¶ 34. Nor did CNS refute the fact that both options it proposes—Auto Accept and the Press Review Queue—provide immediate access to newly submitted complaints. *Compare* Dkt. 60-1, ¶ 35, *with* Dkt. 76 at 14.

There is no genuine issue of fact that CNS is seeking immediate, pre-processing access to

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 6

newly submitted civil complaints. Even if the right of access attaches upon submission, CNS's First Amendment claim fails as a matter of law because it is not entitled "immediate, pre-processing" access. *Planet III*, 947 F.3d at 594. Summary judgment should be granted to Omundson for this reason alone.

## C.    The right of timely access attaches upon acceptance for filing.

In the Ninth Circuit, courts consider two factors from *Press-Enterprise II* to determine whether a document qualifies as a "judicial document" to which the right of timely access attaches: (1) historical access and (2) whether public access plays a "significant positive role" in the functioning of the court system. *Planet III*, 947 F.3d at 590.  In analyzing these factors in its opinion on Omundson's Motion to Dismiss, Omundson is aware of the Court's pre-discovery finding that "filed is equivalent to submission." Dkt. 40 at 25. Significant, however, is that evidence developed in discovery—which has not been disputed on summary judgment by CNS—contradicts representations CNS made to the Court at the Motion to Dismiss stage, and presumably the Court relied on, regarding historical access to submitted complaints. Omundson therefore respectfully requests that the Court reconsider this finding now that discovery has established that CNS's representations to this Court it its opposition to the Motion to Dismiss were not truthful. Specifically, and as discussed below, in its pre-discovery Motion to Dismiss, CNS wrongly represented to this Court that, historically, "[t]he press could traditionally access new civil complaints after court clerks received them at the intake counter, and before they were subsequently processed or docketed[.]" Dkt. 14-1 (citing Declaration of William Girdner in Support of CNS's Motion for Preliminary Injunction, Dkt. 14-2, ¶ 15). Discovery has now proven this false, as the historical access in Idaho undisputedly did not provide the press with access to civil complaints prior to acceptance for filing and docketing. *See e.g.* Dkt. 60-8 at 55:15-56:16,

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 7

Dkt. 60-26, ¶ 4.

### 1.    Historically, CNS did not have access to newly submitted complaints.

CNS failed to raise a genuine issue of fact regarding historical access to newly submitted complaints in Idaho. Rather, it wrongly attempts to undermine the admission of its Idaho reporter. Without any basis, CNS suggests that Ms. Valenti—**the only CNS agent with knowledge of historical access in Idaho**—confused "filing" with handing a document to a clerk because "she is not familiar with the technical court processes and terminology." Dkt. 76 at 9-10.   Did CNS question Ms. Valenti at the deposition to have her testify to this?  No.  Did Ms. Valenti submit a change sheet correcting this deposition testimony?  No.  Did CNS submit a declaration from Ms. Valenti to clarify her purported confusion?  No.[1]   CNS cannot escape the dispositive admissions of its only witness that knows the historical access CNS had. Dkt. 60-8 at 55:15-56:16.   In her deposition, the transcript of which has been provided to the Court in its entirety, Ms. Valenti admitted that **CNS did not have access to complaints until they had been accepted by the clerk for filing**. *Id.*   She made this admission even clearer when she admitted **she would only review file-stamped copies of complaints**. *Id.* at 56:14-16.  This evidence is undisputed.

In addition to not being able to escape their own agent's admissions, CNS has not submitted any evidence refuting the sworn testimony from Idaho District Court Judges and Trial Court Administrators that paper filed complaints were not made available to the public until they had been accepted for filing. Although Judge Brown testified that complaints were available to the public after "accepting it, file-stamping it, and placing it in the case file" (Dkt. 60-26, ¶ 4) and Sharee Sprague testified that she "she was not aware of any jurisdictions in Idaho that provided the press or public with access to paper complaints before they were reviewed and accepted (Dkt.

---

[1] A declaration from Ms. Valenti still would not have raised an issue of fact. *See e.g. Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 8**

60-33, ¶ 13), CNS claims this unrefuted testimony should be disregarded because the declarants did not specifically use the term "docketing" in their declarations.  However, CNS again ignores its agent's undisputed admission that **a docket list was created** *after* **complaints had been filed and stamped,** (Dkt. 60-8 at 55:15-18) and Judge Brown's testimony that complaints were available only once a case file had been opened.[2] Dkt. 60-26, ¶ 4. A complaint was docketed in the official court record as soon as it was accepted for filing and stamped. Dkt. 60-40, ¶ 4.

> **2.** **Access to newly submitted complaints does not play a "significant positive role" in the functioning of the judicial system.**

CNS did not dispute the material fact that a lawsuit <u>is not</u> initiated until the complaint is accepted for filing, nor did CNS dispute that judges and court staff <u>do not have access</u> to a complaint awaiting clerk review in eFile & Serve. *Compare* Dkt. 60-1, ¶ 20(c), (h), *with* Dkt. 76 at 20. CNS also failed to explain how providing the press and public with access to complaints that have not yet initiated judicial proceedings plays a significant positive role in the judicial process. Instead, it relies on *Planet III* language that is not applicable given the undisputed facts in that case versus this case.

In *Planet III*, the first step of the process involved a filer walking up to the counter, handing the complaint to a court processing assistant, and then a review by the assistant to determine whether the complaint was filed in the correct court and "all documents necessary to initiate the case" had been presented along with the correct filing fee or fee waiver (i.e. the functional equivalent of clerk review in eFile & Serve). 947 F.3d at 586. Then certain administrative steps were performed to open a case file followed by a supervisor's "quality control review," and that is where the delays arose. *Id.*  Given these particular facts, the Ninth Circuit focused on the role of

---

[2] The evidentiary objection cited in the overlength Response to Statement of Undisputed Facts has nothing do with the testimony at issue from Sandra Barrios' declaration. *See* Dkt. 76 at 12, 74-3 at 34.

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 9**

*filed* complaints in evaluating the judicial system. 947 F.3d at 592. The Court started its analysis by defining a judicial document as "an item filed with a court that is 'relevant to the judicial function and useful in the judicial process.'" *Id.* (citation omitted). In rejecting the argument that complaints only become judicial documents once judicial action has been taken, the Ninth Circuit reasoned: "[c]itizens could hardly evaluate  and participate in robust public discussions about the performance of their court systems if complaints—***and, by extension, the very existence of lawsuits***—became available only after a judicial decision had been made." *Id.* (emphasis added). Thus, in *Planet III*, the filing of a complaint was treated as synonymous with the initiation of a lawsuit. But that is not the case with an electronically submitted complaint. Dkt. 60-1, ¶ 20(c).

When looking to this case against Omundson, an electronically submitted complaint has not yet been accepted for filing by the clerk, does not have a file-stamp, and has not initiated legal proceedings. Dkt. 60-8, ¶ 20. In terms of the *Planet III* sequence, a complaint waiting for clerk review in eFile & Serve is the equivalent of a filer standing at the clerk's counter waiting for the thumbs up from the clerk that they have everything they need to initiate a lawsuit and that the clerk's office will take it from there. Thus, a submitted but not yet filed complaint provides practically no settlement leverage, which was another consideration in *Planet III*. 947 F.3d at 592 (public access prior to judicial action "buttresses the institutional integrity of the judiciary[,]" for example by providing the public with access to complaints even if they were only filed to prompt a settlement).  This of course changes once the complaint has been accepted for filing, but clerk accepted, filed complaints are not at issue in this lawsuit.

Based on the above, and how this case is distinguishable from *Planet III*'s facts, both *Press-Enterprise II* factors weigh in favor of the right of access attaching upon acceptance for filing, not

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 10

upon submission. There is no dispute CNS has immediate access to complaints upon acceptance for filing, and therefore its First Amendment claim fails as a matter of law. Dkt. 60-1, ¶ 20(g).

**D.**     **Even if the Court determines the right of access attaches upon submission, the time between submission and clerk review does not give rise to an unconstitutional delay when weighed against the reasons for requiring clerk review and the reasons for not implementing a Press Review Queue or Auto Accept.**

    **1.**     **The time between submission and acceptance for filing does not give rise to an unconstitutional delay.**

*Planet III* does not set a bright-line test for how soon complaints must be made available upon filing. Again, the complaints at issue in *Planet III* had already been accepted by the clerk for filing and, therefore, the processing at issue was post-initiation of a lawsuit. 947 F.3d at 586.  As such, the "no access before processing" policy in *Planet III* that was struck down resulted in delays up to two weeks *after* the clerk had already accepted the complaints for filing. *Id.* Once accepted, there were time periods where up to 65% of complaints were made available two or more days after filing. *Id.* at 597-98.

Notably, and ignored by CNS, is that the *Planet III* court **upheld the scanning policy** even though it did not result in perfect, same-day access, reasoning that the overnight delay in access to complaints filed towards the end of the day was necessary to manage court operations given the limitations on the state court's resources at the time. *Id.* at 598-600. Other federal circuits have adopted similarly flexible approaches. The Fourth Circuit's standard requires access "the same day on which the complaint is filed, insofar as is practicable; and when not practicable, on the next court date — excepting inconsequential deviations and extraordinary circumstances which may, without violating the constitution, delay access." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) (internal quotes omitted). "This flexible standard does not require perfect or instantaneous access." *Id.* Instead, this standard "provides courts with some leeway where same-

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 11

day access would be impracticable, and fully exempts inconsequential delays and those caused by extraordinary circumstances." *Id.* The Tenth Circuit struck down a bright-line five-business hour standard, finding it too inflexible and specifically directing the district court on remand to "accommodate for extraordinary circumstances or a substantial-compliance standard[.]" *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1273 (10th Cir. 2022). Extraordinary circumstances may include things like staffing limitations, having to prioritize certain criminal dockets over civil filings, and the resources New Mexico's district and magistrate courts have depending on "size, staffing, and geographical location." *Id.* at 1271.

Although the standard for timely access upon filing is less than clear cut, there is no dispute that the incidental delay between submission and acceptance is not a constitutional violation. Nearly 85% of complaints filed in the only subset of complaints CNS cares about for running its business in Idaho (the A.A. filing fee category) were reviewed within eight business hours of submission, with over 70% of those complaints reviewed in under four hours and 65% reviewed in less than three hours. Dkt. 60-18, ¶ 20. The average statewide time between submission and review for all initial filings is 4.82 business hours. Dkt. 60-21. The First Amendment does not apply exclusively to the limited types of complaints CNS has deemed relevant for its reporting purposes in this lawsuit (only the A.A. filing fee category). Therefore, it is appropriate (and frankly necessary given handling of all complaints, and not just the complaints CNS is financially interested in, is relevant for First Amendment purposes) for the Court to consider the timing of access to all initial filings, not just complaints filed in the A.A. category.

The uncontroverted data shows the vast majority of complaints are reviewed within eight business hours. Dkt. 60-18, Dkt. 60-20. Once accepted for filing, they are immediately available to the press and public. Dkt. 60-1, ¶ 20(g). Where the time between submission and review has

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 12

taken longer, it has typically been because of limitations on staffing and resources particular to individual counties, particularly Idaho's smaller, more rural counties with fewer staff and resources. *See* Dkt. 60-41, Dkt. 75-1, Dkt. 75-3 through Dkt. 75-9. Where the time between submission and clerk review has taken longer than eight hours, it has been because more immediate access is not practicable based on the staff and resources that particular county has and/or because of extraordinary circumstances that county faces. Similar to the facts surrounding the scanning policy in *Planet III*, the Court should find that any delay in access is "no greater than essential to manage necessary court operations under the circumstances existing at the time." 947 F.3d at 599-600.

    **2.**    **Any incidental delay between submission and filing is justified when weighed against the reasons for requiring clerk review prior to acceptance for filing and the reasons for not implementing a Press Review Queue and Auto Accept.**

    *a.*    *There is no dispute of fact regarding the justifications for clerk review.*

In Idaho, clerks serve as gatekeepers for improperly submitted documents and notify attorneys and litigants if there are any issues with a submission. Dkt. 60-1, ¶ 58. Clerk review ensures filing errors can be promptly corrected on the front end, with clerks interfacing directly with the filer through eFile & Serve, instead of on the back end once an improper filing has been accepted as an official court record and would thus require judicial action to correct. Dkt. 60-1, ¶¶ 61, 66. CNS has not submitted any evidence opposing these undisputed facts. *See* Dkt. 76 at 19-20, 22. CNS instead only provides unfounded evidentiary objections. *Id.* The testimony from Idaho District Judges and Trial Court Administrators is plainly based on their personal knowledge, and this is not expert testimony because they are testifying to facts, not opinions. *See* Dkt. 60-26, Dkt. 60-35.

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 13**

Not only is the clerk review process more efficient than correcting errors on the back end, it helps to ensure confidential information does not become publicly available. Dkt. 60-1, ¶ 68. CNS failed to provide any evidence to oppose these undisputed facts, and instead ignores the uncontroverted evidence to **incorrectly claim** clerk review does not include a review of confidential information. Dkt. 74 at 24. However, it is undisputed the Court Operations Manual explicitly requires clerks to reject *In Camera* Filings, Motion to Seal documents, and any other documents that must be filed in paper form. Dkt. 60-16 at 26. Although it is the filer's responsibility to omit or redact personal protected data identifiers (IREFS 15) clerks still have the authority to reject a submission if it contains information that needs to be redacted. Dkt. 60-1, ¶ 68. Another federal court has recently rejected this unsupported argument by CNS (*i.e.* that placing the burden of redacting or omitting confidential information on the filer somehow removes review of confidential information from the ambit of clerk review). *See Courthouse News Serv. v. Harris*, 2022 WL 17850125, at *35 (D. Md. Dec. 22, 2022) ("And, it is no answer that the burden is on the filer to identify confidential information, as CNS suggests. . . [A]ddressing 'filer mistakes has always been part of the equation' for clerical staff . . . It is certainly appropriate for clerical staff to check submissions, if done within a reasonable time.").

Thus, CNS has not raised an issue of fact with respect to the compelling justifications for requiring clerk review prior to acceptance for filing.

> **b.    There is no dispute of fact regarding the justifications for not implementing a Press Review Queue.**

CNS has not provided any evidence to refute Omundson's justifications for not implementing Tyler's Press Review Queue, and instead merely posits speculation and conjecture to imply that her reasons for not doing so are simply not good enough. Dkt. 74 at 33.

There is no dispute the Press Review Queue comes with an annual fee of $108,000 and this

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 14

number would be "significantly higher" if Tyler agreed to comply with the Idaho Supreme Court's security requirements related to cloud based services. Dkt. 60-1, ¶ 47. CNS has not presented any evidence to refute this information—which is directly from Tyler's 30(b)(6) witness—and instead disingenuously argues this sworn testimony "cannot be tested" because Omundson has not tried to negotiate with Tyler, omitting the testimony from its 30(b)(6) witness who testified unequivocally the price is non-negotiable. Dkt. 74 at 33. That testimony is as follows:

> 15     Q.  So I understand Mr. Girdner obviously wouldn't
> 16   know what Tyler would or wouldn't do, but I think it's
> 17   fair to say, based upon your testimony, that if the
> 18   State of Idaho, regardless of its bargaining power,
> 19   regardless of its amazing negotiation skills, if it
> 20   wants the press review queue, it's going to pay $108,000
> 21   a year for that subscription?
> 22     A.  Yeah, that's an accurate assessment.

Dkt. 59-5 at 172:15-22. There is no factual dispute regarding the steep annual cost of the Press Review Queue. This alone establishes it is not a reasonable alternative for providing pre-acceptance access to newly submitted complaints. *Planet III*, 947 F.3d at 596 ("The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press."). That is exactly what CNS is asking this Court to compel the Idaho Supreme Court to do.

CNS has also failed to raise an issue of fact regarding the security concerns with the Press Review Queue. There is no dispute the Press Review Queue is ***not*** secured against web scraping software and there is an "implied assumption" web scraping bots have access to the Press Review Queue. Dkt. 59-5 at 175:25-176:17. CNS suggests this is a non-issue because, in response to a question about whether Tyler allows clients to use their own firewall for the Press Review Tool, the 30(b)(6) witness responded: "Yeah. I don't – yeah. We would, yes." Dkt. 59-5 at 179:4-8, *see also* Dkt. 76, ¶ 41. However, CNS has not provided any evidence establishing this would protect against web scraping software, or that other Tyler clients have used their own firewalls to protect

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 15

the Press Review Queue. The Press Review Queue provides users with access to documents in the eFile & Serve system, the security for which is Tyler's responsibility, not the client's. *Id.* at 124:23-125:2, *see also* Dkt. 60-1, ¶ 37. eFile & Serve already has firewall protection, but based on Tyler's admission in its 30(b)(6) deposition, this apparently this does not protect the Press Review Queue against web scraping software. Dkt. 59-5 at 127:8-19, 175:25-176:17. Further, the Idaho Supreme Court running its own firewall would only add to the already steep cost of the Press Review Queue.

Nor is there any dispute that CNS uses web scraping software. Dkt. 60-7 at 102:6-103:2, 105:1-106:1 (referring to the automated program as a "spider," "bot," and "crawler"), Dkt. 60-14 at CNS_000003 (CNS's Daily Reports Style Manual instructs reporters not to report on tax cases with the notation that "Though your spider might return them, the entries should be deleted from your report before publishing."). Nor is there any dispute that similar web scraping activities resulted in a massive date breach in another Tyler product which, like the Press Review Queue, is public facing. Dkt. 60-11, 60-12. Specifically, over 322,000 confidential attorney records from the California State Bar were published and remained online for over four months after being "unintentionally swept up and published" by a public records aggregator. Dkt. 60-12.

There is no factual dispute about this serious security vulnerability with the Press Review Queue. Instead of refuting this evidence, CNS misleadingly claims Omundson's security concerns were resolved during the 30(b)(6) deposition of Tyler. Dkt. 74 at 33. This is wholly inaccurate. One particular concern was discussed (namely, whether the Press Review Queue provides a link to the original document or a copy), but the 30(b)(6) testimony of Tyler also confirmed one of Omundson's biggest concerns with the Press Review Queue, namely that it is not secured against web scraping software. So no, the 30(b)(6) deposition did not alleviate Omundson's security concerns, and many of her questions still have not been answered by Tyler. Dkt. 78 at Declaration

REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 16

of Jennifer Dvorak, ¶ 11. Omundson is not required to engage in futile contract negotiations with Tyler to get additional information about security concerns—as CNS suggests—when the Press Review Queue is a non-starter due to the known security concerns and the undisputed hefty price tag. Dkt. 74 at 33.

There is also no factual dispute that the Press Review Queue lacks any feature to prevent the inadvertent or malicious disclosure of confidential information. Dkt. 60-1, ¶ 55. CNS does not deny this, and instead claims this does not matter because court clerks purportedly cannot do anything to protect against the disclosure of confidential information either. Dkt. 76 at 17. As discussed in Section II.D.2.a, *supra*, this is incorrect and not factually supported; clerks can and do reject filings that include confidential information. *See e.g.* 60-35, ¶¶ 10-11.

There is also no factual dispute regarding the erosion of public confidence in Idaho' Courts inherent in using the Press Review Queue. CNS admits it does not issue corrections if its daily report reference a rejected complaint. Dkt. 60-1, ¶ 52, Dkt. 76 at 17. Instead, CNS merely asserts the testimony from Idaho District Court Judges is "unsupported" and "conclusory." Dkt. 76 at 16-17. This does not raise an issue of fact. The testimony at issue is neither "unsupported" nor "conclusory," and instead simply states the logical and straightforward concept that if the press reports on a complaint that is ultimately rejected—and thus does not initiate a lawsuit—the public will be left to speculate about a complaint that was purportedly filed yet did not result in a lawsuit. CNS has not offered any evidence or even a cogent argument to refute this.

Finally, CNS has not raised a factual dispute regarding the reasonableness of the Idaho Supreme Court building its own Press Review Queue. Dkt. 60-1, ¶ 56, Dkt. 76 at 18. CNS' only response is that the Tyler 30(b)(6) deposition took place after Jennifer Dvorak's deposition, and the questions about building a press review queue were purportedly addressed by Tyler at its

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 17**

deposition. Dkt. 76 at 18. This is blatantly misleading; much of the testimony cited in Omundons's

Statement of Undisputed Facts comes from the Tyler 30(b)(6) deposition itself. Dkt. 60-1, ¶ 56.

Tyler could not provide an estimate on the cost of the application that would interface with Tyler's

API, including the cost of  developing the press review queue application, personnel costs, and

data hosting costs. Dkt. 59-5 at 193:2-195:2.

Thus, CNS has not raised a genuine issue of fact regarding the justifications for not

implementing a Press Review Queue.

### c.    *There is no dispute of fact regarding the justifications for not implementing Auto Accept.*

CNS has not offered any evidence refuting the fact that Auto Accept effectively eliminates

the clerk's gatekeeping function, which benefits litigants, the clerks, District Judges, and their

staff. Dkt. 60-1, ¶ 58. Instead, CNS argues Auto Accept does *not* eliminate this gatekeeping

function because clerk review could be performed once the complaint has been accepted for filing,

and thus has initiated a lawsuit. Dkt. 76 at 19. This argument is based on CNS's fundamental

misconception of how gates work. The purpose of a gate is to make sure someone or something

does not go into a particular area in the first place. Fixing filing errors on the backend (e.g. by

striking a complaint filed in the wrong jurisdiction) is not "gatekeeping" because the improperly

filed complaint is already where it is not supposed to be, *i.e.* in the official court record. CNS

disputes that this would be extremely detrimental to litigants, but as is characteristic in its attempts

to not lose this case at summary judgment, CNS cites no evidence to support this unfounded

assertion. Dkt. 76 at 19. *see also* F.R.C.P. 56(c)(1)(A) (party asserting fact is disputed must support

assertion by "citing to particular materials in the record").

Moreover, Auto Accept is no substitute for clerk review. Although Auto Accept can be

configured to accept documents based on case type, party type, or filer type, it is not able to review

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 18**

the complaint itself like a clerk would to look for basic things such as whether the county listed at the top of the complaint is the same county where the complaint has been submitted (e.g. an Ada County complaint is not being filed in Adams County or a Bonneville complaint is not being filed in Bonner County) or if it is a document that needs to be filed under seal. Dkt. 60-1, ¶ 59, Dkt. 76 at 19-20.

Relatedly, Auto Accept is also not able to determine whether the correct filing fee has been paid. Dkt. 60-1, ¶ 64. CNS misstates the testimony of Tyler's 30(b)(6) witness in claiming "Tyler could develop a configuration for auto-accept that would detect whether the filing fee matched a specified amount." Dkt. 76 at 21. However, all the 30(b)(6) witness said was that Tyler was a technology company and therefore "could develop a lot of things" and "would have to get the technical teams involved in scoping of that." Dkt. 59-5 at 212:8-22. Importantly, this configuration is not currently available , and there is no guarantee that it ever will be. Even if it were made available at some point in time, there is no evidence of how much such development would cost the Idaho Supreme Court.

CNS also failed to introduce any evidence to dispute the fact that Auto Accept would require judicial action to correct filing errors and would increase the workload of judges and court staff, and instead only disputes this fact based on evidentiary objections. Dkt. 76 at 20. Judge Brown's declaration does not include expert opinions and is based on his personal knowledge of the Idaho Court's efiling system. Dkt. 60-26. CNS provides no basis for disputing the facts in this declaration or any of the other Idaho District Court Judges' declaratations.

In short, CNS has not submitted any evidence raising a genuine issue of material fact about the reasons for requiring clerk review prior to acceptance and the reasons for not implementing the Press Review Queue and Auto Accept. Instead, CNS relies on speculation, conjecture,

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 19**

mischaracterizations of evidence, and unfounded evidentiary objections to support its armchair quarterbacking of the Idaho Supreme Court's decisions on how to balance public access to judicial records against protecting the integrity of Idaho's state court filings. There is no dispute regarding the reasons for requiring clerk review, nor is there any dispute of fact as to the insignificant length of time between submission and clerk review. Any incidental delay between submission and filing is justified when weighed against the reasons for requiring clerk review prior to acceptance for filing, and therefore the Court should grant Omundson's Motion for Summary Judgment.

## III.    CONCLUSION

For the foregoing reasons, Defendant Sara Omundson respectfully requests that the Court grant her Motion for Summary Judgment.

DATED this 15th day of February, 2023.

DUKE EVETT, PLLC


By /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 20**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of February, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**REPLY MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 21**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                    Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>                    Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

I, Sara Omundson, declare as follows:

1.      I am the Administrative Director of the Idaho Courts ("Administrative Director"). I have been the Administrative Director since July 2016 when I was appointed by the Idaho Supreme Court ("Supreme Court").

2.      In 2012, I was appointed by Governor C.L. "Butch" Otter to serve as Idaho's State Appellate Public Defender. During my time as State Appellate Public Defender, I also served as Chair of the Idaho Criminal Justice Commission through appointment by Governor Otter in June 2013, as well as serving as a member of the State Public Defense Commission. Prior to holding those positions, from 2002 through 2012, I worked as Chief of the State Appellate Public

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1**

Defender's Office's Appellate Unit, where I managed attorneys and support staff while also representing people before the Supreme Court and the Idaho Court of Appeals. I worked as a Deputy State Public Appellate Defender from 1999 through 2002.

3.      Through my role as Administrative Director, I have knowledge of the divisions of the Administrative Office of the Courts. I also have knowledge of the administrative and organizational structure of the Idaho court system, including the role of the Supreme Court, roles authorized by statute, and by the Supreme Court through the Idaho Court Administrative Rules.

4.      My responsibilities as the Administrative Director are generally as follows. I am responsible for assisting the Supreme Court in meeting its constitutional responsibility to administer a unified, integrated court system. I meet regularly with the Supreme Court and am responsible for many of the day-to-day administrative and support operations of the judiciary. These responsibilities include intergovernmental relations with the Executive and Legislative branches of state government. I encourage input from judges and court personnel throughout the state whether through regular direct contact, court committees or the Administrative Conference to enhance services provided to the public by the Idaho courts system. With Supreme Court oversight, I set the leadership agenda of the Supreme Court and the Administrative Conference. The Administrative Conference provides an important governance role and is made up of the administrative district judge and trial court administrator from each of Idaho's seven judicial districts, Supreme Court Justices and Chief Judge of the Court of Appeals, administrative staff, and officers of the magistrate and district judges' associations. I take part in long-term strategic planning activities to meet the goals and objectives of the Idaho court system and to support the mission statement and values of the Idaho court system. I also review current budgets, staffing and resources and determine, with the Administrative Conference, what resources will be needed to

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 2**

meet the Idaho Court System's goals and objectives.  I directly report to the Chief Justice of the Supreme Court. I act under the supervision and direction of the Idaho Supreme Court pursuant to Idaho Code § 1-612. I do not approve or adopt the court rules relevant to the efiling system or the definition of public documents.  I review and make recommendations to the Idaho Supreme Court for potential changes they may then consider and decide whether a change to policies or procedures will be made.

5.      I work with individuals in roles at all levels of the Idaho court system. For example, through my work at the county level, I have knowledge of the processes and procedures employed by Idaho's 44 county district court clerks, their deputy clerks and court staff. Due to the population diversity in Idaho's counties, the clerks' offices are staffed with as little as two full-time deputy clerks (Lewis County) and up to 184 (Ada County).  The 44 elected district court clerks serve terms and are elected every four years. District court clerks (and their deputy clerks) receive, review for filing, and ultimately determine whether a court document can be filed (including civil complaints), receive and account for fees and fines, provide for the management of court records, and calendar cases. I work with the Supreme Court to develop policies and procedures applicable to Idaho's district court staff. The Administrative Office provides training on those policies and procedures, provides resources and support to ensure clerk's offices can comply with the same, and coordinates any needed additional resources, information, or support if an elected clerk has difficulties meeting Idaho Supreme Court requirements.

6.      I am also aware of and knowledgeable about the Idaho Supreme Court's contracts with third-party service providers related to the administration of Idaho's court system, including the Idaho Supreme Court's contract with Tyler Technologies, Inc. ("Tyler") Tyler is a third-party software developer that provides software and services to governmental entities, like the Supreme

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 3**

Court of Idaho. To make efilng mandatory, it is necessary for the Court to ensure that there is at least one efilng vendor doing business in the state, so the Court contracts with Tyler to ensure there is. This allows the Court to require efilng even if a party is indigent and entitled to fee waivers.

7.      With respect to Tyler, the Supreme Court has contracted with Tyler for a license to use Tyler's eFile & Serve (formerly known as Odyssey File & Serve) software platform. On October 8, 2015, the Idaho Supreme Court entered into an Electronic Filing Agreement with Tyler to license and use Tyler's electronic filing system. Twin Falls was the first county to transition to e-filing in late 2015. All Idaho counties transitioned to e-filing by late 2018.

8.      Following the transition to e-filing, attorneys and law firms who practice in State of Idaho courts have been required to electronically submit all court documents for clerk review and filing through File & Serve. There are limited exceptions to the requirement to electronically submit court documents through File & Serve. Those exceptions are defined in Idaho Rules of Electronic Filing and Service 4 and 5. Under Filing Rule 4, self-represented parties who are individuals and not attorneys may choose whether to electronically submit court documents for filing or use paper or mail in service to the court. Under Filing Rule 5, certain documents are identified that must be filed conventionally by paper filing. Those include, but are not limited to original wills, warrants, an oversized or demonstrative exhibit, and grand jury material.

9.      eFile & Serve is designed to allow for the electronic submission of court documents to each of Idaho's district court clerk's offices. It is also configured to allow the clerks' office staff, deputy clerks, to perform a ministerial review of electronically submitted documents and to approve the documents for filing. If accepted, documents are transferred from eFile & Serve (which is hosted by Tyler) into the official court record, which is maintained via software called Case Manager (formerly known as Odyssey Case Manager). Case Manager is hosted by the Idaho

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 4**

Supreme Court. If a submission does not meet the requirements for filing, the clerk will reject the document and provide an explanation of the reasons for rejection and what needs to be done to correct the submission. The filer is automatically notified of the rejection and receives the clerk's explanation via an emailed notice sent through eFile & Serve, which allows clerks to interface directly with the submitter through the portal (as opposed to sending an email from the clerk's own email account or making a phone call).

10. Case Manager is a configurable case management software system that is also provided to the Idaho court system though an agreement with Tyler. Case Manager is the Idaho state courts' official record keeping system. Idaho Rule of Electronic Filing and Service 3 provides that "[t]he official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." When a civil complaint is submitted through File & Serve, once approved by the clerk to be accepted for filing, it is immediately transferred to Case Manager and that is when an official court case is created and opened related to the complaint. Prior to acceptance by the clerk in File & Serve, the complaint is still not an official record as it has not been accepted into the electronic case file maintained by the court in Case Manager. A complaint is not file stamped until it has been accepted for filing by a clerk.

11. Based on Idaho Rule on Electronic Filing and Service 11 ("Filing Rule 11"), there is a significant difference between "submitted" (which is what documents are when they are uploaded and submitted using File & Serve) and "filed" (which is what documents are once they have been reviewed and accepted in eFile & Serve and transferred to Case Manager). Filing Rule 11 provides that "[a] document will be considered filed when: (1) the document has been

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 5**

electronically submitted to the court's electronic filing system; and (2) the submission has been acknowledged and the document accepted for filing." Filing Rule 11 is consistent with Idaho Rule of Civil Procedure 3(b), which instructs that "[a] civil action must be commenced by filing a complaint … with the court." Under Idaho's rules, a complaint is not filed until accepted. Upon acceptance, the filed document automatically transfers from File & Serve to Case Manager, where it is immediately available to the public if it is a publicly available court document and not an exempt or sealed document.

12.     The process of submission and acceptance in eFile & Serve is akin to the days before documents were required to be submitted electronically for filing. As a lawyer who practiced in Idaho at that time, I had my "runner" bring documents for filing to the clerk's office sometime between the hours of 8:00 a.m. to 5:00 p.m. Once it was my runner's turn at the clerk's counter, the runner would hand the to-be filed documents to the clerk and the clerk would perform his or her ministerial review. If all was in order, the clerk would accept the documents and stamp them as filed, at which point they would be scanned for inclusion in the court's official file. If any of the documents provided to the clerk were nonconforming, the clerk would hand the documents back to my runner, who would then return them to me for corrections.  In our current world of electronic filing, File & Serve effectively serves as an "e-runner" that delivers documents to a clerk's "e-counter" where the clerk performs a ministerial review of the submitted documents to determine if the documents conform to basic filing rules.

13.     The timing of access to civil complaints with efiling is akin to the access provided during the days of paper filing. A complaint was not file-stamped, docketed, assigned a case number, and assigned to a particular judge until after it had been reviewed and accepted by a clerk; a case wasn't opened until the complaint had been accepted for filing by a clerk. Once a complaint

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 6**

was reviewed and accepted for filing, the complaint was available to the press and public upon request. The press and public did not have access to complaints that were waiting for clerk review, nor did they have access to complaints that had been rejected for filing.

14.     Prior to this lawsuit, Courthouse News Service demanded that I provide immediate access to newly *submitted* complaints (i.e. complaints that had not yet been accepted for filing) through Tyler's Press Review Queue. After this lawsuit was filed, CNS alleged for the first time that Auto Accept was another option for providing immediate access to newly submitted complaints.

15.      It is not the case, nor has it been my position that there have not been periods of delay in time from submission in eFile & Serve to clerk review. The data attached to the Declaration of Emily Carroll details the time between submission and clerk review.

