No. 24-6697

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

COURTHOUSE NEWS SERVICE,

*Plaintiff-Appellee*,

v.

SARA OMUNDSON,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the District of Idaho,

Case No. 1:21-CV-00305-DCN, the Honorable David C. Nye, Presiding

---

**EXCERPTS OF RECORD, VOL. 4**

---

Keely E. Duke
Molly E. Mitchell
Duke Evett, PLLC
1087 West River Street, Suite 300,
Boise, ID 83702
Telephone (208) 342-3310
Email: ked@dukeevett.com; mem@dukeevett.com

*Attorneys for Appellant Sara Omundson*

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                    Plaintiff,<br><br>          v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>                    Defendant. | Case No: 1:21-cv-00305-DCN<br><br>**NOTICE OF ERRATA REGARDING DECLARATION OF JONATHAN G. FETTERLY IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT [DKT 66]** |

Plaintiff Courthouse News Service ("Courthouse News"), by and through the

undersigned counsel of record, hereby files this Notice of Errata to correct an inadvertent

omission from the "Declaration of Jonathan G. Fetterly in Support of Courthouse News' Motion

for Summary Judgment with Exhibits 1-11" (Dkt. 66).  The document filed as Docket No. 66

**NOTICE OF ERRATA RE: DECLARATION OF JONATHAN G. FETTERLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. 66]- 1**

contains Exhibits 1 to 11 to Mr. Fetterly's declaration but does not contain the declaration itself.

Courthouse News submits this Notice of Errata and a complete version of the "Declaration of

Jonathan G. Fetterly in Support of Plaintiff Courthouse News Service's Motion for Summary

Judgment with Exhibits 1-11" and respectfully requests that it be considered in place of the

incomplete document filed as Docket No. 66.

DATED this 19th day of December, 2022.

BRYAN CAVE LEIGHTON PAISNER LLP

_/s/ Katherine Keating_
Katherine Keating
*Attorneys for Courthouse News Service*

NOTICE OF ERRATA RE: DECLARATION OF JONATHAN G. FETTERLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. 66]- 2

ER-650

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone: (208) 388-1200
Facsimile: (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone: (415) 675-3400
Facsimile: (415) 675-3414

*Attorneys for Courthouse News Service*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>             Plaintiff,<br><br>v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>             Defendant. | Case No: 1:21-CV-00305-DCN<br><br>**DECLARATION OF JONATHAN G. FETTERLY IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[with Exhibits 1-11]** |

**Exhibit 1 to Declaration of Jonathan Fetterly**

Excel spreadsheet submitted in native form on flash drive.

# EXHIBIT 2
# FETTERLY DECLARATION

11.11.2022
30(b)(6) Omundson
**39**
Buell Realtime Reporting

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>Defendant. | CASE NO. 1:21-CV-00305-DCN<br><br>**DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES** |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke Evett, PLLC, hereby supplements her objections, answers, and responses to Plaintiff's First and Third Set of Interrogatories.

## **INTERROGATORIES**

INTERROGATORY NO. 1: State all reasons or justifications supporting the policy or practice of withholding access to new e-filed civil complaints filed with the Idaho District Courts until after those complaints have been Processed or Accepted.

ANSWER TO INTERROGATORY NO. 1: Omundson objects to this interrogatory on

the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered in the Court's case management system, until it has been Processed and Accepted.

Subject to and without waiver of this objection, Omundson responds that the policies and justifications for not providing access to documents that have been submitted but not yet Processed or Accepted are as follows: (1) the public is not provided with access to documents that have not been Processed or Accepted because such documents are not filed and not entered in the court's case management system until they have been Accepted. Providing documents to the public before they are in the court's case management system may mislead the public to believe documents are court filings when they are not yet filed and may never be filed; (2) Tyler Technologies' Auto Accept function has not been implemented because this would allow documents to be filed, and therefore become part of the official record, even if the filing requirements that exist in Idaho Court Rules (e.g. payment of a filing fee and redaction requirements) have not been met or the action had been filed in an improper jurisdiction or venue, which would require judicial action that would add to the already incredibly busy schedules of judges and their court staff; (3) in addition, the Auto Accept function has not been implemented because it creates additional work for Idaho's already busy judges and a privacy risk to litigants and third parties (e.g. publication of sensitive information in a court submission), which would require judicial action to correct; (4) Tyler Technologies' Press Review Queue presents similar concerns because submissions that are Rejected could be published and/or reported on even though such submissions are not yet court filings, do not exist in the court's case management system or in a court file, and may never be entered in the Court's case management system; (5)

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -2

the Press Review Queue does not have any function to ensure that the security settings of documents are accurately reflected, that sensitive information about litigants and/or third parties contained in a submission (e.g. a petition for a civil protection order) will be redacted or otherwise not made available to the press and/or public, whereas the clerks can Reject an improperly redacted submission to ensure confidential information remains protected and can set the proper security setting to a document based upon Idaho Court Administrative Rule 32; (6) the Press Review Queue presents resource concerns because there is a subscription cost, hardware costs, and costs associated with personnel needed to manage the Press Review Queue; and (7) the Press Review Queue presents potential cyber security risks.

In addition, Omundson refers CNS to the Affidavit of Margaret Molchan (Dkt. 20-14); the Affidavit of Judge Hippler (Dkt. 20-16), the Affidavit of Carley Nelson (Dkt. 20-20), and the Declaration of Marissa Garza (Dkt. 23-1).

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 1:  Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 1. Omundson supplements her original response as follows. A document submitted through Tyler Technology's File and Serve system is not a judicial document.  It is not a judicial document because it has not been accepted by the district court clerk for transfer from Tyler Technology's File and Serve system and docketing in the court's case management system.  As such, a document in Tyler Technology's File and Serve system: (1) is not filed in the court's case management system and, therefore, is not part of the court's docket, and may never be.; (2) does not initiate a case; (3) is not relevant to the performance of a judicial function because no case has been initiated yet and therefore cannot materially assist the public in understanding issues before a court because such issues are not yet before a court; (4) does not trigger legal obligations

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -3

because no case has been initiated yet; and (5) does not help the public in evaluating the fairness and integrity of the court's proceedings because no case has been initiated yet. Please also see the Supplemental Answer to Interrogatory No. 12. Omundson also refers CNS to her answer to Interrogatory No. 23, which provides updated information regarding hardware costs.

INTERROGATORY NO. 2:    State all reasons or justifications for not providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to all reasons for not providing access to those complaints through a Press Review Queue or through Auto Accept.

ANSWER TO INTERROGATORY NO. 2: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 2:    Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 2. Omundson supplements her original response as follows. The mere submission of a document intending to initiate a case does not initiate a case. The case is not initiated until the document is accepted by the Court Clerk and then transferred from Tyler Technologies' File and Serve system to the Court's case management system. At that time of such transfer, the accepted document is then docketed in Court's case management system and is immediately available to the public,

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -4

including CNS.

INTERROGATORY NO. 5:  Identify all governmental interests that You contend could not be adequately protected by providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with the Idaho District Courts prior to Processing or Acceptance, including the basis for Your contention(s) with respect to each such governmental interest.

ANSWER TO INTERROGATORY NO. 5: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.  Omundson further responds that the government has an interest in ensuring that confidential information of litigants and/or third parties is not made available to the press or the public. Auto Accept and the Press Review Queue undermine this governmental interest for the reasons discussed in the Answer to Interrogatory No. 1. The government also has an interest in ensuring that the press and public are presented with accurate information regarding civil filings.  The Press Review Queue could result in the publication of inaccurate information regarding civil filings (i.e. if  a submission that is Rejected, and thus never filed or an official court document, is reported on as if it were a filed document and an official court record.).  The government also has an interest in conserving judicial and administrative resources. Auto Accept and the Press Review Queue do not further these interests because there are subscription, hardware and personnel costs associated with remaining the Press Review Queue and Auto

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -5

Accept could result in improper filings that would require judicial action and resources to correct.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 5:   Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 5. Omundson supplements her response as follows. Omundson refers CNS to the refers CNS to the Affidavit of Margaret Molchan (Dkt. 20-14); the Affidavit of Judge Hippler (Dkt. 20-16), the Affidavit of Carley Nelson (Dkt. 20-20), and the Declaration of Marissa Garza (Dkt. 23-1).   Omundson further responds that electronic submissions are housed in Tyler's Odyssey File & Serve prior to clerk review and acceptance or rejection. When documents are in Odyssey File & Serve, clerks can communicate directly with the submitter and any other individuals listed as a service contact, including communications related to reasons for rejection. This functionality is not available in Case Manager, which is where documents are transferred once they have been accepted for filing. Once a document is in Case Manager, a clerk would have to track down contact information for the submitter and any other service contacts and send an email if there are issues with a document that has been accepted for filing. This takes substantially more time than communicating directly through the portal. This is also problematic because although communication in OFS are not available in a central location, that is not true of communications once documents are transferred to the case management system and are instead only available in the individual clerk's email. This presents problems with keeping track of communications relating to documents that should not have been transferred into Case Manager.  Further, clerks are only able to communicate with a submitter if the document includes their contact information (which a party may fail to include, especially if they are pro se). Clerks' workloads would increase substantially if all communications related to improper submissions had to take place once the document was already in Case Manager. Finally, Tyler's Odyssey File & Serve software allows clerks to track

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF
INTERROGATORIES -6

data and trends related to electronic submissions, which provides useful information relating to common reasons for rejection and individual clerk performance. With Auto Accept, electronic submissions never go through Odyssey File & Serve, and therefore this functionality would not be available to the clerks. Omundson also refers CNS to her answer to Interrogatory No. 23, which provides updated information regarding hardware costs. With respect to the other costs identified in her original answer to Interrogatory No. 5, Omundson further responds that the Idaho Supreme Court has discretion on how to manage the State's judicial resources and has determined that incurring the costs associated with the Press Review Queue and Auto Accept is not a reasonable and prudent use of the State's judicial resources.

INTERROGATORY NO. 12: Identify all AOC, Trial Court Administrator or District Clerk policies and statutes, rules, regulations, or other sources of legal authority that You contend support or require the policy and practice of restricting or prohibiting public or press access to new e-filed non-confidential civil complaints upon receipt by the Idaho District Courts until after Processing or Acceptance, including the basis for your contention(s) with respect to each policy, statute, rule, regulation or other authority cited.

ANSWER TO INTERROGATORY NO. 12: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Omundson further objects to this interrogatory on the grounds that it seeks information not within her custody or control; she does not supervise county clerks and does not have copies of their policies. Subject to and without waiver of these objections, Omundson responds that Idaho Rule

on Electronic Filing and Service ("IREFS") 3 defines the official court record to be the electronic case file maintained by the court as well as any paper filings and other conventional filings maintained in accordance with court rules. This does not include documents that reside in Tyler Technologies' Online Filing System program. IREFS 13 authorizes court clerks to reject submitted documents that do not comply with the electronic filing rules.  Rejected documents are not part of the official court record because they are not included in an electronic case file maintained by the courts. Once a document has been accepted by a clerk it is moved out of the OFS system and placed in the Court's case management system, becoming an official court record pursuant to IREFS 3. At that time the Administrative Office of Courts follows Idaho Court Administrative Rule 32 and any relevant court orders in determining the security status of a document.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 12:  Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 12. Omundson supplements her original response as follows. To file a document under seal, the document must be filed conventionally (i.e. not electronically) along with a motion to seal pursuant to IREFS 5(h). IREFS 10(a) specifies that acceptance of the document (not submission) triggers payment to be captured. IREFS 10(b) specifies a document is "deemed to have not been filed" if it is rejected based on a denial of a fee waiver application. IREFS 17 states the electronic filing system (i.e. OFS) sends a notice of electronic filing both "[w]hen the filer submits, and again when the document is accepted for filing under Rule 11[.]" IREFS 17(f). These provisions further establish a document is not filed when it is pending clerk review in Tyler's Odyssey File & Serve; it is filed upon acceptance and transfer into the court's case management system. Omundson also refers CNS to documents produced at SO001582-1590.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -8

INTERROGATORY NO. 18: Identify each category of civil complaint available for filing in the Idaho District Courts that You contend must be kept confidential by the Idaho District Courts by operation of rule or law (including categories of civil complaints You contend are "exempt from public disclosure"), without the need for a motion or request for sealing.

ANSWER TO INTERROGATORY NO. 18: Omundson objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of this objection, Omundson refers CNS to Idaho Court Administrative Rule 32(g) and the documents produced at SO 005360-5364. There are no documents for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) that must be kept confidential by the Idaho District Courts by operation of rule or law without the need for a motion or request for sealing.

INTERROGATORY NO. 19: For each category You identified in response to Interrogatory No. 18, state the number of civil complaints in that category or type e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022.

ANSWER TO INTERROGATORY NO. 19: Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -9

Subject to and without waiver of these objections, and based on the definitions of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that 9,833 civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 19: Omundson objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of these objections, and based on the definitions of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that no civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022 that were required to be kept confidential by the Idaho District Courts by operation of rule or law without the need for a motion or request for sealing. Omundson's original response erroneously referred to the total number of civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022.

INTERROGATORY NO. 20: State the number of civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022 with a motion or request for sealing.

ANSWER TO INTERROGATORY NO. 20: Omundson objects to this Interrogatory on

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -10

the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that from January 1, 2020 through July 21, 2022, one civil complaint in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) was e-filed between January 1, 2020 and July 31, 2022.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 20: Omundson incorporates by reference her objections and answer to Interrogatory No. 20 set forth above. Omundson supplements her original response include the objections that Interrogatory No. 2 is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Omundson supplements her original response as follows. To file a document under seal, the document must be filed conventionally (i.e. not electronically) along with a motion to seal pursuant to IREFS 5(h). Thus, the complaint referenced in Omundson's original response did not comply with the requirements of IREFS 5(h), but was nevertheless accepted for filing.

INTERROGATORY NO. 21: Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected.

ANSWER TO INTERROGATORY NO. 21: Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague;

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -11

Interrogatory No. 22 asks about civil complaints that were Rejected, corrected, and then Accepted, so it is unclear if Interrogatory No. 21 is asking for the total number of Rejected civil complaints, or only those that were Rejected and then not resubmitted. Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,642 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected. Omundson calculated this number based on the number of times a civil complaint was Rejected, meaning if a civil complaint was submitted and Rejected four times, each of the filings were counted in calculating this number.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 21: Omundson incorporates by reference her objections and answer to Interrogatory No. 21 set forth above. Omundson supplements her original response include the objections that Interrogatory No. 21 is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of these objections, Omundson does not have any substantive change to her answer to Interrogatory No. 21 set forth above.

INTERROGATORY NO. 22: Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected, subsequently corrected and re-submitted by the filer, and ultimately Accepted.

ANSWER TO INTERROGATORY NO. 22: Omundson objects to this Interrogatory on

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -12

the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,025 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected, subsequently corrected, resubmitted by the filer, and ultimately Accepted. Omundson calculated this number based on the number of times a civil complaint was Rejected and resubmitted, meaning if a civil complaint was submitted and Rejected and resubmitted four times, each of the filings were counted in calculating this number. Omundson further responds that 28% of rejected filings are missing identifying information that would allow a match with a resubmitted and Accepted filing. These results were also based on the time litigants are allowed to resubmit e-filed complaints before they are considered a new filing (3 days per Rule 13(c) of the Idaho Rules for Electronic Filing and Service).

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 22: Omundson incorporates by reference her objections and answer to Interrogatory No. 22 set forth above. Omundson supplements her original response include the objections that Interrogatory No. 22 is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of these objections, Omundson does not have any substantive change to her answer to Interrogatory No. 22 set forth above.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -13

INTERROGATORY NO. 25: Identify the "potential cyber security risks" presented by the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

ANSWER TO INTERROGATORY NO. 25: Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all cyber security risks associated with the Press Review Queue. Subject to and without waiver of this objection, Omundson refers CNS to the document titled "Risk Memorandum" and dated August 18, 2022. Omundson further responds that Tyler has refused to respond to numerous questions from the AOC regarding security concerns with the Press Review Queue. Tyler has refused to provide an answer to the AOC's questions about whether the Press Review Queue provides a link to the original pleading or a copy of the pleading. Providing a link to the original document raises serious concerns about document security if the system is hacked because filings could be deleted or altered without any backup to the original document. Tyler has also refused to provide a customer attestation letter from their underlying IaaS provider, AWS, indicating Tyler is a customer in good standing and which environment will be storing, processing, and transmitting Idaho District Court's data. Tyler has also refused to provide the architecture and/or data flow diagram to the AOC so that the AOC can understand the Press Review Queue's backend processes for data transfer. Tyler has also refused to provide its policies and procedures surrounding data security. Even though a Non-Disclosure Agreement has been signed, Tyler refuses to provide these policies and procedures on the grounds that this would allegedly violate company policy. Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 25: Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 25. Omundson

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -14

supplements her original response as follows. Tyler has informed the AOC that the Press Review Queue utilizes the same document database as OFS itself, thus the queue provides users a link to the original pleading (as opposed to a copy of the pleading). Providing a public facing uniform resource locator (url) link to the original document increases access to that file, thereby increasing risk to that original file. This raises serious concerns about document security as a public facing url listed in the Press Review Queue increases the possibility of a breach of the OFS database in which original submitted documents could be locked, deleted, or altered prior to being reviewed by clerks or transferred to the case management system.

DATED this 7th day of November, 2022.


DUKE EVETT, PLLC


By  /s/Keely E. Duke
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*


## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber N. Dina                amberdina@givenspursley.com
Katherine A. Keating        katherin.keating@bclplaw
Jonathan G. Fetterly        jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke


DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -15

# EXHIBIT 3
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF REQUESTS FOR ADMISSION** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke

Evett, PLLC, hereby provides supplemental and amended objections, answers, and responses to

Plaintiff's First and Third Set of Requests for Admissions.

## REQUESTS FOR ADMISSION

REQUEST FOR ADMISSION NO. 6: Admit that as of June 15, 2022, You have

not

asked Tyler Technologies to provide a Press Review Queue for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 6: Omundson admits that as of June

15, 2022, she has not asked Tyler Technologies to provide a Press Review Queue for the Idaho

Courts based on the security concerns and costs associated with the Press Review Queue set forth

in her answer to Interrogatory No. 1.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 6: Omundson

incorporates by reference her original answer to Request for Admission No. 6 and supplements her

response by referring CNS to her supplemental answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 7:  Admit as of June 15, 2022, you have not at any

time attempted to negotiate or lower any price quoted by Tyler Technologies for a Press Review

Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 7: Omundson admits that as of June

15, 2022, she has not attempted to negotiate or lower any price quoted by Tyler Technologies for

a Press Review Queue, however cost concerns are not the sole reason for her decision to not

implement a Press Queue. Omundson refers Plaintiffs to her response to Interrogatory No. 1

regarding the reasons for not implementing a Press Review Queue. Omundson further responds

that questions relating to the price of the Press Review are inconsistent with CNS' representations

to the Court that the Press Review Queue is free. *See e.g.* Dkt. 14-1 at 6.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 7: Omundson

incorporates by reference her original answer to Request for Admission No. 7 and supplements her

response by referring CNS to her supplemental answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 8:  Admit that as of June 15 2022, You have not

asked Tyler Technologies to provide an Auto Accept system for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 8:  Omundson admits that as of June

15, 2022, she has not asked Tyler Technologies to provide an Auto Accept System for the Idaho

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD
SET OF REQUESTS FOR ADMISSION - 2

Courts based on the concerns with Auto Accept set forth in her answer to Interrogatory No. 1.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 8: Omundson incorporates by reference her original answer to Request for Admission No. 8 and supplements her response by referring CNS to her supplemental answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 9: Admit that You are aware that Tyler Technologies has agreed to deliver the APIs for the Press Review Queue to its partners.

RESPONSE TO REQUEST FOR ADMISSION NO. 9: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it does not define "partners." Subject to and without waiver of this objection, Omundson admits that she is aware that Tyler Technologies has represented it will deliver APIs for the Press Review Queue. She has been told that Tyler Technologies is reporting that the delivery of an API is now delayed from the original projected date and that there is not a clear time frame for delivery.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 9: Omundson incorporates by reference her original answer to Request for Admission No. 9 and supplements her response as follows. Tyler Technologies has not provided any information to the AOC relating to the cost of creating and/or maintaining an API for the Press Review Queue.

REQUEST FOR ADMISSION NO. 17: Admit that under the default configuration for File & Serve, nonconfidential e-filed civil complaints are not available for viewing by the press or public until after they are "Accepted" by court staff.

RESPONSE TO REQUEST FOR ADMISSION NO. 17: Denied; all documents are immediately available upon filing, which requires acceptance by a court clerk pursuant to Rule 12 of the Idaho Rules for Electronic Filing and Service.

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD
SET OF REQUESTS FOR ADMISSION - 3

AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 17: Omundson amends her response to Request for Admission No. 17 as follows. Denied; all documents are available upon filing once accepted to and docketed in the court's case management system. Dockets submitted in Tyler's Odyssey File & Serve are not filed, and are therefore not judicial documents as they have not been accepted to or docketed in the court's case management system.

REQUEST FOR ADMISSION NO. 21: Admit that Tyler Technologies offers the Press Review Tool as "an application that works in conjunction with eFile & Serve to provide Clerks the option to grant access to filings as soon as they are filed (prior to Clerk review)," as stated on the page bates-labeled SO 000003 of the document titled "Auto-Accept Review & Press Review Tool" (Exhibit 1).

RESPONSE TO REQUEST FOR ADMISSION NO. 21: Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson admits she is aware Tyler Technologies offers a Press Review Tool and that Tyler Technologies has made representations that it works as identified in SO 000003. Omundson otherwise responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 21: Omundson amends her response to Request for Admission No. 21 as follows. Denied; all documents are available upon filing once accepted to and docketed in the court's case management system. Dockets submitted in Tyler's Odyssey File & Serve are not filed, and are therefore not judicial documents as they have not been accepted to or docketed in the court's case management system.

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD
SET OF REQUESTS FOR ADMISSION - 4

DATED this 7th day of November, 2022.

DUKE EVETT, PLLC

By: /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of November, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke_____
Keely E. Duke

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF REQUESTS FOR ADMISSION - 5

# EXHIBIT 4
# FETTERLY DECLARATION

**(Effective July 1, 2022)**

**APPENDIX "A"**

**FILING FEE SCHEDULE - DISTRICT COURT AND MAGISTRATE DIVISION**

## COMMENCING A CIVIL ACTION

A civil action is commenced by filing a complaint, petition, application, or other document that begins a new civil lawsuit. A civil action is commenced if the clerk opens a new case file rather than filing the document in an existing case file. Whether a filing fee is charged does not depend upon the title or name of the document filed, but upon whether it commences a new case.

In a civil lawsuit, a party usually seeks to obtain an order or judgment from the court against another party. However, there are some times when a clerk will have to file a document, such as registering a trust, when it will not commence a lawsuit.  In such instances, no filing fee will be charged.

Only one filing fee is charged even if the complaint, petition, or application includes two or more separate claims for relief. If the claims would have differing filing fees if they were filed as separate actions, then the appropriate fee is whichever is higher; for example, if one action was filed to have a marriage annulled or, if that were denied, to obtain a divorce, the appropriate filing fee would be the fee for filing a divorce action because it is higher than the filing fee for an annulment. Likewise, if one action was filed to compromise a minor's claim and to appoint a conservator, the appropriate filing fee would be for the appointment of a conservator.

The fee for opening any civil case in the District Court not found on this schedule is $221.00 and the correct filing fee code is AA. The fee for opening any civil case in the Magistrate Division not found on this schedule is $166.00 and the correct filing fee code is A.

## APPEARING IN A CIVIL ACTION  (Category I)

An appearance is the first document filed by a party (other than the plaintiff or petitioner) in an existing civil action, regardless of whether it is filed *pro se* or through counsel and regardless of the title of the document (e.g., "notice of appearance," "answer," "motion," or other title).

If a party acting *pro se* has already filed an appearance in an action and then an attorney later files a "notice of appearance" to appear on behalf of that party, the attorney's "notice of appearance" does not constitute an appearance for the purpose of assessing a filing fee because the party has already appeared in the action *pro se*.

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| A. A. All initial civil case filings in District Court of any type not listed in categories E, F, and H(1). | | | | | | | | | |
|   1. Creditor/debtor collections | | | | | | | | | |
|     (more than $10,000) | | | | | | | | | |
|   2. Breach of contract | | | | | | | | | |
|     (more than $10,000) | | | | | | | | | |
|   3. Employment dispute | | | | | | | | | |
|     (more than $10,000) | | | | | | | | | |
|   4. Real property | | | | | | | | | |
|     (more than $10,000) | | | | | | | | | |
|   5. Medical malpractice | | | | | | | | | |
|     (more than $10,000) | | | | | | | | | |
|   6. Personal injury | | | | | | | | | |
|     (more than $10,000) | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 135.00 | 6.00 | 221.00 |
| A. All initial case filings in Magistrate Division of any type not listed in categories B, C, D, G, and H(2): | | | | | | | | | |
|   1. Adoptions | | | | | | | | | |
|   2. Adoption and Termination of parental rights | | | | | | | | | |
|   3. Termination of parental rights | | | | | | | | | |
|   4. Personal Injury | | | | | | | | | |
|     ($10,000 or less) | | | | | | | | | |
|   5. Petition for formal probate | | | | | | | | | |
|   6. Application for informal probate | | | | | | | | | |
|   7. Name change | | | | | | | | | |
|   8. Relief from interlock device | | | | | | | | | |
|   9. Child Support / Custody | | | | | | | | | |
|   (unless filed by DHW) | | | | | | | | | |
|   10. Habeas by prisoners | | | | | | | | | |
|   11. Paternity action | | | | | | | | | |
|   12. Unlawful detainer / Eviction | | | | | | | | | |
|   13. Defacto custodian | | | | | | | | | |
|   14. Relief from firearm disability | | | | | | | | | |
|   15. Legal separation | | | | | | | | | |
|     a. with minor children | | | | | | | | | |
|     b. without minor children | | | | | | | | | |
|   16. Surrogacy/Gestational Carrier | | | | | | | | | |
|   17. Creditor/debtor collections | | | | | | | | | |
|     ($10,000 or less) | | | | | | | | | |
|   18. Breach of contract | | | | | | | | | |
|     ($10,000 or less) | | | | | | | | | |
|   19. Employment dispute | | | | | | | | | |
|     ($10,000 or less) | | | | | | | | | |
|   20. Real property | | | | | | | | | |
|     ($10,000 or less) | | | | | | | | | |
|   21. Medical malpractice | | | | | | | | | |
|     ($10,000 or less) | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 80.00 | 6.00 | 166.00 |

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| B. 1. Divorce State portion includes additional $20 displaced homemaker fund and additional $20 domestic violence fund district court fund includes $5.00 taken from the State General Fund fee, which shall be separately identified and deposited in the District Court Fund, for establishing a uniform system of qualifying counselors in domestic violence cases. I.C. § 31-3201A(q)<br>  a. with minor children<br>  b. without minor children | 10.00 | 26.00 | 10.00 | 52.00 | | 23.00 | 80.00 | 6.00 | 207.00 |
| 2. Petition or stipulation to reopen or modify divorce<br>  a. with minor children<br>  b. without minor children | 10.00 | 26.00 | 10.00 | 15.00 | | 17.00 | 70.00 | 6.00 | 154.00 |
| 3. Amended complaint to convert an action that was not one for divorce (e.g. separate maintenance) into an action for divorce ($1.00 for court clerk fees I.C. § 39-266 & $20 for the displaced homemaker account I.C. § 39-5009 & $20 domestic violence project, I.C. § 39-5213)<br><br>  a. with minor children<br>  b. without minor children | | | | 41.00 | | | | | 41.00 |
| C. Small claims | | 26.00 | 10.00 | | | 7.00 | 20.00 | 6.00 | 69.00 |
| D. Summary administration of small estates | | | 10.00 | 17.00 | | 17.00 | 80.00 | 6.00 | 130.00 |
| E. Petition for release from common law lien | | | | | | 35.00 | | | 35.00 |
| F. Petition for entry of judgment on worker's comp award | 10.00 | 26.00 | 10.00 | | | 9.00 | 20.00 | 6.00 | 81.00 |
| G. 1. Guardianships<br>  a. Initial Petition motion or apperance by any person on behalf of a minor.<br>  b. Initial Petition motion or appearance by any person on behalf of an incapacitated person. | 10.00 | 26.00 | 10.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 216.00 |
| 2. Conservatorship<br>  a. Initial Petition motion or apperance by any person on behalf of a minor.<br>  b. Initial Petition motion or appearance by any person on behalf of an incapacitated person. | 10.00 | 26.00 | 10.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 216.00 |
| 3. Joint petition for guardianship/ conservatorship or joint petition for receipt and acceptance of foreign guardianship<br>  a. where same party is guardian and conservator of a minor person<br>  b. where same party is guardian and conservator of incapacitated person | 10.00 | 26.00 | 10.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 216.00 |

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| c. where different parties are petitioners for guardian and conservator of a minor | | | | | | | | | |
| d. where different parties are petitioners for guardian and conservator of incapacitated person (considered two filings) | 20.00 | 52.00 | 20.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 262.00 |
| 4. Status reports guardianship | | | | | 25.00 | | | | 25.00 |
| 5. Intermediate or final account of conservator | | | | | 41.00 | 9.00 | | | 50.00 |
| 6. Petition for distribution of estate in conservatorship | | | | 13.00 | 41.00 | 6.00 | | 6.00 | 66.00 |
| 7. Inventories by conservator | | | | | 41.00 | | | | 41.00 |

H. Case filings with no fee
  1. In District Court
    a. Petition for sterilization
    b. Judicial consent for abortion petitions
    c. Post-conviction act proceedings*
    d. Stipulation for entry of judgment*
    e. Court initiated contempt*
  2. In Magistrate Division
    a. Cases brought under Ch. 3, Title 66, I.C. for commitment of mentally ill persons
    b. Demand for bond before personal representative is appointed.
    c. Petition to compromise minor's claim
    d. Petition for civil protection order
      (i) Petition for civil protection order or to enforce foreign CPO pursuant to I.C. 39-6304 or 39-6306A (domestic violence)
      (ii) Petition for civil protection order pursuant to I.C. 18-7907 (malicious harassment, stalking, and telephone harassment)
    e. Post-conviction act proceedings*
    f. Stipulation for entry of judgment after initial case filing or reopening fee paid*
    g. BAC license suspension
    h. Child support proceedings filed by DHW
    i. Fugitive warrants
    j. Court initiated contempt*
    k. Child protective cases
    l. Proceeding to suspend a license for non-payment of child support
    m. Petition for review of out of home placement
    n. Cases brought under Ch. 4, Title 66, IC, for commitment of developmentally disabled persons
  3. Registration of trusts and renunciations

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| 4. Filing of a custody decree from another state *Whether filing is in district court of magistrate division depends upon individual case. | | | | | | | | | No Fee |
| I. The fees set out in Category I apply to the first document filed by a party other than the plaintiff or petitioner no matter what the documents are entitled. | | | | | | | | | |
| 1. Initial Appearance by persons other than the plaintiff or petitioner | 10.00 | 26.00 | | 10.00 | | 4.00 | 80.00 | 6.00 | 136.00 |
| a. Motion for Permissive Intervention - Defacto custodian | 10.00 | 26.00 | | 10.00 | | 4.00 | 80.00 | 6.00 | 136.00 |
| 2. Small Claims | | | | | | | | | No fee |
| 3. Stipulation for entry of judgment | | | | | | | | | No fee |
| 4. Any objection or motion filed in a guardianship or conservatorship by the minor or alleged incapacitated person | | | | | | | | | No fee |
| 5. Appearing after judgment when the party has not previously appeared | 10.00 | 26.00 | | 10.00 | | 9.00 | 80.00 | 6.00 | 141.00 |
| J. Additional filings in probate and trusts: the following fees shall be collected from any person filing the following documents, whether or not the person has appeared previously: | | | | | | | | | |
| 1. Probate | | | | | | | | | |
| a. petition for distribution of estate | | | | 13.00 | | 6.00 | | 6.00 | 25.00 |
| b. demand for notice | | | | | | 9.00 | | | 9.00 |
| c. demand for bond after appointment of personal representative | | | | | | 9.00 | | | 9.00 |
| d. intermediate or final accounting of personal rep | | | | | | 9.00 | | | 9.00 |
| e. petition for approval of compromise | | | | 10.00 | | 4.00 | | | 14.00 |
| f. filing of copy of appointment of foreign personal representative | | | | 10.00 | | 17.00 | | | 27.00 |
| 2. Trusts and Renunciations | | | | | | | | | |
| a. intermediate or final accounting of trustee | | | | | | 9.00 | | | 9.00 |
| b. petition for final distribution of estate | | | | 13.00 | | 6.00 | | 6.00 | 25.00 |
| K. Special Filings | | | | | | | | | |
| 1. Order granting change of venue (pay to new county). | | | | | | 9.00 | 20.00 | | 29.00 |
| 2. Petition, motion or stipulation to reopen a case after no activity for one year | 10.00 | 26.00 | 10.00 | | | 9.00 | 70.00 | 6.00 | 131.00 |
| 3. Third party complaint – This fee is in addition to any fee filed as a plaintiff initiating the case or as a defendant appearing in the case | | | | | | 8.00 | | 6.00 | 14.00 |
| 4. Cross claim (defendant v. defendant or plaintiff v. plaintiff). This fee is in addition to any fee filed as a plaintiff to initiate the case or as a defendant appearing in the case | | | | | | 8.00 | | 6.00 | 14.00 |

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| a. For divorce when the complaint did not allege a claim for divorce. The $41 fee is *in addition* to the fee for a general cross-claim.  ($1 for court clerk fee, I.C. § 39-266 & $20 for displaced homemaker account, I.C. § 39-5009 & $20 domestic violence project, I.C. § 39-5213) | | | | | | | | | |
| 1. With minor children | | | | | | | | | |
| 2. Without minor children | | | | 41.00 | | 8.00 | | 6.00 | 55.00 |
| 5. Counterclaim for divorce when the complaint did not allege a claim for divorce *($1.00 for court clerk fees I.C. § 39-266 & $20 for the displaced homemaker account I.C. § 39-5009 & $20 domestic violence project, I.C. § 39-5213) | | | | | | | | | |
| a. With minor children | | | | | | | | | |
| b. Without minor children | | | | 41.00 | | | | | 41.00 |
| 6. Renewing a judgment | | | | | | 9.00 | 20.00 | | 29.00 |
| 7. Filing a foreign judgment | | | | | | 7.00 | 20.00 | | 27.00 |
| L. Appeals | | | | | | | | | |
| 1. Small Claims Dept to Magistrate | 10.00 | 26.00 | 10.00 | | | 9.00 | 20.00 | 6.00 | 81.00 |
| 2. Magistrate Division to District court | 10.00 | 26.00 | 10.00 | | | 9.00 | 20.00 | 6.00 | 81.00 |
| 3. Appeal or petition for judicial review or cross appeal or cross-petition from commission, board, or body to district court | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 135.00 | 6.00 | 221.00 |
| a. Petition for judicial review of IDWR adjudication of water rights | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 135.00 | 6.00 | 221.00 |
| 4. Civil appeal or cross-appeal to Supreme Court (with exception of a. and b. below). The clerk of the district court shall collect the entire fee and remit the $94.00 fee to the Supreme Court with a certified copy of the notice of appeal. (Rule 23(b), I.A.R.) | 94.00 | | | | | 9.00 | 20.00 | 6.00 | 129.00 |
| a. Post-Conviction | Sup. Ct. | | | | | | | | |
| b. Habeas Corpus | | | | | | | | | No Fee |

# EXHIBIT 5
# FETTERLY DECLARATION

# Deposition of 30(b)(6) Sara Omundson

# Courthouse News Service v. Omundson

# November 11, 2022



**206.287.9066 I 800.846.6989**

1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101

www.buellrealtime.com

email: info@buellrealtime.com



Courthouse News Service v. Omundson                                   30(b)(6) Sara Omundson

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____
                                    )
COURTHOUSE NEWS SERVICE,      )
                                    )
            Plaintiff,  )
                                    )
     v.           ) No. 1:21-CV-00305-REP
                                    )
SARA OMUNDSON, in her official  )
capacity as Administrative      )
Director of Idaho Courts,       )
                                    )
            Defendant.  )
_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

SARA OMUNDSON IN HER OFFICIAL CAPACITY

AS ADMINISTRATIVE DIRECTOR OF IDAHO COURTS

_____

Taken at Boise, Idaho
(Conducted via Videoconference.)

DATE TAKEN:  November 11, 2022
REPORTED BY:  Nicole A. Bulldis, RPR
     AZ No. 50955 | CA No. 14441 | WA No. 3384

---

**Page 2**

1          A P P E A R A N C E S
2
3    FOR PLAINTIFF:
4      (via Zoom)    Jonathan G. Fetterly
               Katherine A. Keating
5               BRYAN CAVE LEIGHTON PAISNER LLP
               3 Embarcadero Center, 7th Floor
6               San Francisco, CA 94111
               (415) 675-3400
7               jon.fetterly@bclplaw.com
               katherine.keating@bclplaw.com
8
9    FOR DEFENDANT:
10     (via Zoom)    Keely E. Duke
               Molly E. Mitchell
11              DUKE EVETT, PLLC
               1087 W. River Street, Suite 300
12              PO Box 7387
               Boise, ID 83707
13              (208) 342-3310
               ked@dukeevett.com
14              mem@dukeevett.com
15
16   ALSO PRESENT:
17     (via Zoom)    BILL GIRDNER, CNS
18
19              --o0o--
20
21
22
23
24
25

---

**Page 3**

1         30(b)(6) DEPOSITION OF SARA OMUNDSON
2
3               EXAMINATION INDEX
4    EXAMINATION BY                        PAGE
5    Mr. Fetterly.......................................... 4
6
7
8
9               EXHIBIT INDEX
10   EXHIBITS FOR IDENTIFICATION            PAGE
11   39  Defendant's Supplemental Responses to Plaintiff's
12     First and Third Set of Interrogatories............ 44
13   40  Acceptance of Documents Tendered for Filing....... 60
14   41  Idaho Courts Operations Manual Excerpt............ 62
15   42  E-Filing District Court Civil Case Worksheet...... 73
16   43  Case Initiation.................................. 111
17   44  Case Type Codes................................. 116
18   45  Omundson Press Review Queue Notes................. 124
19   46  File and Serve Quick Guide - 03/16............... 126
20   47  iCourt e-Filing Training & Resources Webpage...... 129
21
22               --o0o--
23
24
25

---

**Page 4**

1    REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
2         Friday, November 11, 2022; 8:05 a.m.
3               --o0o--
4
5    SARA OMUNDSON,        witness herein, having been
6               first duly sworn on oath,
7               was examined and testified
8               as follows:
9
10          E X A M I N A T I O N
11   BY MR. FETTERLY:
12      Q.  And good morning.  Can you please state and
13   spell your name for the record?
14      A.  I'm Sara Omundson.  It's S-a-r-a, and the last
15   name is O-m-u-n-d-s-o-n.
16      Q.  And thank you, Ms. Omundson.
17         I'm Jon Fetterly, counsel for Courthouse News
18   Service, and I'm with the law firm Bryan Cave Leighton
19   Paisner.
20         I understand you've been attending this week's
21   depositions, so this is probably not the first time
22   you've seen me or been through the process; is that
23   correct?
24      A.  That is -- well, this is the first time I've
25   been through the process.  This is not the first time

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 33



Page 35

1  improving that Portal.  I immediately pivoted to talking
2  with other vendors to see if we could build our own.  As
3  you may recall, in March of 2020, as we were starting
4  those conversations, things changed and I had to focus
5  my IT staff on implementing remote court proceedings and
6  livestreaming of court proceedings, and our focus just
7  had to shift.
8       I started talking with a company out of
9  Seattle about a year ago about building us a new portal.
10  We are continuing to talk about that.  I have some
11  funding set aside in the budget this year.  The Supreme
12  Court included within our spending plan this year some
13  dollars to start that project of building a new portal,
14  and we -- we have a bid from this company to build it
15  for us and to help us implement that.
16       We've not signed a contract with them yet
17  because we are talking about the limited dollars
18  available and what we can get within the scope of those
19  dollars for this fiscal year versus the next fiscal year
20  versus the next fiscal year.  But it has been the bane
21  of my existence that we don't have a portal that does
22  the things that we would really like it to do, and so we
23  are in the process of building that out, including
24  defining use cases for that.
25       I do want to be clear that that would not

Page 34

1  technical, and I'm going to try to pull out right now
2  because we need to move on.
3       I just want to try to understand.  We're
4  talking about the technical -- the Court/Tyler side of
5  things.  From the public/press side of things, is the
6  Court contemplating any changes that would kind of
7  materially impact how the press or public would, you
8  know, see documents or access them when they use the
9  services?
10  A.  Yes.
11  Q.  Okay.
12  A.  I can -- yeah, I can tell you that.  I've
13  mentioned the Tyler Portal.
14  Q.  Yes.
15  A.  And that is -- that is -- that was -- the
16  initial plan with that was to make that an option for
17  the public, attorneys, justice partners, that everyone
18  could use that to review court documents.  Because of
19  its instability, because of our inability to keep that
20  running in a -- in a way that just justice partners can
21  use it effectively, we have repeatedly asked Tyler to
22  build upon it, improve it, make it work better.  They
23  had agreed repeatedly to do that.
24       In October of 2019, Tyler told us that they
25  would not be putting investment -- investing in

Page 36

1  include -- what is within the scope of that project
2  right now would not include the type of press queue that
3  is being described in this lawsuit simply because that
4  is designed to run off the case management system and
5  not off of the EFM.
6  Q.  Understood.
7       So the portal that the Idaho Courts is
8  currently exploring would be a portal that would display
9  information from documents in the case management
10  system; is that correct?
11  A.  Yes.  It would be -- it would be built to run
12  on the case management database.
13  Q.  Okay.  As part of these kinds of conversations
14  about changes, has the Court considered changing its
15  e-filing service or building its own e-file manager?
16  A.  That is not within the scope of that project,
17  no.
18  Q.  Okay.  So is it the Court's intention to
19  continue using Tyler -- the present intention to
20  continue using Tyler Technologies for its e-filing
21  solution and the Tyler eFile Manager?
22  A.  Yes.  Although, that wouldn't be the only
23  option.  If another company wanted to come in and
24  provide e-filing services, there's -- we would certainly
25  be willing to talk to any other company that wanted to

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 37

1    provide those services as well.
2        Q.  When is the Tyler -- the current Tyler
3    e-filing agreement up for expiration or renewal?
4        A.  I want to say that we are in the second year
5    of a five-year contract is where I believe we are, but I
6    could be wrong about that.
7        Q.  Okay.  And have you -- has the -- I think you
8    maybe covered this, but as the -- of the conversations
9    with the potential vendor out of Seattle, have they
10   included any discussion of, you know, the creation of a
11   press review queue using the Tyler API for its Press
12   Review Tool?
13       A.  No, because we -- we've been talking with them
14   about building a portal built on the data, the case
15   management database, not on the EFM database.
16       Q.  Is there any reason why the Court has not been
17   talking to this vendor about possibly building a portal
18   based on the EFM or e-filing database?
19       A.  I have not had that discussion with them
20   because the Idaho Supreme Court's rules tell me that a
21   document is available to the public when it is placed in
22   a case file, and so I'm building -- I'm in negotiations
23   to have a system built on the case files.
24       Q.  Okay.  Is there any other reason why the Idaho
25   Courts are not currently talking to this other vendor

Page 38

1    about building a portal on top of the e-file manager or
2    e-file system?
3        MS. DUKE:  Object to the form.
4        Go ahead.
5        THE DEPONENT:  That would be an expansion
6    of the scope, an expansion of the services, and right
7    now, I'm trying to solve the problem of meeting our --
8    our current intentions, our current responsibilities.
9    As opposed to expanding them, we need a portal that does
10   what we promised people it will do.  I haven't expanded
11   the scope to something that is not within the policies
12   of the Idaho Supreme Court.
13       Q.  (By Mr. Fetterly) So is it your position that
14   the -- the policy of the Idaho Supreme Court kind of
15   precludes exploration or expansion of the project to
16   include access to new complaints that are, you know,
17   received into the e-filing system or the EFM but not yet
18   in the case management system?
19       A.  So it's the policy of the Idaho Supreme Court
20   explicitly stated in Idaho Court Administrative Rule 32.
21   That -- that's where it tells me what documents are to
22   be available to the public.  In there, in regards to
23   pleadings, it tells me that those are documents which
24   appear in the case file within the case management
25   system.  And so in scoping this project, I have scoped

Page 39

1    it to that policy.
2        Q.  Understood.
3        Other than Rule 32, are there any other, you
4    know, rules or bases for the statement of policy that
5    you just identified?
6        A.  I think, as far as a basis for that policy, I
7    would look at the rule itself.  It specifically
8    articulates the things that Idaho Supreme Court took
9    into consideration in establishing the policy of what is
10   public.
11       And if what you're asking is if I have other
12   concerns about posting submissions -- submitted
13   documents before they are placed in the -- the case
14   management system, reviewed and placed in the case
15   management system, I do have other concerns.  But at its
16   core, I'm responsible for implementing what the Idaho
17   Supreme Court tells me is the -- are the rules of the
18   Idaho Supreme Court.
19       Q.  Understood.  And we'll get to those other
20   concerns in just a moment.
21       I'm just trying to understand, when you're
22   talking about the Idaho Supreme Court, what are you
23   pointing to specifically that would be direction or
24   instruction from the Idaho Supreme Court?  And I believe
25   you've identified Rule 32.

Page 40

1        A.  Yes.
2        Q.  Are there any other rules or are there any
3    other orders?  Memos?  Any other things that you would
4    consider direction from the Idaho Supreme Court?
5        A.  So I would be looking at a number of rules
6    including the e-filing rules.  Rule 32 is truly the --
7    the basis that I go to determine what should and
8    shouldn't be made public and what the process is --
9    processes are for addressing that.
10       The e-filing rules supplement that, in that
11   they tell me, you know, when something is filed, when it
12   is in -- transferred into the case management system.
13   There are other rules as well, in the civil rules, in
14   the family law rules, that address things like cover
15   sheets and what has to be in a cover sheet and whether
16   or not a cover.  So there are various rules that I look
17   at with sort of the foundation being Rule 32.
18       Q.  Okay.  So you've identified Rule 32.  The
19   e-filing rules, I think that's also referred to as the
20   IREFS in Idaho?
21       A.  Yes.
22       Q.  The Idaho Rules of Electronic Filing and
23   Service?
24       A.  Yes.
25       Q.  Okay.  So Rule 32, IREFS -- I-R-E-F-S, for the

10  (Pages 37 to 40)

Courthouse News Service v. Omundson                        30(b)(6) Sara Omundson

Page 41

1    record.
2            And you cited sort of the general rules of
3    civil procedure.  Would that be with respect to civil
4    cases?
5        A.  So there are references to certain documents;
6    certain protections for documents in the civil rules.
7        Q.  Mm-hmm.
8        A.  There are also some references in the family
9    law rules.  I think there's also some references in the
10   criminal rules in regards to search warrants.  There are
11   just a few rules in -- out there that define things like
12   a family law cover sheet that help explain what
13   information is protected.
14       Q.  Okay.  And excluding family law, I believe
15   there's a general understanding, in this case, that
16   we're talking about, in Idaho, the civil cases that
17   would have the case type of AA or those kind of AA1
18   through 6.
19           Can you identify any particular rules of civil
20   procedure that would apply to those initial filings, AA1
21   through 6 that would kind of inform the -- the policy
22   decision that we're discussing right now?
23       A.  I can't name a rule off the top of my head,
24   but I want to be clear.  The -- the documents that are
25   listed in AA don't have any different designation than

Page 42

1    any other public document.
2            So Rule 32 defines, essentially, three types
3    of documents.  There's public documents, so documents
4    available to the public.  There are exempt documents.
5    Those are documents that are presumed not available to
6    the public.  And then there are sealed documents or
7    redacted documents that require court action to protect
8    either the entire document or portions of that document.
9    So, in my world, I focus on public documents, exempt
10   documents, and sealed documents.
11       Q.  Understood.
12           So if I understand your testimony, you're
13   saying Rule 32 would apply to all -- all filings or
14   documents notwithstanding filing type or case type; is
15   that correct?
16       A.  Yes.
17       Q.  Okay.  And then you -- I'm just trying to --
18   and then, you know, the e-filing -- e-filing rules or
19   IREFS, and would your testimony be the same there that
20   the IREFS would apply generally with respect to all
21   filings?
22       A.  IREFS apply to all filings.  To be clear,
23   there are IREFS themselves that actually require certain
24   things to be filed conventionally, meaning in paper.
25       Q.  Mm-hmm.

Page 43

1        A.  And so they -- the IREFS apply to the extent
2    they define what has to be filed electronically versus
3    what has to be filed conventionally.
4        Q.  Mm-hmm.
5        A.  And then also outlines who has to file, so
6    even things that an attorney would be required to file
7    electronically, someone who is pro se could still file
8    conventionally.
9        Q.  Okay.  And then -- and then -- so setting
10   aside then Rule 32 and the IREFS, you identified the
11   rules of civil procedure.  Can you identify any
12   particular rule of civil procedure that applies to
13   initial civil filings of the AA type that would also
14   support the policy decision you've identified of not
15   making complaints available until after they are in the
16   case management system?
17       A.  So I can't think of a rule off the top of my
18   head, but I do want to offer a caveat.  The documents
19   are immediately available as soon as they are
20   file-stamped by the court clerk, so I would say that as
21   soon as they -- and I know that this is a disagreement,
22   but as soon as they are reviewed and file stamped, they
23   are immediately available on the kiosks within the
24   courthouses.
25       Q.  Understood.

Page 44

1            Would you also agree that the documents are
2    not immediately available at the kiosks or elsewhere
3    upon their receipt into the e-filing system or the EFM?
4        A.  With the exception of in the clerk's queue, I
5    would agree that documents submitted by a filer are not
6    available to the -- any -- anyone but the clerks until
7    after they have been accepted and file stamped.
8        Q.  Gotcha.  So -- so newly e-filed documents --
9    let me strike that to avoid an objection and a dispute.
10           Documents that are electronically submitted to
11   the court and received into the e-filing system or EFM
12   are not available to the press or public until after the
13   court clerk takes the actions required to, you know,
14   accept them and they go into the Court's case management
15   system; correct?
16       A.  If they are accepted by a clerk, yes.
17           MR. FETTERLY:  Okay.  I'm -- I'm going to
18   switch topics here.  We've been going for about one
19   hour.  Can we take another five-minute break?
20           MS. DUKE:  Sounds great.
21           MR. FETTERLY:  Off the record.  Thanks.
22           (A break was taken from
23           9:06 a.m. to 9:21 a.m.)
24           (Exhibit No. 39 marked.)
25       Q.  (By Mr. Fetterly) Okay.  Ms. Omundson, we're

11  (Pages 41 to 44)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 45

1    back on the record, and I'm going to show you a document
2    that we have marked as Exhibit No. 39. And this is a
3    discovery document served in this case by your counsel,
4    and it's titled "Defendant's Supplemental Responses to
5    Plaintiff's First and Third Set of Interrogatories."
6          Do you see that?
7    A. I do.
8    Q. Okay. And I'm going to -- have you seen
9    this document before?
10   A. Yes, I have.
11   Q. Okay. And do you understand that this
12   document contains responses prepared and served by your
13   counsel in response to interrogatories or questions that
14   were asked by Courthouse News Service?
15   A. Yes.
16   Q. Okay. And I'm going to direct your attention
17   to Interrogatory No. 1 which states: "State all reasons
18   or justifications supporting the policy or practice of
19   withholding access to new e-filed civil complaints filed
20   with the Idaho District Courts until after those
21   complaints have been processed or accepted."
22         In response, your counsel made a number of
23   objections. And then following those objections we now
24   have some text that says: "Subject to and without
25   waiver of this objection, Omundson responds that the

---

Page 46

1    policies and justifications for not providing access to
2    the documents that have been submitted but not yet
3    processed or accepted are as follows."
4          Do you see that?
5    A. Yes.
6    Q. And then following the part that says "are as
7    follows," we have a number of numbers, 1, 2, 3, and I'm
8    going to start to break those up and ask you questions
9    about them. Do you understand?
10   A. Yes.
11   Q. Okay. So --
12         MS. DUKE: And we'll get you a hard copy
13   if that's easier, too.
14         THE DEPONENT: Okay. It's a little --
15   I'll be honest, I'm not -- I wear glasses for a reason.
16   It's kind of small.
17         MS. DUKE: Jon, we're getting her a quick
18   printed copy.
19         THE DEPONENT: That's perfect. Right
20   there I can read it.
21   Q. (By Mr. Fetterly) Okay. So I am going to focus
22   right now on Number 1. Do you see that?
23   A. I do see that.
24   Q. So the first reason provided here or the first
25   justification provided here is Number 1: "The public is

---

Page 47

1    not provided with access to documents that have not been
2    processed or accepted because such documents are not
3    filed and not entered into the court's case management
4    system until they have been accepted."
5          Did I read that correctly?
6    A. You did.
7    Q. And does that response kind of reflect what we
8    were just discussing before the break concerning the
9    policy you identified for not providing access to
10   documents until they have been placed in the case
11   management system?
12   A. I'm not sure I entirely understand your
13   question.
14         MS. DUKE: And, Jon, are you in the
15   supplemental answer or the original answer?
16         MR. FETTERLY: Supplemental.
17         MS. DUKE: Okay.
18         THE DEPONENT: So to be clear, it is the
19   Supreme Court's policy that what is to be made available
20   to the public are those things that reside in the case
21   file, and so they don't reside in a case file until they
22   are accepted and filed. And my responsibility is to
23   implement that policy, and so that is -- that is what
24   I've done.
25   Q. (By Mr. Fetterly) And that's what we were

---

Page 48

1    discussing before we took our break?
2    A. Correct.
3    Q. And that's --
4          MS. DUKE: And, Jon, I think that's the
5    original answer. I'm sorry. Just what I'm looking at
6    is different than what you have up.
7          MR. FETTERLY: Oh, well, there's an
8    original -- let me ask a quick question and then I'll
9    revisit.
10         If I scroll down there's also a
11   supplemental answer as well.
12         MS. DUKE: Right.
13         MR. FETTERLY: And the supplemental
14   answer adds to the original answer? You didn't intend
15   to necessarily displace or withdraw this original
16   response?
17         MS. DUKE: I think we actually did with
18   our supplemental response. It doesn't mean that that's
19   not part of it, but we tried to include in full where
20   our supplemental answer was to make it easier. So I --
21   you can ask whatever you want on -- on the original
22   answer, that's not a problem, but the supplemental
23   answer's the most recent complete response.
24         MR. FETTERLY: I understand. So I -- and
25   I appreciate that. So just to be clear, this initial

12 (Pages 45 to 48)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

**ER-688**

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 49

1  answer that we're discussing right now has not been
2  withdrawn by Ms. Omundson by way of the supplemental
3  response.  The supplemental response adds to or
4  supplements this original response; correct?
5        MS. DUKE:  That's correct.
6        Q.  (By Mr. Fetterly)  Okay.  So, Ms. Omundson, I --
7  you were just telling me about the -- your understanding
8  of the Idaho Supreme Court policy.  And does this first
9  sentence of Number 1 reflect what you were just telling
10 me with respect to your understanding of the Idaho
11 Supreme Court policy?  I'm not saying in full, but at
12 least is that what -- is that what this is referring to?
13 That's my question.
14       A.  That is the -- the Supreme Court's policy in
15 Idaho Court Administrative Rule 32 is the basis for that
16 answer, yes.
17       Q.  The basis for this first sentence of Number 1;
18 correct?
19       A.  Yes.
20       Q.  Okay.  Before I move on to the second
21 sentence, I do want to then just go down to the
22 supplemental response, because in the supplemental
23 response that your counsel just identified, I believe
24 more is said on the subject.
25           I'm going to ask you to just read the

---

Page 50

1  supplemental response to Number 1.  Can you see that?
2        Sorry.  My -- let me help you out.
3        A.  There we go.
4           Do you want me to read the whole thing?
5        Q.  If you could just briefly read and review,
6  yes, the supplemental answer to Interrogatory --
7        MS. DUKE:  To yourself.
8        THE DEPONENT:  Oh, to myself.
9        You're not asking me to read it out loud?
10       Q.  (By Mr. Fetterly)  No.
11       A.  Oh, I'm sorry.
12       Q.  I want to ask you about it, and I'd like you
13 to please read it to yourself before I do.
14       A.  Now, I -- I'm to the end of the page.
15       Q.  Thank you.
16       A.  Okay.
17       Q.  Okay.  And does this supplemental answer to
18 Interrogatory No. 1 -- is the basis for it also the --
19 your understanding of the Idaho Supreme Court policy as
20 reflected in Administrative Rule 32?
21       A.  I think it is consistent with Idaho Rule 32,
22 but I don't know that I would say that the basis of that
23 response was Idaho Rule 32.
24       Q.  Okay.  Is there -- so let's just break up the
25 supplemental answer.  So this Number 1, it says:  "A

---

Page 51

1  document in the File & Serve system, one, is not filed
2  in the court's case management system and, therefore, is
3  not part of the court's docket and may never be."
4           So this is not necessarily limited to just the
5  Idaho Supreme Court Rule 32; is that correct?
6        A.  I'm sorry.  I don't understand what you're
7  asking me.  Are you -- are you asking me if -- I would
8  say yes.  The -- the Idaho Court Administrative Rule 32
9  defines what's available to the public.  In there, in
10 regards to pleadings, it specifically says that what's
11 available to the public are the pleadings that exist in
12 the case file.  And so I would say these documents have
13 not yet been accepted, they are not yet filed as a
14 result of that, and so they do not yet exist in a case
15 file as required by Rule 32.
16       Q.  Okay.  And so do I -- is it fair to state then
17 that under the supplemental response, Number 1 here,
18 Number 2, Number 3, Number 4, those would all be
19 supported by the statement that you're saying right now,
20 that a document has not been accepted into the case
21 management system and is not part of the case file?
22       A.  One, yes.
23           Two, as I understand it, a case is initiated
24 when a document is filed initiating a case.  We call
25 them initial pleadings.  It is not -- if it has not yet

---

Page 52

1  been filed, a case has not been initiated.
2        Q.  Mm-hmm.
3        A.  It is not relevant to the performance of a
4  judicial function.  There's a few things that would
5  support that.  One, judges don't have access to it yet,
6  so the -- the -- the public's view of monitoring judges
7  has not yet started because the judge doesn't have
8  access to it.  It isn't in a case file, so the judge
9  can't act on it.
10          So I think it's more than just Rule 32.  I
11 think your initial question was whether Rule 32 was the
12 basis for all of these, and I -- I wouldn't say it's the
13 basis for all of them.
14       Q.  Okay.  So -- and so for this Number 3, you've
15 identified Rule 32 and this other basis, which is the
16 judge doesn't have access to it.
17          Is there anything more that's the basis for
18 this Sub 3 for Supplemental Response to 1?
19       A.  Well, it can't materially assist the public in
20 understanding the issues before the court because until
21 it's filed it's not yet before a court.
22       Q.  Okay.
23       A.  The issue has not -- not been placed before
24 the court yet.  For Subsection 3, this kind of goes to
25 the second part of my answer above, which is I -- there

---

13 (Pages 49 to 52)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 53

1    is concern that because these are not yet filed and may
2    be rejected, that the public could be mislead into
3    understanding that something is pending before a judge
4    when it is not yet pending before a judge.
5            So that -- trying to ensure that the public
6    understands when something is actually pending in a
7    court is important for people to understand the
8    integrity of the courts.  And so until something is
9    actually filed and moved into the case management
10   system, we want to make sure people aren't mislead into
11   believing that there is something pending before the
12   court.
13       Q.  Understood.
14           And I was asking initially in connection with
15   Rule 32, so let me just try it a different way.
16       A.  Mm-hmm.
17       Q.  Would you agree then that, in this
18   supplemental response, as we look at Numbers 1, 2, 3, 4,
19   and 5, that the basis for this response is your view
20   that a document has not been, "filed with the court
21   until it has been placed in the court's case management
22   system"?
23           MS. DUKE:  Object to the form as to "your
24   view."
25           Go ahead.

Page 54

1            THE DEPONENT:  I was about to say, my
2    view really isn't relevant.  It's what is the Supreme
3    Court's view, and if -- they've articulated in the rule
4    that I follow when -- when the court deems it filed.
5        Q.  (By Mr. Fetterly) Understood.
6            So I -- and I want to just be clear.  I'm not
7    asking about your personal view.  I used "you" in the
8    context of you here as the designated representative on
9    behalf of the Administrative Office of the Idaho Courts.
10           So is it -- let me just try it again.  As we
11   look at these subpoints 1, 2, 3, 4, and 5 under the
12   Supplemental Response to Interrogatory No. 1, is it fair
13   to say -- fair to state that each of these
14   justifications in the supplemental response are based on
15   the, you know, administrative office's understanding
16   that a document -- that a document has not been, "filed
17   until it is placed in the case management system"?
18       A.  So I want to go through each -- sorry.  I just
19   want to go through each one to make sure that I -- I
20   agree with what you just said in that context.
21           So is not filed in the case management system,
22   therefore, not part of the court's docket and may never
23   be.  So Number 1, the -- my answer would be yes.
24           Does not initiate a case.  That's not actually
25   out of Rule 32.  That would be in relation to the civil

Page 55

1    rules, which state that a case is initiated with the
2    filing of a document, but, yes, it is based on -- on the
3    Supreme Court's definition of filing.
4            It is not relevant to the performance of a
5    judicial function because no case has been initiated
6    yet.  Covered that.
7            Cannot materially assist the public in
8    understanding issues before a court because there are
9    not issues.  The -- the portion of Number 3, the second
10   half of that that says, "Cannot materially assist the
11   public in understanding issues before a court because
12   such issues are not yet before a court" is in -- in part
13   because the judges don't have access to it.  Until it's
14   in a case file, the judges don't have an issue before
15   them.  They can't even access the filing.
16           Does not trigger legal obligations because no
17   case has been initiated yet.  Again, that goes to my
18   understanding that a case is initiated by the filing of
19   a certain document and the Idaho Supreme Court has told
20   me that's not filed.
21           Does not help the public in evaluating the
22   fairness and integrity of the court's proceedings
23   because no case has been initiated.  Yes, that's true.
24   That's in part based upon the definition of filed and
25   the definition of initiated, but it's also in part based

Page 56

1    on a concern that the public may misunderstand that
2    something has been filed when, in fact, it's not in a
3    case file in the case management system yet.
4        Q.  Understood.  So let -- let me -- thank you for
5    walking me through that.
6            I'm now going to go back up to the initial
7    response, and we were talking about the first sentence
8    of Number 1 before we went on to the supplemental
9    response.  I'm now going to direct your attention to the
10   second sentence of Number 1 for the justifications where
11   it states:  "Providing documents to the public before
12   they are in the court's case management system may
13   mislead the public to believe documents are court
14   filings when they are not yet filed and may never be
15   filed."
16           Did I -- did I understand that correctly or
17   did I read that correctly?
18       A.  Yes, I believe you did.
19       Q.  Okay.  So my question is:  What harm would
20   result from the public believing that a document was a
21   "court filing" when it was not yet in the court's case
22   management system?
23       A.  So my understanding of providing access to
24   case filings and the press reporting on case filings is
25   that the public has an interest in understanding how the

14  (Pages 53 to 56)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 57

```
 1   courts are functioning, whether the courts are doing
 2   their job, and how they're moving forward. Oftentimes,
 3   cases will have requirements that judges perform
 4   functions within a certain period of time. The clerks
 5   have to perform functions within a certain period of
 6   time. That period of time is premised upon the
 7   initiation of a case.
 8          By posting something that may never actually
 9   end up in the case management system or may never end up
10   filed in the county in which it was originally
11   submitted, the public may have a misperception that the
12   justice system, that the court system is not functioning
13   as it should when, in fact, because they believe
14   something has been filed when, in fact, it isn't pending
15   before a judge. It hasn't been filed. It's not in a
16   case file within the court system.
17          So the public may be mislead into believing
18   that the court system is not functioning as it should
19   when it's functioning exactly as the Idaho Supreme Court
20   has set up the processes and the rules. And so it's --
21   it's the risk of misleading the public to believe that
22   the courts are not working in the way that they're
23   supposed to be working.
24          (Pause in the proceedings.)
25      Q. (By Mr. Fetterly) I -- I'm trying to understand
```

Page 58

```
 1   your response, and I -- and I guess what I'm trying to
 2   figure out then is, you know, what harm would result
 3   from that? So I -- you've identified, you know, the
 4   public could be -- strike that. Strike that.
 5          Is there anything more that you would add to
 6   that, or is that the extent of the -- you know, the
 7   basis for this highlighted portion, the second sentence
 8   of Number 1?
 9      A. Well, I -- I would just summarize one thing
10   that I think that Mr. Girdner and I very much agree on, and
11   that is making sure that the public understands the
12   integrity of the institution of the courts is important,
13   and that -- protecting that is of value to me.
14      Q. Understood. Understood.
15          So I'm now going to move on to Number 2 in
16   this response to Number 1. It's a fairly long response.
17   I'll read it and then we can break it up. But for the
18   second justification, you state: "Tyler Technologies'
19   Auto-Accept function has not been implemented because
20   this would allow documents to be filed and, therefore,
21   become part of the official record, even if the filing
22   requirements that exist in the Idaho Court rules, e.g.
23   payment of a filing fee and redaction requirements, have
24   not been met or the action had been filed in an improper
25   jurisdiction or venue, which would require judicial
```

Page 59

```
 1   action that would add to the already incredibly busy
 2   schedules of judges and their court staff."
 3          Did I read this correctly?
 4      A. Yes, you did.
 5      Q. Okay. So this -- as I understand this
 6   response, this is not necessarily limited to your
 7   understanding of the Supreme Court policy based on
 8   Rule 32, because we're talking about the Auto-Accept
 9   function. So this would be access to documents that are
10   in the case management system; correct?
11      A. Correct.
12      Q. Okay. So what we're saying here is -- or, if
13   I understand you correctly, you're -- this response is
14   saying that the Auto-Accept Review has not been
15   implemented because, starting at the top, this would
16   allow documents to be filed and, therefore, become part
17   of the official record even if the filing requirements
18   that exist in the Idaho Court rules, e.g. payment of a
19   filing fee and redaction requirements, have not been
20   met.
21          And let me stop right there and we'll get to
22   the rest of the sentence in a minute. I want to just
23   understand what you mean when you say "even if the
24   filing requirements that exist in the Idaho Court rules
25   have not been met."
```

Page 60

```
 1          Is there a -- well, I know we've discussed
 2   that some. I'm just trying to better understand what
 3   rules might be in play here. So let me show you a
 4   different document. This will be Exhibit No. 40. One
 5   moment.
 6          (Pause in the proceedings.)
 7          (Exhibit No. 40 marked.)
 8      Q. (By Mr. Fetterly) I'm showing you a document
 9   marked as Exhibit No. 40 produced in this case as SO 253
10   to 256 titled "Acceptance of Document Tendered for
11   Filing." It then goes on to identify a number of
12   categories of documents that can be -- or, I guess, must
13   be rejected, reasons and authority, followed by request
14   for correction identifying a number of categories,
15   reasons and authorities, followed by the Tyler
16   File & Serve drop-down options. There's 25 of them
17   listed on this document.
18          Ms. Omundson, do you know what this document
19   is?
20      A. Mr. Fetterly, I'm sorry, but you're not
21   sharing the screen.
22      Q. We've run into the technical issue that began
23   our day. One moment.
24          (Pause in the proceedings.)
25      Q. (By Mr. Fetterly) I'm now showing you the
```

15 (Pages 57 to 60)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 61

1  document that I just summarized, and a copy of it has
2  been sent to the group through the Zoom chat function.
3        MS. OMUNDSON, let me repeat my question. Have
4  you -- do you know what this document is?
5        A.  I don't know what this document is.
6        Q.  Okay. It was produced by your counsel in this
7  action. Are you aware of that?
8        A.  I'm -- I'm assuming this is part of the
9  clerk's manual.
10       MS. DUKE:  If you want to see the whole
11 document, I'm having it printed.
12       THE DEPONENT:  I -- yeah, I'm just not --
13 yeah. I don't know where this came from.
14       Q. (By Mr. Fetterly) Let me just start at the top
15 here. I'm just going to ask you to look at the -- I'll
16 read the top. It says: "A clerk must accept a document
17 tendered for e-filing unless specifically authorized
18 not to accept the document by statute or by the court
19 rules for the reasons below." It then identifies a
20 number of categories followed by reasons and
21 authorities.
22       Do you -- do you agree with the statement on
23 this document that, you know, a -- a clerk must accept
24 the document tendered for e-filing unless specifically
25 authorized not to accept the document by statute or by

Page 62

1  the court rules for the reasons below?
2        A.  So I would -- I would say that that sentence
3  is ambiguous, because I -- when I look at when a court
4  document can be rejected, I actually look at the Idaho
5  Rules of Electronic Filing and Service, the specific
6  rule that articulates when a clerk may reject a filing.
7        And I would also point out that I don't think
8  this document is accurate. For example, I would say
9  that it would be a misreading of ICAR 59 to say that a
10 clerk has the authority to reject a filing that is
11 submitted by a vexatious litigant.
12       Q.  Would that be true for paper filing versus
13 e-filing?
14       A.  Yes, it's for both.
15       Q.  Okay. Do you know -- do you know where this
16 document came from?
17       A.  That's what I'm trying to figure out, what
18 this document actually is. I don't know where this came
19 from.
20           (Exhibit No. 41 marked.)
21       Q. (By Mr. Fetterly) Okay. Let me try this a
22 different way then, so I'm going to mark a different
23 exhibit.
24       This will be Exhibit No. 41. Bear with me.
25       A.  I --

Page 63

1        Q.  I want to bring up exhibit -- I'm sorry.
2  While I'm bringing up Exhibit 41, let me just ask, do
3  you -- do you know who might know where that document
4  came from?
5        A.  I -- I don't. I honestly have no idea where
6  this came from, so I want to -- I'm wondering if this
7  might have been on our system when we put the -- the
8  software on our system to pull anything that might be
9  relevant.
10       Q.  But your testimony is that you've not seen
11 that document before today?
12       A.  No. This is the first time I've -- I've ever
13 seen this.
14       Q.  And -- and do you know of anybody who would
15 know where that document came from or what it might
16 purport to be?
17       MS. DUKE:  Don't speculate.
18       THE DEPONENT:  Yeah. I -- I could ask.
19 I -- I know who I would ask if they recognized it, and
20 that would be my court operations folks.
21       This is my understanding of our court
22 operations manual. I don't know if that's where this
23 came from, although, I would be disheartened if that
24 were the case.
25       Q. (By Mr. Fetterly) Well, I -- I would like to

Page 64

1  know. It's been produced in this case, and it seems to
2  be pretty, you know, relevant to the -- this line of
3  questioning and the interrogatory responses. So if you
4  could bring up, if you could ask your operations
5  specialist, I'd certainly appreciate that. And I'd be
6  happy to take a very brief just two- or three-minute
7  break off the record so that you could do that and then
8  we can continue. We're not going to wait around, but
9  while we continue, maybe somebody could find the answer
10 to that question.
11       MS. DUKE:  Well, and I could check with
12 our paralegal, too, to just get a context of where it is
13 in the production if that'll help. So...
14       MR. FETTERLY:  Sure.
15       MS. DUKE:  All right. So we'll just take
16 a quick couple-minute break?
17       MR. FETTERLY:  Just a real quick
18 couple-minute break to get that ball in motion, and then
19 we'll come back and I can ask you about the operations
20 manual.
21           (A break was taken from
22           9:51 a.m. to 9:57 a.m.)
23       Q. (By Mr. Fetterly) Ms. Omundson, before we took
24 our break, we were discussing the document that was
25 marked as Exhibit No. 40, and you were going to ask

16  (Pages 61 to 64)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 65

1   if -- or you were going to try to find out if you could
2   learn what this document is and where it came from.
3   Were you able to do that during the break?
4       A.  So here's what I learned.  This is a document
5   that was provided by a member of my court operations
6   team.  It was created -- it looks like it's from --
7   sorry -- October of 2016.  I don't have his phone number
8   and so I'm not able to reach him at this moment, but it
9   is not -- as far as I know, this is not in our clerk's
10  manual and it is not what we train to.
11          So this might have been something that he
12  used.  I don't know that this was ever part of our
13  clerk's manual.  It doesn't look like a piece of our
14  clerk's manual, but it's from 2016.
15      Q.  Okay.  And who was that member of your team
16  that created this document?
17      A.  His name is Michael Mehall.
18      Q.  And how is that spelled, Mehall?
19      A.  M-e-h-a-l-l.
20      Q.  Okay.  And you referred to the operations
21  manual.  Is that the -- the manual or the document that
22  you would refer to as the -- the better authority or the
23  authority for determining, you know, what documents may
24  or may not be rejected?
25      A.  The authority for what documents may or may

Page 66

1   not be rejected is actually the Idaho Rules of
2   Electronic Filing and Service, which specifically says
3   when a clerk is allowed to reject a document.  Whether
4   they do -- whether they do reject a document is
5   something that a -- an elected clerk is responsible for
6   determining in conjunction with their administrative
7   district judge within each district, and it does vary
8   around the state.
9       Q.  Okay.  So if we have the operations manual,
10  does that provide any guidance on determining, you know,
11  how or when clerks may reject filings?
12      A.  It does provide some guidance, yes, but the
13  rule is what controls, and it is really an ADJ that
14  defines for their district when a clerk will reject a
15  document.
16      Q.  And what do you mean by "ADJ"?
17      A.  Oh, I'm sorry.  In Idaho, we have seven
18  judicial districts.  And for each of those judicial
19  districts, there is an administrative district judge
20  that is a judge that is elected by the other district
21  judges within the district, and they are -- they are
22  responsible for and have the authority for
23  administration within that district.
24      Q.  Mm-hmm.  When -- when a -- when a clerk is
25  reviewing a document that has been submitted to the

Page 67

1   e-filing system and they're working in their clerk
2   review queue, if a clerk makes a determination that the
3   document should be rejected, are they required to
4   indicate that into -- in the clerk review during their
5   process?
6       A.  Indicate that.  Yes --
7           MS. DUKE:  Objection.  Objection.  Form.
8   I'm just not quite understanding, but go ahead.
9           THE DEPONENT:  Okay.  So I think I
10  understand what you're saying.  And if I don't answer
11  your question, please let me know.
12          So the court rule, the rules of
13  electronic filing say when a clerk may reject a filing.
14  Whether a clerk shall or should reject a filing is -- is
15  a decision that is made between the elected clerk and
16  the county and the administrative district judge.
17          When a clerk does reject a filing, they
18  do have to provide -- there's both a drop-down list they
19  can select from as well as comments that they can make
20  to explain to the person that's submitted it why it is
21  that it's being rejected that gives that person the
22  opportunity to fix whatever the error may be and
23  potentially resubmit it along with the original
24  envelope.  There's a three-day grace period in the rules
25  that if they do resubmit it and they include the

Page 68

1   original envelope and it is within three days, that the
2   filing date may relate back to the original submission
3   date.
4       Q.  (By Mr. Fetterly)  Okay.  So I'm -- I'm showing
5   you right now an exhibit that was marked as
6   Exhibit No. 41.
7       A.  Mm-hmm.
8       Q.  And this is the Idaho Court Operations Manual.
9   Do you see that?
10      A.  Yes.
11      Q.  And do you recognize this document?
12      A.  Yes, I do.
13      Q.  And is this at least the face page of the
14  operations manual?
15      A.  Yes, it is.
16      Q.  Okay.  We had a brief conversation off the
17  record about the operations manual, which is over a
18  thousand pages.  I'm not going to mark the entirety of
19  it as Exhibit No. 41.  Rather, what I have here as
20  Exhibit No. 41 is the face page.  I'm just going to
21  briefly scroll through followed by -- well, I'll need to
22  submit a corrected exhibit.  I intended to include the
23  table of contents.  So this does not have that.  We'll
24  work that out after the fact, but I am moving down to --
25  let's see.

17 (Pages 65 to 68)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 69

1    MS. DUKE:  It has the table of contents.
2    MR. FETTERLY:  Oh, there we go.
3    MS. DUKE:  Yup.
4    MR. FETTERLY:  The second time we've run
5  into the technical issue.
6    Q.  (By Mr. Fetterly) So we have the table of
7  contents, and I note that at table of contents here we
8  see Number 18, Odyssey File & Serve, OFS, at Page 1026.
9         If we scroll on down now past that, here we
10  have, 18, Odyssey File & Serve. Ms. Omundson, do you
11  recognize this section that I'm showing you now
12  beginning at Page 1026 of the Operations Manual as being
13  Section 18 that relates to Odyssey File & Serve?
14    A.  Yes. I believe that is our clerk's manual,
15  but -- thank you. I appreciate that very much.
16         Yes. This appears to be our -- well, it's
17  dated February of 2021, so, yes, that appears to be our
18  clerk's manual --
19    Q.  Okay.
20    A.  -- that we use to train clerks.
21    Q.  So I'm -- I'm scrolling down now through this
22  Section 18. I want to direct your attention to a
23  portion of it that talks about reject the filing/request
24  a correction from e-filer. Do you see that section
25  where it begins?

---

Page 70

1    A.  I do.
2    Q.  And it's followed by a Paragraph 1 and a
3  Paragraph 2.
4         Paragraph 2, select the reasons for rejection.
5  It identifies reasons annotated by letters A through the
6  letter T. Do you see that?
7    A.  Yes, I do.
8    Q.  So a minute ago, you were providing testimony
9  regarding how a clerk would reject or return an e-filing
10  by selecting a reason and noting it in the system.
11         Does this document I'm showing you right here
12  identify the reasons that a clerk would have available
13  to them to select when rejecting a document?
14    A.  These are the most common reasons. There are
15  other possibilities, but the list would, quite frankly,
16  be too long of a drop-down if all of them were included.
17  And so these are the most common reasons that are in
18  there, but they also have a comment section where the
19  clerk can -- can provide additional information to the
20  filer.
21    Q.  So if the -- does the -- do these reasons
22  include an "other" or a catch-all, some type of reason
23  that a clerk would select if they're choosing something
24  other than one of these identified reasons?
25    A.  They could -- they could select "N, please

---

Page 71

1  correct error and then see comment box to provide
2  explanation."
3    Q.  So are -- are the clerks in Idaho trained that
4  if one of these specific reasons is not reflected or --
5  if there's a reason for rejection that's not reflected
6  in these specific reasons, they can use "N, please
7  correct error" followed by comments to, you know,
8  explain to the filer the basis or the reason for the
9  rejection?
10    MS. DUKE:  Object to the form.
11  Foundation as to clerk training.
12    Go ahead.
13    THE DEPONENT:  Yeah. So just to be
14  clear, the training of the deputy clerks is actually
15  done by -- initially done by the elected clerk in the
16  county. They will get support from the local trial
17  court administrator and the ADJ.
18    The training that the Idaho Supreme Court
19  provides, I'm not sure if we have trained on this exact
20  thing recently. We -- I know we trained the clerks on
21  this when Odyssey went live in different counties. We
22  would have trained to this and we would have trained
23  that if the reason for rejection does not exist in this
24  list, you can put -- you can use a general explanation
25  and you can put more information in that box. But the

---

Page 72

1  extent and level of training that each deputy clerk gets
2  is really done by the elected clerk.
3         We're in the process -- my office is
4  currently in the process of building out training for
5  new deputy clerks, but we only have two modules and they
6  wouldn't cover this.
7    Q.  (By Mr. Fetterly) And --
8    A.  We hope -- we hope to get there, we're just
9  not there yet.
10    Q.  Is it your understanding that this reason "N,
11  please correct error" is the general reason that could
12  be used?
13    A.  It is one of -- one of the reasons that could
14  be used, yes. I -- they can select any of these from
15  the drop-down. I -- I would hope they would be as
16  specific as possible in selecting from that, and then
17  they can put whatever other information explaining why
18  it's been rejected in the -- the comment section.
19    Q.  Okay. But in any event, a clerk would be
20  required to select a reason for rejection if they are
21  rejecting an e-file document; correct?
22    A.  I believe so, yes.
23    Q.  And that is something that is prompted in the
24  clerk review queue in the File & Serve system; correct?
25    A.  Yes.

18 (Pages 69 to 72)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

**ER-694**

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 73

1    Q.  And so the clerk, as part of their review of
2  the e -- of the document, if they are to reject it, they
3  would select one of these reasons and, if applicable,
4  apply comments in the comments box; correct?
5    A.  Yes.
6        (Exhibit No. 42 marked.)
7    Q.  (By Mr. Fetterly) Okay.  I'm going to show you
8  one more document.  I guess this will be Exhibit No. 42.
9  One moment.  If it will let me.
10        (Pause in the proceedings.)
11    Q.  (By Mr. Fetterly) This is an Excel spreadsheet
12  that was produced by your counsel yesterday.  I'm
13  putting it on the screen right now.  One moment.  It was
14  Bates labeled 5078.
15    And, Ms. Omundson, have you seen this
16  spreadsheet before?
17    A.  Yes, I have.
18    Q.  And do you have an understanding of what it --
19  what this data represents?
20    A.  It appears to be a listing of filings in the
21  AA fee category -- in the civil AA fee categories.  I
22  don't know the period of time that it covers.
23    Q.  I'm going to scroll to the right because it's
24  a large document with many columns, but just to give you
25  a chance to see in its entirety.

---

Page 74

1    I'm going to focus your -- I'll represent to
2  you it was produced by your counsel in response to both
3  the document request and subsequent meet-and-confer
4  efforts to get a document that showed data for new
5  e-filed complaints in the AA fee category during an
6  agreed-upon time period, including rejection data along
7  the lines that we were just discussing in connection
8  with the operations manual.
9    So I understand your testimony that if a clerk
10  is to reject a filing, the Tyler e-filing system,
11  File & Serve, requires them to select a rejection reason
12  and, if applicable, provide comments.
13    A.  That is my understanding, yes.
14    Q.  Okay.  So directing your attention back to the
15  spreadsheet now, Exhibit No. 41, as part of the data for
16  each of these filings, there's a code or a status of
17  either accepted or rejected.  Do you see that?
18    A.  I do.
19    Q.  My understanding of this spreadsheet is that
20  the rejected -- for a document that has a status of
21  rejected, this reflects a document that would have been
22  rejected by a court clerk and who -- and a clerk would
23  have selected a rejection reason or code pursuant to
24  that rejection; is that correct?
25    A.  It appears so, yes.

---

Page 75

1    Q.  And so if we look at Status, Row K -- excuse
2  me -- Column K, Status, it's accepted or rejected.
3  Column L of this document is reject code.  And if I open
4  this up so you can see what the reject codes are, this
5  appears to relate to the list of reject reasons that we
6  were just discussing in the operations manual.  Is that
7  correct?
8    A.  I'm sorry.  I don't have the manual in front
9  of me to compare the two, but I -- I would take your
10  word for that.
11    Q.  I don't want you to necessarily take my word.
12  I can switch screens back again to put that in front of
13  you given the nature of this --
14    A.  Hold on.  I think -- I think Keely may have --
15        MS. DUKE:  I do.
16        THE DEPONENT:  Okay.  Sorry.  I've got my
17  copy.  Okay.  Sorry, I do have a copy.  Hold on.
18    Q.  (By Mr. Fetterly) Thank you.
19    A.  Can you tell me which page you were on
20  that?
21        MS. DUKE:  I tabbed it.  It's page
22  SO 1587.
23        THE DEPONENT:  I'm sorry.  Can you pull
24  up those codes again for me on the screen?  There were
25  codes that you were asking me to compare.

---

Page 76

1    Q.  (By Mr. Fetterly) Yes.  So are you able to see
2  the spreadsheet on --
3    A.  Yes.
4    Q.  So just for the record, the witness is looking
5  at the Excel spreadsheet that was produced as SO 5708.
6  And, in particular, we are looking at Column L, Reject
7  Code, and I've opened up the column header to see all of
8  the available reject codes that are part of Column L.
9    So my question, Ms. Omundson, is:  Do these
10  reject codes reflected on this spreadsheet under
11  Column L, do these correspond to the rejection reasons
12  that were identified in the operations manual as a basis
13  for rejection?
14        MS. DUKE:  And I'll object to the extent
15  the -- the manual speaks for itself as does this
16  document.  I'm not sure if you want her to take the time
17  to go through every single rejection, but if you do, we
18  can.
19        THE DEPONENT:  Well, I -- they don't --
20  they don't match directly, so I'm not -- so I'll give
21  you an example of what I'm struggling with.  This case
22  already exists, please file through the existing case,
23  and then I'm not sure that I see one that matches that.
24  Maybe that's duplicate.
25        PDF documents combined.  Docs, maybe?  I

---

19  (Pages 73 to 76)

Courthouse News Service v. Omundson        30(b)(6) Sara Omundson

Page 77

1 think it -- I'm not sure that I can -- I can -- I don't
2 know where these came from.  So I don't know where these
3 fields came from, and I'm -- I -- I don't -- I assume
4 that they match this reason for rejection, but I don't
5 know that for certain.
6     Q.  (By Mr. Fetterly) Is there somebody who would
7 know?
8     A.  They're very shorthand.
9     Yeah, my data team would know.  I'm sorry.  My
10 data team would know.
11     Q.  Understood.  And that'll be just one more
12 follow-up question I'll ask you to inquire about.
13     But I just want to confirm that the testimony
14 is that if a filer were to -- excuse me.  If a clerk
15 were to reject a document that they were reviewing in
16 the clerk review queue, they would be required to select
17 a rejection reason; is that correct?
18     A.  That's my understanding, yes.
19     Q.  And in the clerk review queue, might that also
20 be the reject code that they would be required to select
21 as reflected on this spreadsheet?
22     A.  I -- again, I don't know where these fields
23 came from.  I would -- I think that's likely, but I need
24 to confirm that with my data folks.
25     Q.  Okay.  And I'm looking at this document, if we

Page 78

1 go on to Column M, Reject Comment, if a clerk were to
2 provide a comment, would this be the -- you know, does
3 this column reflect the comments that would have been
4 entered by the court with respect to a particular
5 filing?
6     A.  I would -- yes.  There's -- that's what that
7 field appears to be, yes.
8     Q.  Okay.  Thank you.
9     So I'm going to -- we can close this and set
10 this aside.
11     A.  Can we take one second, please?
12     MR. FETTERLY:  Yes.  Off the record?  On
13 the record or off?  I'm sorry.
14     THE DEPONENT:  We can stay on the record.
15 I don't care.
16     I just want to ask Molly:  Will you just
17 email --
18     MS. DUKE:  I did.
19     THE DEPONENT:  Okay.  Got it.  I just
20 want them asking my data folks where that list -- those
21 fields came from.
22     Q.  (By Mr. Fetterly) Thank you very much.  I
23 appreciate that.
24     MS. DUKE:  And, also, as you've said, we
25 haven't quite had a proper break in the last about hour

Page 79

1 and 15 minutes.
2     Do you mind if we do that?
3     MR. FETTERLY:  Sure.  Ten minutes?
4     MS. DUKE:  Yeah, does that work?
5     MR. FETTERLY:  That does work.  Thank
6 you.
7     (A break was taken from
8        10:19 a.m. to 10:34 a.m.)
9     Q.  (By Mr. Fetterly) Ms. Omundson, before we went
10 off the record, part of our questioning involved the
11 document that was marked as Exhibit No. 42, and this was
12 the spreadsheet produced by your counsel that included
13 information for AA filing fee-type complaints.
14     And, specifically, we were talking about a
15 column that had rejection codes.  During our break, did
16 you have an opportunity to speak to anybody on your team
17 regarding, you know, whether -- whether those codes
18 correspond with the rejection reasons that we were
19 discussing in the operations manual?
20     A.  We have not heard back yet, but we sent a
21 message to ask if -- if those -- if that's what this is.
22 Yes.  We've asked -- we've asked the question, but we
23 haven't heard back yet.
24     Q.  Thank you very much.  I appreciate that.
25     I'd like to direct your attention now back to

Page 80

1 Exhibit No. 39.  This is Defendant's Supplemental
2 Response to Plaintiff's Interrogatories.
3     And -- one moment.  Let me put this up on the
4 screen.
5     (Pause in the proceedings.)
6     Q.  (By Mr. Fetterly) Let me direct your attention
7 to the portion of the response to Interrogatory No. 1
8 that I have highlighted on the screen.  This is under
9 Sub 2 where it states:  "Which would require judicial
10 action that would add to the already incredibly busy
11 schedules of judges and their court staff."
12     And this response is with respect to the
13 Auto-Accept function.  And what I'm hoping you can
14 explain to me is:  What are the reasons or circumstances
15 where the auto-accepting of a nonconforming document
16 would result in or require judicial action?
17     A.  So I think there are a number of situations
18 where that could arise.  So, for example, the Idaho
19 Supreme Court's policy has been to allow the clerks to
20 reject things because if they get rejected for these --
21 for failing to comply, there doesn't have to be a
22 judge's action to address issues.  My understanding, for
23 example, if someone submits a document that includes
24 information that should've been redacted but wasn't and
25 the clerk rejects that document, and then they can

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 81

1    redact it and resubmit it and it can all be addressed
2    immediately without a judge's time and effort being
3    taken.
4           If a document is automatically accepted and
5    has information in it that should've been redacted,
6    under Idaho Court Rule 32, it requires a motion may come
7    in to redact that information. It would absolutely
8    require a mandatory hearing. It would require the court
9    to provide notice to any known interested parties, and
10   then the court would have to issue an order and make
11   certain findings as to why it is redacting information.
12   And so it takes less resources and, specifically, less
13   judicial resources if that document is caught before it
14   comes into the system, returned to the filer, and
15   they're asked to redact in advance. That's one example.
16          Q. Okay. I'd like to hear all of them that we
17   can.
18          A. Oh, there's -- you know, I don't know that I
19   could get anywhere real clean. Another example
20   would be if someone -- if it was auto-accepted and the
21   judge determined that the person was not going to get a
22   fee waiver that they had requested. The judge now has
23   to take action and -- and the court has to expend
24   resources to collect that fee, or the court has to have
25   a hearing to determine what to do with the action in the

Page 82

1    absence of the fee being paid.
2           Essentially, there are things right now that
3    are being caught on the front end that can be quickly
4    and easily fixed. For example, it's not an unusual
5    occurrence, I think, to have something filed in Adams
6    County that should've been filed in Ada County. Once
7    it's -- if it's auto-accepted, that action in Adams
8    County would have -- the judge would have to address it
9    and dismiss it -- potentially dismiss it so that it
10   could be refiled in the correct county. So it just --
11   it's -- it's cleaning up those smaller errors that could
12   have been addressed on the front end without taking up
13   additional judicial resources in addressing them.
14          Q. You mentioned the -- your second example was
15   fee waiver. Are fee waiver applications limited to only
16   pro se filers in the state of Idaho?
17          A. No.
18          Q. So a -- a plaintiff represented by counsel
19   would be able to request a fee waiver?
20          A. I don't think there's any limitation on
21   requesting it. Whether they would get it is, I think, a
22   different question.
23          Q. Okay. Do you have an understanding of who is
24   entitled to a fee waiver in the state of Idaho?
25          MS. DUKE: Form and foundation.

Page 83

1           THE DEPONENT: It would be in the -- the
2    court rules. I -- I can tell you that I -- I've seen
3    actions where fee waivers have been requested especially
4    by -- so, for example, the ACLU may enter an appearance
5    on behalf of someone who is indigent and they could
6    request a fee waiver.
7           Q. (By Mr. Fetterly) So we've identified three
8    examples so far. The first was redacted. The second
9    was a fee waiver example. The third was wrong county.
10          Are there any other, you know, reasons you can
11   think of why a nonconforming document, if auto-accepted,
12   would require judicial action?
13          A. If -- if you're only asking about those things
14   that are nonconforming documents, those are the ones
15   that come to me off the top of my head.
16          Q. Okay. And you -- when I'm talking about
17   nonconforming, I -- let me try again. I'm also just
18   referring to any reason for rejection, because my
19   understanding is, you know, we're talking here about
20   Auto-Accept and that the clerk review process, which
21   provides the clerk the opportunity to accept or reject,
22   is the intervening thing that would be removed in the
23   Auto-Accept Review. Is that correct?
24          A. Okay. Yes. And so here's another example
25   that is outside of maybe a non -- "nonconforming," and

Page 84

1    how that impacts a clerk on the other end if Auto-Accept
2    were to be put into place.
3           So, for example, it is not an unheard
4    experience to have someone submit -- when documents come
5    in, they come in in a single envelope.
6           Q. Mm-hmm.
7           A. Right? So all the documents for that case are
8    to be placed in a single electronic envelope within the
9    clerk's queue before they are accepted and file stamped
10   and brought into the system. The clerk is -- they check
11   each of those documents.
12          So let's assume for a second that someone is
13   filing an initial filing, and then along with that, they
14   are filing additional documents. Right? So it's a
15   complaint and then there are additional documents that
16   go with that complaint. If one of those has been
17   photocopied and it did not come through properly, in the
18   clerk's review queue, the clerk has all of those
19   documents together in one place and has direct
20   communication with the person who submitted it.
21          So they can reject that envelope of documents,
22   send it back to the person, and say, "Document X did not
23   come through in read -- in a readable fashion. So all
24   of these need to come through together. This one didn't
25   come through properly. Can you send us a clean copy

21 (Pages 81 to 84)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 85

1  that we can read?"  The clerk has direct communication
2  with that submitter.
3        With Auto-Accept, all of those documents come
4  in and there are two implications to that.  One, is they
5  do not -- they're not all in the same place.  Right?
6  When they come into the case management system, they
7  don't all come in in a single envelope.  They come into
8  different places, so to review those documents, the
9  clerk has to go through different tabs to see where --
10 what those documents are.  That's one thing.
11       The second thing is if the clerk does find a
12 problem, the service address that exists within the case
13 management system where the clerk -- or, sorry -- the
14 service address that exists within the -- the e-filing
15 system does not come along with it, and so the clerk has
16 to figure out:  How do I get in touch with this filer?
17 It may be an attorney that they know the email address
18 and can very easily email that person.  It may be a pro
19 se person that you hope has put their email address on
20 the filing so that you can contact them that way.
21       But that case -- the case management system,
22 once something is in there, the way that a clerk
23 communicates is different than it is in the -- the
24 electronic filing system so it takes more clerk time to
25 go through and find all of the different documents,

---

Page 86

1  address those documents, and communicate with the
2  submitter.
3        In addition, even though they're communicating
4  with the submitter, if -- if the system was used to also
5  communicate with the people it was served on, they
6  wouldn't -- that is gone.  Right?  The clerk would only
7  be communicating with the submitter and not necessarily
8  with others who received copies of those documents.  So
9  it's just -- it changes the amount of clerk resources
10 once it is in the case management system.
11       **Q.  So under this description of what would happen**
12 **under the Auto-Accept system, you said it would take**
13 **more clerk time.  How much more clerk time would it**
14 **take?**
15       A.  I think that depends on the number -- so if
16 you're talking about a single case, how much more clerk
17 time would it take if -- for each individual filing?  Is
18 that what you're talking about?  Sorry.
19       **Q.  Yes, start there.  Yeah.  On a per filing**
20 **basis, do you have an understanding of how much more**
21 **time would -- would be required?**
22       A.  So my understanding, based on
23 Margaret Molchan's affidavit, is they would anticipate a
24 few more minutes for each filing.  I think, in part,
25 that depends upon how easy it is to identify a

---

Page 87

1  communication path back to the person who submitted the
2  document.  If it's a -- an attorney they work with
3  routinely, they typically have an email address for that
4  attorney.  If it's not an attorney, it can be more
5  time-consuming to find a path back to communicate.  But
6  I would have to -- to rely on the expert in that, and
7  that would be Margaret Molchan in her affidavit when she
8  estimates the addition of a few minutes for each filing.
9        **Q.  And I believe, yesterday, the Tyler**
10 **Technologies' witness, Terry Derrick, testified that**
11 **more than 20 state court systems currently use the**
12 **Auto-Accept Review, you know, function of**
13 **eFile & Serve.**
14       **How is Idaho different such that the -- you**
15 **know, the function used by these other courts would not**
16 **work in Idaho?**
17       MS. DUKE:  And I'll just object to the
18 form and foundation.  You failed to provide a list.
19       But go ahead in a general concept on
20 that.
21       THE DEPONENT:  So I would have to start
22 by saying I don't know to what extent they use
23 Auto-Accept, so as -- as he articulated, Auto-Accept
24 could be limited to specific things.  I don't know to
25 what extent they use it, so that's hard to say.  If it

---

Page 88

1  was -- if they used it simply for things like electronic
2  tickets from infraction tickets, that would be different
3  than saying that they use it for every filing.  Right?
4  It wasn't my understanding that they used it for every
5  filing, so I think it's hard to say.
6        The other thing that I would say is the
7  way that the -- the state courts are different is
8  there's incredible variation throughout the country of
9  jurisdiction, of the ways that things get processed, of
10 the roles and responsibility of the clerks.  I mean,
11 there's a myriad of differences in how things were
12 processed.  I just -- I could not give you specifics to
13 how Idaho is different from a jurisdiction that does
14 Auto-Accept, other than the Idaho Supreme Court has made
15 the policy decision that in Idaho we are going to allow
16 the clerks to reject and has placed that in court rule
17 so our system is designed to follow that rule.
18       **Q.  (By Mr. Fetterly) Okay.  And so I'm**
19 **understanding, what court rule are you referring to?**
20       A.  So the Idaho Rules of Electronic Filing and
21 Service, Rule 13, which grants the clerks the ability to
22 return documents to the filer instead of having
23 something that automatically comes in.  I'll be -- I'll
24 be honest, that was a -- a recommendation came from the
25 Court Technology Committee.  That was a very conscious

---

22  (Pages 85 to 88)

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

---

Page 89

1 decision to allow the clerks to do that. The court put
2 it in rule, and so I follow what the Idaho Supreme Court
3 decided on that issue.
4 **Q.  Earlier, you gave me three examples of, you**
5 **know, reasons why a document, if auto-accepted, could**
6 **potentially require judicial action.  And then we went**
7 **on to talk about a fourth, that you said impacts the**
8 **clerks, and you gave the single envelope example and you**
9 **provided some testimony regarding the single envelope.**
10 **Do you recall that?**
11 A.  Yes.
12 **Q.  Would that issue involving the single envelope**
13 **require a judicial action if that document or envelope**
14 **had been auto-accepted?**
15 A.  No.  The -- that is simply how the clerk has
16 to find it, and it takes more time for the clerk to find
17 multiple documents in the case management system and
18 where they are located versus having them all in one
19 place.
20 Where it could take judicial action in that
21 instance is if there was a document that was not
22 readable and was necessary in conjunction with the --
23 the filing, the -- it would have to go to the judge.
24 Once it's filed, it has to go to the judge for the judge
25 to decide what to do.

Page 90

1 The clerk could provide notice or information
2 to the -- the filer to say, "Hey, we received three
3 documents and this particular one was completely
4 unreadable."  They can provide that notice and let
5 the -- the filer respond however they wish, but it would
6 be up to the judge as to whether to accept an amended
7 filing.  It would be up to the judge as to what the
8 impact of an unreadable document would be.  The judge
9 would have to address that depending upon what was
10 brought in front of them at that point.
11 **Q.  So -- so if a document were auto-accepted --**
12 **so if a document -- if a document -- if a document that**
13 **was missing a signature was automatically accepted,**
14 **would that require judicial action?**
15 A.  It would be up to the judge what happens with
16 that.  So it's possible that the clerk would notify the
17 person and they would submit something in an attempt to
18 correct that.  The judge would have to decide whether to
19 accept that correction or not.  The judge would have to
20 decide sort of what to do with a missing signature on a
21 document.  At that point, it's in the judge -- once it
22 is in the case file, it is up to the judge what happens
23 to it, not the clerk.
24 **Q.  Well, why would a judge have to decide that?**
25 A.  Why would a judge have to decide?  I'm sorry,

Page 91

1 like, what to do with the signature, the missing
2 signature?
3 **Q.  Yeah.  We've -- I just want to make sure we're**
4 **clear.  We've talked about a few different things like**
5 **missing signature.  I think you said illegible.  Let's**
6 **just use those two examples, a document missing a**
7 **signature or a document that is illegible.  Why would a**
8 **judge need to decide what to do with that, as opposed to**
9 **the clerk having the ability to take the few extra**
10 **minutes to address the issue?**
11 A.  So once it exists in a case file, once it is
12 filed, any action that's taken on that would be up to
13 the judge, not the clerk.  Clerks can't authorize --
14 they can't remove something from the case file without
15 some sort of authority, and I'm not aware of any
16 authority that would allow them to remove that from the
17 file.
18 The person -- the filer could certainly submit
19 an amended document, and then the court -- the judge can
20 decide whether to accept or reject that amended
21 document.  There are some court rules that allow
22 amendment within a certain period of time, but a clerk
23 can't decide what the impact of an unreadable
24 document or an unsigned document.  That is something
25 that the judge has to decide.

Page 92

1 **Q.  And is there a -- a statute or rule that**
2 **supports that statement?**
3 A.  Is there a statute or rule that supports the
4 statement that it is a judge's decision what to do
5 with...
6 **Q.  You were just saying that a judge must decide**
7 **as opposed to a clerk having some authority to address**
8 **these clerical issues, so I'm just curious if there's a**
9 **statute or rule in Idaho that addresses this and that**
10 **supports the statement that a judge must decide this.**
11 A.  So I'm -- I'm not sure that I understand your
12 question other than to say there is, as far as I know,
13 no authority in this state of Idaho for a clerk to
14 remove something from a -- that has been filed to remove
15 it from the case file.  And, in fact, I believe there is
16 a rule that says it can only be removed for court
17 business.  Right?  I think that is Idaho Court
18 Administrative Rule 31, maybe?
19 MS. DUKE:  We have the rules.
20 THE DEPONENT:  Well, I don't have that
21 one.  I believe it's Idaho Court Administrative Rule 31
22 that talks about what can happen, like, as far as the --
23 the clerk being responsible for maintaining that file,
24 so I don't know of anything that would allow the clerk
25 to do something.  There could certainly be subsequent

23 (Pages 89 to 92)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 93

1  filings to address those -- those issues, but the clerk
2  doesn't decide. The clerk would just accept those
3  additional filings.
4          And what the legal impact of that would
5  be, that's a -- that's a legal question for the judge,
6  so that's why it would be in front of the judge. A
7  party could move to dismiss for failing to have a
8  signature. A party could move to file an amended that
9  included the signature. There are a number of different
10 possibilities with that, but -- but my understanding is
11 is that --
12         Sorry, Keely. It wasn't in that. No,
13 it's not that one.
14         There's an Idaho Court Administrative
15 Rule that requires the clerks to keep the files in a
16 particular way.
17         Sorry, I'm just looking through the
18 rules.
19    Q. (By Mr. Fetterly) Does your counsel have the
20 rulebook right there?
21    A. It is -- it is records kept by clerk of the
22 district court, so they -- they have to keep that record
23 and that is Idaho Court Administrative Rule 31.
24    Q. Let me ask you a different question here
25 because I think I understand the response that you've

---

Page 94

1  provided.
2          And, just for the record, was your counsel
3  showing you the administrative rules as you were
4  providing your response?
5    A. She showed me Administrative Rule 31.
6    Q. Okay.
7    A. There's -- there's a rule that specifically
8  defines when -- that a document can't be removed unless
9  it's for court business, and I'm not sure if that's 31
10 or not.
11    Q. Yeah. Could the Idaho -- could Idaho adjust
12 its procedures to give clerks more flexibility to
13 address issues like illegible pages, missing signatures,
14 other clerical issues?
15    A. The --
16         MS. DUKE: Object to the form and
17 foundation and assumes facts not in evidence. I think
18 the clerks do have that authority if they're not in the
19 case management system, but...
20         THE DEPONENT: So the Idaho Supreme Court
21 constitutionally has the authority to define court
22 procedures, and the Idaho Supreme Court has court rules
23 that do that. The Idaho Supreme Court does amend those
24 rules, so the Idaho Supreme Court itself could vote to
25 amend the rules.

---

Page 95

1    Q. (By Mr. Fetterly) Yeah. I -- I recall from
2  some documents that were produced that there was a rule
3  change surrounding a change to the e-filing system that
4  resulted in a pull-down menu being removed where filers
5  were at one point in time allowed to designate whether a
6  document was public or confidential, but the clerks
7  asked that that be removed and there was a subsequent
8  rule change.
9          Do you -- do you recall that taking place?
10         MS. DUKE: Object to the form as to who
11 asked it to be removed, but go ahead.
12         THE DEPONENT: I -- I do remember when
13 that happened, yes.
14    Q. (By Mr. Fetterly) Okay. And -- and would that
15 be an example of the type of rule change that could
16 result from, you know, clerical issues or requests from
17 the clerks for a change of procedure?
18    A. Yes. That is an example of the clerks
19 identifying an inefficiency and a difficulty and the
20 Idaho Supreme Court voting to change the rule.
21    Q. And on that example, I -- isn't it correct
22 that, you know, one of the reasons for that particular
23 rule change and the removal of the drop-down menu on
24 the -- you know, in the e-filing system was that filers
25 were over-designating confidentiality, meaning they were

---

Page 96

1  identifying documents as confidential that the court
2  clerks would not agree were, in fact, confidential?
3    A. Yes. My understanding is that filers were
4  pretty much designating everything to be confidential
5  and that the clerks thereafter had to go through each
6  document and change the security setting. And so the
7  decision was made to have -- to take that designation
8  and the impact of that designation, in other words, the
9  change of security setting, to change it so that instead
10 of having to unclick and change the security setting to
11 not confidential for each document, instead the decision
12 was made it was more efficient and a better use of
13 resources to take that out of the hands of the filer and
14 leave that in the hands of the clerk. That at the time
15 they reviewed documents, it is the clerk that determines
16 which documents really should be within the confidential
17 setting. In other words, the clerk -- if there is a
18 setting other than public, the clerk selects the -- the
19 security setting of the document at the time they review
20 it and accept it.
21    Q. Isn't it true that there are certain document
22 types or filing codes for which a, you know, security
23 designation is automatically applied so that if the
24 filer designates a certain type of document or case
25 type, there's an automatic security designation that's

---

24 (Pages 93 to 96)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 97

1     applied based on that designation?
2        A.   There is an automatic security setting placed
3     on certain case types.  For document types, I don't know
4     that that's true.
5        Q.   Okay.
6        A.   The document type list that a filer sees is a
7     much smaller list than the document type list a clerk
8     sees.  So the filer selects a general category.  When it
9     comes to the clerk, the clerk selects a more specific
10    designation or can select a more specific designation.
11       Q.   And isn't it correct that in addition to the
12    over-designating issue and the efficiency issue you
13    identified, another reason why the court clerks
14    petitioned for the rule change is that the automatic
15    security settings were working correctly and that was an
16    additional, you know, level of protection to ensure that
17    confidential documents were, in fact, protected?
18       A.   I'm sorry.  I don't understand your question.
19    Could you state that again?
20       Q.   Yes.  You -- you identified that, you know,
21    the, you know, efficiency with the clerks was one reason
22    why or was a reason why, you know, the -- the rule
23    change was requested and the drop-down, you know,
24    confidential selection menu was removed.
25           And my question to you is:  Isn't it true that

Page 98

1     an additional reason is that the, you know, automatic
2     security settings that were applied to case types were,
3     you know, working correctly and the court clerks were
4     able to rely on that as well?
5        A.   Automatic case types.  I'm sorry.  I don't --
6     I don't recall that being part of the discussion.  There
7     are auto -- automatic case types, but the -- the clerk
8     is still responsible for reviewing that at the time they
9     review something.  And so I do think that those
10    automatic case types would -- would reduce the amount of
11    times the clerks have to select that something is
12    confidential because it would be applied to every
13    document that is filed in that case type.
14       Q.   And then going back to this issue of judicial
15    action, I just want to make sure I understand.  We've
16    talked about quite a few examples of where under the
17    Auto-Accept Review there were documents that were
18    automatically accepted, and your testimony is, you know,
19    any number of issues would require judicial action.
20           My question to you is:  The list of rejection
21    reasons that are reflected in the Court Operations
22    Manual, is it your testimony that any of those reasons
23    or all of them could potentially require judicial action
24    if a document that was subject to rejection per one of
25    those reasons was auto-accepted?

Page 99

1        A.   So I'm looking at the list that is in here.
2     Insufficient fees would require judicial action.  The
3     court would have to decide what to do if the fee was not
4     sufficiently paid.
5           Insufficient funds in account of credit card,
6     it is my understanding from yesterday's testimony that
7     that could be auto-rejected or that may route something
8     to a queue.
9           Ill -- excuse me -- illegible and unreadable.
10    If there was a document that was purported to be
11    something and it was not legible, the judge would have
12    to decide what to do with that.
13           Incomplete or missing signature block, a judge
14    would have to decide, you know, whether to accept,
15    maybe, an amended or what the impact -- what the legal
16    impact is of an unsigned document.
17           Incorrect formatting, I don't think that the
18    judge would have to address that.
19           A document that's filed into an incorrect case
20    number, again, I think a judge would have to decide
21    whether to strike that from the -- the record or not.
22           The correct case type, I think a clerk could
23    address that on their own without needing a judge's
24    intervention.
25           The filing code.  If it comes in with a filing

Page 100

1     code, I'm not sure what the practical impact of that is,
2     so I don't know that.
3           If they use the incorrect party names on the
4     documents, once that's in -- they could ask the judge to
5     change that party name, but I don't think a clerk could
6     do that on their own.
7           If the case already exists, they would have
8     to -- a judge would have to dismiss the -- a new case,
9     any new case that's filed and -- and decide -- I guess
10    the judge could decide to put it in the existing case or
11    the party could refile it in the existing case.
12           The PDF documents combined, I don't think that
13    the judge would need to act on that one.
14           A document that must be filed in paper form,
15    that -- that -- my understanding is that those things
16    that have to be filed in paper form, there could be
17    legal implications.  So an original will, if it's filed
18    electronically, a judge would have to act on that
19    because that's not a correct evidentiary submission.  If
20    it's something that was submitted that was supposed to
21    be sealed, I -- I think the -- the judge would have to
22    figure out what to do with a document that should have
23    been sealed that wasn't.  I think at that point, the
24    judge could certainly rule on that.
25           Please correct error.  Again, that's a general

25 (Pages 97 to 100)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 101

1    statement.
2           An in-camera filing, again, is something
3    that's supposed to be filed in paper form.  I don't know
4    that a judge would have to reject that.  The judge could
5    consider it.  I think there would just have to be work
6    on the security setting.
7           Motion to seal document, the subject document
8    must be filed in paper form.  Again, that could be an
9    issue that's raised by a party, but I don't know that it
10   would be.
11          Wrong jurisdiction, the judge would have to
12   intervene to dismiss a case that's filed in the wrong
13   jurisdiction.  A clerk can't dismiss a case once -- once
14   it's been filed.
15          The duplicate filing received.  If it's
16   received in the same case, I'm not sure that would take
17   judicial action.
18          The hearing date or reservation is required
19   fire -- prior to filing.  A judge may or may not have to
20   decide whether or not to schedule the hearing or to -- I
21   mean, that -- that's typically something to make sure
22   that there's a hearing scheduled for it.  The judge
23   would -- I think the judge would have to schedule a
24   hearing regardless, so I'm not sure that's additional
25   work.

---

Page 103

1    done with those documents, that's up to the judge.
2           **Q.  Okay.  Yesterday, Mr. Derrick, on behalf of
3    Tyler Technologies, provided some testimony regarding
4    the functionality of the Auto-Accept Review function,
5    and specifically, that it operates based on conditions,
6    you know, configured by the court such that documents
7    are not auto-accepted unless they satisfy those -- those
8    particular conditions.  Do you recall that testimony?**
9           A.  I do.
10          **Q.  Has the Administrative Office of Idaho spoken
11   to Tyler about whether any of the issues we've just
12   identified on the rejection reason list, whether any of
13   those could be accounted for or addressed through the
14   conditions or configurations of Auto-Accept Review?**
15          A.  If the Idaho Supreme Court authorized
16   Auto-Accept, I would investigate that.  But the court
17   rules tell me that the clerk reviews them and has the
18   opportunity to reject them, so my work is focused on --
19   the scope of my work is focused on following the court
20   rules.  I'm not investigating how to get around the
21   court rules.
22          **Q.  Okay.  I'd like to go back up to our
23   Exhibit No. 1.  One moment.  Excuse me.  I said
24   Exhibit No. 1, I meant Exhibit No. 39, the response to
25   Interrogatory 1.**

---

Page 102

1           **Q.  Why could clerks fix some of these things but
2    not others?**
3           A.  It depends on the authority that they have and
4    what they're changing.  So can a -- can a clerk change a
5    security setting within Odyssey?  They have the
6    authority to do that.
7           Can a clerk remove from a case file a document
8    that has been filed?  I don't know of anything that
9    gives them that authority.
10          So it depends on whether or not it's something
11   that the -- the clerks have authority to do, and there
12   are -- I'm not aware of anything that allows clerks to
13   remove documents that have been filed.  They can reject
14   documents that are not yet in a case file, but once it
15   is filed and has a file stamp on it, I know of nothing
16   that allows the clerk to remove it.
17          **Q.  And what is the basis for the authority that
18   the clerks do have?**
19          A.  So part -- I guess it would be their authority
20   to manage the docket and the case management system.
21   Part of it would be found in the policies of the court
22   in the -- in the clerk's manual.  It's -- it's what to
23   do with -- once there's a document in the case file, it
24   is up to the -- the rules of civil procedure, the rules
25   of criminal procedure.  As to what can and cannot be

---

Page 104

1           And now I'm going to move down from where we
2    were discussing before to Number 3.  In addition, the
3    **Auto-Accept function has not been implemented because it
4    creates additional work for Idaho's already busy judges.**
5    I believe we discussed that.
6           **Moving on, and a privacy risk to litigants and
7    third parties, e.g. publication of sensitive information
8    in a -- in a court submission.**
9           I just want to understand what you mean here
10   where you say "sensitive information."  What -- what
11   sensitive information are you referring to?
12          A.  It could be a lot of different things.  Right
13   now, court clerks have the ability to reject a document
14   that contains certain personally-identifying
15   information, so, for example, someone's social security
16   number.  So there are -- there's PII,
17   personally-identifying information that is supposed to
18   be redacted in filings, and clerks have the authority to
19   reject a filing if it contains that information and note
20   that it needs to be redacted.  That's one thing.
21          Another thing is that sometimes filers, even
22   attorneys, will submit something that really has no
23   business being submitted.  That can involve some -- all
24   sorts of things.  Sometimes, it's just, quite frankly,
25   an oversight, but so there are confidential things that

26  (Pages 101 to 104)

Courthouse News Service v. Omundson                          30(b)(6) Sara Omundson

---

Page 105

1  are not supposed to be in public documents that do get
2  submitted.
3         Another example of that might be if someone
4  submits a cover sheet that is designed to protect the
5  privacy of folks if they were to inadvertently submit
6  that, attach it to a complaint or -- so there are just
7  things that are not supposed to be submitted as public
8  documents that sometimes can be. And if -- with the
9  clerk's review, they can catch that, reject the filing
10 and ask that be corrected.
11        Q.  Okay. I want to break that up a little bit
12 because, as I understand your response, there's at least
13 two components. One being, perhaps, you know, PII, as
14 you referred to it, that is included in a document that
15 is otherwise public. And then separately, documents
16 that might themselves just be exempt or nonpublic, and,
17 you know, so those are two distinctions there that I'm
18 understanding. Do I understand that correctly?
19        A.  Those are two. I also gave the example of
20 something being submitted that simply should never have
21 been submitted.
22        Q.  And what would -- what would that entail?
23        A.  I can give you an example of child
24 pornography.
25        Q.  And has that been filed with the court?

---

Page 106

1         A.  Yes.
2         Q.  When did that occur?
3         A.  The -- the time that I know of, it was in --
4  it was before electronic filing -- thank goodness -- and
5  it was a photograph of child pornography attached to an
6  appellate brief.
7         Q.  So this was a -- not a district court filing,
8  but an appellate court filing; is that correct?
9         A.  Correct.
10        Q.  And it was a paper filing and not an e-filing;
11 is that correct?
12        A.  Correct.
13        Q.  And it sounds like it was --
14        A.  To be --
15        Q.  Well, can you give me an estimate about how
16 long ago this occurred?
17        A.  Maybe ten years ago? I can tell you, though,
18 that since that time, clerks have inadvertently,
19 themselves, sent exhibits of child pornography.
20        It -- there are inappropriate things that can
21 be submitted with filings, both accidentally,
22 inadvertently, and quite frankly, maliciously, so
23 there -- there is the possibility that inappropriate
24 things can be included.
25        Q.  So my question then would be: Can you give me

---

Page 107

1  an estimate of the number of times this has occurred
2  with new electronically-filed civil complaints?
3         A.  That particular example? No, I can't. As far
4  as the PII and things not being redacted that should be,
5  again, I think there's a code that we can try to pull
6  information on, but we haven't pulled that information.
7         As far as documents being, for example,
8  scanned together, the cover sheet along with the initial
9  pleading being scanned together and submitted together,
10 I don't know if we have a code that we could pull that,
11 but that's not a -- an exceptionally unusual experience.
12 I -- I couldn't give you exact numbers.
13        Q.  When you say "code," what do you mean?
14        A.  Well, so we had been talking about these
15 rejection codes. I believe one of those codes was the
16 failure to redact, and so we could look at our system to
17 see how often that code was used. It wouldn't
18 necessarily catch all of them, but it might give us an
19 idea of how often that happens.
20        Q.  Let me ask you: Is it fair to state then that
21 if a document were rejected because of a failure to
22 redact or other sensitive information, we would expect
23 to find or you could look at the rejection data, the
24 codes and the comments, to see if they reflect that
25 reason for rejection; is that correct?

---

Page 108

1         A.  We can -- I'm sorry. I'm just trying to
2  clarify, do you mean in that individual case could we
3  tell that was the reason? It depends on the code that
4  the clerk put in.
5         In general, if you're talking about the
6  universe of all the cases, we certainly could -- could
7  identify how many cases over a period of time had that
8  rejection code, yes.
9         Q.  And -- and is there a rejection code for
10 failure to redact information?
11        A.  I think there is, but I want to look. I know
12 it's --
13        Q.  I would like you to please do that. And if
14 this is one where you would need to place a phone call
15 to an ops manager or something, please let me know.
16        A.  Well, I can -- yeah. And party names...
17        No, there's not. You know, it -- it would
18 just -- I think it would just have to be in the reject
19 comments. It's not one of the common ones that's listed
20 in here.
21        Q.  Okay.
22        MS. DUKE:  And, Jon, when you get to a
23 point, if we could, you know, take a break? And I know
24 our IT person -- she wants to talk to you -- is
25 available to talk to you, so we could do that as well.

---

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 109

1        MR. FETTERLY:  Sure.  Why don't we,
2   because I know that we're also -- well, I'll -- we can
3   take a break.  Let's go off the record.
4            (Discussion off the record.)
5            (A break was taken from
6            11:20 a.m. to 11:34 a.m.)
7        Q.  (By Mr. Fetterly)  Okay.  Ms. Omundson, we are
8   back on the record.  During our time off the record,
9   were you able to obtain an answer to the pending
10  question we have regarding the rejection codes on the
11  Excel spreadsheet, Exhibit 42, relative to the rejection
12  reasons on Exhibit 41?
13       A.  Yes.
14       Q.  And what is the answer to that question?
15       A.  So what he explained is that within the
16  database, those are the rejection codes.  Part of what
17  was confusing me is the numbers looked different from
18  what was in the clerk's manual and what you were showing
19  me.
20           What he explained was that those are the codes
21  that were actually used in the time period that -- that
22  was requested, and so it wouldn't necessarily include
23  every code listed in the clerk's -- or, I mean, yeah, in
24  the clerk's --
25       Q.  You cut out.  In the clerk's what?

---

Page 110

1        A.  So in the clerk's manual, there's A through T,
2   and the list that you were showing me didn't appear to
3   be as long, which what was part of what was confusing
4   me.  What he told me was that the drop-down list that
5   you have are the codes that were actually used in that
6   time period.  So if a code was not in that -- used in
7   that time period, it wouldn't show up in your drop-down
8   list.  So the -- the difference in what appeared to me
9   as the difference in number of codes was because maybe a
10  code hadn't been used during that time period.
11       Q.  Thank you for the answer and the explanation.
12          So Exhibit 41, the operations manual, gives us
13  the -- or provides the codes that could be used, and
14  they are identified as codes A through T.  And then we
15  have our spreadsheet, Exhibit 42, covering a specified
16  time period and the codes on that drop-down menu were
17  the codes that were actually used during that time
18  period; correct?
19          MS. DUKE:  I'll object to the form.
20          Go ahead.
21          THE DEPONENT:  I believe that's accurate,
22  yes.
23       Q.  (By Mr. Fetterly)  Thank you.
24       A.  Yes.  That was the explanation, yes.
25       Q.  Okay.  I'm going to show you another exhibit.

---

Page 111

1   One moment.
2            (Pause in the proceedings.)
3            (Exhibit No. 43 marked.)
4        Q.  (By Mr. Fetterly)  And I'm going to put it up on
5   my screen before, as I've been doing.  This is a
6   document that's Bates labeled SO 14 through 16 produced
7   by your counsel in this action.  It is now up on the
8   screen.
9            I'll show you the first page and then scroll
10  down to Page 1, Page 2, briefly, and then Page 3.
11          Let me go back up to the top of Page 1 and ask
12  you, Ms. Omundson, do you recognize this document?
13       A.  It looks to me to be the list of fee codes
14  that appear as an addendum to the Idaho Civil Rules that
15  is also used in our system as a way to identify, I
16  believe, its case type.
17       Q.  Okay.  So --
18       A.  It might be document type.  Sorry.
19       Q.  Okay.  So does that mean that the -- let me
20  back up.
21          Do you -- do you know who prepared this
22  document?
23       A.  If I had, I can't say for certain.  I believe
24  it is maintained by Michael Mehall.
25       Q.  Mm-hmm.  And do you have an understanding of

---

Page 112

1   why certain codes or document types are highlighted on
2   this document?  And you can take a minute to look
3   through it if that would be helpful in your response.
4        A.  Why would they be highlighted?  I don't --
5   sorry.  You're scrolling really fast and I can't see the
6   ones --
7        Q.  Sorry.
8        A.  I'm trying to compare the ones that are
9   highlighted with the ones that aren't.  Yeah.  I mean,
10  it appears to me that the ones that are highlighted
11  appear to be ones that, per Rule 32, would be exempt
12  from public disclosure.
13       Q.  Okay.  So then I also see that there's a
14  distinction here between district court on the top and
15  magistrate court on the bottom.  Do you see that this
16  document is broken into the two groups?
17       A.  Yes.
18       Q.  And so is it correct that under the district
19  court where we see civil and then there's family, only
20  one type, and probate mental health, there's only one
21  type, those would be the types of cases that could be
22  filed in Idaho District Court.  Is that correct?
23       A.  It --
24          MS. DUKE:  Here's a hard copy.
25          THE DEPONENT:  Sorry.  I'm going to be a

---

28  (Pages 109 to 112)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 137

1     A.  That's part of it, but it's -- the court won't
2  take any -- make any efforts to -- to follow up on that
3  if it doesn't happen, but some courts simply don't
4  follow up on it if it doesn't happen.
5     Q.  Were any of court administrators who were
6  present at this conference, did any of those court
7  administrators, you know, come from states or courts
8  where, you know, press review queues are implemented and
9  available?
10    A.  Yes.
11    Q.  Okay.  And did any of them speak at the
12  conference?
13    A.  Yes.
14    Q.  On this -- on this issue of access?
15    A.  Yes.
16    Q.  And did any of them identify any issues that
17  their courts have had with providing access to new civil
18  complaints through a press review queue?
19    A.  I could only think of one comment about that,
20  and it was not a comment about a problem that was had.
21  Rather, it was a comment about the courts should simply
22  allow access to anything and everything; that that's --
23  that open courts allowing access regardless of what is
24  in there was the priority, which, that is definitely one
25  way to balance it.  It's just not the way the Idaho

---

Page 138

1  Supreme Court has.
2     Q.  And who was the court administrator who made
3  that comment?
4     A.  I believe -- I believe it was the Arizona
5  administrator.
6     Q.  Okay.
7        MS. DUKE:  Are you pretty close to done,
8  Jon, because we're --
9     Q.  (By Mr. Fetterly) All I want to do is a couple
10 of follow-up questions there on that same line of
11 questioning, but I understand there was a September 22
12 conference in which you identified Artie Pepin.
13    A.  Yes.
14    Q.  I believe that's the Administrator of the
15 State of New Mexico, so this would've been very
16 recently.  I just want to ask you about that and then
17 I'm done.
18    A.  Artie and I were standing in line for
19 breakfast and I asked him what the status of his case
20 was, and I believe he told me that it either was just
21 getting ready to be argued in the appellate court or it
22 had just been argued in the appellate court.  That was
23 the extent of it.
24    Q.  Okay.  Did Mr. Pepin make any comments
25 regarding the access provided to the press or public by

---

Page 139

1  the New Mexico Courts?
2     A.  No.  It -- I -- I just asked him if -- if --
3  if his appeal was done yet.
4     Q.  Understood.  Understood.
5        Okay.  I think we're about at time.  I have no
6  further questions.
7        MR. FETTERLY:  Thank you.  Appreciate it,
8  everybody.
9        (Deposition concluded at 12:54 p.m.)
10       (Signature reserved.)
11         --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 140

1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3     The undersigned Certified Shorthand
   Reporter and Deposition Notary Public of the State of
4  California does hereby certify:
5     That the foregoing 30(b)(6) deposition of
   Sara Omundson in her official capacity as Administrative
6  Director of Idaho Courts was taken before me remotely at
   the time, at which time the witness was duly sworn by me;
7
8     That the testimony of the witness and all
   objections made at the time of the deposition were
   recorded stenographically by me and were thereafter
9  transcribed, said transcript being a true and correct copy
   of the proceedings thereof.
10
11    I further certify that I am neither counsel
   for nor related to any party to said action, nor in any
12 way interested in the outcome thereof.
13    Further, that if the foregoing pertains to
   the original transcript of a deposition in a federal case,
14 before completion of the proceedings, review of the
   transcript was discussed on the record.
15
16
      In witness whereof, I have subscribed my
17 name on this 15th day of November 2022.
18
19
20
21
22
23
                                    Nicole A. Bulldis, RPR
24                                  CA CSR No. 14441
25

35 (Pages 137 to 140)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

**ER-705**

# EXHIBIT 6
# FETTERLY DECLARATION

# Deposition of 30(b)(6) Terry Derrick - Vol. I

# Courthouse News Service v. Omundson

# November 10, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____
                              )
COURTHOUSE NEWS SERVICE,      )
                              )
                              )
         Plaintiff,  )
                              )
    v.           ) No. 1:21-CV-00305-REP
                              )
SARA OMUNDSON, in her official  )
capacity as Administrative      )
Director of Idaho Courts,       )
                              )
         Defendant.  )
_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF TYLER TECHNOLOGIES

REPRESENTED BY TERRY DERRICK - VOLUME I

_____

Taken at Plano, Texas
(Conducted via Videoconference.)


DATE TAKEN:  November 10, 2022
REPORTED BY:  Nicole A. Bulldis, RPR
     AZ No. 50955 | CA No. 14441 | WA No. 3384

---

Page 3

1    30(b)(6) DEPOSITION OF TERRY DERRICK - VOLUME I
2
3             EXAMINATION INDEX
4    EXAMINATION BY                    PAGE
5    Mr. Fetterly......................................... 4
6
7
8
9
10            EXHIBIT INDEX
11   EXHIBITS FOR IDENTIFICATION          PAGE
12   33 Subpoena to Tyler Technologies..................... 4
13   34 State of Idaho Judicial Branch - 2019 Tyler
14      Public Sector Excellence Award Winner............. 4
15   34A TylerTech.com Idaho Judicial Branch Article...... 13
16   35B TylerTech.com Enterprise Justice Software........ 17
17   35 Individual File User Guide, Odyssey File & Serve
18   36 Firm Administrator User Guide, Odyssey File & Serve
19   37 iCourt File & Serve: Electronic Filing Overview.... 4
20
21            --o0o--
22
23
24
25

---

Page 2

1        A P P E A R A N C E S
2
3    FOR PLAINTIFF:
4    (via Zoom)    Jonathan G. Fetterly
                   Katherine A. Keating
5                  BRYAN CAVE LEIGHTON PAISNER LLP
                   3 Embarcadero Center, 7th Floor
6                  San Francisco, CA 94111
                   (415) 675-3400
7                  jon.fetterly@bclplaw.com
                   katherine.keating@bclplaw.com
8
9    FOR DEFENDANT:
10   (via Zoom)    Keely E. Duke
                   Molly E. Mitchell
11                 DUKE EVETT, PLLC
                   1087 W. River Street, Suite 300
12                 PO Box 7387
                   Boise, ID 83707
13                 (208) 342-3310
                   ked@dukeevett.com
14                 mem@dukeevett.com
15
16   FOR TYLER TECHNOLOGIES
     AND WITNESS:
17
18   (via Zoom)    Beth W. Petronio
                   K&L GATES LLP
19                 1717 Main Street, Suite 2800
                   Dallas, TX 75201
20                 (214) 939-5815
                   beth.petronio@klgates.com
21
22   ALSO PRESENT:
23   (via Zoom)    SARA OMUNDSON, Idaho Courts
24            --o0o--
25

---

Page 4

1    REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
2       Thursday, November 10, 2022; 9:39 a.m.
3            --o0o--
4       (Exhibit Nos. 33 through 37 marked.)
5
6    TERRY DERRICK,          witness herein, having been
7            first duly sworn on oath,
8            was examined and testified
9            as follows:
10
11        E X A M I N A T I O N
12   BY MR. FETTERLY
13       Q.  And good morning, Mr. Derrick.  Can you please
14   state and spell your name for the record?
15       A.  Sure.  It's Terry Derrick.  T-e-r-r-y,
16   D-e-r-r-i-c-k.
17       Q.  Thank you.
18           I'm Jon Fetterly.  I'm an attorney with the
19   law firm Bryan Cave Leighton Paisner, and I represent
20   Courthouse News Service in the lawsuit Courthouse News
21   versus Sara Omundson in her official capacity as
22   Administrative Director of the Idaho Courts.
23           You're here today pursuant to a subpoena that
24   we served on Tyler Technologies.  I understand that you
25   have been produced in response to that subpoena as the,

---

                              1  (Pages 1 to 4)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 5

1  you know, witness most knowledgeable of the topics that
2  were identified by Courthouse News Service.  Is that
3  your understanding as well?
4       A.  It is.
5       Q.  Thank you.
6       I understand there was also a separate
7  subpoena issued by the defendant, Sara Omundson, in this
8  case.  Later, when I'm done with my questions pursuant
9  to the Courthouse News subpoena, you will be asked
10 questions by Ms. Omundson's counsel.  But for now, this
11 first part of the deposition will be focusing on the
12 subpoena that Courthouse News Service served on Tyler
13 Technologies.
14      Before we get started, I just want to ask you
15 a few general questions and go over a few general ground
16 rules for today.
17      Have you ever been deposed before?
18      A.  No, sir.
19      Q.  Okay.  Well, I'm sure your counsel has gone
20 over some of this with you in preparation for today but
21 just to make sure we are all on the same page, I'll go
22 over some basic ground rules as well.
23      We are here today pursuant to a subpoena in a
24 pending court matter.  This is a legal proceeding.
25 You've just been given a -- you've just sworn an oath to

---

Page 6

1  provide your best and most truthful testimony here
2  today.  The testimony you give today is the same as you
3  would give in a court of law in front of a judge, the
4  difference being we're not in court, we're in our
5  respective offices over Zoom, no less, but the -- but
6  the testimony and oath you just gave holds the same.  Do
7  you understand that?
8       A.  I do.
9       Q.  Okay.  We have Ms. Bulldis here with our court
10 reporter company taking a transcript of everything we
11 say.  She's writing everything down.  At the end of this
12 proceeding, there will be a written transcript.  You
13 will have the opportunity to review that transcript.
14 You'll have the opportunity to make comments or
15 corrections.
16      I would caution you that the purpose of that
17 is to, you know, make sure that we've, you know,
18 accurately and correctly caught information.  Typical
19 corrections involve spellings, clarifications of that
20 sort.  It's not really an opportunity to change your
21 answers.  If you were to do so, any attorney in this
22 action would have the opportunity to, you know, comment
23 on that.  Do you understand?
24      A.  I do.
25      Q.  Okay.  Because our court reporter is

---

Page 7

1  transcribing everything we say, it is very important
2  that we speak slowly, audibly, you know, no hand
3  gestures, noddings of heads, things that don't come
4  across in writing, and most importantly that we not
5  speak over each other.  Only one person at a time.  So
6  it's important that you wait for me to finish my
7  question and then you may respond and I will do my best
8  to wait for your response before I ask my next question.
9  Do you understand that?
10      A.  I do.
11      Q.  Okay.  We're off to a great start.  There's
12 about a two-second lag on the technology on my end so
13 that will hopefully help that process quite a bit.
14      As far as the questions I'll be asking you,
15 I'll be doing my best to keep it clear and
16 understandable.  If at any point, you do not understand
17 a question, and at any point you need clarification,
18 you're just not understanding what I'm asking you,
19 please let me know.  It's my job to ask good and clear
20 questions.  Despite my best efforts, I don't always do
21 so, so I'll rely on you to help me, and I want you to
22 understand what I'm saying.  If you answer my question,
23 I will assume you understood it.  Do you understand
24 that?
25      A.  I do.

---

Page 8

1       Q.  Okay.  And, you know, last but not least, this
2  is not an endurance contest.  I don't know how long
3  we'll be here today, but if at any point you need a
4  break, you need to step away, whatever, you just let us
5  know.  My request would be that you don't do that while
6  there's a question pending; however, you know, once you
7  answer the question, if you need to take a break, please
8  speak up.  Do you understand?
9       A.  I do and I appreciate that.
10      Q.  Oh, absolutely.
11      You're here today because Courthouse News has
12 brought a lawsuit against the Idaho Courts concerning
13 access to court records and, you know, a part of this
14 case involves, I guess, the means by which the Idaho
15 Courts receive court filings and make those court
16 filings available to the public.
17      And, you know, because the court has a
18 relationship with Tyler Technologies, you know, that's
19 what brings us here today.  That's not a question.  I'm
20 just, you know, letting you know why -- why we're -- why
21 we are here from Courthouse News' point of view.
22      I -- I'm going to put up on the screen a
23 document that was premarked as Exhibit No. 33.  Bear
24 with me.
25      And are you able to see my screen?

---

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

Courthouse News Service v. Omundson      30(b)(6) Terry Derrick - Vol. I

Page 9

1   A. I am.
2   Q. I see you maybe straining or squinting. Is it
3  a bit small?
4   A. It's okay. I can read it.
5   Q. Okay. I'll zoom in a little bit.
6   Have you seen this document before?
7   A. I'm not sure if I did, but I don't recall.
8   Q. Understood.
9   I'll just represent for the record that
10  Exhibit No. 33 is the subpoena to testify that the
11  Courthouse News served on Tyler Technologies on
12  September 21st. Counsel for Tyler agreed to accept
13  service. The date states October 4th. That was the
14  original date. We since moved here to today.
15   I guess, more importantly, Mr. Derrick, I'd
16  just like to scroll down to the exhibit that we
17  attached -- or, as the attachment to the subpoena, which
18  identifies the deposition topics that were identified in
19  Courthouse News' subpoena. And I now have that up on my
20  screen.
21   Can you see those topics?
22   A. I can and I do recognize the document now.
23   Q. Excellent. Thank you.
24   And did you review these topics prior to
25  today?

Page 10

1   A. I did.
2   Q. And is it your understanding that you're here
3  on behalf of Tyler Technologies to provide testimony
4  concerning these topics?
5   A. It is.
6   Q. Okay. And are you prepared to proceed today
7  by providing testimony with respect to these topics?
8   A. To the best of my ability.
9   Q. Thank you.
10   And we also attached, to this subpoena, an
11  Exhibit 1. I'll show you the first page. And have you
12  seen this document before?
13   A. Yes, I have.
14   Q. And are you familiar with this document?
15   A. Yes, I am.
16   Q. And it -- and what is it?
17   A. It's a document that describes two pieces
18  of -- of functionality or software that Tyler provides.
19   Q. And do you know who prepared this document?
20   A. I do.
21   Q. Who prepared it?
22   A. Evan Acosta.
23   Q. Thank you.
24   And who is Evan Acosta?
25   A. He's the Program Director for the State of

Page 11

1  Texas, specifically, the eFile Texas Program Manager.
2   Q. Thank you.
3   Before I get into some specific questions
4  regarding the -- some of the detailed aspects of these
5  topics, I want to just take a step back and get a better
6  understanding of the software or technology used by the
7  Idaho Courts as it relates to Tyler Technologies.
8   So I'm going to put up a different exhibit
9  now. This is Exhibit No. 34, and I'm going to ask:
10  Have you -- do you know what this document is?
11   A. It appears to be our excellence award-winning
12  document.
13   Q. Okay. Now when you say "our," are you
14  referring to Tyler Technologies?
15   A. Correct.
16   Q. And what's an excellence award winner? What
17  does that mean?
18   A. It generally means a partner who has been
19  successful in accomplishing certain objectives or
20  certain goals within the judicial system.
21   Q. Okay. And do you have an understanding of who
22  the partner is in the context of this Exhibit No. 34?
23   A. I'm assuming it's the State of Idaho Judicial
24  Branch.
25   Q. Okay. And why do you assume that?

Page 12

1   A. Because it's written right there on the
2  document.
3   Q. Thank you.
4   Let me direct your attention here to a
5  paragraph in this document that, I think, will hopefully
6  help us start to better understand some of the
7  technology.
8   If I look to the second full paragraph on
9  here, it begins "once the infrastructure and network
10  were built." It reads: "Once the infrastructure and
11  network were built, the state deployed Odyssey for all
12  case types including e-filing on day one."
13   My question for you is what is Odyssey?
14   A. Odyssey is Tyler's case management system.
15   Q. And explain to me what is a case management
16  system?
17   A. It's a record repository that helps the courts
18  and clerks manage their case records electronically.
19   Q. Okay. And then it says "including e-filing."
20  What's the significance of putting "including e-filing"?
21   A. E-filing is a separate solution than the case
22  management system.
23   Q. Okay. So let me -- I want to do a different
24  share screen here. Hopefully, you can explain something
25  to me.

3 (Pages 9 to 12)

Courthouse News Service v. Omundson  30(b)(6) Terry Derrick - Vol. I

---

Page 13

1    Okay.  Are you able to see my screen?
2    A.  Yes, I can.
3    Q.  Okay.  So this is -- this is an -- excuse
4  me -- this is a web version of the document that we were
5  just looking at as Exhibit 34.  Would you agree with
6  that?
7    A.  I'd have to take a deeper look to accurately
8  confirm it, but it -- it appears to -- to reference the
9  same judicial partner, Idaho Judicial Branch.
10    MS. DUKE:  And, Jon, is this an exhibit
11  just so we have clarity for the record?
12    MR. FETTERLY:  I guess the screen grab is
13  not.  I can represent for the record, that if you go to
14  this webpage, which is the TylerTech.com webpage, and I
15  can create an exhibit for this, there's a download PDF
16  button.  And if you hit the download PDF, you get
17  Exhibit 34.
18    MS. DUKE:  Okay.  Do you want to -- how
19  about we just print the first page and call it
20  Exhibit 34A, that way we can all track?
21    MR. FETTERLY:  Sure.  Let me stop my
22  share for a brief moment while I do that, and we will
23  carry on.
24    (Pause in the proceedings.)
25    (Exhibit No. 34A marked.)

---

Page 14

1    Q.  (By Mr. Fetterly) Okay.  Back to my share
2  screen.
3    So, Mr. Derrick, I'm on the TylerTech.com --
4  what appears to be a TylerTech.com website with a link
5  or a page to the same excellence award writeup for the
6  Idaho Judicial Branch.  And that same sentence I just
7  read, when I'm on the Tyler site, it has a hyperlink for
8  Odyssey.  So that's what I'm showing you right now.  I'm
9  clicking on that hyperlink.
10    A.  Okay.
11    MR. FETTERLY:  And, Keely, I can do the
12  same thing here and make this 34B.
13    MS. DUKE:  Perfect.
14    Q.  (By Mr. Fetterly) But just to understand, as I
15  click on this document, it says Enterprise Justice
16  Software powered by Odyssey.  Do you see that language?
17    A.  Yes, I do.
18    Q.  Okay.  So what does that mean, or what is the
19  Enterprise Justice Software powered by Odyssey is a
20  better question?
21    A.  We're undergoing a marketing and branding
22  revision of all of our products across Tyler, and the
23  formerly-known Odyssey Case Management solution is now
24  being coined as the Enterprise Justice Software solution
25  powered by Odyssey.  So it's just a change in the -- in

---

Page 15

1  the naming of our applications.
2    Q.  Okay.  So you said applications, so would
3  the -- would the case management system be considered
4  one application?
5    A.  That is correct.
6    Q.  And then are there other applications as well?
7    A.  Sure.  Tyler has several applications as the
8  leading court software provider in the country.
9    Q.  Okay.  Approximately, how many applications
10  would fall within this Enterprise Justice Software
11  powered by Odyssey?
12    A.  The Enterprise Justice is just the case
13  management software.  There are other applications
14  within the suite of products, but this is just referring
15  to our Enterprise Justice case management system.
16    Q.  Okay.  So what are the -- or what is the suite
17  of products?
18    A.  There are other solutions like our
19  eFile & Serve solution, our Tyler Corrections solution,
20  Civil Process solution, our Supervision solution, and
21  there are others.
22    Q.  Okay.  So as I'm on this webpage here, if I
23  were to scroll down, which is what I'm doing right
24  now -- and, again, this will be Exhibit 34B for the
25  record -- I now see a part of the webpage that says

---

Page 16

1  "powerful web-based software connecting justice
2  partners."  Do you see that language?
3    A.  I do.
4    Q.  And then underneath, it appears that there are
5  additional links.  As I scroll my cursor over them, they
6  light up here, but we see Enterprise Case Management is
7  one, Attorney Case Management, Courtroom Management,
8  Electronic Courtroom, Probation Case Tracking,
9  Electronic Filing, Self-Represented Litigants, Global
10  Courts, Jury Selection, Financial Management, and Public
11  Access.
12    Are all those applications within the suite of
13  products for Tyler Odyssey?
14    A.  They -- they aren't.  They are more
15  representative of solutions or services that we provide.
16  Some would be their own applications; others would be
17  portions of existing applications.
18    Q.  Can you identify for me which of these are
19  their own applications?
20    A.  Yeah.  If you look at electronic filing, that
21  represents our eFile & Serve application.
22  Self-Represented Litigants is a -- is a function of our
23  Guide & File platform.  Jury Selection is a
24  representative of our jury -- Enterprise Jury platform.
25  Public Access speaks to our online document access

---

4  (Pages 13 to 16)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 17

1   solutions.  I probably could go and look through the
2   others, but I think that hopefully answers your question
3   on that one.
4        Q.  It does.  It does.
5            So just to be clear, so electronic filing is
6   one of the services offered by Tyler as part of this
7   kind of suite of products; is that correct?
8        A.  That is correct.
9        Q.  Thank you.
10           I'm going to stop the share, take a brief
11  moment to make my Exhibit 34B.  Bear with me.
12           (Pause in the proceedings.)
13           (Exhibit No. 34B marked.)
14       Q.  (By Mr. Fetterly) Thank you.
15           I want to now show you a different document
16  just to make sure, again, we're all on the same page
17  before we get into some of the -- some of the details
18  today.
19           Okay.  I'm going to show you what was
20  previously marked in this case as Exhibit No. 13, and
21  can you see this page?
22       A.  I can.
23       Q.  Okay.  So Exhibit No. 13, this is a -- I'll
24  represent to you that it's just a screen grab of a
25  webpage from the Idaho iCourt website.  I'm not going

Page 18

1   to quiz you on this, but I would ask you just to briefly
2   review what it says:  "What is the 'iCourt' Odyssey
3   project?"
4            Do you see that header?
5        A.  I do.
6        Q.  And then if you could just, you know, briefly
7   read the language below and then look at the -- the blue
8   bars, I'll ask you a couple of questions about them if
9   you could just let me know once you've had a chance to
10  review.
11       A.  Okay.
12       Q.  Great.  So this document here, it states, you
13  know, the header "What is the 'iCourt' Odyssey
14  project?"  It goes on and contains two paragraphs of
15  narrative followed by the sentence:  "Below, you will
16  find more information about each component of the
17  complete iCourt solution."
18           So we first, at the top, see Odyssey Case
19  Manager.  Is this one of the components of the iCourt
20  solution?
21       A.  Yes.  That would be the Enterprise Justice
22  case management system.
23       Q.  Okay.  And then that's the case management
24  system we were just discussing a few minutes ago?
25       A.  That is correct.

Page 19

1        Q.  Below that, we see Portal.  Is Portal also a
2   portion of the complete iCourt solution?
3        A.  It is.
4        Q.  And what is Portal?
5        A.  An online court record repository.
6        Q.  Okay.  And, next, we see Supervision.  Is
7   Supervision also a component of the complete iCourt
8   solution?
9        A.  I'm not familiar with the Idaho contract
10  specifically, but if it's listed here, then it's
11  possible.
12       Q.  Thank you.  Fair enough.
13           I'm going to ask you just the same series of
14  questions for the rest of these just so we have a common
15  understanding.
16           So for Financial Manager, is Financial Manager
17  also a component of the complete iCourt solution?
18       A.  Yeah.  I mean, without me looking at our
19  contract, with all of the solutions that are included,
20  it's difficult for me to answer those questions.
21       Q.  Understood.
22           Moving on, eFile & Serve (e-filing and
23  e-service), is this a component of the complete iCourt
24  solution?
25       A.  It is.

Page 20

1        Q.  Okay.  Guide & File, is it also a component?
2        A.  It is.
3        Q.  And where it says Jury, is Jury a component of
4   the complete iCourt solution?
5        A.  I wouldn't be able to say unless I reviewed
6   the contract.
7        Q.  Fair enough.
8            Is the Tyler service Jury also known as Jury
9   Manager?
10       A.  That's -- well, we've got two different jury
11  solutions, Jury Manager and Enterprise Jury.  And so
12  without reflecting on the contract, it's difficult for
13  me to answer those questions.
14       Q.  Understood.
15           Lastly, Attorney Manager, is that a component
16  of the complete iCourt solution?
17       A.  Without reviewing the contract, I can't say
18  with certainty.
19       Q.  Okay.  Let me direct your attention then back
20  up to eFile & Serve because that was one where you
21  were about to --
22           MS. DUKE:  Case manager is not hosted by
23  Tyler; correct?
24           MS. OMUNDSON:  Well, there are two
25  versions of case management.

5 (Pages 17 to 20)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 21

1          MS. DUKE: Oh, sorry -- sorry about that.
2          Q. (By Mr. Fetterly) Okay. Back to
3    eFile & Serve, Mr. Derrick, can you just please, in
4    your words, you know, tell us, you know, what is
5    eFile & Serve?
6          A. Sure. It's an electronic delivery system and
7    service system for the court.
8          Q. Okay. And are you familiar with the phrase or
9    the term "eFile Manager"?
10         A. Yes, I am.
11         Q. It's commonly referred to as, I think, EFM for
12   short; is that correct?
13         A. That is the acronym that we use, yes.
14         Q. What is an eFile Manager?
15         A. It's the -- hub by which it controls and
16   manages the transmissions to and from in the electronic
17   filing process.
18         Q. Okay. And is -- does eFile & Serve have, as
19   a component, an eFile Manager?
20         A. Yes, it does.
21         Q. Is it your understanding that, you know, all
22   e-filing services have or require, in some form, an
23   e-file manager?
24         A. It is my understanding of that, yes.
25         Q. So that would be true not just for Tyler

Page 22

1    Technologies, but any other, you know, competitors or
2    vendors that operate in this space? If they're
3    providing e-filing services, it's typically true that
4    their e-filing service has an e-file manager; is that
5    correct?
6          MS. DUKE: Form and foundation.
7          THE DEPONENT: Yeah. I can't speak on
8    offerings beyond what Tyler provides.
9          Q. (By Mr. Fetterly) Okay. Is part of your job --
10   well, strike that. Strike that.
11         I want to understand now a little bit more
12   about this eFile & Serve product, and so in order to
13   do that, I will now direct your attention to
14   Exhibit No. 35.
15         Okay. Do you -- let's see. And just so I
16   have an understanding, Mr. Derrick, do you have
17   Exhibit No. 35 in front of you in printed form or are
18   you relying on the screen?
19         A. I'm not sure which exhibit Exhibit No. 35 is.
20         Q. Oh, you know, there might have been a lag
21   there on the technology. It's now up in front of you on
22   the screen.
23         A. Okay. One -- one moment.
24         Okay. I'm sorry. Yeah. I don't have those
25   in front of me, so -- but I can reference the screen if

Page 23

1    that's appropriate.
2          Q. Oh, certainly. Certainly. I asked purely for
3    logistical purposes.
4          Are you familiar with this document?
5          A. I'd have to look through it to -- to see what
6    that document is.
7          MR. FETTERLY: Okay. Why don't we take a
8    quick break?
9          And I would ask, Beth, if you could print
10   out the copies that I've sent to you, I think it might
11   help us go forward today if we could have the printed
12   copies in front the witness so that he has the ability
13   to flip through them. Can we do that?
14         MS. PETRONIO: I'm happy to do that.
15   I've looked at your exhibits and I just want to say, for
16   the record, I don't think any of these exhibits were
17   within the scope of the -- the notice. And everything
18   you've asked him so far, I don't think has been within
19   the scope of the notice.
20         I'm trying to be really, you know,
21   lenient about letting you get the information you need,
22   but this is a really long, complicated document that is
23   outside the scope of what you were planning, I think, to
24   ask him today. So I -- I don't know how much time you
25   want to spend on it, but, you know, I -- I just don't --

Page 24

1    you know, I -- I just want, for the record, at some
2    point, we're not going to continue with questions that
3    are outside the scope of -- what was noticed.
4          MR. FETTERLY: I appreciate that. We
5    really want to keep it within the notice and we believe
6    we are. And the reason being, I don't plan on spending
7    too much time here, but in order to understand the Press
8    Review Tool and the Auto-Accept tools that have been
9    framed within the notice, I do believe it is important
10   to have just a basic understanding of the e-filing
11   system and the Tyler systems, generally, to which they
12   relate; otherwise, we're not going to have a clear
13   record or any understanding.
14         So all I'm trying to do is, at a very
15   high level, understand just the very basic
16   functionalities of the eFile & Serve program which is
17   what this relates to, and I'm happy to point to the
18   specific pages. And I think if we could just go off the
19   record and get the printed copies, we could really speed
20   this along because trying to navigate this purely
21   through video is a little more cumbersome.
22         So if we could take a quick break and I'm
23   happy to point you to the pages that I'm going to ask
24   Mr. Derrick to review -- I think it's two pages -- we
25   can then, I think, move along more expeditiously.

6 (Pages 21 to 24)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 25

1    MS. PETRONIO: That's fine. If you don't
2  mind identifying the pages, I think that would help.
3    MR. FETTERLY: Absolutely. I'll put them
4  up on the screen for everyone's benefit.
5    MS. DUKE: And we're having a printout
6  made too, Jon, real quick so...
7    MR. FETTERLY: Thank you.
8    Now, it looks like the bookmarks that
9  were on this document from the internet when I
10 downloaded it from the Tyler website were removed in the
11 process of -- removed in the process of adding the
12 exhibits, but it's going to be pages -- right here, 17,
13 18, and 19, actually three pages, two and a half of
14 content.
15    MS. PETRONIO: Jon, can you stop
16 screen-sharing for a minute? I'm having trouble on my
17 laptop.
18    There we go. Thank you.
19    MR. FETTERLY: Of course. Sorry.
20 Why don't we go off the record?
21    (A break was taken from
22       10:11 a.m. to 10:21 a.m.)
23 **Q. (By Mr. Fetterly) Mr. Derrick, before we took**
24 **our break, we were talking about some of the -- some of**
25 **the Tyler, I guess, products or solutions as we've**

Page 26

1  **discussed.**
2    **To take a quick break from that, I just want**
3  **to ask you on a more general level, what is your -- what**
4  **is your position with Tyler Technologies?**
5    A. General Manager of the Courts.
6    **Q. And for how long have you held that position?**
7    A. About a month.
8    **Q. Okay. And what was your position before you**
9  **became General Manager of the Courts?**
10   A. General Manager of eSolutions.
11   **Q. And for how long did you hold that position?**
12   A. About five years.
13   **Q. I'm sorry?**
14   A. About five years.
15   **Q. Okay. And before you were General Manager of**
16 **eSolutions, what was your position then?**
17   A. I believe I was the Operations Director of
18 eSolutions.
19   **Q. What is eSolutions?**
20   A. eSolutions is a -- a part of our courts and
21 justice division.
22   **Q. And what were your job duties and**
23 **responsibilities as operation -- Operations Director of**
24 **eSolutions?**
25   A. Sure. As Operations Director of eSolutions, I

Page 27

1  served in the capacity to help with managing the
2  professional services organization and the support
3  organization as well as the client success organization
4  within eSolutions.
5    **Q. And did that entail working with the court**
6  **clients or partners with Tyler Technologies?**
7    A. Occasionally, yes.
8    **Q. And was that then with respect to Tyler's**
9  **eSolutions offerings?**
10   A. That is correct.
11   **Q. And would those eSolutions offerings include**
12 **the Odyssey products?**
13   A. Although those were accompanied with those
14 more comprehensive Tyler offerings, no, my focus was
15 primarily on eSolutions products.
16   **Q. Okay. And you distinguished that from**
17 **Odyssey, how so?**
18   A. The term Odyssey is generally referred to as
19 the case management system, and eSolutions is primarily
20 around our electronic filing platform.
21   **Q. Thank you for clarifying that.**
22   **So then what was your -- what were your job**
23 **duties and responsibilities as the General Manager of**
24 **eSolutions?**
25   A. Oversaw the entire eSolutions operations for

Page 28

1  the courts and justice division.
2    **Q. And that would include the e-filing and**
3  **service -- services; correct?**
4    A. That's correct.
5    **Q. And did that entail working with the courts**
6  **that used Tyler's eSolutions services?**
7    A. Occasionally.
8    **Q. I want to make sure I have my terminology**
9  **correct so that we're speaking the same language because**
10 **I appreciate that you operate in a technical field.**
11   **If I'm referring to eSolutions and e-filing,**
12 **am I -- should I be referring to it as -- are these**
13 **services? Are they programs? You know, how -- how**
14 **would you characterize it? And if there's a difference,**
15 **can you just tell me what that is so we can speak the**
16 **same language here today?**
17   A. Yeah. Sure. So eSolutions is more of a
18 department, a group, if you will. That group oversees a
19 series of applications or solutions, one of which would
20 be our electronic filing platform which is known as
21 eFile & Serve today and formerly known as Odyssey
22 File & Serve historically.
23   **Q. Thank you.**
24   **So if we're referring to eFile & Serve or**
25 **File & Serve, we're speaking about the same application**

7 (Pages 25 to 28)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 29

1  or solution; correct?
2      A.  That's correct.
3      Q.  And in this context, application or solution
4  can be used interchangeably; is that correct?
5      A.  In a sense, yes, sir.
6      Q.  Okay.  So -- and I think I just asked you
7  about your two prior positions with Tyler, but just to
8  make sure I understand, what are your job duties and
9  responsibilities as the, I think, General Manager of the
10  Courts?
11     A.  To oversee our courts business for the C&J,
12  the courts and justice division.
13     Q.  And I think this is implied, but would the
14  courts and justice division encompass the division of
15  Tyler Technologies that provides e-filing solutions to
16  its justice partners?
17     A.  Yes.
18     Q.  Thank you.
19         Now, I'd like to direct your attention to
20  Exhibit No. -- well, this will be Number 33, but it's in
21  a -- the attachment to the subpoena that you've already
22  reviewed and we've already discussed.  I'll put it up on
23  my screen.
24         So this is the page of the Exhibit 1 to the
25  subpoena, Exhibit 33, Bates labeled SO 3 in the bottom

Page 30

1  right-hand corner.
2         And, Mr. Derrick, are you able to see this
3  page?
4      A.  Yes, I am.
5      Q.  Let me first direct your attention to
6  left-hand column where it says Auto-Accept Review.  Do
7  you see that?
8      A.  I do.
9      Q.  Beneath that, it says:  "Auto-Accept Review is
10  a free out-of-the-box e-filing function that allows
11  clerks to automatically accept filings based on a set of
12  conditions."
13         My question to you is where it says "free
14  out-of-the-box," what does that mean?
15     A.  It means it's included in our base product of
16  File & Serve.
17     Q.  So does that mean that any justice partner or
18  court that has the base File & Serve application or
19  solution, they would have, you know, access to or the
20  ability to use the Auto-Accept Review tool; is that
21  correct?
22         MS. DUKE:  Object to the form.
23         THE DEPONENT:  That is correct.
24     Q.  (By Mr. Fetterly) Okay.  Moving to the
25  right-hand column, I see Press Review Tool.  Do you see

Page 31

1  that?
2      A.  Yes, I do.
3      Q.  The -- the first sentence in the paragraph
4  beneath the graphic says:  "Press Review Tool, an
5  application that works in conjunction with eFile & Serve
6  to provide clerks the option to grant access to filings
7  as soon as they are filed (prior to clerk review)."
8         Did I read that correctly?
9      A.  I believe so, yes.
10     Q.  So my question is:  What does it mean where it
11  says "works in conjunction with eFile & Serve"?
12     A.  It means that it is not the same application.
13     Q.  So we have the Auto-Accept Review, which is
14  part of the eFile & Serve application; correct?
15     A.  Correct.
16     Q.  And the Press Review Tool is a separate
17  application that works in conjunction with the
18  eFile & Serve application; correct?
19     A.  Correct.
20         MS. DUKE:  We're having a hard time
21  hearing your answers.
22         Thank you.  Yeah, let's see if that's
23  better.
24         THE DEPONENT:  Can you hear me better
25  now?

Page 32

1         MS. DUKE:  Yes, I can.
2         THE DEPONENT:  I'll scoot up.  I
3  apologize.
4         MR. FETTERLY:  Thank you.
5         MS. DUKE:  No worries.  Thanks.
6      Q.  (By Mr. Fetterly) Okay.  So before I go
7  further with this document, our Attachment 1 to the
8  subpoena, I would like to just get a little better
9  understanding of the eFile & Serve application or
10  solution since the Auto-Accept Review is a part of that
11  application and the Press Review Tool works in
12  conjunction with that File & Serve application.
13         So I will now go to Exhibit No. 35.  And,
14  again, I'll represent to you that this is a document
15  that is available to the -- through the Idaho Court
16  website, and I'm going to direct your attention to
17  Pages 17, 18, and 19.
18         And I have Page 17 up on my screen.  Do you
19  see that?
20     A.  I do.
21     Q.  So it begins at the top "2 E-Filing Overview."
22  Did I read that correctly?
23     A.  You did.
24     Q.  Okay.  The first full paragraph under
25  Figure 2.1 says:  "Once a user has registered to use

8  (Pages 29 to 32)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. I

---

Page 33

1  Odyssey File & Serve, a filer can electronically file
2  documents to the court."
3      Where it references Odyssey File & Serve, do
4  you understand that to mean the same File & Serve
5  application or solution that we've been discussing?
6      A.  Correct, it is the electronic filing system.
7      Q.  Thank you.
8      I want to just walk through the e-filing
9  process that Tyler depicts in its document here
10 describing the e-filing process.  So as I look at the
11 graphic at the, I guess, 12:00 o'clock position, it says
12 "filer submits" and there's a person sitting at their
13 desk.
14     Would you agree that this is depicting a
15 filer, not the court, not a court clerk, but a person
16 that would be submitting a file to the court?
17     A.  No, I would not.
18     Q.  And why not?
19     A.  Because a filer can be anyone.  It could be
20 the court filing it out, it could be an SRL or a
21 self-represented litigant, or it could be a legal
22 professional, so I can't definitively say that it is a
23 specific filer and not the court.
24     Q.  Understood.
25     So why don't you describe -- can you describe

---

Page 34

1  for me, in your words, the e-filing process?
2      A.  Sure.  A filer will use, today, what we call
3  an electronic filing service provider, which is a filing
4  portal, to upload their document that they wish to
5  deliver to the court.  They complete the information
6  that's required by the court, and then they'll click the
7  submit button.
8      And upon submission, that document and the
9  information will be transmitted to the eFiling
10 Manager.  And depending upon the configuration of the
11 court, service could be done at the time of submission
12 or service could be done at the time of acceptance.  But
13 once upon -- once it's upon the review queue inside of
14 the electronic filing manager, the electronic filing
15 manager provides access to those documents via the
16 review queue in which usually it's court clerks that
17 review those records and make a determination whether to
18 accept or reject other -- otherwise known as return for
19 correction, those documents.
20     And assuming that they accept it, which
21 happens the majority of the time, the document is
22 stamped, and then it is passed in two different
23 directions.  It's passed to the case management system,
24 which in many instances is our Enterprise Justice or
25 Odyssey case management system, and it is also delivered

---

Page 35

1  back to the filer who submitted it.
2      Q.  So you -- you described a pretty thorough
3  process of, I guess you'll call that an A to Z, so if I
4  could just break that up a little bit.
5      The graphic here under the e-filing process
6  shows several different stages.  The filer submits,
7  court receives, clerk reviews and notifies filer of
8  status via email, filer receives email, filer checks
9  filing status.
10     Just -- I want to try to understand how this
11 graphic fits into the process you just described.  So
12 you mentioned the -- the EFM, the filer submits the
13 document and it's received into the EFM; is that
14 correct?
15     A.  That's correct.
16     Q.  And at what point -- where does that or how is
17 that reflected on this graphic, the -- the submission to
18 and receipt by the EFM?
19     A.  It's not.
20     Q.  Okay.  Why is that?
21     A.  Well, two reasons.  One, this graphic is old.
22 I think it's based in 2019 if I can read the bottom
23 correctly.  And, two, this is describing more of the
24 general process and not necessarily the steps in that
25 e-filing process along the way.  This is more general

---

Page 36

1  terms or a summary version, if you will.
2      Q.  Okay.  So you -- you asked -- you made
3  reference to a review queue.  Did I understand you
4  correctly that the review queue is within the EFM?
5      A.  It is not within the EFM.
6      Q.  Okay.  Explain to me what is the relationship
7  between the review queue and the EFM, if any.
8      A.  Yeah, sure.  So the EFM is the repository for
9  where the documents and data live.  The review queue is
10 the application or the solution by which the clerks
11 leverage to access that information.
12     MS. DUKE:  And maybe so we're not all
13 confused, instead of using "EFM" can we use "case
14 management" going forward, Jon?  No?  Different?
15     MR. FETTERLY:  I don't believe so.
16     MS. DUKE:  No, it sounds like I'm off on
17 that.
18     MR. FETTERLY:  Mr. Derrick was shaking
19 his head no to that question.
20     Q.  (By Mr. Fetterly) Is that correct, Mr. Derrick?
21     A.  The case management and the eFiling Manager
22 are two distinct solutions.
23     Q.  Okay.  So I'm going to go back to that top
24 paragraph, and let's set the graphic aside, Mr. Derrick.
25 I appreciate your testimony.  We have the general and

9 (Pages 33 to 36)

Courthouse News Service v. Omundson — 30(b)(6) Terry Derrick - Vol. I

Page 37

1  the specific, and I think we'd prefer to work through
2  the specific with you so we understand things correctly.
3         So we have that first paragraph. The
4  second -- so the first sentence is: "Once a user has
5  registered to use Odyssey File & Serve, a filer can
6  electronically file documents to the court."
7         And would it be correct that that would also
8  include submission of the document to the EFM within
9  File & Serve?
10        MS. DUKE: I'll object to the form.
11 Misstates what file means in Idaho versus submitted.
12        THE DEPONENT: Yeah. I -- it says once a
13 user has registered to use the e-filing platform, a
14 filer, which would be that registered user, can
15 electronically file the documents to the court. And
16 that's referring to submitting those documents through
17 an electronic filing service provider or a web portal, a
18 filing portal, if you will, to get the documents to the
19 electronic filing manager.
20    Q. (By Mr. Fetterly) Thank you.
21        MR. FETTERLY: And I'm -- just for the
22 record, I'm happy to do my best to refer to submission
23 receipt and try not to use the word "file" as best I can
24 given that is a point of contention in the lawsuit.
25        MS. DUKE: Sure. Thanks, Jon.

Page 38

1         MR. FETTERLY: But just for the record by
2  doing so, obviously, I'm not going to be waiving or
3  acquiescing any right to say that "submission" and
4  "file" are synonymous for our purposes in the lawsuit,
5  and I understand Ms. Duke would not be acquiescing or
6  waiving any of her arguments if we use the common terms
7  "submission" and "receipt" here today.
8         MS. DUKE: Correct. And I'd add to that,
9  if the words "submission" or "receipt" equals filed, we
10 obviously object to that and do not believe that's the
11 case in Idaho. So I appreciate that and I'll do my best
12 to object, but I may miss some too.
13        MR. FETTERLY: We'll do our best to spare
14 Mr. Derrick and his counsel --
15        MS. DUKE: Sounds good.
16        MR. FETTERLY: -- to those objections.
17    Q. (By Mr. Fetterly) So going back to this first
18 paragraph on this page, we're now looking still at
19 Page 17 of Exhibit 35, when the filing is submitted, the
20 filing is electronically -- is electronically delivered
21 to the clerk's inbox.
22        Can you just again explain to me what that
23 means in the context of the detailed explanation you
24 just provided, Mr. Derrick, of the e-filing process?
25    A. Yeah. When the filing has been submitted or

Page 39

1  reached a submitted status in the system, it is then
2  available for the review queue that the clerks use to
3  pull that information into that application so that they
4  can begin reviewing that document or that filing.
5     Q. So we're talking about submitted by a filer,
6  any filer who submits the document, and it's received
7  into the EFM; correct?
8     A. Correct.
9     Q. And I believe you said it then is available
10 in -- for the, I think, application for the review
11 queue; is that correct? That's a separate application,
12 you said, for the clerk review queue?
13    A. It's a separate application, yes.
14    Q. So where this document references the clerk's
15 inbox, that's the -- would that be referring to the
16 clerk's review queue?
17    A. Correct.
18    Q. And just so I'm clear here, the -- the EFM,
19 eFile Manager, and the clerk's review queue, those are
20 two separate applications but those are both
21 applications within the File & Serve solution; is that
22 correct?
23    A. That is correct.
24    Q. Or itself an application; correct?
25    A. That is correct.

Page 40

1     Q. Okay. How does a clerk access the clerk
2  review queue or clerk's inbox?
3     A. Sure. The clerk accesses the review queue by
4  logging into the URL, the web address for that
5  application, filling out his or her credentials, a user
6  ID and a password, clicking the submit button or the
7  log-in button to get in, and then going into the queues
8  by which they have access to in order to review the
9  filings that have been submitted and are inside of those
10 queues.
11    Q. So you say "web address," so there's a URL or
12 website that a clerk would type into a web browser to
13 then bring up this URL that would then prompt those
14 steps that you just described; is that correct?
15    A. Correct.
16    Q. And as I'm going back to the document again,
17 under the graphic, the clerk then reviews the filing and
18 either accepts, rejects, or returns the filing.
19         This -- this clerk review that is referenced
20 here, that -- is that done by the clerk once they've
21 logged into the clerk review queue or clerk inbox?
22    A. Correct.
23    Q. And -- and whatever review they are doing,
24 they are doing while the document is in the clerk review
25 queue or clerk inbox; correct?

10 (Pages 37 to 40)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 41

1    A. They are doing it while the filing is in the
2  EFM but is being surfaced in the review queue. To be
3  clear, the filing doesn't live in the review queue.
4        Q. Understood. I think it's understood.
5        I'm going to ask you to explain that so I have
6  a clear understanding. So can you elaborate on what you
7  mean when you say the filing lives in the EFM but is
8  surfaced in the clerk review queue?
9    A. Sure. The document and the data reside in
10  the eFiling Manager. The review queue is an
11  application, a review tool is what it's called, is an
12  application for the clerks to access that information.
13        Q. And then the clerks review the -- the surfaced
14  version of the filing that is sitting in the EFM or
15  residing in the EFM, and based on that, they either
16  accept, reject, or return the filing; is that correct?
17    A. That is correct.
18        Q. Does a -- I'm going to ask a general question
19  and do my best. Does a court typically have just one
20  single review queue or can they have multiple review
21  queues? I'm not asking about any particular court. I'm
22  just trying to understand the general functionality of
23  this product.
24        MS. DUKE: Form and foundation.
25        THE DEPONENT: It varies across the

Page 42

1  country.
2        Q. (By Mr. Fetterly) Okay. So if a -- if a court
3  had a statewide e-filing system, would it be common for
4  them to then have, you know, multiple clerk review
5  queues or inboxes based upon the different courts within
6  the -- within the court system?
7        MS. DUKE: Form and foundation.
8        THE DEPONENT: Yes. Depending upon the
9  configuration, we generally see at least one queue per
10  county within a statewide implementation. There could
11  be more depending on the user's preference.
12        Q. (By Mr. Fetterly) But if you -- if you didn't
13  have multiple, if it was just one clerk queue,
14  presumably you'd have a situation where all filings from
15  across the state got dumped into one single queue. So
16  is it fair to conclude that the purpose of multiple
17  queues is to help break up and sort filings according
18  to, you know, court and location?
19        MS. DUKE: Form and foundation. Beyond
20  the scope of the 30(b)(6) as well.
21        THE DEPONENT: Yeah. The queue
22  configuration is based upon court processes, and the
23  breaking up in a statewide engagement by county is
24  because that's generally how those states operate at the
25  county level. For example, when filers submit filings,

Page 43

1  they generally submit it to a county and not necessarily
2  to the state.
3        Q. (By Mr. Fetterly) Understood.
4        So I just want to move on to the next
5  paragraph here: "If the clerk accepts the filing, the
6  case is docketed and set to appear in the clerk's case
7  management system."
8        Can you just explain what that means in the
9  context of the process we've been discussing here?
10    A. Sure. Upon acceptance, that document is
11  stamped with the court's file stamp and it's sent in two
12  different directions. The document and the data are
13  sent into the case management system of the clerk, and
14  the document, the file-stamped version, is delivered
15  back to the filer who submitted it.
16        Q. Okay. And you used the phrase "case
17  management system," and as we've discussed, that's a --
18  yet another application or solution; correct?
19    A. That's correct.
20        Q. Okay. So just to try to recap this, so the
21  filer submits the document and it's received into the
22  Tyler File & Serve solution, and, in particular, the EFM
23  within that solution, and then the document is surfaced
24  to the clerk review queue that's also within the
25  File & Serve solution. And then upon acceptance, the

Page 44

1  document is then sent into two directions, one back to
2  the filer and one to the court's case management system,
3  which is a -- yet another Tyler solution; correct?
4    A. You got it.
5        Q. Thank you.
6        You -- does the -- either the EFM -- well, let
7  me -- I'm going to strike that.
8        Does the Tyler eFile & Serve solution stamp
9  or mark the document that has been submitted upon
10  receipt of that document to reflect the date and time of
11  submission?
12        MS. DUKE: Object to the form.
13  Foundation. Not specific to Idaho.
14        Go ahead.
15        THE DEPONENT: We don't stamp the
16  document itself with that criteria, but we do capture
17  that information.
18        Q. (By Mr. Fetterly) How is that information
19  captured?
20    A. It's -- it's captured in the eFiling
21  Manager, and it is surfaced in the clerk review tool
22  when they're reviewing that document.
23        Q. And you said "clerk review tool." That would
24  also be synonymous with the clerk review queue?
25    A. Correct.

11 (Pages 41 to 44)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 45

1    Q.  If the clerk then accepts the document without
2  returning it or rejecting it, is that date and time of
3  submission the -- the date and time that is then stamped
4  on the document?
5         MS. DUKE:  Again, objection.  Form.
6  Foundation.  Not specific to Idaho.
7         THE DEPONENT:  Yeah, it really varies.
8  It can be the time of submission or it can be the time
9  of acceptance.  It's dependent upon court rule.
10    Q.  (By Mr. Fetterly) Okay.  I'm going to now go to
11  Page 18 of this document.  And by "this document," I
12  mean Exhibit 35.
13         Filing queue status.  And it reads:  "The
14  filing queue status lets you know where you are in the
15  e-filing process.  The key represents the status listed
16  for your filing.  The following filing status key table
17  describes the status associated with each filing type."
18         My goal is to go through this, Mr. Derrick,
19  pretty quickly.  I just want to understand a few things,
20  again, in context of this process that we've been
21  discussing.
22         The first two statuses here are draft and
23  submitting.  Would you agree that these are statuses
24  that would relate to a filing prior to its submission to
25  the eFile Manager?

---

Page 46

1    A.  Draft would.  Submitting would be in the
2  process of delivery to the EFM or the eFiling Manager.
3    Q.  And then submitted would be delivery to or
4  received by the EFM; correct?
5    A.  Correct.  That's an acknowledgment by the
6  eFiling Manager that it's received that document or
7  that filing.
8    Q.  And just so we're understanding each other,
9  where it says draft, I don't understand this to mean the
10  attorney or the filer is drafting their document.  I
11  understand this to mean that someone has logged into --
12  the filer has logged into File & Serve and has begun the
13  process of entering the data they are required to enter
14  in order to submit their filing.  Is that your
15  understanding as well?
16    A.  Correct.
17    Q.  Thank you.
18         So as we're looking at the filing queue,
19  status submitted would be the point in time or the
20  status of the document when it is delivered to or
21  received by the EFM within the File & Serve solution;
22  correct?
23    A.  Correct.
24    Q.  Under the definition, it says:  "The document
25  file format and payment information have been verified

---

Page 47

1  and accepted but the filing has not yet entered the
2  review queue/workflow process."
3         Let me just break that up.  So where it says
4  the document file format and payment information had
5  been verified and accepted, do I -- is it correct that
6  this would be the eFile & Serve solution or
7  application verifying and accepting information that was
8  inputted by the filer during the draft process?
9    A.  Correct.
10    Q.  Okay.  And then it says:  "The filing has not
11  yet entered the review queue/workflow process."
12         If you could just help me understand the
13  distinction between a document that has been submitted
14  to or received by the EFM but not yet entered the review
15  queue/workflow process.  What does that mean?  How does
16  that work?
17    A.  The documents in the filings live -- reside
18  inside of the eFiling Manager, and the review tool
19  allows clerks to then work those filings by pulling them
20  into the review queue and reviewing them.  And the
21  variance here is the eFiling Manager possesses that
22  filing, but the clerk has not initiated the review
23  process of that filing within the review tool.
24    Q.  What does a clerk do to initiate the review
25  process within the clerk review tool or clerk review

---

Page 48

1  queue?
2    A.  Log into the review tool.  They go to the
3  queue that they're going to work.  They identify the
4  filing that they wish to work, and then they go into
5  that filing to begin working it.
6    Q.  So going back to our document, Exhibit 35 --
7  oh, let me back up before we do that.
8         So in terms of what you just described, that
9  would then be the process of a clerk going to their
10  computer, bringing up the web browser into which they
11  would enter the URL so that they could then log into the
12  system, complete the prompts necessary to even get to
13  that stage, and then they would, you know, log into the
14  tool and go forth to, you know, follow the steps you
15  just outlined; is that correct?
16    A.  That is correct.
17    Q.  Okay.  So then back to our Exhibit No. 35,
18  under status court processing, some additional action
19  needs to be taken by the court.  What does that mean?
20    A.  Yeah.  Before it gets to that court
21  processing, the "under review" is the step that happens
22  prior to, and that under review is when the clerk begins
23  that review process.  That's when it changes into that
24  status, when a clerk reviewer has essentially selected
25  the filing from their queue and began working it.

---

12  (Pages 45 to 48)

Courthouse News Service v. Omundson                                    30(b)(6) Terry Derrick - Vol. I

Page 49

1    Court processing is the clerk has taken an
2  action on that filing but it has not completed its steps
3  to get to a final status of whether it's accepted or
4  rejected.
5        Q.  Got it.
6        So the filer submits the document to the court
7  by submitting it to the EFM.  It's received by the EFM
8  and the document lives there until the court clerk is
9  able to log into their review queue, at which point the
10 document surfaces from the EFM to the review queue.
11 They do their review, and it's at that point in time
12 that the process changes from submitted to under review;
13 correct?
14       A.  The moment they enter in that filing to begin
15 that review process, it changes from submitted to under
16 review status.
17       Q.  Okay.
18       A.  The moment they click into that filing.
19       Q.  And when you say "that filing," is it correct,
20 then, that the -- that the clerk review queue, depending
21 on how it's configured, could have one or more filings
22 to be reviewed and accepted; correct?
23       THE DEPONENT:  Sure.
24       Q.  (By Mr. Fetterly) And then the number or volume
25 would just depend on size of the court, number of

Page 50

1  filings, how it's all configured; correct?
2        A.  Correct.
3        Q.  Just real quickly, to understand the rest of
4  these, I see that under review, we have the -- I'm back
5  to Exhibit 35, Page 18, I see receipted.  What does
6  "receipted" mean?
7        A.  It's a separate option that very few courts
8  leverage, but it is an acknowledgment back to the filer
9  that the court has received or receipted that filing.
10 It's generally built around the proposed order process.
11       Q.  Going back up to Page 17 of this document,
12 there was the graphic that shows, you know, filer
13 receives email.  Is that the receipted process or was
14 that something else?
15       A.  This graphic --
16       MS. DUKE:  Objection.  Form and
17 foundation.
18       Go ahead.
19       THE DEPONENT:  This graphic is likely
20 referring to the notifications that he or she has set up
21 to receive within the eFiling Manager.
22       Q.  (By Mr. Fetterly) I see.
23       So would it be fair to say that would be more
24 of an automated process as opposed to a court clerk
25 taking some affirmative step to initiate an

Page 51

1  acknowledgment or a receipt?
2        A.  Correct.
3        Q.  Okay.  And -- and that automated process would
4  just vary court by court; correct?
5        A.  Yes, and also by filer.  By filer, he or she
6  has the privilege of making their own configuration
7  settings as to which notifications that that individual
8  would like to receive.
9        Q.  And then just continuing on here to the bottom
10 of Page 18, we have two more columns here, accepted and
11 rejected.  They seem to speak for themselves here, but
12 just is it correct then that this is reflecting the
13 status of the clerk having done whatever review they do,
14 the clerk then decides to accept or reject the document,
15 and depending on what the clerk does within the review
16 queue, that determines the status of the document as
17 reflected here; is that correct?
18       A.  It is.
19       MR. FETTERLY:  Okay.  We've been going
20 for about now an hour on this and we're going to switch
21 gears into a new line of inquiry so I suggest we take a
22 five- or ten-minute break.  Does that work?
23       MS. DUKE:  Works for me.
24       MR. FETTERLY:  Great.  Thank you.
25       (A break was taken from

Page 52

1        11:01 a.m. to 11:19 a.m.)
2        Q.  (By Mr. Fetterly) Mr. Derrick, I'm going to
3  show you a document that we premarked as Exhibit No. 37.
4  There we go.
5        And, Mr. Derrick, are you -- can you see this
6  document?
7        A.  Yes, I can.
8        Q.  And I'll represent to you that it's a
9  screenshot of a webpage.  Do you recognize this webpage?
10       A.  I don't.
11       Q.  Do you recognize the URL?
12       A.  Oh, yes, I do.
13       Q.  And what does that -- does it have a meaning
14 to you?  And if so, what is it?
15       A.  It's the Idaho's court program.  It's a -- I
16 believe it's the labeling or the branding that they've
17 given their court program.
18       Q.  And would that labeling or branding be the
19 iCourt?
20       A.  That is my understanding, yes.
21       Q.  Okay.  Going now to page -- the second page of
22 this Exhibit No. 37, do you recognize -- do you
23 recognize this webpage?
24       A.  Yes, I do.
25       Q.  And what is it?

13  (Pages 49 to 52)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. I

---

Page 53

1    A.  It is our old electronic filing service
2  provider webpage.
3        Q.  And when you say "old," how old do you mean?
4  Or do you have an understanding of how old is the better
5  question?
6        A.  Yeah.  It's -- we've built multiple filing
7  portals throughout the years, and this is the second
8  iteration that we've built.  It's probably been in
9  production for, I don't know for sure, maybe six, seven,
10 eight years, somewhere along those lines.
11       Q.  So when you say "old," you mean old as it
12 relates to Tyler Technologies and its different versions
13 of the File & Serve solution; is that correct?
14       A.  I say old because we have a new version, a new
15 electronic filing service provider that we are in the
16 process of implementing across the country.
17       Q.  And do you have an understanding if that new
18 e-filing service provider is currently being used by the
19 Idaho Courts?
20       A.  Not off the top of my head, no.
21       Q.  My understanding of the term "e-filing service
22 provider" is that it relates to the -- I guess it would
23 be the path or the solution by which the filer would
24 submit a document to the EFM within File & Serve.  Is
25 that generally accurate?

---

Page 54

1    A.  Yes, it is.
2        Q.  And so this new EFSP you've described, would
3  this be a third-party EFSP or just a Tyler EFSP or a
4  Tyler app that would just be yet another app sitting
5  within the File & Serve system?
6        A.  It would be the latter.
7        Q.  Okay.  Yet another app sitting within the
8  File & Serve solution; correct?
9        A.  Correct.
10       MR. FETTERLY:  Nicole, did you get that?
11       THE STENOGRAPHER:  He said correct, yes.
12       Q.  (By Mr. Fetterly)  Okay.  So -- so back to
13 our -- our document here with Exhibit No. 37, this would
14 still be a -- does this reflect the Tyler File & Serve
15 solution or at least a -- a version thereof, albeit an
16 older one?
17       A.  Yes, it does.
18       Q.  Okay.  And is it your understanding that this
19 version of the File & Serve solution is still in effect
20 to this day at one or more courts?
21       A.  Yes, it is.
22       Q.  Okay.  And is it your understanding that this
23 is the version of the File & Serve solution that is
24 currently in use or in effect at the Idaho Courts?
25       A.  I -- I'm not sure.  I'd have to go check where

---

Page 55

1  they are and what -- what version of the software
2  they're using.
3        Q.  How would you -- how would you know that or go
4  about checking that?
5        A.  I would ask my team if they've implemented the
6  new version and if we are solely on that version.
7        Q.  Okay.  I'm going to stop my screen share real
8  quick for Exhibit No. 37.  I just want to go back --
9        MS. DUKE:  And, Jon, I don't mind either
10 if we have the witness check with his team to confirm.
11 Sara does not believe we've transitioned over to the new
12 one, but we don't mind if you have him check on that to
13 provide that answer.
14       MR. FETTERLY:  Why don't we do that?  I
15 was going to go about it perhaps more cumbersomely by
16 walking through the webpage, because if we go on to
17 the -- that Idaho Court website for iCourt and you
18 click on the "click here" envelope, it takes you to that
19 webpage.  I was going to walk him through that, but I'd
20 love to short-circuit that if we'd all agree that that's
21 appropriate to do so.  Because before we talk about the
22 attachment to the 30(b)(6), I just want to make sure
23 we're understanding which version of File & Serve is at
24 play here.
25       MS. DUKE:  Yup.  Fine by me, as long as

---

Page 56

1  that's okay with Beth and Terry.
2        MS. PETRONIO:  I don't know how quickly
3  he can get an answer to that.  I certainly don't want us
4  to go off the record and wait around for that -- for
5  that answer.  I mean, we've been on the record now
6  almost two hours and I still haven't heard a question
7  that I think is in the scope of the subpoena.
8        And I understand that you think because
9  the Press Review Tool relates to e-filing that the
10 e-filing was within the scope of the subpoena.  I
11 disagree with that, but we are going to have a hard stop
12 here at 6:00 p.m. our time, so it's not looking to me
13 like we're going to make that at this stage.
14       So I -- I'm happy to have him ask, but I
15 don't want to wait for an answer.  I -- I would prefer
16 we move on to something else and when he gets an answer,
17 he can come back to it and share that.
18       MR. FETTERLY:  Sure.  Well, I think we
19 can move this along.  I actually don't think I have a
20 tremendous amount left so I'm happy to just keep -- keep
21 moving.
22       So one moment here.
23       THE DEPONENT:  Do you want me to ask?
24       MS. PETRONIO:  Yeah.
25       Give him one second.  He's going to ask

---

14  (Pages 53 to 56)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 57

1    the question.  I just don't know how quickly we can get
2    a response.
3              MR. FETTERLY:  Sure.  Thank you.
4              (Pause in the proceedings.)
5              THE DEPONENT:  I sent that inquiry.  I'll
6    let you know when I receive a response.
7         Q.  (By Mr. Fetterly) Thank you.
8         A.  Sure.
9         Q.  Going back to my screen share here, I'm still
10   on Exhibit No. 37.  All I've done is scroll down a few
11   pages to the document that's Bates labeled CNS_13284.
12        A.  Okay.
13        Q.  And, Mr. Derrick, do you recognize -- well,
14   first, this is a -- another webpage screenshot of this
15   webpage and, Mr. Derrick, do you recognize this webpage?
16        A.  Yes, I do.
17        Q.  And what is it?
18        A.  This is the older version of our filing
19   portal, specifically, the start a new case screen.
20        Q.  Okay.  And when you say "older," it's the same
21   older version that we were just discussing before we had
22   our break?
23        A.  Yes, just a few moments ago.
24        Q.  I -- just a couple of real quick questions
25   about this just before we move on to the more-detailed

---

Page 58

1    questions about the press tool and Auto-Accept.
2              I understand there are a couple of -- under
3    case information, under start a new case, there are a
4    couple of pull-down menus, but my understanding is that
5    these would be the -- the pull-down menus that would be
6    made available to a filer using this version of
7    File & Serve during their drafting stage or status of
8    preparing their filing for submission; is that correct?
9         A.  That is correct.
10        Q.  So under case information, we see a few -- I
11   guess I'll call them prompts or pull-down menus that
12   would be, you know, required for the filer to select as
13   part of their drafting and submission process; is that
14   correct?
15        A.  That is correct.
16        Q.  Okay.  I'm now scrolling down to the next
17   page, which is 13285.  Under location, this screenshot
18   is the same -- same webpage.  It's just this page
19   reflects the options or some of them under the location
20   drop-down menu.  Do you see that?
21        A.  Yes, I do.
22        Q.  Would -- would these locations, once selected,
23   affect kind of, you know, where within the EFM the
24   filing is routed and/or relate to -- affect the clerk
25   inbox that it is surfaced into?

---

Page 59

1              MS. DUKE:  Form and foundation.
2              THE DEPONENT:  They could.  It depends on
3    the configuration.
4         Q.  (By Mr. Fetterly) Right.
5              So a court could configure their press --
6    strike that.
7              A court could configure their location options
8    and their File & Serve system so that if the filer
9    selects Ada County District Court, the filing would then
10   be routed to a clerk review queue that's for the Ada
11   County District Court; is that correct?
12             MS. DUKE:  Again, foundation.
13             THE DEPONENT:  They could, yes.
14        Q.  (By Mr. Fetterly) Moving on to the next page
15   here, this is the page Bates labeled 13286.  Here, we
16   see a different pull-down menu.  This is the category
17   civil, family, guardianship, probate, or mental health.
18   Those are the options that are reflected here.  These
19   would also be, you know, prompts that a filer would be
20   required to select while they're going -- while they're
21   in the drafting or submission phase of their filing;
22   correct?
23        A.  That is correct.
24        Q.  And so this would be the -- the category of
25   the case before we have the location which is the court

---

Page 60

1    location.  This is now the case category.
2              And then moving on, I see we have one more,
3    it's the case type.  And this is reflected on CNS 13287,
4    and I'll show you this.
5         A.  Yes.
6         Q.  And this case type would be also another, you
7    know, series of selections that a filer would be
8    required to -- a series of options a filer would be
9    required to select as part of their drafting and
10   submission process for a filing; correct?
11        A.  That is correct.
12        Q.  Okay.  Thank you.  I appreciate you bearing
13   with me here.  I just want to make sure we have a common
14   understanding of location, category, case type as we now
15   go back to the attachment to the subpoena, so I'll go
16   there now.
17             Okay.  Mr. Derrick, I now have turned back to
18   Exhibit 33.  This is the subpoena.  And this is the
19   Exhibit 1 to the subpoena, a document titled
20   "Auto-Accept Review and Press Review Tool" dated
21   July 1, 2022.
22             I'm now going to the second page, which is
23   SO 3.  Do you see that in front of you?
24        A.  Yes, I do.
25        Q.  That first paragraph where we're talking about

---

15 (Pages 57 to 60)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 61

1  the Auto-Accept Review on the left-hand column, it talks
2  about the Auto-Accept Review as a free out-of-the-box
3  e-filing function that allows clerks to automatically
4  accept filings based on a set of conditions.  And then
5  it goes on to say: "Conditions can be configured using
6  the same criteria that is used to define which review
7  queues filings are routed to, allowing clerks to
8  configure the solution to meet their needs."
9          I just want to better understand that.  Can
10 you explain to me what the conditions are that can be
11 configured to facilitate the Auto-Accept Review?
12     A.  Yeah.  I can provide some examples, but I
13 won't be able to give you an absolute.
14         I'm sorry.  I'm just receiving a confirmation
15 on my screen that says my internet was unstable, so
16 perhaps that was part of the problem with the audio
17 before.  Apologies.  Can you guys still hear me okay?
18     Q.  Yes.
19     A.  Okay.  Yes, I can provide you a few examples.
20 I don't have a comprehensive list in front of me.
21         An example would be case category; case type;
22 party type, so plaintiff or defendant; filer type, which
23 would be, you know, a legal professional versus a
24 self-represented litigant type thing.  Just different
25 options like that; contains financials, doesn't contain

---

Page 62

1  financials, et cetera.
2      Q.  Mm-hmm.  If the -- if a particular version of
3  the File & Serve system -- strike that.
4          If a particular version of the File & Serve
5  solution is configured so that a filer is, you know,
6  given the option to choose between confidential or
7  public, some type of security feature, would that be yet
8  another way, another condition that could determine
9  whether or not a filing is automatically accepted?
10     A.  I'm not sure if filing security is an option
11 that we have in the Auto-Accept function.
12     Q.  Okay.  Well, I think we'll -- we'll get there
13 in a minute.
14         But as far as the conditions you've just
15 identified, case category, case type, party type, filer
16 type, you know, those were examples of the types of
17 conditions that could be used to configure the
18 Auto-Accept Review; correct?
19     A.  Correct.
20     Q.  So a minute ago, we were looking at the -- the
21 version of the File & Serve solution and, specifically,
22 we were looking at location, case type, case category.
23 Those would be examples of the types of conditions that
24 could be configured; correct?
25     A.  Everything you said was true with the

---

Page 63

1  exception of location.  The conditions themselves live
2  within a location.
3      Q.  Understood.
4          So if I'm understanding you correctly, then,
5  the -- the location would be set first.  And then once
6  the location is set, then within that location, the
7  court would be able to configure the Auto-Accept Review
8  based upon case type, case category, the other
9  conditions you identified; correct?
10     A.  That is correct.
11     Q.  So this would allow a statewide system, for
12 instance, to configure -- it would allow courts within a
13 statewide system to configure their Auto-Accept Reviews
14 based upon their respective locations such that each
15 location could configure according to its wishes or
16 needs; correct?
17         MS. DUKE:  Form and foundation.
18         THE DEPONENT:  Yes, that's correct.
19     Q.  (By Mr. Fetterly)  Thank you.
20         I'm going to go down to the next page here.
21 Auto-Accept Review, it reads:  "E-filing function that
22 allows clerks to automatically accept filings if the
23 filing matches locally configured criteria"; is that
24 correct?
25     A.  Yes, it is.

---

Page 64

1      Q.  And so, again, here we have conditions that
2  can be configured based upon filing firms, filing codes.
3  Again, I don't want to repeat them all, but this is what
4  we were just discussing in terms of the conditions or
5  types of conditions that would allow for configuration;
6  correct?
7      A.  Correct.
8      Q.  It says here:  "Auto-Accept:  How does it
9  work?  Number 1, upon submission, filings are evaluated
10 against the locally configured auto-review conditions."
11         Can you just explain what that means?
12     A.  Yeah.  So once the filings have been submitted
13 and they reach the EFM, the EFM then evaluates those
14 filings and the criteria of those filings based upon the
15 configurations of those conditions to see if it meets
16 any of those conditions.
17     Q.  And this is all done on an automated basis;
18 correct?
19     A.  That's correct.
20     Q.  And then we move on to the -- and, again, just
21 for the record, I'm looking at SO 5, Number 2:  "If the
22 envelope details do not meet the auto-review conditions,
23 the envelope is routed to the appropriate review queue
24 to be reviewed by clerk as it is today."
25         So that -- I think I understand what that

---

16  (Pages 61 to 64)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 65

1   means, but if you could just explain in your words, what
2   does that mean?
3       A.  We have conditions for Auto-Accept configured
4   and the evaluation process does not determine that the
5   envelope or the filing that submitted meets that
6   criteria, then it will then default to whatever the
7   queue configuration is set up for that specific
8   jurisdiction or location.
9       Q.  And so depending on the configurations, if
10  there is some discrepancy between what the
11  configurations would allow for Auto-Accept and what the
12  filer has submitted, the document doesn't just
13  automatically get auto-accepted.  The -- a discrepancy
14  would then result in the clerk still having a chance to
15  review the document and go through the traditional
16  process of the clerk review queue; is that correct?
17      A.  That is correct.
18      Q.  Okay.  And then the third point here is if the
19  envelope detail meets the auto-review conditions, then
20  the filings are accepted.  So accepted, stamped, funds
21  captured, and notification sent to filers/service
22  recipients.
23          Let me just walk through this.  So, again, the
24  filings are automatically accepted.  Is it correct then
25  that this would be the situation where there's no

Page 66

1   discrepancy, the configurations have been set, the filer
2   submitted the document in a way that there's no
3   discrepancy, nothing for the clerk to review based on
4   the configuration set by the clerk, therefore, accepted;
5   is that correct?
6       A.  If the envelope details meets the auto-review
7   conditions that have been configured, then, yes, it can
8   be sent to Auto-Accept.
9       Q.  I see it says stamped.  Is that the -- the
10  date and timestamp that we were discussing earlier?
11      A.  Yes, it is.
12      Q.  So the -- the eFile Manager captures the date
13  and time of submission, and then that -- that gets
14  stamped onto the document at acceptance.  And under the
15  Auto-Accept process, the system would automatically
16  apply that date and timestamp because the criteria had
17  been satisfied; correct?
18      A.  Not necessarily.
19      Q.  Explain to me how I'm incorrect.
20      A.  The file stamps are configurable by location,
21  and so what we are discussing here is what the file
22  stamp would be placed on that record and it's based upon
23  that configuration.  So the characteristics of that file
24  stamp may vary and may not necessarily be the details
25  that you just provided.

Page 67

1       Q.  Understood.
2           That's, again, determined by the court and
3   configured based upon the court's, you know, requirement
4   or request; correct?
5       A.  That is correct.
6       Q.  Thank you.
7           Funds captured.  I believe we discussed
8   earlier that at the submitted stage, you know, funds are
9   verified and accepted when the document is submitted to
10  the EFM based upon information submitted by the filer;
11  is that correct?
12      A.  When the filer submits the filing, Tyler is
13  unique in the way that we handle financials, which is a
14  way that it separates us from many of the other
15  providers out there.  We place a pre-authorization or a
16  hold, if you will, on the credit card of the filer that
17  the filer is using for those funds to validate that he
18  or she has sufficient funds to cover that filing, but we
19  don't actually capture those funds until the clerk
20  actually accepts those filings.  So there is a variance
21  in the way that we describe that.
22      Q.  Understood.
23          So when the filer submits the document to the
24  court and it's received into the EFM, the -- the
25  financial information submitted by the filer, the credit

Page 68

1   card, for instance, that information is verified and
2   approved automatically by the EFM, which results in a
3   hold being placed on the funds that are tied to the
4   payment method; correct?
5           MS. DUKE:  Object to the form.
6           THE DEPONENT:  More or less.  We -- we
7   have a payment processor which is a portion of the
8   application that serves that function for us.  It's not
9   actually conducted by the EFM.  It's conducted by the
10  payment processing solution.  But in generally speaking
11  terms, yes.
12      Q.  (By Mr. Fetterly) Well, I appreciate the
13  distinction.  I'm not going to ask you about Tyler's
14  payment processor.  I just wanted to confirm that the
15  filing process and, specifically, the submission to the
16  court or to the EFM does result in funds being verified
17  and held at that point in time; correct?
18          MS. DUKE:  Object to the form.
19          THE DEPONENT:  That is correct.
20      Q.  (By Mr. Fetterly) Okay.  And then the
21  pre-authorization process, you know, allows, through the
22  verification and approval, that there are funds to be
23  captured.  But they are not actually captured until the
24  document is accepted either through, you know, the
25  Auto-Accept process or the clerk manual acceptance

17 (Pages 65 to 68)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 69

1  process; is that correct?
2          MS. DUKE:  Object to the form.
3          THE DEPONENT:  Correct.  Its -- its
4  intent is to protect against a non-sufficient funds
5  situation.
6      Q.  (By Mr. Fetterly) Okay.  What happens if the
7  filer submits a document to the court, and as part of
8  the submission to the court, the File & Serve program
9  determines that there are insufficient funds and an
10  inability to place the pre-authorization, what happens
11  then?
12          MS. DUKE:  Object to the form.
13          THE DEPONENT:  The filing is immediately
14  rejected with a notification to the filer stating as
15  such.
16      Q.  (By Mr. Fetterly) So the -- the document is not
17  received into the EFM; correct?
18      A.  It -- it actually does touch the EFM and then
19  immediately gets rejected.
20      Q.  Thank you for clarifying.
21          So you're right, the -- the EFM has to receive
22  it in some capacity in order to reject it, and it does
23  that.
24          Is it fair then to say that that document does
25  not get surfaced into the clerk's review queue?

---

Page 70

1      A.  That is correct.
2      Q.  And does that also mean that if the
3  Auto-Accept Review function of File & Serve is activated
4  and configured by the court, the document would not be
5  automatically accepted; correct?
6      A.  Correct.
7          MS. DUKE:  Object to the form.
8          THE DEPONENT:  That assessment of
9  financial availability, if you will, of funds, is prior
10  to the Auto-Accept function taking -- taking effect.
11      Q.  (By Mr. Fetterly) Thank you.
12          I'm looking at the next page, SO 6, benefits
13  of Auto-Accept.  And I'm just trying to get an
14  understanding, if you have one, as to what these mean
15  starting with "improves average response time."  What is
16  your understanding of what this means in terms of the
17  Auto-Accept Review?
18      A.  My interpretation of the document,
19  specifically this point, is that automatically accepting
20  filings will improve the response times of the clerks.
21      Q.  And how -- what do you mean "improve response
22  times of clerks"?
23          MS. DUKE:  And I'll object as to
24  foundation.  Not specific to Idaho.
25          THE DEPONENT:  If there are fewer filings

---

Page 71

1  to review, it would allow for the clerks to review them
2  in a more timely manner.
3      Q.  (By Mr. Fetterly) Would that be because, at
4  least, in part, some of the filings have met the
5  criteria established by the court for auto-acceptance
6  such that the court clerks would not need to review
7  those particular documents prior to acceptance?
8      A.  For the nature of this document specifically
9  on this light, I believe that was the intent, but we
10  would have to check with the author.
11      Q.  Sure.
12          (Pause in the proceedings.)
13      Q.  (By Mr. Fetterly) And can you remind me once
14  again of who the author of this document is?
15      A.  Evan Acosta.
16      Q.  And you -- you're the General Manager of
17  Courts.  Does Mr. Acosta report to you?
18      A.  He no longer does.
19      Q.  Did he at one time?
20      A.  Yes, he did.
21      Q.  And what was your position at the time
22  Mr. Acosta reported to you?
23      A.  He reported to me as I was the General Manager
24  of eSolutions.  I can't recall whether he reported to me
25  as the Operations Director or any of my previous roles.

---

Page 72

1      Q.  Okay.  As the General Manager of the Courts or
2  General Manager of eSolutions, do you have any reason to
3  believe that this statement is incorrect?
4      A.  Which statement are you referring to?
5      Q.  The statement on this slide regarding improved
6  response -- improves average response time?
7      A.  No.  I have no reason to believe it's
8  incorrect.
9      Q.  On the next slide you see "reduces return for
10  correction rates."  Can you just please review that and
11  just let me -- and provide to me your general
12  understanding of what this means?
13      A.  Yeah.  So when we evaluate or we review clerks
14  and their actions taken on filings in the review tool,
15  one of the things that we evaluate is whether they
16  accept or reject the document.  You see the term here
17  "return for correction," that's referring to reject.
18  The State of Texas, where this document was created,
19  uses the term "return for correction" instead of
20  rejection for various reasons.  So the statement here
21  says "reduces return for correction rates" is synonymous
22  with reduces rejection rates, and the reasons being is
23  because if you accept automatically more documents,
24  then, naturally, you will have fewer rejections.
25      Q.  And do you have any reason to believe that the

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

ER-725

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 73

1    statement here is incorrect?
2        A.  I do not.
3        MS. DUKE:  Again, foundation as to Idaho,
4    but that's just an objection I'll have to this entire
5    document given it's not Idaho-based.
6        Q.  (By Mr. Fetterly) And moving on to the next
7    portion of this, it says "reduces operational overhead."
8    If you could just please review that and provide me your
9    general understanding of what that means.
10       A.  Yeah.  My understanding of this statement is
11   if the Auto-Accept function operates in any capacity, it
12   will reduce the number of filings that the clerk needs
13   to review and, therefore, will reduce their operational
14   overhead or increase their operational capacity.
15       Q.  Do you have any reason to believe that
16   statement is incorrect?
17       MS. DUKE:  Same objection.
18       THE DEPONENT:  I do not.  No, I do not.
19       Q.  (By Mr. Fetterly) Earlier, I believe you
20   testified that the -- I'm going to go back up to a
21   different page here.
22       The Auto-Accept Review is a free
23   out-of-the-box e-filing function, and I recall earlier
24   you testified that that is a free out-of-the-box
25   e-filing function for the base level of the File & Serve

Page 74

1    app or solution; is that correct?
2        A.  That is correct.
3        Q.  Is that correct with respect to current-day
4    versions of the File & Serve solution?
5        A.  Yes, it is.
6        Q.  Is that correct for prior versions of the
7    File & Serve solution?
8        A.  Yes, it is.  We've never charged for that
9    function.
10       Q.  Okay.  And is that true for the -- the version
11   of the File & Serve solution that we were discussing
12   earlier with the screen?  Let's see.  With
13   Exhibit No. 37, which I'm now putting in front of you,
14   the second page?
15       A.  Not necessarily.  What you're -- what you're
16   displaying on the screen here is the filing service
17   provider, the electronic filing service provider or the
18   filing portal.  And the auto-configuration is a
19   component of the electronic filing manager, and they are
20   different solutions with different versioning.
21       Q.  Are there any prior versions of the eFile
22   Manager for which the Auto-Accept Review feature is not
23   available?
24       A.  Yes.  There are historical versions of the
25   solution that existed prior to the Auto-Accept function

Page 75

1    being available.
2        Q.  When did the Auto-Accept function first become
3    available?
4        A.  I don't know that.  I'd have to go check.  I
5    don't know.
6        Q.  Can you give me an estimate?
7        MS. DUKE:  Object to the form.  Calls for
8    speculation.
9        THE DEPONENT:  Yeah, I'm not sure.  I'd
10   have to check.  I can't -- I can't state with any level
11   of certainty at this point.
12       Q.  (By Mr. Fetterly) Was the Auto-Accept Review
13   feature available during the period of time that you
14   were the General Manager of eSolutions?
15       A.  Yes, it was.
16       Q.  And was it available during the entire period
17   of time that you were the General Manager of eSolutions?
18       A.  I believe so, but not certain.
19       Q.  And can you remind me of when you -- an
20   estimate is fine -- when you became the General Manager
21   of eSolutions?
22       A.  Around 2017.
23       Q.  And what about when you were the Operations
24   Director of eSolution, was the Auto-Accept Review
25   feature available in File & Serve when you were the

Page 76

1    Operations Director of eSolution?
2        A.  I don't recall.
3        Q.  Okay.  Would you be able to find out if the
4    Auto-Accept Review feature is available for the version
5    of File & Serve used by the Idaho Courts?
6        A.  I -- I can tell you it is.
7        Q.  Thank you.
8        And just to be clear, the Auto-Accept Review
9    feature is available on the version of File & Serve used
10   by the Idaho Courts; correct?
11       A.  That is correct.
12       Q.  Thank you.
13       I'm just going back to where we left off in
14   this document, SO 7, now is the page.  It talks about
15   the effectiveness of auto-review.  There's a -- there's
16   a graphic here that I don't claim to necessarily
17   understand.  Can you please just review it and provide
18   me your understanding of what this page and specifically
19   what this graph represents?
20       MS. DUKE:  Again, I'll object to
21   foundation as to Idaho.
22       THE DEPONENT:  Yeah.  So this graph
23   appears to be reflecting the effectiveness of
24   auto-review as it pertains to different courts that are
25   being evaluated with two different components.  One

19  (Pages 73 to 76)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. I

---

Page 77

1  component being the response time for clerk's action on
2  those envelopes in an under-24-hour duration.  And the
3  second component being the acceptance rate for those
4  same envelopes.  And the variable between the courts
5  appears to be a percentage of envelopes that are
6  automatically reviewed based upon the configuration of
7  those respective courts.
8      Q.  (By Mr. Fetterly) Do you have an understanding
9  of which courts or which courts' data was used to create
10  this graph?
11     A.  Not with 100 percent certainty.
12     Q.  Okay.  What is your understanding based on
13  your less than 100 percent certainty?
14         MS. DUKE:  Speculation.  Foundation.
15         THE DEPONENT:  That, I -- I can't say.
16  I -- I don't know.
17     Q.  (By Mr. Fetterly) Are there -- are there courts
18  that currently use the Auto-Accept Review feature of
19  File & Serve?
20     A.  Yes.
21     Q.  Okay.  Can you tell me how many courts use the
22  Auto-Accept Review feature of File & Serve?
23     A.  Yeah, roughly 25.
24     Q.  And can you tell me how many states are
25  represented within those 25 courts?

---

Page 78

1      A.  I can't speculate that.
2      Q.  Is it -- to your knowledge, is it 25 different
3  states or might those 25 include, you know, one state
4  that has eight courts using it?
5      A.  Yeah.  Some of them are states, like, for
6  example, the State of Maryland, the State of Maine, and
7  the State of Vermont.  Each of those jurisdictions or
8  states have multiple jurisdictions within.
9      Q.  Okay.  Besides the states of Maryland, Maine,
10  and Vermont, are there other states that are using the
11  Auto-Accept Review feature of their File & Serve
12  solution?
13     A.  I believe so.
14     Q.  Okay.  And what states are those?
15     A.  I know the State of New Mexico uses it in a
16  limited capacity.  But beyond that, I'd have to go and
17  look.  I don't -- I don't know beyond that.
18     Q.  I don't want to get into too much detail about
19  any particular state.  I just want to understand when
20  you say "limited capacity," I understand that to mean
21  there's some configuration involved.
22         Can you just generally describe the -- the
23  type of configuration that would result in a limited
24  capacity?
25         MS. DUKE:  Object to the form.

---

Page 79

1  Foundation as to Idaho.
2         Go ahead.
3         THE DEPONENT:  Yeah.  It can vary
4  depending upon the jurisdiction.  Some may restrict the
5  Auto-Accept to government filing only, so government
6  entities that file, which could be a prosecutor or a
7  public defender.  That would be an example.
8      Q.  (By Mr. Fetterly) Okay.  And then we also
9  discussed that the Auto-Accept Review can be configured
10  in other ways such as a case type; correct?
11     A.  Yes, it can.
12     Q.  Or a case category; correct?
13     A.  That's correct.
14     Q.  Are any of the courts that are using
15  Auto-Accept Review, have they configured their
16  Auto-Accept Review to accept -- automatically accept
17  civil case types?
18         MS. DUKE:  Foundation.
19         THE DEPONENT:  I can't speculate on that
20  without looking at the configuration.
21         (Pause in the proceedings.)
22     Q.  (By Mr. Fetterly) Moving back to our
23  document here, SO 8, Auto-Accept Review, how to get
24  started.  So it says "Determine Business Needs" on the
25  left-hand column, then we have "Design Auto-Accept

---

Page 80

1  Criteria," and then "Submit eSolutions Support Ticket."
2         Let me just start with the "Design Auto-Accept
3  Criteria" since that's what we've been discussing here.
4  Do you see that?
5      A.  Yes, I do.
6      Q.  Okay.  So where it says "Auto-Accept
7  Criteria," my understanding is that this is identifying
8  the conditions that we have been discussing by which a
9  court could configure their Auto-Accept Review; is that
10  correct?
11     A.  Yes, it is.
12     Q.  And then I see what looks like an asterisk at
13  the bottom:  "Auto-review feature is configurable by
14  node/court location."
15         Again, I understand this would be reflective
16  of what we were discussing earlier, that within a
17  statewide system, any, you know, individual court could
18  configure their Auto-Accept Review conditions according
19  to their preferences or needs; is that correct?
20         MS. DUKE:  Form and foundation as to
21  Idaho.
22         THE DEPONENT:  Yeah.  That additional
23  bullet is referring to the configuration ability by
24  location.
25     Q.  (By Mr. Fetterly) Understood.

20  (Pages 77 to 80)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 81

1    And just what does it mean when it says
2  "node -- node/court location"?
3         MS. DUKE:  Form and foundation as to
4  Idaho.
5         THE DEPONENT:  Tyler uses an
6  organizational chart to create and organize the way for
7  filings to enter into the e-filing system and for courts
8  to manage those, and a node would be another location or
9  court location as is represented here in the document.
10       Q.  (By Mr. Fetterly) Thank you.
11       I'm going to move on here so we can wrap up
12  this -- the Courthouse News portion of this pretty soon
13  here.
14       I kind of just want to run through this
15  document in the same way we just did a few minutes ago,
16  what we've been doing for the last few minutes, but this
17  time focusing on the Press Review Tool --
18       A.  Sure.
19       Q.  -- that's reflected on here.
20       Here, we have Press Review Tool surfaces
21  filings that match a defined set of configurations,
22  allowing authorized users to access nonsensitive filings
23  that are in a "submitted" or user -- or "under review"
24  status.
25       Let me break that up and ask you a few

Page 82

1  questions.  What do you -- what does it mean here where
2  it says "Press Review Tool surfaces filings"?
3       A.  Sure.  The Press Review Tool is a separate
4  application from the e-filing manager.  It's also a
5  separate application from the review queue that we've
6  been discussing.  And just like the review queue
7  surfaces those filings in its system, the Press Review
8  Tool contains that same functionality.
9       Q.  Right.  So earlier you were testifying that
10  the -- that the filing lives in the EFM or eFile
11  Manager; correct?
12       A.  That's correct.
13       Q.  And so the press review queue is a separate
14  app that -- the filing does not live in the press review
15  queue; correct?
16       A.  By press review queue, I think you're
17  referring to Press Review Tool?
18       Q.  I am and I appreciate you clarifying that.
19  Yes.
20       MS. DUKE:  And I'll object to the form
21  and foundation.  I don't know if you're talking about
22  the original or not.
23       THE DEPONENT:  The Press Review Tool
24  possesses the ability to surface those same documents
25  and records inside of it pulling it from the eFiling

Page 83

1  Manager in a similar way that the review tool would do
2  so for the clerks.
3       Q.  (By Mr. Fetterly) What is -- you have to help
4  me understand.  What do you mean when you say "surface"?
5  What is your understanding of that word in this context?
6       A.  Display.
7       Q.  Okay.  So the press -- so if I were to read
8  this again, we could read it as:  The Press Review Tool
9  displays filings that match a defined set of
10  configuration.
11       Would you agree with that if we used "display"
12  instead of "surface"?
13       A.  Absolutely.  That's a good -- that's a good
14  representation.
15       Q.  Thank you.
16       And then it says "allowing authorized users to
17  access nonsensitive filings that are in 'submitted' or
18  'under review' status."
19       What -- what does authorized users mean here
20  in this context?
21       A.  It means authorized by the court.  The court
22  dictates who has access to the Press Review Tool.
23       Q.  And then if someone was an authorized user,
24  how would they access the Press Review Tool?
25       A.  They would do so in a similar way that the

Page 84

1  reviewing clerks access the review tool.  They would go
2  to a URL that is different from the review tool, but is
3  specific to the Press Review Tool.  They would enter
4  that into their web browser and then they would log in
5  with a set of user credentials with a user ID and
6  password in order to log into the Press Review Tool and
7  see the filings that are displayed based upon the
8  matched conditions or criteria that we've previously
9  discussed.
10       Q.  So a user of the Press Review Tool logs in
11  using a URL that is different than the URL that the
12  clerks use to access their clerk review queue; correct?
13       A.  Yes, because it's a different application.
14       Q.  Understood.
15       So the -- both applications would display the
16  filing, and, again, assuming it meets the criteria or
17  conditions for the Press Review Tool; correct?  That's a
18  bad question.  Don't answer that one.  I combined a few
19  functions.
20       So the clerk -- the court clerks would log
21  into the clerk review using their URL and they can see
22  their filings based on whatever configurations have been
23  used to configure their clerk review queue; correct?
24       A.  That's correct.
25       Q.  And then the user of a Press Review Tool would

21  (Pages 81 to 84)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. I

Page 85

1   log into a different URL, because the Press Review Tool
2   is a different app, and they would then see whatever
3   filings have been displayed based upon the conditions
4   that have been set for the Press Review Tool; correct?
5       A.  Yes, that's correct.
6       Q.  And depending on the configurations, it may be
7   that there would be a particular filing that would be
8   both -- that would be displayed both in the clerk review
9   queue as well as the Press Review Tool; correct?
10      A.  Yes, that's correct.
11      Q.  And under this system, the filing still lives
12  in the EFM until it's been accepted by the court clerk;
13  correct?
14      A.  It -- it will still live in the EFM after it
15  has been accepted from the court clerk.
16      Q.  Okay.  Gotcha.  But -- thank you.
17          But during this -- but a document that lives
18  in the EFM but is being displayed in the clerk review
19  queue and potentially also displayed in the Press Review
20  Tool, that document is simply being displayed in those
21  two respective queues.  It still lives in the EFM;
22  correct?
23      A.  That's correct.
24      Q.  And then if you'd just elaborate on what you
25  meant when you said "it still lives in the EFM after

Page 86

1   acceptance."
2       A.  Yeah.  Sure.  So the document itself will live
3   in the eFiling Manager until the configuration
4   settings to purge that document take effect, and those
5   are configurable settings for each of our customers.  So
6   some will configure those documents to live in the
7   system for a period of 90 days before they fall off.
8   The -- the data that's associated with those filings
9   will live in the eFiling Manager into perpetuity.
10      Q.  Okay.  So a document that has been submitted
11  to the court and received into the EFM lives in the EFM.
12  Depending on the configurations, it could be
13  automatically accepted or put into a clerk review queue
14  for review and acceptance, but under either of those
15  scenarios, upon acceptance, and the information would
16  still live in the EFM depending on these configurations
17  you've just identified; correct?
18      A.  Yes, that's correct.
19      Q.  Okay.  Let me just go to a different document
20  real quick here while we're on this topic of authorized
21  users.  One moment.
22          (Pause in the proceedings.)
23      Q.  (By Mr. Fetterly) Okay.  I'm now going to show
24  you a document that was previously marked in this case
25  as Exhibit No. 10, and can you see that document?

Page 87

1       A.  Yes, I can.
2       Q.  And I'll direct your attention to not the top
3   line, which appears to be a forward, but the -- the
4   email from Jessi Fisher dated August 16, 2022,
5   11:50 a.m., to Jennifer Dvorak.  Do you see that email?
6       A.  Yes, I do.
7       Q.  And who is Jessi Fisher?
8       A.  She's an employee at Tyler.
9       Q.  Okay.  In this email, Ms. Fisher represents to
10  Ms. Dvorak -- I'm going to direct your attention to the
11  middle portion:  "From a functional standpoint, there
12  are two functions to consider.  First, there is access
13  control to the PRT," and then it -- I'm going to just
14  paraphrase for a minute.  Then it goes on to say,
15  "Second, there's access control to the data itself."
16          I want to just understand this paragraph,
17  especially in relation to what we were just talking
18  about in terms of accessing a Press Review Tool and
19  viewing the filings that are displayed in the Press
20  Review Tool.
21      A.  Sure.
22      Q.  So within that context, what does it mean here
23  when it says, "First, there is access control to the
24  PRT," or Press Review Tool?
25      A.  Yeah.  Absolutely.  Its -- its access to that

Page 88

1   is governed by our Identity Provider system.  What that
2   means is if you don't have an authorized user ID and
3   password, you can't access the system.  That's what
4   that's referring to.  And if you recall, I previously
5   stated that that authorization is granted by the court.
6       Q.  Right.  And then this authorization we're
7   speaking of, again, is with respect to the Press Review
8   Tool which is a separate app from the other apps we've
9   been discussing; correct?
10      A.  Yes, that is correct.
11      Q.  And so -- okay.  And then we go on to the
12  second part, which is, "Second, there is access control
13  to the data itself."
14          What does -- read that portion of the email
15  and then explain to me your understanding of what that
16  means.
17      A.  Yeah.  So even though you have access to the
18  Press Review Tool, you don't really have access to any
19  of the data.  It wouldn't be displayed unless it is
20  configured to do so.  And I -- the subsequent statement
21  there says this is governed by configuration.  And
22  that's what it's referring to, is you can have access to
23  the Press Review Tool, but if the Press Review Tool is
24  not configured to display any of the filings, then
25  nothing would show up.

22  (Pages 85 to 88)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 89

1      Q.  So is it fair to say the default configuration
2    is -- is one that does not allow for any filings to be
3    displayed?
4      A.  Good question.  I don't know for sure.
5      Q.  Gotcha.
6        I guess where I'm going here is -- well, is
7    there a way to find that out?
8      A.  Yeah, we could find that out.
9        (Pause in the proceedings.)
10       THE DEPONENT:  I don't think --
11       MS. PETRONIO:  We can check on that, but
12   he's not going to be able to get an answer right away.
13     Q   (By Mr. Fetterly) I'm sorry.  Can you -- did
14   you just make a request to answer my question?
15     A.  No, I wrote it down.  I wrote it down.  On the
16   next break, I will make the request with the team to
17   find out.
18     Q.  Oh, thank you.  I appreciate that.  Let's keep
19   moving.  I don't want to sit around and waste your time,
20   sir.  Thank you.
21       So when we're done talking about the
22   configuration, this goes back to the conditions we were
23   discussing earlier; correct?  Case type, filing type,
24   filing code, those types of conditions that are
25   identified on our Exhibit 1 to the subpoena, those would

Page 90

1    be the conditions that would determine what a user of a
2    press tool is able to view; correct?
3      A.  Yes, that is correct.
4      Q.  Or put differently, those conditions would
5    determine which filings are displayed to a user of a
6    press tool; correct?
7      A.  Yes, that's a better way to put it.
8      Q.  Thank you.  You're teaching me along the way
9    and I appreciate your patience.
10       Once a filing is displayed to a user of the
11   press tool, does the -- does the -- does the user of the
12   press tool have the ability to edit or change the
13   document?
14       MS. DUKE:  Foundation.
15       THE DEPONENT:  Inside of the Press Review
16   Tool, we provide no measures or mechanisms that would
17   allow for the editing of that document, but it wouldn't
18   preclude a user from using external tools to do so.
19     Q.  (By Mr. Fetterly) Explain to me what you mean
20   by that.
21     A.  Any -- anybody who has access to a record can
22   forge it using PDF document editors in any capacity that
23   they deem appropriate, and there's nothing that Tyler
24   can do to prevent that or any other entity for that
25   matter.

Page 91

1        MS. DUKE:  And I'll remove my objection.
2    Thank you.
3      Q.  (By Mr. Fetterly) Yeah.  So that -- that would
4    be true -- well, let me back up.
5        So would a user on the Press Review Tool have
6    the ability to do that to a document that's within the
7    Press Review Tool, or would they have to -- are you
8    referring to a situation where someone has maybe
9    downloaded the press tool and then separately used their
10   own program or application to change or manipulate?
11     A.  I'm saying that inside of the Press Review
12   Tool, users do not have the ability to modify the
13   documents that live in the EFM but are being displayed
14   in the Press Review Tool as part of that process.  It
15   would not prevent them from saving a copy of that
16   document to wherever they chose to save it to and then
17   using a PDF editor or some other mechanism to modify the
18   document in the way that they deem appropriate.
19     Q.  Gotcha.
20       You're referring to a document that is now
21   outside of the Press Review Tool, correct?
22     A.  Yes, that is correct.
23     Q.  So the user would have to download the
24   document or otherwise generate a copy to then do the
25   things you're suggesting outside of the Press Review

Page 92

1    Tool; correct?
2      A.  Yes, that is correct.
3      Q.  And the user of the press tool has no means or
4    ability to do those things within the Press Review Tool;
5    correct?
6      A.  Yes, that is correct.
7      Q.  Okay.  And I believe you were referring to,
8    you know, generally speaking, PDF editors or other -- I
9    believe your testimony was any document can be
10   manipulated or configured through PDF editors or other
11   technology; correct?
12     A.  Yes, that's correct.
13     Q.  So -- and that would be true with respect to a
14   document that was downloaded from a Press Review Tool
15   just as it was or could be with respect to a -- a
16   document that's been downloaded from the Odyssey case
17   management system; correct?
18     A.  Yes, that's correct.
19     Q.  And so once a document is out -- so let's
20   assume a document has been submitted to the court, gone
21   through the EFM, surfaced into the clerk review queue,
22   accepted by the clerk, and then the document migrates to
23   the court's case management system.  If a -- if a person
24   were to then view and download that document, they'd be
25   able to manipulate it in the same manner that you were

23  (Pages 89 to 92)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 93

1  just describing outside of the case management system;
2  correct?
3      A.  Yes, that's correct.
4      Q.  So, I mean, the -- if I understand you
5  correctly, you're saying once the document is outside of
6  the Tyler system, anything can happen to it and that's
7  just kind of outside of Tyler's purview; correct?
8      A.  Well, my statement was around could a user
9  modify the document.
10     Q.  Right.
11     A.  And the context provided, I think, I spoke to
12 that.
13     Q.  Understood.  Understood.
14         We -- we're talking about modification outside
15 of the Tyler system, whether it be the Press Review
16 Tool, the clerk review tool, Odyssey case management
17 system, or any Tyler solution, a user can manipulate a
18 document once it is outside of that universe; correct?
19     A.  Yes, that's correct.
20     Q.  Okay.  And in that respect, the Press Review
21 Tool wouldn't pose any different or greater risk;
22 correct?
23         MS. DUKE:  Objection.  Form.  Foundation.
24 Overbroad.
25         THE DEPONENT:  With regards to editing

---

Page 94

1  the document, is that the premise of the question?
2      Q.  (By Mr. Fetterly)  Correct, yes.
3          MS. DUKE:  Same objection.
4          THE DEPONENT:  Correct.  The users of the
5  Press Review Tool do not have the ability to edit the
6  documents that exist within the EFM as they -- as they
7  exist within that workflow.
8      Q.  (By Mr. Fetterly)  Perfect.  Thank you very
9  much.
10         Let me go back to our Exhibit 1.  Hold on one
11 second.  Wrong PDF deck.
12         Okay.  And when I said Exhibit 1, I'm
13 referring to Exhibit 1 to our Deposition Exhibit No. 33
14 so Exhibit 1 to the subpoena.
15         Moving on to this last portion, so let me
16 direct you back to the right-hand side here, Press
17 Review Tool, the two paragraphs at the bottom.  I'm now
18 going to direct your attention to the last part of that
19 last sentence where it says:  "Allowing authorized users
20 to access nonsensitive filings that are in a 'submitted'
21 or 'under review' status."
22         What is your understanding of the phrase as
23 used here, "nonsensitive filings"?
24     A.  I'm not sure what that references to.  We'd
25 have to check with the author.

---

Page 95

1      Q.  Okay.  When configuring the Press Review Tool,
2  does Tyler rely on its court partners to identify the --
3  the nonsensitive filings that are -- that are displayed
4  in the Press Review Tool?
5      A.  The documents that are displayed are going to
6  be based upon two things:  One, the configuration of
7  those conditions that we've been speaking about, and,
8  two, the selections that the filer makes upon
9  submission.
10     Q.  Understood.
11         So let me just skip ahead now to the portions
12 of the Press Review Tool deck that I think unpack this
13 in a little more detail.
14         So I'm now looking at SO 9, Press Review Tool.
15     A.  Okay.
16     Q.  It says it is "a solution that allows clerks
17 to make e-filed materials immediately available to the
18 press and other authorized stakeholders."
19         My understanding is this is referring to the
20 registered user process that we've been discussing; is
21 that correct?
22     A.  Referring to the authorized users that we
23 discussed, yes.
24     Q.  Right.  So moving on, then, records can be
25 made available based on case type codes, number of days,

---

Page 96

1  filing states or statuses, security groups, and document
2  types.  Again, are these the conditions that we've been
3  discussing that would allow Tyler to configure the Press
4  Review Tool based on criteria selected by the court?
5      A.  Correct.  These are the conditions that govern
6  which filings are displayed in the Press Review Tool.
7      Q.  So case type codes, explain to me what a case
8  type code is.  Is that like a common feature of the
9  Odyssey File & Serve system?  What is a case type code?
10     A.  Sure.  Yeah, most states across the country
11 have case types that are leveraged for different types
12 of litigations.  A few examples would be small claims,
13 evictions, felony cases for criminal matters, et cetera.
14 We provide codes in their case management system and in
15 the e-filing system that help codify those fields so
16 they're not free text fields but referenced in the form
17 of codes, and this case type codes reference is
18 referring to those codes that are leveraged in the
19 configuration.
20     Q.  Gotcha.
21         So earlier when we were looking at the
22 screenshot that was a, you know, version of the
23 File & Serve system, we had the location.  And
24 underneath that, there was case type or case category
25 drop-down fields.  You know, so the case type could be

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 97

1   civil, for case category under AA, you know, those
2   fields, case type and case category, those would be
3   assigned codes so that the information is captured and
4   communicated through the Tyler system; is that a fair
5   statement?
6       A.  Yeah.  I believe those fields actually display
7   the description of those values, but they -- they refer
8   and are accompanied by a code that helps simplify it in
9   the database behind the scenes.
10      Q.  Understood.
11          So if a filer selects a pull-down menu that
12  the Tyler system isn't relying on, you know, the English
13  language so to speak, or somebody enters in some free
14  text, there's coding behind the description to ensure
15  that the information is kind of received and routed
16  correctly?
17      A.  Precisely.
18      Q.  Thank you.
19          Number of days, what -- what does that mean
20  here in relation to the Press Review Tool?
21      A.  So this is the number of days those filings
22  would be made available once they meet the criteria.
23  So, for example, if a filing were to meet the criteria
24  and be displayed or surfaced in the Press Review Tool
25  and that number of days was configured to five, it would

Page 98

1   stay there until the fifth day elapsed by which then it
2   would no longer be displayed or surfaced in the Press
3   Review Tool.
4       Q.  And is that true independent of whether the
5   filing was accepted by the court clerk in the separate
6   application that is the clerk review queue?
7       A.  The filing must meet all of the conditions
8   that are configured in order for it to display.  So if
9   the filing was accepted, and underneath filing states or
10  statuses here accepted was not a configured option, then
11  it would no longer meet that criteria and, therefore, it
12  would not be displayed or surfaced in the Press Review
13  Tool.
14      Q.  Understood.
15          So it's a matrix if you will.  Any number of
16  conditions would have to align in order for the document
17  to display within the Press Review Tool; correct?
18      A.  Yes, sir.  That's correct.
19      Q.  And the court could configure the Press Review
20  Tool to have any number of different configurations that
21  would potentially keep it in or exclude it depending on
22  their configuration; correct?
23      A.  Yes, sir.  That's correct.
24      Q.  So the courts ultimately have, well, control
25  here as to how they control what goes in and for how

Page 99

1   long it stays; correct?
2       A.  Yes, through the configuration.
3       Q.  Through the configurations, yes.
4           So that's helpful.  We just talked about
5   filing states and statuses, and I believe we went over
6   those filing states and statuses earlier when we were
7   looking at that -- that Exhibit No. 35 page that had
8   the, you know, submission -- you know, drafting,
9   submission, submitted, review, and so forth.  Those are
10  all the statuses; correct?
11      A.  That's correct.
12      Q.  So a court could configure their Press Review
13  Tool in a way so that a document that's in drafting mode
14  or submission mode would not be surfaced in the Press
15  Review Tool; correct?
16      A.  That's correct.
17      Q.  They could limit it to documents that have
18  actually been submitted to the court and are received
19  into the EFM; correct?
20      A.  Yes, they could.
21          MS. DUKE:  Object to the form.
22      Q.  (By Mr. Fetterly) Okay.  Security groups.
23  What -- can you explain to me what "security groups"
24  means here in the context of the Press Review Tool?
25      A.  Yeah.  There are certain types of security

Page 100

1   groups that are configured to govern the types of
2   filings that come in, and certain types of those
3   security groups can be omitted from being displayed
4   here.
5           So I believe the last two are actually based
6   upon the omission status, which document security groups
7   to omit -- excuse me -- security groups to omit and
8   document types to omit.  And these two options would
9   permit the configurable -- configuration individual to
10  be able to choose which security groups and/or
11  document types they wish to omit from being displayed or
12  ever surfaced in the Press Review Tool.
13      Q.  Okay.  And so earlier we were talking about
14  the default status of what goes in.  To be a little more
15  precise, we were talking about the configuration that
16  would determine what case type or case type codes,
17  filing types would go into a Press Review Tool or be
18  displayed through the Press Review Tool.
19          And if I'm understanding you correctly, within
20  that universe of case types or filing codes, that
21  would -- that could be configured to display in a Press
22  Review Tool.  In addition to that, there would be
23  security groups or document types that would be omitted
24  from, once again, depending on the configuration;
25  correct?

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

ER-732

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. I

Page 101

1    A.   That's correct.
2    Q.   So a document that is -- I'm sorry.  Give me a
3    second here.
4    A.   Yeah.  Sure.
5    Q.   If a document otherwise satisfies the
6    conditions of case type or filing code such that it
7    would be displayed, but that particular document is --
8    is assigned either by the filer or a court a particular
9    security group that would exclude it from the Press
10   Review Tool, then that document would be excluded even
11   though it otherwise meets the case type or filing type
12   condition; correct?
13   A.   Yeah.  The only thing I would edit you on your
14   statement is you mentioned the filing codes, and I
15   don't believe filing code is one of the available
16   configurations that we have.  I think it's case type
17   codes, number of days, filing state, security groups,
18   and document types --
19   Q.   Okay.
20   A.   -- but your statement is generally accurate.
21   Q.   Is there a distinction between a document type
22   and a filing code?
23   A.   I think it's based upon the way it's
24   configured.  I'd have to check.  I don't know with
25   certainty.  I'd have to check on that one.

Page 102

1    Q.   Sure.  Let me -- let me just take a step back
2    then.  In any event, my understanding is that we're
3    talking about the conditions set by the court that
4    relate to, you know, the -- the filer's designation.
5    So when the filer is designating, you know,
6    location, case type, and really, I guess, you know, the
7    various prompts that are, you know, presented to them
8    during the, you know, drafting stage, once they submit
9    it, the case type codes, security groups, and document
10   types are just -- they would be applying what the filer
11   has designated to determine whether that particular
12   filing is displayed in the Press Review Tool; is that
13   correct?
14   A.   Yes, that's correct.
15   Q.   And depending on what the filer designates,
16   that could result in either the document being displayed
17   or excluded or, I guess -- well, either being displayed
18   or excluded; correct?
19   A.   Yes, that's correct.
20   Q.   And the court would determine all of these
21   conditions based upon its system; correct?
22   A.   Yes, that's correct.
23   Q.   Okay.  I am very -- I think I'm about done.
24   Why don't you just give me a five-minute break here to
25   confirm and then I think we can pass the baton.  One

Page 103

1    moment, please.  Let's go off the record.
2            (A break was taken from
3            12:35 p.m. to 12:48 p.m.)
4    Q.   (By Mr. Fetterly) Okay.  We just took a break.
5    And while we were off the record, Mr. Derrick informed
6    me that he had answers to two questions that were posed
7    earlier in the deposition.
8        So, Mr. Derrick, I'll let you speak.
9    A.   Okay.  Great.  Thank you, Jon.
10       One of the questions was:  If the Press Review
11   Tool was -- it provided access to a user but without any
12   configuration, what would the default be?  And the
13   answer is nothing.  No filings would -- would enter into
14   the Press Review Tool.  So it requires both access and
15   configuration in order to have filings surface or
16   visible in the Press Review Tool.
17   Q.   Thank you.
18   A.   The second question was around whether Tyler's
19   new electronic filing service provider was available in
20   the State of Idaho.  And it is, but only in a kiosk
21   state at present, so it hasn't been introduced online
22   just yet.
23   Q.   And can you help me understand what that means
24   when you say in a "kiosk state"?
25   A.   Yeah.  Absolutely.  A state not meaning like a

Page 104

1    geographical location, but rather a status.  We do have
2    the option to install in what we could consider a kiosk
3    mode, which would be inside of the courthouse and only
4    accessible there as opposed to what you would be able to
5    typically access via the -- the internet or the World
6    Wide Web.
7    Q.   Understood.
8        So this would just be an additional
9    configuration option for the court; correct?
10   A.   That's right.  And we see this occasionally
11   where courts will enable things like that within the
12   court itself or in the clerk's office in a kiosk so that
13   they can provide extra in-person guidance or assistance
14   as necessary.
15   Q.   And this is a good segue to the ground I
16   wanted to cover to wrap-up.
17       In terms of the, you know, courts that use the
18   Press Review Tool, are there courts that are currently
19   using the Press Review Tool?
20   A.   Yes.
21   Q.   Can you give me the number of courts that are
22   currently using the Press Review Tool?
23   A.   About 25.
24   Q.   And in what states are those courts located?
25   A.   I know for sure Texas, California, Nevada, and

26  (Pages 101 to 104)

Courthouse News Service v. Omundson                              30(b)(6) Terry Derrick - Vol. I

Page 105

1   Georgia.
2        Q.  Okay.  One -- when you said you know for
3   certain, is it possible that there might be others?
4        A.  Yes, I'm sorry.  I should've said that.  I
5   don't have an absolute list in front of me or a
6   comprehensive list, but those are the ones that I know
7   for sure.
8        Q.  Thank you.
9             And with all of those courts, with all of the
10  courts within -- strike that.
11            For all the courts that are using the Press
12  Review Tool, they would have configured it in a manner
13  that -- you know, consistent with what we've been
14  discussing today in terms of the configuration options
15  and understanding configurations may vary, but they
16  would've implemented it using the configurations options
17  we've discussed here today?
18       A.  Yes, that's correct.
19       Q.  On that note, for configuration, I just wanted
20  to circle back one more time with respect to the Press
21  Review Tool to make sure we're on the same page, and I'm
22  going to show you -- let me go back to Exhibit No. 37.
23            And do you see Exhibit No. 37 in front of you?
24       A.  Yes, I do.
25       Q.  And, in particular, I'm displaying the page

Page 106

1   Bates No. 13287, and we were talking about configuration
2   options or conditions for the Press Review Tool, and
3   specifically two of the configuration options were case
4   type and document type.  Do you recall that testimony?
5        A.  Yes, I do.
6        Q.  Okay.  So as we're looking at Exhibit No. 37,
7   does this -- does the drop-down menu here reflect the --
8   the case type or, you know, that would be configured as
9   a condition for the Press Review Tool?
10       A.  Yes.
11       Q.  And then scrolling down, there's a pull-down
12  menu here.  Does this reflect the document type that
13  would be configured as a condition for the Press Review
14  Tool?
15       A.  I'm not certain.  I -- I believe those are
16  filing codes.  I'd have to -- I'm not certain on whether
17  that's the referred document type.
18       Q.  I can represent to you that my understanding
19  from other courts that use the Press Review Tool is that
20  this would be the universe of the document type.
21            Is there a way to find out, based on this
22  graphic here and the Idaho Court, if this is the
23  document type?
24            MS. DUKE:  Form and foundation.
25  Speculation --

Page 107

1        Q.  (By Mr. Fetterly) -- that would be -- yeah,
2   that would be used as a configuration option for a Press
3   Review Tool?
4             MS. DUKE:  Form.  Foundation.
5   Speculation.
6             THE DEPONENT:  Yeah, we could find out.
7        Q.  (By Mr. Fetterly) Thank you.
8             And I'm scrolling down because if you go down
9   to the next page, 13289, it's the same drop-down menu
10  just scrolled down.  So I'll represent to you that if
11  you go onto the website, it's a much longer list of
12  document types or filing codes.  I just want to confirm
13  if this is the document type that'd be used as a
14  configuration option.
15            MS. DUKE:  Same objections.
16            THE DEPONENT:  Okay.
17            MR. FETTERLY:  So subject to
18  Mr. Derrick's ability to get the answer to that
19  question, I have no further questions at this time.
20            MS. DUKE:  Perfect.  So it is, what,
21  about 2:54 your time there?  Is that correct?
22            THE DEPONENT:  It is, yes.
23            MS. DUKE:  Okay.  And you have a hard
24  stop at 6:00, I understand?
25            THE DEPONENT:  Yes.

Page 108

1             MS. DUKE:  I'm sorry.  I couldn't hear.
2             THE DEPONENT:  Yes, that's correct.
3             MS. DUKE:  Okay.  Why don't we go ahead
4   and take about a 20-minute break and then I'll start in.
5             THE DEPONENT:  Okay.
6             MS. DUKE:  Thank you.
7             Is that enough time for you, by the way,
8   Mr. Derrick?  If you haven't eaten and you want
9   30 minutes, I'm going to be fine on time.  So...
10            THE DEPONENT:  That should be fine.  20
11  minutes is sufficient.
12            MS. DUKE:  All right.
13            MR. FETTERLY:  And, on that note, I
14  apologize for not paying better attention to eating
15  schedules based on time zones because I'm on a
16  completely different cycle than you over here so
17  apologies for running through your lunch.
18            MS. DUKE:  No worries.
19            THE DEPONENT:  Thank you.
20            MS. DUKE:  All right.  I will see you all
21  back in 20 minutes.
22            THE DEPONENT:  All right.  Thank you.
23            (Deposition concluded at 12:55 p.m.)
24            (Signature reserved.)
25                 --o0o--

27 (Pages 105 to 108)

Courthouse News Service v. Omundson                     30(b)(6) Terry Derrick - Vol. I

Page 109

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3           The undersigned Certified Shorthand
       Reporter and Deposition Notary Public of the State of
4      California does hereby certify:
5           That the foregoing 30(b)(6) deposition of
       Tyler Technologies designee Terry Derrick was taken before
6      me remotely at the time, at which time the witness was
       duly sworn by me;
7
            That the testimony of the witness and all
8      objections made at the time of the deposition were
       recorded stenographically by me and were thereafter
9      transcribed, said transcript being a true and correct copy
       of the proceedings thereof.
10
            I further certify that I am neither counsel
11     for nor related to any party to said action, nor in any
       way interested in the outcome thereof.
12
            Further, that if the foregoing pertains to
13     the original transcript of a deposition in a federal case,
       before completion of the proceedings, review of the
14     transcript was requested/offered on the
       record.
15
16
            In witness whereof, I have subscribed my
17     name on this 15th day of November 2022
18
19
20
21     Nicole A. Bulldis, RPR
       CA CSR No. 14441
22
23
24
25

                                           28 (Page 109)

# Deposition of 30(b)(6) Terry Derrick - Vol. II

## Courthouse News Service v. Omundson

## November 10, 2022



**206.287.9066  I  800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Courthouse News Service v. Omundson — 30(b)(6) Terry Derrick - Vol. II

---

**Page 110**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

```
                          )
COURTHOUSE NEWS SERVICE,  )
                          )
             Plaintiff,   )
                          )
     v.                   ) No. 1:21-CV-00305-REP
                          )
SARA OMUNDSON, in her official )
capacity as Administrative     )
Director of Idaho Courts,      )
                               )
             Defendant.   )
```

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF TYLER TECHNOLOGIES

REPRESENTED BY TERRY DERRICK - VOLUME II

Taken at Plano, Texas
(Conducted via Videoconference.)

DATE TAKEN:  November 10, 2022
REPORTED BY:  Nicole A. Bulldis, RPR
       AZ No. 50955 | CA No. 14441 | WA No. 3384

---

**Page 111**

```
 1          A P P E A R A N C E S
 2
 3   FOR PLAINTIFF:
 4   (via Zoom)    Jonathan G. Fetterly
                   Katherine A. Keating
 5                 BRYAN CAVE LEIGHTON PAISNER LLP
                   3 Embarcadero Center, 7th Floor
 6                 San Francisco, CA 94111
                   (415) 675-3400
 7                 jon.fetterly@bclplaw.com
                   katherine.keating@bclplaw.com
 8
 9   FOR DEFENDANT:
10   (via Zoom)    Keely E. Duke
                   Molly E. Mitchell
11                 DUKE EVETT, PLLC
                   1087 W. River Street, Suite 300
12                 PO Box 7387
                   Boise, ID 83707
13                 (208) 342-3310
                   ked@dukeevett.com
14                 mem@dukeevett.com
15
16   FOR TYLER TECHNOLOGIES
     AND WITNESS:
17
18   (via Zoom)    Beth W. Petronio
                   K&L GATES LLP
19                 1717 Main Street, Suite 2800
                   Dallas, TX 75201
20                 (214) 939-5815
                   beth.petronio@klgates.com
21
22   ALSO PRESENT:
23   (via Zoom)    SARA OMUNDSON, Idaho Courts
24                 --o0o--
25
```

---

**Page 112**

```
 1        30(b)(6) DEPOSITION OF TERRY DERRICK
 2
 3                EXAMINATION INDEX
 4   EXAMINATION BY                          PAGE
 5   Ms. Duke.............................. 113
 6   Mr. Fetterly......................... 209
 7   Ms. Duke.............................. 216
 8
 9
10                EXHIBIT INDEX
11   EXHIBITS FOR IDENTIFICATION          PAGE
12   38 Defendant's 30(b)(6) Notice of Deposition to
13      Tyler Technologies................. 117
14
15                --o0o--
16
17
18
19
20
21
22
23
24
25
```

---

**Page 113**

```
 1   REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
 2        Thursday, November 10, 2022; 1:24 p.m.
 3                    --o0o--
 4
 5   TERRY DERRICK,          witness herein, having been
 6                   first duly sworn on oath,
 7                   was examined and testified
 8                   as follows:
 9
10            E X A M I N A T I O N
11   BY MS. DUKE
12       Q.  Mr. Derrick, it's always hard to go second in
13   these because I might bounce around a bit, but I'll do
14   my best to try to keep it in a logical fashion selfishly
15   for me and then also to hopefully help you.
16       So same -- same general rules that
17   Mr. Fetterly just provided to you.  If I ask you a
18   question that you don't understand, would you please let
19   me know?
20       A.  Of course.
21       Q.  If you're going on to answer my questions,
22   we'll assume then that you understood them; is that
23   fair?
24       A.  Yeah.  Sure.
25       Q.  Excellent.
```

---

1 (Pages 110 to 113)

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

---

Page 114

1    All right.  So let me talk about the State of
2 Idaho real quick.  Do you have any particular, I guess,
3 responsibility or involvement with the State of Idaho
4 from a Tyler perspective, currently?
5    A.  Yes, to an extent.  You know, the new role
6 that I am currently in, my responsibility is to oversee
7 the direction for some of our products by which the
8 State of Idaho is using.  So in that regards, yes.
9    Q.  Which products would those be?
10    A.  Our Enterprise Justice platform, the new case
11 management system.  Odyssey, if you will, the new name
12 for that, I should say.  Same product, new name.  The
13 jury product for Tyler, the -- and I think those are the
14 two primary ones.
15    Q.  Prior to that, so let's just say from 2017
16 forward, what involvement or role did you have with
17 respect to the State of Idaho through Tyler?
18    A.  Sure.  As the general manager of the
19 eSolutions business line, it was oversight into the
20 product and solution and business direction for our
21 eFile & Serve platform, the Guide & File platform, and
22 I believe those would be the two that would be relevant
23 here.
24    Q.  All right.  In your work, let's say, with
25 File & Serve, have you ever talked with any of the Idaho

---

Page 115

1 clerks as far as you know?
2    A.  Yes, a long time ago.
3    Q.  And do you recall what the general nature of
4 those conversations was?
5    A.  Yeah.  During the initial implementation of
6 Idaho for the e-filing project, several years ago, I
7 helped do project kick-off meetings and participate as
8 kind of the program director during that time.
9    Q.  All right.  And in your current role, have you
10 been having any conversations with the clerks of the
11 court?
12    A.  I have not, no.
13    Q.  At any point in time, have you sat down and
14 talked with any of the judges in the state of Idaho with
15 respect to any of Tyler's products?
16    A.  No.
17    Q.  Sorry, I didn't hear you if you answered.
18    A.  I'm sorry.  No, I -- no, I have not.
19    Q.  Okay.
20    A.  Keely, is there a way that you could maybe
21 shut the blinds behind you?
22    Q.  Oh, yeah.  I sure can.
23       Is that better?
24    A.  It isn't.  I'm sorry.
25    Q.  Oh, it must be going right through the -- that

---

Page 116

1 one part, so let me see if I can shift how I'm sitting.
2 How's that sound?
3    A.  That'd be great.
4    Q.  What is really great is we have sun in Boise
5 today.
6       All right.  How's that?  Better?
7    A.  Perfect.  Yes, thank you very much.
8    Q.  Oh, my gosh.  Of course.
9       All right.  So you were asked a number of
10 questions by Mr. Fetterly with respect to that
11 PowerPoint, if you would, of the -- that was attached to
12 your deposition notice.
13    A.  Yes.
14    Q.  Do you recall that?
15    A.  Yes, I do.
16    Q.  Let me -- let me pull that up here.  We had it
17 as 38, I think.  It's our -- our numbering was all off
18 here.  Just bear with me for a second.
19    A.  Sure.
20       (Pause in the proceedings.)
21       MR. FETTERLY:  Keely, I think we also
22 have it marked as our Exhibit 8, if you'd rather not use
23 the subpoena attachment.
24       MS. DUKE:  Yeah.  I appreciate that.
25 Thank you.

---

Page 117

1       What I'll do is I'll just mark our notice
2 as Exhibit 38.
3       (Exhibit No. 38 marked.)
4    Q.  (By Ms. Duke) So I'm going to show you here, in
5 just one moment, Exhibit 38.
6       And Sara will be joining by phone, so if you
7 see another name pop up, that's why.  She's got to run
8 and get her kiddo.
9       All right.  Can you see Exhibit 38?
10    A.  Nothing is showing on the screen.
11    Q.  Oh, it's telling me it wants to quit Zoom.
12       Okay.  I'll be back.
13    A.  Oh, wait.  It's showing now.
14    Q.  Is it?  Okay.
15    A.  Yeah, the notice of -- yeah -- deposition
16 amended, Tyler 30(b)(6); is that right?
17       MR. FETTERLY:  Yeah.  I'm not seeing it
18 on my end.
19       MS. DUKE:  Well, I -- it literally just
20 locked me out.  Now it won't even show me.  I'm not sure
21 why.  Good old Zoom.
22       THE STENOGRAPHER:  Do you want to try
23 logging out and logging back in?
24       MS. DUKE:  Yeah.  That's what I'm going
25 to try.  Sorry.  I'll be back.

---

2 (Pages 114 to 117)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 118

1    MR. FETTERLY:  I'll be on standby.
2    (Off the record due to technical
3    difficulties.)
4    Q.  (By Ms. Duke) Let me go ahead now and try to
5    show you what I was trying to show you when it all
6    decided to go haywire.
7    MS. DUKE:  Do you want to pull that up,
8    the notice of depo and the PowerPoint?
9    Q.  (By Ms. Duke) All right.  Molly is going to
10   start sharing the screen here and we'll go to the
11   PowerPoint first.  Perfect.
12   All right.  First, I understand this
13   PowerPoint was not put together by you; correct?
14   A.  Yes, that's correct.
15   Q.  A Mr. Acosta prepared it?
16   A.  Yes, that's correct.
17   Q.  This is not a PowerPoint that is based on any
18   Idaho data; is that correct?
19   A.  That's right.
20   Q.  And this is a PowerPoint that was prepared by
21   Tyler?
22   A.  It is, yes.
23   Q.  And it's not a PowerPoint that the Idaho
24   Courts or Ms. Omundson at any point in time provided any
25   input as to any of the language contained within it; is

Page 119

1    that fair?
2    A.  Yeah, that's fair.
3    Q.  What's your understanding of why this
4    PowerPoint was provided to Ms. Omundson or the court
5    system in Idaho?
6    A.  I'm not sure why it was provided to anyone in
7    Idaho.
8    Q.  If you look to the -- and it looks like it was
9    prepared on July 1 of 2022?
10   A.  Yes, that's correct.
11   Q.  Do you know if this -- if this PowerPoint is
12   being used anywhere else in the country?
13   A.  It was created for the State of Texas by
14   request by the Office of Court Administration and the
15   Judicial Council for Information Technology.  I'm not
16   sure who else would -- would use this document.
17   Q.  And do you know why the State of Texas
18   requested this PowerPoint?
19   A.  I don't.
20   Q.  Let's go ahead and move to the second page of
21   it, and we'll talk about Auto-Accept first.  You were
22   asked a number of questions related to the Auto-Accept
23   column.  And that first sentence there, it says:
24   "Auto-Accept Review is a free out-of-the-box e-filing
25   function."

Page 120

1    Did I read that correctly?
2    A.  You did.
3    Q.  When -- when Tyler is representing "free,"
4    what is Tyler meaning there?
5    A.  It means it's included as part of the e-filing
6    solution.  So our customers who pay for the e-filing
7    solution get that Auto-Accept function as part of that
8    solution without additional expense beyond the -- the
9    e-filing solution in itself.
10   Q.  And that is not representative of the cost
11   that will be incurred by courts if they were to use the
12   Auto-Accept function; correct?
13   MR. FETTERLY:  Objection.  Vague and
14   ambiguous.  Lacks foundation.
15   THE DEPONENT:  I guess I don't understand
16   the question.  Can you maybe say it again?
17   Q.  (By Ms. Duke) Sure.  Happy to.
18   So, obviously, that's from Tyler's side.  It's
19   a free part of their program.  What I'm asking is if it
20   were something that was utilized in the state of Idaho,
21   Tyler has not done any type of evaluation as to the cost
22   to the State of Idaho to use Auto-Accept in the event
23   there are issues with it?
24   A.  Yeah, that's correct.  We haven't -- we have
25   no visibility into any expense that could be endured by

Page 121

1    the State or by the Courts.  This is just speaking to
2    the availability of that function.
3    Q.  And in order to understand what the costs of
4    an Auto-Accept would be, Tyler -- to a court system,
5    aside from Tyler providing it free, Tyler would defer to
6    the various courts, including the Idaho State Court, as
7    to what they anticipate their internal costs would be as
8    a result of using something like Auto-Accept; is that
9    fair?
10   A.  Yes, it is.
11   Q.  In addition, there's words used in this --
12   this first page.  Given this was prepared for the State
13   of Texas, I'll assume that the Idaho rules of e-filing
14   were in no way considered in creating or providing the
15   language that's included in this PowerPoint; is that
16   correct?
17   A.  I'm not sure.  We would have to ask the
18   author, but, yeah, I am -- I'm not sure.
19   Q.  Okay.  Any reason to believe that this --
20   given that this was prepared for the State of Texas,
21   that the Idaho rules of electronic filing would have
22   been considered in its preparation?
23   A.  No reason to believe that at all.
24   Q.  Are you in any way familiar with the Idaho
25   rules of electronic filing?

3 (Pages 118 to 121)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 122

1    A.  Not -- not very familiar at all.
2    Q.  Are you aware of how they define court
3  documents?
4    A.  No, I am not.
5    Q.  Are you aware of how the Idaho rules of
6  electronic filing define judicial documents?
7    A.  No, I am not.
8    Q.  With respect to this Auto-Accept portion, have
9  you talked -- or has anyone at Tyler talked with anyone
10  in the state of Idaho as to the resources it would take
11  Idaho's judicial clerks, judges, and court staff to
12  address any errors on the back end if something was
13  auto-accepted that should not have been?
14    A.  Not -- not to my knowledge.
15    Q.  Is Tyler aware of what judges -- well, strike
16  that.
17        Under the Auto-Accept, it's my understanding
18  that Auto-Accept means it would go from -- once it's
19  submitted to File & Serve by a user, it would
20  immediately transfer to the court's case management
21  system; is that correct?
22    A.  Well, immediately is a -- is a relative term.
23  The -- the process would be once the filer submits that
24  filing through the electronic filing service provider
25  portal, it would go to the EFM, the eFiling Manager.

Page 123

1  Once inside the eFiling Manager, it would be assessed
2  and evaluated against those Auto-Accept rules.  And if
3  it met that criteria which was pre-configured by the
4  court or the clerk, then it would be accepted and then
5  transmitted in two directions, one to the case
6  management system and then back -- one file-stamped copy
7  back to the original filer who submitted it.  I'm not
8  sure if that answers your question, but...
9    Q.  It does.  I mean, when I say "immediately,"
10  I'm assuming that we're talking that's a matter of
11  seconds for it to go into the EFM and have whatever
12  program is -- has been put together to get it into the
13  case management system?
14    A.  That's correct.  Yeah, a short duration.
15    Q.  Okay.  And with respect to Tyler's
16  eFile & Serve, Tyler is -- is the one that -- that has
17  possession of those documents, meaning they're --
18  they're hosted by Tyler?
19        MR. FETTERLY:  Objection.  Vague and
20  ambiguous as to "possession."
21        THE DEPONENT:  The documents themselves
22  are contained within the eFiling Manager, which exists
23  inside of the AWS GovCloud.  And they can be retrieved
24  and displayed from the review queue or the review tool
25  and the review tool that the clerks use to review them.

Page 124

1    Q.  (By Ms. Duke)  Sure.  Let me -- let me try to
2  phrase it a different way.
3        So when a document is submitted to
4  eFile & Serve by a submitter, Tyler is the one that is
5  responsible for the contractual arrangements with AWS as
6  to the hosting of those documents?
7    A.  Correct.
8    Q.  Then, once those documents -- let's say, it's
9  a complaint -- has been accepted by the court clerk and
10  it transfers to the case management system, when it
11  transfers to the case management system, that is then in
12  the state of Idaho actually hosted internally by the
13  court, the Idaho Supreme Court; correct?
14    A.  That is my understanding, yes.
15    Q.  And, therefore, the State of Idaho's court
16  system with respect to its case management system, that
17  system then is all the security protocols,
18  authentication items, those type -- backups, those types
19  of things are handled by the court staff, not by Tyler;
20  correct?
21    A.  For the case management system, yes, that's
22  correct.
23    Q.  When we go over to the File & Serve system, so
24  back to -- to Tyler's File & Serve system, it's Tyler
25  that is responsible for security, backups,

Page 125

1  authentication, those types of things; correct?
2    A.  Yes, that is correct.
3    Q.  Is Tyler -- or, are you aware, through Tyler,
4  of any of the security protocols that the Idaho Courts
5  have placed on the case management system that they are
6  hosting?
7    A.  I'm not familiar with the security that Idaho
8  uses on their on-premise case management solution, no.
9    Q.  And that's because that's up to the -- the
10  court as the hoster of that data?
11    A.  That's correct.
12    Q.  And how about backups?  Is Tyler or are you
13  familiar with the backups that are generated, how
14  quickly, how many, what is backed up, anything like that
15  with respect to case management system?
16    A.  I'm not familiar with that, no.
17    Q.  From a file integrity monitoring standpoint
18  and ransomware protection, would Tyler be aware of what
19  Idaho's Courts have put into place to protect the case
20  management documents that they host?
21    A.  No.
22    Q.  Is Tyler aware of the advanced endpoint
23  protection that's in place with respect to the case
24  management documents that are hosted by the Idaho Court?
25    A.  No, I'm not aware of that.

4 (Pages 122 to 125)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 126

1    Q.  Would Tyler be involved or know about the 24/7
2   monitoring service of system logs, network traffic, or
3   any type of other anomalous or malicious behavior on the
4   servers for the case management system that's hosted by
5   the Idaho Supreme Court?
6        A.  No, I don't have visibility into those
7   practices.
8        Q.  Would Tyler have any information or knowledge
9   as to who the secured -- or the -- who the limited pool
10  of Idaho Supreme Court employees are that have access to
11  handling, addressing, or protecting the documents that
12  are housed within the case management system hosted by
13  the Idaho Supreme Court?
14       A.  No, we would not have visibility into that.
15       Q.  And would Tyler have any visibility or control
16  over the administrative access to devices and servers
17  and whether they required multifactor authentication
18  with respect to the case management documents that are
19  housed by the Idaho Supreme Court?
20       A.  No, we would not have that.
21       Q.  And to all of these questions that I just
22  asked, I'm assuming the reason Tyler would not have that
23  information, knowledge, or control, is because that is
24  all within the control and purview of the Idaho Supreme
25  Court as the hoster of the case management system?

---

Page 127

1        A.  That is correct.
2        Q.  So let's turn then to File & Serve.  Given
3   that Tyler is the, you know, hoster and in control of
4   the documents related to -- or that have been submitted
5   to eFile & Serve, would Tyler be aware of the security
6   that's in place to protect those documents?
7        A.  Yes, we would.
8        Q.  And just describe generally what that security
9   is for File & Serve.
10       A.  I'll keep it very topical because describing
11  in detail is a security vulnerability in itself, but
12  just general security provisions that we have for the
13  e-filing platform are in our contractual agreement and
14  that would cover anything regarding the Press Review
15  Tool as well.  Some of those are just general best
16  practices like vulnerability scans, virus scans,
17  firewall protection on -- on various tiers, things like
18  denial-of-service-attack protection, and -- and things
19  like that.
20       Q.  And what about backups to the EFS?  And we can
21  limit it to Idaho.  When I ask these questions right
22  now, I'll make it clear when I'm asking about globally
23  versus Idaho.
24           So with respect to a backup of the EFS system
25  for the State of Idaho, what type of backups occur at

---

Page 128

1   Tyler's direction?
2        A.  Sure.  For Idaho specific, we do 15-minute
3   interval backups as well as daily and weekly backups.
4        Q.  So let me give an example.  If -- let's --
5   let's say one of the dreaded things happens that we've
6   all now gotten cybersecurity insurance for -- knock on
7   wood -- and that is, let's say, that Tyler's security is
8   breached and there's a ransomware attack that occurs on
9   Idaho's File & Serve.  Is it Tyler that is the one that
10  would have the -- the documents through backups that it
11  would then be able to -- to use those backups and get
12  Idaho back up and running?
13       A.  If the ransomware attack took place on
14  File & Serve.
15       Q.  Yes?
16       A.  Is that what you're saying?
17       Q.  Correct.
18       A.  Yes, then the backups within File & Serve
19  would be at Tyler's discretion.
20       Q.  And within Tyler's control?
21       A.  Correct.
22       Q.  Okay.  So going back to -- to this
23  PowerPoint -- give me one second.  Actually, a lot of
24  these were answered earlier, so let me just check those
25  off as I go.

---

Page 129

1            Oh, there was a question asked of you that in
2   Auto-Accept, one of the configurations that could be
3   used is to mark -- to have a configuration that allows
4   the -- the person who is submitting the document to be
5   filed to click a box to say confidential or public that
6   way Auto-Accept would know whether it can be
7   automatically transferred to the case management system
8   and filed within that case management system, or whether
9   it was confidential it would go into a different queue;
10  correct?
11       A.  I don't recall that question, but -- but sure.
12       Q.  Well, is that one of the configurations, is
13  you could use a confidential or public setting that the
14  users who are submitting documents to Tyler File & Serve
15  where they could either check it confidential or public?
16       A.  Yes, that is an option for a filer to make
17  that determination.
18       Q.  Okay.  And is Tyler aware of any of the issues
19  when the State of Idaho was using an option to check
20  documents as confidential as to the issues and costs
21  that were created by allowing users to determine whether
22  something was or was not confidential?
23       A.  No, I'm not aware of those costs.
24       Q.  Are you aware of any of the issues that Idaho
25  faced when it had a time period where it permitted uses

---

5  (Pages 126 to 129)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 130

1  to decide whether something would be confidential or
2  public?
3      A.  No, I'm not.  I don't have visibility into
4  that.
5      Q.  So just because it's a configuration that can
6  be used doesn't mean that it necessarily is something
7  that should be done; correct?
8          MR. FETTERLY:  Objection.  Vague and
9  ambiguous.  Overbroad.  Lacks foundation.
10         THE DEPONENT:  All of our configurations
11 are based upon the determination and the -- and the
12 perspective of our partners -- our contract holders to
13 courts, so it's up to them as to what gets configured
14 and is deemed valuable or not.
15     Q.  (By Ms. Duke) Okay.  And so by Tyler testifying
16 and by you testifying earlier today to those numerous
17 configurations that Mr. Fetterly went through with you,
18 those are not configurations that you are specifically
19 stating would work for the State of Idaho; correct?
20     A.  When you say would -- "would work," what do
21 you mean?
22     Q.  Good point.  Let me -- let me rephrase that.
23         So when you were asked a number of questions
24 by Mr. Fetterly regarding the number of configurations
25 that are available to courts to use, you are not stating

Page 131

1  that -- that Idaho -- you're not providing an opinion as
2  to whether those would be practical approaches for the
3  State of Idaho to use; is that correct?
4      A.  That's right.  I don't have intimate knowledge
5  to suggest that that would be a definitive positive
6  change.  I think my statements were really around the
7  availability of those options.
8      Q.  And that's -- that's said far better than the
9  question I asked.
10         So when you were talking about all the
11 configuration options, you were merely talking about
12 configurations that were available; correct?
13     A.  Yes, that's correct.
14     Q.  You were not making a recommendation of what
15 would or would not be useful or practical in Idaho's
16 courts; correct?
17     A.  That's correct.  I was not.
18     Q.  Now, under the -- you were asked some
19 questions about the filing fee that -- that is used.
20 Under Auto-Accept, do you know if a user were to pay
21 what they thought was the filing fee, which was, you
22 know, run through your credit card processing company
23 and sufficient funds were in the account and they were
24 wrong about what the filing fee was, is there anything
25 in Auto-Accept to be configured that would stop that

Page 132

1  auto-transfer to the case management system if an
2  improper filing fee was made?
3      A.  No, there wouldn't be.
4      Q.  Okay.  What if a filer was supposed to have a
5  filing fee and didn't have a filing fee included with a
6  complaint, would Tyler's Auto-Accept stop that filing
7  from being immediately transferred into the case
8  management system for the court?
9      A.  It -- it would be based upon the
10 configuration, but it does not use logic to determine
11 whether something should or should not have it.  It's
12 just based upon the configuration of the court.
13     Q.  And by that, I think you mean if they say,
14 "I'm filing a personal injury complaint," and let's say
15 they don't submit their -- their filing fee with it, are
16 you saying that it would then get auto-accepted and into
17 case manager and then the court would need to deal with
18 the filing fee issue on the back end?
19     A.  I'm saying it depends upon the configuration.
20 I can't tell whether or not it would be auto-accepted
21 unless we understood what the configuration was to -- to
22 evaluate that submission.
23     Q.  And do you know what costs the State of Idaho
24 would incur to come up with the configurations to allow
25 Auto-Accept for any type of complaint?

Page 133

1      A.  No, I do not.
2      Q.  Do you know whether any state using
3  Auto-Accept has been able to configure Auto-Accept so
4  that if someone doesn't file -- or doesn't pay their
5  filing fee, that that is somehow blocked from being
6  auto-accepted and transferred into the court's case
7  management system?
8      A.  I'm not familiar with the -- the intimate
9  configurations of other states and how they've
10 configured specific conditions as they pertain to
11 Auto-Accept rules.
12     Q.  So fair to say, as you sit here today, that
13 you do not know whether any state -- well, strike that.
14         Fair to say, as you sit here today, that you
15 don't know whether there is even a configuration
16 possibility of ensuring that a filing fee in fact
17 accompanies, let's say, a complaint filing; is that
18 correct?
19     A.  Say that one more time?
20     Q.  What I'm trying to get to is, as you sit here
21 today, you can't testify that you know that in fact if a
22 configuration is put in place that there is a
23 configuration that would actually say, "Oh, if you don't
24 provide your filing fee with this filing, it's not going
25 to go into Auto-Accept."

6  (Pages 130 to 133)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. II

---

Page 134

1     A. There is a condition by which can be
2  configured that -- that -- that would say that filings
3  with or without financials would be assessed, and so we
4  can compare the filing against that.
5     What we would not be able to do is determine
6  whether or not that was accurate, whether the filing fees
7  should have been assessed and they weren't, and then
8  it's smart enough to know that the filer made a mistake.
9  It doesn't have that logic built in.
10    Q. All right. So -- I understand what you're
11 saying.
12    So what it does have the logic to do, is you
13 can say, yes, there should be a filing fee with this;
14 right?
15    A. Correct. Yes.
16    Q. But if it's, let's say, a $243 filing fee and
17 the submitter of the document puts one penny down, it
18 wouldn't have the ability to say, "Oh, reject that,
19 that's not correct"?
20    A. That's correct. It does not have that
21 capability.
22    Q. And in those circumstances, if -- if that
23 occurred, the -- filing is then in the case
24 management system, and it's then up to the clerks to
25 address that payment issue; is that correct?

Page 135

1     A. There may be some configuration mechanisms
2  that would prevent that scenario. We would have to
3  understand more about that scenario to know whether or
4  not that could occur. But if it did occur, then, yes,
5  it would be in the case management system and there
6  would be some sort of reaction to -- to address that
7  problem, and I -- I don't know what that is.
8     Q. All right. With respect to Tyler's
9  File & Serve, it is my understanding from talking to my
10 clients that the service address in eFile & Serve is
11 not integrated with the case management system; is that
12 your understanding as well?
13    A. The service address? I don't understand --
14    Q. Correct.
15    A. -- the question.
16    Q. The service address meaning the submitter's
17 address for service or for --
18    A. Oh, the --
19    Q. -- who the document is being served on.
20    A. Correct. The service email address is what
21 you're referring to?
22    Q. Correct.
23    A. Correct. That doesn't get transmitted into
24 Odyssey.
25    Q. And when you say it does not get transmitted

Page 136

1  into Odyssey, you mean Odyssey case management; correct?
2     A. Yes, I apologize. The case management system.
3     Q. Okay.
4        (Pause in the proceedings.)
5     Q. (By Ms. Duke) And on Auto-Accept, if
6  Auto-Accept is used, if a document meets the
7  configurations and is transferred into the case
8  management under Auto-Accept, does that mean it no
9  longer is within eFile & Serve?
10    A. No, it'll stay within the eFiling Manager.
11 It would just be in an accepted state.
12    Q. And how long does it stay in that eFiling
13 Manager?
14    A. Sure. The data itself, the metadata, that
15 stays in the eFiling Manager into perpetuity, and the
16 documents would stay as long as the configuration states
17 it. So there's a configuration setting that would purge
18 the documents after a set duration and then it would be
19 whatever that configuration is set to.
20    Q. All right. So there would be one version of
21 the file document in the e-file management system and a
22 second version of the documents in the court's case
23 management system; correct?
24    A. Yes, that is correct.
25    Q. Now, I think you cleared this up earlier, but

Page 137

1  just to be clear, when a document is submitted to
2  File & Serve, Tyler handles the payment part of
3  processing, confirming that there are sufficient funds,
4  and noting that payment will be able to be made with
5  respect to the filing.
6     A. That's correct.
7     Q. And then the actual payment funds are not
8  transferred from Tyler to the court until the filing is
9  accepted by the court clerk and transferred into the
10 case management system; correct?
11    A. That's correct. We don't capture the payment
12 until the clerk makes that acceptance determination on
13 the submission.
14    Q. So, to be clear, the payment is not made with
15 respect to a filing until the clerk has accepted the
16 filing and it's being transferred into the case
17 management system?
18    A. Yeah. The only edit I would say to that is
19 the payment isn't captured until the submission is
20 accepted, whether that be done by a clerk or through the
21 auto-acceptance process, but, yes.
22    Q. Right. And so regardless whether that process
23 or a clerk reviewing it and accepting it is done,
24 payment does not occur until that document is being
25 transferred into the court's case management system.

7 (Pages 134 to 137)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 138

1    A.  Yeah.  I think it's actually done right before
2  that document is transmitted.  I -- I'd have to go back
3  to look at the order of operations after the acceptance
4  as to which of those takes place first, but it's within
5  that same workflow within that same duration, so we're
6  talking a matter of a few seconds.
7    Q.  Okay.  And within those seconds, after either
8  Auto-Accept or a clerk accepts, that's when the -- the
9  payment is actually being taken from the submitter and
10  then provided to the court?
11    A.  That's correct.
12    Q.  Are you aware -- you mentioned there were 25
13  courts that use Auto-Accept.  Do you recall that
14  testimony?
15    A.  I do.
16    Q.  How many courts, total, use just Tyler
17  File & Serve, not -- not limiting it to Auto-Accept or
18  press review queue?
19    A.  We have 27 states under contract, so roughly
20  1,500.
21    Q.  Okay.  So out of the 1,500 courts that Tyler
22  works with, it sounds like 25 use Auto-Accept?
23    A.  Some of those are actual statewide
24  arrangements, so like the state of Maine, the state of
25  Maryland, the state of Vermont, and those would have

Page 139

1  multiple jurisdictions within.  So the 25 is customers,
2  but each of those customers would have multiple courts,
3  so it would be a higher number than 25.
4    Q.  How many customers does Tyler have that use
5  eFile & Serve?
6    A.  I don't know that -- that number off the top
7  of my head.
8    Q.  Okay.  Is it Tyler's position or does Tyler
9  encourage courts to have Auto-Accept used for all
10  filings?
11    A.  No.  Those encouragements or recommendations
12  are not -- are not there.  We -- we provide the
13  information to the courts and then we help them
14  configure it based upon their needs.
15    Q.  And you also rely on -- on, I'm assuming, the
16  courts to determine whether the courts believe
17  Auto-Accept would be appropriate and practical in their
18  various jurisdictions?
19    A.  Absolutely, yes.
20      MS. DUKE:  Molly, do you mind going to
21  Page 5 of the PowerPoint?
22    Q.  (By Ms. Duke) All right.  We're on Page 5 there
23  of the PowerPoint that you've gone through.
24      Auto-Accept means there's no clerk performing
25  a function to have the document transferred from

Page 140

1  File & Serve to the court's case management system;
2  correct?
3    A.  Yes, that's correct.
4    Q.  When I look at this little box or this little
5  diagram, I think it helps me.  You can see that there's
6  a little round thing right on EFM.  I'm assuming that's
7  kind of the World Wide Web?
8    A.  It is.
9    Q.  So -- and when you look at the World Wide Web
10  there in EFM, and then you look to the left of it on
11  your screen, or the right of it on the document, so all
12  the little -- it says filer, EFSP, filer, EFSP, and then
13  it's got conditional criteria, it's got a little person
14  above, that's all on the Tyler side of File & Serve;
15  correct?
16    A.  Yeah.  So everything that you see from the EFM
17  to the left --
18    Q.  Mm-hmm.
19    A.  -- would all be activities that would be
20  performed within Tyler-maintained infrastructure and
21  solutions.  The -- the -- in Idaho's example here, the
22  CMS on the right would be managed and owned by Idaho.
23    Q.  Right.  And so if I were to use this for Idaho
24  even though it was developed for Texas, I'd be able to
25  explain to our federal judge that that little arrow

Page 141

1  taking it from the World Wide Web to CMS, that is the
2  transfer from Tyler File & Serve to the court's hosted
3  case management system?
4    A.  Yes, that's correct.
5    Q.  Now, a little confusing and -- and maybe
6  confusing to some that haven't been obsessed with this
7  case as Mr. Fetterly, Ms. Keating, myself, and
8  Ms. Mitchell have been, they both are called Odyssey in
9  a way, but that feels like a bit of a confusing factor.
10      So I understand that there's Odyssey
11  File & Serve; right?
12    A.  Yeah.  We -- we've changed the name to
13  eFile & Serve, but -- but, yes, it's formerly known as
14  Odyssey File & Serve, correct.
15    Q.  Right.  It used to be known as Odyssey
16  File & Serve, but it's now known as eFile & Serve, so
17  that would be the right way to refer to it; correct?
18    A.  Yes, it would.
19    Q.  All right.  And then going over to the case
20  management side, that's known as Odyssey case management
21  services?
22    A.  It's -- it's now known as our Enterprise
23  Justice Case Management System, but it was formerly
24  known as Odyssey Case Management System.
25    Q.  Just because they shared the same name of

8  (Pages 138 to 141)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. II

Page 142

1    Odyssey prior to these transitions you've talked about,
2    that does not mean that they were the same applications;
3    correct?
4        A.  That's correct.  The term Odyssey is -- was --
5    was relating to the suite of our products, and the case
6    management system was one of those products within that
7    suite, as was the File & Serve product.
8        Q.  So a court could have the Odyssey Case
9    Management System but not the Odyssey File & Serve
10   portion; is that correct?
11       A.  Yes, that's correct.
12       Q.  Or vice versa?
13       A.  Yes, that's correct too.
14       Q.  And implying to our federal court that because
15   they were called Odyssey way back when or back when,
16   whenever that is, whether it's File & Serve or whether
17   it's case management system, they truly are, in fact,
18   two separate applications that just happen to be under
19   the Odyssey suite of potential products?
20       A.  Yes.  Right.  They're two distinct systems,
21   two distinct offerings, but that are integrated with
22   each other.
23       Q.  All right.  If you look at No. 2 there, it
24   says: "If the envelope details do not meet the
25   auto-review condition(s), the envelope is routed to the

Page 143

1    appropriate review queue to be reviewed by a clerk as it
2    is today."
3            Please help me understand what that is.  Give
4    me an example of what's being referenced there.
5        A.  Yeah.  It's just saying that if the envelope
6    doesn't meet the conditions that were configured under
7    the Auto-accept -- or auto -- yeah, Auto-Accept Review
8    function, then it would flow through its normal
9    workflow, which would be to route it to the review queue
10   for the clerk to be able to review when they had the
11   time or deemed it appropriate.
12       Q.  And who is in control of providing the
13   appropriate envelope details?
14       A.  For the details for that specific envelope, it
15   would be the filer.
16       Q.  That would not be something that would be
17   within the court's control; correct?
18       A.  That's correct.  Every -- every envelope is
19   created and submitted by the filer.  The only exception
20   or edit I would say to that is if the court was actually
21   the filer in that scenario.  Most of the time, that's
22   not the case.
23       Q.  And if I stick to the world of complaints,
24   which is what this case involves, if a complaint were
25   submitted through an envelope, it's up to the submitter

Page 144

1    to get that -- that envelope correct; right?
2        A.  Correct.  It's the filer's responsibility to
3    enter in those details prior to submission.
4        Q.  That's not the court's responsibility?
5        A.  Correct.
6        Q.  So even under Auto-Accept, if Auto-Accept were
7    configured in the State of Idaho, it would be up to the
8    filers to get their envelopes right if the document was
9    going to go through the auto-review process into the
10   case management system?
11       A.  There's actually two components here.  There's
12   the configuration which would be driven by the court as
13   to which criteria is deemed appropriate for the
14   Auto-Accept function to kick in, and then -- and then
15   the second component would be the submission of that
16   envelope and whether or not the criteria within that
17   specific envelope met those conditions which would be
18   the responsibility of the filer.
19       Q.  All right.  So the court could set the
20   criteria.  I know we've talked about that.  But once
21   that criteria is set, it's then up to the submitter as
22   to whether Auto-Accept is going to, you know, auto-file
23   that document; correct?
24       A.  Yes.  I don't know if the filer would have
25   visibility into what those conditions were, but they are

Page 145

1    the responsible party for filling out the envelope
2    details.
3        Q.  "They" being the filer?
4        A.  Yes, that's correct.
5        Q.  And what Number 2 means there is if the filer
6    doesn't fill it out correctly, then it's -- it's going
7    to get routed to a queue for the clerk to then review?
8        A.  Yes, that's correct.
9        Q.  Now, Number 3, it says:  "If the envelope
10   details meets the auto-review conditions, the filings
11   are automatically accepted, stamped, funds captured, and
12   notifications sent to filers/service recipients."
13           Do you see that?
14       A.  I do.
15       Q.  That's if the filer filled out the envelope
16   correctly?
17       A.  It's if the filer's envelope details met the
18   conditions that are being evaluated for the Auto-Accept.
19   They can still fill it out correctly and submit it and
20   it get routed to a clerk for review if it didn't meet
21   those conditions.
22       Q.  Now, there were some questions asked to you as
23   to whether file stamps were configurable by location.
24   Do you recall that?
25       A.  I do.

                                          9 (Pages 142 to 145)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 146

1     Q.  And so it's my understanding the only file
2  stamp that comes on to the document is once the document
3  has been accepted, it's then -- it's then stamped
4  accepted; is that correct?
5     A.  Yeah, that's correct.  The file stamp is --
6  I'm going to call it, for lack of a better term, "burned
7  in."  Back in the old days, it was the (indicating),
8  right?
9     Q.  Yeah.
10    A.  But it's -- that action actually takes effect
11 when the acceptance process occurs.
12    Q.  And it does not -- that action of the file
13 stamp does not take effect while the complaint is in the
14 clerk's queue to review for acceptance; correct?
15    A.  Yeah, that's correct.
16    Q.  It is only in the clerk setting -- without an
17 Auto-Accept, it's only when the clerk has accepted that
18 document that a file stamp is placed on it; is that
19 correct?
20    A.  It -- the file stamp can be placed on it at
21 the time of acceptance regardless of whether a clerk
22 accepts it or the auto-acceptance functionality kicks
23 in.
24    Q.  Sure.  I was just trying to break those out,
25 so take Auto-Accept out of it.

Page 147

1     A.  Okay.
2     Q.  If I'm in a situation where I don't use
3  Auto-Accept and it's clerk review, the -- the file stamp
4  is only placed on the document after the clerk performs
5  their review and accepts the document into the case
6  management system?
7     A.  Yes, that is correct.
8        MS. DUKE:  All right.  Let's go to the
9  next page, Molly.
10    Q.  (By Ms. Duke) If we look at Page 6 of this
11 PowerPoint, this all talks about that first one with the
12 little -- little clock icon, "improves average response
13 time."  This is focused on clerks; correct?
14    A.  Yes, it is.
15    Q.  This is not focused in on the time or impact
16 of Auto-Accept to judges; correct?
17    A.  I'm not sure I understand your question.
18 Auto-Accept to judges, you mean documents like proposed
19 orders?
20    Q.  No, I -- I should say it this way.  So let's
21 assume it's a complaint still.
22    A.  Right.
23    Q.  And let's assume that complaint goes through
24 Auto-Accept with a one-cent filing fee and is then into
25 the court system.  This improves average response time,

Page 148

1  that doesn't have anything to do with the time now that
2  it'll take a judge to deal with an improper filing fee;
3  correct?
4     A.  Correct.  It does not take that into
5  consideration.
6     Q.  And it also talks about low-priority filings
7  and then -- and then assuming clerks will be focusing on
8  more complex high-priority filings.  Explain to me what
9  Tyler, in this PowerPoint, means by a low-priority
10 filing.
11    A.  Yeah.  It could mean a range of -- of things.
12 Certain jurisdictions will deem certain filings less
13 time-sensitive and others more time-sensitive.  I'll
14 give an example of a time-sensitive matter.  An
15 emergency protection order is an emergency protection
16 order, and that's generally deemed as a more highly
17 valued or time-sensitive matter.  And an original --
18 just a motion on a case that's not subject to the
19 statute of limitations is probably a lower priority.
20 I'm assuming that the author meant that when -- when
21 creating this document.
22    Q.  Do you know if the author was in any way
23 factoring in complaints as to the benefits of
24 Auto-Accept when the author generated this document?
25    A.  I can't speculate on -- on that.

Page 149

1     Q.  And do you know whether or not the author was
2  considering low-priority complaints versus high-priority
3  complaints in the state of Idaho when generating this
4  document?
5     A.  I can't speculate on that.
6     Q.  It then goes to reduce return for correction
7  rates, and it says:  "Many courts effectiveness are
8  measured by the percentage of accepted filings.
9  auto-accepted -- auto-acceptance improves these
10 metrics."
11       Do you know whether Idaho's Courts
12 effectiveness are measured by the percentage of accepted
13 filings?
14    A.  I do not.
15    Q.  Do you know who sets these types of -- of
16 measures to determine how effective a court is?
17    A.  I think it -- it varies by court, by
18 jurisdiction.
19    Q.  Any idea what Idaho uses to determine whether
20 its courts are effective?
21    A.  No, I do not.
22    Q.  When it says it "reduces return for correction
23 rates," that's -- that's because it's auto-accepted,
24 meaning nothing's returned for correction; correct?
25    A.  Yes, that's correct.

10  (Pages 146 to 149)

Courthouse News Service v. Omundson — 30(b)(6) Terry Derrick - Vol. II

---

Page 150

1    Q.  Even if something gets through and should be
2  corrected, that's not going to get caught in this
3  auto-acceptance part of this.  Instead, it's going to be
4  dealt with the court clerks now on the case management
5  side; correct?
6    A.  That's correct.  The measurement here is from
7  the time of submission to the time of clerk action or --
8  or action on the envelope.
9    Q.  And, again, this -- this middle column has
10 nothing to do with the impact on judges in the event
11 corrections need to occur to something that's been
12 auto-accepted into the case management system.
13   A.  Yes.
14   Q.  Correct?
15   A.  That's correct, mm-hmm.
16   Q.  Now, the third bullet is -- it says "reduces
17 operational overhead."  I'm assuming that's just because
18 it takes the clerk out of the picture when
19 auto-acceptance is used.
20   A.  Yeah, I assume that's a valid assumption.
21   Q.  But it's not talking about the impact on
22 clerks or court staff or judges in the event something
23 has been auto-accepted and transferred into the court's
24 case management system; correct?
25   A.  Correct.  I don't think it takes that into

Page 151

1  consideration.
2    Q.  And the data for all three of these columns,
3  I'm assuming, is -- is Texas data.  Do you know exactly
4  what data was used to even come up with these three
5  columns?
6    A.  I -- I can't say for sure, but the document
7  was created for Texas, so it's a reasonable assumption.
8    Q.  Any idea how many filings were looked at?
9    A.  No, I don't.
10   Q.  Any idea how many courts were looked at?
11   A.  No, I don't.
12   Q.  Any idea of the volume at all of what was
13 looked at to come up with this PowerPoint?
14   A.  No, I can tell you that Texas has 254
15 counties, multiple offices in each, and handles anywhere
16 from 45- to 65,000 filings a day.  But beyond that, I'm
17 not sure what was used to reference or create this
18 document.
19   Q.  But it's also my understanding that Tyler
20 doesn't cover all of Texas; is that correct?
21   A.  No, we do.
22   Q.  Oh, you do?  Okay.
23   A.  We -- our e-filing program is the e-filing
24 program for the State of Texas.
25   Q.  Let me just look at something real quick that

Page 152

1  I talked to Mr. Girdner about yesterday.
2    So Mr. Girdner testified yesterday as to --
3  and maybe this was just related to a press review queue,
4  is the only court that's on press review queue in Texas,
5  Austin?
6    A.  It's -- it's Travis County, but it is Austin,
7  Texas.  We just gotta be careful because Austin is a
8  county that is not Austin, Texas.
9    Q.  Okay.  Leave it to the Texans to do that.  No
10 offense.  I know you're there, but...
11   All right.  So Travis County, out of all of
12 those courts you were just talking about in Texas,
13 Travis County's the only one who has a press review
14 queue through Tyler; is that correct?
15   A.  That is correct.
16   MS. DUKE:  Okay.  All right.  Let's go to
17 the next page, Molly, Page 7.
18   Q.  (By Ms. Duke) So I'm still a tiny bit confused
19 as to what these charts mean, so let me just ask you a
20 few questions about there.
21   Do you see the little stars down below?  The
22 one that says, first star:  "Example data utilizing Q4
23 2019 review -- reviewer metrics"?
24   A.  I do see that.
25   Q.  Any idea whose Q4 2019 reviewer metrics?

Page 153

1    A.  I would assume Courts A, B, C, D, and E.
2    Q.  But any idea who Court A is?
3    A.  I don't know.
4    Q.  What Court B is?
5    A.  I don't know.  We'd have to ask the author.
6  I'm not sure.
7    Q.  Or Court C, D, or E?
8    A.  No, I -- I don't know.
9    Q.  So then it says, "AR," so that's two little
10 stars, and it says that means auto-review.
11   So we have Court A and Court B that don't use
12 auto-review; right?
13   A.  That's how I interpret it, yes.
14   Q.  And does auto-review mean Auto-Accept or do
15 you know?
16   A.  I believe auto-review and Auto-Accept are
17 synonymous here.
18   Q.  So then Courts C, D, and E use auto-review?
19   A.  That's how I interpret it, correct.
20   Q.  And then it says the AR percentage is based on
21 number of reviewable filings submitted versus number of
22 filings auto-reviewed.  And so I guess let's look at
23 those.
24   So if I were to compare Court A to Court C,
25 what is -- what is this chart telling me?

11 (Pages 150 to 153)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. II

---

Page 154

1      A.  My interpretation of the chart says that
2  Court A is not using auto review where Court C has
3  5 percent of their envelopes being auto-reviewed.
4      Q.  And does it -- is it also comparing, then, the
5  efficiency of Court A to Court C or not?
6      A.  I think that's a subjective term.  I -- I
7  think it is telling you the percent response under 24
8  hours and the acceptance percentage.
9      Q.  And these are all fewer than 24 hours, not
10  broken out by the minute or hour; correct?
11      A.  Correct.
12      Q.  And so this data here on this page doesn't
13  break it down specifically into if a court's not using
14  Auto-Accept, but is processing complaints within, let's
15  say, three hours, how is that reflected here in this
16  data?
17      A.  I don't think that it is.
18      Q.  Okay.  All right.  Let's go to Page 8.
19          With respect to Page 8, again, you were --
20  talked about a number of -- of categories.  We've
21  already addressed that.
22          But in providing Page 8, no evaluation has
23  been done as to what the cost on Idaho's side would be
24  to implement or use an Auto-Accept in any capacity; is
25  that correct?

Page 155

1      A.  Yes, that's correct.
2          (Pause in the proceedings.)
3      Q.  (By Ms. Duke) Under Auto-Accept, is -- well,
4  strike that.
5          Have you been a part of any communications
6  with Idaho's Courts related to Auto-Accept?
7      A.  No.  No, I have not.
8      Q.  Are you aware of whether anyone at Tyler has
9  been involved in any conversations?
10      A.  No, I am not.
11      Q.  Do you know if Tyler has provided Idaho's
12  Courts with any presentation on Auto-Accept?
13      A.  I'm not aware of that.
14      Q.  And you understand that Tyler's contract
15  related to its File & Serve is with the Idaho Supreme
16  Court?
17      A.  Yes, I do.
18      Q.  And with respect to case management, Tyler's
19  contract is also with the Supreme Court?
20      A.  Yes, I do.
21      Q.  I'm just going through a bunch of questions,
22  so bear with me here.
23      A.  Sure.
24          (Pause in the proceedings.)
25      Q.  (By Ms. Duke) Now, in Auto-Accept, even if the

Page 156

1  court configured a confidentiality setting that should
2  be used, assuming confidential information was provided,
3  it would be up to the filer to properly click on that
4  confidential box; correct?
5      A.  Yes, that is correct.
6      Q.  And so, you know, sadly we know that there are
7  malicious, not-nice people out there, so if a malicious
8  not-nice person knew something was confidential but
9  wanted to go ahead and -- and get it filed, he or she
10  could just merely not accept or click the confidential
11  box and that document would then be automatically
12  transferred to and filed in the court's case management
13  system; correct?
14      A.  If the conditions were configured to accept it
15  in that manner and that scenario and transpired, then,
16  yes, it would.
17      Q.  Have any of the courts that have been using
18  Auto-Accept talked to you about how they dealt with any
19  type of malicious filings?
20      A.  No, they have not.
21      Q.  Have any -- I know that we've seen cases sadly
22  here in Idaho, as well as other places, of documents
23  placed in the public record, revenge porn, that type of
24  stuff.  Has Tyler had any communications with any of the
25  states who use an Auto-Accept as to things like revenge

Page 157

1  porn, child porn, anything like that making its way into
2  court documents?
3      A.  We have not.
4      Q.  Now, with respect to Odyssey File & Serve, all
5  documents in the submission are included in the same
6  envelope; correct?
7      A.  Yes.  For each submission, they -- all filings
8  and documents are included in the same envelope.  Yes,
9  that's correct.
10      Q.  That's not the case with Auto-Accept; correct?
11      A.  Correct.
12      Q.  There would actually have to be multiple
13  envelopes that would be used per filing?
14      A.  No, I don't think that's the case.  My
15  understanding is that the envelope is still intact, but
16  the filings are evaluated independently, so every filing
17  is evaluated within that envelope and then made that
18  determination but the envelope still holds true.
19      Q.  Ah, I see.  Okay.  So the envelope holds true
20  but what happens is it gets transferred into the court's
21  case management system and then the clerk has to then
22  break out the documents that are within the envelope?
23      A.  I'm not certain how an envelope containing
24  multiple filings when it's assessed with the auto-review
25  rules where one meets that criteria and the others

12  (Pages 154 to 157)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

**Page 158**

1  don't, exactly what transpires if it sends that record
2  immediately or if it holds it until all actions have
3  been taken on that envelope before transferring it to
4  the CMS.
5       Q.  And so you're not sure what the clerks need to
6  do from a work standpoint once an envelope with multiple
7  documents is transferred into the case management
8  system; is that fair?
9       A.  That's fair, yes.
10      Q.  Once a document is in the case management
11  system, the clerks then need to go through the case
12  management system to interact with -- with the various
13  parties to the case; correct?
14      A.  Yeah, that's a typical scenario.
15      Q.  Give me one second here.
16      A.  Of course.
17           (Pause in the proceedings.)
18      Q.  (By Ms. Duke) So let me ask you a question in
19  the context of a complaint.  If -- so in Idaho, I'll
20  represent to you that when a case is initiated with a
21  complaint, a complaint, a case information sheet, and a
22  summons are all required as part of that filing.
23           I'm assuming that those would all be in the
24  same envelope?
25      A.  Yeah, more than likely in an initial filing.

**Page 159**

1  That's correct.
2       Q.  And if, for instance, the filing fee wasn't
3  the proper amount, but was some sort of filing fee, so
4  that it was taken and transferred to the court and
5  auto-accepted, on filing, that means the summons, the
6  case information sheet, and the complaint would all be
7  filed even though the proper filing fee has not been
8  paid?
9       A.  Yes, that's correct.
10      Q.  And if someone were supposed to mark something
11  confidential and didn't, the only way that could be
12  addressed under an Auto-Accept situation would be for
13  then, in the case management system, however the court's
14  handled, you know, dealing with documents that are in
15  the case management system and correcting their filing,
16  that would have to be done on the case management end;
17  correct?
18      A.  Yes, that's correct.  That would be the
19  appropriate means to correct the -- that security
20  setting.
21      Q.  If, in that context of the complaint, so,
22  again, I mentioned there's a complaint, a case
23  information sheet, and a summons, they're in the same
24  envelope, if -- if they're being submitted and no filing
25  fee is paid, are the summons and case information sheets

**Page 160**

1  filed and the complaint not filed under Auto-Accept or
2  are all three not accepted?
3       A.  It depends on how it's configured.  It would
4  have to hit those criteria, and then depending upon
5  that, it would react accordingly.
6       Q.  Perfect.  So I'm going to transfer, I think,
7  now into press review queue, so why don't we take five
8  minutes and then I'll get through that portion?
9       A.  Okay.  Sounds good.
10      Q.  Okay.
11           (A break was taken from
12           2:36 p.m. to 2:43 p.m.)
13           MS. DUKE:  All right.  We're back on the
14  record.
15           Molly, do you mind pulling up Exhibit 34?
16      Q.  (By Ms. Duke) All right.  Do you see Exhibit 34
17  there?  Do you recall discussing this with Mr. Fetterly?
18      A.  Yes, I do.
19      Q.  This is a Tyler-generated document; correct?
20      A.  Yes, it is.
21      Q.  And the Idaho Courts did not have anything to
22  do with the content in Exhibit 34; is that correct?
23      A.  That's correct.
24      Q.  Okay.  And we had little, you know,
25  screenshots of that being able to show how it came from

**Page 161**

1  the website as 34A and B.  Again, that would all be
2  Tyler-generated language, not Idaho Court language;
3  correct?
4       A.  Yes, that's correct.
5           MS. DUKE:  All right.  Let's go ahead and
6  turn to Exhibit 35, Molly.
7       Q.  (By Ms. Duke) This is the e-filing overview.
8  It's a very large document; correct?
9       A.  Yeah.  Mine shows 248 pages.
10      Q.  And this is a Tyler-drafted document?
11      A.  Yes, it is.
12      Q.  Not one that is drafted or has input from the
13  Idaho Courts; is that correct?
14      A.  That is correct.
15      Q.  So when I turn to that page that we're on of
16  Exhibit 35.
17           MS. DUKE:  Let's go to Page 17, please.
18           There it is.
19      Q.  (By Ms. Duke) Okay.  Can you see that okay?
20      A.  Yes, I can.
21      Q.  All right.  This diagram that is on Page 17 of
22  Exhibit 35, Tyler's individual filer user guide, this is
23  not based on Idaho; is that correct?
24      A.  That is correct.  It is not.
25      Q.  And this Exhibit 35 is for File & Serve;

13 (Pages 158 to 161)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 162

1  right?
2      A.  It is.  Yes, correct.
3      Q.  It is not for the case management system used
4  by the court?
5      A.  That is correct.
6      Q.  Now, when I look at this chart, it says "filer
7  submits."  Do you see that?
8      A.  Yes, I do see it.
9      Q.  And then it goes to the court and it has a
10 little picture of the court.
11     A.  Yes, I see that.
12     Q.  That's not meant to represent the court's case
13 management system; correct?
14     A.  Correct.  That -- that's not the workflow that
15 takes place.
16     Q.  What that really is meant to reflect is when
17 it says "court receives," that means Tyler File & Serve
18 receives that submission.
19     A.  Correct.  I believe it -- it means that the
20 eFiling Manager received that submission and the clerk
21 now has access to review it.
22     Q.  All right.  And then we've got a clerk that
23 looks like a judge as the next little icon; right?
24     A.  Yeah, I was noticing that as well.
25     Q.  And -- and so that would be the filer

---

Page 163

1  submitting it to eFile & Serve, which means it's going
2  into the eFile Manager portion of eFile & Serve and
3  the clerk now has it for review; correct?
4      A.  That is correct.
5      Q.  It then says, "Clerk reviews and notifies
6  filer of status via email," and is that when we get into
7  that whole whether it's accepted or rejected?
8      A.  It is.  And the clerk doesn't actually notify
9  the filer.  That's an automated process that takes --
10 takes place based upon the filer's notification settings
11 or configurations.
12     Q.  So when the clerk reviews and notifies the
13 filer of status, what that really means is the clerk is
14 either accepting or rejecting and the filer is getting
15 auto-noticed as to what's happened.
16     A.  Yes, that's correct.
17     Q.  And in that little multi-second process,
18 obviously, the filer's getting an email.  And then when
19 I look at the computer screen there, that's actually now
20 going to be my case -- court case management document --
21 that's going to now be my court case management
22 database; correct?
23     A.  Well, I -- it -- it's difficult to say by this
24 graphic.  Once the acceptance process takes place, it
25 would be -- the document and the information would be

---

Page 164

1  delivered to the case management system.  Obviously, the
2  filer can't view that information.  They don't have
3  access to the court's case management system.  They
4  could view it in the e-filing system or in whatever
5  online court record repository that the State of Idaho
6  provides any -- any general public or legal professional
7  or SRL to access those records.
8      Q.  I see.
9          Okay.  So what we really could add to this
10 diagram -- first, I think we'd agree this is probably
11 not the best diagram --
12     A.  Yes.
13     Q.  -- to properly represent the -- Idaho's
14 eFile & Serve and how a document gets to the case
15 management system; is that correct?
16     A.  Yeah, I think that's a valid statement.
17     Q.  All right.  Because what we would need to add
18 there is after the filer receives email, probably at
19 that same time when the filer receives the email we
20 could actually put a picture of the courthouse then
21 because that's actually when it would go into the case
22 management system if accepted?
23     A.  Yes.  That's -- that would be a more accurate
24 reflection of reality.
25     Q.  And if rejected, it doesn't go into the

---

Page 165

1  court's case management system, it goes back to the
2  filer to correct whatever issues need to be corrected?
3      A.  That's -- that's correct.
4      Q.  Do you know what time frame or grace period
5  Idaho provides to its filers in the event there's an
6  error that needs to be corrected?
7      A.  No, I do not.
8      Q.  Are you aware that there are various courts in
9  the country that do provide a grace period --
10     A.  Yes, I am.
11     Q.  -- for filers to correct their submission?
12     A.  Yes, I am.
13     Q.  And then that there are some who do not
14 provide grace periods and put the burden on the filers
15 to either gets it right the first time or not?
16     A.  Yes, I'm also aware of that.
17         MS. DUKE:  All right.  Let's go to the
18 next page, Molly.
19     Q.  (By Ms. Duke) Just a few questions on the
20 filing queue status.  Again, there's -- there's a very
21 big debate between CNS and the Idaho Courts as to what
22 "filing" means.
23         I'm assuming any time you've used the word
24 "filing" or these documents are using the word "filing,"
25 I'm assuming Tyler is not weighing in on what is or what

---

14 (Pages 162 to 165)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 166

1   is not a -- an official filing; is that fair?
2       A.  Yeah, that is correct.  A filing is a very
3   broad term that's used to describe a lot of things.
4   Very similar to the word "docket," how it can describe
5   multiple things in the court system, filing can also do
6   that.
7       Q.  When we look at submitted, it says there that
8   document file format and payment information have been
9   verified and accepted.  That does not mean that the
10  money has been transferred to the court yet; correct?
11      A.  That's correct.
12      Q.  That doesn't occur until further down this
13  chart where it says "accepted"; correct?
14      A.  That is correct.
15      Q.  And by the file format and payment information
16  have been verified and corrected, what's the "verified"
17  mean in that submitted row?
18      A.  Say that one more time?
19      Q.  Well, it says --
20      A.  Verified and corrected?
21      Q.  Yeah.  It says:  "The document file format and
22  payment information have been verified and accepted."
23          What's being referred to there as verified?
24      A.  Sorry.  I thought you said verified and
25  corrected.

Page 167

1           Verified and accepted.  The document file
2   format, meaning it's the correct filing type of
3   document.  Most courts require a PDF document, so it's
4   validating that.  And then the payment comment is
5   reflecting the pre-authorization that we do to protect
6   against non-sufficient funds.
7       Q.  That submitted row doesn't have anything to do
8   with verification that the filing has been verified as a
9   proper and accepted filing; correct?
10      A.  That's correct.
11      Q.  Okay.
12      A.  That's done by the clerk.
13      Q.  And that's done there at the accepted or
14  rejected stage; correct?
15      A.  Yeah.  They make that determination while the
16  status is under review.  And then once that
17  determination is made, it either goes into the accepted
18  or rejected status.
19      Q.  All right.  And to the extent there is a case
20  management manual like this e-filing manual, that's a
21  Tyler-documented case management document; correct?
22      A.  I'm not referring -- I'm not familiar with
23  what you're referring to.
24      Q.  Well, does Tyler have a case management
25  document like this Exhibit 35 we were just looking at?

Page 168

1       A.  Yes, we do.
2       Q.  Okay.  Oh, I see.  So there's an individual
3   file user guide for File & Serve, that's Exhibit 35.
4   And then, apparently, there's also a firm administration
5   or administrator user guide for File & Serve.
6       A.  That's correct.
7       Q.  What -- what are each going to?
8       A.  The filer is referring to an individual filer
9   who has the individual filer role.  And the firm
10  administrator is referring to an individual who has the
11  firm administrator role.  The firm administrator is
12  someone who may be responsible for setting up a -- a law
13  firm or an entity and help manages that for that firm.
14      Q.  Okay.  Let me show you Exhibit 37 real quick.
15          (Pause in the proceedings.)
16      Q.  (By Ms. Duke) This document here, tell me, is
17  this the File & Serve -- the first page is the
18  File & Serve for Idaho's Courts?
19      A.  I'm not familiar with that specific page.
20      Q.  Okay.  How about the second page?
21      A.  Yeah.  The second page is our electronic
22  filing service provider.
23      Q.  All right.  And that's the Odyssey
24  File & Serve as it's called or used to be called?
25      A.  Yes, that's correct.

Page 169

1           MS. DUKE:  All right.  Let's jump to --
2   Molly, why don't you bring up -- why don't you bring the
3   PowerPoint back up, actually?
4       Q.  (By Ms. Duke) So let's turn to press review
5   queue.
6       A.  Okay.
7       Q.  We're going to go back to that PowerPoint.
8           All right.  If we turn to the second page of
9   that, that's the press review.  Now, are you aware of
10  whether the State of Idaho has any definition for what
11  "the press" means?
12      A.  No.  I -- I'm not sure Idaho's definition of
13  press, no.
14      Q.  Does Tyler also provide public review queues?
15      A.  No.  Tyler's only review queues that we
16  provide are the clerk review queue and then the
17  additional tool that we provide is labeled the Press
18  Review Tool.  The audience is really -- of that tool,
19  is -- is dependent upon our contract holders, and in
20  this case, it would be the Supreme Court or the Court.
21      Q.  So if press review queue were to be used in
22  the state of Idaho, it'd be up to the State of Idaho to
23  determine who would be credentialed to use the press
24  review queue?
25      A.  Yes, that is correct.

15 (Pages 166 to 169)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 170

1    Q.  Is there a separate credentialing system
2  that's used for each person or is it an entity or how's
3  that used?  Do you know?
4    A.  Yeah.  We use our Tyler Identity Management
5  system, and it -- it is a user ID and a password that
6  grants that access, and so we ask for that information
7  going into providing those authorized users with access.
8    Q.  Okay.  And so when you say that, if Idaho were
9  to use the press review queue tool, would Idaho then
10 need to provide Tyler with the identity of anyone that
11 would have a user ID and password?
12   A.  Yeah.  You would generally provide us with
13 that user ID and we would then set up that user with
14 access to the system.  The normal process that we've
15 seen take place is the court would then create a user
16 inside of the File & Serve platform and then provide us
17 with that user ID and then we grant that access.
18   Q.  And is it multiple user IDs for states that
19 are using -- or courts that are using press review
20 queue?
21   A.  It can be.  It's up to the -- it's up to our
22 contract holders as to how many they provide.
23   Q.  Is there any type of auditing or anything like
24 that that's done as to a specific user's access to a
25 document in the press review queue?

---

Page 171

1    A.  No, not to a specific document.  There is no
2  audit trail.  We don't possess one.
3    Q.  Is there any ability to watermark documents as
4  under review or not filed in the press review queue?
5    A.  No, there is not.
6    Q.  Now, a press review queue, under Page 9 of
7  this document we have here, the -- the PowerPoint we've
8  been referring to, which is SO Page 9, that requires
9  an -- or an amendment to any contract; correct?
10   A.  Yes, that is correct.
11   Q.  So if the State of Idaho were to look to have
12 the Press Review Tool, it would need to negotiate a
13 contract amendment with Tyler?
14   A.  Yes, that is correct.
15   Q.  And it's my understanding that the fee that --
16 that the Supreme Court has been told Idaho will be
17 charged each year is $108,000 for the subscription to
18 the Tyler press review queue; is that correct?
19   A.  That is correct.  108,000 for the -- the
20 subscription to the Press Review Tool solution, correct.
21   Q.  Now, yesterday, Mr. Girdner who is the head of
22 CNS suggested that that was only a starting point for
23 Tyler and that that amount could be negotiated.
24       Does Tyler offer the press review subscription
25 for less than $108,000 for a court who wants to use the

---

Page 172

1  press review queue?
2    A.  We have offered that at a lower rate in the
3  past.
4    Q.  And how low has that rate gone?
5    A.  $60,000 is -- is the -- the lowest rate, and
6  the -- the intent behind that or the reason behind that
7  is that that number was provided before the new pricing
8  came out, and so it was honored for that first one-year
9  term and then it goes up to the normal 108-.
10   Q.  All right.  So even when it was negotiated
11 down, it might have been provided at a lower rate
12 because that had been previously negotiated but it then
13 goes up to the next year to the 108,000?
14   A.  That's correct.
15   Q.  So I understand Mr. Girdner obviously wouldn't
16 know what Tyler would or wouldn't do, but I think it's
17 fair to say, based upon your testimony, that if the
18 State of Idaho, regardless of its bargaining power,
19 regardless of its amazing negotiation skills, if it
20 wants the press review queue, it's going to pay $108,000
21 a year for that subscription?
22   A.  Yeah, that's an accurate assessment.
23   Q.  Now, I know that it says here that there's
24 also updated terms and conditions in addition to the
25 contract amendment that would occur.  Does Tyler

---

Page 173

1  indemnify the courts if someone is harmed by improper
2  use of a document that was provided through the press
3  review queue?
4    A.  No, we do not.
5    Q.  We were also talking about the -- the ability
6  and whether those could be, you know, the documents in
7  the press review could be manipulated, and I want to be
8  clear on this issue.
9        So the Idaho Supreme Court asked Jessi Fisher
10 if the documents in the press review queue were the same
11 documents in eFile & Serve or whether they were copies
12 of the original documents, and she answered that they
13 are the same documents.  Help me understand what that
14 means.
15   A.  Yeah, that's an accurate statement.  So if you
16 recall when we were discussing the EFM's responsibility
17 earlier, we were saying that that's where the documents
18 live, that's where they're housed, and that both the
19 review tool for the clerks and the review tool for the
20 press were just applications that could surface or
21 display that information.  Both of them can display that
22 document exactly in a similar way, and so that's what
23 she's referring to, is that they're both getting access
24 to that same information at the same location.  They're
25 just surfaced in different applications.

16 (Pages 170 to 173)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. II

---

Page 174

1    Q.  Got it.
2        And so with respect to the original document
3    that is submitted to File & Serve, that original
4    document is displayed both in the clerk queue and the
5    press review queue?
6    A.  That is correct.
7    Q.  That's correct?
8    A.  Yes, it is.  Sorry.  Yes, that's correct.
9    Q.  And so it would be the original document that
10   anyone accessing the press review queue would be looking
11   at?
12   A.  That is correct.
13   Q.  And I know that you had said there's no way to
14   modify a document that is in the clerk's -- or in a
15   queue, so the clerk's queue, but there is because it
16   ends up being file stamped upon acceptance; right?
17   A.  Yes, absolutely.  So the clerks have the
18   ability to make edits to the document, right?  They have
19   stamping options, annotation options, strike-through
20   options, a series of tools through the application,
21   through the review tool application.  Many of those
22   tools are commonly found in editors and, you know, like
23   you would see in Microsoft Word or even a PDF editor.
24   Those same tools do not exist in the Press Review Tool.
25   So if I stated that earlier, it was a -- just I misspoke

---

Page 175

1    on my -- on my part.
2    Q.  No, I understand.  I don't think we had
3    separated it out for you, so I appreciate you being
4    precise on that.
5        Okay.  With respect to the press review queue,
6    it -- it says that documents can be made available based
7    on the number of days.  Do you recall testifying to
8    that?
9    A.  Yes, I do.
10   Q.  Does that mean anything not reviewed or
11   accepted within a certain time period could
12   automatically be transferred to the press review queue?
13   A.  No, this would be the inverse.  If it met the
14   criteria, it would exist in the Press Review Tool until
15   that day, duration elapsed, and then in which case it
16   would no longer meet that criteria.
17   Q.  So the press review queue, the time that it's
18   up there, is that defined by the client and in that
19   instance, the courts?
20   A.  That's correct.
21   Q.  Are you aware of any spiders or scraping or
22   bots, you know, those types of things that have been
23   utilized on Tyler's press review queue?
24   A.  Not to my knowledge.
25   Q.  Does Tyler have anything in place to protect

---

Page 176

1    against bots, spiders, whatever, all these technical
2    terms that my children would know and I don't know them
3    all, but those things that can come in and -- and get
4    into a document or into a system, how does Tyler protect
5    that press review queue?
6    A.  We -- we don't on the Press Review Tool.
7    Specifically, on the Press Review Tool, we do not.
8    Q.  And given that you don't have those
9    protections on the press review queue, what does that
10   mean with respect to the ability to, you know, have
11   spiders or scrapers or bots or whatever accessing the
12   press review queue?
13   A.  There is -- there's an implied assumption that
14   they -- the bots would have access to the environment
15   through the user credentials.  If that assumption is
16   true, then they would be able to procure screenshots or
17   captures of that document.
18   Q.  Now, is the clerk's queue protected?
19   A.  The clerk's review tool?
20   Q.  Correct.
21   A.  I don't know.
22   Q.  But the only people accessing the clerk's
23   review tool are the clerks that have been provided
24   authorization through the court system; correct?
25   A.  Yes, that is correct.

---

Page 177

1    Q.  With respect to the press review queue, if it
2    were open to the press, whomever would be determined to
3    be the press in the state of Idaho, would presumptively
4    then receive a user ID and ability to access the press
5    review queue; correct?
6    A.  Yes, that is correct.
7    Q.  So the big difference between those two is the
8    clerks review queue has a very limited number of people
9    who are employed by the courts to do their job; right?
10   A.  Yes.  It's whoever the court grants access to
11   the clerk review tool.
12   Q.  And then the press review queue obviously
13   would be -- we're all presuming those would be
14   non-employed folks that would have access to the press
15   review queue?
16   A.  I think that's up to the court's discretion as
17   to who that audience is.
18   Q.  Okay.  Have any of the courts that you --
19   you're working with had access to the public to the
20   press review queue?
21   A.  I don't know.
22   Q.  You also mentioned, it sounds like, the press
23   review queue could be limited to only being available on
24   certain kiosks at courthouses; is that correct?
25   A.  Yes, that's correct.  We have a few customers

---

17  (Pages 174 to 177)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 178

1  who have attempted to do that.
2      Q.  All right.  And who are those customers?
3      A.  I'm -- I'm not sure which ones they are off
4  the top of my head.
5      Q.  And has -- has that worked with them in their
6  ability to manage their press review queues or do you
7  know why they were doing that?
8      A.  Yeah.  My understanding was that they were
9  doing that to -- to further protect the access and who
10  was getting access to that Press Review Tool and making
11  it available in the court clerk's office gave them that
12  additional oversight.
13      Q.  Do you have any knowledge of whether CNS or
14  any other entity has attempted to, you know, scrape, use
15  spiders, anything like that on the Press Review Tool?
16      A.  I don't.
17      Q.  Do you know how the Press Review Tool is
18  secured against the top ten OWASP attacks?
19      A.  No.  That's a third-party security set of
20  requirements, and it would -- it would take us some time
21  and resources to evaluate and assess the Press Review
22  Tool against those.  We haven't conducted that exercise.
23      Q.  Do you know if the press review queue has ever
24  been attacked, hacked, or compromised at any time?
25      A.  No, I'm unaware of any of those situations.

---

Page 179

1      Q.  And I'm assuming you would be aware of those
2  as the 30(b)(6) representative here today?
3      A.  Correct.
4      Q.  Does Tyler permit its clients to run its own
5  web application firewall to protect the Press Review
6  Tool website?
7      A.  Yeah.  I don't -- yeah.  We would, yes.
8      Q.  Now, have you been involved in any of the
9  conversations with Jennifer Dvorak as to information
10  she's requested from Tyler related to the press review
11  queue and its security parameters?
12      A.  Not directly.
13      Q.  It's my understanding she's asked a number of
14  questions that have been new to -- new to Tyler with
15  respect to clients asking security questions.  Is that a
16  fair representation?
17      A.  My understanding is that some of her questions
18  are pretty detailed and require a higher level of -- of
19  security knowledge to evaluate and assess and provide
20  responses, yes.
21      Q.  And do you know if Tyler is FedRAMP or
22  StateRAMP authorized?
23      A.  Not -- not with regards to the Press Review
24  Tool.
25      Q.  Okay.  What tools is it FedRAMP or

---

Page 180

1  StateRAMP -- and, actually, I don't need to know them
2  all.
3      Is it FedRAMP or StateRAMP authorized with
4  respect to File & Serve?
5      A.  No.
6      Q.  Is it FedRAMP or StateRAMP authorized with
7  respect to its case management system?
8      A.  No, we are not.
9      Q.  Has Tyler attempted to obtain the FedRAMP or
10  StateRAMP authorization?
11      A.  Not within the courts and justice division.
12      Q.  Where does Tyler have FedRAMP or StateRAMP
13  authorization?
14      A.  Within our federal division.
15      Q.  Okay.  And that's PACER; correct?
16      A.  No, PACER's not a Tyler product.
17      Q.  Okay.  Do you know if PACER is FedRAMP
18  certified?
19      A.  I do not know if they are or not.
20      Q.  Do you know if any of your competitors, such
21  as Granicus or Tybera, are FedRAMP or StateRAMP
22  certified?
23      A.  I -- I do not.
24      Q.  Are you aware of the Idaho Supreme Court terms
25  and conditions for cloud-based services that it's

---

Page 181

1  requiring with any contract amendments?
2      A.  Yeah.  I've seen something along those lines
3  come through.  I think that's one of the exhibits, if
4  I'm not mistaken.  Is that the document that you're
5  referring to?
6      Q.  Correct.  It's Exhibit 2 to your request that
7  we provided to you.  Have you had a chance to take a
8  look at that?
9      A.  Yes.
10      Q.  Prior to today?
11      A.  Mm-hmm.
12      Q.  Do you know whether Tyler would be willing to
13  agree to these terms and conditions that are Exhibit 2
14  to the 30(b)(6) today?
15      A.  No.  The -- in evaluating this and assessing
16  it, just going through and trying to determine the
17  applicability of -- of each of these would -- would take
18  a significant number of resources on Tyler as well as a
19  significant amount of time, and that isn't something
20  that we're prepared to do at this time.
21      Q.  Under Tyler's current contract with the courts
22  for its case management system and for its File & Serve,
23  is Tyler under any obligation to go through this
24  evaluation with respect to these terms and conditions
25  such as what you just discussed or -- or is that not

---

18 (Pages 178 to 181)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 182

1   done until either an amendment or a renewal of a
2   contract?
3       A.  My understanding, and I'd have to look at the
4   contract in order to validate that, would be that it
5   would be upon either an amendment to that contract or a
6   new contract being -- being created between the two
7   parties.
8       Q.  So pretty fair to assume if Sara Omundson or
9   someone in her office requested that Tyler take its
10  existing contracts with File & Serve and with the case
11  management and voluntarily go through the process of
12  agreeing to the terms and conditions here that are
13  outlined in Exhibit 2 of our 30(b)(6) request, that
14  Tyler would not be under an obligation to do so?
15      A.  That is my understanding.
16      Q.  And safe to assume that Tyler would not do so?
17      A.  That is my understanding.
18      Q.  Okay.  Now, if Tyler were willing to comply
19  with the terms and conditions that are in this document
20  we're looking at here -- Exhibit 2 to the 30(b)(6) that
21  was served on Tyler -- would that impact the annual
22  subscription fee that Tyler would charge the courts, or
23  is that something that would need to be evaluated as to
24  whether the courts would be charged something higher
25  than $108,000 here in Idaho?

Page 183

1       A.  If Tyler were to go through this document as
2   it pertains specifically to the Press Review Tool, then,
3   yes, it would be significantly higher than 108,000 a
4   year.
5       Q.  Do you have an estimate of what it would
6   likely be?
7       A.  No.  In order to do that, we would have to
8   scope that work out.  And it would require significant
9   resources and time to be able to go through that
10  document, so that's something we would have to look
11  into.
12      Q.  Now, also attached as Exhibit 3 to the
13  30(b)(6) deposition notice -- what exhibit number is
14  that?
15          THE STENOGRAPHER:  You said 38.
16          MS. DUKE:  38?  Okay.  Thank you.
17      Q.  (By Ms. Duke)  Right.  So nice and confusing,
18  Exhibit 38, Exhibit 3 to that.  This was the spreadsheet
19  that we had provided with -- with the document showing
20  the court security controls that are required by the
21  Idaho Supreme Court.
22      A.  Just to make sure I'm looking at the right
23  one, this is Exhibit 3 native format, the Excel
24  spreadsheet?
25      Q.  Correct.

Page 184

1       A.  Yes, I'm pulling it up now.
2       Q.  All right.  Molly's trying to get it up there
3   for all of us too.
4           Do you know if Tyler has represented to
5   Ms. Dvorak that it is currently working on becoming
6   StateRAMP authorized?
7       A.  I'm unaware of -- of that.
8       Q.  If Tyler was working on becoming StateRAMP
9   authorized, would complying with the requirements in
10  this native Excel file from the court, Exhibit 3 to 38,
11  help with obtaining that authorization?
12      A.  I'm not certain.  We'd have to get our
13  security team's perspective on that.
14      Q.  Right.  Do you know if what the State of Idaho
15  is requesting in this Excel spreadsheet that's contained
16  within Exhibit 38 -- that's Exhibit 3 within Exhibit 38,
17  is essentially the same information that would need to
18  be answered by Tyler to become StateRAMP authorized?
19      A.  No, I was unaware of that.
20          MS. DUKE:  Do you know how to get to
21  RO 138 on that?
22      Q.  (By Ms. Duke)  So let me ask you:  How are you
23  using encryption to protect the documents that are in
24  the press review queue?  Do you know?
25      A.  One moment.

Page 185

1       Q.  And that's RO 138.
2       A.  RO 138, yeah.
3           I'm sorry.  Could you repeat the question?  I
4   was looking for that.
5       Q.  Sure.
6           How are you using -- how is Tyler using
7   encryption to protect the documents within the press
8   review queue?
9       A.  Yeah.  So our -- our encryption is both at
10  rest and in transit in our applications.
11      Q.  And is that the same in the clerk's queue?
12      A.  Yes, it is.
13      Q.  How about RO 155?  How is Tyler monitoring for
14  anomalous and malicious communications to and from the
15  press review queue?
16      A.  To -- today, we aren't.  The Press Review Tool
17  isn't live in the state of Idaho.
18      Q.  Okay.  In other states where it is live, is
19  the press review queue being monitored for anomalous and
20  malicious communications to and from the press review
21  queue?
22      A.  We do have some security mechanisms in place,
23  yes.
24      Q.  And do you know what those are?
25      A.  The level of detail is confidential.  It's not

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 186

1  worth sharing.
2        MS. PETRONIO: High level?
3        THE DEPONENT: No, I can't. We'd have to
4  go into the -- sorry. We -- I don't -- can't go into
5  the details of those.
6        Q. (By Ms. Duke) And I'm assuming that's for
7  proprietary reasons? Even with us having a protective
8  order entered with the court, that's still not something
9  that Tyler is comfortable sharing?
10       A. Yeah. Also, it's a lack of deep knowledge
11 into the security protocols.
12       Q. PO 158, do you know how the integrity
13 verification is being used to detect unauthorized access
14 of press review queues that are in place?
15       A. No, I do not.
16       Q. Do you know how Tyler, under PO 160, is
17 using -- or how the press review queue checks the
18 validity of inputs to the system?
19       A. No, I do not.
20       Q. And do you know how Tyler -- how the press
21 review queue prevents unauthorized code execution?
22       A. Not at a detailed level.
23       Q. And do you have an understanding that
24 Ms. Dvorak has asked these questions of Tyler's folks?
25       A. Yeah. I know she's -- she's requested that --

---

Page 187

1  that information.
2        Q. And do you have an understanding that Tyler
3  has not provided her with the details to these questions
4  we've just gone through?
5        A. Yeah, that's -- that's correct.
6        Q. Again, I think that's because you've explained
7  by complying with what is included there, as Exhibit 3
8  to Exhibit 38, would be an incredibly costly product for
9  Tyler, and Tyler's only going to do that in the setting
10 of a contract amendment or a new or renewed contract?
11       A. That's correct.
12       Q. So some hopefully easier questions about the
13 press review queue so that I understand better as well
14 is: Does the press review queue tool have a function
15 that alerts users if a complaint that was originally put
16 into the press review queue is actually rejected?
17       A. We don't send any kind of alerts or
18 notifications as it pertains to the Press Review Tool.
19       Q. Does the press review queue even receive that
20 type of information from File & Serve?
21       A. Yes. It -- it -- it -- well, it doesn't
22 necessarily directly receive it. When the clerk makes
23 that determination, the status, the filing status of
24 that filing is modified in the EFM. And then the way
25 that the Press Review Tool works is every time that a

---

Page 188

1  user goes in there, it makes the pool of those records
2  based upon those conditions. So if the filing status
3  changed to a rejected and that was not a configured
4  condition for the Press Review Tool, then -- then the
5  next time that that screen was refreshed or displayed,
6  it would -- that filing would no longer be available.
7        Q. But if it had been accessed prior to it being
8  rejected, assuming there was a configuration factoring
9  in rejections, there's no notification that, "Oh,
10 actually what you were looking at before is inaccurate
11 and it has been rejected"?
12       A. That's correct. There's no notification of
13 that.
14       Q. Is there anything that would notify anyone in
15 the Press Review Tool whether a complaint has actually
16 been accepted?
17       A. No. Well --
18       Q. Again, I'm assuming it could be configured
19 where if it was accepted it could be then I guess moved
20 out of the press review queue?
21       A. Yeah, absolutely. What I don't -- what I
22 don't remember is whether or not we display the status
23 of that filing within the tool itself. I don't believe
24 that we do. But you're correct in stating that if it's
25 configured to not be available in an accepted status,

---

Page 189

1  then if it reaches an accepted status then it would not
2  be available.
3        Q. Now, in the press review queue, much like
4  Auto-Accept, again, if the setting is configured to
5  confidential, that, again, is going to be on the filer
6  side to make sure that they are noting the proper box so
7  it doesn't end up into the press review queue; correct?
8        A. Yes, that is correct.
9        Q. And so if a submitter marks confidential
10 documents incorrectly and does not say confidential,
11 it's going to go into press review queue?
12       A. If the press review queue was configured --
13 the Press Review Tool was configured in that way, then
14 yes.
15       Q. And back to, sadly, the malicious side of it,
16 if someone wants to be malicious and not mark something
17 confidential, even if it is containing judge's
18 addresses, social security numbers, those types of
19 things, it would go into press review queue if
20 confidential was not checked had confidential been part
21 of the configuration?
22       A. Yes, that is correct.
23       Q. And does Tyler provide any type of
24 indemnification to the courts -- and, in this instance,
25 it would be the State of Idaho -- if confidential

---

20  (Pages 186 to 189)

Courthouse News Service v. Omundson                              30(b)(6) Terry Derrick - Vol. II

| Page 190 | Page 192 |
|---|---|

**Page 190**

1　documents are wrongly, you know, put into the press
2　review queue?
3　　A.　No, we do not.
4　　Q.　Now, I know if we take a look at Exhibit 9, we
5　had some questions that were ultimately answered. "We"
6　being Jennifer Dvorak, had some questions that were
7　ultimately answered by Tyler related to architecture and
8　dataflow diagrams.
9　　　Do you have an understanding that those have
10　not yet been provided to the State of Idaho at
11　Ms. Dvorak's request?
12　　A.　Yes, I do have that understanding.
13　　Q.　Okay. And why has Tyler not provided those
14　items?
15　　A.　Because those items for the Press Review Tool
16　do not exist.
17　　Q.　Do they exist for other Tyler products?
18　　A.　Yes, they do.
19　　Q.　Do they exist for the case management system?
20　　A.　Yes, I believe so.
21　　Q.　Do they exist for File & Serve?
22　　A.　Yes, they do.
23　　Q.　And have they been provided to the State of
24　Idaho with respect to those two applications?
25　　A.　I'm not sure.

**Page 191**

1　　Q.　I assume if the State of Idaho were to ask for
2　those, if they don't already have them related to those
3　two items, would they be provided?
4　　A.　Under the appropriate security provisions, I
5　believe so.
6　　Q.　Okay. Now, I know that there was a response
7　on this Exhibit 9.
8　　　MS. MITCHELL: Do you know which part?
9　　Q.　(By Ms. Duke) Let me just have Molly take a
10　look at something and I can ask you some other questions
11　while she does that.
12　　A.　Okay.
13　　Q.　So we talked about -- we talked about -- or,
14　have not talked about in your deposition yet, something
15　called "API," Tyler's API. Can you tell me what that
16　is?
17　　A.　Yeah, API stands for application interface.
18　　Q.　It's Ms. Dvorak's testimony that Tyler was
19　thinking it would have API available at the end of
20　September or end of Q3, and that that has not yet come
21　to fruition; is that correct?
22　　A.　No, that's incorrect. It was developed and
23　made available to our customers on September 23rd.
24　　Q.　All right. Do you know if the State of Idaho
25　has been advised of that in any way?

**Page 192**

1　　A.　I don't believe so. I saw some correspondence
2　earlier this week that would lead me to believe that
3　they hadn't.
4　　Q.　Now, the API, just describe when a customer
5　gets that -- it sounds like that occurred at the end of
6　September, what happens with API if a customer gets that
7　from Tyler?
8　　A.　Yeah. Sure. It's just a specification
9　document that essentially allows for the customer to
10　build their own version of a Press Review Tool, if you
11　will, calling it whatever name they deem appropriate.
12　But it would allow for them to have access to the
13　filings before a clerk makes a determination on them, so
14　after they've been submitted.
15　　Q.　And so the API is -- is it provided to
16　customers at no charge?
17　　A.　To our contract holders, yes.
18　　Q.　If you're not a contract holder, what is Tyler
19　paying -- or, you know, having folks pay for the API?
20　　A.　We're not making those available to anyone
21　outside of our contract holders.
22　　Q.　All right. Now, if you're a contract holder,
23　that means then that the State of Idaho would then have
24　to go obviously work with a team to then take the API
25　and actually build its own -- own computer application?

**Page 193**

1　　A.　Yes, that is correct.
2　　Q.　And I'm assuming you've done no looking into
3　how much that would cost the State of Idaho to do?
4　　A.　No, I wouldn't know that information.
5　　Q.　Okay. But certainly this isn't like a
6　plug-and-play. This is a, "Here's information, now
7　you've gotta go build an entire program off of it."
8　　A.　That's right. There's a development effort
9　required in order to build a solution that would --
10　would work. The APIs just simply provide a mechanism to
11　gain access to those filings that are currently
12　available in the Press Review Tool.
13　　Q.　Is Tyler looking to transition from providing
14　the Press Review Tool to instead transitioning to
15　providing its API or is it intending to do both?
16　　A.　No, we -- we plan to do both. We're just
17　trying to provide our customers with multiple options to
18　better serve them.
19　　Q.　Okay. Why did Tyler begin this process of
20　allowing API to be provided to its customers?
21　　A.　It was -- it was requested by several
22　customers.
23　　Q.　Obviously, the cost of using press review
24　queue API, there would be hardware costs to the court;
25　is that fair to assume?

21 (Pages 190 to 193)

Courthouse News Service v. Omundson                           30(b)(6) Terry Derrick - Vol. II

Page 194

1    A.  It's -- it's hard to speculate that, but
2  the -- the development of the program must reside
3  somewhere.
4      Q.  Okay.  Certainly, there would be personnel
5  costs.
6      A.  If -- if the application were to be supported,
7  yes.
8      Q.  Costs of developing the press review queue
9  software that would then interface with the API and
10  actually function?
11      A.  Yeah, that's the development effort.
12      Q.  Okay.  So costs to develop; right?
13      A.  I'm sorry?
14      Q.  Costs to develop it?
15      A.  Yes, that's correct.
16      Q.  I'm assuming hosting costs.
17      A.  It -- I think that depends upon where -- where
18  the State of Idaho chose to host it.  You know, whether
19  it be a cloud -- commercial cloud solution or whether
20  it's hosted on-premise.
21      Q.  Okay.  If hosted on-premise, they would
22  obviously need the -- the servers to do so?
23      A.  That's correct.
24      Q.  If hosted in a cloud, it would obviously need
25  a contract for whatever the price of that contract was

Page 195

1  to host it in the cloud?
2      A.  That's correct.
3      Q.  Now, currently, the press review queue for
4  Tyler is hosted by AWS; is that correct?
5      A.  That is correct.
6      Q.  It was Silverlight until October of 2021?
7      A.  No.  That -- it was hosted in Tyler's databank
8  data center and we migrated it to AWS.  It's -- it's
9  always been on the same software.
10      Q.  Where does Silverlight factor into what Tyler
11  has provided to the State of Idaho?
12      A.  Yeah.  Silverlight was the old version of our
13  review tool for the clerks.
14      Q.  Oh, okay.
15      A.  We've migrated away to an HTML5 version that
16  now exists.
17      Q.  So the clerk review tool was on Silverlight
18  and is now on AWS?
19      A.  Silverlight is a software technology and AWS
20  is a hosting location, so the clerk review tool was on
21  Silverlight.  It's now on an HTML5 version.  It was also
22  in databank, which is the Tyler data center.  It was
23  now in the AWS GovCloud.
24      Q.  Got it.
25          What courts have accepted, you know, or gotten

Page 196

1  Tyler's API as the -- as of when it became available at
2  the end of September?
3      A.  I don't have a comprehensive list.  I do know
4  the State of California has access to them.
5  Specifically the --
6      Q.  Do you know --
7      A.  No.
8      Q.  And, sorry, you were saying?
9      A.  I was saying specifically the Judicial Council
10  in California.
11          And to finish your other question, no, I'm not
12  aware of any others.
13      Q.  All right.  We have that document up,
14  Exhibit 9.
15          You'll see there, there's a question by
16  Ms. Dvorak that says:  "Is ISC data hosted and stored
17  separately from other customers?"
18          And the answer was:  "Idaho's data isn't
19  physically separated, but it isn't accessible from other
20  customers as it is stored within its own database."
21          Do you see that?
22      A.  Yes, I do.
23      Q.  Has Tyler had any issues with users that were
24  registered in one state court being able to access data
25  from another state court's system?

Page 197

1      A.  No, it wouldn't be possible.
2      Q.  So is Tyler aware that, for instance, the
3  State of Washington was able to access Idaho's Odyssey
4  File & Serve and vice versa?
5      A.  No.
6      Q.  Has -- it's also my understanding Tyler has
7  not provided a letter from AWS that it is a customer in
8  good standing; is that correct?
9      A.  That's correct.
10      Q.  And Tyler has represented, in this Exhibit 9,
11  Page 5303, in the middle there:  "Are you able to
12  provide a letter from AWS that you are a customer in
13  good standing and which AWS environment ISC data will be
14  stored, processed, and transmitted?"
15          And you see the answer there?
16      A.  Yeah, I'm sorry.  I'm having a tough time
17  trying to locate it.  Where is it?
18          MS. DUKE:  Oh, can you make it bigger,
19  Molly?
20          THE DEPONENT:  Oh, I see it now.
21      Q.  (By Ms. Duke)  Okay.
22      A.  Yes.
23      Q.  And is that a correct response by Tyler?
24      A.  Yeah.  AWS isn't willing to provide us a
25  letter.  I don't think they do provide those letters.

22  (Pages 194 to 197)

Courthouse News Service v. Omundson                      30(b)(6) Terry Derrick - Vol. II

| Page 198 | Page 200 |

Page 198

1  So, yeah, we're not able to obtain one, but we do have
2  the majority of our customers in AWS operating today.
3      Q.  And would -- and that's the case with whether
4  you're in press review queue, File & Serve, case
5  management -- or not case management -- I'm sorry --
6  File & Serve or press review queue?
7      A.  That's correct.  The majority of our customers
8  on electronic filing in File & Serve and the Press
9  Review Tool are in AWS.
10     Q.  You'll see a little bit farther down, it talks
11 about what cadence or regular process is used to perform
12 serving patching.
13         Do you see that little section a couple
14 paragraphs down?
15     A.  Yes, I do, at the very bottom.
16     Q.  Do you see how it notifies:  "We do not
17 provide details of scan or penetration test results"?
18     A.  No, that appears to be cut off on the screen.
19     Q.  Oh, she'll move it up.
20     A.  Yes, I do see that.  Mm-hmm.
21     Q.  And it sounds like although she has asked for
22 that related to the SOC report -- or, no, strike that.
23         Despite the fact she's asked for that related
24 to Tyler, Tyler has not been willing to provide that
25 information; is that correct?

Page 199

1      A.  That's correct.  That's for security reasons.
2      Q.  And do you know if Microsoft performs any type
3  of patching on the press review server?
4      A.  Microsoft doesn't, no.
5      Q.  And does Tyler?
6      A.  Yes.  We -- we provide updates to the hardware
7  in which our software exists on.  Microsoft doesn't, but
8  we do.
9      Q.  And do you have documents that you would share
10 with the State of Idaho to confirm that?
11     A.  No, but they're informed of those updates.
12 They're notified when we make them.
13     Q.  All right.  Let go to Exhibit 6.
14         Are you aware of Doug Hansen with the State of
15 Idaho asking Tyler for the infrastructure requirements,
16 process, and policies around it, and the security
17 documentations for the press review queue?
18     A.  That's what we're looking at here?
19     Q.  Correct.
20     A.  Yeah.  Give me just a second, please.
21     Q.  Yeah, no problem.
22         MS. DUKE:  He might need you to scroll
23 through.
24     Q.  (By Ms. Duke) Just let Molly know if you need
25 to scroll.

Page 200

1      A.  Okay.  I don't know if I've seen this email
2  thread, but it appears to be some of the same questions
3  that we were discussing earlier regarding watermarks and
4  security.
5      Q.  Okay.
6      A.  APIs.
7      Q.  And it's your -- oh, sorry.
8      A.  I was just saying the APIs.
9      Q.  And it's your understanding that no watermarks
10 or any type of -- of item could be placed on a press
11 review queue display, and that's because it's actually
12 displaying the original document?
13     A.  That's correct.  It is technically feasible,
14 but it isn't an option today.  It would have to be
15 developed that way.
16     Q.  Okay.  Now, I know that -- and this is
17 separate and apart from press review queue, but I
18 understand there was a Portal issue in California
19 related to the California State Bar's Odyssey Portal.
20 Do you -- do you have that knowledge?
21     A.  Yes, I have -- I have a little bit.
22     Q.  Okay.  And what's your understanding of -- of
23 how that breach occurred in the State of California with
24 respect to the State Bar's Odyssey Portal?
25     A.  It didn't -- it wasn't with regards to the

Page 201

1  Press Review Tool.
2      Q.  No, I understand that.  Correct.
3         What tool was it with respect to?
4      A.  It was the online repository tool that we have
5  called Odyssey Portal.
6      Q.  And it's my understanding the reason it
7  happened was there was a -- I guess, a check that could
8  be made in the portal itself and that with that check
9  being in there it permitted access that was
10 unanticipated or unexpected.  Is that a proper
11 understanding?
12         MS. PETRONIO:  I'm just going to --
13 (inaudible).
14         THE STENOGRAPHER:  I can't hear you.
15         MS. PETRONIO:  I'm just objecting to the
16 form of the question.  I'm actually not going to let him
17 answer that because it's the subject of pending
18 litigation, and I think it's an inaccurate
19 characterization of what happened.  But, also, he's not
20 designated on that topic, so I think it would be a
21 mistake for us to let him answer that.
22         MS. DUKE:  All right.  Thank you.
23     Q.  (By Ms. Duke) So you were designated, as
24 Item No. 6, as somebody that could identify the courts
25 that implemented Auto-Accept and/or the Press Review

23  (Pages 198 to 201)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 202

1  Tool for civil, criminal, or other categories of
2  filings, including courts that have used Tyler-provided
3  APIs to implement the Press Review Tool.
4          I think we can take that last part out,
5  because that's just come out, and I doubt those -- those
6  courts are up and running yet with that; is that fair?
7      A.  Yes, that is correct.
8      Q.  So just the first part of that, do you have a
9  list of -- of the courts that have, in fact, implemented
10 Auto-Accept Review and/or Press Review Tool?
11     A.  Yeah.  I don't -- I don't have that
12 comprehensive list in front of me.  I do know that there
13 are about 25 of each, and I can give you a handful of
14 each, but I don't have that list in front of me now.
15     Q.  I'm assuming that's a list you could give your
16 counsel and she could just send us an email with it?
17     A.  If it's appropriate, yeah.
18     Q.  It's something we asked for in this 30(b)(6),
19 so I can appreciate it's hard for you to remember 25
20 different courts for each of those various programs, so
21 if it's easier to have that in a list you email to us or
22 in a list we take a quick break on and you read it, it
23 doesn't matter to me.
24         If you can give me a couple examples, that
25 would be great, for each.

Page 203

1      A.  Yeah.  Sure.  And I think I provided them
2  earlier, but I'm happy to restate them.  So for the
3  Auto-Accept, you know, the State of Maryland; the State
4  of Maine; the State of Vermont; Harris County, Texas;
5  and, the Los Angeles Superior Court in California.
6          For the Press Review Tool, Gwinnett County,
7  Georgia; Fulton County, Georgia; DeKalb County, Georgia;
8  Travis County, Texas; and, Clark County, Nevada.
9      Q.  All right.  Has Tyler been made aware of any
10 complaints as to -- oh, strike that.  I already asked
11 you that so don't worry about that.
12         All right.  I believe I already asked you this
13 but it's been a long day for all of us.  Has Tyler
14 received any reports of any security breaches related to
15 its press review queue?
16     A.  We have not.
17     Q.  Now, I know we also had identified Topic 19,
18 which is a document that Tyler sent to CNS related to
19 CNS sending to various courts the PowerPoint that we've
20 been going through with you today.
21         Are you aware of that?
22     A.  Yes, I am.
23     Q.  All right.  And what was Tyler's concern with
24 respect to Mr. Girdner's forwarding of that PowerPoint
25 to those courts?

Page 204

1      A.  We -- we had received some concern from some
2  of our customers regarding feedback, specifically that
3  it -- it was perceived as Tyler and Courthouse News were
4  in a partnership of some sort and we just wanted to be
5  clear that that wasn't the case.
6      Q.  Do Tyler and Courthouse News have any
7  partnership whatsoever?
8      A.  We do not.
9      Q.  Exhibit 4 asked -- to the deposition notice
10 asked that CNS provide to Tyler the communications that
11 CNS was sending to the courts at issue.
12         Do you know if CNS has done that?
13     A.  I do not.
14     Q.  And do Tyler and CNS have any type of
15 arrangement with respect to CNS advocating for the
16 implementation of a press review queue in the federal
17 court in the state of Idaho?
18     A.  We do not.
19     Q.  Did Tyler have an understanding prior to
20 this -- the 30(b)(6) notices, in this case, as to what
21 CNS has identified to the court as options for the Idaho
22 Courts related to CNS's request for an injunction in
23 this case?
24     A.  No.
25     Q.  I'm assuming that Tyler will not be

Page 205

1  representing to the Idaho Federal District Court Judge,
2  Judge Nye, that Tyler is taking a position that the
3  State of Idaho State Courts should, in fact, implement
4  the press review queue through Tyler either through its
5  application or its API; is that correct?
6      A.  That is correct.  We would not take a position
7  on that.
8      Q.  And that is also the same case with respect to
9  Auto-Accept?
10     A.  That is correct, yeah.  We -- our role as a --
11 in our partnership with the Idaho State Court is to
12 serve our partner.  And -- and we provide software and
13 then provide the direction of additional options of
14 configuration and availability of those options, but
15 take the direction as to which of those we implement by
16 the -- by our customers, so we're here to serve our
17 customers.
18     Q.  I will tell you that Mr. Girdner has
19 represented to the federal judge in this case,
20 Judge Nye, that Tyler has implemented its press review
21 queue for free with courts; is that correct?
22     A.  Yeah.  Historically, we have made it available
23 to a few courts for free.
24     Q.  All right.  And is that the process that Tyler
25 is following now?

24 (Pages 202 to 205)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 206

1    A.  No, it is not.  In fact, the Press Review Tool
2  was built for a specific county, Clark County, Nevada,
3  in 2014, as part of their agreement, and was provided a
4  few times thereafter for free.  As it started to gain
5  traction, we ended up realizing that there was a true
6  expense associated with it as more and more customers
7  started to use it.  And so for those courts that do have
8  it for free, upon their contract renewal for their
9  e-filing platform, those -- those topics are being
10 revisited.
11    Q.  And now as we've discussed before, at a
12 minimum, the Idaho Courts would need to pay a $108,000
13 subscription and likely higher given the security
14 protocols that it has asked for Tyler to confirm and
15 adopt?
16    A.  Yes.  108,000 for the subscription license.
17 And if that security provision was a requirement, then,
18 yeah, that would likely be factored into the offering.
19    Q.  Would you agree that Auto-Accept does not
20 substitute for a clerk's review of a document?
21    A.  I can't answer that.  That's subjective, and I
22 think it -- it depends upon each clerk's business
23 process as to whether or not that's a realistic
24 assessment.
25           (Pause in the proceedings.)

---

Page 207

1    Q.  (By Ms. Duke)  Okay.  Is Tyler aware, in this --
2  this lawsuit, that CNS has represented the following to
3  our federal district court, "Cost:  Finally, defendant
4  claims Tyler provided a recent quote of 108,000 per year
5  to configure a press review queue raising serious
6  questions about the ability of private companies to
7  profit from the public record at the expense of the
8  First Amendment.  An unreasonable vendor 'does not allow
9  Idaho Courts to abdicate their responsibility to provide
10 timely access to public court records.' Defendant and
11 this court should be extremely skeptical of this quoted
12 price tag as Tyler has installed its press review queue
13 feature for numerous other courts at no charge."
14    I'll represent that that's in the Reply in
15 Support of Plaintiff Courthouse News' Motion for
16 Preliminary Injunction on Page 10.
17    Has Tyler provided numerous other courts the
18 press review at no cost or no charge?
19    A.  I think your first question was:  Was I aware
20 of this?
21    Q.  Correct.
22    A.  The answer is no.
23    Q.  Okay.
24    A.  The second question is:  Have I -- have we
25 provided that access to numerous.  Numerous is a

---

Page 208

1  subjective term, so I'd have to understand how many
2  numerous is.
3    As I stated just a few moments ago, we have
4  provided it historically for free, but each of those
5  contracts are being revisited upon renewal.
6    Q.  How many contracts have had it for free?
7    A.  I don't know that number off the top of my
8  head.
9    Q.  Is it most of them?  A few of them?  Half of
10 them?  Any estimate?
11    A.  Let's see.  The first -- let me see if I can
12 get this right.  We implemented the solution and created
13 it for Clark County, Nevada, in 2014.  Over the course
14 of the next four years, it was adopted by two other
15 courts, which I believe got it for free.  And since then
16 it has been adopted by the remaining 23, which I believe
17 the majority of those are paying for.
18    Q.  Okay.  And regardless of past practice, Tyler
19 has determined that given Tyler's costs and the market
20 for the product, the press review queue will carry at
21 least a minimum $108,000 subscription cost per year?
22    A.  That is correct for a statewide implementation
23 like the State of Idaho.
24    Q.  Did -- were you involved -- was Tyler involved
25 at all with respect to the Arizona Courts recently

---

Page 209

1  developing a press review queue?
2    A.  No.  Unfortunately, we don't have the e-filing
3  business in the state of Arizona yet.
4    Q.  And do you know who does?
5    A.  I do not.
6    MS. DUKE:  Okay.  I'm just looking
7  through my notes here real quick.  I know we're close.
8    MR. FETTERLY:  I know we're close, and I
9  also have just a few follow-up questions based on this
10 afternoon's session, so I wanted to just put that out
11 there.
12    MS. PETRONIO:  Well, let me just say he's
13 already 30 minutes late for an event that he's hosting
14 at his house, so anything you can do to keep this as
15 brief as possible is much appreciated.
16    MR. FETTERLY:  Maybe I can ask them while
17 Keely's looking through her notes?
18    MS. DUKE:  Sure.  Go for it.
19
20      E X A M I N A T I O N
21 BY MR. FETTERLY:
22    Q.  Mr. Derrick, just a few follow-ups here.
23 There was some testimony about -- a lot of testimony
24 about documents submitted to the court and received into
25 the EFM and the eFile & Serve.

---

25  (Pages 206 to 209)

Courthouse News Service v. Omundson                        30(b)(6) Terry Derrick - Vol. II

---

Page 210

1    Who owns the documents that are submitted to
2  and received by the EFM and eFile & Serve?
3         MS. DUKE: Object to the form.
4  Foundation. Legal conclusion.
5         THE DEPONENT: Yeah. I -- I can't speak
6  to the ownership of those documents. It's -- I don't
7  know if it's still the filer or --
8     Q. (By Mr. Fetterly) As between Tyler or the
9  court?
10        MS. DUKE: Same objections.
11        THE DEPONENT: Yeah. Tyler provides the
12 software. We don't own any of the documents or data
13 that is traversing through.
14    Q. (By Mr. Fetterly) And the court's case
15 management -- or, the Odyssey Case Management System is
16 hosted in Idaho by Idaho but it's Tyler's application;
17 correct?
18    A. Yes, that is correct.
19    Q. And we were also talking about the -- the
20 document that's Exhibit 1 to the Courthouse News
21 subpoena being prepared for Texas. I just want to
22 clarify, it's my understanding that document was
23 prepared for Texas, but the Press Review Tool app was
24 not prepared for Texas; is that correct?
25    A. Yes, that is correct.

---

Page 211

1     Q. Tyler doesn't have different -- different
2  Press Review Tool apps per state; correct?
3     A. Yes. Each individual state is a different
4  implementation and that's a different instance of that
5  application. It's the same application, but it -- just
6  like we said before, it's not the same, so Idaho's would
7  be different than Texas would be different than
8  California's.
9     Q. Correct. So the configurations vary by state
10 or by court, but the app itself does not -- correct? --
11 otherwise.
12    A. The app itself is not a multi-tenant app like
13 our review tool is for the clerks. So there are
14 different instances of that app in each one of those
15 states.
16    Q. Counsel was asking you questions about the
17 ability to watermark documents in the Press Review Tool.
18 Could Tyler develop that for its customers if the
19 customers requested it?
20    A. Yeah. I mean, we're capable of doing that,
21 sure.
22    Q. Earlier, there was testimony regarding
23 issues -- counsel was asking questions about potential
24 issues with filing fees being accurate or correct in the
25 Auto-Accept paradigm.

---

Page 212

1    Have courts using Auto-Accept -- have they
2  actually had the kind of payment issues defense counsel
3  described?
4         MS. DUKE: Objection. Foundation.
5         THE DEPONENT: Yeah. I'm -- I'm not
6  intimately familiar with those issues if they have
7  transpired.
8     Q. (By Mr. Fetterly) Would Tyler have the ability
9  to create or develop a configuration for the auto-review
10 so that a -- a fixed or hard amount would be required in
11 order to meet the conditions for Auto-Accept?
12    A. Yeah. I mean, we could -- we're a technology
13 company. We could develop a lot of things, sure.
14    Q. So if the filing fee is $225, a condition
15 could be configured or developed such that if $225 is
16 the filing fee, then conditions says "yes, could be
17 Auto-Accept," and if it is not then, "no, not
18 Auto-Accept." Is that -- that could be developed?
19        MS. DUKE: Foundation.
20        THE DEPONENT: Yeah. We would have to
21 get the technical teams involved in the scoping of that,
22 but...
23    Q. (By Mr. Fetterly) Okay. Is Amazon Web Services
24 GovCloud FedRAMP-approved?
25    A. I -- I don't know. I don't know if they are.

---

Page 213

1     Q. Does Tyler have any concerns about the
2  security provided by AWS GovCloud relative to the
3  documents submitted to eFile & Serve?
4     A. No, we do not.
5     Q. The -- do you have any reason to believe the
6  information on Idaho's case management system is more
7  secure than the information on the EFM hosted by Tyler?
8         MS. DUKE: Objection. Foundation. He
9  testified he didn't know what any of our safety
10 protocols were.
11        THE DEPONENT: Yeah. I can't speak to
12 any of the security configurations or setting or
13 protocols leveraged in an environment that's not owned
14 by Tyler.
15    Q. (By Mr. Fetterly) Are there any ways in which
16 the Press Review Tool presents security issues that
17 would not also be presented by File & Serve?
18        MS. DUKE: Object to the form.
19 Foundation. Overbroad. And, actually, he's already
20 testified to some.
21        THE DEPONENT: I'm sorry. Say that one
22 more time?
23    Q. (By Mr. Fetterly) Yeah. I'm just -- are there
24 any ways in which the Press Review Tool presents a
25 security issue that would not be also presented by

---

26 (Pages 210 to 213)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 214

1   File & Serve?
2          MS. DUKE:  Same objections.  He's already
3   testified to some.
4          Go ahead.
5          THE DEPONENT:  Yeah.  I -- the Press
6   Review Tool is -- yeah.  I mean, we would -- we would
7   monitor both and -- and do what we can to protect both.
8          Q.  (By Mr. Fetterly) Okay.  And then defendant's
9   counsel was asking whether Tyler indemnifies clients
10  based on improper use of documents accessed via the
11  Press Review Tool.
12         Does Tyler indemnify clients based on improper
13  use of documents accessed via the EFM?
14         A.  I'm not sure if we do.  I'd have to look at
15  the contract.
16         Q.  Same question with respect to the case portal.
17         A.  The Odyssey Portal?
18         Q.  Odyssey Portal.
19         A.  Yeah.  I'm not familiar with those contracts.
20  I would have the look into them.
21         Q.  I think last one here.  Does -- does
22  eFile & Serve comply with the Idaho's cloud-based terms
23  and conditions?
24         MS. DUKE:  Object to the form.
25  Foundation.  Asked and answered.

---

Page 215

1          THE DEPONENT:  Yeah.  The -- those --
2   those were established after the agreement that we have
3   with them was in place.
4          MR. FETTERLY:  Thank you.  I have nothing
5   further.
6          MS. DUKE:  One last quick question.
7          THE DEPONENT:  I did --
8          MS. DUKE:  Oh, go ahead, Mr. Derrick.
9          THE DEPONENT:  I was just going to say
10  one follow-up that I owed you, Mr. Fetterly, is the
11  document type is not the filing type, when we were
12  talking about that in terms of the Press Review Tool and
13  how it pertains to the EFSP.  The document type is
14  related to the document security groups, which,
15  unfortunately, in the exhibits, I did not see that
16  screen which is another click or two down from the
17  screen that you did provide.
18         Q.  (By Mr. Fetterly) Okay.  So just to clarify
19  real quick, I'm looking at the Exhibit 1 to the
20  subpoena, we just talked about the document type.  I
21  know my question about document type was also related to
22  filing code.
23         We do see filing code here on the conditions;
24  correct?
25         A.  Right.  For the Auto-Accept, but it isn't

---

Page 216

1   available on the conditions for the Press Review Tool.
2          Q.  I see.  I see.  So that filing code there is
3   not available for the Press Review Tool.  It is
4   available for the Auto-Accept.
5          And just so we're clear on that, I'm now
6   putting that back up on to the screen.  And so here we
7   have the filing code.  This would be a condition to be
8   configured for the Auto-Accept; correct?
9          A.  Correct, but not for the Press Review Tool.
10         Q.  Gotcha.  Thank you for clarifying.
11         A.  You're welcome.
12         Q.  And just for the record, I'm showing the
13  witness Exhibit No. 37, CNS 013289, where we have the
14  filing code menu pulled down.
15
16          E X A M I N A T I O N
17  BY MS. DUKE:
18         Q.  Mr. Derrick, I'll go ahead and ask a couple
19  follow-ups here and then we'll get you back there to get
20  you to your party.
21         A.  Okay.  Thank you.
22         Q.  You were just asked questions by Mr. Fetterly,
23  of, oh, Tyler could do this, Tyler could do that if a
24  client asked.
25         Tyler's going to charge a fee to do certain

---

Page 217

1   things like that, isn't it?
2          A.  Absolutely.
3          Q.  So those are not things that come free?
4          A.  That is correct.
5          Q.  Has CNS, at any point in time, reached out to
6   Tyler and tried to contract with Tyler to make the cost
7   associated with the press review queue less laborious on
8   the state courts?
9          A.  Not that I'm aware of.
10         Q.  Has Tyler -- excuse me -- has CNS, at any
11  point in time, reached out to Tyler to offer making
12  Auto-Accept more plug-and-play for each of the courts?
13         A.  Not that I'm aware of.
14         Q.  All right.  Thanks a lot for your time today.
15  We appreciate it.
16         MR. FETTERLY:  Thank you, Terry.
17         THE DEPONENT:  Hopefully, this was
18  helpful.
19         MS. DUKE:  It was very helpful.  Thank
20  you very much.
21         MR. FETTERLY:  Very helpful.  Thank you
22  very much.  We appreciate your time.
23         (Deposition concluded at 4:06 p.m.)
24         (Signature reserved.)
25         --o0o--

27 (Pages 214 to 217)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 218

```
 1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2
 3          The undersigned Certified Shorthand
     Reporter and Deposition Notary Public of the State of
 4   California does hereby certify:
 5          That the foregoing 30(b)(6) deposition of
     Tyler Technologies designee Terry Derrick was taken before
 6   me remotely at the time, at which time the witness was
     duly sworn by me;
 7
            That the testimony of the witness and all
 8   objections made at the time of the deposition were
     recorded stenographically by me and were thereafter
 9   transcribed, said transcript being a true and correct copy
     of the proceedings thereof.
10
            I further certify that I am neither counsel
11   for nor related to any party to said action, nor in any
     way interested in the outcome thereof.
12
            Further, that if the foregoing pertains to
13   the original transcript of a deposition in a federal case,
     before completion of the proceedings, review of the
14   transcript was requested/offered on the
     record.
15
16
            In witness whereof, I have subscribed my
17   name on this 15th day of November 2022
18
19
20
21          Nicole A. Bulldis, RPR
            CA CSR No. 14441
22
23
24
25
```

28 (Page 218)

ER-764



# DEPOSITION TRANSCRIPT NOTICE

**DATE:**  11/15/2022

**TO:**   Beth W. Petronio

**CASE NAME:**   Courthouse News Service v. Omundson

**WITNESS:**  30(b)(6) Terry Derrick - Vol. I

**DATE TAKEN:**  11/10/2022

> Reading and signing was requested pursuant to FRCP Rule 30(e).  The above transcript must be read, and the Errata and/or Declaration signed within 30 days of this notice or before the trial date.  Otherwise, signature will be deemed waived for all purposes.  Please contact the witness and arrange a convenient time and place for reading and signing.  Please submit the signed original Errata and/or Declaration to this office. The form(s) may be emailed to info@buellrealtime.com, mailed to Buell's address in the footer of this letter or faxed to 206.287.9832.

Buell Realtime Reporting, LLC

CC:
Jonathan G. Fetterly
Keely Duke

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com



# E R R A T A

**CASE NAME:**   Courthouse News Service v. Omundson

**DATE TAKEN:** 11/10/2022

**WITNESS:**   30(b)(6) Terry Derrick - Vol. I

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 71 | 9 | on this light | in this |
| 86 | 4 | that document take | that document takes |
| 103 | 11 | Tool was -- it | Tool |
| 103 | 15 | filings surface | filings surface or |
| 106 | 17 | referred | referenced |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**  Courthouse News Service v. Omundson

**DATE TAKEN:** 11/10/2022

**WITNESS:**  30(b)(6) Terry Derrick - Vol. I

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

_____
30(b)(6) Terry Derrick - Vol. I

Signed on the _____5_____ day of _____December_____, 202_2_ .

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066   Tacoma 253.235.0111
e-mail production@buellrealtime.com   www.buellrealtime.com

**ER-767**

# EXHIBIT 7
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | |
| vs. | **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION** |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke Evett,

PLLC, hereby provides objections, answers, and responses to Plaintiff's First Set of Interrogatories,

Requests for Production of Documents, and Requests for Admissions.

## **INTERROGATORIES**

INTERROGATORY NO. 1:  State all reasons or justifications supporting the policy or

practice of withholding access to new e-filed civil complaints filed with the Idaho District Courts

until after those complaints have been Processed or Accepted.

ANSWER TO INTERROGATORY NO. 1:  Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-1

**ER-769**

grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered in the Court's case management system, until it has been Processed and Accepted.

Subject to and without waiver of this objection, Omundson responds that the policies and justifications for not providing access to documents that have been submitted but not yet Processed or Accepted are as follows: (1) the public is not provided with access to documents that have not been Processed or Accepted because such documents are not filed and not entered in the court's case management system until they have been Accepted. Providing documents to the public before they are in the court's case management system may mislead the public to believe documents are court filings when they are not yet filed and may never be filed; (2) Tyler Technologies' Auto Accept function has not been implemented because this would allow documents to be filed, and therefore become part of the official record, even if the filing requirements that exist in Idaho Court Rules (e.g. payment of a filing fee and redaction requirements) have not been met or the action had been filed in an improper jurisdiction or venue, which would require judicial action that would add to the already incredibly busy schedules of judges and their court staff; (3) in addition, the Auto Accept function has not been implemented because it creates additional work for Idaho's already busy judges and a privacy risk to litigants and third parties (e.g. publication of sensitive information in a court submission), which would require judicial action to correct; (4) Tyler Technologies' Press Review Queue presents similar concerns because submissions that are Rejected could be published and/or reported on even though such submissions are not yet court filings, do not exist in the court's case management system or in a court file, and may never be entered in the Court's case management system; (5) the Press Review Queue does not have any function to ensure that the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-2

security settings of documents are accurately reflected, that sensitive information about litigants and/or third parties contained in a submission (e.g. a petition for a civil protection order) will be redacted or otherwise not made available to the press and/or public, whereas the clerks can Reject an improperly redacted submission to ensure confidential information remains protected and can set the proper security setting to a document based upon Idaho Court Administrative Rule 32; (6) the Press Review Queue presents resource concerns because there is a subscription cost, hardware costs, and costs associated with personnel needed to manage the Press Review Queue; and (7) the Press Review Queue presents potential cyber security risks.

In addition, Omundson refers CNS to the Affidavit of Margaret Molchan (Dkt. 20-14); the Affidavit of Judge Hippler (Dkt. 20-16), the Affidavit of Carley Nelson (Dkt. 20-20), and the Declaration of Marissa Garza (Dkt. 23-1).

INTERROGATORY NO. 2:    State all reasons or justifications for not providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to all reasons for not providing access to those complaints through a Press Review Queue or through Auto Accept.

ANSWER TO INTERROGATORY NO. 2: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

INTERROGATORY NO. 3: Describe in detail all concerns or issues, if any, with

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-3

providing or utilizing a Press Review Queue for new e-filed civil complaints filed with Idaho District Courts, including the basis for any such concerns or issues.

ANSWER TO INTERROGATORY NO. 3:  Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

INTERROGATORY NO. 4:  Describe in detail all concerns or issues, if any, with providing access to new e-filed civil complaints filed with Idaho District Courts through Auto Accept, including the basis for any such concerns or issues.

ANSWER TO INTERROGATORY NO. 4: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

INTERROGATORY NO. 5:  Identify all governmental interests that You contend could not be adequately protected by providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with the Idaho District Courts prior to Processing or Acceptance, including the basis for Your contention(s) with respect to each such governmental interest.

ANSWER TO INTERROGATORY NO. 5: Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-4

grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1. Omundson further responds that the government has an interest in ensuring that confidential information of litigants and/or third parties is not made available to the press or the public. Auto Accept and the Press Review Queue undermine this governmental interest for the reasons discussed in the Answer to Interrogatory No. 1. The government also has an interest in ensuring that the press and public are presented with accurate information regarding civil filings.  The Press Review Queue could result in the publication of inaccurate information regarding civil filings (i.e. if  a submission that is Rejected, and thus never filed or an official court document, is reported on as if it were a filed document and an official court record.).  The government also has an interest in conserving judicial and administrative resources. Auto Accept and the Press Review Queue do not further these interests because there are subscription, hardware and personnel costs associated with remaining the Press Review Queue and Auto Accept could result in improper filings that would require judicial action and resources to correct.

INTERROGATORY NO. 6:  Identify by name, title and committee affiliation (if any) all persons associated with the AOC's office who considered or evaluated Courthouse News' requests to access new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to any persons who considered or evaluated the requests in Courthouse News' letters dated April 28, 2016, and June 24, 2021.

ANSWER TO INTERROGATORY NO. 6: Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-5

grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson responds  that Michael Henderson and Janica Bisharat reviewed CNS' letter dated April 28, 2016. At that time, Mr. Henderson was Legal Counsel to the Idaho Supreme Court and Administrative Office of the Courts and Ms. Bisharat was the Director of the Court Management Division.     Omundson and Jason Spillman reviewed CNS' letter dated June 24, 2021. Omundson is the Administrative Director of Idaho Courts and Mr. Spillman is Legal Counsel to the Administrative Office of the Courts.

INTERROGATORY NO. 7:  Identify by name, title, employer and committee affiliation (if any) all persons with whom the AOC's office communicated when considering or evaluating Courthouse News' requests to access new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to any persons who considered or evaluated the requests in Courthouse News' letters dated April 28, 2016, and June 24, 2021.

ANSWER TO INTERROGATORY NO. 7:  Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to the individuals identified in her response to Interrogatory No. 6.  Omundson further responds that she communicated with Chief Justice

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-6

Richard Bevan, Mr. Spillman and Renae Bieri with respect to the June 24, 2021 letter. Michael Henderson had email communications with Karen Yacuzzo (First Assistant Legal Counsel for the Colorado State Court Administrator's Office) and Catherine Nelson Zacharias (Legal Counsel for the Office of the State Court Administrator (Missouri)) relating to the implementation of a Press Review Queue. Those emails are produced at SO 000460-463.

INTERROGATORY NO. 8: Identify by providing the Case Name and Case Number all instances in which pre-Acceptance review by Idaho District Courts personnel resulted in sealing or other confidential handling of a new e-filed civil complaint that otherwise would have been available for viewing by members of the public.

ANSWER TO INTERROGATORY NO. 8: Omundson objects to this interrogatory as overly broad, unduly burdensome, and disproportionate to the needs of this case. Omundson further objects to the interrogatory to the extent it requests disclosure of cases that are currently sealed. Omundson further objects to this interrogatory on the grounds that it is vague. Subject to and without waiver of these objections, Omundson responds that, as phrased, the interrogatory assumes that complaints are mislabeled as "public" by the filer and then changed to sealed or exempt status by the clerks. However, clerks assign the case type (which applies the security level) and document security upon Acceptance. Based on the process that is in place, there are no instances of a sealed or confidential civil complaint being "otherwise . . . available for viewing by members of the public" but for correction by clerks during the pre-Acceptance review; it is the pre-Acceptance review that results in the assignment of a document security level.

INTERROGATORY NO. 9: Identify by name, title and job description each person currently employed by the AOC in its Information Division.

ANSWER TO INTERROGATORY NO. 9: Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-7

grounds that it is overly broad, unduly burdensome, disproportionate to the needs of this case, seeks information that is not relevant, and is beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, Omundson refers CNS to the documents produced at SO 000001, 000335-459.

INTERROGATORY NO. 10:  For each of the years 2020, 2021, 2022, and 2023, identify the monetary budget allocated to the AOC and each of its divisions, including but not limited to the Information Division.

ANSWER TO INTERROGATORY NO. 10:  Omundson objects to this interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, Omundson responds that the AOC is not independent; it is part of the Idaho Supreme Court and does not have its own separate budget. The AOC manages a spending plan for each fiscal year which includes funding for the Idaho Supreme Court, the Idaho Court of Appeals, the Administrative Office of Courts, and the trial courts. The actual spending of funds may change throughout the year and funds may be reallocated to different divisions throughout the year. Omundson refers CNS to the spending plans for fiscal years 2020-2023 produced at SO 000257-334.

INTERROGATORY NO. 11:  For each of the years 2020 and 2021, identify the amount and source of revenue generated by the AOC and/or any Idaho District Court from the sale of judicial documents, including but not limited to revenue generated from individual copies and/or certified copies of documents, subscription services, and/or any revenue generating or sharing agreements with Tyler Technologies.

ANSWER TO INTERROGATORY NO. 11: Omundson objects to this interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-8

(Dkt. 42). Subject to and without waiver of these objections, Omundson responds that the AOC does not sell any judicial documents. By statute, elected county clerks may charge $1.00 per page for the service of photocopying documents and may charge a fee for the service of certifying a document. Clerks are not required to assess these charges and many do not.  Counties are not required to report whether they assess the service charges or any amount collected to the AOC. By order of the Supreme Court, the Clerk of the Idaho Supreme Court may charge a fee for providing hard copies of Supreme Court documents. The AOC does not have any subscription services for accessing judicial documents. Tyler Technologies charges a convenience fee for online payments of fines (e.g. parking tickets), and the AOC receives 0.5% of the convenience fee.  Westlaw previously paid the Idaho Supreme Court $6,000 per year to scan any paper filed briefs, but this ended when the Idaho Supreme Court switched to electronic filing.

INTERROGATORY NO. 12:  Identify all AOC, Trial Court Administrator or District Clerk policies and statutes, rules, regulations, or other sources of legal authority that You contend support or require the policy and practice of restricting or prohibiting public or press access to new e-filed non-confidential civil complaints upon receipt by the Idaho District Courts until after Processing or Acceptance, including the basis for your contention(s) with respect to each policy, statute, rule, regulation or other authority cited.

ANSWER TO INTERROGATORY NO. 12: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Omundson further objects to this interrogatory on the grounds that it seeks information not within her custody

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-9

or control; she does not supervise county clerks and does not have copies of their policies. Subject to and without waiver of these objections, Omundson responds that Idaho Rule on Electronic Filing and Service ("IREFS") 3 defines the official court record to be the electronic case file maintained by the court as well as any paper filings and other conventional filings maintained in accordance with court rules. This does not include documents that reside in Tyler Technologies' Online Filing System program. IREFS 13 authorizes court clerks to reject submitted documents that do not comply with the electronic filing rules. Rejected documents are not part of the official court record because they are not included in an electronic case file maintained by the courts. Once a document has been accepted by a clerk it is moved out of the OFS system and placed in the Court's case management system, becoming an official court record pursuant to IREFS 3. At that time the Administrative Office of Courts follows Idaho Court Administrative Rule 32 and any relevant court orders in determining the security status of a document.

INTERROGATORY NO. 13: Identify all tasks performed by Idaho District Court clerks between time of submission of a new e-filed complaint by an e-filer and the time when such complaint is made available for public and press access.

ANSWER TO INTERROGATORY NO. 13: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Omundson further objects to this interrogatory on the grounds that it seeks information not within her custody or control; she does not supervise county clerks. Subject to and without waiver of these objections, Omundson responds that she does not have information responsive to this interrogatory. The AOC

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-10

can provide county clerks with information regarding court processes, but the AOC does not supervise county clerks and thus cannot identify all tasks they perform.  The authorized scope of a clerk's review of submitted documents prior to acceptance and filing is stated in IREFS 13(a): "Documents that do not comply with this rule, or the requirements of the aforementioned Electronic Filing Guide or court policy, may be returned to the filer for correction."

INTERROGATORY NO. 14:  Identify all APIs the AOC and/or any Idaho District Court has received from Tyler Technologies relative to the Idaho eFiling System, including a description or summary of how each API is used or maintained by the AOC and/or any Idaho District Court.

ANSWER TO INTERROGATORY NO. 14:  Omundson objects to this interrogatory on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of this objection, Omundson responds that Tyler Technologies has not provided an API.

INTERROGATORY NO. 15:  State all reasons why the AOC and/or Idaho District Courts stopped requiring filers using the Idaho eFiling System to select document security when filing electronically, as stated in the following "FAQ" on the Idaho iCourt website:

> **Document security designation no longer required.**
>
> **Odyssey File and Serve Feature Changes to Document Security Designation**
>
> Beginning Monday, 8/22, filers using Odyssey and File and Serve will no longer be required to select document security when filing electronically. Previously, filers were required to select either "Public" or "Confidential" on documents filed, and this selection is no longer required. If a filer has a concern of file sensitivity, please add those notes into the filing comments for the clerk to view when submitting the filing.

ANSWER TO INTERROGATORY NO. 15: Omundson responds that some attorneys were marking all submissions as "Confidential," including documents that should have been marked as "Public." This was sometimes occurring in hundreds of cases a day, requiring a great deal of work

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-11

by the clerks to reset the security. Because this feature was using judicial resources and not being used properly, it was disabled. Filers now identify whether they believe a document should be confidential in the filing comments and a clerk will review the document to determine whether it should be public when it is moved to the courts case management system.

INTERROGATORY NO. 16:  Identify and describe all options Tyler Technologies has provided to the AOC and/or Idaho District Courts for providing public or press access to new e-filed non-confidential civil complaints upon receipt by the Idaho District Courts, and prior to Processing or Acceptance.

ANSWER TO INTERROGATORY NO. 16: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson responds Tyler Technologies has notified Omundson that Idaho can, with the addition of certain infrastructure and on-going management, install their Press Review Queue under an annual subscription model at a rate of $108,000 a year.

INTERROGATORY NO. 17:  If You deny Request for Admission No. 12, or any part thereof, describe in detail the basis for your denial.

ANSWER TO INTERROGATORY NO. 17: Omundson incorporates by reference all objections to the Requests for Admission set forth below, and further  objects to this interrogatory and the grounds that it is overly broad and unduly burdensome. Subject to and without waiver of these objections, Omundson refers CNS to its response to the Requests for Admission below.

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-12

## REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1:   Statistics, data, or other compilation of information (preferably in Excel or CVS form), sufficient to identify for each non-confidential civil complaint e-filed  in Idaho District Courts between January 1, 2020 and the present: (a) the date and time of submission of the complaint, (b) the date and time of Acceptance or Rejection of the complaint, (c) the date and time the complaint was made available for press or public access, if applicable, and (d) the amount of time (in calendar days) that elapsed between the submission of the complaint and its being made available for press or public access.

RESPONSE TO REQUEST FOR PRODUCTION NO. 1: Omundson objects to this request for production as overly broad, unduly burdensome and disproportionate to the needs of this case. Subject to and without waiver of these objections, Omundson is in the process of compiling documents responsive to this request and will supplement this response.

REQUEST FOR PRODUCTION NO. 2:   Documents and communications reflecting, evidencing, or sufficient to identify all tasks performed by Idaho District Courts clerks between the time of submission of a new e-filed civil complaint by an e-filer and the time the complaint is made available for public and press access.

RESPONSE TO REQUEST FOR PRODUCTION NO. 2: Omundson objects to this request for production as overly broad, unduly burdensome, disproportionate to the needs of this case, and on the grounds that it seeks documents that are not within her possession, custody or control; she does not supervise county clerks. Subject to and without waiving these objections, please see the documents produced at SO 000465-475.

REQUEST FOR PRODUCTION NO. 3: Documents sufficient to show the form and content of notice(s) provided to litigants informing them that a new e-filed civil complaint has been (i)

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-13

submitted to Idaho Courts, (ii) Accepted by Idaho Courts, and (iii) Rejected by Idaho Courts.

RESPONSE TO REQUEST FOR PRODUCTION NO. 3: Please see the documents produced at SO 000250-252.

REQUEST FOR PRODUCTION NO. 4:  All training and operating manuals for the Idaho eFiling System in effect at or used by the AOC and/or the Idaho Courts.

RESPONSE TO REQUEST FOR PRODUCTION NO. 4: Omundson objects to this request for production on the grounds that it seeks documents that are not within her possession, custody or control; she does not supervise county clerks. Subject to and without waiving this objection, please see the documents produced at SO 000555-001629.

REQUEST FOR PRODUCTION NO. 5:  Documents evidencing or reflecting any policy in effect at the Idaho Courts concerning district court clerk Acceptance or Processing of new electronically submitted civil complaints.

RESPONSE TO REQUEST FOR PRODUCTION NO. 5: Omundson objects to this request for production on the grounds that it seeks documents that are not within her possession, custody or control; she does not supervise county clerks. Subject to and without waiving this objection, Omundson refers CNS to the IREFS and the documents produced at SO 000555-001629.

REQUEST FOR PRODUCTION NO. 6:  Documents sufficient to reflect or evidence filing codes for each civil case category, case type, and case subtype available for case-initiating electronic filings in Idaho Courts.

RESPONSE TO REQUEST FOR PRODUCTION NO. 6: Please see the documents produced at SO 000014-18, 000464.

REQUEST FOR PRODUCTION NO. 7:  Documents sufficient to reflect or evidence each of the rejection or return codes used by Idaho Courts to identify the reason for Rejection of

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-14

an e-filed civil complaint.

RESPONSE TO REQUEST FOR PRODUCTION NO. 7: Please see the documents produced at SO 000253-256.

REQUEST FOR PRODUCTION NO. 8: For each e-filed civil complaint Rejected by Idaho Courts, Documents evidencing or reflecting the reason for Rejection.

RESPONSE TO REQUEST FOR PRODUCTION NO. 8: Omundson objects to this request for production on the grounds that it is overly broad, unduly burdensome, and disproportionate to the needs of this case. Omundson further objects to this Request for Production on the grounds that it is not limited in time; Omundson is only producing data within the time limits set forth in Request for Production No. 1. Omundson further objects to this Request for Production on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson is in the process of compiling documents responsive to this request and will supplement this response.

REQUEST FOR PRODUCTION NO. 9: All Documents evidencing or reflecting internal communications of the AOC concerning the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints in Idaho Courts prior to Acceptance or Processing, including but not limited to providing access through a Press Review Queue or Auto Accept.

RESPONSE TO REQUEST FOR PRODUCTION NO. 9: Omundson objects to this request for production on the grounds that it seeks documents that are protected by the attorney-client

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-15

privilege. Subject to and without waiving this objection, Omundson identifies the documents produced at SO 000019-249.

REQUEST FOR PRODUCTION NO. 10: All documents evidencing or reflecting communications between the AOC, on the one hand, and the Trial Court Administrators and/or District Clerks, on the other hand, the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints prior to Acceptance or Processing, including but not limited to providing access through a Press Review Queue or Auto Accept.

RESPONSE TO REQUEST FOR PRODUCTION NO. 10:    Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 11: Documents evidencing or reflecting communications between the AOC and Tyler Technologies concerning the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints prior to Acceptance or Processing, including but not limited to providing access through a Press Review Queue or Auto Accept.

RESPONSE TO REQUEST FOR PRODUCTION NO. 11: Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 12:    All Documents evidencing or reflecting communications between the AOC or Idaho District Courts, on the one hand, and any other state court or state court administrator, on the other hand, concerning the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-16

civil complaints prior to Acceptance or Processing.

RESPONSE TO REQUEST FOR PRODUCTION NO. 12: Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 13: All Documents evidencing or reflecting communications between the AOC, on the one hand, and Tyler Technologies, on the other, concerning any development, implementation or testing of a Press Review Queue or Auto Accept system for the Idaho District Courts, including any draft or final contracts, agreements, amendments or addenda.

RESPONSE TO REQUEST FOR PRODUCTION NO. 13: Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 14: All Documents evidencing or reflecting any process by or through which either the AOC or Idaho District Courts considered whether to provide Courthouse News, other members of the press, or the public with access to new e-filed civil complaints prior to Processing or Acceptance, including but not limited to any consideration of providing access through a Press Review Queue or through Auto Accept.

RESPONSE TO REQUEST FOR PRODUCTION NO. 14: Please see the documents produced at SO 000002-13, 000019-249.

REQUEST FOR PRODUCTION NO. 15: All contracts or agreements, including any amendments thereto, with Tyler Technologies concerning the Idaho eFiling System or public access to e-filed documents, including but not limited to contracts or agreements relating to Odyssey File & Serve or the Press Review Queue.

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-17

RESPONSE TO REQUEST FOR PRODUCTION NO. 15:  Please see the documents produced at SO 000476-554.

REQUEST FOR PRODUCTION NO. 16:  A current organization chart for the AOC and each of its divisions.

RESPONSE TO REQUEST FOR PRODUCTION NO. 16:  Please see the documents produced at SO 000001 and 000450-459.

REQUEST FOR PRODUCTION NO. 17:  All documents evidencing or reflecting the reason(s) why the AOC and/or Idaho Courts stopped requiring filers using the Idaho eFiling System to select document security when filing electronically.

RESPONSE TO REQUEST FOR PRODUCTION NO. 17:  Please see the documents produced at SO 000219-234.

REQUEST FOR PRODUCTION NO. 18:  If you deny any of Request for Admission Nos. 3 or any portion thereof, all documents evidencing or reflecting the basis for your denial.

RESPONSE TO REQUEST FOR PRODUCTION NO. 18:  Omundson objects to this Request for Production on the grounds that it is overly broad and unduly burdensome and on the grounds that the responses to Request for Admission speak for themselves. Subject to and without waiving these objections, please see the documents produced herewith.

**REQUESTS FOR ADMISSION**

REQUEST FOR ADMISSION NO. 1:  Admit that the AOC maintains the Idaho Judicial Branch's website (https://isc.idaho.gov).

RESPONSE TO REQUEST FOR ADMISSION NO. 1:  Omundson admits only that the AOC maintains the content on the Idaho Judicial Branch's website. The website is hosted by ITS, the State's information technology department.

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-18

REQUEST FOR ADMISSION NO. 2:  Admit that the AOC maintains the iCourt website (https://icourt.idaho.gov).

RESPONSE TO REQUEST FOR ADMISSION NO. 2: Omundson admits only that the AOC maintains the content on the iCourt website. The website is hosted by ITS.

RESPONSE TO REQUEST FOR ADMISSION NO. 3:    Admit the AOC does not have a written policy concerning Idaho Court clerk or staff review of electronically submitted documents  for improperly filed confidential documents or information.

RESPONSE TO REQUEST FOR ADMISSION NO. 3:  Deny. The AOC follows the written policies of the Idaho Supreme Court which appear in the IREFs including IREF 7 regarding clerk review of documents that a filer has identified as confidential and IREF 13 regarding the rejection of submissions that do not comply with court rules.

REQUEST FOR ADMISSION NO. 4:  Admit that, prior to August 22, 2016, filers using Idaho's eFiling System were required to select a document security of either "Public" or "Confidential" when filing documents electronically.

RESPONSE TO REQUEST FOR ADMISSION NO. 4: Omundson objects to this Request for Admission as vague since Twin Falls County was the only Idaho county using the eFiling system prior to August 2016. Subject to and without waiver of this objection, Omundson admits that prior to August 22, 2016, users of the e-filing system were required to select documents as either "Public" or "Confidential."

REQUEST FOR ADMISSION NO. 5:  Admit that as of August 22, 2016, filers using Idaho's eFiling System are no longer required to select a document security when filing documents electronically.

RESPONSE TO REQUEST FOR ADMISSION NO. 5: Omundson objects to this Request

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-19

for Admission as vague since Twin Falls County was the only Idaho county using the eFiling system prior to August 2016. Subject to and without waiver of this objection, Omundson admits that Idaho's e-filing system no longer requires users to select documents as either "Public" or "Confidential."

REQUEST FOR ADMISSION NO. 6:  Admit that as of June 15, 2022, You have not asked Tyler Technologies to provide a Press Review Queue for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 6: Omundson admits that as of June 15, 2022, she has not asked Tyler Technologies to provide a Press Review Queue for the Idaho Courts based on the security concerns and costs associated with the Press Review Queue set forth in her answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 7:  Admit as of June 15, 2022, you have not at any time attempted to negotiate or lower any price quoted by Tyler Technologies for a Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 7: Omundson admits that as of June 15, 2022, she has not attempted to negotiate or lower any price quoted by Tyler Technologies for a Press Review Queue, however cost concerns are not the sole reason for her decision to not implement a Press Queue. Omundson refers Plaintiffs to her response to Interrogatory No. 1 regarding the reasons for not implementing a Press Review Queue. Omundson further responds that questions relating to the price of the Press Review are inconsistent with CNS' representations to the Court that the Press Review Queue is free. *See e.g.* Dkt. 14-1 at 6.

REQUEST FOR ADMISSION NO. 8:  Admit that as of June 15 2022, You have not asked Tyler Technologies to provide an Auto Accept system for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 8:  Omundson admits that as of June

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-20

15, 2022, she has not asked Tyler Technologies to provide an Auto Accept System for the Idaho Courts based on the concerns with Auto Accept set forth in her answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 9:  Admit that You are aware that Tyler Technologies has agreed to deliver the APIs for the Press Review Queue to its partners.

RESPONSE TO REQUEST FOR ADMISSION NO. 9: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it does not define "partners." Subject to and without waiver of this objection, Omundson admits that she is aware that Tyler Technologies has represented it will deliver APIs for the Press Review Queue. She has been told that Tyler Technologies is reporting that the delivery of an API is now delayed from the original projected date and that there is not a clear time frame for delivery.

REQUEST FOR ADMISSION NO. 10:  Admit that You are aware that Tyler Technologies will not charge AOC an additional cost to deliver the APIs for the Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 10:  Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it assumes there are costs associated with the Press Review Queue but does not identify what those costs are. Subject to and without waiver of these objections, Omundson denies this request for admission.

REQUEST FOR ADMISSION NO. 11:  Admit Tyler Technologies has not informed the AOC it will charge the AOC an additional cost to deliver the APIs for the Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 11: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it assumes there are costs associated with the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-21

API but does not identify what those costs are. Subject to and without waiver of these objections, Omundson admits only that she has not had discussions with Tyler Technologies regarding costs associated with the API.

REQUEST FOR ADMISSION NO. 12:   Admit that, using the APIs for the Press Review Queue, the AOC can provide the press or public with access to new complaints electronically submitted to the Idaho Courts in the same, or a substantially similar, manner as the Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 12: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and that it assumes Tyler Technologies has provided the AOC with information about the functionality of the APIs. Subject to and without waiver of this objection, Omundson admits only that she has not had discussions with Tyler Technologies regarding the functionality of the APIs.

DATED this 22nd day of July, 2022.

DUKE EVETT, PLLC

By  /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of July, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke _____

Keely E. Duke

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-23

**VERIFICATION**

STATE OF IDAHO                  )

                                         :ss

County of Ada                    )


     SARA OMUNDSON, being first sworn, deposes and states:

     I am the Defendant in this case, I have read the foregoing DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, and believe the facts and statements set forth in the responses to Interrogatories are true and correct to the best of my knowledge, information, and belief.


                        _____
                        SARA OMUNDSON


SUBSCRIBED AND SWORN to before me this _____day of July, 2022


                        _____
                        NOTARY PUBLIC FOR IDAHO
                        Residing at Ada County, Idaho
                        My Commission Expires:_____

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-24

**ER-792**

# EXHIBIT 8
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke

Evett, PLLC, hereby provides objections, answers, and responses to Plaintiff's Second Set of

Requests for Production of Documents, and Requests for Admissions.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 13:** Admit the document attached hereto as

Exhibit 1 is an authentic, genuine and true copy of an email sent by Michael Henderson

to Artie Pepin on or about November 10, 2016.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:** Omundson objects to this Request for Admission on the grounds that she does not have access to Michael Henderson's email, and thus has no way of verifying that Exhibit 1 is an authentic, genuine and true copy of an email sent by Michael Henderson. Subject to and without waiver of this objection, Omundson admits that the email address listed in Exhibit 1 was the true and correct email address for Michael Henderson when he worked as Legal Counsel for the Idaho Supreme Court/Administrative Office of the Courts and Omundson further responds that she has no reason to believe that Exhibit 1 is anything other than a true and correct copy of an email sent by Michael Henderson to Artie Pepin on November 10, 2016.

DATED this 23rd day of September, 2022.


DUKE EVETT, PLLC


By: /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*


**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of September, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw.com |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |


/s/Keely E. Duke_____
Keely E. Duke


DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION - 2

# EXHIBIT 9
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson ("Omundson"), by and through her counsel of record, Duke Evett,

PLLC, hereby provides objections, answers, and responses to Plaintiff's Third Set of Interrogatories.

## **INTERROGATORIES**

**INTERROGATORY NO. 18:** Identify each category of civil complaint available for filing

in the Idaho District Courts that You contend must be kept confidential by the Idaho District Courts

by operation of rule or law (including categories of civil complaints You contend are "exempt from

public disclosure"), without the need for a motion or request for sealing.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 1

**ANSWER TO INTERROGATORY NO. 18:** Omundson objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of this objection, Omundson refers CNS to Idaho Court Administrative Rule 32(g) and the documents produced at SO 005360-5364. There are no documents for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) that must be kept confidential by the Idaho District Courts by operation of rule or law without the need for a motion or request for sealing.

**INTERROGATORY NO. 19:** For each category You identified in response to Interrogatory No. 18, state the number of civil complaints in that category or type e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022.

**ANSWER TO INTERROGATORY NO. 19:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests. Subject to and without waiver of these objections, and based on the definitions of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that 9,833 civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 2

**INTERROGATORY NO. 20:** State the number of civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022 with a motion or request for sealing.

**ANSWER TO INTERROGATORY NO. 20:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that from January 1, 2020 through July 21, 2022, one civil complaint in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) was e-filed between January 1, 2020 and July 31, 2022.

**INTERROGATORY NO. 21:** Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected.

**ANSWER TO INTERROGATORY NO. 21:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague; Interrogatory No. 22 asks about civil complaints that were Rejected, corrected, and then Accepted, so it is unclear if Interrogatory No. 21 is asking for the total number of Rejected civil complaints, or only those that were Rejected and then not resubmitted. Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,642 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected. Omundson calculated this number based on the number of times a civil complaint was Rejected, meaning if a civil complaint was submitted and Rejected four times, each of the filings were counted in calculating this number.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 3

**INTERROGATORY NO. 22:** Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected, subsequently corrected and re-submitted by the filer, and ultimately Accepted.

**ANSWER TO INTERROGATORY NO. 22:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,025 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected, subsequently corrected, resubmitted by the filer, and ultimately Accepted. Omundson calculated this number based on the number of times a civil complaint was Rejected and resubmitted, meaning if a civil complaint was submitted and Rejected and resubmitted four times, each of the filings were counted in calculating this number. Omundson further responds that 28% of rejected filings are missing identifying information that would allow a match with a resubmitted and Accepted filing. These results were also based on the time litigants are allowed to resubmit e-filed complaints before they are considered a new filing (3 days per Rule 13(c) of the Idaho Rules for Electronic Filing and Service).

**INTERROGATORY NO. 23:** Identify the nature and amount of the "hardware costs" associated with a Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**ANSWER TO INTERROGATORY NO. 23:** Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all hardware costs associated with the Press Review Queue. Subject to and without waiver of this objection, Omundson responds that Tyler claims there are no hardware costs associated with the Press Review Queue. Tyler made this claim after the response to Interrogatory

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 4

No. 1 had been served, and the AOC has been in communications with Tyler to get additional information regarding the Press Review Queue.  Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

**INTERROGATORY NO. 24**: Identify the nature and amount of "costs associated with personnel needed to manage the Press Review Queue," as set forth in Your response to Interrogatory No. 1.

**ANSWER TO INTERROGATORY NO. 24**: Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all personnel costs associated with managing the Press Review Queue. Subject to and without waiver of these objections, Omundson anticipates that personnel costs will include, but not be limited to, costs associated with reeducating clerks, staff, attorneys, and litigants about how the Press Review Queue works and answering questions about the Press Review Queue and/or troubleshooting problems with the Press Review Queue. Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

**INTERROGATORY NO. 25:** Identify the "potential cyber security risks" presented by the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**ANSWER TO INTERROGATORY NO. 25:** Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all cyber security risks associated with the Press Review Queue. Subject to and without waiver of this objection, Omundson refers CNS to the document titled "Risk Memorandum" and dated August 18, 2022. Omundson further responds that Tyler has refused to respond to numerous questions from the AOC regarding security concerns with the Press Review Queue. Tyler has refused to provide an answer to the AOC's questions about whether the Press Review Queue provides a link to the original pleading or a copy of the pleading. Providing a link to the original

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 5

document raises serious concerns about document security if the system is hacked because filings could be deleted or altered without any backup to the original document. Tyler has also refused to provide a customer attestation letter from their underlying IaaS provider, AWS, indicating Tyler is a customer in good standing and which environment will be storing, processing, and transmitting Idaho District Court's data. Tyler has also refused to provide the architecture and/or data flow diagram to the AOC so that the AOC can understand the Press Review Queue's backend processes for data transfer. Tyler has also refused to provide its policies and procedures surrounding data security. Even though a Non-Disclosure Agreement has been signed, Tyler refuses to provide these policies and procedures on the grounds that this would allegedly violate company policy. Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

**INTERROGATORY NO. 26:** If personnel of other courts, Tyler Technologies personnel, or any other third party has relayed to AOC personnel any problems, negative experiences, or bad outcomes purportedly arising from the implementation of a Press Review Queue, Auto-Accept, or other method of providing the press or public with pre-Acceptance access to new civil complaints, identify the person who relayed the information and describe in detail the problems, negative experiences, or bad outcomes relayed by that person.

**ANSWER TO INTERROGATORY NO. 26:** Omundson objects to this Interrogatory on the grounds that it is vague and seeks information that is not relevant and is beyond the scope of the Discovery Plan (Dkt. 42). Given this Interrogatory is not related to the significant problems implementation of Press Review Queue or Auto-Accept would have on Idaho's courts, court staff, clerk staff, and judges, this answer does not list those multitude of issues, inefficiencies, costs, and abuse concerns. Subject to and without waiving these objections, Omundson responds that she has had discussions with other state court administrators regarding generalized concerns about

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 6

publishing submitted but unfiled documents, including how this may undermine public confidence in the courts and the protection of confidential information and documents, and has also had discussions about CNS litigation across the country and the varying standards federal courts have applied. At a Conference of State Court Administrators ("COSCA") in December 2021 in Arizona, concerns were raised by Nancy Cozine, the Oregon State Court Administrator, and other attendees regarding public confidence in the courts and release of protected information. Omundson also attended another COSCA conference in July 2022, which included a panel discussion about CNS litigation and concerns about public confidence in the courts. Laura O'Hanlon was on the panel, but Omundson does not recall who else was on the panel. Omundson also had a conversation with Artie Peppin at a conference in September 2022 regarding the status of CNS' New Mexico lawsuit.

Omundson further responds that Jennifer Dvorak, the Chief Information Security Officer for the AOC, has discussed these concerns with trial court administrators in Oregon and Washington who have expressed similar concerns about Tyler's lack of transparency when it comes to issues of data security.

Omundson is also aware of an alleged data breach involving a Tyler case management portal that resulted in the scraping of confidential information from the California Bar Association's website by judyrecords. It has been reported that over 320,000 confidential records were posted on a third-party site and available from October 2021 to February 2022. The alleged data breach was reportedly due to a previously unknown security vulnerability that allowed the confidential records to be unintentionally scraped.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 7

DATED this 30th day of September, 2022.

DUKE EVETT, PLLC

By /s/Keely E. Duke
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 8

**ER-804**

## VERIFICATION

STATE OF IDAHO          )

                          :ss

County of Ada          )


       SARA OMUNDSON, being first sworn, deposes and states:

       I am the Defendant in this case, I have read the foregoing DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES, and believe the facts and statements set forth in the responses to Interrogatories are true and correct to the best of my knowledge, information, and belief.


                          _____

                          SARA OMUNDSON


SUBSCRIBED AND SWORN to before me this ____day of September, 2022


                          _____

                          NOTARY PUBLIC FOR IDAHO
                          Residing at Ada County, Idaho
                          My Commission Expires:_____

# EXHIBIT 10
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke Evett, PLLC, hereby provides objections, answers, and responses to Plaintiff's Third Set of Interrogatories, Requests for Production of Documents, and Requests for Admissions.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 14:** Admit that the AOC procured a contract with e-filing vendor Tyler Technologies to provide e-filing to the Idaho District Courts using Tyler Technologies' Odyssey File & Serve software program ("File & Serve").

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:** Admit.

**REQUEST FOR ADMISSION NO. 15:** Admit that the Idaho District Courts began implementing mandatory e-filing through File & Serve in 2017.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:** Deny; Idaho District Courts began implementing mandatory e-filing through File & Serve in 2015, not 2017. E-filing became mandatory for different counties over the period of 2015-2018.

**REQUEST FOR ADMISSION NO. 16:** Admit that all Idaho District Courts were transitioned to File & Serve by 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:** Admit.

**REQUEST FOR ADMISSION NO. 17:** Admit that under the default configuration for File & Serve, nonconfidential e-filed civil complaints are not available for viewing by the press or public until after they are "Accepted" by court staff.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:** Denied; all documents are immediately available upon filing, which requires acceptance by a court clerk pursuant to Rule 12 of the Idaho Rules for Electronic Filing and Service.

**REQUEST FOR ADMISSION NO. 18:** Admit that the AOC received the document titled "Auto-Accept Review & Press Review Tool" (produced with bates labels SO 000002-SO 000013 and attached hereto as Exhibit 1) from Tyler Technologies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:** Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson responds that Tyler provided the AOC with the document bates labeled SO 000002-SO 000013.

**REQUEST FOR ADMISSION NO. 19**: Admit that Tyler Technologies offers Auto-Accept Review as a "free, 'out of the box' e-filing function that allows Clerks to automatically accept filings based on a set of conditions," as stated on the page bates-labeled SO 000003 of the document titled "Auto-Accept Review & Press Review Tool" (Exhibit 1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 19**: Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson admits only that she is aware of an "Auto-Accept" function from Tyler Technologies. As to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 20**: Admit that Auto-Accept Review is available to the Idaho District Courts from Tyler Technologies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20**: Denied; the Idaho Supreme Court is responsible for determining whether Auto-Accept Review is available to the Idaho District Courts and the Idaho Supreme Court has chosen not to implement Auto-Accept Review given the incredible burdens such feature would place on the staff at the 44 clerk's offices, judges, and judicial staff across the State of Idaho. As such, it is not available to the Idaho District Courts.

**REQUEST FOR ADMISSION NO. 21**: Admit that Tyler Technologies offers the Press Review Tool as "an application that works in conjunction with eFile & Serve to provide Clerks the option to grant access to filings as soon as they are filed (prior to Clerk review)," as stated on the page bates-labeled SO 000003 of the document titled "Auto-Accept Review & Press Review Tool" (Exhibit 1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:** Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson admits she is aware Tyler Technologies offers a Press Review Tool and that Tyler Technologies has made representations that it works as identified in SO 000003.  Omundson otherwise responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 22:** Admit that the Press Review Queue Tool is available to the Idaho District Courts from Tyler Technologies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:** Denied; the Idaho Supreme Court is responsible for determining whether the Press Review Queue Tool is available to the Idaho District Courts and the Idaho Supreme Court has chosen not to implement the Press Review Queue Tool. As such, it is not available to the Idaho District Courts.

**REQUEST FOR ADMISSION NO. 23:** Admit that the AOC has not calculated the "hardware costs" associated with the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time.  As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press

Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request. Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 24:** Admit that the AOC has not calculated the "costs associated with personnel needed to manage the Press Review Queue," as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time. As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request. Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 25:** Admit that the AOC has not analyzed the "hardware costs" associated with the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 5

Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time.  As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request.  Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 26:** Admit that the AOC has not analyzed the "costs associated with personnel needed to manage the Press Review Queue," as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time.  As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request.  Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 6

**REQUEST FOR ADMISSION NO. 27:** Admit that no personnel of other courts, Tyler Technologies personnel, or any other third party relayed to AOC personnel any problems, negative experiences, or bad outcomes purportedly arising from the implementation of a Press Review Queue or Auto-Accept.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:** Denied; implementation of Press Review Queue or Auto-Accept will create a host of problems for Idaho's courts. In addition, Tyler Technologies itself will advise that most courts do not use a blanket Auto-Accept. For any additional specifics, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

DATED this 30th day of September, 2022.

DUKE EVETT, PLLC

By: /s/Keely E. Duke_____
     Keely E. Duke – Of the Firm
     Molly E. Mitchell – Of the Firm
     *Attorneys for Sara Omundson*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of September, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke_____
Keely E. Duke

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 7

# EXHIBIT 11
# FETTERLY DECLARATION

| From: | no-reply@efilingmail.tylertech.cloud |
|---|---|
| To: | krisw@bannockcounty.us |
| Subject: | Filing Accepted for Case: CV03-21-03817; **********; Envelope Number: 4633181 |
| Date: | Thursday, January 13, 2022 10:08:29 AM |



# Filing Accepted

Envelope Number: 4633181
Case Number: CV03-21-03817
Case Style: **********

The filing below was reviewed and has been accepted by the clerk's office. You may access the file stamped copy of the document filed by clicking on the below link.

| Filing Details | |
|---|---|
| **Court** | Bannock County |
| **Case Number** | CV03-21-03817 |
| **Case Style** | ********** |
| **Date/Time Submitted** | 1/13/2022 9:19 AM MST |
| **Date/Time Accepted** | 1/13/2022 10:08 AM MST |
| **Accepted Comments** | |
| **Filing Type** | Motion to Vacate |
| **Filing Description** | Termination Hearing and Set for Status Conference |
| **Activity Requested** | EFileAndServe |
| **Filed By** | Kris Williams |
| **Filing Attorney** | Kent Reynolds |

| Document Details | |
|---|---|
| **Lead Document** | Motion to Vacate Termination Hearing & Set For Status Conference.pdf |
| **Lead Document Page Count** | 2 |
| **File Stamped Copy** | Download Document |
| This link is active for 30 days. | |

**Please Note:** If you have not already done so, be sure to add yourself as a service contact on this case in order to receive eService.

For technical assistance, contact your service provider
Service Provider Tyler Technologies Odyssey File and
Serve Need Help?
Visit https://odyssey.tylerhost.net/contacts.htm
Email efiling.support@tylertech.com

Please do not reply to this email. It was automatically generated.

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                    Plaintiff,<br><br>    v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>                    Defendant. | Case No: 1:21-CV-00305-DCN<br><br>**DECLARATION OF JONATHAN G. FETTERLY IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[Exhibit 12]** |

DECLARATION OF JONATHAN FETTERLY ISO
MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 12
# FETTERLY DECLARATION



RECEIVED

AUG 2 0 2013

FINANCIAL OFFICE

5101 Tennyson Parkway
Plano, Texas 75024

P: 972.713.3770
F: 972.713.3777

www.tylertech.com

August 28, 2013

Mr. Kevin Iwersen
Idaho Supreme Court
451 W. State Street
Boise, ID 83702

**VIA FEDERAL EXPRESS**

Dear Mr. Iwersen:

Enclosed please find one fully executed original of:

(1) the Software License and Professional Services Agreement

On behalf of everyone at Tyler Technologies, I would like to extend our appreciation
for your confidence in Tyler and the continuing spirit of teamwork that has marked
our relationship to date.

Sincerely,

Ashley Olinghouse
Sales Operations Manager

Enclosure

11.07.2022
30b6 Dvorak
**14**
Buell Realtime Reporting

**ER-819**



## Agreement

This Software License and Professional Services Agreement (this "Agreement") is made and entered into by and between Tyler Technologies, Inc., a Delaware corporation ("Tyler"), and The Idaho Supreme Court (the "Purchaser").

### Background

Purchaser desires to engage Tyler to license certain software and to provide certain professional services related thereto, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein, along with other good and valuable consideration, the receipt and sufficiency of which all parties mutually acknowledge, Tyler and Purchaser agree as follows:

A. Tyler shall furnish the products and services described in this Agreement, and Purchaser shall pay the prices set forth in this Agreement.

B. This Agreement consists of this cover and signature page and the following attachments and exhibits attached hereto and to be attached throughout the Term of this Agreement, all of which are incorporated by reference herein:

- Schedule 1. – Investment Summary

- Exhibit A. – Software License and Professional Services Agreement

- Exhibit B. – Maintenance Support and Services Agreement

- Exhibit C. – Statement of Work

- Exhibit D. – Business Travel Policy

- Exhibit E. – Tyler Technologies Proposal to Idaho Supreme Court's Request for Proposal (RFP), "Statewide Judicial Court Case Management Solution"

IN WITNESS WHEREOF, this Agreement has been executed by a duly authorized officer of each Party hereto to be effective as of the date last set forth below (the "Effective Date"):

**TYLER TECHNOLOGIES, INC.**

Signature: _Bruce Graham_

Date: _8.28.13_

Name: _BRUCE GRAHAM_

Title: _PRESIDENT-C&J_

Address: _5101 Tennyson Parkway_

_Plano, Texas 75024_

**PURCHASER**

Signature: _Patti Tobias_

Date: _8/26/2013_

Name: _Patti Tobias_

Title: _Administrative Director of the Courts_

Address: _451 W. State St_

_Boise, Idaho 83702_

(Exhibit A)
## Software License and Professional Services Agreement

This Software License and Professional Services Agreement is made and entered into as of the Effective Date by and between Tyler and Purchaser.

WHEREAS, Purchaser desires to engage Tyler to license certain software and to provide certain professional services related thereto, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein, along with other good and valuable consideration, the receipt and sufficiency of which all parties mutually acknowledge, Tyler and Purchaser agree as follows:

### 1. CERTAIN DEFINITIONS

1.1.   Agreement means this Software License and Professional Services Agreement, including all exhibits attached hereto and to be attached throughout the Term of this Agreement, all of which are incorporated by reference herein.

1.2.   Business Day means any day, Monday through Friday, excepting any federal holiday.

1.3.   Claims mean any and all claims, liens, demands, damages, liability, actions, causes of action, losses, judgments, costs, and expenses, including reasonable attorneys' fees and expenses.

1.4.   Current Production Software Version means the current production version of Tyler's software listed on the Investment Summary.

1.5.   Defect means any bug, error, malfunction, or other defect in the Licensed Software caused by, arising from, or emanating from the reasonable control of Tyler that renders the Licensed Software in non-conformance with both Tyler's then current published specifications and Purchaser's Specifications for the duration of the Licensed Software Warranty and thereafter with Tyler's then-current published specifications.

1.6.   Documentation means the user's operating manuals and any other materials in any form or media provided by Tyler to the users of the Licensed Software.

1.7.   Embedded Third Party Software means licensed third party software (other than Third Person Software) that is required to provide the functionality of the Licensed Software, which as of the date of this Agreement, consists of the software set forth on Schedule 1 labeled as "Embedded Third Party Software".

1.8.   Escrow Agent means Iron Mountain Intellectual Property Management, Inc.

1.9.   Escrow Agreement means the Master Escrow Service Agreement between Tyler and Escrow Agent.

1.10.   Indemnified Parties mean Purchaser and each of its personnel, agents, successors, and permitted assigns.

1.11.   Investment Summary means the summary of fees and services set forth on Schedule 1.

1.12.   License Fee means the "Total License Fees" as set forth on the Investment Summary, which is due and payable as set forth in Section 3.1.

1.13.   Licensed Property means the Licensed Software and the Documentation.

1.14.   Licensed Software means: (a) the Current Production Software Version; (b) Embedded Third Party Software; and (c) any Local Enhancements.

1.15.   Local Enhancements means any refinement, enhancement, or other customization to the Current Production Software Version to be developed by Tyler per the Investment Summary.

1.16.   Maintenance and Support Fees has the meaning set forth in Exhibit B – Software Maintenance Agreement.

1.17.   Party means, individually, Tyler and Purchaser.

1.18.   Professional Services means those services to install, implement and configure the Licensed Software as described in the Statement of Work and the Tyler response to the RFP to the extent Purchase has elected to purchase the same.

1.19.   Project means the delivery and license of the Licensed Property and the performance of all services to be provided by Tyler in accordance with the provisions of this Agreement.

1.20.   Project Closeout means approval, not to be unreasonably withheld, by the Purchaser that all Licensed Software has been implemented and Professional Services have been fully delivered as specified in the Statement of Work, to include the Purchaser's acceptance of the final report and documentation.

1.21.   Project Manager means the person designated by each Party who is responsible for the management of the Project.

1.22.   Purchaser Modifications means changes, alterations or modifications to the Licensed Software not authorized by Tyler or not performed by Tyler as Local Enhancements.  Purchaser Modification does not include application configuration changes to the Licensed Software.

1.23.   Purchaser's Specifications means the Statement of Work, Tyler's proposal to the RFP to the extent the same applies to software/services purchased by Purchaser hereunder, the Schedules and Appendices hereto.

1.24.   Software Maintenance Agreement means the maintenance and support services agreement attached hereto as Exhibit B.

1.25.   Third Person Hardware means the CPUs, servers, and other hardware to be leased, purchased, or otherwise acquired by Purchaser from a third party that is Minimally Required to operate the Licensed Software and such other CPUs, servers, and other hardware that Purchaser has actually leased, purchased or otherwise acquired and/or may be minimally required in the future to operate the Licensed Software. As used herein, "Minimally Required" means hardware and operating system software meeting the specifications and requirements provided or otherwise approved by Tyler.

1.26.   Third Person Software means the operating systems and other software to be licensed, purchased, or otherwise acquired by Purchaser from a third party that is Minimally Required to operate the Licensed Software and such operating systems and other software that Purchaser has actually licensed, purchased, or otherwise acquired and/or may be minimally required in the future to operate the Licensed Software.

1.27.   Confidential and Proprietary Information means all information in any form relating to, used in, or arising out of Tyler's operations and held by, owned, licensed, or otherwise possessed by Tyler (whether held by, owned, licensed, possessed, or otherwise existing in, on or about Tyler's premises or Purchaser's offices, residence(s), or facilities and regardless of how such information came into being, as well as regardless of who created, generated or gathered the information), including, without limitation, all information contained in, embodied in (in any media whatsoever) or relating to Tyler's inventions, ideas, creations, works of authorship, business documents, licenses, correspondence, operations, manuals, performance manuals, operating data, projections, bulletins, customer lists and data, sales data, cost data, profit data, financial statements, strategic planning data, financial planning data, designs, logos, proposed trademarks or service marks, test results, product or service literature, product or service concepts, process data, specification data, know how, software, databases, database layouts, design documents, release notes, algorithms, source code, screen shots, and other research and development information and data.  Notwithstanding the foregoing, Tyler Confidential and Proprietary Information does not include information that: (a) becomes public other than as a result of a disclosure by Purchaser in breach hereof; (b) becomes available to Purchaser on a non-confidential basis from a source other than Tyler, which is not prohibited from disclosing such information by obligation to Tyler; (c) is known by Purchaser prior to its

receipt from Tyler without any obligation of confidentiality with respect thereto; or (d) is developed by Purchaser independently of any disclosures made by Tyler. This provision shall apply *pari passu* to Purchaser's Confidential Information, to include all court records and data generated or captured by the Purchaser which is not Tyler Confidential and Proprietary Information. In the event of a conflict between this Section and any Non-Disclosure Agreement ("NDA") in place between the parties, the terms of the NDA shall govern.

**2. TITLE AND LICENSE**

2.1. License Grant. In consideration for the License Fee, which shall be due and payable as set forth in Section 3, Tyler hereby grants to Purchaser a non-exclusive, royalty-free, revocable license (and sublicense with respect to the Embedded Third Party Software) to use the Licensed Property for Purchaser's internal administration, operation, and/or conduct of Purchaser's business operations by an unlimited number of users employed by purchaser on an unlimited number of computers and/or computer stations utilized by Purchaser. For purposes of this section, the licensed granted hereunder includes the right of employees of state, county or city entities working on behalf of or with the courts, to include, but not limited to, county or city prosecutors, county or city public defenders, and jail administrative staff to access and use the Licensed Property for conducting court-related duties. Upon Purchaser's payment of the License Fee in full, the foregoing licenses shall become irrevocable, subject to the restrictions on use set forth herein.

2.2. Restrictions. Unless otherwise expressly set forth in this Agreement, Purchaser shall not (a) reverse engineer, de-compile, or disassemble any portion of the Licensed Software or (b) sublicense, transfer, rent, or lease the Licensed Software or its usage. It shall not be a violation of this Section 2.2 for Purchaser to make the Licensed Products available to employees of state, county or city entities working on behalf of or with the courts, to include, but not limited to, county or city prosecutors, county or city public defenders, and jail administrative staff. To the extent Purchaser, or any of the entities to who license is granted in Section 2.1, employs contractors, subcontractors, or other third parties to assist in the Project, Purchaser shall obtain from such third parties an executed Tyler confidentiality agreement prior to such parties being permitted access to Tyler Confidential and Proprietary Information. The above restrictions notwithstanding, to the extent Purchaser utilizes or employs third party service providers needing access to the Licensed Software for the benefit of Purchaser and for conducting Purchaser-related business functions, Purchaser may provide access to the Licensed Software to such third party providers upon Tyler's approval, not to be unreasonably withheld, and conditioned upon the third party executing a Tyler-provided non-disclosure agreement.

2.3. Copies. Purchaser may make and maintain such copies of the Licensed Property as reasonably appropriate for its use and for archival and backup purposes; provided, however, that Purchaser shall retain all proprietary notices, logos, copyright notices, and similar markings on such copies.

2.4. Embedded Third Party Software. The license grant set forth in Section 2.1 includes the right to use any Embedded Third Party Software; provided, however, that if such Embedded Third Party Software requires a separate end user license agreement from the manufacturer, such shall be immediately provided to Purchaser and then thereafter such access to and use of such Embedded Third Party Software shall be according to such terms, conditions, and licenses as are imposed by the manufacturers and/or third party licensors of such Embedded Third Party Software. In the event that no manufacturer's end user license agreement is required, such Embedded Third Party Software shall be subject to the same terms, conditions and restrictions applicable to the Licensed Software contained in this Section 2. All such Embedded Third Party Software shall be included in the License Fee. Tyler shall pass through to Purchaser any and all warranties granted to Tyler by the owners, licensors, and/or distributors of such Embedded Third Party Software. Purchaser shall be responsible for procuring and paying for all Third Person Software.

2.5. Title.

(a) Tyler represents and warrants that it is the owner of all right, title, and interest in and to the Licensed Software (other than Embedded Third Party Software) and all components and copies thereof. Nothing in this Agreement shall be deemed to vest in Purchaser any ownership or intellectual property rights in and to Tyler's intellectual property (including, without limitation, Tyler Confidential and Proprietary Information), any components and copies thereof, or any derivative works based thereon prepared by Tyler.

(b) All training materials developed solely by either Party shall be the sole property of such Party. Any training materials developed jointly by the Parties shall be owned jointly by the Parties, and each Party shall be entitled to exercise all rights of ownership of such materials without any duty to account to the other, subject to Section 9.

(c) All Purchaser data shall remain the property of Purchaser. Tyler shall not use Purchaser data other than in connection with providing the Professional Services pursuant to this Agreement.

2.6. Purchaser Modifications. Tyler shall have no liability pursuant to this Agreement or the Software Maintenance Agreement for any damages or defects to the Licensed Software caused, directly or indirectly, by Purchaser Modifications to the Licensed Software that are implemented without the prior written consent of Tyler.

**3. FEES AND INVOICING**

3.1. License Fee. Purchaser shall pay to Tyler the License Fee in accordance with Schedule 1--Investment Summary.

3.2. Professional Services Charges. Charges for all Professional Services to be performed hereunder shall be invoiced and shall be paid by Purchaser following receipt of invoice in accordance with Section 3.4 and Schedule 1.

3.3. Expenses. Purchaser shall reimburse Tyler for travel (to the extent related to Professional Services authorized hereunder), lodging, and food expenses actually and reasonably incurred by Tyler in performing its professional services herein in accordance with Section 3.4. Tyler shall incur expenses pursuant to the travel expense policy attached hereto.

3.4. Invoice and Payment. Tyler shall invoice Purchaser for Professional Services pursuant to the milestone payment plan contained in Schedule 1 and associated expenses herein on a monthly basis. Each invoice shall state the total invoiced amount and shall be accompanied by a reasonably detailed itemization of services and expenses. Following receipt of a properly submitted invoice, Purchaser shall immediately review the invoice to confirm that the amounts invoiced are proper based upon reference to the said milestone payment plan, the Purchaser Specifications and the applicable travel expense policy and either accept the invoice and immediately process it for payment or dispute the invoice or a part thereof pursuant to Section 17, delineating the reasons for the dispute by reference to the implicated contractual provisions. Invoices or parts thereof not disputed within five (5) business days of receipt shall be deemed accepted. Purchaser shall pay undisputed amounts owing therein thirty (30) days after acceptance. All payments shall be made in U.S. currency. Any undisputed sum not paid when due shall bear interest at a rate of prime rate (as set forth in the Wall Street Journal) plus one percent (1%) per annum or the highest rate allowed by governing law, whichever is less.

3.5. Electronic Payment. Tyler prefers to receive payments electronically. Tyler's electronic payment information is as follows:

| | |
|---|---|
| Bank: | Wells Fargo Bank, N.A. |
| | 420 Montgomery |
| | San Francisco, CA 94104 |
| ABA: | 121000248 |
| Account: | 4124302472 |
| Beneficiary: | Tyler Technologies Inc. – Operating |

**4. PROJECT IMPLEMENTATION**

4.1. Professional Services. Attached hereto as Schedule 1 is Tyler's good faith estimate of the hours and fees associated with the Professional Services to be performed by Tyler for Purchaser, including travel time by Tyler's personnel from Tyler's place of business to and from Purchaser's place of business, and for which Purchaser shall pay pursuant to Section 3.4. Additional services requested by Purchaser which are beyond those hours detailed in Schedule 1 will be billed at Tyler's then current services rates and paid pursuant to Section 3.4.

4.2. Office Space. Purchaser shall, at its sole expense, provide reasonable access to office space, telephone access, network access (including providing Tyler reasonable access to a secure virtual private network connection or other comparable connection for use by Tyler from time to time on a non-dedicated basis), Internet connections, and such other facilities as may be reasonably requested by Tyler for use by Tyler personnel for the purpose of performing this Agreement while such personnel are working on-site and engaged in Project-related services.

4.3. Third Person Hardware and Third Person Software. Purchaser shall be responsible to purchase, install, and configure all Third Person

**ER-822**

Hardware and Third Person Software. Tyler shall have no liability for defects in the Third Person Hardware or Third Person Software.

4.4. Cooperation. Purchaser acknowledges that the implementation of the Project is a cooperative process requiring the time and resources of Purchaser personnel. Purchaser shall, and shall cause its personnel to, use all reasonable efforts to cooperate with and assist Tyler as may be reasonably required to timely implement the Project, including, without limitation, providing reasonable information regarding its operations and reasonable access to its facilities. Tyler shall not be liable for failure to timely implement the Project when such failure is due to Force Majeure (as identified in Section18.15) or to the failure by Purchaser personnel to provide such cooperation and assistance (either through action or omission).

## 5. DELIVERY AND INSTALLATION OF THE LICENSED SOFTWARE

5.1. Delivery; Risk of Loss. Tyler shall deliver the Licensed Software to Purchaser's place of business by electronic means. Risk of loss of the Licensed Software, and media on which such may be delivered, shall remain with Tyler at all times until completed delivery.

5.2. Installation; Diagnostic Testing. Tyler shall install the Licensed Software at Purchaser's place of business. Upon installation, Tyler shall conduct its standard diagnostic evaluation to determine that the Licensed Software is properly installed and shall notify the Purchaser's Project Manager in writing after successful completion thereof.

## 6. VERIFICATION OF THE LICENSED SOFTWARE; FINAL ACCEPTANCE

6.1. Verification Procedure. Upon installation of the Licensed Software, Tyler shall perform its standard test procedures and shall certify to Purchaser that the Licensed Software is in substantial conformance with Tyler's then current published specifications (the "Verification Procedure") and is ready to commence Operational Use.

6.2. Optional Purchaser Validation. Purchaser may, in its sole and absolute discretion, monitor the Verification Procedure by performing its own defined internal validation process to test the software to determine if it substantially complies with both Tyler's then current published specifications and Purchaser's Specifications (without regard to Local Enhancements scheduled to be delivered thereafter). Purchaser may conduct additional Verification Procedure(s) for any Local Enhancements delivered thereafter. Such validation tests shall not be final until confirmed in writing by Purchaser.

6.3. Results Final; Correction. Tyler's verification or Purchaser's validation that the Licensed Software substantially complies with both the then current published Tyler specifications and Purchaser's Specifications shall be final and conclusive except for latent defect, fraud, and such gross mistakes that amount to fraud. In the event said verification / validation becomes other than final, Purchaser's sole right and remedy against Tyler, in addition to whatever other warranty remedies Purchaser may have, shall be to require Tyler to correct the cause thereof at Tyler's sole cost and expense. If Purchaser has made Purchaser Modifications to the software programs, Tyler will not make such corrections, unless such modifications were specifically authorized in writing by Tyler.

6.4. Operational Use. Notwithstanding anything to the contrary herein, Purchaser's use of the Licensed Software for its intended purpose in a production environment ("Operational Use") shall constitute Tyler's verification or Purchaser's validation of the software products, without exception and for all purposes.

6.5. Final Acceptance. When Purchaser agrees in writing that the Licensed Software has commenced Operational Use or is actually used by Purchaser in live production, Purchaser shall be deemed to have "Final Acceptance" of the Licensed Software and the Licensed Software shall be subject to the terms and conditions of the Software Maintenance Agreement for purposes of Defect correction thereafter.

## 7. TRAINING

To the extent that training services are included in Schedule 1, Tyler shall train Purchaser in accordance with a mutually agreeable training plan. The training plan shall outline the training required for personnel to operate the Licensed Software. Tyler shall provide Purchaser personnel with only the number of hours of training for the respective portions of the Licensed Software as set forth in the Schedule 1. Training shall be provided at Purchaser's principal place of business or other site(s) selected by Purchaser. Training shall be performed according to the training plan, but in any event shall be "hands-on" using production-ready versions of the Licensed Software. The courses shall train Purchaser's employees or agents in a manner to provide basic end user training. Purchaser shall be responsible for providing an adequately equipped training facility to operate the Licensed Software.

## 8. MAINTENANCE SERVICES

8.1. Maintenance and Support Agreement. Upon the Effective Date, Tyler shall provide Purchaser with maintenance and support services for the Licensed Software, and Purchaser shall pay the Maintenance and Support Fees.

8.2. Responsibilities of Purchaser. In addition to the other responsibilities set forth herein, Purchaser shall: (a) provide all training of its personnel; (b) collect, prepare, and enter all data necessary for the day-to-day operations of the Licensed Software; (c) retain separate copies of all conversion data delivered to Tyler; (d) provide the computer system on which the Licensed Software will be loaded and operated; (e) provide the requisite networks; (f) maintain an internal help desk function; (g) prior to Project completion, install all changes or updates into the Licensed Software and Third Person Software products that are furnished by Tyler for the purpose of correcting failures of the Licensed Software to conform to, and perform in accordance with, the requirements of this Agreement; and (h) maintain, as part of Purchaser's computer system, a secure Microsoft VPN connection for use by Tyler.

## 9. CONFIDENTIAL AND PROPRIETARY INFORMATION

9.1. Protection of Tyler Confidential and Proprietary Information. Purchaser shall not disclose, disseminate, transmit, publish, distribute, make available, or otherwise convey Tyler Confidential and Proprietary Information, and Purchaser shall not use, make, sell, or otherwise exploit any such Tyler Confidential and Proprietary Information for any purpose other than the performance of this Agreement, without Tyler's written consent, except: (a) as may be required by law, regulation, judicial, or administrative process; or (b) as required in litigation pertaining to this Agreement, provided that Tyler is given advance notice of such intended disclosure in order to permit it the opportunity to seek a protective order. Purchaser shall ensure that all individuals assigned to perform services herein shall abide by the terms of this Section 9.1 and shall be responsible for breaches by such persons.

9.2. Judicial Proceedings. If Purchaser is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand, or other similar process) to disclose any Tyler Confidential and Proprietary Information, Purchaser shall provide Tyler with prompt written notice of such request or requirement so that Tyler may seek protective orders or other appropriate remedies and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by Tyler, Purchaser nonetheless is legally compelled to disclose Tyler Confidential and Proprietary Information to any court or tribunal or else would stand liable for contempt or suffer other censure or penalty, Purchaser may, without liability herein, disclose to such court or tribunal only that portion of Tyler Confidential and Proprietary Information which the court requires to be disclosed, provided that Purchaser uses reasonable efforts to preserve the confidentiality of Tyler Confidential and Proprietary Information, including, without limitation, by cooperating with Tyler to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded Tyler Confidential and Proprietary Information by such court or tribunal.

9.3. This Section 9 shall apply *pari passu* to Purchaser. In the event of a conflict between this Section and any Non-Disclosure Agreement ("NDA") in place between the parties, the terms of the NDA shall govern.

## 10. ESCROW

Tyler maintains an Escrow Agreement with an Escrow Agent under which Tyler places the source code of each major release. Upon Final Acceptance, Tyler will add Purchaser as a beneficiary on its Escrow Agreement. Purchaser will be invoiced the annual beneficiary fee without mark-up by Tyler and is solely responsible for maintaining its status as a beneficiary. Release of the escrowed material shall be governed by the terms of the Escrow Agreement and the use thereof shall be restricted by Sections 2.2 and 10 of this Agreement. Upon request, Tyler shall furnish Purchaser with a copy of its Escrow Agreement.

## 11. REPRESENTATIONS AND WARRANTIES

11.1. Licensed Software Warranty. Tyler warrants that the Licensed Software will, for a period of ninety (90) days after Final Acceptance,

perform in all material respects in accordance with Tyler's then current published specifications and Purchaser's Specifications (the "Licensed Software Warranty Period"). After the Licensed Software Warranty Period, Tyler warrants that for as long as Purchaser continues to receive Maintenance and Support Services, the License Software will conform to Tyler's then-current published specifications. Tyler shall repair or replace all Licensed Software that breaches this Licensed Software Warranty. For as long as Purchaser continues to receive Maintenance and Support Services, upon the discovery of any security vulnerability originating in the Licensed Software, where there is a reasonably foreseeable possibility that unauthorized persons can exploit this vulnerability to access, modify or otherwise alter the Licensed Software, Tyler shall use its commercially reasonable efforts to either: (a) remediate the identified vulnerability; or (b) create reasonable protection against potential unauthorized exploitation of the vulnerability through adjustments to the Licensed Software.

11.2.  Project Personnel.  All Tyler personnel utilized in connection with fulfilling its obligations pursuant to or arising from this Agreement shall be employees of Tyler or, if applicable, Tyler's subcontractor(s), shall be qualified to perform the tasks assigned them, and shall be in compliance with all applicable laws relating to employees generally, including, without limitation, immigration laws.

11.3.  Media Defects.  If Tyler provides Purchaser the Licensed Software on physical media, the media on which the Licensed Software is provided shall, at the time of delivery and installation, be free of Defects in material and workmanship.

11.4.  Pass-Through of Warranties.  Tyler hereby passes through the benefits of all third party warranties that it receives in connection with any product provided to Purchaser.

11.5.  No Actions, Suits, or Proceedings.  There are no actions, suits, or proceedings, pending or, to the knowledge of Tyler, threatened, that shall have a material adverse effect on Tyler's ability to fulfill its obligations pursuant to or arising from this Agreement.

11.6.  Compliance with Laws.  In performing this Agreement, Tyler shall comply with all applicable material licenses, legal certifications, or inspections.  Tyler shall also comply in all material respects with applicable federal, state, and local statutes, laws, ordinances, rules, and regulations.

11.7.  Ownership.  Tyler is a Delaware corporation that is listed for trading on the New York Stock Exchange.  No director, officer, or 5% or more stockholder shall, during the course of this Agreement, receive or confer improper personal benefits or gains associated with the performance of the services outlined in this Agreement.

11.8.  Certain Business Practices.  Neither Tyler nor any of its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in this Agreement by any federal department or agency.  Tyler further represents and warrants that it is not listed on any local, Purchaser, state or federal consolidated list of debarred, suspended, and ineligible contractors and grantees.  No person (other than permanent employees of Tyler) has been engaged or retained by Tyler to solicit, procure, receive, accept, arrange, or secure this Agreement for any compensation, consideration, or value.

11.9.  Illicit Code.  The Licensed Software, when delivered and installed by Tyler, does not contain, and Tyler has not knowingly introduced through any media, any virus, worm, trap door, back door, bomb, bug, or other contaminant or disabling device, including, without limitation, any timer, clock, counter or other limiting routines, codes, commands, or instructions that may have the effect or be used to access, alter, delete, limit, control, damage, or disable any Purchaser property.

**EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 11 OR ELSEWHERE IN THIS AGREEMENT, TYLER DISCLAIMS ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

## 12. LIMITATION OF LIABILITY

TYLER'S LIABILITY TO PURCHASER FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER BASED ON A THEORY OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, SHALL BE LIMITED TO THE TOTAL OF FEES PAID OR TO BE PAID TO TYLER PURSUANT TO THIS AGREEMENT.  THE FOREGOING LIMITATION DOES NOT APPLY TO THE FOLLOWING CIRCUMSTANCES: (1) FRAUD,

GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR (2) FOR BREACH OF SECTION 13.1 (CLAIMS FOR BODILY INJURY AND PROPERTY DAMAGE) OR SECTION 13.2 (INTELLECTUAL PROPERTY INFRINGEMENT).

IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOST REVENUES OR PROFITS, OR LOSS OF BUSINESS OR LOSS OF DATA ARISING OUT OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER THE PARTIES HAVE ADVANCE NOTICE OF THE POSSIBILITY OF SUCH DAMAGE.

## 13. INDEMNIFICATION

13.1.  General – Bodily Injury and Property Damage.  Notwithstanding any other provision of this Agreement, Tyler shall defend, indemnify, hold, and save harmless the Indemnified Parties from and against any and all Claims for bodily injury or property damage sustained by or asserted against Purchaser arising out of, resulting from, or attributable to the negligent or willful misconduct of Tyler, its employees, subcontractors, representatives, and agents; provided, however, that Tyler shall not be liable herein to indemnify Purchaser against liability for damages arising out of bodily injury to people or damage to property to the extent that such bodily injury or property damage is caused by or resulting from the actions, negligent or otherwise, of Purchaser, its agents, contractors, subcontractors, or employees.

13.2.  Intellectual Property.

(a)  Notwithstanding any other provision of this Agreement, if any claim is asserted, or action or proceeding brought against Purchaser that alleges that all or any part of the Professional Services or the Licensed Property, in the form supplied, or modified by Tyler, or Purchaser's use thereof, alone or in combination with an instrumentality provided by Tyler to the extent such infringement would not occur but for said combination, infringes or misappropriates any United States intellectual property, intangible asset, or other proprietary right, title, or interest (including, without limitation, any copyright or patent or any trade secret right, title, or interest), or violates any other contract, license, grant, or other proprietary right of any third party, Purchaser, upon its awareness, shall give Tyler prompt written notice thereof.  Tyler shall defend, and hold Purchaser harmless against, any such claim or action with counsel of Tyler's choice and at Tyler's expense and shall indemnify Purchaser against any liability, damages, and costs resulting from such claim.  Without waiving any rights pursuant to sovereign immunity, Purchaser shall cooperate with and may monitor Tyler in the defense of any claim, action, or proceeding and shall, if appropriate, make employees available as Tyler may reasonably request with regard to such defense.  This indemnity does not apply to the extent that such a claim is attributable to unauthorized modifications to the Licensed Property made by Purchaser, or any third party pursuant to Purchaser's directions, or upon the unauthorized use of the Licensed Software by Purchaser.

(b)  If the Licensed Property becomes the subject of a claim of infringement or misappropriation of a copyright, patent, or trade secret or the violation of any other contractual or proprietary right of any third party, Tyler shall, at its sole cost and expense, select and provide one of the following remedies, which selection shall be in Tyler's sole discretion: (i) promptly replace the Licensed Property with a compatible, functionally equivalent, non-infringing system; or (ii) promptly modify the Licensed Property to make it non-infringing; or (iii) promptly procure the right of Purchaser to use the Licensed Property as intended.

## 14. TAXES

14.1.  Tax Exempt Status.  Purchaser is a governmental tax-exempt entity and shall not be responsible for any taxes for any Licensed Property or services provided for herein, whether federal or state.  The fees paid to Tyler pursuant to this Agreement are inclusive of any applicable sales, use, personal property, or other taxes attributable to periods on or after the Effective Date of this Agreement.

14.2.  Employee Tax Obligations.  Each Party accepts full and exclusive liability for the payment of any and all contributions or taxes for Social Security, Workers' Compensation Insurance, Unemployment Insurance, or Retirement Benefits, Pensions, or annuities now or hereafter imposed pursuant to or arising from any state or federal laws which are measured by the wages, salaries, or other remuneration pay to persons employed by such Party for work performed under this Agreement.

**ER-824**

**15. INSURANCE**

Tyler shall provide, upon the written request of Purchaser (which shall not be less than thirty (30) days after the Effective Date), proof of insurance for and maintain, at Tyler's sole cost and expense, the following insurance coverage issued with an insurance carrier with a Best Key rating of "A VII" or higher: (a) Industrial/Workers' Compensation Insurance protecting Tyler and Purchaser from potential Tyler employee claims based upon job-related sickness, injury, or accident during performance of this Agreement; and (b) Comprehensive General Liability (including, without limitation, bodily injury and property damage) insurance with respect to Tyler's agents and vehicles assigned to perform the services herein with policy limits of not less than $1,000,000 combined single limit per occurrence and $2,000,000 in the aggregate. Purchaser shall be named as an additional insured party and such notation shall appear on the certificate of insurance furnished by Tyler's insurance carrier.

**16. TERM, SUSPENSION, AND TERMINATION**

16.1. <u>Term</u>. The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue until terminated as provided herein.

16.2. <u>Termination for Cause</u>. Either Party may terminate this Agreement for Cause, provided that such Party follows the procedures set forth in this Section 16.2.

(a) For purposes of this Section, "Cause" means either:

(i) a material breach of this Agreement, which has not been cured within ninety (90) days of the date such Party receives written notice of such breach;

(ii) the failure by Purchaser to timely pay when due any fees and expenses owed to Tyler pursuant to this Agreement and any delinquent amounts remain outstanding for a period of thirty (30) days after Tyler provides written notice of its intent to terminate for failure to pay;

(iii) breach of Section 9; or

(iv) if Tyler becomes insolvent or bankrupt, or is the subject of any proceedings relating to its liquidation or insolvency or for the appointment of a receiver or similar officer for it, has a receiver of its assets or property appointed or makes an assignment for the benefit of all or substantially all of its creditors, or institutes or causes to be instituted any proceeding in bankruptcy or reorganization or rearrangement of its affairs.

(b) No Party may terminate this Agreement under Section 16.2(a)(i) unless it cooperates in good faith with the alleged breaching Party during the cure period and complies in good faith with the dispute resolution procedures set forth in Section 17 following such period.

(c) In the event either Party terminates this Agreement pursuant to this Section 16.2, each Party shall return all products, documentation, confidential information, and other information disclosed or otherwise delivered to the other Party prior to such termination and all revocable licenses granted herein shall terminate.

16.3. <u>Termination for Lack of Appropriations</u>. The terms of this Agreement are contingent upon sufficient authorizations and appropriations being or having been made by the Legislature for the performance of this Agreement. If sufficient authorizations and appropriations are not or have not been made by the Legislature, or are discontinued by the Legislature, this Agreement shall terminate upon written notice being given by Purchaser to Tyler. In the event Purchaser terminates this Agreement pursuant to this Section, Purchaser shall pay Tyler for all undisputed services performed and goods delivered at the rates specified herein up through the date of such termination. Purchaser represents that it is a government entity or instrumentality

16.4. <u>Termination for Convenience</u>. Subject to Purchaser's paying all undisputed License Fees, Professional Services fees and Support and Maintenance fees accrued and due prior to the effective date of termination, Purchaser may terminate this Agreement at any time on ninety (90) days' written notice.

16.5. <u>Survival</u>. The following provisions shall survive after the Term of this Agreement: 1; 2; 9; 10; 12; 13; 14; 16; 17; and 18.

**17. DISPUTE RESOLUTION**

Disputes arising out of, or relating to, this Agreement shall first be discussed by the Project Managers. Any dispute that cannot be resolved within five (5) Business Days at the Project Manager level (or such other date as agreed upon by the Project Managers) shall be referred to the individual reasonably designated by Purchaser and Tyler's Vice President of Courts and Justice Systems Division assigned to Purchaser's account ("Intermediary Dispute Level"). Any dispute that cannot be resolved in ten (10) Business Days at the Intermediary Dispute Level shall then be referred to Purchaser's chief executive officer or other individual reasonably designated by Purchaser and Tyler's President of Courts and Justice Systems Division ("Executive Dispute Level"), at such time and location reasonably designated by the Parties. Any negotiations pursuant to this Section 17 are confidential and shall be treated as compromise and settlement negotiations for purposes of the applicable rules of evidence. At the conclusion of any informal dispute resolution efforts, a party may pursue such other remedies as may be available to it in law or equity. The foregoing shall not apply to claims for equitable relief under Section 9.

**18. MISCELLANEOUS**

18.1. <u>Assignment</u>. Neither Party may assign this Agreement or any of its respective rights or obligations herein to any third party without the express written consent of the other Party, which consent shall not be unreasonably withheld.

18.2. <u>Subcontractors</u>. Tyler shall not utilize any subcontractor(s) without the prior written consent of Purchaser's Chief Information Officer, which consent shall not be unreasonably withheld. The approval by Purchaser of Tyler's right to use subcontractor(s) shall not waive or relieve Tyler from Tyler's obligations pursuant to this Agreement.

18.3. <u>Cumulative Remedies</u>. Except as specifically provided herein, no remedy made available herein is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy provided herein or available at law or in equity.

18.4. <u>Notices</u>. Except as otherwise expressly specified herein, all notices, requests or other communications shall be in writing and shall be deemed to have been given if delivered personally or mailed, by certified or registered mail, postage prepaid, return receipt requested, to the Parties at their respective addresses set forth on the signature page hereto, or at such other addresses as may be specified in writing by either of the Parties. All notices, requests, or communications shall be deemed effective upon personal delivery or three (3) days following deposit in the mail.

18.5. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

18.6. <u>Waiver</u>. The performance of any obligation required of a Party herein may be waived only by a written waiver signed by the other Party, which waiver shall be effective only with respect to the specific obligation described therein.

18.7. <u>Entire Agreement</u>. This Agreement constitutes the entire understanding and contract between the Parties and supersedes any and all prior or contemporaneous oral or written representations or communications with respect to the subject matter hereof.

18.8. <u>Amendment</u>. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by the properly delegated authority of each Party. All amendments or modifications of this Agreement shall be binding upon the Parties despite any lack of consideration.

18.9. <u>Severability of Provisions</u>. In the event any provision hereof is found invalid or unenforceable pursuant to judicial decree, the remainder of this Agreement shall remain valid and enforceable according to its terms.

18.10. <u>Relationship of Parties</u>. The Parties intend that the relationship between the Parties created pursuant to or arising from this Agreement is that of an independent contractor only. Neither Party shall be considered an agent, representative, or employee of the other Party for any purpose.

18.11. <u>Governing Law</u>. Any dispute arising out of or relating to this Agreement or the breach thereof shall be governed by the laws of the state of the domicile of Purchaser, without regard to or application of choice of law rules or principles. Tyler consents to the jurisdiction of and to venue

within the state or federal courts located within Purchaser's state of domicile for the resolution of any dispute arising out of or related hereto.

18.12. Audit. Tyler shall maintain complete and accurate records of all work performed pursuant to and arising out of this Agreement. Purchaser may, upon the written request of the Chief Information Officer, audit any and all work or expense records of Tyler relating to materials and/or services provided herein. Purchaser shall provide Tyler twenty-four hour notice of such audit or inspection. Tyler shall have the right to exclude from such inspection any Tyler Confidential and Proprietary Information not otherwise required to be provided to Purchaser to permit Purchaser to perform the audit. Tyler shall make such books and records available to Purchaser during normal business hours. Any such audit shall be conducted at Tyler's principal place of business during Tyler's normal business hours and at Purchaser's sole expense.

18.13. No Third Party Beneficiaries. Nothing in this Agreement is intended to benefit, create any rights in, or otherwise vest any rights upon any third party.

18.14. Contra Proferentem. The doctrine of *contra proferentem* shall not apply to this Agreement. If an ambiguity exists in this Agreement, or in a specific provision, neither the Agreement nor the provision shall be construed against the Party who drafted the Agreement or provision.

18.15. Force Majeure. No Party to this Agreement shall be liable for delay or failure in the performance of its contractual obligations arising from

any one or more events that are beyond its reasonable control, including, without limitation, acts of God, war, terrorism, and riot. Upon such delay or failure affecting one Party, that Party shall notify the other Party and use all reasonable efforts to cure or alleviate the cause of such delay or failure with a view to resuming performance of its contractual obligations as soon as practicable. Notwithstanding the foregoing, in every case the delay or failure to perform must be beyond the control and without the fault or negligence of the Party claiming excusable delay. Any performance times pursuant to or arising from this Agreement shall be considered extended for a period of time equivalent to the time lost because of any delay that is excusable herein.

18.16. Equitable Relief. Each Party covenants, represents, and warrants that any violation of this Agreement by such Party with respect to its respective obligations set forth in Sections 2.2 and 9 shall cause irreparable injury to the other Party and shall entitle the other Party to extraordinary and equitable relief by a court of competent jurisdiction, including, without limitation, temporary restraining orders and preliminary and permanent injunctions, without the necessity of posting bond or security.

18.17. Attorneys' Fees and Costs. If attorneys' fees or other costs are incurred by either Party to secure the performance of any obligations under this Agreement, or to establish damages for the breach thereof or to obtain any other appropriate relief, whether by way of prosecution or defense, the prevailing Party shall be entitled to recover from the other Party its reasonable attorneys' fees and costs incurred in connection therewith.

[Remainder of this page intentionally left blank]

(Exhibit B)
**Maintenance and Support Services Agreement**

In the event of a conflict between anything in this Exhibit B and Exhibit A the terms of Exhibit A shall govern.

## 1. CERTAIN DEFINITIONS

1.1. Terms Not Defined. Terms not otherwise defined herein shall have the meanings assigned to such terms in Exhibit A.

1.2. Business Day means Monday through Friday, excluding Tyler Holidays.

1.3. Business Hour means 7:00 a.m. to 7:00 p.m., Central Time during Business Days.

1.4. Circumvention or Circumvention Procedures means, as applied to a Documented Defect, a change in operating procedures whereby Purchaser can reasonably avoid any deleterious effects of such Documented Defect. If a Circumvention Procedure is not acceptable to Purchaser, Purchaser may escalate this Defect as set forth in Section 3.11.

1.5. Defect means any bug, error, malfunction, or other defect in the Licensed Software caused by, arising from, or emanating from the reasonable control of Tyler that renders the Licensed Software in non-conformance with both Tyler's then current published specifications and Purchaser's Specifications for the duration of the Licensed Software Warranty and thereafter with Tyler's then-current published specifications.

1.6. Documented Defect means a Defect that Purchaser documents for Tyler pursuant to Section 2.1.

1.7. Essential Functionality means any operational aspect of the Licensed Software that is required for immediate and ongoing business continuity by one or more users and which adversely impacts business in a crucial or critical manner.

1.8. Non-essential Functionality means any operational aspect of the Licensed Software that will not interrupt business continuity or which will not adversely impact business in a crucial or critical manner.

1.9. Service Level 1 Defect means a Documented Defect that causes (a) complete application failure or application unavailability; (b) application failure or unavailability in one or more of Purchasers remote location; or (c) systemic loss of multiple essential system functions.

1.10. Service Level 2 Defect means a Documented Defect that causes (a) repeated, consistent failure of Essential Functionality affecting more than one user or (b) loss or corruption of data.

1.11. Service Level 3 Defect means a Service Level 1 Defect with an existing Circumvention Procedure, or a Service Level 2 Defect that affects only one user or for which there is an existing Circumvention Procedure.

1.12. Service Level 4 Defect means a Documented Defect that causes failure of Non-Essential Licensed Software functionality or a cosmetic or other Documented Defect that does not qualify as any other Service Level Defect.

1.13. Third Person Software means all third party software required for the operation and use by Purchaser of the Licensed Software consistent with the license granted to Purchaser.

1.14. Version Release means new versions of the Licensed Software that contain technical improvements, functional enhancements, updates, extensions, and/or maintenance changes to the Licensed Software.

1.15. Tyler Holidays means one (1) day for a New Year's holiday, Good Friday, Memorial Day, a one (1) day holiday for Independence Day, Labor Day, Thanksgiving Day and the day after, and two (2) days during Christmas time. The exact date for any rolling holiday will be published on the Tyler website in advance of the date.

## 2. END USER RESPONSIBILITIES

2.1. Documenting Defects. Purchaser shall use commercially reasonable efforts to document all Defects in writing with sufficient information to recreate the Defect or otherwise clearly and convincingly document or evidence its occurrence, including, but not limited to, the operating environment, data set, user, or any other such information that Tyler may reasonably request. Purchaser shall deliver such information to Tyler concurrently with its notification to Tyler of a Defect. Purchaser shall use all reasonable efforts to eliminate any non-application related issues prior to its notification to Tyler of such Defect, including, but not limited to, issues related to the network, user training, Purchaser-produced extensions, and data problems not caused by the Licensed Software. Any technical or other issue for which Purchaser requests services, but which is not a Documented Defect, shall be treated as a request for other services and governed by Section 5.

2.2. Other Purchaser Responsibilities. Purchaser shall:

(a) maintain all required Third Person Software to the release level compatible with the installed version(s) of the Licensed Software;

(b) establish and maintain an internal help desk to be the central point of contact and communication between the end users and Tyler's support staff. In the event that the Purchaser is unable to establish and maintain an internal help desk, Purchaser may select up to twenty (20) "super users" who may contact Tyler's help desk.

(c) provide training on the Licensed Software to its employees;

(d) allow Tyler to install patches and other maintenance releases provided by Tyler;

(e) allow remote access by Tyler to Purchaser's servers and data via a Microsoft VPN connection or CISCO VPN client or other mutually agreeable protocol, provided, however, that Purchaser acknowledges that failure to provide a timely and practical remote access method may negatively impact Tyler's ability to perform its responsibilities under this M&S Agreement;

(f) implement and perform appropriate data backup and data recovery procedures related to the Licensed Software. In no event shall Tyler be held liable for any loss or other damage associated with the loss or destruction of any data related to the Licensed Software that is attributable to Purchaser's failure to implement and perform such procedures on a timely and regular basis; and

(g) provide onsite installation, new integration, training, and other responsibilities with respect to Version Releases as set forth in Section 6.

## 3. TYLER RESPONSIBILITIES – SUPPORT SERVICES

3.1. General Services for Reporting Production Documented Defects.

(a) Tyler shall provide Purchaser with procedures for contacting support staff during normal business hours (7:00 a.m. to 7:00 p.m., Central Time, Monday through Friday, excluding Tyler Holidays) for reporting Documented Defects. Tyler shall assist Purchaser in the diagnosis of any Documented Defect, including the assigned Service Level and Tyler's tracking number.

(b) For each reported Documented Defect, Tyler shall assign appropriate personnel to diagnose and correct the Documented Defect, and where appropriate, identify Circumvention Procedures. Tyler's initial response shall include an acknowledgement of notice of the Documented Defect, confirmation that Tyler has received sufficient information concerning the Documented Defect, and an action plan for resolving the Documented Defect and avoiding further deleterious consequences of the Documented Defect.

3.2.  Service Level 1 Defects.  Tyler shall provide an initial response to Service Level 1 Defects within one (1) Business Hour of receipt of the Documented Defect.  Tyler shall use commercially reasonable efforts to resolve such Documented Defects or provide a Circumvention Procedure within one (1) Business Day.  Tyler's responsibility for loss or corrupted data is limited to assisting Purchaser in restoring its database to a known, accurate state.

3.3.  Service Level 2 Defects.  Tyler shall provide an initial response to Service Level 2 Defects within four (4) Business Hours of receipt of the Documented Defect.  Tyler shall use commercially reasonable efforts to resolve such Documented Defects  or provide a Circumvention Procedures within five (5) Business Days.  Tyler's responsibility for loss or corrupted data is limited to assisting Purchaser in restoring its database to a known, accurate state.

3.4.  Service Level 3 Defects.  Tyler shall provide an initial response to Service Level 3 Defects within one (1) Business Day of receipt of the Documented Defect.  Tyler shall use commercially reasonable efforts to resolve such Documented Defect without the need for a Circumvention Procedure with the next published maintenance update or service pack, which shall occur at least quarterly.  Tyler's responsibility for lost or corrupted data is limited to assisting Purchaser in restoring its database to a known, accurate state.

3.5.  Service Level 4 Defects.  Tyler shall provide an initial response to Service Level 4 Defects within two (2) Business Days.  Tyler shall use commercially reasonable efforts to resolve such Non-Essential Documented Defect within two version release cycles and a cosmetic or other Documented Defect that does not qualify as any other Service Level Defect with a future Version Release.

3.6.  Help Desk & Desktop Support.  Software Provider shall provide the Purchaser with procedures for contacting support staff during normal business hours (7:00 a.m. to 7:00 p.m., Central Time, Monday through Friday, excluding Tyler Holidays) for reporting Documented Defects or obtaining helpdesk support on general application functionality.  Software provider will provide ample help desk support; however, excessive support requirements may indicate a training need and require the purchase of additional training time.

3.7.  Technical Server & Systems Support.  Tyler shall use commercially reasonable efforts to provide Purchaser with technical support to assist Purchaser with troubleshooting the loss of functionality of Licensed Software for reasons other than a Documented Defect.  Tyler technical support shall be limited to:

(a) assisting the Purchaser with isolating the source of Licensed Software failure due to systems-level hardware, Third Party Software, network, client-level hardware or peripherals;

(b) providing recommendations to Purchaser regarding resolution of said non-defect failure(s); and

(c) providing Purchaser with assistance on basic maintenance and administration of the Licensed Software environment, including basic data backup and restore procedures, deployment of Version Releases, and setup of supported peripheral devices for use with the Licensed Software

3.8.  24 X 7 Emergency Support.  Tyler shall provide the Purchaser with procedures for contacting support staff after normal business hours for the limited purpose of reporting emergency application unavailability issues (such as a Level 1 Defect) within the Licensed Software.  Tyler shall use commercially reasonable efforts to provide the response set forth in Section 3.2.

3.9.  Saturday Technical Support.  Tyler shall use commercially reasonable efforts to be available for one pre-scheduled Saturday of each month to allow assistance to Purchaser IT staff.  This option is available for the application of patches and full release upgrades as well as consulting with the Purchaser IT staff for server maintenance and configuration for the licensed software environment.

3.10.  Base Version Level for Correction.  Tyler shall correct or otherwise cure Documented Defects to the current Version Release of Licensed Software made available to Purchaser and either the immediately preceding Version Release or all Version Releases released to Purchaser within the prior one (1) year, whichever is greater.

## 4.  SUPPORT ACCOUNT MANAGER AND RELATED PROFESSIONAL SERVICES

4.1.  Support Account Management.  Tyler shall assign a named Support Account Manager ("SAM") to Client's account with dedication levels based upon the Annual Maintenance Fee paid by Client during the then current Term, as follows:  (a) 20% dedication if between $150,000 and  $399,999; (b) 40% dedication if between $400,000 and $700,000; (c) 60% dedication if between $700,001 and $999,999; and (d) 100% dedication if $1,000,000 or greater.  The SAM's responsibilities shall be limited to the Purchaser's Environment, which is defined as being the production configuration of Hardware/Software and Operating System that interfaces with one or more eligible licensed Tyler Odyssey Software products.  All such SAM services must be consumed during the Term.  Services not utilized shall be forfeited and will not carry over to any subsequent Term.  Requested services over and above the allocated percentages shall be billed at Tyler's then current rates.  Tyler will notify client of any services that exceed the allocation prior to delivering the services.

4.2.  Strategic Support Plan.  The SAM shall maintain a reasonable understanding of the Client's release level, technical environment, unique business processes, the status of Client-requested product functionality, and high priority support issues; Upon Operational Use of at least one court location, the SAM shall meet with Client to define a Strategic Support Plan (the "Plan").  The Plan shall define the Client's support goals and the SAM's responsibilities, consistent with the dedication level set forth in Section 4.1, and which shall include: (a) quarterly reviews of progress vs. Plan; (b) monitoring of critical support incidents; (c) quarterly trend/pattern analysis of support incidents; (d) release and patch planning; and (e) such other services that Tyler and Client may agree upon consistent with the SAM's dedication level.

4.3.  Location.  Unless otherwise agreed to by Tyler and the Client, SAM Services shall be conducted from Tyler's office in Plano, Texas.  The Client shall be responsible for any travel expenses if the SAM is requested to present at the Client's location.

4.4.  Expanded Support Services Hours - Consulting, Configuration, and Training.  In addition to the maintenance and support obligations outlined in this Agreement, payment of the Maintenance and Support Fee (as defined in Section 8.2) provides Purchaser with the right to request and receive, at no additional cost to the Purchaser, certain Consulting, Configuration, or Training services for products live and in production during the then current Term.  The amount of services shall be limited to 10% of the then current Maintenance and Support Fee for such Term, and shall be calculated based on Tyler's then current hourly rates for such services.  Tyler will notify client of any services that exceed 10% of the then current Maintenance and Support Fee for such Term prior to delivering the services.  All such expanded support services must be consumed during the Term.  Services not utilized shall be forfeited and will not carry over to any subsequent Term.  Requested services over and above the 10% allocation shall be billed at Tyler's then current hourly rates.  Purchaser understands that all expanded support services are subject to availability and that purchaser is responsible for all travel costs including hotel, meals, rental car, parking fees, mileage fees for privately owned vehicles, and airfare.  Tyler shall use commercially reasonable efforts to provide such expanded services; provided, however, that Purchaser shall provide Tyler with at least ninety days' notice of its request for services.

4.5.  Annual User Conference.  The Tyler SAM shall provide Client with vouchers that shall cover Client's registration fees for attendance at Tyler's annual user conference based upon the Annual Maintenance Fee paid by Client during the then current Term, as follows:  (a) 1 voucher if less than $400,000; (b) 2 vouchers if between $400,001 and $700,000; (c) 4 vouchers if between $700,001 and $999,999; and (d) 6 vouchers if $1,000,000 or greater.  Client shall be solely responsible for its related travel expenses.

4.6.  Escalation Procedure.  If Tyler is unable to resolve any Service Level 1 or Service Level 2 Defect as provided in this Section 3, Purchaser may immediately escalate the issue to Purchaser's IT Director or Designee and Tyler's Director of Client Services.  Tyler and Purchaser will use good faith reasonable efforts to meet, discuss, and agree upon a resolution plan for the affected Defect.  If Purchaser's IT Director or Designee and Tyler's Director of Client Services cannot agree upon an acceptable resolution plan within 24 hours of such initial escalation, or such other reasonable time as the parties may agree, Purchaser may further escalate the issue to Purchaser's next level Administrator and

Tyler's Division Chief Operating Officer or Division President who shall have final authority to negotiate an acceptable resolution plan.

**5.   ADDITIONAL SUPPORT SERVICES**

Purchaser may request support services in addition to the standard maintenance offering (a "Service Request").   Such other support services may include, without limitation, services related to: (a) additional training; (b) technical assistance; (c) programming services; (d) installation of add-on components; and/or (e) business analysis.  Tyler shall provide to Purchaser a written response to the request which describes in detail the anticipated impact of the request on the existing Licensed Software, the time required to perform such services, an implementation plan, and a schedule of the fees related thereto.  Fees for additional support services shall be billed by Tyler directly to Purchaser and shall be invoiced monthly, which shall be due and payable in accordance with Section 8.2.

**6.   VERSION RELEASES**

Tyler shall notify Purchaser of the occurrence of bug fixes, patches, upgrades, updates and each new Version Release and shall provide Purchaser with such for the Licensed Software.  The delivery of each new Version Release shall include a complete, installable copy of the Licensed Software, together with release notes and other appropriate documentation.  In the event that Tyler is not able to provide an installable copy of the Licensed Software, Tyler will be responsible for installation, at its own expense.  Purchaser shall, at its own expense, be responsible for any installation assistance, new integration, and training with respect to bug fixes, patches, upgrades, updates and Version Releases.

**7.   THIRD PERSON SOFTWARE**

7.1.   Notice of New Third Person Software.  Tyler shall provide Purchaser with advanced notice of any mandated new Third Person Software revision that shall be required to load a Version Release.  Tyler shall use commercially reasonable efforts to minimize the need for Purchaser to rely upon updates of Third Person Software.

7.2.   Tyler Certification.  At Tyler's expense, Tyler shall certify the compatibility of Third Person Software components used by the Licensed Software and maintain a list of supported Third Person Software release levels. Version Releases shall be certified to supported versions of all required Third Person Software. Tyler shall certify new releases of Third Person Software within a reasonable timeframe.

7.3.   Costs.  Purchaser is responsible for all costs associated with installing and maintaining Third Person Software versions that are identified on Tyler's list of certified Third Person Software.

7.4.   Maintenance.  Purchaser is responsible for maintaining software maintenance/update agreements with Third Person Software vendors at Purchaser's expense.  At the request of Purchaser, Tyler shall participate with Purchaser in discussions with Third Person Software providers on all software maintenance issues.

**8.   FEES**

8.1.   Annual Maintenance Fee.  Purchaser shall pay Tyler the annual maintenance and support fees as set forth on and in accordance with the timetables of Schedule 1 (the "Maintenance and Support Fees") As identified in the RFP, at no time will Tyler increase maintenance and support fees more than 3.5% annually.

8.2.   Each invoice shall include, at a minimum, the total invoiced amount and a reference to the specific items being invoiced under this M&S Agreement.  Following receipt of a properly submitted invoice, Purchaser shall immediately review the invoice, and shall either accept the invoice and immediately process it for payment or dispute the invoice or a part thereof pursuant to Section 11, delineating the reasons for the dispute by reference to the implicated contractual provisions. Invoices or parts thereof not disputed within five (5) business days of receipt shall be deemed accepted. Purchaser shall pay undisputed amounts owed within thirty (30) days after acceptance.  All payments shall be made in U.S. currency.  Any undisputed sum not paid when due shall bear interest at a rate of prime rate (as set forth in the Wall Street Journal) plus one percent (1%) per annum or the highest rate allowed by governing law, whichever is less.

8.3.   Maintenance on Purchaser-Specific Customer Enhancements. The annual Maintenance and Support Fee may be further increased by agreement of the Parties with respect to maintenance and support of Purchaser-Specific Customer Enhancements requested by Purchaser or

for new functionality that is capable of operating as a separate and independent module capable of being separately licensed as such, provided, however, that Purchaser shall have the ability to disable the same and whereupon shall not be subject to additional costs hereunder. For purposes of clarity, new functionality that is capable of operating as a separate and independent module shall not include functionality that is an enhancement of existing Licensed Software as part of Tyler's normal product development.

8.4.   Suspension of Services for Non-payment.  Tyler may suspend its performance of services hereunder during any period for which Purchaser does not pay any undisputed Maintenance and Support Fees for a period of time exceeding sixty (60) days.  Tyler shall promptly reinstate maintenance and support services upon receipt of payment of all undisputed Maintenance and Support Fees, including all such fees for the period(s) during which services were suspended.

**9.   TERM AND TERMINATION**

9.1.   Term.  This M&S Agreement shall commence upon the Effective Date and shall continue in effect for a period of one (1) year; provided, however, that at the end of such initial term, and on each subsequent anniversary of the Effective Date, the term shall automatically extend for an additional year unless a Party provides, at least ninety (90) days prior to the end of the then current term, written notice that it does not wish to extend the term or otherwise terminates the agreement as provided in this Section 9.

9.2.   Termination by Purchaser at the End of a Term.  Purchaser may terminate this M&S Agreement effective as of the end of the initial term or any subsequent term by giving not less than ninety (90) days' notice of its intent to terminate.  Subject to Purchaser's paying all undisputed License fees, Professional Services fees and Support and Maintenance fees accrued and due prior to the effective date of termination, Purchaser may also terminate this M&S Agreement at any time on ninety (90) days' written notice. Purchaser may, at its option, reinstate maintenance by providing notice to Tyler and making payment of fifty percent (50%) of each year's Maintenance and Support Fees that would have been owed by Purchaser during the lapsed period plus the Maintenance and Support Fees for the then upcoming maintenance year.

9.3.   Termination by Purchaser for Cause.  Purchaser may terminate this M&S Agreement for "cause" in accordance with this Section 9.3. For purposes of this Section, "cause" means a continuous or repeated failure to cure Documented Defects timely as provided in Section 3.  In such event, Purchaser shall deliver written notice of its intent to terminate along with a description in reasonable detail of the problems for which Purchaser is invoking its right to terminate.  Following such notice, Tyler shall have ninety (90) days to cure such problems. Following such ninety (90) day period, Tyler and Purchaser shall meet to discuss any outstanding issues.  In the event that "cause" still exists at the end of such period, then Purchaser may terminate this Agreement.  In the event of a termination under this subsection, Tyler shall return all monies paid to Tyler by Purchaser under this M&S Agreement for the remainder of the then current maintenance period.

9.4.   Termination for Lack of Appropriations. The terms of this Agreement are contingent upon sufficient authorizations and appropriations being or having been made by the Legislature for the performance of this Agreement. If sufficient authorizations and appropriations are not or have not been made by the Legislature, or are discontinued by the Legislature, this Agreement shall terminate upon written notice being given by Purchaser to Tyler.  In the event Purchaser terminates this Agreement pursuant to this Section, Purchaser shall pay Tyler for all undisputed services performed and goods delivered at the rates specified herein up through the date of such termination. Purchaser represents that it is a government agency or instrumentality.

**10.  LIMITATION OF LIABILITY**

TYLER'S LIABILITY TO END USER FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS M&S AGREEMENT, WHETHER BASED ON A THEORY OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, SHALL BE LIMITED TO FIXING DEFECTS IN ACCORDANCE WITH SECTION 3 OR AS OTHERWISE SET FORTH IN SECTION 8.3.

IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOST REVENUES OR PROFITS, OR LOSS OF BUSINESS OR LOSS OF DATA ARISING OUT OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER THE PARTIES HAVE ADVANCE NOTICE OF THE POSSIBILITY OF SUCH DAMAGE.

**11. DISPUTE RESOLUTION**

The parties agree to use good faith, reasonable efforts to meet, discuss, and try to resolve any disputes arising out of, or relating to, this M&S Agreement for a period of sixty (60) days. The parties shall include in any such informal meetings persons with appropriate knowledge and authority, including, without limitation, Purchaser's Chief Information Officer and Tyler's Support Manager. Any negotiations pursuant to this Section 11 are confidential and shall be treated as compromise and settlement negotiations for purposes of the applicable rules of evidence. For any dispute that the Parties are unable to resolve through informal discussions or negotiations, the Parties shall have the right to pursue any remedies at law.

**12. MISCELLANEOUS**

12.1. Assignment. Neither party may assign this M&S Agreement or any of its respective rights or obligations herein to any third party without the express written consent of the other party.

12.2. Notices. Except as otherwise expressly specified herein, all notices, requests or other communications shall be in writing and shall be deemed to have been given if delivered personally or mailed, by certified or registered mail, postage prepaid, return receipt requested, to the parties at their respective addresses set forth on the signature page, or at such other addresses as may be specified in writing by either of the parties. All notices, requests, or communications shall be deemed effective upon personal delivery or three (3) days following deposit in the mail.

12.3. Counterparts. This M&S Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.4. Waiver. The performance of any obligation required of a party herein may be waived only by a written waiver signed by the other Parties, which waiver shall be effective only with respect to the specific obligation described therein.

12.5. Entire Agreement. This M&S Agreement constitutes the entire understanding and contract between the parties and supersedes any and all prior or contemporaneous oral or written representations or communications with respect to the subject matter hereof.

12.6. Amendment. This M&S Agreement shall not be modified, amended or in any way altered except by an instrument in writing signed by the properly delegated authority of each Party. All amendments or modifications of this M&S Agreement shall be binding upon the parties despite any lack of consideration.

12.7. Governing Law. Any dispute arising out of or relating to this M&S Agreement or the breach thereof shall be governed by the laws of the state of the domicile of Purchaser, without regard to or application of choice of law rules or principles. Tyler consents to the jurisdiction of and to venue within the state or federal courts located within Purchaser's state of domicile for the resolution of any dispute arising out of or related hereto.

12.8. No Third Party Beneficiaries. Nothing in this M&S Agreement is intended to benefit, create any rights in, or otherwise vest any rights upon any third party.

12.9. Contra Proferentem The doctrine of contra proferentem shall not apply to this M&S Agreement. If an ambiguity exists in this Agreement, or in a specific provision, neither the Agreement nor the provision shall be construed against the party who drafted the M&S Agreement or provision.

Schedule 1 – Investment Summary

In the event of a conflict between anything in this Schedule 1 and the Agreement to which it is attached and incorporated, the terms of the Agreement shall govern.

**Licensed Software**

The software License Fee is $2,400,000 and includes the following software components (and all other software components as identified in the RFP):

- Enterprise license for the Odyssey Case Manager for all court locations, levels, and case types.
- Enterprise license for Odyssey Content Management (all functions)
- Enterprise license for SessionWorks Clerk Edition.
- Enterprise license for SessionWorks Judge Edition.
- Enterprise license for the Integration Toolkit
- Enterprise license for the Odyssey Financial Manager.
- Enterprise license for all document management features
    - Batch Scanning/Workflow.
    - Auto-Attach.
    - Record on Appeal.
    - eSignatures and Merge to .Tiff.
    - Citation Auto Zoom.
- Enterprise Custom Reporting (ECR).
- Enterprise license for all public access components.
- Enterprise license for Remote Document Storage
- Enterprise license for SessionSync.
- Enterprise license for Odyssey Supervision for the purposes of providing pre-trial services, misdemeanor probation and problem-solving court functions.
- Enterprise license for Tyler Jury.  This includes the Enterprise Jury system currently in development.
- Enterprise license for Attorney Manager (for all Prosecuting and Public Defense agencies)
- 100 seat license to Lead Barcode for batch document management processing.
- 100 seat license for Lead Document Imaging for batch document management processing.

Payment of the Licensed Software shall be according to the following schedule.

| Payment Event | Due Date | Amount |
|---|---|---|
| Installment 1 | Contract | $200,000.00 |

| Payment Event | Due Date | Amount |
|---|---|---|
| | Execution | |
| Installment 2 | 1/1/14 | $300,000.00 |
| Installment 3 | 7/1/14 | $300,000.00 |
| Installment 4 | 1/1/15 | $300,000.00 |
| Installment 5 | 7/1/15 | $300,000.00 |
| Installment 6 | 7/1/16 | $600,000.00 |
| Installment 7 | Project Closeout | $400,000.00 |
| TOTAL LICENSED SOFTWARE | | $2,400,000 |

### Annual Maintenance and Support

Maintenance and Support begins upon contract execution.  Payment for Maintenance and Support shall be according to the schedule below:

| Payment Event | Due Date | Amount |
|---|---|---|
| FY 14 | N/A | $0.00 |
| FY 15 | 4/1/15 | $126,000.00 |
| FY 16.1 | 7/1/15 | $252,000.00 |
| FY 16.2 | 1/1/16 | $252,000.00 |
| FY 17.1 | 7/1/16 | $252,000.00 |
| FY 17.2 | 1/1/17 | $252,000.00 |
| FY 18.1 | 7/1/17 | $252,000.00 |
| FY 18.2 | 1/1/18 | $252,000.00 |
| FY 19.1 | 7/1/18 | $252,000.00 |

| Payment Event | Due Date | Amount |
|---|---|---|
| FY 19.2 | 1/1/19 | $252,000.00 |
| FY 20.1 | 7/1/19 | $259,560.00 |
| FY 20.2 | 1/1/20 | $259,560.00 |
| FY 21.1 | 7/1/20 | $259,560.00 |
| FY 21.2 | 1/1/21 | $259,560.00 |

### Professional Services and Deliverable Cost

Total costs for all services including expenses to perform the work for this project shall not exceed $3,841,860 payable based on completion and acceptance of the following project deliverables.

| Deliverables | Estimated Delivery Date | Amount |
|---|---|---|
| 1.2.1 Project Management Plan | 10/8/13 | $25,000 |
| 1.2.2 Core Training Plan | 10/8/13 | $25,000 |
| Produce Written Monthly Status Report 1 | 9/30/13 | $23,128 |
| Produce Written Monthly Status Report 2 | 10/30/13 | $23,128 |
| Produce Written Monthly Status Report 3 | 11/30/13 | $23,128 |
| Produce Written Monthly Status Report 4 | 12/30/13 | $23,128 |
| Produce Written Monthly Status Report 5 | 1/30/14 | $23,128 |
| Produce Written Monthly Status Report 6 | 2/28/14 | $23,128 |
| Produce Written Monthly Status Report 7 | 3/30/14 | $23,128 |
| Produce Written Monthly Status Report 8 | 4/30/14 | $23,128 |
| Produce Written Monthly Status Report 9 | 5/30/14 | $23,128 |

| Deliverables | Estimated Delivery Date | Amount |
|---|---|---|
| Produce Written Monthly Status Report 10 | 6/30/14 | $23,128 |
| Produce Written Monthly Status Report 11 | 7/30/14 | $23,128 |
| Produce Written Monthly Status Report 12 | 8/30/14 | $23,128 |
| Produce Written Monthly Status Report 13 | 9/30/14 | $23,128 |
| Produce Written Monthly Status Report 14 | 10/30/14 | $23,128 |
| Produce Written Monthly Status Report 15 | 11/30/14 | $23,128 |
| Produce Written Monthly Status Report 16 | 12/30/14 | $23,128 |
| Produce Written Monthly Status Report 17 | 1/30/15 | $23,128 |
| Produce Written Monthly Status Report 18 | 2/28/15 | $23,128 |
| Produce Written Monthly Status Report 19 | 3/30/15 | $23,128 |
| Produce Written Monthly Status Report 20 | 4/30/15 | $23,128 |
| Produce Written Monthly Status Report 21 | 5/30/15 | $23,128 |
| Produce Written Monthly Status Report 22 | 6/30/15 | $23,128 |
| Produce Written Monthly Status Report 23 | 7/30/15 | $23,128 |
| Produce Written Monthly Status Report 24 | 8/30/15 | $23,128 |
| Produce Written Monthly Status Report 25 | 9/30/15 | $23,128 |
| Produce Written Monthly Status Report 26 | 10/30/15 | $23,128 |
| Produce Written Monthly Status Report 27 | 11/30/15 | $23,128 |
| Produce Written Monthly Status Report 28 | 12/30/15 | $23,128 |
| Produce Written Monthly Status Report 29 | 1/30/16 | $23,128 |
| Produce Written Monthly Status Report 30 | 2/29/16 | $23,128 |
| Produce Written Monthly Status Report 31 | 3/30/16 | $23,128 |

| Deliverables | Estimated Delivery Date | Amount |
|---|---|---|
| Produce Written Monthly Status Report 32 | 4/30/16 | $23,128 |
| Produce Written Monthly Status Report 33 | 5/30/16 | $23,128 |
| Produce Written Monthly Status Report 34 | 6/30/16 | $23,128 |
| Produce Written Monthly Status Report 35 | 7/30/16 | $23,128 |
| Produce Written Monthly Status Report 36 | 8/30/16 | $23,128 |
| Produce Written Monthly Status Report 37 | 9/30/16 | $23,152 |
| 1.4.1 Certification of Equipment Specification | 10/15/13 | $3,000 |
| 1.5.1 Validated Fit Analysis Planning Documents | 10/22/13 | $6,600 |
| 1.6.1 Pre-Fit Analysis Training Complete | 11/19/13 | $6,600 |
| 1.7.1 Requirements Fit Analysis Results | 1/14/14 | $51,480 |
| 2.1.1 Certification of Infrastructure Build | 1/14/14 | $9,000 |
| 2.2.1 CPD Documents* | 2/11/14 | $150,000 |
| 2.2.2 Delivery to Odyssey Test Environment* | 10/21/14 | $409,728 |
| 2.3.1 Pre-Configuration Workshop Training | 1/28/14 | $20,000 |
| 2.3.2 Case Manager Workshop Complete | 2/18/14 | $20,000 |
| 2.3.3 Security Workshop Complete | 3/18/14 | $20,000 |
| 2.3.4 Forms Workshop Complete | 4/15/14 | $20,000 |
| 2.3.5 Financial Workshop Complete | 5/13/14 | $20,000 |
| 2.4.1 Load of Legacy Data into Staging Database | 1/7/14 | $50,000 |
| 2.4.2 Completion of Data Mapping | 4/1/14 | $75,000 |
| 2.4.3 First Data Conversion Push | 6/24/14 | $50,000 |
| 2.4.4 ECR Training Complete | 7/1/14 | $10,000 |

| Deliverables | Estimated Delivery Date | Amount |
|---|---|---|
| 2.5.1 System Test Plan* | 11/1/14 | $10,000 |
| 2.5.2 Unit and Integration Testing Complete* | 1/13/15 | $20,000 |
| 2.5.3 Performance Testing Complete* | 1/13/15 | $20,000 |
| 2.5.4 User Acceptance Testing Complete* | 1/13/15 | $354,592 |
| 3.1.1 Local Configuration Complete | 2/24/15 | $30,000 |
| 3.2.1 Local Court Readiness | 3/10/15 | $30,000 |
| 3.3.1 Local Court Training Complete | 4/7/15 | $44,400 |
| 3.4.1 Local Data Conversion Complete | 4/10/15 | $81,916 |
| 3.5.1 Local Court  Deployment and Implementation Complete | 4/24/15 | $65,040 |
| 3.6.1 Review Lessons Learned with Project Team | 5/1/15 | $14,200 |
| 4.1.1 Local Configuration Complete | 9/4/15 | $30,000 |
| 4.2.1 Local Court Readiness | 10/2/15 | $30,000 |
| 4.3.1 Local Court Training Complete | 10/30/15 | $44,400 |
| 4.4.1 Local Data Conversion Complete | 11/4/15 | $81,916 |
| 4.5.1 Local Court  Deployment and Implementation Complete | 11/18/15 | $65,040 |
| 4.6.1 Review Lessons Learned with Project Team | 11/25/15 | $14,200 |
| 5.1.A1.1 Local Configuration Complete | 9/4/15 | $30,000 |
| 5.2.A1.1 Local Court Readiness | 9/18/15 | $30,000 |
| 5.3.A1.1 Local Court Training Complete | 10/16/15 | $44,400 |
| 5.4.A1.1 Local Data Conversion Complete | 10/21/15 | $81,916 |
| 5.5.A1.1 Local Court  Deployment and Implementation | 11/4/15 | $65,040 |

| Deliverables | Estimated Delivery Date | Amount |
|---|---|---|
| Complete | | |
| 5.6.A1.1 Lessons Learned | 11/11/15 | $14,200 |
| 5.1.A2.1 Local Configuration Complete | 2/3/16 | $30,000 |
| 5.2.A2.1 Local Court Readiness | 2/17/16 | $30,000 |
| 5.3.A2.1 Local Court Training Complete | 3/16/16 | $44,400 |
| 5.4.A2.1 Local Data Conversion Complete | 3/21/16 | $81,916 |
| 5.5.A2.1 Local Court Deployment and Implementation Complete | 4/4/16 | $65,040 |
| 5.6.A2.1 Lessons Learned | 4/11/16 | $14,200 |
| 5.1.A3.1 Local Configuration Complete | 7/4/16 | $30,000 |
| 5.2.A3.1 Local Court Readiness | 7/18/16 | $30,000 |
| 5.3.A3.1 Local Court Training Complete | 8/15/16 | $44,400 |
| 5.4.A3.1 Local Data Conversion Complete | 8/18/16 | $81,918 |
| 5.5.A3.1 Local Court Deployment and Implementation Complete | 9/1/16 | $65,040 |
| 5.6.A3.1 Lessons Learned | 9/8/16 | $14,200 |
| 6.1.1.P - eFiling Configuration Documentation | 5/29/15 | $0 |
| 6.2.1.P - eFiling Training Plans and Materials | 6/12/15 | $0 |
| 6.3.1.P - eFiling Go-Live Status Report | 6/26/15 | $0 |
| 6.1.1.Ada - eFiling Configuration Documentation | 12/23/15 | $0 |
| 6.2.1.Ada - eFiling Training Plans and Materials | 1/6/16 | $0 |
| 6.3.1.Ada - eFiling Go-Live Status Report | 1/20/16 | $0 |
| 6.1.1.A1 - eFiling Configuration Documentation | 12/9/15 | $0 |

| Deliverables | Estimated Delivery Date | Amount |
|---|---|---|
| 6.2.1.A1 - eFiling Training Plans and Materials | 12/23/15 | $0 |
| 6.3.1.A1 - eFiling Go-Live Status Report | 1/6/16 | $0 |
| 6.1.1.A1 - eFiling Configuration Documentation | 5/9/16 | $0 |
| 6.2.1.A2 - eFiling Training Plans and Materials | 5/23/16 | $0 |
| 6.3.1.A2 - eFiling Go-Live Status Report | 6/6/16 | $0 |
| 6.1.1.A3 - eFiling Configuration Documentation | 10/6/16 | $0 |
| 6.2.1.A3 - eFiling Training Plans and Materials | 10/20/16 | $0 |
| 6.3.1.A3 - eFiling Go-Live Status Report | 11/3/16 | $0 |
| 7.1.1 Jury Workshops Complete | 11/13/15 | $10,000 |
| 7.2.1 Jury Data Converted / Loaded | 12/25/15 | $20,000 |
| 7.3.1 Jury Test Plan* | 12/1/15 | $10,000 |
| 7.3.2 Unit and Integration Testing Complete* | 12/1/15 | $10,000 |
| 7.3.3 Performance Testing Complete* | 12/1/15 | $10,000 |
| 7.3.4 User Acceptance Testing Complete* | 12/1/15 | $10,000 |
| 7.4.1 Jury Training Complete | 1/8/16 | $20,400 |
| 7.5.1 Jury Go-Live Complete | 1/22/16 | $10,000 |
| 8.1.1 Appeals Configuration Complete | 3/4/16 | $20,000 |
| 8.2.1 Appeals Test Plan* | 3/10/16 | $10,000 |
| 8.2.2 Unit Testing Complete* | 3/10/16 | $10,000 |
| 8.2.3 User Acceptance Testing Complete* | 3/10/16 | $10,000 |
| 8.3.1 Appeals Court Readiness | 3/18/16 | $10,000 |
| 8.4.1 Appeals Court Training Complete | 4/15/16 | $12,000 |

| Deliverables | Estimated Delivery Date | Amount |
|---|---|---|
| 8.5.1 Appeals Court Data Conversion Complete | 4/20/16 | $81,918 |
| 8.6.1 Appeals Court Deployment and Implementation Complete | 5/4/16 | $18,000 |
| 9.1.1 Project Closeout Report | 9/22/16 | $10,000 |

*Denotes deliverable associated with the $1,024,320 pool of dollars or 6,208 hours associated with custom application and integration development. The allocation of these hours will be determined at the completion of the fit analysis activity.

**Reimbursable Costs/Expenses**
Total reimbursable Contractor costs shall not exceed $360,938 inclusive of travel (transportation, including airfare and mileage, car rental, etc.), meals, lodging and incidental and business expenses.

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

The following phases and tasks will be executed by Tyler as part of the implementation of the Odyssey solution throughout the State of Idaho. The AOC will formally sign off and approve each deliverable listed in this Statement of Work. The AOC and Tyler will collectively develop a deliverable approval process as part of the project initiation and planning process. In the event of a conflict between anything in this Statement of Work and the Software License and Professional Services Agreement ("Agreement") between the parties dated ___August 26___, 20 13, the terms of the Agreement shall govern.

## PHASE 1 – PROJECT INITIATION AND PLANNING

During phase 1 of the project, the project is formally kicked off and engages in a number of project planning activities that establishes the overall foundation for the remainder of the project. The tasks associated with phase 1 include the following:

- Task 1.1 – Conduct Project Kickoff
- Task 1.2 – Development of Key Planning Documents
- Task 1.3 – Provide Management and Control Activities
- Task 1.4 – Infrastructure Planning and Procurement
- Task 1.5 – Prepare and Plan for Fit Analysis
- Task 1.6 – Conduct Pre-Design Training
- Task 1.7 – Conduct Fit Analysis

Task 1.1 – Conduct Project Kickoff

Tyler will prepare and deliver a kickoff presentation to the State of Idaho project team. This meeting signifies the start of the project. During the meeting, the joint teams will review the project organization, project tracking and reporting tools, implementation lifecycle, and product development lifecycle.

Additionally, Tyler will introduce its implementation methodologies, terminology, and best practices to the State of Idaho project team. This will also present an opportunity for project managers and project sponsors to discuss the type of metrics and status reporting to be used to measure project progress and manage change.

The project team will leave the kickoff with an understanding of the approaching project activities and their respective roles within each of the activities.

1

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

As part of the Project Kick-off activities, a Project Governance structure will be put in place, with regular reporting to and meetings of the key stakeholders to the project and Tyler management. The goal of this is to establish from the onset open and effective communication at the right level of detail with key decision makers from both organizations.

## Task 1.2 – Development of Key Planning Documents

Immediately following the project kickoff, Tyler will work with the Idaho project team to prepare key planning documents that will be used to guide many activities throughout the life of the project.

| Deliverable | Description |
|---|---|
| 1.2.1 Project Charter | Tyler will provide a proposed Project Charter authorizing the work of the project to begin and giving the joint Project Management Office the authority to manage the project. This document will include a description of the intent of the project and expected results. |
| 1.2.2 Project Management Plan | Includes baseline work plan, statement of work, work breakdown structure, roles and responsibilities; resource management; scope, budget, change and schedule management;; issues tracking; risk management; document version control for project deliverables; quality management and control; and decision management and tracking. |
| 1.2.3 Project Communication Plan | Tyler will provide a document detailing the flow of communication within the project to include communication between Tyler and Idaho resources, as well as those who need to be informed and in what situations. This communication plan will also include a deliberate communications strategy to keep all project stakeholders and users informed of the project (e.g. judges, clerks, external partners, etc). |
| 1.2.4 Core Training Plan | Tyler will work with the AOC to prepare the core training plan. This plan will be a comprehensive artifact, documenting all training to occur throughout the project to include scope, method, timing, roles and responsibilities. |
| 1.2.5 Risk Management Plan | Tyler will work with the project team to document potential project risks, assess impacts, and define risk mitigation actions. |

2

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

Task 1.3 – Provide Management and Control Activities

The Tyler project management team will work with the AOC project
management team to monitor the construction and configuration activities,
refinements of court procedures, development of interoperability with other
applications, conversion of legacy data, and the rollout of the application into
courts across the state.

Tyler will provide continuous project management services to ensure that all
deliverables are produced according to contract schedule and deliverable
specification. The Tyler PM will coordinate responses to all inquiries about
project status and risks in a timely manner, and will identify issues, risks, and
alternative solutions to the AOC as they arise.

The Tyler Project Manager will update the work plan and project budget on a
monthly basis and provide a monthly project status report. In addition, Tyler will
conduct a monthly status meeting to keep the appropriate executive committees
informed of the project status and upcoming milestones.  Any changes to the
statement of work will be mutually agreed upon, in writing, by the Tyler Project
Manager and the Idaho Supreme Court's Chief Information Officer.

During the initial project planning sessions, Tyler will work with the AOC to
review and adopt the AOC's current change management processes and plan.
Tyler will address ongoing change management activities and potential issues in
the monthly status report.

The project deliverables associated with this task will be ongoing throughout the
remainder of the project and include:

| Deliverable | Description |
|---|---|
| 1.3.1 Produce Written Monthly Status Report | Tyler will produce a monthly written status report that will include progress against the project statement of work completed in the reporting period, and variance in schedule between actual and planned activities. It will identify risks and report issues, along with mitigation efforts and issue resolution. It will also identify any variance in budget between actual and planned expenditures. Planned activities for the next reporting period will be outlined. |
| 1.3.2 Participate in Monthly Status Meeting | Tyler will facilitate monthly status meetings to review the monthly status report and determine activities for the next month. |

3

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

Task 1.4 – Infrastructure Planning and Procurement

During this task Tyler will assist the AOC in the planning and procurement of the necessary equipment components that will host and operate the Odyssey environment. Tyler will certify the plans for AOC equipment procurement, indicating that the environment will be able to host the Odyssey environment and that the Odyssey environment installed will meet the Performance Standards .

| Deliverable | Description |
|---|---|
| 1.4.1 Certification of Equipment Specification | Certification by Tyler that the AOC's specification meets the needs of the Odyssey environment. |

Task 1.5 – Prepare and Plan for Fit Analysis

The fit analysis activity is an important step in a project to ensure that the solution meets the needs of the Court. To make the most efficient use of time, some initial preparation is recommended prior to the onsite activity. During the kickoff meeting, Tyler and the AOC will review and validate the existing documented business processes. Should it be necessary, the AOC will provide additional detail regarding legacy system functionality and processes.

This material is a template for the Court and Clerk's Subject Matter Experts (SMEs) to provide Tyler workflows of how the current case management system is used to process cases and exchange data with external systems. Tyler uses this information to build the agenda to ensure that all areas of critical functionality are covered during the activity. The scenarios are walked through step by step to uncover any gaps in functionality or potential business process changes that will result in efficiencies that can be gained with the new system.

In addition, Tyler will provide the AOC with questionnaires to complete with information pertaining to the integration exchanges that need to be developed. This information will assist the integration team in making the most of the time with the AOC integration specialists and ensure that all integration exchanges have been identified and confirmed.

4

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Deliverable | Description |
|---|---|
| **1.5.1 Fit Analysis Template** | Templates and questionnaires for the gathering of business process information on the court's current processes and interfaces. |

### Task 1.6 – Conduct Pre-Fit Analysis Training

Prior to the on-site fit analysis, Tyler will conduct an Odyssey Basics training class for all the participants in the fit analysis. This will give the participants a fundamental understanding of Odyssey and saves time by reducing common questions about functionality. It also gets the participants thinking about the Odyssey capabilities prior to participating in the process.

| Deliverable | Description |
|---|---|
| **1.6.1 Pre-Design Training** | Training will be provided according to this Statement of Work. |

### Task 1.7 – Conduct Fit Analysis

During the fit analysis, Tyler will work with the State of Idaho to validate requirements, business processes, and assumptions, both on the business side and on the technology side. The scope of the fit analysis will encompass the entire scope of the project including the following:

- Case Management (Trial and Appellate Courts)
- Document Management
- Financial Management
- Electronic Filing
- Electronic Payments
- SessionWorks Clerk Edition

5

- SessionWorks Judge Edition

- Public Access

- Jury

### Operational Fit Analysis

During the on-site fit analysis, a Tyler analyst will attempt to perform the current scenarios within Odyssey. Through this process, we jointly determine the "fit" between Idaho's current practices and the functionality within Odyssey. The Fit Analysis will incorporate Idaho's existing case management system (deployed in 44 counties) and the centralized statewide data repository. With the output from the fit analysis, project teams can validate the solution, the project approach and the phased delivery of the statement of work. At the completion of the fit analysis, the project team will review the findings with senior leadership and determine the resolution to any gaps identified.

### Business Process Review

Working with the AOC project team, and in parallel with the Fit Analysis, Tyler will review the functional requirements and a series of cases representative of the courts participating in the fit analysis. Tyler will demonstrate existing functionality in the Odyssey Case Management System and Financial Manager using the above-mentioned representative scenarios and functional requirements. During this operational analysis, the joint project teams participate by reviewing the functionality and determining the fit of any proposed solutions. Proposed solutions and any fits identified are documented for review and action at the closure of the fit analysis.

### Request for Proposal (RFP) Gap Analysis

Alongside the Fit Analysis and the Business Process Review, Tyler will work with the AOC project team to review all requirements and responses to the RFP to identify any functional requirements not previously addressed in the Fit Analysis or the Business Process Review. The joint teams will review the identified requirements, determine if the functionality can be provided within Odyssey, demonstrate the functionality, and document any gaps. Identified gaps and proposed solutions will be reviewed at the closure of the fit analysis.

### Integrations

In addition to the operational fit analysis, the project teams will examine each of the information exchanges that are in scope, to include existing integrations and requested integrations identified within the RFP. Tyler will work with the Court and applicable state agencies of the State of Idaho to understand key

6

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

information regarding each information exchange to determine the best method for communicating with Odyssey. The questionnaires that were completed during the planning phase will be reviewed and an approach for each information exchange will be determined and reviewed during this onsite activity.

### Fit Analysis Results

After the application and integration fit analysis is complete, Tyler will prepare a results document. The outcome of each identified gap could have one of three actions:

1. Implementing a change to the existing practice to accomplish the same objective, without a modification to the software.

2. Identifying a solution that can be accomplished through configuration.

3. Identifying a modification to Odyssey to satisfy the requirement. Such a modification will have a separate scope and estimate.

The fit analysis results will be reviewed with senior leadership, with actions decided for each of the gap items.

| Deliverable | Description |
|---|---|
| 1.7.1 Fit Analysis Results | Tyler will provide a document of the results and recommendations of the fit analysis. This will involve a detailed inventory of system customizations, modifications, and business process changes that will be required to meet the needs of the AOC, courts, county clerks, and integration partners. |
| 1.7.2 Jury Fit Analysis Results | Tyler will provide a document of the results and recommendations of the jury fit analysis. This will involve a detailed inventory of system customizations, modifications, and business process changes that will be required to meet the needs of the AOC, courts, and the county clerks. |
| 1.7.3 Appellate Fit Analysis Results | Tyler will provide a document of the results and recommendations of the appeals fit analysis. This will involve a detailed inventory of system customizations, modifications, and business process changes that will be required to meet the needs of the AOC, courts, and the county clerks. |

7

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

## PHASE 2 – SOLUTION DESIGN AND DEVELOPMENT

During Phase 2 the joint project teams will begin executing on the plans established and approved within Phase 1. At the conclusion of Phase 2 the Odyssey environment will be ready for deployment within the pilot court and includes the following tasks:

- Task 2.1 – Certify Infrastructure Build
- Task 2.2 – Conduct Application and Integration Development
- Task 2.3 – Conduct Application Configuration
- Task 2.4 – Conduct Data Conversion
- Task 2.5 – Conduct System Testing

The activities and deliverables associated with each of these tasks are described below.

### Task 2.1 – Certify Infrastructure Build

Tyler and the AOC's Information Division will work together to install Odyssey on the appropriate network and servers, in accordance with the certified system specifications. The AOC will start with non-production environments, which will serve as a test for the installation process as well as infrastructure for the test application instances.

It should be noted that this task may be repeated throughout the project as the AOC rolls out additional Odyssey environments and becomes more comfortable with the installation management process.

| Deliverable | Description |
|---|---|
| 2.1.1 Certify Infrastructure Build | Certification by Tyler that the AOC's build out of the equipment specification meets Odyssey's requirements. |

### Task 2.2 – Conduct Application and Integration Development

Working from the results of the fit analysis, the project team will have a set of approved development projects needed for the court implementation. Each of the development projects will have a scope and estimate that has been approved by AOC leadership. A scope document will be prepared for each development project authorizing Tyler to complete the development effort using the hours allocated within the contract.

8

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

The first step in the development process is the preparation of a conceptual process design (CPD). The CPD describes the business problem and how it will be addressed in Odyssey. It "tells the story," in addition to outlining the technical solution. The goal is to ensure that the requirements have been properly translated into a design that solves the business problem. The CPD is reviewed with the client either through a WebEx/GoToMeeting session or an on-site review. Modifications are made if necessary to the CPD prior to client approval. The CPD process will consist of the following steps:

- The first step will be a fixed cost for creation of a CPD and an estimated cost for the related development so that the AOC can understand the complexity and potential cost impact, if any.

- Upon approval by the AOC to proceed, Tyler will then prepare a CPD for the AOC's review and approval. The CPD will contain the business requirement, the design approach, any change in cost from the previous estimate, and the anticipated delivery schedule in sufficient detail for Tyler and the AOC to understand the scope of work.

For certain enhancement requests, Tyler will ask the AOC to take part in additional enhancement design/review meetings held throughout the development cycle. Because this process adds overhead to the development cycle, it is ideal for larger enhancements only or enhancements where the Tyler team feels there is a higher than normal risk of missing a requirement. The Tyler project manager will communicate anticipated release and review periods with the AOC project manager.

In addition to any development projects, Tyler will create an integration CPD for each integration identified previously in the project. Each integration CPD will document the integration requirements to include the detailed fields and functionality needed to achieve the intended integration. Subsequently, Tyler will then create integrations for each of the Court's integration needs as identified in the RFP and fit assessment. These integration packages will be staged and delivered for solution testing with subsequent phases.

9

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Deliverable | Description |
|---|---|
| **2.2.1 CPD Documents for each development project** | Tyler will create CPD documents for each development project. |
| **2.2.2 CPD Documents for each integration project** | Tyler will create CPD documents for each integration. |
| **2.2.3 Delivery to the Odyssey Test environment** | Tyler will deliver the completed development and integration projects to the Odyssey Test environment via the Tyler Installation Management System (TIMS).   In addition to the software modifications Tyler will also deliver the following items to the AOC based on the release:<br><br>• Release notes.<br><br>• Data dictionary.<br><br>• Updated design documents (Use Case, CPDs)<br><br>It should be noted that the data dictionary and the updated design documents are internal working documents produced by Tyler as part of the development process.  These will be delivered to the AOC in their working form and may contain grammatical or typographic errors. |

## Task 2.3 – Conduct Application Configuration

The configuration team will reuse scenarios prepared and information learned during the fit analysis as the starting point for the configuration/workflow activity. During this activity, the lead business advisor, subject matter experts, and Tyler configuration team will review and document the case processing workflow in Odyssey.

Prior to the initiation of the configuration activity, Tyler will conduct additional training sessions for participants in the configuration activities. This will enable the participants to have in-depth knowledge of how the system works, and how the configuration will impact the way the application behaves.

Tyler will prepare the teams participating in configuration with a series of workshops. The workshops focus on the areas of configuration, forms, reports, and process review and design. Each workshop has been set up to instruct

10

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

participants on best practices for performing each of the functions. The purpose of the configuration workshop is to jointly configure the system with the Court and County Clerk's SMEs.

Tyler's goal for the configuration workshop is to leave the Court with a 90 percent configured system, feeling confident that the SMEs can configure the remaining elements and maintain the configuration on an ongoing basis. Remaining configuration typically includes decisions that need more thought or items that are part of the new development. After the configuration workshop, the project team will feel comfortable working through the remaining decisions with Tyler.

Tyler's approach for forms, reports, and process review and design takes a little longer. These workshops communicate the major and important points, but the workload documenting each is more labor intensive and is extended over a longer period than the base product configuration.

For the code configuration, forms, reports, and process review workshops, the project managers will be diligent in monitoring the output of the session. A configuration tracking tool will be developed and utilized to help track the configuration progress. At the end of the configuration/workflow design activity, the teams will have successfully configured the Odyssey CMS and defined selected critical processes. Additionally, the AOC will be confident in its ability to support and make changes to the configuration to meet new business needs.

The scope of the configuration activities will include the entire scope of the project including the following:

- Case Management

- Document Management

- Financial Management

- Electronic Filing

- Electronic Payments

- SessionWorks Clerk Edition

- SessionWorks Judge Edition

- Public Access

11

- Jury

| Deliverable | Description |
|---|---|
| 2.3.1 Pre-Configuration Workshop Training | Tyler will train the configuration workshop participants so that they are sufficiently prepared to participate in the configuration workshop activities. |
| 2.3.2 Case Manager Workshop(s) Completion | Completion of the Case Manager Workshop(s), to be delivered on site by Tyler personnel to Idaho's subject matter experts |
| 2.3.3 Security Workshop(s) Completion | Completion of the Security Workshop(s), to be delivered on site by Tyler personnel to Idaho's subject matter experts |
| 2.3.4 Forms Workshop(s) Completion | Completion of the Forms Workshop(s), to be delivered on site by Tyler personnel to Idaho's subject matter experts |
| 2.3.5 Financial Workshop(s) Completion | Completion of the Financial Configuration Workshop(s), to be delivered on site by Tyler personnel to Idaho's subject matter experts. |
| 2.3.6 Reports Workshop(s) Completion | Completion of the Reports Workshop(s) delivered on site by Tyler personnel to Idaho's subject matter experts. |

## Task 2.4 – Conduct Data Conversion

Initial conversion activities will begin shortly after the fit analysis is complete. While the conversion cycles of each phase will have unique characteristics, a significant amount of the analysis and tools built for the first conversion will be reused as a part of the reliable and repeatable implementation process. Tyler and Idaho will assemble a high-level conversion team that will be in place throughout the project, in addition to phase specific conversion teams that are focused on each of the phase business unit areas.

To help Tyler understand the different data conversion conditions, Tyler will conduct a data conversion mapping workshop. Like other workshops, this has a very formal structure to help both teams understand all the elements involved with the conversion. In addition to understanding the structure and conversion

12

techniques, the workshop enables the teams to organize their team structure formally, deciding on the specific roles for the conversion activities.

Tyler has developed a world-class Conversion Toolkit Framework, which has been expanded and enhanced based on hundreds of our successful conversions. The framework is kept current with Odyssey releases and service packs. It has tools that allow for validation of the data and also to verify that no data has been left behind.

The Conversion Toolkit Framework supports all the Odyssey products, so Tyler has experience in converting non-unified Court/County Clerk environments. Tyler has incorporated functions into the Framework and the core Odyssey product to facilitate mass or individual party merge capabilities. This is critical when dealing with data coming from either legacy systems that are not party-based or disparate legacy systems. Without this capability, the new system is unable to provide the true benefit of a party-based system to the user.

*Conversion Approach*
After the initial conversion push, the conversion team will go through several cycles massaging data, reviewing data, and comparing data elements in the AOC legacy system with same data elements in Odyssey.

To complete the conversion cycle for each Court go-live, the conversion team will work with the business team performing a total data conversion and data validation. The teams will execute several cycles completing the following tasks for each cycle:

- Execute conversion scripts pushing data to configured site

- Review data with lead business advisor and subject matter experts

- Document data exceptions and business rules to be applied

- Document schema mapping, assumptions, and decisions applied to converted data

- Identify and document source data to be cleaned up prior to the next conversion run

- Update scripts as needed to influence different or additional data behavior

13

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

It is very common to find issues with the conversion in its initial cycles. As the issues are identified, the teams will update scripts and conversion routines as necessary to create the desired output. The teams will repeat this cycle until the joint teams agree that the conversion routines and the physical data have been validated for production. This iterative process will recur until the data is production-ready. Historically, our conversion teams run three to four cycles before the business has approved the data conversion for the go-live transition.

Once the data has been validated, the team will stage the conversion routines and any procedural instructions for the transition to Odyssey.

The physical data conversion development will be performed at the Tyler office in Plano, Texas. This minimizes the need to secure and utilize network resources to perform the bulk of our conversion programming.

For each conversion push, we will push the data to a conversion environment maintained on the AOC's servers. This will allow for subject matter experts and end users to compare converted data locally with their existing application data and verify its accuracy.

For the initial data push, Tyler staff will be on site to conduct a joint data review. Included with this review will be training on documenting of conversion issues to facilitate efficient and accurate data fixes by Tyler conversion staff.

The last two pushes will be focused primarily on any data elements dependent on custom application development (i.e., judgment information, etc.). Pilot court data is used to build the baseline conversion package, and then is validated and refined with each subsequent rollout.

Once the baseline (statewide) conversion package is developed, it will be included in the reliable and repeatable process that will be used for each implementation event during the statewide rollout. By utilizing this process, the number of conversion cycles will be greatly reduced as the implementation progresses across the state. Milestones during the data configuration development process include conversion logic approval, and pilot court data conversion approval to move the conversion to user acceptance testing.

14

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Deliverable | Description |
|---|---|
| 2.4.1 Load of Legacy Data into Staging Database | Legacy data conversion successfully extracted from the legacy environment by the AOC and loaded into the staging database by Tyler. |
| 2.4.2 Completion of Data Mapping | Mapping of legacy data is complete. The mapping of data elements will be completed by Tyler with assistance from the AOC as necessary. |
| 2.4.3 First Data Conversion Push | First data push from the staging database into the conversion environment is completed. |
| 2.4.4 Enterprise Custom Reporting Training Complete | ECR Training is complete. |

Task 2.5 – Conduct System Testing

The testing process is concerned about testing both the system functionality as well as the associated business processes. Tyler will work with the AOC to create test plan and testing environments for all testing activities. Testing will cover all application development, integration development, business processes, functional requirements, interfaces, configuration, converted data, performance and security testing. Testing is an iterative process, and will occur with every release of new code, new process development, and with each Release. Test results will be centrally tracked within a mutually agreed upon Test and Defect Tracking System. Any defects identified will be assigned a severity level to prioritize defect resolution, using the following severity level categories:

a. Critical – Priority 1 (P1): Show stopper defects that must be resolved. The solution cannot move to production without fixing such defects. Testing cannot be completed with the test case until the defect is fixed.

b. Major – Priority 2 (P2): Sizable defect that must be fixed prior to moving to production. Testing may be completed within a work around to the test case.

c. Minor – Priority 3 (P3): Small defects that are difficult to reproduce or have low visibility. Testing may be able to be completed using the

15

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

defined test case. The solution can move to production, and the identified defect can be fixed at a later time with a subsequent release.

d. Enhancement – Priority 4 (P4): A suggestion to improve the solution's usability. Enhancements are not required to be fixed prior to moving into production.

*Unit and Integration Testing*

After application changes are delivered, integrations are developed, configuration is finalized, and procedures are completed, the joint team will conduct a full system test of each element of the application using test cases developed during the creation of the test plan. Results of the testing will be documented and issues will be escalated for timely resolution and correction. The testing cycle described above will be repeated until all material deficiencies (Critical and Major defects) are resolved. Tyler will be leading this activity with assistance and support from the Idaho project team.

*Performance Testing*

The AOC will test the System against the system performance benchmarks, included as Exhibit A, at a site mutually agreed upon by AOC and Tyler before implementation in the pilot court. These will be considered the lab system performance benchmarks. Any benchmark not met will be considered a Defect and reported to Tyler as such. Such Defects will be assigned Priority 2 Defect. Tyler will be responsible for bringing lab test results up to the performance levels as defined in the performance levels benchmarks defined in the table above.

*User Acceptance Testing*

Special attention should be given to User Acceptance Testing. Best practice traditionally has been to treat this activity as a mock go live, simulating the upcoming milestone go live event. UAT not only tests the functionality of the application but also ensures that the security rights and roles have been appropriately assigned to ensure individuals have access to the functions they need to perform their duties.

The goal for end user acceptance testing is a full end-to-end test cycle. This testing will verify that all aspects of the project (application configuration, forms configuration, security configuration, conversion, development, and integration) are working according to specification. Testing cycles will be completed on both converted and new case data, in order to verify the system is operating at the expected level needed to support an end user go live.

16

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

Running the predefined scenarios through the new site, the lead business advisor and SMEs are able to validate end-to-end functional processes and associated interfaces between Odyssey and the external interface partners.

This process will be led by the court team with assistance and support by the Tyler team.

| Deliverable | Description |
|---|---|
| 2.5.1  System Test Plan | Tyler, in partnership with the project team, will develop and deliver a detailed test plan documenting unit tests, data conversions tests, integration tests, functional tests, performance tests, and regression tests. As part of this plan, Tyler will document each test case and script (if warranted). |
| 2.5.2 Unit and Integration Testing Complete | Unit and integration testing complete with approval of test results from the AOC |
| 2.5.3 Performance Testing Complete | Performance testing complete with approval of test results from the AOC |
| 2.5.4 User Acceptance Testing Complete | User-Acceptance testing complete with approval of test results from the AOC |

17

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

## PHASE 3 – PILOT DEPLOYMENT

During this phase of the project the Odyssey software will be deployed to the
pilot court. The tasks associated with this phase are:

- Task 3.1 – Conduct Local Court Configuration
- Task 3.2 – Validate Local Court Readiness
- Task 3.3 – Conduct Local Court Training
- Task 3.4 – Conduct Local Court Data Conversion
- Task 3.5 – Conduct Go-Live Support
- Task 3.6 – Conduct Lessons Learned

The activities and deliverables associated with these tasks are described below.

### Task 3.1 – Conduct Local Court Configuration

Tyler will assist the AOC and the local court in performing local configuration and
local court testing. This process will refine the configuration performed during
the earlier statewide configuration process to define the code table that will be
specific for the local court (calendars, judicial pools, case numbering, workflows,
etc.). Business process testing will be performed to validate all assumptions and
testing completed during the earlier testing activity, and help confirm readiness
of the local court to proceed with the go-live. Tyler will lead this activity, but this
activity cannot be successfully completed without significant assistance and
direction from the AOC and local court.

| Deliverable | Description |
|---|---|
| 3.1.1 Local Configuration | Tyler will work with the AOC and the local SMEs to configure each local court for use of the new system. |

### Task 3.2 – Validate Local Court Readiness

Tyler, with assistance from the AOC, will verify that all aspects of the deployment
including the following:

- Application Configuration.
- Forms Configuration.

18

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

- Security Configuration.

- Local Equipment Readiness.

- Network Connectivity.

- Local Data Conversion.

- Local Interfaces (if applicable).

| Deliverable | Description |
|---|---|
| 3.2.1 Local Court Readiness | Tyler will work with the AOC and the local SMEs to validate the local court readiness prior to implementation. |

Task 3.3 – Conduct Local Court Training

After completion of the Local Court Readiness, the project team will formally agree to move forward with the planned go-live. Once the go-live schedule is confirmed, the first activity will be to train the subject matter experts. Using a training plan previously reviewed and approved, the project management team will initiate the training activities.

Training materials and the course plan are organized through a series of modules that focus training on the subject matter experts' specific job functions. Tyler will develop a training plan for the local court training, to include a detailed training matrix. This matrix will document all court employees to be trained, a description of the training courses to be offered, identification of the courses (and hours) each court employee must attend, and a complete schedule of the training activity.

Once the subject matter expert training has been completed, Tyler's training staff will proceed with end user training. This training will focus on the specific job functions of the end users, and tailored to the business processes of the court.

Training is administered so as to minimally impact the day-to-day operations of each court location. The schedule and plan are created with area supervisors so that the operation of the court location can continue during training. At the sole

19

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

discretion of the AOC, AOC training personnel may assist Tyler in conducting end-user training activities.

| Deliverable | Description |
|---|---|
| 3.3.1 Local Training Plan | Tyler will develop a local training plan to include the training materials and a training matrix for the local court(s) to be trained. |
| 3.3.2 Local Training Complete | Represents the completion of end-user training activities prior to go-live. |

## Task 3.4 – Conduct Local Data Conversion

During the test data conversion pushes, the time required to perform the data conversion will be determined. Based on this determination, it will be decided when data entry into the legacy system should stop, and the data extract process begin. Typically the data conversion starts after the legacy system is shut down for processing on Friday. If possible, it is preferred to shut down earlier on a Friday and hold over some of the work for processing in the new system. Even if the normal Friday close time is adhered to, some work needs to be retained for processing on the new system over the weekend for testing and validation purposes. The final data conversion schedule will be approved by the AOC.

| Deliverable | Description |
|---|---|
| 3.4.1 Local Data Conversion | Tyler will perform data conversion for each implementation event in using the reliable and repeatable processes established. |

## Task 3.5 – Conduct Go-Live Support

Tyler will provide on-site support at the court location(s) for the local court management, court administration and technical activities in coordination with the AOC customer service and court education staff. Tyler will function as consultants and provide problem resolution for business operations as it pertains to the new system, provide timely issue resolution, transfer knowledge to the AOC customer service staff, and provide support to the Court Education Professionals and SMEs to ensure consistency of information to users of the system.

20

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Deliverable | Description |
| --- | --- |
| **3.5.1 Local Court Deployment and Implementation Complete** | Deployment and Implementation of the System in accordance with applicable Specifications in the pilot court. |

## Task 3.6 – Conduct Lessons Learned

After the go-live is complete time is set aside to review lessons learned, configuration, development, business processes, and data conversion to make any changes prior to continuing with the implementation. Configuration changes will be considered for implementation prior to the next court implementation. Data conversion changes will be made to the code data conversion package that will be used for each subsequent implementation based on issue resolution during the post go-live support phase. Modifications may also be made to training materials, training classes, on-line help or deployment plan if necessary based on the lessons learned during the implementation.

This activity would occur once the primary go-live activities and support are complete.

| Deliverable | Description |
| --- | --- |
| **3.6.1 Go-Live Lessons Learned** | Deliverable summarizing the lessons learned from the go-live activity. This deliverable will address the following topics:<br><br>• Activities that went well.<br><br>• Activities that didn't go well.<br><br>• Alternatives and remedies as to why activities did or didn't go-well.<br><br>• Recommendations to future rollouts. |

21

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

## PHASE 4 – ADA COUNTY DEPLOYMENT

During this phase of the project the Odyssey software will be deployed in Ada County. The tasks associated with this phase are:

- Task 4.1 – Conduct Local Court Configuration
- Task 4.2 – Validate Local Court Readiness
- Task 4.3 – Conduct Local Court Training
- Task 4.4 – Conduct Local Court Data Conversion
- Task 4.5 – Conduct Go-Live Support
- Task 4.6 – Conduct Lessons Learned

The activities and deliverables associated with these tasks are described below.

### Task 4.1 – Conduct Local Court Configuration

Tyler will assist the AOC and the local court in performing local configuration and local court testing. This process will refine the configuration performed during the earlier statewide configuration process to define the code table that will be specific for the local court (calendars, judicial pools, case numbering, workflows, etc.). Business process testing will be performed to validate all assumptions and testing completed during the earlier testing activity, and help confirm readiness of the local court to proceed with the go-live. Tyler will lead this activity, but this activity cannot be successfully completed without significant assistance and direction from the AOC and local court.

| Deliverable | Description |
|---|---|
| 4.1.1 Local Configuration | Tyler will work with the AOC and the local SMEs to configure each local court for use of the new system. |

### Task 4.2 – Validate Local Court Readiness

Tyler, with assistance from the AOC, will verify that all aspects of the deployment including the following:

22

- Application Configuration.
- Forms Configuration.
- Security Configuration.
- Local Equipment Readiness.
- Network Connectivity.
- Local Data Conversion.
- Local Interfaces (if applicable).

| Deliverable | Description |
|---|---|
| 4.2.1 Local Court Readiness | Tyler will work with the AOC and the local SMEs to validate the local court readiness prior to implementation. |

### Task 4.3 – Conduct Local Court Training

After completion of the Local Court Readiness, the project team will formally agree to move forward with the planned go-live. Once the go-live schedule is confirmed, the first activity will be to train the subject matter experts. Using a training plan previously reviewed and approved, the project management team will initiate the training activities.

Training materials and the course plan are organized through a series of modules that focus training on the subject matter experts' specific job functions. Tyler will develop a training plan for the local court training, to include a detailed training matrix. This matrix will document all court employees to be trained, a description of the training courses to be offered, identification of the courses (and hours) each court employee must attend, and a complete schedule of the training activity.

Once the subject matter expert training has been completed, Tyler's training staff will proceed with end user training. This training will focus on the specific job functions of the end users, and tailored to the business processes of the court.

23

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

Training is administered so as to minimally impact the day-to-day operations of each court location. The schedule and plan are created with area supervisors so that the operation of the court location can continue during training. At the sole discretion of the AOC, AOC training personnel may assist Tyler in conducting end-user training activities.

| Deliverable | Description |
|---|---|
| 4.3.1 Local Training Plan | Tyler will develop a local training plan to include the training materials and a training matrix for the local court(s) to be trained. |
| 4.3.2 Local Training Complete | Represents the completion of end-user training activities prior to go-live. |

## Task 4.4 – Conduct Local Data Conversion

During the test data conversion pushes, the time required to perform the data conversion will be determined. Based on this determination, it will be decided when data entry into the legacy system should stop, and the data extract process begin. Typically the data conversion starts after the legacy system is shut down for processing on Friday. If possible, it is preferred to shut down earlier on a Friday and hold over some of the work for processing in the new system. Even if the normal Friday close time is adhered to, some work needs to be retained for processing on the new system over the weekend for testing and validation purposes. The final data conversion schedule will be approved by the AOC.

| Deliverable | Description |
|---|---|
| 4.4.1 Local Data Conversion | Tyler will perform data conversion for each implementation event in using the reliable and repeatable processes established. |

## Task 4.5 – Conduct Go-Live Support

Tyler will provide on-site support at the court location(s) for the local court management, court administration and technical activities in coordination with the AOC customer service and court education staff. Tyler will function as consultants and provide problem resolution for business operations as it pertains to the new system, provide timely issue resolution, transfer knowledge to the AOC customer service staff, and provide support to the Court Education

24

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

Professionals and SMEs to ensure consistency of information to users of the system.

| Deliverable | Description |
| --- | --- |
| **4.5.1 Local Court Deployment and Implementation Complete** | Deployment and Implementation of the System in accordance with applicable Specifications in Ada County. |

## Task 4.6 – Conduct Lessons Learned

After the go-live is complete time is set aside to review lessons learned, configuration, development, business processes, and data conversion to make any changes prior to continuing with the implementation.    Configuration changes will be considered for implementation prior to the next court implementation. Data conversion changes will be made to the code data conversion package that will be used for each subsequent implementation based on issue resolution during the post go-live support phase. Modifications may also be made to training materials, training classes, on-line help or deployment plan if necessary based on the lessons learned during the implementation.

This activity would occur once the primary go-live activities and support are complete.

| Deliverable | Description |
| --- | --- |
| **4.6.1 Go-Live Lessons Learned** | Deliverable summarizing the lessons learned from the go-live activity. This deliverable will address the following topics:<br><br>• Activities that went well.<br><br>• Activities that didn't go well.<br><br>• Alternatives and remedies as to why activities did or didn't go-well.<br><br>• Recommendations to future rollouts. |

25

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

## Phase 5 – Statewide Deployment

During this phase of the project the Odyssey software will be deployed to the remaining courts.  The tasks associated with this phase are:

- Task 5.1 – Conduct Local Court Configuration
- Task 5.2 – Validate Local Court Readiness
- Task 5.3 – Conduct Local Court Training
- Task 5.4 – Conduct Local Court Data Conversion
- Task 5.5 – Conduct Go-Live Support
- Task 5.6 – Conduct Lessons Learned

The activities and deliverables associated with these tasks are described below. **This phase will be executed up to three times to complete the rollout of Odyssey throughout the remaining courts.**

Task 5.1 – Conduct Local Court Configuration

Tyler will assist the AOC and the local court in performing local configuration and local court testing. This process will refine the configuration performed during the earlier statewide configuration process to define the code table that will be specific for the local court (calendars, judicial pools, case numbering, workflows, etc.). Business process testing will be performed to validate all assumptions and testing completed during the earlier testing activity, and help confirm readiness of the local court to proceed with the go-live.  Tyler will lead this activity, but this activity cannot be successfully completed without significant assistance and direction from the AOC and local court.

| Deliverable | Description |
|---|---|
| 5.1.1 Local Configuration | Tyler will work with the AOC and the local SMEs to configure each local court for use of the new system. |

Task 5.2 – Validate Local Court Readiness

Tyler, with assistance from the AOC, will verify that all aspects of the deployment including the following:

- Application Configuration.

26

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

- Forms Configuration.

- Security Configuration.

- Local Equipment Readiness.

- Network Connectivity.

- Local Data Conversion.

- Local Interfaces (if applicable).

| Deliverable | Description |
|---|---|
| 5.2.1 Local Court Readiness | Tyler will work with the AOC and the local SMEs to validate the local court readiness prior to implementation. |

Task 5.3 – Conduct Local Court Training

After completion of the Local Court Readiness, the project team will formally agree to move forward with the planned go-live. Once the go-live schedule is confirmed, the first activity will be to train the subject matter experts. Using a training plan previously reviewed and approved, the project management team will initiate the training activities.

Training materials and the course plan are organized through a series of modules that focus training on the subject matter experts' specific job functions. Tyler will develop a training plan for the local court training, to include a detailed training matrix. This matrix will document all court employees to be trained, a description of the training courses to be offered, identification of the courses (and hours) each court employee must attend, and a complete schedule of the training activity.

Once the subject matter expert training has been completed, Tyler's training staff will proceed with end user training. This training will focus on the specific job functions of the end users, and tailored to the business processes of the court.

Training is administered so as to minimally impact the day-to-day operations of each court location. The schedule and plan are created with area supervisors so that the operation of the court location can continue during training. At the sole

27

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

discretion of the AOC, AOC training personnel may assist Tyler in conducting end-user training activities.

| Deliverable | Description |
|---|---|
| 5.3.1 Local Training Plan | Tyler will develop a local training plan to include the training materials and a training matrix for the local court(s) to be trained. |
| 5.3.2 Local Training Complete | Represents the completion of end-user training activities prior to go-live. |

## Task 5.4 – Conduct Local Data Conversion

During the test data conversion pushes, the time required to perform the data conversion will be determined. Based on this determination, it will be decided when data entry into the legacy system should stop, and the data extract process begin. Typically the data conversion starts after the legacy system is shut down for processing on Friday. If possible, it is preferred to shut down earlier on a Friday and hold over some of the work for processing in the new system. Even if the normal Friday close time is adhered to, some work needs to be retained for processing on the new system over the weekend for testing and validation purposes. The final data conversion schedule will be approved by the AOC.

| Deliverable | Description |
|---|---|
| 5.4.1 Local Data Conversion | Tyler will perform data conversion for each implementation event in using the reliable and repeatable processes established. |

## Task 5.5 – Conduct Go-Live Support

Tyler will provide on-site support at the court location(s) for the local court management, court administration and technical activities in coordination with the AOC customer service and court education staff. Tyler will function as consultants and provide problem resolution for business operations as it pertains to the new system, provide timely issue resolution, transfer knowledge to the AOC customer service staff, and provide support to the Court Education Professionals and SMEs to ensure consistency of information to users of the system.

28

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Deliverable | Description |
|---|---|
| 5.5.1 Local Court Deployment and Implementation Complete | Deployment and Implementation of the System in accordance with applicable Specifications in the local court. |

## Task 5.6 – Conduct Lessons Learned

After the go-live is complete time is set aside to review lessons learned, configuration, development, business processes, and data conversion to make any changes prior to continuing with the implementation. Configuration changes will be considered for implementation prior to the next court implementation. Data conversion changes will be made to the code data conversion package that will be used for each subsequent implementation based on issue resolution during the post go-live support phase. Modifications may also be made to training materials, training classes, on-line help or deployment plan if necessary based on the lessons learned during the implementation.

This activity would occur once the primary go-live activities and support are complete.

| Deliverable | Description |
|---|---|
| 5.6.1 Go-Live Lessons Learned | Deliverable summarizing the lessons learned from the go-live activity. This deliverable will address the following topics:<br><br>• Activities that went well.<br><br>• Activities that didn't go well.<br><br>• Alternatives and remedies as to why activities did or didn't go-well.<br><br>• Recommendations to future rollouts. |

29

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

## PHASE 6 – ELECTRONIC FILING DEPLOYMENT

During this phase of the project electronic filing will be deployed to the trial courts. Electronic filing will be deployed in the same manner that Odyssey is, thru multi-court implementation events. These events will trail the implementation of Odyssey by approximately 90 days, allowing courts to get up and stable on Odyssey before eFiling is deployed. **It is important to note that Tyler will execute Phase 6 of the project up to five times.**

Task 6.1 – Conduct eFiling Configuration and Testing

During this task the e-Filing solution will be configured based on the scope of the rollout and the configuration conducted by the court within the Odyssey case management solution. Additional configuration is performed which enables optional features in the e-Filing module and influences how CMS configuration appears to e-filers, and what choices they will have.

Once configuration is complete, Tyler and the AOC project team will conduct a complete set of system tests to ensure that the e-Filing configuration is working properly and that all information is being successfully transmitted from Odyssey File and Serve to Odyssey Case Manager.

| Deliverable | Description |
|---|---|
| **6.1.1 e-Filing Configuration Documentation** | This deliverable documents the configuration of the e-Filing solution. This documentation is a key artifact and resource to keeping the synchronization between Odyssey and Odyssey File and Serve. |
| **6.1.2 e-Filing Test Plan** | Tyler will develop detailed test plan of the e-filing solution, to include test cases and scripts (if warranted). |
| **6.1.3 Test Plan Approval** | The AOC will review, recommend changes (if necessary) and formally approve the test plan. |

Task 6.2 – Conduct eFiling Training

There will be a cycle of training for internal court users on e-filing specific processes, such as review and acceptance of e-filed documents, recording and distribution of court orders and events, and handling of proposed orders. In

30

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

parallel, there will be an external communication program to make justice partners aware of the overall plan, timing, and schedule.

Immediately prior to deployment of the solution, Tyler will conduct necessary training to e-filing users. The manner in which training will be conducted will be determined by the e-Filing rollout strategy, but is likely to include both in-person training and online training courses.

| Deliverable | Description |
| --- | --- |
| 6.2.1 e-Filing Training Plans and Materials | The e-Filing training plan will define how training is going to be provided to both the internal court staff and the external filing community. |
| 6.2.2 e-Filing Training Complete | Represents the completion of court personnel and end-user training activities prior to go-live. |

Task 6.3 – Conduct eFiling Rollout

During this final task electronic filing will go-live and the court's business partners will begin electronically filing their documents and information with the court.

| Deliverable | Description |
| --- | --- |
| 6.3.1 e-Filing Go-Live Status Reports | Weekly status reports that identify the running log of issues and associated resolution plans during the cutover process to the new e-Filing system. |

## PHASE 7 – JURY DEPLOYMENT

During this phase of the project the Jury system will be configured and deployed to all courts. The implementation of the Jury system is independent of all other project phases and can occur at any point within the project once development of the jury application has been complete.

Task 7.1 – Conduct Jury Configuration

During this first task Tyler will conduct a series of configuration workshops with the subject matter experts to configure the jury application. The number of

31

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

workshops conducted will be jointly determined by the project team upon recommendation by Tyler.

During the configuration workshops Tyler will lead the participants in the configuration of the application. Workshop partiicpants will then complete the configuration of the application after the workshops have concluded with appropriate assistance and consultation from Tyler.

| Deliverable | Description |
| --- | --- |
| 7.1.1 Configuration Workshops Completed | Jury configuration workshops completed. |

## Task 7.2 – Jury Data Conversion

During this task Tyler will work with the State of Idaho to perform the necessary data conversion and/or data load of jury information. The strategy for conducting this task will be mutually agreed upon by both Tyler and the AOC; based on the specific needs of the court at the period of time when this activity occurs. It may be necessary to convert some of the legacy application data in conjunction with a complete load of juror information from the appropriate external sources.

| Deliverable | Description |
| --- | --- |
| 7.2.1 Jury Data Converted / Loaded | The Odyssey Jury system is loaded with appropriate data for normal operations. |

## Task 7.3 – Conduct Jury Application Testing

A testing process (in accordance with Task 2.5) will be conducted for the Jury application to validate the system functionality as well as the associated business processes. Tyler will work with the AOC to create a test plan and testing environments for all testing activities.

32

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Deliverable | Description |
|---|---|
| 7.3.1 Test Plan | Tyler, in partnership with the project team, will develop and deliver a detailed test plan outlining include unit tests, security tests, data conversions tests, integration tests, functional tests, performance tests, and regression tests. As part of this plan, Tyler will document each test case and script (if warranted). |
| 7.3.2 Unit and Integration Testing Complete | Unit and integration testing complete with approval of test results from the AOC |
| 7.3.3 Performance Testing Complete | Performance testing complete with approval of test results from the AOC |
| 7.3.4 User Acceptance Testing Complete | User-Acceptance testing complete with approval of test results from the AOC |

Task 7.4 – Conduct Jury Training

During this task Tyler will develop a comprehensive training plan, training materials, and conduct end-user training on the jury application. This training will be conducted centrally in Boise for all jury commissioners. Appropriate training materials will be provided.

| Deliverable | Description |
|---|---|
| 7.4.1 Jury Training Plan | Tyler will develop a training plan for the jury application to include the training materials and a training matrix for all jury commissioners to be trained. |
| 7.4.2 Jury Training Complete | Jury training complete. |

Task 7.5 – Conduct Jury Go-Live Support

Tyler will provide support for the Jury deployment. The manner in which go-live support will be provided will be jointly determined by Tyler and the AOC. Tyler will function as consultants and provide problem resolution for business

33

operations as it pertains to the new system, provide timely issue resolution, transfer knowledge to the AOC customer service staff, and provide support to the Court Education Professionals and SMEs to ensure consistency of information to users of the system.

| Deliverable | Description |
|---|---|
| 7.5.1 Jury Go-Live Support | Deployment and Implementation of the System in accordance with applicable Specifications. |

## PHASE 8 – APPEALS COURT DEPLOYMENT

During this phase of the project the Odyssey software will be deployed to the Idaho Appeals Court. The tasks associated with this phase are:

- Task 8.1 – Conduct Appeals Court Configuration
- Task 8.2 – Validate Appeals Court Readiness
- Task 8.3 – Conduct Appeals Court Training
- Task 8.4 – Conduct Appeals Court Data Conversion
- Task 8.5 – Conduct Go-Live Support

The activities and deliverables associated with these tasks are described below.

Task 8.1 – Conduct Appeals Court Configuration

Tyler will assist the AOC and the Appeals Court in performing configuration and testing. This process will refine the configuration performed during the earlier statewide configuration process to define the code table and workflow specific for the Appeals Court (calendars, judicial pools, case numbering, workflows, etc.). Business process testing will be performed to validate all assumptions and testing completed during the earlier testing activity, and help confirm readiness of the Appeals Court to proceed with the go-live. Tyler will lead this activity, but this activity cannot be successfully completed without significant assistance and direction from the AOC and Appeals Court.

34

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Deliverable | Description |
|---|---|
| **8.1.1 Appeals Court Configuration** | Tyler will work with the AOC and the SMEs to configure the Appeals Court for use of the new system. |

## Task 8.2 – Conduct Appellate Testing

A testing process will be conducted for the Appellate solution to validate the system functionality as well as the associated business processes. Tyler will work with the AOC to create a test plan and testing environments for all testing activities.

| Deliverable | Description |
|---|---|
| **8.2.1  Test Plan** | Tyler, in partnership with the project team, will develop and deliver a detailed test plan outlining include unit tests, security tests, data conversions tests, integration tests, functional tests, performance tests, and regression tests.  As part of this plan, Tyler will document each test case and script (if warranted). |
| **8.2.2 Unit Testing Complete** | Unit testing complete with approval of test results from the AOC |
| **8.2.3 User Acceptance Testing Complete** | User-Acceptance testing complete with approval of test results from the AOC |

## Task 8.3 – Validate Appeals Court Readiness

Tyler, with assistance from the AOC, will verify that all aspects of the deployment including the following:

- Application Configuration.
- Forms Configuration.
- Security Configuration.
- Local Equipment Readiness.
- Network Connectivity.

35

**ER-874**

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

- Data Conversion.

| Deliverable | Description |
|---|---|
| 8.3.1 Appeals Court Readiness | Tyler will work with the AOC and the SMEs to validate the Appeals Court readiness prior to implementation. |

## Task 8.4 – Conduct Appeals Court Training

After completion of the Appeals Court Readiness, the project team will formally agree to move forward with the planned go-live. Once the go-live schedule is confirmed, the first activity will be to train the subject matter experts. Using a training plan previously reviewed and approved, the project management team will initiate the training activities.

Training materials and the course plan are organized through a series of modules that focus training on the subject matter experts' specific job functions.

Once the subject matter expert training has been completed, Tyler's training staff will proceed with end user training. This training will focus on the specific job functions of the end users, and tailored to the business processes of the court.

| Deliverable | Description |
|---|---|
| 8.4.1 Appeals Court Training Plan | Tyler will develop a training plan to include the training materials and a training matrix for all appeals court personnel to be trained. |
| 8.4.2 Appeals Court Training Complete | Represents the completion of end-user training activities prior to go-live. |

## Task 8.5 – Conduct Appeals Court Data Conversion

During the test data conversion pushes, the time required to perform the data conversion will be determined. Based on this determination, it will be decided when data entry into the legacy system should stop, and the data extract process begin. Typically the data conversion starts after the legacy system is shut down for processing on Friday. If possible, it is preferred to shut down earlier on a Friday and hold over some of the work for processing in the new system. Even if the normal Friday close time is adhered to, some work needs to be retained for

36

**ER-875**

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

processing on the new system over the weekend for testing and validation purposes. The final data conversion schedule will be approved by the AOC.

| Deliverable | Description |
|---|---|
| 8.5.1 Appeals Court Data Conversion | Tyler will perform data conversion using the reliable and repeatable processes established. |

### Task 8.6 – Conduct Go-Live Support

Tyler will provide on-site support at the Appeals Court location for the management, court administration and technical activities in coordination with the AOC customer service and court education staff. Tyler will function as consultants and provide problem resolution for business operations as it pertains to the new system, provide timely issue resolution, transfer knowledge to the AOC customer service staff, and provide support to the Court Education Professionals and SMEs to ensure consistency of information to users of the system.

| Deliverable | Description |
|---|---|
| 8.6.1 Appeals Court Deployment and Implementation Complete | Deployment and Implementation of the System in accordance with applicable Specifications in the Appeals Court. |

## PHASE 9 – PROJECT CLOSEOUT

The final phase of the project is the project closure, and signals the end of the active implementation. The maintenance and support of the system, along with the deployment of new releases, will go on for many years after the initial deployment is complete.

| Deliverable | Description |
|---|---|
| 9.1.1 Project Closeout Report | Final report and documentation concluding the implementation of Odyssey. |

37

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

## Exhibit A - Response Time Performance Standards

The following performance standards will be used to evaluate system performance during the testing tasks outlined within the Statement of Work. For the purpose of this section, "Average" time means the average time for the associated key action to be performed across a sample of (10) instances, across multiple cases or data sets, of similar key actions initiated by a user.

| Key Action | Description | Normal Performance Range |
|---|---|---|
| 1. **Search Cases** | Average time for search results to be displayed after submitting search parameters from "Find a Case" | 0-2 seconds |
| 2. **View Case** | Average time for Case Summary to be displayed after selecting a typical case from search results page. | 0-3 seconds |
| 3. **Add Case** | Average time for Case Number dialog to be displayed after user adds a new case and presses the Save button. | 0-3 seconds |
| 4. **Update Case** | Average time for user to be able to continue processing after updating a typical case and pressing the Save button. | 0-2 seconds |
| 5. **Save Event** | Average time for user to be able to continue processing after adding an event and pressing the Save button. | 0-2 seconds |
| 6. **Save Hearing** | Average time for user to be able to continue processing after adding a hearing and pressing the Save button. | 0-2 seconds |
| 7. **Save Payment** | Average time for user to be able to continue processing after adding a payment and pressing the Save button. | 0-2 seconds |
| 8. **View Document** | Average time for a typical document to be displayed after user clicks on a document icon. | 0-3 seconds (file transfer time is entirely dependent upon available network bandwidth) |
| 9. **View Calendar** | Average time for a calendar to be displayed after user clicks on View Calendar. | 0-3 seconds |
| 10. **View Party** | Average time for party detail data to be displayed after user clicks on a Party link from within a case or search results page. | 0-2 seconds |
| 11. **Add Party** | Average time for a user to be able to continue processing after adding a new party and pressing the Save button. | 0-3 seconds |
| 12. **Update Party** | Average time for a user to be able to continue processing after updating an existing party and pressing the Save button. | 0-2 seconds |
| 13. **Document Access** | Average time for a document to be available for access from the Register of Actions after scanning is complete. | 0-10 seconds |
| 14. **Code Search** | Average time for search results to be displayed after submitting search for a Statute/Offense Code. | 0-3 seconds |

38

Idaho Supreme Court
Administrative Office of the Courts
Case Management Replacement Project
STATEMENT OF WORK

| Key Action | Description | Normal Performance Range |
|---|---|---|
| 15. View Picture | Average time for a 1MB photograph to be displayed after a user selects an icon from the Documents or Exhibits tab, assuming an uncongested 10Mb network connection. | 1-3 seconds (file transfer time is entirely dependent upon available network bandwidth) |
| 16. Launch Assistant | Average time for the Odyssey Assistant to be displayed after user clicks on desktop icon. | 0-3 seconds |
| 17. Login (1st) | Average time for Home page to be displayed after user logs in to Odyssey for the first time each day. | 0-6 seconds (A longer, variable duration is possible if a new release has just been loaded on the server requiring cache updates to each PC). |
| 18. Login (subsequent) | Average time for Home page to be displayed after user logs in to Odyssey for the second or subsequent times each day. | 0-4 seconds |
| 19. SessionWorks Document Cache | Assuming a docket with 20 hearings, each case having an average of 20 documents of 10 pages each) on a uncongested 10Mb network, the average time for a scheduled update of a SessionWorks document cache update (documents associated with a judge's calendared hearings for the next day) to complete after it begins. | 10 minutes (file transfer time is entirely dependent upon available network bandwidth)  Note: This operation is normally a scheduled download that occurs during off hours prior to the court session. |
| 20. Signature Queues | Average time for a document with a judge's signature to be routed to the next defined step in its work queue. | 0-5 seconds |

A "typical" case or document in the table above would be one that is characteristically similar to the majority of records in the System (characterized by number of document pages, number of parties and docket entries, etc.).

39

# Exhibit D – Business Travel Policy

In the event of a conflict between anything in this Exhibit D and Exhibit A, the terms of Exhibit A shall govern.

# State Travel Policy and Procedures

SBEX Policy No. 442-50
Adopted: July 1, 1996
Last Amended: July 1, 2012

## Table of Contents

History of Amendments
Statement of Philosophy

1.  Travel Authorization
2.  Approval of Travel Expense
3.  Allowable Expenses
4.  Expenses Not Allowable
5.  Mode and Route of Travel
6.  Travel by Public Transportation
7.  Use of Privately-owned Automobile, Aircraft, or Other Conveyance
8.  Vehicle Rentals and Aircraft Charters
9.  Use of State Vehicles
10. Lodging Expenses
11. Meal Expenses Not Allowable
12. Meal Expenses Allowable
13. Miscellaneous Expenses
14. Compensatory Time for Travel
15. Leave During Travel Status
16. Foreign Travel
17. Internal Auditing of Travel Expense Vouchers
18. Third Party Reimbursements, Rebates, Promotions
19. Travel Claims Forms

Appendix "A" (History of rate changes)
Appendix "B" (Maximum per diem reimbursement rates)
Federal Rate
Appendix "C" (Per diem examples)

## History of Amendments
Effective July 1, 1996
Approved by State Board of Examiners on June 3, 1996

**Amended by the State Board of Examiners**
April 13, 1999
February 13, 2000
June 13, 2000
January 2, 2001

July 1, 2001
January 1, 2002
January 1, 2003
January 1, 2004
April 12, 2005
September 1, 2005
January 1, 2006
January 1, 2007
January 1, 2008
July 17, 2008
January 1, 2009
December 17, 2009
July 1, 2012

## Statement of Philosophy

These State Travel Policies and Procedures are effective July 1, 1996, as adopted by the Board of
Examiners in accordance with Sections 67-1001, 67-2004, 67-2005, 67-2006, 67-2007, 67-2008, 67-5250,
Idaho Code. These travel policies and procedures replace and supersede any and all prior state travel
regulations, policies and procedures that may have been promulgated or adopted by the Board of
Examiners. These policies and procedures shall be agency guidelines for all personnel defined as
employees of the state of Idaho, except as provided by law, and shall be applicable to all official travel
paid for by the state of Idaho and all departments, agencies, officers, boards, commissions, institutions
and other state entities.

Departments may adopt their own internal travel policies for additional administrative control or
flexibility when deemed necessary or desirable. No department, however, may permit travel
reimbursement exceeding that allowed by these state Travel Policies and Procedures, nor shall they
institute more liberal measures of travel control than those provided herein. Department heads shall
make certain that all of their employees who travel for official purposes are aware of these policies
and procedures. A copy of the department's travel procedures and policies adopted in addition to those
herein provided shall be filed with the State Controller.

All reimbursable travel of state employees must have been properly authorized; actually incurred;
essential in achieving the goals or fulfilling the responsibility of a particular department; and
conducted in the most economical and practical manner for the state.

The primary responsibility for proper control and compliance with State Travel Policies and Procedures,
or those adopted by state departments, is inherent in the administrative responsibility and authority of
the director of each department. For purposes of these policies and procedures, the term "director"
shall also include the appointing authority of any state entity as enumerated above, or their designated
representative(s).

## 1. Travel Authorization

Official travel of state employees must be authorized by the director of the department or by the
director's designated representative(s).

Procedure 1-1. The method for granting authorization is left to the discretion of the director of each
department.

## 2. Approval of Travel Expense

Travel expense vouchers must be approved for payment by the department director or designated
representative(s).

## 3. Allowable Expenses
Payment of travel expense by the state of Idaho is limited to costs authorized in these State Travel Policies and Procedures, unless the Board of Examiners provides an exception thereto.

Travelers with disabilities: With prior approval of the department director or designated representative, employees with disabilities are allowed payments of certain additional travel expenses to accommodate their disabilities such as, but not limited to, subsistence and transportation of an attendant when the employee requires assistance, cost of specialized transportation, increased cost of specialized services for public carriers or special baggage handling.

## 4. Expenses Not Allowable
The following will **not** be paid by the State:

A. Expenses of a personal nature incurred for the convenience of the traveler including travel by indirect routes or stop-overs for personal reasons; or leaving earlier or returning later than necessary on a trip. It is acceptable for the traveler to leave their home station in reasonably sufficient time to arrive at an airport's recommended pre-departure time.

1. Notwithstanding the restrictions contained in 4.A. above, an agency may reimburse an employee for travel expenses incurred during official travel which includes a personal stopover to the extent the employee sufficiently documents that the cost of the entire trip (including transportation, lodging, per diem, miscellaneous expenses and compensatory time) is no more than the costs would have been without the personal stopover. Supporting schedules must be attached to the employee's travel expense voucher.

2. Extraordinary expenses due to unusual circumstances when deemed appropriate and necessary, may be approved by the department director. Supporting documentation shall be attached to the travel expense voucher.

B. Expenses for travel between home and office or for other non-official purposes, except for expenses incurred by a state employee to participate in an approved agency commuting plan. Commuting plans must be submitted by a state agency in writing and approved by the Office of the Governor.

C. Expenses incurred by an employee while on leave.

## 5. Mode and Route of Travel
Employees shall use the most practical mode of travel from the standpoint of time and expense. When unusual circumstances preclude adhering to this procedure, department directors may allow an exception. Supporting documentation shall be attached to the travel expense voucher

## 6. Travel By Public Transportation
Reimbursement for travel by common carrier shall be limited to the lowest cost means of travel unless it is impractical or not available. When for personal reasons a traveler is authorized by the department director to use a private conveyance in lieu of common carrier, reimbursement will be limited to an amount for travel, meals, lodging and miscellaneous expenses equal to the amount which would have been incurred had the travel been by common carrier. Authorized travel time shall be limited to that which would have been allowed had the employee traveled by common carrier. Unless the department director specifically authorized a leave of absence, excess travel time incurred by the authorized use of a private conveyance for personal reasons during working hours shall be charged to the traveler's

accrued leave.

Procedure 6-1. All original receipts for travel by common carrier paid by an employee must be attached to the travel expense voucher. This includes the boarding fees at airports which are considered part of the airline ticket expense. Additional fees such as baggage fees, mileage surcharges and other miscellaneous fees may also be reimbursable to the employee, provided that the same were necessary in the public service (Section 67-2006, Idaho Code).

Procedure 6-2. An explanation must be attached to the travel expense voucher when an employee is authorized to use a private conveyance in preference to the common carrier and is claiming an amount equivalent to the common carrier fare. The explanation must include destination, actual departure and return dates and hours which would have been incurred by the use of the common carrier.

## 7. Use of Privately-owned Automobile, Aircraft, or Other Conveyance

The use of privately-owned automobiles, aircraft, or other conveyances may be authorized whenever it is more practical or beneficial to the state's mission than transportation by common carrier or state vehicles. Privately-owned conveyances shall be covered by public liability and property damage insurance, pursuant to Idaho Code.

The cost of transportation by private conveyance shall be paid at the rate set by the Board of Examiners, pursuant to Appendix A, up to the maximum allowed by law.

If an agency-owned vehicle is available to the traveler, but for personal convenience a privately-owned conveyance is used, the reimbursement shall be limited to one-half the applicable rate, unless otherwise determined by the director.

Allowable in-state mileage shall be computed according to the latest official state highway map or mileage charts. Allowable out-of-state mileage shall be computed according to the latest Rand McNally Atlas. Odometer readings are permissible only when mileage computations cannot be made from such maps or charts.

Travel for official purposes in and about a city, including travel within an employee's official station, as defined in 11, when not constituting a trip between two communities may be consolidated on a daily basis and reported as "vicinity travel".

Automobile storage or parking fees will be an allowable expense when necessary to protect state or private property, or for other reasons is advantageous for the state.

Receipts for storage or long term parking fees must be attached to the travel expense voucher for reimbursement.

## 8. Vehicle Rentals and Aircraft Charters

Automobile rental or aircraft charter may be authorized by the department director when the use of such conveyance is the most economical and practical means of transportation, necessary to accomplish the state's mission.

The most economical and practical rental equipment available will be used. Receipts for vehicle rental or charter costs paid by the traveler must be attached to the travel expense voucher for reimbursement.

## 9. Use of State Vehicles

The use of state vehicles for personal or other non-official business is strictly prohibited. Home-to-office driving is only permissible when beginning or ending an authorized trip outside of regular business hours, or for other reasons considered in the best interest of the state and approved by the department director. The names and an explanation of the responsibilities of administrative personnel determined by the department director to require the permanent assignment of a state vehicle shall be furnished to the Board of Examiners for approval.

Individuals who are not on state business may not operate or ride in a state conveyance while on official state business unless prior approval has been granted by the director or designated representative(s). Supporting documentation must be attached to the travel expense voucher.

State and local traffic laws must be observed at all times. Any employee committing an infraction of such laws shall be personally liable for any damage if the employee is acting outside the course and scope of official duty, and may be subject to disciplinary action. Any employee committing an infraction of such laws may be requested to attend a defensive driving course. Employees shall be personally liable for any fines arising from infractions of state and local traffic laws. State vehicles may be operated only by individuals who possess a valid operator's license. Seat belts must be worn at all times while operating or riding in state vehicles.

## 10. Lodging Expenses
The actual cost of lodging plus applicable tax will be reimbursed to the traveler. Lodging costs may be direct-billed to the department with prior approval of the department director. Lodging costs within an employee's official station (defined in 11.) are not allowable.

Procedure 10-1. Original receipts for all lodging must be attached to the travel expense voucher for reimbursement. Any exception to this procedure must have supporting documentation attached to the travel expense voucher.

Procedure 10-2. At the time of making reservations or registering, employees shall identify themselves as state employees and whenever possible, secure the accommodations at the government rate, if available.

## 11. Meal Expenses Not Allowable
Expenses for meals or lodging of employees at their official station shall not be allowed except as provided below.

"Official station" is defined as the work area or office assigned to the employee or in certain circumstances the department director may further define the "official station" of employees with unique work assignments or responsibilities.

An exception may be made when the department director determines that due to unusual circumstances it is in the best interest of the state that the employee not return home each night, or these expenses are prepaid as part of a registration for a conference, or when the employee's job description requires that employee to be on call for emergencies during meal time.

1. Any potential determination as to what comprises a "conference" or "convention" at the official station must meet certain criteria before any consideration of meals reimbursement will be made. Such criteria may include one or more of the following: (a) the function has participants from various locations; (b) a registration fee is charged; (c) it has a published agenda; (d) meal cost is included in the registration fee; (e) attendance is compulsory or voluntary as determined by the department director, etc.

Meal expense shall not be reimbursed when a clear distinction cannot be made by any agency's

**ER-883**

documentation supporting what constitutes an official "conference" and/or "convention" using the criteria cited in 11.1.herein.

2. Reimbursement for meals at the home station is not allowable for informal meetings (i.e. over a casual breakfast, lunch or dinner) between staff members of an agency or other agencies; other state and federal employees; state employees and legislators, etc. However, with Board of Examiners approval, home station meals may be reimbursed where necessary to promote trade or commerce.

The State Controller's Office will interpret all meetings to be informal unless documented proof is submitted with the travel expense voucher showing otherwise. All meals qualifying for reimbursement will be paid only to the extent authorized by Idaho Code 67-2008.

3. Reimbursement will not be made to an employee for expense of meals or lodging provided by relatives or other parties unless the relative or other party is in the business of providing such services and advertises such to the general public.

4. Reimbursement will not be made to an employee for meal expenses when the employee left their home station earlier than reasonably necessary to meet an airport's recommended pre-departure time.

## 12. Meal Expenses Allowable

### A. Per Diem Reimbursement

Without supporting documentation, a per diem reimbursement shall be paid to the traveler in accordance with the amounts set by the Board of Examiners pursuant to Appendix B, up to the maximum allowed by law, for all official travel which mandates an overnight stay. Per diem is defined as the reimbursement for: meals, meal gratuities, and fees and tips given to porters, baggage carriers, bellhops, hotel maids, stewards or stewardess on ships, and hotel servants in foreign countries.

Complimentary meals, including continental breakfast provided by a hotel and meals provided by common carriers will not be deducted from the per diem allowance to be paid.

### B. Partial Day Reimbursement

Where employees are absent from their official station for less than twenty-four (24) hours, a partial day reimbursement for meals, including gratuity, shall be paid to the traveler at the maximum rate set by the Board of Examiners pursuant to Appendix B, Partial Day Per Diem Reimbursement. Each department may adopt an internal policy regarding partial day per diem reimbursement whenever travel does not involve an overnight stay.

For travel involving an overnight stay a partial day reimbursement for per diem shall be paid to the traveler at the maximum rate set by the Board of Examiners pursuant to Appendix B, Partial Day Meal Reimbursement, within the following limitations:

Breakfast: If the actual departure time is 7:00 a.m. or before, or if the return time is 8:00 a.m. or after.

Lunch: If the actual departure time is 11:00 a.m. or before, or if the return time is 2:00 p.m. or after.

Dinner: If the actual departure time is 5:00 p.m. or before, or if the return time is 7:00 p.m. or after.

If meals are furnished as part of a conference registration fee, the employee shall be reimbursed for meals not provided at the partial day meal reimbursement rate, pursuant to Appendix B.

Procedure 12-1. The destination, time and date of departure and return to official station must be shown on the travel expense voucher for each trip.

**C. Refreshments and Meals for Official Meetings**

The State Board of Examiners recognizes the importance of sponsoring meetings and training sessions. Further, the Board understands that to facilitate the needs of the attendees and to ensure the best utilization of attendee time, refreshments and/or meals may be provided to those attending department-sponsored meetings and/or training sessions under the following criteria:

1. Refreshments

a. The meeting or training session has a published agenda and attendance is mandatory.

b. The meeting or training session has an intended duration of three (3) hours or more;

c. There are five (5) or more attendees; and

d. The total per attendee cost of the refreshments, per refreshment break, will not exceed $7.50, which is the allowable partial day per diem amount established for breakfasts, pursuant to Appendix B.

2. Meals

a. The meeting or training session has a published agenda and attendance is mandatory;

b. Location or scheduling conflicts do not lend themselves to a meal recess;

c. The meeting's business is furthered by speeches, presentations or interpersonal exchange that would not normally occur on a daily basis;

d. The meeting or training session has an intended duration of six (6) hours or more;

e. There are five (5) or more attendees; and

f. The per attendee cost of the meal does not exceed the allowable partial day per diem reimbursement, pursuant to Appendix B.

Regularly scheduled staff meetings or department-sponsored social gatherings shall not qualify for meal or refreshment provisions unless such meetings occur no more than quarterly and attendees are brought together from various locations throughout the state. Further, an attendee shall not be eligible for meal reimbursement due to travel status if such meal is provided while attending a meeting or training session

## 13. Miscellaneous Expenses

With supporting documentation, expenses for certain miscellaneous items are reimbursable if incurred by a state employee in the official conduct of state business. Necessary miscellaneous expenses, for which receipts may not be available, may be reimbursed upon certification by the employee.

Department directors shall establish procedures regarding documentation by receipts for the following items:

A. Taxi or bus fares to and from depots, airports, and hotels, and other ground transportation costs necessary to conduct official state business while in authorized travel status.

B. Telephone calls and telegraph messages, including one personal telephone call per day by the traveling employee, limited to ten (10) minutes. In the case of a family emergency or unusual circumstances, personal calls of longer duration may be approved by the director.

C. All business-related expenses including stenographic or typing and facsimile services, stationery, postage, or other supplies if such were necessary for the transaction of state business.

D. Customary fees for cashiers' checks, bank drafts, or money orders for the purpose of making a remittance to the state.

E. Registration fees which are required as admittance or attendance fees for official participation in conferences, conventions, or other meetings.

F. Laundry during a state business trip of five (5) days or longer duration away from the employee's official station.

G. Expenses not specifically described in these policies and procedures as an allowable expense, but which nevertheless, are necessary in the performance of official state business.

## 14. Compensatory Time for Travel

Compensatory time for travel will be granted in accordance with Fair Labor Standards Act Regulations 29 C.F.R. Section 785.38, 785.39, 785.40, 785.41, to all employees except those listed as "non-covered" under the FLSA, including elected officials, personal staff members selected or appointed by elected public officials, policy-making appointees of elected officials, legal advisors, legislative employees, bona fide volunteers, independent contractors, prisoners, and "trainees".

## 15. Leave During Travel Status

A traveler who has been granted leave, either compensable or non- compensable, while in travel status shall report in his claim for reimbursement the exact date and time of departure from duty and return.

## 16. Foreign Travel

The state of Idaho foreign travel policy, pursuant to Idaho Code §67-2008A, shall be as follows:

The foreign travel per diem allowance (FTPDA) is a payment in lieu of reimbursement for actual expenses. The FTPDA is intended to cover the costs of meals at adequate, suitable and moderately priced facilities including costs of mandatory service charges, taxes, laundry and dry cleaning.

The FTPDA will be based on the most current publication of U.S. Department of State Maximum Travel Per Diem Allowances for Foreign Areas. The daily FTPDA will be 100% of the listed M & IE rate in the above publication.

The actual cost of lodging plus applicable tax and service charge will be reimbursed to the traveler.

## 17. Internal Auditing of Travel Expense Vouchers

Each department shall provide a procedure for auditing all claims for travel expenses for compliance with the standards established by these state policies and procedures, or those adopted or imposed by internal department policies and procedures.

Procedure 17-1. It is the responsibility of individual departments to audit all expense vouchers thoroughly to ensure their completeness, correctness and fiscal integrity. All claims shall be presented in a legible manner. Audit procedures should include verification of the following items:

A. Travel duration does not exceed the trip requirements.
B. Expenses are not claimed by employees in leave status.
C. Vicinity travel is reasonable considering work assignments.
D. Trip mileage corresponds to official state highway maps and mileage charts.
E. Beginning and ending hours and dates are shown for each trip.
F. The travel was properly authorized and the purpose of the travel is shown.
G. All entries are mathematically correct, unallowable expenses are deducted, and
H. All necessary receipts and explanations are securely attached to the travel expense voucher.

Each department will keep a complete record of all employee travel by maintaining a copy of the

travel expense voucher and all applicable and supporting documentation accompanying the claim.

Records as noted above will be maintained by the department for a period of three (3) years or until the next audit of financial records is completed.

## 18. Third Party Reimbursements, Rebates, Promotions

When a third party is expected to reimburse the state for the trip, that information along with the name and billing address of the third party must be included on the travel request. The reimbursement must be made to the agency paying the original travel or endorsed in the agency's favor.

Travel awards and benefits such as frequent flyer miles awarded as a result of state travel will become the property of the traveler and will not be claimed by the state.

## 19. Travel Claims Forms

The State Controller shall provide each department the proper and necessary forms for the processing of travel claims. The State Controller may issue additional instructions for the submission of travel vouchers as specifically provided by Chapter 10, Title 67, Idaho Code.

## Appendix "A"

### Lodging

Lodging expense will be reimbursed at actual cost as long as the cost is not unreasonable or exorbitant.

## Mileage and Meals

**Current Rate:**

| Effective Date | Private Vehicle | MEALS In-State | MEALS Out-State |
|---|---|---|---|
| 7-1-12 | 55.5 cents private vehicle/aircraft | $30.00 | $46.00 or Federal Rate |

**History of Rate Changes:**

| Effective Date | Private Vehicle | MEALS In-State | MEALS Out-State |
|---|---|---|---|
| 7-1-74 | 15 cents car | | |
| 7-1-75 | | $10.00 | $14.00 |
| 7-1-78 | 15 cents car 17 cents air | $12.00 | $15.00 |
| 7-1-79 | | | $17.00 |
| 8-15-79 | 17 cents car | | |
| 5-1-80 | 18 cents car | $15.00 | $20.00 |
| 7-1-84 | 22 cents car | | |
| 1-1-85 | 20.5 cents car | | |
| 12-13-88 | 22 cents pvt | | |

| | vehicle/aircraft | | |
|---|---|---|---|
| 7-1-90 | 26 cents car | $20.00 | $30.00 |
| 7-1-96 | 31 cents pvt vehicle/aircraft | $20.00 | $30.00 |
| 2-13-00 | 32.5 cents pvt vehicle/aircraft | $20.00 | $30.00 |
| 1-2-01 | 34.5 cents pvt vehicle/aircraft | $20.00 | $30.00 |
| 7-1-01 | 34.5 cents pvt vehicle/aircraft | $30.00 | $30.00 or Federal Rate |
| 1-1-02 | 36.5 cents pvt vehicle/aircraft | $30.00 | $30.00 or Federal Rate |
| 1-1-03 | 36.0 cents pvt vehicle/aircraft | $30.00 | $30.00 or Federal Rate |
| 1-1-04 | 37.5 cents private vehicle/aircraft | $30.00 | $31.00 or Federal Rate |
| 4-12-05 | 40.5 cents private vehicle/aircraft | $30.00 | $31.00 or Federal Rate |
| 9-1-05 | 48.5 cents private vehicle/aircraft | $30.00 | $31.00 or Federal Rate |
| 1-1-06 | 44.5 cents private vehicle/aircraft | $30.00 | $39.00 or Federal Rate |
| 1-1-07 | 48.5 cents private vehicle/aircraft | $30.00 | $39.00 or Federal Rate |
| 1-1-08 | 50.5 cents private vehicle/aircraft | $30.00 | $39.00 or Federal Rate |
| 7-1-08 | 58.5 cents private vehicle/aircraft | $30.00 | $39.00 or Federal Rate |
| 1-1-09 | 45.5 cents private vehicle/aircraft | $30.00 | $39.00 or Federal Rate |
| 10-1-09 (Approved on 12-15-09) | 45.5 cents private vehicle/aircraft | $30.00 | $46.00 or Federal Rate |
| 7-1-12 | 55.5 cents private vehicle/aircraft | $30.00 | $46.00 or Federal Rate |

## Appendix "B"

## Maximum Per Diem Reimbursement Rates

**Daily Per Diem Reimbursement** (see definition of "per diem" in Section 12A)
(a) In State $30.00 day

(b) Out-of-State Per Diem Reimbursement Rate
$46.00 per day is the base, but would allow the higher federal rate.

**Partial Day Per Diem Reimbursement**

Where employees are to be absent from their official station on official business for less than twenty four (24) hours, partial day per diem reimbursement is equal to a maximum of twenty-five percent (25%) of the total per diem rate for breakfast, thirty-five percent (35%) for the total per diem rate for lunch, and fifty-five percent (55%) of the total per diem rate for dinner.

|                 | In-State | Out-of-State                    |
|-----------------|----------|---------------------------------|
| Breakfast - 25% | $7.50    | $11.50 or 25% of Federal Rate   |
| Lunch - 35%     | $10.50   | $16.10 or 35% of Federal Rate   |
| Dinner - 55%    | $16.50   | $25.30 or 55% of Federal Rate   |

**Official Conferences or Conventions**
The above limits upon partial day per diem reimbursements do not apply to official conferences or conventions as described in 11.1 herein whether at the official station or not. As to such conferences or conventions, only the statutory daily limits of I.C. §67-2008 will apply.

Agencies may adopt maximums of lesser amounts than those established by the Board of Examiners.

## Appendix "C"

### Per Diem examples

A. Employee attends a conference at their home station and lunch is provided as part of the conference registration fee (registration fee was paid by the employer). The meal is allowable and no reimbursement for the meal cost is due back to the employer from the employee. Providing the conference meets the definition listed in # 11 of the Board of Examiners Travel Policy **(please note on this example the employee is not in travel status since the conference is at their home station, and is not eligible for per diem)

B. Employee is in travel status and the hotel they are staying at offers a continental breakfast. Employee does not have to deduct the partial day per diem amount for the continental breakfast (see # 12 A of the Board of Examiners Travel Policy). The employee can voluntarily choose to deduct the partial day per diem amount for the continental breakfast, if they utilized that service, but it is not required.

C. Employee is in travel status and attends a conference out of town and lunch is provided as part of the conference registration fee (registration fee was paid by the employer) then the employee can only be reimbursed the per diem amounts for any meals not provided (see # 12 B of the Board of Examiners Travel Policy).

D. Employee is in travel status and attends an agency sponsored meeting or training and lunch is provided, then the employee can only be reimbursed for any meals not provided (see # 12 C of the Board of Examiners Travel Policy).