No. 24-6697

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

COURTHOUSE NEWS SERVICE,

*Plaintiff-Appellee*,

v.

SARA OMUNDSON,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the District of Idaho,

Case No. 1:21-CV-00305-DCN, the Honorable David C. Nye, Presiding

---

EXCERPTS OF RECORD, VOL. 7

---

Keely E. Duke
Molly E. Mitchell
Duke Evett, PLLC
1087 West River Street, Suite 300,
Boise, ID 83702
Telephone (208) 342-3310
Email: ked@dukeevett.com; mem@dukeevett.com

*Attorneys for Appellant Sara Omundson*

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                              Plaintiff,<br><br>               v.<br><br>SARA OMUNDSON, in her official capacity<br>as Administrative Director of Idaho Courts,<br><br>                              Defendant. | Case No: 1:21-CV-00305-REP<br><br><br>**DECLARATION OF JIMMY SHIMABUKURO IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT** |

DECLARATION OF JIMMY SHIMABUKURO ISO
MOTION FOR SUMMARY JUDGMENT

I, Jimmy Shimabukuro, declare and state as follows:

1.      I am the office manager for Courthouse News Service ("Courthouse News") and have held this position for approximately twelve years.  I make this declaration in support for Courthouse News' motion for summary judgment for the purpose of explaining calculations I prepared and that are reflected in the documents attached as **Exhibits 1-9.**

2.      My job duties include management of company finances, accounting, and other business operations for Courthouse News.  As part of these duties I regularly create and use Excel and Google spreadsheets for the purpose of calculating and computing statistics and analyzing data.  I have experience using default formulas as well as creating custom formulas for the purpose of calculating and computing financial and business data.

3.      One of my job duties requires that I receive, compile, and analyze data collected by Courthouse News' local courthouse reporters for the purpose of tracking delays in access to new civil complaints.  As part of their job duties and responsibilities, Courthouse News reporters are regularly required to track the dates on which new civil complaints at the courts they cover are first made available to the press or public, and the dates on which those complaints were e-filed with the courts.  Delays in access to new civil complaints can be measured by comparing these two dates.  For instance, if a new civil complaint is made available to a reporter for the first time on July 27, 2022, and if the complaint or docket entry shows a "filed" date of July 25, 2022, then CNS can use those two dates to calculate an access delay of two days.

4.      To help Courthouse News track and measure delays in access at the courts its covers, I created both default and custom Excel formulas that use the dates tracked by Courthouse News reporters reflecting when they are first able to see new civil complaints at the

courts they cover, and when those complaints were filed with those courts. The Excel formulas use the dates tracked and entered by the Courthouse News' reporters to calculate the length of delay between the date of filing and the access date, if any, measured in both calendar and court days. The formulas calculate the length of delay in this manner for each individual complaint tracked by the reporter. They also calculate the total number delayed complaints and the length of the delays, as well as the percentages of delayed complaints based on the length of delays, i.e., one day, two days, etc.

5.      As a result of this particular job duty, I am familiar with CNS's methods and practices for tracking delays in access to new civil complaints filed at state courts, including but not limited to the manner in which tracking data is collected, recorded, and kept in the ordinary course of CNS's regularly conducted business activities.

6.      In November 2022, I received from Bryan Cave Leighton Paisner an Excel spreadsheet produced in discovery as bates number "SO 5078" by defendant Sara Omundson that contained data for new civil complaints e-filed in Idaho's district courts for the time period January 1, 2020 to July 30, 2022 ("Complaint Data Spreadsheet"). My understanding of the Complaint Data Spreadsheet is that it includes, among other data:

      a.  The case type for each e-filed complaint, i.e., "CaseTypeDesc" (Column C). The case type for every complaint listed in the Complaint Data Spreadsheet is "AA-All Initial District Court Filings (Not Listed in E, F, and H1)."

      b.  The date each complaint was e-filed, i.e., "SubmittedDate" (Column N) (hereafter the "Submitted Date");

      c.  The time each complaint was filed, i.e., "SubmittedTime" (Column O) (hereafter the "Submitted Time");

    d.   The date each complaint was made available to the public, i.e.,

        "CreateDocumentDate" date (Column R) (hereafter, the "Access Date"); and

    e.   The time each complaint was made available to the public, i.e.,

        "CreateDoucmentTime" (Column S) (hereafter, the "Access Time").

These are the same data points Courthouse News' reporters submit to me for compilation and use in delay tracking reports I create and maintain for Courthouse News, except Courthouse News reporters typically track filing and access dates, but not always filing and access times.

    7.    Even though the Complaint Data Spreadsheet provided the filing dates/times and public access dates/time, it did not calculate or identify the lapse of time between those points measured in days.  It also did not calculate or identify the percentage of complaints for which access was delayed, measured by days or any other measure.

    8.    In order to calculate delays in access using the data contained in the Complaint Data Spreadsheet, I used the same default and custom Excel formulas that I regularly use to calculate delay stats based on tracking I receive from CNS's reporters.  I did not add any data or other information to the Complaint Data Spreadsheet, nor did I manipulate the raw data provided by Defendant.

    9.    Based on my understanding that the Complaint Data Spreadsheet was intended to include only complaints e-filed with Idaho's district courts and was intended to exclude e-filings made in Idaho's magistrate courts, I omitted from my calculations eight filings for which the "Location" (Column D) listed a magistrate court rather than a district court.  In addition, based on my understanding that the data for filings submitted in 2020 is incomplete, I omitted from my calculations filings submitted in 2020.

<div align="center">4</div>

10.     In order to perform these calculations, I applied formulas to the Submitted Date, Submitted Time, Access Date, and Access Time columns of the Complaint Data Spreadsheet. I also added new columns identifying the "Submitted Year" (2021 or 2022), "Submitted Month" (January – December), and "Submitted Day" (Sunday – Saturday), and added recognized court holidays.  I also added a "Status Flag" column that identified for each submitted complaint whether it was "Accepted" or "Rejected" because only "Accepted" complaints had both a Submitted Date/Time and an Access Date/Time.  I excluded "Rejected" complaints from the delay calculations because they did not have an Access Date/Time.  The native Excel spreadsheet that includes my calculations ("CNS Calculations Workbook") is included as **Exhibit 1**.

11.    The CNS Calculations Workbook includes the original data from Complaint Data Workbook, except that data for filings submitted in 2020 is omitted, as noted above.  The CNS Calculations Workbook also contains the formulas and additional columns I added, as discussed above.  It also contains new tabs reflecting the calculations and data expressed by the calculations.  The new tabs reflect: (1) delays measured by calendar days (the "Calculation (calendar days)" tab); and (2) delays measured by court days ("Calculation (court days)" tab). These new tabs are the same tabs CNS typically creates and uses to calculate delays based on data received from its reporters, as expressed by the CNS's workbook formulas.  The data in both the Calculation (calendar days) tab and the Calculation (court days) tab can be filtered by year and by court using the filter that appears next to the value for "Year" and "Court Name," as illustrated in the examples below:

| Year: | All Years | | Year: | 2021 | | Year: | 2022 | |
| Court Name: | All Courts | | Court Name: | All Courts | | Court Name: | Kootenai | |

12.     For the calendar day delay calculations (the "Calculation (calendar days)" tab), I computed the difference between the Submitted Date and Access Date in number of days based on 365 days in a year for each record. The delays were then allocated under specific categories (zero delay, one day delay, two or more days delay).  I next created formulas to count the total number of records by month, followed by the total number of records per category for each month.  I then created a formula that divided the total number of records in a category for the month by the total number of records of that specific month and displayed the results as a percentage.  This formula was then applied to each month for January 2021 through July 2022. I used a similar method to count and calculate the delays on a weekly basis.  The results of these calculations for filings submitted in 2021 are depicted on **Exhibit 2**, which is a true and correct copy of the "Calculation (calendar days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in 2021.  The results of these calculations for filings submitted in 2022 are depicted on **Exhibit 3**, which is a true and correct copy of the "Calculation (calendar days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in 2022.

13.     I then applied the "Court Name" filter to the "Calculation (calendar days)" tab, selecting "Kootenai," to display delays for filings submitted in 2021 in Kootenai County District Court, measured in calendar days.  The results of these calculations for filings submitted in 2021 in Kootenai County are depicted on **Exhibit 4**, which is a true and correct copy of the "Calculation (calendar days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in Kootenai County District Court 2021, measured in calendar days.  I then applied the "Court Name" filter to the "Calculation (calendar days)" tab, selecting "Kootenai," to display delays for filings submitted in 2022 in Kootenai County District Court, measured in

6

calendar days. The results of these calculations for filings submitted in 2022 in Kootenai County, measured in calendar days, are depicted on **Exhibit 5**, which is a true and correct copy of the "Calculation (calendar days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in Kootenai County District Court in 2022, measured in calendar days.

14.       For the court day delay calculations (the "Calculation (court days)" tab), I computed the difference between the Submitted Date and Access Date in number of days based on the weekdays (Monday through Friday) when the court was open to the public. The court day delay calculations credited weekends and the dates listed as court-observed Holidays under Column AI towards the difference between the Submitted Date and Access Date. For example, a complaint filing with a Submitted Date of Friday, 5/28/2021 and an Access Date of Monday, 6/1/2021 would be measured as a one day delay in court days since the court was closed on the weekend as well as the Memorial Day holiday observed on Monday, 5/31/2021. The delays were then allocated under specific categories (zero delay, one day delay, two or more days delay). I next created formulas to count the total number of records by month, followed by the total number of records per category for each month. I then created a formula that divided the total number of records in a category for the month by the total number of records of that specific month and displayed the results as a percentage. This formula was then applied to each month for January 2021 through July 2022. I used a similar method to count and calculate the delays on a weekly basis. The results of these calculations for filings submitted in 2021, measured in court days, are depicted on **Exhibit 6**, which is a true and correct copy of the "Calculation (court days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in 2021, measured in court days. The results of these calculations for filings submitted in 2022 are depicted on **Exhibit 7**, which is a true and correct copy of the

7

"Calculation (court days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in 2022, measured in court days.

15.     I then applied the "Court Name" filter to the "Calculation (court days)" tab, selecting "Kootenai," to display delays for filings submitted in 2021 in Kootenai County District Court, measured in court days.  The results of these calculations for filings submitted in 2021 in Kootenai County, measured in court days, are depicted on **Exhibit 8**, which is a true and correct copy of the "Calculation (court days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in Kootenai County District Court 2021, measured in court days.  I then applied the "Court Name" filter to the "Calculation (court days)" tab, selecting "Kootenai," to display delays for filings submitted in 2022 in Kootenai County District Court, measured in court days.  The results of these calculations for filings submitted in 2022 in Kootenai County, measured in court days, are depicted on **Exhibit 9**, which is a true and correct copy of the "Calculation (court days)" tab from the CNS Calculations Workbook filtered to show only filings submitted in Kootenai County District Court in 2022, measured in court days.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 13th day of December, 2022.

_____
Jimmy Shimabukuro

**ER-1393**

Exhibit 1 to Declaration of Jimmy Shimabukuro

Excel spreadsheet submitted in native form on flash drive

# EXHIBIT 2
# SHIMABUKURO
# DECLARATION

**Year:**      **2021**

**Court Name:**      **All Courts**

| Total Cases (Submitted vs. Create Document Date) | | |
|---|---|---|
| **Cateory** | **# of cases** | **Percent of Total** |
| Zero Delay | 3049 | 57.33% zero delay |
| One Day Delay | 1376 | 25.87% one day delay |
| Two+ Days Delay | 893 | 16.79% two or more days delay |
| **Total Cases** | **5318** | |

| Breakdown of delay per month (by count) in calendar days | | | | |
|---|---|---|---|---|
| **Month Filed** | **Total cases** | **Zero delay** | **One day delay** | **Two or more days delay** |
| January | 399 | 242 | 98 | 59 |
| February | 435 | 265 | 99 | 71 |
| March | 545 | 326 | 132 | 87 |
| April | 493 | 273 | 119 | 101 |
| May | 419 | 260 | 102 | 57 |
| June | 487 | 301 | 110 | 76 |
| July | 459 | 299 | 106 | 54 |
| August | 415 | 237 | 137 | 41 |
| September | 471 | 255 | 143 | 73 |
| October | 452 | 248 | 126 | 78 |
| November | 380 | 168 | 100 | 112 |
| December | 363 | 175 | 104 | 84 |

| Breakdown of delay per month (by percentage) in calendar days | | | | |
|---|---|---|---|---|
| **Month Filed** | **Total cases** | **Zero delay** | **One day delay** | **Two or more days delay** |
| January | 399 | 60.65% | 24.56% | 14.79% |
| February | 435 | 60.92% | 22.76% | 16.32% |
| March | 545 | 59.82% | 24.22% | 15.96% |
| April | 493 | 55.38% | 24.14% | 20.49% |

| | | | | |
|---|---|---|---|---|
| May | 419 | 62.05% | 24.34% | 13.60% |
| June | 487 | 61.81% | 22.59% | 15.61% |
| July | 459 | 65.14% | 23.09% | 11.76% |
| August | 415 | 57.11% | 33.01% | 9.88% |
| September | 471 | 54.14% | 30.36% | 15.50% |
| October | 452 | 54.87% | 27.88% | 17.26% |
| November | 380 | 44.21% | 26.32% | 29.47% |
| December | 363 | 48.21% | 28.65% | 23.14% |

| Breakdown of delay per week (by percentage) in calendar days | | | | | |
|---|---|---|---|---|---|
| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
| 1/1/2021 | 1/10/2021 | 99 | 66.67% | 19.19% | 14.14% |
| 1/11/2021 | 1/17/2021 | 114 | 62.28% | 21.93% | 15.79% |
| 1/18/2021 | 1/24/2021 | 97 | 53.61% | 29.90% | 16.49% |
| 1/25/2021 | 1/31/2021 | 89 | 59.55% | 28.09% | 12.36% |
| 2/1/2021 | 2/7/2021 | 88 | 61.36% | 20.45% | 18.18% |
| 2/8/2021 | 2/14/2021 | 129 | 58.91% | 26.36% | 14.73% |
| 2/15/2021 | 2/21/2021 | 102 | 52.94% | 22.55% | 24.51% |
| 2/22/2021 | 2/28/2021 | 116 | 69.83% | 20.69% | 9.48% |
| 3/1/2021 | 3/7/2021 | 112 | 66.07% | 25.00% | 8.93% |
| 3/8/2021 | 3/14/2021 | 121 | 57.85% | 24.79% | 17.36% |
| 3/15/2021 | 3/21/2021 | 139 | 62.59% | 20.14% | 17.27% |
| 3/22/2021 | 3/28/2021 | 112 | 55.36% | 22.32% | 22.32% |
| 3/29/2021 | 4/4/2021 | 117 | 52.14% | 24.79% | 23.08% |
| 4/5/2021 | 4/11/2021 | 119 | 47.90% | 30.25% | 21.85% |
| 4/12/2021 | 4/18/2021 | 113 | 67.26% | 16.81% | 15.93% |
| 4/19/2021 | 4/25/2021 | 99 | 63.64% | 23.23% | 13.13% |
| 4/26/2021 | 5/2/2021 | 111 | 47.75% | 29.73% | 22.52% |
| 5/3/2021 | 5/9/2021 | 111 | 54.05% | 21.62% | 24.32% |
| 5/10/2021 | 5/16/2021 | 97 | 70.10% | 22.68% | 7.22% |
| 5/17/2021 | 5/23/2021 | 104 | 59.62% | 25.00% | 15.38% |
| 5/24/2021 | 5/30/2021 | 102 | 64.71% | 29.41% | 5.88% |
| 5/31/2021 | 6/6/2021 | 97 | 57.73% | 35.05% | 7.22% |
| 6/7/2021 | 6/13/2021 | 109 | 59.63% | 22.94% | 17.43% |
| 6/14/2021 | 6/20/2021 | 108 | 58.33% | 26.85% | 14.81% |

Case 1:21-cv-00305-DCN   Document 61-3   Filed 12/15/22   Page 13 of 41

| | | | | | |
|---|---|---|---|---|---|
| 6/21/2021 | 6/27/2021 | 92 | 69.57% | 7.61% | 22.83% |
| 6/28/2021 | 7/4/2021 | 115 | 66.96% | 13.91% | 19.13% |
| 7/5/2021 | 7/11/2021 | 98 | 71.43% | 17.35% | 11.22% |
| 7/12/2021 | 7/18/2021 | 108 | 64.81% | 29.63% | 5.56% |
| 7/19/2021 | 7/25/2021 | 112 | 59.82% | 28.57% | 11.61% |
| 7/26/2021 | 8/1/2021 | 107 | 63.55% | 22.43% | 14.02% |
| 8/2/2021 | 8/8/2021 | 101 | 43.56% | 38.61% | 17.82% |
| 8/9/2021 | 8/15/2021 | 98 | 67.35% | 25.51% | 7.14% |
| 8/16/2021 | 8/22/2021 | 85 | 69.41% | 21.18% | 9.41% |
| 8/23/2021 | 8/29/2021 | 103 | 50.49% | 41.75% | 7.77% |
| 8/30/2021 | 9/5/2021 | 92 | 61.96% | 30.43% | 7.61% |
| 9/6/2021 | 9/12/2021 | 72 | 50.00% | 25.00% | 25.00% |
| 9/13/2021 | 9/19/2021 | 127 | 44.09% | 30.71% | 25.20% |
| 9/20/2021 | 9/26/2021 | 105 | 62.86% | 28.57% | 8.57% |
| 9/27/2021 | 10/3/2021 | 125 | 60.80% | 32.00% | 7.20% |
| 10/4/2021 | 10/10/2021 | 104 | 62.50% | 20.19% | 17.31% |
| 10/11/2021 | 10/17/2021 | 93 | 43.01% | 40.86% | 16.13% |
| 10/18/2021 | 10/24/2021 | 101 | 61.39% | 23.76% | 14.85% |
| 10/25/2021 | 10/31/2021 | 132 | 46.21% | 32.58% | 21.21% |
| 11/1/2021 | 11/7/2021 | 95 | 46.32% | 26.32% | 27.37% |
| 11/8/2021 | 11/14/2021 | 86 | 43.02% | 19.77% | 37.21% |
| 11/15/2021 | 11/21/2021 | 92 | 47.83% | 27.17% | 25.00% |
| 11/22/2021 | 11/28/2021 | 64 | 50.00% | 12.50% | 37.50% |
| 11/29/2021 | 12/5/2021 | 89 | 37.08% | 35.96% | 26.97% |
| 12/6/2021 | 12/12/2021 | 74 | 45.95% | 28.38% | 25.68% |
| 12/13/2021 | 12/19/2021 | 97 | 43.30% | 29.90% | 26.80% |
| 12/20/2021 | 12/26/2021 | 75 | 56.00% | 34.67% | 9.33% |
| 12/27/2021 | 12/31/2021 | 71 | 49.30% | 29.58% | 21.13% |

# EXHIBIT 3
# SHIMABUKURO
# DECLARATION

**Year:**      **2022**

**Court Name:**    **All Courts**

| Total Cases (Submitted vs. Create Document Date) | | |
|---|---|---|
| Cateory | # of cases | Percent of Total |
| Zero Delay | 1546 | 60.51% zero delay |
| One Day Delay | 707 | 27.67% one day delay |
| Two+ Days Delay | 302 | 11.82% two or more days delay |
| Total Cases | 2555 | |

| Breakdown of delay per month (by count) in calendar days | | | | |
|---|---|---|---|---|
| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
| January | 351 | 197 | 115 | 39 |
| February | 228 | 118 | 67 | 43 |
| March | 415 | 217 | 144 | 54 |
| April | 372 | 242 | 91 | 39 |
| May | 389 | 253 | 101 | 35 |
| June | 465 | 304 | 113 | 48 |
| July | 335 | 215 | 76 | 44 |
| August | 0 | 0 | 0 | 0 |
| September | 0 | 0 | 0 | 0 |
| October | 0 | 0 | 0 | 0 |
| November | 0 | 0 | 0 | 0 |
| December | 0 | 0 | 0 | 0 |

| Breakdown of delay per month (by percentage) in calendar days | | | | |
|---|---|---|---|---|
| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
| January | 351 | 56.13% | 32.76% | 11.11% |
| February | 228 | 51.75% | 29.39% | 18.86% |
| March | 415 | 52.29% | 34.70% | 13.01% |
| April | 372 | 65.05% | 24.46% | 10.48% |

| | | | | |
|---|---|---|---|---|
| May | 389 | 65.04% | 25.96% | 9.00% |
| June | 465 | 65.38% | 24.30% | 10.32% |
| July | 335 | 64.18% | 22.69% | 13.13% |
| August | 0 | | | |
| September | 0 | | | |
| October | 0 | | | |
| November | 0 | | | |
| December | 0 | | | |

| Breakdown of delay per week (by percentage) in calendar days | | | | |
|---|---|---|---|---|
| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
| 1/1/2022 | 1/9/2022 | 84 | 54.76% | 30.95% | 14.29% |
| 1/10/2022 | 1/16/2022 | 87 | 58.62% | 33.33% | 8.05% |
| 1/17/2022 | 1/23/2022 | 80 | 66.25% | 25.00% | 8.75% |
| 1/24/2022 | 1/30/2022 | 80 | 45.00% | 41.25% | 13.75% |
| 1/31/2022 | 2/6/2022 | 69 | 68.12% | 24.64% | 7.25% |
| 2/7/2022 | 2/13/2022 | 18 | 5.56% | 0.00% | 94.44% |
| 2/14/2022 | 2/20/2022 | 70 | 57.14% | 31.43% | 11.43% |
| 2/21/2022 | 2/27/2022 | 76 | 43.42% | 36.84% | 19.74% |
| 2/28/2022 | 3/6/2022 | 93 | 53.76% | 32.26% | 13.98% |
| 3/7/2022 | 3/13/2022 | 92 | 43.48% | 47.83% | 8.70% |
| 3/14/2022 | 3/20/2022 | 72 | 59.72% | 20.83% | 19.44% |
| 3/21/2022 | 3/27/2022 | 90 | 47.78% | 35.56% | 16.67% |
| 3/28/2022 | 4/3/2022 | 96 | 61.46% | 31.25% | 7.29% |
| 4/4/2022 | 4/10/2022 | 91 | 62.64% | 26.37% | 10.99% |
| 4/11/2022 | 4/17/2022 | 88 | 59.09% | 30.68% | 10.23% |
| 4/18/2022 | 4/24/2022 | 92 | 63.04% | 25.00% | 11.96% |
| 4/25/2022 | 5/1/2022 | 88 | 73.86% | 19.32% | 6.82% |
| 5/2/2022 | 5/8/2022 | 86 | 58.14% | 31.40% | 10.47% |
| 5/9/2022 | 5/15/2022 | 103 | 70.87% | 22.33% | 6.80% |
| 5/16/2022 | 5/22/2022 | 78 | 64.10% | 25.64% | 10.26% |
| 5/23/2022 | 5/29/2022 | 98 | 64.29% | 25.51% | 10.20% |
| 5/30/2022 | 6/5/2022 | 90 | 56.67% | 31.11% | 12.22% |
| 6/6/2022 | 6/12/2022 | 105 | 72.38% | 14.29% | 13.33% |
| 6/13/2022 | 6/19/2022 | 117 | 71.79% | 18.80% | 9.40% |

| | | | | | |
|---|---|---|---|---|---|
| 6/20/2022 | 6/26/2022 | 96 | 55.21% | 36.46% | 8.33% |
| 6/27/2022 | 7/3/2022 | 90 | 71.11% | 21.11% | 7.78% |
| 7/4/2022 | 7/10/2022 | 64 | 59.38% | 25.00% | 15.63% |
| 7/11/2022 | 7/17/2022 | 88 | 71.59% | 20.45% | 7.95% |
| 7/18/2022 | 7/24/2022 | 75 | 65.33% | 28.00% | 6.67% |
| 7/25/2022 | 7/31/2022 | 99 | 58.59% | 21.21% | 20.20% |
| 8/1/2022 | 8/7/2022 | 0 | | | |
| 8/8/2022 | 8/14/2022 | 0 | | | |
| 8/15/2022 | 8/21/2022 | 0 | | | |
| 8/22/2022 | 8/28/2022 | 0 | | | |
| 8/29/2022 | 9/4/2022 | 0 | | | |
| 9/5/2022 | 9/11/2022 | 0 | | | |
| 9/12/2022 | 9/18/2022 | 0 | | | |
| 9/19/2022 | 9/25/2022 | 0 | | | |
| 9/26/2022 | 10/2/2022 | 0 | | | |
| 10/3/2022 | 10/9/2022 | 0 | | | |
| 10/10/2022 | 10/16/2022 | 0 | | | |
| 10/17/2022 | 10/23/2022 | 0 | | | |
| 10/24/2022 | 10/30/2022 | 0 | | | |
| 10/31/2022 | 11/6/2022 | 0 | | | |
| 11/7/2022 | 11/13/2022 | 0 | | | |
| 11/14/2022 | 11/20/2022 | 0 | | | |
| 11/21/2022 | 11/27/2022 | 0 | | | |
| 11/28/2022 | 12/4/2022 | 0 | | | |
| 12/5/2022 | 12/11/2022 | 0 | | | |
| 12/12/2022 | 12/18/2022 | 0 | | | |
| 12/19/2022 | 12/25/2022 | 0 | | | |
| 12/26/2022 | 12/31/2022 | 0 | | | |

# EXHIBIT 4
# SHIMABUKURO
# DECLARATION

**Year:**                    2021

**Court Name:**              Kootenai

| Total Cases (Submitted vs. Create Document Date) | | |
|---|---|---|
| Cateory | # of cases | Percent of Total |
| Zero Delay | 150 | 24.59% zero delay |
| One Day Delay | 112 | 18.36% one day delay |
| Two+ Days Delay | 348 | 57.05% two or more days delay |
| Total Cases | 610 | |

| Breakdown of delay per month (by count) in calendar days | | | | |
|---|---|---|---|---|
| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
| January | 56 | 20 | 13 | 23 |
| February | 48 | 10 | 4 | 34 |
| March | 66 | 12 | 3 | 51 |
| April | 57 | 0 | 1 | 56 |
| May | 53 | 28 | 12 | 13 |
| June | 57 | 6 | 8 | 43 |
| July | 61 | 19 | 20 | 22 |
| August | 43 | 21 | 10 | 12 |
| September | 53 | 12 | 19 | 22 |
| October | 36 | 7 | 1 | 28 |
| November | 42 | 0 | 8 | 34 |
| December | 38 | 15 | 13 | 10 |

| Breakdown of delay per month (by percentage) in calendar days | | | | |
|---|---|---|---|---|
| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
| January | 56 | 35.71% | 23.21% | 41.07% |
| February | 48 | 20.83% | 8.33% | 70.83% |
| March | 66 | 18.18% | 4.55% | 77.27% |
| April | 57 | 0.00% | 1.75% | 98.25% |

**ER-1404**

| | | | | |
|---|---|---|---|---|
| May | 53 | 52.83% | 22.64% | 24.53% |
| June | 57 | 10.53% | 14.04% | 75.44% |
| July | 61 | 31.15% | 32.79% | 36.07% |
| August | 43 | 48.84% | 23.26% | 27.91% |
| September | 53 | 22.64% | 35.85% | 41.51% |
| October | 36 | 19.44% | 2.78% | 77.78% |
| November | 42 | 0.00% | 19.05% | 80.95% |
| December | 38 | 39.47% | 34.21% | 26.32% |

| Breakdown of delay per week (by percentage) in calendar days | | | | | |
|---|---|---|---|---|---|
| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
| 1/1/2021 | 1/10/2021 | 14 | 42.86% | 14.29% | 42.86% |
| 1/11/2021 | 1/17/2021 | 9 | 55.56% | 11.11% | 33.33% |
| 1/18/2021 | 1/24/2021 | 20 | 5.00% | 35.00% | 60.00% |
| 1/25/2021 | 1/31/2021 | 13 | 61.54% | 23.08% | 15.38% |
| 2/1/2021 | 2/7/2021 | 12 | 25.00% | 0.00% | 75.00% |
| 2/8/2021 | 2/14/2021 | 14 | 0.00% | 0.00% | 100.00% |
| 2/15/2021 | 2/21/2021 | 8 | 0.00% | 0.00% | 100.00% |
| 2/22/2021 | 2/28/2021 | 14 | 50.00% | 28.57% | 21.43% |
| 3/1/2021 | 3/7/2021 | 13 | 76.92% | 15.38% | 7.69% |
| 3/8/2021 | 3/14/2021 | 13 | 0.00% | 7.69% | 92.31% |
| 3/15/2021 | 3/21/2021 | 17 | 11.76% | 0.00% | 88.24% |
| 3/22/2021 | 3/28/2021 | 17 | 0.00% | 0.00% | 100.00% |
| 3/29/2021 | 4/4/2021 | 11 | 0.00% | 0.00% | 100.00% |
| 4/5/2021 | 4/11/2021 | 13 | 0.00% | 0.00% | 100.00% |
| 4/12/2021 | 4/18/2021 | 13 | 0.00% | 0.00% | 100.00% |
| 4/19/2021 | 4/25/2021 | 10 | 0.00% | 0.00% | 100.00% |
| 4/26/2021 | 5/2/2021 | 17 | 0.00% | 5.88% | 94.12% |
| 5/3/2021 | 5/9/2021 | 21 | 38.10% | 19.05% | 42.86% |
| 5/10/2021 | 5/16/2021 | 13 | 76.92% | 23.08% | 0.00% |
| 5/17/2021 | 5/23/2021 | 10 | 80.00% | 10.00% | 10.00% |
| 5/24/2021 | 5/30/2021 | 8 | 25.00% | 50.00% | 25.00% |
| 5/31/2021 | 6/6/2021 | 8 | 37.50% | 62.50% | 0.00% |
| 6/7/2021 | 6/13/2021 | 12 | 0.00% | 0.00% | 100.00% |
| 6/14/2021 | 6/20/2021 | 12 | 16.67% | 25.00% | 58.33% |

**ER-1405**

| | | | | | |
|---|---|---|---|---|---|
| 6/21/2021 | 6/27/2021 | 16 | 6.25% | 0.00% | 93.75% |
| 6/28/2021 | 7/4/2021 | 9 | 0.00% | 0.00% | 100.00% |
| 7/5/2021 | 7/11/2021 | 20 | 30.00% | 40.00% | 30.00% |
| 7/12/2021 | 7/18/2021 | 17 | 41.18% | 58.82% | 0.00% |
| 7/19/2021 | 7/25/2021 | 10 | 40.00% | 20.00% | 40.00% |
| 7/26/2021 | 8/1/2021 | 14 | 14.29% | 0.00% | 85.71% |
| 8/2/2021 | 8/8/2021 | 12 | 8.33% | 0.00% | 91.67% |
| 8/9/2021 | 8/15/2021 | 9 | 77.78% | 22.22% | 0.00% |
| 8/16/2021 | 8/22/2021 | 12 | 83.33% | 8.33% | 8.33% |
| 8/23/2021 | 8/29/2021 | 8 | 37.50% | 62.50% | 0.00% |
| 8/30/2021 | 9/5/2021 | 7 | 0.00% | 100.00% | 0.00% |
| 9/6/2021 | 9/12/2021 | 9 | 0.00% | 33.33% | 66.67% |
| 9/13/2021 | 9/19/2021 | 9 | 0.00% | 0.00% | 100.00% |
| 9/20/2021 | 9/26/2021 | 13 | 53.85% | 38.46% | 7.69% |
| 9/27/2021 | 10/3/2021 | 20 | 40.00% | 30.00% | 30.00% |
| 10/4/2021 | 10/10/2021 | 10 | 30.00% | 10.00% | 60.00% |
| 10/11/2021 | 10/17/2021 | 8 | 12.50% | 0.00% | 87.50% |
| 10/18/2021 | 10/24/2021 | 4 | 0.00% | 0.00% | 100.00% |
| 10/25/2021 | 10/31/2021 | 11 | 0.00% | 0.00% | 100.00% |
| 11/1/2021 | 11/7/2021 | 15 | 0.00% | 13.33% | 86.67% |
| 11/8/2021 | 11/14/2021 | 6 | 0.00% | 33.33% | 66.67% |
| 11/15/2021 | 11/21/2021 | 10 | 0.00% | 0.00% | 100.00% |
| 11/22/2021 | 11/28/2021 | 7 | 0.00% | 0.00% | 100.00% |
| 11/29/2021 | 12/5/2021 | 5 | 0.00% | 100.00% | 0.00% |
| 12/6/2021 | 12/12/2021 | 12 | 0.00% | 66.67% | 33.33% |
| 12/13/2021 | 12/19/2021 | 8 | 62.50% | 37.50% | 0.00% |
| 12/20/2021 | 12/26/2021 | 8 | 87.50% | 12.50% | 0.00% |
| 12/27/2021 | 12/31/2021 | 9 | 33.33% | 0.00% | 66.67% |

# EXHIBIT 5
# SHIMABUKURO
# DECLARATION

**Year:**                **2022**

**Court Name:**          **Kootenai**

| Total Cases (Submitted vs. Create Document Date) | | |
|---|---|---|
| **Catery** | **# of cases** | **Percent of Total** |
| Zero Delay | 181 | 57.83% zero delay |
| One Day Delay | 85 | 27.16% one day delay |
| Two+ Days Delay | 47 | 15.02% two or more days delay |
| **Total Cases** | **313** | |

| Breakdown of delay per month (by count) in calendar days | | | | |
|---|---|---|---|---|
| **Month Filed** | **Total cases** | **Zero delay** | **One day delay** | **Two or more days delay** |
| January | 43 | 24 | 15 | 4 |
| February | 21 | 12 | 8 | 1 |
| March | 57 | 5 | 29 | 23 |
| April | 32 | 22 | 5 | 5 |
| May | 47 | 39 | 7 | 1 |
| June | 62 | 54 | 8 | 0 |
| July | 51 | 25 | 13 | 13 |
| August | 0 | 0 | 0 | 0 |
| September | 0 | 0 | 0 | 0 |
| October | 0 | 0 | 0 | 0 |
| November | 0 | 0 | 0 | 0 |
| December | 0 | 0 | 0 | 0 |

| Breakdown of delay per month (by percentage) in calendar days | | | | |
|---|---|---|---|---|
| **Month Filed** | **Total cases** | **Zero delay** | **One day delay** | **Two or more days delay** |
| January | 43 | 55.81% | 34.88% | 9.30% |
| February | 21 | 57.14% | 38.10% | 4.76% |
| March | 57 | 8.77% | 50.88% | 40.35% |
| April | 32 | 68.75% | 15.63% | 15.63% |

**ER-1408**

| | | | | |
|---|---|---|---|---|
| May | 47 | 82.98% | 14.89% | 2.13% |
| June | 62 | 87.10% | 12.90% | 0.00% |
| July | 51 | 49.02% | 25.49% | 25.49% |
| August | 0 | | | |
| September | 0 | | | |
| October | 0 | | | |
| November | 0 | | | |
| December | 0 | | | |

| Breakdown of delay per week (by percentage) in calendar days | | | | | |
|---|---|---|---|---|---|
| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
| 1/1/2022 | 1/9/2022 | 13 | 30.77% | 46.15% | 23.08% |
| 1/10/2022 | 1/16/2022 | 10 | 80.00% | 20.00% | 0.00% |
| 1/17/2022 | 1/23/2022 | 7 | 57.14% | 28.57% | 14.29% |
| 1/24/2022 | 1/30/2022 | 11 | 54.55% | 45.45% | 0.00% |
| 1/31/2022 | 2/6/2022 | 4 | 100.00% | 0.00% | 0.00% |
| 2/7/2022 | 2/13/2022 | 1 | 0.00% | 0.00% | 100.00% |
| 2/14/2022 | 2/20/2022 | 8 | 75.00% | 25.00% | 0.00% |
| 2/21/2022 | 2/27/2022 | 9 | 33.33% | 66.67% | 0.00% |
| 2/28/2022 | 3/6/2022 | 14 | 14.29% | 57.14% | 28.57% |
| 3/7/2022 | 3/13/2022 | 9 | 11.11% | 55.56% | 33.33% |
| 3/14/2022 | 3/20/2022 | 13 | 7.69% | 23.08% | 69.23% |
| 3/21/2022 | 3/27/2022 | 15 | 0.00% | 60.00% | 40.00% |
| 3/28/2022 | 4/3/2022 | 8 | 25.00% | 50.00% | 25.00% |
| 4/4/2022 | 4/10/2022 | 5 | 60.00% | 0.00% | 40.00% |
| 4/11/2022 | 4/17/2022 | 7 | 71.43% | 14.29% | 14.29% |
| 4/18/2022 | 4/24/2022 | 9 | 77.78% | 22.22% | 0.00% |
| 4/25/2022 | 5/1/2022 | 10 | 70.00% | 20.00% | 10.00% |
| 5/2/2022 | 5/8/2022 | 6 | 83.33% | 16.67% | 0.00% |
| 5/9/2022 | 5/15/2022 | 15 | 100.00% | 0.00% | 0.00% |
| 5/16/2022 | 5/22/2022 | 12 | 75.00% | 25.00% | 0.00% |
| 5/23/2022 | 5/29/2022 | 11 | 63.64% | 27.27% | 9.09% |
| 5/30/2022 | 6/5/2022 | 11 | 90.91% | 9.09% | 0.00% |
| 6/6/2022 | 6/12/2022 | 23 | 95.65% | 4.35% | 0.00% |
| 6/13/2022 | 6/19/2022 | 15 | 100.00% | 0.00% | 0.00% |

| | | | | | |
|---|---|---|---|---|---|
| 6/20/2022 | 6/26/2022 | 7 | 42.86% | 57.14% | 0.00% |
| 6/27/2022 | 7/3/2022 | 10 | 70.00% | 20.00% | 10.00% |
| 7/4/2022 | 7/10/2022 | 10 | 30.00% | 50.00% | 20.00% |
| 7/11/2022 | 7/17/2022 | 10 | 70.00% | 30.00% | 0.00% |
| 7/18/2022 | 7/24/2022 | 10 | 80.00% | 10.00% | 10.00% |
| 7/25/2022 | 7/31/2022 | 20 | 35.00% | 20.00% | 45.00% |
| 8/1/2022 | 8/7/2022 | 0 | | | |
| 8/8/2022 | 8/14/2022 | 0 | | | |
| 8/15/2022 | 8/21/2022 | 0 | | | |
| 8/22/2022 | 8/28/2022 | 0 | | | |
| 8/29/2022 | 9/4/2022 | 0 | | | |
| 9/5/2022 | 9/11/2022 | 0 | | | |
| 9/12/2022 | 9/18/2022 | 0 | | | |
| 9/19/2022 | 9/25/2022 | 0 | | | |
| 9/26/2022 | 10/2/2022 | 0 | | | |
| 10/3/2022 | 10/9/2022 | 0 | | | |
| 10/10/2022 | 10/16/2022 | 0 | | | |
| 10/17/2022 | 10/23/2022 | 0 | | | |
| 10/24/2022 | 10/30/2022 | 0 | | | |
| 10/31/2022 | 11/6/2022 | 0 | | | |
| 11/7/2022 | 11/13/2022 | 0 | | | |
| 11/14/2022 | 11/20/2022 | 0 | | | |
| 11/21/2022 | 11/27/2022 | 0 | | | |
| 11/28/2022 | 12/4/2022 | 0 | | | |
| 12/5/2022 | 12/11/2022 | 0 | | | |
| 12/12/2022 | 12/18/2022 | 0 | | | |
| 12/19/2022 | 12/25/2022 | 0 | | | |
| 12/26/2022 | 12/31/2022 | 0 | | | |

# EXHIBIT 6
# SHIMABUKURO
# DECLARATION

**Year:**  2021

**Court Name:**  All Courts

| Total Cases (Submitted vs. Create Document Date) | | |
|---|---|---|
| Cat<!-- -->egory | # of cases | Percent of Total |
| Zero Delay | 3052 | 57.39% zero delay |
| One Day Delay | 1661 | 31.23% one day delay |
| Two+ Days Delay | 605 | 11.38% two or more days delay |
| Total Cases | 5318 | |

| Breakdown of delay per month (by count) in court days | | | | |
|---|---|---|---|---|
| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
| January | 399 | 244 | 131 | 24 |
| February | 435 | 265 | 122 | 48 |
| March | 545 | 326 | 150 | 69 |
| April | 493 | 273 | 142 | 78 |
| May | 419 | 260 | 135 | 24 |
| June | 487 | 301 | 126 | 60 |
| July | 459 | 299 | 127 | 33 |
| August | 415 | 238 | 153 | 24 |
| September | 471 | 255 | 171 | 45 |
| October | 452 | 248 | 151 | 53 |
| November | 380 | 168 | 124 | 88 |
| December | 363 | 175 | 129 | 59 |

| Breakdown of delay per month (by percentage) in court days | | | | |
|---|---|---|---|---|
| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
| January | 399 | 61.15% | 32.83% | 6.02% |
| February | 435 | 60.92% | 28.05% | 11.03% |
| March | 545 | 59.82% | 27.52% | 12.66% |
| April | 493 | 55.38% | 28.80% | 15.82% |
| May | 419 | 62.05% | 32.22% | 5.73% |

| | | | | |
|---|---|---|---|---|
| June | 487 | 61.81% | 25.87% | 12.32% |
| July | 459 | 65.14% | 27.67% | 7.19% |
| August | 415 | 57.35% | 36.87% | 5.78% |
| September | 471 | 54.14% | 36.31% | 9.55% |
| October | 452 | 54.87% | 33.41% | 11.73% |
| November | 380 | 44.21% | 32.63% | 23.16% |
| December | 363 | 48.21% | 35.54% | 16.25% |

| Breakdown of delay per week (by percentage) in court days | | | | | |
|---|---|---|---|---|---|
| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
| 1/1/2021 | 1/10/2021 | 99 | 66.67% | 30.30% | 3.03% |
| 1/11/2021 | 1/17/2021 | 114 | 63.16% | 30.70% | 6.14% |
| 1/18/2021 | 1/24/2021 | 97 | 53.61% | 34.02% | 12.37% |
| 1/25/2021 | 1/31/2021 | 89 | 60.67% | 37.08% | 2.25% |
| 2/1/2021 | 2/7/2021 | 88 | 61.36% | 23.86% | 14.77% |
| 2/8/2021 | 2/14/2021 | 129 | 58.91% | 30.23% | 10.85% |
| 2/15/2021 | 2/21/2021 | 102 | 52.94% | 32.35% | 14.71% |
| 2/22/2021 | 2/28/2021 | 116 | 69.83% | 25.00% | 5.17% |
| 3/1/2021 | 3/7/2021 | 112 | 66.07% | 26.79% | 7.14% |
| 3/8/2021 | 3/14/2021 | 121 | 57.85% | 29.75% | 12.40% |
| 3/15/2021 | 3/21/2021 | 139 | 62.59% | 23.02% | 14.39% |
| 3/22/2021 | 3/28/2021 | 112 | 55.36% | 27.68% | 16.96% |
| 3/29/2021 | 4/4/2021 | 117 | 52.14% | 32.48% | 15.38% |
| 4/5/2021 | 4/11/2021 | 119 | 47.90% | 35.29% | 16.81% |
| 4/12/2021 | 4/18/2021 | 113 | 67.26% | 21.24% | 11.50% |
| 4/19/2021 | 4/25/2021 | 99 | 63.64% | 25.25% | 11.11% |
| 4/26/2021 | 5/2/2021 | 111 | 47.75% | 30.63% | 21.62% |
| 5/3/2021 | 5/9/2021 | 111 | 54.05% | 37.84% | 8.11% |
| 5/10/2021 | 5/16/2021 | 97 | 70.10% | 25.77% | 4.12% |
| 5/17/2021 | 5/23/2021 | 104 | 59.62% | 34.62% | 5.77% |
| 5/24/2021 | 5/30/2021 | 102 | 64.71% | 31.37% | 3.92% |
| 5/31/2021 | 6/6/2021 | 97 | 57.73% | 39.18% | 3.09% |
| 6/7/2021 | 6/13/2021 | 109 | 59.63% | 27.52% | 12.84% |
| 6/14/2021 | 6/20/2021 | 108 | 58.33% | 31.48% | 10.19% |
| 6/21/2021 | 6/27/2021 | 92 | 69.57% | 9.78% | 20.65% |
| 6/28/2021 | 7/4/2021 | 115 | 66.96% | 20.00% | 13.04% |

| | | | | | |
|---|---|---|---|---|---|
| 7/5/2021 | 7/11/2021 | 98 | 71.43% | 23.47% | 5.10% |
| 7/12/2021 | 7/18/2021 | 108 | 64.81% | 34.26% | 0.93% |
| 7/19/2021 | 7/25/2021 | 112 | 59.82% | 30.36% | 9.82% |
| 7/26/2021 | 8/1/2021 | 107 | 63.55% | 23.36% | 13.08% |
| 8/2/2021 | 8/8/2021 | 101 | 43.56% | 40.59% | 15.84% |
| 8/9/2021 | 8/15/2021 | 98 | 67.35% | 31.63% | 1.02% |
| 8/16/2021 | 8/22/2021 | 85 | 69.41% | 25.88% | 4.71% |
| 8/23/2021 | 8/29/2021 | 103 | 51.46% | 45.63% | 2.91% |
| 8/30/2021 | 9/5/2021 | 92 | 61.96% | 35.87% | 2.17% |
| 9/6/2021 | 9/12/2021 | 72 | 50.00% | 36.11% | 13.89% |
| 9/13/2021 | 9/19/2021 | 127 | 44.09% | 37.01% | 18.90% |
| 9/20/2021 | 9/26/2021 | 105 | 62.86% | 35.24% | 1.90% |
| 9/27/2021 | 10/3/2021 | 125 | 60.80% | 33.60% | 5.60% |
| 10/4/2021 | 10/10/2021 | 104 | 62.50% | 23.08% | 14.42% |
| 10/11/2021 | 10/17/2021 | 93 | 43.01% | 45.16% | 11.83% |
| 10/18/2021 | 10/24/2021 | 101 | 61.39% | 30.69% | 7.92% |
| 10/25/2021 | 10/31/2021 | 132 | 46.21% | 39.39% | 14.39% |
| 11/1/2021 | 11/7/2021 | 95 | 46.32% | 30.53% | 23.16% |
| 11/8/2021 | 11/14/2021 | 86 | 43.02% | 36.05% | 20.93% |
| 11/15/2021 | 11/21/2021 | 92 | 47.83% | 31.52% | 20.65% |
| 11/22/2021 | 11/28/2021 | 64 | 50.00% | 15.63% | 34.38% |
| 11/29/2021 | 12/5/2021 | 89 | 37.08% | 43.82% | 19.10% |
| 12/6/2021 | 12/12/2021 | 74 | 45.95% | 43.24% | 10.81% |
| 12/13/2021 | 12/19/2021 | 97 | 43.30% | 31.96% | 24.74% |
| 12/20/2021 | 12/26/2021 | 75 | 56.00% | 38.67% | 5.33% |
| 12/27/2021 | 12/31/2021 | 71 | 49.30% | 32.39% | 18.31% |

# EXHIBIT 7
# SHIMABUKURO
# DECLARATION

**Year:**          **2022**

**Court Name:**          **All Courts**

| Total Cases (Submitted vs. Create Document Date) | | |
|---|---|---|
| **Cateory** | **# of cases** | **Percent of Total** |
| Zero Delay | 1546 | 60.51% zero delay |
| One Day Delay | 877 | 34.32% one day delay |
| Two+ Days Delay | 132 | 5.17% two or more days delay |
| **Total Cases** | **2555** | |

| Breakdown of delay per month (by count) in court days | | | | |
|---|---|---|---|---|
| **Month Filed** | **Total cases** | **Zero delay** | **One day delay** | **Two or more days delay** |
| January | 351 | 197 | 136 | 18 |
| February | 228 | 118 | 90 | 20 |
| March | 415 | 217 | 168 | 30 |
| April | 372 | 242 | 117 | 13 |
| May | 389 | 253 | 123 | 13 |
| June | 465 | 304 | 136 | 25 |
| July | 335 | 215 | 107 | 13 |
| August | 0 | 0 | 0 | 0 |
| September | 0 | 0 | 0 | 0 |
| October | 0 | 0 | 0 | 0 |
| November | 0 | 0 | 0 | 0 |
| December | 0 | 0 | 0 | 0 |

| Breakdown of delay per month (by percentage) in court days | | | | |
|---|---|---|---|---|
| **Month Filed** | **Total cases** | **Zero delay** | **One day delay** | **Two or more days delay** |
| January | 351 | 56.13% | 38.75% | 5.13% |
| February | 228 | 51.75% | 39.47% | 8.77% |
| March | 415 | 52.29% | 40.48% | 7.23% |
| April | 372 | 65.05% | 31.45% | 3.49% |
| May | 389 | 65.04% | 31.62% | 3.34% |

| | | | | |
|---|---|---|---|---|
| June | 465 | 65.38% | 29.25% | 5.38% |
| July | 335 | 64.18% | 31.94% | 3.88% |
| August | 0 | | | |
| September | 0 | | | |
| October | 0 | | | |
| November | 0 | | | |
| December | 0 | | | |

<div align="center" style="color:red"><strong>Breakdown of delay per week (by percentage) in court days</strong></div>

| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
|---|---|---|---|---|---|
| 1/1/2022 | 1/9/2022 | 84 | 54.76% | 38.10% | 7.14% |
| 1/10/2022 | 1/16/2022 | 87 | 58.62% | 37.93% | 3.45% |
| 1/17/2022 | 1/23/2022 | 80 | 66.25% | 32.50% | 1.25% |
| 1/24/2022 | 1/30/2022 | 80 | 45.00% | 47.50% | 7.50% |
| 1/31/2022 | 2/6/2022 | 69 | 68.12% | 24.64% | 7.25% |
| 2/7/2022 | 2/13/2022 | 18 | 5.56% | 55.56% | 38.89% |
| 2/14/2022 | 2/20/2022 | 70 | 57.14% | 40.00% | 2.86% |
| 2/21/2022 | 2/27/2022 | 76 | 43.42% | 46.05% | 10.53% |
| 2/28/2022 | 3/6/2022 | 93 | 53.76% | 37.63% | 8.60% |
| 3/7/2022 | 3/13/2022 | 92 | 43.48% | 51.09% | 5.43% |
| 3/14/2022 | 3/20/2022 | 72 | 59.72% | 29.17% | 11.11% |
| 3/21/2022 | 3/27/2022 | 90 | 47.78% | 46.67% | 5.56% |
| 3/28/2022 | 4/3/2022 | 96 | 61.46% | 33.33% | 5.21% |
| 4/4/2022 | 4/10/2022 | 91 | 62.64% | 32.97% | 4.40% |
| 4/11/2022 | 4/17/2022 | 88 | 59.09% | 36.36% | 4.55% |
| 4/18/2022 | 4/24/2022 | 92 | 63.04% | 33.70% | 3.26% |
| 4/25/2022 | 5/1/2022 | 88 | 73.86% | 25.00% | 1.14% |
| 5/2/2022 | 5/8/2022 | 86 | 58.14% | 41.86% | 0.00% |
| 5/9/2022 | 5/15/2022 | 103 | 70.87% | 23.30% | 5.83% |
| 5/16/2022 | 5/22/2022 | 78 | 64.10% | 33.33% | 2.56% |
| 5/23/2022 | 5/29/2022 | 98 | 64.29% | 31.63% | 4.08% |
| 5/30/2022 | 6/5/2022 | 90 | 56.67% | 40.00% | 3.33% |
| 6/6/2022 | 6/12/2022 | 105 | 72.38% | 20.95% | 6.67% |
| 6/13/2022 | 6/19/2022 | 117 | 71.79% | 23.08% | 5.13% |
| 6/20/2022 | 6/26/2022 | 96 | 55.21% | 39.58% | 5.21% |
| 6/27/2022 | 7/3/2022 | 90 | 71.11% | 23.33% | 5.56% |

| Start | End | Count | % | % | % |
|---|---|---|---|---|---|
| 7/4/2022 | 7/10/2022 | 64 | 59.38% | 34.38% | 6.25% |
| 7/11/2022 | 7/17/2022 | 88 | 71.59% | 26.14% | 2.27% |
| 7/18/2022 | 7/24/2022 | 75 | 65.33% | 29.33% | 5.33% |
| 7/25/2022 | 7/31/2022 | 99 | 58.59% | 38.38% | 3.03% |
| 8/1/2022 | 8/7/2022 | 0 | | | |
| 8/8/2022 | 8/14/2022 | 0 | | | |
| 8/15/2022 | 8/21/2022 | 0 | | | |
| 8/22/2022 | 8/28/2022 | 0 | | | |
| 8/29/2022 | 9/4/2022 | 0 | | | |
| 9/5/2022 | 9/11/2022 | 0 | | | |
| 9/12/2022 | 9/18/2022 | 0 | | | |
| 9/19/2022 | 9/25/2022 | 0 | | | |
| 9/26/2022 | 10/2/2022 | 0 | | | |
| 10/3/2022 | 10/9/2022 | 0 | | | |
| 10/10/2022 | 10/16/2022 | 0 | | | |
| 10/17/2022 | 10/23/2022 | 0 | | | |
| 10/24/2022 | 10/30/2022 | 0 | | | |
| 10/31/2022 | 11/6/2022 | 0 | | | |
| 11/7/2022 | 11/13/2022 | 0 | | | |
| 11/14/2022 | 11/20/2022 | 0 | | | |
| 11/21/2022 | 11/27/2022 | 0 | | | |
| 11/28/2022 | 12/4/2022 | 0 | | | |
| 12/5/2022 | 12/11/2022 | 0 | | | |
| 12/12/2022 | 12/18/2022 | 0 | | | |
| 12/19/2022 | 12/25/2022 | 0 | | | |
| 12/26/2022 | 12/31/2022 | 0 | | | |

# EXHIBIT 8
# SHIMABUKURO
# DECLARATION

**Year:** **2021**

**Court Name:** **Kootenai**

### Total Cases (Submitted vs. Create Document Date)

| Cateory | # of cases | Percent of Total |
|---|---|---|
| Zero Delay | 150 | 24.59% zero delay |
| One Day Delay | 139 | 22.79% one day delay |
| Two+ Days Delay | 321 | 52.62% two or more days delay |
| **Total Cases** | **610** | |

### Breakdown of delay per month (by count) in court days

| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
|---|---|---|---|---|
| January | 56 | 20 | 23 | 13 |
| February | 48 | 10 | 4 | 34 |
| March | 66 | 12 | 3 | 51 |
| April | 57 | 0 | 1 | 56 |
| May | 53 | 28 | 21 | 4 |
| June | 57 | 6 | 8 | 43 |
| July | 61 | 19 | 23 | 19 |
| August | 43 | 21 | 11 | 11 |
| September | 53 | 12 | 20 | 21 |
| October | 36 | 7 | 1 | 28 |
| November | 42 | 0 | 9 | 33 |
| December | 38 | 15 | 15 | 8 |

### Breakdown of delay per month (by percentage) in court days

| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
|---|---|---|---|---|
| January | 56 | 35.71% | 41.07% | 23.21% |
| February | 48 | 20.83% | 8.33% | 70.83% |
| March | 66 | 18.18% | 4.55% | 77.27% |
| April | 57 | 0.00% | 1.75% | 98.25% |
| May | 53 | 52.83% | 39.62% | 7.55% |

**ER-1420**

| | | | | |
|---|---|---|---|---|
| June | 57 | 10.53% | 14.04% | 75.44% |
| July | 61 | 31.15% | 37.70% | 31.15% |
| August | 43 | 48.84% | 25.58% | 25.58% |
| September | 53 | 22.64% | 37.74% | 39.62% |
| October | 36 | 19.44% | 2.78% | 77.78% |
| November | 42 | 0.00% | 21.43% | 78.57% |
| December | 38 | 39.47% | 39.47% | 21.05% |

| Breakdown of delay per week (by percentage) in court days | | | | | |
|---|---|---|---|---|---|
| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
| 1/1/2021 | 1/10/2021 | 14 | 42.86% | 57.14% | 0.00% |
| 1/11/2021 | 1/17/2021 | 9 | 55.56% | 11.11% | 33.33% |
| 1/18/2021 | 1/24/2021 | 20 | 5.00% | 45.00% | 50.00% |
| 1/25/2021 | 1/31/2021 | 13 | 61.54% | 38.46% | 0.00% |
| 2/1/2021 | 2/7/2021 | 12 | 25.00% | 0.00% | 75.00% |
| 2/8/2021 | 2/14/2021 | 14 | 0.00% | 0.00% | 100.00% |
| 2/15/2021 | 2/21/2021 | 8 | 0.00% | 0.00% | 100.00% |
| 2/22/2021 | 2/28/2021 | 14 | 50.00% | 28.57% | 21.43% |
| 3/1/2021 | 3/7/2021 | 13 | 76.92% | 15.38% | 7.69% |
| 3/8/2021 | 3/14/2021 | 13 | 0.00% | 7.69% | 92.31% |
| 3/15/2021 | 3/21/2021 | 17 | 11.76% | 0.00% | 88.24% |
| 3/22/2021 | 3/28/2021 | 17 | 0.00% | 0.00% | 100.00% |
| 3/29/2021 | 4/4/2021 | 11 | 0.00% | 0.00% | 100.00% |
| 4/5/2021 | 4/11/2021 | 13 | 0.00% | 0.00% | 100.00% |
| 4/12/2021 | 4/18/2021 | 13 | 0.00% | 0.00% | 100.00% |
| 4/19/2021 | 4/25/2021 | 10 | 0.00% | 0.00% | 100.00% |
| 4/26/2021 | 5/2/2021 | 17 | 0.00% | 5.88% | 94.12% |
| 5/3/2021 | 5/9/2021 | 21 | 38.10% | 57.14% | 4.76% |
| 5/10/2021 | 5/16/2021 | 13 | 76.92% | 23.08% | 0.00% |
| 5/17/2021 | 5/23/2021 | 10 | 80.00% | 20.00% | 0.00% |
| 5/24/2021 | 5/30/2021 | 8 | 25.00% | 50.00% | 25.00% |
| 5/31/2021 | 6/6/2021 | 8 | 37.50% | 62.50% | 0.00% |
| 6/7/2021 | 6/13/2021 | 12 | 0.00% | 0.00% | 100.00% |
| 6/14/2021 | 6/20/2021 | 12 | 16.67% | 25.00% | 58.33% |
| 6/21/2021 | 6/27/2021 | 16 | 6.25% | 0.00% | 93.75% |
| 6/28/2021 | 7/4/2021 | 9 | 0.00% | 0.00% | 100.00% |

**ER-1421**

| | | | | | |
|---|---|---|---|---|---|
| 7/5/2021 | 7/11/2021 | 20 | 30.00% | 55.00% | 15.00% |
| 7/12/2021 | 7/18/2021 | 17 | 41.18% | 58.82% | 0.00% |
| 7/19/2021 | 7/25/2021 | 10 | 40.00% | 20.00% | 40.00% |
| 7/26/2021 | 8/1/2021 | 14 | 14.29% | 0.00% | 85.71% |
| 8/2/2021 | 8/8/2021 | 12 | 8.33% | 0.00% | 91.67% |
| 8/9/2021 | 8/15/2021 | 9 | 77.78% | 22.22% | 0.00% |
| 8/16/2021 | 8/22/2021 | 12 | 83.33% | 16.67% | 0.00% |
| 8/23/2021 | 8/29/2021 | 8 | 37.50% | 62.50% | 0.00% |
| 8/30/2021 | 9/5/2021 | 7 | 0.00% | 100.00% | 0.00% |
| 9/6/2021 | 9/12/2021 | 9 | 0.00% | 33.33% | 66.67% |
| 9/13/2021 | 9/19/2021 | 9 | 0.00% | 0.00% | 100.00% |
| 9/20/2021 | 9/26/2021 | 13 | 53.85% | 46.15% | 0.00% |
| 9/27/2021 | 10/3/2021 | 20 | 40.00% | 30.00% | 30.00% |
| 10/4/2021 | 10/10/2021 | 10 | 30.00% | 10.00% | 60.00% |
| 10/11/2021 | 10/17/2021 | 8 | 12.50% | 0.00% | 87.50% |
| 10/18/2021 | 10/24/2021 | 4 | 0.00% | 0.00% | 100.00% |
| 10/25/2021 | 10/31/2021 | 11 | 0.00% | 0.00% | 100.00% |
| 11/1/2021 | 11/7/2021 | 15 | 0.00% | 13.33% | 86.67% |
| 11/8/2021 | 11/14/2021 | 6 | 0.00% | 50.00% | 50.00% |
| 11/15/2021 | 11/21/2021 | 10 | 0.00% | 0.00% | 100.00% |
| 11/22/2021 | 11/28/2021 | 7 | 0.00% | 0.00% | 100.00% |
| 11/29/2021 | 12/5/2021 | 5 | 0.00% | 100.00% | 0.00% |
| 12/6/2021 | 12/12/2021 | 12 | 0.00% | 83.33% | 16.67% |
| 12/13/2021 | 12/19/2021 | 8 | 62.50% | 37.50% | 0.00% |
| 12/20/2021 | 12/26/2021 | 8 | 87.50% | 12.50% | 0.00% |
| 12/27/2021 | 12/31/2021 | 9 | 33.33% | 0.00% | 66.67% |

# EXHIBIT 9
# SHIMABUKURO
# DECLARATION

**Year:**     **2022**

**Court Name:**     **Kootenai**

**Total Cases (Submitted vs. Create Document Date)**

| Cateory | # of cases | Percent of Total |
|---|---|---|
| Zero Delay | 181 | 57.83% zero delay |
| One Day Delay | 108 | 34.50% one day delay |
| Two+ Days Delay | 24 | 7.67% two or more days delay |
| **Total Cases** | **313** | |

**Breakdown of delay per month (by count) in court days**

| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
|---|---|---|---|---|
| January | 43 | 24 | 16 | 3 |
| February | 21 | 12 | 8 | 1 |
| March | 57 | 5 | 36 | 16 |
| April | 32 | 22 | 7 | 3 |
| May | 47 | 39 | 8 | 0 |
| June | 62 | 54 | 8 | 0 |
| July | 51 | 25 | 25 | 1 |
| August | 0 | 0 | 0 | 0 |
| September | 0 | 0 | 0 | 0 |
| October | 0 | 0 | 0 | 0 |
| November | 0 | 0 | 0 | 0 |
| December | 0 | 0 | 0 | 0 |

**Breakdown of delay per month (by percentage) in court days**

| Month Filed | Total cases | Zero delay | One day delay | Two or more days delay |
|---|---|---|---|---|
| January | 43 | 55.81% | 37.21% | 6.98% |
| February | 21 | 57.14% | 38.10% | 4.76% |
| March | 57 | 8.77% | 63.16% | 28.07% |
| April | 32 | 68.75% | 21.88% | 9.38% |
| May | 47 | 82.98% | 17.02% | 0.00% |

| | | | | |
|---|---|---|---|---|
| June | 62 | 87.10% | 12.90% | 0.00% |
| July | 51 | 49.02% | 49.02% | 1.96% |
| August | 0 | | | |
| September | 0 | | | |
| October | 0 | | | |
| November | 0 | | | |
| December | 0 | | | |

| Breakdown of delay per week (by percentage) in court days | | | | | |
|---|---|---|---|---|---|
| Week Beginning | Week Ending | Total records | Zero delay | One day delay | Two or more days delay |
| 1/1/2022 | 1/9/2022 | 13 | 30.77% | 53.85% | 15.38% |
| 1/10/2022 | 1/16/2022 | 10 | 80.00% | 20.00% | 0.00% |
| 1/17/2022 | 1/23/2022 | 7 | 57.14% | 28.57% | 14.29% |
| 1/24/2022 | 1/30/2022 | 11 | 54.55% | 45.45% | 0.00% |
| 1/31/2022 | 2/6/2022 | 4 | 100.00% | 0.00% | 0.00% |
| 2/7/2022 | 2/13/2022 | 1 | 0.00% | 0.00% | 100.00% |
| 2/14/2022 | 2/20/2022 | 8 | 75.00% | 25.00% | 0.00% |
| 2/21/2022 | 2/27/2022 | 9 | 33.33% | 66.67% | 0.00% |
| 2/28/2022 | 3/6/2022 | 14 | 14.29% | 64.29% | 21.43% |
| 3/7/2022 | 3/13/2022 | 9 | 11.11% | 66.67% | 22.22% |
| 3/14/2022 | 3/20/2022 | 13 | 7.69% | 30.77% | 61.54% |
| 3/21/2022 | 3/27/2022 | 15 | 0.00% | 86.67% | 13.33% |
| 3/28/2022 | 4/3/2022 | 8 | 25.00% | 50.00% | 25.00% |
| 4/4/2022 | 4/10/2022 | 5 | 60.00% | 0.00% | 40.00% |
| 4/11/2022 | 4/17/2022 | 7 | 71.43% | 28.57% | 0.00% |
| 4/18/2022 | 4/24/2022 | 9 | 77.78% | 22.22% | 0.00% |
| 4/25/2022 | 5/1/2022 | 10 | 70.00% | 30.00% | 0.00% |
| 5/2/2022 | 5/8/2022 | 6 | 83.33% | 16.67% | 0.00% |
| 5/9/2022 | 5/15/2022 | 15 | 100.00% | 0.00% | 0.00% |
| 5/16/2022 | 5/22/2022 | 12 | 75.00% | 25.00% | 0.00% |
| 5/23/2022 | 5/29/2022 | 11 | 63.64% | 36.36% | 0.00% |
| 5/30/2022 | 6/5/2022 | 11 | 90.91% | 9.09% | 0.00% |
| 6/6/2022 | 6/12/2022 | 23 | 95.65% | 4.35% | 0.00% |
| 6/13/2022 | 6/19/2022 | 15 | 100.00% | 0.00% | 0.00% |
| 6/20/2022 | 6/26/2022 | 7 | 42.86% | 57.14% | 0.00% |
| 6/27/2022 | 7/3/2022 | 10 | 70.00% | 30.00% | 0.00% |

Case 1:21-cv-00305-DCN   Document 61-3   Filed 12/15/22   Page 41 of 41

| | | | | | |
|---|---|---|---|---|---|
| 7/4/2022 | 7/10/2022 | 10 | 30.00% | 60.00% | 10.00% |
| 7/11/2022 | 7/17/2022 | 10 | 70.00% | 30.00% | 0.00% |
| 7/18/2022 | 7/24/2022 | 10 | 80.00% | 20.00% | 0.00% |
| 7/25/2022 | 7/31/2022 | 20 | 35.00% | 65.00% | 0.00% |
| 8/1/2022 | 8/7/2022 | 0 | | | |
| 8/8/2022 | 8/14/2022 | 0 | | | |
| 8/15/2022 | 8/21/2022 | 0 | | | |
| 8/22/2022 | 8/28/2022 | 0 | | | |
| 8/29/2022 | 9/4/2022 | 0 | | | |
| 9/5/2022 | 9/11/2022 | 0 | | | |
| 9/12/2022 | 9/18/2022 | 0 | | | |
| 9/19/2022 | 9/25/2022 | 0 | | | |
| 9/26/2022 | 10/2/2022 | 0 | | | |
| 10/3/2022 | 10/9/2022 | 0 | | | |
| 10/10/2022 | 10/16/2022 | 0 | | | |
| 10/17/2022 | 10/23/2022 | 0 | | | |
| 10/24/2022 | 10/30/2022 | 0 | | | |
| 10/31/2022 | 11/6/2022 | 0 | | | |
| 11/7/2022 | 11/13/2022 | 0 | | | |
| 11/14/2022 | 11/20/2022 | 0 | | | |
| 11/21/2022 | 11/27/2022 | 0 | | | |
| 11/28/2022 | 12/4/2022 | 0 | | | |
| 12/5/2022 | 12/11/2022 | 0 | | | |
| 12/12/2022 | 12/18/2022 | 0 | | | |
| 12/19/2022 | 12/25/2022 | 0 | | | |
| 12/26/2022 | 12/31/2022 | 0 | | | |

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                    Plaintiff,<br><br>v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>                    Defendant. | Case No: 1:21-CV-00305-REP<br><br>**DECLARATION OF ADAM ANGIONE IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT** |

I, Adam Angione, declare and state as follows:

1.　　I am employed as the Midwest & Northeast Bureau Chief for Courthouse News Service ("CNS"). I make this declaration in support for CNS's motion for summary judgment. I have personal knowledge of the following facts, except where otherwise stated, and could testify to the same if called as a witness.

2.　　I graduated from the University of Cincinnati in December 2001 with a Bachelor of Arts in Communications.  CNS hired me as a reporter in 2004 to cover a number of state and federal courts in Ohio.  Since 2006, I have been tasked with monitoring various courts across the country as they transition from a paper-based environment to an electronic one – whether that transition involves a move to electronic filing ("e-filing"), an electronic case management system ("CMS"), or both.  As part of these responsibilities, I have examined and become familiar with the software various courts use to provide e-filing and electronic access to court documents, so I can determine the most efficient and timely method of reviewing new complaints.

3.　　As part of their job duties and responsibilities, CNS reporters are regularly required to track the dates on which new civil complaints at the courts they cover are first made available to the press or public, and the dates on which those complaints were filed with the courts. One of my job duties requires that I receive, compile and analyze data collected by CNS's local courthouse reporters for the purpose of tracking delays in access to new civil complaints. As part of these duties I regularly create and use Excel and Google spreadsheets for the purpose of calculating and computing statistics and analyzing data. I have experience using default formulas as well as creating custom formulas for the purpose of calculating and computing financial and business data. I also have experience creating and using Excel and Google spreadsheets for the purpose of calculating statistics and analyzing data produced by courts in connection with litigation brought by CNS.

4. In November 2022, I received from Bryan Cave Leighton Paisner an Excel spreadsheet produced in discovery as bates number "SO_5708" by defendant Sara Omundson that contained data for new civil complaints filed in the Idaho District Courts for the time period January 1, 2020 to July 31, 2022 ("Complaint Data Spreadsheet"). My understanding of the Complaint Data Spreadsheet is that it includes, among other data, the date and time each e-filed complaint was submitted to the court (columns "N" and "O"), and the date and time each complaint as accepted by court a court clerk, if it was accepted (columns "R" and "S"). It is my understanding that new e-filed complaints are only made available to the press and public after court clerks review and accept them, and that the date and time of acceptance (columns "R" and "S") represent approximately the moment in time when a new e-filed complaint is made available to the public for viewing.

5. The data points identified above are the same data points CNS's reporters typically track for purposes of monitoring delays in access to new complaints, except CNS reporters typically track filing and access dates, but not always filing and access times.

6. The Complaint Data Spreadsheet includes a "DaysSubmittedToPublic" column (column "V") that shows the number of calendar days that elapsed between the "SubmittedDate" (column "N") and the "CreateDocumentDate" (column "R"). However, the Complaint Data Spreadsheet did not calculate or express the percentage of complaints for which access was delayed by calendar days, nor did it calculate or express delays between the "SubmittedDate" (column "N") and the "CreateDocumentDate" (column "R") measured in court days.

7. In order to (i) verify the Defendant's calendar day delay calculations, (ii) calculate delays measured in court days, and (iii) express the percentage of complaints for which access was delayed (under both calendar and court day measurements), I used the same default and custom

Decl. of Adam Angione ISO CNS's
Motion for Summary Judgment                3

Excel formulas that I regularly use to calculate and analyze delay stats for CNS based on data I receive either from CNS's reporters or from courts. I did not add any data or other information to the Complaint Data Spreadsheet, nor did I manipulate the raw data provided by Defendant.

8. Using the data contained in Complaint Data Spreadsheet, I was able to calculate the amount of time that elapsed, measured in both calendar days and court days, between when the complaints were submitted to the court and when they were made available for public viewing. Those calculations are reflected in a new version of the Complaint Data Spreadsheet to which I added these calculations and saved with file name SO 5708AA.xlsx ("Delay Calculation Spreadsheet"), a true and correct copy of which is included in native .xlsx format as **Exhibit 1**.

9. In order to perform these calculations, I applied formulas to the submitted dates/times (columns "N" and "O") and public access dates/time (columns "R" and "S"), columns of the Complaint Data Spreadsheet. I also added new columns "W" – "AI" for the purpose of identifying if the filing was submitted on a weekend or recognized court holiday. Where a filing was submitted on a weekend or court holiday, the SubmittedDate was adjusted forward to the next business day through a series of formulas and calculations in columns "AA" – "AE". If the CreatedDocumentDate was on a weekend or court holiday in the Complaint Data Spreadsheet, I manually adjusted the calendar day delay in column "AF" and the court day delay in column "AG" and indicated the adjustment in column "Y".

10. The Complaint Data Spreadsheet includes a column that identifies for each submitted complaint whether it was "Accepted" or "Rejected" (column "K"). For purposes of my calculations I excluded "Rejected" complaints because only "Accepted" complaints had both a submitted date/time and a public access date/time. I excluded "Rejected" complaints from the delay calculations because they did not have a public access date/time.

Decl. of Adam Angione ISO CNS's
Motion for Summary Judgment                    4

11.     In addition, the Complaint Data Spreadsheet contained eight filings from magistrate courts. For the purposes of my calculations, I excluded the magistrate court filings because CNS is asking for access upon receipt to only district court filings in Idaho.

12.     I also excluded from my calculations the complaints with a submitted date in 2020, and included only complaints with submitted dates in 2021 and 2022 in my calculations. I did this because the Complaint Data Spreadsheet is missing data for filings in most of Idaho's district courts in 2020 and contains no data at all for several weeks in 2020.  Because the 2020 data seems to be incomplete, I limited my calculations to data for filings in 2021 and 2022.

13.     For the period January 1, 2021 to July 31, 2022, excluding entries where column "D" ("Location") lists a magistrate court instead of a district court, Complaint Data Spreadsheet contains a total of 9,497 district court complaint entries, of which 7,873 were "Accepted" status, and 1,624 were "Rejected" status. The Delay Calculation Spreadsheet contains the same number of "Accepted" status and "Rejected" status complaints. This confirms that the Delay Calculation Spreadsheet contains, and is based on, the same universe of complaints identified in the Complaint Data Spreadsheet for the time period of January 1, 2021 to July 31, 2022.

14.     The new calculations I added to the Complaint Data Spreadsheet are reflected in the Delay Calculations Spreadsheet as two new tables in the far-right-hand columns of the first tab of the spreadsheet (columns "AN" – "BH"). One table reflects the calendar day delay calculations, and the other reflects the court day calculations. I briefly discuss each below.

15.     **Calendar Days**. In order to calculate the delays based on calendar days, I created a formula that calculated the difference between the "SubmitDate (Adjust for Holiday)" (Column AE) and the "CreateDocumentDate" (Column R), measured in calendar days based on a seven-day week. The new table reflecting the calendar day calculations is copied from Exhibit 1 as a separate

document, a true and correct copy of which is attached as **Exhibit 2**. The "CNSCalendarDaysDelay" measurement (column "W") matches the Defendant's "DaysSubmittedToPublic" measurement (column "V"). In other words, the parties agree on the number of calendar days that elapsed between when each complaint was submitted to the court and the date when each complaint was made available to the public.

16.      **Court Days**. In order to calculate the delays based on court days, I used the same approach as the calendar day calculations except that I excluded intervening weekends and holidays. The new table reflecting the court day calculations is copied from Exhibit 2 as a separate document, a true and correct copy of which is attached as **Exhibit 3**.

17.      Both the calendar and court day calculations treat documents submitted on a weekend or holiday as submitted on the following court day. The difference between the calendar and court day calculations is that the calendar day calculations count subsequent weekends or holidays when counting delays, whereas the court day calculations do not count them. Put differently, for both calendar and court day calculations the delay clock starts on the first court day *if* the complaint is submitted on a weekend or holiday. Once submitted, the court day calculations stops the delay clock for subsequent weekends or holidays, while the calendar day calculations counts subsequent weekends or holidays when counting delays.

18.      Both the calendar day and court day calculations reflect the total number and percentage of delayed complaints across all courts during the January 1, 2021 to July 31, 2022 period covered by the Complaint Data Spreadsheet. The calculations also show the total number and percentage of delayed complaints on a per-court basis, and the degree to which the delays vary inconsistently across individual courts.

Decl. of Adam Angione ISO CNS's
Motion for Summary Judgment                   6

19.    **Rejections**.  In order to facilitate review and analysis of rejections, I used Excel's

sort function and then kept only entries where the value in column "K" ("Status") was "Rejected"

and the value in column "N" ("Submitted Date") fell within January 2021.  In order to make the

data more legible, I used Excel's "hide" function to hide columns so that only columns "A," "B,"

"C," "D," "G," "K," "L," "M," and "N" are visible.  The resulting data appears in Tab 2 of the

Delay Calculation Spreadsheet (Exhibit 1), labeled "Jan 2021 Rejected."  A true and correct copy of

this January 2021 rejection data is attached hereto as **Exhibit 4**.

20.    In order to prepare additional representative samples of rejection data, I repeated this

process for July 2021, January 2022, and July 2022.  The resulting data for July 2021 appears in

Tab 3 of the Delay Calculation Spreadsheet, labeled "Jul 2021 Rejected."  A true and correct copy

of this July 2021 rejection data is attached as **Exhibit 5**.  The resulting data for January 2022

appears in Tab 4 of the Delay Calculation Spreadsheet, labeled "Jan 2022 Rejected."  A true and

correct copy of this January 2022 rejection data is attached as **Exhibit 6**. The resulting data for July

2022 appears in Tab 5 of the Delay Calculation Spreadsheet, labeled "Jul 2022 Rejected."  A true

and correct copy of this July 2022 rejection data is attached as **Exhibit 7**.

21.    In order to facilitate analysis of the frequency of rejections in these four months, I

created a chart listing each of Idaho's district courts, with columns for January 2021, July 2021,

January 2022, and July 2022.  I created formulas to count the number of rejections for each court in

each of these months and listed the totals for each of these months next to the name of the court.  A

true and correct copy of this chart is attached as **Exhibit 8**.  In a number of cases, multiple rejection

entries appear to correspond to the same filing.  For example, on January 4, 2021, a filer evidently

added the same complaint to a Canyon County District Court submission three times.  This is

reflected in three separate entries in the Complaint Data Spreadsheet and so is counted in the

Exhibit 8 summary as three rejections, even though only one submission was at issue.  Below is an

excerpt from the January 2021 rejection data (Exhibit 4) reflecting this example:

| CV14-21-00080 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DUPLICATE | The complaint was added to the envelope 3 times, please remove all duplicate filings. Plaintiff's Name is spelled McClean on envelope and McLean on document, please correct and resubmit - DH | 1/4/2021 |
| CV14-21-00080 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DUPLICATE | The complaint was added to the envelope 3 times, please remove all duplicate filings. Plaintiff's Name is spelled McClean on envelope and McLean on document, please correct and resubmit - DH | 1/4/2021 |
| CV14-21-00080 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DUPLICATE | The complaint was added to the envelope 3 times, please remove all duplicate filings. Plaintiff's Name is spelled McClean on envelope and McLean on document, please correct and resubmit - DH | 1/4/2021 |
| CV14-21- | Civil | AA - All Initial District Court Filings | Canyon County | Complaint | Rejected | DOCS | The complaint lists Securian Financial Group, Securian | 1/4/2021 |

22.     As reflected in the Exhibit 8 summary, the highest number of rejections in any

district court in any of these four months is sixteen.  Totaling the number of total rejections in a

month and dividing that total by the number of counties in Idaho (44), reveals that the average

number of rejections per month, per court is between one and two.

23.     **Idaho District Courts' E-Filing Interface**.  As noted above, my job duties and

responsibilities for CNS include examining and becoming familiar with the software various courts

use to provide e-filing and electronic access to court documents. One way I do this is by creating e-

filing accounts for CNS so that I can use and familiarize myself with the steps a litigant or filer

must follow to electronically file new civil complaints. I did this for the Idaho Courts by creating an

e-filing account through the iCourt website, and walking through the steps a litigant would follow if

they wanted to electronically file a new complaint through the iCourt File & serve e-filing system.

The screenshots attached as **Exhibit 9** reflect the steps a filer would follow to electronically file a

complaint using the iCourt File & Serve system. Those steps are briefly summarized as follows,

with reference to the particular page numbers (bates labels) on Exhibit 9 depicting the steps:

a.     The filer accesses the iCourt File & Serve website either by clicking on the

"Clerk here to e-File!" link on the iCourt website (CNS_013280) or by entering the following URL

Decl. of Adam Angione ISO CNS's
Motion for Summary Judgment                    8

address in a web browser: https://idaho.tylertech.cloud. (CNS_013282). Either approach leads to the iCourt File & Serve webpage (CNS_013282).

        b.      If the filer does not have an e-filing account they can create one by selecting the "Register" link. If the filer does have an e-filing account they can select the "Sign In" link and proceed with their submission (CNS_013282).

        c.      Once signed in, the filer can select one of two options: (1) "Start a New Case; or (2) "File into Existing Case" (CNS_013283).

        d.      If the filer selects "Start a New Case" they are taken to the "Start a New Case" page. See Exhibit 4 (CNS_013284).

        e.      Within the "Start a New Case" page, the filer is prompted to select or enter the following information: (i) Court Location (e.g., Ada County District Court); (ii) Case Category (e.g., Civil); (iii) Case Type (e.g., AA – All Initial District Court Filings (Not Listed in: E, F, and H1) - $221.00); (iv) Party Information (e.g., Party Type (Plaintiff) and Party Name); (v) add the document by selecting a Filing Code (e.g., Complaint), providing a Filing Description and uploading the .pdf file; and (vi) and paying filing Fees by selecting the Payment Account associated with the users account and selecting Party Responsible for Fees (CNS_013284-013289).

24.      A complete list of the available "**Case Type**" options for "Civil" case category is reflected on the screenshot attached as **Exhibit 10**. A complete list of the "**Filing Code**" options is reflected on the screenshot attaches as **Exhibit 11**.

25.      Once the filer selects or enters the required information they are prompted to review and submit their filing. A true and correct copy of the screenshots depicting the review and submit page for a sample filing I prepared is attached as **Exhibit 12.** A filer submits their filing to the court

by hitting the "Submit" button at the bottom of this page. The "Submit" button is depicted on the second page of Exhibit 12 (CNS_000389).

26.     I have viewed the File and Serve websites used by numerous different state courts. Idaho's iCourt File and Serve website is different from many other File and Serve websites used by other state courts in that it does not include an option for the filer to select the type of security to be assigned to the document. The option is typically included in the "Lead Document" section where the filer is prompted to upload the .pdf document. That section of Idaho's iCourt File and Serve website is depicted here:



27.     In contrast, the File and Serve websites for the California Superior Courts for the counties of Calaveras, Contra Costa, Fresno, Kern, Kings, Mendocino, Merced, Monterey, Napa, San Luis Obispo, San Mateo, Santa Barbara, Santa Clara, Santa Cruz, Sonoma, Stanislaus, Sutter, Tehama, Yolo, and Yuba (which use the same e-filing software from vendor Tyler Technologies as Idaho uses) all prompt the filer to choose a security level for each document being filed.

28.     There are variations in the specific options these courts provide in their security designation menus, but all enable the e-filer to communicate the filer's request for confidential handling.  Below is a true and correct screenshot of the security designation menu as it appears in the e-filing interface for Calaveras, Kings, Mendocino, Merced, Sonoma, and Yolo County Superior Courts:

Decl. of Adam Angione ISO CNS's
Motion for Summary Judgment                    10



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this December 14, 2022.



Adam Angione

**Exhibit 1 to Declaration of Adam Angione**

Excel spreadsheet submitted in native form on flash drive.

# EXHIBIT 2
# ANGIONE DECLARATION

| Location (Calendar Days) | Complaints | Same Day | Same Day % | 1 day delay | 1 day delay % | 2 day delay | 2 day delay % | 3+ days delay | 3+ days delay % |
|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 7873 | 4600 | 58% | 2083 | 26% | 235 | 3% | 955 | 12% |
| Ada County District Court | 2023 | 1117 | 55% | 656 | 32% | 40 | 2% | 210 | 10% |
| Adams County District Court | 21 | 13 | 62% | 7 | 33% | 1 | 5% | 0 | 0% |
| Bannock County District Court | 357 | 219 | 61% | 111 | 31% | 4 | 1% | 23 | 6% |
| Bear Lake District Court | 29 | 16 | 55% | 8 | 28% | 0 | 0% | 5 | 17% |
| Benewah County District Court | 40 | 30 | 75% | 7 | 18% | 0 | 0% | 3 | 8% |
| Bingham County District Court | 173 | 127 | 73% | 36 | 21% | 0 | 0% | 10 | 6% |
| Blaine County District Court | 89 | 70 | 79% | 16 | 18% | 0 | 0% | 3 | 3% |
| Boise County District Court | 52 | 18 | 35% | 20 | 38% | 1 | 2% | 13 | 25% |
| Bonner County District Court | 291 | 152 | 52% | 102 | 35% | 7 | 2% | 30 | 10% |
| Bonneville County District Court | 680 | 536 | 79% | 126 | 19% | 1 | 0% | 17 | 3% |
| Boundary County District Court | 59 | 56 | 95% | 3 | 5% | 0 | 0% | 0 | 0% |
| Butte County District Court | 13 | 11 | 85% | 1 | 8% | 0 | 0% | 1 | 8% |
| Camas County District Court | 6 | 2 | 33% | 3 | 50% | 1 | 17% | 0 | 0% |
| Canyon County District Court | 928 | 496 | 53% | 307 | 33% | 44 | 5% | 81 | 9% |
| Caribou County District Court | 44 | 19 | 43% | 14 | 32% | 8 | 18% | 3 | 7% |
| Cassia County District Court | 123 | 109 | 89% | 12 | 10% | 1 | 1% | 1 | 1% |
| Clark County District Court | 1 | 0 | 0% | 1 | 100% | 0 | 0% | 0 | 0% |
| Clearwater County District Court | 35 | 8 | 23% | 9 | 26% | 1 | 3% | 17 | 49% |
| Custer County District Court | 19 | 18 | 95% | 1 | 5% | 0 | 0% | 0 | 0% |
| Elmore County District Court | 80 | 70 | 88% | 7 | 9% | 0 | 0% | 3 | 4% |
| Franklin County District Court | 52 | 30 | 58% | 19 | 37% | 2 | 4% | 1 | 2% |
| Fremont County District Court | 49 | 20 | 41% | 7 | 14% | 10 | 20% | 12 | 24% |
| Gem County District Court | 75 | 33 | 44% | 26 | 35% | 4 | 5% | 12 | 16% |
| Gooding County District Court | 99 | 67 | 68% | 17 | 17% | 3 | 3% | 12 | 12% |
| Idaho County District Court | 88 | 80 | 91% | 6 | 7% | 0 | 0% | 2 | 2% |
| Jefferson County District Court | 106 | 45 | 42% | 42 | 40% | 1 | 1% | 18 | 17% |
| Jerome County District Court | 102 | 82 | 80% | 17 | 17% | 0 | 0% | 3 | 3% |

Case 1:21-cv-00305-DCN   Document 61-4   Filed 12/15/22   Page 15 of 74

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Kootenai County District Court | 923 | 331 | 36% | 197 | 21% | 78 | 8% | 317 | 34% |
| Latah County District Court | 114 | 71 | 62% | 30 | 26% | 2 | 2% | 11 | 10% |
| Lemhi County District Court | 38 | 32 | 84% | 3 | 8% | 0 | 0% | 3 | 8% |
| Lewis County District Court | 19 | 18 | 95% | 1 | 5% | 0 | 0% | 0 | 0% |
| Lincoln County District Court | 24 | 20 | 83% | 4 | 17% | 0 | 0% | 0 | 0% |
| Madison County District Court | 102 | 17 | 17% | 13 | 13% | 12 | 12% | 60 | 59% |
| Minidoka County District Court | 101 | 81 | 80% | 16 | 16% | 0 | 0% | 4 | 4% |
| Nez Perce County District Court | 108 | 90 | 83% | 15 | 14% | 0 | 0% | 3 | 3% |
| Oneida County District Court | 21 | 11 | 52% | 3 | 14% | 2 | 10% | 5 | 24% |
| Owyhee County District Court | 55 | 38 | 69% | 9 | 16% | 1 | 2% | 7 | 13% |
| Payette County District Court | 81 | 29 | 36% | 26 | 32% | 4 | 5% | 22 | 27% |
| Power County District Court | 23 | 16 | 70% | 4 | 17% | 0 | 0% | 3 | 13% |
| Shoshone County District Court | 67 | 46 | 69% | 17 | 25% | 1 | 1% | 3 | 4% |
| Teton County District Court | 68 | 38 | 56% | 21 | 31% | 6 | 9% | 3 | 4% |
| Twin Falls County District Court | 369 | 222 | 60% | 118 | 32% | 0 | 0% | 29 | 8% |
| Valley County District Court | 85 | 70 | 82% | 14 | 16% | 0 | 0% | 1 | 1% |
| Washington County District Court | 41 | 26 | 63% | 11 | 27% | 0 | 0% | 4 | 10% |

# EXHIBIT 3
# ANGIONE DECLARATION

| Location (Court Days) | Complaints | Same Day | Same Day % | 1 day delay | 1 day delay % | 2 day delay | 2 day delay % | 3+ days delay | 3+ days delay % |
|---|---|---|---|---|---|---|---|---|---|
| **TOTAL** | **7873** | **4600** | **58%** | **2531** | **32%** | **383** | **5%** | **359** | **5%** |
| Ada County District Court | 2023 | 1117 | 55% | 808 | 40% | 94 | 5% | 4 | 0% |
| Adams County District Court | 21 | 13 | 62% | 7 | 33% | 1 | 5% | 0 | 0% |
| Bannock County District Court | 357 | 219 | 61% | 131 | 37% | 7 | 2% | 0 | 0% |
| Bear Lake District Court | 29 | 16 | 55% | 11 | 38% | 1 | 3% | 1 | 3% |
| Benewah County District Court | 40 | 30 | 75% | 10 | 25% | 0 | 0% | 0 | 0% |
| Bingham County District Court | 173 | 127 | 73% | 45 | 26% | 0 | 0% | 1 | 1% |
| Blaine County District Court | 89 | 70 | 79% | 19 | 21% | 0 | 0% | 0 | 0% |
| Boise County District Court | 52 | 18 | 35% | 24 | 46% | 4 | 8% | 6 | 12% |
| Bonner County District Court | 291 | 152 | 52% | 125 | 43% | 13 | 4% | 1 | 0% |
| Bonneville County District Court | 680 | 536 | 79% | 143 | 21% | 1 | 0% | 0 | 0% |
| Boundary County District Court | 59 | 56 | 95% | 3 | 5% | 0 | 0% | 0 | 0% |
| Butte County District Court | 13 | 11 | 85% | 2 | 15% | 0 | 0% | 0 | 0% |
| Camas County District Court | 6 | 2 | 33% | 3 | 50% | 1 | 17% | 0 | 0% |
| Canyon County District Court | 928 | 496 | 53% | 352 | 38% | 68 | 7% | 12 | 1% |
| Caribou County District Court | 44 | 19 | 43% | 18 | 41% | 6 | 14% | 1 | 2% |
| Cassia County District Court | 123 | 109 | 89% | 14 | 11% | 0 | 0% | 0 | 0% |
| Clark County District Court | 1 | 0 | 0% | 1 | 100% | 0 | 0% | 0 | 0% |
| Clearwater County District Court | 35 | 8 | 23% | 12 | 34% | 3 | 9% | 12 | 34% |
| Custer County District Court | 19 | 18 | 95% | 1 | 5% | 0 | 0% | 0 | 0% |
| Elmore County District Court | 80 | 70 | 88% | 10 | 13% | 0 | 0% | 0 | 0% |
| Franklin County District Court | 52 | 30 | 58% | 20 | 38% | 2 | 4% | 0 | 0% |
| Fremont County District Court | 49 | 20 | 41% | 8 | 16% | 14 | 29% | 7 | 14% |
| Gem County District Court | 75 | 33 | 44% | 31 | 41% | 7 | 9% | 4 | 5% |
| Gooding County District Court | 99 | 67 | 68% | 28 | 28% | 4 | 4% | 0 | 0% |
| Idaho County District Court | 88 | 80 | 91% | 8 | 9% | 0 | 0% | 0 | 0% |
| Jefferson County District Court | 106 | 45 | 42% | 52 | 49% | 5 | 5% | 4 | 4% |
| Jerome County District Court | 102 | 82 | 80% | 19 | 19% | 1 | 1% | 0 | 0% |

| Court | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Kootenai County District Court | 923 | 331 | 36% | 248 | 27% | 107 | 12% | 237 | 26% |
| Latah County District Court | 114 | 71 | 62% | 39 | 34% | 4 | 4% | 0 | 0% |
| Lemhi County District Court | 38 | 32 | 84% | 6 | 16% | 0 | 0% | 0 | 0% |
| Lewis County District Court | 19 | 18 | 95% | 1 | 5% | 0 | 0% | 0 | 0% |
| Lincoln County District Court | 24 | 20 | 83% | 4 | 17% | 0 | 0% | 0 | 0% |
| Madison County District Court | 102 | 17 | 17% | 18 | 18% | 14 | 14% | 53 | 52% |
| Minidoka County District Court | 101 | 81 | 80% | 20 | 20% | 0 | 0% | 0 | 0% |
| Nez Perce County District Court | 108 | 90 | 83% | 18 | 17% | 0 | 0% | 0 | 0% |
| Oneida County District Court | 21 | 11 | 52% | 7 | 33% | 2 | 10% | 1 | 5% |
| Owyhee County District Court | 55 | 38 | 69% | 13 | 24% | 4 | 7% | 0 | 0% |
| Payette County District Court | 81 | 29 | 36% | 29 | 36% | 9 | 11% | 14 | 17% |
| Power County District Court | 23 | 16 | 70% | 5 | 22% | 2 | 9% | 0 | 0% |
| Shoshone County District Court | 67 | 46 | 69% | 18 | 27% | 2 | 3% | 1 | 1% |
| Teton County District Court | 68 | 38 | 56% | 23 | 34% | 7 | 10% | 0 | 0% |
| Twin Falls County District Court | 369 | 222 | 60% | 147 | 40% | 0 | 0% | 0 | 0% |
| Valley County District Court | 85 | 70 | 82% | 15 | 18% | 0 | 0% | 0 | 0% |
| Washington County District Court | 41 | 26 | 63% | 15 | 37% | 0 | 0% | 0 | 0% |

# EXHIBIT 4
# ANGIONE DECLARATION

| Case Number | Case Category | CaseType Desc | Location | FilingCode Description | Status | Reject Code | RejectComment | Submitted Date |
|---|---|---|---|---|---|---|---|---|
| CV01-21-00213 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Application or Petition for Release from Common Law Lien | Rejected | CORRECT | It looks like you originally submitted a Civil Case Information Sheet but it was canceled; we will still need that in order to open this case. Please correct and resubmit. L.K. | 1/6/2021 |
| CV01-21-00422 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Petition | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/7/2021 |
| CV01-21-00340 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/8/2021 |
| CV01-21-00825 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/12/2021 |
| CV01-21-00622 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | MISSING | Here is the link to the Case Information sheet: https://adacounty.id.gov/clerk/wp-content/uploads/sites/9/2018/10/Civil_Information_Sheet.pdf     Fill this out and add it to this envelope as a separate pdf. KH | 1/14/2021 |
| CV01-21-00943 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Petition | Rejected | MISSING | Please Add A Civil Case Information Sheet And Resubmit. Thanks -N.S. | 1/19/2021 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Application or Petition For Name Change (Adult) | Rejected | CORRECT | Please see the Supreme Court website on documents needed for a Name Change. You are missing several forms that I cannot file without. In addition all pleadings need to be in their own PDF. Thank you-HD | 1/21/2021 |
| CV01-21-01153 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | COURT | Please correct errors: (1) the plaintiff's address on the documents does not match what is in the envelope, and (2) the total dollar amount of the claim appears to be above $10,000 and thus the case should be filed in the district court. Copy envelope number and resubmit. HH | 1/25/2021 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | Please correct error in envelope and resubmit. | 1/25/2021 |
| CV01-21-01760 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | Please correct error in envelope and resubmit. | 1/27/2021 |
| CV01-21-01516 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/28/2021 |
| CV01-21-01492 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | CORRECT | Complaint is missing the attorney's signature date, please correct & resubmit.  AK | 1/28/2021 |

Jan 2021 Rejected

**ER-1446**

| CV01-21-01707 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/29/2021 |
|---|---|---|---|---|---|---|---|---|
| CV03-21-00234 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint | Rejected | CORRECT | You have listed Mark Hinds in your complaint, but you have not entered him as a party to the case. | 1/22/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint for Eviction (Expedited Proceedings) | Rejected | CASETYPE | This is not an A10-Habeas by Prisoners.  Please file as the appropriate case type | 1/28/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint for Eviction (Expedited Proceedings) | Rejected | CASETYPE | This is not a District Court Case.  This is an Eviction. The case type needs to be an eviction. | 1/28/2021 |
| CV06-21-0069 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Complaint | Rejected | CORRECT | The exhibits need to be attached in the same PDF as the complaint. | 1/12/2021 |
| CV06-21-0129 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/22/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Complaint | Rejected | CORRECT | Complaint is not signed by attorney.  Appears to be missing pages.  Remove the reference to Magistrate Court - you are filing in Distrit Court because of the amount being claimed - over $10,000.  Brandee, bcammack@co.bingham.id.us | 1/22/2021 |
| CV10-21-0156 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | (RS) | 1/8/2021 |
| CV10-21-0416 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/22/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint | Rejected | OTHDOC | (RS) | 1/25/2021 |
| CV10-21-0582 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Petition | Rejected | CORRECT | Determination of Errors is under Probate-$166. Quiet Title is under District Court-$221. This case is not under Magestrate. Please pick the filing category of your chossing and resubmit. Thank you. JL | 1/29/2021 |
| CV14-21-00194 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | MDA | 1/4/2021 |
| CV14-21-00080 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DUPLICATE | The complaint was added to the envelope 3 times, please remove all duplicate filings. Plaintiff's Name is spelled McClean on envelope and McLean on document, please correct and resubmit - DH | 1/4/2021 |

Jan 2021 Rejected

**ER-1447**

| CV14-21-00080 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DUPLICATE | The complaint was added to the envelope 3 times, please remove all duplicate filings. Plaintiff's Name is spelled McClean on envelope and McLean on document, please correct and resubmit - DH | 1/4/2021 |
| CV14-21-00080 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DUPLICATE | The complaint was added to the envelope 3 times, please remove all duplicate filings. Plaintiff's Name is spelled McClean on envelope and McLean on document, please correct and resubmit - DH | 1/4/2021 |
| CV14-21-00079 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | DOCS | The complaint lists Securian Financial Group, Securian Financial Services, Minnesota Mutual Life Insurance Co and Patricia Buskirk as 4 separate defendants. If they are 4 separate defendants please include all 4 on your envelope. If Securian Financial Group is dba Securian Financial Services, please indicate that on the document - DH | 1/4/2021 |
| CV14-21-00196 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | BW | 1/8/2021 |
| CV14-21-00288 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | FORMAT | All pages must be 8.5x11 or smaller in size. Please correct pages 11-14. BW | 1/13/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Appeal or Petition for Judicial Review | Rejected | DUPLICATE | Please seperate all of your documents into seperate pdf's. Please also file this into the correct case type. If you are filing the Stipulation an Answer is not necessary (if Nicholas wants to file an Answer he will need to do it and pay the Apperance Fee at that time for that Answer). If you file the Acknowledgment of Service, the Affidavit of Service is not needed. Please add the Canyon County Courthouse addess and phone number to the blank lines on the Summons. 1115 Albany St. Caldwell, ID 83605. 208-454-7572.  Please be sure to not file any dubplicate documents. If you have any questions about this please feel free to contact our office. My direct line is 208-454-7494. BW | 1/14/2021 |

Jan 2021 Rejected

**ER-1448**

| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Appeal or Petition for Judicial Review | Rejected | PLEADING | Please seperate all of your documents into seperate pdf's. Please also file this into the correct case type. If you are filing the Stipulation an Answer is not necessary (if Nicholas wants to file an Answer he will need to do it and pay the Apperance Fee at that time for that Answer). If you file the Acknowledgment of Service, the Affidavit of Service is not needed. Please add the Canyon County Courthouse addess and phone number to the blank lines on the Summons. 1115 Albany St. Caldwell, ID 83605. 208-454-7572.  Please be sure to not file any dubplicate documents. If you have any questions about this please feel free to contact our office. My direct line is 208-454-7494. BW | 1/14/2021 |
|---|---|---|---|---|---|---|---|---|
| CV14-21-00468 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | DOCS | Please correct the spelling of Toldeo Enterprises to match the envelope spelling. HH | 1/19/2021 |
| CV14-21-00514 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | HH | 1/21/2021 |
| CV14-21-00587 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | HH | 1/22/2021 |
| CV14-21-00647 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | Please be sure the Complaint is signed. HH | 1/25/2021 |
| CV14-21-00647 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | Please be sure the Complaint is signed. HH | 1/26/2021 |
| CV14-21-00995 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | COURT | Your complaint indicates you are asking for more than $9,999.99, please file as a district case, with the 221.00 filing fee - DH | 1/28/2021 |
| CV15-21-0003 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Caribou County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | Please file summons with complaint | 1/8/2021 |
| CV16-21-00058 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/20/2021 |
| CV20-21-00074 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Elmore County District Court | Complaint | Rejected | CORRECT | This needs to be filed in District Court as it's over $10,000. Please refile. Thank you. | 1/26/2021 |
| CV24-21-00032 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Gooding County District Court | Complaint | Rejected | CORRECT | Complaint has 3 Defendant's, But only one was entered as a party Please refile and add the other 3 party's to the filing | 1/15/2021 |

Jan 2021 Rejected

**ER-1449**

| CV26-21-0014 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jefferson County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/6/2021 |
|---|---|---|---|---|---|---|---|---|
| CV26-21-0018 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jefferson County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/8/2021 |
| CV27-21-00016 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jerome County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/8/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jerome County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/20/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jerome County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/20/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | Same reason it was rejected before. Two copies of Civil Complaint, still missing a Civil Case Information Sheet. KF | 1/8/2021 |
| CV28-21-0467 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | KF | 1/13/2021 |
| CV28-21-0467 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | KF | 1/14/2021 |
| CV28-21-0467 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/14/2021 |
| CV28-21-0432 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | KF | 1/21/2021 |
| CV28-21-0590 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | KF | 1/25/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | FREQ | Please correct error in envelope and resubmit. | 1/29/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Latah County District Court | Application | Rejected | COURT | Magistrate Court not District | 1/12/2021 |
| CV36-21-0005 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Oneida County District Court | Complaint | Rejected | INC | I am rejecting this filing because your filing is not complete.  A Civil Case Information Sheet and a Summons must be included in your filing. Also, your Complaint does not have a signature.  Please correct and resubmit within this same envelope.  Thank you! | 1/10/2021 |

Jan 2021 Rejected

**ER-1450**

| CV38-21-0027 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Payette County District Court | Complaint | Rejected | CORRECT | Need info sheet | 1/13/2021 |
|---|---|---|---|---|---|---|---|---|
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Teton County District Court | Petition | Rejected | MISSING | Also, the filing fee is not the correct amount, a divorce is $207.00 | 1/7/2021 |
| CV42-21-0044 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | JURISD | Incorrect county in title | 1/5/2021 |
| CV42-21-0042 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/5/2021 |
| CV42-21-0042 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/6/2021 |
| CV42-21-0152 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | You have entered party information for 3 defendants but document only lists 2 defendants | 1/13/2021 |
| CV42-21-0249 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | DOCS | Defendant name entered does not match name on document and when entering party information, please remove the DBA. The courts will add this information once the case is accepted. | 1/19/2021 |
| CV42-21-0249 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Defendant name entered does not match defendant name on document | 1/20/2021 |
| CV42-21-0249 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/21/2021 |
| CV42-21-0290 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | Please include all parties listed on the complaint | 1/25/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/25/2021 |
| CV42-21-0369 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Party on complaint and new parties put in MUST match | 1/28/2021 |
| CV42-21-0403 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/29/2021 |
| CV42-21-0403 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/29/2021 |

Jan 2021 Rejected

**ER-1451**

# EXHIBIT 5
# ANGIONE DECLARATION

| Case Number | Case Category | CaseType Desc | Location | FilingCode Description | Status | Reject Code | RejectComment | Submitted Date |
|---|---|---|---|---|---|---|---|---|
| CV01-21-10383 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | JURISD | Ada not Adams | 7/2/2021 |
| CV01-21-10608 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/8/2021 |
| CV01-21-10639 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | TL | 7/9/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | TL | 7/9/2021 |
| CV01-21-10797 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | COURT | It appears the damages for this case are above $10,000 and should be filed as a district case.  If that is incorrect please verify in the filing comments. LH | 7/12/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Petition | Rejected | PLEADING | Please correct errors: (1)Each document needs to be in its own separate pdf, with the pages in numeric order. (2) Please make sure to fill in the court name on the first page of the Petition, we are the 4th judicial district county of Ada (3) Also pick the correct type in the envelope for divorce, Type B1b is for Divorce with no kids. Copy envelope number and resubmit. HH | 7/12/2021 |
| CV01-21-10946 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | JURISD | Please review the jurisdiction in data entry and process applicable fee.  (Filed as magistrate case). Thank you GF | 7/14/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Appeal or Petition for Judicial Review | Rejected | CORRECT | If you would like to file for a judicial review, you need to file the correct documents. The fee will be $221. Please contact the court assistance office at cao@adacounty.id.gov. Thank you, AW. | 7/16/2021 |

Jul 2021 Rejected

**ER-1453**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CV01-21-11244 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | FEE | Prayer amount exceeds Magistrate limit of $10,000. Please resubmit appropriate fees for a District level case. Thank you, RP | 7/17/2021 |
| CV01-21-11191 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | A Civil Case Information Sheet is required with the submission of all new cases. Thank you, RP | 7/19/2021 |
| CV01-21-11149 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | KH | 7/19/2021 |
| CV01-21-11401 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/23/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint for Eviction (Forcible Detainer) | Rejected | FREQ | Filer will file in person. Thank you, BE | 7/23/2021 |
| CV01-21-11773 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | CORRECT | Please review defendants/plaintiffs names to match the data entered by the filer and the document. (Kristen or Kristin) Thank you GF | 7/29/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Petition | Rejected | MISSING | Please correct error in envelope and resubmit. | 7/29/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Petition | Rejected | REJCT | Duplicate Filing of Petition. Missing CCIS form and Summons. Pease Fix and Resubmit. BF | 7/29/2021 |
| CV03-21-02298 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint | Rejected | FORMAT | Both plaintiff's names are listed as parties in the case so both names need to appear on all documents. Please copy envelope, correct error and resubmit. Thank you, Kris. | 7/13/2021 |
| CV03-21-02298 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint | Rejected | CORRECT | Jamie Dauphin is listed as a plaintiff but not as a party in the case. All names on documents for Plaintiff and Defendant have to be listed as a party in the case. Also, Bret and Ashlee lase name (Sherer) is spelled incorrectly on the summons. Please copy envelope, correct errors and resubmit. Thank you and have a good day! :) Kris | 7/13/2021 |

Jul 2021 Rejected

**ER-1454**

| CV03-21-02298 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/13/2021 |
|---|---|---|---|---|---|---|---|---|
| CV03-21-02328 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | INC | Reed W. Larsen needs to sign page 7. Please copy envelope, sign and resubmit. Thank you, Kris. | 7/14/2021 |
| CV03-21-02474 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint | Rejected | CORRECT | You have listed Richard and Jerri Bigelow as Plaintiffs and Rodney Bigelow and RNR Homes LLC as Defendants. They ALL need to be listed as parties in the case when filing. Please copy envelope, correct error and resubmit. Thank you, Kris. | 7/27/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Complaint | Rejected | CORRECT | Please remove prefix from defendant's name and resubmit. | 7/13/2021 |
| CV07-21-00316 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Blaine County District Court | Complaint | Rejected | CORRECT | additional defendant's need to be listed | 7/1/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Blaine County District Court | Application | Rejected | DUPLICATE | Please correct error in envelope and resubmit. | 7/20/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Blaine County District Court | Application | Rejected | CORRECT | page 2 is a duplicate page | 7/20/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Blaine County District Court | Application | Rejected | CORRECT | Plaintiff and Def cannot both be Mr. Pankey, please correct issue. | 7/20/2021 |
| CV09-21-1132 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Complaint | Rejected | FEE | you are paying new a District case fee and an appearance fee, please contact us if you have questions (BLS) | 7/15/2021 |
| CV09-21-1166 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Complaint | Rejected | INC | Notary page #7 is blank and missing signatures. CH | 7/23/2021 |
| CV09-21-1166 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Complaint | Rejected | CORRECT | Please file a Civil Case Information Sheet (BLS) | 7/23/2021 |
| CV10-21-4346 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/28/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Boundary County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/7/2021 |

Jul 2021 Rejected

**ER-1455**

| CV14-21-06159 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | COURT | This case should be filed into the District Court. DV | 7/2/2021 |
| CV14-21-06398 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | DOCS | The envelope lists the defendant's last name as Calwson, the documents list it as Clawson. Please make sure the party information listed on the envelope matches what is on your documents and resubmit - DH | 7/12/2021 |
| CV14-21-06508 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | DH | 7/13/2021 |
| CV14-21-06404 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | Please correct your judicial header to read "Third" Judicial district and county of "Ada" - DH | 7/13/2021 |
| CV14-21-06489 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | Party names listed on the documents need to all be included on the envelope. Please include Falcon Valley Subdivision Homeowners Association and Does 1-10 on your envelope and resubmit - DH | 7/15/2021 |
| CV14-21-06489 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | COURT | Please file into district court-MR | 7/15/2021 |
| CV14-21-06685 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | DUPLICATE | You have attached 2 duplicate Civil Case information Sheets. Only 1 is necessary. Please correct and resubmit. NB | 7/19/2021 |
| CV14-21-06585 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | You must include a Civil Case Information Sheet with your complaint. Please correct error and resubmit. MDA | 7/19/2021 |
| CV14-21-06585 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | MISSING | You are missing your case information sheet and your Summons. Please correct error and resubmit. NB | 7/20/2021 |
| CV14-21-06685 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | Documents list incorrect judicial district. This is the 3rd Judicial District. Please correct and resubmit. NB | 7/22/2021 |
| CV14-21-06896 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | Please include a Summons with your filing and resubmit. KE | 7/29/2021 |

Jul 2021 Rejected

**ER-1456**

| CV14-21-06896 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | DOCS | Please correct the Party names of the Plaintiff's on the envelope to match the Party names of the Plaintiff's on the Document and resubmit. KE | 7/29/2021 |
| CV14-21-06922 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | Please correct the judicial district in the header.  Also, please add defendant Jane Doe Sadler to the envelope.  sc | 7/30/2021 |
| CV14-21-06909 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | KE | 7/30/2021 |
| CV14-21-06896 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | KE | 7/30/2021 |
| CV14-21-06896 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | DOCS | Please correct the Plaintiff's Party names on the Envelope to match the Document. Page 6 is missing signatures and dates. Please correct and resubmit. KE | 7/30/2021 |
| CV16-21-00811 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | CORRECT | Please resubmit in black and white N.A. | 7/6/2021 |
| CV16-21-00637 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | CORRECT | Submit in Black and White, for E-filing requirements please see: https://icourt.idaho.gov/efile-resources ~N.A. | 7/12/2021 |
| CV16-21-00669 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | CORRECT | PLease scan in black and white | 7/21/2021 |
| CV16-21-00683 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | CORRECT | Page 1 of complaint and summons contain blue hyperlinks and signatures. Please submit in black and white, for E-filing requirements see: https://icourt.idaho.gov/efile-resources Thank you-SW | 7/27/2021 |
| CV16-21-00683 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | CORRECT | Please scan in black and white | 7/27/2021 |
| CV19-21-0067 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Custer County District Court | Complaint | Rejected | CORRECT | Documents say Fifth Judicial District for Blaine County. Please correct error or file in Blaine County if applicable. Thank you | 7/16/2021 |

Jul 2021 Rejected

**ER-1457**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CV27-21-00580 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jerome County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/1/2021 |
| CV28-21-4410 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | If the address for T.K. Painting, LLC is known, it must be in the envelope as well. Please correct and resubmit. RF | 7/1/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | As per the previous rejection, party names and addresses need to be inputed into the "add party information section" of the envelope in proper case type (not all caps). Thank you BD | 7/2/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | Rule 8 party information. Enter the address and phone number of all parties, in known. CG | 7/8/2021 |
| CV28-21-4447 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | All parties need to be listed in the evelope. See Rule 8:Party Information. CG | 7/9/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | Please use proper case on the envelope. See rule 8:Party Information --CG | 7/9/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | FREQ | Rejected at Filer's request. Duplicate filing received. Case number CV28-21-4524 - MMC | 7/13/2021 |
| CV28-21-4907 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | Please remove "as assignee of Citibank, N.A." from the plantiff name in the envelope. Please correct and resubmit. MC | 7/15/2021 |
| CV28-21-4640 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DUPLICATE | Duplicate complaint filed.--CG | 7/15/2021 |
| CV28-21-4640 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | DUPLICATE | Duplicate complaint filed.--CG | 7/15/2021 |
| CV28-21-4822 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | Please add all parties to the envelope including addresses so we may able to verify parties. | 7/23/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | Please include all known party information in the envelope, including what is on the case information sheet. See Rule 8: Party Information-CG | 7/23/2021 |

Jul 2021 Rejected

**ER-1458**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | Please include all known party information in the envelope, including what is on the case information sheet. See Rule 8: Party Information-CG | 7/23/2021 |
| CV28-21-5108 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | FREQ | JKC | 7/28/2021 |
| CV28-21-5325 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | Under rule 8 of the electronic filing rules you must enter the party names in the correct case. So please change the party names of MARY BYRD to Mary Byrd and BRETT GATTEN to Brett Gatten. Thank you. -LP | 7/30/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Latah County District Court | Application | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/9/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Latah County District Court | Application | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/12/2021 |
| CV33-21-0498 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Madison County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/12/2021 |
| CV33-21-0498 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Madison County District Court | Complaint | Rejected | FREQ | Verify Parties | 7/14/2021 |
| CV35-21-1116 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Nez Perce County District Court | Complaint | Rejected | MISSING | We cannot open a new case without a Civil Law Information Sheet. AA | 7/15/2021 |
| CV37-21-00248 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Owyhee County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/13/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Owyhee County District Court | SC Small Claims form CAO SC 1-2 | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/29/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Owyhee County District Court | Complaint or Claim - Small Claims | Rejected | COURT | Needs to be filed in Magistrate Court, not District Court | 7/29/2021 |
| CV38-21-0635 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Payette County District Court | Complaint | Rejected | MISSING | Please correct error in envelope and resubmit. | 7/26/2021 |
| CV42-21-2486 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/1/2021 |

Jul 2021 Rejected

**ER-1459**

| CV42-21-2353 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | MISSING | Please correct error in envelope and resubmit. | 7/2/2021 |
| CV42-21-2357 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Please add Does I-V as a party in the new parties tab | 7/6/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Per Rule 8: When entering party information, please enter the party names in proper case: Example ?John Doe? do not enter as ?JOHN DOE? or ?john doe? | 7/6/2021 |
| CV42-21-2486 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Please remove the a/s/o as this will be added after accepting | 7/13/2021 |
| CV42-21-2512 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | DOCS | Plaintiff was entered twice | 7/16/2021 |
| CV42-21-2530 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Please remove initial appearance fee of $136.00 | 7/20/2021 |
| CV42-21-2590 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | Please add all parties listed on the complaint | 7/23/2021 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Please add John Does I through X in new party tab and remove CV from the case # line | 7/28/2021 |

Jul 2021 Rejected

**ER-1460**

# EXHIBIT 6
# ANGIONE DECLARATION

| Case Number | Case Category | CaseType Desc | Location | Status | Reject Code | RejectComment | Submitted Date |
|---|---|---|---|---|---|---|---|
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | PLEADING | Also, the fee for Adult Name change is $166.00. KH | 1/4/2022 |
| CV01-22-00452 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | MISSING | Civil Case Information Sheet is required when filing a new case. EAR | 1/5/2022 |
| CV01-22-00452 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | DUPLICATE | 2 copies of Complaint submitted. EAR | 1/5/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | CORRECT | You are missing a civil case information sheet. Please correct and resubmit. Thanks. EM | 1/6/2022 |
| CV01-22-00613 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | CORRECT | Please correct error in envelope and resubmit. | 1/12/2022 |
| CV01-22-00930 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | MISSING | I apologize to reject this; please provide a Civil Case Information Sheet and resubmit. L.K. | 1/14/2022 |
| CV01-22-01012 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | CORRECT | The attorney # is for a Utah State Bar attorney, not Idaho.  Needs to be filed by an attorney licensed in Idaho. Thank you. CS | 1/18/2022 |
| CV01-22-01024 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | CORRECT | Please correct error in envelope and resubmit. | 1/20/2022 |
| CV01-22-01516 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Rejected | CORRECT | Please correct error in envelope and resubmit. | 1/29/2022 |
| CV03-22-00214 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Rejected | CORRECT | You have this as a Fee Category of A1.  That is an adoption.  The Fee Category is an AA | 1/20/2022 |
| CV03-22-00214 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/20/2022 |
| CV06-22-0072 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Rejected | | Please correct error in envelope and resubmit. | 1/12/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Blaine County District Court | Rejected | CORRECT | header requires an email address.  Blaine County is not a Superior Court | 1/18/2022 |

Jan 2022 Rejected

**ER-1462**

| CV07-22-00055 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Blaine County District Court | Rejected | CORRECT | Please add Blaine County in heading on complaint & summons and add attorney law firm info including email address on top left hand corner of complaint. | 1/31/2022 |
| CV09-22-0157 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Rejected | CORRECT | Please add Jane Doe Milbrath (all parties must be entered at filing ) Thank you (BLS) | 1/31/2022 |
| CV10-22-0284 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Rejected | MISSING | (RS) | 1/12/2022 |
| CV10-22-0564 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Rejected | DOCS | Missing party - need to add all parties when submitting to match caption on Petition. JWF | 1/31/2022 |
| CV11-22-0033 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Boundary County District Court | Rejected | FEE | This appears to be a district court filing that requires $221 filing fee | 1/20/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Boundary County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/21/2022 |
| CV14-22-00115 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | FREQ | Please correct error in envelope and resubmit. | 1/4/2022 |
| CV14-22-00281 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/7/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | COURT | Filed under Magistrate, Please Correct the filing and Resubmit. - JH | 1/10/2022 |
| CV14-22-00361 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | COURT | this should be filed into district: AA for the Case Type je | 1/11/2022 |
| CV14-22-00393 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | CORRECT | Please add the defendants St Luke's Nampa Medical Center, LTD and John and Jane Does I-V as listed in the case caption on the documents the the Party Tab in the Envelope.  SC | 1/13/2022 |
| CV14-22-00749 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | FEE | Please include fees to open the case. Currently being opened under Waiver account. SF | 1/25/2022 |
| CV14-22-00866 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | CORRECT | Please correct Judicial Header to read Third Judicial District of Canyon County and Resubmit. Also please include Civil Case Information Sheet with your filing. SF | 1/28/2022 |

Jan 2022 Rejected

**ER-1463**

| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | OTHDOC | SF | 1/28/2022 |
|---|---|---|---|---|---|---|---|
| CV14-22-00869 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Rejected | DOCS | Please include all parties on the envelope and resubmit. SF | 1/29/2022 |
| CV16-22-00076 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Rejected | CORRECT | Please scan in black and white | 1/31/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Clearwater County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/17/2022 |
| CV22-22-0025 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Fremont County District Court | Rejected | CORRECT | You have John or Jane Does 1-5 listed on the complaint but have not added them as a party. Please add them as a party, copy the envelope and resubmit. Thanks! | 1/7/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Fremont County District Court | Rejected | CORRECT | Please attach the exhibits to the Complaint. They should not be separate documents, Thanks! | 1/11/2022 |
| CV23-22-0043 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Gem County District Court | Rejected | CORRECT | The complaint is not signed or dated. Please resubmit. - RQ | 1/7/2022 |
| CV26-22-0060 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jefferson County District Court | Rejected | CORRECT | First paragraph list defendants as Steve Obney and Steve Obney Builders | 1/20/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jefferson County District Court | Rejected | MISSING | Please correct error in envelope and resubmit. | 1/26/2022 |
| CV28-22-0052 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Rejected | MISSING | 1) Please add "Does 1-10" as Parties in the envelope. 2) Parties in envelope must match exactly. Specifically Johnson Controls Inc. is Johnson Controls on the documents. 3) Copy and resubmit the envelope with a Civil Case Information Sheet included. - LAG | 1/3/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Rejected | CASETYPE | Filed under wrong case type. Please file under A12 Unlawful detainer/ eviction. AM | 1/5/2022 |
| CV28-22-0167 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Rejected | | Please correct error in envelope and resubmit. | 1/10/2022 |

Jan 2022 Rejected

ER-1464

(81 of 294), Page 81 of 294

Case: 24-6697, 03/06/2025, DktEntry: 10.8, Page 81 of 294
Case 1:21-cv-00305-DCN   Document 61-4   Filed 12/15/22   Page 39 of 74

| CV28-22-0314 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Rejected | OTHDOC | All summons are missing the header which includes the district and county. AM | 1/17/2022 |
|---|---|---|---|---|---|---|---|
| CV28-22-0465 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Rejected | MISSING | Please include a case information sheet. AM | 1/24/2022 |
| CV28-22-0504 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Rejected | CORRECT | Plaintiff on documents and in envelope do not match. Please also add John/Jane Does as a Party. Finally, make sure all parties are listed using proper upper and lower case. AM | 1/26/2022 |
| CV28-22-0504 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Rejected | OTHDOC | Plaintiff name on documents does not match party name listed in envelope or on civil case information sheet. Please copy envelope, correct and resubmit. Thank you - CM | 1/27/2022 |
| CV33-22-0085 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Madison County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/20/2022 |
| CV34-22-00055 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Minidoka County District Court | Rejected | CORRECT | Emery Creek Farms is spelled incorrectly in the 1st paragraph of the 1st page. Please fix, copy envelope and refile. Thanks! | 1/24/2022 |
| CV35-22-0008 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Nez Perce County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/3/2022 |
| CV35-22-0008 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Nez Perce County District Court | Rejected | FREQ | Please correct error in envelope and resubmit. | 1/3/2022 |
| CV42-22-0031 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/4/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | MISSING | Please correct error in envelope and resubmit. | 1/4/2022 |
| CV42-22-0148 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | Party information entered in the new parties tab does not appear to match the information on the complaint | 1/11/2022 |

Jan 2022 Rejected

**ER-1465**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CV42-22-0148 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | Party information entered in the new parties tab does not appear to match the information on the complaint (Please make sure the defendant "Sue Baker" matches one of the names listed on the complaint) | 1/11/2022 |
| CV42-22-0142 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | Please add all parties listed on the complaint, also Party information entered in the new parties tab does not appear to match the information on the complaint | 1/11/2022 |
| CV42-22-0132 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | DOCS | Please do not include the dba in the new party tab.  Clerk will add it when case is accepted. Please include Does I-V as a new party | 1/11/2022 |
| CV42-22-0148 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | DOCS | The name Evlyn Sue Baker on the documents does not match the name in the new party tab | 1/12/2022 |
| CV42-22-0148 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | Party information entered in the new parties tab does not appear to match the information on the complaint (Estate of Pat Dugan) | 1/12/2022 |
| CV42-22-0147 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/12/2022 |
| CV42-22-0147 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | MISSING | Please correct error in envelope and resubmit. | 1/12/2022 |
| CV42-22-0259 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 1/19/2022 |
| CV42-22-0259 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | Please add all parties listed on the complaint | 1/19/2022 |
| CV42-22-0326 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | Party information entered in the new parties tab does not appear to match the information on the complaint (Defendant's Middle Initial) | 1/26/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | We need a full name of the party, also Per Rule 8 of the E-Filing Rule: When entering party information, please enter the party names in proper case format: Example "John Doe" do not enter as "JOHN DOE" or "john doe" | 1/31/2022 |

Jan 2022 Rejected

**ER-1466**

(83 of 294), Page 83 of 294
Case: 24-6697, 03/06/2025, DktEntry: 10.8, Page 83 of 294
Case 1:21-cv-00305-DCN   Document 61-4   Filed 12/15/22   Page 41 of 74

| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Rejected | CORRECT | Email missing in header | 1/31/2022 |
|---|---|---|---|---|---|---|---|

Jan 2022 Rejected

**ER-1467**

# EXHIBIT 7
# ANGIONE DECLARATION

Case 1:21-cv-00305-DCN   Document 61-4   Filed 12/15/22   Page 43 of 74

| Case Number | Case Category | CaseType Desc | Location | FilingCode Description | Status | Reject Code | RejectComment | Submitted Date |
|---|---|---|---|---|---|---|---|---|
| CV01-22-09813 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | L.K. | 7/7/2022 |
| CV01-22-09783 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | JURISD | Please correct error in envelope and resubmit. | 7/7/2022 |
| CV01-22-09847 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | JURISD | Please correct error in envelope and resubmit. | 7/8/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/8/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | MISSING | L.K. | 7/18/2022 |
| CV01-22-10701 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Ada County District Court | Complaint | Rejected | INC | Please sign the complaint. Copy envelope number and resubmit. HH | 7/26/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Adams County District Court | Complaint for Eviction (Expedited Proceedings) | Rejected | COURT | this should be magistrate A12 | 7/28/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | MISSING | Missing Civil Case Information Sheet. Please correct and resubmit under the same envelope number. Thank you! SC | 7/6/2022 |
| CV03-22-02295 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bannock County District Court | Complaint | Rejected | CORRECT | wrong district and county | 7/20/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | The exhibits need to be attached to the complaint in the same PDF, not as separate files. Thank you. | 7/14/2022 |
| CV06-22-1216 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/25/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bingham County District Court | Complaint | Rejected | CORRECT | We are not Bonneville County. | 7/27/2022 |

Jul 2022 Rejected

**ER-1469**

(86 of 294), Page 86 of 294
Case: 24-6697, 03/06/2025, DktEntry: 10.8, Page 86 of 294
Case 1:21-cv-00305-DCN   Document 61-4   Filed 12/15/22   Page 44 of 74

| CV08-22-00124 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Boise County District Court | Appeal or Petition for Judicial Review | Rejected | CORRECT | Please correct Party's tab. | 7/11/2022 |
| CV09-22-0859 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Complaint | Rejected | MISSING | Please file a Civil Case Information Sheet and resubmit. CH | 7/1/2022 |
| CV09-22-0967 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/20/2022 |
| CV09-22-0984 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Complaint | Rejected | DOCS | Please add all Parties listed on the Complaint to the Party Information tab, then resubmit. CH | 7/25/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonner County District Court | Complaint | Rejected | FREQ | Please correct error in envelope and resubmit. | 7/27/2022 |
| CV10-22-3800 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint | Rejected | MISSING | Please correct error in envelope and resubmit. | 7/13/2022 |
| CV10-22-3792 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint | Rejected | CORRECT | Duplicate documents in each document. JB | 7/13/2022 |
| CV10-22-4043 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint | Rejected | DOCS | Missing 3 of the 4 parties referenced in the caption of the Complaint. JWF | 7/26/2022 |
| CV10-22-4079 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Bonneville County District Court | Complaint | Rejected | DOCS | Need to add Party, Missing Does I through X. JWF | 7/27/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Boundary County District Court | Complaint | Rejected | JURISD | Please correct error in envelope and resubmit. | 7/12/2022 |
| CV14-22-05457 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | #NAME? | 7/6/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DOCS | The Plaintiff's first name spelling is Yuliva on the document but Yuliya on the envelope.  Which is the correct spelling?  Also, please add the doe defendants to the envelope.  sc | 7/8/2022 |

Jul 2022 Rejected

**ER-1470**

| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | DOCS | The envelope shows last name spelling of the Plaintiff is Mellow but the document shows Mello. SC | 7/8/2022 |
|---|---|---|---|---|---|---|---|---|
| CV14-22-05543 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | REJCT | parties on document don't match parties on envelope. DOES I-V are on document but not on envelope. RS | 7/11/2022 |
| CV14-22-05646 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | Parties on documents do not all match each other or on the envelope. The summons says DOES 1-10, the complaint does not. RS | 7/12/2022 |
| CV14-22-05592 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | RS | 7/12/2022 |
| CV14-22-05646 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | RS | 7/13/2022 |
| CV14-22-05701 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | OTHDOC | RS | 7/15/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Application | Rejected | CORRECT | Please correct page 1 of the application: we are the THIRD judicial district in the county of CANYON, then resubmit. Everything else looks great! -JE | 7/16/2022 |
| CV14-22-05760 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | Please include our telephone number on summons (208-454-7572) then resubmit. JE | 7/18/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | MISSING | Please include civil case information sheet. SF | 7/22/2022 |

Jul 2022 Rejected

**ER-1471**

|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | MISSING | Please include Civil Law Case Information Sheet and resubmit. SF | 7/25/2022 |
|---|---|---|---|---|---|---|---|---|
| CV14-22-05995 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | The defendants on the envelop do not match the defendants on the documents. Please correct and resubmit. AE | 7/26/2022 |
| CV14-22-05988 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | The defendant names on the document and the envelope do not match. Please correct and resubmit. AE | 7/26/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | INC | Please correct electronic signature. Supreme court rule states it must be in /s/ formatting. SF | 7/28/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Canyon County District Court | Complaint | Rejected | CORRECT | The defendants on the envelope don't match the defendants on the document. Please correct and resubmit. AE | 7/28/2022 |
| CV16-22-00565 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/12/2022 |
| CV16-22-00563 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | CORRECT | Please submit in Black and White, for E-filing requirements please see: https://icourt.idaho.gov/efile-resources -C. Dalsbo | 7/13/2022 |
| CV16-22-00568 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Cassia County District Court | Complaint | Rejected | CORRECT | Second Defendant (Persons Unknown) has not been added as a party N.A. | 7/14/2022 |

Jul 2022 Rejected

**ER-1472**

|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Elmore County District Court | Complaint for Eviction (Expedited Proceedings) | Rejected | CORRECT | should be filed under code A12 ($166.00) Unlawful detainer/eviction.....all documents need to be separated (3 separate documents) and please take your name off of page 2 of the summons and re-submit...thank you | 7/18/2022 |
| CV20-22-00718 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Elmore County District Court | Complaint | Rejected | FREQ | Please correct error in envelope and resubmit. | 7/26/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Franklin County District Court | Complaint | Rejected | FREQ | Please correct error in envelope and resubmit. | 7/19/2022 |
| CV27-22-00692 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Jerome County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/27/2022 |
| CV28-22-3871 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/1/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | FREQ | Please correct error in envelope and resubmit. | 7/1/2022 |
| CV28-22-3891 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | #NAME? | 7/5/2022 |
| CV28-22-3888 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | Names in the party envelope should match this document exactly. - LAG | 7/5/2022 |
|  | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | CORRECT | We are the county of Kootenai and the First Judicial District. If you are trying to file in this county then please correct error, copy envelope & resubmit. If you are trying to file in Nez Perce you will have to file it within that county - ES | 7/7/2022 |

Jul 2022 Rejected

**ER-1473**

| CV28-22-4019 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint | Rejected | OTHDOC | cg | 7/12/2022 |
|---|---|---|---|---|---|---|---|---|
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Petition | Rejected | CORRECT | This needs to be filed into the open case listed on the Petition. This was filed as a new case with the new case fee included. So if you could resubmit it into that case we could then review it. Thank you - LAG | 7/15/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Application or Petition for Filing of a Foreign Judgment | Rejected | CORRECT | These documents need to be separated out and filed individually...BUT within this same envelope. Thank you - LAG | 7/15/2022 |
| CV28-22-4134 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Petition | Rejected | OTHDOC | Surety bond states is attached as exhibit A, however it is not attached. Please attach to petition and resubmit. Thank you BD | 7/18/2022 |
| CV28-22-4330 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/27/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Kootenai County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CORRECT | All parties should be added to the envelope with all their information. "Terri L Walden" as Plaintiff is missing from the party envelope and also "Jane Doe Kirking" as Defendant. - LAG | 7/28/2022 |

Jul 2022 Rejected

**ER-1474**

| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Lemhi County District Court | Complaint | Rejected | INC | Hi Chip - Please sign the complaint and have it notarized. Also, please include the Civil Case Info Sheet. Then resubmit - thanks Jana | 7/27/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Madison County District Court | Complaint | Rejected | CORRECT | Wrong county is listed.  MB | 7/6/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Madison County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/6/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Madison County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/21/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Madison County District Court | Complaint | Rejected | OTHDOC | Please correct error in envelope and resubmit. | 7/29/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Nez Perce County District Court | Complaint | Rejected | CASETYPE | On July 1st the Filing Fee Schedule changed and the case type for creditor/debtor cases over $10,000 is now "AA1". Breach of Contract over $10,000 would be "AA2"..   da | 7/13/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Nez Perce County District Court | Complaint | Rejected | CASETYPE | Should be an AA2 | 7/15/2022 |
| CV35-22-1028 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Nez Perce County District Court | Complaint For Personal Injury or Other Claims (Over $10,000) | Rejected | CASETYPE | On July 1st the Filing Fee Schedule changed.  To file a personal injury case the type is now "AA6".  If you have any questions or need more information, please contact the Supreme Court Web Site. | 7/22/2022 |

Jul 2022 Rejected

**ER-1475**

| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Payette County District Court | Petition | Rejected | CORRECT | Please file with the Prosecuting Attorney. | 7/15/2022 |
|---|---|---|---|---|---|---|---|---|
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Payette County District Court | Petition | Rejected | CORRECT | Please file with Prosecuting Attorney. | 7/15/2022 |
| | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Payette County District Court | Complaint | Rejected | FREQ | Please correct error in envelope and resubmit. | 7/18/2022 |
| CV42-22-2376 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Please make John Does 1-20 and Corporations XYZ two different parties | 7/5/2022 |
| CV42-22-2527 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | Please add all parties listed on the complaint | 7/19/2022 |
| CV42-22-2527 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | CORRECT | When entering party information please enter all parties listed on complaint | 7/19/2022 |
| CV42-22-2610 | Civil | AA - All Initial District Court Filings (Not Listed In: E, F, and H1) | Twin Falls County District Court | Complaint | Rejected | COURT | Filed into wrong court (Mag vs. Dist vs. Supreme). Copy rejected envelope, correct, resubmit. Filed under wrong jurisdiction and filing fee code. | 7/25/2022 |

Jul 2022 Rejected

**ER-1476**

# EXHIBIT 8
# ANGIONE DECLARATION

| County | Jan 2021 Rejections | July 2021 Rejections | Jan 2022 Rejections | July 2022 Rejections |
|---|---|---|---|---|
| Ada County District Court | 13 | 16 | 9 | 6 |
| Adams County District Court | 0 | 0 | 0 | 1 |
| Bannock County District Court | 3 | 5 | 2 | 2 |
| Bear Lake District Court | 0 | 0 | 0 | 0 |
| Benewah County District Court | 0 | 0 | 0 | 0 |
| Bingham County District Court | 3 | 1 | 1 | 3 |
| Blaine County District Court | 0 | 4 | 2 | 0 |
| Boise County District Court | 0 | 0 | 0 | 1 |
| Bonner County District Court | 0 | 3 | 1 | 4 |
| Bonneville County District Court | 4 | 1 | 2 | 4 |
| Boundary County District Court | 0 | 1 | 2 | 1 |
| Butte County District Court | 0 | 0 | 0 | 0 |
| Camas County District Court | 0 | 0 | 0 | 0 |
| Canyon County District Court | 15 | 16 | 9 | 16 |
| Caribou County District Court | 1 | 0 | 0 | 0 |
| Cassia County District Court | 1 | 5 | 1 | 3 |
| Clark County District Court | 0 | 0 | 0 | 0 |
| Clearwater County District Court | 0 | 0 | 1 | 0 |
| Custer County District Court | 0 | 1 | 0 | 0 |
| Elmore County District Court | 1 | 0 | 0 | 2 |
| Franklin County District Court | 0 | 0 | 0 | 1 |
| Fremont County District Court | 0 | 0 | 2 | 0 |
| Gem County District Court | 0 | 0 | 1 | 0 |
| Gooding County District Court | 1 | 0 | 0 | 0 |
| Idaho County District Court | 0 | 0 | 0 | 0 |
| Jefferson County District Court | 2 | 0 | 2 | 0 |
| Jerome County District Court | 3 | 1 | 0 | 1 |
| Kootenai County District Court | 7 | 14 | 7 | 11 |
| Latah County District Court | 1 | 2 | 0 | 0 |
| Lemhi County District Court | 0 | 0 | 0 | 1 |
| Lewis County District Court | 0 | 0 | 0 | 0 |
| Lincoln County District Court | 0 | 0 | 0 | 0 |
| Madison County District Court | 0 | 2 | 1 | 4 |
| Minidoka County District Court | 0 | 0 | 1 | 0 |
| Nez Perce County District Court | 0 | 1 | 2 | 3 |
| Oneida County District Court | 1 | 0 | 0 | 0 |
| Owyhee County District Court | 0 | 3 | 0 | 0 |
| Payette County District Court | 1 | 1 | 0 | 3 |
| Power County District Court | 0 | 0 | 0 | 0 |
| Shoshone County District Court | 0 | 0 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| Teton County District Court | 1 | 0 | 0 | 0 |
| Twin Falls County District Court | 12 | 9 | 15 | 4 |
| Valley County District Court | 0 | 0 | 0 | 0 |
| Washington County District Court | 0 | 0 | 0 | 0 |

# EXHIBIT 9
# ANGIONE DECLARATION



CNS_013280

**ER-1481**



CNS_013282







CNS_013285

**ER-1485**





ER-1487



**ER-1488**



CNS_013289

# EXHIBIT 10
# ANGIONE DECLARATION

After you choose the Location (Court) you choose the Category: Civil, Family, Guardianship/Conservatorship or Probate or Mental Health.



Then choose the Case Type.



Case 1:21-cv-00305-DCN   Document 61-4   Filed 12/15/22   Page 66 of 74



# EXHIBIT 11
# ANGIONE DECLARATION

After you add the parties, you add the document. First choose the Filing Code.



| | |
|---|---|
| Describe your document / PDF title should match | Issuing an Abstract Judgment - $2.00 |
| | Letter |
| **Client Reference Number** | Memorandum |
| | Memorandum of Agreement |
| | Memorandum of Law |
| Courtesy Copies | Motion |
| Describe your document / PDF title should match | Motion & Affidavit |
| | Motion and Affidavit for Fee Waiver |
| **Client Reference Number** | Motion for Appointment of Public Defender |
| | Motion for Change of Venue |
| | Motion for Fee Waiver |
| Courtesy Copies | Motion for Order to Show Cause |
| Describe your document / PDF title should match | Motion for Reconsideration |
| | Motion for Service of Summons by Publication |
| **Client Reference Number** | Motion for Telephonic Hearing |
| | Motion to Augment |
| | Motion to Consolidate |
| Courtesy Copies | Motion to Continue |
| Describe your document / PDF title should match | Motion to Dismiss Case |
| | Motion to Disqualify |
| **Client Reference Number** | Motion to Enlarge |
| | Motion to File Under Seal |
| | Motion to Quash Warrant |
| Courtesy Copies | Motion to Retain |
| | Motion to Transport |
| Describe your document / PDF title should match | Motion to Vacate |
| | Motion to Withdraw |
| **Client Reference Number** | Notice |
| | Notice of Change of Address |
| Courtesy Copies | Notice of Completion |
| | Notice of Hearing |
| Describe your document / PDF title should match | Notice of Oral Argument |
| | Notice of Proposed Dismissal |
| **Client Reference Number** | Notice of Unavailable/Available Dates |
| | Notice of Vacating Hearing |
| | Notice of Withdrawal of Attorney |
| Courtesy Copies | Objection to the Clerk's Record |
| Describe your document / PDF title should match | Order for Temporary Custody & Mental Examination Under I.C. |
| | Other Documents Not Listed |
| **Client Reference Number** | Parental Consent to Name Change |
| | Petition |
| | Petition for Interlock Relief |
| Courtesy Copies | Petition for Involuntary Detention of the Mentally Ill |
| Describe your document / PDF title should match | Petition for Post Conviction Relief |
| | Petition for Sterilization |
| **Client Reference Number** | Petition for Wrongful Conviction |
| | Progress Report |
| Courtesy Copies | Proposed Notice |

**ER-1495**

| | Proposed Order |
|---|---|
| Describe your document / PDF title should match | Proposed Other Document Requiring Court Signature |
| | Redacted Petition for Name Change (Adult/Emancipated Minor) |
| **Client Reference Number** | Redacted Petition for Name Change (Minor) |
| | Redacted Petition for Name Change (Multiple Minors) |
| | Reply to Memorandum |
| Courtesy Copies | Report |
| Describe your document / PDF title should match | Report of The Guardian Ad Litem |
| | Report to the Court |
| **Client Reference Number** | Request |
| | Request for Additional Clerk's Record |
| | Request for BAC Hearing |
| Courtesy Copies | Request for Discovery |
| Describe your document / PDF title should match | Request for Discovery & Response to Request for Discovery |
| | Request for Production of Documents |
| **Client Reference Number** | Request for Trial Setting |
| | Response |
| | Response to Request for Discovery |
| Courtesy Copies | Response to Request for Trial Setting |
| Describe your document / PDF title should match | Satisfaction of Judgment |
| | SC Affidavit of Competence, Non-Military Service and Amt Due |
| **Client Reference Number** | SC Small Claims form CAO SC 1-2 |
| | SC Summons Issued |
| | SC Summons Return of Service Served |
| Courtesy Copies | Sheriff's Return |
| Describe your document / PDF title should match | Statement |
| | Status Report |
| **Client Reference Number** | Stipulation |
| | Stipulation to Amend |
| Courtesy Copies | Stipulation to Continue |
| Describe your document / PDF title should match | Subpoena Issued |
| | Subpoena Returned |
| **Client Reference Number** | Subpoena Returned- Not Served |
| | Substitution of Counsel |
| | Summary of Expected Expert Testimony |
| Courtesy Copies | Summons Issued |
| Describe your document / PDF title should match | Summons Returned - Served |
| | Summons Returned - Unserved |
| **Client Reference Number** | Supplemental Brief Filed |
| | Supplemental Request for Discovery |
| | Supplemental Response to Request for Discovery |
| Courtesy Copies | Transcript Filed |

ER-1496

| Describe your document / PDF title should match | Unredacted Petition for Name Change (Adult/Emancipated Minor) |
| --- | --- |
| | Unredacted Petition for Name Change (Minors) |
| **Client Reference Number** | Unredacted Petition for Name Change (Multiple Minors) |
| | Waiver |
| | Water Administrative Appeal |
| **Courtesy Copies** | Withdrawal of Attorney |
| | Witness and Exhibit List |
| **Courtesy Copies** | Writ Issued - $2.00 |

# EXHIBIT 12
# ANGIONE DECLARATION

After you add payment info for the filing fee, you review a summary of the filing before submitting.



CNS_000388

**ER-1499**



CNS_000389

**ER-1500**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

COMES NOW Defendant Sara Omundson, by and through her counsel of record, and pursuant to Fed. R. Civ. P. 56, and moves the Court for summary judgment in her favor, dismissing Plaintiff Courthouse News Service's claims against her.

This Motion for Summary Judgment is supported by the following documents:

- Memorandum in Support

- Statement of Undisputed Material Facts

- Declaration of Keely E. Duke – Counsel for Sara Omundson

- Declaration of Sara Omundson – Administrative Director of the Idaho Courts

**SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 1**

- Declaration of Jennifer Dvorak – Chief Information Security Officer for the Idaho Supreme Court

- Declaration of Terry Derrick – General Manager of Courts at Tyler Technologies, Inc.

- Declaration of Honorable Cynthia Meyer – District Judge for the State of Idaho's First Judicial District

- Declaration of Honorable Jay Gaskill – District Judge for the State of Idaho's Second Judicial District

- Declaration of Honorable Davis VanderVelde – District Judge for the State of Idaho's Third Judicial District

- Declaration of Honorable Steven J. Hippler (Dkt 20-16) – District Judge for the State of Idaho's Fourth Judicial District

- Declaration of Honorable Eric Wildman – District Judge for the State of Idaho's Fifth Judicial District

- Declaration of Honorable Mitchell W. Brown – District Judge for Idaho's Sixth Judicial District

- Declaration of Honorable Rick Carnaroli -- District Judge for the State of Idaho's Sixth Judicial District

- Declaration of Honorable Dane Watkins – District Judge for the State of Idaho's Seventh Judicial District

- Declaration of Karlene Behringer – Trial Court Administrator for the State of Idaho's First Judicial District

- Declaration of Roland Gammill – Trial Court Administrator for the State of Idaho's Second Judicial District

- Declaration of Jamie Robb – Trial Court Administrator for the State of Idaho's Third Judicial District

- Declaration of Sandra Barrios – Trial Court Administrator for the State of Idaho's Fourth Judicial District

- Declaration of Margaret Molchan (Dkt 20-14) – Direct of Court Clerks for the Clerk's Office of Ada County Idaho (Fourth Judicial District)

- Declaration of Shelli Tubbs – Trial Court Administrator for the State of Idaho's Fifth Judicial District

- Declaration of Kerry Hong – Trial Court Administrator for the State of Idaho's Sixth Judicial District

- Declaration of Sharee Sprague – Clerk of the District Court in Power County, Idaho (Sixth Judicial District)

- Declaration of Tammie Whyte – Trial Court Administrator for the State of Idaho's Seventh Judicial District

- Declaration of Angie Wood – Lead Clerk for Madison County, Idaho (Seventh Judicial District)

- Emily Carroll – Data and Evaluation Manager for the State of Idaho Judicial Branch.

- All exhibits to the Declarations

- Pleadings and other documents on file in this action

DATED this 15th day of December, 2022.

DUKE EVETT, PLLC

By _/s/Keely E. Duke_____
   Keely E. Duke – Of the Firm
   Molly E. Mitchell – Of the Firm
   *Attorneys for Sara Omundson*

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke_____
Keely E. Duke

**SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 4**

**ER-1504**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **STATEMENT OF UNDISPTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Sara Omundson, through her counsel of record, Duke Evett, PLLC, submits this Statement of Undisputed Facts pursuant to District of Idaho Local Rule 7.1(b) in support of her concurrently filed Motion for Summary Judgment.

### Parties

1.      Courthouse News Service ("CNS") is nationwide news service that authors a "variety of publications". Dkt. 1, ¶ 11. The at-issue publication is CNS's Big Sky Report (also known as a daily litigation report). Dkt. 1, ¶ 19. The Big Sky Report includes a short staff written summary of new civil complaints filed in Idaho, Montana, and Wyoming that CNS deems significant enough to include in the Report. *Id.*, *see also* Declaration of Keely E. Duke in Support

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 1**

of Sara Omundson's Motion for Summary Judgment ("Duke Decl."), Ex. D at 49:13-50:14, Ex. E at 96:16-97:14, Ex. L at CNS_000002-3. The Big Sky Report is a subscription service offered by CNS with 51 subscribers receiving it. Dkt. 1, ¶ 21. It is sent to the 51 subscribers via email at the close of business on Monday through Friday, excluding holidays and weekends. *See* Duke Decl., Ex. A, Ex. D at 19:15-19, Ex. E at 37:21-38:13. A few examples of the Big Sky Report are included in Exhibit A to the declaration of counsel. Duke Decl., Ex. A.

2.      Sara Omundson ("Omundson") is the Administrative Director of Idaho Courts. Dkt. 1, ¶ 12. Omundson is responsible for implementing policies set by the Idaho Supreme Court. Declaration of Sara Omundson ("Omundson Decl."), ¶¶ 4-5. She acts under the supervision and direction of the Idaho Supreme Court. *see* I.C. § 1-612. She does not approve or adopt the court rules relevant to the efiling system or the definition of public documents. *Id.*, ¶ 4. She reviews and makes recommendations to the Idaho Supreme Court for potential changes they may consider and decide whether a change to policies or procedures will be made. *Id.*

**Documents at issue in CNS' lawsuit**

3.      "A civil action must be commenced by filing a complaint, petition or application with the court." I.R.C.P. 3(b).

4.      The documents originally at issue in this case were all newly submitted civil complaints. Dkt. 1, ¶ 48. In Idaho, over 403,000 cases were filed between January 1, 2021 and November 18, 2022. Declaration of Emily Carroll ("Carroll Decl".), Ex. C. Fewer than 500 cases were filed in the United States District Court for the District of Idaho from January 1, 2021 to November 18, 2022. Duke Decl., Ex. L.

5.      During discovery, CNS advised it was narrowing the at-issue complaints in this case to initial case filings in one filing fee category (out of 13 categories), which are identified in

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 2**

Appendix A of the Idaho Rules of Civil Procedure:

| A. A. All initial civil case filings in District Court of any type not listed in categories E, F, and H(1). |
|---|
| 1. Creditor/debtor collections (more than $10,000) |
| 2. Breach of contract (more than $10,000) |
| 3. Employment dispute (more than $10,000) |
| 4. Real property (more than $10,000) |
| 5. Medical malpractice (more than $10,000) |
| 6. Personal injury (more than $10,000) |

I.R.C.P., Appendix A, *available at* https://isc.idaho.gov/rules/IRCP-Appendix-A-Civil-Filing-Fee-Schedule_eff070122.pdf

**Idaho's Case Management System**

6.  A "[c]ourt record" includes "[a]ny document, information or other thing that is filed, docketed, or lodged by a court or clerk of court in connection with a judicial proceeding." Idaho Court Administrative Rule ("ICAR") 32(b)(4)(A).  The "official court record" is "the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules."   Idaho Rules of Electronic Filing and Service ("IREFS"), Rule 3(a).

7.  The "official court record" is maintained by the Idaho Supreme Court in a Tyler Technologies case management system, originally referred to as Odyssey Case Manager, and now called Case Manager.  Omundson Decl., ¶ 9. "Case management system ["Case Manager"] means the court technology program, and other technologies that assist in the efficient management of

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 3**

the court or that improve access to the court and court records." ICAR 32(b)(9).

8.      The Idaho Supreme Court is responsible for housing, managing, and maintaining the server that hosts Case Manager.  Duke Decl., Ex. F at 126:1-127:1.The Idaho Supreme Court is also responsible for  all security of the Case Management System, backups, and authentication upon transfer of a document into Case Manager. *Id.* at 124:8-22.

9.      The first step to file a document with the court is for an individual, whether an attorney, legal assistant, or pro se litigant, who seeks to file a document (hereinafter referred to as "filer") to submit it electronically online through Tyler Technologies' eFile & Serve system ("eFile & Serve").  IREFS 11(a)(1). A court clerk then can see the document within the eFile & Serve system, and then must review and either accept or reject it for filing into the Court's Case Manager. IREFS 11(a)(2). Omundson Decl., ¶ 9; Duke Decl., Ex. F at 50:4-53:10.  If the clerk accepts the document, the clerk electronically file stamps the document and then transfers it into Case Manager.  IREFS 11(a); *see also,* Duke Decl., Ex. C at 44:10-16. If the clerk rejects the document, it "will be deemed to have not been filed" and is <u>not</u> transferred into Case Manager. IREFS 13.

10.      Public access to court records is governed by Idaho Court Administrative Rule 32. The Idaho Supreme Court provides access to court records in Case Manager "through terminals at judicial branch facilities or on-line." ICAR 32(d). This includes access to pleadings "filed or lodged in a case file." ICAR 32(d)(7).

### The eFile & Serve system used by Idaho's courts

11.      The Idaho Supreme Court determined that it would implement mandatory efiling for certain groups, including attorneys. *See* IREF 4. To make efiling mandatory, it is necessary for the Court to ensure that there is at least one efiling vendor doing business in the state, so the Court contracts with Tyler Technologies to ensure there is.  Omundson Decl., ¶ 6. In addition, this allows

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 4**

the Court to require efiling even if a party is indigent and entitled to fee waivers. *Id*.

12. Other states have taken different approaches. For example, in Arizona efiling can be done with the state's own system or using a third-party system. *See* https://www.azcourts.gov/efilinginformation/. Similarly, Georgia has two predominant systems (one of them Tyler), but also has File&ServeXpress in Foulton county. *See* https://www.gabar.org/efiling.cfm.

13. eFile & Serve is the name of the e-filing system Tyler provides to Idaho's courts Duke Decl., Ex. C at 18:25-19:5.

14. While both eFile & Serve and the Idaho Supreme Court's Case Management System are Tyler products, they are different products. Duke Decl., Ex. F at 142:14-22 (describing eFile & Serve and Case Manager as "two distinct systems, two distinct offerings, but that are integrated with each other").

15. Tyler is responsible for hosting documents within eFile & Serve. Duke Decl., Ex. F at 124:3-7.

16. Tyler has subcontracted the hosting of documents in its eFile & Serve system with Amazon Web Services ("AWS"), and Tyler is responsible for the contractual arrangement with AWS related to the hosting of these documents. Duke Decl., Ex. F at 124:3-7. Tyler, not the Idaho Supreme Court, is also responsible for document security, backups, and authentication when documents are in eFile & Serve. *Id*. at 124:23-125:2.

**Transfer from eFile & Serve to the Case Management System**

17. When a filer submits a complaint to eFile & Serve, the complaint automatically joins a queue within eFile & Serve. Duke Decl., Ex. C at 44:1-7. The court clerk then performs a ministerial review of the complaint to either accept the document into the Court's Case Manager,

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 5**

or reject it. *Id.* at 44:8-16.

18.     The Idaho Supreme Court publishes a manual, called the Statewide Standard Idaho Court Processes manual, that identifies the process clerks use to perform their ministerial review of all filings, including Complaints. Duke Decl., Ex. M.

19.     After performing this ministerial review, the court clerk then either (1) accepts the complaint into  the Idaho Supreme Court's Case Management System (i.e., the "official court record" per IREFS 3), or (2) rejects the submission and sends it back to the filer through eFile & Serve with a note as to corrections needed before the document will be accepted and transferred from eFile & Serve to Case Manager.  IREFS 11(a) and IREFS 13; *see also,* Duke Decl., Ex. C at 44:10-16 and Ex. M at SO 001587.

20.     If the complaint is accepted by the court clerk, the court clerk hits a button that accepts the complaint for filing and the complaint then immediately transfers to the Idaho Supreme Court's Case Manager.  With this acceptance, many events <u>simultaneously and immediately occur</u>:

> a.  Under Idaho Supreme Court rules, the complaint is now considered a filed document.  IREFS 11(a).
>
> b.  Under  ICAR 32(b)(4)(A) and IREFS 3, the complaint is now a "court record" and is part of the "official court record."
>
> c.  Under I.R.C.P. 3(b), a civil action is initiated by the filing of a complaint with the court. The clerk must enter certain information in Case Manager to initiate a new civil case. Duke Decl., Ex. M at SO 000667.
>
> d.  The filer's payment is captured by Tyler and transferred from Tyler to the Idaho Supreme Court.  Duke Decl., Ex. F at 136:25-137:21.
>
> e.  The complaint is file-stamped.   Duke Decl., Ex. F at 146:1-15.

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 6**

(127 of 294), Page 127 of 294   Case: 24-6697   03/06/2025   DktEntry: 10.8   Page 127 of 294
Case 1:21-cv-00305-DCN   Document 60-1   Filed 12/15/22   Page 7 of 27

      f.   A case number and judge are assigned.  Duke Decl., Ex. M at SO 000667.

      g.   The Complaint is immediately available to the public, including CNS. Duke Decl., Ex. C at 43:9-24.

      h.   Judges and their chambers staff have access to the complaint (they do not have access in eFile & Serve).  Duke Decl., Ex. C at 51:16-52:13, 54:5-56:3.

21.    If the filing is rejected, such document "will be deemed to have not been filed." IREFS 13(a).

      a.   A rejected document is <u>not</u> transferred out of eFile & Serve to Case Manager. IREFS 13(a).

      b.   A rejected document is <u>not</u> made available to the public, including CNS. *See* ICAR 32(b)(4) (defining "court record" as document "that is filed, docketed, or lodged by a court or clerk of court in connection with a judicial proceeding"); ICAR 32(d)(7) (public has access to pleading "and other documents filed or lodged in a case file").

22.    If a document is rejected, there is a grace period the Idaho Supreme Court has adopted which allows the filer three days to correct the errors identified by the clerk in the filing and resubmit the complaint through eFile & Serve.  IREFS 13(c).

      a.   When the filer corrects the filing errors, the filer then resubmits the corrected document through eFile & Serve in the original efiling envelope to prove the original submission date to the clerk.  By doing so, the clerk is then aware of the "relate back to" date and the clerk then manually enters the original submission date in the file stamp field at the time of acceptance of the document into Case Manager so that the filing date relates back to the original submission date.  IREFS

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 7

13(c).

b. The Idaho Supreme Court adopted this rule so that ministerial errors in all electronic filings, including complaints, will not prejudice the filer, as long as such errors were corrected, and the complaint resubmitted within the grace period.

**Historical Access to Newly Filed Complaints in Idaho**

23. Prior to transitioning to efiling, CNS had access to newly filed complaints that had already been accepted by the clerk, file stamped and docketed. Duke Decl., Ex. E, at 47:5-48:11. The CNS agent knowledgeable about historical access to newly filed complaints in Idaho under the paper filing system is Catherine Valenti, CNS's Idaho reporter since 2016. Duke Decl., *Id*. at 9:2-4, Ms. Valenti testified as to the historical access – all of which was during courthouse business hours – CNS had, as follows:

a. **Ada County.** Ms. Valenti testified that prior to electronic filing, she would go to Ada County two to three times a day during business hours. Duke Decl., Ex. E at 49:15-24. She would ask a clerk to print a docket report. *Id*. at 47:5-11. The docket reports would only include complaints that had been accepted for filing and marked with a file stamp. *Id*. at 55:15-18. *Id*. at 47:18-48:11, 52:20-53:3, see also Dkt. 1 at 37 (letter from Christopher Rich stating Ada County adjusted its practices to provide CNS "same day access to the paper record"). She would then circle the complaints she wanted to look at and provide them to the clerk who would then bring the complaints into a room for her to look at. Duke Decl., Ex. E at 47:12-17. She would then request copies of some of complaints and the clerk would copy them for her. *Id*.

b. **Canyon County**. Ms. Valenti testified she followed a similar process in Canyon

County, which she visited once a week during business hours. Duke Decl., Ex. E at 62:7-14.  In Canyon County, she would review the complaints within the case folder and request copies if needed. *Id.* at 62:15-63:10.

    c.    **Owyhee, Elmore, Gem, Washington, and Payette counties**.  Ms. Valenti testified she would visit Owyhee, Elmore, Gem, Washington, and Payette counties once a month, and followed a similar process of reviewing complaints that had been accepted for filing. *Id.* at 62:7-9; 63:11-64:17.

    d.    **Kootenai County**.  A CNS reporter who lived in Washington would travel to Kootenai County once a week to report on newly filed complaints. *Id.* at 65:1-5. The reporter would send her report to Ms. Valenti, and then Ms. Valenti would report on those cases. *Id.* at 65:1-23.

    e.    **Other Idaho counties**.  CNS did not review complaints filed in other Idaho counties, such as Bonneville and Nez Perce, because it chose not to send reporters there; Ms. Valenti would only review docket reports for these counties via the Idaho repository, but not the actual complaints. *Id.* at 64:18-25, 67:21-69:2.  The Idaho repository only included docket entries for actual filed complaints; not complaints waiting to be processed and filed.  *Id.* at 70:1-9.

24.    Ms. Valenti testified she was only interested in reviewing complaints that had actually been filed with the court because, as she put it, "why would I report on something – I wouldn't report on something that hadn't been filed yet in the legal system." Duke Decl., Ex. E at 58:17-59:14.

25.    To this day, Ms. Valenti admitted she only reports on complaints that have been filed in the legal system. *Id.* at 60:23-61:13, 98:15-99:6, 103:12-105:17.

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 9**

26.     Idaho District Judges, Trial Court Administrators, and clerks have confirmed that with paper filings, complaints were not made available to the public until they had been accepted for filing and docketed. Declaration of the Honorable Mitchell Brown ("Brown Decl."), ¶ 4, Declaration of Sharee Sprague ("Sprague Decl."), ¶ 13, Declaration of Sandra Barrios ("Barrios Decl."), ¶ 5. Indeed, the Idaho Supreme Court specifically considered its historical practices with the paper filing system when it made the transition to e-filing to ensure the level of clerk review and public access remained the same. Duke Decl., Ex. N at 82:2-85:15.

27.     CNS based its allegations about historical access to complaints on the testimony of its editor, William Girdner. *See* e.g. Dkt. 14-2, ¶¶ 14-18. Although Mr. Girdner claims to have visited many courts across the country during the days of paper filing, he does not claim to have ever visited an Idaho state court prior to the transition of e-filing. *See* Duke Decl., Ex. D at 20:15-21:25 (deferring to local reporters on Idaho's process with paper filing).  His purported knowledge of Idaho's historical access to newly filed complaints comes from conversations with CNS staff and a retired Ada County Clerk. *Id.*

## Transition to electronic filing

28.     On October 8, 2015, the Idaho Supreme Court entered into an Electronic Filing Agreement with Tyler to license and use Tyler's electronic filing system. Omundson Decl., ¶ 7. Twin Falls was the first county to transition to e-filing in late 2015. *Id*. All Idaho counties transitioned to e-filing by 2018. *Id*.

29.     Like with paper filing, complaints are accessible to the press and public once they have been reviewed by a clerk and accepted for filing. Omundson Decl., ¶ 13. It is at that point in time that the complaint is file-stamped and automatically transferred into Case Manager. *Id*., ¶ 13, *see also* Duke Decl., Ex F. at 146:1-15.  Once it is in Case Manager, it is automatically available

to the public. Omundson Decl., ¶ 11.

30.     The Idaho Supreme Court's court technology committee specifically considered continuing its historical practice of reviewing complaints prior to acceptance when it was making the transfer to electronic filing. Declaration of the Honorable Eric Wildman ("Wildman"), ¶ 6. The elected clerks explained the reasons for rejecting a submission and further explained that if an error was not corrected on the front end (i.e. during clerk review), it would take a lot of work to correct errors once a submission has been accepted for filing. *Id*. The committee made a recommendation to the Idaho Supreme Court that the clerks continue to review submissions and accept or reject them for filing before they are transferred into Case Manager, at which time they are available to the press and public. *Id*.

31.     In the original configuration of what is now the eFile & Serve system, filers were asked to designate whether a submission was "confidential." Omundson Decl., ¶ 24. Documents submitted with this designation were automatically protected and unavailable to the public. *Id*. Soon after the addition of only the second county to the efiling system, Ada County, the Idaho Supreme Court received a request from the court clerks to change this configuration. *Id*. Filers were designating what was described as sometimes hundreds of public documents a day as "confidential," requiring the clerks to manually change the security setting for each one. *Id*. This was inefficient and cumbersome for the clerks. *Id*. As a result of the clerks' request, the Idaho Supreme Court altered the efiling rule and approved the reconfiguration of the system. *Id*. Filers no longer designate a document as confidential. *Id*. Rather, if a filer believes a submitted document should be deemed confidential, he or she can note that in a comment to the clerk in the eFile & Serve system. *Id*. A document security setting is automatically applied based upon the case type and document type selected by the clerk. *Id*. It can then be manually altered by the clerk if the

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 11**

automatic setting for that type of case or document is inapplicable based upon the explanation offered by the filer. *Id*. This process is more efficient for the clerks and helps to ensure documents that should be public are not inadvertently withheld from the public. *Id*.

### CNS' position

32.    On April 28, 2016, counsel for CNS sent a letter to Christopher Rich acknowledging Ada County has largely achieved the goal of same day access to new civil case filings," but nevertheless requesting implementation of an "electronic queue that new civil complaints flow into as soon as they are received by the clerk's office, even if they have not yet been officially 'accepted.'" Dkt. 1 a 46-48. Mr. Rich forwarded this request to the Idaho Supreme Court, and there were communications back and forth over the years relating to CNS' requests to install a Press Review Queue. Dkt. 1 at 17-23, 43-44, 60.  For the reasons discussed below, no Press Review Queue has been approved by the Idaho Supreme Court.

33.    CNS already has immediate access to documents accepted into Case Manager. Omundson Decl., ¶ 11.

34.    CNS now wants immediate access to complaints that have been submitted by a filer to eFile & Serve.  Duke Decl., Ex. D at 129:6-20 (access "a few minutes" after receipt is delayed). To do so, CNS' President and 30(b)(6) witness, Bill Girdner, testified that CNS needs to have access upon submission and prior to review and acceptance by a clerk. *Id*. at 160:4-161:1. Specifically, he wants the press and public to have access to a complaint when it is submitted to eFile & Serve at that time or within a few minutes, and anything longer than a few minutes is an unconstitutional delay, according to CNS. *Id*. at 129:6-20; 207:14-24.  Catherine Valenti testified that her supervisor, Chris Marshall, described this lawsuit as seeking "immediate access to complaints." Duke Decl., Ex. E at 24:8-19.

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 12**

35.    To provide access within a "few minutes" of submission, CNS has proposed a few options, none of which allow for clerk review before the press and public have access to complaints:  Press Review Queue, Idaho Court building its own Press Review Queue, or Auto Accept. Dkt. 14-1, *see also* Duke Decl., Ex. B at 10-13.

### Press Review Queue by Tyler or the Court building a Press Review Tool

36.    CNS' Complaint presents a Press Review Queue from Tyler as the solution for remedying this alleged constitutional violation, and the Press Review Queue was the only solution requested by CNS prior to filing this lawsuit. Dkt. 1, ¶ 3, Exs. 1-3.

37.    The Press Review Queue provides users with access to documents in Tyler's eFile & Serve that have been submitted for filing, but have not yet been reviewed or accepted for filing by a clerk into Case Manager. Dkt. 20-16, ¶ 7.

38.    Documents in the Press Review Queue are not file stamped and are not part of the official court record.  IREFS 3, *see also* Duke Decl., Ex. F at 146:1-15 (document is file stamped upon acceptance by clerk).

39.    To provide access, the Idaho Supreme Court would have to grant the press and anyone in the public, access credentials (username and passwords) to the Press Review Queue (rather than just the court clerks having access to such unreviewed and approved for filing documents).  Duke Decl., Ex. F at 170:1-171:2.

### Implementing the Press Review Queue would require an amendment to the State's contract with Tyler

40.    Implementing the Press Review Tool would require an amendment to the contract between Tyler and the Idaho Supreme Court. Omundson Decl., ¶ 19.

41.    Given Tyler would host the Press Review Queue (because it is part of the eFile & Serve system), the Idaho Supreme Court would not have control over that system or the security

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 13**

surrounding the Press Review Queue.

42.     In August 2021, the Idaho Supreme Court hired its Chief Information Security Officer, Jennifer Dvorak, to establish a formal cybersecurity program, assess risks, and build cybersecurity resiliency into the information technology division. Dvorak Decl., ¶ 4. Ms. Dvorak performed a security assessment and, to remedy some of the gaps she found, worked with the Idaho Supreme Court's general counsel team to establish terms and conditions for cloud-based services for new contracts and amendments to contracts. *Id*., ¶¶ 5-6, Ex. A.

43.     As such, Tyler would have to comply with a full security review and would be required to have the Press Review Tool comply with the Idaho Supreme Court's terms and conditions for cloud-based providers. Duke Decl., Ex. J at 33:10-35:17; 39:4-20.

44.     The terms and conditions Tyler would have to agree to are attached as Exhibit A to the Declaration of Jennifer Dvorak. The key provisions include:

a.     If Contractor will be storing, processing, or transmitting ISC data or end-user credit and debit card information through an IaaS or PaaS provider, Contractor must provide a letter from the IaaS/PaaS stating Contractor is a customer in good standing and which environment ISC data or end-user credit and debit card information will be stored, processed, and transmitted.  ISC should be notified, in writing, of a data location change within ten (10) calendar days or other timeframe as may be mutually agreed upon by the parties.

b.     ISC reserves the right to conduct risk assessments, vulnerability assessments, and penetration tests or hire a third party to conduct risk assessments, vulnerability assessments, and penetration tests of the Contractor's application or environment.

c.      If Contractor or a subcontractor utilized by Contractor has been issued a Federal

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 14**

Risk and Authorization Management Program (FedRAMP) Authorization or a StateRAMP Authorization, they will need to submit their FedRAMP or StateRAMP System Security Plan (SSP) to ISC for review.

d.    ISC has established a National Institute of Standards and Technology (NIST) SP 800-53 revision 4 based process to assess risk associated with storing, processing and/or transmitting ISC Data with external entities, such as Contractor or subcontractors utilized by Contractor. ISC's risk and authorization management process must be completed and reviewed before any relevant work can begin.

Dvorak Decl., ¶ 6.

45.    Tyler testified it is not prepared to agree to these terms and conditions, and it would take "a significant number of resources" for Tyler to evaluate whether these terms are something it could agree to. Duke Decl., Ex. F at 181:12-20.

<div align="center">

**Security concerns related to the Press Review Queue**

</div>

46.    In an effort to evaluate Tyler's security of a Press Review Queue, the Idaho Supreme Court has requested information from Tyler. Dvorak Decl., ¶ 9. Tyler provided minimal information relating to the functionality of the Press Review Queue and security surrounding it. *Id.*    As such, based on the limited information Tyler has provided, it is unknown if or how the Press Review Queue is secured against manipulation of the original documents sitting in the Press Review Queue. Duke Decl., Ex. J at 103:20-104:8, 114:11-115:11. Without this information, the Idaho Supreme Court cannot adequately assess the security risks associated with the Press Review Queue. *Id.* at 144:2-21.

<div align="center">

**Tyler charges for the Press Review Queue**

</div>

47.    The Press Review Queue is not free:  Tyler's 30(b)(6) representative, Terry Derrick,

testified that implementing the Press Review Queue in Idaho would require, at a minimum, an annual subscription fee of $108,000 and is not a number Tyler will negotiate down. Duke Decl., Ex. F at 60:1-61:4. Mr. Derrick also testified that to implement the Press Review Queue in Idaho, a contract amendment would need to be made to the contract between Tyler and the Idaho Supreme Court. Duke Decl., Ex. F at 59:22-60:2. As a result, the annual subscription fee would be "significantly higher" than $108,000 if Tyler had to comply with the Idaho Supreme Court's security requirements relating to cloud based services (referenced as the Terms and Conditions in Jennifer Dvorak's Declaration as Ex. A). *Id.* at 70:23-71:16; see also, Dvorak Decl., Ex. A.

**Funding process to obtain appropriation for Press Review Tool**

48.     Each fiscal year the Idaho Supreme Court receives an appropriation from the Idaho legislature which provides both an appropriation from the state's general fund and sets the Court's spending authority for dedicated funds. Omundson Decl., ¶ 20. The Idaho Supreme Court's technology system is primarily supported through the Court Technology Fund (CTF), a dedicated fund established by Idaho Code § 1-1623 with 91% of its revenue provided through legislatively established fees imposed in both criminal and civil court cases. The fund supports information technology personnel, the case management system, digital audio recording systems, videoconferencing systems, computer equipment, computer network infrastructure, credit card processing for court fine and fee payments, information security systems, and various other software and equipment supporting court administration. *Id.* Court fines and fee receipts that support the CTF have declined an average of 5.2% each year over the last three years. *Id.* In FY2022, fund revenue totaled $7.89 million, the lowest amount flowing into the fund since 2015 when the Legislature approved new civil filing fees. *Id.* Court technology costs have increased about 9.3% each year for the last five years. *Id.* Reasons for the increases include the

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 16**

implementation of new cybersecurity systems and significant hardware and software purchases for remote court proceedings. *Id.* The Court has also experienced remarkable increases in software licensing and credit card processing fees, by as much as 30% in the current year. *Id.* In Fiscal year 2024, fund expenditures are projected to exceed fund receipts by $3.67 million. *Id.* In order to address this shortfall, in its fiscal year 2024 budget request to the legislature, the Idaho Supreme Court has requested the transition of key positions out of the Court Technology Fund and into the state general fund. *Id.*

49.    Due to the current revenue shortage, the Court Technology Fund cannot support the costs of the installation of a Press Review Tool or building a new tool. Omundson Decl., ¶ 21. In order to support these costs, the Idaho Supreme Court would have to seek an on-going enhancement to its general fund appropriation from the Idaho legislature. *Id.* That request could not be made until the next budget cycle, in the fall of 2023, and would typically not be funded until July 1, 2024. *Id.* In the absence of an enhancement to the Court's general fund appropriation, current technology products, services, or projects for Idaho's courts would have to be reduced or eliminated to divert funding to cover the costs of a press review tool and existing personnel would have to be reassigned to manage the access services. *Id.*

50.    In addition to the ongoing costs of a press review queue, there would be initial costs as well. Omundson Decl., ¶ 22. As currently configured, the eFile & Serve system allows a filer to identify what is being filed using a few generic descriptions. *Id.* The security settings in the system do not require a filer to identify a security setting, such as "confidential" for submitted documents. *Id.* The security settings for filings are addressed by the court clerks upon acceptance into the Case Management System. *Id.* The implementation of a press review tool, which would publish documents from the eFile & Serve database, would require alterations to the court rules

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 17**

and processes for efiling as well as a reconfiguration of the eFile & Serve system. *Id.* These changes would require additional training for both court staff and filers. *Id.* The addition of document-level security to documents in the eFile & Serve database would necessitate more specific document type selections for filers and the addition of a "confidential" option for filers. *Id.* Court staff would have to be reassigned from current projects to develop and implement new security settings and new configuration. *Id.* Court staff would also have to develop and implement training for filers explaining the changes made and new requirements. *Id.*

<div align="center">

**Erosion of public confidence in the courts**

</div>

51.    The Press Review Queue is unable to watermark documents as "under review" or "not filed." Duke Decl., Ex. F at 171:3-5. As such, the Press Review Queue would also have the Idaho Supreme Court, as the publisher of the Press Review Queue, implicitly representing that complaints in the queue are official court documents, when they are not. Declaration of the Honorable Cynthia Meyer ("Meyer Decl."), ¶ 12.  If a complaint is reported on but ultimately rejected without a successful resubmission, the press and public will be left to speculate about the reasons for this phenomenon. Omundson Decl., ¶ 19.

52.    In addition, in jurisdictions with a Press Review Queue, CNS does not issue a correction if its daily report references a complaint that was submitted but later rejected; CNS merely removes the entry for that complaint from its non-public archives without notifying users of the erroneous report. Duke Decl., Ex. D at 146:16-147:5. There is nothing in the proposed Press Review Queue to stop the press from reporting on a complaint that is ultimately rejected for filing and not resubmitted within the 3-day window. Meyer Decl., ¶ 11.

53.    The jurisdiction of the Idaho Courts is not invoked until the complaint becomes an official court record. Brown Decl., ¶ 12.

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 18**

<div align="center">

**ER-1522**

</div>

### Potential for abuse of the Press Review Queue

54.     The proposed Press Review Queue lacks safeguards to prevent a litigant or attorney from publishing confidential or inflammatory information. Declaration of the Honorable Dane Watkins, ¶ 14. As one example, an attorney who represented a defendant in a high-profile criminal case in the Seventh Judicial District intentionally filed documents that contained inflammatory information about the prosecutor, and then demanded the information be published on the Idaho Supreme Court's cases of interest website. *Id*. With the Press Review Queue, there is no way to prevent malicious and improper filings from being made available to the public. *Id*. The Auto Accept option, discussed in more detail below, presents these same concerns because there is no clerk review prior to a document becoming publicly available. *Id.*

### Inadvertent or malicious dissemination of information

55.     There is nothing in the Press Review Queue to prevent an individual from inadvertently or maliciously submitting a complaint that includes confidential information, which will be publicly available the entire time that document sits in the Press Review Queue. Meyer Decl., ¶ 13. The Press Review Queue allows exposure of personally identifiable information ("PII") to the public if the submitter fails to properly redact the document. Duke Decl., Ex. J at 83:1-12. PII could also be made available to the press and public if there was a misconfiguration by the AOC. *Id*. at 83:13-85:14. Avoiding public disclosure of PII in the Press Review Queue is contingent upon no user error by the submitter and no misconfigurations in the system. *Id*. at 87:5-20.

### Idaho Supreme Court building its own Press Review Queue

56.     Tyler has also developed an API (known as an Application Programming Interface), which first became available in late September 2022. Duke Decl., Ex. F at 191:17-23.

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 19**

The API is "a specification document that essentially allows for the customer to build their own version of a Press Review Tool." *Id.* at 192:4-14. Although Tyler customers are not charged for the API itself, customers must build their own computer application to interface with the API. *Id.* at 192:15-193:4. Although Tyler could not provide an estimate on the cost of building the application, costs associated with the API include developing the press review queue application, personnel costs, and data hosting costs. *Id.* at 193:2-195:2. Tyler has not provided the Idaho Supreme Court with information it has requested regarding the security, functionality, and costs of the Press Review Queue API. Duke Decl. Ex. J at 21:21-22:8. Consequently, the Idaho Supreme Court has no way of estimating the time and costs associated with creating a program that can interface with the API. *Id.* at 145:6-11. In addition, whatever those ultimate costs would be, the Idaho Supreme Court would need to request an appropriation through the Idaho legislature as described above in paragraphs 48 through 50. Omundson Decl., ¶ 23.

<div align="center">

**Auto Accept**

</div>

57.     CNS alleged Tyler's Auto Accept feature was another potential option in support of its Motion for Preliminary Injunction. Dkt. 14-2, ¶¶ 38-41.

58.     In Idaho, clerks serve as gatekeepers for improperly submitted documents and notify attorneys and litigants if there are any issues with a submission; this was the case well before the transfer to e-filing. *See e.g.* Brown Decl., ¶ 9, Wildman Decl., ¶ 9, Meyer Decl., ¶ 8.   With Auto Accept, documents are automatically accepted into the Idaho Case Management System (i.e. the official court record per IREFS 3) without any review by court clerks. Omundson Decl., ¶ 18. As such, Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, the clerks, District Judges, and their staff, which could be extremely detrimental to litigants. *See e.g.* Brown Decl., ¶ 9, Wildman Decl., ¶¶ 9-10, Meyer Decl., ¶¶ 8-9.

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 20**

<div align="center">

**ER-1524**

</div>

59.     With Auto Accept, a submission would go into Tyler's eFile & Serve, and then without any clerk review, would be immediately accepted, file stamped, and transferred into the Court's Idaho Case Management System. Omundson Decl., ¶ 18.  There are some Auto Accept features Tyler could build into Auto Accept if used by the Idaho Supreme Court in Idaho, such as case category, case type, party type (i.e. plaintiff or defendant), filer type (attorney or pro se). Duke Decl., Ex. G at 60:25-62:1. However, Auto Accept cannot review for other information the clerk typically reviews for, such as whether the county listed on the face of the complaint actually matches the county it was filed. Omundson Decl., ¶ 18, *see also* Duke Decl., Ex. F at 142:23-144:18. This is especially problematic in Idaho, where many cases meant to be filed in Ada County are inadvertently filed in Adams County and Boise County. Declaration of Jamie Robb, ¶ 9, *see also* Carroll Decl., Exs. C, E, F (incorrect jurisdiction accounts for 4% of rejections statewide, but accounts for 58% of rejections in Adams County and 64% in Boise County).   In addition, Tyler was not aware of whether Auto Accept could be programmed to confirm that not just a filing fee was paid, but that the correct filing fee was paid.  Duke Decl., Ex. F at 131:18-135:7.

60.     As Tyler admitted, it is not certain what all of the configurations are that could prevent issues presented below related to Auto Accept, but those configurations would come at an unidentified cost to the Idaho Supreme Court.  Duke Decl. Ex. F at 131:18-135:7 (Auto Accept cannot determine whether filing fee is accurate); 155:25-156:16 (malicious filings would be automatically accepted and publicly available if filer envelope met criteria for acceptance).

### Prejudice to litigants if Auto-Accept is used

61.     Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and so that the filing date relates back to the date of original submission. *See* IREFS 13. With Auto Accept, an issue with a submitted complaint

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 21**

may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. Brown Decl., ¶ 9. Judicial action would be required to notify the attorney or litigant of the filing issue and the court would also need to determine what judicial action must be taken to address the filing issue (e.g. entering a notice of intent to dismiss). Brown Decl., ¶ 8. Auto Accept would increase the already full workload of District Judges and their staff since court intervention would be needed to address filing issues that otherwise would have been caught by a clerk during the ministerial review process. *Id*.  If a litigant files their complaint close to or on the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end. This could disproportionately impact pro se litigants, who may not be as familiar with filing requirements. *See* e.g. Barrios Decl., ¶ 8-9, Declaration of Rolan Gammill ("Gammill Decl."), ¶ 8-9, Declaration of Karlene Behringer, ¶ 7-8.

### Impacts of Auto-Accept

62.     Auto-Accept is available as part of Tyler's efiling software at no additional cost to the customer. Duke Decl., Ex. F at 120:3-9.  However, although Tyler's promotional materials represent that Auto Accept reduces operational overhead, Tyler admitted such materials do not take into consideration the impact on clerks, court staff, or judges once a document has been automatically transferred into Case Manager and requires court action to correct. *Id*. at 150:16-151:1. Candidly, Tyler admitted it has "no visibility into any expense that could be endured by the State or by the Courts" if they were to implement Auto Accept. *Id*. at 120:18-121:2. Tyler defers to Idaho state courts in determining what their internal costs would be as a result of using Auto Accept. *Id*. at 121:3-10.

63.     Auto Accept would increase the workloads of judges and court staff because

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 22**

judicial action would be required to address improperly submitted documents that are automatically accepted into the Case Management System. *See* e.g. Brown Decl., ¶ 8, Wildman Decl., ¶ 8. This would include preparing orders and conducting hearings to strike improperly submitted complaints, or otherwise remove them from the case management system, or redacting filings already in the case file. Wildman Decl., ¶ 8. It could also include entering a notice of dismissal if certain actions are not taken by the litigant or attorney to correct the filing error. Brown Decl., ¶ 8. This would increase the workload of District Judges, their court staff, and clerks. *Id*. This would dramatically increase the workload of judges since they would be tasked with ministerial functions that would otherwise be handled by the clerk. *Id*.

64.     As discussed above, Auto Accept is not able to determine whether the correct filing fee was submitted with a complaint and reject the complaint if not. Duke Decl., Ex. F at 131:17-134:21. If a complaint was Auto Accepted even though the correct fee was not paid, the issue would have to be dealt with in Case Manager (i.e. once the improperly submitted complaint has been file-stamped and is in the official court record). *Id*. at 134:22-135:7. The courts are funded in part through filing fees, so it is imperative that filing fees are collected. Barrios Decl., ¶ 7.

65.     Relatedly, Auto Accept would present issues with refunding filing fees if an action is filed in the wrong county. Currently, filing fees are processed by Tyler and Tyler transfers payment to the District Court only if the complaint is accepted. Duke Decl., Ex. F at 136:25-137:21, see also Gammill Decl., ¶ 10. If complaints were automatically accepted, payment would presumably be automatically received by the District Court in which the case was filed. Gammill Decl., ¶ 10. This means that if a case was filed in Adams County that should have been filed in Ada County, court personnel would have to either issue refunds for filing fees or transfer filing fees from the wrong county to the proper county, which is a difficult and cumbersome process, as

STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 23

opposed to refunds being handled by Tyler. *Id*.

### Burden on Clerks to communicate with filers about filing issues

66.     Filer email addresses are not transferred from eFile & Serve into Case Manager. Duke Decl., Ex. F, at 135:8-24. When a document is in eFile & Serve, the clerk can interface directly with the submitter through the portal. Omundson Decl., ¶ 9, *see also* Brown Decl., ¶ 7, Barrios Decl., ¶ 5. This functionality is lost with Auto Accept; the clerk has to see if the complaint lists contact information and (assuming it does) alert the submitter to let them know there was an error with the filing. Barrios Decl., ¶ 7, *see also* Duke Decl., Ex. F at 135:8-136:2 (service email address is not transmitted from eFile & Serve into Case Manager).  This would be an inefficient process for the deputy clerks, especially since the communications would be housed in individual deputy clerk's email accounts and could not be broadly shared, as they now are in File & Serve. Barrios Decl., ¶ 7. This would result in problems of sharing information whenever a deputy clerk is on vacation, out sick, or is otherwise not in the Clerk's office. *Id*.

67.     When a submission is still in eFile & Serve, all documents included with the submission are included in the same "e-envelope," which acts much like a physical envelope; it keeps all the documents in one place and includes the filer's contact information. Dkt. 20-14, ¶ 8. For example, an initial filing submission would include the complaint, a summons requiring clerk signature, and the case information sheet. The clerk can access the e-envelope and review all documents included with the submission at the same time. *Id.* Once a submission is accepted for filing, the documents within the submission are no longer contained in an "e-enevelope" upon transfer into Case Manager. Dkt. 20-14, ¶ 10. Thus, a clerk would have to review each document by clicking through multiple "tabs" in Case Manager, whereas in eFile & Serve these documents would have all been in the same envelope. *Id.* This increases the amount of time it would take

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 24**

clerks to review documents for compliance with the court filing rules. *Id.*

### Risk of malicious filings

68.     Auto Accept is also not able to protect against malicious or inadvertent disclosure of confidential information; if an envelope meets the criteria for acceptance, it is automatically accepted regardless of the substance of the document or documents therein. Duke Decl., Ex. F at 44:13-45:10, 155:25-156:16. Under the current system, clerks have the authority to reject a submission if it contains information and note that it needs to be redacted. Duke Decl., Ex. C at 104:12-20.

69.     For example, if an image of child pornography was attached as an exhibit to a filing (which has occurred in Idaho), Auto Accept would not intercept this filing before it was made available to the public. *Id.* 104:21-106:24.

### Time Between Submission and Acceptance or Rejection

70.     Between January 4, 2021 and November 18, 2022, it took an average of 4.82 business hours statewide between submission of an initial civil filing and clerk review – this includes ALL initial civil filings (e.g. petitions and applications), not just the A.A complaint filings. Carroll Decl., Ex. C. In total, 403,246 initial civil filings were submitted during this timeframe and 11% of these submissions were rejected for filing (i.e. 44,357 rejections). *Id.*

71.     In Ada County, initial civil filings were reviewed an average of 2.56 hours after submission. In total, 107,616 initial filings were submitted in Ada County during this timeframe and 9% of these submissions were rejected for filing (i.e. 9,685 rejections). Carroll Decl., Ex. D.

72.     As discussed above, CNS has narrowed its request for access within minutes of submission to civil complaints in filing category "A.A. All initial civil case filings in District Court of any type not listed in categories E, F, and H(1)." Supra, ¶ 5. The Idaho Supreme Court requested

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 25**

data from Tyler showing the length of time between submission and acceptance of civil complaints in this filing category under its current process from January 1, 2021 through July 31, 2022 which establishes that the great majority of complaints are available within a business day.  Carroll Decl., Ex., ¶ 6, Ex. A.

DATED this 15th day of December, 2022.

DUKE EVETT, PLLC

By  /s/Keely E. Duke_____
  Keely E. Duke – Of the Firm
  Molly E. Mitchell – Of the Firm
  *Attorneys for Sara Omundson*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of December, 2021, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke_____
Keely E. Duke

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 26**

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 27**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I.    INTRODUCTION ................................................................................................... 3

II.   FACTUAL BACKGROUND ................................................................................. 6

III.  LEGAL STANDARD ........................................................................................... 6

IV.   ARGUMENT ........................................................................................................ 6

   A.  There is no First Amendment violation because CNS has immediate access to complaints upon filing. ............................................................................................... 6

      1.  The "judicial document" analysis in *Planet III* did not apply to complaints that had been submitted but not yet reviewed and accepted by a clerk. ....................................................... 8

      2.  Complaints submitted to eFile & Serve but not yet reviewed by clerks are not judicial documents subject to First Amendment access. ................................................................ 10

      3.  Under the *Planet III* analysis, Idaho is not violating a qualified right of timely access to judicial documents. .................................................................................................. 11

   B.  Even if there is a First Amendment right of access to complaints that have not yet been accepted for filing, the restrictions on such right of access survive constitutional scrutiny. .... 15

      1.  Requiring clerk review prior to acceptance is a content-neutral time, place, and manner restriction, and is not subject to strict scrutiny. .................................................................. 15

      2.  CNS is seeking immediate or near immediate access to newly submitted complaints. . 17

      3.  The requirement for clerk review and acceptance prior to making complaints available to the public is narrowly tailored to serve Idaho Courts' interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources. ............................................................ 18

      4.  Even if access is measured based on time of submission, the length of time between submission and clerk review is not delayed and does not give rise to a constitutional violation when weighed against the reasons for requiring clerk review. ............................................. 20

      5.  The options for providing immediate, pre-processing access to newly submitted complaints are not reasonable and undermine Idaho Courts' interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources. ....................................................... 22

V.    CONCLUSION ..................................................................................................... 29

## I.   INTRODUCTION

Providing the public with access to judicial records while protecting the integrity of Idaho's state court files is a complex endeavor requiring a careful balancing of many different, and sometimes competing, interests. Over the years, and in efficiently using limited judicial resources and funding, the Idaho Supreme Court has developed extensive policies and procedures that promote accessibility and governmental accountability while protecting privacy, efficiency, proprietary information, and integrity and confidence in the courts.  The resulting efiling system and policy applied uniformly in Idaho's state courts across all 44 counties strikes a balance between the importance of providing the public and press with timely access to the thousands of newly filed civil complaints each year (and over a million other types of filings), while ensuring minimal administrative requirements are met before civil complaints (and other filings) become publicly available documents.

The extensive work of the Idaho Supreme Court to develop its uniform efiling system has resulted in court documents becoming immediately available to the public moments after they are file stamped and become judicial documents maintained in the Court's case management system.  The efiling policies and procedures implemented by the Idaho Supreme Court also provide equal treatment to the many different public case filings, without preferential treatment to certain litigants.

CNS asks this Court to reweigh the many interests the Idaho Supreme Court considered in developing its efiling policies and procedures; and asks that this Court require the Idaho Supreme Court to abandon its efiling system, rewrite court rules, and instead provide access to complaints

that have not yet been reviewed by a clerk for administrative requirements.[1]  To further advance its financial interests, CNS also asks this Court to treat certain categories of complaints differently than all other complaints and initial case filings. For the following reasons, the Idaho Supreme Court's efiling rules, policies, and procedures should remain in effect, CNS' requests should be denied, and Omundson awarded summary judgment as to CNS' claims.

First, the Idaho Supreme Court is not violating the First Amendment because CNS has immediate access to civil complaints once they have been accepted for filing in the Idaho Supreme Court's case management system (formerly referred to as Odyssey, and now referred to as Case Manager).  Unlike the documents at-issue in the *Planet III* case, the complaints CNS seeks near immediate access to are not yet judicial documents because they have not gone through the minimal clerk review and been accepted for filing in the Court's case management system.  In addition, the access to newly filed civil complaints under Idaho's e-filing system is consistent with – and in most respects superior to – the access CNS historically had with paper filings.

Alternatively, if this Court determines there is a First Amendment right of access to complaints that have not yet been accepted for filing in the Court's case management system and have therefore not yet initiated a legal action, the limited restrictions currently in place survive constitutional scrutiny.  First, requiring clerk review prior to acceptance is a content-neutral time, place, and manner restriction, and is not subject to strict scrutiny.  Even if subject to strict scrutiny, however, the requirement for clerk review and acceptance into the case management system prior to making complaints available to the public is narrowly tailored to serve the Idaho Supreme Court's interests in promoting access to the courts, protecting document security and privacy

---

[1] The United States Supreme Court has recognized that "[e]very court has supervisory power over its *own* records and files[,]" and therefore decisions relating to access to judicial records are "best left to the sound discretion of the trial court[.]"  *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598-99 (1978) (emphasis added). CNS' request is counter to this fundamental principle.

interests, ensuring public confidence in the judicial system, and managing judicial resources.

In addition, the length of time between submission and clerk review is not delayed and does not give rise to a constitutional violation when weighed against the many reasons for requiring minimal clerk review. Since this lawsuit was filed, the average time between submission and clerk review was 4.82 business hours statewide, and only 2.56 business hours in Ada County.  For complaints filed in the "A.A. Category"—the only category CNS cares about for its reporting purposes and for this lawsuit—over half the complaints were reviewed by a clerk within two hours of submission and about 85% were reviewed within one business day (i.e. eight business hours). Thus, the time between submission and clerk review is insignificant and is justified when weighed against the reasons for requiring clerk review before accepting documents for filing, at which time they are immediately available to the press and public.

There is also no First Amendment violation because there are no reasonable alternatives to providing CNS with even quicker access to newly submitted complaints. The only options for providing this immediate access present serious concerns and unnecessarily undermine the Idaho Supreme Court's interests in balancing administrative interests, managing judicial resources and funding, and maintaining the integrity of the court system.

If this Court were to determine that the First Amendment requires immediacy of access to court documents within minutes of submission, such a ruling would open the floodgates for improper and inappropriate filings, and essentially turn the court filing system into a public media platform. To avoid this, the Idaho Supreme Court's current system has effectively balanced accessibility and governmental accountability with privacy rights, proprietary business information, funding and resources, and integrity of the courts. In doing so, the Idaho Supreme Court is not violating CNS' First Amendment rights and Omundson is entitled to judgment as a

matter of law.

## II.   FACTUAL BACKGROUND

The relevant factual background is set forth in Omundson's Statement of Undisputed Facts.

## III.   LEGAL STANDARD

Summary judgment is appropriate where a party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact, which is a fact "that may affect the outcome of the case." *Id.* at 248. The moving party initially bears the burden of showing the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). In response, the non-moving party must produce evidence sufficient to support a jury verdict in its favor. *Id.* The court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Rather, the "party opposing summary judgment must direct attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## IV.   ARGUMENT

**A.**   **There is no First Amendment violation because CNS has immediate access to complaints upon filing.**

CNS' First Amendment rights have not been violated because CNS has immediate access to civil complaints once they have been accepted for filing, which is the point in time when they are simultaneously file-stamped, transferred into the Idaho Supreme Court's Case management

system ("Case Manager"), become an official court record, and are assigned a file number. SOF, ¶ 20. Although immediate access is not required, that is what CNS currently has in Idaho. *See Courthouse News Service v. Planet* ("*Planet III*"), 947 F.3d 581, 585 (9th Cir. 2020) (qualified right to timely access "does not entitle the press to immediate access" to filed complaints).

Although CNS has immediate access to newly filed complaints, it now demands that this Court expand the Ninth Circuit's decision in *Planet III* to require near instantaneous access – within minutes – to complaints a filer has uploaded into Tyler's eFile & Serve system but that have not yet been accepted by a court clerk for filing in Case Manager.  The President of CNS claims that access after "a few minutes" of submission is an unconstitutional delay. SOF, ¶ 34.  This demand by CNS is not supported by the *Planet III* case and *Planet III* is distinguishable.  In *Planet III,* the at-issue complaints were paper, not electronic, documents that had <u>already been reviewed and accepted by the clerk</u>, but were then subject to days, and sometimes weeks, long process before the press had access. The lengthy, multi-step process the Ninth Circuit found unconstitutional *started* with clerk review "to determine that the complaint is being filed in the correct court and the documents necessary to initiate the case are presented with the correct filing fee or fee waiver." *Id.* at 586. After clerk review and acceptance, there were six *additional* steps relating to the opening of a physical case file followed by an "additional layer of quality control review" performed by supervisors, which took several days to complete.[2] *Id.*

The process in Idaho is markedly different than the process at issue in *Planet III*. Once a

---

[2] The use of Ventura County's Court Case Management System ("CCMS") required clerks to enter "considerably more information" and required "a fair amount of time" to process new complaints before a file number could be generated. *Courthouse News Serv. v. Planet*, No. CV1108083SJOFFMX, 2016 WL 4157210, at *4 (C.D. Cal. May 26, 2016), *judgment entered,* No. CV1108083SJOFFMX, 2016 WL 4157354 (C.D. Cal. June 14, 2016), *vacated and remanded*, 947 F.3d 581 (9th Cir. 2020), and *vacated and remanded,* 947 F.3d 581 (9th Cir. 2020), *and aff'd in part, rev'd in part and remanded,* 947 F.3d 581 (9th Cir. 2020). Information was not entered into the CCMS until *after* the clerk had reviewed and accepted the complaint. *Planet III*, 947 F.3d at 585.

clerk reviews a complaint and determines it meets the minimal requirements for filing, the electronic equivalent of the remaining steps[3] is performed instantaneously, and the complaint is immediately accessible to the press and public. SOF, ¶ 20. For example, the complaint is file-stamped, a case number and judge are assigned, and a new civil case is initiated in Case Manager within seconds of clerk acceptance for filing. *Id.*

In addition, *Planet III* requires undelayed (not immediate) access to filed complaints based on the determination that a complaint becomes a judicial document upon filing. 947 F.3d 593. As addressed below, a submitted but not yet accepted complaint is not a judicial document. *Planet III* did not tackle that issue because the first step of clerk review and acceptance occurred, and then a days to weeks long process occurred after acceptance.

1. **The "judicial document" analysis in *Planet III* did not apply to complaints that had been submitted but not yet reviewed and accepted by a clerk.**

The *Planet III* court assumed a "judicial record" was at issue – presumably because the Ventura County Clerk accepted the documents for filing and then took multiple steps over the next several days to weeks before those "judicial records" were accessible to the press. The *Planet III* court then framed the following analysis related to whether "the qualified First Amendment right of access" existed as to the judicial records in question, which depended on (1) whether that proceeding or record "ha[s] historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular [governmental] process in question." 947 F.3d at 590 (*quoting Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1996) ("*Press-Enterprise II*").

---

[3] Notably, the remaining steps in Idaho do not include the "additional layer of quality control review" discussed in *Planet III* because that is not done in Idaho.

In *Planet II,* under the fact scenario it was considering – which was the Ventura County process where the Complaint was accepted as a court filing and then subject to a days to weeks long process – the Ninth Circuit reasoned that a complaint is a "judicial document" and is relevant to evaluating the performance of the court system. *Id.* (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)).  Notably, however, in *Lugosch*, the Second Circuit found that "the mere filing of a paper or document with the court is insufficient to render that paper or judicial document subject to the right of public access." 435 F.3d at 119 (*quoting United States v. Amodeo*, 44 F.3d 141 (2d. Cir. 1995).[4] "In order to be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process." *Id.*

The Ninth Circuit described filing a complaint as being synonymous with invoking the court's jurisdiction. *Planet III*, 947 F.3d at 593 ("When a complaint is filed, and the authority of the people of the United States is thereby invoked[.]"). In rejecting the argument that a complaint became a judicial document only after judicial action was taken, the Ninth Circuit reasoned that "[c]itizens could hardly evaluate and participate in robust public discussions about the performance of their court systems if complaints—and by, extension, the very existence of lawsuit—became available only after a judicial decision had been made." *Id.* at 592. This is so the

---

[4] The definition of "judicial document" in *Planet III* ultimately comes from *Amodeo*, vis-à-vis the citation to *Lugosch*. The *Amodeo* case discusses how other federal circuits have determined what may be classified as a "judicial document," and therefore accessible to the public. *Id.* at 145. The Third Circuit focuses "on the technical question of whether a document is physically on file with the court." *Id.* (quoting *Pansy v. Borough of Stroudsbourg*, 23 F.3d 772, 782 (3d Cir. 1994)). "According to the Third Circuit, if a document is not filed, it is not a judicial record." *Id.* (quotes and brackets omitted). The First Circuit has "determined that documents must have a role in the adjudication process in order to be accessible and that documents that have no such role, such as those used in discovery, cannot be reached." *Id.* (citing *F.T.C. v. Standard Financial Management Corp.*, 830 F.2d 404 1st Cir. 1987)). The Second Circuit ultimately determined "that the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." *Id.*  Instead, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *Id.* (holding exhibit to investigative report filed under seal was a judicial document and remanding to district court to determine if access should be restricted or redactions made).

public can evaluate how the judges they elect are performing and how the laws the legislators they elect play out in court. *Id.* These considerations do not exist prior to acceptance of the complaint because a lawsuit has not been initiated and the court's jurisdiction has not been invoked.

### 2. Complaints submitted to eFile & Serve but not yet reviewed by clerks are not judicial documents subject to First Amendment access.

This case does not involve judicial documents subject to the First Amendment because the at-issue complaints have not been accepted into the Court's Case Manager, and therefore have not yet initiated a new civil action. A civil action is commenced – and therefore the court's jurisdiction is invoked – "by filing a complaint, petition, or application with the court." I.R.C.P. 3(c), *see also Amodeo*, 44 F.3d at 145 (document must be filed and "relevant to the judicial function to be a judicial document), *Lugosch*, 435 F.3d at 119 (same). A document is considered filed when (1) it has been submitted to the court's electronic filing system [eFile & Serve hosted by Tyler] and (2) "the submission has been acknowledged and the document accepted for filing." SOF, ¶ 9 (citing Idaho Rule for Electronic Filing and Service ("IREFS") 11(a)). A rejected document "will be deemed to have not been filed." *Id.* (citing IREFS 13). Similarly, when litigants were required to file Complaints in person with the Clerk's Office, a Complaint submitted in the wrong jurisdiction would be rejected by the clerk in person and not be filed. *See* Declaration of the Honorable Mitchell Brown, ¶ 4 (paper filings required clerk review). Similarly, submission online by a party does not automatically convert the document into a "court record," which is defined as "[a]ny document, information or other thing that is filed, docketed, or lodged *by a court or clerk of court* in connection with a judicial proceeding." SOF, ¶ 6 (citing Idaho Court Administrative Rule ("ICAR") 32(b)(4)(A) (emphasis added)).

Under Idaho's e-filing system, complaints are submitted through eFile & Serve, which is hosted by Tyler, the Idaho Supreme Court's vendor for e-filing software. SOF, ¶ 15. Once

submitted to eFile & Serve, the complaint is in a queue until a clerk reviews the submission (e.g. checking if the filing fee has been paid, filed in the correct jurisdiction, etc.) and then either (1) accepts the complaint into Tyler's Case Manager, which is the official court record,[5] or (2) rejects the submission and sends it back with a note on what needs to be done to correct the submission. SOF, ¶¶ 17-20. Case Manager is hosted internally by the Idaho Supreme Court, which becomes responsible for document security upon transfer into Case Manager. SOF, ¶ 8. Once an accepted complaint is transferred to Case Manager, the following occurs immediately:  the filing fee payment is captured; the complaint is transferred from Tyler eFile & Serve into the Idaho Supreme Court's Case Manager; the complaint is file-stamped; the complaint is available to judges and court staff (they cannot access documents in eFile & Serve); and the complaint is accessible to the press and public. SOF, ¶ 20. All these things happen instantaneously and simultaneously upon acceptance. *Id.*

Because a complaint sitting in the clerk's review queue has not yet initiated a case, it is not a judicial document. Rather, it becomes a judicial document once it has been accepted for filing and transferred to the official court record. IREFS 3(a) ("official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court"); IREFS 11(a) (document is filed once submission "has been acknowledged and the document accepted for filing").

### 3.    Under the *Planet III* analysis, Idaho is not violating a qualified right of timely access to judicial documents.

In the Ninth Circuit, courts consider two factors from *Press-Enterprise II*, 478 U.S 1 (1986) to determine whether a document qualifies as a "judicial document": (1) historical access and (2)

---

[5] The "official court record" is defined as "the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." SOF, ¶ 6 (citing IREFS 3(a)). The press and public have access to the official court record. *Id.*

**MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 11**

whether public access plays a "significant positive role" in the functioning of the court system. *Planet III*, 947 F.3d at 590.

> ### a. Access to newly filed civil complaints under Idaho's e-filing system is consistent with the access that was historically provided with paper filing.

CNS' demand to have access to pre-acceptance complaints is inconsistent with historical access in Idaho Courts. SOF, ¶¶ 23-27.

CNS' Complaint specifically alleges that in Ada County, CNS had access to paper filings "via a media box, bucket, or cart available to the press regardless of whether the complaints had been docketed (or 'processed' – the term now often used by courts)." Dkt., 1, ¶ 37. Through depositions, this allegation has been disproved. CNS' Idaho reporter, Catherine Valenti, testified she reviewed a docket report (which only included complaints that had been accepted for filing and marked with a file stamp) and then reviewed copies of the file-stamped complaints she requested from the docket report. [6] SOF, ¶¶ 23-27. In terms of Idaho's other 43 counties, Ms. Valenti testified that CNS sent a reporter to Canyon and Kootenai counties on a weekly basis, and to Owyhee, Elmore, Gem, Washington, and Payette on a monthly basis, at which time the reporter would review the docket report, select certain complaints from the report, and review those file-stamped complaints. SOF, ¶ 23.[7] CNS did not send reporters to Idaho's other 36 counties to review complaints; reporters would only review docket reports (which only showed complaints that had been accepted by a clerk for filing, file-stamped, and docketed) available on the Idaho repository.

---

[6] Although CNS based its allegations about historical access on testimony from Mr. Girdner, his purported knowledge of historical access does not come from firsthand experience in Idaho courts; it comes from conversations with CNS' Idaho reporters. SOF, ¶ 27.

[7] In Montana, CNS reporters still visit courthouses on a bi-weekly or monthly rotation, similar to the process in Idaho in the days of paper filing. Duke Decl., Ex. E at 33:19-35:6. Despite CNS' claims that news becomes "stale" if not reported within a matter of hours, it nevertheless reports on Montana complaints weeks after they are filed. *Id.* And despite CNS' claims that delays should be measured on a 24/7 cycle rather than business hours, it does not require its own employees to report on complaints filed after normal business hours. *Id.* at 36:19-38:15, 76:21-77:23.

*Id.* Thus, it is undisputed that CNS did not historically have access to submitted complaints. *Id.* In addition, CNS' Idaho reporter, Cathy Valenti, testified that — both with paper filing and e-filing — she was only interested in reviewing complaints that had been filed because she would not want to report on something that "hadn't yet been filed in the legal system." SOF, ¶¶ 24-25.

After Idaho's state courts transitioned to efiling, CNS reporters had quicker access to newly accepted complaints because the CNS reporter could log onto a computer at the Ada County Courthouse to access Case Manager (and could do so at the Idaho Supreme Court as well) to identify complaints to report on each business day.  In addition, with the transition to efiling, CNS now also has immediate access to all complaints filed in Case Manager across all of Idaho's courts; thus, CNS no longer needs to travel outside Ada County and can now access all initial case filings in Case Manager for all counties (even though it chose not to report on about 80% of Idaho counties filings pre-efiling).

Based on the undisputed evidence, the press and public historically did not have pre-acceptance access to complaints. No First Amendment right of access attaches to these documents under the first *Press-Enterprise* factor.

> **b. Providing the press and public with access to complaints that have not yet been accepted for filing does not play a significant positive role in the functioning of the court system.**

In considering the second *Press-Enterprise* factor, a submitted complaint in eFile & Serve that has not yet been accepted and transferred into the Court's Case Manager provides no insight into how the court system is functioning. *See Planet III*, 947 F.3d at 592 (access to filed complaints is provided so public can "evaluate and participate in robust public discussions about the performance of their court systems"). Prior to acceptance, judicial proceedings have not been initiated and there is not yet an official court record. *Planet III*, 947 F.3d at 593 (cases cited by

defendant were inapplicable because they did not "address documents that are not in fact part of the record of judicial proceedings"), *see also* IREFS 3(a), IREFS 11. The complaint may never become an official court record if the clerk rejects it, and then the filer does not correct and resubmit it. IREFS 3(a), IREFS 13. In short, submission of a complaint does not automatically result in the initiation of judicial proceedings; it is only once that complaint has been accepted and a judicial proceeding initiated that it becomes relevant to evaluating the court system.

On the other hand, there is great concern that providing access before acceptance of a complaint into Case Manager could erode public confidence in the court system. SOF, ¶¶ 51-53. As such, if this Court grants CNS the relief it requests, then all complaints in eFile & Serve would be available to the press (and, therefore public) even though they might not ever result in a judicial action. SOF, ¶ 51. As such, if a complaint is rejected and never refiled, the press and public could be suspicious as to why there is no judicial action. *Id.* The same confusion and skepticism could occur when a case is submitted to eFile & Serve for filing in Adams County and then once rejected, corrected, and resubmitted for filing in Ada County; there could be questions as to judicial transparency as to why a complaint was allegedly filed in a very conservative county and then transferred to a more liberal county. SOF, ¶ 59. There are also serious risks related to disclosure of confidential or personally identifiable information; clerks serve as gatekeepers in an attempt to help make sure confidential information does not make its way into the official court record, which is publicly available. SOF, ¶ 55. Thus, providing the press and public with access to documents outside the scope of the official court record does not provide any insight as to how the courts are functioning, and instead creates unnecessary and unjustifiable risks.

Submitted complaints that have not yet initiated a court proceeding are not judicial documents because historically they have not been available to the press and public in Idaho and

they are not relevant to evaluating the performance of the court system. Although there is a qualified right of timely access to newly filed complaints, CNS cannot establish a violation of this right because it has access to complaints immediately upon acceptance for filing.

**B.**   **Even if there is a First Amendment right of access to complaints that have not yet been accepted for filing, the restrictions on such right of access survive constitutional scrutiny.**

If this Court determines there is a First Amendment right of access to complaints that have not yet been accepted for filing in the Court's Case Manager, the limited restrictions imposed by the Idaho Supreme Court as to processing of complaints survives constitutional scrutiny.

      **1.**   **Requiring clerk review prior to acceptance is a content-neutral time, place, and manner restriction, and is not subject to strict scrutiny.**

In *Planet III*, the Ninth Circuit determined the policies at issue resembled "time, place, and manner restrictions" because they were "content-neutral and affect only the timing of access to the newly filed complaints." 947 F.3d at 595.  The Ninth Circuit determined such restrictions should not be subject to strict scrutiny, but instead a "more relaxed scrutiny" because any incidental delay in access does not pose any inherent dangers to free expression that would justify strict scrutiny. *Id.* (citing *Globe Newspaper Co. v. Superior Court of Norfolk County*, 457 U.S. 596 (1982)). The Ninth Circuit determined that "[s]ome reasonable restrictions resembling time, place, and manner regulations that result in incidental delays in access are constitutionally permitted where they are content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." *Id.* at 585. However, the Ninth Circuit further required the defendant show "no reasonable alternatives exist" to adequately protect the government's interest in order to survive constitutional scrutiny. *Id.* at 596. The majority claimed this standard was derived from *Globe Newspaper* and was *not* the same as strict scrutiny. *Id.* at n. 9.

**MEMORANDUM IN SUPPORT OF SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 15**

*Globe Newspaper* involved a question regarding the right of public access to criminal trials when a minor victim was testifying about a sex offense. 457 U.S. at 598. The Supreme Court stated: "Where, as in the present case, the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 606-07. This sentence was immediately followed by this footnote:

> Of course, limitations on the right of access that resemble "time, place, and manner" restrictions on protected speech, see *h*, would not be subjected to such strict scrutiny. See *Richmond Newspapers, Inc. v. Virginia*, 448 U.S., at 581–582, n. 18, 100 S.Ct., at 2830, n.18 (plurality opinion); *id.*, at 598, n. 23, 100 S.Ct., at 2839 n. 23 (BRENNAN, J., concurring in judgment); *id.*, at 600, 100 S.Ct., at 2840 (Stewart, J., concurring in judgment).

Thus, *Globe Enterprise* did not involve a time, place, and manner restriction; it applied strict scrutiny to a content-based restriction. The strict scrutiny standard and the purportedly "non-strict scrutiny" standard in *Planet III* both require the restriction on access to be necessitated by a "compelling" or "important" government interest and "narrowly tailored" to serve the interest, meaning no reasonable alternatives exist to further the interest.[8]

In his concurrence, Judge N.R. Smith correctly noted that the majority was effectively applying strict scrutiny to a time, place, and manner restriction—even though strict scrutiny undisputedly did not apply—by requiring that "no reasonable alternative" exists for furthering the government's interests. *Planet III*, 947 F.3d. at 601-04 (J. N.R. Smith, concurring). Judge Smith determined the "time, place, and manner standard permits government regulation provided the restrictions are justified without reference to the content of the regulated speech, that they are

---

[8] Strict scrutiny requires a showing that no reasonable alternatives exist. *Daily Herald Co. v. Munro,* 758 F.2d 350, 359 (9th Cir. 1984) ("Thus, the critical question becomes whether Washington has met its "heavy burden" of demonstrating that "no reasonable alternatives, having a lesser impact on First Amendment freedoms," are available to serve the State's legitimate interests.").

narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* at 601 (internal quotes omitted). Narrow tailoring does not require the "least restrictive or least intrusive means; the regulation only needs to promote "a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 601-02. The regulation "must leave open ample alternative channels of communication." *Id.* "Access policies that merely delay (rather than outright deny) access to nonconfidential civil complaints will generally satisfy this requirement." *Id.*

Despite purporting not to apply strict scrutiny, the majority in *Planet III* did precisely that based on a flawed reading of *Globe Enterprises.* Strict scrutiny does not apply to time, place, and manner restrictions, such as requiring clerk review and acceptance before providing access to civil complaints.  947 F.3d at 595.  Therefore, the Court should apply the time, place, and manner test applied by Judge N.R. Smith in his concurrence, which does not require a showing of no reasonable alternatives for furthering Idaho Courts' interests.

Even if the Court applies the framework applied by the majority in *Planet III*, the policy requiring clerk review and acceptance prior to transferring a document into the official court record (at which point it is immediately available to the press and public) still survives constitutional scrutiny because, as discussed below, there are no reasonable alternatives to provide CNS with immediate access to submitted complaints (which CNS is not entitled to in the first place).

**2.    CNS is seeking immediate or near immediate access to newly submitted complaints.**

Through its 30(b)(6) witness, William Girdner, CNS testified that CNS wants access to complaints upon submission and prior to review and acceptance by a clerk. SOF, ¶ 34. Specifically, it is CNS' position that complaints must be provided "on receipt" or "within a few minutes" of receipt, and that anything longer than a few minutes is an unconstitutional delay. *Id.* Even if timing

of access is calculated based on submission, there is no dispute CNS is not entitled to the immediate

or near immediate access to newly submitted complaints it is seeking:

> Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged. After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration. The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

*Planet III*, 947 F.3d at 596.

> 3.  **The requirement for clerk review and acceptance prior to making complaints available to the public is narrowly tailored to serve Idaho Courts' interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources.**

The Idaho Supreme Court is tasked with the "administration and supervision" of Idaho's

district courts, Idaho Const. Art. V, § 2, and "has the inherent power to make rules governing the

procedure in all of Idaho's courts." *Talbot v. Ames Const.,* 127 Idaho 648, 651, 904 P.2d 560, 563

(1995). The Idaho Supreme Court has implemented rules aimed at promoting access to the courts,

protecting document security and privacy interests, ensuring public confidence in the judicial

system, and managing judicial resources. Idaho Courts' strategic goals are to: (1) "provide timely,

fair, and impartial case resolution"; (2) "[e]nsure access to justice"; (3) "[p]romote effective,

innovative services"; and (4) "[i]ncrease public trust and confidence in Idaho Courts." [9] The Idaho

Court Administrative Rule governing access to court records echoes these interests, stating access

will be provided in a manner that:

> (1) Promotes accessibility to court records;
> (2) Supports the role of the judiciary;
> (3) Promotes governmental accountability;
> (4) Contributes to public safety;

---

[9] Mission Statement of the Idaho Courts, *available at* https://isc.idaho.gov/links/AOC-WeAreHereToServeYou-12-05-14.pdf.

(5) Minimizes the risk of injury to Individuals;
(6) Protects individual privacy rights and Interests;
(7) Protects proprietary business information;
(8) Minimizes reluctance to use the court system;
(9) Makes the most effective use of court and clerk of court staff;
(10) Provides excellent customer service; and
(11) Avoids unduly burdening the ongoing business of the judiciary.

ICAR 32(a).

Both before and after the transition to e-filing, Idaho clerks have served as gatekeepers for improperly submitted documents. SOF, ¶ 58. If a document does not meet the requirements for filing, clerks will notify the filer of the error with the submission and provide an explanation of the correction that needs to be made for the document to be accepted upon resubmission. *Id.* Reasons for rejecting a document include, but are not limited to:

- Insufficient fees or insufficient funds in account for credit card
- Submission is illegible of unreadable
- Submission is incomplete or missing a signature block
- Document must be filed in paper format per IREFS 5, such as Motion to Seal Documents and In Camera Filings
- Wrong jurisdiction
- Any other filing error with explanation

Duke Decl., Ex. M at SO 001587.

Clerk review ensures access to justice and provides assistance to litigants and attorneys because filing errors can be addressed on the front end so the filer has an opportunity to correct errors with the submission. A litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office so that the date of the original submission will still appear as the file-stamped date, as the filing date relates to the date of the original submission. SOF, ¶ 61 (citing IREFS 13). Without clerk review, filing errors could go unnoticed for an indefinite period of time, which could have serious adverse consequences for litigants. For example, if a complaint intended to be filed in Ada County was mistakenly filed in Adams County (an easy mistake to make when

checking boxes from a dropdown menu), the claim may be barred if the complaint was filed close to the statute of limitations and dismissed for improper venue. *See* I.R.C.P. 12(b)(3).

In addition, clerk review makes the most effective use of clerks and court staff and avoids unduly burdening the ongoing business of the judiciary. If filing errors are not addressed on the front end by a clerk (i.e. in eFile & Serve), they have to be addressed on the back end by the judge and his or her court staff (i.e. in Case Manager) because the document becomes an official court record upon acceptance for filing. Judicial action would be required to address an improperly filed document once it is in the Case Management System, which would include things like preparing orders and conducting hearings to strike improperly filed documents, redacting filings already in the Case Management System, or entering a notice of dismissal if certain actions are not taken to correct the filing error. SOF, ¶ 63. This is inefficient and would dramatically increase the workload of judges and their court staff since they would be tasked with ministerial functions that could otherwise be handled by the clerk. *Id.*

Further, clerk review minimizes the risk of injury to individuals, protects privacy rights, minimizes reluctance to use the court system, and increases public confidence and trust in Idaho Courts. Clerks can reject documents if they are being submitted for an improper purpose or inadvertently include confidential information. This ensures that confidential, sensitive, or personally identifiable information is not being published by the Idaho Courts, which would erode public trust and confidence in the courts and be detrimental to privacy interests.

**4.  Even if access is measured based on time of submission, the length of time between submission and clerk review is not delayed and does not give rise to a constitutional violation when weighed against the reasons for requiring clerk review.**

The delays between submission and clerk review in Idaho are insignificant and easily justified by the interests they serve.  Between January 4, 2021 and November 18, 2022, it took an

average of 4.82 business hours statewide between submission of an initial civil filing and clerk review. SOF, ¶ 70.  In total, 403,246 initial civil filings were submitted during this timeframe and 11% of these submissions were rejected (i.e. 44,357 rejections). *Id.* In Ada County, the only county CNS visited on a daily basis prior to the transition to e-filing, complaints were reviewed within 2.56 business hours of submission on average. SOF, ¶¶ 71. In total, 107,616 initial filings were submitted in Ada County during this timeframe and 9% of these submissions were rejected for filing (i.e. 9,685 rejections). *Id.* Thus, absent clerk review on the front end, court action would have been required to address over 44,000 improperly submitted complaints statewide (with close to 10,000 of those submitted in Ada County) in a less than two-year time span.

For complaints filed in the A.A. Category (again, Appendix A to the Idaho Rules of Civil Procedure)—the only category of complaints CNS is seeking access upon submission for—8,645 civil complaints were submitted from January 1, 2021 through July 31, 2022. SOF, ¶ 71. Over half of these complaints were reviewed within two business hours of submission, nearly two-thirds (65%) were reviewed within three business hours, and about 85% were reviewed within one business day (i.e. eight business hours). *Id.*

Idaho Courts should not have to incur significant expense and take on unnecessary security risks just so CNS can have access to submitted complaints (which may never initiate a lawsuit or be accepted as an official court record) a few hours sooner than it would have access to accepted civil complaints (which have initiated a lawsuit and are official court records).

When weighed against the significant government interests that are furthered by clerk review prior to acceptance into the official court record, the de minimis length of the alleged delays do not give rise to a constitutional violation and do not provide a basis for granting CNS' legally unfounded request for immediate, pre-processing access to civil complaints. *Planet III*, 947 F.3d

at 594 (qualified right of access does not demand "immediate, pre-processing access to newly filed complaints").

> **5.** **The options for providing immediate, pre-processing access to newly submitted complaints are not reasonable and undermine Idaho Courts' interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources.**

Although CNS has couched its request for relief as enjoining Omundson from denying access to civil complaints prior to review and acceptance by clerks, this request does not exist in a vacuum. Throughout this lawsuit and in discovery—which included a 30(b)(6) deposition of Tyler—CNS identified three options for providing the pre-acceptance access it requests from the Court: (1) a Press Review Queue, (2) the Idaho Supreme Court building its own press review queue, and (3) Auto Accept. SOF, ¶ 35. Both Press Review Queue options and Auto Accept provide CNS with the immediate, pre-processing access the Ninth Circuit specifically held CNS is not entitled to. Other than the three options providing immediate access upon submission, there are no other options with Tyler's software that would provide CNS with quicker access to complaints than it already has.

### c. *The Press Review Queue impairs the Idaho Courts' interests*

#### i. <u>Costs</u>

The Idaho Supreme Court has an important interest in managing the state's judicial resources. "The First Amendment does not require [federal courts] to second guess the careful deliberations the state court undertook in deciding how to manage scarce resources." *Planet III*, 947 F.3d at 600. Despite CNS' representations to this Court that the proposed Press Review Queue is available to Idaho Courts at no charge, the Press Review Queue comes with an annual subscription fee of at least $108,000, SOF, ¶¶ 47. Implementing the Press Review Queue would

require an amendment to the contract between Tyler and the Idaho Supreme Court and would further require a security review to ensure the Press Review Tool complies with the Idaho Supreme Court's terms and conditions for cloud-based providers. *Id*. The $108,000 annual fee would be "significantly higher" if Tyler were to comply with the Idaho Supreme Court's security requirements relating to cloud-based services (which Tyler currently has not agreed to accept). *Id*.

### ii.     Security concerns

The Idaho Supreme Court has an important interest in protecting litigant and third-party information and ensuring its systems are adequately secured. The Press Review Queue is a public-facing queue that allows members of the public to review a submission prior to review and acceptance by the clerk. The proposed Press Review Queue would exist in eFile & Serve, which means it would be hosted by Tyler and Tyler would be responsible for document security, backups, authentication, etc.[10]

Tyler has not provided all information requested by the Idaho Supreme Court relating to security of the Press Review Queue, and some of the answers Tyler provided raise serious concerns. SOF, ¶ 46. The Press Review Queue does not have any security settings that would prevent against inadvertent or malicious disclosure of confidential information; it depends entirely on the submitter checking the right boxes so the complaint is diverted from the Press Review Queue. SOF, ¶ 55. Tyler does not indemnify its customers if documents containing sensitive and confidential information are wrongly placed into the Press Review Queue. Duke Decl., Ex. F at 172:23-173:4.

The Press Review Queue is not protected against web scraping software and "there's an implied assumption that they – the bots would have access to the environment through the user

---

[10] The review queue accessed by clerks is also hosted by Tyler, but only clerks have access to this queue; the public does not. Duke Decl., Ex. F at 169:14-20.

credentials." Duke Decl., Ex. F at 64:6-65:6. CNS uses a bot to perform sweeps of new civil cases on public court sites. Duke Decl., Ex. D at 102:6-103:2, 105:1-106:1 (referring to the automated program as a "spider," "bot," and "crawler"), Ex. K at CNS_000003 (CNS' Daily Reports Style Manual instructs reporters not to report on tax cases with the notation that "Though your spider might return them, the entries should be deleted from your report before publishing.").[11] Similar "sweeping" activities resulted in a massive data breach in another public-facing Tyler product, the Odyssey Portal, which resulted in the inadvertent publication of over 300,000 confidential attorney discipline records. Duke Decl., Exs. H, I. This concern also ties back to the costs listed above; the costs associated with a security breach can be extremely high.

### iii.    Erosion of public confidence in the courts

The Press Review Queue creates potential for confusion surrounding judicial documents. Documents in the Press Review Queue have not been file-stamped and are not part of the official court record. Members of the press or public may not understand that what they are viewing is not an official court document, particularly since Tyler cannot enable documents in the Press Review Queue to be watermarked as "under review" or "not filed." SOF, ¶ 51.

This potential for confusion would be compounded if the press reports on a submitted complaint that gets rejected for filing as if it were an official court record. If the complaint gets rejected, a lawsuit has not been initiated. This is especially concerning because CNS does not issue a correction if its daily report erroneously references a complaint that was submitted but later rejected. SOF, ¶ 52.

The public may not understand why complaints that were purportedly filed do not appear

---

[11] CNS currently may have to pay a county copy service fee for a complaint if it wants to include a complaint filed in Idaho state court as a CNS Plus Downloads. CNS charges a fee for the CNS Plus Downloads. Duke Decl., Ex. E at 92:15-93:14, 95:1-6.

on the docket and will be left to speculate about the reasons for this phenomenon. This may undermine public confidence in the court system.

### iv.     <u>Potential for abuse and inadvertent or malicious dissemination of information</u>

Providing the press and public with access to complaints that have not been reviewed and accepted by clerks is dangerous because an individual could inadvertently or maliciously submit a complaint containing confidential information, which will be publicly available the entire time it sits in the Press Review Queue. SOF, ¶ 55. Thus, litigants or attorneys could misuse the Press Review Queue to publish confidential or inflammatory information. SOF, ¶ 54-55. This would effectively turn the court filing system into a social media platform for all users to access in order to relay public and potentially inappropriate or defamatory information.

### v.     <u>Building a Press Review Queue using Tyler's API is not a reasonable alternative</u>

Tyler has developed an application (referred to as API) that essentially allows customers to build their own version of a press review tool. SOF, ¶ 51. Although Tyler users are not charged for the API itself, customers must build their own computer application to interface with the API. *Id.* Costs associated with the API include the costs of developing the application, personnel costs, and data hosting costs. *Id.* Tyler has not provided the Idaho Supreme Court with information it has requested regarding the security, functionality, and costs of the Press Review Queue API. *Id.* In addition to these costs and security concerns, the API presents similar concerns regarding erosion of confidence in the courts and the potential for abuse.

### b.   **Auto Accept impairs the Idaho Courts' interests**

### i.     <u>Costs</u>

Auto Accept means that documents would not be subject to any clerk review and instead

would be submitted to eFile & Serve and then automatically transferred into Case Manager. Auto Accept would put a significant strain on Idaho Courts' judicial resources because filing errors typically addressed by court clerks will suddenly require court action to fix. SOF, ¶¶ 62-63. Although Tyler's promotional materials say Auto Accept reduces operational overhead, this does not take into consideration the impact on clerks, court staff, or judges once a document has been automatically transferred into Case Manager and requires court action to correct. SOF, ¶ 62. Although Auto-Accept is available as part of Tyler's efiling software at no additional cost, Tyler has "no visibility into any expense that could be endured by the State or by the Courts" if they were to implement Auto-Accept. *Id.*, ¶ 56. Tyler defers to Idaho state courts in determining what their internal costs would be as a result of using Auto-Accept. *Id.*

Auto Accept is not able to determine whether the correct filing fee was submitted with a complaint and reject the complaint if not. SOF, ¶ 64. If a complaint was Auto Accepted even though the correct fee was not paid or there was another filing issue (e.g. filed in the wrong jurisdiction), the issue would have to be dealt with in Case Manager (i.e. once the improperly submitted complaint has been file-stamped and is in the official court record). SOF, ¶ 67. This would increase the workload of judges and their court staff since they would have to spend time and resources addressing filing errors that would have otherwise been fielded by the clerk.

Handling filing errors on the back end is particularly inefficient because there is no ability to interface directly with the filer once a submission has been accepted for filing. In eFile & Serve, the clerk can communicate with the submitter directly through the portal to notify them of any issues with the filing and the reasons for rejection. SOF, ¶ 66. Once a document is transferred out of eFile & Serve and into Case Manager, there is no longer the ability to interface with the submitter through the portal. *Id.* This means that whoever is responsible for addressing the

correction on the backend (e.g. the judge's clerk) would need to track down the filer's contact information (if provided) to let them know there was an error with filing. SOF, ¶ 66. This is a far less efficient process, especially in instances where no contact information was provided (e.g. if the automatically accepted complaint was handwritten and illegible) or the pro se litigant is incarcerated.

Further, Auto Accept is not able to determine whether the correct filing fee was submitted and to reject the complaint if not. SOF, ¶ 64. The courts are funded in part through filing fees, so it is imperative that filing fees are collected. *Id.* Auto Accept would also present issues with refunding filing fees if a complaint was filed in the wrong county. SOF, ¶ 65. The clerks would have to handle refunds, which takes time and resources. *Id.* With the current system, payment is not captured by Tyler unless and until a document is accepted, so no clerk resources are expended issuing refunds for improperly submitted documents. *Id.*

## ii.    Security concerns

Auto Accept is also not able to protect against malicious or inadvertent disclosure of confidential information; if a document meets the criteria for acceptance, it is automatically accepted regardless of the substance of the document. SOF, ¶¶ 68-69. As discussed in Section IV.5.c.iii, this undermines Idaho Courts' interests in protecting privacy interests and would erode public confidence in the judiciary if Idaho Courts were publishing confidential or sensitive information that should not be made available to the public.

## iii.    Prejudice to litigants

Auto Accept would adversely affect litigants because filing errors would not be addressed on the front end and could therefore go unnoticed for an indefinite period of time. Auto Accept effectively eliminates the three-day grace period to correct filing errors under IREFS 13(c) since

there is no clerk review. This negatively impacts the rights of litigants because, at best, time and resources will have to be spent responding to a filing issue on the back end (e.g. preparing a response to a notice of intent to dismiss if filing error is not corrected). At worst, an action could be barred entirely due to a filing error that was not caught on the front end (e.g. a complaint filed close to the statute of limitations is dismissed for improper venue under I.R.C.P. 12(b)(3)). Litigants and attorneys should not have to face exposure to serious legal consequences simply because CNS wishes to review submitted complaints (documents that are not official court records and have not yet initiated a case) a few hours before it can access filed complaints.

> **d.** *Although CNS has limited its request to submitted complaints in the A.A. Category, a ruling that clerk review violates the First Amendment right to timely access to judicial documents would have far reaching consequences.*

CNS has limited its request for relief to the types of complaints CNS cares about for its business and reporting purposes, essentially complaints filed in District Court where the amount in controversy exceeds $10,000. But a judicial document is not whatever CNS deems important; a judicial document is "an item filed with a court that is 'relevant to the judicial function and useful in the judicial process.'" *Planet III*, 947 F.3d at 592 (citing *Lugosch*, 435 F.3d at 119)). Thus, if requiring clerk review of submissions before acceptance for filing and transfer in the Case Management System is deemed unconstitutional, Idaho Courts would need to eliminate this practice with respect to *all* submissions that would qualify as judicial documents (e.g. motions, supporting memoranda and declarations, proposed orders and judgments, etc).

Eliminating clerk review for essentially all submissions would place an extraordinary and wholly unjustifiable burden on Idaho Courts. From the time period of January 4, 2021 through November 18, 2022, there were **2,961,279** filings in Idaho Courts (both civil and criminal) with a 6% rejection rate, meaning 177,677 filings would have required court action to correct if clerk

review had not been in place. Carroll Decl., Ex. B. Only 8,645 complaints were submitted in the A.A category during a similar timeframe (January 1, 2021 and July 31, 2022). Carroll Decl., Ex. A. Declaring the clerk review process unconstitutional would have an enormously detrimental effect on the Idaho Courts and seriously undermines its interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources.

## V.    CONCLUSION

For the foregoing reasons, Defendant Sara Omundson respectfully requests that the Court grant her Motion for Summary Judgment.

DATED this 15th day of December, 2022.

DUKE EVETT, PLLC


By /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15<sup>th</sup> day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-REP |
| Plaintiff | **DECLARATION OF KEELY E. DUKE IN SUPPORT OF DEFENDANT SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Keely E. Duke, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I am one of the attorneys of record for Defendant Sara Omundson ("Omundson") in the above-entitled matter. The information contained herein is based upon my personal knowledge and is true and correct to the best of my knowledge and belief.

3.      Attached as Exhibit A is a compilation of true and correct copies of Courthouse News Service's ("CNS") *Big Sky Report*, published October 11, 2022, and November 8, 2022.

4.      Attached as Exhibit B is a true and correct copy of Plaintiff's Responses to Second

Set of Interrogatories and Requests for Production of Documents and First Set of Requests for Admissions, served November 11, 2022.

5. Attached as Exhibit C is a true and correct copy of the transcript from the deposition of Sara Omundson, taken November 11, 2022.

6. Attached as Exhibit D is a true and correct copy of the transcript from the 30(b)(6) deposition of Courthouse News Service, taken November 9, 2022.

7. Attached as Exhibit E is a true and correct copy of the transcript from the deposition of Catherine Valenti, taken November 8, 2022.

8. Attached as Exhibit F is a true and correct copy of Volume II of the transcript from the 30(b)(6) deposition of Tyler Technologies, Inc., taken November 10, 2022.

9. Attached as Exhibit G is a true and correct copy of an excerpt from Volume I of the transcript from the 30(b)(6) deposition of Tyler Technologies, Inc., taken November 10, 2022.

10. Attached as Exhibit H is a true and correct copy of a document published by Tyler Technologies, Inc. titled *Information on Odyssey Portal Data Harvesting*, last updated May 3, 2022, and available at https://www.tylertech.com/dataharvest#2969419-judyrecordscom-has-asked-tyler-to-state-its-belief-as-to-whether-or-not-the-nonpublic-records-were-harvested-intentionally-what-is-tylers-response.

11. Attached as Exhibit I is a true and correct copy an article published by the Orange County Register titled *State Bar Notifies 1,300 individuals identified in massive data breach*, last updated May 9, 2022, and available at https://www.ocregister.com/2022/05/06/state-bar-begins-notifying-individuals-identified-in-massive-data-breach/

12. Attached as Exhibit J is a true and correct copy of the transcript from the deposition of Jennifer Dvorak, taken November 7, 2022.

DECLARATION OF KEELY E. DUKE IN SUPPORT OF DEFENDANT SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 2

13.    Attached as Exhibit K is a true and correct copy of CNS Daily Reports Style Manual, produced as CNS_00001-24 and marked as deposition exhibit 21.

14.    Attached as Exhibit L is a true and correct copy of a Civil Cases Report for the U.S. District Court, District of Idaho for the filed report period of January 1, 2021 through November 18, 2022.

15.    Attached as Exhibit M is a true and correct copy of excerpts (pages 1-16, 113, 1026-1038) from the Idaho Court Operations Manual (which is 1,074 pages in total).

16.    Attached as Exhibit N is a true and correct copy of the transcript from the deposition of Carley Nelson, taken November 28, 2022.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 15th day of December, 2022.

_/s/Keely E. Duke __
Keely E. Duke

### CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF KEELY E. DUKE IN SUPPORT OF DEFENDANT SARA OMUNDSON'S MOTION FOR SUMMARY JUDGMENT - 3**

# Exhibit A

**From:** CNS Big Sky <boise@courthousenews.com>
**Sent:** Tuesday, October 11, 2022 6:41 PM
**To:** Keely Duke <ked@dukeevett.com>
**Subject:** CNS Big Sky Report Oct 11, 2022

Courthouse News Service        Dingers        Database Search

<p style="text-align:center;">Big Sky Report</p>
<p style="text-align:center;">October 11, 2022</p>

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

<p style="text-align:center;"><strong>USDC Montana<br>Great Falls, Missoula</strong></p>

| | | |
|---|---|---|
| Janice Teeter, individually and on behalf of all others similarly situated v. Easterseals-Goodwill Northern Rocky Mountain Inc. 10/11/2022 4:22 cv 96 Morris (Great Falls) | Class action for consumer privacy. Defendant did not properly safeguard plaintiffs' personal information, such as full names and driver's license numbers, resulting in a data breach. CNS Plus Download | Eric Rasmusson |
| Forest Service Employees For Environmental Ethics v. United States Forest Service 10/11/2022 9:22 cv 168 Christensen (Missoula) | Environmental tort and Clean Water Act. Defendant discharged thousands of gallons of retardant pollutant in waterways where that is not allowed. CNS Plus Download | Timothy Bechtold |

<p style="text-align:center;"><strong>ER-1566</strong></p>

**USDC Idaho**
**Boise - Southern**

| | | |
|---|---|---|
| Sulema Flores<br>v.<br>Target Corporation<br>10/11/2022 1:22 cv 424 W Dale<br>(Boise - Southern) | Removal from the Third Judicial District of Idaho.<br>Personal injury. | p: Scott Rose<br>d: Neil McFeeley<br>Eberle Berlin |

**USDC Montana**
**Butte, Billings**

| | | |
|---|---|---|
| Great Harvest Franchishing Inc.<br>v.<br>Golden Wheat Llc; Teodora<br>Kostadinova; Gueorgui<br>Kostadinova<br>10/7/2022 2:22 cv 64 Morris<br>(Butte) | Removal. Contract. | Andrew Suenram<br>Erb Suenram |
| First Interstate Bancsystem Inc.;<br>First Interstate Bank; Whitsell<br>Investments LLC; Whitsell<br>Manufacturing Inc.<br>v.<br>The Travelers Indemnity<br>Company Of America; The<br>Charter Oak Fire Insurance<br>Company; Travelers Property<br>Casualty Company Of America<br>10/11/2022 1:22 cv 112 Watters<br>(Billings) | Removal. Insurance contract. | p: Martha Sheehy<br>d: John Bohyer<br>Bohyer Erickson |

**Ada County District Court**
**Idaho**

| | | |
|---|---|---|
| H A Fabrocators Inc.<br>v.<br>Aerospace Engineering and<br>Support Inc.<br>10/10/2022 CV01-22-15151 | Foreign judgment. | Richard Stacey |

**Canyon County District Court**
**Idaho**

2

**ER-1567**

| | | |
|---|---|---|
| A.F., a minor by and through her parents Steven Fleshman and Kendal Fleshman; B.F., a minor by and through his parents Steven Fleshman and Kendal Fleshman<br>v.<br>Jo Ann Goodwin; Ronald R. Penny; Suzanne M. Penny, individually, as husband and wife, and as trustees of the Ronald and Suzanne Penny Revocable Family Trust; Does<br>10/10/2022 CV14-22-8461 | Car collision. | Evan Mortimer<br>Litster Frost Injury Lawyers |

### Kootenai County District Court
### Idaho

| | | |
|---|---|---|
| Diana Marie Witt<br>v.<br>Milton R. Jackson dba Swollen Thumb Fine Wood Working<br>10/7/2022 CV28-22-6155 | Contract. Defendant has not completed cabinet building work defendant was hired to do and has refused to provide plaintiff with a refund. | Muriel Burke-Love |

### Bannock County District Court
### Idaho

| | | |
|---|---|---|
| Michelle Jensen; Justin Jensen<br>v.<br>Kenneth S. Lundquest; Idaho VetMed Services PLLC dba Alpine Animal Hospital; Does<br>10/9/2022 CV03-22-3283 | Civil rights. Defendants performed an unauthorized spay procedure on plaintiffs' dog and did not follow proper care procedures, resulting in the dog's death. | Eileen Johnson |

### Camas County District Court
### Idaho

| | | |
|---|---|---|
| William A. Simon; Shirley M. Simon<br>v.<br>Union Pacific Railroad Company; Does<br>10/7/2022 CV13-22-37 | Quiet title. | J. Varin |

### Gallatin County District Court
### Montana

3

**ER-1568**

| | | |
|---|---|---|
| Alan Rayner<br>v.<br>Taylor Hauser; 406 Civil<br>Construction Inc; Does<br>10/11/2022 DV-22-974 Brown | Car collision. While driving a vehicle owned by defendant<br>406 Construction, defendant Hauser ran a stop sign and hit<br>plaintiff, causing damage. | Jory Ruggiero |

**Park County District Court**
**Montana**

| | | |
|---|---|---|
| Jim Melin<br>v.<br>Travis Caldwell dba Total Ranch<br>Construction<br>9/29/2022 DV-22-155 Gilbert | Contract. Defendant agreed to build a barn but did not<br>complete the project.<br>CNS Plus Download | Karl Knuchel |
| West Boulder Holdings LLC<br>v.<br>IconMT Inc; Icon Ranch+Build<br>MT Inc. ; Zeph Thorning; Carla<br>Thorning<br>10/7/2022 DV-22-158 Gilbert | Contract. Defendants agreed to build structures for<br>plaintiff that were not completed in the proper time frame. | Adam Warren<br>Moulton Bellingham |

Have questions about your account or need help troubleshooting an issue? Contact customer support at courthousenews.com/support
or (909) 483-6165.

■

**From:** CNS Big Sky <boise@courthousenews.com>
**Sent:** Tuesday, November 8, 2022 6:44:25 PM (UTC-07:00) Mountain Time (US & Canada)
**To:** Keely Duke <ked@dukeevett.com>
**Subject:** CNS Big Sky Report Nov 08, 2022

Courthouse News Service      Dingers      Database Search

<div align="center">

Big Sky Report

November 08, 2022

</div>

The report below and its attendant dings and download links may not be transmitted outside the subscribing office location, or accessed from a non-subscribing office. A separate subscription is required for each office that receives the report or its dings and download links, unless your firm has signed up for firm-wide distribution. If you need help finding the underlying complaint, please call or email Cathy Valenti at boise@courthousenews.com or 208-850-7569. The summaries below describe allegations only and should not be taken as fact.

<div align="center">

**USDC Montana**
**Great Falls, Butte**

</div>

| | | |
|---|---|---|
| United States of America v. Sherry Gairrett 11/8/2022 4:22 cv 106 Morris (Great Falls) | Unlawful prescribing of controlled substance. Defendant, a nurse practitioner, issued numerous prescriptions for oxycodone and hydrocodone to many patients without legitimate medical purposes. CNS Plus Download | p: Michael Kakuk U.S. Attorney's Office - Helena d: Lisa Speare Billings Clinic |
| Daniel Wayne Hale, individually, beneficiary and trustee of the Hale Family Trust dated 3/13/2019; Personal representative of the Estate of Cecil Elmer Hale v. State of Montana; Montana Department of Revenue; Montana Department of Natural Resources & Conservation; Montana Department of Fish, Wildlife and Parks dba Missouri Headwaters State Park; Montana Supreme Court; Frank Hart; Opal Hart; Donald Beebe; Estate of Donald Beebe and Eileen Allen; Estate of Eileen Allen; John T. Flynn; Estate of John T. Flynn; Attorney Rachel A. Taylor; Patrick Finnegan dba Missouri Headwaters Museum--The Three Forks Area Heritage Society; Fidelity National Title Company; American Land Title Company; Does | Civil rights, abuse of power and quiet title. Plaintiffs claim interest in property after defendants have denied legal ownership without due process. CNS Plus Download | Pro se |

<div align="center">

**ER-1570**

</div>

11/8/2022 2:22 cv 77 Morris
(Butte)

### USDC Wyoming

| | | |
|---|---|---|
| William Jerome Ruth, individually and as wrongful death representative of the Estate of Cynthia Shook Ruth v. Beartooth Electric Cooperative Inc., a MT corp.; Asplundh Tree Expert LLC, a PA LLC 11/7/2022 2:22 cv 230 | Wrongful death and negligent hiring and supervision. Decedent plaintiff Cynthia Ruth died from a fire caused by a tree that touched a power line and started a wildfire that spread to plaintiffs' home. Defendants did not ensure the proper trimming of the tree that was growing on defendant Beartooth Electric Cooperative's right-of-way. CNS Plus Download | Kenneth Barker |
| Protection & Advocacy System Inc. v. Stefan Johansson, in his official capacity as Director of the Wyoming Department of Health; Paul Mullenax, in his official capacity as Administrator of the Wyoming State Hospital 11/8/2022 2:22 cv 231 Skavdahl | Injunctive relief. Defendants have not provided plaintiff with "full, complete, timely, and meaningful" access to requested videos that provide evidence of mistreatment of vulnerable patients. Some patients have died, been injured or sexually assaulted at defendant's hospital and defendants have delayed and impeded plaintiff's investigations. CNS Plus Download | Andrew Lemke |

### Yellowstone County District Court
### Montana

| | | |
|---|---|---|
| Andrew Hedrick; Shannon Hedrick v. Plourde Construction Siding; David Plourde; Does 11/7/2022 DV-22-1140 Harada | Negligent misrepresentation and contract. Plaintiffs hired defendants to replace the windows in their home. Defendants measured wrong and now water leaks into the home, but defendants are refusing to fix the issue. | Paul Adam Gerstner Adam |

### Jefferson County District Court
### Montana

| | | |
|---|---|---|
| Ty L. Balbach v. Great Midwest Insurance | Fraud, bad faith and insurance contract. Plaintiff was insured by defendant GMIC, but after he was sued, they paid the settlement amount but not his legal fees, | Lawrence Henke Vicevich |

Company; Trenton Bailey 11/3/2022 DV-22-78 Berger

leaving him with a large unpaid balance. $9,400 and punitive damages requested.

CNS Plus Download

Have questions about your account or need help troubleshooting an issue? Contact customer support at courthousenews.com/support or (909) 483-6165.

# EXHIBIT B

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone: (208) 388-1200
Facsimile: (208) 388-1300

Katherine A. Keating (admitted *pro hac vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *pro hac vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone: (415) 675-3400
Facsimile: (415) 675-3434

*Attorneys for Courthouse News Service*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | Case No. 1:21-CV-00305-REP |
| Plaintiff, | |
| v. | **PLAINTIFF'S AMENDED RESPONSES TO DEFENDANT'S SECOND SET OF INTERROGATORIES FIRST SET OF REQUESTS FOR ADMISSIONS** |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 19:

Identify with particularity and detail what CNS considers to be "delayed" access to newly e-filed civil complaints and identify all information and data CNS considered to support its conclusion as to what constitutes "delay" and whether CNS includes non-business hours, weekends, and holidays for purposes of determining whether access to a complaint was allegedly delayed.

### RESPONSE TO INTERROGATORY NO. 19:

Objection. This interrogatory is vague, ambiguous and overbroad. This interrogatory is compound.

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Courthouse News typically defines un-delayed access to new public civil complaints to mean access shortly after the court receives the complaint. Courthouse News considers access to new civil complaints "delayed" when a court restricts access and does not make it available to the press until some later point in time, typically one or more days after receipt. Whether or not any amount of delay is constitutionally permissible depends on the reasons or justifications for the delay.

When Courthouse News' founder and editor, William Girdner, started covering the U.S. District Court for the Central District of California in the 1980s as a journalist writing news articles for The Boston Globe and The New York Times, reporters would regularly go to the clerk's office to check the new civil cases that had come across the counter. That check for new civil cases could be conducted at any time during the day but for the purposes of newsgathering efficiency was often conducted at the end of the day, in time for reporters to write news stories

before their evening deadline. The complaints were all filed in paper form, and they were reviewed by journalists before they were processed or docketed by court staff. In the words of Eighth Circuit Judge Ralph Erickson, "There was a time when -- and some in this room may remember it -- when you took a pleading to the courthouse and the clerk stamped it physically and it went into different bins and it was available immediately."

When Courthouse News was formed in the 1990s it visited federal and state courts throughout the country – including courts in Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Hawaii, Maryland, Massachusetts, Nevada, New York, Illinois, Iowa, Texas, Washington, Michigan, Minnesota, New Mexico, Oklahoma, Louisiana, Missouri, Pennsylvania, New Jersey, Ohio, Oregon, South Carolina, Tennessee, Utah, Vermont, Virginia, Wisconsin – and observed similar traditions of access to newly-filed civil complaints as they had crossed the intake counter. Each court had its own method of providing such access – some courts placed newly-filed, unprocessed complaints on carts or in bins or boxes where the press could review them; some courts allowed the reporters to go behind the counter to review newly-filed complaints.

Mr. Girdner personally experienced this tradition in federal and state courts across the nation: Austin, Boston, Brooklyn, Chicago, Dallas, Des Moines, Honolulu, Houston, Los Angeles, Manhattan, Milwaukee, Minneapolis, New Orleans, Newark, Oakland, Phoenix, St. Louis, St. Paul, San Antonio, San Francisco, Seattle and Wilmington. He also experienced it in smaller state courts from Butte, Montana to the island courts of Hawaii to Youngstown, Ohio where there was a wood box on the counter with new paper filings. Courthouse News also experienced this tradition through its reporters and the coverage of state courts in Atlanta, Birmingham, Charleston, Cincinnati, Cleveland, Columbus, Indianapolis, Las Vegas, Miami,

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 3**

**ER-1576**

Nashville, Oklahoma City, Orlando, Palm Beach, Portland, Salt Lake City, Tacoma, Tampa, and Washington, D.C. This nationwide tradition of un-delayed press access to new complaints was followed in Boise when Christopher Rich was the Clerk in Ada County District Court and before the Idaho courts moved to efiling.

The nationwide tradition of un-delayed press access to new complaints was generally alive and well in state and federal courts when the paper medium was dominant, and before the migration to electronic records, scanning and e-filing. With the advent of electronic documents and e-filing, however, some courts began pushing press access behind administrative or clerical tasks, such as scanning paper petitions or clerical processing of new e-filed petitions. Where this occurs, it leads to delays in access to new civil complaints, which inevitably results where courts withhold access to – and effectively seal – new complaints until after the completion of administrative tasks that follow a courts' receipt of them. In Courthouse News' experience, these delays did not traditionally exist in the paper era, when journalists were provided access to new civil complaints as they were received by the court, regardless of whether they had been processed or docketed, and on the day of receipt.

Courthouse News first assesses whether a court provides traditional access at or near the time of receipt or provides delayed access as a result of docketing or what is now called processing by a clerk's staff. The delay that results from clerk processing is most clearly and simply measured in terms of days. In an efiling environment, one way to determine whether access is being delayed for post-receipt processing by clerks is whether new complaints filed outside a clerk's office hours become public at the time of filing. In the U.S. District of Idaho, for example, new civil complaints filed after hours become public at the time they are filed.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 4**

**ER-1577**

Especially in today's digital age, where news is delayed until the next day or longer, it is devalued by the delay.  A day late is generally too late because the news in a day-old complaint has already been overtaken by events in the current news cycle.  Civil actions not reported when they are received by a court are thus effectively suppressed, less likely to prompt news coverage, and thus less likely to come to the public's attention as the days pass.

In order to measure or assess delays in access, Courthouse News typically relies on tracking conducted by Courthouse News reporters who cover courts on a daily basis. Courthouse News reporters typically monitor and track delays by documenting the date on which they are able to first see new complaints, and the "filed" date and time, which typically reflects when the court received the complaint. The lapse of time between these two dates typically reflects the most basic measure of delay in access experienced by Courthouse News, other journalists and the public. When available, Courthouse News also measures delays in access by using court-generated data reflecting the date and time new e-filed civil complaints are submitted and the date and time they are made available to the public.

Courthouse News typically uses calendar days as the measure of delay because it represents the passage of time as experienced by the public, the media, litigators and jurists. The more limited measure of "business hours" represents only the time when a clerk chooses to keep the clerk's office open to the public. Among other reasons, the public—including Courthouse News' subscribers—do not know or care how many "business hours" elapse between when a court receives a new complaint and when it was released to the public. What matters is the passage of time as people actually experience it. Courthouse News also notes that, under Idaho rule for Electronic Filing and Service 12, for purposes of filing by electronic transmission, a

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 5**

**ER-1578**

"day" begins at 12:01 a.m. and ends at midnight in the time zone where the court is located on the day the document must be filed.

CNS can and has calculated delays based on both calendar and court days. When expressed in calendar days, a weekend or holiday that intervenes between filing and access counts as a day of delay. When expressed in court days, a weekend or holiday that intervenes between filing and access does not count as a day of delay. As a general matter, whether measured in calendar or court days, the percentage of cases available on the day of filing varies little.

**AMENDED RESPONSE TO INTERROGATORY NO. 19:**

Objection. This interrogatory is vague, ambiguous and overbroad. This interrogatory is compound.

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Courthouse News typically defines un-delayed access to new public civil complaints to mean access shortly after the court receives the complaint. Courthouse News considers access to new civil complaints "delayed" when a court restricts access and does not make it available to the press until some later point in time. Whether or not any amount of delay is constitutionally permissible depends on the reasons or justifications for the delay.

When Courthouse News' founder and editor, William Girdner, started covering the U.S. District Court for the Central District of California in the 1980s as a journalist writing news articles for The Boston Globe and The New York Times, reporters would regularly go to the clerk's office to check the new civil cases that had come across the counter. That check for new civil cases could be conducted at any time during the day but for the purposes of newsgathering efficiency was often conducted at the end of the day, in time for reporters to write news stories

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 6**

**ER-1579**

before their evening deadline. The complaints were all filed in paper form, and they were
reviewed by journalists before they were processed or docketed by court staff. In the words of
Eighth Circuit Judge Ralph Erickson, "There was a time when -- and some in this room may
remember it -- when you took a pleading to the courthouse and the clerk stamped it physically
and it went into different bins and it was available immediately."

When Courthouse News was formed in the 1990s it visited federal and state courts
throughout the country – including courts in Alabama, Arizona, Arkansas, California, Delaware,
Florida, Georgia, Hawaii, Maryland, Massachusetts, Nevada, New York, Illinois, Iowa, Texas,
Washington, Michigan, Minnesota, New Mexico, Oklahoma, Louisiana, Missouri, Pennsylvania,
New Jersey, Ohio, Oregon, South Carolina, Tennessee, Utah, Vermont, Virginia, Wisconsin –
and observed similar traditions of access to newly-filed civil complaints as they had crossed the
intake counter. Each court had its own method of providing such access – some courts placed
newly-filed, unprocessed complaints on carts or in bins or boxes where the press could review
them; some courts allowed the reporters to go behind the counter to review newly-filed
complaints.

Mr. Girdner personally experienced this tradition in federal and state courts across the
nation: Austin, Boston, Brooklyn, Chicago, Dallas, Des Moines, Honolulu, Houston, Los
Angeles, Manhattan, Milwaukee, Minneapolis, New Orleans, Newark, Oakland, Phoenix, St.
Louis, St. Paul, San Antonio, San Francisco, Seattle and Wilmington. He also experienced it in
smaller state courts from Butte, Montana to the island courts of Hawaii to Youngstown, Ohio
where there was a wood box on the counter with new paper filings. Courthouse News also
experienced this tradition through its reporters and the coverage of state courts in Atlanta,
Birmingham, Charleston, Cincinnati, Cleveland, Columbus, Indianapolis, Las Vegas, Miami,

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 7

ER-1580

Nashville, Oklahoma City, Orlando, Palm Beach, Portland, Salt Lake City, Tacoma, Tampa, and Washington, D.C. This nationwide tradition of un-delayed press access to new complaints was followed in Boise when Christopher Rich was the Clerk in Ada County District Court and before the Idaho courts moved to efiling.

The nationwide tradition of un-delayed press access to new complaints was generally alive and well in state and federal courts when the paper medium was dominant, and before the migration to electronic records, scanning and e-filing. With the advent of electronic documents and e-filing, however, some courts began pushing press access behind administrative or clerical tasks, such as scanning paper petitions or clerical processing of new e-filed petitions. Where this occurs, it leads to delays in access to new civil complaints, which inevitably results where courts withhold access to – and effectively seal – new complaints until after the completion of administrative tasks that follow a courts' receipt of them. In Courthouse News' experience, these delays did not traditionally exist in the paper era, when journalists were provided access to new civil complaints as they were received by the court, regardless of whether they had been processed or docketed, and on the day of receipt.

Courthouse News first assesses whether a court provides traditional access at or near the time of receipt or provides delayed access as a result of docketing or what is now called processing by a clerk's staff. The delay that results from clerk processing is most clearly and simply measured in terms of days. In an efiling environment, one way to determine whether access is being delayed for post-receipt processing by clerks is whether new complaints filed outside a clerk's office hours become public at the time of filing. In the U.S. District of Idaho, for example, new civil complaints filed after hours become public at the time they are filed.

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 8

ER-1581

Especially in today's digital age, where news is delayed until the next day or longer, it is devalued by the delay. A day late is generally too late because the news in a day-old complaint has already been overtaken by events in the current news cycle. Civil actions not reported when they are received by a court are thus effectively suppressed, less likely to prompt news coverage, and thus less likely to come to the public's attention as the days pass.

In order to measure or assess delays in access, Courthouse News typically relies on tracking conducted by Courthouse News reporters who cover courts on a daily basis. Courthouse News reporters typically monitor and track delays by documenting the date on which they are able to first see new complaints, and the "filed" date and time, which typically reflects when the court received the complaint. The lapse of time between these two dates typically reflects the most basic measure of delay in access experienced by Courthouse News, other journalists and the public. When available, Courthouse News also measures delays in access by using court-generated data reflecting the date and time new e-filed civil complaints are submitted and the date and time they are made available to the public.

Courthouse News typically uses calendar days as the measure of delay because it represents the passage of time as experienced by the public, the media, litigators and jurists. The more limited measure of "business hours" represents only the time when a clerk chooses to keep the clerk's office open to the public. Among other reasons, the public—including Courthouse News' subscribers—do not know or care how many "business hours" elapse between when a court receives a new complaint and when it was released to the public. What matters is the passage of time as people actually experience it. Courthouse News also notes that, under Idaho rule for Electronic Filing and Service 12, for purposes of filing by electronic transmission, a

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 9**

**ER-1582**

"day" begins at 12:01 a.m. and ends at midnight in the time zone where the court is located on the day the document must be filed.

CNS can and has calculated delays based on both calendar and court days. When expressed in calendar days, a weekend or holiday that intervenes between filing and access counts as a day of delay. When expressed in court days, a weekend or holiday that intervenes between filing and access does not count as a day of delay. As a general matter, whether measured in calendar or court days, the percentage of cases available on the day of filing varies little.

## INTERROGATORY NO. 20:

If CNS denies Request for Admission No. 5, identify any alternative methods through which Idaho district courts can provide access to newly e-filed civil complaints prior to review and acceptance by a clerk using Tyler Technologies' software

## RESPONSE TO INTERROGATORY NO. 20:

Objection. This interrogatory is vague, ambiguous and overbroad. This interrogatory calls for speculation.

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Courthouse News does not purport to know all of the available methods through which Idaho district courts can provide access to new e-filed civil complaints without restricting or delaying access until the completion of administrative processing and "acceptance." The Idaho district courts, and the IT staff they or the Administrative Office of the Courts employ, either themselves or in conjunction with their e-filing vendor or other third-party service providers, are in the best position to know the full range of available methods for providing access to new e-filed civil complaints, or the full range of options for how courts might tailor or implement any

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 10

ER-1583

available method for providing access to address their particular needs. However, based on Courthouse News' experience covering state and federal courts across the nation, Courthouse News is familiar with the methods used by different courts to provide access to new e-filed civil complaints without restricting or delaying access until after the completion of administrative processing and "acceptance." Those methods include press review queues and auto-accept tools, for which configuration and accessibility can vary from court to court.

**Press Review Queue**. Many state courts across the nation that use Tyler's software provide access to new e-filed civil complaint through a press review queue. They include every mandatory e-filing court in California that uses Tyler's e-filing software, multiple e-filing courts in Georgia, and the Travis County District Court located in Austin, Texas. Each court configures its press queue to allow access to only certain documents according to their case type, filing type or filing code. The result is un-delayed access to new, non-confidential civil complaints, while confidential or non-public filings remain segregated and sealed from public access.

Courthouse News is informed and believes that Tyler provides courts that use its software with the option of either using a version of the press review tool hosted by Tyler, or developing and hosting their own press queue. Courthouse News is informed and believes Tyler will provide courts with the APIs for the press review tool at no additional cost. This would allow courts using Tyler's software to develop and configure their own press queues in a manner that addresses any unique issues they may have, as they deem appropriate.

Some courts have developed their own "in-house" press review queues, which provide access to new civil complaints in virtually the same manner as Tyler's press queue. These courts include the state courts for the California counties of Orange and San Diego

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 11**

**ER-1584**

Numerous other e-filing vendors provide access to new complaints through their own versions of the press review queue. These vendors include Tybera (which provides statewide on-receipt access in neighboring state of Utah), Granicus (which provides statewide on-receipt access in Arizona and in Florida) and Journal Technologies (which provides on-receipt public access to a number of courts in California, including the largest in the country, Los Angeles Superior Court). Courts that provide access to new civil complaints through press review queues, including courts using Tyler's press review queue, do so by making their press review queues available to the press or public either at terminals located at the courthouse, remotely online, or both. Some courts limit access to their press review queues to terminals located at the courthouse or personal computers connected to the court's Wi-Fi network. This is the case at the San Francisco and San Luis Obispo Superior Courts in California.

The Florida courts provide access to new e-filed civil complaints through a statewide, pre-processing review queue, or "portal." The statewide review queue is available to registered users who create a portal account with their name, address, username, password and other requested information. The Florida courts make new e-filed civil complaints available through the portal on a statewide basis, within five minutes of receipt. Other courts, such as Los Angeles Superior Court and state courts of Hawaii, also require a registered account in order to access new e-filed civil complaints through its press review queue.

**Auto-Accept**. The auto-accept method of taking in efiled complaints is widely used within the federal courts, where public civil complaints are assigned a permanent case number and accepted automatically, thus becoming public within minutes of submission. Court clerks subsequently correct any mistakes in the clerical entries made by the filer or request that the filer make the corrections. The Tyler version of auto-accept is highly flexible and allows the clerk to

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 12

ER-1585

auto-accept based on various criterion such as case category and filer. An example of a state court that auto-accepts all new efiled cases is Clark County Superior in Las Vegas which originally used a press queue for providing access and now auto-accepts new civil complaints, using Tyler software then and now. Vermont's courts also auto-accept on a statewide basis, using Tyler software. An example of a court that selectively auto-accepts new civil cases is Houston's Harris County District Court. Other courts auto-accept with their own home-grown software, such as Hawaii, or use other vendors, such as OLIS used by Alabama or Tybera used by Utah. Individual courts such as Pierce County Superior in Washington also auto-accept, in that case through home-grown software.

**Other Variations.** Another option for public access at or shortly after the time of receipt is used by New York which posts online a statewide, pre-processing, public review queue. The New York option, a public review queue, is distinct from an auto-accept system, in that they become public when received but are still processed by clerks before they appear on the docket. Similarly, Florida now provides registered members of the media with access to new complaint statewide on-receipt.

Yet another variation in the ways of providing undelayed access in the digital age is sometimes used by courts in transition from paper to electronic systems. The clerk's office will print out the new efiled complaints as they are received and place them in a bin for press review, representing a hybrid form of access on the path between paper and electronic filing. This form of access was employed by Kern County Superior in Bakersfield, California before it eventually provided a press queue through Tyler's software.

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 13

ER-1586

**INTERROGATORY NO. 21:**

Identify all courts that have implemented Auto-Accept and/or the Press Review Queue, including courts that have used Tyler Technologies' APIs to implement the Press Review Queue, and the circumstances that led to implementation.

**RESPONSE TO INTERROGATORY NO. 21:**

Courthouse News is not aware of any clerk who has chosen to maintain a Tyler Press Review Queue by writing an Application Programming Interface, or API, using court IT staff or a third party software developer. Many courts provide on-receipt access using their own home-grown software which requires programming similar to that required to develop an API. While Courthouse News has not been privy to the decision-making process in California's courts, for example, it is apparent that the California courts requested Tyler to implement their press review queues rather than program and maintain press review queues themselves using Tyler's API. Similarly, in Texas, the state contracted with Tyler to provide all the court clerks in the state the option of providing a press review queue in lieu of clerk-by-clerk programming or payment. Courthouse News does not know the programming ability of the IT staff employed by Idaho courts.

**INTERROGATORY NO. 22:**

Identify all CNS reporters who are responsible for preparing daily litigation reports and, for each reporter, identify the jurisdictions they cover and whether the courts in these jurisdictions have implemented a Press Review Queue, Auto Accept, or otherwise provide remote access to newly e-filed civil complaints.

## RESPONSE TO INTERROGATORY NO. 22:

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is overbroad and burdensome given the proportional needs of the case.

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Courthouse News has provided detailed accounts of how numerous courts across the nation provide access to new civil complaints in the declarations and other documents it has filed in this action, as well as in the discovery response served in this action. Those prior accounts, including those provided in the declaration of William Girdner (ECF 14-2), are incorporated by reference in this response. While the request is burdensome on a national basis, Courthouse News will identify the reporters covering courts within the Ninth Circuit and the means they use for coverage. This sample is representative of the numerous and varying means of access used by Courthouse News' reporters at courts across the nation.

ARIZONA: Reporter John Cavanaugh reports on USDC Arizona remotely through PACER and Maricopa County Superior in Phoenix using a "News Media Portal" that requires registration, user name and password to enter. The News Media Portal gives subscribers on-receipt access to new civil complaints filed anywhere in Arizona. Subscribers are required to pay a flat fee of $8000 per year. Because the complaints flow off the portal in 48 hours, an additional subscription is also required to "eAccess" at azcourtdocs.gov which costs $360 per month for unlimited access to docketed complaints. Complementing the Maricopa coverage, bureau chief Jamie Ross covers the rest of Arizona's courts also through the News Media Portal. The portal was developed by vendor Granicus at the behest of the Arizona Administrative Office of the

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 15**

**ER-1588**

Courts in response to two letters requesting on-receipt access from Courthouse News editor Bill Girdner.

The new complaints can also be reviewed at local public terminals. Inside the Maricopa County Superior Court records building on Jackson Street is a "customer service center" where a row of six computer terminals sit under a sign that says "Media/Commercial Users." The terminals give pre-docketing access to the new efiled complaints. In addition, the limited number of paper-filed complaints are scanned and posted on the terminals before docketing.

HAWAII: Reporter Candace Cheung covers USDC Hawaii remotely through PACER. She covers the Hawaii state courts through the "eCourt Kokua" portal, a homegrown system developed by the Hawaii courts that provides access locally on public terminals for free and remotely based on registration and a yearly payment of $500. The electronic access is a continuation of the paper access is Hawaii's island courts where new civil actions were made public as soon as they crossed the counter.

NEVADA: Paul Roupe covers USDC remotely through PACER and remotely covers Clark County Superior Court in Las Vegas, by far the largest court in the state, through the court's website which can also be reached through public terminals inside the courthouse. Clark Superior is a Tyler court that auto-accepts new civil filings. It is also the court for 2.3 million people, substantially larger than the population of Idaho. It operates a public portal that can be accessed online and locally for free. Any member of the press or public can register and obtain a user name and password. There is no fee for reviewing and downloading the documents. During the past decade, Clark County Superior provided on-receipt access through its "Court Daily" portal developed by efiling vendor Wiznet. The vendor was later bought out by Tyler which then redesigned and rebranded the old Court Daily as the new "Press Review Queue."

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 16**

**ER-1589**

The rest of Nevada's state courts depend on paper filings except for Washoe County in Reno which is an e-filing court that provides post-processing access locally and remotely. It is covered remotely by Courthouse News reporter Paul Roupe. Washoe charges $300 per year for remote access that requires registration, user name and password, and gives unlimited access to the new filings. The access is the same access at courthouse but it's free. There is a modest fee for printouts.

To cover the paper court of Carson County Superior, where the state capital is located, reporter Laney Olson goes to the courthouse in person. In Nye Superior, a paper court, the clerk's office sends the reporter .pdf copies of the new civil complaints. In Douglas Superior, Ms. Olson goes to the court and reviews a stack of paper complaints that were filed since her previous visit. In Churchill, Lyon, Elko and Storey superior courts, Ms. Olson requests complaints by email based on the online docket. The clerk's staff then provides .pdf copies of the complaints via return email. Lyon charges 50 cents per page, the others send the cases no charge. Court rules in Nevada require that efiling courts in Nevada must use the auto-accept method for electronic filing. Implementation of that rule is not complete, most likely based on resistance from the clerks.

OREGON: Reporter Alanna Madden covers the U.S. District Court in Oregon through PACER which is available remotely and through terminals at the federal courthouse. Reporter Jonny Bonner covers Oregon state courts remotely using OJIN which provides only post-processing access, a situation that is currently the subject of litigation. OJIN requires registration and a subscriptions fee. CNS currently pays Oregon $54 per month plus $16 per user profile per month for unlimited access. OJIN is also available through public terminals at individual Oregon courthouses for free with a fee of 25 cents per page for printouts.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 17**

ER-1590

IDAHO: Reporter Cathy Valenti covers USDC Idaho remotely through PACER which, as in all federal courts, is also available on public terminals at the courthouse. She covers new complaints filed in the Idaho state district courts through a public terminal at the Ada County courthouse which provides delayed, post-processing access, a situation that is currently the subject of this litigation. For her report, Ms. Valenti requests copies of Ada County District Court complaints by email.

For her report, Ms. Valenti often asks for copies of complaints to attach to the summary of the allegations contained in her report. In Ada, for example, she emails her request and the staff returns her email, attaching the complaint in pdf format. She is charged $1 a page and pays the accumulated bill once a month. For Bonneville, she also emails requests and the staff sends an invoice monthly, which is paid through the U.S. mail with a check reimbursed by Courthouse News. Twin Falls has allowed Courthouse News to establish a draw down account so Ms. Valenti calls with her request and the staff emails her the .pdf copy and draws down on her account. Most of the remaining courts allow her to call and pay with her credit card at the rate of $1 per page and $3 for the credit card charge, and will email a pdf shortly thereafter. A few will not accept credit cards, such as Lincoln and Jerome counties, and the reporter must first mail them a check, after which the staff will email the requested records. Some courts do not charge for emailed documents. Most will allow Ms. Valenti to specify the requested document, such as a civil complaint, but some, such as Canyon and Bonneville, will only send the complaint with all attachments, and charge for the whole bundle. Kootenai, Canyon and Elmore require that she email them and ask for the copies in the body of her email. Others, such as Bonner and Jefferson, require that she first fill out an official form, attach it to an email, and the staff then notifies her by email when the document is ready, at which point Ms. Valenti must call to give them a credit

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 18**

**ER-1591**

(208 of 294), Page 208 of 294
Case: 24-6697, 03/06/2025, DktEntry: 10.8, Page 208 of 294
Case 1:21-cv-00305-DCN   Document 60-5   Filed 12/15/22   Page 20 of 47

card number. Some counties, including Kootenai and Canyon, return her email promptly, others, such Bonner, Jefferson, can take more than a day and on occasion several days to get back to her. In all, the state imposes an unusually cumbersome and difficult process on anyone trying to get copies of the court record, with each district clerk protecting a source of extra income.

CALIFORNIA: California is the biggest state in the nation with nearly 40 million people. The extraordinary variety with which the state courts provide public access is testimony to the multitude of alternatives available when granting access to the public record. The access alternatives vary based on a series of factors: paper versus efiling; registration versus open public access; free versus paid; remote versus local-only access; and it also varies among vendors and homegrown efiling systems. No matter the alternative, nearly all of the efiling courts in California provide press or public access on receipt. Out of 26 California superior courts that mandate efiling, 25 of them provide on-receipt access currently or have agree to provide it within 5 months. That includes the largest court in the nation, Los Angeles Superior Court, for nearly 10 million people. Next to that monster court, Riverside Superior, covering a county of 2.5 million people, substantially more than Idaho's population of 1.9 million, gives on-receipt access to new civil complaints to the public as a whole -- without any fee or registration requirement.

Starting at the border with Mexico, reporter Faith Mendoza covers Imperial Superior remotely through a tab on the court's site called "Media Portal for Pending Civil Complaints." The site was developed by Los Angeles-based efiling vendor Journal Technologies and gives pre-processing, on-receipt access, without a registration requirement, to any member of the public for free.

In San Diego Superior, the second biggest county in California, reporter Sergio Frez covers USDC for the Southern District of California remotely through PACER. Mr. Frez also

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 19**

ER-1592

remotely covers San Diego County Superior Court, along with a second Courthouse News reporter, through the "San Diego Superior Court Media Access Portal" which requires a log-in and password and payment of $500 per year. The access is not available on courthouse terminals. San Diego does not use a private efiling vendor. The court relies on a home-grown efiling system that evolved from California's early attempt to develop a statewide case management and efiling system known as "CCMS," which collapsed during the last decade after the expenditure of a half-billion dollars in public funds.

To the north, Orange County Superior has followed the same path. It has adapted the old CCMS software into its own version of an efiling and case management system. It too is providing on-receipt access to new civil complaints. Reporter Joanna Mendoza covers the new civil complaints remotely by going to a URL on the court's website which links via user name and password to the "Electronic Media Inbox." The EMI provides on-receipt access to just-received civil cases, before processing. It is the result of a grand bargain that concluded several years of litigation whereby Courthouse News agreed to drop its attorney fee request, which had climbed into the multi-million-dollar category, in exchange for access on receipt. As part of the agreement, members of the media must register and pay $500 a year. The EMI is not available on courthouse terminals.

In San Bernardino County, reporter Ethan Axtell has been covering the paper-based court in person on a daily basis but he is moving on. The access is post-processing and the enormous and somewhat dysfunctional court has no announced plans to change any aspect of its operation.

In Riverside County, reporter Faith Mendoza covers the court remotely through a link on the court's website called "Unlimited Civil Complaint Portal," which, like the access portal in

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 20**

**ER-1593**

Imperial, was developed by Journal Technologies. Also like Imperial, the site is open to the public. It does not require registration and is free. Disaster has not ensued.

In Los Angeles County, with nearly 10 million people, reporter Violet Enciso covers USDC for the Central District of California locally through PACER terminals placed in the press room in federal court. As with other federal courts, she sees new complaints as the court receives them. Reporter Milt Policzer remotely covers Los Angeles Superior Court, the largest court in the state and in the nation, through a "Media Access Portal," also developed by Journal Technologies. The portal gives on-receipt access to the new civil complaints but, unlike the Imperial and Riverside courts, access requires registration, a user name and password, and payment of $350 a month. The access is remote only.

Going generally north from Los Angeles, Reporter Rebekah Kearn remotely covers four superior courts in Kern, Fresno, Santa Barbara and Monterey counties, using each court's Tyler Press Review Queue. Access is based on registration and log-in through a Tyler program called "Odyssey Identity Provider." No payment is required.

Ms. Kearn also remotely covers the paper-filing court, Ventura Superior, which was the subject of a decade of First Amendment litigation that resulted in the Ninth Circuit's *Planet III* decision. The court scans and uploads the new paper complaints as they cross the counter, prior to docketing. The court places those pre-docketing scans access on the court's website which can be reached remotely and at the courthouse, via a tab that says "Unlimited Civil Complaints." While it is a paper court, Ventura Superior provides access in a manner similar to the efiling courts of Imperial and Riverside -- in other words, on receipt, remote and local, without registration, for free, open to the public.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 21**

**ER-1594**

Along the Central Coast of California, a group of Tyler courts provide on-receipt access through press review queues in San Luis Obispo, Santa Cruz and San Mateo superior courts. Those courts are remotely covered, in corresponding order, by reporters Pat Pemberton, Jessica Cohn and Dustin Manduffie. Local terminals do not allow access to the press queue. Santa Cruz and San Mateo give free, post-processing access to the public through their websites. San Luis Obispo Superior provides public access to new civil complaints only at the courthouse. Attorneys can see the processed cases online.

Around the Bay Area, two Tyler courts, Santa Clara Superior in Silicon Valley and Sonoma Superior in Wine Country, give remote access to the media through Tyler press review queues, covered by reporters Manduffie and Ryan Geller in that order. In addition, Contra Costa Superior east of San Francisco recently instituted a Tyler Press Review Queue access, covered by Cassandra Dunn.

In contrast, Alameda County Superior in the East Bay contracted with Journal Technologies for its efiling software. The public access link on the court's website is called "Media Access Portal." Like the other Journal courts, it provides online, pre-processing access to new civil complaints, except that, like the big Journal court of Los Angeles Superior, it requires registration. The access is free. The public has remote access, based on registration, to post-processed filings on the court's eCourt Portal. Access is free to members of the public for the first five days from the date of the complaint's filing and after that for a fee of $1 for the first page and 50 cents for each page thereafter. The new complaints are covered remotely by Courthouse News reporter Donna Martinez.

In San Francisco, reporter Carson McCullough covers USDC Northern District of California remotely via PACER which like other federal courts provides on-receipt access to

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 22**

**ER-1595**

new civil complaints. San Francisco Superior is locally covered by reporter David Tartre through a home-grown "Media Access Portal" that provides on-receipt access through the court's wifi which is only available inside the courthouse. To gain access, Mr. Tartre must go to the MAP "sign in" link and enter his email address. Thereupon an individual code is automatically sent to that email address. He then uses that numerical code to log in and report on the new complaints as they are received across the virtual counter, before processing.

Further north, Mendocino Superior also provides a Tyler Press Review Queue, accessible remotely with registration. Moving east, a group of Tyler courts in Merced, Yolo, Sutter, Yuba, Kings, Stanislaus and Butte superior courts have all agreed to provide press review queues. Stanislaus has already put the review queue in place and the rest have promised to do so within five months. Yolo, Sutter and Yuba are currently covered in person by reporter Madalyn Wright. Mr. Manduffie covers Kings remotely, Paul Roupe covers Stanislaus remotely, and Barbara Wallace covers Butte remotely.

Placer County Superior, next to Sacramento, is covered remotely by Ms. Wright through a link on the court's website titled "Unlimited Civil Complaint Portal." It is a Journal court. As with the Journal courts in Riverside and Imperial, Placer Superior gives access to unlimited civil complaints to the public, on receipt, for free, with no registration required.

Moving to Sacramento, reporter Wallace covers USDC for the Eastern District of California remotely through PACER. Unlike other federal courts, the Eastern District court assigns a temporary case number to new complaints upon receipt and provides public access to those complaints online through PACER and through terminals at the courthouse. The new cases are then processed and assigned permanent case numbers.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 23**

**ER-1596**

Sacramento Superior is covered the old-fashioned way. Reporter Wallace goes to the courthouse every afternoon and looks through a stack of paper filings in the "media box." The filings are from that same day and carry a date stamp but not a permanent case number. The box is filled around 3:30 p.m. and then topped up at 4:30 p.m. The doors to the clerk's office close at 4:00 p.m. but reporters can stay until 5:00 p.m. to complete their review. The court provides pre-docketing access following a practice common in paper courts, which is to require that filers provide multiple copies of case-initiating documents, with one of them called a public access copy.

San Joaquin Superior is the sole mandatory efiling court in California that does not give access on receipt. The court provides remote access to docket and documents for free. The court is one of the few courts in California, along with San Diego and Orange County, that adopted the problem-plagued CCMS software developed by California's Judicial Council. San Diego and Orange adapted the old CCMS system to make it functional and it is likely San Joaquin has done the same. A request for on-receipt access is pending with the clerk.

The remaining courts in California are smaller courts that rely on paper filing or, in three cases, mix paper filing with voluntary efiling. The voluntary efiling courts are Calaveras, Tulare and Napa superior courts. For its efiled complaints, Napa Superior provides a Tyler Press Review Queue that allows remote, on-receipt access. Reporter Geller visits the court once a week to check the new paper filings. Calaveras Superior puts its filings online post-processing for free. Reporter Manduffie goes in person to Tulare Superior and pays 50 cents a page for copies at the courthouse. The court puts documents online but with a high degree of inconsistency, necessitating trips to the courthouse.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 24**

**ER-1597**

The remaining courts in California are in counties with low population numbers that rely on paper filing. All give access post-processing. Nearly all post their dockets online and a few, for example Lassen and Modoc superior courts, will email copies of complaints for free. Amador Superior will mail complaints through the U.S. Postal Service for 50 cents a page. But most of the smaller courts require travel to the courthouse. For example, reporter Martinez drives an hour and fifteen minutes through a region of cattle farms and rising hills along the highway that takes visitors to Yosemite National Park. She arrives at Tuolomne Superior Court which sports a brand new courthouse but still relies on paper filings, and works at public terminals to review and report on scans of the paper filings. She pays 50 cents per page for any copies she needs to upload to her new litigation report.

WASHINGTON: The state courts of Washington state can fairly be described as a public access basket case. Traditionally three of the biggest courts provided access to paper complaints, when they crossed the counter. In the move to electronic records, two of them took away traditional access and imposed a no-access-before-process policy. The remaining courts went part way down the electronic path and then stopped, creating a statewide hodgepodge of delayed access to scans of paper records online and at the courthouses. In order to read the access landscape in Washington, one must understand three basic components of a filing system: the method of filing, the method for docketing and the method for giving public access to court records. These basic components are split into various combinations throughout Washington.

USDC Western District of Washington is covered remotely through PACER by reporter Alanna Madden and USDC Eastern District of Washington by Erica Schweizer. To attempt coverage of the state courts, different reporters for Courthouse News currently travel to superior

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 25

ER-1598

courts in King, Clark, Benton, Grant, Walla Walla, Cowlitz, Skamania and Klickitat counties. The remaining state courts are covered remotely.

With respect to the transition to efiling, the two biggest courts in the state have stayed aloof from any statewide initiatives, using homegrown software to require efiling and provide access to court records. A single smaller court has also mandated efiling using Tyler software. The rest of the Washington courts have adopted Tyler's case management system and put their dockets online. But there the statewide initiative has come to a skidding halt. Only two additional courts have started voluntary efiling. And the rest of the 39 county superior courts in Washington still rely entirely on paper.

Only a few clerks entered into the centralized system for public access to court documents at digitalarchives.wa.gov. A majority of the courts chose to provide public access to court documents, both remotely and on courthouse terminals, through Tyler software. A minority chose public access software from among an assortment of smaller companies. Another court has refused to provide remote public access altogether.

Washington's public access exception is Pierce County Superior in Tacoma. Pierce operates a homegrown, mandatory efiling system that auto-accepts. Reporter Schweizer remotely covers the court through its public access system called "Legal Information Network Exchange," described on the court's site as a "family of integrated software applications designed by court administrators, court clerks, judicial assistants, prosecutors, corrections managers and attorneys." The homegrown system has been in place 20 years. Courthouse News pays $360 per year for a new case list that shows docket information, plus $200 a year for unlimited access to view the new complaints themselves. Through its auto-accept efiling system and the court's public access software, civil complaint are seen in Pierce Superior as they are received.

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 26

ER-1599

In Seattle, King County Superior once upon a time provided on-receipt access. When paper ruled the day, reporters from local newspaper and TV stations were allowed behind the intake counter to check a stack of new complaints at a wooden desk that was built into the dark, ornate woodwork of the small intake area. With the advent of scanning, reporters were required to come twice a day, morning and afternoon, and then, with the arrival of mandatory efiling, were required to run through a complicated process that involved a deputy intake clerk emailing a list of new cases twice a day to reporter Kendra Leon who would use those case numbers to review the new complaints on terminals in the clerk's office. She would then search for the most recent complaints remotely through the court's old public access system by entering subsequent case numbers, then adding a random control digit from 0-9. While cumbersome, the system resulted in access to new civil complaints on the day of receipt.

But the software was "upgraded" in March of 2022 under the longtime direction of clerk Barbara Miner to a new public access system dubbed "KC Script," that withholds access until after processing. As a result, access to roughly 50% of the new cases is now delayed by a day or more, very much like the delay that results from the no-access-before-process policy in Idaho courts. Describing this step backwards, King County Superior Court's website states, "The Clerk's office is fully dedicated to providing the best services to all customers, including maintaining and making court records accessible to everyone."

The only other state court in Washington that mandates efiling is Snohomish Superior in Everett, a small community north of Seattle. The court uses Tyler software. Its acting clerk agreed roughly a year ago to install a Press Review Queue going so far down that path as to agree to the filing codes that would be included in the press queue. But then he ran into a brick wall in the form of Tyler's demand for $43,000 a year. The acting clerk told Mr. Girdner that the

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 27**

**ER-1600**

(217 of 294), Page 217 of 294
Case: 24-6697, 03/06/2025, DktEntry: 10.8, Page 217 of 294
Case 1:21-cv-00305-DCN   Document 60-5   Filed 12/15/22   Page 29 of 47

city council funded the efiling project, because the state courts refused to pay for it, and the city council would not agree to tack $43,000 per year onto its budget simply to give better access to journalists. The acting clerk has since retired, and access remains post-processing, with remote access conditioned on registration and a $600 yearly fee.

An additional two courts offer voluntary efiling, Clark County Superior and Spokane County Superior. Courthouse News reporter Jason Sandefur covers Clark Superior by going to the court and reviewing new complaints after they are processed. The court in years past provided journalists with traditional access to new complaints on the day of filing. In the switch to Tyler's case management, that traditional access was taken away. At the other end of the state, Spokane Superior uses Tyler for case management and "Image Soft" for efiling, while providing public access to the complaints through a link sent by court officials which takes a reporter to Spokane County Media ftp site.

All the rest of the Washington's 39 superior courts depend entirely on paper filing while using Tyler's case management system. All post their dockets online. But then they go in different directions when it comes to public access to the filings themselves. Exemplifying the chaos, Island Superior near Puget Sound provides remote access to document through the statewide database digitalarchives.wa.gov, which requires payment of 25 cents a page plus a $1 transaction fee simply to view a complaint, but Island Superior also gives free access locally on courthouse terminals through Tyler software, selling printouts for 50 cents a page. The clerk also sells unlimited, remote, public access to the documents through the Tyler software for a flat yearly fee of $600 per year.

That pattern is generally true throughout Washington's state courts. Local access is the same as remote access, but local is free for review while remote access is based on a yearly fee.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 28**

**ER-1601**

In the same vein, Chelan Superior uses OnBase to provide access to documents as well as digitalarchives.wa.gov; Columbia Superior uses Tyler's document access system for $100 per year plus digitalarchives.wa.gov; Franklin Superior uses Tyler for $100 per year as well as digitalarchives.wa.gov; Jefferson Superior only gives remote document access through digitalarchives.wa.gov; Kitsap Superior gives public access to documents through Tyler for a yearly fee of $100 and through digitalarchives.wa.gov; Kittitas Superior only gives access through digitalarchives.wa.gov; Klickitat Superior only gives access through digitalarchives.wa.gov; Skagit Superior goes through Tyler for $250 per year as well as digitalarchives.wa.gov; and finally Snohomish gives remote access through Tyler for $600 per year as well as through the state site. The rest of the counties have refused to put their documents onto the statewide access portal.

The only court in the state that does not provide remote access to documents is Clark County Superior which only provides only local access to its records and only in electronic form and only after a processing delay, using yet another document access system called Liberty.

MONTANA: Many of the Montana courts used a case management system called "FullCourt." Those who upgraded to "FullCourt Enterprise" either allow or require efiling. Some of them give remote public access, for a fee, and some do not. Reporter Sarah Blades remotely covers superior courts in the counties of Yellowstone, Jefferson, Flathead, Gallatin, Chouteau, Madison and Fallon, all through Full Court Enterprise. Many of the remaining courts are covered in person. Some are paper courts and some are efiling courts. Blades travels to superior courts in Lewis and Clark, Missoula (efiling court but no remote access) and Cascade counties. She also goes to Silver Bow in Butte which is still a paper court. The small court in the past allowed reporters behind the counter into the archive area which flows into the docketing area where

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 29**

**ER-1602**

clerks were willing to let a reporter what the working on before recommending the café across the street. But the personnel and policy have changed. The computer terminal is now on the filing counter and reporters must remain on the public side of that barrier and wait for post-processing scans to appear on the terminal. Blades prints cases of interest at the rate of 25 cents a page for inclusion in her report.

ALASKA: Reporter Julie St. Louis covers USDC remotely through PACER. The state courts are all paper paper-based and access is post-processing at the courthouse. Dockets are posted online and the court clerks will email documents when requested. Ms. St. Louis visits the Anchorage trial courts in person and reports on paper files. She at one time had access prior to processing but no longer does.

**INTERROGATORY NO. 23:**

Identify any harm CNS alleges it has experienced because of alleged delays in accessing civil complaints filed in Idaho Courts, including any customer complaints and/or loss of subscriptions because of alleged delays.

**RESPONSE TO INTERROGATORY NO. 23:**

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is overbroad and burdensome given the proportional needs of the case.

Subject to and without waiving the foregoing objection, Courthouse News responds as follows: The harm in delaying access to news is articulated by the Ninth Circuit ruling in Planet III at page 24. "Thus, that 'old' news is not worthy of and does not receive, much public attention has been widely recognized. Moreover, as amici argue, the need for immediacy of

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 30

ER-1603

reporting news 'is even more vital in the digital age,' where timeliness is measured in terms of minutes or seconds."

Courthouse News has competitors, and subscribers have noted when a competitor reports on a new civil matters before Courthouse News. In Orange County Superior in California, the clerk's office at times processed new complaints after clerk office hours and also maintained a "captcha" control on its site that it took off after 7:30 in the evening. A Courthouse News competitor began reporting on new cases in the evening, forcing Courthouse News to match the speed of the reporting by also reporting the new cases that appeared on the court's website in the evening.

Any delay in the reporter's ability to review a new complaint delays CNS's ability to report on it, and deters "informed public discussion of ongoing judicial proceedings." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 787 (9th Cir. 2014) ("*Planet I*"). A delay of even one court day means that news about that complaint is delayed by, at the very least, one full news cycle. When there is an intervening weekend and/or holiday, a delay of even one court day results in actual delays of two or more calendar days.

Delays in access to new civil complaints constitute a denial of Courthouse News' First Amendment right of access to public records, the denial of which amounts to irreparable harm as a matter of law. It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also*, *e.g.*, *New York Times Co. v. United States*, 403 U.S. 713, 724-25 (1971) (Brennan, J., concurring); *Carroll v. Princess Anne*, 393 U.S. 175, 182 (1968); *Wood v. Georgia*, 370 U.S. 375, 391-92 (1962). As the Ninth Circuit has recognized, the irreparable nature of a First Amendment injury is further enhanced when the practice sought to be enjoined

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 31

ER-1604

delays the timely dissemination of news to the public. "Where the precious First Amendment right of freedom of the press is at issue, the prevention of access to a public forum is, each day, an irreparable injury: the ephemeral opportunity to present one's paper to an interested audience is lost and the next day's opportunity is different." *Jacobsen v. U.S.P.S.*, 812 F.2d 1151, 1154 (9th Cir. 1987).

## INTERROGATORY NO. 24:

Identify all information, communications, and calculations relating to alleged delays in access to newly e-filed civil complaints in Idaho Courts, including all information relating to the allegations in paragraph 5 of CNS' Complaint (Dkt. 1) and paragraph 3 of Catherine Valenti's Supplemental Declaration (Dkt. 26-1).

## RESPONSE TO INTERROGATORY NO. 24:

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is overbroad and burdensome given the proportional needs of the case. The phrase "relating to" also renders this interrogatory unreasonably overbroad and burdensome. This interrogatory is also compound insofar as it asks for all "information, communications, and calculations." Courthouse News objects to this request to the extent that it calls for the production of documents or communications protected by the attorney-client communication privilege, attorney work-product privilege, or any other applicable privilege

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Pursuant Federal Rule of Civil Procedure, Courthouse News refers to the tracking

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 32

ER-1605

worksheets and calculations produced by Courthouse News in this action, including but not limited to the workbooks produced by Courthouse News as CNS_013312-CNS_013313.

**INTERROGATORY NO. 25:**

Identify any automated programs CNS uses to monitor new filings in civil cases, including all uses for these programs, whether CNS' competitors use similar programs, whether these programs provide CNS with any competitive advantage, and whether these programs can be used in jurisdictions that do not provide remote access to newly e-filed civil complaints.

**RESPONSE TO INTERROGATORY NO. 25:**

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is overbroad and burdensome given the proportional needs of the case. The undefined term "identify" as used in this interrogatory renders is vague and ambiguous.

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Courthouse News backs up its human reporter's work with periodic sweeps of new civil cases done by an automated program on public court sites where such programs are permitted by the court. The programs check public docket information, and run only where the public docket is online and where the court does not prohibit such programs. Where access to documents is limited to terminals at the physical courthouse, the programs cannot "see" the documents online any more than a person can. Such programs are extremely common and check for public information. Any search engine, such as Google, for example, gathers information by progressing through public websites, including court websites that contain information on the

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 33**

**ER-1606**

location of the court, on an automated basis. Any other publisher can do the same. The programs do not provide a competitive advantage

**INTERROGATORY NO. 26:**

Identify the demographics of Idaho subscribers to the CNS Big Sky Report, including the percentage of subscribers that consist of law firms or individual attorneys.

**RESPONSE TO INTERROGATORY NO. 26:**

Objection. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is not likely to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objection, Courthouse News responds as follows: Current subscribers to the Big Sky Report include the Office of the City Attorney for the City of Boise and a host of major law firms, both from within the state of Idaho and across the nation.

**INTERROGATORY NO. 27:**

Identify CNS' total annual revenue for the years 2016 to the present and CNS' annual revenue from daily litigation reports during this timeframe, including but not limited to revenue from subscriptions and downloads of filings linked in the daily litigation reports.

**RESPONSE TO INTERROGATORY NO. 27:**

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is overbroad and burdensome given the proportional needs of the case. This interrogatory seeks confidential and private financial information that is not subject to disclosure.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 34**

**ER-1607**

(224 of 294), Page 224 of 294
Case: 24-6697, 03/06/2025, DktEntry: 10.8, Page 224 of 294
Case 1:21-cv-00305-DCN  Document 60-5  Filed 12/15/22  Page 36 of 47

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: As the Ninth Circuit previously recognized: "[P]rofit motive is entirely irrelevant to a news organization's First Amendment rights. 'If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York times* to *Hustler Magazine* would be little more than empty vessels.'" *Courthouse News Serv. v. Planet,* 947 F.3d 581, 595, n.8 (9th Cir. 2020) (quoting *Harte-Hanks Commc'ns, Inc. v. Cannaughton*, 491 U.S. 657, 667 (1989)).

Notwithstanding the fact this interrogatory is "entirely irrelevant," *id*., in a good faith effort to respond, Courthouse News provides the following, limited response. Virtually all income flows from subscriptions to daily litigation reports, including the Daily Brief which reports on rulings, but is accounted for as part of "subscription" income, in addition to much smaller amounts of income for services connected to those subscriptions. The connected income comes from downloads of filings and "dingers," or alerts, as well trackers that report on any new filing in an ongoing case. The income from downloads of filings is mostly offset by fees paid to courts for copies of court filings that are downloaded as well as those that are not, omitting employee costs associated with that work. The income allows Courthouse News to pay journalists and publish its daily news page, much like a traditional newspaper that relies on subscription income and advertising to remain solvent.

## INTERROGATORY NO. 28:

Identify all sources of revenue associated with CNS' daily litigation reports, including subscription costs and costs associated with downloading document from links in the daily litigation reports.

**RESPONSE TO INTERROGATORY NO. 28:**

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is overbroad and burdensome given the proportional needs of the case. This interrogatory seeks confidential and private financial information that is subject to a right of privacy and not subject to disclosure.

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: As the Ninth Circuit previously recognized: "[P]rofit motive is entirely irrelevant to a news organization's First Amendment rights. 'If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York times* to *Hustler Magazine* would be little more than empty vessels.'" *Courthouse News Serv. v. Planet,* 947 F.3d 581, 595, n.8 (9th Cir. 2020) (quoting *Harte-Hanks Commc'ns, Inc. v. Cannaughton*, 491 U.S. 657, 667 (1989)).

Notwithstanding the fact this interrogatory is "entirely irrelevant," *id.*, in a good faith effort to respond, Courthouse News provides the following, limited response. The sources of revenue associated with daily litigation reports are its subscription fees and much smaller revenue streams from alerts, downloads of filings, copy fees, research fees and advertising. As noted in response No. 27 above, the income stream from downloads of filings and copy fees is largely offset by costs paid to courts for copies of new complaints, including many that are uploaded but never downloaded.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 36**

**ER-1609**

**INTERROGATORY NO. 29:**

Identify all locations in Idaho where CNS has assigned reporters in the past ten years and describe when and how CNS' reporters were able to access newly filed civil complaints prior to the implementation of e-filing in Idaho district courts.

**RESPONSE TO INTERROGATORY NO. 29:**

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)).

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Courthouse News reporters covering Idaho have typically been based in Boise, but have covered new complaints filed at courts located in the counties of Ada, Canyon, Gem, Payette, Elmore, Owyhee and Kootenai. Courthouse News would also report on docket information for new civil complaints on a statewide basis. Prior to the implementation of efiling, Courthouse News' reporters traveled to their assigned courthouses to view the new civil complaints filed at those courts. Courthouse News would rely on reporters located outside of Boise to cover counties not geographically close to Boise, such as a reporter located in Salem, Washington who would cover Kootenai county. As for Ada county, prior to e-filing, the Courthouse News reporter arrived at Ada County District Court at about 4 p.m. and asked a deputy clerk to print out a list of the day's complaints. The clerk then opened the door to a locked viewing room. The reporter used a public terminal to find cases for review based on the list. Meanwhile, the deputy clerk retrieved "the bucket," which contained all of the complaints that came in that day through the mail but had yet to be docketed. At 4:30 p.m., the deputy clerk returned with a second report that included any new civil complaints filed in the previous 30 minutes. The reporter would then

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 37**

**ER-1610**

request any new complaints on the updated list that he or she needed to report on, and the deputy clerk would bring those cases. Just before the filing window closed at 5:00 p.m. the deputy clerk would bring the last set of civil complaints filed that day for the reporter to review. As a result, the reporter saw all the new civil complaints filed that day with rare exceptions.

## INTERROGATORY NO. 30:

Identify all costs CNS incurs in connection with accessing newly e-filed civil complaints in jurisdictions that have implemented the Press Review Queue or Auto Accept.

## RESPONSE TO INTERROGATORY NO. 30:

Objection. This interrogatory is overbroad as to scope and time. This interrogatory exceeds the scope of permissible discovery relative to the parties' claims and defenses and the proportional needs of the case (Fed. R. Civ. P. 26(b)(1)). This interrogatory is overbroad and burdensome given the proportional needs of the case. This interrogatory seeks confidential and private financial information that is subject to a right of privacy and not subject to disclosure.

Subject to and without waiving the foregoing objections, Courthouse News responds as follows: Courthouse News incurs a wide range of costs tied to its court coverage, comprised of subscription fees assessed by courts for access to on-receipt intake queues as well as download fees that vary from court to court. The biggest single bill is paid to PACER for online access to the federal courts docket and filings, where the great majority of the courts are based on auto-accept. The federal courts also charge per-page fees for copies requested from courthouses.

Los Angeles Superior charges the media $350 per month for unlimited access to the Media Access Portal. Orange County Superior charges $500 per year for access by media to its Electronic Media Inbox. Both MAP and EMI are the equivalent to the Press Review Queue by Tyler.

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 38

ER-1611

In Arizona, Courthouse News pays $8,000 per year for online access to the statewide equivalent of a Tyler press review queue. In Hawaii, Courthouse News pays $5000 per year for online access to an auto-accept system.

Courthouse News is not currently aware of any court that uses Tyler software charging for access to a Press Review Queue. Courts that use Tyler's Auto-Accept system include Harris County District Court in Houston which charges a per page fee for downloads. Clark County Superior in Las Vegas also uses the Tyler Auto Accept system, provides online, on-receipt access, and does not charge for downloads. Vermont courts also use Tyler's Auto-Accept system with access limited to terminals at Vermont's state courthouses where the local clerks charge per-page fees for print-outs. Courts in and around Atlanta that use Tyler's Press Review Queue software charge a per-page fee for printouts. Florida, which now provides statewide, on-receipt access to new civil complaints does not charge for access online or at the courthouse, and does not charge fees for online downloads.

## RESPONSES TO REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that as of September 30, 2022, William Girdner's email address was bgirdner@courthousenews.com.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Admit.

### REQUEST FOR ADMISSION NO. 2:

Admit that William Girdner received a copy of the letter attached as Exhibit 1 on September 30, 2022.

### RESPONSE TO REQUEST FOR ADMISSION NO. 2:

Objection. The undefined term "received" is vague and ambiguous. This request call for information that is not reasonably calculated to lead to the discovery of admissible evidence.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 39**

**ER-1612**

Subject to the foregoing objection and without waiving them, Courthouse News responds as follows: Courthouse News admits Mr. Girdner's email account received a copy of the letter attached as Exhibit 1. Courthouse News further admits that the first time he or anyone else at Courthouse News was aware of the letter was on October 11, 2022, when Courthouse News' attorneys saw it attached to Defendant's Requests for Admission and alerted Mr. Girdner to it. Courthouse News further admits that Mr. Girdner receives at least between 50 and 100 unsolicited emails on a daily basis, most of them asking for business or asking for political contributions, and he deletes them en masse. Courthouse News further admits the Tyler letter was evidently deleted in one of those purges. Courthouse News further admits that, upon searching his deleted file, Mr. Girdner viewed a copy of the letter attached at Exhibit 1 on or about October 11, 2022. Except as expressly admitted, Courthouse News denies the request.

**REQUEST FOR ADMISSION NO. 3:**

Admit that William Girdner did not provide Omundson with a copy of the letter attached as Exhibit 1 on or before October 7, 2022.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Objection. This request is vague, ambiguous and overbroad. This request call for information that is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing objection and without waiving them, Courthouse News responds as follows: Admit. Courthouse News further admits that William Girdner had no knowledge of the letter attached as Exhibit 1 until Defendant served its Requests for Admissions.

**REQUEST FOR ADMISSION NO. 4:**

Admit that CNS, whether through counsel or any employee, did not provide Omundson with a copy of the letter attached as Exhibit 1 on or before October 7, 2022.

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 40

ER-1613

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Objection. This request is vague, ambiguous and overbroad. This request call for information that is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to the foregoing objection and without waiving them, Courthouse News responds as follows: Admit. Courthouse News further admits that neither William Girdner nor any attorney for or employee of Courthouse News had any knowledge of the letter attached as Exhibit 1 until Defendant served its Requests of Admission.

**REQUEST FOR ADMISSION NO. 5:**

Admit that the Press Review Queue and Auto-Accept are the only available methods for providing pre-acceptance access to civil complaints e- filed in courts that use Tyler Technologies' software.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Objection. This request is vague, ambiguous and overbroad. This request is unintelligible insofar as it refers to "Auto-Accept" as "a method for providing pre-acceptance access to civil complaints." This request call for speculation.

Courthouse News lacks sufficient information or belief to admit or deny this request, and on that basis denies it.

**REQUEST FOR ADMISSION NO. 6:**

Admit that the Press Review Queue provides immediate access to civil complaints upon submission to the Online Filing Service.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Objection. The undefined term "immediate" is vague and ambiguous. This request is overbroad.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 41**

**ER-1614**

Subject to the foregoing objection and without waiving them, Courthouse News responds as follows: Courthouse News admits the Press Review Queue provides access to those new e-filed civil complaints the court elects to make available through the Press Review Queue shortly after the court receives them. Courthouse News lacks information or belief as to the exact amount of time that may elapse, for any given complaint, between submission by filer, receipt by the court and public access. Courthouse News admits that the Press Review Queue provides access to new e-filed complaints within a few minutes of submission on the day that the court receives them, with limited exceptions.  Except as expressly admitted, Courthouse News lacks sufficient information or belief to admit or deny this request, and on that basis denies it.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the Auto Accept function provides immediate access to newly e-filed civil complaints upon submission.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Objection. The undefined term "immediate" is vague and ambiguous. This request is overbroad.

Subject to the foregoing objection and without waiving them, Courthouse News responds as follows: Courthouse News admits that, based on its experience, the Auto Accept function typically provides access to those new civil complaints the court elects to make available through the Auto Accept Function shortly after the court receives them, with various lag times that depend on the speed with which the software works through the filing and the strength of the internet connections available to the filer and the court. Courthouse News lacks information or belief as to the exact amount of time that may elapse, for any given complaint, between submission by filer, receipt by the court and public access. Courthouse News admits that Auto

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 42

ER-1615

Accept Function typically provides access to new e-filed complaints within a few minutes of submission and on the same day that the court receives them, with limited exception. Except as expressly admitted, Courthouse News lacks sufficient information or belief to admit or deny this request, and on that basis denies it.

**REQUEST FOR ADMISSION NO. 8:**

Admit that in this litigation CNS is only seeking "un-delayed" access to newly e-filed civil complaints listed in Fee Category *A.A. All initial civil case filings in District Court of any type not listed in categories E, F, and H(1)* in Appendix A to the Idaho Rules of Civil Procedure.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Objection. This request is vague, ambiguous and overbroad. Subject to the foregoing objection and without waiving them, Courthouse News responds as follows: Courthouse News lacks sufficient information or belief to admit or deny this request, and on that basis denies it. However, Courthouse News admits it seeks access to only non-confidential civil complaints filed with the Idaho District Courts, which may encompass or be limited to civil complaints listed in Fee Category *A.A. All initial civil case filings in District Court of any type not listed in category E, F, and H(1)*. Courthouse News, through counsel, is currently conferring with Defendant, through counsel, in an effort to identify a stipulated or agreed-upon universe of civil complaints.

**REQUEST FOR ADMISSION NO. 9:**

Admit that CNS is able to access civil complaints e-filed in Idaho district courts at the same time as all other members of the press and public.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Objection. This request is vague, ambiguous and overbroad. This request calls for speculation.

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 43**

**ER-1616**

Subject to the foregoing objections and without waiving them, Courthouse News responds as follows: Courthouse News lacks sufficient information or belief to admit or deny this request, and on that basis denies it.

**REQUEST FOR ADMISSION NO. 10:**

Admit that the document attached as Exhibit 2 is true and correct copy of the "About Us" webpage on CNS' website.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Admit.

**REQUEST FOR ADMISSION NO. 11:**

Admit that historically CNS reporters have not had access to newly filed civil complaints outside of normal courthouse business hours.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Objection. This request is vague, ambiguous and overbroad as to scope and time. The request is also compound insofar as it asks about different courts over different times, including their varying filing and access procedures, which may have changed over time. The undefined phrase "normal courthouse business hours" is also vague, ambiguous and overbroad as to scope and time. The request also improperly requires the adoption of one or more assumptions.

Subject to the foregoing objections and without waiving them, Courthouse News responds as follows: Courthouse News admits that until technology began enabling courts to make complaints available electronically, courts were not able to provide access when courts were closed. Courthouse News further admits that until courts began enabling litigants to file complaints electronically, courts were not able to receive new complaints when they are closed. Courthouse News further admits that with the advent of electronic filing courts are able to both

PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 44

ER-1617

receive new complaints and provide access to them when they are closed. Except as expressly

admitted, Courthouse News lacks sufficient information or belief to admit or deny this request,

and on that basis denies it.

Dated: November 11, 2022                     BRYAN CAVE LEIGHTON PAISNER LLP

                                             */s/ Jonathan Fetterly*
                                             Jonathan G. Fetterly
                                             *Attorneys for Courthouse News Service*

**PLAINTIFF'S RESPONSES TO SECOND SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS AND FIRST SET OF REQUESTS FOR ADMISSIONS - 45**

**ER-1618**

**VERIFICATION**

I, William Girdner, am the publisher of Courthouse News Service.  I believe, based on reasonable inquiry, that the foregoing **PLAINTIFF'S AMENDED RESPONSES TO DEFENDANT'S SECOND SET OF INTERROGATORIES FIRST SET OF REQUESTS FOR ADMISSIONS** are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed this 11 day of November 2022.
_____

By:_____
        William Girdner
        Publisher, Courthouse News Service

# Exhibit C

# Deposition of 30(b)(6) Sara Omundson

# Courthouse News Service v. Omundson

# November 11, 2022



**206.287.9066 I 800.846.6989**

1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101

www.buellrealtime.com

email: info@buellrealtime.com



Courthouse News Service v. Omundson                              30(b)(6) Sara Omundson

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____
                              )
COURTHOUSE NEWS SERVICE,     )
                              )
                              )
        Plaintiff,  )
                              )
    v.                        ) No. 1:21-CV-00305-REP
                              )
SARA OMUNDSON, in her official  )
capacity as Administrative     )
Director of Idaho Courts,      )
                              )
        Defendant.  )
_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

SARA OMUNDSON IN HER OFFICIAL CAPACITY

AS ADMINISTRATIVE DIRECTOR OF IDAHO COURTS

_____

Taken at Boise, Idaho
(Conducted via Videoconference.)

DATE TAKEN:  November 11, 2022
REPORTED BY:  Nicole A. Bulldis, RPR
AZ No. 50955 | CA No. 14441 | WA No. 3384

---

**Page 2**

1           A P P E A R A N C E S
2
3   FOR PLAINTIFF:
4       (via Zoom)    Jonathan G. Fetterly
                      Katherine A. Keating
5                 BRYAN CAVE LEIGHTON PAISNER LLP
                  3 Embarcadero Center, 7th Floor
6                 San Francisco, CA 94111
                  (415) 675-3400
7                 jon.fetterly@bclplaw.com
                  katherine.keating@bclplaw.com
8
9   FOR DEFENDANT:
10      (via Zoom)    Keely E. Duke
                      Molly E. Mitchell
11                DUKE EVETT, PLLC
                  1087 W. River Street, Suite 300
12                PO Box 7387
                  Boise, ID 83707
13                (208) 342-3310
                  ked@dukeevett.com
14                mem@dukeevett.com
15
16  ALSO PRESENT:
17      (via Zoom)    BILL GIRDNER, CNS
18
19                --o0o--
20
21
22
23
24
25

---

**Page 3**

1        30(b)(6) DEPOSITION OF SARA OMUNDSON
2
3              EXAMINATION INDEX
4   EXAMINATION BY                           PAGE
5   Mr. Fetterly.......................................... 4
6
7
8
9              EXHIBIT INDEX
10  EXHIBITS FOR IDENTIFICATION              PAGE
11  39  Defendant's Supplemental Responses to Plaintiff's
12      First and Third Set of Interrogatories............ 44
13  40  Acceptance of Documents Tendered for Filing....... 60
14  41  Idaho Courts Operations Manual Excerpt............ 62
15  42  E-Filing District Court Civil Case Worksheet...... 73
16  43  Case Initiation................................... 111
17  44  Case Type Codes................................... 116
18  45  Omundson Press Review Queue Notes................. 124
19  46  File and Serve Quick Guide - 03/16................ 126
20  47  iCourt e-Filing Training & Resources Webpage...... 129
21
22              --o0o--
23
24
25

---

**Page 4**

1   REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
2       Friday, November 11, 2022; 8:05 a.m.
3                 --o0o--
4
5   SARA OMUNDSON,          witness herein, having been
6                      first duly sworn on oath,
7                      was examined and testified
8                      as follows:
9
10              E X A M I N A T I O N
11  BY MR. FETTERLY
12      Q.  And good morning.  Can you please state and
13  spell your name for the record?
14      A.  I'm Sara Omundson.  It's S-a-r-a, and the last
15  name is O-m-u-n-d-s-o-n.
16      Q.  And thank you, Ms. Omundson.
17          I'm Jon Fetterly, counsel for Courthouse News
18  Service, and I'm with the law firm Bryan Cave Leighton
19  Paisner.
20          I understand you've been attending this week's
21  depositions, so this is probably not the first time
22  you've seen me or been through the process; is that
23  correct?
24      A.  That is -- well, this is the first time I've
25  been through the process.  This is not the first time

---

1 (Pages 1 to 4)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 5

1    I've seen you.
2        Q.  Fair enough.  Fair enough.  I was -- I was
3    vague and ambiguous right out of the gate.
4        Have you been deposed before, Ms. Omundson?
5        A.  Once in about 1986 for about an hour.
6        Q.  And did that deposition have anything to do
7    with your position as the Administrative Director of the
8    Idaho Courts?
9        A.  No, it did not.
10       Q.  Okay.  I know you've observed these
11   depositions this week so I'll be pretty, you know, brief
12   in my introductory comments, but I still wanted to go
13   over a couple of things very briefly.
14       As you know, we have our court reporter taking
15   down everything that is said today to create a
16   transcript which means a few things.  First, we need to
17   make sure that we're not speaking over each other.  I'll
18   do my best to wait until you finish answering my
19   questions, and then ask that you please wait until I ask
20   them before you answer.
21       Do you understand that?
22       A.  Yes.
23       Q.  Also important that we respond audibly; no
24   head nods, hand gestures, any such things.
25       As far as the process that will play out after

Page 6

1    today, you know, the court reporter will record
2    everything in the transcript.  You will have an
3    opportunity to review that transcript.  You'll also have
4    the opportunity to provide comments on that transcript.
5    Typically, that entails corrections such as typos, you
6    know, minor immaterial clarifications.
7        You're not limited to that.  You could change
8    substantive responses, but we caution you against that.
9    If you do make a change from a "yes" to a "no," "no" to
10   a "yes," and such things, that type of a change, myself
11   or any other attorney in this case would be able to
12   comment on that and that could potentially be something
13   that would be, you know, presented to the court.
14       Do you understand that?
15       A.  Yes.
16       Q.  Okay.  You're here today in response to a
17   deposition notice that was previously marked as
18   Exhibit No. 1, and this is a deposition to Sara Omundson
19   in her official capacity as the Administrative Director
20   of Idaho Courts.  And so, in that capacity, you have
21   been presented here today as a witness.  Is that your
22   understanding as well?
23       A.  Yes.
24       Q.  And so just to be clear, because we're
25   proceeding today as a 30(b)(6) deposition with you as

Page 7

1    the witness on behalf of the Administrative Director of
2    Courts, the questions here today are not necessarily
3    limited to just your personal knowledge, but would also
4    include information known to you or available to you
5    that, you know, comes through your position and through
6    the office of the Administrative Director of Idaho
7    Courts.  Do you understand that?
8        A.  I do.
9        Q.  Thank you.
10       Is there any reason why we cannot proceed with
11   this deposition here today?
12       A.  Not that I'm aware of.
13       Q.  Thank you.
14       As we talked about, you've -- you've sat
15   through some depositions this week.  And did you attend
16   the deposition -- well, strike that.
17       Yesterday, we took the deposition of Tyler
18   Technologies, and specifically the 30(b)(6) deposition
19   of Tyler Technologies through their designated witness,
20   Terry Derrick.  Did you attend that deposition?
21       A.  Most of it.  There were a few moments that I
22   missed when I was going to my car and coming into my
23   house.
24       Q.  Understood.
25       Do you have any reason to disagree with the

Page 8

1    testimony that you heard from Mr. Derrick yesterday?
2        MS. DUKE:  Objection.  Overbroad.
3    Foundation.
4        Go ahead.
5        THE DEPONENT:  There were parts of it
6    that I did disagree with.  I -- there are parts of it
7    that I didn't have knowledge about, so I wouldn't have
8    the knowledge to -- to agree or disagree with parts of
9    it, and there were parts of it that I did agree to.
10       Q.  (By Mr. Fetterly) Okay.  What parts did you
11   disagree with?
12       A.  Well, I -- off the top of my head, I disagreed
13   with his -- I guess the way that I would phrase it is he
14   seemed exceptionally comfortable with security.  In my
15   experience, being that comfortable as opposed to
16   identifying levels of risk hasn't been productive, so I
17   would -- I would disagree with that.
18       I -- off the top of my head, I'm sorry.  I
19   can't -- I can't think of some of the other things that
20   I know at the time I was surprised to hear.
21       Q.  Okay.  When you -- with respect to
22   "comfortable with security," did you hear him say
23   anything specific with respect to security that you
24   disagreed with?
25       MS. DUKE:  Same objections.

2 (Pages 5 to 8)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

**Page 9**

1          Go ahead.
2          THE DEPONENT: He seemed very comfortable
3    with the security of the Odyssey system, the current
4    Odyssey system that Idaho has, and he also seemed to not
5    recognize any level of risk in regards to documents held
6    in the EFM.
7          Q. (By Mr. Fetterly) Do you have any reason to
8    believe that the testimony Mr. Derrick provided with
9    respect to security was inaccurate?
10         MS. DUKE: Foundation. Overbroad.
11         THE DEPONENT: I would -- I would need to
12   see specifics before I could say that a specific thing
13   was accurate or inaccurate. I can tell you that I don't
14   have the same level of comfort in the security of the
15   Tyler system that he has.
16         Q. (By Mr. Fetterly) Other than what we've just
17   discussed, were there any -- is there anything
18   concerning the testimony provided by Mr. Derrick
19   yesterday with which you disagreed?
20         MS. DUKE: Overbroad. Foundation.
21         THE DEPONENT: I can't think of anything
22   at this moment, no.
23         Q. (By Mr. Fetterly) Okay. Earlier this week, we
24   also took the deposition of a Ms. Jennifer Dvorak. Did
25   you attend that deposition?

---

**Page 10**

1          A. I did.
2          Q. Do you have -- was there anything -- strike
3    that.
4          Were there any parts of Ms. Dvorak's testimony
5    with which you disagreed?
6          A. Well, I -- I think she indicated that we had
7    not seen a demonstration of the press queue. And I know
8    she has not, but I have.
9          Q. Okay. And we'll get to that in a moment. Was
10   there anything else with respect to Ms. Dvorak's
11   testimony earlier this week with which you disagree?
12         MS. DUKE: Overbroad.
13         Go ahead.
14         THE DEPONENT: Nothing particular that --
15   that I can think of at this moment, no.
16         Q. (By Mr. Fetterly) Okay. You said that you have
17   seen a demonstration of a press review -- of the Press
18   Review Tool; is that correct?
19         A. Yes.
20         Q. And I said Press Review Tool. I believe you
21   said press review queue. For purposes of today, would
22   we agree that those are -- those are the same thing, or
23   the Press Review Tool is also known as the press review
24   queue and vice versa?
25         A. Yes.

---

**Page 11**

1          Q. Okay. And for purposes of today, I'll do my
2    best to just stick with press review queue even though I
3    understand that Tyler, in some materials, has identified
4    it as a Press Review Tool. I believe it's commonly
5    referred to -- well, strike that.
6          Well, let me ask you: Did you see a press
7    review queue by Tyler Technologies or did you see a
8    different court's -- a non-Tyler press review queue?
9          A. I had a demonstration. My attorney was with
10   me, and so I'm not sure if this is subject to privilege
11   or not.
12         MS. DUKE: I think you're okay to answer
13   some basics.
14         THE DEPONENT: Okay. Okay.
15         MS. DUKE: And obviously we're not
16   waiving a privilege in you getting a foundation of what
17   she looked for, Jon, but I think it's fair for you to
18   have an appreciation for it.
19         MR. FETTERLY: Sure. Sure.
20         Q. (By Mr. Fetterly) Go ahead, please.
21         A. Yeah. Tyler gave me a demonstration of a
22   press review queue or Press Review Tool.
23         Q. Okay. And so I think for clarity today, I
24   will use Press Review Tool to refer to the Tyler product
25   or the Tyler app, understanding that more broadly there

---

**Page 12**

1    are press review queues that are available from other,
2    you know, vendors at other courts. But if we're talking
3    about Tyler, so we have a common understanding, I'll do
4    my best to refer to the Tyler Press Review Tool.
5          When did you receive this demonstration from
6    Tyler of its Press Review Tool?
7          A. It was about two months after this litigation
8    was filed.
9          Q. And what were -- I want to exclude the
10   attorney-client element of this, so please don't speak
11   to anything that you discussed with your client [sic] or
12   vice versa.
13         But excluding that, what were the
14   circumstances leading up to this -- or kind of resulting
15   in this demonstration?
16         MS. DUKE: And, that, I think -- Jon, I
17   mean, I'm just trying to think what I would include if
18   it were a document on a privilege log. And I think you
19   have a right to know timing, a general explanation of
20   that she reviewed the -- the Press Review Tool with me
21   present, and you can presume me asking questions. I'm
22   not sure how much more I'd let her go beyond that, quite
23   frankly, to preserve the privilege.
24         MR. FETTERLY: Understood.
25         Q. (By Mr. Fetterly) Well, was someone from Tyler

---

3 (Pages 9 to 12)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 13

1  present during this demonstration?
2      A.  Yes.
3      Q.  And who was that?
4      A.  It was a woman, and she was giving the
5  demonstration.  I -- I don't know -- and it was -- I
6  don't remember her name.  I'm sorry.
7      Q.  Was this woman with you in person or did this
8  occur over Zoom?  What was the -- kind of the nature of
9  the meeting from that point of view?
10         MS. DUKE:  That's okay.
11         THE DEPONENT:  Over Zoom.
12     Q.  (By Mr. Fetterly) Okay.  Who all was present at
13  this Zoom meeting?
14     A.  My attorney, a former attorney, Carley Nelson,
15  who was at that time the acting Chief Information
16  Officer for the Idaho Supreme Court, myself, the woman
17  from Tyler, and I believe that was all.
18     Q.  And who was the former attorney?
19     A.  Anne E. --
20         MS. DUKE:  Henderson.
21         THE DEPONENT:  -- Henderson.
22         MS. DUKE:  With my firm.
23         THE DEPONENT:  Sorry, yeah.
24     Q.  (By Mr. Fetterly) I gotcha.  I didn't know if
25  you were referring to someone else.

---

Page 14

1          Okay.  So can you just walk me through kind of
2  how this demonstration -- how this demonstration went
3  forward in terms of kind of what you were shown and how
4  you were shown it?
5         MS. DUKE:  Okay.
6         THE DEPONENT:  So there was a PowerPoint
7  presentation very similar to, but I don't know that it
8  was identical, to the one that is currently in the
9  record.  So that was shown, and then they actually
10  showed a press review screenshot, essentially, of what
11  the queue looked like.
12          And then we talked about a few things
13  regarding access and methods to control access.  And
14  then we also talked about how the documents were --
15  essentially, that they were URL links.  I was trying to
16  figure out if there were copies that were -- like, if it
17  was a separate server, separate copy.  I -- I don't
18  believe I got answers at that point.  And they just sort
19  of explained and answered some of my questions.
20     Q.  (By Mr. Fetterly) Okay.  And what questions did
21  you have of them?
22     A.  I had questions about, you know, what this
23  looked like, what the -- how the system worked, what
24  database the system ran off of, how people accessed it,
25  what the capabilities were of controlling what was

---

Page 15

1  viewable.  We do have a lot of privileged or protected
2  documents that are filed through our e-filing system and
3  I wanted to know to what extent we could protect that.
4          Yeah, I think that's -- I -- I that was kind of
5  where I was with it.
6      Q.  And was Tyler able to answer those questions?
7      A.  Some of them.  Some of them, they were able to
8  answer.  Other questions, they were not able to answer.
9      Q.  Do you recall the questions that they were not
10  able to answer?

[redacted]

16  answer at that time about what file, what database the
17  system pointed to.  Those are the -- were the two that
18  stick out in my mind at the moment that I did not get
19  answers to.
20     Q.  Would you agree that those questions were
21  answered by the testimony Mr. Derrick provided
22  yesterday?
23     A.  I believe Mr. Derrick did testify regarding
24  those things, yes.
25     Q.  Okay.  And do you have -- do you now have an

---

Page 16

1  understanding of those things based on Mr. Derrick's
2  testimony?
3      A.  Yes.  I -- I have -- taking him at his word,
4  yes.
5      Q.  During the meeting with Tyler, the Zoom
6  conference with Tyler that we're discussing, did you
7  discuss with Tyler other state courts that are using the
8  Press Review Tool?
9      A.  I don't -- I don't recall that, no.
10     Q.  Okay.  So you didn't ask Tyler about the
11  experiences of other state courts that are using the
12  Press Review Tool; is that correct?
13         MS. DUKE:  Objection.  Misrepresents her
14  testimony.
15         THE DEPONENT:  I honestly don't recall.
16     Q.  (By Mr. Fetterly) Okay.  So as you sit here
17  right now, you couldn't say whether you asked Tyler
18  about the experiences of other courts that are using the
19  Press Review Tool?
20     A.  I don't remember doing that.
21     Q.  Did you take any notes from this meeting or at
22  the meeting?
23     A.  Not that I recall, no.  It was -- it was just
24  more of them showing me on my screen and me paying
25  attention and watching it.  I -- I don't -- I'm not sure

---

4 (Pages 13 to 16)

Courthouse News Service v. Omundson                          30(b)(6) Sara Omundson

---

Page 17

1    that there were notes to be taken. I wanted to
2    understand what -- what the discussion was about.
3        Q.  Following this meeting, did you discuss what
4    you had observed with other members of your
5    administrative office team?
6            MS. DUKE:  Without me being present, of
7    course.
8            THE DEPONENT:  Yeah. I -- I'm sure that
9    I have. I can't -- there's not a specific situation
10   where that has come up. I have had discussions about
11   the Press Review Tool with members of my staff. I'm not
12   sure whether or not, and I don't -- I don't believe it
13   was in regards to that demonstration, but I have
14   discussed the Press Review Tool with them.
15       Q.  (By Mr. Fetterly) Understood.
16           And I guess what I'm trying to understand is,
17   like, following this meeting, did you, you know, type up
18   a memo or a report for the administrative office?
19       A.  No.
20       Q.  Okay. Did you ask anybody else to type up a
21   memo or a report for the administrative office?
22       A.  No.
23       Q.  I believe that within the Idaho Courts,
24   there's a Court Technology Committee. Do I understand
25   that correctly?

---

Page 18

1        A.  The Court had historically had a Court
2    Technology Committee. I don't believe it has met since
3    maybe -- July, maybe, of 2016. There may have -- so I
4    started with the Court in July of 2016, and I honestly
5    don't remember them meeting after I started. It's
6    just -- it was a -- it was designed to get the project
7    started and then the focus was on implementation and it
8    hasn't met.
9        Q.  I see. So when you say "get the project
10   started," are you talking about the Idaho Courts'
11   adoption and implementation of the iCourt Odyssey
12   suite of products?
13       A.  So iCourt involves products that are new as
14   well as products that have been in existence for a long
15   time. iCourt is -- essentially, it was a way to wrap
16   in all court technology, and so the parts of that that
17   are new that were being rolled out included our
18   electronic case management system, the Odyssey program.
19   It included the -- what I refer to as "OFS," online
20   filing system. But other parts of it existed -- have
21   existed for, I want to say, probably a decade, and so
22   there are parts of it that were being rolled out and
23   that big part of it was the -- the online case
24   management system and the online filing system.
25       Q.  And when you say "online filing system," is

---

Page 19

1    that the Tyler eFile & Serve?
2        A.  Yeah. It was the OFS, yes. It's now
3    eFile & Serve. They have changed names, and I'm not
4    quite caught up on all of the name changes they've
5    implemented.
6        Q.  So if we're talking about, you know, the
7    e-filing system today, whether it's OFS or File & Serve,
8    we're talking about the Court's adoption and
9    implementation of the Tyler e-filing service; correct?
10       A.  Yes.
11       Q.  Okay. So, you know, following this
12   demonstration that you had via Zoom with Tyler, did you
13   report the contents of that meeting to anyone within the
14   administrative office for purposes of evaluating or kind
15   of considering the possibility of implementing a press
16   review queue or the Press Review Tool?
17           MS. DUKE:  Again, not including any
18   conversations where I was part of them.
19           THE DEPONENT:  I believe that I had a
20   conversation with Carley. Carley Nelson, again, the
21   acting CIO at that time. It wasn't about implementing
22   the Press Review Tool, but I believe I asked her to
23   follow up and try to get answers to the questions of
24   whether it was running -- whether that tool was running
25   on a -- on a Silverlight base or whether or not it had a

---

Page 20

1    different mechanism.
2           And, also, I believe I -- in fact, I know
3    I have repeatedly asked my team to figure out whether or
4    not that system's URL is pointing to the original
5    submission or a -- is there a copy that is made and it's
6    on a -- it's on a separate server. I know I've asked --
7    I had asked that question repeatedly, and so I think I
8    asked her to follow up on that as well.
9        Q.  (By Mr. Fetterly) And did Ms. Nelson report
10   back to you with any answers to those questions?
11       A.  I'm not sure that she did before she left our
12   employment. I think that the answer in regards to where
13   that points, I did not know the answer to that until, I
14   believe, last week, that it does point to the -- the
15   copy in the EFM system, the submission from the filer.
16           As far as it does -- the system does not run
17   on Silverlight, I think I learned that about a month
18   ago.
19       Q.  Okay. And then I know there were some
20   meetings between the administrative office and Tyler
21   earlier this year, and that was the subject of
22   Ms. Dvorak's testimony. Between this period of time
23   where you had the Zoom meeting with Tyler and then when
24   Ms. Dvorak was communicating with Tyler beginning in
25   about May or June of this year, during that interim

---

5 (Pages 17 to 20)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 21

1  period, were there any communications between the
2  administrative office and Tyler concerning the Press
3  Review Tool?
4       A.  I believe that Carley did have communications
5  with them.  I believe she was asking them some
6  questions.  Then, Carley left, and I asked Jennifer if
7  she would -- I was in the middle of budgeting, and I
8  didn't know if I needed to budget for an order from the
9  federal courts to implement something, so I asked her to
10  help me understand what the financial impact might be if
11  we were ordered to either institute Auto-Accept or the
12  press review -- a press review tool.
13       Q.  Okay.  And -- and did you -- and did she
14  perform that assessment?
15       A.  She did, to some extent.  So she provided me
16  with the security.  I also asked her to look at the
17  security issue because, at that point, I still didn't
18  have answers about whether it ran on Silverlight and
19  where the URL pointed.  So she did the security
20  assessment for me, and then I followed up and asked
21  another question about where does the URL point.  She
22  gave me an assessment of -- an initial assessment of
23  what she thought it would take to implement the Press
24  Review Tool.  We had a verbal conversation about that.
25       And then later, she followed up after her

---

Page 22

1  meeting with Tyler and provided me with -- and I don't
2  remember if it was a document or if we just had a
3  conversation, but with an assessment of essentially
4  this -- this is -- you know, it's hosted by Tyler.  This
5  is what it will take to implement it.  But she only has
6  a piece of that information, that's the security piece
7  and the technology piece.  There are other implications
8  that she was not -- she wouldn't be privy to.
9       Q.  Okay.  Well, what was -- what was her -- you
10  know, what were her assessments with respect to the --
11  the cost?
12       A.  That there would be -- that because it was
13  hosted by Tyler, that the hardware costs would be
14  minimal if there were any.  She told me that there would
15  be resource costs within the technology division.
16  Someone would have to manage the -- essentially, the
17  requests -- permission requests for log-ins, someone
18  would have to manage that; that there would be an
19  impact, but it was unclear what that impact would be on
20  our help desk.  That's our technology help desk when
21  someone has a problem with any -- any one of our
22  technology products, they either send an email or call
23  the help desk, but that because we didn't know how usage
24  would be, it was hard to estimate what that -- that
25  would be.

---

Page 23

1       As far as sort of what's within Jennifer's
2  realm, she did not give me an assessment of any kind of
3  a cost for -- and, in fact, I didn't know there would be
4  one until I heard testimony yesterday, a cost for
5  putting what I would say is sort of a bubble over that.
6       I -- I will tell you I am not a techie.  I
7  work hard to understand our technology, but essentially,
8  we've had to put some protections around other Tyler
9  products and we would have to add that same type of
10  protection on our -- any kind of a press queue to -- to
11  prevent any kind of -- or at least catch any kind of
12  nefarious actions.
13       Q.  When you say "bubble," what do you mean?
14       A.  Yes.  That's -- sorry, that is -- that is my
15  version of a tech term.
16       So I'll give you -- if I could use the
17  iCourt Portal, which is the access to the register of
18  actions, as an example.  We have a portal that the
19  public can use.  It is a public-facing website that
20  people can use to see the register of actions of cases.
21       Q.  Yup.
22       A.  And then it's also used by justice partners
23  who actually can log in and see documents in cases.
24  That portal has been difficult to maintain.  We've had a
25  lot of problems with keeping it up and running.  It's a

---

Page 24

1  critical component for certain justice partners to be
2  able to see information they need to do their jobs, and
3  it was consistently crashing, consistently slow.  We had
4  Tyler working on it.  They even were working on
5  rewriting some of the code for it.
6       When Jennifer came on, she recognized that we
7  didn't have it secured in certain ways.  She added more
8  security to it to prevent things like web crawlers.  And
9  as a result of that, it's only been down once in, I
10  believe, the last eight months.  And so putting those
11  security things around it so that it is functional is
12  critical.
13       Q.  Great.
14       I believe there was some testimony yesterday
15  about being able to put a firewall around Tyler
16  products.
17       A.  Yes.
18       Q.  Was that part of the bubble you're referring
19  to?
20       A.  That would be one part of it, one piece of it,
21  yes, but it's not sufficient on its own to protect it.
22       Q.  Okay.  So is the administrative office now
23  content with the level of security it's been able to add
24  to the iCourt portal?
25       A.  Content is a -- a broad term, and I would say

---

6 (Pages 21 to 24)

Courthouse News Service v. Omundson                                    30(b)(6) Sara Omundson

---

**Page 25**

1  I'm not content.  I would say I feel better that it is
2  consistently running.  I would say that keeping that up
3  and -- and available to our justice partners is an
4  absolute critical component so I feel better about that.
5  I'm not sure that I would ever use the word "content"
6  when it comes to our court technology.
7       Q.  Understood.
8       But if I understand you correctly, the
9  court's -- you know, the court technology division or
10 the information technology division has been able to
11 perform its own work to, I guess, increase or add to the
12 security of the Tyler iCourt Portal; correct?
13      A.  Yes, it has.
14      Q.  And I understand that technology is
15 ever-evolving, so I appreciate your comment on
16 contentedness.
17      Is it your understanding that the court
18 information technology division is able to, you know,
19 continuously monitor and take steps necessary to improve
20 or address security as best it can?
21      MS. DUKE:  Object to the form.
22 Overbroad.
23      Go ahead.
24      THE DEPONENT:  We are absolutely working
25 on that.  Hiring Jennifer was a critical component to us

---

**Page 27**

1       A.  To the Portal?  To Tyler's Portal?  Sorry.  So
2  the Portal is actually a Tyler product.  It's the --
3  it's the Tyler portal.  Have we put more security on it?
4  Well, the -- the -- yes, Jennifer has added security
5  since she has started.  I mentioned that.  I -- I
6  couldn't name a particular -- I can't name a particular
7  instance before that when we were adding more security.
8       Q.  Okay.
9       A.  Yeah.
10      Q.  Has Tyler ever told you you cannot or should
11 not take such steps to add additional security to the --
12 to the solutions or apps it has provided?
13      MS. DUKE:  Objection.  Overbroad.
14      THE DEPONENT:  I have not been told that.
15 I am not aware of them telling my staff that either.
16 I'm not aware of that.
17      Q. (By Mr. Fetterly) Earlier, you said that you
18 don't have the same level of comfort with the security
19 of Tyler systems as Terry Derrick seemed to have.  Do
20 you recall that testimony?
21      A.  I do.
22      Q.  Are the Idaho Courts planning to transition to
23 a different software system for its e-filing and case
24 management functions?
25      A.  For the case management functions, yes.  We

---

**Page 26**

1  addressing our security concerns.  I would not say that
2  we are -- that we have solved the issues that we need to
3  solve yet, but we are definitely moving in that
4  direction.
5       Q.  (By Mr. Fetterly) Okay.  Are you aware of any
6  current problems with the security of the iCourt
7  Portal?
8       A.  Of the Portal.  Well, I -- we are currently
9  investigating a log-in issue in which we learned that
10 credentials for Tyler are not entirely separated by
11 the -- whoever has granted those credentials, so we're
12 in the process of investigating that and what that might
13 mean.  And whether or not that is or is not a security
14 issue, we don't have an answer on that one yet.
15      With the Portal, I think that's the only issue
16 going on at the moment.
17      Q.  Okay.  And if I understand correctly, the
18 Portal is the app that provides the public access to the
19 Court's case management system?  Do I understand that
20 correctly?
21      A.  Information from the case management system.
22      Q.  Correct.
23      Has the Court taken any steps to provide
24 additional security to the -- to the Odyssey case
25 management system app?

---

**Page 28**

1  recently sought and received approximately $20 million
2  from the Idaho Legislature to do that.  It is -- we are
3  calling it our "ARPA project" because it will be funded

---

7 (Pages 25 to 28)

Case 1:21-cv-00305-DCN   Document 60-6   Filed 12/15/22   Page 10 of 59

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson



Page 29

1      Q.  (By Mr. Fetterly) Okay.  And I just want to
2   make sure I understand this because you're -- I believe

Page 31

1   What's the acronym there?
2      A.   ARPA is the American Rescue Plan Act.  It's --
3   it was federal funding that was given to each of the
4   states to achieve certain things.  We -- our focus in --
5   the Idaho Supreme Court requested an appropriation from
6   the Idaho Legislature, which -- it received not quite
7   $20 million, which will help us build more effective and
8   it increases our cybersecurity.  It increases our
9   ability to access and work from remote locations when
10  there are things like pandemics or fires or floods.
11  And, yeah, so -- so we received ARPA funding for it so
12  we call it the ARPA project.

17      Q.   Is the Court planning on continuing its
18  relationship with Tyler with respect to the case
19  management system and other systems once that project is
20  complete and implemented, or are the negotiations with
21  Tyler kind of a bridge until you get there?
22      A.   What -- I -- I don't have any -- any -- we've
23  not been investigating changing vendors, if that's, I
24  think, what you're asking me.  We are not investigating

Page 30

19      Q.   Got it.
20          So I guess we'll try to wrap this up because
21  I'd like to spend some time on other topics.  I just
22  want to understand, as part of this -- this project, you
23  called it the "ARPA project"; correct?
24      A.  Yes.
25      Q.   And just for the record, what does that mean?

Page 32

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

ER-1629

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 33

25    Q.  That's okay.  It's okay.  We're getting very

---

Page 34

1   technical, and I'm going to try to pull out right now
2   because we need to move on.
3         I just want to try to understand.  We're
4   talking about the technical -- the Court/Tyler side of
5   things.  From the public/press side of things, is the
6   Court contemplating any changes that would kind of
7   materially impact how the press or public would, you
8   know, see documents or access them when they use the
9   services?
10    A.  Yes.
11    Q.  Okay.
12    A.  I can -- yeah, I can tell you that.  I've
13  mentioned the Tyler Portal.
14    Q.  Yes.
15    A.  And that is -- that is -- that was -- the
16  initial plan with that was to make that an option for
17  the public, attorneys, justice partners, that everyone
18  could use that to review court documents.  Because of
19  its instability, because of our inability to keep that
20  running in a -- in a way that just justice partners can
21  use it effectively, we have repeatedly asked Tyler to
22  build upon it, improve it, make it work better.  They
23  had agreed repeatedly to do that.
24        In October of 2019, Tyler told us that they
25  would not be putting investment -- investing in

---

Page 35

1   improving that Portal.  I immediately pivoted to talking
2   with other vendors to see if we could build our own.  As
3   you may recall, in March of 2020, as we were starting
4   those conversations, things changed and I had to focus
5   my IT staff on implementing remote court proceedings and
6   livestreaming of court proceedings, and our focus just
7   had to shift.
8         I started talking with a company out of
9   Seattle about a year ago about building us a new portal.
10  We are continuing to talk about that.  I have some
11  funding set aside in the budget this year.  The Supreme
12  Court included within our spending plan this year some
13  dollars to start that project of building a new portal,
14  and we -- we have a bid from this company to build it
15  for us and to help us implement that.
16        We've not signed a contract with them yet
17  because we are talking about the limited dollars
18  available and what we can get within the scope of those
19  dollars for this fiscal year versus the next fiscal year
20  versus the next fiscal year.  But it has been the bane
21  of my existence that we don't have a portal that does
22  the things that we would really like it to do, and so we
23  are in the process of building that out, including
24  defining use cases for that.
25        I do want to be clear that that would not

---

Page 36

1   include -- what is within the scope of that project
2   right now would not include the type of press queue that
3   is being described in this lawsuit simply because that
4   is designed to run off the case management system and
5   not off of the EFM.
6     Q.  Understood.
7         So the portal that the Idaho Courts is
8   currently exploring would be a portal that would display
9   information from documents in the case management
10  system; is that correct?
11    A.  Yes.  It would be -- it would be built to run
12  on the case management database.
13    Q.  Okay.  As part of these kinds of conversations
14  about changes, has the Court considered changing its
15  e-filing service or building its own e-file manager?
16    A.  That is not within the scope of that project,
17  no.
18    Q.  Okay.  So is it the Court's intention to
19  continue using Tyler -- the present intention to
20  continue using Tyler Technologies for its e-filing
21  solution and the Tyler eFile Manager?
22    A.  Yes.  Although, that wouldn't be the only
23  option.  If another company wanted to come in and
24  provide e-filing services, there's -- we would certainly
25  be willing to talk to any other company that wanted to

---

9  (Pages 33 to 36)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 37

1  provide those services as well.
2      Q.  When is the Tyler -- the current Tyler
3  e-filing agreement up for expiration or renewal?
4      A.  I want to say that we are in the second year
5  of a five-year contract is where I believe we are, but I
6  could be wrong about that.
7      Q.  Okay.  And have you -- has the -- I think you
8  maybe covered this, but as the -- of the conversations
9  with the potential vendor out of Seattle, have they
10  included any discussion of, you know, the creation of a
11  press review queue using the Tyler API for its Press
12  Review Tool?
13     A.  No, because we -- we've been talking with them
14  about building a portal built on the data, the case
15  management database, not on the EFM database.
16     Q.  Is there any reason why the Court has not been
17  talking to this vendor about possibly building a portal
18  based on the EFM or e-filing database?
19     A.  I have not had that discussion with them
20  because the Idaho Supreme Court's rules tell me that a
21  document is available to the public when it is placed in
22  a case file, and so I'm building -- I'm in negotiations
23  to have a system built on the case files.
24     Q.  Okay.  Is there any other reason why the Idaho
25  Courts are not currently talking to this other vendor

Page 38

1  about building a portal on top of the e-file manager or
2  e-file system?
3          MS. DUKE:  Object to the form.
4          Go ahead.
5          THE DEPONENT:  That would be an expansion
6  of the scope, an expansion of the services, and right
7  now, I'm trying to solve the problem of meeting our --
8  our current intentions, our current responsibilities.
9  As opposed to expanding them, we need a portal that does
10  what we promised it will do.  I haven't expanded
11  the scope to something that is not within the policies
12  of the Idaho Supreme Court.
13     Q.  (By Mr. Fetterly) So is it your position that
14  the -- the policy of the Idaho Supreme Court kind of
15  precludes exploration or expansion of the project to
16  include access to new complaints that are, you know,
17  received into the e-filing system or the EFM but not yet
18  in the case management system?
19     A.  So it's the policy of the Idaho Supreme Court
20  explicitly stated in Idaho Court Administrative Rule 32.
21  That -- that's where it tells me what documents are to
22  be available to the public.  In there, in regards to
23  pleadings, it tells me that those are documents which
24  appear in the case file within the case management
25  system.  And so in scoping this project, I have scoped

Page 39

1  it to that policy.
2      Q.  Understood.
3          Other than Rule 32, are there any other, you
4  know, rules or bases for the statement of policy that
5  you just identified?
6      A.  I think, as far as a basis for that policy, I
7  would look at the rule itself.  It specifically
8  articulates the things that Idaho Supreme Court took
9  into consideration in establishing the policy of what is
10  public.
11         And if what you're asking is if I have other
12  concerns about posting submissions -- submitted
13  documents before they are placed in the -- the case
14  management system, reviewed and placed in the case
15  management system, I do have other concerns.  But at its
16  core, I'm responsible for implementing what the Idaho
17  Supreme Court tells me is the -- are the rules of the
18  Idaho Supreme Court.
19     Q.  Understood.  And we'll get to those other
20  concerns in just a moment.
21         I'm just trying to understand, when you're
22  talking about the Idaho Supreme Court, what are you
23  pointing to specifically that would be direction or
24  instruction from the Idaho Supreme Court?  And I believe
25  you've identified Rule 32.

Page 40

1      A.  Yes.
2      Q.  Are there any other rules or are there any
3  other orders?  Memos?  Any other things that you would
4  consider direction from the Idaho Supreme Court?
5      A.  So I would be looking at a number of rules
6  including the e-filing rules.  Rule 32 is truly the --
7  the basis that I go to to determine what should and
8  shouldn't be made public and what the process --
9  processes are for addressing that.
10         The e-filing rules supplement that, in that
11  they tell me, you know, when something is filed, when it
12  is in -- transferred into the case management system.
13  There are other rules as well, in the civil rules, in
14  the family law rules, that address things like cover
15  sheets and what has to be in a cover sheet and whether
16  or not a cover.  So there are various rules that I look
17  at with sort of the foundation being Rule 32.
18     Q.  Okay.  So you've identified Rule 32.  The
19  e-filing rules, I think that's also referred to as the
20  IREFS in Idaho?
21     A.  Yes.
22     Q.  The Idaho Rules of Electronic Filing and
23  Service?
24     A.  Yes.
25     Q.  Okay.  So Rule 32, IREFS -- I-R-E-F-S, for the

10 (Pages 37 to 40)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 41

1  record.
2       And you cited sort of the general rules of
3  civil procedure.  Would that be with respect to civil
4  cases?
5       A.  So there are references to certain documents;
6  certain protections for documents in the civil rules.
7       Q.  Mm-hmm.
8       A.  There are also some references in the family
9  law rules.  I think there's also some references in the
10 criminal rules in regards to search warrants.  There are
11 just a few rules in -- out there that define things like
12 a family law cover sheet that help explain what
13 information is protected.
14      Q.  Okay.  And excluding family law, I believe
15 there's a general understanding, in this case, that
16 we're talking about, in Idaho, the civil cases that
17 would have the case type of AA or those kind of AA1
18 through 6.
19      Can you identify any particular rules of civil
20 procedure that would apply to those initial filings, AA1
21 through 6 that would kind of inform the -- the policy
22 decision that we're discussing right now?
23      A.  I can't name a rule off the top of my head,
24 but I want to be clear.  The -- the documents that are
25 listed in AA don't have any different designation than

Page 42

1  any other public document.
2       So Rule 32 defines, essentially, three types
3  of documents.  There's public documents, so documents
4  available to the public.  There are exempt documents.
5  Those are documents that are presumed not available to
6  the public.  And then there are sealed documents or
7  redacted documents that require court action to protect
8  either the entire document or portions of that document.
9  So, in my world, I focus on public documents, exempt
10 documents, and sealed documents.
11      Q.  Understood.
12      So if I understand your testimony, you're
13 saying Rule 32 would apply to all -- all filings or
14 documents notwithstanding filing type or case type; is
15 that correct?
16      A.  Yes.
17      Q.  Okay.  And then you -- I'm just trying to --
18 and then, you know, the e-filing -- e-filing rules or
19 IREFS, and would your testimony be the same there that
20 the IREFS would apply generally with respect to all
21 filings?
22      A.  IREFS apply to all filings.  To be clear,
23 there are IREFS themselves that actually require certain
24 things to be filed conventionally, meaning in paper.
25      Q.  Mm-hmm.

Page 43

1       A.  And so they -- the IREFS apply to the extent
2  they define what has to be filed electronically versus
3  what has to be filed conventionally.
4       Q.  Mm-hmm.
5       A.  And then also outlines who has to file, so
6  even things that an attorney would be required to file
7  electronically, someone who is pro se could still file
8  conventionally.
9       Q.  Okay.  And then -- and then -- so setting
10 aside then Rule 32 and the IREFS, you identified the
11 rules of civil procedure.  Can you identify any
12 particular rule of civil procedure that applies to
13 initial civil filings of the AA type that would also
14 support the policy decision you've identified of not
15 making complaints available until after they are in the
16 case management system?
17      A.  So I can't think of a rule off the top of my
18 head, but I do want to offer a caveat.  The documents
19 are immediately available as soon as they are
20 file-stamped by the court clerk, so I would say that as
21 soon as they -- and I know that this is a disagreement,
22 but as soon as they are reviewed and file stamped, they
23 are immediately available on the kiosks within the
24 courthouses.
25      Q.  Understood.

Page 44

1       Would you also agree that the documents are
2  not immediately available at the kiosks or elsewhere
3  upon their receipt into the e-filing system or the EFM?
4       A.  With the exception of in the clerk's queue, I
5  would agree that documents submitted by a filer are not
6  available to the -- any -- anyone but the clerks until
7  after they have been accepted and file stamped.
8       Q.  Gotcha.  So -- so newly e-filed documents --
9  let me strike that to avoid an objection and a dispute.
10      Documents that are electronically submitted to
11 the court and received into the e-filing system or EFM
12 are not available to the press or public until after the
13 court clerk takes the actions required to, you know,
14 accept them and they go into the Court's case management
15 system; correct?
16      A.  If they are accepted by a clerk, yes.
17      MR. FETTERLY:  Okay.  I'm -- I'm going to
18 switch topics here.  We've been going for about one
19 hour.  Can we take another five-minute break?
20      MS. DUKE:  Sounds great.
21      MR. FETTERLY:  Off the record.  Thanks.
22      (A break was taken from
23       9:06 a.m. to 9:21 a.m.)
24      (Exhibit No. 39 marked.)
25      Q.  (By Mr. Fetterly) Okay.  Ms. Omundson, we're

11 (Pages 41 to 44)

Courthouse News Service v. Omundson      30(b)(6) Sara Omundson

---

Page 45

1  back on the record, and I'm going to show you a document
2  that we have marked as Exhibit No. 39. And this is a
3  discovery document served in this case by your counsel,
4  and it's titled "Defendant's Supplemental Responses to
5  Plaintiff's First and Third Set of Interrogatories."
6       Do you see that?
7       A. I do.
8       Q. Okay. And I'm going to -- and have you seen
9  this document before?
10       A. Yes, I have.
11       Q. Okay. And do you understand that this
12  document contains responses prepared and served by your
13  counsel in response to interrogatories or questions that
14  were asked by Courthouse News Service?
15       A. Yes.
16       Q. Okay. And I'm going to direct your attention
17  to Interrogatory No. 1 which states: "State all reasons
18  or justifications supporting the policy or practice of
19  withholding access to new e-filed civil complaints filed
20  with the Idaho District Courts until after those
21  complaints have been processed or accepted."
22       In response, your counsel made a number of
23  objections. And then following those objections we now
24  have some text that says: "Subject to and without
25  waiver of this objection, Omundson responds that the

---

Page 46

1  policies and justifications for not providing access to
2  the documents that have been submitted but not yet
3  processed or accepted are as follows."
4       Do you see that?
5       A. Yes.
6       Q. And then following the part that says "are as
7  follows," we have a number of numbers, 1, 2, 3, and I'm
8  going to start to break those up and ask you questions
9  about them. Do you understand?
10       A. Yes.
11       Q. Okay. So --
12       MS. DUKE: And we'll get you a hard copy
13  if that's easier, too.
14       THE DEPONENT: Okay. It's a little --
15  I'll be honest, I'm not -- I wear glasses for a reason.
16  It's kind of small.
17       MS. DUKE: Jon, we're getting her a quick
18  printed copy.
19       THE DEPONENT: That's perfect. Right
20  there I can read it.
21       Q. (By Mr. Fetterly) Okay. So I am going to focus
22  right now on Number 1. Do you see that?
23       A. I do see that.
24       Q. So the first reason provided here or the first
25  justification provided here is Number 1: "The public is

---

Page 47

1  not provided with access to documents that have not been
2  processed or accepted because such documents are not
3  filed and not entered into the court's case management
4  system until they have been accepted."
5       Did I read that correctly?
6       A. You did.
7       Q. And does that response kind of reflect what we
8  were just discussing before the break concerning the
9  policy you identified for not providing access to
10  documents until they have been placed in the case
11  management system?
12       A. I'm not sure I entirely understand your
13  question.
14       MS. DUKE: And, Jon, are you in the
15  supplemental answer or the original answer?
16       MR. FETTERLY: Supplemental.
17       MS. DUKE: Okay.
18       THE DEPONENT: So to be clear, it is the
19  Supreme Court's policy that what is to be made available
20  to the public are those things that reside in the case
21  file, and so they don't reside in a case file until they
22  are accepted and filed. And my respons bility is to
23  implement that policy, and so that is -- that is what
24  I've done.
25       Q. (By Mr. Fetterly) And that's what we were

---

Page 48

1  discussing before we took our break?
2       A. Correct.
3       Q. And that's --
4       MS. DUKE: And, Jon, I think that's the
5  original answer. I'm sorry. Just what I'm looking at
6  is different than what you have up.
7       MR. FETTERLY: Oh, well, there's an
8  original -- let me ask a quick question and then I'll
9  revisit.
10       If I scroll down there's also a
11  supplemental answer as well.
12       MS. DUKE: Right.
13       MR. FETTERLY: And the supplemental
14  answer adds to the original answer? You didn't intend
15  to necessarily displace or withdraw this original
16  response?
17       MS. DUKE: I think we actually did with
18  our supplemental response. It doesn't mean that that's
19  not part of it, but we tried to include in full where
20  our supplemental answer was to make it easier. So I --
21  you can ask whatever you want on -- on the original
22  answer, that's not a problem, but the supplemental
23  answer's the most recent complete response.
24       MR. FETTERLY: I understand. So I -- and
25  I appreciate that. So just to be clear, this initial

---

12 (Pages 45 to 48)

Courthouse News Service v. Omundson                          30(b)(6) Sara Omundson

Page 49

1   answer that we're discussing right now has not been
2   withdrawn by Ms. Omundson by way of the supplemental
3   response. The supplemental response adds to or
4   supplements this original response; correct?
5           MS. DUKE: That's correct.
6        Q. (By Mr. Fetterly) Okay. So, Ms. Omundson, I --
7   you were just telling me about the -- your understanding
8   of the Idaho Supreme Court policy. And does this first
9   sentence of Number 1 reflect what you were just telling
10  me with respect to your understanding of the Idaho
11  Supreme Court policy? I'm not saying in full, but at
12  least is that what -- is that what this is referring to?
13  That's my question.
14       A. That is the -- the Supreme Court's policy in
15  Idaho Court Administrative Rule 32 is the basis for that
16  answer, yes.
17       Q. The basis for this first sentence of Number 1;
18  correct?
19       A. Yes.
20       Q. Okay. Before I move on to the second
21  sentence, I do want to then just go down to the
22  supplemental response, because in the supplemental
23  response that your counsel just identified, I believe
24  more is said on the subject.
25           I'm going to ask you to just read the

Page 50

1   supplemental response to Number 1. Can you see that?
2   Sorry. My -- let me help you out.
3        A. There we go.
4           Do you want me to read the whole thing?
5        Q. If you could just briefly read and review,
6   yes, the supplemental answer to Interrogatory --
7           MS. DUKE: To yourself.
8           THE DEPONENT: Oh, to myself.
9           You're not asking me to read it out loud?
10       Q. (By Mr. Fetterly) No.
11       A. Oh, I'm sorry.
12       Q. I want to ask you about it, and I'd like you
13  to please read it to yourself before I do.
14       A. Now, I -- I'm to the end of the page.
15       Q. Thank you.
16       A. Okay.
17       Q. Okay. And does this supplemental answer to
18  Interrogatory No. 1 -- is the basis for it also the --
19  your understanding of the Idaho Supreme Court policy as
20  reflected in Administrative Rule 32?
21       A. I think it is consistent with Idaho Rule 32,
22  but I don't know that I would say that the basis of that
23  response was Idaho Rule 32.
24       Q. Okay. Is there -- so let's just break up the
25  supplemental answer. So this Number 1, it says: "A

Page 51

1   document in the File & Serve system, one, is not filed
2   in the court's case management system and, therefore, is
3   not part of the court's docket and may never be."
4           So this is not necessarily limited to just the
5   Idaho Supreme Court Rule 32; is that correct?
6        A. I'm sorry. I don't understand what you're
7   asking me. Are you -- are you asking me if -- I would
8   say yes. The -- the Idaho Court Administrative Rule 32
9   defines what's available to the public. In there, in
10  regards to pleadings, it specifically says that what's
11  available to the public are the pleadings that exist in
12  the case file. And so I would say these documents have
13  not yet been accepted, they are not yet filed as a
14  result of that, and so they do not yet exist in a case
15  file as required by Rule 32.
16       Q. Okay. And so I -- is it fair to state then
17  that under the supplemental response, Number 1 here,
18  Number 2, Number 3, Number 4, those would all be
19  supported by the statement that you're saying right now,
20  that a document has not been accepted into the case
21  management system and is not part of the case file?
22       A. One, yes.
23           Two, as I understand it, a case is initiated
24  when a document is filed initiating a case. We call
25  them initial pleadings. It is not -- if it has not yet

Page 52

1   been filed, a case has not been initiated.
2        Q. Mm-hmm.
3        A. It is not relevant to the performance of a
4   judicial function. There's a few things that would
5   support that. One, judges don't have access to it yet,
6   so the -- the -- the public's view of monitoring judges
7   has not yet started because the judge doesn't have
8   access to it. It isn't in a case file, so the judge
9   can't act on it.
10          So I think it's more than just Rule 32. I
11  think your initial question was whether Rule 32 was the
12  basis for all of these, and I -- I wouldn't say it's the
13  basis for all of them.
14       Q. Okay. So -- and so for this Number 3, you've
15  identified Rule 32 and this other basis, which is the
16  judge doesn't have access to it.
17          Is there anything more that's the basis for
18  this Sub 3 for Supplemental Response to 1?
19       A. Well, it can't materially assist the public in
20  understanding the issues before the court because until
21  it's filed it's not yet before a court.
22       Q. Okay.
23       A. The issue has not -- not been placed before
24  the court yet. For Subsection 3, this kind of goes to
25  the second part of my answer above, which is I -- there

13 (Pages 49 to 52)

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

ER-1634

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 53

1  is concern that because these are not yet filed and may
2  be rejected, that the public could be mislead into
3  understanding that something is pending before a judge
4  when it is not yet pending before a judge.
5          So that -- trying to ensure that the public
6  understands when something is actually pending in a
7  court is important for people to understand the
8  integrity of the courts.  And so until something is
9  actually filed and moved into the case management
10 system, we want to make sure people aren't mislead into
11 believing that there is something pending before the
12 court.
13     Q.  Understood.
14         And I was asking initially in connection with
15 Rule 32, so let me just try it a different way.
16     A.  Mm-hmm.
17     Q.  Would you agree then that, in this
18 supplemental response, as we look at Numbers 1, 2, 3, 4,
19 and 5, that the basis for this response is your view
20 that a document has not been, "filed with the court
21 until it has been placed in the court's case management
22 system"?
23         MS. DUKE:  Object to the form as to "your
24 view."
25         Go ahead.

Page 54

1          THE DEPONENT:  I was about to say, my
2  view really isn't relevant.  It's what is the Supreme
3  Court's view, and if -- they've articulated in the rule
4  that I follow when -- when the court deems it filed.
5     Q.  (By Mr. Fetterly) Understood.
6          So I -- and I want to just be clear.  I'm not
7  asking about your personal view.  I used "you" in the
8  context of you here as the designated representative on
9  behalf of the Administrative Office of the Idaho Courts.
10         So is it -- let me just try it again.  As we
11 look at these subpoints 1, 2, 3, 4, and 5 under the
12 Supplemental Response to Interrogatory No. 1, is it fair
13 to say -- fair to state that each of these
14 justifications in the supplemental response are based on
15 the, you know, administrative office's understanding
16 that a document -- that a document has not been, "filed
17 until it is placed in the case management system"?
18     A.  So I want to go through each -- sorry.  I just
19 want to go through each one to make sure that I -- I
20 agree with what you just said in that context.
21         So is not filed in the case management system,
22 therefore, not part of the court's docket and may never
23 be.  So Number 1, the -- my answer would be yes.
24         Does not initiate a case.  That's not actually
25 out of Rule 32.  That would be in relation to the civil

Page 55

1  rules, which state that a case is initiated with the
2  filing of a document, but, yes, it is based on -- on the
3  Supreme Court's definition of filing.
4          It is not relevant to the performance of a
5  judicial function because no case has been initiated
6  yet.  Covered that.
7          Cannot materially assist the public in
8  understanding issues before a court because there are
9  not issues.  The -- the portion of Number 3, the second
10 half of that that says, "Cannot materially assist the
11 public in understanding issues before a court because
12 such issues are not yet before a court" is in -- in part
13 because the judges don't have access to it.  Until it's
14 in a case file, the judges don't have an issue before
15 them.  They can't even access the filing.
16         Does not trigger legal obligations because no
17 case has been initiated yet.  Again, that goes to my
18 understanding that a case is initiated by the filing of
19 a certain document and the Idaho Supreme Court has told
20 me that's not filed.
21         Does not help the public in evaluating the
22 fairness and integrity of the court's proceedings
23 because no case has been initiated.  Yes, that's true.
24 That's in part based upon the definition of filed and
25 the definition of initiated, but it's also in part based

Page 56

1  on a concern that the public may misunderstand that
2  something has been filed when, in fact, it's not in a
3  case file in the case management system yet.
4     Q.  Understood.  So let -- let me -- thank you for
5  walking me through that.
6          I'm now going to go back up to the initial
7  response, and we were talking about the first sentence
8  of Number 1 before we went on to the supplemental
9  response.  I'm now going to direct your attention to the
10 second sentence of Number 1 for the justifications where
11 it states:  "Providing documents to the public before
12 they are in the court's case management system may
13 mislead the public to believe documents are court
14 filings when they are not yet filed and may never be
15 filed."
16         Did I -- did I understand that correctly or
17 did I read that correctly?
18     A.  Yes, I believe you did.
19     Q.  Okay.  So my question is:  What harm would
20 result from the public believing that a document was a
21 "court filing" when it was not yet in the court's case
22 management system?
23     A.  So my understanding of providing access to
24 case filings and the press reporting on case filings is
25 that the public has an interest in understanding how the

14  (Pages 53 to 56)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 57

1   courts are functioning, whether the courts are doing
2   their job, and how they're moving forward. Oftentimes,
3   cases will have requirements that judges perform
4   functions within a certain period of time. The clerks
5   have to perform functions within a certain period of
6   time. That period of time is premised upon the
7   initiation of a case.
8           By posting something that may never actually
9   end up in the case management system or may never end up
10  filed in the county in which it was originally
11  submitted, the public may have a misperception that the
12  justice system, that the court system is not functioning
13  as it should when, in fact, because they believe
14  something has been filed when, in fact, it isn't pending
15  before a judge. It hasn't been filed. It's not in a
16  case file within the court system.
17          So the public may be mislead into believing
18  that the court system is not functioning as it should
19  when it's functioning exactly as the Idaho Supreme Court
20  has set up the processes and the rules. And so it's --
21  it's the risk of misleading the public to believe that
22  the courts are not working in the way that they're
23  supposed to be working.
24              (Pause in the proceedings.)
25      Q. (By Mr. Fetterly) I -- I'm trying to understand

---

Page 58

1   your response, and I -- and I guess what I'm trying to
2   figure out then is, you know, what harm would result
3   from that? So I -- you've identified, you know, the
4   public could be -- strike that. Strike that.
5           Is there anything more that you would add to
6   that, or is that the extent of the -- you know, the
7   basis for this highlighted portion, the second sentence
8   of Number 1?
9       A. Well, I -- I would just summarize one thing
10  that I think Mr. Girdner and I very much agree on, and
11  that is making sure that the public understands the
12  integrity of the institution of the courts is important,
13  and that -- protecting that is of value to me.
14      Q. Understood. Understood.
15          So I'm now going to move on to Number 2 in
16  this response to Number 1. It's a fairly long response.
17  I'll read it and then we can break it up. But for the
18  second justification, you state: "Tyler Technologies'
19  Auto-Accept function has not been implemented because
20  this would allow documents to be filed and, therefore,
21  become part of the official record, even if the filing
22  requirements that exist in the Idaho Court rules, e.g.
23  payment of a filing fee and redaction requirements, have
24  not been met or the action had been filed in an improper
25  jurisdiction or venue, which would require judicial

---

Page 59

1   action that would add to the already incredibly busy
2   schedules of judges and their court staff."
3           Did I read this correctly?
4       A. Yes, you did.
5       Q. Okay. So this -- as I understand this
6   response, this is not necessarily limited to your
7   understanding of the Supreme Court policy based on
8   Rule 32, because we're talking about the Auto-Accept
9   function. So this would be access to documents that are
10  in the case management system; correct?
11      A. Correct.
12      Q. Okay. So what we're saying here is -- or, if
13  I understand you correctly, you're -- this response is
14  saying that the Auto-Accept Review has not been
15  implemented because, starting at the top, this would
16  allow documents to be filed and, therefore, become part
17  of the official record even if the filing requirements
18  that exist in the Idaho Court rules, e.g. payment of a
19  filing fee and redaction requirements, have not been
20  met.
21          And let me stop right there and we'll get to
22  the rest of the sentence in a minute. I want to just
23  understand what you mean when you say "even if the
24  filing requirements that exist in the Idaho Court rules
25  have not been met."

---

Page 60

1           Is there a -- well, I know we've discussed
2   that some. I'm just trying to better understand what
3   rules might be in play here. So let me show you a
4   different document. This will be Exhibit No. 40. One
5   moment.
6               (Pause in the proceedings.)
7               (Exhibit No. 40 marked.)
8       Q. (By Mr. Fetterly) I'm showing you a document
9   marked as Exhibit No. 40 produced in this case as SO 253
10  to 256 titled "Acceptance of Document Tendered for
11  Filing." It then goes on to identify a number of
12  categories of documents that can be -- or, I guess, must
13  be rejected, reasons and authority, followed by request
14  for correction identifying a number of categories,
15  reasons and authorities, followed by the Tyler
16  File & Serve drop-down options. There's 25 of them
17  listed on this document.
18          Ms. Omundson, do you know what this document
19  is?
20      A. Mr. Fetterly, I'm sorry, but you're not
21  sharing the screen.
22      Q. We've run into the technical issue that began
23  our day. One moment.
24              (Pause in the proceedings.)
25      Q. (By Mr. Fetterly) I'm now showing you the

---

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 61

1  document that I just summarized, and a copy of it has
2  been sent to the group through the Zoom chat function.
3         Ms. Omundson, let me repeat my question. Have
4  you -- do you know what this document is?
5      A.  I don't know what this document is.
6      Q.  Okay. It was produced by your counsel in this
7  action. Are you aware of that?
8      A.  I'm -- I'm assuming this is part of the
9  clerk's manual.
10        MS. DUKE: If you want to see the whole
11  document, I'm having it printed.
12        THE DEPONENT: I -- yeah, I'm just not --
13  yeah. I don't know where this came from.
14     Q.  (By Mr. Fetterly) Let me just start at the top
15  here. I'm just going to ask you to look at the -- I'll
16  read the top. It says: "A clerk must accept a document
17  tendered for e-filing unless specifically authorized
18  not to accept the document by statute or by the court
19  rules for the reasons below." It then identifies a
20  number of categories followed by reasons and
21  authorities.
22        Do you -- do you agree with the statement on
23  this document that, you know, a -- a clerk must accept
24  the document tendered for e-filing unless specifically
25  authorized not to accept the document by statute or by

Page 62

1  the court rules for the reasons below?
2      A.  So I would -- I would say that that sentence
3  is ambiguous, because I -- when I look at when a court
4  document can be rejected, I actually look at the Idaho
5  Rules of Electronic Filing and Service, the specific
6  rule that articulates when a clerk may reject a filing.
7         And I would also point out that I don't think
8  this document is accurate. For example, I would say
9  that it would be a misreading of ICAR 59 to say that a
10  clerk has the authority to reject a filing that is
11  submitted by a vexatious litigant.
12     Q.  Would that be true for paper filing versus
13  e-filing?
14     A.  Yes, it's for both.
15     Q.  Okay. Do you know -- do you know where this
16  document came from?
17     A.  That's what I'm trying to figure out, what
18  this document actually is. I don't know where this came
19  from.
20              (Exhibit No. 41 marked.)
21     Q.  (By Mr. Fetterly) Okay. Let me try this a
22  different way then, so I'm going to mark a different
23  exhibit.
24        This will be Exhibit No. 41. Bear with me.
25     A.  I --

Page 63

1      Q.  I want to bring up exhibit -- I'm sorry.
2  While I'm bringing up Exhibit 41, let me just ask, do
3  you -- do you know who might know where that document
4  came from?
5      A.  I -- I don't. I honestly have no idea where
6  this came from, so I want to -- I'm wondering if this
7  might have been on our system when we put the -- the
8  software on our system to pull anything that might be
9  relevant.
10     Q.  But your testimony is that you've not seen
11  that document before today?
12     A.  No. This is the first time I've -- I've ever
13  seen this.
14     Q.  And -- and do you know of anybody who would
15  know where that document came from or what it might
16  purport to be?
17        MS. DUKE: Don't speculate.
18        THE DEPONENT: Yeah. I -- I could ask.
19  I -- I know who I would ask if they recognized it, and
20  that would be my court operations folks.
21        This is my understanding of our court
22  operations manual. I don't know if that's where this
23  came from, although, I would be disheartened if that
24  were the case.
25     Q.  (By Mr. Fetterly) Well, I -- I would like to

Page 64

1  know. It's been produced in this case, and it seems to
2  be pretty, you know, relevant to this -- this line of
3  questioning and the interrogatory responses. So if you
4  could find out, if you could ask your operations
5  specialist, I'd certainly appreciate that. And I'd be
6  happy to take a very brief just two- or three-minute
7  break off the record so that you could do that and then
8  we can continue. We're not going to wait around, but
9  while we continue, maybe somebody could find the answer
10  to that question.
11        MS. DUKE: Well, and I could check with
12  our paralegal, too, to just get a context of where it is
13  in the production if that'll help. So...
14        MR. FETTERLY: Sure.
15        MS. DUKE: All right. So we'll just take
16  a quick couple-minute break?
17        MR. FETTERLY: Just a real quick
18  couple-minute break to get that ball in motion, and then
19  we'll come back and I can ask you about the operations
20  manual.
21              (A break was taken from
22              9:51 a.m. to 9:57 a.m.)
23     Q.  (By Mr. Fetterly) Ms. Omundson, before we took
24  our break, we were discussing the document that was
25  marked as Exhibit No. 40, and you were going to ask

16 (Pages 61 to 64)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 65

1  if -- or you were going to try to find out if you could
2  learn what this document is and where it came from.
3  Were you able to do that during the break?
4       A.  So here's what I learned.  This is a document
5  that was provided by a member of my court operations
6  team.  It was created -- it looks like it's from --
7  sorry -- October of 2016.  I don't have his phone number
8  and so I'm not able to reach him at this moment, but it
9  is not -- as far as I know, this is not in our clerk's
10  manual and it is not what we train to.
11       So this might have been something that he
12  used.  I don't know that this was ever part of our
13  clerk's manual.  It doesn't look like a piece of our
14  clerk's manual, but it's from 2016.
15       Q.  Okay.  And who was that member of your team
16  that created this document?
17       A.  His name is Michael Mehall.
18       Q.  And how is that spelled, Mehall?
19       A.  M-e-h-a-l-l.
20       Q.  Okay.  And you referred to the operations
21  manual.  Is that the -- the manual or the document that
22  you would refer to as the -- the better authority or the
23  authority for determining, you know, what documents may
24  or may not be rejected?
25       A.  The authority for what documents may or may

---

Page 66

1  not be rejected is actually the Idaho Rules of
2  Electronic Filing and Service, which specifically says
3  when a clerk is allowed to reject a document.  Whether
4  they do -- whether they do reject a document is
5  something that a -- an elected clerk is responsible for
6  determining in conjunction with their administrative
7  district judge within each district, and it does vary
8  around the state.
9       Q.  Okay.  So if we have the operations manual,
10  does that provide any guidance on determining, you know,
11  how or when clerks may reject filings?
12       A.  It does provide some guidance, yes, but the
13  rule is what controls, and it is really an ADJ that
14  defines for their district when a clerk will reject a
15  document.
16       Q.  And what do you mean by "ADJ"?
17       A.  Oh, I'm sorry.  In Idaho, we have seven
18  judicial districts.  And for each of those judicial
19  districts, there is an administrative district judge
20  that is a judge that is elected by the other district
21  judges within the district, and they are -- they are
22  responsible for and have the authority for
23  administration within that district.
24       Q.  Mm-hmm.  When -- when a -- when a clerk is
25  reviewing a document that has been submitted to the

---

Page 67

1  e-filing system and they're working in their clerk
2  review queue, if a clerk makes a determination that the
3  document should be rejected, are they required to
4  indicate that into -- in the clerk review during their
5  process?
6       A.  Indicate that.  Yes --
7            MS. DUKE:  Objection.  Objection.  Form.
8  I'm just not quite understanding, but go ahead.
9            THE DEPONENT:  Okay.  So I think I
10  understand what you're saying.  And if I don't answer
11  your question, please let me know.
12       So the court rule, the rules of
13  electronic filing say when a clerk may reject a filing.
14  Whether a clerk shall or should reject a filing is -- is
15  a decision that is made between the elected clerk and
16  the county and the administrative district judge.
17       When a clerk does reject a filing, they
18  do have to provide -- there's both a drop-down list they
19  can select from as well as comments that they can make
20  to explain to the person that's submitted it why it is
21  that it's being rejected that gives that person the
22  opportunity to fix whatever the error may be and
23  potentially resubmit it along with the original
24  envelope.  There's a three-day grace period in the rules
25  that if they do resubmit it and they include the

---

Page 68

1  original envelope and it is within three days, that the
2  filing date may relate back to the original submission
3  date.
4       Q.  (By Mr. Fetterly)  Okay.  So I'm -- I'm showing
5  you right now an exhibit that was marked as
6  Exhibit No. 41.
7       A.  Mm-hmm.
8       Q.  And this is the Idaho Court Operations Manual.
9  Do you see that?
10       A.  Yes.
11       Q.  And do you recognize this document?
12       A.  Yes, I do.
13       Q.  And is this at least the face page of the
14  operations manual?
15       A.  Yes, it is.
16       Q.  Okay.  We had a brief conversation off the
17  record about the operations manual, which is over a
18  thousand pages.  I'm not going to mark the entirety of
19  it as Exhibit No. 41.  Rather, what I have here as
20  Exhibit No. 41 is the face page.  I'm just going to
21  briefly scroll through followed by -- well, I'll need to
22  submit a corrected exhibit.  I intended to include the
23  table of contents.  So this does not have that.  We'll
24  work that out after the fact, but I am moving down to --
25  let's see.

---

17 (Pages 65 to 68)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 69

1    MS. DUKE:  It has the table of contents.
2    MR. FETTERLY:  Oh, there we go.
3    MS. DUKE:  Yup.
4    MR. FETTERLY:  The second time we've run
5  into the technical issue.
6    Q.  (By Mr. Fetterly) So we have the table of
7  contents, and I note that at table of contents here we
8  see Number 18, Odyssey File & Serve, OFS, at Page 1026.
9    If we scroll on down now past that, here we
10  have, 18, Odyssey File & Serve.  Ms. Omundson, do you
11  recognize this section that I'm showing you now
12  beginning at Page 1026 of the Operations Manual as being
13  Section 18 that relates to Odyssey File & Serve?
14    A.  Yes.  I believe that is our clerk's manual,
15  but -- thank you.  I appreciate that very much.
16    Yes.  This appears to be our -- well, it's
17  dated February of 2021, so, yes, that appears to be our
18  clerk's manual --
19    Q.  Okay.
20    A.  -- that we use to train clerks.
21    Q.  So I'm -- I'm scrolling down now through this
22  Section 18.  I want to direct your attention to a
23  portion of it that talks about reject the filing/request
24  a correction from e-filer.  Do you see that section
25  where it begins?

---

Page 70

1    A.  I do.
2    Q.  And it's followed by a Paragraph 1 and a
3  Paragraph 2.
4    Paragraph 2, select the reasons for rejection.
5  It identifies reasons annotated by letters A through the
6  letter T.  Do you see that?
7    A.  Yes, I do.
8    Q.  So a minute ago, you were providing testimony
9  regarding how a clerk would reject or return an e-filing
10  by selecting a reason and noting it in the system.
11    Does this document I'm showing you right here
12  identify the reasons that a clerk would have available
13  to them to select when rejecting a document?
14    A.  These are the most common reasons.  There are
15  other possibilities, but the list would, quite frankly,
16  be too long of a drop-down if all of them were included.
17  And so these are the most common reasons that are in
18  there, but they also have a comment section where the
19  clerk can -- can provide additional information to the
20  filer.
21    Q.  So if the -- does the -- do these reasons
22  include an "other" or a catch-all, some type of reason
23  that a clerk would select if they're choosing something
24  other than one of these identified reasons?
25    A.  They could -- they could select "N, please

---

Page 71

1  correct error and then see comment box to provide
2  explanation."
3    Q.  So are -- are the clerks in Idaho trained that
4  if one of these specific reasons is not reflected or --
5  if there's a reason for rejection that's not reflected
6  in these specific reasons, they can use "N, please
7  correct error" followed by comments to, you know,
8  explain to the filer the basis or the reason for the
9  rejection?
10    MS. DUKE:  Object to the form.
11  Foundation as to clerk training.
12    Go ahead.
13    THE DEPONENT:  Yeah.  So just to be
14  clear, the training of the deputy clerks is actually
15  done by -- initially done by the elected clerk in the
16  county.  They will get support from the local trial
17  court administrator and the ADJ.
18    The training that the Idaho Supreme Court
19  provides, I'm not sure if we have trained on this exact
20  thing recently.  We -- I know we trained the clerks on
21  this when Odyssey went live in different counties.  We
22  would have trained to this and we would have trained
23  that if the reason for rejection does not exist in this
24  list, you can put -- you can use a general explanation
25  and you can put more information in that box.  But the

---

Page 72

1  extent and level of training that each deputy clerk gets
2  is really done by the elected clerk.
3    We're in the process -- my office is
4  currently in the process of building out training for
5  new deputy clerks, but we only have two modules and they
6  wouldn't cover this.
7    Q.  (By Mr. Fetterly) And --
8    A.  We hope -- we hope to get there, we're just
9  not there yet.
10    Q.  Is it your understanding that this reason "N,
11  please correct error" is the general reason that could
12  be used?
13    A.  It is one of -- one of the reasons that could
14  be used, yes.  I -- they can select any of these from
15  the drop-down.  I -- I would hope they would be as
16  specific as possible in selecting from that, and then
17  they can put whatever other information explaining why
18  it's been rejected in the -- the comment section.
19    Q.  Okay.  But in any event, a clerk would be
20  required to select a reason for rejection if they are
21  rejecting an e-file document; correct?
22    A.  I believe so, yes.
23    Q.  And that is something that is prompted in the
24  clerk review queue in the File & Serve system; correct?
25    A.  Yes.

---

18 (Pages 69 to 72)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 73

1    Q.   And so the clerk, as part of their review of
2    the e -- of the document, if they are to reject it, they
3    would select one of these reasons and, if applicable,
4    apply comments in the comments box; correct?
5    A.   Yes.
6              (Exhibit No. 42 marked.)
7    Q. (By Mr. Fetterly) Okay. I'm going to show you
8    one more document. I guess this will be Exhibit No. 42.
9    One moment. If it will let me.
10             (Pause in the proceedings.)
11   Q. (By Mr. Fetterly) This is an Excel spreadsheet
12   that was produced by your counsel yesterday. I'm
13   putting it on the screen right now. One moment. It was
14   Bates labeled 5078.
15        And, Ms. Omundson, have you seen this
16   spreadsheet before?
17   A.   Yes, I have.
18   Q.   And do you have an understanding of what it --
19   what this data represents?
20   A.   It appears to be a listing of filings in the
21   AA fee category -- in the civil AA fee categories. I
22   don't know the period of time that it covers.
23   Q.   I'm going to scroll to the right because it's
24   a large document with many columns, but just to give you
25   a chance to see in its entirety.

---

Page 74

1        I'm going to focus your -- I'll represent to
2    you it was produced by your counsel in response to both
3    the document request and subsequent meet-and-confer
4    efforts to get a document that showed data for new
5    e-filed complaints in the AA fee category during an
6    agreed-upon time period, including rejection data along
7    the lines that we were just discussing in connection
8    with the operations manual.
9        So I understand your testimony that if a clerk
10   is to reject a filing, the Tyler e-filing system,
11   File & Serve, requires them to select a rejection reason
12   and, if applicable, provide comments.
13   A.   That is my understanding, yes.
14   Q.   Okay. So directing your attention back to the
15   spreadsheet now, Exhibit No. 41, as part of the data for
16   each of these filings, there's a code or a status of
17   either accepted or rejected. Do you see that?
18   A.   I do.
19   Q.   My understanding of this spreadsheet is that
20   the rejected -- for a document that has a status of
21   rejected, this reflects a document that would have been
22   rejected by a court clerk and who -- and a clerk would
23   have selected a rejection reason or code pursuant to
24   that rejection; is that correct?
25   A.   It appears so, yes.

---

Page 75

1    Q.   And so if we look at Status, Row K -- excuse
2    me -- Column K, Status, it's accepted or rejected.
3    Column L of this document is reject code. And if I open
4    this up so you can see what the reject codes are, this
5    appears to relate to the list of reject reasons that we
6    were just discussing in the operations manual. Is that
7    correct?
8    A.   I'm sorry. I don't have the manual in front
9    of me to compare the two, but I -- I would take your
10   word for that.
11   Q.   I don't want you to necessarily take my word.
12   I can switch screens back again to put that in front of
13   you given the nature of this --
14   A.   Hold on. I think -- I think Keely may have --
15        MS. DUKE: I do.
16        THE DEPONENT: Okay. Sorry. I've got my
17   copy. Okay. Sorry, I do have a copy. Hold on.
18   Q. (By Mr. Fetterly) Thank you.
19   A.   Can you tell me which page you were on
20   that?
21        MS. DUKE: I tabbed it. It's page
22   SO 1587.
23        THE DEPONENT: I'm sorry. Can you pull
24   up those codes again for me on the screen? There were
25   codes that you were asking me to compare.

---

Page 76

1    Q. (By Mr. Fetterly) Yes. So are you able to see
2    the spreadsheet on --
3    A.   Yes.
4    Q.   So just for the record, the witness is looking
5    at the Excel spreadsheet that was produced as SO 5708.
6    And, in particular, we are looking at Column L, Reject
7    Code, and I've opened up the column header to see all of
8    the available reject codes that are part of Column L.
9        So my question, Ms. Omundson, is: Do these
10   reject codes reflected on this spreadsheet under
11   Column L, do these correspond to the rejection reasons
12   that were identified in the operations manual as a basis
13   for rejection?
14        MS. DUKE: And I'll object to the extent
15   the -- the manual speaks for itself as does this
16   document. I'm not sure if you want her to take the time
17   to go through every single rejection, but if you do, we
18   can.
19        THE DEPONENT: Well, I -- they don't --
20   they don't match directly, so I'm not -- so I'll give
21   you an example of what I'm struggling with. This case
22   already exists, please file through the existing case,
23   and then I'm not sure that I see one that matches that.
24   Maybe that's duplicate.
25        PDF documents combined. Docs, maybe? I

---

19 (Pages 73 to 76)

Courthouse News Service v. Omundson                                    30(b)(6) Sara Omundson

---

Page 77

1  think it -- I'm not sure that I can -- I can -- I don't
2  know where these came from.  So I don't know where these
3  fields came from, and I'm -- I -- I don't -- I assume
4  that they match this reason for rejection, but I don't
5  know that for certain.
6      **Q.  (By Mr. Fetterly) Is there somebody who would**
7  **know?**
8      A.  They're very shorthand.
9          Yeah, my data team would know.  I'm sorry.  My
10  data team would know.
11     **Q.  Understood.  And that'll be just one more**
12  **follow-up question I'll ask you to inquire about.**
13     **But I just want to confirm that the testimony**
14  **is that if a filer were to -- excuse me.  If a clerk**
15  **were to reject a document that they were reviewing in**
16  **the clerk review queue, they would be required to select**
17  **a rejection reason; is that correct?**
18     A.  That's my understanding, yes.
19     **Q.  And in the clerk review queue, might that also**
20  **be the reject code that they would be required to select**
21  **as reflected on this spreadsheet?**
22     A.  I -- again, I don't know where these fields
23  came from.  I would -- I think that's likely, but I need
24  to confirm that with my data folks.
25     **Q.  Okay.  And I'm looking at this document, if we**

---

Page 78

1  **go on to Column M, Reject Comment, if a clerk were to**
2  **provide a comment, would this be the -- you know, does**
3  **this column reflect the comments that would have been**
4  **entered by the court with respect to a particular**
5  **filing?**
6      A.  I would -- yes.  There's -- that's what that
7  field appears to be, yes.
8      **Q.  Okay.  Thank you.**
9          **So I'm going to -- we can close this and set**
10  **this aside.**
11     A.  Can we take one second, please?
12         MR. FETTERLY:  Yes.  Off the record?  On
13  the record or off?  I'm sorry.
14         THE DEPONENT:  We can stay on the record.
15  I don't care.
16         I just want to ask Molly:  Will you just
17  email --
18         MS. DUKE:  I did.
19         THE DEPONENT:  Okay.  Got it.  I just
20  want them asking my data folks where that list -- those
21  fields came from.
22     **Q.  (By Mr. Fetterly) Thank you very much.  I**
23  **appreciate that.**
24         MS. DUKE:  And, also, as you've said, we
25  haven't quite had a proper break in the last about hour

---

Page 79

1  and 15 minutes.
2      Do you mind if we do that?
3      MR. FETTERLY:  Sure.  Ten minutes?
4      MS. DUKE:  Yeah, does that work?
5      MR. FETTERLY:  That does work.  Thank
6  you.
7          (A break was taken from
8  10:19 a.m. to 10:34 a.m.)
9      **Q.  (By Mr. Fetterly) Ms. Omundson, before we went**
10  **off the record, part of our questioning involved the**
11  **document that was marked as Exhibit No. 42, and this was**
12  **the spreadsheet produced by your counsel that included**
13  **information for AA filing fee-type complaints.**
14     **And, specifically, we were talking about a**
15  **column that had rejection codes.  During our break, did**
16  **you have an opportunity to speak to anybody on your team**
17  **regarding, you know, whether -- whether those codes**
18  **correspond with the rejection reasons that we were**
19  **discussing in the operations manual?**
20     A.  We have not heard back yet, but we sent a
21  message to ask if -- if those -- if that's what this is.
22  Yes.  We've asked -- we've asked the question, but we
23  haven't heard back yet.
24     **Q.  Thank you very much.  I appreciate that.**
25     **I'd like to direct your attention now back to**

---

Page 80

1  **Exhibit No. 39.  This is Defendant's Supplemental**
2  **Response to Plaintiff's Interrogatories.**
3      **And -- one moment.  Let me put this up on the**
4  **screen.**
5          **(Pause in the proceedings.)**
6      **Q.  (By Mr. Fetterly) Let me direct your attention**
7  **to the portion of the response to Interrogatory No. 1**
8  **that I have highlighted on the screen.  This is under**
9  **Sub 2 where it states:  "Which would require judicial**
10  **action that would add to the already incredibly busy**
11  **schedules of judges and their court staff."**
12     **And this response is with respect to the**
13  **Auto-Accept function.  And what I'm hoping you can**
14  **explain to me is:  What are the reasons or circumstances**
15  **where the auto-accepting of a nonconforming document**
16  **would result in or require judicial action?**
17     A.  So I think there are a number of situations
18  where that could arise.  So, for example, the Idaho
19  Supreme Court's policy has been to allow the clerks to
20  reject things because if they get rejected for these --
21  for failing to comply, there doesn't have to be a
22  judge's action to address issues.  My understanding, for
23  example, if someone submits a document that includes
24  information that should've been redacted but wasn't and
25  the clerk rejects that document, and then they can

---

Courthouse News Service v. Omundson                                    30(b)(6) Sara Omundson

Page 81

1   redact it and resubmit it and it can all be addressed
2   immediately without a judge's time and effort being
3   taken.
4           If a document is automatically accepted and
5   has information in it that should've been redacted,
6   under Idaho Court Rule 32, it requires a motion may come
7   in to redact that information.  It would absolutely
8   require a mandatory hearing.  It would require the court
9   to provide notice to any known interested parties, and
10  then the court would have to issue an order and make
11  certain findings as to why it is redacting information.
12  And so it takes less resources if that document is caught
13  judicial resources if that document is caught before it
14  comes into the system, returned to the filer, and
15  they're asked to redact in advance.  That's one example.
16      Q.  Okay.  I'd like to hear all of them that we
17  can.
18      A.  Oh, there's -- you know, I don't know that I
19  could get anywhere near all of them.  Another example
20  would be if someone -- if it was auto-accepted and the
21  judge determined that the person was not going to get a
22  fee waiver that they had requested.  The judge now has
23  to take action and -- and the court has to expend
24  resources to collect that fee, or the court has to have
25  a hearing to determine what to do with the action in the

Page 82

1   absence of the fee being paid.
2           Essentially, there are things right now that
3   are being caught on the front end that can be quickly
4   and easily fixed.  For example, it's not an unusual
5   occurrence, I think, to have something filed in Adams
6   County that should've been filed in Ada County.  Once
7   it's -- if it's auto-accepted, that action in Adams
8   County would have -- the judge would have to address it
9   and dismiss it -- potentially dismiss it so that it
10  could be refiled in the correct county.  So it just --
11  it's -- it's cleaning up those smaller errors that could
12  have been addressed on the front end without taking up
13  additional judicial resources in addressing them.
14      Q.  You mentioned the -- your second example was
15  fee waiver.  Are fee waiver applications limited to only
16  pro se filers in the state of Idaho?
17      A.  No.
18      Q.  So a -- a plaintiff represented by counsel
19  would be able to request a fee waiver?
20      A.  I don't think there's any limitation on
21  requesting it.  Whether they would get it is, I think, a
22  different question.
23      Q.  Okay.  Do you have an understanding of who is
24  entitled to a fee waiver in the state of Idaho?
25          MS. DUKE:  Form and foundation.

Page 83

1           THE DEPONENT:  It would be in the -- the
2   court rules.  I -- I can tell you that I -- I've seen
3   actions where fee waivers have been requested especially
4   by -- so, for example, the ACLU may enter an appearance
5   on behalf of someone who is indigent and they could
6   request a fee waiver.
7       Q.  (By Mr. Fetterly) So we've identified three
8   examples so far.  The first was fee waiver.  The second
9   was a fee waiver example.  The third was wrong county.
10          Are there any other, you know, reasons you can
11  think of why a nonconforming document, if auto-accepted,
12  would require judicial action?
13      A.  If -- if you're only asking about those things
14  that are nonconforming documents, those are the ones
15  that come to me off the top of my head.
16      Q.  Okay.  And you -- when I'm talking about
17  nonconforming, I -- let me try again.  I'm also just
18  referring to any reason for rejection, because my
19  understanding is, you know, we're talking here about
20  Auto-Accept and that the clerk review process, which
21  provides the clerk the opportunity to accept or reject,
22  is the intervening thing that would be removed in the
23  Auto-Accept Review.  Is that correct?
24      A.  Okay.  Yes.  And so here's another example
25  that is outside of maybe a non -- "nonconforming," and

Page 84

1   how that impacts a clerk on the other end if Auto-Accept
2   were to be put into place.
3           So, for example, it is not an unheard
4   experience to have someone submit -- when documents come
5   in, they come in in a single envelope.
6       Q.  Mm-hmm.
7       A.  Right?  So all the documents for that case are
8   to be placed in a single electronic envelope within the
9   clerk's queue before they are accepted and file stamped
10  and brought into the system.  The clerk is -- they check
11  each of those documents.
12          So let's assume for a second that someone is
13  filing an initial filing, and then along with that, they
14  are filing additional documents.  Right?  So it's a
15  complaint and then there are additional documents that
16  go with that complaint.  If one of those has been
17  photocopied and it did not come through properly, in the
18  clerk's review queue, the clerk has all of those
19  documents together in one place and has direct
20  communication with the person who submitted it.
21          So they can reject that envelope of documents,
22  send it back to the person, and say, "Document X did not
23  come through in read -- in a readable fashion.  So all
24  of these need to come through together.  This one didn't
25  come through properly.  Can you send us a clean copy

21  (Pages 81 to 84)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

| Page 85 |
| --- |

1   that we can read?" The clerk has direct communication
2   with that submitter.
3          With Auto-Accept, all of those documents come
4   in and there are two implications to that. One, is they
5   do not -- they're not all in the same place. Right?
6   When they come into the case management system, they
7   don't all come in in a single envelope. They come into
8   different places, so to review those documents, the
9   clerk has to go through different tabs to see where --
10  what those documents are. That's one thing.
11         The second thing is if the clerk does find a
12  problem, the service address that exists within the case
13  management system where the clerk -- or, sorry -- the
14  service address that exists within the -- the e-filing
15  system does not come along with it, and so the clerk has
16  to figure out: How do I get in touch with this filer?
17  It may be an attorney that they know the email address
18  and can very easily email that person. It may be a pro
19  se person that you hope has put their email address on
20  the filing so that you can contact them that way.
21         But that case -- the case management system,
22  once something is in there, the way that a clerk
23  communicates is different than it is in the -- the
24  electronic filing system so it takes more clerk time to
25  go through and find all of the different documents,

| Page 86 |
| --- |

1   address those documents, and communicate with the
2   submitter.
3          In addition, even though they're communicating
4   with the submitter, if -- if the system was used to also
5   communicate with the people it was served on, they
6   wouldn't -- that is gone. Right? The clerk would only
7   be communicating with the submitter and not necessarily
8   with others who received copies of those documents. So
9   it's just -- it changes the amount of clerk resources
10  once it is in the case management system.
11     **Q.  So under this description of what would happen**
12  **under the Auto-Accept system, you said it would take**
13  **more clerk time. How much more clerk time would it**
14  **take?**
15     A.  I think that depends on the number -- so if
16  you're talking about a single case, how much more clerk
17  time would it take if -- for each individual filing? Is
18  that what you're talking about? Sorry.
19     **Q.  Yes, start there. Yeah. On a per filing**
20  **basis, do you have an understanding of how much more**
21  **time would -- would be required?**
22     A.  So my understanding, based on
23  Margaret Molchan's affidavit, is they would anticipate a
24  few more minutes for each filing. I think, in part,
25  that depends upon how easy it is to identify a

| Page 87 |
| --- |

1   communication path back to the person who submitted the
2   document. If it's a -- an attorney they work with
3   routinely, they typically have an email address for that
4   attorney. If it's not an attorney, it can be more
5   time-consuming to find a path back to communicate. But
6   I would have to -- to rely on the expert in that, and
7   that would be Margaret Molchan in her affidavit when she
8   estimates the addition of a few minutes for each filing.
9      **Q.  And I believe, yesterday, the Tyler**
10  **Technologies' witness, Terry Derrick, testified that**
11  **more than 20 state court systems currently use the**
12  **Auto-Accept Review, you know, function of**
13  **eFile & Serve.**
14         **How is Idaho different such that the -- you**
15  **know, the function used by these other courts would not**
16  **work in Idaho?**
17         MS. DUKE:  And I'll just object to the
18  form and foundation. You failed to provide a list.
19         But go ahead in a general concept on
20  that.
21         THE DEPONENT:  So I would have to start
22  by saying I don't know to what extent they use
23  Auto-Accept, so as -- as he articulated, Auto-Accept
24  could be limited to specific things. I don't know to
25  what extent they use it, so that's hard to say. If it

| Page 88 |
| --- |

1   was -- if they used it simply for things like electronic
2   tickets from infraction tickets, that would be different
3   than saying that they use it for every filing. Right?
4   It wasn't my understanding that they used it for every
5   filing, so I think it's hard to say.
6          The other thing that I would say is the
7   way that the -- the state courts are different is
8   there's incredible variation throughout the country of
9   jurisdiction, of the ways that things get processed, of
10  the roles and responsibility of the clerks. I mean,
11  there's a myriad of differences in how things were
12  processed. I just -- I could not give you specifics to
13  how Idaho is different from a jurisdiction that does
14  Auto-Accept, other than the Idaho Supreme Court has made
15  the policy decision that in Idaho we are going to allow
16  the clerks to reject and has placed that in court rule
17  so our system is designed to follow that rule.
18     **Q.  (By Mr. Fetterly) Okay. And so I'm**
19  **understanding, what court rule are you referring to?**
20     A.  So the Idaho Rules of Electronic Filing and
21  Service, Rule 13, which grants the clerks the ability to
22  return documents to the filer instead of having
23  something that automatically comes in. I'll be -- I'll
24  be honest, that was a -- a recommendation came from the
25  Court Technology Committee. That was a very conscious

                              22 (Pages 85 to 88)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 89

1    decision to allow the clerks to do that.  The court put
2    it in rule, and so I follow what the Idaho Supreme Court
3    decided on that issue.
4         **Q.  Earlier, you gave me three examples of, you**
5    **know, reasons why a document, if auto-accepted, could**
6    **potentially require judicial action.  And then we went**
7    **on to talk about a fourth, that you said impacts the**
8    **clerks, and you gave the single envelope example and you**
9    **provided some testimony regarding the single envelope.**
10   **Do you recall that?**
11        A.  Yes.
12        **Q.  Would that issue involving the single envelope**
13   **require a judicial action if that document or envelope**
14   **had been auto-accepted?**
15        A.  No.  The -- that is simply how the clerk has
16   to find it, and it takes more time for the clerk to find
17   multiple documents in the case management system and
18   where they are located versus having them all in one
19   place.
20            Where it could take judicial action in that
21   instance is if there was a document that was not
22   readable and was necessary in conjunction with the --
23   the filing, the -- it would have to go to the judge.
24   Once it's filed, it has to go to the judge for the judge
25   to decide what to do.

---

Page 90

1            The clerk could provide notice or information
2    to the -- the filer to say, "Hey, we received three
3    documents and this particular one was completely
4    unreadable."  They can provide that notice and let
5    the -- the filer respond however they wish, but it would
6    be up to the judge as to whether to accept an amended
7    filing.  It would be up to the judge as to what the
8    impact of an unreadable document would be.  The judge
9    would have to address that depending upon what was
10   brought in front of them at that point.
11        **Q.  So -- so if a document were auto-accepted --**
12   **so if a document -- if a document -- if a document that**
13   **was missing a signature was automatically accepted,**
14   **would that require judicial action?**
15        A.  It would be up to the judge what happens with
16   that.  So it's possible that the clerk would notify the
17   person and they would submit something in an attempt to
18   correct that.  The judge would have to decide whether to
19   accept that correction or not.  The judge would have to
20   decide sort of what to do with a missing signature on a
21   document.  At that point, it's in the judge -- once it
22   is in the case file, it is up to the judge what happens
23   to it, not the clerk.
24        **Q.  Well, why would a judge have to decide that?**
25        A.  Why would a judge have to decide?  I'm sorry,

---

Page 91

1    like, what to do with the signature, the missing
2    signature?
3         **Q.  Yeah.  We've -- I just want to make sure we're**
4    **clear.  We've talked about a few different things like**
5    **missing signature.  I think you said illegible.  Let's**
6    **just use those two examples, a document missing a**
7    **signature or a document that is illegible.  Why would a**
8    **judge need to decide what to do with that, as opposed to**
9    **the clerk having the ability to take the few extra**
10   **minutes to address the issue?**
11        A.  So once it exists in a case file, once it is
12   filed, any action that's taken on that would be up to
13   the judge, not the clerk.  Clerks can't authorize --
14   they can't remove something from the case file without
15   some sort of authority, and I'm not aware of any
16   authority that would allow them to remove that from the
17   file.
18            The person -- the filer could certainly submit
19   an amended document, and then the court -- the judge can
20   decide whether to accept or reject that amended
21   document.  There are some court rules that allow
22   amendment within a certain period of time, but a clerk
23   can't decide what the impact is of an unreadable
24   document or an unsigned document.  That is something
25   that the judge has to decide.

---

Page 92

1         **Q.  And is there a -- a statute or rule that**
2    **supports that statement?**
3         A.  Is there a statute or rule that supports the
4    statement that it is a judge's decision what to do
5    with...
6         **Q.  You were just saying that a judge must decide**
7    **as opposed to a clerk having some authority to address**
8    **these clerical issues, so I'm just curious if there's a**
9    **statute or rule in Idaho that addresses this and that**
10   **supports the statement that a judge must decide this.**
11        A.  So I'm -- I'm not sure that I understand your
12   question other than to say there is, as far as I know,
13   no authority in this state of Idaho for a clerk to
14   remove something from a -- that has been filed to remove
15   it from the case file.  And, in fact, I believe there is
16   a rule that says it can only be removed for court
17   business.  Right?  I think that is Idaho Court
18   Administrative Rule 31, maybe?
19            MS. DUKE:  We have the rules.
20            THE DEPONENT:  Well, I don't have that
21   one.  I believe it's Idaho Court Administrative Rule 31
22   that talks about what can happen, like, as far as the --
23   the clerk being responsible for maintaining that file,
24   so I don't know of anything that would allow the clerk
25   to do something.  There could certainly be subsequent

---

23  (Pages 89 to 92)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 93

1  filings to address those -- those issues, but the clerk
2  doesn't decide. The clerk would just accept those
3  additional filings.
4          And what the legal impact of that would
5  be, that's a -- that's a legal question for the judge,
6  so that's why it would be in front of the judge. A
7  party could move to dismiss for failing to have a
8  signature. A party could move to file an amended that
9  included the signature. There are a number of different
10 possibilities with that, but -- but my understanding is
11 is that --
12         Sorry, Keely. It wasn't in that. No,
13 it's not that one.
14         There's an Idaho Court Administrative
15 Rule that requires the clerks to keep the files in a
16 particular way.
17         Sorry, I'm just looking through the
18 rules.
19     Q. (By Mr. Fetterly) Does your counsel have the
20 rulebook right there?
21     A. It is -- it is records kept by clerk of the
22 district court, so they -- they have to keep that record
23 and that is Idaho Court Administrative Rule 31.
24     Q. Let me ask you a different question here
25 because I think I understand the response that you've

---

Page 94

1  provided.
2          And, just for the record, was your counsel
3  showing you the administrative rules as you were
4  providing your response?
5      A. She showed me Administrative Rule 31.
6      Q. Okay.
7      A. There's -- there's a rule that specifically
8  defines when -- that a document can't be removed unless
9  it's for court business, and I'm not sure if that's 31
10 or not.
11     Q. Yeah. Could the Idaho -- could Idaho adjust
12 its procedures to give clerks more flexibility to
13 address issues like illegible pages, missing signatures,
14 other clerical issues?
15     A. The --
16         MS. DUKE: Object to the form and
17 foundation and assumes facts not in evidence. I think
18 the clerks do have that authority if they're not in the
19 case management system, but...
20         THE DEPONENT: So the Idaho Supreme Court
21 constitutionally has the authority to define court
22 procedures, and the Idaho Supreme Court has court rules
23 that do that. The Idaho Supreme Court does amend those
24 rules, so the Idaho Supreme Court itself could vote to
25 amend the rules.

---

Page 95

1      Q. (By Mr. Fetterly) Yeah. I -- I recall from
2  some documents that were produced that there was a rule
3  change surrounding a change to the e-filing system that
4  resulted in a pull-down menu being removed where filers
5  were at one point in time allowed to designate whether a
6  document was public or confidential, but the clerks
7  asked that that be removed and there was a subsequent
8  rule change.
9          Do you -- do you recall that taking place?
10         MS. DUKE: Object to the form as to who
11 asked it to be removed, but go ahead.
12         THE DEPONENT: I -- I do remember when
13 that happened, yes.
14     Q. (By Mr. Fetterly) Okay. And -- and would that
15 be an example of the type of rule change that could
16 result from, you know, clerical issues or requests from
17 the clerks for a change of procedure?
18     A. Yes. That is an example of the clerks
19 identifying an inefficiency and a difficulty and the
20 Idaho Supreme Court voting to change the rule.
21     Q. And on that example, I -- isn't it correct
22 that, you know, one of the reasons for that particular
23 rule change and the removal of the drop-down menu on
24 the -- you know, in the e-filing system was that filers
25 were over-designating confidentiality, meaning they were

---

Page 96

1  identifying documents as confidential that the court
2  clerks would not agree were, in fact, confidential?
3      A. Yes. My understanding is that filers were
4  pretty much designating everything to be confidential
5  and that the clerks thereafter had to go through each
6  document and change the security setting. And so the
7  decision was made to have -- to take that designation
8  and the impact of that designation, in other words, the
9  change of security setting, to change it so that instead
10 of having to unclick and change the security setting to
11 not confidential for each document, instead the decision
12 was made it was more efficient and a better use of
13 resources to take that out of the hands of the filer and
14 leave that in the hands of the clerk. That at the time
15 they reviewed documents, it is the clerk that determines
16 which documents really should be within the confidential
17 setting. In other words, the clerk -- if there is a
18 setting other than public, the clerk selects the --
19 security setting of the document at the time they review
20 it and accept it.
21     Q. Isn't it true that there are certain document
22 types or filing codes for which a, you know, security
23 designation is automatically applied so that if the
24 filer designates a certain type of document or case
25 type, there's an automatic security designation that's

---

24 (Pages 93 to 96)

Courthouse News Service v. Omundson      30(b)(6) Sara Omundson

Page 97

1 applied based on that designation?
2     A. There is an automatic security setting placed
3 on certain case types. For document types, I don't know
4 that that's true.
5     Q. Okay.
6     A. The document type list that a filer sees is a
7 much smaller list than the document type list a clerk
8 sees. So the filer selects a general category. When it
9 comes to the clerk, the clerk selects a more specific
10 designation or can select a more specific designation.
11     Q. And isn't it correct that in addition to the
12 over-designating issue and the efficiency issue you
13 identified, another reason why the court clerks were
14 petitioned for the rule change is that the automatic
15 security settings were working correctly and that was an
16 additional, you know, level of protection to ensure that
17 confidential documents were, in fact, protected?
18     A. I'm sorry. I don't understand your question.
19 Could you state that again?
20     Q. Yes. You -- you identified that, you know,
21 the, you know, efficiency with the clerks was one reason
22 why or was a reason why, you know, the -- the rule
23 change was requested and the drop-down, you know,
24 confidential selection menu was removed.
25     And my question to you is: Isn't it true that

Page 98

1 an additional reason is that the, you know, automatic
2 security settings that were applied to case types were,
3 you know, working correctly and the court clerks were
4 able to rely on that as well?
5     A. Automatic case types. I'm sorry. I don't --
6 I don't recall that being part of the discussion. There
7 are auto -- automatic case types, but the -- the clerk
8 is still responsible for reviewing that at the time they
9 review something. And so I do think that those
10 automatic case types would -- would reduce the amount of
11 times the clerks have to select that something is
12 confidential because it would be applied to every
13 document that is filed in that case type.
14     Q. And then going back to this issue of judicial
15 action, I just want to make sure I understand. We've
16 talked about quite a few examples of where under the
17 Auto-Accept Review there were documents that were
18 automatically accepted, and your testimony is, you know,
19 any number of issues would require judicial action.
20     My question to you is: The list of rejection
21 reasons that are reflected in the Court Operations
22 Manual, is it your testimony that any of those reasons
23 or all of them could potentially require judicial action
24 if a document that was subject to rejection per one of
25 those reasons was auto-accepted?

Page 99

1     A. So I'm looking at the list that is in here.
2 Insufficient fees would require judicial action. The
3 court would have to decide what to do if the fee was not
4 sufficiently paid.
5     Insufficient funds in account of credit card,
6 it is my understanding from yesterday's testimony that
7 that could be auto-rejected or that may route something
8 to a queue.
9     Ill -- excuse me -- illegible and unreadable.
10 If there was a document that was purported to be
11 something and it was not legible, the judge would have
12 to decide what to do with that.
13     Incomplete or missing signature block, a judge
14 would have to decide, you know, whether to accept,
15 maybe, an amended or what the impact -- what the legal
16 impact is of an unsigned document.
17     Incorrect formatting, I don't think that the
18 judge would have to address that.
19     A document that's filed into an incorrect case
20 number, again, I think a judge would have to decide
21 whether to strike that from the -- the record or not.
22     The correct case type, I think a clerk could
23 address that on their own without needing a judge's
24 intervention.
25     The filing code. If it comes in with a filing

Page 100

1 code, I'm not sure what the practical impact of that is,
2 so I don't know that.
3     If they use the incorrect party names on the
4 documents, once that's in -- they could ask the judge to
5 change that party name, but I don't think a clerk could
6 do that on their own.
7     If the case already exists, they would have
8 to -- a judge would have to dismiss the -- a new case,
9 any new case that's filed and -- and decide -- I guess
10 the judge could decide to put it in the existing case or
11 the party could refile it in the existing case.
12     The PDF documents combined, I don't think that
13 the judge would need to act on that one.
14     A document that must be filed in paper form,
15 that -- that -- my understanding is that those things
16 that have to be filed in paper form, there could be
17 legal implications. So an original will, if it's filed
18 electronically, a judge would have to act on that
19 because that's not a correct evidentiary submission. If
20 it's something that was submitted that was supposed to
21 be sealed, I -- I think the -- the judge would have to
22 figure out what to do with a document that should have
23 been sealed that wasn't. I think at that point, the
24 judge could certainly rule on that.
25     Please correct error. Again, that's a general

25 (Pages 97 to 100)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 101

1    statement.
2         An in-camera filing, again, is something
3    that's supposed to be filed in paper form. I don't know
4    that a judge would have to reject that. The judge could
5    consider it. I think there would just have to be work
6    on the security setting.
7         Motion to seal document, the subject document
8    must be filed in paper form. Again, that could be an
9    issue that's raised by a party, but I don't know that it
10   would be.
11        Wrong jurisdiction, the judge would have to
12   intervene to dismiss a case that's filed in the wrong
13   jurisdiction. A clerk can't dismiss a case once -- once
14   it's been filed.
15        The duplicate filing received. If it's
16   received in the same case, I'm not sure that would take
17   judicial action.
18        The hearing date or reservation is required
19   fire -- prior to filing. A judge may or may not have to
20   decide whether or not to schedule the hearing or to -- I
21   mean, that -- that's typically something to make sure
22   that there's a hearing scheduled for it. The judge
23   would -- I think the judge would have to schedule a
24   hearing regardless, so I'm not sure that's additional
25   work.

Page 102

1         Q.  Why could clerks fix some of these things but
2    not others?
3         A.  It depends on the authority that they have and
4    what they're changing. So can a -- can a clerk change a
5    security setting within Odyssey? They have the
6    authority to do that.
7         Can a clerk remove from a case file a document
8    that has been filed? I don't know of anything that
9    gives them that authority.
10        So it depends on whether or not it's something
11   that the -- the clerks have authority to do, and there
12   are -- I'm not aware of anything that allows clerks to
13   remove documents that have been filed. They can reject
14   documents that are not yet in a case file, but once it
15   is filed and has a file stamp on it, I know of nothing
16   that allows the clerk to remove it.
17        Q.  And what is the basis for the authority that
18   the clerks do have?
19        A.  So part -- I guess it would be their authority
20   to manage the docket and the case management system.
21   Part of it would be found in the policies of the court
22   in the -- in the clerk's manual. It's -- it's what to
23   do with -- once there's a document in the case file, it
24   is up to the -- the rules of civil procedure, the rules
25   of criminal procedure. As to what can and cannot be

Page 103

1    done with those documents, that's up to the judge.
2         **Q.  Okay.  Yesterday, Mr. Derrick, on behalf of
3    Tyler Technologies, provided some testimony regarding
4    the functionality of the Auto-Accept Review function,
5    and specifically, that it operates based on conditions,
6    you know, configured by the court such that documents
7    are not auto-accepted unless they satisfy those -- those
8    particular conditions.  Do you recall that testimony?**
9         A.  I do.
10        **Q.  Has the Administrative Office of Idaho spoken
11   to Tyler about whether any of the issues we've just
12   identified on the rejection reason list, whether any of
13   those could be accounted for or addressed through the
14   conditions or configurations of Auto-Accept Review?**
15        A.  If the Idaho Supreme Court authorized
16   Auto-Accept, I would investigate that. But the court
17   rules tell me that the clerk reviews them and has the
18   opportunity to reject them, so my work is focused on --
19   the scope of my work is focused on following the court
20   rules. I'm not investigating how to get around the
21   court rules.
22        **Q.  Okay.  I'd like to go back up to our
23   Exhibit No. 1.  One moment.  Excuse me.  I said
24   Exhibit No. 1, I meant Exhibit No. 39, the response to
25   Interrogatory 1.**

Page 104

1         **And now I'm going to move down from where we
2    were discussing before to Number 3.  In addition, the
3    Auto-Accept function has not been implemented because it
4    creates additional work for Idaho's already busy judges.
5    I believe we discussed that.
6         Moving on, and a privacy risk to litigants and
7    third parties, e.g. publication of sensitive information
8    in a -- in a court submission.
9         I just want to understand what you mean here
10   where you say "sensitive information."  What -- what
11   sensitive information are you referring to?**
12        A.  It could be a lot of different things. Right
13   now, court clerks have the ability to reject a document
14   that contains certain personally-identifying
15   information, so, for example, someone's social security
16   number. So there are -- there's PII,
17   personally-identifying information that is supposed to
18   be redacted in filings, and clerks have the authority to
19   reject a filing if it contains that information and note
20   that it needs to be redacted. That's one thing.
21        Another thing is that sometimes filers, even
22   attorneys, will submit something that really has no
23   business being submitted. That can involve some -- all
24   sorts of things. Sometimes, it's just, quite frankly,
25   an oversight, but so there are confidential things that

26 (Pages 101 to 104)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 105

1  are not supposed to be in public documents that do get
2  submitted.
3        Another example of that might be if someone
4  submits a cover sheet that is designed to protect the
5  privacy of folks if they were to inadvertently submit
6  that, attach it to a complaint or -- so there are just
7  things that are not supposed to be submitted as public
8  documents that sometimes can be. And if -- with the
9  clerk's review, they can catch that, reject the filing
10 and ask that be corrected.
11       **Q. Okay. I want to break that up a little bit**
12 **because, as I understand your response, there's at least**
13 **two components. One being, perhaps, you know, PII, as**
14 **you referred to it, that is included in a document that**
15 **is otherwise public. And then separately, documents**
16 **that might themselves just be exempt or nonpublic, and,**
17 **you know, so those are two distinctions there that I'm**
18 **understanding. Do I understand that correctly?**
19       A. Those are two. I also gave the example of
20 something being submitted that simply should never have
21 been submitted.
22       **Q. And what would -- what would that entail?**
23       A. I can give you an example of child
24 pornography.
25       **Q. And has that been filed with the court?**

---

Page 106

1        A. Yes.
2        **Q. When did that occur?**
3        A. The -- the time that I know of, it was in --
4  it was before electronic filing -- thank goodness -- and
5  it was a photograph of child pornography attached to an
6  appellate brief.
7        **Q. So this was a -- not a district court filing,**
8  **but an appellate court filing; is that correct?**
9        A. Correct.
10       **Q. And it was a paper filing and not an e-filing;**
11 **is that correct?**
12       A. Correct.
13       **Q. And it sounds like it was --**
14       A. To be --
15       **Q. Well, can you give me an estimate about how**
16 **long ago this occurred?**
17       A. Maybe ten years ago? I can tell you, though,
18 that since that time, clerks have inadvertently,
19 themselves, sent exhibits of child pornography.
20       It -- there are inappropriate things that can
21 be submitted with filings, both accidentally,
22 inadvertently, and quite frankly, maliciously, so
23 there -- there is the possibility that inappropriate
24 things can be included.
25       **Q. So my question then would be: Can you give me**

---

Page 107

1  an estimate of the number of times this has occurred
2  with new electronically-filed civil complaints?
3        A. That particular example? No, I can't. As far
4  as the PII and things not being redacted that should be,
5  again, I think there's a code that we can try to pull
6  information on, but we haven't pulled that information.
7        As far as documents being, for example,
8  scanned together, the cover sheet along with the initial
9  pleading being scanned together and submitted together,
10 I don't know if we have a code that we could pull that,
11 but that's not a -- an exceptionally unusual experience.
12 I -- I couldn't give you exact numbers.
13       **Q. When you say "code," what do you mean?**
14       A. Well, so we had been talking about these
15 rejection codes. I believe one of those codes was the
16 failure to redact, and so we could look at our system to
17 see how often that code was used. It wouldn't
18 necessarily catch all of them, but it might give us an
19 idea of how often that happens.
20       **Q. Let me ask you: Is it fair to state then that**
21 **if a document were rejected because of a failure to**
22 **redact or sensitive information, we would expect**
23 **to find or you could look at the rejection data, the**
24 **codes and the comments, to see if they reflect that**
25 **reason for rejection; is that correct?**

---

Page 108

1        A. We can -- I'm sorry. I'm just trying to
2  clarify, do you mean in that individual case could we
3  tell that was the reason? It depends on the code that
4  the clerk put in.
5        In general, if you're talking about the
6  universe of all the cases, we certainly could -- could
7  identify how many cases over a period of time had that
8  rejection code, yes.
9        **Q. And -- and is there a rejection code for**
10 **failure to redact information?**
11       A. I think there is, but I want to look. I know
12 it's --
13       **Q. I would like you to please do that. And if**
14 **this is one where you would need to place a phone call**
15 **to an ops manager or something, please let me know.**
16       A. Well, I can -- yeah. And party names...
17       No, there's not. You know, it -- it would
18 just -- I think it would just have to be in the reject
19 comments. It's not one of the common ones that's listed
20 in here.
21       **Q. Okay.**
22       MS. DUKE: And, Jon, when you get to a
23 point, if we could, you know, take a break? And I know
24 our IT person -- she wants to talk to you -- is
25 available to talk to you, so we could do that as well.

27 (Pages 105 to 108)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

ER-1648

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 109

1    MR. FETTERLY:  Sure.  Why don't we,
2  because I know that we're also -- well, I'll -- we can
3  take a break.  Let's go off the record.
4           (Discussion off the record.)
5           (A break was taken from
6              11:20 a.m. to 11:34 a.m.)
7    Q.  (By Mr. Fetterly) Okay.  Ms. Omundson, we are
8  back on the record.  During our time off the record,
9  were you able to obtain an answer to the pending
10  question we have regarding the rejection codes on the
11  Excel spreadsheet, Exhibit 42, relative to the rejection
12  reasons on Exhibit 41?
13    A.  Yes.
14    Q.  And what is the answer to that question?
15    A.  So what he explained is that within the
16  database, those are the rejection codes.  Part of what
17  was confusing me is the numbers looked different from
18  what was in the clerk's manual and what you were showing
19  me.
20         What he explained was that those are the codes
21  that were actually used in the time period that -- that
22  was requested, and so it wouldn't necessarily include
23  every code listed in the clerk's -- or, I mean, yeah, in
24  the clerk's --
25    Q.  You cut out.  In the clerk's what?

Page 110

1    A.  So in the clerk's manual, there's A through T,
2  and the list that you were showing me didn't appear to
3  be as long, which was part of what was confusing
4  me.  What he told me was that the drop-down list that
5  you have are the codes that were actually used in that
6  time period.  So if a code was not in that -- used in
7  that time period, it wouldn't show up in your drop-down
8  list.  So the -- the difference in what appeared to me
9  as the difference in number of codes was because maybe a
10  code hadn't been used during that time period.
11    Q.  Thank you for the answer and the explanation.
12         So Exhibit 41, the operations manual, gives us
13  the -- or provides the codes that could be used, and
14  they are identified as codes A through T.  And then we
15  have our spreadsheet, Exhibit 42, covering a specified
16  time period and the codes on that drop-down menu were
17  the codes that were actually used during that time
18  period; correct?
19    MS. DUKE:  I'll object to the form.
20    Go ahead.
21    THE DEPONENT:  I believe that's accurate,
22  yes.
23    Q.  (By Mr. Fetterly) Thank you.
24    A.  Yes.  That was the explanation, yes.
25    Q.  Okay.  I'm going to show you another exhibit.

Page 111

1  One moment.
2           (Pause in the proceedings.)
3           (Exhibit No. 43 marked.)
4    Q.  (By Mr. Fetterly) And I'm going to put it up on
5  my screen before, as I've been doing.  This is a
6  document that's Bates labeled SO 14 through 16 produced
7  by your counsel in this action.  It is now up on the
8  screen.
9         I'll show you the first page and then scroll
10  down to Page 1, Page 2, briefly, and then Page 3.
11         Let me go back up to the top of Page 1 and ask
12  you, Ms. Omundson, do you recognize this document?
13    A.  It looks to me to be the list of fee codes
14  that appear as an addendum to the Idaho Civil Rules that
15  is also used in our system as a way to identify, I
16  believe, its case type.
17    Q.  Okay.  So --
18    A.  It might be document type.  Sorry.
19    Q.  Okay.  So does that mean that the -- let me
20  back up.
21         Do you -- do you know who prepared this
22  document?
23    A.  If I had, I can't say for certain.  I believe
24  it is maintained by Michael Mehall.
25    Q.  Mm-hmm.  And do you have an understanding of

Page 112

1  why certain codes or document types are highlighted on
2  this document?  And you can take a minute to look
3  through it if that would be helpful in your response.
4    A.  Why would they be highlighted?  I don't --
5  sorry.  You're scrolling really fast and I can't see the
6  ones --
7    Q.  Sorry.
8    A.  I'm trying to compare the ones that are
9  highlighted with the ones that aren't.  Yeah.  I mean,
10  it appears to me that the ones that are highlighted
11  appear to be ones that, per Rule 32, would be exempt
12  from public disclosure.
13    Q.  Okay.  So then I also see that there's a
14  distinction here between district court on the top and
15  magistrate court on the bottom.  Do you see that this
16  document is broken into the two groups?
17    A.  Yes.
18    Q.  And so is it correct that under the district
19  court where we see civil and then there's family, only
20  one type, and probate mental health, there's only one
21  type, those would be the types of cases that could be
22  filed in Idaho District Court.  Is that correct?
23    A.  It --
24    MS. DUKE:  Here's a hard copy.
25    THE DEPONENT:  Sorry.  I'm going to be a

28  (Pages 109 to 112)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 113

1  little technical on you here but --
2      Q. (By Mr. Fetterly) Please.
3      A.  -- all cases are filed in the district court,
4  they would be assigned to a district court versus
5  assigned to a magistrate -- to the magistrate division,
6  so it's a matter of assignment.
7          It appears to me that this is separated per
8  the -- the standard assignment, yes.
9      Q.  Understood.  Thank you for the technical
10 clarity.
11         So when we're talking about the documents
12 under district court, these are the types of cases that
13 would be assigned to a district judge in the district
14 court; correct?
15     A.  Typically, yes.
16     Q.  Typically, yes.
17         And then when we scroll down under magistrate
18 court and we see a number of other civil, family,
19 guardianship, conservatorship, probate or mental health,
20 these are the types of cases that would be assigned to a
21 magistrate judge; correct?
22     A.  Typically, yes.
23     Q.  And I just want to make sure I'm understanding
24 the codes correctly.  So where we have AA, I'm looking
25 at district court civil, the second bullet point down,

---

Page 114

1  "AA - All initial district court filings," that's a --
2  do I understand that that's a code that is -- that
3  specifies the filing fee for certain types of district
4  court filings?
5      A.  I -- I believe that these -- all of these
6  codes come from the filing fee.  So there is an -- an
7  addendum to the Idaho -- or appendix, I guess it would
8  be -- appendix to the Idaho Civil Rules of Procedure,
9  and it includes the filing fees for different things.
10 And I believe that this follows the coding within that
11 addendum -- or appendix, sorry.  I -- we've coded the
12 system to match that appendix when it comes to civil
13 filing fees.
14     Q.  Thank you.
15         So I'm going to ask a similar question now,
16 but now stepping away from this document.  I want to
17 show you a document that was previously marked as
18 Exhibit No. 37.
19         One moment, I'll put it up on the screen.
20         And this document that -- it's not the first
21 page.  The first page, I'm showing you right now.  And
22 would you agree that this is the screenshot of the
23 iCourt File & Serve electronic filing overview webpage
24 on the iCourt website?
25     A.  Yes.

---

Page 115

1      Q.  Okay.  And as I scroll down, would you agree
2  that these are screenshots that depict the -- kind of
3  the e-filing -- or, the public-facing side of the
4  e-filing system on the iCourt website?
5      A.  Yes.
6      Q.  And as I scroll down, there's a page here
7  that's Bates numbered CNS_13287, and do you see that?
8      A.  I do.
9      Q.  And under case type, there's a drop-down menu
10 that shows us some of the available case types or codes
11 that have been coded to reflect the filing fee per the
12 schedule -- (audio interference.)
13         (Stenographer requests clarification.)
14     Q. (By Mr. Fetterly) The schedule that's attached
15 to the civil rules for filing fees?
16     A.  It appears -- yes, I believe that is the case
17 type that we use, yes.
18     Q.  And so a minute ago you provided testimony
19 that the filing codes have been configured to correspond
20 to the schedule of filing fees that's attached to the
21 civil rules; is that correct?
22     A.  For civil cases, yes.
23     Q.  And so is it also correct that the -- the
24 public-facing side of the e-filing system is similarly
25 configured to, you know, identify the -- the case type

---

Page 116

1  code and the corresponding filing fee?
2      A.  Yes.
3          (Exhibit No. 44 marked.)
4      Q. (By Mr. Fetterly) Okay.  Let me stop this
5  document and go back to another one.  I'm now going to
6  show you -- hold on.  This is -- I'm going to show you a
7  document that's been marked Exhibit No. 44.  We might
8  need to zoom in a bit on this one.
9          Do you recognize this document?
10     A.  I believe that I have seen it, but not in
11 quite a while.
12     Q.  And what is it?
13     A.  It appears to be a spreadsheet that shows the
14 security settings that we have assigned to particular
15 case types.
16     Q.  I'm scrolling down so we can get to the second
17 page.
18     A.  Yeah.  It -- it appears to be a spreadsheet
19 assigning security settings for -- based on case type.
20     Q.  Okay.  And just can you explain to me what --
21 what that means and how that works?
22     A.  So for each case type that is configured
23 within our system, we would put a security setting on
24 that case type.  There can also be a security setting
25 for each document within a case.  So the security group

---

29 (Pages 113 to 116)

Courthouse News Service v. Omundson                30(b)(6) Sara Omundson

Page 117

1  would tell you what the security setting is by case
2  type.
3       So if you look at this first one, it has
4  adoption.
5       Q. Mm-hmm.
6       A. The entire case file is exempt from public
7  disclosure because it's an adoption. And so you'll see
8  there that the case type has everything exempt.
9       If you look at the next one below, a paternity
10 action, only certain documents would -- would be exempt
11 from disclosure.
12      This default case, I don't know what is
13 default case security. I don't know what that list is.
14 And, sorry, case security group code would be the code
15 that gets applied for -- sorry. This is very hard for
16 me to see.
17      Q. Let me --
18      A. The case security is --
19      MS. DUKE: Here's a copy for you.
20      THE DEPONENT: Thank you. Yeah, that's
21 much -- sorry, blind as a bat.
22      Q. (By Mr. Fetterly) You're doing great.
23      A. The case security group code, I believe, is
24 the code -- so CDED is typically -- that means that
25 certain things are redacted. I actually don't know what

Page 118

1  some of these codes mean, case security, exempt,
2  petition. Yeah. It appears to me -- I'll go across
3  the -- the case type code does not appear to me to match
4  Rule 32 or that civil filing addendum, the appendix. I
5  don't know where the case type code comes from.
6       The case type -- yeah. A de facto custodian,
7  I don't know what a de facto custodian is. I -- I --
8  honestly, the more I look at this, I'm not sure that I
9  do understand this document. It appears to be a
10 document that would have been used at the time Odyssey
11 was configured to determine what the case security
12 groups are that are needed and what security group
13 should be applied to case types.
14      Q. Understood.
15      And I don't intend to quiz you on the
16 particulars of this document. I'm just trying to
17 understand the general functionality of things. And
18 so --
19      A. Mm-hmm.
20      Q. -- I'd imagine that the determination of which
21 case type or document type could be confidential or
22 exempt could -- could change over time if a new case
23 type or a new document type were created and it's
24 determined that it should be confidential? That might
25 be a new document that needs to be added to a new list,

Page 119

1  is that a generally correct statement?
2       A. Yes, and it has changed over time.
3       Q. Understood. Understood. So, yeah, I'm not
4  trying to bind you to this document here.
5       I guess my -- my question here is: Just so
6  I'm understanding, it sounds like the Idaho Courts have
7  the ability to configure their system to treat -- to
8  assign confidentiality or security based on a case type
9  or a document type; is that correct?
10      A. Yeah. My -- so in the case management system,
11 yes. In EFM, as I heard Tyler say yesterday -- or, yes,
12 the gentleman from Tyler yesterday said that they could
13 utilize those settings. Yes.
14      Q. Thank you. So -- okay. I think that answered
15 my question.
16      And just one more thing here potentially. One
17 moment.
18      (Pause in the proceedings.)
19      Q. (By Mr. Fetterly) Yeah. So when you were
20 referring to the testimony of Mr. Derrick from Tyler
21 Technologies, you said used those settings. It's your
22 understanding that those, you know, security or
23 confidentiality settings as used by the court on the
24 case management side could also correspond to security
25 settings or conditions applied to the e-filing system on

Page 120

1  the EFM side; is that correct?
2       A. My understanding is that we could configure
3  on the EFM side security settings based upon -- I mean,
4  that we could set whatever security settings in there
5  based upon the conditions. The conditions are applied
6  based on whatever the filer submits.
7       Q. Okay. And one example of that would be the --
8  like the drop-down menu we identified just a minute ago
9  where we had the case types. If one of those case types
10 was confidential, the security setting could be applied
11 on the EFM side so that the filer selected that. That
12 designation would signal confidentiality, and that
13 security could then be applied to the filing as it
14 traversed through the system, through the EFM, and into
15 the case manager system; is that correct?
16      A. Yes. That is my understanding of how the --
17 the security settings, if -- if the Idaho Supreme Court
18 switched the rule and allowed the filer instead of the
19 clerks to determine the security setting, then, yes,
20 that's my understanding of how that would work.
21      Q. Well, and I'm not -- I'm not asking about
22 whether the Supreme Court rule allows for it or not.
23 I'm just saying that the court has the ability to
24 configure the system to apply a level of security or
25 confidentiality to those documents that it deems should

30  (Pages 117 to 120)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 121

1  be confidential or secure; correct?
2       A.  For those that are marked by the filer, yes.
3  The Supreme Court -- we have the capability -- put it
4  this way, we have the capability within the system to
5  set up security that would be triggered based upon what
6  the filer says.  So if the filer selects a case category
7  that would be public, then that public security setting
8  would be applied.  If the filer selected a case setting
9  that would not be public, then the security setting
10  would be applied.
11       Is that physically possible within the system?
12  Yes, it is.
13       Q.  Okay.  And is there -- is there a rule that
14  requires clerks to determine security?
15       A.  That was the rule amendment that you referred
16  to previously.  It used to be that the filer -- so when
17  we first had -- it was only two counties that were
18  actually on the system.  When we took the second county
19  onto the system is when the clerks asked us to make the
20  change.
21       It used to be that the filer was making that
22  decision about whether it was confidential or not.  They
23  specifically altered the rule to take that option away,
24  and it is now the clerk's responsibility to decide case
25  security.  And I believe that's in the manual, but

Page 122

1  case -- case security and document security.
2       Q.  And just so we're understanding each other
3  when we're talking about the rule, is this Rule 32?  Was
4  there an amendment to Rule 32?
5       A.  No, this was an amendment to the e-filing
6  rules.  This is the amendment that -- that you had
7  raised.  They amended the e-filing rules in 2016 such
8  that the filer was no longer making the designation or
9  the decision about whether a document would come in with
10  the security of confidential or not.  Rather, there is a
11  presumption applied when -- based on, I believe, the
12  case type.  And then when the clerk -- when it comes to
13  the clerk's desk and they're reviewing it, prior to
14  accepting it, they checked to make sure that the
15  security setting on the document is proper, and that's
16  part of the clerk's review.
17       Q.  And can you just point me to the -- the rule
18  that was amended, the specific e-filing rule, just so we
19  have a common understanding of what rule --
20       MS. DUKE:  They're right there.
21       THE DEPONENT:  No, what I need are the
22  minutes that state the exact rule that was amended.
23       MS. DUKE:  Oh, we produced those.
24       THE DEPONENT:  Because it was a deletion
25  to the rule and to the manual.  Do you know what I'm

Page 123

1  talking about?  The minutes.
2       Yeah.  So Molly's going to find that for
3  me, but it was -- it wasn't in addition to the rule.  It
4  was removing the portion of the rule that allowed the
5  filer to do that.  And then in the -- and then adding
6  that responsibility into the clerk's manual that the
7  clerk has to review that.
8       MR. FETTERLY:  Understood.
9       I'm looking for that as well because I
10  just want to make sure.  We've discussed it quite a bit.
11       MS. DUKE:  I think it might be at 5514 to
12  5528, order amending rule on electronic filing service.
13  Rule -- I just don't know what that document -- 5510.
14       (Pause in the proceedings.)
15       MS. DUKE:  Hey, Jon.  Do you want to take
16  a break and go off the record?  I think you've got a
17  little less than 15 minutes left.  Do you want to take a
18  break and let us find that or?
19       MR. FETTERLY:  Yes, I think we're at the
20  very end anyway, so let's just take a quick break and
21  we'll -- we'll huddle.  Yes, off the record.
22       MS. DUKE:  That's perfect.
23       MR. FETTERLY:  Thank you.
24       (A break was taken from
25       11:57 a.m. to 12:22 p.m.)

Page 124

1       Q.  (By Mr. Fetterly) Okay.  Ms. Omundson, we just
2  came back from a break.  During the break, I learned
3  from counsel that there's an answer to a question and
4  also a -- a new document being produced.  Can you just
5  please explain to me what transpired over the break?
6       A.  So I was trying to find a document to answer
7  your question regarding the rule that says that the
8  clerks review and set the security setting.  As I was
9  looking for that document, I found some notes that I
10  took during the presentation or the -- the -- when Tyler
11  showed me the press review queue.  I remembered that you
12  had asked me about that, and I had not thought I kept
13  notes.  But when I saw that I did have some notes, I
14  notified my attorney and sent them to her.
15       (Exhibit No. 45 marked.)
16       Q.  (By Mr. Fetterly) Thank you.  I appreciate
17  that.
18       And just for the record, that -- those notes
19  were produced over the break as document Bates labeled
20  SO 5709.  That document will be marked as Exhibit
21  No. 45.
22       And I guess just to confirm, one question
23  about that.  I won't get into the notes.  We discussed
24  it, but you said these are the notes that are -- that
25  you took during the Zoom meeting with Tyler shortly

31 (Pages 121 to 124)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 125

1  after Courthouse News filed this lawsuit during which
2  Tyler provided you the demonstration of Press Review
3  Tool; correct?
4        A. Yes, that's correct.
5        Q. And it looks as though, according to these
6  notes, during that Zoom meeting with Tyler, you
7  discussed both the Press Review Tool as well as the
8  Auto-Accept Review; is that correct?
9        A. That's correct.
10       Q. Okay. And then I think, separately, you said
11  there was a -- you obtained an answer to the question
12  regarding the rule that was amended with respect to the
13  security designation and the drop-down menu?
14       A. So I have to -- yes. And I have to be clear,
15  at the time the rule was amended, there was one rule.
16  It was the -- it has since been broken down into pieces
17  and there are a number of rules.
18          So to be clear, your original question to me
19  was: What rule had the clerks review and designate
20  security for the documents? And so I had to look at
21  what the amendment was to remember that. It is Idaho
22  Rule for Electronic Filing and Service 7, which notes
23  that the court -- the filer can say that something is
24  confidential in the comments to the court, but it's the
25  court that verifies that designation and then can change

Page 126

1  the setting. And so it's the clerk that's doing that
2  work.
3        Q. Thank you.
4          And is it correct that part of the impetus for
5  that rule change and the change of the e-filing system
6  interface had something to do with law enforcement
7  filings?
8        A. I have not ever heard that.
9        Q. Okay. I guess I should say filings by law
10  enforcement?
11       A. That was -- actually, the -- no, it was
12  attorney filings that I --
13       Q. Okay.
14       A. That I was aware of, it was attorney filings
15  that were causing the trouble. I never heard anything
16  about law enforcement.
17       Q. Thank you.
18          One moment here. I'm going to bring up one
19  more document.
20          (Pause in the proceedings.)
21          (Exhibit No. 46 marked.)
22       Q. (By Mr. Fetterly) I'm going to drop another
23  document into our folder. This will be Exhibit 46.
24  Just a real quick question here.
25          I'm putting Exhibit No. 46 up on the screen.

Page 127

1  Let me know once you've had a chance to see it.
2        A. I'm sorry. Can you make it a little bigger,
3  please?
4        Q. Sure.
5          MR. DUKE: Are there any Bates numbers on
6  it? I was just trying to see.
7          MR. FETTERLY: There are not. This was
8  previously filed as an exhibit to a declaration in this
9  case, and it's from the iCourt website.
10         MS. DUKE: From Idaho's?
11         MR. FETTERLY: No, this was attached to
12  the -- the Girdner declaration.
13         MS. DUKE: Oh.
14         MR. FETTERLY: Oh, sorry. But from the
15  preliminary injunction, and this comes from the iCourt
16  website that's explained in the declaration. I was
17  looking for a Bates copied version, but it -- I can
18  represent to you --
19         MS. DUKE: No problem. No problem.
20         MR. FETTERLY: It's downloadable from the
21  court's website.
22       Q. (By Mr. Fetterly) And I guess my question to
23  you, Ms. Omundson, is: Do you recognize this document?
24         MS. DUKE: And there's several pages to
25  it. If you want to look, we have a copy.

Page 128

1          THE DEPONENT: So I -- I don't -- I don't
2  recognize it and I'm a little confused because it talks
3  about entering a new criminal complaint into Odyssey,
4  and it's my understanding that criminal cases --
5  initiating documents in criminal cases are not e-filed.
6          Do we have any idea how old this is?
7          MS. DUKE: I can look at Girdner's.
8          THE DEPONENT: Sure.
9          MS. DUKE: Jon, do you want to go off the
10  record real quick?
11         THE DEPONENT: Sorry.
12         MR. FETTERLY: Sure, real quick.
13         THE DEPONENT: Yeah. My understanding is
14  that the initiating documents in a criminal filing are
15  not e-filed. And that doesn't mean that there wasn't an
16  attempt to try that out with the pilot county.
17         MR. FETTERLY: Okay. Well, let's go off
18  the record.
19          (A break was taken from
20          12:28 p.m. to 12:38 p.m.)
21       Q. (By Mr. Fetterly) Ms. Omundson, before we took
22  our break, we were discussing the document attached as
23  Exhibit No. 46. And before we circle back to that so I
24  can just understand what it is, I just want to also show
25  you the iCourt Portal Training & Resources page of the

32 (Pages 125 to 128)

Courthouse News Service v. Omundson                                30(b)(6) Sara Omundson

Page 129

1    iCourt website which I have up on my screen.
2          Do you see that?
3       A.  I do see that.
4       Q.  And is this the iCourt Portal Training &
5    Resources webpage?
6       A.  It appears to be, yes.
7          MR. FETTERLY:  Okay.  And I'll print this
8    and make this an exhibit, Keely.  I think this will be
9    Exhibit 47, which I'll circulate in a moment.
10         (Exhibit No. 47 marked.)
11      Q.  (By Mr. Fetterly) I just want to point out that
12   there's a link here under the quick guides to -- let's
13   see.  Well, that's the Portal, and then I go over to
14   e-File Training & Resources.
15         So now I've gone over to e-File
16   Training & Resources on the iCourt webpage.  Do you
17   see that?
18      A.  Yes.
19      Q.  And Exhibit 47 will actually be this page, the
20   e-File Training & Resources, not the Portal.
21         So on e-File Training & Resources, we go to
22   the "Quick Guide:  Initiate a new case."  I click on
23   that link and it comes up to the document that we were
24   discussing a moment ago, which is currently attached as
25   Exhibit 46.

Page 130

1          So as -- my question to you, Ms. Omundson, I
2    just want to understand:  Do you recognize this
3    document?  And, if so, what is it?
4       A.  Yes.  It is a quick guide that was created
5    when the e-filing system was first put in place to
6    explain to attorneys and their staff how to e-file
7    because it had never been done in Idaho before.
8       Q.  Okay.  And does this document accurately
9    reflect the -- the -- you know, the procedures or the
10   steps that a filer would take to file a new civil
11   complaint?
12      A.  Well, so to be clear -- hold on.  Let me think
13   this through.
14         The -- they updated the e-file system since
15   this document was created.  Having said that, I have not
16   read this closely.  I've been trying to go through it as
17   quickly as I can.  It appears to be the -- the process
18   appears to be the same, but I haven't had a chance to go
19   through this in-depth.
20      Q.  Understood.  Thank you.
21         Are you aware of a newer or a more recent
22   version of this document than the one --
23      A.  I'm not.
24      Q.  Okay.
25      A.  I'm not.

Page 131

1       Q.  We can put this aside.
2          A couple final questions as I know we're
3    nearing end of time.  I understand from -- from the
4    written discovery responses served by your counsel on
5    your behalf, in this case, that you have had discussions
6    with other state court administrators regarding
7    generalized concerns about publishing submitted but
8    unfiled documents including how it may undermine public
9    confidence in the courts; is that correct?
10      A.  That is correct.
11      Q.  Okay.  And I -- I believe this is in response
12   to Interrogatory No. 26.  You state that:  In December
13   of 2021, in Arizona, concerns were raised by
14   Nancy Cozine, the Oregon State Court Administrator, and
15   other attendees, regarding public confidence in the
16   courts and release of protected information.
17         Can you elaborate on that response and that
18   communication with Ms. Cozine?
19      A.  I was in a meeting of state court -- with
20   other state court administrators.  I remember Nancy was
21   there.  She sat across from me.  One of the questions
22   that came up was whether or not prefiled documents --
23   release of prefiled documents or documents that had not
24   been reviewed by a clerk, could they cause confidence
25   issues in the courts, and she mentioned some of the

Page 132

1    concerns that she had with the courts releasing
2    confidential information.
3          Now, this came in the context of a
4    conversation.  There's been an effort amongst the state
5    court administrators to address public confidence in the
6    courts including ways to address disinformation, and
7    then including, I believe, in this particular instance,
8    the question of a CNS lawsuit had come up and the impact
9    that being forced to -- if a state court is forced to
10   publish documents that it otherwise wouldn't, that that
11   would impact the court itself, and so that was just part
12   of the -- that conversation.
13      Q.  What were Ms. Cozine's concerns as expressed
14   in this meeting -- or, conference?  Excuse me.
15      A.  I do -- I remember she spoke for quite a bit,
16   but the thing that I remember very much standing out to
17   me is that the -- the courts would be releasing
18   information that could harm someone.  I remember a
19   discussion about the -- the possibility of a release of
20   information that was not the filers information but
21   someone else's information including PII.  I also seem
22   to recall there was some concern about public trust and
23   confidence in the courts if the courts are publishing
24   PII and could avoid doing so.  But I have to tell you
25   it's been nearly a year, and that's about -- that's

33  (Pages 129 to 132)

Courthouse News Service v. Omundson                30(b)(6) Sara Omundson

Page 133

1    about as much as I can remember from that.
2        Q.  Was Ms. Cozine speaking to an audience when
3    she was making these remarks?
4        A.  No, it wasn't.  No.  So the state court
5    administrators, we all meet twice a year.  It was at a
6    meeting with just all of us.  We were -- all of the
7    state court administrators that are members of COSCA,
8    which is council -- or, Conference of State Court
9    Administrators were sitting in a room and discussing
10   issues, and that was one of them.
11       Q.  Okay.  And did Ms. Cozine mention that there
12   was currently litigation pending in the District Court
13   of Oregon regarding access to documents before they've
14   been "accepted" into the case management system?
15       A.  I actually don't know if she mentioned that.
16   I think, at that point, I knew there was litigation in
17   Oregon, but I don't know that she mentioned it.
18       Q.  Going on, in the same interrogatory response,
19   you mention a COSCA Conference in July of 2002 [sic],
20   which included a panel discussion about CNS litigation
21   and concerns about public confidence in the courts?
22       A.  Yes.
23       Q.  What do you mean when you say "panel
24   discussion about CNS litigation"?
25       A.  There was a presentation that was given with

Page 134

1    some attorneys and they gave a presentation that
2    included some diagrams showing the increasing litigation
3    that CNS is doing around the country and they gave some
4    summaries and information on different cases of what the
5    status of those cases was.  And there was some
6    discussion about the different types of concerns with
7    the -- the damage to the courts and the court system
8    with the type of access that CNS was asking for in the
9    litigation.
10       Q.  Do you know who the attorneys were that were
11   making this presentation?
12       A.  I think I -- I think I mentioned or named one
13   in my response, but off the top of my head, I don't
14   remember.
15       Q.  And the responses --
16       A.  Oh, I do.  I can say it was -- one of the
17   attorneys was -- had worked on the brief that the
18   Council of Chief Justices had filed in one of the cases.
19       Q.  Okay.  And what was their -- what were their
20   comments about damage to the court?  Did they identify
21   any damage to the court?
22       A.  There was discussion about the impact of the
23   courts being forced to release PII without the
24   ability -- being allowed the ability to protect that
25   information.  There was discussion about the impact of

Page 135

1    whether people would continue to trust and use the
2    courts if they started to hear that the courts were
3    releasing information that otherwise should not have
4    been released.
5        There was also a discussion of the federal
6    courts and whether the federal courts should be making
7    policy decisions for the state courts including the --
8    the balancing of interests between speed and maintaining
9    people's confidence that they could trust the courts to
10   manage information appropriately.  I think those were --
11   those were the pieces that -- that really stood out to
12   me.  There was a great deal of concern about access to
13   the courts and the impact on whether people would be
14   willing to utilize the courts.
15       Q.  Did the panelists address or discuss any of
16   the state courts across the nation that provide
17   preprocessing or pre-acceptance access to newly e-filed
18   complaints through a press review queue, whether it be
19   the Tyler Press Review Tool or any of the other vendor
20   press review queues?
21       A.  I think that was discussed.  I'm -- I'm trying
22   to come up with specifics.  I -- I -- I do seem to
23   recall that there was some discussion about some types
24   of cases.  It came up, but, honestly, I'm not coming up
25   with specifics but it was -- I -- I seem to recall that

Page 136

1    that was discussed.
2        Q.  Okay.
3        A.  There's -- the different states have taken
4    different approaches and have balanced or really
5    balanced different interests differently.  Yeah.
6        Q.  And did the -- did the panelists address or
7    discuss the ways in which those other states have
8    addressed issues such as, you know, confidentiality, or,
9    you know, any of the concerns that were raised by the
10   panelists with respect to the type of access sought by
11   Courthouse News?
12       A.  I seem to recall there was a discussion about,
13   in some states, the courts simply presume that anything
14   in -- in -- essentially, the courts don't take
15   responsibility for protection of anything; that they
16   presume that anything that is submitted to them or filed
17   is public.  And it's really they don't take any
18   responsibility, or they -- the court is not taking -- I
19   don't know how to describe it other than that's -- it's
20   on the filer to fix it, not on the court.  And that
21   was -- I -- I -- that that is the approach that some
22   courts are taking.
23       Q.  So would that involve an approach where, you
24   know, a court might put the onus on the filer to redact
25   sensitive information or PII?

                                34 (Pages 133 to 136)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

ER-1655

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 137

1        A.  That's part of it, but it's -- the court won't
2    take any -- make any efforts to -- to follow up on that
3    if it doesn't happen, but some courts simply don't
4    follow up on it if it doesn't happen.
5        Q.  Were any of court administrators who were
6    present at this conference, did any of those court
7    administrators, you know, come from states or courts
8    where, you know, press review queues are implemented and
9    available?
10       A.  Yes.
11       Q.  Okay.  And did any of them speak at the
12   conference?
13       A.  Yes.
14       Q.  On this -- on this issue of access?
15       A.  Yes.
16       Q.  And did any of them identify any issues that
17   their courts have had with providing access to new civil
18   complaints through a press review queue?
19       A.  I could only think of one comment about that,
20   and it was not a comment about a problem that was had.
21   Rather, it was a comment about the courts should simply
22   allow access to anything and everything; that that's --
23   that open courts allowing access regardless of what is
24   in there was the priority, which, that is definitely one
25   way to balance it.  It's just not the way the Idaho

Page 139

1    the New Mexico Courts?
2        A.  No.  It -- I -- I just asked him if -- if --
3    if his appeal was done yet.
4        Q.  Understood.  Understood.
5            Okay.  I think we're about at time.  I have no
6    further questions.
7            MR. FETTERLY:  Thank you.  Appreciate it,
8    everybody.
9            (Deposition concluded at 12:54 p.m.)
10           (Signature reserved.)
11              --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 138

1    Supreme Court has.
2        Q.  And who was the court administrator who made
3    that comment?
4        A.  I believe -- I believe it was the Arizona
5    administrator.
6        Q.  Okay.
7            MS. DUKE:  Are you pretty close to done,
8    Jon, because we're --
9        Q.  (By Mr. Fetterly)  All I want to do is a couple
10   of follow-up questions there on that same line of
11   questioning, but I understand there was a September 22
12   conference in which you identified Artie Pepin.
13       A.  Yes.
14       Q.  I believe that's the Administrator of the
15   State of New Mexico, so this would've been very
16   recently.  I just want to ask you about that and then
17   I'm done.
18       A.  Artie and I were standing in line for
19   breakfast and I asked him what the status of his case
20   was, and I believe he told me that it either was just
21   getting ready to be argued in the appellate court or it
22   had just been argued in the appellate court.  That was
23   the extent of it.
24       Q.  Okay.  Did Mr. Pepin make any comments
25   regarding the access provided to the press or public by

Page 140

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3        The undersigned Certified Shorthand
     Reporter and Deposition Notary Public of the State of
4    California does hereby certify:
5        That the foregoing 30(b)(6) deposition of
     Sara Omundson in her official capacity as Administrative
6    Director of Idaho Courts was taken before me remotely at
     the  ime, at which time the witness was duly sworn by me;
7
         That the testimony of the witness and all
8    objections made at the time of the deposition were
     recorded stenographically by me and were thereafter
9    transcribed, said transcript being a true and correct copy
     of the proceedings thereof.
10
         I further certify that I am neither counsel
11   for nor related to any party to said action, nor in any
     way interested in the outcome thereof.
12
         Further, that if the foregoing pertains to
13   the original transcript of a deposition in a federal case,
     before completion of the proceedings, review of  he
14   transcript was discussed on the record.
15
16
         In witness whereof, I have subscribed my
17   name on this 15 h day of November 2022.
18
19
20
21
22
23
                         Nicole A. Bulldis, RPR
24                       CA CSR No. 14441
25

35 (Pages 137 to 140)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 141

**A**

**a.m** 4:2 44:23,23
  64:22,22 79:8,8
  109:6,6 123:25
**AA** 41:17,25 43:13
  73:21,21 74:5
  79:13 113:24
  114:1
**AA1** 41:17,20
**ability** 31:9 88:21
  91:9 104:13 119:7
  120:23 134:24,24
**able** 6:11 15:6,7,8
  15:10 24:2,15,23
  25:10,18 65:3,8
  76:1 82:19 98:4
  109:9
**absence** 82:1
**absolute** 25:4
**absolutely** 25:24
  81:7
**accept** 44:14 61:16
  61:18,23,25 83:21
  90:6,19 91:20
  93:2 96:20 99:14
**Acceptance** 3:13
  60:10
**accepted** 44:7,16
  45:21 46:3 47:2,4
  47:22 51:13,20
  74:17 75:2 81:4
  84:9 90:13 98:18
  133:14
**accepting** 122:14
**access** 14:13,13
  23:17 26:18 31:9
  34:8 38:16 45:19
  46:1 47:1,9 52:5,8
  52:16 55:13,15
  56:23 59:9 133:13
  134:8 135:12,17
  136:10 137:14,17
  137:22,23 138:25
**accessed** 14:24
**accessing** 32:15

**accidentally** 106:21
**account** 99:5
**accounted** 103:13
**accurate** 9:13 62:8
  110:21
**accurately** 130:8
**achieve** 31:4
**ACLU** 83:4
**acronym** 31:1
**act** 31:2 52:9
  100:13,18
**acting** 13:15 19:21
**action** 42:7 58:24
  59:1 61:7 80:10
  80:16,22 81:23,25
  82:7 83:12 89:6
  89:13,20 90:14
  91:12 98:15,19,23
  99:2 101:17 111:7
  117:10 140:11
**actions** 23:12,18,20
  44:13 83:3
**Ada** 82:6
**Adams** 82:5,7
**add** 23:9 24:23
  25:11 27:11 58:5
  59:1 80:10
**added** 24:7 27:4
  118:25
**addendum** 111:14
  114:7,11 118:4
**adding** 27:7 123:5
**addition** 28:17 86:3
  87:8 97:11 104:2
  123:3
**additional** 26:24
  27:11 70:19 82:13
  84:14,15 93:3
  97:16 98:1 101:24
  104:4
**address** 25:20
  40:14 80:22 82:8
  85:12,14,17,19
  86:1 87:3 90:9
  91:10 92:7 93:1

94:13 99:18,23
  132:5,6 135:15
  136:6
**addressed** 30:7
  81:1 82:12 103:13
  136:8
**addresses** 92:9
**addressing** 26:1
  40:9 82:13
**adds** 48:14 49:3
**adjust** 94:11
**administration**
  66:23
**administrative** 1:7
  1:13 5:7 6:19 7:1
  7:6 17:5,18,21
  19:14 20:20 21:2
  24:22 30:3 38:20
  49:15 50:20 51:8
  54:9,15 66:6,19
  67:16 92:18,21
  93:14,23 94:3,5
  103:10 140:5
**administrator**
  71:17 131:14
  138:2,5,14
**administrators**
  131:6,20 132:5
  133:5,7,9 137:5,7
**adoption** 18:11
  19:8 117:4,7
**advance** 81:15
**affidavit** 86:23
  87:7
**ago** 20:18 35:9 70:8
  106:16,17 115:18
  120:8 129:24
**agree** 8:8,9 10:22
  15:20 44:1,5
  53:17 54:20 58:10
  61:22 96:2 114:22
  115:1
**agreed** 34:23
**agreed-upon** 74:6
**agreement** 37:3

**ahead** 8:4 9:1 10:13
  11:20 25:23 38:4
  53:25 67:8 71:12
  87:19 95:11
  110:20
**allow** 58:20 59:16
  80:19 88:15 89:1
  91:16,21 92:24
  137:22
**allowed** 66:3 95:5
  120:18 123:4
  134:24
**allowing** 137:23
**allows** 102:12,16
  120:22
**altered** 121:23
**ambiguous** 5:3
  62:3
**amend** 94:23,25
**amended** 90:6
  91:19,20 93:8
  99:15 122:7,18,22
  125:12,15
**amending** 123:12
**amendment** 91:22
  121:15 122:4,5,6
  125:21
**American** 31:2
**amount** 86:9 98:10
**Anne** 13:19
**annotated** 70:5
**answer** 5:20 11:12
  15:6,8,8,10,15,16
  20:12,13 26:14
  47:15,15 48:5,11
  48:14,14,20,22
  49:1,16 50:6,17
  50:25 52:25 54:23
  64:9 67:10 109:9
  109:14 110:11
  124:3,6 125:11
**answer's** 48:23
**answered** 14:19
  15:21 119:14
**answering** 5:18

**answers** 14:18
  15:19 19:23 20:10
  21:18
**anticipate** 86:23
**anybody** 17:20
  63:14 79:16
**anymore** 15:14
**anyway** 123:20
**apart** 32:5
**API** 37:11
**app** 11:25 26:18,25
**appeal** 139:3
**appear** 38:24 110:2
  111:14 112:11
  118:3
**appearance** 83:4
**appeared** 110:8
**appears** 69:16,17
  73:20 74:25 75:5
  78:7 112:10 113:7
  115:16 116:13,18
  118:2,9 129:6
  130:17,18
**appellate** 106:6,8
  138:21,22
**appendix** 114:7,8
  114:11,12 118:4
**applicable** 73:3
  74:12
**applications** 82:15
**applied** 96:23 97:1
  98:2,12 117:15
  118:13 119:25
  120:5,10,13 121:8
  121:10 122:11
**applies** 43:12
**apply** 41:20 42:13
  42:20,22 43:1
  73:4 120:24
**appreciate** 25:15
  48:25 64:5 69:15
  78:23 79:24
  124:16 139:7
**appreciation** 11:18
**approach** 136:21

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 142

| | | | |
|---|---|---|---|
| 136:23 | assuming 61:8 | 81:20 82:7 83:11 | base 19:25 | 56:20 57:17 |
| approaches 136:4 | attach 105:6 | 89:5,14 90:11 | based 16:1 37:18 | best 5:18 11:2 12:4 |
| appropriately | attached 106:5 | 98:25 103:7 | 54:14 55:2,24,25 | 25:20 |
| 135:10 | 115:14,20 127:11 | auto-accepting | 59:7 86:22 97:1 | better 25:1,4 34:22 |
| appropriation 31:5 | 128:22 129:24 | 80:15 | 103:5 116:19 | 60:2 65:22 96:12 |
| approximately | attempt 90:17 | auto-rejected 99:7 | 119:8 120:3,5,6 | beyond 12:22 |
| 28:1 | 128:16 | automatic 96:25 | 121:5 122:11 | bid 35:14 |
| apps 27:12 | attend 7:15,20 9:25 | 97:2,14 98:1,5,7 | bases 39:4 | bids 32:6 |
| argued 138:21,22 | attendees 131:15 | 98:10 | basics 11:13 | big 18:23 |
| Arizona 4:1 131:13 | attending 4:20 | automatically 81:4 | basis 39:6 40:7 | bigger 127:2 |
| 138:4 | attention 16:25 | 88:23 90:13 96:23 | 49:15,17 50:18,22 | BILL 2:17 |
| ARPA 28:3,4 30:23 | 45:16 56:9 69:22 | 98:18 | 52:12,13,15,17 | bind 119:4 |
| 31:2,11,12 | 74:14 79:25 80:6 | available 7:4 12:1 | 53:19 58:7 71:8 | bit 105:11 116:8 |
| articulated 54:3 | attorney 6:11 11:9 | 25:3 35:18 37:21 | 76:12 86:20 | 123:10 132:15 |
| 87:23 | 13:14,14,18 43:6 | 38:22 42:4,5 | 102:17 | blind 117:21 |
| articulates 39:8 | 85:17 87:2,4,4 | 43:15,19,23 44:2 | bat 117:21 | block 99:13 |
| 62:6 | 124:14 126:12,14 | 44:6,12 47:19 | Bates 73:14 111:6 | Boise 1:16 2:12 |
| Artie 138:12,18 | attorney-client | 51:9,11 70:12 | 115:7 124:19 | bottom 112:15 |
| aside 35:11 43:10 | 12:10 | 76:8 108:25 | 127:5,17 | box 2:12 71:1,25 |
| 78:10 131:1 | attorneys 34:17 | 115:10 137:9 | Bear 62:24 | 73:4 |
| asked 16:17 19:22 | 104:22 130:6 | avoid 44:9 132:24 | began 60:22 | break 44:19,22 |
| 20:3,6,7,8 21:6,9 | 134:1,10,17 | aware 7:12 26:5 | beginning 20:24 | 46:8 47:8 48:1 |
| 21:16,20 34:21 | audibly 5:23 | 27:15,16 61:7 | 69:12 | 50:24 58:17 64:7 |
| 45:14 79:22,22 | audience 133:2 | 91:15 102:12 | begins 69:25 | 64:16,18,21,24 |
| 81:15 95:7,11 | audio 115:12 | 126:14 130:21 | behalf 7:1 54:9 | 65:3 78:25 79:7 |
| 121:19 124:12 | authorities 60:15 | AWS 28:25 29:19 | 83:5 103:2 131:5 | 79:15 105:11 |
| 138:19 139:2 | 61:21 | 30:7,8 | believe 9:8 10:20 | 108:23 109:3,5 |
| asking 12:21 15:11 | authority 60:13 | AZ 1:24 | 11:4 13:17 14:18 | 123:16,18,20,24 |
| 21:5 31:24 39:11 | 62:10 65:22,23,25 | | 15:23 17:12,23 | 124:2,2,5,19 |
| 50:9 51:7,7 53:14 | 66:22 91:15,16 | _____ | 18:2 19:19,22 | 128:19,22 |
| 54:7 75:25 78:20 | 92:7,13 94:18,21 | **B** | 20:2,14 21:4,5 | breakfast 138:19 |
| 83:13 120:21 | 102:3,6,9,11,17 | back 20:10 45:1 | 24:10,14 29:2 | bridge 31:21 |
| 134:8 | 102:19 104:18 | 56:6 64:19 68:2 | 37:5 39:24 41:14 | brief 5:11 64:6 |
| assessment 21:14 | authorize 91:13 | 74:14 75:12 79:20 | 49:23 56:13,18 | 68:16 106:6 |
| 21:20,22,22 22:3 | authorized 61:17 | 79:23,25 84:22 | 57:13,21 69:14 | 134:17 |
| 23:2 | 61:25 103:15 | 87:1,5 98:14 | 72:22 87:9 92:15 | briefly 5:13 50:5 |
| assessments 22:10 | auto 98:7 | 103:22 109:8 | 92:21 104:5 | 68:21 111:10 |
| assign 119:8 | Auto-Accept 21:11 | 111:11,20 116:5 | 107:15 110:21 | bring 63:1 126:18 |
| assigned 113:4,5,13 | 58:19 59:8,14 | 124:2 128:23 | 111:16,23 114:5 | bringing 63:2 |
| 113:20 116:14 | 80:13 83:20,23 | backbone 28:13,13 | 114:10 115:16 | broad 24:25 |
| assigning 116:19 | 84:1 85:3 86:12 | 28:14 29:6 32:9 | 116:10 117:23 | broadly 11:25 |
| assignment 113:6,8 | 87:12,23,23 88:14 | balance 137:25 | 121:25 122:11 | broken 112:16 |
| assist 52:19 55:7,10 | 98:17 103:4,14,16 | balanced 136:4,5 | 131:11 132:7 | 125:16 |
| assume 77:3 84:12 | 104:3 125:8 | balancing 135:8 | 138:4,4,14,20 | brought 84:10 |
| assumes 94:17 | auto-accepted | ball 64:18 | believing 53:11 | 90:10 |
| | | bane 35:20 | | |

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 143

**Bryan** 2:5 4:18
**bubble** 23:5,13
  24:18
**budget** 21:8 35:11
**budgeting** 21:7
**build** 31:7 32:6
  34:22 35:2,14
**building** 28:5,10,10
  29:3,5 35:9,13,23
  36:15 37:14,17,22
  38:1 72:4
**built** 28:20,24
  29:18,23 36:11
  37:14,23
**Bulldis** 1:24 140:23
**bullet** 113:25
**business** 92:17 94:9
  104:23
**busy** 59:1 80:10
  104:4
**buying** 32:1,2

                C
**C** 2:1
**CA** 1:24 2:6 140:24
**California** 140:4
**call** 22:22 28:12
  29:12 31:12 51:24
  108:14
**called** 29:10 30:23
**calling** 28:3 33:2
**capabilities** 14:25
**capability** 121:3,4
**capacity** 1:7,12
  6:19,20 140:5
**car** 7:22
**card** 99:5
**care** 78:15
**Carley** 13:14 19:20
  19:20 21:4,6
**carry** 29:21
**case** 3:15,16,17
  6:11 18:18,23
  26:19,21,24 27:23
  27:25 28:19,24

29:7,12,18 31:18
32:24 33:1 36:4,9
36:12 37:14,22,23
38:18,24,24 39:13
39:14 40:12 41:15
41:17 42:14 43:16
44:14 45:3 47:3
47:10,20,21 51:2
51:12,14,20,21,23
51:24 52:1,8 53:9
53:21 54:17,21,24
55:1,5,14,17,18
55:23 56:3,3,12
56:21,24,24 57:7
57:9,16 59:10
60:9 63:24 64:1
76:21,22 84:7
85:6,12,21,21
86:10,16 89:17
90:22 91:11,14
92:15 94:19 96:24
97:3 98:2,5,7,10
98:13 99:19,22
100:7,8,9,10,11
101:12,13,16
102:7,14,20,23
108:2 111:16
115:9,10,16,25
116:15,19,22,24
116:25 117:1,6,8
117:12,13,14,18
117:23 118:1,3,5
118:6,11,13,21,22
119:8,10,24 120:9
120:9,15 121:6,8
121:24 122:1,1,12
127:9 129:22
131:5 133:14
138:19 140:13
**cases** 23:20,23
35:24 41:4,16
57:3 108:6,7
112:21 113:3,12
113:20 115:22
128:4,5 134:4,5

134:18 135:24
**catch** 23:11 105:9
  107:18
**catch-all** 70:22
**categories** 60:12,14
  61:20 73:21
**category** 73:21
  74:5 97:8 121:6
**caught** 19:4 81:13
  82:3
**cause** 30:2 131:24
**causing** 126:15
**caution** 6:8
**Cave** 2:5 4:18
**caveat** 43:18
**CDED** 117:24
**Center** 2:5
**certain** 24:1,7 31:4
  41:5,6 42:23
  55:19 57:4,5 77:5
  81:11 91:22 96:21
  96:24 97:3 104:14
  111:23 112:1
  114:3 117:10,25
**certainly** 36:24
  64:5 91:18 92:25
  100:24 108:6
**CERTIFICATE**
  140:1
**Certified** 140:1,3
**certify** 140:4,10
**chance** 73:25 127:1
  130:18
**change** 6:7,9,10
  95:3,3,8,15,17,20
  95:23 96:6,9,9,10
  97:14,23 100:5
  102:4 118:22
  121:20 125:25
  126:5,5
**changed** 19:3 35:4
  119:2
**changes** 19:4 34:6
  36:14 86:9
**changing** 31:23,25

36:14 102:4
**chat** 61:2
**check** 64:11 84:10
**checked** 122:14
**Chief** 13:15 134:18
**child** 105:23 106:5
  106:19
**choosing** 70:23
**CIO** 121:17
**circle** 128:23
**circulate** 129:9
**circumstances**
  12:14 80:14
**cited** 41:2
**civil** 3:15 40:13
  41:3,3,6,16,19
  43:11,12,13 45:19
  54:25 73:21
  102:24 107:2
  111:14 112:19
  113:18,25 114:8
  114:12 115:15,21
  115:22 118:4
  130:10 137:17
**clarification**
  115:13
**clarifications** 6:6
**clarify** 108:2
**clarity** 11:23
  113:10
**clean** 84:25
**cleaning** 82:11
**clear** 6:24 33:2
  35:25 41:24 42:22
  47:18 48:25 54:6
  71:14 91:4 125:14
  125:18 130:12
**clerical** 92:8 94:14
  95:16
**clerk** 43:20 44:13
  44:16 61:16,23
  62:6,10 66:3,5,14
  66:24 67:1,2,4,13
  67:14,15,17 70:9
  70:12,19,23 71:11

71:15 72:1,2,19
72:24 73:1 74:9
74:22,22 77:14,16
77:19 78:1 80:25
83:20,21 84:1,10
84:18 85:1,9,11
85:13,15,22,24
86:6,9,13,13,16
89:15,16 90:1,16
90:23 91:9,13,22
92:7,13,23,24
93:1,2,21 96:14
96:15,17,18 97:7
97:9,9 98:7 99:22
100:5 101:13
102:4,7,16 103:17
108:4 122:12
123:7 126:1
131:24
**clerk's** 44:4 61:9
  65:9,13,14 69:14
  69:18 84:9,18
  102:22 105:9
  109:18,23,24,25
  110:1 121:24
  122:13,16 123:6
**clerks** 44:6 57:4
  66:11 69:20 71:3
  71:14,20 72:5
  80:19 88:10,16,21
  89:1,8 91:13
  93:15 94:12,18
  95:6,17,18 96:2,5
  97:13,21 98:3,11
  102:1,11,12,18
  104:13,18 106:18
  120:19 121:14,19
  124:8 125:19
**click** 129:22
**client** 12:11
**close** 78:9 138:7
**closely** 130:16
**cloud** 29:19,22
  32:14,15,22
**CNS** 2:17 132:8

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 144

133:20,24 134:3,8
CNS_13287 115:7
code 24:5 74:16,23
75:3 76:7 77:20
99:25 100:1 107:5
107:10,13,17
108:3,8,9 109:23
110:6,10 114:2
116:1 117:14,14
117:23,24 118:3,5
coded 114:11
115:11
codes 3:17 75:4,24
75:25 76:8,10
79:15,17 96:22
107:15,15,24
109:10,16,20
110:5,9,13,14,16
110:17 111:13
112:1 113:24
114:6 115:10,19
118:1
coding 114:10
collect 81:24
column 75:2,3 76:6
76:7,8,11 78:1,3
79:15
columns 73:24
combined 76:25
100:12
come 17:10 36:23
64:19 81:6 83:15
84:4,5,17,23,24
84:25 85:3,6,7,7
85:15 114:6 122:9
132:8 135:22
137:7
comes 7:5 25:6
81:14 88:23 97:9
99:25 114:12
118:5 122:12
127:15 129:23
comfort 9:14 27:18
comfortable 8:14
8:15,22 9:2

coming 7:22 135:24
comment 6:12
25:15 70:18 71:1
72:18 78:1,2
137:19,20,21
138:3
comments 5:12 6:4
67:19 71:7 73:4,4
74:12 78:3 107:24
108:19 125:24
134:20 138:24
Committee 17:24
18:2 88:25
common 12:3
70:14,17 108:19
122:19
commonly 11:4
communicate 86:1
86:5 87:5
communicates
85:23
communicating
20:24 86:3,7
communication
84:20 85:1 87:1
131:18
communications
21:1,4
company 35:8,14
36:23,25
compare 75:9,25
112:8
complaint 84:15,16
105:6 128:3
130:11
complaints 38:16
43:15 45:19,21
74:5 79:13 107:2
135:18 137:18
complete 31:20
48:23
completely 90:3
completion 140:13
comply 80:21
component 24:1

25:4,25 32:10
components 105:13
concept 87:19
concern 30:3 53:1
56:1 132:22
135:12
concerning 9:18
21:2 47:8
concerns 15:12
26:1 30:6 39:12
39:15,20 131:7,13
132:1,13 133:21
134:6 136:9
concluded 139:9
conditions 103:5,8
103:14 119:25
120:5,5
Conducted 1:17
conference 16:6
132:14 133:8,19
137:6,12 138:12
confidence 131:9
131:15,24 132:5
132:23 133:21
135:9
confidential 95:6
96:1,2,4,11,16
97:17,24 98:12
104:25 118:21,24
120:10 121:1,22
122:10 125:24
132:2
confidentiality
95:25 119:8,23
120:12,25 136:8
configurations
103:14
configure 119:7
120:2,24
configured 103:6
115:19,25 116:22
118:11
confirm 77:13,24
124:22
confused 128:2

confusing 109:17
110:3
conjunction 66:6
89:22
connect 28:12
32:13,15
connection 53:14
74:7
connections 28:14
conscious 88:25
conservatorship
113:19
consider 40:4 101:5
consideration 39:9
considered 36:14
considering 19:15
consistent 50:21
consistently 24:3,3
25:2
constitutionally
94:21
contact 85:20
contains 45:12
104:14,19
contemplating 29:5
34:6
content 24:23,25
25:1,5
contentedness
25:16
contents 19:13
68:23 69:1,7,7
context 54:8,20
64:12 132:3
continue 36:19,20
64:8,9 135:1
continuing 29:7
31:17 35:10
continuously 25:19
contract 35:16 37:5
control 14:13
controlling 14:25
controls 66:13
conventionally
42:24 43:3,8

conversation 19:20
21:24 22:3 68:16
132:4,12
conversations
19:18 35:4 36:13
37:8
copied 127:17
copies 14:16 86:8
copy 14:17 20:5,15
46:12,18 61:1
75:17,17 84:25
112:24 117:19
127:25 140:9
core 39:16
correct 4:23 10:18
16:12 19:9 25:12
26:22 30:4,16,23
32:25 33:11 36:10
42:15 44:15 48:2
49:4,5,18 51:5
59:10,11 71:1,7
72:11,21,24 73:4
74:24 75:7 77:17
82:10 83:23 90:18
95:21 97:11 99:22
100:19,25 106:8,9
106:11,12 107:25
110:18 112:18,22
113:14,21 115:21
115:23 119:1,9
120:1,15 121:1
125:3,4,8,9 126:4
131:9,10 140:9
corrected 68:22
105:10
correction 60:14
69:24 90:19
corrections 6:5
correctly 17:25
25:8 26:17,20
32:16 47:5 56:16
56:17 59:3,13
97:15 98:3 105:18
113:24
correspond 76:11

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 145

79:18 115:19 119:24
**corresponding** 116:1
**COSCA** 133:7,19
**cost** 22:11 23:3,4
**costs** 22:13,15
**council** 133:8 134:18
**counsel** 4:17 45:3 45:13,22 49:23 61:6 73:12 74:2 79:12 82:18 93:19 94:2 111:7 124:3 131:4 140:10
**counties** 71:21 121:17
**country** 88:8 134:3
**county** 4:1 28:12 28:14,16 57:10 67:16 71:16 82:6 82:6,8,10 83:9 121:18 128:16
**couple** 5:13 131:2 138:9
**couple-minute** 64:16,18
**course** 17:7
**court** 1:1 3:15 5:14 6:1,13 13:16 17:24 18:1,1,4,16 25:6,9,17 26:23 31:5,13,17 34:6 34:18 35:5,6,12 36:14 37:16 38:12 38:14,19,20 39:8 39:17,18,22,24 40:4 42:7 43:20 44:11,13 49:8,11 49:15 50:19 51:5 51:8 52:20,21,24 53:7,12,20 54:4 55:8,11,12,19 56:13,21 57:12,16 57:18,19 58:22

59:2,7,18,24 61:18 62:1,3 63:20,21 65:5 67:12 68:8 71:17 71:18 74:22 78:4 80:11 81:6,8,10 81:23,24 83:2 87:11 88:14,16,19 88:25 89:1,2 91:19,21 92:16,17 92:21 93:14,22,23 94:9,20,21,22,22 94:23,24 95:20 96:1 97:13 98:3 98:21 99:3 102:21 103:6,15,16,19,21 104:8,13 105:25 106:7,8 112:14,15 112:19,22 113:3,4 113:12,14,18,25 114:1,4 119:23 120:17,22,23 121:3 125:23,24 125:25 131:6,14 131:19,20 132:5,9 132:11 133:4,7,8 133:12 134:7,20 134:21 136:18,20 136:24 137:1,5,6 138:1,2,21,22
**court's** 11:8 19:8 25:9 26:19 36:18 37:20 44:14 47:3 47:19 49:14 51:2 51:3 53:21 54:3 54:22 55:3,22 56:12,21 80:19 127:21
**Court/Tyler** 34:4
**Courthouse** 1:3 4:17 45:14 125:1 136:11
**courthouses** 28:15 43:24
**courts** 1:8,13 3:14

5:8 6:20 7:2,7 12:2 16:7,11,18 17:23 21:9 27:22 29:5 36:7 37:25 45:20 53:8 54:9 57:1,1,22 58:12 87:15 88:7 119:6 131:9,16,25 132:1 132:6,17,23,23 133:21 134:7,23 135:2,2,6,6,7,9,13 135:14,16 136:13 136:14,22 137:3,7 137:17,21,23 139:1 140:6
**Courts'** 18:10
**cover** 40:14,15,16 41:12 72:6 105:4 107:8
**covered** 37:8 55:6
**covering** 110:15
**covers** 73:22
**Cozine** 131:14,18 133:2,11
**Cozine's** 132:13
**crashing** 24:3
**crawlers** 24:8
**create** 5:15
**created** 65:6,16 118:23 130:4,15
**creates** 104:4
**creation** 37:10
**credentials** 26:10 26:11
**credit** 99:5
**criminal** 41:10 102:25 128:3,4,5 128:14
**critical** 24:1,12 25:4,25
**CSR** 140:24
**curious** 92:8
**current** 9:3 26:6 28:18 37:2 38:8,8
**currently** 14:8 26:8

28:11 32:19 36:8 37:25 72:4 87:11 129:24 133:12
**custodian** 118:6,7
**cut** 109:25
**cybersecurity** 31:8

─────────
**D**
─────────
**damage** 134:7,20 134:21
**data** 37:14 73:19 74:4,6,15 77:9,10 77:24 78:20 107:23
**database** 14:24 15:16 36:12 37:15 37:15,18 109:16
**date** 1:23 31:15 33:15 68:2,3 101:18
**dated** 69:17
**day** 60:23 140:17
**days** 68:1
**de** 118:6,7
**deal** 135:12
**decade** 18:21
**December** 131:12
**decide** 89:25 90:18 90:20,24,25 91:8 91:20,23,25 92:6 92:10 93:2 99:3 99:12,14,20 100:9 100:10 101:20 121:24
**decided** 89:3
**decision** 41:22 43:14 67:15 88:15 89:1 92:4 96:7,11 121:22 122:9
**decisions** 135:7
**declaration** 127:8 127:12,16
**deems** 54:4 120:25
**default** 117:12,13
**Defendant** 1:9 2:9

**Defendant's** 3:11 45:4 80:1
**define** 41:11 43:2 94:21
**defines** 42:2 51:9 66:14 94:8
**defining** 35:24
**definitely** 26:3 137:24
**definition** 55:3,24 55:25
**deletion** 122:24
**demonstration** 10:7,17 11:9,21 12:5,15 13:1,5 14:2,2 17:13 19:12 125:2
**depending** 90:9
**depends** 86:15,25 102:3,10 108:3
**depict** 115:2
**DEPONENT** 8:5 9:2,11,21 10:14 11:14 13:11,21,23 14:6 16:15 17:8 19:19 25:24 27:14 28:6,9 29:11 38:5 46:14,19 47:18 50:8 54:1 61:12 63:18 67:9 71:13 75:16,23 76:19 78:14,19 83:1 87:21 92:20 94:20 95:12 110:21 112:25 117:20 122:21,24 128:1,8 128:11,13
**deposed** 5:4
**deposition** 1:11 3:1 5:6 6:17,18,25 7:11,16,17,18,20 9:24,25 139:9 140:3,5,8,13
**depositions** 4:21 5:11 7:15

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 146

**deputy** 71:14 72:1 72:5
**Derrick** 7:20 8:1 9:8,18 15:21,23 27:19 87:10 103:2 119:20
**Derrick's** 16:1
**describe** 136:19
**described** 36:3
**description** 86:11
**designate** 95:5 125:19
**designated** 7:19 54:8
**designates** 96:24
**designating** 96:4
**designation** 41:25 96:7,8,23,25 97:1 97:10,10 120:12 122:8 125:13,25
**designed** 18:6 36:4 88:17 105:4
**desk** 22:20,20,23 122:13
**determination** 67:2 118:20
**determine** 40:7 81:25 118:11 120:19 121:14
**determined** 81:21 118:24
**determines** 96:15
**determining** 65:23 66:6,10
**developing** 31:14
**diagrams** 134:2
**difference** 110:8,9
**differences** 88:11
**different** 11:8 20:1 27:23 29:18 41:25 48:6 53:15 60:4 62:22,22 71:21 82:22 85:8,9,23 85:25 87:14 88:2 88:7,13 91:4 93:9

93:24 104:12 109:17 114:9 134:4,6 136:3,4,5
**differently** 136:5
**difficult** 23:24
**difficulty** 95:19
**direct** 28:14 45:16 56:9 69:22 79:25 80:6 84:19 85:1
**directing** 74:14
**direction** 26:4 39:23 40:4
**directly** 76:20
**Director** 1:8,13 5:7 6:19 7:1,6 140:6
**disagree** 7:25 8:6,8 8:11,17 10:11
**disagreed** 8:12,24 9:19 10:5
**disagreement** 43:21
**disclosure** 112:12 117:7,11
**discovery** 45:3 131:4
**discuss** 16:7 17:3 135:15 136:7
**discussed** 9:17 12:11 17:14 60:1 104:5 123:10 124:23 125:7 135:21 136:1 140:14
**discussing** 16:6 41:22 47:8 48:1 49:1 64:24 74:7 75:6 79:19 104:2 128:22 129:24 133:9
**discussion** 17:2 32:3 37:10,19 98:6 109:4 132:19 133:20,24 134:6 134:22,25 135:5 135:23 136:12

**discussions** 17:10 32:4 131:5
**disheartened** 63:23
**disinformation** 132:6
**dismiss** 82:9,9 93:7 100:8 101:12,13
**displace** 48:15
**display** 36:8
**dispute** 44:9
**distinction** 33:5 112:14
**distinctions** 105:17
**district** 1:1,2 3:15 45:20 66:7,7,14 66:19,20,21,23 67:16 93:22 106:7 112:14,18,22 113:3,4,12,13,13 113:25 114:1,3 133:12
**districts** 66:18,19
**division** 22:15 25:9 25:10,18 113:5
**docket** 51:3 54:22 102:20
**Docs** 76:25
**document** 12:18 22:2 37:21 42:1,8 42:8 45:1,3,9,12 51:1,20,24 53:20 54:16,16 55:2,19 56:20 60:4,8,10 60:17,18 61:1,4,5 61:11,16,18,23,24 61:25 62:4,8,16 62:18 63:3,11,15 64:24 65:2,4,16 65:21 66:3,4,15 66:25 67:3 68:11 70:11,13 72:21 73:2,8,24 74:3,4 74:20,21 75:3 76:16 77:15,25 79:11 80:15,23,25

81:4,13 83:11 84:22 87:2 89:5 89:13,21 90:8,11 90:12,12,12,21 91:6,7,19,21,24 91:24 94:8 95:6 96:6,11,19,21,24 97:3,6,7 98:13,24 99:10,16,19 100:14,22 101:7,7 102:7,23 104:13 105:14 107:21 111:6,12,18,22 112:1,2,16 114:16 114:17,20 116:5,7 116:9,25 118:9,10 118:16,21,23,25 119:4,9 122:1,9 122:15 123:13 124:4,6,9,19,20 126:19,23 127:23 128:22 129:23 130:3,8,15,22
**documents** 3:13 9:5 14:14 15:2 23:23 34:8,18 36:9 38:21,23 39:13 41:5,6,24 42:3,3,3 42:4,5,6,7,9,10,10 42:14 43:18 44:1 44:5,8,10 46:2 47:1,2,10 51:12 56:11,13 58:20 59:9,16 60:12 65:23,25 76:25 83:14 84:4,7,11 84:14,15,19,21 85:3,8,10,25 86:1 86:8 88:22 89:17 90:3 95:2 96:1,15 96:16 97:17 98:17 100:4,12 102:13 102:14 103:1,6 105:1,8,15 107:7 113:11 117:10

120:25 125:20 128:5,14 131:8,22 131:23,23 132:10 133:13
**doing** 16:20 57:1 111:5 117:22 126:1 132:24 134:3
**dollars** 35:13,17,19
**downloadable** 127:20
**drop** 126:22
**drop-down** 60:16 67:18 70:16 72:15 95:23 97:23 110:4 110:7,16 115:9 120:8 125:13
**Duke** 2:10,11 8:2 8:25 9:10,20 10:12 11:12,15 12:16 13:10,20,22 14:5 16:13 17:6 19:17 25:21 27:13 28:8 29:9 38:3 44:20 46:12,17 47:14,17 48:4,12 48:17 49:5 50:7 53:23 61:10 63:17 64:11,15 67:7 69:1,3 71:10 75:15,21 76:14 78:18,24 79:4 82:25 87:17 92:19 94:16 95:10 108:22 110:19 112:24 117:19 122:20,23 123:11 123:15,22 127:5 127:10,13,19,24 128:7,9 138:7
**duly** 4:6 140:6
**duplicate** 76:24 101:15
**Dvorak** 9:24 20:24
**Dvorak's** 10:4,10

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 147

| | | | | |
|---|---|---|---|---|
| 20:22 | 120:14 | **errors** 82:11 | 99:9 103:23 | **explain** 41:12 67:20 |
| | **eight** 24:10 | **especially** 83:3 | 132:14 | 71:8 80:14 116:20 |
| **E** | **either** 21:11 22:22 | **essentially** 14:10,15 | **exempt** 42:4,9 | 124:5 130:6 |
| **e** 2:1,1,10,10 4:10 | 27:15 42:8 74:17 | 18:15 22:3,16 | 105:16 112:11 | **explained** 14:19 |
| 13:19 73:2 | 138:20 | 23:7 28:13 42:2 | 117:6,8,10 118:1 | 109:15,20 127:16 |
| **e-file** 36:15 38:1,2 | **elaborate** 131:17 | 82:2 136:14 | 118:22 | **explaining** 72:17 |
| 72:21 129:14,15 | **elected** 66:5,20 | **establishing** 39:9 | **exhibit** 3:9 6:18 | **explanation** 12:19 |
| 129:20,21 130:6 | 67:15 71:15 72:2 | **estimate** 22:24 | 44:24 45:2 60:4,7 | 71:2,24 110:11,24 |
| 130:14 | **electronic** 18:18 | 106:15 107:1 | 60:9 62:20,23,24 | **explicitly** 38:20 |
| **e-filed** 44:8 45:19 | 40:22 62:5 66:2 | **estimates** 87:8 | 63:1,2 64:25 68:5 | **exploration** 38:15 |
| 74:5 128:5,15 | 67:13 84:8 85:24 | **evaluating** 19:14 | 68:6,19,20,22 | **exploring** 36:8 |
| 135:17 | 88:1,20 106:4 | 55:21 | 73:6,8 74:15 | **expressed** 132:13 |
| **e-filer** 69:24 | 114:23 123:12 | **event** 72:19 | 79:11 80:1 103:23 | **extent** 15:23 21:15 |
| **e-filing** 3:15,20 | 125:22 | **ever-evolving** | 103:24,24 109:11 | 43:1 58:6 72:1 |
| 15:2 19:7,9 27:23 | **electronically** 43:2 | 25:15 | 109:12 110:12,15 | 76:14 87:22,25 |
| 36:15,20,24 37:3 | 43:7 44:10 100:18 | **everybody** 139:8 | 110:25 111:3 | 138:23 |
| 37:18 38:17 40:6 | **electronically-filed** | **EVETT** 2:11 | 114:18 116:3,7 | **extra** 91:9 |
| 40:10,19 42:18,18 | 107:2 | **evidence** 94:17 | 124:15,20 126:21 | |
| 44:3,11 61:17,24 | **element** 12:10 | **evidentiary** 100:19 | 126:23,25 127:8 | **F** |
| 62:13 67:1 70:9 | **else's** 132:21 | **exact** 71:19 107:12 | 128:23 129:8,9,10 | **face** 68:13,20 |
| 74:10 85:14 95:3 | **email** 22:22 78:17 | 122:22 | 129:19,25 | **fact** 20:2 23:3 56:2 |
| 95:24 106:10 | 85:17,18,19 87:3 | **exactly** 57:19 | **exhibits** 3:10 | 57:13,14 68:24 |
| 115:3,4,24 119:25 | **Embarcadero** 2:5 | **EXAMINATION** | 106:19 | 92:15 96:2 97:17 |
| 122:5,7,18 126:5 | **employment** 20:12 | 1:11 3:3,4 | **exist** 51:11,14 | **facto** 118:6,7 |
| 130:5 | **enforcement** 126:6 | **examined** 4:7 | 58:22 59:18,24 | **facts** 94:17 |
| **e.g** 58:22 59:18 | 126:10,16 | **example** 23:18 62:8 | 71:23 | **failed** 87:18 |
| 104:7 | **ensure** 53:5 97:16 | 76:21 80:18,23 | **existed** 18:20,21 | **failing** 80:21 93:7 |
| **earlier** 9:23 10:11 | **entail** 105:22 | 81:15,19 82:4,14 | **existence** 18:14 | **failure** 107:16,21 |
| 20:21 27:17 89:4 | **entails** 6:5 | 83:4,9,24 84:3 | 35:21 | 108:10 |
| **easier** 46:13 48:20 | **enter** 83:4 | 89:8 95:15,18,21 | **existing** 76:22 | **fair** 5:2,2 11:17 |
| **easily** 82:4 85:18 | **entered** 47:3 78:4 | 104:15 105:3,19 | 100:10,11 | 51:16 54:12,13 |
| **easy** 86:25 | **entering** 128:3 | 105:23 107:3,7 | **exists** 76:22 85:12 | 107:20 |
| **effect** 29:3 31:15 | **enterprise** 29:12,12 | 120:7 | 85:14 91:11 100:7 | **fairly** 58:16 |
| **effective** 31:7 | 32:24 33:1 | **examples** 83:8 89:4 | **expanded** 38:10 | **fairness** 55:22 |
| **effectively** 34:21 | **entire** 42:8 117:6 | 91:6 98:16 | **expanding** 38:9 | **family** 40:14 41:8 |
| **efficiency** 97:12,21 | **entirely** 26:10 | **Excel** 73:11 76:5 | **expansion** 38:5,6 | 41:12,14 112:19 |
| **efficient** 96:12 | 47:12 | 109:11 | 38:15 | 113:18 |
| **effort** 81:2 132:4 | **entirety** 68:18 | **exception** 44:4 | **expect** 107:22 | **far** 5:25 20:16 23:1 |
| **efforts** 74:4 137:2 | 73:25 | **exceptionally** 8:14 | **expend** 81:23 | 39:6 65:9 83:8 |
| **eFile** 19:1,3 36:21 | **entitled** 82:24 | 107:11 | **experience** 8:15 | 92:12,22 107:3,7 |
| 87:13 | **envelope** 67:24 | **Excerpt** 3:14 | 84:4 107:11 | **fashion** 84:23 |
| **EFM** 9:6 20:15 | 68:1 84:5,8,21 | **exclude** 12:9 | **experiences** 16:11 | **fast** 112:5 |
| 36:5 37:15,18 | 85:7 89:8,9,12,13 | **excluding** 12:13 | 16:18 | **February** 69:17 |
| 38:17 44:3,11 | **error** 67:22 71:1,7 | 41:14 | **expert** 87:6 | **federal** 21:9 31:3 |
| 119:11 120:1,3,11 | 72:11 100:25 | **excuse** 75:1 77:14 | **expiration** 37:3 | 135:5,6 140:13 |

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 148

| | | | | |
|---|---|---|---|---|
| **fee** 58:23 59:19 73:21,21 74:5 81:22,24 82:1,15 82:15,19,24 83:3 83:6,9 99:3 111:13 114:3,6 115:11 116:1 | 58:2 62:17 85:16 100:22 **file** 3:19 15:16 19:7 37:22 38:24 43:5 43:6,7,22 44:7 47:21,21 51:1,12 51:15,21 52:8 | 132:20 **files** 37:23 93:15 **filing** 3:13 18:20,24 18:25 40:22 42:14 55:2,3,15,18 56:21 58:21,23 59:17,19,24 60:11 62:5,6,10,12 66:2 | 4:25 5:16 45:5 46:24,24 49:8,17 56:7 63:12 83:8 111:9 114:20,21 117:3 121:17 130:5 **fiscal** 35:19,19,20 | **former** 13:14,18 **forward** 14:3 57:2 **found** 102:21 124:9 **foundation** 8:3 9:10,20 11:16 40:17 71:11 82:25 87:18 94:17 |
| **fee-type** 79:13 **feel** 25:1,4 **fees** 99:2 114:9,13 115:15,20 | 55:14 56:3 57:16 60:16 69:8,10,13 72:24 74:11 76:22 84:9 90:22 91:11 91:14,17 92:15,23 | 67:13,13,14,17 68:2 74:10 78:5 79:13 84:13,13,14 85:20,24 86:17,19 86:24 87:8 88:3,5 | **five-minute** 44:19 **five-year** 37:5 **fix** 67:22 102:1 136:20 **fixed** 82:4 | **fourth** 89:7 **Francisco** 2:6 **frankly** 12:23 70:15 104:24 106:22 |
| **Fetterly** 2:4 3:5 4:11,17 8:10 9:7 9:16,23 10:16 11:19,20 12:24,25 13:12,24 14:20 16:16 17:15 20:9 26:5 27:17 29:1 29:14 38:13 44:17 44:21,25 46:21 47:16,25 48:7,13 48:24 49:6 50:10 54:5 57:25 60:8 60:20,25 61:14 62:21 63:25 64:14 64:17,23 68:4 69:2,4,6 72:7 73:7 73:11 75:18 76:1 77:6 78:12,22 79:3,5,9 80:6 83:7 88:18 93:19 95:1 95:14 109:1,7 110:23 111:4 113:2 115:14 116:4 117:22 119:19 123:8,19 123:23 124:1,16 126:22 127:7,11 127:14,20,22 128:12,17,21 129:7,11 138:9 139:7 **field** 78:7 **fields** 77:3,22 78:21 **figure** 14:16 20:3 | 93:8 102:7,14,15 102:23 114:23 117:6 130:10 **file-stamped** 43:20 **filed** 12:8 15:2 40:11 42:24 43:2 43:3 45:19 47:3 47:22 51:1,13,24 52:1,21 53:1,9,20 54:4,16,21 55:20 55:24 56:2,14,15 57:10,14,15 58:20 58:24 59:16 82:5 82:6 89:24 91:12 92:14 98:13 99:19 100:9,14,16,17 101:3,8,12,14 102:8,13,15 105:25 112:22 113:3 125:1 127:8 134:18 136:16 **filer** 20:15 44:5 70:20 71:8 77:14 81:14 85:16 88:22 90:2,5 91:18 96:13,24 97:6,8 120:6,11,18 121:2 121:6,6,8,16,21 122:8 123:5 125:23 130:10 136:20,24 **filers** 82:16 95:4,24 96:3 104:21 | 88:20 89:23 90:7 96:22 99:25,25 101:2,15,19 104:19 105:9 106:4,7,8,10 114:3,6,9,13,23 115:11,15,19,20 116:1 118:4 120:13 123:12 125:22 128:14 **filing/request** 69:23 **filings** 41:20 42:13 42:21,22 43:13 56:14,24,24 66:11 73:20 74:16 93:1 93:3 104:18 106:21 114:1,4 126:7,9,12,14 **final** 131:2 **financial** 21:10 **find** 64:4,9 65:1 85:11,25 87:5 89:16,16 107:23 123:2,18 124:6 **findings** 81:11 **finish** 5:18 **fire** 101:19 **fires** 31:10 **firewall** 24:15 **firm** 4:18 13:22 **first** 3:12 4:6,21,24 | 136:20 **five-minute** 44:19 **five-year** 37:5 **fix** 67:22 102:1 136:20 **fixed** 82:4 **flexibility** 94:12 **floods** 31:10 **Floor** 2:5 **focus** 18:7 31:4 35:4,6 42:9 46:21 74:1 **focused** 103:18,19 **folder** 126:23 **folks** 63:20 77:24 78:20 105:5 **follow** 19:23 20:8 54:4 88:17 89:2 137:2,4 **follow-up** 77:12 138:10 **followed** 21:20,25 60:13,15 61:20 68:21 70:2 71:7 **following** 17:3,17 19:11 45:23 46:6 103:19 **follows** 4:8 46:3,7 114:10 **forced** 132:9,9 134:23 **foregoing** 140:5,12 **form** 25:21 29:9 38:3 53:23 67:7 71:10 82:25 87:18 94:16 95:10 100:14,16 101:3,8 110:19 **formatting** 99:17 | **fourth** 89:7 **Francisco** 2:6 **frankly** 12:23 70:15 104:24 106:22 **Friday** 4:2 **front** 75:8,12 82:3 82:12 90:10 93:6 **full** 48:19 49:11 **function** 52:4 55:5 58:19 59:9 61:2 80:13 87:12,15 103:4 104:3 **functional** 24:11 **functionality** 103:4 118:17 **functioning** 57:1 57:12,18,19 **functions** 27:24,25 29:20 57:4,5 **funded** 28:3 **funding** 31:3,11 35:11 **funds** 28:4 99:5 **further** 139:6 140:10,12 **future** 31:15 |
| | | | | **G** |
| | | | | **G** 2:4 **gate** 5:3 **general** 12:19 41:2 41:15 71:24 72:11 87:19 97:8 100:25 108:5 118:17 **generalized** 131:7 **generally** 42:20 119:1 |

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 149

**gentleman** 119:12
**gestures** 5:24
**getting** 11:16 30:9
33:25 46:17
138:21
**Girdner** 2:17 58:10
127:12
**Girdner's** 128:7
**give** 23:2,16 73:24
76:20 88:12 94:12
105:23 106:15,25
107:12,18
**given** 31:3 75:13
133:25
**gives** 67:21 102:9
110:12
**giving** 13:4
**glasses** 46:15
**go** 5:12 8:4 9:1
10:13 11:20 12:22
25:23 29:23 31:14
32:19 38:4 40:7
44:14 49:21 50:3
53:25 54:18,19
56:6 67:8 69:2
71:12 76:17 78:1
84:16 85:9,25
87:19 89:23,24
95:11 96:5 103:22
109:3 110:20
111:11 116:5
118:2 123:16
128:9,17 129:13
129:21 130:16,18
**goes** 52:24 55:17
60:11
**going** 7:22 26:16
28:23 34:1 44:17
44:18 45:1,8,16
46:8,21 49:25
56:6,9 58:15
61:15 62:22 64:8
64:25 65:1 68:18
68:20 73:7,23
74:1 78:9 81:21

**half** 55:10
**hand** 5:24
**hands** 96:13,14
**happen** 86:11
92:22 137:3,4
**happened** 95:13
**happens** 90:15,22
107:19
**happy** 64:6
**hard** 22:24 23:7
46:12 87:25 88:5
112:24 117:15

88:15 98:14 104:1
110:25 111:4
112:25 114:15
116:5,6 123:2
126:18,22 133:18
**good** 4:12
**goodness** 106:4
**gotcha** 13:24 44:8
**Gov** 30:7,8
**grace** 67:24
**granted** 26:11
**grants** 88:21
**great** 24:13 33:24
44:20 117:22
135:12
**group** 61:2 116:25
117:14,23 118:12
**groups** 112:16
118:12
**guardianship**
113:19
**guess** 8:13 17:16
25:11 30:20 58:1
60:12 73:8 100:9
102:19 114:7
119:5 124:22
126:9 127:22
**guidance** 66:10,12
**guide** 3:19 129:22
130:4
**guides** 129:12

**H**

**hardware** 22:13
**harm** 56:19 58:2
132:18
**head** 5:24 8:12,18
41:23 43:18 83:15
134:13
**header** 76:7
**health** 112:20
113:19
**hear** 8:20,22 81:16
135:2
**heard** 8:1 23:4
79:20,23 119:11
126:8,15
**hearing** 81:8,25
101:18,20,22,24
**held** 9:5
**help** 21:10 22:20,20
22:23 31:7 35:15
41:12 50:2 55:21
64:13
**helpful** 112:3
**Henderson** 13:20
13:21
**Hey** 90:2 123:15
**highlighted** 58:7
80:8 112:1,4,9,10
**Hiring** 25:25
**historically** 18:1
**hold** 75:14,17
116:6 130:12
**honest** 46:15 88:24
**honestly** 16:15 18:4
63:5 118:8 135:24
**hope** 72:8,8,15
85:19
**hoping** 80:13
**hosted** 22:4,13
28:25
**hour** 5:5 44:19
78:25
**house** 7:23
**huddle** 123:21
**huge** 28:21

**I**

**I-R-E-F-S** 40:25
**ICAR** 62:9
**iCourt** 3:20 18:11
18:13,15 23:17
24:24 25:12 26:6
114:23,24 115:4
127:9,15 128:25
129:1,4,16
**ID** 2:12
**Idaho** 1:2,8,13,16
3:14 5:8 6:20 7:6
9:4 13:16 17:23
18:10 27:22 28:2
29:5 31:5,6 36:7
37:20,24 38:12,14
38:19,20 39:8,16
39:18,22,24 40:4
40:20,22 41:16
45:20 49:8,10,15
50:19,21,23 51:5
51:8 54:9 55:19
57:19 58:22 59:18
59:24 62:4 66:1
66:17 68:8 71:3
71:18 80:18 81:6
82:16,24 87:14,16
88:13,14,15,20
89:2 92:9,13,17
92:21 93:14,23
94:11,11,20,22,23
94:24 95:20
103:10,15 111:14
112:22 114:7,8
119:6 120:17
125:21 130:7
137:25 140:6
**Idaho's** 104:4
127:10
**idea** 63:5 107:19
128:6
**identical** 14:8
**IDENTIFICATI...**
3:10
**identified** 11:3 39:5

39:25 40:18 43:10
43:14 47:9 49:23
52:15 58:3 70:24
76:12 83:7 97:13
97:20 103:12
110:14 120:8
138:12
**identifies** 61:19
70:5
**identify** 41:19
43:11 60:11 70:12
86:25 108:7
111:15 115:25
134:20 137:16
**identifying** 8:16
60:14 95:19 96:1
**Ill** 99:9
**illegible** 91:5,7
94:13 99:9
**imagine** 118:20
**immaterial** 6:6
**immediately** 35:1
43:19,23 44:2
81:2
**impact** 21:10 22:19
22:19 34:7 90:8
91:23 93:4 96:8
99:15,16 100:1
132:8,11 134:22
134:25 135:13
**impacts** 84:1 89:7
**impetus** 126:4
**implement** 21:9,23
22:5 35:15 47:23
**implementation**
18:7,11 19:9
**implemented** 19:5
31:20 33:14 58:19
59:15 104:3 137:8
**implementing**
19:15,21 35:5
39:16
**implications** 22:7
85:4 100:17
**important** 5:23

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 150

| | | | | |
|---|---|---|---|---|
| 53:7 58:12 | information 7:4 | interest 56:25 | 136:8 137:16 | 88:9,13 101:11,13 |
| **improper** 58:24 | 13:15 22:6 24:2 | **interested** 81:9 | _____ | **justice** 23:22 24:1 |
| **improve** 25:19 | 25:10,18 26:21 | 140:11 | **J** | 25:3 34:17,20 |
| 34:22 | 36:9 41:13 70:19 | **interests** 135:8 | **Jennifer** 9:24 21:6 | 57:12 |
| **improving** 35:1 | 71:25 72:17 79:13 | 136:5 | 24:6 25:25 27:4 | **Justices** 134:18 |
| **in-camera** 101:2 | 80:24 81:5,7,11 | **interface** 126:6 | **Jennifer's** 23:1 | **justification** 46:25 |
| **in-depth** 130:19 | 90:1 104:7,10,11 | **interference** 115:12 | **job** 57:2 | 58:18 |
| **inability** 34:19 | 104:15,17,19 | **interim** 20:25 | **jobs** 24:2 | **justifications** 45:18 |
| **inaccurate** 9:9,13 | 107:6,6,22 108:10 | **interrogatories** | **Jon** 4:17 11:17 | 46:1 54:14 56:10 |
| **inadvertently** | 131:16 132:2,18 | 3:12 45:5,13 80:2 | 12:16 46:17 47:14 | |
| 105:5 106:18,22 | 132:20,20,21 | **interrogatory** | 48:4 108:22 | _____ |
| **inappropriate** | 134:4,25 135:3,10 | 45:17 50:6,18 | 123:15 128:9 | **K** |
| 106:20,23 | 136:25 | 54:12 64:3 80:7 | 138:8 | **K** 75:1,2 |
| **include** 7:4 12:17 | **infraction** 88:2 | 103:25 131:12 | **jon.fetterly@bcl...** | **Katherine** 2:4 |
| 36:1,2 38:16 | **initial** 21:22 34:16 | 133:18 | 2:7 | **katherine.keatin...** |
| 48:19 67:25 68:22 | 41:20 43:13 48:25 | **intervene** 101:12 | **Jonathan** 2:4 | 2:7 |
| 70:22 109:22 | 51:25 52:11 56:6 | **intervening** 83:22 | **judge** 52:7,8,16 | **Keating** 2:4 |
| **included** 18:17,19 | 84:13 107:8 114:1 | **intervention** 99:24 | 53:3,4 57:15 66:7 | **ked@dukeevett.c...** |
| 35:12 37:10 70:16 | **initially** 53:14 | **introductory** 5:12 | 66:19,20 67:16 | 2:13 |
| 79:12 93:9 105:14 | 71:15 | **investigate** 103:16 | 81:21,22 82:8 | **Keely** 2:10 28:6 |
| 106:24 133:20 | **initiate** 54:24 | **investigating** 26:9 | 89:23,24,24 90:6 | 75:14 93:12 129:8 |
| 134:2 | 129:22 | 26:12 31:23,24 | 90:7,8,15,18,19 | **keep** 34:19 93:15 |
| **includes** 80:23 | **initiated** 51:23 52:1 | 103:20 | 90:21,22,24,25 | 93:22 |
| 114:9 | 55:1,5,17,18,23 | **investing** 34:25 | 91:8,13,19,25 | **keeping** 23:25 25:2 |
| **including** 19:17 | 55:25 | **investment** 34:25 | 92:6,10 93:5,6 | **kept** 93:21 124:12 |
| 35:23 40:6 74:6 | **initiating** 51:24 | **involve** 104:23 | 99:11,13,18,20 | **kind** 12:14 13:8 |
| 131:8 132:6,7,21 | 128:5,14 | 136:23 | 100:4,8,10,13,18 | 14:1,3 15:4 19:14 |
| 135:7 | **initiation** 3:16 57:7 | **involved** 79:10 | 100:21,24 101:4,4 | 23:2,10,11,11 |
| **Incomplete** 99:13 | **injunction** 127:15 | **involves** 18:13 | 101:11,19,22,23 | 31:21 32:9,11 |
| **incorrect** 99:17,19 | **inquire** 77:12 | **involving** 89:12 | 103:1 113:13,21 | 33:12 34:6 38:14 |
| 100:3 | **instability** 34:19 | **IREFS** 40:20,25 | **judge's** 80:22 81:2 | 41:17,21 46:16 |
| **increase** 25:11 | **installed** 33:15 | 42:19,20,22,23 | 92:4 99:23 | 47:7 52:24 115:2 |
| **increases** 31:8,8 | **instance** 27:7 29:22 | 43:1,10 | **judges** 52:5,6 55:13 | **kinds** 36:13 |
| **increasing** 134:2 | 33:6 89:21 132:7 | **issue** 21:17 26:9,14 | 55:14 57:3 59:2 | **kiosks** 43:23 44:2 |
| **incredible** 88:8 | **institute** 21:11 | 26:15 52:23 55:14 | 66:21 80:11 104:4 | **knew** 133:16 |
| **incredibly** 59:1 | **institution** 58:12 | 60:22 69:5 81:10 | **judicial** 52:4 55:5 | **know** 5:10,11,14 |
| 80:10 | **instruction** 39:24 | 89:3,12 91:10 | 58:25 66:18,18 | 6:1,6,13 7:5 8:20 |
| **INDEX** 3:3,9 | **Insufficient** 99:2,5 | 97:12,12 98:14 | 80:9,16 81:13 | 10:7 12:2,19 13:5 |
| **indicate** 67:4,6 | **integrity** 53:8 | 101:9 137:14 | 82:13 83:12 89:6 | 13:24 14:7,22 |
| **indicated** 10:6 | 55:22 58:12 | **issues** 26:2 52:20 | 89:13,20 90:14 | 15:3 17:17 19:6 |
| **indigent** 83:5 | **intend** 48:14 | 55:8,9,11,12 | 98:14,19,23 99:2 | 19:11 20:2,6,13 |
| **individual** 86:17 | 118:15 | 80:22 92:8 93:1 | 101:17 | 20:19 21:8 22:4 |
| 108:2 | **intended** 68:22 | 94:13,14 95:16 | **July** 18:3,4 133:19 | 22:10,23 23:3 |
| **inefficiency** 95:19 | **intention** 36:18,19 | 98:19 103:11 | **June** 20:25 | 25:9,18 33:19,21 |
| **inform** 41:21 | **intentions** 38:8 | 131:25 133:10 | **jurisdiction** 58:25 | 33:24 34:8 37:10 |
| | | | | 38:16 39:4 40:11 |

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 151

42:18 43:21 44:13
50:22 54:15 58:2
58:3,6 60:1,18
61:4,5,13,23
62:15,15,18 63:3
63:3,14,15,19,22
64:1,2 65:9,12,23
66:10 67:11 71:7
71:20 73:22 77:2
77:2,5,7,9,10,22
78:2 79:17 81:18
81:18 83:10,19
85:17 87:12,15,22
87:24 89:5 92:12
92:24 95:16,22,24
96:22 97:3,16,20
97:21,22,23 98:1
98:3,18 99:14
100:2 101:3,9
102:8,15 103:6
105:13,17 106:3
107:10 108:11,15
108:17,23,23
109:2 111:21
115:25 117:12,13
117:25 118:5,7
119:22 122:25
123:13 127:1
130:9 131:2
133:15,17 134:10
136:8,9,19,24
137:7,8
**knowing** 15:13
**knowledge** 7:3 8:7
8:8
**known** 7:4 10:23
81:9

**L**
**L** 75:3 76:6,8,11
**labeled** 73:14 111:6
124:19
**large** 73:24
**law** 4:18 40:14 41:9
41:12,14 126:6,9

126:16
**lawsuit** 36:3 125:1
132:8
**leading** 12:14
**learn** 65:2
**learned** 20:17 26:9
65:4 124:2
**leave** 96:14
**left** 20:11 21:6
123:17
**legal** 55:16 93:4,5
99:15 100:17
**legible** 99:11
**Legislature** 28:2
31:6
**Leighton** 2:5 4:18
**let's** 50:24 68:25
84:12 91:5 109:3
123:20 128:17
129:12
**letter** 70:6
**letters** 70:5
**level** 9:5,14 24:23
27:18 72:1 97:16
120:24
**levels** 8:16
**license** 32:20
**licensing** 32:2,18
32:19
**limitation** 82:20
**limited** 6:7 7:3
35:17 51:4 59:6
82:15 87:24
**line** 64:2 138:10,18
**lines** 74:7
**link** 129:12,23
**links** 14:15
**list** 67:18 70:15
71:24 75:5 78:20
87:18 97:6,7,7
98:20 99:1 103:12
110:2,4,8 111:13
117:13 118:25
**listed** 41:25 60:17
108:19 109:23

**listing** 73:20
**litigant** 62:11
**litigants** 104:6
**litigation** 12:7
133:12,16,20,24
134:2,9
**little** 46:14 105:11
113:1 123:17
127:2 128:2
**live** 71:21
**livestreaming** 35:6
**LLP** 2:5
**local** 71:16
**located** 89:18
**locations** 31:9
**log** 12:18 23:23
**log-in** 26:9
**log-ins** 22:17
**long** 18:14 58:16
70:16 106:16
110:3
**longer** 30:15,17,17
122:8
**look** 21:16 39:7
40:16 53:18 54:11
61:15 62:3,4
65:13 75:1 107:16
107:23 108:11
112:2 117:3,9
118:8 125:20
127:25 128:7
**looked** 11:17 14:11
14:23 109:17
**looking** 40:5 48:5
76:4,6 77:25
93:17 99:1 113:24
123:9 124:9
127:17
**looks** 65:6 111:13
125:5
**lot** 15:1 23:25
104:12
**lots** 33:16
**loud** 50:9

**M**
**M** 4:10 78:1
**M-e-h-a-l-l** 65:19
**magistrate** 112:15
113:5,5,17,21
**main** 28:15
**maintain** 23:24
**maintained** 111:24
**maintaining** 92:23
135:8
**making** 43:15
58:11 121:21
122:8 133:3
134:11 135:6
**maliciously** 106:22
**manage** 22:16,18
102:20 135:10
**management** 18:18
18:24 26:19,21,25
27:24,25 28:19,24
29:7,13,18 31:19
32:25 33:1 36:4,9
36:12 37:15 38:18
38:24 39:14,15
40:12 43:16 44:14
47:3,11 51:2,21
53:9,21 54:17,21
56:3,12,22 57:9
59:10 85:6,13,21
86:10 89:17 94:19
102:20 119:10,24
133:14
**manager** 36:15,21
38:1 108:15
120:15
**mandatory** 81:8
**manual** 3:14 61:9
63:22 64:20 65:10
65:13,14,21,21
66:9 68:8,14,17
69:12,14,18 74:8
75:6,8 76:12,15
79:19 98:22
102:22 109:18
110:1,12 121:25

122:25 123:6
**March** 35:3
**Margaret** 86:23
87:7
**MARICOPA** 4:1
**mark** 62:22 68:18
**marked** 6:17 44:24
45:2 60:7,9 62:20
64:25 68:5 73:6
79:11 111:3
114:17 116:3,7
121:2 124:15,20
126:21 129:10
**match** 76:20 77:4
114:12 118:3
**matches** 76:23
**materially** 34:7
52:19 55:7,10
**materials** 11:3
**matter** 113:6
**mean** 12:17 23:13
26:13 30:25 48:18
59:23 66:16 88:10
101:21 104:9
107:13 108:2
109:23 111:19
112:9 118:1 120:3
128:15 133:23
**meaning** 42:24
95:25
**means** 5:16 116:21
117:24
**meant** 103:24
**mechanism** 20:1
**meet** 133:5
**meet-and-confer**
74:3
**meeting** 13:9,13
16:5,21,22 17:3
17:17 18:5 19:13
20:23 22:1 38:7
124:25 125:6
131:19 132:14
133:6
**meetings** 20:20

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 152

**Mehall** 65:17,18
111:24
**mem@dukeevett...**
2:14
**member** 65:5,15
**members** 17:4,11
133:7
**memo** 17:18,21
**Memos** 40:3
**mental** 112:20
113:19
**mention** 133:11,19
**mentioned** 27:5
34:13 82:14
131:25 133:15,17
134:12
**menu** 95:4,23
97:24 110:16
115:9 120:8
125:13
**message** 79:21
**met** 18:2,8 58:24
59:20,25
**methods** 14:13
**Mexico** 138:15
139:1
**Michael** 65:17
111:24
**Microsoft** 15:14
30:15
**middle** 21:7
**migrating** 30:7
**migration** 30:8
**million** 28:1 31:7
**mind** 15:18 79:2
**minimal** 22:14
**minor** 6:6
**minute** 59:22 70:8
112:2 115:18
120:8
**minutes** 79:1,3
86:24 87:8 91:10
122:22 123:1,17
**mislead** 53:2,10
56:13 57:17

**misleading** 57:21
**misperception**
57:11
**misreading** 62:9
**Misrepresents**
16:13
**missed** 7:22
**missing** 90:13,20
91:1,5,6 94:13
99:13
**misunderstand**
56:1
**Mitchell** 2:10
**Mm-hmm** 33:18
41:7 42:25 43:4
52:2 53:16 66:24
68:7 84:6 111:25
117:5 118:19
**modules** 72:5
**Molchan** 87:7
**Molchan's** 86:23
**Molly** 2:10 78:16
**Molly's** 123:2
**moment** 9:22 10:9
10:15 15:18 26:16
39:20 60:5,23
65:8 73:9,13 80:3
103:23 111:1
114:19 119:17
126:18 129:9,24
**moments** 7:21
**monitor** 25:19
**monitoring** 52:6
**month** 20:17
**months** 12:7 24:10
**morning** 4:12
**motion** 64:18 81:6
101:7
**move** 32:5 34:2
49:20 58:15 93:7
93:8 104:1
**moved** 53:9
**moving** 26:3 28:23
32:21 57:2 68:24
104:6

**multiple** 89:17
**myriad** 88:11

---
**N**
---
**N** 2:1 4:10,10 70:25
71:6 72:10
**name** 4:13,15 13:6
19:4 27:6,6 33:6
41:23 65:17 100:5
140:17
**named** 134:12
**names** 19:3 100:3
108:16
**Nancy** 131:14,20
**nation** 135:16
**nature** 13:8 75:13
**near** 81:19
**nearing** 131:3
**nearly** 132:25
**necessarily** 7:2
48:15 51:4 59:6
75:11 86:7 107:18
109:22
**necessary** 25:19
89:22
**need** 5:16 9:11 24:2
26:2 28:7 34:2
38:9 68:21 77:23
84:24 91:8 100:13
108:14 116:8
122:21
**needed** 21:8 118:12
**needing** 99:23
**needs** 104:20
118:25
**nefarious** 23:12
**negotiating** 31:25
**negotiations** 28:22
29:4 31:20 37:22
**neither** 140:10
**Nelson** 13:14 19:20
20:9
**network** 28:5,10,11
29:4,6,8 31:14
32:7,9,12,13

**networks** 28:12,16
**never** 51:3 54:22
56:14 57:8,9
105:20 126:15
130:7
**new** 18:13,17 28:23
30:12,12 31:14
32:1,24 33:1 35:9
35:13 38:16 45:19
72:5 74:4 100:8,9
107:2 118:22,23
118:25,25 124:4
128:3 129:22
130:10 137:17
138:15 139:1
**newer** 130:21
**newly** 44:8 135:17
**News** 1:3 4:17
45:14 125:1
136:11
**Nicole** 1:24 140:23
**nods** 5:24
**non** 83:25
**non-Tyler** 11:8
**nonconforming**
80:15 83:11,14,17
83:25
**nonpublic** 105:16
**Notary** 140:3
**note** 69:7 104:19
**notes** 3:18 16:21
17:1 124:9,13,13
124:18,23,24
125:6,22
**notice** 6:17 81:9
90:1,4
**notified** 124:14
**notify** 90:16
**noting** 70:10
**notwithstanding**
42:14
**November** 1:23 4:2
140:17
**number** 40:5 45:22
46:7,22,25 49:9

49:17 50:1,25
51:17,18,18,18
52:14 54:23 55:9
56:8,10 58:8,15
58:16 60:11,14
61:20 65:7 69:8
80:17 86:15 93:9
98:19 99:20 104:2
104:16 107:1
110:9 113:18
125:17
**numbered** 115:7
**numbers** 46:7
53:18 107:12
109:17 127:5

---
**O**
---
**O** 4:10
**O-m-u-n-d-s-o-n**
4:15
**o0o--** 2:19 3:22 4:3
139:11
**oath** 4:6
**object** 25:21 29:9
38:3 53:23 71:10
76:14 87:17 94:16
95:10 110:19
**objection** 8:2 16:13
27:13 44:9 45:25
67:7,7
**objections** 8:25
45:23,23 140:8
**obligations** 55:16
**observed** 5:10 17:4
**obtain** 109:9
**obtained** 125:11
**obviously** 11:15
**occur** 13:8 106:2
**occurred** 106:16
107:1
**occurrence** 82:5
**October** 34:24 65:7
**Odyssey** 9:3,4
18:11,18 26:24
29:7 69:8,10,13

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 153

71:21 102:5
118:10 128:3
**offer** 43:18
**office** 7:6 17:5,18
  17:21 19:14 20:20
  21:2 24:22 30:3
  54:9 72:3 103:10
**office's** 54:15
**Officer** 13:16
**official** 1:7,12 6:19
  58:21 59:17 140:5
**OFS** 18:19 19:2,7
  69:8
**Oftentimes** 57:2
**Oh** 48:7 50:8,11
  66:17 69:2 81:18
  122:23 127:13,14
  134:16
**okay** 5:10 6:16 8:10
  8:21 9:23 10:9,16
  11:1,12,14,14,23
  13:10,12 14:1,5
  14:20 15:25 16:10
  16:16 17:20 19:11
  20:19 21:13 22:9
  24:22 26:5,17
  27:8 29:1,16
  30:11 32:16 33:22
  33:25,25 34:11
  36:13,18 37:7,24
  40:18,25 41:14
  42:17 43:9 44:17
  44:25 45:8,11,16
  46:11,14,21 47:17
  49:6,20 50:16,17
  50:24 51:16 52:14
  52:22 56:19 59:5
  59:12 61:6 62:15
  62:21 65:15,20
  66:9 67:9 68:4,16
  69:19 72:19 73:7
  74:14 75:16,17
  77:25 78:8,19
  81:16 82:23 83:16
  83:24 88:18 94:6

95:14 97:5 103:2
  103:22 105:11
  108:21 109:7
  110:25 111:17,19
  112:13 115:1
  116:4,20 119:14
  120:7 121:13
  124:1 125:10
  126:9,13 128:17
  129:7 130:8,24
  131:11 133:11
  134:19 136:2
  137:11 138:6,24
  139:5
**old** 128:6
**older** 33:14
**Omundson** 1:7,12
  3:1,18 4:5,14,16
  5:4 6:18 44:25
  45:25 49:2,6
  60:18 61:3 64:23
  69:10 73:15 76:9
  79:9 109:7 111:12
  124:1 127:23
  128:21 130:1
  140:5
**on-prem** 32:3 33:6
  33:17
**on-premise** 28:19
**on-premises** 32:20
  33:3
**once** 5:5 24:9 31:19
  82:6 85:22 86:10
  89:24 90:21 91:11
  91:11 100:4
  101:13,13 102:14
  102:23 127:1
**ones** 83:14 108:19
  112:6,8,9,10,11
**online** 18:19,23,24
  18:25
**onus** 136:24
**open** 75:3 137:23
**opened** 76:7
**operates** 103:5

**operations** 3:14
  63:20,22 64:4,19
  65:5,20 66:9 68:8
  68:14,17 69:12
  74:8 75:6 76:12
  79:19 98:21
  110:12
**opportunity** 6:3,4
  67:22 79:16 83:21
  103:18
**opposed** 8:15 32:18
  33:13 38:9 91:8
  92:7
**ops** 108:15
**option** 34:16 36:23
  121:23
**options** 60:16
**ORAL** 1:11
**order** 21:8 28:8
  81:10 123:12
**ordered** 21:11
**orders** 40:3
**Oregon** 131:14
  133:13,17
**original** 20:4 47:15
  48:5,8,14,15,21
  49:4 67:23 68:1,2
  100:17 125:18
  140:13
**originally** 57:10
**outcome** 140:11
**outlines** 43:5
**outside** 83:25
**over-designating**
  95:25 97:12
**Overbroad** 8:2
  9:10,20 10:12
  25:22 27:13
**oversight** 104:25
**overview** 114:23

―――――――――――
        **P**
―――――――――――
**P** 2:1,1
**p.m** 123:25 128:20
  128:20 139:9

**page** 3:4,10 50:14
  68:13,20 69:8,12
  75:19,21 111:9,10
  111:10,10,11
  114:21,21 115:6
  116:17 128:25
  129:19
**pages** 68:18 94:13
  127:24
**paid** 82:1 99:4
**Paisner** 2:5 4:19
**pandemics** 31:10
**panel** 133:20,23
**panelists** 135:15
  136:6,10
**paper** 42:24 62:12
  100:14,16 101:3,8
  106:10
**Paragraph** 70:2,3,4
**paralegal** 64:12
**part** 18:23 19:18
  24:18,20 30:14,22
  31:13 33:13 36:13
  46:6 48:19 51:3
  51:21 52:25 54:22
  55:12,24,25 58:21
  59:16 61:8 65:12
  73:1 74:15 76:8
  79:10 86:24 98:6
  102:19,21 109:16
  110:3 122:16
  126:4 132:11
  137:1
**particular** 10:14
  27:6,6 41:19
  43:12 76:6 78:4
  90:3 93:16 95:22
  103:8 107:3
  116:14 132:7
**particulars** 118:16
**parties** 81:9 104:7
**partners** 23:22
  24:1 25:3 34:17
  34:20
**parts** 8:5,6,8,9,10

10:4 18:16,20,22
**party** 93:7,8 100:3
  100:5,11 101:9
  108:16 140:11
**patched** 30:18
**paternity** 117:9
**path** 87:1,5
**Pause** 57:24 60:6
  60:24 73:10 80:5
  111:2 119:18
  123:14 126:20
**paying** 16:24
**payment** 58:23
  59:18
**PDF** 76:25 100:12
**pending** 53:3,4,6
  53:11 57:14 109:9
  133:12
**people** 14:24 23:20
  38:10 53:7,10
  86:5 135:1,13
**people's** 135:9
**Pepin** 138:12,24
**perfect** 46:19
  123:22
**perform** 21:14
  25:11 57:3,5
**performance** 52:3
  55:4
**period** 20:22 21:1
  57:4,5,6 67:24
  73:22 74:6 91:22
  108:7 109:21
  110:6,7,10,16,18
**permission** 22:17
**person** 13:7 67:20
  67:21 81:21 84:20
  84:22 85:18,19
  87:1 90:17 91:18
  108:24
**personal** 7:3 54:7
**personally-identi...**
  104:14,17
**pertains** 140:12
**petition** 118:2

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 154

petitioned 97:14
phone 65:7 108:14
photocopied 84:17
photograph 106:5
phrase 8:13
physically 121:11
piece 22:6,6,7
  24:20 65:13
pieces 125:16
  135:11
PII 104:16 105:13
  107:4 132:21,24
  134:23 136:25
pilot 128:16
pivoted 35:1
place 84:2,19 85:5
  89:19 95:9 108:14
  130:5
placed 37:21 39:13
  39:14 47:10 52:23
  53:21 54:17 84:8
  88:16 97:2
places 85:8
plaintiff 1:5 2:3
  82:18
Plaintiff's 3:11
  45:5 80:2
plan 31:2 34:16
  35:12
planning 27:22
  31:17
play 5:25 60:3
pleading 107:9
pleadings 38:23
  51:10,11,25
please 4:12 5:19
  11:20 12:10 50:13
  67:11 70:25 71:6
  72:11 76:22 78:11
  100:25 108:13,15
  113:2 124:5 127:3
PLLC 2:11
PO 2:12
point 13:9 14:18
  20:14 21:17,21

62:7 90:10,21
95:5 100:23
108:23 113:25
122:17 129:11
133:16
pointed 15:17
  21:19
pointing 20:4 39:23
points 20:13
policies 38:11 46:1
  102:21
policy 38:14,19
  39:1,4,6,9 41:21
  43:14 45:18 47:9
  47:19,23 49:8,11
  49:14 50:19 59:7
  80:19 88:15 135:7
pornography
  105:24 106:5,19
portal 23:17,18,24
  24:24 25:12 26:7
  26:8,15,18 27:1,1
  27:2,3 34:13 35:1
  35:9,13,21 36:7,8
  37:14,17 38:1,9
  128:25 129:4,13
  129:20
portion 55:9 58:7
  69:23 80:7 123:4
portions 4:2
position 5:7 7:5
  38:13
possibilities 70:15
  93:10
possibility 19:15
  106:23 132:19
possible 72:16
  90:16 121:11
possibly 37:17
posting 39:12 57:8
potential 37:9
potentially 6:12
  67:23 82:9 89:6
  98:23 119:16
PowerPoint 14:6

practical 100:1
practice 45:18
pre-acceptance
  135:17
precludes 38:15
prefiled 131:22,23
preliminary 127:15
premised 57:6
prepared 45:12
  111:21
preparing 32:6
preprocessing
  135:17
present 2:16 12:21
  13:1,12 17:6
  36:19 137:6
presentation 14:7
  124:10 133:25
  134:1,11
presented 6:13,21
preserve 12:23
press 3:18 10:7,17
  10:17,20,21,23,23
  11:2,4,6,8,22,22
  11:24 12:1,4,6,20
  14:10 16:8,12,19
  17:11,14 19:15,16
  19:22 21:2,12,12
  21:23 23:10 34:7
  36:2 37:11,11
  44:12 56:24
  124:11 125:2,7
  135:18,19,20
  137:8,18 138:25
presumably 31:14
presume 12:21
  136:13,16
presumed 42:5
presumption
  122:11
pretty 5:11 64:2
  96:4 138:7
prevent 23:11 24:8
previously 6:17
  114:17 121:16

127:8
print 129:7
printed 46:18
  61:11
prior 33:15 101:19
  122:13
priority 137:24
privacy 104:6
  105:5
privilege 11:10,16
  12:18,23
privileged 15:1
privy 22:8
pro 43:7 82:16
  85:18
probably 4:21
  18:21
probate 112:20
  113:19
problem 22:21 30:9
  38:7 48:22 85:12
  127:19,19 137:20
problems 23:25
  26:6
procedure 41:3,20
  43:11,12 95:17
  102:24,25 114:8
procedures 94:12
  94:22 130:9
proceed 7:10
proceeding 6:25
proceedings 35:5,6
  55:22 57:24 60:6
  60:24 73:10 80:5
  111:2 119:18
  123:14 126:20
  140:9,13
process 4:22,25
  5:25 26:12 28:4
  28:10 35:23 40:8
  67:5 72:3,4 83:20
  130:17
processed 45:21
  46:3 47:2 88:9,12
processes 40:9

57:20
produced 60:9 61:6
  64:1 73:12 74:2
  76:5 79:12 95:2
  111:6 122:23
  124:4,19
product 11:24 27:2
  28:21 32:1
production 64:13
productive 8:16
products 15:13
  18:12,13,14 22:22
  23:9 24:16 32:12
program 18:18
  30:9,10,12
project 18:6,9 28:3
  30:22,23 31:12,13
  31:19 35:13 36:1
  36:16 38:15,25
promised 38:10
prompted 72:23
proper 78:25
  122:15
properly 84:17,25
protect 15:3 24:21
  42:7 105:4 134:24
protected 15:1 28:7
  41:13 97:17
  131:16
protecting 58:13
protection 23:10
  97:16 136:15
protections 23:8
  41:6
provide 6:4 26:23
  36:24 37:1 66:10
  66:12 67:18 70:19
  71:1 74:12 78:2
  81:9 87:18 90:1,4
  135:16
provided 9:8,18
  15:21 21:15 22:1
  27:12 46:24,25
  47:1 65:5 89:9
  94:1 103:3 115:18

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 155

125:2 138:25
**provides** 26:18
71:19 83:21
110:13
**providing** 46:1
47:9 56:11,23
70:8 94:4 137:17
**public** 23:19 26:18
34:7,17 37:21
38:22 39:10 40:8
42:1,3,4,6,9 44:12
46:25 47:20 51:9
51:11 52:19 53:2
53:5 55:7,11,21
56:1,11,13,20,25
57:11,17,21 58:4
58:11 95:6 96:18
105:1,7,15 112:12
117:6 121:7,7,9
131:8,15 132:5,22
133:21 136:17
138:25 140:3
**public's** 52:6
**public-facing** 23:19
115:3,24
**public/press** 34:5
**publication** 104:7
**publish** 132:10
**publishing** 131:7
132:23
**pull** 34:1 63:8
75:23 107:5,10
**pull-down** 95:4
**pulled** 107:6
**purchasing** 32:17
**purport** 63:16
**purported** 99:10
**purposes** 10:21
11:1 19:14
**pursuant** 74:23
**put** 23:8 24:15 27:3
63:7 71:24,25
72:17 75:12 80:3
84:2 85:19 89:1
100:10 108:4

111:4 114:19
116:23 121:3
130:5 131:1
136:24
**putting** 23:5 24:10
34:25 73:13
126:25

———————
**Q**
———————
**question** 20:7 21:21
33:24 47:13 48:8
49:13 52:11 56:19
61:3 64:10 67:11
76:9 77:12 79:22
82:22 92:12 93:5
93:24 97:18,25
98:20 106:25
109:10,14 114:15
119:5,15 124:3,7
124:22 125:11,18
126:24 127:22
130:1 132:8
**questioning** 64:3
79:10 138:11
**questions** 5:19 7:2
12:21 14:19,20,22
15:6,8,9,20 19:23
20:10 21:6 45:13
46:8 131:2,21
138:10 139:6
**queue** 3:18 10:7,21
10:24 11:2,7,8,22
14:11 19:16 23:10
36:2 37:11 44:4
67:2 72:24 77:16
77:19 84:9,18
99:8 124:11
135:18 137:18
**queues** 12:1 135:20
137:8
**quick** 3:19 46:17
48:8 64:16,17
123:20 126:24
128:10,12 129:12
129:22 130:4

**quickly** 82:3
130:17
**quite** 12:22 19:4
31:6 67:8 70:15
78:25 98:16
104:24 106:22
116:11 123:10
132:15
**quiz** 118:15

———————
**R**
———————
**R** 2:1
**raised** 30:6 101:9
122:7 131:13
136:9
**ran** 14:24 15:12
21:18
**reach** 65:8
**read** 46:20 47:5
49:25 50:4,5,9,13
56:17 58:17 59:3
61:16 84:23 85:1
130:16
**readable** 84:23
89:22
**ready** 138:21
**real** 64:17 126:24
128:10,12
**really** 28:6 35:22
54:2 66:13 72:2
96:16 104:22
112:5 135:11
136:4,17
**realm** 23:2
**reason** 7:10,25 9:7
37:16,24 46:15,24
70:10,22 71:5,8
71:23 72:10,11,20
74:11,23 77:4,17
83:18 97:13,21,22
98:1 103:12
107:25 108:3
**reasons** 45:17
60:13,15 61:19,20
62:1 70:4,5,12,14

70:17,21,24 71:4
71:6 72:13 73:3
75:5 76:11 79:18
80:14 83:10 89:5
95:22 98:21,22,25
109:12
**rebuilt** 29:21
**recall** 15:9 16:9,15
16:23 27:20 35:3
89:10 95:1,9 98:6
103:8 132:22
135:23,25 136:12
**receipt** 44:3
**receive** 12:5
**received** 28:1 31:6
31:11 38:17 44:11
86:8 90:2 101:15
101:16
**recognize** 9:5 68:11
69:11 111:12
116:9 127:23
128:2 130:2
**recognized** 24:6
63:19
**recommendation**
88:24
**record** 4:13 6:1
14:9 30:25 41:1
44:21 45:1 58:21
59:17 64:7 68:17
76:4 78:12,13,14
79:10 93:22 94:2
99:21 109:3,4,8,8
123:16,21 124:18
128:10,18 140:14
**recorded** 140:8
**records** 93:21
**redact** 81:1,7,15
107:16,22 108:10
136:24
**redacted** 42:7
80:24 81:5 83:8
104:18,20 107:4
117:25
**redacting** 81:11

**redaction** 58:23
59:19
**reduce** 98:10
**refer** 11:24 12:4
18:19 65:22
**references** 41:5,8,9
**referred** 11:5 40:19
65:20 105:14
121:15
**referring** 13:25
24:18 49:12 83:18
88:19 104:11
119:20
**refile** 100:11
**refiled** 82:10
**reflect** 47:7 49:9
78:3 107:24
115:11 130:9
**reflected** 50:20
71:4,5 76:10
77:21 98:21
**reflects** 74:21
**regarding** 14:13
15:23 70:9 79:17
89:9 103:3 109:10
124:7 125:12
131:6,15 133:13
138:25
**regardless** 101:24
137:23
**regards** 9:5 17:13
20:12 38:22 41:10
51:10
**register** 23:17,20
**reject** 62:6,10 66:3
66:4,11,14 67:13
67:14,17 69:23
70:9 73:2 74:10
75:3,4,5 76:6,8,10
77:15,20 78:1
80:20 83:21 84:21
88:16 91:20 101:4
102:13 103:18
104:13,19 105:9
108:18

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 156

| | | | | |
|---|---|---|---|---|
| **rejected** 53:2 60:13 62:4 65:24 66:1 67:3,21 72:18 74:17,20,21,22 75:2 80:20 107:21 | 102:16 **removed** 83:22 92:16 94:8 95:4,7 95:11 97:24 **removing** 123:4 | **Rescue** 31:2 **reservation** 101:18 **reserved** 139:10 **reside** 47:20,21 **resolved** 30:7 **resource** 22:15 | **result** 24:9 51:14 56:20 58:2 80:16 95:16 **resulted** 95:4 **resulting** 12:14 **return** 70:9 88:22 | 122:20 **risk** 8:16 9:5 28:16 28:21 57:21 104:6 **risks** 29:21 **River** 2:11 **roles** 88:10 |

**rejected** 53:2 60:13 62:4 65:24 66:1 67:3,21 72:18 74:17,20,21,22 75:2 80:20 107:21
**rejecting** 70:13 72:21
**rejection** 70:4 71:5 71:9,23 72:20 74:6,11,23,24 76:11,13,17 77:4 77:17 79:15,18 83:18 98:20,24 103:12 107:15,23 107:25 108:8,9 109:10,11,16
**rejects** 80:25
**relate** 68:2 75:5
**related** 140:11
**relates** 69:13
**relation** 54:25
**relationship** 31:18
**relative** 109:11
**release** 131:16,23 132:19 134:23
**released** 135:4
**releasing** 132:1,17 135:3
**relevant** 52:3 54:2 55:4 63:9 64:2
**rely** 87:6 98:4
**remarks** 133:3
**remember** 13:6 15:11 16:20 18:5 22:2 95:12 125:21 131:20 132:15,16 132:18 133:1 134:14
**remembered** 124:11
**remote** 31:9 35:5
**remotely** 4:1 140:6
**removal** 95:23
**remove** 91:14,16 92:14,14 102:7,13

102:16
**removed** 83:22 92:16 94:8 95:4,7 95:11 97:24
**removing** 123:4
**renamed** 29:10
**renaming** 29:16
**renewal** 37:3
**repeat** 61:3
**repeatedly** 20:3,7 34:21,23
**report** 17:18,21 19:13 20:9
**REPORTED** 1:24 4:1
**reporter** 5:14 6:1 140:1,3
**reporting** 56:24
**represent** 74:1 127:18
**representative** 54:8
**represented** 82:18
**represents** 73:19
**request** 60:13 74:3 82:19 83:6
**requested** 31:5 81:22 83:3 97:23 109:22
**requesting** 82:21
**requests** 22:17,17 95:16 115:13
**require** 42:7,23 58:25 80:9,16 81:8,8 83:12 89:6 89:13 90:14 98:19 98:23 99:2
**required** 43:6 44:13 51:15 67:3 72:20 77:16,20 86:21 101:18
**requirements** 57:3 58:22,23 59:17,19 59:24
**requires** 74:11 81:6 93:15 121:14

**Rescue** 31:2
**reservation** 101:18
**reserved** 139:10
**reside** 47:20,21
**resolved** 30:7
**resource** 22:15
**resources** 3:20 81:12,13,24 82:13 86:9 96:13 128:25 129:5,14,16,20,21
**respect** 8:21,23 9:9 10:10 22:10 31:18 41:3 42:20 49:10 78:4 80:12 125:12 136:10
**respond** 5:23 90:5
**responds** 45:25
**response** 6:16 45:13,22 47:7 48:16,18,23 49:3 49:3,4,22,23 50:1 50:23 51:17 52:18 53:18,19 54:12,14 56:7,9 58:1,16,16 59:6,13 74:2 80:2 80:7,12 93:25 94:4 103:24 105:12 112:3 131:11,17 133:18 134:13
**responses** 3:11 6:8 45:4,12 64:3 131:4 134:15
**responsibilities** 38:8
**responsibility** 47:22 88:10 121:24 123:6 136:15,18
**responsible** 39:16 66:5,22 92:23 98:8
**rest** 59:22
**resubmit** 67:23,25 81:1

**result** 24:9 51:14 56:20 58:2 80:16 95:16
**resulted** 95:4
**resulting** 12:14
**return** 70:9 88:22
**returned** 81:14
**review** 3:18 6:3 10:17,18,20,21,23 10:23 11:2,4,7,8 11:22,22,24 12:1 12:4,6,20 14:10 16:8,12,19 17:11 17:14 19:16,16,22 21:3,12,12,24 34:18 37:11,12 50:5 59:14 67:2,4 72:24 73:1 77:16 77:19 83:20,23 84:18 85:8 87:12 96:19 98:9,17 103:4,14 105:9 122:16 123:7 124:8,11 125:2,7 125:8,19 135:18 135:19,20 137:8 137:18 140:13
**reviewed** 12:20 39:14 43:22 96:15 131:24
**reviewing** 66:25 77:15 98:8 122:13
**reviews** 103:17
**revisit** 48:9
**rewriting** 24:5
**right** 5:3 12:19 16:17 30:17 34:1 36:2 38:6 41:22 46:19,22 48:12 49:1 51:19 59:21 64:15 68:5 70:11 73:13,23 82:2 84:7,14 85:5 86:6 88:3 92:17 93:20 104:12 114:21

122:20
**risk** 8:16 9:5 28:16 28:21 57:21 104:6
**risks** 29:21
**River** 2:11
**roles** 88:10
**rolled** 18:17,22
**room** 133:9
**route** 99:7
**routinely** 87:3
**Row** 75:1
**RPR** 1:24 140:23
**rule** 38:20 39:3,7 39:25 40:6,17,18 40:25 41:23 42:2 42:13 43:10,12,17 49:15 50:20,21,23 51:5,8,15 52:10 52:11,15 53:15 54:3,25 59:8 62:6 66:13 67:12 81:6 88:16,17,19,21 89:2 92:1,3,9,16 92:18,21 93:15,23 94:5,7 95:2,8,15 95:20,23 97:14,22 100:24 112:11 118:4 120:18,22 121:13,15,23 122:3,3,4,17,18 122:19,22,25 123:3,4,12,13 124:7 125:12,15 125:15,19,22 126:5
**rulebook** 93:20
**rules** 37:20 39:4,17 40:2,5,6,10,13,13 40:14,16,19,22 41:2,6,9,10,11,19 42:18 43:11 55:1 57:20 58:22 59:18 59:24 60:3 61:19 62:1,5 66:1 67:12 67:24 83:2 88:20

(289 of 294), Page 289 of 294
Case: 24-6697, 03/06/2025, DktEntry: 10.8, Page 289 of 294
Case 1:21-cv-00305-DCN Document 60-6 Filed 12/15/22 Page 54 of 59

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 157

91:21 92:19 93:18
94:3,22,24,25
102:24,24 103:17
103:20,21 111:14
114:8 115:15,21
122:6,7 125:17
**run** 15:13 20:16
28:13 29:19,19
32:12,20 33:20
36:4,11 60:22
69:4
**running** 19:24,24
23:25 25:2 29:24
34:20

**S**

**S** 2:1
**S-a-r-a** 4:14
**San** 2:6
**Sara** 1:7,12 3:1 4:5
4:14 6:18 140:5
**sat** 7:14 131:21
**satisfy** 103:7
**saw** 124:13
**saying** 42:13 49:11
51:19 59:12,14
67:10 87:22 88:3
92:6 120:23
**says** 45:24 46:6
50:25 51:10 55:10
61:16 66:2 92:16
121:6 124:7
**scanned** 107:8,9
**schedule** 101:20,23
115:12,14,20
**scheduled** 101:22
**schedules** 59:2
80:11
**scope** 35:18 36:1,16
38:6,11 103:19
**scoped** 38:25
**scoping** 38:25
**screen** 16:24 60:21
73:13 75:24 80:4
80:8 111:5,8

114:19 126:25
129:1
**screens** 75:12
**screenshot** 14:10
114:22
**screenshots** 115:2
**scroll** 48:10 68:21
69:9 73:23 111:9
113:17 115:1,6
**scrolling** 69:21
112:5 116:16
**se** 43:7 82:16 85:19
**seal** 101:7
**sealed** 42:6,10
100:21,23
**search** 41:10
**Seattle** 35:9 37:9
**second** 37:4 49:20
52:25 55:9 56:10
58:7,18 69:4
78:11 82:14 83:8
84:12 85:11
113:25 116:16
121:18
**section** 69:11,13,22
69:24 70:18 72:18
**secure** 121:1
**secured** 24:7
**security** 8:14,22,23
9:3,9,14 21:16,17
21:19 22:6 24:8
24:11,23 25:12,20
26:1,6,13,24 27:3
27:4,7,11,18 96:6
96:9,10,19,22,25
97:2,15 98:2
101:6 102:5
104:15 116:14,19
116:23,24,25
117:1,13,14,18,23
118:1,11,12 119:8
119:22,24 120:3,4
120:10,13,17,19
120:24 121:5,7,9
121:14,25 122:1,1

122:10,15 124:8
125:13,20
**see** 9:12 11:6,7 18:9
23:20,23 24:2
34:8 35:2 45:6
46:4,22,23 50:1
61:10 68:9,25
69:8,24 70:6 71:1
73:25 74:17 75:4
76:1,7,23 85:9
107:17,24 112:5
112:13,15,19
113:18 115:7
117:7,16 127:1,6
129:2,3,13,17
**seen** 4:22 5:1 10:7
10:17 45:8 63:10
63:13 73:15 83:2
116:10
**sees** 97:6,8
**select** 67:19 70:4,13
70:23,25 72:14,20
73:3 74:11 77:16
77:20 97:10 98:11
**selected** 74:23
120:11 121:8
**selecting** 70:10
72:16
**selection** 97:24
**selects** 96:18 97:8,9
121:6
**send** 22:22 84:22
84:25
**sensitive** 104:7,10
104:11 107:22
136:25
**sent** 61:2 79:20
106:19 124:14
**sentence** 49:9,17,21
56:7,10 58:7
59:22 62:2
**separate** 14:17,17
20:6 28:5 32:5,10
**separated** 26:10
113:7

**separately** 105:15
125:10
**September** 138:11
**Serve** 3:19 19:1,3,7
51:1 60:16 69:8
69:10,13 72:24
74:11 87:13
114:23
**served** 45:3,12 86:5
131:4
**server** 14:17 20:6
**servers** 28:15
**serves** 29:20
**service** 1:3 4:18
19:9 33:8,10,13
36:15 40:23 45:14
62:5 66:2 85:12
85:14 88:21
123:12 125:22
**services** 32:12,14
34:9 36:24 37:1
38:6
**set** 3:12 35:11 45:5
57:20 78:9 120:4
121:5 124:8
**setting** 43:9 96:6,9
96:10,17,18,19
97:2 101:6 102:5
116:23,24 117:1
120:10,19 121:7,8
121:9 122:15
124:8 126:1
**settings** 97:15 98:2
116:14,19 119:13
119:21,23,25
120:3,4,17
**seven** 66:17
**sharing** 60:21
**sheet** 40:15 41:12
105:4 107:8
**sheets** 40:15
**shift** 35:7
**shorthand** 77:8
140:1,3
**shortly** 124:25

**should've** 80:24
81:5 82:6
**show** 45:1 60:3
73:7 110:7,25
111:9 114:17
116:6,6 128:24
**showed** 14:10 74:4
94:5 124:11
**showing** 16:24 60:8
60:25 68:4 69:11
70:11 94:3 109:18
110:2 114:21
134:2
**shown** 14:3,4,9
**shows** 115:10
116:13
**sic** 12:11 133:19
**side** 34:4,5 115:3
115:24 119:24
120:1,3,11
**signal** 120:12
**signature** 90:13,20
91:1,2,5,7 93:8,9
99:13 139:10
**signatures** 94:13
**signed** 35:16
**Silverlight** 15:12
15:13 19:25 20:17
21:18 28:20 29:24
30:1,2,6,10,15
**similar** 14:7 114:15
**similarly** 115:24
**simply** 36:3 88:1
89:15 105:20
136:13 137:3,21
**single** 76:17 84:5,8
85:7 86:16 89:8,9
89:12
**sit** 16:16 28:12,15
**sitting** 133:9
**situation** 17:9
**situations** 80:17
**slow** 24:3
**small** 46:16
**smaller** 82:11 97:7

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 158

social 104:15
software 27:23
  32:17 63:8
software-as-a-ser...
  29:23 32:2,21
  33:7,20
solution 36:21
solutions 27:12
solve 26:3 38:7
solved 26:2
solves 30:8
somebody 64:9
  77:6
someone's 104:15
soon 43:19,21,22
sorry 8:18 13:6,23
  23:14 27:1 29:11
  33:23 48:5 50:2
  50:11 51:6 54:18
  60:20 63:1 65:7
  66:17 75:8,16,17
  75:23 77:9 78:13
  85:13 86:18 90:25
  93:12,17 97:18
  98:5 108:1 111:18
  112:5,7,25 114:11
  117:14,15,21
  127:2,14 128:11
sort 14:18 23:1,5
  40:17 41:2 90:20
  91:15
sorts 104:24
sought 28:1 136:10
sounds 44:20
  106:13 119:6
speak 12:10 79:16
  137:11
speaking 5:17
  133:2
speaks 76:15
specialist 64:5
specific 8:23 9:12
  17:9 62:5 71:4,6
  72:16 87:24 97:9
  97:10 122:18

specifically 7:18
  15:11 39:7,23
  51:10 61:17,24
  66:2 79:14 81:12
  94:7 103:5 121:23
specifics 9:12 88:12
  135:22,25
specified 110:15
specifies 114:3
speculate 63:17
speed 135:8
spell 4:13
spelled 65:18
spend 30:21
spending 35:12
spoke 132:15
spoken 103:10
spreadsheet 73:11
  73:16 74:15,19
  76:2,5,10 77:21
  79:12 109:11
  110:15 116:13,18
staff 17:11 27:15
  35:5 59:2 80:11
  130:6
stamp 102:15
stamped 43:22 44:7
  84:9
standard 113:8
standing 132:16
  138:18
start 35:13 46:8
  61:14 86:19 87:21
started 18:4,5,7,10
  27:5 35:8 52:7
  135:2
starting 35:3 59:15
state 4:12 16:7,11
  45:17 51:16 54:13
  55:1 58:18 66:8
  82:16,24 87:11
  88:7 92:13 97:19
  107:20 122:22
  131:6,12,14,19,20
  132:4,9 133:4,7,8

135:7,16 138:15
  140:3
stated 38:20
statement 39:4
  51:19 61:22 92:2
  92:4,10 101:1
  119:1
states 1:1 31:4
  45:17 56:11 80:9
  136:3,7,13 137:7
status 74:16,20
  75:1,2 134:5
  138:19
statute 61:18,25
  92:1,3,9
stay 78:14
Stenographer
  115:13
stenographically
  140:8
stepping 114:16
steps 25:19 26:23
  27:11 130:10
stick 11:2 15:18
stood 135:11
stop 59:21 116:4
Street 2:11
strike 7:16 10:2
  11:5 44:9 58:4,4
  99:21
struggle 29:15
struggling 76:21
Sub 52:18 80:9
subject 11:10 20:21
  45:24 49:24 98:24
  101:7
submission 20:5,15
  68:2 100:19 104:8
submissions 39:12
submit 68:22 84:4
  90:17 91:18
  104:22 105:5
submits 80:23
  105:4 120:6
submitted 39:12

44:5,10 46:2
  57:11 62:11 66:25
  67:20 84:20 87:1
  100:20 104:23
  105:2,7,20,21
  106:21 107:9
  131:7 136:16
submitter 85:2
  86:2,4,7
subpoints 54:11
subscribed 140:16
subscription 33:8
  33:10,13
Subsection 52:24
subsequent 74:3
  92:25 95:7
substantive 6:8
sufficient 24:21
sufficiently 99:4
suite 2:11 18:12
summaries 134:4
summarize 58:9
summarized 61:1
supplement 40:10
supplemental 3:11
  45:4 47:15,16
  48:11,13,18,20,22
  49:2,3,22,22 50:1
  50:6,17,25 51:17
  52:18 53:18 54:12
  54:14 56:8 80:1
supplements 49:4
support 43:14 52:5
  71:16
supported 15:14
  28:20 30:15,17
  51:19
supporting 45:18
supports 92:2,3,10
supposed 57:23
  100:20 101:1
  104:17 105:1,7
Supreme 13:16
  31:5 35:11 37:20
  38:12,14,19 39:8

39:17,18,22,24
  40:4 47:19 49:8
  49:11,14 50:19
  51:5 54:2 55:3,19
  57:19 59:7 71:18
  80:19 88:14 89:2
  94:20,22,23,24
  95:20 103:15
  120:17,22 121:3
  138:1
sure 5:17 11:10,19
  11:19 12:22 16:25
  17:8,12 20:11
  25:5 29:2 47:12
  53:10 54:19 58:11
  64:14 71:19 76:16
  76:23 77:1 79:3
  91:3 92:11 94:9
  98:15 100:1
  101:16,21,24
  109:1 113:23
  118:8 122:14
  123:10 127:4
  128:8,12
surprised 8:20
surrounding 95:3
switch 44:18 75:12
switched 120:18
sworn 4:6 140:6
system 9:3,4,15
  14:23,24 15:2,12
  15:17 18:18,20,24
  18:24,25 19:7
  20:15,16 26:19,21
  26:25 27:23 28:18
  28:24 29:8,13,17
  29:18,23 31:19
  32:3,20,25 33:1
  36:4,10 37:23
  38:2,17,18,25
  39:14,15 40:12
  43:16 44:3,11,15
  47:4,11 51:1,2,21
  53:10,22 54:17,21
  56:3,12,22 57:9

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

ER-1674

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 159

| | | | | |
|---|---|---|---|---|
| 57:12,12,16,18 59:10 63:7,8 67:1 70:10 72:24 74:10 81:14 84:10 85:6 85:13,15,21,24 86:4,10,12 88:17 89:17 94:19 95:3 95:24 102:20 107:16 111:15 114:12 115:4,24 116:23 119:7,10 119:25 120:14,15 120:24 121:4,11 121:18,19 126:5 130:5,14 133:14 134:7 **system's** 20:4 **systems** 27:19 31:19 87:11 ──── **T** **T** 4:10 70:6 110:1 110:14 **tabbed** 75:21 **table** 68:23 69:1,6,7 **tabs** 85:9 **take** 16:21 21:23 22:5 25:19 27:11 44:19 64:6,15 75:9,11 76:16 78:11 81:23 86:12 86:14,17 89:20 91:9 96:7,13 101:16 108:23 109:3 112:2 121:23 123:15,17 123:20 130:10 136:14,17 137:2 **taken** 1:16,23 17:1 26:23 44:22 64:21 79:7 81:3 91:12 109:5 123:24 128:19 136:3 140:6 **takes** 44:13 81:12 | 85:24 89:16 **talk** 35:10 36:25 89:7 108:24,25 **talked** 7:14 14:12 14:14 30:1 91:4 98:16 **talking** 12:2 18:10 19:6,8 32:11,17 33:11 34:4 35:1,8 35:17 37:13,17,25 39:22 41:16 56:7 59:8 79:14 83:16 83:19 86:16,18 107:14 108:5 113:11 122:3 123:1 **talks** 69:23 92:22 128:2 **team** 17:5 20:3 65:6 65:15 77:9,10 79:16 **tech** 23:15 **techie** 23:6 **technical** 34:1,4 60:22 69:5 113:1 113:9 **Technologies** 7:18 7:19 11:7 36:20 103:3 119:21 **Technologies'** 58:18 87:10 **technology** 17:24 18:2,16 22:7,15 22:20,22 23:7 25:6,9,10,14,18 88:25 **tell** 9:13 23:6 34:12 37:20 40:11 75:19 83:2 103:17 106:17 108:3 117:1 132:24 **telling** 27:15 49:7,9 **tells** 38:21,23 39:17 **ten** 79:3 106:17 **tendered** 3:13 | 60:10 61:17,24 **term** 23:15 24:25 **terms** 14:3 **Terry** 7:20 27:19 87:10 **testified** 4:7 87:10 **testify** 15:23 **testimony** 8:1 9:8 9:18 10:4,11 15:21 16:2,14 20:22 23:4 24:14 27:20 42:12,19 63:10 70:8 74:9 77:13 89:9 98:18 98:22 99:6 103:3 103:8 115:18 119:20 140:7 **text** 45:24 **thank** 4:16 7:9,13 50:15 56:4 69:15 75:18 78:8,22 79:5,24 106:4 110:11,23 113:9 114:14 117:20 119:14 123:23 124:16 126:3,17 130:20 139:7 **Thanks** 44:21 **thereof** 140:9,11 **thing** 9:12 10:22 33:3 50:4 58:9 71:20 83:22 85:10 85:11 88:6 104:20 104:21 119:16 132:16 **things** 5:13,16,24 6:10 8:19 14:12 15:24 16:1 24:8 24:11 31:4,10 34:5,5 35:4,22 39:8 40:3,14 41:11 42:24 43:6 47:20 52:4 80:20 82:2 83:13 87:24 88:1,9,11 91:4 | 100:15 102:1 104:12,24,25 105:7 106:20,24 107:4 114:9 117:25 118:17 **think** 8:19 9:21 10:6,15 11:12,17 11:23 12:16,17,18 15:4 20:7,12,17 26:15 31:24 37:7 39:6 40:19 41:9 43:17 48:4,17 50:21 52:10,11 58:10 62:7 67:9 75:14,14 77:1,23 80:17 82:5,20,21 83:11 86:15,24 88:5 91:5 92:17 93:25 94:17 98:9 99:17,20,22 100:5 100:12,21,23 101:5,23 107:5 108:11,18 119:14 123:11,16,19 125:10 129:8 130:12 133:16 134:12,12 135:10 135:21 137:19 139:5 **third** 3:12 45:5 83:9 104:7 **thought** 21:23 124:12 **thousand** 68:18 **three** 42:2 68:1 83:7 89:4 90:2 **three-day** 67:24 **three-minute** 64:6 **tickets** 88:2,2 **time** 4:21,24,25 8:20 13:15 15:16 18:15 19:21 20:22 28:23 30:21 31:15 31:25 33:15 57:4 57:6,6 63:12 69:4 | 73:22 74:6 76:16 81:2 85:24 86:13 86:13,17,21 89:16 91:22 95:5 96:14 96:19 98:8 106:3 106:18 108:7 109:8,21 110:6,7 110:10,16,17 118:10,22 119:2 125:15 131:3 139:5 140:6,6,8 **time-consuming** 87:5 **times** 30:2 98:11 107:1 **timing** 12:19 32:4 **titled** 45:4 60:10 **today** 5:15 6:1,16 6:21,25 7:2,11 10:21 11:1,23 19:7 63:11 **told** 22:14 27:10,14 34:24 55:19 110:4 138:20 **tool** 10:18,20,23 11:4,22,24 12:4,6 12:20 16:8,12,19 17:11,14 19:16,22 19:24 21:3,12,24 37:12 125:3,7 135:19 **top** 8:12,18 38:1 41:23 43:17 59:15 61:14,16 83:15 111:11 112:14 134:13 **topics** 30:21 44:18 **touch** 85:16 **train** 65:10 69:20 **trained** 71:3,19,20 71:22,22 **training** 3:20 71:11 71:14,18 72:1,4 128:25 129:4,14 129:16,20,21 |

Courthouse News Service v. Omundson

30(b)(6) Sara Omundson

Page 160

| | | | |
|---|---|---|---|
| transcribed 140:9 | 21:2 22:1,4,13 | undersigned 140:3 | 56:4 58:14,14 |
| transcript 5:16 6:2 | 23:8 24:4,15 | understand 4:20 | 77:11 113:9 |
| 6:3,4 140:9,13,14 | 25:12 26:10 27:2 | 5:21 6:14 7:7 | 118:14 119:3,3 |
| transferred 40:12 | 27:3,10,19 28:22 | 11:3 17:2,16,24 | 123:8 130:20 |
| transition 27:22 | 28:23 29:4,7,17 | 21:10 23:7 25:8 | 139:4,4 |
| transpired 124:5 | 31:18,21 32:11,14 | 25:14 26:17,19 | unfiled 131:8 |
| traversed 120:14 | 32:17,21 34:13,21 | 29:2 30:2,22 | unheard 84:3 |
| treat 119:7 | 34:24 36:19,20,21 | 32:16 34:3 39:21 | UNITED 1:1 |
| trial 71:16 | 37:2,2,11 58:18 | 42:12 45:11 46:9 | universe 108:6 |
| tried 48:19 | 60:15 74:10 87:9 | 47:12 48:24 51:6 | unreadable 90:4,8 |
| trigger 55:16 | 103:3,11 119:11 | 51:23 53:7 56:16 | 91:23 99:9 |
| triggered 121:5 | 119:12,20 124:10 | 57:25 59:5,13,23 | unsigned 91:24 |
| trouble 126:15 | 124:25 125:2,6 | 60:2 67:10 74:9 | 99:16 |
| true 55:23 62:12 | 135:19 | 92:11 93:25 97:18 | unusual 82:4 |
| 96:21 97:4,25 | Tyler's 27:1 32:24 | 98:15 104:9 | 107:11 |
| 140:9 | type 3:17 6:10 | 105:12,18 114:2 | updated 130:14 |
| truly 40:6 | 17:17,20 23:9 | 118:9,17 128:24 | URL 14:15 20:4 |
| trust 132:22 135:1 | 36:2 41:17 42:14 | 130:2 131:3 | 21:19,21 |
| 135:9 | 42:14 43:13 70:22 | 138:11 | usage 22:23 |
| try 19:23 30:20 | 95:15 96:24,25 | understanding | use 11:24 23:16,19 |
| 34:1,3 53:15 | 97:6,7 98:13 | 6:22 11:25 12:3 | 23:20 25:5 29:7 |
| 54:10 62:21 65:1 | 99:22 111:16,18 | 16:1 25:17 28:18 | 33:6 34:8,18,21 |
| 83:17 107:5 | 112:20,21 115:9 | 29:17 41:15 49:7 | 35:24 69:20 71:6 |
| 128:16 | 115:17,25 116:19 | 49:10 50:19 52:20 | 71:24 87:11,22,25 |
| trying 12:17 14:15 | 116:22,24 117:2,8 | 53:3 54:15 55:8 | 88:3 91:6 96:12 |
| 17:16 38:7 39:21 | 118:3,5,6,21,21 | 55:11,18 56:23,25 | 100:3 115:17 |
| 42:17 53:5 57:25 | 118:23,23 119:8,9 | 59:7 63:21 67:8 | 135:1 |
| 58:1 60:2 62:17 | 122:12 134:8 | 72:10 73:18 74:13 | utilize 119:13 |
| 108:1 112:8 | 136:10 | 74:19 77:18 80:22 | 135:14 |
| 118:16 119:4 | types 42:2 96:22 | 82:23 83:19 86:20 | utilizes 30:10 |
| 124:6 127:6 | 97:3,3 98:2,5,7,10 | 86:22 88:4,19 | |
| 130:16 135:21 | 112:1,21 113:12 | 93:10 96:3 99:6 | V |
| twice 133:5 | 113:20 114:3 | 100:15 105:18 | v 1:6 |
| two 12:7 15:17 | 115:10 116:15 | 111:25 113:23 | vague 5:3 |
| 51:23 72:5 75:9 | 118:13 120:9,9 | 119:6,22 120:2,16 | value 58:13 |
| 85:4 91:6 105:13 | 134:6 135:23 | 120:20 122:2,19 | variation 88:8 |
| 105:17,19 112:16 | typically 6:5 87:3 | 128:4,13 | various 40:16 |
| 121:17 | 101:21 113:15,16 | understands 53:6 | vary 66:7 |
| two- 64:6 | 113:22 117:24 | 58:11 | vendor 37:9,17,25 |
| Tyler 7:17,19 9:15 | typos 6:5 | Understood 7:24 | 135:19 |
| 11:3,7,21,24,25 | | 12:24 17:15 25:7 | vendors 12:2 31:23 |
| 12:3,4,6,25 13:17 | U | 29:25 30:13 32:8 | 31:25 35:2 |
| 15:6,13 16:5,6,7 | unclear 22:19 | 32:23 33:4,9 36:6 | venue 58:25 |
| 16:10,17 19:1,9 | unclick 96:10 | 39:2,19 42:11 | verbal 21:24 |
| 19:12 20:20,23,24 | undermine 131:8 | 43:25 53:13 54:5 | verifies 125:25 |

| | |
|---|---|
| versa 10:24 12:12 | |
| version 23:15 28:19 | |
| 28:24 33:12 | |
| 127:17 130:22 | |
| versioning 33:19 | |
| 33:21 | |
| versions 33:16 | |
| versus 35:19,20 | |
| 43:2 62:12 89:18 | |
| 113:4 | |
| vexatious 62:11 | |
| vice 10:24 12:12 | |
| Videoconference | |
| 1:17 | |
| view 13:9 52:6 | |
| 53:19,24 54:2,3,7 | |
| viewable 15:1 | |
| vote 94:24 | |
| voting 95:20 | |

| W |
|---|
| W 2:11 |
| WA 1:24 |
| wait 5:18,19 64:8 |
| waiver 45:25 81:22 |
| 82:15,15,19,24 |
| 83:6,9 |
| waivers 83:3 |
| waiving 11:16 |
| walk 14:1 |
| walking 56:5 |
| want 12:9 18:21 |
| 29:1 30:22 34:3 |
| 35:25 37:4 41:24 |
| 43:18 48:21 49:21 |
| 50:4,12 53:10 |
| 54:6,18,19 59:22 |
| 61:10 63:1,6 |
| 69:22 75:11 76:16 |
| 77:13 78:16,20 |
| 91:3 98:15 104:9 |
| 105:11 108:11 |
| 113:23 114:16 |
| 123:10,15,17 |
| 127:25 128:9,24 |

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 161

| | | | | |
|---|---|---|---|---|
| 129:11 130:2 138:9,16 | website 23:19 114:24 115:4 127:9,16,21 129:1 | written 131:4 wrong 37:6 83:9 101:11,12 | 54:12,23 56:8,10 58:8,16 70:2 80:7 103:23,24,25 111:10,11 | 140:17 208 2:13 22 138:11 25 60:16 |
| wanted 5:12 15:3 17:1 36:23,25 | week 5:11 7:15 9:23 10:11 20:14 | **X** | **1:21-CV-00305-...** 1:6 | 253 60:9 256 60:10 |
| wants 108:24 | week's 4:20 | X 4:10 84:22 | 10:19 79:8 | 26 131:12 |
| warrants 41:10 | went 14:2 56:8 | **Y** | 10:34 79:8 | **3** |
| wasn't 19:21 80:24 88:4 93:12 100:23 123:3 128:15 133:4 | 71:21 79:9 89:6 whereof 140:16 willing 36:25 135:14 | yeah 11:21 13:23 15:4 17:8 19:2 27:9 31:11 34:12 61:12,13 63:18 | 1026 69:8,12 1087 2:11 11 1:23 4:2 11:20 109:6 11:34 109:6 | 3 2:5 46:7 51:18 52:14,18,24 53:18 54:11 55:9 104:2 111:10 |
| watching 16:25 way 8:13 18:15 34:20 49:2 53:15 57:22 62:22 85:20 85:22 88:7 93:16 111:15 121:4 137:25,25 140:11 | wish 90:5 withdraw 48:15 withdrawn 49:2 withholding 45:19 witness 4:5 6:21 7:1,19 76:4 87:10 140:6,7,16 | 71:13 77:9 79:4 86:19 91:3 94:11 95:1 108:16 109:23 112:9 116:18 117:20 118:2,6 119:3,10 119:19 123:2 128:13 136:5 | 11:57 123:25 111 3:16 116 3:17 12:22 123:25 12:28 128:20 12:38 128:20 12:54 139:9 124 3:18 | 30(b)(6) 1:11 3:1 6:25 7:18 140:5 300 2:11 31 92:18,21 93:23 94:5,9 32 38:20 39:3,25 40:6,17,18,25 |
| ways 24:7 88:9 132:6 136:7 we'll 10:9 30:20 39:19 46:12 59:21 64:15,19 68:23 123:21,21 | woman 13:4,7,16 wondering 63:6 word 16:3 25:5 75:10,11 words 96:8,17 work 23:7 25:11 | year 20:21,25 35:9 35:11,12,19,19,20 37:4 132:25 133:5 years 106:17 yesterday 7:17 8:1 9:19 15:22 23:4 | 126 3:19 129 3:20 13 88:21 14 111:6 14441 1:24 140:24 15 79:1 123:17 | 42:2,13 43:10 49:15 50:20,21,23 51:5,8,15 52:10 52:11,15 53:15 54:25 59:8 81:6 112:11 118:4 |
| we're 5:17 6:24 11:15 12:2 16:6 19:6,8 26:11 32:3 32:4,6,15 33:25 34:3 41:16,22 44:25 46:17 49:1 59:8,12 64:8 72:3 72:8 83:19 91:3 109:2 113:11 122:2,3 123:19 131:2 138:8 139:5 | 31:9 34:22 68:24 79:4,5 87:2,16 101:5,25 103:18 103:19 104:4 120:20 126:2 worked 14:23 134:17 working 24:4,4 25:24 28:22 32:6 57:22,23 67:1 97:15 98:3 | 24:14 73:12 87:9 103:2 119:11,12 yesterday's 99:6 Yup 23:21 69:3 **Z** zoom 2:4,10,17 13:8,11,13 16:5 19:12 20:23 61:2 116:8 124:25 125:6 | 1587 75:22 15th 140:17 16 111:6 18 69:8,10,13,22 1986 5:5 **2** 2 46:7 51:18 53:18 54:11 58:15 70:3 70:4 80:9 111:10 | 122:3,4 3384 1:24 342-3310 2:13 37 114:18 39 3:11 44:24 45:2 80:1 103:24 **4** 4 3:5 51:18 53:18 54:11 40 3:13 60:4,7,9 64:25 |
| we've 9:16 23:8,24 30:1 31:22 35:16 37:13 44:18 60:1 60:22 69:4 79:22 79:22 83:7 91:3,4 98:15 103:11 114:11 123:10 | works 116:21 Worksheet 3:15 world 33:17 42:9 would've 138:15 wouldn't 8:7 22:8 36:22 52:12 72:6 86:6 107:17 | **0** 03/16 3:19 **1** 1 6:18 45:17 46:7 46:22,25 49:9,17 | 20 28:1 31:7 87:11 2002 133:19 2016 18:3,4 65:7,14 122:7 2019 34:24 2020 35:3 | 41 3:14 62:20,24 63:2 68:6,19,20 74:15 109:12 110:12 415 2:6 42 3:15 73:6,8 |
| wear 46:15 web 24:8 webpage 3:20 114:23 129:5,16 | 109:22 110:7 132:10 wrap 18:15 30:20 | 50:1,18,25 51:17 52:18 53:18 54:11 | 2021 69:17 131:13 2022 1:23 4:2 | 79:11 109:11 |

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 162

110:15
**43** 3:16 111:3
**44** 3:12,17 116:3,7
**45** 3:18 124:15,21
**46** 3:19 126:21,23
126:25 128:23
129:25
**47** 3:20 129:9,10,19

**5**
**5** 53:19 54:11
**5078** 73:14
**50955** 1:24
**5510** 123:13
**5514** 123:11
**5528** 123:12
**5708** 76:5
**5709** 124:20
**59** 62:9

**6**
**6** 41:18,21
**60** 3:13
**62** 3:14
**675-3400** 2:6

**7**
**7** 125:22
**73** 3:15
**7387** 2:12
**7th** 2:5

**8**
**8:05** 4:2
**83707** 2:12

**9**
**9:06** 44:23
**9:21** 44:23
**9:51** 64:22
**9:57** 64:22
**94111** 2:6