No. 24-6697

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

COURTHOUSE NEWS SERVICE,

*Plaintiff-Appellee*,

v.

SARA OMUNDSON,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the District of Idaho,

Case No. 1:21-CV-00305-DCN, the Honorable David C. Nye, Presiding

---

**EXCERPTS OF RECORD, VOL. 8**

---

Keely E. Duke
Molly E. Mitchell
Duke Evett, PLLC
1087 West River Street, Suite 300,
Boise, ID 83702
Telephone (208) 342-3310
Email: ked@dukeevett.com; mem@dukeevett.com

*Attorneys for Appellant Sara Omundson*

# Exhibit D

William L Girdner November 9, 2022

```
 1                  IN THE UNITED STATES DISTRICT COURT
 2                      FOR THE DISTRICT OF IDAHO
 3
 4   COURTHOUSE NEWS SERVICE,        ) Case No.
                                     ) 1:21-CV-00305-DCN
 5                   Plaintiff,      )
                                     )
 6   v.                              )
                                     )
 7   SARA OMUNDSON, in her           )
     official capacity as           )
 8   Administrative Director of      )
     Idaho Courts,                   )
 9                                   )
                     Defendant.      )
10   _____ )
11
12
13       REMOTE VIDEOTAPED DEPOSITION OF WILLIAM L. GIRDNER
14                      NOVEMBER 9, 2022
15
16
17
18
19
20
21
22
23
24
25   Reported By: Amy E. Simmons, CSR No. 685, RPR, CRR, CRC

                                                    Page 1
```

William L. Girdner November 9, 2022

---

**Page 2**

```
 1      REMOTE VIDEOTAPED DEPOSITION OF WILLIAM L. GIRDNER
 2
 3      BE IT REMEMBERED that the remote videotaped
 4  deposition of WILLIAM L. GIRDNER was taken via
 5  videoconference by the attorney for the Defendant before
 6  Associated Reporting & Video, a Veritext Company, Amy E.
 7  Simmons, a Court Reporter and Notary Public in and for
 8  the County of Ada, State of Idaho, on Wednesday, the 9th
 9  day of November, 2022, commencing at the hour of
10  9:15 a.m. in the above-entitled matter.
11
12
13  APPEARANCES (remotely):
14  For the Plaintiff:   BRYAN CAVE LEIGHTON PAISNER
                      By:  Jonathan G. Fetterly, Esq.
15                     Three Embarcadero Center, 7th Floor
                       San Francisco, CA  94111-4070
16                     Telephone:  (415) 675-3400
                       Facsimile:  (415) 675-3434
17                     jon.fetterly@bclplaw.com
18
    For the Defendant:   DUKE EVETT, PLLC
19                     By:  Keely E. Duke, Esq.
                           Molly E. Mitchell, Esq.
20                     1087 West River Street, Suite 300
                       Post Office Box 7387
21                     Boise, ID  83707
                       Telephone:  (208) 342-3310
22                     Facsimile:  (208) 342-3299
                       ked@dukeevett.com
23                     mem@dukeevett.com
24  Also Present:    Chris Ennis, Videographer
                     Sara Omundson
25
```

---

**Page 3**

```
 1             I N D E X
 2          E X A M I N A T I O N
 3
 4  WILLIAM L. GIRDNER            PAGE
 5
      By: Ms. Duke.....................6, 233
 6
      Mr. Fetterly....................231
 7
 8
 9          E X H I B I T S
10  NO.                      PAGE
11  Exhibit 24  Plaintiff's Objections to       12
        Defendant's Amended Rule 30(b)(6)
12      Deposition Notice of Courthouse News
        Service (4 pages)
13
      Exhibit 25  Defendant's Amended Notice of     48
14      30(b)(6) Deposition Duces Tecum to
        Courthouse News Service (9 pages)
15
      Exhibit 26  "Appendix A" (6 pages)          54
16
      Exhibit 27  Plaintiff's Responses to Defendant's  104
17      Second Set of Interrogatories First
        Set of Requests for Admissions (41
18      pages)
19  Exhibit 28  Declaration of William Girdner in    154
        Support of Plaintiff Courthouse News
20      Service's Motion for Preliminary
        Injunction (163 pages)
21
      Exhibit 29  Various Letters Signed by Bill      220
22      Girdner, Bates Nos. CNS_013270
        through 013279 (10 pages)
23
      Exhibit 30  Email Chain, Top One Dated 10/13/22  225
24      to Katherine Keating from Abigail
        Diaz, Bates Nos. CNS_013299 through
25      013301 (3 pages)
```

---

**Page 4**

```
 1         E X H I B I T S  (continued)
 2  NO.                      PAGE
 3  Exhibit 31    Complaint (60 pages)           226
 4  Exhibit 32    Supplemental Declaration of William   228
        Girdner in Support of Plaintiff
 5      Courthouse News Service's Motion for
        Preliminary Injunction (62 pages)
 6
      Exhibit 48    Memorandum Decision and Order (29    232
 7      pages)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
 1           P R O C E E D I N G S
 2
 3        THE VIDEOGRAPHER:  All right.  So we are
 4  recording and we are on the record.  Today's date
 5  is November 9, 2022.  The time is 9:15 a.m.
 6        For the record, this is the remote
 7  videotaped deposition of 30(b)(6) designee William
 8  Girdner.  It is taken by the Defendants in the
 9  matter of Courthouse News Service vs. Omundson.
10  It is Case No. 1:21-cv-00305-DCN.  It is in the
11  District Court for the District of Idaho.
12        The videotaped deposition is being held
13  remotely.
14        The videotaped deposition is being
15  recorded by Chris Ennis and reported by Amy
16  Simmons of Associated Reporting & Video, a
17  Veritext Company.
18        And if counsel will please state their
19  appearances and any stipulations for the record.
20        MR. FETTERLY:  Yes.  Appearing for
21  Plaintiff, Courthouse News Service and
22  Mr. Girdner, I am Jon Fetterly with the Bryan Cave
23  Leighton Paisner law firm.
24        MS. DUKE:  Keely Duke and Molly Mitchell
25  on behalf of Sara Omundson.  And we have Sara in
```

2 (Pages 2 - 5)

William L Girdner November 9, 2022

1 the room with us here today.
2        THE VIDEOGRAPHER:  And if the court
3 reporter will please swear the witness.
4
5        WILLIAM L. GIRDNER,
6 a witness having been first duly sworn to tell the truth,
7 the whole truth, and nothing but the truth, testified as
8 follows:
9
10        EXAMINATION
11 BY MS. DUKE:
12    Q.  All right.  Good morning, Mr. Girdner.
13 How are you today?
14    A.  Good.
15    Q.  If you would, state your full name for
16 the record and then provide your date of birth.
17    A.  William L. Girdner, October 7th, 1950.
18    Q.  Where do you reside?
19    A.  Pasadena, California.
20    Q.  Where are you today?
21    A.  In Pasadena, California.
22    Q.  Is anyone in the room with you?
23    A.  No.
24    Q.  Have you been deposed before?
25    A.  Yes.

Page 6

1 in depositions, you know, in the context of how
2 you're being deposed today, any other experience
3 with depositions beyond that?
4    A.  No.
5    Q.  So you know, certainly, the ground rules.
6 I'll just go through them quickly with you so that
7 we're on the same page for this deposition.
8        As I said in yesterday's deposition that
9 you watched, this is not an endurance contest.
10 We're not here to see how long you can sit there
11 without a break.  So if you need a break, just let
12 us know.  We try to take one about every hour.
13        All I ask is that you answer whatever
14 question is pending before we take that break.  Is
15 that fair?
16    A.  Yes, that's fair.
17    Q.  If I ask you a question that you don't
18 understand, will you please let me know?
19    A.  Of course.
20    Q.  If you're going on to answer my
21 questions, we'll assume, then, that you understood
22 them.
23    A.  Got it.
24    Q.  You also know that there will be
25 objections from time to time.  You can go ahead

Page 8

1    Q.  On how many occasions?
2    A.  At least four.
3    Q.  In what context?  All in a similar suit
4 like the one we're talking about today, or in
5 different context?
6    A.  In similar suits.
7    Q.  Which jurisdictions?
8    A.  Central District of California.  I
9 think -- I'm trying to think if that's all of
10 them.
11        They may have all been in the central
12 district, but I'm losing track of one of them.  I
13 think it's all the central district.  I'm not
14 sure.
15    Q.  You know, throughout today --
16    A.  Sure.
17    Q.  -- something might pop in your brain.
18 And it's early.  So if it does, just let us know.
19    A.  Yeah.
20    Q.  I bet you didn't wake up to a bunch of
21 snow like we did, though.
22    A.  A lot of rain last night.
23    Q.  That's good.
24    A.  Yeah.
25    Q.  All right.  So other than being deposed

Page 7

1 and answer unless you're instructed not to answer.
2        Do you understand that?
3    A.  Certainly.
4    Q.  And you're doing a great job of providing
5 audible, clear responses for Amy Simmons, our
6 court reporter.  So keep that up.
7        If for some reason throughout the
8 deposition we need to clarify something, we'll do
9 that.  And we're just doing that so we have a
10 clean record.
11    A.  That's fine.
12    Q.  Now, you understand that you're under
13 oath today, correct?
14    A.  Yes.
15    Q.  And you understand that the answers that
16 you provide to the questions that I ask will be
17 your sworn testimony in this case?
18    A.  Yes.
19    Q.  And that those answers to the questions
20 that you're providing could be used to the
21 detriment of CNS to the extent they are considered
22 to be an admission against CNS's interest?
23    A.  I understand that.
24    Q.  You also understand that this -- you'll
25 have an opportunity to review your deposition.

Page 9

3 (Pages 6 - 9)

William L Girdner November 9, 2022

| | |
|---|---|

1   A.  I've done it before, yes.
2   Q.  Okay.  And you understand that's not a
3 take-home test?
4   A.  I'm not sure what you mean by that.
5   Q.  Well, what I mean is you're providing
6 sworn answers today.  You're under oath.  You're
7 providing answers to my questions.
8       Do you understand that you need to be
9 providing full, complete, truthful answers today
10 to my questions?
11   A.  To the best of my ability, certainly.
12   Q.  And that when you review your transcript,
13 you're reviewing it merely to determine whether
14 Ms. Simmons accurately transcribed your testimony?
15   A.  I've made corrections before.  So I think
16 if I get something wrong, I can correct it.
17   Q.  Okay.  Well, I strongly disagree with
18 that, as do our Idaho district courts.
19       MS. DUKE:  So I guess I'm not sure how to
20 continue, Jon, today with the general objections
21 you made that basically whatever he says today can
22 be changed, modified.
23       I'm not comfortable continuing today's
24 deposition without an assurance that he's going to
25 provide truthful, responsive answers, and that

Page 10

1   he's not going to get his deposition transcript
2 and substantively change his answers.
3       So without that, I won't go forward
4 today, and we'll address this issue with the court
5 and get a ruling from the court on it first.
6       MR. FETTERLY:  I don't believe your
7 comments reflect the testimony from Mr. Girdner.
8 I'm not sure we've identified any reason not to go
9 forward today.
10       MS. DUKE:  Well, I'm reading your
11 objections, and your objections say that he has
12 the right to object on any ground after the fact
13 and that he has the right to revise, correct,
14 supplement, or clarify any of his responses.
15       And that's just not how this is done.
16 And I won't do that.  I'm not going to have my
17 client spend money on a deposition that he's not
18 going to stick with his answers.
19       So I recommend that we postpone today --
20 obviously that's going to set all of our deadlines
21 off -- and that we go ahead and have this teed up
22 with the judge.  I might be able to get the
23 judge's clerk on the line today and deal with
24 this, but I won't go forward and waste the court's
25 money.

Page 11

1       MR. FETTERLY:  Well, let's take a quick
2 break off the record.  I think we can go forward
3 today, and let's discuss how we can do that.
4 Because I think we're ready to go.  And I think we
5 can discuss the objection and perhaps maybe even
6 withdraw it so that we can then move forward.
7       The purpose of the objection wasn't meant
8 to, you know --
9       MS. DUKE:  I've never seen an objection
10 like this, ever.
11       MR. FETTERLY:  Okay.  Let's go off the
12 record and discuss briefly.  And then we can
13 figure out our plan going forward.
14       MS. DUKE:  Before we go off the record,
15 Ms. Simmons, I do want to note for the record I've
16 never seen this objection.
17       I will mark as our next exhibit the
18 objections that were made this morning at
19 9:00 a.m. Mountain to the 30(b)(6) and call out
20 specifically paragraph 2 and 3 to that set of
21 objections.
22       (Deposition Exhibit No. 24 was marked.)
23       MS. DUKE:  Go ahead and go off the
24 record.
25       THE VIDEOGRAPHER:  Okay.  So the time is

Page 12

1   9:23, and we are off the record.
2       (Discussion held off the record.)
3       THE VIDEOGRAPHER:  All right.  So we are
4 recording.  The time is 9:27 a.m., and we are back
5 on the record.
6       MS. DUKE:  All right.  We were just off
7 the record and discussed the objections that were
8 served this morning at about 9:00 Mountain, which
9 are Exhibit 24 to this deposition.
10       Counsel for CNS has agreed to remove in
11 paragraph 2 the first full sentence, which
12 includes an A and a B, of the objections so that
13 we do not need to be concerned about changes to
14 the deposition that do not conform with the
15 Federal Rules of Civil Procedure or the District
16 of Idaho's application, interpretation, and use of
17 those rules.
18       And so with that, what we'll note on
19 Exhibit 24, which is the general objections, we
20 will strike through that sentence, including A and
21 B.
22       I understand -- I guess a bit of a
23 concern is the remainder of that sentence for us
24 on not waiving any objections to relevancy,
25 materiality privilege.  I agree with that.  I

Page 13

4 (Pages 10 - 13)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 don't think that's something that needs to be<br>2 stated. That's simply stated in the Federal Rules<br>3 of Civil Procedure.<br>4     But if you have an objection to make to a<br>5 question today that are required by the Federal<br>6 Rules of Civil Procedure, then you need to make<br>7 those objections today. Those are objections,<br>8 form objections. Not relevancy, not materiality.<br>9     Certainly you can make privilege<br>10 objections today, to the extent those exist. If<br>11 not, there will be a privilege waived.<br>12     So I think at this point I'm comfortable<br>13 going forward as long as I get some assurances to<br>14 the questions that I'm going to ask.<br>15     Do you want to add anything,<br>16 Mr. Fetterly, before I ask those questions?<br>17    MR. FETTERLY: Yes. I agree that that<br>18 accurately reflects our conversation off the<br>19 record.<br>20     And I would just add -- and I believe you<br>21 noted -- that Courthouse News is still reserving<br>22 all rights under the Federal Rules of Civil<br>23 Procedure, both with respect to the questions and<br>24 responses that will go forward today as well as<br>25 Courthouse News's ability to review and address<br><div align="right">Page 14</div> | 1 you on any medications that would impact your<br>2 ability to provide complete, truthful answers to<br>3 my questions?<br>4   A. No.<br>5   Q. Do you also understand that you'll have<br>6 an opportunity to review your transcript, and with<br>7 respect to that review, that is not an opportunity<br>8 for you to add to answers, change answers, that<br>9 type of thing?<br>10   A. I now understand that.<br>11   Q. All right. And you agree to go forward<br>12 with your deposition with that understanding?<br>13   A. I do.<br>14   Q. All right. I appreciate that.<br>15   A. You bet.<br>16   Q. One other ground rule to the deposition.<br>17 If I ask you a question and you provide a response<br>18 and then you finish your response, we'll<br>19 understand that you've provided a complete, full<br>20 response to that question. Okay?<br>21   A. That's fine.<br>22   Q. If you're going on to answer my next<br>23 question, we'll all assume that you, to your<br>24 satisfaction, completed your answer as fully as<br>25 you needed to. Is that fair?<br><div align="right">Page 16</div> |
| 1 the transcript upon receipt. We'll proceed<br>2 according under the federal rules.<br>3     And with that, I believe we can go<br>4 forward.<br>5   Q. (BY MS. DUKE) All right. So,<br>6 Mr. Girdner, we were talking, and I asked you a<br>7 question.<br>8     I asked you, "What I mean is you're<br>9 providing sworn answers today. You're under oath.<br>10 You're providing answers to my questions.<br>11     "Do you understand that you need to be<br>12 providing full, complete, truthful answers today<br>13 to my questions?"<br>14   A. Absolutely. That's my full intention.<br>15   Q. And your answer prior was to the best of<br>16 your ability, certainly.<br>17     Is there anything preventing you today<br>18 from understanding my questions?<br>19   A. No.<br>20   Q. Are you on any medications, have any<br>21 medical condition that would somehow impact your<br>22 ability to understand what's being asked of you<br>23 today?<br>24   A. No.<br>25   Q. Do you have any medical condition or are<br><div align="right">Page 15</div> | 1   A. Yeah. I mean, you asked me earlier if I<br>2 thought -- for example, in the deposition if I<br>3 remembered where the heck it was, that I could add<br>4 that. So if I think of something that would<br>5 complete the answer or be -- you know, add to it,<br>6 I think that would be fine, I'm assuming.<br>7   Q. It would, but I'd want that today.<br>8   A. Yeah. Yeah. Of course. Of course.<br>9   Q. This is your chance to talk to you. So if<br>10 you're going on and answering my questions, we'll<br>11 assume, then, that you provided a full, fair<br>12 response to those unless you indicate you may need<br>13 to think about them a little bit.<br>14   A. That's fine.<br>15   Q. All right. What do you do for a living,<br>16 sir?<br>17   A. I'm the editor of Courthouse News<br>18 Service.<br>19   Q. How long have you been in that position?<br>20   A. At least 30 years.<br>21   Q. Just give me a thumbnail sketch of your<br>22 educational background.<br>23   A. I went to -- I'm assuming post-graduate?<br>24 High school and --<br>25   Q. Yeah, post high school.<br><div align="right">Page 17</div> |

<div align="right">5 (Pages 14 - 17)</div>

William L Girdner November 9, 2022

| | |
|---|---|
| 1    A.  Yeah.  Yeah.  Reed College, undergrad,<br>2 literature degree.<br>3        Went to Lewis & Clark law school, got a<br>4 law degree.<br>5        And then I've worked as a journalist<br>6 almost the entire time since.<br>7    Q.  Do you have any certifications in<br>8 journalism?<br>9    A.  I've gotten -- I've gotten the ID from<br>10 the LAPD and the sheriff.  As far as educational<br>11 degrees in journalism, no.<br>12    Q.  With respect to this case, I know that<br>13 we've talked about -- well, let me ask this:  What<br>14 are you tasked to do with CNS?  What's your job<br>15 responsibility?<br>16    A.  It's running the whole show.  So that<br>17 means making sure that the -- we're publishing our<br>18 reports, that the news site is operating<br>19 correctly, and that the content of our news site<br>20 and our publications is of high quality.<br>21        But I also have responsibility for all<br>22 the major business decisions in keeping Courthouse<br>23 News afloat.  Sorry.  That includes litigation, of<br>24 course.<br>25    Q.  How many employees do you have?<br><div align="right">Page 18</div> | 1 goes to the courthouses she described yesterday,<br>2 looks on the public kiosks.<br>3        And then for the federal coverage of, I<br>4 believe, Montana, Wyoming, and Idaho, she goes on<br>5 to PACER and covers remotely.<br>6    Q.  And is she a good employee?<br>7    A.  Yes, indeed.<br>8    Q.  Trustworthy employee?<br>9    A.  Certainly.<br>10    Q.  And I'm assuming at no point in time<br>11 yesterday during her deposition did you feel that<br>12 she was being dishonest in answering her<br>13 questions; is that correct?<br>14    A.  Certainly not.<br>15    Q.  And I'm assuming you would defer to her<br>16 from the standpoint of the specific process that<br>17 she followed back when it was paper filing; is<br>18 that correct?<br>19    A.  Yes.  There was a predecessor to her,<br>20 which was Phil Janquart.  I don't think she knows<br>21 how he conducted his work.<br>22    Q.  But certainly she was at Courthouse News<br>23 a few months before some of the counties started<br>24 to go electronic, and you would defer to her as to<br>25 how she handled reporting on newly filed paper<br><div align="right">Page 20</div> |
| 1    A.  It's -- it shifts, but it's around 240.<br>2    Q.  And when I say "employees," do you also<br>3 have, like, independent contractors?  Or is that<br>4 kind of the -- how many agents does --<br>5    A.  Right.  We have very few independent<br>6 contractors.  I think almost everyone is an<br>7 employee.  They're not all full time.  Some of<br>8 them are part-time.<br>9    Q.  Got it.  And you had an opportunity<br>10 yesterday to attend the deposition of one of your<br>11 reporters in Idaho; is that correct?<br>12    A.  That's correct.<br>13    Q.  And her name is?<br>14    A.  Cathy Valenti.<br>15    Q.  And Ms. Valenti is Courthouse News's<br>16 reporter here; is that correct?<br>17    A.  She's based in Boise, yes.<br>18    Q.  And her job is to do the Monday through<br>19 Friday Big Sky Report; is that correct?<br>20    A.  She's responsible for the Big Sky Report,<br>21 that's correct.<br>22    Q.  What's your understanding as to the<br>23 process she will go through to make that Big Sky<br>24 Report each Monday through Friday?<br>25    A.  Well, for the Idaho portion of it, she<br><div align="right">Page 19</div> | 1 complaints?<br>2    A.  I think her description of how she did it<br>3 was accurate.<br>4    Q.  And I'm assuming that you would also rely<br>5 on however Mr. Janquart would testify as to what<br>6 his process was in reporting on newly filed paper<br>7 complaints when he worked for CNS; is that<br>8 correct?<br>9    A.  Sure.  I mean, I also have some<br>10 independent knowledge of how that was done.<br>11    Q.  And how do you have that knowledge?<br>12    A.  Through conversations with Mr. Janquart<br>13 and his bureau chief.<br>14    Q.  With respect to Ms. Valenti's description<br>15 of her process --<br>16    A.  Oh, I'm sorry.  I'm sorry.  Can I add one<br>17 thing?  I apologize for interrupting you.<br>18    Q.  Sure.<br>19    A.  To the last question, also through<br>20 correspondence, written correspondence with the<br>21 clerk at the time.<br>22    Q.  At what time?<br>23    A.  Chris Fry was the clerk when Phil<br>24 Janquart was covering the court and I believe when<br>25 Cathy Valenti started.<br><div align="right">Page 21</div> |

<div align="right">6 (Pages 18 - 21)</div>

William L Girdner November 9, 2022

| | | | |
|---|---|---|---|
| 1 Q. And do you know which district? | | 1 words, they'd been passed across the counter and |
| 2 A. Ada County. | | 2 stamped. I don't believe they were docketed. |
| 3 Q. Anything else to add? | | 3 Q. And why don't you believe they were |

1  Q. And do you know which district?
2  A. Ada County.
3  Q. Anything else to add?
4  A. No, I'm done.
5  Q. So now moving into the e-filing time
6  periods, once Idaho's counties went on to the
7  e-filing, would you agree that Cathy is the one
8  with the best knowledge as to what her process is
9  in reviewing filings and then reporting on those
10 filings?
11 A. Yes, of course.
12 Q. So with respect to when Mr. Janquart
13 worked here, you indicated you had some knowledge
14 through conversations with him and then through
15 correspondence with Mr. Fry.
16     Tell me what it is your understanding was
17 related to how Mr. Janquart would review
18 complaints and then report on them.
19 A. He received -- I don't know if it was
20 called a cart or a bucket -- of the new cases at
21 the end of the day that was all the new cases
22 filed that day. In other words, the court was
23 providing same-day access to paper filings.
24 Q. And that was in Ada County?
25 A. Yes.

Page 22

1 words, they'd been passed across the counter and
2 stamped. I don't believe they were docketed.
3 Q. And why don't you believe they were
4 docketed? What's your basis for that? Because
5 that's contrary to Ms. Valenti's testimony.
6 A. I think we had access before all the
7 cases were docketed. That's my recollection.
8 Q. And what's that recollection based on?
9 A. The conversations with Janquart and with
10 the bureau chief and the letter from the clerk.
11 Q. And who was the bureau chief?
12 A. Chris Marshall.
13 Q. And what did Chris Marshall tell you was
14 the process Mr. Janquart went through to look at
15 newly filed complaints in Ada County?
16 A. He would get the cart -- or the bucket, I
17 think it was called. That's my best
18 recollection. And the fact that it was all same
19 day.
20 Q. What else would -- I'm not understanding
21 how that would somehow tell you that those had not
22 yet been accepted in the case management file.
23     So he told you he would get a bucket with
24 stamped complaints on them, and then that that
25 would happen typically in the same day.

Page 24

1 Q. Do you have any idea what the process was
2 for Mr. Janquart in any other county other than
3 Ada County?
4 A. No. We call it circuit riding. In other
5 words, he went to the other courts on a certain
6 schedule, but I don't know specifically what
7 courts or what the schedule was.
8 Q. And you would defer to him as to the
9 courts and the schedule?
10 A. Yes.
11 Q. You would also defer to Ms. Valenti as to
12 the courts and schedule that she testified to
13 yesterday?
14 A. Yes, I would.
15 Q. All right. So when you say there was a
16 cart or bucket of the cases that were newly filed,
17 those are cases that had been provided to the
18 district court clerk. And again, I'm talking, you
19 know, in Mr. Janquart's time, so this is obviously
20 pre-electronic filing -- that those would be
21 complaints that the court clerk had accepted into
22 the case file and then provided us a copy?
23 A. No, I don't agree with that.
24 Q. Tell me why.
25 A. The cases had been filed -- in other

Page 23

1     What more did he tell you other than
2 that?
3 A. My recollection was it was ahead of
4 docketing.
5 Q. And who told you that?
6 A. That, I'm not clear on. But I'm
7 obviously being straightforward. It's -- I don't
8 know if Phil told me that or I just -- that's how
9 I understood the situation to be from all of the
10 conversations.
11 Q. Well, do you have any documentation of
12 anyone during Mr. Janquart's time stating that
13 what Mr. Janquart was reviewing was ahead of
14 docketing?
15 A. No.
16 Q. So your only basis for your belief on
17 that is your recollection of someone telling you
18 that but you don't know who, correct?
19 A. No. In other words, Chris Fry, the
20 clerk, sent the letter saying we had access the
21 same day. And in my experience, if we have
22 100 percent access to same day, it's not possible
23 for the clerk to docket everything the same day.
24 Q. All right. Well, that's your experience.
25 I'm talking about Idaho here.

Page 25

7 (Pages 22 - 25)

William L Girdner November 9, 2022

1  Did you at any point in time ask Mr. Fry
2 whether or not the complaints that were included
3 in the bucket each day had, in fact, been
4 docketed?
5  A. No, I did not.
6  Q. Did you at any point in time ask the
7 bureau chief, Mr. Marshall, whether the complaints
8 provided in the bucket each day that Mr. Janquart
9 would then review had been docketed?
10  A. That, I don't recall. I don't recall
11 asking him that.
12  Q. Do you recall asking anyone in the state
13 of Idaho when Mr. Janquart was reporting for CNS
14 whether the complaints included in the bucket in
15 Ada County and provided each day had been
16 docketed?
17  A. I believe I talked with Phil about that,
18 but that's a vague memory.
19  Q. And what is your vague memory in that
20 regard? Do you have any specifics?
21  A. That not all the cases were docketed.
22  Q. Did he tell you what his basis for that
23 belief was?
24  A. I don't recall.
25  Q. Now, you understand that this is contrary

Page 26

1 she used when Ada County was paper filing, was
2 there any point in time when you said, "That's not
3 what I remember"?
4  A. No, there was no point in time.
5  Q. Was there any point throughout that
6 entire deposition where you thought, "I've got to
7 correct that. That is not accurate what she's
8 saying"?
9  A. There were a number of points in the
10 deposition where you were characterizing the
11 "filed" in a way that I didn't agree with, and I
12 don't think she well understood.
13  Q. Anything else?
14  A. No, that's it.
15  Q. So was there any point in time when she
16 described her job and how she did her job where
17 you went, "That's not what she was supposed to be
18 doing, and that's not what I understand" --
19  A. Oh, no. No. No. She did her job
20 correctly.
21  Q. Okay. And she testified at no point in
22 time did CNS request that she actually go and talk
23 to the people standing in line who were filing to
24 ask, "Hey, what are you going to file today,"
25 correct?

Page 28

1 to what Ms. Valenti testified to yesterday,
2 correct?
3  MR. FETTERLY: Objection; argumentative,
4 misstates testimony.
5  THE WITNESS: Yeah, I don't recall that.
6  Q. (BY MS. DUKE) Okay. Well, as I asked
7 you before, you would defer to Ms. Valenti's
8 description of how she goes about -- or how she
9 went about reviewing the bucket of complaints when
10 there was paper filing, correct?
11  A. The process she went through, yes.
12  Q. And you have no reason to dispute that
13 process that she testified to under oath
14 yesterday, correct?
15  A. Yeah, I just -- I would -- and I'm not
16 trying to play games with you, Ms. Evett. I
17 prefer to, rather than a blank approval, know what
18 you're talking about of what she said.
19  Q. No, you attended her deposition.
20  A. I did.
21  Q. And I'm asking you, was there anything in
22 her deposition where you went, "That is just
23 wrong"?
24  A. No, there was not.
25  Q. When she was describing the process that

Page 27

1  A. I've never requested that of anyone, and
2 I've never done it myself.
3  Q. And you would never request that of
4 anyone who works for you, correct?
5  A. Certainly not.
6  Q. And why?
7  A. The cases haven't been filed yet.
8  Q. Why is that an important distinction for
9 you that if the cases haven't been filed yet, we
10 don't want to report on them?
11  A. Because they haven't crossed into the
12 official sector. They're not in the court's
13 possession. They're not filed. That's the word I
14 used. That's what I meant, filed.
15  Q. But why is that important for you? Why
16 is it important that complaints be filed before
17 you report on them?
18  A. They're in the possession of the court.
19 They're court record today.
20  Q. So once they become a court record, that
21 is when you believe the complaint should be
22 reported on, correct?
23  MR. FETTERLY: Objection. Objection;
24 vague and ambiguous as to the term "court record."
25  Q. (BY MS. DUKE) Well, let me use your own

Page 29

8 (Pages 26 - 29)

William L Girdner November 9, 2022

1 testimony. You specifically just testified that
2 once they're in the possession of the court,
3 they're a court record, that is when they're
4 ripe to be reported on.
5    A. Yeah, I think you're seizing on the word
6 "record." I mean when they're filed. When they
7 cross into the court and are stamped. That's what
8 I mean.
9    Q. When they're actually docketed and filed?
10    A. No, that's not what I mean.
11    Q. Tell me what you mean.
12    A. Across the counter and filed.
13    Q. So if I'm looking at a piece of
14 paper -- and I started out as a runner, so I know
15 this process well because it was back in the paper
16 days.
17       I would go to the courthouse for the law
18 firm I worked for. I would have the complaint.
19 I'd have the filing fee with it.
20       I would hand it to the court clerk. I
21 would hand the filing fee to them.
22       And the great majority of time they would
23 say, "Yep. All right. Thank you. We'll take
24 your check. We'll take your complaint."
25       They would stamp it in front of me, and I

Page 30

1 filing fee amount and bring it back," and then
2 they would accept it and file it.
3    Q. You're not reporting on those -- you're
4 not going to stop that clerk and say, "Hey, what
5 did you just try to file?" That's what I'm trying
6 to get to.
7    A. You're describing a hypothetical that
8 I've never seen. Okay? I'm talking about cases
9 that have crossed the counter.
10    Q. Okay.
11    A. So in your instance the case didn't cross
12 the counter. It's not received by the court. I
13 don't think we would be reporting on it.
14    Q. Right. That's what I was looking at.
15 Thank you.
16       So let's talk about CNS has the
17 responsibility for timely news reporting, correct?
18    A. Yes. Most news organizations do.
19    Q. And you would agree that the timeliness
20 of your Big Sky Report is a fundamental report of
21 CNS's value to its subscribers, correct?
22    A. Indeed.
23    Q. And you listened to the testimony of
24 Ms. Valenti. At no point in time has Courthouse
25 News demanded that she work on Friday nights or

Page 32

1 would walk away.
2    A. That's right.
3    Q. That's what you mean by "filed," correct?
4    A. Correct.
5    Q. All right. Now, there were also times
6 when we would go and I would hand something and
7 they would say, "This doesn't have a signature,"
8 or "The filing fee is wrong. You've got to go
9 back and correct that."
10       Those are not the complaints that you're
11 reporting on, correct?
12    MR. FETTERLY: Objection; vague and
13 ambiguous, overbroad.
14    THE WITNESS: Yeah, I don't quite
15 understand your question. It's kind of a
16 hypothetical. Give it another try, would you,
17 please?
18    Q. (BY MS. DUKE) Sure. There were also
19 times when I would actually go as a clerk, as a
20 runner, and I would hand the clerk the document
21 and they would look at me and say, "It's missing a
22 signature here." Or, "You have the wrong filing
23 fee."
24       And they would say, "You've got to go
25 back, get the signature, and go get the correct

Page 31

1 the weekends to report on something that is filed
2 either after she did her last look on Friday or
3 over the weekend, correct?
4    A. Reporters often work late or check
5 filings late when they have access to filings
6 later. But in her --
7    Q. That's not my question.
8    A. Yeah. There has been no need to ask her.
9 Let me try to answer your question correctly.
10       There has been no need to ask her because
11 there's no availability.
12       So, yes, you're correct. We have not
13 asked her to stay late after 5:00 or to
14 work -- I'm sorry. I take that back.
15       Okay. Let me answer carefully.
16    Q. Well, and just so you know, I want you to
17 answer all questions carefully.
18    A. Of course.
19    Q. So don't qualify things by saying, "I'm
20 going to answer carefully," or "Let me be straight
21 with you." That's how you should be the whole
22 deposition.
23    A. Of course. I understand I'm under oath,
24 Ms. Evett.
25    Q. Wonderful. And my name is not Ms. Evett.

Page 33

9 (Pages 30 - 33)

William L Girdner November 9, 2022

1  It's Ms. Duke. I'm quite proud of that. My law
2  firm is Duke Evett.
3      A. Sorry. Sorry. I apologize.
4      Q. No problem.
5      A. I'm looking at your screen. I apologize.
6  No, I think getting names correct is very
7  important.
8      Q. Yeah. Thank you.
9      A. So we've never asked her to work past
10 when she files her report. But she completes her
11 report later in the day. So 6:00, I would
12 estimate, is when she files her report.
13     Q. Have you ever asked her to work on the
14 weekends and report on anything that's filed after
15 typically 6:00 p.m. on Friday or over the weekend?
16     A. Not that I know of.
17     Q. Okay. Now, she is also responsible for
18 reporting on the federal court filings in the
19 District of Idaho, the District of Wyoming, and
20 the District of Montana, correct?
21     A. Correct.
22     Q. And those are filing systems that if
23 something is filed in the district court of the
24 District of Idaho at 9:00 p.m., let's say, on a
25 Friday night, those are accessible to Ms. Valenti
Page 34

1  to review?
2      A. That's correct.
3      Q. And they would be accessible for her to
4  review on Saturday or Sunday, correct?
5      A. Yes, correct.
6      Q. And Courthouse News has never asked her
7  to work later on Friday or on the weekends or on a
8  holiday to report on cases in the federal courts
9  for Idaho that are filed after hours?
10     A. That's correct. We do have other
11 reporters in different time zones who check late
12 in federal courts. So, for example, in Alaska and
13 I think Hawaii.
14        So there are mop-up reporters who check
15 for late filings, but I don't know their
16 particular schedule and whether it includes the
17 federal courts in Montana and Idaho and Wyoming.
18     Q. And who are these mop-up reporters?
19     A. Well, there's Julie St. Louis in Alaska
20 who is one of them. I think there's a couple
21 others, but that's the one I can think of.
22     Q. Are you aware --
23     A. Because of her time zone.
24     Q. Are you aware of a Big Sky Report ever
25 being published twice in one day in the state of
Page 35

1  Idaho?
2      A. No.
3      Q. Are you aware of any of these mop-up
4  reporters finding a complaint that's been filed
5  after Ms. Valenti submitted her Big Sky Report and
6  doing an additional one that day?
7      A. It's quite possible -- and I mean this --
8  it's quite possible -- I mean everything I'm
9  saying.
10        It's quite possible that they're
11 reporting it. I just don't know specifically.
12     Q. My question is are you aware of whether
13 or not any of these reporters have submitted an
14 additional Big Sky Report if they found something
15 that was filed after Ms. Valenti did the day's Big
16 Sky Report?
17     A. They would report on the complaint if
18 they found one. But they wouldn't submit a
19 separate report.
20     Q. Where would they report on such
21 complaint?
22     A. It would go into our database.
23     Q. But would it go out to the subscribers?
24     A. Certainly, if there was somebody who
25 asked for a notice on the topic or on those
Page 36

1  defendants.
2      Q. But only if someone asked?
3      A. Yeah, if there was a request.
4      Q. Now, it's my understanding that in your
5  role at Courthouse News that you have developed
6  extensive personal knowledge of the procedures
7  that courts use both now and in the past to
8  intake, docket, and provide access to new
9  complaints; is that correct?
10     A. That's correct.
11     Q. Tell me what you have done in the state
12 of Idaho to develop extensive personal knowledge
13 of the procedures that the Idaho state courts
14 used -- or currently use, I'm sorry -- with
15 respect to electronic filings.
16     A. Other than what I've already described.
17 In other words, talking with or reviewing the
18 correspondence from Chris Fry, listening to
19 yesterday's testimony, and discussing the report
20 over the years. I've never been to the
21 courthouses to do the reporting myself. In Idaho,
22 I mean.
23     Q. Have you reviewed any of the Idaho Rules
24 of Civil Procedure to develop a personal knowledge
25 of the procedures the courts use?
Page 37

10 (Pages 34 - 37)

William L Girdner November 9, 2022

| | |
|---|---|
| 1   A. I've at times looked at the rules. | 1 filed complaints so that the Big Sky Report can be |
| 2   Q. Okay. Any rules jump out to you that | 2 generated each business day, correct? |
| 3 would be applicable to this case? | 3   A. It has to do with the timeliness of the |
| 4   A. No, not one that I can think of. | 4 access, that's correct. |
| 5   Q. Have you reviewed any of the Idaho | 5   Q. And tell me what you understand CNS's |
| 6 electronic filing rules that have been adopted by | 6 position to be as to why CNS believes timely |
| 7 the Idaho Supreme Court? | 7 access is not being provided by the Idaho state |
| 8   A. I've looked at some of the discovery, | 8 courts. |
| 9 which I think included some of the rules, or | 9   A. Because it's not -- access is not being |
| 10 discussion or amendments to the rules. | 10 provided at the time of receipt or shortly |
| 11   Q. So you would have looked at discovery, | 11 thereafter like in the federal courts, like in |
| 12 meaning answers that we provided in this lawsuit | 12 three of the four biggest courts -- state courts |
| 13 to questions that your counsel asked on CNS's | 13 in the U.S., like a bunch of courts in the Ninth |
| 14 behalf? | 14 Circuit such as Arizona and Hawaii. That's why. |
| 15   A. That's what I mean. | 15   Q. Are you able to answer that question |
| 16   Q. Prior to this lawsuit, at any point in | 16 without referring to other courts so that you |
| 17 time had you reviewed any of the Idaho electronic | 17 could be more specific? Or does your answer need |
| 18 filing rules that the Idaho State supreme court | 18 to be that broad? |
| 19 has adopted? | 19   A. I don't understand your question. |
| 20   A. I don't know. Because prior to filing | 20   Q. What specifically is your complaint as to |
| 21 the lawsuit, it seems possible that I would have | 21 why you believe there's a delay? |
| 22 looked at those rules along with our attorneys. | 22   And when I say "you," I obviously mean |
| 23 But I don't have a specific recollection of it. | 23 CNS, why CNS believes there was a delay in the |
| 24   Q. As you sit here today, are you aware of | 24 timely access to newly filed complaints in the |
| 25 any Idaho electronic rules that the Idaho Supreme | 25 state of Idaho. |
| Page 38 | Page 40 |

| | |
|---|---|
| 1 Court has adopted related to e-filings? | 1   A. Yeah, I think I just answered that |
| 2   A. No. I mean, I've said I looked at | 2 question, but I'm happy to answer it again. |
| 3 discovery. I think there were some changes made | 3   I think that the state of Idaho is not |
| 4 in the security, for example, of -- and there were | 4 providing access to the new complaints at the time |
| 5 some amendments made, sorry, to the e-filing | 5 of receipt or shortly after, as many courts do on |
| 6 rules. I have looked at those. | 6 the federal side and the state side. |
| 7   Q. Okay. Well, and what did they tell you? | 7   Q. And it's CNS's position that Idaho should |
| 8 What do those e-filing rules say? | 8 be providing more timely access to newly filed |
| 9   A. My recollection is that -- oh, it had to | 9 complaints, correct? |
| 10 do -- what my recollection has to do with, the | 10   A. It's our position that Idaho should be |
| 11 designation of "Confidential" by a filer, and that | 11 providing access at or near the time of receipt. |
| 12 the filer did have the power to designate a filing | 12   Q. That's not my question. My question is |
| 13 is confidential. And then that ability was | 13 should Idaho be providing more timely access to |
| 14 amended and taken away by me. That's my | 14 newly filed complaints? Is that CNS's position? |
| 15 recollection. And it's -- I'm just saying it's | 15   A. I'm not sure what you're trying to ask |
| 16 vague. | 16 because what you mean by "newly filed" -- I'm |
| 17   Q. Okay. Other than that vague | 17 saying that once they're received or shortly |
| 18 understanding of e-filing rules that are | 18 thereafter, we should see the new complaints. |
| 19 applicable to this case, any other e-filing rules | 19 That's how I'm answering your question. |
| 20 that you're aware of? | 20   Q. And when you say "received," do you mean |
| 21   A. Specific to Idaho, no. | 21 that it can be something that has not yet been |
| 22   Q. Now, this case that we're talking about | 22 filed? |
| 23 here that CNS has filed in the district court for | 23   MR. FETTERLY: Objection; vague and |
| 24 the state of Idaho, this case involves the | 24 ambiguous as to the term "filed" as used in this |
| 25 timeliness of reporters having access to newly | 25 context. Calls for a legal conclusion. |
| Page 39 | Page 41 |

11 (Pages 38 - 41)

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

William L Girdner November 9, 2022

| | |
|---|---|
| 1    You may answer. | 1    MR. FETTERLY: Objection; misstates |
| 2    THE WITNESS: It's filed when it's | 2 testimony, argumentative. |
| 3 submitted. | 3    You may answer. |
| 4    Q. (BY MS. DUKE) Okay. You mean a | 4    THE WITNESS: Yeah, I'm saying it's |
| 5 complaint is filed when it's submitted? | 5 filed -- when it's submitted, it's filed. |
| 6    A. Correct. That's when -- | 6    Q. (BY MS. DUKE) And is there anything in |
| 7    Q. What is your basis for believing that | 7 Idaho, its rules of civil procedure or its |
| 8 when a complaint is submitted in the state of | 8 electronic filing rules, that supports your belief |
| 9 Idaho, that it has been filed? | 9 that when a complaint is submitted, it is filed? |
| 10    A. I think the -- I have not seen an | 10    MR. FETTERLY: And objection; calls for a |
| 11 e-filing rule in the United States, federal or | 11 legal conclusion. |
| 12 state court, that says a filing time is anything | 12    I've been liberal with letting you ask |
| 13 other than when it's submitted. | 13 these questions. Ultimately I believe this is an |
| 14    Q. And -- perfect. I like that. | 14 issue that's been argued before the Court, and |
| 15    So you're not familiar with any Idaho | 15 there's a legal issue involved in it. |
| 16 electronic rule that distinguishes between | 16    The witness has provided his answer. |
| 17 submitted versus filed, correct? | 17 Asked and answered. |
| 18    A. I think they're the same. | 18    I'll give you one more shot at this. |
| 19    Q. You believe that in the state of Idaho, | 19    THE WITNESS: I'll answer the same way I |
| 20 the e-filing rules state that a submitted | 20 answered it before. When it's submitted, it's |
| 21 complaint is the same as a filed complaint? | 21 filed. |
| 22    A. I don't know what you -- I'm saying that | 22    Q. (BY MS. DUKE) That's not my question. |
| 23 it is filed on the point of submission. That's my | 23    My question is: Is there anything in |
| 24 understanding. | 24 Idaho, either in its civil rules of civil |
| 25    Q. Okay. And I'm asking you what that | 25 procedure or its electronic filing rules, that |
| Page 42 | Page 44 |
| 1 understanding is based on in the state of Idaho. | 1 supports your belief that when a complaint is |
| 2    MR. FETTERLY: Objection; asked and | 2 submitted in Idaho state courts, it is filed? |
| 3 answered. | 3    MR. FETTERLY: Objection; calls for a |
| 4    THE WITNESS: I've seen no other state in | 4 legal conclusion, asked and answered, |
| 5 the nation, federal or another court in the | 5 argumentative. |
| 6 nation, federal or state that does not do it that | 6    THE WITNESS: What I answered and what |
| 7 way. That's my reasoning. | 7 I'm saying now is that I've seen no other court, |
| 8    Q. (BY MS. DUKE) I'm not asking about other | 8 ever, that made a distinction between submitting |
| 9 courts. I'm not asking about other jurisdictions. | 9 and filing. And I have not seen anything in Idaho |
| 10 I'm asking about the state of Idaho. | 10 that tells me otherwise. |
| 11    What is your understanding based on in | 11    Q. (BY MS. DUKE) Okay. Thank you. |
| 12 the state of Idaho that a submitted complaint is | 12    A. You bet. Ms. Duke, do you mind if I get |
| 13 the same thing as a filed complaint? | 13 a quick cup of coffee? |
| 14    A. I'm saying when it's filed -- I'm saying | 14    MS. DUKE: Not at all. Let's go ahead |
| 15 when it's submitted, it's filed. I don't know | 15 and take a five-, ten-minute break. |
| 16 what you mean by "filed complaint." | 16    THE WITNESS: I appreciate it. Thanks. |
| 17    Q. I'm asking what your basis is for saying | 17    THE VIDEOGRAPHER: All right. So the |
| 18 that when it's submitted, it's filed. | 18 time is 10:07 a.m., and we're off the record. |
| 19    A. And I'm saying it's because that's the | 19    (Break taken from 10:07 a.m. to 10:27 a.m.) |
| 20 case throughout the courts of this nation. And I | 20    THE VIDEOGRAPHER: All right. So we are |
| 21 don't -- I have not seen anything that tells me | 21 recording. The time is 10:27 a.m., and we are |
| 22 Idaho's different. | 22 back on the record. |
| 23    Q. So it is CNS's position that the | 23    Q. (BY MS. DUKE) All right. During the |
| 24 Idaho -- that Idaho has not made a distinction | 24 break, did you have an opportunity to talk with |
| 25 between "submitted" and "filed," correct? | 25 anybody? |
| Page 43 | Page 45 |

12 (Pages 42 - 45)

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

William L Girdner November 9, 2022

1   A.  Yes, I talked with Jon Fetterly.
2   Q.  All right.  Anyone else?
3   A.  No.
4   Q.  All right.  Tell me what you did to
5  prepare for your deposition today.
6   A.  I read my declaration, and I also read
7  the 12(b)(6) notice.  And then I -- that's -- I've
8  been following the various discovery and filings
9  as we go along, but specifically for this
10  deposition, I looked over my declaration and the
11  12(b)(6) notice.
12   Q.  The 30(b)(6)?
13   A.  I'm sorry.  Sorry, yes.
14   Q.  All right.  And the declaration that
15  you're referring to is the declaration that was
16  filed on CNS's behalf on November 15 of 2021?
17   A.  Yeah.  I don't have it in front of me,
18  but I think there's been only one that I've filed
19  in this case, so that would be it.
20   Q.  I actually have a supplemental as well
21  that was January 24, 2022.  And I'll pop those up
22  later.
23   A.  Okay.
24   Q.  But other than that declaration or both
25  of those declarations, no other -- and of course
Page 46

1   Q.  Okay.  Did you talk with anyone at all to
2  prepare for your deposition other than counsel so
3  that you could better understand what your answers
4  would be to any of the 30(b)(6) topics?
5   A.  No.  I'm trying to think.  No.
6   Q.  And so after reviewing the topics, you
7  felt that you had the information and knowledge
8  necessary to be able to provide full, complete
9  answers to items 1 through 28 of the 30(b)(6)
10  notice on CNS's behalf?
11   A.  Yes.
12       MS. DUKE:  We'll mark as Exhibit 25 the
13  30(b)(6) notice.
14       (Deposition Exhibit No. 25 was marked.)
15   Q.  (BY MS. DUKE)  All right.  Let me chat
16  with you about the CNS Daily Reports Style Manual.
17  Ms. Valenti testified to this yesterday.  It was
18  Exhibit 21.
19       Who put that style manual together?
20   A.  Chris Marshall is primarily responsible.
21  I call him the editor.  But he discussed it with
22  me.
23   Q.  And it's my understanding from
24  Ms. Valenti's testimony that Exhibit 21 was put
25  together prior to her starting at CNS?
Page 48

1  reading the 30(b)(6) notice, no other documents
2  that you reviewed to prepare for today's depo?
3   A.  Yeah, not specifically.  As I say, I've
4  been keeping abreast of the litigation.
5   Q.  Sure.  And you understand -- certainly
6  you're a lawyer, so that helps.
7       You understand that a 30(b)(6) witness
8  means that you've been designated by CNS to
9  testify and bind CNS as to answers that you're
10  providing in today's deposition on the topics that
11  were identified in the notice?
12   A.  I do.  I'm a nonpracticing lawyer.  I
13  haven't practiced in, oh, my gosh, three decades.
14   Q.  It's been a while?
15   A.  Yeah.  Yeah.
16   Q.  But that aside, you certainly have the
17  understanding as a 30(b)(6) deponent that you've
18  been designated by CNS and that your testimony
19  binds CNS as to the topics that you were
20  identified to testify to, correct?
21   A.  Correct.
22   Q.  And you were identified to testify as to
23  all of the topics that were identified in the
24  30(b)(6) notice?
25   A.  Correct.
Page 47

1   A.  I think that's right.  I think, yes, that
2  sounds right.
3   Q.  And that it has not been updated or
4  changed since?
5   A.  Yeah, that's what I'm -- I'm not sure
6  about that.  I tried to check on that yesterday,
7  but I didn't get an answer.
8   Q.  Okay.  If you do get an answer today, if
9  you let me know, that would be great.
10   A.  Absolutely, yeah.  I can tell you if
11  there have been any changes, they've been very
12  minor.
13   Q.  And Ms. Valenti is expected to follow and
14  comply with the CNS Daily Reports Style Manual,
15  correct?
16   A.  Yes.
17   Q.  And that manual identifies certain types
18  of cases that she is to report on?
19   A.  Yes.
20   Q.  And by "report on," I mean to include in
21  the Big Sky Report.
22   A.  Correct.
23   Q.  Give me a summary of what those types of
24  cases are.
25   A.  Sure.  I mean, the style manual lays them
Page 49

13 (Pages 46 - 49)

**ER-1693**

William L Girdner November 9, 2022

1 out, but off the top of my head, having done
2 reports myself, fraud cases, defamation,
3 environmental cases would be at the top. A major
4 tort case.
5      Q. Why not, for instance, criminal filings?
6      A. Well, I heard that question yesterday.
7 We are focused on civil litigation. That's our
8 inspiration at Courthouse News is that lawyers,
9 and actually the public as well, had a great
10 interest in seeing what the civil business of the
11 courthouse was, and that the civil -- there's a
12 lot more civil cases than criminal cases. And the
13 civil cases tend to be ignored or not covered as
14 well is how I should say it.
15      But I have asked our reporters to stay in
16 touch with the U.S. Attorney's Office and get
17 their announcements and indictments and things
18 like that.
19      Q. And is that the case here in Idaho?
20      A. I don't recall specifically. It would be
21 my general practice, but I do not know
22 specifically with Cathy. And then, you know, it's
23 not -- there's 240 people. I have bureau chiefs,
24 and I don't talk to each individual reporter.
25      Q. Do you know if anyone in Idaho has asked

Page 50

1 to stay in contact with the U.S. Attorney's Office
2 as to indictments, those types of things?
3      A. I don't.
4      Q. Have you asked anyone in the state of
5 Idaho to talk with the U.S. Attorney's Office
6 about indictments they're thinking about doing or
7 instead just indictments that they actually go
8 forward with?
9      A. I don't quite understand your question,
10 but I haven't talked to -- I can't remember asking
11 anybody to stay in touch with the U.S. Attorney's
12 Office, which I think covers your question.
13      Q. Okay. Well, what I'm asking is there's
14 obviously a lot that goes into actually going
15 forward and filing an official indictment.
16      You understand that?
17      A. Of course.
18      Q. Have you asked anyone across the country
19 to be in touch with U.S. Attorney's Offices about
20 indictments they're considering filing?
21      A. No. I'm just -- the reason I want to
22 answer your question fully, or carefully, as I'm
23 doing with all of these, is that U.S. attorneys, I
24 think, will announce investigations, as I recall.
25 And so I think an investigation can come before an

Page 51

1 indictment. But that's just general.
2      Q. Why has CNS determined that its reporters
3 should only focus in on non-individual civil
4 filings unless the individuals are high profile
5 or, you know, stars, that type of thing?
6      A. Sure. Sure. I thought they were the
7 ones of consequence. That's why.
8      Q. What is your understanding of the
9 complaints that are issued -- or at issue in this
10 case that CNS believes it is not receiving timely
11 access to once filed?
12      A. General civil cases, the general civil
13 litigation.
14      Q. Beyond calling it general civil
15 litigation cases, are you able to refine it in any
16 other way than that?
17      A. Every court has a kind of -- its own
18 unique breakdown of case categories and case
19 definitions. I'm not familiar with the particular
20 case definitions in Idaho, but I did see in the
21 discovery a list of -- I believe they were file
22 codes of different case types.
23      Q. And is it your understanding that in the
24 discovery of the list of file types, that those
25 are the complaints that CNS believes are at issue

Page 52

1 in this lawsuit?
2      A. No.
3      MR. FETTERLY: Objection; vague and
4 ambiguous, overbroad.
5      THE WITNESS: It's very broad. There's a
6 lot of different categories. So we're looking for
7 the public cases.
8      Q. (BY MS. DUKE) Well, and what I mean by
9 that, have you seen some documents that talk about
10 filing fee categories in a chart?
11      A. Yes.
12      Q. All right. And why don't I go ahead and
13 share --
14      A. I'm sorry. "Filing fee categories," did
15 you say?
16      Q. Correct.
17      A. No. I've just seen the chart of all the
18 different -- I think they're file codes, but I did
19 not see -- I don't recall that those were tied to
20 fees, but they may have been.
21      Q. Okay. Let me share my screen and see if
22 maybe we're talking about the same thing.
23      A. Yeah.
24      Q. All right. Can you see that?
25      A. Yes, I can.

Page 53

14 (Pages 50 - 53)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 Q. I can make it bigger too, if that helps. | 1 Q. All right. Well, here's the magistrate |
| 2 A. I get the idea. I don't think -- yeah, I | 2 court filings. |
| 3 don't think this is what I saw. | 3 A. No, we would not be interested in those. |
| 4 Q. All right. If your counsel were to have | 4 Q. Divorce? |
| 5 represented on CNS's behalf that this lawsuit is | 5 A. No, certainly not. Guardianship, no. |
| 6 only involving these items in AA1 through 6, do | 6 Q. Small claims? |
| 7 you have any reason to dispute that? | 7 A. No. |
| 8 A. No. And I have seen this. I have seen | 8 Q. Administration of small estates? |
| 9 this. It's coming back to me. Because I remember | 9 A. No. |
| 10 the number, those letters, A.A.1., yeah. | 10 Q. Petition for release from common-law |
| 11 Q. All right. So if you look at those, can | 11 lien? |
| 12 you see that okay? | 12 A. No. |
| 13 A. I can. | 13 Q. Petition for entry of judgment on |
| 14 Q. I can blow it up here a bit too so it's | 14 workers' comp award? |
| 15 easier. Is that better? | 15 A. No. |
| 16 A. Yes. | 16 Q. How about guardianships, |
| 17 Q. All right. So it says "Fee Category | 17 conservatorships, or joint petitions for |
| 18 A.A." | 18 guardianship/conservatorship? |
| 19 MS. DUKE: And I'll mark this, by the | 19 A. No. |
| 20 way, as Exhibit 26. | 20 Q. Anything related to, you know, those |
| 21 (Deposition Exhibit No. 26 was marked.) | 21 types of things? |
| 22 Q. (BY MS. DUKE) "All initial civil case | 22 A. No. I'm doing my best to give you the |
| 23 filings in district of any type not listed in | 23 broad strokes, but it's general civil litigation. |
| 24 Categories E, F, and H(1)." | 24 We're not interested in probate or the |
| 25 And then it lists 1 through 6 as | 25 various categories -- or family law, the various |
| Page 54 | Page 56 |

| | |
|---|---|
| 1 creditor, debtor, collections, breach of contract, | 1 categories you've been listing here. |
| 2 employment dispute, real property, medical | 2 Q. And then also when you list case filings |
| 3 malpractice, personal injury. | 3 with no fee, these are petitions for |
| 4 Is it your understanding that these | 4 sterilization, abortion petitions, post-conviction |
| 5 categories I've just read off are the only | 5 act proceedings, stipulation for entry of |
| 6 complaints that are at issue in this lawsuit? | 6 judgment, court-initiated contempt. |
| 7 MR. FETTERLY: Objection; vague and | 7 Are those at all an issue in this case? |
| 8 ambiguous, overbroad. | 8 A. No. |
| 9 You may answer. | 9 Q. And then of course you said no magistrate |
| 10 Lacks foundation. | 10 claims, correct? |
| 11 You may answer. | 11 A. Correct. |
| 12 THE WITNESS: I don't know what you're | 12 Q. And no trust estates, that type of thing? |
| 13 referring to, the document you're referring to. I | 13 A. No. So I'm satisfied that what we're |
| 14 would describe this as general civil litigation. | 14 talking about is category A.A.1. |
| 15 So normally that would be the category of cases | 15 Q. All right. A.A.1. through 6? |
| 16 we're after -- we're looking for to review. But I | 16 A. Yes. Yeah. Thanks for taking the time. |
| 17 don't know all the other categories, so it's hard | 17 Q. No, it's okay. It's important to be on |
| 18 for me to say with clarity. | 18 the same page. |
| 19 Q. (BY MS. DUKE) Well, when you look at the | 19 So if CNS were to determine that -- I |
| 20 categories identified here 1 through 6, are there | 20 understand -- well, strike that. |
| 21 any others that you understand are at issue in | 21 I understand that we're only talking in |
| 22 this lawsuit? | 22 this case about the A.A.1. through 6 as we've just |
| 23 A. I don't know the rest of the list. | 23 described in Exhibit 26, correct? |
| 24 Q. Okay. | 24 A. Correct. |
| 25 A. So it's hard for me to confirm. | 25 Q. Now, if CNS were to determine at some |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

William L Girdner November 9, 2022

1 later date that it, in fact, wanted to report on
2 magistrate cases in the state of Idaho, and the
3 Idaho courts were following the same process they
4 currently are following with respect to access to
5 those types of complaints or initial pleadings
6 that initiate a case, would it be your position
7 that the First Amendment concerns that you are
8 raising in this lawsuit would apply to those as
9 well?
10     MR. FETTERLY:  Objection; vague and
11 ambiguous, overbroad, calls for a legal
12 conclusion, lacks foundation.
13     THE WITNESS:  Yeah, that's really
14 hypothetical.  Best I can say is I don't know.  We
15 normally are not interested in magistrate cases,
16 and I don't see that becoming -- that changing.
17 I've been running this business for over 30 years.
18 I don't see that as likely to happen.
19     I understand that wasn't your question.
20 If it's a public filing, it should be -- anyway.
21 I don't know is the best I can tell you.
22     Q.  (BY MS. DUKE)  Well, I think what you're
23 about to say, if it's a public filing, it should
24 be subject to the same scrutiny that these cases
25 A.A.1. through 6 are subject to; is that fair?

Page 58

1     A.  I think that's where I was going.  I mean
2 that is where I was going.
3     Q.  So with respect to the reporters that
4 have been employed in Idaho, I know that we talked
5 about a gentleman this morning, Phil Janquart.
6     A.  Correct.
7     Q.  Other than Phil Janquart and then
8 Ms. Valenti, have there been any other
9 Idaho-specific reporters that you're aware of
10 employed here in Idaho?
11     A.  No.  It's -- and I just want to make
12 sure, it's Janquart, J-a-n-q-u-a-r-t, I believe.
13     As far as I know, no.  Just Cathy and
14 then Carson as you saw yesterday, does some
15 substitution.
16     Q.  And he -- as I understand it, Carson
17 fills in when Cathy's on vacation, sick leave,
18 that type of thing?
19     A.  Yeah.  And there was one other.  Jamie
20 Hennemen, as you correctly surmised, was based in
21 Spokane.  And then she would go across and report
22 on Kootenai in the paper list.
23     Q.  And any reason to believe that
24 Ms. Valenti's description of what she understood
25 Ms. Hennemen's process to be in reviewing

Page 59

1 Kootenai's paper filings, any reason to dispute
2 what Ms. Valenti testified to is what she believed
3 that process was?
4     A.  No.
5     Q.  And does Ms. Hennemen still work for you
6 all?
7     A.  No.
8     Q.  All right.  Anybody else responsible in
9 the state of Idaho for CNS Big Sky Reports other
10 than these folks you've talked about?
11     A.  There's the bureau chiefs who hires,
12 Chris Marshall, and he's been to Boise.
13     Q.  What is the role of a bureau chief?
14     A.  We have five bureau chiefs at Courthouse
15 News.  They are -- I guess you'd call them the
16 field operators.  They're responsible for the
17 coverage, for hiring reporters, for managing them.
18     Q.  What cost does CNS incur in connection
19 with reporting on civil complaints in
20 jurisdictions that have not implemented
21 Auto-Accept or the press review queue?
22     A.  I think the costs are the same, but I'll
23 try to make the distinction for you.  Actually, if
24 you don't mind, I'll talk about the cost --
25     Q.  Sure.

Page 60

1     A.  -- and then I don't know if I can make
2 the distinction between the two that you're
3 talking about.
4     Q.  Sounds good.
5     A.  Okay.  The cost would be labor,
6 obviously.
7     And then in various jurisdictions there's
8 subscription costs for online access, for remote
9 access.  That seems to be the model that is
10 emerging, much like the federal court.  And so
11 those subscription costs and then costs for
12 individual documents.
13     There's other things, you know, like
14 internet costs and computer costs and all that
15 kind of stuff.
16     Q.  Sure.  And I understand from your
17 declaration, it sounds like there are 51
18 subscribing institutions, or at least there were
19 as of November 15, 2022, in the state of Idaho?
20     A.  Sorry.  Yes, I don't think that's
21 changed.  That's correct.
22     Q.  And when you say a "subscribing
23 institution," what do you mean by that?
24     A.  Yeah, it would be like a law firm, a law
25 school, a newspaper, TV station as opposed to an

Page 61

16 (Pages 58 - 61)

William L Girdner November 9, 2022

Page 62

1 individual.
2    Q.   And the only folks that have access to
3 the Big Sky Report are the subscribing
4 institutions, correct?
5    A.   Yes, that would be correct.  Yes.
6    Q.   I'll represent my firm is a subscribing
7 institution and so I get -- what was that?
8    A.   I suspected as much.
9    Q.   Yes.  And so I get a report each day,
10 each business day, as to what's been filed.
11       When you --
12    A.   Thank you for your subscription.
13    Q.   Yes.  You are very welcome.  Very
14 welcome.
15       So there's 51 total subscribers for the
16 Big Sky Report, which includes Idaho, Wyoming, and
17 Montana, right?
18    A.   Yes, that's right.
19    Q.   The 51 wasn't just limited to Idaho
20 subscription posts?
21    A.   No, it was not.  Sorry.
22    Q.   And so the subscription costs that you're
23 talking about for CNS are obviously we pay a fee
24 to CNS so that we can have the subscription?
25    A.   Right.

Page 63

1    Q.   And then if we want to do the CNS
2 download and get a copy of one of the complaints,
3 then we pay a fee for that copy?
4    A.   Correct.
5    Q.   What about the costs on CNS's end?  So if
6 the press review queue was used in the state of
7 Idaho, would you have a need for a local reporter
8 anymore?
9    A.   I would -- I'd say yes, we want a local
10 reporter.  There's more flexibility.  We can cover
11 the state remotely, but I prefer to have a
12 reporter at the courthouse.
13    Q.   But if press review queue was initiated,
14 it would be possible to not have a reporter at the
15 courthouse and instead to just do it remotely,
16 correct?
17    A.   It would be possible, yes.
18    Q.   And if Auto-Accept were initiated in the
19 state of Idaho for state court filings, would
20 there still be a need for a local reporter, or
21 could all of that be accessed online?
22    A.   It's a different issue.  The
23 Auto-Accept -- it depends.  Auto-Accept is
24 independent of where you get access.
25       So, for example, let's say you had

Page 64

1 Auto-Accept in Idaho but you had limited access to
2 the kiosk.  Well, we would still have to have
3 Ms. Valenti go to the courthouse and use the
4 kiosk, regardless of whether it's Auto-Accept or
5 not.
6    Q.   Press review queue would eliminate that
7 need to have her go to the courthouse, but
8 Auto-Accept she would still need to go and review
9 the case filings?
10    A.   Yeah.  And let me explain that as well.
11 There are some press review queues, for example in
12 Georgia, that are based at the courthouse.  And I
13 don't know if they're remote as well.
14       So it's the same dilemma as with
15 Auto-Accept.  It just depends on where the access
16 is made available.  If it's remote, yes, you're
17 correct.  But if it's based on locally at the
18 kiosk, then, no, we have to have somebody there.
19    Q.   With respect to the press review
20 queues -- well, how many states -- and I'll limit
21 it to state courts, and then we can move to
22 federal courts if that's different.  So just to
23 try to break it into the two different court
24 systems.
25    A.   Yeah.

Page 65

1    Q.   With respect to state courts, how
2 many -- as a result of CNS's lawsuits, how many
3 state courts have gone to a press review queue?
4       MR. FETTERLY:  Objection; vague and
5 ambiguous and overbroad.
6       Are you asking only with respect to
7 lawsuits, or press review queues in general?  I
8 just want to make sure we're clear on the
9 question.
10       MS. DUKE:  Starting with lawsuits.
11       THE WITNESS:  Yeah, I was going along the
12 same lines.  In other words, some courts have
13 given us press review based on request.  So if I
14 could modify -- if I could modify based on
15 requests or lawsuits -- I don't know if that's
16 satisfactory to you -- but then I can run through
17 the press review queues.
18    Q.   (BY MS. DUKE)  Why don't you run through
19 them.  That's probably the --
20    A.   Yeah.  I'll start with the easy ones.
21    Q.   Sure.
22    A.   Georgia, I believe we have -- I believe
23 it's eight review queues in and around Atlanta,
24 but they're not all Tyler.  There's a mix of
25 courts there.  It's just a remarkable jumble of

17 (Pages 62 - 65)

William L Girdner November 9, 2022

1 courts and vendors and, actually, amazingly
2 enough, e-file managers.
3      Fulton County has three different
4 vendors, which each have their own e-file manager,
5 which I've never seen anywhere else.
6      Then we have one press review queue in
7 Austin which was the result of litigation and a
8 settlement.
9      We have a -- first, a press review queue
10 and now Auto-Accept through Tyler in Las Vegas,
11 which was always -- it was based on a request.
12 Okay? No lawsuit there.
13      And then in California, I'll go through
14 the Tyler. Do you want to go through the Tyler
15 ones first?
16   Q. Yeah. Why don't we do that.
17   A. Okay. So for Tyler in California --
18 there's a lot, so I'm going to do my best based on
19 my --
20   Q. Sure.
21   A. Kern County, based on a request.
22      Fresno, based on a request.
23      Santa Barbara on a request.
24      Monterey, based on a request.
25      San Luis Obispo, based on a request.

Page 66

1 Georgia it sounds like it's a whole mish-mash of
2 different providers?
3   A. Yes, correct.
4   Q. All right. So for the non Tyler
5 products --
6   A. Okay.
7   Q. Why don't you run through that list.
8   A. Yeah.
9   Q. Similar press review or an Auto-Accept.
10   A. Yeah. So -- oh, you want me to put
11 Auto-Accept?
12   Q. Sure.
13   A. Okay. I'm going to take you around the
14 country, so it's going to take a while. Are you
15 all right with that?
16   Q. Let's go around the country. And if
17 you'll do it so that I've been everywhere, then
18 you'll really get bonus points.
19   A. I'll do my best.
20      Okay. So Vermont, we have Auto-Accept
21 statewide at the courthouse.
22   Q. With or without litigation?
23   A. With litigation, certainly.
24   Q. Okay.
25   A. Litigation and a decision by Judge Rice.

Page 68

1      And then -- oh, yeah, Sonoma, San Mateo
2 and Santa Cruz based on a request. I'm sorry.
3 Sorry, sorry. Based on litigation.
4   Q. Sonoma, Santa Cruz -- and what was the
5 other one?
6   A. San Mateo.
7   Q. San Mateo.
8   A. Yeah. And then I'm going to go through
9 some eastern county -- eastern district courts
10 that are small. I'll do my best.
11   Q. Sure.
12   A. These courts have agreed to install press
13 review queues within five months. They're Merced,
14 Yolo, Sutter, Yuba, Butte, and Stanislaus and
15 Kings had already -- there was -- I believe they
16 were named as defendants, but they settled out
17 early.
18   Q. Okay.
19   A. I think that covers the territory.
20   Q. All right.
21   A. Now, there's other -- the equivalent of
22 press review queue in -- by other vendors in
23 California.
24   Q. Okay. So what you've provided me are
25 Tyler press review queues with the caveat that in

Page 67

1      In Connecticut, Auto-Accept without
2 litigation.
3      In New York, statewide public review
4 queue. By that I mean that the cases have come
5 into the court; they don't have a permanent case
6 number yet, but they are publicly available. Not
7 simply -- not limited by registration to the press
8 or any other entity.
9      All right.
10   Q. And that was not with litigation?
11   A. That was with litigation.
12   Q. That was with?
13   A. Yes.
14   Q. Okay.
15   A. It was with an injunction. Now, the
16 injunction was limited to Manhattan, the New York
17 Supreme Court, but then voluntarily was extended
18 throughout the state.
19      All right. Going south -- and I'm
20 leaving out the federal courts which are virtually
21 all Auto-Accept. Okay?
22   Q. Yep. Yep.
23   A. So then we get down to Georgia. And as I
24 mentioned, there's eight different courts. I
25 think I'm right on that. It's close. And they

Page 69

18 (Pages 66 - 69)

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1698**

William L Girdner November 9, 2022

1  include Peach Court, Tyler, and it's a company
2  called File & Serve Express.
3      So just a quick illustrative example in
4  Fulton County, which is Atlanta itself, all three
5  File & Serve Express, Peach Court, and Tyler are
6  vendors, so they're court e-filing vendors and
7  they also run their own e-file managers. Through
8  all three we have access on receipt. So a press
9  review queue.
10    Q.  Press review, okay.
11    A.  Going down to Florida, we have
12 statewide -- it's a statewide review queue just
13 recently put in place about a week and a half ago.
14 And it's -- you have to have a role, but the media
15 is one role that -- to get access at the time of
16 receipt.
17     So it's pretty -- it's somewhere in the
18 middle between review -- a press review queue and
19 a public review queue. I've looked at the roles
20 quickly, and I think a member of the public could
21 qualify. But I haven't gone into it further.
22     All right. In Alabama, statewide upon
23 receipt through OLIS. And -- sorry. Statewide
24 Auto-Accept through OLIS.
25    Q.  How do you spell "OLIS"?

Page 70

1  it a press review queue. It's called the News
2  Media Portal.
3      And by the way, I'm leaving out all the
4  fees and everything else. So a number of these
5  are not free and not nearly free.
6     Q.  Sure.
7     A.  Jumping out to Hawaii, Auto-Accept,
8  statewide, free at the courthouse. I think it's
9  something like 300 a year remote. I'm not sure.
10 There's a fee for remote.
11     Then coming back to --
12    Q.  Was that with litigation or no?
13    A.  No, no litigation. There's a tradition
14 there of statewide access that's really quite
15 remarkable -- that's really remarkable.
16    Q.  Okay.
17    A.  In California, so from -- going up the
18 state from the bottom to the top, start with
19 Imperial County. That's a press review -- that's,
20 sorry, a public review queue put in place by
21 Journal Technologies, which is based in
22 California. And it's open to the public. No
23 registration. Wide open.
24     Then San Diego County is homegrown.
25 There was a very expensive attempt to put a

Page 72

1      A.  O-L-I-S. It's, I think, Online
2  Information Systems.
3     Q.  And just if you could just remember to
4  say if they were with or without litigation.
5     A.  Oh, yeah. Florida was with litigation.
6      Georgia was not.
7      And then Alabama is not, I think I said.
8      And then keep going through across the
9  south, Texas. There's the administrative office
10 has signed an agreement with -- and paid, as I
11 understand it, with an agreement with Tyler for a
12 statewide press review queue. But only Austin has
13 implemented it.
14    Q.  And that was through litigation?
15    A.  Yes. And there's still litigation
16 pending there.
17    Q.  And that's related to the remainder of
18 the state?
19    A.  Yeah. It's on hiatus because there's
20 currently a review of policy going on.
21     And then moving west -- yeah. I'm going
22 in circles right now.
23    Q.  No worries.
24    A.  Arizona, the vendor is Granicus, no
25 litigation, a request. Statewide. I would call

Page 71

1  statewide case management system and e-filing
2  system in place about ten years ago. San Diego
3  was one of the testers of that, and then went on
4  its own and modified the software that was
5  developed at that time. Anyway, that's a press
6  review queue but through this homegrown system.
7     Q.  And were Imperial or San Diego the result
8  of litigation or just voluntary after a request?
9     A.  Both voluntary. Not even a request.
10    Q.  Not even a request?
11    A.  Oh, sorry. Sorry. Sorry. In Imperial,
12 yes, there was a request. Yes, there was. And
13 same in San Diego.
14    Q.  Okay.
15    A.  Orange County, brother to San Diego in
16 the sense of the old CCMS system was adapted. And
17 based on extensive, years-long litigation.
18    Q.  So they have kind of a homegrown press
19 review queue?
20    A.  Yes. I would say that.
21    Q.  Okay.
22    A.  Then you go eastward to Riverside County,
23 2.5 million people, huge county, but not very
24 famous. They have, through Journal Technologies,
25 a public review queue, meaning that the cases

Page 73

19 (Pages 70 - 73)

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-1699

William L Girdner November 9, 2022

Page 74

1  don't have case numbers, processing has not been
2  completed, but it's a site that's open to the
3  public for review.
4       You go to LA, the big kahuna, 10 million
5  people, huge court, the biggest court in the
6  nation. Journal Technologies, they have something
7  called a media access portal, subscription-based,
8  no litigation. Voluntary.
9       Sorry, Riverside was also voluntary based
10 on a request.
11 Q. Okay.
12 A. Okay. And Los Angeles based on request.
13      So then you go to -- so moving north,
14 I've mentioned Santa Barbara. Ventura, that's the
15 planet case. That's a -- I would call that a
16 review queue, but it's public.
17      They're scanning -- there's so many
18 variations, that's kind of one of my points here.
19 They're scanning paper filings as they come in and
20 putting them online for public review without
21 requiring registration.
22      Then let's see. All right. So
23 Sacramento -- Sacramento's paper. We see the
24 access on receipt old school, but that's not a
25 press review queue.

Page 75

1       So let me keep going with review queues.
2  San Francisco is a -- the press review queue, but
3  it's based at the courthouse and it's through the
4  court's wifi.
5  Q. Was that litigation or --
6  A. No. No. Request. Placer County is
7  Journal Technologies, based on a request. That's
8  a press review queue -- sorry, public review
9  queue.
10      Alameda, also Journal Technologies press
11 review queue based on registration.
12      So I don't know if -- I'm assuming
13 Alameda would allow anyone to subscribe if they
14 paid the subscriber fee, so I'm just not specific
15 on that part of it.
16      And then I think I left one Tyler court,
17 which is -- it's this beautiful county north of
18 San Francisco. I've forgotten. It will come back
19 to me.
20 Q. Okay.
21 A. I'm trying to think if there are any
22 others. I think that's it. Give me just a minute
23 to think about it for just a second.
24 Q. Yeah, no problem.
25 A. California, yeah. Yeah. Okay.

Page 76

1       And then there's -- Utah is Auto-Accept.
2  Q. Was that litigation or --
3  A. No, no litigation. A request.
4  Q. Okay. How about Oregon?
5  A. Oregon, of course there's litigation
6  ongoing right now. So there's no press review
7  queue there. And it's not Auto-Accept.
8       Oh, but that reminds me. Good. Up in
9  Washington, Tacoma is an Auto-Accept court. So
10 that's Pierce County Superior Court.
11 Q. And litigation or --
12 A. King County was Auto-Accept and they took
13 it back, so it's now post-processing.
14 Q. So and is there a lawsuit with King
15 County?
16 A. No. And I'm trying to kind of swing
17 around back towards the middle of the country.
18 Q. Sure. And real quick, so King County was
19 Auto-Accept and now they are not and now they're
20 post-processing?
21 A. Yeah. Let me see if I can say this
22 correctly.
23      I don't know if they were actually
24 Auto-Accept. I know we could see the cases --
25 okay? -- as they came in. But it was complicated.

Page 77

1  You had to use a wild card digit at the end, zero
2  through nine. So if we're going up in the
3  numbers, you'd have to check the numbers, but
4  you'd have to check ten times or up to ten times
5  for each number.
6  Q. Okay.
7  A. And then they changed the online system
8  so that now it's delayed.
9       And let me swing eastward, just back
10 eastward a bit. I'm not thinking of any other
11 Auto-Accept state courts.
12 Q. So that's all? Okay. And then what
13 about press review queues? Any others to add?
14 A. No, I think those are the ones I can
15 think of.
16 Q. Okay. So obviously there's a lot of
17 states we haven't talked about, Minnesota,
18 Montana, Wyoming, Iowa, Illinois, Tennessee, a lot
19 of those middle states.
20      Are there lawsuits at all right now in
21 those jurisdictions?
22 A. Oh, let me give you just a bit of
23 context.
24 Q. Sure.
25 A. Because this geography is so varied.

20 (Pages 74 - 77)

William L Girdner November 9, 2022

| | |
|---|---|
| 1  Q.  Yeah. | 1   A.  Yeah. |
| 2   A.  A lot of those courts are still paper. | 2    Q.  And only providing post-processing newly |
| 3   Q.  Okay. | 3 filed complaints to, it sounds like, attorneys? |
| 4   A.  We should not assume that these are all | 4 And attorneys can access any case and there's not |
| 5 e-filing courts, because they're not.  And a lot | 5 such access being provided to the public or press? |
| 6 of them are mixed paper and voluntary e-filing. | 6   A.  Correct. |
| 7   Q.  Okay.  Got it.  Thanks for that list. | 7    Q.  How about Missouri?  Is that paper? |
| 8      So that covers any press review queue, | 8   A.  No.  That's e-filing. |
| 9 whether through Tyler or through a different | 9    Q.  Right.  And tell me what the circumstance |
| 10 entity or self-made, and whether it's a public | 10 is there. |
| 11 press review queue or public review queue or a | 11   A.  Sure.  The courts are delaying access |
| 12 press review queue? | 12 between a day -- from a day to a week for |
| 13   A.  Right, plus Auto-Accept. | 13 processing.  We've challenged that.  It's -- the |
| 14   Q.  Plus Auto-Accept.  Okay. | 14 judge at the district court level ruled that he |
| 15      What cases is CNS currently litigating? | 15 should abstain, and then the Eighth Circuit |
| 16 Obviously Oregon and Idaho. | 16 reversed him fairly recently.  So we're now |
| 17   A.  Right.  There's -- Texas is pending.  New | 17 pending back in front of the same district court |
| 18 Mexico is pending.  Missouri is pending. | 18 judge. |
| 19   Q.  And what are the systems -- sorry.  Any | 19    Q.  And what's the process there by which |
| 20 others? | 20 complaints are, you know, I guess passed over the |
| 21   A.  Yeah.  Yeah.  New York.  I mean, sorry, | 21 e-counter and then ultimately filed? |
| 22 Vermont is pending in the second circuit.  Did you | 22   A.  Right.  You know, I don't know if I'm |
| 23 ask for any pending litigation? | 23 treading on toes here.  But for me it's a fairly |
| 24   Q.  Correct. | 24 common process.  In other words, the filer submits |
| 25   A.  Yeah, so in Maryland, there's -- at the | 25 an e-filing.  It goes into the EFM.  And there, |
| <div align="right">Page 78</div> | <div align="right">Page 80</div> |
| 1 district court level there's a case ongoing.  And | 1 the clerk reviews and processes the case.  I |
| 2 then in Virginia there's a case ongoing also. | 2 think, to use your terminology, accepts it, and |
| 3   Q.  So in Virginia, is that a state court | 3 then it goes into the docket, the public docket. |
| 4 case? | 4 So it's the same basic process. |
| 5   A.  Yeah.  It's really -- it's a different | 5   Q.  Is it Tyler? |
| 6 issue.  It's -- the courts are providing online | 6   A.  No.  Let me think.  No, it's homegrown. |
| 7 access to lawyers but not to journalists or | 7   Q.  And do you know if it's homegrown as in |
| 8 members of the public. | 8 there's a file and serve program and then there's |
| 9      And to be clear, it's not just their own | 9 a separate case management program, you know, or |
| 10 cases that the lawyers have access to.  It's all | 10 court file program? |
| 11 the cases. | 11   A.  I understand the distinction, but it's |
| 12   Q.  And do you know how -- like, are those | 12 homegrown all the way, meaning the e-filing |
| 13 cases that have already had the complaints filed? | 13 component and the case management component are |
| 14 Or do you know what the circumstance is there in | 14 all handled by the state. |
| 15 Virginia? | 15   Q.  Okay.  And how about Maryland? |
| 16   A.  Post-processing.  I'm sorry.  Can I add | 16   A.  Maryland's Tyler.  And by the way, |
| 17 one thing? | 17 Vermont is too.  I think you know, but -- |
| 18   Q.  Sure. | 18   Q.  Sure.  And does Maryland have Tyler's |
| 19   A.  It's paper.  It's amazing.  The whole | 19 File & Serve? |
| 20 state is paper with -- there's optional e-filing, | 20   A.  Yes. |
| 21 but it's only, like, 16 percent in Norfolk, and | 21   Q.  And then do they have a Tyler case |
| 22 that's the biggest state -- the biggest county | 22 management product or a different case management |
| 23 that's using e-filing.  So we're talking about | 23 product? |
| 24 paper. | 24   A.  No, top to bottom, the whole way. |
| 25   Q.  All right.  So Virginia is paper? | 25   Q.  Is all Tyler? |
| <div align="right">Page 79</div> | <div align="right">Page 81</div> |

<div align="right">21 (Pages 78 - 81)</div>

William L Girdner November 9, 2022

| Page 82 | Page 84 |
|---------|---------|
| 1   A. Yes. | 1   A. Yeah, yeah. A court, they used to be |
| 2   Q. How about New Mexico? | 2 paper, as you're aware. And then at some point -- |
| 3   A. Tyler top to bottom, same thing. | 3 courts are currently in the process of transition |
| 4   Q. So they have File & Serve through Tyler, | 4 still throughout the U.S., to e-filing. |
| 5 and then they also have their court file or case | 5   So I'm saying any court that's now |
| 6 management file through Tyler? | 6 e-filing, they didn't have a preceding different |
| 7   A. Correct. | 7 e-filing vendor. |
| 8   Q. All right. How about Oregon? | 8   Q. Oh, right. |
| 9   A. Oregon is Tyler all the way, same thing. | 9   A. Their preceding system of filing was |
| 10   Q. Okay. How about the remainder, Texas? | 10 paper. |
| 11   A. Texas is -- yes. Tyler was -- it was | 11   Q. Right. |
| 12 statewide e-file file and serve, and then the | 12   A. I don't know of any court that's switched |
| 13 individual courts have their own case management | 13 to e-filing and then changed vendors. It's a |
| 14 systems, but they are almost all using Tyler | 14 pretty heavy decision to go with a vendor. |
| 15 Odyssey for case management. But the universality | 15   Q. Sure. Okay. So when we're talking about |
| 16 comes from the File & Serve. That is statewide | 16 New York, for instance, as paper, the litigation |
| 17 through Tyler. | 17 involved delay in access to paper-filed |
| 18   Q. Okay. And then a Tyler Odyssey product? | 18 complaints? |
| 19   A. Sorry? | 19   A. No. |
| 20   Q. And then Tyler Odyssey for case | 20   Q. No? |
| 21 management? | 21   A. No, we had great access to paper. |
| 22   A. Yeah. Yeah. And just to be clear what | 22   Q. Okay. |
| 23 I'm saying, the -- some sort of compromise, | 23   A. It was when they switched over to their |
| 24 legislative compromise. | 24 homegrown e-filing system. |
| 25   But the local clerks, of which there are | 25   Q. Got it. How about Vermont? Are they |

| Page 83 | Page 85 |
|---------|---------|
| 1 254, I believe, were able to hang on to their | 1 Tyler? |
| 2 traditional or heritage case management systems, | 2   A. Yes. |
| 3 but one by one, they've been folding over to | 3   Q. And all the way through? |
| 4 Odyssey. | 4   A. Yes. And they're now, as I mentioned, on |
| 5   And I believe the large majority of the | 5 Auto-Accept. |
| 6 state is now using Odyssey as a case management | 6   Q. And how about Sonoma, Santa Cruz, and San |
| 7 system. But the statewide contract is for | 7 Mateo? Were they e-filing when the litigation |
| 8 e-filing service with Tyler. | 8 started, or were they paper? |
| 9   Q. With respect to Orange County, what was | 9   A. E-filing, and all Tyler. |
| 10 their system before they did the homegrown press | 10   Q. And the Austin, Texas, court? |
| 11 review queue? | 11   A. Paper before, switched to e-filing |
| 12   A. Paper. | 12 through Tyler. And now provide a press review |
| 13   Q. Okay. And how about -- I think I've got | 13 queue through Tyler. |
| 14 them all here. How about New York? | 14   Q. Okay. So they were paper before, and |
| 15   A. Vermont, you mean? No, you mean New | 15 then once they went to e-filing, that's when the |
| 16 York. I'm sorry. | 16 litigation commenced? And now they are continuing |
| 17   Q. Yeah. | 17 through Tyler; they just added a press review |
| 18   A. Paper. I would say, just to help you | 18 queue? |
| 19 out, I think there are -- I've never -- I don't | 19   A. Yeah. You know, it -- it's |
| 20 know if I've ever seen a court change its e-file | 20 not -- there's a sequence of events. So there was |
| 21 service. So whatever they have now, it was paper | 21 a former clerk in the transition to e-filing |
| 22 beforehand. But I'm happy to go through the | 22 who -- hang on. Hang on. No. That sequence is |
| 23 individual courts. | 23 correct. |
| 24   Q. And just explain that to me. I don't | 24   After they switched to e-filing, there |
| 25 quite understand what you just said. | 25 was a lot of negotiation, effort to work things |

22 (Pages 82 - 85)

1 out, and then there was litigation.
2    Q.  Any other jurisdictions statewide?
3    A.  The litigation?  Or do you mean the
4 access?
5    Q.  Litigation or access after request.
6    A.  Yeah, that's what I can think of now.
7 And I'm not -- like I say, I'm going -- in my mind
8 I'm going through the geography of the U.S. and on
9 the stateside, and it is a true patchwork.  But
10 I've -- I've given you my list as best I can
11 remember it.
12    Q.  Sure.  I appreciate that.
13    A.  It's pretty important to me, so I think I
14 remember most of them.
15    Q.  Excellent.  Now, in the jurisdictions
16 that have implemented Auto-Accept either after
17 request or litigation, does CNS continue to employ
18 reporters specific to those jurisdictions that
19 actually reside in those jurisdictions?
20    A.  Yeah.  For example, we had -- a reporter
21 in Honolulu reports on Hawaii through I guess it
22 would be the Auto-Accept system.  We pay for
23 remote access, a registration fee.
24       And then she also reports pretty
25 extensively on news out of Honolulu for the web

Page 86

1 page.
2    Q.  And what about all the other
3 jurisdictions?  Have there been any reductions in
4 force, layoffs, terminations as a result of the
5 court transitioning to Auto-Accept after request
6 or litigation?
7    A.  No.  I mean, the work of doing the report
8 remains the same, right?  The reporter has to go
9 through the reports and look at the -- go through
10 litigation and summarize it.  That work doesn't
11 change.  Remote access allows more flexibility.
12    Q.  Sure.  With respect to a press review
13 queue, when those have been implemented in courts
14 that you've gone through with us, either
15 voluntarily or through litigation, has there been
16 a change in CNS's employment of reporters in those
17 various jurisdictions?
18    A.  Not specifically tied to that.  There's a
19 constant churn in a 240-member staff.
20    Q.  Sure.
21    A.  And whether -- once a person quits, then
22 how their job gets replaced can -- if there's a
23 press review queue in a place that's remote as
24 opposed to the courthouse, then we can hire or add
25 the work to somebody else's workload.

Page 87

1       So there's, as I say, flexibility.  But I
2 don't -- I can't think of any reporter that was
3 dismissed because we got a press review queue.
4    Q.  Sure.  From the numbers, once a press
5 review queue has been adopted -- and by "press
6 review queue," I'm including press review queue or
7 public review queue in that question -- but once
8 that's been adopted, I understand there's some
9 reporters that may quit and then decisions made by
10 CNS not to replace that reporter in that
11 jurisdiction now that there's press review queue
12 or public review queue.  Has that occurred?
13    A.  Well, we would replace the work, meaning
14 we would have somebody else do the job.  But it
15 doesn't have to be local.
16    Q.  Right.
17    A.  And I'm trying to think of an example for
18 you.  Imperial County is the one I can think of.
19 It's a very small county down next to the border,
20 and I think we had a local reporter.  She left,
21 and I think that job is now done remotely.
22       But I think she left on her own.  I don't
23 think it had to do -- it was not timed with the
24 arrival of the press review queue or of the public
25 review queue.

Page 88

1    Q.  Got it.  And ultimately what I'm trying
2 to get to is if CNS is successful, for instance,
3 in the state of Idaho in having our federal judge
4 order that a press review queue or public review
5 queue must be put in place by the Idaho state
6 courts, the job that Ms. Valenti does could be
7 done remotely and not with somebody here in Idaho,
8 correct?
9       MR. FETTERLY:  Objection as to the
10 characterization of the relief sought by
11 Courthouse News, vague.
12       You may answer.
13       THE WITNESS:  I missed that part.  As far
14 as the employment of Cathy, she's a valued and
15 liked employee.  We would keep her in place
16 regardless.  The job would need to be done
17 regardless.
18       If she decided for her own reasons that
19 it was time to move on, I would still prefer to
20 hire somebody in Boise because we want coverage of
21 local jurisdictions.
22       That's part of what Courthouse News is
23 about, is instead of focusing on New York and DC,
24 which everybody else does, one of the advantages
25 of having local reporters is we can report on

Page 89

23 (Pages 86 - 89)

William L Girdner November 9, 2022

Page 90

1 local controversies and local issues. So that is
2 my orientation.
3    Q. (BY MS. DUKE) Now, does CNS or must CNS
4 employ additional reporters if a daily reports
5 region includes more than one jurisdiction that
6 has not implemented a press review queue or
7 otherwise does not provide remote access to newly
8 submitted civil complaints?
9    A. I think I know what you're getting at.
10 Could you just give me another shot at the
11 question.
12    Q. Sure. Must CNS employ additional
13 reporters if a daily reports region includes more
14 than one jurisdiction that has not implemented a
15 press review queue or otherwise does not provide
16 remote access to newly submitted civil complaints?
17    A. It's -- there is a balance, right? In
18 other words, to hire -- see if I can frame my
19 thought correctly.
20    It costs money to send a reporter to a
21 courthouse, for a reporter to cover a courthouse.
22 So that decision on whether to cover a courthouse
23 locally is made regardless of whether a press
24 review queue exists somewhere else.
25    So if you have a small remote county in

Page 91

1 Montana that is only paper, then we have -- as an
2 organization, have to make a call as to how
3 important it is or how worthwhile it is to get a
4 reporter out there to cover it. And that's
5 independent of whether there's a press review
6 queue somewhere else.
7    So I think what I'm trying to say is
8 they're not related.
9    Q. Okay. What are the number of
10 jurisdictions a single reporter could cover in
11 CNS's view if a press review queue was implemented
12 in all the jurisdictions that you've gone through?
13    A. If you don't mind -- I know you like to
14 use Idaho as an example, so I'll stick with that.
15    The job in -- let's say we're to have a
16 press review queue in Idaho, hypothetically. The
17 job would stay the same. Cathy would still do it,
18 and she would be the statewide reporter. And the
19 amount of time it would take wouldn't make any
20 difference.
21    Do you see what I'm trying to get at?
22 She's still going -- anyway.
23    Q. Now, has CNS employed any type of
24 scraping or scraping technology related to press
25 review queues or public review queues that have

Page 92

1 been implemented across the country?
2    A. No.
3    MR. FETTERLY: Belated objection as to
4 "scraping," but I --
5    THE WITNESS: Let me --
6    Q. (BY MS. DUKE) Sure.
7    A. Let me give the answer correctly. We
8 have not employed any automated program to gather
9 information from a court -- from a press review
10 queue, period, press review queue court.
11    Q. But CNS certainly uses an automated
12 program on public court sites where those programs
13 are permitted by the court, correct?
14    A. For docket information, yes. And for
15 example, with the federal courts.
16    Q. So let's just stick with state courts for
17 now. Describe for me the automated program that
18 is used to do periodic sweeps of new civil cases
19 that are filed.
20    MR. FETTERLY: Objection; vague and
21 ambiguous, overbroad.
22    You may answer.
23    THE WITNESS: It just goes court by
24 court. A lot of court websites ask that we
25 don't -- that nobody run an automated program.

Page 93

1 We, of course, respect that.
2    Q. (BY MS. DUKE) Well, what's the name of
3 the program, the automated program that CNS uses
4 on automated court sites to do periodic sweeps of
5 new civil cases?
6    A. As I say, it's on some sites. And we've
7 been using the word "homegrown." It's a homegrown
8 program.
9    Q. Meaning CNS created it?
10    A. Yes.
11    Q. What's it called at CNS?
12    A. You know, that's -- I don't know -- it's
13 just -- it's our automated program. I don't know
14 that we have a name for it.
15    Q. When did CNS develop this homegrown
16 program?
17    A. It's over time. Websites constantly
18 change, so it has to be adapted.
19    Q. When do you think this automated -- let
20 me finish.
21    When do you think this automated program
22 was first used to do periodic sweeps of new civil
23 cases?
24    A. On some sites, some court sites, I'd say
25 ten years ago.

24 (Pages 90 - 93)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 Q. Okay. And what court sites is this<br>2 automated program currently doing periodic sweeps<br>3 of new civil cases on?<br>4 A. I don't have a list of that. I'm trying<br>5 to think of an example for you, but the only<br>6 examples I can think of are federal courts. And I<br>7 know you want state courts, but I don't know.<br>8 Q. Well, I can ask it this way and then we<br>9 can move to federal.<br>10 A. Okay.<br>11 Q. Are there any state courts that this<br>12 automatic program is doing periodic sweeps of new<br>13 civil case filings currently?<br>14 A. I'm sure that there are some state court<br>15 sites that we are checking for docket information<br>16 to help the reporter, to assist the reporter. But<br>17 I can't -- and I may, as we go on, be able to<br>18 remember this, but I can't think of any individual<br>19 sites.<br>20 Q. How could you obtain that information<br>21 here, you know, during lunch break or something<br>22 like that so that --<br>23 A. Yeah. Yeah. I could ask for it.<br>24 Q. And who would you ask?<br>25 A. I would ask Jimmy most likely, Jimmy, our<br><div align="right">Page 94</div> | 1 understand those documents to be.<br>2 Plaintiff --<br>3 A. A docket is pretty common. In other<br>4 words, it has a plaintiff, a defendant, a case<br>5 number, often the nature of the case, like a<br>6 general category.<br>7 So in federal court, you have what are<br>8 called the case types. It's a particular code<br>9 that they use for the case type, and that's part<br>10 of the docket. There's usually a filing order as<br>11 well. Sorry, I apologize. NOS numbers, nature of<br>12 suit numbers.<br>13 Q. So as you understand it, docket, what<br>14 this is doing in the federal courts, for instance,<br>15 is looking for plaintiff, defendant, case number.<br>16 It's able to obtain this information, I guess,<br>17 with an automatic sweep of that court's site,<br>18 correct?<br>19 A. Yeah. If the reporter has not covered it<br>20 yet, all the -- it's not -- let me see if I can<br>21 answer your question correctly.<br>22 The automated program looks for docket<br>23 information on the federal court site, including<br>24 plaintiff, defendant, nature of suit, and filing<br>25 where. And that is to assist the reporter.<br><div align="right">Page 96</div> |
| 1 financial manager. But he has -- he plays many<br>2 roles.<br>3 Q. Okay. Would you please ask Jimmy, just<br>4 so we have that list of state courts that CNS is<br>5 currently using its automated, homegrown program<br>6 to do periodic sweeps of new civil filings?<br>7 A. Yeah, new docket information, not the<br>8 filings themselves.<br>9 Q. And then from a federal standpoint, what<br>10 federal courts is CNS using its automated program<br>11 on to periodically sweep new civil cases?<br>12 A. I would say all of them. Again, it's to<br>13 sweep -- not sweep. It's to check the docket<br>14 information.<br>15 Q. And when you say "to check the docket<br>16 information," what do you mean?<br>17 A. In other words, a reporter has primary<br>18 responsibility for covering a court. But we use<br>19 the automated program to assist the reporter in<br>20 gathering routine clerical information such as the<br>21 docket entries.<br>22 Q. And those are entries such as what?<br>23 A. Docket entries. Plaintiffs, defendant,<br>24 so forth.<br>25 Q. I'm just trying to get a list of what you<br><div align="right">Page 95</div> | 1 Q. And you had also mentioned case number,<br>2 correct?<br>3 A. Correct.<br>4 Q. And are Idaho federal courts swept by<br>5 this automated program?<br>6 A. The program searches the site. And I<br>7 want to be careful because I'm assuming it does.<br>8 I can check on that. Okay?<br>9 Q. All right. If you could do that, that<br>10 would be great.<br>11 A. Yeah, and I'm assuming it is because it's<br>12 a federal.<br>13 Can I add one thing, please?<br>14 Q. Sure.<br>15 A. On the program, we go in through PACER<br>16 with our PACER registration, and we pay for the<br>17 information that we grab or that we find.<br>18 Q. In a federal court?<br>19 A. Yes.<br>20 Q. So when the automatic program is used to<br>21 look for newly filed lawsuit docket information in<br>22 a federal court, you're going through PACER to do<br>23 that?<br>24 A. Correct.<br>25 MS. DUKE: Okay. All right. We've been<br><div align="right">Page 97</div> |

<div align="right">25 (Pages 94 - 97)</div>

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

(28 of 297), Page 28 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 28 of 297
Case 1:21-cv-00354-DCN Document 60-7 Filed 12/15/22 Page 27 of 118
William L Girdner November 9, 2022

1 going a bit. Do you want to take a quick break?
2 Does that sound good?
3     THE WITNESS: Sure.
4     MS. DUKE: I'm thinking about doing a
5 lunch break right around 12:30 our time, 11:30
6 your time. Does that work for you both?
7     MR. FETTERLY: That works.
8     MS. DUKE: We'll take a quick break and
9 then we can cover some more ground and then take a
10 lunch break and then finish up.
11     MR. FETTERLY: Sounds great.
12     MS. DUKE: Excellent. Thank you.
13     THE VIDEOGRAPHER: So the time is
14 11:41 a.m., and we are off the record.
15     (Break taken from 11:41 a.m. to 11:57 a.m.)
16     THE VIDEOGRAPHER: All right. So we are
17 recording. The time is 11:57 a.m., and we are
18 back on the record.
19   Q.  (BY MS. DUKE) All right. We're back on
20 the record.
21     Over the break did you have an
22 opportunity to talk with anybody?
23   A.  I talked with Mr. Fetterly.
24   Q.  Okay. Anyone else?
25   A.  No.

Page 98

1   Q.  Okay. At lunch we'll have you get one.
2   A.  Okay.
3   Q.  How about, do you know if it's ever been
4 run on the Idaho state courts?
5   A.  I don't. Yes, I think it has been. Yes.
6   Q.  Okay. And tell me about that.
7   A.  Yeah. It was run for information in the
8 past. And I believe what happened is -- I think
9 we got a message saying, in rough words, "We don't
10 want you to do this anymore. We can't do this."
11 And we stopped.
12   Q.  When was this?
13   A.  It wasn't long ago. It was in -- I think
14 in August.
15   Q.  And are you aware of whether that
16 automated program was causing the -- what impact
17 it was having on the server for the Idaho state
18 courts?
19   A.  I'm not.
20   Q.  Whether it was causing the portal to go
21 down?
22   A.  No. We were not told that. And
23 obviously we don't want to do that. And we
24 respect any request to stop.
25   Q.  Prior to being asked to stop doing that

Page 100

1   Q.  All right. And have you asked your folks
2 to take a look at the courts so that we have an
3 idea where this automated program is being used in
4 the state courts?
5   A.  You suggested doing that at lunchtime,
6 which is what I plan to do.
7   Q.  Okay. On the top of your head, are you
8 aware of any state courts where that automated
9 program has been used by CNS?
10   A.  I'm just thinking about California for
11 you. I'm sure it's running in some courts, but I
12 can't think of individual examples.
13     To give you just a rough lay of the land,
14 there's -- a lot of courts put CAPTCHAs on the
15 system, and the program cannot handle a CAPTCHA.
16     And essentially, in the big picture, the
17 program is just doing what a human can do and
18 less, actually, because it cannot go past a
19 CAPTCHA.
20     And there's many court sites that say,
21 "Please do not run an automated program on our
22 site," and then we say, "Of course not." We
23 respect that.
24     I know you want an example, and I don't
25 have one off the top of my head.

Page 99

1 with the Idaho state courts, how long had CNS been
2 doing that, running that automatic program?
3   A.  I'm not sure we were asked to stop or
4 just cut off. I just want to make sure I'm not
5 misrepresenting that. I would -- I believe it was
6 very -- it was problematic, in any case.
7     And so I think we were attempting to run
8 it over a period of time, which I would estimate
9 at two years. But that's very rough.
10     The true answer is I don't actually know.
11 But I do know that it was problematic and that
12 most of the time we were attempting to run it, it
13 wasn't running correctly. That's the best I can
14 tell you.
15   Q.  And explain that to me. I don't
16 understand that.
17   A.  Yeah. I mean, as I was saying, websites
18 change constantly, and the automated program is a
19 set of instructions that mimic what a person would
20 do for the clerical side of collecting docket
21 information. And they simply don't work
22 sometimes. They fail. So this one was not
23 working well.
24   Q.  And do you know if it was -- I'm assuming
25 in Idaho when this automated program was being

Page 101

26 (Pages 98 - 101)

William L Girdner November 9, 2022

1 used, it was going through Idaho's portal?
2    A.  It would have to go through however a
3 human would go look at docket information, which
4 I'm not familiar with.  In Idaho it would have to
5 go through the same path.  So if --
6    Q.  It would take whatever path Ms. Valenti
7 takes?
8    A.  Correct.
9    Q.  How about Washington?  Was it -- was this
10 automated program being used in Washington for
11 some period of time?
12    A.  Yeah, I can check for you.  I don't know.
13    MR. FETTERLY:  Real quick while we're on
14 this topic, I don't want to get too far ahead, but
15 looking ahead to the lunch break, just kind of
16 curious to get a sense of what level of volume or
17 detail, I don't know whether the call or series of
18 calls over a lunch break will be able to cover the
19 entire universe.  You're looking for a couple of
20 examples?
21    We can talk about this offline.  Just
22 while we're on this topic now, I want to
23 understand what you're looking for so we can try
24 to do our best to respond.
25    MS. DUKE:  Sure.  And, I mean, it may

Page 102

1 make sense to take a quick break just so you can
2 get the wheels in motion.  But we'd just like to
3 know what state courts the automated program that
4 CNS created -- you know, what courts that's been
5 used in state court-wise.
6    And then I'll have questions as to
7 whether, you know, CNS has been asked to stop or
8 whether they're aware of it causing any issues for
9 those portals.
10    MR. FETTERLY:  Okay.  Thank you.  Let's
11 not break right now.  I think we're about
12 30 minutes off of your target lunchtime.
13 Let's -- we'll get those wheels in motion, and we
14 can report back after lunch where we are and what
15 we know.
16    Q.  (BY MS. DUKE)  Okay.  So ultimately, what
17 this automated program that CNS uses does is it
18 basically extracts data in Idaho's case -- Idaho's
19 iCourt portal, and then provides certain data that
20 it's able to grab from that portal, correct?  Like
21 you said, case names, numbers, plaintiff filing,
22 that type of thing?
23    MR. FETTERLY:  Objection; vague and
24 ambiguous, overbroad, lacks foundation.
25    THE WITNESS:  I would characterize it

Page 103

1 differently from extracting data.  I would simply
2 say it gathered information from the docket.
3    Q.  (BY MS. DUKE)  Okay.  So it gathers
4 information from the docket.  I'll rephrase that
5 then.
6    A.  Thanks.
7    Q.  The automated program gathered
8 information from, in Idaho's instance, from the
9 iCourt portal, and then provides that information
10 to CNS in an automated way?
11    A.  That would be fair.
12    Q.  Let me pull up a couple documents here.
13    MS. DUKE:  All right.  So today we were
14 served -- within the time frame permitted, we were
15 served Plaintiff's Responses to Defendant's Second
16 Set of Interrogatories, First Set of Requests For
17 Admissions.
18    I'll go ahead and share that document.
19 That will be our next exhibit, which is 27.  So
20 this will be Exhibit 27.
21    (Deposition Exhibit No. 27 was marked.)
22    Q.  (BY MS. DUKE)  Can you see that there?
23    A.  Yes.  I'm going to get a little close to
24 the screen, if you don't mind.  I have my reading
25 glasses on.

Page 104

1    Q.  No problem.  And I'll try to make it a
2 little bigger for you.
3    A.  Okay.  Thanks.
4    Q.  All right.  Does that help?
5    A.  Yeah, that's great.
6    Q.  All right.  These were served today, and
7 we were just talking about this automated program.
8    So let me just go to your answer to
9 Interrogatory No. 25, which is on page 29 of the
10 document.
11    You'll see here we're asking about any
12 type of automated program that was used by
13 Courthouse News there to monitor new filings and
14 civil cases.
15    That's what we've been talking about here
16 with this homegrown automated program, correct?
17    A.  Correct.
18    Q.  And you'll see -- so as Courthouse News
19 describes it, "Subject to and without waiving the
20 foregoing objections, Courthouse News responds as
21 follows.  Courthouse News backs up its human
22 reporters' work with periodic sweeps of new civil
23 cases done by an automated program on public court
24 sites where such programs are permitted by the
25 court."

Page 105

27 (Pages 102 - 105)

(30 of 297), Page 30 of 297 Case 24-6697, 03/06/2025, DktEntry: 10.9, Page 30 of 297
Case 1:21-cv-00305-DCN   Document 68-7   Filed 12/15/22   Page 29 of 118
William L Girdner November 9, 2022

| | |
|---|---|
| 1  Did I read that correctly? | 1 information from Tyler's press review queue with |
| 2  A.  You did.  It's correct. | 2 an automated program? |
| 3  Q.  Right.  And that's a correct statement of | 3  A.  No. |
| 4 what this automated, homegrown program does? | 4  Q.  Has CNS at any point in time asked for |
| 5  A.  It is. | 5 Tyler's permission to use an automated program to |
| 6  Q.  And that's what you're going to get us a | 6 extract information through an automated program? |
| 7 list for, of the states where that's being done? | 7  A.  No.  I'm thinking about something. |
| 8  A.  Correct. | 8  Q.  Sure. |
| 9  Q.  All right.  Why does CNS use that | 9  A.  I want my answer to be accurate. |
| 10 automated program?  What's the reason? | 10  There's the -- Tyler in Texas runs |
| 11  A.  It's simply to help the reporter with | 11 a -- what they call Re: Search where they put up |
| 12 some of the clerical work.  And I -- there is a | 12 the docket information online.  And I don't think |
| 13 very limited -- it has very limited use. | 13 we're running a spider on -- sorry -- we're |
| 14  Some reporters refuse to even use it | 14 running automated programs on that.  But it's |
| 15 because it's slower correcting -- the entries from | 15 possible.  We'll check for you at lunch. |
| 16 the automated program are slower than it would be | 16  Q.  Okay.  Thank you. |
| 17 if they typed it themselves. | 17  And when you were talking about the |
| 18  But really it is to assist them and to | 18 automated program, is that commonly referred to as |
| 19 make sure they don't miss something.  To back them | 19 a "spider"? |
| 20 up, essentially. | 20  A.  No.  It's -- there's all different words |
| 21  Q.  And do you know if Ms. Valenti uses that | 21 for those programs.  They're called bots.  They're |
| 22 here in Idaho? | 22 also called crawlers. |
| 23  A.  She has used it.  I believe she has | 23  Q.  Spiders? |
| 24 commented that it doesn't work well in the past. | 24  A.  Yeah.  You know how -- a spider has a |
| 25 And that's as much as I know. | 25 negative association, so I prefer to go with |
| Page 106 | Page 108 |

| | |
|---|---|
| 1  So, I mean, if we were running it, | 1 "automated program." |
| 2 normally she would have used it.  But obviously | 2  Q.  Sure.  But other words for "automated |
| 3 we're not running it now, and she's not using it. | 3 programs" are "bots," "crawlers," "spiders," et |
| 4  Q.  We were talking -- and we'll follow back | 4 cetera. |
| 5 up on that after lunch once you have some | 5  A.  "Bot" would probably be the most common |
| 6 information. | 6 one.  Like the Googlebot is the most famous of |
| 7  We were talking about the number of | 7 these programs.  Which is -- that's how the court |
| 8 subscribers here to the Big Sky Report, and you | 8 in Idaho has its website recognized, right, is |
| 9 had indicated there's 51 or so that you're aware | 9 because Googlebot found it and put it into its |
| 10 of. | 10 index. |
| 11  Are there any media outlets that are a | 11  Q.  All right.  What communications has CNS |
| 12 subscriber? | 12 had with Tyler?  And let's start back in -- well, |
| 13  A.  Not to the Big Sky Report.  To the | 13 strike that. |
| 14 others, many, but not to the Big Sky Report. | 14  Let me first ask, when did CNS believe |
| 15  Q.  The Big Sky Report, as I understand it, | 15 that the state Idaho courts were not providing |
| 16 are basically the office of the city attorney and | 16 timely access to filed complaints? |
| 17 then a host of major law firms, both from within | 17  A.  When they switched to e-filing is what I |
| 18 the state of Idaho and across the nation? | 18 would say. |
| 19  A.  Correct. | 19  Q.  And do you know the general year of that? |
| 20  Q.  All right.  Let's turn to -- at any point | 20  A.  It's all over the documents.  I'm |
| 21 in time has CNS had any conversation with | 21 thinking five or six years ago, but it could have |
| 22 Tyler -- and by -- I should say "communication," | 22 been more. |
| 23 so strike that. | 23  Q.  And once CNS concluded that it felt that |
| 24  At any point in time, has CNS had any | 24 it was not being provided timely access to e-filed |
| 25 communication with Tyler as to CNS extracting | 25 complaints, did it reach out to Tyler in any way? |
| Page 107 | Page 109 |

28 (Pages 106 - 109)

William L Girdner November 9, 2022

1 Or when was CNS's first communication with Tyler
2 about this issue?
3      MR. FETTERLY:  Objection; lacks
4 foundation.
5      You can answer.
6      THE WITNESS:  Yeah, I don't believe we've
7 talked to Tyler at all about this issue.  You
8 know, the -- yeah, I don't think we have.
9    Q.  (BY MS. DUKE)  All right.  So I'll phrase
10 it this way, then.
11    A.  Okay.
12      MS. DUKE:  And I appreciate the "lack of
13 foundation" objection, because that's probably why
14 it was made.
15    Q.  (BY MS. DUKE)  At any point in time, has
16 Tyler -- strike that.
17      At any point in time, has CNS talked with
18 Tyler about this lawsuit?
19    A.  Not that I can think of.
20      MR. FETTERLY:  I'll just clarify.  Are we
21 talking about the third-party subpoena and
22 communications with counsel, KL Gates?
23      Or are you -- I want to be clear on that
24 because, Keely, as you know, counsel have spoken
25 to Tyler with thinking it was the subpoena.  So if

Page 110

1 you could just clarify your question, please.
2    Q.  (BY MS. DUKE)  Sure.  At any point in
3 time aside from a deposition request or a 30(b)(6)
4 request or subpoena, has CNS had any
5 communications at all with Tyler about this Idaho
6 lawsuit?
7    A.  Let me just say, I have not.  And as far
8 as our lawyers, I don't know.  Like Jon mentioned
9 correctly that there's a deposition coming up, so
10 that involved communication, obviously.  But
11 outside that, I don't know of any other
12 communication.
13    Q.  Right.  And -- go ahead.
14    A.  Well, concerning this lawsuit.
15    Q.  Has CNS had any communication with Tyler
16 about its press review queue?  And again, not
17 including any request for a deposition or a
18 subpoena in this action.
19    A.  Right.  I don't think so.  There was this
20 exchange with Nina Minney, right?  That I think
21 you have the documentation on that where -- and
22 there was a tangential reference to a press review
23 queue in that exchange, but not beyond that.
24      Oh, I'm sorry.  There was one.
25 In -- five years ago, maybe, four.  There was a

Page 111

1 JCOIT meeting in Texas where we made a
2 presentation -- and JCOIT stands, I believe, for
3 Judicial Committee on Information Technology --
4 where we made a presentation asking for a press
5 review queue.
6      And Terry Derrick was there.  He'd made a
7 presentation before us, and then he was sitting
8 along the side of the room.
9      And when I described the press review
10 queue as a program, he was vigorously shaking his
11 head.
12      So I turned to him and I said, "Terry, if
13 you've got something to say, go ahead."
14      And he said, "It's not a program.  It's
15 an app."
16      I said, "Okay.  We'll call it an app."
17      So we had that exchange.
18    Q.  All right.  Any other communications or
19 exchanges that CNS has had with Tyler, absent any
20 lawyer communications, related to a subpoena or
21 deposition?
22    A.  There was one conversation years ago
23 with -- he's a senior sales guy, I think, with a
24 really gravelly voice.  And we talked about the
25 access in California, but it was a general civil

Page 112

1 somewhat -- I would call it introductory
2 conversation.
3    Q.  Any others?
4    A.  The exchanges, as I said, with Nina
5 Minney that I think you have the records on.
6    Q.  And tell me what those exchanges with
7 Nina Minney were.
8    A.  Oh, I had written a column, and it was
9 about -- what was it called?  The Money Versus
10 Access or something.
11      And I was describing how the Re: Search
12 system run by Tyler in Texas and elsewhere was a
13 split of income where the courts were getting copy
14 fees and Tyler was getting search fees.
15      And then Nina was -- you know, some email
16 to me saying she thought I should mention the fact
17 that the initial public search was free.
18      And so -- but she was saying my
19 description was inaccurate, and I took a bit of
20 umbrage at that.
21      And I admit I was a little snippy in my
22 response, but I said in essence that she's right,
23 that the initial search is free and that I could
24 phrase my description with that in mind in the
25 future.

Page 113

29 (Pages 110 - 113)

William L Girdner November 9, 2022

1    And also -- sorry --
2    Q.  Go ahead.
3    A.  That's also where I got the product
4  statement, on the press review.  I think she
5  attached that.
6    Q.  And when were these communications?
7    A.  I'm guessing two or three years ago.
8    Q.  And who did you understand Nina Minney to
9  be?
10    A.  She's from the PR department of Tyler
11  Technologies.
12    Q.  Other than that communication or exchange
13  that you've just testified to, any other
14  communication or exchange with Nina Minney?
15    A.  Those three represent the sum total.
16    Q.  And then you mentioned a senior sales guy
17  that you discussed the California program with.
18  Describe that for me and when that was.
19    A.  It was a long time ago.  I think it was
20  just to meet and greet.  We did not consider Tyler
21  an opponent or a friend.  We just -- we were
22  working -- you know, it was just, as I said, a
23  meet-and-greet, so we weren't running -- a
24  courtesy.
25    Q.  Any other communication with any type of

Page 114

1  he's the head of fulfillment services, I think,
2  something like that.
3    You know, those euphemisms, they can be a
4  number of things.  But I think he interfaces with
5  court personnel quite a bit.
6    Q.  And when he vigorously shook his head and
7  insisted that rather than call press review queue
8  a program, it should be called an app, what did he
9  explain as to why that was the case?
10    A.  That's all he said.  I mean, I shook his
11  hand afterwards.  "How are you doing?"  And that's
12  it.
13    But he did not -- he did not go on
14  further.  He just wanted to correct my use of the
15  word "program."  And he wanted me to call it an
16  app, and I said, "Fine."
17    Q.  And did you do any type of investigation
18  or looking into why they want it to be called an
19  app and not a program?
20    A.  No.  I mean, I think he's accurate.  It
21  is an application.  But an application relies on
22  programming.  So both words are correct.
23    Q.  What do you understand Tyler's press
24  review queue to be?
25    A.  It's a filtered queue that only allows

Page 116

1  salesperson with Tyler other than what you've just
2  relayed?  And obviously this is on CNS's behalf.
3    A.  Yeah.  Yeah.  Yeah.  No.  I mean, you
4  know, we've seen lots of emails from Tyler reps
5  and so forth.  I don't believe I've ever talked to
6  a Tyler rep directly.
7    Our lawyer in Atlanta, I believe he
8  emailed a Tyler rep in the context of access
9  review queue in Atlanta, but I was not involved in
10  those exchanges.
11    Q.  And then approximately five years ago you
12  indicated there was that meeting in Texas.
13    A.  Yeah.
14    Q.  And that Tracy Derrick had, you know,
15  insisted that press review queue was an app.
16    When was that?  Do you think it was about
17  five years ago?
18    A.  It's Terry Derrick.  T-e-r --
19    Q.  Terry?
20    A.  Yeah.  In the initial adjacent meeting,
21  we made that presentation.  I would say -- let me
22  just kind of track back four to five years ago.
23    Q.  And who's Terry Derrick?
24    A.  I think he's called a fulfillment -- he's
25  the head of -- he's an executive at Tyler.  And

Page 115

1  public documents into a queue that allows
2  reporters to see the new public civil complaints
3  shortly after they're filed.  And if -- yeah.  Let
4  me correct that.  Shortly after they're received.
5    Q.  What does a complaint being filed mean to
6  you?
7    A.  It means that it crosses the counter into
8  the court and gets stamped.  Sorry, I just -- it
9  crosses the counter into the court.  That's it.
10    Q.  Well, the old way was it would cross the
11  counter and it would get stamped, correct?
12    A.  That's correct.
13    Q.  And isn't that what your understanding of
14  the new way is, that it crosses the electronic
15  counter, gets stamped, and is then in the file?
16    A.  Yeah.  The stamping is a little bit
17  mysterious.  There is a shadow stamp that gets put
18  on it.
19    Q.  And what do you mean by that?
20    A.  There was testimony in our New Mexico
21  case where the head IT person before the state
22  said a shadow time stamp and date stamp gets fixed
23  on the document as it comes in.
24    Q.  Did they explain why or what that meant?
25    A.  No.

Page 117

30 (Pages 114 - 117)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 Q. And that was a Tyler product? | 1 common understanding or definition of that term. |
| 2 A. Yes. | 2 THE WITNESS: I can answer that question. |
| 3 Q. Okay. So in the state of Idaho, you | 3 It initiates a lawsuit. That's true. |
| 4 understand that in the e-filing context, the | 4 Q. (BY MS. DUKE) All right. Do you agree |
| 5 complaint is -- crosses the clerk's desk and is | 5 that "file" means accepting a docket into the |
| 6 stamped and placed into the court's file? | 6 official court record? |
| 7 MR. FETTERLY: Objection; vague and | 7 A. I do not. |
| 8 ambiguous, overbroad as to scope and time and | 8 Q. Why not? |
| 9 specifically whether we're talking about paper | 9 A. Because it's filed when it's submitted. |
| 10 versus electronic filing. | 10 Q. So it's filed before a clerk ever even |
| 11 MS. DUKE: I had said e-filing, but okay. | 11 sees it? |
| 12 THE WITNESS: It's okay. I just don't | 12 A. No. I think the clerk has access to it |
| 13 think it's right anyway. Okay. Let me explain. | 13 as soon as it's submitted. |
| 14 Q. (BY MS. DUKE) Yeah. | 14 Q. No, not under your definition. So as I |
| 15 A. It crosses the counter into the court, | 15 understand it, it's your testimony that the second |
| 16 the virtual counter, and goes into a queue. The | 16 it is submitted into Tyler's File & Serve, it is |
| 17 clerk then checks the clerical entries, what I | 17 now a court document; is that correct? |
| 18 call the pre-docketing entries made by the filer, | 18 A. No, I didn't say that either. Sorry. |
| 19 and then accepts it. And then it goes into the | 19 MR. FETTERLY: Objection; misstates prior |
| 20 public docket. | 20 testimony, argumentative. |
| 21 Q. And CNS's issue is not with the | 21 THE WITNESS: It does misstate the prior |
| 22 pre-docketing review that is done, correct? | 22 testimony. That's not my testimony. |
| 23 A. Well, we want access to the records at | 23 Q. (BY MS. DUKE) Okay. Well, what is your |
| 24 the same time, but the public records. So that's | 24 testimony on that? |
| 25 why I say it's a filtered queue. You see, it runs | 25 A. I have said a number of times that when |
| Page 118 | Page 120 |

| | |
|---|---|
| 1 parallel to the clerk's queue. | 1 it's submitted, it's filed. |
| 2 Q. So you want them before they're filed? | 2 Q. That's what I'm saying. And so you |
| 3 MR. FETTERLY: Objection; vague and | 3 are -- it's your theory that in the state of |
| 4 ambiguous, overbroad, calls for a legal | 4 Idaho, if a document, a complaint, is submitted to |
| 5 conclusion. | 5 Tyler's File & Serve, that means it's immediately |
| 6 THE WITNESS: That's what our dispute is | 6 filed, correct? |
| 7 about. I'm saying they're filed when they cross | 7 A. No. |
| 8 the virtual counter. | 8 MR. FETTERLY: Objection; vague and |
| 9 I understand you're saying they're filed | 9 ambiguous, lacks foundation, calls for legal |
| 10 later. But that's, as I say, for you folks to | 10 conclusion. |
| 11 argue about before Judge Nye. | 11 You may answer. |
| 12 Q. (BY MS. DUKE) Well, I think it's | 12 THE WITNESS: It gets filed when it's |
| 13 important for Judge Nye to understand CNS's | 13 submitted. |
| 14 position. | 14 Q. (BY MS. DUKE) Okay. So that's what I'm |
| 15 A. Yeah. | 15 trying to clarify. |
| 16 Q. As well as ours, and the definitions that | 16 So the second it is submitted means to |
| 17 are being used. So let me see if I can try to | 17 you it is then immediately filed? |
| 18 clarify some of that. | 18 A. It's filed -- |
| 19 Would you agree that a complaint | 19 MR. FETTERLY: And objection; vague and |
| 20 initiates a civil -- strike that. | 20 ambiguous as to the term "immediately filed." |
| 21 Would you agree that a civil complaint | 21 MS. DUKE: Well, I'm just trying to have |
| 22 initiates a lawsuit once it is filed? | 22 him explain. |
| 23 MR. FETTERLY: Objection; vague and | 23 Q. (BY MS. DUKE) So you just said, "I have |
| 24 ambiguous as to the word "filed," calls for a | 24 said a number of times when it's submitted it's |
| 25 legal conclusion. I don't believe we have a | 25 filed." So explain what you mean by that. |
| Page 119 | Page 121 |

31 (Pages 118 - 121)

William L Girdner November 9, 2022

| | |
|---|---|
| 1   A.   Those are pretty simple words. I'm not | 1   deposition, but I don't know what you mean by |
| 2   trying to be a smart ass. | 2   "know." I don't have them memorized, that's for |
| 3   Q.   I think you are kind of trying to be a | 3   sure. |
| 4   smart aleck, but go ahead. We'll let Judge Nye | 4   Q.   Well, you can't, as you stated earlier in |
| 5   decide that. | 5   the deposition, refer to any as they rely or are |
| 6   A.   Yeah, you bet. When it's submitted, it's | 6   relevant to this topic of submission versus |
| 7   filed. | 7   filing? |
| 8   Q.   Is there any time period that exists when | 8       MR. FETTERLY: Objection; misstates prior |
| 9   something is submitted that would -- well, strike | 9   testimony, argumentative. |
| 10   that. | 10   Q.   (BY MS. DUKE) Well, let me not misstate |
| 11       So if a document is submitted, under your | 11   your prior testimony. Let's hear it again out of |
| 12   understanding, in the state of Idaho, that means | 12   those lips. |
| 13   it is filed, correct? | 13   A.   Okay. |
| 14   A.   That's when it's filed. | 14   Q.   Are you aware of any Idaho rule of |
| 15   Q.   Okay. Therefore, no clerk reviews the | 15   electronic filing that addresses what submitted |
| 16   submissions to accept the document to be filed, | 16   complaints or documents are versus filing? |
| 17   correct? | 17       MR. FETTERLY: And objection; vague and |
| 18       MR. FETTERLY: Objection; vague and | 18   ambiguous, lacks foundation, calls for legal |
| 19   ambiguous, overbroad, lacks foundation, calls for | 19   conclusion. |
| 20   speculation. | 20       I don't know that we agreed on any of |
| 21       You may answer. | 21   these terms, but you may answer. |
| 22       THE WITNESS: The clerk can see it right | 22       THE WITNESS: Yeah, I think there are |
| 23   away at the same time. | 23   rules that address this topic, but I'm not |
| 24   Q.   (BY MS. DUKE) No, that's not the | 24   familiar with them myself. |
| 25   question. | 25   Q.   (BY MS. DUKE) And, therefore, you're not |
| Page 122 | Page 124 |
| 1       What I'm saying is you're saying when | 1   considering those rules in your answers here |
| 2   it's submitted, it's automatically filed, correct? | 2   today, correct? |
| 3       MR. FETTERLY: Objection; vague and | 3       MR. FETTERLY: Objection; misstates prior |
| 4   ambiguous, overbroad, calls for speculation. | 4   testimony, argumentative. |
| 5       You may answer. | 5       THE WITNESS: I think they're most likely |
| 6       THE WITNESS: I'm saying at the time it's | 6   consistent with my -- |
| 7   filed. We're not in an Auto-Accept court. | 7   Q.   (BY MS. DUKE) That's not my question. |
| 8   Q.   (BY MS. DUKE) No, what you're saying is | 8   If you know that there are rules but you're not |
| 9   when it's submitted, it's automatically filed. | 9   familiar with them yourself, you, therefore, can't |
| 10   A.   No, I'm saying that's the time of filing. | 10   be relying on those rules one way or the other, |
| 11   Q.   So you're saying when it's submitted, | 11   correct? |
| 12   that's the time of filing? | 12       MR. FETTERLY: Objection; misstates prior |
| 13   A.   Correct. And that's when we'll write it, | 13   testimony, lacks foundation, calls for a legal |
| 14   yes. | 14   conclusion. |
| 15   Q.   Why are you saying in the state of Idaho | 15       Mr. Girdner was not brought here to |
| 16   that when a complaint submitted that is its | 16   testify regarding the identification, |
| 17   time of filing? | 17   interpretation, or application of any rule, |
| 18   A.   Because that's the general standard | 18   statute, or other law. We're pretty far afield of |
| 19   nationwide. | 19   the 30(b)(6) topics. We're trying to be patient |
| 20   Q.   Well -- | 20   with you here, but pretty soon I'm going to |
| 21   A.   I know of no exceptions to it. | 21   instruct him not to answer. |
| 22   Q.   And as we established early on in your | 22       Mr. Girdner -- |
| 23   deposition, you don't know any of the Idaho rules | 23       MS. DUKE: I hope you do, Mr. Fetterly. |
| 24   of electronic filing, correct? | 24       MR. FETTERLY: Mr. Girdner is not here to |
| 25   A.   I looked at them as I said earlier in the | 25   argue the legal issue of this case. |
| Page 123 | Page 125 |

32 (Pages 122 - 125)

William L Girdner November 9, 2022

| | |
|---|---|
| 1    MS. DUKE: These aren't legal issues. | 1    Q. Okay. And not a standard in the Idaho |
| 2 I'm asking for a factual basis, and that's exactly | 2 courts? |
| 3 what I'm permitted to do here. | 3    A. I don't believe there is any exception to |
| 4       And your speaking objections are too much | 4 it, including Idaho. |
| 5 at this point. So if you're going to continue | 5    Q. And that's because you have not looked at |
| 6 those, we'll go ahead and postpone the deposition. | 6 the Idaho rules of electronic filing to determine |
| 7 We'll bring those speaking objections up to the | 7 how the Idaho electronic rules of filing address |
| 8 court. We'll adjust the deadlines accordingly, | 8 submitted versus filed? |
| 9 and we'll go forward from there. | 9    A. I have looked at some of the rules. |
| 10    MR. FETTERLY: I made my objection. | 10    Q. But you're not relying on any -- |
| 11    Mr. Girdner, you can answer if you can. | 11    A. I don't have them memorized. |
| 12    THE WITNESS: I've said a number of times | 12    Q. Correct. And you're not relying on any |
| 13 that the national standard, which I have no reason | 13 of those rules in providing your testimony here |
| 14 to believe Idaho is different from because I've | 14 today, correct? |
| 15 never heard an exception to this, is that when the | 15    A. I'm relying on the national standard. |
| 16 filing is submitted, it is then filed. | 16    Q. Right. So the answer to my question is |
| 17    Q. (BY MS. DUKE) And your testimony in this | 17 you are not relying on any of those rules, the |
| 18 case for that position is based on what you | 18 Idaho rules, in providing your testimony here |
| 19 understand to be a national standard, correct? | 19 today, correct? |
| 20    A. Yes, that's correct. | 20    A. I'm relying on the fact that I don't |
| 21    Q. Not based upon any knowledge you have as | 21 believe the Idaho rules have any exception from my |
| 22 to what the Idaho rules of electronic filing say | 22 review of them, which has been very brief in |
| 23 on this issue, correct? | 23 summary, I agree. |
| 24    A. I don't know what they say. That's for | 24    MS. DUKE: Ms. Simmons, will you please |
| 25 you folks to interpret. | 25 read my question back? |
| Page 126 | Page 128 |
| 1    Q. Right. And you don't know what they say, | 1       (The record was read by the reporter.) |
| 2 and, therefore, the testimony that you're | 2    MR. FETTERLY: Objection; asked and |
| 3 providing on this issue is not factoring those | 3 answered. |
| 4 rules in, correct? | 4    THE WITNESS: Yeah, I'm not relying on |
| 5    MR. FETTERLY: And objection to the | 5 them specifically. |
| 6 extent this is beyond and outside the scope of the | 6    Q. (BY MS. DUKE) What does CNS consider to |
| 7 Rule 30(b)(6) topics. | 7 be delayed access to newly E-filed civil |
| 8    But you may answer. | 8 complaints in this lawsuit? |
| 9    THE WITNESS: I'm not -- I don't have the | 9    A. Access past the time of receipt or |
| 10 rules memorized. I've looked at them, and I think | 10 shortly thereafter, as we see in so many other |
| 11 they address this topic. But that's not what I'm | 11 courts, state and federal. |
| 12 basing my statement on. I'm basing my statement | 12    Q. How much time shortly thereafter? What's |
| 13 on a national standard. And I know of no | 13 too long? |
| 14 exception here, and I'm sure there's no | 14    A. Yeah, I'd say a few minutes. For |
| 15 exceptions, actually. | 15 example, in Miami -- I'm sorry, in Florida, we |
| 16    Q. (BY MS. DUKE) Well, you can't be sure if | 16 agreed with the e-filing authority to -- at the |
| 17 you haven't actually reviewed the Idaho rules of | 17 time of receipt or within five minutes afterwards. |
| 18 electronic filing related to this issue; fair? | 18 I think that's typically the amount of time that |
| 19    A. No. I really don't think so. I don't | 19 it takes for these -- for the complaints to come |
| 20 think that's fair. I don't think -- | 20 into the system. |
| 21    Q. So if you don't know what something | 21    Q. So it's your testimony that in the state |
| 22 says -- if you don't know what something says, you | 22 of Idaho, the Idaho state courts will be causing a |
| 23 can somehow just automatically exclude it just | 23 delay in access to newly e-filed civil complaints |
| 24 because. | 24 if CNS does not have those within a few minutes; |
| 25    A. I can say there's a national standard. | 25 is that correct? |
| Page 127 | Page 129 |

33 (Pages 126 - 129)

William L Girdner November 9, 2022

| | |
|---|---|
| 1    MR. FETTERLY: Objection; vague and<br>2 ambiguous, overbroad, lacks foundation.<br>3    THE WITNESS: I just don't understand the<br>4 phrase.<br>5    Q. (BY MS. DUKE) What phrase?<br>6    A. The whole thing. You can have the court<br>7 reporter read it back. I don't care.<br>8    MS. DUKE: Sure. Let's have her do that.<br>9    (The record was read by the reporter.)<br>10    MR. FETTERLY: And objection; vague and<br>11 ambiguous, overbroad, lacks foundation, incomplete<br>12 hypothetical.<br>13    MS. DUKE: All right. Mr. Fetterly, when<br>14 she reads it back, you don't do that. That's the<br>15 whole point, to try to not confuse the witness.<br>16    Go ahead and read it back again, Ms.<br>17 Simmons. I'm really sorry about that.<br>18    (The record was read by the reporter.)<br>19    THE WITNESS: I don't understand the<br>20 question. I really don't.<br>21    Q. (BY MS. DUKE) How long do you believe<br>22 the Idaho state courts could take without it being<br>23 considered a delay by CNS --<br>24    A. Sure.<br>25    Q. -- for them to provide access to CNS of<br><div align="right">Page 130</div> | 1 state of Idaho in a timely fashion?<br>2    MR. FETTERLY: Objection; vague and<br>3 ambiguous as to "timely."<br>4    You may answer.<br>5    THE WITNESS: Yeah. As I defined<br>6 "timely," which is shortly after -- at receipt or<br>7 shortly thereafter.<br>8    Q. (BY MS. DUKE) You would agree that it is<br>9 important to CNS that it receive -- to be, I<br>10 guess, First Amendment compliant, that CNS needs<br>11 to receive newly filed complaints quicker than it<br>12 does?<br>13    MR. FETTERLY: Objection; vague and<br>14 ambiguous, overbroad, incomplete hypothetical,<br>15 calls for a legal conclusion.<br>16    You may answer.<br>17    THE WITNESS: To answer that question, I<br>18 would have to run through the First Amendment<br>19 analysis. I would say the right of access<br>20 attaches on receipt. And then the State has to<br>21 justify delays. Maybe it can. Okay?<br>22    Q. (BY MS. DUKE) Okay. And when you say<br>23 "receipt," what do you mean by "receipt"?<br>24    A. When the court receives the submission,<br>25 which is generally very close to the time<br><div align="right">Page 132</div> |
| 1 newly filed complaints?<br>2    A. It's not something I can guess at or<br>3 define what the correct amount of time is. I can<br>4 say that the right of access attaches on receipt.<br>5 And after that, the court needs to justify delays.<br>6 It needs to have an overriding reason and no less<br>7 restrictive alternative. So that's how I would<br>8 analyze whether the delay is, you know, consistent<br>9 with the First Amendment or not.<br>10    Q. (BY MS. DUKE) Well, and based on what<br>11 you just provided as to your understanding of the<br>12 First Amendment, what is the time frame where that<br>13 would be considered by CNS to be a delay in the<br>14 state of Idaho?<br>15    A. It has to be analyzed within that<br>16 framework. There's no magic number.<br>17    Q. Right. So you would agree there's no<br>18 magic number?<br>19    A. I would agree.<br>20    Q. What is important to CNS is that it<br>21 receive either immediate, or close to it, access<br>22 to newly filed complaints in the state of Idaho?<br>23    A. That's not what I said.<br>24    Q. Well, you would agree that it -- that CNS<br>25 wants access to newly filed complaints in the<br><div align="right">Page 131</div> | 1 submission, if not identical to it.<br>2    Q. And when you say "when the court receives<br>3 the submission," do you mean when the court has<br>4 filed the document?<br>5    A. No. I mean when the filer has submitted<br>6 it.<br>7    Q. And --<br>8    MR. FETTERLY: Belated objection as to<br>9 the term "filed." We, again, don't have a common<br>10 understanding or definition, so vague and<br>11 ambiguous, overbroad, potentially calls for a<br>12 legal conclusion.<br>13    MS. DUKE: All right. Let's go to<br>14 Webster's so we can get that all sorted out.<br>15    Q. (BY MS. DUKE) Mr. Girdner, do you have<br>16 an actual definition of "filed" in your mind?<br>17    A. Well, I've been saying a number of times<br>18 it's when it's submitted.<br>19    Q. Now, you would agree that the purpose of<br>20 a complaint being filed is to place it in the<br>21 court's case management system, correct?<br>22    A. I would not agree with that.<br>23    Q. Would you agree that the word "file"<br>24 means submitting to be placed on record by the<br>25 appropriate authority?<br><div align="right">Page 133</div> |

<div align="right">34 (Pages 130 - 133)</div>

(37 of 297), Page 37 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 37 of 297
Case 1:21-cv-00054-DCN Document 66-7 Filed 12/15/22 Page 36 of 118
William L Girdner November 9, 2022

1   A.  I already said "submitted."  That's what
2  I mean.
3   Q.  My question is would you agree that the
4  word "file" means when it is submitted to be
5  placed on record by the appropriate authority?
6   A.  No.
7   Q.  When you say "submitted," what is it
8  being submitted to in the state of Idaho?
9   A.  It's being submitted into an e-file
10  manager which is controlled by the state of Idaho.
11   Q.  The e-file manager is Tyler File & Serve,
12  correct?
13   A.  Correct.
14   Q.  And have you talked to Tyler as to who is
15  responsible for the data contained within the
16  E-File & Serve that Tyler manages?
17   A.  No.
18   Q.  Do you know through any communications
19  with Tyler or the Idaho courts as to what
20  documents -- well, strike that.
21      With respect to Tyler File & Serve, do
22  you have an understanding of where those documents
23  are hosted when they are submitted to Tyler
24  File & Serve?
25   A.  I believe they're hosted in the e-file

Page 134

1  manager.
2   Q.  And do you know who manages the e-file
3  management?
4   A.  I'd say the vendor for the state courts,
5  which is Tyler.
6   Q.  Do you know who manages the court's case
7  management system?
8   A.  It's a Tyler product.
9      MR. FETTERLY:  Objection; vague and
10  ambiguous, overbroad.
11      You may answer.
12      THE WITNESS:  Yeah, it's a Tyler product.
13  You know, there's -- I -- hang on a second.  Oh,
14  it was the deposition of Ms. Dvorak.
15      There's a Tyler product, just like the
16  File & Serve program -- I understand Ms. Dvorak's
17  statement that it's hosted by the Idaho courts,
18  but I -- you know, the -- I understand that
19  argument.  I don't know where it's actually --
20  where the data is actually kept.  Let me put that.
21   Q.  (BY MS. DUKE)  That's not something that
22  you've investigated, correct?
23   A.  No.
24   Q.  Correct?
25   A.  Correct.

Page 135

1   Q.  And you attended Ms. Dvorak's deposition?
2   A.  I did.
3   Q.  Do you have any access to any notes or
4  email communications or text communications during
5  the course of this deposition?
6   A.  No.  You mean as we're talking?
7   Q.  Correct.
8   A.  No, I have -- I call Mr. Fetterly during
9  the breaks.  That's it.
10   Q.  All right.  So the only knowledge you
11  have as to who manages the case management system
12  for the state of Idaho is through Ms. Dvorak's
13  deposition; is that correct?
14   A.  Yeah, it's just -- "manages" is what I'm
15  having a little trouble with.  I remember her
16  saying that it's hosted by the courts.  But, as I
17  said, I don't know where the data is kept.
18  Anyway, you know --
19   Q.  You understood it's hosted by the courts,
20  not by Tyler, correct?
21   A.  The case management system itself.  But
22  the underlying data, I don't know.
23   Q.  So to be clear, the case management
24  system is hosted by the Idaho courts, not Tyler,
25  correct?

Page 136

1      MR. FETTERLY:  Objection; calls for
2  speculation.
3      THE WITNESS:  It's a Tyler product, so
4  Tyler's obviously involved in the management of
5  its product.
6      MS. DUKE:  Ms. Simmons, will you please
7  read my question back?
8      THE WITNESS:  Yeah.
9      (The record was read by the reporter.)
10      THE WITNESS:  I don't know.  Ms. Duke,
11  I'm not trying to be evasive.  I know it probably
12  sounds like I am, but I don't know.
13      I heard Ms. Dvorak say that Idaho hosts
14  it.
15      I also know that it's a Tyler product.
16      So -- and Tyler has to be involved in the
17  management of its own product, which is the case
18  management system.
19      And "hosting" is a large word.  So, for
20  example, is the underlying data hosted by a local
21  server or is it, for example, a WS?  I don't know.
22  So I'm doing the best I can for you.
23   Q.  (BY MS. DUKE)  Well, do you know what
24  Tyler's role is, if any, with respect to the case
25  management system other than the fact it is a

Page 137

35 (Pages 134 - 137)

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-1715

William L Girdner November 9, 2022

1 Tyler product?
2   A. I'm assuming --
3   Q. Don't assume. Do you know?
4   A. I don't know.
5   Q. Okay.
6     MS. DUKE: All right. Let's go ahead and
7 take our lunch break. We'll see you back in about
8 an hour.
9     MR. FETTERLY: Great. Okay.
10     THE VIDEOGRAPHER: Okay. So the time is
11 12:51 p.m., and we are off the record.
12   (Lunch break taken from 12:51 p.m. to 1:57 p.m.)
13     THE VIDEOGRAPHER: All right. So we are
14 recording. The time is 1:57 p.m., and we are back
15 on the record.
16   Q. (BY MS. DUKE) All right. We're back on
17 the record after a lunch break.
18     Other than your counsel, did you talk to
19 anyone else over the lunch break?
20   A. Yes, I talked to Jimmy Shimabukuro,
21 because you'd asked for the list of states where
22 we're spidering -- I'm sorry -- where we're using
23 an automated program.
24   Q. And what did you -- I guess fill me in on
25 your conversation.

Page 138

1   A. Yeah. I asked him for a list that he
2 dictated to me.
3   Q. Perfect. Anything else other than that?
4   A. No.
5   Q. All right. So tell us the list.
6   A. Alaska, California, Florida, Georgia,
7 Illinois, Kansas, Minnesota, Montana, North
8 Dakota, Nevada, Ohio, Oklahoma, Pennsylvania,
9 South Carolina, Tennessee, Texas, Virginia, and
10 Wisconsin. 18 states in all.
11   Q. All right.
12     MS. DUKE: Go ahead, Jon.
13     MR. FETTERLY: Double-check your math.
14     THE WITNESS: No, it's 18. It's correct.
15     MR. FETTERLY: Okay.
16   Q. (BY MS. DUKE) And what about Idaho?
17   A. No.
18   Q. So what was it in Idaho that you were
19 doing when you were asked to stop using the
20 automated program?
21   A. The same thing. An automated program
22 checking for docket information.
23   Q. How was that different than the program
24 that was used with respect to the states you just
25 read off?

Page 139

1   A. Same.
2   Q. Okay. So Idaho should be on that list
3 too, for --
4   A. No. No. Because it's not running.
5   Q. Oh, this is where it's currently running?
6   A. Correct.
7   Q. Okay. And where has it run in the past
8 where you've all been asked to stop like Idaho?
9     MR. FETTERLY: Objection; misstates prior
10 testimony.
11     You may answer.
12     THE WITNESS: Yeah, I don't have that. I
13 just have the list where we're running. That's
14 what I asked him for.
15     MS. DUKE: Okay. Well, why don't we take
16 a quick break and why don't you ask him where
17 you're no longer running it and why.
18     MR. FETTERLY: We can do that.
19     MS. DUKE: Okay. Thanks.
20     MR. FETTERLY: See what you can find out.
21 I don't know if that information is available, but
22 we'll ask.
23     MS. DUKE: All right. Thank you.
24     THE VIDEOGRAPHER: Okay. So the time is
25 2:00 p.m., and we are off the record.

Page 140

1   (Break taken from 2:00 p.m. to 2:15 p.m.)
2     THE VIDEOGRAPHER: All right. So we are
3 recording. The time is 2:15 p.m., and we are back
4 on the record.
5     MS. DUKE: We're back on the record.
6   Q. (BY MS. DUKE) Did you have an
7 opportunity to make a call to determine the
8 questions we were asking prior to the break?
9   A. I did.
10   Q. All right. And who did you call?
11   A. Jimmy.
12   Q. And remind me, what's his title?
13   A. Jimmy Shimabukuro, he's the chief
14 financial officer, but he's also the office
15 manager.
16   Q. And how long has he been in that role?
17   A. Oh, ten years, I would say.
18   Q. All right. And what did you learn?
19   A. The states where we've stopped
20 spiders -- stopped spiders, is Maryland, Arizona,
21 Washington, D.C., Florida, Georgia, Hawaii, Idaho,
22 Kansas, Louisiana, Massachusetts, Michigan,
23 Maryland, Missouri, Nevada, Ohio, Oregon, South
24 Carolina, and Texas.
25   Q. And what are the reasons for stopping the

Page 141

36 (Pages 138 - 141)

William L Girdner November 9, 2022

1 use of spiders in those jurisdictions?
2    A.  It would require looking into each one.
3    Q.  Oh, you would need to look at each one as
4 to why that occurred?
5    A.  Yeah.
6    Q.  He didn't know?
7    A.  No.
8    Q.  Did he have any details on Idaho beyond
9 what you had testified to?
10    A.  He just said it stopped working.
11    Q.  Thank you for reaching out to Jimmy.  I
12 appreciate it.
13    A.  You bet.
14    Q.  All right.  So back to some questions to
15 just hopefully close the loop on this area of
16 questioning and then move on.
17       We've obviously talked that it's my
18 understanding that "submitted" to you means
19 "filed."  Fair?
20    A.  Correct.  Fair.
21    Q.  So when you say "submitted," is that
22 submission to the e-filing vendor?
23    A.  Yes.
24       MR. FETTERLY:  Objection; vague and
25 ambiguous, overbroad, lacks foundation.

Page 142

1    THE WITNESS:  And can I complete that
2 answer?
3    Q.  (BY MS. DUKE)  Sure.
4    A.  Yeah, it's submission to the vendor that
5 is acting for -- that is providing the e-file
6 service to Idaho.
7    Q.  Right.  And in this case, that's Tyler
8 E-File & Serve?
9    A.  Correct.
10    Q.  So "submission" and, therefore, "filing"
11 to you means submission of a complaint through
12 Tyler's e-filing system?
13    A.  To the court.
14    Q.  And then what do you call the transfer of
15 that complaint from Tyler's File & Serve to the
16 court's case management system?
17    A.  Well, I don't think it's from Tyler's
18 File & Serve.  I think Tyler File & Serve, that's
19 the vehicle for which the complaint goes into the
20 e-file manager.  And then it goes into queues that
21 the deputy clerks have access to.  They then
22 process the cases.  And when they accept them, the
23 cases move into the case management system.
24    Q.  So it's your understanding that once
25 something is submitted to Tyler E-File & Serve,

Page 143

1 that once it goes through the clerk's process and
2 is accepted, it then transitions into the court's
3 case management system?
4    A.  That's correct.
5    Q.  Do you know whether when a complaint in
6 Idaho is submitted to Tyler's File & Serve,
7 whether a court case number is opened at that
8 point?
9       MR. FETTERLY:  Objection; vague and
10 ambiguous, overbroad, lacks foundation, calls for
11 speculation.
12       THE WITNESS:  I don't believe it does.  I
13 think it has a case ID number.
14    Q.  (BY MS. DUKE)  What is your understanding
15 of when a court action will actually be opened and
16 a case number provided when a complaint is
17 submitted to Tyler File & Serve?
18       MR. FETTERLY:  Same objections.
19       THE WITNESS:  I'm not agreeing with
20 "opened" there.  I'm happy to tell you when I
21 think it gets a case number.  Is that okay?
22    Q.  (BY MS. DUKE)  Sure.
23    A.  Okay.  When it's accepted.
24    Q.  And when you say "when it's accepted,"
25 that means accepted by the court clerk and

Page 144

1 transferred to the court's case management system?
2    A.  Yeah.  Another way to put it is when the
3 processing is completed.  Then there's a permanent
4 case number assigned that's within the Tyler
5 system.
6       And if I can just add to that, within the
7 Tyler system as it's set up in Idaho.  In other
8 words, Tyler also runs Auto-Accept systems where
9 the case number, the permanent case number is
10 assigned automatically upon receipt.
11    Q.  And that's not what is happening in
12 Idaho, correct, at this time?
13    A.  That's correct.
14    Q.  And so when you say submit equals filed,
15 are you essentially saying that's Auto-Accept?  Or
16 is that something different?
17    A.  No.  I'm saying it is filed at that
18 point.  That's all I'm saying.
19    Q.  And under an Auto-Accept, if that were
20 used, a case file number would actually be
21 generated at the time of submission to Tyler
22 File & Serve, correct?
23    A.  A permanent case number is the word I'm
24 using.  I think that's the correct word.
25    Q.  And is that correct?

Page 145

37 (Pages 142 - 145)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 A. Yes.<br>2 Q. Now, in Idaho, with respect to the spider<br>3 or bot that CNS was using and has stopped using,<br>4 did you have to log into iCourt through<br>5 Ms. Valenti's account in order to do so? Or did<br>6 CNS have some other access to the iCourt portal<br>7 other than through her account?<br>8 A. I don't know. If the docket is public<br>9 and online, then it would be the spider<br>10 or -- would simply go to the court's site. If<br>11 it's only through registration, then I believe it<br>12 would have to go through Ms. Valenti's<br>13 registration.<br>14 So I don't know which it was.<br>15 Q. It varies on whatever circumstance you<br>16 just described?<br>17 A. Yeah. It follows the human. So if the<br>18 human needs to register, like with PACER for<br>19 example --<br>20 Q. Sure.<br>21 A. -- then it would follow that path.<br>22 If a human does not need to register but<br>23 simply goes to an open court site with the docket<br>24 listed, which is common, then it would follow that<br>25 path.<br><div align="right">Page 146</div> | 1 Q. Now, you've talked about -- when you<br>2 talked about your definition of submit equals<br>3 filed, you've referenced a national standard that<br>4 has led you to that conclusion.<br>5 What is the factual basis or<br>6 underpinnings of what you believe to be that<br>7 national standard?<br>8 A. Well, we report on cases filed through<br>9 paper and through e-filing. And the date of<br>10 filing is always the date of receipt in all those<br>11 states.<br>12 Q. Which courts are you referencing?<br>13 A. All the courts we're covering. So it<br>14 would be all 52 states -- sorry, all 50 states and<br>15 all federal courts.<br>16 Q. And CNS covers all 50 states?<br>17 A. Yes. Not statewide. As I was saying<br>18 earlier, there's a real mix. It's just an amazing<br>19 geography out there as people try to switch over<br>20 to e-filing.<br>21 But we have coverage within each state.<br>22 It doesn't necessarily cover the whole state.<br>23 Q. You mentioned California and there being<br>24 a number of different e-filing systems that even<br>25 just the state itself uses, unlike just one<br><div align="right">Page 148</div> |
| 1 Q. So the bot or spider is obtaining access<br>2 to the iCourt portal however Ms. Valenti would<br>3 access the portal?<br>4 A. I think that's fair.<br>5 MR. FETTERLY: Objection; vague and<br>6 ambiguous, overbroad.<br>7 THE WITNESS: Yeah, you know, I don't<br>8 know for sure. But that's what I think would<br>9 happen.<br>10 Q. (BY MS. DUKE) Well, you were saying it<br>11 follows the person, so I was just following up<br>12 saying if that's the case, then it would follow<br>13 Ms. Valenti and --<br>14 A. I'd agree. I'd agree. But that, I don't<br>15 know for sure. Based on that basic principle,<br>16 yes, you're right.<br>17 Q. Now, you're aware CNS has not disclosed<br>18 any expert witnesses in this case; is that<br>19 correct?<br>20 A. I'm going to leave that to -- I'm not<br>21 sure. I think we were considering a rebuttal<br>22 witness, but I'm not sure of that matter.<br>23 Q. Are you aware of CNS disclosing any<br>24 expert witnesses in this case?<br>25 A. No.<br><div align="right">Page 147</div> | 1 uniform e-filing system.<br>2 A. Correct.<br>3 Q. And it sounds like Georgia is the same<br>4 way.<br>5 A. Correct.<br>6 Q. In those instances, whenever you're<br>7 talking about the word "submitted" or the word<br>8 "filed" in all of these contexts, are you saying<br>9 that they all mean the same thing, "submitted"<br>10 equals "filed"?<br>11 A. Yes.<br>12 Q. And that's the case regardless of the<br>13 e-file and serve vendor?<br>14 A. Yes.<br>15 Q. And that's the case regardless of the<br>16 case management system that's being used --<br>17 A. Absolutely.<br>18 Q. -- at the court?<br>19 A. Yes.<br>20 MS. DUKE: Sara is going to run and grab<br>21 her child, so she'll be hopping on -- you'll see<br>22 her pop on through the thing. That's why it's<br>23 happening that way through the Zoom.<br>24 Q. (BY MS. DUKE) All right. So let's turn<br>25 to -- does CNS have a process for monitoring<br><div align="right">Page 149</div> |

<div align="right">38 (Pages 146 - 149)</div>

(41 of 297), Page 41 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 41 of 297
Case 1:21-cv-00305-DCN   Document 69-7   Filed 12/15/22   Page 40 of 118
William L Girdner November 9, 2022

1  whether civil complaints available in Tyler's
2  press review queue are ultimately accepted or
3  rejected or transferred to the court's case
4  management system?
5     A.  We have a process for confirming the case
6  numbers.
7     Q.  What is that process?
8     A.  Well, when we're reporting, for example,
9  in a press review queue, as I was saying, there's
10 a case ID number.  So we report with the case ID
11 number.
12        And then for our archives, a reporter
13 goes back and corrects those case ID numbers with
14 the permanent case number.
15    Q.  Has there ever been a time when -- to
16 your knowledge when CNS has reported on a civil
17 complaint that was available in Tyler's press
18 review queue but had been rejected and not refiled
19 or reserved?
20    A.  I've thought about this.  If I can answer
21 it this way:  I don't agree with the term
22 "rejected."
23        I will answer your question.  There are
24 instances where a deputy clerk returns a filing to
25 the filer and says, "You need to fix" some things.

Page 150

1  File & Serve?
2     A.  I believe the harm is to not only us, but
3  the constitution and the openness of the courts.
4  That's one reason I have dedicated so much time
5  and money to this.
6        I think transparency in the courts is
7  really important, a hallmark of our democracy.
8        So when I feel that that is being
9  smothered or threatened with delay, with devaluing
10 of the news of the courts, that is the harm that I
11 see.  And I think that ultimately harms the
12 constitution as well.
13    Q.  And I think I know what your answer is
14 going to be here, but I'll ask the question
15 anyway.
16    A.  All right.
17    Q.  What length of time would pass or need to
18 pass for you to believe there is this harm you've
19 just described in Idaho?
20    A.  You asked the question earlier, and I
21 said there's no magic number.  That's correct.  I
22 said we need to go through the steps, right?
23 Right of access attaches on receipt.
24        Do you delay?  Yes, you do.
25        Do you have an overriding reason?

Page 152

1  That's true in federal court.  It's true in state
2  court.
3        There are very rare instances when the
4  filer does not either fix the case or refile it.
5  It does happen.
6     Q.  And does CNS do anything about that in
7  that instance when the document is not
8  resubmitted?  Is there anything that Tyler does to
9  correct the record or to modify its report that
10 went out for new case filings?
11    A.  Not Tyler.  I think you --
12    Q.  Or not Tyler, CNS.
13    A.  Yes, we take it out of our archives.  We
14 take that summary, entry, the whole thing out of
15 the archives.
16    Q.  Is there any report that's made to the
17 subscribers as to that, you know --
18    A.  No.  I can answer your question.
19    Q.  Sure.
20    A.  No.  It's very rare, and the answer is
21 no.
22    Q.  All right.  Is there any harm that CNS is
23 alleging it has experienced due to the delays it
24 alleges are occurring in its access to civil
25 complaints that are submitted to Tyler

Page 151

1        Do you have a less restrictive
2  alternative?
3        That's how I would answer that question.
4     Q.  And you participated in answering
5  discovery in this case, correct?
6     A.  Yes.
7     Q.  And you recall providing up to a day or
8  so as your response for when you believe, you
9  know, you're still within a time frame where
10 there's not this harm that you've described?
11    A.  Yeah, I -- I don't know if -- anyway, the
12 answer is a practical one in that I do not think I
13 would challenge a court if that was the case.
14 It's just not worth it I think is the way to put
15 it.  It's such an enormous expense and effort.  If
16 you look at this week alone, the amount of expense
17 and effort that's entailed.
18        So I do not undertake these cases
19 lightly.  If a court is providing access to us by
20 the end of the day, I see no reason to challenge
21 it.
22    Q.  I think we marked these, CNS's responses
23 from today.
24        MS. DUKE:  What's our next number, Amy?
25        THE REPORTER:  28.

Page 153

39 (Pages 150 - 153)

1    (Deposition Exhibit No. 28 was marked.)
2    Q.  (BY MS. DUKE)  Let me show you
3 Exhibit 28.  And these are the responses that we
4 were provided today.
5       Can you see that okay?
6    A.  Yeah.  Can you make it just a little
7 bigger?
8    Q.  You bet.  One moment, I'll just shift it
9 over here.
10      All right.  How about that?
11   A.  Better.  There.  Okay.
12   Q.  So when I look to this, this is where I'm
13 talking about the answer that you just provided
14 today.
15   A.  Yeah.
16   Q.  Related to -- you'll see here where it
17 says -- where are you?  Yeah.
18      "Subject to and without waiving the
19 objections, Courthouse News typically defines
20 'undelayed access' to new public civil complaints
21 to mean access shortly after the court receives
22 the complaint.  Courthouse News considers access
23 to new civil complaints delayed when a court
24 restricts access and does not make it available to
25 the press until some later point in time,

Page 154

1    Q.  When do you believe, as you've testified
2 to earlier, that news becomes stale?
3    A.  Overnight.  And let me add to that.
4       Overnight is the traditional measure and
5 reality measure, right?  We look at the news at
6 night.  We watch TV.  We read the paper in the
7 early morning.  We look at late editions in the
8 evening, listen to the radio.  So news does have a
9 daily cycle.
10      However, in the modern internet age, the
11 news cycle has been abbreviated, I have to say.
12 So even two hours or four hours later is pretty
13 late on news.
14   Q.  Your subscribers -- what are you trying
15 to provide your subscribers of the Big Sky Report
16 when they sign up for your service?
17   A.  A window into the court, into its public
18 filings and to the -- let me just say this again.
19      The journal -- I mean, lawyers such as
20 the lawyers in your office, work at the
21 courthouse.  I think there's a great deal of
22 interest in what happens at the courthouse.  Not
23 only what affects your clients, but also what your
24 competitors are doing, what your old friends from
25 law school are doing.

Page 156

1 typically one or more days after receipt."
2       Is that a fair description --
3    A.  It is.
4    Q.  -- of Courthouse News's view on delay?
5    A.  I don't think so.  It's what I said
6 earlier just now, which is that in practical
7 terms, we're not going to challenge a court that
8 delays -- that provides access on the day of
9 filing.
10      But under the analysis that I've talked
11 about, which I think is the correct analysis, any
12 delay beyond receipt needs to be justified.  And
13 if it can be, fine.
14   Q.  All right.  Thank you for that.
15   A.  Yeah, you bet.
16   Q.  With what you've just said, why is that
17 your litmus test, or whatever word you want to
18 use?  Why is that your guide that you'll use as to
19 whether or not to pursue any type of alleged
20 violation?
21   A.  We have to make a selection, right?  I
22 mean, like I said, the investment is enormous in
23 this litigation.  So I am going to challenge a
24 court where the delays are longer than a day
25 because of the amount of investment.

Page 155

1       I find the reports quite fascinating.
2 Obviously there's a lot of run-of-the-mill stuff.
3    Q.  Sure.
4    A.  But as you noticed, the actions by the
5 attorney general were quite interesting.  And so
6 that -- the interest of lawyers is quite varied,
7 but it is deep, if I can answer it that way.
8    Q.  And when it comes to the Big Sky Report
9 and what you're wanting subscribers like my firm
10 and others to have, as I understand it, it's an
11 access into what's happening in the court system?
12   A.  Yes.  That was the inspiration for
13 Courthouse News to begin with.  I was looking at
14 stacks of paper filings in the Central District of
15 California, the U.S. Central District.
16      And I looked at that and I thought,
17 "There's a lot of stuff in here that's interesting
18 that a lot of reporters just blow right past."
19      So, yes, that's exactly right.
20   Q.  And have you had any discussions or
21 internal meetings or -- you know, you are the
22 boss, so any musings as to whether you're going to
23 start, you know, having your reporters check for
24 filings every day including holidays and weekends?
25   A.  No.  Let me approach this from a little

Page 157

40 (Pages 154 - 157)

(43 of 297), Page 43 of 297 Case 24-6697, 03/06/2025, DktEntry 19.9, Page 43 of 297
Case 1:21-cv-00305-DCN Document 66-7 Filed 12/15/22 Page 42 of 118
William L Girdner November 9, 2022

1 further back.
2      In other words, because e-filing has
3 opened up a 24/7 window, filing window -- and, for
4 example, in federal courts, we see those cases
5 when they're filed on the weekends. So we have
6 made arrangements, I think you'd call it, or
7 arranged for coverage, for example, of -- well,
8 East and West Coast federal court cases that are
9 filed after the reports are published.
10 I can't say in advance whether we would
11 do that with the Idaho state courts. I'm not
12 sure. Because -- you know, there's a balance,
13 right?
14      How much is filed after hours?
15      What is the nature of litigation?
16      And how much does it cost to pay a
17 reporter to monitor the court there?
18      "Musings" is the word that Judge Rice
19 used when she came on the bench, in ruling on her
20 case. That case is stuck in my mind.
21 Q. It's a good word.
22 A. Yep.
23 Q. How does CNS define what "press" is?
24 What is press at CNS?
25 A. Yeah, I saw that on the topics. It's

Page 158

1 institutions within the state will keep a list of
2 media.
3 Q. Are you aware of the state of Idaho doing
4 that?
5 A. No. In other words -- sorry. I just
6 said the state of Idaho. I'm not aware the state
7 of Idaho does. Whether individual institutions
8 such as the U.S. Attorney in Idaho does, I don't
9 know.
10 Q. And so in the terms of what we're talking
11 about here with the First Amendment, is this a
12 press issue, a public issue, or both?
13 A. I would say it's both.
14 Q. And explain why.
15 A. Yeah, we as reporters stand in the shoes
16 of the public. I just believe that. We represent
17 the public. But I don't put the press ahead of
18 the public or above the public.
19      I think, you know, the courts are pretty
20 interesting places. Just give me a moment. It
21 serves the court and it serves our democracy if
22 the courts are better understood.
23 Q. Is CNS, in this lawsuit, asserting that
24 immediate access to newly filed -- strike that.
25      Is CNS, in this lawsuit, asserting that

Page 160

1 kind of a tough one these days. But two-part
2 definition. One is in general, a person who is
3 reporting on current events to the public through
4 whatever means.
5      But there's also a practical side to it,
6 which is that most court public information
7 officers, for example, or as we talked about, the
8 U.S. attorney general, will have a press list.
9 There's a list of media members that they want to
10 send out announcements to.
11      So it's -- there is no one clear register
12 or index of who a member of the media is. It's
13 pretty broad.
14 Q. Do you know if Idaho has any type of
15 definition of the press in Idaho?
16 A. I don't think it does.
17 Q. Do you know if Idaho has any type of list
18 like what you're talking about as to members of
19 the press that would receive certain
20 announcements?
21 A. Right. I heard you ask Cathy that. I've
22 never heard of a state keeping such a list
23 of -- I'm not saying it doesn't happen, but I've
24 never encountered it.
25      What I have encountered is individual

Page 159

1 complaints that are submitted to Tyler in File &
2 Serve, the only way for the Idaho courts to
3 satisfy the First Amendment would be to make those
4 immediately available?
5      MR. FETTERLY: Objection. It's vague and
6 ambiguous, overbroad.
7      THE WITNESS: We have never tried to tell
8 a court how to provide access. And I would not
9 presume to.
10      What we will say is that if you're
11 holding up access beyond the point of receipt, you
12 need to have a pretty darn good reason and no
13 other alternative.
14 Q. (BY MS. DUKE) Have you learned in the
15 cases you've had across the country whether there
16 are, in fact, pretty darn good reasons or another
17 reasonable alternative?
18 A. Well, other reasonable alternatives, in
19 my view, pretty easy, yes. There are many
20 reasonable alternatives -- or less restrictive, I
21 think, are the words used.
22      We were going through this today in
23 our -- in the deposition about California. And I
24 was saying then, I'll say now, the way in
25 which -- the different ways in which those courts

Page 161

41 (Pages 158 - 161)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 are providing access on receipt is -- I use the<br>2 word "myriad," and it is truly myriad. None of<br>3 them are quite identical, you know. I guess the<br>4 Tyler press queues are all pretty similar, but<br>5 even then there's a few little variations.<br>6    Q. What about pretty darn good reasons for<br>7 not immediate receipt? Have you heard of any of<br>8 those?<br>9    A. Again, I'm going to step back, and I'll<br>10 do my best to drill down.<br>11    When I write my letters asking for<br>12 access, I always acknowledge the importance of<br>13 what the clerks do. I think it's very important<br>14 to docket and keep the court in good order. I<br>15 agree with that.<br>16    I'm just saying we're not in conflict.<br>17 We can both do our jobs. We can report on the<br>18 court and the deputy clerks and court officials<br>19 can do their job, which is an important one,<br>20 absolutely.<br>21    Q. So you would agree the courts have an<br>22 important job to do?<br>23    A. Yes, I would.<br>24    Q. And that the court clerks have an<br>25 important job to do?<br><div align="right">Page 162</div> | 1    A. I don't quite know what that means.<br>2 Yeah, I don't know.<br>3    I think it's important that the system<br>4 has integrity. I think the courts that provide<br>5 same day -- I'm sorry, that provide access on<br>6 receipt have integrity. It's been proved<br>7 throughout the U.S., including the court we're in,<br>8 in the U.S. District Court in Oregon.<br>9    The clerks, of course, are a part of that<br>10 institution and help support its strength as an<br>11 institution.<br>12    Q. And so what I was asking is that<br>13 certainly court clerks are a part of upholding the<br>14 strength of the judicial system.<br>15    A. Oh, yes, indeed.<br>16    Q. And part of what they're charged with is<br>17 to ensure that certain documents are included in<br>18 court files.<br>19    MR. FETTERLY: Objection; vague and<br>20 ambiguous, overbroad, lacks foundation.<br>21    THE WITNESS: They're charged with<br>22 putting the -- including the document -- I'm<br>23 sorry. Maintaining a case management system and<br>24 creating a docket is how I would put it, in a very<br>25 old-fashioned way.<br><div align="right">Page 164</div> |
| 1    A. Absolutely.<br>2    Q. And what do you believe is the important<br>3 job that the Idaho clerks have to do in our state<br>4 court system?<br>5    A. Well, as I've just said, they keep the<br>6 courts -- they keep the business of the courts in<br>7 order, in regular order. They keep track of<br>8 things.<br>9    Q. And I know when we were talking earlier<br>10 about the importance of reporting on what's going<br>11 on with the courts and whatnot, and I know that<br>12 you were getting a little choked up.<br>13    A. Yeah.<br>14    Q. And this is probably not a bad time in<br>15 our lives to all be a little choked up about<br>16 what's happened to the country in the last four<br>17 years.<br>18    A. Absolutely.<br>19    Q. And I'm assuming that the integrity of<br>20 the judicial system is of utmost importance to you<br>21 as a member of the press?<br>22    A. Of course.<br>23    Q. And I'm assuming that you appreciate that<br>24 the court clerks are a part of upholding the<br>25 integrity of the judicial system in Idaho?<br><div align="right">Page 163</div> | 1    Q. (BY MS. DUKE) Sure. And that's an<br>2 important function of their jobs is to maintain a<br>3 case management system and create a docketing for<br>4 each case?<br>5    A. Yes, indeed.<br>6    Q. And so then obviously preserve those<br>7 records and keep those records undisturbed, I<br>8 guess, or --<br>9    A. Safe and intact.<br>10    Q. Sure.<br>11    A. Yeah. My point all along is we can do<br>12 it. We can both do our jobs and not threaten each<br>13 other.<br>14    Q. If a -- and that's what I want to drill<br>15 down into a little bit. My issue is if -- you<br>16 know, in trying to let you both do your jobs, why<br>17 is a clerk's confirmation of a few items before<br>18 accepting the transfer of a complaint from the<br>19 file and serve to the case management system<br>20 somehow contradictory to your goals to provide,<br>21 you know, information of what's going on in the<br>22 court system?<br>23    MR. FETTERLY: Objection; vague and<br>24 ambiguous, overbroad, lacks foundation.<br>25    You may answer.<br><div align="right">Page 165</div> |

<div align="right">42 (Pages 162 - 165)</div>

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

William L Girdner November 9, 2022

| | |
|---|---|
| 1      THE WITNESS: It's a question of timing. | 1   a declaration, I'm not sure. But in our Eighth |
| 2   If we're able to see the cases at the same time | 2   Circuit arguments, Judge Bobby Shepherd |
| 3   they're working on them, in other words, after | 3   said -- because he was a practitioner. And he |
| 4   they're received, then there's no conflict. They | 4   said he remembers when somebody brought a case |
| 5   can do their -- I mean, they do their jobs anyway. | 5   into the courthouse, it crossed the counter, and |
| 6   I'm saying there's no need for a conflict. | 6   it was public. People could walk in and look at |
| 7      And I think you're asking about, well, | 7   it. And that's exactly right. |
| 8   what's -- essentially what's the big deal of | 8      And then the docketing took place, |
| 9   waiting, maybe, if I can phrase it that way. And | 9   afterwards. |
| 10   it's time. It's the passage of time. That's the | 10   Q.   Well, and so that's what maybe we're |
| 11   problem. | 11   getting a little hung up on that word, then. |
| 12   Q.   (BY MS. DUKE) And that's the passage of | 12      And so what to you is docketing, then, in |
| 13   time in the state of Idaho from when it's | 13   state of Idaho? |
| 14   submitted to Tyler File & Serve and then | 14   A.   Processing. |
| 15   transferred to the case management system and | 15      MR. FETTERLY: Objection; vague and |
| 16   filed? | 16   ambiguous, overbroad as to time. |
| 17   A.   I would put it until when the processing | 17   Q.   (BY MS. DUKE) So -- and this is where in |
| 18   is completed, that passage of time. So from the | 18   the old days, like the example I gave when I was a |
| 19   time of submission to the completion of | 19   runner, it only passed the counter of the court |
| 20   processing. | 20   once the court clerk looked and said, "Yep, you're |
| 21   Q.   And you understand the completion of the | 21   in the right place, Ms. Duke. You handed me the |
| 22   process is when it's filed and docketed into the | 22   right stuff. You have the signatures you need. |
| 23   case management system? | 23   You have the filing fee you need. Fine. In it |
| 24   A.   I'm not agreeing with "filed" because | 24   goes." |
| 25   we've discussed this quite a bit. | 25      And they would stamp it, take it, and |
| Page 166 | Page 168 |

| | |
|---|---|
| 1      But I'm agreeing with when it's | 1   then I would hand them my next document in a |
| 2   transferred into the case management system. | 2   different case, or leave if I didn't have any |
| 3   Q.   How is it different when I looked | 3   others. |
| 4   to -- because I asked Ms. Valenti this, and I | 4   A.   Sure. So anticipating where you're |
| 5   asked you this, which is of course we were not | 5   going, the interface for the e-filer does all that |
| 6   going to, in the olden days, ask the runners, | 6   and more. Requires payment. You have to fill in |
| 7   "Hey, what's in your hand? What are you about to | 7   the parties, the nature of the case, attach your |
| 8   file?" | 8   PDF, and they say, "Pay." |
| 9      Why under the e-filing system is it now | 9   Q.   But do you know when the courts actually |
| 10   okay for you to want those documents before | 10   receive the money that has been placed to Tyler's |
| 11   they've been accepted and entered into the court's | 11   File & Serve? |
| 12   management system? | 12   A.   You know, it's interesting. That's a |
| 13   A.   Yeah, accepted, I think, on the clerk's | 13   policy issue. Because some courts, like Florida |
| 14   side or on the e-filer -- yeah, there's different | 14   courts are very money oriented. And they take the |
| 15   words. I've heard docket -- docketing called | 15   money right away at submission. So it's a policy |
| 16   "creation," okay? Some of the clerks are in | 16   choice within the courts. Because they want the |
| 17   charge of creation. But I would call it a docket, | 17   float, you know. |
| 18   right? | 18   Q.   They take it right away from Tyler |
| 19      And in the past, what you call | 19   File & Serve even though it hasn't been |
| 20   "acceptance" is -- I would call "docket." And in | 20   transferred? |
| 21   the past, journalists had access to the new | 21   A.   Sorry I interrupted you. |
| 22   complaints when they crossed the counter before | 22      No. They're a Granicus court. And they |
| 23   they were docketed. And really, that's what I'm | 23   take the money and put it in the bank as soon as |
| 24   asking for here. | 24   the filing is submitted so they can get the |
| 25      And I think I said something, possibly in | 25   interest. |
| Page 167 | Page 169 |

43 (Pages 166 - 169)

(46 of 297), Page 46 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 46 of 297
Case 1:21-cv-00354-DCN Document 60-7 Filed 12/15/22 Page 45 of 118
William L Girdner November 9, 2022

Page 170

1    Q.  Right.  But my question was related to
2  Idaho and Tyler.
3    A.  Fair enough.
4    Q.  Do you know whether Idaho's courts -- and
5  I should have limited it to that because in all
6  fairness, I said the courts.  I meant the Idaho
7  courts.
8        So do you know when the Idaho courts
9  actually receive the money that has been submitted
10 by the person who wants the document filed -- do
11 you know when Idaho's courts actually get that
12 money?
13   A.  I don't know for Idaho specifically.
14       Let me put it this way:  I believe I
15 know the usual pattern, but there's variations.
16 So maybe I'll just say that.
17       I actually don't know because there are
18 differences.  Some people take it right away; some
19 people take it later.
20   Q.  Sure.
21   A.  In other words, some people settle later.
22 So the filer puts in a credit card number and the
23 amount and then file -- and then submit it.
24 Right?
25       So then the -- in the case, in some

Page 171

1  cases, that settlement is made where you grab the
2  money from the credit card company right away.
3        In other courts, it's at the point of
4  where the case goes into the e-file -- the case
5  management systems.
6    Q.  And in Idaho, you just don't know when
7  the money changes hands; is that fair?
8    A.  Yeah.  One or the other, yeah.
9    Q.  So we talked to Ms. Valenti -- and I can
10 pull up her declaration, so just give me one
11 moment.
12       As you know, we chatted with her about
13 her declaration and the spreadsheet that she was
14 using.
15   A.  Yep.
16   Q.  Let's get there.
17   A.  I'm going to close the door to the
18 office.
19   Q.  No problem.
20       MR. FETTERLY:  And, Keely, while you're
21 doing that, I need to step away for just one
22 minute.  I don't think we need to go take a break.
23       MS. DUKE:  No problem.
24       MR. FETTERLY:  Give me one minute.  I'll
25 be right back.

Page 172

1        MS. DUKE:  No problem.  I'll just ask all
2  the case-cracking questions right now.  Just
3  kidding.
4        MR. FETTERLY:  Bill, I instruct you not
5  to answer until I return.
6        MS. DUKE:  You know I'm joking.  I'll get
7  some hot water.  How does that sound?
8        MR. FETTERLY:  Thank you.  I appreciate
9  that.
10       (Brief pause in the proceedings.)
11       MS. DUKE:  Perfect.  We can go back on
12 the record.
13       THE REPORTER:  We weren't off the video,
14 Keely, so go ahead.
15       THE VIDEOGRAPHER:  We never went off the
16 record.
17       MS. DUKE:  Oh, I'm sorry.  I feel
18 terrible you guys were having to sit there.  Sorry
19 about that.  I should have said "Off the record"
20 real quick.
21       THE REPORTER:  No problem.
22       MS. DUKE:  Okay.  Well, we'll forge on
23 here.
24   Q.  (BY MS. DUKE)  So let me pull up
25 Ms. Valenti's declaration we talked about

Page 173

1  yesterday.
2        All right.  I'm going to pull up
3  Exhibit 22, and I'll make it viewable here for
4  you, Mr. Girdner.
5    A.  Thank you.
6    Q.  Give me one moment.  Okay.  Can you see
7  that okay?
8    A.  Yeah.
9    Q.  Okay.  This was the declaration that she
10 submitted in support of the preliminary
11 injunction.
12   A.  Okay.
13   Q.  And we had talked with her in her
14 deposition about this chart.  And I'll blow that
15 up here.
16       Okay.  So we had chatted with her about
17 this.  And I want to talk to you about it.
18       Do you have an understanding of who
19 created this spreadsheet for Ms. Valenti to use?
20   A.  I do.
21   Q.  And who did?
22   A.  Me and Jimmy.
23   Q.  When did you first put this together for
24 tracking?
25   A.  This is a model we use for tracking.

44 (Pages 170 - 173)

William L Girdner November 9, 2022

1 We've had it five, six years, probably longer.
2    Q. A model that's used regardless of the
3 jurisdiction?
4    A. Yeah.
5    Q. This was just one provided to Ms. Valenti
6 because Idaho came on your radar?
7    A. A form, I would call it, for tracking.
8    Q. A form for tracking?
9    A. Yeah.
10    Q. And this form was provided to Ms. Valenti
11 to start tracking certain items that you included
12 on this form?
13    A. Yeah. I mean, she's meant to track all
14 general civil filings, I believe, all general
15 civil complaints. That's pretty broad, but
16 it's -- yeah, anyway, yes.
17    Q. Who came up -- if we look at the columns,
18 it says "Date," "File," "Case Number," "Nature of
19 Case," "Date Docket Online," "Date Available,"
20 "Lawyer Filed," "Which Court," and "Notes," and
21 I'll stop there.
22    Who created those columns?
23    A. I'd say I -- I'm willing to take
24 responsibility for it. I approved it, and I
25 probably wrote some of the words.

Page 174

1 would lead you to feel that there's some
2 unreasonable delay?
3    A. No, I think we would. Those are next
4 day, I believe. One-day delay. Do you see the
5 column?
6    Q. Sure.
7    A. Zero means we saw it on the day of
8 filing. One means one-day delay. And then below
9 that I think it's a three. I can't see very well.
10 But red is past one day.
11    Q. And if I look at those -- and I can take
12 that third case down -- it says there was a
13 one-day delay by date in calendar days and by
14 court days, so it must have not gone over a
15 weekend. I'm assuming that's kind of what we're
16 talking about there.
17    A. Yeah. The weekends will change the
18 color, if you will, of Friday filings, depending
19 on whether they use calendar days or court days.
20    Q. If I use calendar days and I have a
21 filing that's Friday at, let's say, 4:45, then I'm
22 going to have a delay, per this chart, of what,
23 two or three calendar days?
24    A. I think it's three, until Monday.
25    Q. Okay.

Page 176

1    Q. And then she said there were some
2 calculations that were built into it?
3    A. Right. Yes.
4    Q. That would then provide the delay
5 and -- delay by date and calendar days and delay
6 by court days. Is that also you?
7    A. No. Those are spreadsheet formulas. I
8 don't know how to do that. Jimmy does that.
9    Q. But did you provide the parameters, "I
10 want calendar days, and I also want court days"?
11    A. Yes.
12    Q. Now, as we talked earlier about court
13 days, and when -- I don't want to use the wrong
14 word, so obviously correct me if I do.
15    A. Okay.
16    Q. But when the delay becomes such in CNS's
17 mind that there's something that CNS is going to
18 do about it, we've talked about that
19 within-the-day concept. Fair?
20    A. Fair.
21    Q. And so are any of the ones that are in
22 yellow, are those within that time frame that
23 would be -- I don't want to say "acceptable"
24 because I don't think that's what you're
25 necessarily saying, but those are not ones that

Page 175

1    A. Because that's, in fact, when we can see
2 it. It's Monday.
3    Q. Right. And then a delay by court days
4 would be what, one?
5    A. One day. One. A case filed on Friday,
6 seen on Monday, no intervening -- well, there
7 couldn't be a holiday on a Monday --
8    Q. Sure.
9    A. But so, yes, that would be a one-day
10 delay.
11    Q. In the court's assessment of this, is it
12 your position that calendar days should be used
13 rather than court days?
14    A. Yes, it is. However, the percentage
15 of -- the number of cases seen on -- that are
16 delayed in one form or another -- let me see if I
17 can say this.
18    The answer is yes. I think calendar days
19 should be used because time passes in calendar
20 days. And because some -- again, New York.
21 There's this huge argument about, "Oh, my gosh.
22 You expect us to work on weekends?" which is not
23 what we're asking for.
24    But to avoid that kind of dispute, we
25 say, "Look, we can measure either way."

Page 177

45 (Pages 174 - 177)

William L Girdner November 9, 2022

1    Q.   Meaning you take your pick, court, you
2 can do it by court days or by calendar days?
3    A.   No.  I think in the judging or in the --
4 you know, in seeking a determination on the
5 constitutionality of these delays, we give you the
6 alternative, and the judge is the alternative.
7    Q.   Oh, I see.
8    A.   Of measuring it either way.
9    Q.   So --
10   A.   Because the case number -- the percentage
11 of cases seen on the day of filing, they're
12 normally almost zero.  It's usually the same
13 percentage.
14   Q.   So in the context of this case, that
15 would mean, "Judge Nye, we're providing you this
16 spreadsheet.  And it's up to you, Judge, to
17 determine whether you're going to consider
18 calendar days or court days"?
19   A.   No, I don't want to tread on the -- what
20 the lawyers will argue, of course.
21       I am telling you the reality, which is
22 that these are two alternate ways of measuring the
23 delays, but they yield the same result in terms of
24 cases that are delayed.  But -- percentage of
25 cases delayed, shall I say?

Page 178

1 and any delay beyond that needs to be justified.
2 So it's pretty close to what you're saying.
3    Q.   When saying "Date Filed" in that first
4 column, what I understand that to mean is again
5 that fits with your definition of what filed is,
6 and that is the date it was submitted to Tyler
7 File & Serve?
8    A.   Yes.
9    Q.   Is that fair?
10   A.   Yes.  We've gone round and round quite a
11 bit on that.
12   Q.   Right.  I'm just making it clear on this
13 spreadsheet, that's what that means?
14   A.   Yes.
15   Q.   And then the case number is the actual
16 case number assigned by the court to the case?
17   A.   Yeah, the permanent case number.
18   Q.   And the nature of the case is just a few
19 words' description of the case, the type of case?
20   A.   Yeah.  I think that would normally be a
21 docket item, right?  The nature of the case, yeah.
22 And I think that's probably on the interface when
23 the filer files the case.  They check off a
24 certain -- it's usually a drop-down menu with
25 certain categories.  And these would come from

Page 180

1    Q.   A third alternate way to, I guess,
2 calculate this alleged delay would be to count
3 court hours versus non-business hours, correct?
4    A.   We would not agree with that.
5    Q.   And why not?
6    A.   The court hours are not the way time
7 passes.  It doesn't matter to most people.  And it
8 doesn't assess -- court hours are not real time.
9 They're the particular hours set by the clerk,
10 which vary.
11       And if I can step back just a bit, we're
12 not asking clerks to docket faster.  We're asking
13 them to just let us see the cases.  So the court
14 hours are a function of the docket.
15   Q.   Well, but that's where the rubber kind of
16 meets the road on this case, which is you are
17 asking and argue to see something that has not yet
18 been filed and entered into the court system,
19 whereas you're saying, "No, when it's submitted to
20 Tyler File & Serve, it should automatically be
21 considered filed and available for us to see."
22   A.   Pretty close.  I mean, I'm saying yes,
23 that is what I've been saying, that when it's
24 submitted, it's filed.  And that if there's
25 delay -- that the right of access attaches then,

Page 179

1 that drop-down menu.
2    Q.   Got it.  And then "Date Docket Online,"
3 tell me what that column represents.
4    A.   So that's when Cathy Valenti can see the
5 docket online.
6    Q.   And do you know what it is she's seeing
7 that encompasses the docket?
8    A.   I think she testified yesterday a docket
9 is plaintiff, defendant, nature of case, case
10 number, filing party or filing lawyer.
11   Q.   And then "Date Available," what's your
12 understanding of that column?
13   A.   When she can see the actual full text,
14 the complaints of.
15   Q.   Meaning the complaint is actually
16 available through the iCourt portal?
17   A.   Correct.  Or available through any means,
18 right?  That's the only means we have.
19   Q.   Got it.  Okay.  But in this instance
20 through the iCourt portal?
21   A.   Yes, indeed.
22   Q.   And then "Lawyer Filed" is just
23 representing whether it is filed by an attorney or
24 pro se, I'm assuming?
25   A.   I think that's -- that is correct.

Page 181

46 (Pages 178 - 181)

William L Girdner November 9, 2022

| | |
|---|---|
| 1    Q. "Which Court" being the county in which | 1 red. So I'm not sure what it means. |
| 2 it's filed, or district? | 2    Q. Right. And then red is three days or |
| 3    A. Yeah. Ada, for example, or -- yeah. | 3 more. |
| 4    Q. And then what was the "Notes" column | 4    A. Apparently, yeah. |
| 5 intended to reference? | 5    Q. Do you know why that was the color coding |
| 6    A. Just anything unusual, like for what | 6 system that CNS has argued before Judge Nye? |
| 7 would be the equivalent of an asterisk. I don't | 7    A. Normally it's just -- you know, as I say, |
| 8 know. Just anything unusual. | 8 Adam designs his spreadsheets a little bit. It's |
| 9    Q. And then we have this column that does | 9 just a way to indicate visually and clearly which |
| 10 not have black over it. And I think that's just a | 10 cases are -- we can see on the day of filing and |
| 11 repeat of the first column brought over to this | 11 which cases are delayed by one day and which cases |
| 12 chart that then calculates either calendar day or | 12 are delayed by more than one day. |
| 13 court delay -- or court delay, alleged delays. | 13      The orange is -- I'm not sure why we're |
| 14    A. I believe that's correct. Yeah, I | 14 using it here. Normally it's just green, yellow, |
| 15 believe that everything along the black line would | 15 and red. |
| 16 be what's there, the form that Cathy's entering | 16    Q. And why even use -- like, assume you're |
| 17 into. And then everything to the right of that is | 17 just using green, yellow, and red in this. |
| 18 a product of the spreadsheet formula. | 18    A. Okay. |
| 19    Q. And the formula that Jimmy created? | 19    Q. Why have yellow in there at all? |
| 20    A. Yeah, correct. | 20    A. It's visual, right? We're calculating |
| 21    Q. Who -- oh, go ahead. | 21 statistics. Statistics are numbers on a piece of |
| 22    A. Well, we have another bureau chief who | 22 paper. The visual gives you a visual impression |
| 23 can also write in this language. And he | 23 of the same numbers. |
| 24 also -- the man's name is Jody. But he has -- he | 24    Q. But is it CNS's position that if it's |
| 25 uses Google spreadsheets and he calculates the | 25 yellow, that still would be something that's |
| Page 182 | Page 184 |

| | |
|---|---|
| 1 formulas on Google spreadsheets. | 1 actionable in the state of Idaho under the First |
| 2      I'm not sure why I'm adding that. I'm | 2 Amendment? |
| 3 trying to say it's not this magic language that | 3    A. You know, according to what we said |
| 4 takes a big specialist. The spreadsheet formulas | 4 earlier, if it's delayed and if there's no |
| 5 are quite commonly known by people working in | 5 justification for it, yes. |
| 6 offices. I don't know. | 6    Q. And are you able to think of any |
| 7    Q. I don't either. I have other people that | 7 justifications that would be reasonable to |
| 8 help me with those things. | 8 consider that would justify the delay? |
| 9    A. Exactly. | 9    A. For example, the computer. For |
| 10    Q. And tell me what -- by providing this to | 10 example -- I'm not sure if this is helping us out |
| 11 Judge Nye -- well, actually before I ask that, let | 11 or not. But in one of our filings, I think it was |
| 12 me first ask, who came up with the color coding of | 12 in Oregon, the federal courts were updating their |
| 13 green, yellow, orange, and red? | 13 software. Okay? So for a day or two, we couldn't |
| 14    A. I did, like a traffic light. | 14 see our own filings online. That's perfectly -- I |
| 15    Q. Okay. And tell me -- I'm assuming green | 15 don't see that as violating the First Amendment. |
| 16 means we don't have an issue with access, timing | 16    Q. Any other justifications that you |
| 17 of access to that? | 17 wouldn't see as violating the First Amendment? |
| 18    A. Yeah. Essentially, yes, it's good | 18    A. You know, the variations in |
| 19 access. | 19 circumstances, I'm honestly not trying to be |
| 20    Q. And yellow means what? | 20 vague, but to try to say this is the full universe |
| 21    A. Delayed for one day. | 21 of things that could go crazy. |
| 22    Q. And orange means what? | 22      I went to the state court in Iowa that |
| 23    A. That's interesting. Apparently -- I'm | 23 was on a little island in a river, and the |
| 24 not sure what the orange means here. It appears | 24 courthouse got flooded. All the records were |
| 25 to be for two days, but normally that would be | 25 flooded. They were still drying them out a year |
| Page 183 | Page 185 |

47 (Pages 182 - 185)

William L Girdner November 9, 2022

1 later. You know, the amount of things that can
2 happen to people and systems is really quite
3 incredible.
4    Q. So the date filed, which we know through
5 your testimony today means the submission date to
6 file and serve in that first column, is that
7 information -- do you know exactly where
8 Ms. Valenti obtains that information to fill into
9 that code?
10    A. I think what she testified -- and I think
11 is correct -- is from the file stamp.
12    Q. All right. And is it your
13 understanding -- you know, I've been produced
14 multiple of these various --
15    A. Yeah.
16    Q. -- charts. I'm assuming your answers
17 would be the same to any of them. I don't need to
18 go through each and every one that we've been
19 provided; is that fair?
20    A. That is fair. My answer would be the
21 same for each of them.
22    Q. Thank you for shortening that up for all
23 of us.
24    A. Yes, indeed.
25    Q. Now, you've mentioned a couple of
Page 186

1    A. So, you know, in -- Tigera is operating
2 in Utah. That's their file system. I think
3 that's the state next door -- yeah, that is the
4 state next door.
5       And then Montana is using -- I can't
6 remember, but it's a really small one, as far as I
7 know. They're national, but as far as I know,
8 they don't have offices in Idaho, for example.
9    Q. Now, when we turn to Tyler, you've made
10 some representations that Tyler has provided press
11 review queue at no cost to courts that have
12 requested it.
13       What are you basing that testimony on?
14    A. Okay. Emails from clerks and
15 conversations with clerks in California.
16       Emails from Tyler representatives in
17 Georgia.
18       And then Director Artie Pepin in New
19 Mexico made a report to the supreme court in
20 Idaho -- I mean, sorry, in New Mexico, in which he
21 listed in his report Georgia, Nevada, and I
22 believe California, saying that Tyler was
23 providing the press review queue in those states
24 at no -- I believe he used the words "at no cost."
25    Q. Do you know what it is Tyler provided at
Page 188

1 different courts that have not a Tyler press
2 review queue. They have either generated their
3 own or they're with a different company.
4    A. Correct.
5    Q. Are you aware of what file and serve
6 companies there are available to the Idaho courts
7 in the state of Idaho?
8    A. You're asking me a very broad question,
9 but I'm happy to give you a broad answer. There
10 are a lot of e-file vendors. I can list some for
11 you. There's -- File & Serve Express is a pretty
12 small one.
13       There's Granicus.
14       There's Tigera.
15       Montana -- oh, yeah, Tyler -- not Tyler.
16 Thomson Reuters has developed its own e-filing.
17 And there's, like, ImageSoft.
18       There's -- there are tons of small ones
19 out there too, in addition to all the homegrown.
20    Q. And my question, though, is are you aware
21 of any of those doing business in the state of
22 Idaho at all?
23    A. No. No. They're doing business
24 nationally.
25    Q. Sure.
Page 187

1 no cost in those states?
2    A. Press review queue.
3    Q. Do you know whether that included a
4 subscription for the press review queue?
5    A. Oh, you mean a payment to Tyler?
6    Q. Correct.
7    A. No, I don't think it did.
8    Q. Or what I'm saying is in addition to
9 providing access to it, I'm doing it separately.
10    A. Yeah.
11    Q. Are you aware of whether there's a
12 subscription cost to the Tyler press review queue?
13       MR. FETTERLY: Objection; vague and
14 ambiguous as to --
15       THE WITNESS: Yeah, I want to answer your
16 question. I'm just confused by it. Who is paying
17 the subscription, if I can ask?
18    Q. (BY MS. DUKE) Well, it would be the
19 courts. Are you aware of Tyler telling the
20 courts, "You're going to have to pay a
21 subscription cost to use this in your state"?
22    A. Yes. Subsequently, yes.
23    Q. Okay. And what have you learned in that
24 regard?
25    A. Well, they've set a number of different
Page 189

48 (Pages 186 - 189)

1 fees, all right? So I think at the beginning they
2 were asking for 200,000 a year.
3    Q. When you say "they," you mean Tyler?
4    A. Yeah.
5    Q. Okay. Go ahead.
6    A. They're now settled on a statewide press
7 queue for 108,000. And referring to Pepin again,
8 Director Pepin who said on the witness stand, "I
9 bargain, negotiate with Tyler about everything."
10    So I think that they're on a 108,000 on a
11 statewide basis is the coming-out price, if you
12 know what I mean, the offering price from Tyler,
13 but I believe that -- well, I think that amount
14 would be subject to negotiation.
15    Q. When did you first learn about this
16 108,000?
17    A. It was a contract in -- I'm not sure
18 about the order. Can I give you just a couple
19 instances? There's a -- well, there's a contract
20 for statewide press queue in Texas, which is the
21 home base for Tyler, right? They dominate that
22 state, and that's where they're based, with the
23 director of the office of court administration for
24 108,000. That's a public record in the federal
25 record.

1 asking. What they'll settle for, for example, in
2 negotiating for a statewide contract from -- for
3 the case -- for the E-File & Serve and the case
4 manager system, I don't know if they'd throw that
5 in. That's a pretty common tactic for people
6 trying to sell something.
7    So all I'm saying is I've heard they're
8 asking that, yes.
9    Q. And you don't know whether they would
10 come off that or not in the state of Idaho; is
11 that correct?
12    A. I don't.
13    Q. And so at this point, knowing what you
14 know, you would not represent to Judge Nye that
15 Tyler does not charge any cost for the press
16 review queue, correct?
17    A. I would say they're asking -- my
18 understanding is they're now asking 108,000 a
19 year. Whether you would end up paying that, I
20 don't know.
21    Oh, and I should add that the -- there is
22 an alternative, which is Auto-Accept, which is
23 free.
24    Q. I'm going to talk about Auto-Accept here
25 in a second.

1    Q. But when did you learn of that?
2    A. I'd say four or five months ago, maybe
3 six. That litigation is actually pretty recently,
4 now that I think of it. So two or three months
5 ago.
6    Q. In the last few months?
7    A. Yeah, fair.
8    Q. Was that the first you'd ever learned of
9 the 108,000?
10    A. No, they're -- that fee, I believe that
11 came -- let me just think if it came up in Oregon.
12 I've heard the fee mentioned elsewhere. I can't
13 place it now.
14    My conclusion is that that's their common
15 coming-out price.
16    Q. So when you filed your declaration with
17 the court, that's obviously not information you
18 had at the time?
19    A. I'd have to see what I said, but I said
20 it was offered for free, and that's correct. It
21 was offered for free.
22    Q. And you've now since learned that it is
23 not offered for free?
24    A. You know, as I say, I think
25 that's -- I've learned that's the price they're

1    A. Yeah, okay. All right.
2    Q. Any other court -- you think maybe New
3 Mexico, maybe Oregon -- where you learned about
4 the $108,000 fee? And it sounds like it was even
5 higher at one point, but Tyler came down to, it
6 sounds like, 108,000 as what you're calling it, an
7 opening price.
8    Any other jurisdiction that you've heard
9 that or learned that in?
10    A. The 108,000, no.
11    Q. You certainly have heard it in our case,
12 correct?
13    A. Yes. I think so.
14    Q. In the filings that we provided to
15 Judge Nye?
16    A. Yeah. That sounds right. I'm very
17 familiar with the number, okay? That certainly
18 rings a bell.
19    Q. All right. So then let's turn to
20 Auto-Accept. What is your understanding of
21 Auto-Accept? Is that a separate application or
22 program? Or what is it through Tyler, as you
23 understand it?
24    A. I -- well, again, if I can step back just
25 a bit. And I'll answer your question.

William L Girdner November 9, 2022

| | |
|---|---|
| 1　　The state courts in Vermont switched over | 1 aware those are the expressed concerns. |
| 2 to Auto-Accept from File & Serve within three | 2　　Q.　(BY MS. DUKE)　And would those be |
| 3 weeks.　So I think it's easy to switch over and | 3 concerns that would provide a justification for |
| 4 integrate into the current system in many states, | 4 not doing the press review queue in CNS's view? |
| 5 which is where there's a clerk review first before | 5　　A.　No, because so many other courts -- I |
| 6 the case goes into the case management system. | 6 mean, it's a lot of courts that don't have that |
| 7　　So whether it's a separate application, I | 7 problem that can provide access on receipt. |
| 8 doubt.　I think it's probably a variation on the | 8　　Q.　Any other reason why that wouldn't be a |
| 9 e-file -- on the file and serve is what I suspect. | 9 justification in CNS's mind? |
| 10　　Q.　That's why I'm asking if you know. | 10　　A.　That it's not substantiated, yeah.　It's |
| 11 Obviously don't speculate.　We have Tyler's | 11 a worry, but it's not substantiated. |
| 12 deposition tomorrow.　We're obviously going to ask | 12　　Q.　Anything else? |
| 13 those questions. | 13　　A.　No, that's it. |
| 14　　A.　Yeah. | 14　　Q.　Now, you served some answers to discovery |
| 15　　Q.　But do you know exactly what's entailed | 15 today. |
| 16 in having Auto-Accept be a part of Idaho's system? | 16　　Did you have an opportunity to review |
| 17　　MR. FETTERLY:　Objection; vague and | 17 those before they were provided to us? |
| 18 ambiguous, overbroad, lacks foundation. | 18　　A.　Yes. |
| 19　　THE WITNESS:　I don't know the details. | 19　　Q.　And there was mention in those of a |
| 20 I know it can be done quickly. | 20 conversation that you had with a Washington clerk |
| 21　　Q.　(BY MS. DUKE)　Okay. | 21 about the press review queue. |
| 22　　A.　And that courts such as Las Vegas | 22　　Do you recall that? |
| 23 switched from press queue to an Auto-Accept system | 23　　A.　Yes. |
| 24 without even a request.　But what is required to | 24　　Q.　And I was asking these questions of who |
| 25 do that, I don't know. | 25 you would have talked to clerk-wise, and you said |
| Page 194 | Page 196 |

| | |
|---|---|
| 1　　Q.　And are you aware of any of the state of | 1 New Mexico. |
| 2 Idaho's -- its court system's concerns if | 2　　And then you were also talking about your |
| 3 Auto-Accept were to be used? | 3 knowledge in the Oregon case of there being a |
| 4　　MR. FETTERLY:　Objection; vague and | 4 $108,000 fee. |
| 5 ambiguous, overbroad. | 5　　A.　Right. |
| 6　　You may answer. | 6　　Q.　Do you also recall conversations with the |
| 7　　THE WITNESS:　I've seen the declarations, | 7 Washington clerk about the press review queue? |
| 8 but I don't find them convincing. | 8　　A.　Yes. |
| 9　　Q.　(BY MS. DUKE)　And why not? | 9　　Q.　What do you recall in that regard? |
| 10　　A.　I think the basic argument is that the | 10　　A.　He was willing to provide it.　We had |
| 11 court couldn't have collected its fees, and I | 11 actually agreed on the filing codes. |
| 12 don't think that's correct. | 12　　And then he said Tyler was demanding |
| 13　　Q.　Any other argument you're aware of the | 13 43,000 a year, and he couldn't sell -- Washington |
| 14 state courts making as to the problems it would | 14 is a little crazy in that the state will not |
| 15 face with Auto-Accept? | 15 require lawyers to pay an extra fee, so they don't |
| 16　　A.　No. | 16 have a funding source to pay Tyler. |
| 17　　Q.　What about with press review queue?　Are | 17　　As a result, a small town like Snohomish |
| 18 you aware through any of the filings in this case | 18 County -- small town of Everett, Snohomish County |
| 19 or discovery responses the concerns that the Idaho | 19 north of Seattle, is required to pay for e-filing |
| 20 courts have about initiating a press review queue? | 20 through the city council. |
| 21　　MR. FETTERLY:　Objection; vague and | 21　　And he said the city council would be |
| 22 ambiguous.　 | 22 willing to pay 43,000 a year.　And they're too |
| 23　　You can answer. | 23 small to push back, so he asked me to ask the |
| 24　　THE WITNESS:　It was the subject of a | 24 statewide director to push back. |
| 25 pretty long deposition with Ms. Dvorak.　So I'm | 25　　Q.　And did you? |
| Page 195 | Page 197 |

50 (Pages 194 - 197)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 A. I talked to him. | 1 we got to the 108,000 because you heard they |
| 2 Q. And who did you talk to? | 2 originally charged 200,000 and then you said they |
| 3 A. I don't remember his name. He's | 3 landed on 108,000. |
| 4 retiring. He's the statewide IT director. Keith, | 4 A. I'm not trying to play games with you, |
| 5 first name. Best I can come up with. | 5 but your question was specifically about 108,000, |
| 6 Q. And what did the two of you discuss? | 6 if I knew anybody else charging 108,000. |
| 7 A. Just what the state of e-filing was in | 7 And my answer was 108, no. If you want |
| 8 Washington and general. It was a very informative | 8 to know about the others, that's fine. |
| 9 conversation. | 9 Q. Yeah, I do. I want to know any |
| 10 Q. Fill me in on that conversation. | 10 conversations -- you represented to Judge Nye that |
| 11 A. Sure. Sure. He said that the supreme | 11 Tyler was free of charge, and that is not correct. |
| 12 court and the administrative office of the courts | 12 We all know that now. |
| 13 were not willing to assess a filing fee, which can | 13 So I want to know every communication or |
| 14 be 450 a filing, on the state bar. He didn't say | 14 piece of knowledge you've learned to have you now |
| 15 why. | 15 be informed that Tyler does in fact charge for its |
| 16 And they weren't willing to pay Tyler out | 16 service. |
| 17 of the state judicial budget. And so as a result, | 17 MR. FETTERLY: Objection; misstates prior |
| 18 it's still paper filing. | 18 testimony. |
| 19 Q. Was this with respect to Snohomish | 19 THE WITNESS: It was free of charge when |
| 20 County? | 20 I made that statement. All right? |
| 21 A. No. No. This conversation was broadly | 21 Q. (BY MS. DUKE) I don't think you can say |
| 22 about Washington state. | 22 that. You can say you think it's free of charge, |
| 23 Q. Okay. | 23 but you've done nothing with Tyler to confirm |
| 24 A. And then -- oh, and the possessive nature | 24 that, have you? |
| 25 of the clerks with their documents. That was a | 25 A. I've talked to clerks. |
| Page 198 | Page 200 |
| 1 big part of the discussion was how some clerks | 1 Q. That's not my question. My question is |
| 2 felt they owned the documents and refused to | 2 about Tyler. |
| 3 include their documents in the statewide document | 3 Did you talk to Tyler before submitting |
| 4 system and thus led to its downfall. | 4 your affidavit to Judge Nye saying there was no |
| 5 Q. What do you mean what "led to its | 5 cost -- let me finish. |
| 6 downfall"? | 6 Did you confirm with Tyler that it was |
| 7 A. There is a statewide system, but it's | 7 not going to charge a subscription cost to the |
| 8 very anemic. There are only a few courts that are | 8 State of Idaho for press review queue? |
| 9 going into it for documents. Each court is | 9 MR. FETTERLY: Objection; misstates prior |
| 10 selling its own documents online is what it | 10 testimony. |
| 11 amounts to. And there are a few exceptions, as I | 11 THE WITNESS: I've only talked to anybody |
| 12 mentioned, Tacoma, and I don't -- yeah, I'm sure, | 12 from Tyler three times. I've talked about that. |
| 13 actually, King County is charging for its | 13 I didn't talk to them about their price structure. |
| 14 documents. | 14 Q. (BY MS. DUKE) There we go. Okay. So |
| 15 Q. So I asked you earlier about learning | 15 prior to submitting the declaration that you |
| 16 that Tyler was going to charge, and you mentioned | 16 submitted to Judge Nye back in November of 2021, |
| 17 those two instances. And you did not bring up | 17 you did not call Tyler to ask whether Tyler |
| 18 this instance with Washington until I refreshed | 18 charged anything for the press review queue, |
| 19 your memory of it. | 19 correct? |
| 20 A. No. No. No. | 20 A. I talked to a large number of clerks -- |
| 21 Q. Why is that? | 21 Q. That's not my question. |
| 22 A. Excuse me for interrupting. You | 22 A. Yeah, and you're misrepresenting my |
| 23 mentioned 108,000. You were specific about that. | 23 testimony. |
| 24 That's my recollection. | 24 Q. No, I'm not. |
| 25 Q. I actually said charging a fee, and then | 25 A. I am not lying to a judge. I have never |
| Page 199 | Page 201 |

51 (Pages 198 - 201)

(54 of 297), Page 54 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 54 of 297
Case 1:21-cv-00854-DCN Document 60-7 Filed 12/15/22 Page 53 of 118
William L Girdner November 9, 2022

1 done that. Okay? I have a good faith reason,
2 very substantial reason for believing the press
3 queue was free. Eight different clerks, is my
4 count, saying that, and I have the director from
5 New Mexico. So please do not insinuate that I am
6 being deceptive to a judge, because I am not and I
7 never will be.
8    Q. You are the one that is apparently going
9 to that conclusion yourself. What I asked you,
10 very specifically, was prior to submitting the
11 declaration that you submitted to Judge Nye back
12 in November of 2021, you did not call Tyler to ask
13 whether Tyler charged anything for the press
14 review, correct?
15    A. I'm putting your answer in context.
16    Q. I don't need it in context.
17    A. I want to put it in context. I do have a
18 right to answer this question.
19       MS. DUKE: Mr. Fetterly, have him answer
20 the question or I will stop the deposition. If he
21 needs a break, I'll give him a break, but I am not
22 going to --
23       MR. FETTERLY: Let's take a break. Let's
24 take a break.
25       THE VIDEOGRAPHER: Okay. So the time is
Page 202

1    Q. So there was a report you read that this
2 AO for New Mexico submitted to his supreme court?
3    A. Yes.
4    Q. And that gentleman's name was?
5    A. Artie Pepin, P-e-p-i-n.
6    Q. All right. And did you ever call
7 Mr. Pepin to talk about that?
8    A. No, I read his report. I did not talk to
9 him. Sorry, excuse me. He did testify.
10    Q. Okay. Did you have that question asked
11 of him in his testimony?
12    A. I believe he did testify about that.
13    Q. And what did he testify to?
14    A. That -- what he said in his report, that
15 they had -- that Tyler had given them the press
16 review queue in those three states, in Georgia, in
17 Nevada, and in California, at no cost.
18    Q. But was he asked whether or not -- not
19 giving access to it or not being provided it, but
20 was he asked whether Tyler charged a subscription
21 for such service going forward?
22    A. He said there was no cost. That's the
23 word he used.
24       I'm trying to answer your question, but
25 he said specifically there was no cost.
Page 204

1 3:42 p.m., and we are off the record.
2       (Break taken from 3:42 p.m. to 3:49 p.m.)
3       THE VIDEOGRAPHER: All right. So we are
4 recording. The time is 3:49 p.m., and we are back
5 on the record.
6    Q. (BY MS. DUKE) All right. What I was
7 asking you was very specific, and that is, before
8 submitting the declaration that you submitted to
9 Judge Nye back in November of 2021, did you call
10 anyone at Tyler to ask whether Tyler charged
11 anything for the press review queue?
12    A. No.
13    Q. It is my understanding that the basis for
14 your representation to Judge Nye was your
15 discussion with the New Mexico -- was it court
16 clerk or administrative officer?
17    A. It was a report by him to the supreme
18 court, a memo by the director of the
19 administrative office.
20    Q. Okay.
21    A. That wasn't the only basis. There were a
22 number of --
23    Q. I'm getting to those. If you'll let
24 me -- I am getting to those.
25    A. All right.
Page 203

1    Q. And when was his deposition taken?
2    A. It was a memo to the supreme court.
3    Q. Well, no, you said he also testified to
4 it. So when was it?
5    A. It wasn't a deposition. He testified in
6 an open-court hearing with Judge Browning.
7    Q. And when was this report?
8    A. The date on the report escapes me.
9    Q. Do you have a copy of the report?
10    A. I think we've attached it to one of my
11 declarations.
12       MR. FETTERLY: It's been filed and/or
13 produced in this case.
14    Q. (BY MS. DUKE) Now, in addition to
15 Mr. Pepin, did you talk -- you referenced, I
16 think, eight or nine Georgia clerks that you
17 talked to?
18    A. No. In total, eight clerks. I'd say
19 five or six in California.
20    Q. Okay. Five or six in California. And
21 then where were the others?
22    A. Georgia.
23    Q. And who were the court clerks you talked
24 to in California?
25    A. I can tell you the courts. I can't
Page 205

52 (Pages 202 - 205)

1  remember their names off the top of my mind.
2     Q.  All right.  And what were the courts?
3     A.  Kern, Santa Barbara, Monterey, Napa,
4  Santa Clara, and there may have been one or two
5  others.  Those are the ones I can remember.
6     Q.  And why did you choose those clerks?
7     A.  They're the ones who would answer my
8  question, and they were Tyler courts.
9     Q.  And were they the actual district court
10 clerk?  Or what were those official titles?
11    A.  Well, they call them CEOs in California,
12 chief executive officer.
13    Q.  And when would you have made those calls
14 to them?
15    A.  Two years ago, year and a half ago.
16    Q.  All right.  And then you mentioned some
17 Georgia clerks?
18    A.  Yeah.
19    Q.  How many of those?
20    A.  Well, there's two that -- I believe two.
21 One I'm certain of, and she's from DeKalb County.
22 And the other one -- I don't know what county is
23 from.
24    Q.  And again, are they district clerks or
25 CEOs?  What are they referenced to there?

Page 206

1     A.  Court clerks.
2     Q.  And why did you call those two?
3     A.  Our lawyer in Georgia called them or
4  emailed them because they had press review queues.
5     Q.  So there's actually emails to them about
6  this?
7     A.  Yes.  We've submitted them in federal
8  court cases.
9     Q.  Anyone else that you consulted prior to
10 making the representation that Tyler did not
11 charge anything for its press review queue?
12    A.  That's the universe of consultation I can
13 think of.
14    Q.  Now, CNS's, I guess, goal in this
15 litigation to take back the traditional access
16 that was taken away by the clerks when the
17 e-filing started in the state of Idaho; is that
18 correct?
19        MR. FETTERLY:  Objection; vague and
20 ambiguous, overbroad.
21        You may answer.
22        THE WITNESS:  That's one of the goals,
23 which is to -- we had traditional access to paper
24 that was on receipt.  As I said, Judge Bobby
25 Shepherd in the Eighth Circuit referred to it, and

Page 207

1  it is commonly known by older judges, actually,
2  who practice in the courts.
3        So that's one goal is to not lose that
4  access.  But the -- what we've been talking about
5  today is to also keep the courts open.  That is
6  the goal.  And to keep our democracy and the
7  constitution in their strength.
8     Q.  Sure.  But you've represented to
9  Judge Nye that you are seeking through either
10 negotiation or litigation to take back the
11 traditional access that was taken away by clerks
12 in the thrall of a new technology, correct?
13    A.  And I wrote that introduction.  Yes,
14 that's one of the goals.
15    Q.  And that's actually your sworn testimony,
16 right?
17    A.  Yes, I believe so.
18    Q.  And that traditional access that you're
19 referring to is the access that we have discussed
20 with Ms. Valenti yesterday as to what was
21 occurring when there were paper filings before the
22 court clerks got this new technology, correct?
23        MR. FETTERLY:  Objection; vague and
24 ambiguous, overbroad, lacks foundation.
25        THE WITNESS:  Traditional access is not

Page 208

1  limited to Idaho.
2     Q.  (BY MS. DUKE)  Sure.  But we certainly
3  understand that Ms. Valenti testified to the
4  access that she had, and access related to civil
5  complaints filed in the state of Idaho before
6  electronic filing, correct?
7     A.  Idaho is consistent with that tradition.
8  Ada County was.
9     Q.  And she testified to what her process was
10 in other counties to have access to newly filed
11 complaints, correct?
12    A.  She did.  She did, yes.
13    Q.  And one of CNS's goals is to get back the
14 access that Ms. Valenti had before?
15    A.  No.  You're rephrasing.  That's the
16 traditional access.  By that I've been pretty
17 specific.  Access at the time the case crosses the
18 counter.  That's my goal.
19    Q.  Okay.  And if that's your testimony sworn
20 to today, then that would be the case in any
21 declaration you filed in this case.
22        Is that your representation to Judge Nye,
23 that that's what you mean by "traditional access"?
24    A.  Traditional access is access at the
25 counter at the time or shortly after receipt.

Page 209

53 (Pages 206 - 209)

(56 of 297), Page 56 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 56 of 297
Case 1:21-cv-00305-DCN Document 60-7 Filed 12/15/22 Page 55 of 118
William L Girdner November 9, 2022

| | |
|---|---|
| 1   Q. And that is what Ms. Valenti testified to | 1   A. I think the courts, respectfully, need to |

Q. And that is what Ms. Valenti testified to
was occurring prior to Idaho's courts getting new
technology, correct?
   A. In Ada County.
     MR. FETTERLY: Objection; vague and
ambiguous, overbroad.
   Q. (BY MS. DUKE) And then Ms. Valenti also
testified to how she accessed new filings under
the paper system across the state, correct?
   A. In addition to Ada County, yes.
     MR. FETTERLY: We've been going a while
without a proper break. I know we've had a couple
small ones. Let's go off the record, take a
proper, ten-minute break. Okay?
     THE VIDEOGRAPHER: So it is 3:59 p.m.,
and we are off the record.
     (Break taken from 3:59 p.m. to 4:09 p.m.)
     THE VIDEOGRAPHER: All right. So we are
recording. The time is 4:09 p.m., and we are back
on the record.
   Q. (BY MS. DUKE) So if Idaho's courts
provide same-day access to newly filed -- the
A.A.1. through 6 that we talked about earlier,
that would satisfy CNS with respect to any First
Amendment concerns in this lawsuit; is that

<div align="right">Page 210</div>

A. I think the courts, respectfully, need to
stop the practice of withholding the cases until
the completion of processing.
   Q. Do you have an understanding of what
processing is done on state court complaints that
are submitted to File & Serve by the court clerks?
   A. Submitted by the court clerks?
   Q. No. No. Sorry. I might have asked that
wrong.
   A. Yeah.
   Q. Do you have an idea of what the court
clerks do processing-wise with a new complaint
that's been submitted to Tyler File & Serve before
they transfer it to the case management system?
   A. Only a very rough idea. I know that --
   Q. And what's that rough idea?
   A. Yeah, the complaint goes into a queue for
review, and I believe the clerks go through the
various clerical entries by the filer and check
the amount of money.
     And otherwise, there is a fairly thick
manual that -- of how to go about it that I have
not looked at for Idaho.
     So I know the really rough basis is, I
guess, what I'm saying.

<div align="right">Page 212</div>

correct?
     MR. FETTERLY: Objection; vague and
ambiguous.
     THE WITNESS: That's not what I testified
to.
     What I've testified to is that I think
we're entitled to access shortly -- at receipt or
shortly after without having to wait for
processing to be completed. And the -- and I said
that the same-day access is a question of
practicality and finances. In other words, I
wouldn't challenge a court that was providing same
day.
     So it's not a question -- you understand
me, I know.
   Q. (BY MS. DUKE) So if Idaho's courts were
to provide same-day access to CNS of the
complaints we talked about, which were the A.A.1.
through 6, that would not be something you would
pursue litigation-wise in the state of Idaho?
   A. Had they provided that in the past, I
certainly wouldn't have brought this suit.
   Q. And at this point, is it your position
that if they were to do that now, that would not
be sufficient to resolve this lawsuit?

<div align="right">Page 211</div>

Q. Are you aware of the bases in which
clerks reject a complaint for transfer into the
case management system?
   A. Yeah, I talked about the word "reject,"
so if you'll allow me, I'll just say "ask for
corrections," which is how I would see it, from
the filer.
     And I believe there is a short list, but
I'm not familiar with what that list is. Such a
list is common in many courts.
   Q. Has CNS had any communications with state
courts regarding concerns those state courts
have -- security concerns those state courts have
as to implementing the press review queue or using
the press review queue?
   A. No, not along the lines of Ms. Dvorak's
concerns.
   Q. Have any of them raised any type of
security concerns as far as you know from CNS's
standpoint?
   A. Confidentiality is a very common
argument. I wouldn't call it a security concern.
   Q. And what do you mean by
"confidentiality"?
   A. The argument is often made that

<div align="right">Page 213</div>

<div align="right">54 (Pages 210 - 213)</div>

William L Girdner  November 9, 2022

| | |
|---|---|
| 1 a -- well, that a filer might make a mistake. | 1 the door and then the individual -- the |
| 2 Q. And what's CNS's response to that? | 2 administration, the IT staff of the client, of the |
| 3 A. That it's the filer's duty and that where | 3 court, needs to come and grab the information. |
| 4 there is -- that the evidence of such mistakes, to | 4 Q. And in grabbing the info, then build |
| 5 use Judge Rice's language, in the Gable decision, | 5 their own press review queue with that |
| 6 is -- I think -- she didn't say "minuscule," but | 6 information, right? |
| 7 it was something very close to that. I was going | 7 A. Correct. Yes. |
| 8 to quote her, but I forgot what she said. | 8 Q. Have you had any discussions with any |
| 9 Q. Any other either confidentiality or | 9 state courts as to the cost that it would take a |
| 10 security concerns that have been raised by any | 10 court to take -- you know, to get Tyler's press |
| 11 state courts with respect to implementation of the | 11 review API from Tyler? Do you know if Tyler's |
| 12 press review queue? | 12 charging for that? |
| 13 A. No, not that I can think of. | 13 A. I think I know where you're going, and I |
| 14 Q. Same question for Auto-Accept. Any | 14 think I can answer the question. |
| 15 communications between CNS and any state courts | 15 In other words, the API is offered for |
| 16 about any security or confidentiality concerns | 16 free. That is by Tyler. But obviously the IT |
| 17 with the implementation of Auto-Accept? | 17 staff then has to program it. And that is not |
| 18 Sorry. Did you answer? | 18 without cost. |
| 19 A. I answered "no." | 19 Q. And have you talked with any state courts |
| 20 Q. I'm sorry. I did not hear you. | 20 about what that cost would be for a state court to |
| 21 A. I said it slowly. | 21 utilize Tyler's press review API? |
| 22 Q. Any communications with any state courts | 22 A. No. |
| 23 about any of the costs they would incur associated | 23 Q. Do you know whether Tyler's press review |
| 24 with implementation of the press review queue | 24 API is even available at this point? |
| 25 other than what we already testified to -- you | 25 A. I heard from yesterday that it's not. |
| Page 214 | Page 216 |

| | |
|---|---|
| 1 know, you already testified to with respect to New | 1 Q. Has CNS had any communications with Tyler |
| 2 Mexico, the Georgia and California clerks, and | 2 at all relating to Auto-Accept and it being |
| 3 Washington? | 3 implemented in the state of Idaho? |
| 4 A. Yeah, again, not that I can think of. I | 4 A. Of Idaho? |
| 5 think if there's any labor costs that were | 5 Q. Correct. |
| 6 discussed -- but, no, none of that. Nothing like | 6 A. There's been no conversations with Tyler |
| 7 that. Nothing other than what we talked about. | 7 about Auto-Accept anywhere. |
| 8 Q. And any costs discussed between CNS and | 8 Q. And as I understand it -- |
| 9 state courts as to costs associated with the | 9 A. Including Idaho. |
| 10 implementation of Auto-Accept? | 10 Q. Okay. That's fair. |
| 11 A. No. My understanding is there are no | 11 Have there been any communications |
| 12 costs. | 12 between CNS and Tyler relating to the application |
| 13 Q. So you mean no costs as in Tyler does not | 13 programming interface, so the API, for the press |
| 14 charge for it? | 14 review queue and its use in the state of Idaho? |
| 15 A. Correct. | 15 A. I'm trying to think what you're driving |
| 16 Q. Any discussion of any other costs if | 16 at. But there's no communication at all with |
| 17 Auto-Accept is implemented on the court side? | 17 Tyler. So they haven't talked to me about an API. |
| 18 A. No. | 18 Q. And you, CNS, have not talked to them |
| 19 Q. Now, we've talked some -- or we haven't | 19 about API either, correct? |
| 20 talked yet. What do you understand Tyler's press | 20 A. No. |
| 21 review API to be? | 21 Q. Is that correct? |
| 22 A. This is a very, very rough idea. Okay? | 22 A. Yeah, that's correct. That's correct. |
| 23 I think Director Cozin, during her deposition, | 23 Q. Given that, then there certainly are no |
| 24 said an API is like a door. And I think that's a | 24 communications between CNS and Tyler relating to |
| 25 pretty good analogy. Meaning that the Tyler opens | 25 the API or the press review queue including its |
| Page 215 | Page 217 |

William L Girdner November 9, 2022

1  availability to and implementation in Idaho,
2  correct?
3      A.  No, I just want to be careful and
4  not -- you know, there was a conversation between
5  the counsel for Tyler, which you're aware of, I
6  know, which is attached to the -- in the list of
7  subjects today.  And the lawyer from Bryan Cave,
8  but I have not been involved in those
9  conversations.
10      MR. FETTERLY:  Bill, let me jump in to
11  help with the transcript.  Be mindful of the
12  "yeses" and "nos," because sometimes I think
13  you're saying -- she's asking you if something is
14  correct and she's saying "no," and it might
15  create some confusion in the transcript.
16      THE WITNESS:  Okay.  Sorry.  That is
17  correct.
18      Q.  (BY MS. DUKE)  Have there been any
19  communications at all between CNS and Tyler
20  relating to the press review queue as part of
21  CNS's position in this lawsuit and its preliminary
22  injunction that it filed with the court?
23      A.  No.  We've referenced the email from Nina
24  Minney attaching the products.  I'm not including
25  that.

Page 218

1      A.  That I make it clear that we're not in
2  league together.
3      Q.  And to whom did they want you to make
4  that clear?
5      A.  To the -- well, I think to anyone in the
6  future and to anyone that I had sent a copy of
7  their product -- I think it's called a product
8  statement -- explaining the benefits and costs of
9  Auto-Accept and the press review queue.
10      Q.  And did you take any action after you
11  were made aware of this letter?
12      A.  I did.
13      Q.  What did you do?
14      A.  I wrote letters to the officials in
15  Minnesota and South Dakota saying that obviously
16  we're not in league.  They're an e-file service
17  provider, and we're a news agency.  And I'm sure
18  you got copies of those letters.
19      Q.  Sure.
20      MS. DUKE:  And I'll pull one up here, or
21  pull up the group that we've been provided.  I'll
22  mark this as Exhibit 29.
23      (Deposition Exhibit No. 29 was marked.)
24      Q.  (BY MS. DUKE)  All right.  You'll see
25  October 13, 2022, there is an email to the state

Page 220

1      Q.  Got it.  So let me turn to that document
2  you were talking about.  Just give me a moment.
3      All right.  We had talked about a letter.
4  If you take a look at the notice of today's
5  30(b)(6) deposition -- and that's Exhibit 25 for
6  the record.
7      We had included as Exhibit 1 -- I'll just
8  put it up here on the screen -- a letter that was
9  emailed to you by Tyler.
10      Can you see that okay?
11      A.  Yes.
12      Q.  So it's my understanding that you
13  received this September 30, 2022, email, but
14  deleted it without knowing after you received it;
15  is that correct?
16      A.  Yeah, that's correct.  I receive 50 to
17  100 unsolicited commercial and political,
18  especially these days, emails, like a lot of
19  people.  And I delete them in series.  I deleted
20  this one inadvertently.
21      Q.  All right.  And what did you
22  understand -- now that you have seen a copy of it,
23  what did you understand Tyler was requesting of
24  CNS in this September 30, 2022, Exhibit 1 to
25  Exhibit 25?

Page 219

1  court administrator for Pierre, South Dakota.  And
2  I can move down.
3      Is this the letter that you're referring
4  to?
5      A.  It is.
6      Q.  Now, you reference in there a letter that
7  you had sent on the 26th of September.
8      Please explain for me what that letter
9  was, what the purpose of it was, and what was
10  attached and included with that September 26th
11  letter.
12      A.  I was asking -- as we've said in the
13  past, I've made requests by letters for access at
14  or near the time of receipt.  And so I was making
15  that request to the state court administrator.  Is
16  this -- South Dakota, yeah.
17      Q.  Yeah, this one is South Dakota.
18      A.  And it was -- my Exhibit A is the Tyler
19  statement saying "You have this alternative.  It's
20  available to you.  Would you please implement one
21  of the two solutions?"
22      Q.  And when you say your Exhibit A, do you
23  mean the PowerPoint that had been included or
24  produced in this case?
25      A.  Yeah.  But it's also online in Texas to

Page 221

56 (Pages 218 - 221)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 the public. It's -- I believe I used the one that<br>2 was produced in this case, but as I say, it's<br>3 identical to others that are publicly available.<br>4    Q.  And was this letter that we're looking at<br>5 here that's Exhibit 29 to the South Dakota state<br>6 administrative officer, was this your effort to<br>7 satisfy Tyler's demand of you and the email that<br>8 they sent you and you inadvertently deleted?<br>9    A.  Yeah, if I can put it a little<br>10 differently to explain that that demand was<br>11 ridiculous, that there was no implication or<br>12 association between us, and that should be<br>13 obvious.<br>14    Q.  And have you provided this communication<br>15 to Tyler?<br>16    A.  No.<br>17    Q.  And why not?<br>18    A.  I apologize. Our lawyers may have. They<br>19 probably have. But I don't --<br>20    Q.  Have you? Have you provided it to the<br>21 counsel that have sent you the letter?<br>22    A.  No.<br>23    Q.  And why not?<br>24    A.  I believe our lawyer sent it.<br>25    Q.  But I just want to be clear for the<br>*Page 222* | 1    Q.  And were those the only five that you had<br>2 done that to, so those were the only five letters<br>3 that you needed to send out at Tyler's request<br>4 asking you to clarify?<br>5    A.  That is correct.<br>6    MR. FETTERLY:  Objection, lacks<br>7 foundation, misstates prior testimony with respect<br>8 to need to do anything.<br>9    Q.  (BY MS. DUKE)  Okay.  And not trying to<br>10 say "need." It's just that Tyler asked that you<br>11 send these letters.<br>12    Are these the five letters that you sent<br>13 in response to that request by Tyler?<br>14    A.  Yes.<br>15    Q.  Now, is it also your understanding you<br>16 received this email an additional time in addition<br>17 to the one that you had inadvertently deleted?<br>18    A.  Yes, it is.<br>19    Q.  All right.  And what happened with<br>20 respect -- I'll mark it as Exhibit 30 -- in<br>21 exchange between Ms. Keating and Ms. Diaz, what<br>22 happened to that email?  Why didn't you see that<br>23 one?<br>24    A.  Same thing.  You know, it's a mistake.<br>25 Same thing.  It's inadvertent.<br>*Page 224* |
| 1 record.<br>2    Did you provide this to Abigail Diaz, the<br>3 chief legal officer who had sent you the<br>4 September 30, '22, letter?<br>5    A.  I provided it to Katherine Keating of<br>6 Bryan Cave, who I believe provided it to Abigail<br>7 Diaz.<br>8    MR. FETTERLY:  Bill, I'm going to just<br>9 caution you not to divulge the --<br>10    THE WITNESS:  Okay.  Okay.  Sorry.  Okay.<br>11 I did not.  The answer is no.<br>12    Q.  (BY MS. DUKE)  And then I have a couple<br>13 other examples that are included in Exhibit 29.<br>14 There's one to Minnesota and then there's one to<br>15 another state court administrator in Minnesota,<br>16 Sioux Falls, South Dakota.  I think there's one<br>17 more.<br>18    A.  There's five in all.<br>19    Q.  Let's see.  Minneapolis.  So, yeah, five.<br>20    So these were the five courts that you<br>21 had sent the PowerPoint that was produced in this<br>22 case to these folks, just explaining what Tyler<br>23 had to provide related to Auto-Accept and press<br>24 review?<br>25    A.  Correct.<br>*Page 223* | 1    (Deposition Exhibit No. 30 was marked.)<br>2    Q.  (BY MS. DUKE)  All right.  And so that's<br>3 referenced here, so it was just another<br>4 inadvertent deletion?<br>5    A.  Yes.<br>6    Q.  Have you sent the PowerPoint that was<br>7 produced in this case that Tyler had provided to<br>8 the Idaho courts, have you sent that to any courts<br>9 other than the five that we just talked about in<br>10 Exhibit 29?<br>11    A.  No.<br>12    Q.  And do you intend to send that to any<br>13 other courts?<br>14    A.  I haven't planned on that.  But as I<br>15 said, it's a public document, in my opinion.  And<br>16 I don't want to foreclose that responsibility.<br>17 But I have no present plans.  I think that answers<br>18 your question.<br>19    Q.  It does.  Just let me look through things<br>20 here.  We just checked off quite a bit.<br>21    It's been a long day for me too, so just<br>22 to be clear, I don't think I asked this, but if I<br>23 did, I apologize.<br>24    A.  Okay.  That's fine.<br>25    Q.  Have there been any communications<br>*Page 225* |

57 (Pages 222 - 225)

William L Girdner November 9, 2022

| | |
|---|---|
| 1 between CNS and Tyler related to this lawsuit | 1 produced today, and that stays at 27. But I had |
| 2 before this lawsuit was filed? | 2 also referenced it as 28. |
| 3   A. No. | 3       I'll just mark Mr. Girdner's 11/15/21 |
| 4   Q. How about related to the complaint in | 4 declaration and his attachments as 28 so that we |
| 5 this case? | 5 have 28 completed there. |
| 6   A. Certainly not. | 6   Q. (BY MS. DUKE) Mr. Girdner, just a few |
| 7   Q. And how about the preliminary injunction | 7 other questions, and then we'll get you out of |
| 8 in the case? | 8 here. |
| 9   A. No, ma'am. | 9   A. Okay. |
| 10   Q. And how about related to CNS's requests | 10       MS. DUKE: The -- I also have a |
| 11 in the preliminary injunction related to | 11 supplemental declaration that you submitted. And |
| 12 Auto-Accept or press review queue by Tyler? | 12 this one was done on 1/24/22. And I'll mark that |
| 13   A. No. | 13 as Exhibit 32. So let me show you that. |
| 14   Q. Let me pull up the complaint, which I | 14       (Deposition Exhibit No. 32 was marked.) |
| 15 don't think we have marked yet. So this will be | 15   Q. (BY MS. DUKE) Okay. You'll see that |
| 16 Exhibit 31. | 16 1/24/22. Again, this was a declaration that was |
| 17       Did you have an opportunity -- well, let | 17 submitted by your counsel with respect to the |
| 18 me pull it up first. | 18 preliminary injunction that Courthouse News was |
| 19       (Deposition Exhibit No. 31 was marked.) | 19 seeking. |
| 20   Q. (BY MS. DUKE) Did you have an | 20   A. Okay. |
| 21 opportunity to review this complaint that | 21   Q. I'm assuming with respect to Exhibit 32 |
| 22 initiated this lawsuit in the District of Idaho on | 22 that you would have reviewed it and corrected |
| 23 July 23 of 2021, did you have an opportunity to | 23 anything before agreeing that it could be filed on |
| 24 review it and provide input and comment prior to | 24 your behalf? |
| 25 it being filed? | 25   A. Yes. |
| Page 226 | Page 228 |
| 1   A. Yes. | 1   Q. And that it's true and accurate in what |
| 2   Q. And I'm assuming if there was anything | 2 you represent in it? |
| 3 that came from within it that you felt shouldn't | 3   A. Yes. |
| 4 have been included, you would have said something | 4   Q. The deposition notice, I think I marked |
| 5 to your attorneys? | 5 that as Exhibit 24 or 5 -- 25. And 25A, I'll mark |
| 6   A. That's true. That's fair. | 6 the objections to the exhibit with the |
| 7   Q. And that the complaint effectively, you | 7 modification we noted at the beginning. |
| 8 believe, is a true and accurate representation of | 8       Oh, that's 24. Okay. 24, I guess, |
| 9 what CNS represents in it and the relief that CNS | 9 should be the objections. So that should be the |
| 10 is seeking? | 10 end of that tidying. |
| 11   A. That's true. | 11       In the state of Idaho, Mr. Girdner, what |
| 12       MS. DUKE: Let's take a quick break, | 12 do you understand a judicial document to be? |
| 13 because I think I'm pretty much done. So let me | 13       MR. FETTERLY: Objection; vague and |
| 14 just make sure, be obsessive-compulsive. And | 14 ambiguous, overbroad, calls for a legal |
| 15 you're almost to your glass of red wine. | 15 conclusion. |
| 16       THE WITNESS: You too. | 16       You may answer if you can. |
| 17       THE VIDEOGRAPHER: All right. So the | 17       THE WITNESS: I don't have a definition |
| 18 time is 4:34 p.m., and we are off the record. | 18 for that. |
| 19       (Break taken from 4:34 p.m. to 4:41 p.m.) | 19   Q. (BY MS. DUKE) Do you have a definition |
| 20       THE VIDEOGRAPHER: All right. So we are | 20 in the state of Idaho for what a court |
| 21 recording. The time is 4:41 p.m., and we are back | 21 file -- strike that. |
| 22 on the record. | 22       Do you have a definition in the state of |
| 23       MS. DUKE: All right. As a matter of | 23 Idaho for what types of documents are housed |
| 24 housekeeping, I had inadvertently, or wrongly, I | 24 within the case management system for the Idaho |
| 25 should say, marked Exhibit 27 as the discovery you | 25 courts? |
| Page 227 | Page 229 |

58 (Pages 226 - 229)

William L Girdner November 9, 2022

1    A. I think all documents filed in a case are
2  housed in a case management system.
3       MR. FETTERLY: And objection belatedly,
4  vague and ambiguous, overbroad, lacks foundation,
5  calls for speculation.
6    Q. (BY MS. DUKE) And do you have an
7  understanding that the way a document is
8  transferred into the case management system for
9  the district court is through a review by the
10  clerk when it's in the Tyler File & Serve system?
11      MR. FETTERLY: Objection; vague and
12  ambiguous, overbroad.
13      THE WITNESS: Yeah, just -- the problem I
14  have is with transfer. And if I can explain that.
15    Q. (BY MS. DUKE) Sure.
16    A. I don't know where the document actually
17  moves, whether it's in a database that changes a
18  spot or not. I've always wondered that. So, no.
19      But as far as the process of processing
20  the cases, I do understand that the case goes into
21  the e-file manager, is then reviewed by the clerks
22  and deputy clerks, and when they hit a button,
23  that I believe says "Accept," then it goes into
24  the case management system.
25    Q. And it's your understanding that for a

Page 230

1  document that is submitted through Tyler
2  File & Serve, to become part of the case
3  management system, the "Accept" button needs to be
4  hit by the clerk?
5    A. As currently structured.
6       MS. DUKE: All right. Mr. Girdner, I
7  really appreciate your time today. And I'm sure
8  we'll see you tomorrow too, but it's -- you're
9  done.
10      THE WITNESS: Thank you.
11      MS. DUKE: At least from my standpoint.
12  Mr. Fetterly might have some questions.
13      MR. FETTERLY: I think I have maybe two
14  or three questions.
15      THE WITNESS: Okay.
16
17            EXAMINATION
18  BY MR. FETTERLY:
19    Q. One moment. Mr. Girdner, earlier today
20  and throughout the deposition, there has been
21  quite a bit of testimony concerning filed
22  documents or what it means to be filed.
23      Do you remember that testimony?
24    A. Yeah, of course. It was a central part
25  of this deposition.

Page 231

1    Q. And I believe at one point counsel asked
2  you on behalf of Courthouse News to provide a
3  definition of the word "file."
4       Do you recall that?
5    A. Yes.
6    Q. And I believe you answered that question;
7  is that correct?
8    A. Yes.
9    Q. I just want to show you a document here.
10  One moment.
11      Can you see my screen?
12    A. I can.
13    Q. Okay. I will represent to you that this
14  is a copy of the order issued by the court in this
15  action on April 14, 2022, Docket No. 40.
16      And I would ask the court reporter to
17  please mark this exhibit next sequential number.
18      (Deposition Exhibit No. 48 was marked.)
19    Q. (BY MS. DUKE) And for the record, I am
20  showing you the paragraph that begins at the very
21  bottom of page 24 -- or I'd direct your attention
22  to that paragraph.
23    A. Yes.
24    Q. And it continues on to the top of
25  page 25.

Page 232

1       Do you see that paragraph?
2    A. I do.
3    Q. And I will read the first sentence of the
4  paragraph.
5    A. Okay.
6    Q. "The court is inclined to agree with CNS
7  and other courts that 'filed' is best understood
8  to mean when the complaint is submitted to the
9  respective e-filing system, not to mean once the
10  documents are reviewed/accepted/processed by a
11  clerk."
12      Does CNS agree with that statement?
13    A. Very much so.
14    Q. And does Courthouse News agree with that
15  meaning of the word "filed"?
16    A. Yes, indeed.
17      MR. FETTERLY: No further questions.
18      THE WITNESS: Thank you.
19
20         FURTHER EXAMINATION
21  BY MS. DUKE:
22    Q. And I guess I would just note, do you
23  have an understanding that there are additional
24  proceedings to be had before Judge Nye?
25    A. Yes, I do.

Page 233

59 (Pages 230 - 233)

William L Girdner November 9, 2022

1    MS. DUKE: And with respect to that, I'll
2  certainly submit to you that we'll be asking him
3  to reconsider that portion, given that we felt
4  there was a lack of explanation and thus a lack of
5  understanding by him by the parties as to that
6  issue.
7    So I'll just note that so it's clear on
8  the record and it's not some waiver. So duly
9  noted.
10    MR. FETTERLY: Thank you.
11    THE WITNESS: I just want to tell you I
12  usually take a swim in the mornings. That's kind
13  of my ritual, but we got started early today so I
14  didn't get my swim, and I got my coffee. So I was
15  a bit jumpy at the beginning. So I apologize for
16  that. Okay?
17    MS. DUKE: It happens. It's not fun
18  being deposed. So I appreciate your time.
19    THE VIDEOGRAPHER: So this concludes our
20  video deposition of William Girdner, the 30(b)(6)
21  designee. The date is November 9th, 2022. The
22  time is 4:50 p.m., and we are off the record.
23  (Whereupon the deposition was concluded at 4:50 p.m.)
24    ****
25    (Signature requested.)

Page 234

1    REPORTER'S CERTIFICATE
2  STATE OF IDAHO    )
               )
3  COUNTY OF ADA    )
4
5    I, Amy E. Simmons, Certified Shorthand Reporter and
6  Notary Public in and for the State of Idaho, do hereby
7  certify:
8    That prior to being examined, the witness named in
9  the foregoing deposition was by me duly sworn to testify
10  to the truth, the whole truth and nothing but the truth;
11    That said deposition was taken down by me in
12  shorthand at the time and place therein named and
13  thereafter reduced to typewriting under my direction, and
14  that the foregoing transcript contains a full, true and
15  verbatim record of said deposition.
16    I further certify that I have no interest in the
17  event of the action.
18    WITNESS my hand and seal this 21st day of November,
19  2022.
20
21
22
23    AMY E. SIMMONS
      CSR, RPR, CRR, CRC, and Notary
24    Public in and for the
      State of Idaho.
25  My commission expires: 6/13/28.

Page 236

1    VERIFICATION
2
   STATE OF _____  )
3              )
   COUNTY OF _____  )
4
5    I, WILLIAM L. GIRDNER, being first duly sworn on my
6  oath, depose and say:
7    That I am the witness named in the foregoing
8  deposition taken the 9th day of November, 2022,
9  consisting of pages numbered 1 to 234, inclusive; that I
10  have read the said deposition and know the contents
11  thereof; that the questions contained therein were
12  propounded to me; the answers to said questions were
13  given by me, and that the answers as contained therein
14  (or as corrected by me therein) are true and correct.
15
16  Corrections Made: Yes_____ No_____
17
18
      _____
19    WILLIAM L. GIRDNER
20
21  Subscribed and sworn to before me this _____ day of
22  _____, 2022, at _____, Idaho.
23
      _____
24  Notary Public for Idaho
      Residing at _____, Idaho
25    My commission expires: _____.

Page 235

60 (Pages 234 - 236)

William L Girdner November 9, 2022

**[& - 4:41]**

| & |
|---|
| **&** 2:6 5:16 18:3 70:2,5 81:19 82:4,16 120:16 121:5 134:11,16 134:21,24 135:16 143:8,15 143:18,18,25 144:6,17 145:22 152:1 161:1 166:14 169:11 169:19 179:20 180:7 187:11 192:3 194:2 212:6,13 230:10 231:2 |

| 0 |
|---|
| **00305** 1:4 5:10 |
| **013270** 3:22 |
| **013279** 3:22 |
| **013299** 3:24 |
| **013301** 3:25 |

| 1 |
|---|
| **1** 48:9 54:24,25 55:20 219:7,24 235:9 |
| **1/24/22** 228:12 228:16 |
| **10** 3:22 74:4 |
| **10/13/22** 3:23 |
| **100** 25:22 219:17 |
| **104** 3:16 |
| **108** 200:7 |
| **108,000** 190:7,10 190:16,24 191:9 192:18 193:4,6 193:10 197:4 |

199:23 200:1,3,5 200:6
**1087** 2:20
**10:07** 45:18,19
**10:27** 45:19,21
**11/15/21** 228:3
**11:41** 98:14,15
**11:57** 98:15,17
**12** 3:11 46:7,11
**12:30** 98:5
**12:51** 138:11,12
**13** 220:25
**14** 232:15
**15** 46:16 61:19
**154** 3:19
**16** 79:21
**163** 3:20
**18** 139:10,14
**1950** 6:17
**1:21** 1:4 5:10
**1:57** 138:12,14

| 2 |
|---|
| **2** 12:20 13:11 |
| **2.5** 73:23 |
| **200,000** 190:2 200:2 |
| **2021** 46:16 201:16 202:12 203:9 226:23 |
| **2022** 1:14 2:9 5:5 46:21 61:19 219:13,24 220:25 232:15 234:21 235:8,22 236:19 |
| **208** 2:21,22 |

**21** 48:18,24
**21st** 236:18
**22** 173:3 223:4
**220** 3:21
**225** 3:23
**226** 4:3
**228** 4:4
**23** 226:23
**231** 3:6
**232** 4:6
**233** 3:5
**234** 235:9
**24** 3:11 12:22 13:9,19 46:21 229:5,8,8 232:21
**24/7** 158:3
**240** 19:1 50:23 87:19
**25** 3:13 48:12,14 105:9 219:5,25 229:5 232:25
**254** 83:1
**25a** 229:5
**26** 3:15 54:20,21 57:23
**26th** 221:7,10
**27** 3:16 104:19 104:20,21 227:25 228:1
**28** 3:19 48:9 153:25 154:1,3 228:2,4,5
**29** 3:21 4:6 105:9 220:22,23 222:5 223:13 225:10
**29423** 236:22

**2:00** 140:25 141:1
**2:15** 141:1,3

| 3 |
|---|
| **3** 3:25 12:20 |
| **30** 3:11,14,23 5:7 12:19 17:20 46:12 47:1,7,17 47:24 48:4,9,13 58:17 103:12 111:3 125:19 127:7 219:5,13 219:24 223:4 224:20 225:1 234:20 |
| **300** 2:20 72:9 |
| **31** 4:3 226:16,19 |
| **32** 4:4 228:13,14 228:21 |
| **342-3299** 2:22 |
| **342-3310** 2:21 |
| **3:42** 203:1,2 |
| **3:49** 203:2,4 |
| **3:59** 210:15,17 |

| 4 |
|---|
| **4** 3:12 |
| **40** 232:15 |
| **41** 3:17 |
| **415** 2:16,16 |
| **43,000** 197:13,22 |
| **450** 198:14 |
| **48** 3:13 4:6 232:18 |
| **4:09** 210:17,19 |
| **4:34** 227:18,19 |
| **4:41** 227:19,21 |

Page 1

William L Girdner November 9, 2022

**[4:45 - accessed]**

| | | | |
|---|---|---|---|
| **4:45** 176:21 | **9** | **absolutely** 15:14 | **access** 22:23 |
| **4:50** 234:22,23 | | 49:10 149:17 | 24:6 25:20,22 |
| **5** | **9** 1:14 3:14 5:5 | 162:20 163:1,18 | 33:5 37:8 39:25 |
| | **94111-4070** 2:15 | **abstain** 80:15 | 40:4,7,9,24 41:4 |
| **5** 229:5 | **9:00** 12:19 13:8 | **accept** 32:2 | 41:8,11,13 52:11 |
| **50** 148:14,16 | 34:24 | 60:21 63:18,23 | 58:4 61:8,9 62:2 |
| 219:16 | **9:15** 2:10 5:5 | 63:23 64:1,4,8 | 63:24 64:1,15 |
| **51** 61:17 62:15 | **9:23** 13:1 | 64:15 66:10 | 70:8,15 72:14 |
| 62:19 107:9 | **9:27** 13:4 | 68:9,11,20 69:1 | 74:7,24 79:7,10 |
| **52** 148:14 | **9th** 2:8 234:21 | 69:21 70:24 | 80:4,5,11 84:17 |
| **54** 3:15 | 235:8 | 72:7 76:1,7,9,12 | 84:21 86:4,5,23 |
| **5:00** 33:13 | **a** | 76:19,24 77:11 | 87:11 90:7,16 |
| **6** | | 78:13,14 85:5 | 109:16,24 |
| | **a.a.** 54:18 | 86:16,22 87:5 | 112:25 113:10 |
| **6** 3:5,11,14,15 | **a.a.1.** 54:10 | 122:16 123:7 | 115:8 118:23 |
| 5:7 12:19 46:7 | 57:14,15,22 | 143:22 145:8,15 | 120:12 129:7,9 |
| 46:11,12 47:1,7 | 58:25 210:23 | 145:19 192:22 | 129:23 130:25 |
| 47:17,24 48:4,9 | 211:18 | 192:24 193:20 | 131:4,21,25 |
| 48:13 54:6,25 | **a.m.** 2:10 5:5 | 193:21 194:2,16 | 132:19 136:3 |
| 55:20 57:15,22 | 12:19 13:4 | 194:23 195:3,15 | 143:21 146:6 |
| 58:25 111:3 | 45:18,19,19,21 | 214:14,17 | 147:1,3 151:24 |
| 125:19 127:7 | 98:14,15,15,17 | 215:10,17 217:2 | 152:23 153:19 |
| 210:23 211:19 | **aa1** 54:6 | 217:7 220:9 | 154:20,21,22,24 |
| 219:5 234:20 | **abbreviated** | 223:23 226:12 | 155:8 157:11 |
| **6/13/28** 236:25 | 156:11 | 230:23 231:3 | 160:24 161:8,11 |
| **60** 4:3 | **abigail** 3:24 | **acceptable** | 162:1,12 164:5 |
| **62** 4:5 | 223:2,6 | 175:23 | 167:21 179:25 |
| **675-3400** 2:16 | **ability** 10:11 | **acceptance** | 183:16,17,19 |
| **675-3434** 2:16 | 14:25 15:16,22 | 167:20 | 189:9 196:7 |
| **685** 1:25 | 16:2 39:13 | **accepted** 23:21 | 204:19 207:15 |
| **6:00** 34:11,15 | **able** 11:22 40:15 | 24:22 144:2,23 | 207:23 208:4,11 |
| **7** | 48:8 52:15 83:1 | 144:24,25 150:2 | 208:18,19,25 |
| | 94:17 96:16 | 167:11,13 | 209:4,4,10,14,16 |
| **7387** 2:20 | 102:18 103:20 | 233:10 | 209:17,23,24,24 |
| **7th** 2:15 6:17 | 166:2 185:6 | **accepting** 120:5 | 210:22 211:7,10 |
| **8** | **abortion** 57:4 | 165:18 | 211:17 221:13 |
| | **abreast** 47:4 | **accepts** 81:2 | **accessed** 63:21 |
| **83707** 2:21 | **absent** 112:19 | 118:19 | 210:8 |

Page 2

William L Girdner November 9, 2022

## [accessible - ambiguous]

**accessible** 34:25
35:3
**account** 146:5,7
**accurate** 21:3
28:7 108:9
116:20 227:8
229:1
**accurately** 10:14
14:18
**acknowledge**
162:12
**act** 57:5
**acting** 143:5
**action** 111:18
144:15 220:10
232:15 236:17
**actionable** 185:1
**actions** 157:4
**actual** 133:16
180:15 181:13
206:9
**ada** 2:8 22:2,24
23:3 24:15
26:15 28:1
182:3 209:8
210:4,10 236:3
**adam** 184:8
**adapted** 73:16
93:18
**add** 14:15,20
16:8 17:3,5
21:16 22:3
77:13 79:16
87:24 97:13
145:6 156:3
192:21
**added** 85:17

**adding** 183:2
**addition** 187:19
189:8 205:14
210:10 224:16
**additional** 36:6
36:14 90:4,12
224:16 233:23
**address** 11:4
14:25 124:23
127:11 128:7
**addresses**
124:15
**adjacent** 115:20
**adjust** 126:8
**administration**
56:8 190:23
216:2
**administrative**
1:8 71:9 198:12
203:16,19 222:6
**administrator**
221:1,15 223:15
**admission** 9:22
**admissions** 3:17
104:17
**admit** 113:21
**adopted** 38:6,19
39:1 88:5,8
**advance** 158:10
**advantages**
89:24
**affidavit** 201:4
**afield** 125:18
**afloat** 18:23
**age** 156:10
**agency** 220:17
**agents** 19:4

**ago** 70:13 73:2
93:25 100:13
109:21 111:25
112:22 114:7,19
115:11,17,22
191:2,5 206:15
206:15
**agree** 13:25
14:17 16:11
22:7 23:23
28:11 32:19
119:19,21 120:4
128:23 131:17
131:19,24 132:8
133:19,22,23
134:3 147:14,14
150:21 162:15
162:21 179:4
233:6,12,14
**agreed** 13:10
67:12 124:20
129:16 197:11
**agreeing** 144:19
166:24 167:1
228:23
**agreement** 71:10
71:11
**ahead** 8:25
11:21 12:23
25:3,13 45:14
53:12 102:14,15
104:18 111:13
112:13 114:2
122:4 126:6
130:16 138:6
139:12 160:17
172:14 182:21
190:5

**alabama** 70:22
71:7
**alameda** 75:10
75:13
**alaska** 35:12,19
139:6
**aleck** 122:4
**alleged** 155:19
179:2 182:13
**alleges** 151:24
**alleging** 151:23
**allow** 75:13
213:5
**allows** 87:11
116:25 117:1
**alternate** 178:22
179:1
**alternative**
131:7 153:2
161:13,17 178:6
178:6 192:22
221:19
**alternatives**
161:18,20
**amazing** 79:19
148:18
**amazingly** 66:1
**ambiguous**
29:24 31:13
41:24 53:4 55:8
58:11 65:5
92:21 103:24
118:8 119:4,24
121:9,20 122:19
123:4 124:18
130:2,11 132:3
132:14 133:11
135:10 142:25

Page 3

William L Girdner November 9, 2022

[ambiguous - argumentative]

| | | | |
|---|---|---|---|
| 144:10 147:6 | **answer** 8:13,20 | **answers** 9:15,19 | **appearing** 5:20 |
| 161:6 164:20 | 9:1,1 15:15 | 10:6,7,9,25 11:2 | **appears** 183:24 |
| 165:24 168:16 | 16:22,24 17:5 | 11:18 15:9,10,12 | **appendix** 3:15 |
| 189:14 194:18 | 33:9,15,17,20 | 16:2,8,8 38:12 | **applicable** 38:3 |
| 195:5,22 207:20 | 40:15,17 41:2 | 47:9 48:3,9 | 39:19 |
| 208:24 210:6 | 42:1 44:3,16,19 | 125:1 186:16 | **application** |
| 211:3 229:14 | 49:7,8 51:22 | 196:14 225:17 | 13:16 116:21,21 |
| 230:4,12 | 55:9,11 89:12 | 235:12,13 | 125:17 193:21 |
| **amended** 3:11 | 92:7,22 96:21 | **anticipating** | 194:7 217:12 |
| 3:13 39:14 | 101:10 105:8 | 169:4 | **apply** 58:8 |
| **amendment** 58:7 | 108:9 110:5 | **anybody** 45:25 | **appreciate** 16:14 |
| 131:9,12 132:10 | 120:2 121:11 | 51:11 60:8 | 45:16 86:12 |
| 132:18 160:11 | 122:21 123:5 | 98:22 200:6 | 110:12 142:12 |
| 161:3 185:2,15 | 124:21 125:21 | 201:11 | 163:23 172:8 |
| 185:17 210:25 | 126:11 127:8 | **anymore** 63:8 | 231:7 234:18 |
| **amendments** | 128:16 132:4,16 | 100:10 | **approach** 157:25 |
| 38:10 39:5 | 132:17 135:11 | **anyway** 58:20 | **appropriate** |
| **amount** 32:1 | 140:11 143:2 | 73:5 91:22 | 133:25 134:5 |
| 91:19 129:18 | 150:20,23 | 118:13 136:18 | **approval** 27:17 |
| 131:3 153:16 | 151:18,20 | 152:15 153:11 | **approved** 174:24 |
| 155:25 170:23 | 152:13 153:3,12 | 166:5 174:16 | **approximately** |
| 186:1 190:13 | 154:13 157:7 | **ao** 204:2 | 115:11 |
| 212:20 | 165:25 172:5 | **api** 215:21,24 | **april** 232:15 |
| **amounts** 199:11 | 177:18 186:20 | 216:11,15,21,24 | **archives** 150:12 |
| **amy** 1:25 2:6 | 187:9 189:15 | 217:13,17,19,25 | 151:13,15 |
| 5:15 9:5 153:24 | 193:25 195:6,23 | **apologize** 21:17 | **area** 142:15 |
| 236:5,23 | 200:7 202:15,18 | 34:3,5 96:11 | **argue** 119:11 |
| **analogy** 215:25 | 202:19 204:24 | 222:18 225:23 | 125:25 178:20 |
| **analysis** 132:19 | 206:7 207:21 | 234:15 | 179:17 |
| 155:10,11 | 214:18 216:14 | **app** 112:15,16 | **argued** 44:14 |
| **analyze** 131:8 | 223:11 229:16 | 115:15 116:8,16 | 184:6 |
| **analyzed** 131:15 | **answered** 41:1 | 116:19 | **argument** |
| **anemic** 199:8 | 43:3 44:17,20 | **apparently** | 135:19 177:21 |
| **angeles** 74:12 | 45:4,6 129:3 | 183:23 184:4 | 195:10,13 |
| **announce** 51:24 | 214:19 232:6 | 202:8 | 213:22,25 |
| **announcements** | **answering** 17:10 | **appearances** | **argumentative** |
| 50:17 159:10,20 | 20:12 41:19 | 2:13 5:19 | 27:3 44:2 45:5 |
| | 153:4 | | 120:20 124:9 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

[argumentative - availability]

125:4
**arguments** 168:2
**arizona** 40:14
71:24 141:20
**arranged** 158:7
**arrangements**
158:6
**arrival** 88:24
**artie** 188:18
204:5
**aside** 47:16
111:3
**asked** 15:6,8,22
17:1 27:6 33:13
34:9,13 35:6
36:25 37:2
38:13 43:2
44:17 45:4
50:15,25 51:4,18
99:1 100:25
101:3 103:7
108:4 129:2
138:21 139:1,19
140:8,14 152:20
167:4,5 197:23
199:15 202:9
204:10,18,20
212:8 224:10
225:22 232:1
**asking** 26:11,12
27:21 42:25
43:8,9,10,17
51:10,13 65:6
105:11 112:4
126:2 141:8
162:11 164:12
166:7 167:24
177:23 179:12

179:12,17 187:8
190:2 192:1,8,17
192:18 194:10
196:24 203:7
218:13 221:12
224:4 234:2
**ass** 122:2
**asserting** 160:23
160:25
**assess** 179:8
198:13
**assessment**
177:11
**assigned** 145:4
145:10 180:16
**assist** 94:16
95:19 96:25
106:18
**associated** 2:6
5:16 214:23
215:9
**association**
108:25 222:12
**assume** 8:21
16:23 17:11
78:4 138:3
184:16
**assuming** 17:6
17:23 20:10,15
21:4 75:12 97:7
97:11 101:24
138:2 163:19,23
176:15 181:24
183:15 186:16
227:2 228:21
**assurance** 10:24
**assurances**
14:13

**asterisk** 182:7
**atlanta** 65:23
70:4 115:7,9
**attach** 169:7
**attached** 114:5
205:10 218:6
221:10
**attaches** 131:4
132:20 152:23
179:25
**attaching** 218:24
**attachments**
228:4
**attempt** 72:25
**attempting**
101:7,12
**attend** 19:10
**attended** 27:19
136:1
**attention** 232:21
**attorney** 2:5
107:16 157:5
159:8 160:8
181:23
**attorney's** 50:16
51:1,5,11,19
**attorneys** 38:22
51:23 80:3,4
227:5
**audible** 9:5
**august** 100:14
**austin** 66:7
71:12 85:10
**authority** 129:16
133:25 134:5
**auto** 60:21 63:18
63:23,23 64:1,4
64:8,15 66:10

68:9,11,20 69:1
69:21 70:24
72:7 76:1,7,9,12
76:19,24 77:11
78:13,14 85:5
86:16,22 87:5
123:7 145:8,15
145:19 192:22
192:24 193:20
193:21 194:2,16
194:23 195:3,15
214:14,17
215:10,17 217:2
217:7 220:9
223:23 226:12
**automated** 92:8
92:11,17,25 93:3
93:4,13,19,21
94:2 95:5,10,19
96:22 97:5 99:3
99:8,21 100:16
101:18,25
102:10 103:3,17
104:7,10 105:7
105:12,16,23
106:4,10,16
108:2,5,6,14,18
109:1,2 138:23
139:20,21
**automatic** 94:12
96:17 97:20
101:2
**automatically**
123:2,9 127:23
145:10 179:20
**availability**
33:11 218:1

William L Girdner November 9, 2022

## [available - best]

| | | | |
|---|---|---|---|
| **available** 64:16 69:6 140:21 150:1,17 154:24 161:4 174:19 179:21 181:11 181:16,17 187:6 216:24 221:20 222:3 | 103:14 106:19 107:4 109:12 115:22 128:25 130:7,14,16 137:7 138:7,14 138:16 141:3,5 142:14 150:13 158:1 162:9 | **bases** 213:1 **basic** 24:17 81:4 147:15 195:10 **basically** 10:21 103:18 107:16 **basing** 127:12,12 188:13 **basis** 24:4 25:16 | 65:22 67:15 83:1,5 100:8 101:5 106:23 109:14 110:6 112:2 115:5,7 119:25 126:14 128:3,21 130:21 |
| **avoid** 177:24 | 171:25 172:11 | 26:22 42:7 | 134:25 144:12 |
| **award** 56:14 | 179:11 193:24 | 43:17 126:2 | 146:11 148:6 |
| **aware** 35:22,24 | 197:23,24 | 148:5 190:11 | 152:2,18 153:8 |
| 36:3,12 38:24 | 201:16 202:11 | 203:13,21 | 156:1 160:16 |
| 39:20 59:9 84:2 | 203:4,9 207:15 | 212:24 | 163:2 170:14 |
| 99:8 100:15 | 208:10 209:13 | **bates** 3:22,24 | 174:14 176:4 |
| 103:8 107:9 | 210:19 227:21 | **bclplaw.com** | 182:14,15 |
| 124:14 147:17 | **background** | 2:17 | 188:22,24 |
| 147:23 160:3,6 | 17:22 | **beautiful** 75:17 | 190:13 191:10 |
| 187:5,20 189:11 | **backs** 105:21 | **becoming** 58:16 | 204:12 206:20 |
| 189:19 195:1,13 | **bad** 163:14 | **beginning** 190:1 | 208:17 212:18 |
| 195:18 196:1 | **balance** 90:17 | 229:7 234:15 | 213:8 222:1,24 |
| 213:1 218:5 | 158:12 | **begins** 232:20 | 223:6 227:8 |
| 220:11 | **bank** 169:23 | **behalf** 5:25 | 230:23 232:1,6 |
| | **bar** 198:14 | 38:14 46:16 | **believed** 60:2 |
| **b** | **barbara** 66:23 | 48:10 54:5 | **believes** 40:6,23 |
| | 74:14 206:3 | 115:2 228:24 | 52:10,25 |
| **b** 3:9,11,14 4:1 | **bargain** 190:9 | 232:2 | **believing** 42:7 |
| 5:7 12:19 13:12 | **base** 190:21 | **belated** 92:3 | 202:2 |
| 13:21 46:7,11,12 | **based** 19:17 24:8 | 133:8 | **bell** 193:18 |
| 47:1,7,17,24 | 43:1,11 59:20 | **belatedly** 230:3 | **bench** 158:19 |
| 48:4,9,13 111:3 | 64:12,17 65:13 | **belief** 25:16 | **benefits** 220:8 |
| 125:19 127:7 | 65:14 66:11,18 | 26:23 44:8 45:1 | **best** 10:11 15:15 |
| 219:5 234:20 | 66:21,22,24,25 | **believe** 11:6 | 22:8 56:22 |
| **back** 13:4 20:17 | 67:2,3 72:21 | 14:20 15:3 20:4 | 58:14,21 66:18 |
| 30:15 31:9,25 | 73:17 74:7,9,12 | 21:24 24:2,3 | 67:10 68:19 |
| 32:1 33:14 | 75:3,7,11 126:18 | 26:17 29:21 | 86:10 101:13 |
| 45:22 54:9 | 126:21 131:10 | 40:21 42:19 | 102:24 137:22 |
| 72:11 75:18 | 147:15 190:22 | 44:13 52:21 | 162:10 198:5 |
| 76:13,17 77:9 | | 59:12,23 65:22 | 233:7 |
| 80:17 98:18,19 | | | |

Page 6

William L Girdner November 9, 2022

## [bet - call]

**bet** 7:20 16:15
45:12 122:6
142:13 154:8
155:15
**better** 48:3
54:15 154:11
160:22
**beyond** 8:3
52:14 111:23
127:6 142:8
155:12 161:11
180:1
**big** 19:19,20,23
32:20 35:24
36:5,14,15 40:1
49:21 60:9 62:3
62:16 74:4
99:16 107:8,13
107:14,15
156:15 157:8
166:8 183:4
199:1
**bigger** 54:1
105:2 154:7
**biggest** 40:12
74:5 79:22,22
**bill** 3:21 172:4
218:10 223:8
**bind** 47:9
**binds** 47:19
**birth** 6:16
**bit** 13:22 17:13
54:14 77:10,22
98:1 113:19
116:5 117:16
165:15 166:25
179:11 180:11
184:8 193:25

225:20 231:21
234:15
**black** 182:10,15
**blank** 27:17
**blow** 54:14
157:18 173:14
**bobby** 168:2
207:24
**boise** 2:21 19:17
60:12 89:20
**bonus** 68:18
**border** 88:19
**boss** 157:22
**bot** 109:5 146:3
147:1
**bots** 108:21
109:3
**bottom** 72:18
81:24 82:3
232:21
**box** 2:20
**brain** 7:17
**breach** 55:1
**break** 8:11,11,14
12:2 45:15,19,24
64:23 94:21
98:1,5,8,10,15
98:21 102:15,18
103:1,11 138:7
138:12,17,19
140:16 141:1,8
171:22 202:21
202:21,23,24
203:2 210:12,14
210:17 227:12
227:19
**breakdown**
52:18

**breaks** 136:9
**brief** 128:22
172:10
**briefly** 12:12
**bring** 32:1 126:7
199:17
**broad** 40:18
53:5 56:23
159:13 174:15
187:8,9
**broadly** 198:21
**brother** 73:15
**brought** 125:15
168:4 182:11
211:22
**browning** 205:6
**bryan** 2:14 5:22
218:7 223:6
**bucket** 22:20
23:16 24:16,23
26:3,8,14 27:9
**budget** 198:17
**build** 216:4
**built** 175:2
**bunch** 7:20
40:13
**bureau** 21:13
24:10,11 26:7
50:23 60:11,13
60:14 182:22
**business** 18:22
40:2 50:10
58:17 62:10
163:6 179:3
187:21,23
**butte** 67:14
**button** 230:22
231:3

### c

**c** 5:1
**ca** 2:15
**calculate** 179:2
**calculates**
182:12,25
**calculating**
184:20
**calculations**
175:2
**calendar** 175:5
175:10 176:13
176:19,20,23
177:12,18,19
178:2,18 182:12
**california** 6:19
6:21 7:8 66:13
66:17 67:23
72:17,22 75:25
99:10 112:25
114:17 139:6
148:23 157:15
161:23 188:15
188:22 204:17
205:19,20,24
206:11 215:2
**call** 12:19 23:4
48:21 60:15
71:25 74:15
91:2 102:17
108:11 112:16
113:1 116:7,15
118:18 136:8
141:7,10 143:14
158:6 167:17,19
167:20 174:7
201:17 202:12
203:9 204:6

Page 7

(70 of 297), Page 70 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 70 of 297
Case 1:21-cv-00305-DCN Document 60 Filed 12/13/22 Page 69 of 118
William L Girdner November 9, 2022

[call - certainly]

| | | | |
|---|---|---|---|
| 206:11 207:2 213:22 | 23:22 24:22 32:11 38:3 | 179:16 180:15 180:16,16,17,18 | 55:5,17,20 56:25 57:1 180:25 |
| **called** 22:20 24:17 70:2 72:1 74:7 93:11 96:8 108:21,22 113:9 115:24 116:8,18 167:15 207:3 220:7 | 39:19,22,24 43:20 46:19 50:4,19 52:10,18 52:18,20,22 54:22 57:2,7,22 58:6 64:9 69:5 73:1 74:1,15 79:1,2,4 80:4 | 180:19,19,21,23 181:9,9 192:3,3 193:11 194:6,6 195:18 197:3 205:13 209:17 209:20,21 212:14 213:3 221:24 222:2 | **category** 54:17 55:15 57:14 96:6 **cathy** 19:14 21:25 22:7 50:22 59:13 89:14 91:17 159:21 181:4 |
| **calling** 52:14 193:6 | 81:1,9,13,21,22 82:5,13,15,20 | 223:22 225:7 226:5,8 229:24 | **cathy's** 59:17 182:16 |
| **calls** 41:25 44:10 45:3 58:11 102:18 119:4,24 121:9 122:19 123:4 124:18 125:13 132:15 133:11 137:1 144:10 206:13 229:14 230:5 | 83:2,6 94:13 96:4,5,8,9,15 97:1 101:6 103:18,21 116:9 117:21 125:25 126:18 133:21 135:6 136:11,21 136:23 137:17 137:24 143:7,16 | 230:1,2,8,20,24 231:2 **cases** 22:20,21 23:16,17,25 24:7 26:21 29:7,9 32:8 35:8 49:18 49:24 50:2,3,12 50:12,13 52:12 52:15 53:7 | **causing** 100:16 100:20 103:8 129:22 **caution** 223:9 **cave** 2:14 5:22 218:7 223:6 **caveat** 67:25 **ccms** 73:16 **center** 2:15 |
| **capacity** 1:7 | 143:23 144:3,7 | 55:15 58:2,15,24 | **central** 7:8,11,13 |
| **captcha** 99:15 99:19 | 144:13,16,21 145:1,4,9,9,20 | 69:4 73:25 76:24 78:15 | 157:14,15 231:24 |
| **captchas** 99:14 | 145:23 147:12 | 79:10,11,13 | **ceos** 206:11,25 |
| **card** 77:1 170:22 171:2 | 147:18,24 149:12,15,16 | 92:18 93:5,23 94:3 95:11 | **certain** 23:5 49:17 103:19 |
| **care** 130:7 | 150:3,5,10,10,13 | 105:14,23 | 159:19 164:17 |
| **careful** 97:7 218:3 | 150:14 151:4,10 153:5,13 158:20 | 143:22,23 148:8 153:18 158:4,8 | 174:11 180:24 180:25 206:21 |
| **carefully** 33:15 33:17,20 51:22 | 158:20 164:23 165:3,4,19 | 161:15 166:2 171:1 177:15 | **certainly** 8:5 9:3 10:11 14:9 |
| **carolina** 139:9 141:24 | 166:15,23 167:2 168:4 169:2,7 | 178:11,24,25 179:13 184:10 | 15:16 20:9,14,22 29:5 36:24 47:5 |
| **carson** 59:14,16 | 170:25 171:4,4 | 184:11,11 207:8 | 47:16 56:5 |
| **cart** 22:20 23:16 24:16 | 172:2 174:18,19 176:12 177:5 | 212:2 230:20 **categories** 52:18 | 68:23 92:11 164:13 193:11 |
| **case** 1:4 5:10 9:17 18:12 | 178:10,14 | 53:6,10,14 54:24 | 193:17 209:2 |

Page 8

William L Girdner November 9, 2022

[certainly - clerks]

211:22 217:23
226:6 234:2
**certificate** 236:1
**certifications**
18:7
**certified** 236:5
**certify** 236:7,16
**cetera** 109:4
**chain** 3:23
**challenge** 153:13
153:20 155:7,23
211:12
**challenged** 80:13
**chance** 17:9
**change** 11:2 16:8
83:20 87:11,16
93:18 101:18
176:17
**changed** 10:22
49:4 61:21 77:7
84:13
**changes** 13:13
39:3 49:11
171:7 230:17
**changing** 58:16
**characterization**
89:10
**characterize**
103:25
**characterizing**
28:10
**charge** 167:17
192:15 199:16
200:11,15,19,22
201:7 207:11
215:14
**charged** 164:16
164:21 200:2

201:18 202:13
203:10 204:20
**charging** 199:13
199:25 200:6
216:12
**chart** 53:10,17
173:14 176:22
182:12
**charts** 186:16
**chat** 48:15
**chatted** 171:12
173:16
**check** 30:24 33:4
35:11,14 49:6
77:3,4 95:13,15
97:8 102:12
108:15 139:13
157:23 180:23
212:19
**checked** 225:20
**checking** 94:15
139:22
**checks** 118:17
**chief** 21:13
24:10,11 26:7
60:13 141:13
182:22 206:12
223:3
**chiefs** 50:23
60:11,14
**child** 149:21
**choice** 169:16
**choked** 163:12
163:15
**choose** 206:6
**chris** 2:24 5:15
21:23 24:12,13
25:19 37:18

48:20 60:12
**churn** 87:19
**circles** 71:22
**circuit** 23:4
40:14 78:22
80:15 168:2
207:25
**circumstance**
79:14 80:9
146:15
**circumstances**
185:19
**city** 107:16
197:20,21
**civil** 13:15 14:3
14:6,22 37:24
44:7,24,24 50:7
50:10,11,12,13
52:3,12,12,14
54:22 55:14
56:23 60:19
90:8,16 92:18
93:5,22 94:3,13
95:6,11 105:14
105:22 112:25
117:2 119:20,21
129:7,23 150:1
150:16 151:24
154:20,23
174:14,15 209:4
**claims** 56:6
57:10
**clara** 206:4
**clarify** 9:8 11:14
110:20 111:1
119:18 121:15
224:4

**clarity** 55:18
**clark** 18:3
**clean** 9:10
**clear** 9:5 25:6
65:8 79:9 82:22
110:23 136:23
159:11 180:12
220:1,4 222:25
225:22 234:7
**clearly** 184:9
**clerical** 95:20
101:20 106:12
118:17 212:19
**clerk** 11:23
21:21,23 23:18
23:21 24:10
25:20,23 30:20
31:19,20 32:4
81:1 85:21
118:17 120:10
120:12 122:15
122:22 144:25
150:24 168:20
179:9 194:5
196:20,25 197:7
203:16 206:10
230:10 231:4
233:11
**clerk's** 118:5
119:1 144:1
165:17 167:13
**clerks** 82:25
143:21 162:13
162:18,24 163:3
163:24 164:9,13
167:16 179:12
188:14,15
198:25 199:1

Page 9

William L Girdner November 9, 2022

[clerks - complaint]

| | | | |
|---|---|---|---|
| 200:25 201:20 | 129:6,24 130:23 | **collected** 195:11 | **common** 56:10 |
| 202:3 205:16,18 | 130:25 131:13 | **collecting** | 80:24 96:3 |
| 205:23 206:6,17 | 131:20,24 132:9 | 101:20 | 109:5 120:1 |
| 206:24 207:1,16 | 132:10 146:3,6 | **collections** 55:1 | 133:9 146:24 |
| 208:11,22 212:6 | 147:17,23 | **college** 18:1 | 191:14 192:5 |
| 212:7,12,18 | 148:16 149:25 | **color** 176:18 | 213:10,21 |
| 213:2 215:2 | 150:16 151:6,12 | 183:12 184:5 | **commonly** |
| 230:21,22 | 151:22 158:23 | **column** 113:8 | 108:18 183:5 |
| **client** 11:17 | 158:24 160:23 | 176:5 180:4 | 208:1 |
| 216:2 | 160:25 175:17 | 181:3,12 182:4,9 | **communication** |
| **clients** 156:23 | 184:6 210:24 | 182:11 186:6 | 107:22,25 110:1 |
| **close** 69:25 | 211:17 213:11 | **columns** 174:17 | 111:10,12,15 |
| 104:23 131:21 | 214:15 215:8 | 174:22 | 114:12,14,25 |
| 132:25 142:15 | 217:1,12,18,24 | **come** 51:25 69:4 | 200:13 217:16 |
| 171:17 179:22 | 218:19 219:24 | 74:19 75:18 | 222:14 |
| 180:2 214:7 | 226:1 227:9,9 | 129:19 180:25 | **communications** |
| **cns** 3:22,24 9:21 | 233:6,12 | 192:10 198:5 | 109:11 110:22 |
| 13:10 18:14 | **cns's** 9:22 32:21 | 216:3 | 111:5 112:18,20 |
| 21:7 26:13 | 38:13 40:5 41:7 | **comes** 82:16 | 114:6 134:18 |
| 28:22 32:16 | 41:14 43:23 | 117:23 157:8 | 136:4,4 213:11 |
| 39:23 40:6,23,23 | 46:16 48:10 | **comfortable** | 214:15,22 217:1 |
| 47:8,9,18,19 | 54:5 63:5 65:2 | 10:23 14:12 | 217:11,24 |
| 48:16,25 49:14 | 87:16 91:11 | **coming** 54:9 | 218:19 225:25 |
| 52:2,10,25 57:19 | 110:1 115:2 | 72:11 111:9 | **comp** 56:14 |
| 57:25 60:9,18 | 118:21 119:13 | 190:11 191:15 | **companies** 187:6 |
| 62:23,24 63:1 | 153:22 175:16 | **commenced** | **company** 2:6 |
| 78:15 86:17 | 184:24 196:4,9 | 85:16 | 5:17 70:1 171:2 |
| 88:10 89:2 90:3 | 207:14 209:13 | **commencing** 2:9 | 187:3 |
| 90:3,12 91:23 | 213:19 214:2 | **comment** 226:24 | **competitors** |
| 92:11 93:3,9,11 | 218:21 226:10 | **commented** | 156:24 |
| 93:15 95:4,10 | **coast** 158:8 | 106:24 | **complaint** 4:3 |
| 99:9 101:1 | **code** 96:8 186:9 | **comments** 11:7 | 29:21 30:18,24 |
| 103:4,7,17 | **codes** 52:22 | **commercial** | 36:4,17,21 40:20 |
| 104:10 106:9 | 53:18 197:11 | 219:17 | 42:5,8,21,21 |
| 107:21,24,25 | **coding** 183:12 | **commission** | 43:12,13,16 44:9 |
| 108:4 109:11,14 | 184:5 | 235:25 236:25 | 45:1 117:5 |
| 109:23 110:17 | **coffee** 45:13 | **committee** 112:3 | 118:5 119:19,21 |
| 111:4,15 112:19 | 234:14 | | 121:4 123:16 |

Page 10

[complaint - contract]

| | | | |
|---|---|---|---|
| 133:20 143:11 | **compliant** | **conducted** 20:21 | **considers** 154:22 |
| 143:15,19 144:5 | 132:10 | **confidential** | **consistent** 125:6 |
| 144:16 150:17 | **complicated** | 39:11,13 | 131:8 209:7 |
| 154:22 165:18 | 76:25 | **confidentiality** | **consisting** 235:9 |
| 181:15 212:12 | **comply** 49:14 | 213:21,24 214:9 | **constant** 87:19 |
| 212:17 213:2 | **component** | 214:16 | **constantly** 93:17 |
| 226:4,14,21 | 81:13,13 | **confirm** 55:25 | 101:18 |
| 227:7 233:8 | **compromise** | 200:23 201:6 | **constitution** |
| **complaints** 21:1 | 82:23,24 | **confirmation** | 152:3,12 208:7 |
| 21:7 22:18 | **compulsive** | 165:17 | **constitutionality** |
| 23:21 24:15,24 | 227:14 | **confirming** | 178:5 |
| 26:2,7,14 27:9 | **computer** 61:14 | 150:5 | **consultation** |
| 29:16 31:10 | 185:9 | **conflict** 162:16 | 207:12 |
| 37:9 40:1,24 | **concept** 175:19 | 166:4,6 | **consulted** 207:9 |
| 41:4,9,14,18 | **concern** 13:23 | **conform** 13:14 | **contact** 51:1 |
| 52:9,25 55:6 | 213:22 | **confuse** 130:15 | **contained** |
| 58:5 60:19 63:2 | **concerned** 13:13 | **confused** 189:16 | 134:15 235:11 |
| 79:13 80:3,20 | **concerning** | **confusion** | 235:13 |
| 84:18 90:8,16 | 111:14 231:21 | 218:15 | **contains** 236:14 |
| 109:16,25 117:2 | **concerns** 58:7 | **connecticut** 69:1 | **contempt** 57:6 |
| 124:16 129:8,19 | 195:2,19 196:1,3 | **connection** | **content** 18:19 |
| 129:23 131:1,22 | 210:25 213:12 | 60:18 | **contents** 235:10 |
| 131:25 132:11 | 213:13,17,19 | **consequence** | **contest** 8:9 |
| 150:1 151:25 | 214:10,16 | 52:7 | **context** 7:3,5 8:1 |
| 154:20,23 161:1 | **concluded** | **conservatorship** | 41:25 77:23 |
| 167:22 174:15 | 109:23 234:23 | 56:18 | 115:8 118:4 |
| 181:14 209:5,11 | **concludes** | **conservatorshi...** | 178:14 202:15 |
| 211:18 212:5 | 234:19 | 56:17 | 202:16,17 |
| **complete** 10:9 | **conclusion** 41:25 | **consider** 114:20 | **contexts** 149:8 |
| 15:12 16:2,19 | 44:11 45:4 | 129:6 178:17 | **continue** 10:20 |
| 17:5 48:8 143:1 | 58:12 119:5,25 | 185:8 | 86:17 126:5 |
| **completed** 16:24 | 121:10 124:19 | **considered** 9:21 | **continued** 4:1 |
| 74:2 145:3 | 125:14 132:15 | 130:23 131:13 | **continues** 232:24 |
| 166:18 211:9 | 133:12 148:4 | 179:21 | **continuing** 10:23 |
| 228:5 | 191:14 202:9 | **considering** | 85:16 |
| **completes** 34:10 | 229:15 | 51:20 125:1 | **contract** 55:1 |
| **completion** | **condition** 15:21 | 147:21 | 83:7 190:17,19 |
| 166:19,21 212:3 | 15:25 | | 192:2 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[contractors - county]**

| | | | |
|---|---|---|---|
| **contractors** 19:3 | 32:21 33:3,12 | 175:14 179:3 | 189:12,21 |
| 19:6 | 34:6,20,21 35:2 | 181:17,25 | 192:15 201:5,7 |
| **contradictory** | 35:4,5,10 37:9 | 182:14,20 | 204:17,22,25 |
| 165:20 | 37:10 40:2,4 | 186:11 187:4 | 216:9,18,20 |
| **contrary** 24:5 | 41:9 42:6,17 | 189:6 191:20 | **costs** 60:22 61:8 |
| 26:25 | 43:25 47:20,21 | 192:11,16 | 61:11,11,14,14 |
| **controlled** | 47:25 49:15,22 | 193:12 195:12 | 62:22 63:5 |
| 134:10 | 53:16 57:10,11 | 200:11 201:19 | 90:20 214:23 |
| **controversies** | 57:23,24 59:6 | 202:14 207:18 | 215:5,8,9,12,13 |
| 90:1 | 61:21 62:4,5 | 208:12,22 209:6 | 215:16 220:8 |
| **conversation** | 63:4,16 64:17 | 209:11 210:3,9 | **council** 197:20 |
| 14:18 107:21 | 68:3 78:24 80:6 | 211:1 215:15 | 197:21 |
| 112:22 113:2 | 82:7 85:23 89:8 | 216:7 217:5,19 | **counsel** 5:18 |
| 138:25 196:20 | 92:13 96:18 | 217:21,22,22 | 13:10 38:13 |
| 198:9,10,21 | 97:2,3,24 102:8 | 218:2,14,17 | 48:2 54:4 |
| 218:4 | 103:20 105:16 | 219:15,16 | 110:22,24 |
| **conversations** | 105:17 106:2,3,8 | 223:25 224:5 | 138:18 218:5 |
| 21:12 22:14 | 107:19 116:14 | 232:7 235:14 | 222:21 228:17 |
| 24:9 25:10 | 116:22 117:4,11 | **corrected** 228:22 | 232:1 |
| 188:15 197:6 | 117:12 118:22 | 235:14 | **count** 179:2 |
| 200:10 217:6 | 120:17 121:6 | **correcting** | 202:4 |
| 218:9 | 122:13,17 123:2 | 106:15 | **counter** 24:1 |
| **conviction** 57:4 | 123:13,24 125:2 | **corrections** | 30:12 32:9,12 |
| **convincing** | 125:11 126:19 | 10:15 213:6 | 80:21 117:7,9,11 |
| 195:8 | 126:20,23 127:4 | 235:16 | 117:15 118:15 |
| **copies** 220:18 | 128:12,14,19 | **correctly** 18:19 | 118:16 119:8 |
| **copy** 23:22 63:2 | 129:25 131:3 | 28:20 33:9 | 167:22 168:5,19 |
| 63:3 113:13 | 133:21 134:12 | 59:20 76:22 | 209:18,25 |
| 205:9 219:22 | 134:13 135:22 | 90:19 92:7 | **counties** 20:23 |
| 220:6 232:14 | 135:24,25 136:7 | 96:21 101:13 | 22:6 209:10 |
| **correct** 9:13 | 136:13,20,25 | 106:1 111:9 | **country** 51:18 |
| 10:16 11:13 | 139:14 140:6 | **corrects** 150:13 | 68:14,16 76:17 |
| 19:11,12,16,19 | 142:20 143:9 | **correspondence** | 92:1 161:15 |
| 19:21 20:13,18 | 144:4 145:12,13 | 21:20,20 22:15 | 163:16 |
| 21:8 25:18 27:2 | 145:22,24,25 | 37:18 | **county** 2:8 22:2 |
| 27:10,14 28:7,25 | 147:19 149:2,5 | **cost** 60:18,24 | 22:24 23:2,3 |
| 29:4,22 31:3,4,9 | 151:9 152:21 | 61:5 158:16 | 24:15 26:15 |
| 31:11,25 32:17 | 153:5 155:11 | 188:11,24 189:1 | 28:1 66:3,21 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

William L Girdner November 9, 2022

[county - courts]

| | | | |
|---|---|---|---|
| 67:9 70:4 72:19 | 75:16 76:9,10 | 191:17 193:2 | 185:24 228:18 |
| 72:24 73:15,22 | 79:1,3 80:14,17 | 195:2,11 198:12 | 232:2 233:14 |
| 73:23 75:6,17 | 81:10 82:5 | 199:9 203:15,18 | **courthouses** |
| 76:10,12,15,18 | 83:20 84:1,5,12 | 204:2 205:2,6,23 | 20:1 37:21 |
| 79:22 83:9 | 85:10 87:5 92:9 | 206:9 207:1,8 | **courts** 1:8 10:18 |
| 88:18,19 90:25 | 92:10,12,13,23 | 208:22 211:12 | 23:5,7,9,12 35:8 |
| 182:1 197:18,18 | 92:24,24 93:4,24 | 212:5,6,7,11 | 35:12,17 37:7,13 |
| 198:20 199:13 | 94:1,14 95:18 | 215:17 216:3,10 | 37:25 40:8,11,12 |
| 206:21,22 209:8 | 96:7,23 97:18,22 | 216:20 218:22 | 40:12,13,16 41:5 |
| 210:4,10 235:3 | 99:20 103:5 | 221:1,15 223:15 | 43:9,20 45:2 |
| 236:3 | 105:23,25 109:7 | 229:20 230:9 | 58:3 64:21,22 |
| **couple** 35:20 | 116:5 117:8,9 | 232:14,16 233:6 | 65:1,3,12,25 |
| 102:19 104:12 | 118:15 120:6,17 | **court's** 11:24 | 66:1 67:9,12 |
| 186:25 190:18 | 123:7 126:8 | 29:12 75:4 | 69:20,24 77:11 |
| 210:12 223:12 | 130:6 131:5 | 96:17 118:6 | 78:2,5 79:6 |
| **course** 8:19 17:8 | 132:24 133:2,3 | 133:21 135:6 | 80:11 82:13 |
| 17:8 18:24 | 143:13 144:7,15 | 143:16 144:2 | 83:23 84:3 |
| 22:11 33:18,23 | 144:25 146:23 | 145:1 146:10 | 87:13 89:6 |
| 46:25 51:17 | 149:18 151:1,2 | 150:3 167:11 | 92:15,16 94:6,7 |
| 57:9 76:5 93:1 | 153:13,19 | 177:11 | 94:11 95:4,10 |
| 99:22 136:5 | 154:21,23 155:7 | **courtesy** 114:24 | 96:14 97:4 99:2 |
| 163:22 164:9 | 155:24 156:17 | **courthouse** 1:4 | 99:4,8,11,14 |
| 167:5 178:20 | 157:11 158:8,17 | 3:12,14,19 4:5 | 100:4,18 101:1 |
| 231:24 | 159:6 160:21 | 5:9,21 14:21,25 | 103:3,4 109:15 |
| **court** 1:1 2:7 | 161:8 162:14,18 | 17:17 18:22 | 113:13 128:2 |
| 5:11 6:2 9:6 | 162:18,24 163:4 | 19:15 20:22 | 129:11,22 |
| 11:4,5 21:24 | 163:24 164:7,8 | 30:17 32:24 | 130:22 134:19 |
| 22:22 23:18,21 | 164:13,18 | 35:6 37:5 50:8 | 135:4,17 136:16 |
| 29:18,19,20,24 | 165:22 168:19 | 50:11 60:14 | 136:19,24 |
| 30:2,3,7,20 | 168:20 169:22 | 63:12,15 64:3,7 | 148:12,13,15 |
| 32:12 34:18,23 | 174:20 175:6,10 | 64:12 68:21 | 152:3,6,10 158:4 |
| 38:7,18 39:1,23 | 175:12 176:14 | 72:8 75:3 87:24 | 158:11 160:19 |
| 42:12 43:5 | 176:19 177:3,13 | 89:11,22 90:21 | 160:22 161:2,25 |
| 44:14 45:7 | 178:1,2,18 179:3 | 90:21,22 105:13 | 162:21 163:6,6 |
| 52:17 56:2 57:6 | 179:6,8,13,18 | 105:18,20,21 | 163:11 164:4 |
| 61:10 63:19 | 180:16 182:1,13 | 154:19,22 155:4 | 169:9,13,14,16 |
| 64:23 69:5,17 | 182:13 185:22 | 156:21,22 | 170:4,6,7,8,11 |
| 70:1,5,6 74:5,5 | 188:19 190:23 | 157:13 168:5 | 171:3 185:12 |

Page 13

William L Girdner November 9, 2022

[courts - declaration]

187:1,6 188:11
189:19,20 194:1
194:22 195:14
195:20 196:5,6
198:12 199:8
205:25 206:2,8
208:2,5 210:2,21
211:16 212:1
213:10,12,12,13
214:11,15,22
215:9 216:9,19
223:20 225:8,8
225:13 229:25
233:7
**cover** 63:10
90:21,22 91:4,10
98:9 102:18
148:22
**coverage** 20:3
60:17 89:20
148:21 158:7
**covered** 50:13
96:19
**covering** 21:24
95:18 148:13
**covers** 20:5
51:12 67:19
78:8 148:16
**cozin** 215:23
**cracking** 172:2
**crawlers** 108:22
109:3
**crazy** 185:21
197:14
**crc** 1:25 236:23
**create** 165:3
218:15

**created** 93:9
103:4 173:19
174:22 182:19
**creating** 164:24
**creation** 167:16
167:17
**credit** 170:22
171:2
**creditor** 55:1
**criminal** 50:5,12
**cross** 30:7 32:11
117:10 119:7
**crossed** 29:11
32:9 167:22
168:5
**crosses** 117:7,9
117:14 118:5,15
209:17
**crr** 1:25 236:23
**cruz** 67:2,4 85:6
**csr** 1:25 236:23
**cup** 45:13
**curious** 102:16
**current** 159:3
194:4
**currently** 37:14
58:4 71:20
78:15 84:3 94:2
94:13 95:5
140:5 231:5
**cut** 101:4
**cv** 1:4 5:10
**cycle** 156:9,11

**d**

**d** 3:1 5:1
**d.c.** 141:21

**daily** 48:16
49:14 90:4,13
156:9
**dakota** 139:8
220:15 221:1,16
221:17 222:5
223:16
**darn** 161:12,16
162:6
**data** 103:18,19
104:1 134:15
135:20 136:17
136:22 137:20
**database** 36:22
230:17
**date** 5:4 6:16
58:1 117:22
148:9,10 174:18
174:19,19 175:5
176:13 180:3,6
181:2,11 186:4,5
205:8 234:21
**dated** 3:23
**day** 2:9 22:21,22
22:23 24:19,25
25:21,22,23 26:3
26:8,15 34:11
35:25 36:6 40:2
62:9,10 80:12,12
153:7,20 155:8
155:24 157:24
164:5 175:19
176:4,4,7,8,10
176:13 177:5,9
178:11 182:12
183:21 184:10
184:11,12
185:13 210:22

211:10,13,17
225:21 235:8,21
236:18
**day's** 36:15
**days** 30:16 155:1
159:1 167:6
168:18 175:5,6
175:10,10,13
176:13,14,19,19
176:20,23 177:3
177:12,13,18,20
178:2,2,18,18
183:25 184:2
219:18
**dc** 89:23
**dcn** 1:4 5:10
**deadlines** 11:20
126:8
**deal** 11:23
156:21 166:8
**debtor** 55:1
**decades** 47:13
**deceptive** 202:6
**decide** 122:5
**decided** 89:18
**decision** 4:6
68:25 84:14
90:22 214:5
**decisions** 18:22
88:9
**declaration** 3:19
4:4 46:6,10,14
46:15,24 61:17
168:1 171:10,13
172:25 173:9
191:16 201:15
202:11 203:8
209:21 228:4,11

Page 14

William L Girdner November 9, 2022

[declaration - diego]

228:16
**declarations**
46:25 195:7
205:11
**dedicated** 152:4
**deep** 157:7
**defamation** 50:2
**defendant** 1:9
2:5,18 95:23
96:4,15,24 181:9
**defendant's** 3:11
3:13,16 104:15
**defendants** 5:8
37:1 67:16
**defer** 20:15,24
23:8,11 27:7
**define** 131:3
158:23
**defined** 132:5
**defines** 154:19
**definition** 120:1
120:14 133:10
133:16 148:2
159:2,15 180:5
229:17,19,22
232:3
**definitions** 52:19
52:20 119:16
**degree** 18:2,4
**degrees** 18:11
**dekalb** 206:21
**delay** 40:21,23
84:17 129:23
130:23 131:8,13
152:9,24 155:4
155:12 175:4,5,5
175:16 176:2,4,8
176:13,22 177:3

177:10 179:2,25
180:1 182:13,13
185:8
**delayed** 77:8
129:7 154:23
177:16 178:24
178:25 183:21
184:11,12 185:4
**delaying** 80:11
**delays** 131:5
132:21 151:23
155:8,24 178:5
178:23 182:13
**delete** 219:19
**deleted** 219:14
219:19 222:8
224:17
**deletion** 225:4
**demand** 222:7
222:10
**demanded** 32:25
**demanding**
197:12
**democracy**
152:7 160:21
208:6
**department**
114:10
**depending**
176:18
**depends** 63:23
64:15
**depo** 47:2
**deponent** 47:17
**depose** 235:6
**deposed** 6:24
7:25 8:2 234:18

**deposition** 1:13
2:1,4 3:12,14
5:7,12,14 8:7,8
9:8,25 10:24
11:1,17 12:22
13:9,14 16:12,16
17:2 19:10
20:11 27:19,22
28:6,10 33:22
46:5,10 47:10
48:2,14 54:21
104:21 111:3,9
111:17 112:21
123:23 124:1,5
126:6 135:14
136:1,5,13 154:1
161:23 173:14
194:12 195:25
202:20 205:1,5
215:23 219:5
220:23 225:1
226:19 228:14
229:4 231:20,25
232:18 234:20
234:23 235:8,10
236:9,11,15
**depositions** 8:1,3
**deputy** 143:21
150:24 162:18
230:22
**derrick** 112:6
115:14,18,23
**describe** 55:14
92:17 114:18
**described** 20:1
28:16 37:16
57:23 112:9
146:16 152:19

153:10
**describes** 105:19
**describing** 27:25
32:7 113:11
**description** 21:2
21:14 27:8
59:24 113:19,24
155:2 180:19
**designate** 39:12
**designated** 47:8
47:18
**designation**
39:11
**designee** 5:7
234:21
**designs** 184:8
**desk** 118:5
**detail** 102:17
**details** 142:8
194:19
**determination**
178:4
**determine** 10:13
57:19,25 128:6
141:7 178:17
**determined** 52:2
**detriment** 9:21
**devaluing** 152:9
**develop** 37:12,24
93:15
**developed** 37:5
73:5 187:16
**diaz** 3:24 223:2
223:7 224:21
**dictated** 139:2
**diego** 72:24 73:2
73:7,13,15

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com 208-343-4004

ER-1755

William L Girdner November 9, 2022

## [difference - duke]

| | | | |
|---|---|---|---|
| **difference** 91:20 | **discussed** 13:7 | 95:7,13,15,21,23 | 134:20,22 |
| **differences** | 48:21 114:17 | 96:3,10,13,22 | 164:17 167:10 |
| 170:18 | 166:25 208:19 | 97:21 101:20 | 198:25 199:2,3,9 |
| **different** 7:5 | 215:6,8 | 102:3 104:2,4 | 199:10,14 |
| 35:11 43:22 | **discussing** 37:19 | 108:12 118:20 | 229:23 230:1 |
| 52:22 53:6,18 | **discussion** 13:2 | 120:5 139:22 | 231:22 233:10 |
| 63:22 64:22,23 | 38:10 199:1 | 146:8,23 162:14 | **doing** 9:4,9 |
| 66:3 68:2 69:24 | 203:15 215:16 | 164:24 167:15 | 28:18 36:6 51:6 |
| 78:9 79:5 81:22 | **discussions** | 167:17,20 | 51:23 56:22 |
| 84:6 108:20 | 157:20 216:8 | 174:19 179:12 | 87:7 94:2,12 |
| 126:14 139:23 | **dishonest** 20:12 | 179:14 180:21 | 96:14 98:4 99:5 |
| 145:16 148:24 | **dismissed** 88:3 | 181:2,5,7,8 | 99:17 100:25 |
| 161:25 167:3,14 | **dispute** 27:12 | 232:15 | 101:2 116:11 |
| 169:2 187:1,3 | 54:7 55:2 60:1 | **docketed** 24:2,4 | 137:22 139:19 |
| 189:25 202:3 | 119:6 177:24 | 24:7 26:4,9,16 | 156:24,25 160:3 |
| **differently** 104:1 | **distinction** 29:8 | 26:21 30:9 | 171:21 187:21 |
| 222:10 | 43:24 45:8 | 166:22 167:23 | 187:23 189:9 |
| **digit** 77:1 | 60:23 61:2 | **docketing** 25:4 | 196:4 |
| **dilemma** 64:14 | 81:11 | 25:14 118:18,22 | **dominate** 190:21 |
| **direct** 232:21 | **distinguishes** | 165:3 167:15 | **door** 171:17 |
| **direction** 236:13 | 42:16 | 168:8,12 | 188:3,4 215:24 |
| **directly** 115:6 | **district** 1:1,2 | **document** 31:20 | 216:1 |
| **director** 1:8 | 5:11,11 7:8,12 | 55:13 104:18 | **double** 139:13 |
| 188:18 190:8,23 | 7:13 10:18 | 105:10 117:23 | **doubt** 194:8 |
| 197:24 198:4 | 13:15 22:1 | 120:17 121:4 | **downfall** 199:4,6 |
| 202:4 203:18 | 23:18 34:19,19 | 122:11,16 133:4 | **download** 63:2 |
| 215:23 | 34:20,23,24 | 151:7 164:22 | **drill** 162:10 |
| **disagree** 10:17 | 39:23 54:23 | 169:1 170:10 | 165:14 |
| **disclosed** 147:17 | 67:9 79:1 80:14 | 199:3 219:1 | **driving** 217:15 |
| **disclosing** | 80:17 157:14,15 | 225:15 229:12 | **drop** 180:24 |
| 147:23 | 164:8 182:2 | 230:7,16 231:1 | 181:1 |
| **discovery** 38:8 | 206:9,24 226:22 | 232:9 | **drying** 185:25 |
| 38:11 39:3 46:8 | 230:9 | **documentation** | **duces** 3:14 |
| 52:21,24 153:5 | **divorce** 56:4 | 25:11 111:21 | **due** 151:23 |
| 195:19 196:14 | **divulge** 223:9 | **documents** 47:1 | **duke** 2:18,19 3:5 |
| 227:25 | **docket** 25:23 | 53:9 61:12 96:1 | 5:24,24 6:11 |
| **discuss** 12:3,5,12 | 37:8 81:3,3 | 104:12 109:20 | 10:19 11:10 |
| 198:6 | 92:14 94:15 | 117:1 124:16 | 12:9,14,23 13:6 |

Page 16

William L Girdner November 9, 2022

## [duke - emails]

15:5 27:6 29:25
31:18 34:1,2
42:4 43:8 44:6
44:22 45:11,12
45:14,23 48:12
48:15 53:8
54:19,22 55:19
58:22 65:10,18
90:3 92:6 93:2
97:25 98:4,8,12
98:19 102:25
103:16 104:3,13
104:22 110:9,12
110:15 111:2
118:11,14
119:12 120:4,23
121:14,21,23
122:24 123:8
124:10,25 125:7
125:23 126:1,17
127:16 128:24
129:6 130:5,8,13
130:21 131:10
132:8,22 133:13
133:15 135:21
137:6,10,23
138:6,16 139:12
139:16 140:15
140:19,23 141:5
141:6 143:3
144:14,22
147:10 149:20
149:24 153:24
154:2 161:14
165:1 166:12
168:17,21
171:23 172:1,6
172:11,17,22,24

189:18 194:21
195:9 196:2
200:21 201:14
202:19 203:6
205:14 209:2
210:7,21 211:16
218:18 220:20
220:24 223:12
224:9 225:2
226:20 227:12
227:23 228:6,10
228:15 229:19
230:6,15 231:6
231:11 232:19
233:21 234:1,17
**dukeevett.com**
2:22,23
**duly**  6:6 234:8
235:5 236:9
**duty**  214:3
**dvorak**  135:14
137:13 195:25
**dvorak's**  135:16
136:1,12 213:16

### e

**e**  1:25 2:6,19,19
3:1,2,9 4:1 5:1,1
22:5,7 39:1,5,8
39:18,19 42:11
42:20 54:24
66:2,4 70:6,7
73:1 78:5,6
79:20,23 80:8,21
80:25 81:12
82:12 83:8,20
84:4,6,7,13,24
85:7,9,11,15,21

85:24 109:17,24
115:18 118:4,11
129:7,16,23
134:9,11,16,25
135:2 142:22
143:5,8,12,20,25
148:9,20,24
149:1,13 158:2
167:9,14 169:5
171:4 187:10,16
192:3 194:9
197:19 198:7
204:5 207:17
220:16 230:21
233:9 236:5,23
**earlier**  17:1
123:25 124:4
148:18 152:20
155:6 156:2
163:9 175:12
185:4 199:15
210:23 231:19
**early**  7:18 67:17
123:22 156:7
234:13
**easier**  54:15
**east**  158:8
**eastern**  67:9,9
**eastward**  73:22
77:9,10
**easy**  65:20
161:19 194:3
**editions**  156:7
**editor**  17:17
48:21
**educational**
17:22 18:10

**effectively**  227:7
**effort**  85:25
153:15,17 222:6
**efm**  80:25
**eight**  65:23
69:24 202:3
205:16,18
**eighth**  80:15
168:1 207:25
**either**  33:2 44:24
86:16 87:14
120:18 131:21
147:22 151:4
177:25 178:8
182:12 183:7
187:2 208:9
214:9 217:19
**electronic**  20:24
23:20 37:15
38:6,17,25 42:16
44:8,25 117:14
118:10 123:24
124:15 126:22
127:18 128:6,7
209:6
**eliminate**  64:6
**else's**  87:25
**email**  3:23
113:15 136:4
218:23 219:13
220:25 222:7
224:16,22
**emailed**  115:8
207:4 219:9
**emails**  115:4
188:14,16 207:5
219:18

Page 17

## [embarcadero - explain]

| | | | |
|---|---|---|---|
| **embarcadero** 2:15 | **entry** 56:13 57:5 151:14 | 194:15 | **executive** 115:25 206:12 |
| **emerging** 61:10 | **environmental** 50:3 | **examination** 6:10 231:17 233:20 | **exhibit** 3:11,13 3:15,16,19,21,23 |
| **employ** 86:17 90:4,12 | **equals** 145:14 148:2 149:10 | **examined** 236:8 | 4:3,4,6 12:17,22 13:9,19 48:12,14 |
| **employed** 59:4 59:10 91:23 92:8 | **equivalent** 67:21 182:7 | **example** 17:2 35:12 39:4 63:25 64:11 | 48:18,24 54:20 54:21 57:23 104:19,20,21 |
| **employee** 19:7 20:6,8 89:15 | **escapes** 205:8 | 70:3 86:20 88:17 91:14 | 154:1,3 173:3 219:5,7,24,25 |
| **employees** 18:25 19:2 | **especially** 219:18 | 92:15 94:5 99:24 129:15 | 220:22,23 221:18,22 222:5 |
| **employment** 55:2 87:16 89:14 | **esq** 2:14,19,19 | 137:20,21 146:19 150:8 | 223:13 224:20 225:1,10 226:16 |
| **encompasses** 181:7 | **essence** 113:22 | 158:4,7 159:7 168:18 182:3 | 226:19 227:25 228:13,14,21 |
| **encountered** 159:24,25 | **essentially** 99:16 106:20 145:15 166:8 183:18 | 185:9,10 188:8 192:1 | 229:5,6 232:17 232:18 |
| **endurance** 8:9 | **established** 123:22 | **examples** 94:6 99:12 102:20 223:13 | **exist** 14:10 |
| **ennis** 2:24 5:15 | **estates** 56:8 57:12 | **excellent** 86:15 98:12 | **exists** 90:24 122:8 |
| **enormous** 153:15 155:22 | **estimate** 34:12 101:8 | **exception** 126:15 127:14 128:3,21 | **expect** 177:22 |
| **ensure** 164:17 | **et** 109:3 | **exceptions** 123:21 127:15 199:11 | **expected** 49:13 |
| **entailed** 153:17 194:15 | **euphemisms** 116:3 | **exchange** 111:20 111:23 112:17 | **expense** 153:15 153:16 |
| **entered** 167:11 179:18 | **evasive** 137:11 | 114:12,14 224:21 | **expensive** 72:25 |
| **entering** 182:16 | **evening** 156:8 | **exchanges** 112:19 113:4,6 | **experience** 8:2 25:21,24 |
| **entire** 18:6 28:6 102:19 | **event** 236:17 | 115:10 | **experienced** 151:23 |
| **entitled** 2:10 211:7 | **events** 85:20 159:3 | **exclude** 127:23 | **expert** 147:18,24 |
| **entity** 69:8 78:10 | **everett** 197:18 | **excuse** 199:22 204:9 | **expires** 235:25 236:25 |
| **entries** 95:21,22 95:23 106:15 118:17,18 212:19 | **everybody** 89:24 | | **explain** 64:10 83:24 101:15 |
| | **evett** 2:18 27:16 33:24,25 34:2 | | 116:9 117:24 118:13 121:22 |
| | **evidence** 214:4 | | |
| | **exactly** 126:2 157:19 168:7 183:9 186:7 | | |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1758**

William L Girdner November 9, 2022

[explain - file]

| | | | |
|---|---|---|---|
| 121:25 160:14 | 58:25 104:11 | 89:3 92:15 94:6 | 120:19 121:8,19 |
| 221:8 222:10 | 127:18,20 | 94:9 95:9,10 | 122:18 123:3 |
| 230:14 | 142:19,20 147:4 | 96:7,14,23 97:4 | 124:8,17 125:3 |
| **explaining** 220:8 | 155:2 170:3 | 97:12,18,22 | 125:12,23,24 |
| 223:22 | 171:7 175:19,20 | 129:11 148:15 | 126:10 127:5 |
| **explanation** | 180:9 186:19,20 | 151:1 158:4,8 | 129:2 130:1,10 |
| 234:4 | 191:7 217:10 | 185:12 190:24 | 130:13 132:2,13 |
| **express** 70:2,5 | 227:6 | 207:7 | 133:8 135:9 |
| 187:11 | **fairly** 80:16,23 | **fee** 30:19,21 31:8 | 136:8 137:1 |
| **expressed** 196:1 | 212:21 | 31:23 32:1 | 138:9 139:13,15 |
| **extended** 69:17 | **fairness** 170:6 | 53:10,14 54:17 | 140:9,18,20 |
| **extensive** 37:6 | **faith** 202:1 | 57:3 62:23 63:3 | 142:24 144:9,18 |
| 37:12 73:17 | **falls** 223:16 | 72:10 75:14 | 147:5 161:5 |
| **extensively** | **familiar** 42:15 | 86:23 168:23 | 164:19 165:23 |
| 86:25 | 52:19 102:4 | 191:10,12 193:4 | 168:15 171:20 |
| **extent** 9:21 | 124:24 125:9 | 197:4,15 198:13 | 171:24 172:4,8 |
| 14:10 127:6 | 193:17 213:9 | 199:25 | 189:13 194:17 |
| **extra** 197:15 | **family** 56:25 | **feel** 20:11 152:8 | 195:4,21 200:17 |
| **extract** 108:6 | **famous** 73:24 | 172:17 176:1 | 201:9 202:19,23 |
| **extracting** 104:1 | 109:6 | **fees** 53:20 72:4 | 205:12 207:19 |
| 107:25 | **far** 18:10 59:13 | 113:14,14 190:1 | 208:23 210:5,11 |
| **extracts** 103:18 | 89:13 102:14 | 195:11 | 211:2 218:10 |
| | 111:7 125:18 | **felt** 48:7 109:23 | 223:8 224:6 |
| **f** | 188:6,7 213:19 | 199:2 227:3 | 229:13 230:3,11 |
| | 230:19 | 234:3 | 231:12,13,18 |
| **f** 54:24 | **fascinating** | **fetterly** 2:14 3:6 | 233:17 234:10 |
| **face** 195:15 | 157:1 | 5:20,22 11:6 | **field** 60:16 |
| **facsimile** 2:16,22 | **fashion** 132:1 | 12:1,11 14:16,17 | **figure** 12:13 |
| **fact** 11:12 24:18 | **fashioned** | 27:3 29:23 | **file** 23:22 24:22 |
| 26:3 58:1 | 164:25 | 31:12 41:23 | 28:24 32:2,5 |
| 113:16 128:20 | **faster** 179:12 | 43:2 44:1,10 | 52:21,24 53:18 |
| 137:25 161:16 | **federal** 13:15 | 45:3 46:1 53:3 | 66:2,4 70:2,5,7 |
| 177:1 200:15 | 14:2,5,22 15:2 | 55:7 58:10 65:4 | 81:8,10,19 82:4 |
| **factoring** 127:3 | 20:3 34:18 35:8 | 89:9 92:3,20 | 82:5,6,12,12,16 |
| **factual** 126:2 | 35:12,17 40:11 | 98:7,11,23 | 83:20 117:15 |
| 148:5 | 41:6 42:11 43:5 | 102:13 103:10 | 118:6 120:5,16 |
| **fail** 101:22 | 43:6 61:10 | 103:23 110:3,20 | 121:5 133:23 |
| **fair** 8:15,16 | 64:22 69:20 | 118:7 119:3,23 | 134:4,9,11,11,16 |
| 16:25 17:11 | | | |

Page 19

(82 of 297), Page 82 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 82 of 297
Case 1:21-cv-00305-DCN Document 60 Filed 12/13/22 Page 81 of 118
William L Girdner November 9, 2022

## [file - first]

| | | | |
|---|---|---|---|
| 134:21,24,25 | 119:22,24 120:9 | 27:10 28:1,23 | 37:15 39:1 46:8 |
| 135:2,16 143:5,8 | 120:10 121:1,6 | 30:19,21 31:8,22 | 50:5 52:4 54:23 |
| 143:15,18,18,20 | 121:12,17,18,20 | 32:1 34:22 38:6 | 56:2 57:2 60:1 |
| 143:25 144:6,17 | 121:25 122:7,13 | 38:18,20 39:5,8 | 63:19 64:9 |
| 145:20,22 | 122:14,16 123:2 | 39:12,18,19 | 74:19 94:13 |
| 149:13 152:1 | 123:7,9 126:16 | 42:11,12,20 44:8 | 95:6,8 105:13 |
| 161:1 165:19 | 128:8 129:7,23 | 44:25 45:9 | 151:10 156:18 |
| 166:14 167:8 | 131:1,22,25 | 51:15,20 53:10 | 157:14,24 |
| 169:11,19 | 132:11 133:4,9 | 53:14 58:20,23 | 174:14 176:18 |
| 170:23 171:4 | 133:16,20 | 70:6 73:1 78:5,6 | 185:11,14 |
| 174:18 179:20 | 142:19 145:14 | 79:20,23 80:8,25 | 193:14 195:18 |
| 180:7 186:6,11 | 145:17 148:3,8 | 81:12 83:8 84:4 | 208:21 210:8 |
| 187:5,10,11 | 149:8,10 158:5,9 | 84:6,7,9,13,24 | **fill** 138:24 169:6 |
| 188:2 192:3 | 158:14 160:24 | 85:7,9,11,15,21 | 186:8 198:10 |
| 194:2,9,9 212:6 | 166:16,22,24 | 85:24 96:10,24 | **fills** 59:17 |
| 212:13 220:16 | 170:10 174:20 | 103:21 109:17 | **filtered** 116:25 |
| 229:21 230:10 | 177:5 179:18,21 | 118:4,10,11 | 118:25 |
| 230:21 231:2 | 179:24 180:3,5 | 123:10,12,17,24 | **finances** 211:11 |
| 232:3 | 181:22,23 182:2 | 124:7,15,16 | **financial** 95:1 |
| **filed** 20:25 21:6 | 186:4 191:16 | 126:16,22 | 141:14 |
| 22:22 23:16,25 | 205:12 209:5,10 | 127:18 128:6,7 | **find** 97:17 |
| 24:15 28:11 | 209:21 210:22 | 129:16 142:22 | 140:20 157:1 |
| 29:7,9,13,14,16 | 218:22 226:2,25 | 143:10,12 148:9 | 195:8 |
| 30:6,9,12 31:3 | 228:23 230:1 | 148:10,20,24 | **finding** 36:4 |
| 33:1 34:14,23 | 231:21,22 233:7 | 149:1 150:24 | **fine** 9:11 16:21 |
| 35:9 36:4,15 | 233:15 | 155:9 158:2,3 | 17:6,14 116:16 |
| 39:23 40:1,24 | **filer** 39:11,12 | 167:9 168:23 | 155:13 168:23 |
| 41:8,14,16,22,24 | 80:24 118:18 | 169:24 176:8,21 | 200:8 225:24 |
| 42:2,5,9,17,21 | 133:5 150:25 | 178:11 181:10 | **finish** 16:18 |
| 42:23 43:13,14 | 151:4 167:14 | 181:10 184:10 | 93:20 98:10 |
| 43:15,16,18,25 | 169:5 170:22 | 187:16 197:11 | 201:5 |
| 44:5,5,9,21 45:2 | 180:23 212:19 | 197:19 198:7,13 | **firm** 5:23 30:18 |
| 46:16,18 52:11 | 213:7 214:1 | 198:14,18 | 34:2 61:24 62:6 |
| 62:10 79:13 | **filer's** 214:3 | 207:17 209:6 | 157:9 |
| 80:3,21 84:17 | **files** 34:10,12 | 233:9 | **firms** 107:17 |
| 92:19 97:21 | 164:18 180:23 | **filings** 22:9,10 | **first** 3:17 6:6 |
| 109:16,24 117:3 | **filing** 20:17 22:5 | 22:23 33:5,5 | 11:5 13:11 58:7 |
| 117:5 119:2,7,9 | 22:7 23:20 | 34:18 35:15 | 66:9,15 93:22 |

Page 20

William L Girdner November 9, 2022

[first - general]

104:16 109:14
110:1 131:9,12
132:10,18
160:11 161:3
173:23 180:3
182:11 183:12
185:1,15,17
186:6 190:15
191:8 194:5
198:5 210:24
226:18 233:3
235:5
**fits** 180:5
**five** 45:15 60:14
67:13 109:21
111:25 115:11
115:17,22
129:17 174:1
191:2 205:19,20
223:18,19,20
224:1,2,12 225:9
**fix** 150:25 151:4
**fixed** 117:22
**flexibility** 63:10
87:11 88:1
**float** 169:17
**flooded** 185:24
185:25
**floor** 2:15
**florida** 70:11
71:5 129:15
139:6 141:21
169:13
**focus** 52:3
**focused** 50:7
**focusing** 89:23
**folding** 83:3

**folks** 60:10 62:2
99:1 119:10
126:25 223:22
**follow** 49:13
107:4 146:21,24
147:12
**followed** 20:17
**following** 46:8
58:3,4 147:11
**follows** 6:8
105:21 146:17
147:11
**force** 87:4
**foreclose** 225:16
**foregoing**
105:20 235:7
236:9,14
**forge** 172:22
**forgot** 214:8
**forgotten** 75:18
**form** 14:8 174:7
174:8,10,12
177:16 182:16
**former** 85:21
**formula** 182:18
182:19
**formulas** 175:7
183:1,4
**forth** 95:24
115:5
**forward** 11:3,9
11:24 12:2,6,13
14:13,24 15:4
16:11 51:8,15
126:9 204:21
**found** 36:14,18
109:9

**foundation**
55:10 58:12
103:24 110:4,13
121:9 122:19
124:18 125:13
130:2,11 142:25
144:10 164:20
165:24 194:18
208:24 224:7
230:4
**four** 7:2 40:12
111:25 115:22
156:12 163:16
191:2
**frame** 90:18
104:14 131:12
153:9 175:22
**framework**
131:16
**francisco** 2:15
75:2,18
**fraud** 50:2
**free** 72:5,5,8
113:17,23
191:20,21,23
192:23 200:11
200:19,22 202:3
216:16
**fresno** 66:22
**friday** 19:19,24
32:25 33:2
34:15,25 35:7
176:18,21 177:5
**friend** 114:21
**friends** 156:24
**front** 30:25
46:17 80:17

**fry** 21:23 22:15
25:19 26:1
37:18
**fulfillment**
115:24 116:1
**full** 6:15 10:9
13:11 15:12,14
16:19 17:11
19:7 48:8
181:13 185:20
236:14
**fully** 16:24 51:22
**fulton** 66:3 70:4
**fun** 234:17
**function** 165:2
179:14
**fundamental**
32:20
**funding** 197:16
**further** 70:21
116:14 158:1
233:17,20
236:16
**future** 113:25
220:6

**g**

**g** 2:14 5:1
**gable** 214:5
**games** 27:16
200:4
**gates** 110:22
**gather** 92:8
**gathered** 104:2,7
**gathering** 95:20
**gathers** 104:3
**general** 10:20
13:19 50:21

Page 21

William L Girdner November 9, 2022

[general - granicus]

| | | | |
|---|---|---|---|
| 52:1,12,12,14 | **girdner's** 228:3 | 111:13 112:13 | 97:22 98:1 |
| 55:14 56:23 | **give** 17:21 31:16 | 114:2 116:13 | 102:1 104:23 |
| 65:7 96:6 | 44:18 49:23 | 122:4 126:6,9 | 106:6 125:20 |
| 109:19 112:25 | 56:22 75:22 | 130:16 133:13 | 126:5 147:20 |
| 123:18 157:5 | 77:22 90:10 | 138:6 139:12 | 149:20 152:14 |
| 159:2,8 174:14 | 92:7 99:13 | 146:10,12 | 155:7,23 157:22 |
| 174:14 198:8 | 160:20 171:10 | 152:22 171:22 | 161:22 162:9 |
| **generally** 132:25 | 171:24 173:6 | 172:11,14 | 163:10 165:21 |
| **generated** 40:2 | 178:5 187:9 | 182:21 185:21 | 167:6 169:5 |
| 145:21 187:2 | 190:18 202:21 | 186:18 190:5 | 171:17 173:2 |
| **gentleman** 59:5 | 219:2 | 201:14 210:13 | 175:17 176:22 |
| **gentleman's** | **given** 65:13 | 212:18,22 | 178:17 189:20 |
| 204:4 | 86:10 204:15 | **goal** 207:14 | 192:24 194:12 |
| **geography** 77:25 | 217:23 234:3 | 208:3,6 209:18 | 199:9,16 201:7 |
| 86:8 148:19 | 235:13 | **goals** 165:20 | 202:8,22 204:21 |
| **georgia** 64:12 | **gives** 184:22 | 207:22 208:14 | 210:11 214:7 |
| 65:22 68:1 | **giving** 204:19 | 209:13 | 216:13 223:8 |
| 69:23 71:6 | **glass** 227:15 | **goes** 20:1,4 27:8 | **good** 6:12,14 |
| 139:6 141:21 | **glasses** 104:25 | 51:14 80:25 | 7:23 20:6 61:4 |
| 149:3 188:17,21 | **go** 8:6,25 11:3,8 | 81:3 92:23 | 76:8 98:2 |
| 204:16 205:16 | 11:21,24 12:2,4 | 118:16,19 | 158:21 161:12 |
| 205:22 206:17 | 12:11,14,23,23 | 143:19,20 144:1 | 161:16 162:6,14 |
| 207:3 215:2 | 14:24 15:3 | 146:23 150:13 | 183:18 202:1 |
| **getting** 34:6 90:9 | 16:11 19:23 | 168:24 171:4 | 215:25 |
| 113:13,14 | 20:24 28:22 | 194:6 212:17 | **google** 182:25 |
| 163:12 168:11 | 30:17 31:6,8,19 | 230:20,23 | 183:1 |
| 203:23,24 210:2 | 31:24,25 36:22 | **going** 8:20 10:24 | **googlebot** 109:6 |
| **girdner** 1:13 2:1 | 36:23 45:14 | 11:1,16,18,20 | 109:9 |
| 2:4 3:4,19,22 | 46:9 51:7 53:12 | 12:13 14:13,14 | **gosh** 47:13 |
| 4:4 5:8,22 6:5 | 59:21 64:3,7,8 | 16:22 17:10 | 177:21 |
| 6:12,17 11:7 | 66:13,14 67:8 | 28:24 32:4 | **gotten** 18:9,9 |
| 15:6 125:15,22 | 68:16 73:22 | 33:20 51:14 | **grab** 97:17 |
| 125:24 126:11 | 74:4,13 83:22 | 59:1,2 65:11 | 103:20 149:20 |
| 133:15 173:4 | 84:14 87:8,9 | 66:18 67:8 | 171:1 216:3 |
| 228:6 229:11 | 94:17 97:15 | 68:13,14 69:19 | **grabbing** 216:4 |
| 231:6,19 234:20 | 99:18 100:20 | 70:11 71:8,20,21 | **graduate** 17:23 |
| 235:5,19 | 102:2,3,5 104:18 | 72:17 75:1 77:2 | **granicus** 71:24 |
| | 105:8 108:25 | 86:7,8 91:22 | 169:22 187:13 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

William L Girdner November 9, 2022

[gravelly - human]

| | | | |
|---|---|---|---|
| **gravelly** 112:24 | **hand** 30:20,21 | **hear** 124:11 | **holidays** 157:24 |
| **great** 9:4 30:22 | 31:6,20 116:11 | 214:20 | **home** 10:3 |
| 49:9 50:9 84:21 | 167:7 169:1 | **heard** 50:6 | 190:21 |
| 97:10 98:11 | 236:18 | 126:15 137:13 | **homegrown** |
| 105:5 138:9 | **handed** 168:21 | 159:21,22 162:7 | 72:24 73:6,18 |
| 156:21 | **handle** 99:15 | 167:15 191:12 | 81:6,7,12 83:10 |
| **green** 183:13,15 | **handled** 20:25 | 192:7 193:8,11 | 84:24 93:7,7,15 |
| 184:14,17 | 81:14 | 200:1 216:25 | 95:5 105:16 |
| **greet** 114:20,23 | **hands** 171:7 | **hearing** 205:6 | 106:4 187:19 |
| **ground** 8:5 | **hang** 83:1 85:22 | **heavy** 84:14 | **honestly** 185:19 |
| 11:12 16:16 | 85:22 135:13 | **heck** 17:3 | **honolulu** 86:21 |
| 98:9 | **happen** 24:25 | **held** 5:12 13:2 | 86:25 |
| **group** 220:21 | 58:18 147:9 | **help** 83:18 94:16 | **hope** 125:23 |
| **guardianship** | 151:5 159:23 | 105:4 106:11 | **hopefully** 142:15 |
| 56:5,18 | 186:2 | 164:10 183:8 | **hopping** 149:21 |
| **guardianships** | **happened** 100:8 | 218:11 | **host** 107:17 |
| 56:16 | 163:16 224:19 | **helping** 185:10 | **hosted** 134:23,25 |
| **guess** 10:19 | 224:22 | **helps** 47:6 54:1 | 135:17 136:16 |
| 13:22 60:15 | **happening** | **hennemen** 59:20 | 136:19,24 |
| 80:20 86:21 | 145:11 149:23 | 60:5 | 137:20 |
| 96:16 131:2 | 157:11 | **hennemen's** | **hosting** 137:19 |
| 132:10 138:24 | **happens** 156:22 | 59:25 | **hosts** 137:13 |
| 162:3 165:8 | 234:17 | **heritage** 83:2 | **hot** 172:7 |
| 179:1 207:14 | **happy** 41:2 | **hey** 28:24 32:4 | **hour** 2:9 8:12 |
| 212:25 229:8 | 83:22 144:20 | 167:7 | 138:8 |
| 233:22 | 187:9 | **hiatus** 71:19 | **hours** 35:9 |
| **guessing** 114:7 | **hard** 55:17,25 | **high** 17:24,25 | 156:12,12 |
| **guide** 155:18 | **harm** 151:22 | 18:20 52:4 | 158:14 179:3,3,6 |
| **guy** 112:23 | 152:2,10,18 | **higher** 193:5 | 179:8,9,14 |
| 114:16 | 153:10 | **hire** 87:24 89:20 | **housed** 229:23 |
| **guys** 172:18 | **harms** 152:11 | 90:18 | 230:2 |
| **h** | **hawaii** 35:13 | **hires** 60:11 | **housekeeping** |
| | 40:14 72:7 | **hiring** 60:17 | 227:24 |
| **h** 3:9 4:1 54:24 | 86:21 141:21 | **hit** 230:22 231:4 | **huge** 73:23 74:5 |
| **half** 70:13 | **head** 50:1 99:7 | **holding** 161:11 | 177:21 |
| 206:15 | 99:25 112:11 | **holiday** 35:8 | **human** 99:17 |
| **hallmark** 152:7 | 115:25 116:1,6 | 177:7 | 102:3 105:21 |
| | 117:21 | | 146:17,18,22 |

Page 23

William L Girdner November 9, 2022

[hung - including]

| | | | |
|---|---|---|---|
| **hung**  168:11 | 123:23 124:14 | 210:2,21 211:16 | 217:3 |
| **hypothetical** | 126:14,22 | **idea**  23:1 54:2 | **implementing** |
| 31:16 32:7 | 127:17 128:1,4,6 | 99:3 212:11,15 | 213:14 |
| 58:14 130:12 | 128:7,18,21 | 212:16 215:22 | **implication** |
| 132:14 | 129:22,22 | **identical**  133:1 | 222:11 |
| **hypothetically** | 130:22 131:14 | 162:3 222:3 | **importance** |
| 91:16 | 131:22 132:1 | **identification** | 162:12 163:10 |
| | 134:8,10,19 | 125:16 | 163:20 |
| **i** | 135:17 136:12 | **identified**  11:8 | **important**  29:8 |
| **icourt**  103:19 | 136:24 137:13 | 47:11,20,22,23 | 29:15,16 34:7 |
| 104:9 146:4,6 | 139:16,18 140:2 | 55:20 | 57:17 86:13 |
| 147:2 181:16,20 | 140:8 141:21 | **identifies**  49:17 | 91:3 119:13 |
| **idaho**  1:2,8 2:8 | 142:8 143:6 | **ignored**  50:13 | 131:20 132:9 |
| 5:11 10:18 | 144:6 145:7,12 | **illinois**  77:18 | 152:7 162:13,19 |
| 19:11,25 20:4 | 146:2 152:19 | 139:7 | 162:22,25 163:2 |
| 25:25 26:13 | 158:11 159:14 | **illustrative**  70:3 | 164:3 165:2 |
| 34:19,24 35:9,17 | 159:15,17 160:3 | **imagesoft** | **impression** |
| 36:1 37:12,13,21 | 160:6,7,8 161:2 | 187:17 | 184:22 |
| 37:23 38:5,7,17 | 163:3,25 166:13 | **immediate** | **inaccurate** |
| 38:18,25,25 | 168:13 170:2,6,8 | 131:21 160:24 | 113:19 |
| 39:21,24 40:7,25 | 170:13 171:6 | 162:7 | **inadvertent** |
| 41:3,7,10,13 | 174:6 185:1 | **immediately** | 224:25 225:4 |
| 42:9,15,19 43:1 | 187:6,7,22 188:8 | 121:5,17,20 | **inadvertently** |
| 43:10,12,24,24 | 188:20 192:10 | 161:4 | 219:20 222:8 |
| 44:7,24 45:2,9 | 195:19 201:8 | **impact**  15:21 | 224:17 227:24 |
| 50:19,25 51:5 | 207:17 209:1,5,7 | 16:1 100:16 | **inclined**  233:6 |
| 52:20 58:2,3 | 211:20 212:23 | **imperial**  72:19 | **include**  49:20 |
| 59:4,9,10 60:9 | 217:3,4,9,14 | 73:7,11 88:18 | 70:1 199:3 |
| 61:19 62:16,19 | 218:1 225:8 | **implement** | **included**  26:2,14 |
| 63:7,19 64:1 | 226:22 229:11 | 221:20 | 38:9 164:17 |
| 78:16 89:3,5,7 | 229:20,23,24 | **implementation** | 174:11 189:3 |
| 91:14,16 97:4 | 235:22,24,24 | 214:11,17,24 | 219:7 221:10,23 |
| 100:4,17 101:1 | 236:2,6,24 | 215:10 218:1 | 223:13 227:4 |
| 101:25 102:4 | **idaho's**  13:16 | **implemented** | **includes**  13:12 |
| 106:22 107:18 | 22:6 43:22 | 60:20 71:13 | 18:23 35:16 |
| 109:8,15 111:5 | 102:1 103:18,18 | 86:16 87:13 | 62:16 90:5,13 |
| 118:3 121:4 | 104:8 170:4,11 | 90:6,14 91:11 | **including**  13:20 |
| 122:12 123:15 | 194:16 195:2 | 92:1 215:17 | 88:6 96:23 |

Page 24

[including - issue]

111:17 128:4
157:24 164:7,22
217:9,25 218:24
**inclusive** 235:9
**income** 113:13
**incomplete**
130:11 132:14
**incredible** 186:3
**incur** 60:18
214:23
**independent**
19:3,5 21:10
63:24 91:5
**index** 109:10
159:12
**indicate** 17:12
184:9
**indicated** 22:13
107:9 115:12
**indictment**
51:15 52:1
**indictments**
50:17 51:2,6,7
51:20
**individual** 50:24
52:3 61:12 62:1
82:13 83:23
94:18 99:12
159:25 160:7
216:1
**individuals** 52:4
**info** 216:4
**information**
48:7 71:2 92:9
92:14 94:15,20
95:7,14,16,20
96:16,23 97:17
97:21 100:7

101:21 102:3
104:2,4,8,9
107:6 108:1,6,12
112:3 139:22
140:21 159:6
165:21 186:7,8
191:17 216:3,6
**informative**
198:8
**informed** 200:15
**initial** 54:22 58:5
113:17,23
115:20
**initiate** 58:6
**initiated** 57:6
63:13,18 226:22
**initiates** 119:20
119:22 120:3
**initiating** 195:20
**injunction** 3:20
4:5 69:15,16
173:11 218:22
226:7,11 228:18
**injury** 55:3
**input** 226:24
**insinuate** 202:5
**insisted** 115:15
116:7
**inspiration** 50:8
157:12
**install** 67:12
**instance** 32:11
50:5 84:16 89:2
96:14 104:8
151:7 181:19
199:18
**instances** 149:6
150:24 151:3

190:19 199:17
**institution** 61:23
62:7 164:10,11
**institutions**
61:18 62:4
160:1,7
**instruct** 125:21
172:4
**instructed** 9:1
**instructions**
101:19
**intact** 165:9
**intake** 37:8
**integrate** 194:4
**integrity** 163:19
163:25 164:4,6
**intend** 225:12
**intended** 182:5
**intention** 15:14
**interest** 9:22
50:10 156:22
157:6 169:25
236:16
**interested** 56:3
56:24 58:15
**interesting** 157:5
157:17 160:20
169:12 183:23
**interface** 169:5
180:22 217:13
**interfaces** 116:4
**internal** 157:21
**internet** 61:14
156:10
**interpret** 126:25
**interpretation**
13:16 125:17

**interrogatories**
3:17 104:16
**interrogatory**
105:9
**interrupted**
169:21
**interrupting**
21:17 199:22
**intervening**
177:6
**introduction**
208:13
**introductory**
113:1
**investigated**
135:22
**investigation**
51:25 116:17
**investigations**
51:24
**investment**
155:22,25
**involved** 44:15
84:17 111:10
115:9 137:4,16
218:8
**involves** 39:24
**involving** 54:6
**iowa** 77:18
185:22
**island** 185:23
**issue** 11:4 44:14
44:15 52:9,25
55:6,21 57:7
63:22 79:6
110:2,7 118:21
125:25 126:23
127:3,18 160:12

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com 208-343-4004

## [issue - know]

160:12 169:13
183:16 234:6
**issued** 52:9
232:14
**issues** 90:1 103:8
126:1
**item** 180:21
**items** 48:9 54:6
165:17 174:11

### j

**j** 59:12
**jamie** 59:19
**janquart** 20:20
21:5,12,24 22:12
22:17 23:2 24:9
24:14 25:13
26:8,13 59:5,7
59:12
**janquart's** 23:19
25:12
**january** 46:21
**jcoit** 112:1,2
**jimmy** 94:25,25
95:3 138:20
141:11,13
142:11 173:22
175:8 182:19
**job** 9:4 18:14
19:18 28:16,16
28:19 87:22
88:14,21 89:6,16
91:15,17 162:19
162:22,25 163:3
**jobs** 162:17
165:2,12,16
166:5

**jody** 182:24
**joint** 56:17
**joking** 172:6
**jon** 5:22 10:20
46:1 111:8
139:12
**jon.fetterly** 2:17
**jonathan** 2:14
**journal** 72:21
73:24 74:6 75:7
75:10 156:19
**journalism** 18:8
18:11
**journalist** 18:5
**journalists** 79:7
167:21
**judge** 11:22
68:25 80:14,18
89:3 119:11,13
122:4 158:18
168:2 178:6,15
178:16 183:11
184:6 192:14
193:15 200:10
201:4,16,25
202:6,11 203:9
203:14 205:6
207:24 208:9
209:22 214:5
233:24
**judge's** 11:23
**judges** 208:1
**judging** 178:3
**judgment** 56:13
57:6
**judicial** 112:3
163:20,25
164:14 198:17

229:12
**julie** 35:19
**july** 226:23
**jumble** 65:25
**jump** 38:2
218:10
**jumping** 72:7
**jumpy** 234:15
**jurisdiction**
88:11 90:5,14
174:3 193:8
**jurisdictions** 7:7
43:9 60:20 61:7
77:21 86:2,15,18
86:19 87:3,17
89:21 91:10,12
142:1
**justification**
185:5 196:3,9
**justifications**
185:7,16
**justified** 155:12
180:1
**justify** 131:5
132:21 185:8

### k

**kahuna** 74:4
**kansas** 139:7
141:22
**katherine** 3:24
223:5
**keating** 3:24
223:5 224:21
**ked** 2:22
**keely** 2:19 5:24
110:24 171:20
172:14

**keep** 9:6 71:8
75:1 89:15
160:1 162:14
163:5,6,7 165:7
208:5,6
**keeping** 18:22
47:4 159:22
**keith** 198:4
**kept** 135:20
136:17
**kern** 66:21 206:3
**kidding** 172:3
**kind** 19:4 31:15
52:17 61:15
73:18 74:18
76:16 102:15
115:22 122:3
159:1 176:15
177:24 179:15
234:12
**king** 76:12,14,18
199:13
**kings** 67:15
**kiosk** 64:2,4,18
**kiosks** 20:2
**kl** 110:22
**knew** 200:6
**know** 7:15,18
8:1,5,12,18,24
12:8 17:5 18:12
22:1,19 23:6,19
25:8,18 27:17
30:14 33:16
34:16 35:15
36:11 38:20
42:22 43:15
49:9 50:21,22,25
52:5 55:12,17,23

Page 26

(89 of 297), Page 89 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 89 of 297
Case 1:21-cv-06303-DCN Document 60-7 Filed 12/13/22 Page 88 of 118
William L Girdner November 9, 2022

**[know - left]**

56:20 58:14,21
59:4,13 61:1,13
64:13 65:15
75:12 76:23,24
79:12,14 80:20
80:22,22 81:7,9
81:17 83:20
84:12 85:19
90:9 91:13
93:12,12,13 94:7
94:7,21 99:24
100:3 101:10,11
101:24 102:12
102:17 103:3,4,7
103:15 106:21
106:25 108:24
109:19 110:8,24
111:8,11 113:15
114:22 115:4,14
116:3 123:21,23
124:1,2,20 125:8
126:24 127:1,13
127:21,22 131:8
134:18 135:2,6
135:13,18,19
136:17,18,22
137:10,11,12,15
137:21,23 138:3
138:4 140:21
142:6 144:5
146:8,14 147:7,8
147:15 151:17
152:13 153:9,11
157:21,23
158:12 159:14
159:17 160:9,19
162:3 163:9,11
164:1,2 165:16

165:21 169:9,12
169:17 170:4,8
170:11,13,15,17
171:6,12 172:6
175:8 178:4
181:6 182:8
183:6 184:5,7
185:3,18 186:1,4
186:7,13 188:1,7
188:7,25 189:3
190:12 191:24
192:4,9,14,20
194:10,15,19,20
194:25 200:8,9
200:12,13
206:22 210:12
211:15 212:15
212:24 213:19
215:1 216:10,11
216:13,23 218:4
218:6 224:24
230:16 235:10
**knowing** 192:13
219:14
**knowledge** 21:10
21:11 22:8,13
37:6,12,24 48:7
126:21 136:10
150:16 197:3
200:14
**known** 183:5
208:1
**knows** 20:20
**kootenai** 59:22
**kootenai's** 60:1

## l

**l** 1:13 2:1,4 3:4
6:5,17 71:1
235:5,19
**la** 74:4
**labor** 61:5 215:5
**lack** 110:12
234:4,4
**lacks** 55:10
58:12 103:24
110:3 121:9
122:19 124:18
125:13 130:2,11
142:25 144:10
164:20 165:24
194:18 208:24
224:6 230:4
**land** 99:13
**landed** 200:3
**language** 182:23
183:3 214:5
**lapd** 18:10
**large** 83:5
137:19 201:20
**las** 66:10 194:22
**late** 33:4,5,13
35:11,15 156:7
156:13
**law** 5:23 18:3,4
30:17 34:1
56:10,25 61:24
61:24 107:17
125:18 156:25
**lawsuit** 38:12,16
38:21 53:1 54:5
55:6,22 58:8
66:12 76:14
97:21 110:18

111:6,14 119:22
120:3 129:8
160:23,25
210:25 211:25
218:21 226:1,2
226:22
**lawsuits** 65:2,7
65:10,15 77:20
**lawyer** 47:6,12
112:20 115:7
174:20 181:10
181:22 207:3
218:7 222:24
**lawyers** 50:8
79:7,10 111:8
156:19,20 157:6
178:20 197:15
222:18
**lay** 99:13
**layoffs** 87:4
**lays** 49:25
**lead** 176:1
**league** 220:2,16
**learn** 141:18
190:15 191:1
**learned** 161:14
189:23 191:8,22
191:25 193:3,9
200:14
**learning** 199:15
**leave** 59:17
147:20 169:2
**leaving** 69:20
72:3
**led** 148:4 199:4
199:5
**left** 75:16 88:20
88:22

Page 27

William L Girdner November 9, 2022

## [legal - lunchtime]

| | | | |
|---|---|---|---|
| **legal** 41:25 44:11 44:15 45:4 58:11 119:4,25 121:9 124:18 125:13,25 126:1 132:15 133:12 223:3 229:14 | **lines** 65:12 213:16 | **litmus** 155:17 | **looked** 38:1,8,11 38:22 39:2,6 46:10 70:19 123:25 127:10 128:5,9 157:16 167:3 168:20 212:23 |
| **legislative** 82:24 | **lips** 124:12 | **little** 17:13 104:23 105:2 113:21 117:16 136:15 154:6 157:25 162:5 163:12,15 165:15 168:11 184:8 185:23 197:14 222:9 | |
| **leighton** 2:14 5:23 | **list** 52:21,24 55:23 57:2 59:22 68:7 78:7 86:10 94:4 95:4 95:25 106:7 138:21 139:1,5 140:2,13 159:8,9 159:17,22 160:1 187:10 213:8,9 213:10 218:6 | | **looking** 30:13 32:14 34:5 53:6 55:16 96:15 102:15,19,23 116:18 142:2 157:13 222:4 |
| **length** 152:17 | | **lives** 163:15 | **looks** 20:2 96:22 |
| **letter** 24:10 25:20 219:3,8 220:11 221:3,6,8 221:11 222:4,21 223:4 | | **living** 17:15 | **loop** 142:15 |
| | **listed** 54:23 146:24 188:21 | **local** 63:7,9,20 82:25 88:15,20 89:21,25 90:1,1 137:20 | **los** 74:12 |
| | **listen** 156:8 | | **lose** 208:3 |
| **letters** 3:21 54:10 162:11 220:14,18 221:13 224:2,11 224:12 | **listened** 32:23 | **locally** 64:17 90:23 | **losing** 7:12 |
| | **listening** 37:18 | **log** 146:4 | **lot** 7:22 50:12 51:14 53:6 66:18 77:16,18 78:2,5 85:25 92:24 99:14 157:2,17,18 187:10 196:6 219:18 |
| | **listing** 57:1 | **long** 8:10 14:13 17:19 73:17 100:13 101:1 114:19 129:13 130:21 141:16 195:25 225:21 | |
| **letting** 44:12 | **lists** 54:25 | | |
| **level** 79:1 80:14 102:16 | **literature** 18:2 | | |
| | **litigating** 78:15 | | |
| **lewis** 18:3 | **litigation** 18:23 47:4 50:7 52:13 52:15 55:14 56:23 66:7 67:3 68:22,23,25 69:2 69:10,11 71:4,5 71:14,15,25 72:12,13 73:8,17 74:8 75:5 76:2,3 76:5,11 78:23 84:16 85:7,16 86:1,3,5,17 87:6 87:10,15 155:23 158:15 191:3 207:15 208:10 211:20 | **longer** 140:17 155:24 174:1 | **lots** 115:4 |
| **liberal** 44:12 | | **look** 24:14 31:21 33:2 54:11 55:19 87:9 97:21 99:2 102:3 142:3 153:16 154:12 156:5,7 168:6 174:17 176:11 177:25 219:4 225:19 | **louis** 35:19 |
| **lien** 56:11 | | | **louisiana** 141:22 |
| **light** 183:14 | | | **luis** 66:25 |
| **lightly** 153:19 | | | **lunch** 94:21 98:5 98:10 100:1 102:15,18 103:14 107:5 108:15 138:7,12 138:17,19 |
| **liked** 89:15 | | | |
| **limit** 64:20 | | | |
| **limited** 62:19 64:1 69:7,16 106:13,13 170:5 209:1 | | | **lunchtime** 99:5 103:12 |
| **line** 11:23 28:23 182:15 | | | |

Page 28

William L Girdner November 9, 2022

**[lying - meets]**

| | | | |
|---|---|---|---|
| **lying** 201:25 | **manager** 66:4 | **massachusetts** | **meaning** 38:12 |
| **m** | 95:1 134:10,11 | 141:22 | 73:25 81:12 |
| **m** 3:2 | 135:1 141:15 | **mateo** 67:1,6,7 | 88:13 93:9 |
| **ma'am** 226:9 | 143:20 192:4 | 85:7 | 178:1 181:15 |
| **magic** 131:16,18 | 230:21 | **materiality** | 215:25 233:15 |
| 152:21 183:3 | **managers** 66:2 | 13:25 14:8 | **means** 18:17 |
| **magistrate** 56:1 | 70:7 | **math** 139:13 | 47:8 117:7 |
| 57:9 58:2,15 | **manages** 134:16 | **matter** 2:10 5:9 | 120:5 121:5,16 |
| **maintain** 165:2 | 135:2,6 136:11 | 179:7 227:23 | 122:12 133:24 |
| **maintaining** | 136:14 | **mean** 10:4,5 | 134:4 142:18 |
| 164:23 | **managing** 60:17 | 15:8 17:1 21:9 | 143:11 144:25 |
| **major** 18:22 | **manhattan** | 30:6,8,10,11 | 159:4 164:1 |
| 50:3 107:17 | 69:16 | 31:3 36:7,8 | 176:7,8 180:13 |
| **majority** 30:22 | **manual** 48:16,19 | 37:22 38:15 | 181:17,18 |
| 83:5 | 49:14,17,25 | 39:2 40:22 | 183:16,20,22,24 |
| **making** 18:17 | 212:22 | 41:16,20 42:4 | 184:1 186:5 |
| 180:12 195:14 | **mark** 12:17 | 43:16 49:20,25 | 231:22 |
| 207:10 221:14 | 48:12 54:19 | 53:8 59:1 61:23 | **meant** 12:7 |
| **malpractice** 55:3 | 220:22 224:20 | 69:4 78:21 | 29:14 117:24 |
| **man's** 182:24 | 228:3,12 229:5 | 83:15,15 86:3 | 170:6 174:13 |
| **management** | 232:17 | 87:7 95:16 | **measure** 156:4,5 |
| 24:22 73:1 81:9 | **marked** 12:22 | 101:17 102:25 | 177:25 |
| 81:13,22,22 82:6 | 48:14 54:21 | 107:1 115:3 | **measuring** 178:8 |
| 82:13,15,21 83:2 | 104:21 153:22 | 116:10,20 117:5 | 178:22 |
| 83:6 133:21 | 154:1 220:23 | 117:19 121:25 | **media** 70:14 |
| 135:3,7 136:11 | 225:1 226:15,19 | 124:1 132:23 | 72:2 74:7 |
| 136:21,23 137:4 | 227:25 228:14 | 133:3,5 134:2 | 107:11 159:9,12 |
| 137:17,18,25 | 229:4 232:18 | 136:6 149:9 | 160:2 |
| 143:16,23 144:3 | **marshall** 24:12 | 154:21 155:22 | **medical** 15:21 |
| 145:1 149:16 | 24:13 26:7 | 156:19 166:5 | 15:25 55:2 |
| 150:4 164:23 | 48:20 60:12 | 174:13 178:15 | **medications** |
| 165:3,19 166:15 | **maryland** 78:25 | 179:22 180:4 | 15:20 16:1 |
| 166:23 167:2,12 | 81:15,18 141:20 | 188:20 189:5 | **meet** 114:20,23 |
| 171:5 194:6 | 141:23 | 190:3,12 196:6 | **meeting** 112:1 |
| 212:14 213:3 | **maryland's** | 199:5 209:23 | 115:12,20 |
| 229:24 230:2,8 | 81:16 | 213:23 215:13 | **meetings** 157:21 |
| 230:24 231:3 | **mash** 68:1 | 221:23 233:8,9 | **meets** 179:16 |

Page 29

William L Girdner November 9, 2022

## [mem - n]

| | | | |
|---|---|---|---|
| **mem** 2:23 | **middle** 70:18 | **misstates** 27:4 | **monitoring** |
| **member** 70:20 | 76:17 77:19 | 44:1 120:19 | 149:25 |
| 87:19 159:12 | **mill** 157:2 | 124:8 125:3,12 | **montana** 20:4 |
| 163:21 | **million** 73:23 | 140:9 200:17 | 34:20 35:17 |
| **members** 79:8 | 74:4 | 201:9 224:7 | 62:17 77:18 |
| 159:9,18 | **mimic** 101:19 | **mistake** 214:1 | 91:1 139:7 |
| **memo** 203:18 | **mind** 45:12 | 224:24 | 187:15 188:5 |
| 205:2 | 60:24 86:7 | **mistakes** 214:4 | **monterey** 66:24 |
| **memorandum** | 91:13 104:24 | **mitchell** 2:19 | 206:3 |
| 4:6 | 113:24 133:16 | 5:24 | **months** 20:23 |
| **memorized** | 158:20 175:17 | **mix** 65:24 | 67:13 191:2,4,6 |
| 124:2 127:10 | 196:9 206:1 | 148:18 | **mop** 35:14,18 |
| 128:11 | **mindful** 218:11 | **mixed** 78:6 | 36:3 |
| **memory** 26:18 | **minneapolis** | **model** 61:9 | **morning** 6:12 |
| 26:19 199:19 | 223:19 | 173:25 174:2 | 12:18 13:8 59:5 |
| **mention** 113:16 | **minnesota** 77:17 | **modern** 156:10 | 156:7 |
| 196:19 | 139:7 220:15 | **modification** | **mornings** 234:12 |
| **mentioned** 69:24 | 223:14,15 | 229:7 | **motion** 3:20 4:5 |
| 74:14 85:4 97:1 | **minney** 111:20 | **modified** 10:22 | 103:2,13 |
| 111:8 114:16 | 113:5,7 114:8,14 | 73:4 | **mountain** 12:19 |
| 148:23 186:25 | 218:24 | **modify** 65:14,14 | 13:8 |
| 191:12 199:12 | **minor** 49:12 | 151:9 | **move** 12:6 64:21 |
| 199:16,23 | **minuscule** 214:6 | **molly** 2:19 5:24 | 89:19 94:9 |
| 206:16 | **minute** 45:15 | **moment** 154:8 | 142:16 143:23 |
| **menu** 180:24 | 75:22 171:22,24 | 160:20 171:11 | 221:2 |
| 181:1 | 210:14 | 173:6 219:2 | **moves** 230:17 |
| **merced** 67:13 | **minutes** 103:12 | 231:19 232:10 | **moving** 22:5 |
| **merely** 10:13 | 129:14,17,24 | **monday** 19:18 | 71:21 74:13 |
| **message** 100:9 | **mish** 68:1 | 19:24 176:24 | **multiple** 186:14 |
| **mexico** 78:18 | **misrepresenting** | 177:2,6,7 | **musings** 157:22 |
| 82:2 117:20 | 101:5 201:22 | **money** 11:17,25 | 158:18 |
| 188:19,20 193:3 | **missed** 89:13 | 90:20 113:9 | **myriad** 162:2,2 |
| 197:1 202:5 | **missing** 31:21 | 152:5 169:10,14 | **mysterious** |
| 203:15 204:2 | **missouri** 78:18 | 169:15,23 170:9 | 117:17 |
| 215:2 | 80:7 141:23 | 170:12 171:2,7 | |
| **miami** 129:15 | **misstate** 120:21 | 212:20 | **n** |
| **michigan** 141:22 | 124:10 | **monitor** 105:13 | **n** 3:1,2,2 5:1 |
| | | 158:17 | 59:12 204:5 |

Page 30

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

William L Girdner November 9, 2022

**[name - november]**

name   6:15 19:13
33:25 93:2,14
182:24 198:3,5
204:4
named   67:16
235:7 236:8,12
names   34:6
103:21 206:1
napa   206:3
nation   43:5,6,20
74:6 107:18
national   126:13
126:19 127:13
127:25 128:15
148:3,7 188:7
nationally
187:24
nationwide
123:19
nature   96:5,11
96:24 158:15
169:7 174:18
180:18,21 181:9
198:24
near   41:11
221:14
nearly   72:5
necessarily
148:22 175:25
necessary   48:8
need   8:11 9:8
10:8 13:13 14:6
15:11 17:12
33:8,10 40:17
63:7,20 64:7,8
89:16 142:3
146:22 150:25
152:17,22

161:12 166:6
168:22,23
171:21,22
186:17 202:16
212:1 224:8,10
needed   16:25
224:3
needs   14:1 131:5
131:6 132:10
146:18 155:12
180:1 202:21
216:3 231:3
negative   108:25
negotiate   190:9
negotiating
192:2
negotiation
85:25 190:14
208:10
nevada   139:8
141:23 188:21
204:17
never   12:9,16
29:1,2,3 32:8
34:9 35:6 37:20
66:5 83:19
126:15 159:22
159:24 161:7
172:15 201:25
202:7
new   22:20,21
37:8 41:4,18
69:3,16 78:17,21
82:2 83:14,15
84:16 89:23
92:18 93:5,22
94:3,12 95:6,7
95:11 105:13,22

117:2,14,20
151:10 154:20
154:23 167:21
177:20 188:18
188:20 193:2
197:1 202:5
203:15 204:2
208:12,22 210:2
210:8 212:12
215:1
newly   20:25 21:6
23:16 24:15
39:25 40:24
41:8,14,16 80:2
90:7,16 97:21
129:7,23 131:1
131:22,25
132:11 160:24
209:10 210:22
news   1:4 3:12,14
3:19 4:5 5:9,21
14:21 17:17
18:18,19,23
20:22 32:17,18
32:25 35:6 37:5
50:8 60:15 72:1
86:25 89:11,22
105:13,18,20,21
152:10 154:19
154:22 156:2,5,8
156:11,13
157:13 220:17
228:18 232:2
233:14
news's   14:25
19:15 155:4
newspaper
61:25

night   7:22 34:25
156:6
nights   32:25
nina   111:20
113:4,7,15 114:8
114:14 218:23
nine   77:2 205:16
ninth   40:13
non   52:3 68:4
179:3
nonpracticing
47:12
norfolk   79:21
normally   55:15
58:15 107:2
178:12 180:20
183:25 184:7,14
north   74:13
75:17 139:7
197:19
nos   3:22,24
96:11 218:12
notary   2:7
235:24 236:6,23
note   12:15 13:18
233:22 234:7
noted   14:21
229:7 234:9
notes   136:3
174:20 182:4
notice   3:12,13
36:25 46:7,11
47:1,11,24 48:10
48:13 219:4
229:4
noticed   157:4
november   1:14
2:9 5:5 46:16

Page 31

(94 of 297), Page 94 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 94 of 297
Case 1:21-cv-00305-DCN Document 60 Filed 12/13/22 Page 93 of 118
William L Girdner November 9, 2022

[november - okay]

| | **o** | | |
|---|---|---|---|
| 61:19 201:16 202:12 203:9 234:21 235:8 236:18 **number** 28:9 54:10 69:6 72:4 77:5 91:9 96:5 96:15 97:1 107:7 116:4 120:25 121:24 126:12 131:16 131:18 133:17 144:7,13,16,21 145:4,9,9,20,23 148:24 150:10 150:11,14 152:21 153:24 170:22 174:18 177:15 178:10 180:15,16,17 181:10 189:25 193:17 201:20 203:22 232:17 **numbered** 235:9 **numbers** 74:1 77:3,3 88:4 96:11,12 103:21 150:6,13 184:21 184:23 **nye** 119:11,13 122:4 178:15 183:11 184:6 192:14 193:15 200:10 201:4,16 202:11 203:9,14 208:9 209:22 233:24 | **o** 3:2 5:1 71:1 **oath** 9:13 10:6 15:9 27:13 33:23 235:6 **obispo** 66:25 **object** 11:12 **objection** 12:5,7 12:9,16 14:4 27:3 29:23,23 31:12 41:23 43:2 44:1,10 45:3 53:3 55:7 58:10 65:4 89:9 92:3,20 103:23 110:3,13 118:7 119:3,23 120:19 121:8,19 122:18 123:3 124:8,17 125:3,12 126:10 127:5 129:2 130:1,10 132:2 132:13 133:8 135:9 137:1 140:9 142:24 144:9 147:5 161:5 164:19 165:23 168:15 189:13 194:17 195:4,21 200:17 201:9 207:19 208:23 210:5 211:2 224:6 229:13 230:3,11 **objections** 3:11 8:25 10:20 11:11,11 12:18 12:21 13:7,12,19 | 13:24 14:7,7,8 14:10 105:20 126:4,7 144:18 154:19 229:6,9 **obsessive** 227:14 **obtain** 94:20 96:16 **obtaining** 147:1 **obtains** 186:8 **obvious** 222:13 **obviously** 11:20 23:19 25:7 40:22 51:14 61:6 62:23 77:16 78:16 100:23 107:2 111:10 115:2 137:4 142:17 157:2 165:6 175:14 191:17 194:11,12 216:16 220:15 **occasions** 7:1 **occurred** 88:12 142:4 **occurring** 151:24 208:21 210:2 **october** 6:17 220:25 **odyssey** 82:15,18 82:20 83:4,6 **offered** 191:20 191:21,23 216:15 **offering** 190:12 **office** 2:20 50:16 51:1,5,12 71:9 | 107:16 141:14 156:20 171:18 190:23 198:12 203:19 **officer** 141:14 203:16 206:12 222:6 223:3 **officers** 159:7 **offices** 51:19 183:6 188:8 **official** 1:7 29:12 51:15 120:6 206:10 **officials** 162:18 220:14 **offline** 102:21 **oh** 21:16 28:19 39:9 47:13 67:1 68:10 71:5 73:11 76:8 77:22 84:8 111:24 113:8 135:13 140:5 141:17 142:3 164:15 172:17 177:21 178:7 182:21 187:15 189:5 192:21 198:24 229:8 **ohio** 139:8 141:23 **okay** 10:2,17 12:11,25 16:20 27:6 28:21 32:8 32:10 33:15 34:17 38:2 39:7 39:17 42:4,25 45:11 46:23 |

William L Girdner November 9, 2022

[okay - p.m.]

| | | | |
|---|---|---|---|
| 48:1 49:8 51:13 | 201:14 202:1,25 | 108:12 146:9 | **organization** |
| 53:21 54:12 | 203:20 204:10 | 174:19 181:2,5 | 91:2 |
| 55:24 57:17 | 205:20 209:19 | 185:14 199:10 | **organizations** |
| 61:5 66:12,17 | 210:14 215:22 | 221:25 | 32:18 |
| 67:18,24 68:6,13 | 217:10 218:16 | **open** 72:22,23 | **orientation** 90:2 |
| 68:20,24 69:14 | 219:10 223:10 | 74:2 146:23 | **oriented** 169:14 |
| 69:21 70:10 | 223:10,10 224:9 | 205:6 208:5 | **originally** 200:2 |
| 72:16 73:14,21 | 225:24 228:9,15 | **opened** 144:7,15 | **outlets** 107:11 |
| 74:11,12 75:20 | 228:20 229:8 | 144:20 158:3 | **outside** 111:11 |
| 75:25 76:4,25 | 231:15 232:13 | **opening** 193:7 | 127:6 |
| 77:6,12,16 78:3 | 233:5 234:16 | **openness** 152:3 | **overbroad** 31:13 |
| 78:7,14 81:15 | **oklahoma** 139:8 | **opens** 215:25 | 53:4 55:8 58:11 |
| 82:10,18 83:13 | **old** 73:16 74:24 | **operating** 18:18 | 65:5 92:21 |
| 84:15,22 85:14 | 117:10 156:24 | 188:1 | 103:24 118:8 |
| 91:9 94:1,10 | 164:25 168:18 | **operators** 60:16 | 119:4 122:19 |
| 95:3 97:8,25 | **olden** 167:6 | **opinion** 225:15 | 123:4 130:2,11 |
| 98:24 99:7 | **older** 208:1 | **opponent** 114:21 | 132:14 133:11 |
| 100:1,2,6 103:10 | **olis** 70:23,24,25 | **opportunity** | 135:10 142:25 |
| 103:16 104:3 | **omundson** 1:7 | 9:25 16:6,7 19:9 | 144:10 147:6 |
| 105:3 108:16 | 2:24 5:9,25 | 45:24 98:22 | 161:6 164:20 |
| 110:11 112:16 | **once** 22:6 29:20 | 141:7 196:16 | 165:24 168:16 |
| 118:3,11,12,13 | 30:2 41:17 | 226:17,21,23 | 194:18 195:5,22 |
| 120:23 121:14 | 52:11 85:15 | **opposed** 61:25 | 207:20 208:24 |
| 122:15 124:13 | 87:21 88:4,7 | 87:24 | 210:6 229:14 |
| 128:1 132:21,22 | 107:5 109:23 | **optional** 79:20 | 230:4,12 |
| 138:5,9,10 | 119:22 143:24 | **orange** 73:15 | **overnight** 156:3 |
| 139:15 140:2,7 | 144:1 168:20 | 83:9 183:13,22 | 156:4 |
| 140:15,19,24 | 233:9 | 183:24 184:13 | **overriding** 131:6 |
| 144:21,23 154:5 | **ones** 52:7 65:20 | **order** 4:6 89:4 | 152:25 |
| 154:11 167:10 | 66:15 77:14 | 96:10 146:5 | **owned** 199:2 |
| 167:16 172:22 | 175:21,25 | 162:14 163:7,7 | **p** |
| 173:6,7,9,12,16 | 187:18 206:5,7 | 190:18 232:14 | |
| 175:15 176:25 | 210:13 | **oregon** 76:4,5 | **p** 5:1 204:5,5 |
| 181:19 183:15 | **ongoing** 76:6 | 78:16 82:8,9 | **p.m.** 34:15,24 |
| 184:18 185:13 | 79:1,2 | 141:23 164:8 | 138:11,12,12,14 |
| 188:14 189:23 | **online** 61:8 | 185:12 191:11 | 140:25 141:1,1,3 |
| 190:5 193:1,17 | 63:21 71:1 | 193:3 197:3 | 203:1,2,2,4 |
| 194:21 198:23 | 74:20 77:7 79:6 | | 210:15,17,17,19 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com 208-343-4004

**ER-1773**

William L Girdner November 9, 2022

## [p.m. - places]

227:18,19,19,21
234:22,23
**pacer** 20:5 97:15
97:16,22 146:18
**page** 3:4,10 4:2
8:7 57:18 87:1
105:9 232:21,25
**pages** 3:12,14,15
3:18,20,22,25
4:3,5,7 235:9
**paid** 71:10 75:14
**paisner** 2:14
5:23
**paper** 20:17,25
21:6 22:23
27:10 28:1
30:14,15 59:22
60:1 74:19,23
78:2,6 79:19,20
79:24,25 80:7
83:12,18,21 84:2
84:10,16,17,21
85:8,11,14 91:1
118:9 148:9
156:6 157:14
184:22 198:18
207:23 208:21
210:9
**paragraph** 12:20
13:11 232:20,22
233:1,4
**parallel** 119:1
**parameters**
175:9
**part** 19:8 75:15
89:13,22 96:9
159:1 163:24
164:9,13,16

194:16 199:1
218:20 231:2,24
**participated**
153:4
**particular** 35:16
52:19 96:8
179:9
**parties** 169:7
234:5
**party** 110:21
181:10
**pasadena** 6:19
6:21
**pass** 152:17,18
**passage** 166:10
166:12,18
**passed** 24:1
80:20 168:19
**passes** 177:19
179:7
**patchwork** 86:9
**path** 102:5,6
146:21,25
**patient** 125:19
**pattern** 170:15
**pause** 172:10
**pay** 62:23 63:3
86:22 97:16
158:16 169:8
189:20 197:15
197:16,19,22
198:16
**paying** 189:16
192:19
**payment** 169:6
189:5
**pdf** 169:8

**peach** 70:1,5
**pending** 8:14
71:16 78:17,18
78:18,22,23
80:17
**pennsylvania**
139:8
**people** 28:23
50:23 73:23
74:5 148:19
168:6 170:18,19
170:21 179:7
183:5,7 186:2
192:5 219:19
**pepin** 188:18
190:7,8 204:5,7
205:15
**percent** 25:22
79:21
**percentage**
177:14 178:10
178:13,24
**perfect** 42:14
139:3 172:11
**perfectly** 185:14
**period** 92:10
101:8 102:11
122:8
**periodic** 92:18
93:4,22 94:2,12
95:6 105:22
**periodically**
95:11
**periods** 22:6
**permanent** 69:5
145:3,9,23
150:14 180:17

**permission**
108:5
**permitted** 92:13
104:14 105:24
126:3
**person** 87:21
101:19 117:21
147:11 159:2
170:10
**personal** 37:6,12
37:24 55:3
**personnel** 116:5
**petition** 56:10,13
**petitions** 56:17
57:3,4
**phil** 20:20 21:23
25:8 26:17 59:5
59:7
**phrase** 110:9
113:24 130:4,5
166:9
**pick** 178:1
**picture** 99:16
**piece** 30:13
184:21 200:14
**pierce** 76:10
**pierre** 221:1
**place** 70:13
72:20 73:2
87:23 89:5,15
133:20 168:8,21
191:13 236:12
**placed** 118:6
133:24 134:5
169:10
**placer** 75:6
**places** 160:20

Page 34

## [plaintiff - pretty]

| | | | |
|---|---|---|---|
| **plaintiff** 1:5 2:14 3:19 4:4 5:21 96:2,4,15,24 103:21 181:9 | **policy** 71:20 169:13,15 | **powerpoint** 221:23 223:21 225:6 | 72:1,19 73:5,18 74:25 75:2,8,10 76:6 77:13 78:8 |
| **plaintiff's** 3:11 3:16 104:15 | **political** 219:17 | **pr** 114:10 | 78:11,12 80:5 |
| **plaintiffs** 95:23 | **pop** 7:17 46:21 149:22 | **practical** 153:12 155:6 159:5 | 83:10 85:12,17 87:12,23 88:3,4 |
| **plan** 12:13 99:6 | **portal** 72:2 74:7 100:20 102:1 103:19,20 104:9 146:6 147:2,3 181:16,20 | **practicality** 211:11 | 88:5,6,11,24 89:4 90:6,15,23 |
| **planet** 74:15 | | **practice** 50:21 208:2 212:2 | 91:5,11,16,24 92:9,10 108:1 |
| **planned** 225:14 | | **practiced** 47:13 | 111:16,22 112:4 |
| **plans** 225:17 | **portals** 103:9 | **practitioner** 168:3 | 112:9 114:4 |
| **play** 27:16 200:4 | **portion** 19:25 234:3 | **pre** 23:20 118:18 118:22 | 115:15 116:7,23 150:2,9,17 |
| **plays** 95:1 | **position** 17:19 40:6 41:7,10,14 43:23 58:6 119:14 126:18 177:12 184:24 211:23 218:21 | **preceding** 84:6,9 | 154:25 158:23 |
| **pleadings** 58:5 | | **predecessor** 20:19 | 158:24 159:8,15 159:19 160:12 |
| **please** 5:18 6:3 8:18 31:17 95:3 97:13 99:21 111:1 128:24 137:6 202:5 221:8,20 232:17 | | **prefer** 27:17 63:11 89:19 108:25 | 160:17 162:4 163:21 187:1 188:10,23 189:2 189:4,12 190:6 |
| **pllc** 2:18 | **possession** 29:13 29:18 30:2 | **preliminary** 3:20 4:5 173:10 218:21 226:7,11 228:18 | 190:20 192:15 194:23 195:17 195:20 196:4,21 |
| **plus** 78:13,14 | **possessive** 198:24 | **prepare** 46:5 47:2 48:2 | 197:7 201:8,18 202:2,13 203:11 |
| **point** 14:12 20:10 26:1,6 28:2,4,5,15,21 32:24 38:16 42:23 84:2 107:20,24 108:4 110:15,17 111:2 126:5 130:15 144:8 145:18 154:25 161:11 165:11 171:3 192:13 193:5 211:23 216:24 232:1 | **possible** 25:22 36:7,8,10 38:21 63:14,17 108:15 | **present** 2:24 225:17 | 204:15 207:4,11 213:14,15 |
| | **possibly** 167:25 | **presentation** 112:2,4,7 115:21 | 214:12,24 |
| | **post** 2:20 17:23 17:25 57:4 76:13,20 79:16 80:2 | **preserve** 165:6 | 215:20 216:5,10 216:21,23 |
| | **postpone** 11:19 126:6 | **press** 60:21 63:6 63:13 64:6,11,19 65:3,7,13,17 66:6,9 67:12,22 67:25 68:9 69:7 70:8,10,18 71:12 | 217:13,25 218:20 220:9 223:23 226:12 |
| | **posts** 62:20 | | **presume** 161:9 |
| | **potentially** 133:11 | | **pretty** 70:17 84:14 86:13,24 96:3 122:1 |
| **points** 28:9 68:18 74:18 | **power** 39:12 | | |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com 208-343-4004

William L Girdner November 9, 2022

[pretty - provides]

| | | | |
|---|---|---|---|
| 125:18,20 | **problem** 34:4 | **produced** 186:13 | 108:21 109:3,7 |
| 156:12 159:13 | 75:24 105:1 | 205:13 221:24 | **proper** 210:12 |
| 160:19 161:12 | 166:11 171:19 | 222:2 223:21 | 210:14 |
| 161:16,19 162:4 | 171:23 172:1,21 | 225:7 228:1 | **property** 55:2 |
| 162:6 174:15 | 196:7 230:13 | **product** 81:22 | **propounded** |
| 179:22 180:2 | **problematic** | 81:23 82:18 | 235:12 |
| 187:11 191:3 | 101:6,11 | 114:3 118:1 | **proud** 34:1 |
| 192:5 195:25 | **problems** 195:14 | 135:8,12,15 | **proved** 164:6 |
| 209:16 215:25 | **procedure** 13:15 | 137:3,5,15,17 | **provide** 6:16 |
| 227:13 | 14:3,6,23 37:24 | 138:1 182:18 | 9:16 10:25 16:2 |
| **preventing** | 44:7,25 | 220:7,7 | 16:17 37:8 48:8 |
| 15:17 | **procedures** 37:6 | **products** 68:5 | 85:12 90:7,15 |
| **price** 190:11,12 | 37:13,25 | 218:24 | 130:25 156:15 |
| 191:15,25 193:7 | **proceed** 15:1 | **profile** 52:4 | 161:8 164:4,5 |
| 201:13 | **proceedings** | **program** 81:8,9 | 165:20 175:4,9 |
| **primarily** 48:20 | 57:5 172:10 | 81:10 92:8,12,17 | 196:3,7 197:10 |
| **primary** 95:17 | 233:24 | 92:25 93:3,3,8 | 210:22 211:17 |
| **principle** 147:15 | **process** 19:23 | 93:13,16,21 94:2 | 223:2,23 226:24 |
| **prior** 15:15 | 20:16 21:6,15 | 94:12 95:5,10,19 | 232:2 |
| 38:16,20 48:25 | 22:8 23:1 24:14 | 96:22 97:5,6,15 | **provided** 16:19 |
| 100:25 120:19 | 27:11,13,25 | 97:20 99:3,9,15 | 17:11 23:17,22 |
| 120:21 124:8,11 | 30:15 58:3 | 99:17,21 100:16 | 26:8,15 38:12 |
| 125:3,12 140:9 | 59:25 60:3 | 101:2,18,25 | 40:7,10 44:16 |
| 141:8 200:17 | 80:19,24 81:4 | 102:10 103:3,17 | 67:24 80:5 |
| 201:9,15 202:10 | 84:3 143:22 | 104:7 105:7,12 | 109:24 131:11 |
| 207:9 210:2 | 144:1 149:25 | 105:16,23 106:4 | 144:16 154:4,13 |
| 224:7 226:24 | 150:5,7 166:22 | 106:10,16 108:2 | 174:5,10 186:19 |
| 236:8 | 209:9 230:19 | 108:5,6,18 109:1 | 188:10,25 |
| **privilege** 13:25 | **processed** | 112:10,14 | 193:14 196:17 |
| 14:9,11 | 233:10 | 114:17 116:8,15 | 204:19 211:21 |
| **pro** 181:24 | **processes** 81:1 | 116:19 135:16 | 220:21 222:14 |
| **probably** 65:19 | **processing** 74:1 | 138:23 139:20 | 222:20 223:5,6 |
| 109:5 110:13 | 76:13,20 79:16 | 139:21,23 | 225:7 |
| 137:11 163:14 | 80:2,13 145:3 | 193:22 216:17 | **provider** 220:17 |
| 174:1,25 180:22 | 166:17,20 | **programming** | **providers** 68:2 |
| 194:8 222:19 | 168:14 211:9 | 116:22 217:13 | **provides** 103:19 |
| **probate** 56:24 | 212:3,5,12 | **programs** 92:12 | 104:9 155:8 |
| | 230:19 | 105:24 108:14 | |

Page 36

**ER-1776**

William L Girdner November 9, 2022

[providing - quick]

| | | | |
|---|---|---|---|
| **providing** 9:4,20 10:5,7,9 15:9,10 15:12 22:23 41:4,8,11,13 47:10 79:6 80:2 109:15 127:3 128:13,18 143:5 153:7,19 162:1 178:15 183:10 188:23 189:9 211:12 **public** 2:7 20:2 50:9 53:7 58:20 58:23 69:3 70:19,20 72:20 72:22 73:25 74:3,16,20 75:8 78:10,11 79:8 80:5 81:3 88:7 88:12,24 89:4 91:25 92:12 105:23 113:17 117:1,2 118:20 118:24 146:8 154:20 156:17 159:3,6 160:12 160:16,17,18,18 168:6 190:24 222:1 225:15 235:24 236:6,24 **publications** 18:20 **publicly** 69:6 222:3 **published** 35:25 158:9 **publishing** 18:17 | **pull** 104:12 171:10 172:24 173:2 220:20,21 226:14,18 **purpose** 12:7 133:19 221:9 **pursue** 155:19 211:20 **push** 197:23,24 **put** 48:19,24 68:10 70:13 72:20,25 89:5 99:14 108:11 109:9 117:17 135:20 145:2 153:14 160:17 164:24 166:17 169:23 170:14 173:23 202:17 219:8 222:9 **puts** 170:22 **putting** 74:20 164:22 202:15 | **q** |
| | | **qualify** 33:19 70:21 **quality** 18:20 **question** 8:14,17 14:5 15:7 16:17 16:20,23 21:19 31:15 33:7,9 36:12 40:15,19 41:2,12,19 44:22,23 50:6 51:9,12,22 58:19 65:9 88:7 90:11 96:21 111:1 | **120:2 122:25 125:7 128:16,25 130:20 132:17 134:3 137:7 150:23 151:18 152:14,20 153:3 166:1 170:1 187:8,20 189:16 193:25 200:5 201:1,1,21 202:18,20 204:10,24 206:8 211:10,14 214:14 216:14 225:18 232:6 questioning 142:16 questions 8:21 9:16,19 10:7,10 14:14,16,23 15:10,13,18 16:3 17:10 20:13 33:17 38:13 44:13 103:6 141:8 142:14 172:2 194:13 196:24 228:7 231:12,14 233:17 235:11 235:12 queue 60:21 63:6,13 64:6 65:3 66:6,9 67:22 69:4 70:9 70:12,18,19 71:12 72:1,20 73:6,19,25 74:16 74:25 75:2,8,9** | **75:11 76:7 78:8 78:11,11,12 83:11 85:13,18 87:13,23 88:3,5 88:6,6,7,11,12 88:24,25 89:4,5 90:6,15,24 91:6 91:11,16 92:10 92:10 108:1 111:16,23 112:5 112:10 115:9,15 116:7,24,25 117:1 118:16,25 119:1 150:2,9,18 187:2 188:11,23 189:2,4,12 190:7 190:20 192:16 194:23 195:17 195:20 196:4,21 197:7 201:8,18 202:3 203:11 204:16 207:11 212:17 213:14 213:15 214:12 214:24 216:5 217:14,25 218:20 220:9 226:12 queues 64:11,20 65:7,17,23 67:13 67:25 75:1 77:13 91:25,25 143:20 162:4 207:4 quick 12:1 45:13 70:3 76:18 98:1 98:8 102:13 103:1 140:16** |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

[quick - referencing]

172:20 227:12
**quicker** 132:11
**quickly** 8:6
70:20 194:20
**quit** 88:9
**quite** 31:14 34:1
36:7,8,10 51:9
72:14 83:25
116:5 157:1,5,6
162:3 164:1
166:25 180:10
183:5 186:2
225:20 231:21
**quits** 87:21
**quote** 214:8

**r**

**r** 5:1 59:12
115:18
**radar** 174:6
**radio** 156:8
**rain** 7:22
**raised** 213:18
214:10
**raising** 58:8
**rare** 151:3,20
**reach** 109:25
**reaching** 142:11
**read** 46:6,6 55:5
106:1 128:25
129:1 130:7,9,16
130:18 137:7,9
139:25 156:6
204:1,8 233:3
235:10
**reading** 11:10
47:1 104:24

**reads** 130:14
**ready** 12:4
**real** 55:2 76:18
102:13 148:18
172:20 179:8
**reality** 156:5
178:21
**really** 58:13
68:18 72:14,15
79:5 106:18
112:24 127:19
130:17,20 152:7
167:23 186:2
188:6 212:24
231:7
**reason** 9:7 11:8
27:12 51:21
54:7 59:23 60:1
106:10 126:13
131:6 152:4,25
153:20 161:12
196:8 202:1,2
**reasonable**
161:17,18,20
185:7
**reasoning** 43:7
**reasons** 89:18
141:25 161:16
162:6
**rebuttal** 147:21
**recall** 26:10,10
26:12,24 27:5
50:20 51:24
53:19 153:7
196:22 197:6,9
232:4
**receipt** 15:1
40:10 41:5,11

70:8,16,23 74:24
129:9,17 131:4
132:6,20,23,23
145:10 148:10
152:23 155:1,12
161:11 162:1,7
164:6 196:7
207:24 209:25
211:7 221:14
**receive** 131:21
132:9,11 159:19
169:10 170:9
219:16
**received** 22:19
32:12 41:17,20
117:4 166:4
219:13,14
224:16
**receives** 132:24
133:2 154:21
**receiving** 52:10
**recognized**
109:8
**recollection** 24:7
24:8,18 25:3,17
38:23 39:9,10,15
199:24
**recommend**
11:19
**reconsider** 234:3
**record** 5:4,6,19
6:16 9:10 12:2
12:12,14,15,24
13:1,2,5,7 14:19
29:19,20,24 30:3
30:6 45:18,22
98:14,18,20
120:6 129:1

130:9,18 133:24
134:5 137:9
138:11,15,17
140:25 141:4,5
151:9 172:12,16
172:19 190:24
190:25 203:1,5
210:13,16,20
219:6 223:1
227:18,22
232:19 234:8,22
236:15
**recorded** 5:15
**recording** 5:4
13:4 45:21
98:17 138:14
141:3 203:4
210:19 227:21
**records** 113:5
118:23,24 165:7
165:7 185:24
**red** 176:10
183:13 184:1,2
184:15,17
227:15
**reduced** 236:13
**reductions** 87:3
**reed** 18:1
**refer** 124:5
**reference** 111:22
182:5 221:6
**referenced** 148:3
205:15 206:25
218:23 225:3
228:2
**referencing**
148:12

Page 38

[referred - represent]

| | | | |
|---|---|---|---|
| **referred** 108:18 207:25 | 226:1,4,10,11 | **remotely** 2:13 | 88:10,20 90:20 |
| **referring** 40:16 | **relating** 217:2 | 5:13 20:5 63:11 | 90:21 91:4,10,18 |
| 46:15 55:13,13 | 217:12,24 | 63:15 88:21 | 94:16,16 95:17 |
| 190:7 208:19 | 218:20 | 89:7 | 95:19 96:19,25 |
| 221:3 | **relayed** 115:2 | **remove** 13:10 | 106:11 129:1 |
| **refile** 151:4 | **release** 56:10 | **rep** 115:6,8 | 130:7,9,18 137:9 |
| **refiled** 150:18 | **relevancy** 13:24 | **repeat** 182:11 | 150:12 153:25 |
| **refine** 52:15 | 14:8 | **rephrase** 104:4 | 158:17 172:13 |
| **reflect** 11:7 | **relevant** 124:6 | **rephrasing** | 172:21 232:16 |
| **reflects** 14:18 | **relief** 89:10 | 209:15 | 236:5 |
| **refreshed** 199:18 | 227:9 | **replace** 88:10,13 | **reporter's** 236:1 |
| **refuse** 106:14 | **relies** 116:21 | **replaced** 87:22 | **reporters** 19:11 |
| **refused** 199:2 | **rely** 21:4 124:5 | **report** 19:19,20 | 33:4 35:11,14,18 |
| **regard** 26:20 | **relying** 125:10 | 19:24 22:18 | 36:4,13 39:25 |
| 189:24 197:9 | 128:10,12,15,17 | 29:10,17 32:20 | 50:15 52:2 59:3 |
| **regarding** | 128:20 129:4 | 32:20 33:1 | 59:9 60:17 |
| 125:16 213:12 | **remainder** 13:23 | 34:10,11,12,14 | 86:18 87:16 |
| **regardless** 64:4 | 71:17 82:10 | 35:8,24 36:5,14 | 88:9 89:25 90:4 |
| 89:16,17 90:23 | **remains** 87:8 | 36:16,17,19,20 | 90:13 105:22 |
| 149:12,15 174:2 | **remarkable** | 37:19 40:1 | 106:14 117:2 |
| **region** 90:5,13 | 65:25 72:15,15 | 49:18,20,21 58:1 | 157:18,23 |
| **register** 146:18 | **remember** 28:3 | 59:21 62:3,9,16 | 160:15 |
| 146:22 159:11 | 51:10 54:9 71:3 | 87:7 89:25 | **reporting** 2:6 |
| **registration** 69:7 | 86:11,14 94:18 | 103:14 107:8,13 | 5:16 20:25 21:6 |
| 72:23 74:21 | 136:15 188:6 | 107:14,15 148:8 | 22:9 26:13 |
| 75:11 86:23 | 198:3 206:1,5 | 150:10 151:9,16 | 31:11 32:3,13,17 |
| 97:16 146:11,13 | 231:23 | 156:15 157:8 | 34:18 36:11 |
| **regular** 163:7 | **remembered** 2:3 | 162:17 188:19 | 37:21 60:19 |
| **reject** 213:2,4 | 17:3 | 188:21 203:17 | 150:8 159:3 |
| **rejected** 150:3 | **remembers** | 204:1,8,14 205:7 | 163:10 |
| 150:18,22 | 168:4 | 205:8,9 | **reports** 18:18 |
| **related** 22:17 | **remind** 141:12 | **reported** 1:25 | 48:16 49:14 |
| 39:1 56:20 | **reminds** 76:8 | 5:15 29:22 30:4 | 50:2 60:9 86:21 |
| 71:17 91:8,24 | **remote** 1:13 2:1 | 150:16 | 86:24 87:9 90:4 |
| 112:20 127:18 | 2:3 5:6 61:8 | **reporter** 2:7 6:3 | 90:13 157:1 |
| 154:16 170:1 | 64:13,16 72:9,10 | 9:6 19:16 50:24 | 158:9 |
| 209:4 223:23 | 86:23 87:11,23 | 63:7,10,12,14,20 | **represent** 62:6 |
| | 90:7,16,25 | 86:20 87:8 88:2 | 114:15 160:16 |

Page 39

**[represent - reviews]**

| | | | |
|---|---|---|---|
| 192:14 229:2 232:13 | **requires** 169:6 | **responsible** 19:20 34:17 | 85:12,17 87:12 |

192:14 229:2
232:13
**representation**
203:14 207:10
209:22 227:8
**representations**
188:10
**representatives**
188:16
**represented** 54:5
200:10 208:8
**representing**
181:23
**represents** 181:3
227:9
**reps** 115:4
**request** 28:22
29:3 37:3 65:13
66:11,21,22,23
66:24,25 67:2
71:25 73:8,9,10
73:12 74:10,12
75:6,7 76:3 86:5
86:17 87:5
100:24 111:3,4
111:17 194:24
221:15 224:3,13
**requested** 29:1
188:12 234:25
**requesting**
219:23
**requests** 3:17
65:15 104:16
221:13 226:10
**require** 142:2
197:15
**required** 14:5
194:24 197:19

**requires** 169:6
**requiring** 74:21
**reserved** 150:19
**reserving** 14:21
**reside** 6:18
86:19
**residing** 235:24
**resolve** 211:25
**respect** 14:23
16:7 18:12
21:14 22:12
37:15 58:4 59:3
64:19 65:1,6
83:9 87:12 93:1
99:23 100:24
134:21 137:24
139:24 146:2
198:19 210:24
214:11 215:1
224:7,20 228:17
228:21 234:1
**respectfully**
212:1
**respective** 233:9
**respond** 102:24
**responds** 105:20
**response** 16:17
16:18,20 17:12
113:22 153:8
214:2 224:13
**responses** 3:16
9:5 11:14 14:24
104:15 153:22
154:3 195:19
**responsibility**
18:15,21 32:17
95:18 174:24
225:16

**responsible**
19:20 34:17
48:20 60:8,16
134:15
**responsive** 10:25
**rest** 55:23
**restrictive** 131:7
153:1 161:20
**restricts** 154:24
**resubmitted**
151:8
**result** 65:2 66:7
73:7 87:4
178:23 197:17
198:17
**retiring** 198:4
**return** 172:5
**returns** 150:24
**reuters** 187:16
**reversed** 80:16
**review** 9:25
10:12 14:25
16:6,7 22:17
26:9 35:1,4
55:16 60:21
63:6,13 64:6,8
64:11,19 65:3,7
65:13,17,23 66:6
66:9 67:13,22,25
68:9 69:3 70:9
70:10,12,18,18
70:19 71:12,20
72:1,19,20 73:6
73:19,25 74:3,16
74:20,25 75:1,2
75:8,8,11 76:6
77:13 78:8,11,11
78:12 83:11

85:12,17 87:12
87:23 88:3,5,6,6
88:7,11,12,24,25
89:4,4 90:6,15
90:24 91:5,11,16
91:25,25 92:9,10
108:1 111:16,22
112:5,9 114:4
115:9,15 116:7
116:24 118:22
128:22 150:2,9
150:18 187:2
188:11,23 189:2
189:4,12 192:16
194:5 195:17,20
196:4,16,21
197:7 201:8,18
202:14 203:11
204:16 207:4,11
212:18 213:14
213:15 214:12
214:24 215:21
216:5,11,21,23
217:14,25
218:20 220:9
223:24 226:12
226:21,24 230:9
**reviewed** 37:23
38:5,17 47:2
127:17 228:22
230:21 233:10
**reviewing** 10:13
22:9 25:13 27:9
37:17 48:6
59:25
**reviews** 81:1
122:15

Page 40

William L Girdner November 9, 2022

[revise - sara]

| | | | |
|---|---|---|---|
| **revise** 11:13 | 130:13 131:4,17 | **river** 2:20 | **run** 65:16,18 |
| **rice** 68:25 | 132:19 133:13 | 185:23 | 68:7 70:7 92:25 |
| 158:18 | 136:10 138:6,13 | **riverside** 73:22 | 99:21 100:4,7 |
| **rice's** 214:5 | 138:16 139:5,11 | 74:9 | 101:7,12 113:12 |
| **ridiculous** | 140:23 141:2,10 | **road** 179:16 | 132:18 140:7 |
| 222:11 | 141:18 142:14 | **role** 37:5 60:13 | 149:20 157:2 |
| **riding** 23:4 | 143:7 147:16 | 70:14,15 137:24 | **runner** 30:14 |
| **right** 5:3 6:12 | 149:24 151:22 | 141:16 | 31:20 168:19 |
| 7:25 11:12,13 | 152:16,22,23 | **roles** 70:19 95:2 | **runners** 167:6 |
| 13:3,6 15:5 | 154:10 155:14 | **room** 6:1,22 | **running** 18:16 |
| 16:11,14 17:15 | 155:21 156:5 | 112:8 | 58:17 99:11 |
| 19:5 23:15 | 157:18,19 | **rough** 99:13 | 101:2,13 107:1,3 |
| 25:24 30:23 | 158:13 159:21 | 100:9 101:9 | 108:13,14 |
| 31:2,5 32:14 | 167:18 168:7,21 | 212:15,16,24 | 114:23 140:4,5 |
| 45:17,20,23 46:2 | 168:22 169:15 | 215:22 | 140:13,17 |
| 46:4,14 48:15 | 169:18 170:1,18 | **round** 180:10,10 | **runs** 108:10 |
| 49:1,2 53:12,24 | 170:24 171:2,25 | **routine** 95:20 | 118:25 145:8 |
| 54:4,11,17 56:1 | 172:2 173:2 | **rpr** 1:25 236:23 | |
| 57:15 60:8 | 175:3 177:3 | **rubber** 179:15 | **s** |
| 62:17,18,25 | 179:25 180:12 | **rule** 3:11 16:16 | **s** 3:9 4:1 5:1 71:1 |
| 67:20 68:4,15 | 180:21 181:18 | 42:11,16 124:14 | **sacramento** |
| 69:9,19,25 70:22 | 182:17 184:2,20 | 125:17 127:7 | 74:23 |
| 71:22 74:22 | 186:12 190:1,21 | **ruled** 80:14 | **sacramento's** |
| 76:6 77:20 | 193:1,16,19 | **rules** 8:5 13:15 | 74:23 |
| 78:13,17 79:25 | 197:5 200:20 | 13:17 14:2,6,22 | **safe** 165:9 |
| 80:9,22 82:8 | 202:18 203:3,6 | 15:2 37:23 38:1 | **sales** 112:23 |
| 84:8,11 87:8 | 203:25 204:6 | 38:2,6,9,10,18 | 114:16 |
| 88:16 90:17 | 206:2,16 208:16 | 38:22,25 39:6,8 | **salesperson** |
| 97:9,25 98:5,16 | 210:18 216:6 | 39:18,19 42:20 | 115:1 |
| 98:19 99:1 | 219:3,21 220:24 | 44:7,8,24,25 | **san** 2:15 66:25 |
| 103:11 104:13 | 224:19 225:2 | 123:23 124:23 | 67:1,6,7 72:24 |
| 105:4,6 106:3,9 | 227:17,20,23 | 125:1,8,10 | 73:2,7,13,15 |
| 107:20 109:8,11 | 231:6 | 126:22 127:4,10 | 75:2,18 85:6 |
| 110:9 111:13,19 | **rights** 14:22 | 127:17 128:6,7,9 | **santa** 66:23 67:2 |
| 111:20 112:18 | **rings** 193:18 | 128:13,17,18,21 | 67:4 74:14 85:6 |
| 113:22 118:13 | **ripe** 30:4 | **ruling** 11:5 | 206:3,4 |
| 120:4 122:22 | **ritual** 234:13 | 158:19 | **sara** 1:7 2:24 |
| 127:1 128:16 | | | 5:25,25 149:20 |

Page 41

(104 of 297), Page 104 of 297 ... 24-6697, 03/06/2025, DktEntry: 19.9, Page 104 of 297
Case 1:21-cv-00305-DCN Document 60-7 Filed 12/13/22 Page 103 of 118
William L Girdner November 9, 2022

[satisfaction - serve]

| | | | |
|---|---|---|---|
| **satisfaction** 16:24 | 174:18 176:12 230:23 | 96:20 104:22 105:11,18 117:2 | **send** 90:20 159:10 224:3,11 |
| **satisfactory** 65:16 | **scanning** 74:17 74:19 | 118:25 119:17 122:22 129:10 | 225:12 **senior** 112:23 |
| **satisfied** 57:13 | **schedule** 23:6,7 | 138:7 140:20 | 114:16 |
| **satisfy** 161:3 | 23:9,12 35:16 | 149:21 152:11 | **sense** 73:16 |
| 210:24 222:7 | **school** 17:24,25 | 153:20 154:5,16 | 102:16 103:1 |
| **saturday** 35:4 | 18:3 61:25 | 158:4 166:2 | **sent** 25:20 220:6 |
| **saw** 54:3 59:14 | 74:24 156:25 | 173:6 176:4,9 | 221:7 222:8,21 |
| 158:25 176:7 | **scope** 118:8 | 177:1,16 178:7 | 222:24 223:3,21 |
| **saying** 25:20 | 127:6 | 179:13,17,21 | 224:12 225:6,8 |
| 28:8 33:19 36:9 | **scraping** 91:24 | 181:4,13 184:10 | **sentence** 13:11 |
| 39:15 41:17 | 91:24 92:4 | 185:14,15,17 | 13:20,23 233:3 |
| 42:22 43:14,14 | **screen** 34:5 | 191:19 213:6 | **separate** 36:19 |
| 43:17,19 44:4 | 53:21 104:24 | 219:10 220:24 | 81:9 193:21 |
| 45:7 82:23 84:5 | 219:8 232:11 | 223:19 224:22 | 194:7 |
| 100:9 101:17 | **scrutiny** 58:24 | 228:15 231:8 | **separately** 189:9 |
| 113:16,18 119:7 | **se** 181:24 | 232:11 233:1 | **september** |
| 119:9 121:2 | **seal** 236:18 | **seeing** 50:10 | 219:13,24 221:7 |
| 123:1,1,6,8,10 | **search** 108:11 | 181:6 | 221:10 223:4 |
| 123:11,15 | 113:11,14,17,23 | **seeking** 178:4 | **sequence** 85:20 |
| 133:17 136:16 | **searches** 97:6 | 208:9 227:10 | 85:22 |
| 145:15,17,18 | **seattle** 197:19 | 228:19 | **sequential** |
| 147:10,12 | **second** 3:17 | **seen** 12:9,16 | 232:17 |
| 148:17 149:8 | 75:23 78:22 | 32:8 42:10 43:4 | **series** 102:17 |
| 150:9 159:23 | 104:15 120:15 | 43:21 45:7,9 | 219:19 |
| 161:24 162:16 | 121:16 135:13 | 53:9,17 54:8,8 | **serve** 70:2,5 81:8 |
| 166:6 175:25 | 192:25 | 66:5 83:20 | 81:19 82:4,12,16 |
| 179:19,22,23 | **sector** 29:12 | 115:4 177:6,15 | 120:16 121:5 |
| 180:2,3 188:22 | **security** 39:4 | 178:11 195:7 | 134:11,16,21,24 |
| 189:8 192:7 | 213:13,19,22 | 219:22 | 135:16 143:8,15 |
| 201:4 202:4 | 214:10,16 | **sees** 120:11 | 143:18,18,25 |
| 212:25 218:13 | **see** 8:10 41:18 | **seizing** 30:5 | 144:6,17 145:22 |
| 218:14 220:15 | 52:20 53:19,21 | **selection** 155:21 | 149:13 152:1 |
| 221:19 | 53:24 54:12 | **self** 78:10 | 161:2 165:19 |
| **says** 10:21 42:12 | 58:16,18 74:22 | **sell** 192:6 197:13 | 166:14 169:11 |
| 54:17 127:22,22 | 74:23 76:21,24 | **selling** 199:10 | 169:19 179:20 |
| 150:25 154:17 | 90:18 91:21 | | 180:7 186:6 |

Page 42

William L Girdner November 9, 2022

[serve - sorry]

| | | | |
|---|---|---|---|
| 187:5,11 192:3 194:2,9 212:6,13 230:10 231:2 | shift 154:8 | 10:14 12:15 128:24 130:17 137:6 236:5,23 | 188:6 197:17,18 197:23 210:13 |
| served 13:8 104:14,15 105:6 196:14 | shifts 19:1 shimabukuro 138:20 141:13 | simple 122:1 | smart 122:2,4 |
| | shoes 160:15 | simply 14:2 69:7 101:21 104:1 106:11 146:10 146:23 | smothered 152:9 |
| server 100:17 137:21 | shook 116:6,10 short 213:8 | | snippy 113:21 snohomish 197:17,18 198:19 |
| serves 160:21,21 | shortening 186:22 | single 91:10 | |
| service 1:4 3:12 3:14 5:9,21 17:18 83:8,21 143:6 156:16 200:16 204:21 220:16 | shorthand 236:5 236:12 | sioux 223:16 sir 17:16 | snow 7:21 software 73:4 185:13 |
| | shortly 40:10 41:5,17 117:3,4 129:10,12 132:6 132:7 154:21 209:25 211:7,8 | sit 8:10 38:24 172:18 | solutions 221:21 |
| | | site 18:18,19 74:2 96:17,23 97:6 99:22 146:10,23 | somebody 36:24 64:18 87:25 88:14 89:7,20 168:4 |
| service's 3:20 4:5 | shot 44:18 90:10 | sites 92:12 93:4 93:6,24,24 94:1 94:15,19 99:20 105:24 | somewhat 113:1 |
| services 116:1 | show 18:16 154:2 228:13 232:9 | | sonoma 67:1,4 85:6 |
| set 3:17,17 11:20 12:20 101:19 104:16,16 145:7 179:9 189:25 | | | soon 120:13 125:20 169:23 |
| | showing 232:20 | sitting 112:7 | sorry 18:23 21:16,16 33:14 34:3,3 37:14 39:5 46:13,13 53:14 61:20 62:21 67:2,3,3 70:23 72:20 73:11,11,11 74:9 75:8 78:19,21 79:16 82:19 83:16 96:11 108:13 111:24 114:1 117:8 120:18 129:15 130:17 138:22 148:14 160:5 164:5,23 169:21 |
| settle 170:21 192:1 | sick 59:17 | situation 25:9 | |
| settled 67:16 190:6 | side 41:6,6 101:20 112:8 159:5 167:14 215:17 | six 109:21 174:1 191:3 205:19,20 | |
| | | sketch 17:21 | |
| settlement 66:8 171:1 | sign 156:16 | sky 19:19,20,23 32:20 35:24 36:5,14,16 40:1 49:21 60:9 62:3 62:16 107:8,13 107:14,15 156:15 157:8 | |
| shadow 117:17 117:22 | signature 31:7 31:22,25 234:25 236:22 | | |
| shaking 112:10 | signatures 168:22 | | |
| share 53:13,21 104:18 | signed 3:21 71:10 | | |
| she'll 149:21 | similar 7:3,6 68:9 162:4 | slower 106:15,16 slowly 214:21 | |
| shepherd 168:2 207:25 | | small 56:6,8 67:10 88:19 90:25 187:12,18 | |
| sheriff 18:10 | simmons 1:25 2:7 5:16 9:5 | | |

Page 43

William L Girdner  November 9, 2022

[sorry - statement]

| | | | |
|---|---|---|---|
| 172:17,18 | speculation | stand 160:15 | 94:11,14 95:4 |
| 188:20 204:9 | 122:20 123:4 | 190:8 | 99:4,8 100:4,17 |
| 212:8 214:18,20 | 137:2 144:11 | standard 123:18 | 101:1 103:3,5 |
| 218:16 223:10 | 230:5 | 126:13,19 | 107:18 109:15 |
| sort 82:23 | spell 70:25 | 127:13,25 128:1 | 117:21 118:3 |
| sorted 133:14 | spend 11:17 | 128:15 148:3,7 | 121:3 122:12 |
| sought 89:10 | spider 108:13,19 | standing 28:23 | 123:15 129:11 |
| sound 98:2 | 108:24 146:2,9 | standpoint 20:16 | 129:21,22 |
| 172:7 | 147:1 | 95:9 213:20 | 130:22 131:14 |
| sounds 49:2 61:4 | spidering 138:22 | 231:11 | 131:22 132:1,20 |
| 61:17 68:1 80:3 | spiders 108:23 | stands 112:2 | 134:8,10 135:4 |
| 98:11 137:12 | 109:3 141:20,20 | stanislaus 67:14 | 136:12 148:21 |
| 149:3 193:4,6,16 | 142:1 | stars 52:5 | 148:22,25 151:1 |
| source 197:16 | split 113:13 | start 65:20 72:18 | 158:11 159:22 |
| south 69:19 71:9 | spokane 59:21 | 109:12 157:23 | 160:1,3,6,6 |
| 139:9 141:23 | spoken 110:24 | 174:11 | 163:3 166:13 |
| 220:15 221:1,16 | spot 230:18 | started 20:23 | 168:13 185:1,22 |
| 221:17 222:5 | spreadsheet | 21:25 30:14 | 187:7,21 188:3,4 |
| 223:16 | 171:13 173:19 | 85:8 207:17 | 189:21 190:22 |
| speaking 126:4,7 | 175:7 178:16 | 234:13 | 192:10 194:1 |
| specialist 183:4 | 180:13 182:18 | starting 48:25 | 195:1,14 197:14 |
| specific 20:16 | 183:4 | 65:10 | 198:7,14,17,22 |
| 38:23 39:21 | spreadsheets | state 2:8 5:18 | 201:8 207:17 |
| 40:17 59:9 | 182:25 183:1 | 6:15 26:12 | 209:5 210:9 |
| 75:14 86:18 | 184:8 | 35:25 37:11,13 | 211:20 212:5 |
| 199:23 203:7 | st 35:19 | 38:18 39:24 | 213:11,12,13 |
| 209:17 | stacks 157:14 | 40:7,12,25 41:3 | 214:11,15,22 |
| specifically | staff 87:19 216:2 | 41:6 42:8,12,19 | 215:9 216:9,19 |
| 12:20 23:6 30:1 | 216:17 | 42:20 43:1,4,6 | 216:20 217:3,14 |
| 36:11 40:20 | stale 156:2 | 43:10,12 45:2 | 220:25 221:15 |
| 46:9 47:3 50:20 | stamp 30:25 | 51:4 58:2 60:9 | 222:5 223:15 |
| 50:22 87:18 | 117:17,22,22 | 61:19 63:6,11,19 | 229:11,20,22 |
| 118:9 129:5 | 168:25 186:11 | 63:19 64:21 | 235:2 236:2,6,24 |
| 170:13 200:5 | stamped 24:2,24 | 65:1,3 69:18 | stated 14:2,2 |
| 202:10 204:25 | 30:7 117:8,11,15 | 71:18 72:18 | 124:4 |
| specifics 26:20 | 118:6 | 77:11 79:3,20,22 | statement 106:3 |
| speculate 194:11 | stamping 117:16 | 81:14 83:6 89:3 | 114:4 127:12,12 |
| | | 89:5 92:16 94:7 | 135:17 200:20 |

Page 44

William L Girdner November 9, 2022

[statement - suite]

| | | | |
|---|---|---|---|
| 220:8 221:19 233:12 | **stipulation** 57:5 | 132:24 133:1,3 | 202:10 203:8 |
| **states** 1:1 42:11 | **stipulations** 5:19 | 142:22 143:4,10 | **subpoena** 110:21 |
| 64:20 77:17,19 | **stop** 32:4 100:24 | 143:11 145:21 | 110:25 111:4,18 |
| 106:7 138:21 | 100:25 101:3 | 166:19 169:15 | 112:20 |
| 139:10,24 | 103:7 139:19 | 186:5 | **subscribe** 75:13 |
| 141:19 148:11 | 140:8 174:21 | **submissions** | **subscribed** |
| 148:14,14,16 | 202:20 212:2 | 122:16 | 235:21 |
| 188:23 189:1 | **stopped** 100:11 | **submit** 36:18 | **subscriber** 75:14 |
| 194:4 204:16 | 141:19,20 | 145:14 148:2 | 107:12 |
| **stateside** 86:9 | 142:10 146:3 | 170:23 234:2 | **subscribers** |
| **statewide** 68:21 | **stopping** 141:25 | **submits** 80:24 | 32:21 36:23 |
| 69:3 70:12,12,22 | **straight** 33:20 | **submitted** 36:5 | 62:15 107:8 |
| 70:23 71:12,25 | **straightforward** | 36:13 42:3,5,8 | 151:17 156:14 |
| 72:8,14 73:1 | 25:7 | 42:13,17,20 | 156:15 157:9 |
| 82:12,16 83:7 | **street** 2:20 | 43:12,15,18,25 | **subscribing** |
| 86:2 91:18 | **strength** 164:10 | 44:5,9,20 45:2 | 61:18,22 62:3,6 |
| 148:17 190:6,11 | 164:14 208:7 | 90:8,16 120:9,13 | **subscription** |
| 190:20 192:2 | **strike** 13:20 | 120:16 121:1,4 | 61:8,11 62:12,20 |
| 197:24 198:4 | 57:20 107:23 | 121:13,16,24 | 62:22,24 74:7 |
| 199:3,7 | 109:13 110:16 | 122:6,9,11 123:2 | 189:4,12,17,21 |
| **stating** 25:12 | 119:20 122:9 | 123:9,11,16 | 201:7 204:20 |
| **station** 61:25 | 134:20 160:24 | 124:15 126:16 | **subsequently** |
| **statistics** 184:21 | 229:21 | 128:8 133:5,18 | 189:22 |
| 184:21 | **strokes** 56:23 | 134:1,4,7,8,9,23 | **substantial** |
| **statute** 125:18 | **strongly** 10:17 | 142:18,21 | 202:2 |
| **stay** 33:13 50:15 | **structure** 201:13 | 143:25 144:6,17 | **substantiated** |
| 51:1,11 91:17 | **structured** 231:5 | 149:7,9 151:25 | 196:10,11 |
| **stays** 228:1 | **stuck** 158:20 | 161:1 166:14 | **substantively** |
| **step** 162:9 | **stuff** 61:15 157:2 | 169:24 170:9 | 11:2 |
| 171:21 179:11 | 157:17 168:22 | 173:10 179:19 | **substitution** |
| 193:24 | **style** 48:16,19 | 179:24 180:6 | 59:15 |
| **steps** 152:22 | 49:14,25 | 201:16 202:11 | **successful** 89:2 |
| **sterilization** | **subject** 58:24,25 | 203:8 204:2 | **sufficient** 211:25 |
| 57:4 | 105:19 154:18 | 207:7 212:6,7,13 | **suggested** 99:5 |
| **stick** 11:18 91:14 | 190:14 195:24 | 228:11,17 231:1 | **suit** 7:3 96:12,24 |
| 92:16 | **subjects** 218:7 | 233:8 | 211:22 |
| | **submission** | **submitting** 45:8 | **suite** 2:20 |
| | 42:23 124:6 | 133:24 201:3,15 | |

Page 45

William L Girdner November 9, 2022

**[suits - talk]**

| | | | t |
|---|---|---|---|

suits 7:6
sum 114:15
summarize
87:10
summary 49:23
128:23 151:14
sunday 35:4
superior 76:10
supplement
11:14
supplemental
4:4 46:20
228:11
support 3:19 4:4
164:10 173:10
supports 44:8
45:1
supposed 28:17
supreme 38:7,18
38:25 69:17
188:19 198:11
203:17 204:2
205:2
sure 7:14,16
10:4,19 11:8
18:17 21:9,18
31:18 41:15
47:5 49:5,25
52:6,6 59:12
60:25 61:16
65:8,21 66:20
67:11 68:12
72:6,9 76:18
77:24 79:18
80:11 81:18
84:15 86:12
87:12,20 88:4
90:12 92:6

94:14 97:14
98:3 99:11
101:3,4 102:25
106:19 108:8
109:2 111:2
124:3 127:14,16
130:8,24 143:3
144:22 146:20
147:8,15,21,22
151:19 157:3
158:12 165:1,10
168:1 169:4
170:20 176:6
177:8 183:2,24
184:1,13 185:10
187:25 190:17
198:11,11
199:12 208:8
209:2 220:17,19
227:14 230:15
231:7
surmised 59:20
suspect 194:9
suspected 62:8
sutter 67:14
swear 6:3
sweep 95:11,13
95:13 96:17
sweeps 92:18
93:4,22 94:2,12
95:6 105:22
swept 97:4
swim 234:12,14
swing 76:16 77:9
switch 148:19
194:3
switched 84:12
84:23 85:11,24

109:17 194:1,23
sworn 6:6 9:17
10:6 15:9
208:15 209:19
235:5,21 236:9
system 73:1,2,6
73:16 77:7 83:7
83:10 84:9,24
86:22 99:15
113:12 129:20
133:21 135:7
136:11,21,24
137:18,25
143:12,16,23
144:3 145:1,5,7
149:1,16 150:4
157:11 163:4,20
163:25 164:3,14
164:23 165:3,19
165:22 166:15
166:23 167:2,9
167:12 179:18
184:6 188:2
192:4 194:4,6,16
194:23 199:4,7
210:9 212:14
213:3 229:24
230:2,8,10,24
231:3 233:9
system's 195:2
systems 34:22
64:24 71:2
78:19 82:14
83:2 145:8
148:24 171:5
186:2

t 3:2,9 4:1 59:12
115:18
tacoma 76:9
199:12
tactic 192:5
take 8:12,14
10:3 12:1 30:23
30:24 33:14
45:15 68:13,14
91:19 98:1,8,9
99:2 102:6
103:1 130:22
138:7 140:15
151:13,14
168:25 169:14
169:18,23
170:18,19
171:22 174:23
176:11 178:1
202:23,24
207:15 208:10
210:13 216:9,10
219:4 220:10
227:12 234:12
taken 2:4 5:8
39:14 45:19
98:15 138:12
141:1 203:2
205:1 207:16
208:11 210:17
227:19 235:8
236:11
takes 102:7
129:19 183:4
talk 17:9 28:22
32:16 45:24
48:1 50:24 51:5

Page 46

(109 of 297), Page 109 of 297, 24-6697, 03/06/2025, DktEntry: 10.9, Page 109 of 297
Case 1:21-cv-00305-DCN Document 60-7 Filed 12/15/22 Page 108 of 118
William L Girdner November 9, 2022

## [talk - thing]

53:9 60:24
98:22 102:21
138:18 173:17
192:24 198:2
201:3,13 204:7,8
205:15
**talked** 18:13
26:17 46:1
51:10 59:4
60:10 77:17
98:23 110:7,17
112:24 115:5
134:14 138:20
142:17 148:1,2
155:10 159:7
171:9 172:25
173:13 175:12
175:18 196:25
198:1 200:25
201:11,12,20
205:17,23
210:23 211:18
213:4 215:7,19
215:20 216:19
217:17,18 219:3
225:9
**talking** 7:4 15:6
23:18 25:25
27:18 32:8
37:17 39:22
53:22 57:14,21
61:3 62:23
79:23 84:15
105:7,15 107:4,7
108:17 110:21
118:9 136:6
149:7 154:13
159:18 160:10

163:9 176:16
197:2 208:4
219:2
**tangential**
111:22
**target** 103:12
**tasked** 18:14
**technologies**
72:21 73:24
74:6 75:7,10
114:11
**technology**
91:24 112:3
208:12,22 210:3
**tecum** 3:14
**teed** 11:21
**telephone** 2:16
2:21
**tell** 6:6 22:16
23:24 24:13,21
25:1 26:22
30:11 37:11
39:7 40:5 46:4
49:10 58:21
80:9 100:6
101:14 113:6
139:5 144:20
161:7 181:3
183:10,15
205:25 234:11
**telling** 25:17
178:21 189:19
**tells** 43:21 45:10
**ten** 45:15 73:2
77:4,4 93:25
141:17 210:14
**tend** 50:13

**tennessee** 77:18
139:9
**term** 29:24
41:24 120:1
121:20 133:9
150:21
**terminations**
87:4
**terminology**
81:2
**terms** 124:21
155:7 160:10
178:23
**terrible** 172:18
**territory** 67:19
**terry** 112:6,12
115:18,19,23
**test** 10:3 155:17
**testers** 73:3
**testified** 6:7
23:12 27:1,13
28:21 30:1
48:17 60:2
114:13 142:9
156:1 181:8
186:10 205:3,5
209:3,9 210:1,8
211:4,6 214:25
215:1
**testify** 21:5 47:9
47:20,22 125:16
204:9,12,13
236:9
**testimony** 9:17
10:14 11:7 24:5
27:4 30:1 32:23
37:19 44:2
47:18 48:24

117:20 120:15
120:20,22,22,24
124:9,11 125:4
125:13 126:17
127:2 128:13,18
129:21 140:10
186:5 188:13
200:18 201:10
201:23 204:11
208:15 209:19
224:7 231:21,23
**texas** 71:9 78:17
82:10,11 85:10
108:10 112:1
113:12 115:12
139:9 141:24
190:20 221:25
**text** 136:4
181:13
**thank** 30:23
32:15 34:8
45:11 62:12
98:12 103:10
108:16 140:23
142:11 155:14
172:8 173:5
186:22 231:10
233:18 234:10
**thanks** 45:16
57:16 78:7
104:6 105:3
140:19
**theory** 121:3
**thereof** 235:11
**thick** 212:21
**thing** 16:9 21:17
43:13 52:5
53:22 57:12

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

William L Girdner November 9, 2022

## [thing - time]

| | | | |
|---|---|---|---|
| 59:18 79:17 | 100:5,8,13 101:7 | 214:6,13 215:4,5 | **time** 5:5 8:25,25 |
| 82:3,9 97:13 | 103:11 108:12 | 215:23,24 | 12:25 13:4 18:6 |
| 103:22 130:6 | 110:8,19 111:19 | 216:13,14 | 19:7,8 20:10 |
| 139:21 149:9,22 | 111:20 112:23 | 217:15 218:12 | 21:21,22 22:5 |
| 151:14 224:24 | 113:5 114:4,19 | 220:5,7 223:16 | 23:19 25:12 |
| 224:25 | 115:16,24 116:1 | 225:17,22 | 26:1,6 28:2,4,15 |
| **things** 33:19 | 116:4,20 118:13 | 226:15 227:13 | 28:22 30:22 |
| 50:17 51:2 | 119:12 120:12 | 229:4 230:1 | 32:24 35:11,23 |
| 56:21 61:13 | 122:3 124:22 | 231:13 | 38:17 40:10 |
| 85:25 116:4 | 125:5 127:10,19 | **thinking** 51:6 | 41:4,11 42:12 |
| 150:25 163:8 | 127:20,20 | 77:10 98:4 | 45:18,21 57:16 |
| 183:8 185:21 | 129:18 143:17 | 99:10 108:7 | 70:15 73:5 |
| 186:1 225:19 | 143:18 144:13 | 109:21 110:25 | 89:19 91:19 |
| **think** 7:9,9,13 | 144:21 145:24 | **third** 110:21 | 93:17 98:5,6,13 |
| 10:15 12:2,4,4 | 147:4,8,21 | 176:12 179:1 | 98:17 101:8,12 |
| 14:1,12 17:4,6 | 151:11 152:6,11 | **thomson** 187:16 | 102:11 104:14 |
| 17:13 19:6 | 152:13 153:12 | **thought** 17:2 | 107:21,24 108:4 |
| 20:20 21:2 24:6 | 153:14,22 155:5 | 28:6 52:6 90:19 | 110:15,17 111:3 |
| 24:17 28:12 | 155:11 156:21 | 113:16 150:20 | 114:19 117:22 |
| 30:5 32:13 34:6 | 158:6 159:16 | 157:16 | 118:8,24 122:8 |
| 35:13,20,21 38:4 | 160:19 161:21 | **thrall** 208:12 | 122:23 123:6,10 |
| 38:9 39:3 41:1,3 | 162:13 164:3,4 | **threaten** 165:12 | 123:12,17 129:9 |
| 42:10,18 46:18 | 166:7 167:13,25 | **threatened** | 129:12,17,18 |
| 48:5 49:1,1 | 171:22 175:24 | 152:9 | 131:3,12 132:25 |
| 51:12,24,25 | 176:3,9,24 | **three** 2:15 40:12 | 138:10,14 |
| 53:18 54:2,3 | 177:18 178:3 | 47:13 66:3 70:4 | 140:24 141:3 |
| 58:22 59:1 | 180:20,22 181:8 | 70:8 114:7,15 | 145:12,21 |
| 60:22 61:20 | 181:25 182:10 | 176:9,23,24 | 150:15 152:4,17 |
| 67:19 69:25 | 185:6,11 186:10 | 184:2 191:4 | 153:9 154:25 |
| 70:20 71:1,7 | 186:10 188:2 | 194:2 201:12 | 163:14 166:2,10 |
| 72:8 75:16,21,22 | 189:7 190:1,10 | 204:16 231:14 | 166:10,13,18,19 |
| 75:23 77:14,15 | 190:13 191:4,11 | **throw** 192:4 | 168:16 175:22 |
| 81:2,6,17 83:13 | 191:24 193:2,13 | **thumbnail** 17:21 | 177:19 179:6,8 |
| 83:19 86:6,13 | 194:3,8 195:10 | **tidying** 229:10 | 191:18 202:25 |
| 88:2,17,18,20,21 | 195:12 200:21 | **tied** 53:19 87:18 | 203:4 209:17,25 |
| 88:22,23 90:9 | 200:22 205:10 | **tigera** 187:14 | 210:19 221:14 |
| 91:7 93:19,21 | 205:16 207:13 | 188:1 | 224:16 227:18 |
| 94:5,6,18 99:12 | 211:6 212:1 | | 227:21 231:7 |

Page 48

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

**ER-1788**

(111 of 297), Page 111 of 297, Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 111 of 297
Case 1:21-cv-00305-DCN Document 60-7 Filed 12/15/22 Page 110 of 118
William L Girdner November 9, 2022

[time - tyler]

| | | | |
|---|---|---|---|
| 234:18,22 | **toes** 80:23 | **traffic** 183:14 | **try** 8:12 31:16 |
| 236:12 | **told** 24:23 25:5,8 | **transcribed** | 32:5 33:9 60:23 |
| **timed** 88:23 | 100:22 | 10:14 | 64:23 102:23 |
| **timeliness** 32:19 | **tomorrow** | **transcript** 10:12 | 105:1 119:17 |
| 39:25 40:3 | 194:12 231:8 | 11:1 15:1 16:6 | 130:15 148:19 |
| **timely** 32:17 | **tons** 187:18 | 218:11,15 | 185:20 |
| 40:6,24 41:8,13 | **top** 3:23 50:1,3 | 236:14 | **trying** 7:9 27:16 |
| 52:10 109:16,24 | 72:18 81:24 | **transfer** 143:14 | 32:5 41:15 48:5 |
| 132:1,3,6 | 82:3 99:7,25 | 165:18 212:14 | 75:21 76:16 |
| **times** 31:5,19 | 206:1 232:24 | 213:2 230:14 | 88:17 89:1 91:7 |
| 38:1 77:4,4 | **topic** 36:25 | **transferred** | 91:21 94:4 |
| 120:25 121:24 | 102:14,22 124:6 | 145:1 150:3 | 95:25 121:15,21 |
| 126:12 133:17 | 124:23 127:11 | 166:15 167:2 | 122:2,3 125:19 |
| 201:12 | **topics** 47:10,19 | 169:20 230:8 | 137:11 156:14 |
| **timing** 166:1 | 47:23 48:4,6 | **transition** 84:3 | 165:16 183:3 |
| 183:16 | 125:19 127:7 | 85:21 | 185:19 192:6 |
| **title** 141:12 | 158:25 | **transitioning** | 200:4 204:24 |
| **titles** 206:10 | **tort** 50:4 | 87:5 | 217:15 224:9 |
| **today** 6:1,13,20 | **total** 62:15 | **transitions** | **turn** 107:20 |
| 7:4,15 8:2 9:13 | 114:15 205:18 | 144:2 | 149:24 188:9 |
| 10:6,9,20,21 | **touch** 50:16 | **transparency** | 193:19 219:1 |
| 11:4,9,19,23 | 51:11,19 | 152:6 | **turned** 112:12 |
| 12:3 14:5,7,10 | **tough** 159:1 | **tread** 178:19 | **tv** 61:25 156:6 |
| 14:24 15:9,12,17 | **town** 197:17,18 | **treading** 80:23 | **twice** 35:25 |
| 15:23 17:7 | **track** 7:12 | **tried** 49:6 161:7 | **two** 61:2 64:23 |
| 28:24 29:19 | 115:22 163:7 | **trouble** 136:15 | 101:9 114:7 |
| 38:24 46:5 49:8 | 174:13 | **true** 86:9 101:10 | 156:12 159:1 |
| 104:13 105:6 | **tracking** 173:24 | 120:3 151:1,1 | 176:23 178:22 |
| 125:2 128:14,19 | 173:25 174:7,8 | 227:6,8,11 229:1 | 183:25 185:13 |
| 153:23 154:4,14 | 174:11 | 235:14 236:14 | 191:4 198:6 |
| 161:22 186:5 | **tracy** 115:14 | **truly** 162:2 | 199:17 206:4,15 |
| 196:15 208:5 | **tradition** 72:13 | **trust** 57:12 | 206:20,20 207:2 |
| 209:20 218:7 | 209:7 | **trustworthy** | 221:21 231:13 |
| 228:1 231:7,19 | **traditional** 83:2 | 20:8 | **tyler** 65:24 66:10 |
| 234:13 | 156:4 207:15,23 | **truth** 6:6,7,7 | 66:14,14,17 |
| **today's** 5:4 | 208:11,18,25 | 236:10,10,10 | 67:25 68:4 70:1 |
| 10:23 47:2,10 | 209:16,23,24 | **truthful** 10:9,25 | 70:5 71:11 |
| 219:4 | | 15:12 16:2 | 75:16 78:9 81:5 |

Page 49

**[tyler - universality]**

| | | u | |
|---|---|---|---|
| 81:16,21,25 82:3 | 207:10 212:13 | **u** 59:12 | 135:18 157:10 |
| 82:4,6,9,11,14 | 215:13,25 | **u.s.** 40:13 50:16 | 166:21 180:4 |
| 82:17,18,20 83:8 | 216:11,16 217:1 | 51:1,5,11,19,23 | 193:23 209:3 |
| 85:1,9,12,13,17 | 217:6,12,17,24 | 84:4 86:8 | 211:14 215:20 |
| 107:22,25 | 218:5,19 219:9 | 157:15 159:8 | 217:8 219:22,23 |
| 108:10 109:12 | 219:23 221:18 | 160:8 164:7,8 | 229:12 230:20 |
| 109:25 110:1,7 | 222:15 223:22 | **ultimately** 44:13 | **understanding** |
| 110:16,18,25 | 224:10,13 225:7 | 80:21 89:1 | 15:18 16:12 |
| 111:5,15 112:19 | 226:1,12 230:10 | 103:16 150:2 | 19:22 22:16 |
| 113:12,14 | 231:1 | 152:11 | 24:20 37:4 |
| 114:10,20 115:1 | **tyler's** 81:18 | **umbrage** 113:20 | 39:18 42:24 |
| 115:4,6,8,25 | 108:1,5 116:23 | **undelayed** | 43:1,11 47:17 |
| 118:1 134:11,14 | 120:16 121:5 | 154:20 | 48:23 52:8,23 |
| 134:16,19,21,23 | 137:4,24 143:12 | **undergrad** 18:1 | 55:4 117:13 |
| 135:5,8,12,15 | 143:15,17 144:6 | **underlying** | 120:1 122:12 |
| 136:20,24 137:3 | 150:1,17 169:10 | 136:22 137:20 | 131:11 133:10 |
| 137:15,16 138:1 | 194:11 215:20 | **underpinnings** | 134:22 142:18 |
| 143:7,18,25 | 216:10,11,21,23 | 148:6 | 143:24 144:14 |
| 144:17 145:4,7,8 | 222:7 224:3 | **understand** 8:18 | 173:18 181:12 |
| 145:21 151:8,11 | **type** 16:9 52:5 | 9:2,12,15,23,24 | 186:13 192:18 |
| 151:12,25 161:1 | 54:23 57:12 | 10:2,8 13:22 | 193:20 203:13 |
| 162:4 166:14 | 59:18 91:23 | 15:11,22 16:5,10 | 212:4 215:11 |
| 169:18 170:2 | 96:9 103:22 | 16:19 26:25 | 219:12 224:15 |
| 179:20 180:6 | 105:12 114:25 | 28:18 31:15 | 230:7,25 233:23 |
| 187:1,15,15 | 116:17 155:19 | 33:23 40:5,19 | 234:5 |
| 188:9,10,16,22 | 159:14,17 | 47:5,7 48:3 51:9 | **understood** 8:21 |
| 188:25 189:5,12 | 180:19 213:18 | 51:16 55:21 | 25:9 28:12 |
| 189:19 190:3,9 | **typed** 106:17 | 57:20,21 58:19 | 59:24 136:19 |
| 190:12,21 | **types** 49:17,23 | 59:16 61:16 | 160:22 233:7 |
| 192:15 193:5,22 | 51:2 52:22,24 | 71:11 81:11 | **undertake** |
| 197:12,16 | 56:21 58:5 96:8 | 83:25 88:8 96:1 | 153:18 |
| 198:16 199:16 | 229:23 | 96:13 101:16 | **undisturbed** |
| 200:11,15,23 | **typewriting** | 102:23 107:15 | 165:7 |
| 201:2,3,6,12,17 | 236:13 | 114:8 116:23 | **uniform** 149:1 |
| 201:17 202:12 | **typically** 24:25 | 118:4 119:9,13 | **unique** 52:18 |
| 202:13 203:10 | 34:15 129:18 | 120:15 126:19 | **united** 1:1 42:11 |
| 203:10 204:15 | 154:19 155:1 | 130:3,19 135:16 | **universality** |
| 204:20 206:8 | | | 82:15 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-1790

(113 of 297), Page 113 of 297, 24-6697, 03/06/2025, DktEntry: 10.9, Page 113 of 297
Case 1:21-cv-00303-DCN Document 60-7 Filed 12/15/22 Page 112 of 118
William L Girdner November 9, 2022

[universe - voluntary]

| | | | |
|---|---|---|---|
| **universe** 102:19 185:20 207:12 | **vague** 26:18,19 29:24 31:12 39:16,17 41:23 53:3 55:7 58:10 65:4 89:11 92:20 103:23 118:7 119:3,23 121:8,19 122:18 123:3 124:17 130:1,10 132:2 132:13 133:10 135:9 142:24 144:9 147:5 161:5 164:19 165:23 168:15 185:20 189:13 194:17 195:4,21 207:19 208:23 210:5 211:2 229:13 230:4,11 | **value** 32:21 | **video** 2:6 5:16 172:13 234:20 |
| **unreasonable** 176:2 | | **valued** 89:14 | **videoconference** 2:5 |
| **unsolicited** 219:17 | | **variation** 194:8 | **videographer** 2:24 5:3 6:2 12:25 13:3 45:17,20 98:13 98:16 138:10,13 140:24 141:2 172:15 202:25 203:3 210:15,18 227:17,20 234:19 |
| **unusual** 182:6,8 | | **variations** 74:18 162:5 170:15 185:18 | |
| **updated** 49:3 | | **varied** 77:25 157:6 | |
| **updating** 185:12 | | **varies** 146:15 | |
| **upholding** 163:24 164:13 | | **various** 3:21 46:8 56:25,25 61:7 87:17 186:14 212:19 | |
| **use** 13:16 29:25 37:7,14,25 64:3 77:1 81:2 91:14 95:18 96:9 106:9,13,14 108:5 116:14 142:1 155:18,18 162:1 173:19,25 175:13 176:19 176:20 184:16 189:21 214:5 217:14 | | | **videotaped** 1:13 2:1,3 5:7,12,14 |
| | | **vary** 179:10 | **view** 91:11 155:4 161:19 196:4 |
| | | **vegas** 66:10 194:22 | **viewable** 173:3 |
| | | **vehicle** 143:19 | **vigorously** 112:10 116:6 |
| | | **vendor** 71:24 84:7,14 135:4 142:22 143:4 149:13 | **violating** 185:15 185:17 |
| **uses** 92:11 93:3 103:17 106:21 148:25 182:25 | **valenti** 19:14,15 21:25 23:11 27:1 32:24 34:25 36:5,15 48:17 49:13 59:8 60:2 64:3 89:6 102:6 106:21 147:2,13 167:4 171:9 173:19 174:5,10 181:4 186:8 208:20 209:3,14 210:1,7 | **vendors** 66:1,4 67:22 70:6,6 84:13 187:10 | **violation** 155:20 |
| **usual** 170:15 | | **ventura** 74:14 | **virginia** 79:2,3 79:15,25 139:9 |
| **usually** 96:10 178:12 180:24 234:12 | | **verbatim** 236:15 | **virtual** 118:16 119:8 |
| | | **verification** 235:1 | **virtually** 69:20 |
| **utah** 76:1 188:2 | | **veritext** 2:6 5:17 | **visual** 184:20,22 184:22 |
| **utilize** 216:21 | | **vermont** 68:20 78:22 81:17 83:15 84:25 194:1 | **visually** 184:9 |
| **utmost** 163:20 | | | **voice** 112:24 |
| **v** | | **versus** 42:17 113:9 118:10 124:6,16 128:8 179:3 | **volume** 102:16 |
| **v** 1:6 **vacation** 59:17 | **valenti's** 21:14 24:5 27:7 48:24 59:24 146:5,12 172:25 | | **voluntarily** 69:17 87:15 |
| | | | **voluntary** 73:8,9 74:8,9 78:6 |

Page 51

**ER-1791**

**[vs - witness]**

| | | | |
|---|---|---|---|
| **vs** 5:9 | **washington** 76:9 | 220:21 221:12 | **window** 156:17 |
| **w** | 102:9,10 141:21 | **web** 86:25 | 158:3,3 |
| **wait** 211:8 | 196:20 197:7,13 | **website** 109:8 | **wine** 227:15 |
| **waiting** 166:9 | 198:8,22 199:18 | **websites** 92:24 | **wisconsin** |
| **waived** 14:11 | 215:3 | 93:17 101:17 | 139:10 |
| **waiver** 234:8 | **waste** 11:24 | **webster's** 133:14 | **wise** 103:5 |
| **waiving** 13:24 | **watch** 156:6 | **wednesday** 2:8 | 196:25 211:20 |
| 105:19 154:18 | **watched** 8:9 | **week** 70:13 | 212:12 |
| **wake** 7:20 | **water** 172:7 | 80:12 153:16 | **withdraw** 12:6 |
| **walk** 31:1 168:6 | **way** 28:11 43:7 | **weekend** 33:3 | **withholding** |
| **want** 12:15 | 44:19 52:16 | 34:15 176:15 | 212:2 |
| 14:15 17:7 | 54:20 72:3 | **weekends** 33:1 | **witness** 6:3,6 |
| 29:10 33:16 | 81:12,16,24 82:9 | 34:14 35:7 | 27:5 31:14 42:2 |
| 51:21 59:11 | 85:3 94:8 | 157:24 158:5 | 43:4 44:4,16,19 |
| 63:1,9 65:8 | 104:10 109:25 | 176:17 177:22 | 45:6,16 47:7 |
| 66:14 68:10 | 110:10 117:10 | **weeks** 194:3 | 53:5 55:12 |
| 89:20 94:7 97:7 | 117:14 125:10 | **welcome** 62:13 | 58:13 65:11 |
| 98:1 99:24 | 145:2 149:4,23 | 62:14 | 89:13 92:5,23 |
| 100:10,23 101:4 | 150:21 153:14 | **went** 17:23 18:3 | 98:3 103:25 |
| 102:14,22 108:9 | 157:7 161:2,24 | 22:6 23:5 24:14 | 110:6 118:12 |
| 110:23 116:18 | 164:25 166:9 | 27:9,11,22 28:17 | 119:6 120:2,21 |
| 118:23 119:2 | 170:14 177:25 | 73:3 85:15 | 121:12 122:22 |
| 155:17 159:9 | 178:8 179:1,6 | 151:10 172:15 | 123:6 124:22 |
| 165:14 167:10 | 184:9 230:7 | 185:22 | 125:5 126:12 |
| 169:16 173:17 | **ways** 161:25 | **west** 2:20 71:21 | 127:9 129:4 |
| 175:10,10,13,23 | 178:22 | 158:8 | 130:3,15,19 |
| 178:19 189:15 | **we've** 11:8 18:13 | **whatnot** 163:11 | 132:5,17 135:12 |
| 200:7,9,13 | 34:9 57:22 | **wheels** 103:2,13 | 137:3,8,10 |
| 202:17 218:3 | 80:13 93:6 | **wide** 72:23 | 139:14 140:12 |
| 220:3 222:25 | 97:25 105:15 | **wifi** 75:4 | 143:1 144:12,19 |
| 225:16 232:9 | 110:6 115:4 | **wild** 77:1 | 147:7,22 161:7 |
| 234:11 | 141:19 142:17 | **william** 1:13 2:1 | 164:21 166:1 |
| **wanted** 58:1 | 166:25 174:1 | 2:4 3:4,19 4:4 | 189:15 190:8 |
| 116:14,15 | 175:18 180:10 | 5:7 6:5,17 | 194:19 195:7,24 |
| **wanting** 157:9 | 186:18 205:10 | 234:20 235:5,19 | 200:19 201:11 |
| **wants** 131:25 | 207:7 208:4 | **willing** 174:23 | 207:22 208:25 |
| 170:10 | 210:11,12 | 197:10,22 | 211:4 218:16 |
| | 215:19 218:23 | 198:13,16 | 223:10 227:16 |

Page 52

William L Girdner November 9, 2022

[witness - yep]

229:17 230:13
231:10,15
233:18 234:11
235:7 236:8,18
**witnesses** 147:18
147:24
**wondered**
230:18
**wonderful** 33:25
**word** 29:13 30:5
93:7 116:15
119:24 133:23
134:4 137:19
145:23,24 149:7
149:7 155:17
158:18,21 162:2
168:11 175:14
204:23 213:4
232:3 233:15
**words** 22:22
23:5 24:1 25:19
37:17 65:12
80:24 90:18
95:17 96:4
100:9 108:20
109:2 116:22
122:1 145:8
158:2 160:5
161:21 166:3
167:15 170:21
174:25 180:19
188:24 211:11
216:15
**work** 20:21
32:25 33:4,14
34:9,13 35:7
60:5 85:25 87:7
87:10,25 88:13

98:6 101:21
105:22 106:12
106:24 156:20
177:22
**worked** 18:5
21:7 22:13
30:18
**workers** 56:14
**working** 101:23
114:22 142:10
166:3 183:5
**workload** 87:25
**works** 29:4 98:7
**worries** 71:23
**worry** 196:11
**worth** 153:14
**worthwhile** 91:3
**write** 123:13
162:11 182:23
**written** 21:20
113:8
**wrong** 10:16
27:23 31:8,22
175:13 212:9
**wrongly** 227:24
**wrote** 174:25
208:13 220:14
**ws** 137:21
**wyoming** 20:4
34:19 35:17
62:16 77:18

**x**

**x** 3:1,2,9 4:1

**y**

**yeah** 7:19,24
17:1,8,8,25 18:1
18:1 27:5,15

30:5 31:14 33:8
34:8 37:3 41:1
44:4 46:17 47:3
47:15,15 49:5,10
53:23 54:2,10
57:16 58:13
59:19 61:24
64:10,25 65:11
65:20 66:16
67:1,8 68:8,10
71:5,19,21 75:24
75:25,25 76:21
78:1,21,21,25
79:5 80:1 82:22
82:22 83:17
84:1,1 85:19
86:6,20 94:23,23
95:7 96:19
97:11 100:7
101:17 102:12
105:5 108:24
110:6,8 115:3,3
115:3,13,20
117:3,16 118:14
119:15 122:6
124:22 129:4,14
132:5 135:12
136:14 137:8
139:1 140:12
142:5 143:4
145:2 146:17
147:7 153:11
154:6,15,17
155:15 158:25
160:15 163:13
164:2 165:11
167:13,14 171:8
171:8 173:8

174:4,9,13,16
176:17 180:17
180:20,21 182:3
182:3,14,20
183:18 184:4
186:15 187:15
188:3 189:10,15
190:4 191:7
193:1,16 194:14
196:10 199:12
200:9 201:22
206:18 212:10
212:17 213:4
215:4 217:22
219:16 221:16
221:17,25 222:9
223:19 230:13
231:24
**year** 72:9 109:19
185:25 190:2
192:19 197:13
197:22 206:15
**years** 17:20
37:20 58:17
73:2,17 93:25
101:9 109:21
111:25 112:22
114:7 115:11,17
115:22 141:17
163:17 174:1
206:15
**yellow** 175:22
183:13,20
184:14,17,19,25
**yep** 30:23 69:22
69:22 158:22
168:20 171:15

Page 53

William L Girdner November 9, 2022

[yeses - zoom]

| | |
|---|---|
| **yeses** 218:12 | |
| **yesterday** 19:10 | |
| 20:1,11 23:13 | |
| 27:1,14 48:17 | |
| 49:6 50:6 59:14 | |
| 173:1 181:8 | |
| 208:20 216:25 | |
| **yesterday's** 8:8 | |
| 37:19 | |
| **yield** 178:23 | |
| **yolo** 67:14 | |
| **york** 69:3,16 | |
| 78:21 83:14,16 | |
| 84:16 89:23 | |
| 177:20 | |
| **yuba** 67:14 | |

**z**

**zero** 77:1 176:7
178:12
**zone** 35:23
**zones** 35:11
**zoom** 149:23

Page 54

Idaho Rules of Civil
Procedure

Rule
30

(e) Review by the Witness; Changes.

(1) Unless waived by the deponent and the
parties, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which (A)
to review the transcript or recording; and
(B) if there are changes in form or
substance, to sign a statement listing the
changes and the reasons for making them. (2)
Changes indicated in the Officer's
Certificate.  The officer must note in
the certificate prescribed by Rule 30
(f)(1) whether a review was requested
and, if so, must attach any changes the
deponent makes during the 30-day period.
(3) Witness Failure to Sign. (A) In
General, If the deposition is not signed
by the witness within the 30-day period,
the officer must sign it and state on
the record the fact of the waiver of
signature, or of the illness or absence

of the witness or the fact of the
refusal to sign the deposition together
with any reason given for not signing.

(B)  Use of Unsigned Deposition.  The
deposition may be used as if it were
signed, unless pursuant to Rule 32
(d)(4) the court determines that the
reasons given for the refusal to sign
require rejection of the deposition in
whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit E

ER-1798

Catherine Valenti November 8, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF IDAHO

 3

 4   COURTHOUSE NEWS SERVICE,      ) Case No.
                                   ) 1:21-CV-00305-DCN
 5                   Plaintiff,    )
                                   )
 6   v.                            )
                                   )
 7   SARA OMUNDSON, in her         )
     official capacity as         )
 8   Administrative Director of   )
     Idaho Courts,                 )
 9                                 )
                     Defendant.    )
10   _____ )

11

12

13       REMOTE VIDEOTAPED DEPOSITION OF CATHERINE VALENTI

14                     NOVEMBER 8, 2022

15

16

17

18

19

20

21

22   Reported By: Amy E. Simmons, CSR No. 685, RPR, CRR, CRC

23

24

25

                                              Page 1
```

Catherine Valenti November 8, 2022

```
 1    REMOTE VIDEOTAPED DEPOSITION OF CATHERINE VALENTI
 2
 3    BE IT REMEMBERED that the remote videotaped
 4  deposition of CATHERINE VALENTI was taken via
 5  videoconference by the attorney for the Defendant before
 6  Associated Reporting & Video, a Veritext Company, Amy E.
 7  Simmons, a Court Reporter and Notary Public in and for
 8  the County of Ada, State of Idaho, on Tuesday, the 8th
 9  day of November, 2022, commencing at the hour of
10  1:12 p.m. in the above-entitled matter.
11
12
13  APPEARANCES (remotely):
14  For the Plaintiff:   BRYAN CAVE LEIGHTON PAISNER
                 By: Jonathan G. Fetterly, Esq.
15               Three Embarcadero Center, 7th Floor
                 San Francisco, CA  94111-4070
16               Telephone: (415) 675-3400
                 Facsimile: (415) 675-3434
17               jon.fetterly@bclplaw.com
18
    For the Defendant:   DUKE EVETT, PLLC
19               By:  Keely E. Duke, Esq.
                    Molly E. Mitchell, Esq.
20               1087 West River Street, Suite 300
                 Post Office Box 7387
21               Boise, ID  83707
                 Telephone:  (208) 342-3310
22               Facsimile:  (208) 342-3299
                 ked@dukeevett.com
23               mem@dukeevett.com
24  Also Present:   Chris Ennis, Videographer
                 Sara Omundson
25               William Girdner
                                           Page 2
```

```
 1            I N D E X
 2         E X A M I N A T I O N
 3
 4  CATHERINE VALENTI               PAGE
 5
     By:  Ms. Duke.................................5, 161
 6
     Mr. Fetterly.................................157
 7
 8
 9
           E X H I B I T S
10
    NO.                         PAGE
11
     Exhibit 20 Big Sky Report Dated 10/11/22 (4 pages)   27
12
     Exhibit 21 CNS Daily Reports Style Manual        40
13         (24 pages)
14  Exhibit 22 Declaration of Catherine Valenti In    121
         Support of Plaintiff Courthouse News
15         Service's Motion for Preliminary
           Injunction (73 pages)
16
     Exhibit 23 Supplemental Declaration of Catherine   158
17         Valenti In Support of Plaintiff
           Courthouse News Service's Motion for
18         Preliminary Injunction (5 pages)
19
20
21
22
23
24
25
                                           Page 3
```

```
 1         P R O C E E D I N G S
 2
 3       THE VIDEOGRAPHER:  So we are recording,
 4  and we are on the record.  Today's date is
 5  November 8th, 2022.  The time is 1:12 p.m.
 6       For the record, this is the remote
 7  videotaped deposition of Cathy Valenti taken by
 8  the Defendants in the matter of Courthouse News
 9  Services vs. Omundson.  It's Case No.
10  1:21-CV-00305-DCN.  It is in the District Court
11  for the District of Idaho.
12       The videotaped deposition is being held
13  remotely via Zoom videoconference.  The videotaped
14  deposition is being recorded by Chris Ennis and
15  reported by Amy Simmons of Associated Reporting &
16  Video, a Veritext company.
17       And if counsel will please state their
18  appearances and any stipulations for the record.
19       MR. FETTERLY:  This is Jon Fetterly with
20  Bryan Cave Leighton Paisner for the Plaintiff,
21  Courthouse News Service, representing Ms. Valenti.
22       MS. DUKE:  Keely Duke and Molly Mitchell
23  on behalf of Ms. Omundson.
24       And I also have Ms. Omundson here today
25  in the room.
                                           Page 4
```

```
 1       MR. FETTERLY:  And for Courthouse News --
 2  this is Jon Fetterly speaking.  We also have
 3  Mr. Girdner in the room, Mr. William Girdner.
 4       THE VIDEOGRAPHER:  And if the court
 5  reporter will please swear the witness.
 6
 7            CATHERINE VALENTI,
 8  a witness having been first duly sworn to tell the truth,
 9  the whole truth, and nothing but the truth, testified as
10  follows:
11
12            EXAMINATION
13  BY MS. DUKE:
14    Q.  Good morning, Ms. Valenti.  Am I saying
15  that correctly?
16    A.  "Valenti," but it's okay.
17    Q.  Valenti.  Perfect.  Will you please state
18  your full name for the record.
19    A.  Catherine Ann Valenti.
20    Q.  And date of birth?
21    A.  11/19/1957.
22    Q.  Where do you reside?
23    A.  In Meridian, Idaho.
24    Q.  How long have you lived in Idaho?
25    A.  Over 50 years, 55 years.
                                           Page 5
```

2 (Pages 2 - 5)

Catherine Valenti November 8, 2022

| | |
|---|---|
| 1    Q. Have you ever been through a deposition<br>2 before?<br>3    A. No, I have not.<br>4    Q. All right. Let me go through a couple<br>5 ground rules with you real quick to hopefully make<br>6 the process a little smoother for you.<br>7      First and foremost, if I ask you a<br>8 question that you don't understand, will you<br>9 please let me know?<br>10    A. Sure.<br>11    Q. If you're going on to answer my<br>12 questions, we'll assume, then, that you understood<br>13 the question. Is that fair?<br>14    A. Yes, it is.<br>15    Q. This also isn't an endurance contest.<br>16 We're not here to see how long you can sit in that<br>17 chair. So we intend to take a break about every<br>18 hour or so, but if you need one before that, you<br>19 just, you know, shout out, let us know. Okay?<br>20    A. Okay. Thank you.<br>21    Q. My only request is that if we have a<br>22 question pending, you answer that question before<br>23 we take the break. Is that fair?<br>24    A. Yes, that's fair.<br>25    Q. From time to time there may be objections<br><div align="right">Page 6</div> | 1    Q. Aside from that, verbal responses, even<br>2 though we're being videotaped here today, it's<br>3 still really important to have you use "yes,"<br>4 "no," rather than nods of the head, shakes of the<br>5 head. And it's also important to avoid "uh-huhs"<br>6 and "huh-uhs" because they can be difficult to<br>7 transcribe.<br>8      So just do your best. And if we need to<br>9 clarify it with you, we will on the record. But<br>10 that's why we're doing it. Okay?<br>11    A. Okay.<br>12    Q. All right. Any questions for me before<br>13 we start?<br>14    A. No, not right now.<br>15    Q. What did you do to prepare for your<br>16 deposition today?<br>17    A. I went over the style manual, although<br>18 I've worked with it before, and just went over in<br>19 my head what things I do at court.<br>20    Q. What specifically did you look to in the<br>21 style manual to kind of refresh your memory as to<br>22 what you're doing?<br>23    A. Cases that we report on, that we don't<br>24 report on that we get copies of, mostly.<br>25      I've been doing this for a while, so I<br><div align="right">Page 8</div> |
| 1 to the questions that I'm asking you. We don't<br>2 have a judge here to call the balls and strikes,<br>3 so what we do is we can lodge some objections that<br>4 then are basically put as a little placeholder in<br>5 the deposition so if we need at some point in the<br>6 future to have a judge rule, we then have those<br>7 marked. Okay?<br>8    A. Okay.<br>9    Q. When objections are made, it will be a<br>10 little confusing at first for you. So you'll be<br>11 able to answer, but if you have any confusion in<br>12 it, you can certainly confirm with your counsel<br>13 that you're okay to go forward. Okay?<br>14    A. Okay. Thank you.<br>15    Q. The only time you wouldn't answer a<br>16 question is if you're instructed by your attorney<br>17 not to answer; is that fair?<br>18    A. Yes.<br>19    Q. Also, from the standpoint of today,<br>20 you're doing a great job right now of letting me<br>21 finish my questions or statements before you<br>22 provide a response. Keep doing that. That will<br>23 really help Amy Simmons, our court reporter, out.<br>24 Okay?<br>25    A. Okay.<br><div align="right">Page 7</div> | 1 didn't need to go too much through it.<br>2    Q. Okay. And you've been with Courthouse<br>3 News since 2016, as I understand it?<br>4    A. Yes, that's right.<br>5    Q. All right. In addition to the style<br>6 manual -- what version of the style manual is<br>7 that? Is there a specific version? Or how do you<br>8 maintain that manual?<br>9    A. This is the one that I received in<br>10 2015 -- well, 2016 when I started. And it's dated<br>11 2015 is all I know.<br>12    Q. Do you know if it's been updated at all?<br>13    A. If it has, I don't have a copy of it.<br>14    Q. Do you know who put it together?<br>15    A. No.<br>16    Q. Do you know what entity put it together?<br>17    A. Courthouse News, I'm sure.<br>18    Q. So you received a style manual from<br>19 Courthouse News when you started.<br>20      And the style manual you reviewed was<br>21 from 2015 in prep for your deposition here?<br>22    A. I received it earlier than that, but,<br>23 yes, this is the one I have referred to.<br>24    Q. Correct. I'm assuming you received it<br>25 when you started working there so that you could<br><div align="right">Page 9</div> |

<div align="right">3 (Pages 6 - 9)</div>

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com 208-343-4004

Catherine Valenti November 8, 2022

1 be up to speed on what your duties were?
2　　A.　Correct.
3　　Q.　All right.  In addition to that style
4 manual, what other documents did you review to
5 prepare for today's deposition?
6　　A.　I looked over the declaration that I had
7 made.
8　　Q.　And I actually have two declarations for
9 you.
10　　　　Did you look at both or just one?
11　　A.　I only looked at one.
12　　Q.　Which one did you look at?
13　　A.　I don't know which one you have.  I'm not
14 sure.
15　　Q.　Well, that doesn't matter.  Just tell me
16 which one you looked at.
17　　A.　I believe it was the first one that
18 I -- I only remember doing one declaration, but it
19 was the first one I received or that I did that I
20 received a copy of.
21　　Q.　And I'll have that declaration here for
22 you in a moment to take a look at so that we can
23 confirm that we're looking at the right thing.
24　　　　Any other documents that you reviewed to
25 prepare for your deposition today?

Page 10

1　　A.　I don't know specifically.
2　　Q.　Was it provided to you by someone at CNS?
3　　A.　Yes.
4　　Q.　When was it provided to you for the first
5 time?
6　　A.　I believe I was tracking Ada County not
7 too long -- when they went online.  And as soon as
8 the others went online.  I honestly can't
9 remember.  I could find out for you exactly when
10 it was, but it's been a while.
11　　Q.　It sounds like it's only used
12 when -- once the counties here in Idaho went
13 online; is that fair?
14　　A.　As far as I know, yes.
15　　Q.　Prior to the counties going online -- and
16 you were here before many of the counties went
17 online -- you were not using the tracking sheet;
18 is that correct?
19　　A.　No, I wasn't using the tracking sheet at
20 that time.
21　　Q.　What was your understanding of why CNS
22 was asking you to use a tracking sheet?
23　　A.　I don't know for sure.  My understanding
24 was to keep track of the complaints for the cases.
25　　Q.　Was there any kind of tracking sheet you

Page 12

1　　A.　I looked through the tracking sheet that
2 we used, and I looked -- that's pretty much it.
3 Just whatever I usually work on.
4　　Q.　Well, in addition to the tracking sheet,
5 you were going to say something else.
6　　　　What else did you look at in addition to
7 the tracking sheet?
8　　A.　Oh, I'm sorry.  I have a check-off list
9 that I use.  And of course the program that we use
10 online.
11　　Q.　All right.  Describe for me what the
12 tracking sheet looks like.
13　　A.　The tracking sheet is an Excel
14 spreadsheet.  They track the date that I see a
15 complaint, the case number.  They track the type
16 of case it is, the date that I can see the docket
17 report, and then the date I can see the full
18 summary.  If there's an attorney that represents
19 the defendant -- or the plaintiff, I'm sorry, and
20 if there's -- which county it's in.
21　　Q.　Okay.  So that's -- the Excel spreadsheet
22 is the tracking sheet?
23　　A.　Correct.
24　　Q.　Who created or developed that Excel
25 spreadsheet?

Page 11

1 used prior to the courts going online in Idaho to
2 track cases?
3　　A.　Just the check-off sheet that has the
4 numbers that I check off when I look at them.
5　　Q.　Who provided you the tracking sheet once
6 the courts were online?
7　　A.　That came from the office.  I think Chris
8 and Jimmy sent it to me.
9　　Q.　And who is Chris?
10　　A.　Chris Marshall is my direct supervisor.
11　　Q.　And Jimmy?
12　　A.　Jimmy is -- I'm not sure what his title
13 is.  He works at the main office, and I get a lot
14 of -- the tracking sheet and updates from him.
15　　Q.　On the tracking sheet, does this tracking
16 sheet also note when the document was submitted to
17 Tyler File & Serve?
18　　A.　I'm not sure I understand.
19　　Q.　Well, do you have an understanding of
20 how -- let's use, for example, a complaint -- how
21 a complaint ultimately makes its way into the
22 judicial record in the state of Idaho?
23　　A.　Yes.  Someone files it.
24　　Q.　Do you have an understanding of what that
25 process for filing entails in the state of Idaho?

Page 13

4 (Pages 10 - 13)

Catherine Valenti November 8, 2022

1    A.  I haven't filed, but they file online.
2  And as soon as it's filed I believe -- but I'm not
3  positive -- that there is a date and time stamp
4  that that time -- is that what you're referring
5  to?
6    Q.  Well, I'm just asking if you have any
7  familiarity or knowledge as to how, for example, a
8  complaint ultimately makes its way into the
9  judicial record in the state of Idaho.
10    A.  Oh, the clerks would put it there, if
11  that's what you're asking.  I'm not completely
12  clear.  But that's as far as I go.  I don't work
13  on that end, so I can only say what I think.
14    Q.  Sure.  Let me ask you a few questions
15  based on that.
16        Do you know what Tyler's File & Serve
17  program is?
18    A.  Is that the iCourts?  I don't know.  I
19  don't have anything to do with that part of it.
20    Q.  Okay.  Do you know what the State of
21  Idaho's case management system is?
22    A.  No, not really.
23    Q.  All right.  So we were talking about
24  doing a tracking sheet.
25        And again, I'll show some examples here

Page 14

1  documents that you reviewed to prepare for today's
2  deposition?
3    A.  I did scan through some of the court
4  information, the court filings.  I didn't read
5  them very closely, but I scanned through earlier.
6    Q.  And what are you referencing there?
7    A.  The case and the -- I'm not sure what
8  it's called.  The filings, the request for
9  information, I think.
10    Q.  Oh, like discovery requests or discovery
11  responses?
12    A.  I think so.
13    Q.  Do you have those documents in front of
14  you so we have an understanding of what those
15  documents were that you reviewed?
16    A.  I can download it, but I don't have it.
17    Q.  Sure.  Go ahead.  That's the one beauty
18  of Zoom is we can multitask.
19    A.  Oh, good.  So this one is the first
20  amended response to the first set of
21  interrogatories.  And I just scanned through that.
22    Q.  But who was answering the
23  interrogatories?
24    A.  Responding party, Courthouse News.
25    Q.  So just read the full title for me so I

Page 16

1  in a bit of what I think you mean by that, but
2  asking some general questions at this time on
3  that.
4        Does the tracking sheet -- well, strike
5  that.
6        Before I go into that, anything
7  else -- you mentioned the check-off list.
8        What's the check-off list?
9    A.  It's a list of numbers by hundreds that I
10  use to track -- my personal tracking of all of the
11  complaints that I have seen.
12        And I can separate -- for instance, I
13  circle the district court cases, which is what I
14  use, and then I don't miss cases.
15    Q.  Who provided you the check-off list that
16  you use?
17    A.  Chris Marshall.
18    Q.  What is included on the check-off list?
19    A.  It's just a series of numbers in six
20  blocks of numbers.  And each of them encompass 100
21  numbers.
22    Q.  Okay.  Other than the style manual, the
23  tracking sheets that you use, the check-off list
24  that you use, one of your declarations, anything
25  else that you did to -- you know, any other

Page 15

1  understand what document --
2    A.  Plaintiff's First Amended Response to
3  Defendant's First Set of Interrogatories and
4  Requests for Production of Documents.
5    Q.  And what's the date of that?
6    A.  It looks like the 4th of November.
7    Q.  Of 2022?
8    A.  Yes.
9    Q.  All right.  And in reviewing the First
10  Amended Responses to Defendant's Request for
11  Production, what did -- what was, I guess,
12  relevant to you in preparing for your deposition
13  today?
14    A.  What was relevant would be how I do my
15  job, how I track.  Some of it is not relevant, but
16  the tracking, the actual procedure that I do when
17  I go to the courthouse.
18    Q.  Anything else?
19    A.  I'd have to scan through it.  That's
20  generally it.  That just would help me understand
21  what my role would be and what I need to take a
22  look at.  So, for instance, the tracking sheet, my
23  procedure when I go to court.
24    Q.  Okay.  Other than that court document
25  that relates to this case, any other court

Page 17

5 (Pages 14 - 17)

(126 of 297), Page 126 of 297 Case: 24-6607, 03/06/2025, DktEntry: 19.9, Page 126 of 297
Case 1:21-cv-00305-DCN, Document 60-8, Filed 12/15/22, Page 7 of 79
Catherine Valenti November 8, 2022

1 documents that relate to this case that you
2 reviewed?
3    A. No.
4    Q. Any other documents that you reviewed to
5 prepare for your deposition?
6    A. No. Unless you mean -- I did review the
7 original complaint because I reported on it. But
8 other than that -- these were really all the
9 things that I looked at.
10    Q. Did you review the original complaint in
11 prep for your deposition today?
12    A. I did not.
13    Q. All right. Sounds like you read the
14 original complaint after it was filed so that you
15 could report on it?
16    A. Yes.
17    Q. Any other case documents in this case
18 that you've reviewed so that you could report on
19 it?
20    A. For this one -- regarding this case? I'm
21 a little confused.
22    Q. Correct. Other than the complaint, any
23 other documents that you've reviewed in the case
24 so that you could report on them?
25    A. No. I only reported on the original

*Page 18*

1 case.
2    Q. And when you say you only reported on the
3 original case, you mean you only reported on the
4 original complaint that started this case?
5    A. Correct.
6    Q. Okay. So have we adequately and
7 thoroughly covered all the documents that you
8 would have reviewed to prepare for your deposition
9 today?
10    A. I believe so. I can't think of anything
11 else off the top of my head. If I think of
12 something, should I let you know?
13    Q. Absolutely. Yep, that would be great,
14 Cathy.
15    A. Okay.
16    Q. And important to let me know before we're
17 done today, because this is my opportunity to have
18 your deposition today.
19       How about meetings to prepare for your
20 deposition?
21    A. Yes.
22       MR. FETTERLY: Objection to the extent
23 that the question would call for attorney-client
24 communications, in which case I'll instruct the
25 witness not to answer to the extent that it would

*Page 19*

1 divulge the contents of any such communications.
2       MS. DUKE: And let me ask it in a
3 different way so that I provide you some
4 protection there, Ms. Valenti.
5    Q. (BY MS. DUKE) Did you meet with any
6 legal counsel to prepare for your deposition
7 today?
8    A. Yes.
9    Q. And who did you meet with?
10    A. I met with Jon Fetterly.
11    Q. Other than Jon Fetterly, did you meet
12 with anyone else to prepare for your deposition?
13    A. Chris -- I'm sorry, Carson McCullough was
14 on the phone. He didn't help me prepare, but he
15 was on the phone.
16    Q. And tell me who Carson McCullough is.
17    A. Carson is my substitute at Courthouse
18 News.
19    Q. I understand that he covers for you when
20 you're on vacation or sick?
21    A. Yes.
22    Q. Anyone other than Mr. McCullough,
23 yourself, and Mr. Fetterly on that prep call?
24    A. No.
25    Q. Did you meet with anyone else about your

*Page 20*

1 deposition other than Mr. Fetterly?
2    A. No.
3    Q. Did you have any conversations with Bill
4 Girdner at all about your deposition?
5    A. He gave me the information about when it
6 was and asked me a few questions in general.
7    Q. All right. And what questions did he ask
8 you?
9    A. Mostly about my procedure, go to court,
10 and some about the tracking. I can't recall which
11 ones he asked.
12    Q. All right. So what would you have told
13 Mr. Girdner about the procedure that you use while
14 working for CNS in Idaho?
15    A. I went through the steps that I do every
16 day when I go to the courthouse and prepare.
17    Q. What about with respect to tracking?
18 What would you have discussed with Mr. Girdner?
19    A. I can't remember exactly what it was.
20 Just he asked how I ensured that I tracked
21 everything.
22    Q. When was this conversation?
23    A. That was -- he called earlier. I'm not
24 sure exactly when. But I've talked to him a few
25 times over the, you know, at least like -- this

*Page 21*

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Catherine Valenti November 8, 2022

| | |
|---|---|
| 1 particular conversation, was it either Monday or | 1    Q. Did he talk to you before or after the |
| 2 Friday? Friday, I believe. I can't remember. I | 2 lawsuit was filed? |
| 3 can't remember. I'm sorry. | 3    A. It must have been before; I can't |
| 4    Q. It's okay. So it sounds like around | 4 remember exactly. That there was going to be a |
| 5 Friday of last week, Mr. Girdner talked to you | 5 lawsuit filed. |
| 6 about what your process is and what your tracking | 6    Q. What did he tell you as to the basis for |
| 7 process is. | 7 the lawsuit? |
| 8    A. I think he just wanted clarification on a | 8    A. He mentioned we were looking for |
| 9 few things. | 9 immediate access to complaints that were meant for |
| 10    Q. You mentioned that you talked with him | 10 public. |
| 11 other times about this case. When were those? | 11    Q. So did he describe to you that the |
| 12    MR. FETTERLY: And real quick, objection | 12 lawsuit entailed looking for immediate access to |
| 13 to the extent that it relates to conversations | 13 complaints that had been filed in the district |
| 14 with Mr. Girdner and counsel. That would be | 14 court of the state of Idaho? |
| 15 protected attorney-client communications. | 15    A. Yes, for the counties. |
| 16    Q. (BY MS. DUKE) Correct. So what he's | 16    Q. Anything else that he told you about the |
| 17 saying there is if Mr. Fetterly or someone from | 17 lawsuit? |
| 18 Mr. Fetterly's office was there during the | 18    A. I think that's it. Just letting me know |
| 19 communication with Mr. Girdner, you don't tell me | 19 that it's going to happen. |
| 20 what the content is. It's only when it's you and | 20    Q. Did he ask you for any information to |
| 21 Mr. Girdner talking. | 21 include in the lawsuit? |
| 22    A. Okay. The time before -- and I can't | 22    A. Other than the tracking that I was |
| 23 remember exactly when it was -- he was just | 23 already doing, I think that was it. |
| 24 letting me know that there would be this | 24    Q. Did you -- prior to this lawsuit being |
| 25 deposition going on. | 25 filed, did you ever raise as a concern to anyone |
| Page 22 | Page 24 |

| | |
|---|---|
| 1    Q. Any other time? | 1 at CNS that you were concerned about your timing |
| 2    A. Regarding this specific deposition? | 2 of getting filed complaints in the state courts in |
| 3    Q. No, regarding the lawsuit itself, | 3 Idaho? |
| 4 Courthouse News vs. Sarah Omundson. | 4    A. I'm not sure if it was concern, but I |
| 5    A. No. Just the times that I've already | 5 would think if there was a complaint that was |
| 6 talked about. | 6 delayed, then they would have to. But I can't |
| 7    Q. And were there times where it was you, | 7 think of anything specific. |
| 8 Mr. Girdner, and counsel for Courthouse News | 8    Q. Well, what I'm trying to get to is is |
| 9 Service -- were there times when there were | 9 there a point in time where you yourself, without |
| 10 conversations that you had with them? | 10 having somebody initiate it, but as a person |
| 11    A. All together? | 11 reporting in the state of Idaho, where you raised |
| 12    Q. Yes. | 12 a concern or an issue or a question to CNS about |
| 13    A. No. | 13 the timing in which you were receiving filed |
| 14    Q. Other than Mr. Girdner, anyone else at | 14 complaints in the state courts? |
| 15 Courthouse News that you talked to about this | 15    A. I did not. That was their end that they |
| 16 lawsuit? Not just your deposition, but this | 16 were talking, a concern about it. |
| 17 lawsuit. | 17    Q. So what that means to me is that you |
| 18    A. Are you talking about the details of the | 18 didn't raise any concern about the timeliness of |
| 19 lawsuit or that there was a lawsuit? | 19 you being able to see filed complaints. Instead, |
| 20    Q. We can start with whether -- you know, | 20 CNS came to you with questions about "We'd like to |
| 21 that there was a lawsuit, and then we can get into | 21 know how quickly you're getting filed complaints"; |
| 22 the details. | 22 is that correct? |
| 23    A. My immediate supervisor, Chris Marshall, | 23    A. Correct. My job was just to report them. |
| 24 he talked to me. But in general, just what I've | 24    Q. And when they asked whether there were |
| 25 already told you. | 25 any delays in receiving filed complaints, you then |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

(128 of 297), Page 128 of 297 Case: 24-6607, 03/06/2025, DktEntry: 19.9, Page 128 of 297
Case 1:21-cv-00305-DCN, Document 60-8, Filed 12/15/22, Page 9 of 79
Catherine Valenti November 8, 2022

1 would provide your tracking sheets that would then
2 provide that information to them as to the timing
3 that you were providing?
4     A.  I provided the tracking sheet first on a
5 weekly and then every day.  So they received that
6 all the time.
7     Q.  Other than the tracking sheets, anything
8 else that you provided to them to show the timing
9 of when you would receive a filed complaint?
10     A.  Specifically, just the request that they
11 asked for a few specific cases that are in the
12 proceedings that I just showed you.
13     Q.  Oh, in the documents that you were
14 reviewing?
15     A.  Right.  There's a few cases that were
16 late, and so I provided those.
17     Q.  Any other conversations with anyone at
18 CNS without legal counsel present related to this
19 lawsuit and CNS's claims that it is not receiving
20 filed complaints in a First Amendment, timely
21 manner?
22     A.  Not that I can think of.
23     Q.  All right.  So have we covered the
24 universe of documents that you would have used to
25 prepare for your deposition today along with any

Page 26

1 correct?
2     A.  That's my understanding, but you would
3 have to verify that.
4     Q.  And do you have an understanding of what
5 the subscription fee is to receive the Big Sky
6 Report?
7     A.  No, I don't.
8     Q.  What training did you receive when you
9 started at CNS as to what to include in the Big
10 Sky Report?
11     A.  Received about two or three weeks of
12 training with the person that I took over from.  I
13 was a substitute initially, and then I was hired
14 full time.
15         And so we went through what to include,
16 mostly based on the CNS manual and how to format
17 everything.
18     Q.  Why do you include in the Big Sky Report
19 a report on Montana, Wyoming, and Idaho all
20 included in one?
21     A.  The Big Sky Report is actually from
22 Montana, Wyoming, and Idaho.  And I report on the
23 USDC Montana, Idaho, and Wyoming complaints.
24         I, of course, report on all of the Idaho
25 counties, and I also collect information that

Page 28

1 meetings that you would have had to prepare for
2 that deposition?
3     A.  Yes, I believe so.
4     Q.  All right.
5         Is Exhibit No. 20 -- we're going to keep
6 a continuing list of exhibits, so we'll start with
7 Exhibit No. 20 here.  Let me go ahead and share my
8 screen and show you that.
9         (Deposition Exhibit No. 20 was marked.)
10     Q.  (BY MS. DUKE)  All right.  Can you see
11 the document I have up there?
12     A.  Yes, I can.
13     Q.  Tell me what Exhibit 20 is.
14     A.  It's -- Exhibit 20 looks like a copy of a
15 Big Sky Report.
16     Q.  What is the Big Sky Report?
17     A.  A Big Sky Report is what I put together
18 when I report on the different cases.  And at the
19 end of the day, I put them all into the reporting
20 program, and they go out to our subscribers.
21     Q.  Does the Big Sky Report go to the public?
22     A.  Anyone who is a subscriber, as far as I
23 know.
24     Q.  So the Big Sky Report only goes to
25 subscribers, not to the general public; is that

Page 27

1 researchers we have in Montana and Wyoming that
2 send me either daily or weekly or monthly.  And I
3 compile those into the report.
4     Q.  So when we talk about this report with
5 Montana -- and let's use Montana as an example.
6 And not the district court in Montana.  Let's use
7 the state court.
8         Do you report on state court proceedings
9 in Montana?
10     A.  I collect the state court information
11 from the researchers that are there.  I just edit
12 them and put them in my report.
13     Q.  So describe what that process is like.
14 If I were a complaint and I were filed today in
15 the state of Montana in Missoula County, when are
16 you going to report on that filing and how?
17         MR. FETTERLY:  Objection; vague and
18 ambiguous and overbroad.
19         You may answer.
20         THE WITNESS:  So I can answer?  Yes?
21         MR. FETTERLY:  Yes.
22     Q.  (BY MS. DUKE)  Yes.
23     A.  When the researcher gets the
24 report -- and I'm not sure how often.  It depends
25 on the researcher -- they put it in basically the

Page 29

8 (Pages 26 - 29)

Catherine Valenti  November 8, 2022

| | |
|---|---|
| 1 same order that I would put it in, and they send<br>2 it to me by email. And sometimes they include a<br>3 copy of the complaint so that I can include that.<br>4       And it's usually pretty well done, but I<br>5 do a little minor editing on the summaries,<br>6 usually to make sure everything reads well.<br>7    Q.   So there are researchers employed in the<br>8 state of Montana, for instance, that are learning<br>9 what complaints have been filed in the state<br>10 courts in Montana; is that correct?<br>11    A.   Yes.<br>12    Q.   And then those researchers, do they, to<br>13 your knowledge, report on those filings in the<br>14 state of Montana?  Or is that, then, directed to<br>15 you to do?<br>16    A.   They report on them, but they send it to<br>17 me to include.  So they write up a summary, but<br>18 I'm the one that puts it into our report.<br>19    Q.   Where do they report on them?<br>20       MR. FETTERLY:  Objection; vague and<br>21 ambiguous.<br>22       You can answer.<br>23    Q.   (BY MS. DUKE)  Go ahead.<br>24    A.   They report on them from the counties<br>25 they've been assigned to, if that's what you mean.<br><div align=right>Page 30</div> | 1    A.   They go through the docket report that<br>2 they were given, and they look at the cases that<br>3 are applicable.  They give me the complaint with<br>4 the date and the case number, the county that it's<br>5 in, the defendant, the plaintiff, the judge, and<br>6 the attorney fields and a short summary.  And I<br>7 take it from there.<br>8    Q.   It's my understanding they have to, it<br>9 sounds like from a previous answer, actually go<br>10 county to county?<br>11    A.   Yes, although I think there are some<br>12 counties in Montana now that allow online access.<br>13    Q.   Has CNS asked that you track Montana's<br>14 timeliness of filings that are then available to<br>15 the press?<br>16    A.   No.<br>17    Q.   Has CNS asked you to track Wyoming's<br>18 timing related to a complaint that's filed and<br>19 then its access to the press once it's filed?<br>20    A.   No.<br>21    Q.   Do you have any kind of data or report<br>22 that would show how much time it takes for a<br>23 Montana court to allow CNS to have access to a<br>24 newly filed complaint?<br>25    A.   No, I don't track that.<br><div align=right>Page 32</div> |
| 1 They, most of the time, have to drive to counties.<br>2    Q.   And then they send out a report to<br>3 subscribers?<br>4    A.   No.  They send it to me, and I compile<br>5 all of the cases for the day and compile the<br>6 report.  And then I -- it gets sent out to all the<br>7 subscribers.<br>8    Q.   So you're responsible for actually doing<br>9 the report to subscribers of any Montana complaint<br>10 that's filed?<br>11       MR. FETTERLY:  Objection; vague and<br>12 ambiguous, overbroad.<br>13       You may answer.<br>14       THE WITNESS:  Yes.<br>15    Q.   (BY MS. DUKE)  And you're also<br>16 responsible for reporting on any Wyoming complaint<br>17 that's filed?<br>18       MR. FETTERLY:  Same objections, lacks<br>19 foundation.<br>20       You may answer.<br>21       THE WITNESS:  Yes, as long as all the<br>22 file is sent to me, yes.<br>23    Q.   (BY MS. DUKE)  And when you say that the<br>24 researchers in Montana, for example, report on<br>25 these new filings, what do you mean by that?<br><div align=right>Page 31</div> | 1    Q.   Do you know anybody that does?<br>2    A.   I'm not sure.  That's something that<br>3 you'd have to ask them.<br>4    Q.   When you say "them," you mean CNS?<br>5    A.   Yes, I'm sorry.  CNS.<br>6    Q.   And do you know if anyone tracks<br>7 Wyoming's newly filed complaints and the time it<br>8 takes for those newly filed complaints to be<br>9 available to the press?<br>10    A.   As far as I know, no.<br>11    Q.   Same answer, that I would need to ask<br>12 somebody at CNS?<br>13    A.   Yes.<br>14    Q.   Do you know whether Montana, all of its<br>15 counties are on an electronic filing system now?<br>16    A.   I don't know that.<br>17    Q.   Do you know whether Wyoming's are all on<br>18 an electronic filing system?<br>19    A.   I don't know that.<br>20    Q.   Do you know whether some of Montana's are<br>21 on an electric filing system?<br>22    A.   Yes, some of them, I believe, are.<br>23    Q.   And do you know which counties?<br>24    A.   I don't know all of them, but I --<br>25    Q.   What are some of them?<br><div align=right>Page 33</div> |

<div align=right>9 (Pages 30 - 33)</div>

Page 34

```
 1      A.  I think Yellowstone, Gallatin, Flathead,
 2  Madison, Jefferson, Fallon, Chouteau.
 3      Q.  Chouteau, okay.
 4      A.  And those are just some I know off the
 5  top of my head.  I don't know the others.
 6      Q.  Do you know how long it takes for the
 7  reporters in Montana, for instance, that work with
 8  CNS to send you newly filed complaints that you
 9  then report on?
10      A.  They're on a schedule.  I'm not sure what
11  you mean.  For instance --
12      Q.  Well, what schedule are they on?
13      A.  Well, for instance, Yellowstone, I
14  get -- if there's something available, I get it
15  every day.  That's pretty much all I know.  But
16  some of them only visit a court once a week or
17  once a month or every two weeks.
18      Q.  And that's a schedule that you understand
19  has been set by CNS as to CNS accessing complaints
20  in those various counties in the state of Montana?
21      A.  Correct.
22      Q.  And then same for Wyoming, I'm assuming?
23  Are any same-day in Wyoming?
24      A.  I don't know.  Any same-day?  If they
25  happen to visit the court on the same day,
```

Page 36

```
 1      A.  Yes.
 2      Q.  And it looks like that would have been
 3  filed on 10/7/2022, but not reported by you until
 4  the date of Exhibit 20, which is October 11, 2022.
 5      A.  That's what it looks like, yes.
 6      Q.  With respect to federal court filings, do
 7  you know if Montana's federal court is on an
 8  electronic filing system?
 9      A.  Yes, I believe so.
10      Q.  Who is the reporter for CNS that will
11  obtain the federal court filings in Montana and
12  then provide them to you to report on?
13      A.  I collect that myself.
14      Q.  And how frequently do you look at the
15  Montana federal court?
16      A.  Several times a day.
17      Q.  So if we go back to this example, why
18  would it have taken you four days to report on
19  this Great Harvest Franchising, Inc., case?
20      A.  I'm not sure.  Sometimes if it -- I don't
21  know if that's a weekend.  And it takes a couple
22  weekends, sometimes.  It could be that it was
23  reported later after I closed out my complaint.  I
24  can't tell you for sure.
25      Q.  What are the hours that you work?
```

Page 35

```
 1  possibly.  But I don't know.
 2      Q.  So if I'm in Montana, for instance, and
 3  it's one of the counties where CNS is going to do
 4  their visit each month, it's possible that you'll
 5  receive a newly filed complaint to report on up to
 6  a month after it's been filed; is that correct?
 7      A.  Yes.
 8      Q.  Now, with respect to including Wyoming
 9  and Montana in the Big Sky Report, is there
10  anything in Exhibit 20 that would tell you when
11  those Montana cases were filed?
12      A.  When the -- yes, the date that I get
13  them.  The date is in there.  It will tell them
14  when it's filed.
15      Q.  So if I look at this example we have up
16  right now, you see it's the United States District
17  Court, so that's a federal court.  Is that your
18  understanding?
19      A.  Yes.
20      Q.  And it looks like it says "Butte,
21  Billings."  So that must be one's in Butte and
22  one's in Billings?
23      A.  Correct.
24      Q.  Is the Butte one the Great Harvest
25  Franchising, Inc.?
```

Page 37

```
 1      A.  I work -- start at home in the mornings.
 2  Usually work six to seven hours a day.  Probably
 3  average of six and a half.
 4          I start out in the mornings doing docket
 5  reports and going into other cases.  And then I go
 6  into the courthouse in the afternoon.
 7      Q.  So what are your typical hours?
 8      A.  It's broken up.  I usually have, like,
 9  maybe 8:00 to 9:00 to midmorning, then I take a
10  break, and then I usually work until before I go
11  to court, so maybe -- it can vary.  10:00 to 2:00,
12  something like that.
13      Q.  Okay.  And then the court, when are you
14  done with your day?
15      A.  5:00.  Well, 5:00 from the court, and
16  then I have to finish up when I get home.
17      Q.  Is that Monday through Friday?
18      A.  Yes.
19      Q.  Do you work on weekends?
20      A.  No.
21      Q.  So if a complaint is filed in the United
22  States District Court for the District of Idaho,
23  let's say at 6:00 p.m. on a Friday night, you're
24  not likely going to report on that until Monday;
25  is that correct?
```

10 (Pages 34 - 37)

Catherine Valenti November 8, 2022

| | |
|---|---|
| 1    A.  Most likely I won't see it until Monday. | 1         THE VIDEOGRAPHER:  All right.  So we are |
| 2    Q.  And same for a holiday weekend; if it's | 2  recording.  The time is 2:11 p.m., and we are back |
| 3  Labor Day and that same complaint, let's say, is | 3  on the record. |
| 4  filed at 6:00 on a Friday night, you're not going | 4    Q.  (BY MS. DUKE)  All right.  Ms. Valenti, |
| 5  to report on it until a Tuesday, correct? | 5  we're back on the record. |
| 6    A.  Correct. | 6         Did you have an opportunity to talk to |
| 7    Q.  Have you been asked by CNS to review the | 7  anybody on the break? |
| 8  federal court docket in the state of Idaho on the | 8    A.  Yes. |
| 9  weekends to determine what's been filed since you | 9    Q.  And with whom did you speak? |
| 10  looked on Friday so that you can report on | 10    A.  With Jon Fetterly. |
| 11  anything that's been filed Friday or throughout | 11    Q.  Okay.  Anybody else? |
| 12  the weekend? | 12    A.  No. |
| 13    A.  No. | 13    Q.  All right.  So let me go through a few |
| 14    Q.  I'm going to stop my screen share here | 14  things with you. |
| 15  real quick. | 15         We were looking at a Big Sky Report, the |
| 16         With respect to the reports you generate, | 16  October 11 report, which is Exhibit 20. |
| 17  are you the one that comes up with the summary for | 17         You had also mentioned a manual.  And let |
| 18  the state of Idaho district court and state | 18  me go ahead and pull that up.  We can mark it as |
| 19  courts? | 19  Exhibit 21. |
| 20    A.  Yes. | 20         (Deposition Exhibit No. 21 was marked.) |
| 21    Q.  And then for Montana and Wyoming, it's my | 21    Q.  (BY MS. DUKE)  All right.  Can you see |
| 22  understanding you have reporters from those areas | 22  Exhibit 21? |
| 23  send you those, and then you'll either publish | 23    A.  Yes, I can. |
| 24  them as is or you'll do some revisions? | 24    Q.  All right.  Perfect.  Tell me what the |
| 25    A.  Yes.  I do check three courts online in | 25  Exhibit 21 is. |

Page 38                                                                    Page 40

| | |
|---|---|
| 1  Montana. | 1    A.  This is the reports style manual from |
| 2    Q.  And which courts are those again? | 2  CNS. |
| 3    A.  I check Madison and Fallon and Flathead. | 3    Q.  This was provided to you when you started |
| 4    Q.  When -- and what about Wyoming?  Do you | 4  with CNS? |
| 5  do any in Wyoming? | 5    A.  Yes. |
| 6    A.  No. | 6    Q.  And did you understand that this was the |
| 7    Q.  Do you have reporters in Wyoming, that | 7  training manual related to what you were to report |
| 8  same process; they'll go to the various | 8  on, how you were to report on, and the timeliness |
| 9  courthouses at whatever time they know they're | 9  to report on by CNS when you were retained? |
| 10  supposed to, and then they'll send that info to | 10    A.  Yes. |
| 11  you to include in the actual report that CNS sends | 11    Q.  Now, CNS is a subscription-based legal |
| 12  out? | 12  news service, correct? |
| 13    A.  Yes. | 13    A.  Yes. |
| 14         MS. DUKE:  Now, let's go ahead -- real | 14    Q.  One of their subscription services is the |
| 15  quick, actually, I know we haven't been going | 15  Big Sky Report that we just looked at as |
| 16  quite an hour, but we're close.  Let's take a | 16  Exhibit 20? |
| 17  quick break so I can just get some exhibits | 17    A.  Yes. |
| 18  organized here real fast. | 18    Q.  That is the Big Sky Report is the report |
| 19         THE WITNESS:  Okay. | 19  that you are responsible for putting together? |
| 20         MS. DUKE:  So take, I don't know, five to | 20    A.  Yes, that's correct. |
| 21  ten minutes, whatever works for you. | 21    Q.  Are you responsible for putting together |
| 22         MR. FETTERLY:  Cathy -- off the record. | 22  any other report for CNS? |
| 23         THE VIDEOGRAPHER:  Okay.  So the time is | 23    A.  No. |
| 24  2:03 p.m., and we are off the record. | 24    Q.  Who did you replace when you took over at |
| 25         (Break taken from 2:03 p.m. to 2:11 p.m.) | 25  CNS? |

Page 39                                                                    Page 41

11 (Pages 38 - 41)

(132 of 297), Page 132 of 297 · Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 132 of 297
Case 1:21-cv-06305-DCN Document 60-8 Filed 12/15/22 Page 13 of 79
Catherine Valenti November 8, 2022

1    A.  Phil Janquart.
2    Q.  Do you know where he went?
3    A.  I do not.
4    Q.  How do you spell his last name?
5    A.  I think it's J-a-n-q-u-a-r-t, I think.
6    Q.  Prior to starting at CNS, what type of
7  work had you done?  Had you been a reporter
8  before?
9    A.  I have not been a reporter.
10    Q.  Are you currently a reporter?
11    A.  Yes.
12    Q.  Do you have any credentials?
13    A.  Explain "credentials."  Official
14  professional credentials?
15    Q.  Correct.
16    A.  No.  I'm a member of the Idaho Press
17  Club, but that's not credentials.
18        MR. FETTERLY:  Belated objection to
19  overbroad.  Excuse me.
20    Q.  (BY MS. DUKE)  You understand that when
21  you're a member of the Idaho Press Club, that that
22  does not mean that you're a credentialed member of
23  the press in the state of Idaho, correct?
24    A.  Correct.
25    Q.  When did you become a member of the Idaho

Page 42

1  member of the press?
2        MR. FETTERLY:  Objection; vague and
3  ambiguous, overbroad as to the definition of
4  "credentialed member of the press," lacks
5  foundation.
6        THE WITNESS:  I don't.
7    Q.  (BY MS. DUKE)  Do you consider yourself a
8  member of the press?
9    A.  Yes.
10    Q.  What do you understand "press" to mean in
11  the state of Idaho as a member of the press?
12    A.  Someone who would report on news and
13  bring it to the public.
14    Q.  And the news that you're reporting on to
15  bring to the public are the newly -- a summary of
16  the newly filed complaints in the state of Idaho;
17  is that correct?
18    A.  Yes, for civil district court cases.
19    Q.  Do you have any education or training
20  related to Idaho's court system?
21        MR. FETTERLY:  Objection; vague and
22  ambiguous, overbroad.
23        THE WITNESS:  I only have what I've
24  learned on this job specifically.
25    Q.  (BY MS. DUKE)  What have you learned on

Page 44

1  Press Club?
2    A.  I don't remember exactly.  Several years
3  ago.
4    Q.  Is that something that CNS asked you to
5  do?
6    A.  No.
7    Q.  It's something you did on your own?
8    A.  Yes.
9    Q.  Was it before you started working with
10  CNS?
11    A.  No, it was after.
12    Q.  Why did you become a member of the Idaho
13  Press Club?
14    A.  I thought it would be a good idea to get
15  more information.
16    Q.  What information have you learned since
17  being a member of the Idaho Press Club?
18    A.  Now, initially -- I'm not active in
19  there, but just going through some of the records,
20  I can't remember.  Some of the things that they
21  have, some of the issues that come up.  I can't
22  really remember very much.  It was quite a while
23  ago.
24    Q.  Do you know what steps one would need to
25  take in the state of Idaho to be a credentialed

Page 43

1  this job as to Idaho's court system?
2    A.  The court system?
3    Q.  Yes.
4    A.  How to read the cases, how to condense
5  them into a summary, what is important to a court,
6  those types of things.
7    Q.  Anything else?
8    A.  Just how it relates to Courthouse News.
9  I understand the basic filings and reporting
10  follow-ups, but that's pretty much it.
11    Q.  Have you, while working for CNS, been
12  trained by CNS as to the difference between a
13  complaint and a petition in the state of Idaho?
14    A.  Not specifically, but I understand
15  petitions and complaints.  You know, I report on a
16  few petitions, but I'm not sure exactly what
17  you're asking I've been trained on the differences
18  between.
19    Q.  Well, what do you understand a petition
20  is in the state of Idaho?
21    A.  It's asking for something from the court,
22  from the judge, as far as I know.
23    Q.  Do you know what types of cases it
24  applies to?
25    A.  There may be appeals.  I'm not sure

Page 45

12 (Pages 42 - 45)

(133 of 297), Page 133 of 297 Case 24-6697, 03/06/2025, DktEntry: 10.9, Page 133 of 297
Case 1:21-cv-00305-DCN   Document 60-8   Filed 12/15/22   Page 14 of 79
Catherine Valenti November 8, 2022

1 exactly what you mean. Petitions for what kind of
2 cases?
3    Q. Does CNS report on any appeals that are
4 filed in the Idaho Supreme Court?
5    A. I don't know. I don't report on the
6 Idaho Supreme Court appeals.
7    Q. Tell me what you understand a complaint
8 to be in the state of Idaho.
9    A. That I work with, the complaint?
10    Q. Yeah, what is it? What do you understand
11 a complaint to be in the state of Idaho?
12    A. A complaint is a lawsuit action brought
13 by a party and submitted to the court, a lawsuit,
14 complaint.
15    Q. Let me ask some questions related to
16 that.
17       Do you understand a complaint to be a
18 legal document that once filed with the court
19 starts a legal proceeding in the state of Idaho?
20    A. Yes.
21    Q. And do you have an understanding that
22 until that complaint is filed, there is not a
23 legal proceeding in the state of Idaho related to
24 that complaint?
25    A. Yes.

Page 46

1 question, what do you need me to clarify on that?
2       MR. FETTERLY: I believe the question
3 incorporated "actual filed." I don't know what
4 that means.
5       MS. DUKE: Okay. I'll rephrase it.
6    Q. (BY MS. DUKE) Ms. Valenti, so when you
7 would receive that docket report from the clerk,
8 that report would include newly filed complaints
9 that had initiated court proceedings in the state
10 of Idaho; is that your understanding?
11    A. That is my understanding, yes.
12    Q. What is your understanding as to how
13 quickly the court clerk in Ada County would get
14 you that docket report so that you could take a
15 look at the newly filed complaints in Ada County
16 that were initiating -- that initiated a legal
17 proceeding?
18       MR. FETTERLY: Objection; vague and
19 ambiguous, overbroad.
20       You may answer.
21       THE WITNESS: The docket report that I
22 requested they just gave to me every day. So it
23 came right away, if that's what you --
24    Q. (BY MS. DUKE) What time of day would you
25 ask for it?

Page 48

1    Q. Now, I know that you worked prior to the
2 county, Ada County, going online and then
3 ultimately other counties in the state before they
4 all went fully electronic.
5       Describe for us your process, how you
6 would obtain a filed complaint from -- let's say a
7 complaint that's filed in Ada County before the
8 electronic filing system.
9    A. Okay. I would get reports, docket
10 reports from the clerk, who would print them off
11 for me.
12       And I would go through them and circle
13 the ones that were district court cases that I
14 wanted to look at and then give that to them. And
15 they would bring paper copies into the room to
16 look at. If I wanted any copies, they could copy
17 it off for me.
18    Q. And did you understand when you would
19 receive those docket reports from the clerk, those
20 were actual filed complaints --
21    A. Yes.
22    Q. -- reflected in the documents?
23       MR. FETTERLY: Objection; vague and
24 ambiguous, overbroad, lacks foundation.
25       MS. DUKE: So, Jon, so I can clarify the

Page 47

1    A. For the docket report?
2    Q. Yeah. What was your typical process back
3 then as to the timing when you would ask for the
4 docket report by the clerk for newly filed
5 complaints in Ada County?
6    A. So usually it would be back a few days to
7 make sure that we caught all of the complaints in
8 case we missed a number. And so a lot of them I
9 didn't because that was reported on or looked at.
10       So we usually went back about, I don't
11 know, two or three days -- I can't remember
12 exactly -- just to cover it up to the current date
13 and time that I arrived. And we would do that
14 multiple times a day.
15    Q. How many times a day would you have the
16 Ada County district court clerk print a docket
17 report for you back prior to Ada County going on
18 to electronic filing?
19       MR. FETTERLY: Objection; vague and
20 ambiguous, overbroad.
21       You may answer.
22       THE WITNESS: At least two times. It
23 depends. Sometimes three if I was caught up, just
24 to make sure we caught them all.
25    Q. (BY MS. DUKE) When those docket reports

Page 49

13 (Pages 46 - 49)

Catherine Valenti November 8, 2022

1 were provided to you by one of the clerks at Ada
2 County, what were you working on for copies of
3 complaints that you wanted to report on?
4    A.  The civil district court cases.
5    Q.  Why were you limiting what you wanted to
6 report on to just the civil district court cases?
7    A.  That was the only thing that I was
8 requested to obtain and report on.  We don't do
9 magistrate or small claims.
10   Q.  And when you say that was all you were
11 requested to report on, that was -- when you say
12 that, that's CNS giving you the directive that it
13 was only district court complaints that it wanted
14 you to look to and potentially report on, correct?
15   A.  Correct.
16   Q.  And then with respect to those district
17 court complaints, CNS also advised you that it was
18 interested in any case where a business, public
19 entity, or other non-individual was included among
20 the defendants to report on, correct?
21   A.  Correct.
22   Q.  And if there were any famous individuals
23 like Bill Clinton or Martha Stewart, to go ahead
24 and report on those as well?
25   A.  Yes, anything that would be newsworthy

Page 50

1 like that.
2      MS. DUKE:  One second.
3       (Brief pause in the proceedings.)
4      MS. DUKE:  All right.  Sara is going to
5 be jumping on -- she's got to go get her daughter
6 from school.  That's why -- if you see another
7 name pop up, that's why, Jon.
8      MR. FETTERLY:  Okay.  Thank you.
9      MS. DUKE:  Yep.
10   Q.  (BY MS. DUKE)  And the way that you knew
11 what to report on was identified for you in what I
12 have up as Exhibit 21, the CNS daily report,
13 correct?
14      MR. FETTERLY:  Objection; vague and
15 ambiguous, overbroad.
16      You may answer.
17      MS. DUKE:  Let me try to correct that.
18 I'm not sure what the issue is.
19   Q.  (BY MS. DUKE)  You were asked by CNS to
20 report on certain filed complaints in the state of
21 Idaho, correct?
22   A.  Yes.
23   Q.  And the filed complaints that you were
24 instructed to report on, the way that you would
25 filter through those was described for you in

Page 51

1 Exhibit No. 21, which is the CNS Daily Reports,
2 Introduction and Style Manual?
3    A.  Yes.
4    Q.  Is that the only manual that you would
5 use in determining whether something was going to
6 be newsworthy for CNS?
7    A.  That's the only one I know, yes.
8    Q.  In looking to this docketing sheet that
9 you would receive from the Ada County
10 clerk -- strike that.
11      In looking at the docketing reports that
12 you would receive from the Ada County clerk prior
13 to Ada County going to electronic filing, it's my
14 understanding you would not have them provide you
15 with magistrate or small claims cases; is that
16 correct?
17   A.  The docket report had them on there, but
18 they would not give me the -- I didn't ask for the
19 others.
20   Q.  Got it.  So Ada County would provide you
21 with the docket report that had all of those
22 initial case complaints that had been filed or
23 petitions that had been filed; you were just
24 honing in to the district court; is that correct?
25   A.  Yes.

Page 52

1    Q.  And that was based on your instruction by
2 CNS?
3    A.  Yes.
4    Q.  Prior to Ada County transitioning to an
5 electronic filing system -- and do you know when
6 that was that Ada County converted from
7 electronic -- or from paper filing to electronic
8 filing?
9    A.  I am not certain, but I believe it was
10 later in 2016.  But I don't remember exactly.
11 Again, I could look it up.
12   Q.  Sure.  And how would you look that up
13 again?
14   A.  I would be able to go through the website
15 that they have up that shows everything that --
16   Q.  Gotcha.
17   A.  I believe that's still up.
18   Q.  It's not a document you separately
19 maintain?
20   A.  No.  No.
21   Q.  So prior to Ada County going
22 electronic -- so this is back in the paper filing
23 days -- tell me what the process you understood to
24 be for a filer to actually go to the courthouse,
25 provide the copy of the complaint to the clerk,

Page 53

14 (Pages 50 - 53)

Catherine Valenti November 8, 2022

1  have the clerk accept it and put it into the file.
2  What's your understanding of how that process
3  worked?
4      MR. FETTERLY: Objection. Once again,
5  vague and ambiguous as to the word "actually."
6      You may answer.
7      THE WITNESS: I think as you explained
8  it. I wasn't on that end of it. I haven't filed
9  anything. So I'm thinking that my understanding
10  would be that they would have it for the clerk,
11  and that was how it would be filed.
12      Q. (BY MS. DUKE) So you understood that
13  someone would be standing in line -- I'm sure you
14  actually personally observed this from time to
15  time; is that fair?
16      A. I'm sure I did, yeah. It was a while
17  ago.
18      Q. Someone would be standing in line to wait
19  their turn and to then talk with the county clerk,
20  correct?
21      A. Yes.
22      MR. FETTERLY: Objection; vague and
23  ambiguous, overbroad, foundation.
24      Q. (BY MS. DUKE) And then they would hand
25  the -- let's say it's a district court complaint

Page 54

1      Q. And then you would go through and you
2  would actually determine what you wanted a copy of
3  and ask them for a copy?
4      A. Yes.
5      MR. FETTERLY: Objection; vague and
6  ambiguous, overbroad.
7      Q. (BY MS. DUKE) Sorry, Cathy. What was
8  your answer?
9      A. I would look at it, yes, before I would
10  ask for a copy. Sometimes I did not need a copy.
11      Q. Oh, I see. When you say you would look
12  at it, what do you mean?
13      A. The paper copy.
14      Q. And so the clerk would hand you the file
15  stamped paper copy; is that correct?
16      A. Yes.
17      Q. And then you could look and decide
18  whether you actually wanted a copy or whether you
19  could just quickly, I think, jot down some notes
20  so you had an understanding of the case and then
21  not need a copy; is that fair?
22      A. Yes, I had my laptop with me so I could
23  put in -- type in notes that I needed.
24      Q. And those complaints that you were
25  looking to, if you looked on the docket sheet and

Page 56

1  where Micron Technologies is going to be the
2  defendant, so it fits the criteria that CNS wanted
3  you to look to to report on.
4      Okay? Are you following me?
5      A. Yes.
6      Q. And the person who was going to file that
7  complaint would hand it to the district court
8  clerk, right?
9      A. Yes, I believe so.
10      Q. And do you have an understanding of what
11  process the district court clerk would go through
12  before saying "Yes" and stamp it with a stamp to
13  be filed?
14      A. I don't know what they go through.
15      Q. What you do know is once those complaints
16  were filed and stamped by the district court
17  clerk, they would create a docket list of them?
18      A. Yes.
19      Q. And then a few times a day, at your
20  request, they would print out a docket list of
21  those filed documents?
22      A. Yes.
23      Q. And they would then hand you that docket
24  list?
25      A. Yes.

Page 55

1  wanted to review a complaint, those were
2  complaints that had already been accepted and
3  filed by the court clerk, correct?
4      MR. FETTERLY: Objection; vague and
5  ambiguous, overbroad, calls for legal conclusion,
6  lacks foundation.
7      You may answer.
8      THE WITNESS: As far as I know, they
9  were. I always received a copy when I asked for
10  one.
11      Q. (BY MS. DUKE) Sure. And the copy you
12  received had a stamp on top that would provide the
13  date and that information so you could have that
14  as well, correct?
15      A. Yes.
16      Q. And that was a stamp that the district
17  court clerk had placed when the document was
18  filed, right?
19      A. I'm assuming that's when it was placed,
20  yes.
21      Q. Because it was a district court stamp
22  that appeared on the first page of the complaint,
23  correct?
24      A. Yes. Well, I don't remember exactly what
25  the stamp was, if it's the same as a time stamp,

Page 57

15 (Pages 54 - 57)

Catherine Valenti November 8, 2022

1  but, yes, this would be the one identifying it.
2      Q.  But it was a stamp that told you, "Hey,
3  this is an official court document; it's been
4  accepted into the court filing"?
5      A.  Yes.
6          MR. FETTERLY:  Objection; vague and
7  ambiguous, overbroad, lacks foundation, calls for
8  a legal conclusion.
9      Q.  (BY MS. DUKE)  Your answer was "yes"?
10     A.  As far as I know, yes.
11     Q.  Now, was there ever a time when you were
12  at the courthouse doing your work where there was
13  a line of people, where you'd actually go to the
14  people that were standing in line to file
15  something and ask to see what was in their hands?
16     A.  No.
17     Q.  And why wouldn't you do that?
18     A.  It wasn't part of my job.  I only wanted
19  the ones that were filed.
20     Q.  Why did you only want the ones that had
21  actually been filed?
22         MR. FETTERLY:  Objection; vague and
23  ambiguous, overbroad, calls for a legal
24  conclusion.
25         THE WITNESS:  Those were the only

Page 58

1      A.  Yeah, nobody is sending me anything.
2      Q.  Okay.  And throughout this deposition, no
3  one has been emailing you or texting you as to
4  your responses; is that correct?
5      A.  Correct.
6      Q.  All right.  So what we had been talking
7  about is that you had said to a question I asked
8  you, I said, "Why did you want the ones that had
9  actually been filed?"
10         And let me go a little bit above that.  I
11  asked, "Was there a time when you were at the
12  courthouse doing your work where there was a line
13  of people where you'd actually go to the people
14  that were standing in line to file something and
15  ask to see what was in their hands?"
16         Do you remember that line of questioning?
17     A.  Yes.
18     Q.  And you had said, "No, I wouldn't want to
19  do that because that wasn't part of my job.  I
20  only wanted the ones that were filed"; is that
21  correct?
22     A.  Correct.
23     Q.  And I then said, "Well, why would you
24  only want the ones that had actually been filed?"
25         And after objections by Mr. Fetterly, you

Page 60

1  ones -- why would I report on something -- I
2  wouldn't report on something that hadn't been
3  filed yet in the legal system.
4      Q.  (BY MS. DUKE)  And why do you believe as
5  a reporter for CNS you would not want to report on
6  something that has not yet been filed in the
7  actual court record?
8          MR. FETTERLY:  Objection; vague and
9  ambiguous, overbroad, misstates testimony, calls
10  for a legal conclusion.
11     Q.  (BY MS. DUKE)  Go ahead.
12     A.  I would not want to report on something
13  unless it was already in the legal system.  That
14  was my job.
15     Q.  Well, and when you say "the legal
16  system" -- you actually used the words.
17         And let me go back because there's an
18  objection that I'm misstating your testimony, so
19  let me go to the realtime and make sure that we're
20  clear on this.
21         And when you're sitting there, no one is
22  asking you any questions or sending you any
23  information; is that correct?
24     A.  Right now?
25     Q.  Correct.

Page 59

1  said, "Those were the only ones -- why would I
2  report on something -- I wouldn't report on
3  something that hadn't been filed yet in the legal
4  system."
5          Do you recall that testimony?
6      A.  Yes.
7      Q.  And so my question for you is why would
8  you not want to report on something in your role
9  as a CNS reporter that had not yet been filed in
10  the legal system?
11     A.  In my own particular role, my job was to
12  report on filed cases and put them into our
13  reporting program.
14     Q.  And is that still your job at CNS today?
15     A.  Yes.
16     Q.  Your job is to only report on filed
17  cases?
18     A.  My job is, yes.
19     Q.  Now, we talked about the Ada County
20  court -- we talked about the Ada County court
21  process where you would come when they were still
22  in the paper filing stage and they would actually
23  provide you with the docket report at your
24  request, right?
25     A.  Yes.

Page 61

16 (Pages 58 - 61)

Page 62

```
 1    Q.  Was there any other county that you did
 2  that with in the state of Idaho back when they
 3  were all filing electronically -- or filing paper
 4  copies?
 5    A.  Yes.
 6    Q.  Which ones?
 7    A.  I would visit Canyon County once a week.
 8  And I would visit Owyhee, Elmore, Gem, Washington,
 9  and Payette Counties once a month.
10    Q.  And same questions for those.  When you
11  would go to Canyon County one time per week, I'm
12  assuming, then, that you're getting a week's worth
13  of docketed complaint filings from the clerk?
14    A.  Yes.
15    Q.  And you're then going through to
16  determine whether you want to see one of those
17  filed complaints so that you can determine whether
18  you want to report on it?
19    A.  Well, actually in Canyon County, they
20  just gave me all of the file folders.
21    Q.  Okay.
22    A.  So I apologize if -- it was a long time
23  ago.  I'm trying to think back.
24    Q.  No worries.  So Canyon County, they would
25  actually give you the file folders, meaning the
```

Page 64

```
 1    Q.  And when you say "stand there with it,"
 2  what are you referring to?
 3    A.  I would stand at the counter and look
 4  through it at the counter.
 5    Q.  And when you're saying you would stand
 6  and look at the counter, you'd look through it,
 7  you're talking about the actual court filing?
 8    A.  Yes.  I can't remember if any of them
 9  actually had a docket filed.  They may have.  That
10  was a while ago.  I think one of the counties -- a
11  couple counties I might have been able to go into
12  a room with the files to look at them, but it was
13  all pretty much the same process.
14    Q.  And again, no matter what the county,
15  these were all filed complaints that you were
16  looking for?
17    A.  Yes.
18    Q.  Okay.  How about the other counties, Twin
19  Falls, Kootenai, Nez Perce, you know, all
20  the -- we have 44 of them, so how about the other
21  counties?  How would you report on those counties
22  prior to going electronic?
23    A.  I would just do a docket report.  We had
24  another person that would send me the dockets, and
25  I would include that.
```

Page 63

```
 1  actual case file?
 2    A.  Yes.
 3    Q.  And then you would review the filed
 4  complaints within that case folder, get the
 5  information you needed, and if you wanted, also
 6  obtain a copy?
 7    A.  Correct.
 8    Q.  And you did that process with Canyon
 9  County up until they went electronic?
10    A.  Yes.
11    Q.  Now, once you then moved to Owyhee
12  County, Elmore, Gem, Washington, Payette, tell me
13  what your process was with those counties that you
14  would visit once a month.
15    A.  The same basic thing.  I would request
16  certain of the filings from the last filing case
17  number that I had reported on so that I wouldn't
18  miss any, and they would give me the ones to look
19  through.
20    Q.  Would they actually give you the actual
21  court file, just like Canyon County would?  Or
22  would they give you a docket sheet like Ada
23  County?
24    A.  Yes, I would just stand there with it and
25  look at it with those smaller counties.
```

Page 65

```
 1        Kootenai County, I believe there was a
 2  reporter that lived in Washington that could go
 3  over there once a week and do the reporting.
 4    Q.  And then you would report on it?
 5    A.  Yes.  And she would send it to me.
 6    Q.  Kind of like what the Montana people do,
 7  where they go, they learn the information, and
 8  then they forward it to you to report on?
 9    A.  Yes.
10    Q.  So it sounds like before Kootenai County
11  went to e-filing, there was a Washington reporter,
12  probably in the Spokane area, that would go
13  over -- and do you know what their process was
14  with the Kootenai County clerk?
15    A.  I don't know.  Just collecting for me and
16  getting to me.  And I think she was in Spokane,
17  but I'm not positive.
18    Q.  Okay.  I was making an assumption.
19        Do you know if she would receive the
20  actual court files or whether she would just get a
21  docket report of filed complaints?
22    A.  I don't know how she did it, but I did
23  get information from the full complaint.
24    Q.  And what was her name?
25    A.  I can't remember.
```

17 (Pages 62 - 65)

| | |
|---|---|
| 1  Q.  Does she still work for CNS?<br>2  A.  I don't believe so, but I'm not positive.<br>3  Q.  Would she email the information to you?<br>4  A.  Yes.<br>5  Q.  Would you still have those emails?<br>6  A.  Either she would email or -- I can't<br>7  remember.  Sometimes you can put it into the<br>8  complaint.  I don't know if I would still have<br>9  them or not.<br>10  Q.  Have you ever received what's called a<br>11  litigation hold from CNS about documents and<br>12  needing to preserve those documents?<br>13  A.  Yes.<br>14  Q.  And do you know when you received that<br>15  litigation hold?<br>16  A.  For this one, I don't remember exactly<br>17  when.<br>18  Q.  For this lawsuit?<br>19  A.  Yeah, I don't remember when.<br>20  Q.  Okay.  Do you know if it was back in 2016<br>21  or 2017?<br>22  A.  For this lawsuit, I don't think it was<br>23  that far back.  But I really can't remember.<br>24  Q.  Would you keep a copy of a litigation<br>25  hold? | 1  any of those types of counties?<br>2  A.  No.  Because we couldn't get full<br>3  complaints from them.  Nobody visited them.<br>4  Q.  So until those counties went online with<br>5  online filing, there wasn't an effort by CNS to go<br>6  and learn what the district court filings that<br>7  would meet the criteria to report on, what those<br>8  were prior to electronic filing?<br>9       MR. FETTERLY:  Objection; calls for<br>10  speculation, misstates prior testimony, lacks<br>11  foundation.<br>12  Q.  (BY MS. DUKE)  And I don't want to<br>13  misstate your prior testimony, so let me ask it in<br>14  a way that hopefully doesn't do that.  That's not<br>15  my intent at all.<br>16       For the counties where you yourself or<br>17  someone else with CNS who would then send you the<br>18  information, for those counties that didn't do<br>19  that, where you weren't going yourself or where<br>20  someone else wasn't going on CNS's behalf to send<br>21  you the information, would those district court<br>22  complaint filings get reported on prior to<br>23  electronic filing?<br>24  A.  Just the docket reports.  I would get a<br>25  copy of the docket reports. |
| Page 66 | Page 68 |
| 1  A.  Possibly.<br>2  Q.  How would you go about looking and<br>3  determining whether you got a copy of the<br>4  litigation hold?<br>5  A.  I would have to look through all the<br>6  emails that I had and the old emails that I had.<br>7  Q.  And so look at your emails, let's talk<br>8  about that real quick.<br>9       Because it sounds like you would get<br>10  emails, then, from somebody that would report on<br>11  Kootenai County before Kootenai County went to<br>12  electronic filing.<br>13  A.  I should have some, but I honestly don't<br>14  remember.<br>15  Q.  No.  And that's okay, Ms. Valenti.  We<br>16  can have you take a look on a break and see<br>17  whether you have some of those so that we know --<br>18  that might provide the name of this person as well<br>19  that would have emailed you and what she was<br>20  mailing.<br>21       Other than Kootenai County's process,<br>22  we've got 44 counties.  We've talked about a<br>23  handful of them.<br>24       Any other process you would follow for,<br>25  like, Bonneville, Idaho Falls, Lewiston, you know, | 1  Q.  For every county?<br>2  A.  Yes.<br>3  Q.  It's my understanding that at some<br>4  point -- well, you tell me what that process was.<br>5  I think I know it because I've talked to folks<br>6  about it, but tell me about the docket reports<br>7  that you would get statewide.<br>8  A.  How I would get them or --<br>9  Q.  Who would provide them?  When you started<br>10  getting them, what they included.<br>11  A.  One of CNS's employees would go through<br>12  the Idaho repository and collect that information.<br>13  And so she would send me the docket, the reports<br>14  with the dockets on it.  And I would --<br>15  Q.  I'm sorry.  What was that?<br>16  A.  I would include them in my report.<br>17  Q.  Who was this CNS employee?<br>18  A.  I know one of them was Jane Hall, and I<br>19  think her daughter, but I can't remember what her<br>20  name is.<br>21  Q.  Do you know where they reside?<br>22  A.  No.<br>23  Q.  When you say that they would go through<br>24  the Idaho repository and collect the information,<br>25  what do you mean "the Idaho repository"? |
| Page 67 | Page 69 |

18 (Pages 66 - 69)

| | |
|---|---|
| 1    A. The old system that you could go online | 1    A. I did not track that, no. |
| 2 and look at the different cases. But you get, | 2    Q. Do you know of anyone at CNS that tracked |
| 3 again, just the bare bones cases that were filed | 3 that in the state of Idaho? |
| 4 that they put in there before iCourts. | 4    A. I don't know the answer to that. |
| 5    Q. Right. And so pre-iCourt, the system | 5    Q. You're not aware of anyone; is that fair? |
| 6 that the Idaho courts used, you could go onto that | 6    A. This is pre-iCourts? |
| 7 Idaho repository and find newly filed complaints | 7    Q. Yes. |
| 8 on that repository? | 8    A. Pre-electronic? |
| 9    A. Yes, I think that's how she did it. | 9    Q. Right. |
| 10    Q. Do you know how often she would do that? | 10    A. I don't know. |
| 11    A. She went through every day, but I don't | 11    Q. All right. So that we're clear and the |
| 12 know if she went through all the counties every | 12 record's clear, you personally would go to Ada |
| 13 day. I don't know what her process was. | 13 County -- well, strike that. |
| 14    Q. For counties, did she report on these | 14      Let me set this line of questions up with |
| 15 even for the counties that you would get | 15 the following understanding, and that is this is |
| 16 information from? | 16 pre-electronic filing. Okay? |
| 17    A. No. | 17    A. Okay. |
| 18    Q. This was only for counties where you or | 18    Q. So pre-electronic filing, you would go to |
| 19 the person from Washington were not getting the | 19 Ada County every day -- every weekday, I should |
| 20 information from the court clerks? | 20 say, and ask for a docket report, sometimes |
| 21    A. Right. Correct. | 21 multiple times a day, that identified newly filed |
| 22    Q. Would she, then, email you that | 22 and docketed cases, correct? |
| 23 information? | 23    A. Yes. |
| 24    A. Yes. I think it was emailed. | 24    Q. You would then go to Canyon County one |
| 25    Q. And that's something you can check for | 25 time a week and actually get copies of the actual |
| Page 70 | Page 72 |
| 1 us? | 1 court files that had been initiated or started |
| 2    A. Um-hmm. | 2 with a newly filed complaint? |
| 3    Q. Yes? | 3    A. Yes. |
| 4    A. Yes. I'm sorry. Yes. | 4      MR. FETTERLY: Belated objection. |
| 5    Q. And do you know how long it took for, | 5      Sorry, Keely, I want to get this in. |
| 6 let's say -- so let's use Bonneville County | 6      Belated objection to the phrase "docket" |
| 7 because that's not one of the counties that you | 7 as being vague and ambiguous and overbroad. |
| 8 would go into and it's obviously a large county in | 8    Q. (BY MS. DUKE) What do you understand |
| 9 Idaho. | 9 "docket" to mean? |
| 10      In Bonneville, do you know what the time | 10    A. Me? |
| 11 frame was from a newly filed complaint being filed | 11    Q. Yes. |
| 12 in Bonneville County courthouse, how long it would | 12    A. The docket is just basic information |
| 13 take to then show up on the Idaho repository? | 13 without a summary -- or without the case. So |
| 14    A. I don't know that. | 14 plaintiff, defendant, date, case number. |
| 15    Q. Did you do any kind of evaluation or | 15    Q. And do you understand docketed |
| 16 investigation into that? | 16 info -- "docketed" means a court [sic] that has |
| 17    A. I did not, no. | 17 been filed in a county's clerk's office and that's |
| 18    Q. Did CNS at any point in time ask for you | 18 then included in a case that's been opened? |
| 19 to tell them how long it took a newly filed | 19      MR. FETTERLY: Objection; vague and |
| 20 complaint, district court complaint in the state | 20 ambiguous, overbroad. |
| 21 of Idaho, prior to electronic filing, to be | 21      You may answer. |
| 22 included in the Idaho repository? | 22      THE WITNESS: I -- what do you mean, a |
| 23    A. No. They didn't ask me. | 23 docket is? |
| 24    Q. And that's not something you tracked, | 24    Q. (BY MS. DUKE) Yeah. So I guess tell me |
| 25 correct? | 25 what you understand a docket to be. |
| Page 71 | Page 73 |

19 (Pages 70 - 73)

Catherine Valenti   November 8, 2022

| | |
|---|---|
| 1   Do you understand it to be documents that | 1  like the way I phrased that better that time with |
| 2  have actually been filed and included in the | 2  Ada County. |
| 3  court's file? | 3   So at any point in time did CNS ever tell |
| 4   A.  It's something that has been filed, yes. | 4  you that going to Ada County once a day was not |
| 5  But a docket itself, I couldn't see the full | 5  timely enough for CNS from a reporting standpoint? |
| 6  complaint. | 6   A.  I'm not sure -- I went once a day.  I |
| 7   Q.  Right.  And you understand a docket is | 7  don't know.  I guess not, because I could only go |
| 8  basically an index of documents that have been | 8  one time a day. |
| 9  filed in each case? | 9   Q.  And then with Canyon County, was there |
| 10   A.  Yes. | 10  any point in time when CNS told you that going to |
| 11   Q.  And you would receive a docket report for | 11  Canyon County once a week was not timely enough |
| 12  newly filed cases in Ada County? | 12  for them from a reporting standpoint? |
| 13   A.  Yes. | 13   A.  No, they never told me that. |
| 14   Q.  And then in Ada County you would then go | 14   Q.  And are you aware of CNS ever |
| 15  and actually be provided the court file itself for | 15  communicating to you that you needed to be more |
| 16  documents that had been filed in that court file | 16  timely in reporting on Kootenai County cases prior |
| 17  and determine how to report and what to report? | 17  to them going to the electronic filing? |
| 18   A.  Yes. | 18   A.  No, because I didn't -- I just took the |
| 19   Q.  In Owyhee, Elmore, Gem, Washington, and | 19  information she sent me and put it in my report. |
| 20  Payette Counties, those you would go to once a | 20   Q.  Then last, on the docket reports that you |
| 21  month, correct? | 21  would receive from Jane Hall or her daughter, are |
| 22   A.  Yes. | 22  you aware of how frequently you would receive |
| 23   Q.  And in those, either get a docket report | 23  those reports? |
| 24  from the clerks or actually go into a room with | 24   A.  They checked every day as far as I know, |
| 25  the actual court files themselves? | 25  and got them.  If there was something to report on |
| Page 74 | Page 76 |
| 1   A.  Yes. | 1  daily. |
| 2   Q.  And then in Kootenai County, you would | 2   Q.  And at any point in time, did CNS ever |
| 3  receive once a week a report from a Washington CNS | 3  tell you that your reporting on the counties |
| 4  person who would send you the docket information | 4  covered by the docket reports from Ms. Hall or her |
| 5  on newly filed complaints from Kootenai County? | 5  daughter were not timely enough reporting done by |
| 6   A.  The person that was covering Kootenai | 6  you? |
| 7  County, which may or may not have been in | 7   A.  No. |
| 8  Washington, would send me the case summary.  She | 8   Q.  Has CNS provided you with a time certain |
| 9  could visit the court, so she had more than just | 9  by which, now that we have electronic filing, when |
| 10  the docketed report. | 10  you should be reporting on something? |
| 11   Q.  And then it was your job to actually | 11   A.  As soon as I can see it if I'm -- during |
| 12  report on the case summary she would send? | 12  the weekday.  Or I can see it online. |
| 13   A.  Yes.  That was included in my report. | 13   Q.  But they haven't asked you to work after |
| 14   Q.  Did CNS at any point in time tell you | 14  hours to do so, correct? |
| 15  that going to Canyon County only once a week was | 15   MR. FETTERLY:  Objection; vague and |
| 16  not speedy enough for them with respect to | 16  ambiguous, overbroad. |
| 17  reporting on newly filed complaints in Canyon | 17   MS. DUKE:  So let me rephrase that so I |
| 18  County? | 18  can have that clear. |
| 19   A.  No.  They never told me that. | 19   Q.  (BY MS. DUKE)  CNS has not asked that you |
| 20   Q.  At any point in time did CNS ever tell | 20  work in the middle of the night to report on cases |
| 21  you that going to Owyhee, Elmore, Gem, Washington, | 21  that may be filed after 5:00 p.m.; is that |
| 22  and Payette Counties once a month was not timely | 22  correct, on a weekday? |
| 23  enough for them from a reporting standpoint? | 23   A.  They never asked me to work in the middle |
| 24   A.  No.  They didn't tell me that. | 24  of the night, that's correct. |
| 25   Q.  And let me ask that same question.  I | 25   Q.  And has CNS ever asked you to work on a |
| Page 75 | Page 77 |

20 (Pages 74 - 77)

Catherine Valenti November 8, 2022

1 weekend so that you can report on anything that
2 was filed Friday late in the day or on Saturday or
3 Sunday?
4    A.  No, they have not asked me.
5    Q.  Has CNS asked that you work on a holiday
6 like Christmas or Thanksgiving or Veterans Day,
7 Labor Day, whatever holiday it is, so that if
8 something were filed, it could be reported on more
9 quickly?
10    A.  No, they have not.
11      MS. DUKE:  Okay.  Why don't we go ahead
12 and take a break and let me look at my notes.
13 About five or ten minutes.
14      Does that work for you, Ms. Valenti?
15      MR. FETTERLY:  Off the record.
16      THE VIDEOGRAPHER:  So the time is
17 3:00 p.m., and we are off the record.
18      (Break taken from 3:00 p.m. to 3:15 p.m.)
19      THE VIDEOGRAPHER:  All right.  So the
20 camera is rolling.  The time is 3:15 p.m., and we
21 are back on the record.
22    Q.  (BY MS. DUKE)  All right.  Ms. Valenti,
23 we're back on the record from a break.
24      Did you have the opportunity to speak
25 with anyone over the break?

Page 78

1    A.  No.
2    Q.  And did you have the opportunity to
3 correspond with anyone over the break?
4    A.  No.
5    Q.  Over the break did you look at any of
6 your emails to see if you were able to determine
7 whether you still had Jane Hall and her daughter's
8 emails that they would send you, and then the
9 Kootenai County gal?
10    A.  I did not.  I think they're probably
11 archived.  And I might be able to get them later,
12 but not right now.  And the daughter's first name
13 is Kayla.  I do remember that.
14    Q.  Okay.
15    A.  It all comes back little by little.
16    Q.  I get it.  I appreciate that.
17      All right.  So we're back on the record.
18      Now, with respect to the CNS Daily
19 Reports Style Manual that you received and is
20 dated 2015 but you received in 2016 when you
21 started working for CNS, has that ever been
22 updated, to your knowledge, while you've been at
23 CNS?
24    A.  No, I've never gotten another update.
25    Q.  So this same CNS daily reporting manual

Page 79

1 has been in place whether you're on a paper filing
2 or an electronic filing system in Idaho; is that
3 correct?
4    A.  As far as I know, yes.
5    Q.  You haven't been told otherwise?
6    A.  Right.  I haven't been told otherwise.
7    Q.  And were you instructed that as part of
8 your job, you needed to comply with the directions
9 in the CNS Daily Reports Style Manual?
10    A.  Yes.
11    Q.  And part of that, it looks like, you
12 would look to -- do you have that with you, by
13 chance?
14    A.  I have it on my computer.  I can take a
15 look at it.
16    Q.  Okay.  If not, I can certainly pull it up
17 for you if that's easier.
18      Do you have a preference?
19    A.  I have it up right now.
20    Q.  Okay.  If you'd take a look at page 3,
21 please.
22      MS. DUKE:  Jon, do you need me to pull
23 that up or do you have it?
24      MR. FETTERLY:  Please, can you please put
25 it up on your screen so we can all have it?

Page 80

1      MS. DUKE:  Absolutely.
2      MR. FETTERLY:  Thank you.
3    Q.  (BY MS. DUKE)  All right.  So we have
4 Exhibit 21 up.  Let me go to -- all right.  You
5 see here we're on page 3, "Docketing"?
6    A.  Yes.
7    Q.  All right.  It says "Daily Courts."
8      Go ahead and read that paragraph to
9 yourself, and I'm going to ask you a few
10 questions.
11    A.  Just the paragraph?  Or the entire
12 section?
13    Q.  Well, read that paragraph.  But you
14 should probably read the exceptions too because I
15 think it relates to that first paragraph.
16    A.  Okay.
17    Q.  All right.  So the first paragraph on
18 page 3 of Exhibit 21 under "Docketing," what is
19 that referring to?
20    A.  I believe that one is just cases that we
21 don't have full text, so it's just the docket
22 report.  That would be something I couldn't see
23 the full text.
24    Q.  And by "text," you mean the filed
25 complaint?

Page 81

21 (Pages 78 - 81)

Catherine Valenti   November 8, 2022

| | |
|---|---|
| 1    A.   Correct.<br>2    Q.   So what are they telling you to do in<br>3  situations where you know you want to report on<br>4  them but you don't have all the available<br>5  information in the first docket report?  What does<br>6  the 90 percent mean?<br>7    A.   Well, on this one, I'm not sure about the<br>8  90 percent.  I check it all the time until I find<br>9  it.  But maybe they're talking about ones that you<br>10 can't get a full complaint for.  I report into my<br>11 program; I put all of the docket reports in there.<br>12 If I don't have a full text for the case, I wait<br>13 until I do and then I publish that.<br>14    Q.   Now, today, now that we're in e-filing<br>15 world, which has brought us all here together, how<br>16 do you -- tell me what docket reports you're<br>17 looking to that you then go and look at what<br>18 copies of complaints you want and how you look at<br>19 that process.<br>20    A.   I can't determine it from the docket<br>21 report.  If I want a copy, I have to wait for the<br>22 full text.  Unless I can look at the magic ball<br>23 and be able to tell what's important, I have to<br>24 wait for the full text.<br>25    Q.   And so I understand that.  So what do you<br><div align="right">Page 82</div> | 1  going to report on that same day?<br>2      Like today, I know you're obviously here<br>3  so somebody's probably covering it, but how would<br>4  you -- like, let's take yesterday's report.<br>5      So if we're looking at the 11/7 report,<br>6  what process would you have gone through yesterday<br>7  to determine what it is you reported on in the<br>8  11/7/22 Big Sky Report?<br>9    A.   I look -- first of all, I can sort the<br>10 cases by district court cases, so I look at all<br>11 those once I sort them.<br>12    Q.   Okay.  You can sort by state and district<br>13 court cases?<br>14    A.   Yes.  You just hit "Location," and it<br>15 will sort by the -- I go by 100s, so I look at 100<br>16 at a time at the kiosk.<br>17      And then I look at all of the district<br>18 court cases first, make sure that I have or -- see<br>19 if I have or have not reported on them.  And I<br>20 open them all up to see if I need to report on it<br>21 in my complaints program.<br>22    Q.   And when you're looking at this, the<br>23 kiosk and you're filtering district court cases,<br>24 is there, like, a button you'd hit that then says,<br>25 "Hey, here's all the district court cases"?<br><div align="right">Page 84</div> |
| 1  receive right now for, let's say, Ada County under<br>2  the new e-filing -- so under the e-filing system,<br>3  what do you receive now from Ada County so you can<br>4  identify what it is you want to look to?<br>5    A.   Is that when I go into the courthouse?<br>6    Q.   Correct.  Yeah.  What are you getting<br>7  from Ada County?  Are you getting a docket report<br>8  like you used to?<br>9    A.   No.  I go onto the iCourts program at the<br>10 kiosk.<br>11    Q.   And why do you do that rather than get a<br>12 printed-out docket report from the Ada County<br>13 clerk like you used to under the filing system?<br>14    A.   It's much easier for me and for the clerk<br>15 and saves paper.  I can see everything from<br>16 iCourts that I need to see.<br>17    Q.   To log onto iCourt, did you have to<br>18 register as a user?<br>19    A.   Not when I'm at the kiosk, no.<br>20    Q.   When you're at the kiosk, you can just<br>21 get on?<br>22    A.   Correct.  It's public information.<br>23    Q.   And so you go to the kiosk at Ada County.<br>24 And tell me, then, for Ada County cases, what is<br>25 your process to then determine what it is you're<br><div align="right">Page 83</div> | 1    A.   It's the location field.  So you click on<br>2  that.  And usually what comes up is district court<br>3  cases.  Once in a while, because of whatever they<br>4  do, there's another county that they throw up at<br>5  the beginning, but I easily can see all the<br>6  district court cases.<br>7      I also go through numerically after I'm<br>8  done to make sure I check off all the ones I don't<br>9  need.<br>10    Q.   And is that just Ada County that you're<br>11 looking at, or is that statewide?<br>12    A.   Statewide.  I look at each county<br>13 separately.<br>14    Q.   And you're able to access all of that<br>15 information at the Ada County Courthouse for<br>16 statewide district court filings?<br>17    A.   Yes.<br>18    Q.   All right.  So once you've sorted it by,<br>19 let's say, Ada County and now it's by district<br>20 court, what do you actually see that tells<br>21 you -- is it like the old docket sheets you would<br>22 give that would give party name, you know, type of<br>23 case?  Like, just tell us what information you<br>24 were getting.<br>25    A.   When I first look at them, I don't get<br><div align="right">Page 85</div> |

<div align="right">22 (Pages 82 - 85)</div>

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1820**

Catherine Valenti November 8, 2022

1 very much information with the list. So when I
2 click on it, it brings me to the docket report,
3 basically. It doesn't tell you what the case is
4 about most of the time. Sometimes it will say,
5 you know, "debt collection" or something. And
6 then I have to click on it to open it further.
7         And when I click on it then, I see the
8 first page of what I'm looking for, and I can open
9 it up fully to see the rest of the report.
10     Q.   Okay. So let me stop my screen share
11 real quick. And let me just grab yesterday's
12 report.
13         All right. Let me send you -- I'll just
14 share what's in my email inbox from yesterday.
15         So this is the CNS report dated
16 November 7th, 2022.
17         Do you see that?
18     A.   Yes.
19     Q.   So let's go to Ada County here. It looks
20 like there, what, one, two, three,
21 four -- five cases you reported on at Ada County.
22         So that first list that you're talking
23 about, if you're looking at Ada County, are you
24 looking at a list of just newly filed district
25 court cases that you then click on to actually get

Page 86

1 The 01 is the designator; 22 is the year. And
2 that's how I sort through.
3     Q.   And when you say "01 is the designator,"
4 does that mean district court?
5     A.   That's Ada County.
6     Q.   Ada County, okay. So 01 is Ada County.
7         And then 22 is the year.
8         And then it says 16. What's that?
9     A.   So that is the case number. So if I want
10 to look at -- if I want to look at a certain
11 block, which I look at by hundreds, I would put in
12 166 asterisk. And when I put in the asterisk, it
13 will automatically give me all of the files, 100
14 block for that.
15     Q.   Oh, I see. Okay. So if you're looking
16 at this -- I think I'm understanding what you're
17 saying now.
18         So the "16672" means -- does that mean
19 it's the 16,672nd case filed in Ada County?
20     A.   Yes, in civil court.
21     Q.   For '22?
22     A.   Right.
23     Q.   Okay. And so then obviously 16676,
24 you'll look at these in hundreds.
25         And then out of the hundreds that you

Page 88

1 the docket information?
2     A.   Yes. All of them -- some are older
3 depending on how big the county is, but, yes, all
4 these -- I look at -- 166,000, so that's what I
5 would see. And then I pull out the district court
6 cases to look at them.
7     Q.   Okay. And when you say "166,000," that's
8 under the Experian Data Corp --
9     A.   Sorry, 16,000. I'm way over. 16,772.
10 So I look at -- it would be 1-6-6 and then an
11 asterisk, and it will just give me the 100s for
12 that.
13         It's kind of confusing to explain.
14 Basically I look at up to 100 at a time. That's
15 all the database will let me see.
16     Q.   But what's the "16" mean? I'm just
17 trying to understand.
18         In that line there that says "11/7/2022,
19 CV01-22-16672," is the 16 you're talking about
20 before the 672?
21     A.   I want to sort it, and I want to look at
22 just the ones that fall within that 100 range, so
23 166 is what I would be looking at.
24         And it would go from 16600 to 16699 if
25 they are filed that -- maybe that explains better.

Page 87

1 looked at, based on the CNS Daily Reports Style
2 Manual, there were five of which you believed CNS
3 would want you to report on in the Big Sky Report
4 on November 7th for Ada County, correct?
5     A.   Yes.
6     Q.   Got it. So when you get this list, are
7 you basically -- like if I were to look
8 at -- let's look at these two because they're back
9 to back.
10         Stephanie Guyon was busy. She was an old
11 law school classmate of mine.
12         All right. So 16276 and 16677, what you
13 first see is a list of them.
14         So then I'm assuming in the matter of
15 Idaho Attorney General vs. T-Mobile, that would be
16 in a list right above in the matter of Idaho
17 Attorney General vs. Experian, that would be on a
18 list right above it; is that correct?
19     A.   Most of the time they're in numerical
20 order. Once in a while they're not, depending on
21 when they're filed.
22     Q.   And then what you'll do -- how do you
23 then know to go and say, "Oh, I do want to look at
24 16676"?
25     A.   I click on it. If it's a civil district

Page 89

23 (Pages 86 - 89)

Catherine Valenti November 8, 2022

Page 90

1  court case, I always check it.
2     Q.  Okay.  So anytime it's a CV01, you're
3  going to click on it to see if it meets the
4  criteria that CNS has provided to you as to what
5  you report on daily through the CNS Daily Reports
6  Style Manual?
7     A.  Yes.
8     Q.  So how many do you think you looked at in
9  District Court of Idaho yesterday and then
10  obviously only had five that meet CNS's criteria
11  for Ada County?
12    A.  I do not remember how many I looked at
13  for Ada County.
14    Q.  Is it typically hundreds or tens?
15    A.  Not typically hundreds, but it's -- I
16  would have to look back, but it's usually at least
17  50 new cases that I look at and sort through.
18  Sometimes more.  It depends on the day.  Sometimes
19  it's not very busy.
20    Q.  Okay.  Now, when you do click, let's say,
21  on this Done-Rite Tree Company vs. Gary Butcher,
22  when you do click on that one, number 16653, what
23  does it take you to at that point?  Does it take
24  you to the docket report like you used to get?
25    A.  Yes, it's a docket report.

Page 92

1  specific.
2     At the bottom it has more of the
3  information of when it was filed and when it
4  was -- well, the top when it was filed, the bottom
5  is when the payment was made, which that I have
6  nothing to do with.  I just -- I don't track that
7  as far as payment.
8     Q.  When you say the payments made -- strike
9  that.
10    When you say the payment made, you mean
11  the filing fee?
12    A.  The filing fee, yeah.
13    Q.  Okay.  When that's actually been made?
14    A.  Yeah, that's what it looks like at the
15  bottom of the docket.
16    Q.  And so with Done-Rite Tree Company, based
17  upon you clicking on the docket report, you're
18  then going to see the complaint that's been filed?
19    A.  When I click on the document, there's
20  clickable sections, document summons, et cetera.
21  I ignore the rest.  I just click on the document
22  or the complaint.
23    Q.  Because sometimes -- I'm assuming what
24  you see on those dockets -- like, sometimes when
25  we file a complaint, we'll serve initial discovery

Page 91

1     Q.  Okay.  And is that like the docket report
2  or similar to the docket report you used to get
3  back in the paper filing days?
4     A.  It's got the same information on it that
5  I used to get.
6     Q.  It has the same info?
7     A.  Yes.
8     Q.  Okay.  And then when you look at that
9  docket report, how do you determine whether you're
10  going to report or not?  Just walk us through
11  that.
12    A.  A docket report, if it's -- I always have
13  to click and open up the case to determine whether
14  I'll report on it.  If it's something that's
15  against a non-individual, again, through the style
16  manual with a few exceptions, I will report on
17  that in the program.
18    Q.  And so when you click on the docket
19  report for Done-Rite Tree Company, what kind of
20  information does it give you in the docket report?
21    A.  It gives me the names of the parties, the
22  judge's name, the attorney's name if an attorney
23  has filed it.
24    It will say -- I can't remember the exact
25  wording, but, you know, district court, nothing

Page 93

1  with it.
2     You're not worrying about any of those
3  notice of services or requests for depositions;
4  you're just looking at the complaint?
5     A.  Correct.
6     Q.  But the docket can sometimes show the
7  other things that were filed with the complaint?
8     A.  Yes, like summons.  I usually -- I don't
9  know if the others regularly see those, but yes.
10    Q.  And then once you click on it, what does
11  "CNS Plus Download" mean?
12    A.  CNS Plus Download will take you to our
13  main website.
14    Q.  Right.  So I'll click on that.
15    A.  So if our subscribers would like a copy
16  of the complaint, they can get it at that time.
17    Q.  And what I have to do is put in my email
18  address, my password, and then if that's
19  available, then we're charged a certain fee
20  through CNS to get that, correct?
21    A.  Yes.
22    Q.  All right.  So going back to CNS Plus
23  Download, why are some of them CNS Plus Download
24  and others aren't?  Why are all these CNS Plus
25  Download but the tax appeal is not?

24 (Pages 90 - 93)

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Catherine Valenti November 8, 2022

1    A.  I usually -- well, I always try to make
2  sure I upload something that someone might want to
3  look at, one of our subscribers might want to look
4  at.  And so I use the CNS style manual, plus
5  particularly seeing what some of our subscribers
6  have downloaded to determine that.
7         But anything more newsworthy, defamation
8  cases, things like that would be ones that I would
9  include the copies.
10    Q.  And how do you get the copy of the
11  complaint?
12    A.  I request it from the court clerk and I
13  get it emailed to me.
14    Q.  Okay.  And how long does it usually take
15  to get emailed to you?
16    A.  From Ada County it's right away.  Some
17  counties I have to go through a different process.
18    Q.  Right.  And we'll talk about those.  But
19  Ada is fast?
20    A.  Oh, yes.
21    Q.  Like -- it sounds like -- do you just
22  give them a list of the ones you want and do they
23  just email them to you in one batch that day?
24    A.  Right.
25    Q.  Okay.  What about other counties?  What's

Page 94

1    A.  Yes.
2    Q.  Okay.  And that sounds like a very
3  similar process that you follow there, even though
4  it's electronic, that you would follow back in the
5  paper document world, that you wanted a copy of
6  the complaint, you would ask, and Ada County would
7  get you a copy?
8    A.  That's right.
9    Q.  And then other districts, I'm assuming,
10  would get you a copy upon request following
11  whatever their practice was?
12    A.  Correct.
13    Q.  Now, if you look back -- let me stop that
14  share and go back to Exhibit 21.
15         All right.  Exhibit 21, so this is back
16  on page 3.  And we were talking about the
17  docketing portion.  It then says "Two exceptions:
18  Continue to look for and eventually report cases
19  that are (1) obviously newsworthy or important."
20         So tell me how you know or what you've
21  been trained to -- by CNS as to what is obviously
22  newsworthy or important.
23    A.  It would be a complaint that any -- or
24  some subscribers might want to take a look against
25  corporations -- and this is for getting a copy of

Page 96

1  your process in other counties for actually
2  getting the complaints themselves that have been
3  filed?
4    A.  It depends on the county.  There is a
5  huge discrepancy or indifference between them.
6         Some counties I can call and they take
7  payment over the phone and then they email that to
8  me with a receipt.
9         Other counties I have to email my request
10  and they will get back to me when they are -- the
11  thing is ready.
12         And there are some that I have to
13  actually fill out an official form, attach it to
14  an email, and then they will get it back to
15  me -- you know, they'll let me know when payment
16  can be taken.
17    Q.  But at the Ada County computer, you can
18  see the complaint; you just don't have a copy of
19  it yet?
20    A.  Right.
21    Q.  And your purpose of getting a copy is so
22  that you can then include it with that?  So the
23  subscriber will say, "Oh, I want a copy of that
24  complaint," and go to CNS Plus Download and go
25  ahead and pay for a copy of the complaint?

Page 95

1  a complaint.  I would still report on it.
2         Big corporations, Walmart, Target, if
3  it's something like a wrongful death or if it's a
4  defamation, anything that is a little more
5  newsworthy than, say, a car crash case.
6    Q.  And that's within your discretion based
7  on your training with CNS as to what it is you're
8  going to determine is newsworthy or important to
9  report on?
10    A.  I'll report on anything that I should be
11  reporting on, which is against non-individuals.
12  It's getting a copy of the complaint that I have
13  more of a discretion in.  But I will report on all
14  of the ones that are against non-individuals.
15    Q.  Oh, I see.  Okay.  So the docketing
16  portion just talks about getting the actual
17  complaints?
18    A.  Right.  I think what they're referencing
19  is if we can only see the docket, the complaint
20  isn't ready yet, we keep looking for it.  That
21  doesn't happen like it used to because we can go
22  online and look as soon as it's ready.
23    Q.  Sure.  And when you say you can go online
24  and look as soon as it's ready, it's your
25  understanding that what you're looking at on the

Page 97

25 (Pages 94 - 97)

Catherine Valenti November 8, 2022

1 iCourt portal that you access in the Ada County
2 Courthouse are the district court complaints that
3 were filed during whatever time period you plug
4 into the system?
5    A.  Well, I do it by cases, so it would be
6 time period.  Because I report every day, and I
7 look for the cases for that day going by case
8 number so I don't miss any.
9    Q.  And but what I'm asking is those are, as
10 you understand it, filed documents that are in the
11 court's case management system?
12    A.  As I understand it.
13    MR. FETTERLY:  Objection; vague and
14 ambiguous, overbroad, lacks foundation.
15    Q.  (BY MS. DUKE)  Well, what's your
16 understanding of what you're accessing when you're
17 at the iCourts portal in the Ada County Courthouse
18 when you're looking at a docket, you understand
19 those to be filed documents?
20    A.  Yes.
21    Q.  And same questions that I asked you when
22 you were talking about the paper filing.
23        You're not charged with reporting on
24 unfiled documents, correct?
25    A.  Correct.

Page 98

1    Q.  From there, you then generate the Big Sky
2 Report, correct?
3    A.  From all of the reports, yes.
4    Q.  Once you generate the Big Sky Report, you
5 then also determine what complaints you want to
6 also have included for the CNS Plus Download, and
7 you've walked us through that process of how you
8 do that?
9    A.  Yes.  You're talking about the uploads,
10 the complaints that I get a copy of?
11    Q.  Yes.
12    A.  Yes.  I can determine that usually when I
13 look at the case itself.
14    Q.  Now, back in the old filing days where it
15 was paper filing, did CNS ever ask you to actually
16 go talk with people who were about to file
17 something about what they were going to file?
18    A.  No.
19    Q.  And they haven't asked you to do that
20 under the new e-filing; is that correct?
21    A.  Correct.
22    Q.  All right.  Now, if you look at what we
23 have up as Exhibit 21, page 3, second paragraph
24 under "Docketing," Section C, you'll see where it
25 says "Two exceptions."

Page 100

1    Q.  CNS isn't asking you to report on
2 documents that are not yet filed in the court
3 system, right?
4    A.  If they're still in the customers' hands,
5 no, we don't report on that that I know of.  I've
6 never been asked to.
7    Q.  And do you understand that sometimes when
8 something is submitted by a filer, that it will be
9 rejected and not filed?
10    A.  I guess so.  I'm not on that end of the
11 workflow, but I think that would be a court
12 answer.
13    Q.  Well, has CNS ever asked you to report on
14 rejected attempted filings?
15    MR. FETTERLY:  Objection; assumes facts,
16 lacks foundation.
17    THE WITNESS:  No, they have not.
18    Q.  (BY MS. DUKE)  What CNS has asked you to
19 do is to report on filed documents, correct?
20    A.  Yes.
21    Q.  And that's what you do when you go to
22 iCourt; you are looking at dockets that then
23 provide a list of documents that have been filed
24 in that case?
25    A.  Yes.

Page 99

1        And number 2 is "or (2) were requested by
2 a client."
3        What does that mean?
4    A.  I am not positive if that is referring to
5 current or if it was when we could only see the
6 docket reports.  It looks like it was -- because
7 at that time we can only see docket reports.
8        I can try to give you my best guess, but
9 I can't tell you for certain.  But I think that's
10 what it refers to is docket.
11    Q.  It refers to the docket reports?
12    A.  And not the full summary.  Because
13 obviously if the full case was there, we could see
14 it and report on it.
15    Q.  Okay.  Now, when you're at the Ada County
16 Courthouse accessing the iCourt portal, do you
17 plug in a web address to get there?
18    A.  No.
19    Q.  Tell me what it is you access, just so we
20 have an appreciation for that.
21    A.  When I go into court, I click into the
22 kiosk and click on "iCourts."  There's a little
23 icon there.
24        And then from there, I would -- there's
25 different options.  I would go for the smart

Page 101

26 (Pages 98 - 101)

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1824**

(147 of 297), Page 147 of 297, 24-6697, 03/06/2025, DktEntry: 10.9, Page 147 of 297
Case 1:21-cv-00305-DCN Document 60-8 Filed 12/15/22 Page 28 of 79
Catherine Valenti November 8, 2022

1 search, and then I could put the numbers in.
2   Q.  How many kiosks are available?
3   A.  There are -- there's four in the room I
4 usually go in.  In the other side of the hallway,
5 there's two more.  And I think there's a couple in
6 the center of the main area.
7   Q.  Has there been a time when they've all
8 been taken and you needed to wait?
9   A.  No.  They actually remodeled the rooms
10 and put the computers in there, so we have
11 actually more access now for the computers.
12       But in the past, there were times when
13 you didn't really have to wait, but some people
14 would have to go into the other room to get the
15 reports.
16   Q.  What do you mean by "some people" --
17   A.  Well, like, if a member of the public --
18 if we were using the computers and the kiosks,
19 they would have to use -- there's a civil side,
20 which is what I'm on.  They would have to go into
21 the other room and use the other computer there.
22   Q.  Oh, because -- sorry, go ahead.
23   A.  I'm sorry.  I don't ever remember not
24 having a computer to work on since they've started
25 doing this.

1   Q.  And is every single clerk's office --
2 like, you're able to access every county filing
3 for district court at that kiosk?
4   A.  Yes, all the counties, yes, I can do
5 that.
6   Q.  Any that you have to do manually or do
7 another process other than what you've described
8 you do now by going to Ada County and using the
9 kiosk?
10   A.  No, I can see all of the counties from
11 Ada County.
12   Q.  Now, you would agree that the accuracy of
13 your reports is of the utmost importance, correct?
14   A.  Yes.
15   Q.  And part of what you're doing with those
16 reports is you are reporting on cases that have
17 actually been filed in the state of Idaho,
18 correct?
19   A.  Yes.
20   Q.  And you would not want to be inaccurate
21 about whether a case had in fact been filed,
22 correct?
23   A.  I'm not sure I understand.  Inaccurate
24 about whether it had been filed?
25   Q.  Yeah.  You don't want to report on cases

1 that have not yet made its way into the court's
2 filing system, correct?
3   A.  Correct.
4       MR. FETTERLY:  Objection; vague and
5 ambiguous, overbroad, lacks foundation.
6   Q.  (BY MS. DUKE)  Well, you would not want
7 to report on district court complaints that had
8 not yet been docketed by the clerk's office before
9 reporting on them, correct?
10       MR. FETTERLY:  Objection; vague and
11 ambiguous, lacks foundation, calls for legal
12 conclusion.
13   Q.  (BY MS. DUKE)  Go ahead.
14   A.  I just report on the ones that show up on
15 the kiosk.
16   Q.  And the ones that show up on the kiosk
17 are docketed complaints, correct?
18   A.  Yes.
19   Q.  And by "docketed complaints," you
20 understand that that means they are complaints
21 that have actually been filed into the court's
22 filing system?
23       MR. FETTERLY:  Objection; vague and
24 ambiguous, overbroad as to "actually filed,"
25 potentially calls for a legal conclusion.

1   Q.  (BY MS. DUKE)  Is that correct?
2   A.  Yes, that's correct.
3   Q.  I guess let me ask it this way:  Have you
4 been asked to include in your Big Sky Report,
5 since e-filing's been used in the state of Idaho,
6 to report on cases that have not yet been filed in
7 the court's case management system?
8       MR. FETTERLY:  Objection; vague and
9 ambiguous, overbroad, lacks foundation, assumes
10 facts.
11       You may answer.
12       THE WITNESS:  I have -- so you're
13 asking -- I'm sorry.  Start over again.
14       I only report on the ones that have been
15 filed as far as I know because those are the only
16 ones I see on the computer, if that answers your
17 question.
18   Q.  (BY MS. DUKE)  Do you have any idea what
19 the press review queue is by Tyler Enterprises or
20 Tyler Technologies?
21   A.  I am not positive.  I assume -- if I can
22 assume -- that it is something that allows
23 immediate access when something is first filed.
24   Q.  Okay.  Do you know whether that's what
25 the Tyler Technologies' press review queue is?

Catherine Valenti November 8, 2022

1    A.  Just from what I have read, possibly that
2  would give us immediate access.
3    Q.  And what you've read is the complaint; is
4  that correct?
5    A.  Yes.
6    Q.  And is that your basis for your
7  understanding of what the press review queue is?
8    A.  That's my understanding, yes.
9    Q.  Have you been asked by CNS to in any way
10  look at the press review queue as part of your job
11  reporting on the Big Sky Reports -- well, strike
12  that.
13       Do you know whether the state of Montana
14  has the press review queue?
15    A.  I don't know.
16    Q.  Do you know whether the state of Wyoming
17  has the press review queue?
18    A.  No, I don't know.
19    Q.  Do you know whether the state of Idaho
20  has the press review queue?
21    A.  I don't think so.  I don't know for sure.
22  I don't know if it's available, but I can't access
23  it.
24    Q.  And it's your understanding that the
25  press review queue would provide access to filed

Page 106

1  complaints?
2    A.  Yes.
3    Q.  Do you have any understanding or
4  knowledge whether the press review queue would
5  only include prefiled complaints?
6       MR. FETTERLY:  Objection; vague and
7  ambiguous as to the term "prefiled," overbroad,
8  lacks foundation.
9       THE WITNESS:  I don't know.
10    Q.  (BY MS. DUKE)  When I use the phrase
11  "prefiled complaint," what does that mean to you?
12    A.  If it's not filed, then someone hasn't
13  taken it to the court to be entered.  That's what
14  it means to me.
15    Q.  When it's not filed, it's not something
16  that's in the court's case management system; is
17  that fair?
18       MR. FETTERLY:  Objection; vague and
19  ambiguous, overbroad, lacks foundation, calls for
20  speculation, calls for legal conclusion.
21    Q.  (BY MS. DUKE)  Would you agree?
22    A.  I don't know how -- what the process is
23  at the Ada County -- or any of the courthouses, so
24  I'm not sure I can answer that.
25    Q.  Well, what you know is that you're

Page 107

1  provided, at the portals, an access to the
2  computer system, which then provides you the
3  docketing sheets for each case for the district
4  court that you hone your search into, correct?
5    A.  Yes.
6    Q.  And from those docketing sheets, you then
7  are able to access the complaint to review it to
8  see if it's something you're going to report on?
9    A.  Right.  Yes.
10    Q.  And has there ever been, to your
11  knowledge, a delay in your ability to access one
12  of those docketed complaints through the iCourt
13  portal?
14       MR. FETTERLY:  Objection; vague and
15  ambiguous, overbroad.
16       You may answer.
17       THE WITNESS:  Well, if it's docketed
18  almost always, if I can see it on the docket
19  report.  Almost always I can see the complaint.
20  The exceptions would be once in a while there's a
21  short delay.  I don't know if it's
22  because -- between the time that they actually
23  receive and enter it in.  I don't know how that
24  works.
25       And sometimes there's more than a day

Page 108

1  delay of seeing the full report, if it's a pro se
2  filer and they are not doing it electronically and
3  they haven't scanned it in yet.
4    Q.  (BY MS. DUKE)  Got it.  And those are the
5  times when you understand there are times when the
6  complaint's not available when you're looking at
7  the docket on the iCourt portal?
8    A.  Right.
9    Q.  Those times when you're only looking at
10  the docket, let's say it's a pro se person who is
11  suing Micron and you don't have the complaint in
12  there yet.
13       Would you still be able to report on that
14  case via the docket entry?
15    A.  Yes.
16    Q.  And tell me why that is.
17    A.  I can see the basic information of the
18  docket.  I can see the defendant and the
19  plaintiff, that it's pro se.  I can't tell you
20  what the complaint is about, but I can see the
21  basic information.
22    Q.  So access to the complaint in that
23  circumstance isn't necessary for your reporting
24  abilities, correct?
25    A.  It's not necessary to report the docket

Page 109

28 (Pages 106 - 109)

1 part, but I would need to see the complaint to be
2 able to do the full report.
3    Q.   And the docket part for any of these
4 complaints would include filer, plaintiff name,
5 defendant name, judge name, and I'm assuming a
6 brief description like legal malpractice, let's
7 say?
8    A.   Not always.
9    Q.   Okay.  And that's when you have to go to
10 the complaint itself?
11    A.   Right.
12    Q.   Have you ever had a subscriber ask for
13 certain dingers or keywords that they want flagged
14 for reporting?
15    A.   I haven't, no.
16    Q.   Are you aware of that ever happening?
17    A.   I am not.  If anybody wanted that
18 particular one, maybe they need to ask for help
19 from CNS, because I don't handle that part of it,
20 if they're just asking for ones with certain
21 dingers.
22    Q.   Let's look to page 14 of Exhibit 21.
23 I'll get there for you.
24       Do you ever yourself use the "Specific
25 Terms and Dinger and Keywords"?
Page 110

1    Q.   Do you know how those -- oh, sorry.  Go
2 ahead.
3    A.   If I don't already have it uploaded and
4 they would like a copy of it, or sometimes they
5 see it ahead of time, they will ask me for it.
6    Q.   And are they able to get there by going
7 to contact customer support at
8 courthousenews.com/customer support?
9    A.   Actually, my name and phone number and
10 email address is at the top of every report.
11    Q.   Okay.  Where then they can call you, "Oh,
12 yeah, Cathy," and then specifically ask for that
13 copy from you?
14    A.   Correct.
15    Q.   Have there ever been times -- let's say
16 for the federal court system.  Let's talk about
17 that.
18       Federal court, how do you report on
19 federal court here in the state of Idaho?
20    A.   I just do the same basic procedure and
21 get the copy of the complaint, take a look at it,
22 and report on it, summarize it.  At that time,
23 almost all of them, unless they're removals or
24 transfers, they will have a copy attached
25 automatically.
Page 112

1    A.   Do I ever use that specific term?
2    Q.   Correct.  Like, do you need to reference
3 this sheet -- you'll see it here on page 14.
4    A.   Oh, yeah.
5    Q.   And what are you using that for?
6    A.   For these keywords?  When I first write
7 up the summary, I put keywords in there so that
8 subscribers can easily find out what the case is
9 about.  And then I write the summary.
10    Q.   And have you ever had a subscriber ever
11 request certain summaries from you or certain
12 types of cases?
13    A.   They request the complaints, but not,
14 like, summaries or dingers from me.
15    Q.   Well, when you say they've requested
16 complaints, have you had subscribers directly
17 reach out to you for copies of complaints?  Or do
18 you mean just through the CNS download?
19    A.   Well, if they see something and it
20 doesn't have a complaint on it, they will often
21 contact me.  And then I can upload it to our
22 reports program so that they can download it.
23    Q.   And that's subscribers reaching out to
24 you?
25    A.   Yes.  If I --
Page 111

1    Q.   But when you say "the same basic
2 procedure," just describe for me, you know, what
3 you do to look at -- you know, filter through the
4 federal court docket.
5    A.   Oh, okay.  Well, for the federal courts,
6 when I look at them, I report on everything,
7 again, that is against a non-individual.
8       There are a lot of times, though, federal
9 courts will have a little more intense cases, and
10 so I report on anything that is newsworthy for
11 that.
12       I don't report on, like, pro se prisoner
13 cases, Social Security cases, student loans,
14 things like that, but it's the same idea.  I just
15 go through and any -- I would say almost all of
16 the federal court cases I will report on.  Some I
17 will not if it's just a car collision between a
18 defendant and a plaintiff and they're both
19 individuals.
20    Q.   To report on federal court cases, you're
21 using the same training and process that CNS has
22 asked you to use through the CNS Daily Reports
23 Style Manual?
24    A.   Yes.  They're slightly different in what
25 they ask for.  For instance, forfeitures I would
Page 113

29 (Pages 110 - 113)

Catherine Valenti November 8, 2022

1 do in USDC Courts, but I would not report on them.
2 I'd still track them but not report on them in
3 state courts.
4        So there are a few exceptions that are in
5 the manual.
6    Q.   So when you go on, tell me what the
7 process is.  What do you go onto for the district
8 court so that you can get your list of cases and
9 then click through?  Is it a docketing process
10 like what you're talking about, and then you'll
11 click on the actual complaint once you see the
12 list of docketed cases?
13    A.   Right.  The cases are there, and they
14 have some basic information.  Sometimes they pull
15 it with the auto track system into our report and
16 I can look at it from there, but I always do a
17 double-check and make sure I don't miss any.
18        So when I look at it on PACER, for
19 instance, they have just the docket part.  And I
20 can click on anything that I want to see, which is
21 the -- I can tell -- if it's a prisoner complaint
22 that has no attorney, I don't have to report on
23 those.
24    Q.   So you have a list of the cases,
25 similar -- it sounds like very similar to what you

Page 114

1 those cases at all?  Or is this all -- your entire
2 job is tasked with just providing the Big Sky
3 Report each day for new case filings that meet
4 CNS's Daily Reports Style Manual guidelines?
5    A.   In the past I have followed some cases.
6 I don't do that now.
7        But if I see one that's particularly
8 newsworthy that we might want a write-up for, say,
9 to post on the website, I will send a copy of that
10 and the information to Chris Marshall.
11    Q.   And how frequently do you believe you do
12 that?
13    A.   Not really often.  It just depends on the
14 day the cases are filed.  So I -- it's not very
15 often.  Maybe once a week or twice a week.  I
16 don't know.
17    Q.   Where will you send those if you want to
18 report?  What do you report them on?
19    A.   If I want a report for --
20    Q.   Well, if you have an already filed case,
21 so you've done your Big Sky Report, but it's one
22 that you think "Oh, that's probably something we
23 may want to report on," you know, that there's
24 been a dismissal or whatever it might be, if you
25 do that, where do you report on it?

Page 116

1 have for state court, and then you're just going
2 to click on it to then get the additional
3 information from the complaint?
4    A.   Right.
5    Q.   And you understand that those are actual
6 filed complaints that you're looking at in federal
7 court?
8        MR. FETTERLY:  Objection; vague and
9 ambiguous, overbroad, lacks foundation, calls for
10 a legal conclusion, all with respect to the phrase
11 "actual filed."
12    Q.   (BY MS. DUKE)  Well, let me ask again.
13        Do you understand that those are filed
14 complaints that you're looking at on the federal
15 court docket system?
16    A.   Yes.
17    Q.   And again, you are not there to report on
18 unfiled complaints in federal court, correct?
19    A.   Correct.
20    Q.   You are there to report on filed
21 complaints?
22    A.   Correct.
23    Q.   Now, with respect to any of the reports
24 that we've looked at and the cases that you report
25 on each day, does CNS expect that you will follow

Page 115

1    A.   Okay.  So if I'm thinking that it might
2 be something we want to write a story on?  Is that
3 what you're asking?
4    Q.   Yes.
5    A.   I send the information to Chris Marshall.
6    Q.   Do you write the stories yourself?
7    A.   I don't now, no.
8    Q.   Did you at some point?
9    A.   I did a few times, yes.
10    Q.   And why is it that you did write a story
11 a few times but haven't since?
12    A.   Most of the time I'm pretty busy with all
13 of the work that I'm doing now.
14    Q.   And then do you know what process
15 Mr. Marshall goes through to determine whether
16 there will be an actual press write-up by CNS on a
17 case that you believe deserves a write-up?
18    A.   I don't know.
19    Q.   And do you know how many he's actually
20 gone forward and actually written something up and
21 reported on?
22    A.   No, I don't know.
23    Q.   Has there ever been a time where there's
24 been an error in your Big Sky Report that you
25 needed to correct?

Page 117

30 (Pages 114 - 117)

1      MR. FETTERLY:  Objection; vague and
2  ambiguous, overbroad, lacks foundation, calls for
3  speculation.
4      You may answer.
5      THE WITNESS:  And by "error," what do you
6  mean by "error"?  A typo?
7      Q.  (BY MS. DUKE)  Well, has there ever been
8  a time where someone has reached out and said,
9  "Hey, your Big Sky Report description is wrong"?
10     A.  No.
11     Q.  Has there ever been a time when someone's
12  reached out and said you needed to somehow modify
13  or change a Big Sky Report that you've done?
14     A.  Yes.
15     Q.  And tell me about those instances.
16     A.  It was with an attorney's office when I
17  had a USDC case.  And the person, the law firm
18  that was attached to it from the PACER program,
19  which is the USDC program, had the incorrect
20  attorney firm.  So all I did was go into my
21  program and delete it out of there.
22     Q.  Any other examples where you have been
23  notified by someone that they feel something is
24  inaccurate in your Big Sky Report?
25     A.  No, other than typos.

Page 118

1      Q.  Well, when you say "typos," you mean
2  somebody will actually call and say, "You have an
3  extra L in my name" or --
4      A.  No.
5      Q.  Nobody's called in -- it sounds like
6  other than that one complaint in the U.S. District
7  Court related to a law firm name being incorrect,
8  you have not had any similar complaints or issues
9  with any of the state court complaints you've
10  reported on in the Big Sky Report; is that
11  correct?
12     A.  Yes.
13     Q.  Do you have any idea what the process
14  would be -- strike that.
15     Do you have any idea how your work would
16  change if the press review queue was initiated in
17  the state of Idaho?
18     A.  I haven't been told anything, but I'm
19  assuming that the biggest change would be I would
20  be able to see the complaints sooner.  There
21  wouldn't be a delay.  I would still follow the
22  same process as far as writing them up, and I'm
23  assuming that I would get training on anything
24  else I need to know.
25     Q.  And so when you say that -- let me read

Page 119

1  your answer there real quick.
2      So when you say you assume the biggest
3  change would be that you would be able to see the
4  complaints sooner, is it your understanding that
5  you'd be able to see the complaints that had been
6  filed sooner?
7      A.  If they were e-filed?
8      Q.  Correct.
9      A.  Yes, I would think so, yes.
10     Q.  And meaning that you'd be able to see
11  them in the court's case management system sooner?
12     MR. FETTERLY:  Objection; vague and
13  ambiguous, overbroad, lacks foundation.
14     THE WITNESS:  That's my understanding.
15     Q.  (BY MS. DUKE)  And meaning that you'd be
16  able to see them on the iCourt portal sooner?
17     MR. FETTERLY:  Objection; vague and
18  ambiguous, lacks foundation, calls for
19  speculation.
20     THE WITNESS:  I don't know if it's the
21  iCourt portal exactly, but wherever they would be,
22  that's where I would be able to see them sooner,
23  yes.
24     Q.  (BY MS. DUKE)  And again, you would only
25  be wanting to report on filed cases, correct?

Page 120

1      A.  Yes.
2      Q.  Okay.  All right.  So let's take a look
3  here --
4      MR. FETTERLY:  Keely, before we move on,
5  this seems like a good pausing point.  Can we just
6  take a quick break?
7      MS. DUKE:  Sure.
8      MR. FETTERLY:  Just five minutes.  And I
9  also wanted to -- off the record.
10     THE VIDEOGRAPHER:  All right.  So the
11  time is 4:11 p.m., and we are off the record.
12     (Break taken from 4:11 p.m. to 4:24 p.m.)
13     THE VIDEOGRAPHER:  All right.  So we are
14  recording.  The time is 4:24 p.m., and we are back
15  on the record.
16     (Deposition Exhibit No. 22 was marked.)
17     Q.  (BY MS. DUKE)  All right.  Let me show
18  you Exhibit 22.
19     First of all, did you talk with anybody
20  on the break?
21     A.  No, I did not.
22     Q.  And did you communicate with anybody on
23  the break in written communications?
24     A.  Nope.
25     Q.  All right.  I'm showing you your

Page 121

31 (Pages 118 - 121)

Catherine Valenti November 8, 2022

1 declaration.
2        Is this the declaration that you reviewed
3 in preparation for your deposition today?
4    A.   Yes, I looked through that.
5    Q.   And tell me why it is you -- what your
6 understanding is as to why you put this
7 declaration together.
8    A.   To explain what I do and how I do
9 reporting.
10    Q.   Okay.  Bear with me one second here.
11        And after reviewing your declaration
12 here, which is marked as Exhibit 22, do you
13 believe that it is still accurate and truthful?
14    A.   Yes.
15    Q.   I'm sorry.  What?
16    A.   Oh, yes, the procedure is accurate.
17    Q.   Well, I mean the declaration.
18    A.   Yes.  Yes, it is.
19    Q.   Okay.  And so as you're under oath today,
20 you understand you were under oath when you
21 reviewed and ultimately signed this declaration?
22    A.   Correct.
23    Q.   You would agree that, as a result of your
24 coverage in the state of Idaho, that you were
25 thoroughly familiar with the press and public

Page 122

1    Q.   Why did you start tracking delays in the
2 Idaho district courts on a statewide basis in May
3 of 2021?
4    A.   That's when I was asked to do so.
5    Q.   That's what we talked about at the start
6 of your deposition; you were asked by CNS to start
7 doing that?
8    A.   Yes.
9    Q.   And to do so, you would begin each
10 morning by checking docketing information from the
11 remote access website.
12        Tell me what that is.
13    A.   I can look and see the docketed reports
14 from my computer at home.  I can't see any of the
15 complaints, but at least I can get started.
16        Since I'm covering 44 counties and have
17 other work to do besides that, it's really nice to
18 have some of that done ahead of time before I go
19 to court.  So I fill in what I can at home.
20    Q.   Then you travel to Ada County to keep
21 looking.
22        And so when you look on your computer at
23 MyCourts at home, mycourts.idaho.gov, what you're
24 seeing is exactly what you're seeing on the iCourt
25 portal, just not with the complaint linked to it;

Page 124

1 access provided by the Idaho courts to the general
2 civil litigation complaints; is that correct?
3    A.   At least for the public, yes, it was
4 correct.
5    Q.   Why do you qualify that as to the public
6 versus the press?
7    A.   Well, I'm assuming that -- I'm looking at
8 what the public can see.  I don't know if that is
9 lumped in with the press or not, so I can't answer
10 that.
11    Q.   Okay.  And why can't you answer that?
12    A.   Because I look at the public kiosk and I
13 don't know if there's a separate press one that I
14 should be looking at or not.  So I don't know.
15    Q.   Got it.  And as you are familiar with the
16 public's access to general civil litigation
17 complaints provided by the Idaho courts, it's your
18 understanding that the public can go to the iCourt
19 portal and access the complaints that have been
20 filed, correct?
21    A.   Yes, that's correct.
22    Q.   All right.  If you go to paragraph 5, it
23 states there -- go ahead and read that to
24 yourself.  I'm going to ask you some questions.
25    A.   Okay.

Page 123

1 is that correct?
2    A.   That's correct.
3    Q.   You then talk about a spreadsheet.  So
4 let me go to that so we can understand that.
5        Okay.  Let me blow that up some.  One
6 second.  Hopefully that will make it bigger.
7        Can you see that?
8    A.   Yes, I can.  Thanks.
9    Q.   Okay.  So is this the spreadsheet that
10 you were talking about that you were asked to
11 start tracking in May of 2021?
12    A.   It is, although I have one for Ada County
13 and one for the rest of the counties.  But this is
14 all the information I'm asked to track for on all
15 of them.
16    Q.   I see.  So this is just a blended version
17 of it?
18    A.   Right.  All the information is there, but
19 I think just for ease of use, it looks like.
20 Because I can see all of them on here.
21    Q.   And so when I look at case number, I
22 understand what that is.  Nature of the case,
23 collections, date docket online, date available.
24        Tell me, when you say "Date Docket
25 Online," what does that mean?  Like, what are you

Page 125

32 (Pages 122 - 125)

(153 of 297), Page 153 of 297, Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 153 of 297
Case 1:21-cv-00305-DCN Document 60-8 Filed 12/15/22 Page 34 of 79
Catherine Valenti November 8, 2022

1 looking to?
2    A.  That's when I open up iCourts and do my
3 searches.  That's when I first see the docket.  So
4 I can put that in there in the morning, for
5 instance.
6        And then when I get to court, if it's
7 available, which it almost always is, when I can
8 see the docket, I can put in the date available
9 and I can see the full text complaint.
10    Q.  Okay.  And so, like, if we take some of
11 these, you know, red ones -- well, did you come up
12 with the color coding?
13    A.  No, I did not.
14    Q.  Have you ever seen this color coding
15 before?
16    A.  Yes.
17    Q.  All right.  And do you know who came up
18 with the color coding?
19    A.  Somebody at CNS, but I don't know who.
20    Q.  Did you do anything to calculate?  See
21 these columns here that say "Delay (by date in
22 calendar days)," "Delay (by date in court days)"?
23        Do you see that?
24    A.  Yes.
25    Q.  Did you do any -- sorry, are you the one

Page 126

1 on them.  But I track all of them.
2    Q.  Do you know if you reported on this
3 complaint, No. 8110?
4    A.  I do not know if I did or not.
5    Q.  And so how are you calculating the date
6 it was docketed online and the date it's
7 available?
8        Do you see that there?
9    A.  Um-hmm.
10    Q.  That's the same day, right?
11    A.  It looks like it, yes.
12    Q.  And yet it then shows something on -- see
13 this column that says "9/1"?
14    A.  Um-hmm.
15    Q.  Where are you getting that information
16 from?
17    A.  I don't put that in there.
18    Q.  Who puts that information in there?
19    A.  Whoever created the spreadsheet.
20    Q.  Do you know who that is?
21    A.  I don't know.
22        MS. DUKE:  Well, Jon, I would ask for the
23 metadata for this spreadsheet that was submitted
24 to the federal court.  So if you want to give it
25 in the original form, that will give us the data

Page 128

1 that made those columns, or did somebody else?
2    A.  No, I think those are auto generated.  I
3 don't do anything with them.
4    Q.  Did you do anything to auto generate
5 those?
6    A.  No.  Well, I put the information in the
7 fields, and if that's what auto generates them,
8 then -- I did not do any creation of the Excel
9 spreadsheet.  I just put that information in.
10    Q.  So this spreadsheet was provided to you
11 by CNS?
12    A.  Correct.
13    Q.  And you just would put the information
14 in?
15    A.  Correct.
16    Q.  And so for instance, if I look here,
17 9/1/21, it's a little hard to track.
18        Do you see how I'm doing that?
19    A.  Yes.
20    Q.  "Collections" here.  Do you see this one?
21    A.  Yes.
22    Q.  Are collections something that CNS has
23 you report on?
24    A.  If they're collections against a
25 business, any non-individual, then I will report

Page 127

1 we need to know who makes additions.
2    Q.  (BY MS. DUKE)  So let me understand
3 this -- I think I'm getting this now, and this
4 will maybe shorten it up for you, Ms. Valenti --
5 is you provide the case number, the nature of the
6 case, the date, docket, online, the date
7 available, lawyer who filed it, meaning not pro
8 se, right?
9    A.  Right.
10    Q.  Which court, and that's where we have our
11 various counties, right?
12    A.  Correct.
13    Q.  And then notes.  And we can look for
14 examples if you have some notes there.  I'll ask
15 you about that.
16        But the next column, do you have any idea
17 what that next column is?
18    A.  The only thing I can think of, and I'm
19 not positive, because usually at the beginning on
20 the left side, I have a date of the filing, when
21 it was filed and the date available.  That might
22 be the date it was filed.  But I'm not sure
23 because it seems like that could be it.  But you
24 would have to ask somebody who gave you this
25 compilation.

Page 129

33 (Pages 126 - 129)

(154 of 297), Page 154 of 297 03/06/2025, DktEntry: 10.9, Page 154 of 297
Case 1:21-cv-00305-DCN   Document 60-8   Filed 12/15/22   Page 35 of 79
Catherine Valenti   November 8, 2022

| | |
|---|---|
| 1   Q.   So -- but that's not a date you entered, | 1      Do you recall that? |
| 2 right? | 2   A.   Yes. |
| 3   A.   I didn't enter it in that order, no. | 3   Q.   And my understanding is you are not |
| 4   Q.   And you don't know that that -- what that | 4 familiar with whatever Tyler Technologies E-File & |
| 5 date represents, I mean, to talk to whomever put | 5 Serve is? |
| 6 it in? | 6   A.   I'm not familiar with that. |
| 7   A.   Yeah, I'm just guessing because of the | 7   Q.   What you are familiar with is the iCourt |
| 8 ones that are green that are all like 9/1, 9/1, | 8 portal, right? |
| 9 9/1, but that was -- actually they missed a | 9   A.   Yes. |
| 10 heading, and that was the date of the complaint, | 10   Q.   And you're also familiar with the "Date |
| 11 the date that is on the complaint, because that is | 11 Docket Online," right? |
| 12 missing from this particular part. | 12   A.   Correct. |
| 13   Q.   What do you mean "they missed a heading"? | 13      MR. FETTERLY:   Vague and ambiguous, |
| 14 I don't know what you mean. | 14 overbroad. |
| 15   A.   Missed the heading -- where it says "Case | 15      You may answer. |
| 16 Number," it shows case, date docket online. There | 16   Q.   (BY MS. DUKE)   And the "Date Docket |
| 17 should be a date filed on there, unless it's over | 17 Online" that's on your spreadsheet here, that is |
| 18 to the -- if you scroll to the left or something. | 18 the date that the document is available on the |
| 19      MR. FETTERLY:   Keely, can you scroll to | 19 docket sheet, correct? |
| 20 the left?   Because I don't think you're showing | 20   A.   Correct. |
| 21 the entire document.   I just opened it on my end, | 21   Q.   And "Date Available" really is the same |
| 22 and I see the date filed on the far left. | 22 as the date docketed; is that correct?   Or is that |
| 23      THE WITNESS:   That's what I think we're | 23 different? |
| 24 missing. | 24   A.   That can be different. |
| 25      MS. DUKE:   Oh, okay.   Let me look.   Maybe | 25   Q.   And when it's different, tell me some of |
| Page 130 | Page 132 |

| | |
|---|---|
| 1 I am -- okay.   "Date Filed."   You're right.   I'm | 1 the circumstances -- I think you've told me some. |
| 2 sorry. | 2 Like pro se filers, right? |
| 3   Q.   (BY MS. DUKE)   So when you look at "Date | 3   A.   Once in a great while, a regular filing |
| 4 Filed," where are you getting that date filed | 4 will be delayed for one reason or another. |
| 5 from? | 5      But most of the time when it's different |
| 6   A.   From the time stamp on the complaint or | 6 it's because I have -- I do a final check of all |
| 7 the docket report if I haven't seen the complaint | 7 of these when I get home. |
| 8 yet. | 8      I don't have access to the courthouse |
| 9   Q.   All right.   So explain that to me.   So | 9 anymore, so at that point I can say all of them |
| 10 "Date Filed," where are you pulling that | 10 that I can see the docket reports, but it's after |
| 11 information from?   From the actual iCourt docket? | 11 hours or they -- I don't know if the court people |
| 12   A.   It's on it, but it's also a time | 12 stay late or not.   I don't know. |
| 13 stamp and a date stamp on the regular complaint as | 13      But I can only see the docket report, and |
| 14 well. | 14 I haven't reported on it yet.   I haven't seen it |
| 15   Q.   Do you know if that time stamp and | 15 at court.   So I put in there the date the docket |
| 16 date -- have you ever asked anyone whether that | 16 is online.   And then the next time I go to court, |
| 17 time and date stamp actually means filed or | 17 I check. |
| 18 submitted? | 18   Q.   Right.   So when we look at this |
| 19   A.   I have not asked them.   I mean, filed or | 19 Exhibit 22, you know how it says "Date Filed" on |
| 20 submitted, I'm not sure I know the difference. | 20 the far left here? |
| 21   Q.   Sure.   I think you don't.   So that's part | 21   A.   Yes. |
| 22 of what I'm getting to is I asked a question | 22   Q.   You're not the one that came up with the |
| 23 earlier on in the deposition as to whether you | 23 names of these categories, correct? |
| 24 were familiar with Tyler Technologies E-File & | 24   A.   Correct. |
| 25 Serve. | 25   Q.   That was come up -- somebody from CNS |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

Catherine Valenti November 8, 2022

Page 134

1  came up with that and said, "Hey, use this; use
2  this document"?
3      A.  Right.
4      Q.  And when you use "Date Filed," when
5  you're filling in that column, what you're doing
6  is you're looking at a little stamp on the
7  documents to identify that date, correct?
8      A.  Correct.  I also look at the docket
9  report, and it's the same.
10     Q.  Right.
11     A.  But if I can't see the complaint, I can
12  see it on the docket.
13     Q.  But when you see it says "Date Docket
14  Online" --
15     A.  Yes.
16     Q.  -- the little stamp you're looking at,
17  where is it when you're filling this in?
18     A.  The "Date Docket Online" is not when I
19  see it.  The "Date Docket Online" is when I can
20  see it myself.
21         So if I go in on the 1st and I can see
22  the docket on the 1st, that's when I'll fill that
23  out.
24         And then if I can't see the complaint
25  until the 2nd, then the "Date Available" would be

Page 135

1  the 2nd instead of the 1st.  So that's what it
2  means.
3      Q.  So let's use this one here.  So you see
4  how you say "Date Docket Online" of 9/9?
5      A.  Right.
6      Q.  That means that's when you could actually
7  access it on the court's iCourt portal, right?
8      A.  That's correct.
9      Q.  That's when you had a docket available?
10     A.  Right.
11     Q.  And then you put "Date Available" that
12  same date.
13         What date are you using to say "Date
14  Available"?  Does that mean the complaint?
15     A.  Yes.  That's when I can see the
16  complaint.
17     Q.  And then if you go all the way over to
18  "Date Filed," what I'm trying to understand is
19  exactly where you're getting what someone has
20  called "Date Filed" on this spreadsheet.
21     A.  The "Date Filed" is the date that is on
22  the docket report and on the full text document.
23  It will say "file date" and -- I'm not sure
24  exactly how it says it.  And then it has that date
25  in there.

Page 136

1         The date the docket is online is when it
2  actually shows up and I can see it in court.
3      Q.  And have you ever talked with -- if you
4  look at these reds, it's my understanding you're
5  not the one that came up with the color coding; is
6  that right?
7      A.  That's right.
8      Q.  And, therefore, you also, I'm assuming,
9  do not know how these number of days are counted,
10  whether they're business hours, whether they're
11  just full 24-hour periods?  You don't know that,
12  correct?
13     A.  Correct, other than what I can see.
14     Q.  Sure.  And have you ever -- on any of
15  these that are marked either yellow, orange, or
16  red, have you ever talked to any of the clerks as
17  to the first column of why there's a date filed of
18  a certain time?
19     A.  I have not.
20     Q.  Has anyone at CNS asked you to talk to
21  any of the court clerks as to whether this
22  attachment to your declaration accurately reports
23  the court's case management file?
24         MR. FETTERLY:  Objection; vague and
25  ambiguous, overbroad, lacks foundation.

Page 137

1         THE WITNESS:  I'm not sure what you're
2  asking, if somebody from CNS --
3      Q.  (BY MS. DUKE)  Well, I'm asking if you or
4  anyone from CNS has actually taken this
5  spreadsheet to any court clerk and asked if you're
6  filling it out correctly.
7      A.  No, I haven't.
8      Q.  And I'm asking if anyone, you or CNS, has
9  taken this to any court clerk to ask if that
10  column "Date Filed" is correctly labeled or not.
11     A.  I have not asked.
12     Q.  And you don't know who came up with that
13  "Date Filed" column; is that correct?
14     A.  I don't know.  Whoever created the
15  spreadsheet, I assume.
16     Q.  Now, have you, since May of 2021 -- are
17  you doing these even to this day, where you're
18  tracking still today?
19     A.  Yes.
20     Q.  And are you submitting those to CNS?
21     A.  Yes, I am.
22     Q.  Who do you submit them to?
23     A.  I submit them to Jon.  And Jimmy
24  Shimabukuro and Chris Marshall and Bill Girdner.
25     Q.  Remind me who Jon is.

35 (Pages 134 - 137)

Catherine Valenti November 8, 2022

| | |
|---|---|
| 1    A.  Jon Fetterly. | 1    Q.  And you're not going to testify to our |
| 2    Q.  Oh, Jon Fetterly. | 2  federal judge in this case as to how one would |
| 3    A.  It's been a while. | 3  interpret this spreadsheet; is that fair? |
| 4    Q.  No problem.  Counsel too, all right. | 4    A.  As far as it's interpreted?  Yeah, it's |
| 5       And how often do you send these to that | 5  just how I report it, what I see. |
| 6  group? | 6    Q.  Correct.  But when it comes to what the |
| 7    A.  Every day at the end of the last time I | 7  columns actually mean, you're not the one that |
| 8  check. | 8  created those, and, therefore, you're not going to |
| 9    Q.  And has that been the case since May of | 9  testify as to what's meant by those columns, |
| 10  2021? | 10  correct? |
| 11    A.  Yes. | 11       MR. FETTERLY:  Objection; vague and |
| 12    Q.  So I should have a daily report that CNS | 12  ambiguous, overbroad, document speaks for itself. |
| 13  and its counsel have from you every single day in | 13    Q.  (BY MS. DUKE)  And do you have any idea |
| 14  the state of Idaho including this data on these | 14  if the "Date Filed" column is actually related to |
| 15  spreadsheets? | 15  the Tyler Technologies File & Serve submission |
| 16    A.  Yes, although there was a time when I was | 16  date? |
| 17  only submitting them once a week.  But I can't | 17       MR. FETTERLY:  Objection; vague and |
| 18  remember when that ended.  And it might have been | 18  ambiguous, lacks foundation, calls for |
| 19  May 2021 when we started doing it daily.  I really | 19  speculation. |
| 20  can't remember now.  But they would have a record. | 20       THE WITNESS:  No, I don't know. |
| 21       MR. FETTERLY:  I want to jump in to avoid | 21    Q.  (BY MS. DUKE)  Do you know whether or not |
| 22  a confusion. | 22  that column, "Date Filed," should actually be |
| 23       As of our last production, whatever the | 23  called "Submitted to Tyler File & Serve"? |
| 24  last time you produced one of these spreadsheets, | 24    A.  I don't know. |
| 25  it would capture all of the information.  It's not | 25    Q.  Those are things you could not answer as |
| Page 138 | Page 140 |

| | |
|---|---|
| 1  multiple spreadsheets.  It's a spreadsheet that | 1  you sit here today, correct? |
| 2  gets added to over time.  So we've produced the | 2    A.  To answer what?  Today? |
| 3  spreadsheet. | 3    Q.  You cannot answer today, or any other day |
| 4       We can produce to you a -- most recent to | 4  at this point, whether or not that "Date Filed" |
| 5  date, happy to do so.  You already have one that | 5  column should actually be called "Submitted |
| 6  has as of the last time we produced it.  But | 6  Through Tyler File & Serve"? |
| 7  that's -- I don't believe that you will find 365 | 7    A.  I could not because I don't know the |
| 8  different spreadsheets.  That's why I want to | 8  procedure once it gets in there. |
| 9  clarify that. | 9    Q.  And you don't -- that's fine.  Thank you. |
| 10       MS. DUKE:  Got it.  And I appreciate | 10       Now, you have a number of conclusions |
| 11  that, Jon. | 11  when you go to paragraph 8 of your declaration. |
| 12    Q.  (BY MS. DUKE)  So this is something that | 12  Let me get there. |
| 13  you add to and then provide them access to, | 13       So when we go to paragraph 8 of your |
| 14  Ms. Valenti? | 14  declaration, can you see that still? |
| 15    A.  Right, every day. | 15    A.  No. |
| 16       MS. DUKE:  Okay.  And, yes, we would like | 16    Q.  Okay.  There it is.  Can you see it? |
| 17  an updated version of that, Jon, before the | 17    A.  Yes. |
| 18  deposition tomorrow. | 18    Q.  Now, when you provide the opinions that |
| 19       MR. FETTERLY:  Sure. | 19  you do in paragraph 8, you're making some |
| 20       MS. DUKE:  For sure, given that that's | 20  assumptions in that, correct? |
| 21  the 30(b)(6) of CNS. | 21    A.  Yes, I am. |
| 22    Q.  (BY MS. DUKE)  All right.  And you've | 22    Q.  You're making an assumption -- or |
| 23  been doing that since May of 2021 when you were | 23  assumptions that you don't know the answer to, as |
| 24  asked to do so? | 24  we were just establishing, with respect to what |
| 25    A.  Yes. | 25  "Date Filed" actually represents in that |
| Page 139 | Page 141 |

36 (Pages 138 - 141)

Catherine Valenti November 8, 2022

Page 142

1 spreadsheet, correct?
2        MR. FETTERLY: Objection; misstates prior
3 testimony, vague and ambiguous, overbroad, lacks
4 foundation.
5        THE WITNESS: I'm not sure if we're
6 talking about the same date. I just know that
7 this is what I put on "Date Filed" as what is time
8 stamped and what is on the docket report.
9        But I don't know what happens as far as
10 when somebody actually does a filing, so I can't
11 answer that.
12    Q. (BY MS. DUKE) And with respect to
13 paragraph 8, you can't answer how Tyler File &
14 Serve is factored into this data that you've been
15 tracking in Exhibit 1, correct?
16    A. I can't answer anything about Tyler,
17 correct.
18    Q. And so you are making assumptions --
19 paragraph 8 is an assumption -- that the
20 complaints are actually filed with the court's
21 case management system on the date you put
22 on -- the date that you enter on the spreadsheet
23 of the date filed, correct?
24        MR. FETTERLY: Objection; vague and
25 ambiguous, overbroad, lacks foundation, misstates

Page 143

1 prior testimony.
2    Q. (BY MS. DUKE) Is that correct?
3    A. This is my understanding, yes.
4    Q. Well, that wasn't my question. My
5 question is you're making assumptions that the
6 "Date Filed" actually represents when the
7 complaint was accepted into the court's case
8 management system, correct?
9        MR. FETTERLY: Objection. Same
10 objections; vague and ambiguous, overbroad, lacks
11 foundation, calls for speculation, calls for a
12 legal conclusion.
13        MS. DUKE: Jon likes this question.
14    Q. (BY MS. DUKE) Is that correct?
15    A. Well, the way you phrased it, I guess if
16 it's an assumption, yes, I am making that
17 assumption.
18    Q. Because you haven't talked to anybody
19 about what those stamps mean, correct?
20    A. Correct.
21    Q. And you haven't talked to anybody about
22 what Tyler File & Serve is?
23    A. Correct.
24    Q. And you haven't talked to anybody about
25 what the process is when a filer submits a

Page 144

1 document through Tyler File & Serve, what it means
2 to be actually filed in the court's case
3 management file, correct?
4    A. Correct.
5    Q. And so with respect to any reporting of
6 data that you do when you look to any of these
7 spreadsheets, so whether you take one of these
8 spreadsheets and say that it needs X, Y, or Z, you
9 don't know any of the information we just went
10 through in providing that response, correct?
11        MR. FETTERLY: Same objections; misstates
12 prior testimony. The witness has testified as to
13 what she knows and the source of the information
14 she enters.
15        MS. DUKE: And what she doesn't know.
16    Q. (BY MS. DUKE) Go ahead.
17    A. I would say that's correct that I don't
18 know for sure. But I just -- like I said, I
19 pulled out the information that's on the complaint
20 and time stamps.
21    Q. Okay. Thank you for that.
22        Now, you've pulled some examples here in
23 paragraph 9. Were those examples that you came up
24 with for your declaration?
25        And, again, if this is attorney-client,

Page 145

1 certainly don't divulge anything that Mr. Fetterly
2 would have told you.
3        But I'm asking you did you actually sit
4 and say, "Wow. Case No. CV 01-21-13641, I didn't
5 get access to that as quickly as I thought I
6 should"?
7        Is that something you brought to CNS's
8 attention?
9    A. I was finding out the cases that were
10 delayed, and yes.
11    Q. So what process did you use to come up
12 with the examples that you provided to our federal
13 district court?
14    A. I looked through the Big Sky Report, and
15 I noted between that and my tracking sheet which
16 complaints that were pretty newsworthy, which
17 complaints had a delay.
18    Q. And you came up with four examples,
19 correct?
20    A. Correct.
21    Q. Why only four examples?
22    A. I don't know why only four. I could have
23 done a lot more, but I think it was just an
24 impression of the examples.
25    Q. And do you know whether -- for the time

37 (Pages 142 - 145)

(158 of 297), Page 158 of 297 Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 158 of 297
Case 1:21-cv-00305-DCN Document 60-8 Filed 12/15/22 Page 39 of 79
Catherine Valenti November 8, 2022

1 frame that these documents were actually filed in
2 the court's case management system?
3     MR. FETTERLY: Objection; vague and
4 ambiguous as to the word "filed," potentially
5 calls for a legal conclusion, overbroad, lacks
6 foundation, calls for speculation.
7     THE WITNESS: So you have to ask the
8 question again. I'm sorry.
9     MS. DUKE: Go ahead and read it back,
10 Amy. Sorry.
11     (The record was read by the reporter.)
12     THE WITNESS: For the time frame? I
13 guess I'm not quite clear on the question, but I
14 know the time frame they were filed versus when I
15 saw them.
16     Q. (BY MS. DUKE) Well, that's because
17 you're making those assumptions we talked about,
18 correct?
19     A. I think so, correct, yes.
20     Q. And so let me ask it this way: Do you
21 know when that first example for the high school
22 graduate working as a page in the Idaho State
23 legislature, do you know when that complaint was
24 transferred from the Tyler Technologies File &
25 Serve system to the district -- or to the Ada

Page 146

1 County court case management system?
2     A. I don't know anything about transferring
3 any of the files. All I know is that the time
4 stamp on it said that particular date.
5     Q. And so you do not know when this
6 complaint would have been reviewed by a court
7 clerk and accepted for filing into the case
8 management document for the court, correct?
9     A. Correct.
10     Q. And that is the same answer for the
11 second example you have there related to a Bitcoin
12 operator, correct?
13     A. Correct.
14     Q. And that's the same for the next example
15 that you have, which is the collision of two
16 planes, correct?
17     A. Correct.
18     Q. And that is also the case for the no
19 wake zone case, correct?
20     A. Correct.
21     Q. With respect to any of those four cases,
22 at any point in time did you write to anyone at
23 CNS that those were newsworthy cases that should
24 be further reported on?
25     A. That is in the report. I don't

Page 147

1 specifically -- well, once I got this one, you
2 know, you send -- you can send in a case -- I
3 don't think I specifically mentioned them, but
4 they're in the Big Sky Report.
5     Q. Well -- I'm sorry, go ahead.
6     A. The tracking report. So are you asking
7 if I told them that these were issues at the time?
8     Q. No. I'm asking whether -- after putting
9 them in the Big Sky Report whether you followed up
10 with these cases and further reported to CNS that
11 these were newsworthy cases that should be
12 followed and further reported on as to how the
13 cases were progressing.
14     A. I don't remember all of -- if I did any
15 of those, but probably did the one with the
16 legislature.
17     MS. DUKE: And, Jon --
18     Q. (BY MS. DUKE) Oh, go ahead.
19     A. I can't remember for sure. But that one
20 would be one I would send in for a story write-up.
21     Q. And do you know if a story write-up was
22 done?
23     A. I do not.
24     Q. All right. When you look to your
25 affidavit here in these examples again, you would

Page 148

1 agree with me that with respect to that first
2 bullet, the high school graduate working as a
3 page, that you are making an assumption that the
4 case was filed on Friday, August 27th, correct?
5     MR. FETTERLY: Objection; vague and
6 ambiguous, misstates prior testimony, lacks
7 foundation, and calls for a legal conclusion.
8     Q. (BY MS. DUKE) So let me ask it this way,
9 Ms. Valenti: These are your written words on this
10 affidavit or declaration, correct?
11     A. Correct.
12     Q. These are words that you would have
13 reviewed and approved before signing?
14     A. Correct.
15     Q. And you chose to use the word "filed"
16 with respect to all four of these bullets.
17     Let me just get them all highlighted for
18 you. There's that one.
19     You would agree with me they all say
20 "filed"?
21     A. Yes.
22     Q. And the word "filed" is a word that you
23 chose to use in this sworn declaration?
24     A. Correct.
25     Q. A declaration that you declared under

Page 149

38 (Pages 146 - 149)

1  penalty of perjury under the laws of the United
2  States of America that was true and correct?
3     A.  Correct.
4     Q.  And your signature is there on the
5  signature page, correct?
6     A.  Correct.
7     Q.  And with respect to "Filed," you felt it
8  was important to note with all four of those what
9  you understood to be the filing date of those
10  complaints, correct?
11     A.  Correct.
12     Q.  And by "Filed," you testified before that
13  "Filed" meant that it actually was in the court
14  file, correct?
15     A.  That's my understanding, correct.
16     Q.  And that means that it would actually be
17  on the docket as of the date filed, correct?
18        MR. FETTERLY:  Objection; vague and
19  ambiguous, misstates prior testimony.
20     Q.  (BY MS. DUKE)  Correct?
21     A.  I mean, it should be, obviously, if it's
22  in the court system.
23     Q.  Because you don't want to report on cases
24  that have not yet had filed complaints, correct?
25     A.  Correct.

Page 150

1     Q.  Because that's not what you are tasked to
2  do by CNS, right?
3     A.  Right.
4     Q.  And what you've been asked to do is only
5  report on cases that are actually filed and
6  initiate a court proceeding, right?
7     A.  That are actually filed, yes.
8        MR. FETTERLY:  Belated objection as to
9  the "actually filed," lacks foundation, calls for
10  speculation, calls for legal conclusion.
11     Q.  (BY MS. DUKE)  Do you have anything else
12  to add?
13     A.  Just that I'm not sure how else to say it
14  was filed except the date that it was time
15  stamped, that it went into the system.
16     Q.  And what's important to you is that it is
17  a filed complaint that initiates a court
18  proceeding, correct?
19     A.  Correct.
20     Q.  Because it is filed complaints that
21  initiate court proceedings that you have been
22  charged by CNS to report on?
23     A.  Correct.
24     Q.  You are not looking to report on
25  non-filed complaints that have not yet initiated a

Page 151

1  proceeding, correct?
2     A.  Correct.
3     Q.  Let me show you your second declaration.
4        All right.  You see that, your
5  supplemental declaration?
6     A.  Yes.
7     Q.  And it's my understanding you did not
8  review this in preparing for today's deposition?
9     A.  Unless it was in the other one, I don't
10  remember seeing -- reviewing that.
11     Q.  You in this declaration, same questions.
12  You understood that you were under oath when you
13  signed this document?
14     A.  Yes.
15     Q.  And you would agree that you would not
16  have signed it if everything contained within it
17  was not true, accurate; is that correct?
18     A.  As far as I know it to be true and
19  accurate, obviously.
20     Q.  Well, and when you say "as far as I know
21  it to be true and accurate," we've been able to
22  establish through this deposition that there were
23  a number of assumptions that were made related to
24  your interpretation of the spreadsheet you were
25  asked by CNS to fill out that you don't know the

Page 152

1  answer to; is that fair?
2     A.  Yes, correct.  We have different ideas of
3  filing dates.
4     Q.  And those are things you have not
5  verified with the court clerks as to how Tyler's
6  File & Serve fits within everything we're talking
7  about here today as to date filed; is that
8  correct?
9     A.  Correct.
10     Q.  And so again, same question with
11  paragraph 3.  Paragraph 3 is just based on
12  assumptions that you've made and have not yet
13  verified as to timing or alleged delays of
14  complaints; is that fair?
15     A.  Yes, that's fair.
16        MS. DUKE:  Jon, let's go ahead and take
17  just a couple minutes, and I think I'm almost
18  done.
19        MR. FETTERLY:  Okay.
20        THE VIDEOGRAPHER:  Okay.  So the time is
21  5:06 p.m., and we are off the record.
22        (Break taken from 5:06 p.m. to 5:11 p.m.)
23        THE VIDEOGRAPHER:  All right.  So we are
24  recording.  The time is 5:11 p.m., and we are back
25  on the record.

Page 153

39 (Pages 150 - 153)

1      MS. DUKE:  Okay.  We're back on the
2   record.
3      Q.  (BY MS. DUKE)  Now, it's my understanding
4   that Carson McCullough will cover for you when you
5   are either sick or on vacation, taking a day off;
6   is that fair?
7      A.  That's fair, yes.
8      Q.  You are the person at CNS that is
9   primarily responsible for reporting in the state
10  of Idaho?
11     A.  Yes.
12     Q.  And when I say "reporting in the state of
13  Idaho," you understand that to mean preparing and
14  distributing the Big Sky Report each day, each
15  workday?
16     A.  Yes.
17     Q.  And does Carson McCullough have anything
18  to do with telling you how to do your job here in
19  the state of Idaho?
20     A.  No.
21     Q.  And do you have to report to him in any
22  way as to how you do your job?
23     A.  I don't report to him, but I give him the
24  information that he needs to sub for me.
25     Q.  Right.  When he's going to sub for you,

Page 154

1   dockets or the actual filed civil complaints so
2   that you could view them the same day of filing or
3   shortly thereafter; is that fair?
4      A.  Yes.
5      Q.  And right now, as you understand it, the
6   electronic inbox is the functional
7   equivalent -- well, strike that.
8         At this point, is it your understanding
9   that by you going to the iCourt portal, you are
10  getting to view the dockets and then obtain the
11  necessary information so that you can timely
12  report on newly filed complaints that initiate a
13  state action in the state of Idaho?
14     MR. FETTERLY:  Objection; vague and
15  ambiguous, overbroad, lacks foundation, calls for
16  a legal conclusion as to "timely," likewise with
17  respect to "filed."
18     THE WITNESS:  I can -- I go there to get
19  the reports and file them as soon as I see them.
20  I think that's what you're asking.
21     Q.  (BY MS. DUKE)  You mean report on them?
22     A.  Report on them, yes.
23     Q.  And do you yourself have an understanding
24  of what the First Amendment means in the context
25  of this lawsuit?

Page 156

1   you're going to provide him with your working
2   documents so that he can use those and catch up?
3      A.  Correct.
4      Q.  Does he physically go to the courthouses,
5   or to the Ada County Courthouse?
6      A.  Yes.
7      Q.  And so he'll do what you do in going and
8   making those reports?
9      A.  Yes.
10     Q.  Are you two basically equals?
11     A.  Yes.
12     Q.  When he's not covering for you, what does
13  he do?  What's his job?  Do you know?
14     A.  He does reports on other -- other
15  aspects.  I'm not sure everything he does, but he
16  does do other work for CNS.
17     Q.  Okay.  But he's not the one primarily
18  responsible for reporting on initial complaints
19  that are filed in the state of Idaho through the
20  Big Sky Reports, right?
21     A.  Correct.
22     Q.  Now, back in the -- we'll call them the
23  olden days of paper filing, the Ada County
24  Courthouse and other counties, as you've
25  indicated, would actually provide you either

Page 155

1      A.  Not being able to get the information out
2   as soon as we get it.  The public's right to know.
3      Q.  And what you do is as soon as you get it,
4   you then advise the public, the subscribers,
5   through the Big Sky Report?
6      A.  Yes.
7      Q.  And do you understand that access to
8   newly filed complaints is consistent with the
9   First Amendment's right of timely access?
10     MR. FETTERLY:  Objection; vague and
11  ambiguous, overbroad, lacks foundation, calls for
12  a legal opinion, calls for a legal conclusion.
13     THE WITNESS:  Yes, I would say timely is
14  important, sure.
15     MS. DUKE:  All right.  Thank you very
16  much for your time.
17     THE WITNESS:  Thank you, Keely.
18     MR. FETTERLY:  Before we go, couple just
19  quick follow-up questions.
20
21         EXAMINATION
22  BY MR. FETTERLY:
23     Q.  Ms. Valenti, bear with me while I bring
24  up my screen here.
25

Page 157

40 (Pages 154 - 157)

1    MR. FETTERLY: And actually, first
2 question to Keely. What was the exhibit number we
3 were using for the Valenti declaration?
4    MS. DUKE: 22. And 23 is the
5 supplemental.
6    (Deposition Exhibit No. 23 was marked.)
7    MR. FETTERLY: Thank you.
8    Q. (BY MR. FETTERLY) So, Ms. Valenti, I'm
9 showing you a portion of your declaration that you
10 were discussing earlier with Ms. Duke concerning
11 Exhibit No. 22. And specifically you were
12 providing testimony concerning this paragraph
13 No. 9.
14    Do you recall that?
15    A. Yes.
16    Q. And you were providing testimony
17 concerning how you ascertained the date on which
18 the complaints identified in paragraph 9 were
19 filed as you described in your declaration.
20    Do you recall that testimony?
21    A. Yes, I do.
22    Q. I'm going to go to Exhibit No. 2. I'm
23 showing you the caption or face page of Exhibit
24 No. 2.
25    Do you see that?

1    A. It's at the top, the time stamp.
2    Q. Now I'm going to go to Exhibit No. 4 and
3 ask you the same line of questions.
4    I'm showing you the face page for Exhibit
5 No. 4.
6    Does this document reflect the date that
7 you used to ascertain the date filed for Exhibit
8 No. 4?
9    A. Yes. 6/24, yes.
10    Q. And where do you see that?
11    A. At the top under "Electronically Filed."
12    Q. Yeah. And so this one, the blue ribbon
13 does not obscure the court's time stamp; is that
14 correct?
15    A. Correct.
16    Q. And what is the first sentence on the top
17 of the U.S. District Court applied time stamp?
18    A. Above the time stamp is "Electronically
19 Filed."
20    Q. Thank you. I'm now showing you Exhibit
21 No. 5, and I'm showing you the face page of
22 Exhibit No. 5.
23    Does this document reflect the date that
24 you used to ascertain the date filed?
25    A. Yes. I think I can see it.

1    A. Yes.
2    Q. Does this document reflect the date that
3 you used to ascertain the date filed?
4    A. On the second, yes.
5    Q. Okay. Where do you see that?
6    A. It's at the top, the time stamp where it
7 says time and date stamp.
8    Q. There's a blue ribbon at the top which is
9 added by the federal court when we file documents.
10 Can you read, or are you familiar with the
11 language at the top of that time stamp applied by
12 the Idaho District Court that's partially obscured
13 by the blue ribbon applied by the U.S. District
14 Court?
15    A. I am sure I could recognize it if I saw
16 it, but it's hard to see right now.
17    Q. Understood. I'm going to go to Exhibit
18 No. 3. This is -- I'm showing you the face page
19 of Exhibit No. 2.
20    A. Okay.
21    Q. Does this face page reflect the date that
22 you used to ascertain the date filed for Exhibit
23 No. 3?
24    A. Yes. 8/27.
25    Q. And where do you see that?

1    Q. I can try to enlarge it for you. And
2 what is it?
3    A. 6/8/2021.
4    Q. And where is that reflected?
5    A. That's on the time stamp at the top.
6    Q. We've just looked at four time stamps on
7 four documents that were attached as exhibits to
8 your declaration.
9    When you track complaints, are you
10 similarly using the same time stamp on those -- on
11 complaints you track when entering the date filed
12 on the courthouse tracking sheet?
13    A. Yes, that's what I use.
14    MR. FETTERLY: Thank you. Nothing
15 further.
16    MS. DUKE: Couple follow-ups for you,
17 Ms. Valenti.
18    If you'd keep that up, Mr. Fetterly, that
19 would be great.
20    MR. FETTERLY: Sure.
21
22    FURTHER EXAMINATION
23 BY MS. DUKE:
24    Q. Again, though, you have not talked with
25 anyone in the district court clerk's office as to

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1839**

1 when or why this stamp is applied as it is,
2 correct?
3    A.  Correct.
4    Q.  And you do not know how Tyler File &
5 Serve factors into the entries that Mr. Fetterly
6 just went through with you, correct?
7    A.  Correct.
8    Q.  And you are not the one who came up with
9 the "Date Filed" column, correct?
10    MR. FETTERLY:  Objection; overbroad,
11 vague and ambiguous, misstates prior testimony.
12    Q.  (BY MS. DUKE)  You're not the one that
13 came up with the "Date Filed" column as in what it
14 was called, correct?  That was provided to you by
15 somebody at CNS?
16    A.  Correct.
17    Q.  And you don't know whether instead it
18 should say "Date Submitted," correct?
19    A.  Correct.
20    MS. DUKE:  All right.  Thank you.
21    MR. FETTERLY:  Nothing further.
22    THE VIDEOGRAPHER:  All right.  Are we
23 done?
24    MS. DUKE:  Yeah.  Thank you.
25    THE VIDEOGRAPHER:  Okay.  So then this

Page 162

1 concludes our video deposition with Cathy Valenti.
2 It is November 8th, 2022.  The time is 5:21 p.m.,
3 and we are off the record.
4
5    (Whereupon the deposition was concluded at 5:21 p.m.)
6              ****
7        (Signature requested.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 163

1                VERIFICATION
2
   STATE OF _____ )
3                        )
   COUNTY OF _____ )
4
5    I, CATHERINE VALENTI, being first duly sworn on my
6 oath, depose and say:
7    That I am the witness named in the foregoing
8 deposition taken the 8th day of November, 2022,
9 consisting of pages numbered 1 to 163, inclusive; that I
10 have read the said deposition and know the contents
11 thereof; that the questions contained therein were
12 propounded to me; the answers to said questions were
13 given by me, and that the answers as contained therein
14 (or as corrected by me therein) are true and correct.
15
16 Corrections Made:  Yes____ No____
17
18
   _____
19         CATHERINE VALENTI
20
21 Subscribed and sworn to before me this ____ day of
22 _____, 2022, at _____, Idaho.
23
   _____
24    Notary Public for Idaho
       Residing at _____, Idaho
25    My commission expires: _____

Page 164

1            REPORTER'S CERTIFICATE
2 STATE OF IDAHO    )
                    )
3 COUNTY OF ADA     )
4
5    I, Amy E. Simmons, Certified Shorthand Reporter and
6 Notary Public in and for the State of Idaho, do hereby
7 certify:
8    That prior to being examined, the witness named in
9 the foregoing deposition was by me duly sworn to testify
10 to the truth, the whole truth and nothing but the truth;
11    That said deposition was taken down by me in
12 shorthand at the time and place therein named and
13 thereafter reduced to typewriting under my direction, and
14 that the foregoing transcript contains a full, true and
15 verbatim record of said deposition.
16    I further certify that I have no interest in the
17 event of the action.
18    WITNE            5th day of November,
19 2022.
20
21
22
23       AMY E. SIMMONS
         CSR, RPR, CRR, CRC, and Notary
         Public in and for the
24       State of Idaho.
25 My commission expires:  6/13/28.

Page 165

42 (Pages 162 - 165)

**[& - 7th]**

| & | 16,672nd  88:19 | 86:16 163:2 | 4 |
|---|---|---|---|
| **&**   2:6 4:15 13:17 14:16 131:24 132:4 140:15,23 141:6 142:13 143:22 144:1 146:24 153:6 162:4 | **16,772**   87:9<br>**161**   3:5<br>**16276**   89:12<br>**163**   164:9<br>**166**   87:23 88:12<br>**166,000**   87:4,7<br>**16600**   87:24<br>**16653**   90:22<br>**16672**   88:18<br>**16676**   88:23 89:24 | 164:8,22 165:19<br>**208**   2:21,22<br>**21**   3:12 40:19,20 40:22,25 51:12 52:1 81:4,18 96:14,15 100:23 110:22<br>**22**   3:14 88:1,7,21 121:16,18 | **4**   3:11 160:2,5,8<br>**40**   3:12<br>**415**   2:16,16<br>**44**   64:20 67:22 124:16<br>**4:11**   121:11,12<br>**4:24**   121:12,14<br>**4th**   17:6 |
| **0** | **16677**   89:12<br>**16699**   87:24 | 122:12 133:19<br>158:4,11 | **5** |
| **00305**   1:4 4:10<br>**01**   88:1,3,6<br>**01-21-13641** 145:4 | **1:12**   2:10 4:5<br>**1:21**   1:4 4:10<br>**1st**   134:21,22 135:1 | **23**   3:16 158:4,6<br>**24**   3:13 136:11<br>**27**   3:11<br>**27th**   149:4 | **5**   3:5,18 123:22 160:21,22<br>**50**   5:25 90:17<br>**55**   5:25<br>**5:00**   37:15,15 |
| **1** | **2** | **29423**   165:21<br>**2:00**   37:11 | 77:21<br>**5:06**   153:21,22 |
| **1**   96:19 142:15 164:9<br>**1-6-6**   87:10<br>**10/11/22**   3:11<br>**10/7/2022**   36:3<br>**100**   15:20 84:15 87:14,22 88:13<br>**100s**   84:15 87:11<br>**1087**   2:20<br>**10:00**   37:11<br>**11**   36:4 40:16<br>**11/19/1957**   5:21<br>**11/7**   84:5<br>**11/7/2022**   87:18<br>**11/7/22**   84:8<br>**121**   3:14<br>**14**   110:22 111:3<br>**157**   3:6<br>**158**   3:16<br>**15th**   165:18<br>**16**   87:16,19 88:8<br>**16,000**   87:9 | **2**   101:1,1 158:22 158:24 159:19<br>**20**   3:11 27:5,7,9 27:13,14 35:10 36:4 40:16 41:16<br>**2015**   9:10,11,21 79:20<br>**2016**   9:3,10 53:10 66:20 79:20<br>**2017**   66:21<br>**2021**   124:3 125:11 137:16 138:10,19 139:23<br>**2022**   1:14 2:9 4:5 17:7 36:4 | **2:03**   39:24,25<br>**2:11**   39:25 40:2<br>**2nd**   134:25 135:1 | **5:11**   153:22,24<br>**5:21**   163:2,5 |
| | | **3** | **6** |
| | | **3**   80:20 81:5,18 96:16 100:23 153:11,11 159:18,23<br>**30**   139:21<br>**300**   2:20<br>**342-3299**   2:22<br>**342-3310**   2:21<br>**365**   139:7<br>**3:00**   78:17,18<br>**3:15**   78:18,20 | **6**   139:21<br>**6/13/28**   165:25<br>**6/24**   160:9<br>**6/8/2021**   161:3<br>**672**   87:20<br>**675-3400**   2:16<br>**675-3434**   2:16<br>**685**   1:22<br>**6:00**   37:23 38:4 |
| | | | **7** |
| | | | **73**   3:15<br>**7387**   2:20<br>**7th**   2:15 86:16 89:4 |

Page 1

## [8 - amendment]

| 8 | 147:7 | 61:20 63:22 | 149:1,19 152:15 |
|---|---|---|---|
| **8** 1:14 141:11,13 141:19 142:13 142:19 | **access** 24:9,12 32:12,19,23 85:14 98:1 101:19 102:11 103:2 105:23 106:2,22,25 108:1,7,11 109:22 123:1,16 123:19 124:11 133:8 135:7 139:13 145:5 157:7,9 | 72:12,19 74:12 74:14 76:2,4 83:1,3,7,12,23 83:24 85:10,15 85:19 86:19,21 86:23 88:5,6,6 88:19 89:4 90:11,13 94:16 94:19 95:17 96:6 98:1,17 101:15 103:8,11 107:23 124:20 125:12 146:25 155:5,23 165:3 | **ahead** 16:17 27:7 30:23 39:14 40:18 50:23 59:11 78:11 81:8 95:25 102:22 104:13 112:2,5 123:23 124:18 144:16 146:9 148:5,18 153:16 |
| **8/27** 159:24 | | | **alleged** 153:13 |
| **8110** 128:3 | | | **allow** 32:12,23 |
| **83707** 2:21 | | | **allows** 105:22 |
| **8:00** 37:9 | | | **ambiguous** 29:18 30:21 31:12 44:3,22 47:24 48:19 49:20 51:15 54:5,23 56:6 57:5 58:7,23 59:9 73:7,20 77:16 98:14 104:5,11,24 105:9 107:7,19 108:15 115:9 118:2 120:13,18 132:13 136:25 140:12,18 142:3 142:25 143:10 146:4 149:6 150:19 156:15 157:11 162:11 |
| **8th** 2:8 4:5 163:2 164:8 | **accessing** 34:19 98:16 101:16 | **add** 139:13 151:12 | |
| **9** | **accuracy** 103:12 | **added** 139:2 159:9 | |
| **9** 144:23 158:13 158:18 | **accurate** 122:13 122:16 152:17 152:19,21 | **addition** 9:5 10:3 11:4,6 | |
| **9/1** 128:13 130:8 130:8,9 | **accurately** 136:22 | **additional** 115:2 | |
| **9/1/21** 127:17 | **action** 46:12 156:13 165:17 | **additions** 129:1 | |
| **9/9** 135:4 | **active** 43:18 | **address** 93:18 101:17 112:10 | |
| **90** 82:6,8 | **actual** 17:16 39:11 47:20 48:3 59:7 63:1 63:20 64:7 65:20 72:25 74:25 97:16 114:11 115:5,11 117:16 131:11 156:1 | **adequately** 19:6 | |
| **94111-4070** 2:15 | | **administrative** 1:8 | |
| **9:00** 37:9 | | **advise** 157:4 | |
| **a** | | **advised** 50:17 | |
| **abilities** 109:24 | | **affidavit** 148:25 149:10 | |
| **ability** 108:11 | | **afternoon** 37:6 | **amended** 16:20 17:2,10 |
| **able** 7:11 25:19 53:14 64:11 79:6,11 82:23 85:14 103:2 108:7 109:13 110:2 112:6 119:20 120:3,5 120:10,16,22 152:21 157:1 | **ada** 2:8 12:6 47:2,7 48:13,15 49:5,16,17 50:1 52:9,12,13,20 53:4,6,21 61:19 | **ago** 43:3,23 54:17 62:23 64:10 | **amendment** 26:20 156:24 |
| **absolutely** 19:13 81:1 | | **agree** 103:12 107:21 122:23 | |
| **accept** 54:1 | | | |
| **accepted** 57:2 58:4 143:7 | | | |

Page 2

## [amendment's - back]

**amendment's**
  157:9
**america**  150:2
**amy**  1:22 2:6
  4:15 7:23
  146:10 165:5,22
**ann**  5:19
**answer**  6:11,22
  7:11,15,17 19:25
  29:19,20 30:22
  31:13,20 32:9
  33:11 48:20
  49:21 51:16
  54:6 56:8 57:7
  58:9 72:4 73:21
  99:12 105:11
  107:24 108:16
  118:4 120:1
  123:9,11 132:15
  140:25 141:2,3
  141:23 142:11
  142:13,16
  147:10 153:1
**answering**  16:22
**answers**  105:16
  164:12,13
**anybody**  33:1
  40:7,11 110:17
  121:19,22
  143:18,21,24
**anymore**  133:9
**anytime**  90:2
**apologize**  62:22
**appeal**  93:25
**appeals**  45:25
  46:3,6
**appearances**
  2:13 4:18

**appeared**  57:22
**applicable**  32:3
**applied**  159:11
  159:13 160:17
  162:1
**applies**  45:24
**appreciate**  79:16
  139:10
**appreciation**
  101:20
**approved**  149:13
**archived**  79:11
**area**  65:12 102:6
**areas**  38:22
**arrived**  49:13
**ascertain**  159:3
  159:22 160:7,24
**ascertained**
  158:17
**aside**  8:1
**asked**  21:6,11,20
  25:24 26:11
  32:13,17 38:7
  43:4 51:19 57:9
  60:7,11 77:13,19
  77:23,25 78:4,5
  98:21 99:6,13,18
  100:19 105:4
  106:9 113:22
  124:4,6 125:10
  125:14 131:16
  131:19,22
  136:20 137:5,11
  139:24 151:4
  152:25
**asking**  7:1 12:22
  14:6,11 15:2
  45:17,21 59:22

98:9 99:1
  105:13 110:20
  117:3 137:2,3,8
  145:3 148:6,8
  156:20
**aspects**  155:15
**assigned**  30:25
**associated**  2:6
  4:15
**assume**  6:12
  105:21,22 120:2
  137:15
**assumes**  99:15
  105:9
**assuming**  9:24
  34:22 57:19
  62:12 89:14
  92:23 96:9
  110:5 119:19,23
  123:7 136:8
**assumption**
  65:18 141:22
  142:19 143:16
  143:17 149:3
**assumptions**
  141:20,23
  142:18 143:5
  146:17 152:23
  153:12
**asterisk**  87:11
  88:12,12
**attach**  95:13
**attached**  112:24
  118:18 161:7
**attachment**
  136:22
**attempted**  99:14

**attention**  145:8
**attorney**  2:5
  7:16 11:18
  19:23 22:15
  32:6 89:15,17
  91:22 114:22
  118:20 144:25
**attorney's**  91:22
  118:16
**august**  149:4
**auto**  114:15
  127:2,4,7
**automatically**
  88:13 112:25
**available**  32:14
  33:9 34:14 82:4
  93:19 102:2
  106:22 109:6
  125:23 126:7,8
  128:7 129:7,21
  132:18,21
  134:25 135:9,11
  135:14
**average**  37:3
**avoid**  8:5 138:21
**aware**  72:5
  76:14,22 110:16

**b**

**b**  3:9 139:21
**back**  36:17 40:2
  40:5 49:2,6,10
  49:17 53:22
  59:17 62:2,23
  66:20,23 78:21
  78:23 79:15,17
  89:8,9 90:16
  91:3 93:22

Catherine Valenti November 8, 2022

**[back - case]**

95:10,14 96:4,13
96:14,15 100:14
121:14 146:9
153:24 154:1
155:22
**ball** 82:22
**balls** 7:2
**bare** 70:3
**based** 14:15
28:16 41:11
53:1 89:1 92:16
97:6 153:11
**basic** 45:9 63:15
73:12 109:17,21
112:20 113:1
114:14
**basically** 7:4
29:25 74:8 86:3
87:14 89:7
155:10
**basis** 24:6 106:6
124:2
**batch** 94:23
**bclplaw.com**
2:17
**bear** 122:10
157:23
**beauty** 16:17
**beginning** 85:5
129:19
**behalf** 4:23
68:20
**belated** 42:18
73:4,6 151:8
**believe** 10:17
12:6 14:2 19:10
22:2 27:3 33:22
36:9 48:2 53:9

53:17 55:9 59:4
65:1 66:2 81:20
116:11 117:17
122:13 139:7
**believed** 89:2
**best** 8:8 101:8
**better** 76:1
87:25
**big** 3:11 27:15
27:16,17,21,24
28:5,9,18,21
35:9 40:15
41:15,18 84:8
87:3 89:3 97:2
100:1,4 105:4
106:11 116:2,21
117:24 118:9,13
118:24 119:10
145:14 148:4,9
154:14 155:20
157:5
**bigger** 125:6
**biggest** 119:19
120:2
**bill** 21:3 50:23
137:24
**billings** 35:21,22
**birth** 5:20
**bit** 15:1 60:10
**bitcoin** 147:11
**blended** 125:16
**block** 88:11,14
**blocks** 15:20
**blow** 125:5
**blue** 159:8,13
160:12
**boise** 2:21

**bones** 70:3
**bonneville** 67:25
71:6,10,12
**bottom** 92:2,4,15
**box** 2:20
**break** 6:17,23
37:10 39:17,25
40:7 67:16
78:12,18,23,25
79:3,5 121:6,12
121:20,23
153:22
**brief** 51:3 110:6
**bring** 44:13,15
47:15 157:23
**brings** 86:2
**broken** 37:8
**brought** 46:12
82:15 145:7
**bryan** 2:14 4:20
**bullet** 149:2
**bullets** 149:16
**business** 50:18
127:25 136:10
**busy** 89:10 90:19
117:12
**butcher** 90:21
**butte** 35:20,21
35:24
**button** 84:24

**c**

**c** 4:1 100:24
**ca** 2:15
**calculate** 126:20
**calculating**
128:5

**calendar** 126:22
**call** 7:2 19:23
20:23 95:6
112:11 119:2
155:22
**called** 16:8 21:23
66:10 119:5
135:20 140:23
141:5 162:14
**calls** 57:5 58:7
58:23 59:9 68:9
104:11,25
107:19,20 115:9
118:2 120:18
140:18 143:11
143:11 146:5,6
149:7 151:9,10
156:15 157:11
157:12
**camera** 78:20
**canyon** 62:7,11
62:19,24 63:8,21
72:24 75:15,17
76:9,11
**capacity** 1:7
**caption** 158:23
**capture** 138:25
**car** 97:5 113:17
**carson** 20:13,16
20:17 154:4,17
**case** 1:4 4:9
11:15,16 14:21
16:7 17:25 18:1
18:17,17,20,23
19:1,3,4,24
22:11 32:4
36:19 49:8
50:18 52:22

Page 4

[case - cns]

| | | | |
|---|---|---|---|
| 56:20 63:1,4,16 | 111:12 113:9,13 | **charged** 93:19 | 77:18 146:13 |
| 73:13,14,18 74:9 | 113:13,16,20 | 98:23 151:22 | **clerk** 47:10,19 |
| 75:8,12 82:12 | 114:8,12,13,24 | **check** 11:8 13:3 | 48:7,13 49:4,16 |
| 85:23 86:3 88:9 | 115:24 116:1,5 | 13:4 15:7,8,15 | 52:10,12 53:25 |
| 88:19 90:1 | 116:14 120:25 | 15:18,23 38:25 | 54:1,10,19 55:8 |
| 91:13 97:5 98:7 | 145:9 147:21,23 | 39:3 70:25 82:8 | 55:11,17 56:14 |
| 98:11 99:24 | 148:10,11,13 | 85:8 90:1 | 57:3,17 62:13 |
| 100:13 101:13 | 150:23 151:5 | 114:17 133:6,17 | 65:14 83:13,14 |
| 103:21 105:7 | **catch** 155:2 | 138:8 | 94:12 137:5,9 |
| 107:16 108:3 | **categories** | **checked** 76:24 | 147:7 |
| 109:14 111:8 | 133:23 | **checking** 124:10 | **clerk's** 73:17 |
| 116:3,20 117:17 | **catherine** 1:13 | **chose** 149:15,23 | 103:1 104:8 |
| 118:17 120:11 | 2:1,4 3:4,14,16 | **chouteau** 34:2,3 | 161:25 |
| 125:21,22 129:5 | 5:7,19 164:5,19 | **chris** 2:24 4:14 | **clerks** 14:10 |
| 129:6 130:15,16 | **cathy** 4:7 19:14 | 13:7,9,10 15:17 | 50:1 70:20 |
| 136:23 138:9 | 39:22 56:7 | 20:13 23:23 | 74:24 136:16,21 |
| 140:2 142:21 | 112:12 163:1 | 116:10 117:5 | 153:5 |
| 143:7 144:2 | **caught** 49:7,23 | 137:24 | **click** 85:1 86:2,6 |
| 145:4 146:2 | 49:24 | **christmas** 78:6 | 86:7,25 89:25 |
| 147:1,7,18,19 | **cave** 2:14 4:20 | **circle** 15:13 | 90:3,20,22 91:13 |
| 148:2 149:4 | **center** 2:15 | 47:12 | 91:18 92:19,21 |
| **cases** 8:23 12:24 | 102:6 | **circumstance** | 93:10,14 101:21 |
| 13:2 15:13,14 | **certain** 51:20 | 109:23 | 101:22 114:9,11 |
| 26:11,15 27:18 | 53:9 63:16 77:8 | **circumstances** | 114:20 115:2 |
| 31:5 32:2 35:11 | 88:10 93:19 | 133:1 | **clickable** 92:20 |
| 37:5 44:18 45:4 | 101:9 110:13,20 | **civil** 44:18 50:4 | **clicking** 92:17 |
| 45:23 46:2 | 111:11,11 | 50:6 88:20 | **client** 19:23 |
| 47:13 50:4,6 | 136:18 | 89:25 102:19 | 22:15 101:2 |
| 52:15 61:12,17 | **certainly** 7:12 | 123:2,16 156:1 | 144:25 |
| 70:2,3 72:22 | 80:16 145:1 | **claims** 26:19 | **clinton** 50:23 |
| 74:12 76:16 | **certificate** 165:1 | 50:9 52:15 | **close** 39:16 |
| 77:20 81:20 | **certified** 165:5 | **clarification** | **closed** 36:23 |
| 83:24 84:10,10 | **certify** 165:7,16 | 22:8 | **closely** 16:5 |
| 84:13,18,23,25 | **cetera** 92:20 | **clarify** 8:9 47:25 | **club** 42:17,21 |
| 85:3,6 86:21,25 | **chair** 6:17 | 48:1 139:9 | 43:1,13,17 |
| 87:6 90:17 94:8 | **chance** 80:13 | **classmate** 89:11 | **cns** 3:12 12:2,21 |
| 96:18 98:5,7 | **change** 118:13 | **clear** 14:12 | 21:14 25:1,12,20 |
| 103:16,25 105:6 | 119:16,19 120:3 | 59:20 72:11,12 | 26:18 28:9,16 |

Page 5

[cns - complaints]

| | | | |
|---|---|---|---|
| 32:13,17,23 33:4 | 90:10 116:4 | **communication** | 114:21 115:3 |
| 33:5,12 34:8,19 | 145:7 | 22:19 | 119:6 124:25 |
| 34:19 35:3 | **coding** 126:12 | **communications** | 126:9 128:3 |
| 36:10 38:7 | 126:14,18 136:5 | 19:24 20:1 | 130:10,11 131:6 |
| 39:11 41:2,4,9 | **collect** 28:25 | 22:15 121:23 | 131:7,13 134:11 |
| 41:11,22,25 42:6 | 29:10 36:13 | **company** 2:6 | 134:24 135:14 |
| 43:4,10 45:11,12 | 69:12,24 | 4:16 90:21 | 135:16 143:7 |
| 46:3 50:12,17 | **collecting** 65:15 | 91:19 92:16 | 144:19 146:23 |
| 51:12,19 52:1,6 | **collection** 86:5 | **compilation** | 147:6 151:17 |
| 53:2 55:2 59:5 | **collections** | 129:25 | **complaint's** |
| 61:9,14 66:1,11 | 125:23 127:20 | **compile** 29:3 | 109:6 |
| 68:5,17 69:17 | 127:22,24 | 31:4,5 | **complaints** |
| 71:18 72:2 75:3 | **collision** 113:17 | **complaint** 11:15 | 12:24 15:11 |
| 75:14,20 76:3,5 | 147:15 | 13:20,21 14:8 | 24:9,13 25:2,14 |
| 76:10,14 77:2,8 | **color** 126:12,14 | 18:7,10,14,22 | 25:19,21,25 |
| 77:19,25 78:5 | 126:18 136:5 | 19:4 25:5 26:9 | 26:20 28:23 |
| 79:18,21,23,25 | **column** 128:13 | 29:14 30:3 31:9 | 30:9 33:7,8 34:8 |
| 80:9 86:15 89:1 | 129:16,17 134:5 | 31:16 32:3,18,24 | 34:19 44:16 |
| 89:2 90:4,5 | 136:17 137:10 | 35:5 36:23 | 45:15 47:20 |
| 93:11,12,20,22 | 137:13 140:14 | 37:21 38:3 | 48:8,15 49:5,7 |
| 93:23,24 94:4 | 140:22 141:5 | 45:13 46:7,9,11 | 50:3,13,17 51:20 |
| 95:24 96:21 | 162:9,13 | 46:12,14,17,22 | 51:23 52:22 |
| 97:7 99:1,13,18 | **columns** 126:21 | 46:24 47:6,7 | 55:15 56:24 |
| 100:6,15 106:9 | 127:1 140:7,9 | 53:25 54:25 | 57:2 62:17 63:4 |
| 110:19 111:18 | **come** 43:21 | 55:7 57:1,22 | 64:15 65:21 |
| 113:21,22 | 61:21 126:11 | 62:13 65:23 | 68:3 70:7 75:5 |
| 115:25 117:16 | 133:25 145:11 | 66:8 68:22 | 75:17 82:18 |
| 124:6 126:19 | **comes** 38:17 | 71:11,20,20 73:2 | 84:21 95:2 |
| 127:11,22 | 79:15 85:2 | 74:6 81:25 | 97:17 98:2 |
| 133:25 136:20 | 140:6 | 82:10 92:18,22 | 100:5,10 104:7 |
| 137:2,4,8,20 | **commencing** 2:9 | 92:25 93:4,7,16 | 104:17,19,20 |
| 138:12 139:21 | **commission** | 94:11 95:18,24 | 107:1,5 108:12 |
| 147:23 148:10 | 164:25 165:25 | 95:25 96:6,23 | 110:4 111:13,16 |
| 151:2,22 152:25 | **communicate** | 97:1,12,19 106:3 | 111:17 115:6,14 |
| 154:8 155:16 | 121:22 | 107:11 108:7,19 | 115:18,21 119:8 |
| 162:15 | **communicating** | 109:11,20,22 | 119:9,20 120:4,5 |
| **cns's** 26:19 | 76:15 | 110:1,10 111:20 | 123:2,17,19 |
| 68:20 69:11 | | 112:21 114:11 | 124:15 142:20 |

Page 6

[complaints - correspond]

| | | | |
|---|---|---|---|
| 145:16,17 | **confusion** 7:11 | 95:18,21,23,25 | 117:25 119:11 |
| 150:10,24 | 138:22 | 96:5,7,10,25 | 120:8,25 122:22 |
| 151:20,25 | **consider** 44:7 | 97:12 100:10 | 123:2,4,20,21 |
| 153:14 155:18 | **consistent** 157:8 | 112:4,13,21,24 | 125:1,2 127:12 |
| 156:1,12 157:8 | **consisting** 164:9 | 116:9 | 127:15 129:12 |
| 158:18 161:9,11 | **contact** 111:21 | **corp** 87:8 | 132:12,19,20,22 |
| **completely** | 112:7 | **corporations** | 133:23,24 134:7 |
| 14:11 | **contained** | 96:25 97:2 | 134:8 135:8 |
| **comply** 80:8 | 152:16 164:11 | **correct** 9:24 | 136:12,13 |
| **computer** 80:14 | 164:13 | 10:2 11:23 | 137:13 140:6,10 |
| 95:17 102:21,24 | **contains** 165:14 | 12:18 18:22 | 141:1,20 142:1 |
| 105:16 108:2 | **content** 22:20 | 19:5 22:16 | 142:15,17,23 |
| 124:14,22 | **contents** 20:1 | 25:22,23 28:1 | 143:2,8,14,19,20 |
| **computers** | 164:10 | 30:10 34:21 | 143:23 144:3,4 |
| 102:10,11,18 | **contest** 6:15 | 35:6,23 37:25 | 144:10,17 |
| **concern** 24:25 | **context** 156:24 | 38:5,6 41:12,20 | 145:19,20 |
| 25:4,12,16,18 | **continue** 96:18 | 42:15,23,24 | 146:18,19 147:8 |
| **concerned** 25:1 | **continuing** 27:6 | 44:17 50:14,15 | 147:9,12,13,16 |
| **concerning** | **conversation** | 50:20,21 51:13 | 147:17,19,20 |
| 158:10,12,17 | 21:22 22:1 | 51:17,21 52:16 | 149:4,10,11,14 |
| **concluded** 163:5 | **conversations** | 52:24 54:20 | 149:24 150:2,3,5 |
| **concludes** 163:1 | 21:3 22:13 | 56:15 57:3,14,23 | 150:6,10,11,14 |
| **conclusion** 57:5 | 23:10 26:17 | 59:23,25 60:4,5 | 150:15,17,20,24 |
| 58:8,24 59:10 | **converted** 53:6 | 60:21,22 63:7 | 150:25 151:18 |
| 104:12,25 | **copies** 8:24 | 70:21 71:25 | 151:19,23 152:1 |
| 107:20 115:10 | 47:15,16 50:2 | 72:22 74:21 | 152:2,17 153:2,8 |
| 143:12 146:5 | 62:4 72:25 | 77:14,22,24 80:3 | 153:9 155:3,21 |
| 149:7 151:10 | 82:18 94:9 | 82:1 83:6,22 | 160:14,15 162:2 |
| 156:16 157:12 | 111:17 | 89:4,18 93:5,20 | 162:3,6,7,9,14 |
| **conclusions** | **copy** 9:13 10:20 | 96:12 98:24,25 | 162:16,18,19 |
| 141:10 | 27:14 30:3 | 99:19 100:2,20 | 164:14 |
| **condense** 45:4 | 47:16 53:25 | 100:21 103:13 | **corrected** 164:14 |
| **confirm** 7:12 | 56:2,3,10,10,13 | 103:18,22 104:2 | **corrections** |
| 10:23 | 56:15,18,21 57:9 | 104:3,9,17 105:1 | 164:16 |
| **confused** 18:21 | 57:11 63:6 | 105:2 106:4 | **correctly** 5:15 |
| **confusing** 7:10 | 66:24 67:3 | 108:4 109:24 | 137:6,10 |
| 87:13 | 68:25 82:21 | 111:2 112:14 | **correspond** 79:3 |
| | 93:15 94:10 | 115:18,19,22 | |

Page 7

[counsel - created]

**counsel** 4:17
  7:12 20:6 22:14
  23:8 26:18
  138:4,13
**counted** 136:9
**counter** 64:3,4,6
**counties** 12:12
  12:15,16 24:15
  28:25 30:24
  31:1 32:12
  33:15,23 34:20
  35:3 47:3 62:9
  63:13,25 64:10
  64:11,18,21,21
  67:22 68:1,4,16
  68:18 70:12,14
  70:15,18 71:7
  74:20 75:22
  77:3 94:17,25
  95:1,6,9 103:4
  103:10 124:16
  125:13 129:11
  155:24
**county** 2:8 11:20
  12:6 29:15 32:4
  32:10,10 47:2,2
  47:7 48:13,15
  49:5,16,17 50:2
  52:9,12,13,20
  53:4,6,21 54:19
  61:19,20 62:1,7
  62:11,19,24 63:9
  63:12,21,23
  64:14 65:1,10,14
  67:11,11 69:1
  71:6,8,12 72:13
  72:19,24 74:12
  74:14 75:2,5,7

  75:15,18 76:2,4
  76:9,11,16 79:9
  83:1,3,7,12,23
  83:24 85:4,10,12
  85:15,19 86:19
  86:21,23 87:3
  88:5,6,6,19 89:4
  90:11,13 94:16
  95:4,17 96:6
  98:1,17 101:15
  103:2,8,11
  107:23 124:20
  125:12 147:1
  155:5,23 164:3
  165:3
**county's** 67:21
  73:17
**couple** 6:4 36:21
  64:11 102:5
  153:17 157:18
  161:16
**course** 11:9
  28:24
**court** 1:1 2:7
  4:10 5:4 7:23
  8:19 15:13 16:3
  16:4 17:23,24,25
  21:9 24:14 29:6
  29:7,8,10 32:23
  34:16,25 35:17
  35:17 36:6,7,11
  36:15 37:11,13
  37:15,22 38:8,18
  44:18,20 45:1,2
  45:5,21 46:4,6
  46:13,18 47:13
  48:9,13 49:16
  50:4,6,13,17

  52:24 54:25
  55:7,11,16 57:3
  57:17,21 58:3,4
  59:7 61:20,20
  63:21 64:7
  65:20 68:6,21
  70:20 71:20
  73:1,16 74:15,16
  74:25 75:9
  84:10,13,18,23
  84:25 85:2,6,16
  85:20 86:25
  87:5 88:4,20
  90:1,9 91:25
  94:12 98:2 99:2
  99:11 101:21
  103:3 104:7
  107:13 108:4
  112:16,18,19
  113:4,16,20
  114:8 115:1,7,15
  115:18 119:7,9
  124:19 126:6,22
  128:24 129:10
  133:11,15,16
  136:2,21 137:5,9
  145:13 147:1,6,8
  150:13,22 151:6
  151:17,21 153:5
  159:9,12,14
  160:17 161:25
**court's** 74:3
  98:11 104:1,21
  105:7 107:16
  120:11 135:7
  136:23 142:20
  143:7 144:2
  146:2 160:13

**courthouse** 1:4
  3:14,17 4:8,21
  5:1 9:2,17,19
  16:24 17:17
  20:17 21:16
  23:4,8,15 37:6
  45:8 53:24
  58:12 60:12
  71:12 83:5
  85:15 98:2,17
  101:16 133:8
  155:5,24 161:12
**courthousene...**
  112:8
**courthouses**
  39:9 107:23
  155:4
**courts** 1:8 13:1,6
  25:2,14 30:10
  38:19,25 39:2
  70:6 81:7 113:5
  113:9 114:1,3
  123:1,17 124:2
**cover** 49:12
  154:4
**coverage** 122:24
**covered** 19:7
  26:23 77:4
**covering** 75:6
  84:3 124:16
  155:12
**covers** 20:19
**crash** 97:5
**crc** 1:22 165:23
**create** 55:17
**created** 11:24
  128:19 137:14
  140:8

Page 8

(171 of 297), Page 171 of 297, 03/06/2025, 24-6697, 03/06/2025, 19.9, Page 171 of 297
Case 1:21-cv-00305-DCN, Document 60-8, Filed 12/15/22, Page 52 of 79
Catherine Valenti November 8, 2022

**[creation - deposition]**

| | | | |
|---|---|---|---|
| **creation** 127:8 | 73:14 125:23,23 | 38:3 48:22,24 | 32:5 55:2 73:14 |
| **credentialed** | 125:24 126:8,21 | 49:14,15 55:19 | 109:18 110:5 |
| 42:22 43:25 | 126:22 128:5,6 | 70:11,13 72:19 | 113:18 |
| 44:4 | 129:6,6,20,21,22 | 72:21 76:4,6,8 | **defendant's** 17:3 |
| **credentials** | 130:1,5,10,11,16 | 76:24 78:2,6,7 | 17:10 |
| 42:12,13,14,17 | 130:17,22 131:1 | 84:1 90:18 | **defendants** 4:8 |
| **criteria** 55:2 | 131:3,4,10,13,16 | 94:23 98:6,7 | 50:20 |
| 68:7 90:4,10 | 131:17 132:10 | 108:25 115:25 | **definition** 44:3 |
| **crr** 1:22 165:23 | 132:16,18,21,22 | 116:3,14 128:10 | **delay** 108:11,21 |
| **csr** 1:22 165:23 | 133:15,19 134:4 | 137:17 138:7,13 | 109:1 119:21 |
| **current** 49:12 | 134:7,13,18,19 | 139:15 141:3 | 126:21,22 |
| 101:5 | 134:25 135:4,11 | 154:5,14 156:2 | 145:17 |
| **currently** 42:10 | 135:12,13,13,18 | 164:8,21 165:18 | **delayed** 25:6 |
| **customer** 112:7 | 135:20,21,21,23 | **days** 36:18 49:6 | 133:4 145:10 |
| 112:8 | 135:24 136:1,17 | 49:11 53:23 | **delays** 25:25 |
| **customers** 99:4 | 137:10,13 139:5 | 91:3 100:14 | 124:1 153:13 |
| **cv** 1:4 4:10 145:4 | 140:14,16,22 | 126:22,22 136:9 | **delete** 118:21 |
| **cv01** 90:2 | 141:4,25 142:6,7 | 155:23 | **depending** 87:3 |
| **cv01-22-16672** | 142:21,22,23 | **dcn** 1:4 4:10 | 89:20 |
| 87:19 | 143:6 147:4 | **death** 97:3 | **depends** 29:24 |
| | 150:9,17 151:14 | **debt** 86:5 | 49:23 90:18 |
| **d** | 153:7 158:17 | **decide** 56:17 | 95:4 116:13 |
| **d** 3:1 4:1 | 159:2,3,7,21,22 | **declaration** 3:14 | **depose** 164:6 |
| **daily** 3:12 29:2 | 160:6,7,23,24 | 3:16 10:6,18,21 | **deposition** 1:13 |
| 51:12 52:1 77:1 | 161:11 162:9,13 | 122:1,2,7,11,17 | 2:1,4 4:7,12,14 |
| 79:18,25 80:9 | 162:18 | 122:21 136:22 | 6:1 7:5 8:16 |
| 81:7 89:1 90:5,5 | **dated** 3:11 9:10 | 141:11,14 | 9:21 10:5,25 |
| 113:22 116:4 | 79:20 86:15 | 144:24 149:10 | 16:2 17:12 18:5 |
| 138:12,19 | **dates** 153:3 | 149:23,25 152:3 | 18:11 19:8,18,20 |
| **data** 32:21 87:8 | **daughter** 51:5 | 152:5,11 158:3,9 | 20:6,12 21:1,4 |
| 128:25 138:14 | 69:19 76:21 | 158:19 161:8 | 22:25 23:2,16 |
| 142:14 144:6 | 77:5 | **declarations** | 26:25 27:2,9 |
| **database** 87:15 | **daughter's** 79:7 | 10:8 15:24 | 40:20 60:2 |
| **date** 4:4 5:20 | 79:12 | **declared** 149:25 | 121:16 122:3 |
| 11:14,16,17 14:3 | **day** 2:9 21:16 | **defamation** 94:7 | 124:6 131:23 |
| 17:5 32:4 35:12 | 26:5 27:19 31:5 | 97:4 | 139:18 152:8,22 |
| 35:13 36:4 | 34:15,23,24,25 | **defendant** 1:9 | 158:6 163:1,5 |
| 49:12 57:13 | 36:16 37:2,14 | 2:5,18 11:19 | 164:8,10 165:9 |

Page 9

(172 of 297), Page 172 of 297 Case: 24-6697, 03/06/2025, DktEntry: 19.9, Page 172 of 297
Case 1:21-cv-00305-DCN  Document 60-8  Filed 12/15/22  Page 53 of 79
Catherine Valenti November 8, 2022

[deposition - documents]

| | | | |
|---|---|---|---|
| 165:11,15 | **direct** 13:10 | 159:12,13 | 135:9,22 136:1 |
| **depositions** 93:3 | **directed** 30:14 | 160:17 161:25 | 142:8 150:17 |
| **describe** 11:11 | **direction** 165:13 | **districts** 96:9 | **docketed** 62:13 |
| 24:11 29:13 | **directions** 80:8 | **divulge** 20:1 | 72:22 73:15,16 |
| 47:5 113:2 | **directive** 50:12 | 145:1 | 75:10 104:8,17 |
| **described** 51:25 | **directly** 111:16 | **docket** 11:16 | 104:19 108:12 |
| 103:7 158:19 | **director** 1:8 | 32:1 37:4 38:8 | 108:17 114:12 |
| **description** | **discovery** 16:10 | 47:9,19 48:7,14 | 124:13 128:6 |
| 110:6 118:9 | 16:10 92:25 | 48:21 49:1,4,16 | 132:22 |
| **deserves** 117:17 | **discrepancy** | 49:25 52:17,21 | **docketing** 52:8 |
| **designator** 88:1 | 95:5 | 55:17,20,23 | 52:11 81:5,18 |
| 88:3 | **discretion** 97:6 | 56:25 61:23 | 96:17 97:15 |
| **details** 23:18,22 | 97:13 | 63:22 64:9,23 | 100:24 108:3,6 |
| **determine** 38:9 | **discussed** 21:18 | 65:21 68:24,25 | 114:9 124:10 |
| 56:2 62:16,17 | **discussing** | 69:6,13 72:20 | **dockets** 64:24 |
| 74:17 79:6 | 158:10 | 73:6,9,12,23,25 | 69:14 92:24 |
| 82:20 83:25 | **dismissal** 116:24 | 74:5,7,11,23 | 99:22 156:1,10 |
| 84:7 91:9,13 | **distributing** | 75:4 76:20 77:4 | **document** 13:16 |
| 94:6 97:8 100:5 | 154:14 | 81:21 82:5,11,16 | 17:1,24 27:11 |
| 100:12 117:15 | **district** 1:1,2 | 82:20 83:7,12 | 46:18 53:18 |
| **determining** | 4:10,11 15:13 | 85:21 86:2 87:1 | 57:17 58:3 |
| 52:5 67:3 | 24:13 29:6 | 90:24,25 91:1,2 | 92:19,20,21 96:5 |
| **developed** 11:24 | 35:16 37:22,22 | 91:9,12,18,20 | 130:21 132:18 |
| **difference** 45:12 | 38:18 44:18 | 92:15,17 93:6 | 134:2 135:22 |
| 131:20 | 47:13 49:16 | 97:19 98:18 | 140:12 144:1 |
| **differences** | 50:4,6,13,16 | 101:6,7,10,11 | 147:8 152:13 |
| 45:17 | 52:24 54:25 | 108:18 109:7,10 | 159:2 160:6,23 |
| **different** 20:3 | 55:7,11,16 57:16 | 109:14,18,25 | **documents** 10:4 |
| 27:18 70:2 | 57:21 68:6,21 | 110:3 113:4 | 10:24 16:1,13,15 |
| 94:17 101:25 | 71:20 84:10,12 | 114:19 115:15 | 17:4 18:1,4,17 |
| 113:24 132:23 | 84:17,23,25 85:2 | 125:23,24 126:3 | 18:23 19:7 |
| 132:24,25 133:5 | 85:6,16,19 86:24 | 126:8 129:6 | 26:13,24 47:22 |
| 139:8 153:2 | 87:5 88:4 89:25 | 130:16 131:7,11 | 55:21 66:11,12 |
| **difficult** 8:6 | 90:9 91:25 98:2 | 131:12 132:11 | 74:1,8,16 98:10 |
| **dinger** 110:25 | 103:3 104:7 | 132:16,19 | 98:19,24 99:2,19 |
| **dingers** 110:13 | 108:3 114:7 | 133:10,13,15 | 99:23 134:7 |
| 110:21 111:14 | 119:6 124:2 | 134:8,12,13,18 | 146:1 155:2 |
| | 145:13 146:25 | 134:19,22 135:4 | 159:9 161:7 |

Page 10

Catherine Valenti   November 8, 2022

## [doing - event]

**doing** 7:20,22
8:10,22,25 10:18
14:24 24:23
31:8 37:4 58:12
60:12 102:25
103:15 109:2
117:13 124:7
127:18 134:5
137:17 138:19
139:23
**double** 114:17
**download** 16:16
93:11,12,23,23
93:25 95:24
100:6 111:18,22
**downloaded**
94:6
**drive** 31:1
**duke** 2:18,19 3:5
4:22,22 5:13
20:2,5 22:16
27:10 29:22
30:23 31:15,23
39:14,20 40:4,21
42:20 44:7,25
47:25 48:5,6,24
49:25 51:2,4,9
51:10,17,19
54:12,24 56:7
57:11 58:9 59:4
59:11 68:12
73:8,24 77:17,19
78:11,22 80:22
81:1,3 98:15
99:18 104:6,13
105:1,18 107:10
107:21 109:4
115:12 118:7

120:15,24 121:7
121:17 128:22
129:2 130:25
131:3 132:16
137:3 139:10,12
139:16,20,22
140:13,21
142:12 143:2,13
143:14 144:15
144:16 146:9,16
148:17,18 149:8
150:20 151:11
153:16 154:1,3
156:21 157:15
158:4,10 161:16
161:23 162:12
162:20,24
**dukeevett.com**
2:22,23
**duly** 5:8 164:5
165:9
**duties** 10:1

### e

**e** 1:22 2:6,19,19
3:1,2,9 4:1,1
65:11 82:14
83:2,2 100:20
105:5 120:7
131:24 132:4
165:5,22
**earlier** 9:22 16:5
21:23 131:23
158:10
**ease** 125:19
**easier** 80:17
83:14

**easily** 85:5 111:8
**edit** 29:11
**editing** 30:5
**education** 44:19
**effort** 68:5
**either** 22:1 29:2
38:23 66:6
74:23 136:15
154:5 155:25
**electric** 33:21
**electronic** 33:15
33:18 36:8 47:4
47:8 49:18
52:13 53:5,7,7
53:22 63:9
64:22 67:12
68:8,23 71:21
72:8,16,18 76:17
77:9 80:2 96:4
156:6
**electronically**
62:3 109:2
160:11,18
**elmore** 62:8
63:12 74:19
75:21
**email** 30:2 66:3
66:6 70:22
86:14 93:17
94:23 95:7,9,14
112:10
**emailed** 67:19
70:24 94:13,15
**emailing** 60:3
**emails** 66:5 67:6
67:6,7,10 79:6,8
**embarcadero**
2:15

**employed** 30:7
**employee** 69:17
**employees** 69:11
**encompass**
15:20
**ended** 138:18
**endurance** 6:15
**enlarge** 161:1
**ennis** 2:24 4:14
**ensured** 21:20
**entailed** 24:12
**entails** 13:25
**enter** 108:23
130:3 142:22
**entered** 107:13
130:1
**entering** 161:11
**enterprises**
105:19
**enters** 144:14
**entire** 81:11
116:1 130:21
**entitled** 2:10
**entity** 9:16 50:19
**entries** 162:5
**entry** 109:14
**equals** 155:10
**equivalent** 156:7
**error** 117:24
118:5,6
**esq** 2:14,19,19
**establish** 152:22
**establishing**
141:24
**et** 92:20
**evaluation** 71:15
**event** 165:17

Page 11

**ER-1851**

[eventually - file]

| | | | |
|---|---|---|---|
| **eventually** 96:18 | 81:18 96:14,15 | 140:3 153:1,14 | 22:12,17 29:17 |
| **evett** 2:18 | 100:23 110:22 | 153:15 154:6,7 | 29:21 30:20 |
| **exact** 91:24 | 121:16,18 | 156:3 | 31:11,18 39:22 |
| **exactly** 12:9 | 122:12 133:19 | **fall** 87:22 | 40:10 42:18 |
| 21:19,24 22:23 | 142:15 158:2,6 | **fallon** 34:2 39:3 | 44:2,21 47:23 |
| 24:4 43:2 45:16 | 158:11,22,23 | **falls** 64:19 67:25 | 48:2,18 49:19 |
| 46:1 49:12 | 159:17,19,22 | **familiar** 122:25 | 51:8,14 54:4,22 |
| 53:10 57:24 | 160:2,4,7,20,22 | 123:15 131:24 | 56:5 57:4 58:6 |
| 66:16 120:21 | **exhibits** 27:6 | 132:4,6,7,10 | 58:22 59:8 |
| 124:24 135:19 | 39:17 161:7 | 159:10 | 60:25 68:9 73:4 |
| 135:24 | **expect** 115:25 | **familiarity** 14:7 | 73:19 77:15 |
| **examination** | **experian** 87:8 | **famous** 50:22 | 78:15 80:24 |
| 5:12 157:21 | 89:17 | **far** 12:14 14:12 | 81:2 98:13 |
| 161:22 | **expires** 164:25 | 27:22 33:10 | 99:15 104:4,10 |
| **examined** 165:8 | 165:25 | 45:22 57:8 | 104:23 105:8 |
| **example** 13:20 | **explain** 42:13 | 58:10 66:23 | 107:6,18 108:14 |
| 14:7 29:5 31:24 | 87:13 122:8 | 76:24 80:4 92:7 | 115:8 118:1 |
| 35:15 36:17 | 131:9 | 105:15 119:22 | 120:12,17 121:4 |
| 146:21 147:11 | **explained** 54:7 | 130:22 133:20 | 121:8 130:19 |
| 147:14 | **explains** 87:25 | 140:4 142:9 | 132:13 136:24 |
| **examples** 14:25 | **extent** 19:22,25 | 152:18,20 | 138:1,2,21 |
| 118:22 129:14 | 22:13 | **fast** 39:18 94:19 | 139:19 140:11 |
| 144:22,23 | **extra** 119:3 | **federal** 35:17 | 140:17 142:2,24 |
| 145:12,18,21,24 | **f** | 36:6,7,11,15 | 143:9 144:11 |
| 148:25 | | 38:8 112:16,18 | 145:1 146:3 |
| **excel** 11:13,21 | **face** 158:23 | 112:19 113:4,5,8 | 149:5 150:18 |
| 11:24 127:8 | 159:18,21 160:4 | 113:16,20 115:6 | 151:8 153:19 |
| **exceptions** 81:14 | 160:21 | 115:14,18 | 156:14 157:10 |
| 91:16 96:17 | **facsimile** 2:16,22 | 128:24 140:2 | 157:18,22 158:1 |
| 100:25 108:20 | **fact** 103:21 | 145:12 159:9 | 158:7,8 161:14 |
| 114:4 | **factored** 142:14 | **fee** 28:5 92:11,12 | 161:18,20 162:5 |
| **excuse** 42:19 | **factors** 162:5 | 93:19 | 162:10,21 |
| **exhibit** 3:11,12 | **facts** 99:15 | **feel** 118:23 | **fetterly's** 22:18 |
| 3:14,16 27:5,7,9 | 105:10 | **felt** 150:7 | **field** 85:1 |
| 27:13,14 35:10 | **fair** 6:13,23,24 | **fetterly** 2:14 3:6 | **fields** 32:6 127:7 |
| 36:4 40:16,19,20 | 7:17 12:13 | 4:19,19 5:1,2 | **file** 13:17 14:1 |
| 40:22,25 41:16 | 54:15 56:21 | 19:22 20:10,11 | 14:16 31:22 |
| 51:12 52:1 81:4 | 72:5 107:17 | 20:23 21:1 | 54:1 55:6 56:14 |

Page 12

(175 of 297), Page 175 of 297
Case 1:21-cv-00305-DCN Document 60-8 Filed 12/15/22 Page 56 of 79
Catherine Valenti November 8, 2022

**[file - folks]**

58:14 60:14
62:20,25 63:1,21
74:3,15,16 92:25
100:16,17
131:24 132:4
135:23 136:23
140:15,23 141:6
142:13 143:22
144:1,3 146:24
150:14 153:6
156:19 159:9
162:4
**filed** 14:1,2
18:14 24:2,5,13
24:25 25:2,13,19
25:21,25 26:9,20
29:14 30:9
31:10,17 32:18
32:19,24 33:7,8
34:8 35:5,6,11
35:14 36:3
37:21 38:4,9,11
44:16 46:4,18,22
47:6,7,20 48:3,8
48:15 49:4
51:20,23 52:22
52:23 54:8,11
55:13,16,21 57:3
57:18 58:19,21
59:3,6 60:9,20
60:24 61:3,9,12
61:16 62:17
63:3 64:9,15
65:21 70:3,7
71:11,11,19
72:21 73:2,17
74:2,4,9,12,16
75:5,17 77:21

78:2,8 81:24
86:24 87:25
88:19 89:21
91:23 92:3,4,18
93:7 95:3 98:3
98:10,19 99:2,9
99:19,23 103:17
103:21,24
104:21,24 105:6
105:15,23
106:25 107:12
107:15 115:6,11
115:13,20
116:14,20 120:6
120:7,25 123:20
129:7,21,22
130:17,22 131:1
131:4,4,10,17,19
133:19 134:4
135:18,20,21
136:17 137:10
137:13 140:14
140:22 141:4,25
142:7,20,23
143:6 144:2
146:1,4,14 149:4
149:15,20,22
150:7,12,13,17
150:24 151:5,7,9
151:14,17,20,25
153:7 155:19
156:1,12,17
157:8 158:19
159:3,22 160:7
160:11,19,24
161:11 162:9,13
**filer** 53:24 99:8
109:2 110:4

143:25
**filers** 133:2
**files** 13:23 64:12
65:20 73:1
74:25 88:13
147:3
**filing** 13:25
29:16 33:15,18
33:21 36:8 47:8
49:18 52:13
53:5,7,8,22 58:4
61:22 62:3,3
63:16 64:7
65:11 67:12
68:5,8,23 71:21
72:16,18 76:17
77:9 80:1,2
82:14 83:2,2,13
91:3 92:11,12
98:22 100:14,15
100:20 103:2
104:2,22 129:20
133:3 142:10
147:7 150:9
153:3 155:23
156:2
**filing's** 105:5
**filings** 16:4,8
30:13 31:25
32:14 36:6,11
45:9 62:13
63:16 68:6,22
85:16 99:14
116:3
**fill** 95:13 124:19
134:22 152:25
**filling** 134:5,17
137:6

**filter** 51:25
113:3
**filtering** 84:23
**final** 133:6
**find** 12:9 70:7
82:8 111:8
139:7
**finding** 145:9
**fine** 141:9
**finish** 7:21 37:16
**firm** 118:17,20
119:7
**first** 5:8 6:7 7:10
10:17,19 12:4
16:19,20 17:2,3
17:9 26:4,20
57:22 79:12
81:15,17 82:5
84:9,18 85:25
86:8,22 89:13
105:23 111:6
121:19 126:3
136:17 146:21
149:1 156:24
157:9 158:1
160:16 164:5
**fits** 55:2 153:6
**five** 39:20 78:13
86:21 89:2
90:10 121:8
**flagged** 110:13
**flathead** 34:1
39:3
**floor** 2:15
**folder** 63:4
**folders** 62:20,25
**folks** 69:5

Page 13

Catherine Valenti November 8, 2022

**[follow - go]**

| | | | |
|---|---|---|---|
| **follow** 45:10 | **frame** 71:11 | **general** 15:2 | 32:1,9 36:17 |
| 67:24 96:3,4 | 146:1,12,14 | 21:6 23:24 | 37:5,10 39:8,14 |
| 115:25 119:21 | **franchising** | 27:25 89:15,17 | 40:13,18 47:12 |
| 157:19 161:16 | 35:25 36:19 | 123:1,16 | 50:23 51:5 |
| **followed** 116:5 | **francisco** 2:15 | **generally** 17:20 | 53:14,24 55:11 |
| 148:9,12 | **frequently** 36:14 | **generate** 38:16 | 55:14 56:1 |
| **following** 55:4 | 76:22 116:11 | 100:1,4 127:4 | 58:13 59:11,17 |
| 72:15 96:10 | **friday** 22:2,2,5 | **generated** 127:2 | 59:19 60:10,13 |
| **follows** 5:10 | 37:17,23 38:4,10 | **generates** 127:7 | 62:11 64:11 |
| **foregoing** 164:7 | 38:11 78:2 | **getting** 25:2,21 | 65:2,7,12 67:2 |
| 165:9,14 | 149:4 | 62:12 65:16 | 68:5 69:11,23 |
| **foremost** 6:7 | **front** 16:13 | 69:10 70:19 | 70:1,6 71:8 |
| **forfeitures** | **full** 5:18 11:17 | 83:6,7 85:24 | 72:12,18,24 |
| 113:25 | 16:25 28:14 | 95:2,21 96:25 | 74:14,20,24 76:7 |
| **form** 95:13 | 65:23 68:2 74:5 | 97:12,16 128:15 | 78:11 81:4,8 |
| 128:25 | 81:21,23 82:10 | 129:3 131:4,22 | 82:17 83:5,9,23 |
| **format** 28:16 | 82:12,22,24 | 135:19 156:10 | 84:15 85:7 |
| **forward** 7:13 | 101:12,13 109:1 | **girdner** 2:25 5:3 | 86:19 87:24 |
| 65:8 117:20 | 110:2 126:9 | 5:3 21:4,13,18 | 89:23 94:17 |
| **foundation** | 135:22 136:11 | 22:5,14,19,21 | 95:24,24 96:14 |
| 31:19 44:5 | 165:14 | 23:8,14 137:24 | 97:21,23 99:21 |
| 47:24 54:23 | **fully** 47:4 86:9 | **give** 32:3 47:14 | 100:16 101:21 |
| 57:6 58:7 68:11 | **functional** 156:6 | 52:18 62:25 | 101:25 102:4,14 |
| 98:14 99:16 | **further** 86:6 | 63:18,20,22 | 102:20,22 |
| 104:5,11 105:9 | 147:24 148:10 | 85:22,22 87:11 | 104:13 110:9 |
| 107:8,19 115:9 | 148:12 161:15 | 88:13 91:20 | 112:1 113:15 |
| 118:2 120:13,18 | 161:22 162:21 | 94:22 101:8 | 114:6,7 118:20 |
| 136:25 140:18 | 165:16 | 106:2 128:24,25 | 123:18,22,23 |
| 142:4,25 143:11 | **future** 7:6 | 154:23 | 124:18 125:4 |
| 146:6 149:7 | | **given** 32:2 | 133:16 134:21 |
| 151:9 156:15 | **g** | 139:20 164:13 | 135:17 141:11 |
| 157:11 | | **gives** 91:21 | 141:13 144:16 |
| **four** 36:18 86:21 | **g** 2:14 4:1 | **giving** 50:12 | 146:9 148:5,18 |
| 102:3 145:18,21 | **gal** 79:9 | **go** 6:4 7:13 9:1 | 153:16 155:4 |
| 145:22 147:21 | **gallatin** 34:1 | 14:12 15:6 | 156:18 157:18 |
| 149:16 150:8 | **gary** 90:21 | 16:17 17:17,23 | 158:22 159:17 |
| 161:6,7 | **gem** 62:8 63:12 | 21:9,16 27:7,20 | 160:2 |
| | 74:19 75:21 | 27:21 30:23 | |

Page 14

Catherine Valenti November 8, 2022

[goes - idaho]

| goes 27:24 | guess 17:11 | held 4:12 | i |
|---|---|---|---|
| 117:15 | 73:24 76:7 | help 7:23 17:20 | |
| going 6:11 11:5 | 99:10 101:8 | 20:14 110:18 | icon 101:23 |
| 12:15 13:1 | 105:3 143:15 | hey 58:2 84:25 | icourt 70:5 |
| 22:25 24:4,19 | 146:13 | 118:9 134:1 | 83:17 98:1 |
| 27:5 29:16 35:3 | guessing 130:7 | high 146:21 | 99:22 101:16 |
| 37:5,24 38:4,14 | guidelines 116:4 | 149:2 | 108:12 109:7 |
| 39:15 43:19 | guyon 89:10 | highlighted | 120:16,21 |
| 47:2 49:17 51:4 | | 149:17 | 123:18 124:24 |
| 52:5,13 53:21 | **h** | hired 28:13 | 131:11 132:7 |
| 55:1,6 62:15 | h 3:9 | hit 84:14,24 | 135:7 156:9 |
| 64:22 68:19,20 | half 37:3 | hmm 71:2 128:9 | icourts 14:18 |
| 75:15,21 76:4,10 | hall 69:18 76:21 | 128:14 | 70:4 72:6 83:9 |
| 76:17 81:9 84:1 | 77:4 79:7 | hold 66:11,15,25 | 83:16 98:17 |
| 90:3 91:10 | hallway 102:4 | 67:4 | 101:22 126:2 |
| 92:18 93:22 | hand 54:24 55:7 | holiday 38:2 | idaho 1:2,8 2:8 |
| 97:8 98:7 | 55:23 56:14 | 78:5,7 | 4:11 5:23,24 |
| 100:17 103:8 | 165:18 | home 37:1,16 | 12:12 13:1,22,25 |
| 108:8 112:6 | handful 67:23 | 124:14,19,23 | 14:9 21:14 |
| 115:1 123:24 | handle 110:19 | 133:7 | 24:14 25:3,11 |
| 140:1,8 154:25 | hands 58:15 | hone 108:4 | 28:19,22,23,24 |
| 155:1,7 156:9 | 60:15 99:4 | honestly 12:8 | 37:22 38:8,18 |
| 158:22 159:17 | happen 24:19 | 67:13 | 42:16,21,23,25 |
| 160:2 | 34:25 97:21 | honing 52:24 | 43:12,17,25 |
| good 5:14 16:19 | happening | hopefully 6:5 | 44:11,16 45:13 |
| 43:14 121:5 | 110:16 | 68:14 125:6 | 45:20 46:4,6,8 |
| gotcha 53:16 | happens 142:9 | hour 2:9 6:18 | 46:11,19,23 |
| gotten 79:24 | happy 139:5 | 39:16 136:11 | 48:10 51:21 |
| grab 86:11 | hard 127:17 | hours 36:25 37:2 | 62:2 67:25 |
| graduate 146:22 | 159:16 | 37:7 77:14 | 69:12,24,25 70:6 |
| 149:2 | harvest 35:24 | 133:11 136:10 | 70:7 71:9,13,21 |
| great 7:20 19:13 | 36:19 | huge 95:5 | 71:22 72:3 80:2 |
| 35:24 36:19 | he'll 155:7 | huh 8:6 | 89:15,16 90:9 |
| 133:3 161:19 | head 8:4,5,19 | huhs 8:5 | 103:17 105:5 |
| green 130:8 | 19:11 34:5 | hundreds 15:9 | 106:19 112:19 |
| ground 6:5 | heading 130:10 | 88:11,24,25 | 119:17 122:24 |
| group 138:6 | 130:13,15 | 90:14,15 | 123:1,17 124:2 |
| | | | 138:14 146:22 |
| | | | 154:10,13,19 |

**[idaho - job]**

155:19 156:13
159:12 164:22
164:24,24 165:2
165:6,24
**idaho's**  14:21
44:20 45:1
**idea**  43:14
105:18 113:14
119:13,15
129:16 140:13
**ideas**  153:2
**identified**  51:11
72:21 158:18
**identify**  83:4
134:7
**identifying**  58:1
**ignore**  92:21
**immediate**  23:23
24:9,12 105:23
106:2
**importance**
103:13
**important**  8:3,5
19:16 45:5
82:23 96:19,22
97:8 150:8
151:16 157:14
**impression**
145:24
**inaccurate**
103:20,23
118:24
**inbox**  86:14
156:6
**include**  24:21
28:9,15,18 30:2
30:3,17 39:11
48:8 64:25

69:16 94:9
95:22 105:4
107:5 110:4
**included**  15:18
28:20 50:19
69:10 71:22
73:18 74:2
75:13 100:6
**including**  35:8
138:14
**inclusive**  164:9
**incorporated**
48:3
**incorrect**  118:19
119:7
**index**  74:8
**indicated**  155:25
**indifference**
95:5
**individual**  50:19
91:15 113:7
127:25
**individuals**
50:22 97:11,14
113:19
**info**  39:10 73:16
91:6
**information**
16:4,9 21:5
24:20 26:2
28:25 29:10
43:15,16 57:13
59:23 63:5 65:7
65:23 66:3
68:18,21 69:12
69:24 70:16,20
70:23 73:12
75:4 76:19 82:5

83:22 85:15,23
86:1 87:1 91:4
91:20 92:3
109:17,21
114:14 115:3
116:10 117:5
124:10 125:14
125:18 127:6,9
127:13 128:15
128:18 131:11
138:25 144:9,13
144:19 154:24
156:11 157:1
**initial**  52:22
92:25 155:18
**initially**  28:13
43:18
**initiate**  25:10
151:6,21 156:12
**initiated**  48:9,16
73:1 119:16
151:25
**initiates**  151:17
**initiating**  48:16
**injunction**  3:15
3:18
**instance**  15:12
17:22 30:8 34:7
34:11,13 35:2
113:25 114:19
126:5 127:16
**instances**  118:15
**instruct**  19:24
**instructed**  7:16
51:24 80:7
**instruction**  53:1
**intend**  6:17

**intense**  113:9
**intent**  68:15
**interest**  165:16
**interested**  50:18
**interpret**  140:3
**interpretation**
152:24
**interpreted**
140:4
**interrogatories**
16:21,23 17:3
**introduction**
52:2
**investigation**
71:16
**issue**  25:12
51:18
**issues**  43:21
119:8 148:7

**j**

**j**  42:5
**jane**  69:18 76:21
79:7
**janquart**  42:1
**jefferson**  34:2
**jimmy**  13:8,11
13:12 137:23
**job**  7:20 17:15
25:23 44:24
45:1 58:18
59:14 60:19
61:11,14,16,18
75:11 80:8
106:10 116:2
154:18,22
155:13

Page 16

**[jon - legal]**

| | | | |
|---|---|---|---|
| **jon**  4:19 5:2 20:10,11 40:10 47:25 51:7 80:22 128:22 137:23,25 138:1 138:2 139:11,17 143:13 148:17 153:16 | **kiosk**  83:10,19 83:20,23 84:16 84:23 101:22 103:3,9 104:15 104:16 123:12 | 106:13,15,16,18 106:19,21,22 107:9,22,25 108:21,23 112:1 113:2,3 116:16 116:23 117:14 117:18,19,22 119:24 120:20 | **labeled**  137:10 **labor**  38:3 78:7 **lacks**  31:18 44:4 47:24 57:6 58:7 68:10 98:14 99:16 104:5,11 105:9 107:8,19 |

**jon**  4:19 5:2
    20:10,11 40:10
    47:25 51:7
    80:22 128:22
    137:23,25 138:1
    138:2 139:11,17
    143:13 148:17
    153:16
**jon.fetterly**  2:17
**jonathan**  2:14
**jot**  56:19
**judge**  7:2,6 32:5
    45:22 110:5
    140:2
**judge's**  91:22
**judicial**  13:22
    14:9
**jump**  138:21
**jumping**  51:5

**k**

**kayla**  79:13
**ked**  2:22
**keely**  2:19 4:22
    73:5 121:4
    130:19 157:17
    158:2
**keep**  7:22 12:24
    27:5 66:24
    97:20 124:20
    161:18
**keywords**
    110:13,25 111:6
    111:7
**kind**  8:21 12:25
    32:21 46:1 65:6
    71:15 87:13
    91:19

**kiosk**  83:10,19
    83:20,23 84:16
    84:23 101:22
    103:3,9 104:15
    104:16 123:12
**kiosks**  102:2,18
**knew**  51:10
**know**  6:9,19,19
    9:11,12,14,16
    10:13 12:1,14,23
    14:16,18,20
    15:25 19:12,16
    21:25 22:24
    23:20 24:18
    25:21 27:23
    33:1,6,10,14,16
    33:17,19,20,23
    33:24 34:4,5,6
    34:15,24 35:1
    36:7,21 39:9,15
    39:20 42:2
    43:24 45:15,22
    45:23 46:5 47:1
    48:3 49:11 52:7
    53:5 55:14,15
    57:8 58:10
    64:19 65:13,15
    65:19,22 66:8,14
    66:20 67:17,25
    69:5,18,21 70:10
    70:12,13 71:5,10
    71:14 72:2,4,10
    76:7,24 80:4
    82:3 84:2 85:22
    86:5 89:23
    91:25 93:9
    95:15,15 96:20
    99:5 105:15,24

106:13,15,16,18
    106:19,21,22
    107:9,22,25
    108:21,23 112:1
    113:2,3 116:16
    116:23 117:14
    117:18,19,22
    119:24 120:20
    123:8,13,14
    126:11,17,19
    128:2,4,20,21
    129:1 130:4,14
    131:15,20
    133:11,12,19
    136:9,11 137:12
    137:14 140:20
    140:21,24 141:7
    141:23 142:6,9
    144:9,15,18
    145:22,25
    146:14,21,23
    147:2,3,5 148:2
    148:21 152:18
    152:20,25
    155:13 157:2
    162:4,17 164:10
**knowledge**  14:7
    30:13 79:22
    107:4 108:11
**knows**  144:13
**kootenai**  64:19
    65:1,10,14 67:11
    67:11,21 75:2,5
    75:6 76:16 79:9

**l**

**l**  119:3

**labeled**  137:10
**labor**  38:3 78:7
**lacks**  31:18 44:4
    47:24 57:6 58:7
    68:10 98:14
    99:16 104:5,11
    105:9 107:8,19
    115:9 118:2
    120:13,18
    136:25 140:18
    142:3,25 143:10
    146:5 149:6
    151:9 156:15
    157:11
**language**  159:11
**laptop**  56:22
**large**  71:8
**late**  26:16 78:2
    133:12
**law**  89:11 118:17
    119:7
**laws**  150:1
**lawsuit**  23:3,16
    23:17,19,19,21
    24:2,5,7,12,17
    24:21,24 26:19
    46:12,13 66:18
    66:22 156:25
**lawyer**  129:7
**learn**  65:7 68:6
**learned**  43:16
    44:24,25
**learning**  30:8
**left**  129:20
    130:18,20,22
    133:20
**legal**  20:6 26:18
    41:11 46:18,19

Page 17

Catherine Valenti November 8, 2022

[legal - manual]

| | | | **m** |
|---|---|---|---|

46:23 48:16 57:5 58:8,23 59:3,10,13,15 61:3,10 104:11 104:25 107:20 110:6 115:10 143:12 146:5 149:7 151:10 156:16 157:12 157:12

**legislature** 146:23 148:16

**leighton** 2:14 4:20

**letting** 7:20 22:24 24:18

**lewiston** 67:25

**likes** 143:13

**likewise** 156:16

**limiting** 50:5

**line** 54:13,18 58:13,14 60:12 60:14,16 72:14 87:18 160:3

**linked** 124:25

**list** 11:8 15:7,8,9 15:15,18,23 27:6 55:17,20,24 86:1 86:22,24 89:6,13 89:16,18 94:22 99:23 114:8,12 114:24

**litigation** 66:11 66:15,24 67:4 123:2,16

**little** 6:6 7:4,10 18:21 30:5 60:10 79:15,15

97:4 101:22 113:9 127:17 134:6,16

**lived** 5:24 65:2

**loans** 113:13

**location** 84:14 85:1

**lodge** 7:3

**log** 83:17

**long** 5:24 6:16 12:7 31:21 34:6 62:22 71:5,12,19 94:14

**look** 8:20 10:10 10:12,22 11:6 13:4 17:22 32:2 35:15 36:14 47:14,16 48:15 50:14 53:11,12 55:3 56:9,11,17 63:18,25 64:3,6 64:6,12 67:5,7 67:16 70:2 78:12 79:5 80:12,15,20 82:17,18,22 83:4 84:9,10,15,17 85:12,25 87:4,6 87:10,14,21 88:10,10,11,24 89:7,8,23 90:16 90:17 91:8 94:3 94:3 96:13,18,24 97:22,24 98:7 100:13,22 106:10 110:22 112:21 113:3,6 114:16,18 121:2

123:12 124:13 124:22 125:21 127:16 129:13 130:25 131:3 133:18 134:8 136:4 144:6 148:24

**looked** 10:6,11 10:16 11:1,2 18:9 38:10 41:15 49:9 56:25 89:1 90:8 90:12 115:24 122:4 145:14 161:6

**looking** 10:23 24:8,12 40:15 52:8,11 56:25 64:16 67:2 82:17 84:5,22 85:11 86:8,23,24 87:23 88:15 93:4 97:20,25 98:18 99:22 109:6,9 115:6,14 123:7,14 124:21 126:1 134:6,16 151:24

**looks** 11:12 17:6 27:14 35:20 36:2,5 80:11 86:19 92:14 101:6 125:19 128:11

**lot** 13:13 49:8 113:8 145:23

**lumped** 123:9

**m** 3:2

**madison** 34:2 39:3

**magic** 82:22

**magistrate** 50:9 52:15

**mailing** 67:20

**main** 13:13 93:13 102:6

**maintain** 9:8 53:19

**making** 65:18 141:19,22 142:18 143:5,16 146:17 149:3 155:8

**malpractice** 110:6

**management** 14:21 98:11 105:7 107:16 120:11 136:23 142:21 143:8 144:3 146:2 147:1,8

**manner** 26:21

**manual** 3:12 8:17,21 9:6,6,8 9:18,20 10:4 15:22 28:16 40:17 41:1,7 52:2,4 79:19,25 80:9 89:2 90:6 91:16 94:4 113:23 114:5 116:4

Page 18

Catherine Valenti November 8, 2022

[manually - needed]

| | | | |
|---|---|---|---|
| **manually** 103:6 | **means** 25:17 | **missing** 130:12 | **move** 121:4 |
| **mark** 40:18 | 48:4 73:16 | 130:24 | **moved** 63:11 |
| **marked** 7:7 27:9 | 88:18 104:20 | **missoula** 29:15 | **multiple** 49:14 |
| 40:20 121:16 | 107:14 131:17 | **misstate** 68:13 | 72:21 139:1 |
| 122:12 136:15 | 135:2,6 144:1 | **misstates** 59:9 | **multitask** 16:18 |
| 158:6 | 150:16 156:24 | 68:10 142:2,25 | **mycourts** 124:23 |
| **marshall** 13:10 | **meant** 24:9 | 144:11 149:6 | **mycourts.idah...** |
| 15:17 23:23 | 140:9 150:13 | 150:19 162:11 | 124:23 |
| 116:10 117:5,15 | **meet** 20:5,9,11 | **misstating** 59:18 | |
| 137:24 | 20:25 68:7 | **mitchell** 2:19 | **n** |
| **martha** 50:23 | 90:10 116:3 | 4:22 | **n** 3:1,2,2 4:1 |
| **matter** 2:10 4:8 | **meetings** 19:19 | **mobile** 89:15 | 42:5 |
| 10:15 64:14 | 27:1 | **modify** 118:12 | **name** 5:18 42:4 |
| 89:14,16 | **meets** 90:3 | **molly** 2:19 4:22 | 51:7 65:24 |
| **mccullough** | **mem** 2:23 | **moment** 10:22 | 67:18 69:20 |
| 20:13,16,22 | **member** 42:16 | **monday** 22:1 | 79:12 85:22 |
| 154:4,17 | 42:21,22,25 | 37:17,24 38:1 | 91:22,22 110:4,5 |
| **mean** 15:1 18:6 | 43:12,17 44:1,4 | **montana** 28:19 | 110:5 112:9 |
| 19:3 30:25 | 44:8,11 102:17 | 28:22,23 29:1,5 | 119:3,7 |
| 31:25 33:4 | **memory** 8:21 | 29:5,6,9,15 30:8 | **named** 164:7 |
| 34:11 42:22 | **mentioned** 15:7 | 30:10,14 31:9,24 | 165:8,12 |
| 44:10 46:1 | 22:10 24:8 | 32:12,23 33:14 | **names** 91:21 |
| 56:12 69:25 | 40:17 148:3 | 34:7,20 35:2,9 | 133:23 |
| 73:9,22 81:24 | **meridian** 5:23 | 35:11 36:11,15 | **nature** 125:22 |
| 82:6 87:16 88:4 | **met** 20:10 | 38:21 39:1 65:6 | 129:5 |
| 88:18 92:10 | **metadata** 128:23 | 106:13 | **necessary** |
| 93:11 101:3 | **micron** 55:1 | **montana's** 32:13 | 109:23,25 |
| 102:16 107:11 | 109:11 | 33:20 36:7 | 156:11 |
| 111:18 118:6 | **middle** 77:20,23 | **month** 34:17 | **need** 6:18 7:5 8:8 |
| 119:1 122:17 | **midmorning** | 35:4,6 62:9 | 9:1 17:21 33:11 |
| 125:25 130:5,13 | 37:9 | 63:14 74:21 | 43:24 48:1 |
| 130:14 131:19 | **mine** 89:11 | 75:22 | 56:10,21 80:22 |
| 135:14 140:7 | **minor** 30:5 | **monthly** 29:2 | 83:16 84:20 |
| 143:19 150:21 | **minutes** 39:21 | **morning** 5:14 | 85:9 110:1,18 |
| 154:13 156:21 | 78:13 121:8 | 124:10 126:4 | 111:2 119:24 |
| **meaning** 62:25 | 153:17 | **mornings** 37:1,4 | 129:1 |
| 120:10,15 129:7 | **missed** 49:8 | **motion** 3:15,17 | **needed** 56:23 |
| | 130:9,13,15 | | 63:5 76:15 80:8 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1859**

Catherine Valenti November 8, 2022

[needed - okay]

| | | | |
|---|---|---|---|
| 102:8 117:25 118:12 | non 50:19 91:15 97:11,14 113:7 127:25 151:25 | objection 19:22 22:12 29:17 30:20 31:11 | office 2:20 13:7 13:13 22:18 73:17 103:1 |
| needing 66:12 | nope 121:24 | 42:18 44:2,21 | 104:8 118:16 |
| needs 144:8 154:24 | notary 2:7 164:24 165:6,23 | 47:23 48:18 49:19 51:14 | 161:25 |
| never 75:19 76:13 77:23 79:24 99:6 | note 13:16 150:8 noted 145:15 | 54:4,22 56:5 57:4 58:6,22 59:8,18 68:9 | official 1:7 42:13 58:3 95:13 oh 11:8 14:10 |
| new 31:25 83:2 90:17 100:20 116:3 | notes 56:19,23 78:12 129:13,14 notice 93:3 | 73:4,6,19 77:15 98:13 99:15 104:4,10,23 | 16:10,19 26:13 56:11 88:15 89:23 94:20 |
| newly 32:24 33:7 33:8 34:8 35:5 | notified 118:23 november 1:14 | 105:8 107:6,18 108:14 115:8 | 95:23 97:15 102:22 111:4 |
| 44:15,16 48:8,15 49:4 70:7 71:11 | 2:9 4:5 17:6 86:16 89:4 | 118:1 120:12,17 136:24 140:11 | 112:1,11 113:5 116:22 122:16 |
| 71:19 72:21 73:2 74:12 75:5 | 163:2 164:8 165:18 | 140:17 142:2,24 143:9 146:3 | 130:25 138:2 148:18 |
| 75:17 86:24 156:12 157:8 | number 11:15 32:4 49:8 63:17 | 149:5 150:18 151:8 156:14 | okay 5:16 6:19 6:20 7:7,8,13,13 |
| news 1:4 3:14,17 4:8,21 5:1 9:3 | 73:14 88:9 90:22 98:8 | 157:10 162:10 objections 6:25 | 7:14,24,25 8:10 8:11 9:2 11:21 |
| 9:17,19 16:24 20:18 23:4,8,15 | 101:1 112:9 125:21 129:5 | 7:3,9 31:18 60:25 143:10 | 14:20 15:22 17:24 19:6,15 |
| 41:12 44:12,14 45:8 | 130:16 136:9 141:10 152:23 | 144:11 obscure 160:13 | 22:4,22 34:3 37:13 39:19,23 |
| newsworthy 50:25 52:6 94:7 | 158:2 numbered 164:9 | obscured 159:12 observed 54:14 | 40:11 47:9 48:5 51:8 55:4 60:2 |
| 96:19,22 97:5,8 113:10 116:8 | numbers 13:4 15:9,19,20,21 | obtain 36:11 47:6 50:8 63:6 | 62:21 64:18 65:18 66:20 |
| 145:16 147:23 148:11 | 102:1 numerical 89:19 | 156:10 obviously 71:8 | 67:15 72:16,17 78:11 79:14 |
| nez 64:19 | numerically 85:7 | 84:2 88:23 90:10 96:19,21 | 80:16,20 81:16 84:12 86:10 |
| nice 124:17 night 37:23 38:4 | **o** | 101:13 150:21 152:19 | 87:7 88:6,15,23 90:2,20 91:1,8 |
| 77:20,24 nobody's 119:5 | o 3:2 4:1 oath 122:19,20 | october 36:4 40:16 | 92:13 94:14,25 96:2 97:15 |
| nods 8:4 | 152:12 164:6 | | 101:15 105:24 |

Page 20

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1860**

## [okay - pause]

110:9 112:11
113:5 117:1
121:2 122:10,19
123:11,25 125:5
125:9 126:10
130:25 131:1
139:16 141:16
144:21 153:19
153:20 154:1
155:17 159:5,20
162:25
**old**  67:6 70:1
85:21 89:10
100:14
**olden**  155:23
**older**  87:2
**omundson**  1:7
2:24 4:9,23,24
23:4
**once**  12:12 13:5
32:19 34:16,17
46:18 54:4
55:15 62:7,9
63:11,14 65:3
74:20 75:3,15,22
76:4,6,11 84:11
85:3,18 89:20
93:10 100:4
108:20 114:11
116:15 133:3
138:17 141:8
148:1
**one's**  35:21,22
**ones**  21:11 47:13
58:19,20 59:1
60:8,20,24 61:1
62:6 63:18 82:9
85:8 87:22 94:8

94:22 97:14
104:14,16
105:14,16
110:20 126:11
130:8
**online**  11:10
12:7,8,13,15,17
13:1,6 14:1
32:12 38:25
47:2 68:4,5 70:1
77:12 97:22,23
125:23,25 128:6
129:6 130:16
132:11,17
133:16 134:14
134:18,19 135:4
136:1
**open**  84:20 86:6
86:8 91:13
126:2
**opened**  73:18
130:21
**operator**  147:12
**opinion**  157:12
**opinions**  141:18
**opportunity**
19:17 40:6
78:24 79:2
**options**  101:25
**orange**  136:15
**order**  30:1 89:20
130:3
**organized**  39:18
**original**  18:7,10
18:14,25 19:3,4
128:25
**overbroad**  29:18
31:12 42:19

44:3,22 47:24
48:19 49:20
51:15 54:23
56:6 57:5 58:7
58:23 59:9 73:7
73:20 77:16
98:14 104:5,24
105:9 107:7,19
108:15 115:9
118:2 120:13
132:14 136:25
140:12 142:3,25
143:10 146:5
156:15 157:11
162:10
**owyhee**  62:8
63:11 74:19
75:21

### p

**p**  4:1
**p.m.**  2:10 4:5
37:23 39:24,25
39:25 40:2
77:21 78:17,18
78:18,20 121:11
121:12,12,14
153:21,22,22,24
163:2,5
**pacer**  114:18
118:18
**page**  3:4,10
57:22 80:20
81:5,18 86:8
96:16 100:23
110:22 111:3
146:22 149:3
150:5 158:23

159:18,21 160:4
160:21
**pages**  3:11,13,15
3:18 164:9
**paisner**  2:14
4:20
**paper**  47:15 53:7
53:22 56:13,15
61:22 62:3 80:1
83:15 91:3 96:5
98:22 100:15
155:23
**paragraph**  81:8
81:11,13,15,17
100:23 123:22
141:11,13,19
142:13,19
144:23 153:11
153:11 158:12
158:18
**part**  14:19 58:18
60:19 80:7,11
103:15 106:10
110:1,3,19
114:19 130:12
131:21
**partially**  159:12
**particular**  22:1
61:11 110:18
130:12 147:4
**particularly**
94:5 116:7
**parties**  91:21
**party**  16:24
46:13 85:22
**password**  93:18
**pause**  51:3

Page 21

(184 of 297), Page 184 of 297 Case 24-6697, 03/06/2025, DktEntry: 19.9, Page 184 of 297
Case 1:21-cv-00305-DCN Document 60-8 Filed 12/15/22 Page 65 of 79
Catherine Valenti November 8, 2022

[pausing - probably]

| | | | |
|---|---|---|---|
| **pausing** 121:5 | **phrase** 73:6 | **portals** 108:1 | 43:1,13,17 44:1 |
| **pay** 95:25 | 107:10 115:10 | **portion** 96:17 | 44:4,8,10,11 |
| **payette** 62:9 | **phrased** 76:1 | 97:16 158:9 | 105:19,25 106:7 |
| 63:12 74:20 | 143:15 | **positive** 14:3 | 106:10,14,17,20 |
| 75:22 | **physically** 155:4 | 65:17 66:2 | 106:25 107:4 |
| **payment** 92:5,7 | **place** 80:1 | 101:4 105:21 | 117:16 119:16 |
| 92:10 95:7,15 | 165:12 | 129:19 | 122:25 123:6,9 |
| **payments** 92:8 | **placed** 57:17,19 | **possible** 35:4 | 123:13 |
| **penalty** 150:1 | **placeholder** 7:4 | **possibly** 35:1 | **pretty** 11:2 30:4 |
| **pending** 6:22 | **plaintiff** 1:5 2:14 | 67:1 106:1 | 34:15 45:10 |
| **people** 58:13,14 | 3:14,17 4:20 | **post** 2:20 116:9 | 64:13 117:12 |
| 60:13,13 65:6 | 11:19 32:5 | **potentially** | 145:16 |
| 100:16 102:13 | 73:14 109:19 | 50:14 104:25 | **previous** 32:9 |
| 102:16 133:11 | 110:4 113:18 | 146:4 | **primarily** 154:9 |
| **perce** 64:19 | **plaintiff's** 17:2 | **practice** 96:11 | 155:17 |
| **percent** 82:6,8 | **planes** 147:16 | **pre** 70:5 72:6,8 | **print** 47:10 |
| **perfect** 5:17 | **please** 4:17 5:5 | 72:16,18 | 49:16 55:20 |
| 40:24 | 5:17 6:9 80:21 | **preference** 80:18 | **printed** 83:12 |
| **period** 98:3,6 | 80:24,24 | **prefiled** 107:5,7 | **prior** 12:15 13:1 |
| **periods** 136:11 | **pllc** 2:18 | 107:11 | 24:24 42:6 47:1 |
| **perjury** 150:1 | **plug** 98:3 101:17 | **preliminary** | 49:17 52:12 |
| **person** 25:10 | **plus** 93:11,12,22 | 3:15,18 | 53:4,21 64:22 |
| 28:12 55:6 | 93:23,24 94:4 | **prep** 9:21 18:11 | 68:8,10,13,22 |
| 64:24 67:18 | 95:24 100:6 | 20:23 | 71:21 76:16 |
| 70:19 75:4,6 | **point** 7:5 25:9 | **preparation** | 142:2 143:1 |
| 109:10 118:17 | 69:4 71:18 | 122:3 | 144:12 149:6 |
| 154:8 | 75:14,20 76:3,10 | **prepare** 8:15 | 150:19 162:11 |
| **personal** 15:10 | 77:2 90:23 | 10:5,25 16:1 | 165:8 |
| **personally** 54:14 | 117:8 121:5 | 18:5 19:8,19 | **prisoner** 113:12 |
| 72:12 | 133:9 141:4 | 20:6,12,14 21:16 | 114:21 |
| **petition** 45:13,19 | 147:22 156:8 | 26:25 27:1 | **pro** 109:1,10,19 |
| **petitions** 45:15 | **pop** 51:7 | **preparing** 17:12 | 113:12 129:7 |
| 45:16 46:1 | **portal** 98:1,17 | 152:8 154:13 | 133:2 |
| 52:23 | 101:16 108:13 | **present** 2:24 | **probably** 37:2 |
| **phil** 42:1 | 109:7 120:16,21 | 26:18 | 65:12 79:10 |
| **phone** 20:14,15 | 123:19 124:25 | **preserve** 66:12 | 81:14 84:3 |
| 95:7 112:9 | 132:8 135:7 | **press** 32:15,19 | 116:22 148:15 |
| | 156:9 | 33:9 42:16,21,23 | |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1862**

[problem - read]

| | | | |
|---|---|---|---|
| **problem** 138:4 | 91:17 111:22 | **publish** 38:23 | **questions** 6:12 |
| **procedure** 17:16 | 118:18,19,21 | 82:13 | 7:1,21 8:12 |
| 17:23 21:9,13 | **progressing** | **pull** 40:18 80:16 | 14:14 15:2 21:6 |
| 112:20 113:2 | 148:13 | 80:22 87:5 | 21:7 25:20 |
| 122:16 141:8 | **propounded** | 114:14 | 46:15 59:22 |
| **proceeding** | 164:12 | **pulled** 144:19,22 | 62:10 72:14 |
| 46:19,23 48:17 | **protected** 22:15 | **pulling** 131:10 | 81:10 98:21 |
| 151:6,18 152:1 | **protection** 20:4 | **purpose** 95:21 | 123:24 152:11 |
| **proceedings** | **provide** 7:22 | **put** 7:4 9:14,16 | 157:19 160:3 |
| 26:12 29:8 48:9 | 20:3 26:1,2 | 14:10 27:17,19 | 164:11,12 |
| 51:3 151:21 | 36:12 52:14,20 | 29:12,25 30:1 | **queue** 105:19,25 |
| **process** 6:6 | 53:25 57:12 | 54:1 56:23 | 106:7,10,14,17 |
| 13:25 22:6,7 | 61:23 67:18 | 61:12 66:7 70:4 | 106:20,25 107:4 |
| 29:13 39:8 47:5 | 69:9 99:23 | 76:19 80:24 | 119:16 |
| 49:2 53:23 54:2 | 106:25 129:5 | 82:11 88:11,12 | **quick** 6:5 22:12 |
| 55:11 61:21 | 139:13 141:18 | 93:17 102:1,10 | 38:15 39:15,17 |
| 63:8,13 64:13 | 155:1,25 | 111:7 122:6 | 67:8 86:11 |
| 65:13 67:21,24 | **provided** 12:2,4 | 126:4,8 127:6,9 | 120:1 121:6 |
| 69:4 70:13 | 13:5 15:15 26:4 | 127:13 128:17 | 157:19 |
| 82:19 83:25 | 26:8,16 41:3 | 130:5 133:15 | **quickly** 25:21 |
| 84:6 94:17 95:1 | 50:1 74:15 77:8 | 135:11 142:7,21 | 48:13 56:19 |
| 96:3 100:7 | 90:4 108:1 | **puts** 30:18 | 78:9 145:5 |
| 103:7 107:22 | 123:1,17 127:10 | 128:18 | **quite** 39:16 |
| 113:21 114:7,9 | 145:12 162:14 | **putting** 41:19,21 | 43:22 146:13 |
| 117:14 119:13 | **provides** 108:2 | 148:8 | |
| 119:22 143:25 | **providing** 116:2 | | **r** |
| 145:11 | 144:10 158:12 | **q** | **r** 4:1 42:5 |
| **produce** 139:4 | 158:16 | **qualify** 123:5 | **raise** 24:25 |
| **produced** 138:24 | **public** 2:7 24:10 | **question** 6:8,13 | 25:18 |
| 139:2,6 | 27:21,25 44:13 | 6:22,22 7:16 | **raised** 25:11 |
| **production** 17:4 | 44:15 50:18 | 19:23 25:12 | **range** 87:22 |
| 17:11 138:23 | 83:22 102:17 | 48:1,2 60:7 61:7 | **reach** 111:17 |
| **professional** | 122:25 123:3,5,8 | 75:25 105:17 | **reached** 118:8 |
| 42:14 | 123:12,18 157:4 | 131:22 143:4,5 | 118:12 |
| **program** 11:9 | 164:24 165:6,23 | 143:13 146:8,13 | **reaching** 111:23 |
| 14:17 27:20 | **public's** 123:16 | 153:10 158:2 | **read** 16:4,25 |
| 61:13 82:11 | 157:2 | **questioning** | 18:13 45:4 81:8 |
| 83:9 84:21 | | 60:16 | 81:13,14 106:1,3 |

Page 23

[read - report]

| | | | |
|---|---|---|---|
| 119:25 123:23 146:9,11 159:10 164:10 | 40:3,5 59:7 78:15,17,21,23 79:17 121:9,11 | **relate** 18:1 **related** 26:18 32:18 41:7 | 25:23 27:15,16 27:17,18,21,24 28:6,10,18,19,21 |
| **reads** 30:6 | 121:15 138:20 | 44:20 46:15,23 | 28:22,24 29:3,4 |
| **ready** 95:11 97:20,22,24 | 146:11 153:21 153:25 154:2 | 119:7 140:14 147:11 152:23 | 29:8,12,16,24 30:13,16,18,19 |
| **real** 6:5 22:12 38:15 39:14,18 67:8 86:11 120:1 | 163:3 165:15 **record's** 72:12 **recorded** 4:14 **recording** 4:3 | **relates** 17:25 22:13 45:8 81:15 **relevant** 17:12 | 30:24 31:2,6,9 31:24 32:1,21 34:9 35:5,9 36:12,18 37:24 |
| **really** 7:23 8:3 14:22 18:8 43:22 66:23 102:13 116:13 124:17 132:21 138:19 | 40:2 121:14 153:24 **records** 43:19 **red** 126:11 136:16 **reds** 136:4 | 17:14,15 **remember** 10:18 12:9 21:19 22:2 22:3,23 24:4 43:2,20,22 49:11 53:10 57:24 | 38:5,10 39:11 40:15,16 41:7,8 41:9,15,18,18,22 44:12 45:15 46:3,5 48:7,8,14 48:21 49:1,4,17 |
| **realtime** 59:19 **reason** 133:4 **recall** 21:10 61:5 132:1 158:14,20 **receipt** 95:8 **receive** 26:9 28:5 28:8 35:5 47:19 48:7 52:9,12 65:19 74:11 75:3 76:21,22 83:1,3 108:23 | **reduced** 165:13 **reference** 111:2 **referencing** 16:6 97:18 **referred** 9:23 **referring** 14:4 64:2 81:19 101:4 **refers** 101:10,11 **reflect** 159:2,21 160:6,23 | 60:16 64:8 65:25 66:7,16,19 66:23 67:14 69:19 79:13 90:12 91:24 102:23 138:18 138:20 148:14 148:19 152:10 **remembered** 2:3 **remind** 137:25 **remodeled** 102:9 | 50:3,6,8,11,14 50:20,24 51:11 51:12,20,24 52:17,21 55:3 59:1,2,5,12 61:2 61:2,8,12,16,23 62:18 64:21,23 65:4,8,21 67:10 68:7 69:16 70:14 72:20 74:11,17,17,23 |
| **received** 9:9,18 9:22,24 10:19,20 26:5 28:11 57:9 57:12 66:10,14 79:19,20 | **reflected** 47:22 161:4 **refresh** 8:21 **regarding** 18:20 23:2,3 | **remote** 1:13 2:1 2:3 4:6 124:11 **remotely** 2:13 4:13 **removals** 112:23 | 75:3,10,12,13 76:19,25 77:20 78:1 81:22 82:3 82:5,10,21 83:7 83:12 84:1,4,5,8 |
| **receiving** 25:13 25:25 26:19 **recognize** 159:15 **record** 4:4,6,18 5:18 8:9 13:22 14:9 39:22,24 | **register** 83:18 **regular** 131:13 133:3 **regularly** 93:9 **rejected** 99:9,14 | **rephrase** 48:5 77:17 **replace** 41:24 **report** 3:11 8:23 8:24 11:17 18:15,18,24 | 84:20 86:2,9,12 86:15 89:3,3 90:5,24,25 91:1 91:2,9,10,12,14 91:16,19,20 92:17 96:18 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-1864

Catherine Valenti November 8, 2022

**[report - right]**

| | | | |
|---|---|---|---|
| 97:1,9,10,13 | **reporter** 2:7 5:5 | **repository** 69:12 | **response** 7:22 |
| 98:6 99:1,5,13 | 7:23 36:10 42:7 | 69:24,25 70:7,8 | 16:20 17:2 |
| 99:19 100:2,4 | 42:9,10 59:5 | 71:13,22 | 144:10 |
| 101:14 103:25 | 61:9 65:2,11 | **representing** | **responses** 8:1 |
| 104:7,14 105:4,6 | 146:11 165:5 | 4:21 | 16:11 17:10 |
| 105:14 108:8,19 | **reporter's** 165:1 | **represents** 11:18 | 60:4 |
| 109:1,13,25 | **reporters** 34:7 | 130:5 141:25 | **responsible** 31:8 |
| 110:2 112:10,18 | 38:22 39:7 | 143:6 | 31:16 41:19,21 |
| 112:22 113:6,10 | **reporting** 2:6 | **request** 6:21 | 154:9 155:18 |
| 113:12,16,20 | 4:15 25:11 | 16:8 17:10 | **rest** 86:9 92:21 |
| 114:1,2,15,22 | 27:19 31:16 | 26:10 55:20 | 125:13 |
| 115:17,20,24 | 44:14 45:9 | 61:24 63:15 | **result** 122:23 |
| 116:3,18,18,19 | 61:13 65:3 | 94:12 95:9 | **retained** 41:9 |
| 116:21,23,25 | 75:17,23 76:5,12 | 96:10 111:11,13 | **review** 10:4 18:6 |
| 117:24 118:9,13 | 76:16 77:3,5,10 | **requested** 48:22 | 18:10 38:7 57:1 |
| 118:24 119:10 | 79:25 97:11 | 50:8,11 101:1 | 63:3 105:19,25 |
| 120:25 127:23 | 98:23 103:16 | 111:15 163:7 | 106:7,10,14,17 |
| 127:25 131:7 | 104:9 106:11 | **requests** 16:10 | 106:20,25 107:4 |
| 133:13 134:9 | 109:23 110:14 | 17:4 93:3 | 108:7 119:16 |
| 135:22 138:12 | 122:9 144:5 | **researcher** 29:23 | 152:8 |
| 140:5 142:8 | 154:9,12 155:18 | 29:25 | **reviewed** 9:20 |
| 145:14 147:25 | **reports** 3:12 | **researchers** 29:1 | 10:24 16:1,15 |
| 148:4,6,9 150:23 | 37:5 38:16 41:1 | 29:11 30:7,12 | 18:2,4,18,23 |
| 151:5,22,24 | 47:9,10,19 49:25 | 31:24 | 19:8 122:2,21 |
| 154:14,21,23 | 52:1,11 68:24,25 | **reside** 5:22 | 147:6 149:13 |
| 156:12,21,22 | 69:6,13 76:20,23 | 69:21 | **reviewing** 17:9 |
| 157:5 | 77:4 79:19 80:9 | **residing** 164:24 | 26:14 122:11 |
| **reported** 1:22 | 82:11,16 89:1 | **respect** 21:17 | 152:10 |
| 4:15 18:7,25 | 90:5 100:3 | 35:8 36:6 38:16 | **revisions** 38:24 |
| 19:2,3 36:3,23 | 101:6,7,11 | 50:16 75:16 | **ribbon** 159:8,13 |
| 49:9 63:17 | 102:15 103:13 | 79:18 115:10,23 | 160:12 |
| 68:22 78:8 84:7 | 103:16 106:11 | 141:24 142:12 | **right** 6:4 7:20 |
| 84:19 86:21 | 111:22 113:22 | 144:5 147:21 | 8:12,14 9:4,5 |
| 117:21 119:10 | 115:23 116:4 | 149:1,16 150:7 | 10:3,23 11:11 |
| 128:2 133:14 | 124:13 133:10 | 156:17 | 14:23 17:9 |
| 147:24 148:10 | 136:22 155:8,14 | **responding** | 18:13 21:7,12 |
| 148:12 | 155:20 156:19 | 16:24 | 26:15,23 27:4,10 |
| | | | 35:16 40:1,4,13 |

Page 25

Case 1:21-cv-00305-DCN, Document 60-8, 03/06/2025, 19.9, Page 188 of 297
Case 1:21-cv-00305-DCN   Document 60-8   Filed 12/15/22   Page 89 of 79

Catherine Valenti November 8, 2022

**[right - sends]**

40:21,24 48:23
51:4 55:8 57:18
59:24 60:6
61:24 70:5,21
72:9,11 74:7
78:19,22 79:12
79:17 80:6,19
81:3,4,7,17 83:1
85:18 86:13
88:22 89:12,16
89:18 93:14,22
94:16,18,24
95:20 96:8,15
97:18 99:3
100:22 108:9
109:8 110:11
114:13 115:4
121:2,10,13,17
121:25 123:22
125:18 126:17
128:10 129:8,9
129:11 130:2
131:1,9 132:8,11
133:2,18 134:3
134:10 135:5,7
135:10 136:6,7
138:4 139:15,22
148:24 151:2,3,6
152:4 153:23
154:25 155:20
156:5 157:2,9,15
159:16 162:20
162:22
**rite** 90:21 91:19
92:16
**river** 2:20
**role** 17:21 61:8
61:11

**rolling** 78:20
**room** 4:25 5:3
47:15 64:12
74:24 102:3,14
102:21
**rooms** 102:9
**rpr** 1:22 165:23
**rule** 7:6
**rules** 6:5

**s**

**s** 3:9 4:1
**san** 2:15
**sara** 1:7 2:24
51:4
**sarah** 23:4
**saturday** 78:2
**saves** 83:15
**saw** 146:15
159:15
**saying** 5:14
22:17 55:12
64:5 88:17
**says** 35:20 81:7
84:24 87:18
88:8 96:17
100:25 128:13
130:15 133:19
134:13 135:24
159:7
**scan** 16:3 17:19
**scanned** 16:5,21
109:3
**schedule** 34:10
34:12,18
**school** 51:6
89:11 146:21
149:2

**screen** 27:8
38:14 80:25
86:10 157:24
**scroll** 130:18,19
**se** 109:1,10,19
113:12 129:8
133:2
**seal** 165:18
**search** 102:1
108:4
**searches** 126:3
**second** 51:2
100:23 122:10
125:6 147:11
152:3 159:4
**section** 81:12
100:24
**sections** 92:20
**security** 113:13
**see** 6:16 11:14
11:16,17 25:19
27:10 35:16
38:1 40:21 51:6
56:11 58:15
60:15 62:16
67:16 74:5
77:11,12 79:6
81:5,22 83:15,16
84:18,20 85:5,20
86:7,9,17 87:5
87:15 88:15
89:13 90:3
92:18,24 93:9
95:18 97:15,19
100:24 101:5,7
101:13 103:10
105:16 108:8,18
108:19 109:17

109:18,20 110:1
111:3,19 112:5
114:11,20 116:7
119:20 120:3,5
120:10,16,22
123:8 124:13,14
125:7,16,20
126:3,8,9,20,23
127:18,20 128:8
128:12 130:22
133:10,13
134:11,12,13,19
134:20,21,24
135:3,15 136:2
136:13 140:5
141:14,16 152:4
156:19 158:25
159:5,16,25
160:10,25
**seeing** 94:5
109:1 124:24,24
152:10
**seen** 15:11
126:14 131:7
133:14
**send** 29:2 30:1
30:16 31:2,4
34:8 38:23
39:10 64:24
65:5 68:17,20
69:13 75:4,8,12
79:8 86:13
116:9,17 117:5
138:5 148:2,2,20
**sending** 59:22
60:1
**sends** 39:11

Page 26

Catherine Valenti November 8, 2022

[sent - speculation]

**sent** 13:8 31:6,22
76:19
**sentence** 160:16
**separate** 15:12
123:13
**separately** 53:18
85:13
**series** 15:19
**serve** 13:17
14:16 92:25
131:25 132:5
140:15,23 141:6
142:14 143:22
144:1 146:25
153:6 162:5
**service** 1:4 4:21
23:9 41:12
**service's** 3:15,17
**services** 4:9
41:14 93:3
**set** 16:20 17:3
34:19 72:14
**seven** 37:2
**shakes** 8:4
**share** 27:7 38:14
86:10,14 96:14
**sheet** 11:1,4,7,12
11:13,22 12:17
12:19,22,25 13:3
13:5,14,15,16
14:24 15:4
17:22 26:4 52:8
56:25 63:22
111:3 132:19
145:15 161:12
**sheets** 15:23
26:1,7 85:21
108:3,6

**shimabukuro**
137:24
**short** 32:6
108:21
**shorten** 129:4
**shorthand** 165:5
165:12
**shortly** 156:3
**shout** 6:19
**show** 14:25 26:8
27:8 32:22
71:13 93:6
104:14,16
121:17 152:3
**showed** 26:12
**showing** 121:25
130:20 158:9,23
159:18 160:4,20
160:21
**shows** 53:15
128:12 130:16
136:2
**sic** 73:16
**sick** 20:20 154:5
**side** 102:4,19
129:20
**signature** 150:4
150:5 163:7
165:21
**signed** 122:21
152:13,16
**signing** 149:13
**similar** 91:2 96:3
114:25,25 119:8
**similarly** 161:10
**simmons** 1:22
2:7 4:15 7:23
165:5,22

**single** 103:1
138:13
**sit** 6:16 141:1
145:3
**sitting** 59:21
**situations** 82:3
**six** 15:19 37:2,3
**sky** 3:11 27:15
27:16,17,21,24
28:5,10,18,21
35:9 40:15
41:15,18 84:8
89:3 100:1,4
105:4 106:11
116:2,21 117:24
118:9,13,24
119:10 145:14
148:4,9 154:14
155:20 157:5
**slightly** 113:24
**small** 50:9 52:15
**smaller** 63:25
**smart** 101:25
**smoother** 6:6
**social** 113:13
**somebody** 25:10
33:12 67:10
119:2 126:19
127:1 129:24
133:25 137:2
142:10 162:15
**somebody's** 84:3
**someone's**
118:11
**soon** 12:7 14:2
77:11 97:22,24
156:19 157:2,3

**sooner** 119:20
120:4,6,11,16,22
**sorry** 11:8,19
20:13 22:3 33:5
56:7 69:15 71:4
73:5 87:9
102:22,23
105:13 112:1
122:15 126:25
131:2 146:8,10
148:5
**sort** 84:9,11,12
84:15 87:21
88:2 90:17
**sorted** 85:18
**sounds** 12:11
18:13 22:4 32:9
65:10 67:9
94:21 96:2
114:25 119:5
**source** 144:13
**speak** 40:9 78:24
**speaking** 5:2
**speaks** 140:12
**specific** 9:7 23:2
25:7 26:11 92:1
110:24 111:1
**specifically** 8:20
12:1 26:10
44:24 45:14
112:12 148:1,3
158:11
**speculation**
68:10 107:20
118:3 120:19
140:19 143:11
146:6 151:10

Page 27

[speed - supplemental]

| | | | |
|---|---|---|---|
| **speed** 10:1 | **start** 8:13 23:20 | **statewide** 69:7 | 141:5 162:18 |
| **speedy** 75:16 | 27:6 37:1,4 | 85:11,12,16 | **submitting** |
| **spell** 42:4 | 105:13 124:1,5,6 | 124:2 | 137:20 138:17 |
| **spokane** 65:12 | 125:11 | **stay** 133:12 | **subscribed** |
| 65:16 | **started** 9:10,19 | **stephanie** 89:10 | 164:21 |
| **spreadsheet** | 9:25 19:4 28:9 | **steps** 21:15 | **subscriber** 27:22 |
| 11:14,21,25 | 41:3 43:9 69:9 | 43:24 | 95:23 110:12 |
| 125:3,9 127:9,10 | 73:1 79:21 | **stewart** 50:23 | 111:10 |
| 128:19,23 | 102:24 124:15 | **stipulations** 4:18 | **subscribers** |
| 132:17 135:20 | 138:19 | **stop** 38:14 86:10 | 27:20,25 31:3,7 |
| 137:5,15 139:1,3 | **starting** 42:6 | 96:13 | 31:9 93:15 94:3 |
| 140:3 142:1,22 | **starts** 46:19 | **stories** 117:6 | 94:5 96:24 |
| 152:24 | **state** 2:8 4:17 | **story** 117:2,10 | 111:8,16,23 |
| **spreadsheets** | 5:17 13:22,25 | 148:20,21 | 157:4 |
| 138:15,24 139:1 | 14:9,20 24:14 | **street** 2:20 | **subscription** |
| 139:8 144:7,8 | 25:2,11,14 29:7 | **strike** 15:4 52:10 | 28:5 41:11,14 |
| **stage** 61:22 | 29:8,10,15 30:8 | 72:13 92:8 | **substitute** 20:17 |
| **stamp** 14:3 | 30:9,14 34:20 | 106:11 119:14 | 28:13 |
| 55:12,12 57:12 | 38:8,18,18 42:23 | 156:7 | **suing** 109:11 |
| 57:16,21,25,25 | 43:25 44:11,16 | **strikes** 7:2 | **suite** 2:20 |
| 58:2 131:6,13,13 | 45:13,20 46:8,11 | **student** 113:13 | **summaries** 30:5 |
| 131:15,17 134:6 | 46:19,23 47:3 | **style** 3:12 8:17 | 111:11,14 |
| 134:16 147:4 | 48:9 51:20 62:2 | 8:21 9:5,6,18,20 | **summarize** |
| 159:6,7,11 160:1 | 71:20 72:3 | 10:3 15:22 41:1 | 112:22 |
| 160:13,17,18 | 84:12 103:17 | 52:2 79:19 80:9 | **summary** 11:18 |
| 161:5,10 162:1 | 105:5 106:13,16 | 89:1 90:6 91:15 | 30:17 32:6 |
| **stamped** 55:16 | 106:19 112:19 | 94:4 113:23 | 38:17 44:15 |
| 56:15 142:8 | 114:3 115:1 | 116:4 | 45:5 73:13 75:8 |
| 151:15 | 119:9,17 122:24 | **sub** 154:24,25 | 75:12 101:12 |
| **stamps** 143:19 | 138:14 146:22 | **submission** | 111:7,9 |
| 144:20 161:6 | 154:9,12,19 | 140:15 | **summons** 92:20 |
| **stand** 63:24 64:1 | 155:19 156:13 | **submit** 137:22 | 93:8 |
| 64:3,5 | 156:13 164:2 | 137:23 | **sunday** 78:3 |
| **standing** 54:13 | 165:2,6,24 | **submits** 143:25 | **supervisor** 13:10 |
| 54:18 58:14 | **statements** 7:21 | **submitted** 13:16 | 23:23 |
| 60:14 | **states** 1:1 35:16 | 46:13 99:8 | **supplemental** |
| **standpoint** 7:19 | 37:22 123:23 | 128:23 131:18 | 3:16 152:5 |
| 75:23 76:5,12 | 150:2 | 131:20 140:23 | 158:5 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-1868

Catherine Valenti November 8, 2022

[support - thanksgiving]

| | | | |
|---|---|---|---|
| **support** 3:14,17 112:7,8 | 99:3 104:2,22 105:7 107:16 | 136:20 | 96:20 101:9,19 109:16,19 114:6 |
| **supposed** 39:10 | 108:2 112:16 | **talked** 21:24 | 114:21 118:15 |
| **supreme** 46:4,6 | 114:15 115:15 | 22:5,10 23:6,15 | 122:5 124:12 |
| **sure** 6:10 9:17 | 120:11 142:21 | 23:24 61:19,20 | 125:24 132:25 |
| 10:14 12:23 | 143:8 146:2,25 | 67:22 69:5 | **telling** 82:2 |
| 13:12,18 14:14 | 147:1 150:22 | 124:5 136:3,16 | 154:18 |
| 16:7,17 21:24 | 151:15 | 143:18,21,24 | **tells** 85:20 |
| 25:4 29:24 30:6 | | 146:17 161:24 | **ten** 39:21 78:13 |
| 33:2 34:10 | **t** | **talking** 14:23 | **tens** 90:14 |
| 36:20,24 45:16 | | 22:21 23:18 | **term** 107:7 |
| 45:25 49:7,24 | **t** 3:2,9 42:5 | 25:16 60:6 64:7 | 111:1 |
| 51:18 53:12 | 89:15 | 82:9 86:22 | **terms** 110:25 |
| 54:13,16 57:11 | **take** 6:17,23 | 87:19 96:16 | **testified** 5:9 |
| 59:19 76:6 82:7 | 10:22 17:21 | 98:22 100:9 | 144:12 150:12 |
| 84:18 85:8 94:2 | 32:7 37:9 39:16 | 114:10 125:10 | **testify** 140:1,9 |
| 97:23 103:23 | 39:20 43:25 | 142:6 153:6 | 165:9 |
| 106:21 107:24 | 48:14 67:16 | **talks** 97:16 | **testimony** 59:9 |
| 114:17 121:7 | 71:13 78:12 | **target** 97:2 | 59:18 61:5 |
| 129:22 131:20 | 80:14,20 84:4 | **tasked** 116:2 | 68:10,13 142:3 |
| 131:21 135:23 | 90:23,23 93:12 | 151:1 | 143:1 144:12 |
| 136:14 137:1 | 94:14 95:6 | **tax** 93:25 | 149:6 150:19 |
| 139:19,20 142:5 | 96:24 112:21 | **technologies** | 158:12,16,20 |
| 144:18 148:19 | 121:2,6 126:10 | 55:1 105:20,25 | 162:11 |
| 151:13 155:15 | 144:7 153:16 | 131:24 132:4 | **text** 81:21,23,24 |
| 157:14 159:15 | **taken** 2:4 4:7 | 140:15 146:24 | 82:12,22,24 |
| 161:20 | 36:18 39:25 | **telephone** 2:16 | 126:9 135:22 |
| **swear** 5:5 | 78:18 95:16 | 2:21 | **texting** 60:3 |
| **sworn** 5:8 | 102:8 107:13 | **tell** 5:8 10:15 | **thank** 6:20 7:14 |
| 149:23 164:5,21 | 121:12 137:4,9 | 20:16 22:19 | 51:8 81:2 141:9 |
| 165:9 | 153:22 164:8 | 24:6 27:13 | 144:21 157:15 |
| **system** 14:21 | 165:11 | 35:10,13 36:24 | 157:17 158:7 |
| 33:15,18,21 36:8 | **takes** 32:22 33:8 | 40:24 46:7 | 160:20 161:14 |
| 44:20 45:1,2 | 34:6 36:21 | 53:23 63:12 | 162:20,24 |
| 47:8 53:5 59:3 | **talk** 24:1 29:4 | 69:4,6 71:19 | **thanks** 125:8 |
| 59:13,16 61:4,10 | 40:6 54:19 67:7 | 73:24 75:14,20 | **thanksgiving** |
| 70:1,5 80:2 83:2 | 94:18 100:16 | 75:24 76:3 77:3 | 78:6 |
| 83:13 98:4,11 | 112:16 121:19 | 82:16,23 83:24 | |
| | 125:3 130:5 | 85:23 86:3 | |

Page 29

[thereof - transferred]

| | | | |
|---|---|---|---|
| **thereof** 164:11 | **three** 2:15 28:11 | 161:5,6,10 163:2 | **top** 19:11 34:5 |
| **thing** 10:23 50:7 | 38:25 49:11,23 | 165:12 | 57:12 92:4 |
| 63:15 95:11 | 86:20 | **timeliness** 25:18 | 112:10 159:6,8 |
| 129:18 | **throw** 85:4 | 32:14 41:8 | 159:11 160:1,11 |
| **things** 8:19 18:9 | **time** 4:5 6:25,25 | **timely** 26:20 | 160:16 161:5 |
| 22:9 40:14 | 7:15 12:5,20 | 75:22 76:5,11,16 | **track** 11:14,15 |
| 43:20 45:6 93:7 | 14:3,4 15:2 | 77:5 156:11,16 | 12:24 13:2 |
| 94:8 113:14 | 22:22 23:1 25:9 | 157:9,13 | 15:10 17:15 |
| 140:25 153:4 | 26:6 28:14 31:1 | **times** 21:25 | 32:13,17,25 72:1 |
| **think** 13:7 14:13 | 32:22 33:7 39:9 | 22:11 23:5,7,9 | 92:6 114:2,15 |
| 15:1 16:9,12 | 39:23 40:2 | 36:16 49:14,15 | 125:14 127:17 |
| 19:10,11 22:8 | 48:24 49:13 | 49:22 55:19 | 128:1 161:9,11 |
| 24:18,23 25:5,7 | 54:14,15 57:25 | 72:21 102:12 | **tracked** 21:20 |
| 26:22 32:11 | 58:11 60:11 | 109:5,5,9 112:15 | 71:24 72:2 |
| 34:1 42:5,5 54:7 | 62:11,22 71:10 | 113:8 117:9,11 | **tracking** 11:1,4 |
| 56:19 62:23 | 71:18 72:25 | **timing** 25:1,13 | 11:7,12,13,22 |
| 64:10 65:16 | 75:14,20 76:1,3 | 26:2,8 32:18 | 12:6,17,19,22,25 |
| 66:22 69:5,19 | 76:8,10 77:2,8 | 49:3 153:13 | 13:5,14,15,15 |
| 70:9,24 79:10 | 78:16,20 82:8 | **title** 13:12 16:25 | 14:24 15:4,10,23 |
| 81:15 88:16 | 84:16 86:4 | **today** 4:24 7:19 | 17:16,22 21:10 |
| 90:8 97:18 | 87:14 89:19 | 8:2,16 10:25 | 21:17 22:6 |
| 99:11 101:9 | 93:16 98:3,6 | 17:13 18:11 | 24:22 26:1,3,4,7 |
| 102:5 106:21 | 101:7 102:7 | 19:9,17,18 20:7 | 124:1 125:11 |
| 116:22 120:9 | 108:22 112:5,22 | 26:25 29:14 | 137:18 142:15 |
| 125:19 127:2 | 117:12,23 118:8 | 61:14 82:14 | 145:15 148:6 |
| 129:3,18 130:20 | 118:11 121:11 | 84:2 122:3,19 | 161:12 |
| 130:23 131:21 | 121:14 124:18 | 137:18 141:1,2,3 | **tracks** 33:6 |
| 133:1 145:23 | 131:6,12,15,17 | 153:7 | **trained** 45:12,17 |
| 146:19 148:3 | 133:5,16 136:18 | **today's** 4:4 10:5 | 96:21 |
| 153:17 156:20 | 138:7,16,24 | 16:1 152:8 | **training** 28:8,12 |
| 160:25 | 139:2,6 142:7 | **told** 21:12 23:25 | 41:7 44:19 97:7 |
| **thinking** 54:9 | 144:20 145:25 | 24:16 58:2 | 113:21 119:23 |
| 117:1 | 146:12,14 147:3 | 75:19 76:10,13 | **transcribe** 8:7 |
| **thoroughly** 19:7 | 147:22 148:7 | 80:5,6 119:18 | **transcript** |
| 122:25 | 151:14 153:20 | 133:1 145:2 | 165:14 |
| **thought** 43:14 | 153:24 157:16 | 148:7 | **transferred** |
| 145:5 | 159:6,7,11 160:1 | **tomorrow** | 146:24 |
| | 160:13,17,18 | 139:18 | |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[transferring - vague]**

| | | | |
|---|---|---|---|
| **transferring** 147:2 | **type** 11:15 42:6 56:23 85:22 | 129:2 135:18 154:13 156:5 157:7 | **ups** 45:10 161:16 |
| **transfers** 112:24 | **types** 45:6,23 68:1 111:12 | **understanding** 12:21,23 13:19 | **usdc** 28:23 114:1 118:17,19 |
| **transitioning** 53:4 | **typewriting** 165:13 | 13:24 16:14 28:2,4 32:8 | **use** 8:3 11:9,9 12:22 13:20 |

**transferring** 147:2
**transfers** 112:24
**transitioning** 53:4
**travel** 124:20
**tree** 90:21 91:19 92:16
**true** 150:2 152:17,18,21 164:14 165:14
**truth** 5:8,9,9 165:10,10,10
**truthful** 122:13
**try** 51:17 94:1 101:8 161:1
**trying** 25:8 62:23 87:17 135:18
**tuesday** 2:8 38:5
**turn** 54:19
**twice** 116:15
**twin** 64:18
**two** 10:8 28:11 34:17 49:11,22 86:20 89:8 96:17 100:25 102:5 147:15 155:10
**tyler** 13:17 105:19,20,25 131:24 132:4 140:15,23 141:6 142:13,16 143:22 144:1 146:24 162:4
**tyler's** 14:16 153:5

**type** 11:15 42:6 56:23 85:22
**types** 45:6,23 68:1 111:12
**typewriting** 165:13
**typical** 37:7 49:2
**typically** 90:14 90:15
**typo** 118:6
**typos** 118:25 119:1

**u**

**u** 42:5
**u.s.** 119:6 159:13 160:17
**uh** 8:5
**uhs** 8:6
**ultimately** 13:21 14:8 47:3 122:21
**um** 71:2 128:9 128:14
**understand** 6:8 9:3 13:18 17:1 17:20 20:19 34:18 41:6 42:20 44:10 45:9,14,19 46:7 46:10,17 47:18 73:8,15,25 74:1 74:7 82:25 87:17 98:10,12 98:18 99:7 103:23 104:20 109:5 115:5,13 122:20 125:4,22

129:2 135:18 154:13 156:5 157:7
**understanding** 12:21,23 13:19 13:24 16:14 28:2,4 32:8 35:18 38:22 46:21 48:10,11 48:12 52:14 54:2,9 55:10 56:20 69:3 72:15 88:16 97:25 98:16 106:7,8,24 107:3 120:4,14 122:6 123:18 132:3 136:4 143:3 150:15 152:7 154:3 156:8,23
**understood** 6:12 53:23 54:12 150:9 152:12 159:17
**unfiled** 98:24 115:18
**united** 1:1 35:16 37:21 150:1
**universe** 26:24
**update** 79:24
**updated** 9:12 79:22 139:17
**updates** 13:14
**upload** 94:2 111:21
**uploaded** 112:3
**uploads** 100:9

**ups** 45:10 161:16
**usdc** 28:23 114:1 118:17,19
**use** 8:3 11:9,9 12:22 13:20 15:10,14,16,23 15:24 21:13 29:5,6 52:5 71:6 94:4 102:19,21 107:10 110:24 111:1 113:22 125:19 134:1,1,4 135:3 145:11 149:15,23 155:2 161:13
**user** 83:18
**usually** 11:3 30:4,6 37:2,8,10 49:6,10 85:2 90:16 93:8 94:1 94:14 100:12 102:4 129:19
**utmost** 103:13

**v**

**v** 1:6
**vacation** 20:20 154:5
**vague** 29:17 30:20 31:11 44:2,21 47:23 48:18 49:19 51:14 54:5,22 56:5 57:4 58:6 58:22 59:8 73:7 73:19 77:15 98:13 104:4,10 104:23 105:8

Page 31

**[vague - words]**

| | | | |
|---|---|---|---|
| 107:6,18 108:14 115:8 118:1 120:12,17 132:13 136:24 140:11,17 142:3 142:24 143:10 146:3 149:5 150:18 156:14 157:10 162:11 | **videographer** 2:24 4:3 5:4 39:23 40:1 78:16,19 121:10 121:13 153:20 153:23 162:22 162:25 | 117:2 128:24 138:21 139:8 150:23 **wanted** 22:8 47:14,16 50:3,5 50:13 55:2 56:2 56:18 57:1 58:18 60:20 63:5 96:5 110:17 121:9 | **weekend** 36:21 38:2,12 78:1 **weekends** 36:22 37:19 38:9 **weekly** 26:5 29:2 **weeks** 28:11 34:17 **went** 8:17,18 12:7,8,12,16 21:15 28:15 |
| **valenti** 1:13 2:1 2:4 3:4,14,17 4:7,21 5:7,14,16 5:17,19 20:4 40:4 48:6 67:15 78:14,22 129:4 139:14 149:9 157:23 158:3,8 161:17 163:1 164:5,19 | **videotaped** 1:13 2:1,3 4:7,12,13 8:2 **view** 156:2,10 **visit** 34:16,25 35:4 62:7,8 63:14 75:9 **visited** 68:3 **vs** 4:9 23:4 89:15 89:17 90:21 | **wanting** 120:25 **washington** 62:8 63:12 65:2,11 70:19 74:19 75:3,8,21 **way** 13:21 14:8 20:3 51:10,24 68:14 76:1 87:9 104:1 105:3 106:9 135:17 143:15 146:20 149:8 154:22 | 42:2 47:4 49:10 63:9 65:11 67:11 68:4 70:11,12 76:6 144:9 151:15 162:6 **west** 2:20 **william** 2:25 5:3 **witness** 5:5,8 19:25 29:20 31:14,21 39:19 |
| **various** 34:20 39:8 129:11 **vary** 37:11 **verbal** 8:1 **verbatim** 165:15 **verification** 164:1 | **w** | **we've** 67:22,22 115:24 139:2 152:21 161:6 **web** 101:17 **website** 53:14 93:13 116:9 124:11 | 44:6,23 48:21 49:22 54:7 57:8 58:25 73:22 99:17 105:12 107:9 108:17 118:5 120:14,20 130:23 137:1 |
| | **wait** 54:18 82:12 82:21,24 102:8 102:13 **wake** 147:19 **walk** 91:10 **walked** 100:7 | | |
| **verified** 153:5,13 **verify** 28:3 **veritext** 2:6 4:16 **version** 9:6,7 125:16 139:17 **versus** 123:6 146:14 | **walmart** 97:2 **want** 58:20 59:5 59:12 60:8,18,24 61:8 62:16,18 68:12 73:5 82:3 82:18,21 83:4 | **week** 22:5 34:16 62:7,11 65:3 72:25 75:3,15 76:11 116:15,15 138:17 | 140:20 142:5 144:12 146:7,12 156:18 157:13 157:17 164:7 165:8,18 **word** 54:5 146:4 |
| **veterans** 78:6 **video** 2:6 4:16 163:1 **videoconference** 2:5 4:13 | 87:21,21 88:9,10 89:3,23 94:2,3 94:22 95:23 96:24 100:5 103:20,25 104:6 110:13 114:20 116:8,17,19,23 | **week's** 62:12 **weekday** 72:19 77:12,22 | 149:15,22,22 **wording** 91:25 **words** 59:16 149:9,12 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**ER-1872**

Catherine Valenti November 8, 2022

**[work - zoom]**

| | |
|---|---|
| **work** 11:3 14:12 34:7 36:25 37:1 37:2,10,19 42:7 46:9 58:12 60:12 66:1 77:13,20,23,25 78:5,14 102:24 117:13 119:15 124:17 155:16 | 35:8 38:21 39:4 39:5,7 106:16 |
| | **wyoming's** 32:17 33:7,17 |
| **workday** 154:15 | **x** |
| **worked** 8:18 47:1 54:3 | **x** 3:1,2,9 144:8 |
| **workflow** 99:11 | **y** |
| **working** 9:25 21:14 43:9 45:11 50:2 79:21 146:22 149:2 155:1 | **y** 144:8 |
| | **yeah** 46:10 49:2 54:16 60:1 66:19 73:24 83:6 92:12,14 103:25 111:4 112:12 130:7 140:4 160:12 162:24 |
| **works** 13:13 39:21 108:24 | |
| **world** 82:15 96:5 | |
| **worries** 62:24 | **year** 88:1,7 |
| **worrying** 93:2 | **years** 5:25,25 43:2 |
| **worth** 62:12 | **yellow** 136:15 |
| **wow** 145:4 | **yellowstone** 34:1 34:13 |
| **write** 30:17 111:6,9 116:8 117:2,6,10,16,17 147:22 148:20 148:21 | **yep** 19:13 51:9 |
| | **yesterday** 84:6 86:14 90:9 |
| | **yesterday's** 84:4 86:11 |
| **writing** 119:22 | **z** |
| **written** 117:20 121:23 149:9 | **z** 144:8 |
| **wrong** 118:9 | **zone** 147:19 |
| **wrongful** 97:3 | **zoom** 4:13 16:18 |
| **wyoming** 28:19 28:22,23 29:1 31:16 34:22,23 | |

Page 33

Idaho Rules of Civil
Procedure

Rule
30

(e) Review by the Witness; Changes.

(1) Unless waived by the deponent and the parties, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them. (2) Changes indicated in the Officer's Certificate.  The officer must note in the certificate prescribed by Rule 30 (f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period. (3) Witness Failure to Sign. (A) In General, If the deposition is not signed by the witness within the 30-day period, the officer must sign it and state on the record the fact of the waiver of signature, or of the illness or absence

of the witness or the fact of the
refusal to sign the deposition together
with any reason given for not signing.
(B)  Use of Unsigned Deposition.  The
deposition may be used as if it were
signed, unless pursuant to Rule 32
(d)(4) the court determines that the
reasons given for the refusal to sign
require rejection of the deposition in
whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit H

ER-1877

Home • Dataharvest

# Information on Odyssey Portal Data Harvesting

*Updated May 3, 2022*
We are pleased to report that as of April 21, 2022, 100% of potentially affected client Odyssey Portals have been remediated.

In the coming months, we will publish additional releases of Odyssey Portal that further "harden" the application against undesired harvesting activity. In accordance with industry best practices, we consistently encourage our clients to stay up to date with the latest releases of our software to take advantage of both stability and security enhancements.

We will post news of the next few Portal releases for clients on the Tyler Community site in addition to our usual client communication channels for software update information. Clients will also receive notification from their Client Success teams when these updates are available for independent or assisted installation.

## Previous Updates

*April 19, 2022*
As of April 2, 2022, 99% of potentially affected client Odyssey Portals have been remediated. The remediation for each client is unique and based on individual configurations and preferences. We are optimistic that we will reach 100% remediation soon.

We continue to work cooperatively with judyrecords.com on behalf of our clients to best understand what nonpublic data, if any, may have been made available via the judyrecords.com site. Tyler has developed a process to facilitate our clients' investigations and we continue to make resources available to streamline such process for all stakeholders.

In addition, Tyler is coordinating with multiple third-party security firms, including Mandiant, on this active investigation. While a complete forensic analysis is still underway, we are pleased to have nearly all potentially affected Odyssey Portal users remediated and live.

*March 21, 2022*
Remediation efforts and the security of our clients' data remain Tyler's top priorities. Our cross-functional internal team along with our third-party security firms have been working continuously on behalf of our clients since this matter was first identified. We are committed to working in a forensically sound, responsible manner.

As of March 21, 2022, over 80% of potentially affected client Odyssey Portals have been remediated and are back online. Our support team continues to work with remaining clients on remediation based on their individual configurations and scheduling preferences.

Tyler is working with and on behalf of our clients to best understand what nonpublic data may have been made available through a judyrecords.com search, if any, and what data may have actually been viewed via the judyrecords.com site, if any. We understand from

### Contents

- Previous Updates
- Steps Being Taken
- Available Facts
- Support for Tyler Clients
- FAQs

### Contact Information

**MEDIA CONTACT**
**TYLER TECHNOLOGIES MEDIA TEAM**
Media.team@tylertech.com
Media Room

judyrecords.com that they have the ability to both identify what data was harvested and what was accessed while on their site and, thus, judyrecords.com's continued cooperation is extremely important.

For those clients where judyrecords.com has provided the full data, Tyler has worked to help our clients fully assess the harvested information and identify what may have been viewed or accessed while on this third-party site. Tyler will continue acting as an intermediary between these clients and judyrecords.com to ensure that all nonpublic information has been removed from this third-party site. We look forward to judyrecords.com's continued cooperation in this effort.

---

*March 8, 2022*

On Feb. 24, 2022, Tyler Technologies was notified by the State Bar of California that nonpublic case record data was posted to judyrecords.com. Judyrecords.com is not associated with the State Bar of California or Tyler. Tyler immediately launched an extensive investigation.

Based on our research to date, it appears that judyrecords.com regularly conducts data harvesting to make <u>public</u> records available through an online search tool. During judyrecord.com's harvesting activity, it appears that certain <u>public</u> and <u>nonpublic</u> case records were accessed by judyrecords.com via the State Bar of California's Odyssey Portal and made available for search on the judyrecords.com site. Tyler confirmed this activity did not involve access to the State Bar's Odyssey case management system and was contained to its public-facing Odyssey Portal.

On Feb. 28, 2022, Tyler learned that judyrecords.com may have performed data harvesting activity on the Odyssey Portals of other Tyler clients, and may have made certain nonpublic data of other Tyler clients available for search online as well. Tyler quickly contacted clients that have an installation of Odyssey Portal identified as potentially affected and provided recommendations for containment, including the option of taking their portal offline and similar mitigation steps.

The data harvesting activity surfaced a vulnerability in the Odyssey Portal that is being addressed through intensive efforts by the Tyler team in coordination with our clients. Clients use the Odyssey Portal to provide access to public case records, but also may authorize and grant access to approved third parties to access nonpublic case records. Tyler is working with clients to make sure that only authorized parties can access nonpublic case records.

On March 4, 2022, judyrecords.com confirmed to Tyler that they had performed data harvesting on the Odyssey Portals of other Tyler clients and had information that could assist in identifying the exposed nonpublic records. Please see the steps below for more information.

## Steps Being Taken

1. The issue is of utmost concern to Tyler. Tyler's first priority is working with our clients to (1) ensure the security of their data, and (2) remediate the issue as soon as possible so our clients can continue to use Odyssey Portal to serve their constituents.

2. We are gathering as much information as possible to determine what type of data was accessed and whose nonpublic data may have been made available through a judyrecords.com search. We are committed to sharing our findings with our clients and taking appropriate actions to ensure security of client data.

3. Tyler and judyrecords.com are currently coordinating with each other to identify other potentially impacted Tyler clients. The operator of judyrecords.com has indicated a willingness to share detailed information that will assist Tyler in determining which client data was involved. Tyler acknowledges and appreciates that judyrecords.com has taken steps to contain further disclosure of nonpublic information. We acknowledge judyrecords.com takes the position that the accessing and disclosure of nonpublic information by judyrecords.com was inadvertent.

4. Tyler has been receiving and will continue to work to receive information from judyrecords.com and from Tyler's clients in a forensically sound manner to assist with the investigation. Tyler has engaged our outside security team, Mandiant, to assist with this work. Tyler looks forward to continuing to work cooperatively with judyrecords.com and with our potentially impacted clients to ensure a full investigation is completed and all nonpublic information remains confidential.

## Available Facts

- On Feb. 24, 2022, Tyler learned that the State Bar of California's nonpublic case record data was posted to judyrecords.com.

- On Feb. 28, 2022, Tyler learned that judyrecords.com may have also performed data harvesting activity on the Odyssey Portals of other Tyler clients and had potentially posted nonpublic data of other Tyler clients online as well. This activity was confirmed by judyrecords.com on March 4, 2022.

- Tyler quickly notified potentially affected Odyssey Portal clients and provided recommendations for containment, including the option of taking their public-facing Odyssey Portal offline.

- Judyrecords.com's data harvesting activity involved only certain public-facing Odyssey Portal installations. It did not involve nonpublic-facing Odyssey Portal installations or Odyssey case management systems.

- Between March 2 and March 18, 2022, Tyler held eight webinars for Odyssey Portal clients to explain what we know about the judyrecords.com activity, the scope of its impact, and the steps clients can take to remediate and/or mitigate a data harvesting risk on their Odyssey Portal deployment.

## Support for Tyler Clients

- The Tyler team invited all potentially affected clients to multiple online webinars to explain the issue and direct them to resources for more information.

- Tyler's support team has posted recommended actions and instructions on Tyler's community platform, and these are being updated regularly.

- Tyler has dedicated additional staff and resources to research and mitigate this matter.

- Tyler has engaged Mandiant, a third-party security forensic company, to support Tyler's investigation of this issue.

## FAQs

| Why were nonpublic records accessible in this way? |
| --- |

| How many Odyssey Portal locations were involved with data harvesting and what kind of data was harvested? |
| --- |

| Was my nonpublic information made publicly available? |
| --- |

| How soon can each Odyssey Portal be remediated? |
| --- |

**Judyrecords.com has asked Tyler to state its belief as to whether or not the nonpublic records were harvested intentionally. What is Tyler's response?**

Tyler has previously acknowledged that judyrecords.com's position is that its accessing and disclosure of nonpublic information was inadvertent. In addition, Tyler has also stated that it is taking a deliberate, systematic approach to the research and forensic activities it has mobilized. While we understand that involved parties desire a quick resolution, our focus is on conducting a full and responsible forensic analysis, which takes time. Consistent with standard forensic protocols,

it is not prudent to draw conclusions while this analysis is ongoing. We continue to appreciate judyrecords.com's cooperation with Tyler and look forward to continued collaboration.

**How many Tyler clients use Odyssey Portal?**

**What does it mean if a jurisdiction is listed on judyrecords.com?**

# Exhibit I

**NEWS** • Investigative

# State Bar notifies 1,300 individuals identified in massive data breach

State Bar Executive Director Leah Wilson says contacting those affected is the 'right thing to do'

By **SCOTT SCHWEBKE** | sschwebke@scng.com | Orange County Register
PUBLISHED: May 6, 2022 at 7:50 p.m. | UPDATED: May 9, 2022 at 1:02 p.m.

The State Bar of California has begun notifying thousands of individuals whose names appeared in 322,525 confidential attorney discipline records published online in a massive data breach discovered in February,

Specifically, the State Bar said Friday, May 6, it will contact through email or postal mail 1,300 complainants, witnesses or respondents whose names appeared in the 1,034 confidential records that showed evidence of a page view. Those named in unviewed records with emails on file with the State Bar also will be contacted.

"We are taking these steps because we believe it's the right thing to do," State Bar Executive Director Leah Wilson said in a statement. "The State Bar is committed to transparency, and maintaining the public's trust in our agency is paramount. That said, we had to balance our commitment to being transparent with considerations of costs, logistics, and fiscal prudence. We believe we have struck the right balance."

The documents, published by public records aggregator Judyrecords, remained online from Oct. 15, 2021, to Feb 26, 2022.

The breach, first reported by the Southern California News Group, was not a malicious hack, but rather a security vulnerability in the State Bar's Odyssey Portal operated by Texas-based Tyler Technologies. As a result, the confidential records were unintentionally swept up and published by Judyrecords.

Access to the State Bar Court's public records has been restored and the Odyssey Portal vulnerability has been corrected.

The search function on the Judyrecords website remained disabled Friday. The website's administrator said in a note to users the Tyler Technologies portal glitch allowed access to court cases for various jurisdictions in California, Texas, Georgia and Kansas.

Newsroom Guidelines
News Tips
Contact Us
Report an Error

 The Trust Project

---

## Coronavirus Update.

Stay up to date on the latest coronavirus coverage in your area, right in your inbox.



**ER-1883**

Sign Up

Privacy Policy

Tags: **court**, **SoCal Watchdog**, **Top Stories Breeze**, **top stories ivdb**, **Top Stories LADN**, **Top Stories LBPT**, **Top Stories OCR**, **Top Stories PE**, **Top Stories PSN**, **top stories rdf**, **Top Stories SGVT**, **top stories sun**, **Top Stories WDN**



## Scott Schwebke | Investigative Reporter

Scott Schwebke is an investigative reporter for the Orange County Register and the Southern California News Group. A native of Fort Lauderdale, Fla., he was previously a breaking news and multimedia reporter for the Ogden, Utah, Standard-Examiner. Scott has also worked at newspapers in Utah, Colorado, North Carolina and Virginia covering everything from methamphetamine trafficking cops to hurricanes. He has also accompanied police on undercover drug buys and also provided an award winning, eyewitness account of the execution of a North Carolina death row inmate. Scott was part of the OC Register's investigative team that in 2017 produced the year-long, award winning Rehab Riviera series, examining problems in Southern California's drug rehabilitation industry. He also teamed up with reporter Joe Nelson in 2019 on Bad Apples, an award winning investigation that exposed years of sex abuse cover up in the Redlands Unified School District. Having spent two years living in England including Liverpool, he is an avid Beatles fan and memorabilia collector.

sschwebke@scng.com



**Regular People Call It A Pocketknife - It's Anything but That**

**Deejo** | Sponsored

**Gwen Stefani, 53, Takes Off Makeup, Leaves Us With No Words**

**Finance Wealth Post** | Sponsored

**Cher's Son Chaz Bono Is So Skinny Now And Looks Like A Model (Photos)**

Daily Finance Stories | Sponsored

**Do This Immediately If You Have Moles Or Skin Tags (It's Genius!)**

EcoHealthNews | Sponsored

**Cadillac Has Done It Again. This Year's Lineup Has Left Us Speechless**

All Things Auto | Sponsored

Search Now

**Diabetes Is Not From Sweets! Meet The Main Enemy Of Diabetes**

Health Benefits | Sponsored

**Here Are 7 Legal Discounts Seniors Only Get When They Ask**

Senior Discounts By National Penny | Sponsored

**Wexford Waterproof Boot**

$199.95 - ARIAT | Sponsored

**This Pillowcase is Becoming The Must-Have Holiday Gift of 2022**

Blissy | Sponsored

**JTV has fashionable jewelry to complete any wardrobe.**

JTV | Sponsored

**Maurices Womens Waffle Tank Pajama Top Beige - Size Medium**

$8.00 - Maurices | Sponsored

**Here Are 23 of the Coolest Gifts for This 2022**

TrendingGifts | Sponsored

**Man who jumped to death at Disneyland was Huntington Beach school principal**

Orange County Register

**Orange County restaurants shut down by health inspectors (Nov. 10-17)**

Orange County Register

**15 Actors That Hollywood Banned For Life**

YourBump | Sponsored

**Chrissy Metz, 42, Shows Off Massive Weight Loss In Fierce New Photo**

Daily Finance Stories | Sponsored

Learn More

**New Retirement Villages Near Boise (Take A Look At The Prices)**

Senior Living | Sponsored Searches | Sponsored

**Here's what 30 historical figures actually looked like in real life**

Livestly | Sponsored

**Fountain Valley district grieving principal who died at Disneyland**

Orange County Register

**Santa Ana woman killed by bullet meant for 2 teenage boys, police say**

Orange County Register

**Cardiologist: Too Much Belly Fat? Do This Before Bed**

Healthbay | Sponsored

**New Shaftless Stair Lifts (Take a Look at the Prices)**

Stair Lifts | Search Ads | Sponsored

Search Now

**Most Dog Owners Don't Know This About Their Dog Eating Dry Food**

Ultimate Pet Nutrition | Sponsored



How many times have we fallen for this?

SPONSORED CONTENT

**Penny Hoarder Issues "Urgent" Alert: 6 Companies Are Overcharging You** 

By The Penny Hoarder

# Exhibit J

# Deposition of 30(b)(6) Jennifer Dvorak

# Courthouse News Service v. Omundson

# November 7, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____
                                )
COURTHOUSE NEWS SERVICE,        )
                                )
                                )
        Plaintiff,              )
                                )
    v.                          ) No. 1:21-CV-00305-REP
                                )
SARA OMUNDSON, in her official  )
capacity as Administrative      )
Director of Idaho Courts,       )
                                )
        Defendant.              )
_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF IDAHO COURTS

REPRESENTED BY JENNIFER DVORAK

_____

Taken at Boise, Idaho
(Conducted via Videoconference.)

DATE TAKEN:  November 7, 2022
REPORTED BY: Nicole A. Bulldis, RPR
         AZ No. 50955 | CA No. 14441 | WA No. 3384

---

**Page 2**

1           A P P E A R A N C E S
2
3   FOR PLAINTIFF:
4   (via Zoom)    Jonathan G. Fetterly
                  Katherine A. Keating
5                 BRYAN CAVE LEIGHTON PAISNER LLP
                  3 Embarcadero Center, 7th Floor
6                 San Francisco, CA 94111
                  (415) 675-3400
7                 jon.fetterly@bclplaw.com
                  katherine.keating@bclplaw.com
8
9   FOR DEFENDANT:
10  (via Zoom)    Keely E. Duke
                  Molly E. Mitchell
11                DUKE EVETT, PLLC
                  1087 W. River Street, Suite 300
12                PO Box 7387
                  Boise, ID 83707
13                (208) 342-3310
                  ked@dukeevett.com
14                mem@dukeevett.com
15
16  ALSO PRESENT:
17  (via Zoom)    BILL GIRDNER, CNS
18                SARA OMUNDSON, Idaho Courts
19                --o0o--
20
21
22
23
24
25

---

**Page 3**

1       30(b)(6) DEPOSITION OF JENNIFER DVORAK
2
3               EXAMINATION INDEX
4   EXAMINATION BY                          PAGE
5   Mr. Fetterly........................................ 5
6   Ms. Duke........................................... 141
7   Mr. Fetterly........................................ 149
8   Ms. Duke........................................... 151
9
10              EXHIBIT INDEX
11  EXHIBITS FOR IDENTIFICATION              PAGE
12   1  Notice of Deposition............................ 5
13   2  ISC Organizational Chart........................ 5
14   3  Employee List................................... 5
15   4  IT Division as of 7/15/22........................ 5
16   5  Hansen/Marx Email String - 5/18/22............... 5
17   6  Dvorak Email String - 6/30/22.................... 5
18   7  Howland Email String - 7/6/22.................... 5
19   8  Fisher Email w/ Tyler Slide Deck - 7/14/22....... 5
20   9  Fisher Email String - 8/8/22..................... 5
21  10  Dvorak Email String - 8/19/22.................... 5
22  11  Dvorak Risk Memorandum - 8/18/22..*CONFIDENTIAL*.. 5
23  12  Fisher Email String - 8/24/22.................... 5
24  13  iCourt Project Overview & FAQs................... 5
25  14  Tyler Agreement - 8/28/13....................... 5

---

**Page 4**

1       30(b)(6) DEPOSITION OF JENNIFER DVORAK
2
3           EXHIBIT INDEX (Cont'd)
4   EXHIBITS FOR IDENTIFICATION              PAGE
5   15 Tyler Electronic Filing Agreement - 5/27/21........ 5
6   16 iCourt File & Serve: Electronic Filing Overview.... 5
7   17 iCourt Odyssey File & Serve Log-in Portal.......... 5
8   18 iCourt Odyssey File & Serve Filer Dashboard........ 5
9   19 ISC Terms and Conditions for Cloud-Based Services.. 5
10
11                  --o0o--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1 (Pages 1 to 4)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 5

1    REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
2        Monday, November 7, 2022; 12:04 p.m.
3                --o0o--
4            (Exhibit Nos. 1 through 19 marked.)
5
6    JENNIFER DVORAK,         witness herein, having been
7              first duly sworn on oath,
8              was examined and testified
9              as follows:
10
11           E X A M I N A T I O N
12   BY MR. FETTERLY:
13     Q.   Okay.  Can you please state and spell your
14   name for the record, please?
15     A.   Jennifer, J-e-n-n-i-f-e-r.  Dvorak, D, as in
16   "David" -v, as in "Victor" -o-r-a-k.
17     Q.   Thank you.
18         Ms. Dvorak, my name is John Fetterly.  I am an
19   attorney with the law firm Bryan Cave Leighton Paisner.
20   I represent Courthouse News Service in the case
21   Courthouse New Service versus Sara Omundson in her
22   official capacity as Administrator of Idaho Courts.
23         We've noticed the deposition here today
24   pursuant to our premarked Exhibit No. 1, which is the
25   notice of deposition, and this is a deposition calling

---

Page 6

1    for a 30(b)(6) witness to testify on one or more topics
2    that are identified in the notice.  Bear with me here.
3    I'll put that up on the screen.
4         I'm now showing you that document.  You may
5    have a copy of it in front of you.
6     A.   Yes.
7     Q.   Have you seen this document before?
8     A.   Yes, I have.
9     Q.   And is it your understanding that you have
10   been produced today to testify with respect to one or
11   more of the categories identified in the exhibit to this
12   notice?
13     A.   Yes.
14     Q.   Can you identify those categories for me?
15     A.   Numbers 9, 15, 16, 17, and 18.
16     Q.   And are you qualified to speak on behalf of
17   the defendant as to these topics that you've just
18   identified?
19     A.   I believe so, yes.
20     Q.   Okay.  Before I start asking you any questions
21   about those topics, first, I just want to go over a few
22   basic things.  I trust your counsel may have already
23   gone over some of this with you, but I just want to make
24   sure that we're on the same page.
25         We'll be asking you questions today concerning

---

Page 7

1    the lawsuit and specifically with respect to the topics
2    or categories that we've just identified on the
3    deposition notice.  You've been produced as a witness to
4    speak on behalf of the defendant so your knowledge is
5    not necessarily limited to your personal knowledge, but
6    rather, you know, your ability to speak on behalf of the
7    defendant based on both personal knowledge and anything
8    else you have done to educate yourself or prepare for
9    today, and I'll ask you some questions about that
10   momentarily.
11         As we go forward, I am entitled to your -- you
12   know, answers to your questions unless your counsel
13   instructs you to not answer.  Assuming your counsel does
14   not instruct you to not answer, you know, I'll await
15   your responses.  I'll do my best to wait for you to
16   respond in full before I ask my next question.  I'll ask
17   that you please allow me to get my question out before
18   you attempt to answer.
19         It's important that we not speak over each
20   other today.  There's a court reporter who is with us
21   and she's recording everything we say, questions and
22   answers, objections by counsel, and anything else that
23   may be said.  We want to have a clear transcript in the
24   end, so it's important that we not speak over each
25   other.

---

Page 8

1         In that regard, I'd also ask that you provide
2    verbal responses to my questions.  Nodding your head,
3    hand gestures, things of the sort, don't come across in
4    a written transcript.  And we're not videoing this
5    deposition today, so, you know, please try to provide
6    auditory responses.  I'll do my best to prompt you if
7    necessary along the way.
8         It's also important that we speak slowly.
9    That's advice I give to myself as much as I give to you,
10   so give the court reporter the chance to record
11   everything accurately.
12         It's also important that you understand my
13   questions.  I will do my best to ask clear questions
14   that you understand.  If you do not understand my
15   question, please let me know.  If you need me to
16   rephrase, if you need me to clarify, you're entitled to
17   seek clarification along the way, so please do so.  If
18   you do not, we will assume that you understood the
19   question and you provided your best answer in response
20   to the question.
21         Again, because we're not limited to just your
22   personal knowledge, I may be asking you questions about,
23   you know, the court and specifically the administrative
24   office, you know, matters that concern the topics
25   identified in the deposition notice.  If, for some

---

2 (Pages 5 to 8)

Courthouse News Service v. Omundson      30(b)(6) Jennifer Dvorak

Page 9

1   reason, you're unable to provide an answer because you
2   don't know, I might -- we may need to adjourn and give
3   you the opportunity to find out. But I just point this
4   out now because, again, there's a distinction between
5   you being produced as a 30(b)(6) witness versus a
6   witness in your individual capacity.
7       One thing I'm not entitled to is privileged
8   information. So any conversations you've had with
9   counsel, I'm not entitled to that. I'll do my best not
10   to ask those questions. I'm sure your counsel will let
11   me know if I cross that line and fair enough.
12       So those are some of the basic ground rules
13   that govern today. Do you have any questions about this
14   proceeding before we begin?
15     A. No.
16     Q. Okay. With respect to the topics that you
17   identified on the notice, what, if anything, did you do
18   to prepare for today's deposition?
19     A. I did meet with my legal counsel. I reviewed
20   my past emails with Tyler Technologies, and I reviewed
21   some of the information that I received from them
22   regarding their press review queue too.
23     Q. A number of emails have been produced in this
24   lawsuit that we have identified as premarked exhibits.
25   We'll talk about those in due course.

Page 10

1       Have you had a chance to review those emails
2   this morning?
3     A. Yes.
4     Q. Okay. Do those emails that we've premarked as
5   exhibits reflect the communications that you had with
6   Tyler that you just referenced in preparation for today?
7       MS. DUKE: She actually hasn't seen the
8   emails from today, so I think you guys might be talking
9   about two different things.
10       THE DEPONENT: I only have the emails
11   that I was party to, either as a carbon copy or as -- or
12   to or from.
13     Q. (By Mr. Fetterly) Let me come at it from a
14   different direction. Do those emails cover a particular
15   time frame or time period? An estimate is fine if you
16   can't provide exact.
17     A. Yeah, because I don't -- I don't think I even
18   looked at this product until June of 2022.
19     Q. Understood.
20       So the emails you're referring to would be
21   emails that were approximately June '22 and forward;
22   correct?
23     A. Correct.
24     Q. Did you have any meetings with Tyler
25   Technologies that informed, you know, your knowledge or

Page 11

1   preparation for today's deposition?
2     A. No, not in particular.
3     Q. Okay. Have you met with Tyler Technologies at
4   any point since you were asked to get involved in this
5   in June of 2022?
6     A. Yes. I mean, in the course of -- of them
7   being a major vendor of the Courts, I've met with them
8   about many topics.
9     Q. Okay. Bear with me.
10       (Pause in the proceedings.)
11     Q. (By Mr. Fetterly) I'm pulling up back to
12   Exhibit 1 and ask you to reference that document, and
13   specifically the categories of testimony you've been
14   asked to address today.
15       Looking at Number 9, the category is: "The
16   factual basis for the statement that Tyler Technologies'
17   press review queue presents potential cybersecurity
18   risks as referenced in defendant's response to CNS's
19   Interrogatory No. 1."
20       I just want to ask you, generally, do you have
21   an understanding of what the Tyler Press Review Tool is?
22     A. Yes.
23     Q. What is that understanding?
24     A. So my understanding is that documents that are
25   submitted to the eFile & Serve have the ability to be

Page 12

1   exposed publicly in another web portal to be viewed
2   prior to being accepted and filed and moved to the case
3   management system.
4     Q. Okay. Do you have an understanding of what
5   types of documents could be made available through the
6   press review queue?
7     A. Yes. My understanding is documents that are
8   submitted could -- could contain lawsuit filings, any
9   type of requests for court -- not court information, but
10   requests for court decisions, so divorce filings,
11   lawsuits, that kind of thing. Those documents are
12   submitted when folks need the -- the courts to
13   intervene.
14     Q. And when you say "submitted," submitted to
15   where?
16     A. Submitted to the -- the File & Serve portal.
17     Q. Okay.
18     A. There's like a queue of documents.
19     Q. And do you have an understanding of what
20   documents or what types of documents can be made
21   available into the press review queue? Well, strike
22   that. Let me ask a different question.
23       Do you have an understanding that the Idaho
24   Courts would have the ability to determine which
25   documents from File & Serve are made available in the

3 (Pages 9 to 12)

Courthouse News Service v. Omundson      30(b)(6) Jennifer Dvorak

---

Page 13

1　press review queue?
2　　A.　My understanding is that they have the ability
3　to configure some specific case types or document types
4　to potentially move to a press review queue.
5　　Q.　Okay.　I want to pause on this topic for a
6　minute and just take a step back.
7　　　　You had mentioned that you were -- well, you
8　said you first learned about this in June of 2022; is
9　that correct?
10　　A.　That's correct.
11　　Q.　And what were the circumstances around which
12　you became aware of the press review queue?
13　　A.　So we had recently performed a security
14　review.　I had recently performed a security review of
15　the Tyler Enterprise Jury Management product that we
16　were -- that we had procured recently that we were
17　working on a contract amendment for.　I had completed
18　that and was asked to do a similar security review on
19　the Tyler press review tool.
20　　Q.　Okay.　Who asked you to do that review for the
21　Process Review Queue or press review tool?
22　　A.　I believe it was Sara --
23　　Q.　Okay.
24　　A.　-- Omundson.
25　　Q.　When did you perform the security review for

---

Page 14

1　the jury manager tool?
2　　A.　It had been a month or so before.　I couldn't
3　say for sure.
4　　Q.　Have you -- and is the jury manager tool a
5　Tyler product?
6　　A.　Yes.
7　　Q.　Is it a Tyler product that falls under the
8　Odyssey, you know, line of products?
9　　A.　Not that I'm aware of.　I think it's separate.
10　　Q.　Have you done this type of review for any
11　other Tyler product?
12　　A.　No.　Because it's currently attached to a
13　contract or contract amendment, so usually a new
14　purchase or an amendment to a current purchase.　So it's
15　not -- it's not a process that's currently in place for
16　products we currently own.
17　　Q.　Is it a -- strike that.
18　　　　So is it correct then that you've not
19　performed a security review for Tyler's eFile & Serve
20　product?
21　　　　MS. DUKE:　Object to the form.
22　　　　Go ahead.
23　　　　THE DEPONENT:　So that product has not
24　been reviewed because it has not gone through a contract
25　amendment or a new contract.

---

Page 15

1　　Q.　(By Mr. Fetterly) Is Tyler eFile & Serve
2　currently part of -- or, is there a contract between the
3　Idaho Courts and Tyler for eFile & Serve.
4　　A.　I believe so, but I've never reviewed that
5　contract.
6　　Q.　Okay.　Let me -- one moment.
7　　　　(Pause in the proceedings.)
8　　Q.　(By Mr. Fetterly) I'm going to show you another
9　document.　This is a document marked as Exhibit No. 14.
10　　　　MS. DUKE:　Just go to that level tab.
11　　Q.　(By Mr. Fetterly) And I can put it up on the
12　screen as well here.
13　　　　Can you see the screen?
14　　A.　Yes.
15　　Q.　Okay.　This is a cover letter dated
16　August 28, 2013.　Have you seen this letter before?
17　　A.　I -- I couldn't say.　I don't believe so.
18　　Q.　Okay.　And it's a cover letter for a -- a
19　contract.　I don't want to characterize it myself, but
20　if we go to Page 2, and this is Page 1 of 11 that
21　states -- and it -- the Tyler logo is at the top
22　followed by "Agreement."
23　　　　Have you seen this document before?
24　　A.　I'm not sure if I've seen this before.
25　　Q.　Oh, okay.　Can you take a moment --

---

Page 16

1　　A.　I don't --
2　　Q.　Oh, go ahead.
3　　A.　I don't believe so, no.
4　　Q.　Okay.　I want to give you a chance to just,
5　you know, browse through the pages if you need a chance
6　to look to familiarize yourself.
7　　　　Can you please do so and then let me know if
8　you recall ever seeing this contract before?
9　　A.　Actually, I don't -- I don't believe I've seen
10　this document before.
11　　Q.　Okay.　Thank you.　You can set Exhibit 14
12　aside.
13　　　　I will ask you to then also just look at
14　Exhibit 15, and I put that up on the screen as well.
15　I'd ask you to please review it and then let me know,
16　once you've done so, whether you've seen this document
17　before.
18　　A.　No, I have not.
19　　Q.　Okay.　Switching gears for a moment, what is
20　your -- what is your title or position with the Idaho
21　Courts?
22　　A.　Chief Information Security Officer.
23　　Q.　And for how long have you held that position?
24　　A.　Since late August 2021.
25　　Q.　Were you working for the Idaho Courts prior to

---

4　(Pages 13 to 16)

Courthouse News Service v. Omundson                                30(b)(6) Jennifer Dvorak

---

Page 17

1    August of 2021?
2        A.   No.
3        Q.   Okay.  What was your -- where were you working
4    prior to August 2021?
5        A.   I was working for the Arizona Department of
6    Homeland Security.
7        Q.   And for how long were you working with them?
8        A.   Ten years.
9        Q.   And what was your position at the time of your
10   departure?
11       A.   Statewide Information Security Architect and
12   Assistant Director.
13       Q.   And for how long did you hold that position?
14       A.   I don't know.  Two -- two years.
15       Q.   What's your highest level of education?
16       A.   I have a master's degree.
17       Q.   And what's that degree in?
18       A.   It's in -- I have a master's of business in
19   management information systems.
20       Q.   Okay.  I'm going to ask you to please look at
21   Exhibit 2.  I'll put that up on the screen as well.
22           Do you recognize this document?
23       A.   Yes.
24       Q.   What is it?
25       A.   It looks to be an org chart for the ISC.

---

Page 18

1        Q.   And I'll just direct your attention to the
2    right-hand column.  The far right-hand column, I believe
3    you are identified as Chief Information Security
4    Officer, and it looks like you would report up to
5    Mr. Hansen, the Chief Information Officer; is that
6    correct?
7        A.   Yes, that's correct.
8        Q.   And then on this org chart, there are two
9    individuals below you, Mr. Howland and Mr. Wilson?
10       A.   Correct.
11       Q.   And do both of them report up to you?
12       A.   Yes.
13       Q.   Does this org chart accurately reflect the
14   present-day organization of the information services
15   division, to the best of your knowledge?
16       A.   To the best of my knowledge, but there may be
17   a few changes.
18       Q.   Okay.  Any changes in terms of your direct
19   line of authority or reporting?
20       A.   No.
21       Q.   So there are no additional people below you
22   that should be reflected on this chart that are not?
23       A.   No, there are not.
24       Q.   Okay.  In preparation for your deposition
25   today, did you speak with Mr. Howland or Mr. Wilson?

---

Page 19

1        A.   No, I did not.  Well, I did speak with them
2    today but not about the case.
3        Q.   Sure.  Yeah, and I'll try to focus my
4    questions accordingly.  I'm curious about, you know,
5    this case and specifically your preparation for today's
6    deposition.  I understand you may have ongoing
7    communications on a whole host of other matters.
8            So when was the last time you spoke with
9    Mr. Howland or Mr. Wilson concerning this case or the
10   review you were asked to conduct of the press review
11   queue?
12       A.   Probably when we completed the review, so that
13   would've been in August, I think.
14       Q.   Okay.  And when you say "completed the
15   review," I'll direct your attention to Exhibit No. 11.
16   If you could please turn to that.
17       A.   Yes.
18       Q.   This is a document titled "Risk Memorandum
19   from the Desk of Jennifer Dvorak" dated August 18, 2022.
20           Would you consider this the end of the review,
21   or was there some later point in time that you would
22   call the end of the review?
23       A.   I think we did ask a few follow-up questions
24   after this review of Tyler, but this was basically the
25   information that I had at the time.

---

Page 20

1        Q.   Understood.
2            And I -- I'll direct your attention then to
3    Exhibit No. 12.
4        A.   Yes.
5        Q.   I believe --
6        A.   Yes.
7        Q.   Okay.  Do you recognize this document?
8        A.   Yeah.  So this would've been one of the
9    follow-up questions.
10       Q.   Were there other follow-up questions after
11   those posed in this document?
12       A.   The only other question that we had posed
13   specific to this tool has been when the API
14   functionality would become available, and I asked that
15   verbally in a meeting with our account manager last
16   week.
17       Q.   And what was the answer to that question?
18       A.   It was unknown.
19       Q.   Okay.  And why did you ask that question?
20       A.   Because I was told that it would be available
21   at the end of Q3 or the end of September, and since
22   it's -- when we met with them on October 31st, I wanted
23   to know if it was available yet because we hadn't heard
24   anything.
25       Q.   Okay.  Are the Idaho Courts currently planning

---

5 (Pages 17 to 20)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

ER-1893

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 21

1   to implement a press review queue using the APIs?
2        MS. DUKE: And I'll object to the form.
3   Go ahead.
4        THE DEPONENT: I think we are
5   investigating whether or not the API is available and
6   what functionality or cost would be included in that
7   API.
8        Q. (By Mr. Fetterly) Okay. So I believe we just
9   spoke to the issue of availability. Is anything --
10  anything more to that?
11       A. As far as I know, it's not available. I don't
12  have any additional information about the functionality
13  or the cost.
14       Q. Okay. As far as the functionality, have steps
15  been taken beyond the review process that we were
16  discussing that's reflected in Exhibits, you know, 11
17  and 12 that have been taken to examine functionality?
18       A. It's hard to assess functionality when I
19  haven't been notified that it's available so that I
20  could assess the functionality.
21       Q. Okay. What -- what do you understand
22  assessing functionality to entail?
23       A. I'd like to understand what fields out of
24  File & Serve are available, how the API is secured, and
25  what the costs are associated.

---

Page 22

1        Q. Is it your understanding, then, that Tyler --
2   well, strike that.
3        Has Tyler provided you any information, to
4   date, on either of those three items?
5        A. We were told it would be made available at the
6   end of Q3 or the end of September, and so far we
7   haven't -- it's not available to us. So we've been
8   asking and we just haven't received any information.
9        Q. Have you ever used the Tyler press review
10  queue?
11       A. I don't know how I could when it's not a
12  product we currently own.
13       Q. So is that a "no"?
14       A. Yeah. We don't -- it's not a product that the
15  ISC currently owns so I've not been able to use it.
16       Q. Yeah. Have you -- to your knowledge, has
17  anybody with the Idaho Courts used a Tyler Press Review
18  Tool?
19       MS. DUKE: Object to the form.
20       THE DEPONENT: Yeah. I -- not that I'm
21  aware of.
22       Q. (By Mr. Fetterly) Okay. And just to be clear,
23  I think I'm using "Press Review Tool" and "press review
24  queue" interchangeably, but do you understand that if
25  I'm referring to the press review queue, I'm also

---

Page 23

1   referring to the press review tool, and vice versa?
2        A. Yes.
3        Q. Okay. And I'll try to stick with Press Review
4   Tool going forward.
5        A. Okay.
6        Q. Have the Idaho Courts asked Tyler to provide
7   any demonstrations of the Press Review Tool?
8        A. I think so, yes. When we inquired about it
9   in -- when I was made part of the conversation in June,
10  we did ask for more information, can we look at -- take
11  a look at the product? We were provided with a -- a
12  marketing sheet about it, but no demo.
13       Q. Okay. Did the Idaho Courts specifically ask
14  for a demo?
15       A. I couldn't say. I don't recall. I think that
16  when we engage our account manager to look at a new
17  product offering by Tyler, it's implied that a demo
18  would be part of that conversation.
19       Q. Were you at the -- during any of the meetings
20  that you were present at, did anyone from the Idaho
21  Courts specifically ask for a demonstration of the press
22  review tool?
23       A. We definitely asked for more information about
24  how it works, which I would presume a demo would be the
25  easiest way to provide that information.

---

Page 24

1        Q. Okay. I'm not sure you're answering my
2   question. So I --
3        A. I don't know that we -- I don't know --
4        Q. Go ahead.
5        A. I don't know that we used the words "demo,"
6   but we did ask for more information. Can you provide us
7   all the information about this tool? And, for me, that
8   would assume that a demo would occur.
9        Q. Did the Idaho Courts contact any of the other
10  state courts that use a Tyler Press Review Tool to ask
11  about their experience with the Press Review Tool?
12       MS. DUKE: I'll object to the form.
13  Foundation.
14       Go ahead.
15       THE DEPONENT: That I'm aware of, we did
16  not. I did take a look at some of the states that are
17  using the Tyler Press Review Tool, their websites, and
18  one of the websites I went to did not have an HTTPS/SSL
19  certificate, so I was a little bit concerned about that,
20  and that was the furthest investigation I did.
21       Q. (By Mr. Fetterly) Okay. And what state was
22  that?
23       A. I believe it was Clark County in Nevada.
24       Q. And when did you go to their website?
25       A. Probably after we met with Tyler in July about

---

6 (Pages 21 to 24)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 25

1 the Press Review Tool.
2     Q. And what did you do? Please walk me through
3 the steps you took to kind of review their site and form
4 the basis of what you just said.
5     A. So I visited Clark County, Nevada's website
6 for the courts, and I looked for the -- the link to
7 their court portal or court information. However, when
8 I went to their website, it was not securely displaying,
9 so I left the website.
10     Q. What do you mean when you say "not securely
11 displaying"?
12     A. So it did not have a valid SSL certificate.
13 So modern web applications, websites use HTTPS and SSL
14 certifications. Clark County's court website did not.
15     Q. Mm-hmm.
16     Do you have an understanding of whether the
17 Tyler Press Review Tool is hosted on local courts'
18 websites as opposed to Tyler's websites or websites
19 hosted by Tyler?
20     A. I believe that it is hosted by Tyler
21 Technologies.
22     Q. Okay. Does Tyler Technologies use HTTPS
23 security?
24     A. I believe they do, yes.
25     Q. Okay. And the Idaho Courts use Tyler

---

Page 26

1 Technologies for e-filing; correct?
2     A. Yes.
3     Q. And does the -- and I believe that e-filing
4 occurs through iCourt eFile & Serve; is that correct?
5     A. Yes.
6     Q. And does eFile & Serve through iCourt have
7 HTTPS security?
8     A. It does.
9     Q. Do the Idaho Courts have any concerns about
10 the security of Tyler's eFile & Serve as it relates to
11 iCourt?
12     A. I believe because it's not publicly facing,
13 it's only clerks that have access to that site and
14 the -- the folks submitting documents. We don't have
15 security concerns about that, per se.
16     Q. Okay. Let me show you a document here. Can
17 you go to Exhibit 16, please?
18     A. Yes.
19     Q. Okay. Do you recognize this document or what
20 it purports to represent?
21     A. Yes.
22     Q. Okay. And what is this?
23     A. I believe that that this is the electronic
24 filing front site for the iCourt portal.
25     Q. And is this website public-facing?

---

Page 27

1     A. I believe so, yes.
2     Q. Okay. And then go -- I see on the right-hand
3 column of this document there's a button that says
4 "click here to e-file." Do you know where that button
5 takes you if someone were to click on that?
6     A. I don't, no.
7     Q. Okay. I'm going to show you Exhibit No. 17.
8 Do you recognize this document?
9     A. Yes.
10     Q. And what is this?
11     A. Well, I assume that's what happens when you
12 click the button.
13     Q. And I guess the question is: Is this also
14 public-facing?
15     A. I believe so, yes.
16     Q. Okay. So -- and would you agree that the
17 eFile & Serve system does have a public-facing
18 component?
19     A. Yes.
20     Q. Okay. And that would be the component that
21 allows filers to submit their filings to the court;
22 correct?
23     A. So anyone submitting a document would need to
24 register or sign in first.
25     Q. Okay.

---

Page 28

1     A. So that functionality is not available
2 publicly.
3     Q. Understood.
4     So I guess that's -- let me try to just
5 understand then what you mean when you talk about
6 publicly versus not. So the -- the requirement to
7 register and sign in, is that, in your mind, a
8 differentiator between a system that's publicly facing
9 and one that is not?
10     A. I would assume so because, you know, there are
11 information you have to provide in order to create a
12 sign-in. There's trackability. There's auditability.
13     Q. Okay. So this website here, you -- would you
14 agree that it is public-facing, anybody can reach it,
15 but in order to get past this website, that would not be
16 public-facing because someone would have to register and
17 then sign in; is that correct?
18     A. That's correct, yes.
19     Q. Okay. And any other factors that distinguish
20 between which of the eFile & Serve systems here are
21 public-facing versus not?
22     A. I mean, I think that any information on a
23 website that you can view without logging in would be
24 considered public, and this is viewable without logging
25 in.

7 (Pages 25 to 28)

Courthouse News Service v. Omundson                     30(b)(6) Jennifer Dvorak

Page 29

1      Q.  Okay.  So then once -- I can show you this
2   next page, Exhibit No. 18, do you recognize this
3   document?
4      A.  No, because I've never logged in.  I don't
5   have the need to log in to the e-filing, but I assume
6   that once you log in that this is what you receive.
7          MS. DUKE:  I can grab my legal assistant.
8   She'll know well.
9          THE DEPONENT:  Yeah.
10     Q.  (By Mr. Fetterly) Well, just so I understand
11  your response, what leads you to conclude or assume that
12  this is what you would see after you've logged in?
13     A.  Filer dashboard, filing activity, start a new
14  case.  I don't know that this would be information that
15  would be accessible without registration or log-in.
16     Q.  Okay.  But just to confirm, you've never
17  registered or logged in yourself; is that correct?
18     A.  No, correct.
19     Q.  Okay.  So we were talking about
20  eFile & Serve specifically and whether it is
21  public-facing, and we just talked about how part of the
22  eFile & Serve system through iCourt is
23  public-facing, but then once a register -- once a user
24  registers and logs in, they're now on a different side
25  that you would consider not public-facing; is that

Page 30

1   correct?
2      A.  That's correct.
3      Q.  And does that registration and logging-in
4   process address the concerns that the Idaho Courts would
5   have with respect to public-facing websites?
6          MS. DUKE:  Object to the form.
7   Foundation.
8          Go ahead.
9          THE DEPONENT:  I think that it provides
10  the ability to audit who was assess -- accessing this
11  information beyond what is publicly-facing.
12     Q.  (By Mr. Fetterly) Okay.
13     A.  It provides -- yeah.  Sorry.  Let me think it
14  through.  It provides an audit trail for the types of
15  documents that are being submitted for filing.
16     Q.  (By Mr. Fetterly) Okay.  And does that audit
17  trail address the concerns that the court has with
18  respect to the public-facing nature of eFile & Serve?
19         MS. DUKE:  Again, same objection.  She's
20  also here on behalf of the Administrative Officer for

Page 31

1   beyond the submitting of files before they're exact --
2   before their accepted into the case management system.
3      Q.  (By Mr. Fetterly) I understand that.  I guess I
4   was just -- you identified public-facing as a potential
5   concern, and I'm just trying to understand whether this
6   process of registration and sign-in addresses that
7   concern, or if there are other things that would, you
8   know -- that are required to sufficiently address that
9   concern.
10         MS. DUKE:  Same objections.  Asked and
11  answered.
12         Go ahead.
13         THE DEPONENT:  Yeah.  I would just say
14  that there are additional concerns because there's
15  additional layers of security even on a public-facing
16  website.  And I -- because I haven't received
17  information regarding the security controls and tools in
18  use by Tyler Technologies, I don't understand what
19  additional controls would be available.  Logging in is
20  just one of those concerns being addressed.
21     Q.  (By Mr. Fetterly) Okay.  But the courts
22  currently use eFile & Serve; correct?
23     A.  I believe so, yes.
24     Q.  Okay.  Have -- has the administrative office
25  notified Tyler of any additional information it needs

Page 32

1   with respect to eFile & Serve?
2      A.  So we haven't done a -- like I mentioned
3   previously, we haven't done a full security review on
4   this program, this service because it is already under
5   contract is my understanding.  So we are only able to
6   provide security oversight or security review on new
7   products per the contract or amendment -- contract
8   amendment process.  So we don't have the ability to
9   compel our vendors to provide information about their
10  security controls unless it's embedded in the contract
11  process.  We can ask them and they can tell us or not
12  tell us, but they're not particularly compelled to
13  provide that information.
14     Q.  And I guess I was asking a slightly different
15  question.  I mean, has the administrative office
16  notified Tyler of any concerns it has with respect to
17  eFile & Serve?
18         MS. DUKE:  Asked and answered.
19         Go ahead.
20         THE DEPONENT:  Not that I'm aware of, but
21  we also -- we don't know what we don't know.  So it's
22  not something that we've been able to investigate
23  because it's not a product that we're currently
24  negotiating a contract for or we have a contract
25  amendment underway.

                                        8 (Pages 29 to 32)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 33

1    Q.  (By Mr. Fetterly) Has the administrative office
2  informed Tyler Technologies that it would like to
3  investigate the functionality or security of
4  eFile & Serve?
5    A.  No.  Because, again, it's not something that
6  we're negotiating a contract with or a contract
7  amendment.  So we have other Tyler products that we're
8  currently negotiating a contract or contract amendment
9  for and those are included in the security review.
10    Q.  When is -- if you -- when is the Tyler
11  e-filing agreement -- this would be the contract between
12  Tyler and the administrative office with Idaho Courts
13  concerning e-filing.  When is that contract up for
14  amendment?
15    A.  I don't know.
16    Q.  Okay.
17    A.  Actually, well, I'll -- I'll revise that.  I
18  do know the Press Review Tool, adding that would require
19  a contract amendment.  So at that time, we would have
20  the opportunity to do a full security review as part of
21  that contract amendment.
22    Q.  Okay.  I would like to direct your attention
23  to Exhibit No. 10.  Once again, I'll put it back up on
24  the screen.
25    A.  Mm-hmm.

---

Page 34

1    Q.  Have you seen this document before?
2    A.  Yes.
3    Q.  And what is it?
4    A.  This is an email between myself and
5  Jessi Fisher, our client executive, about functionality
6  within the Press Review Tool.
7    Q.  Okay.  And I'd like to direct your attention
8  to, I guess, Page 3.  The bottom right-hand corner would
9  be SO 5117.
10    A.  Yes.
11    Q.  Great.  I'm going to highlight something for
12  you, but let me -- I'll point to the bottom paragraph
13  here, the paragraph that begins "As part of our new risk
14  authorization and management process."
15      Do you see that paragraph?
16    A.  Yes.
17    Q.  Can you please read that paragraph?
18    A.  "As part of our risk authorization and
19  management process, we will be requiring vendors
20  storing, processing, and/or transmitting ISC data into
21  third-party IaaS/PaaS environments, AWS, Azure, GCP, et
22  cetera, to provide a letter from their provider stating
23  they are a customer in good standing and identifying
24  which environment ISC data will be stored and/or
25  traversing.  I don't need the letter for the purpose of

---

Page 35

1  this discussion, but I wanted to give you all the
2  heads-up that it will be part of the contract amendment
3  discussions."
4    Q.  Okay.  I want to break that up a little bit
5  and try to better understand this.  So where it says "as
6  part of our new risk authorization and management
7  process," can you elaborate on -- on what that is or
8  what that means, the new risk authorization and
9  management process?
10    A.  So as part of our new contracting with cloud
11  vendors process, so this was created as part of -- we
12  have a -- a credit card request for proposal which will
13  be a cloud-based solution.  I worked with our general
14  counsel to develop a cloud-based terms and conditions to
15  add to all of our cloud-based vendor contracts, so that
16  is the new risk authorization management process.  It's
17  built into the cloud vendor terms and conditions.
18    Q.  And just for quick reference, if you could
19  hold your spot there at Exhibit 10, but I'd like to then
20  direct your attention to Exhibit 19.
21    A.  Yes.
22    Q.  Are these the terms and conditions that you
23  just referenced?
24    A.  Correct, yes.
25    Q.  Okay.  And when were these created?

---

Page 36

1    A.  These were -- oh, gosh.  I'm not sure.  They
2  were created as -- again, as part of our new credit card
3  request for proposal, and that would've been maybe in
4  the spring of this year.
5    Q.  Okay.  So is it correct, then, that these
6  terms and conditions did not exist prior to this year?
7    A.  No, they did not.  Yeah.
8    Q.  Okay.  And who was involved in creating them?
9  I think you mentioned yourself and at least one other
10  person.  Can you identify the other people besides
11  yourself?
12    A.  So myself and David Roscheck, who is our
13  deputy legal counsel for ISC.
14    Q.  Okay.  And you said that they were created in
15  connection with a new credit card RFP.  Did I hear that
16  correctly?
17    A.  That's correct.
18    Q.  And what is that?
19    A.  That is a -- we are looking for services to
20  process our credit card payments.
21    Q.  Is -- does this have any connection or
22  relation to the Tyler eFile & Serve and filing fees
23  that would be submitted through File & Serve?
24    A.  Nope, it's completely separate --
25    Q.  Okay.

---

9 (Pages 33 to 36)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 37

1    A. -- as far as I'm aware.
2    Q. So payments other than e-filing payments; is
3  that accurate?
4    A. Correct.
5    Q. Okay.
6    A. So any court fees that we collect. There is a
7  mix of credit card providers throughout the state, so
8  this would bring us under one provider.
9    Q. Okay. Has the administrative office asked
10 Tyler to -- or strike that.
11      Do these terms and conditions apply to any of
12 the Tyler services or Tyler contracts?
13   A. As far as I know, the Tyler contracts are
14 already underway, so this would apply to new cloud-based
15 contracts moving forward.
16   Q. Okay. So I -- now I'll ask you to go back to
17 Exhibit No. 10.
18   A. Okay.
19   Q. And that same bottom paragraph. So the last
20 sentence where you state: "I wanted to give you all the
21 heads-up that it will be part of the contract amendment
22 discussions."
23   A. Correct.
24   Q. Is that what you're referring to then,
25 incorporation of these terms and conditions into

---

Page 38

1  amendments to the Tyler contracts going forward?
2    A. Yes, because I did ask them for the
3  third-party letter and they said no, they would not
4  be -- they would not be providing it to me.
5    Q. Okay.
6    A. So I wanted to let them know that they would
7  need to as part of our new contracts moving forward.
8    Q. Okay. And pause there for a minute. We'll
9  get into that in a little more detail going forward.
10      In this same paragraph, you state: "I don't
11 need the letter for the purpose of this discussion."
12 What did you mean by that?
13   A. Well, I was responding to the fact that they
14 would not provide it to me. So because this was not a
15 product that we were in the process of purchasing, we
16 didn't need it as just a preliminary review. But if we
17 did end up purchasing it, we did end up with a contract
18 amendment, it would be a requirement.
19   Q. And when you were talking about "this
20 product," you're referring to the Press Review Tool?
21   A. Yes.
22   Q. Okay. So just to make sure that I'm
23 understanding you correctly, the -- the terms and
24 conditions that we just talked about as Exhibit 19,
25 those are not currently part of any Tyler contract;

---

Page 39

1  correct?
2    A. No. Because as far as I know, the contracts
3  are already well underway.
4    Q. But the Idaho Courts will require those terms
5  and conditions to be part of any future contracts or
6  amendments to contracts; correct?
7    A. For any cloud-based services, yes.
8    Q. Understood.
9      And would that include eFile & Serve?
10   A. Yes.
11   Q. Would that include Portal?
12   A. Yes.
13   Q. Okay. What other Tyler products would require
14 these terms and conditions?
15   A. All -- all of them that are cloud-based.
16   Q. Okay.
17   A. So if they're not -- if they're not hosted in
18 our data center, they would be -- any -- and not just
19 Tyler products. Any product not hosted in our data
20 center will be required to go through this process.
21   Q. Okay. Are there any Tyler products that are
22 currently hosted in the Idaho Courts data center?
23   A. Yes.
24      MS. DUKE: And beyond the scope of the
25 30(b)(6), but go ahead.



10  (Pages 37 to 40)

---

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak



Page 41

Page 43

Page 42

```
 1        A.  Correct.
 2        Q.  But as of today, neither -- neither contract
 3   for neither service incorporates these terms and
 4   conditions; correct?
 5        A.  Correct, because it was before I arrived at
 6   the courts.
 7        Q.  Gotcha.
 8            MR. FETTERLY:  We've been going for about
 9   one hour almost.  Let me take a quick break.
10   Ten minutes work for the group?
11            MS. DUKE:  Sure.
12            THE DEPONENT:  Sure.
13            MR. FETTERLY:  Thank you.  Off the
14   record.
15            (A break was taken from
16            12:54 p.m. to 1:04 p.m.)
17        Q.  (By Mr. Fetterly) Okay.  So, Ms. Dvorak, before
18   our break, we were talking about the terms and
19   conditions that are marked as Exhibit No. 19.
20        A.  Yes.
21        Q.  Has the administrative office incorporated
22   these contracts into any contract that's currently in
23   effect?
24        A.  Yes, because they -- the credit card RFP will
25   include these.
```

Page 44

```
 1   did the security review process on, and it wasn't the
 2   full security review process, because we had a shortened
 3   amendment, but we did ask for third-party attestation
 4   and they did provide it.
 5        Q.  Okay.  And who was the third party in that --
 6   in that situation?
 7        A.  They had Rackspace hosting.  Also, Kiteworks,
 8   which is what they used for their secure file transfer,
 9   and that's it.
10        Q.  Okay.  Did either of those involve Amazon Web
11   Services or AWS?
12        A.  No.
13        Q.  Okay.  We were also talking about the instance
14   you gave us of visiting the Clark County website.
15        A.  Yes.
16        Q.  As part of that visit to the Clark County
17   website, did you visit any Tyler-hosted portions of the,
18   you know, Clark County website?
19        A.  I would've viewed their iCourt portal.
20        Q.  Okay.  And was the Clark County iCourt
21   portal HTTPS secure?
22        A.  I believe so, yes.
23        Q.  Mm-hmm.
24            Do you have an understanding of whether the
25   Clark County of Nevada uses a Tyler Press Review Tool or
```

11 (Pages 41 to 44)

Courthouse News Service v. Omundson       30(b)(6) Jennifer Dvorak

---

Page 45

1 Auto-Accept tool?
2     A. I believe so. I believe that they were one of
3 the customers that currently uses the product.
4     Q. Which product?
5     A. The Press Review Tool.
6     Q. Okay. Did you contact or did the
7 administrative office contact anyone at Clark County to
8 request, you know, access to the press -- their Press
9 Review Tool?
10     A. Not that I'm aware of.
11     Q. Did the administrative office contact any
12 other state courts to request access to their Press
13 Review Tools?
14     A. I wouldn't have knowledge of who they
15 contacted. I know that I didn't contact them.
16     Q. Okay. Did the administrative office contact
17 Tyler to request the opportunity to view any of the
18 existing Press Review Tools used by other state courts?
19        MS. DUKE: Asked and answered.
20        Go ahead.
21        THE DEPONENT: I know that I didn't.
22     Q. (By Mr. Fetterly) Do you have any reason
23 to believe that somebody else did?
24     A. I don't -- I don't -- I don't go to all the
25 meetings that all of our folks have with Tyler

---

Page 46

1 Technologies. I know they meet pretty regularly, so I
2 don't -- I wouldn't -- I wouldn't know.
3     Q. Okay. But if I understand correctly, the
4 administrative office has not used any of the Press
5 Review Tools that are available through other state
6 courts; is that correct?
7        MS. DUKE: Object to the form. Asked and
8 answered. Foundation.
9        THE DEPONENT: Yeah. Again, I wouldn't
10 have all that information. I can only say what I've
11 done, and I haven't done that.
12     Q. (By Mr. Fetterly) But we are -- you have been
13 produced today as a witness -- as a 30(b)(6) witness to
14 speak on behalf of the administrative office with
15 respect to the categories we've identified, which
16 include testing and functionality of the Press Review
17 Tool. So we are entitled to know whether the
18 administrative office has taken steps to, for instance,
19 you know, use or test the Press Review Tools that are
20 made available by other state courts.
21        So if you don't know, is there somebody else
22 in your office who would know?
23     A. I don't know. I just know that I -- I haven't
24 done that. I've been on several conversations about the
25 Press Review Tool, but my -- the major component that I

---

Page 47

1 was asked to review was the cybersecurity portion.
2     Q. Okay.
3     A. And that is reliant on our particular
4 configuration. I wouldn't be able to comment on another
5 state court's configuration or how they used the Press
6 Review Tool.
7     Q. Okay.
8        MS. DUKE: And I just want to be clear
9 that she did previously testify, you know, they all but
10 said we want a demo and they haven't been provided that
11 by Tyler; so...
12        MR. FETTERLY: Okay. I believe that
13 misstates the testimony, but in any event --
14        THE DEPONENT: But -- okay.
15     Q. (By Mr. Fetterly) But as part of your
16 cybersecurity review, you did not, you know, review
17 or -- I guess you did not use or test any of the Press
18 Review Tools that are currently in existence through
19 other state courts that use the Press Review Tool;
20 correct?
21        MS. DUKE: Same objections.
22        Go ahead.
23        THE DEPONENT: That's correct. I didn't.
24     Q. (By Mr. Fetterly) Okay. Let's turn now to
25 the -- the cybersecurity review that we've been talking

---

Page 48

1 about. If I could just direct your attention back to
2 Exhibit No. 11.
3        And let me know when you have that in front of
4 you.
5     A. It is, yes.
6     Q. Okay. Earlier, you were telling us that you
7 did a similar review for the Tyler jury manager product.
8 Did that review resemble or reflect the level of
9 analysis that's reflected in this review?
10     A. It actually was more comprehensive because I
11 had more information about that product and the data
12 types that would traverse it.
13     Q. Okay. Understood.
14        And what was your --
15     A. So -- and -- and just to clarify, so jury
16 management is a purchased product, so that's also the
17 difference. Press Review Tool is an unpurchased
18 product. We haven't purchased it.
19     Q. Mm-hmm. Maybe you can help me understand.
20 I'm having a hard time following one thing. It seems
21 like there's maybe a bit of a chicken-and-egg situation
22 here where because it's not purchased or implemented
23 there's information you don't have, but you're claiming
24 you need information in order to move forward and
25 purchase.

12 (Pages 45 to 48)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

**Page 49**



---

**Page 51**

1  would be planning on joining those organizations. And
2  those include a third-party assessment, so as part of
3  that process, that would provide us the assurances that
4  we're looking for. So if they do become FedRAMP or
5  StateRAMP authorized, we could use that in lieu of
6  having these terms and conditions that rely on our own
7  risk authorization management process.
8      **Q. Is Amazon Web Services' GovCloud StateRAMP or**
9  **FedRAMP qualified or certified?**
10     A. It is on GovCloud, but StateRAMP and FedRAMP
11  are specific to products on top of that platform. So
12  there are questions about how you do authentication, how
13  you do audit, how do you manage your logging, how do you
14  manage your third-party assessments of vulnerabilities.
15  Those would be all part of the vendor supplier. Those
16  would not be on the underlying platform.
17     **Q. Yeah. Insofar as the Idaho Courts are**
18  **concerned about cloud-based services for hosting, if --**
19  **if the Idaho Courts data is stored on GovCloud, does**
20  **that satisfy or address any concerns the Idaho Courts**
21  **have regarding the security of that data?**
22     A. It provides certain -- it provides for a
23  certain level of security for the data. However,
24  there's overlying configuration options that the vendor
25  manages that would not be included as part of being in a

---

**Page 50**

1  August 2021.
2      **Q. Okay. And have the Idaho Courts requested**
3  **that Tyler agree to amend its e-filing agreement for the**
4  **specific purpose of incorporating the terms and**
5  **conditions that are reflected in Exhibit 19?**
6      A. As far as I know, they have not, but that's
7  because we have additional purchases that -- that we are
8  working through with Tyler. So we're doing security
9  review on some of their other products, so there will be
10  overlap in some of their answers from those products.
11     **Q. And what other products are currently**
12  **undergoing security review?**
13     A. So the Odyssey SaaS, so security as a service
14  product. Tyler Technologies, while we are currently not
15  under contract, they did ask if they could begin taking
16  a look at the process. And some of the audit questions
17  that we do ask as part of our risk authorization process
18  ask general questions about their organization, so those
19  general questions about their organization could be
20  utilized across products.
21     **Q. Mm-hmm.**
22     A. We've also asked them if they have plans to
23  join StateRAMP or FedRAMP, which is the state or the
24  federal risk authorization management programs. And
25  they have stated that it is on its roadmap, that they

---

**Page 52**

1  GovCloud.
2      **Q. And what are those?**
3      A. It would be the same things I stated. So
4  whether or not they're doing any kind of external
5  vulnerability or penetration tests, whether or not
6  they're remediating those findings, how they perform
7  authentication, how they manage operating system
8  patches, how they manage antivirus patching, all of that
9  is controlled by the vendor on top of the data storage
10  layer.
11     **Q. Okay. And do the Idaho Courts currently have**
12  **any concerns in that regard with respect to Tyler's**
13  **eFile & Serve system and any cloud component to that**
14  **system?**
15     A. They're unknown at this time. We have no
16  information about how they're managing that process.
17  So, again, if we had StateRAMP authorization, FedRAMP
18  authorization, or if we're able to conduct our own risk
19  authorization, we would have a level of comfort with
20  those products.
21     **Q. So are the Idaho Courts presently concerned**
22  **about the security of their data that's, you know, held**
23  **by or traversing through eFile & Serve?**
24     A. I think it's limited because it's not publicly
25  accessible. So what happens is, again, it's log-in

13 (Pages 49 to 52)

Courthouse News Service v. Omundson                                    30(b)(6) Jennifer Dvorak

---

Page 53

```
1    functionality, there is an audit trail for who is
2    uploading documents, and it's reviewed by a person prior
3    to being brought into the case management system.
4          So, again, there's processes built into --
5    it's not publicly accessible.  It's not something that
6    anybody off the street could just come in and have
7    access to.
8          Q.  Mm-hmm.  I want to go back to the risk
9    memorandum here to get a better understanding, then, of
10   what -- what review you did.  Let me -- I can put that
11   up on the screen so we can look at the same
12   document, but I'd ask you to go to Exhibit No. 11.
13         A.  Yes.
14         Q.  Okay.  Okay.  So let's see.  Let me -- let me
15   just first ask you to go to Page 3 here.  This is 5531.
16   It's a three-page document.
17         A.  Yes.
18         Q.  Have you seen this document before?
19         A.  Yes.
20         Q.  And what is it?
21         A.  This is our risk analysis matrix, how we
22   assess risk.
23         Q.  Okay.  And was this prepared unique to the
24   review of the Press Review Tool, or did it -- is it --
25   does it apply more broadly?
```

Page 55

*(black/blank page)*

---

Page 54

*(black/blank page)*

Page 56

```
1          Q.  Okay.  And does the jury management product or
2    system include any cloud-based technology?
3          A.  Yes.
4          Q.  Okay.  Going back to this risk analysis memo,
5    so the Press Review Tool, this is the second time that
6    it's been used; correct?
7          A.  Correct.
8          Q.  I see that this document has Pages 1 of 5 on
9    the bottom left-hand corner.  When I scroll down, I see
10   Page 2, I see a Page 3, and then I see some other -- a
11   different document that we'll talk about separately.  I
12   don't see Pages 4 and 5.
13         Are there Pages 4 and 5 to this document?
14         A.  I don't believe so.
15         Q.  Okay.  So would you characterize the 1 of 5, 2
16   of 5, 3 of 5 as a typo?
17         A.  I believe so, yes.
18         Q.  Okay.  Did anyone besides you prepare this
19   risk analysis memorandum?
20         A.  No.
21         Q.  Okay.  And I think you kind of answered it,
22   but I just want to be clear, for approximately how long
23   has this been in effect with the Idaho Courts?
24         A.  I would say it's new as of this year.
25         Q.  Can you give me an estimate of when in this
```

14  (Pages 53 to 56)

Courthouse News Service v. Omundson          30(b)(6) Jennifer Dvorak

---

Page 57



Page 59

1      Q.  And when you say you make the assessment, the
2 person conducting the review makes the assessment?
3      A.  Correct.
4      Q.  And in the context of the Press Review Tool,
5 you were that person; correct?
6      A.  Yes.
7      Q.  Okay.  Looking at the chart where it says
8 likelihood, I see we have five options, very likely,
9 likely, possible, unlikely, and unlikely [sic]?
10      A.  Mm-hmm.
11      Q.  Is -- is there some standard or methodology
12 for determining when the likelihood is possible versus
13 one of the other four options?
14      A.  So I think in the case of this particular
15 product, because I wasn't provided all the information
16 that I requested, it just landed in the middle of
17 possible.  I don't -- I don't know the possibility or
18 the likelihood of it occurring.
19      Q.  Would you agree that very likely, likely,
20 unlikely and unlikely are all possible?
21      A.  I don't know, because, again, I wasn't
22 provided the information I requested.  I would have a
23 better understanding if it was a system that I
24 controlled.  But beyond that, I can only go based on the
25 information that I receive from the vendor.

---

Page 58

1 see that?
2      A.  Yes.
3      Q.  Can you just kind of walk me through how this
4 works?  As you're the author of this document, I'm just
5 looking for a little -- if you can elaborate, explain to
6 me kind of how this table works.
7      A.  So -- so you're looking at the -- so it's not
8 an independent graphic, so it's used in conjunction with
9 the table ahead of it.  So we look at loss of
10 confidentiality, so what is the likelihood of loss of
11 confidentiality?  What would the impact be and what is
12 the likelihood?
13      So in using that graphic below, we try to
14 understand what the impact would be if this information
15 was -- the confidentiality was not in -- was out of your
16 control.  So if nonpublic data was disclosed, what would
17 the impact be to the organization?  What fees and fines?
18 What regulatory requirements would you be breaking?
19 What loss of goodwill?  So understanding what that
20 impact would be, the greater the impact, the more you
21 move to the right.  And then also the likelihood, so
22 what is the likelihood of this occurring?  And so for
23 each of those, confidentiality, integrity, and
24 availability, you make this assessment for each of
25 those.

---

Page 60

1      Q.  So would you say that possible here was based
2 on the lack of information as opposed to based on
3 information received?
4      A.  Definitely.  I -- I requested the information.
5 I didn't receive it, so I wasn't able to move forward
6 with any -- any other likelihood.
7      Q.  Same -- same question with respect to impact.
8 Is there a standard or methodology when determining
9 whether an impact is negligible or minor or moderate and
10 so forth?
11      A.  So, again, it's based on understanding of
12 regulatory requirements, applicable laws, court rules,
13 recovery, and just goodwill, so there isn't an exact --
14 it's not an exact science, but it's based on my many
15 years in cybersecurity.
16      Q.  And so the -- the intersection between
17 likelihood and impact then, is it -- is it one that you
18 would apply then just depending on the product?  So it's
19 not necessarily a consistent or standard application,
20 but more of a -- kind of a subjective application
21 depending on the product you're reviewing?
22      A.  No.  It would actually be based on the data
23 types, so the data that's contained.  The impact is
24 significantly tied to the data.  It's not product based.
25      Q.  Understood.

15 (Pages 57 to 60)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 61

1    So for likelihood, in this case, it was you
2    didn't have enough information to form a different
3    conclusion, so you landed on possible.  But for impact,
4    you are capable of forming a conclusion based upon the
5    data at issue; is that correct?
6    A.  That is correct.
7    Q.  Okay.  So let's go back up now to the first
8    page of this document.  I want to start to walk through
9    it so I can better understand it.
10    Did anybody assist you in the preparation of
11    this document, Exhibit No. 11?
12    A.  No.
13    Q.  Starting with the first paragraph where it
14    says:  "The Tyler Press Review Tool is a hosted
15    software-as-a-service solution in which the vendor and a
16    third-party infrastructure-as-a-service provider manage
17    all the underlying architecture."
18    I just want to better understand that.  In
19    this sentence, when you say "the vendor," who is the
20    vendor?
21    A.  The vendor would be Tyler Technologies.
22    Q.  Okay.  And where we say
23    "information-as-a-service provider," who are you
24    referring to there?
25    A.  AWS.

---

Page 62

2    provider for any other products?
3    A.  Not outside of Tyler Technologies' product
4    offering.
5    Q.  Okay.  Let me just ask it a little bit
6    differently.
7    Does the Idaho Court use any other vendors
8    that use Amazon Web Services as their IaaS?
9    A.  No, not that I'm aware of.
10    Q.  What IaaS providers do the Idaho Courts use?
11    A.  We use Azure.
12    Q.  And for how long have the Idaho Courts used
13    Azure?
14    A.  Prior to my joining the ISC.
15    Q.  Any others?
16    A.  Not that I'm aware of, no.
17    Q.  So where we're -- where we're talking about
18    the Idaho Court-hosted aspects of the Tyler products or
19    Odyssey products, the web-based IaaS provider for those
20    products and services would be Azure?
21    A.  I don't understand the question.
22    MS. DUKE:  And, again, this is beyond the
23    scope of the 30(b)(6).
24    You can answer from your personal
25    knowledge, if you know.

---

Page 63

9    Q.  (By Mr. Fetterly) Okay.  So the Idaho Courts do
10    not use a third-party IaaS provider for that data?
11    A.  Correct.
12    Q.  Moving on to the next sentence on this
13    Exhibit No. 11, it says:  "Tyler Technologies has
14    indicated that they comply with applicable statutory and
15    regulatory compliance."
16    A.  Yes.  They did make that general statement to
17    me.
18    Q.  Any reason to believe it is not true?
19    A.  I have no reason to believe either way.  They
20    just made the statement.
21    So, typically, when you do an assessment, you
22    would ask for a statement and then you would also ask
23    for a show of proof of compliance.  And they have shown
24    no proof, so that's just the statement that I received
25    from them.

---

Page 64

1    Q.  But just to be clear, no reason to believe
2    that it is not true; correct?
3    MS. DUKE:  Object to the form.  Misstates
4    her testimony.
5    Go ahead.
6    THE DEPONENT:  Yeah, I can't -- I can't
7    speak either way because I don't know.
8    Q.  (By Mr. Fetterly) What would be required --
9    what would you require in order to be able to know?
10    A.  I would need them to document what applicable
11    statutory and regulatory compliance that they meet and
12    also provide documentation showing that it does meet.
13    So, for instance, if they say we follow a NIST-compliant
14    framework, I would want to see how their framework
15    aligns with NIST requirements.
16    Q.  Okay.  So I guess -- but you spoke in
17    generalities.  Is there something specific that you have
18    requested from Tyler that the Idaho Courts have not
19    received that would be relevant to understanding -- your
20    understanding of whether or not their statement is true
21    or not true?
22    A.  Yes.  Well, again, because this isn't a
23    contracted -- this isn't a contracted solution, we have
24    asked it for other products and we were not provided the
25    information; so...

---

16  (Pages 61 to 64)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 65

1    Q.  Has the administrative office asked for this
2  information in connection with contracted products?
3    A.  No, because they're already under contract.
4  So our process is built into a new contract or an
5  amendment of an existing contract.
6    Q.  Earlier, I thought I heard you say that part
7  of the -- whether you -- that the Idaho Courts request
8  information that, you know, Tyler might be contractually
9  obligated to provide, so I guess I'm trying to
10  understand how this works.  Either you're under a
11  contract and they're contractually obligated to provide
12  it, or you're not under a contract and there's no
13  contractual obligation.
14      Can you explain to me how that works in terms
15  of the Idaho Courts requesting and obtaining this
16  information?
17    A.  So as part of our cloud-based terms and
18  conditions, we do ask the vendor to complete our risk
19  authorization and management process.  Part of that
20  process is asking questions about their security
21  controls and asking for them to provide documentation or
22  attestation to that effect.
23      So we might ask for, you know, you're doing
24  security awareness training for all of your employees
25  every year, can you provide proof of that?  And,

---

Page 66

1  typically, that would be a screenshot of your learning
2  management system or your employee files that say that
3  you've completed the -- the training.  So that would be
4  the -- the proof that we're looking for, but that is
5  just part of working through a new contract or an
6  amendment.
7      This was -- this review was based on
8  information that I received from Tyler.  It was very
9  minimal.  It didn't provide any information about their
10  security program as part of this review.
11    Q.  And the level of detail that you've just
12  referenced, has Tyler agreed to provide that in
13  connection with any product used by the Idaho Courts?
14    A.  They have agreed to work with us to
15  potentially give us that information, but they have not
16  agreed to give us that information yet.
17    Q.  Okay.  Do you have an understanding of where
18  that process currently sits?  Has any information been
19  provided?  None to date?  You know, where -- where do
20  things currently stand on that?
21    A.  We have some information.  So they did take a
22  first pass at our audit questionnaire.  Some of the
23  questions are just -- the answers are restated of what I
24  asked for.  They don't provide any detail and there's no
25  documentation or -- or proof in any of the requests that

---

Page 67

1  I made.
2    Q.  Is the audit questionnaire that you just
3  referenced in relation to the Press Review Tool, or is
4  it the, you know, broader, you know, Tyler offering of
5  products and services?
6    A.  Some of the questions are
7  organization-specific and some are service-specific or
8  product-specific.  So the questions about the
9  organization would be applicable to all of Tyler's
10  products.
11    Q.  And does this product ask questions about the
12  Tyler eFile & Serve service or product?
13    A.  In particular, no.
14    Q.  Okay.  What about the Tyler Portal product?
15    A.  No.  Not in particular, no.
16    Q.  Mm-hmm.  And what about the Tyler case
17  management system product?
18    A.  For their SaaS offering, yes.
19    Q.  Okay.  But just to be clear, to date, Tyler
20  has not provided, I guess, the -- the complete level of
21  information requested by the Idaho Courts in connection
22  with any of its products; is that correct?
23    A.  That's correct.
24    Q.  Mm-hmm.  Are the Idaho Courts currently
25  considering, you know, switching to other vendors?

---

Page 68

1      MS. DUKE:  Beyond the scope of the
2  30(b)(6).  Yeah, I'm actually going to instruct her not
3  to answer.  I don't know how that's relevant, and I'm
4  not going to get into a fight with Tyler whether there's
5  some kind of tortuous interference with contract or
6  something as a result of this suit.  So...
7      MR. FETTERLY:  Okay.  Instruction noted.
8    Q.  (By Mr. Fetterly) I wanted to continue on down,
9  then, in this paragraph where we -- let's see.  There's
10  a sentence here that states -- following the one that we
11  just discussed where we talked about Tyler Technologies
12  has indicated they comply with the applicable statutory
13  and regulatory compliance, and you stated you have no
14  reason to believe either way whether that's true or
15  untrue.
16      The next sentence goes:  "And while PRT isn't
17  named specifically, it is included in their SOC 2 Type 2
18  audit report as part of eFile & Serve."
19      So I guess my first question to you is:  What
20  is the SOC 2 Type 2 audit report?
21    A.  That is a third-party assessment of security
22  controls.
23    Q.  And who or what is the third party that
24  provides that assessment?
25    A.  I'd have to go back and look at their SOC 2.

---

17 (Pages 65 to 68)

Courthouse News Service v. Omundson                30(b)(6) Jennifer Dvorak

---

Page 69

1    I don't remember the name of the company that provided
2    that for them.
3        Q. Is this something that's typically requested
4    in connection with risk analysis?
5        A. Yes, and it's built into our cloud-based terms
6    and conditions.
7        Q. Mm-hmm. And was that something that was
8    requested specifically in connection with this risk
9    analysis?
10       A. No. It was actually requested as part of the
11   Enterprise Jury Management product.

25       Q. Okay. Do the Idaho Courts have this SOC 2

---

Page 70

1    audit report?
2        A. Yes.
3        Q. And does the SOC 2 audit report cover
4    eFile & Serve?
5        A. It does, yes.
6        Q. Okay. And any reason to believe that Tyler --
7    Tyler's statements are not correct, that the Press
8    Review Tool is part of their SOC 2 report vis-à-vis
9    eFile & Serve?
10       A. The product names aren't specifically called
11   out in the report, so it is difficult to determine
12   whether it truly is part of that report.
13       Q. Do the Idaho Courts have any reason to
14   believe that eFile & Serve is not covered by the SOC 2
15   report?
16       A. eFile & Serve is specifically called out.
17   The Press Review Tool is not. Similarly, to jury
18   management, it was -- it was not called out in the
19   press -- in the SOC 2.
20       Q. Okay. Let me just take a quick moment to
21   direct your attention over to Exhibit No. 10.
22       I have that up on the screen. Let me see if
23   you see it.
24       A. Yes.
25       Q. So starting with this first sentence here, we

---

Page 71

1    have -- and just to be clear, I'm talking about the
2    August 16th email, 11:50 a.m., Jessi Fisher to you. Do
3    you see that?
4        A. Yes.
5        Q. The first sentence of the first full paragraph
6    states: "The Press Review Tool's communication with our
7    eFiling Manager, EFM, all takes place within Tyler's
8    SaaS-operated network within the AWS GovCloud."
9        A. Yes.
10       Q. Do you have any reason to believe that that
11   sentence is not accurate?
12       A. All I have is to go on -- based on what the
13   information they've given me, so I have no reason to
14   believe it or not believe it. I mean, that's what they
15   stated.
16       Q. Okay. Where it talks about the eFiling
17   Manager, do you see that reference?
18       Is the eFiling Manager within
19   eFile & Serve or part of eFile & Serve?
20       A. I believe so, yes.
21       Q. Okay. This SOC 2 audit that we're discussing,
22   you said it was received in connection with jury
23   manager, so that would've been received earlier this
24   year; is that correct?
25       A. Correct.

---

Page 72

1        Q. Had the Idaho Courts previously requested or
2    received a SOC 2 audit from Tyler?
3        A. Not that I'm aware of; not before I arrived.
4        Q. And did this SOC 2 audit satisfy the Idaho
5    Courts' requirements for this type of audit?
6        A. No, because it's -- it's just one part of our
7    requirements.
8        Q. Okay. And then what were the other
9    requirements?
10       A. So what -- which product are you talking
11   about?
12       Q. Well, I guess that's the question. Is there a
13   standard set of requirements that the court requires, or
14   is it on a -- on a per-product basis?
15       A. We have -- the standards are detailed in the
16   cloud-based vendor's terms and conditions, so the SOC 2
17   report is to assess the data center in which the data is
18   housed. And then in addition to that, we have an
19   additional questionnaire that we ask that's based on
20   configuration, audit logging, organizational security
21   standards, that type of thing. So it is a standard
22   process, but, again, since this is not a contracted
23   product that we purchased, I've -- I've not gone through
24   that process with Tyler Press Review Tool.
25       Q. Okay. And the same would be true with respect

18  (Pages 69 to 72)

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

ER-1906

Courthouse News Service v. Omundson                          30(b)(6) Jennifer Dvorak

---

Page 73

1    to Tyler eFile & Serve?
2        A.  Because that is already under contract,
3    correct.
4        Q.  Okay.  And did Tyler provide that additional
5    information from exhibit -- I guess the terms and
6    conditions in connection with the jury manager?
7        A.  They did not because the contract was already
8    signed.
9        Q.  Mm-hmm.
10       A.  And regardless, they wouldn't have -- I'll
11   just add that they wouldn't have met the requirements
12   because the jury manager is not included in their SOC 2
13   report.
14       Q.  But the Idaho Courts are currently using jury
15   manager; correct?
16       A.  Correct.
17       Q.  So going back here to our Exhibit No. 11, I
18   guess the next sentence is:  "Tyler has -- however,
19   Tyler has stated that they will not provide a customer
20   attestation letter from their underlying IaaS provider,
21   AWS, indicating they are a customer in good standing and
22   which AWS environment will be storing, processing, and
23   transmitting ISC data."
24       And, again, I just want to understand why did
25   you put that sentence into this report?

---

Page 74

1        A.  Because, again, that's a part of our
2    requirements for cloud-based vendors.  And we talked
3    about that earlier, in my email, that I did ask for that
4    specifically.  They said they would not be providing it,
5    and I also reminded Tyler that we would be asking that
6    as part of a contracted service.
7        Additionally, this is not something that is
8    out of bounds with asking for -- asking a vendor for.
9    It's part of the standard process that I utilized in
10   Arizona.
11       Q.  So if -- if Tyler were to provide that
12   letter -- well, strike that.
13       So if Tyler provided that letter, how would
14   that affect this risk analysis?
15       A.  It would not have affected the risk analysis.
16   It's just information about the product that was
17   gathered.  It should be noted as part of the risk
18   analysis.
19       So, again, I'm just trying to -- to assess the
20   risk based on the information provided.  For me, that --
21   that would be -- it's -- it -- it's a little bit -- I
22   was surprised that they wouldn't provide that.  They
23   specifically said that they would not provide that
24   information.  They -- they provided it to us for jury
25   management when hosted in Rackspace.  I've asked other

---

Page 75

1    vendors in the past to provide that, and, in fact, they
2    have provided that same letter to other states.  So it
3    was surprising that they said, "I will not provide you
4    that letter."
5        Q.  So I think I asked if they did provide the
6    letter, would it affect the risk analysis, and you said
7    no.
8        My follow-up question there is:  Why not?
9        A.  Well, I think that it would've -- because,
10   again, we don't have a full picture of the environment,
11   I don't think that it would've changed the -- the -- the
12   likelihood or the impact.  It's just additional
13   information that could inform the risk, but it's -- the
14   actual impact assessment, it would not have affected.
15       Q.  I believe one of the issues is, per your
16   sentence here, you state you're looking for a
17   certification that, you know, Tyler is a customer in
18   good standing and which AWS environment will be storing,
19   processing, and transmitting ISC data.
20       So we -- earlier, we talked about AWS
21   GovCloud.  If the Idaho Courts' data is stored,
22   processed, and transmitted in AWS GovCloud, and that's
23   confirmed through a certification letter, are you saying
24   that would not be relevant to the risk analysis?
25       MS. DUKE:  And I'll object as to the form

---

Page 76

1    with you calling it Idaho documents in that setting,
2    Idaho Court documents.
3        Go ahead.
4        THE DEPONENT:  Yeah.  I guess it would
5    make a difference in this risk assessment.
6        Q.  (By Mr. Fetterly) And how would that make a
7    difference?
8        A.  I think that it would put us in a more
9    comfortable position that Tyler Technologies could be
10   transparent about where our data's being stored and,
11   hopefully, it's attached to a contract process so that
12   the data cannot be moved or -- or changed without our
13   permission or input.
14       Q.  So is the issue then the quality of the
15   security provided by the IaaS, or is it more the
16   contractual accountability vis-à-vis, you know, the
17   contract process?
18       MS. DUKE:  Object to the form.
19       THE DEPONENT:  Yeah, I would say it's
20   both.
21       Q.  (By Mr. Fetterly) Okay.  So as to the quality
22   of the security, if the -- if the -- if the data at
23   issue is being hosted or stored or transmitted through
24   AWS GovCloud, are there any issues there that give rise
25   to -- that create any concerns with the Idaho Courts?

19  (Pages 73 to 76)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 77

1  A. Not with the AWS GovCloud, but, you know, that
2 is just where the data is stored and housed. That
3 doesn't take into consideration any configuration
4 maintained by the vendor on top of that cloud provider.
5  Q. Understood.
6  So now -- okay. So what about -- so then the
7 contract process, how does the contract process factor
8 in to provide the assurances to address these concerns
9 and how would that affect the risk analysis?
10  MS. DUKE: Go ahead.
11  THE DEPONENT: So I -- I don't know how
12 it would affect the risk analysis, but it is -- it's
13 just part of the contract process. So we do ask for a
14 letter from any third-party providers, and we do ask to
15 be part of the process or at least be notified of when
16 there's a change to that provider.
17  Q. (By Mr. Fetterly) Okay. Do you know whether
18 AWS provides such attestation letters to customers?
19  A. Absolutely.
20  Q. Okay. Is it common practice for AWS to
21 provide this type of attestation letter?
22  A. Yes, it is.
23  Q. Okay. And how would that look in this case?
24 Would it be something that would be provided directly to
25 the Idaho administrative office? Would it be provided

---

Page 78

1 to Tyler? You know, how would that -- how would that
2 work here?
3  A. So, typically, we would ask Tyler to initiate
4 that conversation with their vendor because we don't
5 have a relationship with AWS, and they would either
6 provide it on AWS letterhead directly to us or to Tyler
7 so that Tyler could provide it to us. Either way would
8 work.
9  Q. Okay. Does the current contract between the
10 administrative office and Tyler allow the administrative
11 office to, you know, request this type of certification
12 letter or attestation letter?
13  MS. DUKE: Object to the form.
14 Foundation.
15  THE DEPONENT: I don't know that it's
16 built into the current contract. I would believe it's
17 not. But in future contracts, it should be part of
18 that.
19  Q. (By Mr. Fetterly) Okay. Have the -- has the
20 administrative office contacted AWS to request this
21 attestation letter itself?
22  A. No, because we are not a vendor of AWS. We
23 cannot ask AWS to provide information on another
24 vendor's behalf.
25  Q. Okay. Have the Idaho Courts requested this

---

Page 79

1 type of certification letter in connection with other
2 services through other IaaS providers?
3  MS. DUKE: Again, beyond the scope, but
4 go ahead.
5  THE DEPONENT: Yes.
6  Q. (By Mr. Fetterly) So my understanding is even
7 if Tyler were to provide this letter, that doesn't
8 necessarily address all of the Idaho Courts' concerns,
9 because the Idaho Courts are still seeking full
10 compliance with the terms and conditions reflected in
11 Exhibit 19; is that correct?
12  A. Yes.
13  Q. Okay. And that would be on a -- on a
14 going-forward basis for future contracted services;
15 correct?
16  A. That's correct.
17  Q. And -- okay. But, currently, Exhibit 19 is
18 not part of any current contract with Tyler in
19 connection with eFile & Serve or Portal; correct?
20  A. Correct.
21  MR. FETTERLY: All right. I think we've
22 been going for about another hour. Why don't we go off
23 the record, and shall we take another 10-minute break?
24  MS. DUKE: Sounds great.
25  THE DEPONENT: Sure.

---

Page 80

1  MR. FETTERLY: Thank you.
2  (A break was taken from
3  1:58 p.m. to 2:14 p.m.)
4  MS. DUKE: Excellent. We were talking
5 off the record and we've addressed needing to put a
6 protective order entered by the court. We'll put
7 together a form that Mr. Fetterly and Ms. Keating can
8 take a look at and ultimately come to an agreement on
9 the protective order related to certain information
10 that's been testified to today and probably will be
11 testified to in other depositions, which includes, but
12 is not limited to, the location of the Court's computer
13 backup data systems, the housing of them, the security
14 surrounding them, and the security related to those like
15 Tyler and others who are contracting with the State
16 related to certain information and documents.
17  And we'll get a form to you, Jon and
18 Katherine, to take a look at, and it'll be a standard --
19 I'm fine with it not being an "attorney's eyes only."
20 There's no need for that, but it's my understanding that
21 your client, my client all understand this on today's
22 Zoom, and this will be handled through a protective
23 order with the Court.
24  MR. FETTERLY: That is correct. Nothing
25 further to add at this time.

20  (Pages 77 to 80)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 81

1          MS. DUKE:  Thank you.
2          Q.  (By Mr. Fetterly) All right.  So, Ms. Dvorak,
3     before we took our break, we were discussing
4     Exhibit No. 11, and we were specifically working through
5     the first page of the risk memorandum.
6          Moving now to the bottom paragraph, there's a
7     bolded header called "Risk statement."  Do you see that?
8          A.  Yes.
9          Q.  And did you draft this paragraph as part of
10    your preparation of this memorandum?
11         A.  Yes.
12         Q.  Okay.  As part of your risk review, did you
13    identify any risks that are not reflected in this risk
14    statement?
15         A.  It pretty well encompasses.  Especially
16    because it specifically calls out the contractual
17    obligation to protect ISC data and provide indemnity in
18    the case of a data breach, so I think it is pretty
19    encompassing.
20         Q.  Okay.  Let me just focus then on that part
21    before we walk through the statement.  Why do you single
22    that aspect out as being noteworthy?
23         A.  Because that relies on us completing our
24    cloud-based terms and conditions.
25         Q.  Understood.

---

Page 82

1          So if I understand you correctly, the -- the
2     execution of a contract that incorporates those terms
3     and conditions, that would be -- you would deem that
4     then sufficient to address the risk concerns?
5          A.  Yes.  Because part of our process is to look
6     through all of the risk concerns, and then we have the
7     ability to reject issuing a PO if its security
8     requirements are not met.
9          Q.  And help me understand that.  You say "ability
10    to reject a PO," what does that mean?
11         A.  So we would have -- we would not have to move
12    forward with completing the contract and completing the
13    purchase.
14         Q.  How would that apply to a product or service
15    that is already under contract?
16         A.  It would not, because this is part of a --
17    new contract or contract amendment process.
18         Q.  Okay.  Let me go with the -- direct your
19    attention to the first sentence of that paragraph under
20    "Risk statement."
21          "The PRT can contain sensitive data types and
22    there is the potential for misconfiguration to expose
23    nonpublic data."
24          Did I read that correctly?
25         A.  Yeah.  Yes.

---

Page 83

1          Q.  So let's break that up and better understand
2     it.  So, first, what -- what is the basis for this
3     statement?
4          A.  So my understanding is that when you submit
5     documents through eFile & Serve, publicly-identifiable
6     information such as first name, last name, social
7     security number, those could potentially not be redacted
8     on a document and those would be made available in a
9     Press Review Tool for the public to review.  So those
10    data types would not be considered public or
11    public-facing, but they could be made public-facing if
12    they were not redacted.
13          Additionally, if there was a misconfiguration
14    on the AOC side, in which we accidentally made data
15    types that we didn't want to be made publicly -- made
16    publicly-available because there's no human interaction
17    with that automation, it would just -- the
18    misconfiguration would automatically push potentially
19    nonpublic information to the press review tool.
20         Q.  Understood.
21          Okay.  So I'm going to break that up a little
22    bit further to make sure I properly understand it.  So
23    the first part of that sentence where it talks about
24    sensitive data types, you're referring to data that the
25    Idaho Courts believe should have been redacted in a --

---

Page 84

1     in a document; correct?
2          A.  Yes.
3          Q.  Okay.  So this -- and so we're talking about a
4     document that might otherwise be publicly available or
5     nonconfidential, but contains sensitive information that
6     should be redacted; is that correct?
7          A.  Yes.
8          Q.  Okay.  And so that's for sensitive data types.
9     But then for potential for misconfiguration, if I
10    understand you correctly, you're referring to a
11    misconfiguration that results in nonpublic or
12    confidential documents going into a Press Review Tool;
13    is that correct?
14         A.  Correct, because there's no -- there's no
15    humans looking at it.  It's completely automated, so it
16    could potentially just pass right over to that Press
17    Review Tool to be viewed by the public without anyone
18    reviewing it.
19         Q.  And what, I guess, I want to -- I want to
20    understand what you mean when you say no one's reviewing
21    it.  Are you talking about human review of the
22    configuration, or human review of the document once the
23    system has been configured?
24         A.  Human review of the document once the system's
25    been configured.

---

21  (Pages 81 to 84)

Courthouse News Service v. Omundson                                    30(b)(6) Jennifer Dvorak

---

Page 85

1      Q.  Okay.  So I'd like to set that aside now and
2  just focus on the configuration.
3          So how would the Press Review Tool be
4  misconfigured in a manner that would expose nonpublic
5  data?
6      A.  Well, my understanding is that the Press
7  Review Tool configuration is based on case types,
8  document types, security groups.  There's multiple
9  different ways that it can be configured so that you
10  understand what will be pushed to the press review tool.
11  If we or the vendor don't understand the implications of
12  what we're configuring or we make a mistake, that
13  automation will push documents that we don't intend to
14  be pushed to the Press Review Tool.
15      Q.  Okay.  So that seems to be based on a
16  hypothetical about if you don't understand or if you
17  misconfigure.
18          If we assume that Tyler and the Idaho Courts
19  have a clear understanding of the types of documents to
20  be put into the press tool, and it's configured
21  correctly so that only public documents are made
22  available, would that address the Idaho Courts' concern?
23      A.  Well, I think we'd have to think through every
24  scenario in which documents or case types could be
25  potentially submitted.  We may not know what all of

---

Page 86

1  those potential use cases or -- could entail.
2      Q.  Do you have an understanding of whether the --
3  the press review tool as a default places documents into
4  the press tool or whether the default is to exclude them
5  from the press tool?
6      A.  I think that it's -- again, it's based on the
7  configuration, and it would be an allow -- allow open,
8  allow move to the press review tool.
9      Q.  I'm not sure I understand that response.  So
10  is --
11      A.  Maybe I didn't understand your question.
12      Q.  Fair enough.  I appreciate you pointing that
13  out.
14          Do -- do you have an understanding of whether
15  the Press Review Tool operates such that the Idaho
16  Courts select which documents to exclude from it or does
17  the -- do the Idaho Courts, would they identify which
18  courts to be allowed into it?
19      MS. DUKE:  Object to the form.
20      Go ahead.
21      THE DEPONENT:  Yeah.  I think that it is
22  kind of an either/or thing because it is based on case
23  types used select, document types used select, security
24  groups which could encompass multiple case types and
25  document types.  So there could be parent-child

---

Page 87

1  relationships within the security groups that encompass
2  multiple case types and document types, that, again, we
3  may not -- we may not know until they're published in
4  the Press Review Tool.
5      Q.  (By Mr. Fetterly) So if we -- if we assume that
6  there is a nonconfidential or public case type and
7  document type, and only that case type and document type
8  is made available through the press tool, and -- and
9  it's configured correctly to operate that way, would
10  that address the Court's concerns?
11      MS. DUKE:  Again, object to the form.
12  Also, calls for speculation.  Foundation.
13      THE DEPONENT:  Yeah, and I don't know.
14  I -- my understanding is that it would rely on not only
15  a perfect configuration of the system, it would also
16  rely on a perfect submission by the submitter of the
17  documents.  So they would also need to understand the
18  file types, the case types, the document types, and so
19  on and so forth, that they're selecting.  So there's --
20  there's a lot of room for error or unknowns.
21      Q.  (By Mr. Fetterly) Okay.  Did the Idaho Courts
22  discuss with Tyler any scenarios where Press Review
23  Tools at other courts who used them were misconfigured?
24      MS. DUKE:  Same objections.
25      Go ahead.

---

Page 88

1      THE DEPONENT:  Yeah, I'm not aware of
2  that.
3      Q.  (By Mr. Fetterly) Did the Idaho Courts discuss
4  with any other state courts directly any experiences
5  with misconfiguration of their Press Review Tools?
6      MS. DUKE:  Same objections.  Also, beyond
7  the scope.
8      THE DEPONENT:  Yeah.  I'm not -- I'm not
9  aware of that.
10      Q.  (By Mr. Fetterly) Are the Idaho Courts aware of
11  any specific examples of misconfiguration of press
12  review tools, or is this concern based on a -- a
13  hypothetical risk?
14      MS. DUKE:  Beyond the scope.  Same
15  objections.
16      THE DEPONENT:  Yeah, I'm not aware of
17  that either.
18      Q.  (By Mr. Fetterly) Let me quickly switch to a --
19  a different document.  Bear with me.
20          (Pause in the proceedings.)
21      Q.  (By Mr. Fetterly) I think this would be
22  Exhibit No. 8.  Can you please go to that document?
23      A.  Yes.
24      Q.  Okay.  So this Exhibit No. 8, do you recognize
25  this document?

---

22  (Pages 85 to 88)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 89

1    A. Yes.
2    Q. And what is it?
3    A. This was an email from Jessi following our
4  meeting about the Press Review Tool.
5    Q. Okay. And so this email is a cover email and
6  it makes reference to a deck. So if we turn the page,
7  there's now a slide deck beginning with SO 5035. Do you
8  see that?
9    A. Yes.
10   Q. And have you seen this document before?
11   A. Yes.
12   Q. And did you consider this document when
13  conducting your risk analysis?
14   A. Yes.
15   Q. Okay. And we're talking about the issue of
16  configuration. Let me turn your attention to the
17  document with, I guess, the Page SO 5037. Do you see
18  that?
19   A. Yes.
20   Q. Excuse me. This is the wrong page.
21      Here we go, 5042. If you could please turn to
22  that page.
23   A. Yes.
24   Q. So I just want to be clear as we're talking
25  about the issue of configuration, is this the

---

Page 90

1  configuration to which you are referring where it states
2  records can be made available based upon case type
3  codes, number of days, filing states or statuses,
4  security groups and document types?
5    A. Yeah, also on 5044.
6    Q. Excellent.
7      Okay. So if I -- if I understand your
8  testimony correctly, the issue with potential for
9  misconfiguration would be that it could be configured in
10  a way where, for instance, documents of a certain case,
11  type code, or security group would be allowed into the
12  Press Review Tool because it was not configured
13  correctly. Do I understand that correctly?
14   A. Yes.
15   Q. Okay. And assuming that the Press Review Tool
16  is configured correctly so only certain case type codes
17  or security groups are allowed in, do I understand
18  correctly that still would not necessarily address the
19  Court's concerns?
20   A. Well, I believe it still relies upon a perfect
21  submission by the person submitting the documents and
22  the filing.
23   Q. So if -- so if the system is configured
24  correctly and only the case type codes or security
25  groups are allowed in, and that's performed and it's

---

Page 91

1  operating correctly, the issue then would be filer
2  submission or filer error; is that correct?
3      MS. DUKE: Object to the form.
4      THE DEPONENT: Potentially, yes.
5    Q. (By Mr. Fetterly) Any other issues once -- if
6  we assume that the system is configured and operating
7  correctly?
8      MS. DUKE: Same objections.
9      THE DEPONENT: I believe that the -- the
10  other question we asked in regards to the documents is
11  whether or not the original is shared with the Press
12  Review Tool, so that would be another concern. Original
13  document shared to the public without understanding if
14  there are audit trails, anomalous behavior detection,
15  any type of -- any way to verify the integrity of the
16  document, so that would be another concern.
17   Q. (By Mr. Fetterly) Okay. You'll have to help me
18  understand -- well, what do you mean by that in terms of
19  the integrity of the document? How does that relate to
20  the issue of the original document that you just
21  referenced?
22   A. Well, you asked me if there were any other
23  security concerns.
24   Q. Oh, my question was more narrow, tied to
25  configuration. So if we assume that the system is

---

Page 92

1  configured correctly and operating correctly, then you
2  identified, you know, the submission being one issue.
3  And so does this other issue in terms of the original,
4  does that also apply here with respect to if we assume
5  it's configured correctly?
6    A. If it's configured correctly, and the
7  submission is perfect --
8      MS. DUKE: Same objections.
9      Go ahead.
10     THE DEPONENT: Yeah. There would still
11  be the issue with an original document in the hands of
12  the public that potentially could be pulled into our
13  case management system.
14   Q. (By Mr. Fetterly) Help me understand what
15  the -- what the issue or concern there is. Can you
16  elaborate?
17   A. Because we don't understand the security
18  controls in place on the Tyler side, we don't know if
19  there is auditability of who is accessing the document,
20  if the document's integrity is intact, so if there's
21  been any kind of manipulation or changes prior to being
22  moved into the case management system.
23   Q. Did -- did anything you review or consider in
24  preparing this analysis lead you to conclude that
25  someone using the press tool would have the ability to

---

23 (Pages 89 to 92)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

Page 93

1  manipulate a document in the --
2      A.  So --
3      Q.  -- e-file manager before it --
4      A.  Oh, I'm sorry.
5          (Stenographer requests clarification.)
6      Q.  (By Mr. Fetterly) -- before it migrates into
7  the case management system?
8      A.  So that was a question that I asked after the
9  risk memorandum was issued about the original document.
10     Q.  Was that question answered?
11     A.  Yes.  Well, it was -- it was just stated that
12 it was the original document.  But because I don't have
13 any additional information on security controls in the
14 system, I don't understand how the integrity of the
15 document is verified.  I did ask for dataflow and
16 architecture diagrams that were never provided that
17 would at least give me an understanding of the security
18 layers that are embedded on the back end of the system.
19     Q.  So just so we have a common understanding, if
20 you could go to Exhibit No. 12.
21     A.  Yes.
22     Q.  I have it up on the screen.
23         Is this the -- is this the question and answer
24 to which you just referred that occurred after the risk
25 analysis?

Page 94

1      A.  Yes.
2      Q.  Okay.  And is there anything here in this
3  response that allows you to conclude that there's a risk
4  of documents in the Press Review Tool being manipulated
5  or, you know, that would allow for manipulation of
6  documents before they go into the case management
7  system?
8      A.  Well, it's based on my previous knowledge of
9  the Press Review Tool.  I know that the public is going
10 to have access to these documents and it is the same
11 document that is in the queue that the clerk will
12 review.
13     Q.  Okay.  Let me direct your attention to
14 Exhibit No. 10.
15     A.  Yes.
16     Q.  And I would direct your attention to the
17 second full paragraph, multi-sentence paragraph, that
18 begins with "first, comma."  Do you see that?
19     A.  Yes.
20     Q.  And just to be clear, this is the August 16th
21 once again, and this is Tyler emailing you; is that
22 correct?
23     A.  Yes.
24     Q.  Okay.  So the first sentence says:  "First,
25 there is access control to the PRT, Press Review Tool,

Page 95

1  which is governed by our identity provider system.  This
2  system ensures that only users who are granted the
3  correct role are able to log in and view the data in the
4  PRT."
5          Did I read that correctly?
6      A.  That is correct.
7      Q.  So does this address the issue of kind of
8  public-facing control or audit control that would allow
9  Tyler or the court to monitor or audit who has access
10 to or entry into the Press Review Tool?
11     A.  Well, currently, I don't know how we would vet
12 who has access to or the ability to log in to view the
13 Press Review Tool.
14         As far as I know, we would have to identify
15 who has access or we would have to allow access to
16 everyone.
17     Q.  Does the -- does the first sentence -- so
18 these first two sentences, do they not address how the
19 Press Review Tool allow -- you know, addresses which
20 users are granted access based on their role?  Is there
21 something more that you would need to know that?
22     A.  Well, I don't know who potentially would be
23 identified as the press in Idaho.  So who would we -- I
24 don't know who we would give access to.
25     Q.  Well, that's a -- that's a separate question.

Page 96

1  I guess I'm just asking about in terms of being able to
2  audit who is going into the system, that's what you were
3  speaking to, and does -- do these first two sentences
4  not address that concern about the court or Tyler being
5  able to audit who is accessing the system?
6      A.  If we knew who needed access and we provided a
7  log-in information to them and we were able to
8  understand -- and we had a whole process flow around who
9  has access, who doesn't have access, whose access could
10 be revoked, then yes, but we do not have a process for
11 that currently.
12     Q.  So is the issue then -- it sounds like the
13 issue is a lack of a process with the court as opposed
14 to a functional shortcoming with the press review tool;
15 is that correct?
16         MS. DUKE:  Object to the form.  On that
17 sole issue, her testimony stands, but that's a
18 misstatement of her testimony as to other issues with
19 the Press Review Tool.
20     Q.  (By Mr. Fetterly) On the issue of the ability
21 to audit or control who has access, my understanding is
22 this sentence from -- or these two sentences from Tyler
23 address that issue and that, Ms. Dvorak, you've just
24 identified a separate issue regarding a lack of a
25 process for determining who would have -- who the users

24  (Pages 93 to 96)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

Page 97

1   would be; is that correct?
2       A.  I believe so, yeah.
3       Q.  Okay.  If we go on down further into that
4   paragraph, we have "second."  So the paragraph begins
5   with a first and it's followed by:  "Second, there is
6   access control to the data itself.  This is governed by
7   configuration within the EFM which allows our partners
8   to set the parameters by which this data is made
9   available."
10          My understanding is that this relates to what
11  we were just discussing in connection with the -- the
12  brochure that Tyler provided the court.  Is that your
13  understanding as well?
14      A.  Yes.  So, again, this would be based on no
15  misconfigurations.
16      Q.  Correct.  And we -- and we've discussed that,
17  so that would be the configuration that we were talking
18  about with respect to the fields on Exhibit No. 8.
19      A.  Mm-hmm.
20      Q.  Correct?
21      A.  Yes.
22      Q.  Okay.  Let's direct our attention back to
23  Exhibit No. 11.  So we -- under the risk statement,
24  we've discussed the first sentence.  We then have the
25  second sentence:  "The solution should ensure the

Page 98

1   confidentiality, integrity, and availability of data
2   contained in the court filings."
3           So this sentence seems to be speaking not to a
4   risk but to a solution.  Do I understand that correctly?
5       A.  No.  I mean, it is -- it's certainly a risk.
6   A lack of confidentiality, a lack of integrity, or a
7   lack of availability of data would be considered a risk,
8   so I'm stating that a solution should encompass those
9   things.
10      Q.  So if we were to break that up, I think we've
11  covered confidentiality.  Is there anything more to add
12  on confidentiality here that we haven't already
13  discussed?
14      A.  No.
15      Q.  So moving on to integrity, how would -- again,
16  I think we've kind of touched on it, but I just want to
17  be clear.  In the context of this sentence, how would
18  providing access to new complaints through the press
19  review tool implicate the integrity of data contained in
20  court filings?
21      A.  How is the document's integrity ensured that
22  it hasn't been tampered with?  What security controls
23  are in place to guarantee that?
24      Q.  Okay.  And I think we just talked about that
25  in some respect with respect to the registered user

Page 99

1   audit control.  Is there anything more -- anything more
2   that is not captured by what we've already discussed?
3       A.  Yeah.  So there would be additional security
4   controls that I would've liked to see in an architecture
5   diagram or a dataflow diagram so I can understand how
6   those documents are checked for integrity prior to being
7   accepted into the case management system.
8           So is there any type of file integrity
9   monitoring that Tyler Technologies is utilizing?  Is
10  there any type of encryption on the documents, or are
11  they being validated against their original cache when
12  the file is created?  So those are the types of
13  information I would've liked to have seen in an
14  architecture diagram.  I also asked for a system
15  security plan.  None of these were provided to me.
16      Q.  I believe that Tyler provided you information
17  regarding how their system works in the emails that were
18  exchanged and the questions and answers.  Is it correct
19  that lying at the heart of this is that they provided
20  information, but they didn't provide kind of the backup,
21  you know, documents or kind of the -- the workflow
22  diagrams, kind of the schematics of their system?  Is
23  that the issue here?
24      A.  No.  I mean, these -- they certainly didn't
25  provide that.  They did answer the questions that I

Page 100

1   asked with minimal information.  I don't -- I don't
2   know, and this is, again, why I said that the loss of
3   integrity, the likelihood was possible.  I don't know
4   how they're protecting the integrity of the documents.
5   They haven't provided any indication of that.  They just
6   said, "We're protecting it."
7       Q.  So -- okay.  So on this issue of integrity, I
8   wanted to scroll down then further into Exhibit 11,
9   because we have some questions and answers.
10      A.  Mm-hmm.
11      Q.  And my understanding is that these are
12  questions that were posed by the Idaho Courts, that's
13  the block bold.  And the green texts were the responses
14  provided by Idaho; is that correct?
15      A.  The green was provided by Tyler, yes.
16      Q.  By Tyler, excuse me.  I might have misspoke
17  there.
18          So looking at this first answer and question,
19  the question is:  "We'd really like to understand how
20  the data is transferred between environments, i.e.,
21  between filling and press review."
22          And by that question, are you meaning between
23  eFile & Serve and the Press Review Tool?  Is that --
24  is that what is meant there?
25          MR. FETTERLY:  I didn't hear the

25 (Pages 97 to 100)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

| Page 101 |
| --- |

1    response.  Did the reporter pick that up?
2         THE STENOGRAPHER:  No.
3         THE DEPONENT:  Yes.
4         Q.  (By Mr. Fetterly)  Thank you.
5         The answer Tyler provides is:  "The press
6    review tool is hosted alongside the eFiling Manager
7    and uses SQL queries to pull information in based upon
8    how the Press Review Tool environment is configured."
9         So, again, configuration in this context,
10   I think as we've been discussing it, means the settings
11   that determine which documents or document types are
12   allowed into the Press Review Tool.  Is that your
13   understanding?
14        A.  Yes.  The SQL queries are not a security
15   control.  That's just a function.  Typically, that's
16   unencrypted traffic, so that's -- that was the basis of
17   me asking for more information.
18        Q.  Understood.  Understood.
19        And I guess what I'm trying to get at here is,
20   you know, would it be relevant to your risk analysis if
21   the Press Review Tool is merely using SQL queries to
22   pull information that provides copies of the original
23   document, but it's not the original document itself?
24   Would that be relevant to the risk analysis?
25        A.  That would be relevant.  And that's why I

| Page 102 |
| --- |

1    asked if it was the original or if it was a copy, and I
2    was told that it was the original document.
3         Q.  Understood.
4         And I guess what I'm -- that's what I'm trying
5    to understand as well.  I understand what they told you.
6    I'm just trying to understand, you know, in a -- you
7    would agree that with electronic documents, you can
8    have -- original document can mean different things.
9    It's not like we're talking about a physical paper
10   document where there can really only be one original
11   with, you know, copies of that original.  Do you agree
12   with that or disagree with that?
13        A.  I -- I don't think that I asked the question
14   in a way to be misleading.
15        Q.  I'm not suggesting --
16        A.  I did ask -- I did ask how the document was
17   pulled into the Press Review Tool, which would've been
18   helpful to further explicate with a diagram.  I
19   understand that sometimes using words to explain
20   technology is not the best way to do it, so a diagram or
21   a dataflow, how the data is flowing and which direction
22   would have been really helpful.
23        Q.  Understood.
24        And I wasn't suggesting you asked the question
25   in a way to be misleading.  I agree with you there's a

| Page 103 |
| --- |

1    lot of room for miscommunication here.  That's why I'm
2    asking some of these questions trying to get to the
3    bottom of it so that I understand you.
4         So we're talking about the issue of integrity
5    of the document.  And just to be clear, if I understand
6    your testimony, you would agree that it would be
7    relevant to your risk analysis if the -- if the document
8    made available in the Press Review Tool was a copy of
9    the original but not necessarily the original document
10   that's sitting in the EFM; is that correct?
11        A.  I think that it would be something to consider
12   as part of the conversation, yes.
13        Q.  Okay.  And then --
14        A.  And I'll just say, again, the risk memorandum
15   was drafted based on the information that I had from
16   Tyler at the time.
17        Q.  Understood.
18        A.  And that's -- that's all I -- that's all I had
19   to go on.
20        Q.  Would -- if the Press Review Tool provides
21   access to a copy of the original without any ability of
22   the user to manipulate or affect the file sitting in the
23   EFM, the eFile Manager, would that address the Court's
24   concerns about the integrity of the file?
25        MS. DUKE:  Objection.  Overstatement.

| Page 104 |
| --- |

1    Form.
2         Go ahead.
3         THE DEPONENT:  Again, we'd have to
4    understand the security controls around how that would
5    be made possible especially because it's in the same
6    environment.  It's using the same database.  We'd --
7    we'd really need to be clear on how that was -- that
8    solution was architected.
9         Q.  (By Mr. Fetterly)  But if it is possible, and if
10   we assume that it's architected in a way where the
11   original document in the EFM cannot be manipulated or
12   affected, would that address the Court's concerns about
13   integrity?
14        MS. DUKE:  Same objections.  Overbroad.
15   Form.
16        THE DEPONENT:  Yeah.  It could
17   potentially address that, yes.
18        Q.  (By Mr. Fetterly)  Okay.  And you say
19   "potentially."  What more would there be --
20        A.  Because it's a hypothetical.  It's a
21   hypothetical.
22        Q.  Okay.
23            (Stenographer gives admonishment
24             regarding crosstalk.)
25        THE DEPONENT:  Sorry.

26  (Pages 101 to 104)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Courthouse News Service v. Omundson                        30(b)(6) Jennifer Dvorak

| Page 105 |
| --- |

1  Q. (By Mr. Fetterly) So moving on to
2  availability -- actually, let me take a step back before
3  we move on to availability.
4         On the issue of integrity, did you have any
5  information -- well, strike that. Strike that. Let's
6  move on to availability.
7         We're looking at -- let me go back to
8  Exhibit 11. I'm going back up to the risk memorandum
9  and specifically the risk statement. So we talked about
10 confidentiality. We talked about integrity.
11        Availability of the data, I'm just curious.
12 It seems that the intended purpose of the Press Review
13 Tool is to provide access or make documents available,
14 so I'm curious -- yeah, how availability factors into
15 the risk analysis and whether it's considered a positive
16 or a negative factor.
17     A. So availability is one of the tenets of
18 cybersecurity in that the system that you're paying for
19 and the system that the public relies on that you are
20 providing is, in fact, available. It's not necessarily
21 related to specific documents or specific information,
22 but just that your system is up and running and
23 available as you intended and as you promised.
24     Q. Understood.
25        So availability in this context is referring

| Page 106 |
| --- |

1  to is the system available; or, put differently, is the
2  system prone to crashing or failure or any other issue
3  that would make it not available; is that correct?
4      A. Exactly. Do we have to go back to our
5  constituents and tell them, "Hey, we know we promised
6  you this cool tool, but now it's not available. It's
7  down."
8      Q. What information did you receive from Tyler or
9  rely on, in preparing this, that addresses this issue of
10 availability?
11     A. So we did ask about the backup cadence. I
12 think that was in one of my previous emails or even in
13 the document. Maybe in 10?
14     Q. We'll go look at that right now, Number 10.
15     A. I think it was actually 9.
16     Q. Are you referring to the green text?
17     A. Yeah.
18     Q. Responses to the questions?
19     A. Yes.
20     Q. Just for the record, I believe that is an
21 attachment to the email that's marked as Exhibit 9.
22 Those green answers are also attached to the risk
23 memorandum that we've marked as Exhibit No. 11.
24     A. Well, there wasn't a lot of information -- or
25 detailed information provided in the question about:

| Page 107 |
| --- |

1  "What is the service's backup cadence? How are backups
2  protected, confirmed, and tested on a regular cadence?"
3      Q. Are you looking at one of the questions on
4  this document?
5      A. Yeah. It's actually on 5304, yeah.
6      Q. Thank you.
7      A. What is the service's backup cadence?
8      Q. I see. So this is the question that relates
9  to your concern about availability as reflected on the
10 risk statement; correct?
11     A. Correct.
12     Q. And then Tyler provides its response, which
13 neither of us needs to read into the transcript.
14        Did you consider this response sufficient or
15 is there more information that you would've wanted in
16 order to, you know, assess availability?
17     A. I would've wanted more information. I mean,
18 I -- I -- it's great that they're backing up the data,
19 but how are they testing that? How are they proving
20 that the ability to recover from a disaster is taking
21 place?
22        They just mention that it's considered highly
23 confidential and not shared with external parties. We
24 have a nondisclosure agreement in place with Tyler, so I
25 don't know why they couldn't share that information with

| Page 108 |
| --- |

1  us.
2      Q. Yeah. Would -- would this issue of
3  availability apply -- apply more broadly to all Tyler
4  products or systems, not just the Press Review Tool?
5         MR. FETTERLY: Oh, her audio is dropping
6  out.
7         THE STENOGRAPHER: Did they freeze?
8         MR. FETTERLY: Can we go off the record?
9         (Off the record due to technical
10 difficulties.)
11        MR. FETTERLY: I believe we had a
12 question pending before we had our technical difficulty.
13 Can you please read the question back?
14        (Record read back as requested.)
15        MS. DUKE: Objection. Beyond the scope,
16 but go ahead.
17        THE DEPONENT: Yeah. So this would apply
18 to all -- all products that we contract in the cloud,
19 but this question specific to the Press Review Tool.
20     Q. (By Mr. Fetterly) Has Tyler -- or, excuse me --
21 have the Idaho Courts had any issues with availability
22 as to the Tyler eFile & Serve product?
23     A. I'd have to go back in and review. I mean,
24 nothing's 100 percent, so I'm sure they've had outages,
25 but...

27 (Pages 105 to 108)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 109

1    Q.  I direct your attention, I guess, to 5303.
2    The answer provided here is that the review tool is
3    hosted alongside the eFiling Manager.  And I know from
4    some of the other documents that we've reviewed and
5    statements from Tyler, the e-filing -- that the Press
6    Review Tool seems to be part of or connected to the
7    eFile Manager.  Is that your understanding as well?
8        A.  It is connected to, but it is -- it is a
9    separate product.  And it is a separate portal, so it's
10   not something that you just turn on.  There is
11   additional -- additional work to stand it up.  It's not
12   just ready -- readily available.
13       Q.  Understood.
14          I guess where I'm going here is -- I'm
15   curious.  Are these issues that we've discussed with
16   respect to confidentiality, integrity, and availability
17   relative to the press review tool, are those not equally
18   implicated by eFile & Serve?
19       A.  So if I had a -- an architecture diagram -- I
20   know I keep going back to this, but if I had an
21   architecture diagram or a dataflow diagram so that I
22   could understand what data is central to EFM and what is
23   independent, I could make that assessment.
24       Q.  And can you help me understand, you know, why
25   that information would be relevant to your ability to

---

Page 110

1    make that assessment?
2        A.  So, like you said before, you know, asking --
3    asking if it's the original copy of a document versus
4    the copy of a document, there are implications for that.
5    So I'm not able to assess if the Press Review Tool is
6    completely on the same environment and would be
7    completely tied into EFM, or are there separate
8    components that if EFM were to go down, the Press Review
9    Tool would still be available?  I don't -- I don't
10   understand that architecture because it's never been
11   outlined to me.
12       Q.  Understood.
13          And you just spoke to availability, and I
14   guess my question was a little bit broader with respect
15   to confidentiality, integrity, and availability.  You
16   know, all of these things we've just discussed with
17   respect to Press Review Tool as reflected in your risk
18   analysis, are those not also issues that would exist
19   with respect to eFile & Serve?
20       A.  They could, but I don't know that with
21   certainty because I don't know -- I only know what
22   information has been given to me.  You know, there could
23   be room for confusion, especially with regards to the
24   original document versus it's just, you know, housed in
25   the same database and it's a copy.

---

Page 111

1        I can only base my assessment based on what
2    I've been told, and I've been told that there's one
3    document.  The public has access to it.  I don't have
4    any insight into what security controls protect that
5    document such that it will not be altered; the integrity
6    has been verified before it's moved to the case
7    management system.
8        So I also think that the -- the
9    eFile & Serve is such that only the filer -- only the
10   person submitting the documents has access to those
11   documents, and then only the clerk accesses those
12   documents before they are moved into the case management
13   tool.  So there -- there's a chain of custody, so to
14   speak, in that process.  I don't have that same chain of
15   custody potentially in Press Review Tool because it is
16   open to the public.
17       Q.  You would agree open to the public subject to
18   the registration and kind of authorized user
19   requirements that Tyler outlined in its emails; correct?
20          MS. DUKE:  Well, object to the form.
21   Foundation.  Speculation.  I don't think Tyler defines
22   anything for us.
23          THE DEPONENT:  Yeah.  It would depend on
24   that configuration of how the log-in is -- is created.
25   Is it -- is it a generic log-in?  Is it a named log-in

---

Page 112

1    associated with a specific user?  None of that was
2    defined.
3        Q.  (By Mr. Fetterly) Did you specifically ask
4    Tyler about how that would work?  Were there any
5    follow-up conversations in the email traffic that would
6    ask Tyler to specify nature of registered user and how
7    that process works?
8        A.  I did not, but they did mention that it is
9    part of their log-in, that they -- their identity
10   provider that they currently use.
11       Q.  Did you contact any other state courts that
12   use the Press Review Tool to ask about their experience
13   with, you know, providing registered users access to the
14   press review tool?

---

28 (Pages 109 to 112)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 113

1  So I don't know if -- I -- I don't understand the
2  implications of their Identity Management System and how
3  that would affect the Press Review Tool.
4      Q.  Did -- any of the states that you spoke with,
5  did any of these conversations involve the ability to
6  log into Press Review Tools across --
7      A.  Not specifically, no, but my concern is that
8  it uses the same.  This is new information that I just
9  received based on another conversation about the
10  iCourt Portal, in general, so I haven't been able to
11  get additional information about that.
12     Q.  Okay.  But so if I'm -- just to be clear, you
13  didn't speak to any courts about issues with accessing
14  other court's complaints or data through the Press
15  Review Tool; correct?
16     A.  I did not, no.
17     Q.  And is iCourt Portal a separate product than
18  eFile & Serve?
19     A.  It is a separate product, but I believe it
20  uses the same identity management.
21     Q.  Okay.  For -- strike that question.  Hold on.
22         As we're talking about kind of these issues of
23  confidentiality, integrity, availability, I just want to
24  understand a few more issues that may or may not have
25  been relevant to your analysis.  I know we've discussed

---

Page 114

1  configuration, but just to be clear, if we're talking
2  about a document that is only a copy of the original and
3  the access is limited to only viewing or downloading,
4  would that be relevant to your risk analysis?
5         MS. DUKE:  Objection.  Speculation.
6  Improper hypothetical.  Assumes facts.
7         Go ahead.
8         THE DEPONENT:  Yeah.  I don't know
9  because it is hypothetical.  That's not what was
10  described to me as the solution.
11     Q.  (By Mr. Fetterly) Okay.  Do you have an
12  understanding of how someone using the Press Review Tool
13  could manipulate a document that's made available in the
14  Press Review Tool?
15         MS. DUKE:  Again, form and foundation,
16  but go ahead.
17         THE DEPONENT:  Yeah.  Potentially, there
18  could be an external-facing vulnerability that's
19  exploited.  There could be permissions that maybe are
20  mishandled on the document that allows "write" instead
21  of "read only."  This would -- these are things that
22  would potentially come up in a third-party pen test.  I
23  did ask for that as well, and I was told that those
24  results are not shared with customers, nor do they
25  provide a remediation schedule when findings are made.

---

Page 115

1      Q.  (By Mr. Fetterly) Are the Idaho Court -- is the
2  Idaho Court aware of any examples of either of those
3  scenarios, those hypothetical scenarios, occurring at
4  any court that uses the Press Review Tool?
5      A.  Not the Press Review Tool, no, but other Tyler
6  products.
7      Q.  Aware of that with eFile & Serve?
8      A.  Not with that product, but with another
9  product.
10     Q.  And what product is that?
11     A.  The iCourt Portal, in general.
12     Q.  And what is the iCourt Portal?
13     A.  That's the ability for public users to look up
14  public court information.
15     Q.  Okay.  And does the iCourt Portal provide
16  access to documents before or after they are accepted
17  into the court's case management system?
18     A.  It only provides access to the case management
19  system, so cases that are already recorded.
20     Q.  Okay.  So the iCourt Portal does not address
21  access to the eFile Manager or access through a press
22  review tool; correct?
23         MS. DUKE:  Object to the form.  Go ahead.
24     Q.  (By Mr. Fetterly) The iCourt Portal -- let me
25  rephrase.

---

Page 116

1         The iCourt Portal does not provide access to
2  documents that are in the eFile & Serve system, the
3  EFM, or the Press Review Tool; correct?
4      A.  Correct, but the authentication is handled by
5  Tyler Technologies; the authentication piece for all
6  three of those products.
7      Q.  You're talking about authentication, but those
8  would be --
9      A.  The identity permissions that they mentioned
10  in this.
11     Q.  Where do they mention that?
12     A.  Let me -- sorry, we were just there.
13         MS. DUKE:  It might have been in an
14  email?
15         THE DEPONENT:  Yeah, it might have been
16  in that one.
17         So on Exhibit 10, in the email from
18  Jessi Fisher, it does state that access control to the
19  PRT is governed by our identity provider system.
20     Q.  (By Mr. Fetterly) Have the Idaho Courts had any
21  problems or concerns with the Tyler identity provider
22  system with respect to the Idaho products?

---

29 (Pages 113 to 116)

Courthouse News Service v. Omundson                30(b)(6) Jennifer Dvorak

---

Page 117

1    Q.  My understanding is that your view is that the
2  Idaho Courts' lack of -- lack the contractual power to
3  require Tyler to provide information about
4  eFile & Serve and the Press Review Tool.  Is that --
5  is that consistent with your testimony today?
6         MS. DUKE:  Object to the form.
7         Go ahead.
8         THE DEPONENT:  So that -- that is a bit
9  consistent, but in -- in Exhibit 19, in the ISC terms
10 and conditions for cloud-based services, on the last
11 page, Page 7, we do have a statement for RFP and other
12 processes to pre-assess multiple vendors.  There is the
13 separate ISC vendor security requirements to be
14 completed.
15        I provided this document to Tyler
16 Technologies when we were speaking about the Enterprise
17 Jury Management and they refused to complete it.  It's
18 just another security questionnaire.  It asks very
19 high-level questions.  It asks for technology diagrams
20 or if there's a system security plan.  I did request
21 that as part of another product and they would not
22 complete it.
23        I've also asked it for another product
24 that we're inquiring about called Tyler Supervision.
25 We're assessing multiple -- multiple vendors for this

---

Page 118

1  supervision and drug court product.  All the vendors
2  provided me with the questionnaire back.  Tyler
3  Technologies has not provided it to me.
4    Q.  (By Mr. Fetterly) So that particular
5  questionnaire, the Idaho Courts have not received it
6  from Tyler in connection with any product; correct?
7    A.  Correct.
8    Q.  And this Exhibit 19, the terms and conditions,
9  that has not been agreed to by Tyler with respect to any
10 Tyler product; correct?
11   A.  Correct.
12   Q.  So -- so sitting here today, do you have
13 concerns about whether File & Serve is sufficiently
14 secure?
15        MS. DUKE:  So I'll object to the form and
16 I'll also say it's beyond the scope.
17        THE DEPONENT:  So, again, we haven't had
18 the ability to request it based on a contract amendment.
19 So because Press Review Tool requires a contract
20 amendment, that would've been our opportunity to do a
21 security review on the -- on those products, especially
22 if they're as connected as Tyler states.
23        MR. FETTERLY:  And responding to
24 Counsel's objection, I do believe this is within the
25 scope of the topics we're talking about.

---

Page 119

1         MS. DUKE:  Which ones --
2         MR. FETTERLY:  The questions that
3  incorporate EFM.  So --
4         MS. DUKE:  Sorry, which one in
5  particular?
6         MR. FETTERLY:  The testing and
7  implementation and the security -- cybersecurity
8  concerns with respect to the PRT.  I believe all of the
9  testimony here has linked the Press Review Tool to
10 eFile & Serve, and so understanding the relationship
11 between the two, I think, is very much within the scope
12 of the topics.
13        MS. DUKE:  I don't agree that they've
14 linked them completely.  Actually, that's part of the
15 significant issue.  But, regardless, my -- I have my
16 objection and that's fine.  It's noted.
17   Q.  (By Mr. Fetterly) So I just want to understand.
18 I asked about whether there's a concern with -- you
19 know, whether the Idaho Courts have concerns about
20 whether eFile & Serve is sufficiently secure, and I --
21 my understanding of your response is that you're
22 referring to the contractual process and that there's an
23 opportunity to amend and address these through the
24 amendment process.  So -- and that's not a question.
25 I'm just trying to get past the objections.

---

Page 120



---

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

**ER-1918**

Courthouse News Service v. Omundson                30(b)(6) Jennifer Dvorak

---

Page 121

8  a Press Review Tool contract would be a basis for
9  concern; is that correct?
10         MS. DUKE: Same objections.
11         Go ahead.
12         THE DEPONENT: Yeah. I mean, we --
13  ideally, we would like these terms and conditions
14  associated with all new cloud purchases or purchases
15  that require contract amendment.
16     Q. (By Mr. Fetterly) And is it correct that the
17  administrative office would not enter into a contract
18  for the Press Review Tool without these terms and
19  conditions?
20         MS. DUKE: And, again, legal conclusion.
21  Beyond the scope. Probably more of a Sara question than
22  a Jennifer question, so I'll instruct her not to answer.
23     Q. (By Mr. Fetterly) Okay. And in terms of the
24  cybersecurity or other security risks, would you agree
25  that any -- any risks arising from not having these

Page 122

1  terms and conditions in place would apply equally to
2  both the Press Review Tool and eFile & Serve?
3         MS. DUKE: Again, form. Foundation.
4  Speculation.
5         THE DEPONENT: Yeah. I think in order to
6  make that conclusion, we'd have to, again, understand
7  what -- what is -- what is -- what interlinking areas
8  the EFM has with the Press Review Tool. And, again,
9  that should be documented in an architecture or a
10  dataflow diagram so we can understand what components
11  are reliant upon that File & Serve product versus what
12  is standalone, and I don't -- I don't know that.
13     Q. (By Mr. Fetterly) As it relates to cloud --
14  cloud services or IaaS providers, wouldn't the risk of
15  not having these terms and conditions in place apply
16  equally to both the Press Review Tool and
17  eFile & Serve?
18         MS. DUKE: Again, same objections. Form.
19  Foundation. Calls for speculation.
20         THE DEPONENT: Yeah. I mean, the risk
21  exists for sure, but the things that we have immediate
22  control over are purchases that are underway because we
23  have the ability to negotiate a new contract. It's very
24  difficult to negotiate an existing contract with a
25  vendor.

Page 123

1     Q. (By Mr. Fetterly) I -- I understand what you're
2  saying. I'm speaking more in terms of the concerns that
3  exist or do not exist, which I believe would exist
4  notwithstanding the -- the contract process.
5         So I guess my question is: Do the concerns
6  then go away if the contract process results in the
7  adoption of these terms and conditions of Exhibit 19?
8         MS. DUKE: Again, same objections. Form.
9  Foundation. Speculation.
10         Go ahead.
11         THE DEPONENT: Yeah, and it's a -- it's a
12  completely different product. It's going to be the
13  public that's accessing documents, the public that's
14  accessing the original documents is what I've been told
15  by Tyler; whereas, with just the EFM, just the
16  File & Serve, the only folks that have access to that
17  chain of the document are the person submitting the
18  documents and the clerk who is reviewing and filing the
19  documents. So it's a pretty closed-loop system.
20         So in addition to security concerns about
21  the Press Review Tool, the confidentiality, integrity,
22  and availability, it is more of a -- an open-loop
23  process because the public is now available -- you know,
24  can have access.
25     Q. (By Mr. Fetterly) Is it correct that the EFM

Page 124

1  in -- within eFile & Serve receives all e-file
2  documents submitted to the Idaho Courts?
3     A. I believe so.
4     Q. Are you familiar with the different case types
5  and filing codes or document types that are available to
6  e-filers who use the Idaho Courts' e-filing system?
7     A. Not intimately because that's not --
8         MS. DUKE: And that's not what she was
9  disclosed for.
10     Q. (By Mr. Fetterly) Well, I understand, but I
11  think that speaks to the issue of configuration.
12         In your analysis of the configuration issue or
13  configuration risk, did you consider or evaluate the
14  different types of filing types, case types, document
15  types, that could be configured?
16     A. Oh, certainly. And, again, my understanding
17  is that the security groups within the EFM could
18  encompass multiple case and/or document types. So I
19  think that that's where there could be some parent-child
20  relationships that could have unintended consequences
21  with an automated system exposing documents.
22     Q. Understood.
23         But the -- but the -- we're talking about
24  those concerns about security, you would agree that the
25  eFile & Serve system receives all e-file documents;

31 (Pages 121 to 124)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 125

1  correct?
2         MS. DUKE:  And, again, objection.
3  Foundation, to the extent it's beyond her knowledge.
4         THE DEPONENT:  Yeah, I believe so.
5         Q.  (By Mr. Fetterly)  Okay.  And so -- okay.  And
6  we've established that the eFile & Serve's contract
7  does not incorporate or include these terms and
8  conditions that are Exhibit 19; correct?
9         MS. DUKE:  Asked and answered.
10        THE DEPONENT:  I don't believe so because
11  it's a completely new process.
12        Q.  (By Mr. Fetterly)  Okay.  So then we talk about
13  the Press Review Tool, and that would be a separate
14  product for which the Idaho Court would require a
15  separate contract; correct?
16        A.  I believe that in the documents -- in the
17  email documents, Tyler did state that it would require a
18  contract amendment.
19        Q.  Okay.  Are those contract discussions
20  underway?
21        MS. DUKE:  Again, I'll object to the
22  extent it's outside your scope or foundation.
23        You can answer from your personal
24  knowledge if you know.
25        THE DEPONENT:  I don't know.

---

Page 126

1         Q.  (By Mr. Fetterly)  Okay.  Have you reviewed any
2  draft contracts with respect to the Press Review Tool?
3         MS. DUKE:  Same objections.
4         THE DEPONENT:  No, but that's not
5  unusual.
6         Q.  (By Mr. Fetterly)  Yeah.  Have you been asked to
7  review any contracts for the Press Review Tool?
8         MS. DUKE:  Same objections.
9         THE DEPONENT:  No, but again that's not
10  unusual.
11        Q.  (By Mr. Fetterly)  Okay.  I want to switch gears
12  here.
13        Actually, before I do, I know we've talked
14  about the eFile & Serve contract and how it's not
15  currently being amended.  But if I understand you
16  correctly, when it is amended, you will want to address
17  the terms and conditions that are part of Exhibit 19; is
18  that correct?
19        A.  That's correct.
20        Q.  So has the administrative office taken any
21  intermediate steps to address any potential risk or
22  security concerns prior to the point in time when that
23  contract might be amended and these terms and conditions
24  would be included?
25        MS. DUKE:  Again.  Object to the form.

---

Page 127

1  Beyond the scope, and I'll instruct her not to answer.
2         Q.  (By Mr. Fetterly)  Okay.  Let's go back to our
3  Exhibit No. 11, the memo.
4         At the top of Page 2, we see a section called
5  "Risk acceptance options."  Do you see that?
6         A.  Yes.
7         Q.  What does "risk acceptance option" mean?
8         A.  It's our potential options that I outlined
9  that the executives could choose to accept or not accept
10  to move forward with this product.
11        Q.  Okay.
12        A.  So this is a way so that technology -- or
13  technologists are not accepting risk on behalf of the
14  organization.
15        Q.  Understood.
16        So I guess from -- from your point of view,
17  and I am acknowledging what you said about -- from a --
18  from a -- from your point of view and from your purview,
19  not what the executives might decide, but at least from
20  your point of view, these two options would present
21  forward paths for implementing a Press Review Tool; is
22  that correct?
23        MS. DUKE:  Object to the form.
24        Go ahead.
25        THE DEPONENT:  Yes, potentially.  These

---

Page 128

1  are -- these are the options that -- that I could --
2  that I could see and think through.
3         Q.  (By Mr. Fetterly)  So how does -- how does
4  Option No. 1 implement the Tyler Press Review Tool with
5  a contract -- with a contract amendment?  I won't read
6  the entire thing, but that's Option No. 1.
7         How does that option address the risks
8  identified in the risk statement?
9         A.  So it -- it helps us to clear up some of these
10  items that were deemed possible because we didn't have
11  additional information to make an adequate risk
12  assessment.
13        Q.  Okay.  And how does it do that?
14        A.  So it works through our baseline security
15  control questionnaire which asks questions such as the
16  security posture of the vendor; the controls in place
17  for the tool that would help us to understand if there
18  are any additional risks that we didn't see by not
19  having this information.
20        Q.  So it says:  "Implement the Tyler press review
21  tool with a contract amendment to include cloud provider
22  terms and conditions."
23        So what specifically does that entail?
24        A.  So that includes -- so that would have a
25  contract amendment that would include the ISC terms and

---

32 (Pages 125 to 128)

Courthouse News Service v. Omundson          30(b)(6) Jennifer Dvorak

---

Page 129

```
 1   conditions for cloud-based services. And within that
 2   document, it does require a baseline controls
 3   questionnaire be filled out. It also provides language
 4   for indemnification in -- in the case of a data breach,
 5   and there are additional protections for ISC that are
 6   embedded in the terms and conditions for cloud-based
 7   services.
 8       Q.  Okay. So in the absence of that contractual
 9   amendment and in the absence of the things you just
10   spelled out, is it correct, then, that your view would
11   be the -- there is -- the risk is too -- too great to
12   accept the option, or maybe the risk isn't sufficiently
13   addressed?
14       A.  I don't think I understand the question.
15       Q.  It was a bad question.
16       A.  Okay.
17       Q.  So in the absence of the contractual amendment
18   and the things you just identified, is it your testimony
19   then that the -- the court should not move forward
20   because of the risk?
21       A.  I'm just providing options for the executives
22   to make a decision. So I didn't -- they're not ranked
23   in any way. These are just two potential options. They
24   could accept them or reject them.
25       Q.  I understand, but you were being asked to
```

Page 130

```
 1   provide an analysis on risk; correct?
 2       A.  Correct.
 3       Q.  And so Option No. 1 spells out one option for
 4   addressing the risk; correct?
 5           MS. DUKE: Objection. That's overbroad.
 6   She's obviously talking about security issues. There's
 7   plenty of other things that are outside her scope.
 8           MR. FETTERLY: Understood.
 9       Q.  (By Mr. Fetterly) So within your scope of this
10   risk assessment or risk analysis, you've proposed an
11   Option No. 1 as a way to accept the risk; is that
12   correct?
13       A.  Potentially, yes.
14       Q.  And when you say -- and I just want to
15   understand what "risk acceptance" means. Are you using
16   risk -- does Option No. 1 sufficiently address the risk
17   in your view?
18       A.  It could, yes, but, again, there's -- no
19   system is without -- without risk. You know, there's no
20   such thing as zero percent risk, so this could be a
21   potential option to reduce risk.
22       Q.  Understood.
23           So your testimony is it would not eliminate
24   potential risk, but it addresses or mitigates potential
25   risk; is that correct?
```

Page 131

```
 1           MS. DUKE: Same objections. Asked and
 2   answered.
 3           THE DEPONENT: Yeah. It could address
 4   some of the risks and it -- some of the potential risks,
 5   but not all.
 6       Q.  (By Mr. Fetterly) But in your experience, this
 7   contractual amendment and the other things you
 8   identified would provide a path where you'd feel
 9   comfortable recommending an option should the executives
10   wish to accept it; is that correct?
11           MS. DUKE: Again, same objections. Asked
12   and answered multiple times.
13           Go ahead and answer one more time.
14           THE DEPONENT: It helps to reduce the
15   risk.
16       Q.  (By Mr. Fetterly) Okay. So you would agree
17   that the risk would be higher without the contractual
18   amendment and the things you've identified?
19       A.  Yes.
20       Q.  Mm-hmm. And that would be true with any Tyler
21   product, not just the press review tool; correct?
22       A.  That would be true of any product.
23       Q.  Okay. Same question for risk acceptance
24   Option No. 2, how does that address the risks of
25   confidentiality, integrity, and availability?
```

Page 132

```
 1       A.  So this could potentially provide a path that
 2   ISC could fully vet a Press Review Tool based on our
 3   security requirements with an understanding of what
 4   information could potentially pass to the solution. We
 5   would also potentially have the ability to have our own
 6   security controls so that we could -- we could have a
 7   full understanding of the confidentiality, integrity,
 8   and availability of that system.
 9       Q.  So as I understand these options, Option No. 1
10   is kind of just implementing the Tyler press review tool
11   as provided by Tyler. Option No. 2 would entail, you
12   know, an RFP or a third-party vendor implementing the
13   Press Review Tool using the Tyler -- I guess using the
14   APIs for the Press Review Tool; is that correct?
15       A.  If the API was available, yes, potentially.
16       Q.  Okay. As part of your risk analysis, did you
17   consider the -- the feasibility of the Idaho Courts, or
18   the administrative office building or implementing its
19   own Press Review Tool using the API as opposed to, say,
20   an RFP for a separate third-party vendor?
21       A.  We did discuss it, but because the API is not
22   yet available, it -- we have no understanding of what --
23   what capabilities would be available to us in order to
24   build our own. So we just don't -- we don't have any
25   information.
```

33 (Pages 129 to 132)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 133

1    Q.  And as part of your risk analysis, did you
2    analyze or consider the possibility of providing access
3    to a press review queue through the kiosks located at
4    the courthouse?
5         MS. DUKE:  Sorry.  Can I have that
6    question read back?
7              (Record read back as requested.)
8         THE DEPONENT:  I mean, I guess I don't
9    know what the difference would be.  Because the court
10   portal is a web application, I don't -- I don't
11   understand what the difference would be if it's
12   available on a kiosk or if it's available -- because
13   it's available regardless to the public.  It's -- it's a
14   public-facing web application.
15        Q.  (By Mr. Fetterly) So -- so that wouldn't be a
16   relevant factor in your analysis, if the Press Review
17   Tool could be made available at the courthouse versus
18   being made available remotely online?
19        MS. DUKE:  And, again, object to the form
20   and foundation as to she's a security person.  She's not
21   a clerk.  She's not a filer or any of that.
22        Go ahead.
23        THE DEPONENT:  Yeah.  Again, I -- a
24   web-based application is available on the web whether
25   it's in a courthouse on a kiosk or if it's available on

---

Page 134

1    your computer at home.  The availability is still the
2    same.
3         Q.  (By Mr. Fetterly) Was that possibility
4    considered as part of your analysis, or is this the
5    first time you're thinking about that?
6         MS. DUKE:  And, again, same objections.
7    Limited to your security analysis, you
8    can answer.
9         THE DEPONENT:  Yeah.  Just, again, a
10   web-based application is -- that was -- that was the
11   only scope.  And we have kiosks available and our web --
12   our public-facing web application is available on that
13   kiosk, so the form factor makes no difference to me.
14        Q.  (By Mr. Fetterly) Okay.  You didn't answer my
15   question though.
16        The question was:  As part of your risk
17   analysis, did you consider that possibility or did you
18   not consider it?
19        MS. DUKE:  Same -- same objections.
20        Go ahead.
21        THE DEPONENT:  Yeah.  It was not
22   considered because there is no difference between where
23   you access your public-facing web application.
24        Q.  (By Mr. Fetterly) Are the kiosks --
25        MS. DUKE:  So, Jon, we've been going

---

Page 135

1    another chunk of time.  Do you mind if we take a break
2    and then do you have kind of an estimate of how long
3    you're going to go?
4         MR. FETTERLY:  I think we're very -- off
5    the record?
6         MS. DUKE:  Yeah.
7              (Discussion off the record.)
8              (A break was taken from
9               3:43 p.m. to 3:50 p.m.)
10        Q.  (By Mr. Fetterly) Okay.  I'm going to go back
11   to Exhibit No. 1 and just ask you to put that back in
12   front of you.  This is our list of deposition topics.
13        I just want to recap very briefly, starting
14   with Number 15, we've discussed quite a few
15   communications between the AOC or the District Courts on
16   the one hand and Tyler on the other, many of which were
17   premarked as exhibits, most of which were discussed.
18        Are there any communications that were
19   material or relevant to your risk analysis that we've --
20   that we're not covered or not discussed so far today?
21        MS. DUKE:  And the only thing I should
22   say, Jon, is obviously she came in August of 2021, so if
23   she knew of anything prior to that that she considered,
24   obviously, she can answer that.  But you can ask the
25   same question of Sara as well, of course, since she has

---

Page 136

1    knowledge pre-August 2021.
2         MR. FETTERLY:  Sure.
3         MS. DUKE:  But go ahead.
4         THE DEPONENT:  Yeah.  As -- as far as the
5    communications we've discussed, I mean, I think
6    that's -- that's about it.
7         Q.  (By Mr. Fetterly) And do you have any knowledge
8    of communications between the court and Tyler that
9    predate your joining the court in August of 2021?
10        A.  No.
11        Q.  Okay.  Actually, I skipped over Number 9.  Let
12   me jump back up.
13        Number 9 was the factual basis for the
14   statement that Tyler Technologies' press review queue
15   presents potential cybersecurity risks as referenced in
16   defendant's response to CNS's Interrogatory No. 1.
17        Is there anything additional to support the
18   factual basis for the statement referenced in Number 9
19   that we've not already discussed here today?
20        A.  I think we've covered pretty -- pretty much
21   everything.  You know, I -- I will just restate that
22   there's a lot of unknowns.  We only have the ability to
23   address the potential cybersecurity risks that we're
24   aware of, that are included in the information that we
25   were given, so there's still outstanding questions

---

34 (Pages 133 to 136)

Courthouse News Service v. Omundson        30(b)(6) Jennifer Dvorak

Page 137

1  about, you know, potential vulnerabilities that could be
2  exploited in the Press Review Tool, the integrity of the
3  documents because they have been stated as the original,
4  and just how any of those things could be mitigated. We
5  don't -- we don't have any knowledge of how those things
6  are mitigated.
7      Q. Understood.
8         And so the deposition topic here was the
9  factual basis for a statement that's been provided in a
10  written discovery request. And so have we covered
11  everything that goes into the factual basis for the
12  statement there's potential cybersecurity risks
13  including -- you know, including unknowns?
14      A. I believe so, yes.
15      Q. Okay. I'm now going back to our list.
16  Number 16, the ability of AOC or Tyler to implement a
17  press review queue using APIs provided by Tyler
18  Technologies.
19         Is there anything more than what we've
20  discussed today that would be, you know, relevant or
21  responsive to the ability of the AOC or Tyler to
22  implement a press review queue using APIs provided by
23  Tyler Technologies?
24      A. So we don't know that the API is even
25  available. It was supposed to be available at the end

Page 138

1  of Q3, end of September. As far as I know, it's not --
2  there is no API available for this yet.
3      Q. Understood.
4         So -- and I believe we did cover that. Any --
5  any other reasons or issues concerning the ability of
6  AOC or Tyler to implement a press queue using APIs?
7       MS. DUKE: Objection. Overbroad, but go
8  ahead.
9       THE DEPONENT: Yeah. Just, you know,
10  functionality and cost. Like, those are all things that
11  have not been addressed.
12       MS. DUKE: And -- and, in all fairness,
13  she's here from a security standpoint, so the clerks
14  would have plenty to say on that, as you know, from
15  their -- their declarations as with people like
16  Judge Hippler.
17       MR. FETTERLY: Understood.
18       I guess, Keely, real quick then, just so
19  I understand it, since this witness is being produced
20  from the cybersecurity perspective, is it your view
21  these Topics 16, 17, and 18 are still fair game topics
22  for Sara on Friday even though --
23       MS. DUKE: Yeah. From a different angle,
24  yeah.
25       MR. FETTERLY: Okay. Thank you.

Page 139

1       MS. DUKE: Yeah. We just figured
2  cybersecurity-wise, this was the person. There's --
3  obviously, those all overlap, and then I think Sara will
4  be able to adequately address the, you know, clerk,
5  judge, trial administrator issues.
6       MR. FETTERLY: Got it. I appreciate
7  that.
8      Q. (By Mr. Fetterly) So then looking at 16, 17,
9  and 18, you know, from the cybersecurity point of view,
10  have we covered all of the, you know, information or
11  kind of the bases that were relevant to your
12  cybersecurity review and analysis?
13      A. Yeah, I believe so.
14      Q. Were you asked to perform a security analysis
15  or a security review for the Tyler Auto-Accept tool?
16      A. No.
17      Q. Did you perform a security risk or review
18  analysis of the Auto-Accept tool?
19      A. No, I did not.
20      Q. Okay.
21      A. And my understanding is that's not a separate
22  tool to be assessed. Is that correct?
23       MS. DUKE: I think Sara's going be able
24  to better handle the Auto-Accept side of things, but...
25      Q. (By Mr. Fetterly) But what's the basis of your

Page 140

1  understanding?
2      A. That it's not a separate tool. It doesn't
3  require contract amendment.
4      Q. And -- and when I say what is the basis for
5  that understanding, how or why do you believe that to be
6  the case?
7      A. I believe in that presentation deck that was
8  provided, I think -- I think that it states that it was
9  already available functionality.
10      Q. So I just pulled up Exhibit No. 8.
11      A. Yeah.
12      Q. And is this the document you just referred to?
13      A. Yup.
14      Q. This sentence here on the left-hand side,
15  which is Auto-Accept Review is a free, out-of-the-box
16  e-filing function?
17      A. Yes.
18      Q. Is that, at least in part, what you base your
19  conclusion on --
20      A. Yes.
21      Q. -- or your understanding on?
22      A. Yup.
23      Q. Thank you.
24         We were discussing earlier communications with
25  other courts or dealings with other courts, whether

35 (Pages 137 to 140)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

Page 141

1   there had been any, concerning, you know, other courts'
2   press review queues. I believe at the outset of the
3   case -- outset of today, you were telling us that you
4   previously worked for -- I think it was the State of
5   Arizona Department of Homeland Security; is that
6   correct?
7       A. Yup.
8       Q. As part of your time with the Arizona
9   Department of Homeland Security, did you have any
10  connection to the Arizona State Court's adoption of a
11  press review queue through the Granicus e-filing vendor?
12      A. No. I was on a -- they're a separate branch
13  of government, so I was on the executive branch.
14      Q. Okay. So you had -- you had no insight into
15  or dealings with the Arizona Judicial Branch?
16      A. No.
17      Q. And, specifically, none with respect to their
18  implementation of a press review queue?
19      A. No.
20      Q. Okay. I have no further questions.
21
22          E X A M I N A T I O N
23  BY MS. DUKE
24      Q. Okay. I think, just to be clear, you were
25  asked a number of questions with respect to Exhibit 11.

Page 142

1   When you're answering those questions as to your
2   assessments and whatnot, are those limited to a security
3   assessment, cybersecurity assessment?
4       A. Yes.
5       Q. And are you providing any testimony or
6   knowledge based upon your understanding of how the use
7   of press review queue would impact the court clerks
8   across the state of Idaho?
9       A. No, I have no understanding.
10      Q. Are -- does any of your testimony include how
11  implementing the press review queue would impact the
12  district judges or magistrate judges in the state of
13  Idaho?
14      A. No.
15      Q. And does any of your testimony have anything
16  to do with how the press review queue would impact the
17  trial court administrators?
18      A. No.
19      Q. Does any of your testimony include the costs
20  associated to the -- each individual judicial district
21  in the state of Idaho if press review queue was
22  implemented?
23      A. No.
24      Q. Same questions for Auto-Accept, I'll just lump
25  them all together. Any of your testimony, does that, in

Page 143

1   any way -- well, strike that.
2           With respect to Auto-Accept, if the court were
3   to -- or if Auto-Accept were to be used in the state of
4   Idaho, are you providing any testimony based upon your
5   understanding of any of the impacts that would or would
6   not have on the judges, court staff, clerks, et cetera?
7       A. No.
8       Q. We've talked about the case management system
9   and we've also talked about Tyler OFS system.
10      A. Yes.
11      Q. Who runs and operates the Tyler OFS system?
12      A. Who -- who hosts it?

18      Q. Now, you've been involved in a procurement
19  process with Tyler related to other products, and fair
20  to say, Tyler has not been forthcoming with a host of
21  different requests and security information that you've
22  asked them?
23      A. That's correct.
24      Q. You've also mentioned that the way the
25  contract process works is that if you're under contract

Page 144

1   already, that's not built into the contract itself.
2           Has Tyler given any indication that it will
3   willingly just provide information related to its press
4   review queue whether it was in contract or not?
5       A. No.
6       Q. And if they were to provide information
7   related to the press review queue, could that also be
8   used to then assess the current contract that they don't
9   have an obligation under with respect to the OFS system?
10      A. Yes, it could.
11      Q. Without the information from Tyler, are you
12  able to report to the Idaho Supreme Court, who are your
13  executives in this case, that the press review queue
14  would, in fact, be a program that could be used that
15  from your standpoint was safe?
16      A. There are certainly risks associated with
17  using this tool.
18      Q. And without knowing the information from
19  Tyler, are you able to have a complete understanding of
20  what those risks are?
21      A. No.
22      Q. Same with the API. The API sounds like
23  Tyler's indicated it'd be ready by the end of September
24  or the third quarter of this year. And, at this point,
25  the API sounds like it's not even available to look to.

36 (Pages 141 to 144)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 145

1    A.  I don't think that it's available.
2    Q.  And you've asked Tyler whether it has it
3  available and what have they told you?
4    A.  I asked them as -- as most recently as last
5  week and I got no response.  It's unknown.
6    Q.  And given that, I'm assuming there's no way to
7  estimate the costs or time it would take, the efforts
8  that would need to be taken by the Idaho Court System to
9  use Tyler's API, procure Tyler's API, and ultimately
10  build something based on that API; is that correct?
11    A.  That's correct.
12    Q.  You were asked a question as to whether or not
13  you had specifically asked to see a demo of the press
14  review queue.  Do you recall that testimony?
15    A.  Yes.
16    Q.  What have you asked Tyler to see related to
17  the press review queue?
18    A.  We asked for more information about it.  We
19  let them know we were interested in investigating it
20  further.  We didn't use the word "demo," but we did ask
21  for more information, how does it work, what can you --
22  what can you tell us about it.
23    Q.  Do you find it odd that Tyler is not providing
24  you and, therefore, Idaho Supreme Court with the
25  security data that you've asked?

---

Page 146

1    A.  Yes.
2    Q.  And is that out of experience -- is that out
3  of the ordinary in your experience?
4    A.  It is, yes.
5    Q.  And do you have any idea at all why Tyler is
6  not being forthcoming with the data you've asked for
7  related to the press review queue?
8    A.  I don't know, but it is -- I'm used to a
9  little bit of push back, a little bit of back and forth,
10  but just outright saying no or not providing any
11  information is -- that's not what I've experienced in
12  the past.
13    Q.  Given how Tyler is handling procurement-type
14  questions related to the press review queue, how do you
15  think they would respond to questions about their OFS
16  system that's currently under contract?
17    A.  I think that they would respond similarly and
18  that they would not be forthcoming in providing that
19  information.
20    Q.  Without the information that you've discussed
21  today in this deposition, are you able to recommend
22  whether the press review queue is, in fact, a safe
23  system for consideration by the Idaho Supreme Court?
24    A.  I'm not able to make that recommendation.
25    Q.  What were you hired to do for the Idaho

---

Page 147

1  Supreme Court?
2    A.  I was hired to be the Chief Information
3  Security Officer, to create a formal security program
4  that included risk management of vendors.
5    Q.  And in performing that job, what's your
6  understanding as to when you're talking about, for
7  instance, this risk assessment that you've been talking
8  about in -- that's Exhibit 11, and you talk about the
9  risk acceptance options, what's it -- what's your
10  understanding as to, you know, what your charge is that
11  you're telling your executives who are the Idaho Supreme
12  Court?
13    A.  So my job is to outline the risks that I
14  found, attempt to quantify them and provide them with
15  options for moving forward to either accept the risks
16  that I've discovered or to reject them and move on to a
17  different product or a different offering.
18    Q.  When you look at Item No. 1 on Page 2 of
19  Exhibit 11 -- Exhibit 11.
20    A.  Oh, thank you.  Sorry.
21    Q.  Yup.  Page 2.
22    A.  Page 2, got it.
23    Q.  It talks about implementing the Tyler Press
24  Review Tool with a contract amendment.  If you had that
25  contract amendment, what steps would Tyler have to go

---

Page 148

1  through and what information would it have to provide to
2  you so that you could then assess whether a contract
3  amendment would be recommended to the Idaho Supreme
4  Court?
5    A.  Well, they would first have to agree to the
6  cloud provider terms and conditions.  Additionally, they
7  would have to complete a baseline security controls
8  questionnaire and provide supporting documentation for
9  each of their answers to the questionnaire.
10    Q.  If they were to refuse to provide that
11  information, and, you know, with respect to developing a
12  contract amendment, would you recommend a contract
13  amendment?
14    A.  I would not.
15    Q.  And then Number 2 certainly is the wait for
16  Tyler Technologies application program interfacing
17  capability to become available.
18    Again, this isn't available at this point as
19  far as you know it?
20    A.  Correct.
21    Q.  And in order to consider whether that would,
22  in any way, be an option security-wise for the Idaho
23  Supreme Court and the court systems across the state of
24  Idaho, what would you need from Tyler in order for you
25  to do your job as the Chief Information Security Officer

---

37 (Pages 145 to 148)

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

---

Page 149

1  for the Courts in recommending that they go with the
2  API?
3      A.  So the API becoming available would be the
4  first step.  And then we would need additional
5  information about what's -- what's contained within the
6  API, what functionality would be available to us to pull
7  from the file system, and what the costs would be
8  associated with that.  And then we would have to
9  potentially build our own portal for press review.
10     Q.  Okay.  Thank you.
11
12          E X A M I N A T I O N
13  BY MR. FETTERLY:
14     Q.  Just two follow-up questions.
15         Without the information you've requested from
16  Tyler, are you able to assess the risk associated with
17  the Odyssey File & Serve system?
18     A.  No, I'm not.
19     Q.  And without the information requested from
20  Tyler, would you be able to recommend an amendment to
21  the Odyssey File & Serve system when it is up for
22  amendment?
23     A.  So those -- those kind of go hand in hand.  So
24  if a contract amendment is required to move forward with
25  a product purchase, then we would move forward with the

---

Page 150

1  cloud-based terms and conditions and the baseline
2  security controls questionnaire.
3      Q.  So without the information requested from
4  Tyler, are you able to recommend an amendment to the
5  Odyssey File & Serve system if an amendment is required
6  to move forward?
7      A.  I am not able to make a recommendation because
8  the -- the contract amendment is not underway, and it
9  hasn't -- the process hasn't been completed.
10     Q.  When the time comes to amend the contract, I
11  believe, assuming there's a termination date at some
12  point in time, without the information requested from
13  Tyler, would you be able to recommend to the Idaho
14  Supreme Court that it proceed with entering into a new
15  contract with Tyler?
16     A.  No.  And, at that point, it becomes a
17  procurement issue, and that's -- that's not necessarily
18  a security issue.  Security is just, again, identifying
19  the risk, helping to inform the folks that actually do
20  the contracts do the procurements.
21         So they would have to make the call of whether
22  or not -- by Tyler not completing this security
23  questionnaire or accepting the terms and conditions, the
24  executives would have to make the call of whether or not
25  the contract would be accepted, the contract amendment

---

Page 151

1  would be accepted.
2      Q.  But from a cybersecurity point of view, you
3  would not be able to recommend the new contract without
4  the additional information requested from Tyler?
5      A.  Correct.  I would go through a similar risk
6  memo process that we've already done.
7      Q.  Thank you.  I have nothing further.
8
9          E X A M I N A T I O N
10  BY MS. DUKE:
11     Q.  One quick follow-up on the question about --
12  so you're not able to assess Odyssey File & Serve.
13  Explain again how Odyssey File & Serve is very different
14  from press review queue.
15     A.  Well, it -- so Odyssey File & Serve is a
16  closed system in that only the -- the filer or the
17  submitter of documents has access and only the clerk.
18  So those documents are filed, accepted into the case
19  management system, only those two parties have access to
20  those documents.
21         In the Press Review Tool, those documents are
22  open for public viewing, potentially public
23  manipulation, before they are then moved to the case
24  management system.  And our understanding, based on the
25  information provided by Tyler Technologies is they are,

---

Page 152

1  in fact, the same document.
2      Q.  Meaning the original?
3      A.  The original document.
4      Q.  Okay.  Thank you.
5          MR. FETTERLY:  Nothing further.
6              (Deposition concluded at 4:13 p.m.)
7              (Signature reserved.)
8              --o0o--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

38 (Pages 149 to 152)

Courthouse News Service v. Omundson                          30(b)(6) Jennifer Dvorak

Page 153

1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3            The undersigned Certified Shorthand
   Reporter and Deposition Notary Public of the State of
4    California does hereby certify:
5            That  he foregoing 30(b)(6) deposition of
   Idaho Court designee Jennifer Dvorak was taken before me
6    remotely at the time, at which time the witness was duly
   sworn by me;
7
             That  he testimony of the witness and all
8    objections made at the time of the deposition were
   recorded stenographically by me and were thereafter
9    transcribed, said transcript being a true and correct copy
   of  he proceedings thereof.
10
             I further certify that I am neither counsel
11   for nor related to any party to said action, nor in any
   way interested in the outcome thereof.
12
             Further, that if the foregoing pertains to
13   the original transcript of a deposition in a federal case,
   before completion of the proceedings, review of the
14   transcript was requested.
15
16
             In witness whereof, I have subscribed my
17   name on this 9th day of November 2022
18
19
20
21   Nicole A. Bulldis, RPR
   CA CSR No. 14441
22
23
24
25

                                    39 (Page 153)

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 154

**A**

**a.m** 71:2
**ability** 7:6 11:25
  12:24 13:2 30:10
  32:8 49:4 82:7,9
  92:25 95:12 96:20
  103:21 107:20
  109:25 113:5
  115:13 118:18
  120:3 122:23
  132:5 136:22
  137:16,21 138:5
**able** 22:15 32:5,22
  47:4 52:18 55:14
  60:5 64:9 95:3
  96:1,5,7 110:5
  112:21,21,23,25
  113:10 139:4,23
  144:12,19 146:21
  146:24 149:16,20
  150:4,7,13 151:3
  151:12
**absence** 121:6
  129:8,9,17
**Absolutely** 77:19
**accept** 127:9,9
  129:12,24 130:11
  131:10 147:15
**acceptance** 127:5,7
  130:15 131:23
  147:9
**accepted** 12:2 31:2
  99:7 115:16
  150:25 151:1,18
**accepting** 127:13
  150:23
**access** 26:13 45:8
  45:12 53:7 94:10
  94:25 95:9,12,15
  95:15,20,24 96:6
  96:9,9,9,21 97:6
  98:18 103:21
  105:13 111:3,10
  112:13,16 114:3
  115:16,18,21,21

116:1,18 123:16
  123:24 133:2
  134:23 151:17,19
**accesses** 111:11
**accessible** 29:15
  52:25 53:5
**accessing** 30:10
  92:19 96:5 113:13
  123:13,14
**accidentally** 83:14
**account** 20:15
  23:16
**accountability**
  76:16
**accurate** 37:3
  71:11
**accurately** 8:11
  18:13
**acknowledging**
  127:17
**action** 153:11
**activity** 29:13
**actual** 40:19 41:7
  75:14
**add** 35:15 73:11
  80:25 98:11
**adding** 33:18
**addition** 72:18
  123:20
**additional** 18:21
  21:12 31:14,15,19
  31:25 50:7 72:19
  73:4 75:12 93:13
  99:3 109:11,11
  113:11 120:3
  128:11,18 129:5
  136:17 149:4
  151:4
**Additionally** 74:7
  83:13 148:6
**address** 11:14 30:4
  30:17 31:8 51:20
  77:8 79:8 82:4
  85:22 87:10 90:18
  95:7,18 96:4,23

103:23 104:12,17
  115:20 119:23
  126:16,21 128:7
  130:16 131:3,24
  136:23 139:4
**addressed** 31:20
  57:9 80:5 129:13
  138:11
**addresses** 30:25
  31:6 95:19 106:9
  130:24
**addressing** 130:4
**adequate** 128:11
**adequately** 139:4
**adjourn** 9:2
**administrative** 1:7
  8:23 30:20 31:24
  32:15 33:1,12
  37:9 41:15 42:21
  43:21 45:7,11,16
  46:4,14,18 65:1
  77:25 78:10,10,20
  121:17 126:20
  132:18
**administrator** 5:22
  139:5
**administrators**
  142:17
**admonishment**
  104:23
**adoption** 49:21
  123:7 141:10
**advice** 8:9
**affect** 74:14 75:6
  77:9,12 103:22
  113:3
**ago** 120:10
**agree** 27:16 28:14
  50:3 59:19 102:7
  102:11,25 103:6
  111:17 119:13
  121:24 124:24
  131:16 148:5
**agreed** 43:14 66:12
  66:14,16 118:9

**agreement** 3:25 4:5
  15:22 33:11 50:3
  80:8 107:24
**ahead** 14:22 16:2
  21:3 24:4,14 30:8
  30:23 31:12 32:19
  39:25 40:2,3
  43:24 45:20 47:22
  58:9 63:6 64:5
  76:3 77:10 79:4
  86:20 87:25 92:9
  104:2 108:16
  114:7,16 115:23
  117:7 120:7
  121:11 123:10
  127:24 131:13
  133:22 134:20
  136:3 138:8
**aligns** 64:15
**allow** 7:17 78:10
  86:7,7,8 94:5 95:8
  95:15,19
**allowed** 86:18
  90:11,17,25
  101:12
**allows** 27:21 41:3
  94:3 97:7 114:20
**alongside** 101:6
  109:3
**altered** 111:5
**Amazon** 44:10 51:8
  62:8
**amend** 50:3 119:23
  150:10
**amended** 126:15
  126:16,23
**amending** 121:1
**amendment** 13:17
  14:13,14,25 32:7
  32:8,25 33:7,8,14
  33:19,21 35:2
  37:21 38:18 41:14
  41:16,23 44:3
  65:5 66:6 82:17
  118:18,20 119:24

120:2,4 121:15
  125:18 128:5,21
  128:25 129:9,17
  131:7,18 140:3
  147:24,25 148:3
  148:12,13 149:20
  149:22,24 150:4,5
  150:8,25
**amendments** 38:1
  39:6 120:19
**analysis** 48:9 53:21
  55:3 56:4,19 69:4
  69:9 74:14,15,18
  75:6,24 77:9,12
  89:13 92:24 93:25
  101:20,24 103:7
  105:15 110:18
  113:25 114:4
  124:12 130:1,10
  132:16 133:1,16
  134:4,7,17 135:19
  139:12,14,18
**analyze** 133:2
**and/or** 34:20,24
  57:20 124:18
**angle** 138:23
**anomalous** 91:14
**answer** 7:13,14,18
  8:19 9:1 20:17
  49:13,18 55:24
  62:24 68:3 93:23
  99:25 100:18
  101:5 109:2
  121:22 125:23
  127:1 131:13
  134:8,14 135:24
**answered** 31:11
  32:18 45:19 46:8
  56:21 93:10 125:9
  131:2,12
**answering** 24:1
  142:1
**answers** 7:12,22
  50:10 66:23 99:18
  100:9 106:22

148:9
**antivirus** 52:8
**anybody** 22:17
  28:14 53:6 61:10
**AOC** 83:14 135:15
  137:16,21 138:6
**API** 20:13 21:5,7
  21:24 132:15,19
  132:21 137:24
  138:2 144:22,22
  144:25 145:9,9,10
  149:2,3,6
**APIs** 21:1 132:14
  137:17,22 138:6
**applicable** 60:12
  63:14 64:10 67:9
  68:12
**application** 54:19
  60:19,20 133:10
  133:14,24 134:10
  134:12,23 148:16
**applications** 25:13
**apply** 37:11,14
  53:25 60:18 82:14
  92:4 108:3,3,17
  122:1,15
**appreciate** 86:12
  139:6
**approximately**
  10:21 56:22
**Architect** 17:11
**architected** 104:8
  104:10
**architecture** 61:17
  93:16 99:4,14
  109:19,21 110:10
  122:9
**areas** 122:7
**arising** 121:25
**Arizona** 5:1 17:5
  74:10 141:5,8,10
  141:15
**arrival** 49:25 55:1
**arrived** 42:5 54:2
  57:10 72:3 120:9

**aside** 16:12 85:1
**asked** 11:4,14
  13:18,20 19:10
  20:14 23:6,23
  31:10 32:18 37:9
  45:19 46:7 47:1
  50:22 57:13 64:24
  65:1 66:24 74:25
  75:5 91:10,22
  93:8 99:14 100:1
  102:1,13,24
  117:23 119:18
  125:9 126:6
  129:25 131:1,11
  139:14 141:25
  143:22 145:2,4,12
  145:13,16,18,25
  146:6
**asking** 6:20,25 8:22
  22:8 32:14 65:20
  65:21 74:5,8,8
  96:1 101:17 103:2
  110:2,3
**asks** 117:18,19
  128:15
**aspect** 63:2 81:22
**aspects** 62:18
**assess** 21:18,20
  30:10 53:22 72:17
  74:19 107:16
  110:5 120:15,22
  121:3 144:8 148:2
  149:16 151:12
**assessed** 139:22
**assessing** 21:22
  117:25
**assessment** 49:21
  51:2 58:24 59:1,2
  63:21 68:21,24
  75:14 76:5 109:23
  110:1 111:1
  128:12 130:10
  142:3,3 147:7
**assessments** 51:14
  142:2

**assist** 61:10
**assistant** 17:12
  29:7
**associated** 21:25
  112:1 121:14
  142:20 144:16
  149:8,16
**assume** 8:18 24:8
  27:11 28:10 29:5
  29:11 85:18 87:5
  91:6,25 92:4
  104:10
**Assumes** 114:6
**assuming** 7:13
  90:15 145:6
  150:11
**assurances** 51:3
  77:8
**attached** 14:12
  76:11 106:22
**attachment** 106:21
**attempt** 7:18
  147:14
**attention** 18:1
  19:15 20:2 33:22
  34:7 35:20 48:1
  55:7 70:21 82:19
  89:16 94:13,16
  97:22 109:1
  116:23
**attestation** 43:18
  43:20 44:3 65:22
  73:20 77:18,21
  78:12,21
**attorney** 5:19
**attorney's** 80:19
**audio** 108:5
**audit** 30:10,14,16
  50:16 51:13 53:1
  66:22 67:2 68:18
  68:20 69:14 70:1
  70:3 71:21 72:2,4
  72:5,20 91:14
  95:8,9 96:2,5,21
  99:1

**auditability** 28:12
  92:19
**auditory** 8:6
**August** 15:16 16:24
  17:1,4 19:13,19
  50:1 71:2 94:20
  135:22 136:9
**authentication**
  40:17 41:7 51:12
  52:7 116:4,5,7
**author** 58:4
**authority** 18:19
**authorization**
  34:14,18 35:6,8
  35:16 50:17,24
  51:7 52:17,18,19
  65:19 120:11
**authorized** 51:5
  111:18
**Auto-Accept** 45:1
  139:15,18,24
  140:15 142:24
  143:2,3
**automated** 84:15
  124:21
**automatically**
  83:18
**automation** 83:17
  85:13
**availability** 21:9
  58:24 98:1,7
  105:2,3,6,11,14
  105:17,25 106:10
  107:9,16 108:3,21
  109:16 110:13,15
  113:23 123:22
  131:25 132:8
  134:1
**available** 12:5,21
  12:25 20:14,20,23
  21:5,11,19,24
  22:5,7 28:1 31:19
  46:5,20 83:8 84:4
  85:22 87:8 90:2
  97:9 103:8 105:13

105:20,23 106:1,3
  106:6 109:12
  110:9 114:13
  123:23 124:5
  132:15,22,23
  133:12,12,13,17
  133:18,24,25
  134:11,12 137:25
  137:25 138:2
  140:9 144:25
  145:1,3 148:17,18
  149:3,6
**await** 7:14
**aware** 13:12 14:9
  22:21 24:15 32:20
  37:1 45:10 62:9
  62:16 72:3 88:1,9
  88:10,16 115:2,7
  136:24
**awareness** 65:24
**AWS** 34:21 44:11
  61:25 62:1 71:8
  73:21,22 75:18,20
  75:22 76:24 77:1
  77:18,20 78:5,6
  78:20,22,23
**AZ** 1:24
**Azure** 34:21 62:11
  62:13,20 63:3

**B**
**back** 11:11 13:6
  33:23 37:16 48:1
  53:8 54:11,14
  56:4 61:7 68:25
  73:17 93:18 97:22
  105:2,7,8 106:4
  108:13,14,23
  109:20 118:2
  120:22 121:3
  127:2 133:6,7
  135:10,11 136:12
  137:15 146:9,9
**backing** 107:18
**backup** 80:13
  99:20 106:11

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 156

107:1,7
**backups** 107:1
**bad** 129:15
**base** 111:1 140:18
**based** 7:7 49:4
59:24 60:1,2,11
60:14,22,24 61:4
66:7 71:12 72:19
74:20 85:7,15
86:6,22 88:12
90:2 94:8 95:20
97:14 101:7
103:15 111:1
113:9 118:18
132:2 142:6 143:4
145:10 151:24
**baseline** 128:14
129:2 148:7 150:1
**bases** 139:11
**basic** 6:22 9:12
49:13
**basically** 19:24
**basis** 11:16 25:4
72:14 79:14 83:2
101:16 121:8
136:13,18 137:9
137:11 139:25
140:4
**Bear** 6:2 11:9 88:19
**becoming** 149:3
**beginning** 89:7
**begins** 34:13 94:18
97:4
**behalf** 6:16 7:4,6
30:20 46:14 78:24
127:13
**behavior** 91:14
**believe** 6:19 13:22
15:4,17 16:3,9
18:2 20:5 21:8
24:23 25:20,24
26:3,12,23 27:1
27:15 31:23 44:22
45:2,2,23 47:12
55:5 56:14,17

63:18,19 64:1
68:14 70:6,14
71:10,14,14,20
75:15 78:16 83:25
90:20 91:9 97:2
99:16 106:20
108:11 113:19
118:24 119:8
123:3 124:3 125:4
125:10,16 137:14
138:4 139:13
140:5,7 141:2
150:11
**best** 7:15 8:6,13,19
9:9 18:15,16 49:3
49:6 102:20
**better** 35:5 53:9
59:23 61:9,18
83:1 139:24
**beyond** 21:15
30:11 31:1 39:24
40:2 59:24 62:22
68:1 79:3 88:6,14
108:15 118:16
120:6 121:21
125:3 127:1
**BILL** 2:17
**bit** 24:19 35:4
48:21 62:5 74:21
83:22 110:14
117:8 146:9,9
**block** 100:13
**Boise** 1:16 2:12
**bold** 100:13
**bolded** 81:7
**bottom** 34:8,12
37:19 56:9 81:6
103:3
**bounds** 74:8
**Box** 2:12
**branch** 141:12,13
141:15
**breach** 81:18 129:4
**break** 35:4 42:9,15
42:18 79:23 80:2

81:3 83:1,21
98:10 135:1,8
**breaking** 58:18
**briefly** 135:13
**bring** 37:8
**broader** 67:4
110:14
**broadly** 53:25
108:3
**brochure** 97:12
**brought** 53:3 55:7
**browse** 16:5
**Bryan** 2:5 5:19
**build** 120:11
132:24 145:10
149:9
**building** 132:18
**built** 35:17 43:2
53:4 65:4 69:5
78:16 144:1
**Bulldis** 1:24 153:21
**bullet** 57:18
**business** 17:18
**button** 27:3,4,12

─────────

**C**

**C** 2:1
**CA** 1:24 2:6 153:21
**cache** 99:11
**cadence** 106:11
107:1,2,7
**California** 153:4
**call** 19:22 150:21
150:24
**called** 69:20 70:10
70:16,18 81:7
117:24 127:4
**calling** 5:25 76:1
**calls** 81:16 87:12
122:19
**capabilities** 132:23
**capability** 148:17
**capable** 61:4
**capacity** 1:7 5:22
9:6
**captured** 99:2

**carbon** 10:11
**card** 35:12 36:2,15
36:20 37:7 42:24
43:3,3
**case** 5:20 12:2 13:3
19:2,5,9 29:14
31:2 40:4 41:3,8
53:3 59:14 61:1
63:2 67:16 77:23
81:18 85:7,24
86:22,24 87:2,6,7
87:18 90:2,10,16
90:24 92:13,22
93:7 94:6 99:7
111:6,12 115:17
115:18 124:4,14
124:18 129:4
140:6 141:3 143:8
143:15 144:13
151:18,23 153:13
**cases** 86:1 115:19
**categories** 6:11,14
7:2 11:13 46:15
**category** 11:15
**Cave** 2:5 5:19
**center** 2:5 39:18,20
39:22 40:11,13
63:8 72:17
**central** 109:22
**certain** 51:22,23
55:5,7 80:9,16
90:10,16
**certainly** 57:11
98:5 99:24 124:16
144:16 148:15
**certainty** 110:21
**certificate** 24:19
25:12 153:1
**certification** 41:11
75:17,23 78:11
79:1
**certifications** 25:14
**certified** 51:9 153:1
153:3
**certify** 153:4,10

**cetera** 34:22 143:6
**chain** 111:13,14
123:17
**chance** 8:10 10:1
16:4,5
**change** 77:16
**changed** 75:11
76:12
**changes** 18:17,18
92:21
**characterize** 15:19
56:15
**charge** 147:10
**chart** 3:13 17:25
18:8,13,22 59:7
**checked** 99:6
**chicken-and-egg**
48:21
**Chief** 16:22 18:3,5
147:2 148:25
**choose** 127:9
**chunk** 135:1
**circumstances**
13:11
**claiming** 48:23
**clarification** 8:17
93:5
**clarify** 8:16 48:15
**Clark** 24:23 25:5
25:14 44:14,16,18
44:20,25 45:7
**clear** 7:23 8:13
22:22 30:21 47:8
56:22 64:1 67:19
71:1 85:19 89:24
94:20 98:17 103:5
104:7 113:12
114:1 128:9
141:24
**clerk** 94:11 111:11
123:18 133:21
139:4 151:17
**clerks** 26:13 138:13
142:7 143:6
**click** 27:4,5,12

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 157

client 34:5 80:21,21
closed 151:16
closed-loop 123:19
cloud 35:10,17
  52:13 77:4 108:18
  121:14 122:13,14
  128:21 148:6
cloud-based 4:9
  35:13,14,15 37:14
  39:7,15 41:10
  51:18 56:2 65:17
  69:5 72:16 74:2
  81:24 117:10
  129:1,6 150:1
CNS 2:17
CNS's 11:18
  136:16
code 90:11
codes 90:3,16,24
  124:5
coding 57:25
collect 37:6
color 57:25
column 18:2,2 27:3
come 8:3 10:13
  49:9 53:6 80:8
  114:22
comes 41:16,22
  150:10
comfort 52:19
comfortable 76:9
  131:9
comma 94:18
comment 47:4
common 77:20
  93:19
communication
  71:6
communications
  10:5 19:7 135:15
  135:18 136:5,8
  140:24
company 69:1
compel 32:9
compelled 32:12

complaints 98:18
  113:14
complete 65:18
  67:20 117:17,22
  144:19 148:7
completed 13:17
  19:12,14 66:3
  117:14 150:9
completely 36:24
  43:25 84:15 110:6
  110:7 119:14
  123:12 125:11
completing 81:23
  82:12,12 150:22
completion 153:13
compliance 63:15
  63:23 64:11 68:13
  79:10
comply 63:14
  68:12
component 27:18
  27:20 46:25 52:13
components 110:8
  122:10
comprehensive
  48:10
computer 80:12
  134:1
concern 8:24 31:5
  31:7,9 85:22
  88:12 91:12,16
  92:15 96:4 107:9
  113:7 119:18
  121:9
concerned 24:19
  51:18 52:21
concerning 6:25
  19:9 33:13 138:5
  141:1
concerns 26:9,15
  30:4,17 31:14,20
  32:16 51:20 52:12
  76:25 77:8 79:8
  82:4,6 87:10
  90:19 91:23

103:24 104:12
  116:21 118:13
  119:8,19 120:2
  123:2,5,20 124:24
  126:22
conclude 29:11
  92:24 94:3
concluded 152:6
conclusion 54:9
  55:10 61:3,4
  120:6 121:20
  122:6 140:19
conditions 4:9
  35:14,17,22 36:6
  37:11,25 38:24
  39:5,14 41:12,18
  41:24 42:4,19
  43:15 50:5 51:6
  55:20,23 65:18
  69:6 72:16 73:6
  79:10 81:24 82:3
  117:10 118:8
  120:14 121:7,13
  121:19 122:1,15
  123:7 125:8
  126:17,23 128:22
  129:1,6 148:6
  150:1,23
conduct 19:10
  49:20 52:18
Conducted 1:17
conducting 55:2
  59:2 89:13
confidential 3:22
  84:12 107:23
confidentiality
  58:10,11,15,23
  98:1,6,11,12
  105:10 109:16
  110:15 113:23
  123:21 131:25
  132:7
configuration 47:4
  47:5 51:24 72:20
  77:3 84:22 85:2,7

86:7 87:15 89:16
  89:25 90:1 91:25
  97:7,17 101:9
  111:24 114:1
  124:11,12,13
configure 13:3
configured 84:23
  84:25 85:9,20
  87:9 90:9,12,16
  90:23 91:6 92:1,5
  92:6 101:8 124:15
configuring 85:12
confirm 29:16
confirmed 75:23
  107:2
confusion 110:23
conjunction 57:12
  58:8
connected 109:6,8
  118:22
connection 36:15
  36:21 65:2 66:13
  67:21 69:4,8,13
  71:22 73:6 79:1
  79:19 97:11 118:6
  120:2 121:7
  141:10
consequences
  124:20
consider 19:20
  29:25 89:12 92:23
  103:11 107:14
  124:13 132:17
  133:2 134:17,18
  148:21
consideration 77:3
  146:23
considered 28:24
  54:15,18 57:21
  83:10 98:7 105:15
  107:22 134:4,22
  135:23
considering 67:25
consistent 60:19
  117:5,9

constituents 106:5
Cont'd 4:3
contact 24:9 45:6,7
  45:11,15,16
  112:11
contacted 45:15
  78:20
contain 12:8 82:21
contained 54:18
  60:23 98:2,19
  149:5
contains 84:5
context 59:4 98:17
  101:9 105:25
continue 68:8
contract 13:17
  14:13,13,24,25
  15:2,5,19 16:8
  32:5,7,7,10,24,24
  33:6,6,8,8,11,13
  33:19,21 35:2
  37:21 38:17,25
  41:13,22 42:2,22
  43:3,4,10,12,12
  49:14,23 50:15
  54:23,25 55:4,13
  55:21,22 65:3,4,5
  65:11,12 66:5
  68:5 73:2,7 76:11
  76:17 77:7,7,13
  78:9,16 79:18
  82:2,12,15,17,17
  108:18 118:18,19
  120:19,25 121:2,4
  121:8,15,17
  122:23,24 123:4,6
  125:6,15,18,19
  126:14,23 128:5,5
  128:21,25 140:3
  143:25,25 144:1,4
  144:8 146:16
  147:24,25 148:2
  148:12,12 149:24
  150:8,10,15,25,25
  151:3

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 158

contracted 64:23
64:23 65:2 72:22
74:6 79:14
contracting 35:10
80:15
contracts 35:15
37:12,13,15 38:1
38:7 39:2,5,6
42:22 78:17
120:19 126:2,7
150:20
contractual 65:13
76:16 81:16 117:2
119:22 129:8,17
131:7,17
contractually 49:5
49:18 65:8,11
control 58:16 94:25
95:8,8 96:21 97:6
99:1 101:15
116:18 122:22
128:15
controlled 52:9
59:24
controls 31:17,19
32:10 65:21 68:22
92:18 93:13 98:22
99:4 104:4 111:4
128:16 129:2
132:6 148:7 150:2
conversation 23:9
23:18 78:4 103:12
113:9
conversations 9:8
46:24 112:5 113:5
cool 106:6
copies 101:22
102:11
copy 6:5 10:11
102:1 103:8,21
110:3,4,25 114:2
153:9
corner 34:8 56:9
correct 10:22,23
13:9,10 14:18

18:6,7,10 26:1,4
27:22 28:17,18
29:17,18 30:1,2
31:22 35:24 36:5
36:17 37:4,23
39:1,6 40:11,25
41:1,19,20,25
42:1,4,5 43:10
46:6 47:20,23
54:13 55:25 56:6
56:7 57:21 59:3,5
61:5,6 63:11 64:2
67:22,23 70:7
71:24,25 73:3,15
73:16 79:11,15,16
79:19,20 80:24
84:1,6,13,14 91:2
94:22 95:3,6
96:15 97:1,16,20
99:18 100:14
103:10 106:3
107:10,11 111:19
113:15 115:22
116:3,4 118:6,7
118:10,11 120:1,4
121:9,16 123:25
125:1,8,15 126:18
126:19 127:22
129:10 130:1,2,4
130:12,25 131:10
131:21 132:14
139:22 141:6
143:23 145:10,11
148:20 151:5
153:9
correctly 36:16
38:23 46:3 49:1
82:1,24 84:10
85:21 87:9 90:8
90:13,13,16,18,24
91:1,7 92:1,1,5,6
95:5 98:4 126:16
cost 21:6,13 138:10
costs 21:25 142:19
145:7 149:7

counsel 6:22 7:12
7:13,22 9:9,10,19
35:14 36:13
120:13 153:10
Counsel's 118:24
County 5:1 24:23
25:5 44:14,16,18
44:20,25 45:7
County's 25:14
course 9:25 11:6
135:25
court 1:1 7:20 8:10
8:23 12:9,9,10
25:7,7,14 27:21
30:17 37:6 40:19
60:12 62:7 72:13
76:2 80:6,23 95:9
96:4,13 97:12
98:2,20 112:22
115:1,2,4,14
116:25 118:1
125:14 129:19
133:9 136:8,9
142:7,17 143:2,6
143:17 144:12
145:8,24 146:23
147:1,12 148:4,23
148:23 150:14
153:5
court's 47:5 80:12
87:10 90:19
103:23 104:12
113:14 115:17
141:10 143:15
court-hosted 41:5
62:18 63:1
courthouse 1:3
5:20,21 133:4,17
133:25
courts 1:8,12 2:18
5:22 11:7 12:12
12:24 15:3 16:21
16:25 20:25 22:17
23:6,13,21 24:9
24:10 25:6,25

26:9 30:4,21
31:21 33:12 39:4
39:22 40:11,12
41:23 42:6 43:18
43:20 45:12,18
46:6,20 47:19
49:20 50:2 51:17
51:19,20 52:11,21
54:2,24 55:1
56:23 62:1,10,12
63:3,9 64:18 65:7
65:15 66:13 67:21
67:24 69:25 70:13
72:1 73:14 76:25
78:25 79:9 83:25
85:18 86:16,17,18
87:21,23 88:3,4
88:10 100:12
108:21 112:11
113:13 116:20
118:5 119:19
120:10 124:2
132:17 135:15
140:25,25 149:1
courts' 25:17 72:5
75:21 79:8 85:22
117:2 124:6 141:1
cover 10:14 15:15
15:18 70:3 89:5
138:4
covered 70:14
98:11 135:20
136:20 137:10
139:10
crashing 106:2
create 28:11 76:25
147:3
created 35:11,25
36:2,14 57:4,5,11
99:12 111:24
creating 36:8
credit 35:12 36:2
36:15,20 37:7
42:24 43:2,3
cross 9:11

crosstalk 104:24
CSR 153:21
curious 19:4
105:11,14 109:15
current 14:14 78:9
78:16 79:18 144:8
currently 14:12,15
14:16 15:2 20:25
22:12,15 31:22
32:23 33:8 38:25
39:22 42:22 43:10
45:3 47:18 50:11
50:14 52:11 54:23
66:18,20 67:24
73:14 79:17 95:11
96:11 112:10
126:15 143:17
146:16
custody 111:13,15
customer 34:23
73:19,21 75:17
customers 45:3
77:18 114:24
cybersecurity
11:17 47:1,16,25
60:15 105:18
119:7 121:24
136:15,23 137:12
138:20 139:9,12
142:3 151:2
cybersecurity-wise
139:2

_____
D

D 5:15
dashboard 4:8
29:13
data 34:20,24
39:18,19,22 40:11
40:13 48:11 49:12
51:19,21,23 52:9
52:22 54:17 55:6
55:7 57:21 58:16
60:22,23,24 61:5
63:8,10 72:17,17
73:23 75:19,21

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 159

76:12,22 77:2
80:13 81:17,18
82:21,23 83:10,14
83:24,24 84:8
85:5 95:3 97:6,8
98:1,7,19 100:20
102:21 105:11
107:18 109:22
113:14 129:4
145:25 146:6
**data's** 76:10
**database** 104:6
110:25
**dataflow** 93:15
99:5 102:21
109:21 122:10
**date** 1:23 22:4
66:19 67:19
150:11
**dated** 15:15 19:19
**David** 5:16 36:12
**day** 153:17
**days** 90:3
**dealings** 140:25
141:15
**decide** 127:19
**decision** 129:22
**decisions** 12:10
**deck** 3:19 89:6,7
140:7
**declarations**
138:15
**deem** 82:3
**deemed** 128:10
**default** 86:3,4
**defendant** 1:9 2:9
6:17 7:4,7
**defendant's** 11:18
136:16
**defined** 112:2
**defines** 111:21
**definitely** 23:23
57:8 60:4
**degree** 17:16,17
**demo** 23:12,14,17

23:24 24:5,8
47:10 145:13,20
**demonstration**
23:21
**demonstrations**
23:7
**Department** 17:5
141:5,9
**departure** 17:10
**depend** 111:23
**depending** 60:18
60:21
**DEPONENT** 10:10
14:23 21:4 22:20
24:15 29:9 30:9
30:24 31:13 32:20
40:4 42:12 45:21
46:9 47:14,23
63:7 64:6 76:4,19
77:11 78:15 79:5
79:25 86:21 87:13
88:1,8,16 91:4,9
92:10 101:3 104:3
104:16,25 108:17
111:23 114:8,17
116:15 117:8
118:17 120:8
121:12 122:5,20
123:11 125:4,10
125:25 126:4,9
127:25 131:3,14
133:8,23 134:9,21
136:4 138:9
**deposition** 1:11 3:1
3:12 4:1 5:23,25
5:25 7:3 8:5,25
9:18 11:1 18:24
19:6 135:12 137:8
146:21 152:6
153:3,5,8,13
**depositions** 80:11
**deputy** 36:13
**described** 114:10
**designee** 153:5
**desk** 19:19 49:9

**detail** 38:9 66:11
66:24
**detailed** 72:15
106:25
**details** 57:16
**detection** 91:14
**determine** 12:24
70:11 101:11
**determining** 59:12
60:8 96:25
**develop** 35:14
120:13,14
**developing** 148:11
**development** 55:23
**diagram** 99:5,5,14
102:18,20 109:19
109:21,21 122:10
**diagrams** 93:16
99:22 117:19
**difference** 48:17
76:5,7 133:9,11
134:13,22
**different** 10:9,14
12:22 29:24 32:14
56:11 61:2 85:9
88:19 102:8
123:12 124:4,14
138:23 143:21
147:17,17 151:13
**differentiator** 28:8
**differently** 62:6
106:1
**difficult** 70:11
122:24
**difficulties** 108:10
**difficulty** 108:12
**direct** 18:1,18
19:15 20:2 33:22
34:7 35:20 48:1
70:21 82:18 94:13
94:16 97:22 109:1
**direction** 10:14
102:21
**directly** 77:24 78:6
88:4

**Director** 1:8 17:12
**disagree** 102:12
**disaster** 107:20
**disclosed** 58:16
124:9
**discovered** 147:16
**discovery** 137:10
**discuss** 87:22 88:3
132:21
**discussed** 68:11
97:16,24 98:13
99:2 109:15
110:16 113:25
135:14,17,20
136:5,19 137:20
146:20
**discussing** 21:16
71:21 81:3 97:11
101:10 140:24
**discussion** 35:1
38:11 135:7
**discussions** 35:3
37:22 125:19
**displaying** 25:8,11
**distinction** 9:4
**distinguish** 28:19
**district** 1:1,2
135:15 142:12,20
**division** 3:15 18:15
**divorce** 12:10
**document** 6:4,7
11:12 13:3 15:9,9
15:23 16:10,16
17:22 19:18 20:7
20:11 26:16,19
27:3,8,23 29:3
34:1 53:12,16,18
56:8,11,13 58:4
61:8,11 64:10
83:8 84:1,4,22,24
85:8 86:23,25
87:2,7,7,18 88:19
88:22,25 89:10,12
89:17 90:4 91:13
91:16,19,20 92:11

92:19 93:1,9,12
93:15 94:11
101:11,23,23
102:2,8,10,16
103:5,7,9 104:11
106:13 107:4
110:3,4,24 111:3
111:5 114:2,13,20
117:15 123:17
124:5,14,18 129:2
140:12 152:1,3
**document's** 92:20
98:21
**documentation**
64:12 65:21 66:25
148:8
**documented** 122:9
**documents** 11:24
12:5,7,11,18,20
12:20,25 26:14
30:15 41:4 53:2
76:1,2 80:16 83:5
84:12 85:13,19,21
85:24 86:3,16
87:17 90:10,21
91:10 94:4,6,10
99:6,10,21 100:4
101:11 102:7
105:13,21 109:4
111:10,11,12
115:16 116:2
123:13,14,18,19
124:2,21,25
125:16,17 137:5
151:17,18,20,21
**doing** 50:8 52:4
65:23
**downloading** 114:3
**draft** 81:9 126:2
**drafted** 103:15
**dropping** 108:5
**drug** 118:1
**due** 9:25 108:9
**Duke** 2:10,11 3:6,8
10:7 14:21 15:10

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 160

---

21:2 22:19 24:12
29:7 30:6,19
31:10 32:18 39:24
40:2 42:11 45:19
46:7 47:8,21
55:17 62:22 63:5
64:3 68:1 75:25
76:18 77:10 78:13
79:3,24 80:4 81:1
86:19 87:11,24
88:6,14 91:3,8
92:8 96:16 103:25
104:14 108:15
111:20 114:5,15
115:23 116:13
117:6 118:15
119:1,4,13 120:5
121:10,20 122:3
122:18 123:8
124:8 125:2,9,21
126:3,8,25 127:23
130:5 131:1,11
133:5,19 134:6,19
134:25 135:6,21
136:3 138:7,12,23
139:1,23 141:23
151:10
**duly** 5:7 153:6
**Dvorak** 1:13 3:1,17
3:21,22 4:1 5:6,15
5:18 19:19 42:17
81:2 96:23 153:5

### E

**E** 2:1,1,10,10 5:11
141:22 149:12
151:9
**e-file** 27:4 93:3
124:1,25
**e-filers** 124:6
**e-filing** 26:1,3 29:5
33:11,13 37:2
50:3 109:5 124:6
140:16 141:11
**earlier** 48:6 65:6
71:23 74:3 75:20

140:24
**easiest** 23:25
**educate** 7:8
**education** 17:15
**effect** 42:23 56:23
65:22
**efforts** 145:7
**eFile** 11:25 14:19
15:1,3 26:4,6,10
27:17 28:20 29:20
29:22 30:18 31:22
32:1,17 33:4
36:22 39:9 40:10
41:22 49:22,22
52:13,23 67:12
68:18 69:21 70:4
70:9,14,16 71:19
71:19 73:1 79:19
83:5 100:23
103:23 108:22
109:7,18 110:19
111:9 113:18
115:7,21 116:2
117:4 119:10,20
122:2,17 124:1,25
125:6 126:14
**eFiling** 71:7,16,18
101:6 109:3
**EFM** 71:7 97:7
103:10,23 104:11
109:22 110:7,8
116:3 119:3 122:8
123:15,25 124:17
**either** 10:11 22:4
44:10 63:19 64:7
65:10 68:14 78:5
78:7 88:17 115:2
147:15
**either/or** 86:22
**elaborate** 35:7 58:5
92:16
**electronic** 4:5,6
26:23 102:7
**eliminate** 130:23
**email** 3:16,17,18,19

3:20,21,23 34:4
71:2 74:3 89:3,5,5
106:21 112:5
116:14,17 125:17
**emailing** 94:21
**emails** 9:20,23 10:1
10:4,8,10,14,20
10:21 99:17
106:12 111:19
**Embarcadero** 2:5
**embedded** 32:10
93:18 120:21,25
129:6
**employee** 3:14 66:2
**employees** 65:24
**encompass** 86:24
87:1 98:8 124:18
**encompasses** 81:15
**encompassing**
81:19
**encryption** 99:10
**engage** 23:16
**ensure** 97:25
**ensured** 98:21
**ensures** 95:2
**entail** 21:22 86:1
128:23 132:11
**enter** 41:3 121:17
**entered** 80:6
**entering** 49:22
150:14
**Enterprise** 13:15
54:8 69:11,15,23
117:16
**entire** 30:25 128:6
**entitled** 7:11 8:16
9:7,9 46:17
**entry** 95:10
**environment** 34:24
73:22 75:10,18
101:8 104:6 110:6
**environments**
34:21 100:20
**equally** 109:17
122:1,16

**error** 87:20 91:2
**especially** 81:15
104:5 110:23
118:21
**established** 125:6
**estimate** 10:15
56:25 135:2 145:7
**et** 34:21 143:6
**evaluate** 124:13
**event** 47:13
**EVETT** 2:11
**exact** 10:16 31:1
60:13,14
**Exactly** 106:4
**EXAMINATION**
1:11 3:3,4
**examine** 21:17
**examined** 5:8
**examples** 88:11
115:2
**Excellent** 80:4 90:6
**exchanged** 99:18
**exclude** 86:4,16
**excuse** 41:12 89:20
100:16 108:20
**execution** 82:2
**executive** 34:5
141:13
**executives** 127:9,19
129:21 131:9
144:13 147:11
150:24
**exhibit** 3:10 4:3 5:4
5:24 6:11 11:12
15:9 16:11,14
17:21 19:15 20:3
26:17 27:7 29:2
33:23 35:19,20
37:17 38:24 41:19
41:25 42:19 43:14
48:2 50:5 53:12
55:20 61:11 63:13
70:21 73:5,17
79:11,17 81:4
88:22,24 93:20

94:14 97:18,23
100:8 105:8
106:21,23 116:17
117:9 118:8 123:7
125:8 126:17
127:3 135:11
140:10 141:25
147:8,19,19
**exhibits** 3:11 4:4
9:24 10:5 21:16
135:17
**exist** 36:6 110:18
123:3,3,3
**existence** 47:18
**existing** 45:18 65:5
121:1 122:24
**exists** 122:21
**experience** 24:11
69:22 112:12
131:6 146:2,3
**experienced** 146:11
**experiences** 88:4
**explain** 58:5 65:14
102:19 151:13
**explicate** 102:18
**exploited** 114:19
137:2
**expose** 82:22 85:4
**exposed** 12:1
**exposing** 124:21
**extent** 125:3,22
**external** 52:4
107:23
**external-facing**
114:18
**eyes** 80:19

### F

**facing** 26:12 28:8
**fact** 38:13 69:24
75:1 105:20
144:14 146:22
152:1
**factor** 77:7 105:16
133:16 134:13
**factors** 28:19

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 161

105:14
**facts** 114:6
**factual** 11:16
  136:13,18 137:9
  137:11
**failure** 106:2
**fair** 9:11 86:12
  138:21 143:19
**fairness** 138:12
**falls** 14:7
**familiar** 124:4
**familiarize** 16:6
**FAQs** 3:24
**far** 18:2 21:11,14
  22:6 37:1,13 39:2
  40:16 49:24 50:6
  95:14 135:20
  136:4 138:1
  148:19
**feasibility** 132:17
**feature** 57:10
**federal** 50:24
  153:13
**FedRAMP** 50:23
  51:4,9,10 52:17
**feel** 131:8
**fees** 36:22 37:6
  58:17
**Fetterly** 2:4 3:5,7
  5:12,18 10:13
  11:11 15:1,8,11
  21:8 22:22 24:21
  29:10 30:12,16
  31:3,21 33:1 40:1
  40:6 42:8,13,17
  45:22 46:12 47:12
  47:15,24 55:19
  63:1,9 64:8 68:7,8
  76:6,21 77:17
  78:19 79:6,21
  80:1,7,24 81:2
  87:5,21 88:3,10
  88:18,21 91:5,17
  92:14 93:6 96:20
  100:25 101:4

104:9,18 105:1
  108:5,8,11,20
  112:3 114:11
  115:1,24 116:20
  118:4,23 119:2,6
  119:17 121:6,16
  121:23 122:13
  123:1,25 124:10
  125:5,12 126:1,6
  126:11 127:2
  128:3 130:8,9
  131:6,16 133:15
  134:3,14,24 135:4
  135:10 136:2,7
  138:17,25 139:6,8
  139:25 149:13
  152:5
**fields** 21:23 97:18
**fight** 68:4
**figured** 139:1
**file** 4:6,7,8 12:16,25
  21:24 36:23 40:16
  44:8 87:18 99:8
  99:12 103:22,24
  118:13 122:11
  123:16 149:7,17
  149:21 150:5
  151:12,13,15
**filed** 12:2 151:18
**filer** 4:8 29:13 91:1
  91:2 111:9 133:21
  151:16
**filers** 27:21
**files** 31:1 66:2
**filing** 4:5,6 26:24
  29:13 30:15 36:22
  90:3,22 123:18
  124:5,14
**filings** 12:8,10
  27:21 98:2,20
**filled** 129:3
**filling** 100:21
**find** 9:3 145:23
**findings** 52:6
  114:25

**fine** 10:15 80:19
  119:16
**fines** 58:17
**firm** 5:19
**first** 5:7 6:21 13:8
  27:24 53:15 54:3
  54:7 57:13 61:7
  61:13 66:22 68:19
  70:25 71:5,5 81:5
  82:19 83:2,6,23
  94:18,24,24 95:17
  95:18 96:3 97:5
  97:24 100:18
  134:5 148:5 149:4
**Fisher** 3:19,20,23
  34:5 71:2 116:18
**five** 59:8
**Floor** 2:5
**flow** 96:8
**flowing** 102:21
**focus** 19:3 81:20
  85:2 121:5
**folks** 12:12 26:14
  45:25 123:16
  150:19
**follow** 64:13
**follow-up** 19:23
  20:9,10 75:8
  112:5 149:14
  151:11
**followed** 15:22
  97:5
**following** 48:20
  68:10 89:3
**follows** 5:9
**foregoing** 153:5,12
**form** 14:21 21:2
  22:19 24:12 25:3
  30:6 46:7 61:2
  64:3 75:25 76:18
  78:13 80:7,17
  86:19 87:11 91:3
  96:16 104:1,15
  111:20 114:15
  115:23 117:6

118:15 120:5
  122:3,18 123:8
  126:25 127:23
  133:19 134:13
**formal** 120:11
  147:3
**forming** 61:4
**forth** 60:10 87:19
  146:9
**forthcoming**
  143:20 146:6,18
**forward** 7:11 10:21
  23:4 37:15 38:1,7
  38:9 48:24 54:21
  60:5 82:12 120:18
  127:10,21 129:19
  147:15 149:24,25
  150:6
**found** 147:14
**foundation** 24:13
  30:7 46:8 78:14
  87:12 111:21
  114:15 120:5
  122:3,19 123:9
  125:3,22 133:20
**four** 59:13
**frame** 10:15
**framework** 64:14
  64:14
**Francisco** 2:6
**free** 140:15
**freeze** 108:7
**fresh** 55:15
**Friday** 138:22
**front** 6:5 26:24
  48:3 135:12
**full** 7:16 32:3 33:20
  44:2 71:5 75:10
  79:9 94:17 132:7
**fully** 55:14 132:2
**function** 101:15
  140:16
**functional** 96:14
**functionality** 20:14
  21:6,12,14,17,18

21:20,22 28:1
  33:3 34:5 46:16
  53:1 138:10 140:9
  149:6
**further** 69:17
  80:25 83:22 97:3
  100:8 102:18
  141:20 145:20
  151:7 152:5
  153:10,12
**furthest** 24:20
**future** 39:5 43:5
  78:17 79:14

### G

**G** 2:4
**game** 138:21
**gathered** 74:17
**GCP** 34:21
**gears** 16:19 126:11
**general** 35:13
  50:18,19 63:16
  112:17 113:10
  115:11 120:13
**generalities** 64:17
**generally** 11:20
**generic** 111:25
**gestures** 8:3
**getting** 49:2
**GIRDNER** 2:17
**give** 8:9,9,10 9:2
  16:4 35:1 37:20
  49:5 56:25 66:15
  66:16 76:24 93:17
  95:24
**given** 49:7 71:13
  110:22 136:25
  144:2 145:6
  146:13
**gives** 104:23
**go** 6:21 7:11 14:22
  15:10,20 16:2
  21:3 24:4,14,24
  26:17 27:2 30:8
  30:23 31:12 32:19
  37:16 39:20,25

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 162

40:2,3,8 43:24
45:20,24 47:22
53:8,12,15 54:11
54:14,21 59:24
61:7 63:6 64:5
68:25 71:12 76:3
77:10 79:4,22
82:18 86:20 87:25
88:22 89:21 92:9
93:20 94:6 97:3
103:19 104:2
105:7 106:4,14
108:8,16,23 110:8
114:7,16 115:23
117:7 120:7,15,21
121:2,11 123:6,10
127:2,24 131:13
133:22 134:20
135:3,10 136:3
138:7 147:25
149:1,23 151:5
**goal** 120:18 121:2
**goes** 68:16 137:11
**going** 15:8 17:20
23:4 27:7 34:11
38:1,9 42:8 56:4
68:2,4 73:17
79:22 83:21 84:12
94:9 96:2 105:8
109:14,20 123:12
134:25 135:3,10
137:15 139:23
**going-forward**
79:14
**good** 34:23 73:21
75:18
**goodwill** 58:19
60:13
**gosh** 36:1
**Gotcha** 41:9 42:7
**gotten** 120:24
**GovCloud** 51:8,10
51:19 52:1 71:8
75:21,22 76:24
77:1

**govern** 9:13
**governed** 95:1 97:6
116:19
**government** 141:13
**grab** 29:7
**Granicus** 141:11
**granted** 95:2,20
**graph** 57:24
**graphic** 58:8,13
**great** 34:11 79:24
107:18 129:11
**greater** 58:20
**green** 100:13,15
106:16,22
**ground** 9:12
**group** 42:10 90:11
**groups** 85:8 86:24
87:1 90:4,17,25
124:17
**guarantee** 98:23
**guess** 27:13 28:4
31:3 32:14 34:8
47:17 57:16 64:16
65:9 67:20 68:19
72:12 73:5,18
76:4 84:19 89:17
96:1 101:19 102:4
109:1,14 110:14
123:5 127:16
132:13 133:8
138:18
**guys** 10:8

**H**

**hand** 8:3 135:16
149:23,23
**handle** 139:24
**handled** 80:22
116:4
**handling** 146:13
**hands** 92:11
**Hansen** 18:5
**Hansen/Marx** 3:16
**happens** 27:11
52:25
**hard** 21:18 48:20

**head** 8:2
**header** 81:7
**heads-up** 35:2
37:21
**hear** 36:15 100:25
**heard** 20:23 43:5
65:6
**heart** 99:19
**held** 16:23 52:22
**help** 48:19 82:9
91:17 92:14
109:24 128:17
**helpful** 102:18,22
**helping** 150:19
**helps** 128:9 131:14
**Hey** 106:5
**high** 54:16 57:17
**high-level** 117:19
**high-risk** 54:19
**higher** 131:17
**highest** 17:15
**highlight** 34:11
**highly** 107:22
**Hippler** 138:16
**hired** 146:25 147:2
**hold** 17:13 35:19
113:21
**home** 134:1
**Homeland** 17:6
141:5,9
**hopefully** 76:11
**host** 19:7 143:20
**hosted** 25:17,19,20
39:17,19,22 40:11
40:12,14,15,17,18
40:19,22,25 41:7
41:8 61:14 63:7
74:25 76:23 101:6
109:3
**hosting** 44:7 51:18
**hosts** 143:12,13,15
**hour** 42:9 79:22
**housed** 72:18 77:2
110:24
**housing** 80:13

**Howland** 3:18 18:9
18:25 19:9
**HTTPS** 25:13,22
26:7 44:21
**HTTPS/SSL** 24:18
**human** 83:16 84:21
84:22,24
**humans** 84:15
**hypothetical** 85:16
88:13 104:20,21
114:6,9 115:3

**I**

**i.e** 100:20
**IaaS** 62:1,8,10,19
63:3,10 73:20
76:15 79:2 122:14
**IaaS/PaaS** 34:21
**iCourt** 3:24 4:6,7,8
26:4,6,11,24
29:22 44:19,20
112:17,19,20,22
112:23,24,25
113:10,17 115:11
115:12,15,20,24
116:1
**ID** 2:12
**Idaho** 1:2,8,12,16
2:18 5:22 12:23
15:3 16:20,25
20:25 22:17 23:6
23:13,20 24:9
25:25 26:9 30:4
33:12 39:4,22
40:11,12 41:23
43:18,20 49:20
50:2 51:17,19,20
52:11,21 54:24
56:23 62:1,7,10
62:12,18 63:1,2,9
64:18 65:7,15
66:13 67:21,24
69:25 70:13 72:1
72:4 73:14 75:21
76:1,2,25 77:25
78:25 79:8,9

83:25 85:18,22
86:15,17 87:21
88:3,10 95:23
100:12,14 108:21
112:24 115:1,2
116:20,22 117:2
118:5 119:19
124:2,6 125:14
132:17 142:8,13
142:21 143:4
144:12 145:8,24
146:23,25 147:11
148:3,22,24
150:13 153:5
**idea** 146:5
**ideally** 121:13
**IDENTIFICATI...**
3:11 4:4
**identified** 6:2,11,18
7:2 8:25 9:17,24
18:3 31:4 46:15
55:5 92:2 95:23
96:24 128:8
129:18 131:8,18
**identify** 6:14 36:10
81:13 86:17 95:14
**identifying** 34:23
150:18
**identity** 95:1 112:9
112:18 113:2,20
116:9,19,21
**immediate** 122:21
**impact** 57:25 58:11
58:14,17,20,20
60:7,9,17,23 61:3
75:12,14 142:7,11
142:16
**impacts** 143:5
**implement** 21:1
128:4,20 137:16
137:22 138:6
**implementation**
119:7 141:18
**implemented** 48:22
142:22

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 163

**implementing**
127:21 132:10,12
132:18 142:11
147:23
**implicate** 98:19
**implicated** 109:18
**implications** 85:11
110:4 113:2
**implied** 23:17
**important** 7:19,24
8:8,12
**Improper** 114:6
**include** 39:9,11
42:25 43:5 46:16
51:2 56:2 125:7
128:21,25 142:10
142:19
**included** 21:6 33:9
51:25 68:17 69:16
69:18 73:12
126:24 136:24
147:4
**includes** 80:11
128:24
**including** 137:13
137:13
**incorporate** 119:3
120:3 125:7
**incorporated** 42:21
55:21
**incorporates** 42:3
82:2
**incorporating** 50:4
**incorporation**
37:25 41:18,24
**indemnification**
129:4
**indemnity** 81:17
**independent** 58:8
109:23
**independently** 57:5
**INDEX** 3:3,10 4:3
**indicated** 63:14
68:12 144:23
**indicating** 73:21

**indication** 100:5
144:2
**individual** 9:6
142:20
**individuals** 18:9
**inform** 75:13
150:19
**information** 9:8,21
12:9 16:22 17:11
17:19 18:3,5,14
19:25 21:12 22:3
22:8 23:10,23,25
24:6,7 25:7 28:11
28:22 29:14 30:11
31:17,25 32:9,13
46:10 48:11,23,24
49:4,7,19 52:16
58:14 59:15,22,25
60:2,3,4 61:2
64:25 65:2,8,16
66:8,9,15,16,18
66:21 67:21 69:13
71:13 73:5 74:16
74:20,24 75:13
78:23 80:9,16
83:6,19 84:5
93:13 96:7 99:13
99:16,20 100:1
101:7,17,22
103:15 105:5,21
106:8,24,25
107:15,17,25
109:25 110:22
113:8,11 115:14
116:24 117:3
128:11,19 132:4
132:25 136:24
139:10 143:21
144:3,6,11,18
145:18,21 146:11
146:19,20 147:2
148:1,11,25 149:5
149:15,19 150:3
150:12 151:4,25
**information-as-a...**

61:23
**informed** 10:25
33:2
**infrastructure-as...**
61:16
**initiate** 78:3
**input** 76:13
**inquired** 23:8
**inquiring** 117:24
**insight** 111:4
141:14
**Insofar** 51:17
**instance** 44:13
46:18 64:13 90:10
147:7
**instruct** 7:14 68:2
121:22 127:1
**Instruction** 68:7
**instructs** 7:13
**intact** 92:20
**integrity** 58:23
91:15,19 92:20
93:14 98:1,6,15
98:19,21 99:6,8
100:3,4,7 103:4
103:24 104:13
105:4,10 109:16
110:15 111:5
113:23 123:21
131:25 132:7
137:2
**intend** 85:13
**intended** 105:12,23
**interaction** 83:16
**interchangeably**
22:24
**interested** 145:19
153:11
**interfacing** 148:16
**interference** 68:5
**interlinking** 122:7
**intermediate**
126:21
**Interrogatory**
11:19 136:16

**intersection** 60:16
**intervene** 12:13
**intimately** 124:7
**inventory** 40:9
**investigate** 32:22
33:3
**investigating** 21:5
116:25 145:19
**investigation** 24:20
**involve** 44:10 113:5
**involved** 11:4 36:8
143:18
**ISC** 3:13 4:9 17:25
22:15 34:20,24
36:13 40:20,22
41:8 57:10 62:14
73:23 75:19 81:17
117:9,13 128:25
129:5 132:2
**issue** 21:9 61:5
76:14,23 89:15,25
90:8 91:1,20 92:2
92:3,11,15 95:7
96:12,13,17,20,23
96:24 99:23 100:7
103:4 105:4 106:9
108:2 119:15
124:11,12 150:17
150:18
**issued** 93:9
**issues** 75:15 76:24
91:5 96:18 108:21
109:15 110:18
113:13,22,24
130:6 138:5 139:5
**issuing** 82:7
**it'd** 144:23
**it'll** 80:18
**Item** 147:18
**items** 22:4 128:10

**Jessi** 34:5 71:2 89:3
116:18
**job** 147:5,13
148:25
**John** 5:18
**join** 50:23
**joining** 51:1 62:14
136:9
**Jon** 80:17 134:25
135:22
**jon.fetterly@bcl...**
2:7
**Jonathan** 2:4
**judge** 138:16 139:5
**judges** 142:12,12
143:6
**judicial** 141:15
142:20
**July** 24:25
**jump** 136:12
**June** 10:18,21 11:5
13:8 23:9
**jury** 13:15 14:1,4
48:7,15 54:8,12
54:20,24 55:21
56:1 57:5,12
69:11,15,23 70:17
71:22 73:6,12,14
74:24 117:17

**K**
**Katherine** 2:4
80:18
**katherine.keatin...**
2:7
**Keating** 2:4 80:7
**ked@dukeevett....**
2:13
**Keely** 2:10 138:18
**keep** 109:20
**kind** 12:11 25:3
52:4 56:21 58:3,6
60:20 68:5 86:22
92:21 95:7 98:16
99:20,21,22
111:18 113:22

**J**
**J-e-n-n-i-f-e-r** 5:15
**Jennifer** 1:13 3:1
4:1 5:6,15 19:19
121:22 153:5

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 164

132:10 135:2
139:11 149:23
**kiosk** 133:12,25
134:13
**kiosks** 133:3
134:11,24
**Kiteworks** 44:7
**knew** 96:6 135:23
**know** 7:6,12,14 8:5
8:15,23,24 9:2,11
10:25 14:8 16:5,7
16:15 17:14 19:4
20:23 21:11,16
22:11 24:3,3,5
27:4 28:10 29:8
29:14 31:8 32:21
32:21 33:15,18
37:13 38:6 39:2
40:7,16 44:18
45:8,15,21 46:1,2
46:17,19,21,22,23
46:23 47:9,16
48:3 49:8,11,21
49:24 50:6 52:22
54:17 57:2 59:17
59:21 62:25 64:7
64:9 65:8,23
66:19 67:4,4,25
68:3 69:18 75:17
76:16 77:1,11,17
78:1,11,15 85:25
87:3,13 92:2,18
94:5,9 95:11,14
95:19,21,22,24
99:21 100:2,3
101:20 102:6,11
106:5 107:16,25
109:3,20,24 110:2
110:16,20,21,21
110:22,24 112:13
113:1,25 114:8
119:19 122:12
123:23 125:24,25
126:13 130:19
132:12 133:9

136:21 137:1,13
137:20,24 138:1,9
138:14 139:4,9,10
141:1 145:19
146:8 147:10
148:11,19
**knowing** 144:18
**knowledge** 7:4,5,7
8:22 10:25 18:15
18:16 22:16 45:14
62:25 94:8 125:3
125:24 136:1,7
137:5 142:6

--- **L** ---

**lack** 60:2 96:13,24
98:6,6,7 117:2,2
121:7
**landed** 59:16 61:3
**language** 129:3
**late** 16:24
**law** 5:19
**laws** 60:12
**lawsuit** 7:1 9:24
12:8
**lawsuits** 12:11
**layer** 52:10
**layers** 31:15 93:18
**lead** 40:24 92:24
**leads** 29:11
**learned** 13:8
**learning** 66:1
**left** 25:9
**left-hand** 56:9
140:14
**legal** 9:19 29:7
36:13 120:6
121:20
**Leighton** 2:5 5:19
**let's** 47:24 53:14
61:7 68:9 83:1
97:22 105:5 127:2
**letter** 15:15,16,18
34:22,25 38:3,11
43:18,20 73:20
74:12,13 75:2,4,6

75:23 77:14,21
78:12,12,21 79:1
79:7
**letterhead** 78:6
**letters** 77:18
**level** 15:10 17:15
48:8 51:23 52:19
54:9 66:11 67:20
**lieu** 51:5
**liked** 99:4,13
**likelihood** 57:25
58:10,12,21,22
59:8,12,18 60:6
60:17 61:1 75:12
100:3
**limited** 7:5 8:21
52:24 80:12 114:3
134:7 142:2
**line** 9:11 14:8 18:19
**link** 25:6
**linked** 119:9,14
**list** 3:14 57:8,11
135:12 137:15
**little** 24:19 35:4
38:9 58:5 62:5
74:21 83:21
110:14 120:10
146:9,9
**LLP** 2:5
**local** 25:17
**located** 133:3
**location** 80:12
**log** 29:5,6 95:3,12
112:19,21,23,25
113:6
**log-in** 4:7 29:15
52:25 96:7 111:24
111:25,25 112:9
112:19 116:24
**logged** 29:4,12,17
**logging** 28:23,24
31:19 51:13 72:20
**logging-in** 30:3
**logo** 15:21
**logs** 29:24

**long** 16:23 17:7,13
56:22 62:12 135:2
**long-term** 121:2
**look** 16:6,13 17:20
23:10,11,16 24:16
50:16 54:11,14
55:8 58:9 68:25
77:23 80:8,18
82:5 106:14
115:13 144:25
147:18
**looked** 10:18 25:6
**looking** 11:15
36:19 51:4 53:11
55:15 58:5,7 59:7
66:4 75:16 84:15
100:18 105:7
107:3 139:8
**looks** 17:25 18:4
**lookup** 41:8
**loss** 58:9,10,19
100:2
**lot** 40:7 49:8 87:20
103:1 106:24
136:22
**low** 54:16 57:17,21
**lump** 142:24
**lying** 99:19

--- **M** ---

**M** 5:11 141:22
149:12 151:9
**magistrate** 142:12
**main** 40:9
**maintained** 77:4
**major** 11:7 46:25
**manage** 51:13,14
52:7,8 61:16
**management** 12:3
13:15 17:19 31:2
34:14,19 35:6,9
35:16 40:5 48:16
50:24 51:7 53:3
54:8,12,20,24
55:21 56:1 57:5,9
57:12 63:2 65:19

66:2 67:17 69:11
69:16,23 70:18
74:25 92:13,22
93:7 94:6 99:7
111:7,12 112:18
113:2,20 115:17
115:18 117:17
120:12 143:8,16
147:4 151:19,24
**manager** 14:1,4
20:15 23:16 48:7
71:7,17,18,23
73:6,12,15 93:3
101:6 103:23
109:3,7 115:21
**manages** 51:25
**managing** 52:16
**manipulate** 93:1
103:22 114:13
**manipulated** 94:4
104:11
**manipulation**
92:21 94:5 151:23
**manner** 85:4
**MARICOPA** 5:1
**marked** 5:4 15:9
42:19 55:20
106:21,23
**marketing** 23:12
**master's** 17:16,18
**material** 135:19
**matrix** 53:21
**matters** 8:24 19:7
**mean** 11:6 25:10
28:5,22 32:15
38:12 71:14 82:10
84:20 91:18 98:5
99:24 102:8
107:17 108:23
121:12 122:20
127:7 133:8 136:5
**meaning** 100:22
152:2
**means** 35:8 101:10
130:15

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 165

**meant** 100:24
**meet** 9:19 46:1
  64:11,12
**meeting** 20:15 89:4
**meetings** 10:24
  23:19 45:25
**mem@dukeevett...**
  2:14
**members** 41:3
**memo** 56:4 127:3
  151:6
**memorandum** 3:22
  19:18 53:9 56:19
  81:5,10 93:9
  103:14 105:8
  106:23
**mention** 107:22
  112:8 116:11
**mentioned** 13:7
  32:2 36:9 116:9
  143:24
**merely** 101:21
**met** 11:3,7 20:22
  24:25 73:11 82:8
**methodology** 59:11
  60:8
**metric** 57:24
**middle** 59:16
**migrates** 93:6
**mind** 28:7 55:15
  135:1
**minimal** 66:9 100:1
**minor** 60:9
**minute** 13:6 38:8
**minutes** 42:10
**miscommunicati...**
  103:1
**misconfiguration**
  82:22 83:13,18
  84:9,11 88:5,11
  90:9
**misconfigurations**
  97:15
**misconfigure** 85:17
**misconfigured** 85:4

87:23
**mishandled** 114:20
**misleading** 102:14
  102:25
**misspoke** 100:16
**misstatement**
  96:18
**misstates** 47:13
  64:3
**mistake** 85:12
**Mitchell** 2:10
**mitigated** 137:4,6
**mitigates** 130:24
**mix** 37:7 41:6
**Mm-hmm** 25:15
  33:25 44:23 48:19
  50:21 53:8 57:15
  59:10 67:16,24
  69:7 73:9 97:19
  100:10 131:20
**moderate** 54:16
  57:17 60:9
**modern** 25:13
**Molly** 2:10
**moment** 15:6,25
  16:19 70:20
**momentarily** 7:10
**Monday** 5:2
**monitor** 95:9
**monitoring** 99:9
**month** 14:2 57:1
**morning** 10:2
**move** 13:4 48:24
  58:21 60:5 82:11
  86:8 105:3,6
  127:10 129:19
  147:16 149:24,25
  150:6
**moved** 12:2 76:12
  92:22 111:6,12
  151:23
**moving** 37:15 38:7
  63:12 81:6 98:15
  105:1 120:18
  147:15

**multi-sentence**
  94:17
**multiple** 85:8 86:24
  87:2 117:12,25,25
  124:18 131:12

**— N —**

**N** 2:1 5:11,11
  141:22,22 149:12
  149:12 151:9,9
**name** 5:14,18 69:1
  83:6,6 153:17
**named** 68:17
  111:25
**names** 70:10
**narrow** 91:24
**nature** 30:18 112:6
**necessarily** 7:5
  60:19 79:8 90:18
  103:9 105:20
  150:17
**necessary** 8:7
**need** 8:15,16 9:2
  12:12 16:5 27:23
  29:5 34:25 38:7
  38:11,16 48:24
  64:10 80:20 87:17
  95:21 104:7 145:8
  148:24 149:4
**needed** 57:9 96:6
  120:10
**needing** 80:5
**needs** 31:25 107:13
**negative** 105:16
**negligible** 60:9
**negotiate** 122:23
  122:24
**negotiating** 32:24
  33:6,8
**neither** 42:2,2,3
  107:13 153:10
**network** 71:8
**Nevada** 24:23
  44:25
**Nevada's** 25:5
**never** 15:4 29:4,16

93:16 110:10
**new** 5:21 14:13,25
  23:16 29:13 32:6
  34:13 35:6,8,10
  35:16 36:2,15
  37:14 38:7 49:16
  54:1 56:24 65:4
  66:5 82:17 98:18
  113:8 120:9,19
  121:1,14 122:23
  125:11 150:14
  151:3
**News** 1:3 5:20
**Nicole** 1:24 153:21
**NIST** 64:15
**NIST-compliant**
  64:13
**Nodding** 8:2
**nonconfidential**
  84:5 87:6
**nondisclosure**
  107:24
**nonpublic** 58:16
  82:23 83:19 84:11
  85:4
**Nope** 36:24
**Nos** 5:4
**Notary** 153:3
**noted** 68:7 74:17
  119:16
**notes** 54:14
**noteworthy** 81:22
**nothing's** 108:24
**notice** 3:12 5:25 6:2
  6:12 7:3 8:25
  9:17
**noticed** 5:23
**notified** 21:19
  31:25 32:16 77:15
**notwithstanding**
  123:4
**November** 1:23 5:2
  153:17
**number** 9:23 11:15
  83:7 90:3 106:14

135:14 136:11,13
  136:18 137:16
  141:25 148:15
**numbers** 6:15 41:4

**— O —**

**O** 5:11 141:22
  149:12 151:9
**o-r-a-k** 5:16
**o0o--** 2:19 4:11 5:3
  152:8
**oath** 5:7
**object** 14:21 21:2
  22:19 24:12 30:6
  46:7 64:3 75:25
  76:18 78:13 86:19
  87:11 91:3 96:16
  111:20 115:23
  117:6 118:15
  125:21 126:25
  127:23 133:19
**objection** 30:19
  63:5 103:25
  108:15 114:5
  118:24 119:16
  120:5 125:2 130:5
  138:7
**objections** 7:22
  31:10 47:21 87:24
  88:6,15 91:8 92:8
  104:14 119:25
  121:10 122:18
  123:8 126:3,8
  131:1,11 134:6,19
  153:8
**obligated** 49:5,19
  65:9,11
**obligation** 65:13
  81:17 144:9
**obtaining** 65:15
**obviously** 130:6
  135:22,24 139:3
**occur** 24:8
**occurred** 93:24
**occurring** 58:22
  59:18 115:3

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 166

occurs 26:4
October 20:22
odd 145:23
Odyssey 4:7,8 14:8
  40:4 50:13 62:19
  149:17,21 150:5
  151:12,13,15
offering 23:17 62:4
  67:4,18 147:17
office 8:24 31:24
  32:15 33:1,12
  37:9 42:21 43:21
  45:7,11,16 46:4
  46:14,18,22 65:1
  77:25 78:10,11,20
  121:17 126:20
  132:18
office's 41:15
Officer 16:22 18:4
  18:5 30:20 147:3
  148:25
official 1:7 5:22
OFS 143:9,11
  144:9 146:15
oh 15:25 16:2 36:1
  91:24 93:4 108:5
  124:16 147:20
okay 5:13 6:20 9:16
  10:4 11:3,9 12:4
  12:17 13:5,20,23
  15:6,15,18,25
  16:4,11,19 17:3
  17:20 18:18,24
  19:14 20:7,19,25
  21:8,14,21 22:22
  23:3,5,13 24:1,21
  25:22,25 26:16,19
  26:22 27:2,7,16
  27:20,25 28:13,19
  29:1,16,19 30:12
  30:16 31:21,24
  33:16,22 34:7
  35:4,25 36:5,8,14
  36:25 37:5,9,16
  37:18 38:5,8,22

39:13,16,21 40:6
  40:10,15 41:2,15
  42:17 43:17,23
  44:5,10,13,20
  45:6,16,22 46:3
  47:2,7,12,14,24
  48:6,13 50:2
  52:11 53:14,14,23
  54:4,7,15,20 55:2
  55:10,17 56:1,4
  56:15,18,21 57:4
  57:23 59:7 61:7
  61:22 62:1,5 63:9
  64:16 66:17 67:14
  67:19 68:7 69:12
  69:25 70:6,13,20
  71:16,21 72:8,25
  73:4 76:21 77:6
  77:17,20,23 78:9
  78:19,25 79:13,17
  81:12,20 82:18
  83:21 84:3,8 85:1
  85:15 87:21 88:24
  89:5,15 90:7,15
  91:17 94:2,13,24
  97:3,22 98:24
  100:7 103:13
  104:18,22 113:12
  113:21 114:11
  115:15,20 121:23
  125:5,5,12,19
  126:1,11 127:2,11
  128:13 129:8,16
  131:16,23 132:16
  134:14 135:10
  136:11 137:15
  138:25 139:20
  141:14,20,24
  149:10 152:4
Omundson 1:7
  2:18 5:21 13:24
on-boarded 120:22
on-premise 63:8
once 16:16 29:1,6
  29:23,23 33:23

40:23 84:22,24
  91:5 94:21 120:20
one's 84:20
ones 119:1
ongoing 19:6 43:8
online 133:18
open 86:7 111:16
  111:17 151:22
open-loop 123:22
operate 87:9
operates 86:15
  143:11
operating 52:7
  91:1,6 92:1
opportunity 9:3
  33:20 45:17
  118:20 119:23
opposed 25:18 60:2
  96:13 132:19
option 127:7 128:4
  128:6,7 129:12
  130:3,3,11,16,21
  131:9,24 132:9,11
  148:22
options 51:24 59:8
  59:13 127:5,8,20
  128:1 129:21,23
  132:9 147:9,15
ORAL 1:11
order 28:11,15
  48:24 64:9 80:6,9
  80:23 107:16
  122:5 132:23
  148:21,24
ordinary 146:3
org 17:25 18:8,13
organization 18:14
  50:18,19 58:17
  67:9 127:14
organization-spe...
  67:7
organizational
  3:13 72:20
organizations 51:1
original 55:13

91:11,12,20 92:3
  92:11 93:9,12
  99:11 101:22,23
  102:1,2,8,10,11
  103:9,9,21 104:11
  110:3,24 114:2
  123:14 137:3
  152:2,3 153:13
out-of-the-box
  140:15
outages 108:24
outcome 153:11
outline 147:13
outlined 110:11
  111:19 127:8
outright 146:10
outset 141:2,3
outside 49:5 62:3
  125:22 130:7
outstanding 136:25
overall 57:7
overbroad 104:14
  130:5 138:7
overlap 50:10
  139:3
overlying 51:24
oversight 32:6
Overstatement
  103:25
Overview 3:24 4:6
owns 22:15

---

**P**

P 2:1,1
p.m 5:2 42:16,16
  80:3,3 135:9,9
  152:6
page 3:4,11 4:4
  6:24 15:20,20
  29:2 34:8 53:15
  56:10,10 57:17,23
  61:8 81:5 89:6,17
  89:20,22 117:11
  117:11 127:4
  147:18,21,22
pages 16:5 56:8,12

56:13
Paisner 2:5 5:19
paper 102:9
paragraph 34:12
  34:13,15,17 37:19
  38:10 61:13 68:9
  71:5 81:6,9 82:19
  94:17,17 97:4,4
parameters 97:8
parent-child 86:25
  124:19
part 15:2 23:9,18
  29:21 33:20 34:13
  34:18 35:2,6,10
  35:11 36:2 37:21
  38:7,25 39:5
  44:16 47:15 50:17
  51:2,15,25 55:13
  57:7 65:6,17,19
  66:5,10 68:18
  69:10,21,23 70:8
  70:12 71:19 72:6
  74:1,6,9,17 77:13
  77:15 78:17 79:18
  81:9,12,20 82:5
  82:16 83:23
  103:12 109:6
  112:9 117:21
  119:14 120:12
  126:17 132:16
  133:1 134:4,16
  140:18 141:8
particular 10:14
  11:2 47:3 59:14
  67:13,15 118:4
  119:5
particularly 32:12
parties 107:23
  151:19
partners 97:7
party 10:11 43:14
  44:5 68:23 153:11
pass 66:22 84:16
  132:4
patches 52:8

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 167

patching 52:8
path 131:8 132:1
paths 127:21
pause 11:10 13:5
15:7 38:8 88:20
paying 105:18
payment 40:18,18
payments 36:20
37:2,2
pen 114:22
pending 108:12
penetration 52:5
people 18:21 36:10
138:15
per-product 72:14
percent 108:24
130:20
perfect 87:15,16
90:20 92:7
perform 13:25 52:6
57:13 139:14,17
performed 13:13
13:14 14:19 90:25
performing 147:5
period 10:15
permission 76:13
permissions 114:19
116:9
person 36:10 53:2
59:2,5 90:21
111:10 123:17
133:20 139:2
personal 7:5,7 8:22
62:24 125:23
perspective 138:20
pertains 153:12
physical 102:9
pick 101:1
picture 75:10
piece 41:7 116:5
place 14:15 49:25
54:25 71:7 92:18
98:23 107:21,24
122:1,15 128:16
places 86:3

Plaintiff 1:5 2:3
plan 99:15 117:20
planning 20:25
51:1
plans 50:22
platform 51:11,16
please 5:13,14 7:17
8:5,15,17 16:7,15
17:20 19:16 25:2
26:17 34:17 55:8
88:22 89:21
108:13
plenty 130:7
138:14
PLLC 2:11
PO 2:12 82:7,10
point 9:3 11:4
19:21 34:12 49:15
120:25 126:22
127:16,18,20
139:9 144:24
148:18 150:12,16
151:2
pointing 86:12
points 57:18
portal 4:7 12:1,16
25:7 26:24 39:11
40:10,12,19 41:2
41:10,16 44:19,21
67:14 79:19 109:9
112:17,19,20,22
112:23,24,25
113:10,17 115:11
115:12,15,20,24
116:1 133:10
149:9
portion 30:25
40:16,17,18 41:2
41:5,5,10 47:1
69:22
portions 40:13,15
40:23,24 41:9
44:17
posed 20:11,12
100:12

position 16:20,23
17:9,13 41:15
76:9
positive 105:15
possibility 59:17
133:2 134:3,17
possible 59:9,12,17
59:20 60:1 61:3
100:3 104:5,9
128:10
posture 128:16
potential 11:17
31:4 82:22 84:9
86:1 90:8 126:21
127:8 129:23
130:21,24,24
131:4 136:15,23
137:1,12
potentially 13:4
41:17 66:15 83:7
83:18 84:16 85:25
91:4 92:12 95:22
104:17,19 111:15
114:17,22 127:25
130:13 132:1,4,5
132:15 149:9
151:22
power 117:2
practice 77:20
pre-assess 117:12
pre-August 136:1
predate 136:9
preliminary 38:16
premarked 5:24
9:24 10:4 135:17
preparation 10:6
11:1 18:24 19:5
61:10 81:10
prepare 7:8 9:18
56:18
prepared 53:23
preparing 92:24
106:9
present 2:16 23:20
127:20

present-day 18:14
presentation 140:7
presently 52:21
presents 11:17
136:15
press 9:22 11:17,21
12:6,21 13:1,4,12
13:19,21 19:10
21:1 22:9,17,23
22:23,25 23:1,3,7
23:21 24:10,11,17
25:1,17 33:18
34:6 38:20 41:3
44:25 45:5,8,8,12
45:18 46:4,16,19
46:25 47:5,17,19
48:17 53:24 56:5
59:4 61:14 67:3
70:7,17,19 71:6
72:24 83:9,19
84:12,16 85:3,6
85:10,14,20 86:3
86:4,5,8,15 87:4,8
87:22 88:5,11
89:4 90:12,15
91:11 92:25 94:4
94:9,25 95:10,13
95:19,23 96:14,19
98:18 100:21,23
101:5,8,12,21
102:17 103:8,20
105:12 108:4,19
109:5,17 110:5,8
110:17 111:15
112:12,14,15
113:3,6,14 114:12
114:14 115:4,5,21
116:3 117:4
118:19 119:9
121:8,18 122:2,8
122:16 123:21
125:13 126:2,7
127:21 128:4,20
131:21 132:2,10
132:13,14,19

133:3,16 136:14
137:2,17,22 138:6
141:2,11,18 142:7
142:11,16,21
144:3,7,13 145:13
145:17 146:7,14
146:22 147:23
149:9 151:14,21
presume 23:24
pretty 46:1 81:15
81:18 123:19
136:20,20
previous 94:8
106:12 120:17
previously 32:3
47:9 72:1 141:4
prior 12:2 16:25
17:4 36:6 49:21
53:2 54:25 55:22
62:14 92:21 99:6
126:22 135:23
privileged 9:7
probably 19:12
24:25 54:5 80:10
121:21
problems 116:21
proceed 150:14
proceeding 9:14
proceedings 11:10
15:7 88:20 153:9
153:13
process 13:21
14:15 21:15 30:4
30:25 31:6 32:8
32:11 34:14,19
35:7,9,11,16
36:20 38:15 39:20
43:8 44:1,2 49:16
49:24,25 50:16,17
51:3,7 52:16 54:1
57:12 65:4,19,20
66:18 72:22,24
74:9 76:11,17
77:7,7,13,15 82:5
82:17 96:8,10,13

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 168

96:25 111:14
112:7 119:22,24
120:3,9,18,20,21
123:4,6,23 125:11
143:19,25 150:9
151:6
**processed** 75:22
**processes** 53:4
57:20 117:12
**processing** 34:20
73:22 75:19
**procure** 145:9
**procured** 13:16
**procurement**
120:20,21 143:18
150:17
**procurement-type**
146:13
**procurements**
121:4 150:20
**produced** 6:10 7:3
9:5,23 46:13
138:19
**product** 10:18
13:15 14:5,7,11
14:20,23 22:12,14
23:11,17 32:23
38:15,20 39:19
41:16 43:25 45:3
45:4 48:7,11,16
48:18 49:10,17
50:14 54:10 55:3
56:1 57:14 59:15
60:18,21,24 62:3
66:13 67:11,12,14
67:17 69:11,16
70:10 72:10,23
74:16 82:14
108:22 109:9
113:17,19 115:8,9
115:10 117:21,23
118:1,6,10 122:11
123:12 125:14
127:10 131:21,22
147:17 149:25

**product-specific**
67:8
**products** 14:8,16
32:7 33:7 39:13
39:19,21 40:1,8
49:8 50:9,10,11
50:20 51:11 52:20
62:2,18,19,20
64:24 65:2 67:5
67:10,22 108:4,18
115:6 116:6,22
118:21 120:23
121:1,3 143:19
**program** 32:4 57:7
66:10 120:11,12
144:14 147:3
148:16
**programs** 50:24
**project** 3:24 54:21
**promised** 105:23
106:5
**prompt** 8:6
**prone** 106:2
**proof** 63:23,24
65:25 66:4,25
**properly** 83:22
**proposal** 35:12
36:3
**proposed** 130:10
**protect** 81:17 111:4
**protected** 107:2
**protecting** 100:4,6
**protections** 129:5
**protective** 80:6,9
80:22
**provide** 8:1,5 9:1
10:16 23:6,25
24:6 28:11 32:6,9
32:13 34:22 38:14
44:4 49:6,19,20
51:3 64:12 65:9
65:11,21,25 66:9
66:12,24 69:12
73:4,19 74:11,22
74:23 75:1,3,5

77:8,21 78:6,7,23
79:7 81:17 99:20
99:25 105:13
114:25 115:15
116:1 117:3 130:1
131:8 132:1 144:3
144:6 147:14
148:1,8,10
**provided** 8:19 22:3
23:11 43:19 47:10
59:15,22 64:24
66:19 67:20 69:1
74:13,20,24 75:2
76:15 77:24,25
93:16 96:6 97:12
99:15,16,19 100:5
100:14,15 106:25
109:2 117:15
118:2,3 132:11
137:9,17,22 140:8
151:25
**provider** 34:22
37:8 61:16,23
62:2,19 63:10
73:20 77:4,16
95:1 112:10
116:19,21 128:21
148:6
**providers** 37:7
62:10 77:14 79:2
122:14
**provides** 30:9,13
30:14 51:22,22
68:24 77:18 101:5
101:22 103:20
107:12 115:18
129:3
**providing** 38:4
74:4 98:18 105:20
112:13 129:21
133:2 142:5 143:4
145:23 146:10,18
**proving** 107:19
**PRT** 68:16 69:20
82:21 94:25 95:4

116:19 119:8
**public** 28:24 41:3
57:21 83:9,10
84:17 85:21 87:6
91:13 92:12 94:9
105:19 111:3,16
111:17 115:13,14
123:13,13,23
133:13 151:22,22
153:3
**public-facing** 26:25
27:14,17 28:14,16
28:21 29:21,23,25
30:5,18 31:4,15
83:11,11 95:8
133:14 134:12,23
**publicly** 12:1 26:12
28:2,6,8 52:24
53:5 83:15 84:4
**publicly-available**
83:16
**publicly-facing**
30:11
**publicly-identifia...**
83:5
**published** 87:3
**pull** 101:7,22 149:6
**pulled** 92:12
102:17 140:10
**pulling** 11:11
**purchase** 14:14,14
48:25 82:13
149:25
**purchased** 48:16
48:18,22 49:17
72:23
**purchases** 50:7
121:1,14,14
122:22
**purchasing** 38:15
38:17 49:14
**purports** 26:20
**purpose** 34:25
38:11 50:4 55:2
105:12

**pursuant** 5:24
**purview** 127:18
**push** 83:18 85:13
146:9
**pushed** 85:10,14
**put** 6:3 15:11 16:14
17:21 33:23 53:10
69:19 73:25 76:8
80:6 85:20 106:1
135:11

**Q**

**Q3** 20:21 22:6
138:1
**qualified** 6:16 51:9
**quality** 76:14,21
**quantify** 147:14
**quarter** 144:24
**queries** 101:7,14,21
**question** 7:16,17
8:15,19,20 12:22
20:12,17,19 24:2
27:13 32:15 60:7
62:21 68:19 72:12
75:8 86:11 91:10
91:24 93:8,10,23
95:25 100:18,19
100:22 102:13,24
106:25 107:8
108:12,13,19
110:14 113:21
119:24 120:1
121:21,22 123:5
129:14,15 131:23
133:6 134:15,16
135:25 145:12
151:11
**questioning** 69:17
**questionnaire**
66:22 67:2 72:19
117:18 118:2,5
120:14 128:15
129:3 148:8,9
150:2,23
**questions** 6:20,25
7:9,12,21 8:2,13

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

Page 169

8:13,22 9:10,13
19:4,23 20:9,10
49:13,18 50:16,18
50:19 51:12 65:20
66:23 67:6,8,11
99:18,25 100:9,12
103:2 106:18
107:3 117:19
119:2 128:15
136:25 141:20,25
142:1,24 146:14
146:15 149:14
**queue** 9:22 11:17
12:6,18,21 13:1,4
13:12,21 19:11
21:1 22:10,24,25
94:11 133:3
136:14 137:17,22
138:6 141:11,18
142:7,11,16,21
144:4,7,13 145:14
145:17 146:7,14
146:22 151:14
**queues** 141:2
**quick** 35:18 42:9
70:20 138:18
151:11
**quickly** 88:18
**quite** 135:14

---
**R**

**R** 2:1
**Rackspace** 44:7
74:25
**ranked** 129:22
**reach** 28:14
**read** 34:17 82:24
95:5 107:13
108:13,14 114:21
128:5 133:6,7
**readily** 109:12
**reading** 69:17
**ready** 109:12
144:23
**real** 138:18
**really** 100:19

102:10,22 104:7
120:10,24
**reason** 9:1 45:22
63:18,19 64:1
68:14 70:6,13
71:10,13
**reasons** 138:5
**recall** 16:8 23:15
54:15 145:14
**recap** 135:13
**receive** 29:6 59:25
60:5 106:8
**received** 9:21 22:8
31:16 60:3 63:24
64:19 66:8 71:22
71:23 72:2 113:9
118:5
**receives** 124:1,25
**recognize** 17:22
20:7 26:19 27:8
29:2 88:24
**recommend** 146:21
148:12 149:20
150:4,13 151:3
**recommendation**
146:24 150:7
**recommended**
148:3
**recommending**
131:9 149:1
**record** 5:14 8:10
42:14 79:23 80:5
106:20 108:8,9,14
133:7 135:5,7
**recorded** 115:19
153:8
**recording** 7:21
**records** 90:2
**recover** 107:20
**recovery** 60:13
**redacted** 83:7,12
83:25 84:6
**reduce** 130:21
131:14
**reference** 11:12

35:18 71:17 89:6
**referenced** 10:6
11:18 35:23 66:12
67:3 91:21 136:15
136:18
**referred** 93:24
140:12
**referring** 10:20
22:25 23:1 37:24
38:20 61:24 83:24
84:10 90:1 105:25
106:16 119:22
**reflect** 10:5 18:13
48:8
**reflected** 18:22
21:16 48:9 50:5
79:10 81:13 107:9
110:17
**refuse** 148:10
**refused** 117:17
**regard** 8:1 52:12
**regarding** 9:22
31:17 51:21 54:24
96:24 99:17
104:24
**regardless** 73:10
119:15 133:13
**regards** 91:10
110:23
**register** 27:24 28:7
28:16 29:23
**registered** 29:17
98:25 112:6,13
**registers** 29:24
**registration** 29:15
30:3 31:6 111:18
**regular** 107:2
**regularly** 46:1
**regulatory** 58:18
60:12 63:15 64:11
68:13
**reject** 82:7,10
129:24 147:16
**relate** 91:19
**related** 80:9,14,16

105:21 143:19
144:3,7 145:16
146:7,14 153:11
**relates** 26:10 97:10
107:8 122:13
**relation** 36:22 67:3
**relationship** 78:5
119:10
**relationships** 87:1
124:20
**relative** 109:17
**relevant** 64:19 68:3
75:24 101:20,24
101:25 103:7
109:25 113:25
114:4 133:16
135:19 137:20
139:11
**reliant** 47:3 122:11
**relies** 81:23 90:20
105:19
**rely** 51:6 87:14,16
106:9
**remediating** 52:6
**remediation**
114:25
**remember** 69:1
**reminded** 74:5
**remotely** 5:1
133:18 153:6
**renewal** 41:13
**rephrase** 8:16
115:25
**report** 18:4,11
68:18,20 69:16,17
70:1,3,8,11,12,15
72:17 73:13,25
144:12
**REPORTED** 1:24
5:1
**reporter** 7:20 8:10
101:1 153:1,3
**reporting** 18:19
**represent** 5:20
26:20

**REPRESENTED**
1:13
**request** 35:12 36:3
45:8,12,17 65:7
78:11,20 117:20
118:18 137:10
**requested** 43:17,18
50:2 59:16,22
60:4 64:18 67:21
69:3,8,10,13 72:1
78:25 108:14
133:7 149:15,19
150:3,12 151:4
153:14
**requesting** 65:15
**requests** 12:9,10
66:25 93:5 143:21
**require** 33:18 39:4
39:13 41:11,17,24
64:9 117:3 121:15
125:14,17 129:2
140:3
**required** 31:8
39:20 64:8 149:24
150:5
**requirement** 28:6
38:18
**requirements**
58:18 60:12 64:15
72:5,7,9,13 73:11
74:2 82:8 111:19
117:13 132:3
**requires** 72:13
118:19
**requiring** 34:19
**resemble** 48:8
**reserved** 152:7
**respect** 6:10 7:1
9:16 30:5,18 32:1
32:16 41:21 46:15
52:12 60:7 72:25
92:4 97:18 98:25
98:25 109:16
110:14,17,19
116:22 118:9

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 170

119:8 126:2
141:17,25 143:2
144:9 148:11
**respond** 7:16
146:15,17
**responding** 38:13
118:23
**response** 8:19
11:18 29:11 57:4
86:9 94:3 101:1
107:12,14 119:21
136:16 145:5
**responses** 7:15 8:2
8:6 100:13 106:18
**responsive** 137:21
**restate** 120:9
136:21
**restated** 66:23
**result** 68:6
**results** 84:11
114:24 123:6
**review** 9:22 10:1
11:17,21 12:6,21
13:1,4,12,14,14
13:18,19,20,21,21
13:25 14:10,19
16:15 19:10,10,12
19:15,20,22,24
21:1,15 22:9,17
22:23,23,25 23:1
23:3,7,22 24:10
24:11,17 25:1,3
25:17 32:3,6 33:9
33:18,20 34:6
38:16,20 44:1,2
44:25 45:5,9,13
45:18 46:5,16,19
46:25 47:1,6,16
47:16,18,19,25
48:7,8,9,17 49:3
49:10 50:9,12
53:10,24,24 56:5
57:5,13 59:2,4
61:14 66:7,10
67:3 70:8,17 71:6

72:24 81:12 83:9
83:9,19 84:12,17
84:21,22,24 85:3
85:7,10,14 86:3,8
86:15 87:4,22
88:5,12 89:4
90:12,15 91:12
92:23 94:4,9,12
94:25 95:10,13,19
96:14,19 98:19
100:21,23 101:6,8
101:12,21 102:17
103:8,20 105:12
108:4,19,23 109:2
109:6,17 110:5,8
110:17 111:15
112:12,14,15
113:3,6,15 114:12
114:14 115:4,5,22
116:3 117:4
118:19,21 119:9
121:8,18 122:2,8
122:16 123:21
125:13 126:2,7,7
127:21 128:4,20
131:21 132:2,10
132:13,14,19
133:3,16 136:14
137:2,17,22
139:12,15,17
140:15 141:2,11
141:18 142:7,11
142:16,21 144:4,7
144:13 145:14,17
146:7,14,22
147:24 149:9
151:14,21 153:13
**reviewed** 9:19,20
14:24 15:4 53:2
109:4 126:1
**reviewing** 60:21
84:18,20 123:18
**revise** 33:17
**revoked** 96:10
**RFP** 36:15 42:24

43:3,8,12 117:11
132:12,20
**right** 58:21 79:21
81:2 84:16 106:14
121:5 143:15
**right-hand** 18:2,2
27:2 34:8
**rise** 76:24
**risk** 3:22 19:18
34:13,18 35:6,8
35:16 49:21 50:17
50:24 51:7 52:18
53:8,21,22 54:9
54:16 56:4,19
57:9,17,17,18,21
65:18 69:4,8
74:14,15,17,20
75:6,13,24 76:5
77:9,12 81:5,7,12
81:13 82:4,6,20
88:13 89:13 93:9
93:24 94:3 97:23
98:4,5,7 101:20
101:24 103:7,14
105:8,9,15 106:22
107:10 110:17
114:4 120:11
122:14,20 124:13
126:21 127:5,7,13
128:8,11 129:11
129:12,20 130:1,4
130:10,10,11,15
130:16,16,19,20
130:21,24,25
131:15,17,23
132:16 133:1
134:16 135:19
139:17 147:4,7,9
149:16 150:19
151:5
**risks** 11:18 81:13
121:24,25 128:7
128:18 131:4,4,24
136:15,23 137:12
144:16,20 147:13

147:15
**River** 2:11
**roadmap** 50:25
**role** 95:3,20 120:17
**room** 87:20 103:1
110:23
**Roscheck** 36:12
**RPR** 1:24 153:21
**rules** 9:12 60:12
**running** 105:22
**runs** 143:11

**S**

**S** 2:1
**SaaS** 50:13 67:18
**SaaS-operated**
71:8
**safe** 144:15 146:22
**San** 2:6
**Sara** 1:7 2:18 5:21
13:22 121:21
135:25 138:22
139:3
**Sara's** 139:23
**satisfy** 51:20 72:4
**saying** 75:23 123:2
146:10
**says** 27:3 35:5 59:7
61:14 63:13 94:24
128:20
**scenario** 85:24
**scenarios** 87:22
115:3,3
**schedule** 114:25
**schematics** 99:22
**science** 60:14
**scope** 39:24 62:23
68:1 79:3 88:7,14
108:15 118:16,25
119:11 120:6
121:21 125:22
127:1 130:7,9
134:11
**screen** 6:3 15:12,13
16:14 17:21 33:24
53:11 70:22 93:22

**screenshot** 66:1
**scroll** 56:9 100:8
**se** 26:15
**search** 41:4
**second** 54:5 56:5
94:17 97:4,5,25
**section** 127:4
**secure** 44:8,21
49:12 55:9,11
118:14 119:20
**secured** 21:24
**securely** 25:8,10
**security** 13:13,14
13:18,25 14:19
16:22 17:6,11
18:3 25:23 26:7
26:10,15 31:15,17
32:3,6,6,10 33:3,9
33:20 41:11 44:1
44:2 49:9,11 50:8
50:12,13 51:21,23
52:22 55:3 57:7
57:13 65:20,24
66:10 68:21 72:20
76:15,22 80:13,14
82:7 83:7 85:8
86:23 87:1 90:4
90:11,17,24 91:23
92:17 93:13,17
98:22 99:3,15
101:14 104:4
111:4 117:13,18
117:20 118:21
119:7 120:11,15
121:24 123:20
124:17,24 126:22
128:14,16 130:6
132:3,6 133:20
134:7 138:13
139:14,15,17
141:5,9 142:2
143:21 145:25
147:3,3 148:7,25
150:2,18,18,22
**security-wise**

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

**ER-1944**

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 171

148:22
see 15:13 27:2
  29:12 34:15 53:14
  56:8,9,10,10,12
  57:17,18,20 58:1
  59:8 64:14 68:9
  70:22,23 71:3,17
  81:7 89:8,17
  94:18 99:4 107:8
  127:4,5 128:2,18
  145:13,16
seeing 16:8
seek 8:17
seeking 79:9
seen 6:7 10:7 15:16
  15:23,24 16:9,16
  34:1 53:18 89:10
  99:13
select 86:16,23,23
selected 43:9
selecting 87:19
sensitive 82:21
  83:24 84:5,8
sentence 37:20
  61:19 63:12 68:10
  68:16 69:19 70:25
  71:5,11 73:18,25
  75:16 82:19 83:23
  94:24 95:17 96:22
  97:24,25 98:3,17
  140:14
sentences 95:18
  96:3,22
separate 14:9
  36:24 95:25 96:24
  109:9,9 110:7
  113:17,19 117:13
  125:13,15 132:20
  139:21 140:2
  141:12
separately 56:11
September 20:21
  22:6 138:1 144:23
Serve 4:6,7,8 11:25
  12:16,25 14:19

15:1,3 21:24 26:4
  26:6,10 27:17
  28:20 29:20,22
  30:18 31:22 32:1
  32:17 33:4 36:22
  36:23 39:9 40:10
  40:16 41:22 49:22
  49:22 52:13,23
  67:12 68:18 69:21
  70:4,9,14,16
  71:19,19 73:1
  79:19 83:5 100:23
  108:22 109:18
  110:19 111:9
  113:18 115:7
  116:2 117:4
  118:13 119:10,20
  122:2,11,17
  123:16 124:1,25
  126:14 149:17,21
  150:5 151:12,13
  151:15
Serve's 125:6
service 1:3 5:20,21
  32:4 42:3 50:13
  67:12 74:6 82:14
service's 107:1,7
service-specific
  67:7
services 4:9 18:14
  36:19 37:12 39:7
  44:11 51:18 62:8
  62:20 63:3 67:5
  79:2,14 117:10
  122:14 129:1,7
Services' 51:8
set 16:11 72:13
  85:1 97:8
setting 76:1
settings 101:10
share 107:25
shared 91:11,13
  107:23 112:18
  114:24
She'll 29:8

sheet 23:12
shortcoming 96:14
shortened 44:2
Shorthand 153:1,3
show 15:8 26:16
  27:7 29:1 63:23
showing 6:4 64:12
shown 63:23
sic 59:9
side 29:24 83:14
  92:18 139:24
  140:14
sign 27:24 28:7,17
sign-in 28:12 31:6
Signature 152:7
signed 55:22 73:8
significant 119:15
significantly 60:24
similar 13:18 48:7
  151:5
similarly 70:17
  146:17
single 81:21
sit 43:13
site 25:3 26:13,24
sits 66:18
sitting 103:10,22
  118:12
situation 44:6
  48:21
skipped 136:11
slide 3:19 89:7
slightly 32:14
slowly 8:8
SOC 68:17,20,25
  69:13,16,22,24,25
  70:3,8,14,19
  71:21 72:2,4,16
  73:12
social 83:6
software-as-a-ser...
  61:15
sole 96:17
solution 35:13
  61:15 64:23 97:25

98:4,8 104:8
  114:10 132:4
somebody 45:23
  46:21
sorry 30:13 43:24
  93:4 104:25
  116:12 119:4
  133:5 147:20
sort 8:3
sounds 79:24 96:12
  144:22,25
speak 6:16 7:4,6,19
  7:24 8:8 18:25
  19:1 46:14 64:7
  111:14 113:13
speaking 96:3 98:3
  112:16 117:16
  123:2
speaks 124:11
specific 13:3 20:13
  50:4 51:11 64:17
  88:11 105:21,21
  108:19 112:1
specifically 7:1
  8:23 11:13 19:5
  23:13,21 29:20
  68:17 69:8,19,20
  70:10,16 74:4,23
  81:4,16 105:9
  112:3,15 113:7
  128:23 141:17
  145:13
specify 112:6
speculation 87:12
  111:21 114:5
  122:4,19 123:9
spell 5:13
spelled 129:10
spells 130:3
spoke 19:8 21:9
  64:16 110:13
  113:4
spot 35:19
spring 36:4
springtime 57:1,3

SQL 101:7,14,21
SSL 25:12,13
staff 143:6
stand 66:20 109:11
standalone 122:12
standard 59:11
  60:8,19 72:13,21
  74:9 80:18
standards 72:15,21
standing 34:23
  73:21 75:18
standpoint 138:13
  144:15
stands 96:17
start 6:20 29:13
  61:8
starting 57:16
  61:13 70:25
  135:13
state 5:13 24:10,21
  37:7,20 38:10
  45:12,18 46:5,20
  47:5,19 50:23
  75:16 80:15 88:4
  112:11,19,22,23
  112:24 116:18,24
  125:17 141:4,10
  142:8,12,21 143:3
  148:23 153:3
stated 50:25 52:3
  68:13 71:15 73:19
  93:11 137:3
statement 11:16
  63:16,20,22,24
  64:20 81:7,14,21
  82:20 83:3 97:23
  105:9 107:10
  117:11 128:8
  136:14,18 137:9
  137:12
statements 70:7
  109:5
StateRAMP 50:23
  51:5,8,10 52:17
states 1:1 15:21

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 172

24:16 68:10 71:6
75:2 90:1,3
112:16 113:4
118:22 140:8
**Statewide** 17:11
**stating** 34:22 98:8
**statuses** 90:3
**statutory** 63:14
64:11 68:12
**Stenographer** 93:5
101:2 104:23
108:7
**stenographically**
153:8
**step** 13:6 105:2
149:4
**steps** 21:14 25:3
46:18 126:21
147:25
**stick** 23:3
**storage** 52:9
**stored** 34:24 51:19
75:21 76:10,23
77:2
**stores** 57:20
**storing** 34:20 73:22
75:18
**street** 2:11 53:6
**strike** 12:21 14:17
22:2 37:10 74:12
105:5,5 113:21
143:1
**String** 3:16,17,18
3:20,21,23
**strong** 57:10
**subject** 111:17
**subjective** 60:20
**submission** 87:16
90:21 91:2 92:2,7
**submit** 27:21 83:4
**submitted** 11:25
12:8,12,14,14,16
30:15 36:23 85:25
124:2
**submitter** 87:16

151:17
**submitting** 26:14
27:23 31:1 90:21
111:10 123:17
**subscribed** 153:16
**sufficient** 82:4
107:14
**sufficiently** 31:8
118:13 119:20
129:12 130:16
**suggesting** 102:15
102:24
**suit** 68:6
**Suite** 2:11
**supervision** 117:24
118:1
**supplier** 51:15
**support** 136:17
**supporting** 148:8
**supposed** 137:25
**Supreme** 144:12
145:24 146:23
147:1,11 148:3,23
150:14
**sure** 6:24 9:10 14:3
15:24 19:3 24:1
36:1 38:22 42:11
42:12 55:9 79:25
83:22 86:9 108:24
122:21 136:2
**surprised** 74:22
**surprising** 75:3
**surrounding** 80:14
**switch** 88:18
126:11
**switching** 16:19
67:25
**sworn** 5:7 153:6
**system** 12:3 27:17
28:8 29:22 31:2
40:5 52:7,13,14
53:3 55:6,8,9 56:2
57:20 59:23 63:2
66:2 67:17 84:23
87:15 90:23 91:6

91:25 92:13,22
93:7,14,18 94:7
95:1,2 96:2,5 99:7
99:14,17,22
105:18,19,22
106:1,2 111:7
112:18 113:2
115:17,19 116:2
116:19,22 117:20
123:19 124:6,21
124:25 130:19
132:8 143:8,9,11
143:16 144:9
145:8 146:16,23
149:7,17,21 150:5
151:16,19,24
**system's** 84:24
**systems** 17:19
28:20 80:13 108:4
148:23

---

**T**

**T** 5:11 141:22
149:12 151:9
**tab** 15:10
**table** 58:6,9
**take** 13:6 15:25
23:10 24:16 42:9
55:8 66:21 70:20
77:3 79:23 80:8
80:18 105:2 135:1
145:7
**taken** 1:16,23
21:15,17 42:15
46:18 80:2 126:20
135:8 145:8 153:5
**takes** 27:5 71:7
**talk** 9:25 28:5
56:11 125:12
147:8
**talked** 29:21 38:24
41:12 68:11 74:2
75:20 98:24 105:9
105:10 126:13
143:8,9
**talking** 10:8 29:19

38:19 42:18 43:17
44:13 47:25 62:17
71:1 72:10 80:4
84:3,21 89:15,24
97:17 102:9 103:4
113:22 114:1
116:7 118:25
124:23 130:6
147:6,7
**talks** 71:16 83:23
147:23
**tampered** 98:22
**team** 112:21
**technical** 108:9,12
**Technologies** 9:20
10:25 11:3 25:21
25:22 26:1 31:18
33:2 46:1 49:7
50:14 61:21 63:13
68:11 76:9 99:9
116:5 117:16
118:3 137:18,23
143:14 148:16
151:25
**Technologies'**
11:16 62:3 136:14
**technologists**
127:13
**technology** 56:2
102:20 117:19
127:12
**tell** 32:11,12 106:5
145:22
**telling** 48:6 141:3
147:11
**Ten** 17:8 42:10
**tenets** 105:17
**tense** 43:5
**termination** 150:11
**terms** 4:9 18:18
35:14,17,22 36:6
37:11,25 38:23
39:4,14 41:12,18
41:24 42:3,18
43:15 50:4 51:6

55:19,23 65:14,17
69:5 72:16 73:5
79:10 81:24 82:2
91:18 92:3 96:1
117:9 118:8 120:3
120:13 121:7,13
121:18,23 122:1
122:15 123:2,7
125:7 126:17,23
128:22,25 129:6
148:6 150:1,23
**test** 46:19 47:17
114:22
**tested** 107:2 112:24
**testified** 5:8 80:10
80:11
**testify** 6:1,10 47:9
**testifying** 30:22
**testimony** 11:13
47:13 64:4 90:8
96:17,18 103:6
117:5 119:9
129:18 130:23
142:5,10,15,19,25
143:4 145:14
153:7
**testing** 46:16
107:19 119:6
**tests** 52:5
**text** 106:2
**texts** 100:13
**thank** 5:17 16:11
42:13 80:1 81:1
101:4 107:6
138:25 140:23
147:20 149:10
151:7 152:4
**thereof** 153:9,11
**thing** 9:7 12:11
41:21 48:20 72:21
86:22 128:6
130:20 135:21
**things** 6:22 8:3
10:9 31:7 41:17
41:23 52:3 66:20

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 173

| | | | | |
|---|---|---|---|---|
| 98:9 102:8 106:2 | 131:13 134:5 | 102:17 103:8,20 | **transfer** 44:8 | 41:7,10 43:19,22 |
| 110:16 114:21 | 135:1 141:8 145:7 | 105:13 106:6 | **transferred** 100:20 | 44:25 45:17,25 |
| 122:21 129:9,18 | 150:10,12 153:6,6 | 108:4,19 109:2,6 | **transmitted** 75:22 | 47:11 48:7 49:7 |
| 130:7 131:7,18 | 153:8 | 109:17 110:5,9,17 | 76:23 | 50:3,8,14 54:8,23 |
| 137:4,5 138:10 | **times** 54:4 131:12 | 111:13,15 112:12 | **transmitting** 34:20 | 55:21 61:14,21 |
| 139:24 | **title** 16:20 | 112:14,15 113:3 | 73:23 75:19 | 62:3,18 63:2,13 |
| **think** 10:8,17 14:9 | **titled** 19:18 | 113:15 114:12,14 | **transparent** 76:10 | 64:18 65:8 66:8 |
| 19:13,23 21:4 | **to-do** 57:11 | 115:4,5,22 116:3 | **traverse** 48:12 | 66:12 67:4,12,14 |
| 22:23 23:8,15 | **today** 5:23 6:10,25 | 117:4 118:19 | **traversing** 34:25 | 67:16,19 68:4,11 |
| 28:22 30:9,13 | 7:9,20 8:5 9:13 | 119:9 121:8,18 | 52:23 55:6,8 | 69:12 70:6 72:2 |
| 36:9 52:24 55:12 | 10:6,8 11:14 | 122:2,8,16 123:21 | **trial** 139:5 142:17 | 72:24 73:1,4,18 |
| 56:21 59:14 75:5 | 18:25 19:2 42:2 | 125:13 126:2,7 | **true** 63:18 64:2,20 | 73:19 74:5,11,13 |
| 75:9,11 76:8 | 43:13 46:13 80:10 | 127:21 128:4,17 | 64:21 68:14 72:25 | 75:17 76:9 78:1,3 |
| 79:21 81:18 85:23 | 117:5 118:12 | 128:21 131:21 | 131:20,22 153:9 | 78:6,7,10 79:7,18 |
| 85:23 86:6,21 | 135:20 136:19 | 132:2,10,13,14,19 | **truly** 70:12 | 80:15 85:18 87:22 |
| 88:21 98:10,16,24 | 137:20 141:3 | 133:17 137:2 | **trust** 6:22 | 92:18 94:21 95:9 |
| 101:10 102:13 | 146:21 | 139:15,18,22 | **try** 8:5 19:3 23:3 | 96:4,22 97:12 |
| 103:11 106:12,15 | **today's** 9:18 11:1 | 140:2 144:17 | 28:4 35:5 49:3 | 99:9,16 100:15,16 |
| 111:8,21 119:11 | 19:5 80:21 | 147:24 151:21 | 58:13 120:22 | 101:5 103:16 |
| 122:5 124:11,19 | **told** 20:20 22:5 | **Tool's** 71:6 | **trying** 31:5 65:9 | 106:8 107:12,24 |
| 128:2 129:14 | 69:15,21,23 102:2 | **tools** 31:17 45:13 | 74:19 101:19 | 108:3,20,22 109:5 |
| 135:4 136:5,20 | 102:5 111:2,2 | 45:18 46:5,19 | 102:4,6 103:2 | 111:19,21 112:4,6 |
| 139:3,23 140:8,8 | 114:23 123:14 | 47:18 87:23 88:5 | 119:25 | 115:5 116:5,21 |
| 141:4,24 145:1 | 145:3 | 88:12 113:6 | **turn** 19:16 47:24 | 117:3,15,24 118:2 |
| 146:15,17 | **tool** 11:21 13:19,21 | **top** 15:21 51:11 | 89:6,16,21 109:10 | 118:6,9,10,22 |
| **thinking** 134:5 | 14:1,4 20:13 | 52:9 57:18 77:4 | **turning** 57:23 | 121:3 123:15 |
| **third** 43:14 44:5 | 22:18,23 23:1,4,7 | 127:4 | **two** 10:9 17:14,14 | 125:17 128:4,20 |
| 68:23 144:24 | 23:22 24:7,10,11 | **topic** 13:5 55:18 | 18:8 95:18 96:3 | 131:20 132:10,11 |
| **third-party** 34:21 | 24:17 25:1,17 | 137:8 | 96:22 119:11 | 132:13 135:16 |
| 38:3 44:3 51:2,14 | 33:18 34:6 38:20 | **topics** 6:1,17,21 7:1 | 127:20 129:23 | 136:8,14 137:16 |
| 61:16 63:10 68:21 | 44:25 45:1,5,9 | 8:24 9:16 11:8 | 149:14 151:19 | 137:17,21,23 |
| 77:14 114:22 | 46:17,25 47:6,19 | 118:25 119:12 | **Tyler** 3:19,25 4:5 | 138:6 139:15 |
| 132:12,20 | 48:17 53:24 56:5 | 135:12 138:21,21 | 9:20 10:6,24 11:3 | 143:9,11,14,19,20 |
| **thought** 65:6 | 59:4 61:14 67:3 | **tortuous** 68:5 | 11:16,21 13:15,19 | 144:2,11,19 145:2 |
| **three** 22:4 57:18 | 69:20 70:8,17 | **touched** 98:16 | 14:5,7,11 15:1,3 | 145:16,23 146:5 |
| 116:6 | 72:24 83:9,19 | **trackability** 28:12 | 15:21 19:24 22:1 | 146:13 147:23,25 |
| **three-page** 53:16 | 84:12,17 85:3,7 | **traffic** 101:16 | 22:3,9,17 23:6,17 | 148:16,24 149:16 |
| **tied** 60:24 91:24 | 85:10,14,20 86:3 | 112:5 | 24:10,17,25 25:17 | 149:20 150:4,13 |
| 110:7 | 86:4,5,8,15 87:4,8 | **trail** 30:14,17 53:1 | 25:19,20,22,25 | 150:15,22 151:4 |
| **time** 10:15,15 17:9 | 89:4 90:12,15 | **trails** 91:14 | 31:18,25 32:16 | 151:25 |
| 19:8,21,25 33:19 | 91:12 92:25 94:4 | **training** 65:24 66:3 | 33:2,7,10,12 | **Tyler's** 14:19 25:18 |
| 48:20 52:15 54:3 | 94:9,25 95:10,13 | **transcribed** 153:9 | 36:22 37:10,12,12 | 26:10 40:8 52:12 |
| 54:5,7 56:5 57:13 | 95:19 96:14,19 | **transcript** 7:23 8:4 | 37:13 38:1,25 | 67:9 70:7 71:7 |
| 80:25 103:16 | 98:19 100:23 | 107:13 153:9,13 | 39:13,19,21 40:14 | 144:23 145:9,9 |
| 120:12 126:22 | 101:6,8,12,21 | 153:14 | 40:15,17,18,25 | **Tyler-hosted** 41:4 |

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 174

44:17
type 12:9 14:10
  43:19 68:17,20
  72:5,21 77:21
  78:11 79:1 87:6,7
  87:7,7 90:2,11,16
  90:24 91:15 99:8
  99:10
types 12:5,20 13:3
  13:3 30:14 48:12
  54:17 55:6,7
  60:23 82:21 83:10
  83:15,24 84:8
  85:7,8,19,24
  86:23,23,24,25
  87:2,2,18,18,18
  90:4 99:12 101:11
  124:4,5,14,14,14
  124:15,18
typically 63:21
  66:1 69:3 78:3
  101:15
typo 56:16

U
ultimately 80:8
  145:9
unable 9:1
undergoing 50:12
underlying 51:16
  61:17 73:20
undersigned 153:3
understand 8:12
  8:14,14 19:6
  21:21,23 22:24
  28:5 29:10 31:3,5
  31:18 35:5 46:3
  48:19 49:11 58:14
  61:9,18 62:21
  65:10 73:24 80:21
  82:1,9 83:1,22
  84:10,20 85:10,11
  85:16 86:9,11
  87:17 90:7,13,17
  91:18 92:14,17
  93:14 96:8 98:4

99:5 100:19 102:5
  102:5,6,19 103:3
  103:5 104:4
  109:22,24 110:10
  113:1,24 119:17
  122:6,10 123:1
  124:10 126:15
  128:17 129:14,25
  130:15 132:9
  133:11 138:19
understanding 6:9
  11:21,23,24 12:4
  12:7,19,23 13:2
  22:1 25:16 32:5
  38:23 44:24 49:1
  49:12 53:9 55:1
  58:19 59:23 60:11
  64:19,20 66:17
  79:6 80:20 83:4
  85:6,19 86:2,14
  87:14 91:13 93:17
  93:19 96:21 97:10
  97:13 100:11
  101:13 109:7
  112:17 114:12
  117:1 119:10,21
  124:16 132:3,7,22
  139:21 140:1,5,21
  142:6,9 143:5
  144:19 147:6,10
  151:24
understood 8:18
  10:19 20:1 28:3
  39:8 40:21 43:13
  48:13 60:25 77:5
  81:25 83:20
  101:18,18 102:3
  102:23 103:17
  105:24 109:13
  110:12 124:22
  127:15 130:8,22
  137:7 138:3,17
underway 32:25
  37:14 39:3 121:5
  122:22 125:20

150:8
unencrypted
  101:16
unintended 124:20
unique 53:23
  116:24
UNITED 1:1
unknown 20:18
  52:15 145:5
unknowns 55:12
  87:20 136:22
  137:13
unpurchased 48:17
untrue 68:15
unusual 126:5,10
uploading 53:2
use 22:15 24:10
  25:13,22,25 31:18
  31:22 40:7 43:5
  46:19 47:17,19
  51:5 62:1,7,8,10
  62:11 63:3,10
  86:1 112:10,12
  120:18 124:6
  142:6 145:9,20
user 29:23 98:25
  103:22 111:18
  112:1,6
users 95:2,20 96:25
  112:13 115:13
uses 44:25 45:3
  101:7 113:8,20
  115:4
usually 14:13
Utah 112:25
Utah's 112:25
utilized 50:20 54:2
  74:9
utilizing 99:9

V
v 1:6 5:16
valid 25:12
validated 99:11
vendor 11:7 35:15
  35:17 43:7,9,11

43:14 49:4 51:15
  51:24 52:9 59:25
  61:15,19,20,21
  65:18 74:8 77:4
  78:4,22 85:11
  117:13 122:25
  128:16 132:12,20
  141:11
vendor's 72:16
  78:24
vendors 32:9 34:19
  35:11 43:19 62:7
  67:25 74:2 75:1
  117:12,25 118:1
  120:15 147:4
verbal 8:2
verbally 20:15
verified 93:15
  111:6
verify 91:15
versa 23:1
versus 5:21 9:5
  28:6,21 57:25
  59:12 110:3,24
  122:11 133:17
vet 49:10 55:14
  95:11 132:2
vice 23:1
Victor 5:16
Videoconference
  1:17
videoing 8:4
view 28:23 45:17
  95:3,12 117:1
  127:16,18,20
  129:10 130:17
  138:20 139:9
  151:2
viewable 28:24
viewed 12:1 44:19
  84:17
viewing 114:3
  151:22
vis-à-vis 70:8 76:16
visit 44:16,17

visited 25:5
visiting 44:14
vulnerabilities
  51:14 137:1
vulnerability 52:5
  114:18

W
W 2:11
w/ 3:19
WA 1:24
wait 7:15 148:15
walk 25:2 57:15
  58:3 61:8 81:21
want 6:21,23 7:23
  11:20 13:5 15:19
  16:4 30:21 35:4
  47:8,10 53:8
  55:16 56:22 61:8
  61:18 64:14 73:24
  83:15 84:19,19
  89:24 98:16
  113:23 119:17
  126:11,16 130:14
  135:13
wanted 20:22 35:1
  37:20 38:6 68:8
  100:8 107:15,17
Washington
  112:22,23
wasn't 44:1 55:13
  55:14,17 59:15,21
  60:5 102:24
  106:24
way 8:7,17 23:25
  63:19 64:7 68:14
  78:7 87:9 90:10
  91:15 102:14,20
  102:25 104:10
  127:12 129:23
  130:11 143:1,24
  145:6 148:22
  153:11
ways 85:9
we'll 6:25 9:25 38:8
  56:11 80:6,17

Courthouse News Service v. Omundson

30(b)(6) Jennifer Dvorak

Page 175

106:14
**we're** 6:24 8:4,21
  32:23 33:6,7 50:8
  51:4 52:18 62:17
  62:17 66:4 71:21
  84:3 85:12 89:15
  89:24 100:6 102:9
  103:4 105:7
  113:22 114:1
  117:24,25 118:25
  121:1 124:23
  135:4,20 136:23
**we've** 5:23 7:2 10:4
  22:7 32:22 42:8
  46:15 47:25 50:22
  79:21 80:5 97:16
  97:24 98:10,16
  99:2 101:10
  106:23 109:4,15
  110:16 113:25
  116:25 125:6
  126:13 134:25
  135:14,19 136:5
  136:19,20 137:19
  143:8,9 151:6
**web** 12:1 25:13
  44:10 51:8 62:8
  133:10,14,24
  134:11,12,23
**web-based** 62:19
  133:24 134:10
**website** 24:24 25:5
  25:8,9,14 26:25
  28:13,15,23 31:16
  40:19,22,23 44:14
  44:17,18
**websites** 24:17,18
  25:13,18,18,18
  30:5
**week** 20:16 145:5
**went** 24:18 25:8
**whatnot** 142:2
**whereof** 153:16
**whoa** 43:24
**willingly** 144:3

**Wilson** 18:9,25
  19:9
**Wintertime** 57:1
**wish** 131:10
**witness** 5:6 6:1 7:3
  9:5,6 46:13,13
  138:19 153:6,7,16
**word** 145:20
**words** 24:5 102:19
**work** 42:10 66:14
  78:2,8 109:11
  112:4 145:21
**worked** 35:13
  120:13 141:4
**workflow** 99:21
**working** 13:17
  16:25 17:3,5,7
  50:8 66:5 81:4
**works** 23:24 58:4,6
  65:10,14 99:17
  112:7 128:14
  143:25
**would've** 19:13
  20:8 36:3 44:19
  71:23 75:9,11
  99:4,13 102:17
  107:15,17 118:20
**wouldn't** 45:14
  46:2,2,9 47:4
  49:14 73:10,11
  74:22 122:14
  133:15
**write** 114:20
**written** 8:4 137:10
**wrong** 49:2 89:20

**X**

**X** 5:11 141:22
  149:12 151:9

**Y**

**yeah** 10:17 19:3
  20:8 22:14,16,20
  29:9 30:13 31:13
  36:7 43:9 46:9
  51:17 63:7 64:6

68:2 76:4,19
  82:25 86:21 87:13
  88:1,8,16 90:5
  92:10 97:2 99:3
  104:16 105:14
  106:17 107:5,5
  108:2,17 111:23
  114:8,17 116:15
  121:12 122:5,20
  123:11 125:4
  126:6 131:3
  133:23 134:9,21
  135:6 136:4 138:9
  138:23,24 139:1
  139:13 140:11
**year** 36:4,6 56:24
  57:1 65:25 71:24
  120:10 144:24
**years** 17:8,14 60:15
**Yup** 140:13,22
  141:7 147:21

**Z**

**zero** 130:20
**Zoom** 2:4,10,17
  80:22

**0**

**1**

**1** 3:12 5:4,24 11:12
  11:19 15:20 56:8
  56:15 57:17 128:4
  128:6 130:3,11,16
  132:9 135:11
  136:16 147:18
**1:04** 42:16
**1:21-CV-00305-...**
  1:6
**1:58** 80:3
**10** 3:21 33:23 35:19
  37:17 70:21 94:14
  106:13,14 116:17
**10-minute** 79:23
**100** 108:24
**1087** 2:11

**11** 3:22 15:20 19:15
  21:16 48:2 53:12
  61:11 63:13 73:17
  81:4 97:23 100:8
  105:8 106:23
  127:3 141:25
  147:8,19,19
**11:50** 71:2
**12** 3:23 20:3 21:17
  93:20
**12:04** 5:2
**12:54** 42:16
**13** 3:24
**14** 3:25 15:9 16:11
**141** 3:6
**14441** 1:24 153:21
**149** 3:7
**15** 4:5 6:15 16:14
  135:14
**151** 3:8
**16** 4:6 6:15 26:17
  137:16 138:21
  139:8
**16th** 71:2 94:20
**17** 4:7 6:15 27:7
  138:21 139:8
**18** 4:8 6:15 19:19
  29:2 138:21 139:9
**19** 4:9 5:4 35:20
  38:24 41:19,25
  42:19 43:14 50:5
  55:20 79:11,17
  117:9 118:8 123:7
  125:8 126:17

**2**

**2** 3:13 15:20 17:21
  56:10,15 68:17,17
  68:20,20,25 69:13
  69:16,22,24,25
  70:3,8,14,19
  71:21 72:2,4,16
  73:12 127:4
  131:24 132:11
  147:18,21,22
  148:15

**2:14** 80:3
**2013** 15:16
**2021** 16:24 17:1,4
  50:1 135:22 136:1
  136:9
**2022** 1:23 5:2 10:18
  11:5 13:8 19:19
  153:17
**208** 2:13
**22** 10:21
**28** 15:16

**3**

**3** 2:5 3:14 34:8
  53:15 56:10,16
**3:43** 135:9
**3:50** 135:9
**30(b)(6)** 1:11 3:1
  4:1 6:1 9:5 39:25
  40:3 46:13 55:18
  62:23 68:2 153:5
**300** 2:11
**31st** 20:22
**3384** 1:24
**342-3310** 2:13

**4**

**4** 3:15 56:12,13
**4:13** 152:6
**415** 2:6

**5**

**5** 3:5,12,13,14,15
  3:16,16,17,18,19
  3:20,21,22,23,24
  3:25 4:5,6,7,8,9
  56:8,12,13,15,16
  56:16
**5/18/22** 3:16
**5/27/21** 4:5
**5035** 89:7
**5037** 89:17
**5042** 89:21
**5044** 90:5
**50955** 1:24
**5117** 34:9

Courthouse News Service v. Omundson                    30(b)(6) Jennifer Dvorak

**5303** 109:1
**5304** 107:5
**5531** 53:15

**6**

**6** 3:17
**6/30/22** 3:17
**675-3400** 2:6

**7**

**7** 1:23 3:18 5:2
  117:11
**7/14/22** 3:19
**7/15/22** 3:15
**7/6/22** 3:18
**7387** 2:12
**7th** 2:5

**8**

**8** 3:19 88:22,24
  97:18 140:10
**8/18/22** 3:22
**8/19/22** 3:21
**8/24/22** 3:23
**8/28/13** 3:25
**8/8/22** 3:20
**83707** 2:12

**9**

**9** 3:20 6:15 11:15
  106:15,21 136:11
  136:13,18
**94111** 2:6
**9th** 153:17

# Exhibit K

# CNS Daily Reports Style Manual

## I. Introduction and Style Manual

### A. Overview

### B. Coverage

### C. Docketing

### D. Structure of Report Entries

### E. Summaries

### F. Specific Style Guidelines

### G. Order of Report Entries

### H. Messages

## II. Common Errors

## III. Specific Terms & Dinger Keywords

## IV. Coverage Do's & Don'ts

## V. Uploading

## VI. Uploading Do's & Don'ts

## VII. Pitching the News

CNS_000001

# CNS DAILY REPORTS

# I.   INTRODUCTION AND STYLE MANUAL

## A. OVERVIEW

CNS provides subscription-based legal news services in an increasingly competitive field. The key points we compete on are **speed**, **thoroughness, accuracy** and **full-text availability.** Speed, thoroughness and accuracy will be described in greater detail below. The process for making full text available is outlined in "Uploading Do's & Don'ts" (Section VI).

Our competitive edge is based on live coverage. That edge consists of the summaries written by reporters and the speed at which they get their reports out to subscribers. The reports keep subscribing law firms informed about the latest litigation, particularly cases affecting their clients, and allows the firms to quickly determine the nature of the complaints filed each day. For courts visited every day, reporters should strive, through  their own discipline and in their dealings with the court, to publish a report in the evening that covers new cases filed earlier that day. For courts not visited every day, reporters should strive to cover all new cases filed since their last visit.

The reports need to be thorough and accurate. Reporters must include all parties in the cases they cover (with the exception of asbestos cases; see below). And reporters should include a full-text copy of all major cases as part of their coverage.

In general, use the rule, "When in doubt, report it" and "When in doubt, upload it."

### One of the worst errors a CNS reporter can make is to not report a case that should have been reported.

The only way to avoid missing cases is to thoroughly track case numbers and make sure you've seen each and every civil complaint filed. Cases cannot fall through the cracks – reporters must make sure they are seeing and accounting for all new civil cases filed in the courthouses they  cover, as a condition of their employment.

The aim of the CNS Daily Report is to capture information of interest to our subscribers in a way that is complete, brief and interesting by entering the information into the CNS Complaints Program. This manual provides a comprehensive reference on  the basics of compiling a solid CNS report, including coverage, style, structure and  common errors. It also includes a rough guide to the cases that deserve a full-text copy.

## B. COVERAGE

In general, we report on any case where a business, public entity or another non-individual is included  among the defendants. These include:
- Businesses
- Federal and state agencies, cities, municipalities, school districts
- Individuals doing business as (dba) a corporation

- 1 -

CNS_000002

- Trusts, Estates, Trustees and Estate Holders or Representatives, also called Estatees
- Doctors, lawyers, dentists, accountants or other professionals being sued for actions stemming from their work. These can often be identified by titles after the name, such as MD and DDS.

**Famous individuals.** Reporters should report cases against famous individuals, even though we generally do not report cases where all the defendants are individuals. Reporters should report a case if the individual defendant is famous (e.g., Bill Clinton, Martha Stewart), notorious, recently in the news or the case is simply unusual and interesting. However, do not automatically assume that someone with the same name as a famous person is, in fact, that famous person (think Michael Bolton from "Office Space"). Do not write that Mr. Doe is a congressman or a professional basketball player unless the complaint explicitly says so, or you know for sure.

**Interesting cases against individuals.** Reporters should skim through cases against individuals, if it won't cost extra money, in order to determine if a case is interesting. If a case against an individual is at all interesting or newsworthy, report it.

### *Federal Court*
We summarize all cases against non-individuals, including "mc" or "ms" cases and white-collar or otherwise interesting/newsworthy criminal cases for which a press release is issued, with the following **exceptions**:
- Mortgages/foreclosures in which a bank is foreclosing upon an individual's home, though we do report when a business property is being foreclosed
- HHS (Human and Health Services) decisions and appeals of Medicare decisions
- Prisoner petitions filed pro se (Don't look through every prisoner petition to see if the prisoner has an attorney but if you notice a prisoner is represented, report it)
- Social Security appeals
- Student loan collections
- Writ of habeas corpus
- Cases with "mc" or "ms" as the letter combination that are filed pro se by vexatious litigants with a pre-filing order against them.

### *State Court*
We summarize all cases against non-individuals, with the following **exceptions**:
- Change of name
- Civil protection/stalking orders
- Criminal
- Driver's license suspension
- Family/domestic (including child support, custody, divorce and annulment)
- Habeas corpus/prisoner petitions filed pro se (Don't look through every prisoner petition to see if the prisoner has an attorney but if you notice a prisoner is represented, report it)
- Municipal court matters (including small claims cases and, in California, limited jurisdiction complaints)
- Mortgages/foreclosures in which a bank is foreclosing upon an individual's home (We do report cases in which a bank is foreclosing on a business property)
- Social Security
- Student loans
- Summons
- Tax cases (Though your spider might return them, the entries should be

- 2 -

**ER-1954**

CNS_000003

deleted from your report before publishing. If your court does not have a spider and tax cases are filed there, talk to your editor about how to report them).

**Sealed cases**. We do not report sealed information. If a sealed case has inadvertently been made available to reporters, the reporter should NOT report on the case and should bring the mistake to the attention of court personnel. If a court publishes limited information about a sealed case, such as its general nature and case number, we do report that information. If the parties are not sealed, we can publish that information. If the parties are sealed, they should be reported as "Under seal." The summary should include the phrase "Case filed under seal."

## C. DOCKETING

Daily Courts: Report to the database only cases that you know we want to report but for which full text is not available on the first day docket information is available. Then look for the case each day until at least 90 percent of your cases would normally be reported, at which point you should include the docket in the published report and stop looking for the case.

Two exceptions: Continue to look for and eventually report cases that are (1) obviously newsworthy or important or (2) were requested by a client. Intersperse the docketed cases you include in your report among other cases for which you don't make full text available. Arrange them all by seeming importance.

Courts we don't visit every day: Include the docketed cases in your published report, then look for the case for two subsequent trips and report from full text when you get the case.

If a court has particularly bad access and following this policy would mean we don't write full-text summaries on a high percentage of cases, let your editor know and we'll work out a specialized plan for that court.

If a case number is unused look for three months from when it should have been used. After that, circle it as unused and stop looking for it. Generally speaking you should look every day for one week, then once a week for two weeks after that, then once a month until 3 months after the case should have been used.

If you report with temporary numbers it is your responsibility to update the numbers every day. If a temporary number still has not been assigned a permanent number three months after it is filed, ask Lisa Williams (lwilliams@courthousenews.com) to delete the number from the database. If you are reporting from a Pacer court, confirm that the temporary number is no longer on Pacer before asking for it to be deleted. If the temporary number is still there, we cannot delete the case.

## D. STRUCTURE OF REPORT ENTRIES

The report entry for each case you write about will be comprised of three sections: the data fields, the case identifier and the summary. This chapter explains how to write and format each section.

### *Data Fields*
The data fields are where you enter basic information about the case, including the names of plaintiffs, defendants, judges and lawyers and case numbers.

- 3 -

CNS_000004

**Parties**

List all parties, separated by semicolons. Do not use a comma after the business name, except to introduce a modifying phrase, such as "a Florida company." Do not capitalize the word "corporation," "company," "limited partnership," etc., except where it is part of a proper name.

*Example*: "John and Jane Limited Partnership, a  Florida limited partnership."

List *all* defendants, including dbas, fkas or akas. If there are John or Jane Doe defendants, write "Does." Do not include the numbers after "Does." Never use "et al" (meaning "and others") for parties. Always write them all out.

*Exception:* When reporting asbestos cases, write out the first five defendants followed by ", (asbestos defendants), et al." rather than listing each defendant.

**Individual defendants**. You can leave off "individually" or "an individual" unless it is something like "individually  and dba XYZ business" or if it adds information, like "individually and as director of human resources."

If the complaint lists something like "Jim and Jane Smith, individually and as trustees of the Jim and Jane Smith Trust," we should write it like the following: "Jim Smith; Jane Smith, individually and as trustees of the Jim and Jane Smith Trust."

**Class or representative actions**. Write out the entire phrase, where applicable.

*Examples*:
"Jim Smith, on behalf of himself and all others similarly situated" or
"Jim Smith, as guardian ad litem to J.D., a minor" or
"Jim Smith, as trustee of the Jim and Jane Smith Trust"
"Jim Smith, by next friend Jane Smith"

**Out-of-state corporate parties**. If a corporation is out of state, we list the state where it was incorporated.

*Example (if your report is from outside California)*:  "Courthouse News Service, a California corporation."

**In-state corporate parties.** If a corporation is in state, this information  is not necessary. The same goes for partnerships, joint ventures, etc.

**Abbreviation**. When listing the parties, you may abbreviate "Corporation" to "Corp." and "Company" to "Co.;" "doing business as" to "dba;" "formerly known" as to "fka" and "also known as" to "aka." Leave the periods or slashes out of "aka," "fka" and "dba." Do not abbreviate the terms if you use them in summaries.

**Acronyms.** Acronyms following party names should be capitalized with no periods.

*Example*: "Wells Fargo Bank NA; Does"

**Commas**. Eliminate commas wherever possible. Commas within the proper party name can be used, but a comma is not necessary before "Inc.," "Corp.," "Co.," "LLC," etc. *Example*: "ABC Inc." <u>Not</u> "ABC, Inc."

**Middle names and initials**. Include middle names and initials for parties, according to how  they appear on the complaint, but not for attorneys.

- 4 -

CNS_000005

### *Other Fields*
**Case number**. In state court, write the entire case number, including any prefixes, as a general rule. In federal court, leave out dashes and preceding zeroes.

*Example for federal court cases:* write 3:15cv425. Not 3:15-cv-00425.

**Judge**. Write only the judge's last name, where available, and omit suffixes. If no judge is listed, leave the field blank.

**City.** Fill in this field only when we report on cases filed and housed in multiple courthouse locations within a given county or court section.

**Local lawyer.** Write the first and last name of the lead lawyer. The lead lawyer is the one who signed the complaint. For transfers and removals, list both the lead plaintiff attorney and lead defense attorney, when available. If the lead plaintiff attorney is not available, put "NA" or "Not Listed." For self-representing plaintiffs, write "Pro se" or "In pro per," according to the phrase used by your court.

If a lawyer is representing him or herself write the lawyer's name followed by "(Attorney Representing Self)," all in the local lawyer field.

*Example:* "John Smith (Attorney Representing Self)"

Be careful when you put "Pro se" as the plaintiff attorney for removals. In e-filing courts defendant attorneys who file removals often put "Pro se" in the plaintiff field even though the case was not filed Pro se. If you can look at the exhibits without paying, look to see if the original complaint is attached. The civil cover sheet lists attorneys as well. You can also search our database. If you don't know, put "NA" or "Not listed." Don't put "Pro se."

**Local firm**. Write the first two names of a law firm's name, without commas or other punctuation. Leave out "LLP," "PC," "PLLC" or any other such designations.

*Example:* "Larry Moe" for the firm "Larry, Moe & Curly" or "Bert Ernie" for "Bert & Ernie LLP."

If the lawyer is a sole practitioner, leave this blank. We don't list the firm's name if it's "John McCarthy" of the "Law Office of John McCarthy" or "John McCarthy" of "John McCarthy & Associates" because it is redundant.

### *Accuracy*
Accuracy in our reports is of the utmost importance. If you misspell a party's name, the error will be transferred into our searchable database. Subscribers can specify certain "dingers," or keywords that they want flagged, such as "employment" or "Procter & Gamble." If you incorrectly write "Proctor & Gamble," the subscribers will not receive the proper dinger. (See the Specific Terms & Dinger Keywords list.)

### *Case Identifier*
The identifier establishes the main cause(s) of action/case category(s). We introduce this with a brief descriptive phrase about the nature of the complaint, such as "Securities" or "Product liability." Always start with the main cause of action. Be as specific as possible and use dinger keywords where appropriate.

*Examples:*
"Contract."
"Employment and race discrimination."

- 5 -

ER-1957

CNS_000006

**Damages.** Do not list "damages" as a cause of action. It is not a cause of action and most complaints ask for damages. Indicating as much does not add to the understanding of the case and should therefore be avoided. You should, however, report the amount of damages sought unless it is a standard jurisdictional minimum. Generally speaking monetary amounts should appear as a stand-alone sentence, with the exception of a request for punitive damages, which should be noted because it ups the ante.

*Example:* "Plaintiff seeks $4 million in punitive damages."

**Multiple causes of action**. If there is more than one cause of action you want to include – a contract case involving unfair competition allegations, for example – list a maximum of four causes of action, choosing the most important ones as best you can. Those that involve intent, such as fraud, are more important than those where no intent is alleged, such as an action for accounting.

*Examples:*
"Contract and unfair competition."
"Employment, gender discrimination, retaliation and sexual harassment."

**Class actions.** The phrase "class action" should appear in the cause of action statement for all class actions.

*Example:* "Class action for false advertising."

If the cause of action is otherwise only one word, that word can appear before "class action." Otherwise "class action" should appear first with "for" after it.

*Example:* "Contract class action."
*Example:* "Employment class action."
*Example:* "Class action for bad faith."

Exception: In California there is a cause of action called PAGA (Private Attorneys General Act). These cases can be class actions too but are not always class actions. Look for the word "class action" or for "class action allegations" somewhere in the suit to help determine whether to call it a class action.

**Declaratory or injunctive relief complaints.** Only use "Declaratory relief," "Declaratory judgment," "Indemnity" or "Injunctive relief" as causes of action if there are no other causes alleged and you can't tell what law or contract the plaintiff is suing about. The former are desired remedies, not causes, and should only be used as causes of action when you have no other option.

**Specific laws.** For common laws, translate into keywords wherever possible. For example, use "Antitrust" instead of "Sherman Act" or "Trademark" instead of "Lanham Act." Only a few federal laws can be shortened to their acronym (see Specific Terms & Dinger Keywords), but state laws and more obscure ones should always be written out.

*Example*: "Truth in Lending Act." <u>Not</u> "TILA."

## E. SUMMARIES

After the identifier comes the actual summary. These should be thorough, accurate and concise – not an easy combination.

- 6 -

CNS_000007

(281 of 297), Page 281 of 297
Case: 24-6697, 03/06/2025, DktEntry: 10.9, Page 281 of 297
Case 1:21-cv-00305-DCN Document 60-14 Filed 12/15/22 Page 9 of 25

### *Party References*

**General party references**. You will usually refer to parties in a summary as "plaintiff(s)" and "defendant(s)."

*Example:* "Defendant hit plaintiff in the head with a bottle."

**Specific party references**. In cases with multiple plaintiffs and defendants, you might need to specify by saying "plaintiff Sherlock" or "defendant Watson." When you cite a specific corporate party, use the whole name or an abbreviated version that amply captures the name.

*Example*: For "Wells Fargo Bank," say "defendant Wells Fargo" rather than "defendant Wells."

**Individual references.** When referring to specific individuals, use their last name unless more than one party has the same last name and put "plaintiff" or "defendant" before the last name on the first mention. If there is more than one party with the same last name, write "plaintiff" or "defendant" followed by the full name.

If one party is listed in the plaintiff field, use the word "plaintiff" in the summary. If more than one is listed, use "plaintiffs" in the summary. Use the same logic for defendants. Do not count "Does" as a party for this purpose.

**IMPORTANT**: It is crucial that you never interchange the terms "plaintiff" and "defendant." This exposes us to libel lawsuits. Always carefully proofread each report to make sure you do not mistakenly accuse a plaintiff of the defendant's alleged misconduct! This warning is particularly relevant to inexperienced reporters.

**Removals and Transfers.** Put the court from which the case was removed and the cause of action, which you can glean from the nature of suit code in federal court. The cause of action might be listed on the docket for state court transfers.

*Example:* "Removal from San Francisco County Superior Court. Contract."
*Example:* "Transfer from the Northern District of California. Contract."

Do not upload PDFs for transfers or removals when compiling your reports. If someone requests a transfer tell them to download it from the original court. If someone requests a removal make the notice of removal available for download followed by the original complaint.

### *Writing Style*

**Be brief**. Make sure to include all relevant details, but aim to keep it short. Never use a long phrase when a short one will do. Most summaries will be one or two sentences, but those for more complex cases can be longer. These include class actions and major business disputes, as well as antitrust, environmental and sexual harassment cases. But keep in mind that even the meatier cases can be boiled down to three or four well-worded sentences. Generally speaking the longest summary you write should fit in the summary box in record view in the complaints program, when viewed in fullscreen mode, without having to scroll.

**Be specific**. If a plaintiff was injured by medication, specify the medication. If a famous rapper or rock band was sued, name the band or artist. If someone was harassed, give a few examples of what happened. If stock prices dropped due to manipulation, say how much they dropped. If someone was "the subject of police brutality," tell what happened - if he was hogtied, say he was hogtied; if beaten, say

- 7 -

**ER-1959**

CNS_000008

he was beaten; if shot, say he was shot. Avoid legalistic generalization.

**Be definitive**. Do not write "allegedly" or "claims." Report all cases as though the facts in the complaint were true. We include a disclaimer at the top of every report stating that all allegations are just that, allegations, and should not be understood as fact.

**Keep it simple**. Use the simple version of equivalent words.

Examples: "says" rather than "states;" "white" instead of "Caucasian;" "black" rather than "African-American."

Avoid using "etc." If there is something to add, we should say it. If not, it's pointless to make a general allusion to undefined allegations.

**Avoid legalese. Lawyers are not inherently good writers, so please avoid parroting their jargon.** We can't stress this point enough. Pretend you are in the kitchen telling your mother what happened in the case. For example, you would not tell her that, "Defendant's failure to build, equip and maintain a construction area caused plaintiff to make unexpected contact with a depression in the ground, causing him to suffer severe personal injuries." Instead you would say, "Plaintiff rode his bike into a hole at a construction site." Make it your mantra to **use plain English.**

**Use active voice whenever possible.** In active voice, the actor performs the action on the recipient. In passive voice, the recipient has the action performed on it by the actor. Passive voice can bog down, lengthen and unnecessarily complicate your summaries. It also dilutes the power of your verbs. Note the difference between:

_Active_: "Defendant forced plaintiff to dance naked."
_Passive_: "Plaintiff was forced to dance naked by defendant."

**Lift good quotes**. Quote from the complaint when it adds detail, such as dialogue or important descriptions. Otherwise, paraphrase and condense allegations. See additional quoting tips in the next point.

**Make it interesting**. Colorful, telling details liven up the report. Most of our subscribers are lawyers or legal librarians who read hundreds of boring case descriptions each day. Anything you can do to make things more interesting will help. If a guy got hurt on the boat, your readers want to know what happened – did he break an arm, fall in the hold, what? Some lawsuits are bland as can be and there is nothing you can do to make them exciting. But if there is any funky detail that helps bring a case to life, put it in.

This is especially true of sexual harassment cases. Don't hold back – tell us a few of the dirty things the harasser said. For example, if a male supervisor allegedly told his female assistant, "I want to snort cocaine off your bare ass" (an actual quote from a complaint!), include it in the summary.

Keeping summaries both brief and interesting is often difficult. Use extra words to add real detail and color to the summaries, and save words by tightening up other, less descriptive phrases.

**Find the Beef**. An old Wendy's commercial featured a woman saying, "Where's the beef?" That could also describe the reporter's mission in summarizing a complaint.

- 8 -

CNS_000009

Get to the beef, the heart of the complaint, and tell that story in simple terms, as you would when telling a story to a family member in the kitchen.

## F. SPECIFIC STYLE GUIDELINES

We use AP style unless otherwise indicated. CNS will reimburse you for a copy of the AP Stylebook. We also recommend these books:
- "The Elements of Style," by William Strunk and E.B. White
- "When Words Collide: A Media Writer's Guide to Grammar and Style," by Lauren Kessler and Duncan McDonald
- "The Word," by Rene Cappon, a former AP editor

**Capitalization**.
- Capitalize proper names only when you write out the full title on first reference. Shortened versions in subsequent references are generally lower case.

  *Example:* "The City of Chicago Parking Authority" or "Chicago's parking authority"

- Capitalize words like "city," "court," "act" and "district" only in the context of the proper name.

  *Example:* "The city voted to ban scissors." "The school district does not allow hooligans." "The court erred in its decision."

- Format the cause of action as you would a normal sentence.

  *Example:* "Civil rights." Not "Civil Rights."

**Copyrighted materials**. Place copyrighted materials in quotes. Trademarks and patents should be capitalized but not placed in quotes. Use the AP Stylebook as a reference.

**Dollar amounts**. Always round down: For hundreds, to the 100 ($624 is $600); for thousands and tens of thousands, to the 1,000 ($4,915 is $4,000, $14,786 is $14,000); for millions, to the hundred thousand and write out ($1.5 million). Generally speaking monetary amounts should appear at the end of the summary as a sort of stand-alone sentence, unless the amount is for punitive damages. (See Damages section.)

**Hyphens.** Words should be hyphenated when the hyphen makes them a compound modifier that functions as a single part of speech. "He has a billion-dollar financial empire" is hyphenated because "billion-dollar" functions as an adjective, but there is no hyphen in the phrase "he has a billion dollars." Do not hyphenate adverbs ending in "-ly."

*Example*: "newly purchased home." Not "newly-purchased home."

**Lawyer inaccuracy**. When lawyers make mistakes in their pleadings, do not repeat the errors unless you put them in quotes with a (sic). If they misspell a party name, write the correctly spelled party name in the appropriate party field without a (sic).

**Modifiers**. Modifiers should almost always be placed next to the words they modify. Even if it seems clumsy, you should do it to make the meaning clear. For example,

- 9 -

CNS_000010

try modifying the sentence "I hit him in his eye" with the word "only." You can stick the modifier in seven places, and it can mean six different things.

**Numbers.** Write out zero and numbers less than 10. Use numerals for numbers 10 and up, except when they begin a sentence. Never use Roman numerals, unless they are part of a proper noun.

*Examples:* "John Smith II" or "World War II."

**Percent.** Percent is one word, written out instead of a symbol. Always use with a numeral, except when beginning a new sentence.

*Examples:*
"Defendant owns 51 percent of the company."
"Sixty-five percent of the proceeds were supposed to be paid to plaintiff."
"Plaintiff charges 6 percent interest."

**Serial commas.** According to AP style, we do not put a comma before "and" in a list, unless it helps make the list more easily understood.

*Example:* "Fraud, theft and embezzlement." Not "Fraud, theft, and embezzlement;" *also:* "Fraud, theft, and negligent and intentional misrepresentation."

**Slang.** Be casual, but not cavalier. For example, do not use the word "ass" unless you are quoting the complaint.

**Titles.** All book titles except the Bible and reference works should be placed in quotation marks, as should TV shows, songs and movies.

### **Spell Check**
Always run spell check before you send out your report. Typos and misspellings make us look sloppy, lazy and unprofessional. They also erode our credibility, which is a journalist's main currency. There is no excuse for sending a report without running spell check.

That said, some legal terms are not in the spell check database. For example, spell check will try to change "tortious" to "tortuous," a very different word. If spell check highlights the word, and you are unsure of the correct spelling, refer to the complaint it came from, or – better yet – check a dictionary. Often the complaints themselves just plain get it wrong. The AP Stylebook, the Law.com Dictionary (http://dictionary.law.com) and Merriam-Webster Online (www.m-w.com) are more reliable sources.

## **G. ORDER OF REPORT ENTRIES**

We order by importance, not by date filed.

The general order should be as follows:

**Cases with PDF links.** Big news, class actions, antitrust, securities/fraud/intentional torts, employment, defamation, environmental, slip and falls against huge companies and other cases against huge companies that don't fit any of the case types listed above, then others by case type.

- 10 -

**ER-1962**

CNS_000011

**Cases without PDF links.** Cases for contract, slip and fall and other types of premises liability, collections, removals and transfers, cases that are a dime a dozen in your court like quiet title cases or underinsured motorist complaints, then car collisions at the very bottom.

Docketed cases no longer go at the very bottom of the report. Intersperse them with the cases without PDFs by how important they seem to be based on the cause of action. (See the rules for docketing to determine whether and when to include dockets in your published reports.)

## H. MESSAGES

If the main or anchor section in a report will not be published, include a message at the bottom of the report. If an entire report won't be published on a Monday through Friday, publish a report with a message only that day or put a message at the top of the report the day before the closure indicating the next day's report won't publish due to a court closure.

### *COMMUNICATION*
**Because CNS is so spread out geographically, it is supremely important to communicate promptly and frequently with your editor, other CNS employees and subscribers. It is a grave mistake for a CNS reporter to ignore an email or phone call. Given the amount of autonomy this job offers there is no excuse for not getting back to someone within a reasonable amount of time.**

**With your editors.** Check in with your immediate editor at least once a week. Your editor expects a timely response when he or she contacts you by phone or email.

**With the court staff.** In dealing with courtroom personnel, you should be courteous, diplomatic and persistent in obtaining prompt access to new cases. Bear in mind that court employees need to accomplish their tasks while allowing the media access to public documents. Your job as a reporter relies heavily on the court staff.

For this reason, it is essential to develop a good rapport with the clerks. If they merely don't mind you, you'll get treated like everyone else. If they genuinely like you, they'll go out of their way to get you what you need. Keep your ears open for birthdays and other office celebrations – and don't hesitate to show up with homemade chocolate chip cookies every once in a while. Your tokens of thoughtfulness will make your job a whole lot easier.

**With subscribers.** If a subscriber emails you with a question or problem you don't know how to handle, either forward the message to **home@courthousenews.com**, or give the subscriber the number to our home office in California: **626.577.6700**.

- 11 -

**ER-1963**

# II. COMMON ERRORS

We compiled a list of the most common grammatical and spelling errors reporters make. Please read them carefully.

| WORD OR PHRASE | CORRECT USAGE |
|---|---|
| **Broadcast** | The past tense is also "broadcast," not "broadcasted" |
| **Canceled** | Spelled with only one "l" |
| **Carpal tunnel syndrome** | Do not write "carpel" |
| **caesarean section** | Note the "ae;" can be shortened to "C-section" |
| **Co-worker/Co-defendant** | Any occupation or status will retain the hyphen |
| **Disburse/disperse** | Use "disburse" when you mean to spend or distribute money; "disperse" means to break up and scatter |
| **Electrocute** | Electrocute means "to kill with electricity;" if the person is not dead, then "electrocute" is wrong |
| **Female/male** | "Female" and "male" are adjectives. You can hire or fire a female worker, but you don't hire a female; you hire a woman |
| **Him/his** | Say "plaintiff was fired due to his having diabetes," not due to "him having" |
| **Internet** | Capitalize the "I" in "Internet" |
| **Its/it's** | "Its" is a possessive and has no apostrophe; "It's" is a contraction for "it is" |
| **Libel/liable** | "Libel" is written defamation; "liable" refers to liability |
| **Lie/lay** | "Lie" is intransitive; "lay" is transitive. In other words, "lie" has no direct object, but "lay" does. You lie down, but you lay down your arms. If the verb has an object, it's "lay." If it involves a person becoming supine, it's "lie." |
| **Mace** | Always capitalize the trade name Mace |
| **Misappropriation/ misrepresent** | No hyphens in either word |
| **Mislead** | The past tense of "mislead" is "misled" |
| **Money/monies** | Always use the term "money," never "monies" |
| **Plurals** | Plurals do not require an apostrophe before the "s;" the apostrophe makes it possessive, not plural |
| **Possessives** | Singular possessives require an apostrophe before the "s;" plural possessives require an apostrophe after the "s" |
| **Prostate** | "Prostate" is the gland; "prostrate" means "lying flat" |

- 12 -

CNS_000013

| Principal/principle | The noun "principal" refers to the school official or money; the adjective means "main" or "primary." "Principle" refers to a standard |
|---|---|
| Rescission | This is the correct spelling; note the "sc" |
| Social Security | Always capitalize Social Security when referring to the government program |
| Superseding | The proper spelling is with an "s," not a "c" |
| Taser | Like Mace, the trade name Taser should be capitalized |
| Wal-Mart | Written with a dash and capital "M" |
| Website | Website is one word |
| Who/whom | "Who" is the subject case; "Whom" is the objective case. To determine which word to use, substitute the word "they" or "them" for "who/whom." If you would use "they," it's "who." If you would use "them," it's "whom" |
| ZIP code | Use all caps |

- 13 -

CNS_000014

# III.  SPECIFIC TERMS & DINGER KEYWORDS

A guide to using specific terms and dinger keywords in complaint identifiers

| General category | Keywords | Use when you have: |
|---|---|---|
| **PROFESSIONAL NEGLIGENCE** | **Elder abuse** | Nursing home abuse; use only if the phrase "elder abuse" appears in the complaint |
| | **Legal malpractice** | Professional negligence/ negligence regarding the provision of legal services |
| | **Fiduciary duty** | Fiduciary duty (not related to securities laws) |
| | **Medical malpractice** | Professional negligence/ health-care provider negligence |
| **PERSONAL INJURY** | **Slip and fall** | Personal injury involving a slip |
| | **Trip and fall** | Personal injury involving a trip |
| | **Premises liability** | Non slip/trip injury in which the landowner is being sued for an injury that took place on the property |
| | **FELA** | Personal injury while working on a government-regulated jobsite |
| | **Marine personal injury or Jones Act** | Jones Act/injury occurring at sea |
| | **Workplace injury** | All other jobsite injuries |
| | **Car collision** | Injury and damages involving a car collision |
| | **Asbestos** | Case involving asbestos-related injuries |
| | **Product liability** | Malfunctioning/defective products |
| | **Assault** | Assault (threat with the intent of physical harm) |
| | **Battery** | Battery (actual physical harm) |
| | **Libel** | Libel |
| | **Slander** | Slander |
| | **Defamation** | Defamation |

- 14 -

CNS_000015

| PERSONAL INJURY (CONT'D) | Negligent hiring | Defendant's employee injured the plaintiff |
|---|---|---|
| CONTRACT/FRAUD | Insurance contract | Breach of contract involving an insurance contract |
| | Lease | Failure to pay rent on housing/property |
| | Equipment Lease | Failure to pay rent on equipment |
| | Consumer warranty | Car manufacturer warranty violations/lemon law/Magnussen-Moss/Song-Beverly/ Consumer Legal Remedies Act |
| | Habitability | Defects in rental housing |
| | Wrongful eviction | Breach of rental agreement in which landlord tries to illegally evict tenant |
| | Contract | Failure to pay money due under a contract, esp. construction, early termination, all other contract cases |
| | Collections | Open book, money due for goods/services |
| | Mechanic's lien | Foreclosure on mechanic's lien (usually goes with breach of contract) |
| | Unfair debt collection | Rosenthal Act or cases alleging violations by debt collectors |
| | Unfair credit reporting | Fair Credit Reporting Act violations |
| | Fraud | Defendant promised one thing and did something else, lying, cheating, etc. |
| | Misrepresentation | Defendant presented something falsely or inaccurately |
| | Intentional interference with economic relations | A party damages another party's contractual or other business relationship on purpose |
| | Construction defects | Breach of contract to do quality construction work |

- 15 -

CNS_000016

| **CONTRACT/FRAUD** (CONT'D) | **Bad faith** | Breach of the covenant of good faith and fair dealing; Example: an insurance company manipulated the contract language to deny a legitimate claim |
|---|---|---|
| **LABOR/EMPLOYMENT** | **Employment** | Labor code violations including failure to pay wages, provide wage statements or allow breaks |
| | **Employment and _____.** <br><br> **For example, ...wrongful termination.** <br> **Or** <br> **.... _____ discrimination.** <br><br> **(Types include race, gender, pregnancy, family leave, disability)** <br><br> **Or ....retaliation.** <br> **Or ...whistle-blower retaliation.** <br> **Or ...sexual harassment.** <br><br> **Example: Employment and gender discrimination.** <br><br> **Example: Employment and retaliation.** | Cases alleging civil rights violations by an employer, including: ADA violations in employment (disability discrimination) Sexual harassment FEHA violations (race/age/national origin/gender discrimination) FMLA violations (pregnancy, medical, disability discrimination) Wrongful termination |
| **CORPORATE/BUSINESS LAW** | **Antitrust** | Sherman/Cartwright acts/price-fixing |
| | **Securities** | Violations of securities laws, shareholder suits or fiduciary duty owed to stockholders |
| | **RICO** | Racketeer Influenced and Corrupt Organizations |

- 16 -

CNS_000017

| CORPORATE/BUSINESS LAW (CONT'D) | Unfair business practices | Consumer rights violations/unfair tactics by businesses to the detriment of consumers; usually tacked on to other causes of action, including employment |
| --- | --- | --- |
| | Unfair competition | One party gains an undeserved advantage over another party, usually another business |
| | False advertising | Use of false or misleading statements in advertising, usually about a product, that can negatively affect consumers and other stakeholders |
| CIVIL RIGHTS | ADA | Inadequate facilities for the disabled, not employment-related |
| | Housing discrimination or Race discrimination | Non-employment discrimination in housing, racial profiling, etc., including Fair Employment and Housing Act violations |
| | Civil rights (Unless you have a more specific option, like Assault, Excessive force, False imprisonment) | Civil rights violations by police or the courts |
| PROPERTY | Copyright | Using plaintiff's copyrighted materials |
| | Trademark | Using plaintiff's name/logos |
| | Patent | Using plaintiff's products or processes without a license |
| | Trade secrets | A former employee absconds with confidential info, or another company steals it |
| | Negligence | Property damage caused by someone else's error |
| | FOIA | Freedom of Information Act |
| MISCELLANEOUS | Environmental tort | Contamination/spills/pollution |
| | To confirm an arbitration award | Petitioner wants court to order respondent to comply with terms |
| | Mandate/Mandamus | Petitioner wants court to order respondent to do something |

- 17 -

CNS_000018

| **MISCELLANEOUS (CONT'D)** | **Subrogation** | Complaint to recover money/damages owed to someone else, usually an insurance company on behalf of its insured |
| --- | --- | --- |

**Notes.**

Leave out "Breach of" before contract, warranty, fiduciary duty, etc.

Leave out "Violation of" before the name of an act.

Leave out "infringement" after copyright, trademark, patent, etc.

Leave out "Petition" from summaries on petitions.

We no longer use "Labor" as a cause of action for cases involving unpaid wages or other labor code violations. Use "Employment" instead.

- 18 -

CNS_000019

# IV. COVERAGE DO'S & DON'TS

A quick reference of the cases we do and do not cover

| Do | Don't |
|---|---|
| Asbestos | Annulment |
| Bankruptcy appeals | Bond forfeiture |
| Bankruptcy withdrawals | Change of name |
| Car collision | Criminal (with the exception of newsworthy or white-collar indictments in federal court for which a press release issues) |
| Contract | Custody |
| Civil rights acts | Declaration of taking |
| Collections | Divorce |
| Consent Decree | Driver's license suspension or revocation and challenges of such decisions |
| Diet drug | Forfeited recognizance |
| Equity (individual v. corporation) | Habeas corpus |
| Fraud | JD municipal claim |
| Judgment (Exemplification, Registration, Confession, Foreign) | Jury contempt |
| Legal malpractice | Liens (Report lien foreclosures but not liens) |
| Mandate/Mandamus | Motions (Report if federal "mc" or "ms" case) |
| Medical malpractice | NISI forfeiture |
| Negligence | Pro se prisoner suits |
| Petition for approval of a contract with a minor | Student loans |
| Pharmaceutical tort | |
| Personal injury | |
| Product warranty liability | |
| Replevin | |
| Seizure/Forfeiture (in federal court) | Seizure/Forfeiture (in state court) |
| Sexual harassment | |
| Trespass | |
| Transfers | |
| Workers' compensation | |
| Wrongful death | |
| Wrongful foreclosure (in which an individual is challenging a bank foreclosure) | Mortgage/foreclosures (in which a bank or other financing entity is foreclosing upon someone's home) |

- 19 -

CNS_000020

# V. UPLOADING

The main objective is to upload enough to keep your subscribers happy without wasting time uploading cases nobody cares about. Although deciding which complaints to upload sometimes seems to involve a series of constantly shifting, interconnected variables, only the three things really matter: the defendant in the complaint, the nature of the complaint and the newsworthiness of the complaint - all filtered through the lens of your personal experience and the advice of your editor.

When in doubt, upload.

**Note: <u>We do not upload exhibits, cover sheets or summonses. We upload complaints only.</u>**

**Defendants.**
Big defendants mean downloads; 90 percent of your decision to upload is determined by whether or not the complaint names a recognizable defendant. Subscribers will download a case about chewing gum if Microsoft is a defendant. On the other hand, you can have a huge class action, but if it's against East Regional Sprockets Inc., nobody cares. That being said, you should always upload class actions.

You know if a defendant is big usually just by recognizing the name. Have you heard it mentioned on TV or in the news? Is it a name your friend, parents or grandparents would know? IBM, Ford Motor Company, Federal Express, Google, Apple, Wal-Mart — look out for the big names in American business. Reading the business section of newspapers and watching financial news shows on TV are good ways to familiarize yourself with different companies.

**Nature of the case.**
Class actions are important cases and should always be uploaded. If you look at a page and see the words "class action" next to a word like, say, "Google," you know you are staring at a hot case. A class action against any remotely recognizable defendant almost always get downloads.

Complaints filed under the less-restrictive "on behalf of the general public" standard also deserve special attention. Private attorney general actions, as such cases are known in California, possibly involve more people than the plaintiffs named on the complaint, and so are of much interest to subscribers. Similarly, a complaint alleging unfair business practices that affects many insurance policyholders will be of more interest than one that deals with an isolated case.

Finally, the dollar amount at issue could tip the scales. If it's a boring case but involves more than a few hundred thousand dollars, generally speaking you should upload it.

**Newsworthiness.**
When a company or story is in the news and is the source of public interest, you should upload related complaints that you otherwise would not. For instance, while we don't typically upload excessive force and or other civil rights complaints against the police, when the Oakland Police Department beat and pepper-sprayed seemingly peaceful Occupy protesters, it made national news and any resulting lawsuits should have been uploaded.

Likewise, uniqueness can play a major role in determining subscriber interest. An unusual employment discrimination action is more interesting than a routine contract complaint. Class actions for unfair competition are rare; lease complaints are a dime a dozen.

- 20 -

**ER-1972**

CNS_000021

**The "x factor."**
Another factor informing all of these decisions will be your own experience and the preferences of the subscribers to your report. If you know that many of your subscribers are concerned with a certain type of litigation, be sure to upload such cases. And when in doubt, upload. If you put up a few cases that you think should be huge and no one bites, eventually you'll know not to waste your time uploading cases of that type.

CNS_000022

**ER-1973**

# VI. Uploading Do's & Don'ts

A quick reference guide of the cases we generally do and do not upload

| DO UPLOAD | DON'T UPLOAD |
|---|---|
| Antitrust | Asbestos |
| Securities | Eminent domain/Quiet title/Partition of property |
| Most cases against a large law firm or big national businesses like Microsoft, Samsung, Google, Shell, Wal-Mart, Walgreens, etc. | Contract/Lease/Collections (when a small sum of money or lesser-known defendant is involved) |
| Class actions | Car collision/Un/underinsured motorist |
| Environment/Toxic waste | Dissolution of corporation/partnership |
| Defamation/Libel/Slander | Failure to cover car insurance claim |
| Fraud | Medical malpractice (unless wrongful death is also alleged) |
| Employment | False arrest/civil rights against police |
| Legal malpractice | Pharmaceutical product liability (but only when a large number of similar cases have already been filed) |
| Newsworthy cases | Premises liability/slip or trip and fall (unless the defendant is large and/or nationally known) |
| Unfair competition/Deceptive business practices/False advertising/ Trade secrets | Free Appropriate Public Education actions |
| Patent/Trademark/Copyright (but not enforcement actions against knock-off sellers) | Lemon law cases |
| Private attorney general actions (PAGA) | ERISA (for unpaid contributions to a union or fund) |
| Nursing home/Elder abuse | Mechanic's lien |
| ERISA (for denial of benefits) | Mortgage foreclosure (in which a bank is foreclosing upon someone's home) |
| Construction defects | Nuisance |
| Wrongful death | Removals/Transfers |
| | Workers' compensation |

CNS_000023

# VII. Pitching the News

Pitching not only newsworthy cases but also local news with national import or news that is just plain fascinating is part of your job.

- If something is happening in your community that is national news or related to national news, immediately let your editor(s) know. The Baltimore riots and the Charleston shooting are prime examples of national news stories for which our reporters had excellent coverage.
- Stay in touch with news happening near you. Read the paper. If something is happening in your backyard, like a high-profile trial, a protest about a national issue, an environmental catastrophe or anything else that is newsworthy, your job is to pitch it.
- If you see something on your daily report that looks newsworthy or interesting, immediately let your editor(s) know. If you don't know to whom to pitch stories, ask your direct editor. Attach the complaint to your email and describe the suit in the body. If you have already written the summary, copy and paste it from document view.

We no longer see our competition as just the other researchers those of you who cover courts in person might see every day sitting at the computer terminal next to you. We're now competing with the New York Times, the Washington Post and every other major news outlet.

- 23 -

CNS_000024