No. 24-6697

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

COURTHOUSE NEWS SERVICE,

*Plaintiff-Appellee*,

v.

SARA OMUNDSON,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the District of Idaho,

Case No. 1:21-CV-00305-DCN, the Honorable David C. Nye, Presiding

---

**EXCERPTS OF RECORD, VOL. 11**

---

Keely E. Duke
Molly E. Mitchell
Duke Evett, PLLC
1087 West River Street, Suite 300,
Boise, ID 83702
Telephone (208) 342-3310
Email: ked@dukeevett.com; mem@dukeevett.com

*Attorneys for Appellant Sara Omundson*

# Exhibit B

(3 of 268), Page 3 of 268

Case: 24-6697, 03/06/2025, DktEntry: 10.12, Page 3 of 268
Case 1:21-cv-00305-DCN   Document 60-20   Filed 12/15/22   Page 2 of 2



# Exhibit C



# Exhibit D

ER-2417

(7 of 268), Page 7 of 268

Case: 24-6697, 03/06/2025, DktEntry: 10.12, Page 7 of 268
Case 1:21-cv-00305-DCN   Document 60-22   Filed 12/15/22   Page 2 of 2



# Exhibit E



# Exhibit F



# Exhibit G



Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF THE HONORABLE MITCHELL W. BROWN** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, the Honorable Mitchell W. Brown, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I have served in the capacity of a District Judge for the State of Idaho's Sixth Judicial District since 2008. As a District Judge, I have jurisdiction over civil and criminal cases.

3.     As a District Judge, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court

**DECLARATION OF THE HONORABLE MITCHELL W. BROWN- 1**

system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court, e.g. district court or the magistrate division. If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing, a file stamp is affixed and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted document is filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      This configuration is consistent with the access the press and public had prior to the transition to e-filing. In the days of paper filings, the clerk would perform a ministerial review of the document before accepting it, file-stamping it, and placing it in the case file. At that point, the document was a public record and could be immediately reviewed by the press or public upon request. Idaho Courts kept the administrative function of clerk review prior to acceptance as they transitioned to e-filing.

5.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil filings before they have been reviewed or accepted for filing by a county clerk.

6.      Under Auto Accept, the filing would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction. Judicial action would be required to address improperly

**DECLARATION OF THE HONORABLE MITCHELL W. BROWN- 2**

**ER-2426**

submitted documents that are automatically accepted into the case management system.

7.      Auto Accept would create backlogs and additional issues and work for the clerks. Using the same process as was in place with paper filing, the clerks review newly submitted documents before accepting them as an official court record (e.g. to make sure the complaint is filed in the correct county and proper filing fee has been submitted). When filings are in File & Serve, clerks can communicate directly with the submitter about issues with the submission. Once a document is transferred from File & Serve into Case Manager, there is no ability to communicate directly with the submitter through the Tyler portal; the clerk or court staff would have to call or email the party regarding an error with the submission. In addition, all documents come in the same envelope (e.g. a complaint, summons, and case information sheet). Once the documents in the envelope are accepted for filing, they are transferred into Case Manager. Once in Case Manager, the documents are no longer kept together in an envelope, meaning clerks would have to access each document included in an improper submission individually in order to correct mistakes with the submission. Thus, Auto Accept would significantly increase the workload of the clerks because it eliminates their ability to communicate directly with the submitter through the Tyler portal and easily access all documents included in a submission. This change in process, while minimal in a single transaction, increases exponentially with the number of filings.

8.      Auto Accept would also increase the already full workload of District Judges and their court staff because they would have to spend time addressing improperly submitted complaints that would have been resolved by the clerks under our current system. For example, a judge may have to enter a notice of intent to dismiss if there is an error with a filing that was automatically submitted into Case Manager. Because complaints in Case Manager are official court records, a judicial order of some sort would be required to take any action in response to an

**DECLARATION OF THE HONORABLE MITCHELL W. BROWN- 3**

improperly submitted complaint that was automatically accepted. This would dramatically increase the workload of judges since they would be tasked with ministerial functions that would otherwise be handled by the clerk.

9.      For decades, and long before the transition to e-filing, clerks have served as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, Magistrate Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a filing if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date as the filing date relates back to the date of original submission. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed as part of the historical ministerial review process.

10.     Another concern with Auto Accept is that filings can include sensitive or confidential information. Because there is no clerk review to address these concerns with Auto Accept, Idaho Courts would be publishing documents as official court records that contain confidential or sensitive information or that should otherwise not be made available to the public. Public access to such information before it can be reviewed and sanitized, if necessary, would erode public confidence in the courts and its ability to be trusted with confidential and sensitive information.

11.     The Press Review Queue would provide members of the press and public with access to newly submitted filings before they are reviewed and accepted by the Clerk's Office.

**DECLARATION OF THE HONORABLE MITCHELL W. BROWN- 4**

12.     The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil filings before the Clerk's Office reviews and accepts them. This means the press and public have access to newly submitted complaints and other civil filings before the presiding judges and their staff have access to them. It is counterintuitive to provide the press and public with access to documents that are *not* official court records and that presiding judges do not even have access to. District Judges cannot take any action on documents that are not part of the official court record, so providing the press and public with access to filings that have not been accepted serves no purpose in informing the press and public about how the courts are functioning; the jurisdiction of the Idaho Courts is not invoked until the complaint becomes an official court record.

13.     I am also concerned about the implicit representation that a document in the Press Review Queue has been filed or is otherwise an official court document. Members of the press and public may not understand such documents have not been reviewed or accepted by clerks and will not become part of the record if they are rejected. This could result in the press and/or members of the public reporting on filings available in the Press Review Queue as if they are official court documents, when in reality a filing in the Press Review Queue is not an official court document because it has not been reviewed and accepted for filing. This could erode public confidence in the judiciary if members of the press and public report on filings in the Press Review Queue before they are accepted as official court records.

14.     Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a filing that includes confidential information, such as social security numbers, birthdates, bank account information, etc. That information will be available to the press and public during

**DECLARATION OF THE HONORABLE MITCHELL W. BROWN- 5**

**ER-2429**

the entire time the filing sits in the Press Review Queue prior to review and acceptance as an official court record. Further, filing errors could result in cases and or specific pleadings subject to protection orders or other restrictions on being made public.

15.    I understand the importance of providing the public and press with timely access to newly submitted civil complaints and am a staunch advocate of First Amendment Rights. However, the Sixth Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring that civil filings are reviewed by clerks so any filing errors can be timely addressed. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints and civil filings via Auto Accept or the Press Review Queue substantially impairs the Sixth Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 13th day of December, 2022.

Mitchell W. Brown
District Judge

**DECLARATION OF THE HONORABLE MITCHELL W. BROWN- 6**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                          amberdina@givenspursley.com
Katherine A. Keating                   katherin.keating@bclplaw
Jonathan G. Fetterly                   jon.fetterly@bclplaw.com

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF THE HONORABLE MITCHELL W. BROWN- 7**

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF THE HONORABLE ERIC WILDMAN** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, the Honorable Eric Wildman, declare as follows:

1.   I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.   I serve as District Judge for the State of Idaho's Fifth Judicial District. As a District Judge, I have jurisdiction over civil and criminal cases.

3.   I also serve as the Administrative District Judge (ADJ) for the Fifth Judicial District. As the ADJ, I have administrative supervision and authority over the operating of the district courts and magistrate courts in the Fifth Judicial District.

4.   As a District Judge and ADJ, I am aware that each county Clerk's Office is

**DECLARATION OF THE HONORABLE ERIC WILDMAN- 1**

responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court. If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

5.  I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Courts, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

6.  I served on the Idaho Supreme Court's Technology Committee when Idaho Courts decided to make the transition to paperless filing. The Idaho Supreme Court hired consultants to help with the transition to e-filing. We were looking for an "off the shelf" case management system, and the Odyssey system from Tyler was the closest option. The issue of turning on Auto Accept or implementing a Press Review Queue came up and was discussed extensively by the committee in conjunction with the consultants. At first blush, Auto Accept seemed like a viable option because we thought this would save time and money. Historically, clerks would review

**DECLARATION OF THE HONORABLE ERIC WILDMAN- 2**

paper submissions and accept or reject them before they became part of the docket. Neither the press nor the public was provided with access to paper submissions before they had been reviewed and accepted for filing. The elected clerks explained all the reasons why they would have to reject paper submissions and further explained that if an error is not corrected on the front end, it takes a lot of work to correct errors once a submission has been accepted for filing. This topic was discussed, debated, and voted on. We specifically considered press and public access to newly submitted documents. Ultimately, the committee made a recommendation to the Idaho Supreme Court that the clerks continue to review submissions and accept or reject them for filing before they are filtered into Case Manager, at which time they are available to the public and press.

7. Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction.

8. Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This would include preparing orders and conducting hearings to strike improperly submitted complaints, otherwise remove them from the case management system, or redact filings already in the case file. This is inefficient and would increase the workload of District Judges, their court staff, and clerks.

9. Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue

**DECLARATION OF THE HONORABLE ERIC WILDMAN- 3**

with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end. If a complaint was filed in the wrong venue (i.e. a venue other than what was listed on the face of the complaint), this would need to be remedied either through dismissal of the complaint or a change of action. The first option could adversely impact litigants, particularly if they filed the complaint on or near the statute of limitations, as discussed above. The second option adversely impacts the courts because judicial action would be required to transfer the case to the venue listed on the face of the complaint.

10.      Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

11.      The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Court judges have access to them. A complaint is not an official court document until it has been accepted, and the District Courts should not be publishing documents (including pleadings that potentially include confidential information or that should have been filed under seal) that have not been reviewed and accepted by a clerk.

12.      Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the

**DECLARATION OF THE HONORABLE ERIC WILDMAN- 4**

entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

13.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Fifth Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Fifth Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 30 day of November, 2022.

_____
Eric Wildman
District Judge

**DECLARATION OF THE HONORABLE ERIC WILDMAN- 5**

**ER-2436**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke _____
Keely E. Duke

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF THE HONORABLE CYNTHIA MEYER** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, the Honorable Cynthia Meyer, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as a District Judge for the State of Idaho's First Judicial District. As a District Judge, I have jurisdiction over civil and criminal cases.

3.     I am also the Administrative District Judge (ADJ) for the First Judicial District. As the ADJ, I have administrative supervision and authority over the operating of the district courts and magistrate divisions in the First Judicial District.

4.     As the ADJ and as a District Judge, I am aware that each county Clerk's Office is

**DECLARATION OF THE HONORABLE CYNTHIA MEYER - 1**

responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court, e.g. magistrate division or district court. If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed and becomes an official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

5.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrative Director of Courts, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk and before they are an official court record.

6.      Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction. Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system.

7.      This is a serious concern because caseloads in the First Judicial District are increasing, and District Judges and their court staff are incredibly busy. Auto Accept would increase their already full workload since District Judges and their court staff would have to spend

**DECLARATION OF THE HONORABLE CYNTHIA MEYER - 2**

time addressing improperly submitted complaints that would have been fielded by the clerks under our current system (e.g. by preparing and entering an order striking the pleading). This puts District Judges in the difficult position of determining what action should be taken if a complaint is improperly submitted.

8.     For decades, and long before the transition to e-filing, clerks have served as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the filing date will then relate back to the date of the original submission. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end.

9.     Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

10.    The Press Review Queue would provide members of the press and public with access to newly submitted complaints before they are reviewed and accepted by the Clerk's Office and before they are an official court record.

11.    The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before they are an official court record and District Court judges have access to them.

**DECLARATION OF THE HONORABLE CYNTHIA MEYER - 3**

12.     I am also concerned about the implicit representation that a document in the Press Review Queue has been filed or is otherwise an official court document. Members of the press and public may not understand such documents have not been reviewed or accepted by clerks and will not become part of the record if they are rejected and not corrected. This could result in the press and/or members of the public reporting on complaints available in the Press Review Queue as if they are official court documents, when in reality no complaint in the Press Review Queue is an official court document because it has not been reviewed and accepted for filing. This could erode public confidence in the judiciary if members of the press and public falsely report on complaints in the Press Review Queue as if they are official court records.

13.     Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint that includes confidential information, such as social security numbers, birthdates, bank account information, etc. That information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

14.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The First Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring that complaints are reviewed by clerks so any filing errors can be timely addressed. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the First Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the

**DECLARATION OF THE HONORABLE CYNTHIA MEYER - 4**

foregoing is true and correct.

DATED this 28th day of November, 2022.

_____
Cynthia Meyer
District Judge

**DECLARATION OF THE HONORABLE CYNTHIA MEYER - 5**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF THE HONORABLE CYNTHIA MEYER - 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF THE HONORABLE DAVIS VANDERVELDE** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, the Honorable Davis VanderVelde, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as District Judge for the State of Idaho's Third Judicial District. As a District Judge, I have jurisdiction over civil and criminal cases.

3.     I also serve as the Administrative District Judge (ADJ) for the Third Judicial District. As the ADJ, I have administrative supervision and authority over the operating of the district courts and magistrate division of the courts in the Third Judicial District.

4.     As a District Judge and ADJ, I am aware that each county Clerk's Office is

**DECLARATION OF THE HONORABLE DAVIS VANDERVELDE - 1**

responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public.

5. I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrative Director of Idaho Courts, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

6. It is my understanding that Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction.

7. Judicial action would likely be required to address improperly submitted documents that are automatically accepted into the case management system. This may include preparing orders and conducting hearings to strike improperly submitted complaints, otherwise remove them from the case management system, or redact documents in a case file. This is likely to increase the workload of District Judges, their court staff, and clerks.

8. Currently, clerks serve as gatekeepers for improperly submitted documents. It is my understanding that Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Additionally, I believe eliminating this gatekeeping function could be detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, it is possible that any issues with a submitted complaint may go unnoticed for a substantial period of time as filing issues will only be addressed if they are

DECLARATION OF THE HONORABLE DAVIS VANDERVELDE - 2

brought to the District Court's attention. For instance, if a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end.

9.      I believe eliminating the clerk's gatekeeping function is harmful to all litigants and it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements. For instance, if a *pro se* litigant were to file a case in the wrong jurisdiction, without clerk review to catch this common mistake, the litigant could presumably miss a statute of limitation and have their case dismissed.

10.      The Press Review Queue is also concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. I do not believe that the press and public should have access to newly submitted complaints before the District Court judges have access to them.

11.      Providing the press and public with access to documents that have not been reviewed and accepted is dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

12.      I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Third Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes working to avoid improper disclosure of confidential information to the press and public. Providing CNS with *immediate* access to newly

**DECLARATION OF THE HONORABLE DAVIS VANDERVELDE - 3**

submitted civil complaints via Auto Accept or the Press Review Queue would likely impair the Third Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this __13__ day of December, 2022.

Davis VanderVelde
District Judge

**DECLARATION OF THE HONORABLE DAVIS VANDERVELDE - 4**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF THE HONORABLE DANE WATKINS** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, the Honorable Dane Watkins, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as a District Judge for the State of Idaho's Seventh Judicial District. As a District Judge, I have jurisdiction over civil and criminal cases.

3.      I am also the Administrative District Judge (ADJ) for the Seventh Judicial District. As the ADJ, I have administrative supervision and authority over the operating of the district courts and magistrate courts in the Seventh Judicial District.

4.      As the ADJ and as a District Judge, I am aware that each county Clerk's Office is

**DECLARATION OF THE HONORABLE DANE WATKINS - 1**

responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court , e.g. district court or the magistrate division.  If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing, a file stamp is affixed and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

5.    The clerk review process was in place prior to the transition to e-filing. With paper filings, the filer would hand the clerk their submission (e.g. a complaint and summons), the clerk would then review the submission to make sure all filing requirements were met (e.g. correct filing fee was included, filed in the correct jurisdiction, etc.). The clerk would either accept the submission—at which point it was file stamped and docketed in the official court record—or reject the submission and provide the filer with an explanation of what needed to be fixed for the complaint to be accepted.

6.    I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted

**DECLARATION OF THE HONORABLE DANE WATKINS - 2**

for filing by a county clerk.

7.      Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction. Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system.

8.      This is a serious concern because Auto Accept would increase the already full workload of District Judges and their court staff because they would have to spend time addressing improperly submitted complaints that would have been fielded by the clerks under our current system (e.g. by preparing and entering an order striking the pleading). This puts District Judges in the difficult position of determining what action should be taken if a complaint is improperly submitted. There are twenty judges in the Seventh Judicial District, including magistrate judges. Only six judges have a law clerk or staff attorney. Magistrate Judges in the Seventh Judicial District will occasionally be assigned cases where the amount in controversy is $25,000 (as opposed to the $10,000 threshold that invokes the jurisdiction on the District Court). Magistrate Judges do not have law clerks. Thus, although some judges may be able to delegate certain tasks to their law clerks related to correcting improperly submitted documents, many judges do not have this option and will have to spend their own time correcting erroneous filings. In either scenario, automatically routing improper submissions into Case Manager via Auto Accept puts a strain on judicial resources. The clerks and judges are extremely busy, and adding to their already heavy workload would require additional resources such as hiring additional clerks.

9.      For decades, and long before the transition to e-filing, clerks have served as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating

**DECLARATION OF THE HONORABLE DANE WATKINS - 3**

this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date as the filing date relates back to the date of original submission. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end. If a complaint was filed in the wrong venue (i.e. a venue other than what was listed on the face of the complaint), this would need to be remedied either through dismissal of the complaint or a change of action. The first option could adversely impact litigants, particularly if they filed the complaint on or near the statute of limitations, as discussed above. The second option adversely impacts the courts because judicial action would be required to transfer the case to the venue listed on the face of the complaint.

10.     Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements. *Pro se* litigants are also less likely to be aware of the requirement that sealed documents need to be "filed conventionally" (i.e. paper filed). IREFS 5(h). This makes them more vulnerable to exposing confidential information if they fail to follow the requirements for filing confidential documents.

11.     The Press Review Queue would provide members of the press and public with access to newly submitted complaints before they are reviewed and accepted by the Clerk's Office.

12.     The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before

**DECLARATION OF THE HONORABLE DANE WATKINS - 4**

the District Court judges have access to them.

13.    I am also concerned about the implicit representation that a document in the Press Review Queue has been filed or is otherwise an official court document. Members of the press and public may not understand such documents have not been reviewed or accepted by clerks and will not become part of the record if they are rejected. This could result in the press and/or members of the public reporting on complaints available in the Press Review Queue as if they are official court documents, when in reality no complaint in the Press Review Queue is an official court document because it has not been reviewed and accepted for filing. This could erode public confidence in the judiciary if members of the press and public falsely report on complaints in the Press Review Queue as if they are official court records.

14.    There is a potential for both litigants and attorneys misusing the Press Review Queue or Auto Accept to publish confidential or inflammatory information. As an example, an attorney representing a defendant in a high profile criminal case in the Seventh Judicial District intentionally filed documents that contained inflammatory information about the prosecutor, and then contacted the Clerk's Office to demand this information be published on the Idaho Supreme Court's cases of interest website immediately. With Auto Accept or the Press Review Queue, there is no way to prevent malicious and improper filings from being made available to the public. This is especially concerning since many bloggers and other purported members of the media are looking for information that will generate traffic to their website regardless of its accuracy. There are heightened concerns about the dissemination of newly submitted complaints that contain inflammatory or confidential information since these are the types of complaints that can essentially be used as clickbait.

15.    I understand the importance of providing the public and press with timely access to

**DECLARATION OF THE HONORABLE DANE WATKINS - 5**

newly submitted civil complaints. The Seventh Judicial District also needs to ensure that litigants'

rights are protected. This includes ensuring that complaints are reviewed by clerks so any filing

errors can be timely addressed. This also includes ensuring that individuals' personal information

is not made available to the press and public. Providing CNS with *immediate* access to newly

submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the

Seventh Judicial District's ability to serve and protect the individuals who access the court system.

    I declare under penalty of perjury pursuant to the law of the State of Idaho that the

foregoing is true and correct.

    DATED this 8 day of December, 2022.

Dane Watkins
District Judge

**DECLARATION OF THE HONORABLE DANE WATKINS - 6**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>    Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>    Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**DECLARATION OF THE HONORABLE RICK CARNAROLI** |

I, the Honorable Rick Carnaroli, declare as follows:

1.    I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.    I serve as District Judge for the State of Idaho's Sixth Judicial District. As a District Judge, I have jurisdiction over civil and criminal cases.

3.    I also serve as the Administrative District Judge (ADJ) for the Sixth Judicial District. As the ADJ, I have administrative supervision and authority over the operating of the district courts and magistrate courts in the Sixth Judicial District.

4.    As a District Judge and ADJ, I am aware that each county Clerk's Office is

**DECLARATION OF THE HONORABLE RICK CARNAROLI- 1**

responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the to-be-filed documents to ensure they meet the requirements established by the Idaho Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court, e.g. district court or magistrate division.   If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

5.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

6.      Under Auto Accept, the complaint would immediately transfer to the official record in Case Manager before ministerial review by the clerks, which they have been performing for years both pre- and post-transition to e-filing. Rather than catch errors before the documents were made public and filed in the official court record, clerks would be forced to perform their critical ministerial review in Case Manager.

7.      Judicial action would be required to address improperly submitted documents that

**DECLARATION OF THE HONORABLE RICK CARNAROLI- 2**

are automatically accepted into the case management system. This would include preparing orders and conducting hearings to strike improperly submitted complaints, otherwise remove them from the case management system, or redact already filed documents. This is inefficient and would increase the workload of District Judges, their court staff, and clerks.

8.      The clerk's offices are funded through filing fees, so it is imperative that filing fees are actually collected. With Auto Accept, a complaint would be automatically accepted even though a filing fee had not been paid. Thus, Auto Accept limits the clerk's ability to collect a filing fee and will simultaneously require judicial and clerk action in cases where the complaint was submitted without a filing fee. This puts a strain on judicial resources.

9.      Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end. If a complaint was filed in the wrong venue (i.e. a venue other than what was listed on the face of the complaint), this would need to be remedied either through dismissal of the complaint or a change of action. The first option could adversely impact litigants, particularly if they filed the complaint on or near the statute of limitations, as discussed above. The second option adversely impacts the courts

**DECLARATION OF THE HONORABLE RICK CARNAROLI- 3**

because judicial action would be required to transfer the case to the venue listed on the face of the complaint.

10.     Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

11.     In sum, clerk review is a huge component of providing the public with access to the courts. It is much more beneficial for attorneys and litigants to be notified of errors with a submission on the front end so they can correct the error and re-submit the document. Auto Accept eliminates safeguards we currently have in place to ensure documents are properly submitted and that litigants and attorneys are promptly notified of errors.

12.     The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Court judges have access to them. A complaint is not an official court document until it has been accepted, and the District Courts should not be publishing documents (including pleadings that potentially include confidential information or that should have been filed under seal) that have not been reviewed and accepted by a clerk.

13.     Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

14.     Both Auto Accept and Press Review Queue could erode the public's confidence in

**DECLARATION OF THE HONORABLE RICK CARNAROLI- 4**

**ER-2459**

the judicial system because, under either system, documents that have not been reviewed by a clerk will be available to the press and public. This could include documents that contain confidential or inflammatory information, as discussed above, or documents that are rejected for filing (Press Review Queue) or stricken from the docket because they were improperly filed (Auto Accept). The public may attribute filing mistakes to the District Courts rather than the filer. Further, the public would understandably lose confidence in the courts if the courts were publishing documents containing confidential information or that are later rejected for filing. There is no guarantee that members of the press or public will understand—or accurately report—that documents reviewed in the Press Review Queue are *not* official court records. Thus, the Press Review Queue presents concerns about the press reporting on newly submitted complaints as though they are official court records, when in reality they are not official records—and have not been filed—until clerks have reviewed and accepted them for filing. Again, the public may not appreciate where the fault lies when members of the press inaccurately report on newly submitted civil complaints accessed through the Press Review Queue as though they are official court documents.

15.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Sixth Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Sixth Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the

**DECLARATION OF THE HONORABLE RICK CARNAROLI- 5**

foregoing is true and correct.

DATED this ___ day of December, 2022.

Rick Carnaroli
District Judge

**DECLARATION OF THE HONORABLE RICK CARNAROLI- 6**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                    amberdina@givenspursley.com
Katherine A. Keating             katherin.keating@bclplaw
Jonathan G. Fetterly              jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke


**DECLARATION OF THE HONORABLE RICK CARNAROLI- 7**

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF THE HONORABLE JAY GASKILL** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, the Honorable Jay Gaskill, declare as follows:

1.       I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.       I serve as a District Judge for the State of Idaho's Second Judicial District. As a District Judge, I have jurisdiction over civil and criminal cases.

3.       I previously served as the Administrative District Judge (ADJ) for the Second Judicial District. As the ADJ, I had administrative supervision and authority over the operating of the district courts and magistrate courts in the Second Judicial District.

4.       As a District Judge and the former ADJ, I am aware that each county Clerk's Office

**DECLARATION OF THE HONORABLE JAY GASKILL - 1**

Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court's case management system as official court records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court.  If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing, a filing stamp is placed on the document, and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is now filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

5.     I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

6.     Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction.

7.     Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This would include preparing

**DECLARATION OF THE HONORABLE JAY GASKILL - 2**

orders and conducting hearings to strike improperly submitted complaints or otherwise remove them from the case management system or to authorize the redaction of already filed documents. This is inefficient and would increase the workload of District Judges and their court staff.

8.   Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date as the filing date relates back to the original submission date. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end.

9.   Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

10.   The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Court judges have access to them. A complaint is not an official court document until it has been accepted (file stamped and transferred into the case management system), and the District Courts should not be publishing documents (including pleadings that potentially include confidential information or that should have been filed under seal) that have not been reviewed

**DECLARATION OF THE HONORABLE JAY GASKILL - 3**

and accepted by a clerk.

11.     Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

12.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Second Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Second Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 14 day of December, 2022.

Jay Gaskill
District Judge

**DECLARATION OF THE HONORABLE JAY GASKILL - 4**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF THE HONORABLE JAY GASKILL - 5**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF SHAREE SPRAGUE** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Sharee Sprague, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as the Clerk of the District Court in Power County, Idaho. I began working for the Idaho Courts in 1991. From 2006 through 2015, I served as the Court Assistance Officer for Idaho's Sixth Judicial District, as Bannock County's Lead Court Assistance Officer, and as the statewide trainer for Court Assistance Officers. I was elected as the Clerk of the District Court in Power County in late 2014 and began serving as the Clerk of the District Court in January 2015.

3.     As the Clerk of the District Court for Power County, I am familiar with the e-filing

**DECLARATION OF SHAREE SPRAGUE - 1**

process, including the requirement for clerk review prior to acceptance for filing. The Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks review the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court, e.g. district court or magistrate division. This also includes confirming all necessary documents are included in the e-filing envelope. For example, an initial filing needs to include the complaint, a summons for clerk signature, and an initial case information sheet. If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred out of Tyler's database and into the Idaho Courts' Case Management system, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is now filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrative Director of Courts, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

5.      Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction.

**DECLARATION OF SHAREE SPRAGUE - 2**

6.      Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This may include preparing orders and conducting hearings to strike improperly submitted complaints or otherwise remove them from the case management system. This is inefficient and would increase the workload of District Judges, their court staff, and clerks.

7.      Placing extra burdens on the clerks is especially problematic for smaller counties with limited court personnel. Power County has two full time clerks who can review new submissions, but there are some counties with even fewer clerks or that require clerks to perform a number of tasks unrelated to court filings (e.g. assisting with elections, serving as in court clerks). If a filing error has to be corrected on the back end (i.e. once a document is in Case Manager), it can take around an hour for court personnel to correct the error and more when monies are attached to the filing that need to be backed out. *See* IREFS 2(i) (court has discretion to reject documents that have been accepted for filing). Notifying the filer of an error in File & Serve, on the other hand, can be accomplished in a matter of minutes or seconds. If all or even some portion of complaints were auto accepted, this would greatly increase the workload for the clerks. In Power County, I anticipate we would need to hire at least one additional clerk if filing errors had to be addressed after documents had been accepted for filing. Hiring an additional clerk is not in Power County's budget.

8.      Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the

**DECLARATION OF SHAREE SPRAGUE - 3**

file-stamped date. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for an indefinite period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end.

9. Clerk review is also important because some filings need to be presented to a judge immediately, and clerks ensure that such documents are flagged for the judge.

10. Clerk review is important not only for complaints, but for other types of documents. For example, attorneys or litigants oftentimes have errors with interest calculations in writs of execution, e.g. by applying compound interest or filing subsequent writs of execution that do not deduct for amount previously collected. Clerks review the writs of execution to ensure they list the correct amount and that interest has been calculated correctly.

11. The Press Review Queue and Auto Accept are concerning to me because both options provide the press and public with access to newly submitted civil complaints before the Clerk's Office reviews them and determines they are acceptable for filing. People could submit documents with confidential or sensitive information, which would be publicly available on submission. Neither option prevents against malicious filings, or even the inadvertent disclosure of confidential information.

12. Another concern with the Press Review Queue involves inaccurate reporting on complaints that are rejected for filing. If a complaint is reported on by the press but is ultimately rejected for filing, the public may speculate about the reasons why this purportedly filed complaint did not initiate a civil action. The public may blame the courts—rather than the news organization that inaccurately reported on the complaint—for this.

**DECLARATION OF SHAREE SPRAGUE - 4**

13.     In my previous roles as a court clerk of Power County, Court Assistance Officer for Idaho's Sixth Judicial District, as Bannock County's Lead Court Assistance Officer, and as the statewide trainer for Court Assistance Officers, I became familiar with the filing process when Idaho Courts were still on a paper filing system. I am not aware of any jurisdictions in Idaho that provided the press or public with access to paper complaints before they were reviewed and accepted for filing.

14.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Power County District Court also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Power County District Court's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 15th day of December, 2022.

Sharee Sprague

**DECLARATION OF SHAREE SPRAGUE - 5**

## **CERTIFICATE OF SERVICE**

I hereby certify that on 15ᵗʰ day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                    amberdina@givenspursley.com
Katherine A. Keating         katherin.keating@bclplaw
Jonathan G. Fetterly         jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF SHAREE SPRAGUE - 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF ROLAND GAMMILL** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Roland Gammill, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Trial Court Administrator for the State of Idaho's Second Judicial District.

3.      As a Trial Court Administrator, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter

**DECLARATION OF ROLAND GAMMILL- 1**

Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court, e.g. district court or magistrate division. If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred out of Tyler's database and into the Idaho courts' Case Management system, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is now filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.     I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrative Director of Courts, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

5.     Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction.

6.     Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This would include preparing orders and conducting hearings to strike improperly submitted complaints or otherwise remove them from the case management system. This is inefficient and would increase the workload of District Judges, their court staff, and clerks.

7.     One of the counties in the Second Judicial District has only one clerk and one

**DECLARATION OF ROLAND GAMMILL- 2**

part-time clerk. There has also been significant staffing issues throughout the Second Judicial District. Two counties have had 100% turnover in clerks over the past year, another has had 50% turnover, and two other counties have had 15% to 30% turnover per year. Placing extra ministerial burdens on the clerks is especially problematic for smaller counties with limited court personnel.

8.      Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end.

9.      Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements. Particularly in smaller counties, clerks go the extra mile to help litigants and attorneys with their submissions to ensure filings or accepted. Auto Accept limits the clerks' abilities to provide attorneys and litigants with this assistance.

10.     Auto Accept would also present issues with refunding filing fees if an action is filed in the wrong county. Currently, filing fees are processed by Tyler and Tyler transfers payment to the District Court only if the complaint is accepted. If complaints were automatically

**DECLARATION OF ROLAND GAMMILL- 3**

accepted, payment would presumably be automatically received by the District Courts. This means the District Courts would have to dedicate personnel to issuing refunds for filing fees, which is a difficult and cumbersome process, as opposed to refunds being handled by Tyler.

11.    The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Courts have access to them. A complaint is not an official court document until it has been accepted, and the District Courts should not be publishing documents (including pleadings that potentially include confidential information or that should have been filed under seal) that have not been reviewed and accepted by a clerk.

12.    Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

13.    I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Second Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review

**DECLARATION OF ROLAND GAMMILL- 4**

Queue substantially impairs the Second Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 14 day of December, 2022.

Roland Gammill

**DECLARATION OF ROLAND GAMMILL- 5**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF ROLAND GAMMILL- 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF SANDRA BARRIOS** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Sandra Barrios, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as the Trial Court Administrator for the State of Idaho's Fourth Judicial District.

3.     As a Trial Court Administrator, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the to-be-filed documents to ensure they meet the requirements established by the Idaho

**DECLARATION OF SANDRA BARRIOS - 1**

Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court.  If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing, a file stamp is affixed, and the filing is transferred to the court's Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is now filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

5.      Under Auto Accept, the complaint would immediately transfer to the official record in Case Manager before ministerial review by the clerks, which they have been performing for years both pre- and post-transition to e-filing. Rather than catch errors before the documents were made public and filed in the official court record, clerks would be forced to perform their critical ministerial review in Case Manager. This is problematic for the following reasons:

        a.  First, each filed document would be separately docketed in Case Manager, instead of being together in one e-envelope like in File & Serve (the Tyler system clerks currently use to review submitted documents). Thus, a deputy clerk would have to review each document by clicking through multiple

**DECLARATION OF SANDRA BARRIOS - 2**

"tabs" in case manager, as opposed to review one envelope in File & Serve. This will increase the time it takes deputy clerks to review documents for basic conformity with procedural and court filing rules. Increasing the time it takes to review a submission by only a few minutes will have significant impacts on the workload of the Clerk's Office based on the volume of filings reviewed.  On the District Court floor of Ada County, approximately 5,200 documents were processed by one of the areas of the Clerk's Office in the past month. If each of those documents had to be reviewed individually by clicking through tabs in Case Manager, there would be a significant increase in the amount of time it takes to perform the ministerial review, which would produce delays in review and likely result in the need to add staff, re-allocate staffing resources, or both.

b. The current system supports the purpose of deputy clerks, who are responsible for ensuring information and documents move through the court efficiently. The File & Serve platform allows clerks to efficiently review information related to a submission in one place. Once a submission is approved, the press and public have immediate access to filed documents because they are instantaneously transferred to Case Manager. The structure of File & Serve also allows Clerk's Offices to move documents into queues, which are essential to workflow and staffing management. Staff can be assigned to review documents in the queues depending on staffing shortages or court document submission volume. Case Manager does not allow the Clerk's Offices to make any of those decisions. I believe our current system

**DECLARATION OF SANDRA BARRIOS - 3**

of review in File & Serve is efficient and provides the press and public with timely access to filings.

    c.  Making corrections in Case Manager would be time consuming and cumbersome because deputy clerks would have to track down contact information for the filer in File & Serve and then call or email the filer (assuming contact information was provided) to explain the issues with the filings that need to be corrected. All of this would happen outside of the Case Manager program because this program does not have the communication function that File & Serve has. Such communications could not happen in File & Serve because submission would be immediately transferred to Case Manager. This would be an inefficient process for the deputy clerks, especially since the communications would be housed in individual deputy clerk's email accounts and could not be broadly shared, as they now are in File & Serve. This would result in problems of sharing information whenever a deputy clerk is on vacation, out sick, or is otherwise not in the Clerk's office.

6.    Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This would include preparing orders and conducting hearings to strike improperly submitted complaints, otherwise remove them from the case management system, or to redact already filed documents. This is inefficient and would increase the workload of District Judges, their court staff, and clerks. Clerks would also need guidance from the Idaho Supreme Court on how to handle improperly filed documents that were automatically accepted into Case Manager (i.e. what issues can be resolved by clerks and what

**DECLARATION OF SANDRA BARRIOS - 4**

issues require judicial action).

7.      The courts are funded in part through filing fees, so it is imperative that filing fees are actually collected. With Auto Accept, a complaint would be automatically accepted even though a filing fee had not been paid. Thus, Auto Accept limits the clerk's ability to collect a filing fee and will simultaneously require judicial and clerk action in cases where the complaint was submitted without a filing fee. This puts a strain on judicial resources.

8.      Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date as the filing date relates back to the date of original submission. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end.

9.      Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

10.      The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Court judges have access to them. A complaint is not an official court document until

**DECLARATION OF SANDRA BARRIOS - 5**

it has been accepted, and the District Courts should not be publishing documents (including pleadings that potentially include confidential information or that should have been filed under seal) that have not been reviewed and accepted by a clerk.

11.     Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

12.     The potential for the disclosure of confidential information is especially concerning given the recent and unfortunate trend of doxing public officials, including judges, by extremist groups.[1] A document labeled as a complaint could be submitted to the Press Review Queue regardless of its actual substance. Thus, the Press Review Queue could be misused for doxing since individuals could submit a document labeled as a complaint that includes home addresses, phone numbers, etc. of public officials or any member of the public. Anything labeled as a complaint by the submitter would appear in the Press Review Queue, which essentially gives individuals a public platform to widely disseminate defamatory statements, confidential information, or any other improper documents that would be interpreted by clerks under the current system.

13.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Fourth Judicial District also needs to ensure that litigants'

---

[1] See e.g. *https*://idahocapitalsun.com/2022/04/15/idaho-extremists-target-judges-prosecutors-health-workers-in-doxxing-campaigns/; https://www.ktvb.com/article/news/local/idaho-judge-doxxed-child-protection/277-751b283e-0675-4f83-9ffe-ffc63094fb4c; https://cdapress.com/news/2022/jun/14/police-face-threats-doxxing-after-patriot-front-ar/

**DECLARATION OF SANDRA BARRIOS - 6**

rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Fourth Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 6th day of December, 2022.

Sandra Barrios

**DECLARATION OF SANDRA BARRIOS - 7**

**CERTIFICATE OF SERVICE**

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                          amberdina@givenspursley.com
Katherine A. Keating                   katherin.keating@bclplaw
Jonathan G. Fetterly                   jon.fetterly@bclplaw.com


/s/Keely E. Duke_____
Keely E. Duke


**DECLARATION OF SANDRA BARRIOS - 8**

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**DECLARATION OF KARLENE BEHRINGER** |

I, Karlene Behringer, declare as follows:

1.    I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.    I serve as the Trial Court Administrator for the State of Idaho's First Judicial District.

3.    As the Trial Court Administrator, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter

**DECLARATION OF KARLENE BEHRINGER- 1**

the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court.  If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed as part of the official court record. The District Judges do not participate in this process with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

5.      Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction. Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system.

6.      This is a serious concern because caseloads in the First Judicial District are increasing, and District Judges and their court staff are incredibly busy. Auto Accept would increase their already full workload since District Judges and their court staff would have to spend time addressing improperly submitted complaints that would have been fielded by the clerks under our current system (e.g. by preparing and entering an order striking the pleading). This puts District Judges in the difficult position of determining what action should be taken if a complaint is

**DECLARATION OF KARLENE BEHRINGER- 2**

improperly submitted.

7.      For decades, and long before the transition to e-filing, clerks have served as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing that claim if their complaint had a filing error that was not addressed on the front end.

8.      Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

9.      The Press Review Queue would provide members of the press and public with access to newly submitted complaints before they are reviewed and accepted by the Clerk's Office.

10.     The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Courts have access.

11.     I am also concerned about the implicit representation that a document in the Press Review Queue has been filed or is otherwise an official court document. Members of the press and public may not understand such documents have not been reviewed or accepted by clerks and will not become part of the record if they are rejected. This could result in the press and/or members of

**DECLARATION OF KARLENE BEHRINGER- 3**

the public reporting on complaints available in the Press Review Queue as if they are official court documents, when in reality no complaint in the Press Review Queue is an official court document because it has not been reviewed and accepted for filing. This could erode public confidence in the judiciary if members of the press and public falsely report on complaints in the Press Review Queue as if they are official court records.

12.    Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint that includes confidential information, such as social security numbers, birthdates, bank account information, etc. That information will be available to the press and public during the entire time the complaint is in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

13.    I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The First Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring that complaints are reviewed by clerks so any filing errors can be timely addressed. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the First Judicial District's ability to serve and protect the individuals who access the court system.

14.    I also understand CNS has alleged there have been delays in reviewing and accepting newly submitted complaints. Since the transition to e-filing roughly four years ago, Clerk's Offices throughout the First Judicial District have been consistently short-staffed. They have experienced an extremely high amount of turnover and have had a very difficult time recruiting new employees. These problems were exacerbated by the COVID-19 pandemic, which

**DECLARATION OF KARLENE BEHRINGER- 4**

caused already short-staffed offices to fall behind on processing newly submitted complaints. Kootenai County has petitioned the County Commissioners for additional funding to hire more clerks to help with the processing of complaints. Thus, any alleged delays in processing complaints are the result of scarce judicial resources and difficulties with recruiting and retaining personnel; the review and acceptance of complaints is not a tedious or lengthy process, but we do not always have enough clerks to keep up with the volume of filings.

15.    Auto Accept will put an additional strain on the Clerk's Offices because it is much more efficient for clerks to review and accept or reject a complaint on the front end, as opposed to tracking down an improperly accepted complaint and working with a District Judge and his or her court staff to take the appropriate judicial action to remedy the improper filing.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 28th day of November, 2022.


*Karlene Behringer*
Karlene Behringer

**DECLARATION OF KARLENE BEHRINGER- 5**

ER-2492

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                          amberdina@givenspursley.com
Katherine A. Keating                   katherin.keating@bclplaw
Jonathan G. Fetterly                   jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke


**DECLARATION OF KARLENE BEHRINGER- 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF KERRY HONG** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Kerry Hong, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Trial Court Administrator for the State of Idaho's Sixth Judicial District.

3.      As a Trial Court Administrator, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the to-be-filed documents to ensure they meet the requirements established by the Idaho

**DECLARATION OF KERRY HONG- 1**

Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court. If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

5.      Under Auto Accept, the complaint would immediately transfer to the official record in Case Manager before ministerial review by the clerks, which they have been performing for years both pre- and post-transition to e-filing. Rather than catch errors before the documents were made public and filed in the official court record, clerks would be forced to perform their critical ministerial review in Case Manager. This is problematic for the following reasons:

      a.   First, each filed document would be separately docketed in Case Manager, instead of being together in one e-envelope like in File & Serve (the Tyler system clerks currently use to review submitted documents). Thus, a deputy clerk would have to review each document by clicking through multiple

**DECLARATION OF KERRY HONG- 2**

"tabs" in case manager, as opposed to review one envelope in File & Serve. This will increase the time it takes deputy clerks to review documents for basic conformity with procedural and court filing rules.

b.  The current system supports the purpose of deputy clerks, who are responsible for ensuring information and documents move through the court efficiently. The File & Serve platform allows clerks to efficiently review information related to a submission in one place. Once a submission is approved, the press and public have immediate access to filed documents because they are instantaneously transferred to Case Manager. The structure of File & Serve also allows Clerk's Offices to move documents into queues, which are essential to workflow and staffing management. Staff can be assigned to review documents in the queues depending on staffing shortages or court document submission volume. Case Manager does not allow the Clerk's Offices to make any of those decisions. I believe our current system of review in File & Serve is efficient and provides the press and public with timely access to filings.

c.  Making corrections in Case Manager would be time consuming and cumbersome because deputy clerks would have to track down contact information for the filer in File & Serve and then call or email the filer (assuming contact information was provided) to explain the issues with the filings that need to be corrected. All of this would happen outside of the Case Manager program because this program does not have the communication function that File & Serve has. Such communications could

**DECLARATION OF KERRY HONG- 3**

not happen in File & Serve because submission would be immediately transferred to Case Manager. This would be an inefficient process for the deputy clerks, especially since the communications would be housed in individual deputy clerk's email accounts and could not be broadly shared, as they now are in File & Serve. This would result in problems of sharing information whenever a deputy clerk is on vacation, out sick, or is otherwise not in the Clerk's Office.

6.       Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This would include preparing orders and conducting hearings to strike improperly submitted complaints, otherwise remove them from the case management system, or to redact already filed documents. This is inefficient and would increase the workload of District Judges, their court staff, and clerks. As an example, in Power County it takes clerks at least an hour to correct an error that is missed during the review and acceptance process. Auto Accept would eliminate clerk review on the front end. If the Clerk's Office had to dedicate an hour to correcting every erroneous filing that went into Case Manager via Auto Accept, this would place a significant strain on judicial resources and would require additional clerks.

7.       The clerk's offices are funded through filing fees, so it is imperative that filing fees are actually collected. With Auto Accept, a complaint would be automatically accepted even though a filing fee had not been paid. Thus, Auto Accept limits the clerk's ability to collect a filing fee and will simultaneously require judicial and clerk action in cases where the complaint was submitted without a filing fee. This puts a strain on judicial resources.

8.       Clerks serve as gatekeepers for improperly submitted documents. Auto Accept

**DECLARATION OF KERRY HONG- 4**

would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date because the filing date relates back to the date of original submission. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end. If a complaint was filed in the wrong venue (i.e. a venue other than what was listed on the face of the complaint), this would need to be remedied either through dismissal of the complaint or a change of action. The first option could adversely impact litigants, particularly if they filed the complaint on or near the statute of limitations, as discussed above. The second option adversely impacts the courts because judicial action would be required to transfer the case to the venue listed on the face of the complaint.

9.      Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

10.     In sum, clerk review is a huge component of providing the public with access to the courts. It is much more beneficial for attorneys and litigants to be notified of errors with a submission on the front end so they can correct the error and re-submit the document. Auto Accept eliminates safeguards we currently have in place to ensure that documents are properly submitted and that litigants and attorneys are promptly notified of errors.

11.     The Press Review Queue is concerning to me because it provides the press and

**DECLARATION OF KERRY HONG- 5**

public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Court judges have access to them. A complaint is not an official court document until it has been accepted, and the District Courts should not be publishing documents (including pleadings that potentially include confidential information or that should have been filed under seal) that have not been reviewed and accepted by a clerk.

12. Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

13. Both Auto Accept and Press Review Queue could erode the public's confidence in the judicial system because, under either system, documents that have not been reviewed by a clerk will be available to the press and public. This could include documents that contain confidential or inflammatory information, as discussed above, or documents that are rejected for filing (Press Review Queue) or stricken from the docket because they were improperly filed (Auto Accept). The public may attribute filing mistakes to the District Courts rather than the filer. Further, the public would understandably lose confidence in the courts if the courts were publishing documents containing confidential information or that are later rejected for filing. There is no guarantee that members of the press or public will understand—or accurately report—that documents reviewed in the Press Review Queue are *not* official court records. Thus, the Press Review Queue presents concerns about the press reporting on newly submitted complaints as though they are official court

**DECLARATION OF KERRY HONG- 6**

records, when in reality they are not official records—and have not been filed—until clerks have reviewed and accepted them for filing. Again, the public may not appreciate where the fault lies when members of the press inaccurately report on newly submitted civil complaints accessed through the Press Review Queue as though they are official court documents.

14.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Sixth Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Sixth Judicial District's ability to serve and protect the individuals who access the court system.

15.     I am not aware of any significant delays in providing the press and public with access to newly submitted civil complaints in the Sixth Judicial District. Complaints are typically reviewed and accepted within 24 hours from the time of their submission.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this _12_ day of December, 2022.

_____
Kerry Hong

**DECLARATION OF KERRY HONG- 7**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF KERRY HONG- 8**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>    Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>    Defendants. | CASE NO. 1:21-CV-00305-DCN<br><br>**DECLARATION OF JAMIE ROBB** |

I, Jamie Robb, declare as follows:

1.      I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.      I serve as the Trial Court Administrator for the State of Idaho's Third Judicial District.

3.      As a Trial Court Administrator, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Trial Court Administrators are responsible for carrying out administrative duties of the District Court as deleted by the Administrative Judge for that particular judicial

**DECLARATION OF JAMIE ROBB - 1**

district. ICAR 43. Trial Court Administrators must be familiar with statewide standardized business processes for court clerks, as well as local practices, and assist where necessary to ensure there is alignment between the two.  Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court.  If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing, file stamped, and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is now filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

5.      Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction.

6.      Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This would include preparing orders

**DECLARATION OF JAMIE ROBB - 2**

and conducting hearings to strike improperly submitted complaints or otherwise remove them from the case management system. This is inefficient and would increase the workload of District Judges, their court staff, and clerks.

7.    Placing extra ministerial burdens on the clerks is problematic for Clerk's Offices that are already struggling to hire and retain sufficient personnel. Canyon County Clerk's Office currently has 8 vacancies. In 2021, the Canyon County Clerk's Office had a 34.4% turnover rate, and in 2022 has had a 16.6% turnover rate. They historically receive few applications for clerk positions, with one position only recently being filled after being open since June of 2021 and receiving one application. These are not high paying jobs and they can be stressful and exhausting since clerks oftentimes deal with member of the public who are frustrated and mistreat clerks. It is already a challenge to hire and retain clerks, and creating additional work related to tracking down and correcting improperly filed complaints will only exacerbate these problems.

8.    Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date as the filing date relates back to the date of original submission. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end.

**DECLARATION OF JAMIE ROBB - 3**

9.     Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements. This is especially concerning in the Third Judicial District because there are a lot of complaints that attorneys and litigants intend to file in Ada County that inadvertently get filed in Adams County. Without clerk review to catch this common mistake, attorneys and litigants are at risk of potentially missing a statute of limitations if the error goes unnoticed. If a complaint was filed in the wrong venue (i.e. a venue other than what was listed on the face of the complaint), this would need to be remedied either through dismissal of the complaint or a change of action. The first option could adversely impact litigants, particularly if they filed the complaint on or near the statute of limitations, as discussed above. The second option adversely impacts the courts because judicial action would be required to transfer the case to the venue listed on the face of the complaint.

10.     Auto Accept would also present issues with refunding filing fees if an action is filed in the wrong county. Currently, filing fees are processed by Tyler and Tyler transfers payment to the District Court only if the complaint is accepted. If complaints were automatically accepted, payment would presumably be automatically received by the District Courts. This means the District Courts would have to dedicate personnel to issuing refunds for filing fees, which is a difficult and cumbersome process, as opposed to refunds being handled by Tyler.

11.     The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Courts have access to them. A complaint is not an official court document until it has been accepted (file stamped and placed in the case management system), and the District Courts should not be publishing documents (including pleadings that potentially include confidential

**DECLARATION OF JAMIE ROBB - 4**

**ER-2505**

information or that should have been filed under seal) that have not been reviewed and accepted by a clerk.

12.    Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

13.    I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Third Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Third Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 9th day of December, 2022.

_____
Jamie Robb

**DECLARATION OF JAMIE ROBB - 5**

**ER-2506**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF JAMIE ROBB - 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, <br><br> Plaintiff <br><br> vs. <br><br> SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, <br><br> Defendants. | CASE NO. 1:21-CV-00305-DCN <br><br> **DECLARATION OF SHELLI TUBBS** |

I, Shelli Tubbs, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as the Trial Court Administrator for the State of Idaho's Fifth Judicial District.

3.     As a Trial Court Administrator, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter

**DECLARATION OF SHELLI TUBBS - 1**

the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court.  If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing, a file stamp is affixed to the document, and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is now filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

5.      Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction.

6.      Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system. This would include preparing orders and conducting hearings to strike improperly submitted complaints,  otherwise remove them from the case management system, or to redact already filed documents. This is inefficient and would increase the workload of District Judges, their court staff, and clerks.

7.      The clerk's offices are funded through filing fees, so it is imperative that filing fees

**DECLARATION OF SHELLI TUBBS - 2**

are actually collected. With Auto Accept, a complaint would be automatically accepted even though a filing fee had not been paid. Thus, Auto Accept limits the clerk's ability to collect a filing fee and will simultaneously require judicial and clerk action in cases where the complaint was submitted without a filing fee. If the wrong filing fee is paid, it takes a substantial amount of time and resources to correct these errors once a complaint has been accepted for filing. Thus, Auto Accept would put a strain on judicial resources based on the issues it presents with collecting filing fees and correcting errors related to filing fees.

8.     Placing extra ministerial burdens on the clerks is problematic for Clerk's Offices that are already struggling to hire and retain sufficient personnel. There have been job vacancies and staffing shortages in Clerk's Offices throughout the Fifth Judicial District since the beginning of the COVID-19 pandemic. The Clerk's Offices do not have a clerk or clerks whose job responsibilities are solely dedicated to reviewing newly submitted documents. Clerks are responsible for answering phone calls, helping pro se litigants at the counter, and reviewing newly submitted documents. Clerks also review notes from attorneys related to newly submitted documents (e.g. if something needs to get in front of a judge for an expedited hearing). Auto Accept would eliminate the ability to include a note with a newly submitted document since submissions would automatically go to Case Manager without clerk review.

9.     Clerks serve as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date because the filing date relates back to the date of the original submission. *See*

**DECLARATION OF SHELLI TUBBS - 3**

Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time; filing issues will only be addressed if they are brought to the District Court's attention. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end. If a complaint was filed in the wrong venue (i.e. a venue other than what was listed on the face of the complaint), this would need to be remedied either through dismissal of the complaint or a change of action. The first option could adversely impact litigants, particularly if they filed the complaint on or near the statute of limitations, as discussed above. The second option adversely impacts the courts because judicial action would be required to transfer the case to the venue listed on the face of the complaint.

10.     Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements.

11.     The Press Review Queue is concerning to me because it provides the press and public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Courts have access to them. A complaint is not an official court document until it has been accepted (file stamped and placed in the court's case management system), and the District Courts should not be publishing documents (including pleadings that potentially include confidential information or that should have been filed under seal) that have not been reviewed and accepted by a clerk.

12.     Providing the press and public with access to documents that have not been reviewed and accepted is also dangerous because an individual could inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank

**DECLARATION OF SHELLI TUBBS - 4**

account information, etc. This information will be available to the press and public during the entire time the complaint sits in the Press Review Queue. Further, filing errors could result in cases that were supposed to be filed under seal being available in the Press Review Queue.

13.    I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Fifth Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring complaints are reviewed by clerks so any filing errors can be timely addressed on the front end. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Fifth Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this   29   day of November, 2022.

_____
Shelli Tubbs

**DECLARATION OF SHELLI TUBBS - 5**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                          amberdina@givenspursley.com
Katherine A. Keating                   katherin.keating@bclplaw
Jonathan G. Fetterly                   jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF SHELLI TUBBS - 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF TAMMIE WHYTE** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Tammie Whyte, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as the Trial Court Administrator for the State of Idaho's Seventh Judicial District.

3.     As the Trial Court Administrator, I am aware that each county Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Trial Court Administrators are responsible for carrying out administrative duties of the District Court as deleted by the Administrative Judge for that particular judicial

**DECLARATION OF TAMMIE WHYTE- 1**

district. ICAR 43. Trial Court Administrators must be familiar with statewide standardized business processes for court clerks, as well as local practices, and assist where necessary to ensure there is alignment between the two. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the requirements established by the Idaho Supreme Court to enter the court system as official records. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court. If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing, affixes a file stamp, and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed as part of the official court record. The District Judges do not participate in this process, with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

4.      The clerk review process was in place prior to the transition to e-filing. With paper filings, the filer would hand the clerk their submission (e.g. a complaint and summons), the clerk would then review the submission to make sure all filing requirements were met (e.g. correct filing fee was included, filed in the correct jurisdiction, etc.). The clerk would either accept the submission—at which point it was file stamped and docketed in the official court record—or reject the submission and provide the filer with an explanation of what needed to be fixed for the complaint to be accepted.

5.      I understand that in this lawsuit, CNS claims Sara Omundson, in her official capacity as Administrator Director of Idaho Court, should be compelled to either enable Tyler's Auto Accept function or implement a Press Review Queue. Either option would provide CNS with

**DECLARATION OF TAMMIE WHYTE- 2**

immediate access to newly submitted civil complaints before they have been reviewed or accepted for filing by a county clerk.

6.     Under Auto Accept, the complaint would immediately be part of the official record even if the applicable filing fee had not been paid or there were other errors with the submission, such as filing in the wrong jurisdiction. Judicial action would be required to address improperly submitted documents that are automatically accepted into the case management system.

7.     This is a serious concern because Auto Accept would increase the already full workload of District Judges and their court staff because they would have to spend time addressing improperly submitted complaints that would have been fielded by the clerks under our current system (e.g. by preparing and entering an order striking the pleading). This puts District Judges in the difficult position of determining what action should be taken if a complaint is improperly submitted. There are twenty judges in the Seventh Judicial District, including magistrate judges. Only the six District Judges have a law clerk or staff attorney. Magistrate Judges in the Seventh Judicial District will occasionally be assigned cases where the amount in controversy is $25,000 (as opposed to the $10,000 threshold that invokes the jurisdiction on the District Court). Magistrate Judges do not have law clerks. Thus, although some judges may be able to delegate certain tasks to their law clerks related to correcting improperly submitted documents, many judges do not have this option and will have to spend their own time correcting erroneous filings. In either scenario, automatically routing improper submissions into Case Manager via Auto Accept puts a strain on judicial resources. The clerks and judges are extremely busy, and adding to their already heavy workload would require additional resources such as hiring additional clerks.

8.     For decades, and long before the transition to e-filing, clerks have served as gatekeepers for improperly submitted documents. Auto Accept would effectively eliminate this

**DECLARATION OF TAMMIE WHYTE- 3**

gatekeeping function that benefits litigants, District Judges, their staff, and the clerks. Eliminating this gatekeeping function could be extremely detrimental to litigants. Under the current process, a litigant has three days to correct a defect with a complaint if it is rejected by the Clerk's Office and the date of the original submission will still appear as the file-stamped date as the filing date relates back to the date of original submission. *See* Idaho Rule for Electronic Filing and Service 13. With Auto Accept, an issue with a submitted complaint may go unnoticed for a substantial period of time. If a litigant files their complaint close to the expiration of the statute of limitations, they could be barred from pursuing the claim if their complaint had a filing error that was not addressed on the front end. If a complaint was filed in the wrong venue (i.e. a venue other than what was listed on the face of the complaint), this would need to be remedied either through dismissal of the complaint or a change of action. The first option could adversely impact litigants, particularly if they filed the complaint on or near the statute of limitations, as discussed above. The second option adversely impacts the courts because judicial action would be required to transfer the case to the venue listed on the face of the complaint.

9.      Eliminating the clerk's gatekeeping function is harmful to all litigants, but it could be especially harmful to *pro se* litigants who are not as familiar with filing requirements. *Pro se* litigants are also less likely to be aware of the requirement that sealed documents need to be "filed conventionally" (i.e. paper filed). IREFS 5(h). This makes them more vulnerable to exposing confidential information if they fail to follow the requirements for filing confidential documents.

10.      It is my understanding that the Press Review Queue would provide members of the press and public with access to newly submitted complaints before they are reviewed and accepted by the Clerk's Office.

11.      The Press Review Queue is concerning to me because it provides the press and

**DECLARATION OF TAMMIE WHYTE- 4**

public with access to newly submitted civil complaints before the Clerk's Office reviews and accepts them. The press and public should not have access to newly submitted complaints before the District Court judges have access to them.

12.     I am also concerned about the implicit representation that a document in the Press Review Queue has been filed or is otherwise an official court document. Members of the press and public may not understand such documents have not been reviewed or accepted by clerks and will not become part of the record if they are rejected. This could result in the press and/or members of the public reporting on complaints available in the Press Review Queue as if they are official court documents, when in reality no complaint in the Press Review Queue is an official court document because it has not been reviewed and accepted for filing. This could erode public confidence in the judiciary if members of the press and public falsely report on complaints in the Press Review Queue as if they are official court records.

13.     There is a potential for both litigants and attorneys misusing the Press Review Queue or Auto Accept to publish confidential or inflammatory information. As an example, an attorney representing a defendant in a high profile criminal case in the Seventh Judicial District intentionally filed documents that contained inflammatory information about the prosecutor, and then contacted the Clerk's Office to demand this information be published on the Supreme Court's cases of interest website immediately. With Auto Accept or the Press Review Queue, there is no way to prevent malicious and improper filings from being made available to the public. This is especially concerning since many bloggers and other purported members of the media are looking for information that will generate traffic to their website regardless of its accuracy. There are heightened concerns about the dissemination of newly submitted complaints that contain inflammatory or confidential information since these are the types of complaints that can

**DECLARATION OF TAMMIE WHYTE- 5**

essentially be used as clickbait.

14.     I understand the importance of providing the public and press with timely access to newly submitted civil complaints. The Seventh Judicial District also needs to ensure that litigants' rights are protected. This includes ensuring that complaints are reviewed by clerks so any filing errors can be timely addressed. This also includes ensuring that individuals' personal information is not made available to the press and public. Providing CNS with *immediate* access to newly submitted civil complaints via Auto Accept or the Press Review Queue substantially impairs the Seventh Judicial District's ability to serve and protect the individuals who access the court system.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 4 day of December, 2022

Tammie Whyte

**DECLARATION OF TAMMIE WHYTE- 6**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF TAMMIE WHYTE- 7**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF ANGIE WOOD** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Angie Wood, declare as follows:

1.     I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.     I serve as the Lead Clerk for Madison County, Idaho. I have worked for the Idaho Courts for approximately 32 years.

3.     I am aware that at times it has taken the Madison County Clerk's Office longer to review and process newly submitted civil complaints in comparison to other counties across the State of Idaho. This has been due to staffing shortages described herein, which we have been diligently trying to fix.

**DECLARATION OF ANGIE WOOD - 1**

4.      Madison County has five full time clerks and one clerk who works less than part time (usually under 10 hours per week).

5.      Because Madison is a small county, we do not have any clerks whose job duties are dedicated to reviewing and processing submissions. All clerks are responsible for answering phone calls, balancing money, and assisting people at the counter.

6.      In addition, the clerks serve as in-court clerks for Magistrate and District Court Judges. One clerk is dedicated to assisting our Magistrate Judge every day of the week.

7.      Madison County's District Judge, the Honorable Steven Boyce, is typically here on Mondays, but sometimes there are court proceedings that will require Judge Boyce to be here the entire week. One clerk serves as the in-court clerk when Judge Boyce is in town. Even when Judge Boyce is not in Madison County, at least a few hours of clerk time per day are dedicated to in-court clerk work on his cases.

8.      We have three treatment courts with three different Judges in Madison County. Clerk time is dedicated to assisting those Judges.

9.      Although we do not have a dedicated clerk for reviewing submissions, we have one clerk who handles a lot of the reviewing. This clerk also serves as the Jury Commissioner for Madison County and also assists with the tasks described above.

10.     Unfortunately, two of our five clerks have had health issues that have required them to be out of office more than expected. Based on the in-court clerk duties described above, this leaves our office very short-staffed when it comes to reviewing submissions if one or more clerks are out of the office with health issues or for any other reasons.

11.     Madison County has been actively looking for other clerks. Very few qualified applicants have applied. We are actively looking into other ways to advertise for the clerk positions

**DECLARATION OF ANGIE WOOD - 2**

so we can attract more applicants.

12.     The clerks in Madison County work diligently to review newly submitted complaints as soon possible, but they have to balance document review with their other job duties. This does not always allow for prompt review of newly submitted complaints. However, Madison County is working to rectify the situation by trying to hire additional personnel and, in the meantime, is making the most efficient use of the clerks it has so they can accomplish all of their job duties, which extend far beyond the review of submitted complaints, in a timely manner.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 5th day of December, 2022.

_Angie Wood_
Angie Wood

**DECLARATION OF ANGIE WOOD - 3**

## CERTIFICATE OF SERVICE

I hereby certify that on 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                          amberdina@givenspursley.com
Katherine A. Keating                   katherin.keating@bclplaw
Jonathan G. Fetterly                   jon.fetterly@bclplaw.com


/s/Keely E. Duke _____
Keely E. Duke

**DECLARATION OF ANGIE WOOD - 4**

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-REP |
| Plaintiff | **DECLARATION OF TERRY DERRICK** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, TERRY DERRICK, and pursuant to 28 U.S.C. § 1746, I declare as follows:

1.    My name is Terry Derrick, and I am an adult resident and citizen of the State of Texas.  I am currently the General Manager of Courts at Tyler Technologies, Inc. ("Tyler").  I have also previously served as General Manager of eSolutions for Tyler and Operations Director of eSolutions for Tyler.  In these roles, I am familiar with and was involved in the management of the professional services and support organizations at Tyler that are responsible for, among other things, Tyler's electronic filing platform currently known as eFile & Serve.  I make this Declaration based on my own personal knowledge and I am competent to the matters herein.

2.    On November 10, 2022, I served as Tyler's designated corporate representative in

**DECLARATION OF TERRY DERRICK - 1**
506239974.4

connection with subpoenas and deposition notices served in this matter in accordance with Rules 30(b)(6) and 45. Among other topics, my testimony included information regarding Tyler's eFile & Serve platform and various functionality related-thereto that I understand to be at issue in this case. That functionality includes two specific tools: (1) the Press Review Tool; and (2) the Auto-Accept Review feature.

3.     In response to the 30(b)(6) notice from Sara Omundson and as a follow-up to my November 10, 2022 deposition, I am providing additional information regarding the Press Review Tool and the Auto-Accept Review feature.

4.     Attached as Exhibit 1 to this Declaration is a true and correct copy of an Excel spreadsheet that was prepared under my supervision and at my direction by individuals at Tyler. This spreadsheet titled "Press Review Tool Case Types by Jurisdiction" identifies each jurisdiction that currently utilizes the Press Review Tool. The second column of Exhibit 1 also identifies the types of cases in each jurisdiction that are made available via the Press Review Tool.

5.     Attached as Exhibit 2 to this Declaration is a true and correct copy of an Excel spreadsheet that was prepared under my supervision and at my direction by individuals at Tyler. This spreadsheet titled "Auto Accept Config - 111922" identifies each jurisdiction that currently utilizes the Auto-Accept Review feature. In addition, the spreadsheet identifies the various conditions under which each jurisdiction has configured its eFile & Serve system to auto-accept a filing. Those conditions include (1) a Case Category (*e.g.*, Civil, Family, Probate, etc.); (2) a Case Type (*e.g.*, Small Claims, Debt/Collections, etc.); (3) a Filing Code (*e.g.*, Affidavit, Notice, Objection, etc.); (4) a Judicial Officer (*e.g.*, a specific judge); (5) a Filing Firm (*e.g.*, The Smith Law Firm, etc.); (5) a Filing Component (*e.g.,* an optional or required fee); (6) a Document Type (*e.g.*, Confidential, Public, etc.); (7) a Payment Type (*e.g.*, cash or credit); (8) a Filer Type (*e.g.*,

**DECLARATION OF TERRY DERRICK - 2**
506239974.4

Batch Filings); and (9) a Party Type (*e.g.*, Plaintiff, Defendant, etc.).

6. While the Auto-Accept Review feature can be configured to account for all of these various conditions, the conditions under which various jurisdictions utilize the auto-accept feature vary. Many jurisdictions focus their auto-accept functionality on conditions related to the Case Category, Case Type, and Filing Code.

7. Exhibit 2 identifies the applicable jurisdiction and describes each condition it has configured in the column labeled "Condition." The spreadsheet further identifies what specific condition criteria must be met before the Auto-Accept Review feature is triggered. Where a column says "NULL," that reflects that the jurisdiction did not specify any condition criteria for that category.

8. For example, line 3 of the spreadsheet identifies the jurisdiction as Fresno County and identifies the condition's description as "Fresno Juvenile Rush Auto Receipt." The only configured criteria for this condition is located in the Filing Code column as "Juvenile Rush (Hearing Within 2 Days)." The remaining columns possess "NULL" values. This means that if a document is e-filed in Fresno County with the Filing Code "Juvenile Rush (Hearing Within 2 Days)", the eFile & Serve system is configured to auto-accept that filing via the Auto-Accept Review feature.

9. Line 46 identifies the jurisdiction as Los Angeles County – Adoptions. The eFile & Serve system is configured to auto-accept filings that are "Subsequent Filings"—meaning not the initial filings in a matter—and that are filed with the filing code "Home Study from Agency."

10.

11. The information included on Exhibits 1 and 2 is confidential and proprietary to Tyler and to the various jurisdictions that have chosen to configure their Press Review Tool and/or

**DECLARATION OF TERRY DERRICK - 3**
506239974.4

Auto-Accept Review feature as identified on the spreadsheets. These spreadsheets are designated CONFIDENTIAL pursuant to the terms of the Protective Order entered by this Court.

I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 15 day of December, 2022.

_____
TERRY DERRICK

**DECLARATION OF TERRY DERRICK - 4**
506239974.4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on __day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber K. Dina                          amberdina@givenspursley.com
Katherine A. Keating                   katherin.keating@bclplaw
Jonathan G. Fetterly                   jon.fetterly@bclplaw.com


/s/Keely E. Duke _____
Keely E. Duke

**DECLARATION OF TERRY DERRICK - 5**
506239974.4

# Exhibit F

# Deposition of 30(b)(6) Terry Derrick - Vol. II

# Courthouse News Service v. Omundson

# November 10, 2022



206.287.9066  I  800.846.6989

1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101

www.buellrealtime.com

email: info@buellrealtime.com



Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. II

---

Page 110

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____
                                    )
COURTHOUSE NEWS SERVICE,      )
                                    )
                                    )
          Plaintiff,  )
                                    )
     v.                ) No. 1:21-CV-00305-REP
                                    )
SARA OMUNDSON, in her official   )
capacity as Administrative       )
Director of Idaho Courts,        )
                                    )
          Defendant.  )
_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF TYLER TECHNOLOGIES

REPRESENTED BY TERRY DERRICK - VOLUME II

_____

Taken at Plano, Texas
(Conducted via Videoconference.)


DATE TAKEN:  November 10, 2022
REPORTED BY:  Nicole A. Bulldis, RPR
     AZ No. 50955 | CA No. 14441 | WA No. 3384

---

Page 112

1          30(b)(6) DEPOSITION OF TERRY DERRICK
2
3               EXAMINATION INDEX
4    EXAMINATION BY                         PAGE
5    Ms. Duke............................................. 113
6    Mr. Fetterly........................................ 209
7    Ms. Duke............................................. 216
8
9
10               EXHIBIT INDEX
11   EXHIBITS FOR IDENTIFICATION              PAGE
12   38 Defendant's 30(b)(6) Notice of Deposition to
13      Tyler Technologies................................ 117
14
15               --o0o--
16
17
18
19
20
21
22
23
24
25

---

Page 111

1          A P P E A R A N C E S
2
3    FOR PLAINTIFF:
4    (via Zoom)     Jonathan G. Fetterly
                    Katherine A. Keating
5                   BRYAN CAVE LEIGHTON PAISNER LLP
6                   3 Embarcadero Center, 7th Floor
                    San Francisco, CA 94111
7                   (415) 675-3400
                    jon.fetterly@bclplaw.com
8                   katherine.keating@bclplaw.com
9    FOR DEFENDANT:
10   (via Zoom)     Keely E. Duke
                    Molly E. Mitchell
11                  DUKE EVETT, PLLC
                    1087 W. River Street, Suite 300
12                  PO Box 7387
                    Boise, ID 83707
13                  (208) 342-3310
                    ked@dukeevett.com
14                  mem@dukeevett.com
15
16   FOR TYLER TECHNOLOGIES
     AND WITNESS:
17
18   (via Zoom)     Beth W. Petronio
                    K&L GATES LLP
19                  1717 Main Street, Suite 2800
                    Dallas, TX 75201
20                  (214) 939-5815
                    beth.petronio@klgates.com
21
22   ALSO PRESENT:
23   (via Zoom)     SARA OMUNDSON, Idaho Courts
24                  --o0o--
25

---

Page 113

1    REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
2         Thursday, November 10, 2022; 1:24 p.m.
3                   --o0o--
4
5    TERRY DERRICK,              witness herein, having been
6                   first duly sworn on oath,
7                   was examined and testified
8                   as follows:
9
10              E X A M I N A T I O N
11   BY MS. DUKE
12      Q.  Mr. Derrick, it's always hard to go second in
13   these because I might bounce around a bit, but I'll do
14   my best to try to keep it in a logical fashion selfishly
15   for me and then also to hopefully help you.
16          So same -- same general rules that
17   Mr. Fetterly just provided to you.  If I ask you a
18   question that you don't understand, would you please let
19   me know?
20      A.  Of course.
21      Q.  If you're going on to answer my questions,
22   we'll assume then that you understood them; is that
23   fair?
24      A.  Yeah.  Sure.
25      Q.  Excellent.

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

ER-2532

Courthouse News Service v. Omundson                                    30(b)(6) Terry Derrick - Vol. II

---

Page 114

1      All right.  So let me talk about the State of
2  Idaho real quick.  Do you have any particular, I guess,
3  responsibility or involvement with the State of Idaho
4  from a Tyler perspective, currently?
5      A.  Yes, to an extent.  You know, the new role
6  that I am currently in, my responsibility is to oversee
7  the direction for some of our products by which the
8  State of Idaho is using.  So in that regards, yes.
9      Q.  Which products would those be?
10     A.  Our Enterprise Justice platform, the new case
11 management system.  Odyssey, if you will, the new name
12 for that, I should say.  Same product, new name.  The
13 jury product for Tyler, the -- and I think those are the
14 two primary ones.
15     Q.  Prior to that, so let's just say from 2017
16 forward, what involvement or role did you have with
17 respect to the State of Idaho through Tyler?
18     A.  Sure.  As the general manager of the
19 eSolutions business line, it was oversight into the
20 product and solution and business direction for our
21 eFile & Serve platform, the Guide & File platform, and
22 I believe those would be the two that would be relevant
23 here.
24     Q.  All right.  In your work, let's say, with
25 File & Serve, have you ever talked with any of the Idaho

---

Page 115

1  clerks as far as you know?
2      A.  Yes, a long time ago.
3      Q.  And do you recall what the general nature of
4  those conversations was?
5      A.  Yeah.  During the initial implementation of
6  Idaho for the e-filing project, several years ago, I
7  helped do project kick-off meetings and participate as
8  kind of the program director during that time.
9      Q.  All right.  And in your current role, have you
10 been having any conversations with the clerks of the
11 court?
12     A.  I have not, no.
13     Q.  At any point in time, have you sat down and
14 talked with any of the judges in the state of Idaho with
15 respect to any of Tyler's products?
16     A.  No.
17     Q.  Sorry, I didn't hear you if you answered.
18     A.  I'm sorry.  No, I -- no, I have not.
19     Q.  Okay.
20     A.  Keely, is there a way that you could maybe
21 shut the blinds behind you?
22     Q.  Oh, yeah.  I sure can.
23         Is that better?
24     A.  It isn't.  I'm sorry.
25     Q.  Oh, it must be going right through the -- that

---

Page 116

1  one part, so let me see if I can shift how I'm sitting.
2  How's that sound?
3      A.  That'd be great.
4      Q.  What is really great is we have sun in Boise
5  today.
6          All right.  How's that?  Better?
7      A.  Perfect.  Yes, thank you very much.
8      Q.  Oh, my gosh.  Of course.
9          All right.  So you were asked a number of
10 questions by Mr. Fetterly with respect to that
11 PowerPoint, if you would, of the -- that was attached to
12 your deposition notice.
13     A.  Yes.
14     Q.  Do you recall that?
15     A.  Yes, I do.
16     Q.  Let me -- let me pull that up here.  We had it
17 as 38, I think.  It's our -- our numbering was all off
18 here.  Just bear with me for a second.
19     A.  Sure.
20         (Pause in the proceedings.)
21         MR. FETTERLY:  Keely, I think we also
22 have it marked as our Exhibit 8, if you'd rather not use
23 the subpoena attachment.
24         MS. DUKE:  Yeah.  I appreciate that.
25 Thank you.

---

Page 117

1          What I'll do is I'll just mark our notice
2  as Exhibit 38.
3          (Exhibit No. 38 marked.)
4      Q.  (By Ms. Duke) So I'm going to show you here, in
5  just one moment, Exhibit 38.
6          And Sara will be joining by phone, so if you
7  see another name pop up, that's why.  She's got to run
8  and get her kiddo.
9          All right.  Can you see Exhibit 38?
10     A.  Nothing is showing on the screen.
11     Q.  Oh, it's telling me it wants to quit Zoom.
12         Okay.  I'll be back.
13     A.  Oh, wait.  It's showing now.
14     Q.  Is it?  Okay.
15     A.  Yeah, the notice of -- yeah -- deposition
16 amended, Tyler 30(b)(6); is that right?
17         MR. FETTERLY:  Yeah.  I'm not seeing it
18 on my end.
19         MS. DUKE:  Well, I -- it literally just
20 locked me out.  Now it won't even show me.  I'm not sure
21 why.  Good old Zoom.
22         THE STENOGRAPHER:  Do you want to try
23 logging out and logging back in?
24         MS. DUKE:  Yeah.  That's what I'm going
25 to try.  Sorry.  I'll be back.

2 (Pages 114 to 117)

Courthouse News Service v. Omundson      30(b)(6) Terry Derrick - Vol. II

---

Page 118

1   MR. FETTERLY: I'll be on standby.
2   (Off the record due to technical
3   difficulties.)
4   Q. (By Ms. Duke) Let me go ahead now and try to
5 show you what I was trying to show you when it all
6 decided to go haywire.
7   MS. DUKE: Do you want to pull that up,
8 the notice of depo and the PowerPoint?
9   Q. (By Ms. Duke) All right. Molly is going to
10 start sharing the screen here and we'll go to the
11 PowerPoint first. Perfect.
12   All right. First, I understand this
13 PowerPoint was not put together by you; correct?
14   A. Yes, that's correct.
15   Q. A Mr. Acosta prepared it?
16   A. Yes, that's correct.
17   Q. This is not a PowerPoint that is based on any
18 Idaho data; is that correct?
19   A. That's right.
20   Q. And this is a PowerPoint that was prepared by
21 Tyler?
22   A. It is, yes.
23   Q. And it's not a PowerPoint that the Idaho
24 Courts or Ms. Omundson at any point in time provided any
25 input as to any of the language contained within it; is

---

Page 119

1 that fair?
2   A. Yeah, that's fair.
3   Q. What's your understanding of why this
4 PowerPoint was provided to Ms. Omundson or the court
5 system in Idaho?
6   A. I'm not sure why it was provided to anyone in
7 Idaho.
8   Q. If you look to the -- and it looks like it was
9 prepared on July 1 of 2022?
10   A. Yes, that's correct.
11   Q. Do you know if this -- if this PowerPoint is
12 being used anywhere else in the country?
13   A. It was created for the State of Texas by
14 request by the Office of Court Administration and the
15 Judicial Council for Information Technology. I'm not
16 sure who else would -- would use this document.
17   Q. And do you know why the State of Texas
18 requested this PowerPoint?
19   A. I don't.
20   Q. Let's go ahead and move to the second page of
21 it, and we'll talk about Auto-Accept first. You were
22 asked a number of questions related to the Auto-Accept
23 column. And that first sentence there, it says:
24 "Auto-Accept Review is a free out-of-the-box e-filing
25 function."

---

Page 120

1   Did I read that correctly?
2   A. You did.
3   Q. When -- when Tyler is representing "free,"
4 what is Tyler meaning there?
5   A. It means it's included as part of the e-filing
6 solution. So our customers who pay for the e-filing
7 solution get that Auto-Accept function as part of that
8 solution without additional expense beyond the -- the
9 e-filing solution in itself.
10   Q. And that is not representative of the cost
11 that will be incurred by courts if they were to use the
12 Auto-Accept function; correct?
13   MR. FETTERLY: Objection. Vague and
14 ambiguous. Lacks foundation.
15   THE DEPONENT: I guess I don't understand
16 the question. Can you maybe say it again?
17   Q. (By Ms. Duke) Sure. Happy to.
18   So, obviously, that's from Tyler's side. It's
19 a free part of their program. What I'm asking is if it
20 were something that was utilized in the state of Idaho,
21 Tyler has not done any type of evaluation as to the cost
22 to the State of Idaho to use Auto-Accept in the event
23 there are issues with it?
24   A. Yeah, that's correct. We haven't -- we have
25 no visibility into any expense that could be endured by

---

Page 121

1 the State or by the Courts. This is just speaking to
2 the availability of that function.
3   Q. And in order to understand what the costs of
4 an Auto-Accept would be, Tyler -- to a court system,
5 aside from Tyler providing it free, Tyler would defer to
6 the various courts, including the Idaho State Court, as
7 to what they anticipate their internal costs would be as
8 a result of using something like Auto-Accept; is that
9 fair?
10   A. Yes, it is.
11   Q. In addition, there's words used in this --
12 this first page. Given this was prepared for the State
13 of Texas, I'll assume that the Idaho rules of e-filing
14 were in no way considered in creating or providing the
15 language that's included in this PowerPoint; is that
16 correct?
17   A. I'm not sure. We would have to ask the
18 author, but, yeah, I am -- I'm not sure.
19   Q. Okay. Any reason to believe that this --
20 given that this was prepared for the State of Texas,
21 that the Idaho rules of electronic filing would have
22 been considered in its preparation?
23   A. No reason to believe that at all.
24   Q. Are you in any way familiar with the Idaho
25 rules of electronic filing?

---

3 (Pages 118 to 121)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 122

1    A. Not -- not very familiar at all.
2    Q. Are you aware of how they define court
3 documents?
4    A. No, I am not.
5    Q. Are you aware of how the Idaho rules of
6 electronic filing define judicial documents?
7    A. No, I am not.
8    Q. With respect to this Auto-Accept portion, have
9 you talked -- or has anyone at Tyler talked with anyone
10 in the state of Idaho as to the resources it would take
11 Idaho's judicial clerks, judges, and court staff to
12 address any errors on the back end if something was
13 auto-accepted that should not have been?
14    A. Not -- not to my knowledge.
15    Q. Is Tyler aware of what judges -- well, strike
16 that.
17        Under the Auto-Accept, it's my understanding
18 that Auto-Accept means it would go from -- once it's
19 submitted to File & Serve by a user, it would
20 immediately transfer to the court's case management
21 system; is that correct?
22    A. Well, immediately is a -- is a relative term.
23 The -- the process would be once the filer submits that
24 filing through the electronic filing service provider
25 portal, it would go to the EFM, the eFiling Manager.

---

Page 123

1 Once inside the eFiling Manager, it would be assessed
2 and evaluated against those Auto-Accept rules. And if
3 it met that criteria which was pre-configured by the
4 court or the clerk, then it would be accepted and then
5 transmitted in two directions, one to the case
6 management system and then back -- one file-stamped copy
7 back to the original filer who submitted it. I'm not
8 sure if that answers your question, but...
9    Q. It does. I mean, when I say "immediately,"
10 I'm assuming that we're talking that's a matter of
11 seconds for it to go into the EFM and have whatever
12 program is -- has been put together to get it into the
13 case management system?
14    A. That's correct. Yeah, a short duration.
15    Q. Okay. And with respect to Tyler's
16 eFile & Serve, Tyler is -- is the one that -- that has
17 possession of those documents, meaning they're --
18 they're hosted by Tyler?
19        MR. FETTERLY: Objection. Vague and
20 ambiguous as to "possession."
21        THE DEPONENT: The documents themselves
22 are contained within the eFiling Manager, which exists
23 inside of the AWS GovCloud. And they can be retrieved
24 and displayed from the review queue or the review tool
25 and the review tool that the clerks use to review them.

---

Page 124

1    Q. (By Ms. Duke) Sure. Let me -- let me try to
2 phrase it a different way.
3        So when a document is submitted to
4 eFile & Serve by a submitter, Tyler is the one that is
5 responsible for the contractual arrangements with AWS as
6 to the hosting of those documents?
7    A. Correct.
8    Q. Then, once those documents -- let's say, it's
9 a complaint -- has been accepted by the court clerk and
10 it transfers to the case management system, when it
11 transfers to the case management system, that is then in
12 the state of Idaho actually hosted internally by the
13 court, the Idaho Supreme Court; correct?
14    A. That is my understanding, yes.
15    Q. And, therefore, the State of Idaho's court
16 system with respect to its case management system, that
17 system then is all the security protocols,
18 authentication items, those type -- backups, those types
19 of things are handled by the court staff, not by Tyler;
20 correct?
21    A. For the case management system, yes, that's
22 correct.
23    Q. When we go over to the File & Serve system, so
24 back to -- to Tyler's File & Serve system, it's Tyler
25 that is responsible for security, backups,

---

Page 125

1 authentication, those types of things; correct?
2    A. Yes, that is correct.
3    Q. Is Tyler -- or, are you aware, through Tyler,
4 of any of the security protocols that the Idaho Courts
5 have placed on the case management system that they are
6 hosting?
7    A. I'm not familiar with the security that Idaho
8 uses on their on-premise case management solution, no.
9    Q. And that's because that's up to the -- the
10 court as the hoster of that data?
11    A. That's correct.
12    Q. And how about backups? Is Tyler are you
13 familiar with the backups that are generated, how
14 quickly, how many, what is backed up, anything like that
15 with respect to case management system?
16    A. I'm not familiar with that, no.
17    Q. From a file integrity monitoring standpoint
18 and ransomware protection, would Tyler be aware of what
19 Idaho's Courts have put into place to protect the case
20 management documents that they host?
21    A. No.
22    Q. Is Tyler aware of the advanced endpoint
23 protection that's in place with respect to the case
24 management documents that are hosted by the Idaho Court?
25    A. No, I'm not aware of that.

---

4 (Pages 122 to 125)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 126

1    Q. Would Tyler be involved or know about the 24/7
2  monitoring service of system logs, network traffic, or
3  any type of other anomalous or malicious behavior on the
4  servers for the case management system that's hosted by
5  the Idaho Supreme Court?
6    A. No, I don't have visibility into those
7  practices.
8    Q. Would Tyler have any information or knowledge
9  as to who the secured -- or the -- who the limited pool
10  of Idaho Supreme Court employees are that have access to
11  handling, addressing, or protecting the documents that
12  are housed within the case management system hosted by
13  the Idaho Supreme Court?
14    A. No, we would not have visibility into that.
15    Q. And would Tyler have any visibility or control
16  over the administrative access to devices and servers
17  and whether they required multifactor authentication
18  with respect to the case management documents that are
19  housed by the Idaho Supreme Court?
20    A. No, we would not have that.
21    Q. And to all of these questions that I just
22  asked, I'm assuming the reason Tyler would not have that
23  information, knowledge, or control, is because that is
24  all within the control and purview of the Idaho Supreme
25  Court as the hoster of the case management system?

Page 127

1    A. That is correct.
2    Q. So let's turn then to File & Serve. Given
3  that Tyler is the, you know, hoster and in control of
4  the documents related to -- or that have been submitted
5  to eFile & Serve, would Tyler be aware of the security
6  that's in place to protect those documents?
7    A. Yes, we would.
8    Q. And just describe generally what that security
9  is for File & Serve.
10    A. I'll keep it very topical because describing
11  in detail is a security vulnerability in itself, but
12  just general security provisions that we have for the
13  e-filing platform are in our contractual agreement and
14  that would cover anything regarding the Press Review
15  Tool as well. Some of those are just general best
16  practices like vulnerability scans, virus scans,
17  firewall protection on -- on various tiers, things like
18  denial-of-service-attack protection, and -- and things
19  like that.
20    Q. And what about backups to the EFS? And we can
21  limit it to Idaho. When I ask these questions right
22  now, I'll make it clear when I'm asking about globally
23  versus Idaho.
24    So with respect to a backup of the EFS system
25  for the State of Idaho, what type of backups occur at

Page 128

1  Tyler's direction?
2    A. Sure. For Idaho specific, we do 15-minute
3  interval backups as well as daily and weekly backups.
4    Q. So let me give an example. If -- let's --
5  let's say one of the dreaded things happens that we've
6  all now gotten cybersecurity insurance for -- knock on
7  wood -- and that is, let's say, that Tyler's security is
8  breached and there's a ransomware attack that occurs on
9  Idaho's File & Serve. Is it Tyler that is the one that
10  would have the -- the documents through backups that it
11  would then be able to -- to use those backups and get
12  Idaho back up and running?
13    A. If the ransomware attack took place on
14  File & Serve?
15    Q. Yes?
16    A. Is that what you're saying?
17    Q. Correct.
18    A. Yes, then the backups within File & Serve
19  would be at Tyler's discretion.
20    Q. And within Tyler's control?
21    A. Correct.
22    Q. Okay. So going back to -- this
23  PowerPoint -- give me one second. Actually, a lot of
24  these were answered earlier, so let me just check those
25  off as I go.

Page 129

1    Oh, there was a question asked of you that in
2  Auto-Accept, one of the configurations that could be
3  used is to mark -- to have a configuration that allows
4  the -- the person who is submitting the document to be
5  filed to click a box to say confidential or public that
6  way Auto-Accept would know whether it can be
7  automatically transferred to the case management system
8  and filed within that case management system, or whether
9  it was confidential it would go into a different queue;
10  correct?
11    A. I don't recall that question, but -- but sure.
12    Q. Well, is that one of the configurations, is
13  you could use a confidential or public setting that the
14  users who are submitting documents to Tyler File & Serve
15  where they could either check it confidential or public?
16    A. Yes, that is an option for a filer to make
17  that determination.
18    Q. Okay. And is Tyler aware of any of the issues
19  when the State of Idaho was using an option to check
20  documents as confidential as to the issues and costs
21  that were created by allowing users to determine whether
22  something was or was not confidential?
23    A. No, I'm not aware of those costs.
24    Q. Are you aware of any of the issues that Idaho
25  faced when it had a time period where it permitted uses

5 (Pages 126 to 129)

Courthouse News Service v. Omundson                                30(b)(6) Terry Derrick - Vol. II

Page 130

1    to decide whether something would be confidential or
2    public?
3        A.  No, I'm not.  I don't have visibility into
4    that.
5        Q.  So just because it's a configuration that can
6    be used doesn't mean that it necessarily is something
7    that should be done; correct?
8            MR. FETTERLY:  Objection.  Vague and
9    ambiguous.  Overbroad.  Lacks foundation.
10           THE DEPONENT:  All of our configurations
11   are based upon the configuration and the -- and the
12   perspective of our partners -- our contract holders to
13   courts, so it's up to them as to what gets configured
14   and is deemed valuable or not.
15       Q.  (By Ms. Duke)  Okay.  And so by Tyler testifying
16   and by you testifying earlier today to those numerous
17   configurations that Mr. Fetterly went through with you,
18   those are not configurations that you are specifically
19   stating would work for the State of Idaho; correct?
20       A.  When you say would -- "would work," what do
21   you mean?
22       Q.  Good point.  Let me -- let me rephrase that.
23           So when you were asked a number of questions
24   by Mr. Fetterly regarding the number of configurations
25   that are available to courts to use, you are not stating

Page 131

1    that -- that Idaho -- you're not providing an opinion as
2    to whether those would be practical approaches for the
3    State of Idaho to use; is that correct?
4        A.  That's right.  I don't have intimate knowledge
5    to suggest that that would be a definitive positive
6    change.  I think my statements were really around the
7    availability of those options.
8        Q.  And that's -- that's said far better than the
9    question I asked.
10           So when you were talking about all the
11   configuration options, you were merely talking about
12   configurations that were available; correct?
13       A.  Yes, that's correct.
14       Q.  You were not making a recommendation of what
15   would or would not be useful or practical in Idaho's
16   courts; correct?
17       A.  That's correct.  I was not.
18       Q.  Now, under the -- you were asked some
19   questions about the filing fee that -- that is used.
20   Under Auto-Accept, do you know if a user were to pay
21   what they thought was the filing fee, which was, you
22   know, run through your credit card processing company
23   and sufficient funds were in the account and they were
24   wrong about what the filing fee was, is there anything
25   in Auto-Accept to be configured that would stop that

Page 132

1    auto-transfer to the case management system if an
2    improper filing fee was made?
3        A.  No, there wouldn't be.
4        Q.  Okay.  What if a filer was supposed to have a
5    filing fee and didn't have a filing fee included with a
6    complaint, would Tyler's Auto-Accept stop that filing
7    from being immediately transferred into the case
8    management system for the court?
9        A.  It -- it would be based upon the
10   configuration, but it does not use logic to determine
11   whether something should or should not have it.  It's
12   just based upon the configuration of the court.
13       Q.  And by that, I think you mean if they say,
14   "I'm filing a personal injury complaint," and let's say
15   they don't submit their -- their filing fee with it, are
16   you saying that it would then get auto-accepted and into
17   case manager and then the court would need to deal with
18   the filing fee issue on the back end?
19       A.  I'm saying it depends upon the configuration.
20   I can't tell whether or not it would be auto-accepted
21   unless we understood what the configuration was to -- to
22   evaluate that submission.
23       Q.  And do you know what costs the State of Idaho
24   would incur to come up with the configurations to allow
25   Auto-Accept for any type of complaint?

Page 133

1        A.  No, I do not.
2        Q.  Do you know whether any state using
3    Auto-Accept has been able to configure Auto-Accept so
4    that if someone doesn't file -- or doesn't pay their
5    filing fee, that that is somehow blocked from being
6    auto-accepted and transferred into the court's case
7    management system?
8        A.  I'm not familiar with the -- the intimate
9    configurations of other states and how they've
10   configured specific conditions as they pertain to
11   Auto-Accept rules.
12       Q.  So fair to say, as you sit here today, that
13   you do not know whether any state -- well, strike that.
14           Fair to say, as you sit here today, that you
15   don't know whether there is even a configuration
16   possibility of ensuring that a filing fee in fact
17   accompanies, let's say, a complaint filing; is that
18   correct?
19       A.  Say that one more time?
20       Q.  What I'm trying to get to is, as you sit here
21   today, you can't testify that you know that in fact if a
22   configuration is put in place that there is a
23   configuration that would actually say, "Oh, if you don't
24   provide your filing fee with this filing, it's not going
25   to go into Auto-Accept."

6  (Pages 130 to 133)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 134

1    A.  There is a condition by which can be
2  configured that -- that -- that would say that filings
3  with or without financials would be assessed, and so we
4  can compare the filing against that.
5      What we would not be able to do is determine
6  whether or not that was accurate, meaning filing fees
7  should have been assessed and they weren't, and then
8  it's smart enough to know that the filer made a mistake.
9  It doesn't have that logic built in.
10     **Q.  All right.  So -- I understand what you're**
11 **saying.**
12     **So what it does have the logic to do, is you**
13 **can say, yes, there should be a filing fee with this;**
14 **right?**
15     A.  Correct.  Yes.
16     **Q.  But if it's, let's say, a $243 filing fee and**
17 **the submitter of the document puts one penny down, it**
18 **wouldn't have the ability to say, "Oh, reject that,**
19 **that's not correct"?**
20     A.  That's correct.  It does not have that
21 capability.
22     **Q.  And in those circumstances, if -- if that**
23 **occurred, the -- the filing is then in the case**
24 **management system, and it's then up to the clerks to**
25 **address that payment issue; is that correct?**

---

Page 135

1    A.  There may be some configuration mechanisms
2  that would prevent that scenario.  We would have to
3  understand more about that scenario to know whether or
4  not that could occur.  But if it did occur, then, yes,
5  it would be in the case management system and there
6  would be some sort of reaction to -- to address that
7  problem, and I -- I don't know what that is.
8      **Q.  All right.  With respect to Tyler's**
9  **File & Serve, it is my understanding from talking to my**
10 **clients that the service address in eFile & Serve is**
11 **not integrated with the case management system; is that**
12 **your understanding as well?**
13     A.  The service address?  I don't understand --
14     **Q.  Correct.**
15     A.  -- the question.
16     **Q.  The service address meaning the submitter's**
17 **address for service or for --**
18     A.  Oh, the --
19     **Q.  -- who the document is being served on.**
20     A.  Correct.  The service email address is what
21 you're referring to?
22     **Q.  Correct.**
23     A.  Correct.  That doesn't get transmitted into
24 Odyssey.
25     **Q.  And when you say it does not get transmitted**

---

Page 136

1  into Odyssey, you mean Odyssey case management; correct?
2     A.  Yes, I apologize.  The case management system.
3     **Q.  Okay.**
4         **(Pause in the proceedings.)**
5     **Q.  (By Ms. Duke)  And on Auto-Accept, if**
6  **Auto-Accept is used, if a document meets the**
7  **configurations and is transferred into the case**
8  **management under Auto-Accept, does that mean it no**
9  **longer is within eFile & Serve?**
10    A.  No, it'll stay within the eFiling Manager.
11 It would just be in an accepted state.
12    **Q.  And how long does it stay in that eFiling**
13 **Manager?**
14    A.  Sure.  The data itself, the metadata, that
15 stays in the eFiling Manager into perpetuity, and the
16 documents would stay as long as the configuration states
17 it.  So there's a configuration setting that would purge
18 the documents after a set duration and then it would be
19 whatever that configuration is set to.
20    **Q.  All right.  So there would be one version of**
21 **the file document in the e-file management system and a**
22 **second version of the documents in the court's case**
23 **management system; correct?**
24    A.  Yes, that is correct.
25    **Q.  Now, I think you cleared this up earlier, but**

---

Page 137

1  **just to be clear, when a document is submitted to**
2  **File & Serve, Tyler handles the payment part of**
3  **processing, confirming that there are sufficient funds,**
4  **and noting that payment will be able to be made with**
5  **respect to the filing.**
6     A.  That's correct.
7     **Q.  And then the actual payment funds are not**
8  **transferred from Tyler to the court until the filing is**
9  **accepted by the court clerk and transferred into the**
10 **case management system; correct?**
11    A.  That's correct.  We don't capture the payment
12 until the clerk makes that acceptance determination on
13 the submission.
14    **Q.  So, to be clear, the payment is not made with**
15 **respect to a filing until the clerk has accepted the**
16 **filing and it's being transferred into the case**
17 **management system?**
18    A.  Yeah.  The only edit I would say to that is
19 the payment isn't captured until the submission is
20 accepted, whether that be done by a clerk or through the
21 auto-acceptance process, but, yes.
22    **Q.  Right.  And so regardless whether that process**
23 **or a clerk reviewing it and accepting it is done,**
24 **payment does not occur until that document is being**
25 **transferred into the court's case management system.**

---

7  (Pages 134 to 137)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 138

1    A.  Yeah.  I think it's actually done right before
2  that document is transmitted.  I -- I'd have to go back
3  to look at the order of operations after the acceptance
4  as to which of those takes place first, but it's within
5  that same workflow within that same duration, so we're
6  talking a matter of a few seconds.
7    Q.  Okay.  And within those seconds, after either
8  Auto-Accept or a clerk accepts, that's when the -- the
9  payment is actually being taken from the submitter and
10  then provided to the court?
11    A.  That's correct.
12    Q.  Are you aware -- you mentioned there were 25
13  courts that use Auto-Accept.  Do you recall that
14  testimony?
15    A.  I do.
16    Q.  How many courts, total, use just Tyler
17  File & Serve, not -- not limiting it to Auto-Accept or
18  press review queue?
19    A.  We have 27 states under contract, so roughly
20  1,500.
21    Q.  Okay.  So out of the 1,500 courts that Tyler
22  works with, it sounds like 25 use Auto-Accept?
23    A.  Some of those are actual statewide
24  arrangements, so like the state of Maine, the state of
25  Maryland, the state of Vermont, and those would have

Page 139

1  multiple jurisdictions within.  So the 25 is customers,
2  but each of those customers would have multiple courts,
3  so it would be a higher number than 25.
4    Q.  How many customers does Tyler have that use
5  eFile & Serve?
6    A.  I don't know that -- that number off the top
7  of my head.
8    Q.  Okay.  Is it Tyler's position or does Tyler
9  encourage courts to have Auto-Accept used for all
10  filings?
11    A.  No.  Those encouragements or recommendations
12  are not -- are not there.  We -- we provide the
13  information to the courts and then we help them
14  configure it based upon their needs.
15    Q.  And you also rely on -- on, I'm assuming, the
16  courts to determine whether the courts believe
17  Auto-Accept would be appropriate and practical in their
18  various jurisdictions?
19    A.  Absolutely, yes.
20       MS. DUKE:  Molly, do you mind going to
21  Page 5 of the PowerPoint?
22    Q.  (By Ms. Duke)  All right.  We're on Page 5 there
23  of the PowerPoint that you've gone through.
24       Auto-Accept means there's no clerk performing
25  a function to have the document transferred from

Page 140

1  File & Serve to the court's case management system;
2  correct?
3    A.  Yes, that's correct.
4    Q.  When I look at this little box or this little
5  diagram, I think it helps me.  You can see that there's
6  a little round thing right on EFM.  I'm assuming that's
7  kind of the World Wide Web?
8    A.  It is.
9    Q.  So -- and when you look at the World Wide Web
10  there in EFM, and then you look to the left of it on
11  your screen, or the right of it on the document, so all
12  the little -- it says filer, EFSP, filer, EFSP, and then
13  it's got conditional criteria, it's got a little person
14  above, that's all on the Tyler side of File & Serve;
15  correct?
16    A.  Yeah.  So everything that you see from the EFM
17  to the left --
18    Q.  Mm-hmm.
19    A.  -- would all be activities that would be
20  performed within Tyler-maintained infrastructure and
21  solutions.  The -- the -- in Idaho's example here, the
22  CMS on the right would be managed and owned by Idaho.
23    Q.  Right.  And so if I were to use this for Idaho
24  even though it was developed for Texas, I'd be able to
25  explain to our federal judge that that little arrow

Page 141

1  taking it from the World Wide Web to CMS, that is the
2  transfer from Tyler File & Serve to the court's hosted
3  case management system?
4    A.  Yes, that's correct.
5    Q.  Now, a little confusing and -- and maybe
6  confusing to some that haven't been obsessed with this
7  case as Mr. Fetterly, Ms. Keating, myself, and
8  Ms. Mitchell have been, they both are called Odyssey in
9  a way, but that feels like a bit of a confusing factor.
10       So I understand that there's Odyssey
11  File & Serve; right?
12    A.  Yeah.  We -- we've changed the name to
13  eFile & Serve, but -- but, yes, it's formerly known as
14  Odyssey File & Serve, correct.
15    Q.  Right.  It used to be known as Odyssey
16  File & Serve, but it's now known as eFile & Serve, so
17  that would be the right way to refer to it; correct?
18    A.  Yes, it would.
19    Q.  All right.  And then going over to the case
20  management side, that's known as Odyssey case management
21  services?
22    A.  It's -- it's now known as our Enterprise
23  Justice Case Management System, but it was formerly
24  known as Odyssey Case Management System.
25    Q.  Just because they shared the same name of

8  (Pages 138 to 141)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 142

1    Odyssey prior to these transitions you've talked about,
2    that does not mean that they were the same applications;
3    correct?
4        A.   That's correct.  The term Odyssey is -- was --
5    was relating to the suite of our products, and the case
6    management system was one of those products within that
7    suite, as was the File & Serve product.
8        Q.   So a court could have the Odyssey Case
9    Management System but not the Odyssey File & Serve
10   portion; is that correct?
11       A.   Yes, that's correct.
12       Q.   Or vice versa?
13       A.   Yes, that's correct too.
14       Q.   And implying to our federal court that because
15   they were called Odyssey way back when or back when,
16   whenever that is, whether it's File & Serve or whether
17   it's case management system, they truly are, in fact,
18   two separate applications that just happen to be under
19   the Odyssey suite of potential products?
20       A.   Yes.  Right.  They're two distinct systems,
21   two distinct offerings, but that are integrated with
22   each other.
23       Q.   All right.  If you look at No. 2 there, it
24   says:  "If the envelope details do not meet the
25   auto-review condition(s), the envelope is routed to the

Page 143

1    appropriate review queue to be reviewed by a clerk as it
2    is today."
3            Please help me understand what that is.  Give
4    me an example of what's being referenced there.
5        A.   Yeah.  It's just saying that if the envelope
6    doesn't meet the conditions that were configured under
7    the Auto-accept -- or auto -- yeah, Auto-Accept Review
8    function, then it would flow through its normal
9    workflow, which would be to route it to the review queue
10   for the clerk to be able to review when they had the
11   time or deemed it appropriate.
12       Q.   And who is in control of providing the
13   appropriate envelope details?
14       A.   For the details for that specific envelope, it
15   would be the filer.
16       Q.   That would not be something that would be
17   within the court's control; correct?
18       A.   That's correct.  Every -- every envelope is
19   created and submitted by the filer.  The only exception
20   or edit I would say to that is if the court was actually
21   the filer in that scenario.  Most of the time, that's
22   not the case.
23       Q.   And if I stick to the world of complaints,
24   which is what this case involves, if a complaint were
25   submitted through an envelope, it's up to the submitter

Page 144

1    to get that -- that envelope correct; right?
2        A.   Correct.  It's the filer's responsibility to
3    enter in those details prior to submission.
4        Q.   That's not the court's responsibility?
5        A.   Correct.
6        Q.   So even under Auto-Accept, if Auto-Accept were
7    configured in the State of Idaho, it would be up to the
8    filers to get their envelopes right if the document was
9    going to go through the auto-review process into the
10   case management system?
11       A.   There's actually two components here.  There's
12   the configuration which would be driven by the court as
13   to which criteria is deemed appropriate for the
14   Auto-Accept function to kick in, and then -- and then
15   the second component would be the submission of that
16   envelope and whether or not the criteria within that
17   specific envelope met those conditions which would be
18   the responsibility of the filer.
19       Q.   All right.  So the court could set the
20   criteria.  I know we've talked about that.  But once
21   that criteria is set, it's then up to the submitter as
22   to whether Auto-Accept is going to, you know, auto-file
23   that document; correct?
24       A.   Yes.  I don't know if the filer would have
25   visibility into what those conditions were, but they are

Page 145

1    the responsible party for filling out the envelope
2    details.
3        Q.   "They" being the filer?
4        A.   Yes, that's correct.
5        Q.   And what Number 2 means there is if the filer
6    doesn't fill it out correctly, then it's -- it's going
7    to get routed to a queue for the clerk to then review?
8        A.   Yes, that's correct.
9        Q.   Now, Number 3, it says:  "If the envelope
10   details meets the auto-review conditions, the filings
11   are automatically accepted, stamped, funds captured, and
12   notifications sent to filers/service recipients."
13           Do you see that?
14       A.   I do.
15       Q.   That's if the filer filled out the envelope
16   correctly?
17       A.   It's if the filer's envelope details met the
18   conditions that are being evaluated for the Auto-Accept.
19   They can still fill it out correctly and submit it and
20   it get routed to a clerk for review if it didn't meet
21   those conditions.
22       Q.   Now, there were some questions asked to you as
23   to whether file stamps were configurable by location.
24   Do you recall that?
25       A.   I do.

9 (Pages 142 to 145)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 146

1    Q.  And so it's my understanding the only file
2  stamp that comes on to the document is once the document
3  has been accepted, it's then -- it's then stamped
4  accepted; is that correct?
5    A.  Yeah, that's correct.  The file stamp is --
6  I'm going to call it, for lack of a better term, "burned
7  in."  Back in the old days, it was the (indicating),
8  right?
9    Q.  Yeah.
10   A.  But it's -- that action actually takes effect
11 when the acceptance process occurs.
12   Q.  And it does not -- that action of the file
13 stamp does not take effect while the complaint is in the
14 clerk's queue to review for acceptance; correct?
15   A.  Yeah, that's correct.
16   Q.  It is only in the clerk setting -- without an
17 Auto-Accept, it's only when the clerk has accepted that
18 document that a file stamp is placed on it; is that
19 correct?
20   A.  It -- the file stamp can be placed on it at
21 the time of acceptance regardless of whether a clerk
22 accepts it or the auto-acceptance functionality kicks
23 in.
24   Q.  Sure.  I was just trying to break those out,
25 so take Auto-Accept out of it.

---

Page 147

1    A.  Okay.
2    Q.  If I'm in a situation where I don't use
3  Auto-Accept and it's clerk review, the -- the file stamp
4  is only placed on the document after the clerk performs
5  their review and accepts the document into the case
6  management system?
7    A.  Yes, that is correct.
8        MS. DUKE:  All right.  Let's go to the
9  next page, Molly.
10   Q.  (By Ms. Duke) If we look at Page 6 of this
11 PowerPoint, this all talks about that first one with the
12 little -- little clock icon, "improves average response
13 time."  This is focused on clerks; correct?
14   A.  Yes, it is.
15   Q.  This is not focused in on the time or impact
16 of Auto-Accept to judges; correct?
17   A.  I'm not sure I understand your question.
18 Auto-Accept to judges, you mean documents like proposed
19 orders?
20   Q.  No, I -- I should say it this way.  So let's
21 assume it's a complaint still.
22   A.  Right.
23   Q.  And let's assume that complaint goes through
24 Auto-Accept with a one-cent filing fee and is then into
25 the court system.  This improves average response time,

---

Page 148

1  that doesn't have anything to do with the time now that
2  it'll take a judge to deal with an improper filing fee;
3  correct?
4    A.  Correct.  It does not take that into
5  consideration.
6    Q.  And it also talks about low-priority filings
7  and then -- and then assuming clerks will be focusing on
8  more complex high-priority filings.  Explain to me what
9  Tyler, in this PowerPoint, means by a low-priority
10 filing.
11   A.  Yeah.  It could mean a range of -- of things.
12 Certain jurisdictions will deem certain filings less
13 time-sensitive and others more time-sensitive.  I'll
14 give an example of a time-sensitive matter.  An
15 emergency protection order is an emergency protection
16 order, and that's generally deemed as a more highly
17 valued or time-sensitive matter.  And an original --
18 just a motion on a case that's not subject to the
19 statute of limitations is probably a lower priority.
20 I'm assuming that the author meant that when -- when
21 creating this document.
22   Q.  Do you know if the author was in any way
23 factoring in complaints as to the benefits of
24 Auto-Accept when the author generated this document?
25   A.  I can't speculate on -- on that.

---

Page 149

1    Q.  And do you know whether or not the author was
2  considering low-priority complaints versus high-priority
3  complaints in the state of Idaho when generating this
4  document?
5    A.  I can't speculate on that.
6    Q.  It then goes to reduce return for correction
7  rates, and it says: "Many courts effectiveness are
8  measured by the percentage of accepted filings.
9  auto-accepted -- auto-acceptance improves these
10 metrics."
11       Do you know whether Idaho's Courts
12 effectiveness are measured by the percentage of accepted
13 filings?
14   A.  I do not.
15   Q.  Do you know who sets these types of -- of
16 measures to determine how effective a court is?
17   A.  I think it -- it varies by court, by
18 jurisdiction.
19   Q.  Any idea what Idaho uses to determine whether
20 its courts are effective?
21   A.  No, I do not.
22   Q.  When it says it "reduces return for correction
23 rates," that's -- that's because it's auto-accepted,
24 meaning nothing's returned for correction; correct?
25   A.  Yes, that's correct.

10  (Pages 146 to 149)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. II

Page 150

1      Q.  Even if something gets through and should be
2   corrected, that's not going to get caught in this
3   auto-acceptance part of this.  Instead, it's going to be
4   dealt with the court clerks now on the case management
5   side; correct?
6      A.  That's correct.  The measurement here is from
7   the time of submission to the time of clerk action or --
8   or action on the envelope.
9      Q.  And, again, this -- this middle column has
10  nothing to do with the impact on judges in the event
11  corrections need to occur to something that's been
12  auto-accepted into the case management system.
13     A.  Yes.
14     Q.  Correct?
15     A.  That's correct, mm-hmm.
16     Q.  Now, the fourth bullet is -- it says "reduces
17  operational overhead."  I'm assuming that's just because
18  it takes the clerk out of the picture when
19  auto-acceptance is used.
20     A.  Yeah, I assume that's a valid assumption.
21     Q.  But it's not talking about the impact on
22  clerks or court staff or judges in the event something
23  has been auto-accepted and transferred into the court's
24  case management system; correct?
25     A.  Correct.  I don't think it takes that into

Page 151

1   consideration.
2      Q.  And the data for all three of these columns,
3   I'm assuming, is -- is Texas data.  Do you know exactly
4   what data was used to even come up with these three
5   columns?
6      A.  I -- I can't say for sure, but the document
7   was created for Texas, so it's a reasonable assumption.
8      Q.  Any idea how many filings were looked at?
9      A.  No, I don't.
10     Q.  Any idea how many courts were looked at?
11     A.  No, I don't.
12     Q.  Any idea of the volume at all of what was
13  looked at to come up with this PowerPoint?
14     A.  No, I can tell you that Texas has 254
15  counties, multiple offices in each, and handles anywhere
16  from 45- to 65,000 filings a day.  But beyond that, I'm
17  not sure what was used to reference or create this
18  document.
19     Q.  But it's also my understanding that Tyler
20  doesn't cover all of Texas; is that correct?
21     A.  No, we do.
22     Q.  Oh, you do?  Okay.
23     A.  We -- our e-filing program is the e-filing
24  program for the State of Texas.
25     Q.  Let me just look at something real quick that

Page 152

1   I talked to Mr. Girdner about yesterday.
2      So Mr. Girdner testified yesterday as to --
3   and maybe this was just related to a press review queue,
4   is the only court that's on press review queue in Texas,
5   Austin?
6      A.  It's -- it's Travis County, but it is Austin,
7   Texas.  We just gotta be careful because Austin is a
8   county that is not Austin, Texas.
9      Q.  Okay.  Leave it to the Texans to do that.  No
10  offense.  I know you're there, but...
11     All right.  So Travis County, out of all of
12  those courts you were just talking about in Texas,
13  Travis County's the only one who has a press review
14  queue through Tyler; is that correct?
15     A.  That is correct.
16     MS. DUKE:  Okay.  All right.  Let's go to
17  the next page, Molly, Page 7.
18     Q.  (By Ms. Duke)  So I'm still a tiny bit confused
19  as to what these charts mean, so let me just ask you a
20  few questions about there.
21     Do you see the little stars down below?  The
22  one that says, first star:  "Example data utilizing Q4
23  2019 review -- reviewer metrics"?
24     A.  I do see that.
25     Q.  Any idea whose Q4 2019 reviewer metrics?

Page 153

1      A.  I would assume Courts A, B, C, D, and E.
2      Q.  But any idea who Court A is?
3      A.  I don't know.
4      Q.  What Court B is?
5      A.  I don't know.  We'd have to ask the author.
6   I'm not sure.
7      Q.  Or Court C, D, or E?
8      A.  No, I -- I don't know.
9      Q.  So then it says, "AR," so that's two little
10  stars, and it says that means auto-review.
11     So we have Court A and Court B that don't use
12  auto-review; right?
13     A.  That's how I interpret it, yes.
14     Q.  And does auto-review mean Auto-Accept or do
15  you know?
16     A.  I believe auto-review and Auto-Accept are
17  synonymous here.
18     Q.  So then Courts C, D, and E use auto-review?
19     A.  That's how I interpret it, correct.
20     Q.  And then it says the AR percentage is based on
21  number of reviewable filings submitted versus number of
22  filings auto-reviewed.  And so I guess let's look at
23  those.
24     So if I were to compare Court A to Court C,
25  what is -- what is this chart telling me?

11  (Pages 150 to 153)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 154

1    A.  My interpretation of the chart says that
2  Court A is not using auto review where Court C has
3  5 percent of their envelopes being auto-reviewed.
4    Q.  And does it -- is it also comparing, then, the
5  efficiency of Court A to Court C or not?
6    A.  I think that's a subjective term.  I -- I
7  think it is telling you the percent response under 24
8  hours and the acceptance percentage.
9    Q.  And these are all fewer than 24 hours, not
10 broken out by the minute or hour; correct?
11   A.  Correct.
12   Q.  And so this data here on this page doesn't
13 break it down specifically into if a court's not using
14 Auto-Accept, but is processing complaints within, let's
15 say, three hours, how is that reflected here in this
16 data?
17   A.  I don't think that it is.
18   Q.  Okay.  All right.  Let's go to Page 8.
19      With respect to Page 8, again, you were --
20 talked about a number of -- categories.  We've
21 already addressed that.
22      But in providing Page 8, no evaluation has
23 been done as to what the cost on Idaho's side would be
24 to implement or use an Auto-Accept in any capacity; is
25 that correct?

Page 155

1    A.  Yes, that's correct.
2      (Pause in the proceedings.)
3    Q.  (By Ms. Duke) Under Auto-Accept, is -- well,
4  strike that.
5      Have you been a part of any communications
6  with Idaho's Courts related to Auto-Accept?
7    A.  No.  No, I have not.
8    Q.  Are you aware of whether anyone at Tyler has
9  been involved in any conversations?
10   A.  No, I am not.
11   Q.  Do you know if Tyler has provided Idaho's
12 Courts with any presentation on Auto-Accept?
13   A.  I'm not aware of that.
14   Q.  And you understand that Tyler's contract
15 related to its File & Serve is with the Idaho Supreme
16 Court?
17   A.  Yes, I do.
18   Q.  And with respect to case management, Tyler's
19 contract is also with the Supreme Court?
20   A.  Yes, I do.
21   Q.  I'm just going through a bunch of questions,
22 so bear with me here.
23   A.  Sure.
24      (Pause in the proceedings.)
25   Q.  (By Ms. Duke) Now, in Auto-Accept, even if the

Page 156

1  court configured a confidentiality setting that should
2  be used, assuming confidential information was provided,
3  it would be up to the filer to properly click on that
4  confidential box; correct?
5    A.  Yes, that is correct.
6    Q.  And so, you know, sadly we know that there are
7  malicious, not-nice people out there, so if a malicious
8  not-nice person knew something was confidential but
9  wanted to go ahead and -- and get it filed, he or she
10 could just merely not accept or click the confidential
11 box and that document would be automatically
12 transferred to and filed in the court's case management
13 system; correct?
14   A.  If the conditions were configured to accept it
15 in that manner and that scenario and transpired, then,
16 yes, it would.
17   Q.  Have any of the courts that have been using
18 Auto-Accept talked to you about how they dealt with any
19 type of malicious filings?
20   A.  No, they have not.
21   Q.  Have any -- I know that we've seen cases sadly
22 here in Idaho, as well as other places, of documents
23 placed in the public record, revenge porn, that type of
24 stuff.  Has Tyler had any communications with any of the
25 states who use an Auto-Accept as to things like revenge

Page 157

1  porn, child porn, anything like that making its way into
2  court documents?
3    A.  No, we have not.
4    Q.  Now, with respect to Odyssey File & Serve, all
5  documents in the submission are included in the same
6  envelope; correct?
7    A.  Yes.  For each submission, they -- all filings
8  and documents are included in the same envelope.  Yes,
9  that's correct.
10   Q.  That's not the case with Auto-Accept; correct?
11   A.  Correct.
12   Q.  There would actually have to be multiple
13 envelopes that would be used per filing?
14   A.  No, I don't think that's the case.  My
15 understanding is that the envelope is still intact, but
16 the filings are evaluated independently, so every filing
17 is evaluated within that envelope and then made that
18 determination but the envelope still holds true.
19   Q.  Ah, I see.  Okay.  So the envelope holds true
20 but what happens is it gets transferred into the court's
21 case management system and then the clerk has to then
22 break out the documents that are within the envelope?
23   A.  I'm not certain how an envelope containing
24 multiple filings when it's assessed with the auto-review
25 rules where one meets that criteria and the others

12  (Pages 154 to 157)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 158

1  don't, exactly what transpires if it sends that record
2  immediately or if it holds it until all actions have
3  been taken on that envelope before transferring it to
4  the CMS.
5      Q.  And so you're not sure what the clerks need to
6  do from a work standpoint once an envelope with multiple
7  documents is transferred into the case management
8  system; is that fair?
9      A.  That's fair, yes.
10     Q.  Once a document is in the case management
11 system, the clerks then need to go through the case
12 management system to interact with -- with the various
13 parties to the case; correct?
14     A.  Yeah, that's a typical scenario.
15     Q.  Give me one second here.
16     A.  Of course.
17         (Pause in the proceedings.)
18     Q.  (By Ms. Duke) So let me ask you a question in
19 the context of a complaint.  If -- so in Idaho, I'll
20 represent to you that when a case is initiated with a
21 complaint, a complaint, a case information sheet, and a
22 summons are all required as part of that filing.
23         I'm assuming that those would all be in the
24 same envelope?
25     A.  Yeah, more than likely in an initial filing.

Page 159

1  That's correct.
2      Q.  And if, for instance, the filing fee wasn't
3  the proper amount, but was some sort of filing fee, so
4  that it was taken and transferred to the court and
5  auto-accepted, on filing, that means the summons, the
6  case information sheet, and the complaint would all be
7  filed even though the proper filing fee has not been
8  paid?
9      A.  Yes, that's correct.
10     Q.  And if someone were supposed to mark something
11 confidential and didn't, the only way that could be
12 addressed under an Auto-Accept situation would be for
13 then, in the case management system, however the court's
14 handled, you know, dealing with documents that are in
15 the case management system and correcting their filing,
16 that would have to be done on the case management end;
17 correct?
18     A.  Yes, that is correct.  That would be the
19 appropriate means to correct the -- that security
20 setting.
21     Q.  If, in that context of the complaint, so,
22 again, I mentioned there's a complaint, a case
23 information sheet, and a summons, they're in the same
24 envelope, if -- if they're being submitted and no filing
25 fee is paid, are the summons and case information sheets

Page 160

1  filed and the complaint not filed under Auto-Accept or
2  are all three not accepted?
3      A.  It depends on how it's configured.  It would
4  have to hit those criteria, and then depending upon
5  that, it would react accordingly.
6      Q.  Perfect.  So I'm going to transfer, I think,
7  now into press review queue, so why don't we take five
8  minutes and then I'll get through that portion?
9      A.  Okay.  Sounds good.
10     Q.  Okay.
11         (A break was taken from
12         2:36 p.m. to 2:43 p.m.)
13         MS. DUKE:  All right.  We're back on the
14 record.
15         Molly, do you mind pulling up Exhibit 34?
16     Q.  (By Ms. Duke) All right.  Do you see Exhibit 34
17 there?  Do you recall discussing this with Mr. Fetterly?
18     A.  Yes, I do.
19     Q.  This is a Tyler-generated document; correct?
20     A.  Yes, it is.
21     Q.  And the Idaho Courts did not have anything to
22 do with the content in Exhibit 34; is that correct?
23     A.  That's correct.
24     Q.  Okay.  And we had little, you know,
25 screenshots of that being able to show how it came from

Page 161

1  the website as 34A and B.  Again, that would all be
2  Tyler-generated language, not Idaho Court language;
3  correct?
4      A.  Yes, that's correct.
5         MS. DUKE:  All right.  Let's go ahead and
6  turn to Exhibit 35, Molly.
7      Q.  (By Ms. Duke) This is the e-filing overview.
8  It's a very large document; correct?
9      A.  Yeah.  Mine shows 248 pages.
10     Q.  And this is a Tyler-drafted document?
11     A.  Yes, it is.
12     Q.  Not one that is drafted or has input from the
13 Idaho Courts; is that correct?
14     A.  That is correct.
15     Q.  So when I turn to that page that we're on of
16 Exhibit 35.
17         MS. DUKE:  Let's go to Page 17, please.
18 There it is.
19     Q.  (By Ms. Duke) Okay.  Can you see that okay?
20     A.  Yes, I can.
21     Q.  All right.  This diagram that is on Page 17 of
22 Exhibit 35, Tyler's individual filer user guide, this is
23 not based on Idaho; is that correct?
24     A.  That is correct.  It is not.
25     Q.  And this Exhibit 35 is for File & Serve;

13 (Pages 158 to 161)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 162

1  right?
2      A.  It is.  Yes, correct.
3      Q.  It is not for the case management system used
4  by the court?
5      A.  That is correct.
6      Q.  Now, when I look at this chart, it says "filer
7  submits."  Do you see that?
8      A.  Yes, I do see it.
9      Q.  And then it goes to the court and it has a
10  little picture of the court.
11      A.  Yes, I see that.
12      Q.  That's not meant to represent the court's case
13  management system; correct?
14      A.  Correct.  That -- that's not the workflow that
15  takes place.
16      Q.  What that really is meant to reflect is when
17  it says "court receives," that means Tyler File & Serve
18  receives that submission.
19      A.  Correct.  I believe it -- it means that the
20  eFiling Manager received that submission and the clerk
21  now has access to review it.
22      Q.  All right.  And then we've got a clerk that
23  looks like a judge as the next little icon; right?
24      A.  Yeah, I was noticing that as well.
25      Q.  And -- and so that would be the filer

---

Page 163

1  submitting it to eFile & Serve, which means it's going
2  into the eFile Manager portion of eFile & Serve and
3  the clerk now has it for review; correct?
4      A.  That is correct.
5      Q.  It then says, "Clerk reviews and notifies
6  filer of status via email," and is that when we get into
7  that whole whether it's accepted or rejected?
8      A.  It is.  And the clerk doesn't actually notify
9  the filer.  That's an automated process that takes --
10  takes place based upon the filer's notification settings
11  or configurations.
12      Q.  So when the clerk reviews and notifies the
13  filer of status, what really means is the clerk is
14  either accepting or rejecting and the filer is getting
15  auto-noticed as to what's happened.
16      A.  Yes, that's correct.
17      Q.  And in that little multi-second process,
18  obviously, the filer's getting an email.  And then when
19  I look at the computer screen there, that's actually now
20  going to be my case -- court case management document --
21  that's going to now be my court case management
22  database; correct?
23      A.  Well, I -- it -- it's difficult to say by this
24  graphic.  Once the acceptance process takes place, it
25  would be -- the document and the information would be

---

Page 164

1  delivered to the case management system.  Obviously, the
2  filer can't view that information.  They don't have
3  access to the court's case management system.  They
4  could view it in the e-filing system or in whatever
5  online court record repository that the State of Idaho
6  provides any -- any general public or legal professional
7  or SRL to access those records.
8      Q.  I see.
9          Okay.  So what we really could add to this
10  diagram -- first, I think we'd agree this is probably
11  not the best diagram --
12      A.  Yes.
13      Q.  -- to properly represent the -- Idaho's
14  eFile & Serve and how a document gets to the case
15  management system; is that correct?
16      A.  Yeah, I think that's a valid statement.
17      Q.  All right.  Because what we would need to add
18  there is after the filer receives email, probably at
19  that same time when the filer receives the email we
20  could actually put a picture of the courthouse then
21  because that's actually when it would go into the case
22  management system if accepted?
23      A.  Yes.  That's -- that would be a more accurate
24  reflection of reality.
25      Q.  And if rejected, it doesn't go into the

---

Page 165

1  court's case management system, it goes back to the
2  filer to correct whatever issues need to be corrected?
3      A.  That's -- that's correct.
4      Q.  Do you know what time frame or grace period
5  Idaho provides to its filers in the event there's an
6  error that needs to be corrected?
7      A.  No, I do not.
8      Q.  Are you aware that there are various courts in
9  the country that do provide a grace period --
10      A.  Yes, I am.
11      Q.  -- for filers to correct their submission?
12      A.  Yes, I am.
13      Q.  And then that there are some who do not
14  provide grace periods and put the burden on the filers
15  to either gets it right the first time or not?
16      A.  Yes, I'm also aware of that.
17          MS. DUKE:  All right.  Let's go to the
18  next page, Molly.
19      Q.  (By Ms. Duke) Just a few questions on the
20  filing queue status.  Again, there's -- there's a very
21  big debate between CNS and the Idaho Courts as to what
22  "filing" means.
23          I'm assuming any time you've used the word
24  "filing" or these documents are using the word "filing,"
25  I'm assuming Tyler is not weighing in on what is or what

---

14 (Pages 162 to 165)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 166

1    is not a -- an official filing; is that fair?
2        A.   Yeah, that is correct.  A filing is a very
3    broad term that's used to describe a lot of things.
4    Very similar to the word "docket," how it can describe
5    multiple things in the court system, filing can also do
6    that.
7        Q.   When we look at submitted, it says there that
8    document file format and payment information have been
9    verified and accepted.  That does not mean that the
10   money has been transferred to the court yet; correct?
11       A.   That's correct.
12       Q.   That doesn't occur until further down this
13   chart where it says "accepted"; correct?
14       A.   That is correct.
15       Q.   And by the file format and payment information
16   have been verified and corrected, what's the "verified"
17   mean in that submitted row?
18       A.   Say that one more time?
19       Q.   Well, it says --
20       A.   Verified and corrected?
21       Q.   Yeah.  It says: "The document file format and
22   payment information have been verified and accepted."
23       What's being referred to there as verified?
24       A.   Sorry.  I thought you said verified and
25   corrected.

---

Page 167

1        Verified and accepted.  The document file
2    format, meaning it's the correct filing type of
3    document.  Most courts require a PDF document, so it's
4    validating that.  And then the payment comment is
5    reflecting the pre-authorization that we do to protect
6    against non-sufficient funds.
7        Q.   That submitted row doesn't have anything to do
8    with verification that the filing has been verified as a
9    proper and accepted filing; correct?
10       A.   That's correct.
11       Q.   Okay.
12       A.   That's done by the clerk.
13       Q.   And that's done there at the accepted or
14   rejected stage; correct?
15       A.   Yeah.  They make that determination while the
16   status is under review.  And then once that
17   determination is made, it either goes into the accepted
18   or rejected status.
19       Q.   All right.  And to the extent there is a case
20   management manual like this e-filing manual, that's a
21   Tyler-documented case management document; correct?
22       A.   I'm not referring -- I'm not familiar with
23   what you're referring to.
24       Q.   Well, does Tyler have a case management
25   document like this Exhibit 35 we were just looking at?

---

Page 168

1        A.   Yes, we do.
2        Q.   Okay.  Oh, I see.  So there's an individual
3    file user guide for File & Serve, that's Exhibit 35.
4    And then, apparently, there's also a firm administration
5    or administrator user guide for File & Serve.
6        A.   That's correct.
7        Q.   What -- what are each going to?
8        A.   The filer is referring to an individual filer
9    who has the individual filer role.  And the firm
10   administrator is referring to an individual who has the
11   firm administrator role.  The firm administrator is
12   someone who may be responsible for setting up a -- a law
13   firm or an entity and help manages that for that firm.
14       Q.   Okay.  Let me show you Exhibit 37 real quick.
15            (Pause in the proceedings.)
16       Q.   (By Ms. Duke) This document here, tell me, is
17   this the File & Serve -- the first page is the
18   File & Serve for Idaho's Courts?
19       A.   I'm not familiar with that specific page.
20       Q.   Okay.  How about the second page?
21       A.   Yeah.  The second page is our electronic
22   filing service provider.
23       Q.   All right.  And that's the Odyssey
24   File & Serve as it's called or used to be called?
25       A.   Yes, that's correct.

---

Page 169

1            MS. DUKE:  All right.  Let's jump to --
2    Molly, why don't you bring up -- why don't you bring the
3    PowerPoint back up, actually?
4        Q.   (By Ms. Duke) So let's turn to press review
5    queue.
6        A.   Okay.
7        Q.   We're going to go back to that PowerPoint.
8            All right.  If we turn to the second page of
9    that, that's the press review.  Now, are you aware of
10   whether the State of Idaho has any definition for what
11   "the press" means?
12       A.   No.  I -- I'm not sure Idaho's definition of
13   press, no.
14       Q.   Does Tyler also provide public review queues?
15       A.   No.  Tyler's only review queues that we
16   provide are the clerk review queue and then the
17   additional tool that we provide is labeled the Press
18   Review Tool.  The audience is really -- of that tool,
19   is -- is dependent upon our contract holders, and in
20   this case, it would be the Supreme Court or the Court.
21       Q.   So if press review queue were to be used in
22   the state of Idaho, it'd be up to the State of Idaho to
23   determine who would be credentialed to use the press
24   review queue?
25       A.   Yes, that is correct.

15 (Pages 166 to 169)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

ER-2546

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 170

1    Q.  Is there a separate credentialing system
2  that's used for each person or is it an entity or how's
3  that used?  Do you know?
4    A.  Yeah.  We use our Tyler Identity Management
5  system, and it -- it is a user ID and a password that
6  grants that access, and so we ask for that information
7  going into providing those authorized users with access.
8    Q.  Okay.  And so when you say that, if Idaho were
9  to use the press review queue tool, would Idaho then
10  need to provide Tyler with the identity of anyone that
11  would have a user ID and password?
12    A.  Yeah.  You would generally provide us with
13  that user ID and we would then set up that user with
14  access to the system.  The normal process that we've
15  seen take place is the court would then create a user
16  inside of the File & Serve platform and then provide us
17  with that user ID and then we grant that access.
18    Q.  And is it multiple user IDs for states that
19  are using -- or courts that are using press review
20  queue?
21    A.  It can be.  It's up to the -- it's up to our
22  contract holders as to how many they provide.
23    Q.  Is there any type of auditing or anything like
24  that that's done as to a specific user's access to a
25  document in the press review queue?

---

Page 171

1    A.  No, not to a specific document.  There is no
2  audit trail.  We don't possess one.
3    Q.  Is there any ability to watermark documents as
4  under review or not filed in the press review queue?
5    A.  No, there is not.
6    Q.  Now, a press review queue, under Page 9 of
7  this document we have here, the -- the PowerPoint we've
8  been referring to, which is SO Page 9, that requires
9  an -- or an amendment to any contract; correct?
10    A.  Yes, that is correct.
11    Q.  So if the State of Idaho were to look to have
12  the Press Review Tool, it would need to negotiate a
13  contract amendment with Tyler?
14    A.  Yes, that is correct.
15    Q.  And it's my understanding that the fee that --
16  that the Supreme Court has been told Idaho will be
17  charged each year is $108,000 for the subscription to
18  the Tyler press review queue; is that correct?
19    A.  That is correct.  108,000 for the -- the
20  subscription to the Press Review Tool solution, correct.
21    Q.  Now, yesterday, Mr. Girdner who is the head of
22  CNS suggested that that was only a starting point for
23  Tyler and that that amount could be negotiated.
24      Does Tyler offer the press review subscription
25  for less than $108,000 for a court who wants to use the

---

Page 172

1  press review queue?
2    A.  We have offered that at a lower rate in the
3  past.
4    Q.  And how low has that rate gone?
5    A.  $60,000 is -- is the -- the lowest rate, and
6  the -- the intent behind that or the reason behind that
7  is that that number was provided before the new pricing
8  came out, and so it was honored for that first one-year
9  term and then it goes up to the normal 108-.
10    Q.  All right.  So even when it was negotiated
11  down, it might have been provided at a lower rate
12  because that had been previously promised but it then
13  goes up the next year to the 108,000?
14    A.  That's correct.
15    Q.  So I understand Mr. Girdner obviously wouldn't
16  know what Tyler would or wouldn't do, but I think it's
17  fair to say, based upon your testimony, that if the
18  State of Idaho, regardless of its bargaining power,
19  regardless of its amazing negotiation skills, if it
20  wants the press review queue, it's going to pay $108,000
21  a year for that subscription?
22    A.  Yeah, that's an accurate assessment.
23    Q.  Now, I know that it says here that there's
24  also updated terms and conditions in addition to the
25  contract amendment that would occur.  Does Tyler

---

Page 173

1  indemnify the courts if someone is harmed by improper
2  use of a document that was provided through the press
3  review queue?
4    A.  No, we do not.
5    Q.  We were also talking about the -- the ability
6  and whether those could be, you know, the documents in
7  the press review could be manipulated, and I want to be
8  clear on this issue.
9      So the Idaho Supreme Court asked Jessi Fisher
10  if the documents in the press review queue were the same
11  documents in eFile & Serve or whether they were copies
12  of the original documents, and she answered that they
13  are the same documents.  Help me understand what that
14  means.
15    A.  Yeah, that's an accurate statement.  So if you
16  recall when we were discussing the EFM's responsibility
17  earlier, we were saying that that's where the documents
18  live, that's where they're housed, and that both the
19  review tool for the clerks and the review tool for the
20  press were just applications that could surface or
21  display that information.  Both of them can display that
22  document exactly in a similar way, and so that's what
23  she's referring to, is that they're both getting access
24  to that same information at the same location.  They're
25  just surfaced in different applications.

16  (Pages 170 to 173)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 174

1    Q.  Got it.
2        And so with respect to the original document
3    that is submitted to File & Serve, that original
4    document is displayed both in the clerk queue and the
5    press review queue?
6    A.  That is correct.
7    Q.  That's correct?
8    A.  Yes, it is.  Sorry.  Yes, that's correct.
9    Q.  And so it would be the original document that
10   anyone accessing the press review queue would be looking
11   at?
12   A.  That is correct.
13   Q.  And I know that you had said there's no way to
14   modify a document that is in the clerk's -- or in a
15   queue, so the clerk's queue, but there is because it
16   ends up being file stamped upon acceptance; right?
17   A.  Yes, absolutely.  So the clerks have the
18   ability to make edits to the document, right?  They have
19   stamping options, annotation options, strike-through
20   options, a series of tools through the application,
21   through the review tool application.  Many of those
22   tools are commonly found in editors and, you know, like
23   you would see in Microsoft Word or even a PDF editor.
24   Those same tools do not exist in the Press Review Tool.
25   So if I stated that earlier, it was a -- just I misspoke

---

Page 175

1    on my -- on my part.
2    Q.  No, I understand.  I don't think we had
3    separated it out for you, so I appreciate you being
4    precise on that.
5        Okay.  With respect to the press review queue,
6    it -- it says that documents can be made available based
7    on the number of days.  Do you recall testifying to
8    that?
9    A.  Yes, I do.
10   Q.  Does that mean anything not reviewed or
11   accepted within a certain time period could
12   automatically be transferred to the press review queue?
13   A.  No, this would be the inverse.  If it met the
14   criteria, it would exist in the Press Review Tool until
15   that day, duration elapsed, and then in which case it
16   would no longer meet that criteria.
17   Q.  So the press review queue, the time that it's
18   up there, is that defined by the client and in that
19   instance, the courts?
20   A.  That's correct.
21   Q.  Are you aware of any spiders or scraping or
22   bots, you know, those types of things that have been
23   utilized on Tyler's press review queue?
24   A.  Not to my knowledge.
25   Q.  Does Tyler have anything in place to protect

---

Page 176

1    against bots, spiders, whatever, all these technical
2    terms that my children would know and I don't know them
3    all, but those things that can come in and -- and get
4    into a document or into a system, how does Tyler protect
5    that press review queue?
6    A.  We -- we don't on the Press Review Tool.
7    Specifically, on the Press Review Tool, we do not.
8    Q.  And given that you don't have those
9    protections on the press review queue, what does that
10   mean with respect to the ability to, you know, have
11   spiders or scrapers or bots or whatever accessing the
12   press review queue?
13   A.  There is -- there's an implied assumption that
14   they -- the bots would have access to the environment
15   through the user credentials.  If that assumption is
16   true, then they would be able to procure screenshots or
17   captures of that document.
18   Q.  Now, is the clerk's queue protected?
19   A.  The clerk's review tool?
20   Q.  Correct.
21   A.  I don't know.
22   Q.  But the only people accessing the clerk's
23   review tool are the clerks that have been provided
24   authorization through the court system; correct?
25   A.  Yes, that is correct.

---

Page 177

1    Q.  With respect to the press review queue, if it
2    were open to the press, whomever would be determined to
3    be the press in the state of Idaho, would presumptively
4    then receive a user ID and ability to access the press
5    review queue; correct?
6    A.  Yes, that is correct.
7    Q.  So the big difference between those two is the
8    clerks review queue has a very limited number of people
9    who are employed by the courts to do their job; right?
10   A.  Yes.  It's whoever the court grants access to
11   the clerk review tool.
12   Q.  And then the press review queue obviously
13   would be -- we're all presuming those would be
14   non-employed folks that would have access to the press
15   review queue?
16   A.  I think that's up to the court's discretion as
17   to who that audience is.
18   Q.  Okay.  Have any of the courts that you --
19   you're working with had access to the public to the
20   press review queue?
21   A.  I don't know.
22   Q.  You also mentioned, it sounds like, the press
23   review queue could be limited to only being available on
24   certain kiosks at courthouses; is that correct?
25   A.  Yes, that's correct.  We have a few customers

---

17 (Pages 174 to 177)

Courthouse News Service v. Omundson      30(b)(6) Terry Derrick - Vol. II

---

Page 178

1  who have attempted to do that.
2      Q.  All right.  And who are those customers?
3      A.  I'm -- I'm not sure which ones they are off
4  the top of my head.
5      Q.  And has -- has that worked with them in their
6  ability to manage their press review queues or do you
7  know why they were doing that?
8      A.  Yeah.  My understanding was that they were
9  doing that to -- to further protect the access and who
10  was getting access to that Press Review Tool and making
11  it available in the court clerk's office gave them that
12  additional oversight.
13      Q.  Do you have any knowledge of whether CNS or
14  any other entity has attempted to, you know, scrape, use
15  spiders, anything like that on the Press Review Tool?
16      A.  I don't.
17      Q.  Do you know how the Press Review Tool is
18  secured against the top ten OWASP attacks?
19      A.  No.  That's a third-party security set of
20  requirements, and it would -- it would take us some time
21  and resources to evaluate and assess the Press Review
22  Tool against those.  We haven't conducted that exercise.
23      Q.  Do you know if the press review queue has ever
24  been attacked, hacked, or compromised at any time?
25      A.  No, I'm unaware of any of those situations.

Page 179

1      Q.  And I'm assuming you would be aware of those
2  as the 30(b)(6) representative here today?
3      A.  Correct.
4      Q.  Does Tyler permit its clients to run its own
5  web application firewall to protect the Press Review
6  Tool website?
7      A.  Yeah.  I don't -- yeah.  We would, yes.
8      Q.  Now, have you been involved in any of the
9  conversations with Jennifer Dvorak as to information
10  she's requested from Tyler related to the press review
11  queue and its security parameters?
12      A.  Not directly.
13      Q.  It's my understanding she's asked a number of
14  questions that have been new to -- new to Tyler with
15  respect to clients asking security questions.  Is that a
16  fair representation?
17      A.  My understanding is that some of her questions
18  are pretty detailed and require a higher level of -- of
19  security knowledge to evaluate and assess and provide
20  responses, yes.
21      Q.  And do you know if Tyler is FedRAMP or
22  StateRAMP authorized?
23      A.  Not -- not with regards to the Press Review
24  Tool.
25      Q.  Okay.  What tools is it FedRAMP or

Page 180

1  StateRAMP -- and, actually, I don't need to know them
2  all.
3      Is it FedRAMP or StateRAMP authorized with
4  respect to File & Serve?
5      A.  No.
6      Q.  Is it FedRAMP or StateRAMP authorized with
7  respect to its case management system?
8      A.  No, we are not.
9      Q.  Has Tyler attempted to obtain the FedRAMP or
10  StateRAMP authorization?
11      A.  Not within the courts and justice division.
12      Q.  Where does Tyler have FedRAMP or StateRAMP
13  authorization?
14      A.  Within our federal division.
15      Q.  Okay.  And that's PACER; correct?
16      A.  No, PACER's not a Tyler product.
17      Q.  Okay.  Do you know if PACER is FedRAMP
18  certified?
19      A.  I do not know if they are or not.
20      Q.  Do you know if any of your competitors, such
21  as Granicus or Tybera, are FedRAMP or StateRAMP
22  certified?
23      A.  I -- I do not.
24      Q.  Are you aware of the Idaho Supreme Court terms
25  and conditions for cloud-based services that it's

Page 181

1  requiring with any contract amendments?
2      A.  Yeah.  I've seen something along those lines
3  come through.  I think that's one of the exhibits, if
4  I'm not mistaken.  Is that the document that you're
5  referring to?
6      Q.  Correct.  It's Exhibit 2 to your request that
7  we provided to you.  Have you had a chance to take a
8  look at that?
9      A.  Yes.
10      Q.  Prior to today?
11      A.  Mm-hmm.
12      Q.  Do you know whether Tyler would be willing to
13  agree to those terms and conditions that are Exhibit 2
14  to the 30(b)(6) today?
15      A.  No.  The -- in evaluating this and assessing
16  it, just going through and trying to determine the
17  applicability of -- of each of these would -- would take
18  a significant number of resources on Tyler as well as a
19  significant amount of time, and that isn't something
20  that we're prepared to do at this time.
21      Q.  Under Tyler's current contract with the courts
22  for its case management system and for its File & Serve,
23  is Tyler under any obligation to go through this
24  evaluation with respect to these terms and conditions
25  such as what you just discussed or -- or is that not

18 (Pages 178 to 181)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 182

1  done until either an amendment or a renewal of a
2  contract?
3       A.  My understanding, and I'd have to look at the
4  contract in order to validate that, would be that it
5  would be upon either an amendment to that contract or a
6  new contract being -- being created between the two
7  parties.
8       Q.  So pretty fair to assume if Sara Omundson or
9  someone in her office requested that Tyler take its
10  existing contracts with File & Serve and with the case
11  management and voluntarily go through the process of
12  agreeing to the terms and conditions here that are
13  outlined in Exhibit 2 of our 30(b)(6) request, that
14  Tyler would not be under an obligation to do so?
15       A.  That is my understanding.
16       Q.  And safe to assume that Tyler would not do so?
17       A.  That is my understanding.
18       Q.  Okay.  Now, if Tyler were willing to comply
19  with the terms and conditions that are in this document
20  we're looking at here -- Exhibit 2 to the 30(b)(6) that
21  was served on Tyler -- would that impact the annual
22  subscription fee that Tyler would charge the courts, or
23  is that something that would need to be evaluated as to
24  whether the courts would be charged something higher
25  than $108,000 here in Idaho?

---

Page 183

1       A.  If Tyler were to go through this document as
2  it pertains specifically to the Press Review Tool, then,
3  yes, it would be significantly higher than 108,000 a
4  year.
5       Q.  Do you have an estimate of what it would
6  likely be?
7       A.  No.  In order to do that, we would have to
8  scope that work out.  And it would require significant
9  resources and time to be able to go through that
10  document, so that's something we would have to look
11  into.
12       Q.  Now, also attached as Exhibit 3 to the
13  30(b)(6) deposition notice -- what exhibit number is
14  that?
15       THE STENOGRAPHER:  You said 38.
16       MS. DUKE:  38?  Okay.  Thank you.
17       Q.  (By Ms. Duke)  Right.  So nice and confusing,
18  Exhibit 38, Exhibit 3 to that.  This was the spreadsheet
19  that we had provided with -- with the document showing
20  the court security controls that are required by the
21  Idaho Supreme Court.
22       A.  Just to make sure I'm looking at the right
23  one, this is Exhibit 3 native format, the Excel
24  spreadsheet?
25       Q.  Correct.

---

Page 184

1       A.  Yes, I'm pulling it up now.
2       Q.  All right.  Molly's trying to get it up there
3  for all of us too.
4       Do you know if Tyler has represented to
5  Ms. Dvorak that it is currently working on becoming
6  StateRAMP authorized?
7       A.  I'm unaware of -- of that.
8       Q.  If Tyler was working on becoming StateRAMP
9  authorized, would complying with the requirements in
10  this native Excel file from the court, Exhibit 3 to 38,
11  help with obtaining that authorization?
12       A.  I'm not certain.  We'd have to get our
13  security team's perspective on that.
14       Q.  Right.  Do you know if what the State of Idaho
15  is requesting in this Excel spreadsheet that's contained
16  within Exhibit 38 -- that's Exhibit 3 within Exhibit 38,
17  is essentially the same information that would need to
18  be answered by Tyler to become StateRAMP authorized?
19       A.  No, I was unaware of that.
20       MS. DUKE:  Do you know how to get to
21  RO 138 on that?
22       Q.  (By Ms. Duke)  So let me ask you:  How are you
23  using encryption to protect the documents that are in
24  the press review queue?  Do you know?
25       A.  One moment.

---

Page 185

1       Q.  And that's RO 138.
2       A.  RO 138, yeah.
3       I'm sorry.  Could you repeat the question?  I
4  was looking for that.
5       Q.  Sure.
6       How are you using -- how is Tyler using
7  encryption to protect the documents within the press
8  review queue?
9       A.  Yeah.  So our -- our encryption is both at
10  rest and in transit in our applications.
11       Q.  And is that the same in the clerk's queue?
12       A.  Yes, it is.
13       Q.  How about RO 155?  How is Tyler monitoring for
14  anomalous and malicious communications to and from the
15  press review queue?
16       A.  To -- today, we aren't.  The Press Review Tool
17  isn't live in the state of Idaho.
18       Q.  Okay.  In other states where it is live, is
19  the press review queue being monitored for anomalous and
20  malicious communications to and from the press review
21  queue?
22       A.  We do have some security mechanisms in place,
23  yes.
24       Q.  And do you know what those are?
25       A.  The level of detail is confidential.  It's not

---

19 (Pages 182 to 185)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 186

1  worth sharing.
2          MS. PETRONIO:  High level?
3          THE DEPONENT:  No, I can't.  We'd have to
4  go into the -- sorry.  We -- I don't -- can't go into
5  the details of those.
6      Q.  (By Ms. Duke) And I'm assuming that's for
7  proprietary reasons?  Even with us having a protective
8  order entered with the court, that's still not something
9  that Tyler is comfortable sharing?
10     A.  Yeah.  Also, it's a lack of deep knowledge
11 into the security protocols.
12     Q.  PO 158, do you know how the integrity
13 verification is being used to detect unauthorized access
14 of press review queues that are in place?
15     A.  No, I do not.
16     Q.  Do you know how Tyler, under PO 160, is
17 using -- or how the press review queue checks the
18 validity of inputs to the system?
19     A.  No, I do not.
20     Q.  And do you know how Tyler -- how the press
21 review queue prevents unauthorized code execution?
22     A.  Not at a detailed level.
23     Q.  And do you have an understanding that
24 Ms. Dvorak has asked these questions of Tyler's folks?
25     A.  Yeah.  I know she's -- she's requested that --

---

Page 187

1  that information.
2      Q.  And do you have an understanding that Tyler
3  has not provided her with the details to these questions
4  we've just gone through?
5      A.  Yeah, that's -- that's correct.
6      Q.  Again, I think that's because you've explained
7  by complying with what is included there, as Exhibit 3
8  to Exhibit 38, would be an incredibly costly process for
9  Tyler, and Tyler's only going to do that in the setting
10 of a contract amendment or a new or renewed contract?
11     A.  That's correct.
12     Q.  So some hopefully easier questions about the
13 press review queue so that I understand better as well
14 is:  Does the press review queue tool have a function
15 that alerts users if a complaint that was originally put
16 into the press review queue is actually rejected?
17     A.  We don't send any kind of alerts or
18 notifications as it pertains to the Press Review Tool.
19     Q.  Does the press review queue even receive that
20 type of information from File & Serve?
21     A.  Yes.  It -- it -- it -- well, it doesn't
22 necessarily directly receive it.  When the clerk makes
23 that determination, the status, the filing status of
24 that filing is modified in the EFM.  And then the way
25 that the Press Review Tool works is every time that a

---

Page 188

1  user goes in there, it makes the pool of those records
2  based upon those conditions.  So if the filing status
3  changed to a rejected and that was not a configured
4  condition for the Press Review Tool, then -- then the
5  next time that that screen was refreshed or displayed,
6  it would -- that filing would no longer be available.
7      Q.  But if it had been accessed prior to it being
8  rejected, assuming there was a configuration factoring
9  in rejections, there's no notification that, "Oh,
10 actually what you were looking at before is inaccurate
11 and it has been rejected"?
12     A.  That's correct.  There's no notification of
13 that.
14     Q.  Is there anything that would notify anyone in
15 the Press Review Tool whether a complaint has actually
16 been accepted?
17     A.  No.  Well --
18     Q.  Again, I'm assuming it could be configured
19 where if it was accepted it could be then I guess moved
20 out of the press review queue?
21     A.  Yeah, absolutely.  What I don't -- what I
22 don't remember is whether or not we display the status
23 of that filing within the tool itself.  I don't believe
24 that we do.  But you're correct in stating that if it's
25 configured to not be available in an accepted status,

---

Page 189

1  then if it reaches an accepted status then it would not
2  be available.
3      Q.  Now, in the press review queue, much like
4  Auto-Accept, again, if the setting is configured to
5  confidential, that, again, is going to be on the filer
6  side to make sure that they are noting the proper box so
7  it doesn't end up into the press review queue; correct?
8      A.  Yes, that is correct.
9      Q.  And so if a submitter marks confidential
10 documents incorrectly and does not say confidential,
11 it's going to go into press review queue?
12     A.  If the press review queue was configured --
13 the Press Review Tool was configured in that way, then
14 yes.
15     Q.  And back to, sadly, the malicious side of it,
16 if someone wants to be malicious and not mark something
17 confidential, even if it is containing judge's
18 addresses, social security numbers, those types of
19 things, it would go into press review queue if
20 confidential was not checked had confidential been part
21 of the configuration?
22     A.  Yes, that is correct.
23     Q.  And does Tyler provide any type of
24 indemnification to the courts -- and, in this instance,
25 it would be the State of Idaho -- if confidential

---

20  (Pages 186 to 189)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 190

1    documents are wrongly, you know, put into the press
2    review queue?
3        A.   No, we do not.
4        Q.   Now, I know if we take a look at Exhibit 9, we
5    had some questions that were ultimately answered.  "We"
6    being Jennifer Dvorak, had some questions that were
7    ultimately answered by Tyler related to architecture and
8    dataflow diagrams.
9        Do you have an understanding that those have
10   not yet been provided to the State of Idaho at
11   Ms. Dvorak's request?
12       A.   Yes, I do have that understanding.
13       Q.   Okay.  And why has Tyler not provided those
14   items?
15       A.   Because those items for the Press Review Tool
16   do not exist.
17       Q.   Do they exist for other Tyler products?
18       A.   Yes, they do.
19       Q.   Do they exist for the case management system?
20       A.   Yes, I believe so.
21       Q.   Do they exist for File & Serve?
22       A.   Yes, they do.
23       Q.   And have they been provided to the State of
24   Idaho with respect to those two applications?
25       A.   I'm not sure.

---

Page 191

1        Q.   I assume if the State of Idaho were to ask for
2    those, if they don't already have them related to those
3    two items, would they be provided?
4        A.   Under the appropriate security provisions, I
5    believe so.
6        Q.   Okay.  Now, I know that there was a response
7    on this Exhibit 9.
8        MS. MITCHELL:  Do you know which part?
9        Q.  (By Ms. Duke) Let me just have Molly take a
10   look at something and I can ask you some other questions
11   while she does that.
12       A.   Okay.
13       Q.   So we talked about -- we talked about -- or,
14   have not talked about in your deposition yet, something
15   called "API," Tyler's API.  Can you tell me what that
16   is?
17       A.   Yeah, API stands for application interface.
18       Q.   It's Ms. Dvorak's testimony that Tyler was
19   thinking it would have API available at the end of
20   September or end of Q3, and that that has not yet come
21   to fruition; is that correct?
22       A.   No, that's incorrect.  It was developed and
23   made available to our customers on September 23rd.
24       Q.   All right.  Do you know if the State of Idaho
25   has been advised of that in any way?

---

Page 192

1        A.   I don't believe so.  I saw some correspondence
2    earlier this week that would lead me to believe that
3    they hadn't.
4        Q.   Now, the API, just describe when a customer
5    gets that -- it sounds like that occurred at the end of
6    September, what happens with API if a customer gets that
7    from Tyler?
8        A.   Yeah.  Sure.  It's just a specification
9    document that essentially allows for the customer to
10   build their own version of a Press Review Tool, if you
11   will, calling it whatever name they deem appropriate.
12   But it would allow for them to have access to the
13   filings before a clerk makes a determination on them, so
14   after they've been submitted.
15       Q.   And so the API is -- is it provided to
16   customers at no charge?
17       A.   To our contract holders, yes.
18       Q.   If you're not a contract holder, what is Tyler
19   paying -- or, you know, having folks pay for the API?
20       A.   We're not making those available to anyone
21   outside of our contract holders.
22       Q.   All right.  Now, if you're a contract holder,
23   that means then that the State of Idaho would then have
24   to go obviously work with a team to then take the API
25   and actually build its own -- own computer application?

---

Page 193

1        A.   Yes, that is correct.
2        Q.   And I'm assuming you've done no looking into
3    how much that would cost the State of Idaho to do?
4        A.   No, I wouldn't know that information.
5        Q.   Okay.  But certainly this isn't like a
6    plug-and-play.  This is a, "Here's information, now
7    you've gotta go build an entire program off of it."
8        A.   That's right.  There's a development effort
9    required in order to build a solution that would --
10   would work.  The APIs just simply provide a mechanism to
11   gain access to those filings that are currently
12   available in the Press Review Tool.
13       Q.   Is Tyler looking to transition from providing
14   the Press Review Tool to instead transitioning to
15   providing its API or is it intending to do both?
16       A.   No, we -- we plan to do both.  We're just
17   trying to provide our customers with multiple options to
18   better serve them.
19       Q.   Okay.  Why did Tyler begin this process of
20   allowing API to be provided to its customers?
21       A.   It was -- it was requested by several
22   customers.
23       Q.   Obviously, the cost of using press review
24   queue API, there would be hardware costs to the court;
25   is that fair to assume?

---

21 (Pages 190 to 193)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 194

1    A.  It's -- it's hard to speculate that, but
2    the -- the development of the program must reside
3    somewhere.
4         Q.  Okay.  Certainly, there would be personnel
5    costs.
6         A.  If -- if the application were to be supported,
7    yes.
8         Q.  Costs of developing the press review queue
9    software that would then interface with the API and
10   actually function?
11        A.  Yeah, that's the development effort.
12        Q.  Okay.  So costs to develop; right?
13        A.  I'm sorry?
14        Q.  Costs to develop it?
15        A.  Yes, that's correct.
16        Q.  I'm assuming hosting costs.
17        A.  It -- I think that depends upon where -- where
18   the State of Idaho chose to host it.  You know, whether
19   it be a cloud -- commercial cloud solution or whether
20   it's hosted on-premise.
21        Q.  Okay.  If hosted on-premise, they would
22   obviously need the -- the servers to do so?
23        A.  That's correct.
24        Q.  If hosted in a cloud, it would obviously need
25   a contract for whatever the price of that contract was

---

Page 195

1    to host it in the cloud?
2         A.  That's correct.
3         Q.  Now, currently, the press review queue for
4    Tyler is hosted by AWS; is that correct?
5         A.  That is correct.
6         Q.  It was Silverlight until October of 2021?
7         A.  No.  That -- it was hosted in Tyler's databank
8    data center and we migrated it to AWS -- it's
9    always been on the same software.
10        Q.  Where does Silverlight factor into what Tyler
11   has provided to the State of Idaho?
12        A.  Yeah.  Silverlight was the old version of our
13   review tool for the clerks.
14        Q.  Oh, okay.
15        A.  We've migrated away to an HTML5 version that
16   now exists.
17        Q.  So the clerk review tool was on Silverlight
18   and is now on AWS?
19        A.  Silverlight is a software technology and AWS
20   is a hosting location, so the clerk review tool was on
21   Silverlight.  It's now on an HTML5 version.  It was also
22   in databank, which is the Tyler data center and it is
23   now in the AWS GovCloud.
24        Q.  Got it.
25             What courts have accepted, you know, or gotten

---

Page 196

1    Tyler's API as the -- as of when it became available at
2    the end of September?
3         A.  I don't have a comprehensive list.  I do know
4    the State of California has access to them.
5    Specifically the --
6         Q.  Do you know --
7         A.  No.
8         Q.  And, sorry, you were saying?
9         A.  I was saying specifically the Judicial Council
10   in California.
11             And to finish your other question, no, I'm not
12   aware of any others.
13        Q.  All right.  We have that document up,
14   Exhibit 9.
15             You'll see there, there's a question by
16   Ms. Dvorak that says:  "Is ISC data hosted and stored
17   separately from other customers?"
18             And the answer was:  "Idaho's data isn't
19   physically separated, but it isn't accessible from other
20   customers as it is stored within its own database."
21             Do you see that?
22        A.  Yes, I do.
23        Q.  Has Tyler had any issues with users that were
24   registered in one state court being able to access data
25   from another state court's system?

---

Page 197

1    A.  No, it wouldn't be possible.
2         Q.  So is Tyler aware that, for instance, the
3    State of Washington was able to access Idaho's Odyssey
4    File & Serve and vice versa?
5         A.  No.
6         Q.  Has -- it's also my understanding Tyler has
7    not provided a letter from AWS that it is a customer in
8    good standing; is that correct?
9         A.  That's correct.
10        Q.  And Tyler has represented, in this Exhibit 9,
11   Page 5303, in the middle there:  "Are you able to
12   provide a letter from AWS that you are a customer in
13   good standing and which AWS environment ISC data will be
14   stored, processed, and transmitted?"
15             And you see the answer there?
16        A.  Yeah, I'm sorry.  I'm having a tough time
17   trying to locate it.  Where is it?
18             MS. DUKE:  Oh, can you make it bigger,
19   Molly?
20             THE DEPONENT:  Oh, I see it now.
21        Q. (By Ms. Duke) Okay.
22        A.  Yes.
23        Q.  And is that a correct response by Tyler?
24        A.  Yeah.  AWS isn't willing to provide us a
25   letter.  I don't think they do provide those letters.

---

                                                    22  (Pages 194 to 197)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 198

1    So, yeah, we're not able to obtain one, but we do have
2    the majority of our customers in AWS operating today.
3         Q.  And would -- and that's the case with whether
4    you're in press review queue, File & Serve, case
5    management -- or not case management -- I'm sorry --
6    File & Serve or press review queue?
7         A.  That's correct.  The majority of our customers
8    on electronic filing in File & Serve and the Press
9    Review Tool are in AWS.
10        Q.  You'll see a little bit farther down, it talks
11   about what cadence or regular process is used to perform
12   serving patching.
13        Do you see that little section a couple
14   paragraphs down?
15        A.  Yes, I do, at the very bottom.
16        Q.  Do you see how it notifies:  "We do not
17   provide details of scan or penetration test results"?
18        A.  No, that appears to be cut off on the screen.
19        Q.  Oh, she'll move it up.
20        A.  Yes, I do see that.  Mm-hmm.
21        Q.  And it sounds like although she has asked for
22   that related to the SOC report -- or, no, strike that.
23        Despite the fact she's asked for that related
24   to Tyler, Tyler has not been willing to provide that
25   information; is that correct?

---

Page 199

1         A.  That's correct.  That's for security reasons.
2         Q.  And do you know if Microsoft performs any type
3    of patching on the press review server?
4         A.  Microsoft doesn't, no.
5         Q.  And does Tyler?
6         A.  Yes.  We -- we provide updates to the hardware
7    in which our software exists on.  Microsoft doesn't, but
8    we do.
9         Q.  And do you have documents that you would share
10   with the State of Idaho to confirm that?
11        A.  No, but they're informed of those updates.
12   They're notified when we make them.
13        Q.  All right.  Let go to Exhibit 6.
14        Are you aware of Doug Hansen with the State of
15   Idaho asking Tyler for the infrastructure requirements,
16   process, and policies around it, and the security
17   documentations for the press review queue?
18        A.  That's what we're looking at here?
19        Q.  Correct.
20        A.  Yeah.  Give me just a second, please.
21        Q.  Yeah, no problem.
22        MS. DUKE:  He might need you to scroll
23   through.
24        Q.  (By Ms. Duke) Just let Molly know if you need
25   to scroll.

---

Page 200

1         A.  Okay.  I don't know if I've seen this email
2    thread, but it appears to be some of the same questions
3    that we were discussing earlier regarding watermarks and
4    security.
5         Q.  Okay.
6         A.  APIs.
7         Q.  And it's your -- oh, sorry.
8         A.  I was just saying the APIs.
9         Q.  And it's your understanding that no watermarks
10   or any type of -- of item could be placed on a press
11   review queue display, and that's because it's actually
12   displaying the original document?
13        A.  That's correct.  It is technically feasible,
14   but it isn't an option today.  It would have to be
15   developed that way.
16        Q.  Okay.  Now, I know that -- and this is
17   separate and apart from press review queue, but I
18   understand there was a Portal issue in California
19   related to the California State Bar's Odyssey Portal.
20   Do you -- do you have that knowledge?
21        A.  Yes, I have -- I have a little bit.
22        Q.  Okay.  And what's your understanding of -- of
23   how that breach occurred in the State of California with
24   respect to the State Bar's Odyssey Portal?
25        A.  It didn't -- it wasn't with regards to the

---

Page 201

1    Press Review Tool.
2         Q.  No, I understand that.  Correct.
3         What tool was it with respect to?
4         A.  It was the online repository tool that we have
5    called Odyssey Portal.
6         Q.  And it's my understanding the reason it
7    happened was there was a -- I guess, a check that could
8    be made in the portal itself and that with that check
9    being in there it permitted access that was
10   unanticipated or unexpected.  Is that a proper
11   understanding?
12        MS. PETRONIO:  I'm just going to --
13   (inaudible).
14        THE STENOGRAPHER:  I can't hear you.
15        MS. PETRONIO:  I'm just objecting to the
16   form of the question.  I'm actually not going to let him
17   answer that because it's the subject of pending
18   litigation, and I think it's an inaccurate
19   characterization of what happened.  But, also, he's not
20   designated on that topic, so I think it would be a
21   mistake for us to let him answer that.
22        MS. DUKE:  All right.  Thank you.
23        Q.  (By Ms. Duke) So you were designated, as
24   Item No. 6, as somebody that could identify the courts
25   that implemented Auto-Accept and/or the Press Review

---

23  (Pages 198 to 201)

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

---

Page 202

1    Tool for civil, criminal, or other categories of
2    filings, including courts that have used Tyler-provided
3    APIs to implement the Press Review Tool.
4        I think we can take that last part out,
5    because that's just come out, and I doubt those -- those
6    courts are up and running yet with that; is that fair?
7        A.  Yes, that is correct.
8        Q.  So just the first part of that, do you have a
9    list of -- of the courts that have, in fact, implemented
10   Auto-Accept Review and/or Press Review Tool?
11       A.  Yeah.  I don't -- I don't have that
12   comprehensive list in front of me.  I do know that there
13   are about 25 of each, and I can give you a handful of
14   each, but I don't have that list in front of me now.
15       Q.  I'm assuming that's a list you could give your
16   counsel and she could just send us an email with it?
17       A.  If it's appropriate, yeah.
18       Q.  It's something we asked for in this 30(b)(6),
19   so I can appreciate it's hard for you to remember 25
20   different courts for each of those various programs, so
21   if it's easier to have that in a list you email to us or
22   in a list we take a quick break on and you read it, it
23   doesn't matter to me.
24       If you can give me a couple examples, that
25   would be great, for each.

Page 203

1        A.  Yeah.  Sure.  And I think I provided them
2    earlier, but I'm happy to restate them.  So for the
3    Auto-Accept, you know, the State of Maryland; the State
4    of Maine; the State of Vermont; Harris County, Texas;
5    and, the Los Angeles Superior Court in California.
6        For the Press Review Tool, Gwinnett County,
7    Georgia; Fulton County, Georgia; DeKalb County, Georgia;
8    Travis County, Texas; and, Clark County, Nevada.
9        Q.  All right.  Has Tyler been made aware of any
10   complaints as to -- oh, strike that.  I already asked
11   you that so don't worry about that.
12       All right.  I believe I already asked you this
13   but it's been a long day for all of us.  Has Tyler
14   received any reports of any security breaches related to
15   its press review queue?
16       A.  We have not.
17       Q.  Now, I know we also had identified Topic 19,
18   which is a document that Tyler sent to CNS related to
19   CNS sending to various courts the PowerPoint that we've
20   been going through with you today.
21       Are you aware of that?
22       A.  Yes, I am.
23       Q.  All right.  And what was Tyler's concern with
24   respect to Mr. Girdner's forwarding of that PowerPoint
25   to those courts?

Page 204

1        A.  We -- we had received some concern from some
2    of our customers regarding feedback, specifically that
3    it -- it was perceived as Tyler and Courthouse News were
4    in a partnership of some sort and we just wanted to be
5    clear that that wasn't the case.
6        Q.  Do Tyler and Courthouse News have any
7    partnership whatsoever?
8        A.  We do not.
9        Q.  Exhibit 4 asked -- to the deposition notice
10   asked that CNS provide to Tyler the communications that
11   CNS was sending to the courts at issue.
12       Do you know if CNS has done that?
13       A.  I do not.
14       Q.  And do Tyler and CNS have any type of
15   arrangement with respect to CNS advocating for the
16   implementation of a press review queue in the federal
17   court in the state of Idaho?
18       A.  We do not.
19       Q.  Did Tyler have an understanding prior to
20   this -- the 30(b)(6) notices, in this case, as to what
21   CNS has identified to the court as options for the Idaho
22   Courts related to CNS's request for an injunction in
23   this case?
24       A.  No.
25       Q.  I'm assuming that Tyler will not be

Page 205

1    representing to the Idaho Federal District Court Judge,
2    Judge Nye, that Tyler is taking a position that the
3    State of Idaho State Courts should, in fact, implement
4    the press review queue through Tyler either through its
5    application or its API; is that correct?
6        A.  That is correct.  We would not take a position
7    on that.
8        Q.  And that is also the same case with respect to
9    Auto-Accept?
10       A.  That is correct, yeah.  We -- our role as a --
11   in our partnership with the Idaho State Court is to
12   serve our partner.  And -- and we provide software and
13   then provide the direction of additional options of
14   configuration and availability of those options, but
15   take the direction as to which of those we implement by
16   the -- by our customers, so we're here to serve our
17   customers.
18       Q.  I will tell you that Mr. Girdner has
19   represented to the federal judge in this case,
20   Judge Nye, that Tyler has implemented its press review
21   queue for free with courts; is that correct?
22       A.  Yeah.  Historically, we have made it available
23   to a few courts for free.
24       Q.  All right.  And is that the process that Tyler
25   is following now?

24  (Pages 202 to 205)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 206

1      A.  No, it is not.  In fact, the Press Review Tool
2   was built for a specific county, Clark County, Nevada,
3   in 2014, as part of their agreement, and was provided a
4   few times thereafter for free.  As it started to gain
5   traction, we ended up realizing that there was a true
6   expense associated with it as more and more customers
7   started to use it.  And so for those courts that do have
8   it for free, upon their contract renewal for their
9   e-filing platform, those -- those topics are being
10  revisited.
11      Q.  And now as we've discussed before, at a
12  minimum, the Idaho Courts would need to pay a $108,000
13  subscription and likely higher given the security
14  protocols that it has asked for Tyler to confirm and
15  adopt?
16      A.  Yes.  108,000 for the subscription license.
17  And if that security provision was a requirement, then,
18  yeah, that would likely be factored into the offering.
19      Q.  Would you agree that Auto-Accept does not
20  substitute for a clerk's review of a document?
21      A.  I can't answer that.  That's subjective, and I
22  think it -- it depends upon each clerk's business
23  process as to whether or not that's a realistic
24  assessment.
25          (Pause in the proceedings.)

---

Page 207

1      Q.  (By Ms. Duke) Okay.  Is Tyler aware, in this --
2   this lawsuit, that CNS has represented the following to
3   our federal district court, "Cost:  Finally, defendant
4   claims Tyler provided a recent quote of 108,000 per year
5   to configure a press review queue raising serious
6   questions about the ability of private companies to
7   profit from the public record and the violation of the
8   First Amendment.  An unreasonable vendor 'does not allow
9   Idaho Courts to abdicate their responsibility to provide
10  timely access to public court records.' Defendant and
11  this court should be extremely skeptical of this quoted
12  price tag as Tyler has installed its press review queue
13  feature for numerous other courts at no charge."
14          I'll represent that that's in the Reply in
15  Support of Plaintiff Courthouse News' Motion for
16  Preliminary Injunction on Page 10.
17          Has Tyler provided numerous other courts the
18  press review at no cost or no charge?
19      A.  I think your first question was:  Was I aware
20  of this?
21      Q.  Correct.
22      A.  The answer is no.
23      Q.  Okay.
24      A.  The second question is:  Have I -- have we
25  provided that access to numerous.  Numerous is a

---

Page 208

1   subjective term, so I'd have to understand how many
2   numerous is.
3          As I stated just a few moments ago, we have
4   provided it historically for free, but each of those
5   contracts are being revisited upon renewal.
6      Q.  How many contracts have had it for free?
7      A.  I don't know that number off the top of my
8   head.
9      Q.  Is it most of them?  A few of them?  Half of
10  them?  Any estimate?
11      A.  Let's see.  The first -- let me see if I can
12  get this right.  We implemented the solution and created
13  it for Clark County, Nevada, in 2014.  Over the course
14  of the next four years, it was adopted by two other
15  courts, which I believe got it for free.  And since then
16  it has been adopted by the remaining 23, which I believe
17  the majority of those are paying for.
18      Q.  Okay.  And regardless of past practice, Tyler
19  has determined that given Tyler's costs and the market
20  for the product, the press review queue will carry at
21  least a minimum $108,000 subscription cost per year?
22      A.  That is correct for a statewide implementation
23  like the State of Idaho.
24      Q.  Did -- were you involved -- was Tyler involved
25  at all with respect to the Arizona Courts recently

---

Page 209

1   developing a press review queue?
2      A.  No.  Unfortunately, we don't have the e-filing
3   business in the state of Arizona yet.
4      Q.  And do you know who does?
5      A.  I do not.
6          MS. DUKE:  Okay.  I'm just looking
7   through my notes here real quick.  I know we're close.
8          MR. FETTERLY:  I know we're close, and I
9   also have just a few follow-up questions based on this
10  afternoon's session, so I wanted to just put that out
11  there.
12          MS. PETRONIO:  Well, let me just say he's
13  already 30 minutes late for an event that he's hosting
14  at his house, so anything you can do to keep this as
15  brief as possible is much appreciated.
16          MR. FETTERLY:  Maybe I can ask them while
17  Keely's looking through her notes?
18          MS. DUKE:  Sure.  Go for it.
19
20          E X A M I N A T I O N
21  BY MR. FETTERLY
22      Q.  Mr. Derrick, just a few follow-ups here.
23  There was some testimony about -- a lot of testimony
24  about documents submitted to the court and received into
25  the EFM and the eFile & Serve.

---

25 (Pages 206 to 209)

Courthouse News Service v. Omundson                                    30(b)(6) Terry Derrick - Vol. II

---

Page 210

1    Who owns the documents that are submitted to
2    and received by the EFM and eFile & Serve?
3         MS. DUKE:  Object to the form.
4    Foundation.  Legal conclusion.
5         THE DEPONENT:  Yeah.  I -- I can't speak
6    to the ownership of those documents.  It's -- I don't
7    know if it's still the filer or --
8    Q.  (By Mr. Fetterly) As between Tyler or the
9    court?
10        MS. DUKE:  Same objections.
11        THE DEPONENT:  Yeah.  Tyler provides the
12   software.  We don't own any of the documents or data
13   that is traversing through.
14   Q.  (By Mr. Fetterly) And the court's case
15   management -- or, the Odyssey Case Management System is
16   hosted in Idaho by Idaho but it's Tyler's application;
17   correct?
18   A.  Yes, that is correct.
19   Q.  And we were also talking about the -- the
20   document that's Exhibit 1 to the Courthouse News
21   subpoena being prepared for Texas.  I just want to
22   clarify, it's my understanding that document was
23   prepared for Texas, but the Press Review Tool app was
24   not prepared for Texas; is that correct?
25   A.  Yes, that is correct.

---

Page 211

1    Q.  Tyler doesn't have different -- different
2    Press Review Tool apps per state; correct?
3    A.  Yes.  Each individual state is a different
4    implementation and that's a different instance of that
5    application.  It's the same application, but it -- just
6    like we said before, it's not the same, so Idaho's would
7    be different than Texas would be different than
8    California's.
9    Q.  Correct.  So the configurations vary by state
10   or by court, but the app itself does not -- correct? --
11   otherwise.
12   A.  The app itself is not a multi-tenant app like
13   our review tool is for the clerks.  So there are
14   different instances of that app in each one of those
15   states.
16   Q.  Counsel was asking you questions about the
17   ability to watermark documents in the Press Review Tool.
18   Could Tyler develop that for its customers if the
19   customers requested it?
20   A.  Yeah.  I mean, we're capable of doing that,
21   sure.
22   Q.  Earlier, there was testimony regarding
23   issues -- counsel was asking questions about potential
24   issues with filing fees being accurate or correct in the
25   Auto-Accept paradigm.

---

Page 212

1    Have courts using Auto-Accept -- have they
2    actually had the kind of payment issues defense counsel
3    described?
4         MS. DUKE:  Objection.  Foundation.
5         THE DEPONENT:  Yeah.  I'm -- I'm not
6    intimately familiar with those issues if they have
7    transpired.
8    Q.  (By Mr. Fetterly) Would Tyler have the ability
9    to create or develop a configuration for the auto-review
10   so that a -- a fixed or hard amount would be required in
11   order to meet the conditions for Auto-Accept?
12   A.  Yeah.  I mean, we could -- we're a technology
13   company.  We could develop a lot of things, sure.
14   Q.  So if the filing fee is $225, a condition
15   could be configured or developed such that if $225 is
16   the filing fee, then conditions says "yes, could be
17   Auto-Accept," and if it is not then, "no, not
18   Auto-Accept."  Is that -- that could be developed?
19        MS. DUKE:  Foundation.
20        THE DEPONENT:  Yeah.  We would have to
21   get the technical teams involved in the scoping of that,
22   but...
23   Q.  (By Mr. Fetterly) Okay.  Is Amazon Web Services
24   GovCloud FedRAMP-approved?
25   A.  I -- I don't know.  I don't know if they are.

---

Page 213

1    Q.  Does Tyler have any concerns about the
2    security provided by AWS GovCloud relative to the
3    documents submitted to eFile & Serve?
4    A.  No, we do not.
5    Q.  The -- do you have any reason to believe the
6    information on Idaho's case management system is more
7    secure than the information on the EFM hosted by Tyler?
8         MS. DUKE:  Objection.  Foundation.  He
9    testified he didn't know what any of our safety
10   protocols were.
11        THE DEPONENT:  Yeah.  I can't speak to
12   any of the security configurations or setting or
13   protocols leveraged in an environment that's not owned
14   by Tyler.
15   Q.  (By Mr. Fetterly) Are there any ways in which
16   the Press Review Tool presents security issues that
17   would not also be presented by File & Serve?
18        MS. DUKE:  Object to the form.
19   Foundation.  Overbroad.  And, actually, he's already
20   testified to some.
21        THE DEPONENT:  I'm sorry.  Say that one
22   more time?
23   Q.  (By Mr. Fetterly) Yeah.  I'm just -- are there
24   any ways in which the Press Review Tool presents a
25   security issue that would not be also presented by

---

26  (Pages 210 to 213)

Courthouse News Service v. Omundson                                    30(b)(6) Terry Derrick - Vol. II

Page 214

1    File & Serve?
2         MS. DUKE:  Same objections.  He's already
3    testified to some.
4         Go ahead.
5         THE DEPONENT:  Yeah.  I -- the Press
6    Review Tool is -- yeah.  I mean, we would -- we would
7    monitor both and -- and do what we can to protect both.
8         Q.  (By Mr. Fetterly)  Okay.  And then defendant's
9    counsel was asking whether Tyler indemnifies clients
10   based on improper use of documents accessed via the
11   Press Review Tool.
12        Does Tyler indemnify clients based on improper
13   use of documents accessed via the EFM?
14        A.  I'm not sure if we do.  I'd have to look at
15   the contract.
16        Q.  Same question with respect to the case portal.
17        A.  The Odyssey Portal?
18        Q.  Odyssey Portal.
19        A.  Yeah.  I'm not familiar with those contracts.
20   I would have the look into them.
21        Q.  I think last one here.  Does -- does
22   eFile & Serve comply with the Idaho's cloud-based terms
23   and conditions?
24        MS. DUKE:  Object to the form.
25   Foundation.  Asked and answered.

Page 215

1         THE DEPONENT:  Yeah.  The -- those --
2    those were established after the agreement that we have
3    with them was in place.
4         MR. FETTERLY:  Thank you.  I have nothing
5    further.
6         MS. DUKE:  One last quick question.
7         THE DEPONENT:  I did --
8         MS. DUKE:  Oh, go ahead, Mr. Derrick.
9         THE DEPONENT:  I was just going to say
10   one follow-up that I owed you, Mr. Fetterly, is the
11   document type is not the filing type, when we were
12   talking about that in terms of the Press Review Tool and
13   how it pertains to the EFSP.  The document type is
14   related to the document security groups, which,
15   unfortunately, in the exhibits, I did not see that
16   screen which is another click or two down from the
17   screen that you did provide.
18        Q.  (By Mr. Fetterly)  Okay.  So just to clarify
19   real quick, I'm looking at the Exhibit 1 to the
20   subpoena, we just talked about the document type.  I
21   know my question about document type was also related to
22   filing code.
23        We do see filing code here on the conditions;
24   correct?
25        A.  Right.  For the Auto-Accept, but it isn't

Page 216

1    available on the conditions for the Press Review Tool.
2         Q.  I see.  I see.  So that filing code there is
3    not available for the Press Review Tool.  It is
4    available for the Auto-Accept.
5         And just so we're clear on that, I'm now
6    putting that back up on to the screen.  And so here we
7    have the filing code.  This would be a condition to be
8    configured for the Auto-Accept; correct?
9         A.  Correct, but not for the Press Review Tool.
10        Q.  Gotcha.  Thank you for clarifying.
11        A.  You're welcome.
12        Q.  And just for the record, I'm showing the
13   witness Exhibit No. 37, CNS 013289, where we have the
14   filing code menu pulled down.
15
16        E X A M I N A T I O N
17   BY MS. DUKE:
18        Q.  Mr. Derrick, I'll go ahead and ask a couple
19   follow-ups here and then we'll get you back there to get
20   you to your party.
21        A.  Okay.  Thank you.
22        Q.  You were just asked questions by Mr. Fetterly,
23   of, oh, Tyler could do this, Tyler could do that if a
24   client asked.
25        Tyler's going to charge a fee to do certain

Page 217

1    things like that, isn't it?
2         A.  Absolutely.
3         Q.  So those are not things that come free?
4         A.  That is correct.
5         Q.  Has CNS, at any point in time, reached out to
6    Tyler and tried to contract with Tyler to make the cost
7    associated with the press review queue less laborious on
8    the state courts?
9         A.  Not that I'm aware of.
10        Q.  Has Tyler -- excuse me -- has CNS, at any
11   point in time, reached out to Tyler to offer making
12   Auto-Accept more plug-and-play for each of the courts?
13        A.  Not that I'm aware of.
14        Q.  All right.  Thanks a lot for your time today.
15   We appreciate it.
16        MR. FETTERLY:  Thank you, Terry.
17        THE DEPONENT:  Hopefully, this was
18   helpful.
19        MS. DUKE:  It was very helpful.  Thank
20   you very much.
21        MR. FETTERLY:  Very helpful.  Thank you
22   very much.  We appreciate your time.
23        (Deposition concluded at 4:06 p.m.)
24        (Signature reserved.)
25        --o0o--

27 (Pages 214 to 217)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 218

1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3            The undersigned Certified Shorthand
Reporter and Deposition Notary Public of the State of
4  California does hereby certify:
5            That the foregoing 30(b)(6) deposition of
Tyler Technologies designee Terry Derrick was taken before
6  me remotely at the time, at which time the witness was
duly sworn by me;
7
8            That the testimony of the witness and all
objections made at the time of the deposition were
9  recorded stenographically by me and were thereafter
transcribed, said transcript being a true and correct copy
of the proceedings thereof.
10
11            I further certify that I am neither counsel
for nor related to any party to said action, nor in any
way interested in the outcome thereof.
12
13            Further, that if the foregoing pertains to
the original transcript of a deposition in a federal case,
before completion of the proceedings, review of the
14  transcript was requested/offered on the
record.
15
16
17            In witness whereof, I have subscribed my
name on this 15th day of November 2022
18
19
20
21        Nicole A. Bulldis, RPR
CA CSR No. 14441
22
23
24
25

28 (Page 218)

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 219

**A**

abdicate 207:9
ability 134:18
  171:3 173:5
  174:18 176:10
  177:4 178:6 207:6
  211:17 212:8
able 128:11 133:3
  134:5 137:4
  140:24 143:10
  160:25 176:16
  183:9 196:24
  197:3,11 198:1
absolutely 139:19
  174:17 188:21
  217:2
accept 156:10,14
acceptance 137:12
  138:3 146:11,14
  146:21 154:8
  163:24 174:16
accepted 123:4
  124:9 136:11
  137:9,15,20
  145:11 146:3,4,17
  149:8,12 160:2
  163:7 164:22
  166:9,13,22 167:1
  167:9,13,17
  175:11 188:16,19
  188:25 189:1
  195:25
accepting 137:23
  163:14
accepts 138:8
  146:22 147:5
access 126:10,16
  162:21 164:3,7
  170:6,7,14,17,24
  173:23 176:14
  177:4,10,14,19
  178:9,10 186:13
  192:12 193:11
  196:4,24 197:3
  201:9 207:10,25

accessed 188:7
  214:10,13
accessible 196:19
accessing 174:10
  176:11,22
accompanies
  133:17
account 131:23
accurate 134:6
  164:23 172:22
  173:15 211:24
Acosta 118:15
action 146:10,12
  150:7,8 218:11
actions 158:2
activities 140:19
actual 137:7
  138:23
add 164:9,17
addition 121:11
  172:24
additional 120:8
  169:17 178:12
  205:13
address 122:12
  134:25 135:6,10
  135:13,16,17,20
addressed 154:21
  159:12
addresses 189:18
addressing 126:11
administration
  119:14 168:4
administrative
  110:7 126:16
administrator
  168:5,10,11,11
adopt 206:15
adopted 208:14,16
advanced 125:22
advised 191:25
advocating 204:15
afternoon's 209:10
ago 115:2,6 208:3
agree 164:10

181:13 206:19
agreeing 182:12
agreement 127:13
  206:3 215:2
Ah 157:19
ahead 118:4 119:20
  156:9 161:5 214:4
  215:8 216:18
alerts 187:15,17
allow 132:24
  192:12 207:8
allowing 129:21
  193:20
allows 129:3 192:9
amazing 172:19
Amazon 212:23
ambiguous 120:14
  123:20 130:9
amended 117:16
amendment 171:9
  171:13 172:25
  182:1,5 187:10
  207:8
amendments 181:1
amount 159:3
  171:23 181:19
  212:10
and/or 201:25
  202:10
Angeles 203:5
annotation 174:19
annual 182:21
anomalous 126:3
  185:14,19
answer 113:21
  196:18 197:15
  201:17,21 206:21
  207:22
answered 115:17
  128:24 173:12
  184:18 190:5,7
  214:25
answers 123:8
anticipate 121:7
apart 200:17

API 191:15,15,17
  191:19 192:4,6,15
  192:19,24 193:15
  193:20,24 194:9
  196:1 205:5
APIs 193:10 200:6
  200:8 202:3
apologize 136:2
app 210:23 211:10
  211:12,12,14
apparently 168:4
appears 198:18
  200:2
applicability
  181:17
application 174:20
  174:21 179:5
  191:17 192:25
  194:6 205:5
  210:16 211:5,5
applications 142:2
  142:18 173:20,25
  185:10 190:24
appreciate 116:24
  175:3 202:19
  217:15,22
appreciated 209:15
approaches 131:2
appropriate 139:17
  143:1,11,13
  144:13 159:19
  191:4 192:11
  202:17
apps 211:2
AR 153:9,20
architecture 190:7
Arizona 113:1
  208:25 209:3
arrangement
  204:15
arrangements
  124:5 138:24
arrow 140:25
aside 121:5
asked 116:9 119:22

126:22 129:1
  130:23 131:9,18
  145:22 173:9
  179:13 186:24
  198:21,23 202:18
  203:10,12 204:9
  204:10 206:14
  214:25 216:22,24
asking 120:19
  127:22 179:15
  199:15 211:16,23
  214:9
assess 178:21
  179:19
assessed 123:1
  134:3,7 157:24
assessing 181:15
assessment 172:22
  206:24
associated 206:6
  217:7
assume 113:22
  121:13 147:21,23
  150:20 153:1
  182:8,16 191:1
  193:25
assuming 123:10
  126:22 139:15
  140:6 148:7,20
  150:17 151:3
  156:2 158:23
  165:23,25 179:1
  186:6 188:8,18
  193:2 194:16
  202:15 204:25
assumption 150:20
  151:7 176:13,15
attached 116:11
  183:12
attachment 116:23
attack 128:8,13
attacked 178:24
attacks 178:18
attempted 178:1,14
  180:9

Courthouse News Service v. Omundson                30(b)(6) Terry Derrick - Vol. II

Page 220

**audience** 169:18
  177:17
**audit** 171:2
**auditing** 170:23
**Austin** 152:5,6,7,8
**authentication**
  124:18 125:1
  126:17
**author** 121:18
  148:20,22,24
  149:1 153:5
**authorization**
  176:24 180:10,13
  184:11
**authorized** 170:7
  179:22 180:3,6
  184:6,9,18
**auto** 143:7 154:2
**Auto-Accept**
  119:21,22,24
  120:7,12,22 121:4
  121:8 122:8,17,18
  123:2 129:2,6
  131:20,25 132:6
  132:25 133:3,3,11
  133:25 136:5,6,8
  138:8,13,17,22
  139:9,17,24 143:7
  143:7 144:6,6,14
  144:22 145:18
  146:17,25 147:3
  147:16,18,24
  148:24 153:14,16
  154:14,24 155:3,6
  155:12,25 156:18
  156:25 157:10
  159:12 160:1
  189:4 201:25
  202:10 203:3
  205:9 206:19
  211:25 212:1,11
  212:17,18 215:25
  216:4,8 217:12
**auto-acceptance**
  137:21 146:22

  149:9 150:3,19
**auto-accepted**
  122:13 132:16,20
  133:6 149:9,23
  150:12,23 159:5
**auto-file** 144:22
**auto-noticed**
  163:15
**auto-review** 142:25
  144:9 145:10
  153:10,12,14,16
  153:18 157:24
  212:9
**auto-reviewed**
  153:22 154:3
**auto-transfer**
  132:1
**automated** 163:9
**automatically**
  129:7 145:11
  156:11 175:12
**availability** 121:2
  131:7 205:14
**available** 130:25
  131:12 175:6
  177:23 178:11
  188:6,25 189:2
  191:19,23 192:20
  193:12 196:1
  205:22 216:1,3,4
**average** 147:12,25
**aware** 122:2,5,15
  125:3,18,22,25
  127:5 129:18,23
  129:24 138:12
  155:8,13 165:8,16
  169:9 175:21
  179:1 180:24
  196:12 197:2
  199:14 203:9,21
  207:1,19 217:9,13
**AWS** 123:23 124:5
  195:4,8,18,19,23
  197:7,12,13,24
  198:2,9 213:2

**AZ** 110:24

---
**B**
---
**B** 153:1,4,11 161:1
**back** 117:12,23,25
  122:12 123:6,7
  124:24 128:12,22
  132:18 138:2
  142:15,15 146:7
  160:13 165:1
  169:3,7 189:15
  216:6,19
**backed** 125:14
**backup** 127:24
**backups** 124:18,25
  125:12,13 127:20
  127:25 128:3,3,10
  128:11,18
**Bar's** 200:19,24
**bargaining** 172:18
**based** 118:17
  130:11 132:9,12
  139:14 153:20
  161:23 163:10
  172:17 175:6
  188:2 209:9
  214:10,12
**bear** 116:18 155:22
**becoming** 184:5,8
**behavior** 126:3
**believe** 114:22
  121:19,23 139:16
  153:16 162:19
  188:23 190:20
  191:5 192:1,2
  203:12 208:15,16
  213:5
**benefits** 148:23
**best** 113:14 127:15
  164:11
**Beth** 111:18
**beth.petronio@k...**
  111:20
**better** 115:23 116:6
  131:8 146:6
  187:13 193:18

**beyond** 120:8
  151:16
**big** 165:21 177:7
**bigger** 197:18
**bit** 113:13 141:9
  152:18 198:10
  200:21
**blinds** 115:21
**blocked** 133:5
**Boise** 111:12 116:4
**bots** 175:22 176:1
  176:11,14
**bottom** 198:15
**bounce** 113:13
**box** 111:12 129:5
  140:4 156:4,11
  189:6
**breach** 200:23
**breached** 128:8
**breaches** 203:14
**break** 146:24
  154:13 157:22
  160:11 202:22
**brief** 209:15
**bring** 169:2,2
**broad** 166:3
**broken** 154:10
**BRYAN** 111:5
**build** 192:10,25
  193:7,9
**built** 134:9 206:2
**Bulldis** 110:24
  218:21
**bullet** 150:16
**bunch** 155:21
**burden** 165:14
**burned** 146:6
**business** 114:19,20
  206:22 209:3

---
**C**
---
**C** 111:1 153:1,7,18
  153:24 154:2,5
**CA** 110:24 111:6
  218:21
**cadence** 198:11

**California** 196:4
  196:10 200:18,19
  200:23 203:5
  218:4
**California's** 211:8
**call** 146:6
**called** 141:8 142:15
  168:24,24 191:15
  201:5
**calling** 192:11
**capability** 134:21
**capable** 211:20
**capacity** 110:7
  154:24
**capture** 137:11
**captured** 137:19
  141:25
**captures** 176:17
**card** 131:22
**careful** 152:7
**carry** 208:20
**case** 114:10 120:20
  123:5,13 124:10
  124:11,16,21
  125:5,8,15,19,23
  126:4,12,18,25
  129:7,8 132:1,7
  132:17 133:6
  134:23 135:5,11
  136:1,2,7,22
  137:10,16,25
  140:1 141:3,7,19
  141:20,23,24
  142:5,8,17 143:22
  143:24 144:10
  147:5 148:18
  150:4,12,24
  155:18 156:12
  157:10,14,21
  158:7,10,11,13,20
  158:21 159:6,13
  159:15,16,22,25
  162:3,12 163:20
  163:20,21 164:1,3
  164:14,21 165:1

167:19,21,24
169:20 175:15
180:7 181:22
182:10 190:19
198:3,4,5 204:5
204:20,23 205:8
205:19 210:14,15
213:6 214:16
218:13
**cases** 156:21
**categories** 154:20
202:1
**caught** 150:2
**CAVE** 111:5
**center** 111:5 195:8
195:22
**certain** 148:12,12
157:23 175:11
177:24 184:12
216:25
**certainly** 193:5
194:4
**CERTIFICATE**
218:1
**certified** 180:18,22
218:1,3
**certify** 218:4,10
**chance** 181:7
**change** 131:6
**changed** 141:12
188:3
**characterization**
201:19
**charge** 182:22
192:16 207:13,18
216:25
**charged** 171:17
182:24
**chart** 153:25 154:1
162:6 166:13
**charts** 152:19
**check** 128:24
129:15,19 201:7,8
**checked** 189:20
**checks** 186:17

**child** 157:1
**children** 176:2
**chose** 194:18
**circumstances**
134:22
**civil** 202:1
**claims** 207:4
**clarify** 210:22
215:18
**clarifying** 216:10
**Clark** 203:8 206:2
208:13
**clear** 127:22 137:1
137:14 173:8
204:5 216:5
**cleared** 136:25
**clerk** 123:4 124:9
137:9,12,15,20,23
138:8 139:24
143:1,10 145:7,20
146:16,17,21
147:3,4 150:7,18
157:21 162:20,22
163:3,5,8,12,13
167:12 169:16
174:4 177:11
187:22 192:13
195:17,20
**clerk's** 146:14
174:14,15 176:18
176:19,22 178:11
185:11 206:20,22
**clerks** 115:1,10
122:11 123:25
134:24 147:13
148:7 150:4,22
158:5,11 173:19
174:17 176:23
177:8 195:13
211:13
**click** 129:5 156:3
156:10 215:16
**client** 175:18
216:24
**clients** 135:10

179:4,15 214:9,12
**clock** 147:12
**close** 209:7,8
**cloud** 194:19,19,24
195:1
**cloud-based** 180:25
214:22
**CMS** 140:22 141:1
158:4
**CNS** 165:21 171:22
178:13 203:18,19
204:10,11,12,14
204:15,21 207:2
216:13 217:5,10
**CNS's** 204:22
**code** 186:21 215:22
215:23 216:2,7,14
**column** 119:23
150:9
**columns** 151:2,5
**come** 132:24 151:4
151:13 176:3
181:3 191:20
202:5 217:3
**comes** 146:2
**comfortable** 186:9
**comment** 167:4
**commercial** 194:19
**commonly** 174:22
**communications**
155:5 156:24
185:14,20 204:10
**companies** 207:6
**company** 131:22
212:13
**compare** 134:4
153:24
**comparing** 154:4
**competitors** 180:20
**complaint** 124:9
132:6,14,25
133:17 143:24
146:13 147:21,23
158:19,21,21
159:6,21,22 160:1

187:15 188:15
**complaints** 143:23
148:23 149:2,3
154:14 203:10
**completion** 218:13
**complex** 148:8
**comply** 182:18
214:22
**complying** 184:9
187:7
**component** 144:15
**components** 144:11
**comprehensive**
196:3 202:12
**compromised**
178:24
**computer** 163:19
192:25
**concern** 203:23
204:1
**concerns** 213:1
**concluded** 217:23
**conclusion** 210:4
**condition** 134:1
188:4 212:14
216:7
**condition(s)** 142:25
**conditional** 140:13
**conditions** 133:10
143:6 144:17,25
145:10,18,21
156:14 172:24
180:25 181:13,24
182:12,19 188:2
212:11,16 214:23
215:23 216:1
**conducted** 110:17
178:22
**confidential** 129:5
129:9,13,15,20,22
130:1 156:2,4,8
156:10 159:11
185:25 189:5,9,10
189:17,20,20,25
**confidentiality**

156:1
**configurable**
145:23
**configuration**
129:3 130:5
131:11 132:10,12
132:19,21 133:15
133:22,23 135:1
136:16,17,19
144:12 188:8
189:21 205:14
212:9
**configurations**
129:2,12 130:10
130:17,18,24
131:12 132:24
133:9 136:7
163:11 211:9
213:12
**configure** 133:3
139:14 207:5
**configured** 130:13
131:25 133:10
134:2 143:6 144:7
156:1,14 160:3
188:3,18,25 189:4
189:12,13 212:15
216:8
**confirm** 199:10
206:14
**confirming** 137:3
**confused** 152:18
**confusing** 141:5,6,9
183:17
**consideration**
148:5 151:1
**considered** 121:14
121:22
**considering** 149:2
**contained** 118:25
123:22 184:15
**containing** 157:23
189:17
**content** 160:22
**context** 158:19

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 222

159:21
**contract** 130:12
  138:19 155:14,19
  169:19 170:22
  171:9,13 172:25
  181:1,21 182:2,4
  182:5,6 187:10,10
  192:17,18,21,22
  194:25,25 206:8
  214:15 217:6
**contracts** 182:10
  208:5,6 214:19
**contractual** 124:5
  127:13
**control** 126:15,23
  126:24 127:3
  128:20 143:12,17
**controls** 183:20
**conversations**
  115:4,10 155:9
  179:9
**copies** 173:11
**copy** 123:6 218:9
**correct** 118:13,14
  118:16,18 119:10
  120:12,24 121:16
  122:21 123:14
  124:7,13,20,22
  125:1,2,11 127:1
  128:17,21 129:10
  130:7,19 131:3,12
  131:13,16,17
  133:18 134:15,19
  134:20,25 135:14
  135:20,22,23
  136:1,23,24 137:6
  137:10,11 138:11
  140:2,3,15 141:4
  141:14,17 142:3,4
  142:10,11,13
  143:17,18 144:1,2
  144:5,23 145:4,8
  146:4,5,14,15,19
  147:7,13,16 148:3
  148:4 149:24,25

150:5,6,14,15,24
150:25 151:20
152:14,15 153:19
154:10,11,25
155:1 156:4,5,13
157:6,9,10,11
158:13 159:1,9,17
159:18,19 160:19
160:22,23 161:3,4
161:8,13,14,23,24
162:2,5,13,14,19
163:3,4,16,22
164:15 165:2,3,11
166:2,10,11,13,14
167:2,9,10,14,21
168:6,25 169:25
171:9,10,14,18,19
171:20 172:14
174:6,7,8,12
175:20 176:20,24
176:25 177:5,6,24
177:25 179:3
180:15 181:6
183:25 187:5,11
188:12,24 189:7,8
189:22 191:21
193:1 194:15,23
195:2,4,5 197:8,9
197:23 198:7,25
199:1,19 200:13
201:2 202:7 205:5
205:6,10,21
207:21 208:22
210:17,18,24,25
211:2,9,10,24
215:24 216:8,9
217:4 218:9
**corrected** 150:2
165:2,6 166:16,20
166:25
**correcting** 159:15
**correction** 149:6
149:22,24
**corrections** 150:11
**correctly** 120:1

145:6,16,19
**correspondence**
192:1
**cost** 120:10,21
154:23 193:3,23
207:3,18 208:21
217:6
**costly** 187:8
**costs** 121:3,7
129:20,23 132:23
193:24 194:5,8,12
194:14,16 208:19
**Council** 119:15
196:9
**counsel** 202:16
211:16,23 212:2
214:9 218:10
**counties** 151:15
**country** 119:12
165:9
**county** 113:1 152:6
152:8,11 203:4,6
203:7,7,8,8 206:2
206:2 208:13
**County's** 152:13
**couple** 198:13
202:24 216:18
**course** 113:20
116:8 158:16
208:13
**court** 110:1 115:11
119:4,14 121:4,6
122:2,11 123:4
124:9,13,13,15,19
125:10,24 126:5
126:10,13,19,25
132:8,12,17 137:8
137:9 138:10
142:8,14 143:20
144:12,19 147:25
149:16,17 150:4
150:22 152:4
153:2,4,7,11,11
153:24,24 154:2,2
154:5,5 155:16,19

156:1 157:2 159:4
161:2 162:4,9,10
162:17 163:20,21
164:5 166:5,10
169:20,20 170:15
171:16,25 173:9
176:24 177:10
178:11 180:24
183:20,21 184:10
186:8 193:24
196:24 203:5
204:17,21 205:1
205:11 207:3,10
207:11 209:24
210:9 211:10
**court's** 122:20
133:6 136:22
137:25 140:1
141:2 143:17
144:4 150:23
154:13 156:12
157:20 159:13
162:12 164:3
165:1 177:16
196:25 210:14
**courthouse** 110:3
164:20 204:3,6
207:15 210:20
**courthouses** 177:24
**courts** 110:8
111:23 118:24
120:11 121:1,6
125:4,19 130:13
130:25 131:16
138:13,16,21
139:2,9,13,16,16
149:7,11,20
151:10 152:12
153:1,18 155:6,12
156:17 160:21
161:13 165:8,21
167:3 168:18
170:19 173:1
175:19 177:9,18
180:11 181:21

182:22,24 189:24
195:25 201:24
202:2,6,9,20
203:19,25 204:11
204:22 205:3,21
205:23 206:7,12
207:9,13,17
208:15,25 212:1
217:8,12
**cover** 127:14
151:20
**create** 151:17
170:15 212:9
**created** 119:13
129:21 143:19
151:7 182:6
208:12
**creating** 121:14
148:21
**credentialed**
169:23
**credentialing** 170:1
**credentials** 176:15
**credit** 131:22
**criminal** 202:1
**criteria** 123:3
140:13 144:13,16
144:20,21 157:25
160:4 175:14,16
**CSR** 218:21
**current** 115:9
181:21
**currently** 114:4,6
184:5 193:11
195:3
**customer** 192:4,6,9
197:7,12
**customers** 120:6
139:1,2,4 177:25
178:2 191:23
192:16 193:17,20
193:22 196:17,20
198:2,7 204:2
205:16,17 206:6
211:18,19

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 223

cut 198:18
cybersecurity
  128:6

**D**

D 153:1,7,18
daily 128:3
Dallas 111:19
data 118:18 125:10
  136:14 151:2,3,4
  152:22 154:12,16
  195:8,22 196:16
  196:18,24 197:13
  210:12
databank 195:7,22
database 163:22
  196:20
dataflow 190:8
DATE 110:23
day 151:16 175:15
  203:13 218:17
days 146:7 175:7
deal 132:17 148:2
dealing 159:14
dealt 150:4 156:18
debate 165:21
decide 130:1
decided 118:6
deem 148:12
  192:11
deemed 130:14
  143:11 144:13
  148:16
deep 186:10
defendant 110:9
  111:9 207:3,10
defendant's 112:12
  214:8
defense 212:2
defer 121:5
define 122:2,6
defined 175:18
definition 169:10
  169:12
definitive 131:5
DeKalb 203:7

delivered 164:1
denial-of-service...
  127:18
dependent 169:19
depending 160:4
depends 132:19
  160:3 194:17
  206:22
depo 118:8
DEPONENT
  120:15 123:21
  130:10 186:3
  197:20 210:5,11
  212:5,20 213:11
  213:21 214:5
  215:1,7,9 217:17
deposition 110:11
  112:1,12 116:12
  117:15 183:13
  191:14 204:9
  217:23 218:3,5,8
  218:13
Derrick 110:13
  112:1 113:5,12
  209:22 215:8
  216:18 218:5
describe 127:8
  166:3,4 192:4
described 212:3
describing 127:10
designated 201:20
  201:23
designee 218:5
Despite 198:23
detail 127:11
  185:25
detailed 179:18
  186:22
details 142:24
  143:13,14 144:3
  145:2,10,17 186:5
  187:3 198:17
detect 186:13
determination
  129:17 130:11

137:12 157:18
  167:15,17 187:23
  192:13
determine 129:21
  132:10 134:5
  139:16 149:16,19
  169:23 181:16
determined 177:2
  208:19
develop 194:12,14
  211:18 212:9,13
developed 140:24
  191:22 200:15
  212:15,18
developing 194:8
  209:1
development 193:8
  194:2,11
devices 126:16
diagram 140:5
  161:21 164:10,11
diagrams 190:8
difference 177:7
different 124:2
  129:9 173:25
  202:20 211:1,1,3
  211:4,7,7,14
difficult 163:23
difficulties 118:3
direction 114:7,20
  128:1 205:13,15
directions 123:5
directly 179:12
  187:22
director 110:8
  115:8
discretion 128:19
  177:16
discussed 181:25
  206:11
discussing 160:17
  173:16 200:3
display 173:21,21
  188:22 200:11
displayed 123:24

174:4 188:5
displaying 200:12
distinct 142:20,21
district 110:1,2
  205:1 207:3
division 180:11,14
docket 166:4
document 119:16
  124:3 129:4
  134:17 135:19
  136:6,21 137:1,24
  138:2 139:25
  140:11 144:8,23
  146:2,2,18 147:4
  147:5 148:21,24
  149:4 151:6,18
  156:11 158:10
  160:19 161:8,10
  163:20,25 164:14
  166:8,21 167:1,3
  167:3,21,25
  168:16 170:25
  171:1,7 173:2,22
  174:2,4,9,14,18
  176:4,17 181:4
  182:19 183:1,10
  183:19 192:9
  196:13 200:12
  203:18 206:20
  210:20,22 215:11
  215:13,14,20,21
documentations
  199:17
documents 122:3,6
  123:17,21 124:6,8
  125:20,24 126:11
  126:18 127:4,6
  128:10 129:14,20
  136:16,18,22
  147:18 156:22
  157:2,5,8,22
  158:7 159:14
  165:24 171:3
  173:6,10,11,12,13
  173:17 175:6

184:23 185:7
  189:10 190:1
  199:9 209:24
  210:1,6,12 211:17
  213:3 214:10,13
doing 178:7,9
  211:20
doubt 202:5
Doug 199:14
drafted 161:12
dreaded 128:5
driven 144:12
due 118:2
Duke 111:10,11
  112:5,7 113:11
  116:24 117:4,19
  117:24 118:4,7,9
  120:17 124:1
  130:15 136:5
  139:20,22 147:8
  147:10 152:16,18
  155:3,25 158:18
  160:13,16 161:5,7
  161:17,19 165:17
  165:19 168:16
  169:1,4 183:16,17
  184:20,22 186:6
  191:9 197:18,21
  199:22,24 201:22
  201:23 207:1
  209:6,18 210:3,10
  212:4,19 213:8,18
  214:2,24 215:6,8
  216:17 217:19
duly 113:6 218:6
duration 123:14
  136:18 138:5
  175:15
Dvorak 179:9
  184:5 186:24
  190:6 196:16
Dvorak's 190:11
  191:18

**E**

E 111:1,1,10,10

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 224

113:10 153:1,7,18
209:20 216:16
**e-file** 136:21
**e-filing** 115:6
119:24 120:5,6,9
121:13 127:13
151:23,23 161:7
164:4 167:20
206:9 209:2
**earlier** 128:24
130:16 136:25
173:17 174:25
192:2 200:3 203:2
211:22
**easier** 187:12
202:21
**edit** 137:18 143:20
**editor** 174:23
**editors** 174:22
**edits** 174:18
**effect** 146:10,13
**effective** 149:16,20
**effectiveness** 149:7
149:12
**efficiency** 154:5
**effort** 193:8 194:11
**eFile** 114:21 123:16
124:4 127:5
135:10 136:9
139:5 141:13,16
163:1,2,2 164:14
173:11 209:25
210:2 213:3
214:22
**eFiling** 122:25
123:1,22 136:10
136:12,15 162:20
**EFM** 122:25
123:11 140:6,10
140:16 187:24
209:25 210:2
213:7 214:13
**EFM's** 173:16
**EFS** 127:20,24
**EFSP** 140:12,12

215:13
**either** 129:15 138:7
163:14 165:15
167:17 182:1,5
205:4
**elapsed** 175:15
**electronic** 121:21
121:25 122:6,24
168:21 198:8
**email** 135:20 163:6
163:18 164:18,19
200:1 202:16,21
**Embarcadero**
111:5
**emergency** 148:15
148:15
**employed** 177:9
**employees** 126:10
**encourage** 139:9
**encouragements**
139:11
**encryption** 184:23
185:7,9
**ended** 206:5
**endpoint** 125:22
**ends** 174:16
**endured** 120:25
**ensuring** 133:16
**enter** 144:3
**entered** 186:8
**Enterprise** 114:10
141:22
**entire** 193:7
**entity** 168:13 170:2
178:14
**envelope** 142:24,25
143:5,13,14,18,25
144:1,16,17 145:1
145:9,15,17 150:8
157:6,8,15,17,18
157:19,22,23
158:3,6,24 159:24
**envelopes** 144:8
154:3 157:13
**environment**

176:14 197:13
213:13
**error** 165:6
**errors** 122:12
**eSolutions** 114:19
**essentially** 184:17
192:9
**established** 215:2
**estimate** 183:5
208:10
**evaluate** 132:22
178:21 179:19
**evaluated** 123:2
145:18 157:16,17
182:23
**evaluating** 181:15
**evaluation** 120:21
154:22 181:24
**event** 120:22
150:10,22 165:5
209:13
**EVETT** 111:11
**exactly** 151:3 158:1
173:22
**EXAMINATION**
110:11 112:3,4
**examined** 113:7
**example** 128:4
140:21 143:4
148:14 152:22
**examples** 202:24
**Excel** 183:23
184:10,15
**Excellent** 113:25
**exception** 143:19
**excuse** 217:10
**execution** 186:21
**exercise** 178:22
**exhibit** 112:10
116:22 117:2,3,5
117:9 160:15,16
160:22 161:6,16
161:22,25 167:25
168:3,14 181:6,13
182:13,20 183:12

183:13,18,18,23
184:10,16,16,16
187:7,8 190:4
191:7 196:14
197:10 199:13
204:9 210:20
215:19 216:13
**exhibits** 112:11
181:3 215:15
**exist** 174:24 175:14
190:16,17,19,21
**existing** 182:10
**exists** 123:22
195:16 199:7
**expense** 120:8,25
206:6 207:7
**explain** 140:25
148:8
**explained** 187:6
**extent** 114:5
167:19
**extremely** 207:11

**F**

**faced** 129:25
**fact** 133:16,21
142:17 198:23
202:9 205:3 206:1
**factor** 141:9 195:10
**factored** 206:18
**factoring** 148:23
188:8
**fair** 113:23 119:1,2
121:9 133:12,14
158:8,9 166:1
172:17 179:16
182:8 193:25
202:6
**familiar** 121:24
122:1 125:7,13,16
133:8 167:22
168:19 212:6
214:19
**far** 115:1 131:8
**farther** 198:10
**fashion** 113:14

**feasible** 200:13
**feature** 207:13
**federal** 140:25
142:14 180:14
204:16 205:1,19
207:3 218:13
**FedRAMP** 179:21
179:25 180:3,6,9
180:12,17,21
**FedRAMP-appr...**
212:24
**fee** 131:19,21,24
132:2,5,5,15,18
133:5,16,24
134:13,16 147:24
148:2 159:2,3,7
159:25 171:15
182:22 212:14,16
216:25
**feedback** 204:2
**feels** 141:9
**fees** 134:6 211:24
**Fetterly** 111:4
112:6 113:17
116:10,21 117:17
118:1 120:13
123:19 130:8,17
130:24 141:7
160:17 209:8,16
209:21 210:8,14
212:8,23 213:15
213:23 214:8
215:4,10,18
216:22 217:16,21
**fewer** 154:9
**file** 114:21,25
122:19 124:23,24
125:17 127:2,9
128:9,14,18
129:14 133:4
135:9 136:21
137:2 138:17
140:1,14 141:2,11
141:14,16 142:7,9
142:16 145:23

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 225

| | | | | |
|---|---|---|---|---|
| 146:1,5,12,18,20 | 159:7,15,24 | 215:10 | **GATES** 111:18 | **going** 113:21 |
| 147:3 155:15 | 165:20,22,24,24 | **follow-ups** 209:22 | **general** 113:16 | 115:25 117:4,24 |
| 157:4 161:25 | 166:1,2,5 167:2,8 | 216:19 | 114:18 115:3 | 118:9 128:22 |
| 162:17 166:8,15 | 167:9 168:22 | **following** 205:25 | 127:12,15 164:6 | 133:24 139:20 |
| 166:21 167:1 | 187:23,24 188:2,6 | 207:2 | **generally** 127:8 | 141:19 144:9,22 |
| 168:3,3,5,17,18 | 188:23 198:8 | **follows** 113:8 | 148:16 170:12 | 145:6 146:6 150:2 |
| 168:24 170:16 | 211:24 212:14,16 | **foregoing** 218:5,12 | **generated** 125:13 | 150:3 155:21 |
| 174:3,16 180:4 | 215:11,22,23 | **form** 201:16 210:3 | 148:24 | 160:6 163:1,20,21 |
| 181:22 182:10 | 216:2,7,14 | 213:18 214:24 | **generating** 149:3 | 168:7 169:7 170:7 |
| 184:10 187:20 | **filings** 134:2 | **format** 166:8,15,21 | **Georgia** 203:7,7,7 | 172:20 181:16 |
| 190:21 197:4 | 139:10 145:10 | 167:2 183:23 | **getting** 163:14,18 | 187:9 189:5,11 |
| 198:4,6,8 213:17 | 148:6,8,12 149:8 | **formerly** 141:13,23 | 173:23 178:10 | 201:12,16 203:20 |
| 214:1 | 149:13 151:8,16 | **forward** 114:16 | **Girdner** 152:1,2 | 215:9 216:25 |
| **file-stamped** 123:6 | 153:21,22 156:19 | **forwarding** 203:24 | 171:21 172:15 | **good** 117:21 130:22 |
| **filed** 129:5,8 156:9 | 157:7,16,24 | **found** 174:22 | 205:18 | 160:9 197:8,13 |
| 156:12 159:7 | 192:13 193:11 | **foundation** 120:14 | **Girdner's** 203:24 | **gosh** 116:8 |
| 160:1,1 171:4 | 202:2 | 130:9 210:4 212:4 | **give** 128:4,23 143:3 | **Gotcha** 216:10 |
| **filer** 122:23 123:7 | **fill** 145:6,19 | 212:19 213:8,19 | 148:14 158:15 | **gotta** 152:7 193:7 |
| 129:16 132:4 | **filled** 145:15 | 214:25 | 199:20 202:13,15 | **gotten** 128:6 |
| 134:8 140:12,12 | **filling** 145:1 | **four** 208:14 | 202:24 | 195:25 |
| 143:15,19,21 | **Finally** 207:3 | **frame** 165:4 | **given** 121:12,20 | **GovCloud** 123:23 |
| 144:18,24 145:3,5 | **financials** 134:3 | **Francisco** 111:6 | 127:2 176:8 | 195:23 212:24 |
| 145:15 156:3 | **finish** 196:11 | **free** 119:24 120:3 | 206:13 208:19 | 213:2 |
| 161:22 162:6,25 | **firewall** 127:17 | 120:19 121:5 | **globally** 127:22 | **grace** 165:4,9,14 |
| 163:6,9,13,14 | 179:5 | 205:21,23 206:4,8 | **go** 113:12 118:4,6 | **Granicus** 180:21 |
| 164:2,18,19 165:2 | **firm** 168:4,9,11,11 | 208:4,6,15 217:3 | 118:10 119:20 | **grant** 170:17 |
| 168:8,8,9 189:5 | 168:13,13 | **front** 202:12,14 | 122:18,25 123:11 | **grants** 170:6 |
| 210:7 | **first** 113:6 118:11 | **fruition** 191:21 | 124:23 128:25 | 177:10 |
| **filer's** 144:2 145:17 | 118:12 119:21,23 | **Fulton** 203:7 | 129:9 133:25 | **graphic** 163:24 |
| 163:10,18 | 121:12 138:4 | **function** 119:25 | 138:2 144:9 147:8 | **great** 116:3,4 |
| **filers** 144:8 165:5 | 147:11 152:22 | 120:7,12 121:2 | 152:16 154:18 | 202:25 |
| 165:11,14 | 164:10 165:15 | 139:25 143:8 | 156:9 158:11 | **groups** 215:14 |
| **filers/service** | 168:17 172:8 | 144:14 187:14 | 161:5,17 164:21 | **guess** 114:2 120:15 |
| 145:12 | 202:8 207:8,19 | 194:10 | 164:25 165:17 | 153:22 188:19 |
| **filing** 121:21,25 | 208:11 | **functionality** | 169:7 181:23 | 201:7 |
| 122:6,24,24 | **Fisher** 173:9 | 146:22 | 182:11 183:1,9 | **guide** 114:21 |
| 131:19,21,24 | **five** 160:7 | **funds** 131:23 137:3 | 186:4,4 189:11,19 | 161:22 168:3,5 |
| 132:2,5,5,6,14,15 | **fixed** 212:10 | 137:7 145:11 | 192:24 193:7 | **Gwinnett** 203:6 |
| 132:18 133:5,16 | **Floor** 111:5 | 167:6 | 199:13 209:18 | |
| 133:17,24,24 | **flow** 143:8 | **further** 166:12 | 214:4 215:8 | |
| 134:4,6,13,16,23 | **focused** 147:13,15 | 178:9 215:5 | 216:18 | **H** |
| 137:5,8,15,16 | **focusing** 148:7 | 218:10,12 | **goes** 147:23 149:6 | **hacked** 178:24 |
| 147:24 148:2,10 | **folks** 177:14 186:24 | | 162:9 165:1 | **Half** 208:9 |
| 157:13,16 158:22 | 192:19 | **G** | 167:17 172:9,13 | **handful** 202:13 |
| 158:25 159:2,3,5 | **follow-up** 209:9 | **G** 111:4 | 188:1 | **handled** 124:19 |
| | | **gain** 193:11 206:4 | | 159:14 |
| | | | | **handles** 137:2 |

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 226

151:15
handling 126:11
Hansen 199:14
happen 142:18
happened 163:15
  201:7,19
happens 128:5
  157:20 192:6
happy 120:17
  203:2
hard 113:12 194:1
  202:19 212:10
hardware 193:24
  199:6
harmed 173:1
Harris 203:4
haywire 116:8
head 139:7 171:21
  178:4 208:8
hear 115:17 201:14
help 113:15 139:13
  143:3 168:13
  173:13 184:11
helped 115:7
helpful 217:18,19
  217:21
helps 140:5
High 186:2
high-priority 148:8
  149:2
higher 139:3
  179:18 182:24
  183:3 206:13
highly 148:16
historically 205:22
  208:4
hit 160:4
holder 192:18,22
holders 130:12
  169:19 170:22
  192:17,21
holds 157:18,19
  158:2
honored 172:8
hopefully 113:15

187:12 217:17
host 125:20 194:18
  195:1
hosted 123:18
  124:12 125:24
  126:4,12 141:2
  194:20,21,24
  195:4,7 196:16
  210:16 213:7
hoster 125:10
  126:25 127:3
hosting 124:6
  125:6 194:16
  195:20 209:13
hour 154:10
hours 154:8,9,15
house 209:14
housed 126:12,19
  173:18
how's 116:2,6
  170:2
HTML5 195:15,21

—— I ——
icon 147:12 162:23
ID 111:12 170:5,11
  170:13,17 177:4
Idaho 110:2,8
  111:23 114:2,3,8
  114:17,25 115:6
  115:14 118:18,23
  119:5,7 120:20,22
  121:6,13,21,24
  122:5,10 124:12
  124:13 125:4,7,24
  126:5,10,13,19,24
  127:21,23,25
  128:2,12 129:19
  129:24 130:19
  131:1,3 132:23
  140:22,23 144:7
  149:3,19 155:15
  156:22 158:19
  160:21 161:2,13
  161:23 164:5
  165:5,21 169:10

169:22,22 170:8,9
  171:11,16 172:18
  173:9 177:3
  180:24 182:25
  183:21 184:14
  185:17 189:25
  190:10,24 191:1
  191:24 192:23
  193:3 194:18
  195:11 199:10,15
  204:17,21 205:1,3
  205:11 206:12
  207:9 208:23
  210:16,16
Idaho's 122:11
  124:15 125:19
  128:9 131:15
  140:21 149:11
  154:23 155:6,11
  164:13 168:18
  169:12 196:18
  197:3 211:6 213:6
  214:22
idea 149:19 151:8
  151:10,12 152:25
  153:2
IDENTIFICATI...
  112:11
identified 203:17
  204:21
identify 201:24
identity 170:4,10
IDs 170:18
II 110:13
immediately
  122:20,22 123:9
  132:7 158:2
impact 147:15
  150:10,21 182:21
implement 154:24
  202:3 205:3,15
implementation
  115:5 204:16
  208:22 211:4
implemented

201:25 202:9
  205:20 208:12
implied 176:13
implying 142:14
improper 132:2
  148:2 173:1
  214:10,12
improves 147:12
  147:25 149:9
inaccurate 188:10
  201:18
inaudible 201:13
included 120:5
  121:15 132:5
  157:5,8 187:7
including 121:6
  202:2
incorrect 191:22
incorrectly 189:10
incredibly 187:8
incur 132:24
incurred 120:11
indemnification
  189:24
indemnifies 214:9
indemnify 173:1
  214:12
independently
  157:16
INDEX 112:3,10
indicating 146:7
individual 161:22
  168:2,8,9,10
  211:3
information 119:15
  126:8,23 139:13
  156:2 158:21
  159:6,23,25
  163:25 164:2
  166:8,15,22 170:6
  173:21,24 179:9
  184:17 187:1,20
  193:4,6 198:25
  213:6,7
informed 199:11

infrastructure
  140:20 199:15
initial 115:5 158:25
initiated 158:20
injunction 204:22
  207:16
injury 132:14
input 118:25
  161:12
inputs 186:18
inside 123:1,23
  170:16
installed 207:12
instance 159:2
  175:19 189:24
  197:2 211:4
instances 211:14
insurance 128:6
intact 157:15
integrated 135:11
  142:21
integrity 125:17
  186:12
intending 193:15
intent 172:6
interact 158:12
interested 218:11
interface 191:17
  194:9
internal 121:7
internally 124:12
interpret 153:13,19
interpretation
  154:1
interval 128:3
intimate 131:4
  133:8
intimately 212:6
inverse 175:13
involved 126:1
  155:9 179:8
  208:24,24 212:21
involvement 114:3
  114:16
involves 143:24

**ISC** 196:16 197:13
**issue** 132:18 134:25
  173:8 200:18
  204:11 213:25
**issues** 120:23
  129:18,20,24
  165:2 196:23
  211:23,24 212:2,6
  213:16
**it'd** 169:22
**it'll** 136:10 148:2
**item** 200:10 201:24
**items** 124:18
  190:14,15 191:3

**J**

**Jennifer** 179:9
  190:6
**Jessi** 173:9
**job** 177:9
**joining** 117:6
**jon.fetterly@bcl...**
  111:7
**Jonathan** 111:4
**judge** 140:25 148:2
  162:23 205:1,2,19
  205:20
**judge's** 189:17
**judges** 115:14
  122:11,15 147:16
  147:18 150:10,22
**judicial** 119:15
  122:6,11 196:9
**July** 119:9
**jump** 169:1
**jurisdiction** 149:18
**jurisdictions** 139:1
  139:18 148:12
**jury** 114:13
**justice** 114:10
  141:23 180:11

**K**

**K&L** 111:18
**Katherine** 111:4
**katherine.keatin...**

**111:7
Keating** 111:4
  141:7
**ked@dukeevett....**
  111:13
**Keely** 111:10
  115:20 116:21
**Keely's** 209:17
**keep** 113:14 127:10
  209:14
**kick** 144:14
**kick-off** 115:7
**kicks** 146:22
**kiddo** 117:8
**kind** 115:8 140:7
  187:17 212:2
**kiosks** 117:24
**knew** 156:8
**knock** 128:6
**know** 113:19 114:5
  115:1 119:11,17
  126:1 127:3 129:6
  131:20,22 132:23
  133:2,13,15,21
  134:8 135:3,7
  139:6 144:20,22
  144:24 148:22
  149:1,11,15 151:3
  152:10 153:3,5,8
  153:15 155:11
  156:6,6,21 159:14
  160:24 165:4
  170:3 172:16,23
  173:6 174:13,22
  175:22 176:2,2,10
  176:21 177:21
  178:7,14,17,23
  179:21 180:1,17
  180:19,20 181:12
  184:4,14,20,24
  185:24 186:12,16
  186:20,25 190:1,4
  191:6,8,24 192:19
  193:4 194:18
  195:25 196:3,6

199:2,24 200:1,16
  202:12 203:3,17
  204:12 208:7
  209:4,7,8 210:7
  212:25,25 213:9
  215:21
**knowledge** 122:14
  126:8,23 131:4
  175:24 178:13
  179:19 186:10
  200:20
**known** 141:13,15
  141:16,20,22,24

**L**

**labeled** 169:17
**laborious** 217:7
**lack** 146:6 186:10
**Lacks** 120:14 130:9
**language** 118:25
  121:15 161:2,2
**large** 161:8
**late** 209:13
**law** 168:12
**lawsuit** 207:2
**lead** 192:2
**Leave** 152:9
**left** 140:10,17
**legal** 164:6 210:4
**LEIGHTON** 111:5
**let's** 114:15,24
  119:20 124:8
  127:2 128:4,5,7
  132:14 133:17
  134:16 147:8,20
  147:23 152:16
  153:22 154:14,18
  161:5,17 165:17
  169:1,4 208:11
**letter** 197:7,12,25
**letters** 197:25
**level** 179:18 185:25
  186:2,22
**leveraged** 213:13
**license** 206:16
**limit** 127:21

**limitations** 148:19
**limited** 126:9 177:8
  177:23
**limiting** 138:17
**line** 114:19
**lines** 181:2
**list** 196:3 202:9,12
  202:14,15,21,22
**literally** 117:19
**litigation** 201:18
**little** 140:4,4,6,12
  140:13,25 141:5
  147:12,12 152:21
  153:9 160:24
  162:10,23 163:17
  198:10,13 200:21
**live** 173:18 185:17
  185:18
**LLP** 111:5,18
**locate** 197:17
**location** 145:23
  173:24 195:20
**locked** 117:20
**logging** 117:23,23
**logic** 132:10 134:9
  134:12
**logical** 113:14
**logs** 126:2
**long** 115:2 136:12
  136:16 203:13
**longer** 136:9
  175:16 188:6
**look** 119:8 138:3
  140:4,9,10 142:23
  147:10 151:25
  153:22 162:6
  163:19 166:7
  171:11 181:8
  182:3 183:10
  190:4 191:10
  214:14,20
**looked** 151:8,10,13
**looking** 167:25
  174:10 182:20
  183:22 185:4

188:10 193:2,13
  199:18 209:6,17
  215:19
**looks** 119:8 162:23
**Los** 203:5
**lot** 128:23 166:3
  209:23 212:13
  217:14
**low** 172:4
**low-priority** 148:6
  148:9 149:2
**lower** 148:19 172:2
  172:11
**lowest** 172:5

**M**

**M** 113:10 209:20
  216:16
**Main** 111:19
**Maine** 138:24
  203:4
**majority** 198:2,7
  208:17
**making** 131:14
  157:1 178:10
  192:20 217:11
**malicious** 126:3
  156:7,7,19 185:14
  185:20 189:15,16
**manage** 178:6
**managed** 140:22
**management**
  114:11 122:20
  123:6,13 124:10
  124:11,16,21
  125:5,8,15,20,24
  126:4,12,18,25
  129:7,8 132:1,8
  133:7 134:24
  135:5,11 136:1,2
  136:8,21,23
  137:10,17,25
  140:1 141:3,20,20
  141:23,24 142:6,9
  142:17 144:10
  147:6 150:4,12,24

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 228

| | | | | |
|---|---|---|---|---|
| 155:18 156:12 157:21 158:7,10 158:12 159:13,15 159:16 162:3,13 163:20,21 164:1,3 164:15,22 165:1 167:20,21,24 170:4 180:7 181:22 182:11 190:19 198:5,5 210:15,15 213:6 | 122:18 139:24 145:5 148:9 153:10 159:5,19 162:17,19 163:1 163:13 165:22 169:11 173:14 192:23 | **minutes** 160:8 209:13 **misspoke** 174:25 **mistake** 134:8 201:21 **mistaken** 181:4 **Mitchell** 111:10 141:8 191:8 **mm-hmm** 140:18 150:15 181:11 198:20 | 216:16 **name** 114:11,12 117:7 141:12,25 192:11 218:17 **native** 183:23 184:10 **nature** 115:3 **necessarily** 130:6 187:22 | 116:12 117:1,15 118:8 183:13 204:9 **notices** 204:20 **noticing** 162:24 **notification** 163:10 188:9,12 **notifications** 145:12 187:18 **notified** 199:12 **notifies** 163:5,12 198:16 |

155:18 156:12
157:21 158:7,10
158:12 159:13,15
159:16 162:3,13
163:20,21 164:1,3
164:15,22 165:1
167:20,21,24
170:4 180:7
181:22 182:11
190:19 198:5,5
210:15,15 213:6
**manager** 114:18
122:25 123:1,22
132:17 136:10,13
136:15 162:20
163:2
**manages** 168:13
**manipulated** 173:7
**manner** 156:15
**manual** 167:20,20
**MARICOPA** 113:1
**mark** 117:1 129:3
159:10 189:16
**marked** 116:22
117:3
**market** 208:19
**marks** 189:9
**Maryland** 138:25
203:3
**matter** 123:10
138:6 148:14,17
202:23
**mean** 123:9 130:6
130:21 132:13
136:1,8 142:2
147:18 148:11
152:19 153:14
166:9,17 175:10
176:10 211:20
212:12 214:6
**meaning** 120:4
123:17 134:6
135:16 149:24
167:2
**means** 120:5

122:18 139:24
145:5 148:9
153:10 159:5,19
162:17,19 163:1
163:13 165:22
169:11 173:14
192:23
**meant** 148:20
162:12,16
**measured** 149:8,12
**measurement**
150:6
**measures** 149:16
**mechanism** 193:10
**mechanisms** 135:1
185:22
**meet** 142:24 143:6
145:20 175:16
212:11
**meetings** 115:7
**meets** 136:6 145:10
157:25
**mem@dukeevett...**
111:14
**mentioned** 138:12
159:22 177:22
**menu** 216:14
**merely** 131:11
156:10
**met** 123:3 144:17
145:17 175:13
**metadata** 136:14
**metrics** 149:10
152:23,25
**Microsoft** 174:23
199:2,4,7
**middle** 150:9
197:11
**migrated** 195:8,15
**mind** 139:20
160:15
**Mine** 161:9
**minimum** 206:12
208:21
**minute** 154:10

**minutes** 160:8
209:13
**misspoke** 174:25
**mistake** 134:8
201:21
**mistaken** 181:4
**Mitchell** 111:10
141:8 191:8
**mm-hmm** 140:18
150:15 181:11
198:20
**modified** 187:24
**modify** 174:14
**Molly** 111:10 118:9
139:20 147:9
152:17 160:15
161:6 165:18
169:2 191:9
197:19 199:24
**Molly's** 184:2
**moment** 117:5
184:25
**moments** 208:3
**money** 166:10
**monitor** 214:7
**monitored** 185:19
**monitoring** 125:17
126:2 185:13
**motion** 148:18
207:15
**move** 119:20
198:19
**moved** 188:19
**multi-second**
163:17
**multi-tenant**
211:12
**multifactor** 126:17
**multiple** 139:1,2
151:15 157:12,24
158:6 166:5
170:18 193:17

_____
N
_____
**N** 111:1 113:10,10
209:20,20 216:16

216:16
**name** 114:11,12
117:7 141:12,25
192:11 218:17
**native** 183:23
184:10
**nature** 115:3
**necessarily** 130:6
187:22
**need** 132:17 150:11
158:5,11 164:17
165:2 170:10
171:12 180:1
182:23 184:17
194:22,24 199:22
199:24 206:12
**needs** 139:14 165:6
**negotiate** 171:12
**negotiated** 171:23
172:10
**negotiation** 172:19
**neither** 218:10
**network** 126:2
**Nevada** 203:8
206:2 208:13
**new** 114:5,10,11,12
172:7 179:14,14
182:6 187:10
**News** 110:3 204:3,6
210:20
**News'** 207:15
**nice** 183:17
**Nicole** 110:24
218:21
**non-employed**
177:14
**non-sufficient**
167:6
**normal** 143:8
170:14 172:9
**not-nice** 156:7,8
**Notary** 218:3
**notes** 209:7,17
**nothing's** 149:24
**notice** 112:12

116:12 117:1,15
118:8 183:13
204:9
**notices** 204:20
**noticing** 162:24
**notification** 163:10
188:9,12
**notifications**
145:12 187:18
**notified** 199:12
**notifies** 163:5,12
198:16
**notify** 163:8 188:14
**noting** 137:4 189:6
**November** 110:23
113:2 218:17
**number** 116:9
119:22 130:23,24
139:3,6 145:5,9
153:21,21 154:20
172:7 175:7 177:8
179:13 181:18
183:13 208:7
**numbering** 116:17
**numbers** 189:18
**numerous** 130:16
207:13,17,25,25
208:2
**Nye** 205:2,20

_____
O
_____
**O** 113:10 209:20
216:16
**o0o--** 111:24
112:15 113:3
217:25
**oath** 113:6
**Object** 210:3
213:18 214:24
**objecting** 201:15
**Objection** 120:13
123:19 130:8
212:4 213:8
**objections** 210:10
214:2 218:8
**obligation** 181:23

182:14
**obsessed** 141:6
**obtain** 180:9 198:1
**obtaining** 184:11
**obviously** 120:18
    163:18 164:1
    172:15 177:12
    192:24 193:23
    194:22,24
**occur** 127:25 135:4
    135:4 137:24
    150:11 166:12
    172:25
**occurred** 134:23
    192:5 200:23
**occurs** 128:8
    146:11
**October** 195:6
**Odyssey** 114:11
    135:24 136:1,1
    141:8,10,14,15,20
    141:24 142:1,4,8
    142:9,15,19 157:4
    168:23 197:3
    200:19,24 201:5
    210:15 214:17,18
**offense** 152:10
**offer** 171:24 217:11
**offered** 172:2
**offering** 206:18
**offerings** 142:21
**office** 119:14
    178:11 182:9
**offices** 151:15
**official** 110:7 166:1
**oh** 115:22,25 116:8
    117:11,13 129:1
    133:23 134:18
    135:18 151:22
    168:2 188:9
    195:14 197:18,20
    198:19 200:7
    203:10 215:8
    216:23
**okay** 115:19 117:12

117:14 121:19
123:15 128:22
129:18 130:15
132:4 136:3 138:7
138:21 139:8
147:1 151:22
152:9,16 154:18
157:19 160:9,10
160:24 161:19,19
164:9 167:11
168:2,14,20 169:6
170:8 175:5
177:18 179:25
180:15,17 182:18
183:16 185:18
190:13 191:6,12
193:5,19 194:4,12
194:21 195:14
197:21 200:1,5,16
200:22 207:1,23
208:18 209:6
212:23 214:8
215:18 216:21
**old** 117:21 146:7
    195:12
**Omundson** 110:7
    111:23 118:24
    119:4 182:8
**on-premise** 125:8
    194:20,21
**once** 122:18,23
    123:1 124:8
    144:20 146:2
    158:6,10 163:24
    167:16
**one-cent** 147:24
**one-year** 172:8
**ones** 114:14 178:3
**online** 164:5 201:4
**open** 177:2
**operating** 198:2
**operational** 150:17
**operations** 138:3
**opinion** 131:1
**option** 129:16,19

200:14
**options** 131:7,11
    174:19,19,20
    193:17 204:21
    205:13,14
**ORAL** 110:11
**order** 121:3 138:3
    148:15,16 182:4
    183:7 186:8 193:9
    212:11
**orders** 147:19
**original** 123:7
    148:17 173:12
    174:2,3,9 200:12
    218:13
**originally** 187:15
**out-of-the-box**
    119:24
**outcome** 218:11
**outlined** 182:13
**outside** 192:21
**Overbroad** 130:9
    213:19
**overhead** 150:17
**oversee** 114:6
**oversight** 114:19
    178:12
**overview** 161:7
**OWASP** 178:18
**owed** 215:10
**owned** 140:22
    213:13
**ownership** 210:6
**owns** 210:1

---

**P**

**P** 111:1,1
**p.m** 113:2 160:12
    160:12 217:23
**PACER** 180:15,17
**PACER's** 180:16
**page** 112:4,11
    119:20 121:12
    139:21,22 147:9
    147:10 152:17,17
    154:12,18,19,22

161:15,17,21
165:18 168:17,19
168:20,21 169:8
171:6,8 197:11
207:16
**pages** 161:9
**paid** 159:8,25
**PAISNER** 111:5
**paradigm** 211:25
**paragraphs** 198:14
**parameters** 179:11
**part** 116:1 120:5,7
    120:19 137:2
    150:3 155:5
    158:22 175:1
    189:20 191:8
    202:4,8 206:3
**participate** 115:7
**particular** 114:2
**parties** 158:13
    182:7
**partner** 205:12
**partners** 130:12
**partnership** 204:4
    204:7 205:11
**party** 145:1 216:20
    218:11
**password** 170:5,11
**patching** 198:12
    199:3
**Pause** 116:20 136:4
    155:2,24 158:17
    168:15 206:25
**pay** 120:6 131:20
    133:4 172:20
    192:19 206:12
**paying** 192:19
    208:17
**payment** 134:25
    137:2,4,7,11,14
    137:19,24 138:9
    166:8,15,22 167:4
    212:2
**PDF** 167:3 174:23
**pending** 201:17

**penetration** 198:17
**penny** 134:17
**people** 156:7
    176:22 177:8
**perceived** 204:3
**percent** 154:3,7
**percentage** 149:8
    149:12 153:20
    154:8
**Perfect** 116:7
    118:11 160:6
**perform** 198:11
**performed** 140:20
**performing** 139:24
**performs** 147:4
    199:2
**period** 129:25
    165:4,9 175:11
**periods** 165:14
**permit** 179:4
**permitted** 129:25
    201:9
**perpetuity** 136:15
**person** 129:4
    140:13 156:8
    170:2
**personal** 132:14
**personnel** 194:4
**perspective** 114:4
    130:12 184:13
**pertain** 133:10
**pertains** 183:2
    187:18 215:13
    218:12
**Petronio** 111:18
    186:2 201:12,15
    209:12
**phone** 117:6
**phrase** 124:2
**physically** 196:19
**picture** 150:18
    162:10 164:20
**place** 125:19,23
    127:6 128:13
    133:22 138:4

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 230

| | | | | |
|---|---|---|---|---|
| 162:15 163:10,24 170:15 175:25 185:22 186:14 215:3 **placed** 125:5 146:18,20 147:4 156:23 200:10 **places** 156:22 **Plaintiff** 110:5 111:3 207:15 **plan** 193:16 **Plano** 110:16 **platform** 114:10,21 114:21 127:13 170:16 206:9 **please** 113:18 143:3 161:17 199:20 **PLLC** 111:11 **plug-and-play** 193:6 217:12 **PO** 111:12 186:12 186:16 **point** 115:13 118:24 130:22 171:22 217:5,11 **policies** 199:16 **pool** 126:9 188:1 **pop** 117:7 **porn** 156:23 157:1 157:1 **portal** 122:25 200:18,19,24 201:5,8 214:16,17 214:18 **portion** 122:8 142:10 160:8 163:2 **position** 139:8 205:2,6 **positive** 131:5 **possess** 171:2 **possession** 123:17 123:20 **possibility** 133:16 | **possible** 197:1 209:15 **potential** 142:19 211:23 **power** 172:18 **PowerPoint** 116:11 118:8,11,13,17,20 118:23 119:4,11 119:18 121:15 128:23 139:21,23 147:11 148:9 151:13 169:3,7 171:7 203:19,24 **practical** 131:2,15 139:17 **practice** 208:18 **practices** 126:7 127:16 **pre-authorization** 167:5 **pre-configured** 123:3 **precise** 175:4 **Preliminary** 207:16 **preparation** 121:22 **prepared** 118:15 118:20 119:9 121:12,20 181:20 210:21,23,24 **PRESENT** 111:22 **presentation** 155:12 **presented** 213:17 213:25 **presents** 213:16,24 **press** 127:14 138:18 152:3,4,13 160:7 169:4,9,11 169:13,17,21,23 170:9,19,25 171:4 171:6,12,18,20,24 172:1,20 173:2,7 173:10,20 174:5 174:10,24 175:5 | 175:12,14,17,23 176:5,6,7,9,12 177:1,2,3,4,12,14 177:20,22 178:6 178:10,15,17,21 178:23 179:5,10 179:23 183:2 184:24 185:7,15 185:16,19,20 186:14,17,20 187:13,14,16,18 187:19,25 188:4 188:15,20 189:3,7 189:11,12,13,19 190:1,15 192:10 193:12,14,23 194:8 195:3 198:4 198:6,8 199:3,17 200:10,17 201:1 201:25 202:3,10 203:6,15 204:16 205:4,20 206:1 207:5,12,18 208:20 209:1 210:23 211:2,17 213:16,24 214:5 214:11 215:12 216:1,3,9 217:7 **presuming** 177:13 **presumptively** 177:3 **pretty** 179:18 182:8 **prevent** 135:2 **prevents** 186:21 **previously** 172:12 **price** 194:25 207:12 **pricing** 172:7 **primary** 114:14 **prior** 114:15 142:1 144:3 181:10 188:7 204:19 **priority** 148:19 **private** 207:6 | **probably** 148:19 164:10,18 **problem** 135:7 199:21 **proceedings** 116:20 136:4 155:2,24 158:17 168:15 206:25 218:9,13 **process** 122:23 137:21,22 144:9 146:11 163:9,17 163:24 170:14 182:11 187:8 193:19 198:11 199:16 205:24 206:23 **processed** 197:14 **processing** 131:22 137:3 154:14 **procure** 176:16 **product** 114:12,13 114:20 142:7 180:16 208:20 **products** 114:7,9 115:15 142:5,6,19 190:17 **professional** 164:6 **profit** 207:7 **program** 115:8 120:19 123:12 151:23,24 193:7 194:2 **programs** 202:20 **project** 115:6,7 **promised** 172:12 **proper** 159:3,7 167:9 189:6 201:10 **properly** 156:3 164:13 **proposed** 147:18 **proprietary** 186:7 **protect** 125:19 127:6 167:5 175:25 176:4 | 178:9 179:5 184:23 185:7 214:7 **protected** 176:18 **protecting** 126:11 **protection** 125:18 125:23 127:17,18 148:15,15 **protections** 176:9 **protective** 186:7 **protocols** 124:17 125:4 186:11 206:14 213:10,13 **provide** 133:24 139:12 165:9,14 169:14,16,17 170:10,12,16,22 179:19 189:23 193:10,17 197:12 197:24,25 198:17 198:24 199:6 204:10 205:12,13 207:9 215:17 **provided** 113:17 118:24 119:4,6 138:10 155:11 156:2 172:7,11 173:2 176:23 181:7 183:19 187:3 190:10,13 190:23 191:3 192:15 193:20 195:11 197:7 203:1 206:3 207:4 207:17,25 208:4 213:2 **provider** 122:24 168:22 **provides** 164:6 165:5 210:11 **providing** 121:5,14 131:1 143:12 154:22 170:7 193:13,15 **provision** 206:17 |

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 231

provisions 127:12
  191:4
public 129:5,13,15
  130:2 156:23
  164:6 169:14
  177:19 207:7,10
  218:3
pull 116:16 118:7
pulled 216:14
pulling 160:15
  184:1
purge 136:17
purview 126:24
put 118:13 123:12
  125:19 133:22
  164:20 165:14
  187:15 190:1
  209:10
puts 134:17
putting 216:6

**Q**

Q3 191:20
Q4 152:22,25
question 113:18
  120:16 123:8
  129:1,11 131:9
  135:15 147:17
  158:18 185:3
  196:11,15 201:16
  207:19,24 214:16
  215:6,21
questions 113:21
  116:10 119:22
  126:21 127:21
  130:23 131:19
  145:22 152:20
  155:21 165:19
  179:14,15,17
  186:24 187:3,12
  190:5,6 191:10
  200:2 207:6 209:9
  211:16,23 216:22
queue 123:24 129:9
  138:18 143:1,9
  145:7 146:14

152:3,4,14 160:7
  165:20 169:5,16
  169:21,24 170:9
  170:20,25 171:4,6
  171:18 172:1,20
  173:3,10 174:4,5
  174:10,15,15
  175:5,12,17,23
  176:5,9,12,18
  177:1,5,8,12,15
  177:20,23 178:23
  179:11 184:24
  185:8,11,15,19,21
  186:17,21 187:13
  187:14,16,19
  188:20 189:3,7,11
  189:12,19 190:2
  193:24 194:8
  195:3 198:4,6
  199:17 200:11,17
  203:15 204:16
  205:4,21 207:5,12
  208:20 209:1
  217:7
queues 169:14,15
  178:6 186:14
quick 114:2 151:25
  168:14 202:22
  209:7 215:6,19
quickly 125:14
quit 117:11
quote 207:4
quoted 207:11

**R**

R 111:1
raising 207:5
range 148:11
ransomware
  125:18 128:8,13
rate 172:2,4,5,11
rates 149:7,23
reached 217:5,11
reaches 189:1
react 160:5
reaction 135:6

read 120:1 202:22
real 114:2 151:25
  168:14 209:7
  215:19
realistic 206:23
reality 164:24
realizing 206:5
really 116:4 131:6
  162:16 163:13
  164:9 169:18
reason 121:19,23
  126:22 172:6
  201:6 213:5
reasonable 151:7
reasons 186:7
  199:1
recall 115:3 116:14
  129:11 138:13
  145:24 160:17
  173:16 175:7
receive 177:4
  187:19,22
received 162:20
  203:14 204:1
  209:24 210:2
receives 162:17,18
  164:18,19
recipients 145:12
recommendation
  131:14
recommendations
  139:11
record 118:2
  156:23 158:1
  160:14 164:5
  207:7 216:12
  218:14
recorded 218:8
records 164:7
  188:1
records.' 207:10
reduce 149:6
reduces 149:22
  150:16
refer 141:17

reference 151:17
referenced 143:4
referred 166:23
referring 135:21
  167:22,23 168:8
  168:10 171:8
  173:23 181:5
reflect 162:16
reflected 154:15
reflecting 167:5
reflection 164:24
refreshed 188:5
regarding 127:14
  130:24 200:3
  204:2 211:22
regardless 137:22
  146:21 172:18,19
  208:18
regards 114:8
  179:23 200:25
registered 196:24
regular 198:11
reject 134:18
rejected 163:7
  164:25 167:14,18
  187:16 188:3,8,11
rejecting 163:14
rejections 188:9
related 119:22
  127:4 152:3 155:6
  155:15 179:10
  190:7 191:2
  198:22,23 200:19
  203:14,18 204:22
  215:14,21 218:11
relating 142:5
relative 122:22
  213:2
relevant 114:22
rely 139:15
remaining 208:16
remember 188:22
  202:19
remotely 113:1
  218:6

renewal 182:1
  206:8 208:5
renewed 187:10
repeat 185:3
rephrase 130:22
Reply 207:14
report 198:22
REPORTED
  110:24 113:1
Reporter 218:1,3
reports 203:14
repository 164:5
  201:4
represent 158:20
  162:12 164:13
  207:14
representation
  179:16
representative
  120:10 179:2
represented 110:13
  184:4 197:10
  205:19 207:2
representing 120:3
  205:1
request 119:14
  181:6 182:13
  190:11 204:22
requested 119:18
  179:10 182:9
  186:25 193:21
  211:19
requested/offered
  218:14
requesting 184:15
require 167:3
  179:18 183:8
required 126:17
  158:22 183:20
  193:9 212:10
requirement
  206:17
requirements
  178:20 184:9
  199:15

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 232

**requires** 171:8
**requiring** 181:1
**reserved** 217:24
**reside** 194:2
**resources** 122:10
178:21 181:18
183:9
**respect** 114:17
115:15 116:10
122:8 123:15
124:16 125:15,23
126:18 127:24
135:8 137:5,15
154:19 155:18
157:4 174:2 175:5
176:10 177:1
179:15 180:4,7
181:24 190:24
200:24 201:3
203:24 204:15
205:8 208:25
214:16
**response** 147:12,25
154:7 191:6
197:23
**responses** 179:20
**responsibility**
114:3,6 144:2,4
144:18 173:16
207:9
**responsible** 124:5
124:25 145:1
168:12
**rest** 185:10
**restate** 203:2
**result** 121:8
**results** 198:17
**retrieved** 123:23
**return** 149:6,22
**returned** 149:24
**revenge** 156:23,25
**review** 119:24
123:24,24,25,25
127:14 138:18
143:1,7,9,10

145:7,20 146:14
147:3,5 152:3,4
152:13,23 154:2
160:7 162:21
163:3 167:16
169:4,9,14,15,16
169:18,21,24
170:9,19,25 171:4
171:4,6,12,18,20
171:24 172:1,20
173:3,7,10,19,19
174:5,10,21,24
175:5,12,14,17,23
176:5,6,7,9,12,19
176:23 177:1,5,8
177:11,12,15,20
177:23 178:6,10
178:15,17,21,23
179:5,10,23 183:2
184:24 185:8,15
185:16,19,20
186:14,17,21
187:13,14,16,18
187:19,25 188:4
188:15,20 189:3,7
189:11,12,13,19
190:2,15 192:10
193:12,14,23
194:8 195:3,13,17
195:20 198:4,6,9
199:3,17 200:11
200:17 201:1,25
202:3,10,10 203:6
203:15 204:16
205:4,20 206:1,20
207:5,12,18
208:20 209:1
210:23 211:2,13
211:17 213:16,24
214:6,11 215:12
216:1,3,9 217:7
218:13
**reviewable** 153:21
**reviewed** 143:1
175:10

**reviewer** 152:23,25
**reviewing** 137:23
**reviews** 163:5,12
**revisited** 206:10
208:5
**right** 114:1,24
115:9,25 116:6,9
117:9,16 118:9,12
118:19 127:21
131:4 134:10,14
135:8 136:20
137:22 138:1
139:22 140:6,11
140:22,23 141:11
141:15,17,19
142:20,23 144:1,8
144:19 146:8
147:8,22 152:11
152:16 153:12
154:18 160:13,16
161:5,21 162:1,22
162:23 164:17
165:15,17 167:19
168:23 169:1,8
172:10 174:16,18
177:9 178:2
183:17,22 184:2
184:14 191:24
192:22 193:8
194:12 196:13
199:13 201:22
203:9,12,23
205:24 208:12
215:25 217:14
**River** 111:11
**RO** 184:21 185:1,2
185:13
**role** 114:5,16 115:9
168:9,11 205:10
**roughly** 138:19
**round** 140:6
**route** 143:9
**routed** 142:25
145:7,20
**row** 166:17 167:7

**RPR** 110:24 218:21
**rules** 113:16
121:13,21,25
122:5 123:2
133:11 157:25
**run** 117:7 131:22
179:4
**running** 128:12
202:6

---
**S**
---

**S** 111:1
**sadly** 156:6,21
189:15
**safe** 182:16
**safety** 213:9
**San** 111:6
**Sara** 110:7 111:23
117:6 182:8
**sat** 115:13
**saw** 192:1
**saying** 128:16
132:16,19 134:11
143:5 173:17
196:8,9 200:8
**says** 119:23 140:12
142:24 145:9
149:7,22 150:16
152:22 153:9,10
153:20 154:1
162:6,17 163:5
166:7,13,19,21
172:23 175:6
196:16 212:16
**scan** 198:17
**scans** 127:16,16
**scenario** 135:2,3
143:21 156:15
158:14
**scope** 183:8
**scoping** 212:21
**scrape** 178:14
**scrapers** 176:11
**scraping** 175:21
**screen** 117:10
118:10 140:11

163:19 188:5
198:18 215:16,17
216:6
**screenshots** 160:25
176:16
**scroll** 199:22,25
**second** 113:12
116:18 119:20
128:23 136:22
144:15 158:15
168:20,21 169:8
199:20 207:24
**seconds** 123:11
138:6,7
**section** 198:13
**secure** 213:7
**secured** 126:9
178:18
**security** 124:17,25
125:4,7 127:5,8
127:11,12 128:7
159:19 178:19
179:11,15,19
183:20 184:13
185:22 186:11
189:18 191:4
199:1,16 200:4
203:14 206:13,17
213:2,12,16,25
215:14
**see** 116:1 117:7,9
140:5,16 145:13
152:21,24 157:19
160:16 161:19
162:7,8,11 164:8
168:2 174:23
196:15,21 197:15
197:20 198:10,13
198:16,20 208:11
208:11 215:15,23
216:2,2
**seeing** 117:17
**seen** 156:21 170:15
181:2 200:1
**selfishly** 113:14

(163 of 268), Page 163 of 268
Case: 24-6697, 03/06/2025, DktEntry: 10.12, Page 163 of 268
Case 1:21-cv-00305-DCN Document 59-5 Filed 12/15/22 Page 45 of 49

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 233

**send** 187:17 202:16
**sending** 203:19
204:11
**sends** 158:1
**sent** 145:12 203:18
**sentence** 119:23
**separate** 142:18
170:1 200:17
**separated** 175:3
196:19
**separately** 196:17
**September** 191:20
191:23 192:6
196:2
**series** 174:20
**serious** 207:5
**serve** 114:21,25
122:19 123:16
124:4,23,24 127:2
127:5,9 128:9,14
128:18 129:14
135:9,10 136:9
137:2 138:17
139:5 140:1,14
141:2,11,13,14,16
141:16 142:7,9,16
155:15 157:4
161:25 162:17
163:1,2 164:14
168:3,5,17,18,24
170:16 173:11
174:3 180:4
181:22 182:10
187:20 190:21
193:18 197:4
198:4,6,8 205:12
205:16 209:25
210:2 213:3,17
214:1,22
**served** 135:19
182:21
**server** 199:3
**servers** 126:4,16
194:22
**service** 110:3

122:24 126:2
135:10,13,16,17
135:20 168:22
**services** 141:21
180:25 212:23
**serving** 198:12
**session** 209:10
**set** 136:18,19
144:19,21 170:13
178:19
**sets** 149:15
**setting** 129:13
136:17 146:16
156:1 159:20
168:12 187:9
189:4 213:12
**settings** 163:10
**share** 199:9
**shared** 141:25
**sharing** 118:10
186:1,9
**she'll** 198:19
**sheet** 158:21 159:6
159:23
**sheets** 159:25
**shift** 116:1
**short** 123:14
**Shorthand** 218:1,3
**show** 117:4,20
118:5,5 160:25
168:14
**showing** 117:10,13
183:19 216:12
**shows** 161:9
**shut** 115:21
**side** 120:18 140:14
141:20 150:5
154:23 189:6,15
**Signature** 217:24
**significant** 181:18
181:19 183:8
**significantly** 183:3
**Silverlight** 195:6
195:10,12,17,19
195:21

**similar** 166:4
173:22
**simply** 193:10
**sit** 133:12,14,20
**sitting** 116:1
**situation** 147:2
159:12
**situations** 178:25
**skeptical** 207:11
**skills** 172:19
**smart** 134:8
**SOC** 198:22
**social** 189:18
**software** 194:9
195:9,19 199:7
205:12 210:12
**solution** 114:20
120:6,7,8,9 125:8
171:20 193:9
194:19 208:12
**solutions** 140:21
**somebody** 201:24
**sorry** 115:17,18,24
117:25 166:24
174:8 185:3 186:4
194:13 196:8
197:16 198:5
200:7 213:21
**sort** 135:6 159:3
204:4
**sound** 116:2
**sounds** 138:22
160:9 177:22
192:5 198:21
**speak** 210:5 213:11
**speaking** 121:1
**specific** 128:2
133:10 143:14
144:17 168:19
170:24 171:1
206:2
**specifically** 130:18
154:13 176:7
183:2 196:5,9
204:2

**specification** 192:8
**speculate** 148:25
149:5 194:1
**spiders** 175:21
176:1,11 178:15
**spreadsheet** 183:18
183:24 184:15
**SRL** 164:7
**staff** 122:11 124:19
150:22
**stage** 167:14
**stamp** 146:2,5,13
146:18,20 147:3
**stamped** 145:11
146:3 174:16
**stamping** 174:19
**stamps** 145:23
**standby** 118:1
**standing** 197:8,13
**standpoint** 125:17
158:6
**stands** 191:17
**star** 152:22
**stars** 152:21 153:10
**start** 118:10
**started** 206:4,7
**starting** 171:22
**state** 114:1,3,8,17
115:14 119:13,17
120:20,22 121:1,6
121:12,20 122:10
124:12,15 127:25
129:19 130:19
131:3 132:23
133:2,13 136:11
138:24,24,25
144:7 149:3
151:24 164:5
169:10,22,22
171:11 172:18
177:3 184:14
185:17 189:25
190:10,23 191:1
191:24 192:23
193:3 194:18

195:11 196:4,24
196:25 197:3
199:10,14 200:19
200:23,24 203:3,3
203:4 204:17
205:3,3,11 208:23
209:3 211:2,3,9
217:8 218:3
**stated** 174:25 208:3
**statement** 164:16
173:15
**statements** 131:6
**StateRAMP**
179:22 180:1,3,6
180:10,12,21
184:6,8,18
**states** 110:1 133:9
136:16 138:19
156:25 170:18
185:18 211:15
**statewide** 138:23
208:22
**stating** 130:19,25
188:24
**status** 163:6,13
165:20 167:16,18
187:23,23 188:2
188:22,25 189:1
**statute** 148:19
**stay** 136:10,12,16
**stays** 136:15
**STENOGRAPH...**
117:22 183:15
201:14
**stenographically**
218:8
**stick** 143:23
**stop** 131:25 132:6
**stored** 196:16,20
197:14
**Street** 111:11,19
**strike** 122:15
133:13 155:4
198:22 203:10
**strike-through**

Courthouse News Service v. Omundson      30(b)(6) Terry Derrick - Vol. II

Page 234

| | | | | |
|---|---|---|---|---|
| 174:19 | 159:5,23,25 | 142:9,17 144:10 | team's 184:13 | thank 116:7,25 |
| stuff 156:24 | sun 116:4 | 147:6,25 150:12 | teams 212:21 | 183:16 201:22 |
| subject 148:18 | Superior 203:5 | 150:24 156:13 | technical 118:2 | 215:4 216:10,21 |
| 201:17 | Support 207:15 | 157:21 158:8,11 | 176:1 212:21 | 217:16,19,21 |
| subjective 154:6 | supported 194:6 | 158:12 159:13,15 | technically 200:13 | Thanks 217:14 |
| 206:21 208:1 | supposed 132:4 | 162:3,13 164:1,3 | Technologies | That'd 116:3 |
| submission 132:22 | 159:10 | 164:4,15,22 165:1 | 110:12 111:16 | thereof 218:9,11 |
| 137:13,19 144:3 | Supreme 124:13 | 166:5 170:1,5,14 | 112:13 218:5 | thing 140:6 |
| 144:15 150:7 | 126:5,10,13,19,24 | 176:4,24 180:7 | technology 119:15 | things 124:19 |
| 157:5,7 162:18,20 | 155:15,19 169:20 | 181:22 186:18 | 195:19 212:12 | 125:1 127:17,18 |
| 165:11 | 171:16 173:9 | 190:19 196:25 | tell 132:20 151:14 | 128:5 148:11 |
| submit 132:15 | 180:24 183:21 | 210:15 213:6 | 168:16 191:15 | 156:25 166:3,5 |
| 145:19 | sure 113:24 114:18 | systems 142:20 | 205:18 | 175:22 176:3 |
| submits 122:23 | 115:22 116:19 | | telling 117:11 | 189:19 212:13 |
| 162:7 | 117:20 119:6,16 | **T** | 153:25 154:7 | 217:1,3 |
| submitted 122:19 | 120:17 121:17,18 | **T** 113:10 209:20 | ten 178:18 | think 114:13 |
| 123:7 124:3 127:4 | 123:8 124:1 128:2 | 216:16 | term 122:22 142:4 | 116:17,21 131:6 |
| 137:1 143:19,25 | 129:11 136:14 | tag 207:12 | 146:6 154:6 166:3 | 132:13 136:25 |
| 153:21 159:24 | 146:24 147:17 | take 122:10 146:13 | 172:9 208:1 | 138:1 140:5 |
| 166:7,17 167:7 | 151:6,17 153:6 | 146:25 148:2,4 | terms 172:24 176:2 | 149:17 150:25 |
| 174:3 192:14 | 155:23 158:5 | 160:7 170:15 | 180:24 181:13,24 | 154:6,7,17 157:14 |
| 209:24 210:1 | 169:12 178:3 | 178:20 181:7,17 | 182:12,19 214:22 | 160:6 164:10,16 |
| 213:3 | 183:22 185:5 | 182:9 190:4 191:9 | 215:12 | 172:16 175:2 |
| submitter 124:4 | 189:6 190:25 | 192:24 202:4,22 | Terry 110:13 112:1 | 177:16 181:3 |
| 134:17 138:9 | 192:8 203:1 | 205:6,15 | 113:5 217:16 | 187:6 194:17 |
| 143:25 144:21 | 209:18 211:21 | taken 110:16,23 | 218:5 | 197:25 201:18,20 |
| 189:9 | 212:13 214:14 | 138:9 158:3 159:4 | test 198:17 | 202:4 203:1 |
| submitter's 135:16 | surface 173:20 | 160:11 218:5 | testified 113:7 | 206:22 207:19 |
| submitting 129:4 | surfaced 173:25 | takes 138:4 146:10 | 152:2 213:9,20 | 214:21 |
| 129:14 163:1 | sworn 113:6 218:6 | 150:18,25 162:15 | 214:3 | thinking 191:19 |
| subpoena 116:23 | synonymous | 163:9,10,24 | testify 133:21 | third 150:16 |
| 210:21 215:20 | 153:17 | talk 114:1 119:21 | testifying 130:15 | third-party 178:19 |
| subscribed 218:16 | system 114:11 | talked 114:25 | 130:16 175:7 | thought 131:21 |
| subscription | 119:5 121:4 | 115:14 122:9,9 | testimony 138:14 | 166:24 |
| 171:17,20,24 | 122:21 123:6,13 | 142:1 144:20 | 172:17 191:18 | thread 200:2 |
| 172:21 182:22 | 124:10,11,16,16 | 152:1 154:20 | 209:23,23 211:22 | three 151:2,4 |
| 206:13,16 208:21 | 124:17,21,23,24 | 156:18 191:13,13 | 218:7 | 154:15 160:2 |
| substitute 206:20 | 125:5,15 126:2,4 | 191:14 215:20 | Texans 152:9 | Thursday 113:2 |
| sufficient 131:23 | 126:12,25 127:24 | talking 123:10 | Texas 110:16 | tiers 127:17 |
| 137:3 | 129:7,8 132:1,8 | 131:10,11 135:9 | 119:13,17 121:13 | time 115:2,8,13 |
| suggest 131:5 | 133:7 134:24 | 138:6 150:21 | 121:20 140:24 | 118:24 129:25 |
| suggested 171:22 | 135:5,11 136:2,21 | 152:12 173:5 | 151:3,7,14,20,24 | 133:19 143:11,21 |
| suite 111:11,19 | 136:23 137:10,17 | 210:19 215:12 | 152:4,7,8,12 | 146:21 147:13,15 |
| 142:5,7,19 | 137:25 140:1 | talks 147:11 148:6 | 203:4,8 210:21,23 | 147:25 148:1 |
| summons 158:22 | 141:3,23,24 142:6 | 198:10 | 210:24 211:7 | 150:7,7 164:19 |
| | | team 192:24 | | |

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 235

165:4,15,23
166:18 175:11,17
178:20,24 181:19
181:20 183:9
187:25 188:5
197:16 213:22
217:5,11,14,22
218:6,6,8
time-sensitive
148:13,13,14,17
timely 207:10
times 206:4
tiny 152:18
today 116:5 130:16
133:12,14,21
143:2 179:2
181:10,14 185:16
198:2 200:14
203:20 217:14
told 171:16
tool 123:24,25
127:15 169:17,18
169:18 170:9
171:12,20 173:19
173:19 174:21,24
175:14 176:6,7,19
176:23 177:11
178:10,15,17,22
179:6,24 183:2
185:16 187:14,18
187:25 188:4,15
188:23 189:13
190:15 192:10
193:12,14 195:13
195:17,20 198:9
201:1,3,4 202:1,3
202:10 203:6
206:1 210:23
211:2,13,17
213:16,24 214:6
214:11 215:12
216:1,3,9
tools 174:20,22,24
179:25
top 139:6 178:4,18

208:7
topic 201:20
203:17
topical 127:10
topics 206:9
total 138:16
tough 197:16
traction 206:5
traffic 126:2
trail 171:2
transcribed 218:9
transcript 218:9,13
218:14
transfer 122:20
141:2 160:6
transferred 129:7
132:7 133:6 136:7
137:8,9,16,25
139:25 150:23
156:12 157:20
158:7 159:4
166:10 175:12
transferring 158:3
transfers 124:10,11
transit 185:10
transition 193:13
transitioning
193:14
transitions 142:1
transmitted 123:5
135:23,25 138:2
197:14
transpired 156:15
212:7
transpires 158:1
traversing 210:13
Travis 152:6,11,13
203:8
tried 217:6
true 157:18,19
176:16 206:5
218:9
truly 142:17
try 113:14 117:22
117:25 118:4

124:1
trying 118:5
133:20 146:24
181:16 184:2
193:17 197:17
turn 127:2 161:6
161:15 169:4,8
two 114:14,22
123:5 142:18,20
142:21 144:11
153:9 177:7 182:6
190:24 191:3
208:14 215:16
TX 111:19
Tybera 180:21
Tyler 110:12
111:16 112:13
114:4,13,17
117:16 118:21
120:3,4,21 121:4
121:5,5 122:9,15
123:16,18 124:4
124:19,24 125:3,3
125:12,18,22
126:1,8,15,22
127:3,5 128:9
129:14,18 130:15
137:2,8 138:16,21
139:4,8 140:14
141:2 148:9
151:19 152:14
155:8,11 156:24
162:17 165:25
167:24 169:14
170:4,10 171:13
171:18,23,24
172:16,25 175:25
176:4 179:4,10,14
179:21 180:9,12
180:16 181:12,18
181:23 182:9,14
182:16,18,21,22
183:1 184:4,8,18
185:6,13 186:9,16
186:20 187:2,9

189:23 190:7,13
190:17 191:18
192:7,18 193:13
193:19 195:4,10
195:22 196:23
197:2,6,10,23
198:24,24 199:5
199:15 203:9,13
203:18 204:3,6,10
204:14,19,25
205:2,4,20,24
206:14 207:1,4,12
207:17 208:18,24
210:8,11 211:1,18
212:8 213:1,7,14
214:9,12 216:23
216:23 217:6,6,10
217:11 218:5
Tyler's 115:15
120:18 123:15
124:24 128:1,7,19
128:20 132:6
135:8 139:8
155:14,18 161:22
169:15 175:23
181:21 186:24
187:9 191:15
195:7 196:1
203:23 208:19
210:16 216:25
Tyler-documented
167:21
Tyler-drafted
161:10
Tyler-generated
160:19 161:2
Tyler-maintained
140:20
Tyler-provided
202:2
type 120:21 124:18
126:3 127:25
132:25 156:19,23
167:2 170:23
187:20 189:23

199:2 200:10
204:14 215:11,11
215:13,20,21
types 124:18 125:1
149:15 175:22
189:18
typical 158:14

U

ultimately 190:5,7
unanticipated
201:10
unauthorized
186:13,21
unaware 178:25
184:7,19
undersigned 218:3
understand 113:18
118:12 120:15
121:3 134:10
135:3,13 141:10
143:3 147:17
155:14 172:15
173:13 175:2
187:13 200:18
201:2 208:1
understanding
119:3 122:17
124:14 135:9,12
146:1 151:19
157:15 171:15
178:8 179:13,17
182:3,15,17
186:23 187:2
190:9,12 197:6
200:9,22 201:6,11
204:19 210:22
understood 113:22
132:21
unexpected 201:10
unfortunately
209:2 215:15
UNITED 110:1
unreasonable
207:8
updated 172:24

Courthouse News Service v. Omundson

30(b)(6) Terry Derrick - Vol. II

Page 236

**updates** 199:6,11
**use** 116:22 119:16
  120:11,22 123:25
  128:11 129:13
  130:25 131:3
  132:10 138:13,16
  138:22 139:4
  140:23 147:2
  153:11,18 154:24
  156:25 169:23
  170:4,9 171:25
  173:2 178:14
  206:7 214:10,13
**useful** 131:15
**user** 122:19 131:20
  161:22 168:3,5
  170:5,11,13,13,15
  170:17,18 176:15
  177:4 188:1
**user's** 170:24
**users** 129:14,21
  170:7 187:15
  196:23
**uses** 125:8 129:25
  149:19
**utilized** 120:20
  175:23
**utilizing** 152:22

**V**

**v** 110:6
**Vague** 120:13
  123:19 130:8
**valid** 150:20
  164:16
**validate** 182:4
**validating** 167:4
**validity** 186:18
**valuable** 130:14
**valued** 148:17
**varies** 149:17
**various** 121:6
  127:17 139:18
  158:12 165:8
  202:20 203:19
**vary** 211:9

**vendor** 207:8
**verification** 167:8
  186:13
**verified** 166:9,16
  166:16,20,22,23
  166:24 167:1,8
**Vermont** 138:25
  203:4
**versa** 142:12 197:4
**version** 136:20,22
  192:10 195:12,15
  195:21
**versus** 127:23
  149:2 153:21
**vice** 142:12 197:4
**Videoconference**
  110:17
**view** 164:2,4
**virus** 127:16
**visibility** 120:25
  126:6,14,15 130:3
  144:25
**volume** 110:13
  151:12
**voluntarily** 182:11
**vulnerability**
  127:11,16

**W**

**W** 111:11,18
**WA** 110:24
**wait** 117:13
**want** 117:22 118:7
  173:7 210:21
**wanted** 156:9 204:4
  209:10
**wants** 117:11
  171:25 172:20
  189:16
**Washington** 197:3
**wasn't** 159:2
  200:25 204:5
**watermark** 171:3
  211:17
**watermarks** 200:3
  200:9

**way** 115:20 121:14
  121:24 124:2
  129:6 141:9,17
  142:15 147:20
  148:22 157:1
  159:11 173:22
  174:13 187:24
  189:13 191:25
  200:15 218:11
**ways** 213:15,24
**we'll** 113:22 118:10
  119:21 216:19
**we're** 123:10 138:5
  139:22 160:13
  161:15 169:7
  177:13 181:20
  182:20 192:20
  193:16 198:1
  199:18 205:16
  209:7,8 211:20
  212:12 216:5
**we've** 128:5 141:12
  144:20 154:20
  156:21 162:22
  170:14 171:7
  187:4 195:15
  203:19 206:11
**web** 140:7,9 141:1
  179:5 212:23
**website** 161:1
  179:6
**week** 192:2
**weekly** 128:3
**weighing** 165:25
**welcome** 216:11
**went** 130:17
**weren't** 134:7
**whatsoever** 204:7
**whereof** 218:16
**Wide** 140:7,9 141:1
**willing** 181:12
  182:18 197:24
  198:24
**witness** 111:16
  113:5 216:13

  218:6,7,16
**wood** 128:7
**word** 165:23,24
  166:4 174:23
**words** 121:11
**work** 114:24
  130:19,20 158:6
  183:8 192:24
  193:10
**worked** 178:5
**workflow** 138:5
  143:9 162:14
**working** 177:19
  184:5,8
**works** 138:22
  187:25
**world** 140:7,9
  141:1 143:23
**worry** 203:11
**worth** 186:1
**wouldn't** 132:3
  134:18 172:15,16
  193:4 197:1
**wrong** 131:24
**wrongly** 190:1

**X**

**X** 113:10 209:20
  216:16

**Y**

**yeah** 113:24 115:5
  115:22 116:24
  117:15,15,17,24
  119:2 120:24
  121:18 123:14
  137:18 138:1
  140:16 141:12
  143:5,7 146:5,9
  146:15 148:11
  150:20 158:14,25
  161:9 162:24
  164:16 166:2,21
  167:15 168:21
  170:4,12 172:22
  173:15 178:8

  179:7,7 181:2
  185:2,9 186:10,25
  187:5 188:21
  191:17 192:8
  194:11 195:12
  197:16,24 198:1
  199:20,21 202:11
  202:17 203:1
  205:10,22 206:18
  210:5,11 211:20
  212:5,12,20
  213:11,23 214:5,6
  214:19 215:1
**year** 171:17 172:13
  172:21 183:4
  207:4 208:21
**years** 115:6 208:14
**yesterday** 152:1,2
  171:21

**Z**

**Zoom** 111:4,10,18
  111:23 117:11,21

**0**

**013289** 216:13

**1**

**1** 119:9 210:20
  215:19
**1,500** 138:20,21
**1:21-CV-00305-...**
  110:6
**1:24** 113:2
**10** 110:23 113:2
  207:16
**108-** 172:9
**108,000** 171:17,19
  171:25 172:13,20
  182:25 183:3
  206:12,16 207:4
  208:21
**1087** 111:11
**113** 112:5
**117** 112:13
**138** 184:21 185:1,2

Courthouse News Service v. Omundson     30(b)(6) Terry Derrick - Vol. II

Page 237

**14441** 110:24
218:21
**15-minute** 128:2
**155** 185:13
**158** 186:12
**15th** 218:17
**160** 186:16
**17** 161:17,21
**1717** 111:19
**19** 203:17

---
**2**

**2** 142:23 145:5
181:6,13 182:13
182:20
**2:36** 160:12
**2:43** 160:12
**2014** 206:3 208:13
**2017** 114:15
**2019** 152:23,25
**2021** 195:6
**2022** 110:23 113:2
119:9 218:17
**208** 111:13
**209** 112:6
**214** 111:20
**216** 112:7
**225** 212:14,15
**23** 208:16
**23rd** 191:23
**24** 154:7,9
**24/7** 126:1
**243** 134:16
**248** 161:9
**25** 138:12,22 139:1
139:3 202:13,19
**254** 151:14
**27** 138:19
**2800** 111:19

---
**3**

**3** 111:5 145:9
183:12,18,23
184:10,16 187:7
**30** 209:13
**30(b)(6)** 110:11

112:1,12 117:16
179:2 181:14
182:13,20 183:13
202:18 204:20
218:5
**300** 111:11
**3384** 110:24
**34** 160:15,16,22
**342-3310** 111:13
**34A** 161:1
**35** 161:6,16,22,25
167:25 168:3
**37** 168:14 216:13
**38** 112:12 116:17
117:2,3,5,9
183:15,16,18
184:10,16,16
187:8

---
**4**

**4** 204:9
**4:06** 217:23
**415** 111:6
**45-** 151:16

---
**5**

**5** 139:21,22 154:3
**50955** 110:24
**5303** 197:11

---
**6**

**6** 147:10 199:13
201:24
**60,000** 172:5
**65,000** 151:16
**675-3400** 111:6

---
**7**

**7** 152:17
**7387** 111:12
**75201** 111:19
**7th** 111:5

---
**8**

**8** 116:22 154:18,19
154:22

**83707** 111:12

---
**9**

**9** 171:6,8 190:4
191:7 196:14
197:10
**939-5815** 111:20
**94111** 111:6

# EXHIBIT G

# Deposition of 30(b)(6) Terry Derrick - Vol. I

## Courthouse News Service v. Omundson

## November 10, 2022



206.287.9066  I  800.846.6989
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 57

1  the question.  I just don't know how quickly we can get
2  a response.
3              MR. FETTERLY:  Sure.  Thank you.
4              (Pause in the proceedings.)
5              THE DEPONENT:  I sent that inquiry.  I'll
6  let you know when I receive a response.
7              Q.  (By Mr. Fetterly) Thank you.
8              A.  Sure.
9              Q.  Going back to my screen share here, I'm still
10 on Exhibit No. 37.  All I've done is scroll down a few
11 pages to the document that's Bates labeled CNS_13284.
12             A.  Okay.
13             Q.  And, Mr. Derrick, do you recognize -- well,
14 first, this is a -- another webpage screenshot of a
15 webpage and, Mr. Derrick, do you recognize this webpage?
16             A.  Yes, I do.
17             Q.  And what is it?
18             A.  This is the older version of our filing
19 portal, specifically, the start a new case screen.
20             Q.  Okay.  And when you say "older," it's the same
21 older version that we were just discussing before we had
22 our break?
23             A.  Yes, just a few moments ago.
24             Q.  I -- just a couple of real quick questions
25 about this just before we move on to the more-detailed

---

Page 58

1  questions about the press tool and Auto-Accept.
2              I understand there are a couple of -- under
3  case information, under start a new case, there are a
4  couple of pull-down menus, but my understanding is that
5  these would be the -- the pull-down menus that would be
6  made available to a filer using this version of
7  File & Serve during their drafting stage or status of
8  preparing their filing for submission; is that correct?
9              A.  That is correct.
10             Q.  So under case information, we see a few -- I
11 guess I'll call them prompts or pull-down menus that
12 would be, you know, required for the filer to select as
13 part of their drafting and submission process; is that
14 correct?
15             A.  That is correct.
16             Q.  Okay.  I'm now scrolling down to the next
17 page, which is 13285.  Under location, this screenshot
18 is the same -- same webpage.  It's just this page
19 reflects the options or some of them under the location
20 drop-down menu.  Do you see that?
21             A.  Yes, I do.
22             Q.  Would -- would these locations, once selected,
23 affect kind of, you know, where within the EFM the
24 filing is routed and/or relate to -- affect the clerk
25 inbox that it is surfaced into?

---

Page 59

1              MS. DUKE:  Form and foundation.
2              THE DEPONENT:  They could.  It depends on
3  the configuration.
4              Q.  (By Mr. Fetterly) Right.
5              So a court could configure their press --
6  strike that.
7              A court could configure their location options
8  and their File & Serve system so that if the filer
9  selects Ada County District Court, the filing would then
10 be routed to a clerk review queue that's for the Ada
11 County District Court; is that correct?
12             MS. DUKE:  Again, foundation.
13             THE DEPONENT:  They could, yes.
14             Q.  (By Mr. Fetterly) Moving on to the next page
15 here, this is the page Bates labeled 13286.  Here, we
16 see a different pull-down menu.  This is the category
17 civil, family, guardianship, probate, or mental health.
18 Those are the options that are reflected here.  These
19 would also be, you know, prompts that a filer would be
20 required to select while they're going -- while they're
21 in the drafting or submission phase of their filing;
22 correct?
23             A.  That is correct.
24             Q.  And so this would be the -- the category of
25 the case before we have the location which is the court

---

Page 60

1  location.  This is now the case category.
2              And then moving on, I see we have one more,
3  it's the case type.  And this is reflected on CNS 13287,
4  and I'll show you this.
5              A.  Yes.
6              Q.  And this case type would be also another, you
7  know, series of selections that a filer would be
8  required to -- a series of options a filer would be
9  required to select as part of their drafting and
10 submission process for a filing; correct?
11             A.  That is correct.
12             Q.  Okay.  Thank you.  I appreciate you bearing
13 with me here.  I just want to make sure we have a common
14 understanding of location, category, case type as we now
15 go back to the attachment to the subpoena, so I'll go
16 there now.
17             Okay.  Mr. Derrick, I now have turned back to
18 Exhibit 33.  This is the subpoena.  And this is the
19 Exhibit 1 to the subpoena, a document titled
20 "Auto-Accept Review and Press Review Tool" dated
21 July 1, 2022.
22             I'm now going to the second page, which is
23 SO 3.  Do you see that in front of you?
24             A.  Yes, I do.
25             Q.  That first paragraph where we're talking about

15 (Pages 57 to 60)

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

**ER-2581**

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 61

1  the Auto-Accept Review on the left-hand column, it talks
2  about the Auto-Accept Review as a free out-of-the-box
3  e-filing function that allows clerks to automatically
4  accept filings based on a set of conditions. And then
5  it goes on to say: "Conditions can be configured using
6  the same criteria that is used to define which review
7  queues filings are routed to, allowing clerks to
8  configure the solution to meet their needs."
9      I just want to better understand that. Can
10  you explain to me what the conditions are that can be
11  configured to facilitate the Auto-Accept Review?
12      A. Yeah. I can provide some examples, but I
13  won't be able to give you an absolute.
14      I'm sorry. I'm just receiving a confirmation
15  on my screen that says my internet was unstable, so
16  perhaps that was part of the problem with the audio
17  before. Apologies. Can you guys still hear me okay?
18      Q. Yes.
19      A. Okay. Yes, I can provide you a few examples.
20  I don't have a comprehensive list in front of me.
21      An example would be case category; case type;
22  party type, so plaintiff or defendant; filer type, which
23  would be, you know, a legal professional versus a
24  self-represented litigant type thing. Just different
25  options like that; contains financials, doesn't contain

Page 62

1  financials, et cetera.
2      Q. Mm-hmm. If the -- if a particular version of
3  the File & Serve system -- strike that.
4      If a particular version of the File & Serve
5  solution is configured so that a filer is, you know,
6  given the option to choose between confidential or
7  public, some type of security feature, would that be yet
8  another way, another condition that could determine
9  whether or not a filing is automatically accepted?
10      A. I'm not sure if filing security is an option
11  that we have in the Auto-Accept function.
12      Q. Okay. Well, I think we'll -- we'll get there
13  in a minute.
14      But as far as the conditions you've just
15  identified, case category, case type, party type, filer
16  type, you know, those were examples of the types of
17  conditions that could be used to configure the
18  Auto-Accept Review; correct?
19      A. Correct.
20      Q. So a minute ago, we were looking at the -- the
21  version of the File & Serve solution and, specifically,
22  we were looking at location, case type, case category.
23  Those would be examples of the types of conditions that
24  could be configured; correct?
25      A. Everything you said was true with the

Page 63

1  exception of location. The conditions themselves live
2  within a location.
3      Q. Understood.
4      So if I'm understanding you correctly, then,
5  the -- the location would be set first. And then once
6  the location is set, then within that location, the
7  court would be able to configure the Auto-Accept Review
8  based upon case type, case category, the other
9  conditions you identified; correct?
10      A. That is correct.
11      Q. So this would allow a statewide system, for
12  instance, to configure -- it would allow courts within a
13  statewide system to configure their Auto-Accept Reviews
14  based upon their respective locations such that each
15  location could configure according to its wishes or
16  needs; correct?
17      MS. DUKE: Form and foundation.
18      THE DEPONENT: Yes, that's correct.
19      Q. (By Mr. Fetterly) Thank you.
20      I'm going to go down to the next page here.
21  Auto-Accept Review, it reads: "E-filing function that
22  allows clerks to automatically accept filings if the
23  filing matches locally configured criteria"; is that
24  correct?
25      A. Yes, it is.

Page 64

1      Q. And so, again, here we have conditions that
2  can be configured based upon filing firms, filing codes.
3  Again, I don't want to repeat them all, but this is what
4  we were just discussing in terms of the conditions or
5  types of conditions that would allow for configuration;
6  correct?
7      A. Correct.
8      Q. It says here: "Auto-Accept: How does it
9  work? Number 1, upon submission, filings are evaluated
10  against the locally configured auto-review conditions."
11      Can you just explain what that means?
12      A. Yeah. So once the filings have been submitted
13  and they reach the EFM, the EFM then evaluates those
14  filings and the criteria of those filings based upon the
15  configurations of those conditions to see if it meets
16  any of those conditions.
17      Q. And this is all done on an automated basis;
18  correct?
19      A. That's correct.
20      Q. And then we move on to the -- and, again, just
21  for the record, I'm looking at SO 5, Number 2: "If the
22  envelope details do not meet the auto-review conditions,
23  the envelope is routed to the appropriate review queue
24  to be reviewed by clerk as it is today."
25      So that -- I think I understand what that

16 (Pages 61 to 64)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

```
                                                    Page 109
 1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2
 3              The undersigned Certified Shorthand
    Reporter and Deposition Notary Public of the State of
 4  California does hereby certify:
 5              That the foregoing 30(b)(6) deposition of
    Tyler Technologies designee Terry Derrick was taken before
 6  me remotely at the time, at which time the witness was
    duly sworn by me;
 7
 8              That the testimony of the witness and all
    objections made at the time of the deposition were
 9  recorded stenographically by me and were thereafter
    transcribed, said transcript being a true and correct copy
    of the proceedings thereof.
10
11              I further certify that I am neither counsel
    for nor related to any party to said action, nor in any
    way interested in the outcome thereof.
12
13              Further, that if the foregoing pertains to
    the original transcript of a deposition in a federal case,
    before completion of the proceedings, review of the
14  transcript was requested/offered on the
    record.
15
16
17              In witness whereof, I have subscribed my
    name on this 15th day of November 2022
18
19
20
21              Nicole A. Bulldis, RPR
                CA CSR No. 14441
22
23
24
25
```

28  (Page 109)

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson, by and through her undersigned counsel of record, hereby

provides her answer and response to Plaintiff's Complaint, and thereby admits, denies, and alleges

as follows.

**FIRST DEFENSE**

Plaintiff's Complaint, and each and every allegation therein, fails to state a claim against

Ms. Omundson upon which relief can be granted and, as such, should be dismissed.

**SECOND DEFENSE**

Ms. Omundson denies each and every allegation of Plaintiff's Complaint except those

specifically admitted herein. Ms. Omundson denies all remaining allegations for the following

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 1**

reasons: Plaintiff's characterizations are improper, the allegations are not accurate, the allegations call for a legal conclusion, and/or Ms. Omundson does not have sufficient information or knowledge to respond.

## THIRD DEFENSE

With respect to the specific allegations contained in Plaintiff's Complaint, Ms. Omundson admits, denies, and/or alleges as follows:

1.  With regard to the allegations and statements made in paragraph 1, Ms. Omundson admits only that the Administrative Office of the Courts for the Judicial Branch of the State of Idaho is involved with the oversight and maintenance of Idaho's electronic court records filing system. Ms. Omundson is without sufficient information or knowledge of the remaining allegations and/or Plaintiff's remaining characterizations are improper and therefore Plaintiff denies the same.

2.  With regard to the allegations and statements made in paragraph 2, Ms. Omundson admits that it began to move from exclusively in-clerk's office court document submission to providing a platform for electronic court document submission in 2016, which process was not complete until October 2018. Ms. Omundson admits that Plaintiff, through counsel, sent a letter to Director Omundson dated June 14, 2021, to request that Idaho's state courts employ an electronic media inbox to provide it access to new civil complaints. Ms. Omundson admits that Plaintiff sent a letter, through counsel dated December 28, 2016, to Michael Henderson, legal counsel for the Idaho Supreme Court, also requesting an electronic inbox for the media to see complaints. Ms. Omundson admits Plaintiff sent a letter dated April 28, 2016, to Christopher Risch, Clerk of the Ada County District Court regarding a proposal to meet regarding the transition to e-filing. Ms. Omundson denies all remaining allegations in paragraph 2, including Plaintiff's

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 2**

characterizations.

3.      With regard to the allegations and statements made in paragraph 3, Ms. Omundson admits to knowing about the Tyler Technologies, Inc. software environment referred to as a "Press Review Queue." Ms. Omundson denies the remaining allegations of paragraph 3, including Plaintiff's characterizations.

4.      Ms. Omundson denies the allegations of paragraph 4.

5.      Ms. Omundson denies the allegations of paragraph 5.

6.      With regard to the allegations made in paragraph 6, Ms. Omundson admits Plaintiff, through counsel, sent a letter to Director Omundson dated June 14, 2021, and that the content of the document speaks for itself. Ms. Omundson denies any remaining allegations in paragraph 6, including Plaintiff's characterizations.

7.      With regard to the allegations and statements made in paragraph 7, Ms. Omundson admits that she provided a letter dated July 6, 2021, to Plaintiff through its counsel and that the content of the document speaks for itself. Ms. Omundson denies any remaining allegations in paragraph 7.

8.      Paragraph 8  states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

9.      With regard to the allegations made in paragraph 9 regarding this Court's jurisdiction, Ms. Omundson admits the Court has subject matter jurisdiction and that she is subject to personal jurisdiction in the District of Idaho. Ms. Omundson denies any remaining allegations in paragraph 9, including Plaintiff's characterizations.

10.     With regard to the allegations made in paragraph 10 regarding venue, Ms. Omundson admits that venue in the District of Idaho is proper. Ms. Omundson denies any

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 3**

remaining allegations in paragraph 10, including Plaintiff's characterizations.

11.     With regard to the allegations in paragraph 11, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

12.     With regard to the allegations in paragraph 12, Ms. Omundson Sara Omundson admits she is currently the Administrative Director of Idaho Courts and admits she oversees only partial administration of Idaho's e-filing system. Ms. Omundson denies all remaining allegations in paragraph 12, including Plaintiff's characterizations.

13.     Ms. Omundson denies the allegations of paragraph 13.

14.     Ms. Omundson denies the allegations of paragraph 14.

15.     Ms. Omundson denies the allegations of paragraph 15, which call for legal conclusions.

16.     With regard to the allegations in paragraph 16, Ms. Omundson admits that Plaintiff has a website at the address of www.courthousenews.com. Ms. Omundson is without sufficient information or knowledge to admit or deny the remaining allegations in paragraph 16.

17.     With regard to the allegations in paragraph 17, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

18.     With regard to the allegations in paragraph 18, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

19.     With regard to the allegations in paragraph 19, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

20.     With regard to the allegations in paragraph 20, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

21.     With regard to the allegations in paragraph 21, Ms. Omundson is without sufficient

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 4**

information or knowledge to admit or deny and therefor denies the same.

22.     With regard to the allegations in paragraph 22, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

23.     With regard to the allegations in paragraph 23, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

24.     With regard to the allegations in paragraph 24, Ms. Omundson admits only that Plaintiff made requests to officials within the Idaho Court system regarding access to new civil complaint documents. Ms. Omundson denies the remaining allegations in paragraph 24, including Plaintiff's characterizations.

25.     With regard to the allegations in paragraph 25, Ms. Omundson admits that public access terminals are located in Idaho's courthouses, which provide public access to newly filed civil complaints during Clerks' office business hours. Ms. Omundson is without sufficient information or knowledge to respond to the remaining allegations in paragraph 25 and therefore denies the same.

26.     Ms. Omundson denies the allegations of paragraph 26, including Plaintiff's characterizations.

27.     With regard to the allegations in paragraph 27, Ms. Omundson admits a complaint was filed in the District Court for the First Judicial District for the County of Kootenai and assigned the Case Number CV28-21-4053. Ms. Omundson is without sufficient information or knowledge to admit or deny the remaining allegations in paragraph 27 and therefor denies the same.

28.     Paragraph 28 states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

29.     Paragraph 29 states legal conclusions to which no answer is required. To the extent

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 5**

these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

30.     Paragraph 30 states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

31.     Paragraph 31 states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

32.     Paragraph 32 states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

33.     Paragraph 33 states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

34.     Paragraph 34 states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied. Any remaining allegations are also denied.

35.     Ms. Omundson denies the allegations in paragraph 35, including Plaintiff's characterizations.

36.     Ms. Omundson denies the allegations in paragraph 36, including Plaintiff's characterizations.

37.     Ms. Omundson is without sufficient information or knowledge to admit or deny allegations regarding the historical actions of reporters and therefore denies the same. Ms. Omundson denies all remaining allegations in paragraph 37, including Plaintiff's characterizations.

38.     Ms. Omundson denies the allegations in paragraph 38, including Plaintiff's characterizations.

39.     With regard to the allegations of paragraph 39, Ms. Omundson admits generally

that other state court systems have e-file systems, as does the Federal Court system in the United States. Ms. Omundson is without sufficient knowledge or information to either admit or deny the remaining allegations in paragraph 39 and therefore denies the same.

40.    With regard to the allegations in paragraph 40, Ms. Omundson is without sufficient information or knowledge to admit or deny and therefor denies the same.

41.    With regard to the allegations in paragraph 41, Ms. Omundson admits Plaintiff provided a letter to Christopher Rich in 2016, the content thereof speaks for itself. Ms. Omundson denies any other allegations in paragraph 41, including Plaintiff's characterizations.

42.    With regard to the allegations in paragraph 42, Ms. Omundson admits that Christopher Rich provided a letter to the interim Administrative Director of Idaho Courts in 2016, the content thereof speaks for itself. Ms. Omundson denies any other allegations in paragraph 42, including Plaintiff's characterizations.

43.    With regard to the allegations in paragraph 43, Ms. Omundson admits that staff of the Idaho Judicial Branch and/or Idaho Courts engaged in conversations with representatives of Plaintiff regarding the issues raised in this case. Ms. Omundson denies any remaining allegations in paragraph 43, including Plaintiff's characterizations.

44.    With regard to the allegations in paragraph 44, Ms. Omundson admits Plaintiff, through counsel, made a request for a specialized "Press Review Queue" in 2021 and that Ms. Omundson denied the request because there is no delay in access to newly filed civil complaints. Ms. Omundson denies the remaining allegations in paragraph 44, including Plaintiff's characterizations.

45.    Ms. Omundson admits it has not provided a specialized "Press Review Queue" for Plaintiff to have special access to electronically submitted but unfiled civil complaint documents.

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 7**

Ms. Omundson denies the remaining allegations of paragraph 45, including Plaintiff's characterizations.

46.    Paragraph 46 states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

47.    Ms. Omundson incorporates her responses to paragraphs 1-46 of the Complaint as if fully restated herein.

48.    Ms. Omundson denies the allegations of paragraph 48, including Plaintiff's characterizations. Paragraph 48 also states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

49.    Ms. Omundson denies the allegations of paragraph 49, including Plaintiff's characterizations. Paragraph 49 also states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

50.    Ms. Omundson denies the allegations of paragraph 50, including Plaintiff's characterizations. Paragraph 50 also states legal conclusions to which no answer is required. To the extent these legal conclusions are deemed to be conclusions of fact, they are hereby denied.

## **FOURTH DEFENSE**

Plaintiff has failed to join a necessary and indispensable party under FRCP 19.

## **FIFTH DEFENSE**

There is no ongoing violation of Plaintiff's qualified First Amendment rights because the Idaho County Court Clerks' offices are already providing timely and appropriate access to newly e-filed civil complaints to the public and Plaintiff. There is no delay in access to newly filed civil complaints because access to the public and Plaintiff is immediate upon filing.

## SIXTH DEFENSE

The policies and procedures of Idaho's County Court Clerks' offices (in their respective offices) ensure that newly submitted civil complaint documents are processed and stamped as filed in a timely and efficient manner, where such process is no greater than necessary to serve the legitimate administrative interests of the Idaho courts.

## SEVENTH DEFENSE

A state-wide federal injunction requiring Idaho's courts and Clerks' offices to provide pre-processing access to newly submitted civil complaint documents will disrupt the operations of Idaho's Clerks' offices and will cause harm to the legitimate administrative interests of the Idaho courts and the public's interests in the integrity of judicial records and confidence in the orderly operations of the courts.

## EIGHTH DEFENSE

The length of delays alleged by Plaintiff in the Complaint is misleading and inaccurate. Idaho's Clerks' offices provide timely access to newly filed civil complaints in each Idaho county.

## NINTH DEFENSE

CNS's claim for injunctive relief is moot.

## TENTH DEFENSE

CNS's claims are barred by quasi-judicial immunity.

## ELEVENTH DEFENSE

CNS's claims are barred by the applicable statute of limitations including, but not limited to, Idaho Code § 5-218.

## TWELFTH DEFENSE

CNS's claims are barred by waiver.

## THIRTEENTH DEFENSE

CNS's claims are barred to the extent that CNS has not suffered, and will not suffer, irreparable harm or injury.

## FOURTEENTH DEFENSE

CNS's claims are barred to the extent that CNS has not suffered any injury in fact from the conduct alleged in the Complaint.

## FIFTEENTH DEFENSE

CNS's claims are barred because Ms. Omundson's conduct has not proximately caused any injury, loss or damage alleged by CNS.

## SIXTEENTH DEFENSE

CNS's claims are barred to the extent that CNS lacks standing.

## SEVENTEENTH DEFENSE

CNS's claims are barred because CNS challenges a lawful regulation of commercial speech.

## EIGHTEENTH DEFENSE

CNS's claims are barred because CNS challenges a reasonable time, place, and manner restriction.

## NINETEENTH DEFENSE

CNS's claims are barred because there is an overriding interest in processing a complaint before making them publicly available that is essential to preserve higher values and is narrowly tailored to serve that interest.

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 10**

## RESERVATION OF DEFENSES

Ms. Omundson, by virtue of pleading a defense above, does not admit that said defense is an affirmative defense within the meaning of applicable law, and Ms. Omundson does not thereby assume a burden of proof or production not otherwise imposed upon them as a matter of law. In addition, in asserting any of the above defenses, Ms. Omundson does not admit any fault, responsibility, liability or damage but, to the contrary, expressly denies the same. Discovery has yet to conclude, the results of which may disclose the existence of facts supporting further and additional defenses. Ms. Omundson, therefore, reserves the right to seek leave of this Court to amend this Answer as it deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Ms. Omundson demands a trial of not fewer than twelve persons on all issues so triable.

## REQUEST FOR ATTORNEY FEES

Ms. Omundson has been required to retain the services of counsel and is entitled to recover her reasonable attorney fees and costs incurred in the defense of this matter pursuant to Federal Rule of Civil Procedure 54, 28 U.S.C. § 1988, and all other applicable laws and agreements allowing for the recovery of costs or attorney fees in this action.

## PRAYER FOR RELIEF

Wherefore, Defendant Sara Omundson prays for judgment as follows:

1.      That Plaintiff take nothing against Ms. Omundson by way of the Complaint and that the Complaint be dismissed with prejudice.

2.      That Ms. Omundson be awarded her costs and reasonable attorney fees incurred in the defense of this action; and

**ANSWER TO COMPLAINT AND DEMAND FOR JURY TRIAL - 11**

3.      For such other and further relief as this Court may deem just and proper.

DATED this 10th day of June, 2022.

DUKE EVETT, PLLC


By /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of June, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |


/s/Keely E. Duke_____
Keely E. Duke

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

COURTHOUSE NEWS SERVICE,              Case No. 1:21-CV-305-DCN

        Plaintiff,

    vs.                               Boise, Idaho
                                      February 18, 2022
SARA OMUNDSON, in her official        9:59 a.m.
capacity As Administrative
Director of Idaho Courts,

        Defendant.

---

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE DAVID C. NYE
CHIEF UNITED STATES DISTRICT COURT JUDGE

---

APPEARANCES:

For the Plaintiff:      MR. JONATHAN G. FETTERLY
                        Bryan Cave Leighton Paisner, LLP
                        3 Embarcadero Center, 7th Floor
                        San Francisco, California  94111
                                    and
                        MS. DEBORA KRISTENSEN GRASHAM
                        Givens Pursley
                        P.O. Box 2720
                        Boise, Idaho  83701

For the Defendant:      MS. KEELY E. DUKE
                        MS. ANNE HENDERSON
                        Duke Evett, PLLC
                        P.O. Box 7387
                        Boise, Idaho  83707

Court Reporter:         MS. ANNE BOWLINE, RMR, CRR
                        Anne_Bowline@id.uscourts.gov

*Proceedings recorded by stenography.  Transcript produced by
computer-aided transcription.*

2

<u>I N D E X</u>

| <u>MOTIONS</u> | <u>PAGE</u> |
|---|---|
| Motion to Dismiss | |
|    Ms. Duke | 4 |
|    Mr. Fetterly | 16 |
|    Ms. Duke | 30 |
| | |
| Motion for Preliminary Injunction | |
|    Mr. Fetterly | 35 |
|    Ms. Duke | 49 |
|    Mr. Fetterly | 65 |

3

```
 1        (Proceedings commenced at 9:59 a.m., February 18, 2022.)

 2        THE LAW CLERK:  The Court will now hear the motion

 3   hearing in Case Number 1:21-CV-305-DCN, Courthouse News

 4   Service versus Omundson.

 5        THE COURT:  Good morning, Counsel.  I'm going to ask

 6   each of you, if you would, starting with the plaintiffs, just

 7   identify yourself and tell me who's going to argue from your

 8   side.

 9        MS. GRASHAM:  Good morning, Your Honor.  It's Deb

10   Grasham from Givens Pursley.  I am local counsel, and Jon

11   Fetterly is here as well, and he will be arguing this morning.

12        THE COURT:  All right.

13        MR. FETTERLY:  Good morning, Your Honor.  This is Jon

14   Fetterly.  I'll be arguing.  Thank you.

15        MS. DUKE:  Good morning, Your Honor.  Keely Duke and

16   Annie Henderson on behalf of Ms. Omundson, and I will be

17   arguing.

18        THE COURT:  Okay.  Thank you.  I'm also going to just

19   say, because she won't listen to me, Patti's on here, but she

20   has COVID.  I can't get her to get off the hearing.  That's

21   why I had Bennett call the case.  She doesn't have much of a

22   voice right now.

23        All right.  We're here today on two motions, a motion

24   to dismiss by the defense and a motion for preliminary

25   injunction by the plaintiffs.  I think we ought to take up the
```

Ms. Duke                                                    4

1    motion to dismiss first.  So, Ms. Duke, that would be you.

2    You may go ahead.

3         MS. DUKE:  Thank you, Your Honor.  And may it please

4    the Court.

5         Patti, I'm sorry you're dealing with COVID.

6    Hopefully it all goes just fine.

7         THE COURT:  I probably just violated all kinds of

8    federal laws telling you that.

9         MS. DUKE:  Unless you're a doctor, I think you're

10   okay.  So, Your Honor, thank you very much.  Do you mind if I

11   share my screen?

12        THE COURT:  No.  Go ahead.

13        MS. DUKE:  Thank you, sir.  Your Honor, first and

14   foremost, we are asking that this Court exercise the doctrine

15   of abstention and abstain from ruling related to this case and

16   dismissing it for state proceedings.  Certainly it's well

17   established in the *Quackenbush* case -- which is, quite

18   frankly, similar to this case in that, as I'll discuss in a

19   few minutes, the entire recordkeeping court process for the

20   state of Idaho if CNS gets what it asks this Court to do will

21   have to be changed; and that change will be dictated and

22   mandated by a federal court, not by the Idaho legislature, not

23   by the Idaho Supreme Court.

24        And so while abstention is the exception rather than

25   the rule, federal courts may decline to exercise their

Ms. Duke                                                              5

1    jurisdiction in otherwise exceptional circumstances where

2    denying a federal forum would clearly serve an important

3    countervailing interest.

4            We turn next to the *Colorado River Water Conservation*

5    case, a United States Supreme Court case in which it was noted

6    that considerations of wide judicial administration alone may

7    sometimes warrant dismissal of a federal court proceeding.

8            And next we look to the guidelines provided by *Hart*

9    *v. Massanari* in the Ninth Circuit, where the Ninth Circuit has

10   specifically instructed that using the techniques developed at

11   common law, a court confronted with apparent controlling

12   authority must parse the precedent in light of the facts

13   presented and the rule announced.  Insofar as there may be

14   factual differences between the current case and the earlier

15   one, the court must determine whether those differences are

16   material to the application of the rule or allow the precedent

17   to be distinguished on a principled basis.

18           That's exactly where we come to here with this

19   *Planet III* and *Planet I* decision.  Abstention in this case is

20   appropriate because the requests for relief are sufficiently

21   distinctive from those in the *Planet* case to warrant this

22   Court's independent consideration of whether abstention is

23   appropriate or not.  And that's directly within the Ninth

24   Circuit purview of indicating that we need to look at the

25   facts of the case to determine whether its precedent will in

Ms. Duke                                              6

1    fact guide.

2         When you look to this case, CNS demands instantaneous

3    preprocessing access to nonconfidential complaints.  This --

4    in order to do that, CNS relies on the time it takes from a

5    complaint being submitted -- which I'll discuss here in a

6    moment -- to actually being filed and then part of the court

7    record.  To then attempt to further justify an incredible

8    overexpansion of *Planet III*, CNS then misuses the 24 hours in

9    a day, seven days a week, 365 days a year ability for someone

10   who wants to submit a document for filing to submit that

11   document.

12        So let's look at the distinguishing factors between

13   *Planet I* and this case.  First and foremost, in *Planet I*, when

14   the court decided it would abstain, the question of access --

15   so the First Amendment question -- had not yet been decided.

16   In Idaho we already have the benefit of the court's decision.

17   You'll see in *Planet I* here on page 789 one of the important

18   factors that *Planet I* used in choosing to not abstain was that

19   this was a question of first impression and a matter of

20   particular federal concern that removes this case from the

21   realm of sensitive state issues that federal courts should

22   hesitate to address.

23        That's not the plain view that we have here today.

24   We have the answer in *Planet,* and that is that in applying

25   *Press-Enterprise*, *Planet III* later subsequently held that, "We

Ms. Duke                                                    7

1    conclude that the press has a qualified right of timely access

2    to newly filed civil nonconfidential complaints that attaches

3    when the complaint is filed."

4         Now, we're going to talk a lot about the "however"

5    later, but I thought it was important to highlight that first

6    distinction for you, Your Honor, that we're not dealing with a

7    case of first impression.  We already know what the Ninth

8    Circuit in *Planet III* has said related to access of filed

9    civil complaints.

10        Now, if we turn next to the next significant

11   difference between *Planet I* and this case, *Planet I* California

12   is not what we do here in Idaho.  In the *Planet I* case, the

13   Ventura County clerk failed to raise the very issue that we've

14   raised for you, Your Honor, at the Ninth Circuit level, and

15   that is this whole submitted versus filed issue.

16        And let me show you.  As we've submitted, submitted

17   versus filed in Idaho is very different.  If you look here at

18   the first bubble, submission through public side of File &

19   Serve.  This is the Tyler side; this is not the State of

20   Idaho's case management system.  So this is different than

21   when you were an Idaho state district judge, Your Honor.  The

22   system has changed a bit.

23        So the Tyler side of things is File & Serve, not part

24   of the court record.  The complaint is then received on the

25   private side of File & Serve -- again, maintained and run by

Ms. Duke                                                    8

1   Tyler -- to the ministerial clerk review and private side of

2   File & Serve.  And once that ministerial review is done, then

3   you hop to this blue bubble, which says "official court

4   record."  None of this was addressed before the *Planet III*

5   court.

6          And this is where you need to get into the actual

7   rules that the State of Idaho uses.  Electronic filing in

8   Idaho is not a submitted document.  If you look at Rule 11

9   that the Idaho Supreme Court has promulgated and adopted and

10  has used by our 44 county clerks across the state of Idaho,

11  electronic filing means a document is filed when the document

12  has been electronically submitted.

13         So that's the first part of what CNS is trying to do.

14  CNS is trying to have you say, "Oh, I'm a federal judge.  I'm

15  going to tell Idaho, 'Nope, electronic filing needs to end

16  there.'"  Delete part 2 of this definition that the Idaho

17  Supreme Court has come up with, because that part 2 is exactly

18  the difference between our case and *Planet III*.  And that is

19  the submission has been acknowledged and the document accepted

20  for filing.  None of this was brought to the *Planet III* court

21  because the Ventura County clerk waived that argument and

22  failed to raise it.

23         Second, of course, Rule 11 in Idaho was certainly not

24  addressed, because every state has their own procedure and

25  process.  In Idaho it's the -- it's the courts that define the

Ms. Duke                                                                 9

1   rules related to filings.  It is not the Idaho legislature.

2       So if you turn next, then, this is -- this is where I

3   think things get a little hazy in CNS's briefing and in their

4   complaint.  You'll see that to emphasize to you, Your Honor,

5   they will cite the Ninth Circuit decision in *Planet III*, but

6   then they intertwine a District Court decision that was never

7   ruled upon by the District -- by the Circuit Court.

8       And that's a very important distinction here, because

9   the entire crux of their argument, trying to have you exercise

10  federal power over a state court and its system related to how

11  it handles its filings.  They tried to jump to a conclusion

12  that is not anywhere contained within *Planet III's* Circuit

13  Court decision that e-filed complaints are exactly the same

14  thing.  And therefore, because the District Court ruled that

15  regardless of whether courts use paper filing or e-filing

16  systems, that submission is effectively when this should

17  occur.

18      That's not a Ninth Circuit decision.  That is from

19  the district judge, and the district judge notes there that

20  Ventura County abandoned its objection to this language by not

21  raising it on appeal, and this Court cannot now revisit its

22  already final determination on the issue.  That is by no means

23  the Ninth Circuit saying that this court said a submitted

24  e-filing equals a filing and, therefore, has the

25  constitutional protections that *Planet III* provided.

Ms. Duke                                                    10

1        THE COURT:  Ms. Duke, if I can interrupt for just a

2   minute.

3        MS. DUKE:  Sure, Your Honor.

4        THE COURT:  Tell me how it works if a plaintiff's

5   lawyer on Friday afternoon files a complaint -- well, submits

6   a complaint under your argument, and that's the last day of

7   the statute of limitations, but the case isn't actually filed

8   until Monday when it's reviewed.  Have they lost their statute

9   of limitations argument?

10       MS. DUKE:  No.  I don't believe anything in the rules

11  provides that, Your Honor.

12       THE COURT:  So it is filed when it's submitted?

13       MS. DUKE:  Well, it's been provided to the court, and

14  we have the specific provision that indicates that it's

15  effectively accepted with a three-day window for corrections

16  to be made.

17       THE COURT:  And then that's a Idaho Supreme Court --

18       MS. DUKE:  The correction does not impact --

19       THE COURT:  What rule is that?

20       MS. DUKE:  Well, let me -- I will get it to Your

21  Honor --

22       THE COURT:  Is it 12?

23       MS. DUKE:  -- in one moment.  I think it is 12, but

24  let me -- let me get that to Your Honor.

25       THE COURT:  I guess my real question is, is that so

**ER-2605**

Ms. Duke                                                    11

1   for some purposes, the complaint is deemed filed when it is

2   submitted to the court?  But for other purposes, including

3   today's argument, you're saying it's not filed until it's been

4   reviewed and accepted?

5        MS. DUKE:  Well, and that's why I think the rules

6   have addressed that issue, and that is mistakes happen.  And

7   in the old days of filing with -- you know, where we had a

8   runner run over -- and that's how I started my legal career.

9   I was a runner who would run to the courthouse.  I would take

10  the documents, and they would stamp them.  Or my heart would

11  skip a beat, and the clerk would say, "Sorry, you're missing

12  this," and I would have to sprint back to the office to have

13  it filed.

14       And it is Rule 12 that you're referencing.  And what

15  it -- what it envisions is that we get -- in the electronic

16  world, given that you're able to file these in the middle of

17  the night, on Christmas Day, you know, whenever it is, we

18  don't want a litigant to be prejudiced if there's some

19  ministerial issue with their -- with their filing, and

20  therefore we provide a grace period of three days for a

21  correction to be made so that it can revert back to the

22  original date of submission.

23       And that's the practical impact of -- it's not Keely

24  walking it up to the clerk's office and having my heart skip a

25  beat and realize that we didn't have a signature or a filing

Ms. Duke                                                    12

1   fee and, therefore, at 4:58 having to leave the courthouse,

2   run back, and not make my time.  That's because the Idaho

3   Supreme Court has recognized, "We need to have you litigants

4   have an opportunity on a ministerial issue to correct that so

5   you are not prejudiced."

6          THE COURT:  Okay.

7          MS. DUKE:  So next you look to *Planet*, and you look

8   at the process that was used.  And this is very different.

9   The initial seven-step process was not that different,

10  although, please remember, in *Planet* -- again, California, not

11  Idaho -- this was paper files.  We're dealing with electronic

12  files.  Nothing in *Planet III* dealt with this is the rule for

13  electronic files.

14         Items 8 and 9 are the real kicker for *Planet I*, and

15  that is the supervisor, once -- it was already approved by a

16  clerk.  So in Idaho, once that happens, it's immediately

17  transferred from the Tyler system to Idaho's court management

18  system, and that document immediately becomes available to the

19  judge and to the public at the same time.  The judge does not

20  have first access.  It all becomes available for the first

21  time to the judge and the public at the same time.

22         And as Your Honor may be aware or remember from your

23  days on the state court bench, "press" is not defined in Idaho

24  like it is in California.  There is no credentialed press in

25  Idaho.  Press is the public.  That is the way it's been

Ms. Duke                                                    13

1    handled, and it's never been defined differently.

2         So what's very different between *Planet I* and Idaho

3    is that the supervisor, after it was already approved, would

4    review, and then maybe it was put into a media event.  That's

5    not the case here.  Once it's submitted and goes through its

6    administrative checks, it is then deemed filed, transferred

7    from the Tyler system to the court's file management system,

8    and then at the same time becomes immediately available to the

9    public and to the judge.

10        If you look to -- I'll move forward because I know

11   I'm limited on time.  This is the case, *State v. Salisbury*

12   that indicates that the press or media is defined differently.

13   Unlike Idaho, Idaho does not have -- or unlike California,

14   Idaho does not have a press shield in which the press or the

15   media is defined differently than the general public.

16        Obviously, we can talk about this during the

17   preliminary injunction phase, but, Your Honor, when you look

18   to the rules, you look to Idaho Rule 32, which provides, you

19   know, the court's indication of how they're going to control

20   access to court records -- and it's recognized in the Public

21   Records Act, which the Idaho legislature enacted.  It accepted

22   the court records and said, "You courts, you're in charge of

23   your records."

24        So what did we do?  We promulgated Idaho Rule 32.

25   The Supreme Court then also built in a response to requests.

Ms. Duke

14

1   So within three working days from receipt of a request, the

2   custodian shall disclose the records requested.  Now, notably,

3   we can do far better than that, which is what we do with our

4   filed complaints.  Filed complaints in the state of Idaho are

5   immediately available to the public by CNS and anyone who

6   wants to look and at the same time to the judge.  So -- but it

7   needs to happen within those three working days.

8           The custodians of the records are the clerks.  That's

9   well lined out.  And the official court record for a case file

10  maintained in accordance with these rules is the electronic

11  case file maintained by the court as well as any paper

12  filings.  So again, these are the accepted filings, not that,

13  hey, I'm a runner standing at the clerk, handing you my

14  document.  It's once it has had that ministerial review done.

15          Now, notably, when we talk about abstention, Your

16  Honor, something that is very different as well is the impact.

17  The *Planet I* case concluded that this is not a big policy

18  changing, policy sweeping decision if we, as the Ninth

19  Circuit, determine that we're going to evaluate whether or not

20  the Ventura County Superior Court was violating the First

21  Amendment.  It's noted there's little risk that the federal

22  courts would need to examine the administration of the

23  substantial number of individual cases to provide the

24  requested relief.

25          Very different than this case, where we have the

Ms. Duke                                          15

1    entire Supreme Court process, where the Idaho legislature has

2    indicated, "You courts decide what you're going to do with

3    your records," and the very rules promulgated by the Idaho

4    Supreme Court to do so.  It's not this ministerial interest

5    where this is not a challenging thing for Ventura County

6    Superior Court to address and deal with.

7            And, Your Honor, I do want to reserve a couple

8    minutes for being able to rebut the plaintiffs.  But the

9    biggest issue here, Your Honor, is, you know, you're going to

10   hear a lot from Mr. Fetterly of *Planet I*, *Planet I*, they

11   abstained.  Well, you have a Ninth Circuit precedent that says

12   when you have a very factually distinguishable case, the right

13   to abstention is something that this Court -- or the doctrine

14   of abstention is something that this Court could look to

15   exercise.  And we're asking that this Court do so based upon

16   the fact that the issue is not ripe as to what really is going

17   to be protected when it comes to a filing by a court related

18   to a complaint.  That's been answered.  That wasn't answered

19   in *Planet I*.

20           So, Your Honor, unless you have some questions on

21   that point, I would like to reserve a couple minutes.

22           THE COURT:  I do not have any questions, and you're

23   welcome to reserve some time.

24           MS. DUKE:  Thank you, Your Honor.

25           THE COURT:  Thank you.

Mr. Fetterly                                    16

1          Mr. Fetterly.

2          MR. FETTERLY:  Thank you, Your Honor, and good

3    morning.

4          THE COURT:  Good morning.

5          MR. FETTERLY:  So we've heard a lot there about

6    abstention.  However, counsel's argument really, in my view,

7    goes quite far beyond abstention and really starts to go into

8    what should be the second part of the *Press-Enterprise II*

9    test, which is the defendant's burden to justify her policy

10   and practice.  So we'll get to that in a minute, but I'll

11   tackle the abstention piece first.  And then I will follow

12   that by talking a little bit about what Courthouse News's

13   claim actually is and how it should actually be analyzed by

14   this Court under the *Press-Enterprise II* test, which is a

15   factual inquiry which really isn't -- I believe it does not

16   implicate abstention.

17         But counsel's correct.  You are going to hear me talk

18   about the Ninth Circuit and *Planet*, because the Ninth Circuit

19   has spoken.  It has addressed this issue.  The -- it rejected

20   an abstention challenge in the *Planet* case in *Planet I*.  And

21   then in *Planet III* the Ninth Circuit, in footnote 4, expressly

22   disagreed with the decision in *Courthouse News Service v.*

23   *Brown*, which counsel cites in her papers.  She doesn't mention

24   it here.

25         But it really goes to this idea that there's some

**ER-2611**

Mr. Fetterly                                    17

1    principled basis in, you know, comity that would allow this

2    Court to abstain from exercising its jurisdiction over a First

3    Amendment claim.  And the Ninth Circuit did agree with that,

4    citing back to its original opinion.  So the Ninth Circuit has

5    addressed this issue and all of these grounds on which counsel

6    attempts to distinguish *Planet*.  Again, we'll talk about them

7    in connection with the *Press-Enterprise II* test and

8    specifically defendant's burden under the second part of that

9    test.

10          But none of those are real material distinctions

11   here, because this case involves the same claim that was

12   asserted in the *Planet* case, and Courthouse News here is

13   seeking the same relief that was sought in the *Planet* case and

14   which was affirmed by the Ninth Circuit in *Planet III*.  So we

15   have got a pretty clear statement from the Ninth Circuit on

16   abstention.

17          Now, if we were to just take a bigger step back and

18   say what would the Supreme Court say about this, because we

19   already have counsel talking about *Quackenbush* and other

20   cases.  She cites a number of older cases that predate the

21   more recent and controlling Supreme Court authority that has

22   made it very clear that abstention should only be used in the

23   most exceptional circumstances.  And these most recent Supreme

24   Court cases have significantly limited the scope and reach of

25   abstention, and specifically the *New Orleans Public Service*

Mr. Fetterly                                                        18

1    *Inc.*, and the *Sprint Communications* cases.  Both of those are

2    cited in our opposition to the motion to dismiss, and both of

3    those cases significantly restrict the reach of *Younger*

4    abstention and its progeny, which is really what counsel is

5    asking for, the application of *Younger* and its progeny under

6    *O'Shea*.

7            So if we read *Sprint Communications* and the three

8    very narrow and limited categories in which the Court can

9    potentially abstain, they simply don't apply here.  And the

10   Court doesn't need to take my word for it.  There are --

11   there's a growing list of Federal District Court cases that

12   have considered this exact issue.  It's the same claim brought

13   by Courthouse News, the same relief sought by Courthouse News.

14   And some of these cases even involve the same Tyler File &

15   Serve system used by the Idaho courts, and these courts have

16   considered and rejected the same argument counsel makes about

17   the distinction between submission and acceptance.  You know,

18   the law is pretty clear, and there's a growing line of

19   authority that has considered *Planet* and this new e-filing

20   environment and agreed with it when rejecting abstention

21   challenges.

22           So to quickly walk through the line of cases so that

23   the Court has them -- and admittedly at least one of them is

24   not in our papers, because some of this is very fresh -- we

25   first have the Fourth Circuit agreeing with Courthouse News.

Mr. Fetterly                                                  19

1    Admittedly, the Fourth Circuit in the *Schaefer* case was also a

2    paper case, so, you know, it doesn't reach the e-filing issue.

3    But again, same claim, same relief sought.

4            *Courthouse News v. Tingling*, this is the Southern

5    District of New York, and we attached a transcript as

6    Exhibit 17 to the Girdner declaration in support of the

7    preliminary injunction motion.  And there Judge Ramos rejected

8    an abstention challenge in a case that involved e-filing.

9    That was the e-filing system in New York.  So some of the same

10   arguments you've heard, the grounds upon which the defendant

11   is trying to distinguish *Planet,* didn't hold up when Judge

12   Ramos in *Tingling* rejected the abstention challenge.

13           Most recently now we have three cases in District

14   Courts that are perhaps the most persuasive because they

15   involve the same Tyler File & Serve system.  So the attempts

16   to distinguish *Planet* simply fall away if we look to these

17   other District Court cases that have rejected abstention.

18           We have the *Courthouse News Service v. Gabel* case in

19   Vermont, and we attached that ruling in our supplemental

20   authority.  That's Docket 12 [sic] in this court, and it's

21   also a Westlaw cite, which is 2021 WL 5416650.  Judge Reiss

22   considered the abstention argument, many of the same things

23   Your Honor just heard, and she rejected abstention and looked

24   at the merits of the case when applying the *Press-Enterprise*

25   *II* test.

Mr. Fetterly                                    20

1    In New Mexico, same result.  We have Judge

2  Browning -- and we also cite this in our reply brief in

3  support of the motion for preliminary injunction.  And again,

4  these were issued after the briefing closed on the motion to

5  dismiss.  But the Westlaw cite there is 2021 WL 4710644.

6  Judge Browning also considered the abstention issue freshly

7  unconstrained by the Ninth Circuit, but he agreed with it, and

8  he rejected abstention in a case that involved the same Tyler

9  system and all of the grounds upon which counsel just tried to

10  distinguish *Planet*.

11    And then we also have *CNS v. Price*.  This case does

12  not appear in our papers, admittedly.  It's another pretty new

13  case.  At the end of November, November 29, Magistrate Judge

14  Hightower in the Western District of Texas, she issued a

15  report and recommendation rejecting an abstention challenge on

16  the same grounds, considering all of the relevant federal

17  authorities.  And Judge Yeakel in the Western District of

18  Texas, he agreed.  And the Magistrate Judge in -- his report

19  and recommendation is 2021 WL 5567748.

20    So when you look at the body of law, we have a pretty

21  clear trend against abstention.  And these are cases that are

22  not in the Ninth Circuit.  So here, Your Honor, in the Ninth

23  Circuit I think the case should be even clearer and stronger.

24  But where we do have two cases that admittedly have abstained,

25  they're clearly not going to be persuasive in the Ninth

Mr. Fetterly                          21

1    Circuit.  The one Seventh Circuit opinion, *Courthouse News*

2    *Service v. Brown,* I've discussed that.  The Ninth Circuit

3    disagreed with it.

4           The only other case that has abstained was the *Gilmer*

5    case in the Eastern District of Missouri, and in that case

6    Judge Autrey framed the issue as a choice between the Seventh

7    Circuit decision in *Brown* and the Ninth Circuit decision in

8    *Planet*.  And he chose to follow the Seventh Circuit.  Well, we

9    believe this Court should, naturally, follow the Ninth.

10          So again, the body of abstention law I think is quite

11   clear and really brings us back to this point that counsel

12   keeps making about, well, somehow *Planet* is distinguishable.

13   And quite frankly, I refer the Court to the other District

14   Court cases that have considered this issue in the e-filing

15   context with Tyler e-filing services and have found that

16   abstention was inappropriate and have agreed with the Ninth

17   Circuit on that point.

18          Now, I do want to address some of the grounds on

19   which counsel tries to distinguish *Planet* here, because,

20   again, I don't think those necessarily support an abstention

21   argument.  But in her papers at least she frames them as

22   grounds upon which Courthouse News is -- has failed to state a

23   claim.  That's the argument in the papers.  And she begins the

24   factual distinction discussion by talking about a single line

25   in the *Planet III* opinion where the Ninth Circuit says, you

Mr. Fetterly                                                    22

1    know, the First Amendment does not demand immediate

2    preprocessing access to newly filed civil clients -- or excuse

3    me -- new civil complaints.  E-filing admittedly was not in

4    *Planet*.

5            But the defendant's focus on that statement, however,

6    completely misses the mark for a claim of abstention or

7    whichever other purpose she's trying to advance that line,

8    because that is not the claim here, and that is not the test

9    that this Court must apply to that claim.  So what, then, is

10   the claim, and what is the test?  I'm going to spend the rest

11   of my time talking about this, because it really lays the

12   foundation for both motions and how this Court needs to apply

13   the *Press-Enterprise II* test.

14           So the claim here is a 42 U.S.C. Section 1983 claim

15   based on delays in access to new e-filings of complaints filed

16   with the Idaho State District Courts.  And we allege that the

17   delays at issue are the result of the Idaho courts' practice

18   of withholding access to new civil complaints until after

19   court staff review them.  We just heard counsel talk about

20   that.  I don't think that's really in dispute here.  There's

21   admittedly a delay, a lapse of time between when the court

22   receives the complaint and when court staff get around to

23   viewing it, conducting the ministerial review, and then

24   accepting it.  And that delay, that lapse of time, that's the

25   delay at issue.

Mr. Fetterly                                    23

1          And the Ninth Circuit in *Planet III* has given us the

2     test that we must apply to those delays to determine whether

3     they are in fact constitutional under the First Amendment or

4     whether the policy and practice that's causing those delays

5     can withstand constitutional scrutiny.

6          And the test that the Ninth Circuit announced in

7     *Planet III* comes from the U.S. Supreme Court case

8     *Press-Enterprise Company v. Superior Court*, or

9     *Press-Enterprise II.* Or if I say *Press-Enterprise,* I'm

10    referring to *Press-Enterprise II.* The first part of that test

11    is for the Court to determine whether experience and logic

12    create an entitlement under the First Amendment to a

13    particular document or process. The Ninth Circuit has

14    addressed that issue. That's -- that's *Planet III*. The Ninth

15    Circuit made it very clear. There is a First Amendment right

16    of access to new civil complaints that attaches when they are

17    received by the court.

18          Now, counsel argues that the right of access does not

19    attach until after Idaho courts accept and process the

20    complaint, which is the way that the Idaho courts deem them,

21    quote, filed for administrative recordkeeping purposes.

22    However, this argument ignores the plain language in

23    *Planet III*, which uses the terms "filed" and "received"

24    interchangeably. *Planet III* agrees with the District Court

25    that the right of access attaches upon receipt, and the Ninth

Mr. Fetterly                                                    24

1    Circuit affirmed that ruling.  And it also ignores the

2    plain -- the definition of "filed" in the judicial context,

3    which means submitted to or received by the court.

4           Now, the parties have thoroughly briefed this issue,

5    and I don't want to repeat all of what is in our papers.  I

6    trust the Court has enough paper in front of it.  But I will,

7    however, point out that Magistrate Judge You's recent report

8    and recommendation in the Courthouse News v. Cozine case,

9    which is currently pending in the District of Oregon,

10   addresses this issue directly.  And we submitted that earlier

11   this week as a notice of supplemental authority.  I believe

12   that's Docket Number 32.  And this is very fresh.  Magistrate

13   Judge You just issued this report and recommendation on Monday

14   of this week.

15          So in the Cozine case, we have a statewide court

16   administrator, just like Defendant Omundson.  The Oregon

17   courts use File & Serve, just like Idaho.  That's the Tyler

18   product.  Counsel referenced Idaho Rule 11.  Well, Oregon has

19   Trial Court Rule 20.060.  That's basically the same thing.

20   And Magistrate Judge You walked through this entire argument

21   about when the right attaches.  Does it attach upon receipt?

22   Does it attach upon acceptance?

23          And after thoroughly analyzing the *Planet* cases and

24   after thoroughly considering all of the arguments counsel just

25   made, she rejected the argument that the right of access

Mr. Fetterly                                            25

1   attaches upon acceptance, which would be after the delays at

2   issue have already occurred.  So I would just point the Court

3   to that report and recommendation.  It's currently going to

4   Judge Simon in the District of Oregon.  But just as this Court

5   is free to make its own decision, I think Magistrate Judge

6   You's report and recommendation lays out a pretty clear and

7   convincing roadmap and path for this Court we would ask that

8   you follow.

9        So with the Ninth Circuit then, having already

10  applied the first part of the *Press-Enterprise II* test and

11  having already established that there's a qualified First

12  Amendment right of access to civil complaints that attaches

13  when they are received by the court, we then turn to the

14  second part of the *Press-Enterprise II* test.  And that's, I

15  think, really where most of what counsel has argued should be

16  addressed, because what counsel is saying is we have all of

17  these processes in Oregon and they're different.  Well, what

18  she's saying is these are all the processes that we need, and,

19  well, under constitutional scrutiny they have to be examined

20  under the second part of the test.

21       And it is a factual inquiry that asks whether the

22  defendant has met its burden of justifying the delays in

23  access under constitutional scrutiny.  And that burden is

24  twofold.  As the *Planet III* opinion explains, the defendant

25  must first demonstrate that a compelling governmental interest

Mr. Fetterly                                                    26

1    would be impaired by providing more immediate access; and

2    second, that no readily available alternatives exist to

3    adequately address that governmental interest.  And that's

4    what the Ninth Circuit calls rigorous scrutiny.  So again, it

5    is defendant's burden of justifying the delays in access

6    alleged in the complaint under rigorous scrutiny.

7            So again, we're under a Rule 12 motion for this part

8    of our morning, and the question then is, has Courthouse News

9    stated a claim?  And the short answer is yes.  We've alleged

10   delays in access.  We've alleged defendant cannot met her

11   burden of justifying the delays in access under rigorous

12   scrutiny.  We also allege that defendant is -- in her capacity

13   as a state court administrator is responsible for the

14   statewide e-filing system in Idaho and public access to

15   records through those systems and thus responsible for the

16   delays at issue.  That's paragraphs 12 and 13 of the

17   complaint.

18           So the Court must accept these allegations as true at

19   this stage.  And if, as alleged, defendant cannot satisfy her

20   burden of justifying the access delays at issue under the

21   second part of the *Press-Enterprise II* test, or rigorous

22   scrutiny, then the policy or practice causing those delays

23   violates the constitution.  And that is Courthouse News's

24   claim, and that is the test this Court must apply to evaluate

25   it.

Mr. Fetterly                                           27

1        And the complaint here, again, it seeks the same --

2    it asserts the same claim asserted in *Planet*.  It seeks the

3    same relief that was affirmed in *Planet*, and that is a

4    declaration that defendant's practice of withholding access

5    until after clerical processing violates the First Amendment

6    and a permanent injunction prohibiting that -- prohibiting

7    that practice.

8        So that right there should be the end of the analysis

9    on the state of claim.  And again, on the abstention issue,

10   everything the Court has heard about the reasons why *Planet* is

11   supposedly different, I just refer back to the many District

12   Court cases that have found those arguments unpersuasive and

13   rejected them.

14       I'll conclude my comments here, Your Honor, with one

15   final point.  And I think it's significant, because we've

16   already heard counsel begin part of her argument with this

17   idea that Courthouse News is demanding immediate access or

18   that, you know, the First Amendment does not demand immediate

19   preprocessing access.  And as I just discussed, that is not

20   the claim, and that is not the test, and quite simply, it

21   doesn't support a motion to dismiss.

22       I want to address it because I think we're going to

23   hear more of that today, because we see that throughout the

24   papers.  And that sentence from the Ninth Circuit in *Planet* is

25   significant to the extent it simply underscores the qualified

Mr. Fetterly                                            28

1    nature of the right of access.  The First Amendment right of

2    access to new civil complaints is qualified because defendant

3    has the opportunity to try to justify the delays and access

4    under rigorous scrutiny.

5            However, rather than address that burden under the

6    second part of the test, which we did not hear about during

7    counsel's presentation.  And to be candid, she can't address

8    it at this stage because it's a fact-intensive inquiry that's

9    beyond the scope of a pleading motion.  So instead of

10   addressing that test, defendant instead intends to avoid

11   constitutional scrutiny altogether by reframing and

12   mischaracterizing Courthouse News's claim as one demanding

13   immediate access.  But again, that's not the test, and that's

14   not the claim.

15           So, you know, I'd point the Court to the *Planet II*

16   decision, because it's pretty instructive on this point.

17   Defendant's attempt to recast Courthouse News's claim as one

18   demanding immediate access so she can avoid rigorous scrutiny,

19   it's reminiscent of the motion to dismiss that the defendant

20   in *Planet* filed that led to the *Planet II* decision.  In that

21   case the defendant moved to dismiss Courthouse News's

22   complaint on the ground that the First Amendment does not

23   demand same-day access to civil complaints.  It didn't say

24   immediate; it says same day.  That was their shorthand in the

25   *Planet* case.

Mr. Fetterly                                                    29

1          And the District Court took the bait, and it granted

2     the motion to dismiss.  Well, Courthouse News appealed.  In

3     *Planet II* -- and in *Planet II* the Ninth Circuit reversed that

4     dismissal, finding that the District Court erred by narrowing

5     the legal question to one divorced from the proper legal

6     framework.  That's the *Press-Enterprise II* that we discussed,

7     and we'll discuss more later today.

8          So whenever we hear defendant say Courthouse News is

9     seeking immediate access or that Courthouse News has not

10    stated a claim because the First Amendment does not demand

11    immediate access, that should be a cue that Defendant

12    Omundson, just like the *Planet* defendant, is attempting to

13    sidestep rigorous scrutiny by incorrectly reframing and

14    narrowing the legal question to one that is divorced from the

15    applicable *Press-Enterprise II* test.

16         So for the purposes of this motion to dismiss, Your

17    Honor, I think if we simply follow the *Press-Enterprise II*

18    test as set forth in *Planet III* and if we follow *Planet* and

19    the growing list of other federal court cases that have

20    rejected abstention, it's pretty clear that Courthouse News

21    has in fact stated a claim for relief, because we've alleged

22    delays in access to new civil complaints, and we have alleged

23    that defendant cannot meet her burden under the applicable

24    *Press-Enterprise II* test.

25         So I'll stop there.  And if Your Honor has any

Ms. Duke                                              30

1    questions, I'll be happy to answer them.

2              THE COURT:  I do not have any questions.  Thank you.

3              Ms. Duke, you have about five minutes for rebuttal.

4              MS. DUKE:  Thank you, Your Honor.  So first and

5    foremost, let's deal with the first allegation.  This is a

6    very different proceeding than California.  Mr. Fetterly would

7    like to have this be California, not Idaho.  And fortunately,

8    that's not the case here for many reasons.  But under the

9    Idaho constitution, oversight of the judicial branch falls to

10   the Idaho Supreme Court.  It's Article V of our constitution.

11   That power includes the inherent power to manage judicial

12   records, which the Idaho Supreme Court has done, and the

13   legislature has authorized it to do or directed it to do under

14   Idaho Code Section 74-104, with the Idaho Supreme Court doing

15   so in its rules that we've gone through with you.

16             In this case the rules that have actually been

17   challenged by CNS's request for immediate access or press

18   review are the Idaho Supreme Court rules.  These are not, like

19   they were in California, some clerk policy, some local

20   procedure.  These are rules that the Idaho Supreme Court in

21   its constitutionally granted power enacted.  As we noted in

22   our opening filing on the motion to dismiss, Ms. Omundson does

23   not have the independent power to or the authority to enact or

24   modify those rules.  It is the Idaho Supreme Court that must.

25   That's point one.

Ms. Duke                                                    31

1          Point two, Your Honor, if you actually look at the

2     complaint, I truly do not understand how CNS can argue that

3     they're not looking for immediate access.  They don't use that

4     word, but if you look at paragraph 2 of their complaint, if

5     you look at paragraph 3 of their complaint, if you look at

6     paragraph 32 of their complaint, they are telling you, Your

7     Honor, that to do your job, to federally tell the State of

8     Idaho's court system how to handle its documents.  They're

9     saying you go get a press review queue.  And we'll talk about

10    that in the preliminary injunction.

11          What that means and what that all means in

12    paragraph 3 -- and they say it right there -- is that if you

13    install it, CNS is going to get the complaints at the very

14    same time the court does.  So there's two issues with that.

15    One, whether they say instantaneous or not, that's exactly

16    what that means, is that the press review queue would provide

17    CNS with instantaneous access.

18          You then look to paragraph 32, and this is where they

19    get cute and they try to rely on a district judge whose

20    opinion was not challenged by the Ventura County court clerk,

21    which is, what does it really mean to be filed?  What does it

22    mean to be processed or not?  And what they're trying to do is

23    have the courts across the country -- and it is stunning when

24    you read these decisions, Your Honor.  And I look at them, and

25    I highly encourage you to read through *Planet III* again,

Ms. Duke                                                    32

1    because when you read through *Planet III*, it talks about

2    receipt twice.  And that's just in the context of talking

3    about the filings.  Look at every single time that it talks

4    about filed, when it talks about judicial proceedings, all of

5    those things.  In the state of California, it's not defined

6    like it is in the state of Idaho.  The Idaho Supreme Court has

7    exercised its authority to say something is deemed filed when

8    it has been approved for filing.

9           Now, the other point that I'll make, Your Honor, with

10   respect to our motion to dismiss for failure to state a claim

11   is when you listen to the arguments by CNS -- I'll just go

12   here -- they essentially -- you have to ignore number two.

13   You ignore the second point.  The Ninth Circuit has said that

14   you're -- the public's interest is going to be weighed with

15   the state's administrative interest in the fair and orderly

16   processing of the filing.

17          In the complaint I just showed you and in the very

18   arguments that Mr. Fetterly's going to make on the preliminary

19   injunction, take that and put a big red X through it, because

20   they are demanding that you enjoin Idaho from not providing

21   immediate access to submitted complaints before a clerk can

22   ever touch them.  That's exactly what they're doing.

23          And if we look at Judge Smith in his concurrence,

24   obviously a much beloved jurist from our state who hits the

25   nail on the head in his concurrence.  Timeliness and news

Ms. Duke                                                    33

1   worthiness are not the focus of the First Amendment analysis.

2   Rather, the First Amendment analysis focuses on the

3   significant government interest and whether the restriction is

4   narrowly tailored to meet that interest.  Absent either an

5   unreasonable burden on the right of access or the access

6   restrictions that also operate as limitations on publishing

7   information previously obtained, ample alternatives for

8   communication are left open.

9          Under CNS's claim, which is not supported by

10  *Planet III*, you would not do the weighing of the balances.

11  *Planet III* -- and again, I highly encourage the Court and your

12  staff to read back through *Planet III* after this argument to

13  really see what it says about the importance that a document

14  be filed and then being provided to the public and press.  And

15  in the state of Idaho, that instantaneously happens -- even

16  though it's not required to instantaneously happen, that

17  instantaneously happens once that clerk exercises number two

18  here, that CNS wants to ignore.  Once that clerk does a fair

19  and orderly processing of the filing, it is instantaneous

20  access.

21         That is why we're asking this Court to abstain,

22  because the Ninth Circuit itself has said when you can

23  significantly factually distinguish a case from its precedent,

24  then you do not need to follow that precedent.  And by no

25  means did *Planet I* address this very issue.

Ms. Duke                                                    34

1          So, Your Honor, we request that the motion be

2    dismissed on two grounds:  First, that the Court abstain; and

3    second, that CNS has failed to state a claim.  *Planet III* does

4    not get CNS to the words of its complaint that it, itself,

5    chose to author and how they included them in the state of

6    Idaho complaint, where they are effectively demanding if the

7    clerk gets it, so does the public.  And that would ignore the

8    very bounds and tests that *Planet III* itself indicated in the

9    Ninth Circuit needs to be followed.  It ignores the fair and

10   orderly processing of filing.

11          THE COURT:  Ms. Duke, I do have one question for you,

12   and it's kind of a step back, overall question.

13          MS. DUKE:  Sure.

14          THE COURT:  If the -- if these are Idaho Supreme

15   Court rules and not some clerk's policy, as you said, and if

16   the Idaho constitution authorizes the Supreme Court to make

17   these rules, then who oversees the constitutionality of the

18   rules?  We can't let the Idaho Supreme Court review their own

19   rules, can we, for constitutionality?

20          MS. DUKE:  Why not?  I mean, that's -- that's the

21   purview of what they're able to do.

22          THE COURT:  Well, I'm having a hard time with that.

23   But I can guarantee you that my staff and I will read all of

24   the *Planet* cases again, and we'll set out the decision when we

25   get to it.

Mr. Fetterly                                    35

1          Let's turn to the preliminary injunction, and,

2    Mr. Fetterly, that's your motion.  You can go first on it.

3          MR. FETTERLY:  Thank you, Your Honor.  I'll -- for my

4    presentation I will focus on the tests that this Court must

5    apply when ruling on the motion, starting briefly with the

6    test for evaluating preliminary injunctions followed by, once

7    again, the test this Court must apply to Courthouse News's

8    claim, and that is the *Press-Enterprise II* test.  And I'll

9    conclude by discussing how we apply the second part of that

10   *Press-Enterprise II* test, which is the fact-intensive inquiry

11   that looks at whether the defendant has met her burden under

12   rigorous scrutiny.  We just heard counsel say in connection

13   with the other motion that the Court should disregard that,

14   but that is the test.  It's the Ninth Circuit test in which

15   the Ninth Circuit is applying the Supreme Court's test in

16   *Press-Enterprise*.

17         So let me first start with the preliminary injunction

18   test, and only very briefly.  You know, the factors this Court

19   must consider when evaluating preliminary injunctions are set

20   forth in the Supreme Court case *Winter v. Natural Resources*

21   *Defense Council*.  Now, because this is a First Amendment case,

22   I will focus my argument on the likelihood of success element,

23   because, you know, the loss of a First Amendment freedom even

24   for minimal periods of time constitutes irreparable harm as a

25   matter of law.  And the balance of equities weighs in favor of

Mr. Fetterly                                                    36

1    protecting First Amendment rights.  That's pretty black-letter

2    law we've cited in our papers.

3         So focusing on the likelihood of success element, we

4    have to determine whether Courthouse News has established a

5    likelihood of success on the merits of its claim.  And to do

6    so we look again to the *Press-Enterprise II* test as applied by

7    the Ninth Circuit in *Planet III*.  And once again, this is a

8    two-part test.  The first part considers whether there's a

9    First Amendment right of access to documents or proceedings

10   and, relatedly, when it attaches.  And the second part is the

11   fact-intensive inquiry that asks whether the defendant has

12   carried her burden of justifying the access delays under

13   rigorous scrutiny.

14        So as to the first part, I'll be pretty brief because

15   we just discussed it in connection with the other motion.  I

16   will note that the District Court ruling in *Planet*, where the

17   amended judgment speaks to e-filing, well, yes, that was not

18   part of the judgment that was affirmed by the Ninth Circuit,

19   and I concede that e-filing was not before the Ninth Circuit.

20        But it does not change the fact that the right of

21   access attaches upon receipt, and the Ninth Circuit precedent

22   in *Planet III* makes that quite clear.  The underlying District

23   Court order that was affirmed by *Planet III* makes that quite

24   clear, and the growing list of federal court cases that I've

25   cited and already discussed here this morning also make that

Mr. Fetterly                                    37

1    quite clear.  And I think the Court need not look further than

2    Magistrate Judge You's findings and recommendations in the

3    Cozine case that issued just earlier this week, in which she

4    thoroughly analyzed and rejected the same arguments counsel

5    just made in a case that also involves a statewide

6    administrator and also involves the same Tyler File & Serve

7    system.

8            So again, with the first part of this

9    *Press-Enterprise II* test already established by *Planet III* and

10   the growing list of federal authorities that have applied it,

11   we turn to the second part of the test to analyze the delays

12   and to determine whether Courthouse News has shown a

13   likelihood of success on the merits.

14           Now, before we turn to that second part of the test

15   and apply it, I want to briefly discuss the actual delays

16   themselves, because they form the basis of the claim.  And as

17   we discussed earlier in connection with the motion to dismiss,

18   the delays are the lapse of time between when the Idaho courts

19   receive newly filed complaints and when they make them

20   available to the press and public.

21           And defendant acknowledges in her papers that newly

22   filed complaints, once received by the court, they sit in an

23   electronic queue, where they wait until court staff are able

24   to conduct what the defendant calls ministerial review, which

25   is checking for clerical and other administrative things.

Mr. Fetterly                                                            38

1    It's basically a form of quality control, as we hear counsel

2    talk about it, because they're checking for clerical and

3    administrative errors.

4           So the defendant does not actually see that

5    Courthouse News is experiencing these delays in access as a

6    result of the Idaho courts' practice of withholding access

7    until after clerical review.  The delays between submission by

8    the filer and review by the court, those are at issue, and

9    defendant acknowledges they exist.  So, you know, defendant is

10   asking -- instead of saying there are no delays, she's simply

11   asking the Court to review them differently in terms of

12   business hours so they just look less severe than how

13   Courthouse News experiences them in kind of real life and

14   realtime based upon the actual passage of time.

15          And this distinction -- I'll be very brief here --

16   it's immaterial because defendant's business hour formulation

17   actually confirms the delays experienced by Courthouse News.

18   Defendant claims that on average, it takes four or five

19   business hours for court staff to get to the complaints in the

20   queue and conduct their ministerial review.  Well, an average

21   delay of four or five business hours means that new complaints

22   received on or after noon on any given day would be delayed

23   until the next court day.  And of course, we're speaking in

24   averages here.  Courthouse News's moving papers cite to

25   provide specific examples of newsworthy civil complaints that

Mr. Fetterly                                                    39

1    were delayed for much longer.

2            So those are the delays at issue.  That's the basis

3    of the claim.  And we now need to apply the second part of the

4    *Press-Enterprise II* test in order to see whether or not

5    Courthouse News is entitled to relief based on the likelihood

6    of success on the merits.

7            And again, the second part of the test is defendant's

8    burden.  Defendant carries the burden of justifying these

9    delays under rigorous scrutiny, and to do so she must

10   establish that there's a substantial probability that a

11   compelling governmental interest would be impaired by

12   immediate access.  And counsel asserts the fair and orderly

13   administration of justice as that interest, and we'll talk

14   about that.  And that's the same interest that the *Planet*

15   defendants asserted.  And then, second, that no reasonable

16   alternatives exist to adequately protect that governmental

17   interest.

18           So again, I don't want to belabor the point any more

19   than I have already done so, but this is the same test that

20   the growing list of Federal District Courts have already

21   applied.  We have the Vermont case in *Gabel*.  We have *Tingling*

22   in New York.  These cases have applied the same test.  And

23   specifically, I keep coming back to the *Gabel* case in Vermont,

24   because in that case Judge Reiss applied the second part of

25   the *Press-Enterprise II* test that this Court must now apply,

Mr. Fetterly                                                    40

1    and she did so and concluded that the reasons for withholding

2    access to new e-files or complaints until after clerical

3    review did not survive constitutional scrutiny.  And that's

4    the same e-filing system as the Idaho courts on a statewide

5    level.  So there's nothing terribly controversial or unique

6    about that.  We have to apply the test, and that's all we're

7    asking this Court to do.

8           So I want to spend the balance of my opening remarks

9    here just kind of walking through a few examples of how we

10   apply that test, because I think it's really important to

11   understand how we do so.

12          Again, at page 19 of her opposition brief, defendant

13   identifies the overriding governmental interest at stake as

14   the general interest in the fair and orderly administration of

15   justice.  So we're going to have to, you know, unpack that box

16   a little bit and actually scratch the surface of what that

17   means and what that looks like.

18          And I'll do that in a minute, but before I do, I just

19   want to point out all courts, state and federal, share that

20   interest, including the many courts that provide access to new

21   e-filed complaints upon receipt and without delaying access

22   until after clerical review of the process.  And the press and

23   the courts have worked side by side for as long as we've had

24   courts that have free press.  And in this new electronic age,

25   they have found ways to do so, and there are many of them.

Mr. Fetterly                                    41

1    There are many alternatives.  We heard counsel talk about

2    press review queue.  Well, yes.  For instance, some courts in

3    California, Arizona, and Georgia, they provide access to new

4    e-filed complaints without delaying access for clerical review

5    by making them available through Press Review Queues.

6          Now, we addressed this in more detail in our papers,

7    but all this is is a way to let the press or the public review

8    the complaint while it's sitting in the queue after the court

9    has received it so we don't have the delay of time from when

10   it's received to when it's accepted.

11         And many of the courts that provide access in this

12   manner, they do so using the same File & Serve system used by

13   the Idaho courts, but that's not the only way.  There's the

14   auto accept option as well.  And just to be clear, auto

15   accept, what I'm referring to there is the system that the

16   federal courts use, this court and many state courts, whereby

17   cases -- new e-filings, new civil complaints, upon receipt

18   they're automatically assigned a case number, and they're

19   automatically made available on the court's public docket.

20   State courts in Nevada, Hawaii, Utah, and how Vermont provide

21   on-receipt access in this manner.  Again, this court provides

22   access to new e-filed complaints in that manner, as do the

23   vast majority of federal courts using the PACER system.  So,

24   you know, the list of courts that provide timely, on-receipt

25   access to new e-files goes on and on.  We identify them in the

Mr. Fetterly                                              42

1   papers.  I don't want to illustrate every single one right

2   now.

3          The point is that all of these courts share

4   defendant's interest in the fair and orderly administration of

5   justice.  So that vague assertion cannot by itself constitute

6   a compelling governmental interest that warrants withholding

7   access to newly filed complaints until after clerical review

8   for processing.  Additionally, the ability of these other

9   courts to provide that access further demonstrates the

10  availability of less restrictive alternatives to the Idaho

11  courts' current practice.  So again, we're just following the

12  test.  That's the two-part test.

13         So as we apply the second part of the

14  *Press-Enterprise II* test in this case, we cannot blindly

15  accept defendant's assertion that the practice of withholding

16  access to new e-filed complaints under ministerial review and

17  until after acceptance is necessary to protect the fair and

18  orderly administration of justice.  We know from experience in

19  these other courts that is not necessary.  So the rigorous

20  scrutiny that this Court must apply to the reasons by

21  defendant for Idaho's current practice require that we scratch

22  the surface and closely scrutinize those reasons.  As the

23  Ninth Circuit said in *Klein v. San Clemente*, this Court cannot

24  rubber stamp an access restriction simply because the

25  government claims it is necessary.

Mr. Fetterly                                    43

1          So I'll spend the remaining part of my time --

2      (Reporter interruption.)

3          THE COURT:  I know you're worried about the time, but

4      don't.  We're doing okay.

5          MR. FETTERLY:  Thank you both.  I appreciate the

6      reminder, and I will slow it down.  I'll spend the balance of

7      my time simply illustrating a few examples of how we apply

8      that rigorous scrutiny test to the issues that the defendant

9      has raised in her papers.  So let's take a look at what that

10     actually looks like here.  And I'm not going to address

11     everything in the papers.  It's in them.  These are a few

12     examples.

13          So as the first example, defendant claims that

14     providing pre-review access to new e-filed complaints could

15     result in the disclosure of sensitive and confidential

16     information.  But she does not establish that the current

17     practice of delaying access for ministerial review actually

18     protects against the hypothetical risk.

19          Under the Idaho Rules of Civil Procedure 2.6(a) and

20     under the Idaho Rules of E-Filing and Service 15(a), (b), and

21     (f), sensitive information must be redacted by the filers, not

22     the clerks.  15(a) explicitly states clerks will not review

23     e-filing for sensitive information.  Under the rules,

24     documents accompanied by a motion to seal must be filed in

25     paper, IRS 5(h).  It's also posted on the frequently asked

Mr. Fetterly                                                    44

1    questions portion of the iCourt website.

2            So there's simply no nexus between defendant's

3    current practice and the hypothetical harm she claims could

4    result if the Idaho courts applied one of the available less

5    restrictive alternatives.  And of course, courts handle

6    confidential filings, documents, and sensitive information all

7    the time.  That's the nature of the business.  And that

8    includes courts that provide access without delaying it for

9    clerical review.  So there are less restrictive alternatives.

10           Defendant also points to cost as the reason why the

11   Idaho courts supposedly cannot provide access to complaints

12   through a press queue.  She claims that Tyler, the e-filing

13   vendor, has quoted a price tag of $108,000 annually --

14   annually -- to provide access through the review future that

15   already exists.  And we know from experience it does not cost

16   that amount or any amount.  Numerous courts using Tyler

17   software have confirmed that Tyler did not charge them for

18   their press queues.  This is in the opening and the

19   supplemental record declarations.

20           In New Mexico, Judge Browning found, based on a

21   preponderance of the evidence, that there would be no charge

22   for a press queue even though the defendant in that case

23   cited -- or quoted the same price tag from Tyler.  And in

24   Arizona, the state court administrator arranged for its vendor

25   to create a press queue from scratch for a onetime charge of

Mr. Fetterly                                    45

1   $12,500.

2       So, you know, perhaps most troubling here is that

3   this quoted price tag of $108,000 appears to represent an

4   attempt by Tyler, a third-party vendor, to create an annual

5   revenue stream and profit off the public record.  And we're

6   not talking about a onetime installation or setup fee, like we

7   saw in Arizona.  This is six figures annually.  And I'm sorry,

8   but it simply cannot be the case that a vendor can attempt to

9   create a revenue stream and profit from the public record and

10  can constitute a legitimate and compelling governmental

11  interest that justifies an access restriction.

12      So then, finally, the opposition papers describe

13  Idaho's current administrative practices in rather great

14  detail, implying that providing more timely access may require

15  them to change one or more of their practices.  They talk

16  about filing fees, letting court clerks review documents, all

17  manner of things that all courts deal with, including those

18  that provide timely access without delays.

19      And the point I want to emphasize here is that, yes

20  indeed, some internal administrative procedures may need to

21  change.  That is the inevitable result of a policy or practice

22  is found to violate the constitution.  And although defendant

23  does not come right out and say this in her opposition papers,

24  the rather clear implication is that preservation of the

25  status quo is itself an overriding interest for which there

Mr. Fetterly                                                    46

1    are no readily available alternatives.  However, as we

2    explained in our reply brief, the status quo simply cannot be

3    used to justify the status quo.  Otherwise, virtually no

4    Section 1983 action could succeed.

5           And as I conclude my opening remarks here, I once

6    again direct the Court to Judge Reiss's recent order and

7    findings in the *Gabel* case in the District of Vermont.  Again,

8    same e-filing system, same arguments, same issues.  And within

9    three weeks of Judge Reiss entering a permanent injunction

10   prohibiting the defendant's practice of withholding access

11   until after clerical review, the Vermont courts implemented an

12   auto-accept system that now provides the press and the public

13   with timely, on-receipt access to new e-filed civil

14   complaints, just like this Court did -- or this Court does,

15   just like the vast majority of federal courts do.  And we talk

16   about this in the supplemental Girdner declaration.

17          And as far as we know, none of the parade of

18   horribles that defendant cites in her opposition papers has in

19   fact come to pass by simply providing access in the same

20   manner that the vast majority of federal courts do and many

21   other states' courts do, including other courts using the

22   Tyler e-filing system.

23          So just as the defendant in the Vermont case failed

24   to justify her burden under the second part of the

25   *Press-Enterprise II* test, we believe here as well that if this

**ER-2641**

Mr. Fetterly                                                                47

1    Court simply scratches the surface of defendant's

2    justification and properly scrutinizes them by applying the

3    second part of the *Press-Enterprise II* test, as it must --

4    because it is a Supreme Court and Ninth Circuit authority --

5    we find that defendant simply has failed to meet her burden of

6    justifying the access delays.

7            One last thing I also want to point out, and then

8    I'll reserve the balance of my time for reply.  I'll note

9    there have now been four or five different cases in which the

10   federal courts have granted injunctive relief on this same

11   issue, prohibiting a policy or practice that withholds access

12   until after receipt.  None of those orders have dictated to

13   the state courts how to do their job or what to do.  None of

14   those orders have specified a particular manner or method of

15   access.  They have simply said the practice of withholding

16   access until after clerical review fails the constitutional

17   test because the defendants have failed to survive rigorous

18   scrutiny or constitutional scrutiny.

19           And so, yes, it may be that the inevitable result

20   there is something that closely resembles immediate or

21   preprocessing access, but the federal court is not dictating

22   the courts what to do.  These courts are simply choosing one

23   of the many alternatives that is available to them, one of the

24   many less restrictive, available alternatives.  And in any of

25   those cases, and all of them, where the courts have complied

Mr. Fetterly                                          48

1   with the injunction by implementing one of the available

2   alternatives, at no point has Courthouse News ever had to go

3   back to the court to seek enforcement, and at no point has the

4   court ever had to step in and intervene.  There's been no

5   ongoing federal audit to invoke an extension term.  There's

6   been nothing of the sort.

7          So we simply ask this Court to apply the test, and we

8   believe if it does so, it would conclude that defendant has

9   failed to meet her burden under rigorous scrutiny.  Thank you,

10  Your Honor.

11         THE COURT:  Counsel, I do have one question before

12  you end.  You mentioned that there were four or five cases out

13  there that have reached the level of a preliminary injunction

14  and granted it.  Are you aware -- I'm not, but are you aware

15  of any cases out there where the court got to the preliminary

16  injunction stage and denied a preliminary injunction?

17         MR. FETTERLY:  No, Your Honor, I am not either.  I

18  believe that the two cases where Courthouse News has been on

19  the wrong end of a ruling have been on that abstention ground

20  that we discussed earlier.  That's *Brown* in the Seventh

21  Circuit and then, you know, the *Gilmer* case in the Eastern

22  District.  And I will note in the Seventh Circuit the

23  underlying District Court opinion applied the test and found

24  the defendant failed to meet her burden.  So that was an

25  appeal from an order granting the preliminary injunction.  The

**ER-2643**

Ms. Duke                                           49

1    Seventh Circuit ended up dismissing the case on abstention

2    grounds.

3           But to Your Honor's point and to the question, no,

4    I'm not aware of any case where the District Court applied the

5    test and found that the defendant satisfied it.  I suppose, in

6    full candor here, that in the *Planet* opinion, we do have kind

7    of a split on the scanning policy.  But that's a little bit

8    different.  And in the e-filing context, the answer is, no,

9    I'm not aware of any court that considered an e-filing

10   scenario like we have here, applied the test, and found that

11   the defendant met their burden, and then on that basis

12   declined to grant the injunction.

13          THE COURT:  Okay.  Thank you.

14          Ms. Duke, you may go ahead.  And if you have a

15   different answer on my question, you're welcome to give it.

16   Otherwise, you can just go ahead.

17          MS. DUKE:  Sure, Your Honor.  Thank you.  I'm not

18   aware of -- certainly not every court has issued a preliminary

19   injunction.  I don't think that Mr. Fetterly can say that,

20   whether they just haven't gotten to that decision yet, whether

21   that wasn't what was precisely requested.

22          But in this instance, Your Honor, I think the big

23   question -- you know, one of them for Mr. Fetterly is, under

24   the automatic -- we all get it.  If it's, you know, submitted

25   through the electronic court record, we all get the complaint.

Ms. Duke

50

1   Under that, how is the second significant balancing scale in

2   the *Planet III* case addressed?  We know *Planet III* said you've

3   got a qualified right of timely access to newly filed,

4   nonconfidential complaints.

5           But it went on to say, however, this right does not

6   entitle the press to immediate access to those complaints.

7   Some reasonable restrictions resembling time, place, and

8   manner regulations that result in incidental delays and access

9   are constitutionally permitted where they are content neutral,

10  narrowly tailored, and necessary to preserve the court's

11  important interest in the fair and orderly administration of

12  justice.

13          How does CNS's request to this Court related to an

14  injunction give any recognition, any weight at all to that

15  other important balance that *Planet III* has defined as the law

16  of our circuit?  It doesn't.  If you were to grant the

17  injunction that they have sought, then when a complaint is

18  submitted through the Tyler filing system, that means it's

19  automatically within our court record, which it is not.  It's

20  still on the Tyler side of the filing.  But even if it was

21  immediately on our side of the filing, then there's no

22  administrative review that Mr. Fetterly and CNS are indicating

23  to you will occur or should occur.

24          That completely ignores the holding of *Planet III*,

25  and it obliterates that important scale that I mentioned in

Ms. Duke                                             51

1    our opening remarks on the motion to dismiss, Your Honor.  The

2    State -- it is acknowledged that the State has an

3    administrative interest in the fair and orderly processing of

4    filings.  If we grant CNS what they want, which is to have a

5    submission automatically provided to CNS, how are we -- how

6    are we handling that administrative interest?  We're not.

7         And why other courts in our circuit have not looked

8    at that, have not seen that that's an important part of

9    *Planet III*, I don't know.  But I never like the argument that

10   CNS is making of, "Well, Judge, just because all of these

11   other courts are doing it, you would be crazy not to."  We

12   have a Ninth Circuit case that specifically states here's your

13   balancing that you're going to do.  The public interest and

14   contemporaneous filings with the court and the State's

15   administrative interest in the fair and orderly processing of

16   complaints.

17        THE COURT:  Am I splitting the hairs too much to say

18   that there's a difference between providing it immediately and

19   not delaying access?  Could I view those as two separate

20   things?

21        MS. DUKE:  Of not providing it immediately and of

22   delaying access?

23        THE COURT:  Not delaying access.  Is there a

24   difference between immediate access and not-delayed access?

25        MS. DUKE:  Well, I think in Idaho's context there is,

**ER-2646**

Ms. Duke                                    52

1    and that is there is no delay in access.  Because once it is

2    accepted and filed, unlike *Planet III*, where the clerk even

3    after that step had a supervisory review and then couldn't say

4    that the complaints made it into the bin, in Idaho, once

5    our -- once our clerks perform that very crucial balancing

6    test that CNS wants ignored, that administrative interest in

7    making sure that we're maintaining our court records, once

8    they say, "Boom, yes, I've got the check, I've got the

9    signature," it's now accepted as a file -- or a filing, it's

10   immediate.

11          And so, Your Honor, I hope I'm answering your

12   question.  I don't know that I fully understood it, but I can

13   tell you this is a very different circumstance than anything

14   else presented, and that is that even though the State of

15   Idaho does not have to provide immediate access once a

16   document is filed, it is.  So what's the harm to CNS?  How is

17   it not newsworthy for them to say, "Today filed in the state

18   of Idaho:  Huge case against the State of Idaho for

19   environmental claims"?  That is the newsworthy point.

20          CNS is saying that they are somehow not having their

21   First Amendment right satisfied because they can't say to the

22   public, "Hey, there's going to be a filing.  We know it

23   because there was a submission to this -- to the Idaho courts.

24   They're looking at it to get it now officially filed."

25          Where is -- where is this great harm that they're

Ms. Duke                                                           53

1    referencing?  It's an immediate access, an access that, Judge,

2    I didn't even appreciate until I worked with my clients on

3    this.  Once the clerks say, yes, this is filed, that's the

4    first time even the judge knows about the case.

5              THE COURT:  Right.

6              MS. DUKE:  CNS wants to know about the case before

7    anybody.  They want to know about it at the very same time

8    that the runner is literally leaving my office to walk to the

9    courthouse to file the complaint and to stop my runner and

10   say, you know, "Hey there, Ally, do you mind?  I need to see

11   that real quick before you hand that to the clerk, because I

12   need to now take that and run and get an advantage on other

13   news organizations."

14             That's not what the First Amendment's for.  The First

15   Amendment is for the timely access without unreasonable

16   restrictions to -- we admit, to court filings.  And that's why

17   this concept of filings is so crucial and why it's so ignored

18   in CNS's papers.

19             Judge, did I hit your question and answer it?

20             THE COURT:  Yeah.

21             MS. DUKE:  I really want to.

22             THE COURT:  I think you did.  Go ahead with your

23   argument.

24             MS. DUKE:  Okay.  Thank you, Your Honor.

25             So when you look to the preliminary injunction

Ms. Duke

54

1   standard, I mean, this is an extremely high burden that CNS

2   has.  This is not the situation where we don't have immediate

3   access to a filed complaint.  We have that in Idaho.

4   Mr. Fetterly has to admit that.

5        So there is no way that they can show that there's

6   some irreparable harm in that they're not receiving

7   immediately filed complaints.  Instead, again, they want you

8   to not let the clerks do exactly what the Idaho Supreme Court

9   has instructed them to do, and that is to review the

10   complaints, take care of the administration portion, and then

11   let them be a part of the official court record.

12        I don't see how the second balance is in any way

13   factored in if any news organization, including CNS, gets the

14   prefiled submissions by a party, again, stopping my runner on

15   their way to the courthouse.  And I suspect their argument's

16   going to be, yeah, but in this new-fangled, you know, e-filing

17   world, we can file in the middle of the night or file on

18   Christmas Day or submit on Christmas Day or submit on a

19   weekend.  A court clerk has still not had the opportunity to

20   do their job, and that is to make sure that the processes are

21   being filed -- or followed.

22        And so it really is a distinction that is glaring

23   when you read through *Planet III* and what CNS is asking this

24   Court to do.  And again, I -- I'm puzzled by how other courts

25   have not followed that second scale, but they haven't.  It's

Ms. Duke                                              55

1     as if there's just one scale in CNS's argument.

2          Your Honor, quite frankly, for CNS to prevail, you're

3     going to need to ignore a lot of things.  You're going to need

4     to ignore those limitations that are specifically outlined in

5     *Planet II*.  As you know, in your review of *Planet III*, at

6     page 596 that, *Planet III* itself acknowledged even in this era

7     of electronic filing systems, instantaneous public access to

8     court filings, especially complaints, could impair the orderly

9     filing and processing of cases with which clerks' offices are

10    charged.  After all, litigants are not uploading their

11    complaints to the Internet.  They are filing them with the

12    court, making them subject to judicial administration.

13          How is a complaint in Idaho subject to judicial

14    administration if this Court orders that every nonconfidential

15    complaint filed in the state of Idaho be immediately available

16    pre-administrative processing?  We submit to you that that

17    can't be done.

18          The *Planet* case went on to emphasize that the First

19    Amendment does not require courts, public entities with

20    limited resources, to set aside their judicial operational

21    needs to satisfy the immediate demands of the press.  Now,

22    that's why, I'm sure, CNS argues that the State of Idaho needs

23    to implement -- which likely -- you know, who knows, but

24    likely when we're talking implementation, read through those

25    declarations that CNS has submitted.  They're talking about

Ms. Duke                                              56

1   implementation.  They're not talking about licensing.

2   Licensing is a very different beast than implementation.  A

3   company can come and say, "We'll implement this.  We'll get

4   your programming running.  We'll get it up.  But by the way,

5   to use it, for the next year it's going to be $108,000.  And

6   to use it the year after, it's going to be $108,000, until we

7   contract again."

8           And there is nothing that Mr. Fetterly has provided

9   from anyone to dispute what Ms. Omundson submitted to you:

10   that the State of Idaho -- if you are to rule that they are

11   now enjoined from following their court rules and from doing

12   their process, the State of Idaho is now going to need to go

13   and get legislative approval to add to its budget to then

14   implement this system.  All of this is in contradiction to

15   *Planet III*, all of it.  Where is the judicial administration

16   that they have the ability to do?

17           Now, in their submissions that they provided to you,

18   you know, those green and yellow and red spreadsheets, those

19   spreadsheets start with date filed.  And I should at least

20   just show this, Your Honor.  So let me just pop that up here.

21   So if you look here, and it's a little hard to see, but you'll

22   see the red and then you'll see their little column.  It says

23   "date filed."  That is -- that's the very start of them trying

24   to show you that 44 counties of elected clerks and all of

25   their staff are failing to do their job.  And they're basing

**ER-2651**

Ms. Duke                                                        57

1    it on an absolute, in my view, misconception and trying to, I

2    think, hide the ball on what "filed" means.  It's not filing.

3    What it should say there, Your Honor, if they were going to be

4    genuine in their report of data, is it should say "date

5    submitted."  Then there should be a "date filed."

6         And what did we do to contradict and counter that?

7    We worked hard to show you, Judge, that if you actually take

8    the data and if you actually do a few things that comply with

9    Idaho's rules, that our Idaho clerks -- and if you look here,

10   this is at Docket 20-3.  Our Idaho clerks are, in this time

11   period of 9/1/2021 to 10/31/2021 -- which is a time period

12   that CNS cleverly chose, because it knew that the State of

13   Idaho had Tyler, who was changing one of the platforms.  That

14   caused some delays by our clerks.  That had nothing to do with

15   our clerks and their administrative processing with but

16   instead a switchover to Amazon.  They cleverly chose this time

17   period.

18        And what they also did is they did a 24/7/365

19   analysis, failing to factor in courthouse hours.  Now, let's

20   think about that, because courthouse hours were at issue in

21   the *Planet III* case.  And what was the *Planet III* clerk doing

22   with courthouse hours?  The *Planet III* clerk had adjusted them

23   to deal with, you know, we're open until 4:00 or 4:30, but

24   we're not going to let you have access to these filed

25   complaints after 3:00 because we got to get some stuff done.

Ms. Duke                                              58

1      That's not what the state of Idaho's doing.  The

2  state of Idaho has access during court hours to all of the

3  administratively reviewed, accepted, filed complaints.  And if

4  you factor in 24/7/365, they are doing that in this time

5  period at an average time of 5.07 hours to review, approve,

6  and have it filed.  How is that not timely for CNS to then be

7  able to report a newly filed complaint today, stating blank?

8      I'll also note that all of this is done through the

9  lens of what we've all been experiencing together, something

10 that the entire world, humanity has all experienced all

11 together, and that is COVID.  And you look at -- when we have

12 a search in, for instance, Ada County and we have our

13 hospitals on crisis standards of care in this very time

14 period, what are our court clerks doing?  They're doing their

15 job.  They are doing the administrative task that *Planet III*

16 charged them with and said they could do, and they're doing it

17 and they're doing it timely.

18     CNS wants everybody to ignore those clerks, to ignore

19 what they do, and to ignore the important function of their

20 job.  They want records automatically included in the court's

21 file so that they can see them, in complete contradiction to

22 what the Idaho Supreme Court has identified as its process for

23 forming the necessary administrative review of complaints.

24     You'll also note that in the supplemental filing --

25 and I don't have a slide on this one, but in the supplemental

Ms. Duke                                     59

1   filing, they then also chose to take January and February of

2   this year, which we responded to.  And we unfortunately all

3   know -- and as Patti's going through now and as my entire

4   family and myself went through two days before Christmas for

5   the next two weeks, we, as we call it, got omicron, as did the

6   great majority of the state of Idaho from mid-December through

7   about three weeks ago.  We've all watched the curves.

8          And the data that we submitted to you, Your Honor, is

9   that our court clerks were still doing exactly what they're

10  allowed and permitted to do under *Planet III*, and that is

11  timely review submitted complaints and mark them accepted.

12  And once they're accepted, they are immediately available.

13         And this concept -- I guess I would love to know how

14  the First Amendment -- of why it gets to ignore business

15  hours.  And as Justice Smith noted in his concurrence, you

16  still need to have the reasonable access to review these

17  administrative filings.  And as *Planet II* indicated -- let me

18  get there -- again, the First Amendment does not require

19  courts, public entities with limited resources, to set aside

20  their judicial operation to meet the immediate demands of the

21  press.

22         CNS here has required -- or is requesting you to

23  order that immediately the entire state, 44 counties with

24  their elected clerks and all of their staff, process and

25  evaluate complaints to make sure that they can be included in

Ms. Duke

60

1  the judicial record. That is not something that should be

2  done at this preliminary injunction stage.

3  And if this Court is not going to dismiss the case,

4  is not going to abstain, then we request, Your Honor, that a

5  trial occur so that the Court can understand and hear

6  testimony as to the great implication of what it is CNS is

7  trying to do, which includes erasing part of *Planet III's* very

8  holding, which, as you know, Your Honor, is this portion here:

9  However, this right does not entitle the press to immediate

10  access to those complaints. Some reasonable restrictions

11  resembling time, place, and manner regulations that result in

12  incidental delays in access are constitutionally permitted

13  where they are content neutral, narrowly tailored, and

14  necessary to preserve the court's important interest in the

15  fair and orderly administration of justice.

16  We have provided to you, Your Honor, affidavits and

17  whatnot for you to review so that you have an appreciation of

18  what the evidence will be in the event the case is not

19  dismissed and we head to a motion for permanent injunction.

20  And when you look to what we've submitted to you, Your Honor,

21  the balance of the equity very much tips in favor of the Idaho

22  courts. The Idaho courts, if an injunction issues, will be

23  forced to rebuild their entire system for new filings. The

24  Idaho Supreme Court will be forced to implement, revise, and

25  upgrade new court administrative rules.

Ms. Duke                                                    61

1          And I understand Mr. Fetterly's going to say, you

2    know what?  When states are behaving badly, you've got to step

3    in, and you've got to deal with these things.  And there

4    should not be an issue with the State of Idaho having to

5    revamp its entire process because all these other states where

6    judges have ignored the second important balancing act have

7    been able to do it.  Well, that is not what *Planet III* says.

8          In addition, there will be a change to court rules.

9    They're going to necessitate training 44 county clerks, all of

10   their staff, and all of the staff in Ms. Omundson's office to

11   handle this new system.  A change to auto-accept will

12   necessitate training Idaho's state court judges regarding the

13   new policy, because what do they do when someone files -- like

14   you asked me at the start of the hearing, Judge, when someone

15   is auto-accept, here's what happens, and here's why Rule 12

16   protects against this and in the balance of a litigant's

17   interests, in my view, should happen with electronic court

18   submissions.

19         Under the Idaho system, if you goof and you didn't

20   provide the proper filing fee, guess what happens?  That

21   filing's rejected.  And guess what defense lawyers like myself

22   are going to do for our insurance claims?  You better bet I'm

23   going to come in and say, "I'm sorry.  It was rejected.  It

24   wasn't filed on time.  Yeah, it was auto-accepted, but a Court

25   has since dismissed it because the filing fee was not paid."

Ms. Duke                                                      62

1    And you can bet that we're going to argue that the statute of

2    limitation was not met.

3         Is that right?  Is that fair?  Is that just?  That

4    does not occur under the court system now.  Under the court

5    system now, that litigant has three days to correct the issue

6    under Rule 12.  That litigant has three days to be able to

7    say, "Oh, I didn't get you my filing fee?  Here you go."  How

8    is that so damaging to the First Amendment access to a

9    complaint versus all of the perils that could exist on the

10   other side of it?

11        You also are going to have to educate the

12   attorneys -- which I often say managing attorneys is like

13   herding cats -- about the new system.  They're going to have

14   to know that there's no more three-day grace period.  And as

15   we submitted to you with the Ada County clerk's declaration,

16   gone is the enforcement ability of the clerks to be able to

17   have the rule to say, "You know what?  You didn't file it

18   correctly, Ms. Duke.  You've got to get your affidavit with a

19   signature."  Right now, if I don't do that in three days, it

20   will not be accepted for filing as of the date it was

21   submitted.  It will be late.

22        There will be no power under this auto-accept feature

23   for a county clerk to go and have the actual record itself be

24   complete and be what it's supposed to be so that a district

25   judge or magistrate judge can make a decision.  This is why

Ms. Duke                                                  63

1    *Planet III* very wisely included the second scale, the scale

2    that CNS ignores.  And that is the scale of we need to make

3    sure from an administrative standpoint our court records are

4    accurate and complete.

5         In addition, the press review queue -- here's where

6    we come to a unique Idaho issue that CNS ignores.  That again,

7    Your Honor, is that case I cited to you earlier, where "press"

8    is not defined in the state of Idaho like it is in California

9    and other states.  The Supreme Court has declined to do so.

10   The press is the public under Idaho law, period.  CNS has no

11   greater right than my grandmother, than my kids to go access

12   something.  They don't have a greater right.  They're asking

13   you to have something special that no one else will have.  The

14   public is the press in the state of Idaho.  That's not like

15   California; that's here.

16        And again.  I mentioned the $108,000.  Mr. Fetterly

17   can unsupportedly and without foundation make lots of

18   assertions as to Tyler, and he can also say, "Oh, I can't

19   believe a company would charge for something like that, and

20   that's not right."  Well, guess what?  That's what

21   Ms. Omundson was told:  "If you have the press review queue,

22   you -- we will implement it, but you're going to have $108,000

23   a year as an estimate to have this benefit of a press review

24   queue."

25        There is nothing in *Planet III* -- and in fact

Ms. Duke                                                    64

1    *Planet III* itself -- again on that quote that I've shown you

2    before many times that is ignored by CNS -- does not require

3    courts, or a public entity with limited resources, to set

4    aside their judicial operational needs to satisfy the

5    immediate demands of the press.

6         How is 5.07 hours -- business hours -- to review a

7    complaint impeding CNS's right to timely review?  We submit,

8    Your Honor, that it's not.  And under *Planet III* there is

9    no -- there is no harm to them, because we're doing exactly

10   what *Planet III* said we could do, and we're doing it in a

11   timely fashion.

12        We even have our Supreme Court saying -- they rule

13   that it can take up to three days.  That's not even what's

14   happening.  It's happening much sooner than that, unless you

15   want to manipulate the data and ignore when clerks actually

16   work.  Under CNS's theory, we as a state should now staff our

17   clerks' offices 24/7/365 if we want to be able to not have a

18   press review queue, if we want to be able to do some sort of

19   orderly administration of justice.  And that's not at all what

20   any of the precedence says.

21        You know, Your Honor, one last point I'd like to

22   make.  You had asked me at the conclusion of our last

23   argument, What do we use?  And in that tax case, in *Schaefer*,

24   there was a note that the U.S. Supreme Court can also handle

25   those types of things when there is something that a state

Mr. Fetterly                                        65

1    court is doing that has been challenged.  And so when you look

2    to that precedent as well, that's at least an avenue.

3         Your Honor, do you have any questions for me, or is

4    there anything I can hit?  Because I want to make sure that

5    I've answered anything you have to your satisfaction.

6         THE COURT:  I do not have any further questions.

7    Thank you.

8         MS. DUKE:  All right.  Thank you, Your Honor.  We

9    would request, then, that the preliminary injunction be

10   denied.

11        THE COURT:  All right.  Mr. Fetterly, you may have

12   about five minutes for rebuttal.

13        MR. FETTERLY:  Thank you, Your Honor.  I want to

14   first start by addressing this issue about kind of the

15   immediate access again that counsel keeps referring to and

16   this notion that *Planet III* somehow has this alternative

17   test -- the other scale, if you will -- that isn't reflected

18   in the opinion, quite frankly.  And I think the reason why

19   counsel hasn't seen any other court apply the so-called

20   additional scale is because it's not the actual test.  We have

21   the *Press-Enterprise II* test, and that is the test.

22        You know, Your Honor, you posed the question, is

23   there a distinction between immediate access and enjoining a

24   policy or practice that results in delays, and if enjoined may

25   in fact result in more immediate access?

Mr. Fetterly                                                    66

1          Yes, I think there is a distinction, and the

2     distinction again hinges on the qualified First Amendment

3     right of access.  I think counsel perhaps, you know -- well, I

4     think part of the confusion in *Planet II* is that there are

5     three phrases, like entitlement, demanding, and these words.

6     I think if we read *Planet III* clearly, it comes out that what

7     the court is saying is that there is no immediate right of

8     access in the sense that if there is a delay, Courthouse News

9     cannot say, "My First Amendment rights have been violated" per

10    se because there was a delay.  It's a qualified right.

11         Defendant has the opportunity under the

12    *Press-Enterprise II* test, the second part of it, to justify

13    the delay.  And that's why we have the immediate right and

14    that's why we have all of this language throughout *Planet III*

15    that says there's no entitlement.

16         However, immediate access is not off the table just

17    because the defendant has to justify her burden under

18    *Press-Enterprise II*.  And I'd point the Court -- this is the

19    response to the surreply, but it's in *Planet III*, and I

20    quote -- and I just point to this document because it's

21    recent, and it's a one-page document.  I quote from

22    *Planet III:*  The defendant's burden is to first -- quote,

23    Demonstrate that first there is a substantial probability that

24    its interest in the fair and orderly administration of justice

25    would be impaired by immediate access and, second, that no

Mr. Fetterly                                                    67

1    reasonable alternatives exist to adequately protect that

2    government interest.

3           So the Ninth Circuit is even using immediate access

4    in the test.  And we're not demanding it as a matter of right

5    because the First Amendment entitles us to do it.  What we are

6    saying is that under this test, defendant has failed and will

7    fail at trial to show that there is in fact a substantial

8    probability that its interest in the fair and orderly

9    administration of justice would be impaired by immediate

10   access.

11          And so if the Court applies this test and if the

12   Court finds that defendant has failed to meet her burden, the

13   policy and practice that results in the delays in access can

14   be enjoined.  And if we enjoin that practice, yes, it may in

15   fact be that there is immediate access, but that's not because

16   the First Amendment demands it.  It's because defendant failed

17   to meet her burden under constitutional scrutiny of justifying

18   the practice.  So that, I believe, is the distinction.  And

19   again, that's why I just keep coming back to the idea that

20   this is a test, and we ask the Court to apply it.

21          Now, very briefly, a few other points.  Counsel has

22   made various arguments based upon the court rules.  There is

23   no conflict between the court rules and the First Amendment.

24   There's not a single court rule that I'm aware of -- and I

25   don't think counsel has pointed to one -- that says that

Mr. Fetterly                                68

1    access cannot be provided to the public or the press until --

2    and to be clear, we're not suggesting that Courthouse News has

3    any greater rights than the public.  But as *Planet III* talks

4    about, the press is the public.  It is an extension of the

5    public.  There's nothing in the rules that says that access

6    must be withheld or restricted until after clerical review and

7    acceptance.  So there's no tension.  There's no conflict.

8         And we are not saying that the court clerks cannot do

9    their jobs.  What we're saying is that they cannot withhold or

10   restrict access while they do them.  And that really is the

11   crux of what Judge Reiss talks about at length in her ruling

12   and order out of Vermont.  In the -- in the electronic world,

13   you don't have some of the same considerations you have in the

14   paper world, which the *Planet* court had to deal with.  We

15   aren't talking about a singular physical object only one

16   person at a time can hold.  We're talking about an electronic

17   document that eliminates those barriers, eliminates those

18   issues.  Judge Reiss talks about that.  And in the electronic

19   world, there is simply no compelling or governmental interest

20   to withholding access to that document while the court staff

21   do their job.

22        And, yes, there has been a pandemic.  Yes, there is

23   hardship.  There will always be circumstances that make life

24   hard, and Courthouse News is not unsympathetic to that.  We're

25   not asking anybody to not do their job, and we're not looking

Mr. Fetterly                                                          69

1    past the realities of life.

2           But what we are saying is that these circumstances

3    really illustrate the problem with inserting, you know, human

4    physical review of documents and withholding access while the

5    courts do their jobs.  If you simply remove the policy or

6    practice of withholding access until after review and

7    processing, all of these other issues simply fall by the

8    wayside.  They're not real issues anymore, and they need not

9    be issues, as we see in the vast majority of federal courts

10   that provide this level of access and the numerous state

11   courts that do so as well.

12          So, you know, again, we've talked a little bit

13   about -- counsel talked about filed versus received.  You

14   know, there's no sleight of hand here.  We believe filed and

15   received are synonymous and interchangeable as the Ninth

16   Circuit uses them.  I suppose there is a difference between

17   the clerical and administrative use of that word as defendant

18   uses it versus when the First Amendment right attaches, which

19   is upon receipt.

20          But as we talked about in our papers, you know,

21   clerical definitions simply cannot define the First Amendment,

22   and the First Amendment does not bend to local court rules.

23   That's -- that's just the opposite.  Supreme Court rule

24   establishes that local court rules must comply with the

25   substantive law.  And what we're saying here is, you know, the

Mr. Fetterly                                    70

1    First Amendment trumps.

2          But once again, there is no conflict, because these

3    rules do not actually prohibit access.  Counsel invokes the

4    three hours [sic] that is allowed under the Public Records Act

5    in Idaho, which I think, as we all commonly know, is simply

6    used for archival research and such things.  Yes, some period

7    of time is allowed for clerks to do their job in responding to

8    those requests, but that does not preclude more timely access

9    under the First Amendment standard than applies to civil

10   complaints.  And I guess if there were a conflict -- and to be

11   clear, there is not -- I don't think there would be any more

12   question that the First Amendment prevails and must trump the

13   local court rule or statute.

14          So when we start talking about the delays, counsel

15   spent a fair amount of time talking about the number of hours.

16   And, you know, again, this kind of just points or makes a

17   distinction between working hours and the real-life passage of

18   time.  However you look at it, there is no actual dispute -- I

19   don't believe that there are delays in access.  The only way

20   that delays are eliminated is if you start the clock on the

21   First Amendment once the document has been accepted, which is

22   after the delay at issue has already occurred.

23          So if we're talking about the length of time between

24   receipt by the Court or submission by the filer on the one

25   hand and clerk review and acceptance on the other, what

Mr. Fetterly                                          71

1    counsel's papers show is that, you know, during that period in

2    November, it was -- 5.8 average hours lapsed in between, and

3    in the surreply it was 4.81 average hours that lapsed in

4    between.  Again, these are averages.  It doesn't account for

5    the longer delays that exist that we address in our papers.

6         And I guess the important point that I want to just

7    land with here is that it's not this Court's job to divine the

8    number of hours that constitutes timely access.  This Court's

9    job, as set forth in *Planet III,* is to apply the

10   constitutional test to those delays and closely scrutinize

11   whether the defendant's justifications for the current

12   practice of withholding access until after processing and

13   acceptance satisfies rigorous scrutiny.  And we believe that

14   if the Court does that, as we've explained, that we'll find

15   that the defendant has failed to meet that test, just as the

16   clerks in the other cases that we've discussed have failed to

17   meet that test.

18        And to put a slightly finer point on it, I think the

19   problem here is that if the Court starts talking about four

20   hours is okay, five hours is okay, six hours is okay, whatever

21   the number may be, we've now created a First Amendment dead

22   zone.  There's a period of time in which complaints can be

23   withheld from the press or the public for any reason or no

24   reason at all, and that is squarely at odds with the

25   *Press-Enterprise II* test as set forth in *Planet III.*

Mr. Fetterly                                    72

1        The defendant must demonstrate that, you know, more

2   immediate access would be impaired -- or governmental interest

3   would be impaired by more immediate access.  That is the test.

4   This Court must apply that test.  And that's what we ask the

5   Court to do, and we respectfully request that if the Court

6   applies that test, it will conclude that the defendant has

7   failed to meet her burden and that the motion for preliminary

8   injunction should be granted.

9        Unless the Court has questions, I have nothing

10  further, Your Honor.

11       THE COURT:  No, I do not have any further questions.

12       I will say -- and I suspect that all of you hear this

13  quite frequently, and I mean that as a compliment.  It's very

14  refreshing to get briefs and arguments as coherent and as well

15  done as has been done in this case, and I appreciate that.

16  The issues are clearly defined.  The positions have been well

17  enunciated.  Unfortunately, the hard part is coming to an

18  answer.

19       But I will take this under advisement.  I will get a

20  decision out as quickly as I can.  I'm not going to say it's

21  going to be immediate and I'm not going to say it's going to

22  be without delay, but I will get it out as soon as I can.  So

23  thank you.  Unless there's anything else, I think we're done

24  for today.

25       MS. DUKE:  Your Honor, thank you for your comments.

73

1    Appreciate your time.

2              And, Patti, please get better.

3              MR. FETTERLY:  Thank you, Your Honor.

4              THE COURT:  Thank you, court's in recess.

5         (Proceedings concluded at 11:51 a.m., February 18, 2022.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

74

1          C E R T I F I C A T E

2

3          I, ANNE BOWLINE, a Registered Merit Reporter and

4    Certified Realtime Reporter, do hereby certify that I reported

5    by machine shorthand the proceedings contained herein on the

6    aforementioned subject on the date herein set forth, and that

7    the foregoing 73 pages constitute a full, true and correct

8    transcript.

9          Dated this 28th day of February, 2022.

10

11

12

13              ____/s/ Anne Bowline____

14                 ANNE BOWLINE
                Registered Merit Reporter
15              Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO
# U.S. DISTRICT JUDGE MINUTE ENTRY

**(X) Motion hearing [7 & 14]**

U.S. District Judge: David C. Nye                Date: February 18, 2022
Deputy Clerk: Patti Richmond                     Time: 10:00 – 11:50 am
Court Reporter: Anne Bowline                     Place: Boise, ID

### COURTHOUSE NEWS SERVICE V SARA OMUNDSON
### 1:21-cv-305-DCN

Counsel for Plaintiff: Jonathan G. Fetterly and Debora K.Grasham
Counsel for Defendant: Keely E. Duke and Anne E. Henderson

(X)     All parties agreed to have this matter heard via zoom rather than an in-person hearing.
(X)     Court heard oral arguments.
(X)     Matter taken under advisement with a written decision to be forthcoming.

Debora Kristensen Grasham (ISB # 5337)
dkk@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>               Plaintiff,<br><br>      v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>               Defendant. | Case No: 1:21-cv-00305-DCN<br><br>**COURTHOUSE NEWS SERVICE'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS [D] AND IN SUPPORT OF COURTHOUSE NEWS SERVICE'S MOTION FOR PRELIMINARY INJUNCTION [D 14]** |

Mindful of the volume of documents already before the Court, Courthouse News Service ("Courthouse News") submits this Notice of Supplemental Authority to bring to the Court's attention new authority directly relevant to the motions set for hearing on February 18.

The new authority, issued on February 14, is the Findings and Recommendations by Magistrate Judge ou in *Courthouse News Service v. Cozine,* Case No. 3:21-cv-00680-   (D. Or.) ("*Cozine*"), attached hereto as Exhibit 1. Like this case, the *Cozine* case involves a claim arising under the First Amendment against the Oregon State Court Administrator based on state-wide delays in access to new e-filed civil complaints. The Findings and Recommendations address an issue presented in this case: when the First Amendment right of access attaches to new e-filed civil complaints. Applying the Ninth Circuit's opinions from *Courthouse News Service v. Planet*, Magistrate Judge ou concludes the First Amendment right of access attaches to new e-filed civil complaints when they are *received* by the court, and rejects the Oregon State Court Administrator's argument that the right of access does not attach until after new e-filed complaints are "accepted" by court staff.

Dated: February 15, 2022

BR AN CAVE LEIGHTON PAISNER LLP

*/s/ Jonathan G. Fetterly*
Jonathan G. Fetterly
*Attorneys for Courthouse News Service*

Debora Kristensen Grasham (ISB # 5337)
dkk@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>Defendant. | Case No: 1:21-cv-00305-DCN<br><br>**RESPONSE TO NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING DEFENDANT SARA OMUNDSON'S MOTION TO DISMISS [DKT 7]** |

Defendant Sara Omundson's notice of supplemental authority does not offer any authority at all. Defendant instead offers an *amicus curiae* brief filed in a pending First Circuit appeal involving a case in which the issue of abstention—an issue raised by Defendant in her motion to dismiss and for which she offers the *amicus* brief—was not raised or briefed by the parties in the district court. The *Courthouse News Service v. Glessner* case offers no authority from either the district court or the court of appeals on the issue of abstention. Defendant's submission of an *amicus* brief on that issue at this late hour is nothing more than additional argument and briefing beyond the scope of this Court's rules.[1] *See, e.g.,* Loc. Civ. R. 7.1 (addressing limitations on motion practice).

Regardless, the *amicus* brief offered by Defendant stands in stark contrast to the controlling Ninth Circuit precedent this Court should follow on the issue of abstention. In *Courthouse News Service v. Planet*—a case involving the same issue and claim as this case—the Ninth Circuit not once, **but twice**, rejected Defendant's argument that the federal courts should abstain from hearing Courthouse News' claim based on a violation of its First Amendment right of access to new civil complaints. The Ninth Circuit first rejected this argument in *Courthouse News Service v. Planet*, 750 F.3d 776 (9th Cir. 2014) ("*Planet I*"), when it reversed the district court's order dismissing Courthouse News' claim on abstention grounds. It then rejected Defendant's argument a second time in *Courthouse News Service v. Planet*, 947 F.3d 581 (9th Cir. 2020) ("*Planet III*"), when it expressly disapproved of the Seventh Circuit case upon which Defendant relies for her abstention argument. 947 F.3d at 591 n.4 ("We disagree… with the Seventh Circuit's decision to abstain from resolving the dispute about when the right attaches and when delays are so long as to be tantamount to a denial of the right."). The amicus brief

---

[1]    If Defendant believed *amicus curiae* support was necessary or appropriate for her motion she presumably could have requested it in this case, and in a timely manner.

offered by Defendant obviously does not (and cannot) provide a basis for this Court to deviate from binding Ninth Circuit authority.

Finally, there is no reason to believe the Ninth Circuit would consider this particular *amicus* authoritative. The Ninth Circuit heard from it on a different issue in the *Planet* case and rejected its arguments. In *Planet III*, the Conference of Chief Justices submitted an *amicus curiae* brief in support of the defendant clerk, arguing: (1) access to pre-judgment court records in civil cases is not compelled by the First Amendment; and (2) finding that a First Amendment right of access attaches when new complaints are filed would "burden the state courts in the performance of their duties." 2017 WL 1857422, *ii. The Ninth Circuit rejected these arguments when it "conclude[d] that the press has a qualified right of timely access to newly filed civil nonconfidential complaints that attaches when the complaint is filed." *Planet III*, 947 F.3d at 585; *see also id.* at 588, 594 (agreeing with district court that "the right to timely access attaches at the moment of filing, i.e., when the complaint is received by the court").

Dated: February 11, 2022

BRYAN CAVE LEIGHTON PAISNER LLP

    */s/ Jonathan G. Fetterly*
Jonathan G. Fetterly
*Attorneys for Courthouse News Service*

RESPONSE TO NOTICE OF SUPPLEMENTAL AUTHORITY - 3

Keely E. Duke
ISB #6044; ked@dukevett.com
Anne E. Henderson
ISB#10412; aeh@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, <br><br> Plaintiff <br><br> vs. <br><br> SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, <br><br> Defendants. | CASE NO. 1:21-CV-00305-REP <br><br> **NOTICE OF SUPPLEMENTAL SUPPORT REGARDING DEFENDANT SARA OMUNDSON'S MOTION TO DISMISS [DKT 7]** |

Defendant Sara Omundson, by and through the undersigned counsel of record, Duke Evett, PLLC, hereby submits this Notice of Supplemental Support Regarding Defendant's Motion to Dismiss [Dkt. 7] the Complaint [Dkt. 1] filed by Plaintiff Courthouse News Service ("CNS"), to bring the Court's attention to updates to arguments being made regarding the issue of abstention, which is raised by Ms. Omundson's Motion to Dismiss.

In a case brought the District of Maine, which is in the first judicial district, *Courthouse News Serv. v. Glessner*, No. 1:21-CV-00040-NT, 2021 WL 3024286 (D. Me. July 16, 2021), Courthouse News brought an action similar to that in this case against the state court administrator for the State of Maine, seeking declaratory and injunctive relieve to allow them immediate access

**NOTICE OF SUPPLEMENTAL SUPPORT REGARDING DEFENDANT SARA OMUNDSON'S MOTION TO DISMISS - 1**

to civil complaint submissions. *Id*. The District Court raised the issue of abstention, but ultimately, did not fully consider the issue because defendants had not raised it themselves. *Id*. at *7 n. 14. The District Court granted defendant's motion to dismiss, finding Courthouse News failed to state a claim upon which relief could be granted. *Id*. at *7. Courthouse News appealed to the First Circuit Court of Appeals. Case No. 21-1624.

The Conference of Chief Justices ("CCJ") filed an amicus curiae brief for the consideration of the First Circuit on Courthouse News' appeal (Exhibit A hereto). The CCJ "was founded in 1949 to provide an opportunity for the highest judicial officers of each State and U.S. Territory to address matters of importance in improving the administration of justice, rules and methods of procedure, and operation of state courts and judicial systems." Ex. A at 13. The CCJ indicated the brief was "filed pursuant to a policy unanimously approved by CCJ's Board of Directors. That policy authorizes the filing of a brief only where critical interests of state courts are at stake, as they are in [that] case. *Id*. at 14.

CCJ argues that "[p]roper  application of the principles of comity, federalism, and equity calls for federal court abstention in a challenge to court record rules promulgated by a state's highest court, which has the exclusive authority to establish court rules and oversee a co-equal, centralized judicial system." *Id*. at 14.

The argument and position of the CCJ is significant and supportive of Ms. Omundson's abstention argument for the following reasons:

1) As in Maine where the supreme court of that state exercised its inherent, constitutional and statutory powers to manage the state judicial system, here, the Idaho Supreme Court has also exercised its inherent constitutional and statutory powers to manage the

**NOTICE OF SUPPLEMENTAL SUPPORT REGARDING DEFENDANT SARA OMUNDSON'S MOTION TO DISMISS - 2**

Idaho state judicial system by adopting rules and regulations governing electronic filing (*see e.g.* IREFS 3, 4, 5, and 11) and access to court records (ICAR 32).

2) As in Maine, Courthouse News seeks to have federal courts oversee the Supreme Court of Idaho's policy determinations imbedded in these rules by entering an injunction requiring instant access to civil complaints submitted for filing to Idaho's state courts. Dkt. 7.1 at 6 ("Idaho's county clerks are elected officials, who have independent duties and rights conferred by the Constitution of the State of Idaho, state statutes, and Idaho Supreme Court rules.")

3) As in Maine, the exercise of federal jurisdiction in this case runs counter to the principles of comity, because it would involve this federal court supervising Idaho's judicial system. Dkt. 7-1 at 6 ("CNS asks the federal district court to issue declaratory and injunctive relief to apply across all of Idaho's state judicial districts s, and to each and every alleged agent, assistant, and employee of Director Omundson.").

Counsel for Ms. Omundson will be able to further address the points made by the CCJ in its arguments on the Motion to Dismiss, which are set for February 18, 2022.

DATED this 10th day of February, 2022.

DUKE EVETT, PLLC

By /s/Keely E. Duke
    Keely E. Duke – Of the Firm
    Anne E. Henderson – Of the Firm
    *Attorneys for Sara Omundson*

**NOTICE OF SUPPLEMENTAL SUPPORT REGARDING DEFENDANT SARA OMUNDSON'S MOTION TO DISMISS - 3**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 10th day of February, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Debora Kristensen Grasham | dkk@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**NOTICE OF SUPPLEMENTAL SUPPORT REGARDING DEFENDANT SARA OMUNDSON'S MOTION TO DISMISS - 4**