U.S. Court of Appeals Docket No. 24-6697

_____

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

_____

COURTHOUSE NEWS SERVICE,

*Plaintiff/Appellee*,

vs.

SARA OMUNDSON, in her official capacity as
Administrative Director of Idaho Courts,

*Defendant/Appellant.*

_____

On Appeal from a Decision of the United States District Court
For the District of Idaho
Case No. 1:21-cv-00305-DCN
The Honorable David C. Nye

_____

## ANSWERING BRIEF OF APPELLEE COURTHOUSE NEWS SERVICE

_____

Roger Myers
Rachel Matteo-Boehm
Jonathan Fetterly
Katherine Keating
**BRYAN CAVE LEIGHTON PAISNER LLP**
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
roger.myers@bclplaw.com; rachel.matteo-boehm@bclplaw.com;
jon.fetterly@bclplaw.com; katherine.keating@bclplaw.com

*Attorneys for Plaintiff-Appellee*
COURTHOUSE NEWS SERVICE

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

STATEMENT OF JURISDICTION....................................................3

ISSUES PRESENTED..............................................................3

STATEMENT OF SEPARATE ADDENDUM .....................................4

STATEMENT OF THE CASE......................................................5

    A.    About Courthouse News Service .................................5

    B.    How Courts Provide Timely Access To E-Filed Complaints.............6

    C.    How E-Filing Works In Idaho................................9

    D.    CNS Attempted To Fix The Problem Before It Began.................11

    E.    CNS Tried to Resolve The Delays Again After *Planet III* But Was Rebuffed ........................................................12

    F.    Delays Caused By Appellant's Policy ...........................13

    G.    The District Court Denied Appellant's Motion To Dismiss, Rejecting Both Abstention And The Notion That *Planet III* Forecloses Any Outcome Leading To "Immediate" Access.......................14

    H.    On Summary Judgment, Appellant Failed To Carry Her Burden Of Justifying Her No-Access-Before-Processing Policy .................15

SUMMARY OF ARGUMENT ...................................................15

I. *PLANET I & III* AND *CNS v. YAMASAKI* CONTROL THIS CASE .................19

    A.    The *Planet* Trilogy .......................................19

    B.    *CNS v. Yamasaki* .......................................21

II. ABSTENTION IS FORECLOSED BY *PLANET I* AND *III* AND THE REJECTION OF APPELLANT'S ONLY AUTHORITY BY EVERY CIRCUIT TO CONSIDER IT ................................................22

    A.    Appellant Places Misguided Faith In *Brown* .....................23

    B.    The *Citizens* Decision Provides No Basis For Abstention.................25

III. AS *PLANET III* AND EVERY COURT TO CONSIDER THE QUESTION HAS CONCLUDED, THE FIRST AMENDMENT ACCESS RIGHT ATTACHES WHEN THE FILER SUBMITS THE COMPLAINT ...............27

i

A.    *Planet III* Established That The First Amendment Access Right
      Attaches When The Filer Submits A Complaint To The Court..........28

B.    Courts Have Uniformly Found The First Amendment Access Right
      Attaches On Receipt, Regardless Of Administrative Definitions.......31

C.    Idaho's Own E-Filing Rules Undermine Appellant's Argument .......34

IV.  APPELLANT CONCEDES, AS SHE MUST, THAT HER POLICY HAS
      CREATED PERVASIVE DELAYS IN ACCESS TO CIVIL COMPLAINTS
      ....................................................................................................35

      A.    The Delays In This Case ...................................................36

      B.    How Appellant Measures Delays........................................38

V.   APPELLANT CANNOT SATISFY HER BURDEN OF JUSTIFYING HER
      NO-ACCESS-BEFORE-PROCESSING POLICY ...........................................40

      A.    Following *Planet III*, The District Court Correctly Tested Appellant's
            Delay-Causing Policy Under *Press-Enterprise II* "Rigorous" Scrutiny
            ...................................................................................................41

      B.    Appellant Has Failed To "Demonstrate a Substantial Probability That"
            Any Overriding Government "Interest …Would Be Impaired"
            Without Her No-Access-Before-Processing Policy............................44

            1.    Ensuring Clerical Errors Are Corrected....................................45

            2.    Preventing Confusion................................................................45

            3.    Confidentiality ........................................................................46

      C.    Appellant's Arguments About Alternatives Show A Lack Of Will,
            Not A Lack Of Options ........................................................................49

            1.    Auto-Accepting The Complaints At Issue.................................50

                  a.    So-Called "Costs".........................................................51

                  b.    "Security Concerns".......................................................54

                  c.    "Prejudice To Litigants".................................................54

            2.    Tyler's Press Review Tool......................................................55

            3.    Using Tyler's Free API To Develop A Tailored Solution........57

CONCLUSION .........................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmerisourceBergen Corp. v. Roden*,
    495 F.3d 1143 (9th Cir. 2007) ...............................................................23

*Berger v. City of Seattle*,
    569 F.3d 1029 (9th Cir. 2009) (en banc) ............................................43

*Center for Biological Diversity v. U.S. Forest Serv*.,
    925 F.3d 1041 (9th Cir. 2019) ...............................................................22

*Citizens Against Linscott/Interstate Asphalt Plant v. Bonner Cnty. Bd.
    Of Commissioners*,
    168 Idaho 705 (2021) .....................................................................25, 26

*CNS. v. Brown*,
    908 F.3d 1063 (7th Cir. 2018) .........................................3, 16, 23, 24

*CNS v. Corsones*,
    131 F.4th 59 (2d Cir. 2025) .....................................................*passim*

*CNS v. Cozine*,
    2022 WL 593603 (D. Or. Feb. 14, 2022) ...........................................28

*CNS v. Cozine*,
    2022 WL 1000775 (D. Or. Apr. 4, 2022) ...............................4, 29, 32

*CNS v. Gabel*,
    2021 WL 5416650 (D. Vt. Nov. 19, 2021).........................................32

*CNS v. Gilmer*,
    48 F.4th 908 (8th Cir. 2022) ................................................23, 24, 27

*CNS v. Gilmer*,
    543 F. Supp. 3d 759 (E.D. Mo. 2021) ................................................24

*CNS v. New Mexico*,
    53 F.4th 1245 (10th Cir. 2022) ...............................................*passim*

*CNS v. O'Shaughnessy*,
     663 F. Supp. 3d 810 (S.D. Ohio 2023) ...........................................................3, 32

*CNS v. Planet*,
     2011 WL 11715054 (C.D. Cal. Nov. 30, 2011) ..................................................19

*CNS v. Planet*,
     2014 WL 12740134 (C.D. Cal. Aug. 8, 2014) ....................................................20

*CNS v. Planet*,
     2016 WL 4157210 (C.D. Cal. May 26, 2016) .......................................20, 29, 30

*CNS v. Planet*,
     2021 WL 1605216 (C.D. Cal. Jan. 26, 2021) .....................................................21

*CNS v. Planet*,
     750 F.3d 776 (9th Cir. 2014) ("*Planet I*") ...................................................*passim*

*CNS v. Planet*,
     614 F.App'x 912 (9th Cir. 2015) ("*Planet II*") ...........................................19, 20

*CNS v. Planet*,
     947 F.3d 581 (9th Cir. 2020) ("*Planet III*") ...............................................*passim*

*CNS v. Schaefer*,
     2 F.4th 318 (4th Cir. 2021) .....................................................................3, 24, 42

*CNS v. Schaefer*,
     440 F. Supp. 3d 532 (E.D. Va. 2020) .........................................................37, 42

*CNS v. Tingling*,
     2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) ....................................................38

*CNS v. Yamasaki*,
     312 F. Supp. 3d 844 (C.D. Cal. 2018) .........................................................22, 38

*CNS v. Yamasaki*,
     950 F.3d 640 (9th Cir. 2020) ............................................................19, 21, 22, 38

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
     657 F.3d 936 (9th Cir. 2011) ..............................................................................43

iv

*El Vocero de Puerto Rico v. Puerto Rico*,
    508 U.S. 147 (1993)................................................................33

*Globe Newspaper Co. v. Superior Court*,
    457 U.S. 596 (1982)................................................................42

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) .........................................40, 45

*McCullen v. Coakley*,
    573 U.S. 464 (2014)........................................................43, 61

*Miofsky v. Superior Court*,
    703 F.2d 332 (9th Cir. 1983) .............................................23

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)..........................................................*passim*

*Press-Enterprise Co. v. Superior Court*,
    478 U.S. 1 (1986) ("*Press-Enterprise II*")...............*passim*

*Princeton Univ. v. Schmid*,
    455 U.S. 100 (1982)..............................................................54

*Railroad Comm'n of Texas v. Pullman Co.*,
    312 U.S. 496 (1941)..................................................19, 23, 27

*Redd v. Guerrero*,
    84 F.4th 874 (9th Cir. 2023) .............................................25

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980)..............................................................42

*Rizzo v. Goode*,
    423 U.S. 362 (1976)........................................................24, 27

*Rocky Mountain Bank v. Google*,
    428 F.App'x 690 (9th Cir. 2011) .......................................34

*Saavedra v. Korean Air Lines Co.*,
    93 F.3d 547 (9th Cir. 1996) ...............................................26

*Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*,
    598 F.3d 1061 (9th Cir. 2010) ...................................................26

*Sprint Commc'ns v. Jacobs*,
    571 U.S. 69 (2013)...................................................................24

*Turner Broad. Sys. v. F.C.C.*,
    512 U.S. 622 (1994)................................................................43

*Vincent v. Trend W. Tech. Corp.*,
    828 F.2d 563 (9th Cir. 1987) ..................................................26

*Washington-S. Nav. Co. v. Baltimore & Philadelphia Steamboat Co.*,
    263 U.S. 629 (1924)................................................................34

**Statutes**

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 1331 ........................................................................3

28 U.S.C. § 1343 ........................................................................3

28 U.S.C. § 2201 ........................................................................3

42 U.S.C. § 1983 ......................................................................23

**Rules**

Idaho Court Administrative Rule ("ICAR") 32 ......................47

ICAR 33 ...........................................................................52, 53

Idaho Rule of Civil Procedure ("IRCP") 2.6 ....................48, 57

Idaho Rule for Electronic Filing and Service ("IREFS") 2(c)................34

IREFS 3 ............................................................................35, 36

IREFS 5(h) ...............................................................................47

IREFS 7(a)(2)-(3)....................................................................47

IREFS 11(a) ............................................................................34

IREFS 12(a) ....................................................................................................35

IREFS 13 ................................................................................................26, 35

IREFS 15 ..........................................................................................48, 57, 59

Ninth Circuit Rule 28-2.7 .............................................................................4, 5

Ninth Circuit Rule 36-5...............................................................................19

# INTRODUCTION[1]

Appellant Sara Omundson, Administrative Director of Idaho Courts, turns somersaults to avoid reaching the only part of this case that has not already been determined by controlling Ninth Circuit authority: whether her policy of withholding access to new non-confidential civil complaints until clerks have completed a "ministerial review," AOB 6, survives First Amendment scrutiny.

To satisfy the First Amendment, Appellant must "demonstrate first that there is a 'substantial probability'" her policy is justified by an overriding government interest that "would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect'" that interest. *CNS v. Planet*, 947 F.3d 581, 596 (9th Cir. 2020) ("*Planet III*"); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9, 14 (1986) ("*Press-Enterprise II*"). Scores of courts around the country that share the same interests as Idaho manage to protect those interests without withholding access for processing. They do so by using alternatives that are equally available to Appellant.

Unable to explain why Idaho cannot do what other courts do, Appellant attempts to re-litigate what this Court has already established: (1) that federal courts should not abstain from deciding First Amendment claims based on policies like Appellant's that delay making newly filed civil complaints available, *CNS v.*

---

[1] In this brief, emphases in **bold italics** are added and those in *italics* were in the original. Citations for quotations within quotations are omitted unless noted.

