U.S. Court of Appeals Docket No. 24-6697

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

COURTHOUSE NEWS SERVICE,

*Plaintiff/Appellee*,

vs.

SARA OMUNDSON, in her official capacity as
Administrative Director of Idaho Courts,

*Defendant/Appellant.*

_____

On Appeal from a Decision of the United States District Court
For the District of Idaho
Case No. 1:21-cv-00305-DCN
The Honorable David C. Nye

_____

## SUPPLEMENTAL EXCERPTS OF RECORD
## SINGLE VOLUME

_____

Roger Myers
Rachel Matteo-Boehm
Jonathan Fetterly
Katherine Keating
### BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
roger.myers@bclplaw.com; rachel.matteo-boehm@bclplaw.com;
jon.fetterly@bclplaw.com; katherine.keating@bclplaw.com

*Attorneys for Plaintiff-Appellee*
COURTHOUSE NEWS SERVICE

| DOCUMENT | FILED DATE | USDC Dkt No. | SER No. |
|---|---|---|---|
| Supplemental Declaration of Jonathan G Fetterly in Support of Motion for Summary Judgment with Exhibits 1-11 | 12/19/2022 | [67-1] | 3 |
| Exhibit 1 to Supplemental Declaration of Jonathan G Fetterly in Support of Motion for Summary Judgment<br><br>(Excel spreadsheet to be submitted in native form subject to grant of motion for leave to transmit, filed on May 21, 2025) | 12/19/2022 | [67-1] | 174 |
| Exhibit 1 to Declaration of Jimmy Shimabukuro in Support of Motion for Summary Judgment<br><br>(Excel spreadsheet to be submitted in native form subject to grant of motion for leave to transmit, filed on May 21, 2025) | 12/15/2022 | [61-3] | 175 |
| Declaration of Sara Omundson in Support of Motion for Summary Judgment[1] | 12/15/2022 | [59-7] | 176 |
| Affidavit of The Honorable Steven Hippler in Support of Response in Opposition to Motion for Preliminary Injunction[2] | 12/22/2021 | [20-16] | 189 |
| Affidavit of Margaret Molchan in Support of Response in Opposition to Motion for Preliminary Injunction[3] | 12/22/2021 | [20-14] | 195 |

---

[1] A redacted version of this document appears in the Excerpts of Record at 2-ER-188-200 and 2-ER-202-214. Pursuant to Ninth Cir. R. 27-13(h), the parties have stipulated that an unredacted version of the document, filed under seal in the district court as ECF 59-7, may be included in these Supplemental Excerpts of Record.

[2] Cited as summary judgment evidence. *E.g.*, 6-ER-1354, 7-ER-1502.

[3] Cited as summary judgment evidence. *E.g.*, 6-ER-1339, 7-ER-1503.

Amber N. Dina (ISB # 7708)
amberdina@givenspursley.com
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701
Telephone:  (208) 388-1200
Facsimile:  (208) 388-1300

Katherine A. Keating (admitted *Pro Hac Vice*)
katherine.keating@bclplaw.com
Jonathan G. Fetterly (admitted *Pro Hac Vice*)
jon.fetterly@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111
Telephone:  (415) 675-3400
Facsimile:  (415) 675-3434

*Attorneys for Courthouse News Service*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>                              Plaintiff,<br><br>v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>                              Defendant. | Case No: 1:21-CV-00305-DCN<br><br>**DECLARATION OF JONATHAN G. FETTERLY IN SUPPORT OF PLAINTIFF COURTHOUSE NEWS SERVICE'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[with Exhibits 1-11]** |

DECLARATION OF JONATHAN FETTERLY ISO
MOTION FOR SUMMARY JUDGMENT

I, Jonathan G. Fetterly, declare:

1.      I am an attorney at law licensed to practice before the Courts of the State of California, each of the four United States District Courts in California and the Ninth Circuit Court of Appeals.  I am admitted *pro hac vice* in this case.  I am a Partner with Bryan Cave Leighton Paisner LLP, counsel of record for Plaintiff Courthouse News Service ("Courthouse News"). Unless otherwise stated, I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.      On November 10, 2022, Defendant produced an Excel spreadsheet in native form, Bates-labeled SO 5708 (the "Complaint Data Spreadsheet").  A true and correct copy of this Excel spreadsheet is included in native form as **Exhibit 1**.  Pursuant to the Court's direction, the native spreadsheet comprising Exhibit 1 will be delivered to the Court on a flash drive.

3.      Based on representations of opposing counsel, Courthouse News understood that the Complaint Data Spreadsheet included categories of information agreed upon by the parties with respect to every complaint e-filed in Idaho's district courts from January 1, 2020 through July 31, 2022 in the types of cases listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed in: E, F and H1)").  On or about November 29, 2022, counsel for Courthouse News determined that the Complaint Data Spreadsheet contained virtually no data for e-filings in courts other than Ada County District Court and that it was missing data for several weeks in 2020 altogether.  In light of the incompleteness of the 2020 data in the Complaint Data Spreadsheet, Courthouse News has excluded the 2020 data from its calculations and relied instead on the data for complaints submitted from January 1, 2021 through July 31, 2022.

2
DECLARATION OF JONATHAN FETTERLY ISO
MOTION FOR SUMMARY JUDGMENT

4.      On November 7, 2022, Defendant served supplemental and amended responses to Courthouse News' first set and third set of interrogatories.  True and correct copies of relevant excerpts from Defendant's responses are attached as **Exhibit 2**.

5.      On November 7, 2022, Defendant served supplemental and amended responses to Courthouse News' first and third set of requests for admission.  Defendant's responses were also used as an exhibit (Depo. Ex. No 39) to Defendant's deposition.  True and correct copies of relevant excerpts from Defendant's responses are attached as **Exhibit 3**.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of Appendix A to the Idaho Rules of Civil Procedure.

7.      On November 11, 2022, Courthouse News took the deposition of Sara Omundson ("Defendant").  Attached hereto as **Exhibit 5** are true and correct copies of excerpts from Defendant's deposition transcript relating to the issues raised in Courthouse News' Motion for Summary Judgment, and related exhibits.

8.      On November 10, 2022, Courthouse News took the deposition of Terry Derrick "Derrick").  Attached hereto as **Exhibit 6** are true and correct copies of excerpts from Derrick's deposition transcript relating to the issues raised in Courthouse News' Motion for Summary Judgment, and related exhibits.

9.      On June 16, 2022, Courthouse News served its first set of interrogatories, requests for production and requests for admission on Defendant.  On July 23, 2022, Defendant served responses to Courthouse News' interrogatories, requests for production and requests for admission.  True and correct copies of relevant excerpts from Defendant's responses are attached as **Exhibit 7**.

DECLARATION OF JONATHAN FETTERLY ISO
MOTION FOR SUMMARY JUDGMENT     3

10.     On August 19, 2022, Courthouse News served its second set of requests for admission on Defendant.  On September 23, 2022, Defendant served responses to Courthouse News' second set of requests for admissions.  True and correct copies of relevant excerpts from Defendant's responses are attached as **Exhibit 8**.

11.     On August 26, 2022, Courthouse News served its third first set of interrogatories on Defendant.  On September 30, 2022, Defendant served responses to Courthouse News' third set of interrogatories.  True and correct copies of relevant excerpts from Defendant's responses are attached as **Exhibit 9**.

12.     On August 26, 2022, Courthouse News served its third set of requests for admission on Defendant.  On September 30, 2022, Defendant served responses to Courthouse News' third set of requests for admission.  True and correct copies of relevant excerpts from Defendant's responses are attached as **Exhibit 10**.

13.     On July 22, 2022, Defendant produced a document entitled "Filing Accepted", Bates-labeled SO 000250 – SO 000251.  A true and correct copy of this document is attached as **Exhibit 11**.

14.     On July 22, 2022, Defendant produced a document consisting of an Agreement between Tyler Technologies and the Idaho Supreme Court dated August 28, 2013, Bates-labeled SO 000476 – SO 000546.  This document was also used as an exhibit (Depo. Ex. 14) to the deposition of Dvorak.  A true and correct copy of this document is attached **Exhibit 12**.

15.     On July 22, 2022, Defendant produced a document consisting of an Electronic Filing Amendment – May 2021, Bates-labeled SO 000547 – SO 000554.  This document was also used as an exhibit (Depo. Ex. 15) to the deposition of Dvorak.  A true and correct copy of this document is attached as **Exhibit 13**.

16.     A true and correct copy of the Tyler Technologies Individual Filer User Guide is attached as **Exhibit 14**.  This document was also used as an exhibit (Depo. Ex. 35) to the deposition of Derrick.

17.     On September 16, 2022 Courthouse News produced a document consisting of an October 22, 2022 email, Bates-labeled CNS 13299-CNS 13301.  This document was also used as an exhibit (Depo Ex. 30) to the deposition of Girdner.  A true and correct copy of this document is attached as **Exhibit 15**.

18.     On September 23, 2022, Defendant produced a document consisting of a cover e-mail dated July 14, 2022, and what appears to be a Powerpoint presentation, dated July 1, 2022 and entitled "Auto-Accept Review & Press Review Tool," Bates-labeled SO_05034-SO_05046.  This document was also used as an exhibit (Depo Ex. 8) to the deposition of Dvorak.  A true and correct copy of this document is attached as **Exhibit 16**.

19.     On August 22, 2022 Defendant produced a document consisting of an Idaho Operations Manual, Bates-labeled SO_00555-SO_00570; -SO_01580-SO_1592.  This document was also used as an exhibit (Depo Ex. 41) to the deposition of Omundson.  A true and correct copy of this document is attached as **Exhibit 17**.

20.     A true and correct copy of a print-out of the page "Correcting E-Filing Mistakes" from the website of the District Court for the Northern District of California," available at https://www.cand.uscourts.gov/cases-e-filing/cm-ecf/support-and-troubleshooting/correcting-e-filing-mistakes/, is attached hereto as **Exhibit 18**.

21.     A true and correct copy of a print-out of Florida's "Statewide Non-Confidential Circuit Civil Filings" webpage, available at

https://www.myflcourtaccess.com/Common/UIPages/PublicAccess.aspx, is attached hereto as **Exhibit 19**.

22.     On November 7, 2022, Courthouse News took the deposition of Jennifer Dvorak ("Dvorak").  Attached hereto as **Exhibit 20** are true and correct copies of excerpts from Derrick's deposition transcript relating to the issues raised in Courthouse News' Motion for Summary Judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed at San Francisco on this 15th day of December 2022.

/s/ Jonathan G. Fetterly
Jonathan G. Fetterly

**Exhibit 1 to Declaration of Jonathan Fetterly**

Excel spreadsheet submitted in native form on flash drive.

# EXHIBIT 2
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299



11.11.2022
30(b)(6) Omundson
**39**
Buell Realtime Reporting

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

COURTHOUSE NEWS SERVICE,

        Plaintiff

vs.

SARA OMUNDSON, in her official capacity
as Administrative Director of Idaho Courts,

        Defendant.

CASE NO. 1:21-CV-00305-DCN

**DEFENDANT'S SUPPLEMENTAL
RESPONSES TO PLAINTIFF'S
FIRST AND THIRD SET OF
INTERROGATORIES**

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke

Evett, PLLC, hereby supplements her objections, answers, and responses to Plaintiff's First and

Third Set of Interrogatories.

## **INTERROGATORIES**

INTERROGATORY NO. 1:  State all reasons or justifications supporting the policy or

practice of withholding access to new e-filed civil complaints filed with the Idaho District Courts

until after those complaints have been Processed or Accepted.

ANSWER TO INTERROGATORY NO. 1:  Omundson objects to this interrogatory on

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF
INTERROGATORIES -1

EXHIBIT 2, page 1 of 15
Decl. of Fetterly

the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered in the Court's case management system, until it has been Processed and Accepted.

Subject to and without waiver of this objection, Omundson responds that the policies and justifications for not providing access to documents that have been submitted but not yet Processed or Accepted are as follows: (1) the public is not provided with access to documents that have not been Processed or Accepted because such documents are not filed and not entered in the court's case management system  until they have been Accepted. Providing documents to the public before they are in the court's case management system may mislead the public to believe documents are court filings when they are not yet filed and may never be filed; (2) Tyler Technologies' Auto Accept function has not been implemented because this would allow documents to be filed, and therefore become part of the official record, even if the filing requirements that exist in Idaho Court Rules (e.g. payment of a filing fee and redaction requirements) have not been met or the action had been filed in an improper jurisdiction or venue, which would require judicial action that would add to the already incredibly busy schedules of judges and their court staff; (3) in addition, the Auto Accept function has not been implemented because it creates additional work for Idaho's already busy judges and a privacy risk to litigants and third parties (e.g. publication of sensitive information in a court submission), which would require judicial action to correct; (4) Tyler Technologies' Press Review Queue presents similar concerns because submissions that are Rejected could be published and/or reported on even though such submissions are not yet court filings, do not exist in the court's case management system or in a court file, and may never be entered in the Court's case management system; (5)

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -2

the Press Review Queue does not have any function to ensure that the security settings of documents are accurately reflected, that sensitive information about litigants and/or third parties contained in a submission (e.g. a petition for a civil protection order) will be redacted or otherwise not made available to the press and/or public, whereas the clerks can Reject an improperly redacted submission to ensure confidential information remains protected and can set the proper security setting to a document based upon Idaho Court Administrative Rule 32; (6) the Press Review Queue presents resource concerns because there is a subscription cost, hardware costs, and costs associated with personnel needed to manage the Press Review Queue; and (7) the Press Review Queue presents potential cyber security risks.

In addition, Omundson refers CNS to the Affidavit of Margaret Molchan (Dkt. 20-14); the Affidavit of Judge Hippler (Dkt. 20-16), the Affidavit of Carley Nelson (Dkt. 20-20), and the Declaration of Marissa Garza (Dkt. 23-1).

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 1:   Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 1. Omundson supplements her original response as follows. A document submitted through Tyler Technology's File and Serve system is not a judicial document.  It is not a judicial document because it has not been accepted by the district court clerk for transfer from Tyler Technology's File and Serve system and docketing in the court's case management system.  As such, a document in Tyler Technology's File and Serve system: (1) is not filed in the court's case management system and, therefore, is not part of the court's docket, and may never be.; (2) does not initiate a case; (3) is not relevant to the performance of a judicial function because no case has been initiated yet and therefore cannot materially assist the public in understanding issues before a court because such issues are not yet before a court; (4) does not trigger legal obligations

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -3

EXHIBIT 2, page 3 of 15
Decl. of Fetterly

because no case has been initiated yet; and (5) does not help the public in evaluating the fairness and integrity of the court's proceedings because no case has been initiated yet. Please also see the Supplemental Answer to Interrogatory No. 12. Omundson also refers CNS to her answer to Interrogatory No. 23, which provides updated information regarding hardware costs.

INTERROGATORY NO. 2:    State all reasons or justifications for not providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to all reasons for not providing access to those complaints through a Press Review Queue or through Auto Accept.

ANSWER TO INTERROGATORY NO. 2: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 2:   Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 2. Omundson supplements her original response as follows. The mere submission of a document intending to initiate a case does not initiate a case. The case is not initiated until the document is accepted by the Court Clerk and then transferred from Tyler Technologies' File and Serve system to the Court's case management system. At that time of such transfer, the accepted document is then docketed in Court's case management system and is immediately available to the public,

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -4

including CNS.

INTERROGATORY NO. 5:  Identify all governmental interests that You contend could not be adequately protected by providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with the Idaho District Courts prior to Processing or Acceptance, including the basis for Your contention(s) with respect to each such governmental interest.

ANSWER TO INTERROGATORY NO. 5: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.  Omundson further responds that the government has an interest in ensuring that confidential information of litigants and/or third parties is not made available to the press or the public. Auto Accept and the Press Review Queue undermine this governmental interest for the reasons discussed in the Answer to Interrogatory No. 1. The government also has an interest in ensuring that the press and public are presented with accurate information regarding civil filings.  The Press Review Queue could result in the publication of inaccurate information regarding civil filings (i.e. if  a submission that is Rejected, and thus never filed or an official court document, is reported on as if it were a filed document and an official court record.).  The government also has an interest in conserving judicial and administrative resources. Auto Accept and the Press Review Queue do not further these interests because there are subscription, hardware and personnel costs associated with remaining the Press Review Queue and Auto

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF
INTERROGATORIES -5

EXHIBIT 2, page 5 of 15
Decl. of Fetterly

Accept could result in improper filings that would require judicial action and resources to correct.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 5:   Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 5. Omundson supplements her response as follows. Omundson refers CNS to the refers CNS to the Affidavit of Margaret Molchan (Dkt. 20-14); the Affidavit of Judge Hippler (Dkt. 20-16), the Affidavit of Carley Nelson (Dkt. 20-20), and the Declaration of Marissa Garza (Dkt. 23-1).   Omundson further responds that electronic submissions are housed in Tyler's Odyssey File & Serve prior to clerk review and acceptance or rejection. When documents are in Odyssey File & Serve, clerks can communicate directly with the submitter and any other individuals listed as a service contact, including communications related to reasons for rejection. This functionality is not available in Case Manager, which is where documents are transferred once they have been accepted for filing. Once a document is in Case Manager, a clerk would have to track down contact information for the submitter and any other service contacts and send an email if there are issues with a document that has been accepted for filing. This takes substantially more time than communicating directly through the portal. This is also problematic because although communication in OFS are not available in a central location, that is not true of communications once documents are transferred to the case management system and are instead only available in the individual clerk's email. This presents problems with keeping track of communications relating to documents that should not have been transferred into Case Manager.  Further, clerks are only able to communicate with a submitter if the document includes their contact information (which a party may fail to include, especially if they are pro se). Clerks' workloads would increase substantially if all communications related to improper submissions had to take place once the document was already in Case Manager. Finally, Tyler's Odyssey File & Serve software allows clerks to track

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF
INTERROGATORIES -6

data and trends related to electronic submissions, which provides useful information relating to common reasons for rejection and individual clerk performance. With Auto Accept, electronic submissions never go through Odyssey File & Serve, and therefore this functionality would not be available to the clerks. Omundson also refers CNS to her answer to Interrogatory No. 23, which provides updated information regarding hardware costs. With respect to the other costs identified in her original answer to Interrogatory No. 5, Omundson further responds that the Idaho Supreme Court has discretion on how to manage the State's judicial resources and has determined that incurring the costs associated with the Press Review Queue and Auto Accept is not a reasonable and prudent use of the State's judicial resources.

INTERROGATORY NO. 12:  Identify all AOC, Trial Court Administrator or District Clerk policies and statutes, rules, regulations, or other sources of legal authority that You contend support or require the policy and practice of restricting or prohibiting public or press access to new e-filed non-confidential civil complaints upon receipt by the Idaho District Courts until after Processing or Acceptance, including the basis for your contention(s) with respect to each policy, statute, rule, regulation or other authority cited.

ANSWER TO INTERROGATORY NO. 12: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Omundson further objects to this interrogatory on the grounds that it seeks information not within her custody or control; she does not supervise county clerks and does not have copies of their policies. Subject to and without waiver of these objections, Omundson responds that Idaho Rule

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -7

on Electronic Filing and Service ("IREFS") 3 defines the official court record to be the electronic case file maintained by the court as well as any paper filings and other conventional filings maintained in accordance with court rules. This does not include documents that reside in Tyler Technologies' Online Filing System program. IREFS 13 authorizes court clerks to reject submitted documents that do not comply with the electronic filing rules. Rejected documents are not part of the official court record because they are not included in an electronic case file maintained by the courts. Once a document has been accepted by a clerk it is moved out of the OFS system and placed in the Court's case management system, becoming an official court record pursuant to IREFS 3. At that time the Administrative Office of Courts follows Idaho Court Administrative Rule 32 and any relevant court orders in determining the security status of a document.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 12: Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 12. Omundson supplements her original response as follows. To file a document under seal, the document must be filed conventionally (i.e. not electronically) along with a motion to seal pursuant to IREFS 5(h). IREFS 10(a) specifies that acceptance of the document (not submission) triggers payment to be captured. IREFS 10(b) specifies a document is "deemed to have not been filed" if it is rejected based on a denial of a fee waiver application. IREFS 17 states the electronic filing system (i.e. OFS) sends a notice of electronic filing both "[w]hen the filer submits, and again when the document is accepted for filing under Rule 11[.]" IREFS 17(f). These provisions further establish a document is not filed when it is pending clerk review in Tyler's Odyssey File & Serve; it is filed upon acceptance and transfer into the court's case management system. Omundson also refers CNS to documents produced at SO001582-1590.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF
INTERROGATORIES -8

INTERROGATORY NO. 18: Identify each category of civil complaint available for filing in the Idaho District Courts that You contend must be kept confidential by the Idaho District Courts by operation of rule or law (including categories of civil complaints You contend are "exempt from public disclosure"), without the need for a motion or request for sealing.

ANSWER TO INTERROGATORY NO. 18: Omundson objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of this objection, Omundson refers CNS to Idaho Court Administrative Rule 32(g) and the documents produced at SO 005360-5364. There are no documents for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) that must be kept confidential by the Idaho District Courts by operation of rule or law without the need for a motion or request for sealing.

INTERROGATORY NO. 19: For each category You identified in response to Interrogatory No. 18, state the number of civil complaints in that category or type e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022.

ANSWER TO INTERROGATORY NO. 19: Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -9

EXHIBIT 2, page 9 of 15
Decl. of Fetterly

Subject to and without waiver of these objections, and based on the definitions of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that 9,833 civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 19: Omundson objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of these objections, and based on the definitions of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that no civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022 that were required to be kept confidential by the Idaho District Courts by operation of rule or law without the need for a motion or request for sealing. Omundson's original response erroneously referred to the total number of civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022.

INTERROGATORY NO. 20: State the number of civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022 with a motion or request for sealing.

ANSWER TO INTERROGATORY NO. 20: Omundson objects to this Interrogatory on

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -10

EXHIBIT 2, page 10 of 15
Decl. of Fetterly

the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that from January 1, 2020 through July 21, 2022, one civil complaint in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) was e-filed between January 1, 2020 and July 31, 2022.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 20:  Omundson incorporates by reference her objections and answer to Interrogatory No. 20 set forth above. Omundson supplements her original response include the objections that Interrogatory No. 2 is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Omundson supplements her original response as follows. To file a document under seal, the document must be filed conventionally (i.e. not electronically) along with a motion to seal pursuant to IREFS 5(h). Thus, the complaint referenced in Omundson's original response did not comply with the requirements of IREFS 5(h), but was nevertheless accepted for filing.

INTERROGATORY NO. 21: Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected.

ANSWER TO INTERROGATORY NO. 21: Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague;

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -11

Interrogatory No. 22 asks about civil complaints that were Rejected, corrected, and then Accepted, so it is unclear if Interrogatory No. 21 is asking for the total number of Rejected civil complaints, or only those that were Rejected and then not resubmitted. Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,642 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected. Omundson calculated this number based on the number of times a civil complaint was Rejected, meaning if a civil complaint was submitted and Rejected four times, each of the filings were counted in calculating this number.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 21: Omundson incorporates by reference her objections and answer to Interrogatory No. 21 set forth above. Omundson supplements her original response include the objections that Interrogatory No. 21 is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of these objections, Omundson does not have any substantive change to her answer to Interrogatory No. 21 set forth above.

INTERROGATORY NO. 22: Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected, subsequently corrected and re-submitted by the filer, and ultimately Accepted.

ANSWER TO INTERROGATORY NO. 22: Omundson objects to this Interrogatory on

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -12

the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,025 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected, subsequently corrected, resubmitted by the filer, and ultimately Accepted. Omundson calculated this number based on the number of times a civil complaint was Rejected and resubmitted, meaning if a civil complaint was submitted and Rejected and resubmitted four times, each of the filings were counted in calculating this number. Omundson further responds that 28% of rejected filings are missing identifying information that would allow a match with a resubmitted and Accepted filing. These results were also based on the time litigants are allowed to resubmit e-filed complaints before they are considered a new filing (3 days per Rule 13(c) of the Idaho Rules for Electronic Filing and Service).

    <ins>SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 22</ins>: Omundson incorporates by reference her objections and answer to Interrogatory No. 22 set forth above. Omundson supplements her original response include the objections that Interrogatory No. 22 is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of these objections, Omundson does not have any substantive change to her answer to Interrogatory No. 22 set forth above.

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -13

INTERROGATORY NO. 25: Identify the "potential cyber security risks" presented by the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

ANSWER TO INTERROGATORY NO. 25: Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all cyber security risks associated with the Press Review Queue. Subject to and without waiver of this objection, Omundson refers CNS to the document titled "Risk Memorandum" and dated August 18, 2022. Omundson further responds that Tyler has refused to respond to numerous questions from the AOC regarding security concerns with the Press Review Queue. Tyler has refused to provide an answer to the AOC's questions about whether the Press Review Queue provides a link to the original pleading or a copy of the pleading. Providing a link to the original document raises serious concerns about document security if the system is hacked because filings could be deleted or altered without any backup to the original document. Tyler has also refused to provide a customer attestation letter from their underlying IaaS provider, AWS, indicating Tyler is a customer in good standing and which environment will be storing, processing, and transmitting Idaho District Court's data. Tyler has also refused to provide the architecture and/or data flow diagram to the AOC so that the AOC can understand the Press Review Queue's backend processes for data transfer. Tyler has also refused to provide its policies and procedures surrounding data security. Even though a Non-Disclosure Agreement has been signed, Tyler refuses to provide these policies and procedures on the grounds that this would allegedly violate company policy. Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 25: Omundson incorporates by reference the objections set forth in her original response to Interrogatory No. 25. Omundson

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -14

supplements her original response as follows. Tyler has informed the AOC that the Press Review Queue utilizes the same document database as OFS itself, thus the queue provides users a link to the original pleading (as opposed to a copy of the pleading). Providing a public facing uniform resource locator (url) link to the original document increases access to that file, thereby increasing risk to that original file. This raises serious concerns about document security as a public facing url listed in the Press Review Queue increases the possibility of a breach of the OFS database in which  original submitted documents  could be locked, deleted, or altered prior to being reviewed by clerks or transferred to the case management system.

DATED this 7th day of November, 2022.

DUKE EVETT, PLLC

By /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of November, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw.com |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke_____
Keely E. Duke

DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF INTERROGATORIES -15

EXHIBIT 2, page 15 of 15
Decl. of Fetterly

# EXHIBIT 3
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>    Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>    Defendant. | CASE NO. 1:21-CV-00305-DCN<br><br>**DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF REQUESTS FOR ADMISSION** |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke Evett, PLLC, hereby provides supplemental and amended objections, answers, and responses to Plaintiff's First and Third Set of Requests for Admissions.

**REQUESTS FOR ADMISSION**

REQUEST FOR ADMISSION NO. 6:  Admit that as of June 15, 2022, You have not asked Tyler Technologies to provide a Press Review Queue for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 6: Omundson admits that as of June

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF REQUESTS FOR ADMISSION - 1

EXHIBIT 3, page 1 of 5
Decl. of Fetterly

15, 2022, she has not asked Tyler Technologies to provide a Press Review Queue for the Idaho
Courts based on the security concerns and costs associated with the Press Review Queue set forth
in her answer to Interrogatory No. 1.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 6: Omundson
incorporates by reference her original answer to Request for Admission No. 6 and supplements her
response by referring CNS to her supplemental answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 7: Admit as of June 15, 2022, you have not at any
time attempted to negotiate or lower any price quoted by Tyler Technologies for a Press Review
Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 7: Omundson admits that as of June
15, 2022, she has not attempted to negotiate or lower any price quoted by Tyler Technologies for
a Press Review Queue, however cost concerns are not the sole reason for her decision to not
implement a Press Queue. Omundson refers Plaintiffs to her response to Interrogatory No. 1
regarding the reasons for not implementing a Press Review Queue. Omundson further responds
that questions relating to the price of the Press Review are inconsistent with CNS' representations
to the Court that the Press Review Queue is free. *See e.g.* Dkt. 14-1 at 6.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 7: Omundson
incorporates by reference her original answer to Request for Admission No. 7 and supplements her
response by referring CNS to her supplemental answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 8: Admit that as of June 15 2022, You have not
asked Tyler Technologies to provide an Auto Accept system for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 8: Omundson admits that as of June
15, 2022, she has not asked Tyler Technologies to provide an Auto Accept System for the Idaho

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD
SET OF REQUESTS FOR ADMISSION - 2

EXHIBIT 3, page 2 of 5
Decl. of Fetterly

Courts based on the concerns with Auto Accept set forth in her answer to Interrogatory No. 1.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 8: Omundson incorporates by reference her original answer to Request for Admission No. 8 and supplements her response by referring CNS to her supplemental answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 9: Admit that You are aware that Tyler Technologies has agreed to deliver the APIs for the Press Review Queue to its partners.

RESPONSE TO REQUEST FOR ADMISSION NO. 9: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it does not define "partners." Subject to and without waiver of this objection, Omundson admits that she is aware that Tyler Technologies has represented it will deliver APIs for the Press Review Queue. She has been told that Tyler Technologies is reporting that the delivery of an API is now delayed from the original projected date and that there is not a clear time frame for delivery.

SUPPLEMENTAL RESPONSE TO REQUEST FOR ADMISSION NO. 9: Omundson incorporates by reference her original answer to Request for Admission No. 9 and supplements her response as follows. Tyler Technologies has not provided any information to the AOC relating to the cost of creating and/or maintaining an API for the Press Review Queue.

REQUEST FOR ADMISSION NO. 17: Admit that under the default configuration for File & Serve, nonconfidential e-filed civil complaints are not available for viewing by the press or public until after they are "Accepted" by court staff.

RESPONSE TO REQUEST FOR ADMISSION NO. 17: Denied; all documents are immediately available upon filing, which requires acceptance by a court clerk pursuant to Rule 12 of the Idaho Rules for Electronic Filing and Service.

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF REQUESTS FOR ADMISSION - 3

EXHIBIT 3, page 3 of 5
Decl. of Fetterly

AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 17: Omundson amends her response to Request for Admission No. 17 as follows. Denied; all documents are available upon filing once accepted to and docketed in the court's case management system. Dockets submitted in Tyler's Odyssey File & Serve are not filed, and are therefore not judicial documents as they have not been accepted to or docketed in the court's case management system.

REQUEST FOR ADMISSION NO. 21: Admit that Tyler Technologies offers the Press Review Tool as "an application that works in conjunction with eFile & Serve to provide Clerks the option to grant access to filings as soon as they are filed (prior to Clerk review)," as stated on the page bates-labeled SO 000003 of the document titled "Auto-Accept Review & Press Review Tool" (Exhibit 1).

RESPONSE TO REQUEST FOR ADMISSION NO. 21: Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson admits she is aware Tyler Technologies offers a Press Review Tool and that Tyler Technologies has made representations that it works as identified in SO 000003.  Omundson otherwise responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 21: Omundson amends her response to Request for Admission No. 21 as follows. Denied; all documents are available upon filing once accepted to and docketed in the court's case management system. Dockets submitted in Tyler's Odyssey File & Serve are not filed, and are therefore not judicial documents as they have not been accepted to or docketed in the court's case management system.

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD
SET OF REQUESTS FOR ADMISSION - 4

EXHIBIT 3, page 4 of 5
Decl. of Fetterly

DATED this 7th day of November, 2022.

DUKE EVETT, PLLC


By: /s/Keely E. Duke
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber N. Dina                         amberdina@givenspursley.com
Katherine A. Keating                  katherin.keating@bclplaw
Jonathan G. Fetterly                  jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke

DEFENDANT'S SUPPLEMENTAL AND AMENDED RESPONSES TO PLAINTIFF'S FIRST AND THIRD SET OF REQUESTS FOR ADMISSION - 5

EXHIBIT 3, page 5 of 5
Decl. of Fetterly

# EXHIBIT 4
# FETTERLY DECLARATION

**(Effective July 1, 2022)**

**APPENDIX "A"**

**FILING FEE SCHEDULE - DISTRICT COURT AND MAGISTRATE DIVISION**

**COMMENCING A CIVIL ACTION**

A civil action is commenced by filing a complaint, petition, application, or other document that begins a new civil lawsuit. A civil action is commenced if the clerk opens a new case file rather than filing the document in an existing case file. Whether a filing fee is charged does not depend upon the title or name of the document filed, but upon whether it commences a new case.

In a civil lawsuit, a party usually seeks to obtain an order or judgment from the court against another party. However, there are some times when a clerk will have to file a document, such as registering a trust, when it will not commence a lawsuit.  In such instances, no filing fee will be charged.

Only one filing fee is charged even if the complaint, petition, or application includes two or more separate claims for relief. If the claims would have differing filing fees if they were filed as separate actions, then the appropriate fee is whichever is higher; for example, if one action was filed to have a marriage annulled or, if that were denied, to obtain a divorce, the appropriate filing fee would be the fee for filing a divorce action because it is higher than the filing fee for an annulment. Likewise, if one action was filed to compromise a minor's claim and to appoint a conservator, the appropriate filing fee would be for the appointment of a conservator.

The fee for opening any civil case in the District Court not found on this schedule is $221.00 and the correct filing fee code is AA. The fee for opening any civil case in the Magistrate Division not found on this schedule is $166.00 and the correct filing fee code is A.

**APPEARING IN A CIVIL ACTION  (Category I)**

An appearance is the <u>first </u>document filed by a party (other than the plaintiff or petitioner) in an existing civil action, regardless of whether it is filed *pro se* or through counsel and regardless of the title of the document (e.g., "notice of appearance," "answer," "motion," or other title).

If a party acting *pro se* has already filed an appearance in an action and then an attorney later files a "notice of appearance" to appear on behalf of that party, the attorney's "notice of appearance" does not constitute an appearance for the purpose of assessing a filing fee because the party has already appeared in the action *pro se*.

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| A. A. All initial civil case filings in District Court of any type not listed in categories E, F, and H(1).<br>　1. Creditor/debtor collections<br>　　(more than $10,000)<br>　2. Breach of contract<br>　　(more than $10,000)<br>　3. Employment dispute<br>　　(more than $10,000)<br>　4. Real property<br>　　(more than $10,000)<br>　5. Medical malpractice<br>　　(more than $10,000)<br>　6. Personal injury<br>　　(more than $10,000) | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 135.00 | 6.00 | 221.00 |
| A. All initial case filings in Magistrate Division of any type not listed in categories B, C, D, G, and H(2):<br>　1. Adoptions<br>　2. Adoption and Termination of parental rights<br>　3. Termination of parental rights<br>　4. Personal Injury<br>　　($10,000 or less)<br>　5. Petition for formal probate<br>　6. Application for informal probate<br>　7. Name change<br>　8. Relief from interlock device<br>　9. Child Support / Custody<br>　(unless filed by DHW)<br>　10. Habeas by prisoners<br>　11. Paternity action<br>　12. Unlawful detainer / Eviction<br>　13. Defacto custodian<br>　14. Relief from firearm disability<br>　15. Legal separation<br>　　a. with minor children<br>　　b. without minor children<br>　16. Surrogacy/Gestational Carrier<br>　17. Creditor/debtor collections<br>　　($10,000 or less)<br>　18. Breach of contract<br>　　($10,000 or less)<br>　19. Employment dispute<br>　　($10,000 or less)<br>　20. Real property<br>　　($10,000 or less)<br>　21. Medical malpractice<br>　　($10,000 or less) | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 80.00 | 6.00 | 166.00 |

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| B. 1. Divorce<br>State portion includes additional $20 displaced homemaker fund and additional $20 domestic violence fund district court fund includes $5.00 taken from the State General Fund fee, which shall be separately identified and deposited in the District Court Fund, for establishing a uniform system of qualifying counselors in domestic violence cases. I.C. § 31-3201A(q)<br>  a. with minor children<br>  b. without minor children | 10.00 | 26.00 | 10.00 | 52.00 | | 23.00 | 80.00 | 6.00 | 207.00 |
| 2. Petition or stipulation to reopen or modify divorce<br>  a. with minor children<br>  b. without minor children | 10.00 | 26.00 | 10.00 | 15.00 | | 17.00 | 70.00 | 6.00 | 154.00 |
| 3. Amended complaint to convert an action that was not one for divorce (e.g. separate maintenance) into an action for divorce ($1.00 for court clerk fees I.C. § 39-266 & $20 for the displaced homemaker account I.C. § 39-5009 & $20 domestic violence project, I.C. § 39-5213)<br><br>  a. with minor children<br>  b. without minor children | | | | 41.00 | | | | | 41.00 |
| C. Small claims | | 26.00 | 10.00 | | | 7.00 | 20.00 | 6.00 | 69.00 |
| D. Summary administration of small estates | | | 10.00 | 17.00 | | 17.00 | 80.00 | 6.00 | 130.00 |
| E. Petition for release from common law lien | | | | | | 35.00 | | | 35.00 |
| F. Petition for entry of judgment on worker's comp award | 10.00 | 26.00 | 10.00 | | | 9.00 | 20.00 | 6.00 | 81.00 |
| G. 1. Guardianships<br>  a. Initial Petition motion or apperance by any person on behalf of a minor.<br>  b. Initial Petition motion or appearance by any person on behalf of an incapacitated person. | 10.00 | 26.00 | 10.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 216.00 |
| 2. Conservatorship<br>  a. Initial Petition motion or apperance by any person on behalf of a minor.<br>  b. Initial Petition motion or appearance by any person on behalf of an incapacitated person. | 10.00 | 26.00 | 10.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 216.00 |
| 3. Joint petition for guardianship/ conservatorship or joint petition for receipt and acceptance of foreign guardianship<br>  a. where same party is guardian and conservator of a minor person<br>  b. where same party is guardian and conservator of incapacitated person | 10.00 | 26.00 | 10.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 216.00 |

EXHIBIT 4, page 3 of 6
Decl. of Fetterly

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| c. where different parties are petitioners for guardian and conservator of a minor | | | | | | | | | |
| d. where different parties are petitioners for guardian and conservator of incapacitated person (considered two filings) | 20.00 | 52.00 | 20.00 | 17.00 | 50.00 | 17.00 | 80.00 | 6.00 | 262.00 |
| 4. Status reports guardianship | | | | | 25.00 | | | | 25.00 |
| 5. Intermediate or final account of conservator | | | | | 41.00 | 9.00 | | | 50.00 |
| 6. Petition for distribution of estate in conservatorship | | | | 13.00 | 41.00 | 6.00 | | 6.00 | 66.00 |
| 7. Inventories by conservator | | | | | 41.00 | | | | 41.00 |

H. Case filings with no fee
  1. In District Court
    a. Petition for sterilization
    b. Judicial consent for abortion petitions
    c. Post-conviction act proceedings*
    d. Stipulation for entry of judgment*
    e. Court initiated contempt*
  2. In Magistrate Division
    a. Cases brought under Ch. 3, Title 66, I.C. for commitment of mentally ill persons
    b. Demand for bond before personal representative is appointed.
    c. Petition to compromise minor's claim
    d. Petition for civil protection order
      (i) Petition for civil protection order or to enforce foreign CPO pursuant to I.C. 39-6304 or 39-6306A (domestic violence)
      (ii) Petition for civil protection order pursuant to I.C. 18-7907 (malicious harassment, stalking, and telephone harassment)
    e. Post-conviction act proceedings*
    f. Stipulation for entry of judgment after initial case filing or reopening fee paid*
    g. BAC license suspension
    h. Child support proceedings filed by DHW
    i. Fugitive warrants
    j. Court initiated contempt*
    k. Child protective cases
    l. Proceeding to suspend a license for non-payment of child support
    m. Petition for review of out of home placement
    n. Cases brought under Ch. 4, Title 66, IC, for commitment of developmentally disabled persons
  3. Registration of trusts and renunciations

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| 4. Filing of a custody decree from another state *Whether filing is in district court of magistrate division depends upon individual case. | | | | | | | | | No Fee |
| I. The fees set out in Category I apply to the first document filed by a party other than the plaintiff or petitioner no matter what the documents is entitled. | | | | | | | | | |
| 1. Initial Appearance by persons other than the plaintiff or petitioner | 10.00 | 26.00 | | 10.00 | | 4.00 | 80.00 | 6.00 | 136.00 |
| a. Motion for Permissive Intervention - Defacto custodian | 10.00 | 26.00 | | 10.00 | | 4.00 | 80.00 | 6.00 | 136.00 |
| 2. Small Claims | | | | | | | | | No fee |
| 3. Stipulation for entry of judgment | | | | | | | | | No fee |
| 4. Any objection or motion filed in a guardianship or conservatorship by the minor or alleged incapacitated person | | | | | | | | | No fee |
| 5. Appearing after judgment when the party has not previously appeared | 10.00 | 26.00 | | 10.00 | | 9.00 | 80.00 | 6.00 | 141.00 |
| J. Additional filings in probate and trusts: the following fees shall be collected from any person filing the following documents, whether or not the person has appeared previously: | | | | | | | | | |
| 1. Probate | | | | | | | | | |
| a. petition for distribution of estate | | | | 13.00 | | 6.00 | | 6.00 | 25.00 |
| b. demand for notice | | | | | | 9.00 | | | 9.00 |
| c. demand for bond after appointment of personal representative | | | | | | 9.00 | | | 9.00 |
| d. intermediate or final accounting of personal rep | | | | | | 9.00 | | | 9.00 |
| e. petition for approval of compromise | | | | 10.00 | | 4.00 | | | 14.00 |
| f. filing of copy of appointment of foreign personal representative | | | | 10.00 | | 17.00 | | | 27.00 |
| 2. Trusts and Renunciations | | | | | | | | | |
| a. intermediate or final accounting of trustee | | | | | | 9.00 | | | 9.00 |
| b. petition for final distribution of estate | | | | 13.00 | | 6.00 | | 6.00 | 25.00 |
| K. Special Filings | | | | | | | | | |
| 1. Order granting change of venue (pay to new county). | | | | | | 9.00 | 20.00 | | 29.00 |
| 2. Petition, motion or stipulation to reopen a case after no activity for one year | 10.00 | 26.00 | 10.00 | | | 9.00 | 70.00 | 6.00 | 131.00 |
| 3. Third party complaint – This fee is in addition to any fee filed as a plaintiff initiating the case or as a defendant appearing in the case | | | | | | 8.00 | | 6.00 | 14.00 |
| 4. Cross claim (defendant v. defendant or plaintiff v. plaintiff). This fee is in addition to any fee filed as a plaintiff to initiate the case or as a defendant appearing in the case | | | | | | 8.00 | | 6.00 | 14.00 |

| Fee Category | Idaho Code Fund | Judges Retire. Fund | County Facility Fund | State | State/ Guardship Project Fund | County Dist. Ct. Fund | Court Tech. Fund | Senior Mag. Judges Fund | Total |
|---|---|---|---|---|---|---|---|---|---|
| a. For divorce when the complaint did not allege a claim for divorce. The $41 fee is *in addition* to the fee for a general cross-claim. ($1 for court clerk fee, I.C. § 39-266 & $20 for displaced homemaker account, I.C. § 39-5009 & $20 domestic violence project, I.C. § 39-5213) | | | | | | | | | |
|     1. With minor children | | | | | | | | | |
|     2. Without minor children | | | | 41.00 | | 8.00 | | 6.00 | 55.00 |
| 5. Counterclaim for divorce when the complaint did not allege a claim for divorce *($1.00 for court clerk fees I.C. § 39-266 & $20 for the displaced homemaker account I.C. § 39-5009 & $20 domestic violence project, I.C. § 39-5213) | | | | | | | | | |
|   a. With minor children | | | | | | | | | |
|   b. Without minor children | | | | 41.00 | | | | | 41.00 |
| 6. Renewing a judgment | | | | | | 9.00 | 20.00 | | 29.00 |
| 7. Filing a foreign judgment | | | | | | 7.00 | 20.00 | | 27.00 |
| L. Appeals | | | | | | | | | |
|   1. Small Claims Dept to Magistrate | 10.00 | 26.00 | 10.00 | | | 9.00 | 20.00 | 6.00 | 81.00 |
|   2. Magistrate Division to District court | 10.00 | 26.00 | 10.00 | | | 9.00 | 20.00 | 6.00 | 81.00 |
| 3. Appeal or petition for judicial review or cross appeal or cross-petition from commission, board, or body to district court | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 135.00 | 6.00 | 221.00 |
|   a. Petition for judicial review of IDWR adjudication of water rights | 10.00 | 26.00 | 10.00 | 17.00 | | 17.00 | 135.00 | 6.00 | 221.00 |
| 4. Civil appeal or cross-appeal to Supreme Court (with exception of a. and b. below). The clerk of the district court shall collect the entire fee and remit the $94.00 fee to the Supreme Court with a certified copy of the notice of appeal. (Rule 23(b), I.A.R.) | 94.00 | | | | | 9.00 | 20.00 | 6.00 | 129.00 |
|   a. Post-Conviction | Sup. Ct. | | | | | | | | |
|   b. Habeas Corpus | | | | | | | | | No Fee |

# EXHIBIT 5
# FETTERLY DECLARATION

# Deposition of 30(b)(6) Sara Omundson

# Courthouse News Service v. Omundson

# November 11, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
**www.buellrealtime.com**
email: info@buellrealtime.com



EXHIBIT 5, page 1 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                          30(b)(6) Sara Omundson

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____

COURTHOUSE NEWS SERVICE,        )
                                )
                                )
                Plaintiff,       )
                                )
        v.              ) No. 1:21-CV-00305-REP
                                )
SARA OMUNDSON, in her official   )
capacity as Administrative       )
Director of Idaho Courts,        )
                                )
                Defendant.       )

_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION OF

SARA OMUNDSON IN HER OFFICIAL CAPACITY

AS ADMINISTRATIVE DIRECTOR OF IDAHO COURTS

_____

Taken at Boise, Idaho
(Conducted via Videoconference.)

DATE TAKEN:  November 11, 2022
REPORTED BY:  Nicole A. Bulldis, RPR
        AZ No. 50955 | CA No. 14441 | WA No. 3384

---

Page 2

        A P P E A R A N C E S

FOR PLAINTIFF:
(via Zoom)      Jonathan G. Fetterly
                Katherine A. Keating
                BRYAN CAVE LEIGHTON PAISNER LLP
                3 Embarcadero Center, 7th Floor
                San Francisco, CA 94111
                (415) 675-3400
                jon.fetterly@bclplaw.com
                katherine.keating@bclplaw.com

FOR DEFENDANT:
(via Zoom)      Keely E. Duke
                Molly E. Mitchell
                DUKE EVETT, PLLC
                1087 W. River Street, Suite 300
                PO Box 7387
                Boise, ID 83707
                (208) 342-3310
                ked@dukeevett.com
                mem@dukeevett.com

ALSO PRESENT:
(via Zoom)      BILL GIRDNER, CNS

                --o0o--

---

Page 3

1       30(b)(6) DEPOSITION OF SARA OMUNDSON
2
3               EXAMINATION INDEX
4    EXAMINATION BY                         PAGE
5    Mr. Fetterly.......................................... 4
6
7
8
9               EXHIBIT INDEX
10   EXHIBITS FOR IDENTIFICATION          PAGE
11   39 Defendant's Supplemental Responses to Plaintiff's
12      First and Third Set of Interrogatories............ 44
13   40 Acceptance of Documents Tendered for Filing....... 60
14   41 Idaho Courts Operations Manual Excerpt............ 62
15   42 E-Filing District Court Civil Case Worksheet..... 73
16   43 Case Initiation.................................. 111
17   44 Case Type Codes.................................. 116
18   45 Omundson Press Review Queue Notes................ 124
19   46 File and Serve Quick Guide - 03/16................ 126
20   47 iCourt e-Filing Training & Resources Webpage...... 129
21
22              --o0o--
23
24
25

---

Page 4

1    REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
2         Friday, November 11, 2022; 8:05 a.m.
3              --o0o--
4
5    SARA OMUNDSON,           witness herein, having been
6              first duly sworn on oath,
7              was examined and testified
8              as follows:
9
10      E X A M I N A T I O N
11   BY MR. FETTERLY
12      Q.  And good morning.  Can you please state and
13   spell your name for the record?
14      A.  I'm Sara Omundson.  It's S-a-r-a, and the last
15   name is O-m-u-n-d-s-o-n.
16      Q.  And thank you, Ms. Omundson.
17      I'm Jon Fetterly, counsel for Courthouse News
18   Service, and I'm with the law firm Bryan Cave Leighton
19   Paisner.
20      I understand you've been attending this week's
21   depositions, so this is probably not the first time
22   you've seen me or been through the process; is that
23   correct?
24      A.  That is -- well, this is the first time I've
25   been through the process.  This is not the first time

---

1 (Pages 1 to 4)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

EXHIBIT 5, page 2 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

**Page 33**



**Page 35**

1   improving that Portal.  I immediately pivoted to talking
2   with other vendors to see if we could build our own.  As
3   you may recall, in March of 2020, as we were starting
4   those conversations, things changed and I had to focus
5   my IT staff on implementing remote court proceedings and
6   livestreaming of court proceedings, and our focus just
7   had to shift.
8           I started talking with a company out of
9   Seattle about a year ago about building us a new portal.
10  We are continuing to talk about that.  I have some
11  funding set aside in the budget this year.  The Supreme
12  Court included within our spending plan this year some
13  dollars to start that project of building a new portal,
14  and we -- we have a bid from this company to build it
15  for us and to help us implement that.
16          We've not signed a contract with them yet
17  because we are talking about the limited dollars
18  available and what we can get within the scope of those
19  dollars for this fiscal year versus the next fiscal year
20  versus the next fiscal year.  But it has been the bane
21  of my existence that we don't have a portal that does
22  the things that we would really like it to do, and so we
23  are in the process of building that out, including
24  defining use cases for that.
25          I do want to be clear that that would not

---

**Page 34**

1   technical, and I'm going to try to pull out right now
2   because we need to move on.
3           I just want to try to understand.  We're
4   talking about the technical -- the Court/Tyler side of
5   things.  From the public/press side of things, is the
6   Court contemplating any changes that would kind of
7   materially impact how the press or public would, you
8   know, see documents or access them when they use the
9   services?
10  A.  Yes.
11      Q.  Okay.
12  A.  I can -- yeah, I can tell you that.  I've
13  mentioned the Tyler Portal.
14      Q.  Yes.
15  A.  And that is -- that is -- that was -- the
16  initial plan with that was to make that an option for
17  the public, attorneys, justice partners, that everyone
18  could use that to review court documents.  Because of
19  its instability, because of our inability to keep that
20  running in a -- in a way that just justice partners can
21  use it effectively, we have repeatedly asked Tyler to
22  build upon it, improve it, make it work better.  They
23  had agreed repeatedly to do that.
24          In October of 2019, Tyler told us that they
25  would not be putting investment -- investing in

**Page 36**

1   include -- what is within the scope of that project
2   right now would not include the type of press queue that
3   is being described in this lawsuit simply because that
4   is designed to run off the case management system and
5   not off of the EFM.
6       Q.  Understood.
7           So the portal that the Idaho Courts is
8   currently exploring would be a portal that would display
9   information from documents in the case management
10  system; is that correct?
11      A.  Yes.  It would be -- it would be built to run
12  on the case management database.
13      Q.  Okay.  As part of these kinds of conversations
14  about changes, has the Court considered changing its
15  e-filing service or building its own e-file manager?
16      A.  That is not within the scope of that project,
17  no.
18      Q.  Okay.  So is it the Court's intention to
19  continue using Tyler -- the present intention to
20  continue using Tyler Technologies for its e-filing
21  solution and the Tyler eFile Manager?
22      A.  Yes.  Although, that wouldn't be the only
23  option.  If another company wanted to come in and
24  provide e-filing services, there's -- we would certainly
25  be willing to talk to any other company that wanted to

---

9 (Pages 33 to 36)

EXHIBIT 5, page 3 of 23
Decl. of Fetterly

SER-42

Courthouse News Service v. Omundson                          30(b)(6) Sara Omundson

Page 37

1   provide those services as well.
2        Q.  When is the Tyler -- the current Tyler
3   e-filing agreement up for expiration or renewal?
4        A.  I want to say that we are in the second year
5   of a five-year contract is where I believe we are, but I
6   could be wrong about that.
7        Q.  Okay.  And have you -- has the -- I think you
8   maybe covered this, but as the -- in the conversations
9   with the potential vendor out of Seattle, have they
10  included any discussion of, you know, the creation of a
11  press review queue using the Tyler API for its Press
12  Review Tool?
13       A.  No, because we -- we've been talking with them
14  about building a portal built on the data, the case
15  management database, not on the EFM database.
16       Q.  Is there any reason why the Court has not been
17  talking to this vendor about possibly building a portal
18  based on the EFM or e-filing database?
19       A.  I have not had that discussion with them
20  because the Idaho Supreme Court's rules tell me that a
21  document is available to the public when it is placed in
22  a case file, and so I'm building -- I'm in negotiations
23  to have a system built on the case files.
24       Q.  Okay.  Is there any other reason why the Idaho
25  Courts are not currently talking to this other vendor

Page 38

1   about building a portal on top of the e-file manager or
2   e-file system?
3        MS. DUKE:  Object to the form.
4        Go ahead.
5        THE DEPONENT:  That would be an expansion
6   of the scope, an expansion of the services, and right
7   now, I'm trying to solve the problem of meeting our --
8   our current intentions, our current responsibilities.
9   As opposed to expanding them, we need a portal that does
10  what we promised people it will do.  I haven't expanded
11  the scope to something that is not within the policies
12  of the Idaho Supreme Court.
13       Q.  (By Mr. Fetterly) So is it your position that
14  the -- the policy of the Idaho Supreme Court kind of
15  precludes exploration or expansion of the project to
16  include access to new complaints that are, you know,
17  received into the e-filing system or the EFM but not yet
18  in the case management system?
19       A.  So it's the policy of the Idaho Supreme Court
20  explicitly stated in Idaho Court Administrative Rule 32.
21  That -- that's where it tells me what documents are to
22  be available to the public.  In there, in regards to
23  pleadings, it tells me that those are documents which
24  appear in the case file within the case management
25  system.  And so in scoping this project, I have scoped

Page 39

1   it to that policy.
2        Q.  Understood.
3        Other than Rule 32, are there any other, you
4   know, rules or bases for the statement of policy that
5   you just identified?
6        A.  I think, as far as a basis for that policy, I
7   would look at the rule itself.  It specifically
8   articulates the things that Idaho Supreme Court took
9   into consideration in establishing the policy of what is
10  public.
11       And if what you're asking is if I have other
12  concerns about posting submissions -- submitted
13  documents before they are placed in the -- the case
14  management system, reviewed and placed in the case
15  management system, I do have other concerns.  But at its
16  core, I'm responsible for implementing what the Idaho
17  Supreme Court tells me is the -- are the rules of the
18  Idaho Supreme Court.
19       Q.  Understood.  And we'll get to those other
20  concerns in just a moment.
21       I'm just trying to understand, when you're
22  talking about the Idaho Supreme Court, what are you
23  pointing to specifically that was direction or
24  instruction from the Idaho Supreme Court?  And I believe
25  you've identified Rule 32.

Page 40

1        A.  Yes.
2        Q.  Are there any other rules or are there any
3   other orders?  Memos?  Any other things that you would
4   consider direction from the Idaho Supreme Court?
5        A.  So I would be looking at a number of rules
6   including the e-filing rules.  Rule 32 is truly the --
7   the basis that I go to to determine what should and
8   shouldn't be made public and what the process --
9   processes are for addressing that.
10       The e-filing rules supplement that, in that
11  they tell me, you know, when something is filed, when it
12  is in -- transferred into the case management system.
13  There are other rules as well, in the civil rules, in
14  the family law rules, that address things like cover
15  sheets and what has to be in a cover sheet and whether
16  or not a cover.  So there are various rules that I look
17  at with sort of the foundation being Rule 32.
18       Q.  Okay.  So you've identified Rule 32.  The
19  e-filing rules, I think that's also referred to as the
20  IREFS in Idaho?
21       A.  Yes.
22       Q.  The Idaho Rules of Electronic Filing and
23  Service?
24       A.  Yes.
25       Q.  Okay.  So Rule 32, IREFS -- I-R-E-F-S, for the

10 (Pages 37 to 40)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

EXHIBIT 5, page 4 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 41

1    record.
2         And you cited sort of the general rules of
3    civil procedure.  Would that be with respect to civil
4    cases?
5         A.  So there are references to certain documents;
6    certain protections for documents in the civil rules.
7         Q.  Mm-hmm.
8         A.  There are also some references in the family
9    law rules.  I think there's also some references in the
10   criminal rules in regards to search warrants.  There are
11   just a few rules in -- out there that define things like
12   a family law cover sheet that help explain what
13   information is protected.
14        Q.  Okay.  And excluding family law, I believe
15   there's a general understanding, in this case, that
16   we're talking about, in Idaho, the civil cases that
17   would have the case type of AA or those kind of AA1
18   through 6.
19        Can you identify any particular rules of civil
20   procedure that would apply to those initial filings, AA1
21   through 6 that would kind of inform the -- the policy
22   decision that we're discussing right now?
23        A.  I can't name a rule off the top of my head,
24   but I want to be clear.  The -- the documents that are
25   listed in AA don't have any different designation than

---

Page 42

1    any other public document.
2         So Rule 32 defines, essentially, three types
3    of documents.  There's public documents, so documents
4    available to the public.  There are exempt documents.
5    Those are documents that are presumed not available to
6    the public.  And then there are sealed documents or
7    redacted documents that require court action to protect
8    either the entire document or portions of that document.
9    So, in my world, I focus on public documents, exempt
10   documents, and sealed documents.
11        Q.  Understood.
12        So if I understand your testimony, you're
13   saying Rule 32 would apply to all -- all filings or
14   documents notwithstanding filing type or case type; is
15   that correct?
16        A.  Yes.
17        Q.  Okay.  And then you -- I'm just trying to --
18   and then, you know, the e-filing -- e-filing rules or
19   IREFS, and would your testimony be the same there that
20   the IREFS would apply generally with respect to all
21   filings?
22        A.  IREFS apply to all filings.  To be clear,
23   there are IREFS themselves that actually require certain
24   things to be filed conventionally, meaning in paper.
25        Q.  Mm-hmm.

---

Page 43

1         A.  And so they -- the IREFS apply to the extent
2    they define what has to be filed electronically versus
3    what has to be filed conventionally.
4         Q.  Mm-hmm.
5         A.  And then also outlines who has to file, so
6    even things that an attorney would be required to file
7    electronically, someone who is pro se could still file
8    conventionally.
9         Q.  Okay.  And then -- and then -- so setting
10   aside then Rule 32 and the IREFS, you identified the
11   rules of civil procedure.  Can you identify any
12   particular rule of civil procedure that applies to
13   initial civil filings of the AA type that would also
14   support the policy decision you've identified of not
15   making complaints available until after they are in the
16   case management system?
17        A.  So I can't think of a rule off the top of my
18   head, but I do want to offer a caveat.  The documents
19   are immediately available as soon as they are
20   file-stamped by the court clerk, so I would say that as
21   soon as they -- and I know that this is a disagreement,
22   but as soon as they are reviewed and file stamped, they
23   are immediately available on the kiosks within the
24   courthouses.
25        Q.  Understood.

---

Page 44

1         Would you also agree that the documents are
2    not immediately available at the kiosks or elsewhere
3    upon their receipt into the e-filing system or the EFM?
4         A.  With the exception of in the clerk's queue, I
5    would agree that documents submitted by a filer are not
6    available to the -- any -- anyone but the clerks until
7    after they have been accepted and file stamped.
8         Q.  Gotcha.  So -- so newly e-filed documents --
9    let me strike that to avoid an objection and a dispute.
10        Documents that are electronically submitted to
11   the court and received into the e-filing system or EFM
12   are not available to the press or public until after the
13   court clerk takes the actions required to, you know,
14   accept them and they go into the Court's case management
15   system; correct?
16        A.  If they are accepted by a clerk, yes.
17        MR. FETTERLY:  Okay.  I'm -- I'm going to
18   switch topics here.  We've been going for about one
19   hour.  Can we take another five-minute break?
20        MS. DUKE:  Sounds great.
21        MR. FETTERLY:  Off the record.  Thanks.
22        (A break was taken from
23        9:06 a.m. to 9:21 a.m.)
24        (Exhibit No. 39 marked.)
25        Q.  (By Mr. Fetterly) Okay.  Ms. Omundson, we're

---

11 (Pages 41 to 44)

EXHIBIT 5, page 5 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 45

1   back on the record, and I'm going to show you a document
2   that we have marked as Exhibit No. 39. And this is a
3   discovery document served in this case by your counsel,
4   and it's titled "Defendant's Supplemental Responses to
5   Plaintiff's First and Third Set of Interrogatories."
6        Do you see that?
7   A. I do.
8   Q. Okay. And I'm going to -- and have you seen
9   this document before?
10  A. Yes, I have.
11  Q. Okay. And do you understand that this
12  document contains responses prepared and served by your
13  counsel in response to interrogatories or questions that
14  were asked by Courthouse News Service?
15  A. Yes.
16  Q. Okay. And I'm going to direct your attention
17  to Interrogatory No. 1 which states: "State all reasons
18  or justifications supporting the policy or practice of
19  withholding access to new e-filed civil complaints filed
20  with the Idaho District Courts until after those
21  complaints have been processed or accepted."
22       In response, your counsel made a number of
23  objections. And then following those objections we now
24  have some text that says: "Subject to and without
25  waiver of this objection, Omundson responds that the

---

Page 46

1   policies and justifications for not providing access to
2   the documents that have been submitted but not yet
3   processed or accepted are as follows."
4        Do you see that?
5   A. Yes.
6   Q. And then following the part that says "are as
7   follows," we have a number of numbers, 1, 2, 3, and I'm
8   going to start to break those up and ask you questions
9   about them. Do you understand?
10  A. Yes.
11  Q. Okay. So --
12       MS. DUKE: And we'll get you a hard copy
13  if that's easier, too.
14       THE DEPONENT: Okay. It's a little --
15  I'll be honest, I'm not -- I wear glasses for a reason.
16  It's kind of small.
17       MS. DUKE: Jon, we're getting her a quick
18  printed copy.
19       THE DEPONENT: That's perfect. Right
20  there I can read it.
21  Q. (By Mr. Fetterly) Okay. So I am going to focus
22  right now on Number 1. Do you see that?
23  A. I do see that.
24  Q. So the first reason provided here or the first
25  justification provided here is Number 1: "The public is

---

Page 47

1   not provided with access to documents that have not been
2   processed or accepted because such documents are not
3   filed and not entered into the court's case management
4   system until they have been accepted."
5        Did I read that correctly?
6   A. You did.
7   Q. And does that response kind of reflect what we
8   were just discussing before the break concerning the
9   policy you identified for not providing access to
10  documents until they have been placed in the case
11  management system?
12  A. I'm not sure I entirely understand your
13  question.
14       MS. DUKE: And, Jon, are you in the
15  supplemental answer or the original answer?
16       MR. FETTERLY: Supplemental.
17       MS. DUKE: Okay.
18       THE DEPONENT: So to be clear, it is the
19  Supreme Court's policy that what is to be made available
20  to the public are those things that reside in the case
21  file, and so they don't reside in a case file until they
22  are accepted and filed. And my responsibility is to
23  implement that policy, and so that is -- that is what
24  I've done.
25  Q. (By Mr. Fetterly) And that's what we were

---

Page 48

1   discussing before we took our break?
2   A. Correct.
3   Q. And that's --
4        MS. DUKE: And, Jon, I think that's the
5   original answer. I'm sorry. Just what I'm looking at
6   is different than what you have up.
7        MR. FETTERLY: Oh, well, there's an
8   original -- let me ask a quick question and then I'll
9   revisit.
10       If I scroll down there's also a
11  supplemental answer as well.
12       MS. DUKE: Right.
13       MR. FETTERLY: And the supplemental
14  answer adds to the original answer? You didn't intend
15  to necessarily displace or withdraw this original
16  response?
17       MS. DUKE: I think we actually did with
18  our supplemental response. It doesn't mean that that's
19  not part of it, but we tried to include in full where
20  our supplemental answer was to make it easier. So I --
21  you can ask whatever you want on -- on the original
22  answer, that's not a problem, but the supplemental
23  answer's the most recent complete response.
24       MR. FETTERLY: I understand. So I -- and
25  I appreciate that. So just to be clear, this initial

12 (Pages 45 to 48)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

EXHIBIT 5, page 6 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 49

1  answer that we're discussing right now has not been
2  withdrawn by Ms. Omundson by way of the supplemental
3  response.  The supplemental response adds to or
4  supplements this original response; correct?
5          MS. DUKE:  That's correct.
6          Q.  (By Mr. Fetterly) Okay.  So, Ms. Omundson, I --
7  you were just telling me about the -- your understanding
8  of the Idaho Supreme Court policy.  And does this first
9  sentence of Number 1 reflect what you were just telling
10  me with respect to your understanding of the Idaho
11  Supreme Court policy?  I'm not saying in full, but at
12  least is that what -- is that what this is referring to?
13  That's my question.
14          A.  That is the -- the Supreme Court's policy in
15  Idaho Court Administrative Rule 32 is the basis for that
16  answer, yes.
17          Q.  The basis for this first sentence of Number 1;
18  correct?
19          A.  Yes.
20          Q.  Okay.  Before I move on to the second
21  sentence, I do want to then just go down to the
22  supplemental response, because in the supplemental
23  response that your counsel just identified, I believe
24  more is said on the subject.
25          I'm going to ask you to just read the

Page 50

1  supplemental response to Number 1.  Can you see that?
2          Sorry.  My -- let me help you out.
3          A.  There we go.
4          Do you want me to read the whole thing?
5          Q.  If you could just briefly read and review,
6  yes, the supplemental answer to Interrogatory --
7          MS. DUKE:  To yourself.
8          THE DEPONENT:  Oh, to myself.
9          You're not asking me to read it out loud?
10          Q.  (By Mr. Fetterly) No.
11          A.  Oh, I'm sorry.
12          Q.  I want to ask you about it, and I'd like you
13  to please read it to yourself before I do.
14          A.  Now, I -- I'm to the end of the page.
15          Q.  Thank you.
16          A.  Okay.
17          Q.  Okay.  And does this supplemental answer to
18  Interrogatory No. 1 -- is the basis for it also the --
19  your understanding of the Idaho Supreme Court policy as
20  reflected in Administrative Rule 32?
21          A.  I think it is consistent with Idaho Rule 32,
22  but I don't know that I would say that the basis of that
23  response was Idaho Rule 32.
24          Q.  Okay.  Is there -- so let's just break up the
25  supplemental answer.  So this Number 1, it says:  "A

Page 51

1  document in the File & Serve system, one, is not filed
2  in the court's case management system and, therefore, is
3  not part of the court's docket and may never be."
4          So this is not necessarily limited to just the
5  Idaho Supreme Court Rule 32; is that correct?
6          A.  I'm sorry.  I don't understand what you're
7  asking me.  Are you -- are you asking me if -- I would
8  say yes.  The -- the Idaho Court Administrative Rule 32
9  defines what's available to the public.  In there, in
10  regards to pleadings, it specifically says that what's
11  available to the public are the pleadings that exist in
12  the case file.  And so I would say these documents have
13  not yet been accepted, they are not yet filed as a
14  result of that, and so they do not yet exist in a case
15  file as required by Rule 32.
16          Q.  Okay.  And so do I -- is it fair to state then
17  that under the supplemental response, Number 1 here,
18  Number 2, Number 3, Number 4, those would all be
19  supported by the statement that you're saying right now,
20  that a document has not been accepted into the case
21  management system and is not part of the case file?
22          A.  One, yes.
23          Two, as I understand it, a case is initiated
24  when a document is filed initiating a case.  We call
25  them initial pleadings.  It is not -- if it has not yet

Page 52

1  been filed, a case has not been initiated.
2          Q.  Mm-hmm.
3          A.  It is not relevant to the performance of a
4  judicial function.  There's a few things that would
5  support that.  One, judges don't have access to it yet,
6  so the -- the -- the public's view of monitoring judges
7  has not yet started because the judge doesn't have
8  access to it.  It isn't in a case file, so the judge
9  can't act on it.
10          So I think it's more than just Rule 32.  I
11  think your initial question was whether Rule 32 was the
12  basis for all of these, and I -- I wouldn't say it's the
13  basis for all of them.
14          Q.  Okay.  So -- and so for this Number 3, you've
15  identified Rule 32 and this other basis, which is the
16  judge doesn't have access to it.
17          Is there anything more that's the basis for
18  this Sub 3 for Supplemental Response to 1?
19          A.  Well, it can't materially assist the public in
20  understanding the issues before the court because until
21  it's filed it's not yet before a court.
22          Q.  Okay.
23          A.  The issue has not -- not been placed before
24  the court yet.  For Subsection 3, this kind of goes to
25  the second part of my answer above, which is I -- there

13 (Pages 49 to 52)

EXHIBIT 5, page 7 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

**Page 53**

1  is concern that because these are not yet filed and may
2  be rejected, that the public could be mislead into
3  understanding that something is pending before a judge
4  when it is not yet pending before a judge.
5        So that -- trying to ensure that the public
6  understands when something is actually pending in a
7  court is important for people to understand the
8  integrity of the courts. And so until something is
9  actually filed and moved into the case management
10 system, we want to make sure people aren't mislead into
11 believing that there is something pending before the
12 court.
13     Q.  Understood.
14        And I was asking initially in connection with
15 Rule 32, so let me just try it a different way.
16     A.  Mm-hmm.
17     Q.  Would you agree then that, in this
18 supplemental response, as we look at Numbers 1, 2, 3, 4,
19 and 5, that the basis for this response is your view
20 that a document has not been, "filed with the court
21 until it has been placed in the court's case management
22 system"?
23        MS. DUKE:  Object to the form as to "your
24 view."
25        Go ahead.

**Page 54**

1        THE DEPONENT:  I was about to say, my
2  view really isn't relevant. It's what is the Supreme
3  Court's view, and if -- they've articulated in the rule
4  that I follow when -- when the court deems it filed.
5     Q.  (By Mr. Fetterly) Understood.
6        So I -- and I want to just be clear. I'm not
7  asking about your personal view. I used "you" in the
8  context of you here as the designated representative on
9  behalf of the Administrative Office of the Idaho Courts.
10       So is it -- let me just try it again. As we
11 look at these subpoints 1, 2, 3, 4, and 5 under the
12 Supplemental Response to Interrogatory No. 1, is it fair
13 to say -- fair to state that each of these
14 justifications in the supplemental response are based on
15 the, you know, administrative office's understanding
16 that a document -- that a document has not been, "filed
17 until it is placed in the case management system"?
18     A.  So I want to go through each -- sorry. I just
19 want to go through each one to make sure that I -- I
20 agree with what you just said in that context.
21       So is not filed in the case management system,
22 therefore, not part of the court's docket and may never
23 be. So Number 1, the -- my answer would be yes.
24       Does not initiate a case. That's not actually
25 out of Rule 32. That would be in relation to the civil

**Page 55**

1  rules, which state that a case is initiated with the
2  filing of a document, but, yes, it is based on -- on the
3  Supreme Court's definition of filing.
4        It is not relevant to the performance of a
5  judicial function because no case has been initiated
6  yet. Covered that.
7        Cannot materially assist the public in
8  understanding issues before a court because there are
9  not issues. The -- the portion of Number 3, the second
10 half of that that says, "Cannot materially assist the
11 public in understanding issues before a court because
12 such issues are not yet before a court" is in -- in part
13 because the judges don't have access to it. Until it's
14 in a case file, the judges don't have an issue before
15 them. They can't even access the filing.
16       Does not trigger legal obligations because no
17 case has been initiated yet. Again, that goes to my
18 understanding that a case is initiated by the filing of
19 a certain document and the Idaho Supreme Court has told
20 me that's not filed.
21       Does not help the public in evaluating the
22 fairness and integrity of the court's proceedings
23 because no case has been initiated. Yes, that's true.
24 That's in part based upon the definition of filed and
25 the definition of initiated, but it's also in part based

**Page 56**

1  on a concern that the public may misunderstand that
2  something has been filed when, in fact, it's not in a
3  case file in the case management system yet.
4     Q.  Understood. So let -- let me -- thank you for
5  walking me through that.
6        I'm now going to go back up to the initial
7  response, and we were talking about the first sentence
8  of Number 1 before we went on to the supplemental
9  response. I'm now going to direct your attention to the
10 second sentence of Number 1 for the justifications where
11 it states:  "Providing documents to the public before
12 they are in the court's case management system may
13 mislead the public to believe documents are court
14 filings when they are not yet filed and may never be
15 filed."
16       Did I -- did I understand that correctly or
17 did I read that correctly?
18     A.  Yes, I believe you did.
19     Q.  Okay. So my question is:  What harm would
20 result from the public believing that a document was a
21 "court filing" when it was not yet in the court's case
22 management system?
23     A.  So my understanding of providing access to
24 case filings and the press reporting on case filings is
25 that the public has an interest in understanding how the

---

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

EXHIBIT 5, page 8 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 57

1  courts are functioning, whether the courts are doing
2  their job, and how they're moving forward. Oftentimes,
3  cases will have requirements that judges perform
4  functions within a certain period of time. The clerks
5  have to perform functions within a certain period of
6  time. That period of time is premised upon the
7  initiation of a case.
8      By posting something that may never actually
9  end up in the case management system or may never end up
10 filed in the county in which it was originally
11 submitted, the public may have a misperception that the
12 justice system, that the court system is not functioning
13 as it should when, in fact, because they believe
14 something has been filed when, in fact, it isn't pending
15 before a judge. It hasn't been filed. It's not in a
16 case file within the court system.
17     So the public may be mislead into believing
18 that the court system is not functioning as it should
19 when it's functioning exactly as the Idaho Supreme Court
20 has set up the processes and the rules. And so it's --
21 it's the risk of misleading the public to believe that
22 the courts are not working in the way that they're
23 supposed to be working.
24              (Pause in the proceedings.)
25     Q. (By Mr. Fetterly) I -- I'm trying to understand

Page 58

1  your response, and I -- and I guess what I'm trying to
2  figure out then is, you know, what harm would result
3  from that? So I -- you've identified, you know, the
4  public could be -- strike that. Strike that.
5      Is there anything more that you would add to
6  that, or is that the extent of the -- you know, the
7  basis for this highlighted portion, the second sentence
8  of Number 1?
9      A. Well, I -- I would just summarize one thing
10 that I think Mr. Girdner and I very much agree on, and
11 that is making sure that the public understands the
12 integrity of the institution of the courts is important,
13 and that -- protecting that is of value to me.
14     Q. Understood. Understood.
15     So I'm now going to move on to Number 2 in
16 this response to Number 1. It's a fairly long response.
17 I'll read it and then we can break it up. But for the
18 second justification, you state: "Tyler Technologies'
19 Auto-Accept function has not been implemented because
20 this would allow documents to be filed and, therefore,
21 become part of the official record, even if the filing
22 requirements that exist in the Idaho Court rules, e.g.
23 payment of a filing fee and redaction requirements, have
24 not been met or the action had been filed in an improper
25 jurisdiction or venue, which would require judicial

Page 59

1  action that would add to the already incredibly busy
2  schedules of judges and their court staff."
3      Did I read this correctly?
4      A. Yes, you did.
5      Q. Okay. So this -- as I understand this
6  response, this is not necessarily limited to your
7  understanding of the Supreme Court policy based on
8  Rule 32, because we're talking about the Auto-Accept
9  function. So this would be access to documents that are
10 in the case management system; correct?
11     A. Correct.
12     Q. Okay. So what we're saying here is -- or, if
13 I understand you correctly, you're -- this response is
14 saying that the Auto-Accept Review has not been
15 implemented because, starting at the top, this would
16 allow documents to be filed and, therefore, become part
17 of the official record even if the filing requirements
18 that exist in the Idaho Court rules, e.g. payment of a
19 filing fee and redaction requirements, have not been
20 met.
21     And let me stop right there and we'll get to
22 the rest of the sentence in a minute. I want to just
23 understand what you mean when you say "even if the
24 filing requirements that exist in the Idaho Court rules
25 have not been met."

Page 60

1  Is there a -- well, I know we've discussed
2  that some. I'm just trying to better understand what
3  rules might be in play here. So let me show you a
4  different document. This will be Exhibit No. 40. One
5  moment.
6              (Pause in the proceedings.)
7              (Exhibit No. 40 marked.)
8      Q. (By Mr. Fetterly) I'm showing you a document
9  marked as Exhibit No. 40 produced in this case as SO 253
10 to 256 titled "Acceptance of Document Tendered for
11 Filing." It then goes on to identify a number of
12 categories of documents that can be -- or, I guess, must
13 be rejected, reasons and authority, followed by request
14 for correction identifying a number of categories,
15 reasons and authorities, followed by the Tyler
16 File & Serve drop-down options. There's 25 of them
17 listed on this document.
18     Ms. Omundson, do you know what this document
19 is?
20     A. Mr. Fetterly, I'm sorry, but you're not
21 sharing the screen.
22     Q. We've run into the technical issue that began
23 our day. One moment.
24              (Pause in the proceedings.)
25     Q. (By Mr. Fetterly) I'm now showing you the

15 (Pages 57 to 60)

EXHIBIT 5, page 9 of 23
Decl. of Fetterly

SER-48

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 61

1    document that I just summarized, and a copy of it has
2    been sent to the group through the Zoom chat function.
3    Ms. Omundson, let me repeat my question. Have
4    you -- do you know what this document is?
5        A.  I don't know what this document is.
6        Q.  Okay. It was produced by your counsel in this
7    action. Are you aware of that?
8        A.  I'm -- I'm assuming this is part of the
9    clerk's manual.
10           MS. DUKE:  If you want to see the whole
11   document, I'm having it printed.
12           THE DEPONENT:  I -- yeah, I'm just not --
13   yeah. I don't know where this came from.
14       Q.  (By Mr. Fetterly) Let me just start at the top
15   here. I'm just going to ask you to look at the -- I'll
16   read the top. It says:  "A clerk must accept a document
17   tendered for e-filing unless specifically authorized
18   not to accept the document by statute or by the court
19   rules for the reasons below." It then identifies a
20   number of categories followed by reasons and
21   authorities.
22           Do you -- do you agree with the statement on
23   this document that, you know, a -- a clerk must accept
24   the document tendered for e-filing unless specifically
25   authorized not to accept the document by statute or by

---

Page 62

1    the court rules for the reasons below?
2        A.  So I would -- I would say that that sentence
3    is ambiguous, because I -- when I look at when a court
4    document can be rejected, I actually look at the Idaho
5    Rules of Electronic Filing and Service, the specific
6    rule that articulates when a clerk may reject a filing.
7           And I would also point out that I don't think
8    this document is accurate. For example, I would say
9    that it would be a misreading of ICAR 59 to say that a
10   clerk has the authority to reject a filing that is
11   submitted by a vexatious litigant.
12       Q.  Would that be true for paper filing versus
13   e-filing?
14       A.  Yes, it's for both.
15       Q.  Okay. Do you know -- do you know where this
16   document came from?
17       A.  That's what I'm trying to figure out, what
18   this document actually is. I don't know where this came
19   from.
20           (Exhibit No. 41 marked.)
21       Q.  (By Mr. Fetterly) Okay. Let me try this a
22   different way then, so I'm going to mark a different
23   exhibit.
24           This will be Exhibit No. 41. Bear with me.
25       A.  I --

---

Page 63

1        Q.  I want to bring up exhibit -- I'm sorry.
2    While I'm bringing up Exhibit 41, let me just ask, do
3    you -- do you know who might know where that document
4    came from?
5        A.  I -- I don't. I honestly have no idea where
6    this came from, so I want to -- I'm wondering if this
7    might have been on our system when we put the -- the
8    software on our system to pull anything that might be
9    relevant.
10       Q.  But your testimony is that you've not seen
11   that document before today?
12       A.  No. This is the first time I've -- I've ever
13   seen this.
14       Q.  And -- and do you know of anybody who would
15   know where that document came from or what it might
16   purport to be?
17           MS. DUKE:  Don't speculate.
18           THE DEPONENT:  Yeah. I -- I could ask.
19   I -- I know who I would ask if they recognized it, and
20   that would be my court operations folks.
21           This is my understanding of our court
22   operations manual. I don't know if that's where this
23   came from, although, I would be disheartened if that
24   were the case.
25       Q.  (By Mr. Fetterly) Well, I -- I would like to

---

Page 64

1    know. It's been produced in this case, and it seems to
2    be pretty, you know, relevant to the -- this line of
3    questioning and the interrogatory responses. So if you
4    could find out, if you could ask your operations
5    specialist, I'd certainly appreciate that. And I'd be
6    happy to take a very brief just two- or three-minute
7    break off the record so that you could do that and then
8    we can continue. We're not going to wait around, but
9    while we continue, maybe somebody could find the answer
10   to that question.
11           MS. DUKE:  Well, and I could check with
12   our paralegal, too, to just get a context of where it is
13   in the production if that'll help. So...
14           MR. FETTERLY:  Sure.
15           MS. DUKE:  All right. So we'll just take
16   a quick couple-minute break?
17           MR. FETTERLY:  Just a real quick
18   couple-minute break to get that ball in motion, and then
19   we'll come back and I can ask you about the operations
20   manual.
21           (A break was taken from
22   9:51 a.m. to 9:57 a.m.)
23       Q.  (By Mr. Fetterly) Ms. Omundson, before we took
24   our break, we were discussing the document that was
25   marked as Exhibit No. 40, and you were going to ask

---

16  (Pages 61 to 64)

EXHIBIT 5, page 10 of 23
Decl. of Fetterly

SER-49

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 65

1  if -- or you were going to try to find out if you could
2  learn what this document is and where it came from.
3  Were you able to do that during the break?
4      A.  So here's what I learned.  This is a document
5  that was provided by a member of my court operations
6  team.  It was created -- it looks like it's from --
7  sorry -- October of 2016.  I don't have his phone number
8  and so I'm not able to reach him at this moment, but it
9  is not -- as far as I know, this is not in our clerk's
10  manual and it is not what we train to.
11          So this might have been something that he
12  used.  I don't know that this was ever part of our
13  clerk's manual.  It doesn't look like a piece of our
14  clerk's manual, but it's from 2016.
15      Q.  Okay.  And who was that member of your team
16  that created this document?
17      A.  His name is Michael Mehall.
18      Q.  And how is that spelled, Mehall?
19      A.  M-e-h-a-l-l.
20      Q.  Okay.  And you referred to the operations
21  manual.  Is that the -- the manual or the document that
22  you would refer to as the -- the better authority or the
23  authority for determining, you know, what documents may
24  or may not be rejected?
25      A.  The authority for what documents may or may

---

Page 66

1  not be rejected is actually the Idaho Rules of
2  Electronic Filing and Service, which specifically says
3  when a clerk is allowed to reject a document.  Whether
4  they do -- whether they do reject a document is
5  something that -- an elected clerk is responsible for
6  determining in conjunction with their administrative
7  district judge within each district, and it does vary
8  around the state.
9      Q.  Okay.  So if we have the operations manual,
10  does that provide any guidance on determining, you know,
11  how or when clerks may reject filings?
12      A.  It does provide some guidance, yes, but the
13  rule is what controls, and it is really an ADJ that
14  defines for their district when a clerk will reject a
15  document.
16      Q.  And what do you mean by "ADJ"?
17      A.  Oh, I'm sorry.  In Idaho, we have seven
18  judicial districts.  For each of those judicial
19  districts, there is an administrative district judge
20  that is a judge that is elected by the other district
21  judges within the district, and they are -- they are
22  responsible for and have the authority for
23  administration within that district.
24      Q.  Mm-hmm.  When -- when a -- when a clerk is
25  reviewing a document that has been submitted to the

---

Page 67

1  e-filing system and they're working in their clerk
2  review queue, if a clerk makes a determination that the
3  document should be rejected, are they required to
4  indicate that into -- in the clerk review during their
5  process?
6      A.  Indicate that.  Yes --
7          MS. DUKE:  Objection.  Objection.  Form.
8  I'm just not quite understanding, but go ahead.
9          THE DEPONENT:  Okay.  So I think I
10  understand what you're saying.  And if I don't answer
11  your question, please let me know.
12          So the court rule, the rules of
13  electronic filing say when a clerk may reject a filing.
14  Whether a clerk shall or should reject a filing is -- is
15  a decision that is made between the elected clerk and
16  the county and the administrative district judge.
17          When a clerk does reject a filing, they
18  do have to provide -- there's both a drop-down list they
19  can select from as well as comments that they can make
20  to explain to the person that's submitted it why it is
21  that it's being rejected that gives that person the
22  opportunity to fix whatever the error may be and
23  potentially resubmit it along with the original
24  envelope.  There's a three-day grace period in the rules
25  that if they do resubmit it and they include the

---

Page 68

1  original envelope and it is within three days, that the
2  filing date may relate back to the original submission
3  date.
4      Q.  (By Mr. Fetterly)  Okay.  So I'm -- I'm showing
5  you right now an exhibit that was marked as
6  Exhibit No. 41.
7      A.  Mm-hmm.
8      Q.  And this is the Idaho Court Operations Manual.
9  Do you see that?
10      A.  Yes.
11      Q.  And do you recognize this document?
12      A.  Yes, I do.
13      Q.  And is this at least the face page of the
14  operations manual?
15      A.  Yes, it is.
16      Q.  Okay.  We had a brief conversation off the
17  record about the operations manual, which is over a
18  thousand pages.  I'm not going to mark the entirety of
19  it as Exhibit No. 41.  Rather, what I have here as
20  Exhibit No. 41 is the face page.  I'm just going to
21  briefly scroll through followed by -- well, I'll need to
22  submit a corrected exhibit.  I intended to include the
23  table of contents.  So this does not have that.  We'll
24  work that out after the fact, but I am moving down to --
25  let's see.

---

17 (Pages 65 to 68)

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

EXHIBIT 5, page 11 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 69

1     MS. DUKE: It has the table of contents.
2     MR. FETTERLY: Oh, there we go.
3     MS. DUKE: Yup.
4     MR. FETTERLY: The second time we've run
5  into the technical issue.
6     Q. (By Mr. Fetterly) So we have the table of
7  contents, and I note that at table of contents here we
8  see Number 18, Odyssey File & Serve, OFS, at Page 1026.
9        If we scroll on down now past that, here we
10 have, 18, Odyssey File & Serve. Ms. Omundson, do you
11 recognize this section that I'm showing you now
12 beginning at Page 1026 of the Operations Manual as being
13 Section 18 that relates to Odyssey File & Serve?
14    A. Yes. I believe that is our clerk's manual,
15 but -- thank you. I appreciate that very much.
16       Yes. This appears to be our -- well, it's
17 dated February of 2021, so, yes, that appears to be our
18 clerk's manual --
19    Q. Okay.
20    A. -- that we use to train clerks.
21    Q. So I'm -- I'm scrolling down now through this
22 Section 18. I want to direct your attention to a
23 portion of it that talks about reject the filing/request
24 a correction from e-filer. Do you see that section
25 where it begins?

Page 70

1     A. I do.
2     Q. And it's followed by a Paragraph 1 and a
3  Paragraph 2.
4        Paragraph 2, select the reasons for rejection.
5  It identifies reasons annotated by letters A through the
6  letter T. Do you see that?
7     A. Yes, I do.
8     Q. So a minute ago, you were providing testimony
9  regarding how a clerk would reject or return an e-filing
10 by selecting a reason and noting it in the system.
11       Does this document I'm showing you right here
12 identify the reasons that a clerk would have available
13 to them to select when rejecting a document?
14    A. These are the most common reasons. There are
15 other possibilities, but the list would, quite frankly,
16 be too long of a drop-down if all of them were included.
17 And so these are the most common reasons that are in
18 there, but they also have a comment section where the
19 clerk can -- can provide additional information to the
20 filer.
21    Q. So if the -- does the -- do these reasons
22 include an "other" or a catch-all, some type of reason
23 that a clerk would select if they're choosing something
24 other than one of these identified reasons?
25    A. They could -- they could select "N, please

Page 71

1  correct error and then see comment box to provide
2  explanation."
3     Q. So are -- are the clerks in Idaho trained that
4  if one of these specific reasons is not reflected or --
5  if there's a reason for rejection that's not reflected
6  in these specific reasons, they can use "N, please
7  correct error" followed by comments to, you know,
8  explain to the filer the basis or the reason for the
9  rejection?
10       MS. DUKE: Object to the form.
11 Foundation as to clerk training.
12       Go ahead.
13       THE DEPONENT: Yeah. So just to be
14 clear, the training of the deputy clerks is actually
15 done by -- initially done by the elected clerk in the
16 county. They will get support from the local trial
17 court administrator and the ADJ.
18       The training that the Idaho Supreme Court
19 provides, I'm not sure if we have trained on this exact
20 thing recently. We -- I know we trained the clerks on
21 this when Odyssey went live in different counties. We
22 would have trained to this and we would have trained
23 that if the reason for rejection does not exist in this
24 list, you can put -- you can use a general explanation
25 and you can put more information in that box. But the

Page 72

1  extent and level of training that each deputy clerk gets
2  is really done by the elected clerk.
3        We're in the process -- my office is
4  currently in the process of building out training for
5  new deputy clerks, but we only have two modules and they
6  wouldn't cover this.
7     Q. (By Mr. Fetterly) And --
8     A. We hope -- we hope to get there, we're just
9  not there yet.
10    Q. Is it your understanding that this reason "N,
11 please correct error" is the general reason that could
12 be used?
13    A. It is one of -- one of the reasons that could
14 be used, yes. I -- they can select any of these from
15 the drop-down. I -- I would hope they would be as
16 specific as possible in selecting from that, and then
17 they can put whatever other information explaining why
18 it's been rejected in the -- the comment section.
19    Q. Okay. But in any event, a clerk would be
20 required to select a reason for rejection if they are
21 rejecting an e-file document; correct?
22    A. I believe so, yes.
23    Q. And that is something that is prompted in the
24 clerk review queue in the File & Serve system; correct?
25    A. Yes.

18 (Pages 69 to 72)

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

EXHIBIT 5, page 12 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 73

1  Q. And so the clerk, as part of their review of
2  the e -- of the document, if they are to reject it, they
3  would select one of these reasons and, if applicable,
4  apply comments in the comments box; correct?
5  A. Yes.
6       (Exhibit No. 42 marked.)
7  Q. (By Mr. Fetterly) Okay. I'm going to show you
8  one more document. I guess this will be Exhibit No. 42.
9  One moment. If it will let me.
10       (Pause in the proceedings.)
11  Q. (By Mr. Fetterly) This is an Excel spreadsheet
12  that was produced by your counsel yesterday. I'm
13  putting it on the screen right now. One moment. It was
14  Bates labeled 5078.
15       And, Ms. Omundson, have you seen this
16  spreadsheet before?
17  A. Yes, I have.
18  Q. And do you have an understanding of what it --
19  what this data represents?
20  A. It appears to be a listing of filings in the
21  AA fee category -- in the civil AA fee categories. I
22  don't know the period of time that it covers.
23  Q. I'm going to scroll to the right because it's
24  a large document with many columns, but just to give you
25  a chance to see it in its entirety.

---

Page 74

1       I'm going to focus your -- I'll represent to
2  you it was produced by your counsel in response to both
3  the document request and subsequent meet-and-confer
4  efforts to get a document that showed data for new
5  e-filed complaints in the AA fee category during an
6  agreed-upon time period, including rejection data along
7  the lines that we were just discussing in connection
8  with the operations manual.
9       So I understand your testimony that if a clerk
10  is to reject a filing, the Tyler e-filing system,
11  File & Serve, requires them to select a rejection reason
12  and, if applicable, provide comments.
13  A. That is my understanding, yes.
14  Q. Okay. So directing your attention back to the
15  spreadsheet now, Exhibit No. 41, as part of the data for
16  each of these filings, there's a code or a status of
17  either accepted or rejected. Do you see that?
18  A. I do.
19  Q. My understanding of this spreadsheet is that
20  the rejected -- for a document that has a status of
21  rejected, this reflects a document that would have been
22  rejected by a court clerk and who -- and a clerk would
23  have selected a rejection reason or code pursuant to
24  that rejection; is that correct?
25  A. It appears so, yes.

---

Page 75

1  Q. And so if we look at Status, Row K -- excuse
2  me -- Column K, Status, it's accepted or rejected.
3  Column L of this document is reject code. And if I open
4  this up so you can see what the reject codes are, this
5  appears to relate to the list of reject reasons that we
6  were just discussing in the operations manual. Is that
7  correct?
8  A. I'm sorry. I don't have the manual in front
9  of me to compare the two, but I -- I would take your
10  word for that.
11  Q. I don't want you to necessarily take my word.
12  I can switch screens back again to put that in front of
13  you given the nature of this --
14  A. Hold on. I think -- I think Keely may have --
15       MS. DUKE: I do.
16       THE DEPONENT: Okay. Sorry. I've got my
17  copy. Okay. Sorry, I do have a copy. Hold on.
18  Q. (By Mr. Fetterly) Thank you.
19  A. Can you tell me which page you were on
20  that?
21       MS. DUKE: I tabbed it. It's page
22  SO 1587.
23       THE DEPONENT: I'm sorry. Can you pull
24  up those codes again for me on the screen? There were
25  codes that you were asking me to compare.

---

Page 76

1  Q. (By Mr. Fetterly) Yes. So are you able to see
2  the spreadsheet on --
3  A. Yes.
4  Q. So just for the record, the witness is looking
5  at the Excel spreadsheet that was produced as SO 5708.
6  And, in particular, we are looking at Column L, Reject
7  Code, and I've opened up the column header to see all of
8  the available reject codes that are part of Column L.
9       So my question, Ms. Omundson, is: Do these
10  reject codes reflected on this spreadsheet under
11  Column L, do these correspond to the rejection reasons
12  that were identified in the operations manual as a basis
13  for rejection?
14       MS. DUKE: And I'll object to the extent
15  the -- the manual speaks for itself as does this
16  document. I'm not sure if you want her to take the time
17  to go through every single rejection, but if you do, we
18  can.
19       THE DEPONENT: Well, I -- they don't --
20  they don't match directly, so I'm not -- so I'll give
21  you an example of what I'm struggling with. This case
22  already exists, please file through the existing case,
23  and then I'm not sure that I see one that matches that.
24  Maybe that's duplicate.
25       PDF documents combined. Docs, maybe? I

---

                                19 (Pages 73 to 76)

EXHIBIT 5, page 13 of 23
Decl. of Fetterly

SER-52

Courthouse News Service v. Omundson                         30(b)(6) Sara Omundson

Page 77

1   think it -- I'm not sure that I can -- I can -- I don't
2   know where these came from. So I don't know where these
3   fields came from, and I'm -- I -- I don't -- I assume
4   that they match this reason for rejection, but I don't
5   know that for certain.
6           Q. (By Mr. Fetterly) Is there somebody who would
7   know?
8           A. They're very shorthand.
9               Yeah, my data team would know. I'm sorry. My
10  data team would know.
11          Q. Understood. And that'll be just one more
12  follow-up question I'll ask you to inquire about.
13              But I just want to confirm that the testimony
14  is that if a filer were to -- excuse me. If a clerk
15  were to reject a document that they were reviewing in
16  the clerk review queue, they would be required to select
17  a rejection reason; is that correct?
18          A. That's my understanding, yes.
19          Q. And in the clerk review queue, might that also
20  be the reject code that they would be required to select
21  as reflected on this spreadsheet?
22          A. I -- again, I don't know where these fields
23  came from. I would -- I think that's likely, but I need
24  to confirm that with my data folks.
25          Q. Okay. And I'm looking at this document, if we

Page 78

1   go on to Column M, Reject Comment, if a clerk were to
2   provide a comment, would this be the -- you know, does
3   this column reflect the comments that would have been
4   entered by the court with respect to a particular
5   filing?
6           A. I would -- yes. There's -- that's what that
7   field appears to be, yes.
8           Q. Okay. Thank you.
9               So I'm going to -- we can close this and set
10  this aside.
11          A. Can we take one second, please?
12          MR. FETTERLY: Yes. Off the record? On
13  the record or off? I'm sorry.
14          THE DEPONENT: We can stay on the record.
15  I don't care.
16              I just want to ask Molly: Will you just
17  email --
18          MS. DUKE: I did.
19          THE DEPONENT: Okay. Got it. I just
20  want them asking my data folks where that list -- those
21  fields came from.
22          Q. (By Mr. Fetterly) Thank you very much. I
23  appreciate that.
24          MS. DUKE: And, also, as you've said, we
25  haven't quite had a proper break in the last about hour

Page 79

1   and 15 minutes.
2               Do you mind if we do that?
3           MR. FETTERLY: Sure. Ten minutes?
4           MS. DUKE: Yeah, does that work?
5           MR. FETTERLY: That does work. Thank
6   you.
7               (A break was taken from
8           10:19 a.m. to 10:34 a.m.)
9           Q. (By Mr. Fetterly) Ms. Omundson, before we went
10  off the record, part of our questioning involved the
11  document that was marked as Exhibit No. 42, and this was
12  the spreadsheet produced by your counsel that included
13  information for AA filing fee-type complaints.
14              And, specifically, we were talking about a
15  column that had rejection codes. During our break, did
16  you have an opportunity to speak to anybody on your team
17  regarding, you know, whether -- whether those codes
18  correspond with the rejection reasons that we were
19  discussing in the operations manual?
20          A. We have not heard back yet, but we sent a
21  message to ask if -- if those -- if that's what this is.
22  Yes. We've asked -- we've asked the question, but we
23  haven't heard back yet.
24          Q. Thank you very much. I appreciate that.
25              I'd like to direct your attention now back to

Page 80

1   Exhibit No. 39. This is Defendant's Supplemental
2   Response to Plaintiff's Interrogatories.
3               And -- one moment. Let me put this up on the
4   screen.
5               (Pause in the proceedings.)
6           Q. (By Mr. Fetterly) Let me direct your attention
7   to the portion of the response to Interrogatory No. 1
8   that I have highlighted on the screen. This is under
9   Sub 2 where it states: "Which would require judicial
10  action that would add to the already incredibly busy
11  schedules of judges and their court staff."
12              And this response is with respect to the
13  Auto-Accept function. And what I'm hoping you can
14  explain to me is: What are the reasons or circumstances
15  where the auto-accepting of a nonconforming document
16  would result in or require judicial action?
17          A. So I think there are a number of situations
18  where that could arise. So, for example, the Idaho
19  Supreme Court's policy has been to allow the clerks to
20  reject things because if they get rejected for these --
21  for failing to comply, there doesn't have to be a
22  judge's action to address issues. My understanding, for
23  example, if someone submits a document that includes
24  information that should've been redacted but wasn't and
25  the clerk rejects that document, and then they can

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

EXHIBIT 5, page 14 of 23
Decl. of Fetterly

SER-53

Courthouse News Service v. Omundson                    30(b)(6) Sara Omunson

---

Page 81

1   redact it and resubmit it and it can all be addressed
2   immediately without a judge's time and effort being
3   taken.
4           If a document is automatically accepted and
5   has information in it that should've been redacted,
6   under Idaho Court Rule 32, a motion may come
7   in to redact that information.  It would absolutely
8   require a mandatory hearing.  It would require the court
9   to provide notice to any known interested parties, and
10  then the court would have to issue an order and make
11  certain findings as to why it is redacting information.
12  And so it takes less resources and, specifically, less
13  judicial resources if that document is caught before it
14  comes into the system, returned to the filer, and
15  they're asked to redact in advance.  That's one example.
16      Q.  Okay.  I'd like to hear all of them that we
17  can.
18      A.  Oh, there's -- you know, I don't know that I
19  could get anywhere near all of them.  Another example
20  would be if someone -- if it was auto-accepted and the
21  judge determined that the person was not going to get a
22  fee waiver that they had requested.  The judge now has
23  to take action and -- and the court has to expend
24  resources to collect that fee, or the court has to have
25  a hearing to determine what to do with the action in the

---

Page 82

1   absence of the fee being paid.
2           Essentially, there are things right now that
3   are being caught on the front end that can be quickly
4   and easily fixed.  For example, it's not an unusual
5   occurrence, I think, to have something filed in Adams
6   County that should've been filed in Ada County.  Once
7   it's -- if it's auto-accepted, that action in Adams
8   County would have -- the judge would have to address it
9   and dismiss it -- potentially dismiss it so that it
10  could be refiled in the correct county.  So it just --
11  it's -- it's cleaning up those smaller errors that could
12  have been addressed on the front end without taking up
13  additional judicial resources in addressing them.
14      Q.  You mentioned the -- your second example was
15  fee waiver.  Are fee waiver applications limited to only
16  pro se filers in the state of Idaho?
17      A.  No.
18      Q.  So a -- a plaintiff represented by counsel
19  would be able to request a fee waiver?
20      A.  I don't think there's any limitation on
21  requesting it.  Whether they would get it is, I think, a
22  different question.
23      Q.  Okay.  Do you have an understanding of who is
24  entitled to a fee waiver in the state of Idaho?
25          MS. DUKE:  Form and foundation.

---

Page 83

1           THE DEPONENT:  It would be in the -- the
2   court rules.  I -- I can tell you that I -- I've seen
3   actions where fee waivers have been requested especially
4   by -- so, for example, the ACLU may enter an appearance
5   on behalf of someone who is indigent and they could
6   request a fee waiver.
7       Q.  (By Mr. Fetterly) So we've identified three
8   examples so far.  The first was redacted.  The second
9   was a fee waiver example.  The third was wrong county.
10          Are there any other, you know, reasons you can
11  think of why a nonconforming document, if auto-accepted,
12  would require judicial action?
13      A.  If -- if you're only asking about those things
14  that are nonconforming documents, those are the ones
15  that come to me off the top of my head.
16      Q.  Okay.  And you -- when I'm talking about
17  nonconforming, I -- let me try again.  I'm also just
18  referring to any reason for rejection, because my
19  understanding is, you know, we're talking here about
20  Auto-Accept and that the clerk review process, which
21  provides the clerk the opportunity to accept or reject,
22  is the intervening thing that would be removed in the
23  Auto-Accept Review.  Is that correct?
24      A.  Okay.  Yes.  And so here's another example
25  that is outside of maybe a non -- "nonconforming," and

---

Page 84

1   how that impacts a clerk on the other end if Auto-Accept
2   were to be put into place.
3           So, for example, it is not an unheard
4   experience to have someone submit -- when documents come
5   in, they come in in a single envelope.
6       Q.  Mm-hmm.
7       A.  Right?  So all the documents for that case are
8   to be placed in a single electronic envelope within the
9   clerk's queue before they are accepted and file stamped
10  and brought into the system.  The clerk is -- they check
11  each of those documents.
12          So let's assume for a second that someone is
13  filing an initial filing, and then along with that, they
14  are filing additional documents.  Right?  So it's a
15  complaint and then there are additional documents that
16  go with that complaint.  If one of those has been
17  photocopied and it did not come through properly, in the
18  clerk's review queue, the clerk has all of those
19  documents together in one place and has direct
20  communication with the person who submitted it.
21          So they can reject that envelope of documents,
22  send it back to the person, and say, "Document X did not
23  come through in -- in a readable fashion.  So all
24  of these need to come through together.  This one didn't
25  come through properly.  Can you send us a clean copy

---

21 (Pages 81 to 84)

EXHIBIT 5, page 15 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 85

1  that we can read?"  The clerk has direct communication
2  with that submitter.
3        With Auto-Accept, all of those documents come
4  in and there are two implications to that.  One, is they
5  do not -- they're not all in the same place.  Right?
6  When they come into the case management system, they
7  don't all come in in a single envelope.  They come into
8  different places, so to review those documents, the
9  clerk has to go through different tabs to see where --
10 what those documents are.  That's one thing.
11       The second thing is if the clerk does find a
12 problem, the service address that exists within the case
13 management system where the clerk -- or, sorry -- the
14 service address that exists within the -- the e-filing
15 system does not come along with it, and so the clerk has
16 to figure out:  How do I get in touch with this filer?
17 It may be an attorney that they know the email address
18 and can very easily email that person.  It may be a pro
19 se person that you hope has put their email address on
20 the filing so that you can contact them that way.
21       But that case -- the case management system,
22 once something is in there, the way that a clerk
23 communicates is different than it is in the -- the
24 electronic filing system so it takes more clerk time to
25 go through and find all of the different documents,

Page 86

1  address those documents, and communicate with the
2  submitter.
3        In addition, even though they're communicating
4  with the submitter, if -- if the system was used to also
5  communicate with the people it was served on, they
6  wouldn't -- that is gone.  Right?  The clerk would only
7  be communicating with the submitter and not necessarily
8  with others who received copies of those documents.  So
9  it's just -- it changes the amount of clerk resources
10 once it is in the case management system.
11       Q.  So under this description of what would happen
12 under the Auto-Accept system, you said it would take
13 more clerk time.  How much more clerk time would it
14 take?
15       A.  I think that depends on the number -- so if
16 you're talking about a single case, how much more clerk
17 time would it take if -- for each individual filing?  Is
18 that what you're talking about?  Sorry.
19       Q.  Yes, start there.  Yeah.  On a per filing
20 basis, do you have an understanding of how much more
21 time would -- would be required?
22       A.  So my understanding, based on
23 Margaret Molchan's affidavit, is they would anticipate a
24 few more minutes for each filing.  I think, in part,
25 that depends upon how easy it is to identify a

Page 87

1  communication path back to the person who submitted the
2  document.  If it's a -- an attorney they work with
3  routinely, they typically have an email address for that
4  attorney.  If it's not an attorney, it can be more
5  time-consuming to find a path back to communicate.  But
6  I would have to -- to rely on the expert in that, and
7  that would be Margaret Molchan in her affidavit when she
8  estimates the addition of a few minutes for each filing.
9        Q.  And I believe, yesterday, the Tyler
10 Technologies' witness, Terry Derrick, testified that
11 more than 20 state court systems currently use the
12 Auto-Accept Review, you know, function of
13 eFile & Serve.
14       How is Idaho different such that the -- you
15 know, the function used by these other courts would not
16 work in Idaho?
17       MS. DUKE:  And I'll just object to the
18 form and foundation.  You failed to provide a list.
19       But go ahead in a general concept on
20 that.
21       THE DEPONENT:  So I would have to start
22 by saying I don't know to what extent they use
23 Auto-Accept, so as -- as he articulated, Auto-Accept
24 could be limited to specific things.  I don't know to
25 what extent they use it, so that's hard to say.  If it

Page 88

1  was -- if they used it simply for things like electronic
2  tickets from infraction tickets, that would be different
3  than saying that they use it for every filing.  Right?
4  It wasn't my understanding that they used it for every
5  filing, so I think it's hard to say.
6        The other thing that I would say is the
7  way that the -- the state courts are different is
8  there's incredible variation throughout the country of
9  jurisdiction, of the ways that things get processed, of
10 the roles and responsibility of the clerks.  I mean,
11 there's a myriad of differences in how things were
12 processed.  I just -- I could not give you specifics to
13 how Idaho is different from a jurisdiction that does
14 Auto-Accept, other than the Idaho Supreme Court has made
15 the policy decision that in Idaho we are going to allow
16 the clerks to reject and has placed that in court rule
17 so our system is designed to follow that rule.
18       Q.  (By Mr. Fetterly)  Okay.  And so I'm
19 understanding, what court rule are you referring to?
20       A.  So the Idaho Rules of Electronic Filing and
21 Service, Rule 13, which grants the clerks the ability to
22 return documents to the filer instead of having
23 something that automatically comes in.  I'll be -- I'll
24 be honest, that was a -- a recommendation came from the
25 Court Technology Committee.  That was a very conscious

                                    22  (Pages 85 to 88)

EXHIBIT 5, page 16 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 89

1  decision to allow the clerks to do that.  The court put
2  it in rule, and so I follow what the Idaho Supreme Court
3  decided on that issue.
4      Q.  Earlier, you gave me three examples of, you
5  know, reasons why a document, if auto-accepted, could
6  potentially require judicial action.  And then we went
7  on to talk about a fourth, that you said impacts the
8  clerks, and you gave the single envelope example and you
9  provided some testimony regarding the single envelope.
10  Do you recall that?
11     A.  Yes.
12     Q.  Would that issue involving the single envelope
13  require a judicial action if that document or envelope
14  had been auto-accepted?
15     A.  No.  The -- that is simply how the clerk has
16  to find it, and it takes more time for the clerk to find
17  multiple documents in the case management system and
18  where they are located versus having them all in one
19  place.
20         Where it could take judicial action in that
21  instance is if there was a document that was not
22  readable and was necessary in conjunction with the --
23  the filing, the -- it would have to go to the judge.
24  Once it's filed, it has to go to the judge for the judge
25  to decide what to do.

Page 90

1         The clerk could provide notice or information
2  to the -- the filer to say, "Hey, we received three
3  documents and this particular one was completely
4  unreadable."  They can provide that notice and let
5  the -- the filer respond however they wish, but it would
6  be up to the judge as to whether to accept an amended
7  filing.  It would be up to the judge as to what the
8  impact of an unreadable document would be.  The judge
9  would have to address that depending upon what was
10  brought in front of them at that point.
11     Q.  So -- so if a document were auto-accepted --
12  so if a document -- if a document -- if a document that
13  was missing a signature was automatically accepted,
14  would that require judicial action?
15     A.  It would be up to the judge what happens with
16  that.  So it's possible that the clerk would notify the
17  person and they would submit something in an attempt to
18  correct that.  The judge would have to decide whether to
19  accept that correction or not.  The judge would have to
20  decide sort of what to do with a missing signature on a
21  document.  At that point, it's in the judge -- once it
22  is in the case file, it is up to the judge what happens
23  to it, not the clerk.
24     Q.  Well, why would a judge have to decide that?
25     A.  Why would a judge have to decide?  I'm sorry,

Page 91

1  like, what to do with the signature, the missing
2  signature?
3      Q.  Yeah.  We've -- I just want to make sure we're
4  clear.  We've talked about a few different things like
5  missing signature.  I think you said illegible.  Let's
6  just use those two examples, a document missing a
7  signature or a document that is illegible.  Why would a
8  judge need to decide what to do with that, as opposed to
9  the clerk having the ability to take the few extra
10  minutes to address the issue?
11     A.  So once it exists in a case file, once it is
12  filed, any action that's taken on that would be up to
13  the judge, not the clerk.  Clerks can't authorize --
14  they can't remove something from the case file without
15  some sort of authority, and I'm not aware of any
16  authority that would allow them to remove that from the
17  file.
18         The person -- the filer could certainly submit
19  an amended document, and then the court -- the judge can
20  decide whether to accept or reject that amended
21  document.  There are some courts rules that allow
22  amendment within a certain period of time, but a clerk
23  can't decide what the impact is of an unreadable
24  document or an unsigned document.  That is something
25  that the judge has to decide.

Page 92

1      Q.  And is there a -- a statute or rule that
2  supports that statement?
3      A.  Is there a statute or rule that supports the
4  statement that it is a judge's decision what to do
5  with...
6      Q.  You were just saying that a judge must decide
7  as opposed to a clerk having some authority to address
8  these clerical issues, so I'm just curious if there's a
9  statute or rule in Idaho that addresses this and that
10  supports the statement that a judge must decide this.
11     A.  So I'm -- I'm not sure that I understand your
12  question other than to say there is, as far as I know,
13  no authority in this state of Idaho for a clerk to
14  remove something from a -- that has been filed to remove
15  it from the case file.  And, in fact, I believe there is
16  a rule that says it can only be removed for court
17  business.  Right?  I think that is Idaho Court
18  Administrative Rule 31, maybe?
19         MS. DUKE:  We have the rules.
20         THE DEPONENT:  Well, I don't have that
21  one.  I believe it's Idaho Court Administrative Rule 31
22  that talks about what can happen, like, as far as the --
23  the clerk being responsible for maintaining that file,
24  so I don't know of anything that would allow the clerk
25  to do something.  There could certainly be subsequent

23 (Pages 89 to 92)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 93

1    filings to address those -- those issues, but the clerk
2    doesn't decide.  The clerk would just accept those
3    additional filings.
4            And what the legal impact of that would
5    be, that's a -- that's a legal question for the judge,
6    so that's why it would be in front of the judge.  A
7    party could move to dismiss for failing to have a
8    signature.  A party could move to file an amended that
9    included the signature.  There are a number of different
10   possibilities with that, but -- but my understanding is
11   is that --
12           Sorry, Keely.  It wasn't in that.  No,
13   it's not that one.
14           There's an Idaho Court Administrative
15   Rule that requires the clerks to keep the files in a
16   particular way.
17           Sorry, I'm just looking through the
18   rules.
19       Q.  (By Mr. Fetterly) Does your counsel have the
20   rulebook right there?
21       A.  It is -- it is records kept by clerk of the
22   district court, so they -- they have to keep that record
23   and that is Idaho Court Administrative Rule 31.
24       Q.  Let me ask you a different question here
25   because I think I understand the response that you've

---

Page 94

1    provided.
2            And, just for the record, was your counsel
3    showing you the administrative rules as you were
4    providing your response?
5       A.  She showed me Administrative Rule 31.
6       Q.  Okay.
7       A.  There's -- there's a rule that specifically
8    defines when -- that a document can't be removed unless
9    it's for court business, and I'm not sure if that's 31
10   or not.
11       Q.  Yeah.  Could the Idaho -- could Idaho adjust
12   its procedures to give clerks more flexibility to
13   address issues like illegible pages, missing signatures,
14   other clerical issues?
15       A.  The --
16           MS. DUKE:  Object to the form and
17   foundation and assumes facts not in evidence.  I think
18   the clerks do have that authority if they're not in the
19   case management system, but...
20           THE DEPONENT:  So the Idaho Supreme Court
21   constitutionally has the authority to define court
22   procedures, and the Idaho Supreme Court has court rules
23   that do that.  The Idaho Supreme Court does amend those
24   rules, so the Idaho Supreme Court itself could vote to
25   amend the rules.

---

Page 95

1       Q.  (By Mr. Fetterly) Yeah.  I -- I recall from
2    some documents that were produced that there was a rule
3    change surrounding a change to the e-filing system that
4    resulted in a pull-down menu being removed where filers
5    were at one point in time allowed to designate whether a
6    document was public or confidential, but the clerks
7    asked that that be removed and there was a subsequent
8    rule change.
9            Do you -- do you recall that taking place?
10           MS. DUKE:  Object to the form as to who
11   asked it to be removed, but go ahead.
12           THE DEPONENT:  I -- I do remember when
13   that happened, yes.
14       Q.  (By Mr. Fetterly) Okay.  And -- and would that
15   be an example of the type of rule change that could
16   result from, you know, clerical issues or requests from
17   the clerks for a change of procedure?
18       A.  Yes.  That is an example of the clerks
19   identifying an inefficiency and a difficulty and the
20   Idaho Supreme Court voting to change the rule.
21       Q.  And on that example, I -- isn't it correct
22   that, you know, one of the reasons for that particular
23   rule change and the removal of the drop-down menu on
24   the -- you know, in the e-filing system was that filers
25   were over-designating confidentiality, meaning they were

---

Page 96

1    identifying documents as confidential that the court
2    clerks would not agree were, in fact, confidential?
3       A.  Yes.  My understanding is that filers were
4    pretty much designating everything to be confidential
5    and that the clerks thereafter had to go through each
6    document and change the security setting.  And so the
7    decision was made to have -- to take that designation
8    and the impact of that designation, in other words, the
9    change of security setting, to change it so that instead
10   of having to unclick and change the security setting to
11   not confidential for each document, instead the decision
12   was made it was more efficient and a better use of
13   resources to take that out of the hands of the filer and
14   leave that in the hands of the clerk.  That at the time
15   they reviewed documents, it is the clerk that determines
16   which documents really should be within the confidential
17   setting.  In other words, the clerk -- if there is a
18   setting other than public, the clerk selects the -- the
19   security setting of the document at the time they review
20   it and accept it.
21       Q.  Isn't it true that there are certain document
22   types or filing codes for which a, you know, security
23   designation is automatically applied so that if the
24   filer designates a certain type of document or case
25   type, there's an automatic security designation that's

---

24 (Pages 93 to 96)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

**Page 97**

1   applied based on that designation?
2        A.   There is an automatic security setting placed
3   on certain case types.  For document types, I don't know
4   that that's true.
5        Q.   Okay.
6        A.   The document type list that a filer sees is a
7   much smaller list than the document type list a clerk
8   sees.  So the filer selects a general category.  When it
9   comes to the clerk, the clerk selects a more specific
10  designation or can select a more specific designation.
11       Q.   And isn't it correct that in addition to the
12  over-designating issue and the efficiency issue you
13  identified, another reason why the court clerks
14  petitioned for the rule change is that the automatic
15  security settings were working correctly and that was an
16  additional, you know, level of protection to ensure that
17  confidential documents were, in fact, protected?
18       A.   I'm sorry.  I don't understand your question.
19  Could you state that again?
20       Q.   Yes.  You -- you identified that, you know,
21  the, you know, efficiency with the clerks was one reason
22  why or was a reason why, you know, the -- the rule
23  change was requested and the drop-down, you know,
24  confidential selection menu was removed.
25            And my question to you is:  Isn't it true that

**Page 98**

1   an additional reason is that the, you know, automatic
2   security settings that were applied to case types were,
3   you know, working correctly and the court clerks were
4   able to rely on that as well?
5        A.   Automatic case types.  I'm sorry.  I don't --
6   I don't recall that being part of the discussion.  There
7   are auto -- automatic case types, but the -- the clerk
8   is still responsible for reviewing that at the time they
9   review something.  And so I do think that those
10  automatic case types would -- would reduce the amount of
11  times the clerks have to select that something is
12  confidential because it would be applied to every
13  document that is filed in that case type.
14       Q.   And then going back to this issue of judicial
15  action, I just want to make sure I understand.  We've
16  talked about quite a few examples of where under the
17  Auto-Accept Review there were documents that were
18  automatically accepted, and your testimony is, you know,
19  any number of issues would require judicial action.
20            My question to you is:  The list of rejection
21  reasons that are reflected in the Court Operations
22  Manual, is it your testimony that any of those reasons
23  or all of them could potentially require judicial action
24  if a document that was subject to rejection per one of
25  those reasons was auto-accepted?

**Page 99**

1        A.   So I'm looking at the list that is in here.
2   Insufficient fees would require judicial action.  The
3   court would have to decide what to do if the fee was not
4   sufficiently paid.
5            Insufficient funds in account of credit card,
6   it is my understanding from yesterday's testimony that
7   that could be auto-rejected or that may route something
8   to a queue.
9            Ill -- excuse me -- illegible and unreadable.
10  If there was a document that was purported to be
11  something and it was not legible, the judge would have
12  to decide what to do with that.
13            Incomplete or missing signature block, a judge
14  would have to decide, you know, whether to accept,
15  maybe, an amended or what the impact -- what the legal
16  impact is of an unsigned document.
17            Incorrect formatting, I don't think that the
18  judge would have to address that.
19            A document that's filed into an incorrect case
20  number, again, I think a judge would have to decide
21  whether to strike that from the -- the record or not.
22            The correct case type, I think a clerk could
23  address that on their own without needing a judge's
24  intervention.
25            The filing code.  If it comes in with a filing

**Page 100**

1   code, I'm not sure what the practical impact of that is,
2   so I don't know that.
3            If they use the incorrect party names on the
4   documents, once that's in -- they could ask the judge to
5   change that party name, but I don't think a clerk could
6   do that on their own.
7            If the case already exists, they would have
8   to -- a judge would have to dismiss the -- a new case,
9   any new case that's filed and -- and decide -- I guess
10  the judge could decide to put it in the existing case or
11  the party could refile in the existing case.
12            The PDF documents combined, I don't think that
13  the judge would need to act on that one.
14            A document that must be filed in paper form,
15  that -- that -- my understanding is that those things
16  that have to be filed in paper form, there could be
17  legal implications.  So an original will, if it's filed
18  electronically, a judge would have to act on that
19  because that's not a correct evidentiary submission.  If
20  it's something that was submitted that was supposed to
21  be sealed, I -- I think the -- the judge would have to
22  figure out what to do with a document that should have
23  been sealed that wasn't.  I think at that point, the
24  judge could certainly rule on that.
25            Please correct error.  Again, that's a general

25  (Pages 97 to 100)

EXHIBIT 5, page 19 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 101

```
 1   statement.
 2          An in-camera filing, again, is something
 3   that's supposed to be filed in paper form. I don't know
 4   that a judge would have to reject that. The judge could
 5   consider it. I think there would just have to be work
 6   on the security setting.
 7          Motion to seal document, the subject document
 8   must be filed in paper form. Again, that could be an
 9   issue that's raised by a party, but I don't know that it
10   would be.
11          Wrong jurisdiction, the judge would have to
12   intervene to dismiss a case that's filed in the wrong
13   jurisdiction. A clerk can't dismiss a case once -- once
14   it's been filed.
15          The duplicate filing received. If it's
16   received in the same case, I'm not sure that would take
17   judicial action.
18          The hearing date or reservation is required
19   fire -- prior to filing. A judge may or may not have to
20   decide whether or not to schedule the hearing or to -- I
21   mean, that -- that's typically something to make sure
22   that there's a hearing scheduled for it. The judge
23   would -- I think the judge would have to schedule a
24   hearing regardless, so I'm not sure that's additional
25   work.
```

Page 102

```
 1       Q.   Why could clerks fix some of these things but
 2   not others?
 3       A.   It depends on the authority that they have and
 4   what they're changing. So can a -- can a clerk change a
 5   security setting within Odyssey? They have the
 6   authority to do that.
 7          Can a clerk remove from a case file a document
 8   that has been filed? I don't know of anything that
 9   gives them that authority.
10          So it depends on whether or not it's something
11   that the -- the clerks have authority to do, and there
12   are -- I'm not aware of anything that allows clerks to
13   remove documents that have been filed. They can reject
14   documents that are not yet in a case file, but once it
15   is filed and has a file stamp on it, I know of nothing
16   that allows the clerk to remove it.
17       Q.   And what is the basis for the authority that
18   the clerks do have?
19       A.   So part -- I guess it would be their authority
20   to manage the docket and the case management system.
21   Part of it would be found in the policies of the court
22   in the -- in the clerk's manual. It's -- it's what to
23   do with -- once there's a document in the case file, it
24   is up to the -- the rules of civil procedure, the rules
25   of criminal procedure. As to what can and cannot be
```

Page 103

```
 1   done with those documents, that's up to the judge.
 2       Q.   Okay. Yesterday, Mr. Derrick, on behalf of
 3   Tyler Technologies, provided some testimony regarding
 4   the functionality of the Auto-Accept Review function,
 5   and specifically, that it operates based on conditions,
 6   you know, configured by the court such that documents
 7   are not auto-accepted unless they satisfy those -- those
 8   particular conditions. Do you recall that testimony?
 9       A.   I do.
10       Q.   Has the Administrative Office of Idaho spoken
11   to Tyler about whether any of the issues we've just
12   identified on the rejection reason list, whether any of
13   those could be accounted for or addressed through the
14   conditions or configurations of Auto-Accept Review?
15       A.   If the Idaho Supreme Court authorized
16   Auto-Accept, I would investigate that. But the court
17   rules tell me that the clerk reviews them and has the
18   opportunity to reject them, so my work is focused on --
19   the scope of my work is focused on following the court
20   rules. I'm not investigating how to get around the
21   court rules.
22       Q.   Okay. I'd like to go back up to our
23   Exhibit No. 1. One moment. Excuse me. I said
24   Exhibit No. 1, I meant Exhibit No. 39, the response to
25   Interrogatory 1.
```

Page 104

```
 1          And now I'm going to move down from where we
 2   were discussing before to Number 3. In addition, the
 3   Auto-Accept function has not been implemented because it
 4   creates additional work for Idaho's already busy judges.
 5   I believe we discussed that.
 6          Moving on, and a privacy risk to litigants and
 7   third parties, e.g. publication of sensitive information
 8   in a -- in a court submission.
 9          I just want to understand what you mean here
10   where you say "sensitive information." What -- what
11   sensitive information are you referring to?
12       A.   It could be a lot of different things. Right
13   now, court clerks have the ability to reject a document
14   that contains certain personally-identifying
15   information, so, for example, someone's social security
16   number. So there are -- there's PII,
17   personally-identifying information that is supposed to
18   be redacted in filings, and clerks have the authority to
19   reject a filing if it contains that information and note
20   that it needs to be redacted. That's one thing.
21          Another thing is that sometimes filers, even
22   attorneys, will submit something that really has no
23   business being submitted. That can involve some -- all
24   sorts of things. Sometimes, it's just, quite frankly,
25   an oversight, but so there are confidential things that
```

26  (Pages 101 to 104)

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

Page 105

1    are not supposed to be in public documents that do get
2    submitted.
3          Another example of that might be if someone
4    submits a cover sheet that is designed to protect the
5    privacy of folks if they were to inadvertently submit
6    that, attach it to a complaint or -- so there are just
7    things that are not supposed to be submitted as public
8    documents that sometimes can be.  And if -- with the
9    clerk's review, they can catch them, reject the filing
10   and ask that be corrected.
11         Q.  Okay.  I want to break that up a little bit
12   because, as I understand your response, there's at least
13   two components.  One being, perhaps, you know, PII, as
14   you referred to it, that is included in a document that
15   is otherwise public.  And then separately, documents
16   that might themselves just be exempt or nonpublic, and,
17   you know, so those are two distinctions there that I'm
18   understanding.  Do I understand that correctly?
19         A.  Those are two.  I also gave the example of
20   something being submitted that simply should never have
21   been submitted.
22         Q.  And what would -- what would that entail?
23         A.  I can give you an example of child
24   pornography.
25         Q.  And has that been filed with the court?

Page 106

1          A.  Yes.
2          Q.  When did that occur?
3          A.  The -- the time that I know of, it was in --
4    it was before electronic filing -- thank goodness -- and
5    it was a photograph of child pornography attached to an
6    appellate brief.
7          Q.  So this was a -- not a district court filing,
8    but an appellate court filing; is that correct?
9          A.  Correct.
10         Q.  And it was a paper filing and not an e-filing;
11   is that correct?
12         A.  Correct.
13         Q.  And it sounds like it was --
14         A.  To be --
15         Q.  Well, can you give me an estimate about how
16   long ago this occurred?
17         A.  Maybe ten years ago?  I can tell you, though,
18   that since that time, clerks have inadvertently,
19   themselves, sent exhibits of child pornography.
20         It -- there are inappropriate things that can
21   be submitted with filings, both accidentally,
22   inadvertently, and quite frankly, maliciously, so
23   there -- there is the possibility that inappropriate
24   things can be included.
25         Q.  So my question then would be:  Can you give me

Page 107

1    an estimate of the number of times this has occurred
2    with new electronically-filed civil complaints?
3          A.  That particular example?  No, I can't.  As far
4    as the PII and things not being redacted that should be,
5    again, I think there's a code that we can try to pull
6    information on, but we haven't pulled that information.
7          As far as documents being, for example,
8    scanned together, the cover sheet along with the initial
9    pleading being scanned together and submitted together,
10   I don't know if we have a code that we could pull that,
11   but that's not a -- an exceptionally unusual experience.
12   I -- I couldn't give you exact numbers.
13         Q.  When you say "code," what do you mean?
14         A.  Well, so we had been talking about these
15   rejection codes.  I believe one of those codes was the
16   failure to redact, and so we could look at our system to
17   see how often that code was used.  It wouldn't
18   necessarily catch all of them, but it might give us an
19   idea of how often that happens.
20         Q.  Let me ask you:  Is it fair to state then that
21   if a document were rejected because of a failure to
22   redact or other sensitive information, we would expect
23   to find or you could look at the rejection data, the
24   codes and the comments, to see if they reflect that
25   reason for rejection; is that correct?

Page 108

1          A.  We can -- I'm sorry.  I'm just trying to
2    clarify, do you mean in that individual case could we
3    tell that was the reason?  It depends on the code that
4    the clerk put in.
5          In general, if you're talking about the
6    universe of all the cases, we certainly could -- could
7    identify how many cases over a period of time had that
8    rejection code, yes.
9          Q.  And -- and is there a rejection code for
10   failure to redact information?
11         A.  I think there is, but I want to look.  I know
12   it's --
13         Q.  I would like you to please do that.  And if
14   this is one where you would need to place a phone call
15   to an ops manager or something, please let me know.
16         A.  Well, I can -- yeah.  And party names...
17         No, there's not.  You know, it -- it would
18   just -- I think it would just have to be in the reject
19   comments.  It's not one of the common ones that's listed
20   in here.
21         Q.  Okay.
22         MS. DUKE:  And, Jon, when you get to a
23   point, if you could, you know, take a break?  And I know
24   our IT person -- she wants to talk to you -- is
25   available to talk to you, so we could do that as well.

27 (Pages 105 to 108)

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

EXHIBIT 5, page 21 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                           30(b)(6) Sara Omundson

Page 109

```
1        MR. FETTERLY:  Sure.  Why don't we,
2   because I know that we're also -- well, I'll -- we can
3   take a break.  Let's go off the record.
4        (Discussion off the record.)
5        (A break was taken from
6        11:20 a.m. to 11:34 a.m.)
7   Q.  (By Mr. Fetterly) Okay.  Ms. Omundson, we are
8   back on the record.  During our time off the record,
9   were you able to obtain an answer to the pending
10  question we have regarding the rejection codes on the
11  Excel spreadsheet, Exhibit 42, relative to the rejection
12  reasons on Exhibit 41?
13  A.  Yes.
14  Q.  And what is the answer to that question?
15  A.  So what he explained is that within the
16  database, those are the rejection codes.  Part of what
17  was confusing me is the numbers looked different from
18  what was in the clerk's manual and what you were showing
19  me.
20       What he explained was that those are the codes
21  that were actually used in the time period that -- that
22  was requested, and so it wouldn't necessarily include
23  every code listed in the clerk's -- or, I mean, yeah, in
24  the clerk's --
25  Q.  You cut out.  In the clerk's what?
```

Page 110

```
1   A.  So in the clerk's manual, there's A through T,
2   and the list that you were showing me didn't appear to
3   be as long, which what was part of what was confusing
4   me.  What he told me was that the drop-down list that
5   you have are the codes that were actually used in that
6   time period.  So if a code was not in that -- used in
7   that time period, it wouldn't show up in your drop-down
8   list.  So the -- the difference in what appeared to me
9   as the difference in number of codes was because maybe a
10  code hadn't been used during that time period.
11  Q.  Thank you for the answer and the explanation.
12       So Exhibit 41, the operations manual, gives us
13  the -- or provides the codes that could be used, and
14  they are identified as codes A through T.  And then we
15  have our spreadsheet, Exhibit 42, covering a specified
16  time period and the codes on that drop-down menu were
17  the codes that were actually used during that time
18  period; correct?
19       MS. DUKE:  I'll object to the form.
20       Go ahead.
21       THE DEPONENT:  I believe that's accurate,
22  yes.
23  Q.  (By Mr. Fetterly) Thank you.
24  A.  Yes.  That was the explanation, yes.
25  Q.  Okay.  I'm going to show you another exhibit.
```

Page 111

```
1   One moment.
2        (Pause in the proceedings.)
3        (Exhibit No. 43 marked.)
4   Q.  (By Mr. Fetterly) And I'm going to put it up on
5   my screen before, as I've been doing.  This is a
6   document that's Bates labeled SO 14 through 16 produced
7   by your counsel in this action.  It is now up on the
8   screen.
9        I'll show you the first page and then scroll
10  down to Page 1, Page 2, briefly, and then Page 3.
11       Let me go back up to the top of Page 1 and ask
12  you, Ms. Omundson, do you recognize this document?
13  A.  It looks to me to be the list of fee codes
14  that appear as an addendum to the Idaho Civil Rules that
15  is also used in our system as a way to identify, I
16  believe, its case type.
17  Q.  Okay.  So --
18  A.  It might be document type.  Sorry.
19  Q.  Okay.  So does that mean that the -- let me
20  back up.
21       Do you -- do you know who prepared this
22  document?
23  A.  If I had, I can't say for certain.  I believe
24  it is maintained by Michael Mehall.
25  Q.  Mm-hmm.  And do you have an understanding of
```

Page 112

```
1   why certain codes or document types are highlighted on
2   this document?  And you can take a minute to look
3   through it if that would be helpful in your response.
4   A.  Why would they be highlighted?  I don't --
5   sorry.  You're scrolling really fast and I can't see the
6   ones --
7   Q.  Sorry.
8   A.  I'm trying to compare the ones that are
9   highlighted with the ones that aren't.  Yeah.  I mean,
10  it appears to me that the ones that are highlighted
11  appear to be ones that, per Rule 32, would be exempt
12  from public disclosure.
13  Q.  Okay.  So then I also see that there's a
14  distinction here between district court on the top and
15  magistrate court on the bottom.  Do you see that this
16  document is broken into the two groups?
17  A.  Yes.
18  Q.  And so is it correct that under the district
19  court where we see civil and then there's family, only
20  one type, and probate mental health, there's only one
21  type, those would be the types of cases that could be
22  filed in Idaho District Court.  Is that correct?
23  A.  It --
24       MS. DUKE:  Here's a hard copy.
25       THE DEPONENT:  Sorry.  I'm going to be a
```

28 (Pages 109 to 112)

EXHIBIT 5, page 22 of 23
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Sara Omundson

---

Page 137

1  A.  That's part of it, but it's -- the court won't
2  take any -- make any efforts to -- to follow up on that
3  if it doesn't happen, but some courts simply don't
4  follow up on it if it doesn't happen.
5     Q.  Were any of court administrators who were
6  present at this conference, did any of those court
7  administrators, you know, come from states or courts
8  where, you know, press review queues are implemented and
9  available?
10  A.  Yes.
11    Q.  Okay.  And did any of them speak at the
12  conference?
13  A.  Yes.
14    Q.  On this -- on this issue of access?
15  A.  Yes.
16    Q.  And did any of them identify any issues that
17  their courts have had with providing access to new civil
18  complaints through a press review queue?
19  A.  I could only think of one comment about that,
20  and it was not a comment about a problem that was had.
21  Rather, it was a comment about the courts should simply
22  allow access to anything and everything; that that's --
23  that open courts allowing access regardless of what is
24  in there was the priority, which, that is definitely one
25  way to balance it.  It's just not the way the Idaho

Page 138

1  Supreme Court has.
2     Q.  And who was the court administrator who made
3  that comment?
4  A.  I believe -- I believe it was the Arizona
5  administrator.
6     Q.  Okay.
7        MS. DUKE:  Are you pretty close to done,
8  Jon, because we're --
9     Q.  (By Mr. Fetterly) All I want to do is a couple
10  of follow-up questions there on that same line of
11  questioning, but I understand there was a September 22
12  conference in which you identified Artie Pepin.
13  A.  Yes.
14    Q.  I believe that's the Administrator of the
15  State of New Mexico, so this would've been very
16  recently.  I just want to ask you about that and then
17  I'm done.
18  A.  Artie and I were standing in line for
19  breakfast and I asked him what the status of his case
20  was, and I believe he told me that it either was just
21  getting ready to be argued in the appellate court or it
22  had just been argued in the appellate court.  That was
23  the extent of it.
24    Q.  Okay.  Did Mr. Pepin make any comments
25  regarding the access provided to the press or public by

Page 139

1  the New Mexico Courts?
2  A.  No.  It -- I -- I just asked him if -- if --
3  if his appeal was done yet.
4     Q.  Understood.  Understood.
5        Okay.  I think we're about at time.  I have no
6  further questions.
7        MR. FETTERLY:  Thank you.  Appreciate it,
8  everybody.
9        (Deposition concluded at 12:54 p.m.)
10       (Signature reserved.)
11          --o0o--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3        The undersigned Certified Shorthand
    Reporter and Deposition Notary Public of the State of
4    California does hereby certify:
        That the foregoing 30(b)(6) deposition of
5    Sara Omundson in her official capacity as Administrative
    Director of Idaho Courts was taken before me remotely at
6    the time, at which time the witness was duly sworn by me;
7        That the testimony of the witness and all
8    objections made at the time of the deposition were
    recorded stenographically by me and were thereafter
9    transcribed, said transcript being a true and correct copy
    of the proceedings thereof.
10
        I further certify that I am neither counsel
11    for nor related to any party to said action, nor in any
    way interested in the outcome thereof.
12
        Further, that if the foregoing pertains to
13    the original transcript of a deposition in a federal case,
    before completion of the proceedings, review of the
14    transcript was discussed on the record.
15
16
        In witness whereof, I have subscribed my
17    name on this 15th day of November 2022.
18
19
20
21
22
23
        Nicole A. Buildis, RPR
24    CA CSR No. 14441
25

35 (Pages 137 to 140)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

EXHIBIT 5, page 23 of 23
Decl. of Fetterly

# EXHIBIT 6
# FETTERLY DECLARATION

# Deposition of 30(b)(6) Terry Derrick - Vol. I

# Courthouse News Service v. Omundson

# November 10, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
**www.buellrealtime.com**
email: info@buellrealtime.com



EXHIBIT 6, page 1 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____

COURTHOUSE NEWS SERVICE,      )
                              )
                              )
         Plaintiff,           )
                              )
v.                            )   No. 1:21-CV-00305-REP
                              )
SARA OMUNDSON, in her official )
capacity as Administrative    )
Director of Idaho Courts,     )
                              )
         Defendant.           )
_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF TYLER TECHNOLOGIES

REPRESENTED BY TERRY DERRICK - VOLUME I

_____

Taken at Plano, Texas
(Conducted via Videoconference.)

DATE TAKEN:  November 10, 2022
REPORTED BY:  Nicole A. Bulldis, RPR
AZ No. 50955 | CA No. 14441 | WA No. 3384

---

**Page 2**

```
 1        A P P E A R A N C E S
 2
 3   FOR PLAINTIFF:
 4    (via Zoom)   Jonathan G. Fetterly
                   Katherine A. Keating
 5                 BRYAN CAVE LEIGHTON PAISNER LLP
                   3 Embarcadero Center, 7th Floor
 6                 San Francisco, CA 94111
                   (415) 675-3400
 7                 jon.fetterly@bclplaw.com
                   katherine.keating@bclplaw.com
 8
 9   FOR DEFENDANT:
10    (via Zoom)   Keely E. Duke
                   Molly E. Mitchell
11                 DUKE EVETT, PLLC
                   1087 W. River Street, Suite 300
12                 Boise, ID 83707
                   PO Box 7387
13                 (208) 342-3310
                   ked@dukeevett.com
14                 mem@dukeevett.com
15
16   FOR TYLER TECHNOLOGIES
     AND WITNESS:
17
18    (via Zoom)   Beth W. Petronio
                   K&L GATES LLP
19                 1717 Main Street, Suite 2800
                   Dallas, TX 75201
20                 (214) 939-5815
                   beth.petronio@klgates.com
21
22   ALSO PRESENT:
23    (via Zoom)      SARA OMUNDSON, Idaho Courts
24                 --oOo--
25
```

---

**Page 3**

```
 1   30(b)(6) DEPOSITION OF TERRY DERRICK - VOLUME I
 2
 3            EXAMINATION INDEX
 4   EXAMINATION BY                    PAGE
 5   Mr. Fetterly........................... 4
 6
 7
 8
 9
10            EXHIBIT INDEX
11   EXHIBITS FOR IDENTIFICATION          PAGE
12   33 Subpoena to Tyler Technologies.................... 4
13   34 State of Idaho Judicial Branch - 2019 Tyler
14      Public Sector Excellence Award Winner............. 4
15   34A TylerTech.com Idaho Judicial Branch Article...... 13
16   35B TylerTech.com Enterprise Justice Software........ 17
17   35 Individual File User Guide, Odyssey File & Serve... 4
18   36 Firm Administrator User Guide, Odyssey File & Serve
19   37 iCourt File & Serve: Electronic Filing Overview.... 4
20
21              --oOo--
22
23
24
25
```

---

**Page 4**

```
 1   REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
 2       Thursday, November 10, 2022; 9:39 a.m.
 3                  --oOo--
 4        (Exhibit Nos. 33 through 37 marked.)
 5
 6   TERRY DERRICK,          witness herein, having been
 7                  first duly sworn on oath,
 8                  was examined and testified
 9                  as follows:
10
11          E X A M I N A T I O N
12   BY MR. FETTERLY:
13       Q.  And good morning, Mr. Derrick.  Can you please
14   state and spell your name for the record?
15       A.  Sure.  It's Terry Derrick.  T-e-r-r-y,
16   D-e-r-r-i-c-k.
17       Q.  Thank you.
18       I'm Jon Fetterly.  I'm an attorney with the
19   law firm Bryan Cave Leighton Paisner, and I represent
20   Courthouse News Service in the lawsuit Courthouse News
21   versus Sara Omundson in her official capacity as
22   Administrative Director of the Idaho Courts.
23       You're here today pursuant to a subpoena that
24   we served on Tyler Technologies.  I understand that you
25   have been produced in response to that subpoena as the,
```

---

1 (Pages 1 to 4)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 5

1  you know, witness most knowledgeable of the topics that
2  were identified by Courthouse News Service.  Is that
3  your understanding as well?
4      A.  It is.
5      Q.  Thank you.
6          I understand there was also a separate
7  subpoena issued by the defendant, Sara Omundson, in this
8  case.  Later, when I'm done with my questions pursuant
9  to the Courthouse News subpoena, you will be asked
10  questions by Ms. Omundson's counsel.  But for now, this
11  first part of the deposition will be focusing on the
12  subpoena that Courthouse News Service served on Tyler
13  Technologies.
14          Before we get started, I just want to ask you
15  a few general questions and go over a few general ground
16  rules for today.
17          Have you ever been deposed before?
18      A.  No, sir.
19      Q.  Okay.  Well, I'm sure your counsel has gone
20  over some of this with you in preparation for today but
21  just to make sure we are all on the same page, I'll go
22  over some basic ground rules as well.
23          We are here today pursuant to a subpoena in a
24  pending court matter.  This is a legal proceeding.
25  You've just been given a -- you've just sworn an oath to

Page 6

1  provide your best and most truthful testimony here
2  today.  The testimony you give today is the same as you
3  would give in a court of law in front of a judge, the
4  difference being we're not in court, we're in our
5  respective offices over Zoom, no less, but the -- but
6  the testimony and oath you just gave holds the same.  Do
7  you understand that?
8      A.  I do.
9      Q.  Okay.  We have Ms. Bulldis here with our court
10  reporter company taking a transcript of everything we
11  say.  She's writing everything down.  At the end of this
12  proceeding, there will be a written transcript.  You
13  will have the opportunity to review that transcript.
14  You'll have the opportunity to make comments or
15  corrections.
16          I would caution you that the purpose of that
17  is to, you know, make sure that we've, you know,
18  accurately and correctly caught information.  Typical
19  corrections involve spellings, clarifications of that
20  sort.  It's not really an opportunity to change your
21  answers.  If you were to do so, any attorney in this
22  action would have the opportunity to, you know, comment
23  on that.  Do you understand?
24      A.  I do.
25      Q.  Okay.  Because our court reporter is

Page 7

1  transcribing everything we say, it is very important
2  that we speak slowly, audibly, you know, no hand
3  gestures, noddings of heads, things that don't come
4  across in writing, and most importantly that we not
5  speak over each other.  Only one person at a time.  So
6  it's important that you wait for me to finish my
7  question and then you may respond and I will do my best
8  to wait for your response before I ask my next question.
9  Do you understand that?
10      A.  I do.
11      Q.  Okay.  We're off to a great start.  There's
12  about a two-second lag on the technology on my end so
13  that will hopefully help that process quite a bit.
14          As far as the questions I'll be asking you,
15  I'll be doing my best to keep it clear and
16  understandable.  If at any point, you do not understand
17  a question, and at any point you need clarification,
18  you're just not understanding what I'm asking you,
19  please let me know.  It's my job to ask good and clear
20  questions.  Despite my best efforts, I don't always do
21  so, so I'll rely on you to help me, and I want you to
22  understand what I'm saying.  If you answer my question,
23  I will assume you understood it.  Do you understand
24  that?
25      A.  I do.

Page 8

1      Q.  Okay.  And, you know, last but not least, this
2  is not an endurance contest.  I don't know how long
3  we'll be here today, but if at any point you need a
4  break, you need to step away, whatever, you just let us
5  know.  My request would be that you don't do that while
6  there's a question pending; however, you know, once you
7  answer the question, if you need to take a break, please
8  speak up.  Do you understand?
9      A.  I do and I appreciate that.
10      Q.  Oh, absolutely.
11          You're here today because Courthouse News has
12  brought a lawsuit against the Idaho Courts concerning
13  access to court records and, you know, a part of this
14  case involves, I guess, the means by which the Idaho
15  Courts receive court filings and make those court
16  filings available to the public.
17          And, you know, because the court has a
18  relationship with Tyler Technologies, you know, that's
19  what brings us here today.  That's not a question.  I'm
20  just, you know, letting you know why -- why we're -- why
21  we are here from Courthouse News' point of view.
22          I -- I'm going to put up on the screen a
23  document that was premarked as Exhibit No. 33.  Bear
24  with me.
25          And are you able to see my screen?

2  (Pages 5 to 8)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

EXHIBIT 6, page 3 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 9

1    A.  I am.
2    Q.  I see you maybe straining or squinting.  Is it
3  a bit small?
4    A.  It's okay.  I can read it.
5    Q.  Okay.  I'll zoom in a little bit.
6       Have you seen this document before?
7    A.  I'm not sure if I did, but I don't recall.
8    Q.  Understood.
9       I'll just represent for the record that
10  Exhibit No. 33 is the subpoena to testify that the
11  Courthouse News served on Tyler Technologies on
12  September 21st.  Counsel for Tyler agreed to accept
13  service.  The date states October 4th.  That was the
14  original date.  We since moved here to today.
15       I guess, more importantly, Mr. Derrick, I'd
16  just like to scroll down to the exhibit that we
17  attached -- or, as the attachment to the subpoena, which
18  identifies the deposition topics that were identified in
19  Courthouse News' subpoena.  And I now have that up on my
20  screen.
21       Can you see those topics?
22    A.  I can and I do recognize the document now.
23    Q.  Excellent.  Thank you.
24       And did you review these topics prior to
25  today?

Page 10

1    A.  I did.
2    Q.  And is it your understanding that you're here
3  on behalf of Tyler Technologies to provide testimony
4  concerning these topics?
5    A.  It is.
6    Q.  Okay.  And are you prepared to proceed today
7  by providing testimony with respect to these topics?
8    A.  To the best of my ability.
9    Q.  Thank you.
10       And we also attached, to this subpoena, an
11  Exhibit 1.  I'll show you the first page.  And have you
12  seen this document before?
13    A.  Yes, I have.
14    Q.  And are you familiar with this document?
15    A.  Yes, I am.
16    Q.  And it -- and what is it?
17    A.  It's a document that describes two pieces
18  of -- of functionality or software that Tyler provides.
19    Q.  And do you know who prepared this document?
20    A.  I do.
21    Q.  Who prepared it?
22    A.  Evan Acosta.
23    Q.  Thank you.
24       And who is Evan Acosta?
25    A.  He's the Program Director for the State of

Page 11

1  Texas, specifically, the eFile Texas Program Manager.
2    Q.  Thank you.
3       Before I get into some specific questions
4  regarding the -- some of the detailed aspects of these
5  topics, I want to just take a step back and get a better
6  understanding of the software or technology used by the
7  Idaho Courts as it relates to Tyler Technologies.
8       So I'm going to put up a different exhibit
9  now.  This is Exhibit No. 34, and I'm going to ask:
10  Have you -- do you know what this document is?
11    A.  It appears to be our excellence award-winning
12  document.
13    Q.  Okay.  Now when you say "our," are you
14  referring to Tyler Technologies?
15    A.  Correct.
16    Q.  And what's an excellence award winner?  What
17  does that mean?
18    A.  It generally means a partner who has been
19  successful in accomplishing certain objectives or
20  certain goals within the judicial system.
21    Q.  Okay.  And do you have an understanding of who
22  the partner is in the context of this Exhibit No. 34?
23    A.  I'm assuming it's the State of Idaho Judicial
24  Branch.
25    Q.  Okay.  And why do you assume that?

Page 12

1    A.  Because it's written right there on the
2  document.
3    Q.  Thank you.
4       Let me direct your attention here to a
5  paragraph in this document that, I think, will hopefully
6  help us start to better understand some of the
7  technology.
8       If I look to the second full paragraph on
9  here, it begins "once the infrastructure and network
10  were built."  It reads:  "Once the infrastructure and
11  network were built, the state deployed Odyssey for all
12  case types including e-filing on day one."
13       My question for you is what is Odyssey?
14    A.  Odyssey is Tyler's case management system.
15    Q.  And explain to me what is a case management
16  system?
17    A.  It's a record repository that helps the courts
18  and clerks manage their case records electronically.
19    Q.  Okay.  And then it says "including e-filing."
20  What's the significance of putting "including e-filing"?
21    A.  E-filing is a separate solution than the case
22  management system.
23    Q.  Okay.  So let me -- I want to do a different
24  share screen here.  Hopefully, you can explain something
25  to me.

3 (Pages 9 to 12)

EXHIBIT 6, page 4 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 13

1    Okay.  Are you able to see my screen?
2    A.  Yes, I can.
3    Q.  Okay.  So this is -- this is an -- excuse
4    me -- this is a web version of the document that we were
5    just looking at as Exhibit 34.  Would you agree with
6    that?
7       A.  I'd have to take a deeper look to accurately
8    confirm it, but it -- it appears to -- to reference the
9    same judicial partner, Idaho Judicial Branch.
10           MS. DUKE:  And, Jon, is this an exhibit
11   just so we have clarity for the record?
12           MR. FETTERLY:  I guess the screen grab is
13   not.  I can represent for the record, that if you go to
14   this webpage, which is the TylerTech.com webpage, and I
15   can create an exhibit for this, there's a download PDF
16   button.  And if you hit the download PDF, you get
17   Exhibit 34.
18           MS. DUKE:  Okay.  Do you want to -- how
19   about we just print the first page and call it
20   Exhibit 34A, that way we can all track?
21           MR. FETTERLY:  Sure.  Let me stop my
22   share for a brief moment while I do that, and we will
23   carry on.
24           (Pause in the proceedings.)
25           (Exhibit No. 34A marked.)

Page 14

1    Q.  (By Mr. Fetterly) Okay.  Back to my share
2    screen.
3    So, Mr. Derrick, I'm on the TylerTech.com --
4    what appears to be a TylerTech.com website with a link
5    or a page to the same excellence award writeup for the
6    Idaho Judicial Branch.  And that same sentence I just
7    read, when I'm on the Tyler site, it has a hyperlink for
8    Odyssey.  So that's what I'm showing you right now.  I'm
9    clicking on that hyperlink.
10      A.  Okay.
11           MR. FETTERLY:  And, Keely, I can do the
12   same thing here and make this 34B.
13           MS. DUKE:  Perfect.
14      Q.  (By Mr. Fetterly) But just to understand, as I
15   click on this document, it says Enterprise Justice
16   Software powered by Odyssey.  Do you see that language?
17      A.  Yes, I do.
18      Q.  Okay.  So what does that mean, or what is the
19   Enterprise Justice Software powered by Odyssey is a
20   better question?
21      A.  We're undergoing a marketing and branding
22   revision of all of our products across Tyler, and the
23   formerly-known Odyssey Case Management solution is now
24   being coined as the Enterprise Justice Software solution
25   powered by Odyssey.  So it's just a change in the -- in

Page 15

1    the naming of our applications.
2    Q.  Okay.  So you said applications, so would
3    the -- would the case management system be considered
4    one application?
5       A.  That is correct.
6       Q.  And then are there other applications as well?
7       A.  Sure.  Tyler has several applications as the
8    leading court software provider in the country.
9       Q.  Okay.  Approximately, how many applications
10   would fall within this Enterprise Justice Software
11   powered by Odyssey?
12      A.  The Enterprise Justice is just the case
13   management software.  There are other applications
14   within the suite of products, but this is just referring
15   to our Enterprise Justice case management system.
16      Q.  Okay.  So what are the -- or what is the suite
17   of products?
18      A.  There are other solutions like our
19   eFile & Serve solution, our Tyler Corrections solution,
20   Civil Process solution, our Supervision solution, and
21   there are others.
22      Q.  Okay.  So as I'm on this webpage here, if I
23   were to scroll down, which is what I'm doing right
24   now -- and, again, this will be Exhibit 34B for the
25   record -- I now see a part of the webpage that says

Page 16

1    "powerful web-based software connecting justice
2    partners."  Do you see that language?
3       A.  I do.
4       Q.  And then underneath, it appears that there are
5    additional links.  As I scroll my cursor over them, they
6    light up here, but we see Enterprise Case Management is
7    one, Attorney Case Management, Courtroom Management,
8    Electronic Courtroom, Probation Case Tracking,
9    Electronic Filing, Self-Represented Litigants, Global
10   Courts, Jury Selection, Financial Management, and Public
11   Access.
12          Are all those applications within the suite of
13   products for Tyler Odyssey?
14      A.  They -- they aren't.  They are more
15   representative of solutions or services that we provide.
16   Some would be their own applications; others would be
17   portions of existing applications.
18      Q.  Can you identify for me which of these are
19   their own applications?
20      A.  Yeah.  If you look at electronic filing, that
21   represents our eFile & Serve application.
22   Self-Represented Litigants is a -- is a function of our
23   Guide & File platform.  Jury Selection is a
24   representative of our jury -- Enterprise Jury platform.
25   Public Access speaks to our online document access

4 (Pages 13 to 16)

Courthouse News Service v. Omundson                          30(b)(6) Terry Derrick - Vol. I

Page 17

1  solutions.  I probably could go and look through the
2  others, but I think that hopefully answers your question
3  on that one.
4      Q.  It does.  It does.
5          So just to be clear, so electronic filing is
6  one of the services offered by Tyler as part of this
7  kind of suite of products; is that correct?
8      A.  That is correct.
9      Q.  Thank you.
10         I'm going to stop the share, take a brief
11 moment to make my Exhibit 34B.  Bear with me.
12             (Pause in the proceedings.)
13             (Exhibit No. 34B marked.)
14     Q.  (By Mr. Fetterly) Thank you.
15         I want to now show you a different document
16 just to make sure, again, we're all on the same page
17 before we get into some of the -- some of the details
18 today.
19         Okay.  I'm going to show you what was
20 previously marked in this case as Exhibit No. 13, and
21 can you see this page?
22     A.  I can.
23     Q.  Okay.  So Exhibit No. 13, this is a -- I'll
24 represent to you that it's just a screen grab of a
25 webpage from the Idaho iCourt website.  I'm not going

Page 18

1  to quiz you on this, but I would ask you just to briefly
2  review when it says:  "What is the 'iCourt' Odyssey
3  project?"
4          Do you see that header?
5      A.  I do.
6      Q.  And then if you could just, you know, briefly
7  read the language below and then look at the -- the blue
8  bars, I'll ask you a couple of questions about them if
9  you could just let me know once you've had a chance to
10 review.
11     A.  Okay.
12     Q.  Great.  So this document here, it states, you
13 know, the header "What is the 'iCourt' Odyssey
14 project?"  It goes on and contains two paragraphs of
15 narrative followed by the sentence:  "Below, you will
16 find more information about each component of the
17 complete iCourt solution."
18         So we first, at the top, see Odyssey Case
19 Manager.  Is this one of the components of the iCourt
20 solution?
21     A.  Yes.  That would be the Enterprise Justice
22 case management system.
23     Q.  Okay.  And then that's the case management
24 system we were just discussing a few minutes ago?
25     A.  That is correct.

Page 19

1      Q.  Below that, we see Portal.  Is Portal also a
2  portion of the complete iCourt solution?
3      A.  It is.
4      Q.  And what is Portal?
5      A.  An online court record repository.
6      Q.  Okay.  And, next, we see Supervision.  Is
7  Supervision also a component of the complete iCourt
8  solution?
9      A.  I'm not familiar with the Idaho contract
10 specifically, but if it's listed here, then it's
11 possible.
12     Q.  Thank you.  Fair enough.
13         I'm going to ask you just the same series of
14 questions for the rest of these just so we have a common
15 understanding.
16         So for Financial Manager, is Financial Manager
17 also a component of the complete iCourt solution?
18     A.  Yeah.  I mean, without me looking at our
19 contract, with all of the solutions that are included,
20 it's difficult for me to answer those questions.
21     Q.  Understood.
22         Moving on, eFile & Serve (e-filing and
23 e-service), is this a component of the complete iCourt
24 solution?
25     A.  It is.

Page 20

1      Q.  Okay.  Guide & File, is it also a component?
2      A.  It is.
3      Q.  And where it says Jury, is Jury a component of
4  the complete iCourt solution?
5      A.  I wouldn't be able to say unless I reviewed
6  the contract.
7      Q.  Fair enough.
8          Is the Tyler service Jury also known as Jury
9  Manager?
10     A.  That's -- well, we've got two different jury
11 solutions, Jury Manager and Enterprise Jury.  And so
12 without reflecting on the contract, it's difficult for
13 me to answer those questions.
14     Q.  Understood.
15         Lastly, Attorney Manager, is that a component
16 of the complete iCourt solution?
17     A.  Without reviewing the contract, I can't say
18 with certainty.
19     Q.  Okay.  Let me direct your attention then back
20 up to eFile & Serve because that was one where you
21 were about to --
22         MS. DUKE:  Case manager is not hosted by
23 Tyler; correct?
24         MS. OMUNDSON:  Well, there are two
25 versions of case management.

5 (Pages 17 to 20)

EXHIBIT 6, page 6 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 21

1          MS. DUKE:  Oh, sorry -- sorry about that.
2      Q.  (By Mr. Fetterly)  Okay.  Back to
3  eFile & Serve, Mr. Derrick, can you just please, in
4  your words, you know, tell us, you know, what is
5  eFile & Serve?
6      A.  Sure.  It's an electronic delivery system and
7  service system for the court.
8      Q.  Okay.  And are you familiar with the phrase or
9  the term "eFile Manager"?
10     A.  Yes, I am.
11     Q.  It's commonly referred to as, I think, EFM for
12  short; is that correct?
13     A.  That is the acronym that we use, yes.
14     Q.  What is an eFile Manager?
15     A.  It's the -- the hub by which it controls and
16  manages the transmissions to and from in the electronic
17  filing process.
18     Q.  Okay.  And is -- does eFile & Serve have, as
19  a component, an eFile Manager?
20     A.  Yes, it does.
21     Q.  Is it your understanding that, you know, all
22  e-filing services have or require, in some form, an
23  e-file manager?
24     A.  It is my understanding of that, yes.
25     Q.  So that would be true not just for Tyler

---

Page 22

1  Technologies, but any other, you know, competitors or
2  vendors that operate in this space?  If they're
3  providing e-filing services, it's typically true that
4  their e-filing service has an e-file manager; is that
5  correct?
6          MS. DUKE:  Form and foundation.
7          THE DEPONENT:  Yeah.  I can't speak on
8  offerings beyond what Tyler provides.
9      Q.  (By Mr. Fetterly)  Is part of your job --
10  well, strike that.  Strike that.
11          I want to understand now a little bit more
12  about this eFile & Serve product, and so in order to
13  do that, I will now direct your attention to
14  Exhibit No. 35.
15          Okay.  Do you -- let's see.  And just so I
16  have an understanding, Mr. Derrick, do you have
17  Exhibit No. 35 in front of you in printed form or are
18  you relying on the screen?
19     A.  I'm not sure which exhibit Exhibit No. 35 is.
20     Q.  Oh, you know, there might have been a lag
21  there on the technology.  It's now up in front of you on
22  the screen.
23     A.  Okay.  One -- one moment.
24          Okay.  I'm sorry.  Yeah.  I don't have those
25  in front of me, so -- but I can reference the screen if

---

Page 23

1  that's appropriate.
2      Q.  Oh, certainly.  Certainly.  I asked purely for
3  logistical purposes.
4          Are you familiar with this document?
5      A.  I'd have to look through it to -- to see what
6  that document is.
7          MR. FETTERLY:  Okay.  Why don't we take a
8  quick break?
9          And I would ask, Beth, if you could print
10  out the copies that I've sent to you, I think it might
11  help us go forward today if we could have the printed
12  copies in front of the witness so that he has the ability
13  to flip through them.  Can we do that?
14          MS. PETRONIO:  I'm happy to do that.
15  I've looked at your exhibits and I just want to say, for
16  the record, I don't think any of these exhibits were
17  within the scope of the -- the notice.  And everything
18  you've asked him so far, I don't think has been within
19  the scope of the notice.
20          I'm trying to be really, you know,
21  lenient about letting you get the information you need,
22  but this is a really long, complicated document that is
23  outside the scope of what you were planning, I think, to
24  ask him today.  So I -- I don't know how much time you
25  want to spend on it, but, you know, I -- I just don't --

---

Page 24

1  you know, I -- I just want, for the record, at some
2  point, we're not going to continue with questions that
3  are outside the scope of -- of what was noticed.
4          MR. FETTERLY:  I appreciate that.  We
5  really want to keep it within the notice and we believe
6  we are.  And the reason being, I don't plan on spending
7  too much time here, but in order to understand the Press
8  Review Tool and the Auto-Accept tools that have been
9  framed within the notice, I do believe it is important
10  to have just a basic understanding of the e-filing
11  system and the Tyler systems, generally, to which they
12  relate; otherwise, we're not going to have a clear
13  record or any understanding.
14          So all I'm trying to do is, at a very
15  high level, understand just the very basic
16  functionalities of the eFile & Serve program which is
17  what this relates to, and I'm happy to point to the
18  specific pages.  And I think if we could just go off the
19  record and get the printed copies, we could really speed
20  this along because trying to navigate this purely
21  through video is a little more cumbersome.
22          So if we could take a quick break and I'm
23  happy to point you to the pages that I'm going to ask
24  Mr. Derrick to review -- I think it's two pages -- we
25  can then, I think, move along more expeditiously.

6 (Pages 21 to 24)

EXHIBIT 6, page 7 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson — 30(b)(6) Terry Derrick - Vol. I

---

**Page 25**

1  MS. PETRONIO:  That's fine.  If you don't
2  mind identifying the pages, I think that would help.
3  MR. FETTERLY:  Absolutely.  I'll put them
4  up on the screen for everyone's benefit.
5  MS. DUKE:  And we're having a printout
6  made too, Jon, real quick so...
7  MR. FETTERLY:  Thank you.
8  Now, it looks like the bookmarks that
9  were on this document from the internet when I
10  downloaded it from the Tyler website were removed in the
11  process of -- removed in the process of adding the
12  exhibits, but it's going to be pages -- right here, 17,
13  18, and 19, actually three pages, two and a half of
14  content.
15  MS. PETRONIO:  Jon, can you stop
16  screen-sharing for a minute?  I'm having trouble on my
17  laptop.
18  There we go.  Thank you.
19  MR. FETTERLY:  Of course.  Sorry.
20  Why don't we go off the record?
21  (A break was taken from
22  10:11 a.m. to 10:21 a.m.)
23  Q. (By Mr. Fetterly) Mr. Derrick, before we took
24  our break, we were talking about some of the -- some of
25  the Tyler, I guess, products or solutions as we've

---

**Page 26**

1  discussed.
2  To take a quick break from that, I just want
3  to ask you on a more general level, what is your -- what
4  is your position with Tyler Technologies?
5  A. General Manager of the Courts.
6  Q. And for how long have you held that position?
7  A. About a month.
8  Q. Okay.  And what was your position before you
9  became General Manager of the Courts?
10  A. General Manager of eSolutions.
11  Q. And for how long did you hold that position?
12  A. About five years.
13  Q. I'm sorry?
14  A. About five years.
15  Q. Okay.  And before you were General Manager of
16  eSolutions, what was your position then?
17  A. I believe I was the Operations Director of
18  eSolutions.
19  Q. What is eSolutions?
20  A. eSolutions is a -- a part of our courts and
21  justice division.
22  Q. And what were your job duties and
23  responsibilities as operation -- Operations Director of
24  eSolutions?
25  A. Sure.  As Operations Director of eSolutions, I

---

**Page 27**

1  served in the capacity to help with managing the
2  professional services organization and the support
3  organization as well as the client success organization
4  within eSolutions.
5  Q. And did that entail working with the court
6  clients or partners with Tyler Technologies?
7  A. Occasionally, yes.
8  Q. And was that then with respect to Tyler's
9  eSolutions offerings?
10  A. That is correct.
11  Q. And would those eSolutions offerings include
12  the Odyssey products?
13  A. Although those were accompanied with those
14  more comprehensive Tyler offerings, no, my focus was
15  primarily on eSolutions products.
16  Q. Okay.  And you distinguished that from
17  Odyssey, how so?
18  A. The term Odyssey is generally referred to as
19  the case management system, and eSolutions is primarily
20  around our electronic filing platform.
21  Q. Thank you for clarifying that.
22  So then what was your -- what were your job
23  duties and responsibilities as the General Manager of
24  eSolutions?
25  A. Oversaw the entire eSolutions operations for

---

**Page 28**

1  the courts and justice division.
2  Q. And that would include the e-filing and
3  service -- services; correct?
4  A. That's correct.
5  Q. And did that entail working with the courts
6  that used Tyler's eSolutions services?
7  A. Occasionally.
8  Q. I want to make sure I have my terminology
9  correct so that we're speaking the same language because
10  I appreciate that you operate in a technical field.
11  If I'm referring to eSolutions and e-filing,
12  am I -- should I be referring to it as -- are these
13  services?  Are they programs?  You know, how -- how
14  would you characterize it?  And if there's a difference,
15  can you just tell me what that is so we can speak the
16  same language here today?
17  A. Yeah.  Sure.  So eSolutions is more of a
18  department, a group, if you will.  That group oversees a
19  series of applications or solutions, one of which would
20  be our electronic filing platform which is known as
21  eFile & Serve today and formerly known as Odyssey
22  File & Serve historically.
23  Q. Thank you.
24  So if we're referring to eFile & Serve or
25  File & Serve, we're speaking about the same application

---

7 (Pages 25 to 28)

EXHIBIT 6, page 8 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 29

1  or solution; correct?
2      A.  That's correct.
3      Q.  And in this context, application or solution
4  can be used interchangeably; is that correct?
5      A.  In a sense, yes, sir.
6      Q.  Okay.  So -- and I think I just asked you
7  about your two prior positions with Tyler, but just to
8  make sure I understand, what are your job duties and
9  responsibilities as the, I think, General Manager of the
10  Courts?
11      A.  To oversee our courts business for the C&J,
12  the courts and justice division.
13      Q.  And I think this is implied, but would the
14  courts and justice division encompass the division of
15  Tyler Technologies that provides e-filing solutions to
16  its justice partners?
17      A.  Yes.
18      Q.  Thank you.
19          Now, I'd like to direct your attention to
20  Exhibit No. -- well, this will be Number 33, but it's in
21  a -- the attachment to the subpoena that you've already
22  reviewed and we've already discussed.  I'll put it up
23  my screen.
24          So this is the page of the Exhibit 1 to the
25  subpoena, Exhibit 33, Bates labeled SO 3 in the bottom

Page 30

1  right-hand corner.
2          And, Mr. Derrick, are you able to see this
3  page?
4      A.  Yes, I am.
5      Q.  Let me first direct your attention to the
6  left-hand column where it says Auto-Accept Review.  Do
7  you see that?
8      A.  I do.
9      Q.  Beneath that, it says:  "Auto-Accept Review is
10  a free out-of-the-box e-filing function that allows
11  clerks to automatically accept filings based on a set of
12  conditions."
13          My question to you is where it says "free
14  out-of-the-box," what does that mean?
15      A.  It means it's included in our base product of
16  File & Serve.
17      Q.  So does that mean that any justice partner or
18  court that has the base File & Serve application or
19  solution, they would have, you know, access to or the
20  ability to use the Auto-Accept Review tool; is that
21  correct?
22          MS. DUKE:  Object to the form.
23          THE DEPONENT:  That is correct.
24      Q.  (By Mr. Fetterly)  Okay.  Moving to the
25  right-hand column, I see Press Review Tool.  Do you see

Page 31

1  that?
2      A.  Yes, I do.
3      Q.  The -- the first sentence in the paragraph
4  beneath the graphic says:  "Press Review Tool, an
5  application that works in conjunction with eFile & Serve
6  to provide clerks the option to grant access to filings
7  as soon as they are filed (prior to clerk review)."
8          Did I read that correctly?
9      A.  I believe so, yes.
10      Q.  So my question is:  What does it mean where it
11  says "works in conjunction with eFile & Serve"?
12      A.  It means that it is not the same application.
13      Q.  So we have the Auto-Accept Review, which is
14  part of the eFile & Serve application; correct?
15      A.  Correct.
16      Q.  And the Press Review Tool is a separate
17  application that works in conjunction with the
18  eFile & Serve application; correct?
19      A.  Correct.
20          MS. DUKE:  We're having a hard time
21  hearing your answers.
22          Thank you.  Yeah, let's see if that's
23  better.
24          THE DEPONENT:  Can you hear me better
25  now?

Page 32

1          MS. DUKE:  Yes, I can.
2          THE DEPONENT:  I'll scoot up.  I
3  apologize.
4          MR. FETTERLY:  Thank you.
5          MS. DUKE:  No worries.  Thanks.
6      Q.  (By Mr. Fetterly)  Okay.  So before I go
7  further with this document, our Attachment 1 to the
8  subpoena, I would like to just get a little better
9  understanding of the eFile & Serve application or
10  solution since the Auto-Accept Review is a part of that
11  application and the Press Review Tool works in
12  conjunction with that File & Serve application.
13          So I will now go to Exhibit No. 35.  And,
14  again, I'll represent to you that this is a document
15  that is available to the -- through the Idaho Court
16  website, and I'm going to direct your attention to
17  Pages 17, 18, and 19.
18          And I have Page 17 up on my screen.  Do you
19  see that?
20      A.  I do.
21      Q.  So it begins at the top "2 E-Filing Overview."
22  Did I read that correctly?
23      A.  You did.
24      Q.  Okay.  The first full paragraph under
25  Figure 2.1 says:  "Once a user has registered to use

8  (Pages 29 to 32)

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 33

1    Odyssey File & Serve, a filer can electronically file
2    documents to the court."
3            Where it references Odyssey File & Serve, do
4    you understand that to mean the same File & Serve
5    application or solution that we've been discussing?
6        A.   Correct, it is the electronic filing system.
7        Q.   Thank you.
8            I want to just walk through the e-filing
9    process that Tyler depicts in its document here
10   describing the e-filing process.  So as I look at the
11   graphic at the, I guess, 12:00 o'clock position, it says
12   "filer submits" and there's a person sitting at their
13   desk.
14           Would you agree that this is depicting a
15   filer, not the court, not a court clerk, but a person
16   that would be submitting a file to the court?
17       A.   No, I would not.
18       Q.   And why not?
19       A.   Because a filer can be anyone.  It could be
20   the court filing it out, it could be an SRL or a
21   self-represented litigant, or it could be a legal
22   professional, so I can't definitively say that it is a
23   specific filer and not the court.
24       Q.   Understood.
25           So why don't you describe -- can you describe

Page 34

1    for me, in your words, the e-filing process?
2        A.   Sure.  A filer will use, today, what we call
3    an electronic filing service provider, which is a filing
4    portal, to upload their document that they wish to
5    deliver to the court.  They complete the information
6    that's required by the court, and then they'll click the
7    submit button.
8            And upon submission, that document and the
9    information will be transmitted to the eFiling
10   Manager.  And depending upon the configuration of the
11   court, service could be done at the time of submission
12   or service could be done at the time of acceptance.  But
13   once upon -- once it's upon the review queue inside of
14   the electronic filing manager, the electronic filing
15   manager provides access to those documents via the
16   review queue in which usually it's court clerks that
17   review those records and make a determination whether to
18   accept or reject other -- otherwise known as return for
19   correction, those documents.
20           And assuming that they accept it, which
21   happens the majority of the time, the document is
22   stamped, and then it is passed in two different
23   directions.  It's passed to the case management system,
24   which in many instances is our Enterprise Justice or
25   Odyssey case management system, and it is also delivered

Page 35

1    back to the filer who submitted it.
2        Q.   So you -- you described a pretty thorough
3    process of, I guess you'd call that an A to Z, so if I
4    could just break that up a little bit.
5            The graphic here under the e-filing process
6    shows several different stages.  The filer submits,
7    court receives, clerk reviews and notifies filer of
8    status via email, filer receives email, filer checks
9    filing status.
10           Just -- I want to try to understand how this
11   graphic fits into the process you just described.  So
12   you mentioned the -- the EFM, the filer submits the
13   document and it's received into the EFM; is that
14   correct?
15       A.   That's correct.
16       Q.   And at what point -- where does that or how is
17   that reflected on this graphic, the -- the submission to
18   and receipt by the EFM?
19       A.   It's not.
20       Q.   Okay.  Why is that?
21       A.   Well, two reasons.  One, this graphic is old.
22   I think it's based in 2019 if I can read the bottom
23   correctly.  And, two, this is describing more of the
24   general process and not necessarily the steps in that
25   e-filing process along the way.  This is more general

Page 36

1    terms or a summary version, if you will.
2        Q.   Okay.  So you -- you asked -- you made
3    reference to a review queue.  Did I understand you
4    correctly that the review queue is within the EFM?
5        A.   It is not within the EFM.
6        Q.   Okay.  Explain to me what is the relationship
7    between the review queue and the EFM, if any.
8        A.   Yeah, sure.  So the EFM is the repository for
9    where the documents and data live.  The review queue is
10   the application or the solution by which the clerks
11   leverage to access that information.
12           MS. DUKE:  And maybe so we're not all
13   confused, instead of using "EFM" can we use "case
14   management" going forward, Jon?  No?  Different?
15           MR. FETTERLY:  I don't believe so.
16           MS. DUKE:  No, it sounds like I'm off on
17   that.
18           MR. FETTERLY:  Mr. Derrick was shaking
19   his head no to that question.
20       Q.   (By Mr. Fetterly) Is that correct, Mr. Derrick?
21       A.   The case management and the eFiling Manager
22   are two distinct solutions.
23       Q.   Okay.  So I'm going to go back to that top
24   paragraph, and let's set the graphic aside, Mr. Derrick.
25   I appreciate your testimony.  We have the general and

9  (Pages 33 to 36)

EXHIBIT 6, page 10 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

**Page 37**

1  the specific, and I think we'd prefer to work through
2  the specific with you so we understand things correctly.
3      So we have that first paragraph.  The
4  second -- so the first sentence is:  "Once a user has
5  registered to use Odyssey File & Serve, a filer can
6  electronically file documents to the court."
7      And would it be correct that that would also
8  include submission of the document to the EFM within
9  File & Serve?
10     MS. DUKE:  I'll object to the form.
11  Misstates what file means in Idaho versus submitted.
12     THE DEPONENT:  Yeah.  I -- it says once a
13  user has registered to use the e-filing platform, a
14  filer, which would be that registered user, can
15  electronically file the documents to the court.  And
16  that's referring to submitting those documents through
17  an electronic filing service provider or a web portal, a
18  filing portal, if you will, to get the documents to the
19  electronic filing manager.
20     Q. (By Mr. Fetterly) Thank you.
21     MR. FETTERLY:  And I'm -- just for the
22  record, I'm happy to do my best to refer to submission
23  receipt and try not to use the word "file" as best I can
24  given that is a point of contention in the lawsuit.
25     MS. DUKE:  Sure.  Thanks, Jon.

**Page 38**

1      MR. FETTERLY:  But just for the record by
2  doing so, obviously, I'm not going to be waiving or
3  acquiescing any right to say that "submission" and
4  "file" are synonymous for our purposes in the lawsuit,
5  and I understand Ms. Duke would not be acquiescing or
6  waiving any of her arguments if we use the common terms
7  "submission" and "receipt" here today.
8      MS. DUKE:  Correct.  And I'd add to that,
9  if the words "submission" or "receipt" equals filed, we
10  obviously object to that and do not believe that's the
11  case in Idaho.  So I appreciate that and I'll do my best
12  to object, but I may miss some too.
13     MR. FETTERLY:  We'll do our best to spare
14  Mr. Derrick and his counsel --
15     MS. DUKE:  Sounds good.
16     MR. FETTERLY:  -- to those objections.
17     Q. (By Mr. Fetterly) So going back to this first
18  paragraph on this page, we're now looking still at
19  Page 17 of Exhibit 35, when the filing is submitted, the
20  filing is electronically -- is electronically delivered
21  to the clerk's inbox.
22     Can you just again explain to me what that
23  means in the context of the detailed explanation you
24  just provided, Mr. Derrick, of the e-filing process?
25     A.  Yeah.  When the filing has been submitted or

**Page 39**

1  reached a submitted status in the system, it is then
2  available for the review queue that the clerks use to
3  pull that information into that application so that they
4  can begin reviewing that document or that filing.
5      Q.  So we're talking about submitted by a filer,
6  any filer who submits the document, and it's received
7  into the EFM; correct?
8      A.  Correct.
9      Q.  And I believe you said it then is available
10  in -- for the, I think, application for the review
11  queue; is that correct?  That's a separate application,
12  you said, for the clerk review queue?
13     A.  It's a separate application, yes.
14     Q.  So where this document references the clerk's
15  inbox, that's the -- would that be referring to the
16  clerk's review queue?
17     A.  Correct.
18     Q.  And just so I'm clear here, the -- the EFM,
19  eFile Manager, and the clerk's review queue, those are
20  two separate applications but those are both
21  applications within the File & Serve solution; is that
22  correct?
23     A.  That is correct.
24     Q.  Or itself an application; correct?
25     A.  That is correct.

**Page 40**

1      Q.  Okay.  How does a clerk access the clerk
2  review queue or clerk's inbox?
3      A.  Sure.  The clerk accesses the review queue by
4  logging into the URL, the web address for that
5  application, filling out his or her credentials, a user
6  ID and a password, clicking the submit button or the
7  log-in button to get in, and then going into the queues
8  by which they have access to in order to review the
9  filings that have been submitted and are inside of those
10  queues.
11     Q.  So you say "web address," so there's a URL or
12  website that a clerk would type into a web browser to
13  then bring up this URL that would then prompt those
14  steps that you just described; is that correct?
15     A.  Correct.
16     Q.  And as I'm going back to the document again,
17  under the graphic, the clerk then reviews the filing and
18  either accepts, rejects, or returns the filing.
19     This -- this clerk review that is referenced
20  here, that -- is that done by the clerk once they've
21  logged into the clerk review queue or clerk inbox?
22     A.  Correct.
23     Q.  And -- and whatever review they are doing,
24  they are doing while the document is in the clerk review
25  queue or clerk inbox; correct?

10  (Pages 37 to 40)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 41

1    A.   They are doing it while the filing is in the
2   EFM but is being surfaced in the review queue.  To be
3   clear, the filing doesn't live in the review queue.
4    Q.   Understood.  I think it's understood.
5    I'm going to ask you to explain that so I have
6   a clear understanding.  So can you elaborate on what you
7   mean when you say the filing lives in the EFM but is
8   surfaced in the clerk review queue?
9    A.   Sure.  The document and the data reside in
10  the eFiling Manager.  The review queue is an
11  application, a review tool is what it's called, is an
12  application for the clerks to access that information.
13   Q.   And then the clerks review the -- the surfaced
14  version of the filing that is sitting in the EFM or
15  residing in the EFM, and based on that, they either
16  accept, reject, or return the filing; is that correct?
17   A.   That is correct.
18   Q.   Does a -- I'm going to ask a general question
19  and do my best.  Does a court typically have just one
20  single review queue or can they have multiple review
21  queues?  I'm not asking about any particular court.  I'm
22  just trying to understand the general functionality of
23  this product.
24       MS. DUKE:  Form and foundation.
25       THE DEPONENT:  It varies across the

Page 42

1   country.
2    Q.   (By Mr. Fetterly) Okay.  So if a -- if a court
3   had a statewide e-filing system, would it be common for
4   them to then have, you know, multiple clerk review
5   queues or inboxes based upon the different courts within
6   the -- within the court system?
7        MS. DUKE:  Form and foundation.
8        THE DEPONENT:  Yes.  Depending upon the
9   configuration, we generally see at least one queue per
10  county within a statewide implementation.  There could
11  be more depending on the user's preference.
12   Q.   (By Mr. Fetterly) But if you -- if you didn't
13  have multiple, if it was just one clerk queue,
14  presumably you'd have a situation where all filings from
15  across the state got dumped into one single queue.  So
16  is it fair to conclude that the purpose of multiple
17  queues is to help break up and sort filings according
18  to, you know, court and location?
19       MS. DUKE:  Form and foundation.  Beyond
20  the scope of the 30(b)(6) as well.
21       THE DEPONENT:  Yeah.  The queue
22  configuration is based upon court processes, and the
23  breaking up in a statewide engagement by county is
24  because that's generally how those states operate at the
25  county level.  For example, when filers submit filings,

Page 43

1   they generally submit it to a county and not necessarily
2   to the state.
3    Q.   (By Mr. Fetterly) Understood.
4    So I just want to move on to the next
5   paragraph here:  "If the clerk accepts the filing, the
6   case is docketed and set to appear in the clerk's case
7   management system."
8    Can you just explain what that means in the
9   context of the process we've been discussing here?
10   A.   Sure.  Upon acceptance, that document is
11  stamped with the court's file stamp and it's sent in two
12  different directions.  The document and the data are
13  sent into the case management system of the clerk, and
14  the document, the file-stamped version, is delivered
15  back to the filer who submitted it.
16   Q.   Okay.  And you used the phrase "case
17  management system," and as we've discussed, that's a --
18  yet another application or solution; correct?
19   A.   That's correct.
20   Q.   Okay.  So just to try to recap this, so the
21  filer submits the document and it's received into the
22  Tyler File & Serve solution, and, in particular, the EFM
23  within that solution, and then the document is surfaced
24  to the clerk review queue that's also within the
25  File & Serve solution.  And then upon acceptance, the

Page 44

1   document is then sent into two directions, one back to
2   the filer and one to the court's case management system,
3   which is a -- yet another Tyler solution; correct?
4    A.   You got it.
5    Q.   Thank you.
6    You -- does the -- either the EFM -- well, let
7   me -- I'm going to strike that.
8    Does the Tyler eFile & Serve solution stamp
9   or mark the document that has been submitted upon
10  receipt of that document to reflect the date and time of
11  submission?
12       MS. DUKE:  Object to the form.
13  Foundation.  Not specific to Idaho.
14       Go ahead.
15       THE DEPONENT:  We don't stamp the
16  document itself with that criteria, but we do capture
17  that information.
18   Q.   (By Mr. Fetterly) How is that information
19  captured?
20   A.   It's -- it's captured in the eFiling
21  Manager, and it is surfaced in the clerk review tool
22  when they're reviewing that document.
23   Q.   And you said "clerk review tool."  That would
24  also be synonymous with the clerk review queue?
25   A.   Correct.

11  (Pages 41 to 44)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

EXHIBIT 6, page 12 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 45

1     Q.  If the clerk then accepts the document without
2  returning it or rejecting it, is that date and time of
3  submission of the -- the date and time that is then stamped
4  on the document?
5          MS. DUKE:  Again, objection.  Form.
6  Foundation.  Not specific to Idaho.
7          THE DEPONENT:  Yeah, it really varies.
8  It can be the time of submission or it can be the time
9  of acceptance.  It's dependent upon court rule.
10     Q.  (By Mr. Fetterly)  Okay.  I'm going to now go to
11  Page 18 of this document.  And by "this document," I
12  mean Exhibit 35.
13          Filing queue status.  And it reads:  "The
14  filing queue status lets you know where you are in the
15  e-filing process.  The key represents the status listed
16  for your filing.  The following filing status key table
17  describes the status associated with each filing type."
18          My goal is to go through this, Mr. Derrick,
19  pretty quickly.  I just want to understand a few things,
20  again, in context of this process that we've been
21  discussing.
22          The first two statuses here are draft and
23  submitting.  Would you agree that these are statuses
24  that would relate to a filing prior to its submission to
25  the eFile Manager?

Page 46

1     A.  Draft would.  Submitting would be in the
2  process of delivery to the EFM or the eFiling Manager.
3     Q.  And then submitted would be delivery to or
4  received by the EFM; correct?
5     A.  Correct.  That's an acknowledgment by the
6  eFiling Manager that it's received that document or
7  that filing.
8     Q.  And just so we're understanding each other,
9  where it says draft, I don't understand this to mean the
10  attorney or the filer is drafting their document.  I
11  understand this to mean that someone has logged into --
12  the filer has logged into File & Serve and has begun the
13  process of entering the data they are required to enter
14  in order to submit their filing.  Is that your
15  understanding as well?
16     A.  Correct.
17     Q.  Thank you.
18          So as we're looking at the filing queue,
19  status submitted would be the point in time or the
20  status of the document when it is delivered to or
21  received by the EFM within the File & Serve solution;
22  correct?
23     A.  Correct.
24     Q.  Under the definition, it says:  "The document
25  file format and payment information have been verified

Page 47

1  and accepted but the filing has not yet entered the
2  review queue/workflow process."
3          Let me just break that up.  So where it says
4  the document file format and payment information had
5  been verified and accepted, do I -- is it correct that
6  this would be the eFile & Serve solution or
7  application verifying and accepting information that was
8  inputted by the filer during the draft process?
9     A.  Correct.
10     Q.  Okay.  And then it says:  "The filing has not
11  yet entered the review queue/workflow process."
12          If you could just help me understand the
13  distinction between a document that has been submitted
14  to or received by the EFM but not yet entered the review
15  queue/workflow process.  What does that mean?  How does
16  that work?
17     A.  The documents in the filings live -- reside
18  inside of the eFiling Manager, and the review tool
19  allows clerks to then work those filings by pulling them
20  into the review queue and reviewing them.  And the
21  variance here is the eFiling Manager possesses that
22  filing, but the clerk has not initiated the review
23  process of that filing within the review tool.
24     Q.  What does a clerk do to initiate the review
25  process within the clerk review tool or clerk review

Page 48

1  queue?
2     A.  Log into the review tool.  They go to the
3  queue that they're going to work.  They identify the
4  filing that they wish to work, and then they go into
5  that filing to begin working it.
6     Q.  So going back to our document, Exhibit 35 --
7  oh, let me back up before we do that.
8          So in terms of what you just described, that
9  would then be the process of a clerk going to their
10  computer, bringing up the web browser into which they
11  would enter the URL so that they could then log into the
12  system, complete the prompts necessary to even get to
13  that stage, and then they would, you know, log into the
14  tool and go forth to, you know, follow the steps you
15  just outlined; is that correct?
16     A.  That is correct.
17     Q.  Okay.  So then back to our Exhibit No. 35,
18  under status court processing, some additional action
19  needs to be taken by the court.  What does that mean?
20     A.  Yeah.  Before it gets to that court
21  processing, the "under review" is the step that happens
22  prior to, and that under review is when the clerk begins
23  that review process.  That's when it changes into that
24  status, when a clerk reviewer has essentially selected
25  the filing from their queue and began working it.

12 (Pages 45 to 48)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 49

1      Court processing is the clerk has taken an
2 action on that filing but it has not completed its steps
3 to get to a final status of whether it's accepted or
4 rejected.
5      Q.  Got it.
6      So the filer submits the document to the court
7 by submitting it to the EFM.  It's received by the EFM
8 and the document lives there until the court clerk is
9 able to log into their review queue, at which point the
10 document surfaces from the EFM to the review queue.
11 They do their review, and it's at that point in time
12 that the process changes from submitted to under review;
13 correct?
14      A.  The moment they enter in that filing to begin
15 that review process, it changes from submitted to under
16 review status.
17      Q.  Okay.
18      A.  The moment they click into that filing.
19      Q.  And when you say "that filing," is it correct,
20 then, that the -- that the clerk review queue, depending
21 on how it's configured, could have one or more filings
22 to be reviewed and accepted; correct?
23      THE DEPONENT:  Sure.
24      Q.  (By Mr. Fetterly) And then the number or volume
25 would just depend on size of the court, number of

Page 50

1 filings, how it's all configured; correct?
2      A.  Correct.
3      Q.  Just real quickly, to understand the rest of
4 these, I see that under review, we have the -- I'm back
5 to Exhibit 35, Page 18, I see receipted.  What does
6 "receipted" mean?
7      A.  It's a separate option that very few courts
8 leverage, but it is an acknowledgment back to the filer
9 that the court has received or receipted that filing.
10 It's generally built around the proposed order process.
11      Q.  Going back up to Page 17 of this document,
12 there was the graphic that shows, you know, filer
13 receives email.  Is that the receipted process or was
14 that something else?
15      A.  This graphic --
16      MS. DUKE:  Objection.  Form and
17 foundation.
18      Go ahead.
19      THE DEPONENT:  This graphic is likely
20 referring to the notifications that he or she has set up
21 to receive within the eFiling Manager.
22      Q.  (By Mr. Fetterly) I see.
23      So would it be fair to say that that would be more
24 of an automated process as opposed to a court clerk
25 taking some affirmative step to initiate an

Page 51

1 acknowledgment or a receipt?
2      A.  Correct.
3      Q.  Okay.  And -- and that automated process would
4 just vary court by court; correct?
5      A.  Yes, and also by filer.  By filer, he or she
6 has the privilege of making their own configuration
7 settings as to which notifications that that individual
8 would like to receive.
9      Q.  And then just continuing on here to the bottom
10 of Page 18, we have two more columns here, accepted and
11 rejected.  They seem to speak for themselves here, but
12 just is it correct then that this is reflecting the
13 status of the clerk having done whatever review they do,
14 the clerk then decides to accept or reject the document,
15 and depending on what the clerk does within the review
16 queue, that determines the status of the document as
17 reflected here; is that correct?
18      A.  It is.
19      MR. FETTERLY:  Okay.  We've been going
20 for about now an hour on this and we're going to switch
21 gears into a new line of inquiry so I suggest we take a
22 five- or ten-minute break.  Does that work?
23      MS. DUKE:  Works for me.
24      MR. FETTERLY:  Great.  Thank you.
25      (A break was taken from

Page 52

1      11:01 a.m. to 11:19 a.m.)
2      Q.  (By Mr. Fetterly) Mr. Derrick, I'm going to
3 show you a document that we premarked as Exhibit No. 37.
4 There we go.
5      And, Mr. Derrick, are you -- can you see this
6 document?
7      A.  Yes, I can.
8      Q.  And I'll represent to you that it's a
9 screenshot of a webpage.  Do you recognize this webpage?
10      A.  I don't.
11      Q.  Do you recognize the URL?
12      A.  Oh, yes, I do.
13      Q.  And what does that -- does it have a meaning
14 to you?  And if so, what is it?
15      A.  It's the Idaho's court program.  It's a -- I
16 believe it's the labeling or the branding that they've
17 given their court program.
18      Q.  And would that labeling or branding be the
19 iCourt?
20      A.  That is my understanding, yes.
21      Q.  Okay.  Going now to page -- the second page of
22 this Exhibit No. 37, do you recognize -- do you
23 recognize this webpage?
24      A.  Yes, I do.
25      Q.  And what is it?

13  (Pages 49 to 52)

EXHIBIT 6, page 14 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 53

1   A.  It is our old electronic filing service
2   provider webpage.
3   Q.  And when you say "old," how old do you mean?
4   Or do you have an understanding of how old is the better
5   question?
6   A.  Yeah.  It's -- we've built multiple filing
7   portals throughout the years, and this is the second
8   iteration that we've built.  It's probably been in
9   production for, I don't know for sure, maybe six, seven,
10  eight years, somewhere along those lines.
11  Q.  So when you say "old," you mean old as it
12  relates to Tyler Technologies and its different versions
13  of the File & Serve solution; is that correct?
14  A.  I say old because we have a new version, a new
15  electronic filing service provider that we are in the
16  process of implementing across the country.
17  Q.  And do you have an understanding if that new
18  e-filing service provider is currently being used by the
19  Idaho Courts?
20  A.  Not off the top of my head, no.
21  Q.  My understanding of the term "e-filing service
22  provider" is that it relates to the -- I guess it would
23  be the path or the solution by which the filer would
24  submit a document to the EFM within File & Serve.  Is
25  that generally accurate?

---

Page 54

1   A.  Yes, it is.
2   Q.  And so this new EFSP you've described, would
3   this be a third-party EFSP or just a Tyler EFSP or a
4   Tyler app that would just be yet another app sitting
5   within the File & Serve system?
6   A.  It would be the latter.
7   Q.  Okay.  Yet another app sitting within the
8   File & Serve solution; correct?
9   A.  Correct.
10  MR. FETTERLY:  Nicole, did you get that?
11  THE STENOGRAPHER:  He said correct, yes.
12  Q.  (By Mr. Fetterly) Okay.  So -- so back to
13  our -- our document here with Exhibit No. 37, this would
14  still be a -- does this reflect the Tyler File & Serve
15  solution or at least a -- a version thereof, albeit an
16  older one?
17  A.  Yes, it does.
18  Q.  Okay.  And is it your understanding that this
19  version of the File & Serve solution is still in effect
20  to this day at one or more courts?
21  A.  Yes, it is.
22  Q.  Okay.  And is it your understanding that this
23  is the version of the File & Serve solution that is
24  currently in use or in effect at the Idaho Courts?
25  A.  I -- I'm not sure.  I'd have to go check where

---

Page 55

1   they are and what -- what version of the software
2   they're using.
3   Q.  How would you -- how would you know that or go
4   about checking that?
5   A.  I would ask my team if they've implemented the
6   new version and if we are solely on that version.
7   Q.  Okay.  I'm going to stop my screen share real
8   quick for Exhibit No. 37.  I just want to go back --
9   MS. DUKE:  And, Jon, I don't mind either
10  if we have the witness check with his team to confirm.
11  Sara does not believe we've transitioned over to the new
12  one, but we don't mind if you have him check on that to
13  provide that answer.
14  MR. FETTERLY:  Why don't we do that?  I
15  was going to go about it perhaps more cumbersomely by
16  walking through the webpage, because if we go on to
17  the -- that Idaho Court website for iCourt and you
18  click on the "click here" envelope, it takes you to that
19  webpage.  I was going to walk him through that, but I'd
20  love to short-circuit that if we'd all agree that that's
21  appropriate to do so.  Because before we talk about the
22  attachment to the 30(b)(6), I just want to make sure
23  we're understanding which version of File & Serve is at
24  play here.
25  MS. DUKE:  Yup.  Fine by me, as long as

---

Page 56

1   that's okay with Beth and Terry.
2   MS. PETRONIO:  I don't know how quickly
3   he can get an answer to that.  I certainly don't want us
4   to go off the record and wait around for that -- for
5   that answer.  I mean, we've been on the record now
6   almost two hours and I still haven't heard a question
7   that I think is in the scope of the subpoena.
8   And I understand that you think because
9   the Press Review Tool relates to e-filing that the
10  e-filing was within the scope of the subpoena.  I
11  disagree with that, but we are going to have a hard stop
12  here at 6:00 p.m. our time, so it's not looking to me
13  like we're going to make that at this stage.
14  So I -- I'm happy to have him ask, but I
15  don't want to wait for an answer.  I -- I would prefer
16  we move on to something else and when he gets an answer,
17  he can come back to it and share that.
18  MR. FETTERLY:  Sure.  Well, I think we
19  can move this along.  I actually don't think I have a
20  tremendous amount left so I'm happy to just keep -- keep
21  moving.
22  So one moment here.
23  THE DEPONENT:  Do you want me to ask?
24  MS. PETRONIO:  Yeah.
25  Give him one second.  He's going to ask

---

14 (Pages 53 to 56)

EXHIBIT 6, page 15 of 61
Decl. of Fetterly

SER-78

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 57

1  the question. I just don't know how quickly we can get
2  a response.
3        MR. FETTERLY: Sure. Thank you.
4        (Pause in the proceedings.)
5        THE DEPONENT: I sent that inquiry. I'll
6  let you know when I receive a response.
7        Q. (By Mr. Fetterly) Thank you.
8        A. Sure.
9        Q. Going back to my screen share here, I'm still
10 on Exhibit No. 37. All I've done is scroll down a few
11 pages to the document that's Bates labeled CNS_13284.
12       A. Okay.
13       Q. And, Mr. Derrick, do you recognize -- well,
14 first, this is a -- another webpage screenshot of a
15 webpage and, Mr. Derrick, do you recognize this webpage?
16       A. Yes, I do.
17       Q. And what is it?
18       A. This is the older version of our filing
19 portal, specifically, the start a new case screen.
20       Q. Okay. And when you say "older," it's the same
21 older version that we were just discussing before we had
22 our break?
23       A. Yes, just a few moments ago.
24       Q. I -- just a couple of real quick questions
25 about this just before we move on to the more-detailed

---

Page 58

1  questions about the press tool and Auto-Accept.
2        I understand there are a couple of -- under
3  case information, under start a new case, there are a
4  couple of pull-down menus, but my understanding is that
5  these would be the -- the pull-down menus that would be
6  made available to a filer using this version of
7  File & Serve during their drafting stage or status of
8  preparing their filing for submission; is that correct?
9        A. That is correct.
10       Q. So under case information, we see a few -- I
11 guess I'll call them prompts or pull-down menus that
12 would be, you know, required for the filer to select as
13 part of their drafting and submission process; is that
14 correct?
15       A. That is correct.
16       Q. Okay. I'm now scrolling down to the next
17 page, which is 13285. Under location, this screenshot
18 is the same -- same webpage. It's just this page
19 reflects the options or some of them under the location
20 drop-down menu. Do you see that?
21       A. Yes, I do.
22       Q. Would -- would these locations, once selected,
23 affect kind of, you know, where within the EFM or the
24 filing is routed and/or relate to -- affect the clerk
25 inbox that it is surfaced into?

---

Page 59

1        MS. DUKE: Form and foundation.
2        THE DEPONENT: They could. It depends on
3  the configuration.
4        Q. (By Mr. Fetterly) Right.
5        So a court could configure their press --
6  strike that.
7        A court could configure their location options
8  and their File & Serve system so that if the filer
9  selects Ada County District Court, the filing would then
10 be routed to a clerk review queue that's for the Ada
11 County District Court; is that correct?
12       MS. DUKE: Again, foundation.
13       THE DEPONENT: They could, yes.
14       Q. (By Mr. Fetterly) Moving on to the next page
15 here, this is the page Bates labeled 13286. Here, we
16 see a different pull-down menu. This is the category
17 civil, family, guardianship, probate, or mental health.
18 Those are the options that are reflected here. These
19 would also be, you know, prompts that a filer would be
20 required to select while they're going -- while they're
21 in the drafting or submission phase of their filing;
22 correct?
23       A. That is correct.
24       Q. And so this would be the -- the category of
25 the case before we have the location which is the court

---

Page 60

1  location. This is now the case category.
2        And then moving on, I see we have one more,
3  it's the case type. And this is reflected on CNS 13287,
4  and I'll show you this.
5        A. Yes.
6        Q. And this case type would be also another, you
7  know, series of selections that a filer would be
8  required to -- a series of options a filer would be
9  required to select as part of their drafting and
10 submission process for a filing; correct?
11       A. That is correct.
12       Q. Okay. Thank you. I appreciate you bearing
13 with me here. I just want to make sure we have a common
14 understanding of location, category, case type as we now
15 go back to the attachment to the subpoena, so I'll go
16 there now.
17       Okay. Mr. Derrick, I now have turned back to
18 Exhibit 33. This is the subpoena. And this is the
19 Exhibit 1 to the subpoena, a document titled
20 "Auto-Accept Review and Press Review Tool" dated
21 July 1, 2022.
22       I'm now going to the second page, which is
23 SO 3. Do you see that in front of you?
24       A. Yes, I do.
25       Q. That first paragraph where we're talking about

---

15 (Pages 57 to 60)

EXHIBIT 6, page 16 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 61

1  the Auto-Accept Review on the left-hand column, it talks
2  about the Auto-Accept Review as a free out-of-the-box
3  e-filing function that allows clerks to automatically
4  accept filings based on a set of conditions.  And then
5  it goes on to say:  "Conditions can be configured using
6  the same criteria that is used to define which review
7  queues filings are routed to, allowing clerks to
8  configure the solution to meet their needs."
9        I just want to better understand that.  Can
10 you explain to me what the conditions are that can be
11 configured to facilitate the Auto-Accept Review?
12      A.  Yeah.  I can provide some examples, but I
13 won't be able to give you an absolute.
14        I'm sorry.  I'm just receiving a confirmation
15 on my screen that says my internet was unstable, so
16 perhaps that was part of the problem with the audio
17 before.  Apologies.  Can you guys still hear me okay?
18      Q.  Yes.
19      A.  Okay.  Yes, I can provide you a few examples.
20 I don't have a comprehensive list in front of me.
21        An example would be case category; case type;
22 party type, so plaintiff or defendant; filer type, which
23 would be, you know, a legal professional versus a
24 self-represented litigant type thing.  Just different
25 options like that; contains financials, doesn't contain

---

Page 62

1  financials, et cetera.
2      Q.  Mm-hmm.  If the -- if a particular version of
3  the File & Serve system -- strike that.
4        If a particular version of the File & Serve
5  solution is configured so that a filer is, you know,
6  given the option to choose between confidential or
7  public, some type of security feature, would that be yet
8  another way, another condition that could determine
9  whether or not a filing is automatically accepted?
10      A.  I'm not sure if filing security is an option
11 that we have in the Auto-Accept function.
12      Q.  Okay.  Well, I think we'll -- we'll get there
13 in a minute.
14        But as far as the conditions you've just
15 identified, case category, case type, party type, filer
16 type, you know, those were examples of the types of
17 conditions that could be used to configure the
18 Auto-Accept Review; correct?
19      A.  Correct.
20      Q.  So a minute ago, we were looking at the -- the
21 version of the File & Serve solution and, specifically,
22 we were looking at location, case type, case category.
23 Those would be examples of the types of conditions that
24 could be configured; correct?
25      A.  Everything you said was true with the

---

Page 63

1  exception of location.  The conditions themselves live
2  within a location.
3      Q.  Understood.
4        So if I'm understanding you correctly, then,
5  the -- the location would be set first.  And then once
6  the location is set, then within that location, the
7  court would be able to configure the Auto-Accept Review
8  based upon case type, case category, the other
9  conditions you identified; correct?
10      A.  That is correct.
11      Q.  So this would allow a statewide system, for
12 instance, to configure -- it would allow courts within a
13 statewide system to configure their Auto-Accept Reviews
14 based upon their respective locations such that each
15 location could configure according to its wishes or
16 needs; correct?
17        MS. DUKE:  Form and foundation.
18        THE DEPONENT:  Yes, that's correct.
19      Q.  (By Mr. Fetterly) Thank you.
20        I'm going to go down to the next page here.
21 Auto-Accept Review, it reads:  "E-filing function that
22 allows clerks to automatically accept filings if the
23 filing matches locally configured criteria"; is that
24 correct?
25      A.  Yes, it is.

---

Page 64

1      Q.  And so, again, here we have conditions that
2  can be configured based upon filing firms, filing codes.
3  Again, I don't want to repeat them all, but this is what
4  we were just discussing in terms of the conditions or
5  types of conditions that would allow for configuration;
6  correct?
7      A.  Correct.
8      Q.  It says here:  "Auto-Accept:  How does it
9  work?  Number 1, upon submission, filings are evaluated
10 against the locally configured auto-review conditions."
11        Can you just explain what that means?
12      A.  Yeah.  So once the filings have been submitted
13 and they reach the EFM, the EFM then evaluates those
14 filings and the criteria of those filings based upon the
15 configurations of those conditions to see if it meets
16 any of those conditions.
17      Q.  And this is all done on an automated basis;
18 correct?
19      A.  That's correct.
20      Q.  And then we move on to the -- and, again, just
21 for the record, I'm looking at SO 5, Number 2:  "If the
22 envelope details do not meet the auto-review conditions,
23 the envelope is routed to the appropriate review queue
24 to be reviewed by clerk as it is today."
25        So that -- I think I understand what that

---

16 (Pages 61 to 64)

EXHIBIT 6, page 17 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 65

1  means, but if you could just explain in your words, what
2  does that mean?
3       A.  We have conditions for Auto-Accept configured
4  and the evaluation process does not determine that the
5  envelope or the filing that submitted meets that
6  criteria, then it will then default to whatever the
7  queue configuration is set up for that specific
8  jurisdiction or location.
9       Q.  And so depending on the configurations, if
10  there is some discrepancy between what the
11  configurations would allow for Auto-Accept and what the
12  filer has submitted, the document doesn't just
13  automatically get auto-accepted. The -- a discrepancy
14  would then result in the clerk still having a chance to
15  review the document and go through the traditional
16  process of the clerk review queue; is that correct?
17       A.  That is correct.
18       Q.  Okay.  And then the third point here is if the
19  envelope detail meets the auto-review conditions, then
20  the filings are accepted. So accepted, stamped, funds
21  captured, and notification sent to filers/service
22  recipients.
23          Let me just walk through this. So, again, the
24  filings are automatically accepted. Is it correct than
25  that this would be the situation where there's no

Page 66

1  discrepancy, the configurations have been set, the filer
2  submitted the document in a way that there's no
3  discrepancy, nothing for the clerk to review based on
4  the configuration set by the clerk, therefore, accepted;
5  is that correct?
6       A.  If the envelope details meets the auto-review
7  conditions that have been configured, then, yes, it can
8  be sent to Auto-Accept.
9       Q.  I see it says stamped. Is that the -- the
10  date and timestamp that we were discussing earlier?
11       A.  Yes, it is.
12       Q.  So the -- the eFile Manager captures the date
13  and time of submission, and then that -- that gets
14  stamped onto the document at acceptance. And under the
15  Auto-Accept process, the system would automatically
16  apply that date and timestamp because the criteria had
17  been satisfied; correct?
18       A.  Not necessarily.
19       Q.  Explain to me how I'm incorrect.
20       A.  The file stamps are configurable by location,
21  and so what we are discussing here is what the file
22  stamp would be placed on that record and it's based upon
23  that configuration. So the characteristics of that file
24  stamp may vary and may not necessarily be the details
25  that you just provided.

Page 67

1       Q.  Understood.
2          That's, again, determined by the court and
3  configured based upon the court's, you know, requirement
4  or request; correct?
5       A.  That is correct.
6       Q.  Thank you.
7          Funds captured. I believe we discussed
8  earlier that at the submitted stage, you know, funds are
9  verified and accepted when the document is submitted to
10  the EFM based upon information submitted by the filer;
11  is that correct?
12       A.  When the filer submits the filing, Tyler is
13  unique in the way that we handle financials, which is a
14  way that it separates us from many of the other
15  providers out there. We place a pre-authorization or a
16  hold, if you will, on the credit card of the filer that
17  the filer is using for those funds to validate that he
18  or she has sufficient funds to cover that filing, but we
19  don't actually capture those funds until the clerk
20  actually accepts those filings. So there is a variance
21  in the way that we describe that.
22       Q.  Understood.
23          So when the filer submits the document to the
24  court and it's received into the EFM, the -- the credit
25  financial information submitted by the filer, the credit

Page 68

1  card, for instance, that information is verified and
2  approved automatically by the EFM, which results in a
3  hold being placed on the funds that are tied to the
4  payment method; correct?
5          MS. DUKE: Object to the form.
6          THE DEPONENT: More or less. We -- we
7  have a payment processor which is a portion of the
8  application that serves that function for us. It's not
9  actually conducted by the EFM. It's conducted by the
10  payment processing solution. But in generally speaking
11  terms, yes.
12       Q.  (By Mr. Fetterly) Well, I appreciate the
13  distinction. I'm not going to ask you about Tyler's
14  payment processor. I just wanted to confirm that the
15  filing process and, specifically, the submission to the
16  court or to the EFM does result in funds being verified
17  and held at that point in time; correct?
18          MS. DUKE: Object to the form.
19          THE DEPONENT: That is correct.
20       Q.  (By Mr. Fetterly) Okay.  And then the
21  pre-authorization process, you know, allows, through the
22  verification and approval, that there are funds to be
23  captured. But they are not actually captured until the
24  document is accepted either through, you know, the
25  Auto-Accept process or the clerk manual acceptance

17 (Pages 65 to 68)

EXHIBIT 6, page 18 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 69

1  process; is that correct?
2           MS. DUKE:  Object to the form.
3           THE DEPONENT:  Correct.  Its -- its
4  intent is to protect against a non-sufficient funds
5  situation.
6       Q. (By Mr. Fetterly) Okay.  What happens if the
7  filer submits a document to the court, and as part of
8  the submission to the court, the File & Serve program
9  determines that there are insufficient funds and an
10 inability to place the pre-authorization, what happens
11 then?
12          MS. DUKE:  Object to the form.
13          THE DEPONENT:  The filing is immediately
14 rejected with a notification to the filer stating as
15 such.
16      Q. (By Mr. Fetterly) So the -- the document is not
17 received into the EFM; correct?
18      A.  It -- it actually does touch the EFM and then
19 immediately gets rejected.
20      Q.  Thank you for clarifying.
21          So you're right, the -- the EFM has to receive
22 it in some capacity in order to reject it, and it does
23 that.
24          Is it fair then to say that that document does
25 not get surfaced into the clerk's review queue?

---

Page 70

1       A.  That is correct.
2       Q.  And does that also mean that if the
3  Auto-Accept Review function of File & Serve is activated
4  and configured by the court, the document would not be
5  automatically accepted; correct?
6       A.  Correct.
7           MS. DUKE:  Object to the form.
8           THE DEPONENT:  That assessment of
9  financial availability, if you will, of funds, is prior
10 to the Auto-Accept function taking -- taking effect.
11      Q. (By Mr. Fetterly) Thank you.
12          I'm looking at the next page, SO 6, benefits
13 of Auto-Accept.  And I'm just trying to get an
14 understanding, if you have one, as to what these mean
15 starting with "improves average response time."  What is
16 your understanding of what this means in terms of the
17 Auto-Accept Review?
18      A.  My interpretation of the document,
19 specifically this point, is that automatically accepting
20 filings will improve the response times of the clerks.
21      Q.  And how -- what do you mean "improve response
22 times of clerks"?
23          MS. DUKE:  And I'll object as to
24 foundation.  Not specific to Idaho.
25          THE DEPONENT:  If there are fewer filings

---

Page 71

1  to review, it would allow for the clerks to review them
2  in a more timely manner.
3       Q. (By Mr. Fetterly) Would that be because, at
4  least, in part, some of the filings have met the
5  criteria established by the court for auto-acceptance
6  such that the court clerks would not need to review
7  those particular documents prior to acceptance?
8       A.  For the nature of this document specifically
9  on this light, I believe that was the intent, but we
10 would have to check with the author.
11      Q.  Sure.
12          (Pause in the proceedings.)
13      Q. (By Mr. Fetterly) And can you remind me once
14 again of who the author of this document is?
15      A.  Evan Acosta.
16      Q.  And you -- you're the General Manager of
17 Courts.  Does Mr. Acosta report to you?
18      A.  He no longer does.
19      Q.  Did he at one time?
20      A.  Yes, he did.
21      Q.  And what was your position at the time
22 Mr. Acosta reported to you?
23      A.  He reported to me as I was the General Manager
24 of eSolutions.  I can't recall whether he reported to me
25 as the Operations Director or any of my previous roles.

---

Page 72

1       Q.  Okay.  As the General Manager of the Courts or
2  General Manager of eSolutions, do you have any reason to
3  believe that this statement is incorrect?
4       A.  Which statement are you referring to?
5       Q.  The statement on this slide regarding improved
6  response -- improves average response time?
7       A.  No.  I have no reason to believe it's
8  incorrect.
9       Q.  On the next slide you see "reduces return for
10 correction rates."  Can you just please review that and
11 just let me -- and provide to me your general
12 understanding of what this means?
13      A.  Yeah.  So when we evaluate or we review clerks
14 and their actions taken on filings in the review tool,
15 one of the things that we evaluate is whether they
16 accept or reject the document.  You see the term here
17 "return for correction," that's referring to reject.
18 The State of Texas, when this document was created,
19 uses the term "return for correction" instead of
20 rejection for various reasons.  So the statement here
21 says "reduces return for correction rates" is synonymous
22 with reduces rejection rates, and the reasons being is
23 because if you accept automatically more documents,
24 then, naturally, you will have fewer rejections.
25      Q.  And do you have any reason to believe that the

---

18 (Pages 69 to 72)

EXHIBIT 6, page 19 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 73

1  statement here is incorrect?
2      A.  I do not.
3          MS. DUKE:  Again, foundation as to Idaho,
4  but that's just an objection I'll have to this entire
5  document given it's not Idaho-based.
6      Q.  (By Mr. Fetterly) And moving on to the next
7  portion of this, it says "reduces operational overhead."
8  If you could just please review that and provide me your
9  general understanding of what that means.
10     A.  Yeah.  My understanding of this statement is
11  if the Auto-Accept function operates in any capacity, it
12  will reduce the number of filings that the clerk needs
13  to review and, therefore, will reduce their operational
14  overhead or increase their operational capacity.
15     Q.  Do you have any reason to believe that
16  statement is incorrect?
17         MS. DUKE:  Same objection.
18         THE DEPONENT:  I do not.  No, I do not.
19     Q.  (By Mr. Fetterly) Earlier, I believe you
20  testified that the -- I'm going to go back up to a
21  different page here.
22         The Auto-Accept Review is a free
23  out-of-the-box e-filing function, and I recall earlier
24  you testified that that is a free out-of-the-box
25  e-filing function for the base level of the File & Serve

---

Page 74

1  app or solution; is that correct?
2      A.  That is correct.
3      Q.  Is that correct with respect to current-day
4  versions of the File & Serve solution?
5      A.  Yes, it is.
6      Q.  Is that correct for prior versions of the
7  File & Serve solution?
8      A.  Yes, it is.  We've never charged for that
9  function.
10     Q.  Okay.  And is that true for the -- the version
11  of the File & Serve solution that we were discussing
12  earlier with the screen?  Let's see.  With
13  Exhibit No. 37, which I'm now putting in front of you,
14  the second page?
15     A.  Not necessarily.  What you're -- what you're
16  displaying on the screen here is the filing service
17  provider, the electronic filing service provider or the
18  filing portal.  And the auto-configuration is a
19  component of the electronic filing manager, and they are
20  different solutions with different versioning.
21     Q.  Are there any prior versions of the eFile
22  Manager for which the Auto-Accept Review feature is not
23  available?
24     A.  Yes.  There are historical versions of the
25  solution that existed prior to the Auto-Accept function

---

Page 75

1  being available.
2      Q.  When did the Auto-Accept function first become
3  available?
4      A.  I don't know that.  I'd have to go check.  I
5  don't know.
6      Q.  Can you give me an estimate?
7          MS. DUKE:  Object to the form.  Calls for
8  speculation.
9          THE DEPONENT:  Yeah, I'm not sure.  I'd
10  have to check.  I can't -- I can't state with any level
11  of certainty at this point.
12     Q.  (By Mr. Fetterly) Was the Auto-Accept Review
13  feature available during the period of time that you
14  were the General Manager of eSolutions?
15     A.  Yes, it was.
16     Q.  And was it available during the entire period
17  of time that you were the General Manager of eSolutions?
18     A.  I believe so, but not certain.
19     Q.  And can you remind me of when you -- an
20  estimate is fine -- when you became the General Manager
21  of eSolutions?
22     A.  Around 2017.
23     Q.  And what about when you were the Operations
24  Director of eSolution, was the Auto-Accept Review
25  feature available in File & Serve when you were the

---

Page 76

1  Operations Director of eSolutions?
2      A.  I don't recall.
3      Q.  Okay.  Would you be able to find out if the
4  Auto-Accept Review feature is available for the version
5  of File & Serve used by the Idaho Courts?
6      A.  I -- I can tell you it is.
7      Q.  Thank you.
8          And just to be clear, the Auto-Accept Review
9  feature is available on the version of File & Serve used
10  by the Idaho Courts; correct?
11     A.  That is correct.
12     Q.  Thank you.
13         I'm just going back to where we left off in
14  this document, SO 7, now is the page.  It talks about
15  the effectiveness of auto-review.  There's a -- there's
16  a graphic here that I don't claim to necessarily
17  understand.  Can you please just review it and provide
18  me your understanding of what this page and specifically
19  what this graph represents?
20         MS. DUKE:  Again, I'll object to
21  foundation as to Idaho.
22         THE DEPONENT:  Yeah.  So this graph
23  appears to be reflecting the effectiveness of
24  auto-review as it pertains to different courts that are
25  being evaluated with two different components.  One

---

19 (Pages 73 to 76)

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

EXHIBIT 6, page 20 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 77

1    component being the response time for clerk's action on
2    those envelopes in an under-24-hour duration. And the
3    second component being the acceptance rate for those
4    same envelopes. And the variable between the courts
5    appears to be a percentage of envelopes that are
6    automatically reviewed based upon the configuration of
7    those respective courts.
8        Q. (By Mr. Fetterly) Do you have an understanding
9    of which courts or which courts' data was used to create
10   this graph?
11       A. Not with 100 percent certainty.
12       Q. Okay. What is your understanding based on
13   your less than 100 percent certainty?
14       MS. DUKE: Speculation. Foundation.
15       THE DEPONENT: That, I -- I can't say.
16   I -- I don't know.
17       Q. (By Mr. Fetterly) Are there -- are there courts
18   that currently use the Auto-Accept Review feature of
19   File & Serve?
20       A. Yes.
21       Q. Okay. Can you tell me how many courts use the
22   Auto-Accept Review feature of File & Serve?
23       A. Yeah, roughly 25.
24       Q. And can you tell me how many states are
25   represented within those 25 courts?

Page 78

1        A. I can't speculate that.
2        Q. Is it -- to your knowledge, is it 25 different
3    states or might those 25 include, you know, one state
4    that has eight courts using it?
5        A. Yeah. Some of them are states, like, for
6    example, the State of Maryland, the State of Maine, and
7    the State of Vermont. Each of those jurisdictions or
8    states have multiple jurisdictions within.
9        Q. Okay. Besides the states of Maryland, Maine,
10   and Vermont, are there other states that are using the
11   Auto-Accept Review feature of their File & Serve
12   solution?
13       A. I believe so.
14       Q. Okay. And what states are those?
15       A. I know the State of New Mexico uses it in a
16   limited capacity. But beyond that, I'd have to go and
17   look. I don't -- I don't know beyond that.
18       Q. I don't want to get into too much detail about
19   any particular state. I just want to understand when
20   you say "limited capacity," I understand that to mean
21   there's some configuration involved.
22       Can you just generally describe the -- the
23   type of configuration that would result in a limited
24   capacity?
25       MS. DUKE: Object to the form.

Page 79

1    Foundation as to Idaho.
2        Go ahead.
3        THE DEPONENT: Yeah. It can vary
4    depending upon the jurisdiction. Some may restrict the
5    Auto-Accept to government filing only, so government
6    entities that file, which could be a prosecutor or a
7    public defender. That would be an example.
8        Q. (By Mr. Fetterly) Okay. And then we also
9    discussed that the Auto-Accept Review can be configured
10   in other ways such as a case type; correct?
11       A. Yes, it can.
12       Q. Or a case category; correct?
13       A. That's correct.
14       Q. Are any of the courts that are using
15   Auto-Accept Review, have they configured their
16   Auto-Accept Review to accept -- automatically accept
17   civil case types?
18       MS. DUKE: Foundation.
19       THE DEPONENT: I can't speculate on that
20   without looking at the configuration.
21       (Pause in the proceedings.)
22       Q. (By Mr. Fetterly) Okay. Moving back to our
23   document here, SO 8, Auto-Accept Review, how to get
24   started. So it says "Determine Business Needs" on the
25   left-hand column, then we have "Design Auto-Accept

Page 80

1    Criteria," and then "Submit eSolutions Support Ticket."
2        Let me just start with the "Design Auto-Accept
3    Criteria" since that's what we've been discussing here.
4    Do you see that?
5        A. Yes, I do.
6        Q. Okay. So where it says "Auto-Accept
7    Criteria," my understanding is that this is identifying
8    the conditions that we have been discussing by which a
9    court could configure their Auto-Accept Review; is that
10   correct?
11       A. Yes, it is.
12       Q. And then I see what looks like an asterisk at
13   the bottom: "Auto-review feature is configurable by
14   node/court location."
15       Again, I understand this would be reflective
16   of what we were discussing earlier, that within a
17   statewide system, any, you know, individual court could
18   configure their Auto-Accept Review conditions according
19   to their preferences or needs; is that correct?
20       MS. DUKE: Form and foundation as to
21   Idaho.
22       THE DEPONENT: Yeah. That additional
23   bullet is referring to the configuration ability by
24   location.
25       Q. (By Mr. Fetterly) Understood.

20  (Pages 77 to 80)

EXHIBIT 6, page 21 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 81

1    And just what does it mean when it says
2  "node -- node/court location"?
3        MS. DUKE:  Form and foundation as to
4  Idaho.
5        THE DEPONENT:  Tyler uses an
6  organizational chart to create and organize the way for
7  filings to enter into the e-filing system and for courts
8  to manage those, and a node would be another location or
9  court location as is represented here in the document.
10    Q.  (By Mr. Fetterly) Thank you.
11       I'm going to move on here so we can wrap up
12  this -- the Courthouse News portion of this pretty soon
13  here.
14       I kind of just want to run through this
15  document in the same way we just did a few minutes ago,
16  what we've been doing for the last few minutes, but this
17  time focusing on the Press Review Tool --
18    A.  Sure.
19    Q.  -- that's reflected on here.
20       Here, we have Press Review Tool surfaces
21  filings that match a defined set of configurations,
22  allowing authorized users to access nonsensitive filings
23  that are in a "submitted" or user -- or "under review"
24  status.
25       Let me break that up and ask you a few

---

Page 82

1  questions.  What do you -- what does it mean here where
2  it says "Press Review Tool surfaces filings"?
3    A.  Sure.  The Press Review Tool is a separate
4  application from the e-filing manager.  It's also a
5  separate application from the review queue that we've
6  been discussing.  And just like the review queue
7  surfaces those filings in its system, the Press Review
8  Tool contains that same functionality.
9    Q.  Right.  So earlier you were testifying that
10  the -- that the filing lives in the EFM or eFile
11  Manager; correct?
12    A.  That's correct.
13    Q.  And so the press review queue is a separate
14  app that -- the filing does not live in the press review
15  queue; correct?
16    A.  By press review queue, I think you're
17  referring to Press Review Tool?
18    Q.  I am and I appreciate you clarifying that.
19  Yes.
20        MS. DUKE:  And I'll object to the form
21  and foundation.  I don't know if you're talking about
22  the original or not.
23        THE DEPONENT:  The Press Review Tool
24  possesses the ability to surface those same documents
25  and records inside of it pulling it from the eFiling

---

Page 83

1  Manager in a similar way that the review tool would do
2  so for the clerks.
3    Q.  (By Mr. Fetterly) What is -- you have to help
4  me understand.  What do you mean when you say "surface"?
5  What is your understanding of that word in this context?
6    A.  Display.
7    Q.  Okay.  So the press -- so if I were to read
8  this again, we could read it as:  The Press Review Tool
9  displays filings that match a defined set of
10  configuration.
11       Would you agree with that if we used "display"
12  instead of "surface"?
13    A.  Absolutely.  That's a good -- that's a good
14  representation.
15    Q.  Thank you.
16       And then it says "allowing authorized users to
17  access nonsensitive filings that are in 'submitted' or
18  'under review' status."
19       What -- what does authorized users mean here
20  in this context?
21    A.  It means authorized by the court.  The court
22  dictates who has access to the Press Review Tool.
23    Q.  And then if someone was an authorized user,
24  how would they access the Press Review Tool?
25    A.  They would do so in a similar way that the

---

Page 84

1  reviewing clerks access the review tool.  They would go
2  to a URL that is different from the review tool, but is
3  specific to the Press Review Tool.  They would enter
4  that into their web browser and then they would log in
5  with a set of user credentials with a user ID and
6  password in order to log into the Press Review Tool and
7  see the filings that are displayed based upon the
8  matched conditions or criteria that we've previously
9  discussed.
10    Q.  So a user of the Press Review Tool logs in
11  using a URL that is different than the URL that the
12  clerks use to access their clerk review queue; correct?
13    A.  Yes, because it's a different application.
14    Q.  Understood.
15       So the -- both applications would display the
16  filing, and, again, assuming it meets the criteria or
17  conditions for the Press Review Tool; correct?  That's a
18  bad question.  Don't answer that one.  I combined a few
19  functions.
20       So the clerk -- the court clerks would log
21  into the clerk review using their URL and they can see
22  their filings based on whatever configurations have been
23  used to configure their clerk review queue; correct?
24    A.  That's correct.
25    Q.  And then the user of a Press Review Tool would

---

21 (Pages 81 to 84)

EXHIBIT 6, page 22 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 85

1  log into a different URL, because the Press Review Tool
2  is a different app, and they would then see whatever
3  filings have been displayed based upon the conditions
4  that have been set for the Press Review Tool; correct?
5      A.  Yes, that's correct.
6      Q.  And depending on the configurations, it may be
7  that there would be a particular filing that would be
8  both -- that would be displayed both in the clerk review
9  queue as well as the Press Review Tool; correct?
10     A.  Yes, that's correct.
11     Q.  And under this system, the filing still lives
12  in the EFM until it's been accepted by the court clerk;
13  correct?
14     A.  It -- it will still live in the EFM after it
15  has been accepted from the court clerk.
16     Q.  Okay.  Gotcha.  But -- thank you.
17         But during this -- but a document that lives
18  in the EFM but is being displayed in the clerk review
19  queue and potentially also displayed in the Press Review
20  Tool, that document is simply being displayed in those
21  two respective queues.  It still lives in the EFM;
22  correct?
23     A.  That's correct.
24     Q.  And then if you'd just elaborate on what you
25  meant when you said "it still lives in the EFM after

Page 86

1  acceptance."
2      A.  Yeah.  Sure.  So the document itself will live
3  in the eFiling Manager until the configuration
4  settings to purge that document take effect, and those
5  are configurable settings for each of our customers.  So
6  some will configure those documents to live in the
7  system for a period of 90 days before they fall off.
8  The -- the data that's associated with those filings
9  will live in the eFiling Manager into perpetuity.
10     Q.  Okay.  So a document that has been submitted
11  to the court and received into the EFM lives in the EFM.
12  Depending on the configurations, it could be
13  automatically accepted or put into a clerk review queue
14  for review and acceptance, but under either of those
15  scenarios, upon acceptance, and the information would
16  still live in the EFM depending on these configurations
17  you've just identified; correct?
18     A.  Yes, that's correct.
19     Q.  Okay.  Let me just go to a different document
20  real quick here while we're on this topic of authorized
21  users.  One moment.
22         (Pause in the proceedings.)
23     Q.  (By Mr. Fetterly) Okay.  I'm now going to show
24  you a document that was previously marked in this case
25  as Exhibit No. 10, and can you see that document?

Page 87

1      A.  Yes, I can.
2      Q.  And I'll direct your attention to not the top
3  line, which appears to be a forward, but the -- the
4  email from Jessi Fisher dated August 16, 2022,
5  11:50 a.m., to Jennifer Dvorak.  Do you see that email?
6      A.  Yes, I do.
7      Q.  And who is Jessi Fisher?
8      A.  She's an employee at Tyler.
9      Q.  Okay.  In this email, Ms. Fisher represents to
10  Ms. Dvorak -- I'm going to direct your attention to the
11  middle portion:  "From a functional standpoint, there
12  are two functions to consider.  First, there is access
13  control to the PRT," and then it -- I'm going to just
14  paraphrase for a minute.  Then it goes on to say,
15  "Second, there's access control to the data itself."
16          I want to understand this paragraph,
17  especially in relation to what we were just talking
18  about in terms of accessing a Press Review Tool and
19  viewing the filings that are displayed in the Press
20  Review Tool.
21     A.  Sure.
22     Q.  So within that context, what does it mean here
23  when it says, "First, there is access control to the
24  PRT," or Press Review Tool?
25     A.  Yeah.  Absolutely.  Its -- its access to that

Page 88

1  is governed by our Identity Provider system.  What that
2  means is if you don't have an authorized user ID and
3  password, you can't access the system.  That's what
4  that's referring to.  And if you recall, I previously
5  stated that that authorization is granted by the court.
6      Q.  Right.  And then this authorization we're
7  speaking of, again, is with respect to the Press Review
8  Tool which is a separate app from the other apps we've
9  been discussing; correct?
10     A.  Yes, that is correct.
11     Q.  And so -- okay.  And then we go on to the
12  second part, which is, "Second, there is access control
13  to the data itself."
14          What does -- read that portion of the email
15  and then explain to me your understanding of what that
16  means.
17     A.  Yeah.  So even though you have access to the
18  Press Review Tool, you don't really have access to any
19  of the data.  It wouldn't be displayed unless it is
20  configured to do so.  And I -- the subsequent statement
21  there says this is governed by configuration.  And
22  that's what it's referring to, is you can have access to
23  the Press Review Tool, but if the Press Review Tool is
24  not configured to display any of the filings, then
25  nothing would show up.

22 (Pages 85 to 88)

EXHIBIT 6, page 23 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 89

1    Q. So is it fair to say the default configuration
2  is -- is one that does not allow for any filings to be
3  displayed?
4    A. Good question. I don't know for sure.
5    Q. Gotcha.
6       I guess where I'm going here is -- well, is
7  there a way to find that out?
8    A. Yeah, we could find that out.
9       (Pause in the proceedings.)
10      THE DEPONENT: I don't think --
11      MS. PETRONIO: We can check on that, but
12  he's not going to be able to get an answer right away.
13   Q. (By Mr. Fetterly) I'm sorry. Can you -- did
14  you just make a request to answer my question?
15   A. No, I wrote it down. I wrote it down. On the
16  next break, I will make the request with the team to
17  find out.
18   Q. Oh, thank you. I appreciate that. Let's keep
19  moving. I don't want to sit around and waste your time,
20  sir. Thank you.
21      So when we're done talking about the
22  configuration, this goes back to the conditions we were
23  discussing earlier; correct? Case type, filing type,
24  filing code, those types of conditions that are
25  identified on our Exhibit 1 to the subpoena, those would

---

Page 90

1  be the conditions that would determine what a user of a
2  press tool is able to view; correct?
3    A. Yes, that is correct.
4    Q. Or put differently, those conditions would
5  determine which filings are displayed to a user of a
6  press tool; correct?
7    A. Yes, that's a better way to put it.
8    Q. Thank you. You're teaching me along the way
9  and I appreciate your patience.
10      Once a filing is displayed to a user of the
11  press tool, does the -- does the -- does the user of the
12  press tool have the ability to edit or change the
13  document?
14      MS. DUKE: Foundation.
15      THE DEPONENT: Inside of the Press Review
16  Tool, we provide no measures or mechanisms that would
17  allow for the editing of that document, but it wouldn't
18  preclude a user from using external tools to do so.
19   Q. (By Mr. Fetterly) Explain to me what you mean
20  by that.
21   A. Any -- anybody who has access to a record can
22  forge it using PDF document editors in any capacity that
23  they deem appropriate, and there's nothing that Tyler
24  can do to prevent that or any other entity for that
25  matter.

---

Page 91

1       MS. DUKE: And I'll remove my objection.
2  Thank you.
3    Q. (By Mr. Fetterly) Yeah. So that -- that would
4  be true -- well, let me back up.
5       So would a user on the Press Review Tool have
6  the ability to do that to a document that's within the
7  Press Review Tool, or would they have to -- are you
8  referring to a situation where someone maybe
9  downloaded the press tool and then separately used their
10  own program or application to change or manipulate?
11   A. I'm saying that inside of the Press Review
12  Tool, users do not have the ability to modify the
13  documents that live in the EFM but are being displayed
14  in the Press Review Tool as part of that process. It
15  would not prevent them from saving a copy of that
16  document to wherever they chose to save it and then
17  using a PDF editor or some other mechanism to modify the
18  document in the way that they deem appropriate.
19   Q. Gotcha.
20      You're referring to a document that is now
21  outside of the Press Review Tool; correct?
22   A. Yes, that is correct.
23   Q. So the user would have to download the
24  document or otherwise generate a copy to then do the
25  things you're suggesting outside of the Press Review

---

Page 92

1  Tool; correct?
2    A. Yes, that is correct.
3    Q. And the user of the press tool has no means or
4  ability to do those things within the Press Review Tool;
5  correct?
6    A. Yes, that is correct.
7    Q. Okay. And I believe you were referring to,
8  you know, generally speaking, PDF editors or other -- I
9  believe your testimony was any document can be
10  manipulated or configured through PDF editors or other
11  technology; correct?
12   A. Yes, that's correct.
13   Q. So -- and that would be true with respect to a
14  document that was downloaded from a Press Review Tool
15  just as it was or could be with respect to a -- a
16  document that's been downloaded from the Odyssey case
17  management system; correct?
18   A. Yes, that's correct.
19   Q. And so once a document is out -- so let's
20  assume a document has been submitted to the court, gone
21  through the EFM, surfaced into the clerk review queue,
22  accepted by the clerk, and then the document migrates to
23  the court's case management system. So -- if a person
24  were to then view and download that document, they'd be
25  able to manipulate it in the same manner that you were

---

23 (Pages 89 to 92)

EXHIBIT 6, page 24 of 61
Decl. of Fetterly

SER-87

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

**Page 93**

1   just describing outside of the case management system;
2   correct?
3       A.   Yes, that's correct.
4       Q.   So, I mean, the -- if I understand you
5   correctly, you're saying once the document is outside of
6   the Tyler system, anything can happen to it and that's
7   just kind of outside of Tyler's purview; correct?
8       A.   Well, my statement was around could a user
9   modify the document.
10      Q.   Right.
11      A.   And the context provided, I think, I spoke to
12  that.
13      Q.   Understood.  Understood.
14           We -- we're talking about modification outside
15  of the Tyler system, whether it be the Press Review
16  Tool, the clerk review tool, Odyssey case management
17  system, or any Tyler solution, a user can manipulate a
18  document once it is outside of that universe; correct?
19      A.   Yes, that's correct.
20      Q.   Okay.  And in that respect, the Press Review
21  Tool wouldn't pose any different or greater risk;
22  correct?
23           MS. DUKE:  Objection.  Form.  Foundation.
24  Overbroad.
25           THE DEPONENT:  With regards to editing

---

**Page 94**

1   the document, is that the premise of the question?
2       Q.   (By Mr. Fetterly) Correct, yes.
3           MS. DUKE:  Same objection.
4           THE DEPONENT:  Correct.  The users of the
5   Press Review Tool do not have the ability to edit the
6   documents that exist within the EFM as they -- as they
7   exist within that workflow.
8       Q.   (By Mr. Fetterly) Perfect.  Thank you very
9   much.
10           Let me go back to our Exhibit 1.  Hold on one
11  second.  Wrong PDF deck.
12           Okay.  And when I said Exhibit 1, I'm
13  referring to Exhibit 1 to our Deposition Exhibit No. 33
14  so Exhibit 1 to the subpoena.
15           Moving on to this last portion, so let me
16  direct you back to the right-hand side here, Press
17  Review Tool, the two paragraphs at the bottom.  I'm now
18  going to direct your attention to the last part of that
19  last sentence where it says:  "Allowing authorized users
20  to access nonsensitive filings that are in a 'submitted'
21  or 'under review' status."
22           What is your understanding of the phrase as
23  used here, "nonsensitive filings"?
24      A.   I'm not sure what that references to.  We'd
25  have to check with the author.

---

**Page 95**

1       Q.   Okay.  When configuring the Press Review Tool,
2   does Tyler rely on its court partners to identify the --
3   the nonsensitive filings that are -- that are displayed
4   in the Press Review Tool?
5       A.   The documents that are displayed are going to
6   be based upon two things:  One, the configuration of
7   those conditions that we've been speaking about, and,
8   two, the selections that the filer makes upon
9   submission.
10      Q.   Understood.
11           So let me just skip ahead now to the portions
12  of the Press Review Tool deck that I think unpack this
13  in a little more detail.
14           So I'm now looking at SO 9, Press Review Tool.
15      A.   Okay.
16      Q.   It says it is "a solution that allows clerks
17  to make e-filed materials immediately available to the
18  press and other authorized stakeholders."
19           My understanding is this is referring to the
20  registered user process that we've been discussing; is
21  that correct?
22      A.   Referring to the authorized users that we
23  discussed, yes.
24      Q.   Right.  So moving on, then, records can be
25  made available based on case type codes, number of days,

---

**Page 96**

1   filing states or statuses, security groups, and document
2   types.  Again, are these the conditions that we've been
3   discussing that would allow Tyler to configure the Press
4   Review Tool based on criteria selected by the court?
5       A.   Correct.  These are the conditions that govern
6   which filings are displayed in the Press Review Tool.
7       Q.   So case type codes, explain to me what a case
8   type code is.  Is that like a common feature of the
9   Odyssey File & Serve system?  What is a case type code?
10      A.   Sure.  Yeah, most states across the country
11  have case types that are leveraged for different types
12  of litigations.  A few examples would be small claims,
13  evictions, felony cases for criminal matters, et cetera.
14  We provide codes in their case management system and in
15  the e-filing system that help codify those fields so
16  they're not free text fields but referenced in the form
17  of codes, and this case type codes reference is
18  referring to those codes that are leveraged in the
19  configuration.
20      Q.   Gotcha.
21           So earlier when we were looking at the
22  screenshot that was a, you know, version of the
23  File & Serve system, we had the location.  And
24  underneath that, there was case type or case category
25  drop-down fields.  You know, so the case type could be

---

24 (Pages 93 to 96)

EXHIBIT 6, page 25 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 97

1   civil, for case category under AA, you know, those
2   fields, case type and case category, those would be
3   assigned codes so that the information is captured and
4   communicated through the Tyler system; is that a fair
5   statement?
6       A.   Yeah.  I believe those fields actually display
7   the description of those values, but they -- they refer
8   and are accompanied by a code that helps simplify it in
9   the database behind the scenes.
10      Q.   Understood.
11           So if a filer selects a pull-down menu that
12  the Tyler system isn't relying on, you know, the English
13  language so to speak, or somebody enters in some free
14  text, there's coding behind the description to ensure
15  that the information is kind of received and routed
16  correctly?
17      A.   Precisely.
18      Q.   Thank you.
19           Number of days, what -- what does that mean
20  here in relation to the Press Review Tool?
21      A.   So this is the number of days those filings
22  would be made available once they meet the criteria.
23  So, for example, if a filing were to meet the criteria
24  and be displayed or surfaced in the Press Review Tool
25  and that number of days was configured to five, it would

Page 98

1   stay there until the fifth day elapsed by which then it
2   would no longer be displayed or surfaced in the Press
3   Review Tool.
4       Q.   And is that true independent of whether the
5   filing was accepted by the court clerk in the separate
6   application that is the clerk review queue?
7       A.   The filing must meet all of the conditions
8   that are configured in order for it to display.  So if
9   the filing was accepted, and underneath filing states or
10  statuses here accepted was not a configured option, then
11  it would no longer meet that criteria and, therefore, it
12  would not be displayed or surfaced in the Press Review
13  Tool.
14      Q.   Understood.
15           So it's a matrix if you will.  Any number of
16  conditions would have to align in order for the document
17  to display within the Press Review Tool; correct?
18      A.   Yes, sir.  That's correct.
19      Q.   And the court could configure the Press Review
20  Tool to have any number of different configurations that
21  would potentially keep it in or exclude it depending on
22  their configuration; correct?
23      A.   Yes, sir.  That's correct.
24      Q.   So the courts ultimately have, well, control
25  here as to how they control what goes in and for how

Page 99

1   long it stays; correct?
2       A.   Yes, through the configuration.
3       Q.   Through the configurations, yes.
4           So that's helpful.  We just talked about
5   filing states and statuses, and I believe we went over
6   those filing states and statuses earlier when we were
7   looking at that -- that Exhibit No. 35 page that had
8   the, you know, submission -- you know, drafting,
9   submission, submitted, review, and so forth.  Those are
10  all the statuses; correct?
11      A.   That's correct.
12      Q.   So a court could configure their Press Review
13  Tool in a way so that a document that's in drafting mode
14  or submission mode would not be surfaced in the Press
15  Review Tool; correct?
16      A.   That's correct.
17      Q.   They could limit it to documents that have
18  actually been submitted to the court and are received
19  into the EFM; correct?
20      A.   Yes, they could.
21           MS. DUKE:  Object to the form.
22      Q.  (By Mr. Fetterly)  Okay.  Security groups.
23  What -- can you explain to me what "security groups"
24  means here in the context of the Press Review Tool?
25      A.   Yeah.  There are certain types of security

Page 100

1   groups that are configured to govern the types of
2   filings that come in, and certain types of those
3   security groups can be omitted from being displayed
4   here.
5           So I believe the last two are actually based
6   upon the omission status, which document security groups
7   to omit -- excuse me -- security groups to omit and
8   document types to omit.  And these two options would
9   permit the configurable -- configuration individual to
10  be able to configure which security groups and/or
11  document types they wish to omit from being displayed or
12  ever surfaced in the Press Review Tool.
13      Q.   Okay.  And so earlier we were talking about
14  the default status of what goes in.  To be a little more
15  precise, we were talking about the configuration that
16  would determine what case type or case type codes,
17  filing types would go into a Press Review Tool or be
18  displayed through the Press Review Tool.
19           And if I'm understanding you correctly, within
20  that universe of case types or filing codes, that
21  would -- that could be configured to display in a Press
22  Review Tool.  In addition to that, there would be
23  security groups or document types that would be omitted
24  from, once again, depending on the configuration;
25  correct?

25 (Pages 97 to 100)

EXHIBIT 6, page 26 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

Page 101

1    A.  That's correct.
2    Q.  So a document that is -- I'm sorry.  Give me a
3  second here.
4    A.  Yeah.  Sure.
5    Q.  If a document otherwise satisfies the
6  conditions of case type or filing code such that it
7  would be displayed, but that particular document is --
8  is assigned either by the filer or a court a particular
9  security group that would exclude it from the Press
10  Review Tool, then that document would be excluded even
11  though it otherwise meets the case type or filing type
12  condition; correct?
13    A.  Yeah.  The only thing I would edit you on your
14  statement there is you mentioned the filing codes, and I
15  don't believe filing code is one of the available
16  configurations that we have.  I think it's case type
17  codes, number of days, filing state, security groups,
18  and document types --
19    Q.  Okay.
20    A.  -- but your statement is generally accurate.
21    Q.  Is there a distinction between a document type
22  and a filing code?
23    A.  I think it's based upon the way it's
24  configured.  I'd have to check.  I don't know with
25  certainty.  I'd have to check on that one.

Page 102

1    Q.  Sure.  Let me -- let me just take a step back
2  then.  In any event, my understanding is that we're
3  talking about the conditions set by the court that
4  relate to, you know, the -- the filer's designation.
5    So when the filer is designating, you know,
6  location, case type, and really, I guess, you know, the
7  various prompts that are, you know, presented to them
8  during the you, you know, drafting stage, once they submit
9  it, the case type codes, security groups, and document
10  types are just -- they would be applying what the filer
11  has designated to determine whether that particular
12  filing is displayed in the Press Review Tool; is that
13  correct?
14    A.  Yes, that's correct.
15    Q.  And depending on what the filer designates,
16  that could result in either the document being displayed
17  or excluded or, I guess -- well, either being displayed
18  or excluded; correct?
19    A.  Yes, that's correct.
20    Q.  And the court would determine all of these
21  conditions based upon its system; correct?
22    A.  Yes, that's correct.
23    Q.  Okay.  I am very -- I think I'm about done.
24  Why don't you just give me a five-minute break here to
25  confirm and then I think we can pass the baton.  One

Page 103

1  moment, please.  Let's go off the record.
2    (A break was taken from
3    12:35 p.m. to 12:48 p.m.)
4    Q.  (By Mr. Fetterly) Okay.  We just took a break.
5  And while we were off the record, Mr. Derrick informed
6  me that he had answers to two questions that were posed
7  earlier in the deposition.
8    So, Mr. Derrick, I'll let you speak.
9    A.  Okay.  Great.  Thank you, Jon.
10    One of the questions was:  If the Press Review
11  Tool was -- it provided access to a user but without any
12  configuration, what would the default be?  And the
13  answer is nothing.  No filings would -- would enter into
14  the Press Review Tool.  So it requires both access and
15  configuration in order to have filings surface or
16  visible in the Press Review Tool.
17    Q.  Thank you.
18    A.  The second question was around whether Tyler's
19  new electronic filing service provider was available in
20  the State of Idaho.  And it is, but only in a kiosk
21  state at present, so it hasn't been introduced online
22  just yet.
23    Q.  And can you help me understand what that means
24  when you say in a "kiosk state"?
25    A.  Yeah.  Absolutely.  A state not meaning like a

Page 104

1  geographical location, but rather a status.  We do have
2  the option to install in what we could consider a kiosk
3  mode, which would be inside of the courthouse and only
4  accessible there as opposed to what you would be able to
5  typically access via the -- the internet or the World
6  Wide Web.
7    Q.  Understood.
8    So this would just be an additional
9  configuration option for the court; correct?
10    A.  That's right.  And we see this occasionally
11  where courts will enable things like that within the
12  court itself or in the clerk's office in a kiosk so that
13  they can provide extra in-person guidance or assistance
14  as necessary.
15    Q.  And this is a good segue to the ground I
16  wanted to cover to wrap-up.
17    In terms of the, you know, courts that use the
18  Press Review Tool, are there courts that are currently
19  using the Press Review Tool?
20    A.  Yes.
21    Q.  Can you give me the number of courts that are
22  currently using the Press Review Tool?
23    A.  About 25.
24    Q.  And in what states are those courts located?
25    A.  I know for sure Texas, California, Nevada, and

26  (Pages 101 to 104)

EXHIBIT 6, page 27 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

---

Page 105

1  Georgia.
2      Q.  Okay.  One -- when you said you know for
3  certain, is it possible that there might be others?
4      A.  Yes, I'm sorry.  I should've said that.  I
5  don't have an absolute list in front of me or a
6  comprehensive list, but those are the ones that I know
7  for sure.
8      Q.  Thank you.
9          And with all of those courts, with all of the
10 courts within -- strike that.
11         For all the courts that are using the Press
12 Review Tool, they would have configured it in a manner
13 that -- you know, consistent with what we've been
14 discussing today in terms of the configuration options
15 and understanding configurations may vary, but they
16 would've implemented it using the configurations options
17 we've discussed here today?
18     A.  Yes, that's correct.
19     Q.  On that note, for configuration, I just wanted
20 to circle back one more time with respect to the Press
21 Review Tool to make sure we're on the same page, and I'm
22 going to show you -- let me go back to Exhibit No. 37.
23         And do you see Exhibit No. 37 in front of you?
24     A.  Yes, I do.
25     Q.  And, in particular, I'm displaying the page

---

Page 106

1  Bates No. 13287, and we were talking about configuration
2  options or conditions for the Press Review Tool, and
3  specifically two of the configuration options were case
4  type and document type.  Do you recall that testimony?
5      A.  Yes, I do.
6      Q.  Okay.  So as we're looking at Exhibit No. 37,
7  does this -- does the drop-down menu here reflect the --
8  the case type or, you know, that would be configured as
9  a condition for the Press Review Tool?
10     A.  Yes.
11     Q.  And then scrolling down, there's a pull-down
12 menu here.  Does this reflect the document type that
13 would be configured as a condition for the Press Review
14 Tool?
15     A.  I'm not certain.  I -- I believe those are
16 filing codes.  I'd have to -- I'm not certain on whether
17 that's the referred document type.
18     Q.  I can represent to you that my understanding
19 from other courts that use the Press Review Tool is that
20 this would be the universe of the document type.
21         Is there a way to find out, based on this
22 graphic here and the Idaho Court, if this is the
23 document type?
24         MS. DUKE:  Form and foundation.
25 Speculation --

---

Page 107

1      Q.  (By Mr. Fetterly) -- that would be -- yeah,
2  that would be used as a configuration option for a Press
3  Review Tool?
4          MS. DUKE:  Form.  Foundation.
5  Speculation.
6          THE DEPONENT:  Yeah, we could find out.
7      Q.  (By Mr. Fetterly) Thank you.
8          And I'm scrolling down because if you go down
9  to the next page, 13289, it's the same drop-down menu
10 just scrolled down.  So I'll represent to you that if
11 you go onto the website, it's a much longer list of
12 document types or filing codes.  I just want to confirm
13 if this is the document type that'd be used as a
14 configuration option.
15         MS. DUKE:  Same objections.
16         THE DEPONENT:  Okay.
17         MR. FETTERLY:  So subject to
18 Mr. Derrick's ability to get the answer to that
19 question, I have no further questions at this time.
20         MS. DUKE:  Perfect.  So it is, what,
21 about 2:54 your time there?  Is that correct?
22         THE DEPONENT:  It is, yes.
23         MS. DUKE:  Okay.  And you have a hard
24 stop at 6:00, I understand?
25         THE DEPONENT:  Yes.

---

Page 108

1          MS. DUKE:  I'm sorry.  I couldn't hear.
2          THE DEPONENT:  Yes, that's correct.
3          MS. DUKE:  Okay.  Why don't we go ahead
4  and take about a 20-minute break and then I'll start in.
5          THE DEPONENT:  Okay.
6          MS. DUKE:  Thank you.
7          Is that enough time for you, by the way,
8  Mr. Derrick?  If you haven't eaten and you want
9  30 minutes, I'm going to be fine on time.  So...
10         THE DEPONENT:  That should be fine.  20
11 minutes is sufficient.
12         MS. DUKE:  All right.
13         MR. FETTERLY:  And, on that note, I
14 apologize for not paying better attention to eating
15 schedules based on time zones because I'm on a
16 completely different cycle than you over here so
17 apologies for running through your lunch.
18         MS. DUKE:  No worries.
19         THE DEPONENT:  Thank you.
20         MS. DUKE:  All right.  I will see you all
21 back in 20 minutes.
22         THE DEPONENT:  All right.  Thank you.
23         (Deposition concluded at 12:55 p.m.)
24         (Signature reserved.)
25              --o0o--

27  (Pages 105 to 108)

EXHIBIT 6, page 28 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. I

```
                                               Page 109

 1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2
 3          The undersigned Certified Shorthand
    Reporter and Deposition Notary Public of the State of
 4  California does hereby certify:
 5          That the foregoing 30(b)(6) deposition of
    Tyler Technologies designee Terry Derrick was taken before
 6  me remotely at the time, at which time the witness was
    duly sworn by me;
 7
 8          That the testimony of the witness and all
    objections made at the time of the deposition were
 9  recorded stenographically by me and were thereafter
    transcribed, said transcript being a true and correct copy
    of the proceedings thereof.
10
11          I further certify that I am neither counsel
    for nor related to any party to said action, nor in any
    way interested in the outcome thereof.
12
13          Further, that if the foregoing pertains to
    the original transcript of a deposition in a federal case,
    before completion of the proceedings, review of the
14  transcript was requested/offered on the
    record.
15
16
17          In witness whereof, I have subscribed my
    name on this 15th day of November 2022
18
19
20
21          Nicole A. Bulldis, RPR
            CA CSR No. 14441
22
23
24
25
```

                                                    28  (Page 109)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

EXHIBIT 6, page 29 of 61
Decl. of Fetterly

# Deposition of 30(b)(6) Terry Derrick - Vol. II

# Courthouse News Service v. Omundson

# November 10, 2022



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
**www.buellrealtime.com**
email: info@buellrealtime.com



EXHIBIT 6, page 30 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

**Page 110**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____
                                )
COURTHOUSE NEWS SERVICE,     )
                                )
                                )
        Plaintiff,  )
                                )
v.              ) No. 1:21-CV-00305-REP
                                )
SARA OMUNDSON, in her official  )
capacity as Administrative      )
Director of Idaho Courts,    )
                                )
        Defendant.  )
_____

30(b)(6) DEPOSITION UPON ORAL EXAMINATION

OF TYLER TECHNOLOGIES

REPRESENTED BY TERRY DERRICK - VOLUME II

_____

Taken at Plano, Texas
(Conducted via Videoconference.)


DATE TAKEN:  November 10, 2022
REPORTED BY:  Nicole A. Buildis, RPR
       AZ No. 50955 | CA No. 14441 | WA No. 3384

---

**Page 111**

```
 1        A P P E A R A N C E S
 2
 3   FOR PLAINTIFF:
 4     (via Zoom)    Jonathan G. Fetterly
                     Katherine A. Keating
 5              BRYAN CAVE LEIGHTON PAISNER LLP
                3 Embarcadero Center, 7th Floor
 6              San Francisco, CA 94111
                (415) 675-3400
 7              jon.fetterly@bclplaw.com
                katherine.keating@bclplaw.com
 8
 9   FOR DEFENDANT:
10     (via Zoom)    Keely E. Duke
                     Molly E. Mitchell
11              DUKE EVETT, PLLC
                1087 W. River Street, Suite 300
12              PO Box 7387
                Boise, ID 83707
13              (208) 342-3310
                ked@dukeevett.com
14              mem@dukeevett.com
15
16   FOR TYLER TECHNOLOGIES
     AND WITNESS:
17
18     (via Zoom)    Beth W. Petronio
                K&L GATES LLP
19              1717 Main Street, Suite 2800
                Dallas, TX 75201
20              (214) 939-5815
                beth.petronio@klgates.com
21
22   ALSO PRESENT:
23     (via Zoom)    SARA OMUNDSON, Idaho Courts
24              --o0o--
25
```

---

**Page 112**

```
 1        30(b)(6) DEPOSITION OF TERRY DERRICK
 2
 3              EXAMINATION INDEX
 4   EXAMINATION BY                          PAGE
 5   Ms. Duke.............................. 113
 6   Mr. Fetterly.......................... 209
 7   Ms. Duke.............................. 216
 8
 9
10              EXHIBIT INDEX
11   EXHIBITS FOR IDENTIFICATION          PAGE
12   38 Defendant's 30(b)(6) Notice of Deposition to
13      Tyler Technologies................. 117
14
15              --o0o--
16
17
18
19
20
21
22
23
24
25
```

---

**Page 113**

```
 1   REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
 2        Thursday, November 10, 2022; 1:24 p.m.
 3              --o0o--
 4
 5   TERRY DERRICK,         witness herein, having been
 6              first duly sworn on oath,
 7              was examined and testified
 8              as follows:
 9
10        E X A M I N A T I O N
11   BY MS. DUKE:
12     Q.  Mr. Derrick, it's always hard to go second in
13   these because I might bounce around a bit, but I'll do
14   my best to try to keep it in a logical fashion selfishly
15   for me and then also to hopefully help you.
16        So same -- same general rules that
17   Mr. Fetterly just provided to you.  If I ask you a
18   question that you don't understand, would you please let
19   me know?
20     A.  Of course.
21     Q.  If you're going on to answer my questions,
22   we'll assume then that you understood them; is that
23   fair?
24     A.  Yeah.  Sure.
25     Q.  Excellent.
```

---

1 (Pages 110 to 113)

EXHIBIT 6, page 31 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 114

1    All right.  So let me talk about the State of
2  Idaho real quick.  Do you have any particular, I guess,
3  responsibility or involvement with the State of Idaho
4  from a Tyler perspective, currently?
5    A.  Yes, to an extent.  You know, the new role
6  that I am currently in, my responsibility is to oversee
7  the direction for some of our products by which the
8  State of Idaho is using.  So in that regards, yes.
9    Q.  Which products would those be?
10    A.  Our Enterprise Justice platform, the new case
11  management system.  Odyssey, if you will, the new name
12  for that, I should say.  Same product, new name.  The
13  jury product for Tyler, the -- and I think those are the
14  two primary ones.
15    Q.  Prior to that, so let's just say from 2017
16  forward, what involvement or role did you have with
17  respect to the State of Idaho through Tyler?
18    A.  Sure.  As the general manager of the
19  eSolutions business line, it was oversight into the
20  product and solution and business direction for our
21  eFile & Serve platform, the Guide & File platform, and
22  I believe those would be the two that would be relevant
23  here.
24    Q.  All right.  In your work, let's say, with
25  File & Serve, have you ever talked with any of the Idaho

---

Page 115

1  clerks as far as you know?
2    A.  Yes, a long time ago.
3    Q.  And do you recall what the general nature of
4  those conversations was?
5    A.  Yeah.  During the initial implementation of
6  Idaho for the e-filing project, several years ago, I
7  helped do project kick-off meetings and participate as
8  kind of the program director during that time.
9    Q.  All right.  And in your current role, have you
10  been having any conversations with the clerks of the
11  court?
12    A.  I have not, no.
13    Q.  At any point in time, have you sat down and
14  talked with any of the judges in the state of Idaho with
15  respect to any of Tyler's products?
16    A.  No.
17    Q.  Sorry, I didn't hear you if you answered.
18    A.  I'm sorry.  No, I -- no, I have not.
19    Q.  Okay.
20    A.  Keely, is there a way that you could maybe
21  shut the blinds behind you?
22    Q.  Oh, yeah.  I sure can.
23       Is that better?
24    A.  It isn't.  I'm sorry.
25    Q.  Oh, it must be going right through the -- that

---

Page 116

1  one part, so let me see if I can shift how I'm sitting.
2  How's that sound?
3    A.  That'd be great.
4    Q.  What is really great is we have sun in Boise
5  today.
6       All right.  How's that?  Better?
7    A.  Perfect.  Yes, thank you very much.
8    Q.  Oh, my gosh.  Of course.
9       All right.  So you were asked a number of
10  questions by Mr. Fetterly with respect to that
11  PowerPoint, if you would, of the -- that was attached to
12  your deposition notice.
13    A.  Yes.
14    Q.  Do you recall that?
15    A.  Yes, I do.
16    Q.  Let me -- let me pull that up here.  We had it
17  at 38, I think.  It's our -- our numbering was all off
18  here.  Just bear with me for a second.
19    A.  Sure.
20       (Pause in the proceedings.)
21    MR. FETTERLY:  Keely, I think we also
22  have it marked as our Exhibit 8, if you'd rather not use
23  the subpoena attachment.
24    MS. DUKE:  Yeah.  I appreciate that.
25  Thank you.

---

Page 117

1       What I'll do is I'll just mark our notice
2  as Exhibit 38.
3       (Exhibit No. 38 marked.)
4    Q.  (By Ms. Duke) So I'm going to show you here, in
5  just one moment, Exhibit 38.
6       And Sara will be joining by phone, so if you
7  see another name pop up, that's why.  She's got to run
8  and get her kiddo.
9       All right.  Can you see Exhibit 38?
10    A.  Nothing is showing on the screen.
11    Q.  Oh, it's telling me it wants to quit Zoom.
12       Okay.  I'll be back.
13    A.  Oh, wait.  It's showing now.
14    Q.  Is it?  Okay.
15    A.  Yeah, the notice of -- yeah -- deposition
16  amended, Tyler 30(b)(6); is that right?
17    MR. FETTERLY:  Yeah.  I'm not seeing it
18  on my end.
19    MS. DUKE:  Well, I -- it literally just
20  locked me out.  Now it won't even show me.  I'm not sure
21  why.  Good old Zoom.
22    THE STENOGRAPHER:  Do you want to try
23  logging out and logging back in?
24    MS. DUKE:  Yeah.  That's what I'm going
25  to try.  Sorry.  I'll be back.

---

2  (Pages 114 to 117)

EXHIBIT 6, page 32 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson      30(b)(6) Terry Derrick - Vol. II

---

Page 118

1      MR. FETTERLY: I'll be on standby.
2      (Off the record due to technical
3    difficulties.)
4      Q. (By Ms. Duke) Let me go ahead now and try to
5 show you what I was trying to show you when it all
6 decided to go haywire.
7      MS. DUKE: Do you want to pull that up,
8 the notice of depo and the PowerPoint?
9      Q. (By Ms. Duke) All right. Molly is going to
10 start sharing the screen here and we'll go to the
11 PowerPoint first. Perfect.
12      All right. First, I understand this
13 PowerPoint was not put together by you; correct?
14      A. Yes, that's correct.
15      Q. A Mr. Acosta prepared it?
16      A. Yes, that's correct.
17      Q. This is not a PowerPoint that is based on any
18 Idaho data; is that correct?
19      A. That's right.
20      Q. And this is a PowerPoint that was prepared by
21 Tyler?
22      A. It is, yes.
23      Q. And it's not a PowerPoint that the Idaho
24 Courts or Ms. Omundson at any point in time provided any
25 input as to any of the language contained within it; is

---

Page 119

1 that fair?
2      A. Yeah, that's fair.
3      Q. What's your understanding of why this
4 PowerPoint was provided to Ms. Omundson or the court
5 system in Idaho?
6      A. I'm not sure why it was provided to anyone in
7 Idaho.
8      Q. If you look to the -- and it looks like it was
9 prepared on July 1 of 2022?
10      A. Yes, that's correct.
11      Q. Do you know if this -- if this PowerPoint is
12 being used anywhere else in the country?
13      A. It was created for the State of Texas by
14 request by the Office of Court Administration and the
15 Judicial Council for Information Technology. I'm not
16 sure who else would -- would use this document.
17      Q. And do you know why the State of Texas
18 requested this PowerPoint?
19      A. I don't.
20      Q. Let's go ahead and move to the second page of
21 it, and we'll talk about Auto-Accept first. You were
22 asked a number of questions related to the Auto-Accept
23 column. And that first sentence there, it says:
24 "Auto-Accept Review is a free out-of-the-box e-filing
25 function."

---

Page 120

1      Did I read that correctly?
2      A. You did.
3      Q. When -- when Tyler is representing "free,"
4 what is Tyler meaning there?
5      A. It means it's included as part of the e-filing
6 solution. So our customers who pay for the e-filing
7 solution get that Auto-Accept function as part of that
8 solution without additional expense beyond the -- the
9 e-filing solution in itself.
10      Q. And that is not representative of the cost
11 that will be incurred by courts if they were to use the
12 Auto-Accept function; correct?
13      MR. FETTERLY: Objection. Vague and
14 ambiguous. Lacks foundation.
15      THE DEPONENT: I guess I don't understand
16 the question. Can you maybe say it again?
17      Q. (By Ms. Duke) Sure. Happy to.
18      So, obviously, that's from Tyler's side. It's
19 a free part of their program. What I'm asking is if it
20 were something that was utilized in the state of Idaho,
21 Tyler has not done any type of evaluation as to the cost
22 to the State of Idaho to use Auto-Accept in the event
23 there are issues with it?
24      A. Yeah, that's correct. We haven't -- we have
25 no visibility into any expense that could be endured by

---

Page 121

1 the State or by the Courts. This is just speaking to
2 the availability of that function.
3      Q. And in order to understand what the costs of
4 an Auto-Accept would be, Tyler -- to a court system,
5 aside from Tyler providing it free, Tyler would defer to
6 the various courts, including the Idaho State Court, as
7 to what they anticipate their internal costs would be as
8 a result of using something like Auto-Accept; is that
9 fair?
10      A. Yes, it is.
11      Q. In addition, there's words used in this --
12 this first page. Given this was prepared for the State
13 of Texas, I'll assume that the Idaho rules of e-filing
14 were in no way considered in creating or providing the
15 language that's included in this PowerPoint; is that
16 correct?
17      A. I'm not sure. We would have to ask the
18 author, but, yeah, I am -- I'm not sure.
19      Q. Okay. Any reason to believe that this --
20 given that this was prepared for the State of Texas,
21 that the Idaho rules of electronic filing would have
22 been considered in its preparation?
23      A. No reason to believe that at all.
24      Q. Are you in any way familiar with the Idaho
25 rules of electronic filing?

---

3 (Pages 118 to 121)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 122

1    A.  Not -- not very familiar at all.
2        Q.  Are you aware of how they define court
3    documents?
4    A.  No, I am not.
5        Q.  Are you aware of how the Idaho rules of
6    electronic filing define judicial documents?
7    A.  No, I am not.
8        Q.  With respect to this Auto-Accept portion, have
9    you talked -- or has anyone at Tyler talked with anyone
10   in the state of Idaho as to the resources it would take
11   Idaho's judicial clerks, judges, and court staff to
12   address any errors on the back end if something was
13   auto-accepted that should not have been?
14   A.  Not -- not to my knowledge.
15       Q.  Is Tyler aware of what judges -- well, strike
16   that.
17           Under the Auto-Accept, it's my understanding
18   that Auto-Accept means it would go from -- once it's
19   submitted to File & Serve by a user, it would
20   immediately transfer to the court's case management
21   system; is that correct?
22   A.  Well, immediately is a -- is a relative term.
23   The -- the process would be once the filer submits that
24   filing through the electronic filing service provider
25   portal, it would go to the EFM, the eFiling Manager.

---

Page 123

1    Once inside the eFiling Manager, it would be assessed
2    and evaluated against those Auto-Accept rules.  And if
3    it met that criteria which was pre-configured by the
4    court or the clerk, then it would be accepted and then
5    transmitted in two directions, one to the case
6    management system and then back -- one file-stamped copy
7    back to the original filer who submitted it.  I'm not
8    sure if that answers your question, but...
9        Q.  It does.  I mean, when I say "immediately,"
10   I'm assuming that we're talking that's a matter of
11   seconds for it to go into the EFM and have whatever
12   program is -- has been put together to get it into the
13   case management system?
14   A.  That's correct.  Yeah, a short duration.
15       Q.  Okay.  And with respect to Tyler's
16   eFile & Serve, Tyler is -- is the one that -- that has
17   possession of those documents, meaning they're --
18   they're hosted by Tyler?
19           MR. FETTERLY:  Objection.  Vague and
20   ambiguous as to "possession."
21           THE DEPONENT:  The documents themselves
22   are contained within the eFiling Manager, which exists
23   inside of the AWS GovCloud.  And they can be retrieved
24   and displayed from the review queue or the review tool
25   and the review tool that the clerks use to review them.

---

Page 124

1    Q.  (By Ms. Duke) Sure.  Let me -- let me try to
2    phrase it a different way.
3        So when a document is submitted to
4    eFile & Serve by a submitter, Tyler is the one that is
5    responsible for the contractual arrangements with AWS as
6    to the hosting of those documents?
7    A.  Correct.
8        Q.  Then, once those documents -- let's say, it's
9    a complaint -- has been accepted by the court clerk and
10   it transfers to the case management system, when it
11   transfers to the case management system, that is then in
12   the state of Idaho actually hosted internally by the
13   court, the Idaho Supreme Court; correct?
14   A.  That is my understanding, yes.
15       Q.  And, therefore, the State of Idaho's court
16   system with respect to its case management system, that
17   system then is all the security protocols,
18   authentication items, those type -- backups, those types
19   of things are handled by the court staff, not by Tyler;
20   correct?
21   A.  For the case management system, yes, that's
22   correct.
23       Q.  When we go over to the File & Serve system, so
24   back to -- to Tyler's File & Serve system, it's Tyler
25   that is responsible for security, backups,

---

Page 125

1    authentication, those types of things; correct?
2    A.  Yes, that is correct.
3        Q.  Is Tyler -- or, are you aware, through Tyler,
4    of any of the security protocols that the Idaho Courts
5    have placed on the case management system that they are
6    hosting?
7    A.  I'm not familiar with the security that Idaho
8    uses on their on-premise case management solution, no.
9        Q.  And that's because that's up to the --
10   court as the hoster of that data?
11   A.  That's correct.
12       Q.  And how about backups?  Is Tyler or are you
13   familiar with the backups that are generated, how
14   quickly, how many, what is backed up, anything like that
15   with respect to case management system?
16   A.  I'm not familiar with that, no.
17       Q.  From a file integrity monitoring standpoint
18   and ransomware protection, would Tyler be aware of what
19   Idaho's Courts have put into place to protect the case
20   management documents that they host?
21   A.  No.
22       Q.  Is Tyler aware of the advanced endpoint
23   protection that's in place with respect to the case
24   management documents that are hosted by the Idaho Court?
25   A.  No, I'm not aware of that.

---

4 (Pages 122 to 125)

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

EXHIBIT 6, page 34 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 126

1    Q.  Would Tyler be involved or know about the 24/7
2  monitoring service of system logs, network traffic, or
3  any type of other anomalous or malicious behavior on the
4  servers for the case management system that's hosted by
5  the Idaho Supreme Court?
6    A.  No, I don't have visibility into those
7  practices.
8    Q.  Would Tyler have any information or knowledge
9  as to who the secured -- or the -- who the limited pool
10 of Idaho Supreme Court employees are that have access to
11 handling, addressing, or protecting the documents that
12 are housed within the case management system hosted by
13 the Idaho Supreme Court?
14   A.  No, we would not have visibility into that.
15   Q.  And would Tyler have any visibility or control
16 over the administrative access to devices and servers
17 and whether they required multifactor authentication
18 with respect to the case management documents that are
19 housed by the Idaho Supreme Court?
20   A.  No, we would not have that.
21   Q.  And to all of these questions that I just
22 asked, I'm assuming the reason Tyler would not have that
23 information, knowledge, or control, is because that is
24 all within the control and purview of the Idaho Supreme
25 Court as the hoster of the case management system?

Page 127

1    A.  That is correct.
2    Q.  So let's turn then to File & Serve.  Given
3  that Tyler is the, you know, hoster and in control of
4  the documents related to -- or that have been submitted
5  to eFile & Serve, would Tyler be aware of the security
6  that's in place to protect those documents?
7    A.  Yes, we would.
8    Q.  And just describe generally what that security
9  is for File & Serve.
10   A.  I'll keep it very topical because describing
11 in detail is a security vulnerability in itself, but
12 just general security provisions that we have for the
13 e-filing platform are in our contractual agreement and
14 that would cover anything regarding the Press Review
15 Tool as well.  Some of those are just general best
16 practices like vulnerability scans, virus scans,
17 firewall protection on -- on various tiers, things like
18 denial-of-service-attack protection, and -- and things
19 like that.
20   Q.  And what about backups to the EFS?  And we can
21 limit it to Idaho.  When I ask these questions about globally
22 versus Idaho.
23      So with respect to a backup of the EFS system
24 for the State of Idaho, what type of backups occur at

Page 128

1  Tyler's direction?
2    A.  Sure.  For Idaho specific, we do 15-minute
3  interval backups as well as daily and weekly backups.
4    Q.  So let me give an example.  If -- let's --
5  let's say one of the dreaded things happens that we've
6  all now gotten cybersecurity insurance for -- knock on
7  wood -- and that is, let's say, that Tyler's security is
8  breached and there's a ransomware attack that occurs on
9  Idaho's File & Serve.  Is it Tyler that is the one that
10 would have the -- the documents through backups that it
11 would then be able to -- to use those backups and get
12 Idaho back up and running?
13   A.  If the ransomware attack took place on
14 File & Serve?
15   Q.  Yes?
16   A.  Is that what you're saying?
17   Q.  Correct.
18   A.  Yes, then the backups within File & Serve
19 would be at Tyler's discretion.
20   Q.  And within Tyler's control?
21   A.  Correct.
22   Q.  Okay.  So going back to -- to this
23 PowerPoint -- give me one second.  Actually, a lot of
24 these were answered earlier, so let me just check those
25 off as I go.

Page 129

1      Oh, there was a question asked of you that in
2  Auto-Accept, one of the configurations that could be
3  used is to mark -- have a configuration that allows
4  the -- the person who is submitting the document to be
5  filed to click a box to say confidential or public that
6  way Auto-Accept would know whether it can be
7  automatically transferred to the case management system
8  and filed within that case management system, or whether
9  it was confidential it would go into a different queue;
10 correct?
11   A.  I don't recall that question, but -- but sure.
12   Q.  Well, is that one of the configurations, is
13 you could use a confidential or public setting that the
14 users who are submitting documents to Tyler File & Serve
15 where they could either check it confidential or public?
16   A.  Yes, that is an option for a filer to make
17 that determination.
18   Q.  Okay.  And is Tyler aware of any of the issues
19 when the State of Idaho was using an option to check
20 documents as confidential as to the issues and costs
21 that were created by allowing users to determine whether
22 something was or was not confidential?
23   A.  No, I'm not aware of those costs.
24   Q.  Are you aware of any of the issues that Idaho
25 faced when it had a time period where it permitted uses

5  (Pages 126 to 129)

EXHIBIT 6, page 35 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 130

1    to decide whether something would be confidential or
2    public?
3        A.   No, I'm not.  I don't have visibility into
4    that.
5        Q.   So just because it's a configuration that can
6    be used doesn't mean that it necessarily is something
7    that should be done; correct?
8            MR. FETTERLY:  Objection.  Vague and
9    ambiguous.  Overbroad.  Lacks foundation.
10           THE DEPONENT:  All of our configurations
11   are based upon the determination and the -- and the
12   perspective of our partners -- our contract holders to
13   courts, so it's up to them as to what gets configured
14   and is deemed valuable or not.
15       Q.  (By Ms. Duke) Okay.  And so by Tyler testifying
16   and by you testifying earlier today to those numerous
17   configurations that Mr. Fetterly went through with you,
18   those are not configurations that you are specifically
19   stating would work for the State of Idaho; correct?
20       A.   When you say would -- "would work," what do
21   you mean?
22       Q.   Good point.  Let me -- let me rephrase that.
23           So when you were asked a number of questions
24   by Mr. Fetterly regarding the number of configurations
25   that are available to courts to use, you are not stating

Page 131

1    that -- that Idaho -- you're not providing an opinion as
2    to whether those would be practical approaches for the
3    State of Idaho to use; is that correct?
4        A.   That's right.  I don't have intimate knowledge
5    to suggest that that would be a definitive positive
6    change.  My statements were really around the
7    availability of those options.
8        Q.   And that's -- that's said far better than the
9    question I asked.
10           So when you were talking about all the
11   configuration options, you were merely talking about
12   configurations that were available; correct?
13       A.   Yes, that's correct.
14       Q.   You were not making a recommendation of what
15   would or would not be useful or practical in Idaho's
16   courts; correct?
17       A.   That's correct.  I was not.
18       Q.   Now, under the -- you were asked some
19   questions about the filing fee that -- that is used.
20   Under Auto-Accept, do you know if a user were to pay
21   what they thought was the filing fee, which was, you
22   know, run through your credit card processing company
23   and sufficient funds were in the account and they were
24   wrong about what the filing fee was, is there anything
25   in Auto-Accept to be configured that would stop that

Page 132

1    auto-transfer to the case management system if an
2    improper filing fee was made?
3        A.   No, there wouldn't be.
4        Q.   Okay.  What if a filer was supposed to have a
5    filing fee and didn't have a filing fee included with a
6    complaint, would Tyler's Auto-Accept stop that filing
7    from being immediately transferred into the case
8    management system for the court?
9        A.   It -- it would be based upon the
10   configuration, but it does not use logic to determine
11   whether something should or should not have it.  It's
12   just based upon the configuration of the court.
13       Q.   And by that, I think you mean if they say,
14   "I'm filing a personal injury complaint," and let's say
15   they don't submit their -- their filing fee with it, are
16   you saying that it would then get auto-accepted and into
17   case manager and then the court would need to deal with
18   the filing fee issue on the back end?
19       A.   I'm saying it depends upon the configuration.
20   I can't tell whether or not it would be auto-accepted
21   unless we understood what the configuration was to -- to
22   evaluate that submission.
23       Q.   And do you know what costs the State of Idaho
24   would incur to come up with the configurations to allow
25   Auto-Accept for any type of complaint?

Page 133

1        A.   No, I do not.
2        Q.   Do you know whether any state using
3    Auto-Accept has been able to configure Auto-Accept so
4    that if someone doesn't file -- or doesn't pay their
5    filing fee, that that is somehow blocked from being
6    auto-accepted and transferred into the court's case
7    management system?
8        A.   I'm not familiar with the -- the intimate
9    configurations of other states and how they've
10   configured specific conditions as they pertain to
11   Auto-Accept rules.
12       Q.   So fair to say, as you sit here today, that
13   you do not know whether any state -- well, strike that.
14           Fair to say, as you sit here today, that you
15   don't know whether there is even a configuration
16   possibility of ensuring that a filing fee in fact
17   accompanies, let's say, a complaint filing; is that
18   correct?
19       A.   Say that one more time?
20       Q.   What I'm trying to get to is, as you sit here
21   today, you can't testify that you know that in fact if a
22   configuration is put in place that there is a
23   configuration that would actually say, "Oh, if you don't
24   provide your filing fee with this filing, it's not going
25   to go into Auto-Accept."

6  (Pages 130 to 133)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 134

1    A.  There is a condition by which can be
2  configured that -- that -- that would say that filings
3  with or without financials would be assessed, and so we
4  can compare the filing against that.
5        What we would not be able to do is determine
6  whether or not that was accurate, meaning filing fees
7  should have been assessed and they weren't, and then
8  it's smart enough to know that the filer made a mistake.
9  It doesn't have that logic built in.
10    Q.  All right.  So -- I understand what you're
11  saying.
12        So what it does have the logic to do, is you
13  can say, yes, there should be a filing fee with this;
14  right?
15    A.  Correct.  Yes.
16    Q.  But if it's, let's say, a $243 filing fee and
17  the submitter of the document puts one penny down, it
18  wouldn't have the ability to say, "Oh, reject that,
19  that's not correct"?
20    A.  That's correct.  It does not have that
21  capability.
22    Q.  And in those circumstances, if -- if that
23  occurred, the -- the filing is then in the case
24  management system, and it's then up to the clerks to
25  address that payment issue; is that correct?

Page 135

1    A.  There may be some configuration mechanisms
2  that would prevent that scenario.  We would have to
3  understand more about that scenario to know whether or
4  not that could occur.  But if it did occur, then, yes,
5  it would be in the case management system and there
6  would be some sort of reaction to -- to address that
7  problem, and I -- I don't know what that is.
8    Q.  All right.  With respect to Tyler's
9  File & Serve, it is my understanding from talking to my
10  clients that the service address in eFile & Serve is
11  not integrated with the case management system; is that
12  your understanding as well?
13    A.  The service address?  I don't understand --
14    Q.  Correct.
15    A.  -- the question.
16    Q.  The service address meaning the submitter's
17  address for service or for --
18    A.  Oh, the --
19    Q.  -- who the document is being served on.
20    A.  Correct.  The service email address is what
21  you're referring to?
22    Q.  Correct.
23    A.  Correct.  That doesn't get transmitted into
24  Odyssey.
25    Q.  And when you say it does not get transmitted

Page 136

1  into Odyssey, you mean Odyssey case management; correct?
2    A.  Yes, I apologize.  The case management system.
3    Q.  Okay.
4        (Pause in the proceedings.)
5    Q.  (By Ms. Duke)  And on Auto-Accept, if
6  Auto-Accept is used, if a document meets the
7  configurations and is transferred into the case
8  management under Auto-Accept, does that mean it no
9  longer is within eFile & Serve?
10    A.  No, it'll stay within the eFiling Manager.
11  It would just be in an accepted state.
12    Q.  And how long does it stay in that eFiling
13  Manager?
14    A.  Sure.  The data itself, the metadata, that
15  stays in the eFiling Manager into perpetuity, and the
16  documents would stay as long as the configuration states
17  it.  So there's a configuration setting that would purge
18  the documents after a set duration and then it would be
19  whatever that configuration is set to.
20    Q.  All right.  So there would be one version of
21  the file document in the e-file management system and a
22  second version of the documents in the court's case
23  management system; correct?
24    A.  Yes, that is correct.
25    Q.  Now, I think you cleared this up earlier, but

Page 137

1  just to be clear, when a document is submitted to
2  File & Serve, Tyler handles the payment part of
3  processing, confirming that there are sufficient funds,
4  and noting that payment will be able to be made with
5  respect to the filing.
6    A.  That's correct.
7    Q.  And then the actual payment funds are not
8  transferred from Tyler to the court until the filing is
9  accepted by the court clerk and transferred into the
10  case management system; correct?
11    A.  That's correct.  We don't capture the payment
12  until the clerk makes that acceptance determination on
13  the submission.
14    Q.  So, to be clear, the payment is not made with
15  respect to a filing until the clerk has accepted the
16  filing and it's being transferred into the case
17  management system?
18    A.  Yeah.  The only edit I would say to that is
19  the payment isn't captured until the submission is
20  accepted, whether that be done by a clerk or through the
21  auto-acceptance process, but, yes.
22    Q.  Right.  And so regardless whether that process
23  or a clerk reviewing it and accepting it is done,
24  payment does not occur until that document is being
25  transferred into the court's case management system.

7 (Pages 134 to 137)

EXHIBIT 6, page 37 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 138

1    A.  Yeah.  I think it's actually done right before
2  that document is transmitted.  I -- I'd have to go back
3  to look at the order of operations after the acceptance
4  as to which of those takes place first, but it's within
5  that same workflow within that same duration, so we're
6  talking a matter of a few seconds.
7    Q.  Okay.  And within those seconds, after either
8  Auto-Accept or a clerk accepts, that's when the -- the
9  payment is actually being taken from the submitter and
10  then provided to the court?
11    A.  That's correct.
12    Q.  Are you aware -- you mentioned there were 25
13  courts that use Auto-Accept.  Do you recall that
14  testimony?
15    A.  I do.
16    Q.  How many courts, total, use just Tyler
17  File & Serve, not -- not limiting it to Auto-Accept or
18  press review queue?
19    A.  We have 27 states under contract, so roughly
20  1,500.
21    Q.  Okay.  So out of the 1,500 courts that Tyler
22  works with, it sounds like 25 use Auto-Accept?
23    A.  Some of those are actual statewide
24  arrangements, so like the state of Maine, the state of
25  Maryland, the state of Vermont, and those would have

---

Page 139

1  multiple jurisdictions within.  So the 25 is customers,
2  but each of those customers would have multiple courts,
3  so it would be a higher number than 25.
4    Q.  How many customers does Tyler have that use
5  eFile & Serve?
6    A.  I don't know that -- that number off the top
7  of my head.
8    Q.  Okay.  Is it Tyler's position or does Tyler
9  encourage courts to have Auto-Accept used for all
10  filings?
11    A.  No.  Those encouragements or recommendations
12  are not -- are not there.  We -- we provide the
13  information to the courts and then we help them
14  configure it based upon their needs.
15    Q.  And you also rely on -- on, I'm assuming, the
16  courts to determine whether the courts believe
17  Auto-Accept would be appropriate and practical in their
18  various jurisdictions?
19    A.  Absolutely, yes.
20    MS. DUKE:  Molly, do you mind going to
21  Page 5 of the PowerPoint?
22    Q.  (By Ms. Duke) All right.  We're on Page 5 there
23  of the PowerPoint that you've gone through.
24    Auto-Accept means there's no clerk performing
25  a function to have the document transferred from

---

Page 140

1  File & Serve to the court's case management system;
2  correct?
3    A.  Yes, that's correct.
4    Q.  When I look at this little box or this little
5  diagram, I think it helps me.  You can see that there's
6  a little round thing right on EFM.  I'm assuming that's
7  kind of the World Wide Web?
8    A.  It is.
9    Q.  So -- and when you look at the World Wide Web
10  there in EFM, and then you look to the left of it on
11  your screen, or the right of it on the document, so all
12  the little -- it says filer, EFSP, filer, EFSP, and then
13  it's got conditional criteria, it's got a little person
14  above, that's all on the Tyler side of File & Serve;
15  correct?
16    A.  Yeah.  So everything that you see from the EFM
17  to the left --
18    Q.  Mm-hmm.
19    A.  -- would all be activities that would be
20  performed within Tyler-maintained infrastructure and
21  solutions.  The -- the -- in Idaho's example here, the
22  CMS on the right would be managed and owned by Idaho.
23    Q.  Right.  And so if I were to use this for Idaho
24  even though it was developed for Texas, I'd be able to
25  explain to our federal judge that that little arrow

---

Page 141

1  taking it from the World Wide Web to CMS, that is the
2  transfer from Tyler File & Serve to the court's hosted
3  case management system?
4    A.  Yes, that's correct.
5    Q.  Now, a little confusing and -- and maybe
6  confusing to some that haven't been obsessed with this
7  case as Mr. Fetterly, Ms. Keating, myself, and
8  Ms. Mitchell have been, they both are called Odyssey in
9  a way, but that feels like a bit of a confusing factor.
10    So I understand that there's Odyssey
11  File & Serve; right?
12    A.  Yeah.  We -- we've changed the name to
13  eFile & Serve, but -- but, yes, it's formerly known as
14  Odyssey File & Serve, correct.
15    Q.  Right.  It used to be known as Odyssey
16  File & Serve, but it's now known as eFile & Serve, so
17  that would be the right way to refer to it; correct?
18    A.  Yes, it would.
19    Q.  All right.  And then going over to the case
20  management side, that's known as Odyssey case management
21  services?
22    A.  It's -- it's now known as our Enterprise
23  Justice Case Management System, but it was formerly
24  known as Odyssey Case Management System.
25    Q.  Just because they shared the same name of

8  (Pages 138 to 141)

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

EXHIBIT 6, page 38 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 142

1  Odyssey prior to these transitions you've talked about,
2  that does not mean that they were the same applications;
3  correct?
4      A.  That's correct.  The term Odyssey is -- was --
5  was relating to the suite of our products, and the case
6  management system was one of those products within that
7  suite, as was the File & Serve product.
8      Q.  So a court could have the Odyssey Case
9  Management System but not the Odyssey File & Serve
10 portion; is that correct?
11     A.  Yes, that's correct.
12     Q.  Or vice versa?
13     A.  Yes, that's correct too.
14     Q.  And implying to our federal court that because
15 they were called Odyssey way back when or back when,
16 whenever that is, whether it's File & Serve or whether
17 it's case management system, they truly are, in fact,
18 two separate applications that just happen to be under
19 the Odyssey suite of potential products?
20     A.  Yes.  Right.  They're two distinct systems,
21 two distinct offerings, but that are integrated with
22 each other.
23     Q.  All right.  If you look at No. 2 there, it
24 says: "If the envelope details do not meet the
25 auto-review condition(s), the envelope is routed to the

Page 143

1  appropriate review queue to be reviewed by a clerk as it
2  is today."
3          Please help me understand what that is.  Give
4  me an example of what's being referenced there.
5      A.  Yeah.  It's just saying that if the envelope
6  doesn't meet the conditions that were configured under
7  the Auto-accept -- or auto -- yeah, Auto-Accept Review
8  function, then it would flow through its normal
9  workflow, which would be to route it to the review queue
10 for the clerk to be able to review when they had the
11 time or deemed it appropriate.
12     Q.  And who is in control of providing the
13 appropriate envelope details?
14     A.  For the details for that specific envelope, it
15 would be the filer.
16     Q.  That would not be something that would be
17 within the court's control; correct?
18     A.  That's correct.  Every -- every envelope is
19 created and submitted by the filer.  The only exception
20 or edit I would say to that is if the court was actually
21 the filer in that scenario.  Most of the time, that's
22 not the case.
23     Q.  And if I stick to the world of complaints,
24 which is what this case involves, if a complaint were
25 submitted through an envelope, it's up to the submitter

Page 144

1  to get that -- that envelope correct; right?
2      A.  Correct.  It's the filer's responsibility to
3  enter in those details prior to submission.
4      Q.  That's not the court's responsibility?
5      A.  Correct.
6      Q.  So even under Auto-Accept, if Auto-Accept were
7  configured in the State of Idaho, it would be up to the
8  filers to get their envelopes right if the document was
9  going to go through the auto-review process into the
10 case management system?
11     A.  There's actually two components here.  There's
12 the configuration which would be driven by the court as
13 to which criteria is deemed appropriate for the
14 Auto-Accept function to kick in, and then -- and then
15 the second component would be the submission of that
16 envelope and whether or not the criteria within that
17 specific envelope met those conditions which would be
18 the responsibility of the filer.
19     Q.  All right.  So the court could set the
20 criteria.  I know we've talked about that.  But once
21 that criteria is set, it's then up to the submitter as
22 to whether Auto-Accept is going to, you know, auto-file
23 that document; correct?
24     A.  Yes.  I don't know if the filer would have
25 visibility into what those conditions were, but they are

Page 145

1  the responsible party for filling out the envelope
2  details.
3      Q.  "They" being the filer?
4      A.  Yes, that's correct.
5      Q.  And what Number 2 means there is if the filer
6  doesn't fill it out correctly, then it's -- it's going
7  to get routed to a queue for the clerk to then review?
8      A.  Yes, that's correct.
9      Q.  Now, Number 3, it says: "If the envelope
10 details meets the auto-review conditions, the filings
11 are automatically accepted, stamped, funds captured, and
12 notifications sent to filers/service recipients."
13         Do you see that?
14     A.  I do.
15     Q.  That's if the filer filled out the envelope
16 correctly?
17     A.  It's if the filer's envelope details met the
18 conditions that are being evaluated for the Auto-Accept.
19 They can still fill it out correctly and submit it and
20 it get routed to a clerk for review if it didn't meet
21 those conditions.
22     Q.  Now, there were some questions asked to you as
23 to whether file stamps were configurable by location.
24 Do you recall that?
25     A.  I do.

9 (Pages 142 to 145)

EXHIBIT 6, page 39 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 146

1    Q.  And so it's my understanding the only file
2  stamp that comes on to the document is once the document
3  has been accepted, it's then -- it's then stamped
4  accepted; is that correct?
5    A.  Yeah, that's correct.  The file stamp is --
6  I'm going to call it, for lack of a better term, "burned
7  in."  Back in the old days, it was the (indicating),
8  right?
9    Q.  Yeah.
10   A.  But it's -- that action actually takes effect
11 when the acceptance process occurs.
12   Q.  And it does not -- that action of the file
13 stamp does not take effect while the complaint is in the
14 clerk's queue to review for acceptance; correct?
15   A.  Yeah, that's correct.
16   Q.  It is only in the clerk setting -- without an
17 Auto-Accept, it's only when the clerk has accepted that
18 document that a file stamp is placed on it; is that
19 correct?
20   A.  It -- the file stamp can be placed on it at
21 the time of acceptance regardless of whether a clerk
22 accepts it or the auto-acceptance functionality kicks
23 in.
24   Q.  Sure.  I was just trying to break those out,
25 so take Auto-Accept out of it.

Page 147

1    A.  Okay.
2    Q.  If I'm in a situation where I don't use
3  Auto-Accept and it's clerk review, the -- the file stamp
4  is only placed on the document after the clerk performs
5  their review and accepts the document into the case
6  management system?
7    A.  Yes, that is correct.
8      MS. DUKE:  All right.  Let's go to the
9  next page, Molly.
10   Q.  (By Ms. Duke) If we look at Page 6 of this
11 PowerPoint, this talks about that first one with the
12 little -- little clock icon, "improves average response
13 time."  This is focused on clerks; correct?
14   A.  Yes, it is.
15   Q.  This is not focused in on the time or impact
16 of Auto-Accept to judges; correct?
17   A.  I'm not sure I understand your question.
18 Auto-Accept to judges, you mean documents like proposed
19 orders?
20   Q.  No, I -- I should say it this way.  So let's
21 assume it's a complaint still.
22   A.  Right.
23   Q.  And let's assume that complaint goes through
24 Auto-Accept with a one-cent filing fee and is then into
25 the court system.  This improves average response time,

Page 148

1  that doesn't have anything to do with the time now that
2  it'll take a judge to deal with an improper filing fee;
3  correct?
4    A.  Correct.  It does not take that into
5  consideration.
6    Q.  And it also talks about low-priority filings
7  and then -- and then assuming clerks will be focusing on
8  more complex high-priority filings.  Explain to me what
9  Tyler, in this PowerPoint, means by a low-priority
10 filing.
11   A.  Yeah.  It could mean a range of -- of things.
12 Certain jurisdictions will deem certain filings less
13 time-sensitive and others more time-sensitive.  I'll
14 give an example of a time-sensitive matter.  An
15 emergency protection order is an emergency protection
16 order, and that's generally deemed as a more highly
17 valued or time-sensitive matter.  And an original --
18 just a motion on a case that's not subject to the
19 statute of limitations is probably a lower priority.
20 I'm assuming that the author meant that when -- when
21 creating this document.
22   Q.  Do you know if the author was in any way
23 factoring in complaints as to the benefits of
24 Auto-Accept when the author generated this document?
25   A.  I can't speculate on -- on that.

Page 149

1    Q.  And do you know whether or not the author was
2  considering low-priority complaints versus high-priority
3  complaints in the state of Idaho when generating this
4  document?
5    A.  I can't speculate on that.
6    Q.  It then goes to reduce return for correction
7  rates, and it says:  "Many courts effectiveness are
8  measured by the percentage of accepted filings.
9  auto-accepted -- auto-acceptance improves these
10 metrics."
11     Do you know whether Idaho's Courts
12 effectiveness are measured by the percentage of accepted
13 filings?
14   A.  I do not.
15   Q.  Do you know who sets these types of -- of
16 measures to determine how effective a court is?
17   A.  I think it -- it varies by court, by
18 jurisdiction.
19   Q.  Any idea what Idaho uses to determine whether
20 its courts are effective?
21   A.  No, I do not.
22   Q.  When it says it "reduces return for correction
23 rates," that's -- that's because it's auto-accepted,
24 meaning nothing's returned for correction; correct?
25   A.  Yes, that's correct.

10  (Pages 146 to 149)

EXHIBIT 6, page 40 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                                    30(b)(6) Terry Derrick - Vol. II

Page 150

1      Q.  Even if something gets through and should be
2  corrected, that's not going to get caught in this
3  auto-acceptance part of this.  Instead, it's going to be
4  dealt with the court clerks now on the case management
5  side; correct?
6      A.  That's correct.  The measurement here is from
7  the time of submission to the time of clerk action or --
8  or action on the envelope.
9      Q.  And, again, this -- this middle column has
10  nothing to do with the impact on judges in the event
11  corrections need to occur to something that's been
12  auto-accepted into the case management system.
13     A.  Yes.
14     Q.  Correct?
15     A.  That's correct, mm-hmm.
16     Q.  Now, the third bullet is -- it says "reduces
17  operational overhead."  I'm assuming that's just because
18  it takes the clerk out of the picture when
19  auto-acceptance is used.
20     A.  Yeah, I assume that's a valid assumption.
21     Q.  But it's not talking about the impact on
22  clerks or court staff or judges in the event something
23  has been auto-accepted and transferred into the court's
24  case management system; correct?
25     A.  Correct.  I don't think it takes that into

Page 151

1  consideration.
2      Q.  And the data for all three of these columns,
3  I'm assuming, is -- is Texas data.  Do you know exactly
4  what data was used to even come up with these three
5  columns?
6      A.  I -- I can't say for sure, but the document
7  was created for Texas, so it's a reasonable assumption.
8      Q.  Any idea how many filings were looked at?
9      A.  No, I don't.
10     Q.  Any idea how many courts were looked at?
11     A.  No, I don't.
12     Q.  Any idea of the volume at all of what was
13  looked at to come up with this PowerPoint?
14     A.  No, I can tell you that Texas has 254
15  counties, multiple offices in each, and handles anywhere
16  from 45- to 65,000 filings a day.  But beyond that, I'm
17  not sure what was used to reference or create this
18  document.
19     Q.  But it's also my understanding that Tyler
20  doesn't cover all of Texas; is that correct?
21     A.  No, we do.
22     Q.  Oh, you do?  Okay.
23     A.  We -- our e-filing program is the e-filing
24  program for the State of Texas.
25     Q.  Let me just look at something real quick that

Page 152

1  I talked to Mr. Girdner about yesterday.
2      So Mr. Girdner testified yesterday as to --
3  and maybe this was just related to a press review queue,
4  is the only court that's on press review queue in Texas,
5  Austin?
6      A.  It's -- it's Travis County, but it is Austin,
7  Texas.  We just gotta be careful because Austin is a
8  county that is not Austin, Texas.
9      Q.  Okay.  Leave it to the Texans to do that.  No
10  offense.  I know you're there, but...
11     All right.  So Travis County, out of all of
12  those courts you were just talking about in Texas,
13  Travis County's the only one who has a press review
14  queue through Tyler; is that correct?
15     A.  That is correct.
16     MS. DUKE:  Okay.  All right.  Let's go to
17  the next page, Molly, Page 7.
18     Q.  (By Ms. Duke)  So I'm still a tiny bit confused
19  as to what these charts mean, so let me just ask you a
20  few questions about there.
21     Do you see the little stars down below?  The
22  one that says, first star:  "Example data utilizing Q4
23  2019 review -- reviewer metrics"?
24     A.  I do see that.
25     Q.  Any idea whose Q4 2019 reviewer metrics?

Page 153

1      A.  I would assume Courts A, B, C, D, and E.
2      Q.  But any idea who Court A is?
3      A.  I don't know.
4      Q.  What Court B is?
5      A.  I don't know.  We'd have to ask the author.
6  I'm not sure.
7      Q.  Or Court C, D, or E?
8      A.  No, I -- I don't know.
9      Q.  So then it says, "AR," so that's two little
10  stars, and it says that means auto-review.
11     So we have Court A and Court B that don't use
12  auto-review; right?
13     A.  That's how I interpret it, yes.
14     Q.  And does auto-review mean Auto-Accept or do
15  you know?
16     A.  I believe auto-review and Auto-Accept are
17  synonymous here.
18     Q.  So then Courts C, D, and E use auto-review?
19     A.  That's how I interpret it, correct.
20     Q.  And then it says the AR percentage is based on
21  number of reviewable filings submitted versus number of
22  filings auto-reviewed.  And so I guess let's look at
23  those.
24     So if I were to compare Court A to Court C,
25  what is -- what is this chart telling me?

11  (Pages 150 to 153)

EXHIBIT 6, page 41 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 154

1    A.   My interpretation of the chart says that
2  Court A is not using auto review where Court C has
3  5 percent of their envelopes being auto-reviewed.
4    Q.   And does it -- it also comparing, then, the
5  efficiency of Court A to Court C or not?
6    A.   I think that's a subjective term.  I -- I
7  think it is telling you the percent response under 24
8  hours and the acceptance percentage.
9    Q.   And these are all fewer than 24 hours, not
10  broken out by the minute or hour; correct?
11   A.   Correct.
12   Q.   And so this data here on this page doesn't
13  break it down specifically into if a court's not using
14  Auto-Accept, but is processing complaints within, let's
15  say, three hours, how is that reflected here in this
16  data?
17   A.   I don't think that it is.
18   Q.   Okay.  All right.  Let's go to Page 8.
19       With respect to Page 8, again, you were --
20  talked about a number of -- of categories.  We've
21  already addressed that.
22       But in providing Page 8, no evaluation has
23  been done as to what the cost on Idaho's side would be
24  to implement or use an Auto-Accept in any capacity; is
25  that correct?

Page 155

1    A.   Yes, that's correct.
2        (Pause in the proceedings.)
3    Q.   (By Ms. Duke) Under Auto-Accept, is -- well,
4  strike that.
5        Have you been a part of any communications
6  with Idaho's Courts related to Auto-Accept?
7    A.   No.  No, I have not.
8    Q.   Are you aware of whether anyone at Tyler has
9  been involved in any conversations?
10   A.   No, I am not.
11   Q.   Do you know if Tyler has provided Idaho's
12  Courts with any presentation on Auto-Accept?
13   A.   I'm not aware of that.
14   Q.   And you understand that Tyler's contract
15  related to its File & Serve is with the Idaho Supreme
16  Court?
17   A.   Yes, I do.
18   Q.   And with respect to case management, Tyler's
19  contract is also with the Supreme Court?
20   A.   Yes, I do.
21   Q.   I'm just going through a bunch of questions,
22  so bear with me here.
23   A.   Sure.
24       (Pause in the proceedings.)
25   Q.   (By Ms. Duke) Now, in Auto-Accept, even if the

Page 156

1  court configured a confidentiality setting that should
2  be used, assuming confidential information was provided,
3  it would be up to the filer to properly click on that
4  confidential box; correct?
5    A.   Yes, that is correct.
6    Q.   And so, you know, sadly we know that there are
7  malicious, not-nice people out there, so if a malicious
8  not-nice person knew something was confidential but
9  wanted to go ahead and -- and get it filed, he or she
10  could just merely not accept or click the confidential
11  box and that document would then be automatically
12  transferred to and filed in the court's case management
13  system; correct?
14   A.   If the conditions were configured to accept it
15  in that manner and that scenario and transpired, then,
16  yes, it would.
17   Q.   Have any of the courts that have been using
18  Auto-Accept talked to you about how they dealt with any
19  type of malicious filings?
20   A.   No, they have not.
21   Q.   Have any -- I know that we've seen cases sadly
22  here in Idaho, as well as other places, of documents
23  placed in the public record, revenge porn, that type of
24  stuff.  Has Tyler had any communications with any of the
25  states who use an Auto-Accept as to things like revenge

Page 157

1  porn, child porn, anything like that making its way into
2  court documents?
3    A.   No, we have not.
4    Q.   Now, with respect to Odyssey File & Serve, all
5  documents in the submission are included in the same
6  envelope; correct?
7    A.   Yes.  For each submission, they -- all filings
8  and documents are included in the same envelope.  Yes,
9  that's correct.
10   Q.   That's not the case with Auto-Accept; correct?
11   A.   Correct.
12   Q.   There would actually have to be multiple
13  envelopes that would be used per filing?
14   A.   No, I don't think that's the case.  My
15  understanding is that the envelope is still intact, but
16  the filings are evaluated independently, so every filing
17  is evaluated within that envelope and then made that
18  determination but the envelope still holds true.
19   Q.   Ah, I see.  Okay.  So the envelope holds true
20  but what happens is it gets transferred into the court's
21  case management system and then the clerk has to then
22  break out the documents that are within the envelope?
23   A.   I'm not certain how an envelope containing
24  multiple filings when it's assessed with the auto-review
25  rules where one meets that criteria and the others

12  (Pages 154 to 157)

EXHIBIT 6, page 42 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

**Page 158**

1    don't, exactly what transpires if it sends that record
2    immediately or if it holds it until all actions have
3    been taken on that envelope before transferring it to
4    the CMS.
5        Q.   And so you're not sure what the clerks need to
6    do from a work standpoint once an envelope with multiple
7    documents is transferred into the case management
8    system; is that fair?
9        A.   That's fair, yes.
10       Q.   Once a document is in the case management
11   system, the clerks then need to go through the case
12   management system to interact with -- with the various
13   parties to the case; correct?
14       A.   Yeah, that's a typical scenario.
15       Q.   Give me one second here.
16       A.   Of course.
17            (Pause in the proceedings.)
18       Q.   (By Ms. Duke) So let me ask you a question in
19   the context of a complaint.  If -- so in Idaho, I'll
20   represent to you that when a case is initiated with a
21   complaint, a complaint, a case information sheet, and a
22   summons are all required as part of that filing.
23            I'm assuming that those would all be in the
24   same envelope?
25       A.   Yeah, more than likely in an initial filing.

**Page 159**

1    That's correct.
2        Q.   And if, for instance, the filing fee wasn't
3    the proper amount, but was some sort of filing fee, so
4    that it was taken and transferred to the court and
5    auto-accepted, on filing, that means the summons, the
6    case information sheet, and the complaint would all be
7    filed even though the proper filing fee has not been
8    paid?
9        A.   Yes, that's correct.
10       Q.   And if someone were supposed to mark something
11   confidential and didn't, the only way that could be
12   addressed under an Auto-Accept situation would be for
13   then, in the case management system, however the court's
14   handled, you know, dealing with documents that are in
15   the case management system and correcting their filing,
16   that would have to be done on the case management end;
17   correct?
18       A.   Yes, that is correct.  That would be the
19   appropriate means to correct the -- that security
20   setting.
21       Q.   If, in that context of the complaint, so,
22   again, I mentioned there's a complaint, a case
23   information sheet, and a summons, they're in the same
24   envelope, if -- if they're being submitted and no filing
25   fee is paid, are the summons and case information sheets

**Page 160**

1    filed and the complaint not filed under Auto-Accept or
2    are all three not accepted?
3        A.   It depends on how it's configured.  It would
4    have to hit those criteria, and then depending upon
5    that, it would react accordingly.
6        Q.   Perfect.  So, I'm going to transfer, I think,
7    now into press review queue, so why don't we take five
8    minutes and then I'll get through that portion?
9        A.   Okay.  Sounds good.
10       Q.   Okay.
11            (A break was taken from
12            2:36 p.m. to 2:43 p.m.)
13            MS. DUKE:  All right.  We're back on the
14   record.
15            Molly, do you mind pulling up Exhibit 34?
16       Q.   (By Ms. Duke) All right.  Do you see Exhibit 34
17   there?  Do you recall discussing this with Mr. Fetterly?
18       A.   Yes, I do.
19       Q.   This is a Tyler-generated document; correct?
20       A.   Yes, it is.
21       Q.   And the Idaho Courts did not have anything to
22   do with the content in Exhibit 34; is that correct?
23       A.   That's correct.
24       Q.   Okay.  And we had little, you know,
25   screenshots of that being able to show how it came from

**Page 161**

1    the website as 34A and B.  Again, that would all be
2    Tyler-generated language, not Idaho Court language;
3    correct?
4        A.   Yes, that's correct.
5            MS. DUKE:  All right.  Let's go ahead and
6    turn to Exhibit 35, Molly.
7        Q.   (By Ms. Duke) This is the e-filing overview.
8    It's a very large document; correct?
9        A.   Yeah.  Mine shows 248 pages.
10       Q.   And this is a Tyler-drafted document?
11       A.   Yes, it is.
12       Q.   Not one that is drafted or has input from the
13   Idaho Courts; is that correct?
14       A.   That is correct.
15       Q.   So when I turn to that page that we're on of
16   Exhibit 35.
17            MS. DUKE:  Let's go to Page 17, please.
18            There it is.
19       Q.   (By Ms. Duke) Okay.  Can you see that okay?
20       A.   Yes, I can.
21       Q.   All right.  This diagram that is on Page 17 of
22   Exhibit 35, Tyler's individual filer user guide, this is
23   not based on Idaho; is that correct?
24       A.   That is correct.  It is not.
25       Q.   And this Exhibit 35 is for File & Serve;

13 (Pages 158 to 161)

EXHIBIT 6, page 43 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 162

1  right?
2      A.  It is.  Yes, correct.
3      Q.  It is not for the case management system used
4  by the court?
5      A.  That is correct.
6      Q.  Now, when I look at this chart, it says "filer
7  submits."  Do you see that?
8      A.  Yes, I do see it.
9      Q.  And then it goes to the court and it has a
10  little picture of the court.
11     A.  Yes, I see that.
12     Q.  That's not meant to represent the court's case
13  management system; correct?
14     A.  Correct.  That -- that's not the workflow that
15  takes place.
16     Q.  What that really is meant to reflect is when
17  it says "court receives," that means Tyler File & Serve
18  receives that submission.
19     A.  Correct.  I believe it -- it means that the
20  eFiling Manager received that submission and the clerk
21  now has access to review it.
22     Q.  All right.  And then we've got a clerk that
23  looks like a judge as the next little icon; right?
24     A.  Yeah, I was noticing that as well.
25     Q.  And -- and so that would be the filer

Page 163

1  submitting it to eFile & Serve, which means it's going
2  into the eFile Manager portion of eFile & Serve and
3  the clerk now has it for review; correct?
4      A.  That is correct.
5      Q.  It then says, "Clerk reviews and notifies
6  filer of status via email," and is that when we get into
7  that whole whether it's accepted or rejected?
8      A.  It is.  And the clerk doesn't actually notify
9  the filer.  That's an automated process that takes --
10  takes place based upon the filer's notification settings
11  or configurations.
12     Q.  So when the clerk reviews and notifies the
13  filer of status, what that really means is the clerk is
14  either accepting or rejecting and the filer is getting
15  auto-noticed as to what's happened.
16     A.  Yes, that's correct.
17     Q.  And in that little multi-second process,
18  obviously, the filer's getting an email.  And then when
19  I look at the computer screen there, that's actually now
20  going to be my case -- court case management document --
21  that's going to now be my court case management
22  database; correct?
23     A.  Well, I -- it -- it's difficult to say by this
24  graphic.  Once the acceptance process takes place, it
25  would be -- the document and the information would be

Page 164

1  delivered to the case management system.  Obviously, the
2  filer can't view that information.  They don't have
3  access to the court's case management system.  They
4  could view it in the e-filing system or in whatever
5  online court record repository that the State of Idaho
6  provides any -- any general public or legal professional
7  or SRL to access those records.
8      Q.  I see.
9          Okay.  So what we really could add to this
10  diagram -- first, I think we'd agree this is probably
11  not the best diagram --
12     A.  Yes.
13     Q.  -- to properly represent the -- Idaho's
14  eFile & Serve and how a document gets to the case
15  management system; is that correct?
16     A.  Yeah, I think that's a valid statement.
17     Q.  All right.  Because what we would need to add
18  there is after the filer receives email, probably at
19  that same time when the filer receives the email we
20  could actually put a picture of the courthouse then
21  because that's actually when it would go into the case
22  management system if accepted?
23     A.  Yes.  That's -- that would be a more accurate
24  reflection of reality.
25     Q.  And if rejected, it doesn't go into the

Page 165

1  court's case management system, it goes back to the
2  filer to correct whatever issues need to be corrected?
3      A.  That's -- that's correct.
4      Q.  Do you know what time frame or grace period
5  Idaho provides to its filers in the event there's an
6  error that needs to be corrected?
7      A.  No, I do not.
8      Q.  Are you aware that there are various courts in
9  the country that do provide a grace period --
10     A.  Yes, I am.
11     Q.  -- for filers to correct their submission?
12     A.  Yes, I am.
13     Q.  And then that there are some who do not
14  provide grace periods and put the burden on the filers
15  to either gets it right the first time or not?
16     A.  Yes, I'm also aware of that.
17         MS. DUKE:  All right.  Let's go to the
18  next page, Molly.
19     Q.  (By Ms. Duke)  Just a few questions on the
20  filing queue status.  Again, there's -- there's a very
21  big debate between CNS and the Idaho Courts as to what
22  "filing" means.
23         I'm assuming any time you've used the word
24  "filing" or these documents are using the word "filing,"
25  I'm assuming Tyler is not weighing in on what is or what

14  (Pages 162 to 165)

EXHIBIT 6, page 44 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 166

1    is not a -- an official filing; is that fair?
2        A.  Yeah, that is correct.  A filing is a very
3    broad term that's used to describe a lot of things.
4    Very similar to the word "docket," how it can describe
5    multiple things in the court system, filing can also do
6    that.
7        Q.  When we look at submitted, it says there that
8    document file format and payment information has been
9    verified and accepted.  That does not mean that the
10   money has been transferred to the court yet; correct?
11       A.  That's correct.
12       Q.  That doesn't occur until further down this
13   chart where it says "accepted"; correct?
14       A.  That is correct.
15       Q.  And by the file format and payment information
16   have been verified and corrected, what's the "verified"
17   mean in that submitted row?
18       A.  Say that one more time?
19       Q.  Well, it says --
20       A.  Verified and corrected?
21       Q.  Yeah.  It says:  "The document file format and
22   payment information have been verified and accepted."
23          What's being referred to there as verified?
24       A.  Sorry.  I thought you said verified and
25   corrected.

Page 167

1          Verified and accepted.  The document file
2    format, meaning it's the correct filing type of
3    document.  Most courts require a PDF document, so it's
4    validating that.  And then the payment comment is
5    reflecting the pre-authorization that we do to protect
6    against non-sufficient funds.
7        Q.  That submitted row doesn't have anything to do
8    with verification that the filing has been verified as a
9    proper and accepted filing; correct?
10       A.  That's correct.
11       Q.  Okay.
12       A.  That's done by the clerk.
13       Q.  And that's done there at the accepted or
14   rejected stage; correct?
15       A.  Yeah.  They make that determination while the
16   status is under review.  And then once that
17   determination is made, it either goes into the accepted
18   or rejected status.
19       Q.  All right.  And to the extent there is a case
20   management manual like this e-filing manual, that's a
21   Tyler-documented case management document; correct?
22       A.  I'm not referring -- I'm not familiar with
23   what you're referring to.
24       Q.  Well, does Tyler have a case management
25   document like this Exhibit 35 we were just looking at?

Page 168

1        A.  Yes, we do.
2        Q.  Okay.  Oh, I see.  So there's an individual
3    file user guide for File & Serve, that's Exhibit 35.
4    And then, apparently, there's also a firm administration
5    or administrator user guide for File & Serve.
6        A.  That's correct.
7        Q.  What -- what are each going to?
8        A.  The filer is referring to an individual filer
9    who has the individual filer role.  And the firm
10   administrator is referring to an individual who has the
11   firm administrator role.  The firm administrator is
12   someone who may be responsible for setting up a -- a law
13   firm or an entity and help manages that for that firm.
14       Q.  Okay.  Let me show you Exhibit 37 real quick.
15          (Pause in the proceedings.)
16       Q.  (By Ms. Duke) This document here, tell me, is
17   this the File & Serve -- the first page is the
18   File & Serve for Idaho's Courts?
19       A.  I'm not familiar with that specific page.
20       Q.  Okay.  How about the second page?
21       A.  Yeah.  The second page is our electronic
22   filing service provider.
23       Q.  All right.  And that's the Odyssey
24   File & Serve as it's called or used to be called?
25       A.  Yes, that's correct.

Page 169

1          MS. DUKE:  All right.  Let's jump to --
2    Molly, why don't you bring up -- why don't you bring the
3    PowerPoint back up, actually?
4        Q.  (By Ms. Duke) So let's turn to press review
5    queue.
6        A.  Okay.
7        Q.  We're going to go back to that PowerPoint.
8          All right.  If we turn to the second page of
9    that, that's the press review.  Now, are you aware of
10   whether the State of Idaho has any definition for what
11   "the press" means?
12       A.  No.  I -- I'm not sure Idaho's definition of
13   press, no.
14       Q.  Does Tyler also provide public review queues?
15       A.  No.  Tyler's only review queues that we
16   provide are the clerk review queue and then the
17   additional tool that we provide is labeled the Press
18   Review Tool.  The audience is really -- of that tool,
19   is -- is dependent upon our contract holders, and in
20   this case, it would be the Supreme Court or the Court.
21       Q.  So if press review queue were to be used in
22   the state of Idaho, it'd be up to the State of Idaho to
23   determine who would be credentialed to use the press
24   review queue?
25       A.  Yes, that is correct.

15  (Pages 166 to 169)

EXHIBIT 6, page 45 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 170

1    Q.  Is there a separate credentialing system
2  that's used for each person or is it an entity or how's
3  that used?  Do you know?
4    A.  Yeah.  We use our Tyler Identity Management
5  system, and it -- it is a user ID and a password that
6  grants that access, and so we ask for that information
7  going into providing those authorized users with access.
8    Q.  Okay.  And so when you say that, if Idaho were
9  to use the press review queue tool, would Idaho then
10  need to provide Tyler with the identity of anyone that
11  would have a user ID and password?
12    A.  Yeah.  You would generally provide us with
13  that user ID and we would then set up that user with
14  access to the system.  The normal process that we've
15  seen take place is the court would then create a user
16  inside of the File & Serve platform and then provide us
17  with that user ID and then we grant that access.
18    Q.  And is it multiple user IDs for states that
19  are using -- or courts that are using press review
20  queue?
21    A.  It can be.  It's up to the -- it's up to our
22  contract holders as to how many they provide.
23    Q.  Is there any type of auditing or anything like
24  that that's done as to a specific user's access to a
25  document in the press review queue?

Page 171

1    A.  No, not to a specific document.  There is no
2  audit trail.  We don't possess one.
3    Q.  Is there any ability to watermark documents as
4  under review or not filed in the press review queue?
5    A.  No, there is not.
6    Q.  Now, a press review queue, under Page 9 of
7  this document we have here, the -- the PowerPoint we've
8  been referring to, which is SO Page 9, that requires
9  an -- or an amendment to any contract; correct?
10    A.  Yes, that is correct.
11    Q.  So if the State of Idaho were to look to have
12  the Press Review Tool, it would need to negotiate a
13  contract amendment with Tyler?
14    A.  Yes, that is correct.
15    Q.  And it's my understanding that the fee that --
16  that the Supreme Court has been told Idaho will be
17  charged each year is $108,000 for the subscription to
18  the Tyler press review queue; is that correct?
19    A.  That is correct.  108,000 for the --
20  subscription to the Press Review Tool solution, correct.
21    Q.  Now, yesterday, Mr. Girdner who is the head of
22  CNS suggested that that was only a starting point for
23  Tyler and that that amount could be negotiated.
24    Does Tyler offer the press review subscription
25  for less than $108,000 for a court who wants to use the

Page 172

1  press review queue?
2    A.  We have offered that at a lower rate in the
3  past.
4    Q.  And how low has that rate gone?
5    A.  $60,000 is -- is the -- the lowest rate, and
6  the -- the intent behind that or the reason behind that
7  is that that number was provided before the new pricing
8  came out, and so it was honored for that first one-year
9  term and then it goes up to the normal 108-.
10    Q.  All right.  So even when it was negotiated
11  down, it might have been provided at a lower rate
12  because that had been previously promised but it then
13  goes up to the next year to the 108,000?
14    A.  That's correct.
15    Q.  So I understand Mr. Girdner obviously wouldn't
16  know what Tyler would or wouldn't do, but I think it's
17  fair to say, based upon your testimony, that if the
18  State of Idaho, regardless of its bargaining power,
19  regardless of its amazing negotiation skills, if it
20  wants the press review queue, it's going to pay $108,000
21  a year for that subscription?
22    A.  Yeah, that's an accurate assessment.
23    Q.  Now, I know that it says here that there's
24  also updated terms and conditions in addition to the
25  contract amendment that would occur.  Does Tyler

Page 173

1  indemnify the courts if someone is harmed by improper
2  use of a document that was provided through the press
3  review queue?
4    A.  No, we do not.
5    Q.  We were also talking about the -- the ability
6  and whether those could be, you know, the documents in
7  the press review could be manipulated, and I want to be
8  clear on this issue.
9    So the Idaho Supreme Court asked Jessi Fisher
10  if the documents in the press review queue were the same
11  documents in eFile & Serve or whether they were copies
12  of the original documents, and she answered that they
13  are the same documents.  Help me understand what that
14  means.
15    A.  Yeah, that's an accurate statement.  So if you
16  recall when we were discussing the EFM's responsibility
17  earlier, we were saying that that's where the documents
18  live, that's where they're housed, and that both the
19  review tool for the clerks and the review tool for the
20  press were just applications that could surface or
21  display that information.  Both of them can display that
22  document exactly in a similar way, and so that's what
23  she's referring to, is that they're both getting access
24  to that same information at the same location.  They're
25  just surfaced in different applications.

16  (Pages 170 to 173)

EXHIBIT 6, page 46 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 174

1    Q.  Got it.
2        And so with respect to the original document
3    that is submitted to File & Serve, that original
4    document is displayed both in the clerk queue and the
5    press review queue?
6    A.  That is correct.
7    Q.  That's correct?
8    A.  Yes, it is.  Sorry.  Yes, that's correct.
9    Q.  And so it would be the original document that
10   anyone accessing the press review queue would be looking
11   at?
12   A.  That is correct.
13   Q.  And I know that you had said there's no way to
14   modify a document that is in the clerk's -- or in a
15   queue, so the clerk's queue, but there is because it
16   ends up being file stamped upon acceptance; right?
17   A.  Yes, absolutely.  So the clerks have the
18   ability to make edits to the document, right?  They have
19   stamping options, annotation options, strike-through
20   options, a series of tools through the application,
21   through the review tool application.  Many of those
22   tools are commonly found in editors and, you know, like
23   you would see in Microsoft Word or even a PDF editor.
24   Those same tools do not exist in the Press Review Tool.
25   So if I stated that earlier, it was a -- just I misspoke

Page 175

1    on my -- on my part.
2    Q.  No, I understand.  I don't think we had
3    separated it out for you, so I appreciate you being
4    precise on that.
5        Okay.  With respect to the press review queue,
6    it -- it says that documents can be made available based
7    on the number of days.  Do you recall testifying to
8    that?
9    A.  Yes, I do.
10   Q.  Does that mean anything not reviewed or
11   accepted within a certain time period could
12   automatically be transferred to the press review queue?
13   A.  No, this would be the inverse.  If it met the
14   criteria, it would exist in the Press Review Tool until
15   that day, duration elapsed, and then in which case it
16   would no longer meet that criteria.
17   Q.  So the press review queue, the time that it's
18   up there, is that defined by the client and in that
19   instance, the courts?
20   A.  That's correct.
21   Q.  Are you aware of any spiders or scraping or
22   bots, you know, those types of things that have been
23   utilized on Tyler's press review queue?
24   A.  Not to my knowledge.
25   Q.  Does Tyler have anything in place to protect

Page 176

1    against bots, spiders, whatever, all these technical
2    terms that my children would know and I don't know them
3    all, but those things that can come in and -- and get
4    into a document or into a system, how does Tyler protect
5    that press review queue?
6    A.  We -- we don't on the Press Review Tool.
7    Specifically, on the Press Review Tool, we do not.
8    Q.  And given that you don't have those
9    protections on the press review queue, what does that
10   mean with respect to the ability to, you know, have
11   spiders or scrapers or bots or whatever accessing the
12   press review queue?
13   A.  There is -- there's an implied assumption that
14   they -- the bots would have access to the environment
15   through the user credentials.  If that assumption is
16   true, then they would be able to procure screenshots or
17   captures of that document.
18   Q.  Now, is the clerk's queue protected?
19   A.  The clerk's review tool?
20   Q.  Correct.
21   A.  I don't know.
22   Q.  But the only people accessing the clerk's
23   review tool are the clerks that have been provided
24   authorization through the court system; correct?
25   A.  Yes, that is correct.

Page 177

1    Q.  With respect to the press review queue, if it
2    were open to the press, whomever would be determined to
3    be the press in the state of Idaho, would presumptively
4    then receive a user ID and ability to access the press
5    review queue; correct?
6    A.  Yes, that is correct.
7    Q.  So the big difference between those two is the
8    clerks review queue has a very limited number of people
9    who are employed by the courts to do their job; right?
10   A.  Yes.  It's whoever the court grants access to
11   the clerk review tool.
12   Q.  And then the press review queue obviously
13   would be -- we're all presuming those would be
14   non-employed folks that would have access to the press
15   review queue?
16   A.  I think that's up to the court's discretion as
17   to who that audience is.
18   Q.  Okay.  Have any of the courts that you --
19   you're working with had access to the public to the
20   press review queue?
21   A.  I don't know.
22   Q.  You also mentioned, it sounds like, the press
23   review queue could be limited to only being available on
24   certain kiosks at courthouses; is that correct?
25   A.  Yes, that's correct.  We have a few customers

---

17  (Pages 174 to 177)

EXHIBIT 6, page 47 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 178

1   who have attempted to do that.
2       Q.   All right.  And who are those customers?
3       A.   I'm -- I'm not sure which ones they are off
4   the top of my head.
5       Q.   And has -- has that worked with them in their
6   ability to manage their press review queues or do you
7   know why they were doing that?
8       A.   Yeah.  My understanding was that they were
9   doing that to -- to further protect the access and who
10  was getting access to that Press Review Tool and making
11  it available in the court clerk's office gave them that
12  additional oversight.
13      Q.   Do you have any knowledge of whether CNS or
14  any other entity has attempted to, you know, scrape, use
15  spiders, anything like that on the Press Review Tool?
16      A.   I don't.
17      Q.   Do you know how the Press Review Tool is
18  secured against the top ten OWASP attacks?
19      A.   No.  That's a third-party security set of
20  requirements, and it would -- it would take us some time
21  and resources to evaluate and assess the Press Review
22  Tool against those.  We haven't conducted that exercise.
23      Q.   Do you know if the press review queue has ever
24  been attacked, hacked, or compromised at any time?
25      A.   No, I'm unaware of any of those situations.

Page 179

1       Q.   And I'm assuming you would be aware of those
2   as the 30(b)(6) representative here today?
3       A.   Correct.
4       Q.   Does Tyler permit its clients to run its own
5   web application firewall to protect the Press Review
6   Tool website?
7       A.   Yeah.  I don't -- yeah.  We would, yes.
8       Q.   Now, have you been involved in any of the
9   conversations with Jennifer Dvorak as to information
10  she's requested from Tyler related to the press review
11  queue and its security parameters?
12      A.   Not directly.
13      Q.   It's my understanding she's asked a number of
14  questions that have been new to -- new to Tyler with
15  respect to clients asking security questions.  Is that a
16  fair representation?
17      A.   My understanding is that some of her questions
18  are pretty detailed and require a higher level of -- of
19  security knowledge to evaluate and assess and provide
20  responses, yes.
21      Q.   And do you know if Tyler is FedRAMP or
22  StateRAMP authorized?
23      A.   Not -- not with regards to the Press Review
24  Tool.
25      Q.   Okay.  What tools is it FedRAMP or

Page 180

1   StateRAMP -- and, actually, I don't need to know them
2   all.
3       Is it FedRAMP or StateRAMP authorized with
4   respect to File & Serve?
5       A.   No.
6       Q.   Is it FedRAMP or StateRAMP authorized with
7   respect to its case management system?
8       A.   No, we are not.
9       Q.   Has Tyler attempted to obtain the FedRAMP or
10  StateRAMP authorization?
11      A.   Not within the courts and justice division.
12      Q.   Where does Tyler have FedRAMP or StateRAMP
13  authorization?
14      A.   Within our federal division.
15      Q.   Okay.  And that's PACER; correct?
16      A.   No, PACER's not a Tyler product.
17      Q.   Okay.  Do you know if PACER is FedRAMP
18  certified?
19      A.   I do not know if they are or not.
20      Q.   Do you know if any of your competitors, such
21  as Granicus or Tybera, are FedRAMP or StateRAMP
22  certified?
23      A.   I -- I do not.
24      Q.   Are you aware of the Idaho Supreme Court terms
25  and conditions for cloud-based services that it's

Page 181

1   requiring with any contract amendments?
2       A.   Yeah.  I've seen something along those lines
3   come through.  I think that's one of the exhibits, if
4   I'm not mistaken.  Is that the document that you're
5   referring to?
6       Q.   Correct.  It's Exhibit 2 to your request that
7   we provided to you.  Have you had a chance to take a
8   look at that?
9       A.   Yes.
10      Q.   Prior to today?
11      A.   Mm-hmm.
12      Q.   Do you know whether Tyler would be willing to
13  agree to these terms and conditions that are Exhibit 2
14  to the 30(b)(6) today?
15      A.   No.  The -- in evaluating this and assessing
16  it, just going through and trying to determine the
17  applicability of -- of each of these would -- would take
18  a significant number of resources on Tyler as well as a
19  significant amount of time, and that isn't something
20  that we're prepared to do at this time.
21      Q.   Under Tyler's current contract with the courts
22  for its case management system and for its File & Serve,
23  is Tyler under any obligation to go through this
24  evaluation with respect to these terms and conditions
25  such as what you just discussed or -- or is that not

18  (Pages 178 to 181)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 182

1    done until either an amendment or a renewal of a
2    contract?
3        A.  My understanding, and I'd have to look at the
4    contract in order to validate that, would be that it
5    would be upon either an amendment to that contract or a
6    new contract being -- being created between the two
7    parties.
8        Q.  So pretty fair to assume if Sara Omundson or
9    someone in her office requested that Tyler take its
10   existing contracts with File & Serve and with the case
11   management and agreeing to the terms and conditions here that are
12   agreeing to the terms and conditions here that are
13   outlined in Exhibit 2 of our 30(b)(6) request, that
14   Tyler would not be under an obligation to do so?
15       A.  That is my understanding.
16       Q.  And safe to assume that Tyler would not do so?
17       A.  That is my understanding.
18       Q.  Okay.  Now, if Tyler were willing to comply
19   with the terms and conditions that are in this document
20   we're looking at here -- Exhibit 2 to the 30(b)(6) that
21   was served on Tyler -- would that impact the annual
22   subscription fee that Tyler would charge the courts, or
23   is that something that would need to be evaluated as to
24   whether the courts would be charged something higher
25   than $108,000 here in Idaho?

Page 183

1        A.  If Tyler were to go through this document as
2    it pertains specifically to the Press Review Tool, then,
3    yes, it would be significantly higher than 108,000 a
4    year.
5        Q.  Do you have an estimate of what it would
6    likely be?
7        A.  No.  In order to do that, we would have to
8    scope that work out.  And it would require significant
9    resources and time to be able to go through that
10   document, so that's something we would have to look
11   into.
12       Q.  Now, also attached as Exhibit 3 to the
13   30(b)(6) deposition notice -- what exhibit number is
14   that?
15       THE STENOGRAPHER:  You said 38.
16       MS. DUKE:  38?  Okay.  Thank you.
17       Q.  (By Ms. Duke) Right.  So nice and confusing,
18   Exhibit 38, Exhibit 3 to that.  This was the spreadsheet
19   that we had provided with -- with the document showing
20   the court security controls that are required by the
21   Idaho Supreme Court.
22       A.  Just to make sure I'm looking at the right
23   one, this is Exhibit 3 native format, the Excel
24   spreadsheet?
25       Q.  Correct.

Page 184

1        A.  Yes, I'm pulling it up now.
2        Q.  All right.  Molly's trying to get it up there
3    for all of us too.
4        Do you know if Tyler has represented to
5    Ms. Dvorak that it is currently working on becoming
6    StateRAMP authorized?
7        A.  I'm unaware of -- of that.
8        Q.  If Tyler was working on becoming StateRAMP
9    authorized, would complying with the requirements in
10   this native Excel file from the court, Exhibit 3 to 38,
11   help with obtaining that authorization?
12       A.  I'm not certain.  We'd have to get our
13   security team's perspective on that.
14       Q.  Right.  Do you know if what the State of Idaho
15   is requesting in this Excel spreadsheet that's contained
16   within Exhibit 38 -- that's Exhibit 3 within Exhibit 38,
17   is essentially the same information that would need to
18   be answered by Tyler to become StateRAMP authorized?
19       A.  No, I was unaware of that.
20       MS. DUKE:  Do you know how to get to
21   RO 138 on that?
22       Q.  (By Ms. Duke) So let me ask you:  How are you
23   using encryption to protect the documents that are in
24   the press review queue?  Do you know?
25       A.  One moment.

Page 185

1        Q.  And that's RO 138.
2        A.  RO 138, yeah.
3        I'm sorry.  Could you repeat the question?  I
4    was looking for that.
5        Q.  Sure.
6        How are you using -- how is Tyler using
7    encryption to protect the documents within the press
8    review queue?
9        A.  Yeah.  So our -- our encryption is both at
10   rest and in transit in our applications.
11       Q.  And is that the same in the clerk's queue?
12       A.  Yes, it is.
13       Q.  How about RO 155?  How is Tyler monitoring for
14   anomalous and malicious communications to and from the
15   press review queue?
16       A.  To -- today, we aren't.  The Press Review Tool
17   isn't live in the state of Idaho.
18       Q.  Okay.  In other states where it is live, is
19   the press review queue being monitored for anomalous and
20   malicious communications to and from the press review
21   queue?
22       A.  We do have some security mechanisms in place,
23   yes.
24       Q.  And do you know what those are?
25       A.  The level of detail is confidential.  It's not

19 (Pages 182 to 185)

EXHIBIT 6, page 49 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 186

1    worth sharing.
2         MS. PETRONIO:  High level?
3         THE DEPONENT:  No, I can't.  We'd have to
4    go into the -- sorry.  We -- I don't -- can't go into
5    the details of those.
6         Q.  (By Ms. Duke) And I'm assuming that's for
7    proprietary reasons?  Even with us having a protective
8    order entered with the court, that's still not something
9    that Tyler is comfortable sharing?
10        A.  Yeah.  Also, it's a lack of deep knowledge
11   into the security protocols.
12        Q.  PO 158, do you know how the integrity
13   verification is being used to detect unauthorized access
14   of press review queues that are in place?
15        A.  No, I do not.
16        Q.  Do you know how Tyler, under PO 160, is
17   using -- or how the press review queue checks the
18   validity of inputs to the system?
19        A.  No, I do not.
20        Q.  And do you know how Tyler -- how the press
21   review queue prevents unauthorized code execution?
22        A.  Not at a detailed level.
23        Q.  And do you have an understanding that
24   Ms. Dvorak has asked these questions of Tyler's folks?
25        A.  Yeah.  I know she's -- she's requested that --

---

Page 187

1    that information.
2         Q.  And do you have an understanding that Tyler
3    has not provided her with the details to these questions
4    we've just gone through?
5         A.  Yeah, that's -- that's correct.
6         Q.  Again, I think that's because you've explained
7    by complying with what is included there, as Exhibit 3
8    to Exhibit 38, would be an incredibly costly process for
9    Tyler, and Tyler's only going to do that in the setting
10   of a contract amendment or a new or renewed contract?
11        A.  That's correct.
12        Q.  So some hopefully easier questions about the
13   press review queue so that I understand better as well
14   is:  Does the press review queue tool have a function
15   that alerts users if a complaint that was originally put
16   into the press review queue is actually rejected?
17        A.  We don't send any kind of alerts or
18   notifications as it pertains to the Press Review Tool.
19        Q.  Does the press review queue even receive that
20   type of information from File & Serve?
21        A.  Yes.  It -- it -- it -- well, it doesn't
22   necessarily directly receive it.  When the clerk makes
23   that determination, the status, the filing status of
24   that filing is modified in the EFM.  And then the way
25   that the Press Review Tool works is every time that a

---

Page 188

1    user goes in there, it makes the pool of those records
2    based upon those conditions.  So if the filing status
3    changed to a rejected and that was not a configured
4    condition for the Press Review Tool, then -- then the
5    next time that that screen was refreshed or displayed,
6    it would -- that filing would no longer be available.
7         Q.  But if it had been accessed prior to it being
8    rejected, assuming there was a configuration factoring
9    in rejections, there's no notification that, "Oh,
10   actually what you were looking at before is inaccurate
11   and it has been rejected"?
12        A.  That's correct.  There's no notification of
13   that.
14        Q.  Is there anything that would notify anyone in
15   the Press Review Tool whether a complaint has actually
16   been accepted?
17        A.  No.  Well --
18        Q.  Again, I'm assuming it could be configured
19   where if it was accepted it could be then I guess moved
20   out of the press review queue?
21        A.  Yeah, absolutely.  What I don't -- what I
22   don't remember is whether or not we display the status
23   of that filing within the tool itself.  I don't believe
24   that we do.  But you're correct in stating that if it's
25   configured to not be available in an accepted status,

---

Page 189

1    then if it reaches an accepted status then it would not
2    be available.
3         Q.  Now, in the press review queue, much like
4    Auto-Accept, again, if the setting is configured to
5    confidential, that, again, is going to be on the filer
6    side to make sure that they are noting the proper box so
7    it doesn't end up into the press review queue; correct?
8         A.  Yes, that is correct.
9         Q.  And so if a submitter marks confidential
10   documents incorrectly and does not say confidential,
11   it's going to go into press review queue?
12        A.  If the press review queue was configured --
13   the Press Review Tool was configured in that way, then
14   yes.
15        Q.  And back to, sadly, the malicious side of it,
16   if someone wants to be malicious and not mark something
17   confidential, even if it is containing judge's
18   addresses, social security numbers, those types of
19   things, it would go into press review queue if
20   confidential was not checked had confidential been part
21   of the configuration?
22        A.  Yes, that is correct.
23        Q.  And does Tyler provide any type of
24   indemnification to the courts -- and, in this instance,
25   it would be the State of Idaho -- if confidential

---

20  (Pages 186 to 189)

EXHIBIT 6, page 50 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 190

1   documents are wrongly, you know, put into the press
2   review queue?
3       A.  No, we do not.
4       Q.  Now, I know if we take a look at Exhibit 9, we
5   had some questions that were ultimately answered.  "We"
6   being Jennifer Dvorak, had some questions that were
7   ultimately answered by Tyler related to architecture and
8   dataflow diagrams.
9           Do you have an understanding that those have
10  not yet been provided to the State of Idaho at
11  Ms. Dvorak's request?
12      A.  Yes, I do have that understanding.
13      Q.  Okay.  And why has Tyler not provided those
14  items?
15      A.  Because those items for the Press Review Tool
16  do not exist.
17      Q.  Do they exist for other Tyler products?
18      A.  Yes, they do.
19      Q.  Do they exist for the case management system?
20      A.  Yes, I believe so.
21      Q.  Do they exist for File & Serve?
22      A.  Yes, they do.
23      Q.  And have they been provided to the State of
24  Idaho with respect to those two applications?
25      A.  I'm not sure.

Page 191

1       Q.  I assume if the State of Idaho were to ask for
2   those, if they don't already have them related to those
3   two items, would they be provided?
4       A.  Under the appropriate security provisions, I
5   believe so.
6       Q.  Okay.  Now, I know that there was a response
7   on this Exhibit 9.
8           MS. MITCHELL:  Do you know which part?
9       Q.  (By Ms. Duke)  Let me just have Molly take a
10  look at something and I can ask you some other questions
11  while she does that.
12      A.  Okay.
13      Q.  So we talked about -- we talked about -- or,
14  have not talked about in your deposition yet, something
15  called "API," Tyler's API.  Can you tell me what that
16  is?
17      A.  Yeah, API stands for application interface.
18      Q.  It's Ms. Dvorak's testimony that Tyler was
19  thinking it would have API available at the end of
20  September or end of Q3, and that that has not yet come
21  to fruition; is that correct?
22      A.  No, that's incorrect.  It was developed and
23  made available to our customers on September 23rd.
24      Q.  All right.  Do you know if the State of Idaho
25  has been advised of that in any way?

Page 192

1       A.  I don't believe so.  I saw some correspondence
2   earlier this week that would lead me to believe that
3   they hadn't.
4       Q.  Now, the API, just describe when a customer
5   gets that -- it sounds like that occurred at the end of
6   September, what happens with API if a customer gets that
7   from Tyler?
8       A.  Yeah.  Sure.  It's just a specification
9   document that essentially allows for the customer to
10  build their own version of a Press Review Tool, if you
11  will, calling it whatever name they deem appropriate.
12  But it would allow for them to have access to the
13  filings before a clerk makes a determination on them, so
14  after they've been submitted.
15      Q.  And so the API is -- is it provided to
16  customers at no charge?
17      A.  To our contract holders, yes.
18      Q.  If you're not a contract holder, what is Tyler
19  paying -- or, you know, having folks pay for the API?
20      A.  We're not making those available to anyone
21  outside of our contract holders.
22      Q.  All right.  Now, if you're a contract holder,
23  that means then that the State of Idaho would then have
24  to go obviously work with a team to then take the API
25  and actually build its own -- own computer application?

Page 193

1       A.  Yes, that is correct.
2       Q.  And I'm assuming you've done no looking into
3   how much that would cost the State of Idaho to do?
4       A.  No, I wouldn't know that information.
5       Q.  Okay.  But certainly this isn't like a
6   plug-and-play.  This is a, "Here's information, now
7   you've gotta go build an entire program off of it."
8       A.  That's right.  There's a development effort
9   required in order to build a solution that would --
10  would work.  The APIs just simply provide a mechanism to
11  gain access to those filings that are currently
12  available in the Press Review Tool.
13      Q.  Is Tyler looking to transition from providing
14  the Press Review Tool to instead transitioning to
15  providing its API or is it intending to do both?
16      A.  No, we -- we plan to do both.  We're just
17  trying to provide our customers with multiple options to
18  better serve them.
19      Q.  Okay.  Why did Tyler begin this process of
20  allowing API to be provided to its customers?
21      A.  It was -- it was requested by several
22  customers.
23      Q.  Obviously, the cost of using press review
24  queue API, there would be hardware costs to the court;
25  is that fair to assume?

21  (Pages 190 to 193)

EXHIBIT 6, page 51 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 194

1    A.  It's -- it's hard to speculate that, but
2    the -- the development of the program must reside
3    somewhere.
4        Q.  Okay.  Certainly, there would be personnel
5    costs.
6        A.  If -- if the application were to be supported,
7    yes.
8        Q.  Costs of developing the press review queue
9    software that would then interface with the API and
10   actually function?
11       A.  Yeah, that's the development effort.
12       Q.  Okay.  So costs to develop; right?
13       A.  I'm sorry?
14       Q.  Costs to develop it?
15       A.  Yes, that's correct.
16       Q.  I'm assuming hosting costs.
17       A.  It -- I think that depends upon where -- where
18   the State of Idaho chose to host it.  You know, whether
19   it be a cloud -- commercial cloud solution or whether
20   it's hosted on-premise.
21       Q.  Okay.  If hosted on-premise, they would
22   obviously need the -- the servers to do so?
23       A.  That's correct.
24       Q.  If hosted in a cloud, it would obviously need
25   a contract for whatever the price of that contract was

---

Page 195

1    to host it in the cloud?
2        A.  That's correct.
3        Q.  Now, currently, the press review queue for
4    Tyler is hosted by AWS; is that correct?
5        A.  That is correct.
6        Q.  It was Silverlight until October of 2021?
7        A.  No.  That -- it was hosted in Tyler's databank
8    data center and we migrated it to AWS.  It's -- it's
9    always been on the same software.
10       Q.  Where does Silverlight factor into what Tyler
11   has provided to the State of Idaho?
12       A.  Yeah.  Silverlight was the old version of our
13   review tool for the clerks.
14       Q.  Oh, okay.
15       A.  We've migrated away to an HTML5 version that
16   now exists.
17       Q.  So the clerk review tool was on Silverlight
18   and is now on AWS?
19       A.  Silverlight is a software technology and AWS
20   is a hosting location, so the clerk review tool was on
21   Silverlight.  It's now on an HTML5 version.  It was also
22   in databank, which is the Tyler data center and it is
23   now in the AWS GovCloud.
24       Q.  Got it.
25           What courts have accepted, you know, or gotten

---

Page 196

1    Tyler's API as the -- as of when it became available at
2    the end of September?
3        A.  I don't have a comprehensive list.  I do know
4    the State of California has access to them.
5    Specifically the --
6        Q.  Do you know --
7        A.  No.
8        Q.  And, sorry, you were saying?
9        A.  I was saying specifically the Judicial Council
10   in California.
11           And to finish your other question, no, I'm not
12   aware of any others.
13       Q.  All right.  We have that document up,
14   Exhibit 9.
15           You'll see there, there's a question by
16   Ms. Dvorak that says:  "Is ISC data hosted and stored
17   separately from other customers?"
18           And the answer was:  "Idaho's data isn't
19   physically separated, but it isn't accessible from other
20   customers as it is stored within its own database."
21           Do you see that?
22       A.  Yes, I do.
23       Q.  Has Tyler had any issues with users that were
24   registered in one state court being able to access data
25   from another state court's system?

---

Page 197

1        A.  No, it wouldn't be possible.
2        Q.  So is Tyler aware that, for instance, the
3    State of Washington was able to access Idaho's Odyssey
4    File & Serve and vice versa?
5        A.  No.
6        Q.  Has -- it's also my understanding Tyler has
7    not provided a letter from AWS that it is a customer in
8    good standing; is that correct?
9        A.  That's correct.
10       Q.  And Tyler has represented, in this Exhibit 9,
11   Page 5303, in the middle there:  "Are you able to
12   provide a letter from AWS that you are a customer in
13   good standing and which AWS environment ISC data will be
14   stored, processed, and transmitted?"
15           And you see the answer there?
16       A.  Yeah, I'm sorry.  I'm having a tough time
17   trying to locate it.  Where is it?
18           MS. DUKE:  Oh, can you make it bigger,
19   Molly?
20           THE DEPONENT:  Oh, I see it now.
21       Q.  (By Ms. Duke) Okay.
22       A.  Yes.
23       Q.  And is that a correct response by Tyler?
24       A.  Yeah.  AWS isn't willing to provide us a
25   letter.  I don't think they do provide those letters.

---

22  (Pages 194 to 197)

EXHIBIT 6, page 52 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

---

Page 198

1    So, yeah, we're not able to obtain one, but we do have
2    the majority of our customers in AWS operating today.
3        Q.  And would -- and that's the case with whether
4    you're in press review queue, File & Serve, case
5    management -- or not case management -- I'm sorry --
6    File & Serve or press review queue?
7        A.  That's correct.  The majority of our customers
8    on electronic filing in File & Serve and the Press
9    Review Tool are in AWS.
10       Q.  You'll see a little bit farther down, it talks
11   about what cadence or regular process is used to perform
12   serving patching.
13           Do you see that little section a couple
14   paragraphs down?
15       A.  Yes, I do, at the very bottom.
16       Q.  Do you see how it notifies:  "We do not
17   provide details of scan or penetration test results"?
18       A.  No, that appears to be cut off on the screen.
19       Q.  Oh, she'll move it up.
20       A.  Yes, I do see that.  Mm-hmm.
21       Q.  And it sounds like although she has asked for
22   that related to the SOC report -- or, no, strike that.
23           Despite the fact she's asked for that related
24   to Tyler, Tyler has not been willing to provide that
25   information; is that correct?

---

Page 199

1        A.  That's correct.  That's for security reasons.
2        Q.  And do you know if Microsoft performs any type
3    of patching on the press review server?
4        A.  Microsoft doesn't, no.
5        Q.  And does Tyler?
6        A.  Yes.  We -- we provide updates to the hardware
7    in which our software exists on.  Microsoft doesn't, but
8    we do.
9        Q.  And do you have documents that you would share
10   with the State of Idaho to confirm that?
11       A.  No, but they're informed of those updates.
12   They're notified when we make them.
13       Q.  All right.  Let go to Exhibit 6.
14           Are you aware of Doug Hansen with the State of
15   Idaho asking Tyler for the infrastructure requirements,
16   process, and policies around it, and the security
17   documentations for the press review queue?
18       A.  That's what we're looking at here?
19       Q.  Correct.
20       A.  Yeah.  Give me just a second, please.
21       Q.  Yeah, no problem.
22           MS. DUKE:  He might need you to scroll
23   through.
24       Q.  (By Ms. Duke) Just let Molly know if you need
25   to scroll.

---

Page 200

1        A.  Okay.  I don't know if I've seen this email
2    thread, but it appears to be some of the same questions
3    that we were discussing earlier regarding watermarks and
4    security.
5        Q.  Okay.
6        A.  APIs.
7        Q.  And it's your -- oh, sorry.
8        A.  I was just saying the APIs.
9        Q.  And it's your understanding that no watermarks
10   or any type of -- of item could be placed on a press
11   review queue display, and that's because it's actually
12   displaying the original document?
13       A.  That's correct.  It is technically feasible,
14   but it isn't an option today.  It would have to be
15   developed that way.
16       Q.  Okay.  Now, I know that -- and this is
17   separate and apart from press review queue, but I
18   understand there was a Portal issue in California
19   related to the California State Bar's Odyssey Portal.
20   Do you -- do you have that knowledge?
21       A.  Yes, I have -- I have a little bit.
22       Q.  Okay.  And what's your understanding of -- of
23   how that breach occurred in the State of California with
24   respect to the State Bar's Odyssey Portal?
25       A.  It didn't -- it wasn't with regards to the

---

Page 201

1    Press Review Tool.
2        Q.  No, I understand that.  Correct.
3            What tool was it with respect to?
4        A.  It was the online repository tool that we have
5    called Odyssey Portal.
6        Q.  And it's my understanding the reason it
7    happened was there was a -- I guess, a check that could
8    be made in the portal itself and that with that check
9    being in there it permitted access that was
10   unanticipated or unexpected.  Is that a proper
11   understanding?
12           MS. PETRONIO:  I'm just going to --
13   (inaudible).
14           THE STENOGRAPHER:  I can't hear you.
15           MS. PETRONIO:  I'm just objecting to the
16   form of the question.  I'm actually not going to let him
17   answer that because it's the subject of pending
18   litigation, and I think it's an inaccurate
19   characterization of what happened.  But, also, he's not
20   designated on that topic, so I think it would be a
21   mistake for us to let him answer that.
22           MS. DUKE:  All right.  Thank you.
23       Q.  (By Ms. Duke) So you were designated, as
24   Item No. 6, as somebody that could identify the courts
25   that implemented Auto-Accept and/or the Press Review

---

23  (Pages 198 to 201)

EXHIBIT 6, page 53 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                           30(b)(6) Terry Derrick - Vol. II

Page 202

1  Tool for civil, criminal, or other categories of
2  filings, including courts that have used Tyler-provided
3  APIs to implement the Press Review Tool.
4       I think we can take that last part out,
5  because that's just come out, and I doubt those -- those
6  courts are up and running yet with that; is that fair?
7       A.  Yes, that is correct.
8       Q.  So just the first part of that, do you have a
9  list of -- of the courts that have, in fact, implemented
10 Auto-Accept Review and/or Press Review Tool?
11      A.  Yeah.  I don't -- I don't have that
12 comprehensive list in front of me.  I do know that there
13 are about 25 of each, and I can give you a handful of
14 each, but I don't have that list in front of me now.
15      Q.  I'm assuming that's a list you could give your
16 counsel and she could just send us an email with it?
17      A.  If it's appropriate, yeah.
18      Q.  It's something we asked for in this 30(b)(6),
19 so I can appreciate it's hard for you to remember 25
20 different courts for each of those various programs, so
21 if it's easier to have that in a list you email to us or
22 in a list we take a quick break on and you read it, it
23 doesn't matter to me.
24      If you can give me a couple examples, that
25 would be great, for each.

Page 203

1       A.  Yeah.  Sure.  And I think I provided them
2  earlier, but I'm happy to restate them.  So for the
3  Auto-Accept, you know, the State of Maryland; the State
4  of Maine; the State of Vermont; Harris County, Texas;
5  and, the Los Angeles Superior Court in California.
6       For the Press Review Tool, Gwinnett County,
7  Georgia; Fulton County, Georgia; DeKalb County, Georgia;
8  Travis County, Texas; and, Clark County, Nevada.
9       Q.  All right.  Has Tyler been made aware of any
10 complaints as to -- oh, strike that.  I already asked
11 you that so don't worry about that.
12      All right.  I believe I already asked you this
13 but it's been a long day for all of us.  Has Tyler
14 received any reports of any security breaches related to
15 its press review queue?
16      A.  We have not.
17      Q.  Now, I know we also had identified Topic 19,
18 which is a document that Tyler sent to CNS related to
19 CNS sending to various courts the PowerPoint that we've
20 been going through with you today.
21      Are you aware of that?
22      A.  Yes, I am.
23      Q.  All right.  And what was Tyler's concern with
24 respect to Mr. Girdner's forwarding of that PowerPoint
25 to those courts?

Page 204

1       A.  We -- we had received some concern from some
2  of our customers regarding feedback, specifically that
3  it -- it was perceived as Tyler and Courthouse News were
4  in a partnership of some sort and we just wanted to be
5  clear that that wasn't the case.
6       Q.  Do Tyler and Courthouse News have any
7  partnership whatsoever?
8       A.  We do not.
9       Q.  Exhibit 4 asked -- to the deposition notice
10 asked that CNS provide to Tyler the communications that
11 CNS was sending to the courts at issue.
12      Do you know if CNS has done that?
13      A.  I do not.
14      Q.  And do Tyler and CNS have any type of
15 arrangement with respect to CNS advocating for the
16 implementation of a press review queue in the federal
17 court in the state of Idaho?
18      A.  We do not.
19      Q.  Did Tyler have an understanding prior to
20 this -- the 30(b)(6) notices, in this case, as to what
21 CNS has identified to the court as options for the Idaho
22 Courts related to CNS's request for an injunction in
23 this case?
24      A.  No.
25      Q.  I'm assuming that Tyler will not be

Page 205

1  representing to the Idaho Federal District Court Judge,
2  Judge Nye, that Tyler is taking a position that the
3  State of Idaho State Courts should, in fact, implement
4  the press review queue through Tyler either through its
5  application or its API; is that correct?
6       A.  That is correct.  We would not take a position
7  on that.
8       Q.  And that is also the same case with respect to
9  Auto-Accept?
10      A.  That is correct, yeah.  We -- our role as a --
11 in our partnership with the Idaho State Court is to
12 serve our partner.  And -- and we provide software and
13 then provide the direction of additional options of
14 configuration and availability of those options, but
15 take the direction as to which of those we implement by
16 the -- by our customers, so we're here to serve our
17 customers.
18      Q.  I will tell you that Mr. Girdner has
19 represented to the federal judge in this case,
20 Judge Nye, that Tyler has implemented its press review
21 queue for free with courts; is that correct?
22      A.  Yeah.  Historically, we have made it available
23 to a few courts for free.
24      Q.  All right.  And is that the process that Tyler
25 is following now?

24  (Pages 202 to 205)

EXHIBIT 6, page 54 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 206

1    A.  No, it is not.  In fact, the Press Review Tool
2  was built for a specific county, Clark County, Nevada,
3  in 2014, as part of their agreement, and was provided a
4  few times thereafter for free.  As it started to gain
5  traction, we ended up realizing that there was a true
6  expense associated with it as more and more customers
7  started to use it.  And so for those courts that do have
8  it for free, upon their contract renewal for their
9  e-filing platform, those -- those topics are being
10  revisited.
11    Q.  And now as we've discussed before, at a
12  minimum, the Idaho Courts would need to pay a $108,000
13  subscription and likely higher given the security
14  protocols that it has asked for Tyler to confirm and
15  adopt?
16    A.  Yes.  108,000 for the subscription license.
17  And if that security provision was a requirement, then,
18  yeah, that would likely be factored into the offering.
19    Q.  Would you agree that Auto-Accept does not
20  substitute for a clerk's review of a document?
21    A.  I can't answer that.  That's subjective, and I
22  think it -- it depends upon each clerk's business
23  process as to whether or not that's a realistic
24  assessment.
25           (Pause in the proceedings.)

Page 207

1    Q.  (By Ms. Duke)  Okay.  Is Tyler aware, in this --
2  this lawsuit, that CNS has represented the following to
3  our federal district court, "Cost:  Finally, defendant
4  claims Tyler provided a recent quote of 108,000 per year
5  to configure a press review queue raising serious
6  questions about the ability of private companies to
7  profit from the public record at the expense of the
8  First Amendment.  An unreasonable vendor 'does not allow
9  Idaho Courts to abdicate their responsibility to provide
10  timely access to public court records.' Defendant and
11  this court should be extremely skeptical of this quoted
12  price tag as Tyler has installed its press review queue
13  feature for numerous other courts at no charge."
14    I'll represent that that's in the Reply in
15  Support of Plaintiff Courthouse News' Motion for
16  Preliminary Injunction on Page 10.
17    Has Tyler provided numerous other courts the
18  press review at no cost or no charge?
19    A.  I think your first question was:  Was I aware
20  of this?
21    Q.  Correct.
22    A.  The answer is no.
23    Q.  Okay.
24    A.  The second question is:  Have I -- have we
25  provided that access to numerous.  Numerous is a

Page 208

1  subjective term, so I'd have to understand how many
2  numerous is.
3    As I stated just a few moments ago, we have
4  provided it historically for free, but each of those
5  contracts are being revisited upon renewal.
6    Q.  How many contracts have had it for free?
7    A.  I don't know that number off the top of my
8  head.
9    Q.  Is it most of them?  A few of them?  Half of
10  them?  Any estimate?
11    A.  Let's see.  The first -- let me see if I can
12  get this right.  We implemented the solution and created
13  it for Clark County, Nevada, in 2014.  Over the course
14  of the next four years, it was adopted by two other
15  courts, which I believe got it for free.  And since then
16  it has been adopted by the remaining 23, which I believe
17  the majority of those are paying for.
18    Q.  Okay.  And regardless of past practice, Tyler
19  has determined that given Tyler's costs and the market
20  for the product, the press review queue will carry at
21  least a minimum $108,000 subscription cost per year?
22    A.  That is correct for a statewide implementation
23  like the State of Idaho.
24    Q.  Did -- were you involved -- was Tyler involved
25  at all with respect to the Arizona Courts recently

Page 209

1  developing a press review queue?
2    A.  No.  Unfortunately, we don't have the e-filing
3  business in the state of Arizona yet.
4    Q.  And do you know who does?
5    A.  I do not.
6    MS. DUKE:  Okay.  I'm just looking
7  through my notes here real quick.  I know we're close.
8    MR. FETTERLY:  I know we're close, and I
9  also have just a few follow-up questions based on this
10  afternoon's session, so I wanted to just put that out
11  there.
12    MS. PETRONIO:  Well, let me just say he's
13  already 30 minutes late for an event that he's hosting
14  at his house, so anything you can do to keep this as
15  brief as possible is much appreciated.
16    MR. FETTERLY:  Maybe I can ask them while
17  Keely's looking through her notes?
18    MS. DUKE:  Sure.  Go for it.
19
20       E X A M I N A T I O N
21  BY MR. FETTERLY:
22    Q.  Mr. Derrick, just a few follow-ups here.
23  There was some testimony about -- a lot of testimony
24  about documents submitted to the court and received into
25  the EFM and the eFile & Serve.

25  (Pages 206 to 209)

EXHIBIT 6, page 55 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

| | |
|---|---|
| Page 210 | Page 212 |

**Page 210**

1   Who owns the documents that are submitted to
2   and received by the EFM and eFile & Serve?
3            MS. DUKE: Object to the form.
4   Foundation. Legal conclusion.
5            THE DEPONENT: Yeah. I -- I can't speak
6   to the ownership of those documents. It's -- I don't
7   know if it's still the filer or --
8        Q. (By Mr. Fetterly) As between Tyler or the
9   court?
10           MS. DUKE: Same objections.
11           THE DEPONENT: Yeah. Tyler provides the
12  software. We don't own any of the documents or data
13  that is traversing through.
14       Q. (By Mr. Fetterly) And the court's case
15  management -- or, the Odyssey Case Management System is
16  hosted in Idaho by Idaho but it's Tyler's application;
17  correct?
18       A. Yes, that is correct.
19       Q. And we were also talking about the -- the
20  document that's Exhibit 1 to the Courthouse News
21  subpoena being prepared for Texas. I just want to
22  clarify, it's my understanding that document was
23  prepared for Texas, but the Press Review Tool app was
24  not prepared for Texas; is that correct?
25       A. Yes, that is correct.

**Page 211**

1        Q. Tyler doesn't have different -- different
2   Press Review Tool apps per state; correct?
3        A. Yes. Each individual state is a different
4   implementation and that's a different instance of that
5   application. It's the same application, but it -- just
6   like we said before, it's not the same, so Idaho's would
7   be different than Texas would be different than
8   California's.
9        Q. Correct. So the configurations vary by state
10  or by court, but the app itself does not -- correct? --
11  otherwise.
12       A. The app itself is not a multi-tenant app like
13  our review tool is for the clerks. So there are
14  different instances of that app in each one of those
15  states.
16       Q. Counsel was asking you questions about the
17  ability to watermark documents in the Press Review Tool.
18  Could Tyler develop that for its customers if the
19  customers requested it?
20       A. Yeah. I mean, we're capable of doing that,
21  sure.
22       Q. Earlier, there was testimony regarding
23  issues -- counsel was asking questions about potential
24  issues with filing fees being accurate or correct in the
25  Auto-Accept paradigm.

**Page 212**

1        Have courts using Auto-Accept -- have they
2   actually had the kind of payment issues defense counsel
3   described?
4            MS. DUKE: Objection. Foundation.
5            THE DEPONENT: Yeah. I'm -- I'm not
6   intimately familiar with those issues if they have
7   transpired.
8        Q. (By Mr. Fetterly) Would Tyler have the ability
9   to create or develop a configuration for the auto-review
10  so that a -- a fixed or hard amount would be required in
11  order to meet the conditions for Auto-Accept?
12       A. Yeah. I mean, we could -- we're a technology
13  company. We could develop a lot of things, sure.
14       Q. So if the filing fee is $225, a condition
15  could be configured or developed such that if $225 is
16  the filing fee, then conditions says "yes, could be
17  Auto-Accept," and if it is not then, "no, not
18  Auto-Accept." Is that -- that could be developed?
19           MS. DUKE: Foundation.
20           THE DEPONENT: Yeah. We would have to
21  get the technical teams involved in the scoping of that,
22  but...
23       Q. (By Mr. Fetterly) Okay. Is Amazon Web Services
24  GovCloud FedRAMP-approved?
25       A. I -- I don't know. I don't know if they are.

**Page 213**

1        Q. Does Tyler have any concerns about the
2   security provided by AWS GovCloud relative to the
3   documents submitted to eFile & Serve?
4        A. No, we do not.
5        Q. The -- do you have any reason to believe the
6   information in Idaho's case management system is more
7   secure than the information on the EFM hosted by Tyler?
8            MS. DUKE: Objection. Foundation. He
9   testified he didn't know what any of our safety
10  protocols were.
11           THE DEPONENT: Yeah. I can't speak to
12  any of the security configurations or setting or
13  protocols leveraged in an environment that's not owned
14  by Tyler.
15       Q. (By Mr. Fetterly) Are there any ways in which
16  the Press Review Tool presents security issues that
17  would not also be presented by File & Serve?
18           MS. DUKE: Object to the form.
19  Foundation. Overbroad. And, actually, he's already
20  testified to some.
21           THE DEPONENT: I'm sorry. Say that one
22  more time?
23       Q. (By Mr. Fetterly) Yeah. I'm just -- are there
24  any ways in which the Press Review Tool presents a
25  security issue that would not be also presented by

26 (Pages 210 to 213)

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

EXHIBIT 6, page 56 of 61
Decl. of Fetterly

Courthouse News Service v. Omundson                              30(b)(6) Terry Derrick - Vol. II

Page 214

1    **File & Serve?**
2            MS. DUKE:  Same objections.  He's already
3    testified to some.
4            Go ahead.
5            THE DEPONENT:  Yeah.  I -- the Press
6    Review Tool is -- yeah.  I mean, we would -- we would
7    monitor both and -- and do what we can to protect both.
8        **Q.  (By Mr. Fetterly) Okay.  And then defendant's**
9    **counsel was asking whether Tyler indemnifies clients**
10   **based on improper use of documents accessed via the**
11   **Press Review Tool.**
12           **Does Tyler indemnify clients based on improper**
13   **use of documents accessed via the EFM?**
14       A.  I'm not sure if we do.  I'd have to look at
15   the contract.
16       **Q.  Same question with respect to the case portal.**
17       A.  The Odyssey Portal?
18       **Q.  Odyssey Portal.**
19       A.  Yeah.  I'm not familiar with those contracts.
20   I would have the look into them.
21       **Q.  I think last one here.  Does -- does**
22   **eFile & Serve comply with Idaho's cloud-based terms**
23   **and conditions?**
24           MS. DUKE:  Object to the form.
25   Foundation.  Asked and answered.

Page 215

1            THE DEPONENT:  Yeah.  The -- those --
2    those were established after the agreement that we have
3    with them was in place.
4            MR. FETTERLY:  Thank you.  I have nothing
5    further.
6            MS. DUKE:  One last quick question.
7            THE DEPONENT:  I did --
8            MS. DUKE:  Oh, go ahead, Mr. Derrick.
9            THE DEPONENT:  I was just going to say
10   one follow-up that I owed you, Mr. Fetterly, is the
11   document type is not the filing type, when we were
12   talking about that in terms of the Press Review Tool and
13   how it pertains to the EFSP.  The document type is
14   related to the document security groups, which,
15   unfortunately, in the exhibits, I did not see that
16   screen which is another click or two down from the
17   screen that you did provide.
18       **Q.  (By Mr. Fetterly) Okay.  So just to clarify**
19   **real quick, I'm looking at the Exhibit 1 to the**
20   **subpoena, we just talked about the document type.  I**
21   **know my question about document type was also related to**
22   **filing code.**
23           **We do see filing code here on the conditions;**
24   **correct?**
25       A.  Right.  For the Auto-Accept, but it isn't

Page 216

1    available on the conditions for the Press Review Tool.
2        **Q.  I see.  I see.  So that filing code there is**
3    **not available for the Press Review Tool.  It is**
4    **available for the Auto-Accept.**
5            **And just so we're clear on that, I'm now**
6    **putting that back up on to the screen.  And so here we**
7    **have the filing code.  This would be a condition to be**
8    **configured for the Auto-Accept; correct?**
9        A.  Correct, but not for the Press Review Tool.
10       **Q.  Gotcha.  Thank you for clarifying.**
11       A.  You're welcome.
12       **Q.  And just for the record, I'm showing the**
13   **witness Exhibit No. 37, CNS 013289, where we have the**
14   **filing code menu pulled down.**
15
16           E X A M I N A T I O N
17   BY MS. DUKE:
18       **Q.  Mr. Derrick, I'll go ahead and ask a couple**
19   **follow-ups here and then we'll get you back there to get**
20   **you to your party.**
21       A.  Okay.  Thank you.
22       **Q.  You were just asked questions by Mr. Fetterly,**
23   **of, oh, Tyler could do this, Tyler could do that if a**
24   **client asked.**
25           **Tyler's going to charge a fee to do certain**

Page 217

1    things like that, isn't it?
2        A.  Absolutely.
3        **Q.  So those are not things that come free?**
4        A.  That is correct.
5        **Q.  Has CNS, at any point in time, reached out to**
6    **Tyler and tried to contract with Tyler to make the cost**
7    **associated with the press review queue less laborious on**
8    **the state courts?**
9        A.  Not that I'm aware of.
10       **Q.  Has Tyler -- excuse me -- has CNS, at any**
11   **point in time, reached out to Tyler to offer making**
12   **Auto-Accept more plug-and-play for each of the courts?**
13       A.  Not that I'm aware of.
14       **Q.  All right.  Thanks a lot for your time today.**
15   **We appreciate it.**
16           MR. FETTERLY:  Thank you, Terry.
17           THE DEPONENT:  Hopefully, this was
18   helpful.
19           MS. DUKE:  It was very helpful.  Thank
20   you very much.
21           MR. FETTERLY:  Very helpful.  Thank you
22   very much.  We appreciate your time.
23           (Deposition concluded at 4:06 p.m.)
24           (Signature reserved.)
25           --o0o--

27  (Pages 214 to 217)

Courthouse News Service v. Omundson                    30(b)(6) Terry Derrick - Vol. II

Page 218

```
 1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2
 3          The undersigned Certified Shorthand
    Reporter and Deposition Notary Public of the State of
 4  California does hereby certify:
 5          That the foregoing 30(b)(6) deposition of
    Tyler Technologies designee Terry Derrick was taken before
 6  me remotely at the time, at which time the witness was
    duly sworn by me;
 7
 8          That the testimony of the witness and all
    objections made at the time of the deposition were
 9  recorded stenographically by me and were thereafter
    transcribed, said transcript being a true and correct copy
    of the proceedings thereof.
10
11          I further certify that I am neither counsel
    for nor related to any party to said action, nor in any
    way interested in the outcome thereof.
12
13          Further, that if the foregoing pertains to
    the original transcript of a deposition in a federal case,
    before completion of the proceedings, review of the
14  transcript was requested/offered on the
    record.
15
16
17          In witness whereof, I have subscribed my
    name on this 15th day of November 2022
18
19
20
21          Nicole A. Bulldis, RPR
             CA CSR No. 14441
22
23
24
25
```

                                      28  (Page  218)

EXHIBIT 6, page 58 of 61
Decl. of Fetterly



# DEPOSITION TRANSCRIPT NOTICE

**DATE:**  11/15/2022

**TO:**   Beth W. Petronio

**CASE NAME:**   Courthouse News Service v. Omundson

**WITNESS:**   30(b)(6) Terry Derrick - Vol. I

**DATE TAKEN:**   11/10/2022

Reading and signing was requested pursuant to FRCP Rule 30(e).  The above transcript must be read, and the Errata and/or Declaration signed within 30 days of this notice or before the trial date.  Otherwise, signature will be deemed waived for all purposes.  Please contact the witness and arrange a convenient time and place for reading and signing.  Please submit the signed original Errata and/or Declaration to this office.  The form(s) may be emailed to info@buellrealtime.com, mailed to Buell's address in the footer of this letter or faxed to 206.287.9832.

Buell Realtime Reporting, LLC

CC:
Jonathan G. Fetterly
Keely Duke

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com  www.buellrealtime.com

EXHIBIT 6, page 59 of 61
Decl. of Fetterly



# E R R A T A

**CASE NAME:**  Courthouse News Service v. Omundson

**DATE TAKEN:** 11/10/2022

**WITNESS:**  30(b)(6) Terry Derrick - Vol. I

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| 71 | 9 | on this light | in this light |
| 86 | 4 | that document take effect | that document takes effect |
| 103 | 11 | Tool was -- it provided | Tool provided |
| 103 | 15 | filings surface or | filings surface or be |
| 106 | 17 | referred document | referenced document |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com  www.buellrealtime.com

EXHIBIT 6, page 60 of 61
Decl. of Fetterly



# D E C L A R A T I O N

**CASE NAME:**   Courthouse News Service v. Omundson

**DATE TAKEN:** 11/10/2022

**WITNESS:**   30(b)(6) Terry Derrick - Vol. I


I declare under penalty of perjury under the laws of the State of

Washington that I have read my within deposition, and the same is true and

accurate, save and except for changes and/or corrections, if any, as indicated by

me on the ERRATA flyleaf page hereof.


_____
30(b)(6) Terry Derrick - Vol. I


Signed on the ____5____ day of ____December_____, 202__2__ .


1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail production@buellrealtime.com  www.buellrealtime.com

EXHIBIT 6, page 61 of 61
Decl. of Fetterly

# EXHIBIT 7
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke Evett,

PLLC, hereby provides objections, answers, and responses to Plaintiff's First Set of Interrogatories,

Requests for Production of Documents, and Requests for Admissions.

**INTERROGATORIES**

INTERROGATORY NO. 1:  State all reasons or justifications supporting the policy or

practice of withholding access to new e-filed civil complaints filed with the Idaho District Courts

until after those complaints have been Processed or Accepted.

ANSWER TO INTERROGATORY NO. 1:  Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-1

grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered in the Court's case management system, until it has been Processed and Accepted.

Subject to and without waiver of this objection, Omundson responds that the policies and justifications for not providing access to documents that have been submitted but not yet Processed or Accepted are as follows: (1) the public is not provided with access to documents that have not been Processed or Accepted because such documents are not filed and not entered in the court's case management system until they have been Accepted. Providing documents to the public before they are in the court's case management system may mislead the public to believe documents are court filings when they are not yet filed and may never be filed; (2) Tyler Technologies' Auto Accept function has not been implemented because this would allow documents to be filed, and therefore become part of the official record, even if the filing requirements that exist in Idaho Court Rules (e.g. payment of a filing fee and redaction requirements) have not been met or the action had been filed in an improper jurisdiction or venue, which would require judicial action that would add to the already incredibly busy schedules of judges and their court staff; (3) in addition, the Auto Accept function has not been implemented because it creates additional work for Idaho's already busy judges and a privacy risk to litigants and third parties (e.g. publication of sensitive information in a court submission), which would require judicial action to correct; (4) Tyler Technologies' Press Review Queue presents similar concerns because submissions that are Rejected could be published and/or reported on even though such submissions are not yet court filings, do not exist in the court's case management system or in a court file, and may never be entered in the Court's case management system; (5) the Press Review Queue does not have any function to ensure that the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-2

EXHIBIT 7, page 2 of 24
Decl. of Fetterly

security settings of documents are accurately reflected, that sensitive information about litigants and/or third parties contained in a submission (e.g. a petition for a civil protection order) will be redacted or otherwise not made available to the press and/or public, whereas the clerks can Reject an improperly redacted submission to ensure confidential information remains protected and can set the proper security setting to a document based upon Idaho Court Administrative Rule 32; (6) the Press Review Queue presents resource concerns because there is a subscription cost, hardware costs, and costs associated with personnel needed to manage the Press Review Queue; and (7) the Press Review Queue presents potential cyber security risks.

In addition, Omundson refers CNS to the Affidavit of Margaret Molchan (Dkt. 20-14); the Affidavit of Judge Hippler (Dkt. 20-16), the Affidavit of Carley Nelson (Dkt. 20-20), and the Declaration of Marissa Garza (Dkt. 23-1).

INTERROGATORY NO. 2:    State all reasons or justifications for not providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to all reasons for not providing access to those complaints through a Press Review Queue or through Auto Accept.

ANSWER TO INTERROGATORY NO. 2: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

INTERROGATORY NO. 3: Describe in detail all concerns or issues, if any, with

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-3

EXHIBIT 7, page 3 of 24
Decl. of Fetterly

providing or utilizing a Press Review Queue for new e-filed civil complaints filed with Idaho District Courts, including the basis for any such concerns or issues.

ANSWER TO INTERROGATORY NO. 3:  Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

INTERROGATORY NO. 4:  Describe in detail all concerns or issues, if any, with providing access to new e-filed civil complaints filed with Idaho District Courts through Auto Accept, including the basis for any such concerns or issues.

ANSWER TO INTERROGATORY NO. 4:  Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1.

INTERROGATORY NO. 5:  Identify all governmental interests that You contend could not be adequately protected by providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints filed with the Idaho District Courts prior to Processing or Acceptance, including the basis for Your contention(s) with respect to each such governmental interest.

ANSWER TO INTERROGATORY NO. 5:  Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-4

EXHIBIT 7, page 4 of 24
Decl. of Fetterly

grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to her answer to Interrogatory No. 1. Omundson further responds that the government has an interest in ensuring that confidential information of litigants and/or third parties is not made available to the press or the public. Auto Accept and the Press Review Queue undermine this governmental interest for the reasons discussed in the Answer to Interrogatory No. 1. The government also has an interest in ensuring that the press and public are presented with accurate information regarding civil filings.  The Press Review Queue could result in the publication of inaccurate information regarding civil filings (i.e. if  a submission that is Rejected, and thus never filed or an official court document, is reported on as if it were a filed document and an official court record.).  The government also has an interest in conserving judicial and administrative resources. Auto Accept and the Press Review Queue do not further these interests because there are subscription, hardware and personnel costs associated with remaining the Press Review Queue and Auto Accept could result in improper filings that would require judicial action and resources to correct.

INTERROGATORY NO. 6:  Identify by name, title and committee affiliation (if any) all persons associated with the AOC's office who considered or evaluated Courthouse News' requests to access new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to any persons who considered or evaluated the requests in Courthouse News' letters dated April 28, 2016, and June 24, 2021.

ANSWER TO INTERROGATORY NO. 6: Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-5

grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson responds  that Michael Henderson and Janica Bisharat reviewed CNS' letter dated April 28, 2016. At that time, Mr. Henderson was Legal Counsel to the Idaho Supreme Court and Administrative Office of the Courts and Ms. Bisharat was the Director of the Court Management Division.    Omundson and Jason Spillman reviewed CNS' letter dated June 24, 2021. Omundson is the Administrative Director of Idaho Courts and Mr. Spillman is Legal Counsel to the Administrative Office of the Courts.

INTERROGATORY NO. 7:  Identify by name, title, employer and committee affiliation (if any) all persons with whom the AOC's office communicated when considering or evaluating Courthouse News' requests to access new e-filed civil complaints filed with Idaho District Courts prior to Processing or Acceptance, including but not limited to any persons who considered or evaluated the requests in Courthouse News' letters dated April 28, 2016, and June 24, 2021.

ANSWER TO INTERROGATORY NO. 7:  Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson refers CNS to the individuals identified in her response to Interrogatory No. 6.  Omundson further responds that she communicated with Chief Justice

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-6

Richard Bevan, Mr. Spillman and Renae Bieri with respect to the June 24, 2021 letter.  Michael

Henderson had email communications with Karen  Yacuzzo  (First Assistant  Legal Counsel for

the Colorado State Court Administrator's Office) and  Catherine Nelson Zacharias (Legal  Counsel

for the Office of the State Court Administrator (Missouri)) relating to the implementation of a Press

Review Queue.  Those emails are produced at SO 000460-463.

INTERROGATORY NO. 8:  Identify by providing the Case Name and Case Number all

instances in which pre-Acceptance review by Idaho District Courts personnel resulted in sealing or

other confidential handling of a new e-filed civil complaint that otherwise would have been available

for viewing by members of the public.

ANSWER TO INTERROGATORY NO. 8:  Omundson objects to this interrogatory as

overly broad, unduly burdensome, and disproportionate to the needs of this case.  Omundson further

objects to the interrogatory to the extent it requests disclosure of cases that are currently sealed.

Omundson further objects to this interrogatory on the grounds that it is vague. Subject to and

without waiver of these objections, Omundson responds that, as phrased, the interrogatory assumes

that complaints are mislabeled as "public" by the filer and then changed to sealed or exempt status

by the clerks. However, clerks assign the case type (which applies the security level) and document

security upon Acceptance. Based on the process that is in place, there are no instances of a sealed

or confidential civil complaint being "otherwise . . . available for viewing by members of the

public" but for correction by clerks during the pre-Acceptance review; it is the pre-Acceptance

review that results in the assignment of a document security level.

INTERROGATORY NO. 9:  Identify by name, title and job description each person

currently employed by the AOC in its Information Division.

ANSWER TO INTERROGATORY NO. 9: Omundson objects to this interrogatory on the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-7

EXHIBIT 7, page 7 of 24
Decl. of Fetterly

grounds that it is overly broad, unduly burdensome, disproportionate to the needs of this case, seeks information that is not relevant, and is beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, Omundson refers CNS to the documents produced at SO 000001, 000335-459.

INTERROGATORY NO. 10:  For each of the years 2020, 2021, 2022, and 2023, identify the monetary budget allocated to the AOC and each of its divisions, including but not limited to the Information Division.

ANSWER TO INTERROGATORY NO. 10:  Omundson objects to this interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, Omundson responds that the AOC is not independent; it is part of the Idaho Supreme Court and does not have its own separate budget. The AOC manages a spending plan for each fiscal year which includes funding for the Idaho Supreme Court, the Idaho Court of Appeals, the Administrative Office of Courts, and the trial courts. The actual spending of funds may change throughout the year and funds may be reallocated to different divisions throughout the year. Omundson refers CNS to the spending plans for fiscal years 2020-2023 produced at SO 000257-334.

INTERROGATORY NO. 11:  For each of the years 2020 and 2021, identify the amount and source of revenue generated by the AOC and/or any Idaho District Court from the sale of judicial documents, including but not limited to revenue generated from individual copies and/or certified copies of documents, subscription services, and/or any revenue generating or sharing agreements with Tyler Technologies.

ANSWER TO INTERROGATORY NO. 11: Omundson objects to this interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-8

(Dkt. 42). Subject to and without waiver of these objections, Omundson responds that the AOC does not sell any judicial documents. By statute, elected county clerks may charge $1.00 per page for the service of photocopying documents and may charge a fee for the service of certifying a document. Clerks are not required to assess these charges and many do not. Counties are not required to report whether they assess the service charges or any amount collected to the AOC. By order of the Supreme Court, the Clerk of the Idaho Supreme Court may charge a fee for providing hard copies of Supreme Court documents. The AOC does not have any subscription services for accessing judicial documents. Tyler Technologies charges a convenience fee for online payments of fines (e.g. parking tickets), and the AOC receives 0.5% of the convenience fee. Westlaw previously paid the Idaho Supreme Court $6,000 per year to scan any paper filed briefs, but this ended when the Idaho Supreme Court switched to electronic filing.

INTERROGATORY NO. 12: Identify all AOC, Trial Court Administrator or District Clerk policies and statutes, rules, regulations, or other sources of legal authority that You contend support or require the policy and practice of restricting or prohibiting public or press access to new e-filed non-confidential civil complaints upon receipt by the Idaho District Courts until after Processing or Acceptance, including the basis for your contention(s) with respect to each policy, statute, rule, regulation or other authority cited.

ANSWER TO INTERROGATORY NO. 12: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Omundson further objects to this interrogatory on the grounds that it seeks information not within her custody

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-9

or control; she does not supervise county clerks and does not have copies of their policies. Subject to and without waiver of these objections, Omundson responds that Idaho Rule on Electronic Filing and Service ("IREFS") 3 defines the official court record to be the electronic case file maintained by the court as well as any paper filings and other conventional filings maintained in accordance with court rules. This does not include documents that reside in Tyler Technologies' Online Filing System program. IREFS 13 authorizes court clerks to reject submitted documents that do not comply with the electronic filing rules. Rejected documents are not part of the official court record because they are not included in an electronic case file maintained by the courts. Once a document has been accepted by a clerk it is moved out of the OFS system and placed in the Court's case management system, becoming an official court record pursuant to IREFS 3. At that time the Administrative Office of Courts follows Idaho Court Administrative Rule 32 and any relevant court orders in determining the security status of a document.

INTERROGATORY NO. 13: Identify all tasks performed by Idaho District Court clerks between time of submission of a new e-filed complaint by an e-filer and the time when such complaint is made available for public and press access.

ANSWER TO INTERROGATORY NO. 13: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Omundson further objects to this interrogatory on the grounds that it seeks information not within her custody or control; she does not supervise county clerks. Subject to and without waiver of these objections, Omundson responds that she does not have information responsive to this interrogatory. The AOC

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-10

EXHIBIT 7, page 10 of 24
Decl. of Fetterly

can provide county clerks with information regarding court processes, but the AOC does not supervise county clerks and thus cannot identify all tasks they perform.  The authorized scope of a clerk's review of submitted documents prior to acceptance and filing is stated in IREFS 13(a): "Documents that do not comply with this rule, or the requirements of the aforementioned Electronic Filing Guide or court policy, may be returned to the filer for correction."

INTERROGATORY NO. 14:  Identify all APIs the AOC and/or any Idaho District Court has received from Tyler Technologies relative to the Idaho eFiling System, including a description or summary of how each API is used or maintained by the AOC and/or any Idaho District Court.

ANSWER TO INTERROGATORY NO. 14:  Omundson objects to this interrogatory on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of this objection, Omundson responds that Tyler Technologies has not provided an API.

INTERROGATORY NO. 15:  State all reasons why the AOC and/or Idaho District Courts stopped requiring filers using the Idaho eFiling System to select document security when filing electronically, as stated in the following "FAQ" on the Idaho iCourt website:

> **Document security designation no longer required.**
>
> **Odyssey File and Serve Feature Changes to Document Security Designation**
>
> Beginning Monday, 8/22, filers using Odyssey and File and Serve will no longer be required to select document security when filing electronically. Previously, filers were required to select either "Public" or "Confidential" on documents filed, and this selection is no longer required. If a filer has a concern of file sensitivity, please add those notes into the filing comments for the clerk to view when submitting the filing.

ANSWER TO INTERROGATORY NO. 15: Omundson responds that some attorneys were marking all submissions as "Confidential," including documents that should have been marked as "Public." This was sometimes occurring in hundreds of cases a day, requiring a great deal of work

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-11

by the clerks to reset the security. Because this feature was using judicial resources and not being used properly, it was disabled. Filers now identify whether they believe a document should be confidential in the filing comments and a clerk will review the document to determine whether it should be public when it is moved to the courts case management system.

INTERROGATORY NO. 16:  Identify and describe all options Tyler Technologies has provided to the AOC and/or Idaho District Courts for providing public or press access to new e-filed non-confidential civil complaints upon receipt by the Idaho District Courts, and prior to Processing or Acceptance.

ANSWER TO INTERROGATORY NO. 16: Omundson objects to this interrogatory on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson responds Tyler Technologies has notified Omundson that Idaho can, with the addition of certain infrastructure and on-going management, install their Press Review Queue under an annual subscription model at a rate of $108,000 a year.

INTERROGATORY NO. 17:  If You deny Request for Admission No. 12, or any part thereof, describe in detail the basis for your denial.

ANSWER TO INTERROGATORY NO. 17: Omundson incorporates by reference all objections to the Requests for Admission set forth below, and further  objects to this interrogatory and the grounds that it is overly broad and unduly burdensome. Subject to and without waiver of these objections, Omundson refers CNS to its response to the Requests for Admission below.

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-12

## REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1:   Statistics, data, or other compilation of information (preferably in Excel or CVS form), sufficient to identify for each non-confidential civil complaint e-filed  in Idaho District Courts between January 1, 2020 and the present: (a) the date and time of submission of the complaint, (b) the date and time of Acceptance or Rejection of the complaint, (c) the date and time the complaint was made available for press or public access, if applicable, and (d) the amount of time (in calendar days) that elapsed between the submission of the complaint and its being made available for press or public access.

RESPONSE TO REQUEST FOR PRODUCTION NO. 1: Omundson objects to this request for production as overly broad, unduly burdensome and disproportionate to the needs of this case. Subject to and without waiver of these objections, Omundson is in the process of compiling documents responsive to this request and will supplement this response.

REQUEST FOR PRODUCTION NO. 2:   Documents and communications reflecting, evidencing, or sufficient to identify all tasks performed by Idaho District Courts clerks between the time of submission of a new e-filed civil complaint by an e-filer and the time the complaint is made available for public and press access.

RESPONSE TO REQUEST FOR PRODUCTION NO. 2: Omundson objects to this request for production as overly broad, unduly burdensome, disproportionate to the needs of this case, and on the grounds that it seeks documents that are not within her possession, custody or control; she does not supervise county clerks. Subject to and without waiving these objections, please see the documents produced at SO 000465-475.

REQUEST FOR PRODUCTION NO. 3: Documents sufficient to show the form and content of notice(s) provided to litigants informing them that a new e-filed civil complaint has been (i)

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-13

submitted to Idaho Courts, (ii) Accepted by Idaho Courts, and (iii) Rejected by Idaho Courts.

RESPONSE TO REQUEST FOR PRODUCTION NO. 3: Please see the documents produced at SO 000250-252.

REQUEST FOR PRODUCTION NO. 4:   All training and operating manuals for the Idaho eFiling System in effect at or used by the AOC and/or the Idaho Courts.

RESPONSE TO REQUEST FOR PRODUCTION NO. 4: Omundson objects to this request for production on the grounds that it seeks documents that are not within her possession, custody or control; she does not supervise county clerks. Subject to and without waiving this objection, please see the documents produced at SO 000555-001629.

REQUEST FOR PRODUCTION NO. 5:  Documents evidencing or reflecting any policy in effect at the Idaho Courts concerning district court clerk Acceptance or Processing of new electronically submitted civil complaints.

RESPONSE TO REQUEST FOR PRODUCTION NO. 5: Omundson objects to this request for production on the grounds that it seeks documents that are not within her possession, custody or control; she does not supervise county clerks. Subject to and without waiving this objection, Omundson refers CNS to the IREFS and the documents produced at SO 000555-001629.

REQUEST FOR PRODUCTION NO. 6:   Documents sufficient to reflect or evidence filing codes for each civil case category, case type, and case subtype available for case-initiating electronic filings in Idaho Courts.

RESPONSE TO REQUEST FOR PRODUCTION NO. 6: Please see the documents produced at SO 000014-18, 000464.

REQUEST FOR PRODUCTION NO. 7:   Documents sufficient to reflect or evidence each of the rejection or return codes used by Idaho Courts to identify the reason for Rejection of

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-14

an e-filed civil complaint.

     <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 7</u>: Please see the documents produced at SO 000253-256.

     <u>REQUEST FOR PRODUCTION NO. 8</u>:  For each e-filed civil complaint Rejected by Idaho Courts, Documents evidencing or reflecting the reason for Rejection.

     <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 8</u>: Omundson objects to this request for production on the grounds that it is overly broad, unduly burdensome, and disproportionate to the needs of this case. Omundson further objects to this Request for Production on the grounds that it is not limited in time; Omundson is only producing data within the time limits set forth in Request for Production No. 1. Omundson further objects to this Request for Production on the grounds that it is vague. A document is not electronically filed until it has been submitted to the court's electronic filing system and the submission has been acknowledged and the document accepted for filing. I.R.E.F.S. 11(a). Thus, a document is not electronically filed, and is not entered into the Court's case management system, until it has been Processed and Accepted. Subject to and without waiver of this objection, Omundson is in the process of compiling documents responsive to this request and will supplement this response.

     <u>REQUEST FOR PRODUCTION NO. 9</u>:  All Documents evidencing or reflecting internal communications of the AOC concerning the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints in Idaho Courts prior to Acceptance or Processing, including but not limited to providing access through a Press Review Queue or Auto Accept.

     <u>RESPONSE TO REQUEST FOR PRODUCTION NO. 9</u>: Omundson objects to this request for production on the grounds that it seeks documents that are protected by the attorney-client

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-15

privilege. Subject to and without waiving this objection, Omundson identifies the documents produced at SO 000019-249.

REQUEST FOR PRODUCTION NO. 10: All documents evidencing or reflecting communications between the AOC, on the one hand, and the Trial Court Administrators and/or District Clerks, on the other hand, the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints prior to Acceptance or Processing, including but not limited to providing access through a Press Review Queue or Auto Accept.

RESPONSE TO REQUEST FOR PRODUCTION NO. 10:  Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 11: Documents evidencing or reflecting communications between the AOC and Tyler Technologies concerning the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed civil complaints prior to Acceptance or Processing, including but not limited to providing access through a Press Review Queue or Auto Accept.

RESPONSE TO REQUEST FOR PRODUCTION NO. 11: Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 12:      All Documents evidencing or reflecting communications between the AOC or Idaho District Courts, on the one hand, and any other state court or state court administrator, on the other hand, concerning the possibility or feasibility of providing Courthouse News, other members of the press, or the public with access to new e-filed

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-16

civil complaints prior to Acceptance or Processing.

RESPONSE TO REQUEST FOR PRODUCTION NO. 12: Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 13: All Documents evidencing or reflecting communications between the AOC, on the one hand, and Tyler Technologies, on the other, concerning any development, implementation or testing of a Press Review Queue or Auto Accept system for the Idaho District Courts, including any draft or final contracts, agreements, amendments or addenda.

RESPONSE TO REQUEST FOR PRODUCTION NO. 13: Omundson is not aware of any documents responsive to this request for production. Omundson will supplement this response if any responsive documents are identified.

REQUEST FOR PRODUCTION NO. 14:  All Documents evidencing or reflecting any process by or through which either the AOC or Idaho District Courts considered whether to provide Courthouse News, other members of the press, or the public with access to new e-filed civil complaints prior to Processing or Acceptance, including but not limited to any consideration of providing access through a Press Review Queue or through Auto Accept.

RESPONSE TO REQUEST FOR PRODUCTION NO. 14: Please see the documents produced at SO 000002-13, 000019-249.

REQUEST FOR PRODUCTION NO. 15:  All contracts or agreements, including any amendments thereto, with Tyler Technologies concerning the Idaho eFiling System or public access to e-filed documents, including but not limited to contracts or agreements relating to Odyssey File & Serve or the Press Review Queue.

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-17

RESPONSE TO REQUEST FOR PRODUCTION NO. 15:  Please see the documents produced at SO 000476-554.

REQUEST FOR PRODUCTION NO. 16:  A current organization chart for the AOC and each of its divisions.

RESPONSE TO REQUEST FOR PRODUCTION NO. 16:  Please see the documents produced at SO 000001 and 000450-459.

REQUEST FOR PRODUCTION NO. 17:  All documents evidencing or reflecting the reason(s) why the AOC and/or Idaho Courts stopped requiring filers using the Idaho eFiling System to select document security when filing electronically.

RESPONSE TO REQUEST FOR PRODUCTION NO. 17:  Please see the documents produced at SO 000219-234.

REQUEST FOR PRODUCTION NO. 18:  If you deny any of Request for Admission Nos. 3 or any portion thereof, all documents evidencing or reflecting the basis for your denial.

RESPONSE TO REQUEST FOR PRODUCTION NO. 18:  Omundson objects to this Request for Production on the grounds that it is overly broad and unduly burdensome and on the grounds that the responses to Request for Admission speak for themselves. Subject to and without waiving these objections, please see the documents produced herewith.

**REQUESTS FOR ADMISSION**

REQUEST FOR ADMISSION NO. 1:  Admit that the AOC maintains the Idaho Judicial Branch's website (https://isc.idaho.gov).

RESPONSE TO REQUEST FOR ADMISSION NO. 1:  Omundson admits only that the AOC maintains the content on the Idaho Judicial Branch's website. The website is hosted by ITS, the State's information technology department.

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-18

REQUEST FOR ADMISSION NO. 2:  Admit that the AOC maintains the iCourt website (https://icourt.idaho.gov).

RESPONSE TO REQUEST FOR ADMISSION NO. 2: Omundson admits only that the AOC maintains the content on the iCourt website. The website is hosted by ITS.

RESPONSE TO REQUEST FOR ADMISSION NO. 3:     Admit the AOC does not have a written policy concerning Idaho Court clerk or staff review of electronically submitted documents  for improperly filed confidential documents or information.

RESPONSE TO REQUEST FOR ADMISSION NO. 3:  Deny. The AOC follows the written policies of the Idaho Supreme Court which appear in the IREFs including IREF 7 regarding clerk review of documents that a filer has identified as confidential and IREF 13 regarding the rejection of submissions that do not comply with court rules.

REQUEST FOR ADMISSION NO. 4:  Admit that, prior to August 22, 2016, filers using Idaho's eFiling System were required to select a document security of either "Public" or "Confidential" when filing documents electronically.

RESPONSE TO REQUEST FOR ADMISSION NO. 4: Omundson objects to this Request for Admission as vague since Twin Falls County was the only Idaho county using the eFiling system prior to August 2016. Subject to and without waiver of this objection, Omundson admits that prior to August 22, 2016, users of the e-filing system were required to select documents as either "Public" or "Confidential."

REQUEST FOR ADMISSION NO. 5:  Admit that as of August 22, 2016, filers using Idaho's eFiling System are no longer required to select a document security when filing documents electronically.

RESPONSE TO REQUEST FOR ADMISSION NO. 5: Omundson objects to this Request

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-19

for Admission as vague since Twin Falls County was the only Idaho county using the eFiling system prior to August 2016. Subject to and without waiver of this objection, Omundson admits that Idaho's e-filing system no longer requires users to select documents as either "Public" or "Confidential."

REQUEST FOR ADMISSION NO. 6:  Admit that as of June 15, 2022, You have not asked Tyler Technologies to provide a Press Review Queue for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 6: Omundson admits that as of June 15, 2022, she has not asked Tyler Technologies to provide a Press Review Queue for the Idaho Courts based on the security concerns and costs associated with the Press Review Queue set forth in her answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO. 7:  Admit as of June 15, 2022, you have not at any time attempted to negotiate or lower any price quoted by Tyler Technologies for a Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 7: Omundson admits that as of June 15, 2022, she has not attempted to negotiate or lower any price quoted by Tyler Technologies for a Press Review Queue, however cost concerns are not the sole reason for her decision to not implement a Press Queue. Omundson refers Plaintiffs to her response to Interrogatory No. 1 regarding the reasons for not implementing a Press Review Queue. Omundson further responds that questions relating to the price of the Press Review are inconsistent with CNS' representations to the Court that the Press Review Queue is free. *See e.g.* Dkt. 14-1 at 6.

REQUEST FOR ADMISSION NO. 8:  Admit that as of June 15 2022, You have not asked Tyler Technologies to provide an Auto Accept system for the Idaho Courts.

RESPONSE TO REQUEST FOR ADMISSION NO. 8:  Omundson admits that as of June

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-20

EXHIBIT 7, page 20 of 24
Decl. of Fetterly

15, 2022, she has not asked Tyler Technologies to provide an Auto Accept System for the Idaho Courts based on the concerns with Auto Accept set forth in her answer to Interrogatory No. 1.

REQUEST FOR ADMISSION NO.  9:  Admit that You are aware that Tyler Technologies has agreed to deliver the APIs for the Press Review Queue to its partners.

RESPONSE TO REQUEST FOR ADMISSION NO. 9: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it does not define "partners." Subject to and without waiver of this objection, Omundson admits that she is aware that Tyler Technologies has represented it will deliver APIs for the Press Review Queue. She has been told that Tyler Technologies is reporting that the delivery of an API is now delayed from the original projected date and that there is not a clear time frame for delivery.

REQUEST FOR ADMISSION NO. 10:  Admit that You are aware that Tyler Technologies will not charge AOC an additional cost to deliver the APIs for the Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 10:  Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it assumes there are costs associated with the Press Review Queue but does not identify what those costs are. Subject to and without waiver of these objections, Omundson denies this request for admission.

REQUEST FOR ADMISSION NO. 11:  Admit Tyler Technologies has not informed the AOC it will charge the AOC an additional cost to deliver the APIs for the Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 11: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and on the grounds that it is vague since it assumes there are costs associated with the

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-21

EXHIBIT 7, page 21 of 24
Decl. of Fetterly

API but does not identify what those costs are. Subject to and without waiver of these objections, Omundson admits only that she has not had discussions with Tyler Technologies regarding costs associated with the API.

REQUEST FOR ADMISSION NO. 12:  Admit that, using the APIs for the Press Review Queue, the AOC can provide the press or public with access to new complaints electronically submitted to the Idaho Courts in the same, or a substantially similar, manner as the Press Review Queue.

RESPONSE TO REQUEST FOR ADMISSION NO. 12: Omundson objects to this Request for Admission on the grounds that it seeks information beyond the scope of the Discovery Plan (Dkt. 42) and that it assumes Tyler Technologies has provided the AOC with information about the functionality of the APIs. Subject to and without waiver of this objection, Omundson admits only that she has not had discussions with Tyler Technologies regarding the functionality of the APIs.

DATED this 22nd day of July, 2022.

DUKE EVETT, PLLC

By _/s/Keely E. Duke_____
     Keely E. Duke – Of the Firm
     Molly E. Mitchell – Of the Firm
     *Attorneys for Sara Omundson*

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-22

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Amber N. Dina                                 amberdina@givenspursley.com
Katherine A. Keating                          katherin.keating@bclplaw
Jonathan G. Fetterly                          jon.fetterly@bclplaw.com


/s/Keely E. Duke
Keely E. Duke


DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-23

## VERIFICATION

STATE OF IDAHO     )

                    :ss

County of Ada       )


SARA OMUNDSON, being first sworn, deposes and states:

I am the Defendant in this case, I have read the foregoing DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, and believe the facts and statements set forth in the responses to Interrogatories are true and correct to the best of my knowledge, information, and belief.


_____

SARA OMUNDSON


SUBSCRIBED AND SWORN to before me this ____day of July, 2022


_____

NOTARY PUBLIC FOR IDAHO
Residing at Ada County, Idaho
My Commission Expires:_____


DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION-24

EXHIBIT 7, page 24 of 24
Decl. of Fetterly

# EXHIBIT 8
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>  Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>  Defendant. | CASE NO. 1:21-CV-00305-DCN<br><br>**DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION** |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke Evett, PLLC, hereby provides objections, answers, and responses to Plaintiff's Second Set of Requests for Production of Documents, and Requests for Admissions.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 13:** Admit the document attached hereto as Exhibit 1 is an authentic, genuine and true copy of an email sent by Michael Henderson to Artie Pepin on or about November 10, 2016.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:** Omundson objects to this Request for Admission on the grounds that she does not have access to Michael Henderson's email, and thus has no way of verifying that Exhibit 1 is an authentic, genuine and true copy of an email sent by Michael Henderson. Subject to and without waiver of this objection, Omundson admits that the email address listed in Exhibit 1 was the true and correct email address for Michael Henderson when he worked as Legal Counsel for the Idaho Supreme Court/Administrative Office of the Courts and Omundson further responds that she has no reason to believe that Exhibit 1 is anything other than a true and correct copy of an email sent by Michael Henderson to Artie Pepin on November 10, 2016.

DATED this 23rd day of September, 2022.

DUKE EVETT, PLLC

By: /s/Keely E. Duke_____
    Keely E. Duke – Of the Firm
    Molly E. Mitchell – Of the Firm
    *Attorneys for Sara Omundson*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of September, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke_____
Keely E. Duke

DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION - 2

EXHIBIT 8, page 2 of 2
Decl. of Fetterly

# EXHIBIT 9
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukeevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>        Plaintiff<br><br>vs.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>        Defendant. | CASE NO. 1:21-CV-00305-DCN<br><br>**DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES** |

Defendant Sara Omundson ("Omundson"), by and through her counsel of record, Duke Evett, PLLC, hereby provides objections, answers, and responses to Plaintiff's Third Set of Interrogatories.

## **INTERROGATORIES**

**INTERROGATORY NO. 18:** Identify each category of civil complaint available for filing in the Idaho District Courts that You contend must be kept confidential by the Idaho District Courts by operation of rule or law (including categories of civil complaints You contend are "exempt from public disclosure"), without the need for a motion or request for sealing.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 1

**ANSWER TO INTERROGATORY NO. 18:** Omundson objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests; however, CNS's counsel has clarified that for purposes of this lawsuit and discovery, the term "civil complaint" refers to the civil case filings listed in the first fee category in Appendix A to the Idaho Rules of Civil Procedure ("AA – All Initial District Court Filings (Not Listed In: E, F and H1"), and that is how this term will be defined throughout these responses. For purposes of these discovery responses, Omundson is applying the definition of "confidential" from Rule 2(j) of the Idaho Rules for Electronic Filing and Service. Subject to and without waiver of this objection, Omundson refers CNS to Idaho Court Administrative Rule 32(g) and the documents produced at SO 005360-5364. There are no documents for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) that must be kept confidential by the Idaho District Courts by operation of rule or law without the need for a motion or request for sealing.

**INTERROGATORY NO. 19:** For each category You identified in response to Interrogatory No. 18, state the number of civil complaints in that category or type e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022.

**ANSWER TO INTERROGATORY NO. 19:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague because the terms "civil complaint" and "confidential" are not defined by CNS's discovery requests. Subject to and without waiver of these objections, and based on the definitions of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that 9,833 civil complaints in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) were e-filed between January 1, 2020 and July 31, 2022.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 2

EXHIBIT 9, page 2 of 9
Decl. of Fetterly

**INTERROGATORY NO. 20:** State the number of civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022 with a motion or request for sealing.

**ANSWER TO INTERROGATORY NO. 20:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" and "confidential" set forth in the answer to Interrogatory No. 18, Omundson responds that from January 1, 2020 through July 21, 2022, one civil complaint in category AA – All Initial District Court Filings (Not Listed In: E, F and H1) was e-filed between January 1, 2020 and July 31, 2022.

**INTERROGATORY NO. 21:** Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected.

**ANSWER TO INTERROGATORY NO. 21:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Omundson also objects to this Interrogatory on the grounds that it is vague; Interrogatory No. 22 asks about civil complaints that were Rejected, corrected, and then Accepted, so it is unclear if Interrogatory No. 21 is asking for the total number of Rejected civil complaints, or only those that were Rejected and then not resubmitted. Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,642 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected. Omundson calculated this number based on the number of times a civil complaint was Rejected, meaning if a civil complaint was submitted and Rejected four times, each of the filings were counted in calculating this number.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 3

**INTERROGATORY NO. 22:** Of the civil complaints e-filed in the Idaho District Courts from January 1, 2020 through July 31, 2022, state the number that were Rejected, subsequently corrected and re-submitted by the filer, and ultimately Accepted.

**ANSWER TO INTERROGATORY NO. 22:** Omundson objects to this Interrogatory on the grounds that it seeks information that is not relevant and beyond the scope of the Discovery Plan (Dkt. 42). Subject to and without waiver of these objections, and based on the definition of "civil complaint" set forth in the answer to Interrogatory No. 18, Omundson responds that 1,025 civil complaints e-filed in the Idaho District Courts for case type AA - All Initial District Court Filings (Not Listed In: E, F, and H1) from January 1, 2020, through July 31, 2022, were Rejected, subsequently corrected, resubmitted by the filer, and ultimately Accepted. Omundson calculated this number based on the number of times a civil complaint was Rejected and resubmitted, meaning if a civil complaint was submitted and Rejected and resubmitted four times, each of the filings were counted in calculating this number. Omundson further responds that 28% of rejected filings are missing identifying information that would allow a match with a resubmitted and Accepted filing. These results were also based on the time litigants are allowed to resubmit e-filed complaints before they are considered a new filing (3 days per Rule 13(c) of the Idaho Rules for Electronic Filing and Service).

**INTERROGATORY NO. 23:** Identify the nature and amount of the "hardware costs" associated with a Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**ANSWER TO INTERROGATORY NO. 23:** Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all hardware costs associated with the Press Review Queue. Subject to and without waiver of this objection, Omundson responds that Tyler claims there are no hardware costs associated with the Press Review Queue. Tyler made this claim after the response to Interrogatory

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 4

EXHIBIT 9, page 4 of 9
Decl. of Fetterly

No. 1 had been served, and the AOC has been in communications with Tyler to get additional information regarding the Press Review Queue.  Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

**INTERROGATORY NO. 24:** Identify the nature and amount of "costs associated with personnel needed to manage the Press Review Queue," as set forth in Your response to Interrogatory No. 1.

**ANSWER TO INTERROGATORY NO. 24:** Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all personnel costs associated with managing the Press Review Queue. Subject to and without waiver of these objections, Omundson anticipates that personnel costs will include, but not be limited to, costs associated with reeducating clerks, staff, attorneys, and litigants about how the Press Review Queue works and answering questions about the Press Review Queue and/or troubleshooting problems with the Press Review Queue. Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

**INTERROGATORY NO. 25:** Identify the "potential cyber security risks" presented by the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**ANSWER TO INTERROGATORY NO. 25:** Omundson objects to this Interrogatory on the grounds that the AOC has not implemented the Press Review Queue, and therefore does not know the extent of all cyber security risks associated with the Press Review Queue. Subject to and without waiver of this objection, Omundson refers CNS to the document titled "Risk Memorandum" and dated August 18, 2022. Omundson further responds that Tyler has refused to respond to numerous questions from the AOC regarding security concerns with the Press Review Queue. Tyler has refused to provide an answer to the AOC's questions about whether the Press Review Queue provides a link to the original pleading or a copy of the pleading. Providing a link to the original

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 5

document raises serious concerns about document security if the system is hacked because filings could be deleted or altered without any backup to the original document. Tyler has also refused to provide a customer attestation letter from their underlying IaaS provider, AWS, indicating Tyler is a customer in good standing and which environment will be storing, processing, and transmitting Idaho District Court's data. Tyler has also refused to provide the architecture and/or data flow diagram to the AOC so that the AOC can understand the Press Review Queue's backend processes for data transfer. Tyler has also refused to provide its policies and procedures surrounding data security. Even though a Non-Disclosure Agreement has been signed, Tyler refuses to provide these policies and procedures on the grounds that this would allegedly violate company policy. Omunsdon will supplement this answer once Tyler Technologies provides information related to such question of costs.

**INTERROGATORY NO. 26:** If personnel of other courts, Tyler Technologies personnel, or any other third party has relayed to AOC personnel any problems, negative experiences, or bad outcomes purportedly arising from the implementation of a Press Review Queue, Auto-Accept, or other method of providing the press or public with pre-Acceptance access to new civil complaints, identify the person who relayed the information and describe in detail the problems, negative experiences, or bad outcomes relayed by that person.

**ANSWER TO INTERROGATORY NO. 26:** Omundson objects to this Interrogatory on the grounds that it is vague and seeks information that is not relevant and is beyond the scope of the Discovery Plan (Dkt. 42). Given this Interrogatory is not related to the significant problems implementation of Press Review Queue or Auto-Accept would have on Idaho's courts, court staff, clerk staff, and judges, this answer does not list those multitude of issues, inefficiencies, costs, and abuse concerns. Subject to and without waiving these objections, Omundson responds that she has had discussions with other state court administrators regarding generalized concerns about

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 6

publishing submitted but unfiled documents, including how this may undermine public confidence in the courts and the protection of confidential information and documents, and has also had discussions about CNS litigation across the country and the varying standards federal courts have applied. At a Conference of State Court Administrators ("COSCA") in December 2021 in Arizona, concerns were raised by Nancy Cozine, the Oregon State Court Administrator, and other attendees regarding public confidence in the courts and release of protected information. Omundson also attended another COSCA conference in July 2022, which included a panel discussion about CNS litigation and concerns about public confidence in the courts. Laura O'Hanlon was on the panel, but Omundson does not recall who else was on the panel. Omundson also had a conversation with Artie Peppin at a conference in September 2022 regarding the status of CNS' New Mexico lawsuit.

Omundson further responds that Jennifer Dvorak, the Chief Information Security Officer for the AOC, has discussed these concerns with trial court administrators in Oregon and Washington who have expressed similar concerns about Tyler's lack of transparency when it comes to issues of data security.

Omundson is also aware of an alleged data breach involving a Tyler case management portal that resulted in the scraping of confidential information from the California Bar Association's website by judyrecords. It has been reported that over 320,000 confidential records were posted on a third-party site and available from October 2021 to February 2022. The alleged data breach was reportedly due to a previously unknown security vulnerability that allowed the confidential records to be unintentionally scraped.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 7

EXHIBIT 9, page 7 of 9
Decl. of Fetterly

DATED this 30th day of September, 2022.


                               DUKE EVETT, PLLC


                            By /s/Keely E. Duke
                               Keely E. Duke – Of the Firm
                               Molly E. Mitchell – Of the Firm
                               *Attorneys for Sara Omundson*


## **CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of September, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |


                             /s/Keely E. Duke
                             Keely E. Duke

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 8

## VERIFICATION

STATE OF IDAHO          )

                        :ss

County of Ada           )


SARA OMUNDSON, being first sworn, deposes and states:

I am the Defendant in this case, I have read the foregoing DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES, and believe the facts and statements set forth in the responses to Interrogatories are true and correct to the best of my knowledge, information, and belief.


_____
SARA OMUNDSON


SUBSCRIBED AND SWORN to before me this \_\_\_\_day of September, 2022


_____
NOTARY PUBLIC FOR IDAHO
Residing at Ada County, Idaho
My Commission Expires:_____


DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES - 9

# EXHIBIT 10
# FETTERLY DECLARATION

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly Mitchell
ISB # 10035 mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

Defendant Sara Omundson, ("Omundson"), by and through her counsel of record, Duke

Evett, PLLC, hereby provides objections, answers, and responses to Plaintiff's Third Set of

Interrogatories, Requests for Production of Documents, and Requests for Admissions.

**REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 14:** Admit that the AOC procured a contract with e-

filing vendor Tyler Technologies to provide e-filing to the Idaho District Courts using Tyler

Technologies' Odyssey File & Serve software program ("File & Serve").

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:** Admit.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 1

EXHIBIT 10, page 1 of 7
Decl. of Fetterly

**REQUEST FOR ADMISSION NO. 15:** Admit that the Idaho District Courts began implementing mandatory e-filing through File & Serve in 2017.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:** Deny; Idaho District Courts began implementing mandatory e-filing through File & Serve in 2015, not 2017. E-filing became mandatory for different counties over the period of 2015-2018.

**REQUEST FOR ADMISSION NO. 16:** Admit that all Idaho District Courts were transitioned to File & Serve by 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:** Admit.

**REQUEST FOR ADMISSION NO. 17:** Admit that under the default configuration for File & Serve, nonconfidential e-filed civil complaints are not available for viewing by the press or public until after they are "Accepted" by court staff.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:** Denied; all documents are immediately available upon filing, which requires acceptance by a court clerk pursuant to Rule 12 of the Idaho Rules for Electronic Filing and Service.

**REQUEST FOR ADMISSION NO. 18:** Admit that the AOC received the document titled "Auto-Accept Review & Press Review Tool" (produced with bates labels SO 000002-SO 000013 and attached hereto as Exhibit 1) from Tyler Technologies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:** Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson responds that Tyler provided the AOC with the document bates labeled SO 000002-SO 000013.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 2

EXHIBIT 10, page 2 of 7
Decl. of Fetterly

**REQUEST FOR ADMISSION NO. 19:** Admit that Tyler Technologies offers Auto-Accept Review as a "free, 'out of the box' e-filing function that allows Clerks to automatically accept filings based on a set of conditions," as stated on the page bates-labeled SO 000003 of the document titled "Auto-Accept Review & Press Review Tool" (Exhibit 1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:** Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson admits only that she is aware of an "Auto-Accept" function from Tyler Technologies. As to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 20:** Admit that Auto-Accept Review is available to the Idaho District Courts from Tyler Technologies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:** Denied; the Idaho Supreme Court is responsible for determining whether Auto-Accept Review is available to the Idaho District Courts and the Idaho Supreme Court has chosen not to implement Auto-Accept Review given the incredible burdens such feature would place on the staff at the 44 clerk's offices, judges, and judicial staff across the State of Idaho. As such, it is not available to the Idaho District Courts.

**REQUEST FOR ADMISSION NO. 21:** Admit that Tyler Technologies offers the Press Review Tool as "an application that works in conjunction with eFile & Serve to provide Clerks the option to grant access to filings as soon as they are filed (prior to Clerk review)," as stated on the page bates-labeled SO 000003 of the document titled "Auto-Accept Review & Press Review Tool" (Exhibit 1).

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:** Omundson objects to this Request for Admission on the grounds that no exhibits were attached to CNS's third set of discovery requests. Subject to and without waiving this objection, Omundson admits she is aware Tyler Technologies offers a Press Review Tool and that Tyler Technologies has made representations that it works as identified in SO 000003. Omundson otherwise responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 22:** Admit that the Press Review Queue Tool is available to the Idaho District Courts from Tyler Technologies.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:** Denied; the Idaho Supreme Court is responsible for determining whether the Press Review Queue Tool is available to the Idaho District Courts and the Idaho Supreme Court has chosen not to implement the Press Review Queue Tool. As such, it is not available to the Idaho District Courts.

**REQUEST FOR ADMISSION NO. 23:** Admit that the AOC has not calculated the "hardware costs" associated with the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time. As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 4

EXHIBIT 10, page 4 of 7
Decl. of Fetterly

Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request.  Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 24:** Admit that the AOC has not calculated the "costs associated with personnel needed to manage the Press Review Queue," as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time.  As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request.  Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 25:** Admit that the AOC has not analyzed the "hardware costs" associated with the Press Review Queue, as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 5

EXHIBIT 10, page 5 of 7
Decl. of Fetterly

Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time.  As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request.  Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

**REQUEST FOR ADMISSION NO. 26:** Admit that the AOC has not analyzed the "costs associated with personnel needed to manage the Press Review Queue," as set forth in Your response to Interrogatory No. 1.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:** Omundson objects to this Request for Admission on the grounds that it is vague because it does not differentiate between the Press Review Queue software and the Press Review Queue API. Subject to and without waiver of this objection, Omundson admits only that the AOC has asked Tyler Technologies about costs associated with the Press Review Queue software and the Press Review Queue API and does not have a complete list of such costs from Tyler Technologies at this time.  As for the remaining allegations, once Tyler Technologies provides the necessary costs information related to Press Review Queue and the Press Review Queue API, Omundson will then be able to admit or deny the remaining allegations in this Request.  Formally stated as Rule 36 requires, as to the remaining allegations, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 6

EXHIBIT 10, page 6 of 7
Decl. of Fetterly

**REQUEST FOR ADMISSION NO. 27:** Admit that no personnel of other courts, Tyler Technologies personnel, or any other third party relayed to AOC personnel any problems, negative experiences, or bad outcomes purportedly arising from the implementation of a Press Review Queue or Auto-Accept.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:** Denied; implementation of Press Review Queue or Auto-Accept will create a host of problems for Idaho's courts. In addition, Tyler Technologies itself will advise that most courts do not use a blanket Auto-Accept. For any additional specifics, Omundson responds she has made reasonable inquiry and the information she knows or can readily obtain is insufficient to enable her to admit or deny these allegations.

DATED this 30th day of September, 2022.

DUKE EVETT, PLLC

By: /s/Keely E. Duke_____
      Keely E. Duke – Of the Firm
      Molly E. Mitchell – Of the Firm
      *Attorneys for Sara Omundson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber N. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke_____
Keely E. Duke

DEFENDANT'S RESPONSES TO PLAINTIFF'S THIRD SET OF REQUESTS FOR ADMISSION - 7

EXHIBIT 10, page 7 of 7
Decl. of Fetterly

# EXHIBIT 11
# FETTERLY DECLARATION

| | |
|---|---|
| **From:** | no-reply@efilingmail.tylertech.cloud |
| **To:** | krisw@bannockcounty.us |
| **Subject:** | Filing Accepted for Case: CV03-21-03817; **********; Envelope Number: 4633181 |
| **Date:** | Thursday, January 13, 2022 10:08:29 AM |



# Filing Accepted

Envelope Number: 4633181
Case Number: CV03-21-03817
Case Style: **********

The filing below was reviewed and has been accepted by the clerk's office. You may access the file stamped copy of the document filed by clicking on the below link.

| Filing Details | |
|---|---|
| **Court** | Bannock County |
| **Case Number** | CV03-21-03817 |
| **Case Style** | ********** |
| **Date/Time Submitted** | 1/13/2022 9:19 AM MST |
| **Date/Time Accepted** | 1/13/2022 10:08 AM MST |
| **Accepted Comments** | |
| **Filing Type** | Motion to Vacate |
| **Filing Description** | Termination Hearing and Set for Status Conference |
| **Activity Requested** | EFileAndServe |
| **Filed By** | Kris Williams |
| **Filing Attorney** | Kent Reynolds |

| Document Details | |
|---|---|
| **Lead Document** | Motion to Vacate Termination Hearing & Set For Status Conference.pdf |
| **Lead Document Page Count** | 2 |
| **File Stamped Copy** | Download Document |
| This link is active for 30 days. | |

**Please Note:** If you have not already done so, be sure to add yourself as a service contact on this case in order to receive eService.

**SO 000250**
EXHIBIT 11, page 1 of 2
Decl. of Fetterly

For technical assistance, contact your service provider

Service Provider: Tyler Technologies Odyssey File and Serve Need Help?
Visit: https://idaho.tylerhost.net/contacts.htm
Email: efiling.support@tylertech.com

Please do not reply to this email. It was automatically generated.

SO 000251

EXHIBIT 11, page 2 of 2
Decl. of Fetterly

**Slipsheet for Excel File to Be Submitted in Native Form Subject to Grant of Appellee's Motion for Leave to Transmit, Filed on May 21, 2025**

Exhibit 1 to Supplemental Declaration of Jonathan G. Fetterly in Support of Motion for Summary Judgment (*see* SER-4 (¶ 2); SER-9)

**Slipsheet for Excel File to Be Submitted in Native Form Subject to Grant of Appellee's Motion for Leave to Transmit, Filed on May 21, 2025**

Exhibit 1 to Declaration of Jimmy Shimabukuro in Support of Motion for Summary Judgment (*see* 7-ER-1390 (¶ 10); 7-ER-1394)

Keely E. Duke
ISB #6044; ked@dukevett.com
Molly E. Mitchell
ISB#10035; mem@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

I, Sara Omundson, declare as follows:

1.     I am the Administrative Director of the Idaho Courts ("Administrative Director"). I have been the Administrative Director since July 2016 when I was appointed by the Idaho Supreme Court ("Supreme Court").

2.     In 2012, I was appointed by Governor C.L. "Butch" Otter to serve as Idaho's State Appellate Public Defender. During my time as State Appellate Public Defender, I also served as Chair of the Idaho Criminal Justice Commission through appointment by Governor Otter in June 2013, as well as serving as a member of the State Public Defense Commission. Prior to holding those positions, from 2002 through 2012, I worked as Chief of the State Appellate Public

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1**

Defender's Office's Appellate Unit, where I managed attorneys and support staff while also representing people before the Supreme Court and the Idaho Court of Appeals. I worked as a Deputy State Public Appellate Defender from 1999 through 2002.

3.     Through my role as Administrative Director, I have knowledge of the divisions of the Administrative Office of the Courts. I also have knowledge of the administrative and organizational structure of the Idaho court system, including the role of the Supreme Court, roles authorized by statute, and by the Supreme Court through the Idaho Court Administrative Rules.

4.     My responsibilities as the Administrative Director are generally as follows. I am responsible for assisting the Supreme Court in meeting its constitutional responsibility to administer a unified, integrated court system. I meet regularly with the Supreme Court and am responsible for many of the day-to-day administrative and support operations of the judiciary. These responsibilities include intergovernmental relations with the Executive and Legislative branches of state government. I encourage input from judges and court personnel throughout the state whether through regular direct contact, court committees or the Administrative Conference to enhance services provided to the public by the Idaho courts system. With Supreme Court oversight, I set the leadership agenda of the Supreme Court and the Administrative Conference. The Administrative Conference provides an important governance role and is made up of the administrative district judge and trial court administrator from each of Idaho's seven judicial districts, Supreme Court Justices and Chief Judge of the Court of Appeals, administrative staff, and officers of the magistrate and district judges' associations. I take part in long-term strategic planning activities to meet the goals and objectives of the Idaho court system and to support the mission statement and values of the Idaho court system. I also review current budgets, staffing and resources and determine, with the Administrative Conference, what resources will be needed to

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 2**

meet the Idaho Court System's goals and objectives. I directly report to the Chief Justice of the Supreme Court. I act under the supervision and direction of the Idaho Supreme Court pursuant to Idaho Code § 1-612. I do not approve or adopt the court rules relevant to the efiling system or the definition of public documents. I review and make recommendations to the Idaho Supreme Court for potential changes they may then consider and decide whether a change to policies or procedures will be made.

5.     I work with individuals in roles at all levels of the Idaho court system. For example, through my work at the county level, I have knowledge of the processes and procedures employed by Idaho's 44 county district court clerks, their deputy clerks and court staff. Due to the population diversity in Idaho's counties, the clerks' offices are staffed with as little as two full-time deputy clerks (Lewis County) and up to 184 (Ada County). The 44 elected district court clerks serve terms and are elected every four years. District court clerks (and their deputy clerks) receive, review for filing, and ultimately determine whether a court document can be filed (including civil complaints), receive and account for fees and fines, provide for the management of court records, and calendar cases. I work with the Supreme Court to develop policies and procedures applicable to Idaho's district court staff. The Administrative Office provides training on those policies and procedures, provides resources and support to ensure clerk's offices can comply with the same, and coordinates any needed additional resources, information, or support if an elected clerk has difficulties meeting Idaho Supreme Court requirements.

6.     I am also aware of and knowledgeable about the Idaho Supreme Court's contracts with third-party service providers related to the administration of Idaho's court system, including the Idaho Supreme Court's contract with Tyler Technologies, Inc. ("Tyler") Tyler is a third-party software developer that provides software and services to governmental entities, like the Supreme

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 3**

Court of Idaho. To make efilng mandatory, it is necessary for the Court to ensure that there is at least one efilng vendor doing business in the state, so the Court contracts with Tyler to ensure there is. This allows the Court to require efilng even if a party is indigent and entitled to fee waivers.

7.　　With respect to Tyler, the Supreme Court has contracted with Tyler for a license to use Tyler's eFile & Serve (formerly known as Odyssey File & Serve) software platform. On October 8, 2015, the Idaho Supreme Court entered into an Electronic Filing Agreement with Tyler to license and use Tyler's electronic filing system. Twin Falls was the first county to transition to e-filing in late 2015. All Idaho counties transitioned to e-filing by late 2018.

8.　　Following the transition to e-filing, attorneys and law firms who practice in State of Idaho courts have been required to electronically submit all court documents for clerk review and filing through File & Serve. There are limited exceptions to the requirement to electronically submit court documents through File & Serve. Those exceptions are defined in Idaho Rules of Electronic Filing and Service 4 and 5. Under Filing Rule 4, self-represented parties who are individuals and not attorneys may choose whether to electronically submit court documents for filing or use paper or mail in service to the court. Under Filing Rule 5, certain documents are identified that must be filed conventionally by paper filing. Those include, but are not limited to, original wills, warrants, an oversized or demonstrative exhibit, and grand jury material.

9.　　eFile & Serve is designed to allow for the electronic submission of court documents to each of Idaho's district court clerk's offices. It is also configured to allow the clerks' office staff, deputy clerks, to perform a ministerial review of electronically submitted documents and to approve the documents for filing. If accepted, documents are transferred from eFile & Serve (which is hosted by Tyler) into the official court record, which is maintained via software called Case Manager (formerly known as Odyssey Case Manager). Case Manager is hosted by the Idaho

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 4**

Supreme Court. If a submission does not meet the requirements for filing, the clerk will reject the document and provide an explanation of the reasons for rejection and what needs to be done to correct the submission. The filer is automatically notified of the rejection and receives the clerk's explanation via an emailed notice sent through eFile & Serve, which allows clerks to interface directly with the submitter through the portal (as opposed to sending an email from the clerk's own email account or making a phone call).

10.     Case Manager is a configurable case management software system that is also provided to the Idaho court system though an agreement with Tyler. Case Manager is the Idaho state courts' official record keeping system. Idaho Rule of Electronic Filing and Service 3 provides that "[t]he official court record for a case filed or maintained in accordance with these rules is the electronic case file maintained by the court, as well as any paper filings and other conventional filings maintained by the court in accordance with these rules." When a civil complaint is submitted through File & Serve, once approved by the clerk to be accepted for filing, it is immediately transferred to Case Manager and that is when an official court case is created and opened related to the complaint.  Prior to acceptance by the clerk in File & Serve, the complaint is still not an official record as it has not been accepted into the electronic case file maintained by the court in Case Manager. A complaint is not file stamped until it has been accepted for filing by a clerk.

11.     Based on Idaho Rule on Electronic Filing and Service 11 ("Filing Rule 11"), there is a significant difference between "submitted" (which is what documents are when they are uploaded and submitted using File & Serve) and "filed" (which is what documents are once they have been reviewed and accepted in eFile & Serve and transferred to Case Manager). Filing Rule 11 provides that "[a] document will be considered filed when: (1) the document has been

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 5**

electronically submitted to the court's electronic filing system; and (2) the submission has been acknowledged and the document accepted for filing." Filing Rule 11 is consistent with Idaho Rule of Civil Procedure 3(b), which instructs that "[a] civil action must be commenced by filing a complaint … with the court." Under Idaho's rules, a complaint is not filed until accepted. Upon acceptance, the filed document automatically transfers from File & Serve to Case Manager, where it is immediately available to the public if it is a publicly available court document and not an exempt or sealed document.

12.     The process of submission and acceptance in eFile & Serve is akin to the days before documents were required to be submitted electronically for filing. As a lawyer who practiced in Idaho at that time, I had my "runner" bring documents for filing to the clerk's office sometime between the hours of 8:00 a.m. to 5:00 p.m. Once it was my runner's turn at the clerk's counter, the runner would hand the to-be filed documents to the clerk and the clerk would perform his or her ministerial review. If all was in order, the clerk would accept the documents and stamp them as filed, at which point they would be scanned for inclusion in the court's official file. If any of the documents provided to the clerk were nonconforming, the clerk would hand the documents back to my runner, who would then return them to me for corrections.  In our current world of electronic filing, File & Serve effectively serves as an "e-runner" that delivers documents to a clerk's "e-counter" where the clerk performs a ministerial review of the submitted documents to determine if the documents conform to basic filing rules.

13.     The timing of access to civil complaints with efiling is akin to the access provided during the days of paper filing. A complaint was not file-stamped, docketed, assigned a case number, and assigned to a particular judge until after it had been reviewed and accepted by a clerk; a case wasn't opened until the complaint had been accepted for filing by a clerk. Once a complaint

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 6**

was reviewed and accepted for filing, the complaint was available to the press and public upon request. The press and public did not have access to complaints that were waiting for clerk review, nor did they have access to complaints that had been rejected for filing.

14.     Prior to this lawsuit, Courthouse News Service demanded that I provide immediate access to newly *submitted* complaints (i.e. complaints that had not yet been accepted for filing) through Tyler's Press Review Queue. After this lawsuit was filed, CNS alleged for the first time that Auto Accept was another option for providing immediate access to newly submitted complaints.

15.      It is not the case, nor has it been my position that there have not been periods of delay in time from submission in eFile & Serve to clerk review. The data attached to the Declaration of Emily Carroll details the time between submission and clerk review.

16.     When alleged delays have come to my attention, in my role as Administrative Director, I am quick to use my ability to interface with the county or judicial district to see how the Administrative Office can assist in reducing the time from submission to clerk review. For example, on June 28, 2021, I received a letter from a supervising director of Kootenai County District Court's Clerk's Office. She alerted me that Kootenai County's civil department staff was struggling to keep up with the processing of electronic filings. The office was heavily using overtime and re-assigning staff from other areas of the court. Yet, they were only able to process 3,500 pages of the 10,000 pages the court was receiving each day. The director identified several factors driving the issue, including the onset of the pandemic and resulting staff reductions, either through necessitated sick time, or from individuals who did not agree with the Idaho State Supreme Court's COVID-19 exposure requirements. As a result, Kootenai County had to hire and train new staff. The director also cited a recent and unusually large influx of cases, which matched, in her

DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 7

estimation, the local increase in population. To cure the problem the Kootenai County District Court clerk asked the county board of commissioners to approve two more civil clerk positions. I contacted the administrative district judge and asked that he lend his support to the request for new clerks. The county commissioners approved the request, as well as a request for additional overtime funds. With the additional staffing and funding, the Kootenai County Clerk's Office was able to swiftly address the backlog and return to timely review timeframes, as discussed in the Affidavit of Renae Bieri, Dkt. 20-1, ¶ 11.

17.     Before this lawsuit was ever initiated, I had serious concerns with the Press Review Queue and Auto Accept. Through discovery in this lawsuit, I have learned additional information that further establishes the Press Review Queue and/or Auto Accept would undermine Idaho Courts' interests in promoting access to the courts, protecting document security and privacy interests, ensuring public confidence in the judicial system, and managing judicial resources. My concerns with the two options are detailed below.

18.     **Auto Accept.** With Auto Accept, documents are automatically accepted into Case Manager (i.e. the official court record per IREFS) without any review by court clerks. Auto Accept cannot review for some information the clerk typically reviews for, such as whether the county listed on the face of the complaint actually matches the county in which it was filed. With eFile & Serve, all documents for a submission are included in one e-envelope. For example, with an initial filing the e-envelope would include the complaints, a summons for clerk signature, and a case information sheet. With Auto Accept, only the envelope itself is reviewed to determine if it meets certain requirements for acceptance; the documents within the envelope are not reviewed. Auto Accept is not a viable option for the Idaho Courts because it eliminates clerks' ability to review and accept documents through eFile & Serve. This could be extremely detrimental to litigants

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 8**

because a filer error would not be addressed on the front end (when a filer can simply correct the error and resubmit) and instead would be addressed once the document is an official court record (meaning judicial action would be required to fix the error). This would also be detrimental to the courts because judges and their court staff would have to spend time and judicial resources correcting filing errors that could have been corrected by clerks through the review process. Auto Accept is also not able to protect against filings that are malicious or submitted for an improper purpose; if an envelope meets the acceptance criteria, the documents in the envelope are auto accepted regardless of their content.

19.     **Press Review Queue**. Tyler's Press Review Queue can be configured to provide registered users with access to documents that have been submitted for filing but have not been reviewed and accepted by the clerk as official court documents. Implementing the Press Review Queue would require an amendment to the contract between the Idaho Supreme Court and Tyler. Tyler would need to be able to comply with the Idaho Supreme Court's security requirements for cloud-based service providers. The Press Review Queue comes with an annual subscription fee of at least $108,000, and, according to Tyler, that fee would be substantially higher if Tyler had to comply with the Idaho Supreme Court's security requirements for cloud-based service providers. The process for obtaining funds needed to pay for the Press Review Queue is addressed below. Tyler has not provided the Idaho Supreme Court with all the information it has requested relating to its security protocols, and some of the information Tyler has provided raises serious concerns about document security for the Press Review Queue. For example, the Press Review Queue provides access to the original submission, not a copy. The Press Review Queue could also erode public confidence in the courts if members of the press and public are reporting on complaints as if they are official court documents. Documents in the Press Review Queue cannot be watermarked

as "under review," "not an official court document," etc. If a complaint is reported on but ultimately rejected without a successful resubmission, the press and public will be left to speculate about the reasons for this phenomenon.

20.     Each fiscal year the Idaho Supreme Court receives an appropriation from the Idaho legislature which provides both an appropriation from the state's general fund and sets the Court's spending authority for dedicated funds. The Idaho Supreme Court's technology system is primarily supported through the Court Technology Fund (CTF), a dedicated fund established by Idaho Code § 1-1623 with 91% of its revenue provided through legislatively established fees imposed in both criminal and civil court cases. The fund supports information technology personnel, the case management system, digital audio recording systems, videoconferencing systems, computer equipment, computer network infrastructure, credit card processing for court fine and fee payments, information security systems, and various other software and equipment supporting court administration.  Court fines and fee receipts that support the CTF have declined an average of 5.2% each year over the last three years. In FY2022, fund revenue totaled $7.89 million, the lowest amount flowing into the fund since 2015 when the Legislature approved new civil filing fees. Court technology costs have increased about 9.3% each year for the last five years. Reasons for the increases include the implementation of new cybersecurity systems and significant hardware and software purchases for remote court proceedings. The Court has also experienced remarkable increases in software licensing and credit card processing fees, by as much as 30% in the current year.  In FY2024, fund expenditures are projected to exceed fund receipts by $3.67 million.  In order to address this shortfall, in its fiscal year 2024 budget request to the legislature, the Idaho Supreme Court has requested the transition of key positions out of the Court Technology Fund and into the state general fund.

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 10**

21.     Due to the current revenue shortage, the Court Technology Fund cannot support the costs of the installation of a Press Review Tool or building a new tool. In order to support these costs, the Idaho Supreme Court would have to seek an on-going enhancement to its general fund appropriation from the Idaho legislature. That request could not be made until the next budget cycle, in the fall of 2023, and would typically not be funded until July 1, 2024.  In the absence of an enhancement to the Court's general fund appropriation, current technology products, services, or projects for Idaho's courts would have to be reduced or eliminated to divert funding to cover the costs of a press review tool and existing personnel would have to be reassigned to manage the access services.

22.     In addition to the ongoing costs of a Press Review Queue, there would be initial costs as well. As currently configured, the eFile & Serve system allows a filer to identify what is being filed using a few generic descriptions. The security settings in the system do not require a filer to identify a security setting, such as "confidential" for submitted documents. The security settings for filings are addressed by the court clerks upon acceptance into the Case Management System. The implementation of a press review tool, which would publish documents from the eFile & Serve database, would require alterations to the court rules and processes for efiling as well as a reconfiguration of the eFile & Serve system. These changes would require additional training for both court staff and filers. The addition of document-level security to documents in the eFile & Serve database would necessitate more specific document type selections for filers and the addition of a "confidential" option for filers. Court staff would have to be reassigned from current projects to develop and implement new security settings and new configurations. Court staff would also have to develop and implement training for filers explaining the changes made and new requirements.

DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 11

23.    If the Idaho Supreme Court were to develop its own software to interface with the Press Review Queue API, it would need to request an appropriation through the Idaho legislature as described in paragraphs 20 through 22.

24.    In the original configuration of what is now the File & Serve system, filers were asked to designate whether a submission was "confidential." Documents submitted with this designation were automatically protected and unavailable to the public. Soon after the addition of only the second county to the efiling system, Ada county, the Idaho Supreme Court received a request from the court clerks to change this configuration. Filers were designating what was described as sometimes hundreds of public documents a day as "confidential," requiring the clerks to manually change the security setting for each one. This was inefficient and cumbersome for the clerks. As a result of the clerks' request, the Idaho Supreme Court altered the efiling rule and approved the reconfiguration of the system. Filers no longer designate a document as confidential. Rather, if a filer believes a submitted document should be deemed confidential he or she can note that in a comment to the clerk in the File and Serve system. A document security setting is automatically applied based upon the case type and document type selected by the clerk. It can then be manually altered by the clerk if the automatic setting for that type of case or document is inapplicable based upon the explanation offered by the filer. This process is more efficient for the clerks and helps to ensure documents that should be public are not inadvertently withheld from the public.

I declare and certify under penalty of perjury that the foregoing is true and correct.

DATED this 15thd day of December, 2022.

Sara B. Omundson
Digitally signed by Sara B. Omundson
Date: 2022.12.15 15:56:05 -07'00'

_____
Sara Omundson

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 12**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of December, 2022, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Amber K. Dina | amberdina@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**DECLARATION OF SARA OMUNDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 13**

Keely E. Duke
ISB #6044; ked@dukevett.com
Anne E. Henderson
ISB#10412; aeh@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **AFFIDAVIT OF THE HONORABLE STEVEN HIPPLER IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

STATE OF IDAHO    )
                  :
County of Ada     )

The Honorable Steven J. Hippler declares under penalty of perjury pursuant to the law of the State of Idaho, that the foregoing is true and correct pursuant to Idaho Code § 9-1406:

1.      I make this Affidavit of my own personal knowledge and I am competent to testify to the matters herein; and the matters herein are truthful.

2.      I serve as a District Judge for the State of Idaho, in the 4th Judicial District Court, with chambers in Ada County.  I have served in my role as District Judge in the 4th Judicial District Court since my 2013 appointment. As a District Judge, I have jurisdiction over civil and criminal

**AFFIDAVIT OF THE HONORABLE STEVEN HIPPLER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 1**

cases.

      3.     I am also the Administrative District Judge (ADJ) for the Fourth Judicial District and have served in that role since 2020. As the ADJ, I have administrative supervision and authority over the operation of Ada County District Court and magistrates in the District.

      4.     As the ADJ and as a District Judge, I am aware that the Ada County Clerk's Office is responsible for reviewing filings submitted through File & Serve, which is a software platform available to the public. Once documents arrive in File & Serve, clerks perform a ministerial review of the filings to ensure they meet the basic filing requirements of Idaho Rules of Civil Procedure. This includes confirming, if applicable, the correct filing fee has been paid, the necessary signatures are included, the case is being submitted in the appropriate jurisdiction, and that the submitted document indicates the correct court division, e.g. magistrate or district court.  If the ministerial aspects of the filing are correct, the Clerk's Office accepts the document for filing and the filing is transferred to Case Manager, which houses the official dockets of each county court. Once in Case Manager, an accepted complaint is filed as part of the official court record. The District Judges do not participate in this process with the exception of whether to grant filing fee waiver applications submitted under Idaho Rule of Civil Procedure 10.1.

      5.     I am aware of the request from Courthouse News Service that new civil complaint submissions be automatically accepted as filed when electronically submitted into File & Serve.

      6.     With auto accept, the Clerk's Office would not be able to perform its ministerial review of complaint submissions for basic conformity with filing requirements in the Idaho Rules of Civil Procedure, including review to ensure proper filing fees were paid before auto accept filing of the complaint. Litigants in Ada County currently rely on the Clerk's Office ministerial review.

      7.     Under auto accept, the complaint would immediately be part of the official record

**AFFIDAVIT OF THE HONORABLE STEVEN HIPPLER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 2**

even though the attendant filing fee was not paid. If the filing fee was never paid, it would take judicial action to address the improper filing, rather than under the current process, where the Clerk's Office addresses the failure to submit the proper filing fee through File & Serve with a three-day deadline to correct the issue pursuant to Idaho Rule for Electronic Filing and Service 13 ("Filing Rule 13"). The requirement for judicial action would unnecessarily add to the already incredibly busy schedules of the District Judges and their court staff.

8.       In the scenario described above in Paragraph 7, the system could be abused and misused by parties. Prior to becoming a District Judge, I was a civil litigator for Hall, Farley, Oberrecht & Blanton and for Givens Pursley. It is not uncommon in negotiations with an insurance company that the plaintiff's attorney will threaten litigation if a settlement is not reached. Under auto accept, an attorney could file a complaint without the filing fee, forward the filed complaint to the insurance company, and demand payment in "X" days before the complaint was served. In the event the insurance company decided to settle, the plaintiff's attorney could then voluntarily dismiss the complaint under Idaho Rule of Civil Procedure 41(a)(1)(A)(i), and never have paid the filing fee despite obtaining the leverage needed with the filing of a complaint. In addition, even if the insurance company elected not to settle, the plaintiff's attorney could elect not to continue with the case given the actual filing of a complaint did not obtain a settlement and dismiss the case under the same rule. In either scenario, judicial action would need to be taken to press the issue of receiving the mandatory filing fee from the plaintiff's attorney. Currently, this is an issue handled by the Clerk's Office before the complaint is accepted for filing. A clerk has the three-day window provided by Filing Rule 13.

9.       In addition to the above issue with auto accept for civil complaint filings, if new civil complaints were automatically filed through a software application, there would be a rise in

**AFFIDAVIT OF THE HONORABLE STEVEN HIPPLER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 3**

other preventable non-conformities, such as the selection of the wrong jurisdiction, that could lead either to their reassignment or transfer, or their dismissal by motion from opposing party or *sua sponte* through judicial action. Actions dismissed due to non-conformities could impair litigant's rights due to statute of limitations issues.  The following examples illustrate these issues:

    a.   Under auto accept, there would be no review process to confirm a complaint was filed in the correct jurisdiction (for example, magistrate court versus district court). As such, the issue related to jurisdiction may not identified for weeks or even months and then, once identified, the action would need to be remanded to transferred to the proper jurisdiction. This could only occur through *sua sponte* action by the Judge or by motion.

    b.   Other issues with a non-conforming complaint could potentially result in dismissal. If the non-conforming complaint was filed on the last day of the statute of limitation, a dismissal and refiling a week or a month later would result in an untimely commenced action that would be subject to dismissal.

    10.   Such a scenarios are far less likely to occur under the current process used by the Clerk's Office. In performing the ministerial review, a clerk reviews the new civil complaint submission to determine whether it has been signed, it contains a caption naming parties, the correct court has been selected, and whether the attendant and proper filing fee has been paid. If any of these things are missing or incorrect, the Clerk's Office rejects the filing and communicates directly through File & Serve the reason for the rejection. The submitting party then has three days to correct the nonconformity under Filing Rule 13 without any adverse consequence.  Other than the time taken by the clerk to do the ministerial review, communicate through File & Serve about the rejection, and the review the corrected complaint, there are typically no other court staff

**AFFIDAVIT OF THE HONORABLE STEVEN HIPPLER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 4**

involved and the party who submitted a nonconforming filing (or, if an attorney, the client) is not deprived a civil action. Under auto accept, such would not be the case given the Judge and the Judge's staff would now need to be involved in handling a nonconforming civil action and the litigants would incur the expense of handling the situation, with a potential prejudice for the plaintiff of having time-barred action upon dismissal and resubmission.

11.    Further, the impairments to litigants' rights discussed above created by auto accept and the lack of ministerial clerk review may disproportionally impact people who infrequently use the court system and/or pro se litigants because of the work clerks do in reviewing documents for curable non-conformities.

12.    Auto accept also creates a privacy risk to litigants and third parties. This is because all submitted material would be immediately published as filed if auto accept is enabled. Practically speaking, this means that if a person, maliciously or in error, included children's full names or sensitive or explicit material in a court submission made through File & Serve, it would be automatically accepted as filed to Case Manager, along with everything else. Because the documents would be filed and thus an official part of the court record, judicial action would be required to remove from the docket any sensitive or confidential material inadvertently or purposefully filed in auto accepted filings.

**AFFIDAVIT OF THE HONORABLE STEVEN HIPPLER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 5**

13.     I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 22nd day of December, 2021.

Steven Hippler

STATE OF IDAHO          )
                        ) ss.
County of Ada           )

On this 22nd day of December, 2021, before me, the undersigned, a notary public in and for said county and state, personally appeared STEVEN HIPPLER known or identified to me to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in the certificate firs above written.

NOTARY PUBLIC FOR _Idaho_
Residing at _Boise, ID_
My Commission Expires _2/19/2027_

LINDA SIMS-DOUGLAS
NOTARY PUBLIC
Comm. No. 1176
STATE OF IDAHO

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of December, 2021, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

Debora Kristensen Grasham          dkk@givenspursley.com
Katherine A. Keating               katherin.keating@bclplaw
Jonathan G. Fetterly               jon.fetterly@bclplaw.com

/s/Keely E. Duke
Keely E. Duke

**AFFIDAVIT OF THE HONORABLE STEVEN HIPPLER IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 6**

Keely E. Duke
ISB #6044; ked@dukevett.com
Anne E. Henderson
ISB#10412; aeh@dukeevett.com
DUKE EVETT, PLLC
1087 West River Street, Suite 300
P.O. Box 7387
Boise, ID 83707
Telephone (208) 342-3310
Facsimile (208) 342-3299

*Attorneys for Sara Omundson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | CASE NO. 1:21-CV-00305-DCN |
| Plaintiff | **AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendants. | |

STATE OF IDAHO    )
                          :
County of Ada       )

     I, Margaret Molchan, declare and certify under penalty of perjury pursuant to the law of

the State of Idaho, that the foregoing is true and correct pursuant to Idaho Code § 9-1406:

     1. I serve in the role of Director of Court Clerks for the Clerk's Office of Ada County, Idaho.

I have been in this role since March of 2019. I am also a deputy clerk.  I have worked for Ada

County for the past 10 years in the Ada County Clerk's Office. During that time I saw the transition

from paper filing to near exclusive electronic filing that took place when in August 2016, the Idaho

Supreme Court and Idaho court system implemented a software program called Odyssey File &

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION
FOR PRELIMINARY INJUNCTION - 1**

Serve, sometimes referred to as OFS ("File & Serve").

2.   As the Director of Court Clerks, I am responsible for managing and oversight of the day-to-day business activities of the Ada County Clerk's Office, which includes oversight of the staffing and training of deputy clerks. I also supervise two associate directors and nine supervisors, who directly supervise the deputy clerk staff.  In Ada County, we currently have approximately 185 deputy clerks, with approximately 135 of those positions serving the court division.

3.   I work under supervision from the Ada County District Clerk, who oversees five court divisions, which include indigent services, court clerks, the recorder's office, court auditors, and the elections office.

4.   Deputy clerks work in the court clerk division and perform the records-keeping responsibility of the county district clerk. In that work, deputy clerks daily interact with those who utilize the Idaho court system. Deputy clerks handle all phone calls and process all documents submitted to the court for filing, both in person and electronically. With respect to court filings, the purpose of deputy clerks is to strive to have procedures followed and to file documents efficiently. We provide the records-keeping responsibility for the District Courts and the Magistrate division of District Court in Ada County.

5.   Since August 2016, most parties have been required to electronically submit all court documents for clerk review and filing through File & Serve. *See* Idaho R. Elec. Filing & Serv. 4 and 5 ("Filing Rules"). There are limited exceptions to the requirement to electronically submit court documents, defined in Filing Rules 4 and 5. For example under Filing Rule 4, pro se parties who are individuals and not attorneys may choose whether to electronically submit court documents for filing or submit them conventionally at the court or through the mail. And, under Filing Rule 5, certain documents must be filed conventionally by paper filing, including for

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 2**

example, original wills and warrants.

6. With respect to their role in filings, our clerk staff perform a ministerial review of the documents submitted by potential litigants and attorneys through File & Serve, which is a software platform maintained by Tyler Technologies, Inc. ("Tyler"). The purpose of this review is to ensure that to-be-filed documents meet the requirements established by the Idaho Supreme Court to enter the court system as official records. The ministerial review includes checking for the following: the required case information sheet has been submitted; a certification of service was completed and included; the proper case number (if an already opened case) is on the document and correct: that the caption contains party names: that filing fees are paid and paid in the correct amount; that the document includes required signatures; or proper Magistrate division of the District Court has been selected. If there is an issue with one or more of these items, the deputy clerk "rejects" the submission and communicates the reason for the rejection to the Submitting User. This communication flows directly through File & Serve. As explained below in Paragraph 8(d)(vii), under Idaho Rule of Filing and Service X, the Submitting User has a three business-day grace period to correct the non-conformity and resubmit the document.

7. There are two sides to File & Serve: public-facing and clerk-facing. The public-facing side is where potential litigants and attorney filers (and their staff) ("Submitting Users") submit court documents to be reviewed, approved, and filed. The clerk-facing side is where the clerks do their work to perform a basic review of the submission for compliance with court and procedural rules, which is described above in Paragraph 6. In addition, supervisors, such as myself, the associate directors, and supervisors, have "back end" access to additional data in File & Serve, which provides a detailed look at how a particular submission was handled; for example, which deputy clerk reviewed or approved the filing.

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 3**

8.   Under the current system, Submitting Users are those who have registered with Tyler Technologies, Inc. ("Tyler") for a File & Serve account and use the account to make court document submissions online. Due to Filing Rule 4, the majority of documents submitted for clerk review and filing are made electronically. Electronic submissions are made through the public-facing side of File & Serve by a Submitting User at any time of the day, every day of the year (it is a 24/7/365 filing system). However, clerk office hours when clerk staff are available to review the submissions are business hours, unless overtime work has been approved by the Ada County District Court Clerk.  The following is a general description of how the filing team of clerks works:

  a.   Ada County's deputy clerks are organized in teams that work on particular categories of filings. For example, on the civil side, there are general civil and small claims teams. However, some deputy clerks are cross-trained to work in multiple teams to help when submission volumes are higher in a particular category.

  b.   Documents are submitted by the Submitting Users in an "e-envelope" which acts much like a physical envelope: it keeps all the documents in one place and includes the Submitting User's contact information. If the submission is a new civil complaint, it is directed to a queue based on that designation by the Submitting User. Think of these as submitted, not yet filed documents, because they need clerk review as described above in Paragraph 6; they are not yet accepted for filing and are not yet part of the court's file.

  c.   Within the clerk-facing side of File & Serve, deputy clerks pick up an "e-envelope" much the same way they used to take a paper file envelope across the clerk counter. The deputy clerk checks the submission for the basic filing requirements, again those general categories described above in Paragraph 6, to determine whether the

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 4**

submission may be accepted and filed or whether it needs to rejected and procedural issues addressed by the Submitting User before it can be accepted and filed. If the clerk concludes the basic procedural items described above in Paragraph 6 are met, the clerk "accepts" the submission, File & Serve applies a file stamp, and the accepted filing is automatically transferred by the software into Odyssey Case Manager ("Case Manager") within a matter of a few minutes, where it is then an official court document available to the public. This has been our process from August 2016 to present. Case Manager is a software program that houses the court's official digital record.

    i.  Notably, however, in 2021, it is my understanding from Tyler that the underlying internet-based plug-in site for the clerk-facing side of File & Serve (a Microsoft product called "Silverlight") was phased out by Microsoft. Because of Microsoft's change, it is my understanding that Tyler had to implement an upgraded and rewritten version of the clerk-facing side of File & Serve. At the same time, it is my understanding that Tyler chose to migrate from Silverlight to an Amazon hosted cloud service called "AWS." The updated File & Serve system had bugs, delays, and generally looked different in appearance from the Silverlight system. Because of this, clerks in Ada County encountered delays in completing the review and approval process in File & Serve. Those delays have been significantly reduced now that technical errors have largely been addressed by Amazon and Tyler.

    ii.  Despite this change from Silverlight to AWS in File & Serve, however, the

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 5**

time from the decision to accept a document for filing did not change as, with the exception of one day where there were delays, when approved in File & Serve, the documents transfer automatically within seconds to Case Manager.

d.  Related to new civil complaints (which I understand is the issue in this Courthouse News Service litigation), the following is the current process:

    i.  When a Submitting User submits a new civil complaint, the complaint and all attendant documents (including any summons), arrive into File & Serve in a single "e-envelope" much like a zip file. This is like when in the paper filing days, an in-person runner would hand a manila envelope with the required documents over the clerk's counter and to the clerk.

    ii.  The e-envelope also includes important information, such as the Submitting User's contact information. Because all the documents related to the filing and the Submitting User's contact information are all in one place in File & Serve's e-counter, deputy clerks can review the entire submission in total to ensure it conforms to basic filing requirements and approve for filing. Again, akin to the days of paper filings with envelopes handed over the physical counter to the clerk.

    iii.  As with all other filings, the deputy clerk checks the submission for the basic filing requirements, other than a case number because a case number for a new civil complaint will not be created until the complaint is accepted for filing, e-file stamped in File& Serve, and automatically transferred to Case Manager where a case number is then assigned.  Case Manager is the

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 6**

court's official record and is maintained by the clerk staff (like the hard copy files were in pre-electronic filing days).

iv.  If the documents within the e-envelope do not need clerical corrections, the deputy clerk then approves the documents for filing. Unlike submitted filings in File & Serve, once these documents are accepted for filing, they become filed and automatically transferred from the deputy clerk's e-counter in File & Serve to the court's official record and digital docket, Case Manager. This is an immediate process. Notably, until a case-initiating civil complaint is accepted for filing and immediately transferred to Case Manager, no civil action exists yet regarding the new case. The civil action is opened once the case-initiating complaint is filed in Case Manager.

v.  Again, this is much like the old paper system in which a runner would bring the documents and the deputy clerk would verify the clerical portions of the documents and then either tell the runner what was still needed or approve. Once approved under the paper system, those documents would then be put into the court's file through ISTARS, which became the official record.

vi.  If there is a clerical issue with the documents submitted for filing, e.g. the filing fee being incorrect or choice of incorrect division, the deputy clerk can easily identify from the e-envelope submission in File & Serve who the Submitting User is who submitted the documents and reach out to the Submitting User through File & Serve to directly e-message the Submitting User to remedy the issue by submitting a corrected document (this communication feature is included within Tyler's File & Serve program and

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 7**

    is a very convenient and time saving tool for clerk staff to use to communicate with Submitting Users).

    vii.  Under Idaho Rule of Electronic Filing and Service 13 ("Rule 13"), the Submitting User has three business days from submission to correct nonconformities and send it a corrected document back to the clerk through File & Serve. If the non-conforming document is corrected by the Submitting User within that grace period, the deputy clerk can mark the submission approved and it will be stamped "filed" as of the date it was submitted when it is transferred into the Court's official record in Case Manager.

    viii.  A deputy clerk's ability to provide this leeway for corrections is essential to ensuring filed documents conform with court and procedural rules and that if they do not, there is a three-day grace period to correct the procedural issues while at the same time not prejudicing a litigants' rights.

9.  I personally participated in the switch in August 2016 to electronic court document filing through File & Serve from the traditional, in-person filing. As discussed above, the deputy clerk's role, has <u>not</u> changed in substance from the role they served when reviewing and approving a paper filing under the old system, and for some of today's pro se filers as provided by Filing Rule 4.

    a.  Under the old paper filing system, the counter deputy clerk performed a ministerial review of the documents after they were handed across the clerk's counter by the litigant, attorney, or runner as described above in Paragraph 6 (verification of proper case number (if assigned), that the caption contained party names, that the filing fee was paid and correct in amount, that the document included required

signatures, and that the proper court division, magistrate or district).

b. Occasionally, when the Ada County Clerk's Office was busy, the clerk  would set the submissions aside and get back to reviewing them when the counter was less busy.

c. Once accepted under the old paper filing process, accepted files were later "built" which means the deputy clerk put physical labels on file folders and entered the filing into the Idaho Statewide Trial Court Automated Record System ("ISTARS"), which was the internal case management program used by the Clerk's Office prior to the 2016 switch to File & Serve and Case Manager. Entry into ISTARS created a digital docket, which was published on Idaho's online repository, making information about the filings, but not the documents themselves, available to the public online. The hard copy filings were then maintained at the courthouse.

10. I am aware of the request from Courthouse News Service that new civil complaint submissions be automatically accepted as filed when electronically submitted by a Submitting User in File & Serve. If auto accept were enabled, document submissions by a Submitting User would immediately transfer to the official record in Case Manager before the ministerial process deputy clerks have used for years (pre- and post- the transition to electronic filing) to review documents submitted.  Rather than catch errors before the documents were made public and filed in the official court record, the clerks would be forced to perform their critical ministerial review in Case Manager.  This is problematic from a clerk's office perspective for several reasons, which are as follows:

a. First, each filed document would be separately docketed in Case Manager, instead of being together in one e-envelope like in File & Serve. Because of this, a deputy

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 9**

clerk would have to review each document, that ordinarily would be in one file in File & Serve, by clicking through multiple "tabs" in Case Manager. This would increase the time it takes for deputy clerks to review documents for basic conformity with procedural and court filing rules as covered in Paragraph 6, above. An estimate of such time is as follows under the system Courthouse News is attempting to force on Idaho's Court's versus how the system works now: Under the current system it takes approximately three (3) minutes to review a basic new case submission. Under what Courthouse News wants, it will take five (5) or more minutes to review submissions. These minutes add up with the thousands of submissions for filing Ada County clerks process every year.

    i.   The "clicks" through tabs add up when you are talking about the large volume of docs received by the Ada County Clerk's office and Ada County Court. For example, as is show in **Exhibit A**, over the past six (6) weeks, the Ada County Clerk's Office reviewed 45,000 documents. As such, if the clerks were now having to review documents in Case Manager (which under auto accept is where those would have to be  reviewed), then each of those documents would need to be reviewed individually in different tabs in case manager. That is a significant change in process that would produce delays in review and likely result in the need to add staff, re-allocate staffing resources, or both.

   ii.  These review figures demonstrate that the current review system, enabled by File & Serve, supports the purpose of deputy clerks, which is to ensure information moves through the court efficiently. The File & Serve platform

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 10**

allows deputy clerks to efficiently review information related to submission in one place. Once approved, the File & Serve software provides the public immediate access to filed documents by transferring the approved documents to Case Manager. The structure of File & Serve also enables our Clerk's Office to move certain documents into queues, which are essential to workflow and staffing management. We can assign staff to review documents in the various queues depending on staffing shortages, or court document submission volume. Case Manager does not permit us to make any of those divisions. This feature of File & Serve is particularly important in times like today's where staffing is impacted by the COVID-19 pandemic. In total, I believe our current system of review in File & Serve is efficient and provides the public timely access to filings.

b.  Unlike File & Serve, which is software designed by Tyler to serve as a deputy clerk's e-counter, and which as stated above enables clerks to directly communicate with Submitting Users about the submission and either approval or corrections needed, deputy clerks would have to look at the back end of File & Serve application to hunt down the Submitting User contact information; this would be time consuming and cumbersome because they would have to navigate out of Case Manager and into the back-end of File & Serve.

c.  Once the clerks were able to identify the Submitting User's contact information, they would then need to email or call the Submitting User to explain the issues with the filings that needed to be corrected. All of this would happen outside of the Court's Case Manager program because the Case Manager program does not have

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 11**

the communication function. In addition, such communication could not happen in File & Serve because any submissions into File & Serve would be immediately transferred to Case Manager. This would be an inefficient process for the deputy clerks because the Clerk's Office would need to reconfigure access to the "back end" of File & Serve to allow all deputy clerks, not just supervisors, access to the detailed case data, because that is where the Submitting User information would be located if auto accept were enabled. Then, the deputy clerk would need to email or call the Submitting User about the nonconformity in their submission. The one-on-one direct communications would be housed in individual deputy clerk's email accounts and could not be broadly shared, as they are now shared in File & Serve. This would result in problems of sharing information about pending filings whenever a deputy clerk is out for vacation, out sick, or leaves the Clerk's Office.

d.  Another impactful issue with a change to auto accept is that deputy clerks would no longer have authority under Rule 13 to ensure nonconforming documents are corrected within three days of submission. Under the rule, once notified of a non-conformity through communication in File & Serve, the Submitting User has three days to fix the issue and re-submit a conforming document or proper filing fee. If accomplished in the grace period, the document is accepted and stamped as filed as of the date submitted. If a document is not corrected within three-days, once finally corrected, it is stamped as filed as of the date it was corrected. As such, there is a consequence Submitting Users have if they do not correct the deficient documents. Under auto accept, that consequence would not exist because with a new filing for instance, the case would automatically be opened (even if, for example, no filing

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 12**

fee was paid).  As such, the deputy clerks would no doubt struggle to get Submitting Users to correct procedural defects in the filing because Rule 13's three-day grace period to correct any minor issues without losing their filing date would be lost. This is assuming, however, the deputy clerks would have any authority to do so because the documents would be filed and an official part of the court record and when they are an official part of the judicial record, action by the judge is typically needed and not just the clerks, as discussed below.

e.  Auto accept is also incredibly problematic for the Ada County District Court Clerk's management of court staff.  If auto accept were enabled, court staff would need direction from the Idaho Supreme Court regarding which side of the court system is responsible for checking filings in the docket for conformity with basic filing rules. Without an additional grant of authority from the Supreme Court, it is likely deputy clerks would serve a role of checking the filings, but then providing information about non-conforming filings to the presiding judge. However, even in the diminished role, auto accept would increase the time it takes deputy clerks to review documents for basic conformity with filing rules. I estimate this would add an addition 3 minutes of review time. This is because, the deputy clerks would need to look in various places in Case Manager to complete their ministerial review: one tab for financial info, , a tab for review of the document for signature, etc.

f.  In addition, deputy clerks in Ada County assist all potential litigants and attorneys in conforming with the basic rules of filing documents in district and magistrate court. If auto accept were enabled, it would result in non-conforming filings, which deputy clerks would then have no authority to remove from the docket as discussed

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 13**

above.

g.  Deputy clerks are also on the front end to note any submitted documents that contain or constitute sensitive personal content or information. Without basic deputy clerk review, documents that are harmful to litigants and third parties could be automatically accepted as filings and become part of the official court record. An example of this would be a situation where someone submits something containing a child's name, a social security number, bank account numbers, and potential revenge filings containing explicit images.

11. I am aware of the alternative request to auto accept from Courthouse News Service that new civil complaint submissions be automatically available to them through a separate "Press Review Queue" when electronically submitted by a Submitting User in File & Serve but before any ministerial clerk review. In this scenario, document submissions by a Submitting User would immediately transfer to Press Review Queue. The ministerial review conducted by deputy clerks at Ada County is also a stop-gap to catch any potentially sensitive or confidential information that is inadvertently (or purposefully) included in a submission. This is unnecessarily problematic from the clerk's standpoint (and litigants' standpoint). There would be no stop-gap if a Press Review Queue were enabled. As such, any sensitive or confidential information would be available to Courthouse News and its reporters. Without basic deputy clerk review before a document was made available in Press Review Queue before being accepted for filing, documents that are harmful to litigants and third parties could be automatically transferred to Press Review Queue and be available to anyone with access to Press Review Queue. An example of this would be a situation where, like with auto accept discussed above in Paragraph 10, someone submits something containing a child's name, a social security number, bank account numbers, and

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 14**

potential revenge filings containing explicit images. These would be available to whomever had access to Press Review Queue even though such documents in Press Review Queue had not yet been reviewed and approved for filing. Essentially, it would be a "sneak peak" of what may be filed, versus what is actually filed.

I declare and certify under penalty of perjury that the foregoing is true and correct.

DATED this 22nd day of December, 2021.

Margaret Molchan

STATE OF IDAHO      )
                    ) ss.
County of Ada       )

On this 22nd day of December, 2021, before me, the undersigned, a notary public in and for said county and state, personally appeared MARGARET MOLCHAN known or identified to me to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in the certificate firs above written.

NOTARY PUBLIC FOR _Ada County_
Residing at _Boise_
My Commission Expires _6/1/27_



**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 15**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of December, 2021, I served a copy of the foregoing on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

| | |
|---|---|
| Debora Kristensen Grasham | dkk@givenspursley.com |
| Katherine A. Keating | katherin.keating@bclplaw |
| Jonathan G. Fetterly | jon.fetterly@bclplaw.com |

/s/Keely E. Duke
Keely E. Duke

**AFFIDAVIT OF MARGARET MOLCHAN IN SUPPORT OF RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 16**

# EXHIBIT A

## FILE & SERVE - DOCUMENT REVIEW
JUST LOOK AT DATA FROM THE PAST ...

| 2 WEEKS | 6 WEEKS | 6 MONTHS | 1 YEAR | 2 YEARS | 4 YEARS |

### # of Documents Reviewed in the past 6 WEEKS
**45,192**

DOCUMENTS REVIEWED BY DAY



DOCUMENTS REVIEWED BY CLERK

| Clerk | Count |
|---|---|
| Jennifer Keyes | 14,511 |
| Lusina Heiskari | 2,154 |
| Caitlen Schaefer | 1,935 |
| Ashley Pescador | 1,743 |
| Paris Mitchell | 1,679 |
| Kristi Weekley | 1,615 |
| April Charles | 1,579 |
| Lauren Ketchum | 1,559 |
| Sydney Shoemate | 1,468 |
| Katee Hysell | 1,460 |
| Caterina Moritz Guti.. | 1,372 |
| Sara Markle | 1,362 |
| Gena Foley | 1,355 |
| Jennifer Rodriguez-Gi.. | 1,244 |
| Kim Stachowicz | 937 |
| Veronica Kinney | 901 |
| Jolene Mills | 776 |
| Nichole Snell | 763 |
| Elia Mikkelson | 746 |
| Brady Oakes | 715 |

### % of Documents Reviewed within one business day in the past 6 WEEKS
**69.9%**

% OF DOCUMENTS REVIEWED WITHIN ONE BUSINESS DAY



### % of Documents Rejected in the past 6 WEEKS
**6.3%**

% OF DOCUMENTS REJECTED



Filter by Case Type
All

Documents Reviewed by Case Category