No. 24-6697

_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

COURTHOUSE NEWS SERVICE,
Plaintiff-Appellee,

v.

SARA OMUNDSON,
Defendant-Appellant.

On Appeal from the United States District Court for the District of Idaho

No. 1:21-CV-00305-DCN
Hon. David C. Nye Presiding

_____

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 23 MEDIA ORGANIZATIONS
IN SUPPORT OF PLAINTIFF-APPELLEE**

_____

Grayson Clary
  *Counsel of Record*
Lisa Zycherman
Mara Gassmann
Renee M. Griffin
  *Of Counsel*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
gclary@rcfp.org

## CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

American Broadcasting Companies, Inc. is an indirect, wholly-owned subsidiary of The Walt Disney Company, a publicly traded corporation.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc. No publicly held corporation owns 10% or more of its stock.

The Center for Investigative Reporting, Inc. is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Gannett Co., Inc. is publicly traded and no company currently owns 10 percent or more of its stock.

i

Gray Local Media, Inc. is owned by Gray Media, Inc. Gray Media, Inc. is a publicly-traded corporation, and no entity holds 10% or more of its equity. Gray is the nation's largest owner of top-rated local television stations and digital assets, serving 113 television markets that collectively reach approximately 36 percent of US television households.

HuffPost is owned by Buzzfeed, Inc. BuzzFeed, Inc. is a privately owned company, and National Broadcasting Company (NBC) owns 10% or more of its stock.

The Intercept Media, Inc., publisher of The Intercept, is a non-profit non-stock corporation. It has no parent, subsidiaries, or affiliates.

Los Angeles Times Communications LLC is wholly owned by NantMedia Holdings, LLC.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

New York Public Radio is a privately supported, not-for-profit organization that has no parent company and issues no stock.

ii

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the United States and internationally. It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Seattle Times Company:  The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Society of Professional Journalists is a non-stock corporation with no parent company.

iii

TEGNA Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in TEGNA, Inc.

WP Company LLC d/b/a The Washington Post is a wholly-owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos. WP Company LLC and Nash Holdings LLC are both privately held companies with no securities in the hands of the public.

iv

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENTS ........................................................i

TABLE OF CONTENTS ............................................................................v

TABLE OF AUTHORITIES.......................................................................vi

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................1

SOURCE OF AUTHORITY TO FILE .........................................................2

FED. R. APP. 29(a)(4)(E) STATEMENT ...................................................3

SUMMARY OF THE ARGUMENT ............................................................4

ARGUMENT ....................................................................................6

I.     Contemporaneous access to newly filed civil complaints is vital to news reporting and benefits the public. .........................................6

II.    The District Court properly applied the First Amendment right of access to complaints filed in Idaho state court.............................13

      A.    A complaint submitted to a court is a "judicial document" subject to the First Amendment right of access, regardless of whether a clerk has yet accepted it. ....................................14

      B.    The District Court properly balanced the benefit of immediate public access against the purported harm to Idaho. ...........................18

CONCLUSION .................................................................................22

CERTIFICATE OF COMPLIANCE .........................................................24

CERTIFICATE OF SERVICE.................................................................25

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Associated Press v. U.S. Dist. Ct. for C.D. Cal.*,
  705 F.2d 1143 (9th Cir. 1983)....................................................6, 20

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
  No. 14-CV-6867, 2016 WL 1071107 (S.D.N.Y. Mar. 18, 2016) ................15

*Bridges v. California*,
  314 U.S. 252 (1941) ...................................................................7

*Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*,
  117 F.4th 1200 (9th Cir. 2024) ..................................................4, 7

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
  447 U.S. 530 (1980) .................................................................18

*Courthouse News Serv. v. Corsones*,
  131 F.4th 59 (2d Cir. 2025).....................................................18, 19

*Courthouse News Serv. v. Omundson*,
  No. 1:21-CV-00305-DCN, 2024 WL 4349112 (D. Idaho
  Sept. 30, 2024) ....................................................6, 19, 21, 22

*Courthouse News Serv. v. Planet*,
  750 F.3d 776 (9th Cir. 2014)...............................................8, 14, 22

*Courthouse News Serv. v. Planet*,
  947 F.3d 581 (9th Cir. 2020)................................................*passim*

*Courthouse News Serv. v. Schaefer*,
  2 F.4th 318 (4th Cir. 2021) .......................................................20

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975)..................................................................8