16.     When alleged delays have come to my attention, in my role as Administrative Director, I am quick to use my ability to interface with the county or judicial district to see how the Administrative Office can assist in reducing the time from submission to clerk review. For example, on June 28, 2021, I received a letter from a supervising director of Kootenai County District Court's Clerk's Office. She alerted me that Kootenai County's civil department staff was struggling to keep up with the processing of electronic filings. The office was heavily using overtime and re-assigning staff from other areas of the court. Yet, they were only able to process 3,500 pages of the 10,000 pages the court was receiving each day. The director identified several factors driving the issue, including the onset of the pandemic and resulting staff reductions, either through necessitated sick time, or from individuals who did not agree with the Idaho State Supreme Court's COVID-19 exposure requirements. As a result, Kootenai County had to hire and train new staff. The director also cited a recent and unusually large influx of cases, which matched, in her

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 7**

estimation, the local increase in population. To cure the problem the Kootenai County District Court clerk asked the county board of commissioners to approve two more civil clerk positions. I contacted the administrative district judge and asked that he lend his support to the request for new clerks. The county commissioners approved the request, as well as a request for additional overtime funds. With the additional staffing and funding, the Kootenai County Clerk's Office was able to swiftly address the backlog and return to timely review timeframes, as discussed in the Affidavit of Renae Bieri, Dkt. 20-1, ¶ 11.

17.     Before this lawsuit was ever initiated, I had serious concerns with the Press Review Queue and Auto Accept. Through discovery in this lawsuit, I have learned additional information that further establishes the Press Review Queue and/or Auto Accept would undermine Idaho Courts' interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources. My concerns with the two options are detailed below.

18.     **Auto Accept.** With Auto Accept, documents are automatically accepted into Case Manager (i.e. the official court record per IREFS) without any review by court clerks. Auto Accept cannot review for some information the clerk typically reviews for, such as whether the county listed on the face of the complaint actually matches the county in which it was filed. With eFile & Serve, all documents for a submission are included in one e-envelope. For example, with an initial filing the e-envelope would include the complaints, a summons for clerk signature, and a case information sheet. With Auto Accept, only the envelope itself is reviewed to determine if it meets certain requirements for acceptance; the documents within the envelope are not reviewed. Auto Accept is not a viable option for the Idaho Courts because it eliminates clerks' ability to review and accept documents through eFile & Serve. This could be extremely detrimental to litigants

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 8**

because a filer error would not be addressed on the front end (when a filer can simply correct the error and resubmit) and instead would be addressed once the document is an official court record (meaning judicial action would be required to fix the error). This would also be detrimental to the courts because judges and their court staff would have to spend time and judicial resources correcting filing errors that could have been corrected by clerks through the review process. Auto Accept is also not able to protect against filings that are malicious or submitted for an improper purpose; if an envelope meets the acceptance criteria, the documents in the envelope are auto accepted regardless of their content.

19.    **Press Review Queue**. Tyler's Press Review Queue can be configured to provide registered users with access to documents that have been submitted for filing but have not been reviewed and accepted by the clerk as official court documents. Implementing the Press Review Queue would require an amendment to the contract between the Idaho Supreme Court and Tyler. Tyler would need to be able to comply with the Idaho Supreme Court's security requirements for cloud-based service providers. The Press Review Queue comes with an annual subscription fee of at least $108,000, and, according to Tyler, that fee would be substantially higher if Tyler had to comply with the Idaho Supreme Court's security requirements for cloud-based service providers. The process for obtaining funds needed to pay for the Press Review Queue is addressed below. Tyler has not provided the Idaho Supreme Court with all the information it has requested relating to its security protocols, and some of the information Tyler has provided raises serious concerns about document security for the Press Review Queue. REDACTED REDACTED The Press Review Queue could also erode public confidence in the courts if members of the press and public are reporting on complaints as if they are official court documents. Documents in the Press Review Queue cannot be watermarked

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 9**

as "under review," "not an official court document," etc. If a complaint is reported on but ultimately rejected without a successful resubmission, the press and public will be left to speculate about the reasons for this phenomenon.

20.     Each fiscal year the Idaho Supreme Court receives an appropriation from the Idaho legislature which provides both an appropriation from the state's general fund and sets the Court's spending authority for dedicated funds. The Idaho Supreme Court's technology system is primarily supported through the Court Technology Fund (CTF), a dedicated fund established by Idaho Code § 1-1623 with 91% of its revenue provided through legislatively established fees imposed in both criminal and civil court cases. The fund supports information technology personnel, the case management system, digital audio recording systems, videoconferencing systems, computer equipment, computer network infrastructure, credit card processing for court fine and fee payments, information security systems, and various other software and equipment supporting court administration.  Court fines and fee receipts that support the CTF have declined an average of 5.2% each year over the last three years. In FY2022, fund revenue totaled $7.89 million, the lowest amount flowing into the fund since 2015 when the Legislature approved new civil filing fees. Court technology costs have increased about 9.3% each year for the last five years. Reasons for the increases include the implementation of new cybersecurity systems and significant hardware and software purchases for remote court proceedings. The Court has also experienced remarkable increases in software licensing and credit card processing fees, by as much as 30% in the current year.  In FY2024, fund expenditures are projected to exceed fund receipts by $3.67 million.  In order to address this shortfall, in its fiscal year 2024 budget request to the legislature, the Idaho Supreme Court has requested the transition of key positions out of the Court Technology Fund and into the state general fund.

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 10**

21.     Due to the current revenue shortage, the Court Technology Fund cannot support the costs of the installation of a Press Review Tool or building a new tool. In order to support these costs, the Idaho Supreme Court would have to seek an on-going enhancement to its general fund appropriation from the Idaho legislature. That request could not be made until the next budget cycle, in the fall of 2023, and would typically not be funded until July 1, 2024.  In the absence of an enhancement to the Court's general fund appropriation, current technology products, services, or projects for Idaho's courts would have to be reduced or eliminated to divert funding to cover the costs of a press review tool and existing personnel would have to be reassigned to manage the access services.

22.     In addition to the ongoing costs of a Press Review Queue, there would be initial costs as well. As currently configured, the eFile & Serve system allows a filer to identify what is being filed using a few generic descriptions. The security settings in the system do not require a filer to identify a security setting, such as "confidential" for submitted documents. The security settings for filings are addressed by the court clerks upon acceptance into the Case Management System. The implementation of a press review tool, which would publish documents from the eFile & Serve database, would require alterations to the court rules and processes for efiling as well as a reconfiguration of the eFile & Serve system. These changes would require additional training for both court staff and filers. The addition of document-level security to documents in the eFile & Serve database would necessitate more specific document type selections for filers and the addition of a "confidential" option for filers. Court staff would have to be reassigned from current projects to develop and implement new security settings and new configurations. Court staff would also have to develop and implement training for filers explaining the changes made and new requirements.

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 11**

23.     If the Idaho Supreme Court were to develop its own software to interface with the Press Review Queue API, it would need to request an appropriation through the Idaho legislature as described in paragraphs 20 through 22.

24.     In the original configuration of what is now the File & Serve system, filers were asked to designate whether a submission was "confidential." Documents submitted with this designation were automatically protected and unavailable to the public. Soon after the addition of only the second county to the efiling system, Ada county, the Idaho Supreme Court received a request from the court clerks to change this configuration. Filers were designating what was described as sometimes hundreds of public documents a day as "confidential," requiring the clerks to manually change the security setting for each one. This was inefficient and cumbersome for the clerks. As a result of the clerks' request, the Idaho Supreme Court altered the efiling rule and approved the reconfiguration of the system. Filers no longer designate a document as confidential. Rather, if a filer believes a submitted document should be deemed confidential he or she can note that in a comment to the clerk in the File and Serve system. A document security setting is automatically applied based upon the case type and document type selected by the clerk. It can then be manually altered by the clerk if the automatic setting for that type of case or document is inapplicable based upon the explanation offered by the filer. This process is more efficient for the clerks and helps to ensure documents that should be public are not inadvertently withheld from the public.

I declare and certify under penalty of perjury that the foregoing is true and correct.

DATED this 15thd day of December, 2022.

Sara B. Omundson
Digitally signed by Sara B. Omundson
Date: 2022.12.15 15:56:05 -07'00'

Sara Omundson

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 12**

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 13**

# EXHIBIT A

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Sara Omundson, declare as follows:

1.    I am the Administrative Director of the Idaho Courts ("Administrative Director"). I have been the Administrative Director since July 2016 when I was appointed by the Idaho Supreme Court ("Supreme Court").

2.    In 2012, I was appointed by Governor C.L. "Butch" Otter to serve as Idaho's State Appellate Public Defender. During my time as State Appellate Public Defender, I also served as Chair of the Idaho Criminal Justice Commission through appointment by Governor Otter in June 2013, as well as serving as a member of the State Public Defense Commission. Prior to holding those positions, from 2002 through 2012, I worked as Chief of the State Appellate Public

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1**

Defender's Office's Appellate Unit, where I managed attorneys and support staff while also representing people before the Supreme Court and the Idaho Court of Appeals. I worked as a Deputy State Public Appellate Defender from 1999 through 2002.

3.    Through my role as Administrative Director, I have knowledge of the divisions of the Administrative Office of the Courts. I also have knowledge of the administrative and organizational structure of the Idaho court system, including the role of the Supreme Court, roles authorized by statute, and by the Supreme Court through the Idaho Court Administrative Rules.

4.    My responsibilities as the Administrative Director are generally as follows. I am responsible for assisting the Supreme Court in meeting its constitutional responsibility to administer a unified, integrated court system. I meet regularly with the Supreme Court and am responsible for many of the day-to-day administrative and support operations of the judiciary. These responsibilities include intergovernmental relations with the Executive and Legislative branches of state government. I encourage input from judges and court personnel throughout the state whether through regular direct contact, court committees or the Administrative Conference to enhance services provided to the public by the Idaho courts system. With Supreme Court oversight, I set the leadership agenda of the Supreme Court and the Administrative Conference. The Administrative Conference provides an important governance role and is made up of the administrative district judge and trial court administrator from each of Idaho's seven judicial districts, Supreme Court Justices and Chief Judge of the Court of Appeals, administrative staff, and officers of the magistrate and district judges' associations. I take part in long-term strategic planning activities to meet the goals and objectives of the Idaho court system and to support the mission statement and values of the Idaho court system. I also review current budgets, staffing and resources and determine, with the Administrative Conference, what resources will be needed to

meet the Idaho Court System's goals and objectives. I directly report to the Chief Justice of the Supreme Court. I act under the supervision and direction of the Idaho Supreme Court pursuant to Idaho Code § 1-612. I do not approve or adopt the court rules relevant to the efiling system or the definition of public documents. I review and make recommendations to the Idaho Supreme Court for potential changes they may then consider and decide whether a change to policies or procedures will be made.

5. I work with individuals in roles at all levels of the Idaho court system. For example, through my work at the county level, I have knowledge of the processes and procedures employed by Idaho's 44 county district court clerks, their deputy clerks and court staff. Due to the population diversity in Idaho's counties, the clerks' offices are staffed with as little as two full-time deputy clerks (Lewis County) and up to 184 (Ada County). The 44 elected district court clerks serve terms and are elected every four years. District court clerks (and their deputy clerks) receive, review for filing, and ultimately determine whether a court document can be filed (including civil complaints), receive and account for fees and fines, provide for the management of court records, and calendar cases. I work with the Supreme Court to develop policies and procedures applicable to Idaho's district court staff. The Administrative Office provides training on those policies and procedures, provides resources and support to ensure clerk's offices can comply with the same, and coordinates any needed additional resources, information, or support if an elected clerk has difficulties meeting Idaho Supreme Court requirements.

6. I am also aware of and knowledgeable about the Idaho Supreme Court's contracts with third-party service providers related to the administration of Idaho's court system, including the Idaho Supreme Court's contract with Tyler Technologies, Inc. ("Tyler") Tyler is a third-party software developer that provides software and services to governmental entities, like the Supreme

Court of Idaho. To make efilng mandatory, it is necessary for the Court to ensure that there is at least one efilng vendor doing business in the state, so the Court contracts with Tyler to ensure there is. This allows the Court to require efilng even if a party is indigent and entitled to fee waivers.

7.      With respect to Tyler, the Supreme Court has contracted with Tyler for a license to use Tyler's eFile & Serve (formerly known as Odyssey File & Serve) software platform. On October 8, 2015, the Idaho Supreme Court entered into an Electronic Filing Agreement with Tyler to license and use Tyler's electronic filing system. Twin Falls was the first county to transition to e-filing in late 2015. All Idaho counties transitioned to e-filing by late 2018.

8.      Following the transition to e-filing, attorneys and law firms who practice in State of Idaho courts have been required to electronically submit all court documents for clerk review and filing through File & Serve. There are limited exceptions to the requirement to electronically submit court documents through File & Serve. Those exceptions are defined in Idaho Rules of Electronic Filing and Service 4 and 5. Under Filing Rule 4, self-represented parties who are individuals and not attorneys may choose whether to electronically submit court documents for filing or use paper or mail in service to the court. Under Filing Rule 5, certain documents are identified that must be filed conventionally by paper filing. Those include, but are not limited to original wills, warrants, an oversized or demonstrative exhibit, and grand jury material.

9.      eFile & Serve is designed to allow for the electronic submission of court documents to each of Idaho's district court clerk's offices. It is also configured to allow the clerks' office staff, deputy clerks, to perform a ministerial review of electronically submitted documents and to approve the documents for filing. If accepted, documents are transferred from eFile & Serve (which is hosted by Tyler) into the official court record, which is maintained via software called Case Manager (formerly known as Odyssey Case Manager). Case Manager is hosted by the Idaho

Supreme Court. If a submission does not meet the requirements for filing, the clerk will reject the document and provide an explanation of the reasons for rejection and what needs to be done to correct the submission. The filer is automatically notified of the rejection and receives the clerk's explanation via an emailed notice sent through eFile & Serve, which allows clerks to interface directly with the submitter through the portal (as opposed to sending an email from the clerk's own email account or making a phone call).

10.     Case Manager is a configurable case management software system that is also provided to the Idaho court system though an agreement with Tyler. Case Manager is the Idaho state courts' official record keeping system. Idaho Rule of Electronic Filing and Service 3 provides that "[t]he official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." When a civil complaint is submitted through File & Serve, once approved by the clerk to be accepted for filing, it is immediately transferred to Case Manager and that is when an official court case is created and opened related to the complaint.  Prior to acceptance by the clerk in File & Serve, the complaint is still not an official record as it has not been accepted into the electronic case file maintained by the court in Case Manager. A complaint is not file stamped until it has been accepted for filing by a clerk.

11.     Based on Idaho Rule on Electronic Filing and Service 11 ("Filing Rule 11"), there is a significant difference between "submitted" (which is what documents are when they are uploaded and submitted using File & Serve) and "filed" (which is what documents are once they have been reviewed and accepted in eFile & Serve and transferred to Case Manager). Filing Rule 11 provides that "[a] document will be considered filed when: (1) the document has been

electronically submitted to the court's electronic filing system; and (2) the submission has been acknowledged and the document accepted for filing." Filing Rule 11 is consistent with Idaho Rule of Civil Procedure 3(b), which instructs that "[a] civil action must be commenced by filing a complaint … with the court." Under Idaho's rules, a complaint is not filed until accepted. Upon acceptance, the filed document automatically transfers from File & Serve to Case Manager, where it is immediately available to the public if it is a publicly available court document and not an exempt or sealed document.

12.     The process of submission and acceptance in eFile & Serve is akin to the days before documents were required to be submitted electronically for filing. As a lawyer who practiced in Idaho at that time, I had my "runner" bring documents for filing to the clerk's office sometime between the hours of 8:00 a.m. to 5:00 p.m. Once it was my runner's turn at the clerk's counter, the runner would hand the to-be filed documents to the clerk and the clerk would perform his or her ministerial review. If all was in order, the clerk would accept the documents and stamp them as filed, at which point they would be scanned for inclusion in the court's official file. If any of the documents provided to the clerk were nonconforming, the clerk would hand the documents back to my runner, who would then return them to me for corrections.  In our current world of electronic filing, File & Serve effectively serves as an "e-runner" that delivers documents to a clerk's "e-counter" where the clerk performs a ministerial review of the submitted documents to determine if the documents conform to basic filing rules.

13.     The timing of access to civil complaints with efiling is akin to the access provided during the days of paper filing. A complaint was not file-stamped, docketed, assigned a case number, and assigned to a particular judge until after it had been reviewed and accepted by a clerk; a case wasn't opened until the complaint had been accepted for filing by a clerk. Once a complaint

was reviewed and accepted for filing, the complaint was available to the press and public upon request. The press and public did not have access to complaints that were waiting for clerk review, nor did they have access to complaints that had been rejected for filing.

14.     Prior to this lawsuit, Courthouse News Service demanded that I provide immediate access to newly *submitted* complaints (i.e. complaints that had not yet been accepted for filing) through Tyler's Press Review Queue. After this lawsuit was filed, CNS alleged for the first time that Auto Accept was another option for providing immediate access to newly submitted complaints.

15.     It is not the case, nor has it been my position that there have not been periods of delay in time from submission in eFile & Serve to clerk review. The data attached to the Declaration of Emily Carroll details the time between submission and clerk review.

16.     When alleged delays have come to my attention, in my role as Administrative Director, I am quick to use my ability to interface with the county or judicial district to see how the Administrative Office can assist in reducing the time from submission to clerk review. For example, on June 28, 2021, I received a letter from a supervising director of Kootenai County District Court's Clerk's Office. She alerted me that Kootenai County's civil department staff was struggling to keep up with the processing of electronic filings. The office was heavily using overtime and re-assigning staff from other areas of the court. Yet, they were only able to process 3,500 pages of the 10,000 pages the court was receiving each day. The director identified several factors driving the issue, including the onset of the pandemic and resulting staff reductions, either through necessitated sick time, or from individuals who did not agree with the Idaho State Supreme Court's COVID-19 exposure requirements. As a result, Kootenai County had to hire and train new staff. The director also cited a recent and unusually large influx of cases, which matched, in her

estimation, the local increase in population. To cure the problem the Kootenai County District Court clerk asked the county board of commissioners to approve two more civil clerk positions. I contacted the administrative district judge and asked that he lend his support to the request for new clerks. The county commissioners approved the request, as well as a request for additional overtime funds. With the additional staffing and funding, the Kootenai County Clerk's Office was able to swiftly address the backlog and return to timely review timeframes, as discussed in the Affidavit of Renae Bieri, Dkt. 20-1, ¶ 11.

17.     Before this lawsuit was ever initiated, I had serious concerns with the Press Review Queue and Auto Accept. Through discovery in this lawsuit, I have learned additional information that further establishes the Press Review Queue and/or Auto Accept would undermine Idaho Courts' interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources. My concerns with the two options are detailed below.

18.     **Auto Accept.** With Auto Accept, documents are automatically accepted into Case Manager (i.e. the official court record per IREFS) without any review by court clerks. Auto Accept cannot review for some information the clerk typically reviews for, such as whether the county listed on the face of the complaint actually matches the county in which it was filed. With eFile & Serve, all documents for a submission are included in one e-envelope. For example, with an initial filing the e-envelope would include the complaints, a summons for clerk signature, and a case information sheet. With Auto Accept, only the envelope itself is reviewed to determine if it meets certain requirements for acceptance; the documents within the envelope are not reviewed. Auto Accept is not a viable option for the Idaho Courts because it eliminates clerks' ability to review and accept documents through eFile & Serve. This could be extremely detrimental to litigants

because a filer error would not be addressed on the front end (when a filer can simply correct the error and resubmit) and instead would be addressed once the document is an official court record (meaning judicial action would be required to fix the error). This would also be detrimental to the courts because judges and their court staff would have to spend time and judicial resources correcting filing errors that could have been corrected by clerks through the review process. Auto Accept is also not able to protect against filings that are malicious or submitted for an improper purpose; if an envelope meets the acceptance criteria, the documents in the envelope are auto accepted regardless of their content.

19.    **Press Review Queue**. Tyler's Press Review Queue can be configured to provide registered users with access to documents that have been submitted for filing but have not been reviewed and accepted by the clerk as official court documents. Implementing the Press Review Queue would require an amendment to the contract between the Idaho Supreme Court and Tyler. Tyler would need to be able to comply with the Idaho Supreme Court's security requirements for cloud-based service providers. The Press Review Queue comes with an annual subscription fee of at least $108,000, and, according to Tyler, that fee would be substantially higher if Tyler had to comply with the Idaho Supreme Court's security requirements for cloud-based service providers. The process for obtaining funds needed to pay for the Press Review Queue is addressed below. Tyler has not provided the Idaho Supreme Court with all the information it has requested relating to its security protocols, and some of the information Tyler has provided raises serious concerns about document security for the Press Review Queue. REDACTED

REDACTED The Press Review Queue could also erode public confidence in the courts if members of the press and public are reporting on complaints as if they are official court documents. Documents in the Press Review Queue cannot be watermarked

as "under review," "not an official court document," etc. If a complaint is reported on but ultimately rejected without a successful resubmission, the press and public will be left to speculate about the reasons for this phenomenon.

20.    Each fiscal year the Idaho Supreme Court receives an appropriation from the Idaho legislature which provides both an appropriation from the state's general fund and sets the Court's spending authority for dedicated funds. The Idaho Supreme Court's technology system is primarily supported through the Court Technology Fund (CTF), a dedicated fund established by Idaho Code § 1-1623 with 91% of its revenue provided through legislatively established fees imposed in both criminal and civil court cases. The fund supports information technology personnel, the case management system, digital audio recording systems, videoconferencing systems, computer equipment, computer network infrastructure, credit card processing for court fine and fee payments, information security systems, and various other software and equipment supporting court administration.  Court fines and fee receipts that support the CTF have declined an average of 5.2% each year over the last three years. In FY2022, fund revenue totaled $7.89 million, the lowest amount flowing into the fund since 2015 when the Legislature approved new civil filing fees. Court technology costs have increased about 9.3% each year for the last five years. Reasons for the increases include the implementation of new cybersecurity systems and significant hardware and software purchases for remote court proceedings. The Court has also experienced remarkable increases in software licensing and credit card processing fees, by as much as 30% in the current year.  In FY2024, fund expenditures are projected to exceed fund receipts by $3.67 million.  In order to address this shortfall, in its fiscal year 2024 budget request to the legislature, the Idaho Supreme Court has requested the transition of key positions out of the Court Technology Fund and into the state general fund.

21.     Due to the current revenue shortage, the Court Technology Fund cannot support the costs of the installation of a Press Review Tool or building a new tool. In order to support these costs, the Idaho Supreme Court would have to seek an on-going enhancement to its general fund appropriation from the Idaho legislature. That request could not be made until the next budget cycle, in the fall of 2023, and would typically not be funded until July 1, 2024.  In the absence of an enhancement to the Court's general fund appropriation, current technology products, services, or projects for Idaho's courts would have to be reduced or eliminated to divert funding to cover the costs of a press review tool and existing personnel would have to be reassigned to manage the access services.

22.     In addition to the ongoing costs of a Press Review Queue, there would be initial costs as well. As currently configured, the eFile & Serve system allows a filer to identify what is being filed using a few generic descriptions. The security settings in the system do not require a filer to identify a security setting, such as "confidential" for submitted documents. The security settings for filings are addressed by the court clerks upon acceptance into the Case Management System. The implementation of a press review tool, which would publish documents from the eFile & Serve database, would require alterations to the court rules and processes for efiling as well as a reconfiguration of the eFile & Serve system. These changes would require additional training for both court staff and filers. The addition of document-level security to documents in the eFile & Serve database would necessitate more specific document type selections for filers and the addition of a "confidential" option for filers. Court staff would have to be reassigned from current projects to develop and implement new security settings and new configurations. Court staff would also have to develop and implement training for filers explaining the changes made and new requirements.

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 11**

23.     If the Idaho Supreme Court were to develop its own software to interface with the Press Review Queue API, it would need to request an appropriation through the Idaho legislature as described in paragraphs 20 through 22.

24.     In the original configuration of what is now the File & Serve system, filers were asked to designate whether a submission was "confidential." Documents submitted with this designation were automatically protected and unavailable to the public. Soon after the addition of only the second county to the efiling system, Ada county, the Idaho Supreme Court received a request from the court clerks to change this configuration. Filers were designating what was described as sometimes hundreds of public documents a day as "confidential," requiring the clerks to manually change the security setting for each one. This was inefficient and cumbersome for the clerks. As a result of the clerks' request, the Idaho Supreme Court altered the efiling rule and approved the reconfiguration of the system. Filers no longer designate a document as confidential. Rather, if a filer believes a submitted document should be deemed confidential he or she can note that in a comment to the clerk in the File and Serve system. A document security setting is automatically applied based upon the case type and document type selected by the clerk. It can then be manually altered by the clerk if the automatic setting for that type of case or document is inapplicable based upon the explanation offered by the filer. This process is more efficient for the clerks and helps to ensure documents that should be public are not inadvertently withheld from the public.

I declare and certify under penalty of perjury that the foregoing is true and correct.

DATED this 15thd day of December, 2022.

Sara B. Omundson

Digitally signed by Sara B. Omundson
Date: 2022.12.15 15:56:05 -07'00'

Sara Omundson

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 12**

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

# EXHIBIT B

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>    Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>    Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**DECLARATION OF JENNIFER DVORAK** |

I, Jennifer Dvorak, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Chief Information Security Officer for the Idaho Supreme Court.

3.      I have worked in state government information technology since 2011.  Prior to joining the Idaho Supreme Court, I worked for the State of Arizona Department of Homeland Security, CyberCommand, as the Statewide Information Security Architect.  My experience in Arizona included assisting with the development of the Arizona Risk and Authorization Management Program (AZRAMP) based on the Federal Risk and Authorization Management

**DECLARATION OF JENNIFER DVORAK - 1**

Program (FedRAMP) which provides a standardized approach to security assessment, authorization and continuous monitoring for cloud products and services. AZRAMP was built into all State of Arizona procurement contracts and any vendors providing cloud services were required to complete authorization prior to or in conjunction with a purchase.

4.      In August 2021, I was hired by the Idaho Supreme Court as Chief Information Security Officer to establish a formal cybersecurity program, assess risks and build cybersecurity resiliency into the information technology division. After starting the position, my first goal was to complete an assessment of current cybersecurity controls and prioritize any gaps in security controls. I used the Center for Internet Security's (CIS) Top 18 Critical Controls as the framework for assessment. These controls are recognized as the most important controls an organization can implement to protect against cyber-attack vectors.

5.      After performing the CIS assessment, [REDACTED]

[REDACTED]

[REDACTED] These safeguards included items such as security requirements embedded in service provider contracts and security assessments of service providers. When Idaho Supreme Court manages and maintains their own data and relies on the information division employees to perform the work, it's easy to understand how those elements are protected. When the storage and maintenance of data is outsourced to a cloud-based provider, it's important to have a good understanding of how the vendor is safeguarding court data from unintended disclosure, disaster, or manipulation.

6.      [REDACTED] I worked with the Idaho Supreme Court's general counsel team to establish terms and conditions for cloud-based services. This document was based off the State of Idaho's State Procurement terms and conditions and

**DECLARATION OF JENNIFER DVORAK - 2**

included some of the elements of AZRAMP/FedRAMP for the purposes of vendor security assessment. Establishing this process would provide the Idaho Supreme Court with an understanding of how a vendor is protecting court data. A true and correct copy of the ISC Terms and Conditions for Cloud-Based Services is attached as Exhibit A. Some of the key provisions from the ISC Terms and Conditions for Cloud-Based Services include:

a. If Contractor will be storing, processing, or transmitting ISC data or end-user credit and debit card information through an IaaS or PaaS provider, Contractor must provide a letter from the IaaS/PaaS stating Contractor is a customer in good standing and which environment ISC data or end-user credit and debit card information will be stored, processed, and transmitted. ISC should be notified, in writing, of a ▮▮▮REDACTED▮▮▮ 10) calendar days or other timeframe as may be mutually agreed upon by the parties.

b. ISC reserves the right to conduct risk assessments, vulnerability assessments, and penetration tests or hire a third party to conduct risk assessments, vulnerability assessments, and penetration tests of the Contractor's application or environment.

c. If Contractor or a subcontractor utilized by Contractor has been issued a Federal Risk and Authorization Management Program (FedRAMP) Authorization or a StateRAMP Authorization, they will need to submit their FedRAMP or StateRAMP System Security Plan (SSP) to ISC for review.

d. ISC has established a ▮▮▮REDACTED▮▮▮ ▮▮▮REDACTED▮▮▮ process to assess risk associated with

**DECLARATION OF JENNIFER DVORAK - 3**

storing, processing and/or transmitting ISC Data with external entities, such as Contractor or subcontractors utilized by Contractor. ISC's risk and authorization management process must be completed and reviewed before any relevant work can begin.

7.     After establishing these terms and conditions and vendor security assessment process, the Idaho Supreme Court could begin assessing cloud-based services. Because many of the Idaho Supreme Court's procurement contracts were well underway and not up for renewal, the goal would be to incorporate these terms and conditions into new cloud-based service contracts or contract amendments and renewals moving forward.

8.     In May 2022, I was provided with the opportunity to work with Tyler Technologies on a vendor security assessment due to a proposed contract amendment for the cloud-based service, REDACTED. Tyler Technologies refused to complete the assessment. To help the Administrative Office of the Courts quantify the risks associated with moving forward with the product, I developed a risk acceptance memo with standard risk analysis criteria. This memo was given to the Administrative Director of the Court and the Chief Information Officer to accept or reject the proposed risks associated with moving forward.

9.     In June 2022, I was asked to perform a pre-contract security review of Tyler Technologies' cloud-based-service, Press Review Tool. I again requested information from Tyler Technologies to assess the security posture of the software including architecture diagrams, system security plans and REDACTED that they were a customer in good standing. Tyler Technologies refused to provide this information, but they did provide some minimal information which assisted me with understanding the basic functionality of the product and some of the security controls. However, because we were not negotiating a purchase with a

**DECLARATION OF JENNIFER DVORAK - 4**

contract amendment, I was not able to compel the vendor to comply with the Idaho Supreme Court's terms and conditions for cloud-based services.

10.     As I had done previously with the [REDACTED] solution, I prepared a risk acceptance memo for the Administrative Director of Courts and the Chief Information Officer. The information included in the risk acceptance memo was based on the incomplete information provided by Tyler Technologies and was not comprehensive.  Without additional information from the vendor, it's impossible to accurately quantify risks associated with a particular product.

11.     In my role as Chief Information Security Officer for the Idaho Supreme Court, it is important to help the Administrative Director of the Court understand how the data we are entrusted with is protected from unintended disclosure, disaster, and manipulation.  The industry standard framework for cybersecurity controls, CIS, also outlines the importance of assessing vendors for cybersecurity controls to ensure the protection of data on our behalf.  However, this can only be done with cooperation from the service provider.  Without the necessary information, the Idaho Supreme Court is unable to quantify the level of risk they are exposed to.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this  13  day of December, 2022.