*Planet*, 750 F.3d 776, 793 (9th Cir. 2014) ("*Planet I*") & *Planet III*, 947 F.3d at 587-88, 591 n.4; (2) that the First Amendment qualified right to access complaints attaches when the filer submits them to the court rather than after court staff deem them sufficiently "processed," *Planet III*, 947 F.3d at 588, 594; and (3) that the "rigorous scrutiny" of *Press-Enterprise II* applies to policies that create pervasive and ongoing delays in accessing complaints. *Id.* at 594-96.

Once this Court reaches the fact-intensive scrutiny of Appellant's policy that she tries to avoid, it will find – as did the district court – that her arguments cannot be squared with the record in this case. Appellant is perfectly capable of avoiding the access delays caused by her no-access-before-processing policy without sacrificing any overriding government interest, just as other courts do.

The district court's judgment in favor of Courthouse News Service ("CNS") should be affirmed.

2

## STATEMENT OF JURISDICTION

Plaintiff-Appellee Courthouse News Service ("CNS") agrees that the district court had jurisdiction pursuant to 28 U.S.C. § 1331 (as well as 28 U.S.C. §§ 1343 and 2201), this Court has jurisdiction pursuant to 28 U.S.C. § 1291, and the appeal is timely.

## ISSUES PRESENTED

1.      Whether the district court correctly concluded Appellant's abstention argument was foreclosed by *Planet I & III*, and by rejection of the primary authority on which Appellant relies by all five circuits to consider it, including this one, *Planet III*, 947 F.3d at 591 n.4, because it abstained under an "approach … inconsistent with our precedent and Supreme Court guidance."  *CNS v. Schaefer*, 2 F.4th 318, 325 n.2 (4th Cir. 2021) (quoting and rejecting *CNS. v. Brown*, 908 F.3d 1063, 1071 (7th Cir. 2018)); *see CNS v. Corsones*, 131 F.4th 59, 78 (2d Cir. 2025) (collecting cases contrary to *Brown*).

2.      Whether the district court correctly followed *Planet III*, 947 F.3d at 594, and every other court addressing the question to conclude that the qualified First Amendment right of access to new civil complaints attaches when the filer submits it to the court, rather than at some subsequent stage after court staff deem the complaint to have been sufficiently processed.  *E.g.*, *Corsones*, 131 F.4th at 66; *CNS v. New Mexico*, 53 F.4th 1245, 1261-62 (10th Cir. 2022); *CNS v.*

3

*O'Shaughnessy*, 663 F. Supp. 3d 810, 818 (S.D. Ohio 2023); *CNS v. Cozine*, 2022 WL 1000775, at *2 (D. Or. Apr. 4, 2022).

3.     Whether the district court correctly concluded that Appellant failed to justify her no-access-before-processing policy, and the pervasive access delays it causes, by "demonstrat[ing] first that there is a 'substantial probability' that" an overriding interest "would be impaired by immediate access" to new e-filed civil complaints, and, "second, that no reasonable alternatives exist to 'adequately protect' that government interest," as she was required to do under *Planet III*, 947 F.3d at 596, and *Press-Enterprise II*, 478 U.S. at 9.

## **ADDENDUM**

Pursuant to Rule 28-2.7, an addendum listing relevant rules has been submitted separately.

4

## STATEMENT OF THE CASE

**A.    About Courthouse News Service**

CNS is a nationwide news service founded more than 30 years ago to report on civil litigation.  6-ER-1126.  It employs about 240 people, mostly editors and reporters, covering state and federal trial and appellate courts in all 50 states, and reporting on general news through its website.  *Id.*

CNS' website (www.courthousenews.com) is free to the public and read daily by roughly 30,000 people.  6-ER-1129.  CNS' subscriber publications include New Litigation Reports, which contain original, staff-written reports on new litigation focusing on actions involving businesses and public entities in a particular geographic region, e-mailed to subscribers the evening of each court day. 6-ER-1127.  CNS' approximately 2,300 subscribers include law firms, news media, libraries, non-profits, government entities, and businesses.  6-ER-1128-29. Regional subscribers include Boise's Office of City Attorney, *The Salt Lake Tribune*, and Weber State University.  *Id.*

CNS functions as a pool reporter for news about civil litigation.  Its many subscribing media outlets include *The Los Angeles Times*, *San Jose Mercury News*, *The Wall Street Journal*, *The Boston Globe*, *The Denver Post*, *The Dallas Morning News*, and CNN.  *Id.*  CNS reporting is frequently credited as the source for news stories by a wide variety of media (*e.g.*, *The New York Times*, *The Wall Street*

*Journal*, *New York Magazine*, *U.S. News and World Report*, ABC News, Fox News, *Politico*, NPR). 6-ER-1129.

The New Litigation Report covering the Idaho courts is The Big Sky Report, which includes civil complaints filed in Idaho, Montana, and Wyoming. 6-ER-1127-28. CNS does not cover family and probate filings (among others) and does not review or report on complaints that are statutorily confidential or accompanied by a motion to seal. *Id.* In Idaho, CNS' review is limited to complaints in a defined category that does not include any confidential as a matter of rule or law. SER-19.[2]

**B.**   **How Courts Provide Timely Access To E-Filed Complaints**

In the age of paper records, courts around the country made new civil complaints available to reporters shortly after receipt by the court, regardless of whether clerks had completed docketing or other clerical tasks, such that reporters could see them by the end of the day they were filed. 6-ER-1130-33 (¶¶ 12-22). This allowed the press to report on new actions while they were most newsworthy and likely to capture the public's attention. 6-ER-1129-33 (¶¶ 11-19).

Despite the challenge inherent in working with paper – only one person at a time can handle the document – reporters and court staff found ways to work

---

[2] CNS seeks only complaints in "A.A. filing fee category," which encompass "civil cases where the amount in controversy exceeds $10,000." 1-ER-27 (n.12); SER-32-38.

cooperatively so that reporters could review complaints that had not yet been processed. 6-ER-1133 (¶ 22). Providing timely access before processing in an e-filing court is even easier. An e-filed complaint is simply a PDF document to be viewed and downloaded. 6-ER-1134 (¶ 23); SER-87 (90:10-92:17). Reporters and clerks can access it simultaneously. 6-ER-1134 (¶ 23).

Unfortunately, as state courts have transitioned to e-filing, some built unnecessary access delays into their systems, withholding e-filed complaints until court staff finished processing them. Busy clerks often struggle to complete these clerical tasks on the day of filing, which means that "no-access-before-processing"[3] policies nearly always prevent the press from learning about a substantial percentage of new civil actions until a day or more after filing, when the public has moved on to the next day's news. 6-ER-1134-35 (¶ 25).

Of necessity, all e-filing courts conduct some kind of clerical review of new filings, and all have a mechanism for handling filer mistakes (*e.g.*, missing signatures, illegible pages). *See* 6-ER-1140-41 (¶ 43). Some courts automatically accept e-filed documents, addressing clerical issues post-acceptance when the documents are sitting in the court's case management system. 6-ER-1138-41 (¶¶ 35-43); *see also, e.g.*, 5-ER-966-70, 5-ER-1039-40 (N.D. Cal. and D. Idaho e-filing procedures for correcting errors). In other courts, clerks process on the front

---

[3] "No-access-before-process" is the name the Ninth Circuit gave to such policies in *Planet III*, 947 F.3d at 587.

end, culminating with the clerk's manual "acceptance" of the complaint into the case management system or returning it to the filer for correction (*i.e.*, rejection). 6-ER-1141 (¶ 44); SER-198-99 (¶ 8(c)). ***Auto-accept and clerk-accept courts are equally capable of providing timely access to new e-filed civil complaints.*** 6-ER-1137-55 (¶¶ 34-76). In auto-accept courts, clerks can attend to clerical issues ***after*** acceptance. In clerk-accept courts, access can be provided ***while*** clerks are still attending to clerical tasks that precede acceptance.

***Examples of Auto-Accept Courts.*** The overwhelming majority of federal district courts are auto-accept courts. A new complaint is available to anyone with a PACER account moments after the court receives it. 6-ER-1138 (¶ 35). State courts have also implemented auto-accept systems, including Connecticut, Hawaii, and Missouri (through homegrown systems developed in-house) and Alabama, Nevada, and Utah (through software from three different vendors). 6-ER-1138-40 (¶¶ 36-42); Request for Judicial Notice ("RJN"), ¶ 3, ¶ 15 & Exhs. 3, 15. Tyler Technologies, Idaho's e-filing vendor, will configure Idaho's system to auto-accept complaints at no charge to Idaho. SER-72 (29:24-30:23); 5-ER-923-24.

***Examples of Clerk-Accept Courts that Don't Withhold Access for Processing.*** Many courts – including statewide in Arizona, Florida, Iowa, Kansas, New Mexico, New York, Vermont, and many in California, Georgia, Ohio, and Texas – condition "acceptance" of a complaint on action by a human clerk but

8

don't withhold access prior to acceptance. 6-ER-1141-55 (¶¶ 44-76); RJN, ¶¶ 1, 2, 4, 6-7, 14, 16 & Exh. 1, 2, 4, 6-7, 14, 16.

Some display complaints that have not yet been "accepted" alongside complaints that have been "accepted" in the same public portal. *See, e.g.*, 5-ER-972-73, 6-ER-1141-1145 (¶¶ 45-49). Others make complaints that have not yet been accepted available through a separate portal or review queue, sometimes to the public at large, 6-ER-1140 (¶ 41), 6-ER-1151 (¶ 66), sometimes limited to those credentialed by the court, 6-ER-1148 (¶¶ 56-60, 65-66, 68-70, 76), 6-ER-1155 (¶ 76); sometimes available for free, 6-ER-1140 (¶ 41), 6-ER-1151 (¶¶ 66, 68), sometimes subject to payment, 6-ER-1150-53 (¶¶ 65, 70), 6-ER-1155 (¶ 76); sometimes through court-developed software, 6-ER-1153-56 (¶¶ 73, 78), sometimes through vendor-provided software, 6-ER-1148-51 (¶¶ 56-60, 64, 67).

However implemented, systems that do not withhold access for processing allow new, nonconfidential complaints to be read and reported on the day the complaint is submitted to the court, when the new action is most newsworthy and capable of commanding public attention. 6-ER-1134-35 (¶¶ 25-26), 1159 (¶ 86).

## C.    <u>How E-Filing Works In Idaho</u>

Idaho's district courts ("Idaho Courts") use software from vendor Tyler Technologies. 6-ER-1136 (¶ 28). While Tyler's software can be configured as either auto-accept or clerk-accept, Idaho's system is currently configured for

manual clerk acceptance, with public access withheld until after acceptance. 6-ER-1134-35 (¶¶ 25-26), 6-ER-1279 (¶ 3).[4]

*Submission*. After registering for an account, an e-filer logs into the Idaho Courts' e-filing system. 7-ER-1434-35 (¶ 23), 7-ER-1480-83. The filer selects a "Location" (*e.g.*, Ada County District Court), a "Category" (*e.g.*, "Civil"), and a "Case Type" (*e.g.*, "AA – All Initial District Court Filings (Not Listed in E, F, and H1)") from drop-down menus. 7-ER-1435 (¶ 23(c)-(e)), 7-ER-1485-87, 7-ER-1491-92. The filer then uploads the documents to be filed, selecting the document type (*e.g.*, "Complaint") from a drop-down menu. 7-ER-1435 (¶¶ 23(e)-24), 7-ER-1494-97. The filer's selections allow the court to dictate which filings are publicly accessible. 5-ER-923-33; SER-79-81 (60:25-67:5), SER-85-90 (81:14-85:10, 89:21-90:7, 95:1-103:16).