*Elrod v. Burns*,
  427 U.S. 347 (1976)................................................................21

vi

*El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*,
    508 U.S. 147 (1993) …………………………………………………… 17

*Globe Newspaper Co. v. Pokaski*,
    868 F.2d 497 (1st Cir. 1989) ........................................................20

*Globe Newspaper Co. v. Super. Ct. for Cnty. of Norfolk*,
    457 U.S. 596 (1982) ...............................................................7, 14

*Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*,
    24 F.3d 893 (7th Cir. 1994)......................................................7, 9

*Int'l News Serv. v. Associated Press*,
    248 U.S. 215 (1918) .................................................................7, 9

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012).........................................................8

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) .......................................................................7

*Oregonian Publ'g Co. v. U.S. Dist. Ct. of Or.*,
    920 F.2d 1462 (9th Cir. 1990)......................................................4

*Press-Enter. Co. v. Super. Ct. of Cal.*,
    464 U.S. 501 (1984) ..............................................................5, 18

*Press-Enter. Co. v. Super. Ct. of Cal.*,
    478 U.S. 1 (1986) .............................................................5, 18, 20

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ...........................................................2, 4, 14

*United States v. Brooklier*,
    685 F.2d 1162 (9th Cir. 1982)....................................................20

*Valley Broad. Co. v. U.S. Dist. Ct. of Nev.*,
    798 F.2d 1289 (9th Cir. 1986).......................................................6

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989).............................................................18, 19

**Other Authorities:**

Amanda Yeo, *MyPillow CEO's Lawyers File AI-generated Legal Brief Riddled with Errors*, Mashable (Apr. 28, 2025) ...........................................20

*Capitol Police Officers Suing Trump, Proud Boys, Oath Keepers Over Jan. 6 Riot*, Fox 5 DC (Aug. 26, 2021).................................................................11

CBS Evening News, *Capitol Police Officers Sue Trump and Extremist Groups Over January 6 Riot*, CBS.com (Aug. 26, 2021)...........................11

David Bauder, *A Federal Lawsuit Says the Trump Administration Has Unlawfully Shuttered the Voice of America*, Associated Press (Mar. 21, 2025) ....................................................................................................12

David Enrich (@davidenrich), Twitter/X (Mar. 21, 2025) ....................................12

David Folkenflik, *Voice of America Staff Sue Trump Administration for Shutting Down Network*, NPR (Mar. 21, 2025) ..........................................12

Ewan Palmer, *Trump's Last-Ditch Effort To Delay Sentencing 'Incorrectly Filed'—Attorney*, Newsweek (Sept. 2, 2024) ...............................................20

Gary Grumbach & Rebecca Shabad, *Former Rep. Matt Gaetz Unsuccessfully Tried to Halt Release of House Ethics Report*, NBC News (Dec. 23, 2024) ....................................................................................19

Hanna Panreck, *Voice of America Employees File Lawsuit Against the Trump Administration After President Dismantled Agency*, Fox News (Mar. 22, 2025) .........................................................................................12

Josh Gerstein, *7 Capitol Police Officers Sue Trump, Others over Capitol Riot*, Politico (Aug. 26, 2021, 1:17 PM) .......................................................11

*Judicial Document*, Black's Law Dictionary (10th ed. 2014) ................................15

Media Insight Project, *How Americans Describe Their News Consumption Behaviors*, Am. Press Inst. (June 11, 2018)....................................................9

MSNBC, *Capitol Police Officers Sue Trump Over Jan. 6 Role, Cite KKK Act Violation*, YouTube (Aug. 26, 2021).......................................................11

Toni Locy, *Covering America's Courts: A Clash of Rights* 13 (2d ed. 2013) ..........9

Zoe Tillman (@ZoeTillman), Twitter/X (Aug. 26, 2021, 11:11 AM) ...................11

Zoe Tillman, *Seven Capitol Police Officers Suing Trump Shared the Violence and Racism They Experienced on Jan. 6*, BuzzFeed News (Aug. 26, 2021, 1:04 PM) ...........................................................................11

**Rules:**

Fed. R. App. P. 29 ...............................................................................2, 3

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press
("Reporters Committee"); American Broadcasting Companies, Inc.; The
Associated Press; The Atlantic Monthly Group LLC; The Center for Investigative
Reporting; The E.W. Scripps Company; First Amendment Coalition; Gannett Co.,
Inc.; Gray Local Media, Inc.; HuffPost; The Intercept Media, Inc.; Los Angeles
Times Communications LLC; The National Press Club; National Press
Photographers Association; New York Public Radio; The New York Times
Company; News/Media Alliance; Online News Association; Pro Publica, Inc.;
Radio Television Digital News Association; The Seattle Times Company; Society
of Professional Journalists; TEGNA Inc.; and WP Company LLC d/b/a The
Washington Post (together, "amici").