*Jennifer Dvorak*
_____
Jennifer Dvorak

**DECLARATION OF JENNIFER DVORAK** - 5

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                          amberdina@givenspursley.com
Katherine A. Keating                   katherin.keating@bclplaw
Jonathan G. Fetterly                   jon.fetterly@bclplaw.com



/s/Keely E. Duke_____
Keely E. Duke


**DECLARATION OF JENNIFER DVORAK - 6**

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *pro hac vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *pro hac vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>               Plaintiff,<br><br>      v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>               Defendant. | Case No: 1:21-CV-00305-REP<br><br><br>**RESPONSE OF PLAINTIFF COURTHOUSE NEWS SERVICE TO STATEMENT OF UNDISPUTED FACTS IS SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT [ECF 60-1]** |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 1**

Pursuant to L. Civ. R. 7.1(c)(2), Plaintiff Courthouse News Service. ("Courthouse News") submits the following response to the Statement of Undisputed Material Facts in Support of Defendant Sara Omundson's Motion for Summary Judgment (ECF 60-1) ("Defendant's Statement"). Without waiving its right to challenge additional factual allegations (or additional aspects of the factual allegations identified below) should this matter proceed to trial, Courthouse News identifies at least the following factual allegations as being fully or partially in dispute for purposes of summary judgment. Courthouse News responds using the paragraph numbers and headings from Defendant's Statement. Bolding and underlining in the quoted factual allegations has been added by Courthouse News to facilitate the Court's review.

| Defendant's Factual Allegation | Response |
|---|---|
| Parties | |
| 1. ".... [Courthouse News' Big Sky Report] is sent to the 51 subscribers via email **at the close of business** on Monday through Friday, excluding holidays and weekends. *See* Duke Decl., Ex. A, Ex. D at 19:15-19, Ex. E at 37:21-38:13. ...." | Disputed, and unsupported by cited evidence, that Courthouse News' Big Sky Report is sent to subscribers "at the close of business." Ms. Valenti testified that she is "required to leave the courthouse at 5:00 p.m. each day" but then "continue[s] looking for new civil cases from home using the website at https://mycourts.idaho.gov." Declaration of Catherine Valenti in Support of Courthouse News' Motion for Summary Judgment (ECF 62) ("Valenti Decl."), ¶ 4; Declaration of Keely Duke ("Duke Decl."), Exh. E (ECF 60-8) (Valenti Depo. 37:13-16). Copies of the Big Sky Report in the record reflect transmission times after 6:30 p.m. Duke Decl., Exh. A (Big Sky Reports with sent times of 6:41 p.m. and 6:44 p.m.). |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 2**

| Documents at Issue in CNS' Lawsuit |
|---|

| | |
|---|---|
| 4. "The documents **originally at issue in this case** were all newly submitted complaints.  Dkt. 1, ¶ 48." | Disputed to the extent the statement implies a tactical shift rather than a good-faith and cooperative effort by the parties to identify the relevant universe of civil complaints, as described in Courthouse News' complaint.  Complaint, ¶ 19 ("Courthouse News' reporters do not cover family law matters, name changes. Probate filings, most mortgage foreclosures, or collection actions against individuals unless the individual is well-known or otherwise notable."); Declaration of Jonathan Fetterly in Supp. of Courthouse News' MSJ (ECF 67-1) ("Fetterly Decl."), Exh. 2 at 9 ("… CNS' counsel has clarified that for purposes of this lawsuit and discovery, the term 'civil complaint' refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ('AA – All Initial District Court Filings (Not Listed in: E, F and H1'), and that is how this term will be defined throughout these responses."); *see* Declaration of Katherine Keating in Supp. of Opp. to Def. MSJ ("Keating Decl."), ¶ 3 & Exh. 2 (counsel e-mail exchange). |
| 5. "During discovery, **CNS advised it was narrowing the at-issue complaints** in this case to initial case filings in one filing fee category (out of 13 categories), which are identified in Appendix A of the Idaho Rules of Civil Procedure …" | Disputed to the extent the statement implies a tactical shift rather than a good-faith and cooperative effort by the parties to identify the relevant universe of civil complaints, as described in Courthouse News' complaint.  Complaint, ¶ 19 (ECF 1) ("Courthouse News' reporters do not cover family law matters, name changes, probate filings, most mortgage foreclosures, or collection actions against individuals unless the individual is well-known or otherwise notable.");  Fetterly Decl., Exh. 2 at 9 ("… CNS' counsel has clarified that for purposes of this lawsuit and discovery, the term 'civil complaint' refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ('AA – All Initial District Court Filings (Not Listed in: E, F and H1'), and that is how this term will be defined throughout these responses."); *see* Keating Decl., ¶ 3 & Exh. 2 (counsel e-mail exchange). |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 3**

| Idaho's Case Management System | |
|---|---|
| 6. "A '[c]ourt record' includes '[a]ny document, information or other thing that is filed, docketed, or lodged by a court or clerk of court in connection with a judicial proceeding.' Idaho Court Administrative Rule ("ICAR") 32(b)(4)(A)). The 'official court record' is 'the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules.' Idaho Rules of Electronic Filing and Service ("IREFS"), Rule 3(a). | Undisputed that for purposes of Idaho Court Administrative Rule ("ICAR") 32(b)(4)(A), the term "court record" is defined to include "[a]ny document, information or other thing that is filed, docketed, or lodged by a court or clerk of court in connection with a judicial proceeding."

Undisputed that Rule 3 of the Idaho Rules of Electronic Filing and Service ("IREFS") states that:

"(a) The official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules.

(b) If a court digitizes, records, scans or otherwise reproduces a document that is filed in paper into an electronic record, document or image for entry in the court's case file, the court's electronic record, document or image is the official court record of the filed document."

Disputed that these rules determine the significance of the terms "court record" or "official court record" in this action. |
| 9. ".... If the clerk rejects the document, it 'will be deemed to have not been filed' and is <u>not</u> transferred into Case Manager. IREFS 13." | Disputed. A document is "deemed to have not been filed" only if not corrected within the timeframe for doing so.

IREFS 13(a) ("Documents that do not comply with this rule, or the requirements of the aforementioned Electronic Filing Guide or court policy, ***may be returned to the filer for correction. If the document is not corrected as requested within the time frame provided*** for in subsections (b) and (c) of this rule, the document will be deemed to have not been filed.") (emphasis added). |

**RESPONSE TO STATEMENT**
**OF UNDISPUTED FACTS - 4**

| | |
|---|---|
| 10. "Public access to court records is governed by Idaho Court Administrative Rule 32." | Disputed. Whether ICAR 32 or the First Amendment of the U.S. Constitution governs public access to the court records at issue in this case is a legal question, not a factual one. *See, e.g.*, *Press-Enterprise v. Superior Court*, 478 U.S. 1, 14 (1986) ("*Press-Enterprise II*"); *Courthouse News Serv. v. Planet*, 947 F.3d 581, 596 (9th Cir. 2020) ("*Planet III*"). |
| 10.1. "The Idaho Supreme Court provides access to court records in Case Manager 'through terminals at judicial branch facilities or on-line.' ICAR 32(d). This includes access to pleadings "filed or lodged in a case file.' ICAR 32(d)(7)." | Disputed. ICAR 32(d) states that certain documents, including "[p]leadings, motions, affidavits, responses, memoranda, briefs and other documents filed or lodged in a case file," "are subject to examination, inspection," unless exempt under ICAR 32(g) or sealed under ICAR 32(i), and that "[t]he Supreme Court *may* provide such access to these records through terminals at judicial branch facilities or on-line from any remote location over the Internet" (emphasis added). 

In practice, only docket information (*i.e.*, case name, case number, filing date) is available remotely over the Internet. Valenti Decl., ¶¶ 4, 6. 

After new non-confidential civil complaints have been processed, the complaints themselves can be viewed on kiosks at the courthouse. *Id.*, ¶ 3. 

Copies of complaints must be requested from the district court in which they were filed, and the procedure for paying for and receiving copies of complaints varies from district court to district court. Duke Decl., Exh. E (Valenti Depo. 94:10-95:19). |
| 15. "Tyler is responsible for hosting documents within eFile & Serve. Duke Decl., Ex. F at 124:3-7." | Disputed to the extent the statement implies that Tyler, and not the Idaho Judicial Branch, has the ultimate responsibility for and right to control e-filed documents, subject to the rights of the public. *See* Fetterly Decl., Exh. 13 (ECF 66-1); Affidavit of Jason Spillman (ECF 20-21), Exh. B; *see also* Fetterly Decl., Exh. 6 (Derrick Depo. 210:1-13). 

The cited testimony speaks only to contractual relationship between Tyler and a subcontractor. |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 5**

| | |
|---|---|
| 16. "Tyler has subcontracted the hosting of documents in its eFile & Serve system with Amazon Web Services ("AWS"), and Tyler is responsible for the contractual arrangement with AWS related to the hosting of these documents. Duke Decl., Ex. F at 124:3-7. Tyler, not the Idaho Supreme Court, is also responsible for document security, backups, and authentication when documents are in eFile & Serve. *Id.* at 124:23-125:2." | Disputed to the extent the statement implies that Tyler, and not the Idaho Judicial Branch, has the ultimate responsibility for and right to control e-filed documents, subject to the rights of the public. *See* Fetterly Decl., Exh. 13; Affidavit of Jason Spillman (ECF 20-21), Exh. B; *see also* Fetterly Decl., Exh. 6 (Derrick Depo. 210:1-13). The cited testimony speaks only to contractual relationship between Tyler and a subcontractor. |
| Transfer from eFile & Serve to the Case Management System | |
| 19. "After performing this ministerial review, the court clerk then either (1) accepts the complaint into the Idaho Supreme Court's Case Management System **(i.e., the "official court record" per IREFS 3)**, or (2) rejects the submission and sends it back to the filer through eFile & Serve with a note as to corrections needed before the document will be accepted and transferred from eFile & Serve to Case Manager.  IREFS 11(a) and IREFS 13; *see also*, Duke Decl., Ex. C at 44:10-16 and Ex. M at SO 001587." | Disputed that Idaho's case management system is "the 'official court record.'" IREFS 3(a) provides that "[t]he official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." IREFS 3 does not reference Idaho's case management system. |
| 20. "If the complaint is accepted by the court clerk, the court clerk hits a button that accepts the complaint for filing and the complaint then immediately transfers to the Idaho Supreme Court's Case Manager. With this acceptance, many events *simultaneously and immediately occur*: a. Under Idaho Supreme Court rules, **the complaint is now considered a filed document**. IREFS 11(a). b. **Under ICAR 32(b)(4)(A) and IREFS 3, the complaint is now a "court record" and is part of the "official court record."** c. Under I.R.C.P. 3(b), a civil action is initiated by the filing of a | Undisputed that IREFS 11(a) provides that "[a] document will be considered filed when: (1) the document has been electronically submitted to the court's electronic filing system; and (2) the submission has been acknowledged and the document accepted for filing."  Disputed that IREFS 11(a) establishes what it means for a document to be "filed" outside the context of Idaho's Rules for Electronic Filing and Service. Disputed that "[u]nder ICAR 32(b)(4)(A) … the complaint is now a 'court record'" to the extent that statement implies that ICAR 32 establishes what a "court record" is, other than with respect to the application of ICAR 32. Disputed that a complaint is a "court record" for purposes of ICAR 32(b)(4)(A) only after it has been "accepted" by court staff.  Among other |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 6**

| | |
|---|---|
| complaint with the court. **The clerk must enter certain information in Case Manager to initiate a new civil case.** Duke Decl., Ex. M at SO 000667. ….." | things, the listing in ICAR 32(b)(4) of materials that "court record" includes is not exhaustive and ICAR 32(b)(4)(A) includes documents that are lodged. |
| | Disputed that IREFS 3 purports to establish that a complaint "is part of the 'official court record' only after a court clerk has "accepted it."  IREFS 3 provides that "[t]he official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." |
| | Disputed that "[t]he clerk must enter certain information in Case Manager to initiate a new civil case," to the extent "initiate a new civil case" refers to anything other than a technical function within eFile and Serve or case management system software, which is what the cited evidence seems to reference.  Duke Decl., Ex. M at SO 000667. |
| 21.  "If the filing is rejected, such document 'will be deemed to have not been filed.'" IREFS 13(a). | Disputed.  A document is "deemed to have not been filed" only if not corrected within the timeframe for doing so. |
| | IREFS 13(a) ("Documents that do not comply with this rule, or the requirements of the aforementioned Electronic Filing Guide or court policy, *may be returned to the filer for correction*.  *If the document is not corrected as requested within the time frame provided* for in subsections (b) and (c) of this rule, the document will be deemed to have not been filed.") (emphasis added). |
| 21.1.  "A rejected document is *not* made available to the public, including CNS.  *See* ICAR 32(b)(4) (defining "court record" as document "that is filed, docketed, or lodged by a court or clerk of court in connection with a judicial proceeding"); ICAR 32(d)(7) (public has access to pleading "and other documents filed or lodged in a case file"). | Undisputed that Idaho's district courts make complaints available to the public, including CNS, only after a clerk has "accepted" them, but disputed that ICAR 32(b)(4) or ICAR 32(d)(7) provide support for this factual allegation. |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 7**

| | |
|---|---|
| 22. "…. <br><br>  a. When the filer corrects the filing errors, the filer then resubmits the corrected document through eFile & Serve in the original efiling envelope to prove the original submission date to the clerk. By doing so, the clerk is then aware of the "relate back to" date and the clerk then manually enters the original submission date in the file stamp field at the time of acceptance of the document into Case Manager so that the filing date relates back to the original submission date. IREFS 13(c)." <br><br>  b. The Idaho Supreme Court adopted this rule so that ministerial errors in all electronic filings, including complaints, will not prejudice the filer, as long as such errors were corrected, and the complaint resubmitted within the grace period. | Objection. Defendant provides no evidentiary support for these factual assertions beyond IREFS 13(c), which provides only that: <br><br> "Resubmission of rejected filing; relief. A filer who resubmits a document within 3 business days (excluding legal holidays) of the date of the request for correction under this section may request, as part of the resubmission, that the date of filing of the resubmitted document relate back to the date of submission of the original document to meet filing requirements. If the third day following request for correction is not a judicial day, then the filer may resubmit the filing with a request under this subsection on the next judicial day. A filer who resubmits a document under this subsection must copy the existing envelope and include in the 'Comments to Court' field notification for an electronic resubmission the following words: 'Resubmission of corrected filing, request filing relate back to _____, the date of original submission.'" |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 8**

| 23. "Prior to transitioning to efiling, CNS had access to newly filed complaints that had already been **accepted by the clerk**, file stamped and **docketed**.  Duke Decl., Ex. E, at 47:5-48:11." | Disputed as to "accepted by the clerk" except to the extent that phrase is read to mean "handed to the clerk."  The meaning of the term "accepted" is a point of contention in this case, and this limited meaning is the only one consistent with Ms. Valenti's testimony. |
|---|---|
| | Disputed as to "docketed."  Ms. Valenti's testimony reflects that she is not familiar with the technical court processes and terminology.  *See, e.g.*, Duke Decl., Exh. E (Valenti Depo. 13:19-14:22; 46:7-49:24; 53:21-55:18).  Ms. Valenti testified that she understood a "docket" to mean "just basic information without a summary – or without the case.  So plaintiff, defendant, date, case number."  *Id.* (73:8-74:13).  It is not clear that Ms. Valenti has the same understanding of what it means for a complaint to be "docketed" as Defendant seems to attribute to it in this factual assertion.  Ms. Valenti's testimony about "docket lists" is consistent with a list of cases compiled by the court, regardless of whether court staff had completed all of the tasks traditionally associated with docketing. |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 9**

| | |
|---|---|
| 23.1. "**Ada County. The docket reports would only include** complaints that had been **accepted for filing** and marked with a file stamp. *Id*. at 55:15-18. *Id*. at 47:18-48:11, 52:20-53:3." | Disputed as to "accepted for filing" except to the extent that phrase is read to mean "handed to the clerk." The meaning of the term "accepted" is a point of contention in this case, and this limited meaning is the only one consistent with Ms. Valenti's testimony.

Disputed as to "docket reports." Ms. Valenti's testimony reflects that she is not familiar with the technical court processes and terminology. *See, e.g.*, Duke Decl., Exh. E (Valenti Depo. 13:19-14:22; 46:7-49:24; 53:21-55:18). Ms. Valenti testified that she understood a "docket" to mean "just basic information without a summary – or without the case. So plaintiff, defendant, date, case number." *Id*. (73:8-74:13). It is not clear that Ms. Valenti has the same understanding of what it means for a complaint to be "docketed" as Defendant seems to attribute to it in this factual assertion. Ms. Valenti's testimony about "docket lists" is consistent with a list of cases compiled by the court, regardless of whether court staff had completed all of the tasks traditionally associated with docketing. |
| 23.2. "**Owyhee, Elmore, Gem, Washington, and Payette counties.** Ms. Valenti testified she would visit Owyhee, Elmore, Gem, Washington, and Payette counties once a month, and followed a similar process of reviewing complaints **that had been accepted for filing**. *Id*. at 62:7-9; 63:11-64:17." | Disputed as to "accepted for filing" except to the extent that phrase is read to mean "handed to the clerk." The meaning of the term "accepted" is a point of contention in this case, and this limited meaning is the only one consistent with Ms. Valenti's testimony. |
| 24. "Ms. Valenti testified she was only interested in reviewing complaints that had actually been filed with the court because, as she put it, 'why would I report on something – I wouldn't report on something that hadn't been filed yet in the legal system.' Duke Decl., Ex. E at 58:17-59:14." | Disputed to the extent the statement implies that Ms. Valenti ascribes a meaning to "complaints that had actually been filed with the court" consistent with Defendant's view that a complaint is not "filed" until it has been "accepted" by court staff.

Ms. Valenti used the word "filed" to distinguish complaints that had been handed to court staff (filed) from those in the hands of people standing in line waiting to file (not yet filed):

Q: Now, was there ever a time when you were at the courthouse doing your work where |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 10**

| | |
|---|---|
| | there was a line of people, ***where you'd actually go to the people that were standing in line to file something and ask to see what was in their hands***? |
| | A: No. |
| | Q: And why wouldn't you do that? |
| | A: It wasn't part of my job. I only wanted the ones that were filed. |
| | Q: Why did you only want the ones that had actually been filed? |
| | Courthouse News Counsel: objection; vague and ambiguous, overbroad, calls for a legal conclusion. |
| | A: Those were the only ones – why would I report on something – I wouldn't report on something that hadn't been filed yet in the legal system. |
| | Duke Decl., Exh. E (Valenti Decl. 58:11-59:3) |
| 25. To this day, Ms. Valenti admitted she only reports on complaints that have been filed in the legal system. *Id.* at 60:23-61:13, 98:15-99:6, 103:12-105:17. | Disputed to the extent the statement implies that Ms. Valenti ascribes a meaning to "complaints that have been filed in the legal system" consistent with Defendant's view that a complaint is not "filed" until it has been "accepted" by court staff. |
| | Ms. Valenti used the word "filed" to distinguish complaints that had been handed to court staff (filed) from those in the hands of people standing in line waiting to file (not yet filed): |
| | Q: Now, was there ever a time when you were at the courthouse doing your work where there was a line of people, ***where you'd actually go to the people that were standing in line to file something and ask to see what was in their hands***? |
| | A: No. |
| | Q: And why wouldn't you do that? |
| | A: It wasn't part of my job. I only wanted the ones that were filed. |
| | Q: Why did you only want the ones that had |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 11**

| | |
|---|---|
| | actually been filed? |
| | Courthouse News Counsel:  objection; vague and ambiguous, overbroad, calls for a legal conclusion. |
| | A:  Those were the only ones – why would I report on something – I wouldn't report on something that hadn't been filed yet in the legal system. |
| | Duke Decl., Exh. E (Valenti Decl. 58:11-59:3) |
| | Q:  You're not charged with reporting on unfiled documents, correct? |
| | A:  Correct. |
| | Q:  CNS isn't asking you to report on documents that are not yet filed in the court system, right? |
| | A:  *If they're still in the customers' hands, no, we don't report on that* that I know of.  I've never been asked to. |
| | Duke Decl., Exh. E (Valenti Decl., 98:23-99:6) |
| 26.  "Idaho District Judges, Trial Court Administrators, and clerks have confirmed that with paper filings, complaints were not made available to the public until they had been accepted for filing and docketed. Declaration of the Honorable Mitchell Brown ("Brown Decl."), ¶ 4, Declaration of Sharee Sprague ("Sprague Decl."), ¶ 13, Declaration of Sandra Barrios ("Barrios Decl."), ¶ 5." | Objection.  See Evidentiary Objection Appendix No. 27<br><br>Disputed.  Judge Brown testified that "[i]n the days of paper filings, the clerk would perform a ministerial review of the document before accepting it, file-stamping it, and placing it in the case file.  At that point, the document was a public record and could be immediately reviewed by the press or public upon request."  Brown Decl., ¶ 4 (ECF 60-26).  He did not testify that complaints were not available prior to docketing.<br><br>Ms. Sprague testified that she is "not aware of any jurisdictions in Idaho that provided the press or public with access to paper complaints before they were reviewed and accepted for filing."  She did not testify that complaints were not available prior to docketing.  Sprague Decl., ¶ 13 (ECF 60-33).<br><br>Ms. Barrios' testimony refers to a "ministerial review by the clerks, which they have been performing for years both pre- and post-transition to e-filing."  Barrios Decl, ¶ 5 (ECF 60-35).  She |

**RESPONSE TO STATEMENT**
**OF UNDISPUTED FACTS - 12**

| | did not testify that complaints were not available to the public until they had been "accepted for filing" and docketed. |
|---|---|
| | Also disputed as to "accepted for filing" to the extent the statement is meant to establish that whatever actions the declarants refer to as "accepted for filing" has the same meaning when used in the context of Defendant's current policies and practices. |
| 26.1. "Indeed, the Idaho Supreme Court specifically considered its historical practices with the paper filing system when it made the transition to e-filing to ensure the level of clerk review and public access remained the same. Duke Decl., Ex. N at 82:2-85:15." | Disputed. The cited evidence does not reference the Idaho Supreme Court or what, if anything, it "specifically considered" in transitioning to e-filing. Duke Decl., Exh. N (Nelson Depo. 82:2-85:15). |
| 27. Mr. Girdner's "purported knowledge of Idaho's historical access to newly filed complaints comes from conversations with CNS staff and a retired Ada County Clerk." | Disputed as incomplete. In a May 6, 2016 letter from Ada County District Clerk Christopher Rich to Interim Administrative Director of Idaho Courts Justice Linda Copple Trout, Mr. Rich stated that the Ada County district court provided Courthouse News with "same day access to the paper record." Declaration of William Girdner (ECF 64) ("Girdner MSJ Decl."), ¶¶ 30-31 & Exh. 9. |
| Transition to Electronic Filing | |
| 29. "**Like with paper filing**, complaints are accessible to the press and public once they have been reviewed by a clerk and accepted for filing. Omundson Decl., ¶ 13." | Disputed as to "like with paper filing" to the extent the statement implies that the phrase "accepted for filing," as Defendant uses the phrase in the context of paper filing has the same meaning as the phrase "accepted" as the parties have used that phrase in the context of Defendant's current e-filing practices. |
| CNS' Position | |
| 32. "On April 28, 2016, counsel for CNS sent a letter to Christopher Rich **acknowledging Ada County has largely achieved the goal of same day access to new civil case filings,**" but nevertheless requesting implementation of an "electronic queue that new civil complaints flow into as | Disputed as misleading to the extent the reference to Ada County district court's providing same-day access implies that Ada County district court was providing same-day access to **e-filed** complaints. E-filing was not available in civil cases in Ada County district court until September 2016. *See* |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 13**

| | |
|---|---|
| soon as they are received by the clerk's office, even if they have not yet been officially 'accepted.'" Dkt. 1 at 46-48. | https://icourt.idaho.gov/blog-posts/060116-electronic-filing-launch-ada-county. |
| 34. "[A]nything longer than a few minutes is an unconstitutional delay, according to CNS. [Duke Decl., Ex. D] at 129:6-20; 207:14-24." | Disputed.  Mr. Girdner testified that Courthouse News considered access "past the time of receipt or shortly thereafter" to be delayed, but not that such a delay was necessarily unconstitutional. Duke Decl., Exh. D (Girdner Depo. 129:6-20). Mr. Girdner testified that he could not "guess at or define what the correct amount of time is." *Id.* at 131:2-3 "I can say that the right of access attaches on receipt.  And after that, the court needs to justify delays.  It needs to have an overriding reason and no less restrictive alternative.  So that's how I would analyze whether the delay is … consistent with the First Amendment or not." *Id.* at 131:3-9. |
| Press Review Queue by Tyler or the Court Building a Press Review Tool | |
| 38.  **Documents in the Press Review Queue** are not file stamped and **are not part of the official court record**.  IREFS 3, *see also* Duke Decl., Ex. F at 146:1-15 (document is file stamped upon acceptance by clerk)." | Disputed that documents in a Tyler-provided press review queue "are not part of the official court record."  IREFS 3 provides only that "[t]he official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." |
| 39.  "To provide access, the Idaho Supreme Court would have to grant **the press and anyone in the public**, access credentials (username and passwords) to the Press Review Queue (rather than just the court clerks having access to such unreviewed and approved for filing documents).  Duke Decl., Ex. F at 170:1-171:2." | Disputed that access credentials would have to be provided to "the press and anyone in the public." Tyler provides a tool "labeled the Press Review Tool," but "[t]he audience is really … depending upon our contract holders."  Fetterly Decl., Exh. 6 (Derrick Depo. 169:15-19). Q:  So if press review queue were to be used in the state of Idaho, it'd be up to the State of Idaho to determine who would be credentialed to use the press review queue? A:  Yes, that is correct. *Id.* at 169:21-25. *See also id.* (Derrick Depo. 83:21-22 ("The court |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 14**

| | dictates who has access to the Press Review Tool."), 95:14-23, |
|---|---|
| | 170:18-22 ("[I]t's up to our contract holders as to how many [credentials] they provide.")) |
| 41. "Given Tyler would host the Press Review Queue (because it is part of the eFile & Serve system), the Idaho Supreme Court would not have control over that system or the security surrounding the Press Review Queue." | Disputed. Defendant cites no evidence in support of this statement.<br><br>Tyler testified that its clients could run their own application firewalls to protect the press review queue. Fetterly Decl., Exh. 6 (Derrick Depo. 179:4-7). |

|  Security Concerns Related to the Press Review Queue  |
|---|

| 47. In an effort to evaluate Tyler's security of a Press Review Queue, the Idaho Supreme Court has requested information from Tyler. Dvorak Decl., ¶ 9. Tyler provided minimal information relating to the functionality of the Press Review Queue and security surrounding it. *Id.* As such, **based on the limited information Tyler has provided, it is unknown if or how the Press Review Queue is secured against manipulation of the original documents sitting in the Press Review Queue.** Duke Decl., Ex. J at 103:20-104:8, 114:11-115:11. | Disputed. Tyler testified that its press review queue software merely displays documents, and that it is not possible to modify those documents from within the press review queue.<br><br>Fetterly Decl., Exh. 6 (Derrick Depo. 82:23-83:14, 85:17-23, 91:5-93:3). |
| 47.1 "Without this information, the Idaho Supreme Court cannot adequately assess the security risks associated with the Press Review Queue. *Id.* at 144:2-21." | Disputed as incomplete. Defendant's Chief Information Security Officer testified that implementing Tyler's press review queue would require an amendment to the Tyler contract, and that a contract amendment would provide a basis for requiring Tyler to provide additional security information. Fetterly Decl., Exh. 20 (Dvorak Depo. 31:24-33:21). |

|  Funding Process to Obtain Appropriation for Press Review Tool  |
|---|

| 50. "In addition to the ongoing costs of a press review queue, there would be initial costs as well. Omundson Decl., ¶ 22." | Disputed as misleading. The statement implies that the referenced "initial costs" would involve the payment of funds, but the cited testimony references only internal resources such as staff time. Omundson Decl., ¶ 22. |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 15**

| 50.1. "As currently configured, the eFile & Serve system allows a filer to identify what is being filed using a few generic descriptions.  *Id.*" | Disputed as vague, misleading, and incomplete. To the extent the phrase "a few generic descriptions" is not too vague to carry a useful meaning, it conflicts with other evidence setting out the manner in which filers identify filings in the eFile & Serve system.  Declaration of Adam Angione in Supp. of CNS MSJ ("Angione MSJ Decl.") (ECF 61-4), ¶¶ 23-24 & Exhs.  9-12. |
|---|---|
| 50.2. "The implementation of a press review tool, which would publish documents from the eFile & Serve database, would require alterations to the court rules and processes for efiling as well as a reconfiguration of the eFile & Serve system. *Id.*  These changes would require additional training for both court staff and filers.  *Id.*" | Disputed as to "publish."  The press review tool displays documents from the eFile & Serve database based on the court's chosen parameters. It does not "publish" them.  *See* Fetterly Decl., Ex. 6 (Derrick Depo. 82:23-83:14, 85:17-23, 91:5-93:3).<br><br>Disputed that the implementation of a press review tool would require alterations to the court rules and processes for efiling.  Defendant has pointed to no rule or process that would need to be changed and has provided no foundation for this assertion.<br><br>Disputed that the implementation of a press review tool would require "a reconfiguration of the eFile & Serve system."  Defendant has provided no foundation for this assertion. |
| Erosion of Public Confidence in the Courts | |
| 51.  "The Press Review Queue is unable to watermark documents as "under review" or "not filed." Duke Decl., Ex. F at 171:3-5. **As such, the Press Review Queue would also have the Idaho Supreme Court, as the publisher of the Press Review Queue, implicitly representing that complaints in the queue are official court documents, when they are not**.  Declaration of the Honorable Cynthia Meyer ("Meyer Decl."), ¶ 12." | Objection.  See Evidentiary Objection Appendix No. 13<br><br>Disputed as to "publisher."  A court that provides access to court records pursuant to the requirements of the First Amendment and common law rights of access is not a "publisher."<br><br>Disputed that the phrase "official court documents" has an established meaning in the context of this case. |
| 51.1.  "If a complaint is reported on but ultimately rejected without a successful resubmission, the press and public will be left to speculate about the reasons for this phenomenon.  Omundson Decl., ¶ 19." | Objection.  See Evidentiary Objection Appendix No. 2<br><br>Disputed as unsupported supposition. |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 16**

| 53. "The jurisdiction of the Idaho Courts is not invoked until the complaint becomes an official court record.  Brown Decl., ¶ 12." | Disputed as an unsupported conclusory assertion rather than a statement of fact. |
|---|---|
| **Potential for Abuse of the Press Review Queue** | |
| 54. "The proposed Press Review Queue lacks safeguards to prevent a litigant or attorney from publishing confidential or inflammatory information. Declaration of the Honorable Dane Watkins, ¶ 14. | Disputed to the extent that the statement implies that the court's current practices include "safeguards" to prevent the disclosure of "confidential" or "inflammatory" information. *See* ICAR 32(i); IREFS 15(a), (b); IRCP 2.6(a), (b); Courthouse News Memo. in Supp. of MSJ Opp. ("CNS Opp.") at 18-22. |
| 54.1. "With the Press Review Queue, there is no way to prevent malicious and improper filings from being made available to the public. *Id.* The Auto Accept option, discussed in more detail below, presents these same concerns because there is no clerk review prior to a document becoming publicly available. *Id.*" | Disputed to the extent that the statement implies that the court's current practices include "safeguards" to prevent the disclosure of "malicious" or "improper" filings.  *See* ICAR 32(i); IREFS 15(a), (b); IRCP 2.6(a), (b); CNS Opp. at 18-22.

Also disputed as contradicting evidence of the filtering and other safeguards available for both press review queues and auto-accept configurations.  Fetterly Decl., Exh. 6 (Derrick Depo. 60:25-69:15), Exh. 16. |
| **Inadvertent or Malicious Dissemination of Information** | |
| 55. "There is nothing in the Press Review Queue to prevent an individual from inadvertently or maliciously submitting a complaint that includes confidential information, which will be publicly available the entire time that document sits in the Press Review Queue.  Meyer Decl., ¶ 13." | Disputed to the extent that the statement implies that court staff can or do prevent individuals from inadvertently or maliciously submitting a complaint that includes confidential information. *See* ICAR 32(i); IREFS 15(a), (b); IRCP 2.6(a), (b); Courthouse News Memo. in Supp. of MSJ Opp. ("CNS Opp.") at 18-22. |
| 55.1. "The Press Review Queue allows exposure of personally identifiable information ("PII") to the public if the submitter fails to properly redact the document. Duke Decl., Ex. J at 83:1-12." | Disputed to the extent it ignores that Idaho already places the burden of redacting PII from court filings.  *See* IREFS 15(a), (b); IRCP 2.6(a), (b); Courthouse News Memo. in Supp. of MSJ Opp. ("CNS Opp.") at 18-22. |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 17**

| | |
|---|---|
| 55.2. "PII could also be made available to the press and public if there was a misconfiguration by the AOC. *Id.* at 83:13-85:14." | Disputed to the extent it ignores that Idaho already places the burden of redacting PII from court filings. *See* IREFS 15(a), (b); IRCP 2.6(a), (b); Courthouse News Memo. in Supp. of MSJ Opp. ("CNS Opp.") at 18-22. |
| 55.3. "Avoiding public disclosure of PII in the Press Review Queue is contingent upon no user error by the submitter and no misconfigurations in the system. *Id.* at 87:5¬20." | Disputed to the extent it ignores that Idaho already places the burden of redacting PII from court filings. *See* IREFS 15(a), (b); IRCP 2.6(a), (b); Courthouse News Memo. in Supp. of MSJ Opp. ("CNS Opp.") at 18-22. |
| Idaho Supreme Court Building Its Own Press Review Queue | |
| 56. "…. Although Tyler could not provide an estimate on the cost of building the application, costs associated with the API include developing the press review queue application, personnel costs, and data hosting costs. *Id.* at 193:2-195:2." | Disputed. The cited testimony took place on November 7, before Defendant learned that Tyler had begun making the API available and does not reflect any information Defendant obtained from Tyler on or after November 10, when Defendant first learned that the API had become available. Fetterly Decl., Exh. 6 (Derrick Depo. 191:13-23, 192:4-14). |
| 56.1. "Tyler has not provided the Idaho Supreme Court with information it has requested regarding the security, functionality, and costs of the Press Review Queue API. Duke Decl. Ex. J at 21:21-22:8. Consequently, the Idaho Supreme Court has no way of estimating the time and costs associated with creating a program that can interface with the API. *Id.* at 145:6-11." | Disputed. The cited testimony took place on November 7, before Defendant learned that Tyler had begun making the API available and does not reflect any information Defendant obtained from Tyler on or after November 10, when Defendant first learned that the API had become available. Fetterly Decl., Exh. 6 (Derrick Depo. 191:13-23, 192:4-14). |
| 56.2. "In addition, whatever those ultimate costs would be, the Idaho Supreme Court would need to request an appropriation through the Idaho legislature as described above in paragraphs 48 through 50. Omundson Decl., ¶ 23." | Disputed. Defendant has not established that she could not provide access using an API-based solution using the Judicial Branch's internal IT staff. In addition, the assertion that an appropriation would be necessary contradicts the assertion that Defendant has no way of estimating the cost of creating such a solution. |

**RESPONSE TO STATEMENT**
**OF UNDISPUTED FACTS - 18**

| Auto-Accept | |
|---|---|
| 58. "In Idaho, **clerks serve as gatekeepers for improperly submitted documents** and notify attorneys and litigants if there are any issues with a submission; this was the case well before the transfer to e-filing. *See e.g.* Brown Decl., ¶ 9, Wildman Decl., ¶ 9, Meyer Decl., ¶ 8. With Auto Accept, documents are automatically accepted into the Idaho Case Management System (i.e. **the official court record** per IREFS 3) without any review by court clerks. Omundson Decl., ¶ 18. As such, Auto Accept would effectively **eliminate this gatekeeping function that benefits litigants, the clerks, District Judges, and their staff**, which **could be extremely detrimental to litigants**. *See e.g.* Brown Decl., ¶ 9, Wildman Decl., ¶¶ 9-10, Meyer Decl., ¶¶ 8-9. | Objection. See Evidentiary Objection Appendix No. 1

Disputed that "clerks serve as gatekeepers for improperly submitted documents" to the extent "improperly submitted documents" encompasses anything other than XYZ. See, e.g., Molchan PI Aff., ¶ 6.