Finally, the filer enters payment information and clicks the "submit" button. 7-ER-1435-36 (¶ 25), 7-ER-1499-1500. Some defects in an e-filing (*e.g.*, insufficient funds, file format issues) will cause it to be automatically rejected, without ever reaching court clerks. SER-82, SER-108 (69:6-70:6; 166:21-167:6). Otherwise, the e-filer receives an automated e-mail instructing the filer to "allow

---

[4] Courts preferring the clerk-accept configuration of Tyler's system can set it up to allow access before or during processing by using Tyler's off-the-shelf press review tool software, *or* Tyler will give them – free of charge – the technical specification (API) enabling the courts to custom-tailor their own on-receipt access mechanism. *See infra* 57.

24-48 hours for clerk office processing." 6-ER-1276-77. The filing then sits in the court's electronic document repository (known as the "e-filing manager") waiting for a clerk to process it. *See* SER-73 (33:25-34:19; 36:6-11).

*Clerk Processing*. Idaho Court clerks access e-filed documents from the e-filing manager and "perform a ministerial review." SER-197 (¶ 6). For a new complaint, this involves "checking for" the following: (1) case information sheet; (2) certification of service; (3) party names in caption; (4) correct filing fees paid; (5) required signatures included; and (6) the proper division of the District Court selected. SER-197, SER-200-201 (¶¶ 6, 8(d)(iii)).

"If there is an issue with one or more of these items," the clerk returns the complaint to the filer for correction (also known as "rejecting" the complaint). SER-73 (34:8-19), SER-197 (¶ 6). "If the documents … do not need clerical corrections," the clerk "'accepts' the submission." SER-198-99 (¶ 8(c)), SER-201 (¶ 8(d)(iv)). Though this processing takes less than five minutes, SER-203-04 (¶ 10(a)), it often takes a day or more for clerks to turn to it. Once "accepted," a copy of the complaint moves into the court's case management system, at which point it becomes publicly available.

### D.  CNS Attempted To Fix The Problem Before It Began

When, in 2016, CNS learned the Idaho Courts planned to implement e-filing, it wrote to the clerk for Ada County (Idaho's largest county), attempting to

avoid the access delays that sometimes result from a transition to e-filing. 6-ER-1136, 6-ER-1219-32. The Ada County clerk responded, acknowledging that CNS had "same day access to the paper record," 6-ER-1136-37 (¶ 31), 6-ER-1233-34, and referred the matter to state-level administrators. *Id.*

Despite additional attempts to point Idaho to a solution that would avoid access delays, e-filing was launched in Ada County without it, and the delays CNS had predicted came to pass. *See* 6-ER-1137 (¶ 32), 6-ER-1236-38. Conversations between CNS and Idaho administrators "stalled in early 2017," as Appellant waited for the Ninth Circuit to decide *Planet III*. 6-ER-1237.

## E. CNS Tried To Resolve The Delays Again After *Planet III* But Was **Rebuffed**

After *Planet III* settled key legal issues and affirmed the unconstitutionality of a California court's no-access-before-processing policy, CNS renewed its request to Appellant, again urging that Idaho solve the problem of "ongoing and persistent" access delays by providing pre-processing access. 6-ER-1137, 6-ER-1236-38. Appellant responded that she "did not find a statewide or Ada county delay that was currently ongoing and persistent" and would not provide access to e-filed complaints that "have not yet been accepted for filing by the court clerks' offices." 6-ER-1137, 6-ER-1261-63.

On July 31, 2021, CNS brought this lawsuit, alleging that new civil complaints e-filed in Idaho's district courts "are regularly withheld from the press

12

and public until after they have been processed by court staff, resulting in delayed access." 12-ER-2774 (¶ 5). Importantly, CNS' complaint does not allege that *any* access delay violates the First Amendment. Rather, it alleges that Appellant's no-access-before-processing policy causes ongoing and pervasive delays and cannot be justified under the applicable constitutional test. 12-ER-2781-84 (¶¶ 33-46).

### F.    <u>Delays Caused By Appellant's Policy</u>

Appellant's own data reflects that Idaho Courts withheld ***nearly half*** (42%) of all civil complaints e-filed from January 2021 through July 2022 until at least the following day. 7-ER-1429-32 (¶¶ 4-18), 7-ER-1440-41. Approximately 15% were unavailable for two calendar days or longer. 7-ER-1440-41. Delayed complaints included especially newsworthy ones, such as lawsuits about a fatal airplane collision over Lake Coeur D'Alene and alleged sexual assault by an Idaho legislator against a teenage legislative page. 6-ER-1280-1331.

Individual courts' delays during that period were regularly worse, varying in degree from court to court, month to month, and week to week. 7-ER-1387-93 (¶¶ 4, 6-15), 7-ER-1395-1426; SER-175 (native spreadsheet). For example, the district court for Kootenai County, Idaho's third-most populous county, withheld 98% of complaints for two calendar days or longer. 7-ER-1404-06.

13

**G.  The District Court Denied Appellant's Motion To Dismiss, Rejecting Both Abstention And The Notion That *Planet III* Forecloses Any Outcome Leading To "Immediate" Access**

Appellant moved to dismiss based on abstention and failure to state a claim. 12-ER-2763-64.  Her 12(b)(6) theory was that if Idaho courts did not withhold access to new e-filed complaints until after "ministerial review," the resulting access would be immediate.  12-ER-2765-66.  Because *Planet III* said the First Amendment did not require immediate access in all situations, she argued, CNS' claim was "not supported by a cognizable legal theory."  12-ER-2766.

The district court denied the motion, concluding that "abstention does not apply in this case" and that *Planet III* "does not stand for the proposition asserted by Omundson."  1-ER-56.[5]  The court explained CNS "is not actually asking for immediate access; it is asking for un-delayed access.  Thus, the relevant question is whether any delay is occurring in Idaho and, if so, whether that delay is justifiable" under the second step of the *Press-Enterprise II* test as required by *Planet III*.  1-ER-50.  The court declined to resolve the "very fact driven" "second step of the *Press-Enterprise II* analysis on the current record."  *Id*.  Instead, "discovery and further briefing [were] necessary to understand the full picture of what is happening in Idaho state court."  1-ER-52.

---

[5] In the same order, the district court denied CNS' preliminary injunction motion. 1-ER-38.

14

**H.    On Summary Judgment, Appellant Failed To Carry Her Burden Of Justifying Her No-Access-Before-Processing Policy**

Following discovery, the parties filed cross-motions for summary judgment. 6-ER-1332-33, 7-ER-1501-03.  The district court granted CNS' motion and denied Appellant's, entering declaratory judgment and a permanent injunction.  1-ER-36-37.  The court confirmed its prior ruling that the First Amendment access right attaches "when the complaint is submitted to the respective e-filing system, *not …* once the documents are reviewed/accepted/processed by a clerk."  1-ER-23.

Turning to whether Appellant had satisfied the "'fact-intensive' test" set out in *Press-Enterprise II* and *Planet III*, 1-ER-27, the district court found that although Appellant had pointed to "important concerns," the district court found "***no evidence that giving CNS more timely access would hinder her ability to address those concerns***."  1-ER-31-33.  In addition, the court found that "alternatives to the current system … seem reasonable," and are used by "[o]ther states … with good success."  1-ER-34.  The court concluded that it would "not dictate what Omundson must do moving forward, but under the second step of the *Press-Enterprise II* test, she must do something because her current system impermissibly delays CNS' First Amendment access."  1-ER-36.

## SUMMARY OF ARGUMENT

The AOB tries mightily to make it appear that this case is different from the access dispute that led to what the district court called the "*Planet* trilogy."  1-ER-

18.  But when this Court digs into the well-developed record of this case and the binding precedent resulting from *Planet* – as well as the decisions of other courts presented with the same issue, including in the e-filing context – it will find that the district court correctly concluded there were no genuine issues of material fact and that CNS was entitled to summary judgment.  As CNS will explain:

***Abstention.***  This Circuit has twice rejected the argument that the federal abstention doctrines relied on and/or alluded to by Appellant are satisfied in cases like this one.  It has also rejected the Seventh Circuit's abstention analysis in *Brown*, as have four other circuit courts.  The Idaho Supreme Court case Appellant relies on for the first time on appeal does not change the result here.

***When the right of access attaches.***  Appellant advances a fiction that no access delays exist by claiming that the First Amendment clock does not start ticking until she says it does.  Despite the AOB's repeated insistence, based on administrative definitions, that the complaint at issue here "have not been 'filed,'" the district court correctly found that for constitutional access purposes, "'filed' is best understood to mean when the complaint is submitted to the respective e-filing system, not to mean once the documents are reviewed/accepted/processed by a clerk."  1-ER-61-62.  In so ruling, the district court reached the same conclusion as every other court to consider the same question.

16

***Delays and level of scrutiny*.**  Alternatively, Appellant seeks to minimize the access delays in this case – and maximize deference to her unnecessary policy choices – by framing the delays in terms of "business hours;" erroneously suggesting CNS is seeking a per se right of "immediate access;" and claiming that the district court erred by applying the *Press-Enterprise II* scrutiny that *Planet III* requires.

***Application of* Press-Enterprise II *scrutiny*.**  Applying the correct constitutional test to the summary judgment record in this case, the district court correctly found Appellant failed to carry her burden under *Press-Enterprise II*. Providing access before processing does not interfere with courts' ability to review and address any issues in new complaints.  The notion that access to a complaint that is later rejected would somehow create confusion that damages confidence in the courts is unsupported and unsupportable.  And reviewing for confidential information cannot be a reason to withhold for processing when searching for confidential information is not a part of clerk review in Idaho.

Nor has Appellant shown that she lacks alternatives to her current system. She could cure delays by auto-accepting the complaints at issue – something Idaho's e-filing vendor will enable for no charge.  Or she could use the off-the-shelf press review tool her vendor offers.  Or she could use her vendor's free

17

technical specification (API) to build whatever variation of pre-processing access she prefers into the new access portal she has already begun developing.

Other state courts around the country use these alternatives, including states using the same e-filing system Idaho uses. If pre-processing access generally, or any alternative in particular, had caused problems in any of these courts, Appellant surely would have said so. Instead, the summary judgment record reflects that neither she nor CNS is aware of *any* problem arising from pre-processing access in any court. SER-159-60 (Rog. 26); 6-ER-1147, 6-ER-1149-50, 6-ER-1152-53.

The Idaho Courts implemented their access restriction with knowledge that it would lead to pervasive delays and that alternatives were available. 6-ER-1136-37, 6-ER-1219-63. Having chosen this unconstitutional path, they should not be heard to complain that it would now be inconvenient to make adjustments. The judgment of the district court should be affirmed.

## I.

### *PLANET I & III* AND *CNS v. YAMASAKI* CONTROL THIS CASE

Two Ninth Circuit cases – *Planet* and *CNS v. Yamasaki* – resulted in two published decisions (*Planet I & III*) and one published order (*CNS v. Yamasaki*, 950 F.3d 640 (9th Cir. 2020)),[6] that provide the law of the circuit for this case. Another decision, *CNS v. Planet*, 614 F.App'x 912 (9th Cir. 2015) ("*Planet II*"), while unpublished, "helps to contextualize the Ninth Circuit's ruling in *Planet III*." 1-ER-45.

### A.    The *Planet* Trilogy

In September 2011, CNS filed suit against California's Ventura County clerk, Michael Planet, to address pervasive delays in access to newly filed civil complaints caused by Ventura's policy of withholding new complaints until they had been administratively "processed" by court clerks.  That litigation included three appeals:

*Planet I* – In 2011, the district court granted Ventura's motion to dismiss, abstaining under *Railroad Comm'n of Texas v. Pullman Co*., 312 U.S. 496 (1941) and *O'Shea v. Littleton*, 414 U.S. 488 (1974).  *CNS v. Planet*, 2011 WL 11715054 (C.D. Cal. Nov. 30, 2011).  In 2014, this Court reversed, concluding the "novel and

---

[6] Under Circuit Rule 36-5, "[a]n order may be specially designated for publication by a majority of the judges acting and when so published may be used for any purpose for which an opinion may be used."

important" First Amendment issues "may be adjudicated on the merits in federal court, where they belong." *Planet I*, 750 F.3d at 793.