As news organizations and media organizations that gather and report news
to the public, or advocate for the First Amendment and newsgathering rights of the
press, amici have a strong interest in safeguarding the public's presumptive right to
access court proceedings and records.  Lead amicus the Reporters Committee is an
unincorporated nonprofit association founded by leading journalists and media
lawyers in 1970, whose attorneys provide pro bono legal representation, amicus
curiae support, and other legal resources to protect First Amendment freedoms and
the newsgathering rights of journalists.  It regularly files as amicus in courts in this

1

Circuit on matters involving the right of access. *See, e.g.*, Brief for Reporters Committee & 25 Media Orgs. as Amici Curiae, *Courthouse News Serv. v. Yamasaki*, 950 F.3d 640 (9th Cir. 2021) (No. 18-56216); Brief for Reporters Committee & 27 Media Orgs. as Amici Curiae, *Courthouse News Serv. v. Planet*, 947 F.3d 581 (9th Cir. 2020) (Nos. 16-55977 & 16-56714); Brief for Reporters Committee & NPPA as Amici Curiae, *Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012). Prompt access to judicial hearings and records is essential for journalists, in their role as "surrogates for the public," to gather information and keep the public informed about court cases of public interest. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). It is from this perspective that amici write to emphasize the public interest in this case and the importance to the wider press and public of timely access to civil complaints.

## SOURCE OF AUTHORITY TO FILE

Plaintiff-Appellee consents to the filing of this amici brief. Defendant-Appellant declined consent. Amici contemporaneously move for leave to file this brief. *See* Fed. R. App. P. 29(a)(3).

2

## FED. R. APP. 29(A)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund the preparation or submission of the brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund the preparation or submission of the brief.

## SUMMARY OF THE ARGUMENT

The First Amendment guarantees a qualified right of access to judicial proceedings and documents, rooted in the recognition that the public's understanding and oversight of the judicial process are essential to our system of self-governance. *See, e.g.*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 575–77 (1980) (plurality opinion); *see also Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*, 117 F.4th 1200, 1204 (9th Cir. 2024) ("Under the First Amendment, the press and the public have a presumed right of access to court proceedings and documents." (citation and quotation marks omitted)); *Courthouse News Serv. v. Planet* (*Planet III*), 947 F.3d 581, 589 (9th Cir. 2020) ("We have long presumed a First Amendment 'right of access to court proceedings and documents.'" (quoting *Oregonian Publ'g Co. v. U.S. Dist. Ct. of Or.*, 920 F.2d 1462, 1465 (9th Cir. 1990))). This right of access applies to civil complaints filed in state courts, which become judicial documents once submitted by a litigant seeking to avail itself of the court system. *See Planet III*, 947 F.3d at 585. "A necessary corollary of the right to access is a right to *timely* access." *Id.* at 594 (emphasis added) (collecting cases). Once the First Amendment right of access attaches, it can be overcome, whether through a full closure or a delay in access, only by "an overriding [governmental] interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. Co. v.*

4

*Super. Ct. of Cal.* (*Press-Enterprise II*), 478 U.S. 1, 9–10 (1986) (quoting *Press-Enter. Co. v. Super. Ct. of Cal.* (*Press-Enterprise I*), 464 U.S. 501, 510 (1984)).

Amici write here to highlight this Court's astute practical observation in *Planet III* that for many news organizations like Plaintiff-Appellee Courthouse News Services ("CNS"), "reporting on complaints must be timely to be newsworthy and to allow for ample and meaningful public discussion regarding the functioning of our nation's court systems." 947 F.3d at 594. A key aspect of many news organizations' business is to cover newsworthy cases in real time—and many other news organizations in turn rely on that initial reporting—so a delay of even a few business hours can result in a denial of meaningful access, both for reporters themselves and for the public which relies on the press for information. Prompt access to civil complaints ensures that the public learns about important cases while they are still newsworthy, promotes accuracy in reporting, lays the foundation for further investigation and analysis, and leads to more meaningful public debate about individual cases and the justice system as a whole.