Disputed that Idaho's case management system is "the official court record." The cited authority for this purported fact is IREFS 3, which states that "[t]he official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." It does not provide that the Idaho Case Management System is "the official court record."

Disputed that any "gatekeeping function" performed by clerks that "benefits litigants, the clerks, District Judges, and their staff" would cease to do so if Idaho's system were configured to automatically accept the Complaints at Issue. Clerks would continue to conduct the same ministerial review under an auto-accept configuration; they would simply do so after rather than before "acceptance." Declaration of William Girdner, ¶¶23, 43 (ECF 64).

Disputed that clerks' performance of ministerial review of the Complaints at Issue after rather than before "acceptance" would be "extremely detrimental to litigants." |
| 59. "There are some Auto Accept features Tyler could **build into** Auto Accept if used by the Idaho Supreme Court in Idaho, such as case category, case type, party type (i.e. plaintiff or defendant), filer type (attorney or pro se). Duke Decl., Ex. G at 60:25-62:1." | Disputed that Tyler would have to "build" "case category, case type, party type (i.e. plaintiff or defendant), filer type (attorney or pro se)" into Auto-Accept as "features" for the Idaho courts.

The Idaho courts already capture information about case category, case type, party type, and filer type for each filing based on the information |

**RESPONSE TO STATEMENT OF UNDISPUTED FACTS - 19**

| | the filer enters into the e-filing interface. |
|---|---|
| | Tyler simply configures the system to automatically accept filings based on whatever criteria the court selects.  Fetterly Decl., Exh. 6 (Derrick Depo. 60:25-69:15), Exh. 16. |
| 60.  "**<u>As Tyler admitted, it is not certain what all of the configurations are that could prevent issues presented below related to Auto Accept</u>**, but **<u>those configurations would come at an unidentified cost to the Idaho Supreme Court</u>**.  Duke Decl. Ex. F at 131:18-135:7 (Auto Accept cannot determine whether filing fee is accurate); 155:25-156:16 (**<u>malicious filings</u>** would be automatically accepted and publicly available if filer envelope met criteria for acceptance). | Disputed that Tyler "is not certain what all of the configurations are that could prevent issues presented below related to Auto Accept …."  The cited deposition testimony does not support the assertion. |
| | Disputed that configuration of auto-accept "would come at an unidentified cost to the Idaho Supreme Court."  Tyler testified that it would *not* charge Idaho for auto-accept.  Fetterly MSJ Decl., Exh. 6 (Derrick Depo. 29:19-30:23), Exh. 16. |
| | In the deposition testimony cited in support of DSUF No. 60, Tyler's 30(b)(6) deponent testified that he did not know what *internal* costs Idaho might incur to select the parameters for an auto-accept configuration.  Fetterly MSJ Decl., Exh. 6 (Derrick Depo. 132:23-133:1).  Defendant has offered no evidence that Idaho would incur *any* internal costs. |
| Prejudice to Litigants if Auto-Accept Is Used | |
| 61.  "Judicial action would be required to notify the attorney or litigant of the filing issue and the court would also need to determine what judicial action must be taken to address the filing issue (e.g. entering a notice of intent to dismiss). Brown Decl., ¶ 8." | Objection.  See Evidentiary Objection Appendix No. 5 |
| 61.1.  "Auto Accept would increase the already full workload of District Judges and their staff since court intervention would be needed to address filing issues that otherwise would have been caught by a clerk during the ministerial review process. *Id.*" | Objection.  See Evidentiary Objection Appendix No. 5 |

**RESPONSE TO STATEMENT**
**OF UNDISPUTED FACTS - 20**

| | |
|---|---|
| 61.2.  "**This could disproportionately impact pro se litigants**, who may not be as familiar with filing requirements.  *See e.g.* Barrios Decl., ¶ 8-9, Declaration of Rolan Gammill ("Gammill Decl."), ¶ 8-9, Declaration of Karlene Behringer, ¶ 7-8." | Disputed.  Defendant could choose to configure its auto-accept parameters so that filings submitted by pro se litigants would not be automatically accepted and would instead be reviewed by clerks as under Defendant's current practice.  *See* Fetterly Decl., Exh. 6 (Derrick Depo. 60:17-61:11, 61:19-62:1).  Accordingly, auto-accept would impact pro se litigants only to the extent Defendant chose for it to do so. |
| Impacts of Auto-Accept | |
| 63.  "Auto Accept would increase the workloads of judges and court staff because judicial action would be required to address improperly submitted documents that are automatically accepted into the Case Management System.  *See e.g.* Brown Decl., ¶ 8, Wildman Decl., ¶ 8.  This would include preparing orders and conducting hearings to strike improperly submitted complaints, or otherwise remove them from the case management system, or redacting filings already in the case file.  Wildman Decl., ¶ 8.  It could also include entering a notice of dismissal if certain actions are not taken by the litigant or attorney to correct the filing error.  Brown Decl., ¶ 8.  This would increase the workload of District Judges, their court staff, and clerks.  *Id.*  This would dramatically increase the workload of judges since they would be tasked with ministerial functions that would otherwise be handled by the clerk.  *Id.*" | Objection.  See Evidentiary Objection Appendix Nos. 5 and 10 |
| 64.  "As discussed above, Auto Accept is not able to determine whether the correct filing fee was submitted with a complaint and reject the complaint if not. Duke Decl., Ex. F at 131:17-134:21.  …." | Disputed as incomplete.  Tyler could develop a configuration for auto-accept that would detect whether the filing fee matched a specified amount, Fetterly Decl., Exh. 6 (Derrick Depo. 212:8-22), and all of the Complaints at Issue have the same filing fee: $221.  *See* Fetterly Decl., Exh. 4. |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 21**

| Burden on Clerks to Communicate with Filers about Filing Issues | |
|---|---|
| 66. "When a document is in eFile & Serve, the clerk can interface directly with the submitter through the portal. Omundson Decl., ¶ 9, see also Brown Decl., ¶ 7, Barrios Decl., ¶ 5. This functionality is lost with Auto Accept; the clerk has to see if the complaint lists contact information and (assuming it does) alert the submitter to let them know there was an error with the filing. Barrios Decl., ¶ 7, see also Duke Decl., Ex. F at 135:8-136:2 (service email address is not transmitted from eFile & Serve into Case Manager). This would be an inefficient process for the deputy clerks, especially since the communications would be housed in individual deputy clerk's email accounts and could not be broadly shared, as they now are in File & Serve. Barrios Decl., ¶ 7. This would result in problems of sharing information whenever a deputy clerk is on vacation, out sick, or is otherwise not in the Clerk's office. *Id.*" | Objection. See Evidentiary Objection Appendix Nos. 5, 27, and 29 |
| Risk of Malicious Filings | |
| 68. "Auto Accept is also **not able to protect against malicious or inadvertent disclosure of confidential information**; if an envelope meets the criteria for acceptance, it is automatically accepted regardless of the substance of the document or documents therein. Duke Decl., Ex. F at 44:13-45:10, 155:25-156:16." | Disputed to the extent the statement implies that Defendant's current clerk-acceptance system "protect[s] against malicious or inadvertent disclosure of confidential information." *See* IREFS 15(a), (b); IRCP 2.6(a), (b); CNS Opp. at 18-22. |
| 68.1. "Under the current system, clerks have the authority to reject a submission if it contains information and note that it needs to be redacted. Duke Decl., Ex. C at 104:12-20." | Disputed. Idaho expressly places the burden on filers to redact PPI and explicitly warns filers that clerks will not review filings for such information. *See* IREFS 15(a), (b); IRCP 2.6(a), (b); CNS Opp. at 18-22. |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 22**

| Time Between Submission and Acceptance or Rejection | |
|---|---|
| 71.  "In Ada County, initial civil filings were reviewed an average of 2.56 **hours after submission**.  In total, **107,616 initial filings** were submitted in Ada County during this timeframe and **9% of these submissions were rejected for filing** (i.e. 9,685 rejections).  Carroll Decl., Ex. D." | Disputed to the extent these statements imply that the initial civil filings referenced therein represent the relevant universe of Ada County documents at issue in this case.  Courthouse News seeks access only to new civil complaints in the A.A. category (referred to herein and in Courthouse News' other papers in the parties' cross-motions for summary judgment with the defined term "Complaints"). |
| | Also disputed to the extent the phrase "reviewed an average of 2.56 hours after submission" implies that such filings were available on the day of filing.  The cited declaration states that the 2.56-hour average is measured in "business hours," i.e., hours during which the court was open.  A complaint filed within the last two hours of the court day and not reviewed for 2.5 business hours would not be available until the following court day. |
| | Also disputed to the extent the statement "9% of these submissions were rejected for filing" implies that none of these filings were re-submitted with requested corrections and deemed filed as of the day of initial submission. |
| 72.  "As discussed above, CNS has narrowed its request for access within minutes of submission to civil complaints in filing category "A.A. All initial civil case filings in District Court of any type not listed in categories E, F, and H(1)."  Supra, ¶ 5.  The Idaho Supreme Court requested data from Tyler showing the length of time between submission and acceptance of civil complaint in this filing category under its current process from January 1, 2021 through July 31, 2022 which establishes that **the great majority of complaints are available within a business day**.  Carroll Decl., Ex., ¶ 6, Ex. A." | Disputed to the extent the statement that "the great majority of complaints are available **within a business day**" implies that "the great majority of complaints" are available **on the day of e-filing**. |
| | Defendant does not purport to tell the Court the number or percentage of Complaints that were available (or not available) to the public on the day they were e-filed. |
| | The cited evidence lists the number of complaints within the A.A. category what were reviewed "within one business hour of submission," "within two business hours of submission," and so on up to "within twenty-four business hours" of submission.  Carroll Decl., ¶ 6 (ECF 60-18). |
| | A complaint submitted at 4:20 p.m. on a Monday and reviewed at 8:15 a.m. on Tuesday would have been reviewed "within one business hour" but |

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 23**

|  | would be unknown to the press and public until the day after submission.  If the complaint were submitted on a Friday, it would be unknown until Monday.

A complaint submitted at 1:00 p.m. on a Monday and reviewed at 10:00 a.m. on Tuesday would have been reviewed "within six business hours" but would be unknown to the press and public until the day after submission.  If the complaint were submitted on a Friday, it would be unknown until Monday.

The same data Defendant used to generate the information in Paragraph 6 of the Carroll Declaration reflects that nearly half (42%) of all Complaints e-filed in Idaho's district courts were withheld until at least the following day.  Angione MSJ Decl., Exh. 2.  Approximately 15% were withheld for two calendar days or longer.  *Id.*

Individual delays during this period were regularly worse, varying in degree from court to court and from month to month and week to week.  Declaration of Jimmy Shimabukuro in Supp. of CNS MSJ ("Shimabukuro Decl.") (ECF 61-3), Exhs. 1-9.  For example, the district court for Kootenai County withheld every single Complaint filed in April 2021 until at least the following day, with 98% of them withheld for two calendar days or longer.  *Id.*, Exh. 4. |

DATED this 25th day of January, 2023.

BRYAN CAVE LEIGHTON PAISNER LLP

    */s/ Katherine Keating*
Katherine Keating
*Attorneys for Courthouse News Service*

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 24**

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of January, 2023, I served the foregoing on CM/ECF

Registered Participants as reflected on the Notice of Electronic Filing as follows:

Keely E. Duke            ked@dukeevett.com

Molly E. Mitchell        mem@dukeevett.com

                */s/ Katherine Keating*
                Katherine Keating

**RESPONSE TO STATEMENT
OF UNDISPUTED FACTS - 25**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                    Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>                    Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]** |

# TABLE OF CONTENTS

I.   INTRODUCTION                                                                     1

II.  LEGAL STANDARD                                                                   4

III. ARGUMENT                                                                         5

A.   CNS has not established a violation of its First Amendment rights.               5

1.   The qualified right of timely access attaches upon acceptance for filing.       5

     b.   Access to newly submitted complaints does not play a significant positive role in
     the functioning of the judiciary.                                               9

2.   CNS has immediate access to complaints upon acceptance for filing.             11

3.   Even if access is measured based on submission time, CNS cannot establish a
violation of the qualified right to timely access.                                  12

     a.   CNS is seeking immediate access to submitted complaints, and therefore the
     Court does not need to reach the second step of the Press-Enterprise II analysis.  12

     b.   Even if the Court reaches the second step of the Press-Enterprise II analysis, CNS
     cannot establish a First Amendment violation because delays are not occurring in
     Idaho and the minimal time between submission and clerk review is justifiable based
     on the interests clerk review serves.                                          13

B.   CNS has not established causation.                                              21

C.   CNS is not entitled to a permanent injunction because it has not demonstrated an
irreparable injury, that the balance of equities tips in its favor, or that the public interest
would not be disserved by a permanent injunction.                                   24

1.   CNS has not demonstrated an irreparable injury.                                24

2.   The balancing of hardships weighs against a permanent injunction.              26

3.   The public interest factors weigh against a permanent injunction.              28

IV.  CONCLUSION                                                                      30

ii

# I. INTRODUCTION

The First Amendment right of timely access to newly filed complaints does not entitle Courthouse News Service ("CNS") to immediate access to submitted or filed complaints. Nor does this qualified right require federal courts to second guess how state courts manage their judicial resources to ensure that court operations run as smoothly and efficiently as possible. Yet, CNS demands that this Court order Idaho's court to provide almost immediate access to a certain category of complaints CNS is interested in without any review by a clerk first.  CNS's demand should be denied, and Sara Omundson's ("Omundson") Motion for Summary Judgment granted.

Providing the press and public with timely access to judicial records while protecting the integrity of Idaho's state court files is a complex and necessary endeavor requiring a careful balancing of many different, and sometimes competing interests. To achieve these aims, the Idaho Supreme Court has developed extensive policies and procedures that promote accessibility and governmental accountability, while balancing the protection of privacy, efficiency, proprietary information, and integrity and confidence in the courts.  The Idaho Supreme Court has struck this balance by providing the press and public access to civil complaints *immediately* – though not required – upon acceptance for filing, at which time the complaint initiates a lawsuit.

In an attempt to usurp that balance, CNS asks this Court to order that the Idaho Supreme Court abandon its extensive policies and procedures. CNS demands to have near immediate access to a certain category complaints, even prior to any county clerk doing their ministerial review to address these important balancing interests. Notably, CNS makes this demand despite its own Idaho reporter's logical admission that her interest as a reporter is to report on complaints accepted by the clerk, and not those waiting to be accepted for filing. Dkt. 60-8 at 58:25-59:3 ("[W]hy would I report on something – I wouldn't report on something that hadn't been filed in the legal system."). To satisfy CNS's unsupported and illogical demands to receive complaints immediately upon

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 1

submission, or no later than "a few minutes" after submission, CNS proposes Idaho's courts be required to use the Press Review Queue from Tyler Technologies, Inc. ("Tyler"). By doing so, CNS could then satisfy its own business interests — specifically, the ability to use web scraping to automatically "grab" not-yet approved complaints – thus highlighting this lawsuit is not really about legitimate concerns of delayed access. There would be no lawsuit if that were the case. Simply put, Idaho state court complaints are made available to the public *immediately* upon acceptance for filing after a prompt review by state court clerks. CNS is attempting to manufacture a constitutional violation by imposing an impossibly high standard on court clerks, namely review of all complaints within "a few minutes" of submission—an impossible task for any court balancing the interests of judicial integrity and the First Amendment.

Respectfully, the qualified right of timely (not immediate) access should not attach to submitted complaints that have not been accepted for filing and, therefore, have not initiated a lawsuit.[1] This is because: (1) historically, access was not provided until the complaint had been accepted for filing, and (2) providing access to complaints that have not been reviewed and accepted for filing does not play a significant positive role in the functioning of the judiciary.[2] As such, CNS cannot establish a First Amendment violation because there is no qualified right of

---

[1] Omundson is aware of the Court's finding that "'filed' is equivalent to submission." Dkt. 40 at 25. However, the evidence developed in discovery contradicts representations CNS made to the Court regarding historical access to submitted complaints. Discovery also made clear to CNS that Idaho allows immediate access to accepted complaints. Omundson therefore respectfully asks the Court to reconsider this finding based on the evidence described herein and submitted in support of her motion for summary judgment. Even if, however, the Court does not reconsider this finding, Omundson still prevails in this lawsuit, as addressed in Omundson's Motion for Summary Judgment and this opposition.

[2] Notably, the *Planet III* case involved already accepted complaints and then post-acceptance processing done by the clerks. Such is not the case here, as this case involves pre-acceptance processing of complaints. Omundson incorporates by reference the argument raised in her motion for summary judgment that submitted complaints are not judicial documents, the analysis for which is based on these two factors. Dkt. 60-2 at 8-15.

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 2

access to submitted complaints, and there is no dispute CNS has immediate access to filed complaints.

Further, even if there was a right of timely access to submitted complaints, CNS still cannot establish a First Amendment violation because it is seeking *almost immediate* access to submitted complaints. There is no right to almost immediate access to newly submitted complaints, and therefore the First Amendment inquiry should end there without moving to the next step (i.e. "whether delay is occurring in Idaho and, if so, whether that delay is justifiable"). Dkt. 40 at 13.

Even if the Court moves to this next step, CNS still has not established a First Amendment violation because the time between submission and clerk review is insignificant, with all categories of complaints, not just the A.A. complaints CNS is interested in, reviewed in an average of 4.82 business hours. The short amount of time it takes between submission and clerk review does not constitute a meaningful delay. Such insignificant delays are also justified based on the interests that clerk review serves, as well as the interests that would be undermined by either option CNS proposes for immediate access (the Press Review Queue or Auto Accept).

Where clerk review has taken longer than eight business hours, it has typically been because of staffing issues, clerks being out sick (more so in the last few years given the global COVID pandemic), and other justifiable reasons specific to the particular county. On the other hand, many counties are typically able to review complaints within just a few business hours. CNS cannot meet its burden of showing the alleged constitutional violation is proximately caused by a policy implemented or enforced by Omundson because the timing between review and submission depends on factors specific to each of Idaho's 44 counties.

For these reasons, CNS is not entitled to summary judgment on its First Amendment claim.

Nor is CNS entitled to a permanent injunction. CNS has not been irreparably harmed by having to wait on average a few hours after submission to review complaints once they have been

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 3**

filed and therefore have actually initiated a lawsuit. The balance of hardships also weighs against a permanent injunction. The hardship to CNS is non-existent, whereas both Auto Accept and the Press Review Queue would place a massive and costly burden on Idaho's Courts. A permanent injunction is also not in the public interest. The Press Review Queue and Auto Accept do not protect against the inadvertent or malicious disclosure of confidential information and could erode the public's confidence in Idaho's Courts. Auto Accept would adversely affect litigants because filing errors could not be corrected by the clerk on the front end, and would instead require judicial action to fix. This would greatly increase the workload of already overburdened judges and their court staff. The public benefits from a court system that operates efficiently, and overhauling Idaho's clerk review process would affect the court system as a whole by unnecessarily increasing workloads across the board. CNS's desire to review submitted complaints on average a few hours before it has access to actual filed complaints does not justify the substantial hardships that would result from implementation of a Press Review Queue or Auto Accept.

## II.  LEGAL STANDARD

A plaintiff moving for summary judgment "must offer evidence sufficient to support a finding upon every element of his claim for relief." *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980) (plaintiff moving for summary judgment). A claim brought under 42 U.S.C. § 1983 requires proof of two elements: (1) "the conduct complained of was committed by a person acting under color of state law, and (2) "this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Hechavarria v. City & Cnty. of San Francisco*, 463 F. App'x 632, 633 (9th Cir. 2011). If a plaintiff establishes a constitutional violation, the plaintiff must then satisfy a four-factor test before the court may grant injunctive relief. *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1265 (E.D. Cal. 2020) (evaluating permanent injunction after determining First Amendment had been violated and

granting summary judgment in favor of plaintiffs), *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.").  This test requires the plaintiff to demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

### III.  ARGUMENT

**A.     CNS has not established a violation of its First Amendment rights.**

**1.  The qualified right of timely access attaches upon acceptance for filing.**

The press and public have a qualified right of timely access to newly filed complaints, but this right "does not entitle the press to immediate access." *Courthouse News Service v. Planet ("Planet III")*, 947 F.3d, 581, 585 (9th Cir. 2020). Under *Planet III*, when the qualified right of timely access attaches to a civil complaint depends on the *Press Enterprise II* factors, which look at the historic access provided and whether public access plays a "significant positive role" in the functioning of the judicial system. *Id.* at 590. In *Planet III*, CNS claimed that, historically, the public had access to "newly filed" complaints before they were "subjected to judicial review." *Id.* at 592. The Ninth Circuit determined the right attaches to *filed* complaints—even if judicial action had not yet been taken—because it is the filing of the complaint that invokes the court's jurisdiction. *Id.* at 593.  Significant as well, is that the *Planet III* case involved complaints that had already been accepted for filing and were then subjected to processing consisting of six more steps; such is not the case here, as the at-issue complaints are pre-acceptance complaints.

Based on the *Press Enterprise II* factors, when reviewed in conjunction with evidence

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 5**

developed in discovery in this matter, the right of access attaches upon acceptance for filing, which invokes the court's jurisdiction, rather than upon submission. *See* Dkt. 60-1, ¶ 20.

### a. CNS failed to establish it historically had pre-acceptance access to complaints.

#### i. CNS did not have pre-acceptance access to complaints in Idaho.

Historically, Idaho Courts did not provide "pre-acceptance" access to civil complaints. CNS's unfounded testimony relating to historical access comes solely from its editor, Bill Girdner, who does not claim to have visited Idaho prior to the transition to e-filing. Dkt. 64, ¶ 18 (listing state courts Mr. Girdner visited). Mr. Girdner claims the thirty-two state courts he visited provided some form of pre-acceptance access and that Ada County "was no exception." *Id.*, ¶ 20. He provides no opinion on historical access in Idaho's 43 other counties. *See id.*

In addition, Mr. Girdner's declaration ignores and contradicts his under-oath deposition testimony. In his deposition, Mr. Girdner testified he would have to defer to CNS's Idaho reporter regarding historical access to complaints and that he believed the Idaho reporter's testimony was accurate. Dkt. 60-7 at 19:15-21:3. Despite this deferral to CNS's Idaho reporter, Catherine Valenti, as the purported expert on historical access in Idaho, CNS failed to provide the Court with Ms. Valenti's sworn testimony regarding historical access in Idaho. Ms. Valenti's sworn testimony as to historical access directly contradicts Mr. Girdner's unfounded, self-serving, and factually wrong declaration testimony.[3] As Ms. Valenti testified, in the days of paper filing, CNS reporters would only review complaints filed in certain Idaho counties on a daily (Ada), weekly (Canyon and

---

[3] As discussed in more detail below, Mr. Girdner's declaration testimony regarding historical access should be stricken because it is speculative and lacks foundation and because he has not been disclosed as an expert. *See Wolf v. Otter*, No. 1:12-CV-00526-BLW, 2014 WL 2504542, at *5 (D. Idaho June 3, 2014), *aff'd sub nom. Wolf v. Idaho State Bd. Of Corr.*, 772 F. App'x 557 (9th Cir. 2019) (a "party need not file a separate motion to strike when objecting to the admissibility of evidence submitted at the summary judgment stage").

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 6

Kootenai) or monthly basis (Owyhee, Elmore, Gem, Washington, and Payette); CNS did not review complaints filed in Idaho's other counties. Dkt. 60-1, ¶ 23. In addition, for the counties Ms. Valenti visited, she would look at a docket list to determine which complaints she wanted to review, and the clerk would then provide her with those complaints. *Id*. The docket list **only included complaints that had been reviewed by a clerk and accepted for filing**, and the only complaints Ms. Valenti reviewed had been accepted for filing and had a file stamp. *Id.*, *see also* Dkt. 60-8 at 55-18, 47:18-48:11, 52:20-53.3.

As such, there is no factual dispute regarding historical access in Idaho: neither CNS nor any other member of the press or public had access to complaints prior to clerk review and acceptance into the court's file. *See e.g.* Dkt. 60-26, ¶ 4 (in paper filing days, complaints made available to public upon acceptance for filing by clerk), Dkt. 60-27, ¶ 6 (same).  Federal case law is clear that Mr. Girder cannot create a material issue of fact by contradicting his own deposition testimony and by providing factually unsupported opinions.  *Nelson v. City of Davis,* 571 F.3d 924, 927 (9th Cir.2009) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

### ii. *CNS has not presented admissible evidence establishing a national standard of pre-acceptance access.*

By relying on Mr. Girdner's testimony that a handful of county courthouses <u>outside of Idaho</u> purportedly allowed pre-acceptance access to submitted complaints in the days of paper filing, CNS implies that this Court should evaluate historical access based on some sort of "national standard." What other courthouses in other states are or were doing with paper filings is irrelevant to historical access in Idaho. *Courthouse News Serv. v. Hade*, 2022 WL 4485177, at *1 (E.D. Va. Sept. 27, 2022). ("Without information relevant to either prong of the analysis, comparison to the practices of other states is irrelevant.") This is best highlighted by the undisputed testimony of Ms.

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 7

Valenti that Idaho only allowed access to filed complaints.  *See* Section III.A.1.a.i, *supra.*

Even if the Court evaluated access based on some alleged "national standard," CNS has not submitted admissible evidence to support its claim that, across the nation, all courts provided some form of pre-acceptance access.  Ignoring Idaho, CNS relies on the declaration of Mr. Girdner, who claims to have visited courts in 32 states (not Idaho). Dkt. 64, ¶ 18. Mr. Girdner does not identify how many courts in each state he visited (e.g. if he only visited one county courthouse in each state or every single one). *See id.* The conclusion Mr. Girdner contorts from his allegations about visits to an unspecified number of courthouses in other states—namely, that there was historically a nationwide standard of pre-acceptance access—is inadmissible for several reasons. First, Mr. Girdner's opinion testimony about a purported national standard is contradicted by the undisputed evidence relating to historical access to complaints in Idaho by CNS's own reporter. Dkt. 60-8 at 48:6-11.

Second, Mr. Girder was not disclosed as an expert in this case and his testimony on a "national standard" is opinion testimony, not fact testimony.  A qualified expert may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. CNS cannot evade the requirements of Rule 702 "through the simple expedient of proffering an expert in lay witness clothing." *Whitmire v. Wal-Mart Stores Inc.*, 359 F. Supp. 3d 761, 785 (D. Ariz. 2019). Testimony about a purported industry standard is within the scope of Rule 702 if an "average lay person has little or no knowledge regarding those industry standards." *Intercargo Ins. Co. v. Burlington N. Santa Fe R.R.,* 185 F. Supp. 2d 1103, 1114 (C.D. Cal. 2001).

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 8**

The average lay person has no knowledge regarding any sort of alleged "national standard" for when paper filed complaints became accessible. Here, Mr. Girdner's opinion about how *all* is based on specialized knowledge he claims to have based on visits to a handful of courthouses. Therefore, his opinion is within the realm of expert testimony. Because Mr. Girdner was not disclosed as an expert by CNS, he cannot offer opinion testimony within the scope of Rule 702.

Third, Mr. Girdner's testimony about a purported nationwide standard should be excluded because it is not supported by sufficient facts or data or a reliable methodology. *See* F.R.E. 702(b)-(d). His testimony is conclusory, speculative, and contradicted by Ms. Valenti's testimony and the facts in *Planet III*. Girdner does not identify how many courts he visited in each state he claims to have traveled to at some point in his career. *See* Dkt. 64, ¶ 18. If Mr. Girdner only visited one county courthouse in each state, he would have only visited 32 of the nation's 3,143 counties (i.e. about 1% of county courthouses).[4]

Fourth, Mr. Girdner's claim that all the courts he visited throughout the country (including in California) provided pre-acceptance access is contradicted by CNS's own allegations in *Planet III* (namely that CNS had access to complaints only after clerk processing). *Planet III*, 947 F.3d at 586. Thus, visiting a single courthouse in one state does not give rise to a reasonable inference that access to paper complaints provided by that courthouse was uniform throughout the state.

CNS has not submitted any admissible evidence establishing some alleged nationwide standard of historical access to complaints upon submission. Therefore, the first *Press Enterprise II* factor weighs against a finding that the right of access attaches upon submission.

      **b. Access to newly submitted complaints does not play a significant positive role in the functioning of the judiciary.**

---

[4]  https://www.census.gov/library/stories/2021/08/more-than-half-of-united-states-counties-were-smaller-in-2020-than-in-2010.html (identifying number of counties in United States).

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 9**

In addition to failing to show that the press has historically had access to complaints not yet accepted for filing, CNS has also failed to show how reviewing newly submitted complaints plays a significant positive role in the functioning of the judiciary.

A submitted complaint provides no insight into how the judiciary functions because, prior to acceptance, a lawsuit has not been initiated and therefore the state court's jurisdiction has not been invoked. Dkt. 60-1, ¶ 53. When a complaint is in eFile & Serve waiting for clerk review, judges and their staff cannot view the complaint, let alone act on it. Dkt. 60-1, ¶ 20(h). CNS's own reporter testified she has no interest in reviewing complaints prior to acceptance because she would not want to report on a complaint that has not initiated a lawsuit and is not an official court record. Dkt. 60-8 at 58:25-59:3. Further, providing the press and public with access to submitted complaints is detrimental to the functioning of the judiciary because it could mislead the public about whether complaints reported on actually initiated a lawsuit, which could lead to speculation and distrust in the court system. Dkt. 60-1, ¶ 51. It could also result in the inadvertent or malicious disclosure of confidential information. *Id.*, ¶¶ 54-55, 68-69.

Thus, both *Press-Enterprise II* factors weigh against the qualified right of timely access attaching upon submission. Access upon submission was not historically provided in Idaho and providing access to submitted complaints—which have not initiated a lawsuit and are not official court records—does not have a significant positive impact on the functioning of the judicial system.  As such, Omundson respectfully requests the Court reconsider that the First Amendment right of access attaches at the time of submission versus the time of acceptance.  The right of timely access should attach upon acceptance for filing – as it did in under the *Planet III* facts - because it is at that point in time that a civil action has been initiated. Dkt. 60-1, ¶ 20(h).

Indeed, a federal court reviewing the same e-filing configuration (Tyler's eFile & Serve with no Press Review Queue or Auto Accept) found it was "distinguishable" from *Planet III*

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 10**

because "the seven-step procedure at issue in *Planet III* is far more extensive than the review procedure that defendants utilize here." *Harris Courthouse News Serv. v. Harris*, 2022 WL 17850125, at *38 (D. Md. Dec. 22, 2022). The first step in the *Planet III* process was determining whether "the complaint is being filed in the correct court and the documents necessary to initiate the case are presented with the correct filing fee or fee waiver." *Planet III*, 947 F.3d at 586. There were then six more steps to open a case file *and* an additional layer of quality control review by a supervisor, "a process which took several additional days to complete." *Id.* With eFile & Serve, the "processing" of a complaint—which took days if not weeks in *Planet III*—occurs instantaneously once the complaint is accepted for filing. Dkt. 60-1, ¶ 20.

Another critical distinction between eFile & Serve and the seven-step process at issue in *Planet III* is the clerk's ability to interface directly with the submitter through the eFile & Serve portal. Dkt. 60-1, ¶ 66. If there is an error with the submission, the clerk can communicate directly with the submitter to correct this error. *Id.* Thus, the clerk review process is the virtual equivalent of a runner standing at the clerk's counter and being told whether the submission will be accepted or if something needs to be fixed. There may be additional steps to open a case file (i.e. the multi-step process as issue in *Planet III*), but with eFile & Serve these steps occur instantaneously upon acceptance. Dkt. 60-1, ¶ 20. Thus, in the context of efiling software, the right of timely access should attach at the time of filing because it is at that point that virtual "clerk counter" transaction is complete and the submission becomes an official court record.

**2. CNS has immediate access to complaints upon acceptance for filing.**

There is no dispute CNS has access to civil complaints the moment they are accepted by a clerk for filing, at which time a number of things occur simultaneously and instantaneously: (1) the complaint becomes part of the official court record; (2) a civil action is initiated; (3) the complaint is file-stamped; (4) a case number and judge are assigned; (5) judges and their chambers

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 11

have access to the complaint; and (6) the complaint is *immediately* available to the public. Dkt. 60-1, ¶ 20. Thus, CNS has immediate access to newly filed civil complaints in Idaho, which is over and above what is required under *Planet III*. *Id.*, 947 F.3d at 585. Because CNS has access to complaints immediately upon filing, it cannot establish a violation of its First Amendment right to timely access to newly filed complaints.