**Planet II –** On remand, the district court granted a second motion to dismiss. *CNS v. Planet*, 2014 WL 12740134, at *4 (C.D. Cal. Aug. 8, 2014). On appeal, Ventura's single issue presented was "[w]hether the First Amendment creates a right of access to civil complaints …, even before those complaints have been **processed, filed, and entered into the court's official records**." Appeal No. 14-56444, Dkt. 20, at 2. This Court again reversed, saying the district court "failed to conduct the proper analysis dictated by" *Press-Enterprise II*. *Planet II*, 614 F.App'x at 914-15.

**Planet III –** On remand, a new district court judge granted in part and denied in part CNS' motion for summary judgment, *CNS v. Planet*, 2016 WL 4157210 (C.D. Cal. May 26, 2016), concluding: (1) "CNS has succeeded in establishing a qualified First Amendment right of *timely access* to such complaints that *attaches when new complaints are received by a court*," *id*. at *12; and (2) Ventura's no-access-before-processing policy violated the First Amendment because Ventura failed to justify it under either *Press-Enterprise II*-level scrutiny or the intermediate time, place, and manner test Ventura argued should apply. *Id.* at *16-21.

20

Planet appealed. In January 2020, this Court issued *Planet III*, affirming as to the no-access-before-processing policy.[7] *Planet III* includes rulings on most of the matters at issue in this case, including (1) abstention; (2) when the qualified First Amendment right of access to new complaints attaches; and (3) the level of scrutiny used to test the constitutionality of access delays.

Entering judgment for CNS on remand, the district court said there is "a qualified First Amendment right of timely access to newly filed civil complaints" that "attaches when new complaints are received by a court, rather than after they are 'processed,'… *regardless of whether courts use paper filing or e-filing systems*." *CNS v. Planet*, 2021 WL 1605216, at *1 (C.D. Cal. Jan. 26, 2021).

**B.**   **CNS v. Yamasaki**

Filed shortly after the summary judgment ruling in *Planet*, *CNS v. Yamasaki* also involved delays in access caused by a no-access-before-processing policy. Unlike Ventura, the court at issue – California's Orange County Superior Court ("OCSC") – was an e-filing court.

Parting ways with *Planet*, a different district court judge granted OCSC's summary judgment motion, concluding "the public doesn't have a First

---

[7] The Ninth Circuit upheld Ventura's policy of scanning new complaints and posting them to public access terminals, which Ventura adopted after *Planet I*, based on evidence that conditions at the time had left Ventura without alternatives. *Planet III*, 947 F.3d at 599-600.

Amendment right to access new civil complaints on the same day they are

submitted to the courts," and "timely access is provided – at a minimum – when

complaints are released the calendar day after they're submitted." *CNS v.*

*Yamasaki*, 312 F. Supp. 3d 844, 867-68 (C.D. Cal. 2018).  One month after the

*Planet III* ruling, the same panel that decided *Planet III* issued a "for publication"

order reversing and remanding "for further proceedings consistent with this

Court's opinion in [*Planet III*]." *Yamasaki*, 950 F.3d at 640.  In doing so, this

Court effectively rejected the district court's creation of what amounted to a one-

calendar-day constitutional grace period, during which complaints could be

withheld for any reason or no reason at all.  *Yamasaki* subsequently settled after

OCSC agreed to cease its no-access-before-processing policy and provide on-

receipt access through a press review queue.  5-ER-1108-10; 6-ER-1153-55 (¶¶ 73-

76).

## II.

### ABSTENTION IS FORECLOSED BY *PLANET I* AND *III* AND THE REJECTION OF APPELLANT'S ONLY AUTHORITY BY EVERY CIRCUIT TO CONSIDER IT

Nothing about this case makes it so different from *Planet* – in which this

Court rejected abstention not once but twice – to make it one of the rare exceptions

to the rule that "'federal courts have a strict duty to exercise the jurisdiction that is

conferred upon'" it. *Center for Biological Diversity v. U.S. Forest Serv*., 925 F.3d

1041, 1051 (9th Cir. 2019).[8]  Appellant argues *Planet* is distinguishable, that this case is "more similar to" *Brown*, and that an Idaho case changes the result here. AOB 15-21.  But the purported distinctions Appellant relies on are illusory, and *Planet III* "already soundly *rejected* the holding in *Brown*," 1-ER 53, as has **every single court** since *Brown,* except one district court that was reversed.  *See CNS v. Gilmer*, 48 F.4th 908, 913-15 (8th Cir. 2022).

## A.  <u>Appellant Places Misguided Faith In *Brown*</u>

In *Planet I*, CNS sued over the same issue as here: denial of access to new complaints "until they have been fully processed."  750 F.3d at 779.  The clerk obtained abstention in the district court under *O'Shea* on the notion that "if CNS prevailed, federal district courts would, in effect, dictate how the state courts should allocate scarce resources," and under *Pullman* on the theory that state law "could obviate any federal constitutional issue."  *Id.* at 782; AOB 15.  This Court reversed in *Planet I*.  After *Brown*, the clerk argued abstention again in *Planet III*, but this Court rejected the Seventh Circuit's approach.  *Planet III*, 947 F.3d at 591 n.4 ("[w]e disagree … with the Seventh Circuit's decision to abstain").

Appellant neglects to mention *Brown* has also been rejected by **every other**

---

[8] The federal courts' "unflagging obligation" to exercise their jurisdiction "is particularly weighty when those seeking a hearing in federal court are asserting … their right to relief under 42 U.S.C. § 1983."  *Miofsky v. Superior Court*, 703 F.2d 332, 338 (9th Cir. 1983).  An abstention doctrine cannot be applied unless each of its requirements are met; balancing the elements is not permitted. *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1148 (9th Cir. 2007).

***appellate court to consider it.***  The only court to do what Appellant asks and follow *Brown* – the district court in *CNS v. Gilmer*, 543 F. Supp. 3d 759 (E.D. Mo. 2021) – was reversed, 48 F.4th at 913-15, making the Eighth Circuit one of five circuits to reject *Brown*, along with the Second (*Corsones*, 131 F.4th at 78), Fourth (*Schaefer*, 2 F.4th at 324-25), and Tenth (*New Mexico*, 53 F.4th at 1257-63).

This is not surprising.  *Brown* "acknowledged that the facts did not fit perfectly within the four principal abstention doctrines," *Gilmer*, 543 F. Supp. 3d at 766, including "*Younger*, [and] its extension in *O'Shea* and [*Rizzo v. Goode*, 423 U.S. 362 (1976)]," and instead "base[d] [its] decision on the more general principles of federalism that underlie all abstention doctrines."  908 F.3d at 1071. But that is not how *Younger* abstention works, as the Supreme Court explained in *Sprint Commc'ns v. Jacobs*, 571 U.S. 69 (2013).  Because *Brown* "flatly ignores" this "recent Supreme Court guidance emphasizing *Younger* abstention should not be applied 'outside … three exceptional categories,'" 1-ER-54-55 (quoting *Sprint*, 571 U.S. at 78) – which *Brown* conceded do not exist in CNS cases, 908 F.3d at 1072 – it cannot be followed.

This is no less true in cases involving access "in each county of the State" to complaints filed "in electronic form," *Corsones*, 131 F.4th at 63, as Appellant suggests.  AOB 11, 17.  Both the Second and Tenth Circuits rejected *Brown* in the context of cases involving e-filed complaints statewide.  Even within that context,

both circuits found a "bright-line rule invalidating [a] pre-access review process" does "not unreasonably intrude upon the … judiciary's autonomy or risk the sort of 'monitoring of the operation of state court functions that' *O'Shea* prohibits." *Corsones*, 131 F.4th at 77-78; *accord New Mexico*, 53 F.4th at 1257-63.  As this Court has observed, "*O'Shea* abstention has proved exceedingly rare."  *Redd v. Guerrero*, 84 F.4th 874, 887 (9th Cir. 2023) (discussing *Planet I*).

Indeed, though some e-filing courts have adjusted their practices in response to litigation challenging no-access-before-processing policies, Appellant can point to no example of subsequent intervention from a federal court (which would have been a matter of public record), let alone an "'ongoing federal audit'" of state proceedings.  *Planet III*, 750 F.3d at 791-92; *see, e.g.*, 6-ER-1141-47 (¶¶ 45-53) (New York), 6-ER-1148-49 (¶¶ 57-58) (multiple California counties), 6-ER-1151-52 (¶¶ 68-69) (Florida), 6-ER-1153-55 (¶¶ 73-76) (OCSC, California); RJN, ¶¶ 2, 3, 15 & Exhs. 2, 3, 15 (Missouri; New Mexico).

## B.    The *Citizens* Decision Provides No Basis For Abstention

Appellant also asserts a new theory for abstention, not raised below: that abstention is warranted to prevent federal courts from "interfering with" an Idaho Supreme Court decision, *Citizens Against Linscott/Interstate Asphalt Plant v. Bonner Cnty. Bd. Of Commissioners*, 168 Idaho 705 (2021).  AOB 11, 15, 18-20.

Even if not waived,[9] this theory has no merit.

In *Citizens*, a clerk reviewing an e-filed petition for administrative review thought it needed a case information sheet and returned it to the filer for correction (*i.e.*, "rejected" it) rather than "accepting" it. The *Citizen* parties disputed whether the filer had made the correction and re-submitted the petition, such that it would have received a filing date as of the original submission, under IREFS 13(c). The Idaho Supreme Court concluded the petition had not needed a cover sheet in the first place, should not have been rejected, and was "filed" as of the date it was first submitted. *Id*. Thus, *Citizens* does nothing more than repeat what IREFS 13 says.

Nothing in *Citizens* – or IREFS 13(c) – is inconsistent with the district court's ruling that the right of access attaches upon submission, a ruling dictated by *Planet III*, 947 F.3d at 588, 594, and every other case that has addressed this issue, as discussed in Section III *infra*. Nor do Idaho's rules – or *Citizens* – preclude pre-processing access. The district court did not "improperly weigh[in] on and contradict Idaho substantive law," as Appellant suggests. AOB 19.

Moreover, Appellant's reliance on *Citizens* could not support abstention here

---

[9] The "'well-established principle that in most instances an appellant may not present arguments in the Court of Appeals that that it did not raise in the court below,'" *Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1073 (9th Cir. 2010), applies equally to "new," *Vincent v. Trend W. Tech. Corp.*, 828 F.2d 563, 570 (9th Cir. 1987), and/or "alternate theor[ies]." *Saavedra v. Korean Air Lines Co.*, 93 F.3d 547, 552 (9th Cir. 1996).

because her theory that "failing to abstain leads to federal courts interfering with Idaho *substantive* law," AOB 18, is not grounds for abstention under *Younger* or *O'Shea* and *Rizzo*, *see Gilmer*, 48 F.4th at 913-14, or any other abstention doctrine. Only *Pullman* abstention involves questions of state law, but aside from referencing its standard of review on appeal, AOB 14, Appellant has not raised *Pullman*, for good reason. As *Planet I* recognized, *Pullman* does not apply by its terms: it is only allowed where, inter alia, "the proper resolution of the possible determinative issue of state law is uncertain," *Planet I*, 750 F.3d at 783-84, which is not the case here. More fundamentally, as *Planet I* recognized, "*Pullman* abstention 'is generally inappropriate when [as here] First Amendment rights are at stake.'" *Id.* at 784.