The District Court below correctly applied binding precent and found that Defendant-Appellant "has not demonstrated . . . a substantial probability that her interest in the fair and orderly administration of justice would be impaired by immediate access" nor pointed to any "evidence that giving CNS more timely access would hinder" Defendant-Appellant's "ability to address" any of its

purported administrative concerns. *Courthouse News Serv. v. Omundson*, No. 1:21-CV-00305-DCN, 2024 WL 4349112, at *14 (D. Idaho Sept. 30, 2024). Amici agree with CNS that the District Court did not err in its application of the *Press-Enterprise II* standard. To the contrary, it hewed closely to this Court's guidance in *Planet III*, which instructed lower courts on the proper balancing of First Amendment interests in prompt public access to civil complaints against a government's interests in delay, including administrative convenience.

For the reasons herein, amici urge the Court to affirm the District Court's order enjoining Defendant-Appellant from imposing its policy of automatic delay on public access to electronically filed nonconfidential civil complaints during its review and pre-acceptance period.

## ARGUMENT

### I.    Contemporaneous access to newly filed civil complaints is vital to news reporting and benefits the public.

Access to court records "helps the public keep a watchful eye on public institutions and the activities of government," *Valley Broad. Co. v. U.S. Dist. Ct. of Nev.*, 798 F.2d 1289, 1293 (9th Cir. 1986) (internal citation omitted), and is "important to a full understanding of the way in which the judicial process and the government as a whole are functioning," *Associated Press v. U.S. Dist. Ct. for C.D. Cal.*, 705 F.2d 1143, 1145 (9th Cir. 1983) (internal quotation marks omitted). It "leads to a better-informed citizenry," which "tends to deter government officials

from abusing the powers of government." *Civ. Beat L. Ctr. for Pub. Int., Inc.*, 117 F.4th at 1207 (citation omitted) (holding blanket temporary closure violated First Amendment). At its core, the qualified right of contemporaneous access "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Super. Ct. for Cnty. of Norfolk*, 457 U.S. 596, 604 (1982).

Courts in a range of cases implicating First Amendment rights have observed that when it comes to obtaining and publishing information, "the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 561 (1976). Even pre-dating the demands of news reporting in today's online and interconnected era, the Supreme Court appreciated that "[t]he peculiar value of news is in the spreading of it while it is fresh." *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 235 (1918). This is so because "old news" frequently "does not receive[] much public attention." *Planet III*, 947 F.3d at 594 (citation omitted). Thus, under some circumstances, denying access "'at the time [the] audience would be most receptive' would be effectively equivalent to 'a deliberate statutory scheme of censorship.'" *Id.* (quoting *Bridges v. California*, 314 U.S. 252, 269 (1941)); *accord Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) ("The newsworthiness of a particular story is often fleeting. To

7

delay or postpone disclosure . . . may have the same result as complete suppression.").

For reporters who cover the courts, delivering the news requires prompt access to newly filed civil complaints. As the document that initiates litigation, the complaint frames the dispute and legal issues presented, providing the first picture of a case's who, what, when, where, and why. And it lays out the enforcement power that a citizen asks the judiciary to invoke. By reviewing civil complaints, reporters are able to inform the public about what is happening in the courthouse and in their communities. As this Court has observed, "[t]he news media's right of access to judicial proceedings is essential not only to its own free expression, but also to the public's." *Courthouse News Serv. v. Planet* (*Planet I*), 750 F.3d 776, 786 (9th Cir. 2014). In our political system, "[t]he free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Id.* (quoting *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012)). This structure is vital for self-government because "in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490–91 (1975).

8

Moreover, when news organizations like CNS have contemporaneous access to them as the First Amendment requires, it is the public that benefits. Prompt access to newly filed civil complaints ensures that the public learns about important cases while they are still newsworthy, promotes accuracy in reporting, and fosters and informs public understanding about cases and the institutions handling them. *See Planet III*, 947 F.3d at 594; *see also Grove Fresh Distribs., Inc.*, 24 F.3d at 897 (delaying disclosure "undermines the benefit of public scrutiny"). Today, the public obtains a large volume of its news throughout the day, much of its from digital and social media platforms. According to one study, "nearly two-thirds of adults now say they look at news at least several times a day." Media Insight Project, *How Americans Describe Their News Consumption Behaviors*, Am. Press Inst. (June 11, 2018), https://perma.cc/M3L2-84PB; *accord* Toni Locy, *Covering America's Courts: A Clash of Rights* 13 (2d ed. 2013) (describing the demands on news organizations to timely report and the evolving standard of what is "fresh" in the digital era). This reflects the reality that the public recognizes the "value of news" and relies on the press for timely, accurate information about our increasingly complex and interconnected modern world. *Int'l News Serv.*, 248 U.S. at 235.