**3. Even if access is measured based on submission time, CNS cannot establish a violation of the qualified right to timely access.**

    **a.    CNS is seeking immediate access to submitted complaints, and therefore the Court does not need to reach the second step of the Press-Enterprise II analysis.**

Notably, CNS's motion for summary judgment omits any reference to deposition testimony from Mr. Girdner and Ms. Valenti stating CNS is seeking immediate or near-immediate access to newly submitted complaints. Dkt. 60-7 at 129:6-20 (access must be within "a few minutes"); Dkt. 60-8 at 24:8-19 (CNS seeks "immediate access to complaints"). This testimony is counter to representations CNS made to the Court in opposing Omundson's motion to dismiss. *See* Dkt. 40 at 12 ("CNS begins by correcting Omundson and explaining that it did not bring this suit claiming to have a 'right to immediate access,' but that it brought suit because her procedures result in delays and she cannot justify those delays under the second prong of the *Press-Enterprise II* test"). Relatedly, the alternatives CNS presents all provide **for immediate access**. Dkt. 60-1, ¶ 37, 59.

Because evidence obtained in discovery proves CNS is in fact seeking immediate (no more than a "few minutes") access to complaints that have not yet been accepted, Omundson respectfully requests this Court reconsider its factual finding that CNS is not seeking immediate access. *See* Dkt. 40 at 13 ("The Court also agrees that CNS is not actually asking for immediate access; it is asking for un-delayed access."). Indeed, it was this finding that resulted in CNS getting to the second step of the *Press-Enterprise II* analysis, *i.e.* "whether any restriction on CNS's right

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 12

'is essential to preserve higher values and is narrowly tailored to serve those interests.'" Dkt. 40 at 13 (citing *Planet III*, 947 F.3d at 595). Having found that CNS was seeking "un-delayed" rather than immediate access, the Court reasoned "the relevant question is whether any delay is occurring in Idaho and, if so, whether that delay is justifiable." *Id.* Because CNS admitted in depositions that it is in fact seeking immediate access—despite prior representations to the contrary—the Court does not need to reach the second step of the *Press-Enterprise II* analysis. However, even if the Court does so, CNS cannot establish a First Amendment violation, as addressed below.

    **b.**    **Even if the Court reaches the second step of the Press-Enterprise II analysis, CNS cannot establish a First Amendment violation because delays are not occurring in Idaho and the minimal time between submission and clerk review is justifiable based on the interests clerk review serves.**

    *i.*    *The time between submission and review is insignificant.*

The vast majority of newly submitted complaints in Idaho are reviewed and either accepted for filing or rejected within one business day (i.e. eight business hours). CNS attempts to dramatize the alleged delays by calculating them on a 24/7 basis because the news cycle is 24/7 and news allegedly becomes stale if it is not immediately reported on. Dkt. 61-1 at 14. This approach is counter to *Planet III*, which looked at delays based on "court days." *Id.*, at 927 F.3d at 598. Other courts have similarly evaluated alleged days based on business hours. *See e.g. Harris*, 2022 WL 17850125, at * 40 ("This Court interprets this standard to measure delays in terms of court days and business hours, *i.e.*, when the courts are open to the public.").

CNS's 24/7/365 calculations are also unsupported by its own business practices. CNS's reporters do not work around the clock; their typical hours match up with court hours. Dkt. 60-8 at 36:25-37:20. If a complaint is filed after hours, CNS reporters do not review and report on it until the next business day. *Id.* at 37:21-38:13. So, if a complaint is accepted for filing on a Friday late afternoon before a three-day holiday weekend, CNS is not reporting on it until that next

Tuesday.  Dkt. 60-8 at 38:1-6.

Similarly, CNS's argument that complaints become "stale"—and therefore not newsworthy—is contradicted by its own reporting practices. The *Big Sky* report frequently lists complaints filed weeks before the report is issued. Duke Decl., Ex. B. For example:

- The November 16, 2022 report lists a complaint filed in Wyoming state court on October 31, 2022;
- The November 18, 2022 report lists complaints filed in Montana state court on October 26 and 27, 2022;
- The December 6, 2022 report lists complaints filed in Wyoming state court on November 7 and 18, 2022;
- The December 7, 2022 report lists complaints filed in Wyoming state court on November 9 and 21, 2022;
- The December 14, 2022 report lists complaints filed in Wyoming state court on November 3, 7, 9, 10, 11, and 21, 2022; and
- The January 6, 2023 report lists a complaint filed in Montana state court on December 14, 2022.

*Id.*  In contrast, complaints filed in Idaho Courts typically list a filing date on the same day or within a day or two of the report. *See id.* Thus, CNS holds Idaho Courts to an inexplicably and exceptionally higher bar (i.e. immediate access) than it requires of its own reporters, who apparently report on cases filed in Montana and Wyoming state courts when convenient.

In addition, other than the *Big Sky* Report, CNS's reporting on Idaho state court cases appears to be almost non-existent. Ms. Valenti identified four purportedly newsworthy complaints in her declaration submitted in support of CNS's motion for summary judgment. Dkt. 62, ¶ 7. Although Ms. Valenti is CNS's Idaho reporter, she could not recall at her deposition whether CNS reported on a single one of these complaints (other than listing them in the *Big Sky* report). Dkt. 60-8 at 147:5-148:23. Further, the complaints she identified in her new declaration are identical to the complaints she identified in her preliminary injunction declaration filed over a year ago, conceding CNS has not identified a single "newsworthy" civil complaint filed in Idaho since September 1, 2021 (the date the most recent "newsworthy" complaint was filed). Dkt. 14-3, ¶ 9,

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 14**

Dkt. 62, ¶ 7. Thus, CNS's claims about "stale news" and a "24/7 news cycle" does not provide a basis for measuring alleged delays on a 24/7 basis—counter to the analysis in *Planet III*—as CNS itself is not reporting on a 24/7 cycle and routinely reports on weeks-old complaints.

Recognizing its 24/7 calculations do not pass muster, CNS has now provided alternative calculations based on business hours; however, these calculations are flawed. CNS's calculations are based on date of submission, **but they fail to account for submission time**. Supplemental Declaration of Emily Carroll ("Carroll Decl."), ¶ 7. CNS still calculates alleged delays based on business *days* rather than business *hours*. This skews the data in CNS's favor. For example, by CNS's logic, a complaint submitted at 4:59 p.m. on a Monday and reviewed and accepted by a clerk at 8:01 a.m. on a Tuesday would be calculated as a "one day delay," even though it was only a two-minute delay in terms of business hours. As another example, CNS skews the data even more inaccurately in cases where a compliant is rejected and then resubmitted. If a complaint is submitted on March 1 at 9:00 a.m., rejected by the clerk at 10:00 a.m. on March 1, resubmitted on March 4 at 3:00 p.m., and accepted by the clerk on March 4 at 4:00 p.m., that is only a total of two business hours of review time, while CNS instead calculates its filing date from March 1 for a total of 3 days delay. This is misleading and greatly overstates the amount of time it takes between submission and clerk review. Another federal court has rejected a similar attempt by CNS to skew the data in a way that overstates the alleged delays. *Harris*, 2022 WL 17850125 at *40 (delays measured "in terms of court days and business hours, *i.e.*, when the courts are open to the public"). As that court correctly noted, the First Amendment "does not require the impossible" and, "[i]f the courthouse is not open for business then the time of closure cannot be charged as a delay." *Id.*

As such, when the proper analysis is done as to the time between submission and acceptance during the timeframe from which data was pulled, almost 85% of complaints in the A.A. filing fee category were reviewed within eight business hours of submission. Dkt. 60-18, ¶

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 15**

20(h). And the average time between submission and review was 4.82 business hours statewide for all initial civil filings (not just A.A. filings). Dkt. 60-21. In addition, recognizing the clerk's load is all filings, not just initial filings, the average time between submission and review for all filings was 3.68 hours. Dkt. 60-20. This difference in an hour also illustrates the importance of the time it takes for clerks to review initial complaints given items like filing fees, proper venue, proper court, a case information sheet, (*see* I.R.C.P. 3(d)), and creating a new case in the case management system (*see* Dkt. 60-16 at 18).

### ii.    *The time between submission and review is justified when weighed against the reasons for providing access upon acceptance for filing.*

The time between submission and clerk review in Idaho is insignificant, with the great majority of complaints accepted within eight business hours. Dkt. 60-18, ¶ 20. About 65% of A.A. complaints are reviewed in less than three business hours and the average time between submission and review of all initial filings is 4.82 hours. *Id.*, *see also* Dkt. 60-21. This minimal delay is justified when weighed against providing pre-review access to complaints that have not yet been accepted into the court's Case Management System. Put another way, there are justifiable reasons for *not* implementing either option proposed by CNS for pre-review access to submitted complaints.

As discussed in Omundson's summary judgment memorandum, clerks serve an important gatekeeping function. Clerks are not dispensable as CNS impliedly suggests. Clerk review ensures filing errors are efficiently addressed on the front end to maintain the integrity of the judicial record by rejecting certain types of filings due to errors that need to be corrected before a case is initiated. *See e.g.* Krames Declaration (Bonner County often receives complaints intended for Bonneville County). Clerk review before acceptance also assists judges and their staff so they do not have to spend time and resources responding to filing errors that could have been caught by the clerk prior to acceptance into the court's official record. Dkt. 60-2 at 18-20. Neither option

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 16**

CNS presents as an alternative is reasonable.

Although CNS is not entitled to immediate access to newly submitted complaints, the only two options it presents to the Court provide for exactly that. Neither option presents a reasonable alternative for providing access prior to clerk review.

The Press Review Queue is not a reasonable alternative for the following reasons:

- It would require an amendment to the Idaho Supreme Court's contract with Tyler, and Tyler has not agreed to comply with terms and conditions relating to document security required by the Idaho Supreme Court, Dkt. 60-1, ¶¶ 40-45;
- It presents serious security concerns, which have not been adequately addressed by Tyler. Dkt. 60-1, ¶ 46;
- It would cost a minimum of $108,000 annually (price would be "significantly higher" if Tyler agreed to comply with the Idaho Supreme Court's security requirements), which would require additional funding from the Idaho legislature or, in the absence of additional funding, current technology, products, services, or projects for Idaho Courts would have to be reduced or eliminated to divert funding for the Press Review Queue, Dkt. 60-1, ¶¶ 47-50;
- It erodes public confidence in Idaho Courts since it allows for publication of complaints that have not yet initiated a lawsuit and may never initiate a lawsuit if they are rejected for filing and not resubmitted, Dkt. 60-1, ¶¶ 51-53;
- It could be misused to publish confidential or inflammatory information and does not protect against inadvertent or malicious dissemination of information, Dkt. 60-1, ¶¶ 54-55.

The Press Review Queue is also not protected against web scraping software and "there's an implied assumption that they – the bots would have access to the environment through the user credentials." Dkt. 59-5, Derrick Depo. at 64:6-65:6. CNS uses a bot to perform sweeps of new civil cases on public court sites. Dkt. 60-7 at 102:6-103:2, 105:1-106:1 (referring to the automated program as a "spider," "bot," and "crawler"), Ex. K at CNS_000003 (CNS's Daily Reports Style Manual instructs reporters not to report on tax cases with the notation that "Though your spider might return them, the entries should be deleted from your report before publishing."). The *Harris* case from Maryland provides further evidence of CNS's real motivations for demanding a Press Review Queue. In that case, defendants implemented a new queue for submitted civil complaints, which substantially expedited the time between submission and review since new complaints

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 17

essentially got to cut to the front of the line. *Harris*, 2022 WL 1780125 at *5. Data from Tyler showed the statewide average and median business hours from submission to review were 1.5 and 0.75, respectively. *Id.* at *42. This still was not good enough for CNS.

Another CNS case filed in Virginia further illustrates that CNS's real concern is the ease of accessing complaints, not timing. *Hade*, 2022 WL 4485177, at *1. In that case, CNS challenged statutes that (1) denied remote access to nonconfidential civil court records to non-Virginia-barred attorneys (albeit the public could access such records at the courthouse) and (2) prohibited individuals with remote access from selling or redistributing data obtained from these court records. *Id.* at *1. The reasons for denying remote access to the press and public was primarily because of bots mining Virginia's publicly available court databases for personally identifiable information, privacy concerns, and preventing against data mining. *Id.* at *4. The district court granted summary judgment in favor of the defendant, finding both laws passed constitutionally scrutiny and reasoning that "[c]ommon sense and logic support the notion that if any individual with electronic access to all nonconfidential civil court records could freely sell, post, or redistribute such data to third parties, it could jeopardize citizens' privacy and security as well as the orderly and efficient administration of its justice system." *Id.* at *13. Those same concerns ring true in this case.

Auto Accept is not a reasonable alternative for the following reasons:

- Auto Accept would be detrimental to litigants because filing issues that could be addressed on the front end through clerk review may go unnoticed for a substantial period of time, and could result in the complaint being time barred if it was filed near the statute of limitations, Dkt. 60-1, ¶ 61;
- Judicial action would be required to address filing errors that could have been caught by clerk review, which would increase the already full workloads of Idaho's judges and court staff, Dkt. 60-1, ¶¶ 62-63;
- Auto Accept cannot determine whether the court filing fee was provided and creates issues relating to the refunding of fees, Dkt. 60-1, ¶¶ 64-65;
- Auto Accept eliminates the clerk's ability to directly communicate with filers through eFile & Serve, which would greatly increase the amount of time it would take to address

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 18

filing errors with complaints that have been automatically accepted, Dkt. 60-1, ¶¶ 66-67; and

• Auto Accept cannot protect against malicious filings, Dkt. 60-1, ¶¶ 68-69.

Using Auto Accept for newly submitted complaints is particularly impractical because auto accepting a complaint that should have been rejected (e.g. it was filed in the wrong county) does not just result in a particular filing in the docket that needs to be removed or corrected; it results in the initiation of an actual lawsuit that would require judicial action to be dismissed.

In addition, neither option prevents against the disclosure of confidential or sensitive information, which is of critical importance because Idaho Courts would not be able to backtrack the improper disclosure of such information if the Press Review Queue or Auto Accept were implemented. As the United State Court for the District of Maryland reasoned, noting the severe consequences improperly disclosed information can have:

> Moreover, CNS's argument that any error in a submission may be corrected after the submission has been made public is patently flawed. That is tantamount to closing the barn door after the horse has escaped. The leaking of confidential information, even for a few hours, can have severe consequences with regard to a party's privacy, safety, and economic interests.

*Harris*, 2022 WL 17850125, at *35. The Maryland Court went on to address the very issues Idaho's courts recognize, which is that the clerks assist in verifying confidential information is not inadvertently (or intentionally) made public:

> And, it is no answer that the burden is on the filer to identify confidential information, as CNS suggests. To be sure, filers are supposed to redact confidential information. But, merely because they have that responsibility, it does not mean that they will do so with precision. As the Conference of Chief Justices observed in an amicus brief (ECF 50-6), knowing what records are meant to be confidential can be a "daunting task," *id.* at 37, and addressing "filer mistakes has always been part of the equation" for clerical staff. *Id.* at 38. It is certainly appropriate for clerical staff to check submissions, if done within a reasonable time.

*Id.* Although CNS claims Auto Accept is an unproblematic option because it is purportedly similar to PACER (not a Tyler system), the volume of new filings in Idaho's state courts versus federal

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 19

court is significantly different.  For example, there were over 403,000 initial civil case filings in Idaho between January 1, 2021 and November 18, 2022, whereas fewer than 500 cases were filed in the United State District Court for the District of Idaho during this same timeframe. As such, any auto-accept implications would be more than 800-fold for the Idaho courts.

In addition, PACER's "auto accept" system has created the exact same problems relating to improper disclosure of information the Idaho Courts seek to avoid by requiring clerk review before acceptance. Declaration of Keely E. Duke in Opposition to Courthouse News Service's Motion for Summary Judgment ("Duke Decl."), Ex. A. On August 4, 2022, United States Senator Ron Wyden sent a letter to Chief Justice John Roberts stating in relevant part:

> I write with concern that federal courts are failing in their legal obligations to protect Americans' private information, putting Americans at needless risk of identify theft, stalking, and other harms.
> . . .
> Each year, federal courts make available to the public court filings containing tens of thousands of Americans' personal information, such as their Social Security Numbers (SSNs) and dates of birth.

*Id.* As Senator Wyden noted, placing the burden on the filer to ensure "court filings are scrubbed of personal information" does not protect against the disclosure of such information because filers make mistakes. *Id.*

Further, although CNS implies Tyler's Auto Accept and Press Review Queue are widely used by its customers, they are not. A mere two states and 24 counties across the country have implemented a Tyler Press Review Tool for certain types of filings. Dkt. 59-3. CNS claims "twenty-five state courts" are using the Press Review Tool, implying it is being used statewide; it is not. Dkt. 61-2, ¶ 87. As for Auto Accept, only one state has Auto Accept configured such that certain initial filings are Auto Accepted, yet CNS represents that "[m]ore than twenty state courts or jurisdictions currently use Tyler's auto-accept[.]" *See* Dkt. 59-4, Dkt. 61-2, ¶ 80.

Apparently recognizing its misrepresentation of the number of states and counties using

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 20**

Tyler's Auto Accept or Press Review Queue, CNS devotes much of its argument to listing the variations of press review queues or auto accept options implemented by courts that **do not** use Tyler's eFile & Serve. These purported alternatives are irrelevant. Tyler is the Idaho Supreme Court's e-filing software vendor. The Idaho Supreme Court has spent millions of dollars over the last decade to implement Tyler's software statewide. *See* Declaration of Michelle Crist-Aguiar. It is not justifiable or reasonable for CNS to suggest the Idaho Supreme Court should be required to change its vendor, breach its contract with Tyler, enter into a contract with a new e-filing vendor, and completely overhaul Idaho's e-filing system. As discussed above, this lawsuit is not about the timing of access, it is about the convenience of access for CNS. CNS is seeking immediate access, which is not required. *See* Section III.A.3.a, *supra.* By fixating on immediate or near immediate access (i.e. access within a "few minutes" of submission, according to Mr. Girdner, Dkt. 60-7 at 128:6-20) - access to which there is no constitutional support, *see Planet*, 947 F.3d at 585 – CNS overlooks the uncontroverted data showing newly submitted complaints are promptly reviewed by Idaho clerks typically within a few business hours of submission. Even if a right of timely access attaches to submitted complaints, the average time between submission and review is not long enough to give rise to a constitutional violation, especially when weighed against the justifications for requiring clerk review. As such, the data CNS has had in Idaho – and wishes it could ignore – highlights that this lawsuit is not truly about timely access to complaints that have initiated a lawsuit, but instead is about convenience of access for CNS through automatic means, versus reporters going to the courthouses.

**B.     CNS has not established causation.**

CNS cannot establish the statewide practice of providing access upon acceptance for filing is the proximate cause of the alleged delays. To state a claim under 43 U.S.C. § 1983, a plaintiff must allege a violation of a constitutional right proximately caused by conduct of a person acting

under color of state law. *Johnson v. Valdez*, 2013 WL 4494992, at *4 (D. Idaho Aug. 16, 2013),

*see also Russo v. United States*, 37 F. Supp. 2d 450, 454 (E.D. Va. 1999) ("it is well-settled that

standard tort proximate cause principles apply" in Section 1983 cases).

As discussed above, the vast majority of newly submitted complaints (85%) are reviewed

within eight business hours, with about two-thirds accepted within three business hours and a

statewide average of all initial filings within 4.82 hours between submission and clerk review. Dkt.

60-18, ¶ 20, Dkt. 60-21. Where clerk review has taken longer, it has typically been because of

staffing issues, clerks being out sick, and other justifiable reasons for review occasionally taking

more than eight business hours. The following are examples and explanations for such timing:

- Complaints in Gooding County are reviewed within 1.06 hours of submission on average. Declaration of Angie Cooke, ¶ 4. There were a few isolated incidents of clerk review taking longer than eight business hours, which coincided with times the clerk's office was particularly short staffed. *Id.*, ¶¶ 8-11.
- The Clearwater County clerk's office has also experienced staffing shortages impacting the time between submission and clerk review. Supplemental Declaration of Roland Gammill.
- Boise County clerk's office has a very small staff and has struggled to fill vacancies due to a limited applicant pool. Declaration of Mary Prisco, ¶¶ 6, 11. The handful of complaints that took longer than eight business hours to review coincided with time periods when the already small office was short-staffed due to vacation, in-court duties, training new employees, or having a vacant position. *Id.* ¶¶ 5-10.
- Due to budgetary issues, Kootenai County had to request additional funding from the county commissioners to hire more clerks. Dkt. 23-1, ¶¶ 6-15.
- The Bonner County clerk's office is extremely limited in its ability to hire additional clerks, both because of budgetary restrictions and the limited applicant pool. Declaration of Charlene Krames, ¶ 7.
- In Bannock County, about 95% of complaints were reviewed in under 8 business hours. Supplemental Declaration of Kerry Hong, ¶ 4. The few instances where clerk review took longer than 8 business hours coincided with the two clerks in charge of the Civil Queue being out on medical/FMLA leave, as well as staffing turnover and new hires. *Id.*, ¶ 7.

These are precisely the types of issues that justify incidental delays in access to complaints.

*Planet III*, 947 F.3d at 599 (discussing delays caused by budgetary crisis that resulted in budget

control measures, administrative vacancies and noting the "First Amendment does not require us

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY
JUDGMENT [Dkt. 61]- 22**

to second guess the careful deliberations the state court undertook in deciding how to manage scarce resources"). Relatedly, these types of incidental delays do not give rise to a constitutional violation in the first place. The Ninth Circuit recognized that delays resulting from staffing issues or budgetary constraints do not give rise to a violation of the qualified right of timely access. *See Planet III*, 947 F.3d at 599-600. *Planet III* does not identify a bright line for timing of access, and other courts interpreting similarly nebulous standards have crafted flexible standards that account for these types of issues. For example, in *Harris* the court held "the First Amendment requires the defendants to provide contemporaneous access to civil complaints, meaning access on the same day that it is submitted, insofar as practicable, and if not practicable, within one court day." 2022 WL 17850125 at *40. This standard is calculated based on "business hours" and does not apply to delays caused by "extraordinary circumstances" (e.g. delays caused by the COVID-19 pandemic) *Id.* at *39-40. The Tenth Circuit rejected a "bright-line, five-business-hour rule" because it did not accommodate the state court's interests "in extraordinary circumstances where the five-business-hour rule cannot reasonably be met." *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1273 (10th Cir. 2022). In the limited instances where review has taken more than eight hours, it has been due to extraordinary circumstances that have made it not practicable to review complaints more promptly. This does not give rise to a First Amendment violation.

On the other hand, many of Idaho's counties have not had a *single* complaint reviewed after eight business hours of submission during the twenty-month period data was collected for complaints in the A.A. filing fee category. Duke Decl., Ex. C (no complaints took longer than eight business hours for review in Benewah, Boundary, Clark, Custer, Elmore, Idaho, Lewis, Lincoln, Minidoka, Nez Perce, and Valley counties during a twenty-month period). Further, one of Idaho's largest counties, Bonneville, only had three complaints that took longer than eight business hours for clerk review during a twenty-month period. *Id.* Another one of Idaho's largest counties, Twin

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 23

Falls, had only two complaints that took longer than eight business hours for clerk review. *Id*.

Consequently, CNS cannot establish that a statewide policy is causing the alleged unconstitutional delays in access to new civil complaints. Many counties can review complaints almost immediately based on their staffing levels. In counties that cannot always review complaints as quickly, it is due to decisions those counties have to make regarding management of resources and allocation of scarce court personnel. Those are not Omundson's decisions to make. Because the submission to review time varies on a county-by-county basis, the alleged delays cannot be attributed to a statewide policy. Therefore, CNS cannot meet its burden of showing the alleged constitutional violation is proximately caused by a policy implemented or enforced by Omundson.

**C.    CNS is not entitled to a permanent injunction because it has not demonstrated an irreparable injury, that the balance of equities tips in its favor, or that the public interest would not be disserved by a permanent injunction.**

   **1.   CNS has not demonstrated an irreparable injury.**

It is undisputed CNS and the public have access to accepted complaints immediately.  Dkt. 60-1, ¶ 20(g).  With respect to not receiving access to submitted but not yet accepted complaints, CNS has not been irreparably harmed by having to wait a few hours after submission and before acceptance to review newly filed complaints that have actually initiated a lawsuit. As discussed above, according to CNS's own Idaho reporter, CNS has no interest in reviewing submitted but not yet filed complaints because she would not want to report on a complaint that has not been filed with the court. Dkt. 60-8 at 58:25-59:3.

CNS's concerns about "stale news" also ring hollow based on its own reporting practices, as discussed above in Section III.A.3.b.i. The *Big Sky* Report commonly reports on complaints filed weeks before that day's report. Duke Decl., Ex. B. For Montana and Wyoming state court cases, CNS routinely waits weeks to report on newly filed complaints. *See id.* And in the days of

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY
JUDGMENT [Dkt. 61]- 24

paper filing in Idaho, CNS would only visit certain counties on a weekly or monthly basis and never reviewed complaints for the majority of Idaho's counties (instead only reviewing docket reports showing newly *filed* complaints). Dkt. 60-1, ¶ 23. Thus, CNS's reporting objectives are not defeated or even impacted by having to wait a few hours for a clerk to review a complaint before rejecting or accepting it; CNS reports on newly filed civil complaints irrespective of when they are filed, including when delays in reporting are caused by CNS's own business practices.

In addition, despite claiming there was a delay in access to four "newsworthy" complaints, CNS apparently did not report on a single one of them. Dkt. 60-8 at 147:5-148:23. Also, the time between submission and access did not result in this news becoming "stale," as evidenced by the fact that other news outlets reported on them.[5] Importantly, Ms. Valenti's sworn testimony about delay is flatly contradicted by an article from another news outlet. Ms. Valenti swore under oath that the "wake zone" complaint in Kootenai County was submitted on June 8, 2021 but access was "withheld" until June 25, 2021. Dkt. 62, ¶ 7. The Coeur d'Alene Press reported on this complaint on **June 10, 2021**.[6] Further, the data from Tyler shows the delays are nowhere near as long as CNS represents them to be. For example, the Von Ehlinger complaint was submitted at 4:54 p.m. on a Thursday and reviewed at 8:39 a.m. on a Friday, meaning the time between submission and review was only 45 business minutes. Dkt. 60-19. CNS claims access was "withheld" for a full day. Dkt. 62, ¶ 7. The plane crash complaint was submitted on June 24, 2021, reviewed within 34 minutes, and rejected because a page was missing. Dkt. 60-19. Based on the three-day grace period provided by IREFS 13(c), the filing date on the complaint was listed as June 24, 2021 resubmission after this date. Thus, access was not "withheld" for six days, as CNS wrongly claims. Dkt. 62, ¶ 7.

---

[5] *See e.g.* https://lmtribune.com/northwest/alleged-victim-in-von-ehlinger-case-sets-stage-for-civil-lawsuit/article_e55adbff-4a6d-56cb-99f2-efaa0aae1f21.html (Von Ehlinger suit).
[6] https://cdapress.com/news/2021/jun/10/rocking-boat/

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 25**

CNS has not been irreparably harmed by waiting a few hours for clerk review. CNS's Idaho reporter does not have any interest in reporting on complaints that have not been accepted and CNS reports on complaints in its *Big Sky* report irrespective of when the complaint was filed.

### 2.     The balancing of hardships weighs against a permanent injunction.

The hardship to CNS is non-existent. It has immediate access to complaints accepted by the court clerks. As for submitted, but not accepted complaints, CNS has access to newly submitted complaints within a few business hours of submission once the complaint is accepted for filing. CNS also admitted it does not want to report on cases that have not yet been filed, as testified to by Ms. Valenti. Dkt. 60-8 at 58:25-59:3. In accordance with this testimony, the cases in the *Big Sky Report* identify the case number and occasionally list the assigned judge. Duke Decl., Ex. B. Submitted but not yet accepted complaints do not have a case number and have not been assigned to a judge. Dkt. 60-1, ¶ 20. As such, submitted complaints are not, as Ms. Valenti testified, something that CNS includes in the *Big Sky Report*. Dkt. 60-8 at 58:25-59:3.

On the other hand, the hardship on Idaho's courts if a permanent injunction issued would be immense. First, both Auto Accept and the Press Review Queue—the only Tyler options for providing the immediate access upon submission CNS is demanding—would place a massive and costly burden on Idaho's Courts. *See* Section III.A.3.b.ii, *supra.* "The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press." *Planet III*, 947 F.3d at 596.

The Press Review Queue also comes with an annual subscription cost of at least $108,000. CNS claims this cost is not a certainty because Omundson has not yet engaged in contract negotiations with Tyler. Dkt. 61-1 at 25. This argument is misleading; Tyler's representative unequivocally testified that the annual subscription fee of $108,000 was non-negotiable and would be "significantly higher" if Tyler agreed to implement the security measures required by the Idaho

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 26

Supreme Court.[7] Dkt. 59-5, Derrick Depo., 70:23-71:16, 172:15-22. In addition, in order to obtain

the Press Review Queue, a contract amendment would be required and Tyler would need to agree

to the Idaho Supreme Court's security requirements. Dkt. 60-1, ¶¶40-44.

Auto Accept would also require the courts to unnecessarily and significantly shift and use

their limited resources to satisfy CNS's demand for immediate access to newly submitted

complaints. Auto Accept eliminates clerks' ability to review complaints through eFile & Serve

and correct errors on the front end, as opposed to after a complaint has been accepted for filing

and transferred to the case management system (at which time it is an official court record and

judicial action is needed to correct the error). Auto Accept would increase the already full workload

of District Judges and their staff since court intervention would be needed to address filing issues

that otherwise would have been caught by a clerk during the review process. Dkt. 60-1, ¶ 61, *see*

*also* Section III.A.3.b.ii, *supra*.

Idaho Courts are not required to expend and reallocate their judicial resources to satisfy

CNS's demand for immediate access to newly submitted complaints. *See Planet III*, 947 F.3d at

596.  Both Auto Accept and the Press Review Queue require precisely that. The expenditure and

reallocation of judicial resources would be an incredible hardship to Idaho Courts that weighs

against the grant of a permanent injunction.

---

[7] The Press Review Queue also exposes Idaho Courts to a potential data breach. The Press Review
Queue does not protect against web scraping software, which CNS uses. Derrick Depo. At 64:6-
65:6. Similar web-scraping activities resulted in a massive and costly data breach in another public-
facing Tyler portal. Dkt. 60-11, 60-12. Thus, the Press Review Queue impacts Idaho's judicial
resources because it unnecessarily exposes Idaho Courts to a data breach and the significant costs
associated with such a breach. Case management and electronic filing systems are targets for
cyberattacks, as evidenced by the "widespread cybersecurity breaches" relating to vulnerabilities
in the federal judiciary's Case Management/Electronic Case Files System (CM/ECF) "that greatly
risk compromising highly sensitive non-public documents stored on CM/ECF, particularly sealed
filings." https://www.uscourts.gov/news/2021/01/06/judiciary-addresses-cybersecurity-breach-
extra-safeguards-protect-sensitive-court

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY
JUDGMENT [Dkt. 61]- 27**

Both Auto Accept and the Press Review Queue also impose a hardship on Idaho Courts because they come with risks that could undermine the public's confidence in the courts. Neither option prevents against the inadvertent disclosure of confidential information. Dkt. 60-1, ¶¶ 55, 68. In addition, the press and public may not understand that a complaint in the Press Review Queue is not an official court record, has not initiated a judicial proceeding, and may never initiate a judicial proceeding if rejected without successful and timely resubmission. Dkt. 60-1, ¶ 51. This could lead to confusion and skepticism about Idaho Courts where a complaint is viewed in the Press Review Queue—or reported on by CNS without correction—but does not result in a judicial proceeding due to a filing error that goes uncorrected. Dkt. 61, ¶¶ 51-52.

**3.      The public interest factors weigh against a permanent injunction.**

Providing CNS with access to submitted complaints few hours before they are accepted for filing does not benefit the public. The *Big Sky* Report is not available to the public; it is only available to the 51 law firms who subscribe to it. Dkt. 60-1, ¶ 1. Thus, providing CNS with access to newly submitted complaints does not provide the public with any insight about new lawsuits (which may not be initiated if the submitted complaint is rejected for filing). Providing the press and public as a whole with access to complaints that have not been accepted for filing via the Press Review Queue does not benefit the public. Such complaints have not yet initiated a lawsuit, and therefore provide no insight into how the courts are functioning. Providing access to submitted but not yet accepted complaints could cause confusion and undermine the public's confidence in the courts because individuals who view complaints via the Press Review Queue may not understand that such documents are not official court records and have not initiated a lawsuit. Dkt. 60-1, ¶¶51-53, *see also* IREFS 3 (defining official court record).

Auto Accept is also counter to the public interest because it could have significant detrimental impacts on individuals who need to use the court system. Clerk review allows the clerk

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 28

to notify a filer of errors with the submission so they may be corrected, in which case the original submission date will apply if resubmitted within three days. Dkt. 60-1, ¶ 61. Auto Accept effectively eliminates this three-day grace period. This would be extremely harmful to litigants, particularly those who file a complaint on or near the expiration of the statute of limitations. *Id*. They may be barred from bringing their claim if a filing error that was not caught on the front end results in dismissal (e.g. a complaint filed in Adams County instead of Ada is dismissed via a Rule 12(b)(2) motion for improper venue). *Id*. This could disproportionately impact pro se litigants, who may not be as familiar with filing requirements. *Id.*

Relatedly, by taking clerk review out of the equation, Auto Accept undermines the public interest in avoiding the disclosure of confidential information. The Press Review Queue does not have any features to prevent against the inadvertent or malicious submission of complaints that include confidential information, which will be available to the public the entire time they sit in the Press Review Queue (and in perpetuity if a submitted complaint is downloaded from the queue). Dkt. 60-1, ¶¶ 54-55. Auto Accept also cannot protect against malicious or inadvertent disclosure of confidential information; if an envelope meets the criteria for acceptance, it is filed regardless of the substance of the document or documents therein. Dkt. 60-1, ¶ 68.