## III.

### AS *PLANET III* AND EVERY COURT TO CONSIDER THE QUESTION HAS CONCLUDED, THE FIRST AMENDMENT ACCESS RIGHT ATTACHES WHEN THE FILER SUBMITS THE COMPLAINT

Every court to have considered the question, including this one, has rejected the notion that the First Amendment access right only attaches to a complaint if and when court staff deem it to have been sufficiently processed. *E.g., Planet III*, 947 F.3d at 588, 594; *Corsones*, 131 F.4th at 66; *New Mexico*, 53 F.4th at 1262. "Never dissuaded," 1-ER-21, Appellant asks this Court to ignore this authority – and common sense – and hold the district court erred in reaching the conclusion

27

"that 'the First Amendment right of access attaches to complaints when the court receives them, regardless of the technical terms and clerical processes used by the court.'" 1-ER-21 (quoting *New Mexico*, 53 F.4th at 1262).

The appeal of this argument to court administrators is understandable. It "creatively puts any delay in the process *before*" post-processing "acceptance" (what Appellant considers "filing"), such that a complaint could sit in a clerk's computer queue indefinitely "while various processes and procedures are completed," without ever implicating any constitutional access right. 1-ER-22.

It is also obvious why the argument has been uniformly rejected: If "the labels and terminology a state court employs to identify different parts of the filing process" could have "a determinative effect on when the First Amendment right of access attaches," administrators could avoid constitutional scrutiny "by adopting administrative rules that define a document as 'filed' much later in the judicial review process." *CNS v. Cozine*, 2022 WL 593603, at *7 (D. Or. Feb. 14, 2022). Such a result "not only contradicts the Supreme Court's jurisprudence, which makes clear that administrative rules cannot abrogate constitutional rights, but also is antithetical to the importance of media access that *Planet III* identified." *Id*.

## A.  *Planet III* Established That The First Amendment Access Right Attaches When The Filer Submits A Complaint To The Court

Appellant's assertion that "[t]he complaints at issue here are not analogous to those in *Planet III* because they have not yet been 'filed with the court,'" AOB

28

3, ignores that – like Appellant – the *Planet* clerk insisted that "new unlimited civil complaints received [by the court] ***are not 'filed'*** until after they are processed, nor do newly filed complaints become 'official court records' or 'public records' until after they are processed." *Planet*, 2016 WL 4157210, at *3.

The *Planet* district court rejected this position, holding the First Amendment right attaches "when the complaint is received by the court" rather than "after a complaint has been sufficiently 'processed.'" *Id*. at *12. On appeal, the Ninth Circuit characterized the holding as "the right to timely access attaches at the moment of filing, *i.e.*, when the complaint is ***received*** by the court," *Planet III*, 947 F.3d at 588, and agreed with it: "[W]e conclude, ***as did the district court***, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court ...." *Id*. at 594.

An e-filed complaint sitting in Idaho's e-filing manager awaiting clerk processing is no different from the paper-filed complaints in *Planet* that were sitting in a basket awaiting clerk processing. *See Planet*, 2016 WL 4157210, at *4-5. As the District of Oregon recognized in the context of the same Tyler e-filing system Idaho uses, RJN, ¶ 13 & Exh. 13, "the facts … in *Planet* confirm that the right of access attaches when the court receives the document" because "Ventura['s] seven-step acceptance process and quality control review … mirror[s] Oregon's after-submission review of e-filed complaints." *CNS v. Cozine*, 2022

29

WL 1000775, at *2.

Appellant's procedure – review by a clerk, acceptance, and transfer into an electronic case file – is functionally the same as in *Planet*, where clerks would "review complaints," enter their data into a case management system, "stamp the[m] … as 'Filed'" once accepted, then transfer them into the "case file" – all **before** allowing access. *Planet*, 2016 WL 4157210, at *13. Contrary to Appellant's suggestion, AOB 25, an e-filed complaint sitting in Idaho's e-filing manager waiting for clerk processing is not like a paper complaint in the hands of a filer standing in line at the filing counter: "While filers waiting in line at the clerk's window have not yet submitted their paper complaints to the court, electronic complaints waiting in the digital queue has already been submitted by the filer and received by the court." *New Mexico*, 53 F. 4th at 1267.

Appellant's attempts to equate Idaho's e-filing system with the clerk's physical "countertop," *e.g.* AOB 10, 27-28, do not provide a basis to distinguish *Planet* either. While e-filing systems and filing counters are both ways to submit filings to the court, Appellant's "countertop" argument breaks down because she erroneously assumes an e-filed complaint submitted by a filer "has not crossed the clerk's 'counter' until the clerk accepts it." AOB 27. However, it is undisputed "[e]lectronic submissions are made [by filers] through the public-facing side of File & Serve," SER-198, and once submitted the filing is "electronically delivered

30

to the clerk's inbox" where it is then available for clerk review and processing. SER-74 (38:17-40:10), 5-ER-914.

As the Tenth Circuit explained, in e-filing, "submission of a complaint" is "'when the magic of the electronics brings that document … to the court,' … 'the moment when [a clerk] could begin to look at it.'" *Id*. "[T]his critical moment in time – regardless of whether a filer hands a paper complaint to an intake clerk, or whether a filer hits the 'submit' button on the electronic-filing software – is when the First Amendment right of access attaches." *Id*. This moment of submission is when the filer invokes "'the authority of the people of the United States … to achieve his personal ends.'" *Planet III*, 947 F.3d at 592-93.

## B.    Courts Have Uniformly Found The First Amendment Access Right Attaches On Receipt, Regardless Of Administrative Definitions

The folly of using a clerical definition to dictate when a constitutional right applies was evident not only to the district court, 1-ER-20-25, but to every other court that has considered similar arguments, whether in the context of paper-filed or e-filed complaints.

The Tenth Circuit explicitly rejected the notion that terminology associated with New Mexico's e-filing system – the same Tyler system Idaho uses, RJN, ¶ 10 & Exh. 10 – could determine whether and when the First Amendment applies to e-filed complaints: "[T]he First Amendment right of access attaches to complaints when the court receives them, regardless of the technical terms and clerical

31

processes used by the court." *New Mexico*, 53 F.4th at 1261-62.

In *CNS v. Gabel*, 2021 WL 5416650, at *9 (D. Vt. Nov. 19, 2021), which also involved a Tyler system, *id.* at *3, *8 n.3, the district court observed "[t]he public right of access generally attaches when a newly filed civil complaint is received by a court." The Second Circuit affirmed, holding the "First Amendment right of access to newly filed complaints … attaches upon a court's ***receipt*** of such complaints." *Corsones*, 131 F.4th at 66.

As in these other cases, Appellant's attempt to "disingenuously focus on the technical terms applied to various intake and docketing tasks, rather than the delay such tasks may cause" – must be rejected. *New Mexico*, 53 F.4th at 1266; *see also O'Shaughnessy*, 663 F. Supp. 3d at 818 (rejecting clerk's argument that "a complaint is not filed until she says it is"); *Cozine*, 2022 WL 1000775, at *2 ("[A]s *Planet* makes clear, the right of access to civil complaints attaches when they are submitted to the court.").

Notwithstanding this authority, Appellant asserts *Press-Enterprise II* "experience" and "logic" does not support a right of access on receipt in Idaho because, she says, "the press and public did not have pre-acceptance access to complaints in Idaho like CNS seeks in this case." AOB 28-32. As the district court correctly explained, the experience-and-logic test does not hinge on the "timing of CNS' historical access," in the way that Appellant suggests, but instead

32

"looks to the whole 'place and process' of the access …." 1-ER-24 (quoting *Press-Enterprise II*, 478 U.S. at 8); *accord*, *e.g.*, *New Mexico*, 53 F.4th at 1266-69; *Corsones*, 131 F.4th at 68 n.12 (argument that CNS must show that "a novel 'instantaneous access right' … satisfies the 'experience and logic' test … misunderstands the *Press-Enterprise II* framework"). Moreover, the "'experience' test … does not look to the particular practice of any one jurisdiction, but instead 'to the experience in that **type** or **kind** of hearing throughout the United States.'" *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993).[10] The First Amendment applies to civil complaints in Idaho the same as it does to civil complaints in the rest of the country.

In a similar argument, the AOB repeatedly asserts that, unlike the complaints in *Planet*, those here are not "judicial documents" because, the AOB claims, the complaints here are not "filed" under her interpretation of Idaho's administrative definitions. This argument fares no better than others in this same category. Just as courts have found administrative labels do not affect substantive First Amendment rights, this Court has previously found that the "public's right to access" to what is "quintessential[ly] a judicial document" "cannot be absterged"

---

[10] Misrepresenting the testimony of CNS' reporter, the AOB says she only wanted to review paper-filed complaints "the clerk had accepted for filing because she would not report on something that 'hadn't been filed yet in the legal system.'" AOB 29-30. Read in context, the reporter was using "filed" in the ordinary sense – *i.e.*, complaints handed to the intake clerk. 8-ER-1814 (58:11-59:3).

by procedural distinctions like whether a document is "filed" or merely "lodged." *Rocky Mountain Bank v. Google*, 428 F.App'x 690, 692 (9th Cir. 2011).[11]

## C.   Idaho's Own E-Filing Rules Undermine Appellant's Argument

It is black letter law that in the event of a conflict between the constitution and court rules, the constitution controls. *Washington-S. Nav. Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 635–36 (1924) ("[t]he function of rules is to regulate the practice of the court and to facilitate the transaction of its business… no rule of court can .... abrogate or modify the substantive law.").

In any event, Idaho's rule that an e-filed document "will be considered filed" when it has been "accepted for filing," IREFS 11(a), sits in a framework compatible with the traditional understanding of what it means to "file" a document. *See* 1-ER-22-23 ("Omundson's interpretation is contradictory to [Idaho's rules]."). Idaho defines "'[e]lectronic filing'" as "the process whereby a filer electronically *transmits* documents to a court in an electronic form to initiate an action or to be included in the court file of an action." IREFS 2(c). For e-filed documents, "the date and time that the filer submits the electronic filing will serve as the filing date and time for purposes of meeting the statute of limitations or any

---

[11] *Rocky Mountain* and the cases Appellant cites at AOB 25-26 & n.4 for the definition of the term "judicial document" involved the common law right of access, which is distinct from the First Amendment right of access at issue here. While the common law right of access applies to all "judicial documents," it is not as protective of access rights as the First Amendment right.

other filing deadlines, ***even if placed into an error queue for additional***

***processing***." IREFS 12(a)(1). As long as the document is not rejected, "the

electronic filing system will affix the date and time of submission on the document

as the date and time of filing of the document." IREFS 12(a)(2).[12]

Similarly misplaced is Appellant's reliance on IREFS 3 for the proposition

that an e-filed document becomes part of the "official court record" when it is

"accepted." *See, e.g.*, AOB 6, 23-24 & n.3, 30-31. IREFS 3 says no such thing. It

provides only that "[t]he official court record for a case" consists of "the electronic

case file" and "any paper filings," but that the court may digitize a document filed

in paper and consider that electronic version to be "the official court record of the

filed document." IREFS 3.

## IV.

## APPELLANT CONCEDES, AS SHE MUST, THAT HER POLICY HAS CREATED PERVASIVE DELAYS IN ACCESS TO CIVIL COMPLAINTS

While the parties disagree about how delays caused by Appellant's no-

access-before-processing policy should be measured, there is no dispute pervasive

delays exist. Appellant provided detailed data about the complaints in the relevant

categories that were e-filed throughout Idaho from January 1, 2021, to July 31,

---

[12] Even if an e-filing is rejected, it will still receive a filing date and time as of the original submission as long as the filing is corrected and re-submitted within three business days. IREFS 13(c). Only if a document is returned for correction and not re-submitted will it "be deemed to have not been filed." IREFS 13(a).