A degree of urgency is commonplace in the context of news about civil litigation. Journalists routinely rely on contemporaneous access to court records to

9

disseminate breaking news about matters of public concern, and that contemporaneous access is also a central aspect of the information ecosystem that provides for deep coverage and analysis by the press and greater understanding and engagement by the public.  For example, when covering a newly filed lawsuit, a news organization may learn about and report on the existence of the lawsuit, and provide a copy of the complaint, within minutes after it is filed; others will take note, and within hours, multiple articles may be published about the lawsuit online. Soon thereafter, the lawsuit may be reported through channels with scheduled publication times, such as television and radio broadcast programs and print editions of newspapers, and may become part of the public discourse.  Meanwhile, more journalists might begin working on reports for magazines, newspapers, podcasts, and other platforms devoted to "long-form" reporting that deepen the public's understanding of the story or challenge some of the initial reactions or facts.

To take just one high-profile example of this information ecosystem, on the morning of August 26, 2021, seven U.S. Capitol police officers filed a complaint in the U.S. District Court for the District of Columbia, alleging that then-former President Donald Trump and others conspired to incite the violent attack on the U.S. Capitol on January 6, 2021.  *See* Complaint, *Smith v. Trump*, No. 1:21-cv-02265 (D.D.C. Aug. 26, 2021), ECF No. 1.  By 11:11 AM, *BuzzFeedNews* legal

10

reporter Zoe Tillman tweeted a link to the complaint, which was quickly re-shared more than one thousand times and thus came to the attention of other journalists, analysts, and the public.  *See* Zoe Tillman (@ZoeTillman), Twitter/X (Aug. 26, 2021, 11:11 AM), https://perma.cc/HK97-NAFG.  Within two hours, Tillman and other reporters had published articles reporting on the lawsuit in greater depth. *See, e.g.*, Zoe Tillman, *Seven Capitol Police Officers Suing Trump Shared the Violence and Racism They Experienced on Jan. 6*, BuzzFeed News (Aug. 26, 2021, 1:04 PM), https://perma.cc/CJ83-ZDEF; Josh Gerstein, *7 Capitol Police Officers Sue Trump, Others over Capitol Riot*, Politico (Aug. 26, 2021, 1:17 PM), https://perma.cc/MG3D-C54J.  That evening, news anchor and legal analyst Chris Hayes examined the lawsuit in detail during his 8:00 PM ET news broadcast.  *See* MSNBC, *Capitol Police Officers Sue Trump Over Jan. 6 Role, Cite KKK Act Violation*, YouTube (Aug. 26, 2021), https://bit.ly/3I1rDD5; *see also* CBS Evening News, *Capitol Police Officers Sue Trump and Extremist Groups Over January 6 Riot*, CBS.com (Aug. 26, 2021), https://perma.cc/8PGY-5ZGA; *Capitol Police Officers Suing Trump, Proud Boys, Oath Keepers Over Jan. 6 Riot*, Fox 5 DC (Aug. 26, 2021), https://perma.cc/TJ3S-5Z8E.

And as any district judge too well knows, major cases are sometimes filed after business hours—and after business hours on Friday evening.  As one example, on Friday, March 21, 2025, journalists and other plaintiffs sued the U.S.

11

Agency for Global Media and its leaders for unlawfully shutting down the news outlet Voice of America, alleging violations of the First Amendment, Administrative Procedure Act, and other federal laws.  Complaint, *Widakuswara v. Lake*, No. 1:25-cv-2390 (S.D.N.Y. Mar. 21, 2025), ECF No. 1.  Though the suit was filed after 5pm and the Southern District of New York clerk's office was closed, the complaint was immediately available to journalists and they covered it accordingly.  The Associated Press published an article quoting the complaint at 8:38pm that same day.  David Bauder, *A Federal Lawsuit Says the Trump Administration Has Unlawfully Shuttered the Voice of America*, Associated Press (Mar. 21, 2025), https://tinyurl.com/4na97cr9.  NPR followed with an article less than 2 hours later.  David Folkenflik, *Voice of America Staff Sue Trump Administration for Shutting Down Network*, NPR (Mar. 21, 2025), https://perma.cc/9JRP-6AX6.  Fox News posted its article about the complaint the next day, a Saturday.  Hanna Panreck, *Voice of America Employees File Lawsuit Against the Trump Administration After President Dismantled Agency*, Fox News (Mar. 22, 2025), https://perma.cc/NSF9-6HU7. And on X, coverage was even more immediate, with David Enrich of The New York Times reporting the filing at 6:53pm on March 21.  David Enrich (@davidenrich), Twitter/X (Mar. 21, 2025), https://perma.cc/74Y8-H5KZ.  Had such a complaint been filed in Idaho state courts, none of that immediate reporting would have been possible because the