Finally, Auto Accept undermines the public interest because increasing the workload of judges, court staff, and clerks does not just impact the courts; this impacts the public as well because it will jam up court operations. It takes clerks at least an hour to correct a filing error once a document has been transferred into Case Manager. Dkt. 60-37, ¶ 6. The cumulative effects of each filing taking an hour to fix—instead of minutes or even seconds—would significantly increase the court's workload. The hours and hours spent fixing errors that could have otherwise been corrected in mere minutes would detract from the time clerks, court personnel, and judges could be devoting to moving cases through the judicial system and assisting members of the public.

MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 29

Idaho's Courts, particularly those in smaller counties, are already stretched exceptionally thin. *See e.g.* Wood Decl. (Dkt. 60-41), Cooke Decl., Gammill Decl., Krames Decl. Clerk's offices across the state are utilizing their limited personnel as effectively as they can to fulfill their myriad responsibilities, which stretch far beyond review of the subset of newly submitted complaints CNS deems relevant. *See e.g.* Cooke Decl., ¶ 12, Gammill Decl., ¶ 6.

In short, the public benefits from a court system that operates efficiently, and review of newly submitted complaints is one small component of the court system. Overhauling Idaho's clerk review process would affect the court system in its entirety by increasing workloads across the board. This is not beneficial to the public because the entire court system would be operating less efficiently. Thus, the public interest factor weighs against granting a permanent injunction.

## IV.  CONCLUSION

Omundson respectfully requests this Court deny CNS's Motion for Summary Judgment.

DATED this 25th day of January, 2023.

DUKE EVETT, PLLC


By /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

**MEMORNDUM IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 61]- 30**

## CERTIFICATE OF SERVICE

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF LINDSEY BRATCHER** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Lindsey Bratcher, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Payette County Clerk.

3.      In my role as Payette County Clerk, I am familiar with factors that affect the time it takes clerks to review submissions.

4.      I have reviewed a spreadsheet listing the complaints filed in the A.A. filing fee category between January 1, 2021 through July 31, 2022 that took longer than 8 business hours to review.

**DECLARATION OF LINDSEY BRATCHER - 1**

5.      Some of the complaints that took more than eight hours for clerk review were filed when our office was experiencing staffing shortages.

6.      We hired two Magistrate Clerks in May 2021. Those two positions had been vacant for months, meaning we were short-staffed by two clerks. New clerks require training and are not able to process submissions as quickly as more experienced clerks. Thus, hiring new clerks does not automatically translate to quicker processing times.

7.      In March 2022, a new Magistrate Clerk was hired because another Magistrate Clerk had transferred to District Court in February. The newly hired Magistrate Clerk left in August 2022. By the time she left (about five months after her start date), she was not experienced enough to aid in eFile & Serve without assistance. Clerks are responsible for much more than eFile & Serve, and it takes a fair amount of time for them to learn how to do the job and get up to speed.

8.      In September 2022, a Magistrate Clerk resigned and that position has yet to be filled.

9.      The Primary Election was in May 2022. Our District Court clerks work within the Payette County Clerk's Office. Whenever there is a big election, we all have to assist voters which interrupts our other job duties. This will result in delays in processing documents awaiting clerk review in eFile & Serve.

10.     In June 2022, my Chief Deputy/District Court Clerk began training to transition out of in-court work. She has been training a new clerk and a Magistrate Clerk for District Court work.

11.     The summers are generally a time when clerks take vacations. Based on how small our office is, even one person being out of office impacts the workload of the other clerks. This can result in clerk review through eFile & Serve taking longer than normal.

12.     Filling clerk vacancies is impacted by budgetary considerations. Our starting wage

**DECLARATION OF LINDSEY BRATCHER - 2**

is $17.00 per hour. I have worked to get this wage increased (last year it was $15.00 per hour) but this is not a livable wage in today's world. This can make it difficult to attract qualified applicants. I've also worked to increase the wages of existing employees so we can retain experienced clerks. I have a set budget for wages, and I have to balance considerations such as filling vacant positions, paying current employees a high enough wage that they'll stay, and ensuring enough funds are retained in the budget for retirement payouts (6 of my 14.5 employees are of retirement age).

13.     The Payette County clerk's office works diligently to review newly submitted complaints as soon possible, but they have to balance document review with their other job duties. This does not always allow for immediate review of newly submitted complaints. Nevertheless, most submissions are reviewed in under one business day.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 24th day of January, 2023.

Lindsey Bratcher

**DECLARATION OF LINDSEY BRATCHER - 3**

## CERTIFICATE OF SERVICE

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF LINDSEY BRATCHER - 4**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                    Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity<br>as Administrative Director of Idaho Courts,<br><br>                    Defendants. | CASE NO. 1:21-CV-00305-REP<br><br>**SUPPLEMENTAL DECLARATION<br>OF EMILY CARROLL** |

I, Emily Carroll, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I am a Data and Evaluation Manager for the State of Idaho Judicial Branch. As the Data and Evaluation Manager, I am responsible for the management of all research and data analytics for the Idaho Supreme Court, its committees, and for the District Court leadership. I also serve as the primary point of contact for all data analytic research efforts for the Idaho courts statewide.

3.      I am aware of the license the Idaho Supreme Court has with Tyler Technologies,

**SUPPLEMENTAL DECLARATION OF EMILY CARROLL - 1**

Inc. ("Tyler") for use of the eFile & Serve software program. Tyler is a third-party software provider that provides its software solutions and applications to numerous court systems across the United States. With respect to eFile & Serve, Tyler is the custodian of the data maintained on eFile & Serve.

4.      I have reviewed the Declaration of Jimmy Shimabukuro in Support of Plaintiff Courthouse News Service's Motion for Summary Judgment (Dkt. 61-3) and the Declaration of Adam Angione in Support of Plaintiff Courthouse News Service's Motion for Summary Judgment (Dkt. 61-4).

5.      The calculations by Mr. Shimabukuro and Mr. Angione define one day as 24 hours, whereas the calculations in my prior declaration (Dkt. 60-18) defined one day as 9 business hours (8:00 a.m. to 5:00 p.m. on business days).

6.      Our calculations were based on time from submission to clerk review, whereas CNS calculated time from submission to acceptance. This distinction should not have a significant impact on the data analysis because the time between clerk review and acceptance is minimal (i.e. a matter of seconds or minutes). For example, I recalculated based on acceptance time and 86% of accepted filings were accepted (and therefore made public) within nine business hours (6,144 of 7,162 accepted complaints). Similarly 86% of all submitted filings were reviewed by a clerk within nine business hours (7,495 of 8,645 complaints). CNS's use of "acceptance" as the metric for calculating time omits complaints that are rejected for filing from its analysis.

7.      Our calculations take into account the date *and* time to calculate the number of business hours between submission and clerk review. One day is defined as nine business hours, meaning if a filing is submitted on a Tuesday at 4:00 p.m. and reviewed on Wednesday at 9:00 a.m., the time from submission to review is two business hours. CNS does not take into account

**SUPPLEMENTAL DECLARATION OF EMILY CARROLL - 2**

**ER-285**

the time between each event; they calculate time elapsed as a difference between two days. This means if a filing is submitted at 4:00 p.m. on a Tuesday and accepted for filing on Wednesday at 9:00 a.m., CNS calculates the time from submission to acceptance as one day (which CNS defines as 24 hours).

8.      We used the following measures to calculate business time from submission to clerk review, which were based on the definition of one day as nine business hours:

    a.    Effective Submitted Date: Business date of submission, converting weekends/holidays to the next business date

    b.    Effective Submitted Weekday: Business weekday of submission, converting weekends to the next business weekday

    c.    Effective Submitted Time: Time of submission, converting anything submitted before 8:00am to 8:00am on the *same* business day or anything after 5:00pm to 8:00am for the *next* business day

    d.    ReviewedDate: Date submitted envelope was reviewed by a clerk (*excluded* any envelope reviewed on a weekend/holiday). Note: this measure was *not* converted like Effective Submitted Date, and we just excluded these items from the analysis

    e.    ReviewedWeekday: Weekday submitted envelope was reviewed by a clerk (excluded any envelope reviewed on a weekend)

    f.    ReviewedTime: Weekday submitted envelope was reviewed by a clerk (*excluded* any envelope reviewed before 8:00am or after 5:00pm). Note: this measure was *not* converted like Effective Submitted Time, and we just excluded these items from the analysis

**SUPPLEMENTAL DECLARATION OF EMILY CARROLL - 3**

g.    Business Time from Submission to Review: Number of business days/hours/min from the Effective Submitted Date/Time to the ReviewedDate/Time

9.    Mr. Shimabukuro used the following measures to calculate time from submission to acceptance, based on the definition of one day as 24 hours:

a.    SubmittedDate: Date of submission

b.    CreateDocumentDate: Date that the clerk accepted the envelope and it was created in Odyssey

c.    Delay (calendar days): The difference between SubmittedDate and CreateDocumentDate in number of days based on 365 days in a year for each record. (converts anything submitted on holidays to next business day, but keeps weekends in calculation)

d.    Delay (court days): The difference between the SubmittedDate and CreateDocumentDate in number of days (converts anything submitted on weekends/holidays to next business day)

10.    Mr. Angione used the following measures to calculate time from submission to acceptance, based on the definition of one day as 24 hours:

a.    SubmittedDate: Date of submission

b.    CreateDocumentDate: Date that the clerk accepted the envelope and it was created in Odyssey

c.    CNSCalendarDaysDelay: The difference between SubmittedDate and CreateDocumentDate in number of days based on 365 days in a year for each record

**SUPPLEMENTAL DECLARATION OF EMILY CARROLL - 4**

      d.     ADJCourtDaysDelay: The difference between the SubmittedDate and CreateDocumentDate in number of days (converts anything submitted or made public on weekends/holidays to next business day)

11.     The formulas in Mr. Shimabukuro's spreadsheet and Mr. Angione's spreadsheet (columns W-AG, tab 1 in both spreadsheets) only take into account the difference in dates between Submitted Date (column N) and Access Date (column R). Neither Submitted Time nor Access Time are configured into their formulas. For example, for filing ID 8728080, the Submitted date/time was May 2, 2022 at 18:11 (i.e. submitted after business hours) and the Access date/time was May 3, 2022 at 14:14. Mr. Shimabukuro and Mr. Angione calculate this as a one day delay from submission to public access. If delay is calculated from submission to acceptance/access (the metric CNS uses), it is only six hours and fourteen minutes.

12.     The formula used in the "Calculation (calendar days)" tab in Mr. Shimabukuro's spreadsheet excludes observed holidays, but includes weekends, meaning he calculates number of days elapsed between submission and access to include Saturdays and Sundays when the courts are not open.

13.     The formula used in the "Calculation (court days)" tab in Mr. Shimabukuro's declaration spreadsheet excludes observed holidays and weekends. However, the formula still fails to account for submission time and acceptance time; it only calculates based on dates.

      DATED this 11th day of January, 2023.

                                     Emily Carroll

**SUPPLEMENTAL DECLARATION OF EMILY CARROLL - 5**

**<u>CERTIFICATE OF SERVICE</u>**

 I hereby certify that on 25th day of January, 2023 I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

        /s/Keely E. Duke

        Keely E. Duke

**SUPPLEMENTAL DECLARATION OF EMILY CARROLL - 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF ANGIE COOKE** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Angie Cooke, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Gooding County District Court Deputy Clerk.

3.      In my role as Deputy Clerk, I am familiar with factors that affect the time it takes clerks to review submissions.

4.      From January 4, 2021 through July 31, 2022, the Gooding County clerk's office processed a total of 20,227 filings, with an average of 1.06 hours between submission and review. Attached as **Exhibit A** is a true and correct copy of a screenshot of the Idaho Supreme Court's

**DECLARATION OF ANGIE COOKE - 1**

**ER-290**

dashboard showing the total number of filings in Gooding County from January 4, 2021 through July 31, 2022.

5.      From January 1, 2021 through July 31, 2022, the Gooding County clerk's office reviewed 105 complaints filed in the A.A. filing fee category. Only eight of those complaints were reviewed more than eight business hours after submission.

6.      The Gooding County clerk's office has four magistrate clerks. I am the only district court clerk.

7.      I am typically the only clerk who reviews district court filings. There are two other clerks who can review district court filings, but they will have me review a filing if they have any issues or questions about the particular filing.

8.      I have reviewed a spreadsheet listing the complaints that took longer than 8 hours to review, a true and correct copy of which is attached as **Exhibit B**. Our office was very short staffed in May 2021. Two clerks quit around this time. In late May 2021, I was training two new clerks. That training began on May 24, 2021. One experienced clerk was out on vacation and another experienced clerk was out on FMLA leave. Most of the complaints that took longer than eight hours to review were submitted around this time.

9.      Our office was also short staffed in May 2022. Three of the clerks were out for personal reasons.

10.     Previously, the district office was closed on Fridays and only two clerks worked at the magistrate's office on Fridays. We have since made arrangements to ensure clerks are available to review district court filings submitted on Fridays.

11.     I am in court the second and fourth Tuesday of the month. During these days, I am not able to check the district court review queue until I am out of court.

**DECLARATION OF ANGIE COOKE - 2**

12.     The Gooding County clerk's office works diligently to review newly submitted complaints as soon possible, but they have to balance document review with their other job duties. This does not always allow for immediate review of newly submitted complaints. Nevertheless, the vast majority of submissions are reviewed in well under one business day; as discussed above, the average time between submission and clerk review is just over one hour.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this /2 day of January, 2023.

Angie Cooke

**DECLARATION OF ANGIE COOKE - 3**

## **CERTIFICATE OF SERVICE**

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw.com |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke

Keely E. Duke

**DECLARATION OF ANGIE COOKE - 4**

# Exhibit A

Idaho Electronic Filings | Time to Review by Month
IDAHO
Time to Review
Comparison: Before After
Submit Date
1/4/2021
7/31/2022
District
All
County
Gooding
Clear All Filters
Filings
Total Filings
20,227
Filings
Jan 2,257
Oct 952
Nov 990
Dec 1,124
Feb 1,738
Mar 2,307
Apr 2,282
May 2,183
Jun 2,245
Jul 2,192
Aug 1,120
Sep 834
Review
Rejection Rate
5%
Average Hours to Review
1.06
Rejection Rate
5%
District 5
Average Hours to Review
Jan 1
Oct 1
Nov 1
Dec 1
Feb 1
Mar 1
Apr 1
May 2
Jun 1
Jul 1
Aug 1
Sep 1
Same Day Reviews
Same Day Review
90%
Review Within 1 Day
100%
Review Within 2 Days
100%
% of Filings Reviewed Same Day
90%
District 5
% of Filings Reviewed Same Day
Jan 89%
Oct 94%
Nov 89%
Dec 91%
Feb 95%
Mar 94%
Apr 93%
May 80%
Jun 90%
Jul 94%
Aug 85%
Sep 93%
IDAHO SUPREME COURT | ADMINISTRATIVE OFFICE OF THE COURTS | DATA AND EVALUATION
Filters
Filters on all pages
DaystoReview
is greater than or equal to 0
HourstoReview
is greater than or equal to 0
ReviewDay
is not Saturday or Sunday
ReviewHour
is 8, 9, 10, 11, 12, 13, 14, 15, or 16



# Exhibit B

| Effective Submitted Date | Effective Submitted Weekday | Submitted Time | Effective Submitted Time | Reviewed Date | ReviewedWeekday | Reviewed Time | Business Time from Submission to Review |
|---|---|---|---|---|---|---|---|
| 1/12/2021 | Tuesday | 17:17 | 8:00 | 1/13/2021 | Wednesday | 12:19 | 0 days 13 hours 19 minutes |
| 5/21/2021 | Friday | 15:12 | 15:12 | 5/26/2021 | Wednesday | 13:26 | 1 days 1 hours 14 minutes |
| 5/26/2021 | Wednesday | 13:32 | 13:32 | 5/28/2021 | Friday | 8:22 | 0 days 12 hours 49 minutes |
| 5/27/2021 | Thursday | 12:24 | 12:24 | 5/28/2021 | Friday | 15:43 | 0 days 12 hours 19 minutes |
| 5/28/2021 | Friday | 8:01 | 8:01 | 6/1/2021 | Tuesday | 9:59 | 0 days 10 hours 57 minutes |
| 5/28/2021 | Friday | 8:01 | 8:01 | 6/1/2021 | Tuesday | 9:59 | 0 days 10 hours 57 minutes |
| 6/4/2021 | Friday | 9:58 | 9:58 | 6/7/2021 | Monday | 9:37 | 0 days 8 hours 39 minutes |
| 8/6/2021 | Friday | 7:42 | 8:00 | 8/9/2021 | Monday | 8:18 | 0 days 9 hours 18 minutes |
| 5/24/2022 | Tuesday | 8:56 | 8:56 | 5/25/2022 | Wednesday | 8:27 | 0 days 8 hours 30 minutes |

**DECLARATION OF ANGIE COOKE - 6**

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>            Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>           Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**DECLARATION OF MICHELLE CRIST-AGUIAR** |

I, Michelle Crist-Aguiar, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as the Director of Finance and Operations for the Idaho Supreme Court.

3.     In my role as Director of Finance and Operations, I am familiar with the Idaho Supreme Court's contract with Tyler Technologies, Inc. ("Tyler") and the amounts that have been paid pursuant to this contract.

4.     The Idaho Supreme Court has incurred substantial expense to implement Tyler's efiling software in Idaho Courts.

**DECLARATION OF MICHELLE CRIST-AGUIAR - 1**

5.      The Idaho Supreme Court and Tyler entered into a Software License and Professional Services Agreement ("License Agreement"), effective August 28, 2013.

6.      Under the terms of the License Agreement, the Idaho Supreme Court was required to pay a software license fee of $2,400,000 over certain installments. The Idaho Supreme Court has paid the entirety of this license fee.

7.      In addition to the license fee, the Idaho Supreme Court incurred various other costs associated with implementing Tyler's efiling software in Idaho's Courts, including professional services and variable deliverable fees associated with installation and paying for travel costs for Tyler employees to set up the software in Idaho Courts.

8.      The Idaho Supreme Court also pays a licensing fee bi-annually to use Tyler's efiling software. The amount of this fee varies, as Tyler is permitted to increase this fee up to 3.5% annually. This last year, the two bi-annual payments for the license fee totaled $563,093.00.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 25th day of January, 2023.

<div style="text-align:right">

Michelle Crist-Aguiar

Digitally signed by
Michelle Crist-Aguiar
Date: 2023.01.25
16:36:04 -07'00'

Michelle Crist-Aguiar
</div>

**DECLARATION OF MICHELLE CRIST-AGUIAR - 2**

## CERTIFICATE OF SERVICE

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF MICHELLE CRIST-AGUIAR - 3**

# Exhibit A



Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **SUPPLEMENTAL DECLARATION OF ROLAND GAMMILL** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Roland Gammill, declare as follows:

1.    I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.    I serve as the Trial Court Administrator for the State of Idaho's Second Judicial District.

3.    As a Trial Court Administrator, I am aware of staffing issues or shortages in the clerk's offices for counties within the Second Judicial District.

4.    Clearwater County experienced significant staffing issues in spring and early summer 2021 due to COVID-19. The clerk's office did its best to continue court operations during

**SUPPLEMENTAL DECLARATION OF ROLAND GAMMILL- 1**

this time, including but not limited to reviewing newly submitted complaints. For example, the clerk's office had clerks review and release documents from home during periods when the office was particularly short staffed. One of the clerks was also out on maternity leave during this timeframe, which had a real staffing impact on a clerk's office that only employs a few clerks due to the small size of the county.

5.      Clearwater County experienced more clerk turnover from January 2022 through June 2022, during which time two of its four experienced clerks left the office.

6.      The clerks in Clearwater County work diligently to review newly submitted complaints as soon possible, but they have to balance document review with their other job duties. This does not always allow for immediate review of newly submitted complaints. Clearwater County is making the most efficient use of the clerks it has so they can accomplish all of their job duties, which extend far beyond the review of submitted complaints, in a timely manner.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 13 day of January, 2023.

Roland Gammill

**SUPPLEMENTAL DECLARATION OF ROLAND GAMMILL- 2**

**ER-301**

**CERTIFICATE OF SERVICE**

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**SUPPLEMENTAL DECLARATION OF ROLAND GAMMILL- 3**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **SUPPLEMENTAL DECLARATION OF KERRY HONG** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Kerry Hong, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as the Trial Court Administrator for the State of Idaho's Sixth Judicial District.

3.     As a Trial Court Administrator, I am aware of staffing issues or shortages in the clerk's offices for counties within the Sixth Judicial District.

4.     Between January 1, 2021 and July 31, 2022, the vast majority of complaints in the Sixth Judicial District were reviewed by a clerk within eight hours of submission. Based on data

**SUPPLEMENTAL DECLARATION OF KERRY HONG- 1**

provided by Tyler Technologies, Inc., Bannock County was the only county in the Sixth Judicial District that had any complaints that were reviewed more than eight hours after submission. During this timeframe, the Bannock County clerk's office reviewed 385 complaints in the A.A. filing fee category, only 20 of which (i.e. about 5%) took longer than eight hours to review. Attached as **Exhibit A** is a true and correct copy of a spreadsheet listing the complaints that took over eight hours for clerk review. This data comes from the spreadsheet attached as Exhibit A to the Declaration of Emily Carroll (Dkt. 60-19), with the exception of the "Reason for delay" column. The information in that column comes from a review of staffing records. Exhibit A lists the specific reasons for the longer than normal review times.

5. During this timeframe, the Bannock County clerks office reviewed a total of 134,756 filings with an average review time of 1.72 hours.  Attached as **Exhibit B** is a true and correct copy of a screenshot of the Idaho Supreme Court's dashboard, showing the total number of filings in Bannock County from January 4, 2021 through July 31, 2022.

6. The Bannock County clerk's office has two primary deputy clerks that work the Civil Queue. There are three other deputy clerks that check the Civil Queue as their other assignments allow.

7. For most of the dates listed in Exhibit A, the Bannock County clerk's office was experiencing staffing issues. In May and April 2021, the two primary deputy clerks in charge of the Civil Queue had medical/FMLA leave. The Bannock County clerk's office also had staff turnover and new hires during this timeframe. Some of the dates listed in Exhibit A correspond with start dates and training blocks for new hires, which slows the clerks' review capacity.

8. Generally, the clerk's office experiences a high volume of submissions on Mondays and after three-day weekend in particular. Some of the dates in Exhibit A correspond

**SUPPLEMENTAL DECLARATION OF KERRY HONG- 2**

with a backlog from a three-day weekend.

      I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

      DATED this 17th day of January, 2023.

                __/S/Kerry Hong _____
                Kerry Hong

**SUPPLEMENTAL DECLARATION OF KERRY HONG- 3**

## **CERTIFICATE OF SERVICE**

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                              amberdina@givenspursley.com
Katherine A. Keating                       katherin.keating@bclplaw
Jonathan G. Fetterly                       jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke


**SUPPLEMENTAL DECLARATION OF KERRY HONG- 4**

**ER-306**

# EXHIBIT A

| Status | CaseNumber | SubmittedDate | SubmittedWeekday | Effective Submitted Date | Effective Submitted | SubmittedTime | Effective Submitted Time | ReviewedDate | ReviewedWeekday | ReviewedTime | Business Time from Submission to Review | Reason for delay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rejected | CV03-21-00532 | 2/16/2021 | Tuesday | 2/16/2021 | Tuesday | 13:39 | 13:39 | 2/17/2021 | Wednesday | 13:14 | 0 days 8 hours 34 minutes | Backlog from 3 day weekend |
| Accepted | CV03-21-00514 | 2/16/2021 | Tuesday | 2/16/2021 | Tuesday | 11:39 | 11:39 | 2/17/2021 | Wednesday | 12:13 | 0 days 9 hours 34 minutes | Backlog from 3 day weekend |
| Accepted | CV03-21-01208 | 4/12/2021 | Monday | 4/12/2021 | Monday | 8:53 | 8:53 | 4/13/2021 | Tuesday | 10:47 | 0 days 10 hours 54 minutes | Staffing (2 absent) |
| Accepted | CV03-21-01440 | 4/29/2021 | Thursday | 4/30/2021 | Friday | 19:59 | 8:00 | 5/3/2021 | Monday | 11:42 | 0 days 12 hours 42 minutes | Staffing (3 absent) |
| Accepted | CV03-21-01432 | 4/29/2021 | Thursday | 4/29/2021 | Thursday | 12:17 | 12:17 | 4/30/2021 | Friday | 12:24 | 0 days 9 hours 7 minutes | Staffing (3 absent) |
| Accepted | CV03-21-01467 | 5/3/2021 | Monday | 5/3/2021 | Monday | 14:34 | 14:34 | 5/5/2021 | Wednesday | 10:43 | 0 days 14 hours 9 minutes | Staffing (2 absent) |
| Accepted | CV03-21-01472 | 5/4/2021 | Tuesday | 5/4/2021 | Tuesday | 12:07 | 12:07 | 5/5/2021 | Wednesday | 14:27 | 0 days 11 hours 19 minutes | Staffing (2 absent) |
| Accepted | CV03-21-01479 | 5/4/2021 | Tuesday | 5/4/2021 | Tuesday | 14:57 | 14:57 | 5/6/2021 | Thursday | 9:19 | 0 days 12 hours 21 minutes | Staffing (2 absent) |
| Accepted | CV03-21-01484 | 5/4/2021 | Tuesday | 5/4/2021 | Tuesday | 13:44 | 13:44 | 5/6/2021 | Thursday | 10:33 | 0 days 14 hours 49 minutes | Staffing (2 absent) |
| Accepted | CV03-21-01523 | 5/7/2021 | Friday | 5/7/2021 | Friday | 8:42 | 8:42 | 5/10/2021 | Monday | 9:59 | 0 days 10 hours 17 minutes | Staffing (2 absent) |
| Accepted | CV03-21-03007 | 9/13/2021 | Monday | 9/13/2021 | Monday | 9:10 | 9:10 | 9/14/2021 | Tuesday | 8:17 | 0 days 8 hours 7 minutes | High volume and new hire start date |
| Rejected | | 10/14/2021 | Thursday | 10/14/2021 | Thursday | 14:13 | 14:13 | 10/21/2021 | Thursday | 10:40 | 1 days 17 hours 27 minutes | |
| Accepted | CV03-22-01134 | 4/11/2022 | Monday | 4/11/2022 | Monday | 13:14 | 13:14 | 4/13/2022 | Wednesday | 10:18 | 0 days 15 hours 4 minutes | High volume and new hire start date |
| Rejected | CV03-22-01125 | 4/11/2022 | Monday | 4/11/2022 | Monday | 10:11 | 10:11 | 4/12/2022 | Tuesday | 10:08 | 0 days 6 hours 57 minutes | High volume and new hire start date |
| Accepted | CV03-22-01152 | 4/14/2022 | Thursday | 4/14/2022 | Thursday | 10:05 | 10:05 | 4/15/2022 | Friday | 12:15 | 0 days 11 hours 10 minutes | Staffing (1 absent) and new hire start date |
| Accepted | CV03-22-01149 | 4/14/2022 | Thursday | 4/14/2022 | Thursday | 8:29 | 8:29 | 4/15/2022 | Friday | 10:43 | 0 days 11 hours 14 minutes | Staffing (1 absent) and new hire start date |
| Rejected | CV03-22-01187 | 4/15/2022 | Friday | 4/15/2022 | Friday | 14:58 | 14:58 | 4/18/2022 | Monday | 14:45 | 0 days 8 hours 47 minutes | Staffing due to Easter weekend |
| Accepted | CV03-22-01814 | 6/9/2022 | Thursday | 6/9/2022 | Thursday | 13:19 | 13:19 | 6/10/2022 | Monday | 10:59 | 0 days 15 hours 40 minutes | |
| Accepted | CV03-22-02213 | 7/13/2022 | Wednesday | 7/13/2022 | Wednesday | 10:37 | 10:37 | 7/14/2022 | Thursday | 9:51 | 0 days 8 hours 14 minutes | Staffing (0.5 absent) |

**SUPPLEMENTAL DECLARATION OF KERRY HONG- 5**

# EXHIBIT B



Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**DECLARATION OF CHARLENE KRAMES** |

I, Charlene Krames, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Director of Court Operations for the Bonner County Courts.

3.      In my role as Director of Court Operations, I am familiar with factors that affect the time it takes clerks to review submissions.

4.      From January 4, 2021 through July 31, 2022, the Bonner County clerk's office processed a total of 62,136 filings, with an average of 2.85 hours between submission and review. Attached as **Exhibit A** is a true and correct copy of a screenshot of the Idaho Supreme Court's

**DECLARATION OF CHARLENE KRAMES - 1**

dashboard, showing the total number of filings in Bonner County from January 4, 2021 through July 31, 2022.

5.    Between January 1, 2021 and July 31, 2022, the vast majority of complaints in Bonner County were reviewed by a clerk within eight hours of submission. Based on data provided by Tyler Technologies, Inc., the Bonner County clerk's office reviewed 316 complaints in the A.A. filing fee category, 52 of which took longer than eight hours to review.

6.    There are a number of factors that may affect the time its takes clerks to review submissions.

   a.  **Staffing issues.** It takes longer for submissions to be reviewed if the clerk's office is experiencing staffing issues. For the complaints that took longer than eight hours to review, the clerk's office was experiencing staffing shortages for approximately half the days at issue (e.g. staff out sick, on vacation, or on FMLA leave). The clerk's office only has four clerks who process civil complaints. From April 15 through June 10, 2022, two of those clerks were out on FMLA. Another clerk was out sick from May 25 through June 9, 2022. Several of the complaints that took longer than 8 hours to review were submitted during this timeframe.

   b.  **Priority filings.** Filings for hearings scheduled within the next 24-48 hours and high priority case types which have short timeframes, such as child protection, involuntary commitments, civil protection, and expedited evictions, must be processed ahead of other filings. The same clerks that process priority filings are also responsible for reviewing all other civil filings, including newly submitted complaints.

**DECLARATION OF CHARLENE KRAMES - 2**

      c. **Busy counter/phones.** The beginning of the week and the end of the week are our highest volume days for customers calling or coming in, which pulls staff away from processing filings in the OFS system. The same four clerks who are responsible for reviewing civil filings are also responsible for answering the phones, helping people at the counters, and various other tasks.

7. The Bonner County clerk's office is extremely limited in its ability to hire additional clerks, both because of budgetary restrictions and the limited applicant pool.

      a. **Budgetary issues.** Like all other counties in Idaho, Bonner County is only permitted to increase its levy limits by no more than 3% annually. *See* Idaho Code § 63-802. The amounts raised through the annual property tax levy fund, among other items, Bonner County's justice fund. The justice fund pays for the Bonner County clerk's office, Sheriff's office, the Jail, 911 staffing, part of Juvenile Detention, and more. County offices funded through the annual levy are maxed out on their budgets due to the combination of inflation and the limitations imposed by Idaho Code § 63-802. These county offices are struggling to cover things as basic as cost of living raises for the employees they already have. Thus, although the Bonner County clerk's office could certainly benefit from employing additional clerks, it simply does not have the financial resources to do so.

      b. **Applicant pool.** For the clerk positions that can be funded based on the budget, the clerk's office has experienced difficulties filling those positions based on a lack of applicants. For example, a clerk position has been open

**DECLARATION OF CHARLENE KRAMES - 3**

since October 2022 and has not been filled due to a lack of applicants. These are entry level positions, and the Bonner County clerk's office has to compete with national companies such as Starbucks, Walmart, and Jack-In-the-Box. Those companies are offering wages competitive with what the clerk's office pays and offer incentives the clerk's office cannot provide, such as tuition reimbursement. It is very difficult for the clerk's office to compete with national companies in attracting qualified applicants.

8.     Back in the days of paper filing, if anyone inquired about a filing they were expecting or had a question about a filing that was not yet in the system, we would review the clerks' incoming basket and, if a submission was found, we would pull the case and process it so they could view it. We follow the same practice with e-filing; if anyone has an inquiry about a submission, we would scan the OFS queue and process the submission so they could review it.

9.     I am aware of CNS' request in this lawsuit for new civil complaints to be automatically accepted via Tyler Technologies, Inc.'s Auto Accept function. This would significantly increase the clerks' workload because errors could not be corrected on the front end. For example, Bonner County receives a number of submitted complaints intended for filing in Bonneville County. If each of these Bonneville County complaints initiated a new lawsuit in Bonner County upon automatic acceptance, the clerks (in addition to judges and their court staff) would have to spend a significant amount of time essentially "undoing" the initiation of those lawsuits intended for Bonneville County. The Bonner County clerk's office is already stretched exceptionally thin in terms of personnel and resources. Auto Accept would significantly increase the already full workload of the clerks.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the

**DECLARATION OF CHARLENE KRAMES - 4**

foregoing is true and correct.

DATED this 20th day of January, 2023.