2022.  7-ER-1429-31 (¶¶ 4-13), 9-ER-2123-24, 10-ER-2129-2411; SER-174.  Both parties used this same data to analyze delays in access to the complaints at issue during this period.  *Id.*

## A.    <u>The Delays In This Case</u>

Appellant does not and cannot dispute that during this period Idaho Courts withheld ***nearly half*** (***42%***) of all complaints at issue until at least the following day.  7-ER-1429-32 (¶¶ 4-18), 7-ER-1440-41.  Or that approximately 15% were unavailable for two calendar days or longer.  7-ER-1440-41.  Or that individual delays during that period were regularly worse, varying in degree from court to court, month to month, and week to week.  7-ER-1387-1426; SER-175.  For example, the district court for Kootenai County, Idaho's third-most populous county, withheld every complaint e-filed in April 2021 until at least the following day, with 98% of them withheld for two calendar days or longer.  7-ER-1404-06.[13] And there were "several documented periods," *Planet III*, 947 F.3d at 597, during 2021 and 2022, where it took Kootenai County two or more court days to process and make available one-fifth to ***more than three-quarters*** of newly filed complaints:

---

[13] Appellant notes *Planet* measured delays in court days rather than calendar days (*i.e.*, intervening weekends and holidays not counted), AOB 42, but does not mention that counting in court days does not change the percentage of complaints that Idaho Courts withheld until at least the following day – ***nearly half*** (***42%***).  7-ER-1432 (¶¶ 16-18), 7-ER-1442-44.  Approximately 10% of all complaints at issue during the period were unavailable for two court days or longer.  7-ER-1442-44.

| Time Period | Same Day (%) | Next Day (%) | 2+ Day (%) |
|---|---|---|---|
| Jan. 2021 | 36 | 41 | 23 |
| Feb. 2021 | 21 | 8 | 71 |
| March 2021 | 18 | 5 | 77 |
| April 2021 | 0 | 2 | 98 |
| June 2021 | 11 | 14 | 75 |
| July 2021 | 31 | 38 | 31 |
| Aug. 2021 | 49 | 26 | 26 |
| Sept. 2021 | 23 | 38 | 40 |
| Oct. 2021 | 20 | 3 | 78 |
| Nov. 2021 | 0 | 21 | 79 |
| Dec. 2021 | 39 | 39 | 21 |
| March 2022 | 9 | 63 | 28 |

7-ER-1393, 7-ER-1420-21, 7-ER-1424. These delays are hardly a "far cry," AOB 13, from those in *Planet*, where the Court focused on several periods between 2012 and 2014 where it took two or more court days for Ventura County to process and make available "one-fifth to two-thirds of newly filed complaints." *Planet III*, 947 F.3d at 597-98.

The delays in this case are comparable to the pre-lawsuit delays in *CNS v. Schaefer*, 440 F. Supp. 3d 532, 547-48 (E.D. Va. 2020), *aff'd*, 2 F.4th 318 (4th Cir.

37

2021), and *Corsones*, 131 F.4th at 65 (45% delayed a day or more, 23% delayed two or more days), and longer than those in *CNS v. Tingling*, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (rejecting position that "[t]he next business day … is immediate enough" where one-third of complaints were held at least one day). RJN, ¶ 17 & Exh. 17 at 34-35, 46-52).  They are also longer than the one-day grace period in the *Yamasaki* district court decision that was reversed by this Court.  312 F. Supp. 3d at 867-68; *rev'd*, *Yamasaki*, 950 F.3d at 640.

Moreover, the cases that have struck down these no-access-before-processing policies have not done so solely, or even primarily, on the length of the delay.  Rather, once a presumptive constitutional right of access has attached, the next question is whether, under constitutional scrutiny, the delay is justified by the reasons given for it and a lack of alternatives.  Put another way, when it comes to ongoing delays caused by policies challenged as constitutional, whether those delays can be justified is answered not by looking at their length as an abstract matter like the district court reversed in *Yamasaki*, but by applying meaningful and fact-specific constitutional scrutiny to determine whether those delays can be justified under the circumstances of the particular case.

## B.    How Appellant Measures Delays

Unable to deny these delays, Appellant offers a way to measure them so they seem "insignificant and easily justified."  AOB 43.  She disregards the actual

passage of time from the complaint's submission to when it becomes available to the public. Instead, she stops the clock whenever the courthouse is closed to the public, presenting the delays in "business hours." *See* AOB 42-43. The district court recognized how "business hours" compares to the actual passage of time: "[I]f a complaint was filed at 3:00pm on a Friday and reviewed by 9:00am the following Monday, that would only count as three business hours even though two and a half calendar days had elapsed." 1-ER-28.

Measuring a delay in "business hours" rather than court or calendar days yields a smaller number but does not make the actual delay any shorter or less problematic. CNS measures delays in calendar days because it reflects time as humans actually experience it. The press and public care whether a complaint was filed today or yesterday or last week. They do not know or care how many hours court staff were working during that span. Even before the Internet, and especially now, the daily news cycle – and the reality that most people sleep at night – means that a delay until the following day or longer is qualitatively different than a delay within a single day. *See* 6-ER-1129-30 (¶¶ 11-12).

Appellant's "business hour" calculation renders her assertion that the relief CNS seeks would merely make complaints available "a few hours sooner," AOB 45, disingenuous. As Appellant knows, taking "a few" "business hours" to process a complaint filed after 3:00 p.m. – as many of the most newsworthy complaints

typically are – means it won't be available until the next day the court is open. And even under Appellant's "business hour" calculations, substantial numbers of complaints had still not been processed after three business days (24 "business hours").  9-ER-2123-24 (¶ 6(j)).[14]

## V.

### APPELLANT CANNOT SATISFY HER BURDEN OF JUSTIFYING HER NO-ACCESS-BEFORE-PROCESSING POLICY

In order to survive the *Press-Enterprise II* scrutiny that *Planet III* held is required in cases like this one, Appellant "must demonstrate first that there is a 'substantial probability'" that an overriding interest … "would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest."  *Planet III*, 947 F.3d at 596; *Press-Enterprise II*, 677 F.3d at 9, 14.  This part of the *Press-Enterprise II* test "is 'rigorous,' but not strict, scrutiny," *Planet III*, 947 F.3d at 596, and the government bears the burden of satisfying this "fact-intensive" second stage.  *Leigh v. Salazar*, 677 F.3d 892,

---

[14] Appellant further confuses her delay statistics by including all types of initial filings, as opposed to the A.A. filing fee category of cases that are at issue here. For example, she says "it took an average of 4.82 business hours statewide between submission of an initial civil filing and clerk review," AOB 43, without mentioning the statistic is based on *all* initial filings.

40

900 (9th Cir. 2012). The undisputed evidence shows that Appellant cannot meet this burden.[15]

## A. Following *Planet III*, The District Court Correctly Tested Appellant's Delay-Causing Policy Under *Press-Enterprise II* "Rigorous" Scrutiny

*Planet III* recognized that a practice that creates ongoing delays in access to new complaints may be constitutional, but only if it satisfies *Press-Enterprise II* scrutiny. 947 F.3d at 596. Despite this binding authority, Appellant insists the district court should have applied the intermediate-level time, place, and manner ("TPM") test the defendant and concurring judge in *Planet* argued for, but that *Planet III* expressly declined to apply. 947 F.3d at 596 n.9. Appellant's TPM argument has already been decided by this Court, and it did not carry the day.

The Second Circuit similarly rejected TPM for access-delay challenges, explaining:

> [TPM] applies when the achievement of a significant government objective necessitates some imposition on a claimed right that is largely immaterial to the exercise of that right, whether that

---

[15] As in her motion to dismiss, Appellant misreads *Planet III* as foreclosing any outcome that would result in "immediate access." AOB 3, 46-47. To the contrary, when the Court observed that the First Amendment access right does not, in and of itself, "demand[] immediate, pre-processing access" to newly filed complaints, 947 F.3d at 594, it was speaking to the qualified nature of the right. When the right of access attaches, "a presumption of access arises." *Id.* at 594-96. Appellant then has the opportunity to justify her delay-causing restriction by satisfying *Press-Enterprise II* scrutiny. As the district court recognized, in an e-filing environment, immediate access is the natural result when clerks do not delay access for processing – *i.e.*, where access is "un-delayed." 1-ER-50.

41

> imposition at one or another time or place, or in one or another relatively comparable manner. … where a court withholds public access to a complaint, there may be no alternative channel for the public to become aware of the complaint and its substance. … furthermore, news is a perishable commodity. "The peculiar value of news is in the spreading of it while it is fresh."

*Corsones*, 131 F.4th at 73 (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 235 (1918)).[16]

Appellant also claims *Planet III* is "flawed," AOB 36, because, she says, "[a]lthough the *Planet III* majority claimed this standard was a "more relaxed" standard … the standard applied by the *Planet III* majority closely resembled 'strict scrutiny.'" AOB 35. But as the Second Circuit observed, *Press-Enterprise II* scrutiny "is not strict scrutiny":

> The strict scrutiny standard was well established by 1986, when *Press-Enterprise II* was decided. If the Supreme Court had intended policies that burden the right of access to be reviewed under strict scrutiny, it would have said so. Strict scrutiny is far stricter than the *Press-Enterprise II* standard. Applying strict scrutiny to a state practice or policy generally means its death knell. … While *Press-Enterprise II* scrutiny is demanding, it is not strict scrutiny.

*Corsones*, 131 F.4th at 73.[17]

---

[16] In *Schaefer*, the district court said: "Fourth Circuit precedent requires the application of strict scrutiny to this case." 440 F. Supp. 3d at 559. However, it misread *Planet III* as applying "intermediate [TPM] review, *id.*, so it applied – and found the restrictions at issue in that case failed – both tests. The Fourth Circuit affirmed on TPM grounds. 2 F.4th at 328 (4th Cir. 2021).

[17] As the Second Circuit further explained, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) and *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), both "*predate Press-Enterprise II*, in which the Supreme Court

Appellant lobbies for the TPM standard because she believes she would not have to justify her no-access-before-processing policy under TPM.  AOB 36  Appellant is mistaken.  "First Amendment interests … require" courts to "apply [TPM] mid-level scrutiny with care, paying attention to the details of the regulation at issue, the state of the record, and the fit between the regulation and the government interest asserted." *Berger v. City of Seattle*, 569 F.3d 1029, 1059 (9th Cir. 2009) (en banc).  In addition to proving its policy is "content-neutral" and leaves open "'"ample alternative channels for communication of the information,'"" the government must prove it is "'"narrowly tailored to serve a significant government interest,"'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 (9th Cir. 2011), "demonstrat[ing]" its policy "will in fact alleviate those harms in a direct and material way." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994).  TPM restrictions must "not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).

Ventura's no-access-before-processing policy did not survive even the TPM test the *Planet III* concurrence applied.  Even under TPM, Judge Smith concluded

---

crystalized the framework for evaluating the right of access to court documents.  If there is incompatibility between the earlier pronouncements and *Press-Enterprise II*, the later formulation superseded the original and is controlling." *Corsones*, 131 F.4th at 73.

Ventura failed to "explain how 'processing' the complaints before making them available to the press furthered his stated reason for the policy." *Planet III*, 947 F.3d at 604 (N.R. Smith, J., concurring as to Part III).

**B.     Appellant Has Failed To "Demonstrate A Substantial Probability That" Any Overriding Government "Interest …Would Be Impaired" Without Her No-Access-Before-Processing Policy**

Though obscured by lofty language – like "promoting access to the courts" and "ensuring public confidence in the judicial system," AOB 13 – a closer look reveals that Appellant offers three "interests" to justify her no-access-before-processing policy: (1) ensuring clerical errors are corrected; (2) preventing the confusion that would supposedly result if someone saw a complaint that was later rejected and never corrected; and (3) preventing release of confidential information. *See* 1-ER-31.[18]

For each, Appellant must "demonstrate … a '***substantial probability'*** that [the] interest … ***would*** be impaired by immediate access." *Planet III*, 947 F.3d at 596.  Imagining scenarios in which an interest might theoretically be implicated is not enough.  To overcome the presumption of access, the government must prove its policy will actually advance its stated goals. *Press-Enterprise II*, 478 U.S. at 14

---

[18] Other interests mentioned (*e.g.*, "managing judicial resources," "protecting document security"), AOB 13, are not interests she claims are protected by withholding access for clerk review.  Rather, they are reasons she gives for not adopting particular alternatives and are properly addressed in relation to the "alternatives" prong of the *Press-Enterprise II* test. *See infra* 49-60.