12

complaint—and the case its filing created—would have been unavailable to the public until Monday morning or later, whenever the clerk's office was able to complete its review process.

This kind of timely reporting and robust discussion, and the ensuing ongoing investigation and commentary, are a result of prompt access to a complaint after its submission to the court. And the benefits that access affords flow, ultimately, to the public.

## II. The District Court properly applied the First Amendment right of access to complaints filed in Idaho state court.

Timely access to newly filed complaints is not a mere convenience to reporters and the public—it is constitutionally mandated to ensure public oversight of the judicial system and the parties who avail themselves of it.

This Court has already answered a key question that Defendant-Appellant seeks to relitigate when it recently held that "the press has a qualified right of timely access to newly filed civil nonconfidential complaints *that attaches when the complaint is filed.*" *Planet III*, 947 F.3d at 585 (emphasis added). Newly filed civil nonconfidential complaints are the precise documents at issue here, and a clerk's delay in reviewing the complaint after submission does not diminish its status as a filed judicial document that is subject to the qualified right of access under *Planet III*.

13

Defendant-Appellant also challenges the "rigorous scrutiny" applied by the Ninth Circuit in *Planet III* upon attachment of the right, and the District Court's application of that scrutiny here. These arguments are without merit. The Court in *Planet III* correctly applied a heightened degree of scrutiny to a practice that unduly burdened the press's prompt access to a complaint and found it could not pass constitutional muster. Nothing in Idaho's history or process supports a different result here.

### A. A complaint submitted to a court is a "judicial document" subject to the First Amendment right of access, regardless of whether a clerk has yet accepted it.

The First Amendment's free speech guarantee—a cornerstone of our constitutional system—"would lose much meaning" without a constitutional right of access to public proceedings. *Richmond Newspapers*, 448 U.S. at 576–77. The two are "inextricably intertwined" because, while the First Amendment's protection for free speech fosters vigorous debate of governmental activities, it is the right of access that guarantees such debate is informed. *Planet I*, 750 F.3d at 785. Simply put, the right of access to official records and proceedings is "an essential part of the First Amendment's purpose to 'ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government.'" *Id.* (quoting *Globe Newspaper Co.*, 457 U.S. at 604).

14

Complaints are judicial documents subject to this right of access; this Court has said so explicitly. *Planet III*, 947 F.3d at 592 ("A complaint is a judicial document or record: an item filed with a court that is 'relevant to the judicial function and useful in the judicial process.'" (quoting *Judicial Document*, Black's Law Dictionary (10th ed. 2014))). Thus, "the qualified right of access to nonconfidential civil complaints arises when they are filed with the court." *Id.* at 594.

Defendant-Appellant seeks to circumvent the Ninth Circuit's precedent on this precise point, arguing that a filed complaint is not a "judicial document" while it sits in the clerk's electronic inbox, but instead is transformed into one by the clerk once he or she "signs into" the system, "performs a limited review of the submission," and accepts it. Opening Br. 23, 24. Not so. It cannot be the case that an important legal right of public access is triggered by clerical machinations rather than the act by a litigant to engage the judicial process. "When a complaint is filed, and the authority of the people of the United States is thereby invoked . . . the American people have a right to know that the plaintiff has invoked their power to achieve his personal ends." *Planet III*, 947 F.3d at 593 (quoting *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, No. 14-CV-6867 (VEC), 2016 WL 1071107, at *9 (S.D.N.Y. Mar. 18, 2016)).