Charlene Krames

**CERTIFICATE OF SERVICE**

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF CHARLENE KRAMES - 6**

# Exhibit A



Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF MARY PRISCO** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Mary Prisco, declare as follows:

1.    I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.    I serve as the Clerk of the District Court for Boise County.

3.    In my role as Clerk of the District Court, I am familiar with factors that affect the time it takes clerks to review submissions.

4.    From January 4, 2021 through July 31, 2022, the Boise County clerk's office processed a total of 7,188 filings, with an average of 5.21 hours between submission and review. Attached as **Exhibit A** is a true and correct copy of a screenshot of the Idaho Supreme Court's

**DECLARATION OF MARY PRISCO - 1**

dashboard showing the total number of filings in Boise County from January 4, 2021 through July 31, 2022.

5.      I have reviewed a spreadsheet listing the complaints that took longer than 8 hours to review.

6.      When fully staffed, the Boise County Court has only four employees, including the Supervisor position. One court clerk handles the magistrate cases and Magistrate Court is held Monday through Wednesday. Our Court Supervisor handles the District Court cases and District Court is typically held three times per month occurring the second, third, and fourth full week of each month.

7.      The Court Supervisor position was vacant from January 2021 through September 2021, which created an even higher workload for our magistrate clerk, who was handling both magistrate and district cases during that time. Our current Supervisor came on board at the end of September and without any previous court experience, so time was needed for training.

8.      We also had a transition in our Payments Clerk in 2021 and though the vacancy lasted only a month, the new clerk did not have any court related experience and would have been in a learning mode as well. Though the Payments Clerk does not review/accept filings, employee turnover and extended vacancies have a significant impact on a small office group.

9.      Our magistrate clerk was on vacation during the Christmas week of 2021. Some of the complaints that took longer than eights hours to review were submitted around this time.

10.      Several of the documented incidents were filed late in the afternoon, which again, with a small office may result in the filing not being reviewed/accepted until the following morning.

11.      The Boise County clerk's office has always struggled with filling vacancies and

**DECLARATION OF MARY PRISCO - 2**

maintaining a fully staffed office. Boise County has a small population. There are about 8,000

residents for the entire county and only 550 residents in Idaho City, the county seat. Boise County

is divided by a mountain range that can only be traversed via dirt road, which limits the number of

residents who can easily travel to the courthouse. The biggest staffing hurdle, however, is

proximity to Ada County, which is a short commute for many residents. There are a wide range of

employers in Ada County that pay significantly higher wages than the Boise County clerk's office

is able to pay.

12.    The Boise County clerk's office works diligently to review newly submitted

complaints as soon possible, but they have to balance document review with their other job duties.

This does not always allow for immediate review of newly submitted complaints. Nevertheless,

the vast majority of submissions are reviewed in well under one business day.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the

foregoing is true and correct.

DATED this 23rd day of January, 2023.

Mary Prisco

DECLARATION OF MARY PRISCO - 3

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | <u>amberdina@givenspursley.com</u> |
| Katherine A. Keating | <u>katherin.keating@bclplaw</u> |
| Jonathan G. Fetterly | <u>jon.fetterly@bclplaw.com</u> |

<u>/s/Keely E. Duke                     </u>
Keely E. Duke

**DECLARATION OF MARY PRISCO - 4**

# Exhibit A



**DECLARATION OF MARY PRISCO - 5**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF SHELLY TILTON** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Shelly Tilton, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Gem County Clerk.

3.      In my role as Gem County Clerk, I am familiar with factors that affect the time it takes clerks to review submissions.

4.      From January 4, 2021 through July 31, 2022, the Gem County clerk's office processed a total of 20,515 filings, with an average of 1.97 hours between submission and review. Attached as **Exhibit A** is a true and correct copy of a screenshot of the Idaho Supreme Court's

**DECLARATION OF SHELLY TILTON - 1**

dashboard showing the total number of filings in Gem County from January 4, 2021 through July 31, 2022.

5.      I have reviewed a spreadsheet listing the complaints filed in the A.A. filing fee category from January 1, 2022 through July 31, 2022 that took more than eight hours for clerk review after submission. Having reviewed timesheets and court calendars, it appears that many of the submission dates coincide with dates where we had fewer clerks available to review submissions because they were in court or out of the office.

6.      Gem County has five magistrate clerks, we are not always able to review documents on the same day they are submitted. Although eFile & serve is prioritized, clerks also cover court proceedings, help customers at the counter, answer phone calls, etc. Clerks also prioritize review of time sensitive documents (e.g. filings for a hearing within the next couple of days) over other submissions, including newly submitted complaints.

7.      The Gem County clerk's office works diligently to review newly submitted complaints as soon possible, but they must balance document review with their other job duties. This does not always allow for immediate review of newly submitted complaints. Nevertheless, the vast majority of submissions are reviewed in well under one business day. The average time between submission and clerk review is just under two hours and 98% of filings are reviewed within one business day. *See* Ex. A.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 26th day of January, 2023.

*Shelly Tilton*
Shelly Tilton

**DECLARATION OF SHELLY TILTON - 2**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF SHELLY TILTON - 3**

# Exhibit A



DECLARATION OF SHELLY TILTON - 4

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>Defendants. | CASE NO. 1:21-CV-00305-REP<br><br>**DECLARATION OF KEELY E. DUKE IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT** |

I, Keely E. Duke, declare as follows:

1.       I make this Declaration based on my own personal knowledge and I am competent

to the matters herein.

2.       I am one of the attorneys of record for Defendant Sara Omundson ("Omundson")

in the above-entitled matter. The information contained herein is based upon my personal

knowledge and is true and correct to the best of my knowledge and belief.

3.       Attached as Exhibit A is a true and correct copy of a letter from United States

Senator Ron Wyden to Chief Justice John G. Roberts, Jr., dated August 4, 2022, a link to which is

provided in an article authored by Tonya Riley and published by Cyberscoop on August 4, 2022,

**DECLARATION OF KEELY E. DUKE IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT - 1**

available at https://cyberscoop.com/wyden-scotus-privacy-federal-courts-letter/.

4.      Attached as Exhibit B is a compilation of true and correct copies of Courthouse News Service's ("CNS") *Big Sky Report*, published November 16, 2022, November 18, 2022, December 6, 2022, December 7, 2022, December 14, 2022, and January 6, 2023.

5.      Attached as Exhibit C is a true and correct copy of a spreadsheet listing all complaints filed in the A.A. filing fee category between January 1, 2021 and July 31, 2022 that took eight business hours or longer between submission and clerk review. This spreadsheet was prepared using the data from the spreadsheet attached as Exhibit A to the Declaration of Emily Carroll, Dkt. 60-19.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 25th day of January, 2023.

 /s/Keely E. Duke _____
Keely E. Duke

## CERTIFICATE OF SERVICE

I hereby certify that on 25th day of January, 2023, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke _____
Keely E. Duke

**DECLARATION OF KEELY E. DUKE IN OPPOSITION TO COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT - 2**

**RON WYDEN**
OREGON

CHAIRMAN OF COMMITTEE ON
FINANCE

221 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224–5244

## United States Senate
WASHINGTON, DC 20510–3703

**COMMITTEES:**
COMMITTEE ON FINANCE
COMMITTEE ON THE BUDGET
COMMITTEE ON ENERGY AND NATURAL RESOURCES
SELECT COMMITTEE ON INTELLIGENCE
JOINT COMMITTEE ON TAXATION

August 4, 2022

The Honorable John G. Roberts, Jr
Chief Justice
Supreme Court of the United States
1 First Street, NE
Washington, DC 20543

Dear Chief Justice Roberts:

I write with concern that federal courts are failing in their legal obligations to protect Americans' private information, putting Americans at needless risk of identity theft, stalking and other harms.

Each year, federal courts make available to the public court filings containing tens of thousands of Americans' personal information, such as their Social Security Numbers (SSNs) and dates of birth. However, federal court rules — required by Congress — mandate that court filings be scrubbed of personal information before they are publicly available. These rules are not being followed, the courts are not enforcing them, and as a result, each year tens of thousands of Americans are exposed to needless privacy violations.

The Judicial Conference, the courts' policy-making body, has known about this problem for at least a decade and has refused to act.

Twenty years ago, when Congress required federal courts to publish court records online, it required the Supreme Court to establish rules to protect the privacy and security of Americans whose information was contained in public court records. Congress also required the courts to report back every two years to describe whether the rules were in fact protecting Americans' privacy and security. The judiciary has produced a total of three reports, one in 2009, one in 2011, and then one in June of 2022, five months after my office asked for copies of the old reports.

The most recent report, which was provided to my office in draft form, says the Federal Judicial Center (FJC), the courts' research arm, has twice studied the problem of personal data appearing in public court records, in 2010 and 2015, and in both cases found significant violations of the judiciary's privacy rules. In the most recent study, the FJC examined 3.9 million court records filed during a one month period in 2013. It found 5,437 of these documents included one or more SSNs. If these statistics are representative of the problem, it would mean that the courts have made available to the public roughly half a million documents containing personal data since 2015.

911 NE 11TH AVENUE
SUITE 630
PORTLAND, OR 97232
(503) 326–7525

405 EAST 8TH AVE
SUITE 2020
EUGENE, OR 97401
(541) 431–0229

SAC ANNEX BUILDING
105 FIR ST
SUITE 201
LA GRANDE, OR 97850
(541) 962–7691

U.S. COURTHOUSE
310 WEST 6TH ST
ROOM 118
MEDFORD, OR 97501
(541) 858–5122

THE JAMISON BUILDING
131 NW HAWTHORNE AVE
SUITE 107
BEND, OR 97701
(541) 330–9142

707 13TH ST, SE
SUITE 285
SALEM, OR 97301
(503) 589–4555

HTTPS://WYDEN.SENATE.GOV
PRINTED ON RECYCLED PAPER

The Judicial Conference has willfully and deliberately failed to address the privacy problems documented by the FJC study. According to the report, the results of this 2015 FJC study were presented to the Judicial Conference's Standing Committee in 2016, after which the judges on that Committee determined that "no amendments to the privacy rules were warranted."

The report also describes how in 2015-2016, the Judicial Conference considered a proposal to redact the entire SSN from court filings, as federal court rules currently permit, and in some cases require, records to include the last four digits. The judicial conference cites a single reason for ignoring the predictable privacy harms the courts have enabled: consistency. According to the report, the Judicial Conference's Bankruptcy, Civil, Criminal, and Appellate Rules Committees rejected the proposal because of "the need for that information in bankruptcy proceedings and the value of a uniform approach across all the privacy rules [for different federal courts]."

Finally, the report describes a proposal from 2018 to address the problem of judges including sensitive personal information in their published opinions, which are not currently subject to privacy rules governing documents filed by litigants. According to the report, the Judicial Conference rejected a proposal to require that courts consider redacting all but the first name and last initial of any non-government parties in Social Security and immigration cases, which often contain deeply personal details about individuals' lives, because of "hesitation at the prospect of drafting rules that would tell courts how to write their opinions."

This draft report paints a disturbing picture and indicates that federal courts are totally failing in their responsibility to protect Americans' personal information. Federal courts must obey the law and protect the personal data entrusted to them. If federal courts cannot address this issue, quickly, Congress will be forced to act.

Thank you for your attention to this important issue. If you have any questions about this request, please contact Chris Soghoian in my office.

Sincerely,

Ron Wyden
United States Senator

Cozine_002740
EXHIBIT 1, Page 2 of 2
to REQUEST FOR JUDICIAL NOTICE

## Big Sky Report

November 16, 2022

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

### USDC Idaho

**Boise, Pocatello**

| | | |
|---|---|---|
| United States of America v. 23 National Firearms Act Firearms Surrendered from Justin Youngblood 11/16/2022 1:22 cv 471 Nye (Boise) | Forfeiture for unregistered firearms. | William Humphries United States Attorney's Office |
| Malena Jimenez v. HemaTerra Technologies, LLC; Champion Medical Technologies Inc. 11/14/2022 4:22 cv 467 (Pocatello) | Removal from Bonneville County District Court. Contract. | p: Jared Allen d: Jaycee Nall Stoel Rives |

### USDC Montana

**Great Falls**

| | | |
|---|---|---|
| Dean Christiaens v. Crossroads Correctional Center; Corecivic of Tennessee LLC; Does 11/16/2022 4:22 cv 111 Morris (Great Falls) | Removal from Toole County District Court. Employment. | p: Joanne DeLong d: Chad Adams |

### USDC Wyoming

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Sylvia Hutton v. The Estate of Clinton James Devin MD aka Clinton J. Devin aka Clint James Devin aka Clint J. Devin aka Clint Devin, deceased; Jessica Koch Devin, personal representative of the Estate of Clinton James Devin; Powell Valley Hospital District; Powell Valley Health Care Inc. 11/16/2022 2:22 cv 236 Rankin | Medical malpractice. Defendant Devin was negligent performing spinal surgery on plaintiff and did not stay in town for post-operative care. Plaintiff has increased pain and new medical issues due to defendants' negligence. Defendant hospital knew of Devin's history of patient injuries but did not restrict his surgery privileges. CNS Plus Download | Diana Rhodes |

**Ada County District Court**

**Idaho**

| | | |
|---|---|---|
| Meadowcrest Homeowners Association Inc. v. Association Management Inc.; Keystone Idaho LLC 11/15/2022 CV01-22-17064 Barton | Bad faith, conversion and contract. Defendants will not return plaintiff's money they took out of the bank account after their contract was terminated. $17,000. CNS Plus Download | Brindee Collins |

**Canyon County District Court**

**Idaho**

| | | |
|---|---|---|
| Caldwell Transport Services LLC v. EF Corporation, a PA corp. dba West Motor Freight; Does 11/16/2022 CV14-22-9576 Whiting | Contract. Defendant owes plaintiff for a shipment that was destroyed. $52,000. | David Ballard |

**Kootenai County District Court**

**Idaho**

| | | |
|---|---|---|
| Ashley Higgins v. Axis Residential LLC dba Affinity at Coeur d'Alene 11/14/2022 CV28-22-6963 Christensen | Employment and wrongful termination. Defendant fired plaintiff after she asked for and was denied a religious accommodation waiver for the Covid-19 vaccination, which "does not stop the spread of the Covid disease from one person to another." CNS Plus Download | James Bendell |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Guardiar USA LLC fka Betafence USA v. Perimeter Security Group LLC 11/11/2022 CV28-22-6981 Mitchell | Contract. Defendant owes plaintiff for materials and services. $183,000. | Aaron Goforth Davidson Backman |
| Kenneth Luton; Liuba Luton v. David Norton; Carissa Norton; Norton Roofing LLC; Hartford Insurance Company of the Midwest Bond No. 57BSBIN4340 11/8/2022 CV28-22-6977 Meyer | Judgment in favor of plaintiffs for $13,000. | Tyler Waite Campbell Bissell |

**Twin Falls County District Court**

**Idaho**

| | | |
|---|---|---|
| John Kelly v. Jeremy Black, an individual and in his capacity as vice president of Complete Construction Inc. dba Rain Guard Roofing 11/15/2022 CV42-22-4089 Clluff | Employment, fiduciary duty and contract. Defendant and plaintiff were co-owners of the business, but defendant fired plaintiff and moved money out of the business. Defendant has effectively locked plaintiff out of the company. CNS Plus Download | Brooke Redmond Wright Brothers |

**Bingham County District Court**

**Idaho**

| | | |
|---|---|---|
| Tech Ten LLC v. Scott Chappell dba Scott Chappell Haul Hay 11/15/2022 CV06-22-1879 Simpson | Contract. Defendant wrongfully terminated its contract with plaintiff to haul hay. | Peter Wells May Rammell |

**Nez Perce County District Court**

**Idaho**

| | | |
|---|---|---|
| Christopher L. Jenkins; Renee L. Jenkins v. The Work Shop & Sons Ltd.; Kyle A. Cromer; Jessica Cromer, both individually and dba The Work Shop 11/14/2022 CV35-22-1664 Monson | Fraud and contract. Defendants took money from plaintiffs to construct their house, but didn't start the work. $108,000. CNS Plus Download | Anthony Anegon Aherin Rice |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**Valley County District Court**

**Idaho**

| | | |
|---|---|---|
| Donald K. Stritzke; Jaclynn Stritzke; George D. Nourse; George Nourse Sr; Zidec LLC v. Patrick Dorris; John M. Armstrong; Brian Hansen; Gunner Hansen; Kathleen Tresness; Edward Leavitt; Leavitt Properties LLC; Patrick R. Dorris Family Trust 11/16/2022 CV43-22-376 Scott | Trespass. Defendants wrongfully dug up plaintiffs Stritzke's property to connect a water pipeline to their property. Defendants have not paid for the pipe or installation despite requests to do so, and have not paid for maintenance and other costs. | Albert Barker Barker Rosholt |

**Custer County District Court**

**Idaho**

| | | |
|---|---|---|
| Lyle Jones v. The Verl and Hattie L. Jones Trust; The Separate Property Trust, a subtrust of the Verl and Hattie Jones Trust; The Estate of Verl Jones; Clay Jones; Rebecca M. Laughlin; Charles Allen Jones; Phillip Dale Beavers; Delora Mae Beavers; Gertrude Beavers; Does 11/14/2022 CV19-22-141 Thompson | Quiet title. | Andrew Wright Wright Brothers |

**Gallatin County District Court**

**Montana**

| | | |
|---|---|---|
| Hooks Ranch LLC v. Kayle Distributing LLC dba Wild West Local Foods; Harrison Ward 11/14/2022 DV-22-1095 Brown | Bad faith and contract. Plaintiff consolidated all of defendants' debts, but they did not make at least one payment and haven't filed the necessary business reports required under their agreement. $2.9 million. CNS Plus Download | Amy McNulty Tarlow Stonecipher |

**Laramie County District Court**

**Wyoming**

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| EcoPlus Inc. v. Estate of Phillip J. Hicks 11/8/2022 2022-CV-201-005 Froelicher | Contract and declaratory judgment. Prior to his death, Phillip Hicks had previously been the CEO of plaintiff corporation, and during that time, he improperly and illegally issued himself over four billion shares of Common Stock and over four billion shares of Series B Preferred Stock in plaintiff corporation, comprising over 99% of the corporation. New management has discovered this illegal activity and seeks a declaratory judgment to correct its list of shareholders and number of shares issued, in order to protect the other shareholders and to bring plaintiff back into compliance with various overseers. CNS Plus Download | Lucas Buckley Hathaway Kunz |

**Albany County District Court**

**Wyoming**

| | | |
|---|---|---|
| Anita Coleman v. Walmart Inc. 11/9/2022 2022-CV-35872 Westby | Slip and fall. Plaintiff slipped on liquid left on the floor of defendant store in Laramie, Wyoming, and fell on a sign. She suffered significant injuries and complications. CNS Plus Download | Douglas Bailey Bailey Stock |
| Stephanie Long v. In the matter of the wrongful death of Calvin Long, deceased 10/31/2022 2022-CV-35868 Westby | Appointment of wrongful death representative. Plaintiff/petitioner seeks to be named wrongful death representative as she is the surviving ex-wife of decedent and the mother of decedent's two minor children and was "highly involved in decedent's affairs prior to and immediately following his death." | Jeremy Hugas Platte River |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

## Big Sky Report

November 18, 2022

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

### USDC Idaho

#### Boise

| | | |
|---|---|---|
| Jamie Wiggins v. Idaho State University; Idaho State University Board of Trustees aka the Idaho State Board of Education; Kevin Satterlee; Pauline Thiros, in their official and individual capacities; Does 11/17/2022 1:22 cv 474 (Boise) | Employment, bad faith, wrongful termination and due process. Defendants did not renew plaintiff's coaching contract after she and her husband offered to adopt a baby from an adult college student. CNS Plus Download | Emily MacMaster |
| Denison's Publishing Inc. v. Stay Alert Magazine LLC 11/18/2022 1:22 cv 475 (Boise) | Trademark. Defendant is using plaintiff's trademarked name, Alert, in an effort to take revenue away from plaintiff by misleading plaintiff's customers into paying for advertising with defendant. CNS Plus Download | Jordan Stott Parsons Behle |
| Pisa Land Holding LLC v. Project Impact STEM Academy; Teresa Fleming 11/18/2022 1:22 cv 477 (Boise) | Fraud and contract. Defendants terminated its lease with plaintiff for a school building, and took furniture plaintiff had purchased although defendants had signed a 20-year lease that expires in 2038. Plaintiff spent $4 million to fund the building project. Punitive damages requested. CNS Plus Download | p: Cory Carone Stoel Rives d: Bret Walther Anderson Julian |

#### Ada County District Court

#### Idaho

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Phillip M. Meyers MD v. St. Luke's Health System; Does 11/18/2022 CV01-22-17258 Hoagland | Employment, fraudulent inducement and contract. Defendant created a hostile work environment for plaintiff, a neurosurgeon, after plaintiff tried to make improvements in stroke services for patients and had "serious concerns" about Medicare/Medicaid fraud when he was not allowed to know billing codes and patient bills for his own work product. Plaintiff was constructively discharged from employment. CNS Plus Download | Jason Monteleone Johnson Monteleone |
| Timber and Love Inc. v. Roof Systems Pro LLC; Adolfo R. Martin 11/18/2022 CV01-22-17300 Hoagland | Bad faith and contract. Defendants did not finish a roofing job for plaintiff, and did substandard work, then filed a lien against the property. | John Howell Powers Farley |

<div align="center">

**Kootenai County District Court**

**Idaho**

</div>

| | | |
|---|---|---|
| In re: Transfer of structured settlement payment rights by S.N. 11/15/2022 CV28-22-7050 Christensen | Structured settlement. Applicant Stone Street Originations LLC requests approval for transfer of a settlement to them from S.N., paid by obligor Allstate Assignment Company. | Bruce Blohowiak |

<div align="center">

**Bonneville County District Court**

**Idaho**

</div>

| | | |
|---|---|---|
| Sean Malone v. Walgreens Specialty Pharmacy; Doe 11/18/2022 CV10-22-6169 Watkins | Premises liability. Plaintiff's foot became stuck on the wheel of a cart that was sticking out into the walkway of defendant's store, and he fell and was injured. CNS Plus Download | J. Bradford DeBry |
| Ramon Medina v. Boomers LLC; Doe 11/18/2022 CV10-22-6180 Pickett | Workplace injury. Defendant's crane attachment broke and knocked plaintiff off the roof where he was working, causing serious injuries. | Don Gamble Parke Gordon |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-335**

| | | |
|---|---|---|
| Bryant Hafen; Connie Hafen v. Brock Merrill; Rachel Merrill; Michael Eatinger 11/15/2022 CV10-22-6124 Dennert | Contract and conversion. Plaintiffs hired defendant Eatinger to dig a foundation for their cabin, and Eatinger took $60,000 worth of boulders from the property and sold or placed them on Xhale Day Spa, owned by defendants Merrill. Defendants have not returned the boulders. | Andrew Wayment Tolson Wayment |
| Asphalt Physicians LLC v. U-Haul Company of Idaho; Drex Johnson 11/17/2022 CV10-22-6160 Pickett | Contract. Defendants terminated its contract with plaintiff for asphalt seal coating work, but didn't pay them per the agreement. | Jaxon Munns Murray Ziel |

### Twin Falls County District Court
### Idaho

| | | |
|---|---|---|
| Northwest Farm Credit Services FLCA v. Glenn Dale Ranches Inc.; Kipton Gould; Clear Creek Properties Inc.; G+ Ranches Inc.; Sharon Gould; Elk Mountain Grazing Association LLC; Idaho Power Company; Ireland Bank; Does 11/18/2022 CV42-22-4129 Harris | Foreclosure and contract. Defendants Glenn Dale Ranches and Kipton Gould owe for a loan in default. $2.2 million. | Sheila Schwager Hawley Troxell |

### Madison County District Court
### Idaho

| | | |
|---|---|---|
| JSM Construction Inc. v. John Hanson dba John's Siding 11/10/2022 CV33-22-828 Boyce | Contract. Defendant didn't finish siding work for plaintiff despite being paid in full. $11,000. | William Forsberg Forsberg Evans |

### Yellowstone County District Court
### Montana

| | | |
|---|---|---|
| Russ Fagg v. SW Engines LLC; Does 11/18/2022 DV-22-1221 Linneweber | Fraud, bad faith, and contract. Plaintiff purchased an engine from defendant that was supposed to be defect-free, but it didn't work and defendant will not refund plaintiff's money. CNS Plus Download | Pro se |

### Gallatin County District Court
### Montana

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Lino Macebo v. The Lone Mountain Ranch Inc. 11/18/2022 DV-22-1113 Ohman | Consumer protection and negligence. Plaintiff was learning to ride a horse while at defendant's facilities when he was bucked off and injured. Punitive damages requested. CNS Plus Download | John Heenan Heenan Cook |

### Flathead County District Court
### Montana

| | | |
|---|---|---|
| Douglas Rubick; Ashley Rubick v. Finmark Construction LLC; Luke Hojnacki; Nathanael Murray; Stephanie Murray; Does 11/17/2022 DV-22-1315 Allison | Unfair or deceptive acts or practices, contract and construction defects. After plaintiffs moved into a house defendant Finmark recently constructed, defendant Hojnacki inspected, and defendants Murray sold to them, plaintiffs found several serious defects that caused water leaks and damage. CNS Plus Download | Samantha Travis Ogle Worm |

### Carbon County District Court
### Montana

| | | |
|---|---|---|
| Lacy Shull, individually and as personal representative of the estate of Darren Shull, deceased v. Carbon County; Kelly Carrington; Does 10/27/2022 DV-22-91 Wald | Wrongful death and negligence. Deceased plaintiff Darren was traveling on the highway when a suspected drunk rider went by on a motorcycle, crashing in front of him. Plaintiff Darren stopped to help, and while he was providing medical assistance he was struck and killed by defendant Carrington's police cruiser as he sped onto the scene. CNS Plus Download | Layne Scheveck Scheveck Salminen |
| Lisa Bennett; Roy McKenzie v. Crystal Roasico, in her capacity as Carbon County Election Administrator and Custodian of Public Records; Macque Bohleen, in her capacity as Carbon County Interim and Deputy Clerk and Recorder; Carbon County; Does 10/26/2022 DV-22-90 Wald | Official misconduct and injunction. Plaintiffs requested public information related to recent elections but have been denied access. Defendants are also charging exorbitant costs for required items to prevent access. Plaintiffs would like a declaration requiring the release and inspection of records. CNS Plus Download | Chris Gallus |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Sherwin Williams Co. v. Michael Camper as personal guarantor; M&M Precision Painting Inc. 11/10/2022 DV-22-95 Wald | Judgment in favor of plaintiff. $6,500. | Scott Clement Smith |

**Wyoming Chancery Court**
**Wyoming**

| | | |
|---|---|---|
| In the matter of Hawaiian Hospitality Group Inc.; Bryan Wilkinson, petitioner 11/18/2022 CH-22-12 | Petition. Wilkinson would like the court to appoint him as the custodian for Hawaiian Hospitality Group because the directors are deadlocked regarding all business management. | Clyde Hutchins Harmony |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

## Big Sky Report

December 06, 2022

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

### USDC Idaho

### Boise

| | | |
|---|---|---|
| Raul Mendez v. Ada County; Ada County Commissioners; Ada County Treasurer; Ada County Clerk; Ada County Recorder; Ada County Billing Services; Scott Williams; Lyn Call; Employees of Ada County billing services; Ammon Taylor; Republic Services 12/5/2022 1:22 cv 493 (Boise) | Civil rights. CNS Plus Download | Pro se |
| Hunter Lambirth; Rachael Lambrith v. PennyMac Loan Services LLC 12/6/2022 1:22 cv 494 Grasham (Boise) | Removal from Valley County District Court. Insurance contract. | p: Pro se d: J. Will Varin Varin Wardwell |

### USDC Wyoming

| | | |
|---|---|---|
| Maps Towing & Diesel Repair Inc. v. Blue Lines Distribution Ltd.; Tom Della Maestra; Raychel Thornhill 12/6/2022 1:22 cv 255 Skavdahl | Defamation. Defendants made false statements about plaintiff after plaintiff towed defendants' truck in dangerous conditions over several days. Defendants asked plaintiff to refund $45,000 of the $72,000 plaintiff charged defendants which plaintiff would not do. CNS Plus Download | Isaac Sutphin Holland Hart |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| HollyFrontier Cheyenne Refining LLC, a DE LLC v. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local 11-574 12/5/2022 2:22 cv 254 | Vacate arbitration award. Plaintiff asks that an arbitration award from a dispute between plaintiff and defendant be vacated due to the arbitrator's errors. CNS Plus Download | Laurene Rogers Holland Hart |

**Bonneville County District Court**

**Idaho**

| | | |
|---|---|---|
| KuKista LLC v. Block Inc., a DE corp. 12/5/2022 CV10-22-6474 Pickett | Contract and conversion. Defendant issued plaintiff a Square Reader with a Square account to process customer payments. After plaintiff stopped using the reader and closed its account, defendant would not return the balance of the money held in the account. $3,300 and punitive damages requested of $33,000. CNS Plus Download | Bryan Smith Smith Driscoll |

**Twin Falls County District Court**

**Idaho**

| | | |
|---|---|---|
| Damian Vicente v. Rupinder Singh as an employee of BSS Trucking Inc; BSS Trucking Inc.; Does 12/6/2022 CV42-22-4309 Harris | Car collision. | Mark Wasden |

**Bannock County District Court**

**Idaho**

| | | |
|---|---|---|
| Three Rivers Outdoor LLC v. City of Pocatello; City of Pocatello Planning and Development Services 12/6/2022 CV03-22-3937 Gabiola | Judicial review of city action. Plaintiff asks for review of defendants' denial of plaintiff's application for a billboard/off-premises sign. | Ron Kerl Cooper Larsen |

**Cassia County District Court**

**Idaho**

| | | |
|---|---|---|
| Albion Ranch 2006 LLC v. Zoetis Inc., a DE corp.; Zoetis US LLC, a DE LLC 12/6/2022 CV16-22-982 Tribe | Contract. Defendants' cattle vaccine infected plaintiff's herd of 214 pregnant cows with bovine herpesvirus-1, killing 149 calves and 5 heifers due to calving complications. | Daniel Williams Jones WIlliams |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**Benewah County District Court**

**Idaho**

| | | |
|---|---|---|
| Josh Buell v. M&S Electric Inc.; Does 12/5/2022 CV05-22-409 Duggan | Contract. After defendant's employee damaged the hood of plaintiff's truck, defendant offered to pay for repairs, but only paid part of it. $11,000. | Brady Espeland James Vernon |

**Boise County District Court**

**Idaho**

| | | |
|---|---|---|
| Terrace Lakes Recreation Ranch Inc. v. Terrace Lakes Water Company; Dennis Largent; Mary Cordova; Chuck Steele; Julie Stillman; Rolly Woolsey, as members of the Board of Directors of Terrace Lakes Water Copmany 11/30/2022 CV08-22-217 Fleming | Contract and injunctive relief. Defendants have threatened to turn off the water to plaintiff if they do not pay wrongfully assessed back payment for water usage and additional money per month. CNS Plus Download | Terri Manweiler Pickens |

**Yellowstone County District Court**

**Montana**

| | | |
|---|---|---|
| In re: Transfer of structured settlement payment rights by Amy Karr 12/6/2022 DV-22-1275 Fehr | Structured settlement. Applicant Peachtree Settlement Funding LLC requests approval for transfer of a settlement to them from Amy Karr, paid by obligor American General Annuity Service Corporation. | Aaron Nicholson Crowley Fleck |

**Gallatin County District Court**

**Montana**

| | | |
|---|---|---|
| Khaled Brown v. KFBM LLC dba Kendall Ford Lincoln of Bozeman; Does 12/5/2022 DV-22-1158 Breuner | Consumer protection and fraud. Plaintiff was passing through town when his truck broke down. Defendant told plaintiff that his truck needed repairs that were not actually necessary, and because of their lies and the delay it took to have his truck repaired, plaintiff is out money and was not with his father when he died. Punitive damages requested. CNS Plus Download | Kevin Brown Paoli Brown |

**Flathead County District Court**

**Montana**

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-341**

| | | |
|---|---|---|
| Phillip Potter v. Quarter Circle LA Ranches Inc. 12/6/2022 DV-22-1371 Ulbricht | Premises liability. Defendant did not maintain or light up its pathways, and plaintiff drove a golf cart into a short retaining wall and was injured. CNS Plus Download | Teague Westrope Ava |

**Fremont County District Court**

**Wyoming**

| | | |
|---|---|---|
| Patrick Rose; Trisha Rose v. Riverton Memorial Hospital LLC dba SageWest Healthcare; Greg P. Clifford MD; Jeremy H. Newman MD; Mel Meyer MD 11/18/2022 43529 Tyler | Negligent care. Defendants did not give plaintiff Patrick Rose his prescribed medications of Ativan and/or Haldol when he was admitted to defendant facility after manganese poisoning left him disoriented and agitated. Patrick was left unsupervised and he went into another patient's room and caused her "serious bodily injuries." CNS Plus Download | Jon Moyers |
| Anixter Inc. v. Intermountain Electric Service Inc. 11/7/2022 43518 Conder | Collections. Defendant owes plaintiff money for equipment, materials, supplies, and services plaintiff provided to defendant on a credit account. $134,000. CNS Plus Download | William Knight |
| C.H. Brown Co. LLC v. Blaine R. Anderson dba Anderson Farms 11/21/2022 43530 Tyler | Collections. Defendants owe plaintiff for equipment plaintiff provided to defendants. CNS Plus Download | Spencer Lythgoe Gurstel |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