(requiring a "substantial probability that the defendant's right to a fair trial *will* be prejudiced by publicity that *closure would prevent*"); *Leigh*, 677 F.3d at 900 ("[A] court cannot rubber-stamp an access restriction simply because the government says it is necessary"). "[C]onclusory assertion[s]" are insufficient. *Press-Enterprise II*, 478 U.S. at 15.

### 1. Ensuring Clerical Errors Are Corrected

Appellant's emphasis on Idaho clerks as "gatekeepers for improperly submitted documents," AOB 38, misses the point. CNS does not seek – and the district court did not order – the "[e]liminat[ion of] clerk review." AOB 45. Every e-filing court – including those that do not condition access on processing – addresses clerical errors in e-filed complaints. *See, e.g.*, 6-ER-1140-41 (¶ 43); AOB 38. Appellant offers no interest – let alone an overriding one – that could be harmed if such clerical "errors are corrected *after* the documents become public rather than before." 1-ER-31.

### 2. Preventing Confusion

Appellant asserts that "providing access before acceptance of a complaint by the clerk could erode public confidence in the court system" because "the press and public would have access to a complaint that was never filed [*i.e.*, accepted], thereby causing unnecessary suspicion as to why." AOB 31. Setting aside whether this even qualifies as an "overriding interest," *Press-Enterprise II*, 478

45

U.S. at 9, this factually unsupported supposition as to what "could" happen falls into the category of speculation – far short of what *Press-Enterprise II* requires.

The overwhelming majority of e-filed civil complaints are not rejected, and most of those rejected are ultimately accepted. 4-ER-664-66. Appellant offers no evidence that the failure of an e-filed complaint to mature into an active case has been "wrongly attributed to an oversight or error by the judiciary," AOB 31, in any of the numerous courts that have provided pre-processing access for years.

Moreover, if Appellant is correct that the public would be curious as to why a complaint was submitted, returned, and not subsequently corrected, that weighs in favor of giving the public ***more*** information about what happened with a particular complaint – not erasing any trace of it. "[T]he withdrawal or rejection of a complaint might itself be a matter of public interest that the press deems newsworthy." *New Mexico*, 53 F. 4th at 1268. Indeed, Appellant's own evidence establishes that a plaintiff might file a complaint solely to pressure a settlement, with the intention of withdrawing it once the defendant has either capitulated or called plaintiff's bluff. SER-191. In that scenario, "[t]he public still has a right to know that the filing of the complaint in our courts influenced the settlement of the dispute.'" *Planet III*, 947 F.3d at 592-93.

### 3.   <u>Confidentiality</u>

Much of Appellant's summary judgment argument in the district court

46

centered around the supposed risk that pre-processing access would result in the disclosure of confidential information.  Perhaps because the record contains no evidence that the no-access-before-processing policy is necessary to protect confidential information, Appellant's brief barely mentions this justification beyond the bare assertion that the policy "serve[s] … privacy interests."  AOB 13.

Appellant was wise to reduce her reliance on her confidentiality justification. Idaho Courts can withhold access to complaints based on confidential information in only narrowly defined circumstances:

**Documents Exempt from Disclosure.**  Certain categories of documents are presumptively exempt from disclosure by rule or statue.  *See* ICAR 32(g).  ***No such documents are at issue in this case.***  SER-19-20.

**Documents Filed with a Motion to Seal.**  Documents may be sealed only by order of the court pursuant to a motion under ICAR 32(i).  If the motion is e-filed with the document proposed for sealing, the filer "must select" a particular "filing code" (i.e., document type) that automatically keeps the document out of the public record until the motion is decided.  IREFS 5(h), 7(a)(2)-(3); *see supra* at 10.

**Protected Personal Data Identifiers**.  Social security numbers, financial account numbers, and other "personal data identifiers" should be redacted from complaints, but, as in *Planet*, Idaho expressly places the burden of redacting on

filers.  IREFS 15(a)-(b); IRCP 2.6(a)-(b).  "It is the ***responsibility of the filer*** to ensure that protected personal data identifiers are omitted or redacted from documents before the documents are filed. …. ***The clerk of the court will not review filings to determine whether appropriate omissions or redactions have been made***."  IRCP 2.6(a); IREFS 15(a) (same).  *Compare Planet III*, 947 F.3d at 597 ("no-access-before-process policy bears no relationship to … concerns about privacy and confidentiality" where a court rule "requires the filer – not the court – to exclude or redact private information from publicly filed judicial documents").  The rules provide for sanctions against filers who knowingly violate the rules.  IRCP 2.6(f)-(g); IREFS 15(f)-(g).

Given these rules, it is not surprising that Idaho's "ministerial review" of civil complaints does ***not*** include a review for confidential information.  *See, e.g.*, SER-197 (¶ 6); 11-ER-2468-69 (¶ 3), 11-ER-2480-81 (¶ 3).  Declarations from court personnel suggest that "an individual ***could*** inadvertently or maliciously submit a complaint with confidential information, such as social security numbers, birthdates, bank account information, etc.," 11-ER-2477 (¶ 12), 11-ER-2485 (¶ 11), 11-ER-2499 (¶ 12), 11-ER-2506 (¶ 12), 11-ER-2511-12 (¶ 12), but ***not one of them*** identified an instance where this actually happened, let alone where clerk

review prevented such information from being included in a public filing.[19]   Four

months of statewide complaint data shows not a single complaint rejected for

failure to redact such information.  7-ER-1433 (¶¶ 19-20), 7-ER-1445-76.

**C.    Appellant's Arguments About Alternatives Show A Lack of Will, Not A Lack Of Options**

Under *Press-Enterprise II*, Appellant has the burden to prove that "no

reasonable alternatives exist to adequately protect" her interests.  *Planet III*, 947

F.3d at 596.  Despite Appellant's repeated – but factually unsupported – insistence,

Idaho need not "revamp" or "overhaul its statewide e-filing system" to fix the

delays.  AOB 3, 8, 11.  Nor are alternative options "undisputedly limited" based on

Idaho Courts' Tyler e-filing and case management systems.  AOB 46.

The parties agree that alternatives fall within three categories: (1) Idaho

could configure its current system to automatically accept the complaints at issue;

(2) Idaho could keep its clerk-accept configuration but use Tyler's off-the-shelf

"press review tool" application to provide access to complaints awaiting clerk

---

[19] The district court's summary judgment order notes a statement Appellant's counsel made during the hearing about an incident in which a "party wanted to publish … nasty things about the prosecutor which the clerk caught and didn't allow to be filed."  1-ER-33, 2-ER-98 (31:4-8).  In reality, the anecdote involved an attorney who filed a criminal-case document that contained "inflammatory information" and then "demand[ed]" it "be published on the Idaho Supreme Court's cases of interest website."  11-ER-2453 (¶ 14).  The record does not support counsel's assertion that clerk review led to the rejection of the filing, nor can Appellant point to authority that would permit a front-line clerk to refuse to accept a complaint based on a subjective view the contents are "inflammatory."

49

review; (3) Idaho could keep its clerk-accept system, but use free, Tyler-provided technical specifications (API) to customize a solution to provide access to complaints awaiting clerk review. This last category leaves Appellant free to tailor the access to whatever Idaho prefers: a virtually unlimited array of choices.

Conspicuously absent from Appellant's brief is any reference to the undisputed evidence that numerous courts – many of which use the same e-filing system as Idaho – do not withhold access to new e-filed civil complaints until after processing, using alternatives equally available to Appellant. 5-ER-971-73, 6-ER-1138-56, 6-ER-1264-65. Neither Appellant nor CNS is aware of ***any problem*** arising from pre-processing access in these courts. SER-159-60 (Rog. 26); 6-ER-1147 (¶ 53), 6-ER-1149-50 (¶¶ 61, 63), 6-ER-1152-53 (¶¶ 69, 71). The district court correctly concluded, on the basis of this evidence, that "those alternatives seem reasonable. Other states use alternative methods with good success." 1-ER-34.[20]

### 1.    Auto-Accepting The Complaints At Issue

There is no dispute that Idaho could remedy the delays at issue by automatically accepting the categories of civil complaints at issue so they can be accessed regardless of whether clerks have completed processing. More than

---

[20] Appellant is wrong in saying the district court's conclusion that "there [do] appear to be alternatives to the current system," 1-ER-34, was based solely on federal-court practices. AOB 2, 9-10.

50

twenty Tyler state courts have configured their systems to auto-accept certain filings, SER-84 (77:17-78:17), with Nevada's Eighth Judicial District Court using Tyler's system to auto-accept all new complaints. 6-ER-1138-39 (¶ 38), 1264-67. Alabama, Connecticut, Hawaii, and Utah also use statewide auto-accept systems, 6-ER-1138-40 (¶¶ 36-37, 42), and Missouri's auto-accept pilot program is slated to extend statewide by the end of the year. RJN, ¶¶ 3, 15 & Exhs. 3, 15.

Unable to point to any problems experienced by the courts that use auto-accept, Appellant dismisses this alternative based on trumped-up and/or hypothetical concerns about (1) "costs," (2) "security," and (3) "prejudice to litigants." AOB 52-54.

### a. So-Called "Costs"

Despite implying the opposite, Appellant does not contend Idaho would incur any out-of-pocket costs for auto-accept. It is undisputed that Tyler would charge Idaho *nothing* to configure its system to automatically accept the complaints at issue. SER-72 (29:19-30:23); 5-ER-923-24.

Instead, Appellant claims auto-accept "would put a significant strain on Idaho Courts' judicial resources because filing errors typically addressed by court clerks will suddenly require court action to fix." AOB 52. Her support for this is a statement from an Idaho judge that "a judicial order of some sort would be required to take any action in response to an improperly submitted complaint that

51

was automatically accepted," which would "dramatically increase the workload of judges." 11-ER-2427-28. This argument breaks down for three reasons.

*First*, as the district court observed, "[i]t is not clear … why a judge, as opposed to a clerk, would need to fix the errors simply because the case was 'officially on file' instead of in the 'pre-processing' phase." 1-ER-30. The rule Appellant relies on for this notion, ICAR 33, doesn't say this.

*Second*, if Appellant believed this rule would make auto-accept burdensome, it could be changed. 1-ER-29-30; 7-ER 1645 (94:11-25). As the district court observed, "if a rule appears to be dictating *who* can edit materials based on where the file is, it might make the most sense to simply change the rule." 1-ER-30. Appellant's response to the court's observation, AOB 39-42, is misleading and illogical. The district court did not "[r]equir[e] Idaho" to make *any* rule change, let alone require it to "vest its clerks with powers that would affect the substantive legal rights of litigants with no judicial oversight …." AOB 40. Whether it chooses an auto-accept or clerk-accept configuration, Idaho is capable of deciding what actions can be taken by clerks and what must be handled by judges and of directing personnel accordingly.

*Third*, even if judicial action were required to correct filer errors in an auto-accept system, it would not a "significant[ly] strain" judicial resources, AOB 52, or "dramatically increase" judges' workloads. 11-ER-2427-28. Four months of

52

undisputed statewide rejection data shows that each Idaho Court rejected an average of *fewer than two* of the complaints at issue each month. 7-ER-1433-34 (¶¶ 21-22), 7-ER-1477-79.[21] As the district court correctly found, "the number of rejections per day is minimal." 1-ER-30. "Thus, whether it is a judge or clerk that needs to address these cases, such could hardly be called burdensome." *Id*.