15

*Planet III* likewise forecloses Defendant-Appellant's argument that complaints are not judicial documents because "in Idaho the press and public did not historically have access to complaints that had not yet been accepted for filing." Opening Br. 28–30. For purposes of assessing whether the First Amendment right of access attaches, a "pre-acceptance" complaint is not meaningfully different from a "submitted but not yet accepted" complaint in any jurisdiction in the country. *Planet III* squarely rejected the argument of county court administrators in California that "the right of access to civil complaints attaches only at the moment they become the subject of some type of judicial action." *Planet III*, 947 F.3d at 591 (internal quotation marks omitted). In so finding, the Court offered a litany of reasons why history and precedent supported a right of access prior to any act by a clerk or judge: (1) "no court has held or even suggested that the public character of judicial records depends on whether the proceedings have progressed to a stage requiring a judge to act on the papers"; (2) "numerous jurisdictions around the country make newly filed complaints publicly available . . . before they are subjected to judicial review"; (3) "public access to civil complaints before judicial action upon them plays a particularly significant role in the public's ability to ably scrutinize the judicial process and the government as a whole"; (4) "[p]ublic access to civil complaints before judicial action also buttresses the institutional integrity of the judiciary"; and (5)

16

nineteenth-century case law "do[es] not foreclose finding a tradition of access here." *Id.* at 591–93 (internal quotation marks omitted). This reasoning applies with equal force to the arguments of Idaho state courts in this case. Moreover, the *Planet III* Court did not limit its analysis to county history when assessing whether the First Amendment right of access attached to a filed civil complaint, as Defendant-Appellant asks here; the Court looked at cases and practices in courts nationwide. *Id.*; *see also El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993) (per curiam) ("[T]he 'experience' test of *Globe Newspaper* does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing throughout the United States." (citation and quotation marks omitted)). And this zoomed-out approach makes sense, given that the press and public's need for timely access to a nonconfidential civil complaint does not vary state to state or county to county.

In sum, a clerk in Idaho "accepting" a complaint filed by a party is merely "some type of judicial action," *id.* at 591, and so is not a prerequisite to attachment of the right of access to a civil complaint the moment it is filed by a party. Any other conclusion would thwart this Court's articulations of the right in *Planet III* and infringe on journalists' right to timely access to complaints filed in courts across the country.

17

**B.     The District Court properly balanced the benefit of immediate public access against the purported harm to Idaho.**

*Planet III* makes it clear: the First Amendment right of access attaches upon filing of the complaint.  But it is true that the right is qualified—access may only be denied or delayed by "an overriding [governmental] interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Press-Enterprise II*, 478 U.S. at 9 (citing *Press-Enterprise I*, 464 U.S. at 510).  The district court properly weighed those considerations.

As an initial matter, Defendant-Appellant's criticisms of the "rigorous scrutiny" applied by the District Court here and by the Ninth Circuit in *Planet III* fall flat.  While *Planet III* observed that delays in access to civil complaints "resemble" time, place, and manner restrictions, the Court still applied what it called the "rigorous" standard from *Press-Enterprise II* and explained that it is not the same as strict scrutiny.  947 F.3d at 595–96; *see also Courthouse News Serv. v. Corsones*, 131 F.4th 59, 73 (2d Cir. 2025) ("This is not strict scrutiny.").  The separate body of case law regarding reasonable time, place, or manner restrictions developed in the context of restrictions on the exercise of free speech rights.  *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech . . . ."); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 536 (1980) (explaining that "the

18

essence of time, place, or manner regulation" was recognizing the effect of "various methods of speech").

> Delays in providing the press with access to complaints filed in court (if more than trivial) are significantly different. For one thing, where a court withholds public access to a complaint, there may be no alternative channel for the public to become aware of the complaint and its substance. Furthermore, news is a perishable commodity.

*Corsones*, 131 F.4th at 73. But in any event, the *Press-Enterprise II* analysis and the time, place, and manner analysis would lead to the same result here, as even "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests." *Ward*, 491 U.S. at 798. Delayed access while a clerk confirms that administrative filing requirements are met is not narrowly tailored to any relevant interest, as explained herein.