### Big Sky Report

December 07, 2022

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

### USDC Idaho
#### Boise

| | | |
|---|---|---|
| Chelsey Dudley v. Boise State University; Tony Roark, in his official and individual capacity; Mandy Nelson, in her official and individual capacity; Kate Law, in her official and individual capacity; Does 12/7/2022 1:22 cv 495 (Boise) | Due process. Defendants changed plaintiff's internship grade from pass to fail after she had graduated from BSU and passed the social work licensing exam. Plaintiff's internship was with the Idaho Department of Health and Welfare, who had told defendants that plaintiff had accessed confidential client information in their database she had no reason or authorization to view. CNS Plus Download | Christopher Brown Fisher Hudson |

### USDC Montana
#### Butte

| | | |
|---|---|---|
| Wanda J. McCapes v. M Brothers Transportation; Hoxbridge Insurance Company; Pact Claims Administration 12/7/2022 2:22 cv 82 (Butte) | Fraud, insurance contract and car collision. Defendant M Brothers Transportation caused a car collision with plaintiff and defendants Hoxbridge and Pact Claims will not pay plaintiff's claims for damages. Punitive damages requested. CNS Plus Download | Michael Haynes Joyce MacDonald |

### USDC Wyoming

| | | |
|---|---|---|
| XL Specialty Insurance Company, a Delaware corp. as subrogee of Club Bo A36 LLC v. Alpine Airpark Association Inc.; Funk Holdings Ltd., a Calgary, Alberta, Canada company 12/6/2022 1:22 cv 256 | Insurance contract and negligence. Defendants' large metal gate on a taxiway unexpectedly opened in front of an aircraft owned by plaintiff's subrogee, causing mechanical damage that required a complete overhaul to the aircraft. $164,000. CNS Plus Download | Kevin Simon |

### USDC Montana
#### Great Falls

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Ronald Albee; Peggy Albee v. State Farm Fire and Casualty Company 12/7/2022 4:22 cv 114 (Great Falls) | Removal from Fergus County District Court. Insurance contract. | p: Tyler Waite d: Luc Brodhead Garlington Lohn |

**Ada County District Court**

**Idaho**

| | | |
|---|---|---|
| Dr. Aaron Blaser DMD v. Zola Dental dba Harrison Dental; Jeremiah Paventy; Does 12/5/2022 CV01-22-18083 Medema | Employment and wrongful termination. Defendant terminated plaintiff's contract without giving him 30 days notice per the employment agreement. $30,000. CNS Plus Download | Jeffrey Hepworth |
| The Salvation Army v. Jordan-Wilcomb Construction Inc.; Kahrs International Inc., FL corp.; The Dillabaugh Family Limited Partnership dba Dillabaugh's Flooring America; Hardware Sales Inc.; Does 12/5/2022 CV01-22-18182 | Contract. Defendant Dillabaugh incorrectly installed flooring in plaintiff's gym. Defendants will not repair the defects. CNS Plus Download | Gary Cooper Cooper Larsen |
| Paydon Nye, individually and as guardian for K.N., M.N. and T.N., minor children v. Estes Express Lines; GI Trucking Company; GI TRKG Co. dba Estes West; Estes West; Robert Kendrick; Does 12/6/2022 CV01-22-18170 Reardon | Car collision. | Scott Lundgreen Johnson Lundgreen |

**Kootenai County District Court**

**Idaho**

| | | |
|---|---|---|
| Ela Construction LLC v. Superior Rock Drilling LLC; Darrell Chapin; Numerica Credit Union, a WA corp., necessary party 12/6/2022 CV28-22-7380 | Contract and mechanic's lien foreclosure. Plaintiff has not been paid fully for labor and materials. $37,000. | Marcus Johnson Ramsden Marfice |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| State Farm Mutual Automobile Insurance Company as subrogee of Jeff Cross v. Aleksandr Lukitsjov; Leasing Solutions LLC, an IL LLC 12/6/2022 CV28-22-7374 Mitchell | Car collision. $20,000. | Christine Reinert MacMillan Scholz |
| Jeffrey Cross v. Leasing Solutions LLC; Jeep Transport LLC; Prestigeous Transport Inc.; Aleksandr Lukitsjov 12/6/2022 CV28-22-7393 | Car collision. | Melanie Baillie James Vernon |
| Hartley Smith v. Douglas T. Jacobs; Jane Doe Jacobs; Estate of Douglas T. Jacobs; Unknown heirs and devisees of Douglas T. Jacobs; Estate of Jane Doe Jacobs; Unknown heirs and devisees of Jane Doe Jacobs; Does 12/7/2022 CV28-22-7394 Meyer | Quiet title. | Edwin Holmes |

**Bonner County District Court**
**Idaho**

| Ryan Thrailkill v. Estate of Ina M. Thrailkill, deceased and her heirs and devisees; Estate of Ronald L. Baccus, deceased and his heirs and devisees; Idaho Department of Health and Welfare; Does 12/5/2022 CV09-22-1628 Berecz | Quiet title. | Jeremy Featherston |

**Madison County District Court**
**Idaho**

| Richard Bishop v. Zippy Lube 11/22/2022 CV33-22-866 Boyce | Contract. Defendant put the wrong oil filter in plaintiff's vehicle when they changed the oil, damaging the vehicle which needed to be replaced. | Sam Bishop Idaho Legal |

**Gallatin County District Court**

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-345**

### Montana

| | | |
|---|---|---|
| Duck Creek LLC v. Vosen Civil Excavation Inc. abn Vosen Civil; Vosen Inc; Kelly Joe Vosen 12/6/2022 DV-22-1160 Ohman | Fraud, bad faith and contract. Plaintiff hired defendants as subcontractors to bring water onto a new property development and install fire hydrants. Defendants were gone from the work site for days at a time, didn't finish all of their work, and the work they did do was not good. They also didn't pay for equipment rentals, and took out a construction lien against plaintiff despite all of the issues they'd caused. Punitive damages requested. CNS Plus Download | Drew Gaertner McLean Younkin |
| Joann Gail Frizzell v. Cashman Nursery; Ross William Flick 12/7/2022 DV-22-1165 Brown | Car collision. While driving drunk, defendant Flick drove a truck owned by defendant Cashman and ran into plaintiff, causing injury. Punitive damages requested. | Joseph Cook Heenan Cook |

### Flathead County District Court
### Montana

| | | |
|---|---|---|
| Colby L. Lenz v. Mackenstadt Inc. 12/7/2022 DV-22-1373 Eddy | Contract and construction defects. Defendant covered a vent in the roof of plaintiff's house during construction, causing mold to grow and water and mold damage to the attic. A fascia board was not covered in metal despite it being on plaintiff's punch list, and it shows water and mold damage. Defendant has not responded to plaintiff's notification of the issues. $16,000. CNS Plus Download | Pro se |

### Cascade County District Court
### Montana

| | | |
|---|---|---|
| Hanna Shepard v. Walmart 11/30/2022 DV-22-536 Grubich | Unfair or deceptive acts or practices. Defendant incorrectly installed an oil filter in plaintiff's car, causing damage to her vehicle. While installing a new filter, defendant's employee purposely poured transmission fluid into the oil system. Punitive damages requested. CNS Plus Download | Brian Miller Morrison Sherwood |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-346**

| | | |
|---|---|---|
| Judith Smith v. Wal-Mart Stores Inc; Cody Grove; Does 11/29/2022 DV-22-533 Kutzman | Slip and fall. Defendants did not adequately maintain the property, causing plaintiff to fall and suffer injuries. CNS Plus Download | Eric Mills Dubois Mills |

**Natrona County District Court**
**Wyoming**

| | | |
|---|---|---|
| Peggy Sue Birkle-Whitaker, as wrongful death representative of Brett Whitaker, v. FDL Operating LLC, a TX LLC; Does 12/1/2022 112172 Eames | Wrongful death. Plaintiff decedent Brett Whitaker was working at defendant's job site setting a cement plug on a wellhead when an operator engaged a pump that burst open a valve, sending pressurized liquid into Brett's face. Brett died 11 days later of his injuries. Punitive damages requested. CNS Plus Download | Grant Lawson Metier |

**Goshen County District Court**
**Wyoming**

| | | |
|---|---|---|
| Michael Geer; Thelma Geer v. Dr. Tiffany Hartman DDS; Hartman Family Dentistry PC 11/21/2022 CV-2022-134 Buchanan | Dental malpractice, informed consent and medical battery. Despite plaintiff Michael Geer's medical history that requires specialized treatment and antibiotics, defendants went beyond the agreed-upon tooth extraction and performed an unanticipated, complicated surgery on plaintiff Michael Geer without first prescribing antibiotics, resulting in serious infection, hospitalization and additional surgery. CNS Plus Download | Alex Freeburg |
| Nick Olson v. In the matter of the wrongful death of Delrae Bennett 11/28/2022 CV-2022-142 Buchanan | Petition to name wrongful death representative. Plaintiff is surviving son of decedent Delrae Bennett. Decedent's spouse, Robert Bennett, wrongfully caused her death in a car crash when he was driving while intoxicated, with a blood alcohol content more than two-and-one-half times the legal limit. He has been charged criminally and faces a lengthy prison sentence. | Ethan Morris Freeburg |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

Janice Schliske v. Estate of Jack F. Gregg; Sandy Gregg, personal representative of the Estate of Jack F. Gregg; Sandy Gregg 11/9/2022 CV-2022-127 Buchanan

Declaratory judgment, quiet title and partition. Plaintiff was tenant in common with Jack Gregg, now deceased, on a piece of real property. Defendant Sandy Gregg is Jack's sole heir. Plaintiff and defendants are unwilling tenants in common and have a legal right to partition. Plaintiff has paid the property taxes for the past several years and is entitled to contribution by defendants.

Colby Sturgeon
Eddington Sturgeon

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-348**

## Big Sky Report

December 14, 2022

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

### USDC Montana
### Butte

| | | |
|---|---|---|
| Timothy Inman v. Depuy Synthes Inc.; DePuy Orthopaedics; Medical Device Business Services Inc.; Depuy Synthes Products LLC; Synthes USA Products LLC; Johnson & Johnson; Does 12/14/2022 2:22 cv 84 (Butte) | Product liability and unfair or deceptive acts or practices. Defendants' knee replacement device was defective and fractured after plaintiff had it installed. CNS Plus Download | Richard Ramler |

### USDC Wyoming

| | | |
|---|---|---|
| Patrick Carrel, as wrongful death representative on behalf of Deborah Carrel, deceased; Craig Carrel v. Silvio Amico Esq, Curator of the Estate of Estanislao Perez Reyes; 995 Transport LLC 12/14/2022 2:22 cv 263 Freudenthal | Wrongful death. Defendant Reyes' caused a collision with another tractor trailer, blocking the roadway and causing plaintiff Craig to hit the vehicles, and passenger Deborah died. CNS Plus Download | James Fitzgerald |

### Ada County District Court
### Idaho

| | | |
|---|---|---|
| Bollons-I Corporation dba Pool Doctor and Spa v. James L. Winter; Does 12/13/2022 CV01-22-18541 Norton | Contract. Defendant breached his employment agreement after he stopped working for plaintiff then solicited plaintiff's customers to his competing business, using plaintiff's confidential and proprietary information. CNS Plus Download | Mark Wietstock Smart Schofield |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Boise Blue Dog LLC v. NYC&ID LLC; Jerry W. Miller; Alexander DeLuca 12/14/2022 CV01-22-18585 O'Nell | Contract. Defendants have not paid all money due for a liquor license they leased from plaintiffs, and money is owed through the end of the lease. $165,000. | Terry Copple Davison Copple |
| Water, Fire, Mold & Biohazard Services of Idaho Inc. dba Puroclean of West Boise v. Delbert Jones; Sylvia Jones; First American Title Insurance Company; Mortgage Electronic Registration Systems Inc.; Wilmington Finance; Inc.; Bank of New York Mellon; CIT Mortgage Loan Trust 2007-1; Landing Owners Association Inc. 12/12/2022 CV01-22-18538 Hoagland | Contract and lien foreclosure. Defendant has not been paid for labor and materials. $4,000. | Clay Shockley Jacobson Jacobson |
| Rebecca Obey v. Core-Value Construction LLC 12/13/2022 CV01-22-18533 Hoagland | Lien release. Defendant has not given plaintiff a written disclosure statement regarding final payment for labor and materials, and plaintiff asks that the lien against the property for $6,500 be released. | Jacob Bateman Murphy |

### Canyon County District Court
### Idaho

| | | |
|---|---|---|
| Arnold M. Oliveira; Juanita M. Oliveira v. The Estate of Agnes Oliveira; Does 12/14/2022 CV14-22-10438 Whiting | Quiet title. | Julie DeFord |

### Bonneville County District Court
### Idaho

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Julie S. Gibson v. Kelley H. Setterlund; Snake River Search Inc.; Does 12/14/2022 CV10-22-6654 Whyte | Recklessness and negligence. Defendants' dog attacked and bit plaintiff while she was testing it for the Wilderness Cadaver Field Test. Defendant Setterlund told plaintiff the dog was not aggressive, but plaintiff later discovered it had a history of aggression that disqualified the dog from search and rescue training. CNS Plus Download | David Myers Litster Frost |

**Twin Falls County District Court**

**Idaho**

| | | |
|---|---|---|
| Michael G. Cameron v. Glanbia Foods Inc.; Glanbia Nutritional Inc., a DE corp.; Glanbia Nutritionals NA Inc., a DE corp.; Does 12/14/2022 CV42-22-4442 Cluff | Slip and fall on ice. | Evan Mortimer Litster Frost |

**Washington County District Court**

**Idaho**

| | | |
|---|---|---|
| Ross LaCrone; Kelly LaCrone v. Joseph Gams; Joseph G Services LLC 12/13/2022 CV44-22-471 Stuchlik | Contract and conversion. Defendants did not finish all work on plaintiffs' home and did not pay all their subcontractors. | Edward Dindinger Runft Dindinger |

**Benewah County District Court**

**Idaho**

| | | |
|---|---|---|
| Richard Larsen v. Reforestation Inc.; Unknown Statutory Trustees of Reforestation Inc.; Lee George; Jane George, Estate of Jane Doe George; Keiko George; Estate of Keiko Toma George; John George, Estate of John Doe George; Does 12/13/2022 CV05-22-419 Duggan | Quiet title. | Edwin Holmes |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Richard Larsen v. Western High Lands Inc.; Jack Streibick; Unknown Statutory Trustees of Western High Lands, Inc.; Samuel Wright; Estate of Samuel E. Wright aka S.E. Wright; Jane Wright; Estate of Jane Doe Wright; Mandy Wright; Estate of Mandy Wright; John Wright; Estate of John Doe Wright; Does 12/13/2022 CV05-22-420 Duggan | Quiet title. | Edwin Holmes |
| Richard Larsen v. Western High Lands Inc.; Jack Streibick; Unknown Statutory Trustees of Western High Lands Inc.; Samuel Wright; Estate of Samuel E. Wright aka S.E. Wright; Jane Wright; Estate of Jane Doe Wright; Mandy Wright; Estate of Mandy Wright; John Wright; Estate of John Doe Wright; Does 12/13/2022 CV05-22-421 Duggan | Quiet title. | Edwin Holmes |
| Richard Larsen v. Reforestation Inc.; Unknown Statutory Trustees of Reforestation Inc.; Douglas Gonyea, Estate of Douglas A. Gonyea; Jane Gonyea; Estate of Jane Doe Gonyea; Martha Gonyea; Estate of Martha T. Gonyea; John Gonyea; Estate of John Doe Gonyea; Lester Bradley; Estate of Lester E. Bradley;Jane Bradley, Estate of Jane Doe Bradley; Gloria Bradley; Estate of Gloria A. Bradley; John Bradley; Estate of John Doe Bradley; Bennie Cates; Estate of Bennie R. Cates; Jane/John Doe Cates; Estate of Jane/John Doe Cates; Does 12/13/2022 CV05-22-422 Duggan | Quiet title. | Edwin Holmes |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

### Gallatin County District Court
### Montana

| | | |
|---|---|---|
| Edie Ward v. Costco Wholesale Corporation; Precision Fence System, Inc.; Does 12/9/2022 DV-22-1172 McElyea | Trip and fall. While clearing snow from the parking lot for defendant Costco, defendant Precision bent one of the metal strips that holds the cart stand in place and plaintiff tripped on it and fell, causing injury. Punitive damages requested. | Hillary Carls Blackford Carls |

### Ravalli County District Court
### Montana

| | | |
|---|---|---|
| Corina Warila v. Marcus Daly Memorial Hospital Inc.; Luke Channer; Samuel P. Urso; Does 11/10/2022 DV-22-414 Lint | Medical malpractice. Plaintiff's son was suffering abdominal pain related to testicular torsion but defendants suspected the problem was appendicitis. Defendants discharged plaintiff's son with no diagnosis. Plaintiff's son later needed to have a testicle removed because it had been robbed of blood. CNS Plus Download | Andre Gurr Garden City |
| Herbert Copus v. Providence Health and Services Montana dba St. Patrick's Hospital and Providence Medical Group; Montana Cancer Specialists PC dba Montana Cancer Center; Alan W. Thomas; Mandi T. Griffin; Marcus Daly Memorial Hospital Corp.; Does 11/11/2022 DV-22-424 Recht | Medical malpractice. Defendant prescribed plaintiff chemotherapy for blood disease but later a different hospital found plaintiff tested negative for the disease. Defendant Griffin subsequently ignored the information and prescribed chemotherapy again. CNS Plus Download | Nathan Wagner Seifert Wagner |
| Rodney Cook; Kathey Cook v. White River Contracting LLC; Craig Rostad; Terry Cleveland; Jake Hayes 11/21/2022 DV-22-426 Lint | Fraud, misrepresentation and bad faith. Plaintiffs paid $1.65 million to defendants for a residential design-build but defendants went over-budget and misrepresented charges. Defendants charged for roofing but the building still has no roof. Plaintiffs have had to pay subcontractors directly because defendants wouldn't pay. CNS Plus Download | Nick LeTang Passamani LeTang |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Holly Goncena v. Paul Richardson dba All Pro Incorporated 11/7/2022 DV-22-403 Recht | Bad faith, contract and unjust enrichment. Plaintiff contracted with defendant to build a cabin for $60,000. Defendant has not completed the work when promised and plaintiff has had to pay additional funds to protect the cabin. | Nathan Fluter |
| Steve Minnerath; Kirsten Minnerath; Megan Minnerath v. Montana Custom Greenhouses LLC 11/3/2022 DV-22-398 Lint | Unjust enrichment. Plaintiffs paid defendant a $42,000 deposit on the construction of several greenhouses but no contract was signed. Plaintiffs cancelled the project about a month later but defendant has never refunded their deposit. | David Steele Geiszler Steele |
| DOD LLC v. Angel Peak Studios LLC 11/9/2022 DV-22-408 Recht | Contract and injunction. Defendant contracted to make a movie and provide a script for plaintiff. During production, defendant had numerous cost overruns, partly due to payments that were not part of the budget made to the filmmakers and their friends. The contract was later amended but cost overruns continued and defendant paid no payroll taxes. Plaintiff wants to prevent defendant from bringing in other parties to fund the film. | Daniel Browder |
| Custom Ag Solutions LLC v. Seth Thomasson Cattle Co.; Seth Thomasson 11/29/2022 DV-22-435 Lint | Bad faith and contract. Plaintiff was to provide farming services for defendant, but defendant provided no access to the property and didn't pay plaintiff for $16,000 worth of work. | Rufus Peace Christian Samson |
| Farmers Union Mutual Insurance Co. aso Madisen M. Wheeler v. Jessop Properties LLC aka Jessop Properties; Does 12/2/2022 DV-22-444 Lint | Construction defects. Defendant constructed Wheeler's house but the house developed leaks due to incorrectly installed adapter valves. Wheeler filed a claim with plaintiff, which was paid. | Sarah Simkins Johnson Berg |

### Silver Bow County District Court
### Montana

| | | |
|---|---|---|
| Joseph Berger v. State Farm Mutual Automobile Insurance Company 11/9/2022 DV-22-319 Whelan | Insurance contract. Defendants refused to pay the limits of plaintiff's underinsured motorist coverage as stipulated in his policy after his car was rear-ended at a red light. Plaintiff requests punitive damages. | Saidee Johnston Joyce MacDonald |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Jesse E. Dill; Katherine E. Dill v. Jackie Garrett; Wilburg Morris; Sheila Morris; Lori Baker-Patrick, Treasurer of Butte Silver Bow County; JP Gallagher, Chief Executive of Butte Silver Bow County; Butte Silver Bow Water Department; Department of Revenue; Department of Transportation; Does 11/10/2022 DV-22-321 Whelan | Quiet title. | Frank Joseph |
| Mark A. Tripp on behalf of and as personal representative of Thomas Wayne Tripp Jr., deceased v. Christine Kelsey Gonzalez; Noelle Kelsey Nichols; Jennier Kelsey; Wells Fargo Bank NA, trustee of the testamentary trust of Carolyn Kelsey; Ruth Downs Sullivan, trustee of the testamentary trust of Carolyn Kelsey; Butte Silver Bow Water Department; Lori Baker-Patrick, Treasurer of Butte Silver Bow County, Montana; Butte Silver Bow; The Department of Revenue of the State of Montana; Does 11/10/2022 DV-22-322 Krueger | Quiet title. | Amanda Hunger Copper City |

## Laramie County District Court
### Wyoming

| | | |
|---|---|---|
| Mariellen Hoyt; Porter Hoyt v. Security Storage LLC 12/12/2022 2022-CV-201-080 Campbell | Conversion. Plaintiffs are sole owners of personal property placed in defendant storage facility by plaintiff Mariellen's daughter, who had powers of attorney that plaintiffs revoked. Initial storage rent was paid by Stevens through the unauthorized use of plaintiff Porter's credit card. Defendant refuses to divulge any information about the storage unit or its contents, the name under which it was rented, or how they will provide protection of the personal property. CNS Plus Download | Tara Nethercott Crowley Fleck |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Bobby Eggleston; Richard Hillhouse v. Peace Officers Standards and Training Commission, State of Wyoming 12/12/2022 2022-CV-201-079 Campbell | Declaratory judgment. Defendant has revoked the peace officer certifications for plaintiffs based on its rules and regulations that are unconstitutionally vague. CNS Plus Download | Matthew Fermelia Woodhouse Roden |

### Natrona County District Court
### Wyoming

| | | |
|---|---|---|
| Alfred Dunihoo, executor; Mandy J. Dunihoo; Janet Dunihoo; Terry Lynn Schrum; Jackie E. Russell; William Monroe Russell v. Peter S. Fine, CEO; Dr. Robert Neff; Elizabeth M. Pieper RN; Lisa Murray Pauk RN; Sarah Mosier RN 12/7/2022 112193 Johnson | Wrongful death, malpractice and negligence. After plaintiffs' decedent died in the hospital plaintiff was told no autopsy or burial could be made because decedent had Covid-19 and she had to be cremated. Decedent's medical charts were inconsistent and confused with another patient's chart. CNS Plus Download | Pro se |

### Albany County District Court
### Wyoming

| | | |
|---|---|---|
| Kyle Doolen v. WP RE Ventures 1 LLC, an IL LLC 11/29/2022 2022-CV-35880 Westby | Contract. Plaintiff contracted to buy property from defendant then defendant notified plaintiff of its intent to cancel the sale and falsely claimed plaintiff mutually agreed to cancel the contract. CNS Plus Download | Caleb Wilkins Evans Walker |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-356**

## Big Sky Report

January 06, 2023

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

### USDC Montana

| | | |
|---|---|---|
| Alliance for the Wild Rockies; Native Ecosystems Council v. Kirsten Kaiser, District Ranger, Kootenai National Forest, Three Rivers Ranger District; Chad Benson, Forest Supervisor, Kootenai National Forest; Keith Lannom, Deputy Regional Forester, US Forest Service Region One; US Forest Service 1/6/2023 9:23 cv 3 Christensen | Environmental tort. Defendants have not properly barred old roads from public access, and are building new roads for a large logging project. These actions will adversely affect the already declining population of grizzly bears in the area and should not be implemented. CNS Plus Download | Rebecca Smith Public Interest Defense |

### USDC Idaho
#### Pocatello

| | | |
|---|---|---|
| Artem Andrianumearisata v. Department of Health and Welfare 1/5/2023 4:23 cv 5 Winmill (Pocatello) | Pro se civil rights. | Pro se |
| Sean Malone v. Walgreen Co.; Does 1/4/2023 4:23 cv 1 Nye (Pocatello) | Removal from Bonneville County. Premises liability. | p: John DeBry d: Cody Witko Jones Williams |

### USDC Wyoming
#### Casper, Cheyenne

| | | |
|---|---|---|
| Jake Stanley DeWilde v. Attorney General of the United States; Director of the Bureau of Alcohol Tobacco Firearms and Explosives 1/6/2023 1:23 cv 3 Skavdahl (Casper) | Civil rights. Defendants' ban on owning or transferring most machine guns is a violation of the right to keep and bear arms. CNS Plus Download | Pro se |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Stephen P. Kelly v. Powell Police Department; Powell Police Officer 1/6/2023 2:23 cv 4 Johnson (Cheyenne) | Pro se civil rights. CNS Plus Download | Pro se |

**Ada County District Court**
**Idaho**

| | | |
|---|---|---|
| Jeffrey Townsend v. Capital Educators Federal Credit Union; Does 1/6/2023 CV01-23-346 Norton | Unfair or deceptive acts or practices and unfair credit reporting. Defendant charged off plaintiff's debt that was suspended pending the outcome of a claim plaintiff had made for insurance to pay the loan off after his wife died. Defendant's action caused negative and unfair reporting in plaintiff's consumer credit file. Punitive damages requested. CNS Plus Download | Pro se |

**Canyon County District Court**
**Idaho**

| | | |
|---|---|---|
| Ayrlett LLC v. Daniel McCoy; Leonard G. Franklin Jr.; Xmark Holding LLC; Xmark Plumbing Products LLC 1/4/2023 CV14-23-121 Grove | Trade secrets and contract. Defendants violated its non-compete agreement and the invention assignment agreement. Defendant Franklin, while working for plaintiff, designed and developed specialty plumbing products for another company that competes with plaintiff's business. CNS Plus Download | D. John Ashby Hawley Troxell |
| Jeff Labahn; Brittney Labahn v. Noble Homes and Construction LLC 1/6/2023 CV14-23-173 Roker | Lien release. Defendant wrongfully filed a lien against plaintiffs' real property even though he had been paid more than the work he had done, and had picked up his final payment. | Jordan McCrea Nielson McCrea |
| BFS Group LLC dba Builders Firstsource v. Christensen Homes LLC; Chad Christensen; Katherine Christensen; Does 1/6/2023 CV14-23-188 Whiting | Construction lien foreclosure. Defendants owe for materials and services. $76,000. | Aaron Atkission Wettjes Atkission |

**Bonneville County District Court**

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**Idaho**

| | | |
|---|---|---|
| Tonya Bunnell v. LSA Development LLC 1/6/2023 CV10-23-120 Whyte | Contract. Defendant has not paid the contracted 3% brokerage fee to plaintiff for the sale of several properties. | John Avondet Beard St Clair |
| Reve Exteriors LLC dba DaBella v. Mark D. Landon; Vickie C. Landon; Provident Funding Associates LP, a CA LP; Shelly M. Casares, Successor Trustee; New Sweden Irrigation District; Westmark Credit Union; First American Title Company. a NE corp.; Ford Motor Credit Company LLC, a DE LLC 1/6/2023 CV10-23-102 Pickett | Lien foreclosure and contract. Plaintiff has not been paid for materials and labor for work performed. $114,000. | Chad Bernards Jones Williams |
| Kayla Walchli v. Benjamin Tracy; The Estate of Maddi Lyn Hanni; Does 1/6/2023 CV10-23-110 Watkins | Car collision. | Dennis Wilkinson Smith Woolf |

**Bonner County District Court**

**Idaho**

| | | |
|---|---|---|
| Douglas Wayne Porter; Cynthia Ann Porter, Trustees of the Porter Family Revocable Living Trust, dated June 25, 2020 v. Kelly Kearns Elk Meadows Ranch Homeowners Association; Scotchmans Peak Estates LLC 1/5/2023 CV09-23-31 Buchanan | Quiet title. | Stephen Snedden |

**Jerome County District Court**

**Idaho**

| | | |
|---|---|---|
| Goff Welding LLC v. The Scoular Company, a NE corp.; TR Welding Inc. fka T&R Welding Inc.; Starr Corporation; Western States Equipment Company; Does 1/5/2023 CV27-23-26 Emory | Lien foreclosure and contract. Plaintiff has not been paid for labor and materials from real property improvement. $159,000. | Rhett Miller Parsons Loveland |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-359**

### Idaho County District Court
### Idaho

| | | |
|---|---|---|
| CHS Inc. dba Primeland Cooperatives v. Danielle R. Wauer, an individual and dba Elk Creek Station and Cafe; Dave Wauer 1/6/2023 CV25-23-7 FitzMaurice | Contract. Defendants owe for goods purchased from plaintiff. $78,000. | Sheila Schwager Hawley Troxell |

### Yellowstone County District Court
### Montana

| | | |
|---|---|---|
| Kristen Rydstrom v. Target 1/6/2023 DV-22-21 Moses | Employment, discrimination and wrongful termination. Defendant fired plaintiff because she needs to sit down when working because of a disability. CNS Plus Download | Pro se |
| Clay Green v. State Farm Mutual Automobile Insurance Company; Travis Muri 1/6/2023 DV-23-25 Fehr | Insurance contract and car collision. Defendant Muri ran a red light and hit plaintiff, causing injury and car damage. Plaintiff had uninsured motorist insurance with defendant State Farm but they are only paying him for a portion of his damages. | Joseph Cook Heenan Cook |
| Department of Labor & Industry ex. rel. Katelyne N. Plaster v. Yellowstone Coffee Express LLC dba Mountain Mamas Coffee 1/6/2023 DV-23-24 Harris | Judgment in favor of plaintiff. $523. | Lindsey Simon |

### Gallatin County District Court
### Montana

| | | |
|---|---|---|
| Big Sky Resort Area District v. Erika & Company; Erika Jennings 1/5/2023 DV-23-12 Breuner | Collections and contract. Defendants haven't filed their tax forms nor paid resort taxes to plaintiff for a portion of 2022. | Kimberly Beatty Browning Kaleczyc |
| Emily Kramer v. Carta Inc.; Eshares Inc. dba Carta Inc. Does 1/5/2023 DV-23-13 Breuner | Out of state subpoena requested to be served on non-party Montana resident Heidi Johnson. | p: Sharon Vinick Levy Vinick d: Anjali Vadillo Orrick Herrington |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

**ER-360**

**Missoula County District Court**

**Montana**

| | | |
|---|---|---|
| Curtis Gehrke v. Missoula County 1/3/2023 DV-23-10 Halligan | Employment, wrongful termination and FEMA. Plaintiff had worked for defendant for 21 years when he requested time off for a medical condition that required surgery. While on leave, plaintiff used a friend's truck to sand the road to his home and defendants fired him for abuse of sick leave. CNS Plus Download | Nate McConnell |

**Ravalli County District Court**

**Montana**

| | | |
|---|---|---|
| Paul Coleman v. Bitterroot Tool & Machine Inc.; Does 1/5/2023 DV-23-9 Recht | Employment, discrimination and wrongful termination. Plaintiff was fired without cause because of his age. CNS Plus Download | Adrienne Tranel Datsopoulos MacDonald |
| John Herrera dba Curb It Edging and Landscaping Services v. Grenfell Garage LLC; Does 1/5/2023 DV-23-8 Recht | Negligence. Plaintiff took his truck to defendant for repairs, but while they were driving it for a diagnostic test, they drove so recklessly that they overboosted the truck's turbo charger and caused it to blow up. CNS Plus Download | Thomas Schoenleben Bitterroot Law |

**Flathead County District Court**

**Montana**

| | | |
|---|---|---|
| Best Capital Services LLC as power of attorney for Russell Geidl 1/5/2023 DV-23-16 Coffman | Mandate. Plaintiff asks the court to give plaintiff surplus funds after a trustee's sale of Russell Geidl's real property. $47,000. | Alex Hamman Calton Hamman |

**Lake County District Court**

**Montana**

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.

| | | |
|---|---|---|
| Lakeview Loan Servicing LLC v. Unknown heirs and devisees of the estate of William T. Johnson; FirstPlus Financial Inc. dba First Plus Direct 12/14/2022 DV-22-222 Christopher | Quiet title and judicial foreclosure. | Lewis N. Stoddard Halliday Watkins |

**Wyoming Chancery Court**
**Wyoming**

| | | |
|---|---|---|
| Alex Fontaine v. Skyview Partners LLC; Alden Wonnell; Mike Danford 1/6/2023 CH-23-1 | Judgment. Plaintiff and defendant Wonnell created defendant business Skyview in 2019. Defendant Danford came on board and attempted to become a 1/3 owner, but after that he and defendant Wonnell tried to cut plaintiff out of the profit sharing. Plaintiff would like a declaratory judgment regarding his ownership interest in the company and the profits. | John Graham Geittmann Larson |

If you have any questions about subscriptions or need a re-send, please contact our home office at (626) 577-6700.