Aware of how infrequently the complaints at issue in this case are rejected, Appellant seeks to dramatically expand the universe of filings – and thus inflate the number of rejections – by claiming that if Idaho's no-access-before-processing policy is unconstitutional as to the complaints at issue, it is unconstitutional as to all court records (*e.g.*, subsequent civil filings; all filings in family, criminal, probate, and small claims proceedings) such that she will "have to eliminate this practice with respect to *all* submissions that would qualify as judicial documents …." AOB 45.

The district court was right to reject this maneuver. 1-ER-28. CNS' action seeks only A.A. categories of new civil complaints, not the entire universe of court

---

[21] The assessment of Appellant's declarant was based on a mistaken belief that all "civil filings" were at issue, 11-ER-2426 (¶ 5), rather than civil complaints in the relevant category. If he had known how few such complaints are rejected within his entire Judicial District (Bannock, Bear Lake, Caribou, Franklin, Oneida, and Power Counties), he could hardly have predicted a "dramatic[ ] increase" in judicial workloads. *See* 7-ER-1445-51 (Jan. 2021: one rejection in Caribou, one in Oneida, three in Bannock, and none in Bear Lake, Franklin, or Power), 7-ER-1452-1460 (July 2021: five total), 7-ER-1461-67 (Jan. 2022: two total), 7-ER-1468-76 (July 2022: three total).

records.  *See, e.g., Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982) ("We do not sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties before us.").  Nor is there a record in this case that could be used to determine the constitutionality of practices as to the many categories of court records not at issue in this case.

### b.  "Security Concerns"

Appellant's "security concern" with auto-accept– namely, her criticism of auto-accept's supposed inability to "protect against malicious or inadvertent disclosure of confidential information," AOB 54 – fails because, as discussed *supra* at 46-49, Idaho clerk review does not include looking for confidential information.  *See, e.g.*, SER-197; 11-ER-2468-69 (¶ 3), 11-ER-2480-81 (¶ 3).

### c.  "Prejudice To Litigants"

Appellant's contention that automatically accepting the complaints at issue would be "prejudic[ial] to litigants" is equally unsound.  AOB 54.  Her argument that "filing errors" in an automatically accepted complaint would "go unnoticed for an indefinite period of time," *id.*, begs the question of why Idaho clerks would delay their review of new complaints indefinitely if they were automatically accepted.  Nothing in the record suggests that clerks court not promptly review complaints following auto-acceptance.

Moreover, despite her repeated claims of "prejudice," Appellant points to a

single hypothetical scenario where auto-accept might require a choice between taking judicial action or impacting "the rights of litigants": a plaintiff might select the wrong county from the e-filing interface, with neither the filer nor the court noticing the mistake until after the statute of limitations has lapsed.  AOB 39, 54-55.  But even that far-fetched situation would not be catastrophic.  If reluctant to make the plaintiff bear the brunt of its error, the court could "transfer the case to the venue listed on the face of the complaint."  11-ER-2451-52 (¶ 9).  There is no evidence that this scenario has *ever* come to pass in auto-accept courts, let alone that it happens so frequently as to render auto-accept an unreasonable alternative.

## 2.    Tyler's Press Review Tool

Appellant acknowledges that Tyler offers an off-the-shelf "press review tool" to its customers,[22] but she has rejected this option because of cost ($108,000/year) and supposed security concerns.  AOB 47-50.  At summary judgment, Appellant said Idaho's Court Technology Fund could not "support the cost of" Tyler's press review tool because of a projected funding shortfall for 2024 such that an appropriation request would have to be made to the state legislature. 2-ER-211-12 (¶¶ 20-21).  Whether a need to obtain money from the legislature could render alternative unreasonable is a moot point because for FY2025 the Fund

---

[22] Courts using Tyler's "press review tool" include numerous e-filing courts throughout California, Georgia and Texas.  6-ER-1148-49 (¶¶ 56-61); RJN, ¶¶ 4, 6, 7 & Exhs. 4, 6, 7.

revenue is projected to exceed expenditures by $3.1 million.  RJN, ¶ 9 & Exh. 9.

Appellant's "security" arguments are based not on evidence of security risks but rather on Tyler's apparent refusal to provide information Idaho requested per internal procedures for vetting vendor software.  5-ER-983-85 (58:3-60:6). Appellant could get the information if she began the process of amending the e-filing contract to include the press review tool, but she cites the lack of information as a reason not to consider such amendment.  5-ER-980-82 (31:24-33:21).

Nor does the record bear out Appellant's claim that "some of the answers [Tyler] provided raise serious concerns."  AOB 48.  The supposed "serious concern" is whether those accessing e-filed documents in the press review tool could "manipulate" them.  7-ER-1519 (¶ 46); SER-184 (¶ 19).  But Tyler has answered this question, explaining that its press review tool merely displays documents, and that it is *not possible* to modify them from within the tool.  SER-85-88 (82:23-83:14, 85:17-23, 91:5-93:3).  Appellant's "cyber-security" witness Jennifer Dvorak admitted that she had never seen Tyler's press review tool in operation or even spoken to personnel at courts that use it.  8-ER-1894 (24:9-20).

Lacking a basis to attack Tyler's press review tool, Appellant criticizes a *different* Tyler-provided public access portal that Idaho *already uses*.  AOB 49-50. She points to reports that in 2022, third-party bots accessed non-public information from the same Tyler portal used by a different entity.  AOB 49-50.  Tyler's press

56

review tool was not involved.  SER-116 (200:16-201:5).

In the same breath, Appellant notes that CNS sometimes uses bots to review public information on court web sites.  While it is true that CNS sometimes uses bots "to assist the reporter in gathering routine clerical information such as the docket entries," although it does not do so in Idaho, 8-ER-1705 (94:11-19, 95:3-8, 95:12-24), 8-ER-1716 (138:20-139:10), it is baseless and inappropriate for Appellant to suggest that CNS has engaged in "sweeping" activities "similar" to whatever caused the unrelated Tyler portal incident.  AOB 49-50.

Finally, Appellant's criticism of Tyler's press review tool as lacking "security settings" to "prevent against inadvertent or malicious disclosure of confidential information," AOB 48-49, fails because, again, Idaho clerks do not review complaints for such information.  *See supra* 46-49.  Similarly, the comment that Tyler "does not indemnify its customers" if complaints containing confidential information appear in a press review queue implies that Idaho Courts view themselves as potentially liable for allowing access to a complaint that contains confidential information when, in reality, Idaho disclaims any such responsibility.  IRCP 2.6(a); IREFS 15(a).

### 3.    Using Tyler's Free API To Develop A Tailored Solution

Finally, Tyler will provide – at no cost to Idaho – an application programming interface ("API") that Idaho can use to modify its website to provide

access to complaints while they await ministerial review.  11-ER-2552 (191:17-193:12).  Doing so would address the security concerns Appellant professes having about Tyler's press review tool, as Idaho could dictate security parameters for itself.  As for cost, even if Appellant engaged a vendor to develop the queue, the record reflects that other courts have done so *for as little as $12,500*.  6-ER-1153 (¶ 71).  Appellant does not attempt to quantify any development, "personnel," or "data hosting" costs, AOB 51, instead relying on Idaho's since-remedied budget shortfall to assert that a legislative appropriation would be necessary.  2-ER-212 (¶ 21); *see* RJN, Exh. 9.

The record reflects that many state court systems have managed to provide such portals expeditiously, tailoring them to the jurisdiction's preferences.  For example, following a preliminary injunction against a no-access-before-processing policy, the New York courts adjusted their public access portal to display newly filed complaints alongside those that had been "accepted," completing the necessary programming within six weeks.  6-ER-1141-47 (¶¶ 45-53).  Similarly, after insisting that its no-access-before-processing policy was necessary to protect confidential filings, California's OCSC agreed to implement an "Electronic Media Inbox into which new [e-filed complaints would] be automatically deposited upon receipt [by the court] for review by members of the media."  5-ER-1108-14, 6-ER-1154-55 (¶¶ 74-76).

58

Florida also resolved a challenge to delays caused by its no-access-before-processing policy by creating a free, registration-based access portal. 5-ER-971-73, 6-ER-1151-52 (¶¶ 67-69). Launched within 75 days of entering into a settlement agreement, the portal notifies users that "[t]he documents found on this webpage have not been accepted by the Clerk and are not official court documents." *Id*. Similarly, within three months of a preliminary injunction against Franklin County, Ohio's no-access-before-processing policy, the clerk had "modified her public webpage to permit online viewing by the public of newly e-filed, non-confidential, civil filings upon receipt." RJN, ¶ 1 & Exh. 1 (¶¶ 2-3).

Arizona developed its News Media Portal in response to a CNS request, with CNS agreeing to pay the vendor's development costs ($12,500). 5-ER-1106-07, 6-ER-1152-53 (¶¶ 70-72). Minnesota, New Mexico, and South Dakota – all of which use Tyler's e-filing system – have also developed or are currently developing their own mechanisms to provide access to complaints that are awaiting clerk review. RJN, ¶¶ 2, 5, 8, 10-12 & Exhs. 2, 5, 8, 10-12.

Appellant offers no evidence that Idaho could not do the same. Her assertion that Tyler "has not provided" information her staff requested "regarding the security, functionality, and costs of the API," AOB 51, is misleading. On November 7, 2022, Dvorak testified that she expected to evaluate API functionality once Tyler began providing it to its customers. 8-ER-1894 (21:4-22:8), 8-ER-1923

59

(137:15-138:11). Three days later, Appellant learned that Tyler had already begun providing the API to courts that wanted it. 11-ER-2552 (191:18-23). Having had the opportunity to evaluate "security" and "functionality" of the API first-hand since it became available, Appellant cannot plead self-imposed ignorance.

Moreover, Appellant fails to mention that even as this case was pending, she was already "talking with other vendors to see if we could build our own" access portal and had "some funding set aside in the budget … to start that project of building a new portal." 7-ER-1630 (34:5-35:2, 35:8-15). As she explained, "it has been the bane of my existence that we don't have a portal that does the things that we would really like it to do, and so we are in the process of building that out …." 7-ER-1630 (35:20-24).

Appellant had declined, however, to discuss with vendors the possibility of including press review functionality in the new portal – not because of technical or logistical considerations, but because court "rules tell me that a document is available to the public when it is placed in a case file, and so I'm … in negotiations to have a system built on the case files." 7-ER-1631 (37:7-38:12). Appellant's preference to continue withholding access for processing, of course, does not render "unreasonable" the option of including pre-acceptance access within the portal she is already working to build.

## **CONCLUSION**

To borrow from the Supreme Court's discourse on narrow tailoring, "[t]he point is not that [Appellant] must enact all or even any of the proposed measures discussed above.  The point is instead that [Appellant] has available to [her] a variety of approaches that appear capable of serving [her] interests," without restricting access to the complaints at issue.  *McCullen*, 573 U.S. at 493–94.

As the district court correctly recognized, Idaho can choose for itself the best way to provide pre-processing access.  1-ER-36-37.  What it cannot do is choose "the path of least resistance" – maintaining the unconstitutional choice to delay access that it could have avoided from the start – for "mere convenience." *McCullen*, 574 U.S. at 486.  CNS respectfully requests that the Court affirm the judgment of the district court.

DATED:  May 21, 2025          BRYAN CAVE LEIGHTON PAISNER LLP

By:  /s/ Rachel Matteo-Boehm
          Rachel Matteo-Boehm
          Attorneys for Plaintiff-Appellee
          Courthouse News Service

61

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-6697

I am the attorney or self-represented party.

**This brief contains** | 13,960 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [            ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Rachel Matteo-Boehm | **Date** | 5/21/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*