Regarding the "overriding interest" asserted here, Defendant-Appellant argues that denying public access to civil complaints during the pre-access clerk review process is necessary to fix "filing errors . . . on the front end" to help litigants and save judges and their staffs from having to spend time "address[ing] them on the back end." Opening Br. 40–41. First, the District Court correctly assessed that this justification did not "rise to the level sufficient to overcome the presumption of access." *Omundson*, 2024 WL 4349112, at *13. If a litigant makes an error in filing, there is no good reason that the press and the public

should have to pay for that mistake through a delay in access to the complaint—indeed, sometimes an error itself could be newsworthy. *See, e.g.*, Gary Grumbach & Rebecca Shabad, *Former Rep. Matt Gaetz Unsuccessfully Tried to Halt Release of House Ethics Report*, NBC News (Dec. 23, 2024), https://perma.cc/7GPL-C8J4 ("[T]he clerk's office soon informed Gaetz's attorneys that there were paperwork errors made in the complaint that needed to be corrected before any action could be taken."); Ewan Palmer, *Trump's Last-Ditch Effort To Delay Sentencing 'Incorrectly Filed'—Attorney*, Newsweek (Sept. 2, 2024), https://perma.cc/F432-35PK; Amanda Yeo, *MyPillow CEO's Lawyers File AI-generated Legal Brief Riddled with Errors*, Mashable (Apr. 28, 2025), https://perma.cc/KB7R-7ZN2.

Even if this basic administrative convenience and aid to litigants was a sufficiently high-value government interest, *see Press-Enterprise II*, 478 U.S. at 9, Idaho's delay to allow the clerk to review and accept the complaint is not narrowly tailored to serve that interest. Delays in accessing civil complaints are equivalent to denials of access to those documents. Thus, absent a compelling justification by the government, delays in access to court filings, even brief ones, have been found to be unconstitutional. *See, e.g.*, *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021) (requiring courts to provide access to new civil complaints on same day as filed); *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 507 (1st Cir. 1989) ("[E]ven a one to two day delay impermissibly burdens the First

Amendment."); *Associated Press*, 705 F.2d at 1147 (vacating order imposing 48-

hour sealing period on criminal case records as "a total restraint on the public's

first amendment right of access even though the restraint is limited in time");

*United States v. Brooklier*, 685 F.2d 1162, 1172–73 (9th Cir. 1982) (holding that

delayed release of transcript of closed suppression hearing until end of trial

violated right of access); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976)

(noting that a loss of First Amendment rights "for even minimal periods of time,

unquestionably constitutes irreparable injury").

 Here, the District Court reviewed the evidence and concluded that access to

complaints *is* markedly delayed by Idaho's requirement that clerks review and

accept a complaint before making it available to the public. *See Omundson*, 2024

WL 4349112, at *12 ("42% of new complaints were not released until the day after

filing, with 15% delayed two calendar days or longer."). Defendant-Appellant

complains that the District Court looked at real hours rather than "court hours."

Opening Br. 42–43. But of course, the actual hours that pass between filing and

access are the ones that matter to the press and the public, forming the basis for the

First Amendment right. *See supra* Part I. The delay matters.

 In arguing that there are no acceptable alternatives, Defendant-Appellant

argues that the two alternatives proposed by CNS are not ideal, citing extensively

to the factual record. Opening Br. 47–54. But the District Court—best positioned

to review those factual claims—rejected that argument based on sound reasoning: "Other states use alternative methods with good success. Most federal courts, including Idaho, although not using the Odyssey system or Tyler Technologies, have alternative systems that do not have the same review process as Idaho state court, and they use those with success as well." *Omundson*, 2024 WL 4349112, at *14. Idaho cannot receive special dispensation from the constitutional requirement of timely access to complaints because of budgetary concerns or other administrative objections. Allowing the unextraordinary factor of monetary cost to trump a right of access that this Court has recognized as "an essential part of the First Amendment," *Planet I*, 750 F.3d at 785, would create a dangerous precedent not only in Idaho but nationwide. Complying with the Constitution may involve expense; it is worth it. If Idaho believes otherwise, the burden it shoulders is rightly rigorous and was not satisfied here.

## CONCLUSION

For the foregoing reasons, amici urge the Court to affirm the District Court's order enjoining Defendant-Appellant's blanket denial of public access to electronically filed civil complaints during its pre-review period.

Respectfully submitted,

*/s/ Grayson Clary*
Grayson Clary
  *Counsel of Record*
Lisa Zycherman

22

Mara Gassmann
Renee M. Griffin
  *Of Counsel*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Phone: (202) 795-9300
Fax: (202) 795-9310
gclary@rcfp.org

Dated: May 28, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-6697

I am the attorney or self-represented party.

**This brief contains** | 4,874 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Grayson Clary | **Date** | 05/28/25

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I, Grayson Clary, do hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system on May 28, 2025.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/*Grayson Clary*
Grayson Clary
  *Counsel of Record*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS